UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

E.S. Bankest, L.C.                                    CASE NO.: 04-17602-BKC-AJC

      Debtor.

_____/

LEWIS B. FREEMAN, Responsible Officer for the        ADV. CASE NO.
Reorganized Debtor E.S. Bankest, L.C., a Florida
limited liability corporation,

        Plaintiff(s),

vs

BDO SEIDMAN, LLP, BDO INTERNATIONAL
B.V., SANDOR LENNER and KEITH ELLENBERG,

        Defendant(s).

_____/

## ADVERSARY COMPLAINT FOR DAMAGES

      Lewis B. Freeman ("Freeman"), in his capacity as Responsible Officer for

the Reorganized Debtor E.S. Bankest, L.C. ("Bankest"), hereby sues defendants BDO

Seidman, LLP and BDO International B.V. (together, "BDO"), Sandor Lenner and

Keith Ellenberg (together with BDO, "Defendants"), and states, on knowledge as to

himself and his actions and information and belief as to all other matters, as follows:

## INTRODUCTION

      1.      BDO audited Bankest from 1998 to 2002, each time promising to

"detect fraud" or errors that would materially affect the financial statements. Each year,

BDO gave clean, unqualified audit opinions detecting no such fraud or errors.

      2.    In August 2003, a court-appointed receiver discovered in five

minutes what BDO somehow failed to discover in five years --- that over $1 billion of the

accounts receivable that BDO had certified did not exist.   As this financial fraud unraveled, the reason for BDO's blind eye was revealed --- BDO was a strategic partner of Stratasys Group LLC ("Stratasys"), the very company whose accounts receivable it was supposed to verify as Bankest's auditor!   These conflicts blatantly violated professional auditing standards and destroyed the independence required of BDO to conduct the Bankest audit. As a result, BDO was precluded from acting as Bankest's auditors.

3.      BDO's conflicts were no accident.  BDO's Enron-era business plan was to leverage its traditional accounting business into more lucrative "consulting" services.   BDO thus aggressively pursued "strategic partnerships" with businesses providing non-accounting services and shared in its strategic partner's profits.   BDO paid its individual auditors for each "strategic partnership" they generated with businesses affiliated with BDO's audit clients.

4.      BDO's Enron-era business plan created an insurmountable conflict. BDO incentivized Sandor Lenner, the BDO auditor in charge of Bankest's audits, to leverage BDO's relationship with Bankest into a strategic partnership with Bankest affiliate and client Stratasys. By virtue of BDO's strategic partnership with Stratasys, BDO was on both sides of the fence during its audit of Bankest.  With one hand, Lenner directed BDO's audit verification of Bankest's chief asset, account receivables pledged by various clients, including over $30 million in fake account receivables pledged to Bankest by Stratasys.  With the other hand, Mr. Lenner acted as the Alliance Partner in charge of BDO's strategic partnership *with Stratasys*, purportedly helping Stratasys generate the very account receivables BDO and Lenner were supposed to verify as Bankest's auditors.  Mr. Lenner and BDO knew or should have known that Stratasys

was nowhere close to generating millions of dollars in receivables and that the over $30 million in Stratasys account receivables it verified were fake.  Mr. Lenner developed the relationship with Stratasys, regularly visited Stratasys and its CEO, Dominick Parlapiano (also the CFO of Bankest), had access to Stratasys' financial records --- records that proved Stratasys struggled to generate any revenue, let alone over $30 million! --- and even knew that Stratasys was a start-up that had trouble paying its "partnership fees" to BDO.

5.      BDO's commitment to make money off of Bankest notwithstanding professional audit standards extended beyond its Stratasys conflict.  BDO's five audits of Bankest were grossly negligent even without regard to the Stratasys conflict.  In BDO's first audit, BDO's audit manager stopped the audit because the parent of Bankest refused to provide access to records necessary to conduct the Bankest audit. Undeterred, Mr. Lenner and his concurring partner, Keith Ellenberg, overrode the decision and restarted the audit.

6.      Over the next five years, BDO, Mr. Lenner, and Mr. Keith Ellenberg provided five separate audit opinions declaring that Bankest's audited financial statements contained no material misstatements and that no material fraud existed. They were grossly negligent in doing so.  BDO ignored Generally Accepted Auditing Standards (GAAS) and violated basic professional standards in each audit.

7.      In reliance on BDO's grossly negligent audits, Bankest took on debts exceeding $170 million it could not pay.  BDO's conflicts and gross negligence caused Bankest to lose at least $170 million and artificially to prolong its existence as its insolvency deepened.  This action seeks to recover the losses proximately caused by BDO for the legitimate creditors of Bankest.

## JURISDICTION, PARTIES AND VENUE

8.      Plaintiff Freeman is the Responsible Officer for the Reorganized Debtor E.S. Bankest, L.C. (*i.e.*, "Bankest"), a Florida limited liability corporation with its principal place of business in Miami-Dade County, Florida, which filed a voluntary Chapter 11 petition in this Court on August 9, 2004.

9.      Defendant BDO Seidman, LLP ("BDO Seidman") is a professional accounting firm organized as a limited liability partnership under the laws of the State of New York and registered in Florida as a foreign limited liability partnership with partners living and doing business in Florida.  BDO Seidman provides assurance, tax, financial advisory, and consulting services out of 37 offices including an office in Miami, Florida. As a member firm of Defendant BDO International, B.V., BDO Seidman serves clients by leveraging a global distribution network of resources comprised of nearly 600 member firm offices in 99 countries.  BDO Seidman is a citizen of Florida because partners of BDO Seidman reside here.  BDO Seidman is the agent of Defendant BDO International, B.V.

10.     On December 28, 2004, BDO filed its proof of claim in the Bankest estate seeking recoveries under indemnification, contribution and reimbursement relating to the facts, claims and issues raised herein.  As this Court already has held, BDO substantially litigated those issues in this Court.  Based upon this and BDO's actions in the Bankest bankruptcy case, it has submitted itself to the jurisdiction of this Court to fully adjudicate the claims herein.

11.     Defendant BDO International, B.V. ("BDO International") exerts control over its member firms including BDO Seidman, which, in turn, acknowledges

and advertises to the investing public its acceptance and leveraging of that control. Specifically, BDO International:

- *Requires BDO Seidman to comply with its technical standards* "to ensure that both [BDO International's] multi-national clients and our domestic clients are served to the highest possible standard." BDO International provides BDO Seidman an "internationally available suite of software" as well as "model checklists and financial statements" to be used in the conduct of audits. These materials "were specially designed to support the BDO audit methodology" and to ensure — supposedly — uniformity in the conduct of what BDO International refers to as "our audits."

- *Produces an audit manual containing minimum standards of conduct for BDO Seidman audits.* BDO International's Audit Manual "prescribes the procedures to be followed by any of the Member Firms of BDO whenever they are engaged to express an opinion as a result of carrying out the independent audit of financial statements so that we provide, throughout the world, a consistently high quality of service to our clients." These standards are buttressed by BDO International's Policy Statements, which likewise govern BDO Seidman's conduct.

