UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

E.S. BANKEST L.C.,                                  Chapter 11
                                                    Case No. 04-17602-BKC-AJC

       Debtor.
_____/

LEWIS B. FREEMAN,

       Plaintiff,                          Adv. Proc. No. 06-01220-BKC-AJC-A

vs.

BDO SEIDMAN, LLP, BDO
INTERNATIONAL, B.V., SANDOR
LENNER, KEITH ELLENBERG,

       Defendants.
_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO (I) BDO SEIDMAN, LLP
AND SANDOR LENNER'S MOTION TO DISMISS ADVERSARY COMPLAINT
AND, (II) BDO GLOBAL COORDINATION, B.V.'S MOTION
TO DISMISS ADVERSARY COMPLAINT**

       Plaintiff, Lewis B. Freeman ("Freeman" or "Plaintiff"), in his capacity as Responsible

Officer for the Reorganized Debtor E.S. Bankest, L.C. ("Bankest"), by and through undersigned

counsel, responds to the (i) Motion of Defendants BDO Seidman, LLP and Sandor Lenner to

Dismiss Adversary Complaint ("Motion"), (ii) BDO Global Coordination, B.V.'s[1] Motion to

Dismiss Adversary Complaint ("BDO Int'l Motion"), (iii) the Joinder in Motion of Defendants

BDO Seidman, LLP and Sandor Lenner to Dismiss Adversary Complaint, and (iv) Defendant

---

[1] The Complaint filed February 22, 2006 names as a Defendant BDO International B.V., which is the alias of BDO
Global Coordination B.V.  (BDO Int'l Motion at 1.)  For consistency, Plaintiff refers to this entity as "BDO
International."

Keith Ellenberg's Joinder in Motion by BDO Seidman, LLP and Sandor Lenner to Dismiss Freeman's Complaint as follows:

## INTRODUCTION

1.      This Adversary Proceeding seeks damages against Defendants BDO Seidman, LLP, as well as BDO International B.V., of which BDO Seidman, LLP is a member firm, and Sandor Lenner and Keith Ellenberg, respectively current and former employees of BDO Seidman, LLP, (collectively, "Defendants" or "BDO") for BDO's grossly negligent and severely reckless conduct in auditing E.S. Bankest, L.C. ("Bankest").  BDO issued five audit opinions declaring that Bankest's financial statements contained no material misstatements and that no material fraud existed for the years 1998 through 2002.

2.      BDO's audits turned out to be a fiction and BDO's statements that Bankest's audited financial statements contained no material misstatements were false.  Year after year, BDO recklessly failed to notice or discover what Freeman discovered in less than one week after his appointment as receiver for Bankest by the United States District Court: that virtually all of Bankest's assets purportedly verified by BDO in its audits—over $220 million in purported accounts receivable collateralizing Bankest's $170 million debt—*did not exist*.

3.      In addition, BDO's very performance of the audits was reckless because BDO lacked the independence required of an auditor.  BDO's partnership interest in Stratasys Group LLC ("Stratasys") created a disqualifying conflict of interest that provided a direct incentive for BDO to turn a blind eye to the fraud that it agreed to detect.

4.      BDO's grossly negligent and reckless audits proximately caused Bankest in excess of $170 million in damages.  Bankest could not and would not have incurred the over $170 million in debt it could not and did not repay absent BDO's unqualified audit opinions,

which opinions clearly purported to demonstrate that Bankest had sufficient assets to repay its debt.

5.      Freeman therefore asserts claims for (a) professional malpractice, (b) deceptive and unfair trade practices, (c) aiding and abetting breach of fiduciary duty; (d) vicarious liability of BDO International as principal of its agent BDO Seidman; and (e) violation of 15 U.S.C. § 78j(b) and Rule 10b-5(b), and seeks compensatory and punitive damages.

6.      BDO seeks to avoid liability for its clear breach and moves to dismiss Freeman's complaint on three grounds, and BDO International moves on one independent ground.[2]  For the reasons set forth below in detail, each argument fails.

7.      *First*, in arguing Freeman lacks standing to assert these claims against BDO on Bankest's behalf and that the $170 million in debt is "illusory," BDO seeks to relitigate what it already lost before this Court.  *See* (September 14, 2005 Order on cross-motions for summary judgment ("Summary Judgment Order") at 25-27 (holding that acts of the officers who defrauded Bankest cannot be imputed to the corporation).)  BDO again ignores settled law that when a company had innocent insiders at the time the fraud was committed against it—as Bankest did—the company has standing to sue third parties like BDO.  The single case BDO cites in support of its argument that Bankest's injury of deepening insolvency—only one of Bankest's alleged injuries—is "illusory" actually *found standing* based on allegations of deepening insolvency as a result of professional negligence.  Further, BDO ignores the precedents of this Court and other courts that recognize that the other forms of injury Bankest suffered confer standing to pursue such claims.

---

[2] Aside from standing, no Defendant has raised any grounds to dismiss as to Counts I (Professional Malpractice) and IV (Aiding and Abetting Breach of Fiduciary Duty), and Defendant BDO Seidman has not raised any basis to dismiss as to Count III (Deceptive and Unfair Trade Practices).  Therefore, this Court must deny the motion to dismiss as to these counts if Plaintiff is able to establish his standing.

8.    BDO also asks the Court to find that simply because any recovery in this action will go to Bankest's creditors as a result of the bankruptcy distribution scheme under the Bankruptcy Code, Freeman is improperly asserting claims belonging to Bankest's creditors, not Bankest.  Not true.  Freeman sues BDO based on the duty BDO owed to Bankest, its audit client, and *only* Freeman as Bankest's representative can assert such claims against BDO.  It is a bedrock principle of bankruptcy that a debtor's recovery will flow to creditors.  Therefore, dismissing a claim for lack of standing because creditors will recover is absurd.

9.    *Second*, repeating its argument in its Motion to Withdraw the Reference pertaining to this adversary proceeding, BDO claims that this Court lacks subject matter jurisdiction over this action on the grounds that this matter is non-core and that the confirmation of the Bankest bankruptcy plan somehow limits this Court's statutory grant of jurisdiction of all matters "related to" the Bankest bankruptcy case.  As stated in Plaintiff's response to the Motion to Withdraw the Reference, incorporated by reference in this response, pursuant to the Eleventh Circuit's *Lemco* test, this Court has "related to" jurisdiction over this action because the claims brought by Freeman have the potential to affect distributions to creditors and the administration of the bankruptcy estate.  Whether this matter is non-core simply has no relevance to the determination of subject matter jurisdiction.

10.   *Third*, BDO seeks dismissal of the securities law claim for failure to allege BDO's scienter in performing its audits and that the Bankest's injury from BDO's misconduct was not "in connection with" the sale or purchase of securities.  The Complaint alleges that BDO had a direct, disqualifying conflict that incentivized it to turn a blind eye to the fraud that it agreed to detect.  The Complaint further specifically pleads instances where BDO chose to continue to audit Bankest despite refusals by the Capital Officers to provide information BDO deemed

necessary to conclude its audits *and* when BDO should have known the numbers it certified as accurate were false.  To make its argument in the face of the Complaint's substantial and detailed explanation of BDO's severely reckless conduct in performing the Bankest audits, BDO ignores both the allegations in the Complaint that this Court is required to accept as true and the cases holding that such allegations more than suffice to allege conduct by an auditor necessary to plead a 10b-5 claim.

11.    As for the requirement that BDO's severely reckless misconduct be in connection with the sale or purchase of securities, that requirement is broadly construed such that the Complaint need only allege that BDO's severely reckless conduct "coincide" with a securities transaction.  This standard is satisfied by the Complaint's allegations that BDO knew its audited financial statements would be included in the materials provided to Bankest's investors in connection with their purchase of Bankest debenture notes and that BDO's audited financials were relied upon in connection with the decision by the Bankest directors designated by Espirito Santo Bank to authorize the company's issuance of debentures.

