# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                      Case No. 04-17602-BKC-AJC

E.S. BANKEST, L.C.,

_____ Debtor _____/

LEWIS B. FREEMAN, Responsible Officer          Adv. Pro. No. 06-01220-BKC-AJC-A
for the Reorganized Debtor E.S. Bankest,
L.C., a Florida limited liability corporation,

                     Plaintiff,

v.

BDO SEIDMAN, LLP, BDO
INTERNATIONAL B.V., SANDOR
LENNER and KEITH ELLENBERG,

_____ Defendants. _____/


## DEFENDANT BDO GLOBAL COORDINATION BV'S  UNOPPOSED MOTION FOR LEAVE TO AMEND ITS ANSWER TO THE COMPLAINT
## AND
## INCORPORATED MEMORANDUM OF LAW

Defendant BDO Global Coordination B.V.[1] ("BDO BV") respectfully submits its

Unopposed Motion for Leave to Amend Its Answer to the Complaint and Incorporated

Memorandum of Law in support of its motion for an order,[2] pursuant to Federal Rules of Civil

Procedure ("FRCP" or "Rules") 15(a), 16(b), Federal Rules of Bankruptcy Procedure ("FRBP")

§ 7015 and Local Bankruptcy Rule 9013-1(C)(1), granting BDO BV leave to amend its answer

to Plaintiff's complaint, to assert the affirmative defenses of *res judicata* and collateral estoppel;

---

[1] BDO Global Coordination B.V. was formerly known as BDO International B.V.

[2] A proposed order is attached as Exhibit 3.

the attached Declaration of Mark F. Raymond, Esq. in support of its motion, sworn to on March

23, 2007, ("Raymond Decl." (attached as Exhibit 1)); and the exhibits annexed thereto.  For all

of the reasons set forth herein, BDO BV respectfully requests that its unopposed motion be

granted.

## PRELIMINARY STATEMENT

Defendant BDO BV seeks leave to amend its answer to assert the affirmative defenses of

*res judicata* and collateral estoppel on the basis of a final judgment issued in favor of BDO BV

in the Florida State Court action of *Banco Espirito Santo International, Ltd., et al.  v. BDO*

*Seidman, LLP, et al.*, Case No. 04-14009 CA 31 ("State Court Action").  The final judgment for

directed verdict on the issue of agency was entered approximately 3 weeks ago by the Court in

the State Court Action.  At the time that BDO BV answered the Complaint in this action, the

affirmative defenses of *res judicata* and collateral estoppel were not available to BDO BV.  In

light of the recent judgment, BDO BV now has good cause, pursuant to Rules 15(a) and 16(b), to

seek to amend its answer to add these new defenses.

Counsel for BDO BV has communicated with Warren R. Tranzenfeld, Esq., counsel for

Plaintiff, regarding this motion. Mr. Tranzenfeld advised that Plaintiff consented to filing the

amended answer.

## STATEMENT OF FACTS

### A.    The State Court Action

On June 28, 2004, Banco Espirito Santo International, Ltd. ("BESIL"), ESB Finance,

Ltd. ("ESB Finance") and Banco Espirito Santo S.A (Nassau Branch) ("Nassau Branch")

(collectively "State Court Plaintiffs"), filed a Complaint in the State Court Action against BDO

Seidman, LLP ("BDO Seidman") and BDO BV asserting only one cause of action for "Professional Negligence, *i.e.* Malpractice." The Complaint was later amended with the filing of a First Amended Complaint (the "State Court Action Complaint") on or about July 7, 2006. *See* Raymond Decl. ¶ 3, Exhibit A at ¶¶ 76-83. The claims in the State Court Action Complaint arose from allegations that BDO Seidman was negligent in providing auditing and accounting services to E.S. Bankest, L.C. ("Bankest") between 1998 and 2003 by failing to detect a fraud perpetrated by the principals of Bankest. *Id.* The State Court Plaintiffs sought judgment for "actual compensatory and consequential" damages from both BDO Seidman and BDO BV of over $170 million. *Id.* at ¶ 83 and Prayer for Relief. However, the claims against BDO BV were later limited by the Court strictly to "a theory of actual agency." *See* Raymond Decl. ¶ 4-5, Exhibit B (Order dated July 8, 2005).

In January 2007, the State Court Action proceeded to trial and, on February 27, 2007, State Court Judge Jose Rodriguez granted BDO BV's motion for directed verdict. *See* Raymond Decl. ¶ 6, Ex. C (Order entered February 27, 2007). In granting the directed verdict, the Court found that the State Court Plaintiffs failed to introduce evidence establishing the elements of its agency claim against BDO BV. *See id.*

## B. Adversary Proceeding

On February 23, 2006, Bankest's Responsible Officer, Lewis Freeman, filed this Adversary Proceeding in Bankruptcy Court ("Adversary Proceeding"). *See* Raymond Decl. ¶ 7, Exhibit D (Adversary Complaint). In the Adversary Proceeding, Freeman seeks to recover the same $170 million in damages that were sought by the State Court Plaintiffs. *Id.* at ¶¶ 77-116. The Adversary Complaint asserts the following five claims on behalf of Bankest against BDO BV: (1) professional malpractice (Count I); (2) vicarious liability as principal of agent Seidman

(Count II); (3) deceptive and unfair trade practices (Count III); (4) aiding and abetting breach of fiduciary duty (Count IV); and (5) violation of U.S. Securities Law (Count V) (the "Securities Fraud Claim"). *Id.*   Nearly all of Bankest's claims against BDO BV are based upon alleged vicarious liability for the accounting services provided by BDO Seidman – the very same accounting services that were the subject of the State Court Action. *Id.* at   ¶¶ 69-76.

On or about October 9, 2006, BDO BV filed its Answer to the Adversary Complaint and asserted a number of affirmative defenses.  At that time, the directed verdict had not yet been entered and BDO BV could not have asserted the affirmative defenses of *res judicata* or collateral estoppel. *See* Raymond Decl. ¶ 8,  Exhibit E (Answer).

On October 12, 2006, the Bankruptcy Court entered an Amended Order Setting Filing Disclosure Requirements for Pretrial and Trial ("Pretrial Order"), thereby placing the Adversary Proceeding on the court calendar. *See* Raymond Decl. ¶ 9, Exhibit F (Scheduling Order).  On February 28, 2007, Plaintiff filed a Motion to Extend Time for Parties to Comply with Certain Disclosure Requirements and Request Status Conference ("Motion to Extend"), in which it seeks to have all deadlines set forth in the Pretrial Order extended until the completion of the State Court Action. *See* Raymond Decl. ¶ 10.  The Bankruptcy Court has set a hearing on Plaintiff's Motion to Extend for March 28, 2007 at 10:00 a.m. *See id.*

## DISCUSSION

### A.    Defendant BDO BV has Good Cause to Amend its Answer

Federal Rule of Civil Procedure 15(a) provides that "leave [to amend a pleading] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).  Moreover, the Federal Rules of Bankruptcy specifically state that Rule 15(a) applies to adversary proceedings. Fed. R. Bankr. P. § 7015; *see also Kontrick v. Ryan*, 540 U.S. 443, 445, 124 S.Ct. 906, 909 (2004) (discussing that

Fed. Rule Civ. Proc. 15 (a) has been made applicable to adversary proceedings by FRBP §

7015). When a motion to amend is made after the Court establishes a pretrial scheduling order,

the moving party "must first demonstrate good cause under Rule 16(b) before [the court] will

consider whether amendment is proper under Rule 15(a)." *Sosa v. Airprint Sys., Inc.*, 133 F.3d

1417, 1419 (11th Cir. 1998).    In order to establish good cause, the movant must show

"compelling reasons" why the proposed amendment could not have been presented earlier. *See*

*Hargett    v.    Valley    Fed.    Sav.    Bank,*    60    F.3d    754,    761    (11th    Cir.    1995).

