# EXHIBIT A

Page 1

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
    Plaintiffs,
  vs.
BDO SEIDMAN, LLP, AND BDO INTERNATIONAL B.V.,
    Defendants.
------------------------------------------------x
BDO SEIDMAN, LLP,
    Third-Party Plaintiff,
  vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
    Third-Party Defendants.
------------------------------------------------x

PAGES 1 - 143


AFTERNOON SESSION

Miami, Florida

Wednesday, January 31, 2007

1:40 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:   Gizella "Gigi" Baan

Page 2

APPEARANCES

On behalf of the Plaintiffs BANCO ESPIRITO SANTO
INTERNATIONAL, LTD., ET AL.:

SULLIVAN & CROMWELL, LLP
   1888 Century Park East
   Los Angeles, California  90067
   (310) 712-6627
BY:  Steven W. Thomas, Esquire
     Emily S. Alexander, Esquire

GONZALO R. DORTA, P.A.
   334 Minorca Avenue
   Coral Gables, Florida  33134
   (305) 441-2299
BY:  Gonzalo R. Dorta, Esquire

BERGER SINGERMAN
   350 East Las Olas Boulevard, Suite
   Fort Lauderdale, Florida  33301
   (954) 525-9900
BY:  Mitchell W. Berger, Esquire

Page 3

On behalf of Defendant BDO Seidman, LLP:

ALVAREZ, ARMAS & BORRON
   901 Ponce de Leon Boulevard, Suite 304
   Coral Gables, Florida  33134
   (305) 461-5100
BY:  Arturo Alvarez, Esquire

GREENBERG TRAURIG, LLP
   MetLife Building
   200 Park Avenue, 15th Floor
   New York, New York  10166
BY:  Adam D. Cole, Esquire
     Karen Y. Bitar, Esquire

GREENBERG TRAURIG, LLP
   1221 Brickell Avenue
   Miami, Florida  33131
BY:  Mark Schnapp, Esquire
     Nikki Simon, Esquire

Page 4

On behalf of Defendant BDO International B.V., n/k/a BDO
GLOBAL COORDINATION B.V.:

BROAD AND CASSEL
   One Biscayne Tower, 21st Floor
   Miami, Florida  33131
   (305) 373-9400
BY:  Mark Raymond, Esquire
     Rhett Traband, Esquire

SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
   30 Rockefeller Plaza, 24th Floor
   New York, New York  10112
   (212) 332-3831
BY:  Kevin W. Goering, Esquire
     Lisa M. Lewis, Esquire

Page 5

On behalf of Third-Party Defendants Victor Balestra,
Bernard Mollet, and Joaquin Garnecho

RICHMAN, GREER, WEIL, BRUMBAUGH,
MIRABITO & CHRISTENSEN, P.A.
   Miami Center, Suite 1000
   201 S. Biscayne Boulevard
   Miami, Florida  33131
   (305) 373-4000
BY:  Manuel Garcia Linares, Esquire


On behalf of Third-Party Defendant Bernard Mollet

GAMBA & LOMBANA, P.A.
   2701 Ponce de Leon Boulevard, Mezzanine
   Coral Gables, Florida  33134
   (305) 448-4010
BY:  Hector J. Lombana, Esquire
     Geoffrey Marks, Esquire

Page 26

1  3149 into evidence.
2  BY MR. SCHNAPP:
3     Q. All right. Mr. Freeman, do you have that in
4  front of you?
5     A. I do.
6     Q. Let's go through that. Who is Mr. Eduardo
7  Orlansky or who was -- let me withdraw that and rephrase
8  that.
9        With respect to E.S. Bankest, what role, if
10 any, did Mr. Orlansky play?
11    A. He was one of the major shareholders and
12 officers of the corporation.
13    Q. Is it your understanding that he has been
14 convicted of a crime?
15    A. Yes.
16    Q. What was he convicted of?
17    A. There was a lengthy trial. I think it was
18 bank fraud, sir.
19    Q. Do you recognize the name Eduardo Orlansky?
20    A. I do.
21    Q. And who was Eduardo Orlansky?
22    A. His brother.
23    Q. I misspoke. I meant Hector Orlansky. We
24 went through Eduardo.
25    A. I'm sorry. That was -- Eduardo was Hector's

