# EXHIBIT D

Condense It!™

Page 1

```
 1          UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF FLORIDA
 2

 3              CASE NO.:  04-17602-BKC-AJC

 4   IN RE:

 5   E.S. BANKEST, L.C.,

 6        Debtor.
                                   /
 7
     LEWIS B. FREEMAN, Responsible
 8   Officer for the Reorganized
     Debtor, E.S. Bankest, L.C., a
 9   Florida Limited Liability
     Corporation,
10
          Plaintiff,
11
     vs.            ADV. NO.:  06-1220-BKC-AJC-A
12
     BDO SEIDMAN, LLP, BDO
13   INTERNATIONAL, B.V., SANDOR
     LENNER and KEITH ELLENBURG,
14
          Defendants.
15                                 /

16

17                    Greenberg Traurig, P.A.
                      1221 Brickell Avenue
18                    Miami, Florida
                      Thursday, February 21, 2008
19                    10:30 a.m. - 12:30 p.m.

20

21           DEPOSITION OF LEWIS B. FREEMAN

22       Taken before HELAYNE FURMAN WILLS, Shorthand

23   Reporter and Notary Public in and for the State of

24   Florida at Large, pursuant to Notice of Taking

25   Deposition filed in the above cause.
```

Page 2

```
 1   APPEARANCES:

 2     WARREN R. TRAZENFELD, P.A.
       BY: WARREN R. TRAZENFELD, ESQ.,
 3     on behalf of the Plaintiff.

 4     GREENBERG TRAURIG, P.A.
       BY: ADAM D. COLE, ESQ.,
 5     and
       DANIEL L. GOLD, ESQ.,
 6     on behalf of Defendant BDO Seidman.

 7     BROAD AND CASSEL
       BY: RHETT TRABAND, ESQ.,
 8     on behalf of Defendant BDO International.

 9
     ALSO PRESENT:
10   TOM CHARRON, Videographer

11   STEVEN THOMAS, ESQ.
     THOMAS ALEXANDER & FORRESTER
12

13             INDEX

14
     WITNESS      DIRECT    CROSS

15   LEWIS B. FREEMAN
16     By Mr. Cole      4
       By Mr. Traband       76
17

18            EXHIBITS

19   No. 1 ........................57
       No. 2 ........................68
20

21

22

23

24

25
```

Page 3

```
 1        THE VIDEOGRAPHER: Today is February 21,
 2   2008. The time is approximately 10:29. We're at
 3   1221 Brickell Avenue to videotape the deposition of
 4   Lewis Freeman, In Re E.S. Bankest versus BDO
 5   Seidman, case number 04-17602.
 6        The court reporter is Laynie Wills with
 7   Ouellette & Mauldin. My name is Tom Charron with
 8   Custom Video.
 9        Counsel now please state their appearance
10   for the record.
11        MR. TRAZENFELD: Warren Trazenfeld,
12   counsel for Mr. Freeman.
13        MR. COLE: Adam Cole from the firm of
14   Greenberg Traurig for BDO Seidman.
15        MR. TRABAND: Rhett Traband from Broad and
16   Cassel for BDO International.
17        MR. GOLD: Dan Gold, Greenberg Traurig,
18   for BDO Seidman.
19        THE VIDEOGRAPHER: The court reporter will
20   now swear in the witness.
21   Thereupon:
22             LEWIS FREEMAN
23   was called as a witness by the Defendants, and having
24   been first duly sworn, was examined and testified as
25   follows:
```

Page 4

```
 1          DIRECT EXAMINATION
 2   BY MR. COLE:
 3     Q  Good morning, Mr. Freeman.
 4     A  Good morning.
 5     Q  Welcome back.
 6        I'd like to start out today by asking very
 7   quickly what your current position is as it relates
 8   to E.S. Bankest?
 9     A  I'm the responsible officer and the
10   liquidating trustee, two different positions.
11     Q  And in your role as responsible officer,
12   what is your responsibility?
13     A  I'm the fiduciary appointed by the Court.
14     Q  And in your role as liquidating trustee,
15   what is your responsibility?
16     A  Very similar, but different.
17     Q  Okay. How are they different, the two
18   roles?
19     A  I haven't thought about it in a while.
20        Liquidating trustee is to collect the
21   claims, as I understand it. Responsible officer is
22   to bring certain lawsuits.
23     Q  When you say collect claims, are you
24   talking about claims that E.S. Bankest has in other
25   bankruptcies or something else?
```

CondenseIt!™

Page 5

1    A  E.S. Bankest has in other litigation or
2  other business.
3    Q  And what is the nature -- what's the
4  nature of that business?
5    A  Well, it's winding down the estate and
6  maximizing the moneys that are owed to the estate.
7    Q  What claims is E.S. Bankest currently
8  trying to collect?
9    A  We have a piece of litigation up in
10  Washington, D.C., which we have a claim against
11  Stratesec.  The trustee on Stratesec is trying to
12  pay me as a creditor and wind up his estate.
13    Q  Other than the Washington, D.C. litigation
14  against Stratesec or involving Stratesec, are there
15  any other litigations?
16    A  I know my bankruptcy counsel is still
17  handling some other claims, and I don't believe much
18  other litigation, but I believe there are some other
19  accounts receivables and moneys due to us.
20    Q  And when you say "accounts receivable,"
21  you're saying that your bankruptcy counsel is
22  attempting to collect on outstanding accounts
23  receivable from customers of E.S. Bankest?
24    A  Yes.
25    Q  With respect to the Stratesec litigation,

Page 6

1  how much is the claim -- E.S. Bankest's claim?
2    A  I believe it's over $5 million, maybe
3  $9 million.  We have $9 million outstanding.
4    Q  And how much of that $9 million do you
5  anticipate collecting at this point, if you had to
6  predict?
7    A  Subject to litigation.  I'd have to leave
8  it to the trustee up in Washington, who is the
9  person handling this case.
10    Q  As the responsible officer of E.S.
11  Bankest, do you have any estimate as to how much of
12  the $9 million you'll be able to collect?
13    A  I hope some of it.
14    Q  Do you have a more specific estimate?
15    A  Well, it's attorney/client, because my
16  attorneys and I have been talking to him about
17  various amounts, and since there is pending
18  litigation and pending mediation, I'm not at liberty
19  to say.
20    Q  Well, you said that you had been speaking
21  to the trustee of Stratesec; is that right?
22    A  Through my counsel, yes, sir.
23    Q  Okay.  Have you had any direct
24  communication with the trustee of Stratesec,
25  relating to the claim of E.S. Bankest?

Page 7

1    A  Many times.
2    Q  During any of those conversations, have
3  you discussed with the trustee of Stratesec what the
4  estimated recovery for E.S. Bankest would be?
5    A  As I said, we've had multiple
6  conversations.  There have been no offers of
7  settlement, and we're still at a point where I'd be
8  hazarding a guess, because he never gave me a
9  number.
10    Q  And is it your testimony that the
11  information that you have that would give you an
12  estimate as the responsible officer of E.S. Bankest
13  as to how much you'll collect from Stratesec, is
14  something that you've learned from your attorney?
15    A  I think it's been in discussions with the
16  various attorneys.
17    Q  I understand that.
18      My question, sir, is, do you have
19  information, do you have an understanding as to what
20  the estimated recovery is from Stratesec, separate
21  from what you learned directly from your attorney?
22    A  Repeat that back, please.
23      (Whereupon, the requested portion of the
24  record was read by the Reporter as above
25  recorded.)

Page 8

1      THE WITNESS:  No.
2  BY MR. COLE:
3    Q  You also mentioned claims as the
4  liquidating trustee relating to outstanding accounts
5  receivable.
6      Do you have an understanding as to what
7  the volume of those claims are in dollars?
8    A  Could be -- I don't want to guess, but I
9  would believe maybe in the range of up to a million
10  dollars.
11    Q  And other than communications with your
12  counsel, do you have an estimate as to how much you
13  as the liquidating trustee will be able to collect
14  on those outstanding accounts receivable?
15    A  I thought that's what I answered.
16    Q  I'm not talking about the claim against
17  Stratesec.  You said you had a claim against
18  Stratesec, and then you also had outstanding
19  accounts receivable that you were pursuing against
20  customers of E.S. Bankest.
21    A  I believe I said accounts receivable plus
22  claims may reach a million dollars.
23    Q  When you say the million dollars, you're
24  saying separate from the Stratesec claim?
25    A  Yes, sir.

CondenseIt!™

Page 9

1  Q  And up to a million dollars, is that your
2 estimate of how much you'll collect?
3  A  I said up to a million dollars.
4  Q  Do you have any more specific
5 understanding as to -- or estimate as to how much
6 you'll collect with these other claims and accounts
7 receivable claims?
8  A  Same answer.
9  Q  As you sit here today, do you believe
10 you'll collect all $1 million of those claims?
11  A  I believe you're mischaracterizing my
12 answer.  I said up to a million dollars.
13  Q  Sir, I wasn't even referring to your
14 answer.  My question is very -- more specific than
15 that.  As you sit here today -- you said it's up to
16 a million dollars.
17      Do you have a better estimate of how much
18 you'll collect, than just saying up to a million
19 dollars?
20  A  No, sir.  These are just on the other
21 claims.
22  Q  Now, before becoming the responsible
23 officer and the liquidating trustee -- I gather, by
24 the way, those titles were created as part of the
25 plan; is that right?

