# EXHIBIT H

# BANKEST CAPITAL CORP.
## COLLECTION FACTORING AGREEMENT

July 10, 1992

President and Board of Directors
*JOY SILK SCREEN PRODUCTS, INC.*
3555 East 11th Avenue
Hialeah, Florida 33013

Gentlemen:

The following shall constitute the terms upon which we shall act as your sole factor (see section 12 for the definition of certain capitalized terms):

## SECTION 1  Sale and Approval of Accounts

1.1  You hereby sell, assign and transfer to us and we hereby purchase from you all of your now outstanding and hereafter created or acquired Accounts, other than the ones listed on exhibit I, with full power to collect and otherwise deal therewith as the sole exclusive owner thereof.

1.2  (a) You will submit for our credit approval your customers' credit requirements, a description of your normal selling terms and such other information as we may request concerning your customers.  We may, in our sole credit judgement, establish credit lines for sales to your customers on your normal selling terms and all sales to such customers within the established credit lines will be Approved Accounts provided that delivery or performance is completed while the credit line remains in effect.  You may also submit for credit approval, specific orders from your customers and we may, in our sole credit judgement, approve such orders on a single order approval basis.  All of our credit approvals will be in writing.

(b)  We reserve the right to amend or withdraw a credit line at any time by advice to you, which advice will be promptly confirmed in writing.  A credit line will be automatically suspended (i.e. temporarily withdrawn) during any period that the customer is 60 or more days past due.

(c)  We may withdraw a single order credit approval by notifying you verbally and/or in writing at anytime prior to the delivery of goods or performance of services.  A single order credit approval will be automatically withdrawn: (i) in the event delivery or performance is not made within thirty (30) days after the date specified for delivery or performance in your request for credit approval or within thirty (30) days from the date of our approval if no delivery or performance date is specified; or (ii) in the event any change is made in the payment terms or delivery date of the Account or in the event that the dollar amount of the Account is increased without our prior written approval.

(d)  We shall have no liability to you or to any customer for our refusal to credit approve an Account or our withdrawal of a credit approval.

1.3  We will assume the Credit Risk on all Approved Accounts. We shall have full recourse to you for all Non-Approved Accounts.

1.4  In the event that monies shall, at any time, be owing from one of your customers for both Approved Accounts and Non-Approved Accounts, we will apply all payments received first in reduction of the outstanding Approved Accounts.

## SECTION 2.  Payments and Fees

2.1  We will purchase each Account on the longest or shortest selling terms, at our option, and will pay you as the purchase price the net amount thereof calculated by deducting from the gross amount of each Account the discount, if any, our factoring commission and all credits, including, without limitation, merchandise returns, allowances, and chargebacks and all other charges provided for hereunder.  The purchase price less advances, interest and any other amounts due us will be paid to you on the Collection Date.

Page 1

ES-L-034283

ES0519996

2.2   At the time we purchase each Account, or thereafter, we may, upon your request, and in our sole discretion, advance you up to seventy seven (77.00%) percent of the purchase price of such Account.

2.3   You will pay us a factoring commission of two (2.00%) percent of the Net Accounts purchased by us which bear a rating as per exhibit 1 and of three (3.00%) percent for those that do not bear a rating. The accounts listed on exhibit 2 will not be charged a factoring commision. On Accounts in excess of 30 days ("standard Terms"), the factoring commission will be increased by one quarter of one (0.25%) percent for each 30 days or part thereof that the selling terms exceed the standard terms.

2.4   During each contract year(the 12 months immediately following the date hereof or any anniversary thereof) you agree to pay to us factoring commissions aggregating at least $50,000.00 ("Minimum Annual Commission"). If during any month the aggregate factoring commissions paid by you is less than $4,167.00 ("Minimum Monthly Commission"), then you shall pay to us, or we may charge your account with an amount equal to the difference between the Minimum Monthly Commission and the factoring commission actually paid during that month (the "Deficiency Charge"). At such time as you exceed the Minimum Annual Commission, the Minimum Monthly Commission shall be waived for the remainder of the contract year and the Deficiency Charges paid during said contract year shall be applied against subsequent factoring commission charges incurred during said contract year.

2.5   We will charge your account our standard wire transfer fee on all wire transfers, and you will reimburse us for exchanges on checks, charges for returned items and all other bank charges and other charges and costs as stipulated in the Reimbursables and Fee Schedule attached herein. We may also, at our option, charge your account for all amounts owing by you to us under this Agreement and all other Obligations.

2.6   We shall have full power and authority to collect each Account, through legal action or otherwise, and may, in our sole discretion, settle, compromise, assign, sell or refactor (in whole or in part) any or all of the Accounts, and the proceeds of any such sale, assignment or refactoring, or otherwise exercise any other right now existing or hereafter arising with respect to any of the Accounts.

SECTION 3. Interest

3.1   You will pay interest on the daily balance of all monies remitted, paid or otherwise advanced to you or for your account net of all payments received from you or on your behalf including the purchase price of Accounts purchased by us hereunder which is credited to your factoring account on the Collection Date. Interest will be calculated daily at a rate the greater of 9.00% per annum or two (2%) percent plus the Base Rate (the "Interest Rate") and will be charged to your factoring account monthly, in arrears. The Interest Rate will also be charged to you on all other indebtedness due by you to us under this Agreement and on all Obligations, except those specifying a different rate, from the date incurred through the date paid. Any publicly announced decrease or increase in the Base Rate shall result in an adjustment to the Interest Rate on the next business day. Interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed. In no event shall the Interest Rate exceed the maximum rate permitted by applicable law and in the event excess interest is paid, it shall be considered a repayment of the principal.

3.2   If an Account or any payment is charged back to you after the Collection Date, you will pay us interest at the Interest Rate on such Net Account or such payment from the Collection Date to the chargeback date.

SECTION 4. Representations, Warranties and Covenants

4.1   You represent, warrant and covenant as to each Account sold and assigned hereunder that, at the time of its creation, the Account is a valid, bona fide account, representing an undisputed indebtedness incurred by the named account debtor for goods actually sold and delivered or for services completely rendered; there are no setoffs, offsets or counterclaims, genuine or otherwise, against the Account; the Account does not represent a sale to a parent, subsidiary or a consignment, sale or return or a bill and hold transaction; no agreement exists permitting any deduction or discount (other than the discount stated on the invoice); you are the lawful owner of the Account and have the right to sell and assign the same to us; the Account is free of all security interests, liens and encumbrances other than those in our favor, and the Account is due and payable in accordance with its terms.

4.2   You shall not grant or suffer to exist any lien upon or security interest in your inventory in favor of any party other than us without our written consent, or prior knowledge..

4.3   You are a solvent corporation; duly incorporated and in good standing under the laws of the State of Florida and qualified in all States where such qualification is required; the execution, delivery and performance

ES-L-034284

ES0519997

of this Agreement have been duly authorized and are not in contravention of any applicable law, your corporate charter or by-laws or any agreement or order by which you are bound.

4.4  You shall not change your corporate name or the location of your office or open any new offices without giving us at least thirty (30) days prior written notice.  At the present time, you carry on business only at the above address and the addresses set forth below:

> 3555 East 11th Avenue
> Hialeah, Florida 33013

4.5.  all books and records pertaining to the Accounts or to any inventory owned by you shall be maintained solely and exclusively at the above addresses or the addresses listed in Section 4.4 hereof and no such books and records shall be moved or transferred without giving us thirty (30) days prior written notice.

4.6  You shall not sell, lease, transfer or otherwise dispose of all or substantially all of your property or assets, or consolidate with or merge into or with any corporation or entity without our prior written consent, which consent will not be unreasonable withheld.

4.7  After our request, you shall hold all returned, replevied or reclaimed goods coming into your possession in trust for us and all such goods shall be segregated and identified as held in trust for our benefit and you shall, at our request, and at your expense, deliver such goods to such place or places as we may designate.

4.8  The tradenames or styles set forth below are the only tradenames or styles under which you transact business;  Accounts sold to us hereunder and represented by invoices bearing such tradenames or styles are wholly owned by you; the undertakings, representations and warranties made in connection therewith shall be identical to and of the same force and effects as those made with respect to invoices bearing your corporate name

_____

4.9  No discounts, credits or allowances will be issued, granted or allowed by you to customers and no returns will be accepted without our prior written consent; provided, however, that until we notify you to the contrary, you may presume our consent.  Discounts, credits or allowances once issued may be claimed only by the customer.

## SECTION 5. Disputes, Chargebacks and Reserves

5.1  With respect to any Account, upon the occurrence of a breach of any of the representations or warranties contained in Section 4.1, or the assertion by a customer of a Dispute or other defense to payment, other than financial inability, an Approved Account shall automatically become a Non-Approved Account and we may charge back such Account to you.

5.2  You shall notify us immediately in the event that a customer alleges any Dispute, or returns or desires to return any goods purchased from you.  We may, but are not obligated to settle, compromise, adjust or litigate all such Disputes or returns upon such terms as we deem advisable.  If an unadjusted Dispute delays the payment of any Approved Account when due, our credit approval is automatically withdrawn and we shall have the right to charge back to you that Account and all other amounts owing by that customer.

