# EXHIBIT I



**FACTORING AGREEMENT**

by and between

**STRATASYS CORPORATION**

together with

**STRATASYS GROUP L.L.C.**

**STRATASYS EQUIPMENT CO. L.L.C.**

and

**E.S. BANKEST L.L.C.**

USREC-24-00121

ES-STR-001124

ES0908543

**BANKEST CAPITAL CORP.**
**FACTORING AGREEMENT**

November    , 2000

Howard Cantor, President
*STRATYSYS CORPORATION*
10700 North Kendall Drive, 4ᵗʰ Floor
Miami, Florida 33176

Gentlemen:

The following shall constitute the terms upon which we shall act as your sole and exclusive factor (see section 11 for the definition of certain capitalized terms):

SECTION 1    Sale and Approval of Receivables

1.1    StrataSys Corporation, a Delaware corporation together with StrataSys Group L.L.C., a Florida corporation and Stratasys Equipment Co. L.L.C. a Florida Corporation ("You," "you," "Your," "your") hereby sell, assign and transfer to E.S.Bankest L.L.C., a Florida corporation("Us," "us," "Our," "our") and we hereby purchase from you Specified Approved Receivables and/or Specified Non-Approved Receivables with full power to collect and otherwise deal therewith as the sole exclusive owner thereof.  You further sell and assign to us all of your interest in the goods represented by the Specified Approved Receivables and/or Specified Non-Approved Receivables in all goods that may be returned by customers, all rights as an unpaid vendor or lienor, all rights of stoppage in transit, replevin and reclamation relating thereto, all rights in and to all security therefor and guarantees thereof, and all rights against third parties with respect thereto.  Any goods so recovered or returned shall be set aside, marked with our name and held for our account as owner.  You shall notify us promptly of all such returned or recovered goods.

1.2    (a) You will submit for our written approval the amount, terms of payment and delivery, and all other conditions of each prospective sale and each approved sale shall be made only in accordance with such approval, which may be withdrawn at any time before actual delivery of the merchandise or rendition of the services to the customer.  We may, in our sole judgment, and from time to time, establish credit lines for sales to some or all of your customers and, provided sales to such customers are on your normal selling terms which we have approved, all sales to such customers within the established credit lines will be Approved Receivables provided that delivery or performance is completed while the credit line remains in effect.  All of our credit approvals will be in writing.

(b) We reserve the right to amend or withdraw a credit approval or credit line at any time by advice to you, which advice will be promptly confirmed in writing.  A credit line will be automatically suspended (i.e. withdrawn) during any period that the customer is 60 or more days past due.  We will reinstate any suspended credit line in accordance with, and subject to, our credit line approval guidelines.

(c) Without limiting the foregoing, our approval shall automatically be withdrawn if any terms are changed or if delivery is made more than thirty days after the approved delivery date, or more than thirty days after the date of approval if no delivery date is specified.  If the amount of any sale is increased without our prior written consent, our approval shall apply only to the original amount approved.

(d)  We shall have no liability to you or to any customer for our refusal to credit approve a Receivable or

Page 1 of 9

USREC-24-00122

ES-STR-001125

ES0908544

establish or establish a credit line or for our withdrawal of a credit approval or a credit line.

1.3    We shall assume the Credit Risk on all Specified Approved Receivables. We shall have full recourse to you for all Specified Non-Approved Receivables.

1.4    In the event that monies shall, at any time, be owing from one of your customers for both Specified Approved Receivables and/or Specified Non-Approved Receivables, we may, and you so authorize and approve us to, apply all payments received first in reduction of the outstanding Approved Receivables.

SECTION 2  Purchase Price, Commissions, Advances, and Reserve

2.1    We will purchase Specified Approved Receivables and/or Specified Non-Approved Receivables at the Net Amount thereof, less our commission thereon (hereinafter, the "Purchase Price"). "Net Amount" shall mean the face amount less all returns, discounts (which may, at our option, be calculated on the longest or shortest terms), credits or allowances of any nature at any time issued, owing, claimed by customers, granted or outstanding, and out-of-pocket expenses as set forth in the Reimbursable Out-of-Pocket Costs Schedule Attached as Schedule A hereto.

2.2    Upon the Payment Date (as defined in Section 11.8 hereof) with respect to Specified Approved Receivables and/or Specified Non-Approved Receivables, the Purchase Price, less any debits or reserves, shall be credited to your account. The credit balance of the account shall be distributed to you, as available. We may retain from sums payable to you a reserve, which reserve may be revised from time to time at our discretion, in order to provide for Customer Disputes, possible credit losses on Specified Non-Approved Receivables, sums owing to us for goods/services purchased by you from any other firm or company factored or otherwise financed by us, and the Obligations. Amounts in your account shall also be subject to reduction for payment of any charges or credits which may be charged to you pursuant to this Agreement, and shall be given as security for all of your Obligations hereunder or arising from any other agreement between you and us.

2.3    From time to time during the term of this Agreement and prior to the Payment Date, upon your request and in our sole discretion, we may advance funds ("Advance") to you up to eighty  percent (80.0%) percent of the Purchase Price of a Specified Approved Receivables and/or Specified Non-Approved Receivables. Any Advance in excess of the percentages set forth above shall be deemed to be an Overadvance, which Overadvance shall be made in our sole discretion and also subject to this Agreement.

2.4    All Advances, Overadvances and other credits, charges or payments specified herein, except for charges which reduce the Purchase Price pursuant to Section 2.2, shall be charged to your account. You shall be charged interest in the amount as and at such times as herein provided on the outstanding balance of the account. The account shall be reduced by all payments received with respect to a Specified Approved Receivables and/or Specified Non-Approved Receivables.

2.5    You will pay us a factoring commission, which commission shall be in the form of a Discount in the amount of the Applicable Factoring Commission Percentage of each Specified Approved Receivables and/or Specified Non-Approved Receivables purchased by us (the "Applicable Factoring Commission Percentage"). The Applicable Factoring Commission Percentage is predicated upon the number of days the Specified Approved Receivables and/or Specified Non-Approved Receivables remain outstanding and shall be the percentages  set forth on the Factoring Commission Schedule attached hereto as Schedule B.  The minimum Factoring Commission on each invoice shall be Five Dollars ($5.00).

2.6    During each contract year (the 12 months immediately following the date hereof or any anniversary thereof) you agree to pay to us Factoring Commissions aggregating at least $12,000.00 ("Minimum Annual Commission") . If during any month the aggregate factoring commissions paid by you is less than $1,000.00 ("Minimum Monthly Commission"), then you shall pay to us, or we may charge your account with an amount equal to the difference between the Minimum Monthly Commission and the factoring  commission actually paid during that month (the "Deficiency Charge").  At such time as you exceed the Minimum Annual Commission, the Minimum Monthly

USREC-24-00123

ES-STR-001126

ES0908545

Commission shall be waived for the remainder of the contract year and the Deficiency Charges paid during said contract year shall be applied against subsequent factoring commission charges incurred during said contract year.

2.7    We will charge your account our standard wire transfer fee on all wire transfers, and you will reimburse us for exchanges on checks, charges for returned items and all other bank charges and other charges and costs as stipulated in the Reimbursable Out-of-Pocket Costs Schedule attached hereto. We may also, at our option, charge your account for all obligations owing by you to us under this Agreement.

2.8    In the case of sales to customers located outside the continental United States, you shall pay to us and we may conclusively charge to your account (i) the amount of all fees, costs and commissions charged to us by our correspondent foreign factors to which we re-assign or through which we re-factor such sales, (ii) all premiums on any credit insurance obtained by us in connection therewith, (iii) all currency rate differentials, currency conversion charges, transmittal charges and other costs and expenses relating thereto, and (iv) any and all sums which we may be required to pay or assume under our arrangements with any foreign factors. All charge-backs of foreign sales by such foreign factors shall be binding on you and shall relieve us of the Credit Risk with respect thereto. You acknowledge that we have informed us of the terms of our arrangements with any and all such foreign factors, including, without limitation, the Code of International Factoring Customs (IFC76) and Master Agreement relating thereto; you consent thereto and agree to fulfill and to assist in fulfilling those customs as far as your part of the transactions is concerned; your failure to comply with any thereof shall immediately relieve us of the Credit Risk with respect to all affected Specified Approved Receivables. You shall affix to all invoices to foreign customers such legend regarding payment thereof to the foreign factor as we may from time to time require.

