# EXHIBIT M

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | . Case No. 03-20951-CR-Jordan |
| Plaintiff, | . |
| | . Miami, Florida |
| v. | . March 22, 2006 |
| | . 8:58 a.m. |
| EDUARDO ORLANSKY, ET AL., | . |
| Defendants. | . |

- - - - -

Transcript of Testimony of Lewis B. Freeman had

before the Honorable Adalberto Jordan,

United States District Judge, and a jury.

- - - - -

VOLUME II

- - - - -

Proceedings recorded by mechanical stenography, transcript produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305)523-5568

Page 108

APPEARANCES:
For the Government: Caroline Heck Miller
Matthew I. Menchel
Ryan K. Stumphauzer
Assistant U.S. Attorneys
99 N.E. 4th Street
Miami, Florida 33132

For the Defendant   Edward R. Shohat, Esq.
Eduardo Orlansky:   Bierman, Shohat, Loewy & Klein, P.A.
Penthouse Two, 800 Brickell Avenue
Miami, Florida 33131-2944

For the Defendant   Bruce H. Lehr, Esq.
Hector Orlansky:   Lehr Fischer & Feldman
1401 Brickell Avenue, Suite 810
Miami, Florida 33131

For the Defendant   Michael J. Rosen, Esq.
R. Peter Stanham:   Lauren Rosen, Paralegal
Law Offices of Michael J. Rosen, P.A.
Grove Forest Plaza
2937 S.W. 27th Avenue
Miami, Florida 33133
and
Kym E. Bennette, Esq.
Law Offices of Kym E. Bennette, P.A.
Grove Forest Plaza
2937 SW 27th Ave.
Miami, Florida 33133

For the Defendant   Michael Zelman, Esq.
Ariadna Puerto:   Law Offices of Michael Zelman
28 W. Flagler Street, Ste. 1003
Miami, Florida 33130

Court Reporter:   Francine C. Salopek, RMR, CRR
Official Court Reporter
United States District Court
301 North Miami Avenue, Room 804
Miami, Florida 33128-7709
(305)523-5568
- - - - -

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305)523-5568

Page 109

1    WEDNESDAY, MARCH 22, 2006, 8:58 A.M.
2        (The following proceedings were had out of the
3    presence of the jury:)
4        THE COURT: Good morning. Please be seated.
5        This is Case Number 03-20951, United States vs.
6    Eduardo Orlansky, et al. If you could please announce your
7    appearances.
8        MR. MENCHEL: Good morning, your Honor. On
9    behalf of the United States, Matthew Menchel and Ryan
10   Stumphauzer, and Caroline Heck Miller is just outside.
11       THE COURT: Good morning.
12       MR. SHOHAT: Excuse me, Judge.
13       THE COURT: It's okay.
14       MR. SHOHAT: I'm battling a bad, bad cold.
15       Ed Shohat for Eduardo Orlansky. He's here with
16   me.
17       THE COURT: Good morning.
18       Good morning, Mr. Orlansky.
19       DEFENDANT EDUARDO ORLANSKY: Good morning.
20       MR. LEHR: Good morning, your Honor. Bruce Lehr
21   on behalf of Hector Orlansky, who is present.
22       THE COURT: Good morning.
23       Good morning, Mr. Orlansky.
24       MR. ROSEN: Good morning, your Honor. Michael
25   Rosen and Peter Stanham.

