# EXHIBIT N

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | . Case No. 03-20951-CR-Jordan |
| | . |
| Plaintiff, | . Miami, Florida |
| | . December 1, 2006 |
| v. | . 9:02 a.m. |
| | . |
| CARLOS E. MENDEZ, | . |
| | . |
| Defendant. | . |

. . . . . . . . . . . . . . ..

- - - - -

Transcript of Sentencing Proceedings had

before the Honorable Adalberto Jordan,

United States District Judge.

- - - - -

VOLUME I

- - - - -

Proceedings recorded by mechanical stenography, transcript
produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305)523-5568

bd37eea8-ad72-486a-9481-6dc6623174d9

Page 2

APPEARANCES:
For the Government:  Caroline Heck Miller
      Matthew I. Menchel
      Assistant U.S. Attorneys
      99 N.E. 4th Street
      Miami, Florida  33132
For the Defendant:  James McGuirk, Esq.
      James McGuirk, P.A.
      201 Alhambra Circle
      Coral Gables, Florida  33134

Court Reporter:   Francine C. Salopek, RMR, CRR
      Official Court Reporter
      United States District Court
      301 North Miami Avenue, Room 804
      Miami, Florida  33128-7709
      (305)523-5568
      - - - - -

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305)523-5568

Page 3

1     THURSDAY, DECEMBER 1, 2006, 9:02 A.M.
2     THE COURT:  Good morning.  Please be seated.
3     This is Case Number 03-20951, United States vs.
4  Carlos Mendez.  If you could please announce your
5  appearances.
6     MS. HECK MILLER:  For the United States, Assistant
7  United States Attorneys Caroline Heck Miller and Matthew
8  Menchel.  Good morning, your Honor.
9     THE COURT:  Good morning to both of you.
10     MR. MC GUIRK:  James McGuirk, accompanied by Carlos
11  Mendez.  James McGuirk for Mr. Mendez.  Good morning, Judge.
12     THE COURT:  Good morning.
13     Good morning, Mr. Mendez.
14     THE DEFENDANT:  Good morning, your Honor.
15     THE COURT:  We're here for a hearing on the
16  government's Rule 35(b)(5) motion for a reduction of sentence
17  with regard to Mr. Mendez.
18     First, let me tell you why I denied the motion to
19  continue the hearing again.  I don't want to preclude the
20  government from getting every aspect of Mr. Mendez's
21  cooperation and I don't want to prevent Mr. Mendez from
22  getting the benefit of a more favorable recommendation the
23  government might make on his behalf, that's not my intent at
24  all.
25     But given the fact that I've lived with this case

Page 4

1  for a while and that I heard Mr. Mendez on the stand for over
2  twenty days, I do want the government to explain to me what
3  possible other cooperation might impact on any recommendation
4  it might make given Mr. Mendez's cooperation so far.  And if
5  the government makes a compelling argument, I will consider a
6  motion to reset the sentencing date.
7     But the fact that he may -- and now that I've seen,
8  by the way, the objections to the presentence investigation
9  report by the defendants who went to trial, it's difficult
10  for me to understand what other cooperation Mr. Mendez might
11  give.  But, again, I understand that I'm on this side and I
12  am not dealing with the issues that the prosecutors and
13  Mr. McGuirk and Mr. Mendez are dealing with and I'm happy to
14  hear everybody out.
15     But the mere fact that the government said in its
16  papers that cooperation was ongoing was to me insufficient to
17  continue this sentencing hearing yet again, given what I know
18  so far.  But I'm happy to hear any of you on the issue.
19     MS. HECK MILLER:  Thank you, your Honor.  And we
20  truly do appreciate the opportunity to try, seek to revisit
21  with the Court a decision that the Court earlier made to go
22  forward with this proceeding this morning.
23     THE COURT:  Let me just say -- I'm sorry, I should
24  have said this before and not interrupted you, Ms. Heck
25  Miller, I'm sorry -- but regardless of what I decide I'm

