# EXHIBIT Q

Page 1

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

------------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
        Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
        Defendant.
------------------------------------------------------x
BDO SEIDMAN, LLP,
        Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
        Third-Party Defendants.
------------------------------------------------------x

PAGES 1 - 97

MORNING SESSION

Miami, Florida

Monday, May 21, 2007

9:50 a.m.

Before the Honorable Jose M. Rodriguez

Reported by:   Gizella "Gigi" Baan

Page 2

APPEARANCES

On behalf of the Plaintiffs BANCO ESPIRITO SANTO
INTERNATIONAL, LTD., ET AL.:

SULLIVAN & CROMWELL, LLP
    1888 Century Park East
    Los Angeles, California 90067
    (310) 712-6627
BY:  Steven W. Thomas, Esquire
    Emily S. Alexander, Esquire

GONZALO R. DORTA, P.A.
    334 Minorca Avenue
    Coral Gables, Florida 33134
    (305) 441-2299
BY:  Gonzalo R. Dorta, Esquire

BERGER SINGERMAN
    200 South Biscayne Boulevard, Suite 1000
    Miami, Florida 33131
    (305) 755-9500
BY:  Mitchell W. Berger, Esquire
    Rene Harrod, Esquire

Page 3

On behalf of Defendant BDO Seidman, LLP:

GREENBERG TRAURIG, LLP
    MetLife Building
    200 Park Avenue, 15th Floor
    New York, New York 10166
BY:  Adam D. Cole, Esquire
    Karen Y. Bitar, Esquire
    (212) 801-9200

GREENBERG TRAURIG, LLP
    1221 Brickell Avenue
    Miami, Florida 33131
BY:  Mark Schnapp, Esquire
    Nikki Simon, Esquire
    (305) 579-0500

ALVAREZ, ARMAS & BORRON
    901 Ponce de Leon Boulevard, Suite 304
    Coral Gables, Florida 33134
    (305) 461-5100
BY:  Arturo Alvarez, Esquire

Page 4

On behalf of Third-Party Defendants Victor Balestra,
Bernard Mollet, and Joaquim Garnecho

RICHMAN, GREER, WEIL, BRUMBAUGH,
MIRABITO & CHRISTENSEN, P.A.
    Miami Center, Suite 1000
    201 S. Biscayne Boulevard
    Miami, Florida 33131
    (305) 373-4000
BY:  Manuel Garcia Linares, Esquire

On behalf of Third-Party Defendant Bernard Mollet

GAMBA & LOMBANA, P.A.
    2701 Ponce de Leon Boulevard, Mezzanine
    Coral Gables, Florida 33134
    (305) 448-4010
BY:  Hector J. Lombana, Esquire
    Geoffrey Marks, Esquire

Page 5

CONTENTS

EXAMINATION OF VICTOR BALESTRA BY:    PAGE:
    MR. COLE: (Direct)    9

vice chairman of E.S. Bankest. He did not sign the audit letter, the audit engagement letter for Bankest but he did sign one for Pricewaterhouse and it shows what his understanding is, what an auditor does and I'm entitled to ask him those questions.

MR. THOMAS: That's exactly why Your Honor has excluded it because of that confusion. He did not sign the audit letter to Bankest. This is confusion to the jury and it's prejudicial and it's phase two, although I don't believe it is phase two.

MR. COLE: It's not confusion. The jury is pretty clear that what we're talking about in this case is an audit of E.S. Bankest, not Espirito Santo Bank. The only time an audit of Espirito Santo Bank comes up is the fact PWC rolled up the Bankest audit into its financial statements and to the extent to which PWC should have done, knew, or shouldn't have known about confirmations not being received. This document goes to this witness' knowledge. Okay? And I don't think it's confusing at all and I'll be happy to say that this is the only deal with Espirito Santo Bank, not Bankest.

MR. THOMAS: That highlights the confusion and, if anything, it's phase two, although I'm not waiving that argument now.

MR. COLE: I can't understand, frankly, how

this is even close to being confusing given the nature of this trial. I can't believe that of this document that shows his knowledge and shows that PWC is auditing Espirito Santo Bank, not E.S. Bankest. And PWC isn't even in the room. Okay. How his knowledge is confusing.

MR. THOMAS: I don't need to add anything else.

MR. COLE: For example, it says our responsibilities and limitations. He knows what the responsibilities and limitations of an auditor are and when he reviewed the audited financial statements he knows that he's somebody who actually knows it and we can show that through documents that he signed. I'm allowed to show him documents that he signed. It's highly prejudicial if I can't do that. It's not my fault that they chose Pricewaterhouse to audit the bank.

THE COURT: No. I'm not going to let you use it. You can impeach him if you ask him a question and he flatly doesn't know or says something else that he says he's not familiar with it, you can impeach him. But at this time no, I'm not going to allow you to use this letter.

