# EXHIBIT T

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 04-17602-BKC-AJC

In Re:
E.S. BANKEST, L.C.,
              Debtor.
_____/

ORIGINAL

              Greenberg Traurig
              1221 Brickell Avenue
              22nd Floor
              Miami, Florida
              Friday, February 18, 2005
              9:40 a.m.

   2 0 0 4,  7 0 3 0  A N D  9 0 1 4 (C)
           E X A M I N A T I O N
                   O F
         L E W I S  B.  F R E E M A N

     Reported By: Cheryl L. Jenkins, RPR
                  and
              Robin Gonzalez, RPR

```
 1                    APPEARANCES:
 2
                 GREENBERG TRAURIG, by
 3               ADAM D. COLE, ESQUIRE,
                        and
 4             KAREN Y. BITAR, ESQUIRE
                        and
 5               JOHN HUTTON, ESQUIRE
               On behalf of BDO Seidman
 6
 7         RICE PUGATCH ROBINSON & SCHILLER, by
              KENNETH B. ROBINSON, ESQUIRE,
 8      On behalf of Soneet R. Kapila, Chapter 7 Trustee
 9
              GENOVESE JOBLOVE & BATTISTA, by
10               GREGORY GARNO, ESQUIRE,
                        and
11             PAUL BATTISTA, ESQUIRE
            On behalf of Lewis B. Freeman, Receiver
12
13               SULLIVAN & CROMWELL, by
                STEVEN W. THOMAS, ESQUIRE
14    Special counsel on behalf of Lewis Freeman, Receiver
15
                 ZUCKERMAN SPAEDER, by
16               MARILYN KOHN, Esquire
                        and
17               BILZEN, SUMBERG, by
                JAMES C. MOON, Esquire
18           On behalf of Gunster Yoakley
19
                     - - - - - - -
20
21
22
23
24
25
```

```
 1
                           I N D E X
 2
    Witness                      Direct   Cross   Redirect
 3
    Lewis Freeman
 4    By Mr. Cole                   3
 5                        E X H I B I T S
 6                                         Page
 7    No. 1 ............................... 5
      No. 2 ............................... 36
 8    No. 3 ............................... 61
 9
          Exhibits retained by Adam Cole, Esquire
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1  THEREUPON:
2              LEWIS FREEMAN,
3  after having been first duly sworn, was examined and
4  testified as follows:
5              DIRECT EXAMINATION
6  BY MR. COLE:
7       Q.   Good morning, Mr. Freeman.
8       A.   Good morning.
9       Q.   I'd like to start out today just asking you
10 a few additional questions from last time about your
11 background.
12           You have a company known as Lewis B.
13 Freeman & Partners, Inc., is that right?
14      A.   Yes, sir.
15      Q.   Lewis B. Freeman & Partners, Inc. is
16 involved in forensic accounting, is that right?
17      A.   Yes.
18      Q.   And it's also involved in securities fraud
19 investigation, is that right?
20      A.   I don't know.
21      Q.   Why don't we not keep it a secret and mark
22 this.
23      A.   Fine, that's great.
24      Q.   Exhibit 1 is a printout from this morning
25 from the internet of the Lewis B. Freeman & Partners

first week.  The 13th you said you asked for more documents.  Do you remember having any other meetings with Mr. Balestra during that first week?

A.  I'm trying to recall.  Once I was appointed the receiver on the 13th, you know, a lot of things went on.  I know I had conversations with Mr. Balestra, for example, Joy Manufacturer called, they were the largest customer.  I had to make business decisions if there was going to be any more receivables purchased, and I know I either met with Mr. Balestra, I don't know if I had counsel, I know I didn't at the meeting, and I asked him -- it might have been a phone call with counsel, I'm sorry, I go back on that, if we were going to lend any more money, and since the bank had security on everything, so it had said in the Court order, I wanted to make sure that if we weren't going to lend and the business went down, Joy, for example, that it was understood that I had to reach business decisions and use my business judgment in this extraordinary situation.

Mr. Balestra said that he didn't want -- he was not in favor of continuing the lending operations.  I made an independent decision at that point, and I called the people at Joy.  I introduced

1  myself, said that I was the Federal Court Receiver,
2  and I'd like to meet with them because they were a
3  substantial asset, approximately 50 percent, the
4  receivables that they had of E.S. Bankest.
5         The president, Mr. Barnhill was very happy
6  to meet, and he asked if I could wire money before
7  2 o'clock, after 2 o'clock, any time that day.  I
8  asked him for cash flows, I asked him for tax
9  returns, financial statements, invoices, and to meet
10 with us the next morning, Mr. Barnhill, his chief
