*Wood v. Shell Oil Co.*, 495 So. 2d 1034 (Ala. 1986), is also persuasive. The court upheld summary judgment for Shell finding there was not a scintilla of evidence that Shell was the principal of one of its dealers. Despite Shell's extensive restrictions on the dealer's performance, including the right to terminate the dealer, the court found there was no evidence of an actual agency relationship.[3]

By contrast, *Teachers' Retirement System v. A.C.L.N., Ltd.*, 2003 WL 21058090 (S.D.N.Y. 2003), and *In re Parmalat Secs. Litig.*, 375 F. Supp. 2d 278, 294 (S.D.N.Y. 2005), cited by Appellants, are of no persuasive value. In both cases, the court ruled on agency theory claims against international accounting organizations at the pleadings stage on motions to dismiss when the allegations in the complaints were deemed to be true. Moreover, in both cases, the audit reports at issue were signed using the international entities' name. *A.C.L.N.*, 2003 WL 21058090, at *2; *Parmalat*, 375 F. Supp. 2d at 293. BDO International's name was not used in connection with the Bankest audit opinions.

Moreover, *Parmalat* and *A.C.L.N.* represent the decided minority view as numerous other courts have held that an agency relationship did not exist in cases involving the coordinating entity for an international network of accounting firms.

---

[3]    Shell dictated all permitted uses of its logo and name, required the dealer to seek approvals for alterations, required the dealer to follow Shell's "Appearance Guide," and permitted Shell to inspect the dealer's books and records. *Wood*, 495 So. 2d at 1037.

*See Parmalat*, 375 F. Supp. 2d at 294 n.97 (collecting five cases); *In re Lernout &
Hauspie Secs. Litig.*, 230 F. Supp. 2d 152 (D. Mass. 2002).   In *Lernout*, the
Belgian, U.S. and U.K. KPMG accounting firms provided the auditing services at
issue, but the plaintiffs named KPMG International, a Swiss Verein, as a
defendant. *Id.* at 157.   As with BDO International, KPMG International did not
provide any auditing services and it was legally distinct from the KPMG firms.
The plaintiffs argued that an agency relationship existed based on website
statements and annual reports from KPMG International, including statements
regarding "global services and strategies," shared software and shared audit
methodology.  *Id.* at 171-72.   The court dismissed the claim against KPMG
International, finding that the allegations did not support the assertion that KPMG
Belgium acted as an agent of KPMG International.  *See also In re Royal
Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509, 570-72 (D.N.J. 2005)
(granting PricewaterhouseCoopers International and KPMG International's
motions to dismiss for failure to state a claim and noting that "[i]t is well
recognized that **'member firms in an international accounting association are
not part of a single firm and are neither agents nor partners of other member
firms simply by virtue of using the same brand name.'**") (quoting *In re Royal
Ahold N.V. Secs. & ERISA Litig.*, 351 F. Supp. 2d 334, 385 (D. Md. 2004)

19

(emphasis added)). This Court should adopt the reasoning of these decisions, which are factually analogous and legally persuasive.

Appellants predicate their control argument on the following purported evidence and theories: (1) BDO International's Articles of Association supposedly reflect that it controls its member firms; (2) BDO International allegedly controls how its many member firms across the world perform their audits; (3) BDO International controls the use of the BDO name and logo; (4) BDO International supposedly controls the hiring of each professional by member firms; and (5) BDO International retains the right to terminate any member firm.   All of these arguments fail because they are either contrary to the evidence presented at trial or they do not rise singly or collectively to the "very significant" day-to-day operational control that is the *sine qua non* of an agency relationship.

### 1.   The Contractual Guidelines on the Use of the BDO Name Do Not Demonstrate Control

Appellants' argument that BDO International is transformed into the principal of all of its worldwide member firms by virtue of its publication of guidelines for the permitted uses of the BDO name and intellectual property runs counter to established case law and to the reality of licensing. Just as any other licensor of a trade name or trademark, BDO International places restrictions on and establishes guidelines for the use of the BDO name and logo.   Courts have long

held that such common licensing restrictions do not evidence a right to control the day-to-day operations of the licensee.

Courts across a variety of jurisdictions have consistently held that by imposing guidelines on the display of a logo, a licensor does not become the licensee's principal for agency purposes. *See Brooks v. Re/Max International*, 865 N.E.2d 252, 258 (Ill. Ct. App. 2007)(granting summary judgment on agency issue and stating "mere protection of a trade name does not create an agency relationship."); *Emery v. Visa Int'l Ass'n*, 95 Cal. App. 4th 952, 961 (Cal. Ct. App. 2002); *cf. Dinaco v. Time Warner, Inc.*, 346 F.3d 64 (2d Cir. 2003); *Bangkok Crafts v. Capitolo di San Pietro in Vaticano*, 2004 U.S. Dist. LEXIS 25235, at *19-20 (S.D.N.Y. 2004)(collecting cases). The *Emery* court emphatically stated: "[T]he law is clear and dispositive. A trademark owner's grant of permission to another to use the owner's mark, combined with efforts to 'police' such use, do not make the user the agent or intermediary of the owner." *Emery*, 95 Cal. App. 4th at 961. (citation omitted).   Indeed, one court explained why supervision of licensees does not equate to control sufficient to create an agency relationship:

> The Lanham Act requires supervision of trademark licensees at the expense of abandonment of the trademark. The licensor must control the operations of its licensees to ensure that the trademark is not used to deceive the public as to the quality of the goods or services bearing the name. The purpose of the Lanham Act, however, is to ensure the integrity of registered trademarks, not to create a federal law of

21

agency. Furthermore, the scope of the duty of supervision associated with a registered trademark is commensurate with this narrow purpose. The duty does not give a licensor control over the day-to-day operations of a licensee beyond that necessary to ensure uniform quality of the product or service in question. It does not automatically saddle the licensor with the responsibilities under state law of a principal for his agent.

*Oberlin v. Marlin American Corp.*, 596 F.2d 1322, 1327 (7th Cir. 1979)(citations omitted).

The United States Olympic organization provides an apt example of the deleterious effect on licensors if Appellants' argument were adopted. To raise necessary funds for the Olympic competitions, the United States Olympic Committee ("USOC") licenses the Olympic logo to numerous businesses and dictates how the logo may be displayed. *See, e.g., United States Olympic Comm. v. Intelicense Corp.*, 737 F.2d 263, 265 (2d Cir. 1984). Suppose the USOC licenses the logo to a licensee, and the licensee's truck driver runs over a pedestrian. Is the USOC the licensee's principal such that it is subject to vicarious liability? Of course not.

Similarly, BDO International did not become BDO Seidman's principal by publishing guidelines concerning the proper use of the BDO name.

22

### 2.  BDO International's Audit Manuals Did Not Apply to the Bankest Audits

Appellants erroneously claim that BDO International promulgated international audit manuals that governed how BDO Seidman was to perform the Bankest audits. (Appellants' Initial Brief at 16-18). However, once again, Appellants cite to non-existent evidence to support their theories despite clear and unambiguous evidence to the contrary. Even if the manuals provide a form of limited control, the evidence clearly established that those manuals did not apply to the Bankest audits.

Unquestionably BDO International publishes audit manuals and expects its member firms to follow those standards, but only when performing two types of services: Transnational Audits or Inward Referred Work. The audits of Bankest's financial statements were neither Transnational Audits nor Inward Referred Work. RCLVII-54/A7-128. And, the MFA provides that if local law or regulations differ from the manuals, the member firm must follow the local procedure. (Trial Exh. 1487). Thus, BDO Seidman was not required to follow BDO International's audit manuals when auditing Bankest's financial statements or when performing any of its thousands of other audits that were not Transnational Audits or Inward Referred Work. Indeed, the fact that BDO International did not exercise day-to-day

23

operational control over BDO Seidman is borne out by the limited application of the international audit manuals to specified and limited services.

Accordingly, BDO International did not and could not exercise the pervasive control of BDO Seidman's day-to-day operations through its publication of inapplicable audit manuals.

### 3.   BDO International Does Not Play Any Role in BDO Seidman's Employment Decisions

Appellants argue that the MFA grants BDO International the right to "control" who BDO Seidman hires. (Appellants' Initial Brief at 21-22). Apart from the sheer impossibility of a ten person organization based far away from many of its 90+ member firms being able to "control" the hiring process, the MFA does not grant BDO International the right to control the hiring process of its member firms.

Appellants point to a purely hortatory provision that does not evidence "very significant" day-to-day control. The MFA only provides that member firms must hire "suitably qualified" professionals.  Trial Exh. 1487 at §6.3/A11-169. "Suitably qualified" is not defined in the MFA.  *Id.* More importantly, the MFA does not grant BDO International the right to take any action if it discovers a firm has hired a professional who is not suitably qualified.

24

### 4.   BDO International's Conditional Right to Terminate a Member Firm Does Not Demonstrate Control

Appellants' argument that BDO International's limited right to terminate member firms in the network constitutes evidence of control (Appellants' Initial Brief at 23-24) is belied by case law holding that a termination right does not evidence control.   The right to terminate an agreement, in and of itself, is insufficient to establish the control that is necessary to create an agency relationship.   *See York Div., Borg-Warner Corp. v. United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Indus.*, 473 F. Supp. 896 (S.D. Fla. 1979) (holding that no agency relationship existed between the national union and the local union despite the fact that the national union could revoke the local union's charter for cause) (citing *F.A. Villalba & Co. v. United Ass'n of Journeyman and Apprentices of the Plumbing and Pipefitting Indus., AFL-CIO*, 413 F. Supp. 94 (W.D. Tex. 1976) (same)); *Alberter v. McDonald's Corp.*, 70 F. Supp. 2d 1138, 1145 (D. Nev. 1999)(right to terminate franchisee was not dispositive of control element).

Contrary to Appellants' *argument*, Mr. van Elten did not testify that BDO International has the "unqualified" right to terminate BDO Seidman or any member firm. In fact, Mr. van Elten testified termination could occur only "under certain circumstances" as provided in the MFA. RCLVII-66-67/A7-140-41.

25

Again, BDO International's right to terminate the agreement is a common element of licensing agreements and does not evidence the significant control necessary to create a principal-agent relationship.

### 5.    There is No Evidence that BDO International Could or Did "Manage and Control" BDO Seidman

Appellants dwell at length on the term "manage and control" in BDO International's Articles of Association (Appellants' Initial Brief at 16), but that phrase is merely aspirational.  The Articles clearly provide that one of BDO International's primary purposes is to act as a licensor of the BDO logo. Trial Exh. 5001/A12-200. The Articles also provide that one of BDO International's *objects* is "to participate in and to cooperate with other companies, partnerships and other entities which form part of the international association of accountants, auditors, tax-advisors and business advisors, as well as to manage and control such companies, partnerships and other entities." *Id.*

The Articles do not state that BDO International "manages and controls" BDO Seidman.  Clearly, the objects found in the Articles are aspirational in nature and do not demonstrate any indicia of control. The term "object" means an aim or a goal, it does not mean that the goal is or can be achieved. *See American Heritage Dict.* (4th ed. 2004).  Accordingly, the phrase found in BDO International's

Articles does not provide BDO International with the right to control BDO Seidman's day-to-day operations.

### 6.    The Trial Court Properly Ruled on the Agency Issue, Which Was a Question of Law

Appellants assume that the agency determination must be decided by the jury. When the decision involves interpretation of a writing, however, the court may determine the insufficiency of the evidence as a matter of law. *See Villazon v. Prudential Health CarePlan, Inc.*, 843 So. 2d 842, 853 (Fla. 2003) (recognizing that agency relationship predicated on a single contract may pose question of law); *see also Samra v. Shaheen Bus. & Inv. Group*, 355 F. Supp. 2d 483, 502 (D.D.C. 2005) (applying Florida law). Although not deciding the question, the Florida Supreme Court remarked in *Villazon* that in the agency analysis "evaluation of a single contract may be a question of law to be determined by the court. . . ." 843 So. 2d at 853.

Indeed, courts have not hesitated to affirm directed verdicts or summary judgments on the agency question. *See Metropolitan Dade County*, 732 So. 2d at 1125 (reversing denial of directed verdict because plaintiffs did not demonstrate control); *Dalia v. Electronic Realty Assocs.*, 629 So. 2d 1075, 1076 (Fla. 3d DCA 1994); *Keys Jeep Eagle v. Chrysler Corp.*, 897 F. Supp. 1437, 1442-43 (S.D. Fla. 1995); *Madio Group v. Shores*, 897 F. Supp. 1408, 1411 (M.D. Fla. 1995). Here,

27

although Appellants cite Mr. van Elten's trial testimony, all of his testimony related to the MFA, the Articles of Association or reading the International Audit Manuals. Thus, the trial court could properly construe those clear and unambiguous writings in directing a verdict in BDO International's favor.

In sum, this case does not involve a mere difference of interpretation of evidence, it involves the total absence of evidence sufficient to allow any jury to determine that tiny BDO International controls the day-to-day operations of BDO Seidman. Appellants' mere repetition of the word control does not justify reversal.

## C.   The Jurisdictional Order is Not Dispositive of the Agency Issue

Although not featured in a point heading, Appellants argue that the Jurisdictional Order and this Court's *per curiam* affirmance without opinion somehow moot the directed verdict. (Appellants' Initial Brief at 3, 6, 11). This argument fails for several reasons. First, the Jurisdictional Order simply does not include any finding of actual agency. Rather, the Jurisdictional Order determined that BDO International could, for minimum contacts purposes, expect to be subject to jurisdiction in Florida. Second, to the extent that the Jurisdictional Order bears some obtuse relationship to the question of actual agency, it is not decisive of the issue of vicarious liability.

1. **The Extensive Litigation Subsequent to the Jurisdictional Order Illustrates the Lack of Merit in Appellants' Argument**

If Appellants' argument were credited, all litigation about the agency issue would have ceased after the Jurisdictional Order was entered or after it was affirmed *per curiam*. However, the parties actively litigated the agency issue through the issuance of the Directed Verdict. Indeed, the trial court recognized that the agency issue remained undecided when it denied BDO International's Motion for Judgment on the Pleadings by restricting Appellants' claim against BDO International "to a *theory* of actual agency." RXIX-3561 (emphasis added).

2. **Because the Jurisdictional Order is Non-Final and Based on a Limited Record, It Does Not Constitute a Final Determination on the Merits**

The non-final Jurisdictional Order is based on a limited record. As a matter of law, it is patently insufficient to decide the ultimate issue of liability. No case supports the far-fetched notion that a finding that a party is subject to jurisdiction is decisive of liability.

