Page 4889

1    International that BDO Seidman gets the right to use
2    that in connection with its accounting and auditing
3    market?
4        A.   That's right.  With the addition that in
5    order for them to be able to use CaseWare they have to
6    enter an additional adherence agreement with CaseWare
7    directly.  So there's a general overall umbrella
8    agreement between B.V. and the company in Toronto, but
9    for individual member firms to be able to use the
10   software they have to enter into a separate agreement
11   which is basically what it's doing is that they adhere
12   to the terms that B.V. had agreed or the umbrella
13   agreement.
14       Q.   And when -- let's go to the BDO acronym,
15   that's just the letters BDO, right?
16       A.   It's defined so it certainly includes the
17   letters BDO.  It may include the logo but we'd have to
18   look at the --
19       Q.   We can look at the definition if you want.
20   It's on page B.V. 01938.  Can you blow up the BDO
21   acronym?
22           (Technician complies.)
23           And that's defined as the letters BDO,
24   displayed in the manner noted by the member firm from
25   time to time by BDO B.V. and any logo or other means of

Page 4890

1    presenting or displaying the international name which
2    from time to time may be notified by the member firm by
3    BDO B.V. together with the intellectual property
4    associated therewith."  Did I read that correctly?
5        A.   You did.
6        Q.   Doesn't that mean that when you're talking
7    about the BDO acronym you're talking the letters BDO as
8    described by BDO Seidman?
9        A.   Yes, but also the logo.
10       Q.   And the logo.  So the letters BDO and I'm
11   going to go back to my example again.  So when we talk
12   about the letters BDO that's BDO in front of the Seidman
13   name and then the logo is the BDO logo with these lines
14   on here?
15       A.   You're absolutely right.
16       Q.   So that's what we're talking about here.
17           And let's just go to -- back to objects of
18   the license.  And section --
19           THE COURT:  Why don't we stop here so we can
20   go to lunch?  Continue that after lunch.
21           Ladies and gentlemen, you're not to discuss
22   the case amongst yourselves.  You're not to allow
23   anybody to discuss the case with you.  You're not to
24   read or listen to any accounts of this case in the
25   media.  You're not to form a fixed or definite opinion

Page 4891

1    about the merits of the case until you have heard all
2    the evidence, the argument of the lawyers and the
3    instructions on the law by me and you are to ignore the
4    lawyers' presence outside this courtroom, including the
5    witness and they're to ignore yours.
6            1:15 wherever he tells you.  Have a good
7    lunch.
8            (Thereupon, the jury was escorted out of the
9    courtroom.)
10           THE COURT:  Mr. van Elten, you're not to
11   discuss the testimony you've given or about to give with
12   any of the lawyers on either side, including your
13   lawyers.  Understand.
14           THE WITNESS:  Yes --
15           THE COURT:  So you'll have to eat lunch by
16   yourself today, all alone.
17           Thank you.  1:15.
18           (Whereupon, at 12:15 p.m., a luncheon recess
19   was taken.)
20
21
22           *       *       *
23
24
25

Page 4892

1            CERTIFICATE OF COURT REPORTER
2
3        I, GIZELLA BAAN, court reporter, before whom
4    the foregoing statement was taken, do hereby certify
5    that the statement made was taken by me stenographically
6    at the time and place mentioned in the caption hereof
7    and thereafter transcribed by me to the best of my
8    ability; that said transcript is a true record of the
9    statement given; that I am neither counsel or, related
10   to, nor employed by any of the parties to the action in
11   which these proceedings were taken; and further, that I
12   am not a relative or employee of any party hereto, nor
13   financially or otherwise interested in the outcome of
14   this action.
15
16
17
18           _____
19           GIZELLA BAAN
20           Court Reporter and Notary Public
21           in and for the State of Florida
22
23
24
25

Page 4893

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


---------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
          Plaintiffs,
          vs.
BDO SEIDMAN, LLP, AND BDO INTERNATIONAL B.V.,
          Defendants.
---------------------------------------------------x
BDO SEIDMAN, LLP,
          Third-Party Plaintiff,
          vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
          Third-Party Defendants.
---------------------------------------------------x

PAGES 4893 - 5056

VOLUME 42



AFTERNOON SESSION

Miami, Florida

Tuesday, February 20, 2007

1:45 p.m.

Before the Honorable Jose M. Rodriguez



EXHIBIT

Reported by:  Gizella "Gigi" Baan

Page 4894

1        A P P E A R A N C E S
2
3    On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4    INTERNATIONAL, LTD., ET AL.:
5
6    SULLIVAN & CROMWELL, LLP
7        1888 Century Park East
8        Los Angeles, California 90067
9        (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida 33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       350 East Las Olas Boulevard, Suite
21       Fort Lauderdale, Florida 33301
22       (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25

Page 4895

1    On behalf of Defendant BDO Seidman, LLP:
2
3    ALVAREZ, ARMAS & BORRON
4        901 Ponce de Leon Boulevard, Suite 304
5        Coral Gables, Florida 33134
6        (305) 461-5100
7    BY:  Arturo Alvarez, Esquire
8
9    GREENBERG TRAURIG, LLP
10       MetLife Building
11       200 Park Avenue, 15th Floor
12       New York, New York 10166
13   BY:  Adam D. Cole, Esquire
14       Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17       1221 Brickell Avenue
18       Miami, Florida 33131
19   BY:  Mark Schnapp, Esquire
20       Nikki Simon, Esquire
21
22
23
24
25

Page 4896

1    On behalf of Defendant BDO International B.V., n/k/a BDO
2    GLOBAL COORDINATION B.V.:
3
4    BROAD AND CASSEL
5        One Biscayne Tower, 21st Floor
6        Miami, Florida 33131
7        (305) 373-9400
8    BY:  Mark Raymond, Esquire
9        Rhett Traband, Esquire
10
11   SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
12       30 Rockefeller Plaza, 24th Floor
13       New York, New York 10112
14       (212) 332-3831
15   BY:  Kevin W. Goering, Esquire
16       Lisa M. Lewis, Esquire
17
18
19
20
21
22
23
24
25

Page 4897

1    On behalf of Third-Party Defendants Victor Balestra,
2    Bernard Mollet, and Joaquim Garnecho
3
4    RICHMAN, GREER, WEIL, BRUMBAUGH,
5    MIRABITO & CHRISTENSEN, P.A.
6        Miami Center, Suite 1000
7        201 S. Biscayne Boulevard
8        Miami, Florida 33131
9        (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16       2701 Ponce de Leon Boulevard, Mezzanine
17       Coral Gables, Florida 33134
18       (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20       Geoffrey Marks, Esquire
21
22
23
24
25

Page 4898

CONTENTS

EXAMINATION OF PAUL VAN ELTEN BY:          PAGE:
    MS. ALEXANDER: (Direct, cont'd)    4900
    MR. RAYMOND: (Cross)                4941
    MS. ALEXANDER: (Redirect)          4957

EXAMINATION OF DAN GUY BY:                   PAGE:
    MR. THOMAS: (Direct)               4962

Page 4899

PROCEEDINGS

MS. ALEXANDER: Your Honor, I was just going to move Plaintiffs' Exhibit 1477 into evidence over defendant BDO International's objections as to relevance.

THE COURT: Are you stipulating it into evidence or are you objecting.

MR. RAYMOND: I am objecting. 401. And we have a foundation issue.

MS. ALEXANDER: This was -- I believe, your objection was the one that was the subject of your motion in limine as the manuals, which was denied.

MR. RAYMOND: I thought there was only the audit manuals.

MS. ALEXANDER: I believe you objected to all the manuals and this was the administrative manual.

MR. RAYMOND: If I didn't then, I am now.

MR. THOMAS: She's right.

MR. RAYMOND: If I didn't then, I am now.

THE COURT: I just want to make it clear for the record. Because there's a difference because of objecting to it because of the motion in limine. And other than that objection -- you stipulate to it, other than that objection, or are you objecting for it to come into evidence based on evidentiary issues other than 401

Page 4900

or 403.

MR. RAYMOND: Not under 401 or 403.

THE COURT: You're not objecting as to authenticity?

MR. RAYMOND: I am not.

THE COURT: That's what I need to know. Therefore, there's no need for a predicate to be laid other than authenticity. If it's 401 or 403, I've already ruled on the motion. Correct?

MR. RAYMOND: That's what I'm told.

THE COURT: Then I'll accept it into evidence.

MS. ALEXANDER: That's Plaintiffs' Exhibit 1477.

THE COURT: 1477 you said?

MS. ALEXANDER: 1477.

THE COURT: Are you ready? Bring them in.

THE BAILIFF: All rise for the jury.

(Thereupon, the jury was brought into the courtroom.)

THE COURT: Welcome back from lunch, ladies and gentlemen.

Ms. Alexander, you may continue with your direct examination.

DIRECT EXAMINATION (continued)

Page 4901

BY MS. ALEXANDER:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Before we broke off we were looking at the member-firm agreement and specifically 3.1, which concerns the object of the license.

MS. ALEXANDER: Can we put that back up on the screen?

(Technician complies.)

BY MS. ALEXANDER:

Q.   We're having technical difficulty. We were just going through the various terms used in that provision.

Do you have 3.1 in front of you?

A.   Yes, I have.

Q.   So one of the terms that it uses is BDO BV. Is that BDO International BV?

A.   Yes, now called BDO Global Coordination.

Q.   But during the time that's at issue in this lawsuit, it was BDO International?

A.   Yes, that's correct.

Q.   And that's the defendant in this action?

A.   Yes.

Q.   So can we have an agreement when it says BDO BV, it's means BDO International?

Page 4902

1    A.  It is.
2         MS. ALEXANDER:  Actually, I think now we're
3    done with this section.  Let's go down to 3.4.
4         (Technician complies.)
5    BY MS. ALEXANDER:
6    Q.  And again, the subject of this series of
7    provisions, objects of the license, is the use of the
8    BDO name and logo by BDO Seidman, correct?
9    A.  All firms including BDO Seidman.
10   Q.  Yes.  And this particular agreement is
11   between BDO International and BDO Seidman?
12   A.  You're correct.
13   Q.  And 3.4 reads, "All use and display of the
14   International name and the BDO acronym, whether in
15   conjunction with the domestic name or otherwise,
16   howsoever, shall be, and I'm going to read, A) applied
17   consistently to all relevant correspondence invoices,
18   publications, business cards, signage and publicity
19   material whether in printed form or electronic form."
20   And then I'm going to read -- well, stop there.
21        And what you're talking about there is the
22   use of the BDO name, such as -- and the logo, BDO, and
23   then the BDO name as applied to BDO Seidman, correct?
24   A.  That's correct.
25   Q.  And what it's saying under A is that it

Page 4903

1    needs to be applied consistently to letters, invoices,
2    business cards, and any other material that may be
3    produced by BDO Seidman, correct?
4    A.  That's correct.
5    Q.  And we saw some examples of that in the
6    corporate visual identity manual, correct?
7    A.  That's correct.
8    Q.  And then B says, in a form and specification
9    approved by BDO BV from time to time in its absolute
10   discretion.  So BDO International has absolute
11   discretion whether to allow BDO Seidman to use its logo
12   in any particular manner, correct?
13   A.  As set out in the corporate visual identity
14   manual.
15   Q.  And that was the manual we were looking at
16   before, right?
17   A.  That's correct.
18   Q.  That had the example of the letter and the
19   cocktail party sign?
20   A.  That's correct.
21   Q.  So BDO Seidman has to use the logo and the
22   BDO name in the manner that BDO International tells it
23   to, right?
24   A.  That's correct.
25   Q.  And BDO Seidman doesn't have any discretion

Page 4904

1    over that.  They have to do what you tell them to do
2    with respect to the use of the name and the logo, right?
3    A.  The corporate visual identity manual is the
4    product of consultation within the network, and for this
5    particular issue that would be dealt with by the
6    marketing committee where drafts of the manual are being
7    discussed and again where people work together as
8    outside consultants and certainly the input of the
9    member firms through that committee, and we issue the
10   manual.
11   Q.  And BDO Seidman has to follow the manual?
12   A.  As long as the member firm, BDO Seidman has
13   to follow the manual, that's correct.
14   Q.  And, in fact, let's turn to the next page
15   and look at 3.8.  In order to ensure that they're
16   following the manual and using the name and the logo in
17   the manner that you tell them to, BDO International has
18   the right at any time to request copies of BDO Seidman's
19   letterhead, publications, calling cards, note paper,
20   et cetera; is that correct?
21   A.  That's correct.
22   Q.  And again, if you don't like what they're
23   doing with the letterhead or the calling cards or any
24   other publications that they put the BDO name on, you
25   can tell them to stop it, right?

Page 4905

1    A.  Yes.
2    Q.  Let's go to duty which is -- and Mr. van
3    Elten, we're going to be looking at what's called BV
4    01947.
5         Now, the member-firm agreement also imposes
6    certain requirements on BDO Seidman on how it's supposed
7    to conduct its business, correct?
8    A.  It gives some duties of member firms'
9    obligations in different areas, yes.
10   Q.  And some of those affect how BDO Seidman
11   conducts its business, right?
12   A.  They have to follow the manuals, yes.
13   Q.  They have to follow the manuals, but they
14   also have to do other things, right?
15   A.  They -- let's look at those things.
16   Q.  Well, let's look at some of those.  For
17   example, under 6.1 it reads -- under 6.1, BDO Seidman
18   has to promote the BDO name.
19        Is that one of the things that BDO Seidman
20   has to do under this agreement?
21   A.  The BDO acronym, yes.
22   Q.  And the BDO acronym is the BDO name and the
23   BDO logo?
24   A.  That's correct.
25   Q.  So one of the things that BDO Seidman has to

Page 4906

1  do for BDO International is to promote the BDO name and
2  the logo as part of its business, right?
3      A.  To the benefit of the whole network.
4      Q.  Right. It's also to the benefit of BDO
5  International, correct.
6      A.  As part of the network, yes.
7      Q.  One of the other things that BDO Seidman has
8  to do for BDO International is make its partners and
9  staff available when BDO International asks them to,
10  correct?
11      A.  We expect that member firms including this
12  case, BDO Seidman, sends representatives to
13  international meetings or committee meetings. Yes,
14  that's what this clause is about.
15      Q.  I don't know if that's you or me Mr. van
16  Elten.
17      A.  I don't know. I don't know why but --
18      Q.  We'll keep on going and see what happens.
19          One of the things they have to do is what
20  you just said is they have to make their partners and
21  staff available to attend meetings or conferences if you
22  ask them to, correct?
23      A.  Well, we don't ask specific partners to
24  attend, but this is -- in general, we would expect for
25  member firms and other member firms would expect from

Page 4907

1  Seidman that partners be there at functions.
2      Q.  Well, you could ask for them to make a
3  specific person available, right?
4      A.  I can ask, but whether they do it is
5  something else.
6      Q.  Well, that's one of the things they have to
7  do under this member-firm agreement is make their people
8  available to attend conferences and meetings if you
9  asked them to, right?
10      A.  In general terms, yes, but not I want to
11  miss the A to come to conference B. That's not the way
12  it works.
13      Q.  Why don't we take a look at the agreement.
14  I think what you're referring to is subsection D under
15  6.2. And it says -- 6.2 reads, member firms shall
16  prepare that its partners and employees, and under D,
17  attend conferences, exhibitions, talks, seminars, and
18  other similar arrangements relating to the performance
19  of professional services that the member firm shall deem
20  necessary for the performance of the duties of the
21  member firm under this agreement or as BDO BV shall
22  reasonably request.
23          So under that provision, BDO International
24  can ask BDO Seidman to make its partners and employees
25  available to attend conferences, exhibitions, talks,

Page 4908

1  seminars, and other similar arrangements, right?
2      A.  We can ask, that's right.
3      Q.  And BDO Seidman would have to comply with
4  that request under this agreement, right?
5      A.  We would expect them to comply, yes.
6      Q.  Well, they were required to comply. That's
7  part of the agreement, right?
8      A.  They would be obliged to comply with that
9  request.
10      Q.  Because it's part of the agreement, right?
11      A.  Yes.
12      Q.  It's one of their duties under this
13  agreement?
14      A.  We would expect them to participate, yes.
15      Q.  It's one of their duties under the
16  agreement?
17      A.  Yes.
18      Q.  And another thing that they have to do is
19  they have to make their partners and employees available
20  for the purpose of providing professional services which
21  would include accounting and auditing work, right?
22      A.  Yes.
23      Q.  And that's what it says in subsection A
24  there?
25      A.  Yes. That's correct.

Page 4909

1      Q.  So -- and professional services is defined
2  in this agreement to include accounting and auditing
3  work, correct?
4      A.  Correct.
5      Q.  So if BDO International asks BDO Seidman,
6  BDO Seidman would have to make partners and employees
7  available to conduct accounting and auditing work at
8  your request?
9      A.  That's correct.
10      Q.  And the other thing they have to make their
11  partners and employees available to is for the
12  performance of certain kinds of work, right? Under B,
13  talks about the preparation of reports or other papers,
14  and under section C, it talks about the development of
15  products.
16          Do you see where I'm reading from there?
17      A.  Yes.
18      Q.  So those are two other ways that if BDO
19  International asks, BDO Seidman has to make its partners
20  and employees available for those purposes too, right?
21      A.  That's correct. These two subclauses
22  specifically refer to the work of partners of member
23  firms, in this case BDO Seidman, within our
24  international committees.
25      Q.  Well, and this would be at the request of

Page 4910

1   BDO International, right?
2       A.   Yes.
3       Q.   And if they do this work, they prepare
4   reports or develop products, those products and reports
5   then become the property of BDO International, right?
6       A.   That's correct.
7       Q.   And so they do all this work for you, and
8   then you get to keep their work, right?
9       A.   Yes. To issue for the network. For the
10  benefit of the other member firms.
11      Q.   But it's at your request, correct?
12      A.   We would request -- if we think we need
13  support from BDO Seidman at a certain committee or to
14  certain paper, we would request their cooperation and
15  their help in doing that work. And we would require
16  that, yes.
17      Q.   Mr. van Elten, one of the duties of BDO
18  Seidman under this agreement is to make its partners and
19  employees available to prepare reports or other papers
20  or develop products at your request, correct?
21      A.   Yes. That's correct.
22      Q.   And if BDO Seidman's partners and employees
23  prepare such reports or develop such products at your
24  request, those then become the property of BDO
25  International, right?

Page 4911

1       A.   That's correct.
2       Q.   Now, the other thing that -- duty, one of
3   the other duties of BDO Seidman under this agreement is
4   to make sure that when -- that the people that it
5   employs, partners and employees, are suitably qualified
6   to do professional services such as accounting and
7   auditing, right?
8       A.   That's correct.
9       Q.   And that's what's reflected in 6.3.
10          MS. ALEXANDER: Blow that up.
11          (Technician complies.)
12  BY MS. ALEXANDER:
13      Q.   So again, BDO Seidman has a duty under this
14  agreement to make sure that the people it's hired are
15  all suitably qualified to do work under the BDO name,
16  correct?
17      A.   That's correct.
18      Q.   And that would include Mr. Lenner?
19      A.   Yes.
20      Q.   And this is one of the ways that BDO
21  International ensures or imposes quality control over
22  the work that's being done under the BDO name, right?
23      A.   We would expect that all the work that's
24  being done, the member firms, is done by qualified
25  people, yes.

Page 4912

1       Q.   Correct. And that's a requirement imposed
2   on BDO Seidman by BDO International, right?
3       A.   In this agreement, yes.
4       Q.   And, in fact, Mr. Lenner and all the
5   partners of BDO Seidman are bound by this agreement,
6   correct?
7       A.   That's correct.
8       Q.   So if Mr. Lenner said that he was not bound
9   by an agreement with BDO International, he would be
10  incorrect, right?
11      A.   I don't know whether he said that, but he's
12  bound as a partner of BDO Seidman. He's bound by the
13  terms of this agreement.
14      Q.   Right. And so he's bound by an agreement
15  with your company, BDO International?
16      A.   That's correct.
17      Q.   Now, among the other duties that BDO Seidman
18  has and owes to BDO International, is that it has to
19  provide BDO International with information about its
20  business, right? And we'll be looking at exchange of
21  information and, Mr. van Elten, for your purposes it
22  begins at BV 01954.
23      A.   I have it.
24      Q.   Do you have that in front of you?
25      A.   I have it in front of me, yes.

Page 4913

1       Q.   And do you agree with me that one of the
2   duties of BDO Seidman under this agreement is to provide
3   BDO International with information about its business,
4   right?
5       A.   As specified in this agreement, yes.
6       Q.   And that includes who all the partners of
7   BDO Seidman are?
8       A.   Yes, that's correct.
9       Q.   And so you knew that Sandy Lenner, for
10  example, was a partner at BDO Seidman?
11      A.   I didn't know Mr. Lenner personally before
12  this case but he was one of the partners mentioned in
13  our international directory that we issue every year.
14      Q.   So BDO International was aware that
15  Mr. Lenner was a partner at BDO Seidman?
16          MR. RAYMOND: Objection.
17          THE COURT: Overruled.
18          THE WITNESS: His name was in the directory,
19  yes. If that's the -- maybe it's my English but his
20  name was in the list of partners of BDO Seidman, yes.
21  So in that sense we were aware, if you wish. I don't
22  know what -- maybe I'm misunderstanding it.
23  BY MS. ALEXANDER:
24      Q.   I'm sorry, I'm just trying to be clear. I'm
25  sorry.

Page 4914

1       So BDO International was aware that
2  Mr. Lenner was a partner at BDO Seidman?
3       A.  He was in that list.  If that's being aware
4  of that, the answer is yes.
5       Q.  You had been -- BDO International had been
6  providing information by BDO Seidman that Mr. Lenner was
7  a partner?
8       A.  Yes.
9       Q.  Among the other things that BDO Seidman has
10  to keep BDO International informed about is any changes
11  to its performance of auditing and accounting work,
12  right?
13       A.  Where do you see?
14       Q.  I'm looking now at C.
15       A.  Right.  That's -- yeah.  That's correct.
16       Q.  So BDO Seidman is going to change how it
17  performs its auditing and accounting work, it needs to
18  inform BDO International?
19       A.  That's what it says here, yes.
20       Q.  And that's, in fact, a duty imposed on BDO
21  Seidman by BDO International?
22       A.  That's what the agreement says; yes, that's
23  correct.
24       Q.  Well, as an international secretary of BDO
25  International it's your understanding that is, in fact,

Page 4915

1  a duty imposed on BDO Seidman by BDO International?
2       A.  That's correct.
3       Q.  And another thing that BDO Seidman has to
4  keep BDO International informed about is any significant
5  or material changes in domestic laws or professional
6  regulation that apply to its performance of accounting
7  and auditing work, correct?
8       A.  Correct.
9       Q.  And another thing that BDO Seidman has to
10  keep BDO International informed about is how much money
11  it makes each year, right?
12       A.  We asked for the annual accounts of each
13  firm including BDO Seidman.
14       Q.  So every year BDO Seidman provides you with
15  how much money it's making?
16       A.  If it's from the annual accounts, yes.
17       Q.  Well, you would expect that BDO Seidman
18  tells you how much money it's making every year, right?
19       A.  As shown in the financial statements, yes.
20       Q.  And finally under J, if there's any other
21  documentation or information that you believe is
22  necessary, BDO Seidman then has to provide it to you,
23  right?
24       A.  When it's reasonable to request, yes, then
25  there's a duty to provide that information, yes.

