UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                                          Chapter 11

E.S. BANKEST, L.C.,                                   Case No. 04-17602-BKC-AJC
                              Debtor,

_____/

LEWIS B. FREEMAN, Responsible Officer
for the Reorganized Debtor E.S. Bankest, L.C.,
a Florida limited liability corporation,

                    Plaintiff,

                                                          Adv. Pro. No. 06-1220-BKC-AJC-A
v.

BDO SEIDMAN, LLP, BDO
INTERNATIONAL B.V., and SANDOR
LENNER,

                    Defendants.

_____/


**PLAINTIFF'S RESPONSE IN OPPOSITION TO BDO SEIDMAN, LLP AND
SANDOR LENNER'S MOTION FOR SUMMARY JUDGMENT**

   Plaintiff Lewis B. Freeman ("Freeman" or "Plaintiff"), in his capacity as Responsible

Officer for the Reorganized Debtor E.S. Bankest, L.C. ("Bankest"), by and through the

undersigned counsel, responds to the Motion of Defendants BDO Seidman, LLP and Sandor

Lenner for Summary Judgment for Summary Judgment.[1]

---

[1]   BDO International adopted BDO Seidman's motion and to the extent the arguments in this opposition are applicable to BDO International, Plaintiff asserts such arguments against BDO International as well.

## INTRODUCTION

This Court has twice held as a matter of law—once by Judge Schermer and once by Your Honor—that "the fraud perpetrated by the Capital Officers is not imputed to Bankest."[2]  BDO moves for summary judgment on the same ground.  In fact, virtually every legal argument made by BDO has been rejected by this Court in previous orders, which are attached hereto.[3]  Your Honor is still right and the Motion for Summary Judgment should be denied.

Moreover, because the Court already has held that the allegations of the Complaint adequately plead each cause of action as a matter of law, *see* (Exh. 2 [2006 Imputation/Damages Order]; Exh. 3 [2006 Securities Fraud Order]), the only question on summary judgment is whether there is a genuine issue of material fact as to those lawfully asserted claims.  There is.  The Court was right on the law, and the facts prove the allegations of the Complaint, or at least raise a genuine issue of material fact.  Therefore, the Motion for Summary Judgment should be denied.

**A.    The Court Already Has Twice Held that There Is No Imputation as a Matter of Law.**

**1.    The Court's Prior Orders**

This Court has twice rejected BDO's imputation/*in pari delicto* argument as a matter of law.  First, in its 2005 Summary Judgment Order, this Court found that because the Capital officers at Bankest, Hector Orlansky, Eduardo Orlansky, Dominick Parlapiano and Peter Stanham (collectively, the "Capital Officers") "looted [Bankest] for the benefit of themselves,"

---

[2]    *See* (Exh. 1 [September 14, 2005 "Opinion (1) Granting Joint Motion of Lewis B. Freeman and Banco Espirito Santo International, Ltd. for Final Summary Judgment Disallowing Claims Filed by BDO Seidman LLP, and (2) Denying BDO Seidman LLP's Motion for Summary Judgment" ("2005 Summary Judgment Order")] at 25, 27; Exh. 2 [September 20, 2006 "Order Denying (I) BDO Seidman, LLP and Sandor Lenner's Motion to Dismiss Adversary Complaint, and (II) BDO Global Coordination, B.V.'s Motion to Dismiss Adversary Complaint with Respect to Standing and Jurisdiction Arguments" ("2006 Imputation/Damages Order")] at 12.)

their fraudulent conduct could not "be imputed to Bankest as a matter of law." *See* (Exh. 1 [2005 Summary Judgment Order] at 25, 27).[4]

When BDO attempted to re-litigate the imputation defense in its 2006 Motion to Dismiss, this Court held that its 2005 Summary Judgment Order precluded BDO from raising the defense. *See* (Exh. 2 [2006 Imputation/Damages Order] at 11-12.) Specifically, the Court found that "[p]ursuant to the Summary Judgment Order… the fraud perpetrated by the Capital Officers is not imputed to Bankest." (*Id.* at 12.) The Court further found that even absent the binding 2005 Summary Judgment Order, BDO's imputation defense would fail. The Court held that allegations that there were four Bankest directors appointed by Espirito Santo Bank (the "Bank Directors") who were unaware of the fraud, coupled with the injury Bankest suffered as a result of the fraud, established that Bankest had "an identity independent from the wrongdoing Capital Officers." (*Id.* at 12-13.)

### 2. The State Court Jury Verdict

A jury agreed with Your Honor. After hearing evidence for five months, the jury held that each of the ten Espirito Santo individuals blamed by BDO for the fraud (including the five who were former Bankest directors), and each Espirito Santo entity blamed by BDO, had zero fault for the loss caused by BDO. (Exh. 6 [Phase II Verdict Form in *Banco Espirito Santo Int'l Ltd. v. BDO Seidman*, Case No. 04-14009 CA 31 ("Phase II Verdict Form")] at 2-6). Moreover, the jury found that BDO had acted recklessly and awarded $351,689,343 in punitive damages against BDO. (Exh. 7 [Phase III Verdict Form in *Banco Espirito Santo Int'l Ltd. v. BDO*

---

[3]        *See* (Exhs. 1, 2 & 3 [September 20, 2006 "Order Denying (1) BDO Seidman, LLP and Sandor Lenner's Motion to Dismiss Adversary Complaint, and (2) BDO Global Coordination, B.V.'s Motion to Dismiss Adversary Complaint with Respect to 15 U.S.C. § 78j(b) and Rule 10b-5(b) Arguments" ("2006 Securities Fraud Order")].)
[4]        The Court's holding was not disturbed on appeal. The U.S. District Court specifically left undisturbed all findings and analysis concerning imputation when it dismissed BDO's appeal as moot, vacating only this Court's findings of fact and law relating to BDO's claims for fees and expenses. (Exh. 4 [May 8, 2007 "Order Dismissing Appeal as Moot, Vacating Bankruptcy Court Order in Part, and Closing Case"] at 13-14.)

*Seidman*, Case No. 04-14009 CA 31 ("Phase III Verdict Form")] at 2; Exh. 5 [Phase I Verdict

Form in *Banco Espirito Santo Int'l Ltd. v. BDO Seidman*, Case No. 04-14009 CA 31 ("Phase I

Verdict Form")] at 2-3; Exh. 6 [Phase II Verdict Form] at 12; Exh. 58 [6/15/07 Tr.] at 7305; Exh.

8 [Florida Punitive Damages Jury Instruction].)

As this Court has repeatedly stated, Mr. Freeman is entitled to pursue this Adversary

Proceeding notwithstanding the state court proceeding by creditor Espirito Santo.  No money has

been collected under the state court judgment.  BDO Seidman has appealed the state court

judgment, and has repeatedly and publicly stated that the judgment against it will be reversed and

no money will be collected.  That appeal has not even been briefed yet, even though it is over a

year old.  Moreover, there is no judgment against BDO International, and that case will only go

to trial at the end of this month.  Mr. Freeman cannot recover double damages, but until money

satisfying all damages is collected—which BDO says will either never happen in state court or

will not happen for years—Mr. Freeman is duty-bound to try to collect money under the

Confirmed Plan.

This Court and the jury got it right.  Because there were four innocent directors of

Bankest, the imputation/*in pari delicto* defense fails and the Motion for Summary Judgment

should be denied.

>    **B.      Scienter Is and Will Be Proven to a Jury.**

This Court held that the Adversary Complaint adequately pled scienter.  (Exh. 3 [2006

Securities Fraud Order].)  The evidence now proves the allegations of the Adversary Complaint,

raising at least a genuine issue of material fact, and thus the motion for summary judgment

should be denied on both the securities claim and the aiding and abetting breach of fiduciary duty

claim.  In fact, a jury already has found that BDO acted recklessly in auditing Bankest, based on

evidence of BDO's and Lenner's self-dealing, departures from GAAS, GAAP and BDO's own audit manual, disregard for numerous red flags, and an unethical conflict of interest.  (Exh. 5 [Phase I Verdict Form] at 2-3; Exh. 6 [Phase II Verdict Form] at 2; Exh. 58 [6/15/07 Tr.] at 7305; Exh. 8 [Florida Punitive Damages Jury Instruction].)