- *Subjects BDO Seidman to regular practice inspections in the form of quality assurance reviews*, as well as management reviews conducted by BDO International. According to BDO International's website, www.bdoglbal.com, "all members are subject to regular practice inspections to ensure these standards are being adhered to."

- *Takes corrective action where BDO Seidman fails to meet its standards of auditing.* Indeed, according to BDO International's Policy Statements, "it is the responsibility of [International's CEO and ISC] to... ensure corrective action is taken to maintain our practice standards at an acceptably high level." According to BDO International's current International Secretary, BDO International has the unilateral right to terminate a member firm if International feels it is no longer in the best interests to maintain the association, and BDO International exercised that termination option twice in the last year alone.

- *Unilaterally terminates member firms that fail to meet its standards of performance.* According to the Member Firm Agreement between BDO International and BDO Seidman, BDO International may terminate the Member Firm Agreement if it "considers it is in its best interest" or "has major and persistent concerns about the quality of Professional Services rendered by the Member Firm." Its right to terminate is purely discretionary.

- *Provides substantive auditing advice to BDO Seidman.* BDO International serves as a resource of each of its Member Firms, including BDO Seidman, regarding the substantive conduct of their business.

12.    In short, BDO International is a controlling, day-to-day influence on the operation of its member firms and the business of member firms is the business of BDO International and is subject to the jurisdiction of this Court. This issue has been fully litigated in this State, and general jurisdiction over BDO International has been held, and affirmed on appeal, by the Florida State Courts.

13.    Defendant Sandor Lenner ("Lenner") is a resident of the State of Florida and a partner of BDO Seidman.  He was a partner of BDO Seidman at all times relevant to this Complaint, including the engagement partner in charge of the BDO audits of Bankest at issue in the Complaint.  As a partner of BDO Seidman, Lenner acted as BDO Seidman's agent and his acts and negligence are imputed to his principal.  In addition, as a certified public accountant licensed in the State of Florida, Lenner had an individual responsibility to perform his accounting duties competently and with reasonable care and diligence.

14.    Defendant Keith Ellenberg ("Ellenberg") is a resident of the State of Florida.  He was a partner of BDO Seidman at all times relevant to this Complaint. Subsequent to the issuance of the audits identified herein, BDO fired Ellenberg. Ellenberg was the concurring partner on each of the BDO audits of Bankest at issue in the complaint, although he worked more extensively on the audits than would be normal for a concurring partner.  As a partner of BDO Seidman, Ellenberg acted as BDO Seidman's agent and his acts and negligence are imputed to his principal.  In addition, as a certified public accountant licensed in the State of Florida, Ellenberg had an individual responsibility to perform his accounting duties competently and with reasonable care and diligence.

15.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This Adversary Proceeding is brought pursuant to Rule 7001(1), Federal Rules of Bankruptcy Procedure.  This is a core proceeding pursuant to 28 U.S.C. § 157. Venue for this adversary proceeding is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

## FACTUAL ALLEGATIONS

I.   **Bankest Used BDO's Audited Financials to Raise Money to Finance its Factoring Business**

16.    Bankest was formed in March 1998 pursuant to the Shareholders' Agreement executed by Capital and the Bank ("Shareholders' Agreement").  Under the Shareholders' Agreement, together with the remaining formation documents concurrently executed therewith, the Bank and Capital each initially owned 50% of the outstanding shares of Bankest, and each appointed half of its Board of Directors. Bankest subsequently was converted to a limited liability company.

17.    Bankest's business was "factoring" — the purchase of accounts receivable at a discount to their face value.  Bankest was to earn money through factoring fees, interest and the spread between the receivables' invoiced face amount and the discount price paid for the receivables.  Bankest acted primarily as a "refactor," meaning that the majority of the accounts receivable it purchased were from its 50% parent, Capital, which Capital had "factored" from its clients.  Thus, Bankest "advanced" or loaned funds to Capital, which in turn purported to advance or loan funds to the clients.

18.    From inception, the respective responsibilities of Bankest's two shareholders were clear.  Prior to the formation of Bankest, Capital had for many years engaged in the factoring business through its wholly-owned subsidiary, Bankest Receivables Finance and Factoring Corp. ("BRFFC").  Accordingly, and at Capital's request, the day-to-day management of Bankest was performed by the Capital officers, Hector Orlansky, Eduardo Orlansky, Dominick Parlapiano and Peter Stanham (collectively, the "Capital Officers").  The four directors appointed by the Bank (the "Bank Directors") had no responsibilities for the day-to-day management of Bankest.

19.    To fund its purchase of receivables, Bankest issued debenture notes (the "Debenture Notes") whereby the money lent by an investor was supposed to be backed by receivables.    The Bank made available Debenture Notes issued by Bankest to its clients.    In connection with the solicitation, the individual clients of the Bank and some of its affiliates were provided with Bankest's Confidential Memoranda describing the business of Bankest and which attached the BDO audited financial statements of Bankest.    By September 2002, Bankest had approximately $140 million dollars outstanding under the Debenture Notes.    The Debenture Notes were secured by a blanket assignment of the accounts receivable purchased by Bankest.

20.    In addition, Nassau, also in reliance upon the integrity of BDO's audited financials, and with BDO's knowledge, extended a $30 million dollar line of credit to Bankest (the "Bank Line").    The Bank Line is fully drawn and is also secured by Bankest's portfolio of accounts receivable on a pari-passu basis.

21.    To maintain receivables to adequately collateralize the Debenture Notes and the Bank Line, Bankest was prohibited by both the formation agreements and its lending covenants from advancing funds to its factoring clients in amounts greater than 80% of the face amount of the legitimate accounts receivable it purchased from those clients.    Bankest was also required to maintain a balance of accounts receivable valued at 120% of its currently outstanding debt.    Bankest would be in violation of the relevant agreements and ineligible for any additional funding if it paid in excess of 80% of the face value of a receivable or if at any time, it had less than 120% of the value of the then outstanding debt.

22.    Without BDO's audited financials of Bankest, Bankest would not have incurred its debt of $170 million.    Each of BDO's audits purported to confirm the

existence of the receivables collateralizing Bankest's debt and Bankest's compliance with its lending covenants. In reliance on BDO's audited financial statements, the Bank Directors authorized Bankest to take on additional debt. If the Bank Directors had been informed of the true financial position of Bankest by BDO, the Bank Directors would have immediately ceased the continued and increasing incurrence of debt and would have otherwise taken steps to stop or minimize Bankest's deepening insolvency.

**II.     BDO's Lacked the Independence Necessary to be Bankest's Auditor**

23.     The Capital Officers used a series of techniques to create false financials reflecting nonexistent accounts receivables, each one of which should have been detected by BDO. These flagrantly false financials would have been discovered earlier if an independent, neutral auditor had been selected. Thus, BDO's complete lack of independence prevented discovery of the fraud.