12.    BDO International moves separately to dismiss Freeman's Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") count.  BDO International's argument is limited to whether Bankest has alleged actual damages attributable to BDO International.  (BDO Int'l Mot. at 14-16.)  Plaintiff pleads the nature of the worthless audits BDO Seidman performed as the agent of BDO International, that BDO was under the control and standards set by BDO International (a factual holding already made by the state court and affirmed by the Florida Court of Appeal), and that BDO's audits resulted in damage to Bankest.  (Compl. ¶¶ 27-47, 60-76.) Such allegations state a FDUTPA claim.

13.    The motions to dismiss should be denied.

### FACTUAL BACKGROUND RELEVANT TO MOTION TO DISMISS

14.     Bankest was a corporation—subsequently a limited liability company—formed to engage in factoring.  (Compl. ¶ 17.)  At all times relevant to the claims set forth in the Complaint, it had two 50% equity owners, Espirito Santo Bank (the "Bank") and Bankest Capital Corporation ("Capital").  (*Id.* ¶ 16.)  The day-to-day management of Bankest was performed by the Capital officers, Hector Orlansky, Eduardo Orlansky, Dominick Parlapiano and Peter Stanham (collectively, the "Capital Officers").  (*Id.* ¶ 18.)  Each of the equity owners appointed half of Bankest's board of directors and the four directors appointed by the Bank had no responsibilities for the day-to-day management of Bankest.  (*Id.* ¶¶ 16, 18.)

15.     BDO was retained in 1998 as Bankest's auditors at the company's formation and remained the company's auditors until Bankest was placed in receivership in 2003.  (*Id.* ¶¶ 1-2.)  In each audit, BDO promised to "detect fraud" or errors that would materially affect the financial statements, and each year BDO gave clean, unqualified audit opinions that no fraud or errors existed.  (*Id.*)  BDO Seidman is a member firm of BDO International and as its agent, BDO International is liable for its actions.  (*Id.* ¶¶ 69-76, 92-94.)

16.     BDO had a conflict of interest because it was the strategic partner of Stratasys Group LLC ("Stratasys").  Stratasys was a Bankest factor client and BDO, as Bankest's auditor, was charged with verifying Stratasys' accounts receivable.  (*Id.* ¶ 4.)  BDO's conflict should have prevented BDO from auditing Bankest; instead BDO turned a blind eye to the fraud and conducted severely reckless audits where BDO verified over $30 million of *fake* Stratasys receivables as *real* (*id.* ¶¶ 2-4) and certified Bankest's financial statements as free of material misstatement even though the Capital Officers refused to provide BDO with the information BDO deemed necessary to complete its audits.  (*Id.* ¶¶ 37-38.)

6

17.    Without BDO's audited financials of Bankest, Bankest could not have incurred its $170 million debt.  (*Id.* ¶ 22.)  The Capital Officers defrauded Bankest by creating false financials reflecting nonexistent accounts receivable and Bankest incurred $170 million in debt and losses.  (*Id.* ¶¶ 23, 56.)  Each of BDO's audits *confirmed* the existence of those fake accounts receivable collateralizing Bankest's debt and Bankest's compliance with the covenants governing its debt.  (*Id.* ¶ 22.)

18.    Moreover, the four Bankest directors appointed by the Bank (the "Bank Directors") relied on BDO's audit opinions in authorizing Bankest's accumulation of its $170 million debt.  (*Id.* ¶¶ 22, 57.)  Had the Bank Directors been informed by BDO of Bankest's true financial status, they immediately would have ceased the continued and increasing incurrence of debt by the company and any fraudulent activity.  (*Id.* ¶ 22.)  Instead, as extensively detailed in the Complaint, BDO performed grossly negligent audits and—incredibly—issued five annual clean unqualified audit opinions stating that Bankest's financial statements were free from material misstatement.  (*Id.* ¶¶ 27-47, 69-76.)

19.    No factual allegations support BDO's claim that Bankest benefited and suffered no injury from the Capital Officers' fraud.  (Mot. at 5-6, 11-13, 15;  BDO Int'l Motion at 3-6, 8-9.)  To the contrary, the Complaint alleges that Bankest received no benefit:  it suffered a $170 million injury that could have been prevented had BDO properly performed its audits and detected the fraud as it was duty-bound to do.  (Compl. ¶¶ 57-59.)

20.    The Complaint alleges and this Court already has held that in defrauding Bankest, the conduct of the Capital Officers was adverse to Bankest and therefore injured Bankest.  (*Id.* ¶ 56; Summary Judgment Order at 25, 27 ("[T]he Capital Officers looted the Debtor for the benefit of themselves. . . . The Capital Officers acted for their own benefit and adversely to Bankest in

7

loading Bankest with $170 million in debt.").)   The four Bank Directors were innocent of the fraud and Espirito Santo has been recognized by this Court and the Federal District Court as the "victim" of the fraud.  (Compl. ¶ 56); *see* (Mar. 24, 2005 Order on Gunster, Yoakley & Stewart's Motion to Convert at 8); (Restitution Order at 5, *United States v. Dominick Parlapiani*, No. 03-20951-CR-JORDAN (S.D. Fla. Sept. 17, 2004).)

## ARGUMENT

### I.    Legal Standard

21.    In evaluating a motion to dismiss, this Court "must accept the allegations of the complaint as true and must construe the facts alleged in the light most favorable to the plaintiff." *In re Johannessen*, 76 F.3d 347, 350 (11th Cir. 1996).  "The threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceeding low." *In re Southeast Banking Corp.*, 69 F.3d 1539, 1551 (11th Cir. 1995).  The threshold is similarly low when the defendant moves to dismiss on the grounds that the plaintiff lacks standing. *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1536 & n.5 (11th Cir. 1994) (reversing the district court's order granting a motion to dismiss based on standing and "reiterat[ing] that we may only affirm the dismissal of the complaint if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations").

### II.    Freeman Has Standing to Bring This Action Against BDO.

22.    Bankest, through Freeman, is asserting claims against BDO for injury to Bankest itself that could have been avoided had BDO properly audited Bankest and performed its duty to detect fraud. *See, e.g.*, (Compl. ¶ 56 ("Bankest would never have incurred $170 million in debt and losses if BDO would have done its job.").).  These allegations are sufficient to establish Freeman's standing to assert his claims against BDO.

23.     In order to have standing to assert claims, the plaintiff must show that the complaint alleges "injury in fact, causation and redressability," and "that the requested relief will redress the injury." *E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 984 (11th Cir. 1990) (citations omitted).  There are three additional "prudential considerations" for standing, namely that the plaintiff is asserting a third party's rights, that the injury is merely a generalized grievance and finally that the injury asserted is outside the "zone of interests" of the applicable statute or constitution.  *Id*. at 984-85.  Of the relevant factors, BDO limits its argument to the "injury in fact" prong of the standing analysis and argues that Bankest cannot establish injury for the purposes of standing because Bankest's $170 million loss is "illusory" and an injury to Bankest's largest creditor, not Bankest.  (Mot. at 13, 16.)  As discussed below, there is a real and cognizable injury to the debtor corporation Bankest, the injury is particular to Bankest, and Freeman asserts causes of action of, and for recovery belonging to, Bankest.  BDO's arguments therefore fail.

### A.     BDO—who had a duty to detect the fraud—cannot bar Freeman's claims on the grounds that there was a fraud.

24.     The Court should reject BDO's argument that the Capital Officers' fraud[3] on Bankest bars Bankest's claims against BDO because such fraud is inapplicable as a matter of law to Freeman's right to assert such claims.

25.     *First*, this Court already has held that "BDO specifically contracted and agreed to detect fraud."  (Summary Judgment Order at 24.)  More fully, the Court held that BDO could not excuse its failure to detect fraud because there *was* fraud:  "Since BDO specifically contracted

---

[3] Although the Complaint alleges that the Capital Officers defrauded Bankest, concurrently with its Motion to Dismiss, BDO filed a motion asking this Court to take judicial notice of various documents, including to prove that Bankest was actually defrauded by the Capital Officers.  *See* (Mot. at 12-13).  As stated in Plaintiff's opposition to that motion, those documents are inadequate as a matter of law as evidence to establish the point for which BDO seeks to use them.  (Plaintiff's Response to Motion for Judicial Notice at 2-3.)

and agreed to 'detect fraud,' it cannot claim now that it could not 'detect fraud' because of 'fraud.'" (*Id.*)  Still further, the Court held that BDO could not blame others including its audit client—Bankest!—for BDO's failure of duty.  (*Id.* at 23.)  Thus, as a matter of law, BDO cannot bar Freeman's claims based on BDO's breach of its duty owed to Bankest on the grounds that there was a fraud perpertrated by the Capital Officers.  In fact, on these same circumstances, the Supreme Court of New Jersey recently held that when an auditor agrees to detect fraud, it cannot—as a matter of law—raise the imputation, or in pari delicto, defense to bar a claim by the audit client for damages suffered as a result of the auditor's failure to detect fraud.  *NCP Litigation Trust v. KPMG, LLP*, 2006 WL 1766178, at *11 (N.J. Sup. Ct. June 28, 2006) (rejecting imputation defense raised by auditor against audit client and finding that allegations of "auditor negligence" create an "exception" to the imputation doctrine and preclude its application).