BDO BV has a compelling reason why it could not assert the affirmative defenses of *res*

*judicata* and collateral estoppel at the time it filed its answer.  In order to succeed on the

affirmative defenses of *res judicata* and collateral estoppel, a party must establish that the same

issues or claims alleged in the current action were already adjudged in a previous action.  See

*Rhyne v. Miami-Dade Water and Sewer Authority*, 402 So. 2d 54,  (Fla. 3d DCA 1981) ("the

doctrine of *res judicata* bars a second action between the same parties or their privies on the

same issues decided below");  *see also Quinn v. Monroe County*, 330 F.3d 1320 (11th Cir. 2003)

(listing the elements of collateral estoppel: "(1) identical issue, (2) has been fully litigated, (3) by

the same parties or their privies, and (4) *final decision has been rendered by a court of competent*

*jurisdiction*") (emphasis added).  At the time BDO BV filed its Answer, final judgment had not

yet been rendered in BDO BV's favor in the State Court Action and, therefore, BDO BV could

not have asserted *res judicata* and collateral estoppel in its Answer.  As a result, BDO BV has

good cause under Rule 16(b) to seek leave to amend its Answer and to assert the new affirmative

defenses of *res judicata* and collateral estoppel. *See e.g. McKibben v. Zamora*, 358 So.2d 866,

868 (Fla. 3rd DCA 1978) (noting that defendants were permitted to amend answer in second

action to assert affirmative defenses of *res judicata* and collateral estoppel after issuance of a final judgment in first action).

**B.    The Federal Rules of Civil Procedure Provide that Leave to Amend an Answer Shall be Freely Granted**

Courts have typically found that "amendments to add claims are to be granted more freely than claims to add new parties." *Cox v. Krueger Intern., Inc.*, No. 6:05-cv-1210-Orl-18 (JGG), 2007 WL 430726, at *1 (M.D. Fla. 2007) (citations omitted). Moreover, "[t]he Court views amendments to add affirmative defenses as being analogous to amendments to add claims." *Cox*, 2007 WL 430726, at *1.

Here, because of the liberal amendment policy of Rule 15(a), and since BDO BV is merely seeking to add defenses, BDO BV should be permitted to amend its Answer to assert the affirmative defenses of *res judicata* and collateral estoppel. As discussed above, at the time it filed its Answer, the affirmative defenses of *res judicata* and collateral estoppel were not available to BDO BV. Now that a final judgment has been rendered in the State Court Action, the defenses are available to BDO BV and these defenses could potentially preclude litigation of the claims asserted by Plaintiff.

**C.    The Factors that Court's Typically Rely Upon to Deny Requests to Amend Pleadings do not Exist in this Action**

While Rule 15(a) provides for the liberal amendment of pleadings, a Court may deny leave to amend when the proposed amendment is sought "after undue delay . . . [for] bad faith or dilatory motive, if the amendment would cause [Plaintiff] undue prejudice, or if the amendment would be futile" *Edwards v. Niles Sales & Service, Inc.*, 439 F. Supp. 2d 1202, 1209 (M.D. Fla. 2006) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962).

In this case, none of the potential reasons for denying the proposed amendments exist. First, BDO BV has not unduly delayed its request for leave to amend. The final judgment in favor of BDO BV in the State Court Action was only rendered on February 27, 2007, less than three weeks ago. Bringing this request now could hardly be considered undue delay. *See e.g. In re NuMed Home Health Care, Inc.*, 326 B.R. 859, 865 (Bankr. M.D. Fla. 2005) (granting leave to amend and finding that a delay of *3 ½ months*, in seeking leave to amend, was reasonable) (emphasis added). Second, BDO BV has not exhibited any bad faith in bringing this request now since this is the earliest occasion on which the claims could have been brought. Third, the addition of these affirmative defenses will not unduly prejudice Plaintiff because BDO BV did not delay its request for leave, Plaintiff was already on notice of the judgment in the State Court Action and no additional discovery will be needed to defend these claims since Plaintiff is already privy to the relevant documents and orders from the State Court Action. To the contrary, if these additional affirmative defenses are not permitted, it will be BDO BV who is prejudiced because it will be forced to relitigate the exact same issue, brought by the same parties, a second time. Finally, the proposed amendments are not futile because they are potentially dispositive of Plaintiff's claims against BDO BV.

## CONCLUSION

For the aforementioned reasons Defendant BDO BV respectfully requests that the Court issue an order granting Defendant BDO BV leave to amend its Answer and directing that the proposed First Amended Answer, attached as Exhibit 2 to the BDO BV's Unopposed Motion for Leave to Amend its Answer, shall be deemed filed and served as of March 23, 2007.

Dated: Miami, Florida
      March 23, 2007

## CERTIFICATION PURSUANT TO LOCAL RULE 9013-1(c)(1)

I HEREBY CERTIFY that Plaintiff, the affected party, has consented to the requested relief.

I FURTHER CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court as set forth in Local Rule 2090-1(A).

Respectfully submitted,

BROAD AND CASSEL
Attorneys for Defendant, BDO International
B.V., n/k/a BDO Global Coordination B.V.
One Biscayne Tower, 21st Floor
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone: 305.373.9400
Facsimile: 305.995.6385

By: _____
Rhett Traband, P.A.
Florida Bar No. 0028894

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Kevin W. Goering, Esq., admitted *pro hac vice*
Lisa M. Lewis, Esq., admitted *pro hac vice*
Attorneys for Defendant, BDO International
B.V., n/k/a BDO Global Coordination B.V.
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
Telephone: 212.332.3800
Facsimile: 212.332.3888

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 23, 2007 I filed the foregoing document with the Clerk. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified in the attached Service List in the manner specified.

Rhett Traband, P.A.
Florida Bar No. 0028894
rtraband@broadandcassel.com

## SERVICE LIST

**Warren R. Tranzenfeld, Esq.**
Warren R. Tranzenfeld, P.A.
3225 Aviation Avenue, Suite 600
Miami, Florida 33133
(By U.S. Mail )

**Daniel F. Blonsky, Esq.**
Burlington, Schwiep, Kaplan & Blonsky, P.A.
2699 S. Bayshore Drive, Penthouse A
Miami, Florida 33133
(By U.S. Mail)

**Karen Y. Bitar, Esq.**
**Adam D. Cole, Esq.**
Greenberg Traurig, LLP
885 Third Avenue
New York, New York 10022
(By U.S. Mail)

**John B. Hutton, Esq.**
Greenberg Traurig, LLP
1221 Brickell Avenue
Miami, Florida 33131
(By U.S. Mail)

# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                                    Case No. 04-17602-BKC-AJC

E.S. BANKEST, L.C.,

_____Debtor_____/

LEWIS B. FREEMAN, Responsible Officer          Adv. Pro. No. 06-01220-BKC-AJC-A
for the Reorganized Debtor E.S. Bankest,
L.C., a Florida limited liability corporation,

                      Plaintiff,

v.

BDO SEIDMAN, LLP, BDO
INTERNATIONAL B.V., SANDOR
LENNER and KEITH ELLENBERG,

_____Defendants._____/

## DECLARATION OF MARK F. RAYMOND IN SUPPORT OF DEFENDANT BDO GLOBAL COORDINATION B.V.'S UNOPPOSED MOTION FOR LEAVE TO AMEND ITS ANSWER

      I, Mark F. Raymond, being duly sworn, declare under penalty of perjury that the foregoing is true and correct and state as follows:

      1.      I am an partner in the law firm Broad and Cassel, attorneys for Defendant BDO International B.V. n/ka BDO Global Coordination B.V. ("BDO BV"). I submit this Declaration in support of BDO BV's motion for an order granting BDO BV leave to amend its answer in this action and directing that the proposed First Amended Answer, attached as Exhibit 2 to the Motion, shall be deemed filed and served as of March 23, 2007.

2.      I am fully familiar with the facts and circumstances set forth herein.   This Declaration is based upon my personal knowledge and my review of the relevant documents in this case.

3.      Attached as Exhibit A is a true and correct copy of the First Amended Complaint filed on or about July 7, 2006, in the Florida State Court action of *Banco Espirito Santo International, Ltd., et al. v. BDO Seidman, LLP, et al.*, Case No. 04-14009 CA 31 ("State Court Action").

4.      On March 29, 2005, BDO BV moved to dismiss the Complaint in the State Court Action for failure to state a cause of action against BDO BV, arguing that the Complaint did not allege sufficient facts to establish that BDO BV provided professional services in Florida or that it owed any duty to Plaintiffs.   On April 27, 2005, the parties entered into an Agreed Order converting BDO BV's motion to dismiss for failure to state a cause of action into a motion for judgment on the pleadings.   On July 8, 2005, the Court denied BDO BV's motion for judgment on the pleadings, but expressly limited Plaintiffs' claim against BDO BV strictly to "a theory of actual agency."

5.      Attached as Exhibit B is a true and correct copy of the order entered in the State Court Action on July 8, 2005, limiting Plaintiffs' claims against BDO BV strictly to "a theory of actual agency."