Page 27

1  brother. So Hector was also a major shareholder and
2  employee of E.S. Bankest.
3     Q. And who was Mr. Stanham?
4     A. Mr. Stanham was an employee for many years
5  and a director of E.S. Bankest.
6     Q. Now, each of the individuals I named so far,
7  they worked in the same building as Espirito Santo,
8  right?
9     A. Yes, they did.
10    Q. And who was Dominick Parlapiano?
11    A. He was another employee of E.S. Bankest and
12 an officer and director as well as an officer and
13 director of StrataSys.
14    Q. And he's been convicted as well?
15    A. Yes.
16    Q. By the way, in the course of your
17 investigation of the E.S. Bankest matter, you came to
18 learn, did you not, that Hector Orlansky was on the
19 board of directors of Espirito Santo bank; isn't that
20 true?
21    A. Yes.
22    Q. Do you know when he was on the board?
23    A. Prior to my appointment.
24    Q. What period of time?
25    A. For multiple years. I don't recall as I sit

Page 28

1  here today but it was for several years, probably six or
2  seven at least.
3     Q. Now, let's talk about Mr. Carlos Mendez.
4  Who was Carlos Mendez?
5     A. He was also an employee of E.S. Bankest,
6  might have been a director.
7     Q. He's a criminal, too?
8     A. Yes, sir.
9     Q. Convicted of federal crimes?
10    A. Yes, sir.
11    Q. Now, you testified in your direct
12 examination, sir, that you had received a call -- I
13 believe it was Tuesday, August the 12th, from a
14 Mr. James McGuirk; is that true?
15    A. Yes, sir.
16    Q. Mr. McGuirk is a criminal defense lawyer
17 here in Miami, correct?
18    A. Yes, he is.
19    Q. And Mr. McGuirk is Mr. Carlos Mendez's
20 lawyer?
21    A. Yes, sir.
22    Q. I believe actually your testimony -- well,
23 let me back up a minute. Was the call on the 11th or
24 the 12th?
25    A. I believe I testified I wasn't sure if it

Page 29

1  was the 11th or 12th but I thought it was the 12th, on
2  Tuesday.
3     Q. But we would agree, would we not, this is
4  while you were still feeling warm and fuzzy of your
5  responsibilities as the examiner in this case, right?
6     A. Well, Monday, at the end of the day Monday,
7  I testified of that warm and fuzzy feeling. By Tuesday
8  afternoon or Tuesday, other facts and circumstances had
9  happened that seemed to color my mind and my decisions.
10    Q. You even testified at Mr. Mendez's
11 sentencing, didn't you?
12    A. Yes.
13    Q. We'll get back to that in a minute. By the
14 way, he also was told to pay 170 million dollars to the
15 bank; isn't that true?
16    A. I believe you. I haven't seen that
17 document.
18    Q. Well, do you know if -- well, do you know if
19 any of the individuals we just discussed also were held
20 responsible for the fraud that took place involving E.S.
21 Bankest?
22    A. Yes, sir, but I'm not sure if -- I haven't
23 seen the exact amount that Mr. Mendez or anybody else
24 has pled to.
25    Q. How much money did you collect from

Page 30

1  Mr. Mendez, sir?
2      A.   I didn't collect any money from Mr. Mendez,
3  sir.
4      Q.   And, in fact, you gave him a job, did you
5  not?
6      A.   Yes, I did.
7      Q.   You paid Mr. Mendez, a criminal in this
8  case?
9      A.   I paid Mr. Mendez, you classify as a
10 criminal.  He was an ex-employee.  It was early in the
11 case.  I had no one else to speak to.  The Orlanskys
12 wouldn't talk to me.  Mr. Stanham wasn't around.
13 Mr. Parlapiano wasn't around.  And I walked into a
14 business that had no history, none of the executives
15 were there.
16           Yeah.  I definitely went and hired
17 Mr. Mendez and I paid him.  And it was approved by the
18 court.
19     Q.   How much money did you -- you paid him what,
20 about 40 thousand dollars, 50 thousand dollars?
21     A.   No, sir.  I don't think it was anywhere near
22 that amount.  He worked for me for a short period of
23 time and I'd be hazarding a guess but I don't believe it
24 was anywhere near that amount.
25     Q.   Do you know how much -- you don't know how