Page 10

1      MR. TRAZENFELD:  Object to the form.
2      THE WITNESS:  Whatever the documents show.
3 BY MR. COLE:
4  Q  Prior to becoming the responsible officer
5 and the liquidating trustee, you were the Chapter 11
6 trustee of E.S. Bankest; is that right?
7  A  Yes, sir.
8  Q  And prior to that time you were a receiver
9 for E.S. Bankest, right?
10  A  I had various titles, yes, sir.
11  Q  And you also prior to that time was an
12 examiner -- you were an examiner of E.S. Bankest
13 initially, correct?
14  A  Yes, sir.  I believe responsible officer,
15 also.
16  Q  Okay.  During that period of time, I
17 believe you previously testified that one of your
18 roles was to investigate potential fraud at E.S.
19 Bankest; isn't that right?
20  A  Yes, sir.
21  Q  And in fact, you testified previously that
22 you conducted that investigation, you uncovered a
23 fraud; is that right?
24  A  Yes, sir.
25  Q  Now, the people who were involved in the

Page 11

1 fraud, the people who conducted the fraud, included
2 Eduardo Orlansky?  Did you conclude that?
3  A  Yes, sir.
4  Q  And what was Eduardo Orlansky's role in
5 the fraud, according to your investigation?
6  A  My investigation, I believe you've seen
7 the reports.  He was one of the main people.
8  Q  And Hector Orlansky was one of the main
9 people, as well?
10  A  Same.
11  Q  And Dominick Parlapiano; is that right?
12  A  Yes, sir.
13  Q  And he had a role of either treasurer or
14 CFO of E.S. Bankest; is that right?
15  A  I believe that one or both titles may be
16 correct.
17  Q  Then there was Carlos Mendez; is that
18 right?
19  A  Carlos Mendez worked for the company, yes,
20 sir.
21  Q  And he was involved in committing the
22 fraud, as well, correct?
23  A  Yes, sir.
24  Q  And his role was an internal bookkeeper
25 type role; is that right?

Page 12

1  A  I don't know if that's a proper title.
2  Q  How would you -- based upon your
3 investigation, how would you characterize
4 Mr. Mendez's role?
5  A  He was involved in finance.
6  Q  And do you understand what his title was
7 at the time?
8  A  I'm sort of confused from all the
9 different titles you gave me so far, but I know he
10 was involved in the finance.
11  Q  And Otto Ambrosiani was involved; is that
12 right?
13  A  Yes, sir.
14  Q  And you concluded that as part of your
15 investigation?
16  A  Yes, sir.
17  Q  And Ariadna Puerto, did you conclude that
18 she was part of the fraud?
19  A  Well, she was indicted and convicted.
20 Ms. Puerto was involved heavily in the fraud, yes,
21 sir.
22  Q  Okay.  And what was her role or title at
23 that time?
24  A  At what time?
25  Q  At the time of the fraud.

CondenseIt!™

Page 13

1  A  She had various titles.
2  Q  Okay. What was her last title before
3  Bankest imploded?
4  A  Convicted, I guess.
5  Q  What was her last title before Bankest
6  imploded?
7  A  I don't remember specifically. She was
8  represented to me as the most knowledgeable about
9  accounting when I first came in.
10  Q  And based upon your investigation, not the
11  government's investigation, but based upon your
12  investigation, you determined that she was -- had a
13  role in committing the fraud?
14  A  I don't think I ever spent a lot of time
15  on her, but she was heavily involved.
16  Q  Okay. Other than the people I've
17  mentioned, Eduardo Orlansky, Hector Orlansky,
18  Dominick Parlapiano, Carlos Mendez, Otto Ambrosiani,
19  Ariadna Puerto, based upon your investigation
20  conducted at the time as either examiner, trustee,
21  responsible officer, did you determine anybody else
22  at E.S. Bankest was involved in the fraud?
23  A  I believe Mr. Stanham.
24  Q  What was his title at the time?
25  A  He'd retired by the time I got there.

Page 14

1  Q  What was his title prior to retiring?
2  A  He was a board member.
3  Q  Anybody else?
4  A  I can't recall as I sit here today if
5  there's anybody else in E.S. Bankest.
6  Q  That's all I'm asking. I'm not asking
7  about people outside of E.S. Bankest at this point.
8      Did you as part of your investigation
9  determine that Ms. Strudwick (phonetic) was involved
10  in the fraud?
11  A  No.
12  Q  Did you determine that Lorna Wright was
13  involved in the fraud?
14  A  I don't believe so.
15  Q  Have you now told me everybody that you
16  can remember having determined was involved in
17  committing the fraud at E.S. Bankest?
18  A  Mr. Cole, it's a complex question; people
19  that I haven't spent a lot of time on in quite a
20  while.
21      I believe you named most of the people. I
22  don't know if there's anybody you've left out or
23  not. If it does come back to my attention or my
24  memory, I'll let you know.
25  Q  I'm asking as you sit here today, do you

Page 15

1  remember anybody else?
2      So your answer to that is, as you sit here
3  right now, you don't remember anybody else who was
4  an employee, officer or director of E.S. Bankest, as
5  having been involved in the fraud?
6  A  I don't think so.
7      MR. TRAZENFELD: Adam, my understanding is
8  through Karen that we're not going to plow over any
9  old ground. Did I misunderstand her?
10      MR. COLE: This is not old ground.
11      MR. TRAZENFELD: The investigation isn't
12  old ground?
13      MR. COLE: At the trial it may have been,
14  but he's never been deposed on the investigation.
15  And I'm not planning on going much -- any further.
16  I just wanted to find out certain things to create
17  my summary judgment motion. That's all.
18      MR. TRAZENFELD: If you're only here to
19  create things for your summary judgment motion, I
20  imagine it will be a short deposition.
21      MR. COLE: It depends.
22  BY MR. COLE:
23  Q  Now, as part of your investigation, I
24  gather that you made a determination as to what
25  benefit each one of these individuals received from

Page 16

1  the fraud?
2      MR. TRAZENFELD: Object to the form.
3      MR. COLE: Let me rephrase it.
4  BY MR. COLE:
5  Q  As part of your investigation, did you
6  determine if Mr. Orlansky made any money from the
7  fraud; Eduardo Orlansky?
8  A  I really didn't spend a lot of time in
9  looking to see who did what. My job as a fiduciary
10  was trying to recover funds for the creditors.
11  Q  I gather as your job as a fiduciary
12  conducting an investigation, you made a
13  determination as to how much money Eduardo Orlansky
14  received as a result of the fraud, didn't you?
15  A  Well, there were many questions on that
16  over the time, yes, sir.
17  Q  Okay. And --
18  A  How do you define "money"?
19  Q  Well, why don't you tell the jury how you
20  define "money."
21  A  I'm in a deposition. I don't believe I'm
22  in a jury trial.
23      MR. TRAZENFELD: Not yet. Probably we
24  will be.
25      THE WITNESS: There's various -- if you're

CondenseIt!™

1  talking about, did he receive compensation, yes, he
2  definitely received compensation.
3  BY MR. COLE:
4    Q  And the compensation was his compensation
5  as president or CEO of the company; is that right?
6    A  His salary, yes, sir.
7    Q  Other than his salary at the company,
8  after your investigation, did you make any
9  determination that Eduardo Orlansky received any
10  other money from the fraud?
11    A  If I'm saying compensation is money, I
12  don't believe so.
13    Q  How about Hector Orlansky?  Other than his
14  compensation at E.S. Bankest, and after your
15  investigation, did Hector Orlansky receive any other
16  money resulting from the fraud?
17    A  I just believe his compensation.
18    Q  Other than -- before you mentioned the
19  word -- that you had some confusion about the word
20  "money."
21        Is the issue when you're defining money
22  the difference between compensation and other money?
23  Is that what we're talking about here, or is there
24  something else that you had in mind?
25    A  Well, he received dollars that were

1  reported on his tax return.  That's my belief.
2    Q  Did Mr. Eduardo Orlansky receive any other
3  benefit as a result of the fraud, other than money?
4    A  Well, my discovery showed that between
5  them and their other companies, they owned stock in
6  several other, as I call them, portfolio companies,
7  either personally or through corporate entities.
8    Q  And which companies did you determine
9  Eduardo and Hector Orlansky owned stock in?
10    A  Stratesec, Stratasys, Joy, ENA.  There
11  might have been one or two others, but those were
12  the major ones.
13    Q  And as you sit here today, are any of
14  those companies still in business?
15    A  No, sir.
16    Q  How about Dominick Parlapiano?  Other than
17  his compensation, do you have an understanding as to
18  whether or not he received any other money as a
19  result of the fraud?
20    A  I believe he did.
21    Q  And how much money did you determine
22  Dominick Parlapiano received as a result of the
23  fraud?
24    A  I don't recall exactly, but he had several
25  entities that appeared to be -- factoring clients

1  that appeared to be fake, and moneys might have gone
2  to him.
3    Q  Okay.  And one of those factoring clients
4  was CD Jewel Box; is that right?
5    A  That name -- I can recall that name, yes,
6  sir.
7    Q  All right.  And in your investigation, did
8  you determine whether or not Dominick Parlapiano
9  received money from CD Jewel Box personally?
10    A  I don't know if it was -- I can't recall.
11    Q  That would have been something that you
12  would have investigated, right?
13    A  I never had any of the documents of
14  Mr. Parlapiano, and I'm not sure what -- where my
15  investigation ended, and what I remember from the
16  indictment.  So I can't give you a -- I really don't
17  recall.
18    Q  Well, in your role as fiduciary, did you
19  attempt to find out where Mr. -- where all of
20  Mr. Parlapiano's assets were?
21    A  That was -- Mr. Parlapiano had pled with
22  the U.S. Government.  I received no cooperation.
23  And my understanding is that if there were assets
24  they'd come back to me.
25        I didn't spend a lot of time on that, no,

1  sir.
2    Q  And how about either Hector or Eduardo
3  Orlansky?  Did you, as part of your investigation,
4  try to determine where and what assets those
5  individuals had?
6    A  Yes, sir.
7    Q  Okay.  And did you try to determine
8  whether or not any of those individuals had accounts
9  elsewhere where they may have deposited money from
10  the fraud?
11    A  Could you read it back, or rephrase it?
12    Q  Sure.  Let me rephrase it.
13        In conducting your investigation, did you
14  make any determination that Eduardo Orlansky had an
15  account into which money other than compensation was
16  deposited from the fraud at Bankest?
17    A  There were various accounts that the
18  Orlansky brothers controlled, including Bankest
19  Capital Corp., International.  There was money
20  flowing in many different directions.
21    Q  Did you make any determination that
22  Eduardo or Hector Orlansky had an offshore account
23  for any of their entities, or individually, into
24  which money was deposited from the fraud?
25    A  I don't recall as I sit here today.  I