5.3  We may, at our option, charge back to you all amounts owing on Non-Approved Accounts which are not paid when due.

5.4  We shall have the right to charge back to you any payment which we receive with respect to a Non-Approved Account if such payment is subsequently disgorged by us or disgorged by our assigns, whether as a result of any proceeding in bankruptcy or otherwise.

5.5  A chargeback shall not constitute a resale to you of said Accounts; however, upon payment by you to us of all monies due with respect to such charge back Account, title thereto shall revert to you, subject, however, to our security interest therein.  You agree to indemnify and save us harmless from and against any and all loss, costs and expenses, caused by or arising out of disputed Accounts, including, but not limited to, collection expenses and attorney's fees incurred with respect thereto.

5.6  We may maintain such reserves as we, in our sole discretion, deem advisable as security for the payment and performance of all of your Obligations.

Page 3

**ES-L-034285**

ES0519998

## SECTION 6. Administration

6.1  (a) You shall, from time to time, execute and deliver to us confirmatory schedules of Accounts sold to us, together with one copy of each invoice and acceptable evidence of shipment and such other documentation and proofs of delivery as we may require.  Each invoice shall bear a notice, in form satisfactory to us, that it has been sold and assigned to and is payable only to us. You agree to prepare and mail all invoices, but we may do so at our option.  You agree to execute and deliver to us such further instruments of assignments, financing statements and instruments of further assurance as we may reasonably require.  You authorize us to execute on your behalf and file such UCC financing statements as we may deem necessary in order to perfect and maintain the security interests granted by you in accordance with this and any other agreement between you and us, and you further agree that we may file this Agreement or a copy thereof as such UCC financing statement.  You agree to bear the cost of all filing fees, filing taxes, search reports, legal fees and other charges incurred by us in the perfection, protection and preservation of the rights and collateral security herein granted to us.

(b) If any remittances are made directly to you, your employees or agents, you shall act as trustee of an express trust for our benefit, hold the same as our property and deliver the same to us forthwith in kind.  We and/or such designee as we may from time to time appoint, are hereby appointed your attorney-in-fact to endorse your name on any remittances received by us where such endorsement is required to effect collection; this power, being coupled with an interest is irrevocable.

(c) We may, at all times, have access to, inspect and make extracts from all your records, files and books of accounts.  We may, at any time after default by you hereunder, remove from your premises all such records, files and books relating to Accounts.  You will promptly furnish us with all statements prepared by or for you showing your financial condition and the results of your operations and such other statements as we may reasonably require.  You authorize us to communicate directly with your independent certified public accountants and authorize such accountants to discuss your financial condition and statements directly with us.

6.2  If we determine that the credit standing of a customer has deteriorated after we have assumed the Credit Risk on an Account, you shall, at our request, exercise such rights as you may have to reclaim or stop the goods in transit, and you hereby grant us the right to take such steps in your name or ours.

6.3  We shall render a monthly Statement of Account to you within twenty (20) days after the end of each month.  Such Statement of Account shall constitute an account stated unless you make written objection thereto within thirty (30) days from the date such statement is mailed to you.

6.4  You authorize us to disclose such information as we deem appropriate to persons making credit inquiries about you.

## SECTION 7. Collateral Security

As collateral security for all Obligations, you hereby assign and grant to us a continuing security interest in: (i) all of your presently existing and hereafter created Accounts and general intangibles and the proceeds thereof; (ii) all monies, securities and other property now or hereafter held or received by, or in transit to us from or for you, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and all of your deposits and credit balances in our possession; (iii) all returned, reclaimed or repossessed goods and the documents evidencing or relating to such goods; (iv) all books, records and other property at any time evidencing or relating to the Accounts; and (v) the proceeds of any insurance policies covering any of the foregoing.  Recourse to the collateral security herein provided shall not be required, and you shall at all times remain liable for the payment and performance of all of your Obligations upon demand by us.

## SECTION 8. Events of Default

The occurrence of any of the following acts or events shall constitute an Event of Default: (a) if you fail to make payment of any of your Obligations when due, (b) if you fail to make any remittance required by this Agreement, (c) if you commit any breach of any of the terms, representations, warranties, covenants, conditions or provisions of this Agreement, or of any present or future supplement or amendment hereto or of any other agreement between us, (d) if you become insolvent or unable to meet your debts as they mature, (e) if you deliver to us a false financial statement, (f) if you call, or have called by a third party, a meeting of creditors, (g) if you have commenced by or against you any bankruptcy proceeding, insolvency, arrangement

ES-L-034286

ES0519999

or similar proceeding, (h) if you suspend or discontinue doing business for any reason, (i) if a receiver or a trustee of any kind is appointed for you or any of your property, (j) if any guarantor of your Obligations shall become insolvent or have commenced by or against such guarantor any bankruptcy proceeding, insolvency, arrangement or similar proceeding, (k) if any guaranty of your Obligations is terminated, or (l) if any change of ownership occurs with respect to more than forty (40%) percent of your capital stock.

Upon the occurrence of an Event of Default, we shall have the right to terminate this Agreement and all other arrangements existing between us forthwith and without notice, and all of your Obligations to us shall mature and become immediately due and payable and we shall have the right to withhold any further payment to you until all Obligations have been paid in full.  In addition, we shall have all the rights of a secured party under the Uniform Commercial Code, including, without limitation, the right to take possession of any collateral in which we have a security interest and to dispose of same at public or private sale and you will be liable for any deficiency.  We shall not be required to proceed against any Collateral but may proceed against you directly. In the event we institute suit against you, you agree to pay our costs and reasonable attorney's fees.

## SECTION 9.  Terms and Termination

This Agreement shall continue in full force and effect for one (1) year until terminated by either party hereto giving the other party not less than 90 days prior written notice thereof.  Notice of termination shall be given by messenger, registered or certified mail or commercial delivery service; provided however, that you shall not terminate this Agreement so long as you are indebted or obligated to us in connection with any other financing arrangements.  Notwithstanding such notice of termination, our respective rights and obligations arising out of transactions having their inception prior to the specified date of termination shall not be affected by such termination and all terms, provisions and conditions hereof, including but not limited to, the security interests herein above granted to us, shall continue in full force and effect until all Obligations have been paid in full. All of the representations, warranties and covenants made herein shall survive the termination of this Agreement.

## SECTION 10.  Modifications

This Agreement cannot be changed or terminated orally; it constitutes the entire agreement between us and shall be binding upon our respective successors and assigns, but may not be assigned by you without our prior written consent.  No delay or failure on our part in exercising any right, privilege, or option hereunder shall operate as a waiver thereof or of any other right, privilege or option.  No waiver whatsoever shall be valid unless in writing, signed by us, and then only to the extent therein set forth. If any term or provision of this Agreement is held invalid under any statute, rule or regulation of any jurisdiction competent to make such a decision, the remaining terms and provisions shall not be affected, but shall remain in full force and effect. You further acknowledge that during the course of the term of this Agreement, we shall make credit determinations with respect to your Accounts and shall refactor and otherwise assign such Accounts to a Third Party, notwithstanding any such assignment of refactoring you shall in no way rely on any credit determination relayed to us, or any action or inaction taken by such Third Party with respect to the Accounts, and that you shall look only to us as the party responsible for credit determinations and administration of your Accounts and this Agreement generally.

## SECTION 11.  Governing Law, Venue and Waiver of Jury

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Florida.  You hereby consent to the jurisdiction of any local, state or federal court located within the State of Florida .  If you presently are, or in the future become, a non-resident of the State of Florida, you hereby waiver personal service of any and all process and agree that all such service of process may be made by certified or registered mail, return receipt requested, directed to you, at your address appearing in our records and service so made shall be completed ten (10) days after the same has been posted as aforesaid. YOU HEREBY WAIVE YOUR RIGHT TO TRIAL BY JURY IN ANY SUIT OR PROCEEDING ARISING UNDER OR RELATING TO THIS AGREEMENT.

## SECTION 12.  Definitions

12.1 "Accounts" - All presently existing and hereafter created accounts, contract rights and general intangibles relating thereto, notes, drafts and other forms of obligations owed to or owned by you arising or resulting from the sale of goods or the rendering of services, all proceeds thereof, all guaranties and security therefor, and all goods and rights represented thereby or arising therefrom including, but not limited to, the right of stoppage in transit, replevin and reclamation.

Page 5

ES-L-034287

ES0520000

12.2 "Approved Account"- an Account with respect to which we have issued a credit approval which has not subsequently been withdrawn.

12.3 "Base Rate"- the rate of interest publicly announced from time to time by The Chase Manhattan Bank, N.A., as its prime or base rate (or equivalent).

12.4 "Collection Date"- The earlier occurrence Wednesday of the week following the week in which we receive payment of an Account or 120 days after the due date of an Account, provided that such Account remains unpaid solely because of the Customer's financial inability to pay.