2.9    You shall pay us on demand any debit balance at any time existing in your account.

**SECTION 3    Interest**

3.1    You will pay interest on the daily balance of all monies remitted, paid or otherwise advanced to you or for your account net of all payments received from you or on your behalf including the Purchase Price of Specified Approved Receivables and/or Specified Non-Approved Receivables purchased by us hereunder which is credited to your account on the Payment Date. Interest will be calculated daily at a rate the greater of ten percent (10.0%) per annum or two (2.0%) percent plus the Base Rate (the "Interest Rate") and will be charged to your account monthly, in arrears. All other indebtedness due by you to us under this Agreement and on all other Obligations, except those specifying a different rate, from the date incurred through the date paid will be charged interest calculated daily at a rate of two (2.0%) plus the Base Rate and, at our option, may be charged to your account. Any publicly announced decrease or increase in the Base Rate shall result in an adjustment to the Interest Rate on the next business day. Interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed. In no event shall the Interest Rate exceed the maximum rate permitted by applicable law and in the event excess interest is paid, it shall be considered a repayment of the principal.

3.2    If a Specified Approved Receivables and/or Specified Non-Approved Receivables or any payment is charged back to you after the Collection Date, you will pay us interest at the Interest Rate on such Net Receivable or such payment from the Collection Date to the chargeback date.

**SECTION 4    Representations, Warranties and Covenants**

4.1    You represent, warrant and covenant as to each Receivable which is deemed a Specified Approved Receivable by us, in our sole disposition of Receivable(s); our disposition as to whether Receivables are Specified Approved Receivables or Specified Non-approved receivables is evidenced by the listing of such Specified Approved Receivables and Specified Non-Approved Receivables, on  duly mutually executed Assignment of Accounts Receivable Form(s), wherein we state our disposition; such Specified Approved Receivable(s), which is sold and assigned by you to us and purchased by us hereunder, that, at the time of its creation, the Specified Approved Receivable is a valid, bona fide account, representing an undisputed indebtedness  incurred by the named account

USREC-24-00124

ES-STR-001127

ES0908546

debtor for goods actually sold and delivered or for services completely rendered; there are no setoffs, offsets or counterclaims, genuine or otherwise, against the Receivable; the Specified Approved Receivable does not represent a sale to a parent, subsidiary or a consignment, sale or return or a bill and hold transaction; no agreement exists permitting any deduction or discount (other than the discount stated on the invoice); you are the lawful owner of the Receivable(s) and have the right to sell and assign the same to us; the Receivable(s) is free of all security interests, liens and encumbrances other than those in our favor, and the Receivable(s) is due and payable in accordance with its terms.

4.2     You shall not grant or suffer to exist any lien upon or security interest in your inventory in favor of any party other than us without our written consent, or prior knowledge.

4.3  You are a solvent corporation; duly incorporated and in good standing under the laws of the State of Florida and qualified in all States where such qualification is required; the execution, delivery and performance of this Agreement have been duly authorized and are not in contravention of any applicable law, your corporate charter or by-laws or any agreement or order by which you are bound.

4.4     You shall not change your corporate name or the location of your office or open any new offices without giving us at least thirty (30) days prior written notice.  At the present time, you carry on business only at the above address and the addresses set forth below:

_____

_____

4.5     All books and records pertaining to the Specified Approved Receivables and/or Specified Non-Approved Receivables or to any inventory owned by you shall be maintained solely and exclusively at the above addresses or the addresses listed in Section 4.4 and no such books and records shall be moved or transferred without giving us thirty (30) days prior written notice.

4.6     You shall not sell, lease, transfer or otherwise dispose of all or substantially all of your property or assets, or consolidate with or merge into or with any corporation or entity without our prior written consent, which consent will not be unreasonable withheld.

4.7     After our request, you shall hold all returned, replevied or reclaimed goods coming into your possession in trust for us and all such goods shall be segregated and identified as held in trust for our benefit and you shall, at our request, and at your expense, deliver such goods to such place or places as we may designate.

4.8     Specified Approved Receivables and/or Specified Non-Approved Receivables sold to us hereunder and represented by invoices bearing the tradenames or styles set forth below are wholly owned by you and the undertakings, representations and warranties made in connection therewith shall be identical to and of the same force and effects as those made with respect to invoices bearing your corporate name.  The tradenames or styles set forth below are the only tradenames or styles under which you transact business.

Refer to Attachment 4.8 hereof

4.9     No discounts, credits or allowances will be issued, granted or allowed by you to customers and no returns will be accepted without our prior written consent; provided, however, that until we notify you to the contrary, you may presume our consent.  Discounts, credits or allowances once issued may be claimed only by the customer; no third party beneficiary rights are created hereby.

SECTION 5     Disputes, Chargebacks and Reserves

5.1     With respect to any Specified Approved Receivables and/or Specified Non-Approved Receivables, upon the

USREC-24-00125

ES-STR-001128

ES0908547

occurrence of a breach of any of the representations or warranties contained in Section 4.1, or the assertion by a customer of a Dispute or other defense to payment, other than financial inability, an Specified Approved Receivable shall automatically become a Specified Non-Approved Receivable and we may charge back such Receivable to you.

5.2    You will notify us promptly of and settle all Disputes at your cost and expense, including attorneys' fees, and will pay us promptly the amount of the Receivables affected thereby. However, if any Dispute is not settled by you within thirty days after the maturity date of the invoice or within such shorter period as we may determine, we may settle, compromise or litigate such Dispute in our or your name upon such terms as we in our sole discretion deem advisable and for your account and risk. We may also in our discretion and without notice to you take possession of and sell any returned goods at such prices and upon such terms as we deem advisable. We may charge any deficiency, and all costs and expenses, including attorney's fees, to your account. In addition to all other rights to which we are entitled under this Agreement, if there is any Dispute as to any Specified Approved Receivables and/or Specified Non-Approved Receivables, or if any Specified Non-Approved Receivable on which you have the Credit Risk or evidenced by an invoice for less than Fifty Dollars ($50.00) is unpaid at its maturity, we may at any time charge the amount of such Specified Approved Receivables and/or Specified Non-Approved Receivables back to your account. Immediately upon the occurrence of any Dispute and regardless of the date on which we charge back the affected Specified Approved Receivables and/or Specified Non-Approved Receivables, the Credit Risk on such Specified Approved Receivables and/or Specified Non-Approved Receivables, to the extent theretofore borne by us, shall automatically revert to you. We may also charge back the amount of any Specified Approved Receivables and/or Specified Non-Approved Receivables which is not paid to us at maturity due to acts of God, war, civil strife, currency restrictions, foreign political impediments or the like.

5.3    We may, at our option, charge back to you all amounts owing on Specified Non-Approved Receivables which are not paid when due. We shall also have the right to charge back to you any payment which we receive with respect to a Specified Non-Approved Receivable if such payment is subsequently disgorged by us or disgorged by our assigns, whether as a result of any proceeding in bankruptcy or otherwise.

5.4    A chargeback shall not constitute a resale to you of said Specified Approved Receivables and/or Specified Non-Approved Receivables; however, upon payment by you to us of all monies due with respect to such charge back Specified Approved Receivables and/or Specified Non-Approved Receivables, title thereto shall revert to you, subject, however, to our continuing security interest therein. You agree to indemnify and save us harmless from and against any and all loss, costs and expenses, caused by or arising out of disputed Specified Approved Receivables and/or Specified Non-Approved Receivables, including, but not limited to, collection expenses and attorney's fees incurred with respect thereto. We may charge you our reasonable, normal and standard late payment and/or delinquency charges.