Page 110

1        THE COURT: Good morning.
2        Good morning, Mr. Stanham.
3        MR. ZELMAN: Your Honor, Michael Zelman and
4    Ariadna Puerto. Good morning.
5        THE COURT: Good morning.
6        Good morning, Ms. Puerto.
7        We still have one juror missing, but before we
8    picked up with Mr. Freeman, I wanted to talk with
9    Mr. Zelman about what questions he wanted to ask. I think
10   we left that issue sort of hanging at sidebar yesterday and
11   never fully resolved it.
12       So, Mr. Zelman.
13       MR. ZELMAN: Well, I'm sort of pretrying my
14   cross-examination. And to the extent possible, I don't
15   mind, at least in this instance.
16       The subject that I think we're all interested in
17   is the matter of the morning of the 11th of August, which
18   is Monday morning. Mr. Freeman's testimony, by the way,
19   put it on the 13th. I think he's incorrect on that date.
20       MR. MENCHEL: That's right, he is. He has got
21   the date wrong.
22       MR. ZELMAN: And I'll be correcting -- or asking
23   him to correct himself on that.
24       THE COURT: But it was a Monday.
25       MR. ZELMAN: It was Monday.

Page 111

1        THE COURT: Okay.
2        MR. MENCHEL: Yes.
3        MR. ZELMAN: It was Monday. In August, in the
4    year 2003.
5        The questions that I'll ask him will be what he
6    expected after discussing the procedure that morning with
7    Ray Miller and Mark Scheer, attorneys for Gunster Yoakley,
8    who were there representing ES Bankest. And I believe his
9    answer would be, based upon his letter of February 24,
10   2005, that was sent to the United States Trustee, Steven
11   Turner, and that's Puerto Exhibit 163. And I can show it
12   to your Honor now, but if you need a copy, I have an extra
13   copy. It's also in the Jencks material for Mr. Freeman.
14       According to Mr. Freeman's recollection, when he
15   sent this letter to the United States bankruptcy trustee,
16   Mr. Miller and Mr. Scheer brought out Ms. Puerto and
17   introduced her as the chief financial officer of Bankest.
18   And that within his conversation with her then, which he
19   described here as being 20 minutes to a half hour, he
20   realized that she was not the chief financial officer, and
21   in his words in the 2005 letter, she was a secretary.
22       And that's where I intend to end the cross with
23   respect to that issue.
24       THE COURT: Tell me what issues you have with
25   that, Mr. Menchel.

Page 156

1  or they weren't there.
2       When I did my analysis and went down and did the
3  analysis from Bankest Capital, and from the other
4  companies, as you call them, the clients, I believe,
5  Mr. Shohat, Joy, ENA, Stratesec, and Stratasys, they were
6  almost $200 million of the $220 million of the companies
7  that collapsed. So, they -- they didn't have the
8  receivables.
9  Q. Well, that's not my question.
10 A. Oh, I'm sorry.
11 Q. Let's go through that list, on page 10 of your final
12 report. It says --
13 A. Can I see a copy, please?
14 Q. Well, I don't have another --
15      MR. SHOHAT: Do you have another copy?
16      MR. MENCHEL: Which one?
17      MR. SHOHAT: The final report. The second page.
18      MR. MENCHEL: I don't know that I do. I need a
19 copy, as well.
20      MR. SHOHAT: Well, can I --
21      MR. MENCHEL: I have one for me.
22      MR. SHOHAT: We'll do it this way.
23      MR. LEHR: Here.
24      MR. SHOHAT: I'm referring to page 10, Counsel.
25      MR. MENCHEL: Thank you.

Page 157

1  BY MR. SHOHAT:
2  Q. Page 10 contains your analysis of where did the money
3  go, correct?
4  A. Hold on a second, please.
5      This is my final report --
6  Q. Yes, sir.
7  A. -- filed November of '04? Okay.
8  Q. You with me?
9  A. Yes.
10 Q. Page 10 contains your analysis of where did the money
11 go, correct?
12 A. Okay.
13 Q. How much money was traced into Joy?
14 A. $250 million.
15 Q. Now, when you say $250 million went into Joy, this is
16 over what period of time?
17 A. 1998 to 2003.
18 Q. And how much was the net loss at Joy?
19 A. It says $58 million here.
20 Q. How much money went into Stratesec?
21 A. The report says $50 million.
22 Q. And what was the net loss at Stratesec?
23 A. Eight million.
24 Q. How much money went into Stratasys?
25 A. Seventy-five million, with a net loss of 17.