Page 5

1  going to do, my January is going to be pretty busy and I am
2  going to hear from any other witnesses or any other things
3  that Mr. Mendez may wish to put on today.
4     I know that Mr. McGuirk brought witnesses and
5  family members and friends here.  And if I decide to continue
6  things, I will just simply withhold adjudication until a
7  final recommendation by the government at a later time.
8     But January is not going to be a good month for me
9  in terms of time and the trials I have.  So, I'd rather use
10  the time that we have this morning to hear anything else that
11  the parties wish to put on.
12     Go ahead, Ms. Heck Miller.
13     MS. HECK MILLER:  Thank you, your Honor.  And,
14  indeed, that might be a good compromise that could
15  accommodate the interests of all, including the Court's
16  valuable time, to proceed with the testimonial aspect today
17  and to defer adjudication.
18     We do ask the Court to defer adjudication in this
19  matter for the reasons which we stated previously, which is
20  that we wish to be able to take our position to the Court
21  based on the most complete and fulfilled aspect of
22  Mr. Mendez's substantial assistance, which we do believe will
23  be ongoing through sentencing.
24     And in addition, your Honor, as I, too, was
25  reviewing the objections to the presentence reports, it

Page 14

1  encounter a gentleman, the defendant, Carlos Mendez?
2  A.  I don't know when I first met him, but it was somewhere
3  around a month later, yes, sir.
4  Q.  Can you tell us -- tell the Court what did Carlos Mendez
5  do to help your investigation.
6  A.  Well, the very first part of the investigation, in the
7  first three or four days, you, Mr. McGuirk, as counsel for
8  Mr. Mendez, made me aware that there may be a fraud.  And
9  that was the first red flag that I was aware of that the
10  receivables might not have been fully collectible.
11  Q.  Thereafter, did Mr. Mendez assist you in your role and
12  responsibility as the Court-appointed receiver for ES Bankest
13  and the other companies?
14  A.  Yes.
15  Q.  Tell the Court what Mr. -- would you describe generally
16  what Mr. Mendez's role -- well, role was and the quality of
17  his assistance.
18  A.  As a receiver in a situation, first of the examiner
19  where none of the executives or none of the main employees
20  were there or available to be interviewed, from a
21  receivership or forensic examination, it makes a lot of your
22  examination a black-and-white picture, for ease of saying,
23  that you know where people sat, some of the lower employees,
24  you figured what they did, or they could tell you that
25  Mr. So-and-So signed all the checks.  You know, we could find

Page 15

1  out, but we really didn't have any map or any navigator to
2  take us through what had happened in this situation.
3       Several weeks into the case, with your cooperation,
4  with your client, we started asking questions and trying to
5  get some -- for lack of a better word, your Honor --
6  colorization of really what had gone on, what roles people
7  were playing.
8       And approximately a month out, so it be early
9  September, we met with Mr. Mendez.  Originally, it was I
10  believe Ross Gafney (phonetic) and I, with you, and then at a
11  later date Mr. Mendez started to work, we paid them for
12  several weeks to do work, to tell us what was happening.
13       This was more voluntary on our part, because you
14  have -- we're paying the other employees who continued to
15  work.  And Mr. Mendez was giving us valuable information
16  about each of the different companies and how the operations
17  ran.
18  Q.  Did he also identify for you the various lawyers and
19  accountants who were active in the daily affairs of
20  ES Bankest and Bankest Capital?
21  A.  Oh, I believe, you know, as to the lawyers, you know,
22  the billing records, gave us a lot of that information.  But
23  we didn't have were they at the offices often?  Were they
24  calling?  Who you went to for assistance on legal issues --
25  which there appeared to be a lot of.