MR. COLE: So the fact that the witness has knowledge is not relevant?

THE COURT: He hasn't denied that he has the knowledge.

MR. COLE: I see what you're saying. I can ask him questions and if he says otherwise --

THE COURT: Then we'll do this again.

MR. THOMAS: Your Honor, I just want to say that I've been very judicial but we're right on the line of phase two repeatedly and I'm not trying to object, it's clear, but --

THE COURT: There are certain questions I'm going to allow and certain questions I'm not going to allow.

MR. COLE: The fact that when you talk about phase one and phase two in this case, we talked about that early on and there are certain things that are intertwined. That's number one.

THE COURT: Some questions I'll allow and others I won't.

MR. COLE: Number one, I want to lodge again -- if I'm going to get shut down so we don't have to do this every time, I want to lodge my objection again to where -- to the bifurcation in this case to phase two, and phase two because I believe this witness's knowledge as vice chairman of E.S. Bankest as to what an auditor does is directly relevant to this

case.

THE COURT: And I've allowed you to ask those questions.

MR. COLE: All right.

THE COURT: That's it.

(Thereupon, the side-bar conference was concluded.)

BY MR. COLE:

Q. Mr. Balestra, as vice chairman of E.S. Bankest, sir, you understood that the objective of an audit is to express an opinion on the financial statements, right?

A. Yes.

Q. And as somebody who is experienced with audits, you understand that auditors design their audits to obtain reasonable assurance; isn't that right?

A. Yes.

Q. And you understand, sir, that when an auditor comes in and does an audit, the auditor is not looking at every single transaction, right?

A. No.

Q. It's just looking on -- at selected -- doing selective tests, right?

A. But they test certain percentages of the -- whatever they have to verify.

Page 54

1    Q.   Right. But they don't test everything,
2  right?
3    A.   My understanding is that they do not test
4  everything.
5    Q.   And you understand, sir, that an auditor
6  comes in and also examines internal control of the audit
7  client, right?
8    A.   Yes.
9    Q.   All right. And that's what you learned as
10 president of Bankest and even before, right?
11        MR. THOMAS: Objection.
12        THE WITNESS: I was never president of
13 Bankest.
14        THE COURT: Sustained.
15 BY MR. COLE:
16   Q.   I'm sorry, president of Espirito Santo and
17 before, right?
18   A.   Yes.
19   Q.   Sorry about that. It's close --
20   A.   But very different.
21   Q.   Now, with your knowledge of testing internal
22 control, when an auditor comes in and tests internal
23 control, did they rely on information that's provided by
24 the people who are in management?
25   A.   What is your question? I'm sorry.

Page 55

1    Q.   When an auditor comes in and tests internal
2  control in your experience, management provides the
3  auditor with information, right?
4    A.   Management provides the auditor with
5  whatever information the auditor requires or requests.
6    Q.   Well, in your experience, that information
7  includes information about internal control, right?
8    A.   It could.
9    Q.   Now, when you were the vice chairman of E.S.
10 Bankest, is it fair to say that the people you
11 understood who the people were, were providing BDO
12 Seidman with information during its audit?
13   A.   Again, I didn't catch what your question
14 was.
15   Q.   You understood, sir, who the principal
16 people were who provided BDO Seidman with information
17 during its audit of E.S. Bankest, right?
18   A.   Those managing the day-to-day affairs of the
19 company.
20   Q.   You understood one of the people was
21 Dominick Parlapiano, right?
22   A.   Parlapiano.
23   Q.   And Mendez?
24   A.   Mendez.
25   Q.   Now, during the time --

Page 56

1    A.   The Orlanskys.
2    Q.   The Orlanskys. During the time period that
3  you were vice-chairman of E.S. Bankest, you as a member
4  of the board appointed those people to those positions;
5  isn't that right? You appointed Parlapiano and Mendez
6  to their positions, right?
7    A.   Yes.
8    Q.   And in appointing them to their positions,
9  sir, you understood from -- every year Mr. Parlapiano
10 and Mr. Mendez would be providing BDO with information,
11 right?
12   A.   Yes. It would be not only those two but
13 also the other -- the Orlansky brothers.
14   Q.   And as vice chairman you put them in this
15 position to give that information to BDO?
16   A.   Yes, we appointed them to run the company.
17   Q.   And as vice chairman of E.S. Bankest, you
18 didn't do anything to monitor what information
19 Parlapiano and Mendez were providing to BDO, right?
20   A.   No.
21   Q.   Now, you also understood, sir, that there
22 are limitations in the audit process, right?
23   A.   There are limitations?
24   Q.   In the audit process, that somebody with ten
25 years experience providing information or being involved