11 financial officer, and I believe he's -- the other
12 co-shareholder and their attorney, Tom Lehman met
13 with us on the morning of the 14th.
14         In the meantime I tried to find as many
15 records as we could about Joy.  We found catalogues,
16 we found contracts, we found option agreements, and I
17 prepared to meet with them the next morning with my
18 counsel.
19     Q.  Okay.  We're getting a little far afield.
20 My question was really limited to what do you recall
21 speaking to Mr. Balestra about, and I appreciate your
22 answer.
23     A.  Well, my answer -- my question to
24 Mr. Balestra was, did you know that we have documents
25 here saying that we own a piece of Joy Manufacturer.

He said, no, never heard of it, that's against the factoring agreement. I asked, do you know that it's a very large credit, and after I came back from the meeting ---

Q.   The meeting with Joy?

A.   The meeting with Joy on the 14th, and in that meeting the principals of Joy said, no, we don't owe you $50 million. We owe you 5. No, we don't have any current financial statements, nor have we ever had any current financial statements. I said, well, how can it be that I had 50 -- it might even be up to $75 million on my books as receivables due from your company. Then they said, that's impossible, we only do $30 million a year.

   With that counsel and I left the room and I came to a very important point in the receivership, that in one phone call and one meeting, I was able to find out, according to these gentlemen, they only owed us $5 million and did $30 million a year in business, and my question to them was how could they be in business without financial statements, how could this be, and they said, well, there were option agreements and other information that, you know, E.S. Bankest was more of a partner and they were overfunding receivables. They had a right to buy the

Page 80

1  stock and hoped to take us public.
2           I asked him them who their lawyers were,
3  who had handled the work for E.S.B., and they said
4  they had used -- Gunster was the lawyer for E.S.B.,
5  but Gunster had also done work for Joy.
6       Q.   Did you advise all of this to Mr. Balestra
7  that day?
8       A.   I know I advised him on the huge
9  discrepancy in the receivables, that the people at
10 Joy thought that it couldn't be more than $5 million,
11 not the 50 to 75 million or 100 million that were on
12 the books.
13      Q.   Did you have an understanding as to whether
14 or not those receivables were owed to E.S. Bankest or
15 Bankest Capital?
16           MR. GARNO:  Objection to form.  At that
17 time?
18 BY MR. COLE:
19      Q.   At that time.
20      A.   They were on the BCC list.
21      Q.   As you sit here today, which entity do you
22 believe was the owner of those receivables?
23      A.   E.S.B.
24      Q.   When did you come to the conclusion that it
25 was E.S.B. instead of BCC?

Page 81

1  A. Well, many decisions with counsel, also
2  looking at Judge Huck's order and looking at the --
3  Judge Huck's order.
4  Q. Which order was that?
5  A. The initial one, I believe on the
6  monitoring, and several of the other documents.
7  Q. Okay.
8  A. There were no defenses, I remember in
9  Judge Huck's order, that those receivables belonged
10 to E.S.B.
11    MR. GARNO: Can you read back the
12 question?
13    (Thereupon, the last two questions were
14    read back by the court reporter.)
15    MR. GARNO: You asked the question when,
16 correct?
17    MR. COLE: Right, yes.
18    MR. GARNO: Okay.
19    THE WITNESS: Over the period of my
20 investigation.
21 BY MR. COLE:
22 Q. Do you have a recollection as to when
23 you changed your understanding over that period of
24 time?
25    MR. GARNO: Objection to form. I think we

1  covered that on Wednesday.

2          MR. COLE:  If we did, then I'd just like
3  an answer again.  I just want that answer and
4  I'll move on to something else, if he does
5  remember.

6          THE WITNESS:  Repeat it, please.
7  BY MR. COLE:

8     Q.   Do you remember the date or the
9  approximate date on which you came to the
10 conclusion that those receivables, the Joy
11 receivables were not BCC receivables but were,
12 in fact, owned by E.S.B.?

13    A.   In the very beginning I thought that
14 BCC and E.S.B. were intertwined.  I later found
15 out, through the way the books and records and
16 the businesses were separated, that they
17 weren't intertwined and that, in fact, the
18 receivables belonged to BCC but were pledged to
19 E.S.B.

20    Q.   Okay. So, it was around the time that
21 you determined that they were, in fact, not
22 intertwined?

23    A.   Correct.

24    Q.   Now, you said you advised Mr. Balestra on
25 the huge discrepancy in the Joy receivables.  Was