By way of analogy, courts routinely refuse to accord preclusive effect to findings of fact rendered at preliminary injunction hearings. This is because those hearings are non-final, based on limited records and do not afford the parties an opportunity to prove their case-in-full. *See, e.g., Ladner v. Plaza Del Prado Condominium Ass'n*, 423 So. 2d 927, 929 (Fla. 3d DCA 1982); *Klak v. Eagles'*

29

*Reserve Homeowners' Ass'n*, 862 So. 2d 947, 952 (Fla. 2d DCA 2004) (observing that law of the case doctrine does not confer preclusive effect upon determinations "based on a less-than-full hearing"). This is true even when the tentative determination of a trial court has been the subject of interlocutory appellate review. *See Klak*, 862 So. 2d at 952.

The personal jurisdiction hearing conducted in this matter was interlocutory and was based on a limited evidentiary record. Such decisions are not intended to resolve ultimate questions of liability. *See Alvarado v. Cisneros*, 919 So. 2d 585, 587 (Fla. 3d DCA 2006) (personal jurisdiction was interlocutory issue); *Theo. Hirsch Co. v. Scott*, 100 So. 157, 158 (Fla. 1924) (interlocutory orders do not "finally determine or complete the suit"); *Wendt v. Horowitz*, 822 So. 2d 1252, 1258-59 (Fla. 2002) (observing that evidentiary hearing on personal jurisdiction is "limited" and thus distinct from "full-blown trial" on liability); *XL Vision, LLC v. Holloway,* 856 So. 2d 1063, 1066 (Fla. 5th DCA 2003) (stating that when personal jurisdiction facts are in dispute, trial court holds "limited" evidentiary hearing). In a similar vein, when faced with jurisdiction that is predicated on a tort allegedly having been committed in Florida, the court does not decide the ultimate issue of liability. *See Machtinger v. Inertial Airline Servs.*, 937 So. 2d 730, 734 (Fla. 3d DCA 2006).

30

Finally, Appellants erroneously argue that this Court somehow determined the agency issue when it affirmed the Jurisdictional Order *per curiam* without written opinion. (Appellants' Initial Brief at 7, 11). But, a *per curiam* affirmance without written opinion affirms only the result, *i.e.*, that BDO International was subject to jurisdiction.

Appellants would have this Court rule that the case was essentially over as to BDO International once the Jurisdictional Order was affirmed, a position that is belied by the trial court's subsequent rulings, by the parties' litigation of the issue, by the non-final nature of the Jurisdictional Order and by the total absence of case law supporting Appellants' argument.

**D.   The Trial Court Properly Granted the Directed Verdict as there Was No Credibility Issue for a Jury to Resolve**

Appellants argue that Mr. van Elten's credibility was placed at issue and, therefore, a directed verdict should not have been entered. (Appellants' Initial Brief at 24-27). Mr. van Elten testified consistently and his credibility was not placed at issue. Moreover, Appellants waived this issue by failing to preserve it for appeal.

The testimony cited by Appellants illustrates that Mr. van Elten's credibility was never questioned. By way of example, Mr. van Elten was asked if one of BDO International's objects was to "manage and control" BDO Seidman. Mr. van Elten admitted that BDO International's Articles contained that phrase but he

31

testified that he personally believed BDO International did not and could not control BDO Seidman. Thus, Mr. van Elten did not contradict the document about which he was questioned, rather, he offered his opinion that the aspirational object in the Articles had not and could not be met.

Moreover, Appellants failed to argue that Mr. van Elten's credibility was at issue in either their Response to the motion for directed verdict or during the brief argument on that motion. RCXXIV-24482-96; RCLX-33-36. (P.M.). As such, Appellants failed to preserve this argument for appeal.

Accordingly, the trial court did not err by entering the directed Verdict in BDO International's favor.

## CONCLUSION

Based upon the foregoing reasons and authorities, the judgment in favor of

BDO International should be affirmed.

Respectfully submitted,

BROAD AND CASSEL
Attorneys for Appellees
One Biscayne Tower, 21st Floor
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone:  305.373.9400
Facsimile:  305.373.9443


By:_____
    Rhett Traband, P.A.
    Florida Bar No. 0028894
    Mark F. Raymond, P.A.
    Florida Bar No. 373397

SHEPPARD, MULLIN, RICHTER
& HAMPTON LLP
Kevin W. Goering
30 Rockefeller Plaza, 24th Floor
New York, NY  10112
Tel: 212.332.3800
Fax: 212.332.3888
Of Counsel

33

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 5th, 2007 a true and correct copy of the foregoing has been forwarded to all persons on the attached Service List in the manner so indicated.

_____
RHETT TRABAND

### APPEAL SERVICE LIST

**(Banco Espirito Santo International, Ltd., et al. v BDO International, B.V.)**

Mitchell W. Berger, Esq.
BERGER SINGERMAN, P.A.
200 S. Biscayne Boulevard, Suite 1000
Miami, FL 33131
Tel: (305) 755-9500
Fax: (305) 714-4340
**Counsel for Appellants
(via fax and U.S. Mail)**

Manuel A. Garcia-Linares, Esq.
RICHMAN GREER WEIL BRUMBAUGH
201 S. Biscayne Boulevard, Suite 1000
Miami, FL 33131
Tel: (305) 373-4000
Fax: (305) 373-4099
**Counsel for Victor Balestra, Bernard
Mollet, Joaquin Garnecho and Pierre
Trezzini (via fax and U.S. Mail)**

Mark P. Schnapp, Esq.
GREENBERG TRAURIG, P.A.
1221 Brickell Avenue
Miami, FL 33131
Tel: (305) 579-0500
Fax: (305) 579-0717
**Counsel for BDO Seidman, LLP
(via fax and U.S. Mail)**

Ira N. Loewy, Esq.
BIERMAN SHOHAT LOEWY, et al.
800 Brickell Avenue
Penthouse 2
Miami, FL 33131
Tel: (305) 358-7000
Fax: (305) 358-4010
**Counsel for Eduardo Orlansky and
Hector Orlansky (via U.S. Mail)**

Adam D. Cole, Esq.
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 801-9200
Fax: (212) 801-6400
**Counsel for BDO Seidman, LLP
(via fax and U.S. Mail)**

Manuel F. Fente, Esq.
LAW OFFICES OF MANUEL FENTE, P.A.
1110 Brickell Avenue, 7th Floor
Miami, FL 33131
Tel: (305) 372-1350
Fax: (305) 423-3212
**Counsel for Otto Ambrosiani
(via U.S. Mail)**

34

Michel O. Weisz, Esq.
SEGREDO & WEISZ
9350 S. Dixie Highway, Suite 1500
Miami, FL 33156
Tel: (305) 670-3820
Fax: (305) 670-8230
**Counsel for Ariadna Puerto
(via U.S. Mail)**

Hector J. Lombana, Esq.
GAMBA & LOMBANA, P.A.
2701 Ponce de Leon Boulevard
Mezzanine
Coral Gables, FL 33134
Tel: (305) 448-4010
Fax: (305) 448-4010
**Co- Counsel for Bernard Mollet
(via fax and U.S. Mail)**

Gonzalo R. Dorta, Esq.
GONZOLA R. DORTA, P.A.
334 Minorca Ave.
Coral Gables, FL 33134
Tel: (305) 441-2299 Fax: (305) 441-8849
**Co-Counsel for Appellants
(via fax and U.S. Mail)**

Harley E. Riedel II, Esq.
STICHTER RIEDEL BLAIN & PROSSER,
110 E. Madison Street, Suite 200
Tampa, FL 33602
Tel: (813) 229-0144Fax: (813) 229-1811
**Counsel for Non-Party Espirito Santo Bank
of Florida
(via fax and U.S. Mail)**

Carlos E. Mendez
1122 Sevilla Avenue
Coral Gables, FL 33134
Tel: (305) 903-1560
**Pro Se
(via U.S. Mail)**

Geoffrey B. Marks, Esq.
BILLBROUGH & MARKS, P.A.
100 Almeria Avenue, Suite 320
Coral Gables, FL 33134
Tel: (305) 442-2701
Fax: (305) 442-2801
**Counsel for Appellants
(via fax and U.S. Mail)**

Steven W. Thomas, Esq.
Emily S. Alexander, Esq.
THOMAS, ALEXANDER & FORRESTER
LLP
14 27th Avenue
Los Angeles, CA  90291
Tel: (310) 961-2536
Fax: (310) 562-6852
**Counsel for Appellants
(via fax and U.S. Mail)**

Arturo Alvarez, Esq.
ALVAREZ, ARMAS & BORRON
901 Ponce de Leon Boulevard, Suite 304
Coral Gables, FL  33134
Tel: (305) 461-5100 Fax: (305) 461-8642
**Co-Counsel for BDO Seidman, LLP
(via fax and U.S. Mail)**

Lance A Harke, Esq.
David J. Maher, Esq.
HARKE & CLASBY LLP
155 S. Miami Ave., Suite 600
Miami, FL 33130
Tel: (305) 536-8220 Fax: (305) 536-8229
**Co-counsel for BDO Seidman, LLP
(via fax and U.S. Mail)**

Dominick C. Parlapiano
8201 SW 165th Terrace
Palmetto Bay, FL  33157
**Pro Se
(via U.S. Mail)**

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this Brief is prepared in Times New Roman 14

point font, and is in compliance with Rule 9.210, Fla.R.App.P.

_____
RHETT TRABAND

MIA1\COMMLIT\377264.12
34090/0001

36

# 07-599 – 2-5-08

# Banco Espirito Santo Int'l

# vs.

# BDO International, B.V.

# Third District
# ORAL ARGUMENT
# Court of Appeal CD Copy

# (A copy of the CD has been delivered to the Court, but not filed with the Court's CM/ECF system.  In addition a copy of the CD has been provided to all parties identified on the service list.)



EXHIBIT

K



## DECLARATION OF RAMON RIVERA

I, Ramon Rivera, do hereby declare as follows:

1.       I am a former employee of BDO Seidman, LLP ("BDO"). I make this declaration in connection with the action styled *Banco Espirito Santo International, Ltd. et al. v. BDO Seidman, LLP et al.*, Case No. 04-11128, filed on May 18, 2004 in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, and such other actions as have been or may be filed in connection with the dissolution and receivership of E.S. Bankest L.C. ("Bankest"). Except where otherwise indicated, I have personal knowledge of the facts set forth herein and could and would, if necessary, testify competently thereto.

### My Employment With BDO

2.       I was hired by BDO in January 1998 as a "Senior," a position that is more senior than an "Associate," but less senior than a "Manager." Prior to my employment with BDO, I had worked for five years as an accountant for Arthur Andersen in Puerto Rico. At the time I was hired, I was told by BDO partners that one of the reasons that I was hired by BDO was that I speak Spanish fluently and was able to communicate effectively with Spanish-speaking clients located in South Florida.

3.       During my first year with BDO, I worked on numerous audits. I believe these included audits of electronics, manufacturing, real estate and service companies. They did not include any audits of factoring or finance companies.

BDO Defendant's Exhibit 3753
January 16, 2007
Case No. 04-14009 CA 31
Harvey Rubin Clerks of Courts

BESIL05191



EXHIBIT
L

4.      In July 1998, I was promoted to "Manager." The promotion came with a salary increase as well as increased responsibility. Among the new responsibilities was increased contact with and management of clients.

## My Introduction to Bankest and Preparation for the Initial Audit

5.      In October or November of 1998, I was assigned to work on the audit of the 1998 year-end financial statements of Bankest (the "Initial Audit"). Consistent with BDO practice, Sandy Lenner, the Engagement Partner in charge of Bankest, advised me that I would be the Manager on the Initial Audit. He said that although Bankest was a new client, BDO had done work for a related company in prior years. Later, I learned that the name of the previous BDO client was Bankest Receivables Factoring & Finance Corporation ("BRFFC"), and that BRFFC was owned by the principals of Bankest Capital Corporation ("Capital"), a 50% owner of Bankest.

6.      Shortly after learning from Sandy that I would be working on the Initial Audit, and again consistent with BDO's practice, I assisted in the preparation of a package of new client materials to be sent to a client acceptance committee at BDO for approval to proceed with the audit. The package included a form detailing certain information about the new client such as who its owners and what its gross revenues were, budget estimates, and a recommendation of the estimated fee amount. When I finished this "new client" package, I delivered it to Sandy who, on information and belief and in accordance with BDO's practice, forwarded it to the BDO client acceptance committee for approval.

2

BESIL05192

7.      Following or shortly before receiving the required approval, Sandy introduced me to Dominick Parlapiano and Carlos Mendez so we could get acquainted and discuss the Initial Audit. We met at Morton's Steakhouse on Brickell Avenue in Miami, Florida, and discussed, in general terms, the background of Bankest, its relationship to Capital, and what information might be necessary for the conduct of the Initial Audit.

8.      Following this initial meeting, I had a number of conversations with Mr. Mendez and Mr. Parlapiano. Although I do not presently recall all of the specifics of these conversations, which were numerous and took place over the course of several weeks during the planning stages, I recall that we discussed information that BDO would need to audit Bankest's financial statements including Capital's factoring relationship with Bankest, Bankest's relationship to Espirito Santo Bank, its other 50% owner, Bankest's list of factored companies including Joy Athletic ("Joy") and CD Jewelbox, Bankest's placement of notes with investors affiliated with or who were clients of Espirito Santo Bank, and timing of the issuance of the financial statements. Later, during fieldwork, I discussed many of these same issues with Otto Ambrosioni, Adriana Puerto, Hector Orlansky and Eduardo Orlansky, as well as members of Bankest's collections department.

9.      In addition to these conversations, I also reviewed BDO's previous audits of BRFPC and the workpapers underlying these audits.

3

BESIL05193

## BDO's Conduct of the Initial Audit and Work Stoppage

10.    In conducting the Initial Audit, I visited Bankest's offices regularly.  My involvement in the field was, for a Manager, more than is typical because the Senior on the audit had been pulled off to work on other audits.  Also, since Mr. Mendez, the Orlanskys, Mr. Ambrosiani and several other members of Bankest's management were Spanish-speaking, my presence facilitated the audit process.

11.    In or about January 1999, the audit team began to encounter problems with Bankest's provision of information, causing delays in the audit process and threatening the timely completion of the audit.  Although I (or other employees of BDO) had sent several lists of documentation that BDO required for the conduct of its audit, Bankest repeatedly failed to provide the requested information.  As is customary, these lists were general at first and then, as the audit progressed, more specific.  The information requested included trial balances, details regarding the receivables owed to Bankest, backup documentation for payments made by Capital to Bankest (since Bankest was factoring receivables initially factored by Capital), and other documentation relating to the relationship between Capital and Bankest in Capital's possession.