Page 4916

1       Q.  And one of the other things BDO Seidman has
2  to do under this agreement is pay you money, right?
3       A.  That's correct.
4       Q.  And that's set by you, right, not by BDO
5  Seidman?
6       A.  Sorry?
7       Q.  The amount of money that BDO Seidman has to
8  pay BDO International is determined by BDO
9  International, correct?
10       A.  It's calculated using a formula that's been
11  agreed by the network, and it's referred to in the
12  member-firm agreement as the cost memorandum.  And we --
13  BDO BV each year, based on an agreed budget, agreed by
14  the policy board and the council, which is, if you wish,
15  the general assembly of all member firms, that agreed
16  budget is allocated to member firms using the formula
17  agreed again by the policy board and the council to --
18  sorry -- based on that formula which is included in the
19  cost memorandum.
20       So it's not -- if you wish, we cannot simply
21  determine an amount.  We have to follow the rules that
22  the network has established.
23       Q.  That was a rather long answer.  I'm going to
24  try to break it down.  No, no, no, you don't need to
25  apologize.  I'm just going to ask you a bunch of

Page 4917

1  questions about it.
2       You referred to the policy board.  The
3  policy board is the board of directors of BDO
4  International?
5       A.  Used to be.
6       Q.  Right.  And again, we're talking about the
7  time during which these -- the audits at issue in this
8  case occurred?
9       A.  Yes.
10       Q.  During that period, the policy board was the
11  board of directors of BDO International?
12       A.  That's correct.
13       Q.  So when you say policy board, it's just a
14  part of BDO International, right?
15       A.  That's correct, yes.
16       Q.  And the cost memorandum that you were just
17  referring to is a policy statement that's issued by the
18  policy board, right?
19       A.  Well, it's a cost memorandum, and it existed
20  in the member-firm agreement before there was any talk
21  of policy statements.  Afterwards it was in -- I think
22  it was included in the administrative manual as a policy
23  statement.  But it certainly -- the reason why everybody
24  is bound by that is based on the member-firm agreement.
25       So the origin of that document is not in

Page 4918

1  itself a policy board of BV. It's BV and the policy
2  board -- if you wish, that's the same -- plus all member
3  firms acting through the council.
4        MS. ALEXANDER: Okay. Can we look at 8.1?
5        (Technician complies.)
6  BY MS. ALEXANDER:
7        Q.   And this is the -- I believe this is the
8  provision in the agreement that refers to the cost
9  memorandum and the payment by BDO Seidman to BDO
10  International. And it says, the member firm shall pay
11  to BDO BV -- and that means BDO International, correct?
12        A.   That's correct.
13        Q.   -- within one month after the date of the
14  invoice such sum or sums as may be determined by BDO BV,
15  and that's BDO International, in accordance with the
16  provisions set out in the cost memorandum and from time
17  to time issued by BDO BV, and that's BDO International,
18  approved by policy board and council.
19        Did I read that correctly?
20        A.   Yes.
21        Q.   So the amount of money that BDO Seidman gave
22  to BDO International is determined by BDO International
23  in accordance with the cost memorandum issued by BDO
24  International and which also is approved by the policy
25  board and council, correct?

Page 4919

1        A.   Correct.
2        Q.   So BDO International determines how much,
3  with the approval of the policy board and council, but
4  BDO International is determining how much BDO Seidman is
5  paying BDO International, right?
6        A.   We do the calculations, yes.
7        Q.   And part of that calculation is based on how
8  much money BDO Seidman makes every year, right?
9        A.   How -- maybe I misunderstand, but it's been
10  one factor, and that formula is the amount of turnover
11  or fee income, if you wish, of a member firm of BDO
12  Seidman.
13        Q.   Right. In fact, it's 40 percent of that
14  amount is determined based on how much money BDO Seidman
15  is making, right?
16        A.   As part -- yeah, that's part of the formula.
17        Q.   Right. So 40 percent of the formula --
18  40 percent of the amount paid by BDO Seidman to BDO
19  International is based on how much money BDO Seidman
20  made that year?
21        THE WITNESS: May I explain that?
22        THE COURT: Yes.
23        THE WITNESS: Your Honor, 40 percent -- we
24  have a budget, as I told you before, which is agreed by
25  the policy board and by council. 40 percent -- and this

Page 4920

1  is true during the years that we're talking about.
2  40 percent of the budget is allocated to all member
3  firms including BDO Seidman based on the
4  proportionate -- on the side of member firms.
5        60 percent of the budget is allocated to
6  member firms in relation to the amount of
7  inward-referred work, which means that member firms
8  have, which means the work that was referred to a member
9  firm by all the other member firms together. It's quite
10  complicated.
11  BY MS. ALEXANDER:
12        Q.   I know and I'm trying to actually keep it
13  simple. BDO Seidman pays BDO International an amount
14  every year?
15        A.   That's correct.
16        Q.   And 40 percent of that amount is determined
17  on how much money BDO Seidman made that year?
18        A.   How much their turnover was, yes, that's
19  right. If they're making money.
20        Q.   Well, by turnover do you mean how much money
21  they made that year?
22        A.   The sales that they do. That's the top line
23  of the income statement. I'm not talking about the
24  bottom line. I don't know that, but --
25        Q.   So how much revenue they earn from

Page 4921

1  performing audits?
2        A.   Yes.
3        Q.   I'm going to try one more time.
4        A.   Sorry.
5        Q.   No, that's okay.
6        So 40 percent of how much BDO Seidman pays
7  you, BDO International, each year is based on how much
8  money BDO Seidman made from performing accounting and
9  auditing work and whatever other work they made?
10        MR. RAYMOND: Objection. Misstates the
11  witness's statement.
12        THE COURT: Overruled.
13        THE WITNESS: As I explained in the formula,
14  yes.
15  BY MS. ALEXANDER:
16        Q.   Thank you.
17        Now, in addition to the duties that we've
18  just been discussing, BDO International also imposes
19  certain rules and standards on BDO Seidman in order to
20  allow it to conduct accounting and auditing work under
21  the BDO name, right?
22        A.   That's right.
23        Q.   Why don't we take a look at Section 9.1
24  which, Mr. van Elten, is BV 01951? And Mr. van Elten,
25  you've been referring to the member-firm agreement and

Page 4922

1  the provision which distinguishes between certain types
2  of work. I believe this is the provision you've been
3  referring to?
4      A. Clause 9.1, yes.
5          MS. ALEXANDER: So let's take a look at 9.1.
6          (Technician complies.)
7  BY MS. ALEXANDER:
8      Q. 9.1 reads, subject to the provisions of
9  clause 9.3, which we'll get to in a moment, the member
10 firm, which is BDO Seidman, shall at all times comply
11 with the principles set out in the BDO technical
12 manuals, and those are the audit manuals you have there
13 on your ledge there, and with respect to all
14 inward-referred work and transnational audits undertaken
15 by the member firm, again, BDO Seidman. Then it reads,
16 for local work the member firm, BDO Seidman, shall at
17 least comply with the local standards and shall use its
18 best endeavors to comply with the BDO technical manuals
19 for such work.
20         Did I read that correctly?
21     A. Yes, you did.
22     Q. So for local work -- and I'm going to
23 understand local work to include the audits that they
24 performed for E.S. Bankest. Is that your understanding?
25     A. That's my understanding.

Page 4923

1      Q. -- BDO Seidman shall at least comply with
2  the prescribed local standards, and those would mean
3  standards that apply in the United States and in
4  Florida, correct?
5      A. That's correct.
6      Q. And then, also, shall use its best endeavors
7  to comply with the BDO technical manuals, which are
8  again those documents, the stack of documents over
9  there, for such work; is that correct?
10     A. That is correct.
11     Q. Now, if at any time BDO Seidman believed
12 that by complying with the prescribed local standards,
13 the United States or Florida standards, was going to be
14 in violation -- a violation of the BDO technical
15 manuals, they have to provide BDO International notice
16 of that fact, right?
17     A. They have to inform us, yes.
18     Q. And that's true of whether it's a local work
19 or an inward-referred work or a transnational audit,
20 right?
21     A. Can I just read?
22     Q. And I'm looking now at 9.2.
23         MS. ALEXANDER: Why don't we make that -- so
24 we have all of them on the screen.
25         (Technician complies.)

Page 4924

1          THE WITNESS: Yes, I believe that's the
2  case.
3  BY MS. ALEXANDER:
4      Q. So if BDO Seidman is performing the E.S.
5  Bankest audits or some other local audits here in
6  Florida and believes that the performance of that audit
7  will make it in violation with the audit manuals issued
8  by BDO International, they have to provide you notice?
9      A. I think in this case if Florida allows
10 regulations, following those, would bring them in, that
11 would conflict with our rules, we would like to know,
12 yes. That's what it says.
13     Q. Well, it's not just like to know, right?
14 BDO Seidman has to tell you, right?
15     A. Absolutely, right.
16     Q. And then BDO Seidman has to get your
17 authorization to be in violation of the technical
18 manuals in performing such work, right?
19         MS. ALEXANDER: (Inaud.).
20         (Technician complies.)
21         THE WITNESS: We would need to understand
22 the reasons why the rules and the manuals cannot be
23 followed and understand these reasons. And then we
24 would confirm our agreement if you understand that
25 through the member firm, which is, in a way, a

Page 4925

1  dispensation of following the manuals. And that is
2  because -- and, again, this is the -- the focus here is
3  on -- the idea behind all this is the international
4  network.
5          So if member firm like, for instance, BDO in
6  Germany would refer work to BDO Seidman here in the
7  United States, there is a presumption, a valid
8  presumption, because all the member firms have signed
9  this agreement, that BDO Seidman follows the manuals
10 that -- the international manual for referred work.
11         Now, if, in a case, a member firm -- let's
12 take the example here in the U.S. -- would not be able
13 to follow the international rules because it would
14 otherwise be violating local rules, we would understand
15 that. And if we have that understanding, we would
16 confirm that they have that dispensation and we would
17 inform the network that that is the case so that the
18 other member firms know that in country X or in the
19 United States for that -- for those reasons, the member
20 firm cannot follow the international manual. That's
21 what's behind this.
22 BY MS. ALEXANDER:
23     Q. Okay. Well, again, that was another rather
24 long answer. I just want to make sure I can -- maybe
25 the best way to do that is to go through the language of

Page 4926

1  the agreement.
2        Looking at 9.2, it reads, if the member firm
3  shall at any time become aware that it will be in breach
4  of or in variance of any of the domestic laws,
5  accounting standards, professional regulations, or
6  general accepted accounting practices in the territory,
7  which in this case means United States, including
8  Florida, by complying with the provision of any of the
9  BDO technical manuals, the member firm shall forthwith
10 give to BDO BV, which is BDO International, notice in
11 writing of the circumstances surrounding same, and then
12 this goes on.
13       So again, if BDO is performing an audit and
14 by following United States and Florida accounting laws
15 and standards or regulations would be in violation of
16 your technical manual, they have to provide BDO
17 International with notice of that, correct?
18    A.  Yes.
19    Q.  And that's true of any audit that they're
20 performing?
21       MR. RAYMOND: Objection.
22       THE COURT: Sustained.
23 BY MS. ALEXANDER:
24    Q.  Well, this provision doesn't distinguish
25 between the nature of the work that's being performed,

Page 4927

1  does it?
2    A.  I don't read it here.
3    Q.  And then in 9.3 it provides, on receipt of a
4  variation notice from BDO Seidman, a notice that says
5  we're going to have to violate the technical manual in
6  order to comply with the United States or Florida law,
7  BDO International shall be entitled to investigate the
8  circumstances surrounding the proposed variation.
9        And then I'm going to go on, after
10 investigation, BDO BV, BDO International, shall, by
11 notice in writing signed by the chief executive officer,
12 sit out the way in which the member firm, BDO Seidman,
13 may alter its practice from the provision of the
14 relevant technical manuals in order to comply with the
15 laws, standards, practices, or professional regulations
16 in force in the United States including Florida.
17       So BDO International provides BDO Seidman
18 with a written notice signed by your CEO saying that you
19 may alter your practice in the technical manuals in
20 order to comply with the United States or Florida law.
21 Is that how it would work?
22    A.  Yes. That's what it says, yes.
23    Q.  So essentially, BDO Seidman needs your
24 permission in order to follow United States or Florida
25 law regulations if those laws and regulations are in

Page 4928

1  variance with the technical manuals, right?
2    A.  I don't think they need our permission to
3  follow the laws of the United States. They have to do
4  that. What we want to know if they cannot follow our
5  rules, the international rules and the international
6  manual, because of the fact that they have to follow,
7  and that's first.
8        All our member firms are subject to the laws
9  and regulations of their own country, their own
10 institute of accountants, and that's number one. But
11 we -- as I said, we need to understand if there are
12 variations to be able to inform the network that there
13 are variations from the international manual and to
14 explain to the network what the variations are. And we
15 put that in writing. That it's clear for everybody.
16 That's what this 9.2 and 9.3 is meant to cover.
17    Q.  Well, I appreciate that that's what you're
18 telling us it was meant to cover. But the language is
19 actually a little bit different.
20       MR. RAYMOND: Objection. Argumentative.
21       THE COURT: Sustained.
22 BY MS. ALEXANDER:
23    Q.  Again, it provides that BDO International BV
24 shall, and I'll go down, set out the way in which the
25 member firm, BDO Seidman, may alter its practice from

Page 4929

1  the provision of the relevant technical manuals.
2        So doesn't that mean that BDO International
3  informs BDO Seidman how they can change their practice
4  to be in variation with the technical manuals?
5        MR. RAYMOND: Object to the form of the
6  question. I don't understand it.
7        THE COURT: I was just going to ask him, do
8  you understand the question?
9        THE WITNESS: No, I don't.
10       THE COURT: Why don't you rephrase it?
11       MS. ALEXANDER: I'll try one more time. I
12 apologize.
13 BY MS. ALEXANDER:
14    Q.  Under this provision, 9.3, BDO International
15 will set out -- will tell BDO Seidman the manner in
16 which it may alter its practice if that practice is
17 going to be in violation of the technical manual.
18       MR. RAYMOND: Objection. Misstates the
19 predicate of 9.3.
20       THE COURT: Overruled.
21       THE WITNESS: Sorry, could you repeat the
22 question?
23       (Thereupon, the court reporter read back the
24 requested portion.)
25       MR. RAYMOND: Same objection.

Page 4930

1      THE COURT: Overruled.
2      THE WITNESS: What it says here is that
3   BDO BV shall set out the way or the extent to which BDO
4   Seidman does not have to follow the international
5   manual.
6   BY MS. ALEXANDER:
7      Q.   Thank you, Mr. van Elten.
8      A.   You're welcome.
9      Q.   Another obligation under the member-firm
10  agreement of BDO Seidman is to submit to review
11  conducted by BDO International for compliance with the
12  agreement; is that correct?
13     A.   You're referring to clause 10, I believe.
14  And that says what it says. But I cannot agree
15  completely with the way you worded it.
16     Q.   Let me try again.
17     As the international secretary of BDO
18  International, you know that part of what BDO
19  International does is that it conducts reviews of the
20  member firms including BDO Seidman?
21     MR. RAYMOND: Object to the form of the
22  question.
23     THE COURT: Overruled.
24     THE WITNESS: We don't perform reviews. We
25  organize the reviews.

Page 4931

1   BY MS. ALEXANDER:
2      Q.   And those would be -- those would include
3   quality assurance reviews?
4      A.   Yes. That's correct.
5      MS. ALEXANDER: May I approach, Your Honor.
6      THE COURT: You may.
7   BY MS. ALEXANDER:
8      Q.   Mr. van Elten, I'm approaching with what's
9   been marked as Plaintiffs' Exhibit 1477 now in evidence,
10  which is the BDO International administrative manual.
11     The administrative manual is another manual
12  issued by BDO International to the member firms?
13     A.   That's correct.
14     Q.   And it contains policy statements that the
15  member firms must follow?
16     A.   It contains policy statements that sometimes
17  are descriptive of a situation, other times deals with
18  obligations of member firms, that's correct.
19     Q.   So let's look at policy statement 405, which
20  is BV 01251. Do you have that in front of you?
21     A.   Yes, I have.
22     Q.   And is this a policy statement that the
23  member firms are required to follow?
24     A.   This is a, if you wish, a user guide
25  describing the procedures around 10.1 of the member-firm

Page 4932

1   agreement.
2      Q.   And 10.1 of the member-firm agreement
3   obligates BDO Seidman to submit itself to reviews
4   pursuant -- that are conducted pursuant to this policy
5   statement, correct?
6      A.   Pursuant to clause 10.1.
7      Q.   Right. And the policy statement sets forth
8   a more detailed guidance as to how those reviews are to
9   be conducted, correct?
10     A.   Yes.
11     Q.   And those reviews are those that BDO Seidman
12  is required to subject itself to as part of the
13  member-firm agreement?
14     A.   Right.
15     Q.   Let's just start the -- and the title of
16  this is Policy Statement 405, Quality Assurance
17  Standards Reviews. And BDO Seidman is subject to these
18  quality assurance standard reviews?
19     A.   Correct.
20     Q.   And the purpose of these quality assurance
21  standards reviews is to make sure that all member firms,
22  including BDO Seidman, abide by the standards
23  established by BDO International, correct?
24     A.   Issued by BDO International, yes.
25     Q.   And the goal of that is stated right there,

Page 4933

1   in order to protect our position as a recognized,
2   competent, international accounting and consulting
3   organization and to ensure that our multinational and
4   our domestic clients are served to the highest possible
5   standard. That's the goal of the reviews, right?
6      A.   That's what it says here, yes.
7      Q.   Do you disagree with that, that that's the
8   goal of the quality assurance standards reviews?
9      A.   It's not my writing so I don't know.
10     Q.   Mr. van Elten, you're the international
11  secretary of BDO International since 1988, correct?
12     A.   That's correct.
13     Q.   And you are aware that quality assurance
14  standard reviews are conducted of member firms including
15  BDO Seidman?
16     A.   Yes.
17     Q.   And the goal of those quality assurance
18  reviews, to protect BDO's position as a recognized,
19  competent, international accounting and consulting
20  organization?
21     A.   That's what it says here. The way it's
22  describing it -- these are not my words, as I said --
23  it's to make sure that the -- in this case BDO Seidman
24  follows the manuals. That's what the quality assurance
25  review does.

Page 4934

1     Q.   And the manual sets forth the standards that
2  BDO Seidman has to follow, right?
3     A.   That's correct.
4     Q.   And that if they follow the standards,
5  you're ensuring that BDO Seidman and clients are being
6  served to the highest possible standard, right?
7     A.   That's what we achieve -- attempt to
8  achieve.
9     Q.   And going down to the next paragraph, it
10  reads that the quality assurance review program provides
11  for an on-site inspection of the procedures, practices,
12  and files of the member firms.
13        So as part of the quality assurance review
14  program, BDO Seidman's procedures, practices, and files
15  will be reviewed, correct?
16     A.   That's what it says, yes.
17     Q.   Well, again, Mr. van Elten, I appreciate
18  that that's what it says, but is that, in fact, what
19  happens as a result of the quality assurance review
20  program?
21     A.   I must assume --
22        MR. RAYMOND:  Objection.
23        THE COURT:  Overruled.
24        THE WITNESS:  I don't have personal
25  knowledge of how these reviews are conducted.