### 1.    BDO's Intentional Blind Eye to the Fraud

This Court previously held that the allegations concerning BDO overriding its own audit manager and accepting the Capital Officer's refusal to provide documents necessary to the Bankest audit supported scienter.  (Exh. 3 [2006 Securities Fraud Order] at 3.)  The evidence now proves those allegations.  (Exh. 26 [Rivera Aff.]; Exh. 39 [4/17/07 a.m. Tr.] at 1098-1118.) BDO's own audit manager, Ramon Rivera, testified for Plaintiff and explained that BDO and Mr. Lenner purposely ignored auditing standards and indicators of fraud to keep its fees flowing. (Exh. 26 [Rivera Aff.]; Exh. 39 [4/17/07 a.m. Tr.] at.1110-18; Exh. 37 [4/16/07 a.m. Tr.] at 878-90.)  When Mr. Rivera asked for documents that would have revealed the fraud in BDO's very first audit of Bankest in 1998, Dominick Parlapiano refused to provide the documents.  (Exh. 26 [Rivera Aff.] at ¶¶12-15; Exh. 39 [4/17/07 a.m. Tr.] at 1099-1100; Exh. 32 [2/6/07 p.m. Tr.] at 3452-54.)  Mr. Rivera stopped the audit.  (Exh. 39 [4/17/07 a.m. Tr.] at 1101-02.)  However, after Mr. Parlapiano met with Mr. Lenner, the audit was restarted *without* the key documents that would have revealed the fraud.  (Exh. 26 [Rivera Aff.] at ¶¶15, 23-25; Exh. 39 [4/17/07 a.m. Tr.] at.1110-18; Exh. 32 [2/6/07 p.m. Tr.] at 3452-58, 3462; Exh. 44 [4/20/07 a.m. Tr.] at 1799-1800.)  Mr. Lenner explained why to Mr. Rivera:

> Following the meeting, Sandy came to my office and informed me that BDO would be continuing the audit.  He told me that because I had not been in Miami for long, **I did not understand that Mr. Parlapiano was an important person in the community.**  He said that he had known Mr. Parlapiano for many years and that they had developed a good professional relationship.  **He also noted that as a Manager, I should be**

5

> **looking for ways to bring in new business, and suggested that working for Bankest could lead to other work, through Mr. Parlapiano, the Orlanskys and affiliates of Bankest.** He said that as time went on, I would better understand the management of client relationships.

(Exh. 26 [Rivera Aff.] at ¶ 24 (emphasis added).)

This testimony precludes summary judgment on scienter, at least raising a genuine issue of material fact.

### 2.    BDO's Unethical Conflict of Interest

The Court also held that allegations concerning BDO's strategic partnership with Stratasys Group LLC ("Stratasys"), including that BDO verified as real over "$30 million in fake receivables from its financial partner, Stratasys," alleged scienter as a matter of law. (Exh. 3 [2006 Securities Fraud Order] at 4.) The evidence now proves these allegations as well, and demonstrates an even more egregious conflict, including that BDO verified as real over *$77* million in fake receivables from its financial partner Stratasys. (Exh. 46 [4/24/07 Tr.] at 2346-48.) BDO entered into a strategic partnership with Dominick Parlapiano and Stratasys (a Bankest factor client), an ethics violation that should have disqualified BDO from even auditing Bankest. (Exh. 48 [4/30/07 Tr.] at 2483, 2487, 2538-39, 2547-53, 2557.) As auditor of Bankest, one of its job's was to determine whether the accounts receivable of Stratasys were real or fake. (Exh. 46 [4/24/07 Tr.] at 2347-48.) However, because of BDO's strategic partnership with Stratasys, BDO stood to make a twenty percent profit on those same Stratasys accounts receivable as Defendant and lead BDO audit partner Sandor Lenner was forced to admit:

> Q. So by this time, 2002, BDO had certified about 77 million dollars in accounts receivable as real from Stratasys who is your alliance firm member, right?
>
> A. Yes.
>
> . . . .

Q. . . . [As auditor of Bankest] you had to say whether all the receivables were real or fake, right, not just Stratasys?

A.  Yes.

Q.  So for the Stratasys ones you would have to look at what came from Stratasys and you would say whether they were real or fake, right?

A.  Yes.

Q.  And when you were over here, with Stratasys, right, BDO potentially was going to profit from those accounts receivable, right?  You can make 20 percent from them; isn't that right?

A.  Yes.

(Exh. 46 [4/24/07 Tr.] at 2347-48.)

Mr. Lenner used the BDO-Stratasys partnership to increase his personal compensation. Mr. Lenner wrote a memorandum to his superiors to justify increasing his compensation at BDO and trumpeted the forging of the BDO-Stratasys alliance as a reason why.  (Exh. 25 [Good Guy Memo] at 1 ("I have very high expectations for the Miami office and the firm as a result of this Alliance.")  Mr. Lenner admitted his own personal benefit was a motive for the Stratasys alliance.  (Exh. 46 [4/24/07 Tr.] at 2305-08; Exh. 47 [4/26/07 Tr.] at 2435-37.)

In fact, the world's leading expert in accounting ethics described BDO's conflict as follows:

This is a convoluted, intertwined, first class conflict of interest.  And let me tell you, I believe that it is with all of my heart and soul, and it's one of the worst conflicts I've ever seen.

(Exh. 49 [5/2/07 a.m. Tr.] at 2839.)

The factual and expert evidence of BDO's reckless and egregious violation of the ethical rules and Generally Accepted Auditing Standards ("GAAS") prove scienter, or at least raise a

genuine issue of material fact, and therefore the Motion for Summary Judgment should be denied.

###    3.    BDO's Reckless Audits

The Court also held that scienter was alleged by the magnitude of the fraud and BDO's failure to detect that fraud over five years.  (Exh. 3 [2006 Securities Fraud Order] at 4.)  Not only does the evidence prove these allegations, *see* Exh. 35 [4/11/07 p.m. Tr.] at 387-91, Exh. 36 [4/13/07 Tr.] at 701-02, it demonstrates that BDO failed to not only follow GAAS and GAAP, but even its own audit manual.  *In re Eagle Tech*, 319 F.Supp.2d 1318, 1327 (S.D. Fla. 2004); *In re Sunterra Corp. Sec. Litig.,* 199 F.Supp.2d 1308, 1333 (M.D. Fla. 2002).

BDO's reckless audits ignored red flag after red flag, year after year after year.  For example, about 99% of the assets of Bankest were accounts receivable, and thus a vital function of the audit was to determine whether those accounts receivable were real or fake.  (Exh. 34 [4/11/07 a.m. Tr.] at 251; Exh. 42 [4/19/07 a.m. Tr.] at 1605-06; Exh. 46 [4/24/07 Tr.] at 2347-48; Exh. 65 [8/3/07 a.m. Tr.] at 3307.)  BDO sent confirmations to the account debtors who owed the account receivable, like K-Mart, but received *zero* back almost every year.  (Exh. 43 [4/19/07 p.m. Tr.] at 1665-70; Exh. 40 [4/17/07 p.m. Tr.] at 1197-98 (received 2 confirmations for 1998 audit); Exh. 16 [1998 A/R Circularization Workpaper]; Exh. 19 [1999 Confirmation Control]; Exh. 20 [1999 Workpaper] at BDO 03392 ("no confirms received"); Exh. 21 [2000 Confirmation Control]; Exh. 22 [2001 Confirmation Control].)  Although BDO's own audit manual stated that this was a badge of fraud, BDO ignored this red flag and certified the accounts receivable as real.  (Exh. 14 [BDO Audit Manual] at BDO 031771; Exh. 43 [4/19/07 p.m. Tr.] at 1675, 1687-88; Exh. 51 [5/3/07 Tr.] at 3157.)  Similarly, BDO's own audit manual required that BDO check shipping documents to confirm the account receivables, *see* Exh. 14 [BDO Audit

Manual] at BDO 031774, but BDO did not do it.  (Exh. 52 [5/4/07 a.m. Tr.] at 3214-15.)  Still

further, where, as here, virtually all the transactions flowed through related party Bankest Capital

Corporation ("Capital"), BDO's audit manual warned of the possibility for fraud, *see* Exh. 14

[BDO Audit Manual] at BDO 031890, but BDO actually counted on the Capital Officers "to

detect and prevent fraud."  (Exh. 54 [5/9/07 Tr.] at 3944-45; Exh. 18 [Consideration of Fraud

Risk Workpaper] at BDO 00649.)  Such violations of GAAS, GAAP and BDO's own audit

manual, combined with the magnitude of this fraud and the numerous red flags, create a genuine

issue of fact as to scienter.  *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp.2d 461, 476 (E.D.

Va. 2002); *Reilly* v. *Ernst & Young, LLP*, No. Civ. Div. Ad 97-1002, 2003 WL 22761810, at

*17, 27 (Pa. Ct. Comm. Pl. Nov. 20, 2003) (holding punitive damages appropriate when

accountant's actions in violation of accounting rules).

> **C.    The "In Connection With" Requirement Is Satisfied by Proof that BDO
> Knew Its Unqualified Audited Financial Statements Were Provided to Bank
> Directors.**

As this Court held, "the Complaint's allegations that BDO knew or should have known

that its unqualified financial statements were provided to the Espirito Santo Bank Directors

("Bank Directors") who authorized the issuance of the debenture notes and the investors who

purchased the debenture notes satisfied the 'in connection with' prong of a 10b-5 claim.  (Exh. 3

[2006 Securities Fraud Order] at 5 (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,

126 S. Ct. 1503, 1513 (2006)).)  The evidence proves this allegation.  In fact, BDO admitted that

it knew its unqualified audited financial statements were provided to the Bank Directors.  (Exh.

27 [BDO Responses to Requests for Admission] at 12-13.)

     **D.**    **Bankest Was Damaged.**

BDO also reasserts that somehow a $170 million loss is not really a loss and that Bankest really has no damages.  However, as this Court already held, "the Court holds that Bankest suffered injury as a result of the funds stolen by the Capital Officers, for which it can sue BDO." (Exh. 2 [2006 Imputation/Damages Order] at 16.)  As the Court properly reasoned, this includes the "$170 million [that] was stolen from Bankest through fraud that BDO was duty-bound to detect."  (*Id.*)  On summary judgment, material issues of fact preclude summary judgment because the evidence demonstrates that the Capital Officers did perpetrate a fraud and did steal the money, see Exh. 37 [4/16/07 a.m. Tr.] at 852-62, 877-78, Exh. 28 [Parlapiano Restitution Order], that as a matter of law and now admitted fact, BDO had a duty to detect the fraud, see Exh. 51 [5/3/07 Tr.] at 3150-51; Exh. 1 [2005 Summary Judgment Order], and that BDO failed to detect the fraud, see Exh. 47 [4/26/07 Tr.] at 2422.