24.     BDO's ties to the Capital Officers prevented BDO's ability to be independent in performing its audits of Bankest. Dominick Parlapiano had a social relationship with Lenner, the BDO audit partner in charge of Bankest's account and it was Parlapiano and Lenner who cooked up the BDO-Stratasys partnership. In addition, Lenner and Keith Ellenberg had long-term relationships with the Capital Officers starting in 1994 when BDO began to audit BRFFC, the entity Capital used to factor receivables prior to the formation of Bankest.

25.     BDO's own expansion plans proved equally crippling to its independence. BDO was, at the time, actively seeking to expand its business from a company that merely offered traditional accounting services to one that secured and, at times provided, the capital investment for its clients. To achieve its goal, BDO sought to leverage its accounting relationships with its middle-market companies like Bankest by

brokering alliances among them.   In exchange, BDO would take a cut of business generated among alliance members.   BDO partners were encouraged through financial incentives and possible promotion to seek out these leveraging opportunities.

26.    In fact, Lenner and Ellenberg, the BDO audit partners responsible for Bankest, did precisely that.   They used BDO's accounting relationship with the Capital Officers to broker the BDO partnership with Stratasys, an affiliate and factoring client of Bankest.   Their ability to capitalize on relationships with existing clients directly affected the compensation of both Lenner and Ellenberg, who were rewarded for their introduction of new partnerships, including the Stratasys partnership.   Additional examples of BDO's leverage of its Bankest relationship are BDO's provision of additional accounting services to Bankest upon formation, including corporate structuring advice, tax advice and accounting consultation during the years it served as Bankest's auditor.

### III.    BDO's Grossly Negligent 1998-2002 Audits

27.    Throughout the five year audit relationship, BDO failed to audit Bankest in accordance with GAAS and its negligence led directly to Bankest's $170 million loss.   First, and most deadly of all of BDO's errors to Bankest, was that although the majority of Bankest's factoring was funneled through its parent, BDO never audited Capital.   BDO signed off on the audit of the subsidiary, Bankest, without obtaining and reviewing adequate records from Capital or the clients or the ultimate customers who actually owed the purported accounts receivable.

28.    Next, from the beginning and notwithstanding its own classification of Bankest as a "sensitive" or high risk client that would be using its audited financial statements to solicit investment, BDO either willfully or recklessly, in gross negligence,

ignored a host of accounting irregularities and red flags that would have revealed the falsity of the financial statements and required it to cease its audit or render a qualified opinion. Had BDO conducted its audits of Bankest in accordance with GAAS, it would have detected these irregularities and red flags and expanded its audit testing and procedures. In failing to do so, BDO breached its obligations as professional accountants to Bankest and cost Bankest millions of dollars.

29.    Finally, in conducting its audits of Bankest's financial statements for the years ended 1998 through 2002, BDO ignored Generally Accepted Auditing Standards (GAAS)[1], which include the following ten standards:

### General Standards

(1) *Technical training and proficiency.* The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.
(2) *Independence.* In all matters relating to the assignment, independence in mental attitude is to be maintained by the auditor or auditors.
(3) *Due professional care.* Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.

### Standards of Fieldwork

(1) *Proper planning & supervision.* The work is to be adequately planned and assistants, if any, are to be properly supervised.
(2) *Examination & evaluation of internal controls.* A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed.
(3) *Collecting sufficient & competent evidence.* Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

---

[1] The Auditing Standards Board (ASB) is the senior technical body of the American Institute of Certified Public Accountants (AICPA), designated to issue pronouncements on auditing matters. The ASB develops and issues standards in the form of Statements on Auditing Standards (SAS). SAS 1 is made up of ten standards, which are collectively known as generally accepted auditing standards. Rule 202 of the AICPA's Code of Professional Conduct requires adherence to the applicable generally accepted auditing standards (GAAS) promulgated by the AICPA. SAS 1 was superseded by SAS 95 in December 2001. However, SAS 95 did not amend the substance of the ten standards identified herein.

### Standards of Reporting

(1) *Financial statements are in accordance with GAAP.* The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

(2) *Consistency.* The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

(3) *Informative disclosures.* Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

(4) *Expression of opinion.* The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed.

### A.    BDO Disregards Warning Signals Warranting Additional Testing

30.    A number of immediately apparent aspects of Bankest's business should have alerted BDO to the possibility that more substantial testing and risk analysis was warranted. For example, Bankest was, as a rule, a "refactor," with Capital or BRFFC (or another Capital-related entity) serving as the principal factor. Refactoring is an uncommon practice anyway, but here Bankest was refactoring receivables from its *owners' and managers' affiliated companies*. The Capital Officers running Capital were the same persons charged with the day to day management of Bankest. Given that Bankest routinely engaged in transactions that were not arms-length, the transactions deserved greater scrutiny. Instead, BDO accepted — contrary to acceptable accounting principles and auditing standards — a number of "due to/due from" tests of the amounts due between Bankest and Capital that were signed by the same person for both entities!

31.    Moreover, BDO knew of at least one instance where the Capital Officers held interests in Bankest factor clients which should have prompted BDO to undertake special testing measures and BDO failed to do so to Bankest's great

detriment.  BDO knew that Bankest's Chief Financial Officer, Parlapiano, also was the Chief Executive Officer of Bankest client, Stratasys.  With the same person acting on behalf of both lender (Bankest) and borrower (Stratasys),, special steps were required to verify the Stratasys accounts receivable.  BDO failed to undertake any.

32.    Notwithstanding its own classification of Bankest as a "sensitive" or high risk audit client, BDO ignored warning signs and failed to customize its audit to obtain reasonable assurance that Bankest's financial statements were free of material misstatements or fraud.  BDO's failure to properly design the audit was itself a failure of GAAS.  This failure was caused, at least in part, because no member of the BDO audit team had ever before audited a factoring company, much less a refactoring company.

**B.    BDO Ignores Audit Irregularities in its 1998 Audit and Fails to Adequately Confirm the Existence of Bankest's Receivables**

33.    In addition to missing red flags signifying the need to increase testing, BDO also ignored several specific auditing irregularities.  For starters, the Capital Officers declined to let BDO confirm the debts of 22 of the 29 account debtors that BDO had selected for testing.  That is, after BDO generated its sample list of the twenty-nine account debtors to confirm, Bankest requested that BDO not send confirmations to non-notification debtors.

34.    As to the seven account debtors that BDO *was* permitted to send confirmations to, BDO received zero confirmations back.  This pattern continued through subsequent audits during which BDO received little or no direct confirmation of debt from any of the actual debtors.

35.    Unable to get confirmations from Bankest's account *debtors*, BDO also failed to get confirmation that the receivables were valid from the original *sellers* of the debt.  Although sellers' confirmations are inherently less reliable than confirmations

from the actual account debtors, BDO could not even get substantially complete confirmation of the debt from them, including the largest seller Joy, that had returned confirmations to BDO in prior years.