26.      *Next*, the imputation, or *in pari delicto*, defense can only be raised to bar a corporation's claims if *both* the plaintiff corporation and the defendant were a part of the same fraudulent scheme.  *See*, *e.g.*, *Kulla v. E.F. Hutton & Co.*, 426 So. 2d 1055, 1057 (Fla. 3d DCA 1983) ("It is a well-settled principle of law requiring little discussion that one who himself engages in a fraudulent scheme, that is, acts *in pari delicto*, may forfeit his right to any legal remedy against a *co-perpetrator*." (emphasis added)); *Smith ex rel. Estates of Boston Chicken, Inc. v Arthur Anderson LLP*, 175 F. Supp. 2d 1180, 1199 (D. Ariz. 2001) ("The doctrine of in pari delicto dictates that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another *participant in that conduct*, . . . the law will aid neither, but rather, will leave them where it finds them." (emphasis added)).

27.     Because the Complaint does not allege that either Bankest or BDO were co-conspirators in the fraud, BDO cannot raise the imputation defense to bar Freeman's claims. *Compare Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) (corporation barred from suing third parties that participated in the fraud *with* the corporation because the victim of their combined fraud is the creditor, not corporation).  In fact, as set forth below, the existence of the four innocent Bank Directors (which is clearly alleged in the Complaint) preclude BDO's attempt to use the imputation, or *in pari delicto*, defense to block standing in favor of Freeman.

> **B.     BDO's argument that Freeman lacks standing to assert claims against BDO is unsupported by the alleged facts and the law.**

28.     Even if the Court finds that BDO can raise its standing arguments against Freeman, those arguments fail.  BDO seeks to bar Freeman's claims by arguing that because Bankest was "a conduit" used to "funnel money to the Capital Officers," it could not have suffered an injury for which Freeman has standing to sue BDO.  (Mot. at 10, 13.)  BDO has both the law and the facts wrong.

29.     On the facts alleged in the Complaint, this Court already held that Bankest was an entity separate and distinct from the Capital Officers who "acted for their own benefit and adversely to Bankest," and that the fraud committed by the Capital Officers could not be imputed to Bankest.  (Summary Judgment Order at 27.)[4]  Consistent with the Court's Summary Judgment Order, the case law is uniform that a corporation will suffer legal injury from a fraud committed

---

[4] BDO is estopped from relitigating this issue.  *See In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 n.3 (11th Cir. 1990) (law of the case "requires a court to follow what has been decided explicitly, as well as by necessary implication, in an earlier proceeding"); *In re Lawrence*, 251 B.R. 630, 641 (S.D. Fla. 2000) (holding that order in adversary proceeding "became the law of the case, and should continue to govern the issue" in related bankruptcy proceeding); *Compton v. Swanson*, No. 01-35905, 2003 WL 133099, at *1 (9th Cir. 2003) (applying law of the case to preclude arguments in adversary proceeding because same issues decided in related bankruptcy proceedings); *see also In re Uhrig*, 306 B.R. 687, 697 (Bankr. M.D. Fla. 2004) (holding collateral estoppel "requires this Court to recognize prior adjudication" and "preclude[s] relitigation" of a court's decision on an issue of fact or law that is necessary to a judgment) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

by insiders and have standing to sue third parties for injuries arising out that that fraud as long as there were other insiders who were innocent of the fraud.  *See, e.g.*, *In re Fuzion Techs. Group, Inc.*, 332 B.R. 225, 239-40 (Bankr. S.D. Fla. 2005) (holding trustee's claims against law firm were not barred because "there were innocent board members who could have terminated [the fraudulent insider's] wrongdoing had his misconduct been uncovered").

30.    Moreover, when money is "funneled" out of a corporation by the fraudulent insiders and the corporation does not benefit from the fraud—as is alleged here (Compl. ¶¶ 27, 87)—courts find that the corporation is *not* barred from asserting claims to recover for that injury.  *See, e.g., Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1561 (S.D. Fla. 1990) (when wrongdoing insiders looted corporation and directed it to borrow funds without adequate collateral in order to perpetuate fraud, they were acting adversely to corporation and therefore Trustee was not barred from bringing claims to recover for that injury).

31.    Thus, in order for BDO to succeed on its argument that Bankest lacks standing and has no redressable injury, BDO has to show that the Complaint alleges that Bankest was a sham entity operated exclusively by and for the benefit of the Capital Officers such that Bankest was the alter ego of the Capital Officers.  *See, e.g., Feltman*, 122 B.R. at 473-74 & n.8 (corporation was a "sham" that could not suffer injury when corporation was "alter ego" of individual perpetrating fraud); *Wechsler v. Squadron, Ellenoff, Plesent & Scheinfeld, LLP*, 994 F. Supp. 202, 205 (S.D.N.Y. 1997) (recognizing that rule imputing acts of corporate agents' wrongdoings "only applies where *all* relevant shareholders and/or decisionmakers are involved in the fraud" (emphasis added)); *Boston Chicken*, 175 F. Supp. 2d at 1199 (recognizing that fraudulent acts of corporate agents are only attributable to the corporation when "*all* relevant shareholders and/or decisionmakers" were involved in the wrongful conduct (emphasis added)).

12

32.    The Complaint alleges just the opposite:  Bankest was independent from the Capital Officers because Capital never had majority control over the Bankest and half of the eight-member board of directors had no knowledge of the fraud.  (Compl. ¶¶ 16, 18, 57.)  Thus, the identity of Bankest never merged with the identity of the Capital Officers and Bankest therefore suffered injury for which Freeman can seek redress.  *See, e.g.*, *O'Halloran*, 350 F.3d at 1204 (debtor can suffer injury "[a]s long as [the debtor] was not merely [the wrongdoer's] alter ego" and corporation could not be alter ego of director who perpetrated the fraud when corporation had "significant membership and governing body" innocent of the fraud); *In re Fuzion Techs. Group, Inc.*, 332 B.R. at 239-40 (holding that corporation not barred from asserting claims because innocent board members would have stopped the fraudulent activity if they had known about it); *Boston Chicken*, 175 F. Supp. 2d at 1199, 1200 (declining to impute agents' acts to corporation and bar claims when Trustee "alleged that there were innocent members . . . who were unaware of the wrongdoing" and that in "cases involving more than one corporate actor, the plaintiff may avoid dismissal for lack of standing by alleging the existence of an innocent member of management who would have been able to prevent the fraud had he known about it" (internal quotation marks omitted)); *Wechsler*, 994 F. Supp. at 214 (refusing to impute acts of corporate agents' wrongdoings to corporation when innocent directors had been "identified" in pleadings and when pleadings "explained how [the directors] could and would have brought the fraud to an end," and that the debtor "is not required to do more at the initial pleading stage").

33.    This conclusion is supported by the very cases on which BDO relies to argue that Bankest suffered no injury.  In each case cited by BDO where the court found no injury, the plaintiff corporations had no innocent insiders and were merely sham corporations or the alter

egos of the wrongdoers. *See* (Mot. at 10-11); *Feltman*, 122 B.R. at 473-74 ("The complaint alleges [the corporations were] alter egos with no corporate identity separate from [the fraudulent insider] . . . [and] any alleged injury to the debtors is as illusory as was their corporate identity."); *In re Meridian Asset Mgmt., Inc.*, 296 B.R. at 257-58 (finding that the trustee lacked standing because debtor "was managed by a sole owner who committed the wrongful acts.  There were no innocent decision makers who could have prevented the embezzlement").