6.      Attached as Exhibit C is a true and correct copy of the Order entered by Judge Jose Rodriguez in the State Court Action on February 27, 2007, granting BDO BV's motion for a directed verdict.

7.    Attached as Exhibit D is a true and correct copy of the complaint filed on February 23, 2006, in the United States Bankruptcy Court for the Southern District of Florida, in the action of *In re E.S. Bankest L.C.,* Case No. 04-17602-BAK-AJC ("Adversary Proceeding").

8.    Attached as Exhibit E is a true and correct copy of the answer filed by BDO Global in this Adversary Proceeding.

9.    Attached as Exhibit F is a true and correct copy of the Order entered on October 12, 2006 by this Court "Setting Filing Disclosure Requirements for Pretrial and Trial" ("Pretrial Order"), thereby placing the Adversary Proceeding on the court calendar.

10.    On February 28, 2007, Plaintiff filed a Motion to Extend Time for Parties to Comply with Certain Disclosure Requirements and Request Status Conference ("Motion to Extend"), in which it seeks to have all deadlines set forth in the Pretrial Order extended until the completion of the State Court Action.  The Court has set a hearing on Plaintiff's Motion to Extend for March 28, 2007 at 10:00 a.m.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I executed this declaration on March 23, 2007 at Miami, Florida.

Mark F. Raymond

# EXHIBIT A

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

BANCO ESPIRITO SANTO      )    Case No. 04-14009 CA 31
INTERNATIONAL, LTD., ESB     )
FINANCE, LTD. and BANCO      )
ESPIRITO SANTO S.A. (Nassau   )
Branch),                       )
                           )
         Plaintiffs,       )
                           )
   vs.                     )
                           )
BDO SEIDMAN, LLP and BDO    )
INTERNATIONAL B.V.,       )
                           )
        Defendants.     )
                           )

## FIRST AMENDED COMPLAINT

      Plaintiffs Banco Espirito Santo International, Ltd. ("BESIL"), ESB Finance, Ltd. ("ESB

Finance") and Banco Espirito Santo S.A. (Nassau Branch) ("Nassau Bank"), by and through

their attorneys and for their Complaint against defendants BDO Seidman, LLP and BDO

International B.V. (together, "BDO"), allege, upon knowledge as to themselves and their conduct

and information and belief as to all other matters, as follows:

### INTRODUCTION

    1.     As is now clear in the post-Enron, post-Arthur Andersen world, accounting is

supposed to be a profession, which means that accountants' rich compensation comes with

corresponding duties to follow the industry's rules. These rules exist to protect those who rely

on the accountants' work.

    2.     BDO violated its duties and harmed those its profession is designed to protect. It

rubber-stamped four years worth of obviously false financial statements, causing plaintiffs to be

bilked out of more than $170 million. Moreover, BDO did so while it was — or because it was — a strategic ally of an affiliated company that was used to falsify the very financials BDO was "independently" auditing.

3.      E.S. Bankest L.C. ("Bankest") was formed in 1998 by Espirito Santo Bank ("Bank") and Bankest Capital Corporation ("Capital"). Pursuant to the formation agreements entered into by the Bank and Capital, Capital's management, Hector Orlansky, Eduardo Orlansky, Dominick Parlapiano and Peter Stanham (collectively, the "Principals"), were entrusted with the day-to-day management of Bankest. Bankest's business was supposed to be "factoring" — the purchase of accounts receivable at a discount to their face value. Bankest was supposed to earn money through factoring fees, interest and the spread between the receivables' invoiced face amount and the discount price paid for the receivables.

4.      However, Bankest did almost no legitimate factoring and was instead used as a vehicle to funnel money from the Bank's investor clients to the Principals. The scheme was straightforward:  using BDO audited financials, Bankest debenture notes were placed with individual clients of the Bank ("Noteholders") and ultimately with Plaintiffs; Capital created a series of inflated or non-existent receivables from shell or start-up companies which it then sold (or arranged for the sale of) to Bankest. The Noteholders ended up holding worthless notes secured by the falsified and equally-worthless receivables, while Capital ended up with the Noteholders' cash. By the time the Principals were indicted by a Grand Jury on December 4, 2003, they had mined in excess of $170 million out of Bankest, which they had invested in start-up companies, filtered out to its strategic alliance partners, or simply absconded with.

5.      Because their scheme was so transparent, Capital and its Principals required the cooperation and/or tacit agreement of several persons, but none more than its independent

auditors. Bankest was contractually required to provide annual audited financial statements to its shareholders, and its business plan confirmed that these audited financials would be used to attract and be relied on by lenders to finance the business. Accordingly, the Principals needed an independent auditor who would either not discover its manipulations of the accounts receivable or else look the other way when it falsified its financial statements.

6.       The Principals found their shill in BDO. In conducting its audits of Bankest's financial statements for the years ended 1998 through 2002, BDO ignored required auditing procedures and a series of red flags highlighting the Principals' deceptions, including that Bankest: (a) provided little or no information about the entities from whom it was purportedly purchasing receivables, including the supposed $50 million per year T-shirt manufacturer that was its largest "client"; (b) received little or no confirmation of the debts owed from any of the supposedly factored companies; (c) could produce few or no bank records supporting the deposits Capital claimed debtors were making in Bankest's accounts; (d) produced no evidence of any internal standards of underwriting; (e) was allegedly processing some $200 million in receivables with only four employees in its accounting department; and (f) showed on paper a doubling of its factoring business each calendar year. In so doing, BDO abandoned its stated, contractual goal of "provid[ing] reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements" and ignored its own determination that Bankest was a "sensitive" or high risk client.

7.       Worse still, BDO's ignorance proved voluntary. During the conduct of its first audit for Bankest, BDO, as it was obliged, noted and raised several documentation issues with the Principals and sought additional backup materials for testing. When the Principals protested, however, and BDO was faced with the threat of losing Bankest's business, BDO buckled; it

144890-1                                                          3

accepted without protest the Principals' steadfast refusal to provide Capital's basic banking records that BDO had deemed necessary for the conduct of the audits; BDO relied, often exclusively, on summary financial information provided by the Principals; it accepted audit test results signed by the Principals (or others controlled by them) instead of the independent, third-party companies that allegedly owed the debts; it ignored a series of scope violations when denied access to Capital's records and personnel; it declined adequately to test nearly every material account receivable and ignored basic (and generally accepted) auditing standards in the conduct of its audits.

8.      Finally, BDO's ignorance was financially motivated.  BDO was, by agreement, a strategic ally of StrataSys Group LLC ("StrataSys"), one of the principal companies for which Bankest supposedly factored receivables and which was owned by Dominick Parlapiano, one of the Principals.  Bankest purported to factor over $40 million worth of StrataSys receivables, but in fact StrataSys had no real receivables and negligible sales.  Instead, StrataSys used the more than $40 million in checks and wire transfers it received from Bankest to fund its operations, including by paying BDO "licensing fees," "methodology fees," "management fees," "business development revenues," and "product development revenues."  Not surprisingly, and despite having full access to StrataSys's books and records, BDO never discovered — or at least never disclosed — that the financials showing fictitious receivables being factored from StrataSys were fraudulent.

9.      In short, BDO sacrificed its professional responsibilities for money.  In so doing, BDO reneged on its obligations as professionals to profound effect:  it cost the persons who relied on BDO — and who BDO knew would be relying on it — in excess of $170 million.  By this action, those persons, plaintiffs, seek to hold BDO accountable for that loss.

## PARTIES, JURSIDCTION AND VENUE

10.     Plaintiff Banco Espirito Santo International, Ltd. is a corporation organized under the laws of the Cayman Islands with its principal place of business in Grand Cayman, British West Indies.

11.     Plaintiff ESB Finance, Ltd. is a corporation organized under the laws of the British Virgin Islands with its principal place of business in Lausanne, Switzerland.

12.     Plaintiff Banco Espirito Santo S.A. (Nassau Branch) is a corporation organized under the laws of Portugal with its principal place of business in Nassau, Bahamas.

13.     Defendant BDO Seidman, LLP ("BDO Seidman") is a professional accounting firm organized as a limited liability partnership under the laws of the State of New York and registered in Florida as a foreign limited liability partnership.  BDO Seidman provides assurance, tax, financial advisory, and consulting services out of 37 offices including an office in Miami, Florida.  As a member firm of BDO International, BDO Seidman serves clients by leveraging a global distribution network of resources comprised of nearly 600 member firm offices in 99 countries.  BDO Seidman is a citizen of Florida because partners of BDO Seidman reside here.