Page 31

1  much it is?
2      A.   That's what I just said.  Correct.
3      Q.   But it's fair to say then in addition to
4  paying him and giving him a job, you also testified at
5  his sentencing?
6      A.   Yes, sir.
7      Q.   Now, Mr. -- Ms. Puerto, she went to trial
8  and was convicted as well, correct?
9      A.   Yes, she did.
10     Q.   Who was she?
11     A.   She was another officer.  I think she was a
12 director for a period of time and an employee of E.S.
13 Bankest.
14     Q.   Now, Mr. Ambrosiani, who was he?
15     A.   He was an outside computer consultant who
16 worked on the books and records of E.S. Bankest.
17     Q.   And we come to Mr. Barnhill.  Who was
18 Mr. Barnhill?
19     A.   I believe you asked me and I've answered.
20 Mr. Barnhill was the principal of Joy Manufacturing.
21     Q.   My point is that's the same Jeffrey Barnhill
22 we've been talking about this whole time, right?
23     A.   Oh, yes.
24     Q.   And who was Mr. Cantor?
25     A.   Mr. Cantor was a shareholder in the

Page 32

1  beginning but he was an officer of StrataSys Company
2  here in Miami.
3      Q.   And is it your testimony, sir, that an
4  officer of StrataSys was convicted of a federal crime
5  involving E.S. Bankest?
6      A.   Yes, sir.
7      Q.   Now, sir, I wonder if we can bring up --
8  sorry -- page 7 of the indictment.
9           (Technician complies.)
10          And if we can highlight paragraph 3.
11          (Technician complies.)
12          Sir, do you see before you the charges that
13 the objectives of the conspiracy were to obtain money
14 for Bankest, BCC, BRFFC from financial institutions and
15 others by using inflated and false accounts receivable
16 and false financial information to receive funding?
17     A.   Yes, sir.
18     Q.   And so is it your understanding, sir, as the
19 receiver of Bankest that the individuals we just
20 identified entered into a legal agreement to obtain
21 money as is set forth in the indictment?
22     A.   I don't see where it says in a legal
23 agreement.
24     Q.   Is a conspiracy a legal agreement?
25     A.   Mr. Schnapp, your knowledge is much greater

Page 33

1  in that area.  Conspiracy I imagine is not a legal
2  method.  That's why they were indicted.
3      Q.   A violation of federal law and you would
4  agree with that, right?
5      A.   Seems to be, yes, sir.
6      Q.   And it was a further objective of this
7  conspiracy, sir, was it not, at 3-B to cover up and
8  conceal the existence of the conspiracy from federal
9  banking regulators, independent auditing firms, and
10 managers of Espirito Santo bank; isn't that true?
11     A.   Yes, sir.
12     Q.   In fact, you understand the auditing firm
13 that was the subject of this was BDO Seidman; isn't that
14 right?
15     A.   Yes, that's correct.
16     Q.   In fact, it was a purpose and object of
17 these co-conspirators, federal criminals, to deceive the
18 auditors in this case?
19     A.   Is that a question?
20     Q.   Yes.
21     A.   That's what the document says, yes, sir.
22     Q.   Isn't that your understanding of what this
23 charge means?
24     A.   That's what it says, yes.
25     Q.   And it was another purpose and objective of

Page 34

1  this criminal conspiracy, sir, was it not, to perpetuate
2  the appearance through false documents and
3  representations that defendants were engaged in
4  legitimate factoring operations; isn't that true?
5      A.  Yes, sir.
6      Q.  Now, sir, during -- you said it was your
7  responsibility to maintain a -- I'm sorry, to monitor
8  the federal criminal proceedings, right?
9      A.  Yeah.
10     Q.  And you know, sir, do you not, that there
11 was actions taken by the criminals in this case to
12 deceive the auditors, right?
13     A.  Could you maybe rephrase that or reread it?
14     Q.  Sure. Was it your understanding, sir, as
15 the liaison -- I'm sorry, as the monitor, the individual
16 monitoring the federal criminal proceedings that the
17 criminals named in this case took actions to deceive the
18 auditors?
19     A.  Yes.
20     Q.  And that's consistent with your
21 investigation, right?
22     A.  Yeah.
23     Q.  In fact, sir, you knew, did you not, that it
24 was their purpose that they would prepare materially
25 false -- that they would prepare materially false