CondenseIt!™

Page 21

1 haven't really reviewed this in quite a while.
2    Q  What have you done as the fiduciary to try
3 to recover money from Eduardo and Hector Orlansky?
4    A  We looked at their -- and worked with the
5 government agencies and their judgments that were
6 entered by them. We looked at their assets that
7 were, I believe, listed on their personal financial
8 statements, if there were.
9       It's really sort of -- I'm sort of hazy on
10 it, Mr. Cole. I don't really want to speculate or
11 guess. It's been -- part of this has been four
12 years, and I really haven't looked at these parts in
13 quite a while.
14    Q  What, if anything, did you do to verify
15 information on the Orlanskys' personal financial
16 statements?
17    A  In what period of time?
18    Q  During the period of time that you said
19 that you were determining if you could recover money
20 from Hector or Eduardo Orlansky.
21    A  I believe they had given sworn statements.
22       You're really -- you're in an area I don't
23 totally recall. I know that the government was
24 doing an awful lot on this, and I didn't want to
25 duplicate it. It's sort of -- it's mixed between

Page 22

1 what I did and the government. I don't recall.
2    Q  What did the government tell you it was
3 doing to determine whether the personal financial
4 statements were accurate?
5    A  The government said that they were --
6 well, I understand through either the U.S.
7 Attorney's Office -- because the FBI in their
8 discovery, they don't really discuss much with you.
9 They more ask questions. But they seemed to be
10 doing a very thorough job of looking for the assets.
11    Q  So is it your testimony that based upon
12 what you observed, you're assuming that they
13 verified the information on Eduardo and Hector's
14 personal financial statements?
15    A  I believe I said that I was rather hazy.
16 I know that -- I believe the government did. I'd be
17 hazarding a guess. I don't want to guess.
18    Q  How about Carlos Mendez? What, if
19 anything, did you do to try to collect money from
20 Carlos Mendez, as the fiduciary of E.S. Bankest?
21    MR. TRAZENFELD: Object to the form.
22    THE WITNESS: My counsel and I met with
23 his counsel and Mr. Mendez.
24       I think this is -- I apologize, Mr. Cole.
25 Parts of this are over four years ago.

Page 23

1       Mr. Mendez, as I remember, had rather
2 modest means. I don't know what I did or the
3 government did or my counsel did to verify what his
4 assets are.
5 BY MR. COLE:
6    Q  Did you try to collect any money from
7 Mr. Mendez?
8    A  I'd be guessing.
9    Q  How about Mr. Ambrosiani? Did you try to
10 collect any money from Mr. Ambrosiani?
11    A  If I remember properly, Mr. Ambrosiani
12 went bankrupt and had very nominal assets.
13    Q  Now, in fact, did you collect any money
14 from Hector or Eduardo Orlansky, as the trustee or
15 fiduciary of E.S. Bankest?
16    A  I don't believe so.
17    Q  How about Dominick Parlapiano? Did you
18 collect any money from Dominick Parlapiano?
19    A  I don't believe we've ever seen anything.
20 I believe there was recently a settlement with him,
21 and there may be some type of payment. I'm not sure
22 if it's going to me or the government.
23    Q  And do you have an understanding as to how
24 much that settlement is for?
25    A  I don't recall as I sit here today.

Page 24

1    Q  Now, do you know of any benefit, other
2 than his compensation, that Mr. Mendez received from
3 the fraud at E.S. Bankest?
4    A  I don't believe so.
5    Q  How about same question for
6 Mr. Ambrosiani; any benefit that they received?
7    A  Mr. Ambrosiani was not an employee.
8    Q  Okay. Other than the money he was paid
9 for his work at E.S. Bankest, do you have any
10 understanding of any other benefit Mr. Ambrosiani
11 received from the fraud?
12    A  I don't have any understanding.
13    Q  How about the same question for
14 Ms. Puerto? Do you have any understanding, other
15 than her compensation, that she received an
16 additional benefit from the fraud?
17    A  I don't believe so.
18    Q  As part of your investigation, did you
19 investigate the role of Fernando Espirito Santo and
20 his role at Bankest?
21    A  He was one of the independent directors,
22 yes, sir.
23    Q  Okay. And other than determining that he
24 was an independent director, did you conduct any
25 further investigation into his role at E.S. Bankest

CondenseIt!™

Page 25

1  or any Bankest entity?
2      A  I don't believe so, as I recall as I sit
3  here today.
4      Q  Are you familiar with any investments that
5  Mr. Fernando Espirito Santo made in any
6  Bankest-related entity?
7      A  I can't say with a certainty, and I'm not
8  going to guess, if there was any.
9      Q  How about investments or the role of his
10 mother in any E.S. Bankest entity?
11     A  I don't recall, sir.
12     Q  Now, you said that in your role as
13 fiduciary, your job was to try to seek -- try to
14 find money and seek money from different places, and
15 recover as much as you could.
16         Did you recover any money from Joy?
17     A  Yes.
18     Q  And how much money did you recover from
19 Joy?
20     A  I don't have those specific numbers with
21 me.  I know that we collected some receivables that
22 we owned that were factored.  I also know we had a
23 distribution from, I believe the trustee of Joy, and
24 I believe one of the accounts receivables we
25 collected.

Page 26

1      Q  Now, are you expecting any further
2  distribution or collection from Joy?
3      A  I'm not sure as I sit here.  I haven't
4  really focused in on that in quite a while.  If so,
5  it wouldn't be significant.
6      Q  When you say "not significant," you're
7  talking in what range?
8      A  I don't believe over $20,000, but I may
9  be -- I may just -- I'm guessing on that.
10     Q  I gather there -- you say you don't
11 remember what the recovery was from Joy, but I
12 gather that there's some kind of document or piece
13 of paper that would be able to tell you what that
14 recovery is?
15     A  My reports are all filed where the money
16 came from with the Court.
17     Q  Now, did you recover any money from
18 Stratasys?
19     A  I don't believe we recovered any money
20 from Stratasys, no, sir.
21     Q  Did you take control of the assets of
22 Stratasys?
23     A  Stratasys went into an assignment for the
24 benefit of creditors.  After that was over we did
25 take control of whatever books and records the

Page 27

1  assignee had.
2      Q  What about the hard assets?  What happened
3  to those?
4      A  I don't know what you mean by "the hard
5  assets," sir.
6      Q  Well, it was a company, right?  Stratasys
7  was a corporation; is that right?
8      A  Yes, sir.
9      Q  And I gather it had desks and things of
10 that nature?
11     A  The assignee handled all that.  We took
12 in, as I said, records, I believe.
13     Q  And did you receive any money from the
14 assignee for -- withdrawn.
15         Did you receive any money from the
16 assignee of Stratasys?
17     A  I don't believe so.
18     Q  How about United Container?
19     A  We have received money.
20     Q  And that is reflected in a report you
21 filed in the court?
22     A  Yes, sir.
23     Q  How much money -- how much more money do
24 you expect to receive from United Container?
25     A  I believe that's in part of the million

Page 28

1  dollars that I talked about earlier.
2      Q  Is the million dollars in other claims?
3      A  Yes, sir.
4      Q  What about Select Meats?  What did you do
5  to collect money from Select Meats?
6      A  I don't recall.  It would be in the
7  records of the receivership or the trusteeship.
8      Q  And do you anticipate receiving any more
9  money from Select Meats?
10     A  No, sir.
11     Q  How about Alan Stewart?
12     A  Alan Stewart we reached a settlement with,
13 and I believe we received whatever money we had.
14     Q  And what was the amount of money that you
15 settled with Alan Stewart?
16     A  It would be in the records, again.
17     Q  And these are all records that are filed
18 with the Court?
19     A  They'd either be in records filed with the
20 Court, or they'd be filed as part of the
21 receivership records.
22     MR. COLE:  We request a full, up-to-date
23 detail of amounts received by the receiver, by the
24 trustee, by the responsible officer, of moneys from
25 third parties, by Bankest.

CondenseIt!™

Page 29

1     MR. TRAZENFELD: Duly noted, although
2 discovery is over on this case and is only expanded
3 to take Mr. Freeman's deposition and your client's
4 deposition. So that will have to be the subject of
5 future discussions.
6 BY MR. COLE:
7    Q Okay. All right. New topic.
8     As part of your investigation, I gather
9 that you also investigated the manner in which E.S.
10 Bankest raised money for its operations, correct?
11    A Yes.
12    Q And it was your understanding as a result
13 of your investigation that E.S. Bankest issued
14 notes; is that right?
15    A Yes.
16    Q And the purchaser of the note would send
17 cash in exchange for the note; is that right?
18    A It was value. I don't know if it was
19 cash, sir.
20    Q It was value that was provided to E.S.
21 Bankest; is that fair?
22    A Yes, sir.
23    Q And on the date that the noteholder would
24 buy a note, the value at E.S. Bankest would be the
25 same as the value -- face value of the note; is that

Page 30

1 right?
2     MR. TRAZENFELD: Object to the form.
3     THE WITNESS: You've lost me.
4 BY MR. COLE:
5    Q Let me ask you this.
6     MR. TRAZENFELD: This has been gone over
7 many, many times.
8     MR. COLE: Actually, it hasn't. This goes
9 directly to a securities fraud claim, so I can
10 assure you it hasn't been gone over a lot.
11 BY MR. COLE:
12    Q When the purchaser sent value to E.S.
13 Bankest, the purpose of that money was to purchase
14 accounts receivable; is that right?
15    A You've lost me, Mr. Cole. Maybe you can
16 take it back a step and start over.
17    Q Sure. You testified that the purchaser of
18 a note would receive a note, is that right, issued
19 by E.S. Bankest, correct?
20    A Bankest issued notes, correct.
21    Q And the note had a face value; is that
22 right?
23    A Yes, sir.
24    Q And it had an interest component, correct?
25    A Yes, sir.