12.5 "Credit Risk"- The risk that a customer will be financially unable to pay an Account at maturity, provided that the merchandise has been received or services rendered and accepted by the custom without Dispute.

12.6 "Dispute"- A dispute or claim, bona fide or otherwise, as to price, terms, quantity, quality or any cause or defense to payment whatsoever other than financial inability to pay.

12.7 "Net Account"- The gross face amount of an Account less the discount offered by you and taken by us.

12.8 "Non-Approved Account"- an Account with respect to which we have either not issued a credit approval or have subsequently withdrawn a credit approval as a result of a Dispute or otherwise.

12.9 "Obligations"- All loans, advances, debts, liabilities, obligations, covenants and duties owing by you to us, direct or indirect, absolute or contingent, due or to become due, now existing, or hereafter arising, including, without limitation, invoices for goods or services purchased by you from any company whose accounts are factored or financed by us and indebtedness arising under any guaranty made by you or issued by us on your behalf.

**SECTION 13. Acceptance**

This proposal is submitted to you unsigned and shall constitute an agreement between us only when signed by us.

Very truly yours,

BANKEST CAPITAL CORP.

By: _____
    Eduardo Orlansky

Title: President

Effective Date: 8/10/92

Accepted and Agreed To:
**JOY SILK SCREEN PRODUCTS, INC..**

By: _____
    Jeffrey Barnhill

Title: President, CEO

Date: 8-8-92

Attachments:

Reimbursable Out-of-Pocket Costs, Schedule
Security Agreement
Performance Guaranty

Page 6

ES-L-034288

ES0520001

**APPENDIX I**

1. GILRICHCO, INC
   7100 SOPHIA AVE
   VAN NUYS, CA 91406
   (818) 988-5300

2. FIVE STAR PROMOTIONS, INC
   13499 BISCAYNE BLVD
   TOWER SUITE #1
   NORTH MIAMI, FL 33181
   (305) 956-5566

ES-L-034289

ES0520002

## REIMBURSABLE OUT-OF-POCKET COSTS

BANKEST CAPITAL CORP. incurs certain regular expenses for clients, and charges other fees for services it renders, a portion of which are reimbursed as a deduction from closing and advance proceeds otherwise due. The following is an itemization of reimbursed costs and additional fees and scheduled charges:

| Item | Amount |
|---|---|
| 1. Long distance telephone, 800 number calls; telecopies | Free to Clients |
| 2. Dun & Bradstreet report on non rated debtor | $ 45.00 per report * |
| 3. Postage; First class mail of client's invoices to debtors | U.S. Postal Service prevailing rates |
| 4. Analysis, preparation of credit reports and review of trade credit information | Free to Clients |
| 5. Wire transfer of immediately available funds to client accounts throughout the U.S. | $ 35.00 per transfer * |
| 6. Overnight mail delivery of funds | $ 35.00 per package * |
| 7. Check certification / Cashier check | $ 40.00 per check |
| 8. UCC search and filing fee | $500.00 One time charge ** |
| 9. Audit Charge | $700.00 per diem |
| 10. Surcharge for each invoice under $360.00 | $ 2.50 per invoice. |

11. <u>Unused Accounts' Credit Fee:</u> 0.2185% per month of the unused portion of the Accounts' credit approval requested by the Company, payable monthly in arrears.

**These fees do not apply if the Client cancels the Line requested. Lines may be canceled by the Client at any time.**

12. <u>Customer Credit Underwriting Charge:</u>

| | |
|---|---|
| $19.50 per Customer Account of less than | $ 5,000, |
| $32.50 per Customer Account of less than | $ 25,000, |
| $56.70 for Customer Accounts of over | $ 25,000, |
| $87.50 for Customer Accounts over | $ 100,000, |
| and all International Customers, | |
| $500.00 Mexican and South American Customers. | |

\* Service is optional; there is no charge for funds mailed to or picked up by clients.

\*\*Or actual, whichever is higher.

ES-L-034290

ES0520003

1/3/07

BDOS / *n.£.S*
1/3/07

BDOI / *SD*
1/3/07

TPD/ *cen*
1/3/07



*Dt 8/96*
*(all pages)*

# BANKEST CAPITAL CORP.
## COLLECTION FACTORING AGREEMENT

July 10, 1992

President and Board of Directors
***JOY SILK SCREEN PRODUCTS, INC.***
3555 East 11th Avenue
Hialeah, Florida 33013

Gentlemen:

The following shall constitute the terms upon which we shall act as your sole factor (see section 12 for the definition of certain capitalized terms):

### SECTION 1   Sale and Approval of Accounts

1.1  You hereby sell, assign and transfer to us and we hereby purchase from you all of your now outstanding and hereafter created or acquired Accounts, other than the ones listed on exhibit I, with full power to collect and otherwise deal therewith as the sole exclusive owner thereof.

1.2  (a) You will submit for our credit approval your customers' credit requirements, a description of your normal selling terms and such other information as we may request concerning your customers. We may, in our sole credit judgement, establish credit lines for sales to your customers on your normal selling terms and all sales to such customers within the established credit lines will be Approved Accounts provided that delivery or performance is completed while the credit line remains in effect. You may also submit for credit approval, specific orders from your customers and we may, in our sole credit judgement, approve such orders on a single order approval basis. All of our credit approvals will be in writing.

(b)  We reserve the right to amend or withdraw a credit line at any time by advice to you, which advice will be promptly confirmed in writing. A credit line will be automatically suspended (i.e. temporarily withdrawn) during any period that the customer is 60 or more days past due.

(c)  We may withdraw a single order credit approval by notifying you verbally and/or in writing at anytime prior to the delivery of goods or performance of services. A single order credit approval will be automatically withdrawn: (i) in the event delivery or performance is not made within thirty (30) days after the date specified for delivery or performance in your request for credit approval or within thirty (30) days from the date of our approval if no delivery or performance date is specified; or (ii) in the event any change is made in the payment terms or delivery date of the Account or in the event that the dollar amount of the Account is increased without our prior written approval.

(d)  We shall have no liability to you or to any customer for our refusal to credit approve an Account or our withdrawal of a credit approval.

1.3  We will assume the Credit Risk on all Approved Accounts. We shall have full recourse to you for all Non-Approved Accounts.

1.4  In the event that monies shall, at any time, be owing from one of your customers for both Approved Accounts and Non-Approved Accounts, we will apply all payments received first in reduction of the outstanding Approved Accounts.

### SECTION 2.  Payments and Fees

2.1  We will purchase each Account on the longest or shortest selling terms, at our option, and will pay you as the purchase price the net amount thereof calculated by deducting from the gross amount of each Account the discount, if any, our factoring commission and all credits, including, without limitation, merchandise returns, allowances, and chargebacks and all other charges provided for hereunder. The purchase price less advances, interest and any other amounts due us will be paid to you on the Collection Date.

Page 1

BDO 02444
Confidential

Plaintiff's Exhibit
No. ___18 A___
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts

ES0011298

2.2  At the time we purchase each Account, or thereafter, we may, upon your request, and in our sole discretion, advance you up to seventy seven (77.0%) percent of the purchase price of such Account

2.3  You will pay us a factoring commission of three (3.0) percent of the Net Accounts purchased by us. On Accounts in excess of 30 days ("standard Terms"), the factoring commission will be increased by half of one (0.5%) percent for each 30 days or part thereof that the selling terms exceed the standard terms .

2.4  During each contract year(the 12 months immediately following the date hereof or any anniversary thereof) you agree to pay to us factoring commissions aggregating at least $50,000.00("Minimum Annual Commission") .  If during any month the aggregate factoring commissions paid by you is less than $4,167.00("Minimum Monthly Commission"), then you shall pay to us, or we may charge your account with an amount equal to the difference between the Minimum Monthly Commission and the factoring commission actually paid during that month (the "Deficiency Charge"). At such time as you exceed the Minimum Annual Commission, the Minimum Monthly Commission shall be waived for the remainder of the contract year and the Deficiency Charges paid during said contract year shall be applied against subsequent factoring commission charges incurred during said contract year.

2.5  We will charge your account our standard wire transfer fee on all wire transfers, and you will reimburse us for exchanges on checks, charges for returned items and all other bank charges and other charges and costs as stipulated in the Reimbursables and Fee Schedule attached herein.  We may also, at our option, charge your account for all amounts owing by you to us under this Agreement and all other Obligations.

2.6  We shall have full power and authority to collect each Account, through legal action or otherwise, and may, in our sole discretion, discount, anticipate, settle, compromise, assign, sell or refactor (in whole or in part) any or all of the Accounts, and the proceeds of any such sale, assignment or refactoring, or otherwise exercise any other right now existing or hereafter arising with respect to any of the Accounts.