SECTION 6    Administration

6.1    You shall, from time to time, execute and deliver to us confirmatory schedules of Specified Approved Receivables and/or Specified Non-Approved Receivables sold to us, together with one copy of each invoice and acceptable evidence of shipment and such other documentation and proofs of delivery as we may require. Each invoice shall bear a notice, in form mutually satisfactory to you and us regarding the ownership and payee of each invoice. However, the issuance of invoices to customers shall itself constitute the assignment to us of the Receivables represented thereby. You will keep all shipping and delivery receipts and copies of all invoices at your office available for our inspection, and will deliver them to us promptly at our request. The sale of your Specified Approved Receivables and/or Specified Non-Approved Receivables to us and our ownership thereof will be properly reflected on your books. You agree to prepare and mail all invoices or, at our option, you shall send all of the invoices to us ready for mailing to the customers, in which event the postage and clerical charges incurred by us in mailing the same will be paid by you.

6.2    You agree to execute and deliver to us such further instruments of assignments, financing statements and instruments of further assurance as we may reasonably require. You authorize us to execute on your behalf and file such UCC financing statements as we may deem necessary in order to perfect and maintain the security interests

Page 5 of 9          USREC-24-00126

ES-STR-001129

ES0908548

granted by you in accordance with this and any other agreement between you and us, and you further agree that we may file this Agreement or a copy thereof as such UCC financing statement. You agree to bear the cost of all filing fees, filing taxes, search reports, legal fees and other charges incurred by us in the perfection, protection and preservation of the rights and collateral security herein granted to us.

6.3     If any remittances are made directly to you, your employees or agents, you shall act as trustee of an express trust for our benefit, hold the same as our property and deliver the same to us forthwith in kind. We and/or such designee as we may from time to time appoint, are hereby appointed your attorney-in-fact to endorse your name on any remittances received by us where such endorsement is required to effect collection; this power, being coupled with an interest is irrevocable.

6.4     We may, during normal business hours, have access to, inspect and make extracts from all your records, files and books of accounts. We may, at any time after default by you hereunder, remove from your premises all such records, files and books relating to the Specified Approved Receivables and/or Specified Non-Approved Receivables. You agree to promptly furnish us within forty-five (45) days after the close of each quarter financial statements unaudited and in such form and detail as we may reasonably require. You also agree to prepare and furnish to us, within ninety (90) days after the close of your fiscal year, financial statements which have been audited and certified by an independent certified public accountant which is acceptable to us. You authorize us to communicate directly with your independent certified public accountants and authorize such accountants to discuss your financial condition and statements directly with us.

6.5     If we determine that the credit standing of a customer has deteriorated after we have assumed the Credit Risk on an Specified Approved Receivable, you shall, at our request, exercise such rights as you may have to reclaim or stop the goods in transit, and you hereby grant us the right to take such steps in your name or ours.

6.6     You authorize us to disclose such information as we deem appropriate to persons making credit inquiries about you.

6.7     We will send you a monthly statement of your account which shall constitute an account stated and be binding upon you with respect to the matters reflected therein and any matters previously reported to you which are incorporated therein, except to the extent that written exceptions thereto are served upon us within thirty (30) days after such statement is rendered.

6.8     You hereby agree to indemnify us for all costs and expenses incurred by us in connection with Receivables for which credit approval has not been given and in connection with Specified Approved Receivables and/or Specified Non-Approved Receivables which are unpaid at maturity for reasons other than financial inability. Further, you hereby agree to indemnify us for any liability for duties, forwarder's fees, storage, shipping charges and other expense connected with the Specified Approved Receivables and/or Specified Non-Approved Receivables and any losses occasioned by claims of Customers under Specified Approved Receivables and/or Specified Non-Approved Receivables.

**SECTION 7 <u>Collateral Security</u>**

7.1     As collateral security for all Obligations, you hereby assign and grant to us a continuing security interest in: (i) all of your presently existing and hereafter created Specified Approved Receivables and/or Specified Non-Approved Receivables as defined herein and general intangibles and the proceeds thereof; (ii) all monies, securities and other property now or hereafter held or received by, or in transit to us from or for you, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and all of your deposits and credit balances in our possession; (iii) all returned, reclaimed or repossessed goods and the documents evidencing or relating to such goods; (iv) all books, records and other property at any time evidencing or relating to the Specified Approved Receivables and/or Specified Non-Approved Receivables; and (v) the proceeds of any insurance policies covering any of the foregoing. Recourse to the collateral security herein provided shall not be required, and you shall at all times remain liable for the payment and performance of all of your Obligations upon demand by us.

USREC-24-00127

ES-STR-001130

ES0908549

7.2    By your execution of this Agreement, you also hereby grant to us the right and authority to set-off and debit payments and charges you owe us, which we are otherwise entitled to set-off and debit against the account as specified in this Agreement directly against your account, without prior notice or consent from you. We shall in good faith endeavor to provide you written notice of such set-off or debit within ten (10) days after same; provided however, that we shall have no liability to you in respect of our failure to give such notice; and further provided that our failure to give such notice shall have no effect on our rights to set-off or debit as provided above.

## SECTION 8    Events of Default

8.1    The occurrence of any of the following acts or events shall constitute an Event of Default: (a) if you fail to make payment of any of your Obligations when due, (b) if you fail to make any remittance required by this Agreement, (c) if you commit any breach of any of the terms, representations, warranties, covenants, conditions or provisions of this Agreement, or of any present or future supplement or amendment hereto or of any other agreement between us, (d) if you become insolvent or unable to meet your debts as they mature, (e) if you deliver to us a false financial statement, (f) if you call, or have called by a third party, a meeting of creditors, (g) if you have commenced by or against you any bankruptcy proceeding, insolvency, arrangement or similar proceeding, (h) if you suspend or discontinue doing business for any reason, (i) if a receiver or a trustee of any kind is appointed for you or any of your property, (j) if any guarantor of your Obligations should become insolvent or have commenced by or against such guarantor any bankruptcy proceeding, insolvency, arrangement or similar proceeding, (k) if any guaranty of your Obligations is terminated, or (l) if any change of ownership occurs with respect to more than twenty five (25%) percent of your capital and/or voting stock.

8.2    Upon the occurrence of an Event of Default, we shall have the right to terminate this Agreement and all other arrangements existing between us forthwith and without notice, and all of your Obligations to us shall mature and become immediately due and payable and we shall have the right to withhold any further payment to you until all Obligations have been paid in full. In addition, we shall have all the rights of a secured party under the Uniform Commercial Code, including, without limitation, the right to take possession of any collateral in which we have a security interest and to dispose of same at public or private sale and you will be liable for any deficiency. We shall not be required to proceed against any Collateral but may proceed against you directly. In the event we institute suit against you, you agree to pay our costs and reasonable attorney's fees.

## SECTION 9    Terms and Termination

This Agreement shall continue in full force and effect for one (1) year or until terminated by either party hereto giving the other party not less than 2 days prior written notice thereof. Notice of termination shall be registered or certified mail; provided however, that you shall not terminate this Agreement so long as you are indebted or obligated to us in connection with any financing arrangements. Notwithstanding such notice of termination, our respective rights and obligations arising out of transactions having their inception prior to the specified date of termination shall not be affected by such termination and all terms, provisions and conditions hereof, including but not limited to, the security interests herein above granted to us, shall continue in full force and effect until all Obligations have been paid in full. All of the representations, warranties and covenants made herein shall survive the termination of this Agreement.

## SECTION 10    Modifications

This Agreement cannot be changed or terminated orally; it constitutes the entire agreement between us and shall be binding upon our respective successors and assigns, but may not be assigned by you without our prior written consent. No delay or failure on our part in exercising any right, privilege, or option hereunder shall operate as a waiver thereof or of any other right, privilege or option. No waiver whatsoever shall be valid unless in writing, signed by us, and then only to the extent therein set forth. If any term or provision of this Agreement is held invalid under any statute, rule or regulation of any jurisdiction competent to make such a decision, the remaining terms and provisions shall not be affected, but shall remain in full force and effect. You further acknowledge that during the course of the term of this Agreement, we shall make credit determinations with respect to your Receivables and shall

ES-STR-001131

USREC-24-00128

ES0908550

refactor and otherwise assign such Receivables to a Third Party, notwithstanding any such assignment of refactoring you shall in no way rely on any credit determination relayed to us, or any action or inaction taken by such Third Party with respect to the Receivables, and that you shall look only to us as the party responsible for credit determinations and administration of your Receivables and this Agreement generally.