Page 158

1  Q. How much money went into United Container?
2  A. Seventy-nine million.
3  Q. Now, there's no figure in your report for a net loss
4  at United Container, is that correct?
5  A. Yes, sir.
6  Q. United Container went into bankruptcy, did it not?
7  A. Yes, sir.
8  Q. It went into bankruptcy before the collapse of
9  ES Bankest, correct?
10 A. Before I was appointed, yes, sir.
11 Q. Before you were appointed.
12      Do you recall that there were $17 million,
13 approximately, of account receivables on the books of
14 Bankest for United Container at the time that United
15 Container went into bankruptcy?
16 A. I believe that's about the amount of the claim that we
17 filed in the bankruptcy.
18 Q. In the United Container bankruptcy?
19 A. Yes, sir.
20 Q. Is that --
21 A. It might have been more. But there's been a lot of
22 contesting and trying to settle that claim.
23 Q. That's still ongoing?
24 A. Yes, sir.
25 Q. How much have you collected so far on the United

Page 159

1  Container claim, do you recall?
2  A. In excess of a million dollars.
3  Q. In excess of $1 million?
4  A. Yes, sir.
5  Q. The last entry on this wage is Winston Financial.
6      Winston Financial is the Orlanskys' parents'
7  account, correct?
8  A. Winston Financial is what Winston Financial is.
9  It's -- yeah, it was always portrayed that way.
10 Q. What do you mean "portrayed that way"?
11 A. I was told that Winston Financial was that by various
12 counsel.
13 Q. Did you ever see anything that indicated it was other
14 than as it was represented to you?
15 A. I don't recall.
16 Q. And I'm curious, it says in this report that in excess
17 of 32 million was traced from the books and records and
18 bank statements that were available to the receiver. Can
19 you explain to me what that means?
20 A. We still didn't have all the actual records from all
21 the entities, even after November of '04.
22 Q. Ah.
23 A. Or if we had them, they all hadn't been analyzed at
24 that point.
25 Q. What does "32 million was traced from the books and

Page 160

1  records and bank statements" mean? Does that mean money
2  coming in from Winston Financial or going out to Winston
3  Financial? Do you know what that means? Because it's a
4  little unclear to me, Mr. Freeman.
5  A. Without looking at the books and records, I couldn't
6  tell you, Mr. Shohat.
7  Q. Now, you were aware, or made aware, after you took
8  over at Bankest, that Gunster Yoakley had filed a lawsuit
9  on behalf of Bankest against United Container, were you
10 not?
11 A. Yes.
12 Q. And that they had alleged in that lawsuit that United
13 Container had, in essence, stolen money from them using
14 fake invoices, correct?
15 A. I recall that.
16 Q. And as the receiver, you could have, if you chose to,
17 take over that lawsuit and pursue it, correct?
18 A. Well, I think there were many lawsuits, Mr. Shohat,
19 that were part of the United Container. United Container
20 was in bankruptcy, and as I recall it, there were in excess
21 of, I believe, 50 lawsuits that were filed against various
22 vendors of United Container, which is different than filing
23 against United Container.
24 Q. But Bankest, through its lawyer, Mark Scheer and Ray
25 Miller at Gunster Yoakley, had filed a lawsuit against

Page 161

1  United Container, correct? Alleging fraud.
2  A. I'm -- I know there were an awful lot of lawsuits
3  involving United Container.
4  Q. You don't remember the one I'm referring to?
5  A. Was it in state court? Federal court? I don't know,
6  Mr. Shohat.
7  Q. If you don't remember, you don't remember,
8  Mr. Freeman. That's fine.
9      Do you recall that ES Bankest had also initiated
10 suit against certain companies that did business with
11 United Container, like ConAgra, GE Supply, ALCOA, and
12 others?
13 A. That's what I was talking about, yes, sir.
14 Q. Do you recall that?
15 A. Yes. Those were in state court here in Miami, and
16 there were, I don't know, as I stated, maybe 50 lawsuits
17 here in Dade County.
18 Q. Did you undertake to pursue those lawsuits?
19 A. Well, we undertook to get them -- when the Gunster
20 firm ceased being counsel, on the first day of my
21 receivership, we were handed an awful lot of open legal
22 files. Now, I can't say I was overjoyed to get them, but
23 it was part of the job. And what we tried to do is get our
24 hands around what these cases were about.
25 Q. Um-hum.