Page 16

1       And as to the accounting, you know, he was able to
2  tell us, you know, that Mr. Parlapiano was the main
3  interchange with the accountants.  And we have the
4  accounting -- he was there physically when the accountants
5  were there.
6       Other than that, Mr. Parlapiano didn't spend a lot
7  of time the last year or two at ES Bankest, even though he
8  retained an office there.
9  Q.  Did he actually -- did Mr. Mendez connect Mr. Parlapiano
10  to Stratasys --
11  A.  Yes.
12  Q.  -- Stratasys for you?
13  A.  Well, he helped, yeah.  I had already -- early on, we
14  had found that Mr. Parlapiano and the companies were closely
15  associated.
16  Q.  During all this time, these weeks that Mr. Mendez was
17  assisting you in the early stages of the investigation, did
18  you, as a court-appointed examiner, or as a
19  court-appointed --
20  A.  Receiver.
21  Q.  -- receiver -- thank you -- did you have any ability to
22  confer any kind of immunity on him for what he was telling
23  you?
24  A.  No.
25  Q.  To your knowledge, had he received any immunity for what

Page 17

1  he was telling you?
2  A.  Not that I was aware of.
3  Q.  Let's talk about the results of your investigation and
4  Mr. Mendez's assistance.  Did you ultimately file a lawsuit
5  against the law firm?
6  A.  Yes.
7  Q.  What was the -- in what amount?
8  A.  It was in excess of $150 million.
9  Q.  And was there a recovery?
10  A.  Yes.
11  Q.  Are you able to divulge what the nature of the recovery
12  was?
13  A.  No.  That's under seal.
14  Q.  Can you tell us whether it was settled advantageously to
15  the ward or to the, to the company?
16  A.  We believe the estate, as we told the bankruptcy court,
17  we believed it was a fair settlement based upon the
18  conditions and facts.
19  Q.  Have you also filed another lawsuit against the
20  accounting firm?
21  A.  Yes, I have.
22  Q.  That was BDO Seidman?
23  A.  Yes, sir.
24  Q.  And the complaint is seeking what in the way of damages?
25  A.  $170 million, somewhere in that range.

bd37eea8-ad72-486a-9481-6dc6623174d9

Page 18

1  Q. Is that suit ongoing?
2  A. Yes.
3  Q. And do you need Mr. Mendez -- to the best of your
4  knowledge, you're not the lawyer on the case, you're the --
5  A. Thankfully, I'm the client.
6  Q. You're the client. But do you anticipate that he will
7  be a necessary witness in that, to the best of your
8  knowledge?
9  A. (No response.)
10 Q. If you know.
11 A. I really don't know. I think, you know, my counsel --
12 and there are two different cases. I'm only involved in
13 one -- I'll leave that to my counsel.
14 Q. Separately, as a person, were you able to draw any
15 conclusions about Carlos Mendez during the amount of time you
16 worked with him?
17 A. Yes.
18 Q. Would you tell the Court.
19 A. Early on, probably be September of '03, naturally, I had
20 suspicion about anybody who was talking to me. As a
21 receiver -- and by that point, it appeared to be a major
22 fraud. You know, I'm more than glad to gather as much
23 information as I can, filter it through sensors of, I guess
24 the truth factor, and, you know, see in the next year or two
25 years or three years how that information could be verified.

Page 19

1  Because quite often in these cases, I have been interviewing
2  ex-employees and I've gotten disinformation, rather than
3  verifiable, truthful facts.
4       Mr. Mendez from day one was very contrite about the
5  fraud. He was sorry that it happened. He really answered
6  any questions that we had. And as time going on, we would
7  pick up the phone and ask questions. Because, you know, I --
8  fraud of this magnitude, you know, a lot of things don't
9  connect and you need some type of, for lack of a better word,
10 connector. You know, he was very helpful to us, was the
11 first red flag through counsel telling us about it, which
12 helped give me some -- because as I've testified, after day
13 one, I said I don't see any problems with the receivables,
14 they all look great, Fortune 500 companies and all these
15 other things. I had my, you know, untrustworthy hat on
16 always thinking, but that was the first red flag that I got.
17      Then Mr. Barnhill, shortly thereafter, or maybe
18 before -- Mr. Barnhill was either before or after -- but
19 there Mr. Mendez was the first break I would say that I had.
20 Q. Would you say based on -- you've worked with him now for
21 what -- or asked him questions for two-and-a-half years?
22 A. Three years.
23 Q. Three years. Okay.
24      Do you find his statements to be trustworthy?
25 A. A hundred percent.