Page 57

1  in audits, you understood there were limitations in the
2  audit process, right?
3    A.   Well, sir, I'm not an auditor so I don't
4  know if there are limitations or not.
5    Q.   Now, you understand, sir, that an audit is
6  not designed -- because of the nature of fraud an audit
7  is not designed to guarantee that it would detect a
8  fraud, right?
9    A.   Yes. There is no guarantee, but in this
10 particular case, knowing what we know now that over 93
11 or 95 percent of the receivables were fake, were
12 nonexistent, if the proper testing had been done, then
13 they would have found it out.
14   Q.   You understand, sir, that auditors do not
15 assure that they find fraud, right?
16   A.   I already said that.
17   Q.   And you don't know the precise testing that
18 BDO was doing at the time, right?
19   A.   No, I don't.
20   Q.   You think maybe if you would have advised
21 BDO that there was a management problem in '01 and early
22 '02, that maybe BDO would defect the fraud then?
23        MR. THOMAS: Objection.
24        THE COURT: Sustained.
25 BY MR. COLE:

Page 58

1  Q. You said that if BDO did the right things
2  they would have detected the fraud, right?
3  A. Yes.
4  Q. Are you an auditor?
5  A. No, I'm not.
6  Q. And you had to have some knowledge as to
7  what the right things are; is that what you're saying?
8  A. I'm talking particularly and specifically
9  about testing.
10  Q. Now my question, sir --
11  A. Information test.
12  Q. My information, sir, is that auditors
13  compile information, right?
14  A. That auditors --
15  Q. Compile information, correct?
16  A. I don't know.
17  Q. Compile information as part of their audit,
18  management provides them information, right?
19  A. Management provides them with information
20  which they are then supposed to corroborate.
21  Q. Correct. Now, my question, sir, is you know
22  some of the way in which an audit works. My question
23  is -- and you didn't call BDO up and tell them there
24  were management problems in '01.
25      My question is, do you think maybe given

Page 59

1  your knowledge of the audit process and information
2  being provided, you think that maybe would have helped
3  them to detect the fraud?
4      MR. THOMAS: Objection.
5      THE COURT: Sustained.
6  BY MR. COLE:
7  Q. Do you think maybe if you did your job as
8  vice chairman of the board --
9      MR. THOMAS: Objection, Your Honor.
10     THE COURT: Sustained. Rephrase your
11  question.
12  BY MR. COLE:
13  Q. Well, sir, as vice chairman of the board,
14  you went to board meetings every month, right?
15  A. Yes, I did.
16  Q. And during those meetings, you evaluated
17  information; is that right?
18  A. Prior to the meetings, I evaluated -- I read
19  the packets of information that were given. And then I
20  attended the meetings.
21  Q. Now, and during that time period that you
22  were given this information, you evaluated the
23  information even before the meetings, right?
24  A. Yes.
25  Q. And you also had communication and meetings

Page 60

1  with the Orlanskys that were outside the board meetings,
2  right?
3  A. I had a few when a subject needed to be
4  discussed.
5  Q. What about the time period when the
6  relationship in late '01 and early '02 were starting to
7  deteriorate? Did you have meetings outside the board
8  meetings?
9  A. There were a couple, yes.
10  Q. And that -- those meetings discussed the
11  deterioration in the relationship, right?
12  A. Or they were to ask for further
13  clarification.
14  Q. There were no minutes of those meetings,
15  were there?
16  A. Some -- no formal minutes.
17  Q. So when BDO was conducting its audits in
18  early '02 it wouldn't have minutes about those meetings,
19  correct, because there were none, right?
20  A. Right.
21  Q. And you didn't tell BDO about the meetings
22  that you didn't have minutes about?
23  A. I already testified that I did not contact
24  BDO.
25  Q. And it was in these other meetings as well

Page 61

1  that the problems that were starting to occur in late
2  '01 and early '02 were being discussed, right?
3  A. Say that again.
4  Q. These meetings that were outside the board
5  meetings, it was in these meetings that problems with
6  the management of E.S. Bankest were being discussed,
7  correct?
8  A. Again, there were meetings to discuss
9  specific topics, but as far as the statements by BDO,
10  the audited statements, we had statements of '98, '99,
11  '00, '01, and they were all clear, unqualified, clean
12  opinions with no, absolutely no indication that the
13  portfolio of underlying receivables were not existent.
14  Q. Sir, in the meetings that were outside the
15  board meetings in early '01 and '02, the deterioration
16  of the relationship and the problems relating to the
17  accounts receivable were being discussed, correct?
18  A. The deterioration?
19  Q. Of the relationship and problems in
20  collecting accounts receivable were being discussed,
21  correct?
22  A. The problems in the accounts receivable,
23  those were not in the regular board meetings and they
24  are documented in the minutes.
25  Q. Sir, my question is --