12.    Although I felt responsible to complete the audit, at some point I determined that Bankest's management's failure to provide information made it impossible for BDO to move forward in accordance with generally accepted auditing standards.  When I asked Mr. Mendez why we were not getting the information we required, he told me that I should speak to Mr. Parlapiano who was, in addition to his

4

BESIL05194

management role with Bankest and as I was told, a member of Capital's management team.

13.     Accordingly, on a Friday afternoon in or about mid to late February 1999 and at approximately 5:00 p.m., I discussed with Mr. Parlapiano Bankest's failure to produce certain information, namely documents sufficient to justify receivables purportedly owed to Bankest. Although we had received information sufficient to track transactions between Bankest and Capital, I insisted that BDO must be able to review documents sufficient to verify the debts owed to Bankest by Capital's factoring clients, such as Joy and CD Jewelbox. These documents included or may have included invoices to or checks from certain significant customers of the factoring clients such as WalMart and KMart.

14.     After several minutes of conversation, Mr. Parlapiano refused to provide the requested documentation. He informed me that this information and documentation was Capital's, and not Bankest's, and suggested that I still did not understand the nature of the business or the relationship between Bankest and Capital. He reminded me that BDO was not auditing Capital and that Capital records therefore would not be subject to BDO's audit process.

15.     Although I felt uncomfortable, as an employee and not a partner of BDO, in risking the client relationship, I informed Mr. Parlapiano that I believed I understood Bankest's business and that the requested records were necessary for the conduct of the audit of Bankest. I told Mr. Parlapiano that the requested documents were

5

BESIL05195

necessary in order to conduct the audits in accordance with generally accepted auditing standards.

16.    Mr. Parlapiano still refused to produce the necessary records. In all of my years of experience as an auditor, I had never encountered a client that refused to provide patently relevant information. Accordingly, when Mr. Parlapiano declined to provide Capital's records, I instructed my staff to discontinue work on the audit, not to report to Bankest the following work day, and to stop incurring time on the Bankest audit until further notice.

**BDO's Reaction to the Work Stoppage**

17.    Immediately after my conversation with Mr. Parlapiano, I called BDO's Miami offices. I discussed the details of my conversation with Keith Ellenberg, the Concurring Review Partner on the audit, since Sandy was not in the office that afternoon. Mr. Ellenberg agreed that BDO could not continue without the information requested from Bankest, namely the Capital records, and further agreed that it was appropriate to stop the audit. Accordingly, and counter to customary practice, BDO did not work on the Initial Audit over the weekend.

18.    On Monday, I met with Sandy Lenner and Keith Ellenberg to discuss further the conduct of the Initial Audit and Mr. Parlapiano's refusal to permit BDO to access Capital's records. To clarify these matters, and in attempt to preserve the client relationship, we together contacted Mr. Parlapiano by telephone. Sandy was the principal speaker for BDO.

6

BESIL05196

19.    Initially, Sandy told Mr. Parlapiano that, because of my English language limitations, I had failed to understand the scope of the audit and what documents were at issue. Mr. Parlapiano stated that I in fact did understand what documents and records were at issue, that we had discussed the matter in both English and in Spanish, and that BDO would not get access to Capital's records. Mr. Parlapiano spoke in an aggressive and loud manner.

20.    Sandy informed Mr. Parlapiano that this was a very unusual circumstance and that BDO would not be able to continue the audit without access to the records. He informed Mr. Parlapiano that resignation was a formal process, and described the procedures that BDO would have to undergo in order to discontinue the audit. These procedures included the issuance of a resignation letter.

21.    Mr. Parlapiano responded that if BDO needed to resign, it should resign; Bankest would find another auditor. The conversation ended.

22.    Although Sandy seemed shocked by the call with Mr. Parlapiano, I was relieved not to have to continue the audit because I had never encountered a client that refused an auditor's reasonable request for information. That afternoon, I resumed work on other audits.

**Mr. Parlapiano Visits BDO**

23.    One or two days following our Monday call with Mr. Parlapiano, Mr. Parlapiano showed up at BDO's offices. Although we did not have an appointment or other business, I happened to see him in the lobby of the office where he informed me

7

BESIL05197

that he came to have a meeting with Sandy. I was not invited to this meeting and, accordingly, I did not participate in it.

24.     Following the meeting, Sandy came to my office and informed me that BDO would be continuing the audit. He told me that because I had not been in Miami for long, I did not understand that Mr. Parlapiano was an important person in the community. He said that he had known Mr. Parlapiano for many years and that they had developed a good professional relationship. He also noted that as a Manager, I should be looking for ways to bring in new business, and suggested that working for Bankest could lead to other work, through Mr. Parlapiano, the Orlanskys and affiliates of Bankest. He said that as time went on, I would better understand the management of client relationships.

25.     Because BDO's practice was that a Manager acted at the direction of the Engagement Partner, I proceeded to complete the audit according to Sandy's instruction.

I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct.

Executed this ⅃ day of June 2004 at Buenos Aires, Argentina.

_____
/Ramon Rivera

8

BESIL05198

Page 3321

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


-----------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
         Plaintiffs,
     vs.
BDO SEIDMAN, LLP, AND BDO INTERNATIONAL B.V.,
         Defendants.
-----------------------------------------------x
BDO SEIDMAN, LLP,
         Third-Party Plaintiff,
     vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
         Third-Party Defendants.
-----------------------------------------------x

PAGES 3321 - 3465

VOLUME 29



AFTERNOON SESSION

Miami, Florida

Tuesday, February 6, 2007

2:00 p.m.

Before the Honorable Jose M. Rodriguez



EXHIBIT
M

Reported by:  Gizella "Gigi" Baan

Page 3322

1          A P P E A R A N C E S
2
3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4   INTERNATIONAL, LTD., ET AL.:
5
6   SULLIVAN & CROMWELL, LLP
7       1888 Century Park East
8       Los Angeles, California 90067
9       (310) 712-6627
10  BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13  GONZALO R. DORTA, P.A.
14      334 Minorca Avenue
15      Coral Gables, Florida 33134
16      (305) 441-2299
17  BY:  Gonzalo R. Dorta, Esquire
18
19  BERGER SINGERMAN
20      350 East Las Olas Boulevard, Suite
21      Fort Lauderdale, Florida 33301
22      (954) 525-9900
23  BY:  Mitchell W. Berger, Esquire
24
25

Page 3323

1   On behalf of Defendant BDO Seidman, LLP:
2
3   ALVAREZ, ARMAS & BORRON
4       901 Ponce de Leon Boulevard, Suite 304
5       Coral Gables, Florida 33134
6       (305) 461-5100
7   BY:  Arturo Alvarez, Esquire
8
9   GREENBERG TRAURIG, LLP
10      MetLife Building
11      200 Park Avenue, 15th Floor
12      New York, New York 10166
13  BY:  Adam D. Cole, Esquire
14      Karen Y. Bitar, Esquire
15
16  GREENBERG TRAURIG, LLP
17      1221 Brickell Avenue
18      Miami, Florida 33131
19  BY:  Mark Schnapp, Esquire
20      Nikki Simon, Esquire
21
22
23
24
25

Page 3324

1   On behalf of Defendant BDO International B.V., n/k/a BDO
2   GLOBAL COORDINATION B.V.:
3
4   BROAD AND CASSEL
5       One Biscayne Tower, 21st Floor
6       Miami, Florida 33131
7       (305) 373-9400
8   BY:  Mark Raymond, Esquire
9       Rhett Traband, Esquire
10
11  SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
12      30 Rockefeller Plaza, 24th Floor
13      New York, New York 10112
14      (212) 332-3831
15  BY:  Kevin W. Goering, Esquire
16      Lisa M. Lewis, Esquire
17
18
19
20
21
22
23
24
25

Page 3325

1   On behalf of Third-Party Defendants Victor Balestra,
2   Bernard Mollet, and Joaquim Garnecho
3
4   RICHMAN, GREER, WEIL, BRUMBAUGH,
5   MIRABITO & CHRISTENSEN, P.A.
6       Miami Center, Suite 1000
7       201 S. Biscayne Boulevard
8       Miami, Florida 33131
9       (305) 373-4000
10  BY:  Manuel Garcia Linares, Esquire
11
12
13  On behalf of Third-Party Defendant Bernard Mollet
14
15  GAMBA & LOMBANA, P.A.
16      2701 Ponce de Leon Boulevard, Mezzanine
17      Coral Gables, Florida 33134
18      (305) 448-4010
19  BY:  Hector J. Lombana, Esquire
20      Geoffrey Marks, Esquire
21
22
23
24
25

Page 3326

CONTENTS

1       CONTENTS
2
3    EXAMINATION OF KEITH ELLENBURG BY:        PAGE:
4       MS. BITAR: (Cross)        3327, 3374
5       MR. THOMAS: (Redirect)        3320
6
7    EXAMINATION OF CARLOS MENDEZ BY:        PAGE:
8       MR. DORTA: (Direct)        3415

---

Page 3327

1            PROCEEDINGS
2       THE COURT: Ready? Bring them in.
3       THE BAILIFF: (Complies.)
4       All rise for the jury.
5       (Thereupon, the jury was brought into the
6    courtroom.)
7       THE COURT: All right. Ladies and
8    gentlemen, let's go ahead and start. Ms. Bitar, you may
9    proceed with your cross-examination.
10      MS. BITAR: May I inquire, Your Honor?
11      CROSS-EXAMINATION (continued)
12   BY MS. BITAR:
13      Q.   Good afternoon, Mr. Ellenburg.
14      A.   Good afternoon.
15      Q.   Before we broke for lunch we had an exhibit
16   up on the screen. I'd like to put it back up on the
17   screen, please. Exhibit 66.
18      (Technician complies.)
19      Mr. Ellenburg, I'd just like to walk you
20   through the document a little bit so you can discuss the
21   procedures that BDO employed when it learned after the
22   fact that its audit opinion was concluded in a
23   private-placement memorandum.
24      Let me first ask you this question. What is
25   the difference between an audited financial statement

---

Page 3328

1    and an unaudited financial statement?
2       A.   An audited financial statement would have
3    attached to it the opinion of a firm of independent
4    certified public accountants that it had performed an
5    audit in conformity with generally accepted auditing
6    standards and expressed an opinion as to whether the
7    financial statements were fairly stated in accordance
8    with generally accepted accounting principles.
9       An unaudited statement, for example, could
10   be an internal financial statement prepared by a
11   company.
12      Q.   Okay. And why does BDO need to approve
13   before it will permit -- I'm sorry, to approve financial
14   statements before it will permit its opinion to be used
15   in connection with a securities offering?
16      A.   In all cases where the auditor's opinion is
17   attached to another document which contains other
18   information such as a securities offering, both
19   generally accepted auditing standards as well as BDO
20   Seidman's firm policies call for the auditor to review
21   that other document and give its approval or consent for
22   attaching its audit opinion.
23      Q.   Now, before lunch you testified that BDO,
24   after the fact, granted approval with respect to the use
25   of its 1995 opinion in connection with a private

---

Page 3329

1    placement, correct?
2       A.   Correct.
3       Q.   And just to be clear, a private placement of
4    debentures is the sale of a security, correct?
5       A.   It is.
6       Q.   When BDO granted that permission after the
7    fact, did that mean that BDO was giving permission to
8    use its audited opinion in any subsequent offerings?
9       A.   Absolutely not.
10      Q.   So there's no perspective permission that's
11   being granted --
12      A.   No.
13      Q.   -- by virtue of what you talked about
14   earlier today?
15      A.   Each and every time that the financials were
16   utilized as an attachment to a document would require
17   the approval of the accounting firm.
18      Q.   Thank you. Now let's go back to the
19   document. It says, subsequent procedures performed by
20   BDO. That's in the first -- right after the first
21   paragraph.
22      Do you have that in mind, sir?
23      A.   I do.
24      Q.   Going to Number 2 because I know Mr. Thomas
25   read Number 1 with you, it says, we compared the

Page 3450

1    Santo would have invested or loaned over a hundred
2    million dollars without audited financial statements?
3        MR. RAYMOND: Objection.
4        THE COURT: Sustained. Speculative.
5        MR. DORTA: I'll rephrase.
6    BY MR. DORTA:
7        Q.   What was the first audit year that BDO
8    Seidman audited this newly created company E.S. Bankest?
9    The first audit year?
10        A.   It was in 1998 -- fiscal year-end 1998 which
11    is typically conducted at the beginning of the following
12    year, 1999.
13        Q.   You have to help me out here, Mr. Mendez.
14    When you do an audit of a particular audit, you need the
15    year-end to do the audit?
16        A.   That's correct.
17        Q.   Hence, that's why the audit for '98 starts
18    in January or February '99?
19        A.   That's correct.
20        Q.   Now, were you involved in the 1998 audit
21    that started in January or February of 1999?
22        A.   Yes.
23        Q.   And this was an audit of E.S. Bankest?
24        A.   Yes.
25        Q.   At this point in time had E.S. Bankest been

Page 3451

1    using PPMs, subscription agreements to raise money?
2        A.   Yes.
3        Q.   And was E.S. Bankest selling notes and
4    debentures to customers of Espirito Santo group?
5        A.   Yes.
6        Q.   And to your knowledge, were the audited
7    financial statements of BDO being used and given to
8    Espirito Santo group and their customers?
9        A.   Yes. Absolutely. Yes.
10        Q.   Now, let's talk about this first audit
11    year-end audited in 1998.  Do you recall a man by the
12    name of Ramon Rivera concerning the audit of 1998?
13        A.   Yes.
14        Q.   Was Ramon Rivera an employee of BDO?
15        A.   Yes.
16        Q.   Was he an auditor of BDO?
17        A.   Yes.
18        Q.   Do you know whether he was an audit manager
19    or somebody very low, like a staff person?
20        A.   No. He was the manager of the audit.
21        Q.   And did you deal with Ramon Rivera on the
22    audit of '98?
23        A.   Yes.
24        Q.   Were you the person at E.S. Bankest that
25    dealt with this man?

Page 3452

1        A.   Yes.
2        Q.   Did it come a point in time in the
3    commencement of the audit of 1998 that Mr. Rivera asked
4    documents of you, Carlos Mendez, concerning E.S.
5    Bankest?
6        A.   Yes.
7        Q.   Was your understanding that this man needed
8    those records to do his audit?
9        MR. ALVAREZ: Objection as to his
10    understanding, calls to speculation.
11        THE COURT: Sustained.
12    BY MR. DORTA:
13        Q.   Were these records requested because an
14    audit was going?
15        MR. ALVAREZ: Objection.
16        MR. RAYMOND: Objection. Leading.
17        THE COURT: Overruled.
18    BY MR. DORTA:
19        Q.   You can answer.
20        A.   Yes.
21        Q.   I mean, he wasn't requesting records because
22    he wanted to take it home and do leisure reading, did
23    he?
24        MR. RAYMOND: Objection. Argumentative.
25        THE COURT: Sustained.