Page 4935

1  BY MS. ALEXANDER:
2     Q.   And then this policy statement continues to
3  provide -- hold on a second -- that on the completion of
4  such inspection, it is the responsibility of the chief
5  executive officer and/or the international service
6  coordinator follow up on the reports to ensure
7  corrective action is taken to maintain our practice
8  standards at acceptably high level.
9        Now, did I read that correctly, Mr. van
10  Elten?
11     A.   Yes.
12     Q.   And the chief executive officer is the chief
13  executive officer of BDO International, correct?
14     A.   That's correct.
15     Q.   And the international service coordinator is
16  also an employee of BDO International, right?
17     A.   Correct.
18     Q.   And so part of what BDO International does
19  is it follows up on the reports generated by these
20  reviews to ensure that any problems that are found are
21  corrected, right?
22     A.   That's correct.  We follow up the agreed
23  actions, the actions agreed based on the review by the
24  reviewers and the member firm in question.
25     Q.   And the goal of that is to ensure that the

Page 4936

1  practice standards of BDO remain at an acceptably high
2  level, correct?
3     A.   That's correct.
4     Q.   And then -- just one more piece of the
5  policy statement.  It also provides that the failure or
6  refusal of any member firm to maintain the necessary
7  level of standards will result in the member firm being
8  referred to the policy board for a decision as to future
9  action, sanctions, or, ultimately, termination of
10  membership.
11        Did I read that correctly?
12     A.   Yes, you did.
13     Q.   So if BDO Seidman refuses to -- as a result
14  of a review, a member firm such as BDO Seidman is
15  determined to not be performing at the standards
16  required by BDO firm, they can be terminated, correct?
17     A.   If they refuse to fail consistently to apply
18  the standards, any member firm could be proposed for
19  termination to the policy board.
20     Q.   And again, the policy board is part of BDO
21  International, right?
22     A.   During the years that we were talking about,
23  yes.
24     Q.   So during the time that the Bankest audits
25  were being performed, if a member firm such as BDO

Page 4937

1  Seidman was found to be in violation of the standards of
2  the BDO firm and refused to fix that, BDO International
3  could terminate that member firm?
4     A.   Yes, but it's not as easy as you say it.
5  It's not -- just you decide to do that, there's a whole
6  process, of course, before we ultimate terminate
7  membership.
8     Q.   Well, in fact, BDO International did
9  terminate member firms as a result of finding that they
10  didn't perform to the standards required of a BDO firm,
11  right?
12     A.   Yes, that's correct.
13     Q.   And you continued to have that ability to
14  terminate member firms that fail to perform to the
15  standards of a BDO firm, right?
16     A.   If they consistently, we would propose to
17  the policy board to terminate the member, that's
18  correct.
19     Q.   Now, I think what you were trying -- I don't
20  mean to put words into your mouth, but in addition to
21  termination, if a member firm is found to be in
22  violation of the BDO standards, you can also just ask
23  them to take corrective action, right?
24     A.   That would be the first step.  That's the
25  last part I was referring to, to a review.  A review, as

Page 4938

1    shown, that there are some non-compliance or
2    deficiencies in the work performed. That will be the
3    first part, corrective action, that's correct.
4        Q.    And BDO International will work with a
5    member firm to try to get them to put that corrective
6    action in place and be in compliance with the
7    member-firm agreement and the standards imposed by that
8    agreement?
9        A.    We would tell them to get whatever support,
10   training. We would organize that.
11       Q.    Now, BDO Seidman was found in violation of
12   the member-firm agreement, correct?
13       A.    I don't know what you're referring to.
14       Q.    Under the member-firm agreement, can BDO
15   Seidman license or let another company use the BDO name?
16       A.    Not without our consent, BV's consent.
17       Q.    And did BDO International discover at some
18   point that BDO Seidman was allowing other companies to
19   use the BDO name without your consent?
20       A.    Yes. That's correct.
21       Q.    And that was part of the alliance program
22   that BDO Seidman has?
23       A.    That's correct. In relation to the alliance
24   program, we had this issue, yes.
25       Q.    And one of the companies in that alliance

Page 4939

1    program was StrataSys, right? BDO Seidman was allowing
2    StrataSys to enter into alliance and use the BDO name,
3    right?
4        A.    That's what my understanding is since this
5    case came to -- was -- came to our knowledge, yes.
6        Q.    And that was a violation of the member-firm
7    agreement, correct?
8        A.    That was a violation of the member-firm
9    agreement, yes.
10       Q.    And BDO International has asked BDO Seidman
11   to take corrective action about that violation of the
12   member-firm agreement, correct?
13       A.    We've been -- we have had lengthy
14   discussions with BDO Seidman and to try to come to a
15   formalization of the situation by giving our consent on
16   a number of conditions that we believe are required to
17   allow others to use the BDO logo.
18            But I have to say that so far we have been
19   unsuccessful in reaching an agreement with BDO Seidman.
20   They simply continue without our consent.
21       Q.    And just one more point for the termination.
22   Mr. van Elten, is it an accurate statement that under
23   this agreement BDO International can terminate member
24   firms including BDO Seidman if it considers that it's in
25   BDO International's best interest?

Page 4940

1        A.    You're referring to the member-firm
2    agreement because I was looking at --
3        Q.    I'm looking at the termination which is at
4    BV 01958. Do you have that?
5        A.    I have the page.
6        Q.    I'm looking at 16.2. It reads from the top,
7    BDO BV, which is BDO International, may terminate this
8    agreement either immediately or by giving up two years'
9    written notice, and then I'm just looking at division G
10   there.
11            If BDO BV, BDO International, considers it
12   in its best interest or that of the BDO network as a
13   whole that the member firm should no longer be a member
14   of the organization.
15            Did I read that correctly?
16       A.    Yes, you did, except that we need policy
17   board approval.
18       Q.    Right. And again, policy board is just part
19   of BDO International during the time that we're talking
20   about?
21       A.    That's correct.
22       Q.    So again, BDO International may terminate a
23   member firm such as BDO Seidman if it considers it to be
24   in the best interest of BDO International?
25       A.    That's what it says, yes.

Page 4941

1        Q.    And is that, in fact, what BDO International
2    could do if it chose to?
3        A.    To be very honest, I don't think we would
4    ever succeed in getting this agreed by the policy board.
5    I think they would (inaud.) proposal. I think they
6    would fire me.
7        Q.    Well, if BDO International decided that it
8    was in its best interest to terminate a member firm such
9    as BDO Seidman under this agreement, it could terminate
10   BDO Seidman, correct?
11       A.    That's correct. But I don't think you can
12   think of a situation where that would be the case, but
13   that's maybe crystal ball case.
14           MS. ALEXANDER:    Your Honor, I have no
15   further questions at this time of Mr. van Elten. And I
16   pass the witness.
17           THE COURT:    Mr. Cole, Ms. Bitar, I don't
18   know which one is doing this one now.
19           I know it's Mr. Raymond's client, but --
20           MR. COLE:    We have no questions, Your Honor.
21           THE COURT:    Mr. Raymond?
22           MR. RAYMOND:    Thank you, Judge.
23           Good afternoon, ladies and gentlemen.
24           CROSS-EXAMINATION
25   BY MR. RAYMOND:

Page 4942

1    Q.  Good afternoon, Mr. van Elten.
2    A.  Good afternoon.
3    Q.  A couple of preliminary questions, if I may.
4        Were you the first employee of BDO
5    International BV in 1988?
6    A.  That's correct.
7    Q.  Did I hear you testify that you're not an
8    auditor?
9    A.  That is correct, sir.
10   Q.  Are you a CPA?
11   A.  No, sir.
12   Q.  You're a businessman?
13   A.  No, sir.
14   Q.  Are you an international secretary of BDO
15   International BV?
16   A.  That's correct.
17   Q.  Can you tell the ladies and gentlemen of the
18   jury how many employees are in BDO International BV?
19   A.  At this moment that's 15, two of which are
20   part-time.
21   Q.  Part-time secretaries?
22   A.  It's a bookkeeper and a, what we call a
23   development coordinator.
24   Q.  A development --
25   A.  Coordinator.

Page 4943

1    Q.  Coordinator.  The word coordinator, I've
2    heard that a few times.  Can you tell the members of the
3    jury -- I'm going to withdraw that.
4        During the relevant time period, 1995 to
5    2002, what was the average number of employees that BDO
6    International BV?
7    A.  During that period, must have been around 10
8    at the maximum, the average number.
9    Q.  In Brussels, Belgium?
10   A.  That's correct.
11   Q.  And during that period of time, what was the
12   average number of member firms?
13   A.  Must have been around 90.
14   Q.  9-0?
15   A.  That's correct.
16   Q.  And getting back to the question I withdrew
17   a moment ago.  Coordination.  What do you mean when you
18   use the word coordination with regard to your work at
19   BDO International BV and your work and those of the 10
20   to 12 other employees?
21   A.  Okay.  Let me put it this way.  The reason
22   that BDO BV exists is because of the network.  It came
23   into existence in 1988, as you said, because the five
24   largest member firms at that time decided that the
25   network and the activities of the network which, let's

Page 4944

1    say, in those days are around 90 member firms, had to be
2    coordinated.
3        Until that date there was an executive
4    committee of senior partners of these big member firms
5    who did that, coordinated the activities and developed
6    rules, how to work together.  But then in '88 it was
7    decided to set up a professional secretariat.  That was
8    '86.  '86 to hire an international secretary to support
9    that committee.
10       In 1988 a decision was taken to change the
11   structure of the organization, and BDO International BV
12   was created.  Where -- then I was the first, as you say,
13   the first employee.  The -- you understand that
14   90 member firms, if they work together, and the fact
15   that they work together and because they have common
16   clients, as you may understand, if a client in America
17   here has operations in 34 countries, then the American
18   firm would refer (inaud.) to the BDO national firms of
19   this country.
20       So in order to work together, a lot of
21   things have to happen.  As we say, we mentioned the
22   development and the maintenance of manuals like the
23   audit manual, (inaud.) manual, all these things have to
24   be organized.
25       What we do in Brussels is to coordinate

Page 4945

1    these activities.  So we support the committees that
2    consist -- the committees of experts, partners, or
3    employees of the member firms that they can do their
4    work that whatever they decide if it is approved by the
5    policy board, it's moved into manuals and these manuals
6    are issued.
7        We organize international meetings.  People
8    want to meet, they want to know each other.  We issue
9    the annual statement on behalf of the network.  We make
10   sure that, for instance, we have the software in place.
11   It's helping the network to be able to perform their
12   basic work which is serving international clients.
13   Q.  Now, does BDO International perform any
14   audits?
15   A.  No, sir.
16   Q.  Do they perform any accounting services?
17   A.  No, sir.
18   Q.  With respect to the example when you just
19   said that American company does business in 34 other
20   countries, that would be a multinational corporation
21   with numerous subsidiaries or affiliates?
22   A.  That's correct.
23   Q.  And am I correct in my understanding that
24   the job of BDO International BV is to make sure that if
25   you need someone on an audit in Greece, you know who --

Page 4946

1  how to get in touch with that person so you don't have
2  to flying someone from Chicago to New York at great
3  expense to the customer, correct?
4      A.   That's correct. We gather information from
5  all member firms. As we saw earlier today that member
6  firms have to provide information to us and not just for
7  our benefit but for us to be able to communicate that
8  information and knowledge to other member firms.
9      Q.   Is it fair to say that in connection with
10  the job of coordinating, BDO International BV is trying
11  to make things a little more efficient for members of
12  the network?
13      A.   That's our task.
14      Q.   Now, you were shown the member-firm
15  agreement and the manuals, and you agree with me that
16  those documents set forth lots of possibility, correct?
17      A.   That's correct, sir.
18      Q.   Well, let's talk about what actually does
19  occur and did occur. Is Bankest -- was Bankest an
20  inward-referred work client of BDO Seidman?
21      A.   Not to my knowledge.
22      Q.   Was it a transnational client of BDO
23  Seidman?
24      A.   Not to my knowledge, sir.
25      Q.   Does BDO International have any role in the

Page 4947

1  hiring or firing of partners at any member firm?
2      A.   No, sir.
3      Q.   Can you -- could you have hired Sandy Lenner
4  back, I think, in '64 or something. Could you have
5  hired him back then?
6          MS. ALEXANDER: Objection, Your Honor.
7          THE COURT: Overruled.
8          THE WITNESS: No.
9  BY MR. RAYMOND:
10      Q.   What -- let's say that a partner in Chicago
11  wants to recommend a senior in Chicago for promotion.
12  Does BDO International hear anything about those?
13      A.   No, sir.
14      Q.   Does BDO International have any role
15  whatsoever in the hiring, firing, promotion, bonuses,
16  anything to do with any employee of any member firm?
17      A.   No, sir. Nothing.
18      Q.   Continuing about what actually happens as
19  opposed to what could occur.
20          MR. RAYMOND: Can you put up -- and the
21  document is 1487, the section is 12.1 -- and let me, if
22  I can, give you a page. BV 1954, please.
23          (Technician complies.)
24          MR. RAYMOND: Can you go to C, please, Ian?
25          (Technician complies.)

Page 4948

1  BY MR. RAYMOND:
2      Q.   You've been there since 1988. Have you ever
3  been in informed by BDO Seidman that it was changing --
4  intending to implement relating to the performance of
5  professional services?
6      A.   No, sir.
7      Q.   Can you turn to that same document and turn
8  to the variance notice you were being shown with respect
9  to I think it's section 16. No, that's termination.
10      A.   Clause --
11          MR. GOERING: 9.
12          THE WITNESS: Yes.
13          MR. RAYMOND: Go to section 9. And try
14  1951, please.
15          (Technician complies.)
16          MR. RAYMOND: 9.2 and 3, please.
17          (Technician complies.)
18  BY MR. RAYMOND:
19      Q.   The predicate to the language that you were
20  being shown in 9.3, where it says, BDO BV shall set out
21  the way in which the member firm shall practice.
22          There is a predicate to that, isn't there,
23  called the variance notice?
24      A.   Yes, sir.
25          MS. ALEXANDER: Objection, Your Honor.

Page 4949

1          THE COURT: What's your objection?
2          MS. ALEXANDER: Leading.
3          THE COURT: Sustained.
4  BY MR. RAYMOND:
5      Q.   Have you ever received a variance notice,
6  sir?
7      A.   Never.
8      Q.   So in your entire tenure while BDO
9  International BV was in existence, you've never seen any
10  authorization notices, have you?
11          MS. ALEXANDER: Objection, Your Honor.
12  Leading.
13          THE COURT: Rephrase your question.
14  BY MR. RAYMOND:
15      Q.   9.3, there's reference to authorizing
16  notice, misspelled for us Americans. Have you ever had
17  the opportunity to read one?
18      A.   No, sir, I've never seen one.
19      Q.   Why haven't you ever read one?
20      A.   Because, to my knowledge, there's never been
21  one.
22      Q.   Does BDO International --
23          MR. RAYMOND: Thank you, Ian.
24  BY MR. RAYMOND:
25      Q.   Does BDO International have any role

Page 4950

1  whatsoever in how BDO Seidman performs its audits?
2      A.  Specific audits, no.
3      Q.  Does BDO International play any role in
4  determining BDO Seidman's compensation policies?
5      A.  Not at all.
6      Q.  How about with respect to hiring clients?
7  Do member firms have to ask BDO International if they
8  can hire -- if they can become an accountant for a
9  client?
10     A.  No, sir.
11     Q.  So BDO International has no role in
12  authorizing clients?
13     A.  No, sir.
14     Q.  I'm sorry?
15     A.  No.  We have no role.
16     Q.  For a member firm to undertake an audit, do
17  they have to run it by BDO International first?
18     A.  No, sir.
19         MR. RAYMOND:  One moment, please, Your
20  Honor.
21  BY MR. RAYMOND:
22     Q.  Does BDO International control any member
23  firms?
24     A.  No, sir.
25     Q.  How many member firms in how many countries

Page 4951

1  are we talking about?
2      A.  At the moment we have, and I may be missing
3  one or two, but it's about 107 or 108 countries, and we
4  have about 100 or 101 member firms.  Some member firms'
5  territory is more than one country.
6      Q.  You've been there since 1988.  Have you ever
7  attempted to review the correspondence of all the member
8  firms on a daily basis?
9      A.  No.
10     Q.  Is it even sent to you?
11     A.  No, sir.
12     Q.  You saw that you were shown the section
13  about -- let me withdraw that.  Am I correct in
14  understanding from your testimony when you were being
15  requested by the plaintiff that a big part of BDO
16  International is the licensing of the logo; is that
17  correct?
18     A.  That's correct, sir.
19     Q.  And in connection with the document that you
20  were shown that talked about the margin and the size of
21  the logo, did I hear you say that BDO International BV
22  or some committee got consultants involved?
23     A.  Yes, sir.
24     Q.  Can you tell us about that, please?
25     A.  Yes.  When we -- what we saw was the second

Page 4952

1  edition of the manual.  There was -- the first one which
2  was introduced in 1988 and that coincided with the
3  introduction of the BDO logo in 1988.
4          The logo, in itself, the creation of the
5  logo, in itself, took a very long time, but once we had
6  agreed that for the network we -- we, being the policy
7  board -- we had consultants to help us implement it, and
8  the first thing they do, of course, made these nice,
9  thick, very voluminous manuals which gives guidance to
10 the uses of the manuals, and they were as detailed as
11 you saw with guides for typing letters.
12     Q.  Since 1988 how many times have you reviewed
13 the correspondence of a member firm to see if they're in
14 compliance with the margins?
15     A.  I cannot think of one instance, sir.
16     Q.  So when it comes to day-to-day activities,
17 BDO International doesn't concern itself with the
18 margins and the size of the logo, does it?
19     A.  No.
20         MS. ALEXANDER:  Objection.  Leading, Your
21 Honor.
22         THE COURT:  Overruled.  Timing.
23 BY MR. RAYMOND:
24     Q.  Is it fair to say that BDO International
25 does ot control the day-to-day activities of any member

Page 4953

1  firm?
2          MS. ALEXANDER:  Objection.  Leading.
3          THE COURT:  Sustained.
4          Rephrase your question.
5  BY MR. RAYMOND:
6      Q.  On a day-to-day basis does BDO
7  International -- what does BDO International do on a
8  daily basis with respect to member firms' activities?
9      A.  On a day-to-day basis we do what we have to
10 do, but certainly it's not a day-to-day control of a
11 member firm.  How could we do that?
12     Q.  What do you mean?
13     A.  Well, we talked about 90 member firms in
14 those days of the Bankest audits.  We must have been
15 altogether in BDO in the member firms about between 23,
16 25,000 people, I don't know.  How on earth would you be
17 able to do that with 10 people?  Really, it's -- I
18 cannot -- it's physically impossible.
19     Q.  Do you do it?
20     A.  No.
21     Q.  Did you do it?
22     A.  Never.
23         MR. RAYMOND:  If I may have one minute, I
24 may be concluded, Judge.
25         THE COURT:  You may.

Page 4954

1      MR. RAYMOND: Thank you.
2      Thank you, Judge. I have a couple of
3  questions from my co-counsel.
4  BY MR. RAYMOND:
5      Q.  I heard the phrase policy board. Can you
6  tell the ladies and gentlemen of the jury who makes up
7  the members of the policy board or who were the policy
8  board members -- let me withdraw that.
9      Focusing on 1995 to 2002, can you tell the
10  ladies and gentlemen of the jury who were the members of
11  the policy board?
12     A.  Members of the policy board have always been
13  senior partners in BDO member firms, and it has always
14  included -- and I mean from 1988 until today --
15  representatives of the five largest member firms.
16     Q.  And with respect to the members of the
17  policy board, are they employees of BDO International?
18     A.  No, sir.
19     Q.  Do you sit on the policy board?
20     A.  No, sir.
21     Q.  Does BDO International own any part of BDO
22  Seidman or any member firm?
23     A.  No, sir.
24     Q.  I heard a phrase, policy board and council.
25  Can you tell the ladies and gentlemen of the jury what

Page 4955

1  distinguishes the policy board from the council?
2      A.  Yes. The results go into too much legal
3  detail. We have what we call, could refer to as a
4  general assembly of our member firms which is the
5  council on which every member firm irrespective of the
6  volume of the firm has one representative, and they meet
7  annually. They approve, for instance, the annual budget
8  that I referred to earlier. They appoint members of the
9  policy board. It's like (inaud.) or as you say general
10  assembly. Is that the right word?
11     Q.  Let me see if I can help you. Let's use the
12  United Nations because that's what I thought of when you
13  said the general assembly. Would it be fair to say that
14  the general assembly that you were just referring to
15  when you said 90-member firms, that would be like if
16  there were 90 members of the United Nation, is that what
17  you're talking about when you're talking about general
18  assemblies?
19     MS. ALEXANDER: Objection. Leading.
20     THE COURT: Sustained.
21  BY MR. RAYMOND:
22     Q.  Please explain to the ladies and gentlemen
23  of the jury what you mean when you say general assembly?
24     A.  It's an assembly of all the members, or
25  representatives of all the members of BDO, all the

Page 4956

1  representatives of all the member firms.
2      Q.  One person?
3      A.  One person per member.
4      Q.  So if there are 90 member firms, there are
5  90 members of the general assembly?
6      A.  That's correct.
7      Q.  And that is the council?
8      A.  That's correct.
9      Q.  And then how does the council -- withdraw
10  that.
11     Is the council -- is any member of the
12  council an employee of BDO International?
13     A.  No.
14     Q.  How does the policy board relate to the
15  council?
16     A.  The council appoints the members of the
17  policy board.
18     Q.  So the 90 members appoint the board of
19  directors called the policy board?
20     A.  That's correct.
21     Q.  And as I understand your testimony, the
22  policy board members, none of which are employees of BDO
23  International, correct?
24     A.  That's correct.
25     Q.  Thank you very much for your time, sir.

Page 4957

1      THE COURT: Ms. Alexander, redirect?
2      MS. ALEXANDER: Yes. If I could have a
3  moment, Your Honor.
4      THE COURT: Sure.
5      Going to be long, Ms. Alexander.
6      MS. ALEXANDER: No. Very brief.
7      REDIRECT EXAMINATION
8  BY MS. ALEXANDER:
9      Q.  Mr. van Elten, every day BDO Seidman has to
10  follow the member-firm agreement, right?
11     THE COURT: Do you have your mic on?
12  BY MS. ALEXANDER:
13     Q.  Mr. van Elten, every day BDO Seidman has to
14  follow the member-firm agreement, right?
15     A.  Yes, I think there are no blackout dates.
16     (Laughter).
17     Q.  Right. There's no days off (inaud.).
18     A.  No.
19     Q.  And every day they have to follow the rules
20  set forth by BDO International and the corporate visual
21  identity manual as to the use and display of the video
22  logo?
23     A.  Yes.
24     Q.  And there's no days off from that item?
25     A.  No.

Page 4958

1    Q.  And that includes how they're going to use
2  their letters and make their letters look as when he saw
3  in the corporate visual identity manual?
4    A.  I don't know how their letters look but they
5  have to follow the manuals.
6    Q.  They have to follow the manuals and that
7  includes how the letters are supposed to look, right?
8    A.  Yes.  Yes.
9    Q.  No days off from that either?
10    A.  No.
11    Q.  And if at any time you determine that
12  they're in breach of the member-firm agreement, you can
13  terminate that agreement?
14    A.  Because of a letter?
15    Q.  For any reason.  For any reason, if they
16  agreed to that agreement, you can terminate them, right?
17        MR. RAYMOND:  Objection.  Outside the scope.
18  Never asked a question about it.
19        THE COURT:  I don't know what you asked.
20  Overruled.
21        THE WITNESS:  I don't think that would be a
22  realistic statement like you put it.
23  BY MS. ALEXANDER:
24    Q.  I'm just asking if they're in breach of the
25  member-firm agreement, you can terminate them, right?