As this Court held:  "BDO specifically contracted and agreed to 'detect fraud' . . . ." (Exh. 1 [2005 Summary Judgment Order] at 24.)  Although Mr. Lenner stated that BDO "had no duty to detect fraud," *see* Exh. 52 [5/4/07 a.m. Tr.] at 3269, on cross-examination he admitted the truth:

> Q.  Mr. Lenner, you were a certified public accountant doing audits at BRFFC and E.S. Bankest, right?
>
> A.  Yes.
>
> Q.  And you understood you had duties, right?
>
> A.  Yes,
>
> Q.  And you understood that you were hired to do a job?
>
> A.  Yes.
>
> Q.  And you understood people were counting on you to do that job, right?

A.  Yes.

Q.  And you understood that one of your duties was to make sure that there were no material misstatements in these financial statements due to fraud, right?

A.  Yes.

Q.  And here there was a great big fraud, right?

A.  Yes.

Q.  And you had that duty to find the fraud in 1995, right?

A.  Yes.

Q.  And you had that duty to find the fraud in 1996?

A.  Yes.

Q.  And you had the duty to find the great big fraud in 1998, 1999, 2000, 2001, and 2002, right?

A.  Yes.

(Exh. 51 [5/3/07 Tr.] at 3150-51.)

BDO's failure to do its duty to find the fraud directly led to Bankest damages, as testified to by a perpetrator of the fraud, Carlos Mendez.  Mr. Mendez testified he was able to grow the fraud because of BDO's gross negligence:

Q.  And every year did you depend on the fact that BDO was not going to require you to provide them with documents from the customers, the ones who actually owed the money?

A.  Yes.

Q.  And as a result, were you able to grow the fraud?

A.  Yes.

(Exh. 37 [4/16/07 a.m. Tr.] at 891-92; *id*. at 877-91.)

Moreover, although BDO attacks deepening insolvency as a basis of damages, this Court upholds deepening insolvency as a damage theory.  (Exh. 2 [2006 Imputation/Damages Order] at 17); *In re Flagship Health Care*, 269 B.R. 721, 728-29 (Bankr. S.D. Fla. 2001); *In re Huff*, 109 B.R. 506, 512 (Bankr. S.D. Fla. 1989).  Moreover, as recently decided by the Third Circuit, where, as here, the negligence of the auditor proximately causes the issuance of debt that otherwise would not have been issued, deepening insolvency is no bar to damages under state law.  *Thabault v. Chait*, No. 06-2209, 2008 WL 4138407, at *4 (3d Cir. Sept. 9, 2008).

The evidence against BDO is overwhelming.  Material issues of fact preclude summary judgment.  The Motion should be denied.

## MATERIAL ISSUES OF DISPUTED FACT

The material issues of disputed fact are set forth in the separate document filed herewith, the "Material Issues of Disputed Fact that Preclude Summary Judgment on BDO Seidman LLP and Sandor Lenner's Motion for Summary Judgment."

## ARGUMENT

### I.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(c), as incorporated by the Federal Rule of Bankruptcy Procedure 7056 and 9014(c), summary judgment shall be granted only if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *In re Optical Technologies, Inc.*, 246 F.3d 1332, 1334 (11th Cir. 2000) ("It is axiomatic that a bankruptcy court deciding a summary judgment motion, just like a district court, must determine whether there are any genuine issues of material fact.").  "In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *In re Optical Technologies, Inc.*, 246 F.3d at 1334 (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc)).

12

**II.**    **Freeman's Claims Against BDO Are Not Barred**

    **A.**    **The Jury's Verdict Finding Espirito Santo Without Fault Bars BDO's Imputation Defense.**

Summary judgment cannot be granted where there is a genuine question of fact such that a reasonable jury could find in the non-movant's favor.  *In re John's Bean Farm of Homestead, Inc.*, 378 B.R. 385, 387 (Bankr. S.D. Fla. 2007).  BDO seeks summary judgment on all of Plaintiff's claims on the grounds that the fraud committed at Bankest should be imputed to Plaintiff and bar all claims.  As discussed in detail below, to grant summary judgment on the ground that the fraud committed on Bankest is imputed to Plaintiff such that it bars Plaintiff's claims, the court must find that there is no innocent officer or director who could have stopped the fraud had they had knowledge of it.  *See In re Fuzion Tech. Group, Inc.*, 332 B.R. 225, 231 (S.D. Fla. 2005).  To deny summary judgment, this Court need look no further than the jury's verdict in the state court action against BDO Seidman.

BDO's primary defense to that action was that the Bank Directors were at fault and, in fact, BDO argued liability of no less than five Espirito Santo officers and directors to the jury. (Exh. 6 [Phase II Verdict Form] at 6 (Victor Balestra, Bernard Mollet, Pierre Trezzini, Joaquim Garnecho and Robert Stewart).)  The jury, however, rejected each and every one of BDO's arguments, and found that none of the Espirito Santo officers and directors was at fault for the fraud and loss at Bankest.  (*Id*. at 2-6)  Thus, at least one fact finder concluded—after a five month long trial—that the facts overwhelmingly support a finding of complete innocence by the Bank Directors.  (*Id.*)  And, as a matter of law, the presence of the innocent Bank Directors precludes BDO's imputation and *in pari delicto* defenses.

B.      **This Court Already Held that the Fraud Committed by Bankest's Capital Officers Cannot Be Imputed to Bankest as a Matter of Law.**

Next, this court already ruled—in two different orders—that the wrongdoing of the Capital Officers cannot be imputed to Bankest as a matter of law.

First, in its September 2005 Summary Judgment Order, this Court found that because the Capital Officers "looted [Bankest] for the benefit of themselves," their fraudulent conduct could not "be imputed to Bankest as a matter of law." *See* (Exh. 1 [2005 Summary Judgment Order] at 25, 27.)

Second, when BDO attempted to re-litigate the imputation defense in its 2006 Motion to Dismiss, this Court held that its 2005 Summary Judgment Order precluded BDO from raising the defense. *See* (Exh. 2 [2006 Imputation/Damages Order] at 11-12.) Specifically, the Court found that "[p]ursuant to the Summary Judgment Order… the fraud perpetrated by the Capital Officers is not imputed to Bankest." (*Id.* at 12.) The Court further found that even absent the binding 2005 Summary Judgment Order, BDO's imputation defense would fail. The Court held that allegations that there were four Bankest directors who were unaware of the fraud, coupled with the injury Bankest suffered as a result of the fraud, established that Bankest had "an identity independent from the wrongdoing Capital Officers." (*Id.* at 12-13.)

BDO now raises the imputation defense for a *third time* and again it must fail. Without acknowledging this Court's previous findings in the 2005 Summary Judgment Order or the 2006 Imputation/Damages Order, BDO argues anew that knowledge of the Capital Officers' fraud should be imputed to Bankest.

The Court's prior Orders preclude BDO from raising the imputation defense. This Court has already held that the fraud perpetrated by the Capital Officers did not benefit Bankest and cannot be imputed to it: "[T]he Capital Officers looted the Debtor for the benefit of

14

themselves…The Capital Officers acted for their own benefit and adversely to Bankest in

loading Bankest with $170 million in debt." *See* (Exh. 1 [2005 Summary Judgment Order] at 25,

27.)  Moreover, the Court already concluded that Bankest had an identity independent from the

wrongdoers.  *See* (Exh. 2 [2006 Imputation/Damages Order] at 12-14.)

### C.    The Evidence Is that the Capital Officers Looted Bankest, Precluding Imputation and Therefore Summary Judgment.

Even absent the Court's prior Orders, BDO's imputation defense fails because—at the

very minimum—there is ample evidence to create a question of fact precluding summary

judgment.  As the cases relied on by BDO make clear, where—as here—officers "loot" the

corporation for their own benefit, their actions do not benefit the corporation and cannot be

imputed to it.  *See*, *e.g.*, *Seidman & Seidman v. Gee*, 625 So. 2d 1, 3 (Fla. 3d DCA 1992); *Banco

Latino Intern v. Lopez*, 95 F. Supp. 2d 1327, 1335-36 (S.D. Fla. 2000).  The evidence is

overwhelming that such "looting" is exactly the kind of conduct the Capital Officers engaged in.

*See* (Exh. 1 [2005 Summary Judgment Order] at 25.)  The Capital Officers stole hundreds of

millions of dollars by presenting false financial statements to Espirito Santo Bank in order to

continue obtaining funding.  *See* (Exh. 37 [4/16/07 a.m. Tr.] at 868, 877-78, 892.)  They included

hundreds of millions of dollars of fake accounts receivable in its financial statements, even

though the accounts receivable did not exist.  *See* (*id.* at 853-62.)  They represented that invoices

were collectible that they knew were not collectible, *id.* at 864, and created fictitious accounts

receivable records where there were no actual invoices or sales at all, *id.* at 865.