36.    Finally, having received no reliable confirmation of any material fraction of Bankest's receivables, BDO attempted to perform an "alternative procedure" called a "subsequent collections" test that requires examination of actual payments received for the period immediately following the audited period.  BDO failed to obtain — and was denied access to — proper evidence of payments from third parties while conducting its alternative procedures.

**C.    BDO's Partners Ignore A Scope Limitation Identified By Their Own Audit Manager to Prevent Qualification of the Bankest Audit**

37.    During the conduct of BDO's initial Bankest audit, BDO's audit manager encountered consistent refusals in obtaining requested documentation necessary for the audit.   Although BDO's engagement letter and professional accounting standards required that BDO have access to all documents, information and personnel necessary for the conduct of the audit, Bankest employees repeatedly refused to provide the requested information, creating a scope violation and threatening timely completion of the audit.

38.    When the audit manager reported the scope violation to his engagement partners, Lenner and Ellenberg, he was advised that Dominick Parlapiano was an "important person in the community" and that the manager ought to be more business oriented.  At the same time, in a series of meetings and phone calls, Lenner and Ellenberg overrode the audit manager's decision and continued the audit.  Had Lenner and Ellenberg acted properly, BDO would not have been able to issue its unqualified audit opinion.

**D.    In Subsequent Audits BDO Similarly Failed to Confirm Bankest's Receivables**

39.    Later audits were likewise in derogation of GAAS, albeit with increasingly unbelievable — and fake — receivables balances.   For its audit of Bankest's financial statements as of December 31, 1999, BDO determined that Bankest had a little over $60 million in receivables showing on its books, which represented more than 94% of Bankest's total assets.   Again, BDO's confirmation requests failed to support the validity and collectibility of the accounts receivable.   BDO apparently sought confirmation from at least some of Bankest's (or Capital's) *sellers* as opposed to its *debtors*, but only received putative confirmation of approximately $12 million of $60 million outstanding with the sellers, an even smaller percentage than in the prior year, and exclusively from a single client, ENA.   In an alternative subsequent receipts test, BDO apparently tested less than $3.5 of the $22 million in its accounts receivable sample.

40.    As to the balance of the accounts receivable selected as part of the sample — some $17.5 million, nearly 80% of the sample population —   BDO inexplicably employed an "Agreed to Invoice" test in which the auditors simply examined a seller's invoice and compared it to the amount recorded on Bankest's aging reports. This test accomplished nothing except to confirm that Bankest properly recorded the amount it was purportedly owed per the putative purchased receivable and involved no confirmation of the debt owed from any external source.   On the strength of this "testing" alone, however, BDO certified the validity of nearly 80% of the sample, and thus of the entire $60 million receivables population.

41.    By year end 2000, BDO determined that while in previous audits it had purportedly tested account balances (many of which were payments made in

satisfaction of multiple invoices), it would streamline its procedures and select individual *invoices* that had been paid instead of entire customer balances. Again, BDO issued an unqualified audit without any confirmations returned by account debtors or customers.

42.    BDO's Audit of Bankest's financial statements as of December 31, 2001 was similarly deficient. Despite reported significant growth in Bankest, BDO selected an even smaller percentage of receivables for testing, 145 invoices whose balances totaled approximately $17.4 million, less than 10% of Bankest's total accounts receivable balance of $178 million, a significant increase from the prior year.

43.    As in each year before it, BDO in its 2001 Audit sought confirmation of the debt owed directly with the debtors. Forty-eight confirmations were apparently sent to customers and none came back. Moreover, BDO relied nearly exclusively on the "Agreed to Invoice" procedure for each of the 145 invoices selected for testing. In total, this procedure was used to vouch $16.1 million out of the $17.4 million selected for testing.

44.    GAAS requires auditors to have technical training and proficiency, which includes having an understanding of the client's industry. The BDO auditors did not have an understanding of the Bankest factoring contracts, nor did they have experience auditing factoring companies or knowledge of the factoring industry. The auditors should have known that the Capital Officers were not comporting with industry practices or with the factoring contracts at issue.

45.    Had the auditors obtained sufficient and competent evidential matter, as required by GAAS (e.g., proof of the debtor payment information), they would have quickly seen the small amount of actual collections. This would have caused the auditors to note an exception, expand testing and quickly uncover the extent of fake and

inflated accounts receivable. Instead, Bankest continued to delve deeper into insolvency.

46. BDO clearly abdicated its professional responsibilities and failed to meet any of its objectives in the conduct of its audits of Bankest's financial statements. The main objective was to confirm the existence and validity of the accounts receivable. However, BDO did not exercise due professional care, which includes professional skepticism. BDO failed to obtain *any* reasonable assurance that the debts allegedly owed to Bankest were real debts owed by real companies from which Bankest could realistically expect to collect. BDO clearly violated the General Standards and Standards of Fieldwork during their audits of Bankest. Had they followed GAAS, BDO would not have expressed an unqualified opinion on financial statements that reflected millions of dollars of accounts receivable that did not exist.

E.    **BDO Issues Unqualified Opinions**

47. Faced with a scope violation and the repeated failure to obtain the necessary confirmations for Bankest receivables, BDO was not permitted to issue an unqualified opinion warranting the accuracy of Bankest's financial statements. Undaunted, and without qualifying its opinion for a scope violation, BDO nonetheless blessed the financial statements by certifying their accuracy and that certification was provided to and relied upon by Bankest's lenders. Specifically, in its opinions, BDO claims to have obtained "reasonable assurance" that the "financial statements are free of material misstatement." It claims to have "assessed the accounting principles used and significant estimates made by management" and to have "evaluat[ed] the overall financial statement presentation." Finally, it certifies that the "financial statements . . .

present fairly, in all material respects, the financial position of E.S. Bankest . . . in conformity with generally accepted accounting principles."

## IV.   BDO's Conflicts and Improper Incentives, Including its Strategic Partnership with Stratasys,   Precluded BDO's Ability to be Bankest's Independent Auditor.

48.    BDO believed that audit fees would not sustain its Miami office. Lenner believed that audit fees alone would not sustain his personal income.  Lenner and BDO thus stressed the importance of using its audit clients to leverage into strategic partnerships and alliances to earn more lucrative fees.  BDO thus traded on its relationship with Bankest and Parlapiano to enter into a strategic partnership with Stratasys.

49.    By its terms, the BDO-Stratasys partnership gave BDO a share in the revenue Stratasys developed through its relationship with BDO.  BDO generated income from Stratasys by means of a variety of fees including "licensing fees," "methodology fees," "management fees," "business development revenues," and "product development revenues."  As it acknowledged to the Capital Officers, BDO "look[ed] forward to a long and mutually prosperous relationship with StrataSys Group LLC."