34.     In fact, in *O'Halloran*, cited by BDO, the court specifically found the corporation had standing to bring claims against its lender because the existence of innocent insiders prevented the company from being the alter ego of the wrongdoer and as a consequence the corporation had suffered injury from its management's fraud.  *O'Halloran*, 350 F.3d at 1204 (because the debtor "was not merely Payne's alter ego, it is conceivable that Payne could have wrongfully embezzled money from the organization" and therefore the "alleged injury resulting from Payne's embezzlement  . . . gives [the debtor] standing to pursue a claim against [the corporation's lender]").

35.     The same analysis and result applies to Bankest's claims against BDO—the four innocent Bank Directors preclude a finding that Bankest was a sham or the alter ego of the Capital Officers as a matter of law—and this Court should find that Freeman has standing to pursue his claims against BDO for the injury inflicted by BDO's grossly negligent and severely reckless audits.

> **C.**     **Bankest's $170 million debt is not "illusory" and Freeman has standing to pursue claims against BDO to redress that injury.**

36.     BDO also argues Freeman lacks standing on the grounds that Bankest's claimed injury of a "deepening insolvency" as a result of BDO's grossly negligent audits  is "illusory." (Mot. at 14.)  BDO's argument is both confused and unavailing.

37.     First, BDO's argument that Bankest's injury is "illusory" is confined only to one alleged type of injury, deepening insolvency.  (*Id.* at 13-16.)  BDO omits any reference to the other injuries Bankest alleges it suffered, including that Bankest lost $170 million through fraud that BDO was duty-bound to detect.  (Compl. ¶ 79.)  Specifically, Freeman alleges that BDO's negligence proximately caused Bankest's injuries in part because

> "[t]he Capital Officers required the acquiescence and participation of BDO in order to continue their fraudulent scheme and funnel money out of Bankest.  The fraud committed by the Capital Officers should have and would have been discovered had a competent and independent auditor performed the audits of Bankest."  (*Id.* ¶ 87.)

38.     In other words, BDO's negligence injured Bankest by allowing the Capital Officers to steal from Bankest.  It is settled Eleventh Circuit law that a debtor has standing to sue a third party for negligently failing to discover and stop the debtor's principals from stealing money from the debtor.  *See O'Halloran*, 350 F.3d at 1203-04 (trustee has standing to sue bank for the bank's negligence in allowing debtor's principal to embezzle from the debtor); *In re Huff*, 109 B.R. 506, 512 (Bankr. S.D. Fla. 1989) (Cristol, J.) (holding that the fact that $800,000 was stolen from the corporation "alone is sufficient to sustain standing"); *In re Plaza Mortg. & Fin. Corp.*, 187 B.R. 37, 43 (Bankr. N.D. Ga. 1995) (trustee has standing to sue accountants for negligently allowing bankrupt corporation to make improper distributions).  Thus, Bankest suffered injury for which it can sue BDO.

39.     Next, BDO's argument that Bankest's injury is "illusory" ignores the holdings of its own cases.  The only grounds for finding an injury "illusory" such that the plaintiff lacks standing in the cases cited by BDO is when the corporation is the alter ego of the wrongdoing insider.  *See Feltman*, 122 B.R. at 473, 474 n.8 (holding injury was "illusory" where debtor corporations were "sham corporations, alter egos with no corporate identity separate from" the wrongdoer); *In re Meridian Asset Mgmt., Inc.*, 296 B.R. at 252 (holding injury was "illusory"

15

where one wrongdoer "exercised complete dominion and control over the accounts and treated them as his own, they were his alter-ego").  As discussed above, Bankest had four innocent insiders and it was not the alter ego of the Capital Officers.  *See supra*, ¶¶ 18-19, 28-35.

40.    Finally, BDO argues that Bankest could not have been injured by its deepening insolvency because from its formation, Bankest was incapable of rehabilitation.[5]  (Mot. at 14.) In so arguing, BDO ignores the Complaint's allegation that "[a]s a direct and proximate result of BDO's professional negligence, Bankest *became* insolvent."  (Compl. ¶ 89 (emphasis added).) Moreover, the only authority cited by BDO in support of this argument, *In re Flagship Healthcare*, expressly holds that deepening insolvency is an injury that confers standing.[6]  In that case, the court held that even a corporation insolvent *prior* to the commission of any wrongdoing *can* be injured by increased debt incurred as a result of the wrongdoing, because the extra debt itself is a legal injury.  *In re Flagship Healthcare, Inc.*, 269 B.R. 721, 728 (Bankr. S.D. Fla. 2001) ("[E]ven if the Debtor may have been insolvent before the Greenleaf Valuation, the additional debt incurred thereafter, and allegedly as a result of the Defendants' negligence, may provide a measure of damages recoverable by the Trustee."); *see also In re Huff*, 109 B.R. at 512 ("A corporation is damaged where its officers and directors fraudulently conceal its insolvency

_____

[5] BDO also argues that in order to recover for an injury due to deepening insolvency, that injury must be due to the defendant's fraud.  (Mot. at 13-14.)  BDO should know this is not the law because BDO then spends the next two pages of its Motion analyzing a case that permits a trustee to sue for deepening insolvency damages resulting from the defendants' *negligence*.  *In re Flagship Healthcare*, 269 B.R. at 728 n.4) (referring, in dicta, to how "wet" a corporation is and whether it has a "puncher's chance" of recovery).)  BDO also cites a Delaware District Court case concerning whether fraud is an element of a *cause of action* for deepening insolvency under Pennsylvania law, (Mot. at 14 (citing *In re Student Finance Corp.*, 335 B.R. 539, 548 (D. Del. 2005)), however, Bankest is not bringing an action for deepening insolvency, and authority pertaining to such an action is irrelevant to whether Bankest's injuries are sufficient to satisfy constitutional standing.

[6] BDO again ignores the holding of *In re Flagship Healthcare*—that a corporation suffers injury when it incurs additional debt even if already insolvent—and relies on dicta in a footnote that concerns whether allegations of operational limitations on a corporation's ability to make a profit can establish deepening insolvency.  (Mot. at 14-16 (citing *In re Flagship Healthcare*, 269 B.R. at 728 n.4) (referring, in dicta, to how "wet" a corporation is and whether it has a "puncher's chance" of recovery).)  BDO relies on this dicta to argue that because Bankest was insolvent it has no hope of recovery, and it could not be injured by operational limitations.  (Mot. at 14-15.)  The Holding of *Flagship Healthcare*, however, is that even an insolvent corporation can suffer injury from increased debt.  269 B.R. at 728.

and allow the corporation to continue incurring more and more debt and become more and more insolvent"); *Schact v. Brown*, 711 F.2d 1343, 1350 (7th Cir. 1983) ("[T]he corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability").

41.    Here, Bankest began and continued to incur $170 million in debt through the issuance of debentures and a line of credit, debt that would not have been incurred absent the five grossly negligent audits in which BDO verified assets that did not exist and failed to detect the fraud it was duty-bound to detect.  (Compl. ¶¶ 20, 56, 57, 79, 87-89.)  These allegations suffice to plead injury.  *In re Flagship Healthcare*, 269 B.R. at 728.

### D.    Bankest is asserting its own rights, not those of a third party.

42.    BDO also argues that Freeman lacks standing because he is asserting claims belonging to Bankest's creditors.  Not so.  The claims asserted against BDO are seeking recovery for injuries to Bankest, not Bankest's creditors.  *See* (Mot. at 16).  The obvious truth that the funds Freeman collects will ultimately flow to Bankest's creditors does not transform the debtor's claims into a claim that belongs to those creditors.[7]  *R.F. Lafferty & Co., Inc.*, 267 F.3d at 349 \ ("Simply because the creditors of a[n] estate may be the primary or even the only beneficiaries of such a recovery does not transform the action into a suit by the creditors." (alteration in original)); *In re Plaza Mortg.*, 187 B.R. at 41-42 ("To find that the trustee has no standing to pursue causes of action belonging to the debtor because the recovery would only benefit the creditors is an absurd argument, given the fact that the trustee's goal is to make a distribution to creditors."); 11 U.S.C. § 726 (providing the manner in which the property of a bankruptcy estate shall be distributed to creditors).