14.     Defendant BDO International B.V. ("BDO International") is a corporation organized under the laws of the Netherlands with its principal place of business in Brussels, Belgium.  BDO International is one of the five largest multinational accounting and consultancy firms, and operates in 99 countries through its member firms, including BDO Seidman in the United States.  BDO International reports its revenues on a worldwide basis and, as admitted on its web site, considers the clients of its member firms to be clients of BDO International, and the work of its member firms to be its own.

144890-1                                         5

15.    BDO International's contacts with Florida are regular, profitable and purposeful. As alleged in the complaint, BDO International derives revenue from BDO Seidman, including BDO Seidman's Florida offices, for its marketing and quality control functions, and clients of BDO Seidman are considered clients of BDO International.   International's Chief Executive Officers have conceded that "the business of International . . . is conducted in each country where International is represented."   Moreover, as part of its marketing function, BDO International maintains a web site on which it represents to Florida residents that it supports its American offices, and ensures consistency of representation throughout each of its member firms by providing an "internationally available suite of software" as well as "model checklists and financial statements," producing a "world wide [audit] procedures Manual," and subjecting "[a]ll member countries . . . to regular practice inspections to ensure these standards are being adhered to."   In short, BDO International purports to "set standards on such matters as independence, confidentiality, training requirements and quality control" as to all its member firms including BDO Seidman — the very quality controls that are the subject of this Complaint.

16.    This Court has subject matter jurisdiction over this action because the amount in controversy exceeds $15,000 exclusive of interest, costs, and attorneys' fees.  This Court has *in personam* jurisdiction over BDO Seidman LLP because it conducts business and maintains its business address at 100 S.E. 2nd Street, Miami, Florida, and has *in personam* jurisdiction over BDO International, B.V. pursuant to Fla. Stat. § 48.193.

17.    Venue is proper in this circuit because the cause of action accrued in Miami-Dade County, Florida.

## SUBSTANTIVE ALLEGATIONS

A.    **The Relationship Between Bankest, Capital and the Bank**

18.    Bankest was formed in March 1998 pursuant to the Shareholders' Agreement executed by Capital and the Bank ("Shareholders' Agreement"). Per that agreement, together with the remaining formation documents executed concurrently therewith, the Bank and Capital each initially owned 50% of the outstanding shares of Bankest. Bankest's business model purportedly was to obtain capital through the issuance of debenture notes and then to use the capital to purchase receivables to factor.

19.    From inception, the respective responsibilities of Bankest's two shareholders were clear. Prior to the formation of Bankest, Capital had for many years engaged in the commercial factoring business in its own name and through its wholly owned subsidiary, Bankest Receivables Finance and Factoring Corp. ("BRFFC"). Accordingly, and at Capital's request, the Shareholders Agreement provided that the day-to-day management of Bankest would be entrusted to Capital's Principals, Eduardo Orlansky, Hector Orlansky, Dominick Parlapiano and Peter Stanham.

20.    Also per the Shareholders' Agreement, funding for Bankest would be provided pursuant to the issuance of debenture notes. Individual clients of the Bank and some of its affiliates were provided Private Placement Memoranda describing the business of Bankest and Bankest financials audited by BDO. The Bank agreed to use its best efforts to place the debentures described in the placement memorandum (the "Debenture Notes") issued by Bankest to various individuals, who would then, per plan, advance and loan money to Bankest. By September 2002, Bankest had approximately $140 million dollars outstanding under the

Debenture Notes. The Debenture Notes were secured by a blanket assignment of the accounts receivable purchased by Bankest.

21.    In addition, the Nassau Bank, also in reliance upon the integrity of BDO's audited financials, and with BDO's knowledge, extended a $30 million dollar line of credit to Bankest (the "Bank Line'). The Bank Line is fully drawn and is also secured by Bankest's portfolio of accounts receivable on a pari-passu basis.

22.    To maintain adequate collateral to secure the Debenture Notes and the Bank Line, Bankest was prohibited by the formation agreements from advancing funds to its factoring clients in amounts greater than 80% of the face amount of the legitimate accounts receivable it purchased from those clients.

**B.    Factoring: The Business of Bankest**

23.    Bankest was supposed to use the funds loaned to it to engage in the commercial factoring business. A "factor" is a type of financing company that purchases accounts receivable at a discount, earning money through factoring fees, interest and the spread between the receivables' face amount and the discounted price paid for them. Typically, and in consideration of the aforementioned fees, interest and spread, the factor assumes the risk that debtors will not pay the invoices that comprise an account receivable.

24.    By its own design, pursuant to the Shareholders' Agreement, Bankest was intended to be a particular brand of factor, namely "a non-regulated, collection-based factor" that "purchase[s] receivables acquired by manufacturers and sellers of tangible goods and/or services in the regular course of business conducted by such manufacturers and sellers." In addition to generating income, the receivables Bankest purchased through its factoring business served as collateral for the Debenture Notes.

25.    Bankest also served as a "refactor." As of 1998, Capital had for several years already been engaged in the commercial factoring business through BRFFC, whose business model was identical to Bankest's: sell notes and use the proceeds to factor receivables. Upon Bankest's formation, Capital transferred BRFFC's interest in its receivables to Bankest, discontinued its separate factoring business and agreed to undertake all new factoring business through Bankest. To the extent that BRFFC was obliged by prior agreements to continue serving as the principal factoring company for various clients, Bankest "refactored" the accounts receivable initially purchased by Capital, BRFFC, or another Capital-affiliate.

26.    Beginning in 1998, Bankest, Capital and BRFFC entered into a series of factoring agreements (some of which were then refactored through Bankest) with a number of entities which were either managed or owned by Capital's Principals. These included Joy Silk Screen, Inc. and Joy Athletic, Inc. ("Joy"), Florida-based athletic clothing businesses, Stratesec, Inc., a Virginia-based technology company, Enterprise Network Applications ("ENA"), a Georgia-based software business, and CD JewelBox Company ("CD JewelBox"), a purported Florida-based compact disk case manufacturer which in actuality did not exist. Bankest also entered into agreements with StrataSys, which purported to be a Florida-based computer technology and consulting business, but which was owned by Dominick Parlapiano and was a partner of BDO's.

## C.    The False Financials

27.    The Principals used a series of means to create false financials, each one of which should have been detected by BDO. In some instances, the Principals inflated the receivables owed under factoring agreements entered into with companies over which they had influence or control and sold them to Bankest based on the inflated figures. For example, Bankest purchased from Capital what purported to be nearly $50 million in receivables from Joy, in which some of

the Principals had an equity interest. In fact, Joy only owed Capital $5 million and even that amount was of questionable collectibility.

28. In other instances, the Principals made up receivables altogether and caused Bankest to make equity investments in and/or unsecured loans to start-up or poorly-capitalized corporations controlled by the Principals using funds obtained based on the false representations of the existence of those receivables. For example, Bankest made unsecured loans of $25 million and $32 million to ENA and StrataSys, respectively, each of which are entities in which the Principals had an interest in and/or control over. Even if the receivables invented by the Principals as security for the loans were genuine, these loans still would have violated the parties' agreements since the funds were not actually used to purchase receivables. These loans were not repaid.

29. Each of these transgressions, among a host of others leading to the $170 million loss, is detailed in a 50-page, December 4, 2003 Grand Jury indictment (the "Indictment") against, among others, Capital's Principals. The case against these Principals — those that have not already pleaded guilty — is pending, with investigations against other potential defendants ongoing.

**D.    BDO's Selection As Bankest's "Independent" Auditor**

30. Bankest's flagrantly false financials should have been discovered earlier, and would have had an independent, neutral auditor been selected. The Principals and BDO, however, made sure that no such neutral auditor was chosen.

31. As noted in the Indictment, BDO had audited the financial statements of Bankest's de facto predecessor, BRFFC, for fiscal years 1995 and 1996. Dominick Parlapiano had a social relationship with Sandy Lenner, the BDO audit partner in charge of Bankest's

Finally, BDO also provided additional accounting services to Bankest upon formation,
including corporate structuring advice and accounting consultation during the years it served as
Bankest's auditor. The Principals were thus long-term clients of BDO.

account. Finally, BDO also provided additional accounting services to Bankest upon formation, including corporate structuring advice and accounting consultation during the years it served as Bankest's auditor. The Principals were thus long-term clients of BDO.