Page 35

1  financial statements, correct?
2      A.  Where are you reading from, sir?
3      Q.  Well, did you have an understanding to that
4  effect?
5      A.  I'm lost. I'm sorry, Mr. Schnapp.
6      Q.  Let me try it again.
7      A.  Are you still on 3-A, B and C?
8      Q.  No, let's skip ahead. Let's go to paragraph
9  10 of the indictment which is on page 8 -- actually, let
10 me back up one second. Let me go to the bottom of page
11 7. That would be paragraph 9 which carries over to the
12 next page. It says there that defendants would cycle
13 money from Bankest and BCC to factoring clients and then
14 back to BCC and Bankest with no underlying factoring
15 transactions in order to make it appear that the
16 factoring client's account receivables were being paid
17 on a timely basis. Do you see that?
18     A.  Yes, sir.
19     Q.  And having seen the indictment and the word
20 cycling, do you now know what the word cycling meant?
21     A.  I see what they put in the indictment, yes,
22 sir.
23     Q.  Okay. And as the person that was charged
24 with monitoring the federal criminal proceedings, what
25 did you understand the word cycling to mean?

Page 36

1      A.  Same as you had said before. Money going in
2  and out of the bank.
3      Q.  Sir, do you see also that the indictment
4  charges them in paragraph 10 with changing the dates on
5  accounts receivable to make them appear more recent?
6      A.  Yes.
7      Q.  And do you see that the indictment also says
8  that the defendants, the criminals we just talked about,
9  would seek to -- this is paragraph 11 -- would seek to
10 thwart the audit function by providing auditors with
11 fictitious invoices?
12     A.  Yes, sir.
13     Q.  Now, isn't it a fact, sir, that one of the
14 people that did that was Mr. Barnhill?
15     A.  I don't think he ever dealt with the
16 auditors, sir.
17     Q.  Did he -- did Mr. Barnhill seek to thwart
18 the audit function by providing auditors with fictitious
19 invoices? That was the object of the conspiracy, right?
20     A.  I've earlier stated, Mr. Schnapp, and I'm
21 trying to be exact, that the auditors never communicated
22 with Mr. Barnhill.
23     Q.  Did Mr. Barnhill ever help the Orlanskys by
24 preparing false documents that they could give to
25 auditors?

Page 37

1      A.  They might have, yes, sir.
2      Q.  What did he do?
3      A.  There might have been false invoices that
4  were sent to E.S. Bankest.
5      Q.  Wasn't it a fact, sir, that when you met
6  with Mr. Barnhill on August 14th of 2003, he didn't tell
7  you he provided any false documents to the folks at E.S.
8  Bankest so that they in turn could give those documents
9  to the auditors, did he?
10     A.  Mr. Schnapp, could we reread the beginning
11 of that question? I'm not sure how I heard it.
12     Q.  Sure.
13         (Thereupon, the court reporter read back the
14 requested portion.)
15         THE WITNESS: Is there a way to maybe
16 rephrase that or break it down a little different,
17 Mr. Schnapp? I'm having trouble --
18 BY MR. SCHNAPP:
19     Q.  Sure. Let me withdraw that and give you a
20 different question.
21     A.  Thank you.
22     Q.  When you met with Mr. Barnhill he didn't
23 tell you that he, in fact, created false checks to give
24 to -- that he gave to E.S. Bankest, did he?
25     A.  No, he didn't tell me that, no, sir.