Page 31

1    Q And what the purchaser provided to E.S.
2 Bankest in exchange for the note was value equal to
3 the face value of the note; is that right?
4    A Could you give me an example?
5    Q I'll give you an example.
6     If a purchaser of the note purchased a
7 $200,000 note, the purchaser would wire, send,
8 $200,000 in cash in exchange for the note to E.S.
9 Bankest; is that right?
10    A The note was for 200,000. They'd received
11 value for 200,000. I don't know if it was a wire,
12 whatever your hypothet is.
13    Q When you said "they," you mean Bankest
14 would receive value of 200,000?
15    A Yes, sir.
16    Q And it would receive $200,000 in value
17 from the purchaser, fair, in that hypothetical?
18    A Okay.
19    Q Is that yes?
20    A Yes.
21    Q Now, the next step was that Bankest was
22 supposed to buy real accounts receivable, right?
23     MR. TRAZENFELD: Object to the form.
24     THE WITNESS: I don't understand the
25 question.

Page 32

1 BY MR. COLE:
2    Q Well, was the business of Bankest supposed
3 to be the purchase and sale of accounts receivable?
4    A The business of Bankest was the purchase
5 and sale of accounts receivable. That was the
6 stated purpose, yes.
7    Q And in your investigation you found that
8 in fact, E.S. Bankest purchased some real accounts
9 receivable, right?
10    A Yes, sir.
11    Q And it purchased those accounts receivable
12 with money that it raised from investors?
13     I'm just talking about the real ones at
14 this point.
15    A That was some of the money, yes, sir.
16    Q And when it purchased accounts receivable
17 with money that it raised from investors, would you
18 agree with me, sir, that at least with respect to
19 those accounts receivable, E.S. Bankest received
20 some benefit?
21     MR. TRAZENFELD: Object to the form.
22     THE WITNESS: Could you repeat it, sir?
23     MR. COLE: Sure.
24     Could you read it back, please?
25

CondenseIt!™

| Page 33 |
|---|

1    (Whereupon, the requested portion of the
2  record was read by the Reporter as above
3  recorded.)
4    THE WITNESS: I'm trying to answer.  I'm
5  foggy on that.  Maybe you can either rephrase or
6  repeat it again.
7  BY MR. COLE:
8    Q  Sure.  When E.S. Bankest -- based upon
9  your investigation, when E.S. Bankest purchased a
10  receivable and collected on the receivable, it
11  received -- it made a profit; is that right?
12    MR. TRAZENFELD: Object to the form.
13    THE WITNESS: You're mixing different
14  transactions.  Purchased a receivable is at one
15  point, collected might have been at a different
16  point.
17  BY MR. COLE:
18    Q  Well, let me break it down.
19    When E.S. Bankest purchased an account
20  receivable, it received -- an actual account
21  receivable, a real one -- it received an account
22  receivable, correct?
23    MR. TRAZENFELD: Object to the form.
24    THE WITNESS: If it purchased an accounts
25  receivable that was real, your question is, did it

| Page 34 |
|---|

1  get the accounts receivable?
2  BY MR. COLE:
3    Q  That's the first step, right.
4    A  If all the paperwork was done properly,
5  assuming that, yes, sir.
6    Q  And in your investigation, you found
7  paperwork that confirmed that E.S. Bankest received
8  accounts receivable, correct?
9    A  E.S. Bankest would have purchased an
10  accounts receivable.
11    Q  The next step was that E.S. Bankest then
12  in some instances collected on that accounts
13  receivable, right?
14    A  There are some situations where they did,
15  yes.
16    Q  And when it collected on those accounts
17  receivable, it made -- E.S. Bankest made a profit;
18  isn't that right?
19    MR. TRAZENFELD: Object to the form.
20    THE WITNESS: The circumstances were
21  different, but if they purchased a receivable, and
22  then collected the receivable, there might have been
23  a profit.
24  BY MR. COLE:
25    Q  In your investigation, did you find any

| Page 35 |
|---|

1  profits made at E.S. Bankest from collecting real
2  accounts receivable?
3    A  Well, the financial statements that BDO
4  issued showed large profits on an annual basis, and
5  they were certified as to that.
6    Q  My question, sir, is, based upon your
7  multi million dollar investigation, did you
8  determine that E.S. Bankest made a profit on any
9  accounts receivable that it collected?
10    MR. TRAZENFELD: Object to the form.
11    THE WITNESS: You're asking me a very
12  specific question, and I don't know if I can answer
13  it, sir.
14    Did BDO -- did Bankest earn money on a
15  hypothetical $200,000 receivable, and your
16  question -- they had overhead, they had expenses,
17  they had a lot of other things.  I couldn't tell
18  you, based upon your hypothet, if they made money or
19  lost money.
20  BY MR. COLE:
21    Q  My question --
22    A  You're the accountants.  You should have
23  been able to tell us.
24    Q  My question is, based upon your
25  investigation, did E.S. Bankest collect any real

| Page 36 |
|---|

1  accounts receivable in which it made a profit on the
2  account receivable?
3    A  The same answer, sir.
4    Q  You don't know one way or the other?
5    A  Well, I didn't do an allocation of
6  overhead to the real receivables, with an allocation
7  of expenses.  No, sir, I didn't.
8    Q  All right.  Let me ask you this:  In your
9  investigation, did you determine that any of the
10  accounts receivable were collected at face value?
11    A  Yes.
12    Q  Now, you also determined as part of your
13  investigation that Bankest issued dividends; isn't
14  that right?
15    A  Yes.
16    Q  And those dividends went to the two owners
17  of E.S. Bankest, Espirito Santo Bank and Bankest
18  Capital, correct?
19    A  That's what the certified financial
20  statement showed, and that's what my investigation
21  showed.
22    Q  Now, based upon your investigation, did
23  E.S. Bankest pay off old debt, debt that was
24  incurred in 1998, 1999, by issuing new notes?
25    MR. TRAZENFELD: Object to the form.

CondenseIt!™

Page 37

1    THE WITNESS: I don't understand the
2 question.
3 BY MR. COLE:
4    Q  Well, in 1998, E.S. Bankest incurred debt,
5 right, based upon your investigation?
6    A  Well, they issued notes, yes, sir.
7    Q  And in your investigation, were any of
8 those notes paid off?
9    A  Yes, sir.
10    Q  How about notes in 1999?  Did you
11 determine that some were paid off?
12    A  I believe, yes, sir.
13    Q  And the same with 2000 and 2001?
14    A  That was the ordinary course, yes.
15    Q  All right.  And in paying off those notes,
16 E.S. Bankest used money that it earned from its
17 operations in purchasing and selling accounts
18 receivable; is that right?
19    A  Sir, you're asking me the same question
20 you asked before, and I stated that I don't
21 believe I can give you an answer if they made money
22 on the real accounts receivable on any year, based
23 upon my investigation.
24    Q  I'm not asking you that.
25    My question is, based upon E.S. Bankest's

Page 38

1 collection of accounts receivable, was it able --
2 did it have cash to pay off some notes?
3    A  It paid off notes, but I don't know -- you
4 know, this was -- I don't know how to answer your
5 question, was.
6    They paid off notes as they went along.
7 As to the profitability, that's a whole different
8 world.
9    Q  I wasn't asking about profitable.  I was
10 asking about just notes.
11    So your answer is, as they went along,
12 E.S. Bankest paid off notes, right?
13    A  Yes.
14    Q  Now, there came a time when Espirito Santo
15 Bank sold its interest to Bankest Capital; is that
16 right?
17    A  Yes, sir.
18    Q  And Espirito Santo Bank received
19 approximately $10 million for that interest; is that
20 right?
21    A  I believe so.
22    MR. TRABAND:  You're going to get into a
23 new area soon?
24    MR. COLE:  What?
25    MR. TRAZENFELD:  The $10 million, you're

Page 39

1 telling me that hasn't been questioned before?
2    MR. COLE:  Thank you.
3 BY MR. COLE:
4    Q  And Espirito Santo Bank made other money
5 from its interest in E.S. Bankest, right?
6    MR. TRAZENFELD:  Object to the form.
7    THE WITNESS:  Repeat the question.
8 BY MR. COLE:
9    Q  Sure.  Espirito Santo Bank made money off
10 of its interest in E.S. Bankest; isn't that right?
11    A  As to their membership interest -- the
12 financial statements, as you testified -- as you
13 asked me -- showed that there were profits that were
14 distributed to both of the members.  So the answer
15 would be yes.
16    Q  And your investigation showed that, as
17 well, correct?
18    MR. TRAZENFELD:  Object to the form.
19    THE WITNESS:  Showed what, sir?
20 BY MR. COLE:
21    Q  That profits were distributed to the
22 principals.
23    A  The profits in the years that you all
24 certified there were profits, we come to believe at
25 a later date that this was not a profitable

Page 40

1 enterprise on an overall basis.
2    Q  My question, sir, based upon your
3 investigation, did Espirito Santo Bank, other than
4 its $10 million that it received from its --
5 relating to its interest, the dividend payments it
6 received, did Espirito Santo Bank, based upon your
7 investigation, receive any other money out of E.S.
8 Bankest?
9    A  Yes.
10    Q  And what was the nature of the money,
11 based upon your investigation, that Espirito Santo
12 received?
13    A  I believe Espirito Santo received
14 placement fees that were disclosed, and their share
15 of the profits.  They also had a lending -- through
16 one of their affiliates they had a lending
17 situation.
18    Q  And I gather Bankest Capital received
19 other money from E.S. Bankest as its principal?
20    MR. TRAZENFELD:  Object to the form.
21    THE WITNESS:  You lost me.
22    Can we take a break?
23    MR. COLE:  Sure.
24    (Thereupon, a recess was taken, after
25 which the following proceedings were had:)

CondenseIt!™

Page 41

BY MR. COLE:

1  BY MR. COLE:
2    Q  Mr. Freedman, in your -- in your role as
3  responsible officer, have you ever made a
4  determination as to when E.S. Bankest became
5  insolvent?
6    A  Repeat the question.
7    Q  In your role as responsible officer,
8  trustee, receiver, examiner, any of those roles, did
9  you ever make a determination as to when E.S.
10  Bankest became insolvent?
11    A  I really hadn't thought about it.
12    Q  Sir, as part of your claimed damages in
13  this case, you've asserted that Bankest's insolvency
14  was deepened.
15        Are you still pursuing those damages?
16    MR. TRAZENFELD: If you can answer that
17  question independent of any conversations you had
18  with your counsel, by all means go ahead.  Other
19  than that, there would be attorney/client privilege,
20  and I'm instructing you not to answer.
21    THE WITNESS: I had many discussions about
22  this with my counsel, and therefore, I can't answer.
23  BY MR. COLE:
24    Q  I'm certainly entitled to determine what
25  the basis is for your damages.