### SECTION 3.  Interest

3.1  You will pay interest on the daily balance of all monies remitted, paid or otherwise advanced to you or for your account net of all payments received from you or on your behalf including the purchase price of Accounts purchased by us hereunder which is credited to your factoring account on the Collection Date. Interest will be calculated daily at a rate the greater of nine percent (9.0%) per annum or three (3.0%) percent plus the Base Rate (the "Interest Rate") and will be charged to your factoring account monthly, in arrears. The Interest Rate will also be charged to you on all other indebtedness due by you to us under this Agreement and on all Obligations, except those specifying a different rate, from the date incurred through the date paid. Any publicly announced decrease or increase in the Base Rate shall result in an adjustment to the Interest Rate on the next business day.  Interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  In no event shall the Interest Rate exceed the maximum rate permitted by applicable law and in the event excess interest is paid, it shall be considered a repayment of the principal.

3.2  If an Account or any payment is charged back to you after the Collection Date, you will pay us interest at the Interest Rate on such Net Account or such payment from the Collection Date to the chargeback date.

### SECTION 4.  Representations, Warranties and Covenants

4.1  You represent, warrant and covenant as to each Account sold and assigned hereunder that, at the time of its creation, the Account is a valid, bona fide account, representing an undisputed indebtedness incurred by the named account debtor for goods actually sold and delivered or for services completely rendered; there are no setoffs, offsets or counterclaims, genuine or otherwise, against the Account; the Account does not represent a sale to a parent, subsidiary or a consignment, sale or return or a bill and hold transaction; no agreement exists permitting any deduction or discount (other than the discount stated on the invoice); you are the lawful owner of the Account and have the right to sell and assign the same to us; the Account is free of all security interests, liens and encumbrances other than those in our favor, and the Account is due and payable in accordance with its terms.

4.2  You shall not grant or suffer to exist any lien upon or security interest in your inventory in favor of any party other than us without our written consent, or prior knowledge.

4.3  You are a solvent corporation; duly incorporated and in good standing under the laws of the State of Florida and qualified inall States where such qualification is required;theexecution, delivery and performance

Page 2

BDO 02445
Confidential



ES0011299

of this Agreement have been duly authorized and are not in contravention of any applicable law, your corporate charter or by-laws or any agreement or order by which you are bound.

4.4 You shall not change your corporate name or the location of your office or open any new offices without giving us at least thirty (30) days prior written notice. At the present time, you carry on business only at the above address and the addresses set forth below:

> 3555 East 11th Avenue
> Hialeah, Florida 33013

4.5. all books and records pertaining to the Accounts or to any inventory owned by you shall be maintained solely and exclusively at the above addresses or the addresses listed in Section 4.4 hereof and no such books and records shall be moved or transferred without giving us thirty (30) days prior written notice.

4.6 You shall not sell, lease, transfer or otherwise dispose of all or substantially all of your property or assets, or consolidate with or merge into or with any corporation or entity without our prior written consent, which consent will not be unreasonable withheld.

4.7 After our request, you shall hold all returned, replevied or reclaimed goods coming into your possession in trust for us and all such goods shall be segregated and identified as held in trust for our benefit and you shall, at our request, and at your expense, deliver such goods to such place or places as we may designate.

4.8 The tradenames or styles set forth below are the only tradenames or styles under which you transact business; Accounts sold to us hereunder and represented by invoices bearing such tradenames or styles are wholly owned by you; the undertakings, representations and warranties made in connection therewith shall be identical to and of the same force and effects as those made with respect to invoices bearing your corporate name

--------------------

4.9 No discounts, credits or allowances will be issued, granted or allowed by you to customers and no returns will be accepted without our prior written consent; provided, however, that until we notify you to the contrary, you may presume our consent. Discounts, credits or allowances once issued may be claimed only by the customer.

## SECTION 5. Disputes, Chargebacks and Reserves

5.1 With respect to any Account, upon the occurrence of a breach of any of the representations or warranties contained in Section 4.1, or the assertion by a customer of a Dispute or other defense to payment, other than financial inability, an Approved Account shall automatically become a Non-Approved Account and we may charge back such Account to you.

5.2 You shall notify us immediately in the event that a customer alleges any Dispute, or returns or desires to return any goods purchased from you. We may, but are not obligated to settle, compromise, adjust or litigate all such Disputes or returns upon such terms as we deem advisable. If an unadjusted Dispute delays the payment of any Approved Account when due, our credit approval is automatically withdrawn and we shall have the right to charge back to you that Account and all other amounts owing by that customer.

5.3 We may, at our option, charge back to you all amounts owing on Non-Approved Accounts which are not paid when due.

5.4 We shall have the right to charge back to you any payment which we receive with respect to a Non-Approved Account if such payment is subsequently disgorged by us or disgorged by our assigns, whether as a result of any proceeding in bankruptcy or otherwise.

5.5 A chargeback shall not constitute a resale to you of said Accounts; however, upon payment by you to us of all monies due with respect to such charge back Account, title thereto shall revert to you, subject, however, to our security interest therein. You agree to indemnify and save us harmless from and against any and all loss, costs and expenses, caused by or arising out of disputed Accounts, including, but not limited to, collection expenses and attorney's fees incurred with respect thereto.

5.6 We may maintain such reserves as we, in our sole discretion, deem advisable as security for the payment and performance of all of your Obligations.

Page 3

BDO 02446
Confidential

ES0011300

## SECTION 6. Administration

6.1 (a) You shall, from time to time, execute and deliver to us confirmatory schedules of Accounts sold to us, together with one copy of each invoice and acceptable evidence of shipment and such other documentation and proofs of delivery as we may require. Each invoice shall bear a notice, in form satisfactory to us, that it has been sold and assigned to and is payable only to us. You agree to prepare and mail all invoices, but we may do so at our option. You agree to execute and deliver to us such further instruments of assignments, financing statements and instruments of further assurance as we may reasonably require. You authorize us to execute on your behalf and file such UCC financing statements as we may deem necessary in order to perfect and maintain the security interests granted by you in accordance with this and any other agreement between you and us, and you further agree that we may file this Agreement or a copy thereof as such UCC financing statement. You agree to bear the cost of all filing fees, filing taxes, search reports, legal fees and other charges incurred by us in the perfection, protection and preservation of the rights and collateral security herein granted to us.

(b) If any remittances are made directly to you, your employees or agents, you shall act as trustee of an express trust for our benefit, hold the same as our property and deliver the same to us forthwith in kind. We and/or such designee as we may from time to time appoint, are hereby appointed your attorney-in-fact to endorse your name on any remittances received by us where such endorsement is required to effect collection; this power, being coupled with an interest is irrevocable.

(c) We may, at all times, have access to, inspect and make extracts from all your records, files and books of accounts. We may, at any time after default by you hereunder, remove from your premises all such records, files and books relating to Accounts. You will promptly furnish us with all statements prepared by or for you showing your financial condition and the results of your operations and such other statements as we may reasonably require. You authorize us to communicate directly with your independent certified public accountants and authorize such accountants to discuss your financial condition and financial statements directly with us.

6.2 If we determine that the credit standing of a customer has deteriorated after we have assumed the Credit Risk on an Account, you shall, at our request, exercise such rights as you may have to reclaim or stop the goods in transit, and you hereby grant us the right to take such steps in your name or ours.

6.3 We shall render a monthly Statement of Account to you within twenty (20) days after the end of each month. Such Statement of Account shall constitute an account stated unless you make written objection thereto within thirty (30) days from the date such statement is mailed to you.

6.4 You authorize us to disclose such information as we deem appropriate to persons making credit inquiries about you.

## SECTION 7. Collateral Security

As collateral security for all Obligations, you hereby assign and grant to us a continuing security interest in: (i) all of your presently existing and hereafter created Accounts and general intangibles and the proceeds thereof; (ii) all monies, securities and other property now or hereafter held or received by, or in transit to us from or for you, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and all of your deposits and credit balances in our possession; (iii) all returned, reclaimed or repossessed goods and the documents evidencing or relating to such goods; (iv) all books, records and other property at any time evidencing or relating to the Accounts; and (v) the proceeds of any insurance policies covering any of the foregoing. Recourse to the collateral security herein provided shall not be required, and you shall at all times remain liable for the payment and performance of all of your Obligations upon demand by us.

## SECTION 8. Events of Default

The occurrence of any of the following acts or events shall constitute an Event of Default: (a) if you fail to make payment of any of your Obligations when due, (b) if you fail to make any remittance required by this Agreement, (c) if you commit any breach of any of the terms, representations, warranties, covenants, conditions or provisions of this Agreement, or of any present or future supplement or amendment hereto or of any other agreement between us, (d) if you become insolvent or unable to meet your debts as they mature, (e) if you deliver to us a false financial statement, (f) if you call, or have called by a third party, a meeting of creditors, (g) if you have commenced by or against you any bankruptcy proceeding, insolvency, arrangement

Page 4

BDO 02447
Confidential

ES0011301

or similar proceeding, (h) if you suspend or discontinue doing business for any reason, (i) if a receiver or a trustee of any kind is appointed for you or any of your property, (j) if any guarantor of your Obligations shall become insolvent or have commenced by or against such guarantor any bankruptcy proceeding, insolvency, arrangement or similar proceeding, (k) if any guaranty of your Obligations is terminated, or (l) if any change of ownership occurs with respect to more than forty (40%) percent of your capital stock.