## SECTION 11 Definitions

11.1 "Approved Receivable"- any Receivable with respect to which we have issued a credit approval which has not subsequently been withdrawn.

11.2 "Base Rate"- the rate of interest publicly announced from time to time by Citibank N.A., New York, New York as its prime or base rate (or equivalent).

11.3 "Credit Risk"- The risk that a customer will be financially unable to pay a Receivable at maturity, provided the customer has received and accepted the goods and/or services which gave rise to such Receivable, without any Dispute.

11.4 "Dispute"- Any dispute, deduction, claim, offset, defense or counterclaim of any kind, including, without limitation, any dispute relating to goods or services already paid for or relating to Receivables other than the Receivable on which payment is being withheld.

11.5 "Net Receivable"- The gross face amount of a Receivable less the discount offered by you and taken by us.

11.6 "Non-Approved Receivable"- any Receivable which does not comply with your Representations, Warranties and Covenants made in Section 4.1 herein, and with respect to which we have either not issued a credit approval or have subsequently withdrawn a credit approval as a result of a Dispute or otherwise.

11.7 "Obligations"- All loans, advances, debts, liabilities, obligations, covenants and duties owing by you to us, direct or indirect, absolute or contingent, due or to become due, now existing, or hereafter arising, including, without limitation, invoices for goods or services purchased by you from any company whose accounts are factored or financed by us and indebtedness arising under any guaranty made by you or issued by us on your behalf and the debit balance of your account.

11.8 "Payment Date"- The earlier of the business day (Date) following the day which we receive payment of a Receivable or 120 days after the due date of a Receivable, provided that such Receivable remains unpaid solely because of the Customer's financial inability to pay.

11.9    "Receivables" - All presently existing and hereafter created accounts, contract rights and general intangibles relating thereto, and other forms of obligation for the payment of money arising out of the sale of goods or rendition of services together with all proceeds thereof, all guaranties and security therefor, and all goods and rights represented thereby or arising therefrom including, but not limited to, the right of stoppage in transit, replevin and reclamation.

11.10    "Specified Approved Receivables" - any Receivable with respect to which we have issued a credit approval which has not subsequently been withdrawn," which is also listed within duly mutually executed Specified Approved Receivables Form(s).

11.11    "Specified Non-Approved Receivables" - any Receivable which does not comply with your Representations, Warranties and Covenants made in Section 4.1 herein, and with respect to which we have either not issued a credit approval or have subsequently withdrawn a credit approval as a result of a Dispute or otherwise, which is also listed within duly mutually executed Specified Non-Approved Receivables Form(s).

USREC-24-00129

ES-STR-001132

ES0908551

**SECTION 12    Entire Agreement, Governing Law, and Waiver of Jury**

This Agreement embodies our entire agreement as to the subject matter and supersedes all prior agreements as to the subject matter.  This shall be governed by and interpreted in accordance with the laws of the State of Florida. EACH OF US HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY SUIT OR PROCEEDING ARISING UNDER OR RELATING TO TRANSACTIONS UNDER THIS AGREEMENT.

**SECTION 13    Acceptance**

This proposal is submitted to you unsigned and shall constitute an agreement between us only when signed by us.

Very truly yours,

E.S. BANKEST L.L.C.

By: _____

Title: Sr. U.P. , Manager

The foregoing Factoring Agreement is accepted and agreed this 28 day of Nov , 199 2000

STRATYSYS CORPORATION (Delaware)                STRATYSYS GROUP L.L.C.

By: _____               By: _____

Title: President                          Title: President

By: _____               By: _____

Title: Secretary                          Title: Secretary

STRATYSYS EQUIPMENT CO. L.L.C.

By: _____               By: _____

Title: President                          Title: Secretary

Attachments:
    Reimbursable Out-of-Pocket Costs (Schedule A)
    Factoring Commission (Schedule B)
    Security Agreement
    Inventory Security Agreement
    Guaranty Agreement(s)

ES-STR-001133

USREC-24-00130

ES0908552

## SCHEDULE A

To that certain Collection Factoring Agreement By and Between Stratasys Corporation, a Delaware Corporation together with Stratasys Group L.L.C., a Florida Corporation, Stratasys Equipment Co. L.L.C., a Florida Corporation ("Stratasys") and E.S. Bankest L.L.C. ("ES Bankest") dated

### REIMBURSABLE OUT-OF-POCKET COSTS

ES Bankest incurs certain regular expenses for clients, and charges other fees for services it renders its clients. Said expenses and charges are reimbursed and paid to ES Bankest by the Client, as a deduction from Advances and Account Settlement proceeds. The following is an itemization of reimbursable costs and additional scheduled charges:

| Item | Amount |
|---|---|
| 1. Long distance telephone, 800 number calls; telecopies | Free to Clients |
| 2. Dun & Bradstreet report on non rated debtor | $ 45.00 per report * |
| 3. Postage; First class mail of client's invoices to debtors | U.S. Postal Service prevailing rates |
| 4. Analysis, preparation of credit reports and review of trade credit information | Free to Clients |
| 5. Wire transfer of immediately available funds to client accounts throughout the U.S. | $ 35.00 per transfer * |
| 6. Overnight mail delivery of funds | $ 35.00 per package * |
| 7. Check certification / Cashier check | $ 40.00 per check |
| 8. UCC search and filing fee | $500.00 One time charge ** |
| 9. Audit Charge | $700.00 per diem |
| 10. Surcharge for each invoice under $360.00 | $ 2.50 per invoice. |

11. <u>Unused Accounts' Credit Fee:</u> 0.2185% per month of the unused portion of the Accounts' credit approval requested by the Company, payable monthly in arrears. These fees do not apply if the Client cancels the Line requested. Lines may be canceled by the Client at any time.
**_WAIVED FOR STRATASYS_**

12. <u>Customer Credit Underwriting Charge:</u>

| | |
|---|---|
| $19.50 per Customer Account of less than | $   5,000, |
| $32.50 per Customer Account of less than | $  25,000, |
| $56.70 for Customer Accounts of over | $  25,000, |
| $87.50 for Customer Accounts over and all International Customers, | $ 100,000, |
| $500.00 Mexican and South American Customers. | **_WAIVED FOR STRATASYS_** |

* Service is optional; there is no charge for funds mailed to or picked up by clients.
**Or actual expense to E.S. Bankest, whichever is lesser.

USREC-24-00131

ES-STR-001134

ES0908553

### SCHEDULE  B

To that certain Factoring Agreement

By and  Between

Stratasys Corporation ("Stratasys")

together with

Stratasys Group L.L.C.
Stratasys Equipment Co. L.L.C.

and

E.S.Bankest LLC. ("E.S.Bankest")

dated



Stratasys shall pay E.S.Bankest a factoring commission, which commission shall be due and payable at the time of E.S.Bankest acceptance of the purchase and assignment of each Receivable, in the form of a Discount in the monetary amount of the Applicable Factoring Commission Percentage of each Receivable purchased by E.S. Bankest. The Applicable Factoring Commission Percentage is predicated upon the number of days <u>from</u> the Invoice Date <u>to</u> the Payment Date of said Invoice (as defined in Section 11.8 of the Agreement). Such Percentage(s) are set forth as follows:

Applicable Factoring Commision: 0.10% per day, each day of Collection Days,  i.e.:

| Collection Days | Per-day Discount rate or Applicable Factor. Commission | Formula | Applicable Factoring Commission |
|---|---|---|---|
| 30 | 0.10 | 30 X 0.10 | 3.00 % |
| 45 | 0.10 | 45 X 0.10 | 4.50 % |
| 60 | 0.10 | 60 X 0.10 | 6.00 % |
| 75 | 0.10 | 80 X 0.10 | 7.50 % |
| 90 | 0.10 | 90 X 0.10 | 9.00 % |