Page 162

1  A. And were they economically feasible to spend money to
2  try and collect money from these people.
3  Q. You know, I'm not being critical, Mr. -- I'm just
4  asking, did you pursue the lawsuits?
5  A. Yes, we definitely did.
6  Q. And did you pursue those lawsuits to judgment?
7  A. No. We had a series of hearings with the local judge,
8  who thought that the suits really probably should be
9  dismissed. And I believe that she might have dismissed
10 them -- it was not a happy conclusion, if I remember.
11 Q. Okay.
12 A. From the circuit court judge. She didn't think they
13 had merit.
14 Q. And did you discover that ES Bankest had a personal
15 guarantee from one of the owners of United Container?
16 A. Yes, I believe so.
17 Q. Did you pursue that personal guarantee?
18 A. We are still pursuing it.
19 Q. Ah, okay.
20     And Global Apparel was a company that owed money
21 to Bankest, did it not?
22 A. Yes, sir.
23 Q. And, once again, there were allegations that Global
24 Apparel defrauded Bankest through false invoices and the
25 like, were there not?

Page 163

1  A. Yes, sir.
2  Q. And did you come to know that Bankest started a
3  lawsuit against Global Apparel and its owner?
4  A. Yes, I did.
5  Q. And have you pursued that lawsuit?
6  A. Yes, I did.
7  Q. What was the result of that?
8  A. I reached a settlement that I thought was the most
9  beneficial for the estate.
10 Q. Okay.
11 A. I believe it brought in over a million dollars.
12 Q. Out of how much debt, sir, do you recall?
13 A. I believe it was in excess of 15 million.
14 Q. Did you also discover -- well, did you learn that the
15 owner of that company had a multimillion dollar mansion in
16 New York?
17 A. I learned a lot of things about that company. They
18 eventually filed bankruptcy, I believe. Also, the
19 principal of the company filed bankruptcy. They were, in
20 my opinion, very uncollectible individuals.
21 Q. Okay.
22 A. That didn't merit spending a lot of time and effort
23 trying to collect. I'm overjoyed with the result that we
24 got of a collection of over a million dollars.
25 Q. Was there a lawsuit against a company named ExecuTrain

Page 164

1  by Bankest?
2  A. I believe there were several lawsuits on that, yes,
3  sir.
4  Q. Now, I want to stop here a second, and just ask you a
5  couple questions about lawsuits generally.
6     The lawsuits that had been brought by the
7  attorneys for Bankest were basically -- against debtors,
8  people that owed them money, were basically state court
9  actions as far as you could find, correct? In the state
10 courts, not here in the federal court.
11 A. I believe most of them were -- I think United -- I'm
12 sorry -- I believe the case of the New Jersey apparel --
13 Global, was it?
14 Q. Correct.
15 A. Was in federal court.
16 Q. And you're familiar, because you do it yourself,
17 you're familiar with the process of being a plaintiff in a
18 lawsuit to collect a debt. That's something that you -- a
19 position you find yourself in quite frequently in the
20 capacity of receiver for various companies, correct?
21 A. It's part of the job, yes.
22 Q. And, in fact, you have filed lawsuits in this case,
23 and have taken the plaintiff's position in connection with
24 collecting money for the Bankest estate, correct?
25 A. Yes, I have.