Page 20

1  Q. During your examination, Mr. Freeman, did you find that
2  Mr. Mendez profited from the fraud?
3  A. Nothing more than his salary.
4  Q. Thank you. No further questions.
5       THE COURT: All right. Thank you, Mr. McGuirk.
6       Any questions from the government?
7       MR. MENCHEL: No, your Honor. Thank you.
8       THE COURT: Mr. Freeman, thank you very much.
9  You're excused.
10      (Witness excused.)
11      MR. MC GUIRK: The defense will call Mitchell
12 Berger.
13      (MITCHELL BERGER, DEFENDANT'S WITNESS, WAS SWORN.)
14      THE COURT REPORTER: Please sit down. Please stay
15 as close as you can to the microphone and state your full
16 name for the record, spelling your last name.
17      THE WITNESS: Mitchell Berger, B-E-R-G-E-R.
18           DIRECT EXAMINATION
19 BY MR. MC GUIRK:
20 Q. Sir, would you state your professional background and
21 your connection, if any, to the Bankest case?
22 A. I'm a lawyer. I've practiced 27 years in Tennessee and
23 in Florida. And my connection with this case is I was
24 employed as the -- my law firm was employed as the attorneys
25 for Banco Espirito Santo International Limited and ESB

Page 21

1  Finance, the company that purchased the notes, as well as
2  Bank Espirito Santo of Nassau, another company that lent
3  money to the company that committed the fraud.
4  Q. Is it a fair statement that the clients that you
5  represent, those companies, are the victims of the fraud?
6  A. I think, indeed, this Court has found that, yes.
7  Q. Would you briefly describe the litigation that your firm
8  is either conducting or is co-counsel on that has arisen out
9  of this case, the civil litigation, on which you're
10 plaintiffs?
11 A. The civil litigation has been in numerous forum -- from
12 Judge Huck's courtroom, where Mr. Freeman was appointed as
13 the Court-appointed receiver in August of 2003; to Judge
14 Cristol's courtroom in several bankruptcy contexts; to
15 circuit court in Dade County, in terms of the accounting
16 malpractice case against BDO Seidman; to several other
17 receiverships and several other bankruptcies throughout the
18 United States.
19 Q. And in the course of your conducting the investigation
20 and litigation on behalf of your clients, did you encounter
21 the defendant here, Carlos Mendez, and if so, tell the Court
22 the nature of how you happened to encounter him.
23 A. Almost in August of 2000, there was, you know, a great
24 deal of chaos right at the beginning of this case for those
25 of us involved.

6 (Pages 18 to 21)

bd37eea8-ad72-486a-9481-6dc6623174d9

Page 22

1    THE COURT: You said 2000, but it's 2003.
2    THE WITNESS: 2003, I'm sorry, your Honor. I
3 thought I said 2003. If I misspoke, I apologize.
4 A.   2003.  There was a lot of chaos in 2000, too, for some
5 of us -- but 2003, there was a lot of chaos immediately
6 involved.
7    And the defendant, Carlos Mendez, was one of the
8 few people right from the beginning who came forward and
9 tried to set things right, explained to us where recoveries
10 could be had, was forthcoming in terms of the pointing us in
11 the direction of where recoveries could be had -- United
12 Container and Joy Athletics and several of the other
13 companies where he thought monies could be recovered
14 immediately.  He was forthcoming in explaining to us how this
15 happened, and what could be done to maximize our recoveries.
16 Q.   And at the time he was doing this, were you able to
17 confer any immunity on him for the information, statements he
18 was giving to you?
19 A.   No.
20 Q.   And to your knowledge, did he have any immunity at that
21 time in connection with what your conversations were?
22 A.   No.  Not -- as far as I know, he had no immunity.  As
23 far as I knew, he was a cooperating witness with the United
24 States government at the time.  And, you know, and -- but he
25 was also permitted to talk to us.