Page 3453

1    BY MR. DORTA:
2        Q.   He was doing an audit?
3        A.   Absolutely.
4        Q.   Of E.S. Bankest, correct?
5        A.   Yes. He deemed those documents necessary to
6    complete his audit.
7        Q.   Did you provide this man the records he was
8    requesting?
9        A.   No.
10        Q.   Do you recall what you told this auditor
11    when you did not provide the records he was asking for?
12    What did you tell Ramon Rivera?
13        A.   I referred him to Dominick Parlapiano.
14        Q.   Why did you refer him to Dominick
15    Parlapiano -- can't pronounce his name. How do you
16    pronounce his last name?
17        A.   Parlapiano.
18        Q.   Why would you refer him to Dominick
19    Parlapiano if the man is asking you for the records?
20        MR. ALVAREZ: Objection. Irrelevant as to
21    why he would do that.
22        THE COURT: Overruled.
23        THE WITNESS: Because we didn't have the
24    records he was asking for and I honestly thought that
25    that's -- that was -- I mean, that was a very shocking

Page 3454

1  situation to me. I thought that was going to be the end
2  of definitely the audit.
3       MR. ALVAREZ: Unresponsive.
4       THE COURT: Hold on a second. Overruled.
5  BY MR. DORTA: The end of what? What was ending when
6  this man asked for records and you didn't give the man?
7  What was ending?
8       A.  Well, he was about to discover the fraud.
9       Q.  The what?
10      A.  The fraud that was going on.
11      Q.  How long has this fraud been going on when
12  this man asked for records to detect the fraud? How
13  long was the fraud going on, sir?
14      MR. RAYMOND: Objection. Leading.
15      THE COURT: Overruled.
16      MR. RAYMOND: Argumentative.
17      THE COURT: Overruled.
18      THE WITNESS: Since 1995.
19  BY MR. DORTA:
20      Q.  Who was the auditor when the fraud commenced
21  in 1995?
22      A.  BDO Seidman.
23      Q.  Do you know, sir, whether or not Mr. Ramon
24  Rivera went and spoke to Dominick Parlapiano after you
25  told him to go speak to that man for the records?

Page 3455

1       THE COURT: Hold on. There's an objection.
2       MR. ALVAREZ: Objection. Lack of personal
3  knowledge.
4       THE COURT: Overruled. It's a yes-or-no
5  question.
6       THE WITNESS: Can you ask me --
7       THE COURT: Read it back, please.
8       (Thereupon, the court reporter read back the
9  requested portion.)
10      THE WITNESS: Yes.
11      MR. ALVAREZ: Judge, may I have a two-second
12  side bar?
13      THE COURT: No.
14  BY MR. DORTA:
15      Q.  Yes what?
16      A.  Yes, I do know that he went to speak to
17  Dominick Parlapiano.
18      Q.  Do you know if Dominick Parlapiano gave
19  Mr. Rivera the records that he requested of you?
20      MR. ALVAREZ: Objection. Lack of personal
21  knowledge.
22      THE COURT: Overruled.
23      THE WITNESS: No.
24  BY MR. DORTA:
25      Q.  Did Dominick ever come to you in order for

Page 3456

1  both of you to give the man the records that he was
2  requesting?
3       A.  No.
4       Q.  Did the man ever that day walk away with the
5  records he was requesting, sir?
6       MR. RAYMOND: Objection. Leading.
7       THE COURT: Overruled.
8       THE WITNESS: He walked away without the
9  records. He stopped the audit.
10  BY MR. DORTA:
11      Q.  What then happened with respect to the audit
12  that Ramon Rivera stopped because he didn't get all the
13  records? What happened next with this particular audit?
14      A.  The audit was resumed a few days after the
15  audit -- the field team left the office of Bankest and
16  they came back a few days later to continue with the
17  audit.
18      Q.  When the audit was resumed, did you give
19  Ramon Rivera all the documents that he had initially
20  requested?
21      A.  No. We didn't have the documents.
22      Q.  What do you mean you didn't have the
23  documents? What documents did this man initially
24  request of you that you didn't have?
25      A.  He wanted to -- for purpose of one of their

Page 3457

1  tests, which is collectibility test, receivables
2  collectibility test, he wanted to trace the flow of
3  payment all the way from the customer, meaning Wal-Mart
4  which owed Joy, the payment to Joy, from Joy into
5  Bankest Capital, and from Bankest Capital to E.S.
6  Bankest. He wanted proof that that flow took place from
7  the origin.
8       Q.  And why couldn't you give them the check
9  from Wal-Mart paying Joy?
10      A.  Because there was no check from Wal-Mart to
11  Joy because the invoice that was in question that we're
12  trying to test the collectibility, it was a fake
13  invoice. In other words, Wal-Mart had no knowledge of
14  that piece of business.
15      Q.  Did you ever fake a Wal-Mart check?
16      A.  Never.
17      Q.  Do you have access to Wal-Mart's checkbook
18  to fake a check?
19      A.  No.
20      Q.  Is that why you didn't fake it?
21      A.  We couldn't fake a Wal-Mart check.
22      Q.  And that was what Ramon was asking of you,
23  those records?
24      A.  He wanted to see the Wal-Mart check. He
25  wanted to see a copy, rather, of a Wal-Mart check.

Page 3458

1    Q.  Do you know under what procedures was this
2    audit resumed? It's yes or no, and then you can
3    explain. Do you know?
4    A.  Yes.
5    Q.  Okay. Tell the ladies and gentlemen of the
6    jury when this audit restarts, under what procedure does
7    it restart?
8    A.  The auditors or meaning BDO was satisfied
9    for purpose of completing this test with a copy of a
10   check from Joy to Bankest Capital and the payment from
11   Bankest Capital to E.S. Bankest. So in other words, it
12   was, I would say, half of the transaction.
13   Q.  When you say half of the transaction, what
14   do you mean by that? When they restart the audit, what
15   are they looking at when you say half of the
16   transaction?
17       MR. RAYMOND: Objection. Calls for
18   speculation.
19       THE COURT: Overruled.
20       THE WITNESS: There was -- we were not
21   providing proof of payment coming from Wal-Mart for that
22   particular invoice as it was represented in our numbers,
23   in our books. And we're not providing payment from
24   Joy -- proof of payment from Joy to Bankest Capital.
25   BY MR. DORTA:

Page 3459

1    Q.  Let me stop you right there. Why weren't
2    you providing payment from Joy to Bankest Capital?
3    A.  Because it didn't exist. We didn't have any
4    payments from Joy. We didn't have any payments from
5    Wal-Mart. We didn't have any payments from Joy.
6    Q.  You may continue.
7    A.  The only payment that we could show them, it
8    was Bankest Capital to E.S. Bankest.
9    Q.  Let me stop you right there now. Bankest
10   Capital is that company that's controlled by the
11   Orlanskys?
12   A.  Yes.
13   Q.  And what BDO was being satisfied with is a
14   check from Capital to E.S. Bankest?
15   A.  Exactly.
16   Q.  Did you provide them real checks or fake
17   checks of that transaction?
18   A.  I'm sorry. Copy for two years?
19   Q.  The check from Capital to E.S. Bankest, was
20   that a real check?
21   A.  The Capital to E.S. Bankest, it was a real
22   check. The one that was not real, it was a fake check,
23   it was a Joy check to Bankest Capital.
24   Q.  All right. So BDO is -- starts re-auditing
25   or resumes the auditing and they don't need to see the

Page 3460

1    customer checks, Wal-Mart and K-Mart, correct?
2    A.  Right. They didn't need to see the Wal-Mart
3    check. They didn't need to see proof of payment from
4    Joy to E.S. Bankest.
5    Q.  When you say proof of payment, are you
6    referring to like a deposit slip showing the Wal-Mart
7    check being deposited by Joy? Is that what you mean?
8        MR. ALVAREZ: Objection. Leading.
9        THE COURT: Sustained.
10   BY MR. DORTA:
11   Q.  What do you mean by proof of payment into
12   Joy, that they didn't need to see that?
13   A.  I mean, a cancelled check from Joy that
14   supposedly was deposited into Bankest Capital's bank
15   account. They didn't ask for the deposit slip that
16   validated the deposit slip or copy of the validated
17   deposit slip that would correspond to that deposit.
18   They didn't ask and they didn't get to see the Bankest
19   Capital bank statement to vouch the deposit that Joy --
20   the Joy check deposited into Bankest Capital.
21       They only saw a copy from the front of a
22   fake check of Joy issued to the order of Bankest Capital
23   Corp. And the Bankest Capital Corp. check -- copy of a
24   check -- I mean copy of a check from Capital Corp. to
25   E.S. Bankest. And they could vouch the deposit because

Page 3461

1    they had bank statements for E.S. Bankest. So they
2    could confirm that, in fact, there was -- they were
3    monies transferred from Capital to E.S. Bankest.
4    Q.  Now, when this audit was restarted with
5    those procedures in place, did you formulate an
6    impression with respect to how the re-audit was going to
7    be done?
8        MR. ALVAREZ: Objection.
9        THE COURT: I don't understand the question.
10   BY MR. DORTA:
11   Q.  All right. When the audit resumed, were you
12   still the lead person?
13   A.  Yes.
14   Q.  When the audit resumed, were you made aware
15   how the audit was going to be conducted?
16   A.  Yes.
17   Q.  When you were made aware how the audit was
18   going to be conducted, that certain things were not
19   going to be asked for, how did you feel?
20       MR. ALVAREZ: Objection.
21       THE COURT: Sustained. Feel is irrelevant.
22   Rephrase your question.
23   BY MR. DORTA:
24   Q.  What was your view?
25       MR. ALVAREZ: Objection. Calls for the same

Page 3462

1   information in a different question.
2           THE COURT: (Inaud.)
3   BY MR. DORTA:
4       **Q.   Your view as --**
5           THE COURT: Sustained. Rephrase the
6   question.
7   BY MR. DORTA:
8       **Q.   When the audit was redone -- strike that.**
9           **When the audit was restarted with this**
10  **procedure, did you believe that the fraud would be**
11  **uncovered?**
12      **A.   Well, not definitely at that point.**
13          THE COURT: Do you have an objection?
14          MR. ALVAREZ: Yes, Judge.
15          THE COURT: Or are you just standing up?
16          MR. ALVAREZ: No, Judge, I have an
17  objection.
18          THE COURT: What's the legal basis?
19          MR. ALVAREZ: It calls for the information
20  that I referred to in Court in my oral motion in limine.
21          THE COURT: Overruled. You may continue.
22          MR. RAYMOND: Objection 403, Your Honor.
23          THE COURT: Overruled.
24          THE WITNESS: I -- I had a couple of
25  reactions.

Page 3463

1           THE COURT: Why don't we stop there with the
2   couple of reactions (laughter) and we can go -- you can
3   go home. I'm not going home but you can go home.
4   Ladies and gentlemen, we're sending you home. Do not
5   discuss the case amongst yourselves. Do not form a
6   fixed or definite opinion about the merits of the case
7   until you have heard all the evidence, the argument of
8   the lawyers, the instructions on the law by me. You're
9   not to read or listen to any accounts or see any
10  accounts of this case in the media. And you're to
11  ignore all the lawyers outside this courtroom including
12  Mr. Mendez, who is on the witness stand.
13          All right. You have a good night. See you
14  tomorrow morning, same place, same time. And we'll go
15  from there. Leave the notes, please. Thank you.
16          (Thereupon, the jury was escorted out of the
17  courtroom.)
18          THE COURT: (Inaud.) for a second.
19  Mr. Mendez, I'm going to instruct you that you're not to
20  discuss the testimony you have given nor the testimony
21  you are going to give with any of the lawyers or anyone.
22  Period. And that includes any personal lawyers you may
23  have.
24          THE WITNESS: Sure.
25          THE COURT: You understand?

Page 3464

1           THE WITNESS: Yes.
2           THE COURT: Be here before 9:30. Thank you
3   very much. You're excused Mr. Mendez for today.
4           (Thereupon the witness was excused from the
5   courtroom.)
6           THE COURT: Mr. Alvarez, do you wish to say
7   something to the Court?
8           MR. ALVAREZ: No, Judge. I just want to
9   stare.
10          THE COURT: Are you sure? All right.
11  Anything else we need to discuss before we go?
12          MR. ALVAREZ: I guess we can take up his two
13  reactions.
14          THE COURT: We don't know what they're going
15  to be. I don't know what the questions are going to be,
16  so we'll see what the questions will be and then we'll
17  go from there and then you can object. Or not.
18          Mr. Thomas.
19          MR. DORTA: Yes, Your Honor.
20          THE COURT: These are yours.
21          MR. DORTA: Thank you.
22          (Thereupon, at approximately 6:00 p.m., the
23  above portion of the trial was concluded.)
24          *       *       *
25

Page 3465

1           CERTIFICATE OF COURT REPORTER
2
3           I, GIZELLA BAAN, court reporter, before whom
4   the foregoing statement was taken, do hereby certify
5   that the statement made was taken by me stenographically
6   at the time and place mentioned in the caption hereof
7   and thereafter transcribed by me to the best of my
8   ability; that said transcript is a true record of the
9   statement given; that I am neither counsel or, related
10  to, nor employed by any of the parties to the action in
11  which these proceedings were taken; and further, that I
12  am not a relative or employee of any party hereto, nor
13  financially or otherwise interested in the outcome of
14  this action.
15
16
17
18          _____
19              GIZELLA BAAN
20          Court Reporter and Notary Public
21            in and for the State of Florida
22
23
24
25

Page 4788

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

--------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
        Plaintiffs,
     vs.
BDO SEIDMAN, LLP, AND BDO INTERNATIONAL B.V.,
        Defendants.
--------------------------------------------------x
BDO SEIDMAN, LLP,
        Third-Party Plaintiff,
     vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
        Third-Party Defendants.
--------------------------------------------------x

PAGES 4788 - 4892

VOLUME 41

MORNING SESSION

Miami, Florida

Tuesday, February 20, 2007

9:55 a.m.