Page 4959

1    A.  If there are certain situations which we
2  looked at under which BDO BV was in agreement of the
3  policy board, you can do that, yes.
4    Q.  So if they're in breach of the member-firm
5  agreement, you can terminate them, right?
6        MR. RAYMOND:  Objection to the form of the
7  question.
8        THE COURT:  Overruled.
9        THE WITNESS:  Under certain circumstances,
10  yes.
11  BY MS. ALEXANDER:
12    Q.  The answer is yes?
13    A.  At the end, the last word is yes.  Under
14  certain circumstances, yes.
15    Q.  And if you terminate them, they can't put
16  the name BDO on audited financial statements anymore,
17  right?
18    A.  That's correct.
19        MS. ALEXANDER:  No further questions.
20        THE COURT:  You may step down, sir.
21        Ladies and gentlemen, we're going to take a
22  break.  So do not discuss the case amongst yourselves.
23  All right?
24        Follow Jeff.
25        (Thereupon, the jury was escorted out of the

Page 4960

1  courtroom.)
2        THE COURT:  We'll take a few minutes break.
3  We'll go to the restroom.
4        (Thereupon, a brief recess was taken.)
5        (Thereupon, there was a brief discussion off
6  the record.)
7        THE COURT:  I assume someone is going to
8  have a motion for directed verdict.
9        MR. COLE:  You assume correctly.
10        MR. RAYMOND:  Another great assumption by
11  our leader.
12        THE COURT:  It's an educated guess on my
13  part.
14        Is the plaintiff going to have a motion for
15  directed verdict?
16        MR. DORTA:  Yes, we are.
17        THE COURT:  I tried to figure that one out
18  too.  So with that said, and I've gotten no response
19  from all parties, I want them in writing.
20        MR. DORTA:  By tomorrow what time, Your
21  Honor?
22        THE COURT:  You don't have to get them to me
23  by tomorrow.
24        MR. RAYMOND:  You'll have ours tomorrow
25  morning, 9:30.

Page 4961

1        THE COURT:  Don't give them to me until the
2  testimony is over.
3        Can you keep it down to as little as -- let
4  me rephrase that.
5        Don't kill as many trees as you usually
6  kill.
7        MR. RAYMOND:  Ours is the same.
8        THE COURT:  All right.  Bring them in.
9        THE BAILIFF:  All rise for the jury.
10        (Thereupon, the jury was brought into the
11  courtroom.)
12        THE COURT:  All right.  You may be seated.
13        You don't have a pad?
14        JUROR:  Yes, it's here.
15        THE COURT:  Mr. Thomas, you may call your
16  next witness.
17        MR. THOMAS:  Plaintiffs Espirito Santo call
18  Dr. Dan Guy.
19        THE COURT:  Send him in.
20        Thereupon,
21            DAN GUY,
22  having been duly sworn by the clerk of the Court,
23  testified as follows:
24        THE COURT:  I need you to put that
25  microphone on.

Page 839

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


--------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
--------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
--------------------------------------------------x

PAGES 839 - 931

Volume 8




MORNING SESSION

Miami, Florida

Monday, April 16, 2007

9:55 a.m.

Before the Honorable Jose M. Rodriguez




Reported by:  Gizella "Gigi" Baan

Page 840

```
 1            APPEARANCES
 2
 3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
 4   INTERNATIONAL, LTD., ET AL.:
 5
 6   SULLIVAN & CROMWELL, LLP
 7       1888 Century Park East
 8       Los Angeles, California 90067
 9       (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida 33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       350 East Las Olas Boulevard, Suite
21       Fort Lauderdale, Florida 33301
22       (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25
```

Page 841

```
 1   On behalf of Defendant BDO Seidman, LLP:
 2
 3   ALVAREZ, ARMAS & BORRON
 4       901 Ponce de Leon Boulevard, Suite 304
 5       Coral Gables, Florida 33134
 6       (305) 461-5100
 7   BY:  Arturo Alvarez, Esquire
 8
 9   GREENBERG TRAURIG, LLP
10       MetLife Building
11       200 Park Avenue, 15th Floor
12       New York, New York 10166
13   BY:  Adam D. Cole, Esquire
14       Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17       1221 Brickell Avenue
18       Miami, Florida 33131
19   BY:  Mark Schnapp, Esquire
20       Nikki Simon, Esquire
21
22
23
24
25
```

Page 842

```
 1   On behalf of Third-Party Defendants Victor Balestra,
 2   Bernard Mollet, and Joaquin Garnecho
 3
 4   RICHMAN, GREER, WEIL, BRUMBAUGH,
 5   MIRABITO & CHRISTENSEN, P.A.
 6       Miami Center, Suite 1000
 7       201 S. Biscayne Boulevard
 8       Miami, Florida 33131
 9       (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16       2701 Ponce de Leon Boulevard, Mezzanine
17       Coral Gables, Florida 33134
18       (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20       Geoffrey Marks, Esquire
21
22
23
24
25
```