Moreover, the Bank Directors did not know of the fraud and were in fact innocent

directors.  (Exh. 56 [5/18/08 p.m. Tr.] at 4500-02, 4557; Exh. 57 [5/22/07 Tr.] at 4922; Exh. 59

[7/3/07 p.m. Tr.] at 264-65; Exh. 61 [7/20/07 a.m. Tr.] at 1295-96; Exh. 62 [4/20/07 p.m. Tr.] at

1402; Exh. 63 [7/24/07 a.m. Tr.] at 1832, 1834.)  If the Bank Directors would have known of the

fraud, the damages to Bankest would have never occurred.  (Exh. 60 [7/16/07 a.m. Tr.] at 736;

Exh. 59 [7/3/07 p.m. Tr.] at 391; Exh. 56 [5/18/08 p.m. Tr.] at 4500.)

BDO's argument that imputation is required by *Gee v. Seidman & Seidman* because the

Capital Officers' fraud provided a short-term benefit to Bankest fails.  *Gee* involved a

corporation's manager making a misrepresentation regarding the corporation's financial situation

to "inflate artificially the worth of the corporation" and obtain additional corporate clients.  625

So. 2d at 1.  The court in *Gee* found that the fraud benefited the corporation to the detriment of

third-parties, and was therefore imputed to the corporation.  *Id*. at 3.

Here, the Bankest Capital Officers committed a fraud against Bankest itself.  It is

undisputed that the Bankest Capital Officers saddled Bankest with more than $170 million in

debt that it could not repay.  (Exh. 37 [4/16/07 a.m. Tr.] at 915.)  Clearly no benefit—short or

long-term—was conferred on Bankest.  This Court previously held the same.

BDO's claim that imputation should nevertheless bar Plaintiff's claims because the

Capital Directors were the corporation's "sole actors" is similarly misguided.  As an initial

matter, BDO is precluded from asserting the "sole actor" doctrine because BDO is not an

innocent third party who was injured by the fraud.  *See*, *e.g*., *Nerbonne, N.V. v. Lake Bryan

Intern. Properties*, 685 So. 2d 1029, 1032 (Fla. 5th DCA 1997) (sole actor doctrine should be

applied only when controversy is between the corporation and a wronged third party).

Even assuming BDO can raise the "sole actor" argument, it fails here.  Florida law is

clear that the "sole actor" doctrine will not apply to impute wrongdoing to the corporation if

"there was someone involved in [the corporation's] management who was ignorant of the

ongoing fraud and could and would if advised of facts known to defendant have taken steps to

bring the fraudulent conduct to an end."  *In re Fuzion Tech. Group, Inc.*, 332 B.R. 225, 231 (S.D.

Fla. 2005).  In *Fuzion*, the court reviewed the cases that imputed wrongdoing to a corporation based on a sole actor and found that all of them "prohibit imputation of a sole actor's conduct to a corporation (and consequently to its bankruptcy trustee) if there was at least one honest officer, director, shareholder, or other insider who would have taken appropriate action to rectify the wrongdoing."  *Id*. at 239 (discussing cases).

Here, it is undisputed that the four Espirito Santo Bank-appointed members on Bankest's eight-member board of directors had absolutely no knowledge of the fraud.  *See* (Exh. 56 [5/18/08 p.m. Tr.] at 4500-02, 4557 (Garnecho); Exh. 57 [5/22/07 Tr.] at 4922; Exh. 59 [7/3/07 p.m. Tr.] at 264-65; Exh. 61 [7/20/07 a.m. Tr.] at 1295-96; Exh. 62 [7/20/07 p.m. Tr.] at 1402 (Balestra); Exh. 63 [7/24/07 a.m. Tr.] at 1832, 1834 (Mollet); Exh. 64 [7/24/07 p.m. Tr.] at 1973 (Espirito Santo).)  A jury rejected all of BDO's comparative fault claims.  (Exh. 6 [Phase II Verdict Form].)  Moreover, had the directors been aware of the Capital Officers' fraud, they would have taken steps to stop it, and they certainly would have stopped funding Bankest.  *See* (Exh. 60 [7/16/07 a.m. Tr.] at 736; Exh. 59 [7/3/07 pm Tr.] at 391; Exh. 56 [5/18/08 p.m. Tr.] at 4500.)  This precludes imputation of the Capital Officers' fraud to Bankest.  *See, e.g., O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1046-47 (Fla. 2d DCA 2007) (wrongdoing should not have been imputed to corporation when the fraud harmed the corporation and there were innocent corporate insiders).

### D.    BDO Cannot as a Matter of Law Raise the *In Pari Delicto* Defense.

In a last, desperate attempt to push through its argument of imputation, BDO purports to raise the issue of *in pari delicto* (or "unclean hands") as a separate argument.  Yet BDO's argument for the imputation defense and the *in pari delicto* defense are the same.  Indeed, the analysis regarding the *in pari delicto* defense against Bankest (and Freeman) is exactly the same as that regarding the imputation defense.  *See O'Halloran*, 969 So. 2d at 1044 ("Where the

defense of *in pari delicto* is asserted against a corporate entity based on the misconduct of the corporation's agents, it must be determined whether the misconduct of those agents is properly imputed to the corporation."). BDO is forced to admit that the analyses for imputing wrong and applying *in pari delicto* are the same when it cites *Gee v. Seidman & Seidman* as the leading Florida case regarding application of the *in pari delicto* doctrine. In fact, *Gee* never uses the term "*in pari delicto*"—most likely because the plaintiff and defendant were not alleged to be co-conspirators in fraud. Instead, *Gee* considers whether the corporation's claims should be barred based on the "imputation defense." 625 So. 2d at 2.

Regardless, as a matter of law BDO cannot assert an *in pari delicto* defense. Again, as this Court already held, the *in pari delicto* is a defense available only to a defendant who was involved in the same fraudulent scheme as the plaintiff. (Exh. 2 ("2006 Imputation/Damages Order] at 12 n.10.) The Court was and is right. *See, e.g.*, *Kulla v. E.F. Hutton & Co.*, 426 So. 2d 1055, 1057 (Fla. 3d CA 1983) ("It is a well-settled principle of law requiring little discussion that one who himself engages in a fraudulent scheme, that is, acts *in pari delicto*, may forfeit his right to any legal remedy against *a co-perpetrator*." (emphasis added)); *Smith ex rel. Estates of Boston Chicken, Inc. v. Arthur Andersen LLP*, 175 F.Supp.2d 1180, 1199 (D. Ariz. 2001) ("The doctrine of *in pari delicto* dictates that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another *participant in that conduct,*…the law will aid neither, but rather, will leave them where it finds them." (emphasis added)). BDO does not argue that it was a co-conspirator with Bankest in the fraud, and therefore cannot raise *in pari delicto* as a defense Freeman's claims.

Finally, as cited by this Court in the Imputation/Damages Order, BDO cannot assert the "imputation, or *in pari delicto*, defense to bar claims for damages suffered as a result of an [its]

failure to detect fraud" where BDO "agreed to detect fraud."  (Exh. 2 [2006 Imputation/Damages

Order] at 12 (citing *NCP Litigation Trust* v. *KPMG, LLP*, 2006 WL 1766178, at *11 (N.J. Sup.

Ct. June 28, 2006)).)  This is consistent with this Court's Summary Judgment Order where the

Court stated that "[s]ince BDO specifically contracted and agreed to 'detect fraud,' it cannot

claim now that it could not 'detect fraud' because of 'fraud.'"  (Exh. 1 [2005 Summary Judgment

Order] at 24.)

III.    **Summary Judgment Regarding Freeman's Securities Fraud Claim Should Be Denied.**

      A.    **Plaintiff's Claim Satisfies the "In Connection With" Requirement Because the Capital Officers' Fraud Coincided with the Sale of the Bankest Securities.**

Not content to re-litigate the imputation defense, BDO also attempts to re-litigate its

failed arguments regarding Freeman's federal securities claim.  In its 2006 Motion to Dismiss,

BDO argued—unsuccessfully—that BDO's severely reckless conduct did not occur "in

connection with" the purchase or sale of securities as required by federal securities laws.  *See* 15

U.S.C. § 78j(b).  This Court rejected BDO's argument, recognizing that "[r]ecent Supreme Court

cases define the 'in connection with' element of a Rule 10b-5 claim quite expansively."  (Exh. 3

[2006 Securities Fraud Order] at 16.)  The Court found Freeman satisfied the "in connection

with" element of his 10b-5 claim by his undisputed allegation that "BDO knew or should have

known that its unqualified financial statements were provided to the Bank Directors who

authorized the issuance of the debenture notes and the investors who purchased the debenture

notes."  (*Id*.)  Now, there is substantial undisputed evidence that BDO knew that its audited

financial statements were provided to Bankest's directors—BDO addressed the audits to

Bankest's Board of Directors!  *See* (Exhs. 9, 10, 11, 12, 13 [BDO Seidman Audited Financial

Statements of Bankest].)  In fact, BDO admitted that it knew its unqualified audited financial

statements were provided to the Bank Directors.  (Exh. 27 [BDO Responses to Requests for Admission] at 12-13.)  On this basis alone, the Court should deny BDO's motion.

In an attempt to circumvent this Court's prior ruling, BDO repackages the "in connection with" argument under the guise of causation and damages.  BDO relies on many of the same cases it previously cited in its failed "in connection with" argument, and offers the same theory— *i.e.,* Freeman cannot state a 10b-5 claim because Bankest did not suffer injury at the time the debentures were sold.  BDO's attempt to present the "in connection with" argument under a different name is unavailing.  First, BDO relies on stale and superseded precedent. Further, the facts necessary to establish this element are undisputed and BDO's argument fails now, just as it did two years ago.