50.    Still further, BDO licensed its name to Stratasys. Stratasys used the BDO logo on letterhead and business cards.  Stratasys used and displayed the BDO logo to generate --- or to try to generate — the very account receivables that BDO was supposed to verify as the "independent" auditor of Bankest. BDO did not make this commitment to Stratasys blindly.  BDO would not license its name to Stratasys unless it investigated Stratasys and understood its financial status.  BDO, by contract, had full access to Stratasys' financial information. BDO also signed a confidentiality agreement

with Stratasys so that the companies could share even confidential financial and trade secret information.

51.    BDO thus had a direct pecuniary interest in approving Bankest's financials and maintaining the façade of legitimacy in Bankest's business. Lenner and Ellenberg did as well, as their compensation and bonuses were tied to the success of these "strategic partnerships" and alliances, including Stratasys. This interest gave BDO an incentive to turn a blind eye to anything that would jeopardize Bankest's business and should have led BDO to terminate itself as Bankest's auditor.

52.    Instead, while Lenner was "championing" the relationship with Stratasys, he simultaneously acted as Bankest's purportedly "independent" auditor. The information Lenner knew about Stratasys should have led BDO to discover that nearly all of Bankest's receivables were fake. Mr. Lenner repeatedly met with Stratasys personnel, including Parlapiano, who was an officer of both Stratasys and Bankest. Lenner was so important to the development of the Stratasys strategic partnership with BDO, he was named the "Alliance Liaison Partner" and thus was in charge of BDO's strategic relationship with Stratasys. As "Alliance Liaison Partner," Mr. Lenner regularly visited Stratasys. BDO viewed Mr. Lenner as irreplaceable to BDO's relationship with Stratasys.

53.    Notwithstanding that Mr. Lenner had access to Stratasys' financial records and could not possibly have over $30 million in account receivables, as auditor of Bankest, Mr. Lenner signed off on the validity of Stratasys' account receivables even though they did not exist. Stratasys in fact had only a few hundred thousand in account receivables. As a strategic partner of Stratasys, BDO at least should have known, or could have discovered, this fact since it had access to Stratasys' financial information.

Moreover, BDO did know that Stratasys was in trouble since it could barely pay its licensing fees to BDO under their "Alliance Agreement."

## V.    The Result of BDO's Negligence

54.    BDO's assurances of the truth of Bankest's financial statements proved illusory, and its negligence had significant consequences. As a result of BDO's negligence, Bankest's financial statements materially misrepresented virtually all facets of Bankest's true financial position, including by:

(a)    overstating receivables by more than $170 million;

(b)    failing to disclose or describe substantial inter-company transfers of cash occurring between and among Bankest, Capital and its affiliates, disguising the true nature of those transactions and/or failing to assure there were proper offsetting entries and reconciliations for them; and

(c)    misrepresenting and not disclosing either the existence and/or current status of numerous extensive insider loans or transfers made by and to Capital and/or its Capital Officers, affiliates or related companies.

55.    Individually, each of these errors, omissions, or intentional misstatements reflects actionable negligence. Collectively, the enormous level of financial misstatements, as to both the volume and scope of the errors, demonstrate at a minimum a reckless disregard for, or gross negligence in, accurately stating the true financial position of Bankest.

56.    Bankest would never have incurred $170 million in debt and losses if BDO would have done its job. Three former officers of Bankest and officers at Stratasys and other Bankest clients have pleaded guilty or have been indicted for defrauding Bankest. The actions of these officers were adverse to Bankest, were

neither intended to benefit nor did benefit Bankest in either the short or long-term, and these officers' knowledge of the fraud cannot be imputed to Bankest.

57.   Had BDO properly conducted its audits and/or detected the fraud, Bankest's losses would have never occurred or ceased immediately.  Bankest had four independent directors who were not part of or aware of the offending officers' actions or that the majority of the account receivables that Bankest purportedly was factoring did not exist.  Had BDO properly performed its audits and discovered that nearly all of Bankest's receivables did not in fact exist, these four independent directors would have stopped the accumulation of Bankest debt, all of which was lent in reliance on the validity of Bankest's receivables.

58.   BDO conducted an audit so deficient that it grossly violated GAAS and caused Bankest to disseminate materially false and misleading audited financial statements and financial results to potential investors and lenders.   If Bankest had known the truth, it would never have issued the Debenture Notes, and the Noteholders never would have purchased them.  Likewise, Bankest would never have incurred the $30 million line of credit and Nassau would not have entered into the Bank Line with Bankest.  A judgment has been entered against Bankest in the amount of these losses.

59.   If BDO had fulfilled its duties to exercise reasonable care and diligence as Bankest's outside auditor, BDO would have prevented Bankest's increased insolvency totaling more than $170 million.

## VI.   BDO International's Role and Responsibility for the Grossly Negligent Bankest Audits

### A.   BDO International Control of BDO Seidman and Contacts with Florida

60.    BDO International controls BDO Seidman and is liable for its negligence.  BDO International "sets standards on such matters as independence, confidentiality, training requirements and quality control" for BDO Seidman.  BDO International then imposes these stringent standards and quality controls on BDO Seidman.    BDO International finally subjects BDO Seidman to regular practice inspections in the form of quality assurance reviews, as well as management reviews conducted by BDO International, and then takes corrective action where BDO Seidman fails to meet its standards of auditing.  Indeed, if BDO Seidman fails to live up to the standards set by BDO International, BDO International can "fire" BDO Seidman and stop it from using the BDO name.

61.    Moreover, BDO International conducts business in Florida through its member firm's office in Miami ("BDO Florida").  It purposefully licenses the "BDO" name for use by BDO Florida, and charges its member firms for the costs of its operations.  It deploys its Florida partners to do its work, can control BDO Florida's workflow, and requires that BDO International be insured for BDO audit work performed in Florida.  It can even cause BDO Florida partners to service other member firms. BDO International regularly interacts with its Florida partners by email, phone or in person on all manner of business.  It attends meetings in Florida.  BDO International derives revenue from BDO Seidman, including BDO Seidman's Florida offices, and reports BDO Seidman's revenues and work as its own, and refers to BDO Seidman's clients as its own. In sum, BDO International's contacts with Florida are regular, profitable and purposeful.

62.    BDO International formalizes and manifests its control of BDO Seidman in a variety of ways.  It binds individual BDO Florida partners whose deficient

audits are the subject of this action, each of whom executed an agreement to adhere to the standards promulgated by BDO International.   As part of its marketing and management function, BDO International exercises control over BDO Florida by injecting itself into those member firms' daily operations, and advertises this control function to its clients and the investing public.

      63.    BDO International's control function is confirmed and formalized by the "Member Firm Agreement" it executes with each member firm — including BDO Florida —  that purports to bind every firm and every partner of every firm.  Each BDO Florida partner has executed, in writing, a binding agreement to adhere to the terms of the Member Firm Agreement which, echoing the proclamations on BDO International's websites, requires BDO Seidman to submit to quality assurance and management reviews conducted by BDO International  and permits BDO International to terminate the Member Firm Agreement if it "considers it is in its best interest" or "has major and persistent concerns about the quality of Professional Services rendered by the Member Firm."  Indeed, it is only by the grace of BDO International that member firms — and BDO Florida specifically — are permitted to use the "BDO" brand to attract clients such as Bankest in the first instance.