---

[7] BDO also discusses cases where a trustee attempts to bring claims on behalf of a subset of creditors and cases where a trustee attempts to bring claims on behalf of all creditors generally—but that distinction is meaningless here because Bankest is bringing only claims that belong to the debtor.  (Mot. at 17-18.)

43.     BDO reads *Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416

(1972) and its progeny so broadly that they controvert this foundational principle.  Moreover,

*Caplin* is distinguishable on its face because there the trustee brought "a suit on behalf of

debenture holders against an indenture trustee" for the debtor's bondholders—claims that

undisputedly belonged to the debtor's creditors.  *Caplin*, 406 U.S. at 416, 425, 429 ("Nowhere

does petitioner argue that [the debtor] could make any claim against [the indenture trustee].").

Here, all of Bankest's counts in the Complaint are based upon duties owed to Bankest, not to

third parties.  BDO does not argue differently.[8]

44.     Specifically, Bankest is suing BDO on one count of professional malpractice for

grossly negligent audits and its failure to detect the fraud, a claim clearly belonging to the debtor

audit client.  *See O'Halloran*, 350 F.3d at 1202 (trustee "has standing to bring any suit that the

debtor could have instituted had it not been thrown into bankruptcy").  Bankest also asserts a

claim for aiding and abetting breach of fiduciary duty.  The fiduciary duty is owed by officers

and directors of the corporation to the entity, and BDO aided and abetted their breach of that

duty.  Only Bankest, the entity owed the fiduciary duty, has standing to sue for its breach.  *See In*

*re Caribbean K Line, Ltd.*, 288 B.R. 908, 918 (S.D. Fla. 2002) (trustee has standing to bring

---

[8]     To eliminate any doubt that *Caplin* does not apply, the three factors on which the *Caplin* court based its
decision, (Mot. at 16-17 (citing *Caplin*, 406 U.S. at 428-32)), are inapplicable here.  First, Plaintiff is not attempting
to "collect money not owed to the estate"; this action seeks recovery for Bankest's injuries, based on claims that
could not be brought by Bankest's creditors.  *Caplin*, 406 U.S. at 428.  Second, unlike the debtor and defendant in
*Caplin*, Bankest and BDO were not *in pari delicto*, as this Court already expressly found.  *See* (Summary Judgment
Order at 27).  Finally, although BESIL is bringing an action in state court, this action is not inconsistent with, or
duplicative of, that action or any other action Bankest's creditors may bring.  In its state court action, BESIL seeks
recovery for its injuries caused by BDO's breach of its duty to BESIL and the other plaintiffs—not Bankest.  *See*
(Compl. at ¶¶ 65-68, 70-71, 82, *BESIL v. BDO Seidman, LLP*, No. 04-14009 CA 36 (Fla. Cir. Ct. filed June 28,
2004) ("BDO intended that its audits reach and influence each of the Noteholders, BESIL, ESB Finance and Nassau
Bank.")).  Suits brought by different plaintiffs, alleging different injuries based on breaches of different duties, are
not duplicative, and each plaintiff has standing.  *See In re Latin Inv. Corp.*, 168 B.R. 1, 6 (Bankr. D.D.C. 1993)
("[I]nconsistent litigation results are no real threat because the trustee's causes of action arise out of conduct distinct
from that injuring individual creditors . . . .  The only effect of a recovery here will be to limit the amount individual
investors can recover if successful in a suit against defendants.").  The pending state court action in which BESIL is
asserting its own rights against BDO is no bar to Bankest, BDO's client, suing BDO to redress its injuries.

breach of fiduciary duty claim where "[t]he fiduciary duty at issue in this matter was owed simultaneously to both the insolvent corporation and the collective creditor body"). Similarly, Bankest is suing BDO for a securities violation by making a material misrepresentation that induced Bankest to decide to issue more debentures and *sell* securities, a claim Bankest's creditors cannot assert. *See Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373, 378 (S.D. Fla. 1999) (issuer of securities has standing to sue under Rule 10b-5). Finally, Bankest is suing BDO International for deceptive and unfair trade practices, based on BDO International's deceptive and unfair practices towards Bankest, not Bankest's creditors. (Compl. ¶¶ 74-75.)

### III.    **This Court Has Subject Matter Jurisdiction Over This Action.**

45.    BDO's arguments that this Court purportedly lacks subject matter jurisdiction are identical to those it raised in its Motion to Withdraw the Reference and Freeman incorporates by reference his Response to that Motion. As argued by Freeman in his Response, this Court has subject matter jurisdiction over this Adversary Proceeding because any recovery in this action will augment the estate and affect distributions to creditors. *In re Lemco Gypsum, Inc.,* 910 F.2d 784, 788 (11th Cir. 1990) (defining "related to" jurisdiction to include when claims "could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate"); *In re Boston Regional Medical Center,* 410 F.3d 100, 107 (1st Cir. 2005) (holding that when a debtor or its representative, like Freeman here, "commences litigation designed to marshal the debtor's assets for the benefit of its creditors pursuant to a liquidating plan of reorganization, the compass of related to jurisdiction persists undiminished after plan confirmation").

### IV.    **The Complaint States a Claim Under § 10(b) and Rule 10b-5.**

46.    BDO's conflict of interest provided not only the motive but the red flags to satisfy the pleading requirement of scienter. No case cited by BDO involves such a conflict. Even

absent the conflict, the Complaint pleads a sea of red flags demonstrating BDO's "severely reckless" conduct.  To state a claim under Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5 (collectively, "Rule 10b-5"), a plaintiff must show: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury."  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).  BDO moves to dismiss Freeman's 10b-5 claim on the grounds that the Complaint does not adequately allege scienter or that BDO's allegedly unlawful conduct was "in connection with" the sale of debenture notes.  (*See* Mot. at 29, 33.)  As demonstrated below, however, the allegations of the Complaint are sufficient to state a 10b-5 claim against each of the Defendants.

### A. The Complaint's allegations of BDO's severely reckless conduct are sufficient to allege scienter.

47.    BDO is wrong that Bankest must allege that BDO had "an actual intent to aid in the fraud."  (Mot. at 28.)  This is not the standard for pleading scienter in the Eleventh Circuit.  In fact, the Eleventh Circuit and one district court specifically have rejected the argument that plaintiffs asserting 10b-5 claims must allege "intentional misconduct or conscious misbehavior," *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F. Supp. 2d 1324, 1339 (N.D. Ga. 1998), and hold that "a showing of severe recklessness satisfies the scienter requirement" of Rule 10b-5.  *See also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir. 1999) (allegations that defendant "acted with a severely reckless state of mind still suffices to state a claim for civil liability under 10b-5").

48.    The Complaint satisfies the Eleventh Circuit standard for pleading scienter.  The Complaint alleges that BDO, and its lead partners on the Bankest audit, Lenner and Ellenberg,

intentionally ignored red flags that warranted further investigation.  These red flags included the

Capital Officers' refusal to provide documents necessary to the audit and that BDO should have

known that its strategic partner, Stratasys, could not possibly have had over $30 million in

accounts receivable as purported on Bankest's financial statements (Stratasys in fact had less

than $500,000).  (Compl. ¶¶ 37, 53.)

49.     BDO, Lenner and Ellenberg also each had a motive to turn a blind eye to the

fraud because by continuing to certify Bankest's financial statements, they could guarantee that

BDO would continue to receive revenue from its strategic partner Stratasys, revenue that was

reflected in Lenner and Ellenberg's compensation.  (*Id*. ¶ 4, 24-26, 38, 46-48, 51-53.)  Still

further, the magnitude of the fraud BDO failed to detect was so great such that scienter is

established. *See, e.g.*, (*id*. ¶¶ 2, 51.)