32.     Moreover, BDO was, at the time, actively seeking to expand its business from one that merely provided accounting services to a full-fledged finance company that arranged for capital investment in and in some cases partnered with and/or provided capital to its clients. To achieve its goal, BDO sought to leverage its accounting relationships with middle-market companies like Capital and its affiliates by establishing and brokering alliances among them from which it would take a cut of business generated by alliance members. In fact, BDO did precisely that — the accounting relationship with the Principals was leveraged into BDO partnering with StrataSys, an affiliate and factoring client of Capital.

33.     Per the Principals' and BDO's mutual interests, the parties entered into separate engagement letters defining their respective obligations in the conduct of the audits of Bankest's financials for years ending 1998 through 2002. Per those engagement letters and industry standards, and in exchange for its audit fees, BDO was charged with (1) assessing the accounting principles used by Bankest's internal accountants, (2) obtaining reasonable assurance that Bankest's financial statements were free of material misstatements and in conformation with GAAP, (3) alerting Bankest of any reportable conditions, and (4) examining amounts and disclosures in the Bankest's financial statements. In addition, BDO specifically committed to "design [its] audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements."

E.    **BDO's Negligent Conduct of the 1998-2002 Audits**

34.    BDO's experience and familiarity with Bankest and its business apparently did not help it in the proper conduct of audits of Bankest's financial statements. Instead, from the beginning and notwithstanding its own classification of Bankest as a "sensitive" or high risk client, BDO either willfully or negligently ignored a host of accounting irregularities and red flags that would have revealed the falsity of the financial statements. Had BDO conducted its audits of Bankest in accordance with Generally Accepted Auditing Standards ("GAAS"), it would have detected these irregularities and red flags and expanded its audit testing and procedures. In failing to do so, BDO breached its obligations as professional accountants and cost plaintiffs millions.

1.    **BDO Disregards Warning Signals Warranting Additional Testing**

35.    A number of immediately apparent aspects of Bankest's business should have alerted BDO to the possibility that more substantial testing and risk analysis was warranted. For example, Bankest was, as a rule, a "refactor," with Capital or BRFFC (or another Capital-related entity) serving as the principal factor. Refactoring is an uncommon practice anyway, but here Bankest was refactoring receivables from its *owners' and managers' affiliated companies.* Given that Bankest routinely engaged in transactions that were not arms-length, the transactions deserved greater scrutiny. Instead, BDO accepted — contrary to acceptable accounting principles and auditing standards — a number of "due to/due from" tests to confirm amounts due that were signed on both sides by the same person!

36.    Second, Bankest's apparent accounts receivable volume approximately doubled each year. The systematic and wildly disproportionate growth of the company — including

growth inconsistent with that of BRFFC, Bankest's predecessor and BDO's former client —
was a second indicator that closer examination of Bankest's receivables was warranted.

37.     Third, four full-time employees handled collections of accounts receivable from
1998 through 2002. During this four year period, although the accounts receivable volume was
apparently doubling each year, no new collection employees were hired to handle the additional
volume, which reached as high as $200 million. The obvious lack of employees sufficient to
track down and collect $200 million worth of apparent debt should have raised a red flag to
BDO.

38.     Finally, notwithstanding that Bankest's accounting records were regularly
obscured by the fact that money came in through Capital and thus could not be traced to
individual invoices or accounts receivable without access to *Capital*'s bank records, the
Principals would not permit BDO to access to Capital's financial information. When BDO's
accountants specifically requested, for example, records of payments from an account debtor
(Wal Mart) to a seller (Joy), from a seller (Joy) to the original factor (Capital) and then from the
factor (Capital) to the refactor (Bankest), Capital abjectly refused. BDO never insisted on seeing
Capital's financials despite the fact that millions of dollars of Bankest's business went through
Capital. In addition to clearly breaching BDO's professional duties, BDO's failure to insist on
reviewing necessary documentation was a violation of its own policy which requires, per its
engagement letter, that it be permitted access to all requested documents, information and
personnel.

39.     Taken together, these facts should have caused BDO, were it to conduct its audits
in conformance with GAAS, to independently verify or substantiate accounting entries or
otherwise expand its testing. Instead, and notwithstanding its own classification of Bankest as a

"sensitive" or high risk audit client, BDO ignored warning signs and failed to customize its audit to obtain reasonable assurance that Bankest's financial statements were free of fraud. The failure to properly design the audit was itself a failure of GAAS. This failure was caused, at least in part, because no member of the BDO audit team had ever before audited a factoring company, much less a refactoring company.

### 2.    BDO Ignores Audit Irregularities

40.    Passing that BDO should have been aware from the start that malfeasance was afoot, however, and that BDO should therefore have reacted by increasing its level of review and testing, BDO actually did become aware of a host of specific accounting irregularities the moment it began conducting its audits, irregularities that would be repeated throughout each of Bankest's financial statements between 1998 and 2002 and BDO's audits of them. In issuing unqualified opinions certifying the correctness of Bankest's financials, BDO ignored these irregularities in violation of GAAS.

41.    The fundamental error with respect to BDO's audits concerns BDO's failure to properly test Bankest's receivables. Although accounts receivable are not the focus of every audit, in the case of a factoring or refactoring company, an analysis of accounts receivable comprises a majority of the audit since receivables are the audit client's principal asset.

42.    In the ordinary course, to verify an audit client's receivables, an auditor will send out confirmation letters to its account debtors, asking that the account debtors verify amounts due and owing. An auditor is not required by GAAS to test every account receivable, merely a sample sufficient to reasonably determine the validity of the receivables. Initially, pursuant to its own audit program guidelines, BDO selected twenty-nine debtors to test.

43.    The first irregularity that BDO noted in 1998 was that Bankest (in the form of Capital's principals) declined to let BDO test 22 of the 29 account debtors BDO had selected for testing.  That is, after BDO generated its list of the twenty-nine account debtors it felt it necessary to secure confirmations of debt from to test properly Bankest's receivables, Bankest requested that BDO not send confirmations to non-notification customers (those who were not informed that their receivables were sold), which included all but seven of them.

44.    As to the remaining seven account debtors that BDO *was* permitted to send confirmations to, BDO received zero confirmations back.   This pattern continued through subsequent audits during which BDO received no or nearly no direct confirmation of debt from any of the actual debtors.

45.    Having failed to get any confirmations from (or else being asked not to seek confirmations from) any of Bankest's account *debtors*, BDO next sought to receive confirmations that the receivables were valid from the original *sellers* of the debt, a group including purported manufacturers like Joy, CD JewelBox, and Perry Biomedical ("Perry").  Although sellers of debt would have an interest in verifying the debt, rendering their confirmations inherently less reliable than confirmations from the actual account debtors, BDO could not even get substantial complete confirmation of the debt from them.

46.    Three entities (Joy, Perry and CD JewelBox) were responsible for each of the twenty-nine largest accounts receivable selected for testing in the 1998 audit.  That is, Joy, Perry and CD Jewel Box were the vendors who apparently sold products or services to the debtors, and then sold the receivables to Bankest (through Capital).  Of these, CD JewelBox and Perry accounted for approximately $7 million each in receivables, while Joy accounted for approximately $24 million.

47.     Although CD JewelBox and Perry confirmed the accounts receivable balances they had sold to Capital (who in turn sold them to Bankest), their confirmations only proved the suspect nature of a seller confirmation.  CD JewelBox ended up being a shell business operated by Dominick Parlapiano, who provided (or directed the provisions of) the confirmation.  Joy, however, by far the largest factored client, did not return a signed confirmation for the $24 million in receivables it had sold to Capital.  Thus, and as a third irregularity, BDO could not get even a dubious confirmation from the debt's seller that $24 million of the $38 million it was testing was actually due and owing.

48.     BDO's failure to get confirmation from Joy was particularly notable since Joy had returned similar confirmations, signed by Jeff Barnhill, upon request for audits BDO had conducted for BRFFC for years ending 1995 and 1996.  BDO failed to note any exception, however, or conduct any further investigation into the now-apparent reasons for Joy's refusal to return a confirmation, namely that it did not owe the debt Capital had sold to Bankest.

49.     Its efforts having produced no reliable confirmation of any material fraction of Bankest's receivables, BDO took another stab at validating Bankest's financials:  BDO attempted to perform an "alternative procedure" called a "subsequent collections" test.   The subsequent collections test examines payments actually received for the period immediately following the audited period, and is generally used only as an alternative procedure.

50.     But BDO even failed to require Bankest to produce proper evidence of payments from third parties while conducting its alternative procedures.  In the conduct of its initial audit for the year 1998, for example, BDO selected a time period of January 1, 1999 through February 12, 1999 to perform a "subsequent collections" test.  Of the approximately $38 million in

receivables originally selected for testing, the auditors tested the receipts of approximately $7.7 million.