Page 38

1  Q.  But you later found out he did that, right?
2  A.  False checks, no, sir. I don't believe he
3  did.
4  Q.  What, if any, false documents did
5  Mr. Barnhill prepare?
6  A.  My investigation, I believe, showed that he
7  prepared some false invoices, never false checks.
8  Q.  But Mr. Barnhill, the man you said would
9  tell the truth if asked, didn't tell you that on August
10 14th, did he?
11 A.  I got to tell you, whatever he told me on
12 August 14th just really was sort of unimportant. The
13 main thing I remember from that meeting is that 110
14 million dollars was maybe five and I might have zoned
15 out after that, but I know I heard that part loud and
16 clear and I didn't care about much else at that point.
17 Q.  Mr. Freeman, is it your testimony that you
18 might have zoned out when a criminal is asking you to
19 give him money?
20 A.  Sir, at that point I didn't know he was a
21 criminal. At that point he was a factored client who
22 was asking for money to continue his business, and I was
23 less than one day into this operation as the receiver.
24 Everybody was suspect and everybody was honest as far as
25 I was concerned.

Page 39

1      And I met with this gentleman. And I
2  started to learn that here was a business in Miami
3  several miles away from E.S. Bankest that had 110
4  million dollars on the books as assets that should have
5  been collected and he told me, no, it was probably
6  closer to five million.
7      I got to tell you, I didn't know he was a
8  criminal before. And I didn't really care if he was a
9  criminal after that. My job as the receiver was to
10 collect money.
11 Q.  Well, my point Mr. Freeman -- let me
12 withdraw that.
13     Mr. Freeman, this is the same Jeff Barnhill
14 who told you he would have been truthful if someone
15 called him; is that true?
16 A.  Yep.
17 Q.  That wasn't true, was it?
18 A.  I have no idea, Mr. Schnapp. I can tell you
19 he told me the truth that day.
20 Q.  He didn't tell you, sir, that he had
21 provided presigned blank checks to the Orlanskys, did
22 he?
23 A.  No, sir.
24 Q.  He didn't tell you that he gave documents to
25 the Orlanskys to help them trick the auditors, did he?

Page 40

1  A.  No, sir.
2  Q.  So if he, in fact, did those things as he
3  later pled, he didn't tell you what he did, did he?
4  A.  No, sir.
5  Q.  Let's talk a little bit about your contact
6  with Mr. Barnhill on the 14th of that week. You didn't
7  show up at his office to -- strike that.
8      He was -- when you showed up at his office
9  he was asking you for -- let me withdraw it and start it
10 again, make it simple for you.
11     When you showed up at Mr. Barnhill's office,
12 he, Mr. Barnhill, asked you for money?
13 A.  No, sir.
14 Q.  He was requesting money from -- to be
15 advanced to him, did he not?
16 A.  I think, Mr. Schnapp, you may have the
17 circumstances and facts a little confused because I
18 didn't show up at his offices until well into the second
19 week.
20 Q.  Didn't you meet with Mr. Barnhill on August
21 14th of --
22 A.  Yes, I did and I called him on August 13th,
23 the first day as the receiver.
24 Q.  And at that point you were trying to collect
25 the 50 to one hundred million dollars that you thought

Page 41

1  Mr. Barnhill owed, right?
2  A.  I believe my testimony was and is that I
3  called him because they owed us 110 million dollars. I
4  wanted to make sure it was collectible. So I called
5  Mr. Barnhill on the 13th and introduced myself as the
6  receiver. And Mr. Barnhill asked me for money, yes, he
7  did.
8  Q.  And Mr. Barnhill, the difference is --
9  strike that. What he told you is I have a different
10 deal here. It's not factoring, right?
11 A.  No.
12 Q.  He told you, sir, did he not, that -- strike
13 that.
14     When did you first come to learn that he had
15 helped the Orlanskys by giving them phony documents?
16 A.  I previously testified and I'll testify
17 again that on the 14th in the morning I met with
18 Mr. Barnhill and his counsel and two of his other inside
19 people and asked about the collection of the accounts
20 receivable and I wanted to see projections for the
21 business and how the business was doing and financial
22 statements.
23 Q.  Did Mr. Barnhill provide false invoices to
24 facilitate the fraud?
25 A.  That morning I didn't see any false