Page 42

1        Is it your understanding as the plaintiff
2  in this case that you are seeking damages for the
3  amount of money Bankest's insolvency was deepened
4  by?
5    MR. TRAZENFELD: Object to the form.
6    THE WITNESS: I'm seeking damages -- your
7  question -- I'm lost on it, Adam.  I'm not trying to
8  be difficult.
9        I'm seeking documents for the money --
10  there was $220 million worth of receivables that
11  were certified three months before I came in, that
12  were collectable and good.  There was 170 million I
13  owe the creditor, the largest creditor being the
14  bank, and $50 million worth of profits that had
15  accumulated in the corporation over that time.
16        So the total was $220 million of net worth
17  the business had when I came in.
18  BY MR. COLE:
19    Q  My question, sir, is, are you seeking
20  damages for an amount of money by which E.S.
21  Bankest's insolvency was deepened?
22    MR. TRAZENFELD: I'm repeating the
23  instruction I gave you before, Mr. Freeman.
24    THE WITNESS: I can't, without breaking
25  attorney/client privilege.

Page 43

1  BY MR. COLE:
2    Q  And is it your testimony that you have no
3  idea when E.S. Bankest became insolvent?
4    MR. TRAZENFELD: Object to the form.
5    THE WITNESS: That's not what I said, sir.
6  BY MR. COLE:
7    Q  Do you have a date on which you believe,
8  after your investigation, and in your role as
9  fiduciary, E.S. Bankest became insolvent?
10    A  I had many conversations with my counsel
11  on this, starting back in August of '03, and these
12  were opinions I shared with my counsel.
13    MR. TRAZENFELD: So it would be
14  privileged, and he's not going to answer the
15  question.
16  BY MR. COLE:
17    Q  These are opinions that you came up with.
18        Did you independently reach any opinion,
19  separate from your counsel, as to the date on which
20  E.S. Bankest became insolvent?
21    A  I believe I testified on this before, but
22  I can only think of my conversations at the present
23  time with counsel.
24    Q  So as you sit here today --
25    A  Or maybe in other trials.  If so, those

Page 44

1  would be already stated and on the record.
2    Q  As you sit here today, you don't have an
3  understanding as to the date on which E.S. Bankest
4  became insolvent?
5    MR. TRAZENFELD: Object to the form.
6    THE WITNESS: It wasn't part of the
7  analysis that I did, that I can share with you,
8  outside of my attorney/client.
9  BY MR. COLE:
10    Q  Well, you said that you gave an opinion to
11  your attorney, you communicated an opinion to your
12  attorney.
13    A  I said my attorneys and I discussed it.
14    Q  Now, you said also that, I believe, you
15  analyzed each year -- withdrawn.
16        During your investigation of E.S. Bankest,
17  did you spend any time determining what percentage
18  or what amount of accounts receivable were fake on a
19  year-to-year basis?
20    A  I've testified in circuit court, I
21  believe, on this area, that most of the accounts
22  receivable were fake on a year-to-year basis.
23    Q  My question is more specifically, in 1998,
24  did you make a determination as to the exact dollar
25  amount of accounts receivable that were fake?

CondenseIt!™

| Page 45 |
|---|
| 1   MR. TRAZENFELD: Adam, I believe this was |
| 2 covered in the trial, and Karen specifically |
| 3 indicated we weren't going to go over old ground. |
| 4   MR. COLE: Of course, I don't have a |
| 5 videotape of the trial, so I'd like an answer to my |
| 6 question. |
| 7   MR. TRAZENFELD: No, but you were there. |
| 8   MR. COLE: I'm not going to testify at |
| 9 your trial. I'm entitled to put him on tape on |
| 10 this. |
| 11   MR. TRAZENFELD: The answers would be the |
| 12 same. |
| 13 BY MR. COLE: |
| 14   Q In 1998 -- |
| 15   MR. TRAZENFELD: You don't recall his |
| 16 trial testimony? |
| 17   MR. COLE: I know his trial testimony |
| 18 pretty well, because I was there. |
| 19   MR. TRAZENFELD: Then why ask it again? |
| 20   MR. COLE: Because his trial testimony |
| 21 wasn't specific. |
| 22 BY MR. COLE: |
| 23   Q My question to you is -- |
| 24   MR. TRAZENFELD: You expect him to be more |
| 25 specific today? |

| Page 46 |
|---|
| 1   MR. COLE: Maybe he can. He did spend |
| 2 millions of dollars conducting an investigation, so |
| 3 maybe he can understand what was fake and what was |
| 4 real. |
| 5   MR. TRAZENFELD: You charged your client |
| 6 millions of dollars to find out. |
| 7   MR. COLE: No. Actually, my client didn't |
| 8 charge a million dollars. |
| 9   MR. TRAZENFELD: No. I said you've |
| 10 charged your client millions of dollars to do your |
| 11 investigation. |
| 12   MR. COLE: My investigation was not as the |
| 13 receiver of E.S. Bankest. I don't have a fiduciary |
| 14 duty. |
| 15 BY MR. COLE: |
| 16   Q My question is very simple. |
| 17   Do you have a precise number that you came |
| 18 up with after your investigation, as to how many, |
| 19 how much, the value of the accounts receivable that |
| 20 were fake in 1998? |
| 21   A I believe I've testified when I testified |
| 22 in court it was the majority of them, the vast |
| 23 majority. I don't recall ever coming up with an |
| 24 exact figure. |
| 25   Q Okay. And is your answer the same for |

| Page 47 |
|---|
| 1 '99, 2000, 2001? |
| 2   A That's exactly what I testified in court, |
| 3 same answer. |
| 4   Q And you testified in court that -- you |
| 5 gave a similar answer in court, but my question is, |
| 6 sitting here today, do you have a precise number of |
| 7 the amount of accounts receivable that were real in |
| 8 1999, 2000, 2001 and 2002? |
| 9   MR. TRAZENFELD: Object to the form. |
| 10   THE WITNESS: No. I believe I testified |
| 11 in court, of the $220 million that were in the audit |
| 12 as of '03, '02, 5 million was roughly real. I |
| 13 believe I testified to that in federal court and in |
| 14 state court. |
| 15   MR. TRAZENFELD: We're happy to stipulate |
| 16 to his prior testimony. |
| 17 BY MR. COLE: |
| 18   Q So the $5 million -- approximately |
| 19 $5 million was real out of 2002. |
| 20   My question is, based upon 2001, 2000, |
| 21 '99, you don't have any more precise number; is that |
| 22 right? |
| 23   A I don't believe so. |
| 24   MR. TRAZENFELD: Adam, you're going over |
| 25 old ground. |

| Page 48 |
|---|
| 1 BY MR. COLE: |
| 2   Q What is the basis for your claim that |
| 3 BDO -- withdrawn. |
| 4   What is the total amount of money that |
| 5 you're seeking from BDO in this action? |
| 6   MR. TRABAND: Can we just have an |
| 7 understanding than when either Mr. Cole or Mr. |
| 8 Freeman uses the term "BDO," it's referring to BDO |
| 9 Seidman, and we'll differentiate BDO International |
| 10 by calling it BDO International? Can we have that |
| 11 agreement? |
| 12   MR. TRAZENFELD: Well, in our view, they |
| 13 kind of merge together. |
| 14   MR. COLE: I'll rephrase the question. |
| 15   MR. TRAZENFELD: I'm not sure if that |
| 16 agreement would be appropriate. |
| 17   MR. COLE: I find it hard to believe that |
| 18 your view would be merged together, since the Court |
| 19 has already said they haven't. |
| 20   MR. TRAZENFELD: The Court already said |
| 21 you owe half a billion dollars, too. Do you want to |
| 22 stipulate to that? |
| 23   MR. COLE: I can stipulate as to what the |
| 24 Court has said. I invite you to go look in the |
| 25 court file. I'm sure you can find that. |

CondenseIt!™

Page 49

1 BY MR. COLE:
2    Q  My question is very simple, Mr. Freedman.
3       What is the amount of money you're seeking
4 from BDO Seidman in this case?
5    A  Just as the complaint said -- I don't know
6 if it has a specific amount, but as I testified
7 earlier, there was 220 million worth of receivables
8 that were certified, 170 million of debt, and
9 50 million of equity.
10      I talked to my counsel about the damages,
11 but that is privileged, but I'd have to say that's
12 in the range.
13   Q  Well, what's the basis for your claiming
14 those damages?
15   A  Certified audits by BDO Seidman.
16   Q  And how did you calculate those damages?
17   A  Because they said that they fairly
18 presented the financial position of the company at
19 the time they issued those financial statements.
20   Q  Are you saying that your damages claim,
21 you're claiming damages for the net equity that BDO
22 certified in 2002?
23      MR. TRAZENFELD: Object to the form.
24      THE WITNESS: I testified as to what I
25 testified.  They said that there were assets of