Upon the occurrence of an Event of Default, we shall have the right to terminate this Agreement and all other arrangements existing between us forthwith and without notice, and all of your Obligations to us shall mature and become immediately due and payable and we shall have the right to withhold any further payment to you until all Obligations have been paid in full. In addition, we shall have all the rights of a secured party under the Uniform Commercial Code, including, without limitation, the right to take possession of any collateral in which we have a security interest and to dispose of same at public or private sale and you will be liable for any deficiency. We shall not be required to proceed against any Collateral but may proceed against you directly. In the event we institute suit against you, you agree to pay our costs and reasonable attorney's fees.

SECTION 9. <u>Terms and Termination</u>

This Agreement shall continue in full force and effect for one (1) year until terminated by either party hereto giving the other party not less than 90 days prior written notice thereof. Notice of termination shall be given by messenger, registered or certified mail or commercial delivery service; provided however, that you shall not terminate this Agreement so long as you are indebted or obligated to us in connection with any other financing arrangements. Notwithstanding such notice of termination, our respective rights and obligations arising out of transactions having their inception prior to the specified date of termination shall not be affected by such termination and all terms, provisions and conditions hereof, including but not limited to, the security interests herein above granted to us, shall continue in full force and effect until all Obligations have been paid in full. All of the representations, warranties and covenants made herein shall survive the termination of this Agreement.

SECTION 10. <u>Modifications</u>

This Agreement cannot be changed or terminated orally; it constitutes the entire agreement between us and shall be binding upon our respective successors and assigns, but may not be assigned by you without our prior written consent. No delay or failure on our part in exercising any right, privilege, or option hereunder shall operate as a waiver thereof or of any other right, privilege or option. No waiver whatsoever shall be valid unless in writing, signed by us, and then only to the extent therein set forth. If any term or provision of this Agreement is held invalid under any statute, rule or regulation of any jurisdiction competent to make such a decision, the remaining terms and provisions shall not be affected, but shall remain in full force and effect. You further acknowledge that during the course of the term of this Agreement, we shall make credit determinations with respect to your Accounts and shall refactor and otherwise assign such Accounts to a Third Party, notwithstanding any such assignment of refactoring you shall in no way rely on any credit determination relayed to us, or any action or inaction taken by such Third Party with respect to the Accounts, and that you shall look only to us as the party responsible for credit determinations and administration of your Accounts and this Agreement generally.

SECTION 11. <u>Governing Law, Venue and Waiver of Jury</u>

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Florida. You hereby consent to the jurisdiction of any local, state or federal court located within the State of Florida. If you presently are, or in the future become, a non-resident of the State of Florida, you hereby waiver personal service of any and all process and agree that all such service of process may be made by certified or registered mail, return receipt requested, directed to you, at your address appearing in our records and service so made shall be completed ten (10) days after the same has been posted as aforesaid. YOU HEREBY WAIVE YOUR RIGHT TO TRIAL BY JURY IN ANY SUIT OR PROCEEDING ARISING UNDER OR RELATING TO THIS AGREEMENT.

SECTION 12. <u>Definitions</u>

12.1 "Accounts" - All presently existing and hereafter created accounts, contract rights and general intangibles relating thereto, notes, drafts and other forms of obligations owed to or owned by you arising or resulting from the sale of goods or the rendering of services, all proceeds thereof, all guaranties and security therefor, and all goods and rights represented thereby or arising therefrom including, but not limited to, the right of stoppage in transit, replevin and reclamation.

BDO 02448
Confidential



ES0011302

12.2 "Approved Account"- an Account with respect to which we have issued a credit approval which has not subsequently been withdrawn.

12.3 "Base Rate"- the rate of interest publicly announced from time to time by The Chase Manhattan Bank, N.A., as its prime or base rate (or equivalent).

12.4 "Collection Date"- The earlier occurrence Wednesday of the week following the week in which we receive payment of an Account or 120 days after the due date of an Account, provided that such Account remains unpaid solely because of the Customer's financial inability to pay.

12.5 "Credit Risk"- The risk that a customer will be financially unable to pay an Account at maturity, provided that the merchandise has been received or services rendered and accepted by the custom without Dispute.

12.6 "Dispute"- A dispute or claim, bona fide or otherwise, as to price, terms, quantity, quality or any cause or defense to payment whatsoever other than financial inability to pay.

12.7 "Net Account"- The gross face amount of an Account less the discount offered by you and taken by us.

12.8 "Non-Approved Account"- an Account with respect to which we have either not issued a credit approval or have subsequently withdrawn a credit approval as a result of a Dispute or otherwise.

12.9 "Obligations"- All loans, advances, debts, liabilities, obligations, covenants and duties owing by you to us, direct or indirect, absolute or contingent, due or to become due, now existing, or hereafter arising, including, without limitation, invoices for goods or services purchased by you from any company whose accounts are factored or financed by us and indebtedness arising under any guaranty made by you or issued by us on your behalf.

SECTION 13. Acceptance

This proposal is submitted to you unsigned and shall constitute an agreement between us only when signed by us.

Very truly yours,

BANKEST CAPITAL CORP.

By: _Eduardo Orlansky_

Title: President

Effective Date: 8/10/92

Accepted and Agreed To:
JOY SILK SCREEN PRODUCTS, INC..

By: _Jeffrey Barnhill_

Title: President, CEO

Date: 8-8-92

Attachments:

Reimbursable Out-of-Pocket Costs, Schedule
Security Agreement
Performance Guaranty

BDO 02449
Confidential

ES0011303

**APPENDIX I**

1. GILRICHCO, INC
   7100 SOPHIA AVE
   VAN NUYS, CA 91406
   (818) 988-5300

2. FIVE STAR PROMOTIONS, INC
   13499 BISCAYNE BLVD
   TOWER SUITE #1
   NORTH MIAMI, FL 33181
   (305) 956-5566

Page 7

BDO 02450
Confidential

ES0011304

## REIMBURSABLE OUT-OF-POCKET COSTS

BANKEST CAPITAL CORP. incurs certain regular expenses for clients, and charges other fees for services it renders, a portion of which are reimbursed as a deduction from closing and advance proceeds otherwise due. The following is an itemization of reimbursed costs and additional fees and scheduled charges:

| Item | Amount |
|---|---|
| 1. Long distance telephone, 800 number calls; telecopies | Free to Clients |
| 2. Dun & Bradstreet report on non rated debtor | $ 45.00 per report * |
| 3. Postage; First class mail of client's invoices to debtors | U.S. Postal Service prevailing rates |
| 4. Analysis, preparation of credit reports and review of trade credit information | Free to Clients |
| 5. Wire transfer of immediately available funds to client accounts throughout the U.S. . | $ 35.00 per transfer * |
| 6. Overnight mail delivery of funds | $ 35.00 per package * |
| 7. Check certification / Cashier check | $ 40.00 per check |
| 8. UCC search and filing fee | $500.00 One time charge ** |
| 9. Audit Charge | $700.00 per diem |
| 10. Surcharge for each invoice under $360.00 | $  2.50 per invoice. |

11. Unused Accounts' Credit Fee: 0.2185% per month of the unused portion of the Accounts' credit approval requested by the Company, payable monthly in arrears.

These fees do not apply if the Client cancels the Line requested.  Lines may be canceled by the Client at any time.

12. Customer Credit Underwriting Charge:

| | |
|---|---|
| $19.50 per Customer Account of less than | $    5,000, |
| $32.50 per Customer Account of less than | $  25,000, |
| $56.70 for Customer Accounts of over | $  25,000, |
| $87.50 for Customer Accounts over | $ 100,000, |
| and all International Customers, | |
| $500.00 Mexican and South American Customers. | |

* Service is optional; there is no charge for funds mailed to or picked up by clients.

**Or actual, whichever is higher.

BDO 02451
Confidential

ES0011305

## AMENDMENT

To that certain Factoring Agreement by and between
Joy Athletic Inc. (formerly Joy Silk Screen Products, Inc.) and Bankest Capital Corp.
effective August 10, 1992 (the Bankest/Joy Factoring Agreement).

## Memorandum of Understanding and Agreement

This **Memorandum of Understanding and Agreement** ("Agreement") is hereby entered into this 30th day of September, 1996, by and between BANKEST CAPITAL CORP., a Florida corporation ("Bankest") and JOY ATHLETIC INC., a Florida corporation formerly named Joy Silk Screen Products, Inc. ("Joy").

## Recitals

A.      Bankest and Joy entered into that certain Factoring Agreement effective August 10, 1992 (the "Factoring Agreement").

B.      Pursuant to the Factoring Agreement, Bankest has purchased accounts receivable from Joy and Joy has sold accounts receivable to Bankest.  As of the date of this Agreement, Bankest has purchased accounts receivable in the principal amount of $9,080,463, which accounts remain unpaid at this date and are subject to the terms and conditions of the Factoring Agreement.