**USREC-24-00132**

**ES-STR-001135**

ES0908554

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT made as of the __28__ day of __November__, 2000 by and between *StrataSys Corporation, a Delaware corporation together with StrataSys Group L.L.C., a Florida corporation, StrataSys Equipment Co. L.L.C., a Florida Corporation (the "Company")* and *E.S. Bankest L.L.C.*, a Florida corporation ("E.S.Bankest"),

<u>WITNESSETH:</u>

WHEREAS, the Company and E.S.Bankest intend to enter into a Collection Factoring Agreement dated the date hereof (the "Factoring Agreement") and, pursuant to which E.S.Bankest will purchase certain accounts receivable billed to customers of the Company (such accounts receivable, together with the proceeds thereof, are hereinafter referred to as "Accounts Receivable") on the basis of, and in reliance upon, the representations, warranties and covenants of the Company contained in the Account Agreements; and

WHEREAS, it is a condition precedent to the obligation of E.S.Bankest to enter into the Factoring Agreement and to purchase Accounts Receivable pursuant thereto that the Company shall have entered into this Security Agreement for the purpose of securing the performance of the representations, warranties and covenants of the Company in the Factoring Agreement,

NOW, THEREFORE, to induce E.S.Bankest to enter into the Factoring Agreement and purchase Accounts Receivable pursuant hereto, and in consideration thereof and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed as follows:

1. <u>Security Interest.</u>  The Company hereby grants E.S.Bankest a security interest (the "Security Interest") in all of the following property now owned or at any time hereafter acquired by it, or in which it now has or at any time in the future may acquire any right, title or interest (the "Collateral"):

(a) all rights of the Company pursuant to the Factoring Agreement, including the residual equity of the Company in all Accounts Receivable purchased by E.S.Bankest pursuant thereto, and all contract rights and other general intangibles related to the Accounts Receivable purchased by E.S.Bankest pursuant to the Factoring Agreement and associated therewith and the proceeds and products thereof (including without limitation proceeds of insurance) and all additions, accessions and substitutions thereto or therefor; and

(b) all accounts not purchased by E.S.Bankest, all contract rights, all personal property and fixtures, including inventory, equipment and other goods, documents, instruments, certificates of deposit (whether represented by a certificate or not), general intangibles and chattel paper in which the Company now has or hereafter acquires any right, title or interest and the proceeds and products thereof (including without limitation, proceeds of insurance) and all additions, accessions and substitutions thereto or therefor.

Terms used in clauses (a) and (b) of this Section which are defined in the Uniform Commercial Code as enacted and in effect in the State of Florida (the "Code") are used as so defined in the Code.

2. <u>Obligations.</u>  This Agreement and the Security Interest shall secure the following obligations (the "Obligations"):

Page 1

ES-STR-001136

USREC-24-00133

ES0908555

(a) Any and all obligations of the Company under the Factoring Agreement (but not the payment of the Accounts Receivables purchased pursuant thereto) or under any other agreement or instrument executed and delivered pursuant thereto; and

(b) Any and all other liabilities and obligations of every kind and nature whatsoever of the Company to E.S.Bankest, whether such liabilities and obligations be direct or indirect, absolute or contingent, secured or unsecured, now existing or hereafter arising or acquired, due or to become due.

3.  Financing Statement and Other Action.  The Company will do all lawful acts which E.S.Bankest deems necessary or desirable to protect the Security Interest or otherwise to carry out the provisions of this Agreement, including, but not limited to, the execution of Uniform Commercial Code financing, continuation, amendment and termination statements and similar instruments and the procurement of waivers and disclaimers of interest in the Collateral by the owners of any real estate on which Collateral is located.  The Company irrevocably appoints E.S.Bankest as its attorney-in-fact during the term of this Agreement, to do all acts which it may be required to do under this Agreement, such appointment being deemed to be a power coupled with an interest.

4.  Place of Business.   The Company warrants that its principal place of business, chief executive office and the location where the records concerning its accounts and contract rights are located as set forth on Appendix I attached hereto. The Company will supplement Appendix I to add the addresses where any Collateral is located when and as the same becomes subject to Security Interest. .

The Company will notify E.S.Bankest promptly of the addition or discontinuance of any place of business or any change in the information contained in this Section 4 or Appendix I.  None of the Collateral shall be removed from the locations specified in this Section 4 or Appendix I,  as from time to time supplemented, other than in the ordinary course of business to another location specified in this Section 4 or Appendix I, unless E.S.Bankest is given thirty (30) days prior written notice of such removal, which notice shall state the location or locations to which said Collateral will be removed.  The Company warrants that all of the Collateral is and shall continue to be located at the locations set forth on said Appendix I or such other locations of which E.S.Bankest receives notice in accordance with this Section 4.

5.  Encumbrances.  The Company warrants that it has title to the Collateral purportedly owned by it and that there are no sums owed or claims, liens, security interests or other encumbrances against the Collateral other than as set forth on Appendix II hereto.  The Company will notify E.S.Bankest of any lien, security interest or other encumbrance securing an obligation in excess of $5,000 against the Collateral, will defend the Collateral against any claim, lien, security interest or other encumbrance adverse to E.S.Bankest, except for liens having priority listed on Appendix II hereto, and will not create, incur, assume, or suffer to exist any lien, security interest or other encumbrances against the Collateral, whether now owned or hereto acquired, except:

(a) liens in favor of E.S.Bankest and liens listed on Appendix II hereto;

(b) liens for taxes or assessments or other government charges or levies if not yet due and payable or, if due and payable, if they are being contested in good faith by appropriate proceedings and for which appropriate reserves are maintained;

(c) liens imposed by law, such as mechanics', materialmen's, landlords', warehousemen's, and carriers' liens, and other similar liens, securing obligations incurred in the ordinary course of business which are not past due for more than 30 days or which are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established;

(d) liens under workers' compensation, unemployment insurance, Social Security, or similar legislation;

Page 2

USREC-24-00134

ES-STR-001137

ES0908556

(e) liens, deposits, or pledges to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), leases, public or statutory obligations, surety, stay, appeal, indemnity, performance, or other similar bonds, or similar obligations arising in the ordinary course of business;

(f) judgement and other similar liens arising in connection with court proceedings, provided the execution or other enforcement of such liens is effectively stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings;

(g) easements, right-of-way, restrictions, and other similar encumbrances which, in the aggregate, do not materially interfere with the occupation, use, and enjoyment by the Company of the property or assets encumbered thereby in the normal course of its business or materially impair the value of the property subject thereto; and

(h) purchase-money liens on any property hereafter acquired or the assumption of any lien on property existing at the time of such acquisition (and not created in contemplation of such acquisition), or a lien incurred in connection with any conditional sale or other title retention agreement or a capital lease; provided that;

(i) any property subject to any of the foregoing is acquired by the Company in the ordinary course of its business and the lien on any such property attaches to such asset concurrently or within    ninety (90) days after the acquisition thereof;

(ii) the obligation secured by any lien so created, assumed, or existing shall not exceed one hundred percent (100%) of the lesser of the cost or the fair market value as of the time of acquisition of the property covered thereby to the Company; and

(iii) each such lien shall attach only to the property so acquired and fixed improvements thereon.

6.  <u>Maintenance of Collateral</u>.  The Company shall preserve the Collateral for the benefit of E.S.Bankest. Without limiting the generality of the foregoing, the Company shall:

(a) make all such repairs, replacements, additions and improvements to its equipment as in its judgement are necessary to permit such business to be properly and advantageously conducted at all times;

(b) maintained and preserve its inventory except as sold in the ordinary course of business;

(c) preserve all beneficial contract rights to the extent commercially reasonable;

(d) in conjunction with, and at the direction of, E.S.Bankest, take commercially reasonable steps to collect all accounts; and

(e) pay all taxes, assessments or other charges on the Collateral when due, unless the amount or validity of such taxes, assessments or charges are being contested in good faith by appropriate proceedings and reserves with respect thereto in conformity with generally accepted accounting principles have been provided on the books of the Company.

Nothing contained herein shall be construed to prohibit the Company from buying and selling equipment and inventory in the ordinary course of business; provided, however, that the Company will not sell equipment where either (i) the basis of such equipment determined in accordance with generally accepted accounting principles or (ii) the sales price of such equipment exceeds $5,000 in any individual transaction or $10,000 in the aggregate for any twelve month period.