Page 165

1  Q. And it is a fact, is it not, that when you file a
2  lawsuit, you open yourself up -- I'm talking about the
3  plaintiff -- opens themself up to quite a bit of discovery,
4  correct? People from the other side, the lawyers for the
5  defendants can engage in a process known as discovery, and
6  they could find out just about anything they want about
7  your business, correct? As part of the discovery process.
8  A. They were allowed to review documents and take
9  depositions, yes, sir.
10 Q. They can take depositions, they can ask you questions,
11 they can subpoena your records, correct?
12 A. Yes.
13 Q. When you sue somebody for fraud, for example, you open
14 yourself up to all kinds of questions and investigation
15 into your own personal or professional business activities.
16 Fair enough?
17 A. That's a consequence, yes.
18 Q. How much salary did Eduardo Orlansky make, if you
19 recall, while he worked at Bankest, from your review of the
20 records? What was his annual income?
21 A. I don't recall without looking at the records,
22 Mr. Shohat.
23 Q. Would around $200,000 sound accurate to you?
24 A. May be high.
25 Q. May be a little on the high side?

Page 166

1  Other than his salary, what money that came from
2  any funding source, whether it be Espirito Santo Bank and
3  its debenture holders, Espirito Santo Bank Nassau, the line
4  of credit, or any other funding source, has been traced to
5  the pocket or any account controlled by Eduardo Orlansky?
6  A. Could you repeat the question, Mr. Shohat?
7  Q. Please don't make me do that.
8  A. I'm sorry. I want to make sure I give you an accurate
9  answer.
10 Q. Yes, sir.
11    Other than his salary, other than maybe a bonus
12 or two voted by the board, or a dividend, what monies of
13 the 170 million that was put in by Espirito Santo Bank, or
14 any other funding source, that you've traced and been made
15 millions of dollars for tracing, has ended up in the pocket
16 or in an account controlled by Eduardo Orlansky?
17 A. Actual cash, I haven't found any.
18 Q. All right. I'll bite. Am I to read something into
19 the phrase "actual cash"?
20 A. Well, you asked payroll checks, bonuses, dividends.
21 Q. Put aside those. Any money of any kind, any art, any
22 automobiles, any houses? Anything to Eduardo Orlansky?
23 A. Not directly, no, sir.
24 Q. Indirectly.
25 A. Well, there was stock in some of these companies that

Page 167

1  was owned by entities owned by Mr. Orlansky.
2  Q. All of which ended up -- without conceding the
3  accuracy of your statement, any company that we're talking
4  about ended up kaput, right?
5  A. None of them have any value.
6  Q. No value.
7     Can you tell me which company or companies
8  Mr. Orlansky took stock in?
9  A. Could you make -- could you be a little bit more
10 descriptive? Eduardo Orlansky.
11 Q. Eduardo Orlansky -- that's who I represent, so....
12 A. Okay. And when you say "company," are you talking
13 about companies like Joy or Stratasys or anything like
14 that?
15 Q. Yes, sir.
16    Which ones did he take stock in -- let me put it
17 this way, that he had a voting stock interest in the
18 company?
19 A. There were various companies -- Joy Manufacturing,
20 Stratesec, ENA -- that were all companies that were
21 purportedly factored companies, that all had equity
22 interests that were owned or controlled by companies owned
23 by Mr. Orlansky.
24 Q. Let's stop here for a second.
25 A. Okay.

Page 168

1  Q. Are you saying that you have seen and have available
2  to you -- not here today -- stock, or records that show the
3  existence of stock, that a company owned or controlled by
4  Mr. Orlansky had in Joy, voting stock?
5       And here -- let me clarify the question for
6  you -- qualify it. I'm not referring to an agreement for;
7  I'm talking about the actual issuance of stock in the
8  company.
9  A. I don't know about Joy, no, sir.
10 Q. Stratesec, is it accurate to say that in the last
11 phases of Bankest, 2002, any stock interest was taken in
12 Stratesec, correct?
13 A. (No response.)
14 Q. By Bankest.
15 A. ES Bankest had factored money to Stratesec, a public
16 corporation. When debt was cancelled in 2002, early 2003,
17 the stock was issued to Bankest Capital Corporation, not to
18 ES Bankest.
19 Q. But Bankest Capital, in exchange for the cancellation
20 of debt, took stock in Stratesec in 2002, right?
21 A. For cancellation of indebtedness to ES Bankest LC,
22 Bankest Capital took stock.
23 Q. Fair enough.
24      ENA, is it your testimony that -- that's the
25 third company that you listed -- is it your testimony that