Page 23

1 Q.   And do you anticipate -- well, what is the status of the
2 various lawsuits at this time?  Are they over?  Are they just
3 beginning?  You know, what do you anticipate?
4 A.   We're scheduled to go to trial in one of the main
5 actions, the accounting malpractice action, in Judge
6 Rodriguez's courtroom on January the 16th of 2007.  It's
7 anticipated that that trial will last four to six weeks.
8 Q.   What about -- what other litigation is pending?
9 A.   There is still numerous bankruptcies pending in which
10 recoveries are being had in various degrees.
11 Q.   Is Mr. Mendez's assistance necessary or even helpful for
12 any of these litigations?
13 A.   Being a lawyer, "necessary" is a hard word, but helpful,
14 yes.
15 Q.   Okay.  Thank you.
16    And in the event that he's in prison, would this
17 prevent -- would this create an obstacle to the diligent
18 prosecution of your cases?
19 A.   Of course it would.  It would take greater time and
20 effort to coordinate with Mr. Mendez if he were incarcerated.
21 Q.   Would you describe, also -- well, do you have a
22 co-counsel in this case, Sullivan & Cromwell?
23 A.   Yes, sir.
24 Q.   Would you -- go ahead.
25 A.   We have, we've been fortunate to co-counsel this matter

Page 24

1 with Sullivan & Cromwell, their Los Angeles office.
2 Mr. Steven Sullivan is the gentleman leading the efforts on
3 behalf of Sullivan & Cromwell.
4 Q.   And did you bring here with you this morning and hand me
5 an original letter from Mr. Thomas to the Court?
6 A.   Yes.  Mr. Thomas, on occasion, likes to see his
7 children, so he's spending the weekend with his children,
8 otherwise, I'm sure he might have been as helpful, as well,
9 but he had given me a letter to bring.
10    MR. MC GUIRK: Yes.
11    Judge, at this time, may I file this with the
12 Court?
13    THE COURT: Yes.  I'll take it, Mr. McGuirk.
14    You've seen a copy of this, Ms. Heck Miller or
15 Mr. Menchel?
16    MR. MENCHEL: No, your Honor.
17    THE COURT: Let me just read it into the record.
18 It's from Mr. Thomas at Sullivan & Cromwell.  And it's:
19    "Re: Carlos Mendez.
20    "Dear Mr. McGuirk: Mr. Mendez has
21 consistently, to the best of my knowledge, told
22 the truth in his communications with the victim of
23 this crime, Espirito Santo.  He has been available
24 for Espirito Santo to answer questions and has
25 testified in civil matters.  He has personally

Page 25

1 expressed his remorse and I believe he is sorry
2 for his crimes."
3    THE COURT: Go ahead, Mr. McGuirk.
4    MR. MC GUIRK: And, Judge, Mr. Thomas has been good
5 enough to advise that if the Court has any questions of him,
6 he's standing by at a phone number where he can be reached by
7 phone.
8    Mr. Berger is correct, he, Mr. Thomas, had a
9 long-standing vacation, frankly, with his family.
10    THE COURT: I don't need to hear from him.
11    MR. MC GUIRK: Okay.
12    THE COURT: Thank you.
13    MR. MC GUIRK: No further questions.
14    THE WITNESS: May I be excused?
15    THE COURT: Well, as long as nobody else has any
16 questions.
17    Mr. Menchel?
18    MR. MENCHEL: No questions, your Honor.  Thank you.
19    THE COURT: Thank you very much, Mr. Berger.
20 You're excused.
21    THE WITNESS: Thank you.
22    MR. MC GUIRK: Thank you very much.
23    (Witness excused.)
24    MR. MC GUIRK: At this time, the defense will call
25 Carlos Garcia.