Before the Honorable Jose M. Rodriguez

EXHIBIT

N

Reported by:  Gizella "Gigi" Baan

Page 4789

1              A P P E A R A N C E S
2
3     On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4     INTERNATIONAL, LTD., ET AL.:
5
6     SULLIVAN & CROMWELL, LLP
7         1888 Century Park East
8         Los Angeles, California 90067
9         (310) 712-6627
10    BY:  Steven W. Thomas, Esquire
11        Emily S. Alexander, Esquire
12
13    GONZALO R. DORTA, P.A.
14        334 Minorca Avenue
15        Coral Gables, Florida 33134
16        (305) 441-2299
17    BY:  Gonzalo R. Dorta, Esquire
18
19    BERGER SINGERMAN
20        350 East Las Olas Boulevard, Suite
21        Fort Lauderdale, Florida 33301
22        (954) 525-9900
23    BY:  Mitchell W. Berger, Esquire
24
25

Page 4790

1     On behalf of Defendant BDO Seidman, LLP:
2
3     ALVAREZ, ARMAS & BORRON
4         901 Ponce de Leon Boulevard, Suite 304
5         Coral Gables, Florida 33134
6         (305) 461-5100
7     BY:  Arturo Alvarez, Esquire
8
9     GREENBERG TRAURIG, LLP
10        MetLife Building
11        200 Park Avenue, 15th Floor
12        New York, New York 10166
13    BY:  Adam D. Cole, Esquire
14        Karen Y. Bitar, Esquire
15
16    GREENBERG TRAURIG, LLP
17        1221 Brickell Avenue
18        Miami, Florida 33131
19    BY:  Mark Schnapp, Esquire
20        Nikki Simon, Esquire
21
22
23
24
25

Page 4791

1     On behalf of Defendant BDO International B.V., n/k/a BDO
2     GLOBAL COORDINATION B.V.:
3
4     BROAD AND CASSEL
5         One Biscayne Tower, 21st Floor
6         Miami, Florida 33131
7         (305) 373-9400
8     BY:  Mark Raymond, Esquire
9         Rhett Traband, Esquire
10
11    SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
12        30 Rockefeller Plaza, 24th Floor
13        New York, New York 10112
14        (212) 332-3831
15    BY:  Kevin W. Goering, Esquire
16        Lisa M. Lewis, Esquire
17
18
19
20
21
22
23
24
25

Page 4792

1     On behalf of Third-Party Defendants Victor Balestra,
2     Bernard Mollet, and Joaquim Garnecho
3
4     RICHMAN, GREER, WEIL, BRUMBAUGH,
5     MIRABITO & CHRISTENSEN, P.A.
6         Miami Center, Suite 1000
7         201 S. Biscayne Boulevard
8         Miami, Florida 33131
9         (305) 373-4000
10    BY:  Manuel Garcia Linares, Esquire
11
12
13    On behalf of Third-Party Defendant Bernard Mollet
14
15    GAMBA & LOMBANA, P.A.
16        2701 Ponce de Leon Boulevard, Mezzanine
17        Coral Gables, Florida 33134
18        (305) 448-4010
19    BY:  Hector J. Lombana, Esquire
20        Geoffrey Marks, Esquire
21
22
23
24
25

Page 4833

1  you, Mr. Dorta.
2       No, the answer to your question is not yet.
3  When I see Mr. van Elten start giving you a hard time --
4  and I understand the rules. I've read the rules, but
5  it's still my discretion. When I see Mr. van Elten
6  giving you a difficult time on the questions and
7  answers, I will on my own make that determination.
8       I'm not sure at this time BDO International
9  is at a position where Mr. van Elten is going to be in
10 that position. But it may take three minutes. I don't
11 know. It could be four. It could be 30 seconds when he
12 won't give you his name.
13      But trust me -- and I saw Mr. Ellenburg do
14 that during his questioning, even though I had already
15 deemed him in that respect. Let's see what Mr. van
16 Elten does. I'll be very interested in listening to his
17 answers.
18      I'll keep it in mind. I understand your
19 request. I would have done the same thing with
20 Mr. Thomas.
21      MR. DORTA: Judge, can you give me two
22 minutes with Ms. Alexander? Just two minutes, please.
23      THE COURT: I assume you don't have a dog in
24 this fight.
25      MR. COLE: No, I'm just not sure if we

Page 4834

1  should have done the same thing with Mr. Lenner.
2       THE COURT: I don't think so.
3       (Thereupon, a brief recess was taken.)
4       THE CLERK: All rise for the jury.
5       (Thereupon, the jury was brought into the
6  courtroom.)
7       THE COURT: Ms. Alexander, you may call your
8  next witness.
9       MS. ALEXANDER: We call Mr. Paul van Elten
10 from BDO International.
11 Thereupon,
12         PAUL VAN ELTEN,
13 having been duly sworn by the clerk of the Court,
14 testified as follows:
15      THE COURT: You may proceed.
16      MS. ALEXANDER: Thank you, Your Honor.
17      DIRECT EXAMINATION
18 BY MS. ALEXANDER:
19   Q.   Good morning, Mr. van Elten.
20   A.   Good morning.
21   Q.   Mr. van Elten, you're the international
22 secretary for BDO International B.V.?
23   A.   That's correct.
24   Q.   And you're here as the party representative
25 for BDO International B.V.?

Page 4835

1    A.   That's correct.
2    Q.   And plaintiff Espirito Santo have sued --
3  and plaintiff Espirito Santo have sued your company, BDO
4  International B.V. in this lawsuit?
5    A.   That's what I understand from your
6  complaint.
7    Q.   So your company is a defendant in this
8  action?
9    A.   Yes.
10   Q.   And do you understand that plaintiffs,
11 Espirito Santo, claimed that your company, BDO
12 International, are responsible for the audits?
13      MR. RAYMOND: Objection. Leading, Your
14 Honor.
15      THE COURT: Overruled
16 BY MS. ALEXANDER:
17   Q.   Audits conducted by BDO Seidman?
18   A.   That's my understanding.
19   Q.   And you understand also that plaintiff
20 Espirito Santo claimed that BDO International B.V.
21 controls BDO Seidman?
22   A.   That's what I understand.
23   Q.   And do you agree with plaintiffs that BDO
24 International B.V. controls BDO Seidman?
25   A.   Not at all.

Page 4836

1       MS. ALEXANDER: Plaintiffs move to declare
2  Mr. van Elten an adverse witness.
3       THE COURT: No. Keep asking questions.
4  BY MS. ALEXANDER:
5    Q.   Mr. van Elten, you've been the international
6  secretary for BDO International B.V. since 1988,
7  correct?
8    A.   That's correct.
9    Q.   And as international secretary of BDO
10 International, you are responsible for the daily
11 operations of BDO International?
12   A.   Not on my own but together with my
13 colleague.
14   Q.   And part of your responsibilities are
15 overseeing all the member firms, including BDO Seidman?
16   A.   We coordinate activities of the network and
17 one of the activities is monitoring compliance of BDO
18 member firms with the member firm agreements.
19   Q.   Okay. I'm going to take that piece by
20 piece. BDO Seidman is a member of what you refer to as
21 the network?
22   A.   BDO Seidman is a BDO member firm, that's
23 correct. I am a member of the BDO International
24 network.
25   Q.   And the BDO International network are all

Page 4837

1  the member firms throughout the world who performed
2  accounting services under the name BDO?
3     A.   Under the trademark BDO and under the name
4  BDO. BDO plus a local member which in the case of the
5  United States is BDO Seidman.
6     Q.   I'm sorry, Mr. van Elten, I'm having trouble
7  hearing you and so I'm -- so just to be clear. One of
8  the member firms which BDO International oversees is BDO
9  Seidman?
10        MR. RAYMOND: Objection to the form.
11        THE COURT: Overruled.
12        THE WITNESS: BDO Seidman is one of the BDO
13  member firms, that's correct.
14  BY MS. ALEXANDER:
15     Q.   And what BDO International does is it
16  oversees the network which includes BDO Seidman?
17        MR. RAYMOND: Objection. Leading,
18  mischaracterizes his testimony.
19        THE COURT: Overruled.
20        THE WITNESS: We coordinate the activities
21  of the network and one of the -- as I told you -- one of
22  the issues that we do is monitor compliance with the BDO
23  member firm agreement.
24  BY MS. ALEXANDER:
25     Q.   So BDO Seidman and BDO International entered

Page 4838

1  into an agreement called the member firm agreement?
2     A.   That's correct.
3     Q.   And part of what you do is you monitor
4  compliance by all the member firms including BDO Seidman
5  with that member firm agreement?
6     A.   If there are issues that are brought to our
7  attention in the day-to-day operation of the network and
8  basically the network, what it does is providing a
9  network all over the world for international clients,
10  country A, if they need service in another country,
11  that's what the BDO member firms, they have to work
12  together in the organization of that process, that's
13  what we're doing.
14     Q.   And that process includes monitoring
15  compliance by member firms such as BDO Seidman with the
16  member firm agreement?
17     A.   Not on a day-to-day basis. That is not --
18  it would not be possible. But if there are issues that
19  are brought to our attention by other member firms or by
20  whomever, we will obviously deal with the member firms.
21     Q.   I didn't actually ask about day-to-day. I
22  just asked if one of the purposes of BDO International
23  and what you do with BDO International is monitor
24  compliance by BDO Seidman and the other member firms
25  with your member firm agreement, correct?

Page 4839

1     A.   Yes. That's part of my task, I agree.
2     Q.   And just to be clear, one of the things the
3  member firm agreement does is it allows BDO Seidman to
4  use the BDO name, correct?
5     A.   That's correct.
6     Q.   Just so that everybody understands what
7  we're talking about, can we look at Plaintiffs' Exhibit
8  78, just the first page? We're just going to flash it
9  up on the screen. There it is.
10        (Technician complies.)
11        And just so I'm clear, one of the things
12  that the member firm agreement does -- Mr. van Elten, do
13  you have it on your screen now?
14     A.   Yes, I have it.
15     Q.   One of the things that the member firm
16  agreement does is it allows BDO Seidman to put the BDO
17  logo -- and could you just highlight it?
18        (Technician complies.)
19        -- the BDO logo and the BDO Seidman name on
20  audited financial statements just as the E.S. Bankest
21  finance statements that are at issue in this case?
22     A.   That's correct.
23     Q.   As the international secretary of BDO
24  International, you're familiar with the purposes of BDO
25  International, correct?

Page 4840

1     A.   Yes, I think I am.
2     Q.   And one of the purposes and the object of
3  BDO International is to promote high standards of
4  accounting and auditing, correct?
5     A.   That's I think what the heart of the
6  (inaud.) is.
7     Q.   That's right. Actually, let's take a look
8  at that.
9        (Technician complies.)
10        MS. ALEXANDER: Your Honor, may I approach?
11        MR. COLE: You may.
12  BY MS. ALEXANDER:
13     Q.   I'm approaching with BDO International's
14  Exhibit 5001, which is now in evidence.
15        Mr. van Elten, you just referred to the BDO
16  International articles of association. Is that the
17  document I just put in front of you?
18     A.   (Reading).
19        Yes, it is.
20     Q.   And, in fact, it's actually a translation of
21  that document, correct?
22     A.   As it says, yes.
23     Q.   And it also says unofficial translation. Is
24  this the only translation that you know of of the
25  articles of association?

Page 4841

1      A.   Yes, ma'am.  Yes.
2      Q.   And is it the translation that you at BDO
3   International use when people ask to see the articles of
4   association in English?
5      A.   Yes, that's correct.
6      Q.   Now, as we were just talking, one of the
7   objects of the company, if we look under Article 2.
8           (Technician complies.)
9           You can have all three on the screen.
10          (Technician complies.)
11          One of the objects of the company is to,
12   under A, is, "To promote high standards of accountancy,
13   auditing and financial and business advice throughout
14   the world." Did I read that correctly?
15      A.   Yes, you did.
16      Q.   And part of what you do is you, in carrying
17   out the business of BDO International, is to promote
18   high standards of accountancy and auditing, correct?
19      A.   I don't know if that's correct but we have a
20   BDO International audit manual which sets auditing
21   standards for the network.  That's correct.
22      Q.   And so the manual that BDO International has
23   and which it gives to the member firms and the network,
24   including BDO Seidman, is one of the ways that you
25   promote high standards of accounting and auditing,

Page 4842

1   right?
2      A.   I believe it is.
3      Q.   And another object of the company is to
4   license the BDO name, correct?
5      A.   Yes, that's correct.
6      Q.   And as we were looking before, that's what
7   enables -- and that's under B there, correct?
8      A.   Yes.
9      Q.   And that's what enables BDO Seidman to use
10   the BDO logo and put BDO and BDO Seidman in front of
11   financial statements, correct?
12      A.   That's correct.
13      Q.   And one of the other objects of the company
14   is to manage and control companies like BDO Seidman in
15   order to promote high standards of accounting and
16   auditing throughout the world, correct?
17      A.   That's what it says here.
18      Q.   So one of the things that BDO International
19   does is it manages and controls member firms such as BDO
20   Seidman, right?
21      A.   Well, I don't think we do.  It says here but
22   -- I agree with you that's that it says it here but I
23   don't think that's what we do.
24      Q.   So that's what it says in the articles of
25   association in the BDO International B.V.?

Page 4843

1      A.   That's correct.
2      Q.   And you agree with me that when it says that
3   one of the objects of the company is to promote high
4   standards of accounting and auditing, that's in fact one
5   of the objects of the company?
6      A.   That's correct.
7      Q.   And you agree with me also when it says
8   under B that one of the objects of the company is to
9   license the BDO name, that, in fact, is one of the
10   objects of the company?
11      A.   That's correct.
12      Q.   And when it also says under C that one of
13   the objects of the company is to manage and control
14   companies like BDO Seidman, that's, in fact, one of the
15   objects of the company, one of the purposes of BDO
16   International, correct?
17      A.   That's what it says here.
18      Q.   And that is, in fact, one of the objects of
19   the company, that it exists to manage and control
20   companies like BDO Seidman, correct?
21          MR. RAYMOND:  Objection.  Asked and
22   answered.  Misstates his testimony.
23          THE COURT:  Overruled.
24          THE WITNESS:  I must admit that this is the
25   wording of the agreement but I cannot say in all honesty

Page 4844

1   that we manage and control BDO Seidman.
2   BY MS. ALEXANDER:
3      Q.   Well, that's one of the objects of the
4   company in its own articles of association; is that
5   correct?
6      A.   Yes.
7      Q.   And one of the ways that you manage and
8   control entities like BDO Seidman is what we already
9   talked about, is you have an audit manual that's given
10   to BDO Seidman, correct?
11          MR. RAYMOND:  Objection.
12          THE COURT:  What's your objection?
13          MR. RAYMOND:  Misstates the witness's
14   testimony in the prior answer.  And leading.
15          THE COURT:  Overruled.  Let him answer.  I'm
16   sure he can answer for himself.
17          THE WITNESS:  Could you repeat the question,
18   please?
19   BY MS. ALEXANDER:
20      Q.   And one of the ways that you manage and
21   control entities like BDO Seidman is what we already
22   talked about, is that you have an audit manual that you
23   provide to BDO Seidman?
24      A.   We have an audit manual that we provide to
25   BDO Seidman but I don't think that by doing that we

Page 4845

1   control BDO Seidman.
2       Q.  We'll look at that audit manual in some
3   detail, but is it fair to say that the audit manual sets
4   forth the standards by which member firms such as BDO
5   Seidman are to conduct their audits?
6       A.  That's correct.  Their audits as described
7   in the member firm agreement which is international
8   audits and trans-national audits as defined in the
9   member firm agreement.
10      Q.  We'll look at that in a moment.  One other
11  question:
12          Have you changed the articles of association
13  to change what's in the provision C about manage and
14  control companies such as BDO Seidman?
15      A.  No, I don't believe so.
16      Q.  So even though you are the international
17  secretary of BDO International and you actually think
18  the company doesn't do what it says it's going to do,
19  you haven't taken any steps to change the articles of
20  association?
21      A.  No.  We don't look at these articles
22  everyday so --
23      Q.  But you're familiar with the objects of the
24  company, is that correct?
25      A.  I am.