Page 843

```
 1            CONTENTS
 2
 3   EXAMINATION OF CARLOS MENDEZ BY:          PAGE:
 4       MS. ALEXANDER:  (Direct)        846
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 876

1  sentenced for?
2      A.  No.
3      Q.  And whose decision is that?
4      A.  It's exclusively the Court's decision.  It's
5  the judge dispatched to the case, U.S. federal judge
6  Adalberto Jordan's decision.
7      Q.  We were just looking at the indictment and
8  the indictment concluded that you had provided BDO
9  Seidman as the auditors for E.S. Bankest and BRFFC with
10  fake documents; is that right?
11      A.  Yes.
12      Q.  So did you lie to BDO Seidman as part of
13  this fraud?
14      A.  Yes.
15      Q.  And was lying to BDO Seidman a critical part
16  of this fraud?
17      A.  Yes.
18      Q.  Why was it a critical part of the fraud to
19  lie to BDO Seidman?
20          MR. ALVAREZ:  Objection, calls for
21  speculation.
22          THE COURT:  Sustained.
23  BY MS. ALEXANDER:
24      Q.  Mr. Mendez, was it important to continue the
25  fraud -- was it necessary to continue the fraud to have

Page 877

1  BDO issue unqualified audits every year?
2          MR. ALVAREZ:  Same objection.  Judge,
3  different question asking for the same information.
4          THE COURT:  Sustain the objection.  Rephrase
5  the question.
6  BY MS. ALEXANDER:
7      Q.  Mr. Mendez, at BRFFC and at E.S. Bankest,
8  what did you use BDO's unqualified audits for?
9      A.  The audits were used mainly to induce
10  investors to lend monies to the company.  And also to,
11  you know, to use the bank, Espirito Santo Bank, you
12  know, to lend monies to the company.
13          The main purpose was to give comfort to the
14  lenders that the company was -- it was a good operation,
15  a profitable operation, it was a clean company.
16      Q.  Without the audited financial statements
17  provided by BDO Seidman, would have you been able to
18  continue to raise money at BRFFC and E.S. Bankest?
19          MR. ALVAREZ:  Objection.  Calls for
20  speculation.
21          THE COURT:  Overruled.
22          THE WITNESS:  No way.  No way.  It was
23  critical.  It was critical to have audited financial
24  statements to be able to raise monies.
25  BY MS. ALEXANDER:

Page 878

1      Q.  And the money that you raised using BDO's
2  audited financial statements, is that the money that was
3  stolen as part of the fraud?
4      A.  Yes.
5      Q.  Mr. Mendez, did there come a time when you
6  thought BDO Seidman as the auditors would discover this
7  fraud?
8          MR. ALVAREZ:  Objection.  Calls for
9  speculation.
10          THE COURT:  Overruled.
11          MR. ALVAREZ:  In addition to that, 701,
12  Judge.  Calls for an expert opinion.
13          THE COURT:  Overruled.
14          THE WITNESS:  Yes.
15  BY MS. ALEXANDER:
16      Q.  And when was that?
17      A.  That was in early 1999 while BDO was
18  conducting their audit of E.S. Bankest for fiscal
19  year-end 1998.
20      Q.  So that would be the first audit that BDO
21  conducted of E.S. Bankest?
22      A.  Yes.
23      Q.  And what happened?
24          MR. ALVAREZ:  Objection as to a narrative,
25  Judge.

Page 879

1          THE COURT:  Overruled.
2          THE WITNESS:  I was the point person to deal
3  -- for my company to deal with the auditors and to
4  assist the auditors in providing them with the
5  documentation that they required to conduct their audit.
6  And the manager of the audit in that particular year
7  requested that E.S. Bankest or that I provide them for
8  E.S. Bankest proof of payments for certain receivables
9  that we showed as paid in our records.
10          He wanted to see the proof of payment
11  originating from the customer all the way to the
12  company.  The whole stream of the payment.
13  BY MS. ALEXANDER:
14      Q.  And what was the purpose of him asking you
15  for those documents?
16          MR. ALVAREZ:  Objection.  Calls for a legal
17  conclusion.
18          THE COURT:  Sustained.
19  BY MS. ALEXANDER:
20      Q.  Did you --
21          THE COURT:  Go ahead.  Ask the question.
22  BY MS. ALEXANDER:
23      Q.  Did you have an understanding as to what why
24  he was asking for those documents?
25          MR. ALVAREZ:  Objection.  Calls for

Page 880

1  speculation.
2        THE COURT: Overruled. It's yes or no.
3        THE WITNESS: Yes.
4  BY MS. ALEXANDER:
5     Q.   What was your understanding as to why BDO
6  Seidman was requesting those documents?
7        MR. ALVAREZ: Objection. Lack of personal
8  knowledge. Calls for speculation as part of the
9  witness, calls for hearsay.
10       THE COURT: Sir, only if you know exactly
11  why. Do you have an independent knowledge of why?
12       THE WITNESS: (Nodding).
13       THE COURT: Is that a yes or no?
14       THE WITNESS: Yes.
15       THE COURT: Overruled.
16       THE WITNESS: The auditor wanted to confirm
17  that the payments, in fact, were made and that the
18  monies were received ultimately by the company from the
19  party that was supposed to pay which was the customer.
20  BY MS. ALEXANDER:
21     Q.   So the auditor was asking for proof of
22  payment that certain accounts receivable had, in fact,
23  been paid on?
24     A.   Yes.
25     Q.   And if he got proof of that payment, it

Page 881

1  would show that those accounts receivable were real?
2     A.   Yes.
3        MS. ALEXANDER: Your Honor, may I approach?
4        THE COURT: You may.
5  BY MS. ALEXANDER:
6     Q.   (Complies).
7        Mr. Mendez, I'm going to approach you with a
8  demonstrative and ask you to take a look at it. And let
9  me know if it would aid you in describing BDO's Request
10  for Documents in this particular instance.
11     A.   Yes.
12     Q.   And Mr. Mendez, the answer is yes?
13     A.   Yes. Yes. I'm sorry.
14     Q.   Can we put it up?
15       (Technician complies.)
16       Mr. Mendez, you said that there was -- this
17  was a request that came from the audit manager on the
18  1998 audit. What was his name?
19     A.   Ramon Rivera.
20     Q.   So Mr. Rivera was asking for documents for
21  proof of payment from which of these entities?
22     A.   Mr. Rivera wanted to see proof of payments
23  in this particular case from Wal-Mart to our client, Joy
24  Athletic, and from Joy Athletic to Capital which was the
25  factor of Joy Athletic, and from Capital ultimately to

Page 882

1  E.S. Bankest, the company being audited.
2     Q.   So Mr. Ramon wanted documents starting from
3  the customer here in our example Wal-Mart --
4     A.   Yes.
5     Q.   -- showing payment to Joy, the client in our
6  example?
7     A.   Yes.
8     Q.   And then payment from Joy to Capital in our
9  example, and then proof of payment from Capital to
10  Bankest; is that correct?
11     A.   That is correct.
12     Q.   And were you able to give Mr. Rivera those
13  documents?
14     A.   No.
15     Q.   Why not?
16     A.   Because they didn't exist. The receivables
17  in question were fake receivables so there was no such
18  payment ever made by Wal-Mart to Joy Athletic.
19     Q.   So Mr. Rivera was asking for proof of
20  payment on accounts receivable that were fake?
21     A.   Yes.
22     Q.   And when you didn't give Mr. Rivera those
23  documents, what happened?
24     A.   Well, I -- Mr. Rivera stopped the audit. He
25  instructed his team to --

Page 883

1        MR. ALVAREZ: Objection.
2        THE COURT: What's your objection?
3        MR. ALVAREZ: Judge, he's going into a
4  narrative. I would not know where to object to the
5  appropriate objection other than stop the audit.
6        THE COURT: Overruled.
7        THE WITNESS: He stopped the audit. He
8  instructed his team --
9        MR. ALVAREZ: Objection, calls for hearsay.
10       THE COURT: Overruled.
11       THE WITNESS: -- to leave the audit field.
12  That's what happened.
13  BY MS. ALEXANDER:
14     Q.   And when you say "instructed his team to
15  leave the audit field," you mean the auditors left
16  Bankest?
17     A.   Yes.
18     Q.   And for how long was the audit stopped?
19     A.   This, as I recall, happened on a Friday and
20  the audit was resumed by the middle of the following
21  week.
22     Q.   And -- strike that.
23       And when BDO resumed the audit and the audit
24  restarted, were you required to give them the documents
25  that Mr. Rivera had asked for from Wal-Mart to Joy to

Page 884

1    Capital?
2        A.  No.
3        Q.  When the audit restarted, what did BDO ask
4    for?
5            MR. ALVAREZ: Objection, Judge.
6            THE COURT: What's your legal objection?
7            MR. ALVAREZ: There's no BDO.
8            THE COURT: Overruled.
9            THE WITNESS: BDO just wanted to see copy of
10   the check from Joy to Bankest Capital Corp. They wanted
11   to see the payment, the check from Capital to Bankest
12   and that would be the extent of their new requirement.
13   BY MS. ALEXANDER:
14       Q.  So when the audit restarted, BDO wasn't
15   asking for documents from the customer, the one who
16   actually owed the money on the accounts receivable at
17   issue?
18       A.  That is correct.
19           MR. ALVAREZ: May I ask that -- objection.
20   Leading. And so is every other question.
21           THE COURT: You can object to them.
22   Overruled. It's been asked and answered.
23           Go ahead.
24   BY MS. ALEXANDER:
25       Q.  Do you have an understanding of how it was

Page 885

1    that BDO came -- when BDO restarted the audit, they
2    weren't going to ask for the customer documents any
3    more?
4        A.  I'm sorry?
5            MR. ALVAREZ: Objection.
6            MS. ALEXANDER: That was not a great
7    question.
8            THE COURT: Sustained.
9    BY MS. ALEXANDER:
10       Q.  When BDO came back, it wasn't asking for
11   documents from the Wal-Marts, from the customers; is
12   that correct?
13       A.  That is correct.
14       Q.  And why wasn't BDO asking for those
15   documents any more?
16           MR. ALVAREZ: Objection.
17           THE COURT: What's your objection?
18           MR. ALVAREZ: Calls for hearsay. Lack of
19   personal information.
20           THE COURT: Do you have personal knowledge
21   of why, sir?
22           It's a yes or no. Do you have personal
23   knowledge?
24           THE WITNESS: No.
25           THE COURT: Sustained.

Page 886

1    BY MS. ALEXANDER:
2        Q.  Did Mr. Parlapiano have a meeting with
3    Mr. Lenner prior to the restart of the audit?
4            MR. ALVAREZ: Objection. Lack of personal
5    knowledge. Lack of predicate.
6            THE COURT: Overruled.
7            THE WITNESS: Yes.
8    BY MS. ALEXANDER:
9        Q.  And what is your -- what was the result of
10   that meeting?
11           MR. ALVAREZ: Objection. Calls for hearsay.
12           THE COURT: Sustained. Rephrase your
13   question.
14   BY MS. ALEXANDER:
15       Q.  What happened after that meeting?
16       A.  Mr. Parlapiano came back to our office to
17   report --
18           MR. ALVAREZ: Objection as to what it is
19   that Mr. --
20           THE COURT: Overruled.
21           MR. ALVAREZ: The objection is hearsay,
22   Judge.
23           THE COURT: I know. Overruled. Do not tell
24   us what he said. Just what he came back to report.
25   What's next without telling us what he said right now?

Page 887

1            THE WITNESS: He came to report to me and to
2    the management as to BDO's new requirement, new set
3    of -- the new standard to meet their test of this
4    particular collectibility area.
5    BY MS. ALEXANDER:
6        Q.  And what was that new standard?
7            MR. ALVAREZ: Objection. Calls for hearsay.
8            THE COURT: Overruled.
9            THE WITNESS: They would be satisfied in
10   giving us -- I'm talking BDO, this is what
11   Mr. Parlapiano told me and told management -- with a
12   copy of Joy's check, our client's check, to Bankest
13   Capital. And from -- I mean, and the proof of payment
14   or a check from Bankest Capital to E.S. Bankest.
15           MR. ALVAREZ: Objection. Move to strike.
16   Hearsay.
17           THE COURT: Overruled.
18   BY MS. ALEXANDER:
19       Q.  Well, Mr. Mendez, you said that these were
20   fake transactions that Mr. Rivera was asking for
21   documents on. Is that right?
22       A.  That is correct.
23       Q.  Well, if they were fake accounts receivable,
24   how were you able to give them a check from Joy to
25   Capital?

Page 888

1      A.   Because Joy was a client that we control
2  and Joy participated in the fraud. Joy provided our
3  company, Bankest Capital, with copies of blank checks,
4  signed blank checks to enable us to, you know, complete,
5  to fill out those checks to -- you know, for the amounts
6  that were needed for payment of those particular
7  invoices. But this was a check that was never deposited
8  into the Bankest Capital account.
9      Q.   When you provided BDO with a copy of a check
10  from Joy to Capital, did they ask for any proof that
11  that check had, in fact, been deposited into Capital's
12  account?
13      A.   No. No, they didn't, no.
14      Q.   Now, you said that Joy was one of the
15  companies that you controlled?
16      A.   Basically, yes. Yes, we did.
17      Q.   And was that the reason why you could get
18  fake checks from Joy?
19      A.   Yes.
20      Q.   Did you control Wal-Mart or any of the other
21  customers who were factoring their accounts receivable?
22      A.   No.
23      Q.   So were you able to fake customer checks?
24      A.   Never, no.
25      Q.   For the whole time this fraud was going on,

Page 889

1  you never faked a customer check?
2      A.   Never.
3      Q.   And after the audit restarted BDO never
4  again asked for a customer check?
5          MR. ALVAREZ: Objection. Leading.
6          THE COURT: Sustained.
7  BY MS. ALEXANDER:
8      Q.   After the audit restarted in 1998, did BDO
9  ever ask for a customer check?
10      A.   No. No, they never asked. Payments that
11  supposedly came through Joy Athletic they never asked,
12  you know, from -- you know, for copies of customer
13  checks, the origin of the payment.
14      Q.   Well, for any transaction, did BDO after the
15  audit restarted ever ask for a customer check?
16      A.   Again, no, they never asked for customer
17  checks. Some customer checks were provided for some of
18  their real invoices because we did have them, but the
19  vast majority of the receivables were fake. We didn't
20  have customer checks. We didn't provide them customer
21  checks because we didn't have them and they didn't ask
22  for it either.
23      Q.   So if it was a real transaction, you would
24  have a customer check?
25      A.   Yes.

Page 890

1      Q.   And if it was a real transaction and you had
2  a customer check, you would provide it to BDO during the
3  course of their audit?
4      A.   Yes.
5      Q.   But after the restart of the audit in 1998,
6  if it was a fake transaction, you didn't have a customer
7  check?
8      A.   That is correct.
9      Q.   And BDO -- after the restart of the audit,
10  if you didn't have a customer check, BDO didn't ask for
11  it?
12      A.   That is correct.
13      Q.   Now, did BDO, after the restart of the
14  audit, did they ask for any shipping documents that
15  would show that the T-shirts from Joy to Wal-Mart had,
16  in fact, been shipped on any of these fake transactions?
17      A.   No.
18      Q.   When the audit restarted, did BDO ask for
19  any bank account statements from Joy or from Capital
20  that would show that a payment had, in fact, been made
21  on any of these fake transactions?
22      A.   No.
23      Q.   After the audit restarted in 1998, did you
24  know what would satisfy BDO when they came to conduct
25  the audits?

Page 891

1          MR. ALVAREZ: Objection. Calls for
2  speculation.
3          THE COURT: Sustained.
4  BY MS. ALEXANDER:
5      Q.   After -- strike that. Did BDO ever require
6  you to hand over documents that would have revealed the
7  fraud?
8          MR. ALVAREZ: Objection. Calls for
9  speculation and for an expert opinion on the part of the
10  witness.
11          THE COURT: Overruled.
12          THE WITNESS: No.
13  BY MS. ALEXANDER:
14      Q.   And did BDO ever require you to provide them
15  with documents, with customer checks from the people who
16  actually owed the money on the accounts receivable?
17      A.   No.
18      Q.   And in 1999, 2000, 2001, and 2002, did BDO
19  ever require you to provide them with documents from the
20  people who actually owed the money on the accounts
21  receivable, the customers?
22      A.   No.
23      Q.   And every year did you depend on the fact
24  that BDO was not going to require you to provide them
25  with documents from the customers, the ones who actually

Page 892

1    owed the money?
2        A.   Yes.
3        Q.   And as a result, were you able to grow the
4    fraud?
5        A.   Yes.
6        Q.   And as we saw in the audited financial
7    statements, the fraud grew every year?
8        A.   Yes.
9        Q.   And it involved hundreds of millions of
10   dollars?
11       A.   Yes.
12       Q.   Mr. Mendez, I'd like to spend a little time
13   now on background involving BRFFC and E.S. Bankest. You
14   testified that BRFFC raised money to purchase accounts
15   receivable. How would BRFFC raise money to purchase
16   accounts receivable?
17       MR. ALVAREZ: Objection as to relevance.
18       THE COURT: Overruled.
19       THE WITNESS:  BRFFC put together a program
20   for investors, for lenders to lend monies to the company
21   and monies that -- or loans that would be
22   collateralized, secured, backed by accounts receivables.
23       The company, Bankest Receivables, would
24   issue, you know, notes or debentures in favor of these
25   lenders. These were basically promissory notes that

Page 893

1    would be repaid from the collection of those
2    receivables.
3        A private placement memorandum, which is a
4    document that typically explains the nature of the
5    transaction, it would be provided to the lenders and
6    that memorandum, typically called PPMs, it would have
7    attachments to it.
8        But the most important document that would
9    be attached to that document, it was the audited
10   financial statements --
11       MR. ALVAREZ: Objection.
12       THE COURT: Overruled.
13       THE WITNESS: -- by a nationally recognized
14   audit firm. That was a basic requirement that we had to
15   be able to access funding from all these investors and
16   from the bank.
17       MS. ALEXANDER: May I approach, Your Honor?
18       THE COURT: You may.
19   BY MS. ALEXANDER:
20       Q.   (Complies).
21       Mr. Mendez, I'm approaching with Plaintiffs'
22   235 in evidence. Can you identify this document for me?
23       A.   Yes.
24       Q.   Is this a private placement memorandum as
25   you were just describing like the ones used by Bankest

Page 894

1    Receivables, Financing and Factoring Corp.?
2        A.   Yes.
3        Q.   And just looking through the attachment,
4    does one of the attachments include BDO Seidman's
5    audited financial statements for BRFFC?
6        A.   Yes.
7        Q.   And this is the document that would be
8    provided to prospective investors in the company?
9        A.   Yes.
10       Q.   Were these documents part of the files, were
11   the PPMs such as this one part of the files at BRFFC?
12       A.   Yes. Yes.
13       Q.   And were the PPMs part of the files that BDO
14   as auditor of BRFFC would review when it came to audit
15   the company?
16       A.   Yes, they would review the PPMs as well.
17   Yes.
18       Q.   So you made available to the auditors who
19   came to the offices of the company copies of the PPMs
20   which attached BDO's audited financial statements?
21       A.   Yes.
22       Q.   So BDO knew that BRFFC was attaching the
23   audited financial statements to the private placement
24   memorandums provided to the investors?
25       MR. ALVAREZ: Objection, Judge. Leading and

Page 895

1    calls for speculation on the part of the witness.
2        THE COURT: Sustained. It's leading.
3    BY MS. ALEXANDER:
4        Q.   How would BDO know that the audited
5    financial statements were attached to the private
6    placement memorandums that the company provided its
7    investors?
8        A.   Two ways. One, because the copy that were
9    maintained in the office would customarily have the most
10   recent audited financial statements attached to it. But
11   before we ever entered into this program, it was clearly
12   expressed by my company, by me and the other officers of
13   the company, that the audited financial statements were
14   needed to raise funds from the investors and they were
15   going to be attached in the package to be sent to
16   prospective investors.
17       Q.   When E.S. Bankest was formed, what happened
18   to the investment that had been made in BRFFC?
19       A.   Most of the notes or debentures that were
20   outstanding, the investments that the predecessor
21   company BRFFC had received, most of those investments
22   were rolled over to the new company.
23       So, in other words, investors for BRFFC
24   became investors of E.S. Bankest.
25       Q.   And what about the accounts receivable

Page 1064

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
          Plaintiffs,
     vs.
BDO SEIDMAN, LLP,
          Defendant.
------------------------------------------------x
BDO SEIDMAN, LLP,
          Third-Party Plaintiff,
     vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
          Third-Party Defendants.
------------------------------------------------x

PAGES 1064 - 1150

Volume 10




MORNING SESSION

Miami, Florida

Tuesday, April 17, 2007

9:50 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 1065

1  APPEARANCES
2
3  On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4  INTERNATIONAL, LTD., ET AL.:
5
6  SULLIVAN & CROMWELL, LLP
7      1888 Century Park East
8      Los Angeles, California 90067
9      (310) 712-6627
10 BY:  Steven W. Thomas, Esquire
11      Emily S. Alexander, Esquire
12
13 GONZALO R. DORTA, P.A.
14      334 Minorca Avenue
15      Coral Gables, Florida 33134
16      (305) 441-2299
17 BY:  Gonzalo R. Dorta, Esquire
18
19 BERGER SINGERMAN
20      350 East Las Olas Boulevard, Suite
21      Fort Lauderdale, Florida 33301
22      (954) 525-9900
23 BY:  Mitchell W. Berger, Esquire
24
25

Page 1066

1  On behalf of Defendant BDO Seidman, LLP:
2
3  ALVAREZ, ARMAS & BORRON
4      901 Ponce de Leon Boulevard, Suite 304
5      Coral Gables, Florida 33134
6      (305) 461-5100
7  BY:  Arturo Alvarez, Esquire
8
9  GREENBERG TRAURIG, LLP
10     MetLife Building
11     200 Park Avenue, 15th Floor
12     New York, New York 10166
13 BY:  Adam D. Cole, Esquire
14     Karen Y. Bitar, Esquire
15
16 GREENBERG TRAURIG, LLP
17     1221 Brickell Avenue
18     Miami, Florida 33131
19 BY:  Mark Schnapp, Esquire
20     Nikki Simon, Esquire
21
22
23
24
25

Page 1067

1  On behalf of Third-Party Defendants Victor Balestra,
2  Bernard Mollet, and Joaquin Garnecho
3
4  RICHMAN, GREER, WEIL, BRUMBAUGH,
5  MIRABITO & CHRISTENSEN, P.A.
6      Miami Center, Suite 1000
7      201 S. Biscayne Boulevard
8      Miami, Florida 33131
9      (305) 373-4000
10 BY:  Manuel Garcia Linares, Esquire
11
12
13 On behalf of Third-Party Defendant Bernard Mollet
14
15 GAMBA & LOMBANA, P.A.
16      2701 Ponce de Leon Boulevard, Mezzanine
17      Coral Gables, Florida 33134
18      (305) 448-4010
19 BY:  Hector J. Lombana, Esquire
20      Geoffrey Marks, Esquire
21
22
23
24
25

Page 1068

1  CONTENTS
2
3  EXAMINATION OF RAMON RIVERA BY:          PAGE:
4      MR. THOMAS:  (Direct)          1077
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1097

1    A.   My understanding was a related entity with
2  common ownership, yes.
3    Q.   And then E.S. Bankest was part owned by
4  Capital and part owned by Espirito Santo?
5    A.   Yes.
6    Q.   Mr. Rivera, when you were requesting
7  documents, were you trying to verify the whole
8  transaction?
9    A.   Yes.
10    Q.   And in the whole transaction, which one of
11  these entities is the one that owes the money
12  originally?
13    A.   Wal-Mart.
14    Q.   And what do we call -- in this example is
15  Wal-Mart what you're referring to as the customer?
16    A.   Yes.  Yes.
17    Q.   And were the documents that you were
18  requesting, Mr. Rivera, to see the customer check, the
19  payment for Wal-Mart for the goods?
20        MR. COLE: Objection.  Leading.
21        THE WITNESS: I'm sorry?
22        THE COURT: Sustained.
23        THE WITNESS: Could you ask the question
24  again, please.
25  BY MR. THOMAS:

Page 1098

1    Q.   I will.  When you asked for the check from
2  Wal-Mart, the customer --
3    A.   Okay.
4    Q.   -- what was the purpose of you seeing the
5  check from Wal-Mart?
6    A.   To assert and make sure that the receivable
7  is coming from the ultimate customer, which in this case
8  is Wal-Mart.
9    Q.   And in this case is the client Joy?
10    A.   Yeah.  You can define it as a client, yes.
11    Q.   And were you -- in requesting your
12  documents, did you also ask to see deposit slips so that
13  if there was any payment from Joy, you could tell
14  whether or not it actually was deposited into the bank
15  account of Bankest Capital?
16    A.   Yes, sir.
17    Q.   Mr. Rivera, who did you first request the
18  documents to audit the whole transaction including the
19  Wal-Mart customer check?
20    A.   (Inaud.) Carlos Mendez, the controller of
21  E.S. Bankest.
22    Q.   And when you asked Carlos Mendez for these
23  documents, did he give them to you?
24    A.   No.
25    Q.   And when Carlos Mendez didn't give them to

Page 1099

1  you, did you just say, okay, we don't need them, and go
2  on about the audit?
3    A.   No.  I asked for a reason why the documents
4  were not available.
5    Q.   And Mr. Rivera, did Mr. Mendez give you a
6  reason?
7    A.   Yes.
8    Q.   And what was that reason?
9        MR. COLE: Objection.  Hearsay.
10        THE COURT: Sustained.
11  BY MR. THOMAS:
12    Q.   Well, Mr. Rivera, did he -- did you request
13  it several times from Mr. Mendez, these documents?
14    A.   That's right.
15    Q.   And did he ever give them to you?
16    A.   I never received the document from him.
17    Q.   Now, since Mr. Mendez wouldn't give them to
18  you, did you ask anyone else for the documents?
19    A.   Yes.
20    Q.   Who else did you ask to get these customer
21  checks and deposit slips so you could see if the
22  accounts receivable were real?
23    A.   His supervisor, the vice president of the
24  organization, Mr. Dominick Parlapiano.
25    Q.   And when you asked Mr. Dominick Parlapiano

Page 1100

1  to show you the Wal-Mart checks so you could audit the
2  whole transaction, how did he react?
3        MR. COLE: Objection.  Hearsay.
4        THE COURT: Overruled.
5        THE WITNESS: He refused to provide the
6  documents
7  BY MR. THOMAS:
8    Q.   Was he nice about it?
9    A.   Pardon me?
10    Q.   Was he nice about it?
11    A.   He?  No, he was not.
12    Q.   Did he seem angry to you?
13        MR. COLE: Objection.
14        THE COURT: Overruled.
15        THE WITNESS: Upset.  Angry.  I would say
16  yes.
17  BY MR. THOMAS:
18    Q.   And did you ask him several times to give
19  you these documents so you could figure out whether the
20  accounts receivable were real or fake?
21    A.   The answer is yes.
22    Q.   Did he ever give them to you?
23    A.   No.
24    Q.   Do you know approximately when these
25  requests happened when you were doing the audit of E.S.

Page 1101

1    Bankest for the year-ending 1998?
2        A.  Yeah.  The document have been requested
3    since the beginning of January, but then he came to a
4    point like in the middle of February that the document
5    were not available and -- I mean, that day or close to
6    that day, was that Dominick refused -- that the
7    documents were not going to be available for the
8    auditors.
9        Q.  And when Dominick Parlapiano told you that
10   the documents you believed you needed to tell whether
11   these accounts receivable were real or fake would not be
12   given to you --
13           MR. COLE:  Objection.  Hearsay.
14           THE COURT:  Hold on.
15           THE COURT:  Is that a question?
16           MR. THOMAS:  I hadn't finished the question
17   yet.  You want me to rephrase?  I can do it differently,
18   Judge.