        **1.**      **BDO Misstates the Legal Requirements for the "In Connection With" Element.**

BDO relies on cases that have been superseded by the Supreme Court's decision in *SEC v. Zandford*, 535 U.S. 813 (2002).  Following *Zandford*, courts have recognized that "[a]ll that is necessary to satisfy this ['in connection with'] requirement is proof of a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide."  *Jacoboni v. KPMG*, 314 F. Supp. 2d 1172, 1179 (M.D. Fla. 2004).

The cases relied on by BDO discuss causation in the context of the federal securities laws "in connection with" requirement, and apply a narrow interpretation of the requirement specifically rejected in *Zandford*.  For example, in *Rochelle v. Marine Midland*, 535 F.2d 523, 529 (9th Cir 1976), the court barred a trustee's 10b-5 claim for failure to establish the "in connection with" element because the corporation received full value for the allegedly fraudulent securities, and only suffered injury when the officers subsequently "frittered away the funds." Similarly, in *Rollins Inv. Fund v. Valentine*, 1996 WL 943541 (N.D. Ohio Sept. 5, 1996), the

court, citing *Rochelle*, found that a corporation did not allege a 10b-5 claim with an allegation that it initially profited from fraud but ultimately suffered as a result of defendants' looting corporate proceeds. *See also In re Investors Funding Corp*, 523 F. Supp. 533, 539 (SDNY 1980) (citing *Rochelle*, finding that corporation did not incur damages "in connection with" the sales of securities when it "received more than fair value" for the securities and "was not damaged until the proceeds from such sales were subsequently misused"); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir. 1985) (allegations of fraudulent scheme involving misuse or theft of corporate funds subsequent to security transaction do not give rise to claim under section 10(b)).[5]

As this Court has already recognized, (see Exh. 3 [2006 Securities Fraud Order] at 16-17), the holdings of these cases do not survive the U.S. Supreme Court's decision in *SEC v. Zandford*, 535 U.S. 813, 821 (2002). *Zandford* involved a securities broker who had induced a client to invest with him, then subsequently misappropriated the proceeds of various stock sales he made on his client's behalf. The Supreme found that the SEC had alleged a violation of 10(b) and 10b-5 by alleging a "fraudulent scheme in which [defendant] made sales of his customer's securities for his own benefit." *Zandford*, 535 U.S. at 820. The Supreme Court rejected the defendant's claim that the security sales were lawful transactions separate from the fraudulent misappropriation, finding that the "fraud coincided with the sales themselves." *Id*. Indeed, the Supreme Court stated that whether the proceeds of the security sales were subsequently misappropriated was "irrelevant." *Id.* at 822. "It is enough that the scheme to defraud and the

---

[5]     BDO also cites *Baker v. Heller*, 571 F.Supp. 419 (D.C. Fla. 1982), in which the court found the receiver of a corporation lacked standing when the alleged fraud benefited the corporation. *Baker* does not involve any allegations of subsequent misuse of corporate proceeds or other damages to the corporation, and is thus inapplicable here. Moreover, this Court has already found that Plaintiff has standing because the Capital Officers' fraud did not benefit Bankest. *See* (Exh. 2 [2006 Imputation/Damages Order] at 11-18.)

sale of securities coincide." *Id.* (explaining *Superintendent of NY Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6 (1971)).

> **2.    BDO's Unlawful Conduct Was "In Connection With" the Sale of Securities.**

Here, Plaintiff's 10b-5 claim satisfies the "in connection with" element pursuant to the *Zandford* holding.  BDO unlawfully issued unqualified financial statements which it knew or should have known would be provided to innocent Bankest directors and investors in connection with the sale of Bankest debentures.  (Exh. 9, 10, 11, 12, 13 [BDO Audited Financial Statements of Bankest]; Exh. 37 [4/16/07 a.m. Tr.] at 851-52, 905, 908-09; Exh. 39 [4/17/07 a.m. Tr.] at 1081; Exh. 29 [Shareholder Agreement] at 11; Exh. 30 [PPM]; Exh. 15 [1998 Inherent Risk Questionnaire] at BDO 00658; Exh. 55 [5/17/07 Tr.] at 4297.)  The debentures were part of the fraudulent scheme which drove Bankest to insolvency.  (Exh. 37 [4/16/07 a.m. Tr.] at 877-78, 915.)  Clearly, BDO's unlawful conduct coincided with a security transaction to cause injury to Bankest.  That is all the law requires.  *Zandford*, 535 U.S. at 822.  Whether BDO styles its argument as one of "causation" or satisfying the "in connection with" requirement, the argument fails.

> **B.    Overwhelming Evidence Demonstrates Defendants' Scienter.**

BDO's argument that Plaintiff has not established scienter as a matter of law also fails.  The evidence—at the very least—creates a genuine issue of material fact as to whether BDO acted with the "severe recklessness" necessary to satisfy the scienter requirement for a Rule 10b-5 claim.  *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1283 (11th Cir. 1999) (allegations that defendant "acted with a severely reckless state of mind still suffices to state a claim for civil liability under 10b-5").

1.      **BDO's Continuing Audits of Bankest While It Had a Direct and Material Conflict of Interest Is "Severe Recklessness".**

At the same time BDO *audited* Bankest, BDO was the financial partner of Stratasys, a Bankest client.  BDO's relationship with Stratasys meant BDO had an interest in the positive financial results of BDO's own audits.  (Exh. 48 [4/30/07 Tr.] at 2550-51.)  The evidence demonstrates that BDO's relationship with Stratasys gave it every incentive to ignore the numerous red flags that warranted further investigation.  In fact, BDO's audits of Bankest were so deficient, they effectively "amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful."  *In re Eagle Tech*, 319 F.Supp.2d 1318, 1327 (S.D. Fla. 2004); *see also* (Exh. 48 [4/30/07 Tr.] at 2637-38 ("These workpapers do not support any opinion on the financial statements.").)  This evidence more than creates a question of fact as to whether BDO acted with scienter when it continued to audit Bankest despite its conflict of interest.

BDO intended to make millions from its partnership with Stratasys, a client of Bankest. *See* (Exh. 23 [5/23/01 Meeting Memorandum]; Exh. 35 [4/11/07 p.m. Tr.] at 363-65; Exh. 46 [4/24/07 Tr.] at 2305-09, 2323; Exh. 47 [4/26/07 Tr.] at 2435-37.)  BDO leveraged its relationship with Mr. Parlapiano, a Capital Officer of Bankest, so that BDO became a strategic partner with Stratasys.  As Stratasys' partner, BDO shared in Stratasys' revenues.  (Exh. 46 [4/24/07 Tr.] at 2347-48.)

Simultaneously, as the auditor of Bankest BDO was required to verify that the Stratasys' receivables on Bankest's books were real.  (*Id.*)  As a result of its conflict of interest, BDO purported to verify $77 million in Stratasys receivables as real, when all of them were fake.  (*Id.*) BDO's potential financial interest in the accounts receivables it was auditing disqualified BDO

under accounting ethical rules from acting as BDO's accountant.  (Exh. 48 [4/30/07 Tr.] at 2483, 2487, 2547-53; *id*. at 2490-91 (an auditor's independence "is of the utmost importance.").)

Even more, Mr. Lenner, the lead audit partner on the Bankest audit, had a personal financial stake in the BDO-Stratasys partnership that placed him in direct conflict with his duties as Bankest's auditor.  Mr. Lenner wrote a memorandum to his superiors to justify increasing his compensation at BDO and Mr. Lenner trumpeted the forging of the BDO-Stratasys alliance as a reason why.  (Exh. 25 [Good Guy Memo] at 1 ("I have very high expectations for the Miami office and the firm as a result of this Alliance.")  Mr. Lenner admitted his own personal benefit was a motive for the BDO-Stratasys alliance.  (Exh. 46 [4/24/07 Tr.] at 2305-08; Exh. 47 [4/26/07 Tr.] at 2435-37.)

The evidence of BDO's recklessness is overwhelming.  *See* (Exh. 49 [5/2/07 a.m. Tr.] at 2839.)  As Stratasys' business partner, BDO had access to Stratasys' financial information.  (Exh. 34 [4/11/07 a.m. Tr.] at 284-85; Exh. 46 [4/24/07 Tr.] at 2340-41; Exh. 24 [2/14/03 Email from Mr. Parlapiano to Mr. Mendez].)  Despite this access, BDO reported that it had "verified" $77 million of accounts receivable from Stratasys listed on Bankest's books—virtually all of which were fake!  (Exh. 46 [4/24/07 Tr.] at 2346-48.)  Thus, not only did BDO certify fake receivables as real, but BDO knew or should have known Stratasys had less than $1 million in accounts receivable to sell to Bankest. *See* (Exh. 36 [4/13/07 Tr.] at 829-36 (BDO's "own records showed both numbers, and they're totally at odds with each other.").)  BDO's motive to turn a blind eye to the fraud supports a finding of severe recklessness.  *See Bryant*, 187 F.3d at 1285.