      64.    Moreover, the Member Firm Agreement requires each member firm not only to maintain its own insurance for risks related to the provision of auditing services, but to pay for the cost of "a policy or policies of insurance [for BDO International] . . . intended to cover risks arising from all work performed by the Member Firm."  BDO International requires such a policy (and has a policy or policies in place) because it anticipates that it might be called on to account for its BDO audit work and

the audit methodology that it prescribes — including the BDO audit work and methodology that is the subject of this action.

65.    BDO International acknowledges that BDO Seidman will act for it as its agent. Indeed, BDO International trumpets its influence and control to its clients and the investing public. BDO International's Annual Reports and Annual Statements echo its website. In them, BDO International acknowledges that clients of its member firms are its own — and the work of its member firms to be its own — and, accordingly, reports revenues on a worldwide basis, noting that some 50 to 60% of its income is derived from its audit work. Moreover, BDO International expressly claims that the "stringent conditions with which each member firm has to comply to be part of the BDO network are paramount" because they "guarantee that our high standards are met." BDO International purports to "take great care to ensure that every one of our world wide network of member firms embodies BDO's methodology" and employs BDO's "common operating and quality procedures."

66.    In addition to its website and annual reports, BDO International further assures clients of its involvement in and control over all BDO audits — and solicits their reliance on the "BDO" branding — through its newsletters and promotional materials. In those materials, BDO International routinely notes the free exchange of experience and expertise among member firms, the "leveraging" of resources that use of a global accounting firm provides, and the substantial guidance and direction it provides to its member firms. BDO International's far-ranging responsibilities, as described by BDO International's CEO in one such newsletter, is to "coordinate[] the network, assist[] and advise[] the members of the network, lead[] the administration and

control of the network, search[] for opportunities on new markets, and manage[] the reports by the members and the annual reports.

67.     For its own part, BDO Seidman also accepts BDO International's control of it, including the stringent standards that are imposed on it by BDO International, and leverages this control to promote its business.   In its promotional materials, BDO Seidman asserts that it "leverages a global network of resources" by agreeing to International's management and control:  "Our objective to have our practice meet the very highest standards underlies our commitment to the development of stringent quality control procedures.  To achieve this objective, there is a uniform audit process through all BDO International member firms on a worldwide basis.  In addition, we require annual inspection of local offices."   Accordingly, BDO International injects itself into the daily operations of BDO Seidman and, as BDO International's executives have noted, "the business of International . . . is conducted in each country where International is represented."

68.     BDO Seidman is the agent of BDO International and BDO International is liable for the acts of its agents, including the grossly negligent audits of Bankest.

**B.     BDO International's Role in Bankest's Audits**

69.     BDO International's audit methodology and quality control procedures — to the extent they existed — failed here.  Over five years of audits, BDO International's audit team — a BDO Florida team that was supposed to conduct audits of Bankest's financial statements under the management of and in accordance with the quality control standards set and advertised by BDO International — did not adhere to the "stringent standards" applied and supposedly enforced by BDO International and,

despite BDO International's regular monitoring and involvement in its day-to-day activities, failed to detect fraud that it was contractually and professionally obligated to detect.

70.    The result of these failures was dramatic.  BDO's negligent conduct of the Bankest audits included a series of systematic failures of standards and quality controls that damaged Plaintiffs — in other words, the standards and quality controls for which BDO International was responsible.  These included a failure to increase testing or otherwise properly account for several red flags raised by Bankest's business and the fact that the vast majority of its business was "refactoring" through an affiliate; a failure to properly pursue adequate confirmation of receivables for a business whose sole material asset was receivables; and a failure to adequately perform an alternative procedure tailored to the specific business of the audit client.  BDO International did not adequately train, manage and control its BDO Florida auditing team to avoid these failures as it promised it would on its web site, in its annual reports, and in its promotional materials, and failed in its provision of professional accounting services.

71.    BDO International's failures are a failure of its own client.  BDO International views its member firms' clients, including Bankest, as its own clients, and the revenue derived from these clients as its own revenue.  Thus, according to its web site, "[a]udit and accounting work represented 59% of BDO's worldwide fee income in 2003" from "[c]lients rang[ing] from large multi-national listed companies to private ones."  BDO International's duties and knowledge with respect to these clients are identical to those of its member firms.

72.    Moreover, BDO International undertakes its quality control function on behalf of, and with the intention of impressing, its clients.  BDO International's

confessed dual purposes in promulgating its quality control standards and managing its member firms are to maintain the value of its principal asset, the "BDO" mark, and to ensure a minimum level of competence in the work performed by its member firms. BDO International's officers concede that its clients are the intended beneficiaries of its policymaking and quality control functions. BDO International makes sure that its clients and potential clients (and their investors and lenders) are aware that it is performing these quality control functions — and seeks to capitalize on them — by emphasizing its management and control on its web sites (as well as those of its member firms), in its annual reports, and in its promotional materials.

73. BDO International's claims that it is a global firm with rich experience and resources available for "leveraging," that it is one of the five largest multinational accounting and consultancy firms, and that it generates revenues from 99 countries in which its member firms operate are particularly meaningful to clients like Bankest who themselves have international business clients or lenders and who depend on the "BDO" brand to pitch business and secure financing. Without that branding — which BDO International takes great care to maintain and promote —audit clients like Bankest could not get the financing they need to operate their businesses.

74. Throughout the five years that Bankest employed BDO, it depended and relied on BDO International's branding, reputation and international presence, as represented to it and to other clients and investors. Bankest's business model, as expressed in its Shareholder Agreement and other formation documents, included the plain intention to raise financing through placement of debenture notes with international investors, investors that plainly would require the imprimatur of approval of an internationally-recognized auditor. Accordingly, BDO International's quality control

claims were essential since Bankest intended to, stated its intention to, and did include its BDO-audited financial statements in private placement memoranda and other materials intended to help it secure financing from international investors including Plaintiffs and Plaintiffs' assignors, the Noteholders.

75.    That reliance proved ill fated.  By failing to implement an audit procedure and conduct an audit, through its member firm, in accordance with GAAS, BDO International failed Bankest, its audit client, and is therefore equally responsible for damages suffered by Bankest.

76.    Moreover, BDO International, as the principal, is liable for all the acts and failures of its agent, BDO Seidman.

## COUNT I – PROFESSIONAL MALPRACTICE
### (As Against All Defendants)

77.    Freeman incorporates by reference the allegations of paragraphs 1 through 76 of this Complaint as though fully set forth herein.

78.    BDO lacked the independence necessary to audit Bankest.  BDO's strategic partnership with Stratasys destroyed that independence and precluded BDO form acting as Bankest's auditors.  BDO could not verify the accounts receivable of a company with whom it was partners and in which it had a financial stake.