50.     These allegations establish that BDO's "accounting practices were so deficient

that the audit amounted to no audit at all," that BDO made "an egregious refusal to see the

obvious, or to investigate the doubtful" in conducting the audits and "that [BDO's] accounting

judgments . . . were such that no reasonable accountant would have made the same decision if

confronted with the same facts."  *In re Eagle Tech., Inc. Sec. Litig.*, 319 F. Supp. 2d 1318, 1326-

31 (S.D. Fla. 2004) (holding that plaintiff stated a claim under Rule 10b-5 when complaint

alleged that auditors ignored red flags and the magnitude of the fraud was significant (quoting *In

re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 154 (D. Mass. 2001)).

>         **B.**     **The Complaint alleges numerous red flags ignored by BDO and**
>                 **establishes BDO's scienter.**

51.     The Complaint's allegations that BDO's partnership with Stratasys gave BDO a

motive to turn a blind eye to the fraud and that as a result BDO consciously ignored red flags in

its audits of Bankest establishes scienter.  *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308,

1333 (M.D. Fla. 2002) (red flags are what would have put any "reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors"); *Bryant*, 187 F.3d at 1285 ("[M]otive and opportunity may be relevant to a showing of severe recklessness"). *In re Microstrategy, Inc. Secs. Litig.*, 115 F. Supp. 2d 620, 655 (E.D. Va. 2000) (auditor's partnership with audit client destroyed auditor's independence and created a motive to ignore indicia of fraud that supported an inference of scienter).

52.    BDO again mischaracterizes the applicable legal standard when it argues for dismissal of Freeman's 10b-5 claim because the Complaint does not allege that a red flag "tipped [BDO] off that there was a fraud afoot" at Bankest.[9]  (Mot. at 31.)  The scienter standard is severely reckless conduct, not actual knowledge of or intent to participate in the fraud.  *Bryant*, 187 F.3d at 1285.  Indeed, in evaluating allegations of red flags in the context of a 10b-5 claim against an auditor, courts recognize a "wide variety of alleged red flags" to find scienter, none of which are "specifically required or dispositive" because "each analysis of scienter relies heavily on the overall context."  *In re Spear & Jackson Secs. Litig.*, 399 F. Supp. 2d 1350, 1362-63 (S.D. Fla. 2005).[10]

---

[9] BDO supports its untenable position by taking a quote from *Ziemba* out of context and mischaracterizing it.  BDO states that the *Ziemba* court "dismiss[ed] because '. . . Plaintiffs have pointed to no 'tips,' letters or conversations raising inferences that [the auditor] knew of any fraud.'"  (Mot. at 30-31 (quoting *Ziemba*, 256 F.3d at 1210).)  BDO fails to note, however, the immediately following sentence: "Furthermore, Plaintiffs have pointed to no facts suggesting that C&L was severely reckless in not knowing about any fraud."  *Ziemba*, 256 F.3d at 1210.  Thus, the *Ziemba* court clearly contemplated that scienter could be alleged *either* by pointing to tip-offs giving rise to an inference of knowledge, *or* by pointing to red flags giving rise to an inference of severe recklessness.

[10] BDO also argues that because some of the red flags it ignored are a "re-hash" of alleged Generally Accepted Accounting Standard (GAAS) violations, it cannot establish scienter.  (Mot. at 30.)  The fact that a red flag may also constitute a violation of GAAS does not render it inadequate to plead scienter.  *See, e.g., In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d at 1337-38 (noting that a conflict of interest is a GAAS violation and can support an inference of scienter).  Indeed, because auditing standards are designed to ensure the accuracy of audits, it would be surprising if an auditor did not violate GAAS when it ignored a red flag.  Courts will reject as insufficient to establish scienter allegations of red flags that merely "re-hash violations of GAAP and GAAS" and show only "that later disclosed information would have been discovered earlier if the auditor had not violated GAAS."  *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d at 1363 (internal quotations omitted).  In this case, however, the Complaint identifies red flags—some of which included GAAS violations—ignored by BDO at the time of the Bankest audits such that BDO was severely reckless when it failed to investigate further and instead consciously decided to issue unqualified opinions warranting the accuracy of Bankest's financials.

1.    **BDO intentionally chose not to investigate when the Capital Officers refused to provide BDO with information necessary to prepare accurate financial statements.**

53.    BDO signed off on Bankest's financials as "free of material misstatement" even though Bankest—at the direction of the Capital Officers—repeatedly refused to provide BDO with the documents and information BDO deemed necessary to perform accurate audits. (Compl. ¶¶ 37, 47.)  Among the most egregious example of BDO's severely reckless conduct— unmentioned by BDO in its motion to dismiss—is that during BDO's first audit of Bankest one of the Capital Officers *refused* to provide BDO with the requested documentation, raising the suspicion of the audit manager who promptly terminated the audit.  (*Id.* ¶¶ 37-38.)  The audit resumed only because the decision to discontinue the audit was overridden by defendants Lenner and Ellenberg, the BDO partners responsible for the Bankest audit.  (*Id.* ¶¶ 5, 38.)  Lenner had a social relationship with Dominick Parlapiano, the Capital officer who refused to provide the requested information.  (*Id.* ¶ 24.)  Lenner informed the audit manager that Parlapiano, was an "important person in the community" and that the manager should be more "business orientated."  (*Id.* ¶ 38.)

54.    An allegation that an audit partner ignored indicia of fraud and continued an audit on the basis of his personal relationship with the audit client constitutes a red flag sufficient to plead scienter.  *In re Rent-way Secs. Litig.*, 209 F. Supp. 2d 493, 509 (W.D. Pa. 2002) (scienter alleged against auditor when employee who raised concerns regarding accuracy of client's information removed from audit by partner who had friendship with officer at client); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 280 (3d Cir. 2006) (noting that client's limitation of the scope of an audit is a strong indicator of fraud and reversing dismissal of a Rule 10b-5 claim against an outside auditor)**;** *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345,

1366 (N.D. Ga. 2005) (allegations that "defendants published statements when they knew facts

suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of

scienter" and state a 10b-5 claim (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir.

2002)).

> ### 2.    BDO "verified" $30 million Bankest reported in Stratasys accounts receivable although BDO knew Stratasys had less than a $1 million in sales.

55.    Allegations that BDO again deliberately chose to ignore a red flag when it

purported to "verify" $30 million of accounts receivable on Bankest's books it should have

known were fake also demonstrate the severely reckless conduct necessary to plead scienter.  *In

re Eagle Tech., Inc. Sec. Litig.*, 319 F. Supp. 2d at 1327 (severely reckless conduct established

when allegations demonstrate the auditor's "egregious refusal to see the obvious").

56.    The Complaint alleges that at the same time BDO was Bankest's auditor, it was

also the strategic partner of Stratasys, a Bankest factor client who sold Bankest accounts

receivable.  (Compl. ¶ 48.)  As Stratasys' partner, BDO—via Lenner, BDO's "Alliance Liaison

Partner" for Stratasys—had access to Stratasys' financial information.  (*Id*. ¶¶ 50, 52-53.)

Moreover, Lenner frequently met with Stratasys personnel.  (*Id*. ¶ 52.)  BDO also knew that

Stratasys could barely pay its licensing fees to BDO.  (*Id*. ¶ 53.)  Thus, BDO knew or should have

known Stratasys had less than $1 million in accounts receivable to sell to Bankest.  (*Id*.)

Allegations that an auditor had notice of a substantial discrepancy in the financial statements of

its audit client and ignored that red flag satisfy the pleading requirements for scienter.  *Carley

Capital*, 27 F. Supp. 2d at 1330, 1339 (access to financial information that demonstrated falsity

of financial statements creates a strong inference of scienter).

3.    **BDO repeatedly disregarded suspicious results when it purported to test Bankest's accounts receivable and reduced its level of scrutiny to match those results.**

57.    The Complaint also alleges in detail that when BDO obtained a suspicious result in testing the validity of Bankest's accounts receivable it chose to ignore that result and switch to a different—and less rigorous and reliable—test.  (Compl. ¶¶ 33-36, 39-43.)  Specifically, in verifying the existence of Bankest's accounts receivable, BDO could not obtain the necessary third-party confirmations that the receivables were good and valid.  (*Id.*)  BDO chose to apply consistently less rigorous tests, until ultimately BDO accepted verifications based on Bankest internal documents prepared by the Capital Officers.  (*Id.*)  Not only did BDO violate GAAS, by failing to verify Bankest's accounts receivable with information obtained from third parties independent from the audit client, but these allegations establish scienter because they demonstrate that BDO chose to "ignore the obvious" and conducted audits so deficient that they "amounted to no audit at all."  *In re Eagle Tech., Inc. Sec. Litig.*, 319 F. Supp. 2d at 1326-31.