51.     Although it claims to have reviewed checks paid in from every one of the debtors whose receivables comprise the tested $7.7 million, there is no record of such checks for the bulk of those debtors in either BDO's workpapers or Bankest's files.  In fact, checks from account *debtors* do not exist.  BDO could not have reviewed them.

52.     Instead of confirming subsequent receipts by reviewing the debtors' checks, BDO's auditors instead appear to have relied on client prepared schedules and some limited bank records of payments from *Capital* — owned by the same principals as Bankest, the company BDO was auditing — to verify debts purportedly satisfied by third-party debtors.  That is, notwithstanding the series of irregularities it had already encountered, BDO nonetheless vouched for the validity of Bankest's receivables based entirely on payment schedules prepared by the Bankest's management and some minimal bank records provided by Capital.

53.     Moreover, the minimal "records" provided by Capital were woefully incomplete. In some instances, for example, Capital provided a copy of the front of a check but not the back, which would have, had the check been deposited, been marked by a bank as received and circulated for collection.  In the majority of other instances, Capital merely provided summary charts conclusorily stating that monies had been received on a certain account without any accompanying bank reports, deposit slips or any other bank records that an accountant conducting a proper, GAAS-conforming audit would have required.  Inexplicably, BDO accepted these summaries as sufficient to confirm debts repaid for its alternative testing procedures.  This was a negligent application of the "subsequent collections" test.

54.     These irregularities continued and indeed were magnified in each subsequent audit as the amount of purportedly factored receivables grew to over $200 million, including $100 million or more from Joy alone.

55.     At bottom, BDO clearly abdicated its professional responsibilities in the conduct of its audits of Bankest's financial statements by failing to obtain *any* reasonable assurance that the debts allegedly owed to Bankest were real debts owed by real companies from which Bankest could realistically expect to collect.

### 3.     BDO Issues Unqualified Opinions

56.     Faced with the heap of irregularities that it encountered in the conduct of its audits and the absence of any real evidence that Bankest's principal asset was viable, collectible or at least genuine, BDO, to meet its obligations as a professional accountant, could not offer an unqualified opinion warranting the accuracy of Bankest's financial statements.

57.     Rather than acknowledge the irregularities in the audit process by qualifying its opinion or withdrawing from the audit, however, BDO blessed the financial statements by issuing unqualified opinions certifying their accuracy.  In those opinions, BDO claims to have obtained "reasonable assurance" that the "financial statements are free of material misstatement." It claims to have "assessed the accounting principles used and significant estimates made by management" and to have "evaluat[ed] the overall financial statement presentation."  Finally, it warrants that the "financial statements . . . present fairly, in all material respects, the financial position of E.S. Bankest . . . in conformity with generally accepted accounting principles."

### F.     BDO's Conflicts and Incentive

58.     BDO's reasons for issuing its unqualified opinion were many.

59.    For starters, Bankest required BDO to provide an unqualified opinion because a qualified opinion would not serve Bankest's purpose of continuing to attract loans from persons relying on the audits in making their investment decision.    That is, without providing an unqualified audited financial statement, Bankest stood no chance of getting the financing it needed to continue its "business."

60.    BDO had additional incentive to look the other way, even beyond the stream of steady auditing fees.  BDO simultaneously served as a consultant to Bankest, reaping additional "consulting" fees for work that is unclear.  If it refused to issue an unqualified opinion, it was threatened with the loss of not only its audit income, but also of the consulting fees that its work for Capital and its affiliates generated.

61.    More startling still, BDO had a *direct*, pecuniary interest in approving Bankest's financials and maintaining the façade of legitimacy in Bankest's business.  BDO was a contractual, "strategic partner" of StrataSys, one of the companies integrally involved in the scheme to relieve Bankest and its investors of their money.  In licensing to StrataSys the rights to claim affiliation with the "BDO Seidman Alliance" and to use the BDO logo on letterhead and business cards, BDO generated income from StrataSys by means of a variety of fees including "licensing fees," "methodology fees," "management fees," "business development revenues," and "product development revenues."  Accordingly, and as its principals acknowledged, BDO "look[ed] forward to a long and mutually prosperous relationship with StrataSys Group LLC."

62.    The prophecy of prosperity was self-fulfilling.  Despite being a principal factoring client of Bankest with a purported $42 million in accounts receivable, StrataSys in fact had no real factored receivables.  As a strategic partner of StrataSys, BDO at least should have known, or could have discovered, this fact since it had access to StrataSys' financial information.

144890-1                                                    19

Moreover, BDO did know that StrataSys was in trouble since it could barely pay its licensing fees to BDO owed under their "Alliance Agreement."

63.     But BDO nonetheless continued to confirm the validity of Bankest's financial statements reflecting millions of dollars of receivables sold by StrataSys to Bankest. Meanwhile, cash loaned by Plaintiffs in reliance on BDO's audits was used to pay StrataSys's BDO-related fees or else invested in StrataSys in an attempt by the Principals and BDO to take StrataSys public during the high-tech boom and get even richer. This investment in StrataSys was in direct contravention of Bankest's agreement to use the loan proceeds only to purchase receivables for factoring — agreements BDO was bound to know and examine in its audits.

64.     BDO was thus at best conflicted — it had an incentive to ignore the uncollectibility of the debts sold by StrataSys and continue the stream of money from Plaintiffs to Bankest to StrataSys to BDO. Before it became a strategic partner, BDO had entered into a Non-Disclosure Agreement with StrataSys, pursuant to which BDO requested and accessed all manner of StrataSys's confidential information including agreements, financial statements, proposed advertisements and promotional materials, models, employee and partner information, and other financial, statistical, and technological information. If BDO was not aware of StrataSys's misrepresentations as a result of that investigation, it should have been.

## G.     The Result of BDO's Negligence

65.     BDO's assurances of the truth of Bankest's financial statements proved illusory, and its negligence had significant consequences. As a result of BDO's negligence, Bankest's financial statements materially misrepresented virtually all facets of Bankest's true financial position, including by:

        (a)     overstating receivables by more than $170 million;

(b)    failing to disclose or describe substantial inter-company transfers of cash occurring between and among Bankest, Capital and its affiliates, disguising the true nature of those transactions and/or failing to assure there were proper offsetting entries and reconciliations for them; and

(c)    misrepresenting and not disclosing either the existence and/or current status of numerous extensive insider loans or transfers made by and to Capital and/or its principals, affiliates or related companies.

66.    Individually, each of these errors, omissions, or intentional misstatements reflects actionable negligence. Collectively, the enormous level of financial misstatements, as to the both volume and scope of the errors, demonstrate a reckless disregard for accurately stating the true financial position of Bankest.

67.    Of course, if the Noteholders had known the truth, they would never have purchased the Debenture Notes.

68.    The Noteholders who were provided with the BDO audits suffered losses resulting from improperly stated assets of approximately $140,000,000. Fortunately for these investors, the great majority assigned their interests in the Debenture Notes to either BESIL or ESB Finance. Starting in June 2002, after the Bank had sold its interest in Bankest but before the false financials were discovered, BESIL and ESB Finance accepted assignments of the Debenture Notes in exchange for an undertaking from ESB Finance. In taking these assignments, each of BESIL and ESB Finance relied upon the audited financials, a business purpose of the audit of which BDO was aware.

69.    In addition to the Debenture Notes, Bankest executed and delivered to Nassau Bank a Credit Agreement whereby Nassau Bank agreed to make $30 million in loans to Bankest

(*i.e.*, the "Bank Line"). In issuing the Bank Line, Nassau Bank relied upon the audited financials, a business purpose of the audit of which BDO was aware.

70.    BDO knew that its audits would be and were used by a limited group of persons in addition to its audit client. BDO knew that the audits would be relied on by the Noteholders and Nassau Bank to decide whether or not to loan money to Bankest, and intended the audits to reach and influence them in connection with the same, and was further aware that Bankest intended the audits to reach and influence the Noteholders and Nassau Bank. Indeed as part of its audits, BDO reviewed the Private Placement Memorandum used to solicit these loans, which attached the BDO audits. As provided for in the Shareholders' Agreement, the Bank received each annual BDO audited financial statement and, also pursuant to the Shareholders' Agreement, solicited clients and investors with their aid. Because the Debenture Notes were short term (six, twelve or eighteen months), investors were also relying on the audits, in addition to deciding whether or not to invest in the first instance, in deciding whether or not to "roll over" their loans for additional periods.