Page 42

1  invoices, no, sir. Are we still on the 14th or have you
2  switched?
3    Q.  Well, on the 14th.
4    A.  He didn't give any false invoices, no, sir.
5    Q.  And he didn't tell you anything about a
6  fraud?
7    A.  No, sir.
8    Q.  And he didn't tell you he committed a fraud?
9    A.  No, sir.
10   Q.  He didn't tell you he was the beneficiary of
11 helping the Orlanskys with their fraud?
12   A.  No, sir.
13   Q.  He didn't tell you he got millions of
14 dollars for Joy over the years by helping the Orlanskys
15 with this scam, did he?
16   A.  No, sir.
17   Q.  Can we skip ahead to 79 -- I'm sorry,
18 paragraph 79, page 22.
19      (Technician complies.)
20      Sir, do you have page 22 in front of you?
21   A.  Yes, I do.
22   Q.  Do you have paragraph 79 in front of you?
23   A.  Yes, I do.
24   Q.  You see there, sir, that Mr. -- in one of
25 the overt acts it says that "In or about January and

Page 43

1  February of 2001, Eduardo Orlansky, Hector Orlansky, R.
2  Peter Stanham, Dominick Parlapiano, Carlos Mendez,
3  Ariadna Puerto, Otto Ambrosiani, Jeffrey Barnhill and
4  Howard Cantor caused to be provided false documentation
5  supporting the accounts receivable quantities and values
6  reflected in Bankest records from BDO Seidman in
7  connection with its audit of Bankest 2000 financial
8  statements." Do you see that?
9    A.  Yes.
10   Q.  That is, in fact, what happened, isn't it?
11   A.  I don't know if everyone but that's what the
12 government is saying that these people did, yes, sir.
13   Q.  You conducted an investigation, didn't you
14 determine yourself that that's what happened?
15   A.  I don't know if Mr. Stanham, I don't know
16 what he did. You're asking me what each of the
17 individuals did. I can't tell you specifically. That's
18 what the federal indictment says and I have no reason to
19 disbelieve it.
20   Q.  Well, Mr. Freeman, in the course of your
21 testimony how is it that you're able to testify as to
22 conversations that people had in 1991, 1992 if you
23 weren't there?
24   A.  I don't believe I testified to anything in
25 1991 or 1992.

Page 44

1    Q.  Did you not testify about documents that
2  took place and events that took place in the 1990s?
3    A.  You asked me specifically. Are you asking
4  me a different question now?
5    Q.  Let me withdraw that. I'll get to it
6  document by document.
7    A.  That's fine.
8    Q.  Now, sir, isn't it a fact that among the
9  documents, phony documents that were prepared to help
10 the Orlanskys and the Bankest fraud were the Joy
11 invoices relating to goods purportedly sold to various
12 companies?
13   A.  Yes.
14   Q.  That was a document that the crooks prepared
15 to trick the auditors?
16   A.  I don't know if they did it to trick the
17 auditors. All I can say is I know they did it, yes,
18 sir.
19   Q.  Well, sir, did it not say earlier in the
20 same conspiracy count that it was the purpose and object
21 of the conspiracy of the crooks to prepare the phony
22 documents which include these to trick the auditors?
23   A.  This is what the federal indictment says,
24 yes, sir.
25   Q.  The federal indictment which is the product

Page 45

1  of an FBI investigation, correct?
2    A.  Definitely.
3    Q.  Product of a United States Attorney's Office
4  investigation?
5    A.  Unequivocally, yes, sir.
6    Q.  And the charges that were returned by a
7  federal grand jury --
8    A.  Yes, sir.
9    Q.  -- resulted in the conviction of every one
10 of those people, right?
11   A.  Yes.
12   Q.  Which would include people who were the
13 management of E.S. Bankest --
14   A.  Yes.
15   Q.  -- as well as outside people who were
16 helping them commit their fraud; isn't that true?
17   A.  Yes, sir.
18       MR. SCHNAPP: May I have a moment?
19       THE COURT: You may.
20 BY MR. SCHNAPP:
21   Q.  And your investigation confirmed that?
22   A.  You lost me.
23   Q.  Did your investigation confirm that the
24 fraud was committed by management of E.S. Bankest?
25   A.  Sure.