Page 50

1 $220 million.
2 BY MR. COLE:
3    Q  And are you seeking $220 million from BDO?
4    A  I have discussed that with my counsel.  I
5 don't believe we've reached a final determination,
6 but in the range of $220 million is not too low, no,
7 sir.
8    Q  When do you think you'll have a
9 determination as to what damages you're going to be
10 seeking in this case?
11   A  When I work with my counsel and come up
12 with those conclusions.  I don't know if they're due
13 yet.
14   Q  Well, this is the time.  This is your
15 deposition.  Discovery is over.
16      Is it your testimony that you don't know
17 how much your damages are in this case?
18      MR. TRAZENFELD: He's given you his best
19 estimate.
20      MR. COLE: Actually, I want to know how he
21 calculated that estimate.
22      MR. TRAZENFELD: He told you 170 of debt
23 and 50 million of equity.
24 BY MR. COLE:
25   Q  So you're seeking $170 million in debt,

Page 51

1 plus the $50 million in equity in this case?
2    A  The 220, yes.
3    Q  And so the way you calculate it is, you
4 believe BDO should pay the estate of E.S. Bankest
5 for the $50 million in equity; is that right?
6    A  Yes, sir.
7    Q  And what's the basis for calculating
8 $50 million in equity in E.S. Bankest?
9    A  Certified financial statements issued by
10 BDO.
11      MR. TRABAND: Move to strike.
12 BY MR. COLE:
13   Q  Is there any --
14      MR. TRAZENFELD: As non-responsive?
15      MR. TRABAND: As vague.
16      MR. TRAZENFELD: Vague, okay.
17      MR. COLE: BDO instead of BDO
18 International.
19      MR. TRABAND: If you won't stipulate to
20 that, then I ask the witness to be clear about which
21 entity he's referring to.
22      MR. TRAZENFELD: He's referring to both.
23      MR. TRABAND: BDO International did not
24 issue --
25      MR. TRAZENFELD: Our claim is it's

Page 52

1 vicarious liability, so it's the same amount due
2 from both entities.
3      MR. TRABAND: I'll move to strike every
4 time his answer is BDO.
5      MR. COLE: Okay.
6 BY MR. COLE:
7    Q  And you're seeking $170 million in -- on
8 the debt component, correct?
9    A  Pardon me?
10   Q  You just said 50 million on the equity,
11 correct, that you're seeking from BDO Seidman?
12   A  You declaration or dec?
13   Q  I said debt.
14   A  Dec?
15   Q  Debt; D-E-B-T.
16   A  Oh, debt.
17      MR. TRAZENFELD: It's the New York accent
18 that's throwing you off.
19      THE WITNESS: Yes, the 170.  I'm sorry.
20 BY MR. COLE:
21   Q  And is it your testimony, sir, that none
22 of that debt was paid down before the end of E.S.
23 Bankest, based upon your investigation?
24   A  That was the outstanding at the time.
25   Q  $170 million was outstanding at the time?

CondenseIt!™

Page 53

1  A  Yes, sir.
2  Q  That's what your investigation shows?
3  A  I believe so.
4  Q  How much did ESB Finance receive at the
5  end of 2002 and into 2003?
6  A  You've lost me, Mr. Cole.
7  Q  You were aware that some of the debt was
8  paid down by E.S. Bankest, right?
9     MR. TRAZENFELD:  Object to the form.
10    THE WITNESS:  Mr. Cole, I'm really -- I
11 know that between -- before I came in as a receiver
12 or the examiner, operations had continued.  I'm not
13 sure what the existing was at the time.
14    I know that I was given a list of accounts
15 receivable when I came in, showing roughly
16 $220 million, and my belief, about 170 million was
17 owed.
18 BY MR. COLE:
19 Q  Now, as part of your investigation, you
20 did a tracing analysis, correct?
21    MR. TRAZENFELD:  Object to the form.
22    THE WITNESS:  Could you be more specific?
23 BY MR. COLE:
24 Q  Sure.  As part of your role as
25 fiduciary -- you testified to some of this before, I

Page 54

1  just want to finish the part that applies to this
2  case -- in your role as receiver, trustee,
3  responsible officer, your group conducted an
4  analysis tracing money through the bank accounts of
5  E.S. Bankest -- money through the bank accounts of
6  E.S. Bankest; isn't that correct?
7  A  Yes, sir.
8  Q  And you also did a tracing analysis of
9  money that went through Bankest Capital; is that
10 right?
11 A  Yes, sir.
12 Q  And Joy; is that right?
13 A  We did -- what we did you already have
14 copies of, as to Joy's books and records.  I don't
15 recall -- what we've done I've already testified, to
16 and I think we already have turned it over to you.
17 Q  Right.  And I believe the prior testimony
18 was that from bank statements, Ms. Gilden created
19 spread sheets, she took the numbers off the bank
20 statements and put it into a spread sheet.
21    You're familiar with that, right?
22    MR. TRAZENFELD:  Object to the form.
23    THE WITNESS:  We did something like that,
24 yes, sir.
25

Page 55

1  BY MR. COLE:
2  Q  And the spread sheets showed where money
3  went out of the account in the form of a debit,
4  right?
5  A  We traced the money that came in and out
6  of the account.
7  Q  My first question, sir, is, after tracing
8  money that went in and out of the account, did you
9  go to the next step and see where the money went
10 after it was traced to the first party who received
11 it?
12    MR. TRAZENFELD:  Object to the form.
13 BY MR. COLE:
14 Q  Let me give you an example.
15    MR. TRAZENFELD:  Are you withdrawing that
16 question?
17    MR. COLE:  I'll withdraw the question.
18 Let me give you an example.
19    Let's mark this as Freeman Exhibit 1.  It
20 is a portion of Lewis B. Freeman as Receiver for
21 E.S. Bankest, Analysis of Banking Activity, and in
22 particular it's for the E.S. Bankest account
23 106140606, for the year 1999.
24    MR. TRAZENFELD:  And this was obtained in
25 the state court discovery process?

Page 56

1     MR. COLE:  Yes.
2     MR. TRAZENFELD:  And this area has been
3  reviewed numerous times?
4     MR. COLE:  Sorry?
5     MR. TRAZENFELD:  This area has been
6  reviewed numerous times?
7     MR. COLE:  No.
8     MR. THOMAS:  I think that's incorrect.
9  There was substantial testimony and
10 cross-examination.  You spent days with him, and you
11 had Katie on the stand.
12    MR. TRAZENFELD:  Adam, I mentioned at the
13 beginning of the deposition --
14    MR. COLE:  My question is very simple.
15    MR. THOMAS:  Why don't you let him finish
16 his statement?  Because you're wasting all of our
17 times.
18    MR. COLE:  Nobody is wasting any time.
19    MR. THOMAS:  You asked these questions
20 before.  It's not a reason to harass him.
21    MR. COLE:  I'm not going to respond,
22 because you know what's going on.
23    Let's mark the exhibit.
24    MR. THOMAS:  It's marked as an exhibit in
25 the state court, it was entered into evidence in the

CondenseIt!™

Page 57

1 state court, and there was testimony about it in the
2 state court.
3      (Whereupon, the said document was marked
4      as Freeman Exhibit No. 1 for identification
5      by the Reporter.)
6      MR. COLE: As you all know, this is not
7 the state court proceeding. There are different
8 claims in this case, direct claims in this case.
9 The law allows me to ask questions that go to those
10 direct claims.
11      He was not a party in the state court,
12 notwithstanding what he testified to. He was not a
13 party in the state court. He is a party in this
14 case right now.
15      I'm asking questions about the claims that
16 were asserted in this case right now, which are
17 different from the claims in state court.
18      MR. TRAZENFELD: Are you saying this is
19 only about the securities law claim?
20      MR. COLE: No. I don't think you
21 understand. Do you think you only have a securities
22 law claim in this case?
23      You don't have a direct negligence claim
24 or aiding and abetting breach of fiduciary duty? If
25 you want to withdraw those claims, I'll be happy to

Page 58

1 stop.
2      Those claims were not in the state case,
3 and my recollection was, Mr. Freeman wasn't a party
4 there, notwithstanding his involvement with Bankest.
5      So let me just ask some of these questions
6 so we can get this done.
7      MR. THOMAS: Ask questions that are not
8 harassing.
9      MR. COLE: I don't believe there's a
10 harassing question that's been asked, but thank you
11 for your input.
12      I don't even know why you're here.
13      MR. TRAZENFELD: Are you covering new
14 ground or old ground?
15      MR. COLE: Are you here representing
16 Mr. Freeman?
17      MR. THOMAS: I am here to make sure that
18 you don't do exactly what you're doing.
19 Mr. Trazenfeld wasn't in the state court everyday,
20 and didn't see you, and doesn't know what all the
21 exhibits were and everything.
22      He's asked me to be here to enforce the
23 agreement that you reached with him, so you wouldn't
24 do what you're doing right now.
25      MR. COLE: Actually, you don't even know

Page 59

1 what I'm doing.
2 BY MR. COLE:
3      Q My question is --
4      MR. THOMAS: I think I know what you're
5 doing.
6      MR. COLE: Are you here representing
7 anybody?
8      MR. THOMAS: Yes.
9      MR. TRAZENFELD: He's here at my request.
10      MR. COLE: Who are you here representing?
11      MR. THOMAS: I have no ability to answer
12 your questions on the record, because it's not my
13 deposition. Mr. Trazenfeld said I'm here at his
14 request.
15      MR. COLE: Okay. So are you here
16 representing somebody or not?
17      MR. THOMAS: I'm always representing
18 somebody.
19      MR. COLE: Okay. But you're supposed to
20 announce it on the record, as you know.
21      MR. THOMAS: I'm here at Mr. Trazenfeld's
22 request.
23 BY MR. COLE:
24      Q Mr. Freeman, take a look at Exhibit 1.
25      MR. TRAZENFELD: Adam, I'm not going to