C.      In addition to the purchase of accounts under the Factoring Agreement, Bankest has made Advances to Joy, which together with capitalized interest, fees and other charges equal the amount of $9,111,186, of which $4,367,040, is deemed the Overadvance (the "Overadvance"). Pursuant to the Factoring Agreement, Overadvances by Bankest are made in Bankest's sole and exclusive discretion and such Overadvances are repayable to Bankest on demand.

D.      On or about September 24th, 1996, Jeffrey Barnhill, President of Joy ("Barnhill"), notified Bankest that he had learned that day that the designated accounting personnel at Joy had failed to file applicable employment tax returns for the prior three quarters (including the final quarter for 1995) and that in connection therewith, employment tax withholdings may not have been paid as required.  Bankest has not previously requested or received information as to Joy's employment tax matters and has not knowingly advanced monies to Joy for the specific or general purpose of paying either payroll or applicable payroll taxes.  All previous advances by Bankest to Joy were advances of funds which Joy, in its sole and exclusive discretion, determined the application of.

E.      Joy and Barnhill have requested Bankest to make an additional Overadvance to enable Joy to satisfy the outstanding employment tax liabilities and to restructure the existing Overadvance. Subject to the terms and conditions of this Agreement, Bankest is willing to make the additional Overadvance and to restructure the existing Overadvance.

Page 1 of 11

ES-L-034270

ES0519983

**NOW THEREFORE**, in consideration of these premises and the representations, warranties covenants of Joy, and agreements herein contained, Bankest and Joy do hereby agree as follows:

Part I

Bankest's Overadvance of Funds to Joy

1.01    Recitals.    The foregoing recitals are true and correct.

1.02    Estoppel as to Existing Balances; Ratification of Factoring Agreement. Joy agrees that it has no claims, offsets or other defenses to its outstanding obligations under the Factoring Agreement or to the Overadvance and that the Factoring Agreement is in good standing. Except as expressly provided for in this Agreement, Joy hereby confirms and ratifies the Factoring Agreement.

1.03    Agreement to Overadvance Funds.    Subject to the terms and conditions of this Agreement, Bankest has agreed to advance an additional six hundred and eighty one thousand ninety dollars ($681,090) to Joy. Upon disbursement of such amounts to or for the account of Joy, Bankest's total Overadvance, including capitalized interest, fees and other charges, shall be five million forty eight thousand one hundred and thirty dollars ($5,048,130).

1.04    Conversion of Overadvance to Preferred Stock.    In full satisfaction of the Overadvance, Bankest agrees to accept in exchange for the Overadvance, five million forty eight thousand one hundred and thirty (5,048,130) shares of preferred stock of Joy (the "Preferred Stock"), which Preferred Stock shall be subject to the following rights, privileges and preferences:

(i)    Par Value and Redemption Value.    Each share of Preferred Stock shall have a par value of not less than $1.00 and each share of Preferred Stock shall be redeemable for one dollar ($1.00) per share.

(ii)    Preferred Stock Dividend.    From and after issuance and until redeemed by Joy, the rate of dividend each share of Preferred Stock is entitled to receive shall be  equal to the annual rate of Citibank N.A. (NY)'s Base Rate (a/k/a/ Prime Rate) plus three hundred basis points (the "Preferred Stock Coupon Rate").

(iii)    Redemption Provisions.    Each share of Preferred Stock shall be subject to the following redemption provisions:

(1)    Mandatory Redemption.    Unless otherwise consented to by the holders of a majority of Preferred Stock, shares of Preferred Stock shall be subject to Mandatory Redemption upon the following events:

(i)    IPO of Joy.    In the event of a sale by Joy of securities in an initial public offering an amount of not less than one third (1/3 or 33.33%) of the then outstanding Preferred Stock shall be redeemed from the proceeds of any such public offerings of Joy securities.

Page 2 of 11

ES-L-034271

ES0519984

(ii)    <u>Additional Share Issuances by Joy</u>.  Unless previously approved in writing by Bankest, all of the Preferred Stock shall be immediately redeemable upon the issuance or sale of any equity securities in Joy; provided, however, that mandatory redemption shall not be required in the event of issuance of shares to Bankest pursuant to the Option granted Bankest under Section 1.05.

(iii)    <u>Additional Indebtedness of Joy</u>.  Unless previously agreed to in writing by Bankest, Joy's incurrence, after the date of this Agreement, of any debt-type obligation, including but not limited to, senior, subordinate or unsecured debt (other than trade debt), asset based debt and/or lease-type liabilities, in the singular amount of five thousand dollars ($5,000), in which case the Preferred Stock shall be required to be redeemed.

(iv)    <u>Default under Factoring Agreement</u>.  The Preferred Stock shall be redeemed by Joy in the event of any default under the Factoring Agreement.

(2)    <u>Optional Redemption</u>.        Notwithstanding anything herein to the contrary, shares of Preferred Stock may be redeemed by Joy at any time in exchange for:

(i)    <u>Cash Payment</u>.  Payment of the par value of each share plus any accrued but unpaid cumulative dividends due on such shares from the last dividend declaration and payment date through the date of redemption.

(ii)    <u>Accounts Receivable Assignment</u>.  Joy's assignment and transfer to Bankest, with Bankest acceptance of said accounts receivable being in Bankest's sole discretion, and said Joy accounts receivables not being the subject of correlating Advance(s) as described in the Bankest/Joy Factoring Agreement, ("Special Accounts Receivable"). Joy's redemption of its Senior Preferred Stock in exchange for Special Accounts Receivable assigned, transferred and granted to Bankest shall be deemed valid only upon collection by Bankest of the sum(s) evidenced by the Special Accounts Receivable.

(iv)    <u>Voting Rights</u>.        Provided that Joy is not in default of any of its obligations to pay dividends under the Preferred Stock, is not in default of any mandatory redemption obligations with respect to the Preferred Stock and is not in default under the Factoring Agreement, such Preferred Stock shall be non-voting.  In the event of any default, the aggregate sum of Preferred Stock shall be entitled to full voting rights equal to thirty three and one third percent (33.33%) of the common shares of Joy.

(v)    <u>Restrictions on Common Stock Dividends</u>.    Prior to the payment of an dividends on common stock, all of the Preferred Stock shall have first been redeemed.

Page 3 of 11

ES-L-034272

ES0519985

1.05    Common Stock Option.    In addition to the conversion and issuance to Bankest of the Preferred Stock, Joy hereby also grants to Bankest an option (the "Option") to acquire one-third of the common stock of Joy issued and outstanding as of this date (the "Joy Common Shares") for a per share option price equal to the current par value of each share ($0.01) subject to the following terms and conditions:

(1)    Term of Option.  Bankest's Option shall expire, if unexercised, upon the earlier of: (i) the effective date of an Initial Public Offering of Joy securities or (ii) upon the full payment and satisfaction of Joy's Obligations (as defined in the Bankest/Joy Factoring Agreement) to Bankest together with Redemption of the Preferred Stock in accordance with Section 1.04.

(2)    Exercise of Option.  Bankest may exercise its Option, in whole or in part, by delivering written notice to Joy, accompanied by payment in full for the Shares purchased thereby.

(3)    Rights of Bankest prior to Exercise.  Bankest shall not be, nor possess any of the rights or privileges of, a shareholder of Joy with respect of any of the common stock issuable upon the exercise of the Option unless and until the Option has been exercised.

(4)    Shareholders Agreement.  Upon exercise of the common shares to Bankest as a result of the exercise of the Option, the shareholders of Joy agree to enter into a Shareholders Agreement providing for, among other things, mutual and equal, usual and customary pre-emptive, anti-dilutive and piggyback rights.

(i) In the event of a successful Initial Public Offering of Joy Common Shares, pursuant to which at least one third (1/3) of the Preferred Stock is redeemed from the proceeds of such an IPO, then Bankest agrees to release the Stockholder's personal guarantee of the performance of Joy's Obligations to Bankest.

(5)    Capital Changes.    In the event of any change in capitalization that affects the common stock of Joy, such as a stock dividend, stock split, subdivision or combination of shares:  (i) the aggregate number of shares shall be adjusted appropriately so as to avoid dilution; and (ii) the rights of Bankest under the Option, both as to number of shares and exercise price, shall be adjusted appropriately so as to avoid dilution and to maintain an exercise price following such adjustment which is equal to the exercise price prior to the adjustment.

Part II
Representations and Warranties of Joy and Jeff Barnhill and Steve Zimmerman

Each of Joy, Jeff Barnhill and Steve Zimmerman, (Barnhill and Zimmerman hereinafter referred to as the "Stockholders"), hereby represent, covenant and warrant as follows:

2.01    Organization: Good Standing.  Joy is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and has full corporate power and authority

Page 4 of 11

ES-L-034273

ES0519986

to carry on its business as it is now being conducted and to own the properties and assets it now owns. The copies of Joy's Articles of Incorporation, Stock Certificate Book and Log of Corporate Minutes attached hereto as Schedule 2.01 are complete and correct copies of such instruments as presently in effect.