USREC-24-00135

Page 3

ES-STR-001138

ES0908557

7. <u>Additional Provisions Concerning the Collateral.</u>

(a)  The Company authorizes E.S.Bankest to file, without the signature of the Company, where permitted by law, one or more financing or continuation statements, and amendments thereto, relating to the Collateral.

(b)  The Company irrevocably appoints E.S.Bankest as its attorney-in-fact (which such power of attorney is coupled with an interest) and proxy, with full authority in the place and stead of the Company and its name or otherwise, from time to time in E.S.Bankest's discretion, to take any action or execute any instrument which E.S.Bankest may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation: (i) to obtain and adjust insurance required to be paid to E.S.Bankest pursuant to Section 8 hereof; (ii) to ask, demand, collect, sue for, recover, compound, receive, and give acquittance and receipts for moneys due and to become due under or in respect or any of the Collateral; (iii) to receive, endorse, and collect any checks, drafts or other instruments, documents, and chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign the Company's name on any invoice or bill of lading relating to any account, on drafts against customers, on schedules and assignment of accounts, on notices of assignments, financing statements and other public records, on verification of accounts and on notices to customers (including notices directing customers to make payment directly to E.S.Bankest); (v) if a Default (as hereinafter defined) has occurred and is continuing, to notify the postal authorities to change the address for delivery of its mail to an address designated by E.S.Bankest, to receive, open and process all mail addressed to the Company, to send requests for verification of accounts to customers; and (vi) to file any claims or take any action or institute any proceeding which E.S.Bankest may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of E.S.Bankest with respect to any of the Collateral. The Company ratifies and approves all acts of said attorney; and so long as the attorney acts in good faith and without gross negligence it shall have no liability to the Company for any act or omission as such attorney.

(c)  If the Company fails to perform any agreement contained herein, E.S.Bankest may itself perform, or cause performance of, such agreement or obligation, and the costs and expenses of E.S.Bankest incurred in connection therewith shall be payable by the Company, and shall be fully secured hereby.

(d)  The powers conferred on E.S.Bankest hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon E.S.Bankest to exercise any such powers.  Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, E.S.Bankest shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

(e)  Anything herein to the contrary notwithstanding, (i) the Company shall remain liable under any contracts and agreements relating to the Collateral, to the extent set forth therein, to perform all of its obligations thereunder to the same extent as if Agreement had not been executed; (ii) the exercise by E.S.Bankest of any of its rights hereunder shall not release the Company from any of its obligations under the contracts and agreements relating to the Collateral; and (iii) E.S.Bankest shall not have any obligation or liability by reason of this Agreement under any contracts and agreements relating to the Collateral, nor shall E.S.Bankest be obligated to perform any of the obligations or duties of the Company thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

8.  <u>Insurance.</u>  The Company shall maintain insurance covering the Collateral with financially sound and reputable insurers satisfactory to E.S.Bankest against such risks as are customarily insured by a business in the same or similar industry and similarly situated for an amount not less than the full replacement value of such Collateral.  All such insurance policies covering property on and after the date such property becomes subject to the Security Interest shall be  written so as to be payable in the event of loss to E.S.Bankest and shall provide for at least thirty (30) days prior written notice to E.S.Bankest prior to cancellation or modification of each such policy.  At the request of E.S.Bankest, all insurance policies covering property subject to the Security Interest shall be delivered to and held by E.S.Bankest.  If, while any Obligations are outstanding, any proceeds in excess

Page 4

ES-STR-001139

USREC-24-00136

ES0908558

of $5,000 with respect to any casualty loss are paid to E.S.Bankest under such policies on account of such casualty loss, and there is no breach by the Company of any representation or warranty, or default by the Company in the performance of any covenant contained in the Account Agreements(hereinafter referred to as an "Event of Default") which is continuing, E.S.Bankest will pay over such proceeds in whole or in part to the Company, for the purpose of repairing or replacing the Collateral destroyed or damaged, with any such repaired or replaced Collateral to be secured by this Agreement.  If an Event of Default has occurred and is continuing, E.S.Bankest may apply the proceeds in its discretion to any of the Obligations. All proceeds less than or equal to $5,000 with respect to any casualty loss shall be paid to the Company to be used by the Company to replace or repair the Collateral destroyed or damaged, except that if an Event of Default shall have occurred, then E.S.Bankest shall apply the proceeds in its discretion to any of the Obligations.  E.S.Bankest is hereby appointed during the term of this Agreement as irrevocable attorney-in-fact to collect the proceeds of such insurance, to settle any claims with the insurers in the event of loss or damage, to endorse settlement drafts and upon an Event of Default under this Agreement to cancel, assign or surrender any insurance policies.

9.  Fixtures.  It is the intention of the parties hereto that none of the equipment, machinery or other property securing the Obligations hereunder shall become fixtures.

10. Default.   (a)  If any one or more of the following events, (each herein referred to as a "Default) shall occur:

(i) A breach or default shall be made in the due performance or observance of any provision of this Agreement and such breach or default shall continue for a period of five (5) days after written notice thereof shall have been received by the Company from E.S.Bankest; or

(ii) An Event of Default, as defined in Section 8, shall have occurred and shall continue for a period of five (5) days after written notice thereof shall have been received by the Company from E.S.Bankest; then upon the occurrence of any such Default or at any time or times thereafter, unless such Default shall have been cured within the applicable time period, if any, or waived in writing by E.S.Bankest, E.S.Bankest shall have all of the rights and remedies of a secured party under the Uniform Commercial Code and shall have full power and authority to sell or otherwise dispose of the Collateral or any part thereof.  Any such sale or other disposition, subject to the provisions of applicable law, may be by public or private proceedings and may be made by one or more contracts, as a unit or in parcels, at such time and place, by such method, in such manner and on such terms as E.S.Bankest may determine.  Except as required by law, such sale or other disposition may be made without advertisement or notice of any kind or to any third party or third person.  E.S.Bankest will, however, notify the Company of the time and place of such sale or other disposition and such notice will be deemed to have been sufficiently given if such notice is telegraphed, cabled, mailed postage prepaid, sent by courier or telefaxed at least ten (10) days before the time of such sale or other disposition to each person entitled thereto at each such person's address or telefax number, as the case may be, as specified in Section 17 below.  To the extent permitted by law, E.S.Bankest may buy any or all of the Collateral upon any sale thereof.  To the extent permitted by law, upon any such sale or sales, the Collateral so purchased shall be held by the purchaser absolutely free from any claims or rights of whatsoever kind or nature, including any equity of redemption or any similar rights, all such equity of redemption and any similar rights being hereby expressly waived and released by the Company.  In the event any consent, approval or authorization of any governmental agency shall be necessary to effectuate any such sale or sales, the Company each shall execute, as necessary, all applications or other instruments as may be required.  After deducting all reasonable costs and expenses of collection, custody, sale or other disposition or delivery (including legal costs and reasonable attorneys' fees) and all other charges due against Collateral (including any charges of the type described in Section 11 below), the residue of the proceeds of any such sale or other disposition shall be applied to the payment of the obligations, except as otherwise provided by law or directed by any court of competent jurisdiction thereof, and any surplus shall be returned to the Company, except as otherwise provided by law or any such court.  The Company shall be liable for any deficiency in payment of the Obligations, including all reasonable costs and expenses of collection, custody, sale or other disposition or delivery and all other charges due against the Collateral, as hereinbefore enumerated.

USREC-24-00137

ES-STR-001140

ES0908559

15. Termination. This Agreement and the Security Interest shall terminate upon the termination of the Factoring Agreement; provided, that all Obligations have been paid or discharged in full. E.S.Bankest will deliver to the Company appropriate Uniform Commercial Code termination statements with respect to Collateral so released from the Security Interest for filing with each filing officer with which Uniform Commercial Code financing statements have been filed by E.S.Bankest to perfect the Security Interest in such Collateral.

16. Modification. This Agreement may not be modified or amended without the prior written consent of each of the parties hereto.