Page 169

1  Enterprise Network Applications in Atlanta was owned by a
2  Bankest entity through stock that you have seen, that
3  you've actually seen evidence that there was a stock
4  ownership, or a stockholder's agreement, or a stock
5  agreement of some kind, or even a K1, issued by ENA at the
6  end of the year to its parent company for tax purposes,
7  anything, that you've seen such documents?
8  A. I've never seen those documents.
9  Q. It's a fact, is it not, Mr. Freeman, that it was
10 Dominick Parlapiano, not any Bankest entity, not any
11 Orlansky, that owned ENA? Isn't that true?
12 A. I don't know, Mr. Shohat.
13 Q. Well, now that I've mentioned his name, you mentioned
14 that when you went to the offices of Bankest, you went into
15 Mr. Parlapiano's office and you found the office stuffed
16 with documents.
17 A. That's what I recall saying --
18      MR. MENCHEL: I don't think there's any testimony
19 as to what office Mr. Parlapiano was -- I was prevented
20 from asking that, actually.
21      THE COURT: Sustained.
22      MR. MENCHEL: You guys objected.
23      (Discussion had off the record.)
24      MR. ZELMAN: Judge, I'm going to object to
25 Mr. Menchel's gratuitous comment about "you guys objected."

Page 170

1       THE COURT: It's happening on both sides.
2       MR. ZELMAN: It hasn't happened by me.
3       THE COURT: Mr. Zelman, I'm talking now, okay?
4       MR. ZELMAN: Apologize.
5       THE COURT: I'm not saying anybody in particular.
6  I said both sides. It's going to stop now. You make an
7  objection, I rule, and that's the end of the matter, and we
8  go forward.
9       MR. SHOHAT: I'm sorry, your Honor.
10 BY MR. SHOHAT:
11 Q. You see office M here?
12 A. Yep.
13 Q. When you went into office M, was that office loaded to
14 the gills with all kinds of documents?
15 A. If you bring it over a little closer so I can see it.
16 Sorry.
17      Yeah, that was the office that I called
18 Mr. Parlapiano's office.
19 Q. Okay.
20 A. M.
21 Q. M, as in "man," right?
22 A. Yes.
23 Q. I think you even said there were so -- there's a
24 closet in that office?
25 A. Yes, sir.

Page 171

1  Q. You said there were so many documents in that office
2  that you couldn't close -- the closet was stuffed floor to
3  ceiling with documents, you couldn't close the closet?
4  A. That's correct.
5  Q. Now, you also said that when you went in to office
6  Q -- Q, right?
7  A. Okay.
8  Q. There were documents on the desk. Correct?
9       This is Mr. Eduardo Orlansky's office, is it not?
10 A. Yeah, that's what I was trying to figure out. Q would
11 be the office I knew as Eduardo Orlansky's.
12 Q. And you said there were documents on the desk in
13 there, correct?
14 A. There was -- piled high, yes, sir. And on the
15 credenza behind.
16 Q. Lots of documents on the desk and on the credenza,
17 correct?
18 A. And in the drawers, yes, sir.
19      MR. SHOHAT: Can I have just a minute, Judge?
20      THE COURT: Yes.
21      (Pause.)
22 BY MR. SHOHAT:
23 Q. One of the things that you did, as far as tracing the
24 funds was concerned, was hire investigators who are trained
25 to assist for that purpose, correct?