Page 4846

1       Q.  And that's part of your duties to be
2   familiar with the objects and the purpose of the company
3   that you work for?
4       A.  It was the articles of association, yes,
5   that's correct.
6       Q.  Is it fair to say that part of the reason
7   the BDO name has value is about because it's associated
8   with high standards of accounting?
9       A.  Absolutely.
10      Q.  That's what you tell the world every year in
11  your annual reports; is that right?
12      A.  I don't know the exact wording.
13          THE COURT:  You have to speak a little
14  louder.
15          THE WITNESS:  I don't recall the exact
16  wording of the statement, but I'm sure you're going to
17  show me.
18  BY MS. ALEXANDER:
19      Q.  Okay.  Let's start with 1999.  Can I get
20  1999, 2000, 2001, 2002, please?
21          (Technician complies.)
22          MS. ALEXANDER:  May I approach, Your Honor?
23          THE COURT:  You may.
24  BY MS. ALEXANDER:
25      Q.  I'm approaching with BDO International's

Page 4847

1   audit reports for the years 1999, 2000, 2001, and 2002
2   and I'll be directing your attention to certain pages in
3   those documents.
4       A.  Thank you.  Can I make a comment?
5          THE COURT:  Sure.
6          THE WITNESS:  You mentioned to me that
7   you're giving me audit reports which is obviously not
8   correct.
9   BY MS. ALEXANDER:
10      Q.  That's incorrect.  I meant to say annual
11  reports.  And if we could look at the 1999 -- well,
12  first let's start.  These are annual reports issued by
13  your company, BDO International, correct?
14      A.  That's correct.
15      Q.  These are provided to the public, right?
16      A.  These are available to the public, yes.
17      Q.  And for the 1999 year, looking at
18  Defendants' Exhibit 5010 in evidence.  And if we could
19  look at the third page of that document where it says
20  BDO services and then also audit and accounting.  So
21  actually can you put BDO services and that whole square?
22          (Technician complies.)
23          So here in your annual report, you're
24  talking about all the services that are offered
25  throughout the BDO network including those offered by

Page 4848

1   BDO Seidman, correct?
2       A.  Yes.
3       Q.  And under audit and accounting, that would
4   include the work done by BDO Seidman, correct?
5       A.  Yes, it does.
6       Q.  And when it says it accounts for 63 percent
7   of total fees, that's the total fees earned by all the
8   member firms throughout the network?
9       A.  That's correct.
10      Q.  And that would again include the fees earned
11  by BDO Seidman?
12      A.  That's correct.
13      Q.  And it starts out talking about BDO's
14  personalized approach allows to us gain a thorough
15  understanding of our client's businesses.  And when you
16  say BDO you're talking about, again, all the member
17  firms including BDO Seidman?
18      A.  That's correct.
19      Q.  And when you talk about our clients, you're
20  talking about all the clients including those of BDO
21  Seidman, correct?
22      A.  All the clients of BDO member firms
23  including BDO Seidman, that's correct.
24      Q.  And then the last sentence of that paragraph
25  reads, "Our audits are backed up by extensive experience

Page 4849

1  and expertise and therefore adds credibility to a
2  client's financial statements."
3        So when you talk about our audits, you're
4  including the audits performed by BDO Seidman, correct?
5        A.  Yes.
6        Q.  And when you talk about adding credibility
7  to a client's financial statements, you're talking about
8  all those audits done by BDO Seidman as well as those
9  performed by any of the other member firms, correct?
10       A.  It refers to all the audits including BDO
11  Seidman.
12       Q.  So the BDO name -- sorry.  So the BDO name
13  adds credibility to a client's financial statement, you
14  agree with that statement?
15       A.  That's what it says here.
16       Q.  And so when BDO put its name on the audited
17  financial statements at issue in this case for E.S.
18  Bankest, it was lending credibility to these financial
19  statements, right?
20       A.  I don't know whether they do or not but I
21  can see what the text here says.
22       Q.  Well, consistent with what your statement
23  was to the public in your annual report in 1999 putting
24  the BDO name on a financial statement adds credibility
25  to that financial statement, right?

Page 4850

1        A.  That's what it says.
2        Q.  And that's one of the reasons clients use
3  BDO is for that credibility, correct?
4        A.  I hope it would be.
5        Q.  And part of the reason that you can say --
6  BDO International can say that the BDO name adds
7  credibility to a client's financial statement is because
8  you set the standards for those audits, correct?
9        A.  International sets the standards, it's not
10  BDO itself.  It's the experts, the audit experts in the
11  connection of BDO member firms who develop the standards
12  when working together in an international committee.
13       Q.  Let's look at page 8 of your annual report,
14  the 1999 annual report, Defendants' Exhibit 5010, page
15  8.
16             (Technician complies.)
17             And I'm going to be looking at this
18  paragraph right here.  If you can blow that up.
19             (Technician complies.)
20             And I'm going to read from this.  It says,
21  "Stringent conditions with which each member firm has to
22  comply to be part of the BDO network are paramount.
23  They not only guarantee that our high standards are met
24  but also enable each member firm to share information
25  and expertise across the world."

Page 4851

1        So when you're referring to our standards
2  you're referring to BDO International?
3        A.  That's correct.  That's the network.
4        Q.  Well, this is BDO International's annual
5  report, correct?
6        A.  Yes, but we refer to the standards developed
7  by the network and used by the BDO member firms.
8        Q.  Right.  And those standards are developed
9  under BDO International, correct?
10       A.  As I told you, they're developed by experts
11  from BDO member firms working together in an
12  international committee.  So not by BDO B.V. itself.
13       Q.  When we're talking about the stringent
14  conditions with which each member firm is to comply with
15  to be part of the BDO network, those conditions, the
16  compliance with those conditions is something that BDO
17  International monitors, correct?
18       A.  That's correct.
19       Q.  And, in fact, you say you make these similar
20  statements every year in your annual reports.  Let's
21  look at the next year in 2000, which is Defendants'
22  Exhibit, International's Exhibit 5016 in evidence.
23             (Technician complies.)
24             And again, on page 5 of that document and
25  can we pull up where it says audit and accounting?

Page 4852

1             (Technician complies.)
2             The second sentence is BDO -- "Because a BDO
3  audit is backed up by experience and expertise it lends
4  credibility to a client's financial statement."  That's
5  a correct statement, right.
6        A.  That's the same statement as before.
7        Q.  You agree with that statement?
8        A.  That's what it says.
9        Q.  And one of the reasons the BDO name lends
10  credibility to a client's financial statement is because
11  a BDO audit has to adhere to stringent standards,
12  correct?
13       A.  Certainly BDO International audit, as we
14  call it.
15       Q.  I'm sorry, Mr. van Elten.  I didn't hear
16  you.
17       A.  Certainly a BDO International audit.
18       Q.  Are you making a distinction between
19  different types of audits?
20       A.  It's the distinction to the effect that in
21  the member firm agreement, the member firms, BDO member
22  firms have to use the BDO International manual for
23  internationally referred work and trans-national audits,
24  not necessarily for local work, for pure local work,
25  although they are asked to do the best endeavors or to

Page 4853

1    do whatever the word -- something -- to use the
2    international manual.
3        Q.   We'll look at that.  But for right now this
4    document that you give to the public you refer to a BDO
5    audit, correct?
6        A.   That's correct.
7        Q.   And you don't make a distinction between a
8    BDO audit for one kind of work and a BDO audit for
9    another kind of work, do you?
10       A.   No.
11       Q.   And you just said a BDO audit lends
12   credibility to a client's financial statement, correct?
13       A.   That's what it says here, yes.
14       Q.   So all BDO audits lend credibility to a
15   client's financial statement, correct?
16       A.   That's what it says here.
17       Q.   And again, part of the reason that you can
18   make that statement is because all BDO audits adhere to
19   stringent standards, right?
20       A.   I have to make the distinction that I made
21   before between international audits and local audits.
22       Q.   Well, let's look at page 3 of the 2000
23   annual report.  And we'll pull up the paragraph that
24   starts, "It's my belief."
25           (Technician complies.)

Page 4854

1            And it reads, "It is my" -- and this is a
2    statement by the chairman of the council.  And it reads,
3    "It is my belief that these particular qualities will
4    ensure that BDO is as successful in this century as in
5    the last.  They will guarantee that we at BDO
6    International continue," and then I'm going to drop down
7    to the third paragraph, "to ensure that we consistently
8    provide the highest quality of professional services."
9            And again, this is something that BDO
10   International does.  It insures that we, BDO,
11   consistently provide the highest quality of professional
12   services.  Do you agree with that statement?
13       A.   These are words by the chairman of the
14   council, which is not a body of BDO B.V.
15       Q.   This is -- again, this is the annual
16   statement of BDO International, correct?
17       A.   BDO B.V. issues it but it's the statement of
18   the network.  Yes.  That's correct.
19       Q.   And again, the statement of the network
20   which includes BDO Seidman and which is overseen by BDO
21   International is that BDO International will continue to
22   ensure that we consistently provide the highest quality
23   of professional services, correct?
24       A.   I think this is the network saying that.
25   All member firms have that.  They say there's not

Page 4855

1    necessarily B.V. but the network, it's the words of the
2    network.
3        Q.   Well, again, I want to draw your attention
4    to the words that are up above that say, "We, at BDO
5    International, ensure that we consistently provide the
6    highest quality of professional services."
7        A.   But BDO International here is used as to
8    describe the network and not as the legal entity that
9    I'm working for.
10       Q.   Well, when we were discussing the network
11   before, it's the network of all the member firms
12   including BDO Seidman, correct?
13       A.   That's correct.
14       Q.   And one of the things you do as
15   international secretary of BDO International B.V. is
16   oversee the network, correct?
17       A.   As I told you, what we do, we coordinate the
18   activities within the network, various areas, and we
19   also monitor compliance with the member firm agreement.
20       Q.   So one of the things that you do is you
21   monitor compliance by member firms such as BDO Seidman
22   with the member firm agreement which set forth -- and
23   their compliance with certain standards set out by BDO
24   International?
25           MR. RAYMOND:  Objection, asked and answered.

Page 4856

1            THE COURT:  Overruled.
2            THE WITNESS:  We have certain programs to
3    try to make sure that it is what its member firms do, I
4    guess.
5    BY MS. ALEXANDER:
6        Q.   So the answer is yes?
7        A.   We have some programs to do that.
8        Q.   So the answer is yes?
9            MR. RAYMOND:  Objection, asked and answered.
10           THE COURT:  Hold on.  Could you repeat the question?
11           THE WITNESS:  Could you repeat the question?
12           THE COURT:  Hold on.  Do you have an
13   objection?
14           MR. RAYMOND:  Yes, I do.  He's answered it
15   three times.  She didn't like the answer.
16           THE COURT:  Sustained.  Rephrase the
17   question.
18   BY MS. ALEXANDER:
19       Q.   Let's see what you said in 2001, which is
20   Defendant BDO International's Exhibit 5015 in evidence.
21           (Technician complies.)
22           Let's pull up the paragraph that begins just
23   (inaud.)
24           (Technician complies.)
25           And that reads, and this is -- again, this

Page 4857

1   is an annual report issued by your company BDO
2   International B.V.?
3       A.   That's correct.
4       Q.   And this is available to the public?
5       A.   This is available to the public.
6       Q.   And it reads, "These 98 national firms are
7   linked by more than the BDO name.  The organization's
8   structure ensures strict quality control and encourages
9   the sharing of skills and ideas."
10          Did I read that correctly?
11      A.   You did.
12      Q.   Part of the organization, what the
13  organization structure does, it insures strict quality
14  control over member firms such as BDO Seidman?
15      A.   What we mean here is that we -- I referred
16  to a program just a few minutes ago and what I was
17  referring to, to a quality assurance program and
18  that's -- we organize at BDO International B.V.  That's
19  what it says here.
20      Q.   So what this means is that part of what you
21  do is organize, BDO International B.V. organizes quality
22  assurance programs and ensures strict quality control
23  over member firms such as BDO Seidman?
24      A.   We ensure that these programs are in place,
25  that's correct.

Page 4858

1       Q.   And the programs include quality control
2   programs?
3       A.   That's correct.
4       Q.   And that's one of the things that BDO
5   International does?
6       A.   We organize these quality assurance reviews
7   as we call them, yes.
8       Q.   And looking now at Defendant BDO
9   International's Exhibit Number 5014 by which is the 2002
10  annual report of BDO international B.V., do you have
11  that?
12      A.   Yes.
13      Q.   And this is an annual statement issued by
14  your company, BDO International B.V.?
15      A.   That's correct.
16      Q.   Can you just pull down (inaud.)
17          (Technician complies.)
18          I'm sorry. Mr. van Elten, this is just the
19  first page of this document and I'm just going to read,
20  "BDO firms are careful to adhere to strict quality
21  criteria.  BDO member firms are committed to ensuring
22  that they each have sufficient services capability to
23  offer the consistent and high standards that are
24  synonymous with the BDO name."
25          Did I read that correctly?

Page 4859

1       A.   Yes, you have.
2       Q.   And again, part of the reason that the BDO
3   name which your company licenses has value is because
4   each of the member firms are going to offer consistently
5   high standards synonymous with that name, right?
6       A.   That's what it says.
7       Q.   And one of the ways you can ensure that that
8   happens is by managing and controlling those entities
9   such as BDO Seidman?
10      A.   No, that's not correct.
11      Q.   You've imposed standards that they have to
12  follow, correct?
13          THE COURT:  I think your microphone is off.
14  Either that or it's your battery.  No, give me that.
15          THE WITNESS:  (Complies.)
16          THE COURT:  (Changing battery).
17          THE WITNESS:  Thank you, Your Honor.
18          THE COURT:  You're welcome.
19          Ask the question again.
20  BY MS. ALEXANDER:
21      Q.   One of the ways that you ensure that the
22  member firms are going to offer consistently high
23  standards that you promote in your annual statement is
24  by imposing standards on member firms such as BDO
25  Seidman, correct?