19           THE COURT:  (Nodding.)
20   BY MR. THOMAS:
21       Q.  Mr. Rivera, when you understood that
22   Mr. Parlapiano and Mr. Mendez were not going to give you
23   these documents you needed to tell whether the accounts
24   receivable were real or fake, did you continue the
25   audit?

Page 1102

1        A.  No, I stopped the work.
2        Q.  You stopped the audit?
3        A.  That's right.
4        Q.  And when you stopped the audit, did you tell
5    anybody at BDO?
6        A.  Yeah, definitely.  I tried to reach my
7    superiors.
8        Q.  Did you try to reach Mr. Sandy Lenner?
9        A.  Yeah.  I placed a phone call to BDO Seidman
10   at the time.
11       Q.  And were you able to get a hold of Mr. Sandy
12   Lenner at this time?
13       A.  He was not in the office on that date.
14       Q.  Did you try to talk to your other boss,
15   Mr. Keith Ellenburg?
16       A.  That's right.
17       Q.  And did you talk to him?
18       A.  Yeah.  He was in the office.
19       Q.  And what did you say to Mr. Ellenburg?
20       A.  I basically recreated the circumstances
21   under which Dominick Parlapiano refused to provide the
22   documents.  I explained to him what I did in terms of,
23   listen, I stopped the audit, I think the right thing to
24   do is to go back to the office and not to perform any
25   further work.  And he agreed with my decision.

Page 1103

1        Q.  So the number two partner on this audit,
2    Keith Ellenburg, agreed with you that since you couldn't
3    get the documents you needed, that you should stop the
4    audit?
5        A.  That's right.
6        Q.  Now, this was right during the middle of
7    busy audit season; is that right?
8        A.  My best recollection is the middle of
9    February, yes.
10       Q.  And during this time, the busy audit season,
11   would you normally work late on pretty much every day of
12   the week?
13       A.  60-hour week.  Saturday, Sunday were working
14   days at the time.
15       Q.  So you'd normally go to work on Saturday
16   during audit season?
17       A.  And, in fact, I went to work on Saturday but
18   not for E.S. Bankest.
19       Q.  I see.  Now, Mr. Rivera, do you recall what
20   day of the week it was when you stopped the audit and
21   called Mr. Ellenburg?
22       A.  It was a Friday afternoon.
23       Q.  So the next day on Saturday, you went to
24   work but you didn't go to work to E.S. Bankest?
25       A.  No.

Page 1104

1        Q.  You went back to the office instead?
2        A.  That's right.
3        Q.  And on Monday morning, would you normally
4    have gone out to E.S. Bankest to work on the audit?
5    Would that have been what your normal course would be?
6        A.  That's right.
7        Q.  And did you go on Monday morning out to E.S.
8    Bankest?
9        A.  No.  I showed up at the office based on
10   Mr. Ellenburg's instructions.
11       Q.  And when you got to the office on Monday
12   morning, did you meet with Mr. Lenner and Mr. Ellenburg?
13       A.  During that day, yes.
14       Q.  And in the meeting with Mr. Lenner and
15   Mr. Ellenburg, did you describe again why you had
16   stopped the audit?
17       A.  Absolutely right.
18       Q.  And did Mr. Ellenburg in that discussion,
19   state that he agreed with you, that you should have
20   stopped the audit?
21       A.  Yes.
22       Q.  And in this meeting between you and
23   Mr. Ellenburg and Mr. Lenner, was there a determination
24   made to call Dominick Parlapiano?
25       A.  Yes.  They wanted to know what happened.

Page 1105

1    Q.   And, in fact, did Mr. Lenner, Mr. Ellenburg,
2  and you call Mr. Parlapiano?
3    A.   That's right.
4    Q.   And when you called Mr. Parlapiano, were you
5  in Mr. Lenner's office?
6    A.   Yeah, we were in his office.
7    Q.   And did he have one of those speakerphones
8  so you could hear what's being said?
9    A.   That's right.
10   Q.   So could you hear what Mr. Parlapiano was
11 saying?
12   A.   The whole time.
13   Q.   And could you hear what Mr. Lenner and
14 Mr. Ellenburg were saying?
15   A.   Absolutely right.
16   Q.   And during this conversation, did Mr. Lenner
17 tell Mr. Parlapiano that these documents, including the
18 customer checks, were documents that BDO Seidman had to
19 have in order to conduct this audit?
20       MR. COLE: Objection. Leading.
21       THE COURT: Sustained.
22 BY MR. THOMAS:
23   Q.   What did he tell you?
24   A.   Who?  Mr. Lenner?
25   Q.   Mr. Lenner.  What did he tell Mr. Parlapiano

Page 1106

1  in this meeting?
2    A.   In summary, that he didn't understand the
3  circumstances under which the Parlapiano refusal to give
4  out the document was.  And Mr. Parlapiano again
5  explained to him, you know, in plain English what
6  happened on that afternoon.  And that he's not going to
7  provide the documents at the time because --
8        MR. COLE: Objection.
9        THE COURT: Sustained. Stop right there.
10       Ask a question.
11 BY MR. THOMAS:
12   Q.   Stop right there.  I'm sorry.  We're going
13 to stick to what Mr. Lenner said instead of what
14 Mr. Parlapiano said.
15   A.   I'm sorry.
16   Q.   Did Mr. Lenner tell Mr. Parlapiano that
17 these documents, including the customer checks, were
18 documents that BDO had to have to properly do this
19 audit?
20       MR. COLE: Objection. Leading again. Same
21 question.
22       THE COURT: Sustained.
23 BY MR. THOMAS:
24   Q.   What did Mr. Lenner tell Mr. Parlapiano
25 about whether or not BDO Seidman needed these documents

Page 1107

1  to properly complete the audit?
2    A.   That we needed the documents, yes.
3    Q.   And what did Mr. Lenner tell Mr. Parlapiano
4  BDO was going to have to do if Mr. Parlapiano refused to
5  give these documents, including the customer checks?
6    A.   Resign as auditors of E.S. Bankest.
7        MR. COLE: I'm sorry?
8        MR. THOMAS: Resign as auditors of E.S.
9  Bankest.
10 BY MR. THOMAS:
11   Q.   And in this call, did Mr. Parlapiano agree
12 to give the documents?
13       MR. COLE: Objection.
14       THE COURT: Overruled.
15       THE WITNESS: No.
16 BY MR. THOMAS:
17   Q.   And when this call was over, did you
18 understand that BDO Seidman was no longer doing the
19 audit of E.S. Bankest?
20   A.   Based on the results of the conversation,
21 yes.
22   Q.   And so after the call was over, did
23 Mr. Lenner instruct you to go out to E.S. Bankest and
24 continue the audit?
25   A.   No.  His instructions were clear.  Don't do

Page 1108

1  any further work.
2    Q.   And the instructions of don't do any further
3  work, was that an instruction to you from Sandy Lenner?
4    A.   Absolutely, yes.
5    Q.   Did you go back to your office?
6    A.   Yes.
7    Q.   Did you try to tidy up the stuff on E.S.
8  Bankest and then move on to other matters?
9    A.   I basically start working on other clients.
10   Q.   Mr. Rivera, did there come a time later that
11 week where you saw Mr. Parlapiano in BDO's offices?
12   A.   Two days later, yes.
13   Q.   Where was your office?
14   A.   At the time it was like an angle that I can
15 see the lobby of BDO Seidman when they were in the 22nd
16 floor in the Nation's bank building.
17   Q.   So from your desk chair, you could see the
18 lobby entrance of BDO Seidman?
19   A.   Yeah.
20   Q.   Would it be like over here?  (Indicating.)
21   A.   Yes.
22   Q.   And did you see Mr. Parlapiano a few days
23 later come into the lobby of BDO Seidman?
24   A.   Yes.
25   Q.   Did you greet him?

Page 1109

1    A.   Pardon me?
2    Q.   Did you greet him? Did you see him and say
3  hello?
4    A.   Yeah, I stand up and go to him and shake
5  hands. And basically I ask him, what can I do for you?
6    Q.   And what did he say?
7       MR. COLE: Objection.
8       THE COURT: Overruled.
9  BY MR. THOMAS:
10   Q.   Go ahead.
11   A.   He said that he came to -- because he have a
12  meeting with Sandy Lenner.
13   Q.   And when you were out here in the lobby with
14  Mr. Parlapiano, did Mr. Lenner come up?
15   A.   Yeah.
16   Q.   And where did Mr. Lenner and Mr. Parlapiano
17  go?
18   A.   To his office.
19   Q.   To Mr. Lenner's office?
20   A.   Yes.
21   Q.   Did they invite you?
22   A.   No.
23   Q.   Did you ever get to go in there and
24  participate in the meeting?
25   A.   No, I was not invited.

Page 1110

1    Q.   Did they close the door behind them?
2    A.   That's my understanding, yes.
3    Q.   So you don't know what happened in that
4  meeting?
5    A.   Absolutely not.
6    Q.   But after the meeting, did Mr. Lenner come
7  out and talk to you?
8    A.   Yes. During that afternoon, he came to my
9  office and talked to me, yes.
10   Q.   And now, did Mr. Lenner tell you that now
11  you were going to go back to E.S. Bankest and restart
12  the audit?
13   A.   Yes.
14   Q.   Did he tell you when he told you that you
15  were going to go back to E.S. Bankest and restart the
16  audit, did he tell you about his relationship with
17  Mr. Parlapiano?
18   A.   Yeah. He again told me about their
19  relationship as --
20   Q.   What did he tell you?
21   A.   That he knows Dominick from a long time.
22  And since I haven't been in Miami for a long period of
23  time -- because at the time that this incident happened
24  I was basically only like a year working and living in
25  Miami -- I didn't know how important Dominick is in the

Page 1111

1  community of Miami and Florida. And the relationship
2  between BDO and E.S. Bankest could bring more business
3  to BDO through the way -- by the way, I mean figure of
4  Dominick Parlapiano.
5    Q.   Now, did he tell you anything about as a
6  manager was it part of your job to start thinking about
7  bringing in business?
8       MR. COLE: Objection.
9       THE COURT: I'm sorry. Did you object?
10      MR. COLE: Objection. Leading.
11      THE COURT: Overruled.
12      THE WITNESS: Yeah, he mentioned that as a
13  manager of BDO Seidman, I should do better job managing
14  relationship with the clients to -- definitely clients
15  will help to bring other clients into the organization.
16  BY MR. THOMAS:
17   Q.   And did you understand that some of the
18  business that you were supposed to be bringing in was
19  the business that Mr. Parlapiano could bring in through
20  his relationship and important status in the community
21  in Miami?
22      MR. COLE: Objection. Leading.
23      THE COURT: Sustained.
24  BY MR. THOMAS:
25   Q.   What was part of the business that you

Page 1112

1  understood Mr. Lenner was talking about when he told you
2  that you should be trying to bring in business to BDO
3  Seidman?
4    A.   I mean -- sorry? What type of -- like the
5  name of customers?
6    Q.   Yes. Did it include affiliates of Bankest?
7    A.   Absolutely, yes.
8    Q.   Did it include businesses associated with
9  Dominick Parlapiano?
10   A.   Yes. Yeah, I remember Bankest Capital Corp.
11  I remember Espirito Santo Bank. Yes.
12   Q.   And, Mr. Rivera, did Mr. Lenner tell you
13  that now you were going to get the documents that you
14  had requested?
15   A.   That Dominick -- yes. That Dominick came.
16  They met together. And as a result of the meeting,
17  Dominick agreed to provide the documents to us to finish
18  the audit. Yes.
19   Q.   So Mr. Lenner told you that these customer
20  checks and deposit slips that you had requested, been
21  requesting for months, that now Bankest was going to
22  provide them to you?
23   A.   That's right.
24   Q.   Did Bankest ever give you all the documents
25  that you requested?

Page 1113

1    A.  Not the hundred percent that we were asking
2  for, no.
3    Q.  Did you go back to do the audit?
4    A.  Yes.  Per Mr. Lenner's instruction, yes.
5        MR. COLE:  Your Honor, may I stand near the
6  door?
7        THE COURT:  Sure.
8  BY MR. THOMAS:
9    Q.  Do you know this document?
10   A.  Yes.  Is there any way you can put it on
11  that --
12  BY MR. THOMAS:
13   Q.  Yes.  If I put it here, does that help?
14   A.  Yeah, that's fine.
15   Q.  What is this document, Mr. Rivera?
16   A.  This is amplification of a work paper that
17  we prepared as part of the 1998 audit of E.S. Bankest.
18   Q.  And this is a BDO work paper?
19   A.  Yeah.  It's a BDO work paper, yes.
20   Q.  And is this work paper a test to see if
21  these receivables were paid, collected?
22   A.  Yeah.  It was -- summarized the procedures
23  performed for those receivables, yes.  Yes.
24   Q.  And the customer is listed here on the left,
25  K-Marts, Wal-Marts?

Page 1114

1    A.  Yes.  Like the customer -- like at the end
2  of the chart that you have here.
3    Q.  And these numbers at the bottom, are they
4  the instructions for how you're supposed to determine
5  whether or not these receivables have actually been
6  paid, are real?
7    A.  That's right.
8    Q.  Now, number A says, "Examined collection of
9  1998 invoices, trace to copy of customer check and
10  remittance advice noting agreement to amount and date."
11  And it says trace to copy of customer check, is that the
12  customer checks that you were asking for?
13   A.  I'm sorry.  Could you ask me that question
14  again?
15   Q.  When it says down here, trace to copy of
16  customer check, were these the customer checks that you
17  were asking for from E.S. Bankest?
18   A.  At some point in time, some of these
19  customer checks were not available to us.
20   Q.  Yes.  And we're going to explain that.  But
21  I just want to know are the customer checks, you asked
22  for them, they later were not available?
23   A.  Yes.  These are the customer checks we've
24  been asking for.  That's right.
25   Q.  Now, when you asked for these customer

Page 1115

1  checks, if you performed A, you were able to do these
2  things, could you put a check mark under A?  Is this how
3  that worked?
4    A.  The answer is yes.
5    Q.  And what's a remittance advice?
6    A.  It's a -- when you receive a check from an
7  entity that owes you, usually that check comes with a
8  header, like a top side, and then the check is on the
9  bottom.  And then you like tear away and then you
10  deposit the check and you keep the remittance advice,
11  which explains payment of invoice, says X, Y,Z or 1, 2,
12  3. It's common.
13   Q.  So like when you get your paycheck, it's
14  that other thing that's attached to it and you tear off?
15   A.  Exactly.
16   Q.  Now, Mr. Rivera, you stated that
17  Mr. Parlapiano and E.S. Bankest did not give you all the
18  customer checks you asked for; is that right?
19        MR. COLE:  Objection.
20        THE COURT:  Overruled.
21        THE WITNESS:  Yes.  I don't receive all the
22  customer checks what we were asking for during the
23  course of the audit.
24  BY MR. THOMAS:
25   Q.  And notwithstanding Mr. Lenner telling you

Page 1116

1  that you were going to get all the documents you asked
2  for, when you did not receive a customer check, what did
3  Mr. Lenner instruct you that you could accept instead?
4    A.  That we should limit our review to checks
5  received from Bankest Capital Corp., deposits or
6  customer checks from Bankest Capital Corp.
7    Q.  So when you were performing A, could you
8  treat a customer check and put a check mark if the check
9  you saw was from Bankest Capital?
10   A.  Those were the instructions at the time,
11  yes.
12   Q.  And so you didn't have to see a check from
13  JC Penney for number 14?
14   A.  In some instances, no.
15   Q.  If you got the check from JC Penney, was
16  that fine?
17   A.  It's okay.  But if we don't got it, we
18  should limit our review to Bankest Capital Corp.
19  documents.
20   Q.  Could you look at the thing there.  I may be
21  blocking this view from something.  I'm going to move it
22  just like this.
23        Bankest Capital, is that the business
24  controlled by the Orlanskys?
25   A.  Yes.

Page 1117

1     Q.   So when Bankest refused to give you Wal-Mart
2  checks, you could accept a check from the Orlanskys'
3  other business?
4         MR. COLE:  Objection.
5         THE COURT:  Sustained.
6  BY MR. THOMAS:
7     Q.   Could you accept a check from the Orlanskys'
8  other business as proof that the account receivable from
9  Wal-Mart was real?
10    A.   The answer is yes.
11    Q.   And in that instance, Mr. Rivera, did you
12 audit the whole transaction?
13    A.   No.
14    Q.   What would you audit?
15    A.   Just like based on the instruction that the
16 team received at the time, we just stopped our work up
17 to this level (indicating).  We don't go further this
18 entity to see either checks or collections from Joy or
19 checks or collections from Wal-Mart.
20    Q.   What if you got a check from Joy?  If you
21 got a check from Joy, did you have to see a Wal-Mart
22 check?
23    A.   I would say yes.
24    Q.   So to audit your transactions -- can I take
25 that for just a minute?  May I?

Page 1118

1     A.   Sure.  (Complies.)
2     Q.   If E.S. Bankest did not provide you proof
3  that the entity that actually owed the money, the
4  Wal-Mart, if they wouldn't give you that check and
5  sometimes you could take a check from Joy instead?
6     A.   Yeah.  We were -- I mean, those were the
7  instructions that we received.  In that case, then a
8  check from Joy will be sufficient evidence and -- okay.
9  I'm sorry.  Repeat the question.
10    Q.   So that would be okay.  But sometimes you
11 wouldn't even get a Joy check?
12    A.   No.
13    Q.   And in that case, you could just stop with
14 Capital; is that right?
15    A.   That's right, yes.
16        MR. THOMAS:  Just want to make clear for the
17 record that the C-10 that we were putting up here is
18 Plaintiffs' Exhibit Number 376 in evidence.
19 BY MR. THOMAS:
20    Q.   Is that right, Mr. Rivera?
21    A.   Yes.
22    Q.   Now, Mr. Rivera, you previously testified
23 that you had been asking for these kinds of documents
24 for, I think, since January; is that right?
25    A.   Yeah.  The audit began like at the beginning

Page 1119

1  of January.  That's why --
2     Q.   Sorry.  Ms. Alexander was trying to keep me
3  from crashing into something.
4         You said the audit began back in January?
5     A.   That's right.
6     Q.   And you had been asking for these kinds of
7  documents since then?
8     A.   Yeah.  By way of reference, the day of the
9  inherent risk questionnaire which is something that we
10 did at the beginning of the audits.  So that's more or
11 less a reference date for you for your information.
12    Q.   Now, after Mr. Lenner instructed you to
13 restart the audit, did you then make specific requests
14 for documents?  Like did you send a fax and say, okay,
15 you refused to give them to me before but now give me
16 these documents?
17    A.   Yeah.  I think from time to time we sent --
18 relayed information asking for the open items to
19 complete the audit, yes.
20    Q.   I'm going to approach you with Exhibit 287
21 in evidence at pages 381 and 382.
22        If you look at the cover of this, is this
23 your handwriting?
24    A.   Yes, sir.
25    Q.   And it says, "Carlos attaches a list of

Page 1120

1  subsequent collections that we will examine as part of
2  the audit of E.S. Bankest.  Tomorrow I'll provide a
3  sample of the invoices that we need to examine.  Best
4  regards, Ramon."
5         Did I get your handwriting right?
6     A.   Yes, sir.
7     Q.   And if we look at the next page, you see a
8  list?
9     A.   Okay.
10    Q.   And is this a list of some of the ones that
11 you were requesting?
12    A.   Yes.  Absolutely, yes.
13    Q.   And I'm hoping my team isn't going to get
14 too upset with me, but I think we need that C-10 board
15 back out here.
16    A.   Pardon me?
17    Q.   I'm sorry.  I think we need this big C-10
18 board back out here.  If you give me just a moment, I'm
19 going to put it back up.  I hope they don't get too mad
20 at me.
21        Now, for -- I know these aren't in perfect
22 order.  But is this list -- nine or so in this list
23 equal to the first nine or ten of this list?  Can you
24 tell that?
25    A.   Yeah.  Based on the customer names and the

Page 1642

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


--------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
--------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
--------------------------------------------------x

PAGES 1642 - 1759

Volume 15



AFTERNOON SESSION

Miami, Florida

Thursday, April 19, 2007

2:00 p.m.

Before the Honorable Jose M. Rodriguez


EXHIBIT
12

Reported by:  Gizella "Gigi" Baan

Page 1643

APPEARANCES

On behalf of the Plaintiffs BANCO ESPIRITO SANTO
INTERNATIONAL, LTD., ET AL.:

SULLIVAN & CROMWELL, LLP
    1888 Century Park East
    Los Angeles, California 90067
    (310) 712-6627
BY:  Steven W. Thomas, Esquire
    Emily S. Alexander, Esquire

GONZALO R. DORTA, P.A.
    334 Minorca Avenue
    Coral Gables, Florida 33134
    (305) 441-2299
BY:  Gonzalo R. Dorta, Esquire

BERGER SINGERMAN
    350 East Las Olas Boulevard, Suite
    Fort Lauderdale, Florida 33301
    (954) 525-9900
BY:  Mitchell W. Berger, Esquire

Page 1644

On behalf of Defendant BDO Seidman, LLP:

ALVAREZ, ARMAS & BORRON
    901 Ponce de Leon Boulevard, Suite 304
    Coral Gables, Florida 33134
    (305) 461-5100
BY:  Arturo Alvarez, Esquire

GREENBERG TRAURIG, LLP
    MetLife Building
    200 Park Avenue, 15th Floor
    New York, New York 10166
BY:  Adam D. Cole, Esquire
    Karen Y. Bitar, Esquire

GREENBERG TRAURIG, LLP
    1221 Brickell Avenue
    Miami, Florida 33131
BY:  Mark Schnapp, Esquire
    Nikki Simon, Esquire

Page 1645

On behalf of Third-Party Defendants Victor Balestra,
Bernard Mollet, and Joaquin Garnecho

RICHMAN, GREER, WEIL, BRUMBAUGH,
MIRABITO & CHRISTENSEN, P.A.
    Miami Center, Suite 1000
    201 S. Biscayne Boulevard
    Miami, Florida 33131
    (305) 373-4000
BY:  Manuel Garcia Linares, Esquire

On behalf of Third-Party Defendant Bernard Mollet

GAMBA & LOMBANA, P.A.
    2701 Ponce de Leon Boulevard, Mezzanine
    Coral Gables, Florida 33134
    (305) 448-4010
BY:  Hector J. Lombana, Esquire
    Geoffrey Marks, Esquire

Page 1646

CONTENTS

EXAMINATION OF JAMES FELTMAN BY:          PAGE:
    MR. THOMAS:  (Direct, cont'd)          1654

Page 1711

1    A. Yes. But that there were fake client checks
2 prepared that would indicate that a payment was going to
3 be made or made that was never negotiated -- negotiated
4 meaning it was never presented for payment and the check
5 was never intended to be provided as a real transaction.
6    Q. And the fake client checks would be for like
7 Joy or StrataSys, BDO's alliance partner?
8    A. I remember Joy. I can't recall names beyond
9 that.
10    Q. Well, let's for a moment assume -- well,
11 some of these customers here purport to be customers of
12 Joy, the largest client; is that your recollection?
13    A. The retail would be. For example, K-Mart
14 Wal-Mart, JC Penneys. Those would have been names that
15 I recall were associated Joy.
16    Q. And if BDO Seidman in performing the
17 procedure that they laid out on their own work paper had
18 seen a fake Joy check and not seen the Wal-Mart check,
19 but anyway put a little check in box A, would BDO
20 Seidman have violated their very own procedures?
21    A. Yes, because the audit evidence wouldn't be
22 from customers, it would be from a client. Which would
23 make this value less as to that transaction. This
24 procedure valueless of that transaction.
25    Q. And, Mr. Feltman, did you review the

Page 1712

1 testimony and the declarations of Ramon Rivera in which
2 he stated that the partner in charge --
3       MR. COLE: Objection, Your Honor. Referring
4 to something not in evidence.
5       THE COURT: Overruled.
6 BY MR. THOMAS:
7    Q. -- where he stated that the audit partner in
8 charge, Mr. Sandy Lenner, told him that he could treat a
9 Bankest Capital check as a customer check from Wal-Mart
10 if he didn't have the Wal-Mart check?
11       MR. COLE: Objection. Hearsay.
12       THE COURT: Overruled.
13       THE WITNESS: Yes. That's -- my
14 recollection is that Mr. Rivera testified in his second
15 affidavit --
16       MR. COLE: Objection. Hearsay.
17       MR. THOMAS: I can actually do it
18 differently. I'll withdraw that and ask him from his
19 testimony.
20 BY MR. THOMAS:
21    Q. Do you recall reviewing the deposition
22 testimony and the testimony of Mr. Rivera?
23    A. Yes.
24    Q. And do you recall what he said in his
25 testimony about the instruction he had received from

Page 1713

1 Mr. Lenner?
2    A. Yes. But not clearly. It would refresh my
3 recollection if I could look at his testimony.
4    Q. Well, rather than take the time to do that,
5 I'm going to ask you generally from what you reviewed
6 from the record. And the record in this case, you have
7 relied upon testimony from Mr. Rivera?
8    A. Yes.
9    Q. And in relying on the testimony from
10 Mr. Rivera in this case, whether in writing or verbal,
11 do you have an understanding that Mr. Lenner instructed
12 Mr. Rivera that he could accept Bankest Capital checks
13 for customer checks?
14       MR. COLE: Objection. Hearsay once again,
15 especially based on the last predicate question.
16       THE COURT: Overruled.
17       THE WITNESS: My recollection of
18 Mr. Rivera's testimony was that when it came to this
19 audit work paper, Mr. Rivera's instructions were that
20 when he could not get a customer check, he could use --
21 he could receive a client check or a check from Capital
22 instead, that the two would have equal value for audit
23 purposes.
24 BY MR. THOMAS:
25    Q. And in your opinion, Mr. Feltman, if Ramon

Page 1714

1 Rivera as an employee of BDO Seidman accepted Bankest
2 Capital checks instead of the customer checks like
3 K-Mart, when he performed the procedures of C-10, would
4 he have violated BDO's own procedures?
5    A. Yes, because you're not getting the audit
6 evidence that you're trying to achieve with this work
7 paper. And you don't really know if there's an accounts
8 receivable from that customer.
9    Q. And in doing so, would BDO have violated
10 Generally Accepted Auditing Standards and their own
11 audit manual?
12    A. Yes, if BDO's opinion was based on this
13 work, which is apparent from their work papers. In
14 other words, BDO concluded based on the work papers that
15 I reviewed, that this work provided support for the
16 proposition that accounts receivable existed in 1998.
17 And if the majority of these items tested were validated
18 from Bankest Capital checks or client checks, then they
19 did not have audit evidence.
20    Q. So in that case, if Mr. Rivera had treated
21 Bankest Capital checks as customer checks, BDO Seidman
22 would have violated Generally Accepted Auditing
23 Standards, their own audit manual, and their own
24 procedures set out in C-10?
25    A. Yes.

Page 1715

1      MR. THOMAS:  With His Honor's permission,
2   I'll switch places.
3      THE COURT:  You may.
4      MR. THOMAS:  (Complies.)
5   BY MR. THOMAS:
6      Q.   Can we go back to the planning memo because
7   there's more.
8      A.   Right.  That's correct.
9      (Technician complies.)
10  BY MR. THOMAS:
11     Q.   So BDO has sent out confirmations to
12  customers and they've gotten zero back.  They sent out
13  confirmations to clients for a while and then they
14  stopped, then the alternative procedure we first looked
15  at was subsequent collections, and that was C-10 which
16  we just looked at.  And if I'm reading that right, the
17  next thing it says up there is shipping documents?
18     A.   That's correct.
19     Q.   Now, if BDO would have looked at shipping
20  documents, what would that have told you?
21     MR. COLE:  Objection.  Speculative.
22     THE COURT:  Overruled.
23     THE WITNESS:  First of all, before I answer
24  your question, the alternative procedures that we're
25  talking about as I described earlier aren't in a

Page 1716

1   sequencing.  So you would use subsequent remittances if
2   you didn't get confirmations.  And if you didn't get
3   subsequent remittances, in other words, if there was a
4   low level of payments, then you would use these other
5   alternative procedures.  And that is, in fact, what
6   happened in later years.
7      We just looked at an example of 1998 when
8   there was subsequent collections worked on and there
9   were a significant -- there was a significant amount of
10  audit activity, but that wasn't always the case.  In the
11  later years of the audit, BDO relied more and more
12  heavily on the next kind of alternative procedure, which
13  is to look at other documentation if you don't get