       2.       **Scienter Is Established Because BDO Repeatedly Ignored Red Flags that Put It on Notice of the Fraud.**

Moreover, the evidence establishes that BDO and its lead partners on the Bankest audit ignored numerous red flags that warranted further investigation.  *See In re Sunterra Corp. Sec. Litig.,* 199 F.Supp.2d 1308, 1333 (M.D. Fla. 2002) (holding that to establish scienter, red flags are what would have put any "reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors").  In ignoring these obvious and serious red flags, BDO acted with scienter.  *Id*.

       3.       **BDO Continued to Audit Bankest Even After the Bankest Capital Officers Refused to Give BDO the Documents that Would Have Revealed the Fraud.**

It is undisputed that Bankest—at the direction of the Capital Officers—repeatedly refused to provide BDO with documents and information BDO deemed necessary to perform accurate audits.  *See* (Exh. 39 [4/17/07 a.m. Tr.] at 1094-95, 1099-1118; Exh. 44 [4/20/07 a.m. Tr.] at 1799-1800.)  During BDO's first audit of Bankest, one of the Capital Officers refused to provide BDO with the documents that would have provided the sole independent confirmation that the receivables on Bankest's books were real.  *See* (Exh. 26 [Rivera Aff.] at ¶¶12-15; Exh. 39 [4/17/07 a.m. Tr.] at 1099-1100.)  The Capital Officers refused to provide the documents— because the documents did not exist—which sufficiently raised the suspicion of the audit manager that he terminated the audit.  (*Id.* at 1101-02.)  The audit resumed only because the audit manager's decision to discontinue the audit was overridden by BDO's lead audit partner, Sandy Lerner.  (Exh. 26 [Rivera Aff.] at ¶¶15, 23-25; Exh. 39 [4/17/07 a.m. Tr.] at 1110-18.)

When an audit client—here Bankest under the control of the Bankest Capital officers— limits the scope and breadth of an audit, it is an immediate red flag and will establish scienter. *See In re Suprema Specialties, Inc. Sec. Litig*., 438 F.3d 256, 280 (3d Cir. 2006) (client's

limitation of scope of audit is a red flag raising suspicion of fraud); *see also* (Exh. 43 [4/19/07 p.m. Tr.] at 1752-53; Exh. 44 [4/20/07 a.m. Tr.] at 1766-67.)

### 4.    BDO Ignored Suspicious Results and Continued Audits.

When BDO obtained a highly suspicious result in testing the validity of Bankest's accounts receivable, it did not investigate those results.  Instead, it chose to ignore the suspicious result and switched to a different—and less rigorous and reliable—test.  When BDO sent out confirmations to verify the existence of Bankest's accounts receivable, none of the confirmations were returned.  (Exh. 43 [4/19/07 p.m. Tr.] at 1665-1670; Exh. 50 [5/2/07 p.m. Tr.] at 2905; Exh. 40 [4/17/07 p.m. Tr.] at 1197-98 (received 2 confirmations for 1998 audit); Exh. 16 [1998 A/R Circularization Workpaper]; Exh. 19 [1999 Confirmation Control]; Exh. 20 [1999 Workpaper] at BDO 03392 ("no confirms received"); Exh. 21 [2000 Confirmation Control]; Exh. 22 [2001 Confirmation Control].)  When no confirmations are returned, it is indicative that there is a "major problem." (Exh. 43 [4/19/07 p.m. Tr.] at 1687-88, 1692 (noting that it would "cause the hair on the back of your neck to stand up").)  BDO's own audit manual even warns auditors that a zero confirmation response rate is a potential indicator of fraud.  (*Id.* at 1674-75; Exh. 51 [5/3/07 Tr.] at 3157; Exh. 14 [BDO Audit Manual] at BDO 031771.)  In such a situation, the auditor must take strong independent measures to validate the existence of accounts receivable. (Exh. 43 [4/19/07 p.m. Tr.] at 1677-78.)  BDO did not.

BDO's audit manual also required that BDO check shipping documents to confirm the account receivables.  (Exh. 14 [BDO Audit Manual] at BDO 031774.)  Again, BDO did not do what it was required to do and never looked at shipping documents.  (Exh. 52 [5/4/07 a.m. Tr.] at 3214-15.)  Still further, where, as here, virtually all the transactions flowed through related party

Capital, BDO's audit manual warned of the possibility for fraud, see Exh. 14 [BDO Audit Manual] at BDO 031890, but BDO actually counted on the Capital Officers "to detect and prevent fraud."  (Exh. 54 [5/9/07 Tr.] at 3944-45; Exh. 18 [Consideration of Fraud Risk Workpaper] at BDO 00649.)  Again, BDO ignored the warnings in its own audit manual.

Instead BDO chose to apply consistently less rigorous tests, until ultimately BDO accepted verifications based on Bankest internal documents prepared by the Capital Officers— the very people committing the fraud.  (Exh. 43 [4/19/07 p.m. Tr.] at 1706-29, 1738-42.)  BDO's failure to verify Bankest's accounts receivable with information obtained from independent third parties violated GAAS.  *See*, *e.g.*, AU § 330; *see also* (Exh. 43 [4/19/07 p.m. Tr.] at 1741-42; Exh. 44 [4/20/07 Tr.] at 1858-59; Exh. 45 [4/23/07 p.m. Tr.] at 2036-37; Exh. 48 [4/30/07 Tr.] at 2637-38.)

> **5.    The Sheer Magnitude of the Fraud Compels the Conclusion that BDO Was Severely Reckless in Failing to Discover the Fraud.**

Finally, the "sheer magnitude" of the fraud perpetrated on Bankest by the Capital Officers compels the conclusion that BDO was severely reckless in failing to discover it.  *See In re Sunbeam Secs. Litig*., 89 F. Supp. 2d 1326, 1345 (S.D. Fla. 1999).  BDO does not dispute that over $220 Million of the accounts receivable it certified in 2002—about 99% of Bankest's assets—did not actually exist.  (Exh. 35 [4/11/07 p.m. Tr.] at 391-92.)  The massive scale of the Bankest fraud, coupled with BDO's GAAP and GAAS violations, give rise to a strong inference of scienter.  *See In re Sunterra Corp. Secs. Litig*., 199 F. Supp. 2d 1308, 1334-35 (M.D. Fla. 2002) (violations of GAAS that lead to a "drastic overstatement of financial results" support a finding of recklessness).  *See also In re Eagle Tech*, 319 F. Supp. 2d at 1327-28 ("When one of relatively few transactions is fictitious and makes up over 74% of the company's revenue, the

opportunity for the auditor to discover the fraud increases, and the magnitude of the fraud gives rise to an inference of scienter.").

In light of the evidence supporting the Complaint's allegations—allegations which this Court has *already found* demonstrate BDO's scienter—BDO's argument fails.  Freeman has established significant evidence of scienter.

## IV.   BDO's Argument that Plaintiff Has No Recoverable Damages Also Fails

BDO now moves for summary judgment arguing that Plaintiff cannot prove proximate cause or damages.  BDO's arguments fail.

### A.   There Is Overwhelming Evidence for a Jury to Find that BDO's False Audits Caused Harm to Bankest.

Causation is a question of fact to be decided by the trier of fact.  *McCain v. Florida Power Corp.*, 593 So. 2d 500 (Fla. 1992); *Antun Investments Corp. v. Ergas*, 549 So. 2d 706, 710 (Fla. 3d DCA 1989).  In *McCain*, the Florida Supreme Court made it clear that the "proximate causation element … is concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred. … [It] is part of the much more specific *factual* requirement that must be proved to win the case once the courthouse doors are open."  593 So. 2d at 502-03.  As demonstrated below, there is overwhelming evidence to support a jury finding that BDO proximately caused Bankest's loss. Because causation is a question of fact, it cannot be resolved at summary judgment.

Here, the evidence is that BDO's audits falsely certified hundreds of millions worth of fake accounts receivables on Bankest's books as real.  (Exh. 37 [4/16/07 a.m. Tr.] at 852-62.) Bankest's audits were used to issue debenture notes, increasing Bankest's liabilities by $170 million dollars.  (*Id.* at 849, 877-78, 901-02, 905, 915; Exh. 30 [PPM] at ES 0256348, ES0256512-26.)  This $170 million loss would not have occurred without BDO's false and

misleading audits.  (Exh. 37 [4/16/07 a.m. Tr.] at 891-92; *id.* at 877-91.)  Even BDO's own expert testified that "but for" BDO's audits, none of the resulting debt would have been incurred by Bankest.  (Exh. 66 [8/3/07 p.m. Tr.] at 3352-64.)

Finally, courts have recognized claims for damages in these same circumstances for injury caused to an audit client from negligently and fraudulently prepared financial statements. *See Coopers & Lybrand v. Trustees of Archdiocese of Miami*, 536 So. 2d 278, 282-83 (Fla. 3d DCA 1988).  The most recent example is the Third Circuit in *Thabault v. Chait*, where the court held that when a company increases its liabilities using negligently prepared audited financial statements, the damages are the losses incurred on those liabilities.  *Thabault v. Chait*, 2008 WL 4138407 at *4.

Moreover, the jury question includes whether it was foreseeable that the Bankest Capital Officers would commit fraud under the cover of BDO's false audits.  *Cohen v. Schrider*, 533 So. 2d 859, 860 (Fla. 4th DCA 1988) ("Foreseeability is generally a question of fact for the jury."); *see also In re Gourian Holdings, Inc.*, 165 B.R. 104 (E.D.N.Y. 1994) (when insiders commit criminal acts question is whether foreseeable consequence of negligent audits).  Here, BDO admitted it had a duty to detect fraud and it is undisputed that when it failed to do so, massive fraud resulted—the textbook example of foreseeable.  (Exh. 51 [5/3/07 Tr.] at 3150-51; Exh. 37 [4/16/07 a.m. Tr.] at 891-92; *id.* at 878-91; Exh. 41 [4/18/07 a.m. Tr.] at 1322-23.)