79.    Defendants, as professional independent auditors performing accounting services for Bankest, had a duty to possess the degree of learning and skill of a professional accountant practicing in the same locality and under similar circumstances, to use the care and skill as would be used by reputable professional accountants under similar circumstances, and to use reasonable diligence and best judgment in accomplishing the purpose for which it was employed.  By agreement and

as professional accountants, Defendants' express purpose here was to audit Bankest's financials for the years ending 1998 through 2002, and to (1) assess the accounting principles used by Bankest's internal accountants, (2) obtain reasonable assurance that Bankest's financial statements were free of material misstatements, (3) alert Bankest of any reportable conditions, and (4) examine amounts and disclosures in Bankest's financial statements. Defendants specifically committed to "design [its] audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements."

80.     To achieve these purposes, and satisfy their obligations per agreement and as professional accountants, Defendants were required to conduct the audits of Bankest's financial statements in accordance with GAAS that require that they plan and perform audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and in conformance with Generally Accepted Accounting Principles ("GAAP").

81.     Defendants failed to use reasonable diligence, adequate care and skill, and best judgment in attempting to accomplish their purpose by either failing to recognize or else ignoring the Capital Officers' patent manipulation of Bankest's accounting and financial records and failing to identify and report that such accounting and financial records were not maintained in accordance with GAAP. Defendants' failure can be traced to its repeated and flagrant deviations from GAAS and Statements on Auditing Standards (codified as AU sections), which are recognized by the AICPA as the Institute's interpretations of GAAS. The more flagrant of Defendants' knowing, intentional and reckless departures from GAAS, detailed above, include:

(a)     GAAS standards of reporting require the auditor's report to "state whether the financial statements are presented in accordance with generally accepted accounting principles."   The standards also require that "the report shall identify those circumstances in which such principles have not been consistently observed."  (GAAS Standards of Reporting, Standard 1 and Standard 2, AU §§150, 410 and 420.) Defendants violated both standards by incorrectly and recklessly stating that Bankest's statements were in conformance with GAAP, and concealing the many specific circumstances in which Defendants knew or should have known, that the statements deviated from GAAP;

(b)     Defendants failed to remain independent of and objective about its client as required by GAAS General Standard 2 and the AICPA Code of Professional Ethics.  (ET §§54, 55, 102 and AU §150, §220.)  Defendants' lack of independence led it to make statements they knew or should have known to be false in the interest of earning substantial auditing and consulting fees;

(c)     Defendants failed to adequately investigate and disclose all of the affiliated and related party transactions as required by AU §334.  On information and belief, having played a role in structuring and/or consulting on many of these entities and transactions, Defendants knew or should have known, that Bankest and the Capital Officers retained control of these entities or assets and, as such were required as part of its audit to evaluate them fully;

(d)     Defendants ignored risk factors such as significant related-party transactions, overly complex organizational structure, highly complex transactions and significant pressure to obtain additional credit (AU §316.17); risk factors Defendants

knew existed at Bankest because Defendants participated in advising on and structuring these very matters; and

(e)    Defendants failed to properly evaluate and disclose Bankest's inability to survive as a going concern, as required by AU §341.   The massive concealed debt, of which Defendants were well aware, seriously threatened Bankest's viability as a company.  Once revealed, the company collapsed almost immediately.

82.    In short, and as detailed above, given that Defendants had requested but were denied access to Capital's bank records; knew that Capital was an affiliated party; knew that every or nearly every Bankest transaction was funneled through Capital or a Capital affiliate; were asked not to send confirmations to a majority of the client's debtors it had selected for testing; could not get even the sellers of the debts to confirm the majority of the debt; saw no bank or other reliable record that, after the closing of the audit period, Bankest was actually paid the money it was allegedly owed *by the debtors*; and were conflicted because BDO was a strategic ally with a purported factored client that was used to falsify the financials, Defendants breached the standard of care owed to Bankest by issuing an unqualified and unjustified opinion that Bankest's financial statements were accurate and in accordance with GAAP for each of the years ended 1998 - 2002.

83.    The many violations of GAAP that Defendants concealed with its incorrect representations and certifications of conformity were designed to inflate Bankest's revenue and net worth and hide the true amount of Bankest's real receivables from the full board.  Defendants' conduct in failing to exercise due professional care or competence in auditing Bankest and failing to perform the audit in accordance with GAAS despite its express representations to the contrary, and certifying Bankest's

financial statements as in conformance with GAAP when it knew or should have known, that they were not, constituted a breach of the duties owed to Bankest.

84.    Defendants' failure to obtain reasonable assurance that Bankest's financial statements were free of material misstatements constituted a breach of the duties owed to Bankest.

85.    Defendants' failure to design its audits to provide reasonable assurance of detecting errors and/or fraud that would have a material effect on the financial statements constituted a breach of the duties owed to Bankest.

86.    Defendants' failure to discover and alert Bankest of the Capital Officers' fraudulent scheme constituted a breach of the duties owed to Bankest.

87.    Defendants' multiple breaches of the duties owed to Bankest were the proximate cause of Bankest's damages.  The Capital Officers required the acquiescence and participation of BDO in order to continue their fraudulent scheme and funnel money out of Bankest.  The fraud committed by the Capital Officers should have and would have been discovered had a competent and independent auditor performed the audits of Bankest.

88.    Further, BDO's multiple breaches of the duties owed to Bankest caused and contributed to the financial statements' containing significant false information upon which Bankest relied to its detriment.  That is, BDO's incorrect representations of compliance with GAAP and GAAS led Bankest to issue the Debenture Notes and obtain the Bank Line through the dissemination of materially false and misleading audited financial statements and financial results to the market.  These funds would not have been obtained if the true state of Bankest's financial situation had

been known.  The entire debt of $170 million raised from the Debenture Notes and the Bank Line remains as an outstanding obligation of Bankest.

89.    As a direct and proximate result of BDO's professional negligence, Bankest became insolvent which continued to deepen, resulting in debt in excess of $170 million.

## COUNT II

### (Vicarious Liability as Principal of Agent BDO Seidman)
### (As Against BDO International B.V.)

90.    Freeman incorporates by reference the allegations of paragraphs 1 through 77 of this Complaint as though fully set forth herein.

91.    BDO International repeatedly acknowledged that BDO Seidman would act for it in the conduct of its business and the performance of audits, including the audits of Bankest.

92.    BDO Seidman accepted this undertaking to act as BDO International's agent in the conduct of its business and the performance of audits, including the audits of Bankest.

93.    BDO International controlled the actions of BDO Seidman, including the audits of Bankest.

94.    As a result, BDO International is liable for the acts, omissions and negligence of its agent, BDO Seidman.

## COUNT III

### (Deceptive and Unfair Trade Practices)
### (As Against BDO International B.V.)

95.    Freeman incorporates by reference the allegations in paragraphs 1 through 76 of the Complaint as though fully set forth herein.