58.    For example, in its 1998 audit, BDO determined that it needed to contact 29 account debtors to confirm that the accounts receivable listed as Bankest's primary asset actually existed.  Yet, inexplicably, BDO acquiesced when the Capital Officers requested that BDO not contact 22 of the 29 debtors.  (Compl. ¶ 33.)  Even when it switched to the "subsequent collections" test to verify Bankest's receivables, BDO *again* proceeded with the audit despite being denied access to proper evidence of payments from third parties—information necessary to perform that test.  (*Id.* ¶ 36.)

59.    In 1999, for example, BDO was able to obtain confirmation from only one vendor (*id.* ¶ 39), and incredibly BDO never verified Bankest's receivables with the account debtors who actually owed the purported debts.  (*Id.* ¶ 43.)  For its 2001 audit, BDO sent 48

confirmations and did not receive back a single one.  (*Id.*)  Rather than questioning these startling results, BDO gave up.  (*Id.* ¶ 35.)

60.     Ultimately, BDO claims to have relied on a "Agreed to Invoice" test in which the auditors simply examined a seller's invoice and compared it to the amount recorded on Bankest's own books—a test which did nothing but confirm that Bankest properly had recorded the amount it was purportedly owed and was a procedure that conveniently required no third party confirmation of the receivables whatsoever.  (*Id.* ¶¶ 40, 43.)  BDO used this "test" to certify the validity of Bankest's entire accounts receivable portfolio.  (*Id.*)

61.     BDO also never applied the GAAS mandated "greater scrutiny" when it verified the receivables Bankest purchased from its related parties Capital and Stratasys.  (*Id.* ¶¶ 4, 30, 81(c).)  The majority of Bankest's receivables were "re-factored" through Capital, meaning that Capital purchased the receivables and then re-sold them to Bankest.  (*Id.* ¶ 27.)  BDO, despite having a duty to Bankest to detect fraud, accepted without question the validity of transactions confirmed *by the same person for both Capital and Bankest.*  (*Id.* ¶ 30.)

62.     Bankest also listed as assets $30 million in purported receivables from Stratasys, whose CEO was also the CFO of Bankest, making Stratasys another related party for the purposes of GAAS.  (*Id.* ¶ 4.)  Again, even though BDO knew Bankest and Stratasys constituted related parties, BDO performed no additional testing of their transactions.  (*Id.* ¶ 81(c).)

63.     BDO argues that allegations that it failed to verify Bankest's accounts receivable are no different from the red flag found "insufficient" by the court in *Cheney v. Cyberguard Corp.*, No. 98-6879, 2000 WL 1140306 (S.D. Fla. July 31, 2000).  (Mot. at 31-32.)  In *Cheney*, however, the auditor "failed to directly contact [the company's] resellers and make inquiries regarding the terms of their payment obligations"; that is, the auditor negligently failed to take

steps that *would have* put it on notice that something was amiss.  *Cheney*, 2000 WL 1140306, at

*12.  Here, BDO actually took those steps, and obtained highly suspicious results when it

attempted to contact the vendors and their customers.  Thus BDO *was* on notice that something

was amiss—precisely the sort of red flag that courts consistently hold is adequate to allege

scienter under 10b-5.  *See, e.g.*, *In re Eagle Tech., Inc. Sec. Litig.*, 319 F. Supp. 2d at 1329.  As

in *Eagle Tech.*, "Plaintiffs are not pleading that 'later disclosed information' would have been

discovered earlier, but that information actually disclosed should have been investigated."  *Id.*

(distinguishing *Cheney* and finding that plaintiff had alleged facts giving rise to a strong

inference of scienter).

### 4.    BDO's motive to turn a blind eye to the fraud establishes scienter.

64.    BDO had every incentive to ignore these red flags.  BDO leveraged its

relationship with the Bankest officers into a "strategic partnership" with Stratasys, which

permitted BDO to share in Stratasys' revenues that BDO helped generate and paid BDO a

variety of consulting fees and fees for the use of BDO's logo.  (Compl. ¶¶ 48-50.)

65.    Not only did BDO's dual role as both Bankest's auditor and Stratasys' partner

violate the rule against auditor independence, *In re Microstrategy, Inc. Secs. Litig.*, 115 F. Supp.

2d at 655 (auditor's independence compromised when auditor and audit client formed

partnership and auditor earned licensing fees from client), but BDO's motive to turn a blind eye

to the fraud supports a finding that scienter is adequately pled.  *See Bryant*, 187 F.3d at 1285.

66.    At the same time BDO—as Bankest's auditor—was certifying that $30 million in

receivables Stratasys had sold to Bankest were genuine it—as Stratasys' strategic partner—was

profiting from the revenue generated by those receivables.  (Compl. ¶ 53).  Thus, as long as

Bankest had the unqualified audited financials necessary for it remain in business, BDO would

continue to generate audit fees from Bankest and revenue in the form of fees paid to BDO by Stratasys.  (*Id*. ¶¶ 49, 53.)  BDO's direct stake in the Bankest audit alleges motive and supports a finding of scienter.  *See, e.g.*, *In re Microstrategy, Inc. Secs. Litig*., 115 F. Supp. 2d at 655 (holding that auditor's partnership with and financial stake in audit client compromised independence and provided auditor with the "motive" to certify allegedly false financial statements necessary to find inference of scienter).

67.     Moreover, Lenner and Ellenberg also each had a similar motive that supports a finding of scienter:  their compensation was tied to the success of BDO's strategic partnerships, including the Stratasys partnership.  (*Id*. ¶ 51.)  BDO's, Lenner's and Ellenberg's conflicts of interest therefore "weigh heavily in favor of a finding of scienter."  *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d at 1337 (dismissing Rule 10b-5 claim in part because plaintiffs did not allege any "benefit that would enure to [the auditor] as a result of returning an audit favorable to Sunterra").

> **5.     The magnitude of the fraud—over 90% of Bankest's assets certified by BDO were fake—gives rise to an inference of scienter.**

68.     In addition to the red flags, the "sheer magnitude" of the fraud perpetrated on Bankest by the Capital Officers compels the conclusion that BDO was severely reckless in failing to discover it.  *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1345 (S.D. Fla. 1999).  Violations of accounting standards can give rise to a strong inference of scienter "when combined with a drastic overstatement of financial results."  *Carley Capital Group*, 27 F. Supp. 2d at 1339; *see also In re Eagle Tech., Inc. Sec. Litig.*, 319 F. Supp. 2d at 1326.  Thus, BDO's numerous GAAS violations and the massive scale of the fraud that BDO's audits concealed and BDO failed to detect—over $220 million of accounts receivable certified by BDO did not exist—creates an inference of scienter.  (Compl. ¶ 2.)  *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d

at 1345 ("[W]hen tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover the client's fraud raises an inference of scienter on the face of the pleading.").

C.    **BDO's fraud was in connection with the purchase or sale of securities.**

69.    The Complaint alleges that BDO's audited financials were provided to Bankest's investors in connection with their purchase of Bankest debenture notes and relied upon by the Bank Directors in authorizing Bankest's issuance of the debenture notes.  *See* (Compl. ¶115). BDO ignores recent Supreme Court precedent when it argues that these allegations fail to establish that BDO's severely reckless conduct as Bankest's auditor was in connection with the purchase or sale of Bankest debenture notes.  (Mot. at 33; BDO Int'l Mot. at 12-13.)  The Supreme Court has defined "in connection with" broadly to encompass any fraud that "coincide[s]" with a securities transaction.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 126 S. Ct. 1503, 1513 (2006).  This broad construction of the "in connection with" element has been applied to find 10b-5 claims against auditors adequately alleged when the auditor's representations were communicated to the investors.  *See, e.g., In re Enron Corp. Secs., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 584-85 (S.D. Tex. 2002).  Here, the Complaint's allegations that BDO knew or should have known that its unqualified audited financial statements were provided to the Bank Directors who authorized the issuance of the debenture notes and the investors who purchased the debenture notes satisfies the "in connection with" prong of a 10b-5 claim.  (Compl. ¶ 115); *Dabit*, 126 S. Ct. at 1513.