71.    BDO likewise knew that the audits would be relied on by BESIL and ESB Finance in deciding whether or not to take assignments of the Debenture Notes from the Noteholders, intended the audits to reach and influence BESIL and ESB Finance in connection with the same, and was further aware that Bankest intended the audits to reach and influence BESIL and ESB Finance. Again, BDO reviewed the restructuring agreement and even agreed as part of it to discuss the audited financials with BESIL and ESB Finance. BDO was even aware that PricewaterhouseCoopers LLP ("Price Waterhouse"), in the conduct of an audit of the Bank, would include "the audited financial statements of E.S. Bankest . . . in the financial statements of

Espirito Santo Bank, . . . and that [BDO's] report thereon will be relied upon and referred to by [Price Waterhouse]."

## H.    BDO International's Role

72.    BDO International stresses the quality of its global network and the stringent standards and quality controls imposed and implemented by it on each of its member firms, including BDO Seidman.  It creates and fosters the belief in the investing public, through statements on its web site and in its Annual Reports, that the audit reports issued by it and its member firms should be relied on because they are backed by the expertise of its global network, an expertise that is ensured by the strict quality controls imposed and implemented by BDO International.

73.    Those strict quality controls failed here.  BDO's negligent conduct of the Bankest audits included a series of systematic failure of standards and quality controls that damaged Plaintiffs — in other words, the standards and quality controls for which BDO International was responsible.  These included a failure to increase testing or otherwise properly account for several red flags raised by Bankest's business and the fact that the vast majority of its business was "refactoring" through an affiliate; a failure to properly pursue adequate confirmation of receivables for a business whose sole material asset was receivables; and a failure to adequately perform an alternative procedure tailored to the specific business of the audit client.

74.    Moreover, BDO International's failures are not merely an organizational lapse — they are a failure of its own client.  BDO International views its member firms' clients, including Bankest, as its own clients, and the revenue derived from these clients as its own revenue.  Thus, according to its web site, "[a]udit and accounting work represented 59% of BDO's worldwide fee income in 2003" from "[c]lients rang[ing] from large multi-national listed companies to

private ones." BDO International's duties and knowledge with respect to these clients are identical to those of its member firms.

75.    In short, by failing to implement an audit procedure and conduct an audit, through its member firm, in accordance with GAAS, BDO International failed Bankest, its audit client, and is therefore equally responsible for damages suffered by Bankest's investors.

## CAUSE OF ACTION

### (Professional Negligence, *i.e.* Malpractice)

76.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 75 of this Complaint as though fully set forth herein.

77.    BDO, as a professional independent auditor performing accounting services for Bankest, had a duty to possess the degree of learning and skill of a professional accountant practicing in the same locality and under similar circumstances, to use the care and skill as would be used by reputable professional accountants under similar circumstances, and to use reasonable diligence and best judgment in accomplishing the purpose for which it was employed. By agreement and as professional accountants, BDO's express purpose here was to audit Bankest's financials for the years ending 1998 through 2002, and to (1) assess the accounting principles used by the Bankest's internal accountants, (2) obtain reasonable assurance that Bankest's financial statements were free of material misstatements, (3) alert Bankest of any reportable conditions, and (4) examine amounts and disclosures in the Bankest's financial statements. In addition, BDO specifically committed to "design [its] audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements."

78.    To achieve its purposes, and satisfy its obligations per agreement and as professional accountants, BDO was required to conduct its audits of Bankest's financial

statements in accordance with GAAS that require that it plan and perform audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and in conformance with Generally Accepted Accounting Principles ("GAAP").

79.    BDO failed to use reasonable diligence, adequate care and skill, and best judgment in attempting to accomplish its purpose by either failing to recognize or else ignoring the Principals' patent manipulation of Bankest's accounting and financial records and failing to identify and report that such accounting and financial records were not maintained in accordance with GAAP. BDO's failure can be traced to its repeated and flagrant deviation GAAS and Statements on Auditing Standards (codified as AU sections), which are recognized by the AICPA as the Institute's interpretations of GAAS. The more flagrant of BDO's knowing, intentional and reckless departures from GAAS, detailed above, include:

(a)    GAAS standards of reporting require the auditor's report to "state whether the financial statements are presented in accordance with generally accepted accounting principles." The standards also require that "the report shall identify those circumstances in which such principles have not been consistently observed." (GAAS Standards of Reporting, Standard 1 and Standard 2, AU §§150, 410 and 420.) BDO violated both standards by incorrectly and recklessly stating that Bankest's statements were in conformance with GAAP, and concealing the many specific circumstances in which BDO knew or should have known, that the statements deviated from GAAP.

(b)    BDO failed to remain independent of and objective about its client as required by GAAS General Standard 2 and the AICPA Code of Professional Ethics. (ET §§54, 55, 102 and AU §150, §220.) BDO's lack of independence led it to make statements it knew or should have known to be false in the interest of earning substantial auditing and consulting fees.

(c)     BDO failed to adequately investigate and disclose all of the affiliated and as related party transactions as required by AU §334.  On information and belief, having played a role in structuring and/or consulting on many of these entities and transactions, BDO knew or should have known, that Bankest and the Bankest insiders retained control of these entities or assets and, as such was required as part of its audit to evaluate them fully.

(d)     BDO ignored risk factors such as significant related-party transactions, overly complex organizational structure, highly complex transactions and significant pressure to obtain additional credit (AU §316.17); risk factors BDO knew existed at Bankest because BDO participated in advising on and structuring these very matters.

(e)     BDO failed to evaluate and note proper disclosure of Bankest's ability (or inability) to survive as a going concern, as required by AU §341.  The massive concealed debt, of which BDO was well aware, seriously threatened Bankest's viability as a company.  Once revealed, the company collapsed almost immediately.

80.     In short, and as detailed above, given that BDO had requested but was denied access to Capital's bank records; knew that Capital was an affiliated party; knew that BRFFC was Bankest's predecessor and that every or nearly every Bankest transaction was funneled through Capital or a Capital affiliate; was asked not to send confirmations to a majority of the client's debtors it had selected for testing; could not get even the sellers of the debts to confirm the majority of the debt; saw no bank or other reliable record that, after the closing of the audit period, Bankest was actually paid the money it was allegedly owed *by the debtors*; and was conflicted because it was a strategic ally with a purported factored client with a Bankest principal that was used to falsify the financials, BDO breached its standard of care by issuing an

unqualified and unjustified opinion that Bankest's financial statements were accurate and in accordance with GAAP for each of the years ended 1998 - 2002.

81.     The many violations of GAAP that BDO concealed with its incorrect representations and certifications of conformity were designed to inflate Bankest's revenue and net worth and hide the true amount of Bankest's real receivables from Plaintiffs. BDO's conduct in failing to exercise due professional care or competence in auditing Bankest and failing to perform the audit in accordance with GAAS despite its express representations to the contrary, and certifying Bankest's financial statements as in conformance with GAAP when it knew or should have known, that they were not, caused and contributed to the statements' containing significant false information upon which Plaintiffs relied to their detriment. That is, BDO's incorrect representations of compliance with GAAP and GAAS misled Plaintiffs into believing Bankest was the financially healthy and creditworthy company depicted in the financial statements.

82.     BDO intended that its audits reach and influence each of the Noteholders, BESIL, ESB Finance and Nassau Bank. Further, BDO knew that Bankest intended that BDO's audits would reach and influence each of the Noteholders, BESIL, ESB Finance and Nassau Bank and that Bankest would use the audited financial statements in the placement of the Debenture Notes, in securing the Bank Line, and arranging for BESIL and ESB Finance to acquire the Noteholders' interest in the Debenture Notes.

83.     As a direct and proximate result of BDO's professional negligence, Bankest's lenders suffered a loss of no less than $170 million.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that judgment be entered in their favor and against the defendants as follows:

A.      actual compensatory and consequential damages in an amount to be proven at trial;

B.      punitive damages;

C.      such civil penalties as allowed by law;

D.      attorneys' fees and costs of this suit as allowed by law;

E.      pre-judgment and post-judgment interest as allowed by law; and

F.      such other and further legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

Of Counsel:

BERGER SINGERMAN P.A.
*Attorneys for Plaintiffs*
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, Florida 33301
Telephone: (954) 525-9900
Fax: (954) 523-2872

Steven W. Thomas, *pro hac vice*
Sullivan & Cromwell, LLP
1888 Century Park East
Los Angeles, California 90067
Telephone: (310) 712-6600
Fax: (310) 712-8800

By: _____
Mitchell W. Berger, Fla. Bar No. 311340
mberger@bergersingerman.com
James C. Cunningham Jr., Fla. Bar No. 276197
jcunningham@bergersingerman.com
René D. Harrod, Fla. Bar. No.: 627666
rharrod@bergersingerman.com

– and –

Gonzalo Dorta, Esquire
Gonzalo Dorta, P.A.
334 Minorca Avenue
Coral Gables, Florida 33134
Telephone: (305) 441-2299
Fax: (305) 441-2200

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished to the parties listed on the attached Service List by **hand delivery** on those

indicated on the Service List and by **United States Mail** on the remaining parties, this

7 day of July, 2006.