Page 60

1 give you a lot of latitude on this.
2      MR. COLE: That's fine. You can do
3 whatever you want.
4 BY MR. COLE:
5      Q The question I was asking, that was a
6 little confusing earlier, if you turn to the first
7 page with a chart on it, which is the second page of
8 the exhibit --
9      MR. TRAZENFELD: What's the Bates stamp
10 number?
11      MR. COLE: It's 478-B 002.
12      MR. TRAZENFELD: This is from Plaintiff's
13 Exhibit 478-B from the state court case?
14      MR. COLE: I'm not sure if it was
15 plaintiff's or joint or defendant.
16      MR. TRAZENFELD: I'm just reading from the
17 stamp.
18      MR. COLE: Then you're correct.
19 BY MR. COLE:
20      Q Take a look at that page.
21      Again, we don't want to repeat testimony
22 from your prior deposition, but --
23      MR. TRAZENFELD: Thank you.
24 BY MR. COLE:
25      Q Under the column checks and debits, it's

CondenseIt!™

**Page 61**

1 my understanding, sir, that that's money that went
2 out of the account; is that right?
3     A   What was the question?
4     Q   There's a column entitled checks and
5 debits.
6         Do you see that?
7     A   Second column?
8     Q   Correct. Do you see where it says
9 checks/debits?
10    A   Yes, sir.
11    Q   And is it your understanding that that
12 column reflects money that was sent out of the
13 account?
14        MR. TRAZENFELD: Object to the form.
15        THE WITNESS: The exhibit speaks for
16 itself. What it says is what it says, sir. It's a
17 summary of cash, credits and debits.
18 BY MR. COLE:
19    Q   Under the column -- the money under the
20 column called checks and debits, is it your
21 understanding as the person whose name is on the
22 report, is it your understanding that checks and
23 debits is money that was sent out of the account in
24 the form of a check or a transfer?
25    A   I haven't looked at this exhibit in

**Page 62**

1 several years, or at least a year.
2        Mr. Cole, you're taking something and
3 asking me -- it definitely says checks and debits.
4     Q   And as somebody who was involved in this
5 report, is it your understanding as you sit here
6 today that that reflects money that went out of the
7 account?
8        MR. TRAZENFELD: Object to the form.
9        THE WITNESS: It is what it is, Mr. Cole.
10 BY MR. COLE:
11    Q   Well, does it reflect money that went out
12 of the account?
13        MR. TRAZENFELD: Object to the form.
14        THE WITNESS: I don't have the account
15 statement here. You're giving me a document, Mr.
16 Cole, that -- there were many other documents.
17 You're giving me a document that is one of at least
18 478 exhibits. It says what it says.
19 BY MR. COLE:
20    Q   My question, sir, again is, you were
21 involved in creating this report, or this portion of
22 the report. It's entitled Lewis B. Freedman and
23 Partners as Receiver for E.S. Bankest, Analysis of
24 Banking Activity.
25    A   Where does it say that, sir?

**Page 63**

1     Q   On the very first page.
2         You remember doing an analysis of banking
3 activity, right, or don't you remember that now? Do
4 you remember doing an analysis of banking activity?
5     A   Yes, I do, sir.
6         The cover page was not prepared by me. So
7 you're asking me to look at something out of
8 context.
9         We did do a tracing. We did do a summary
10 for 1999.
11    Q   And in the summary of 1999 it says checks
12 and debits?
13    A   It says what it says.
14    Q   And based upon your years of doing these
15 types of analyses, what does a check and a debit
16 mean to you?
17        MR. TRAZENFELD: Object to the form.
18        THE WITNESS: It says what it says, sir.
19 Deposits or credits, checks or debits, then the net.
20 BY MR. COLE:
21    Q   And to your understanding, checks and
22 debits are money that was sent out of the account,
23 either in the form of check or some other debit,
24 right?
25        MR. TRAZENFELD: Object to the form.

**Page 64**

1         THE WITNESS: It says what it says.
2 BY MR. COLE:
3     Q   You don't understand what the word "debit"
4 means?
5     A   I didn't say that, sir.
6     Q   Then what does the word "debit" mean to
7 you in this context?
8     A   In this case it would be checks or debits
9 going out.
10    Q   Okay. Now, after the money -- after you
11 conducted this analysis -- this is just an
12 example -- of check and debits, it shows on this
13 chart the entities or people to whom checks and
14 debits were sent.
15        Do you see that?
16    A   Yes, sir.
17    Q   And my question, sir, is, take for example
18 the very first one, ADG Investment.
19        Did you, as part of your tracing analysis,
20 determine who ADG Investment was?
21    A   I don't recall, sir.
22    Q   My question is really overall.
23        In conducting the tracing analysis, did
24 you go any further than determining that a check was
25 sent to, or series of checks were sent to ADG

CondenseIt!™

Page 65

1 Investment?
2     MR. TRAZENFELD: With this tracing
3 analysis?
4     MR. COLE: Yes.
5     THE WITNESS: You sort of lost me, Mr.
6 Cole.
7     You know, we produced it. You're asking
8 me something I haven't seen in a while. I don't
9 know what the backup is. I haven't seen it. If you
10 have more you want to show me, I'm more than glad to
11 look, but this is all stuff I believe I've testified
12 to in the past.
13 BY MR. COLE:
14     Q I'm just asking for your recollection. I
15 don't believe you testified to this in the past.
16     My question is, after a check or series of
17 checks, the $155,000 you determined was sent to ADG
18 Investment, did you do anything to determine, as
19 part of your tracing analysis, what ADG Investment
20 did with the money?
21     A I don't know, sir. I don't recall what we
22 did.
23     Q So with respect to ADG Investment, did you
24 at least determine what ADG Investment was?
25     A Same answer, sir.

Page 66

1     Q So as you sit here today, you don't know
2 whether or not ADG Investment, for example, was an
3 entity that was related to the Orlanskys?
4     A I don't know either way, sir.
5     Q The same thing --
6     A I don't know what was done, when this was
7 done, which was probably several years ago, without
8 looking at the backup and being refreshed.
9     Q As you sit here today, you don't know one
10 way or the other; is that right?
11     A I'd say the statement is the statement.
12     Q Same thing with Burgen Finance, which is
13 about a third of the way down? Have you ever heard
14 of Burgen Finance?
15     A I don't know, sir. I don't recall.
16     Q You don't know whether or not the $320,000
17 in the form of checks and debits that went to Burgen
18 Finance was sent to the Orlanskys or Espirito Santo?
19     A I don't understand the question at all.
20     If there was a check made out for $320,000
21 to Burgen Finance, my understanding is, the money
22 went to Burgen Finance.
23     Q And the question is, did you then subpoena
24 information from Burgen Finance to find out where
25 the money from Burgen Finance went, if anywhere?

Page 67

1     A I don't know about this specific item.
2 Whatever we did, our work papers would show.
3     MR. TRAZENFELD: All of which have been
4 previously produced.
5     MR. COLE: Actually, they haven't been.
6 BY MR. COLE:
7     Q To your knowledge, as you sit here today,
8 with respect to any recipient of money from an
9 Espirito Santo, E.S. Bankest account -- withdrawn.
10 Let me rephrase it.
11     As you sit here today, with respect to any
12 money a recipient received from an E.S. Bankest
13 account, did you determine what that recipient did
14 with the money?
15     A I'm not trying to be -- maybe you can
16 repeat it, or maybe you could have it reread to me.
17     MR. COLE: Reread it, please.
18     (Whereupon, the requested portion of the
19     record was read by the Reporter as above
20     recorded.)
21     THE WITNESS: Our work papers would show
22 what we did. I couldn't tell you specifically, Mr.
23 Cole, without looking at more documents.
24     MR. COLE: Let's mark as Exhibit 2 another
25 portion of the tracing analysis entitled Joy

Page 68

1 Athletics, Inc., City National Bank, account number
2 7001565052, for the year 2003.
3     (Whereupon, the said document was marked
4     as Freeman Exhibit No. 2 for identification
5     by the Reporter.)
6     MR. TRAZENFELD: This doesn't have a Bates
7 stamp number on it.
8     MR. COLE: It's a portion of the report.
9     MR. TRAZENFELD: This is attorney/client
10 work privileged document. I didn't want you to
11 inadvertently provide this to me.
12     MR. COLE: This is his attorney/client
13 privilege work product.
14     MR. TRAZENFELD: Just looking out for you.
15     Again, this is a document from the state
16 court proceeding?
17     MR. COLE: Yes.
18 BY MR. COLE:
19     Q Mr. Freedman, take a quick look at Exhibit
20 2, which is entitled Joy Athletics. It relates to
21 activity in a bank account at City National Bank in
22 the year 2003.
23     A Okay.
24     Q Does this refresh your memory that the
25 tracing analysis included accounts other than E.S.