2.02    Capitalization; Subsidiaries. (a) The authorized capital stock of Joy consists of 10,000 shares of common stock, $0.01 par value, of which the following shares are issued and outstanding

| Shareholder | Number of Shares | Percentage Owned |
|---|---|---|
| Treasury | 2500 | 25% |
| Jeff Barnhill | 2500 | 25% |
| Steve Zimmerman | 2500 | 25% |
| Etienne Pedinielli (* see below) | 2500 | 25% |
| Total | 10000 | 100% |

All issued and outstanding shares of capital stock are duly and validly authorized, issued, fully paid and nonassessable. Except as provided in this Agreement, there are no outstanding (a) securities convertible into or exchangeable for Joy's capital stock; (b) options, warrants or other rights to purchase or subscribe to capital stock of Joy or securities convertible into or exchangeable for capital stock of Joy; or (c) contracts, commitments, agreements, understandings or arrangements of any kind relating to the issuance of any capital stock of Joy, any such convertible or exchangeable securities or any such options, warrants or rights. The Stockholders own the Joy Common Shares free and clear of all liens, security interests and encumbrances, except that related to a pledge of 2500 shares of Joy's Stock issued to Etienne Pedinielli securing a debt of Joy with a current balance of approximately $65,000. Upon the payment of this debt and delivery of the certificates in accordance with the Bankest Option, Bankest will receive good and marketable title to the Joy Stock, free and clear of all security interest, liens and encumbrances, except only in favor of Bankest.

(b)    Joy does not own any capital stock or other equity securities of any corporation, partnership, or other entity or any rights to acquire any equity or ownership interest in any business, except in Bottom Line Images, Inc.

2.03    Authorization, Etc. Joy has full corporate power and authority, and Stockholders have full power and authority, to enter into this Agreement and to carry out the transactions contemplated hereby.

2.04    No Violation. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will violate any provision of the corporate and/or charter documents of Joy, or be in conflict with, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or cause the acceleration of the maturity of any debt or obligation pursuant to which Joy or Stockholders are party.

ES-L-034274

ES0519987

2.05    No Undisclosed Liabilities.    To the best of Joy's and Stockholders' knowledge, Joy has no liabilities or obligations of any nature (absolute, accrued, contingent or otherwise) which are not fully reflected in the Joy Listing of Liabilities Report as of September 30, 1996, furnished to Bankest by Joy (the "Joy's Liabilities Report") which is Schedule 2.05 hereof.

2.06    Litigation; Contract Defaults.    To the best of Joy's and Stockholders' knowledge, there are no pending or threatened action, suit, inquiry, proceeding or investigation by or before any court or governmental or other regulatory or administrative agency or commission pending or threatened against or involving Joy except as provided in Schedule 2.06 attached hereto.    To the best knowledge of Joy and Stockholders, Joy is not in default under or in violation of, nor is there any valid basis for any claim of default under or violation of any contract, commitment or restriction to which it is a party or by which it is bound.    Joy is not in violation of, or in default with respect to, any law, rule, regulations, order, judgment, or decree; nor is Joy required to take any action in order to avoid such violation or default.    Joy is not subject to any judgment, order or decree entered in any lawsuit or proceeding which may have an adverse effect on its business practices or on its ability to acquire any property or conduct its business in any area.

2.07    Title to Properties; Encumbrances.    Joy has good, valid and marketable title to all the properties and assets which it purports to own (real, personal and mixed, tangible and intangible), free and clear of all liens, mortgages, security interests, pledges, charges and encumbrances ("Encumbrances") (except as may be disclosed in the Joy's Liabilities Report).    Joy will provide Bankest with a list of all properties within five (5) days of the execution of this Agreement.

2.08    Contracts and Commitments.    Within five (5) days of the date of this Agreement, Joy will provide Bankest with a list and copies of all material written contracts, agreements, instruments, leases, licenses, arrangements, or understandings to which Joy is a party or by which any of its assets or properties are bound. All contracts, agreements, plans, leases, policies and licenses are valid and in full force and effect as of the date hereof.    Joy and its Shareholders represent and warrant that there are no:

(a)    agreements, contracts, commitments or restrictions which are material to its business, operations or prospects or which require the making of any charitable contribution;

(b)    purchase contracts or commitments that continue for a period of more than 12 months or are in excess of the normal, ordinary and usual requirements or business or at any excessive price;

(c)    outstanding contracts with officers, employees, agents, consultants, advisors, salesmen, sales representatives, distributors or dealers that are not cancelable by it on notice of not longer than 30 days and that no such contract contains any liability, penalty or premium or any agreement or arrangement providing for the payment of any bonus or commission based on sales or earnings;

(d)    employment agreement, or any other agreement that contains any severance or termination pay liabilities or obligations;

ES-L-034275

ES0519988

(e)    collective bargaining or union contracts or agreements; or

(g)    debt obligation for borrowed money, including guarantees of or agreements to acquire any such debt obligation of others (other than to Bankest).

2.09    Facilities.    All facilities and equipment used by Joy in its business are structurally sound with no defects and are in good operating condition and repair and are adequate for the uses to which they are being put; and to the best of its knowledge, none of such facilities or equipment is in need of maintenance and repairs which are material in nature of cost.  Within five (5) business days of this Agreement, Joy shall provide a list of all  facilities and equipment.

2.10    Taxes.    To the best of Joy's and Stockholders' knowledge, except for Employment Taxes as noted above, Joy has duly filed all tax reports and returns required to be filed by it relating to it (the "Tax Returns") and has duly paid all taxes and other charges due or claimed to be due to federal, state or local taxing authorities.

2.11    Insurance.    Within five (5) business days of this Agreement, Joy shall provide an accurate and complete list of all material policies of fire, liability (including malpractice), workmen's compensation and other forms of insurance owned or held by Joy.  All such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the date of this Agreement have been paid, and no notice of cancellation or termination has been received with respect to any such policy.  To the best of Joy's and Stockholders' knowledge, such policies are sufficient for compliance with all requirements of law and all agreements to which Joy or any Subsidiary is a party.  Joy has not been refused any insurance with respect to its assets or operations, nor has its coverage been limited by any insurance carrier to which it has applied for any such insurance or with which it has carried insurance during the last two years.

2.12    Employee Benefit Plans.    There are no bonus, deferred compensation, pension, profit-sharing, retirement, insurance, stock purchase, stock option or any other fringe benefit plans, arrangement or practice, as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), whether formal or informal (collectively, the "Plans") currently in effect with respect to current or former employees of Joy.

2.13    Environmental Protection.    To the best of Joy's and Stockholders' knowledge,  Joy has obtained all permits, licenses and other authorizations which are required under federal, state and local laws relating to pollution or protection of the environment, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, or hazardous or toxic materials or wastes into ambient air, surface water, ground water, or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants or hazardous or toxic materials or wastes.   Joy is in full compliance with all terms and conditions of the required permits, licenses and authorizations, and is also in full compliance with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in those laws or contained in any regulations, code, plan, order, decree, judgment, notice or demand letter issued, entered, promulgated or approved thereunder.

ES-L-034276

ES0519989

Part III
Survival of Representations and Warranties of Joy and the Stockholders

3.01    Survival of Warranties.  The representations, warranties, covenants and agreements of Joy and Stockholders contained herein or in any certificates or any other documents delivered prior to or after the overadvance funding contemplated in Section 1.03 shall survive funding and shall not be deemed waived or otherwise affected by any investigation made by any party hereto.

Part IV
Indemnification By Joy and Stockholders

4.01    Indemnification By Joy and Stockholders.  Joy and its Stockholders, jointly and severally, agree to indemnify and hold harmless Bankest, Bankest's officer, directors, employees and independent contractors or consultants ("Bankest Indemnitees") from, against and in respect of and shall on demand reimburse each Bankest Indemnitee for all losses, liabilities, damages, costs and expenses arising from any material misrepresentation or breach of any representation, warranty, covenant or agreement on the part of Joy and/or any Stockholder under this Agreement, and any and all actions, suits, proceedings, elections, demands, assessments, judgments, costs and expenses, including without limitation, reasonable legal fees and expenses, incident to any of the foregoing or incurred in investigating or attempting to avoid same or to oppose the imposition thereof, or in enforcing this indemnity (collectively "Losses").

Part V
Expenses: Transfer Taxes, Etc.

5.01    Expenses: Transfer Taxes, Etc.  Whether or not the transactions contemplated by this Agreement shall be consummated. Joy agrees that all fees and expenses incurred by Bankest and Joy in connection with this Agreement shall be borne by Joy, including, without limitation as to Bankest's fees of counsel and accountants. Joy shall pay all documentary stamp taxes on all shares issued under this Agreement.