17. Notices. Except as otherwise provided in this Agreement, all notices and other communications hereunder shall be deemed to have been sufficiently given when mailed, postage prepaid by certified or registered mail, sent by courier or telefaxed, return receipt requested or confirmation of receipt requested in the case of a telefax and the sender shall have received back a return receipt or confirmation, to:

> To: *E.S.Bankest L.L.C.*
> 999 Brickell Av., Penthouse
> Miami, Fl. 33131
> Telefax Number: (305) 372-2816
>
> To: *StrataSys Corporation*
> 10700 North Kendall Drive, 4th Floor
> Miami, Florida 33176-1483

or at such other address or telefax number, as the case may be, as the party to whom such notice or demand is directed may have designated in writing to the other party hereto by notice as provided in this section.

18 Rights. No course of dealing between the Company and E.S.Bankest, nor any delay in exercising, on the part of E.S.Bankest, any right, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies hereunder are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law or in equity, including, without limitation, the rights and remedies of a secured party under the Code.

19. Governing Law, Binding Effect, Etc. This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the laws of the State of Florida. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, including any other holder or holders of any obligations and may be executed in two or more counterparts, each of which shall together constitute one and the same agreement.

20. Severability. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision hereof.

USREC-24-00138

ES-STR-001141

ES0908560

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement as of the date first above written.

*E.S.Bankest LLC*

*StrataSys Corporation, a Delaware corporation together with StrataSys Group L.L.C. and StrataSys Equipment Co., L.L.C. a Florida corporation "Debtor"*

By _____

By _____

Page 7

USREC-24-00139

ES-STR-001142

ES0908561

# INVENTORY SECURITY AGREEMENT

E.S.Bankest L.L.C.
999 Brickell Avenue, Penthouse,
Miami, Florida 33131

1.    **SECURITY INTEREST**

StrataSys Corporation, a Delaware corporation together with StrataSys Group L.L.C., a Florida corporation and Stratasys Equipment Co. L.L.C., whose principal place of business is located at 10700 North Kendall Drive, 4th Floor, Miami, Florida 33176-1483 ("Debtor"), hereby grants to E.S.Bankest L.L.C., 999 Brickell Avenue, Penthouse, Miami, Florida 33131 ("Secured Party"), a security interest in: (a) all Debtor's now owned and hereafter acquired Inventory wherever located, including but not limited to all merchandise, raw materials, parts, supplies, work in process and finished goods, of every kind and description ("Inventory"), (b) all Debtor's rights as a seller of goods, and all inventory which may be returned to Debtor by its customers or repossessed by Debtor, and (c) all proceeds and products of all of the foregoing. All the collateral described in (a), (b) and (c) above is hereinafter referred to as "Collateral".

2.    **OBLIGATIONS SECURED**

The security interest granted in this Agreement shall secure payment and performance of all Obligations of Debtor to Secured Party, as that term is defined in the Factoring Agreement between Debtor and Secured Party, bearing the effective date of _____ (the "Factoring Agreement.")

3.    **WARRANTIES AND COVENANTS**

Debtor warrants and agrees that:

A. All of the existing Collateral is and will be owned by Debtor free and clear of all tax liens and other liens and security interests except the security interest granted hereunder.

B. The Collateral shall be kept at 10700 North Kendall Drive, Suite205, Miami, Florida 33176-1483 or any other location designated by the Secured Party, including the principal place of business of Debtor as set forth above and none of the Collateral will be removed from such locations without the prior written consent of Secured Party, except for deliveries to buyers in the ordinary course of business.

C. Debtor will insure the Collateral at all times against all hazards specified by Secured Party, including but not limited to, fire theft and risks covered by extended coverage insurance, and such policies shall be payable to Secured Party as its interest may appear. Said policies of insurance shall be satisfactory to Secured Party as to form, amount and insurer. Debtor shall furnish certificates, policies or endorsements to Secured Party as proof of such insurance, and if it fails to do so Secured Party is authorized but not required to obtain such insurance at the Debtor's expense. All policies shall provide for at least ten days prior written notice of cancellation to Secured Party. Secured Party may act as attorney-in-fact for Debtor in making, adjusting and settling any claims under any such insurance policies. Debtor assigns to Secured Party all of its

**ES-STR-001143**

**USREC-24-00140**

ES0908562

right, title and interest to any insurance policies insuring the Collateral, including all rights to receive the proceeds of insurance, and directs all insurers to pay all such proceeds directly to Secured Party and authorized Secured Party to endorse Debtor's name on any instrument for such payment.

D. Debtor will not sell any of the Inventory except to buyers in the ordinary course of business.

E. Debtor will notify Secured Party of any destruction of or any substantial damage to any of the Collateral.

F. Debtor will not permit any liens or security interest to attach to any of the Collateral, except in favor of Secured Party.

G. Debtor will pay when due all taxes, license fees and assessments relating to the Collateral.

H. Debtor will be liable to Secured Party for any expenditures by Secured Party for the maintenance and preservation of the Collateral, including warehousing, shipping, taxes, levies, insurance and repairs, and for the repossession, holding, preparation for sale, and the sale of the Collateral (including reasonable expenses), as well as all damages for breach of warranty, misrepresentation, or breach of covenant by Debtor, and all such liabilities shall be secured by the security interest granted herein, and shall be payable upon demand.

I. Debtor will execute Financing Statement pursuant to the Uniform Commercial Code, and any other documents required by Secured Party to perfect the security interest granted herein or to effectuate the purposes of this Agreement.

J. Debtor will at all times during normal business hours allow Secured Party or its agents to examine and inspect the Collateral as well as the Debtor's books and records, and to make extracts and copies of them.

K. Debtor will report, in form satisfactory to Secured Party, such information as Secured Party may request regarding the Collateral; such reports shall be for such periods, shall reflect Debtor's records as at such time and shall be rendered with such frequency as Secured Party may designate.

4.    RIGHTS AND REMEDIES

Upon the occurrence of any default hereunder, under the Factoring Agreement or under any other agreement between Debtor and Secured Party or executed by Debtor in favor of Secured Party or evidencing, guaranteeing or granting collateral security for any of the Obligations, or upon the breach of any covenants, warranties or representations made to Secured Party under any such agreements, or upon the occurrence of any event permitting Secured Party to terminate the Factoring Agreement, and at any time thereafter, Secured Party shall have all rights and remedies provided by law, including those of a Secured Party under the Uniform Commercial Code, in addition to the rights and remedies provided herein or in any other agreement executed by Debtor. Secured Party may require Debtor to assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to Debtor and Secured Party. If notice to Debtor of intended disposition of Collateral is required by law, five (5) days notice shall constitute reasonable notification. All Secured Party's rights and remedies shall be cumulative and none are exclusive. Whether or not default has occurred, all payments made by

USREC-24-00141        ES-STR-001144

ES0908563

or on behalf of and all credits due Debtor under this Security Agreement, and under any other agreement between Debtor and Secured Party, may be applied to the Obligations in whatever order and amounts Secured Party chooses.

5.    MISCELLANEOUS

    A. Any failure or delay by Secured Party to require strict performance by Debtor or any of the provisions, warranties, terms and conditions contained herein or in any other agreement, document or instrument, shall not affect Secured Party's right to demand strict compliance and performance therewith, and any waiver of any default shall not waive or affect any other default, whether prior or subsequent thereto, and whether of the same or of a different type. None of the warranties, conditions, provisions and terms contained herein or in any other agreement, document or instrument shall be deemed to have been waived by any act or knowledge of Secured Party, its agents, officers or employees, but only by an instrument in writing, signed by an officer of Secured Party and directed to Debtor specifying such waiver.

    B. All terms used herein shall have the meanings given in the Uniform Commercial Code, unless otherwise defined herein.

    C. Any notice under this Agreement shall be addressed to the parties at their respective addresses set forth in paragraph 1 hereof.

    D. In the event that any provision hereof shall be deemed to be invalid by any court, such invalidity shall not affect the remainder of this Agreement.

    E. This Security Agreement shall be binding upon and for the benefit of the parties hereto and their respective heirs, executors, administrators, legal representative, successors and assigns.

    F. The validity, interpretation, enforcement and effect of this Security Agreement shall be governed by the laws of the State of Florida, Debtor hereby consents to the jurisdiction of all courts in said State.