Page 172

1  A. Yes, sir.
2  Q. And this was the investigative firm of Ross, Gaffney &
3  Associates?
4  A. That is one of them, yes, sir.
5  Q. And they consist in part of an ex-FBI agent and an
6  ex-National Association of Security Dealers investigator,
7  correct?
8  A. Yes, sir.
9  Q. And you brought in other trained investigators from
10 around the world to assist you, correct?
11 A. We had resources that could help us look for assets,
12 yes, sir.
13      MR. SHOHAT: Thank you. That's all I have at
14 this time, Judge.
15      THE COURT: All right. Thank you.
16      MR. LEHR: Judge, may I ask one question that
17 came from this? I'm sorry.
18      THE COURT: Yes, go ahead.
19      MR. ZELMAN: And I also have a similar request,
20 Judge, as a result of other cross-examinations.
21      THE COURT: Okay, but this is not going to be
22 happening as we go forward.
23      MR. LEHR: I'm sorry, your Honor.
24      THE COURT: No, no. No need to apologize. You
25 can do it this time, but we're not going to be doing it for

Page 173

1  every witness.
2       Go ahead, Mr. Lehr.
3       MR. LEHR: Thank you.
4            CROSS-EXAMINATION
5  BY MR. LEHR:
6  Q. Mr. Freeman, you've described one office completely
7  full of documents, overstuffed closet. Then you've
8  discussed Mr. Eduardo Orlansky's office with plenty of
9  papers.
10      Office S, Hector Orlansky's office, what was the
11 document situation in that office?
12 A. Okay. S was -- when you came in on the -- straight
13 ahead of you when you came in the door, there was a desk,
14 credenza, computer station. Be lots of documents, also.
15 Probably not as many as Eduardo's office, but boxes and
16 boxes of documents were there.
17      MR. LEHR: Thank you.
18           CROSS-EXAMINATION
19 BY MR. ZELMAN:
20 Q. Mr. Freeman, you were asked by some of the other
21 defense counsel about whether you found any money, other
22 than salaries, with any of the defendants. With respect to
23 Ms. Puerto, did you ever discover that she had any of the
24 missing money that you were looking for?
25 A. No.

Page 174

1       MR. ZELMAN: Thank you.
2       THE COURT: Mr. Menchel?
3       MR. MENCHEL: Your Honor, this might take longer.
4  Do you want me to start now?
5       THE COURT: No, no. How long do you think it
6  will be?
7       MR. MENCHEL: I would say maybe 15, 20 minutes.
8       THE COURT: No, go ahead. Go ahead. We started
9  around 9:15, so you can go ahead and we'll take a break
10 after Mr. Freeman is done.
11      MR. MENCHEL: Okay.
12           REDIRECT EXAMINATION
13 BY MR. MENCHEL:
14 Q. Good morning again, Mr. Freeman.
15 A. Good morning, sir.
16 Q. Mr. Freeman, you were asked a number of questions on
17 cross-examination about things you came to learn as a
18 result of your position as receiver at ES Bankest and,
19 ultimately, Bankest Capital Corporation, and let me
20 follow up.
21      I believe you testified earlier that of the
22 $220 million in receivables listed on the books, you only
23 recovered approximately five, is that right?
24 A. Yes.
25 Q. Just so the jury is clear, however, you were able to

Page 175

1  recoup monies from things that were worth something,
2  separate and apart from the accounts receivables.
3  A. Yes, sir.
4  Q. So, all the money that you recovered didn't go into
5  your pocket.
6  A. No, sir.
7  Q. And the monies that you recover, who has to approve
8  them before you get anything?
9  A. The court and the creditors.
10 Q. So, if you put a bill in for your services, is that
11 part of the court record?
12 A. Yes, it is.
13 Q. And if somebody thinks, Lew Freeman is getting paid
14 too much, like a creditor, do they have the opportunity to
15 object?
16 A. There were many of those people, yes. And they did
17 object.
18 Q. And ultimately who decides whether or not your
19 compensation is fair and appropriate?
20 A. The court.
21 Q. Now, Mr. Shohat asked you a series of questions about
22 sometimes when companies go bankrupt, it becomes difficult
23 to collect from the creditors of that company. Do you
24 recall those questions?
25 A. Yes.

18 (Pages 172 to 175)