Page 4860

1       A.   As I explained, we have the issuing manual
2   that's developed by committees, if you wish to see the
3   standards, and we maintain a quality assurance program.
4   Yes.  That's correct.
5       Q.   Well, let's take a look at the manual.  The
6   manual, is it correct to say that the manual is referred
7   to as the technical manual?
8       A.   There is a definition in the member firm
9   agreement of technical manuals that -- if you talk about
10  a manual you're probably talking about audit manual.
11      Q.   Right.  And the audit manual --
12      A.   It's the technical manual (inaud.)
13      Q.   So let's just look quickly at the definition
14  of the technical manual which is the audit manual.  Just
15  so we're all on the same page.  So I'm looking now at --
16  can I have a copy (inaud.).
17          MS. ALEXANDER:  May I approach?
18          THE COURT:  You may
19  BY MS. ALEXANDER:
20      Q.   I'm giving you the agreement of BDO
21  International and BDO United States of America which is
22  Plaintiffs' 1437 in evidence.  We'll spend some more
23  time on this agreement but for now can we just look at
24  the definition on page, what's been Bates stamped BV
25  01938 and look at the BDO technical manual.

Page 4861

```
 1        (Technician complies.)
 2        And BDO technical manuals are defined as,
 3  "Manuals, guidelines or instruction from time to time
 4  issued by BDO B.V.," and that would be your company,
 5  right, BDO International B.V.?
 6    A.  Yes.
 7    Q.  And approved by the policy board and
 8  (inaud.) down to (inaud.) which lays down accounting,
 9  auditing investigation and other standards and practices
10  to be adhered to by the member firm and other member
11  firms. Did I read that correctly?
12    A.  That's correct.
13    Q.  And when it says member firms that would
14  mean BDO Seidman, correct?
15    A.  Correct.
16    Q.  Now, going to -- I'm going to hand you a
17  copy of the BDO International audit manual which is in
18  three volumes and it's Plaintiffs' Exhibit 1478, 79, and
19  80 in evidence.
20        And, Mr. van Elten, if you can look at that
21  and confirm that that's the audit manual issued by your
22  company, BDO International B.V.?
23    A.  I've never seen them before.
24    Q.  You've never seen it before?
25    A.  No. I don't -- I mean, I've seen from the
```

Page 4862

```
 1  outside the manuals but I'm not familiar with all the
 2  manuals.
 3    Q.  Okay. Well, let's --
 4    A.  But I must assume that it is. I'm not
 5  saying they're not the BDO audits.
 6    Q.  I'm sorry?
 7    A.  I'm not saying they're not the BDO
 8  International audit manuals. I'm not familiar with the
 9  document.
10    Q.  Well, let's start at the beginning then. If
11  you will turn to page 1 of the document of volume one.
12    A.  Yes.
13    Q.  And under status, do you see where it says
14  status?
15    A.  Yes, I see it.
16    Q.  And it says, "This manual is the core BDO
17  manual. It describes the basic principles which the
18  member firms of BDO have agreed to apply to both
19  national and international engagements. Each member
20  firm may add additional guidance to its own domestic
21  audit manual to supplement the BDO manual, but may not
22  detract from the core values."
23        Did I read that correctly?
24    A.  Yes.
25    Q.  So this manual is the manual that BDO
```

Page 4863

```
 1  Seidman has agreed to apply to both national and
 2  international engagements, correct?
 3        MR. RAYMOND: Objection. Lack of
 4  foundation. The man said he had no idea what the
 5  document is.
 6        MR. COLE: I join, Your Honor.
 7        MR. RAYMOND: Other than reading.
 8        THE COURT: I understand.
 9        MR. RAYMOND: Thank you, Your Honor.
10        THE COURT: Repeat the question. I'm not
11  sure which question they're objecting to.
12  BY MS. ALEXANDER:
13    Q.  My question was this manual is the manual
14  that BDO Seidman has agreed to apply to both national
15  and international engagements, correct?
16        THE COURT: Sustained. Rephrase your
17  question.
18  BY MS. ALEXANDER:
19    Q.  As a member firm of BDO, BDO Seidman has
20  agreed to apply this manual to its national and
21  international engagements?
22        THE COURT: Sustained. Ask him another
23  question. Lack of predicate.
24  BY MS. ALEXANDER:
25    Q.  As a member firm of BDO, BDO Seidman enters
```

Page 4864

```
 1  into a member firm agreement, correct?
 2    A.  That's correct.
 3    Q.  And that's the way that it can use the BDO
 4  name, right?
 5    A.  That's correct.
 6    Q.  And it also agrees to perform certain duties
 7  under that agreement, correct?
 8    A.  Absolutely.
 9    Q.  And it also agrees to follow certain
10  standards under that agreement, correct?
11    A.  That's correct.
12    Q.  And those standards include the standards
13  set forth in this audit manual prepared by your company,
14  BDO International?
15    A.  We've issued them, yes.
16        THE COURT: I'm sorry?
17        THE WITNESS: We have issued them. I may
18  misunderstand the word prepare but as I said, the
19  standards are not developed by us but we issue the
20  manual.
21  BY MS. ALEXANDER:
22    Q.  So this is the manual issued by BDO
23  International, correct?
24    A.  That's correct. I think that's correct.
25    Q.  And under the member firm agreement BDO
```

Page 4865

1   Seidman has agreed to follow these standards?
2       A.   For international and trans-national audits.
3   That's what the member firm agreement says.
4       Q.   That's not what this says?
5           MR. RAYMOND: Lack of predicate.
6           MR. COLE: And argument.
7           THE COURT: Sustained. It's argumentative.
8   Ask him another question.
9   BY MS. ALEXANDER:
10      Q.   Well, this says, this manual which you've
11  agreed is issued by BDO International B.V. says right
12  there under status that member firms of BDO, which you
13  agree would include BDO Seidman, have agreed to apply to
14  both national and international engagement, correct?
15      A.   You read it correct, yes.
16      Q.   So again, let's go back. This is the manual
17  which BDO Seidman has agreed to apply to both national
18  and international engagements, correct?
19      A.   I don't know.
20          MR. RAYMOND: Objection. Lack of predicate.
21          THE COURT: Sustained. Actually, I'm going
22  to overrule it. I'm going to let his answer stand. He
23  doesn't know.
24  BY MS. ALEXANDER:
25      Q.   Well, let's look at page 4 of the audit

Page 4866

1   manual.
2           MR. RAYMOND: Objection. Lack of predicate
3   for anything concerning this document.
4           THE COURT: Overruled. Let's see what the
5   question is.
6   BY MS. ALEXANDER:
7       Q.   It looks like under page four which is when
8   it talks about our objective in 1.1 there. It reads,
9   "Our objective. This manual prescribes the procedures
10  to be followed by any of the member firms of BDO
11  whenever they are engaged to express an opinion as a
12  result of carrying out the independent audit of
13  financial statements so that we provide throughout the
14  world a consistently high quality of service to our
15  clients."
16          Did I read that correctly?
17      A.   You did.
18      Q.   And BDO Seidman is a member firm of BDO?
19      A.   That's correct.
20      Q.   And BDO Seidman would have to follow the
21  procedures set forth in this manual?
22          MR. RAYMOND: Objection. Lack of predicate.
23          THE COURT: Overruled.
24          THE WITNESS: They have to follow the BDO
25  International management, as I said, based on the member

Page 4867

1   firm agreement (inaud.).
2   BY MS. ALEXANDER:
3       Q.   Again, this manual says it prescribes the
4   procedures to be followed by any of the member firms
5   whenever they're engaged to express an opinion. This
6   manual doesn't distinguish between the nature of the
7   opinion or the audits being performed, does it?
8       A.   As I said, I'm familiar with this document.
9   I'm familiar with the member firm agreement. And that's
10  what I know about the applicability of our international
11  market.
12      Q.   We will get to that member firm agreement
13  but for now, you will agree with me that this manual has
14  not distinguished between the nature of the work being
15  performed by member firms such as BDO Seidman?
16          MR. RAYMOND: Object to the form of the
17  question.
18          THE COURT: Sustained.
19  BY MS. ALEXANDER:
20      Q.   And let's look down to principles under 1.6.
21  And that reads, "Our audit approach is designed to deal
22  with any audit, small or large, simple or complex, while
23  ensuring that all audits are carried out to a
24  consistently high standard. The successful application
25  of our methodology depends on its intelligent

Page 4868

1   application throughout the audit process by all partners
2   and staff drawing on the firm's knowledge and
3   experience."
4           Did I read that correctly?
5       A.   Yes, you did.
6       Q.   And again, what this manual is saying is
7   that the approach set forth in the manual is designed to
8   deal with any audit, small or large, simple or complex,
9   correct?
10          MR. RAYMOND: Object to the form of the
11  question. Lack of predicate, lack of foundation.
12          THE COURT: Sustained.
13  BY MS. ALEXANDER:
14      Q.   Well, again, this manual is not making any
15  distinction between the nature of the audit or the type
16  of audit or the kind of work being performed.
17          MR. RAYMOND: Same objection, Your Honor.
18          THE COURT: Sustained.
19  BY MS. ALEXANDER:
20      Q.   What I just read to you regarding the audit
21  approach doesn't distinguish between the type of audit
22  being performed?
23          MR. RAYMOND: Object to the form of the
24  question.
25          THE COURT: Sustained.

Page 4869

1   BY MS. ALEXANDER:
2       Q.   Mr. van Elten, does that distinguish between
3   the type of audit being performed?
4           MR. RAYMOND: Objection.
5           THE COURT: Are you asking, is that what --
6   are you asking did you read it correctly?
7           MS. ALEXANDER: Yes.
8           MR. RAYMOND: Asked and answered.
9           THE COURT: Overruled.
10          MS. ALEXANDER: And now I'm asking and then
11  I'm going to ask my follow-up question.
12          THE COURT: He hasn't answered that one.
13          MS. ALEXANDER: I'm trying, Your Honor.
14          MR. THOMAS: Let him answer.
15          THE WITNESS: I'm a bit confused.
16          THE COURT: The question was did she read
17  that correctly?
18          THE WITNESS: I think I already said she
19  did, yes.
20  BY MS. ALEXANDER:
21      Q.   And then my next question is what I just
22  read did, does that distinguish between the type of
23  audit being performed?
24          MR. RAYMOND: Objection.
25          THE COURT: Sustained. You're asking for

Page 4870

1   his opinion.
2           MS. ALEXANDER: I'm just asking whether what
3   I just read distinguishes between the type of audit.
4           THE COURT: You asked for his opinion.
5           MS. ALEXANDER: I'll move on.
6   BY MS. ALEXANDER:
7       Q.   One last provision of this we'll look at on
8   page 7, under controlling the audit.
9           (Technician complies.)
10          And controlling the audit under those two
11  sections.
12          (Technician complies.)
13          And this is, it says, "Controlling the
14  audit." And it says, "Throughout the audit we should
15  exercise control to ensure that it's carried out
16  efficiently, completed on time and that the quality of
17  the work is of the high standard required by this
18  manual."
19          Did I read that correctly?
20      A.   You did.
21      Q.   And again, this is a manual that's issued to
22  BDO Seidman, correct?
23      A.   That's correct.
24      Q.   And it's telling BDO Seidman that one of the
25  ways you can control the audit is to perform the work

Page 4871

1   pursuant to the high standards required by this manual,
2   correct?
3           MR. RAYMOND: Objection. Lack of predicate
4   Your Honor.
5           THE COURT: Sustained.
6   BY MS. ALEXANDER:
7       Q.   All right. Let's go down to -- same thing.
8           (Technician complies.)
9           And that reads, "The engagement partner has
10  a key role in ensuring the application of the
11  methodology and procedures in this manual." And it
12  says, "Where staff members perform audit work, the
13  engagement partner should ensure that they also comply
14  with these requirements. While many of the duties of
15  the engagement partner may be delegated, the engagement
16  partner cannot delegate his or her responsibilities."
17          Did I read that correctly?
18      A.   You did.
19      Q.   And the engagement partner would include all
20  the partners at BDO Seidman, correct?
21          MR. RAYMOND: Objection. Lack of predicate.
22          THE COURT: Overruled.
23          THE WITNESS: This is also true for an
24  engagement partner and BDO Seidman
25  BY MS. ALEXANDER:

Page 4872

1       Q.   So an engagement partner would include the
2   members of BDO Seidman?
3       A.   Yes.
4       Q.   And it would also include Mr. Lenner who is
5   a partner of BDO Seidman?
6           MR. COLE: Objection. Lack of predicate.
7           THE COURT: Overruled.
8           THE WITNESS: This would include Mr. Lenner,
9   yes.
10          THE COURT: You need to speak a little
11  louder.
12          THE WITNESS: This would include Mr. Lenner.
13  BY MS. ALEXANDER:
14      Q.   Thank you. And briefly a little bit more on
15  this. If you can do that entire paragraph.
16          (Technician complies.)
17          And I'm just going to look at 1.5. We've
18  already read 1.1. And that reads, "BDO firms should
19  here refer to additional domestic guidance incorporated
20  in local manuals and the way in which that is
21  distinguished from material that is part of the BDO
22  manual."
23          Did I read that correctly?
24      A.   Yes.
25      Q.   So when BDO International issues this audit

Page 4873

1   manual to member firms such as BDO Seidman, the idea is
2   that they're going to incorporate the manual into their
3   own manual, correct?
4       A.  I don't know.
5       Q.  Well, let's look and see if that's what, in
6   fact, BDO Seidman did.
7           MS. ALEXANDER:  May I approach?
8           THE COURT:  You may.
9   BY MS. ALEXANDER:
10      Q.  I'm approaching with Plaintiffs' Exhibit 118
11  which is the BDO Seidman audit manual.
12          And I'm going to look at what is the third
13  page of that document under our objective.
14          (Technician complies.)
15          And I'll read from 1.1 which should be
16  familiar to you.  "This manual prescribes the procedure
17  to be followed by any of the member firms of BDO
18  whenever they're engaged to express an opinion as a
19  result of carrying out the independent audit of
20  financial statements so that we provide throughout the
21  world a consistently high quality of service to our
22  clients."  Did I read that correctly?
23      A.  You did.
24      Q.  And let's look then look down at 1.5.
25  "Accordingly, this U.S. version of the manual includes

Page 4874

1   material in addition to that which is common throughout
2   BDO.  To facilitate comparison to the International BDO
3   version of this manual" -- blow that up for them.
4           (Technician complies.)
5           I'm going to start over.  "Accordingly, this
6   U.S. version of the manual includes material in addition
7   to that which is common throughout BDO.  To facilitate
8   comparison to the international BDO version of the
9   manual, this paragraph numbering of the international
10  manual has been retained unless otherwise noted."
11          So, in fact, Mr. van Elten, did I read that
12  correctly?
13      A.  You did.
14      Q.  And, in fact, BDO Seidman did exactly what
15  the BDO International manual told it to do, which was to
16  incorporate the BDO International manual in its own
17  audit manual, correct?
18          MR. RAYMOND:  Objection.  Lack of predicate.
19          THE COURT:  Sustained.
20          MR. COLE:  Join.
21          THE COURT:  Sustained.  It doesn't matter
22  for whom.
23  BY MS. ALEXANDER:
24      Q.  Well, let's look at some of the -- when we
25  were looking at the international manual, it referred to

Page 4875

1   core guidance.  That could not be detracted by the
2   member firm such as BDO Seidman.  Do you remember that
3   phrase?  Let's get it up there one more time.  We're
4   going to go back to 1478, page 1.
5           (Technician complies.)
6           THE WITNESS:  Is that the international
7   manual?
8       Q.  That's the international manual.  Thank you,
9   Mr. van Elten.  And just the second line of that under
10  status number one, "Each member firm may add additional
11  guidance to its own domestic manual but may not detract
12  from the core guidance."  Did I read that correctly?
13      A.  You did.
14      Q.  So let's see if there was some of this core
15  guidance from the international manual that was
16  incorporated into the BDO Seidman manual.
17          MR. RAYMOND:  Judge, 401.  There is no
18  predicate on either manual.
19          THE COURT:  They're in evidence.  Overruled.
20  BY MS. ALEXANDER:
21      Q.  So we're going to look at page.  So it's
22  better to look at the screen.  Page 1526 of Plaintiffs'
23  Exhibit 118 which is the BDO Seidman manual.  And
24  under --
25          (Technician complies.)