14  enough subsequent collections and if you have little or
15  no confirmations.
16     So now we're talking about a third category
17  of work that auditors do when they're looking to confirm
18  the existence of accounts receivable.
19  BY MR. THOMAS:
20     Q.   Let me see if I get that.  Best thing to do
21  is get confirmations, ask them and they tell you?
22     A.   Ask and be told in written form by an
23  auditor sending out a confirmation and getting it back
24  directly from the customer.  That's the best form of
25  audit evidence to confirm the existence of accounts

Page 1717

1   receivable.  If that doesn't work --
2      Q.   Didn't get that?
3      A.   Didn't get that.
4      Q.   BDO didn't get that?
5      A.   No, never.
6      Q.   Then the next --
7      A.   Never with a few exceptions.  Confirmations
8   didn't work.  Let me just put it this way.
9      Q.   BDO over the course of this sent out
10  hundreds and hundreds of confirmations to customers.
11  You can tell that from the work papers?
12     A.   Yes.
13     Q.   In fact, one year they sent out 145
14  confirmations and they got zero back.  Do you remember
15  that?
16     A.   That's correct.
17     Q.   So that didn't work.  So then you do the
18  subsequent collections test, the one we just looked at?
19     A.   Yes.
20     Q.   And based on your testimony and your opinion
21  in this case, when BDO did the subsequent collections
22  test in those early years, that didn't work either?
23     A.   Based on the discussion that we just had and
24  the assumption that about two-thirds of the accounts
25  that we looked at for 1998, there was no evidence that

Page 1718

1   there was a real customer check.  The check appeared to
2   be from Capital, and that wouldn't work.
3      Q.   And then what you're telling us is over
4   time, that subsequent collections test, that one we
5   looked at, they did less and less and less of even that?
6      A.   Well, BDO did less subsequent collections
7   testing because it was less collections received from
8   customers.  The actual numbers went down, so BDO had to
9   find another way which is in their audit procedures to
10  validate the existence of accounts receivable.
11     Q.   So now we're down to sort of not as good
12  audit evidence over here down when we start running down
13  these names?  Is that what you're trying to say?
14     A.   That's right.  We're in the next level of
15  audit procedures that you use when the first best method
16  doesn't work, when the second best method doesn't work.
17  Now you're using third best method.
18     Q.   So is one of those shipping documents?
19     A.   Well, it's the collection of those.  It's
20  the grouping of those things.  In other words, if you
21  can't prove that the customer actually paid for the
22  goods while you're doing your audit, you want to look at
23  third-party documents that show that the transaction
24  actually took place.  And those are -- in the examples
25  of those are the items that BDO Seidman is describing in

Page 1719

1   item G. One of them is a shipping document.
2       Q.  Now, as a matter of practice in the audits,
3   did BDO get shipping documents?
4       A.  Did they get them?
5       Q.  (Nodding.)
6       A.  No, they did not.
7       Q.  And why would you want shipping documents?
8   How did they help?
9       A.  Well, shipping document is a -- is audit
10  evidence that's prepared by a third party, like a
11  trucking company or a shipping company if the goods came
12  in on a ship, let's say, from China.  So if somebody
13  other than a customer is providing you documentation, an
14  air bill, that the goods that you're looking to confirm,
15  the transaction actually occurred because somebody
16  shipped the things that created the value.
17      Q.  So Joy shipped the T-shirts?
18      A.  The T-shirts were shipped from China to a
19  warehouse or a distribution center.  That would be an
20  example.  Or that a trucking company picked the T-shirts
21  up from a distribution center and shipped them to a
22  store.  That would be another example.  Those would be
23  shipping documents.
24      Q.  Well, since most of these accounts
25  receivable were fake, Joy wasn't shipping any T-shirts,

Page 1720

1   were they?
2       MR. COLE:  Objection.  Speculative.
3       THE COURT:  Overruled.
4       THE WITNESS:  Well, you're not going to find
5   shipping documents for a transaction that never
6   happened.
7   BY MR. THOMAS:
8       Q.  So for all those fake transactions, if you
9   ask for shipping documents, they wouldn't be able to
10  give them to you?
11      A.  Unless they were fabricated, but that can be
12  a challenge.
13      Q.  And the shipping documents to be fabricated,
14  you'd have to get them from the people that were doing
15  the shipping, right?
16      MR. COLE:  Objection, Your Honor.  That's
17  speculative.
18      THE COURT:  Sustained.
19  BY MR. THOMAS:
20      Q.  Do you have experience with shipping
21  documents as an expert?
22      A.  Sure.  Auditors look at shipping documents
23  in their work.  So they know what a freight bill looks
24  like.  They know what an airway bill looks like.  They
25  know what a bill of lading looks like for goods that are

Page 1721

1   shipped over water.
2       MR. THOMAS:  With Your Honor's permission,
3   I'll approach the witness with Exhibit 118 in evidence
4   at page 518.
5       THE COURT:  You may.
6   BY MR. THOMAS:
7       Q.  Mr. Feltman, this is another page of BDO's
8   own audit manual which I copied out of that big box over
9   there.  Is that your understanding?
10      A.  Yes, it is.
11      Q.  And in their own audit manual here, in
12  addition to their planning memo we looked up there, BDO
13  talks about alternative procedures.  Do you see that?
14      A.  Yes, this is what we're talking about now.
15  What you do when you want to confirm accounts receivable
16  but you have to use alternative procedures.
17      Q.  And so one of the things they look at in
18  their own audit manual is they start out with those
19  confirmations.  And if that doesn't work, they go to
20  subsequent remittances.  That's the subsequent
21  collections, right?
22      A.  Just as we've been describing.
23      Q.  And then BDO's own audit manual tells them
24  to look at, what, examine documentation such as shipping
25  documents.  Did I get that right?

Page 1722

1       A.  Yes.
2       Q.  But in this case, at least as any regular
3   practice, BDO didn't even ask or look for the shipping
4   documents, did they?
5       A.  There are no shipping documents as part of
6   the audit work papers that I've examined in this case.
7       Q.  Now, the next thing it says up there is
8   sales invoices?
9       A.  Right.
10      Q.  Does this refer to another test?
11      A.  Well, it's another type of documentation.
12      Q.  And what's that?
13      A.  It's a sales invoice, essentially a bill
14  that's prepared by the seller to the buyer.  In this
15  case we've been talking about Joy and Wal-Mart.  So you
16  would see a sales invoice generated by Joy selling goods
17  or purporting to sell goods to Wal-Mart.
18      Q.  But if you look down there at the bottom in
19  BDO's audit manual, Mr. Feltman, it says, "Regardless of
20  which alternative procedures are performed, we" -- and
21  this is BDO's audit manual -- so we is BDO; is that
22  right?
23      A.  That's right.
24      Q.  "We should always examine some invoices,
25  shipping documents," et cetera.  Even though their own

Page 1723

1  audit manual said they were supposed to do that, from
2  your review of the work papers, is it your opinion that
3  over the seven years, BDO never made a regular practice
4  of examining shipping documents?
5      A.  Yes.  What I found was that when BDO relied
6  less on subsequent collections, they relied more on a
7  test that is called agreed to invoice.  So BDO was
8  looking more and more and placing greater and greater
9  reliance on looking at a sales invoice from a Joy and
10  using that as audit evidence that an accounts receivable
11  was valid and existed at the examination date.  But they
12  were not looking at third-party corroborating documents,
13  like bills of lading, shipping documents, or something
14  that a third party would have to create to provide
15  additional proof that that transaction actually
16  occurred.
17      Q.  With His Honor's permission, I'm going to
18  approach you with some demonstrative aids.
19          THE COURT:  You may.
20          MR. THOMAS:  (Complies.)
21          MR. COLE:  No objection.
22  BY MR. THOMAS:
23      Q.  Mr. Feltman, I think it might be most
24  helpful to start with the pictures there on the end.
25      A.  This picture on the end?  Yes.

Page 1724

1          MR. THOMAS:  Can we put that up for the
2  jury, please?
3          (Technician complies.)
4  BY MR. THOMAS:
5      Q.  Now, when you said agreed -- I think agreed
6  to invoice?  Is that --
7      A.  Yes, that's the term.
8      Q.  When you said agreed to invoice, would this
9  help you explain what you're talking about?  I hope the
10  answer is yes.
11      A.  Yes, it can help.  We're talking about that
12  process of validating accounts receivable.  And we're
13  talking about the third procedure, the least significant
14  procedure in terms of value, where an auditor is going
15  to look at an invoice that's created by a client like
16  Joy as a basis of determining that an accounts
17  receivable existed.
18      Q.  All right.  So in the agreed-to-invoice
19  test, you get an invoice from Joy saying to Wal-Mart,
20  pay this amount?  Is that what the invoice says?
21      A.  Well, it has a reference number, it says
22  it's for a certain amount and perhaps when it's payable,
23  and it may have other information that the auditor would
24  tie to or relate to the company records so that it would
25  provide some corroboration.  But there's limitations

Page 1725

1  about that.  Proof.
2      Q.  But what an invoice is, is an invoice the
3  bill to Wal-Mart to pay for the T-shirts?
4      A.  Yes, that's what it is.
5      Q.  So we've got an invoice from the client.
6  And do you take that and then match it up on something
7  on E.S. Bankest's financial statements?
8      A.  In their books, yes.
9      Q.  In their books?
10      A.  Right.
11      Q.  And is that the test we're talking about to
12  determine whether or not the accounts receivable owed by
13  Wal-Mart is real or fake?
14      A.  That's what we're talking about.
15      Q.  All right.  Now, how is it that test going
16  to tell us whether Wal-Mart actually owes the money,
17  whether the account receivable is real or fake because
18  all we have is a bill from Joy?
19      A.  Well, by itself it's not going to tell you
20  very much because there's a number of challenges.  The
21  way the audit procedure and the audit manual -- BDO's
22  auditing procedures and BDO audit manual says that you
23  look at the sales invoice in connection with things like
24  shipping documents and other correspondence.
25          While they don't use the words from third

Page 1726

1  parties, that's what they're saying to you.  Is get some
2  evidence from someone that doesn't have an economic
3  interest in this transaction like Joy.  To get
4  corroboration that when Joy says, here is an invoice to
5  Wal-Mart, that there's a shipping document that a
6  trucking company picked the goods up at Joy's warehouse
7  or some other warehouse and they actually made it to
8  Wal-Mart.  Or that Wal-Mart has a receiving report that
9  says, we got these T-shirts from Joy, or some other form
10  of evidence that this transaction really took place.
11      Q.  So you use this agreed-to-invoice test, you
12  use it along with something else to tell you whether
13  they're real or fake?
14      A.  Yes.  Because the invoice alone has -- just
15  looking at an invoice is a problem.
16      Q.  Now, one of those up there has a list, maybe
17  some problems on it?
18      A.  Yes.
19          MR. THOMAS:  Can we put that one up?
20          (Technician complies.)
21  BY MR. THOMAS:
22      Q.  So are these a list of reasons why agreed to
23  invoice is not good audit evidence?  It's not going to
24  tell you us really whether Wal-Mart owes the money?
25      A.  Yes.  If you are examining agreed to invoice

Page 1727

1    alone without corroboration, without other audit
2    evidence, these are some of the challenges that an
3    auditor has.
4          It's common in the retail business for there
5    to be disputes or problems with shipments and in the
6    business these are called back orders or cancellations
7    or credits or charge backs.  And so maybe the entire
8    shipment didn't go or the wrong number of sizes went or
9    the colors weren't right.  And there's a constant
10   dialogue between the customers and the clients over
11   whether the full amount of the invoices due or something
12   else.  It's just the way that business operates.
13         Q.   So just because somebody sends me a bill
14   doesn't mean I actually owe the money?
15         A.   Or you owe that amount of money or that you
16   don't have a dispute over whether the goods were late or
17   there were other problems with the goods.  It's very
18   typical to have those kinds of issues.
19         Q.   And then you have number 3 there, it only
20   shows one side of the transaction.  What does that mean?
21         A.   Well, if you're only showing -- if you're
22   only examining as an auditor an invoice from Joy to
23   Wal-Mart, you only know Joy's side of the picture.  You
24   don't know if Wal-Mart ever got the goods, if Wal-Mart
25   ever accepted the goods, if Wal-Mart returned the goods.

Page 1728

1    And you saw when we looked at Perry, for example, that
2    customers can return -- in that case, it was purported
3    to be medical equipment.  And gave it all back.  So if
4    you're only looking at agreed to invoice, you don't know
5    the rest of the story.
6          Q.   And when you say number 4, no proof from the
7    debtor, you mean there's no proof from Wal-Mart that
8    they owe the money?
9          A.   There's no proof from the customer that they
10   agreed that they got those goods, that they accepted
11   them, and that they owe the amount of money that the
12   invoice says is owed.
13         Q.   And number 5, provided by the audit client.
14   What does that mean?
15         A.   That means that you may be getting or are
16   getting the invoice from your client or you could be
17   getting the invoice from the client, in this case, Joy,
18   which should raise some questions about if you can rely
19   on an invoice solely by itself.  You have to look at the
20   source.
21         Q.   And then number 6, not standardized easily
22   faked.  What does that mean?
23         A.   Well, Mr. Mendez testified in his --
24   Mr. Mendez gave testimony that part of the way that
25   Bankest committed the fraud was that they created fake

Page 1729

1    invoices.  So it isn't very difficult, and it was
2    something that was done regularly.  So just because
3    you're looking at an invoice as an auditor doesn't mean
4    that it's a real invoice from the real client.  You've
5    got to do something else other than just look at an
6    invoice and say, okay, I can sign off on tens of
7    hundreds of millions of dollars of accounts receivable.
8          Q.   Well, that's what actually happened in this
9    case, right?
10         A.   Yes.
11         Q.   You saw invoices from Joy for goods they
12   never shipped to Wal-Mart?
13         A.   Joy and others, yes.
14         Q.   And when BDO Seidman relied just on an
15   invoice for Joy to say whether Wal-Mart actually owed
16   the money, turned out that reliance was wrong?
17         A.   Right.  For the reasons that we're
18   discussing now, the agreed to invoice without
19   third-party corroboration is very weak, if any, audit
20   evidence and it's meant as a cleanup device.  It's not
21   meant as a device to support the audited opinion.
22         As I described earlier, you would typically
23   catch most of the audit evidence in a confirmation.
24   What you didn't catch there, you'd catch in subsequent
25   receipts.  And if you didn't have the remaining items,

Page 1730

1    generally a few, you could use this third level of
2    procedures to clean up the sample, the group that you
3    were examining to prove this assertion, the existence of
4    accounts receivable.
5          MR. THOMAS:  Let's use the last
6    demonstrative.
7          (Technician complies.)
8    BY MR. THOMAS:
9          Q.   Now, this one shows the percentage of
10   accounts receivable that BDO used the invoice-only test
11   for over the years at -- at least at E.S. Bankest?
12         A.   Yes.  This is the point that I've been
13   making to you, that over time BDO began to rely more and
14   more heavily -- in the first year that we looked at,
15   1998, BDO only used agreed to invoice to test a half of
16   1 percent of the accounts receivable.  But in the next
17   two years, that reliance went way up to some
18   60-odd percent.
19         And then in years 2001 and 2002, the
20   predominant audit evidence, not more than 90 percent of
21   the evidence BDO relied on to give their opinion that
22   the financial statements were true and correct and three
23   of material misstatements due to fraud was based on this
24   test.  And that obviously doesn't work and didn't work
25   here.

Page 1731

1    Q.  It didn't work here because it turned out
2  that even though BDO certified hundreds of millions of
3  dollars in accounts receivable as real based on this
4  test, turned out they were fake?
5    A.  That's right.  And that's why you can't use
6  agreed to invoice the way it was used in this case and
7  in the level that it was used in this case because it's
8  just not the kind of audit evidence that will support
9  the conclusions that BDO made here about accounts
10  receivable.
11    Q.  With His Honor's permission, I'll approach
12  you with a demonstrative.
13    MR. COLE:  Objection.
14    THE COURT:  I'm sorry?  What was the
15  objection?
16    MR. COLE:  I have an objection.
17    THE COURT:  To that demonstrative?
18    MR. COLE:  Yes, as argumentative.
19    THE COURT:  May I see it?
20    MR. COLE:  (Complies.)
21    THE COURT:  Sustained.
22    MR. THOMAS:  Your Honor, may I just -- I
23  haven't asked him the predicate but -- other than the
24  first one, but I'll ask him the predicate for each one
25  before --

Page 1732

1    THE COURT:  I think Mr. Cole -- it's been a
2  long day.
3    (Laughter.)
4    THE COURT:  He is complaining about that, I
5  suspect (indicating).
6    MR. THOMAS:  And this is -- I'm going to
7  need a side bar.  I can't think of a way to say it --
8    THE COURT:  If you can separate it from --
9    MR. THOMAS:  I think what Your Honor might
10  approve, if I get the opportunity to show you is that
11  you might approve that if I lay the predicate for that
12  testimony, then I might be able do it in that way.  And
13  that's consistent with what I do.
14    THE COURT:  I understand.
15    MR. THOMAS:  You understand what I mean?
16    THE COURT:  I understand what you're saying.
17  He can testify to it.  Let's not show him.
18    MR. THOMAS:  Well, then we'll need the flip
19  chart.
20    Can we get the flip chart, please?
21    (Technician complies.)
22    MR. COLE:  Judge, he's not going to make the
23  same demonstrative --
24    THE COURT:  I have no idea what he's going
25  to do.  But I can assume he's not.  I'm just going on

Page 1733

1  faith.
2    MR. THOMAS:  I'm going to bring him down
3  and --
4    THE COURT:  That's a different issue.  Let's
5  have a side bar.
6    (Thereupon, there was a side-bar conference
7  outside the presence and hearing of the jury.)
8    MR. COLE:  Objection was argumentative.
9    MR. THOMAS:  And, Your Honor, I'm not using
10  a single demonstrative that I didn't use last time.  And
11  what you told me the last time is the same argument.
12  The objection was made and what you told me was --
13  beginning to testify, that then you can use it.  And I
14  understand it's a new trial.  But I would urge that that
15  be the same ruling.  If that's not the same ruling, then
16  what I'm going to have him do is put it up, lay the
17  predicate.  And he can write failed because that's his
18  opinion that it failed.
19    MR. COLE:  It's the same argument with the
20  exhibit.  It's not something that --
21    THE COURT:  Hold on.  Hold on.  If he's
22  testifying to it, what you're objecting to is really the
23  shocking value of it with the red letters in the little
24  box.  That's what you're objecting to because that's
25  argumentative.  That's really what you're arguing.

Page 1734

1    MR. COLE:  No, it's more than that.
2    THE COURT:  What is it?
3    MR. COLE:  It's this word (indicating).
4    THE COURT:  That's what I'm saying.
5    MR. COLE:  The fact is that demonstratives
6  are used to help illustrate for the jury something
7  that's complicated -- be able to testify to something
8  that's complicated.  He can testify -- I don't even mind
9  you using this cover page and ask if it failed.  That's
10  fine.  But the fact is when you write this down like
11  this, that becomes argumentative.  It doesn't become a
12  demonstrative anymore and that's the reason.  And it's
13  overly prejudicial.  He shouldn't be allowed to do that.
14    MR. THOMAS:  That's his opinion that it
15  failed, and so I can.
16    MR. COLE:  He can ask two different color
17  markers.
18    MR. THOMAS:  This is the exact same thing
19  allowed last time.
20    THE COURT:  I can always change my mind.
21    MR. THOMAS:  You can.  But, Your Honor, I
22  have for -- I don't know how long it's been, but this is
23  all.
24    THE COURT:  What is the question?  What is
25  the question you're going to ask him?

Page 1735

1      MR. THOMAS: I'm going to ask him did the
2  written confirmations, did they fail?  Yes.
3      THE COURT: Then he'll write yes?
4      MR. THOMAS: No. I'm entitled -- let me ask
5  why.  This is subparts of a larger test.  So I'm going
6  to go back to some of what he did.  It's complicated.
7  It's going on for hours.
8      THE COURT: If that's the way you're going
9  to ask him, then --
10      MR. THOMAS: It's his opinion that it
11  failed.  And that's something that -- that's the word
12  they use in the accounting world.  The test failed.  I
13  mean, it's not shocking to what they do.  And if you
14  don't like the red box, I'll just have him write it.
15      MR. COLE: The fact is --
16      MR. THOMAS: I'm sorry their test failed.
17      MR. COLE: No.  But that's not the point.
18  That is not the point.
19      THE COURT: Mr. Cole has a point but at the
20  same time he doesn't.  You have a point and at the same
21  time you don't.  It really depends how the question is
22  asked as to whether it's argument or it's not.  And I
23  can't tell you how to ask the question.  The way you
24  asked it, it's argumentative.  I don't know what else
25  you can ask.

Page 1736

1      MR. THOMAS: I'll ask it a different way.
2      MR. COLE: But then the question is, do you
3  then get to go draw this same exhibit, to draw it as
4  opposed to put it up on the board?
5      THE COURT: Exactly.  I'll let him draw it
6  up but you can't put it up on the board.
7      MR. THOMAS: But drawing is no different.
8      THE COURT: I don't know how the question is
9  asked.  Let me see and then you can object to it.
10      MR. COLE: But the question --
11      THE COURT: I don't want to tell him how to
12  question.
13      MR. COLE: But the question is not the thing
14  that is necessarily objectionable.
15      THE COURT: No, but the answer that it's
16  asking for is -- could be argumentative.  Not the
17  question itself, but the answer that he's asking for.
18  In this question what he's asking for is how to give an
19  answer.  And the question may not be argumentative in
20  itself but the responses -- he's asking --
21      MR. THOMAS: Your Honor, what you're telling
22  me is what you told me -- it's pretty close to your
23  ruling last time.  You won't let me use it this way, but
24  I understand that I have to lay it with the expert.
25      THE COURT: You can object, but I need to

Page 1737

1  hear the question first and what he's asking for the
2  expert.
3      MR. COLE: And then the expert can take his
4  testimony and write it down on the board.
5      MR. THOMAS: That's what happens all over
6  the country in courtrooms.
7      THE COURT: It depends how the testimony is
8  asked for.  See what he asks.
9      MR. THOMAS: Thank you, Your Honor.
10      (Thereupon, the side-bar conference was
11  concluded.)
12      THE COURT: Yes.
13      MR. THOMAS: Your Honor, we have a
14  compromise and now no objection.
15      THE COURT: Okay.  Good.  I'm sure (inaud.).
16      MR. COLE: Also depends on how the question
17  is asked.
18  BY MR. THOMAS:
19      Q.  I hope you're not disappointed about not
20  getting to draw.
21      A.  I'm okay either way.
22      Q.  Remember way back when we had BDO's three
23  primary failures?
24      A.  Yes.
25      Q.  On failure number 1 was, failed to confirm

Page 1738

1  existence of receivables.  Do you remember that?
2      A.  Yes, I do.
3      Q.  And we've actually been talking all this
4  time about all the different ways BDO failed to confirm
5  existence of receivables?
6      A.  That's correct.  We have.
7      MR. THOMAS: Now we can put up the next one.
8      (Technician complies.)
9      MR. THOMAS: No, the four.
10      (Technician complies.)
11  BY MR. THOMAS:
12      Q.  And are these the four things that BDO
13  failed to confirm accounts receivable?
14      A.  These four items are the audit procedures or
15  parts of audit procedures that BDO failed to perform or
16  failed to perform effectively that are the foundation of
17  my opinion that BDO failed to obtain evidence to confirm
18  the existence of accounts receivable.  That's what we've
19  been talking about for the last several hours.
20      Q.  For a while.
21      A.  Yes.
22      Q.  So number 1 was those written confirmations.
23  And when BDO over seven years sent out hundreds and
24  hundreds of confirmations and got virtually zero back,
25  was that test successful?

Page 1739

1    A.  No.  You don't get confirmations back, you
2  don't have audit evidence and that test failed.  So
3  using confirmations was not effective because it didn't
4  create audit evidence.
5    Q.  Now, the second thing was the subsequent
6  collections.  That's the C-10 over there.  And when BDO,
7  the times they did the subsequent collections test, was
8  that successful to confirm accounts receivable?
9    A.  No, for the two reasons we've just
10  described.  First, when we looked at 1998 there was
11  evidence that the majority of the items tested were not
12  customer checks but something else.  They could have
13  been client checks.  They could have been Bankest
14  checks.  But they weren't customer checks.
15    After that, I've shown an exhibit that the
16  amount of subsequent collections work that was done
17  began to decrease substantially and in the later years
18  was almost none.  So that was not a successful way that
19  BDO captured audit evidence to confirm the existence of
20  accounts receivable.
21    Q.  So can we put a red X in that one too?
22    A.  Yes.
23    Q.  Now, the next thing we saw, and I believe we
24  saw this in at least BDO's own audit manual and at least
25  in their own audit plan for the Bankest audit, was to

Page 1740

1  look at shipping documents.  And since BDO didn't have
2  any practice of looking at the shipping documents for
3  Bankest, was the shipping documents item successful?
4    A.  No.  BDO's audit procedures and audit
5  manuals said to look at shipping documents.  And I don't
6  believe there's any controversy that that's not a
7  procedure that BDO used.  So they couldn't have gathered
8  audit evidence from examining shipping documents because
9  they didn't do that work.
10    Q.  So did that test fail?
11    A.  Yes.  It wasn't used.  It didn't produce
12  audit evidence that could support the opinion about
13  accounts receivable.
14    Q.  Put a red X in there?
15    A.  Yes.
16    Q.  And the final one was what we've just been
17  spending time on was the agreed-to-invoice test where