### B.    Plaintiff Can Recover for Deepening Insolvency.

This Court already ruled that plaintiff could recover for damages for Bankest's in excess of $170 million in debt incurred as a result of BDO's audits.  (Exh. 2 [2006 Imputation/Damages Order] at 3.)  There is substantial evidence to support the damages claim:  as a result of BDO's issuance of unqualified financial statements, its verification of non-existent assets, and its failure to detect massive fraud, Bankest began and continued to incur more than $170 Million in debt

that it could not repay.  *See* (Exh. 37 [4/16/07 a.m. Tr.] at 877-78, 891-92.)  Bankest could not

have incurred this debt, through the issuance of debentures and the securing of a line of credit,

absent BDO's severely reckless conduct.  (*Id.*; Exh. 59 [7/3/07 p.m. Tr.] at 391; Exh. 60 [7/16/07

a.m. Tr.] at 736; Exh. 56 [5/18/08 p.m. Tr.] at 4500.)

      Despite this record and the Court's prior ruling, BDO argues Plaintiff cannot recover as a

matter of law for damages that caused Bankest's deepening insolvency.  In addition to the

Court's own Order, BDO ignores consistent case law in Florida and other jurisdictions

recognizing claims for damages based on a theory of "deepening insolvency."  *See*, *e.g.*, *In re*

*Flagship Health Care*, 269 B.R. 721, 728-29 (Bankr. S.D. Fla. 2001) ("[E]ven if the Debtor  may

have been insolvent before [the alleged misconduct], the additional debt incurred thereafter, and

allegedly as a result of Defendant's negligence, may provide a measure of damages recoverable

by the Trustee"); *In re Huff*, 109 B.R. 506, 512 (Bankr. S.D. Fla. 1989) ("A corporation is

damaged where its officers and directors fraudulently conceal its insolvency and allow the

corporation to continue incurring more and more debt and become more and more insolvent");

*see also Thabault v. Chait*, 2008 WL 4138407 at *5 ("[W]e hold that an increase in liabilities is a

harm to the company and the law provides a remedy when a plaintiff proves a negligence cause

of action."); *NCP Litig. Trust v. KPMG*, LLP, 901 A.2d 871, 888 (N.J. 2006) ("inflating a

corporation's revenues and enabling a corporation to continue in business 'past the point of

insolvency' cannot be consider a benefit to the corporation."); *Official Comm. of Unsecured*

*Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 345-37 (3d Cir. 2001) (finding that

corporation could recover against auditor for increased debt and ultimate insolvency).

      Moreover, the two "deepening insolvency" cases on which BDO relies—neither of which

involve claims under federal securities law or Florida law—have no bearing here because in both

instances the company at issue was already insolvent.  *See In re Parmalat Securities Litig.*, 501

F.Supp.2d 560, 576 (S.D.N.Y. 2007) ("Plaintiffs do not claim that defendants' actions ultimately

drove the Companies into bankruptcy.  Indeed, they allege that the Companies already were

insolvent by 1999 and would have filed for bankruptcy sooner than they did had Parmalat's true

financial condition been revealed"); *In re CitX Corp., Inc.*, 448 F.3d 672, 677 (3d Cir. 2006)

("Before the equity infusion [at issue], CitX was $2,000,000 in the red…With the added

$1,000,000 investment, it was thereby insolvent only $1,000,000.  Insolvency decreased rather

than deepened").  Here, Bankest was only able to incur the $170 million debt that caused its

insolvency after BDO issued its first fraudulent audited financial statement.  (Exh. 37 [4/16/07

a.m. Tr.] at 877-78.)

> **C.    The Court Already Rejected BDO's Argument that Plaintiff Has No Damages.**

Again ignoring this Court's prior Order, BDO argues for summary judgment on the

grounds that only Bankest's creditors were harmed by BDO's fraudulent audits.  The Court

rejected this argument once before:  "Thus, the Court holds that the BESIL Lawsuit in which

BESIL is asserting its own rights against BDO is no bar to Bankest. BDO's client, suing BDO on

Bankest's own claims to redress the injuries to Bankest."  (Exh. 2 [2006 Imputation/Damages

Order] at 5-6.)

## V.    The Evidence Demonstrates that BDO Aided and Abetted the Capital Officers' Breach of Their Fiduciary Duties.

BDO's motion to grant summary judgment on Plaintiff's claim for aiding and abetting

the Bankest Capital Officers' Breach of their fiduciary duties should be denied.  A claim for

aiding and abetting the breach of a fiduciary duty requires: "(1) a fiduciary duty on the part of the

primary wrongdoer, (2) a breach of this fiduciary duty, (3) knowledge of the breach by the

alleged aider and abettor and (4) the aider and abettor's substantial assistance or encouragement

of the wrongdoing." *AmeriFirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991).

Plaintiff can satisfy all four prongs; BDO does not even dispute the first two prongs.

### A.    BDO Had Knowledge of the Capital Officers' Breach of Fiduciary Duty.

Because knowledge of the fraud must usually be inferred, recklessness satisfies the

knowledge, or scienter, requirement, and is specifically applied to auditors like BDO.  *Woods v.*

*Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010-11 (11th Cir. 1985) (citing with approval

*Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1356-57 (S.D.N.Y. 1982)).  A

recklessness standard is applied to "alleged aiders and abettors who have issued statements or

certifications foreseeably relied upon by investors" because a "duty to disclose arises under such

circumstances."  *See Woods*, 765 F.2d at 1011.

As discussed above, BDO's recklessness or scienter is proven in multiple ways, and at

least a genuine issue of fact exists as to this prong.  Summary judgment therefore should be

denied.

First, where, as here, the act alleged to constitute aiding and abetting is in part silence—

here, BDO's failure to disclose fraud—and the aider and abettor was under a duty to disclose, it

is unnecessary to prove conscious intent of the aider and abettor.  *See Rudolph v. Arthur*

*Anderson & Co.*, 800 F.2d 040, 1045 (11th Cir. 1986) (finding that auditors could be liable for

aiding and abetting a breach of fiduciary duty claim).  Next, when there is silence combined with

affirmative assistance, here, BDO's agreement not to request documents that would have

revealed the fraud, the degree of knowledge required depends upon how ordinary the assisting

activity is in the involved businesses. *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004,

1010 (11th Cir. 1985).  Finally, knowing assistance can be inferred from atypical business

actions that lack business justification.  *Id.* at 1010; *see also Woodward v. Metro Bank of Dallas*,

522 F.2d 84, 97 (5th Cir. 1975).  BDO's conduct satisfies all requirements: BDO aided and abetted the Capital Officers' wrongdoing by silence—BDO failed to disclose the fraud in BDO's audit opinions; and BDO provided affirmative assistance—BDO capitulated to the Capital Officers' demands that they accept insufficient audit evidence.

The facts in *Woods* are instructive.  In *Woods*, the court found that the atypical circumstances surrounding a letter written by a loan officer at defendant Barnett Bank supported the inference that the bank had the requisite knowledge of assistance.  *Woods*, 765 F.2d at 1011-13.  When the wrongdoers were not satisfied with a recommendation letter from defendant bank, they turned to Smith, a loan officer at the bank who allowed the wrongdoers to essentially dictate the bank's recommendation.  *Id*. at 1012.  The court found Smith's actions on behalf of defendant bank constituted "severely reckless conduct, as Smith's representation was given without basis in reckless disregard of its truth or falsity."  *Id*.  The court found that Smith wrote the letter with the sole purpose of "currying favor" with a good client of the bank—an improper motive for not probing more deeply into the wrongdoers' operations before he acted.  *Id*.  The court held that Smith's actions allowing the wrongdoers to write their own recommendation were atypical and sufficient to infer that his assistance was knowingly done.  *Id*.

Following *Woods*, BDO had the requisite knowledge for Plaintiff's aiding and abetting claim.  During the 1998 audit, a BDO auditor, Mr. Rivera, requested customer checks from Bankest in order to validate the existence of the account receivables, Bankest's largest asset. (Exh. 39 [4/17/07 a.m. Tr.] at 1094-95; Exh. 26 [Rivera Aff.] at ¶¶12-13.)  In order to properly perform the audit of Bankest, the auditors had to examine the customer checks.  (Exh. 43 [4/19/07 p.m. Tr.] at 1706-14; Exh. 41 [4/18/07 a.m. Tr.] at 1321-22.)  Dominick Parlapiano refused to provide the required documents to the BDO audit team.  (Exh. 26 [Rivera Aff.] at

¶¶12-16; Exh. 39 [4/17/07 a.m. Tr.] at 1099-1100.)  BDO Seidman immediately stopped work on the audit.  (Exh. 26 [Rivera Aff.] at ¶17; Exh. 39 [4/17/07 a.m. Tr.] at 1101-02.)