96.    As described above, Defendant BDO International has made a series of representations on its web sites, in its annual reports, and in its promotional materials concerning, *inter alia*, the global nature of its enterprise, the quality control standards it implements and enforces throughout its network of member firms, its "guarantee" that its member firms will comply with its standards, and its involvement in and injection into the day-to-day operations of those member firms, and has since claimed that these representations do not accurately describe the relationship between it and its member firms.

97.    BDO International's misrepresentations constitute unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of trade and commerce in Florida as defined pursuant to Florida Statues §§501.210 *et seq*.

98.    As a direct and proximate result of BDO International's unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of trade and commerce in Florida, Bankest became insolvent which deepened to debts in excess of $170 million.

99.    In addition to damages, Freeman is entitled to an award of reasonable attorneys' fees and court costs as provided by Florida Statues §501.2105.

## COUNT IV

### (Aiding and Abetting Breach of Fiduciary Duty)
### (As Against All Defendants)

100.   Freeman incorporates by reference the allegations in paragraphs 1 through 76 of the Complaint as though fully set forth herein.

101.   At all material times hereto, the Capital Officers were officers and/or directors of Bankest who owed a fiduciary duties to Bankest and its creditors to discharge those duties in good faith, with the care which an ordinary prudent officer or director in a like position would exercise and in a manner reasonably believed to be in Bankest's best interests.

102.   The Capital Officers exhibited a conscious and/or reckless disregard for the best interests of Bankest, in relation to the facts and circumstances alleged herein.

103.   BDO, Lenner and Ellenberg had knowledge of the facts and circumstances alleged herein and rendered substantial assistance in regard to such acts and omissions, thereby aiding and abetting the Capital Officers in their breaches of fiduciary duty to Bankest.

104.   Based upon the foregoing, BDO, Lenner and Ellenberg are liable for all damages proximately caused by their actions.

105.   The foregoing breaches, as aided and abetted by BDO proximately caused the insolvency and increased insolvency of Bankest.

106.   The conduct of BDO was not privileged or justified.

## COUNT V

### (Violation of 15 U.S.C. § 78j(b) and Rule 10b-5(b))
### (As Against All Defendants)

107.   Freeman incorporates by reference the allegations in paragraphs 1 through 106 of the Complaint as though fully set forth herein.

108.   Each year from 1998 to 2002, BDO issued an unqualified opinion warranting the accuracy of Bankest's financial statements.  In each unqualified opinion, BDO stated that it had obtained "reasonable assurance" that the "financial statements are free of material misstatement."   It claimed to have "assessed the accounting principles used and significant estimates made by management" and to have "evaluat[ed] the overall financial statement presentation."   Finally, it certified that the "financial statements . . . present fairly, in all material respects, the financial position of E.S. Bankest . . . in conformity with generally accepted accounting principles."   These statements were made in BDO's Independent Auditors' Reports dated February 26, 1999, February 23, 2000, February 16, 2001, February 8, 2002 and April 16, 2003.

109.   In fact, BDO had made no meaningful effort to evaluate Bankest's financial statements, and the financial statements bore no relationship whatsoever to Bankest's financial position. As Bankest's auditor, BDO certified over $1 billion of accounts receivable, virtually all of Bankest's purported assets, which did not exist.

110.   BDO knew, or at a minimum was extremely reckless in not knowing, that its unqualified opinions were false.  As described above, BDO's deviations from GAAS were flagrant and numerous, including the failure to remain independent from its client, the failure to adequately investigate related party transactions, and the failure to address obvious risk factors.

111.   BDO issued its opinions recklessly ignoring numerous red flags that led to significant deviations from the applicable accounting standards and should have prevented BDO from issuing its unqualified opinions certifying the accuracy of Bankest's financial statements and the existence of accounts receivable.   These red flags included:

(a)    Bankest employees repeatedly refused to provide BDO with documents viewed by BDO's audit manager as necessary to complete the audit;

(b)    Bankest refused to allow BDO to contact account debtors that BDO had selected for testing to confirm that the debts existed;

(c)    The account debtors that BDO did attempt to contact consistently and almost without exception failed to confirm the existence of the purported receivables;

(d)    Virtually all of Bankest's transactions were with related parties, including over $30 million of receivables from a company whose CEO was none other than the CFO of Bankest; and

(e)    BDO itself classified Bankest as a "sensitive" or high risk client.

112.    BDO's motive to overlook these red flags was not just continued auditing fees, but the income generated by BDO's strategic partnership with Stratasys, one of Bankest's largest factoring clients and a Bankest affiliate.    Lenner's and Ellenberg's individual motive included that their compensation was tied to the "success" of the Bankest audits and Stratasys consulting fees.    Lenner even wrote, in arguing for higher compensation from BDO, that he could "smell the cheese" of the consulting fees from Stratasys and others.

113.    BDO's strategic partnership with Stratasys also gave BDO access to all of Stratasys' financial records.    Moreover, Lenner regularly visited Stratasys and met with its personnel.    Despite Lenner's close relationship with Stratasys, Lenner and BDO—in their dual role as auditor of Bankest—certified over $30 million in accounts receivable from Stratasys that did not exist.    In fact, Stratasys had only a few hundred thousand dollars in accounts receivable, and even had difficulty paying its licensing fees

to BDO. Defendants either knew or where extremely reckless in not knowing that the Stratasys accounts receivable were fake.

114.    As a result of grossly reckless audits in which BDO certified $1 billion in accounts receivable that did not in fact exist, BDO continued to be retained as Bankest's auditor and received fees for its accounting services.

115.    BDO's unqualified opinions were material and justifiably relied upon. BDO was hired to "detect fraud" and BDO's unqualified opinions certifying the accuracy of Bankest's financials were relied upon by the Bank Directors when they authorized the issuance of the Debenture Notes. Moreover, in connection with the sale of the Debenture Notes, prospective lenders were provided with the BDO false and misleading audited financial statements of Bankest.

116.    BDO's misstatements proximately caused $140 million of Bankest's outstanding debt. The sale of the Debenture Notes raised $140 million which would not have been raised without BDO's false and materially misleading audited financials statements. The fraud that BDO helped conceal, i.e. the fact that virtually all of Bankest's accounts receivable were fake, ultimately made it impossible to repay the still outstanding $140 million debt.

## PRAYER FOR RELIEF

WHEREFORE, Freeman prays that judgment be entered in its favor and against the Defendants as follows:

A.    actual compensatory and consequential damages in an amount to be proven at trial;

B.    such civil penalties as allowed by law;

C.    punitive damages as allowed by law;

D.   attorneys' fees and costs of this suit as allowed by law;

E.   pre-judgment and post-judgment interest as allowed by law; and

F.   such other and further legal and equitable relief as the Court deems just

and proper.

**WARREN R. TRAZENFELD, P.A.**
3225 Aviation Avenue, Suite 600
Miami, Florida 33133-4741
(305) 860-1100
(305) 858-6123 Fax
Counsel for Lewis B. Freeman


By:_____
            Warren R. Trazenfeld