70.    BDO also relies on stale and non-binding precedent.  BDO points to four cases from outside the Eleventh Circuit, three of which hold that the "in connection with" requirement cannot be met if the plaintiff received full value for the securities, and then was injured by a subsequent misappropriation of the proceeds.  *See* (Mot. at 33).  This is not the law.  In *SEC v.*

*Zandford*, the Supreme Court rejected the argument that the misconduct at issue must take place

"within the context of a securities exchange" in order for it to be conduct prohibited by 10b-5.

535 U.S. 813, 821 (2002).

71.    In holding that a 10b-5 claim is stated even when the lawful sale or purchase of a

security "coincides" with a subsequent misappropriation of the value of that security, the

*Zandford* Court cited with approval the holding of *Superintendent of Ins. of N.Y. v. Bankers Life*

*& Casualty Co.*, 404 U.S. 6 (1971).  In *Bankers Life*, the Court found that a corporation could

state a 10b-5 claim based on allegations that its directors had been misled into authorizing the

sale of bonds believing that the corporation would receive the proceeds of the sale, finding that

the fact that those proceeds were misappropriated by someone other than the defendant was

"irrelevant."  *Id.* at 821-22.  Thus, BDO's argument seeking dismissal of Freeman's 10b-5 claim

because the Complaint alleges the Capital Officers defrauded Bankest also is irrelevant.

72.    BDO International cites the Supreme Court's decision in *Dura Pharmaceuticals,*

*Inc. v. Broudo*, to argue that Plaintiff has not alleged "loss causation" because its damages "were

directly caused by the Debtor's scheme to fraudulently funnel money out of the company."

(BDO Int'l Mot. at 12-13.)  This is simply BDO's "in connection with" argument by another

name.[11]  In *Dura Pharmaceuticals* the Court held that all that was required of a plaintiff who

seeks to recover an economic loss under 10b-5 claim is to "provide a defendant with some

indication of the loss and the causal connection that the plaintiff has in mind in the allegations of

his complaint."  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  The

---

[11] Moreover, the holdings of the other cases cited by BDO International, *Rochelle v. Marine Midland Grace Trust Co. of New York*, 535 F.2d 523, 529 (9th Cir. 1976) (stating that "the 'in connection with' requirement bleeds into the requirement that the plaintiff suffer some damages," and upholding dismissal of Rule 10b-5 claim because the company received full value and then "frittered away the funds") and *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985) (holding there was no loss causation because the injury occurred when the proceeds of the securities transactions were funneled out of the company), did not survive the Court's ruling in *Zandford* that it is "irrelevant"  that the funds raised by the sale of securities were misappropriated by someone other than the defendant.

allegations of the Complaint that Bankest lost in excess of $170 million as a result of BDO's certification of $220 million in fake accounts receivable as good and valid more than satisfies that standard. *See, e.g.,* (Compl. ¶ 2).

> ### V.   The Complaint States a Claim Under the Florida Deceptive and Unfair Practices Act.

73.    Freeman also asserts a claim under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 et seq. ("FDUTPA") against BDO International on the grounds that it controlled BDO Seidman (a factual finding affirmed by the Florida Court of Appeals)[12] and made series of representations guaranteeing the standards of each of its member firms, including BDO Seidman, which were deceptive and unconscionable.  BDO International relies on inapposite law to argue that Freeman's FDUTPA claim should be dismissed because the Complaint does not allege that Bankest suffered "actual damages," *i.e.* that the value of the services it received was less than the value of the services for which it bargained.  (BDO Int'l Mot. at 15.)

74.    BDO International's argument makes no sense.  The Complaint alleges that BDO performed a worthless audit, that Bankest paid BDO, as BDO International's agent, for that audit and requests recovery in the form of actual damages as part of the relief sought against all defendants, including BDO International.  (Compl. ¶¶ 27-47, 81(b), 112, 114.)  Nothing more is necessary to state a FDUTPA claim.  *See Tri-County Plumbing Servs., Inc. v. Brown*, 921 So. 2d

---

[12] Specifically, the Complaint alleges that when Bankest purchased audit services from BDO, it was paying in part for the supervisory services of BDO International.  (Compl. ¶ 74 ("Throughout the five years that Bankest employed BDO, it depended and relied on BDO International's branding, reputation and international presence . . . ."); *id*. ¶ 61 ("BDO International derives revenue from BDO Seidman . . . .").)  The Complaint also alleges that BDO International failed to provide the supervisory services it promised:  "BDO International did not adequately train, manage and control its BDO Florida auditing team to avoid these failures as it promised it would on its web site, in its annual reports, and in its promotional materials, and failed in its provision of professional accounting services." (Compl. ¶ 70.)

20, 22 (Fla. 3d DCA 2006) (upholding award of damages under FDUTPA where defendant's

"incomplete work was valueless" to plaintiff).

75.     BDO International relies on cases in which courts reviewed whether actual

damages had been proven at trial.  *See, e.g., Himes v. Brown & Co. Secs. Co.*, 518 So. 2d 937

(Fla. 3d DCA 1988) (reversing judgment for plaintiff on FDUTPA claim when plaintiff failed to

prove any out of pocket damages).  These cases are inapplicable on a motion to dismiss and

BDO International's argument fails.[13]  *Samuels v.  King Motor Co.*, 782 So. 2d 489 (Fla. 4th

DCA 2001) (denying motion to dismiss FDUPTA claim and holding that FDTUPA is to be

"liberally construed").

### VI.     Leave to Amend Any Pleading Deficiencies Should Be Granted.

76.     If the Court determines that the allegations of the Complaint are deficient, leave to

amend should be granted.  *Bryant*, 252 F.3d at 1164 (reversing denial of leave to amend

complaint when plaintiff previously not given opportunity to amend).

### CONCLUSION

77.     For the foregoing reasons, the motions of BDO Seidman, LLP, BDO

International, Sandor Lenner and Keith Ellenberg to dismiss the Complaint should be denied.

Dated this 11th day of July, 2006                WARREN R. TRAZENFELD, PA
                                                 *Attorneys for Plaintiff*
                                                 3225 Aviation Avenue, Suite 600
                                                 Miami, Florida 33133-4741
                                                 (305) 860-1100
                                                 (305) 858-6123 Fax

                                                 and

---

[13] BDO International also argues that Bankest did not incur losses under the deepening insolvency theory.  (BDO Int'l Mot. at 16.)  As explained in Parts II.A-B, *supra*, that is incorrect.

GENOVESE JOBLOVE & BATTISTA, P.A.
Co- Counsel for Plaintiff
Bank of America Tower, Suite 4400
100 Southeast Second Street
Miami, FL 33131
Tel.  (305) 349-2300
Fax. (305) 349-2310


By:    /s/ Paul J. Battista
       Paul J. Battista, Esq.
       Florida Bar No. 884162
       Allison R. Day, Esq.
       Florida Bar No. 494097


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by U.S. mail, postage prepaid and/or electronic mail upon all parties on the attached Service List, this 11[h] day of July, 2006.


       /s/ Paul J. Battista
       Paul J. Battista

## Service List

Daniel A. Miller, Esq.
Broad & Cassel
One North Clematis Street, Suite 500
West Palm Beach, FL 33401

Kevin W. Goering, Esq.
Lisa M. Lewis, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
30 Rockefeller Plaza, 24th Floor
New York, NY 10112

John B. Hutton, Esq.
Greenberg Traurig, P.A.
1221 Brickell Ave.
Miami, FL 33131

Karen Y. Bitar, Esq./Adam D. Cole, Esq.
Greenberg Traurig, P.A.
885 Third Ave.
New York, NY 10166

Daniel F. Blonsky, Esq.
Burlington, Weil, Schweip, Kaplan & Blonsky, P.A.
Office in the Grove, Penthouse A
2699 South Bayshore Drive
Miami, FL 33133

Office of the U.S. Trustee
51 S.W. First Ave., Room 1204
Miami, FL 33130