By: _____
Of Counsel

**SERVICE LIST**
(*Banco Espirito Santo International, Ltd. v. BDO Seidman*)
**In the Circuit of the 11th Judicial Circuit in and Miami-Dade County**
**Case No. 04-14009 CA 31**

René D. Harrod, Esq.
Mitchell W. Berger, Esq.
BERGER SINGERMAN
350 East Las Olas Blvd., Suite 1000
Fort Lauderdale, FL 33301
(954) 525-9900  Telephone
(954) 523-2872  Facsimile
*Counsel for Plaintiffs*

Lance A. Harke, Esq.
David J. Maher, Esq.
HARKE & CLASBY LLP
155 S. Miami Avenue, Suite 600
Miami, FL  33130
Phone:  (305) 536-8220
Fax:     (305) 536-8229
*Co-Counsel for Defendant/ Third Party*
*Plaintiff, BDO Seidman, LLP*

Karen Y. Bitar, Esq. (**by Hand Delivery**)
Adam D. Cole, Esq.
Mark P. Schnapp, Esq.
Nikki Lewis Simon, Esq.
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131
Phone: (305) 579-0500
Fax: (305) 579-0717
*Counsel for Defendant BDO Seidman, LLP*

Kevin W. Goering, Esq.
Lisa M. Lewis, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
30 Rockefeller Plaza, 24th Floor
New York, NY 10112
Phone: (212) 332-3831
Fax: (212) 332-3888
*Co-Counsel for BDO International B.V.*

Daniel A. Miller, Esq. (**by Hand Delivery**)
Patricia Lebow, P.A.
Broad and Cassel
One North Clematis
West Palm Beach, Florida 33401
Phone: (561) 832-3300
Fax: (561) 655-1109
*Counsel for BDO International B.V.*

Michel O. Weisz, Esq. (***mail only***)
Segredo & Weisz
9350 S. Dixie Highway, Suite 1500
Miami, FL 33156
Phone: (305) 670-3820
Fax: (305) 670-8230
*Counsel for Third Party Defendant*
*Ariadna Puerto*

Carlos E. Mendez (***mail only***)
1122 Sevilla Avenue
Coral Gables, FL 33134
Phone: (305) 903-1560
*Third Party Defendant, appearing pro se*

Alan G. Greer, Esq.
Manuel Garcia-Linares, Esq.
Richman Greer Weil Brumbaugh
  Mirabito & Christensen, P.A.
Suite 1000 — Miami Center
201 S. Biscayne Boulevard
Miami, FL 33131
Phone: (305) 373-4000
Fax:     (305) 373-4099
*Counsel for Third Party Defendants Victor*
*Balestra, Bernard Mollet, and Joaquim*
*Garnecho*

CASE NO.:  04-14009 CA 31

Ira N. Loewy, Esq.
Bierman, Shohat, Loewy & Pizzi, P.A.
800 Brickell Avenue, PH 2
Miami, FL 33131-2911
Phone:  (305) 358-7000
Fax:  (305) 358-4010
*Attorneys for Defendants Eduardo Orlansky
and Hector Orlansky*

Manuel F. Fente, Esq.
Law Offices of Manuel F. Fente, P.A.
1110 Brickell Avenue, Seventh Floor
Miami, FL 33131
Phone:  (305) 379-4900
Fax:  (305) 423-3212
*Attorneys for Third Party Defendant Otto
Ambrosiani*

Wendy Peterson Harper, Esq.
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California  94303-3308
Phone:  (650) 461-5600
Fax:  (650) 461-5700
*Co-Counsel for Plaintiffs*

Steven W. Thomas, Esq.
Emily S. Alexander, Esq.
Anthony J. Lewis, Esq.
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA 90067-1725
Phone: (310) 712-6627
Fax:    (310) 712-8800
*Co-Counsel for Plaintiffs*

Dominick C. Parlapiano *(mail only)*
17325 Southwest 84 Court
Miami, Florida  33157
*Appearing Pro Se*

Gonzalo R. Dorta, Esq.
Gonzalo R. Dorta, P.A.
334 Minorca Avenue
Miami, FL 33134-4304
Phone: (305) 441-2299
Fax: (305) 441-8849
*Co-Counsel for Plaintiffs*

2

# EXHIBIT B

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 04-14009 CA 31

BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE, LTD. and BANCO ESPIRITO SANTO S.A. (Nassau Branch),

           Plaintiffs,

v.

BDO    SEIDMAN,    LLP    and    BDO INTERNATIONAL B.V.,

           Defendants.

_____/

## ORDER DENYING DEFENDANT BDO INTERNATIONAL B.V.'S MOTION FOR JUDGMENT ON THE PLEADINGS

THIS CAUSE is before the Court on Defendant BDO International B.V.'s Motion for Judgment on the Pleadings, and the Court having reviewed the pleadings and heard oral argument of counsel, and being otherwise advised in the pleadings, it is hereby

ORDERED AND ADJUDGED that Plaintiffs have adequately pled the elements of actual agency as to BDO International B.V. and therefore BDO International B.V.'s Motion for Judgment on the Pleadings is DENIED. Plaintiffs' complaint as against BDO International B.V. is limited to a theory of actual agency.

DONE AND ORDERED in chambers are Miami, Miami-Dade County, Florida this ____ day of July, 2004.

CONFORMED COPY

JUL 0 8 2005

_____
Circuit Court Judge

PETER R. LOPEZ
CIRCUIT COURT JUDGE

c:    All counsel of record

125795-2

# EXHIBIT C

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

Case No. 04-14009 - CA 31

BANCO ESPIRITO SANTO
INTERNATIONAL, LTD., ESB FINANCE,
LTD. and BANCO ESPIRITO SANTO S.A.
(Nassau Branch),

 Plaintiffs,

 vs.

BDO SEIDMAN, LLP and BDO
INTERNATIONAL B.V.,

 Defendants.

_____

BDO SEIDMAN, LLP,

 Third-Party Plaintiff,

 vs.

VICTOR BALESTRA, et al.,

 Third-Party Defendants.

_____



**ORDER GRANTING DEFENDANT BDO INTERNATIONAL B.V.'S
MOTION FOR DIRECTED VERDICT AND ENTRY OF FINAL JUDGMENT**

 THIS CAUSE having come on to be considered on February 23, 2007 on Defendant

BDO International B.V.'s Motion for Directed Verdict, the Court having reviewed the Motion

for Directed Verdict, the Response filed by all the Plaintiffs, having listened to the evidence,

having reviewed the case law that has been submitted by the parties, having conducted its own

research regarding the agency issue under Florida law, having taken the evidence in the light most favorable to the Plaintiffs, and the Court otherwise being fully advised therein, it is

**ORDERED AND ADJUDGED** that:

1.    During Plaintiffs' case-in-chief, Plaintiffs failed to introduce evidence establishing the elements of its claim against BDO International. Therefore, there is insufficient evidence to raise a question of fact to be presented to the jury. As a result, the jury cannot find that BDO International is liable to Plaintiffs.

2.    Accordingly, BDO International's Motion for Directed Verdict is hereby **GRANTED**.

3.    Based on the foregoing, Plaintiffs' Motion for Judgment against BDO International is **DENIED** as moot.

4.    It is **FURTHER ORDERED AND ADJUDGED** that Plaintiffs, Banco Espirito Santo International, Ltd., ESB Finance, Ltd. and Banco Espirito Santo S.A., take nothing by this action and that Defendant BDO International shall go hence without day; for which let execution issue.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida this **27** day of February, 2007.

_____
JOSE M. RODRIGUEZ
Circuit Court Judge

Judge Jose M. Rodriguez

cc:    Mark F. Raymond, P.A.
       Rhett Traband, P.A.
       for distribution to all counsel of record