Page 69

1 Bankest accounts?
2     MR. TRAZENFELD: Object to the form.
3     THE WITNESS: This is what it says, sir,
4 Joy Athletics.
5 BY MR. COLE:
6     Q My question is, does this refresh your
7 memory that as part of your tracing analysis, you
8 also obtained information from certain clients,
9 including Joy, to trace money through those
10 accounts?
11     MR. TRAZENFELD: Object to the form.
12     THE WITNESS: I stated that earlier.
13 BY MR. COLE:
14     Q And again, the chart that was created here
15 has the deposits and the credits, and the checks and
16 the debits.
17     Do you see that?
18     A Yes, sir.
19     Q Now, there are entries here under the
20 description called Below Scope.
21     I gather that is -- those are debits of
22 checks that were below a certain threshold; is that
23 right?
24     A It is what it says, sir.
25     Q Well, is that what you understand "below

Page 70

1 scope" means?
2     A Sir, this is a document you've handed me.
3 The other document said it was prepared by me. This
4 document, I don't know -- it doesn't have my Bates
5 stamps on it or anything else.
6     Q Well, sir, is it your understanding that
7 below -- do you have an understanding as to what
8 "below scope" meant in your report?
9     A Sir, I don't even know if it's my report.
10     Q Well, I'll represent to you that this came
11 from your report.
12     My question, sir, is, do you have an
13 understanding as to what "below scope" means?
14     A Sir, may I see the whole report?
15     Q I'm showing you this page.
16     A "Below Scope, for all I know, is the name
17 of a company. I don't know, sir.
18     Q Now, in the entry called "Intercompany,"
19 do you recall running into that entry in conducting
20 your tracing analysis?
21     A Same answer, Mr. Cole. Intercompany, I
22 don't know if that's a company that paid or not.
23     You're asking me to look at a needle in a
24 haystack. I'm asking you to give me the full
25 document to see if I even prepared this, and the

Page 71

1 backup that would go with it.
2     Q In your tracing analysis, do you recall
3 dealing with intercompany transfers between
4 accounts?
5     MR. TRAZENFELD: Object to the form.
6     MR. COLE: I'll withdraw the question and
7 ask it again.
8 BY MR. COLE:
9     Q In conducting your tracing analysis, do
10 you recall analyzing intercompany transfers?
11     A Which tracing analysis, the overall?
12     Q Yes.
13     A I'm sure that would be an area that we
14 did.
15     Q Okay. And tell me what you did to analyze
16 intercompany tracing -- analyze intercompany
17 transfers in the Joy Athletics accounts.
18     A Sir, I don't even know if I did this one.
19     You know, Mr. Cole, you're putting me at a
20 disadvantage. You're showing me an exhibit that may
21 have been prepared by my people or not, without any
22 of the backup. My documents usually had Bates
23 stamps on them. And this is part of a report.
24     Q I'm sorry. You think your documents have
25 Bates stamps on them?

Page 72

1     A I believe a lot of my documents -- most of
2 my documents had Bates stamps.
3     Q You believe the plaintiff's exhibit at
4 trial had a Bates stamp on it?
5     A Many of the documents I looked at had
6 Bates stamps on them, yes, sir.
7     Q My question, sir, is, as you sit here
8 today, do you recall analyzing intercompany
9 transfers of Joy Athletics?
10     MR. TRAZENFELD: Asked and answered.
11     THE WITNESS: I've answered the best I
12 can, Mr. Cole.
13 BY MR. COLE:
14     Q I don't think you answered.
15     Do you recall analyzing intercompany
16 transfers within Joy?
17     A Mr. Cole, the statements say what they
18 say. The intercompany is intercompany. Without all
19 the documents, I can't -- I'm not going to hazard a
20 guess.
21     Q Okay. So is it your testimony that as you
22 sit here today, you don't recall one way or the
23 other having conducted an analysis of intercompany
24 transfers between Joy entities?
25     A Mr. Cole, you're asking me to assume that

CondenseIt!™

Page 73

1  this was done by --
2      Q  I'm not even referring to the document.
3  I'm not asking you to assume.  I'm asking a very
4  simple question.
5          As you sit here today --
6      A  I'm sorry.  I was concentrating on the
7  exhibit you put before me.  Let's now go --
8      Q  Well, you said you don't really know if
9  this was even prepared by you, right?
10     A  Correct, sir.  I asked for the full report
11 to see if anything was.
12     Q  And you don't even know if this was
13 prepared by you, right?
14     A  As I sit here today, it looks like stuff
15 that we did, but I don't know if we did this one or
16 not.
17     Q  My question to you, sir, is, as you sit
18 here today, do you recall analyzing the intercompany
19 transfers between Joy accounts?
20        MR. TRAZENFELD:  Do you want to know if he
21 recalls or whether he knows?
22        THE WITNESS:  I don't know what we did.
23 That would be a normal procedure.
24 BY MR. COLE:
25     Q  And do you recall one way or the other if

Page 74

1  you in fact did that for Joy accounts?
2      A  I told you I don't recall.
3      Q  Now, take a look at the exhibit, Exhibit
4  2.  There's a reference there to an entity called
5  Wall Street Banking at the bottom there.
6      A  Okay.
7      Q  Do you see that?
8      A  Yes, sir.
9      Q  Do you recall, in your analysis of the
10 tracing of money through various accounts that you
11 conducted while you were either receiver or
12 responsible officer or trustee, coming into contact
13 with an entity known as Wall Street Banking?
14     A  I can't recall directly.  I know there was
15 an entity with a name something like that, but I'm
16 not sure.
17     Q  Tell me everything you can recall about an
18 entity with a name like that.
19     A  There was some litigation with a group out
20 of New Jersey.  I said they owed me money.  They
21 said we owed them money.  I don't recall much more
22 than that.
23     Q  Do you know of any offshore bank, or
24 recall analyzing any offshore bank accounts at a
25 company known as Wall Street Banking, as part of

Page 75

1  your analysis?
2      A  I don't know, sir.  I've answered to the
3  best of my ability.
4          MR. COLE:  Let's take a five-minute break,
5  if that's okay.
6          THE VIDEOGRAPHER:  We're off.
7          (Thereupon, a recess was taken, after
8  which the following proceedings were had:)
9          THE VIDEOGRAPHER:  We're back on the
10 record.
11 BY MR. COLE:
12     Q  Mr. Freedman, in your role as responsible
13 officer or receiver, trustee, you conducted an
14 investigation of various potential lawsuits; is that
15 right?
16        MR. TRAZENFELD:  You can answer that yes
17 or no.
18        THE WITNESS:  Yes.
19 BY MR. COLE:
20     Q  As part of your investigation, did you
21 interview a guy by the name of Frederick Bise?
22     A  I don't know.  I don't recall.
23     Q  Have you ever heard that name before?
24     A  I've heard the name, but I don't recall,
25 sir.

Page 76

1      Q  Based upon your recollection, do you have
2  a memory as to what his role at Espirito Santo was?
3      A  I don't recall.
4          MR. COLE:  No further questions.
5          CROSS-EXAMINATION
6  BY MR. TRABAND:
7      Q  Good afternoon, Mr. Freeman.
8          MR. TRAZENFELD:  My sense of it is, since
9  we are going to supplement interrogatories, we ought
10 to deal with your questions all in one sitting.  You
11 know you're going to come back after the
12 interrogatories, as much as we're going to make an
13 effort to supplement them, and the questions would
14 be limited at that time to dealing with your issues
15 on International.
16        MR. TRABAND:  You want me to cover it all
17 in one --
18        MR. TRAZENFELD:  Yes.
19        MR. TRABAND:  Sounds good to me, with the
20 understanding that our discovery deadline is
21 extended for that purpose.
22        MR. TRAZENFELD:  Absolutely.
23        MR. TRABAND:  And also, by when can you
24 have the supplemental answers to me?
25        MR. TRAZENFELD:  I have to be in Chicago

CondenseIt!™

Page 77

1 three and a half days next week. If you could give
2 me to a week from this coming Monday. And then
3 we'll make Lew available within a couple of weeks
4 after that, depending on scheduling.
5        MR. TRABAND: With that understanding,
6 your timing, we'll continue Mr. Freeman to a
7 mutually agreeable time.
8        MR. TRAZENFELD: Adam, you're done? We're
9 terminating as to you?
10       MR. COLE: Yes.
11       MR. TRAZENFELD: We'll read, and I'll take
12 a copy and a mini and an ASCII, please.
13       (Thereupon, the taking of the deposition was
14 concluded. Reading, subscribing and notice of filing
15 were not waived.)
16
17
18 _____
             Deponent
19
20
21       Sworn to and subscribed before me this ____
22 day of _____, 2008.
23
24
25

Page 78

1       CERTIFICATE OF OATH
2
3 STATE OF FLORIDA
  COUNTY OF DADE
4
5       I, the undersigned authority, certify that
  LEWIS B. FREEMAN personally appeared before me and was
6 duly sworn.
        WITNESS my hand and official seal this 10th
7 day of March, 2008.
8 _____
  HELAYNE FURMAN WILLS
9 Notary Public - State of Florida
  My Commission No. DD447997
10 Expires: AUGUST 2, 2009
11
12      REPORTER'S DEPOSITION CERTIFICATE
13
  STATE OF FLORIDA
14 COUNTY OF DADE
15      I, HELAYNE FURMAN WILLS, Court Reporter,
  certify that I was authorized and did stenographically
16 report the deposition of LEWIS B. FREEMAN; that a
  review of the transcript was requested; and that the
17 transcript is a true and complete record of my
  stenographic notes.
18
19      I further certify that I am not a relative,
  employee, attorney, or counsel of any of the parties,
20 nor am I a relative or employee of any of the parties'
  attorney or counsel connected with the action, nor am
21 I financially interested in the action.
22
23      Dated this 10th day of March, 2008.
24
  _____
25 HELAYNE FURMAN WILLS

Page 79

1
2
3       OUELLETTE & MAULDIN
        28 WEST FLAGLER STREET
        MIAMI, FLORIDA 33130
4       (305) 358-8875
5
6               March 10, 2008
7 TO: LEWIS B. FREEMAN
      c/o WARREN R. TRAZENFELD, ESQ.
8     3225 Aviation Avenue  Suite 600
      Miami, Fl. 33133
9
10      RE: E.S. Bankest
11      Please be advised that your deposition which was
   taken in the above-styled cause on February 21, 2008,
12 has been transcribed and is ready for your review.
13      Please contract us for an appointment to read and
   sign this deposition at your earliest convenience.
14      The transcript will be sent to counsel with or
15 without your signature in 30 days or at the time of
   trial, whichever comes first.
16      Our office hours are 9:00 a.m. to 4:30 p.m.,
17 Monday through Friday.
18      If you have any questions regarding this matter,
   please feel free to contact us at the above number.
19
20 Sincerely,
21
22
23 OUELLETTE & MAULDIN
24
25 cc: All counsel

**OUELLETTE & MAULDIN COURT REPORTERS 305-358-8875**          Page 77 - Page 79