5.02    Notices.    All notices requests, consents and other communications required or permitted under this Agreement shall be in writing (including electronic transmission) and shall be (as elected by the person giving such notice) hand delivered by messenger or courier service, electronically transmitted, or mailed (airmail if international) by registered or certified mail (postage prepaid), return receipt requested, addressed to:

(a)    If to Bankest to:
Bankest Capital Corp.
Dominick C. Parlapiano
Senior Vice President, Director
1395 Brickell Avenue, 7th Floor
Miami, Florida 33131
Fax (305) 372-2816

Page 8 of 11

ES-L-034277

ES0519990

with a copy to:                          Mark J. Scheer, Esq.
                                         Gunster, Yoakley, Valdes-Fauli & Stewart
                                         2 So. Biscayne Boulevard, Ste. 3400
                                         One Biscayne Tower, Suite 3400
                                         Miami, Florida 33131
                                         Fax (305) 376-6010

                          (b)    If to Joy, to:
                                 Joy Athletic, Inc.
                                 Jeff Barnhill, President
                                 3555 East 11th Avenue
                                 Hialeah, Florida 33013

with a copy to:                          Robert Geiger, Esq.
                                         Geiger, Kasdin, Heller, Kuperstein
                                         1428 Brickell Avenue, 6th floor
                                         Miami, Florida 33131

or to such other address or person as any party may designate by notice complying with the terms of this Section. Each such notice shall be deemed delivered (a) on the date delivered if by personal delivery; (b) on the date of transmission with confirmed answer back if my electronic transmission; and (c) on the date upon which the return receipt is signed or delivery is refused or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed.

5.03    Assignment.    This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns with Bankest's rights, interests or obligations hereunder being assignable to any subsidiary or affiliate of Bankest, but the rights, interests or obligations of Joy and the Stockholders, hereunder shall not be assigned by Joy without the prior written consent of Bankest.

5.04    Governing Law.    This Agreement and the legal relations among the parties hereto shall be governed by and construed in accordance with the laws of the State of Florida, with regard to its conflicts of law doctrine.

5.05    Counterparts.    This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Confirmation of execution by electronic transmission of a facsimile signature page shall be binding upon any party so confirming.

5.06    Headings.    The headings of the Sections and Articles of this Agreement are inserted for convenience only and shall not constitute a part hereof or affect in any way the meaning or interpretation of this Agreement.

5.07    Entire Agreement.    The Bankest/Joy Agreement, this Agreement, including the Exhibits and Schedules hereto; and the other documents and certificates delivered pursuant to the

Page 9 of 11

ES-L-034278

ES0519991

terms hereof, set forth the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and supersede all prior agreements, except the Bankest/Joy Factoring Agreement, which is the controlling Agreement, and which this Agreement is a part thereof; covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, employee or representative of any party hereto.

5.08    Third Parties. Excepts as specifically set forth or referred to herein, nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or corporation other than the parties hereto their successors or assigns, any rights or remedies under or by reason of this Agreement.

5.09    Confidentiality. The parties hereto will hold themselves respectively and will cause its consultants and advisors to hold in strict confidence, unless compelled to disclose by judicial or administrative process or, in the opinion of its counsel, by other requirements of law, all documents and information concerning the other party furnished it by such other party or its representatives in connection with the transactions contemplated by this Agreement (except to the extent that such information can be shown to have been (i) previously known by the party to which it was furnished, or (ii) later lawfully acquired from other sources by the party to which it was furnished), and each party will not release or disclose such information to any other person, except its auditors, attorneys, financial advisors, bankers and other consultants and advisors in connection with this Agreement. If the transactions contemplated by this Agreement are not consummated, such confidence shall be maintained except to the extent such information comes into the public domain through no fault of the party required to hold it in confidence, and such information shall not be used to the detriment of, or in relation to any investment in, the other party and all such documents (including copies thereof) shall be returned to the other party immediately upon the written request of such other party. Each party shall be deemed to have satisfied its obligation to hold confidential information concerning or supplied by the other party if it exercises the same care as it takes to preserve confidentiality for its own similar information.

5.10    Jurisdiction and Venue. Any civil action or legal proceeding arising out of or relating to this MOU Agreement shall be brought in the courts of record of the state of Florida in Dade County or the United States District Court, Southern District of Florida, Dade Division. Each party consents to the jurisdiction of such court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such court. Service of any court paper may be effected on such party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws, rules of procedure or local rules.

5.11    Severability. If any provision of this Agreement or any other agreement entered into pursuant hereto is contrary to, prohibited by or deemed invalid under applicable law or regulation, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given full force and effect so far as possible. If any provision of this Agreement may be construed in two or more ways, one of which would render the provision valid and enforceable, such provision shall have the meaning which renders it valid and enforceable.

ES-L-034279

ES0519992

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed all as of the day and year first above written.

BANKEST CAPITAL CORP.

Eduardo Orlansky, President

JOY ATHLETIC, INC.
(formerly Joy Silk Screen Products, Inc.)

Jeffrey (Jeff) Barnhill, President

Steve Zimmerman, Vice President

Steve Zimmerman, Corporate Secretary

Signing below, personally guaranteeing and warranting the representation, warranties, covenants, agreements and performance of Joy Athletic, Inc.

Jeffrey (Jeff) Barnhill, Individually

Steve Zimmerman, Individually

ES-L-034280

ES0519993

Schedule 2.05 to that Certain MOU Agreement dated September 30, 1996 /
Amendment to the Bankest/ Joy Factoring Agreement effective 8/10/92

# JOY'S LIABILITIES REPORT

|  | As of 9/30/96 | Tax Pymt Adjustm. | Adjusted Liabilities |
|---|---|---|---|
| **Current Liabilities** | | | |
| Bank Overdraft | 300,000 | | 300,000 |
| Current Maturities - LTD | 339,441 | | 339,441 |
| Accounts Payable - Trade | 1,029,000 | | 1,029,000 |
| Suspense (for A/P) | | | |
| Deposits Refunded | | | |
| Credits Refunded | | | |
| State Tax Payable | 31,732 | (31,732) | (0) |
| Local Tax Payable | | | |
| Federal Tax Payable | 649,358 | (649,358) | 0 |
| | | | |
| Accrued Liabilities & Payroll | 55,300 | | 55,300 |
| | | | |
| **FACTORING ACCOUNT (BANKEST)** | | | |
| A/R Sold Bankest | 9,080,463 | | 9,080,463 |
| | | | |
| Due From Bankest | (9,080,463) | | (9,080,463) |
| Ineligible A/R - Charge Backs | 4,336,317 | | 4,336,317 |
| Advances / Fees / Interest | 9,111,186 | 681,090 | 9,792,276 |
| *DUE TO BANKEST - Overadvance* | *4,367,040* | | *5,048,130* |
| | | | |
| Other Current Liabilities | | | |
| | | | |
| **Total Current Liabilities** | 6,771,871 | | 6,771,871 |
| | | | |
| **Long Term Liabilities** | | | |
| Bankest Liability | | | |
| Cap. Lease - Tilden | 9,337 | | 9,337 |
| Note Payable - Key Bank | (22,375) | | (22,375) |
| Note Payable - Stockholder | 11,850 | | 11,850 |
| Note Payable - Pedinielli | 66,186 | | 66,186 |
| Note Payable – Sherman Squire | 7,992 | | 7,992 |
| Note Payable - Bye One | 909,338 | | 909,338 |
| Note Payable - Bye One | 136,190 | | 136,190 |
| Note Payable - Don Koren | 40,000 | | 40,000 |
| Cap. Lease - Datronic | 16,517 | | 16,517 |
| Cap. Lease - Compuquip | 3,426 | | 3,426 |
| AP - Michael Moecher | 183,357 | | 183,357 |
| Current Portion – LTD | (339,441) | | (339,441) |
| | | | |
| Other Long Term Liabilities | | | |
| | | | |
| **Total Long Term Liabilities** | 1,022,379 | | 1,022,379 |
| | | | |
| **Total Liabilities** | 7,794,249 | | 7,794,249 |

Signing below on this 30th day of September 30, 1996,
Affirming, Warrantying and Guaranteeing the accuracy of the above listed:

*[signature]* PRESIDENT                    *[signature]* VICE PRESIDENT                    *[signature]*

Jeffrey S. (Jeff) Barnhill, President for and         Steve Zimmerman, Vice President for and
on behalf of Joy Athletic, Inc. and                 on behalf of Joy Athletic, Inc. and
Jeffrey S. (Jeff) Barnhill, Personally.             Steve Zimmerman, Personally.

ES-L-034281

ES0519994

**Schedule 2.06 to that Certain MOU Agreement dated September 30, 1996 / Amendment to the Bankest/Joy Agreement effective August 10, 1992.**

Litigation: Contract Defaults.

    Joy as Plaintiff:

    Joy vs Universal Studios
    Joy vs C&H Trading

    Joy as Defendant:

    J & D Financial / J&J Manufacturing vs Joy
    C&H vs Joy
    Pigskin Pro vs Joy

ES-L-034282

ES0519995