IN WITNESS WHEREOF, The Debtor has executed and delivered this Agreement on this _____ day of _____, 2000.

StrataSys Corporation together with StrataSys Group L.L.C.and StrataSys Equipment Co. L.L.C. ("Debtor")

By: _____

E.S.Bankest L.L.C. (Secured Party)

By: _____
Eduardo Orlansky, President

USREC-24-00142

ES-STR-001145

ES0908564

State of Florida

| UNIFORM COMMERCIAL CODE | FINANCING STATEMENT | FORM UCC-1 (REV.2000) |

This Financing Statement is presented to a filing officer pursuant to the Uniform Commercial Code:

| 1. Debtor (Last Name First if an individual)<br>STRATASYS EQUIPMENT, LLC | | 1a. Date of Birth or FEI# |
|---|---|---|
| 1b. Mailing Address CAPITAL PLAZA I<br>10700 N. KENDALL DR., #205 | 1c. City, State MIAMI, FLORIDA | 1d. Zip Code 33176 |
| 2. Additional Debtor or Trade Name (Last Name First if an individual) | | 2a. Date of Birth or FEI# |
| 2b. Mailing Address | 2c. City, State | 2d. Zip Code |
| 3. Secured Party (Last Name First if an individual)<br>E.S. BANKEST, LLC | | |
| 3a. Mailing Address 999 BRICKELL AVENUE, 11TH FL. | 3b. City, State MIAMI, FLORIDA | 3c. Zip Code 33131 |
| 4. Assignee of Secured Party (Last Name First if an individual) | | |
| 4a. Mailing Address | 4b. City, State | 4c. Zip Code |

5. This Financing Statement covers the following types or items or property (include description of real property on which located and owner of record when required. If more space is required, attach additional sheet(s)).

SEE ATTACHED EXHIBIT I

6. Check only if Applicable: ☐ Products of collateral are also covered. ☒ Proceeds of collateral are also covered. ☐ Debtor is transmitting utility.

7. Check appropriate box: ☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
(one box must be marked) ☒ Florida Documentary Stamp Tax is not required.

| 8. In accordance with s. 679.402(2) F.S., this statement is filed without the Debtor's signature to perfect a security interest in collateral:<br>☐ already subject to a security interest in another jurisdiction when it was brought into this state or debtor's location changed to this state.<br>☐ which is proceeds of the original collateral described above in which a security interest was perfected.<br>☐ as to which the filing has lapsed. Date filed _____ and previous UCC-1 file number _____<br>☐ acquired after a change of name, identity, or corporate structure of the debtor. | 9. Number of additional sheets presented: ___1___<br><br>This Space for Use of Filing Officer |
|---|---|

10. Signature(s) of Debtor(s) STRATASYS EQUIPMENT, LLC

*Sign Here*

11. Signature(s) of Secured Party or if Assigned, by Assignee(s) E.S. BANKEST, LLC

12. Return Copy to:

Name

Address

Address

City, State, Zip

STANDARD FORM - FORM UCC-1                                    Approved by Secretary of State, State of Florida

USREC-24-00143    ES-STR-001146

ES0908565

## EXHIBIT "1"

To UCC-1 Financing Statement from Stratasys Equipment, LLC a Florida corporation as ("Debtor"), in favor of E. S. Bankest LLC, as(" Secured Party").

The following types or items of property of , Stratasys Equipment, LLC, ("Debtor") are covered:

(a) all presently existing and hereafter created receivables and general intangibles and the proceeds thereof; all monies, securities and other property now or hereafter held or received by, or in transit to or for Debtor, whether for safekeeping, pledge custody, transmission, collection or otherwise, and all the documents evidencing or relating to such goods; all contracts and or agreements, books, records and other property at any time evidencing or relating to the receivables; the proceeds (cash and non-cash) of all the foregoing and any insurance policies covering any of the foregoing.

(b) all inventory of goods now owned or hereafter acquired, held for sale or to be furnished under contracts and or agreements of service, and all raw materials, work in process, or material used or consumed by Debtor, together with all accessions and appurtenances thereto appertaining, attached to or installed or kept or used or intended to be used in connection therewith and all substitutions or renewals thereof, and all replacements and additions thereto, and the products and proceeds (cash or non-cash) of all the foregoing.

USREC-24-00144

ES-STR-001147

ES0908566

State of Florida

UNIFORM COMMERCIAL CODE     **FINANCING STATEMENT**     FORM UCC-1 (REV.2000)

This Financing Statement is presented to a filing officer pursuant to the Uniform Commercial Code:

| 1. Debtor (Last Name First if an individual) STRATASYS GROUP, LLC | | 1a. Date of Birth or FEI# |
|---|---|---|
| 1b. Mailing Address CAPITAL PLAZA I 10700 N. KENDALL DRIVE; #205 | 1c. City, State MIAMI, FLORIDA | 1d. Zip Code 33176 |
| 2. Additional Debtor or Trade Name (Last Name First if an individual) | | 2a. Date of Birth or FEI# |
| 2b. Mailing Address | 2c. City, State | 2d. Zip Code |

| 3. Secured Party (Last Name First if an individual) E.S. BANKEST, LLC | | |
|---|---|---|
| 3a. Mailing Address 999 BRICKELL AVENUE, 11TH FL. | 3b. City, State MIAMI, FLORIDA | 3c. Zip Code 33131 |
| 4. Assignee of Secured Party (Last Name First if an individual) | | |
| 4a. Mailing Address | 4b. City, State | 4c. Zip Code |

5. This Financing Statement covers the following types or items of property (include description of real property on which located and owner of record when required. If more space is required, attach additional sheet(s)).

SEE ATTACHED EXHIBIT I

6. Check only if Applicable: ☐ Products of collateral are also covered.   ☐ Proceeds of collateral are also covered.   ☐ Debtor is transmitting utility.

7. Check appropriate box:   ☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
(one box must be marked)   ☒ Florida Documentary Stamp Tax is not required.

8. In accordance with s. 679.402(2) F.S., this statement is filed without the Debtor's signature to perfect a security interest in collateral:
☐ already subject to a security interest in another jurisdiction when it was brought into this state or debtor's location changed to this state.
☐ which is proceeds of the original collateral described above in which a security interest was perfected.
☐ as to which the filing has lapsed. Date filed _____ and previous UCC-1 file number _____
☐ acquired after a change of name, identity, or corporate structure of the debtor.

9. Number of additional sheets presented: 1

This Space for Use of Filing Officer

10. Signature(s) of Debtor(s) STRATASYS GROUP, LLC

Sign Here

11. Signature(s) of Secured Party or if Assigned, by Assignee(s) E.S. BANKEST, LLC

12. Return Copy to:

Name

Address

Address

City, State, Zip

USREC-24-00145

STANDARD FORM - FORM UCC-1

Approved by Secretary of State, State of Florida

**ES-STR-001148**

ES0908567

**EXHIBIT "1"**

To UCC-1 Financing Statement from Stratasys Equipment, LLC a Florida corporation as ("Debtor"), in favor of E. S. Bankest LLC, as(" Secured Party").

The following types or items of property of , Stratasys Group, LLC, ("Debtor") are covered:

(a) all presently existing and hereafter created receivables and general intangibles and the proceeds thereof; all monies, securities and other property now or hereafter held or received by, or in transit to or for Debtor, whether for safekeeping, pledge custody, transmission, collection or otherwise, and all the documents evidencing or relating to such goods; all contracts and or agreements, books, records and other property at any time evidencing or relating to the receivables; the proceeds (cash and non-cash) of all the foregoing and any insurance policies covering any of the foregoing.

(b) all inventory of goods now owned or hereafter acquired, held for sale or to be furnished under contracts and or agreements of service, and all raw materials, work in process, or material used or consumed by Debtor, together with all accessions and appurtenances thereto appertaining, attached to or installed or kept or used or intended to be used in connection therewith and all substitutions or renewals thereof, and all replacements and additions thereto, and the products and proceeds (cash or non-cash) of all the foregoing.

USREC-24-00146

ES-STR-001149

ES0908568