Page 4876

1           And this talks about the following, the
2   audit and the stages of an audit.  Do you see where it
3   says that?
4       A.  I can see what is on the screen, yes.
5       Q.  So it talks about the audit and the audit
6   involves the following stages, agree to terms of the
7   engagement, gather information, develop an audit
8   strategy, execute the audit, form an opinion, and a
9   report.  Did I read that correctly?  Do you see the
10  headings?  If you highlight the headings that might be
11  helpful.
12          (Technician complies.)
13          Would you agree with me that that's sort of
14  a core principle of performing an audit is the stages of
15  an audit?
16          MR. RAYMOND:  Objection.  Seeks an opinion.
17  Lack of predicate.
18          THE COURT:  Hold on.
19          Sustained.
20  BY MS. ALEXANDER:
21      Q.  Well, let's compare it to what's set forth
22  in the international audit manual under the stages of an
23  audit.  So these are the side by side comparisons of
24  what's in the international audit manual and the BDO
25  Seidman audit manual.

Page 4877

1      Can you see those, Mr. van Elten?
2      A.  Yes, I see them.
3      Q.  And do you see that the two manuals provide
4  for the same stages of an audit in each manual?
5      A.  I see that they're the same headings, yes.
6      Q.  I'm sorry?
7      A.  I see the same headings in both manuals.
8      Q.  So both set forth the same stages of an
9  audit, correct?
10         MR. RAYMOND:  Objection.
11         THE COURT:  Overruled.
12         THE WITNESS:  I was not involved so I read
13  this for the first time in my life.
14         THE COURT:  The question, sir, was so both
15  you can look at them and say yes or no.
16         THE WITNESS:  Yes.
17  BY MS. ALEXANDER:
18      Q.  And then we're going to look at one other
19  comparison of the two audits and see if the BDO Seidman
20  audit incorporated the core guidance of the
21  international audit as it agreed to do.  Let's look at
22  118 at page 1041.  No, not the side by side.
23         (Technician complies.)
24         We're going to look at 31.5.
25         (Technician complies.)

Page 4878

1      And there it sets forth the responsibilities
2  of the auditors, and I'm going to read 31.5.  "Our
3  principle responsibility as auditors is to express an
4  opinion on the financial statements.  Since fraud by its
5  nature affect the accounting records or financial
6  statements, we need to plan and perform our audits so
7  that we have a reasonable expectation of detecting those
8  misstatements arising from fraud which cause the
9  financial statements to be materially misstated."  Did I
10  read that correctly?
11      A.  Yes, you did.
12      Q.  And let's see if this is the core guidance
13  incorporated from the international audit manual.  Could
14  we do the comparison?  And the bottom one is the one
15  that came from the BDO International audit manual.  And
16  I would like to read that one out loud as well, 31.5.
17  "Our principle responsibility as auditors is to express
18  an opinion on the financial statements.  Since frauds
19  may by their nature affect the accounting records or
20  financial statements, we need to design our audit
21  procedures so that we have a reasonable expectation of
22  detecting those misstatements arising from fraud which
23  may cause the financial statements to be materially
24  misstated."
25      Did I read that correctly?

Page 4879

1      A.  You did.
2      Q.  So again, this is another example of the
3  core guidance of the BDO international audit manual that
4  was incorporated into the BDO Seidman manual?
5         MR. RAYMOND:  Objection.  Asked and
6  answered.
7         THE COURT:  Sustained.
8  BY MS. ALEXANDER:
9      Q.  Now, not only did you issue, BDO
10  International issue an audit manual that we've been
11  looking at, these three volumes here, but BDO
12  International also issues a manual that's called the
13  visual identity manual, correct?
14         MR. RAYMOND:  Objection.  Misstates the
15  witness's testimony.
16         THE COURT:  Is this a question or is that a
17  statement?
18         MS. ALEXANDER:  That was a question.
19         THE COURT:  Why don't you ask it again?
20  BY MS. ALEXANDER:
21      Q.  In addition to the audit manuals issued by
22  BDO International, does BDO International also issue a
23  visual corporate identity manual?
24         THE COURT:  Overruled.
25         THE WITNESS:  Yes, we do.

Page 4880

1         MS. ALEXANDER:  May I approach, Your Honor?
2         THE COURT:  You may.
3  BY MS. ALEXANDER:
4      Q.  I'm approaching with Defendant BDO
5  International's Exhibit 5009.
6      A.  Thank you.
7      Q.  And is that the corporate visual identity
8  manual issued by BDO International?
9      A.  This is the manual issued by BDO
10  International, yes.
11      Q.  And the member firms such as BDO Seidman
12  have to adhere to the standards and procedures set forth
13  in this manual, correct?
14      A.  That's correct.
15      Q.  And this manual, the purpose of this manual
16  is to instruct member firms such as BDO Seidman on how
17  to display the BDO name and the BDO logo, correct?
18      A.  Sorry, the last part.
19      Q.  The BDO logo?
20      A.  That's correct.
21      Q.  And when we're talking about the BDO logo,
22  we're talking about things on the E.S. Bankest financial
23  statements right here, correct?
24      A.  Correct.
25      Q.  So let's just look at a couple of examples

Page 4881

1    of what BDO International instructs BDO Seidman as a
2    member firm to do. Can we look at -- I'm going to tell
3    you the Bates number.
4            Mr. van Elten, could you look at BV 01416?
5    Can you guys blow that up because it's a little hard to
6    read?
7            (Technician complies.)
8            Can you blow it up even more?
9            (Technician complies.)
10           Now, Mr. van Elten, are you looking at the
11   -- is the document you're looking at the same thing as
12   what's up on the screen?
13       A.   Yes, I am.
14       Q.   And is this an example of a letter that BDO
15   International provides to member firms such as BDO
16   Seidman to instruct them on how their letters should
17   look?
18       A.   This is an example of how a letter could
19   look, yes.
20       Q.   And actually, the -- it's not -- the
21   language in the letter here provides further instruction
22   on how the letter is supposed to look, right?
23       A.   I would have to read it.
24       Q.   I'll just direct your attention to a couple
25   of lines. The third paragraph down in the letter talks

Page 4882

1    about the -- where it reads, "Where proportionally
2    spaced typefaces are available, Times Roman and Palatino
3    are allowed for use on correspondence. This example is
4    printed in 12 point Times." Did I read that correctly?
5        A.   Yes, you did.
6        Q.   So one of the things BDO International is
7    telling firms such as BDO Seidman is the font and the
8    typeface that they should be using in their letters?
9        A.   That's the recommendations, yes.
10       Q.   Well, they have to follow these standards,
11   correct?
12       A.   Well, it's a recommendation we would like to
13   convey a uniform image around the world but I must admit
14   if they use another typeface we won't go after a member
15   firm.
16       Q.   It's important, though. Well, it's
17   important enough for you to put in the manual that
18   they're supposed to follow, right?
19       A.   Absolutely. Because before maybe if --
20           THE COURT: You can answer the question.
21           THE WITNESS: May I explain a little bit?
22           THE COURT: Sure.
23           THE WITNESS: Before introducing the manual
24   there was no consistency in the way BDO member firms
25   presented themselves. They had their different logos,

Page 4883

1    different styles, different colors. So when we hired
2    consultants on this matter, obviously they deal with the
3    whole spectrum of issues that are related to a visual
4    identity and it goes as far as a model for a letter,
5    that's correct.
6            But basically what I think the importance of
7    this example is is the way that the BDO logo and the BDO
8    member firm's name on the top of the letterhead and the
9    address are positioned.
10       Q.   And you're talking about the BDO logo up at
11   the top of the page?
12       A.   That's correct, yes.
13       Q.   Well, let's look at a couple more examples.
14   If you go back down and it reads, the next paragraph
15   reads, "The left-hand margin should be set at 30
16   millimeters from the edge of the paper to align with the
17   corporate or member firm logo type. A right- hand
18   margin of 25 millimeters should be set."
19           So here you're telling, BDO International is
20   telling firms like BDO Seidman how to set the margins on
21   their letters, right?
22       A.   In order to have a nice looking letter, yes.
23   That's the guidance we or the manual provides.
24       Q.   And let's just -- one more example. The
25   last line of the letter reads, "A single line space

Page 4884

1    separates paragraphs which should not be indented," so
2    there you're telling them how to prepare the letter when
3    it has multiple paragraphs?
4        A.   That's what it says.
5        Q.   And just one more example from this manual.
6    Let's look at BV 01496. I'll give you the number one
7    more time, 1496.
8            (Technician complies.)
9            And these are examples of the signs that
10   member firms such as BDO Seidman might use in the course
11   of their business, right?
12       A.   A few examples, yes.
13       Q.   And you're telling them how their signs
14   should look?
15       A.   It's a recommendation, yes. And again, it
16   is -- it's the way of portraying the logo.
17       Q.   Right. So, for example, on the cocktail
18   party sign, that's how you want the logo to look?
19       A.   That's an example of how it could look.
20       Q.   Well, it's an example of how you want it to
21   look, right?
22       A.   I don't know whether that's what the techs
23   say that.
24       Q.   Well, that's the purpose of the corporate
25   visual identity manual, right, is to tell member firms

Page 4885

1  such as BDO Seidman how the logo should look, right?
2      A.   To give guidance how the logo should look.
3      Q.   Well, don't you require them to follow the
4  corporate visual identity manual?
5      A.   Yes, but you asked me if they have the
6  cocktail party if they have to use this. I cannot say
7  that. I don't believe that's what it says here in the
8  manual.
9      Q.   But the manual gives them instruction on how
10 to use the logo?
11     A.   It gives guidance.
12     Q.   And, in fact, if they're using the logo in a
13 way that BDO International doesn't like it, you can tell
14 them to stop, right?
15     A.   We can tell them, yes. That's correct.
16     Q.   Now, we talked a little bit or referenced a
17 little bit the member firm agreement. Now we'll spend
18 some time on that and I've already given you a copy of
19 that.
20     A.   Yes.
21     Q.   Can you find it under all that?
22     A.   Yes.
23     Q.   And again, just to -- I may have already
24 asked you this but this is the member firm agreement
25 between BDO International, your company, and BDO

Page 4886

1  Seidman, the other defendant in this action, correct?
2      A.   That's correct.
3      Q.   And when it says BDO United States of
4  America that includes BDO Seidman?
5      A.   Yes, as you can see on the second page.
6      Q.   We've talked about how this agreement allows
7  BDO Seidman to use the BDO name in connection with
8  performing audits and accounting. Let's just look at
9  the provision of that agreement. Let's look at what's
10 BV 01942 which refers to the object of the license.
11         (Technician complies.)
12     Do you have that page, Mr. van Elten?
13     A.   Yes.
14     Q.   And looking at 3.1, "The subject of the
15 terms of this agreement, BDO B.V. hereby grants to the
16 member firm," which would be BDO Seidman, "an exclusive
17 and non-transferrable license in the territory." And
18 I'm going to stop there for a second.
19         The territory is the United States?
20     A.   That's correct.
21     Q.   "To use the international name, the BDO
22 acronym, the BDO technical manuals, and the BDO software
23 in connection with professional services performed by
24 the member firm."
25         There's a lot of terms in there and I'm just

Page 4887

1  going to ask you to help us understand what those mean.
2  So this agreement permits BDO Seidman to conduct audits
3  in accounting services under the BDO name, right?
4      A.   Correct.
5      Q.   And without this agreement, with your
6  company, BDO Seidman wouldn't exist as a BDO firm,
7  correct?
8      A.   That's correct. Yes.
9      Q.   And it couldn't perform audits under the BDO
10 name?
11     A.   Correct.
12     Q.   And the other thing it gives BDO Seidman the
13 right to do is it gives them the right to use the
14 technical manuals like the audit manual we were looking
15 at before, right?
16     A.   That's correct.
17     Q.   And it also gives them the right to use
18 BDO's software which is software that's issued by your
19 firm, BDO International, for use in connection with
20 audits and accounting?
21     A.   Two questions here.
22     Q.   I'm sorry. It also refers to BDO software,
23 correct?
24     A.   Yes.
25     Q.   And BDO software is software that's issued

Page 4888

1  by BDO International?
2      A.   Well, I don't know how you issue software.
3  Let me explain.
4      Q.   Sure.
5      A.   Within the network we have developed an
6  audit software with outside consultants which is again a
7  technical committee, with technical experts from member
8  firms who work together with outside consultants and we
9  have developed a product called BDO Compass, just the
10 name to refer to that specifically software. That would
11 come under this definition.
12         Another example is software that we buy on
13 the market, the network buys on the market but we have,
14 B.V., we have agreed on a master agreement which is the
15 company called CaseWare, Inc. in Toronto, Canada
16 allowing member firms to use that specific software on
17 the condition that they enter into, I think it's called
18 an adherence agreement with the company in Toronto, and
19 those two types would come under the definition BDO
20 software, yes.
21     Q.   So, Mr. van Elten, just to understand, there
22 are two types of software, one called Compass and one
23 called CaseWare?
24     A.   Yes.
25     Q.   And it's through this agreement with BDO