18  BDO just looked at the bill from Joy and matched it up
19  to Bankest financial statements to figure out whether
20  Wal-Mart actually owed the money.  And was that a
21  successful test?
22    A.  No.  Not in my opinion for the reasons we've
23  described.  There was no corroborating evidence.  And it
24  was used, at least in the latter years, at 60 and then
25  at 90 percent to gather audit evidence, and it just

Page 1741

1  doesn't provide that kind of evidence.  It's a cleanup
2  tool.  It's not meant as a primary tool.
3    Q.  So did that test fail?
4    A.  Yes.
5    Q.  Put a red X in there?
6    A.  Yes.
7    Q.  And in your opinion, Mr. Feltman, for the
8  confirmation of accounts receivables through written
9  confirmations, subsequent collections, shipping
10  documents, or agreed to invoice, over the seven years
11  did BDO violate GAAS, their own audit manual, and their
12  own procedures in doing the Bankest audits?
13    A.  Yes, they did.  BDO did not use a procedure
14  that ultimately was useful and produced evidence so that
15  BDO could opine on the accounts receivable which they
16  did and were -- I'm ignoring the fact that even through
17  BDO ultimately opined on -- I'm not ignoring it.  But we
18  haven't yet spoken about it, which is obviously the
19  procedures that BDO used failed because at the end of
20  the day, the accounts receivable weren't real.
21    Q.  Well, Mr. Feltman, in trying to confirm
22  these accounts receivable did BDO do their job?  The job
23  they were supposed to do?
24    A.  No, they didn't.  This company was all about
25  factored receivables.  That's what you really were

Page 1742

1  auditing was whether these receivables existed.  And
2  they did not exist.  And the fact that BDO has years of
3  audit work papers that say they do and explained why
4  they exist are wrong.
5    Q.  They didn't do their job?
6    A.  No, they didn't do their job.
7    Q.  So now we're up to the second primary
8  failure.  And that's that BDO was denied access to
9  documents they needed to do these audits.  And,
10  Mr. Feltman, can you tell the jury what this refers to?
11    A.  Yes.  One of the responsibilities of the
12  auditor in planning the audit, which we've spoken about
13  already, is to figure out what they need to get in the
14  way of information.  And it's the decision about what
15  audit evidence is to be gathered and from whom is within
16  the rights of the auditor to make that determination.
17  How much they need, whom they get it from.  When during
18  the conduct of an audit, client says no, you can't have
19  something that is important, that's significant, that's
20  a big deal in the audit environment, and it has a number
21  of implications.
22    Q.  Are we talking about Bankest denying
23  documents in 1998, the whole thing with Ramon Rivera?
24    A.  Yes, we are.
25    Q.  Now, there are rules about that, right?

Page 1743

1    A.  Yes, there are.
2    Q.  Well, why don't we start with Mr. Rivera's
3  declaration.  Can we do that?
4        With His Honor's permission, I'll approach
5  you with Exhibit 3753 in evidence.
6        THE COURT:  You may.
7  BY MR. THOMAS:
8    Q.  You've had a chance to see this before,
9  Mr. Feltman?
10   A.  Yes.  I believe this is what's referred to
11 as the first declaration of Mr. Rivera.
12   Q.  And in this declaration, Mr. Rivera
13 describes that for the 1998 audit on -- in February that
14 he requested documents from E.S. Bankest that Dominick
15 Parlapiano and Carlos Mendez refused to give him.  Do
16 you remember that?
17   A.  Yes.  I'm just going to catch up to the
18 point where I'm reading that in the declaration.  Okay.
19       MR. THOMAS:  Can we go to paragraph 14,
20 please?
21       (Technician complies.)
22 BY MR. THOMAS:
23   Q.  Where Mr. Parlapiano refused to provide the
24 requested documentation.  Do you remember that now?
25   A.  I actually thought that the preceding

Page 1744

1  paragraph 13 provides the context for the controversy,
2  where Mr. Rivera is describing what information he
3  wanted and why he wanted it.
4        MR. THOMAS:  Can we go to paragraph 13,
5  please?
6        (Technician complies.)
7  BY MR. THOMAS:
8    Q.  And this is where he's talking about meeting
9  with Mr. Parlapiano.  And down at the bottom he says,
10 these documents included or may have included invoices
11 to or checks from certain significant customers of the
12 factoring clients such as Wal-Mart or K-Mart?
13   A.  Yes.  I view it as particularly relevant to
14 start at the sentence before that.
15   Q.  Although we had received?
16   A.  Yes.
17   Q.  "Although we had received information
18 sufficient to track transactions between Bankest and
19 Capital, I insisted that BDO must be able to review
20 documents sufficient to verify the debts owed to Bankest
21 Capital's factoring clients such as Joy and CD Jewel
22 Box."  And then the next sentence goes on out to
23 customers Wal-Mart and K-Mart?
24   A.  Right.  In other words, Mr. Rivera was, in
25 my view, understanding correctly the picture that's been

Page 1745

1  presented to the jury about the movement of the invoices
2  and the money.  And in my opinion, Mr. Rivera understood
3  exactly what he needed to look for.  I think he had it
4  just right.
5    Q.  He needed to audit the whole transaction?
6    A.  That's correct.  Mr. Rivera was, in my view,
7  correct in insisting on looking at the documents and
8  checks from certain significant customers of the
9  factoring clients such as Wal-Mart and K-Mart.  He got
10 it right.  He knew what to look for.
11   Q.  And you remember, Mr. Feltman, that then
12 after Mr. Parlapiano and Mr. Mendez failed to give him
13 the documents, that Mr. Rivera stopped the audit and
14 called and spoke to Mr. Ellenburg?
15   A.  Yes.
16   Q.  And that Mr. Ellenburg agreed with him that
17 he should stop the audit?
18   A.  That's what is in the declaration, and I
19 believe that's consistent with Mr. Ellenburg's
20 testimony.  My recollection of Mr. Ellenburg's testimony
21 about this event.
22   Q.  So based upon your review of Mr. Rivera's
23 declaration, based upon your review of his testimony and
24 Mr. Ellenburg's testimony, that then they both agree
25 that Mr. Rivera went back to the office and told

Page 1746

1  Mr. Ellenburg what had happened?
2        MR. COLE:  Objection.  At some point the
3  leading is going to stop?
4        THE COURT:  What's your legal objection?
5        MR. COLE:  Leading.
6        THE COURT:  Sustained.
7  BY MR. THOMAS:
8    Q.  Mr. Feltman, do you know who Keith Ellenburg
9  is?
10   A.  I don't know him personally, but I know the
11 name in context of this litigation.
12   Q.  Is he the concurring partner on all the
13 audits that are at issue in this litigation?
14   A.  Concurring partner or review partner.  He
15 was the -- BDO is the BDO partner whose's job it was to
16 look at the finished product, if you will, the end
17 result, and sign off that BDO had performed the audit in
18 accordance with GAAS and BDO's own rules for conducting
19 audits.
20   Q.  And in review of the BDO partner on these
21 audits, do you recall that Mr. Ellenburg agreed with
22 Mr. Rivera that the audit was stopped on a Friday
23 because it couldn't get documents that BDO believed it
24 needed to do the audit, that Mr. Rivera came back to the
25 office and met with Mr. Ellenburg again, and they both

Page 1747

1    agreed that they had to have these documents to do the
2    audit, that then they both testified that on Monday
3    there was a meeting between Mr. Ellenburg, Mr. Rivera,
4    and Mr. Lenner that they had to have these documents,
5    that Mr. Ellenburg and Mr. Rivera both testified that
6    there was a telephone call --
7            MR. COLE: Objection, Your Honor.
8            MR. THOMAS: -- with Dominick Parlapiano.
9            MR. COLE: You want me to list it all?
10           THE COURT: Let me see what the question is.
11           MR. COLE: It's final argument. It's not a
12   question.
13           MR. THOMAS: I can rephrase, Your Honor.
14   BY MR. THOMAS:
15       Q.   At this point, Mr. Feltman, do you recall
16   that Mr. Ellenburg and Mr. Rivera both testified that
17   they called with Mr. Lenner, Mr. Parlapiano to ask for
18   the documents?
19           MR. COLE: Objection. Not offering an
20   opinion. Resummarizing --
21           THE COURT: Let me read the question.
22           Rephrase the question.
23   BY MR. THOMAS:
24       Q.   Mr. Feltman, in your review of Mr. Rivera
25   and Mr. Ellenburg's testimony, do you recall that there

Page 1748

1    was a telephone conversation between Mr. Lenner,
2    Mr. Rivera, and Mr. Ellenburg, where documents needed to
3    do the Bankest audit were requested?
4            MR. COLE: Objection. He's not here to give
5    an opinion on the testimony.
6            THE COURT: Overruled.
7            THE WITNESS: Yes.
8    BY MR. THOMAS:
9        Q.   Do you recall that Mr. Ellenburg and
10   Mr. Rivera both testified that Mr. Lenner said if the
11   documents were not given, that BDO would have to resign?
12       A.   Yes, or words to that effect.
13       Q.   And do you recall that Mr. Rivera and
14   Mr. Ellenburg both testified that Mr. Parlapiano in this
15   conversation refused to give them the documents?
16           MR. COLE: Objection.
17           MR. THOMAS: That's my final one, Your
18   Honor, to ask the opinions. That's the predicate.
19           THE COURT: Sustained.
20           MR. THOMAS: Your Honor, that's the
21   predicate. And I was asked to -- stopped from doing the
22   whole thing.
23           THE COURT: The predicate is did you review
24   the testimony, did you look at the transcript. That's
25   the predicate. Not a question by question reiterating

Page 1749

1    what the transcript says. That's the predicate.
2            MR. THOMAS: Yes, Your Honor. And I'll show
3    him the rule and then I'll ask him.
4            Can we have the rule that applies to this
5    situation?
6            (Technician complies.)
7    BY MR. THOMAS:
8        Q.   Do you have it in front of you, sir?  I'm
9    also going to put it up on the screen.
10           SAS 82 applies to consideration of fraud in
11   the financial statements audit?
12       A.   Yes. This is a SAS that we've discussed
13   briefly during my testimony today.
14       Q.   And it came up in another situation at the
15   Bankest audit that we discussed; is that right?
16       A.   Yes, it did.
17       Q.   But for this situation, there's another part
18   of this rule that applies; is that right?
19       A.   Yes.
20       Q.   And if we look at this portion of the rule,
21   it's called risk factors relating to misstatements
22   arising from fraudulent financial reporting; is that
23   right?
24       A.   Yes.
25       Q.   And paragraph 17 says, "The following are

Page 1750

1    examples of risk factors relating to misstatements
2    arising from fraudulent financial reporting for each of
3    the three categories described above. Risk factors
4    relating to management's characteristics and influence
5    over the control environment. Examples include."
6            Did I read that right?
7        A.   Yes.
8        Q.   And in this case, in these audits that BDO
9    was doing, management's characteristics included
10   Dominick Parlapiano. Is that your understanding?
11       A.   Mr. Parlapiano was the primary person that
12   the auditors -- among the primary persons the auditors
13   had contact with.
14       Q.   And can we please look at two of the
15   examples. And the first one is "Domineering management
16   behavior in dealing with the auditor, especially
17   involving attempts to influence the scope of the
18   auditor's work."
19       A.   Yes.
20       Q.   Does that example apply to these audits and
21   this case in which BDO acted as the auditor?
22       A.   This SAS which describes risk factors for
23   auditors and gives an example of a risk factor relating
24   to management characteristics is exactly what happened
25   in the beginning of the 1998 audit. In this case,

Page 1751

1    Mr. Parlapiano took it upon himself to -- at least
2    initially, to conclude what was and what wasn't within
3    the scope of what the auditors were asking for.
4         So that is a risk factor that SAS 82 says,
5    when you see this happening, be aware that there could
6    be financial -- fraudulent financial reporting.
7         Q.   I'm going to ask you for purposes of this
8    portion of your opinion that I'm going to ask you, to
9    only consider what Ramon Rivera and Keith Ellenburg both
10   agreed to in their testimony, nothing more.  So for
11   purposes of your opinion here, if you assume that when
12   Mr. Ellenburg and Mr. Rivera both testified on the
13   Friday, Mr. Rivera requested the documents repeatedly
14   from Bankest and refused, that he stopped the audit --
15        MR. COLE:  Objection, Your Honor.  Same
16   thing again.  Not final argument.  Not asking --
17        THE COURT:  Sustained.
18   BY MR. THOMAS:
19        Q.   I'm going to ask you your opinion as an
20   expert.  And --
21        THE COURT:  You can ask him his opinion,
22   then you can ask him what he relied upon to get to that
23   opinion.  Then he can testify to whatever he wants.
24        MR. THOMAS:  I'm entitled, Your Honor, to
25   ask --

Page 1752

1         THE COURT:  That's what you're entitled to.
2    Nothing more than that.
3         MR. THOMAS:  I'm saying something different,
4    Your Honor.  I'm not disagreeing with you.  You know I
5    almost never disagree with you.
6         THE COURT:  (Inaud.).
7         MR. COLE:  Judge --
8         MR. THOMAS:  I appreciate that.  I'm going
9    to ask him a hypothetical.
10        THE COURT:  Ask him whatever you want as
11   long as it's within the rules.
12        MR. THOMAS:  But that's what I'm doing.
13        THE COURT:  Then do it.
14   BY MR. THOMAS:
15        Q.   What I want you to assume, please, is that
16   Mr. Rivera repeatedly asked for the documents and he was
17   refused by E.S. Bankest, that he stopped the audit, that
18   the concurring partner for E.S. Bankest --
19        MR. COLE:  Objection.
20        THE COURT:  Overruled.
21   BY MR. THOMAS:
22        Q.   -- agreed with him that he should stop the
23   audit, that then the concurring partner, the partner in
24   charge and Mr. Rivera all called the main contact at
25   E.S. Bankest and asked for the documents, and that the

Page 1753

1    main contact at E.S. Bankest refused to give the
2    documents even though the auditors threatened to resign.
3         And if you assume only those facts as true,
4    would those facts be a red flag of fraud under this rule
5    to BDO Seidman?
6         A.   Under the hypothetical that you've asked me
7    to consider, there would be a risk that management
8    was -- was or would engage in fraudulent financial
9    reporting.
10        Q.   Thank you.
11        MR. THOMAS:  The next one.
12        (Technician complies.)
13        MR. THOMAS:  Your Honor, with your
14   permission, I will approach the witness with --
15        THE COURT:  You may.  We'll only go 15 more
16   minutes.  I don't think I can take it anymore.  I'm
17   tired.  It's been a long day for me.  And I'm sure for
18   the jury as well.
19        MR. THOMAS:  I'll tell you what, Your Honor,
20   when I'm done with this one, I'm actually going to
21   switch.
22   BY MR. THOMAS:
23        Q.   Mr. Feltman, this is an another page from
24   that box, 118, which is the audit manual of BDO Seidman.
25   Is that what you recognize?

Page 1754

1         A.   Yes, sir.
2         Q.   And if we look at their own audit manual,
3    can we start with 31.9?
4         A.   Yes, that's where you would start.
5         Q.   And this talks about the assessment of risk
6    of a material misstatement due to fraud is a cumulative
7    process.  It says, "We may identify fraud risk factors
8    while conducting field work.  In evaluating the results
9    of our tests, we should neither assume that management
10   is dishonest nor assume unquestioned honesty.  We should
11   therefore perform our work with an attitude of
12   professional skepticism.  We may discover circumstances
13   that could be indicative of fraud such as" -- and then
14   it lists examples.
15        Did I get that right?
16        A.   Yes.
17        Q.   Now, this is more of that professional
18   skepticism from BDO's own audit manual?
19        A.   It's a caution to use professional
20   skepticism of -- what this part of the audit manual is
21   saying is, as you are evaluating the audit procedures
22   that you're doing, when you're assessing risk, that
23   there could be fraud that is material, think about the
24   following things because they could be -- if you see any
25   of the following examples, they could be circumstances

Page 1755

1    that indicate that there's fraud.
2        Q.   Well, let's look at number 13.
3        A.   Okay.
4        Q.   And number 13 says "Development of a
5    contentious relationship -- the client." There may be a
6    word missing there. "Including denied access to
7    records, facilities, certain employees, customers,
8    vendors, and others from whom audit evidence is sought."
9            Is this statement from BDO's own audit
10   manual apply to the situation of the audit they did of
11   E.S. Bankest?
12       A.   Yes.
13       Q.   How?
14       A.   Well, the audit manual is warning the
15   auditor that if you see a situation where your audit
16   team or audit partner is in a difficult relationship
17   with an audit client, where the audit client is refusing
18   or denying access to either people, or locations, or
19   customers, or any information that the auditor thinks is
20   important, that that's a warning sign that there could
21   be fraud.
22           THE COURT: All right. Let's go home. I'm
23   ready. I'm ready to go. Hold on. I need to give you
24   instructions. All right, ladies and gentlemen. You're
25   not to discuss the case amongst yourselves or with

Page 1756

1    anyone else or allow anyone to discuss the case with
2    you. You're not to form a definite or fixed opinion
3    about the merits of the case until you have heard all
4    the evidence, the argument of the lawyers, and the
5    instructions on the law by me. You're not to read,
6    listen, or see -- all three of those -- until you've
7    heard -- in the media concerning this case.
8            And you are to ignore the presence of the
9    lawyers outside this courtroom and also the witness, and
10   they're to ignore yours tomorrow morning same time.
11   Hopefully you'll be rested by then. I'll have rested,
12   and I'll have a better day. This is not the only thing
13   I do. As you can see movement in this courtroom. Have
14   a good night. Have a good dinner. Have a drink. We'll
15   see you tomorrow at 9:30.
16           (Thereupon, the jury was escorted out of the
17   courtroom.)
18           THE COURT: Mr. Feltman, you are not to
19   discuss the testimony you've given or the testimony
20   you're about to give with anyone including the lawyers.
21   Tomorrow morning 9:30.
22           Anything else we need to discuss?
23           MR. COLE: Judge --
24           THE COURT: You can go.
25           THE WITNESS: Okay. (Complies.)

Page 1757

1            THE COURT: I guess it's not for your
2    hearing.
3            THE COURT: Yes, Mr. Cole.
4            MR. COLE: I would like to again object to
5    the testimony of Mr. Feltman to the extent that he was
6    reiterating the testimony of other witnesses and in
7    essence vouching for their credibility, applying his
8    knowledge to what they said. An expert witness is
9    clearly not allowed to vouch for the credibility of
10   testifying witnesses or vouch for the credibility, for
11   example, of an affidavit which I still believe is
12   hearsay.
13           I think that the testimony was incorrect,
14   and I request Your Honor to strike the testimony to the
15   extent that it vouches for the credibility of testifying
16   witnesses. And I also ask that you instruct the jury
17   that it should disregard all testimony of Mr. Feltman to
18   the extent that it vouched for the credibility of other
19   witnesses.
20           THE COURT: Mr. Thomas?
21           MR. THOMAS: Mr. Feltman never vouched for
22   the credibility of other witnesses. What he was asked
23   is lay a predicate for his testimony, do you recall what
24   this witness said. And then basing on that, what's your
25   opinion. And quite frankly, when I took it too far, you

Page 1758

1    completely reined me in and I had to change the whole
2    way to a hypothetical, which I did. So he never gave
3    any credibility vouching for these witnesses. And to
4    the extent I was even close to that, you stopped me.
5            THE COURT: Anything else, Mr. Cole?
6            MR. COLE: I think that secondly, you know,
7    putting all those facts into questions in that manner is
8    something that's completely improper questioning for an
9    expert witness. And you're not allowed to marshal
10   evidence into questions for expert witnesses. An expert
11   is supposed to offer an opinion based upon his or her
12   review of the evidence. And that opinion has to be
13   helpful for the jury without infringing on the jury's
14   job in determining the facts. And therefore, I still
15   think that the questions went too far and so did the
16   testimony.
17           THE COURT: At this time your objection is
18   noted and overruled.
19           Thank you. You have a good evening.
20
21           (Thereupon, at approximately 5:25 p.m., the
22   above portion of the trial was concluded.)
23
24           *      *      *
25

Page 3189

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
     Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
     Defendant.
------------------------------------------------x
BDO SEIDMAN, LLP,
     Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
     Third-Party Defendants.
------------------------------------------------x

PAGES 3189 - 3283

Volume 26



MORNING SESSION

Miami, Florida

Friday, May 4, 2007

10:00 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan



EXHIBIT
S

Page 3190

1        A P P E A R A N C E S
2
3    On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4    INTERNATIONAL, LTD., ET AL.:
5
6    SULLIVAN & CROMWELL, LLP
7        1888 Century Park East
8        Los Angeles, California 90067
9        (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11        Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida 33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       350 East Las Olas Boulevard, Suite
21       Fort Lauderdale, Florida 33301
22       (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25

Page 3192

1    On behalf of Third-Party Defendants Victor Balestra,
2    Bernard Mollet, and Joaquin Garnecho
3
4    RICHMAN, GREER, WEIL, BRUMBAUGH,
5    MIRABITO & CHRISTENSEN, P.A.
6        Miami Center, Suite 1000
7        201 S. Biscayne Boulevard
8        Miami, Florida 33131
9        (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16       2701 Ponce de Leon Boulevard, Mezzanine
17       Coral Gables, Florida 33134
18       (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20        Geoffrey Marks, Esquire
21
22
23
24
25

Page 3191

1    On behalf of Defendant BDO Seidman, LLP:
2
3    ALVAREZ, ARMAS & BORRON
4        901 Ponce de Leon Boulevard, Suite 304
5        Coral Gables, Florida 33134
6        (305) 461-5100
7    BY:  Arturo Alvarez, Esquire
8
9    GREENBERG TRAURIG, LLP
10       MetLife Building
11       200 Park Avenue, 15th Floor
12       New York, New York 10166
13   BY:  Adam D. Cole, Esquire
14        Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17       1221 Brickell Avenue
18       Miami, Florida 33131
19   BY:  Mark Schnapp, Esquire
20        Nikki Simon, Esquire
21
22
23
24
25

Page 3193

1            C O N T E N T S
2
3    EXAMINATION OF SANDOR LENNER BY:          PAGE:
4        MR. THOMAS:  (Cross, cont'd)        3197
5        MS. BITAR:  (Redirect)              3268
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3238

1  very clear that based on your experience, if there is a
2  poor response, you do not even have to send out seconds.
3  But we chose -- or firsts, I'm sorry.
4         You don't even have to send out first
5  confirmations if after one or two years you have the
6  experience.  But we chose -- we exercised our
7  skepticism.  We still sent out first confirmations even
8  though we didn't have to do that, so I disagree with
9  you, sir.
10     Q.   And you got zero of those back, right?
11     A.   That's correct.
12     Q.   And the reason it turns out that you didn't
13  get confirmations back is because it turned out all the
14  accounts receivable were fake, right?
15         MS. BITAR:  Objection, Your Honor.  Asked
16  and answered.
17         THE COURT:  Overruled.
18         THE WITNESS:  Yes.  And I want to explain.
19  BY MR. THOMAS:
20     Q.   Please.
21     A.   The reason why, at the time we had no
22  personal knowledge that -- of the fraud.  It's only
23  after hearing this testimony that there was a massive
24  fraud, in which eight people are going to jail or are in
25  jail, created hundreds of thousands of invoices and

Page 3239

1  other documents, and that's why I know they're fake.
2     Q.   In fact, there were thousands and thousands
3  of fake transactions over seven years, year after year
4  after year after year, right?
5     A.   That's what I've learned during the course
6  of this trial and other proceedings, correct.
7     Q.   And to find the fraud, you only had to find
8  one fake one, right?
9     A.   Yes.
10    Q.   And if we look at the guide --
11        MR. THOMAS:  Can we go to 2.144, please.
12        (Technician complies.)
13  BY MR. THOMAS:
14    Q.   And if you go down there to the finance
15  company and its auditors, it says the finance company
16  and its auditors -- now, in this case the finance
17  company was E.S. Bankest, right?
18    A.   Yes.
19    Q.   The finance company and its auditors usually
20  have access to the seller's or borrower's accounting
21  records if collateral records are maintained in bulk.
22  And in this case the seller or borrowers, that's talking
23  about someone like Joy, right?
24    A.   Yes.
25    Q.   And in this case did you consider this when

Page 3240

1  you did your audits?
2     A.   Yes.
3         MR. THOMAS:  And then if we look down at
4  2.145.
5         (Technician complies.)
6  BY MR. THOMAS:
7     Q.   It says, in addition to the effectiveness of
8  credit-approval policies, collection activities,
9  internal confirmation procedures, and visits by field
10 representatives to the client's or borrower's place of
11 business, the auditor should consider other accounting
12 and management controls.  You see that?
13        Now, did you consider this, visits by field
14 representatives part, when you were doing your audits of
15 E.S. Bankest?
16    A.   Yes.  And I want to explain.
17        Mr. Thomas, this is really not relevant for
18 E.S. Bankest.  This is relevant for a financial -- a
19 finance company in which they take collateral and the
20 person has to go to the field office to examine the
21 collateral.
22        In this case Bankest purchased the invoice.
23 They own the asset.  They had the assets in their
24 possession.  There's no need to go to the field rep to
25 look at the collateral.  That's what this is all about.

Page 3241

1  This --
2     Q.   Anything else?
3     A.   No.
4     Q.   Now, sir, over the years I think you talked
5  about this a bunch.  You tested their controls at E.S.
6  Bankest, right?
7     A.   Yes.
8     Q.   And when you did your audit planning every
9  year, you filled out a form about the controls, right?
10    A.   Yes.
11    Q.   And over all the time that you tested the
12 controls, year after year after year, you determined
13 that the controls were good, right?
14    A.   Yes.
15    Q.   And year after year after year you tested
16 the aging of the receivables, right?
17    A.   I believe so.
18    Q.   Yes?
19    A.   Yes.
20    Q.   And the aging, that's a form that's given to
21 you by the client, right?  It shows when the accounts
22 receivable are going to be paid, right?
23    A.   Yes.
24    Q.   And year after year after year you
25 determined that the aging of the receivables was fine,