Sandor Lenner, the partner in charge of the Bankest audit, and Keith Ellenberg, the concurring partner on the Bankest audit, spoke with Mr. Parlapiano, a Capital Officer of Bankest, about Bankest's refusal to provide the customer checks and threatened to resign if the customer checks were not provided.  (Exh. 26 [Rivera Aff.] at ¶¶18-21.)  A few days later, after Mr. Lenner and Mr. Parlapiano had a closed door meeting, Mr. Lenner told Mr. Rivera to restart the audit and to accept checks from clients or Bankest Capital, a company owned by the Capital Officers, in lieu of customer checks as proof of the existence of Bankest's account receivables. (*Id.* at ¶¶23-24; [Exh. 39 [4/17/07 a.m. Tr.] at.1110-18.)  Mr. Lenner justified his decision by explaining that Mr. Parlapiano was an important person in the community and that a good relationship with him could lead to new business.  (Exh. 26 [Rivera Aff.] at ¶24.)  However, even BDO auditor Mr. Ellenberg admits that customer checks would not provide sufficient audit evidence. (Exh. 41 [4/18/07 a.m. Tr.] at 1321-22.)  Mr. Lenner's actions demonstrate severe recklessness, as the client or Bankest Capital checks accepted in lieu of the required customer checks could not provide the audit evidence needed to satisfy GAAS.  (Exh. 41 [4/18/07 a.m. Tr.] at 1321-22; Exh. 43 [4/19/07 p.m. Tr.] at 1706-14.)

Under *Woods*, BDO's knowledge of the Capital Officers' wrongdoing can be inferred from Mr. Lenner's willingness to allow Mr. Parlapiano to dictate the audit evidence – a highly atypical practice.  *See Woods*, 765 F.2d at 1012.  BDO cannot hide behind Mr. Lenner's willful ignorance about why customer checks could not be provided.  *See Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Group Ltd.*, No. 05-60080-Civ., 2008 WL 926509 (S.D.Fla. 2008) (allegations that defendants willingly, knowingly, consciously, and recklessly failed to use

reasonable skill and care to be aware of, discover, investigate and report numerous glaring red flags which would have put a reasonably prudent director on notice that the wrongdoer was engaged in conduct to the extreme detriment of plaintiff was sufficient to find defendants liable for aiding and abetting a breach of fiduciary duty).

### B.    BDO Substantially Assisted the Capital Officers in Committing the Fraud.

In order to determine whether BDO "substantially assisted" the Capital Officers, the Court must analyze the totality of the circumstances and it is a fact-driven inquiry.[6]  *See Rudolph v. Arthur Anderson & Co.*, 800 F.2d 1040, 1046 (11th Cir. 1986).  Proof that an auditor has knowledge of a fraud and fails to disclose it is sufficient to prove that the auditor substantially assisted the wrongdoing.  *Id*.

Here, substantial assistance is demonstrated because BDO took concrete steps to assist the Capital Officers in committing the fraud.  In the Bankest fraud, fake customer checks did not exist because they were difficult, if not impossible, to manufacture.  (Exh. 32 [2/6/07 p.m. Tr.] at 3457; Exh. 33 [2/8/07 p.m. Tr.] at 3852-55; Exh. 35 [4/11/07 p.m. Tr.] at 442-44; Exh. 37 [4/16/07 a.m. Tr.] at 887-89.)  The Capital Officers needed BDO to do its audit without requiring customer checks.  (Exh. 37 [4/16/07 a.m. Tr.] at 891-92.)  BDO complied – after Mr. Lenner and Mr. Parlapiano's closed door discussion, BDO never asked for customer checks.  (*Id.* at 889, 891.)  If BDO had required customer checks, the fraud would have been discovered.  (Exh. 32 [2/6/07 p.m. Tr.] at 3452-58, 3462; Exh. 37 [4/16/07 a.m. Tr.] at 878-82, 891-92; Exh. 26

---

[6]    BDO argues that Mr. Freeman must show that BDO "'actively participated' in the wrongdoing."  Mot. at 18.  Active participation is one way to demonstrate "substantial assistance;" however, the cases cited by BDO do not require "active participation in the wrongdoing."  In *In re Cascade Int'l Sec. Litig.*, 840 F. Supp. 1558 (S.D. Fla. 1993), the court held plaintiffs had failed to demonstrate substantial assistance because they only alleged that the law firm acted as scriveners for its clients and conducted activities that made up the "daily grist of the mill," and they failed to allege that the law firm "actively participated in soliciting sales or negotiating terms of the deal on

[Rivera Aff.] at ¶¶15, 23-25; Exh. 39 [4/17/07 a.m. Tr.] at 1110-18; Exh. 44 [4/20/07 a.m. Tr.] at 1799-1800; Exh. 52 [5/4/07 a.m. Tr.] at 3239.)  Not only was BDO's assistance substantial – it was necessary to committing the fraud.  (Exh. 37 [4/16/07 a.m. Tr.] at 891-92.)

        **C.**      **The Aiding and Abetting a Breach of Fiduciary Claim Is Not Barred by the "Economic Loss" Doctrine.**

Contrary to BDO's argument, the aiding and abetting a breach of fiduciary duty claim is not barred by the "economic loss" rule.  In Florida, the "economic loss" doctrine bars recovery in tort for economic losses incurred pursuant to the terms of a written contract.  *See Hoseline, Inc. v. U.S.A. Diversified Products, Inc.*, 40 F.3d 1198, 1199 (11th Cir. 1994).  It is inapplicable in this case.

BDO aided and abetted the Capital Officers in their breaches of their fiduciary duties to Bankest.  For the "economic loss" analysis, the issue is whether the breach of duty arises from the breach of a contractual obligation.  *See Hoseline*, 40 F.3d at 1199-1200.  The issue is the relationship between the Capital Officers and Bankest, and any contract between BDO Seidman and Bankest is irrelevant to the "economic loss" doctrine analysis.  *See Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 499 (S.D. Fla. 1996).

The Capital Officers' fiduciary duties to Bankest arose not from contract but from their position as officers on Bankest's Board of Directors.  (Exh. 37 [4/16/07 a.m. Tr.] at 897-98.) The difference between this case and *Waters* case cited by BDO is that the damages from the breach of duty in *Waters* "flow[ed] solely from a breach of contract," whereas the damages here resulted from the Capital Officers breach of their noncontractual fiduciary duties to Bankest.  *See*

---

behalf of the client."  840 F. Supp. at 1566; *see also Bruhl v. Price Waterhouse Int'l*, Case No. 03-23044-Civ., 2007 WL 983263 , at *10 (S.D. Fla. 2007) (relying on *In re Cascade Int'l Sec. Litig.*, 840 F. Supp. 1558).

*Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 499 (S.D. Fla. 1996).

Moreover, BDO's conduct occurred outside the contractual relationship governed by the audit engagement letter between Bankest and BDO Seidman.  BDO's actions were not just a mere breach of contract, but, rather, affirmative, intentional acts assisting the Capital Officers in carrying out their fraud on Bankest.  Such acts are not governed by the "economic loss" doctrine. *See Ishii v. Welty*, 1998 WL 1064846 (M.D. Fla. 1999).

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment should be denied.

Dated:  September 16, 2008

                                   Respectfully submitted,

                                   THOMAS, ALEXANDER & FORRESTER LLP
                                   Co-Counsel for Plaintiff
                                   14 27th Avenue
                                   Venice, CA 90291
                                   Tel:  (310) 961-2536
                                   Fax: (310) 526-6852

                                   and

                                   WARREN R. TRAZENFELD, PA
                                   Co-Counsel for Plaintiff
                                   3225 Aviation Avenue, Suite 600
                                   Miami, FL 33133-4741
                                   Tel.  (305) 860-1100
                                   Fax. (305) 858-6123

                                   and

GENOVESE JOBLOVE & BATTISTA, P.A.
Co-Counsel for Plaintiff
Bank of America Tower, Suite 4400
100 Southeast Second Street
Miami, FL 33131
Tel. (305) 349-2300
Fax. (305) 349-2310


By: _____ /s/ Allison R. Day _____
           Paul J. Battista, Esq.
           Florida Bar No. 884162
           Allison R. Day, Esq.
           Florida Bar No. 494097




## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by U.S. mail, postage prepaid, over-night mail, hand-delivery and/or electronic mail upon all parties on the attached Service List, this 16th day of September, 2008.


By: _____ /s/ Allison R. Day _____
           Allison R. Day

## Service List

Daniel A. Miller, Esq.
Broad & Cassel
One North Clematis Street, Suite 500
West Palm Beach, FL 33401

Kevin W. Goering, Esq.
Lisa M. Lewis, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
30 Rockefeller Plaza, 24th Floor
New York, NY 10112

John B. Hutton, Esq.
Greenberg Traurig, P.A.
1221 Brickell Ave.
Miami, FL 33131

Karen Y. Bitar, Esq./Adam D. Cole, Esq.
Greenberg Traurig, P.A.
885 Third Ave.
New York, NY 10166

Daniel F. Blonsky, Esq.
Burlington, Weil, Schweip, Kaplan & Blonsky, P.A.
Office in the Grove, Penthouse A
2699 South Bayshore Drive
Miami, FL 33133

Office of the U.S. Trustee
51 S.W. First Ave., Room 1204
Miami, FL 33130

Rhett Traband, Esq.
Mark Raymond, Esq.
Broad and Cassel
One Biscayne Tower
21st Floor
2 S. Biscayne Blvd
Miami, Florida 33131

Daniel L. Gold, Esq.
800 Brickell Ave # 902
Miami, FL 33131