# Exhibit 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA



US BANKRUPTCY COURT
SO DISTRICT OF FLA

SEP 1 4 2005

FILED _____ RECEIVED _____

In re:

E.S. BANKEST, L.C.,

    Debtor.

Case No. 04-17602-BKC-AJC
Chapter 11

## OPINION (1) GRANTING JOINT MOTION OF LEWIS B. FREEMAN AND BANCO ESPIRITO SANTO INTERNATIONAL , LTD. FOR FINAL SUMMARY JUDGMENT DISALLOWING CLAIMS FILED BY BDO SEIDMAN, LLP, AND (2) DENYING BDO SEIDMAN, LLP'S MOTION FOR SUMMARY JUDGMENT

On August 2, 2005, the Court entered an Opinion and Judgment granting Summary Judgment to Lewis B. Freeman and Banco Espirito Santo International, LTD, disallowing the claims of BDO Seidman, LLP, and denying BDO Seidman LLP's Motion for Summary Judgment. Because the proposed order and judgment had not been circulated to the Defendant (a mistake for which I assume responsibility), the Court vacated its Order and Judgment on August 8, 2005. In addition, after a hearing, the Court granted BDO Seidman LLP time to submit its competing order and memorandum in support. Lewis B. Freeman and Banco Espirito Santo International, LTD, filed their reply and the matter is now ripe for adjudication. Having consider BDO Seidman LLP's position, the Court has decided to reissue its original opinion and judgment as set for hereafter.

Came before the Court upon the (1) Joint Motion of Lewis B. Freeman and Banco Espirito Santo International, Ltd. for Final Summary Judgment Disallowing Claims filed by BDO Seidman, LLP and Supporting Memorandum of Law (the "Joint S/J Motion") [C.P. #284]; (2) BDO Seidman, LLP's Memorandum of Law in Opposition to Motion for Summary Judgment (the "Response") [C.P. #300]; (3) BDO Seidman, LLP's Motion for Summary Judgment and Memorandum of Law in

1

Support Thereof (the "BDO S/J Motion") [C.P. #285]; (4) Lewis B. Freeman and Banco Espirito Santo International, Ltd.'s Opposition to BDO Seidman, LLP's Motion for Summary Judgment (the "Opposition") [C.P. #298]; (5) BDO Seidman, LLP's Statement of Uncontested Facts in Support of Motion for Partial Summary Judgment (the "BDO SUF") [C.P. #286]; (6) BDO Seidman, LLP's Response to the Custodian's And BESIL's Statement of Uncontested Facts (the "BDO Response") [C.P. #299], and (7) Joint Response by Lewis B. Freeman and Banco Espirito Santo International, Ltd. To BDO Seidman, LLP's Statement of Uncontested Facts (the "Joint Response") [Exhibit E to Opposition] (collectively, the "Summary Judgment Pleadings").

The parties filed the Summary Judgment Pleadings pursuant to this Court's April 5, 2005 Scheduling Order. Through the Joint S/J Motion, Lewis B. Freeman ("Freeman"), in his capacity as custodian excused from turnover for E.S. Bankest, L.C. ("Bankest" or the "Debtor"), and Banco Espirito Santo International, Ltd. ("BESIL") seek entry of an Order (i) sustaining Freeman's Objection to Claims Filed by BDO [C.P. #181] and BESIL's Objection to Claims Filed by BDO [C.P. #179] (collectively, the "Objections"), and (ii) disallowing Claim Numbers 16 and 17 filed by BDO (collectively, the "Claim") pursuant to 11 U.S.C. § 502(e)(1)(B) and other grounds. In addition to the Summary Judgment Pleadings, the Court has also considered the Objections and BDO Seidman, LLP's Combined Response to the Claim Objections of the Custodian and Banco Espirito Santo International, Ltd. (the "Combined Response"). [C.P. #249] Through the BDO S/J Motion, BDO seeks entry of an Order granting partial summary judgment in its favor on its fraud, breach of contract and indemnity claims with the remaining determination of the entire value of its Claim reserved for estimation. The parties have taken substantial discovery relevant to the Summary Judgment Pleadings, including taking numerous depositions and requesting and receiving documents. No party

2

filed a Rule 56(f) affidavit requesting more discovery.

The Court, having reviewed the Summary Judgment Pleadings, the Objections, the Combined Response, the record in the main case, and being otherwise fully advised in the premises, finds that summary judgment on the Objections to the Claim of BDO Seidman, LLP ("BDO") filed by Freeman and BESIL (collectively, Freeman and BESIL shall be referred to as the "Movants") should be and will be **GRANTED,** and BDO's S/J Motion should be and will be **DENIED,** for the reasons set forth in detail below.

In sum, the Court finds the following independent grounds for summary judgment in favor of the Movants: (i) Section 502(e)(1)(B) of the Bankruptcy Code precludes BDO's Claim as a matter of law; (ii) the terms of the Engagement Letters (as hereinafter defined) between BDO and the Debtor preclude BDO's Claim as a matter of law; and (iii) the underlying theories asserted by BDO as a basis for its Claim do not support the allowance of the Claim as a matter of law. In reaching its conclusion hereunder, the Court finds that there are no genuine issues of material fact precluding summary judgment in favor of the Movants.

## STATEMENT OF FACTS

### Background

1. Bankest's business was purported to be the "factoring" of accounts receivable. Joint S/J Motion, ¶ 1; *see* BDO Response, ¶ 1.

2. Prior to September 2002, Bankest Capital Corporation ("Bankest Capital") owned 50% and Espirito Santo Bank owned 50% of Bankest. BDO SUF ¶¶ 2-3.

3. BESIL acted as collateral agent (the "Collateral Agent") for various purchasers of Bankest Debenture Notes. Joint S/J Motion, ¶ 2; *see* BDO SUF, ¶ 12.

3

4.    BESIL and Bankest were parties to a master credit agreement dated on or about April of 1998 (the "Master Credit Agreement"). Joint S/J Motion, ¶ 3; BDO Response, ¶ 3.

5.    Bankest issued Confidential Memoranda or Private Placement Memoranda (the "PPMs") in connection with the issuance of Debenture Notes to prospective lenders. Exhibits 3-5 to Joint S/J Motion.

6.    Pursuant to the PPMs, Bankest issued Debenture Notes which were to be secured by, *inter alia,* the accounts receivable to be purchased by Bankest with the loan proceeds.  Joint S/J Motion, ¶ 6; *see* BDO SUF, ¶ 11; BDO Response ¶¶ 4, 6.

7.    Pursuant to the Master Credit Agreement, Bankest promised, among other things, to pay periodic interest under the Debenture Notes to the purchasers thereof and to repay the principal thereof at maturity. Joint S/J Motion, ¶ 7; BDO Response, ¶ 7.

8.    On February 4, 2002, Bankest executed and delivered to the Nassau Bank a certain Credit Agreement (the "Credit Agreement") whereby the Nassau Bank agreed to make certain loans to Bankest for use in its factoring business.  Joint S/J Motion, ¶ 9; BDO Response, ¶ 9.

9.    BESIL also acted as the Collateral Agent for the Nassau Bank pursuant to the Credit Agreement and related loan documents.  Joint S/J Motion, ¶ 10; *see* BDO SUF, ¶ 12.

### Bankest Retains BDO to Act as Its Auditors and Includes Audited Financial Statements in Private Placement Memoranda

10.    · Shortly after its formation, Bankest retained BDO to audit its financial statements of December 31, 1998 (the "January 22, 1999 Engagement Letter").  Exhibit 6 to Joint S/J Motion.

11.    The January 22, 1999 Engagement Letter does not contain any indemnity language or provision from Bankest in favor of BDO.  Exhibit 6 to Joint S/J Motion.

12.    Thereafter, by letter agreements prepared by BDO and dated October 20, 1999, January 16, 2001, and December 4, 2001, Bankest retained BDO to perform audits of Bankest's Financial Statements for the years 1999, 2000, and 2001 respectively (collectively, the "Engagement Letters"). Composite Exhibit 2 to Joint S/J Motion; *see* BDO Response, ¶ 17.

13.    The Engagement Letters state in pertinent part that "provided the audited financial statements and our report thereon are <u>not</u> included . . . in a Private Placement Memorandum, E.S. Bankest, LLC agrees to release and indemnify BDO Seidman, LLP and its personnel from any liability and costs  relating to our services under this agreement attributable to any misrepresentations by management"; that BDO agreed to "examin[e], on a test basis, evidence supporting the amounts and disclosures in the financial statements" and that its "work will be based primarily upon selected tests of evidence"; and that BDO agreed to "to design [its] audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements." Composite Exhibit 2 to Joint S/J Motion (emphasis added).

14.    BDO's Audited Financial Statements of Bankest done pursuant to the Engagement Letters for year ended 1999, 2000 and 2001 were included in the PPMs issued respectively in January 2001, July 2001 and July 2002. *See* Exhibits 3-5 to Joint S/J Motion. The Court makes no finding as to whether other PPMs attached audited financials.

### BDO Gets Sued for Audit Failure

15.    On May 18, 2004, BESIL, Finance Ltd. and the Nassau Bank commenced litigation against BDO and BDO International B.V. in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No. 04-11128 CA 31 (the "BDO Litigation"). Exhibit 7 to Joint S/J Motion; Joint S/J Motion, ¶ 20; BDO Response, ¶ 20.

16. In the BDO Litigation, BESIL, Finance Ltd. and the Nassau Bank allege that BDO committed professional negligence in connection with its audits of Bankest. Exhibit 7 to Joint S/J Motion; Joint S/J Motion, ¶ 21; BDO Response, ¶ 21.

17. In connection therewith, BESIL, Finance Ltd. and the Nassau Bank seek damages against BDO in an amount not less than $170 million. Exhibit 7 to Joint S/J Motion; Joint S/J Motion, ¶ 22; BDO Response, ¶ 22.

18. On July 19, 2004, BDO filed an answer and affirmative defenses in the BDO Litigation denying the allegations asserted by BESIL, Finance Ltd. and the Nassau Bank and raising a number of defenses, including, without limitation, statute of limitations, failure to mitigate, contributory negligence, intervening causes, lack of privity, comparative negligence, assumption of risk, and *in pari delicto*. Joint S/J Motion, ¶ 23; BDO Response, ¶ 23.

19. On August 23, 2004, BDO amended its answer to include additional detail in respect of its affirmative defenses. Joint S/J Motion, ¶ 24; BDO Response, ¶ 24.

20. In addition, BDO has filed an Amended Third Party Complaint in the BDO Litigation against Victor Balestra, Bernard Mollet, Joaquim Garnecho, Pierre Trezzini, Eduardo Orlansky, Hector Orlansky, R. Peter Stanham, Dominick Parlapiano, Carlos E. Mendez, Adriana Puerto and Otto Ambrosiani. Exhibit 8 to Joint S/J Motion; Joint S/J Motion, ¶ 25; BDO Response, ¶ 25.

21. In the Amended Third Party Complaint, BDO seeks contribution from such third- party defendants, asserts a claim of negligence against such third-party defendants, seeks indemnity from such third-party defendants and asserts a fraud claim against some of the third-party defendants. Exhibit 8 to Joint S/J Motion; Joint S/J Motion, ¶ 26; BDO Response, ¶ 26.

6

22. The BDO Litigation and the related Amended Third Party Complaint are still pending.
Joint S/J Motion, ¶ 27; BDO Response, ¶ 27.

### The Receivership and Bankruptcy Proceedings

23.    On or about August 6, 2003, BESIL commenced an action in the United States District Court for the Southern District of Florida against Bankest, Case No., 03-22112-CIV-HUCK/TURNOFF. Joint S/J Motion, ¶ 28; BDO Response, ¶ 28.

24.    On August 13, 2003, Freeman was appointed receiver over the assets of Bankest by order of the District Court. Joint S/J Motion, ¶ 29; BDO Response, ¶ 29.

25.    On January 30, 2004, BESIL filed its Second Amended Complaint against Bankest. Joint S/J Motion, ¶ 30; BDO Response, ¶ 30.

26.    On June 9, 2004, the District Court entered a Consent Judgment. Joint S/J Motion, ¶ 31; BDO Response, ¶ 31.

27.    Pursuant to the Consent Judgment, BESIL was awarded damages against Bankest and certain affiliates in the amount of $160 million, was determined to have a perfected first priority security interest in the Collateral, as alleged in the Third Amended Complaint, and was awarded a final judgment of foreclosure. BDO S/J Motion, Exhibit F.

28.    On December 20, 2004, BESIL filed Proofs of Claim as Collateral Agent for the Holders of the Notes and their successors and for Nassau Bank in the Debtor's estate. Joint S/J Motion, ¶ 33; BDO Response, ¶ 33.

29.    On December 28, 2004, BDO filed its Claim in the Bankest chapter 11 case. Exhibit 9; Joint S/J Motion, ¶ 34; BDO Response, ¶ 34.

7

# CONCLUSIONS OF LAW

## I.    The Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), as incorporated herein by Federal Rule of Bankruptcy Procedure 7056 and 9014(c), summary judgment shall be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Supreme Court has reaffirmed the vitality of summary judgment as a method for the just, speedy and inexpensive disposition of cases. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  *Accord Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).

An issue of fact is "material" only if it is a legal element of the claim under the applicable substantive law that might affect the outcome of the case. *See Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997).  It is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id.*

Once the moving party identifies those portions of the record that demonstrate the absence of a genuine issue of material fact, any party opposing summary judgment must come forward with "specific facts showing a genuine issue for trial," and may not rely on mere allegations or denials. *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 256-57; *Martin v. Commercial Union Ins. Co.,* 935 F.2d 235, 238 (11th Cir. 1991).  The non-movant must do so by admissible evidence, not by supposition, conjecture or evidence that will not be admissible at trial. *Celotex,* 477 U.S. at 317.  If the record as a whole could not lead a rational finder of fact to find for the non-moving party, then there is no genuine issue of fact precluding summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Tyson Foods,* 121 F.3d at 646.

**II.     BDO's Claim is Disallowed Pursuant to 11 U.S.C. § 502(e)(1)(B) as a Matter of Law**

Section 502(e)(1)(B) of the Bankruptcy Code provides as follows:

> Notwithstanding subsections (a), (b) and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor or has secured the claim of a creditor, to the extent that - . . . such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution.

11 U.S.C. § 502(e)(1)(B). Section 502(e)(1)(B) of the Bankruptcy Code "epitomizes a considered Congressional policy that underlies the Bankruptcy Code as a whole, and Chapter 11 in particular: that is, the bankrupt's estate should not be burdened by estimated claims contingent in nature." *In re The Charter Co.*, 862 F.2d 1500, 1502 (11th Cir. 1989). Another policy advanced by the statute is to accord "fair treatment to creditors by paying ascertainable claims as quickly as possible." *Id.* Moreover, it precludes reimbursement and contribution claims from "double dipping" into the assets of the estate. *See In re Hemingway Transport, Inc.*, 993 F.2d 915 (1st Cir. 1993); *In re Lull Corp.*, 162 B.R. 234 (Bankr. D. Minn. 1993). The "natural reading of this language demonstrates that Congress intended to exclude claims where the claimant and the debtor are jointly liable to a third party." *In re Allegheny Int'l, Inc.*, 126 B.R. 919, 922 (W.D. Pa. 1991).

Section 502(e)(1)(B) cannot be read narrowly for several reasons, including: "(1) Duplicative claims covering the same liability could otherwise be allowed; (2) The claims of the indemnitors or contributors are simply too contingent to be allowed; and (3) . . . a debtor's estate containing numerous contingent claims subject to indemnity or contribution would otherwise be impossible to administer because huge, indeterminate sums might have to be reserved to cover such claims if they would materialize in the future." *In re Amatex Corp.*, 110 B.R. 168, 171 (Bankr. E.D. Pa. 1990).

Courts have adopted the following three-part test to determine whether section 502(e)(1)(B) applies to a particular claim: (i) the claim must be one for reimbursement or contribution; (ii) the entity asserting the claim for reimbursement or contribution must "be liable with the debtor" on the claim of a creditor; and (iii) the claim must be contingent at the time of its allowance or disallowance. *In re Drexel Burnham Lambert Group, Inc.*, 146 B.R. 92, 95 (Bankr. S.D.N.Y. 1992) (citing *In re Wedtech Corp.*, 85 B.R. 285 (Bankr. S.D.N.Y. 1988)) ("*Wedtech I*"); *see also In re Provincetown-Boston Airlines, Inc.*, 72 B.R. 307, 309 (Bankr. M.D. Fla. 1987) (utilizing three-part test).

A.      **Claim for Reimbursement or Contribution**

With respect to the first prong of the *Drexel* test, claims for "reimbursement" or "contribution" under section 502(e)(1)(B) include claims for indemnification because "the concept of reimbursement includes indemnity." *Drexel*, 146 B.R. at 95; *see also In re The Charter Co.*, 81 B.R. 644 (M.D. Fla. 1987), *aff'd*, 862 F.2d 1500 (11th Cir. 1989); *In re Pettibone Corp.*, 110 B.R. 837 (Bankr. N.D. Ill. 1990). In this case, BDO's Claim is one for reimbursement or contribution within the meaning of the statute, and its characterization of the Claim as based on contractual indemnification or common law indemnification fits squarely within the purview of the first prong of the *Drexel* test. However, BDO tries to avoid the effect of section 502(e)(1)(B) by also calling its Claim one for breach of contract and fraud. Notwithstanding BDO's attempt to "fasten a variety of tags to" the basis for the Debtor's alleged liability to BDO, the Claim clearly is encompassed within section 502(e)(1)(B) and the first prong of the *Drexel* test related thereto. *See In re Wedtech Corp.*, 87 B.R. 279, 287-88 (S.D.N.Y. 1988) ("*Wedtech II*").

In *Wedtech II*, the bankruptcy court was faced with a factual situation almost identical to the present case. In *Wedtech II*, the debtor's former accountants were the subject of lawsuits for, among

10

other things, securities law violations, common law fraud and malpractice. *Wedtech II*, 87 B.R. at

282. As here, the accounting firm filed a proof of claim against the debtor for reimbursement of any

monies that the accounting firm might ultimately have to pay as a result of any judgments arising from

such lawsuits. *Id.* As here, the proof of claim filed by the accounting firm alleged fraud,

misrepresentation and breach of contract against the debtor arising out of the debtor's engagement

of the accounting firm. *Id.* As here, the debtor objected to the claims of the accounting firm and

sought their disallowance under section 502(e)(1)(B) of the Bankruptcy Code.

In analyzing whether the claims asserted by the accounting firm for fraud and breach of

contract fell within the purview of "reimbursement" for purposes of section 502(e)(1)(B) of the

Bankruptcy Code, the court concluded that the use of the word "reimbursement" is a "broad word

which encompasses whatever claims a co-debtor has which would entitle him to be made whole for

monies he expended on account of a debt for which he and the debtor are both liable." *Id.* at 287.

The *Wedtech II* court then specifically rejected the accounting firm's "creative arguments" that

"its direct claims for fraud and breach of contract are outside the ambit of section 502(e)(1)(B)" as

follows:

> Although KMG fastens a variety of tags to its claims against Wedtech, the claims all
> seek reimbursement for monies to be expended by KMG in its defense and in
> satisfying its liability to the various plaintiffs in the Civil Actions. The use of the word
> "reimbursement" in the statute cannot be viewed as accidental. It is a broad word
> which encompasses whatever claims a codebtor has which entitle him to be made
> whole for monies he has expended on account of a debt for which he and the debtor
> are both liable. Had Congress meant to limit section 502(e)(1)(B) to claims for
> indemnification, it could easily have said so. To hold that KMG's direct claims for
> fraud and breach of contract seeking the same relief as the claims for indemnity
> or contribution are not claims for reimbursement would emasculate section
> 502(e)(1)(B); in very many cases a codebtor's claim can be recast as a 'direct'
> claim for fraud or breach of contract.

11

*Wedtech II*, 87 B.R. at 287 (emphasis added). The *Wedtech II* court thus held that the accounting

firm's fraud and breach of contract claims were included within the ambit of and barred by section

502(e)(1)(B) of the Bankruptcy Code. *See id.*

      This Court rejects BDO's attempt to do what the *Wedtech II* court and section 502(e)(1)(B)

specifically disallow. BDO is attempting to recast its indemnity, reimbursement and contribution

claims as claims for fraud and breach of contract. Such alleged fraud and breach of contract claims

seek the same relief as the indemnity and reimbursement claims asserted by BDO, namely to be

reimbursed for the damages and costs in, related to or as a result of the BDO Litigation. This is not

contested; BDO admits this. *See* Ex. 1 to Joint S/J Motion, at 103-06; Ex. 9 to Joint S/J Motion.

      As a result, the fraud and breach of contract theories of liability asserted by BDO against the

Debtor in the BDO Claim are also squarely within the scope of section 502(e)(1)(B) and the first

prong of the *Drexel* test thereunder. *See Wedtech II*, 87 B.R. at 287-88 (rejecting accounting firm's

claims for fraud and breach of contract as reimbursement claims covered under section 502(e)(1)(B));

*In re Babcock & Wilcox Co.*, 316 B.R. 62, 69-70 (Bankr. E.D. La. 2003) (rejecting claimant's

attempt to disguise reimbursement and contribution claim as a claim for diminution of value of the

property); *see also In re Eagle-Picher Indus., Inc.*, 131 F.3d 1185 (6th Cir. 1997).

### B. Requirement of Being Liable with the Debtor

      Section 502(e)(1)(B) of the Bankruptcy Code provides, in part, that the court shall disallow

a claim for reimbursement or contribution of an entity that, among other things, is "liable with the

debtor on . . . the claim of a creditor . . . ." 11 U.S.C. § 502(e)(1)(B). The "phrase 'an entity that is

liable with the debtor' is broad enough to encompass any type of liability shared with the debtor,

whatever its basis." *In re Matter of Baldwin-United Corp.*, 55 B.R. 885, 890 (Bankr. S.D. Ohio

1985) (emphasis added); *see also Eagle-Picher*, 131 F.3d at 1185; *Pettibone*, 110 B.R. at 837. That is, for purposes of section 502(e)(1)(b), the "legal theory **underpinning that shared responsibility is irrelevant,**" *Eagle-Picher*, 131 F.3d at 1190 (emphasis added). Accordingly, a claim for reimbursement "has been held to presuppose a co-debtor relationship." Lawrence P. King, 4 <u>Collier on Bankruptcy</u>, ¶ 502.06[2][b], at 502-61 (15th ed. rev. 2003).

BDO seeks to avoid the second prong of section 502(e)(1)(B) by arguing that the liability of the Debtor and BDO to BESIL are based on different theories. BDO argues that the Debtor is liable to BESIL based on its contractual liability under the Debenture Notes, while BDO is contingently liable for professional malpractice. As the statute and applicable case law make clear, this argument misses the mark.

Moreover, the specific language of section 502(e)(1)(B) is clear and unambiguous in that it requires only that the claimant be liable "with the debtor" on the claim of a creditor. Section 502(e)(1)(B), by its plain terms, does not require that the theory of liability of the debtor to a creditor be the identical theory of liability that is asserted by such creditor against the entity seeking indemnity or contribution from the debtor. *See Pension Benefit Guaranty Corp. v. White Motor Corp.*, 731 F.2d 372 (6th Cir. 1984) (PBGC was a codebtor even though liability arose from source different from that of the debtor). If Congress intended section 502(e)(1)(B) to be limited to liability based on identical legal theories, then it could easily have drafted this section accordingly. *See, e.g., Baldwin-United*, 55 B.R. at 890.

In *Drexel*, the FDIC alleged that a former director illegally siphoned assets from a savings and loan association in a lawsuit which Drexel was named on a *respondeat superior* theory. *Drexel, supra*, 146 B.R. at 94. The former director filed an indemnity claim against Drexel based on a

13

provision of Drexel's by-laws which provided indemnity to its officers and directors. The court, in response to Drexel's objection to such proof of claim based on section 502(e)(1)(B), concluded that Drexel was liable with the director to the FDIC irrespective of the fact that the theory of liability asserted by the FDIC against the director was different than the theory of liability asserted by the FDIC against Drexel. In fact, the director argued unsuccessfully to the court that section 502(e)(1)(B) was intended to prevent solely the assertion of identical claims against the debtor from the creditor in question and the entity also liable to such creditor. The court considered this argument and rejected it. *Id.* at 96.

Moreover, as set forth above, in *Wedtech II*, the accounting firm argued that section 502(e)(1)(B) did not apply because it applied only to claims on which the entity seeking indemnity was contractually liable with the debtor on the claim of the creditor. In rejecting this argument, the court concluded that section 502(e)(1)(B) "disallow[ed] the claim of 'an entity that is liable with the debtor,' not merely an entity that is contractually liable with the debtor." *Wedtech II*, 87 B.R. at 283 (quoting *Baldwin-United*, 55 B.R. at 890). Further, had "Congress intended to limit the section to contractual claims it could easily have written 'entity that is *contractually* liable with the debtor.'" *Baldwin-United*, 55 B.R. at 890 (italics in original). As a result, the court in *Wedtech II* held that section 502(e)(1)(B) applied to disallow the claims of the auditors. *Id.* at 284; *see also Baldwin-United*, 55 B.R. at 890; *Provincetown-Boston Airlines*, 72 B.R. at 309.

In *In re American Continental Corp.*, 119 B.R. 216 (D. Ariz. 1990), the court was faced with a fact situation very similar to the present case. Specifically, the debtor sought to disallow the proof of claim of Arthur Young & Company ("Arthur Young"), the debtor's accountant, for damages that Arthur Young might sustain in third party litigation related to the debtor's engagement of it. The

14

proof of claim in question sought both damages in excess of $400 million and defense costs expended in excess of $2 million. In disallowing the claim filed by Arthur Young in its entirety under section 502(e)(1)(B), the court concluded that in "the last analysis, however, Arthur Young's claims against [the debtors] arise out of third party lawsuits grounded in allegations of joint wrongdoing. This is sufficient to constitute a claim by an 'entity that is liable with the debtor' within the meaning of section 502(e)(1)(B)." *Id.* at 219.

In *Lull Corp.*, the court addressed the issue of co-liability with the debtor under section 502(e)(1)(B) in the context of whether a workers' compensation fund created by state law, which was called the Minnesota Self-Insurers' Security Fund ("MSISF"), was liable with the debtor on the payment of workers' compensation claims. *Lull Corp.*, 162 B.R. at 235. In that case, MSISF was liable to employees for workers' compensation claims based on Minn. Stat. § 79A (1992). However, the debtor's liability to such employees arose under a different statute, namely Minn. Stat. § 176.021 (1992). The question considered by the court was "whether both Debtor and MSISF are legally obligated to pay the employees for workers' compensation benefits." *Lull Corp.*, 162 B.R. at 237. Notwithstanding such different theories of liability to the employees, the court concluded that MSISF and the debtor were co-liable to the employees.

The majority of the courts that have addressed the "co-liability" issue under section 502(e)(1)(B) have concluded that the theory of liability asserted by the creditor, BESIL, against the Debtor, Bankest, does not need to be the same theory of liability that the creditor, BESIL, asserts against the entity, BDO, making a contingent claim against the Debtor. For BDO to be liable "with the debtor," there simply needs to be shared responsibility, whatever the basis. Moreover, BESIL seeks the same damages from BDO and Bankest, namely the $170 million it loaned to the Debtor.

15

In addition, the Court finds under the facts of this case that the Defense Costs (as hereinafter defined) are so interdependent with the underlying indemnity claims of BDO that they also come within the scope of section 502(e)(1)(B). *See Drexel, supra,* 146 B.R. at 97; *see also American Continental, supra;* Part II(C)(ii), *infra.* Based on the foregoing and the undisputed facts in this case, BDO is "liable with" with the Debtor on the claims of BESIL within the meaning of section 502(e)(1)(B).

Revealingly, BDO, as part of its Claim, asserts that it is entitled to contribution from the Debtor. Contribution is "a concept clearly associated with the law of torts." *See Wedtech II,* 87 B.R. at 283. In addition, by "its very nature a claim for contribution presupposes a sharing of liability and thus a codebtor relationship." *Baldwin-United,* 55 B.R. at 891. BDO cannot, and the Court will not, simply ignore that BDO has asserted a "contribution" claim against the Debtor, or the legal import of such assertion.

Moreover, to allow BDO's Claim would amount to "double dipping" against Bankest's estate, which would contravene the clear Congressional policies behind section 502(e). BESIL already has asserted a claim against the Debtor for in excess of $170 million. If both BESIL's and BDO's Claim were to be allowed, then the same claim would be asserted against the Debtor for essentially the same monies alleged to be owed, thereby resulting in "double dipping."

Based on the foregoing, BDO's strained and inconsistent interpretation of "liable with the debtor" under section 502(e)(1)(B) would completely emasculate its force and effect and the Bankruptcy Code's desire to minimize estimated claims that are contingent in nature. *Charter Co.,* 862 F.2d at 1502. The law, the undisputed facts and policy considerations discussed above all mandate the conclusion that BDO is "liable with the Debtor," thereby satisfying the second prong of the *Drexel* test under section 502(e)(1)(B) of the Bankruptcy Code.

16

**C.    Contingent Nature of BDO's Claim**

The third and final part of the *Drexel* test under section 502(e)(1)(B) is also satisfied in the present case because the Claim of BDO against the Debtor is contingent in nature. Simply stated, there has been no adjudication by any court, including in the BDO Litigation, of BDO's liability to BESIL, which liability is the central basis for BDO's Claim against the Debtor and which liability is contested by BDO. The BDO Litigation, including the claims asserted by BDO in the Amended Third Party Complaint, remain pending.

(i)    *BDO Admits that $170 million of its Claim is contingent*

BDO admits in its Claim that all but $4 million of the $174 million sought in its Claim is contingent in nature. Exhibit 9 to Joint S/J Motion. The Court agrees and holds that the $170 million portion of BDO's claim that it asserts depends on the outcome of the BDO Litigation is contingent.

(ii)    *The Defense Costs are Not Owed as a Matter of Contract, Statute or Common Law But are in Any Event Contingent Because The Basis for Them Has Not Been Adjudicated*

BDO asserts that its defense costs of at least $4 million are fixed and non-contingent because they are being presently incurred by BDO in the defense of the BDO Litigation or in responding to third party subpoenas from the Receiver and the Government (the "Defense Costs"). BDO claims that it has already expended $2 million and that it expects to expend an additional $2 million in Defense Costs. BDO asserts that the Defense Costs are owed as a matter of contract law under its Engagement Letters or as damages under the fraud characterization of its Claim. BDO does not assert that such Defense Costs are allowable by statute.

First, as discussed more fully below (*see* Part III, *infra*), the Defense Costs are not owed as a matter of contract because the plain language of the Engagement Letters preclude them. The

17

Engagement Letters provide for indemnity only where BDO's audits are *not* attached to a PPM, but in this case the audits *were* attached to PPMs. As a result, the Court need not examine whether the Defense Costs based on contract are contingent because they are not an allowable part of BDO's Claim in the first instance.

Second, even if the Defense Costs somehow were allowable as a matter of contract in this case, then they would still be contingent because they depend on the outcome of a tort claim. *In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980) ("In the case of a tort claim for negligence, the parties at the time of the alleged negligent act would be presumed to have contemplated that the alleged tortfeasor would be liable only if it were so established by a competent tribunal. Such a tort claim is contingent as to liability until a final judgment is entered fixing the rights of the parties."), *aff'd,* 646 F.2d 193 (5th Cir. 1981); *In re Elsub Corp.,* 70 B.R. 797, 808 (Bankr. D. N.J. 1987) ("'Tort claims have been considered contingent because they require proof by the plaintiff creditor of the debtor's liability and the amount of damages are, by their very nature, not fixed unless and until a judgment is entered setting the debtor's liability.'") (quoting *In re Blehm,* 33 B.R. 678, 679-80 (Bankr. D. Colo. 1983)). In the BDO Litigation, BDO asserts an affirmative defense that its losses were attributable to misrepresentations of management and then claims Defense Costs under the Engagement Letters which permit indemnity where, *inter alia,* costs are "attributable to misrepresentations of management." Thus, the State court must determine whether this assertion is true before any liability could attach to the Debtor.  Until such time, the Defense Costs are contingent.

The same reasoning applies if BDO's Defense Costs arise out of its characterization of its Claim as one for fraud.  First, as set forth below (*see* Part IV, *infra*), BDO's fraud claim fails as a

matter of law. As a result, the Court need not examine whether the Defense Costs based on fraud are contingent because they are not an allowable part of BDO's Claim in the first instance.

Second, even if BDO's fraud claim is allowable, then it would still be contingent. The Defense Costs must be "the natural and necessary consequences of the defendant's fraudulent act." *Howard v. Crawford and Co.*, 384 So. 2d 1326, 1328 (Fla. 1st DCA 1980). The Defense Costs must also be proximately and necessarily caused by the act of the defendant complained of by the plaintiff. *See Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999). The underlying basis for the Defense Costs -- findings on the fraud claim in favor of BDO -- are necessarily contingent until such findings have been made and, therefore, the Defense Costs are contingent. *See In re All Media Properties*, 5 B.R. at 133; *In re Elsub Corp.*, 70 B.R. at 808.

Moreover, BDO's General Counsel, who signed the Claim, testified under oath that the only components of the Claim were costs and potential liability in the BDO Litigation. BDO cannot create an issue of fact by having its General Counsel contradict her sworn testimony with an affidavit attached to the BDO Response wherein she now claims entitlement to costs incurred outside the BDO Litigation. *See, e.g., McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1240 n. 7 (11th Cir. 2003) ("[W]e may disregard an affidavit submitted solely for the purpose of opposing summary judgment when that affidavit is directly contradicted by deposition testimony.").

Other accounting firms have unsuccessfully advanced similar claims for defense costs. In *American Continental, supra*, Arthur Young claimed that its defense costs were not contingent. The court concluded that "whether Arthur Young could actually compel these debtors to reimburse defense costs depends upon future events the occurrence of which is uncertain." *Id.* (citing *In re The Charter Company*, 862 F.2d 1500 (11th Cir. 1989)). Moreover, the "interdependence between [the

19

claimant's] Defense Costs and the underlying motion for indemnification places all of [the claimant's] claims under the umbrella of §502(e)(1)(B)." *In re Drexel Burnham Lambert Group, Inc.*, 148 B.R. 982, 989 (S.D.N.Y. 1992) (quoting *In re Drexel Burnham Lambert Group, Inc.*, 146 B.R. 92, 97 (S.D.N.Y. 1992)).

## III.   Independent of Section 502(e)(1)(B), BDO's Indemnity Claims Are Disallowed Based on the Express Terms of the Engagement Letters and Applicable Law

Pursuant to the express terms of the Engagement Letters, "**provided the audited financial statements and our report thereon are not included . . . in a Private Placement Memorandum,** E.S. Bankest, LLC agrees to release and indemnify BDO Seidman, LLP and its personnel from any **liability and costs  relating to our services under this agreement attributable to any misrepresentations by management.**" (Emphasis added). Thus, the Engagement Letters provide that the Debtor is not liable to BDO on its contractual indemnity claim under two, separate grounds. Applicable law provides a third, independent ground that disallows BDO's contractual indemnity claim — BDO has no contract damages.

*First*, the Engagement Letter provides for *no* indemnity where BDO's Audited Financial Statements were attached to the PPMs. They were. *See* Exhibits 3-5 to Joint S/J Motion. As a result, under the plain language of the Engagement Letters, BDO has no indemnity claim against the Debtor, whether for $170 million in damages or for $4 million in Defense Costs.

In its Response, BDO asserts that the "audited financial statements were, in fact, not attached to the PPMs." Response at ¶ 35. As is evidenced by Exhibits 3-5 to the Joint S/J Motion, the undisputed facts demonstrate otherwise. The two PPMs referred to in BDO's Response were the first two issued by Bankest, neither of which, as set forth above, was the subject of a contractual

20

indemnity between BDO and Bankest because the original January 22, 1999 Engagement Letter did not contain a contractual indemnity.

BDO also argues that there is no proof that the PPMs were ever used by or provided to purchasers of the Debenture Notes. This is irrelevant. Whether or not purchasers of the Debenture Notes ever used or were provided the PPMs in connection with their purchases of the Debenture Notes is not a requirement of the express, unambiguous terms of the Engagement Letters, documents drafted by BDO.

Similarly, BDO's argument that the Engagement Letters require that the PPMs could not be used unless they were first submitted to BDO for review and approval also is not a condition to the effectiveness of the contractual indemnity. BDO can litigate that point in defending the BDO Litigation, but it is not a condition that would resurrect the contractual indemnity under the specific terms of the indemnity language in the Engagement Letters.

*Second*, BDO is not being sued in the BDO Litigation for anything "attributable to any misrepresentations by management," and thus again there is no indemnity by the plain terms of the Engagement Letters  BDO is being sued for its own negligence according to the state court complaint in the BDO Litigation. Exhibit 7 to Joint S/J Motion. Moreover, under Florida law, indemnification agreements are not favored and are to be strictly construed. *Diversified Servs., Inc. v. Simkins Indus., Inc.*, 974 F. Supp. 1448, 1451 (S.D. Fla. 1997). Where, as here, the main purpose of the contract is not indemnification, the indemnity provisions are strictly construed in favor of the indemnitor. *Barton-Malow Co. v. Grunan Co.*, 835 So. 2d 1164, 1166 (Fla. 2nd DCA 2003). As a matter of law, the language of the Engagement Letters does not support a construction that BDO may be indemnified for its own negligence. *Gibbs v. Air Canada*, 810 F.2d 1529, 1535-36 (11th Cir.

1987) (agreements to indemnify parties against their own wrongful acts are disfavored under Florida law and will be enforced only if expressed in clear and unequivocal terms); *Zinz v. Concordia Properties, Inc.*, 694 So. 2d 120, 121 (Fla. 4th DCA 1997) (holding that the language "indemnify against any and all claims" does not sufficiently disclose the intention to indemnify against the negligence of the indemnitee); *Diversified Servs.*, 974 F. Supp. at 1451. In the absence of a clear and unequivocal intent to indemnify parties against their own wrongful acts, any fault of the indemnitee that is a cause of its loss will negate the contractual indemnitor's obligation. *Gibbs*, 810 F.2d at 1534-35.

*Third,* BDO has no contract damages under the Engagement Letters. Under Florida law, contract damages are limited to those that arise naturally from the breach or those that were in the contemplation of the parties at the time the contract was made. "[D]amages which do not arise naturally from a breach of the contract, or which are not within the reasonable contemplation of the parties at the time the contract was made, are not recoverable." *Williams v. Atlantic Coast Line R. Co.*, 48 So. 209, 211 (Fla. 1908). *Accord Tillman v. Howell*, 634 So. 2d 268, 270 (Fla. 4th DCA 1994) (same).

In substantially identical circumstances and examining a similar engagement letter, the court in *Ameriwood Indus., supra,* held that an auditor could not recover from its audit client the "consequential" damages occasioned by a suit against it brought by the client's investors. Because Andersen "was paid for performance of those contracts long ago" and instead sought "consequential" damages not contemplated by the parties, the court held that "the damages Andersen seeks are not recoverable in a breach of contract action," and dismissed the auditors' counterclaim with prejudice. *Ameriwood Indus.*, 961 F. Supp. at 1088.

22

BDO has proffered no evidence that it contemplated the payment, in contract, of consequential or extraordinary damages. BDO's damages are limited to ordinary, natural contract damages - of which there are none since there is no dispute that the Debtor long ago paid the requisite engagement fees to BDO.

**IV.    Independent of Section 502(e)(1)(B) and the Engagement Letter Terms Discussed Above, BDO's Fraud Claim is Disallowed Because the Claim Fails as a Matter of Law**

To recover for fraud, BDO must prove that (1) the Debtor knowingly made a material, false statement with the intent that the false statement be relied upon, (2) BDO justifiably and actually relied on that material false statement, and (3) BDO suffered injury proximately caused by the material false statement. *Babbit Electronics v. Dynascan Corp.*, 38 F.3d 1161, 1176-77 (11th Cir. 1994). BDO's fraud claim fails as a matter of law. The Court will follow the better reasoned cases, discussed below, and holds that BDO cannot avoid its alleged negligence by suing its client. Two reasons support this rule. First, an auditor's role is to verify the accuracy of information provided to it by the client and it is therefore antithetical to that role to permit an auditor to seek damages for a client's failure to provide accurate information that the audit was supposed to verify:

> If an auditor . . . acts fraudulently, recklessly, or negligently, it has breached its own professional duties, and **cannot transform those breaches** into, or mask them behind, breaches of **duties allegedly owed to the auditor** by the keepers of the books the auditor was retained to audit.

*Cortec Indus. v. Sum Holding L.P.*, 1994 WL 722708 at *5 (S.D.N.Y. Dec. 30, 1994) (emphasis added). Second,

> [t]he doctrine that an intervening act cuts off the liability of a tort-feasor comes into play only where the intervening cause is not foreseeable. Thus, the doctrine does not apply here, for **it is foreseeable that the negligent failure to detect falsifications will likely result in continued falsifications.**

23

*Lincoln Grain, Inc. v. Cooper & Lybrand*, 216 Neb. 433, 445, 345 N.W. 2d 300, 308-09 (Neb. 1984) (emphasis added).

These reasons apply with particular force here where BDO specifically agreed to "detect[] . . . fraud." Each of the BDO Engagement Letters provided that BDO would "design [its] audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements." Engagement Letters, Composite Exhibit 2 to Joint S/J Motion. Since BDO specifically contracted and agreed to "detect fraud," it cannot claim now that it could not "detect fraud" because of "fraud." In other words, permitting professional auditors essentially to offset their own potential liability by suing their clients, especially under the undisputed language of these Engagement Letters, is illogical, bad policy and inconsistent with applicable law.

Still further, the undisputed facts discussed below show that BDO cannot prove the essential elements of its fraud claim. The Court notes that if the undisputed facts demonstrate that BDO cannot prove any one of the essential elements of its fraud claim, summary judgment for Freeman and BESIL is required as a matter of law. *See, e.g., Celotex Corp., supra*, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *Beck* v. *Prupis*, 162 F.3d 1090, 1096 (11th Cir. 1998) ("Summary judgment is appropriate where the moving party shows an absence of evidence to support an essential element of the nonmoving party's case."), *aff'd*, 529 U.S. 494 (2000).

A.    **The Capital Officers' Misrepresentations Cannot Be Imputed to the Debtor.**

BDO generally points to alleged misrepresentations made to it by certain officers of the

24

Debtor (the "Capital Officers") who were also officers of the Debtor's 50% (and subsequently 100%) owner, Bankest Capital. In Florida, as in most jurisdictions, the knowledge of an officer cannot be imputed to the corporation where the officer acted for his own benefit or otherwise adversely to the corporation. *State Dept. Of Ins. v. Blackburn*, 633 So. 2d 521, 524 (Fla. 2d DCA 1994) ("[W]here it is alleged that the agents were acting adversely to the corporation's interests, the knowledge and misconduct of the agent are not imputed to the corporation.").

The only evidence shows that the Capital Officers looted the Debtor for the benefit of themselves, thus barring imputation. *See, e.g., Seidman & Seidman v. Gee*, 625 So. 2d 1, 3 (Fla. 3d DCA 1993) (drawing distinction between "looting" company and using corporation as "engine of the fraud" to benefit corporate coffers). For example, Jeffrey Barnhill, the CEO of Joy Athletic, Inc., swears under oath that the Capital Officers took money from the Debtor and gave it to Joy "without being related to any accounts receivables" for the Capital Officers' benefit. Exhibit F to Opposition, Jeffrey Barnhill Affidavit, ¶ 3; *see also* Exhibit G to Opposition, at 8-11. He explains that "I understood from [the Capital Officers] that the reason they were willing to commit such funding was because they had an equity stake in Joy." Jeffrey Barnhill Affidavit, ¶ 6. BDO submits no evidence to rebut Mr. Barnhill's Affidavit. In addition, the Report of the Receiver of Bankest shows that money was taken out of Bankest and distributed to other companies, leaving Bankest with over $170 million in debt. Exhibit G to Opposition; *In re Huff*, 109 B.R. 506, 512 (Bankr. S.D. Fla. 1989) (Cristol, J.) (holding that adding more and more debt damages corporation and bars imputation).

BDO offers no evidence on whether the Capital Officers were acting in furtherance of Bankest's interest, the relevant test of imputation. BDO offers only the indictment and the transcript of proffers during the criminal allocutions of certain of the officers of the Debtor, which included

25

proffers by the Government of what it hoped to prove at trial. Exhibits A, B, C and D to BDO S/J Motion. Neither the indictment nor the proffers constitute evidence that can be relied upon in this case. *See, e.g., Scholes* v. *African Enter., Inc.*, 854 F. Supp. 1315, 1324 (N.D. Ill. 1994) (refusing to rely upon an indictment as evidence for summary judgment because it "is conclusory, contains only hearsay and is of no probative value"), *aff'd sub nom., Scholes* v. *Lehmann*, 56 F.3d 750 (7th Cir. 1995); *United States* v. *Reed*, 114 F.3d 1067, 1070 (10th Cir. 1997) ("A proffer is not evidence, *ipso facto.*"); *see also Mundell* v. *Dep't of Alcoholic Beverage Control*, 211 Cal. App. 2d 231, 239 (Cal. Dist. Ct. App. 1962) ("An offer of proof is not evidence.")

Any findings from the criminal case would not have collateral estoppel effect in this case, where neither Freeman, Bankest nor BESIL had a full and fair opportunity to litigate the factual bases for the guilty pleas upon which BDO relies. *See Parker v. Williams*, 862 F.2d 1471, 1474 (11th Cir. 1989) (due process clauses of the Fifth and Fourteenth Amendments require precluded parties to have at least one full and fair opportunity to litigate an issue before being bound by a prior determination of that issue); *see also Quinn v. Monroe County*, 330 F.3d 1320, 1329 (11th Cir. 2003) (listing elements required for application of the doctrine of collateral estoppel; one of the factors not met here is that the issue be litigated by the same parties or their privies).

Finally, even if the proffers can be relied upon as evidence in this case, then when viewed in the light most favorable to BDO, the proffers only go to the mechanism of fraud by which money was transferred. It does not address the relevant and fundamental inquiry -- whether the Capital Officers acted adverse to Bankest or to benefit Bankest. Even the fact that certain of the Capital Officers pled guilty to crimes does not address whether they acted for Bankest's benefit, but rather that they pled guilty to crimes for which they were personally responsible. To the extent that a conclusion could

be drawn from the proffers, they support the conclusion that the Capital Officers acted for their own benefit and adversely to Bankest in loading Bankest with $170 million in debt.

Where, as here, BDO offers no evidence to contradict the evidence of Movants that the Capital Officers acted adversely to Bankest, the Capital Officers' alleged fraud cannot be imputed to Bankest as a matter of law.

**B.      BDO offered no evidence that it *actually* relied on the purported misrepresentations, and the only evidence is that it did not so rely.**

Although BDO does not identify the particular alleged misrepresentations that form the basis of its Claim based on fraud, it cites generally misrepresentations "to auditors [of] the value of accounts receivable" and management representation letters regarding the accuracy and completeness of materials provided to BDO. BDO S/J Motion, at 10-12. As to these representations, however, BDO produces no evidence that it actually relied on this information.

Instead, the only evidence is that BDO did *not* reasonably rely on the cited representations. BDO cannot credibly assert that it *did* rely on these representations because it was hired, and contractually agreed to, test them. Engagement Letters, Composite Exhibit 2 to Joint S/J Motion. It is undisputed that every audit engagement letter provided that BDO will be "examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements," and that its "work will be based primarily upon selected tests of evidence." *See* Engagement Letters, Composite Exhibit 2 to Joint S/J Motion. That BDO did "test" the materials provided to it by Bankest's managers, even if it did so negligently as asserted by BESIL, is evidence that it was not relying on those materials; it was relying on its own testing and examination of those materials, which verification procedures its auditors have described at length, *see, e.g.,* Exhibit J to Opposition, Sandor Lenner Dep. at 46,

27

and which are reflected in BDO's workpapers. *See* Exhibit K to Opposition, Accounts Receivable Planning Schedules.

BDO's stated intention to design an audit to detect fraud at the Debtor is flatly inconsistent with any claim that, as professional and non-fiduciary auditors, it relied baldly on the information provided by the company's management. *See* Engagement Letters, Composite Exhibit 2 to Joint S/J Motion (obligating BDO to "to design its audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements"); Exhibit L to Opposition, Sandor Lenner Dep. at 104; Exhibit M to Opposition, Jorge Herrera Dep. at 42-43.

**C.    BDO did not *justifiably* rely on the purported misrepresentations as a matter of law.**

Recovery for fraud requires proof not only of *actual* reliance, but of *justifiable* reliance. *Tyson v. Viacom, Inc.*, 890 So. 2d 1205, 1210 (Fla. 4th DCA 2005) (requiring for fraud "damages resulting from his justifiable reliance on the misrepresentation"); *Schloper v. Smilovits*, 689 So. 2d 1189, 1190 (Fla. 4th DCA 1997) ("A critical element of a common law fraud claim is reasonable reliance by the representee."); Restatement (Second) of Torts, § 537 ("The recipient of a fraudulent misrepresentation can recover . . . only if . . . his reliance is justifiable."). Even if BDO could plausibly argue that it actually relied on the false information provided to it by Capital's Officers, its reliance would not have been *justifiable*.

The Florida Supreme Court acknowledges that where it is "evident that reliance on the part of a purchaser was not justified as a matter of law," "a trial court may certainly be correct in ruling as a matter of law that no cause of action exists." *M/I Schottenstein Homes, Inc. v. Azam*, 813 So. 2d 91, 95 (Fla. 2002). That determination depends on the "totality of the circumstances surrounding

28

the type of information, the nature of the communication between the parties, and the relative positions of the parties." *Id.* at 94-95.

Here, the undisputed facts demonstrate that, as a matter of law, BDO could not justifiably rely on management's representations in assessing the correctness of Bankest's financial statements, and in any event, BDO again submits no evidence of reasonable reliance. BDO claims to have relied on representations of management that there was no fraud, but in fact BDO contracted to "detect fraud." Composite Exhibit 2 to Joint S/J Motion. BDO was an auditor charged with verifying the information represented in Bankest's financial statements. It is undisputed that BDO considered Bankest to be a "sensitive" and "at risk" client, and that BDO's auditors understood this to mean that they "have to be more careful in [their] audit." Exhibit L to Opposition, Sandor Lenner Dep. at 104; *see also* Exhibit N to Opposition, BDO Audit Manual, Section 6E.3 ("When related parties are dealing among themselves and we do not audit or review the records of significant parties, we may be exposed to unusually high risk."); Exhibit O to Opposition, Jorge Herrera Dep. at 129 ("[I]n my experiences, if we do not audit the [related]-party, it obviously - it lends itself to more risk."). Finally, it is undisputed, as BDO and its colleagues alike admit, that detection of fraud by management is one of an auditor's responsibilities, at least under these Engagement Letters. *See* Exhibit P to Opposition, Sandor Lenner Dep. at 140 ("We perform other procedures that provided reasonable assurance that we would detect . . . fraud."); Exhibit Q to Opposition, *Wall Street Journal*, Thursday March 25, 2004, p. A14 (quoting Douglas Carmichael, chief auditor of the Public Company Accounting Oversight Board, stating that "detection of fraud is clearly an important objective of an audit. That has been true for over 60 years").

When an auditor, like BDO, understands that it is responsible for verifying the materials and

information provided to it by its audit client as BDO specifically contracted to do in this case, reliance is unjustified as a matter of law. *See Lincoln Grain, Inc., supra,* 216 Neb. at 444, 345 N.W. 2d at 308 (declining to hold officers liable for false representations in management letters because the "information in question was not supplied to Coopers & Lybrand for its guidance in its business transactions with others but for its use in auditing and verifying Lincoln Grain's own financial statements").

### D.    BDO's Damages Were Not Proximately Caused By Bankest

BDO's purported damages were not caused by the Debtor because BDO cannot rely on the intervening cause argument here. "[W]hen the intervening criminal act . . . is foreseeable, then the original actor's negligence may be considered the proximate cause of the loss, and he may be liable, notwithstanding the intervening criminal act." *Nicholas v. Miami Burglar Alarm Co.,* 339 So. 2d 175, 179 (Fla. 1976).

Courts examining the intervening cause doctrine in the context of auditors purportedly defrauded by a corporation's officers have held that the corporate officers' misrepresentations to auditors are foreseeable. For example, in *Lincoln Grain, Inc., supra,* 216 Neb. at 443-46, 345 N.W. 2d at 308-09, auditors sued by their client for malpractice cross-claimed against its client's officers that had falsified records provided to auditors, and claimed that the officers' frauds were the intervening and therefore proximate cause of the client's injury. *Id.* The court rejected this argument, holding instead that "[t]he doctrine that an intervening act cuts off the liability of a tort-feasor comes into play only where the intervening cause is not foreseeable. Thus, the doctrine does not apply here, for it is foreseeable that the negligent failure to detect falsifications will likely result in continued falsifications." *Id.,* 216 Neb. at 445, 345 N.W. 2d at 308.

In this case, it was not only *foreseeable* but *anticipated* that management would provide incorrect information. BDO expected the potential for "management frauds . . . [that] may involve acts such as intentional omission or misrepresentation of events, transactions or other significant information affecting the financial statements." Exhibit S to Opposition, Audit Manual at § 31.2. Thus, "documents that are prepared by clients . . . have to be corroborated." Exhibit T to Opposition, Jorge Herrera Dep. at 51. For these reasons, BDO states that it designs its audits to test all information provided to it and "to design its audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements." *See* Engagement Letters, Composite Exhibit 2 to Joint S/J Motion.

Because it cannot reasonably be disputed that BDO not only foresaw the possibility that information provided by management would be incorrect, but planned, contracted for and designed its audit around that possibility, the Capital Officers' misrepresentations, as a matter of law, did not proximately cause BDO's injury.

## CONCLUSION

Having thoroughly reviewed the Summary Judgment Pleadings, the record in the main case, and being otherwise fully advised in the premises, the Court holds that Movants are entitled to summary judgment on their Objection to BDO's Claim, and that BDO is not entitled to summary judgment on its Claim. Accordingly, pursuant to Bankruptcy Rule 9021, by separate judgment, the Joint S/J Motion will be GRANTED, the BDO S/J Motion will be DENIED and the BDO Claim will be DISALLOWED in its entirety.

ORDERED in the Southern District of Florida on ____SEP 1 4 2008____.

_____
BARRY S. SCHERMER, JUDGE
U.S. BANKRUPTCY COURT

31

E.S. BANKEST, L.C.,
Case No. 04-17602-BKC-AJC
Copies to:
Paul Steven Singerman, Esq.
*(Attorney Singerman shall serve a copy of this Order upon receipt to all interested parties.)*

RECEIVED

SEP 1 9 2005

BERGER SINGERMAN

# Exhibit 2

SEP 1   2006

ORDERED in the Southern District of Florida on _____



A. Jay Cristol, Chief Judge Emeritus
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

SEP 20 2006

In re:

E.S. BANKEST L.C.,

     Debtor.

_____/

LEWIS B. FREEMAN,

     Plaintiff,

vs.

BDO SEIDMAN, LLP, BDO
INTERNATIONAL, B.V., SANDOR
LENNER, KEITH ELLENBERG,

     Defendants.

_____/

Chapter 11
Case No. 04-17602-BKC-AJC

Adv. Pro. No. 06-1220-BKC-AJC-A

**ORDER DENYING (I) BDO SEIDMAN, LLP AND SANDOR LENNER'S
MOTION TO DISMISS ADVERSARY COMPLAINT, AND (II) BDO GLOBAL
COORDINATION, B.V.'S MOTION TO DISMISS ADVERSARY COMPLAINT
<u>WITH RESPECT TO STANDING AND JURISDICTION ARGUMENTS</u>**

**THE MATTER** came before the Court on July 13, 2006 at 2:30 p.m. in Miami, Florida upon the (i) Motion of Defendants BDO Seidman, LLP ("BDO") and Sandor Lenner to Dismiss Adversary Complaint ("BDO Seidman Motion") (C.P.#14), (ii) BDO Global Coordination, B.V.'s[1] Motion to Dismiss Adversary Complaint ("BDO Int'l Motion") (C.P.#31), (iii) Defendant Keith Ellenberg's Joinder in Motion by BDO Seidman, LLP and Sandor Lenner to Dismiss Freeman's Complaint (the "Joinder") (C.P.#17) (collectively, the BDO Seidman Motion, BDO Int'l Motion and Joinder shall be referred to herein as the "Motion to Dismiss"), and (iv) Plaintiff's Response in Opposition to (a) BDO Seidman, LLP and Sandor Lenner's Motion to Dismiss Adversary Complaint and (b) BDO Global Coordination, B.V.'s Motion to Dismiss Adversary Complaint.  (C.P.#64)  The Court has reviewed the above-identified pleadings, the Court file in this Adversary Proceeding and the main case, and heard argument of counsel.

By this Order, the Court denies the Motion to Dismiss based on BDO's arguments that Plaintiff Lewis B. Freeman ("Freeman" or "Responsible Officer") lacks standing and that the Court lacks "related to" jurisdiction contemplated by 28 U.S.C. § 1334(b).[2]

## Summary

In this Order, the Court addresses BDO's arguments that (i) the Court lacks subject matter jurisdiction over this Adversary Proceeding, (ii) that E.S. Bankest, L.C. (the "Reorganized Debtor" or "Bankest"), argued by BDO to be the instrumentality of the fraud committed by the

---

[1] The Adversary Complaint for Damages ("Complaint") filed February 22, 2006 names as a Defendant BDO International B.V., which is the alias of BDO Global Coordination B.V. (BDO Int'l Motion at 1.) For consistency, the Court refers to this entity as "BDO International."

[2] The Court intends that the rulings enunciated herein apply to *all* Defendants whether or not a particular Defendant(s) is identified with respect to a particular ruling(s).

Capital Officers,[3] has no injury from such fraud and therefore that Freeman lacks standing to bring claims against BDO on behalf of Bankest, and (iii) that Bankest's $170 million loss is "illusory".[4]  BDO also argues that this Adversary Proceeding should be dismissed because it asserts the identical claims and seeks recovery for the identical injury claimed by Banco Espirito Santo International, Ltd. ("BESIL") in its state court action against BDO styled *Banco Espirito Santo International, Ltd., et al. v. BDO Seidman, LLP, et al.*, Case No. 04-14009 CA 31 (the "BESIL Lawsuit").

The Court has considered BDO's arguments in support of the Motion to Dismiss and for the reasons set forth herein denies the Motion to Dismiss.  In doing so, the Court finds and holds that it has subject matter jurisdiction over the claims asserted in this Adversary Proceeding pursuant to the Eleventh Circuit's decision in *In re Lemco Gypsum*, 910 F.2d 784, 788 (11th Cir. 1990) and the "related to" test enunciated therein.  The Court further finds and holds that Freeman has standing to pursue the claims asserted in the Complaint because Bankest—which had four innocent directors who had no knowledge of the fraud of the Capital Officers—was not merely an instrumentality of the wrongdoers and therefore suffered injury redressable by Freeman's claims asserted in the Complaint.  (Compl. ¶¶ 23-26); *In re Fuzion Techs. Group, Inc.*, 332 B.R. 225 (Bankr. S.D. Fla. 2005).  Finally, the Court finds and holds that Bankest's losses in excess of $170 million are not "illusory" because the Complaint alleges that Bankest incurred and continued to incur $170 million in debt that Bankest would not have incurred absent BDO's five grossly negligent audits.  (Compl. ¶¶ 20, 56, 57, 79, 87-89).  These allegations suffice to plead injury. *In re Flagship Healthcare*, 269 B.R. 721, 728 (Bankr. S.D. Fla. 2001).

---

[3] Compl., ¶ 18 (identifying the Capital Officers as Hector Orlansky, Eduardo Orlansky, Dominick Parlapiano and Peter Stanham).

[4] The Court will address and deny the remainder of BDO's arguments advanced in the Motion to Dismiss in separate orders entered contemporaneously herewith.

## Facts

On a motion to dismiss the trial court "must accept the allegations of the complaint as true and must construe the facts alleged in the light most favorable to the plaintiff," *In re Johannessen*, 76 F.3d 347, 350 (11th Cir. 1996); *Kirwin v. Price Communications Corp.*, 391 F.3d 1323, 1325 (11th Cir. 2004). Therefore the Court adopts the facts as alleged in the Complaint and incorporates those facts herein in their entirety.

## Analysis

### I.      Legal Standards Applicable to Motions to Dismiss

As indicated herein, when considering a motion to dismiss, the Court "must accept the allegations of the complaint as true and must construe the facts alleged in the light most favorable to the plaintiff." *Johannessen*, 76 F.3d at 350; *see also Kirwin*, 391 F.3d at 1325. "The threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low." *In re Southeast Banking Corp.*, 69 F.3d 1539, 1551 (11th Cir. 1995). The threshold is similarly low when the defendant moves to dismiss on the grounds that the plaintiff lacks standing. *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1536 & n.5 (11th Cir. 1994) (reversing the district court's order granting a motion to dismiss based on standing and "reiterat[ing] that we may only affirm the dismissal of the complaint if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations"). At bottom, "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that Plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *Hollywood Comm. Synagogue, Inc. v. City of Hollywood*, 430 F. Supp. 2d 1296, 1309 (S.D. Fla. 2006) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

4

## II. The BESIL Lawsuit Against BDO Is Not Relevant to, or a Basis to Grant, the Motion to Dismiss

BDO has asked this Court to grant the Motion to Dismiss based on the fact that a creditor of Bankest, BESIL, has brought the BESIL Lawsuit against BDO for professional negligence in the Circuit Court of the Eleventh Judicial Circuit for Miami-Dade County, Florida seeking in excess of $170 million in damages. BDO makes several arguments regarding the significance of the BESIL Lawsuit, none of which the Court finds persuasive or relevant to its adjudication of the Motion to Dismiss.

BDO contends that the Complaint filed by Freeman should be dismissed because the present Adversary Proceeding and the BESIL Lawsuit seek the same damages, thereby allowing Freeman and BESIL to somehow obtain a double recovery from BDO. Notwithstanding such argument, the Court finds that the claims asserted by Freeman against BDO seek recovery for injuries to Bankest, not Bankest's creditors, as BDO argues.[5] *See* (BDO Seidman Motion at 16). The obvious truth that any funds Freeman collects from BDO will ultimately flow to Bankest's creditors, including BESIL, does not transform Bankest's claims into claims that belong to Bankest's creditors. *Official Comm. Of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 349 (3d Cir. 2001) ("Simply because the creditors of a[n] estate may be the primary or even the only beneficiaries of such a recovery does not transform the action into a suit by the creditors." (alteration in original)); *In re Plaza Mortg. & Fin. Corp.*, 187 B.R. 42 (Bankr. N.D. Ga. 1995). Thus, the Court holds that the BESIL Lawsuit in which BESIL is asserting its own

---

[5] BDO relies on *Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416 (1972) for the proposition that Freeman is not able to assert claims belonging to creditors. While the Court does not disagree with the holding of *Caplin*, *Caplin* is clearly distinguishable on its face because *Caplin* involved a trustee who brought "a suit on behalf of debenture holders against an indenture trustee," *i.e.* asserted claims that undisputedly belonged to the debtor's creditor bondholders. *Caplin*, 406 U.S. at 416, 425, 429 ("Nowhere does petitioner argue that [the debtor] could make any claim against [the indenture trustee]."). Here, all of Bankest's claims in the Complaint are based upon duties owed to Bankest, not to third parties. BDO does not argue differently.

rights against BDO is no bar to Bankest, BDO's client, suing BDO on Bankest's own claims to redress the injuries to Bankest.

Moreover, because the Complaint and the BESIL Lawsuit do not involve the same plaintiffs or claims and do not seek redress for the same injury, the fact that BDO may be defending two suits at the same time is not a basis to dismiss the Complaint. BESIL seeks recovery for its injuries caused to BESIL by BDO's breach of its duty to BESIL and the other plaintiffs—not injuries caused to Bankest. *See* (Compl. ¶¶ 65-68, 70-71, 82, *BESIL, et al.* v. *BDO Seidman, LLP, et al.*, No. 04-14009 CA 36 (Fla. Cir. Ct. filed June 28, 2004) ("BDO intended that its audits reach and influence each of the Noteholders, BESIL, ESB Finance and Nassau Bank.")). Here, Freeman asserts claims on behalf of and specific to Bankest for duties owed directly to Bankest.[6] Freeman is not asserting claims belonging to BESIL.

## III.    The Court Possesses "Related To" Subject Matter Jurisdiction

The Complaint asserts claims arising out of and directly related to BDO's pre-petition audits of Bankest that were expressly contemplated by the Plan, as hereinafter defined, and Disclosure Statement.[7] As set forth in the Disclosure Statement and the Second Amended Plan

---

[6] Freeman asserts a negligence claim against BDO on behalf of Bankest, BDO's audit client. The remainder of the claims asserted by Freeman similarly belongs only to the Bankest estate. Bankest's claim for aiding and abetting breach of fiduciary duty is based on the duty owed by its officers and directors—here the Capital Officers—to Bankest and the allegations that BDO aided and abetted their breach of such duty. Only Bankest, the entity owed the fiduciary duty, has standing to sue for its breach of such duty. *See In re Caribbean K Line, Ltd.*, 288 B.R. 908, 918 (S.D. Fla. 2002) (trustee has standing to bring breach of fiduciary duty claim where "[t]he fiduciary duty at issue in this matter was owed simultaneously to both the insolvent corporation and the collective creditor body"). Similarly, Bankest is suing BDO for a securities violation based on its making material misrepresentations that induced Bankest to decide to issue more debentures and *sell* securities (Compl. ¶ 88), a claim Bankest's creditors cannot assert. *See Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373, 378 (S.D. Fla. 1999) (issuer of securities has standing to sue under Rule 10b-5). Finally, Bankest is suing BDO International for deceptive and unfair trade practices, based on BDO International's deceptive and unfair practices towards Bankest (Compl. ¶¶ 96, 97), not Bankest's creditors. (Compl. ¶¶ 74-75.) Thus, the allegations of the Complaint refute BDO's contention that Freeman is asserting the same claim that BESIL is asserting in the BESIL Lawsuit.

[7] Several sections of the Plan contemplate prosecution of professional malpractice claims against, *inter alia*, BDO. *See*, Plan, Article 5, Sec. D. at 41, Sec. J at 48-49, Article 14(a) at 58, Article 14(d) at 59. The term "Malpractice and Related Claims", which is defined in Article 1(74) of the Plan, specifically contemplates "all professional malpractice claims and related causes of action of the Debtor against. . . accountants. . . who provided services to the

of Liquidation, as supplemented, dated October 11, 2005 (C.P. #364) (the "Plan"), any recovery by the Bankest estate from BDO will be distributed to Bankest's creditors. Pursuant to the test enunciated by the Eleventh Circuit in *Lemco Gypsum*, the Court finds that it possesses "related to" subject matter jurisdiction contemplated by 28 U.S.C. § 1334(b) over the claims asserted in this Adversary Proceeding.

In *Lemco Gypsum*, the Eleventh Circuit held that "[t]he usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of the proceeding could conceivably have an effect on the estate being administered in bankruptcy. . . . An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Lemco Gypsum*, 910 F.2d at 788. The "related to" test adopted by the Eleventh Circuit in *Lemco Gypsum* and binding on this Court is "extremely broad," and the relevant inquiry is whether there could be any "conceivable" effect on the Bankest estate. *In re Toledo*, 170 F.3d 1340, 1345 (11th Cir. 1999) ("The key word in the *Lemco Gypsum/Pacor* test is 'conceivable,' which makes the jurisdictional grant extremely broad.").

The Court holds that it has subject matter jurisdiction under the Eleventh Circuit's *Lemco Gypsum* "related to" test because the Adversary Proceeding has the potential to redress Bankest's injury and bring funds into the estate to be distributed directly and solely to the creditors of Bankest. *See, e.g., Carter v. Rodgers*, 220 F.3d 1249, 1254 (11th Cir. 2000) ("*Any* recovery would reduce the administrative expenses of the sale of the estate property and would perforce increase the amount of estate property available to satisfy creditors' claims. Thus, the outcome

---

Debtor prior to the Petition date, including, without limitation, those professional malpractice claims and causes of action against. . . BDO, which claims and causes of action are more particularly described below in the Disclosure Statement in Article VI – Summary of Chapter 11 Plan – B. 9. – Preservation of Claims and Causes of action".

of this case will impact Carter's bankruptcy case." (italics added)); *In re Toldeo*, 170 F.3d at 1345-46 (finding "related to" jurisdiction when the outcome of adversary proceeding challenging mortgage would affect the amount of funds available to creditors).

Relying primarily upon the Third Circuit's decision in *In re Resorts Int'l, Inc.*, 372 F.3d 154 (3d Cir. 2004), BDO claims that post-confirmation jurisdiction is much more limited than the pre-confirmation "related to" jurisdiction test adopted by the Eleventh Circuit in *Lemco Gypsum*, and that the facts in this case do not meet that more limited jurisdictional grant. The Court disagrees. First, by adopting the *Lemco Gypsum* "related to" test, the Eleventh Circuit did not apply, nor has it adopted, the "close nexus" formulation set forth in *Resorts Int'l*. Further, the cases cited by BDO do not support a finding by this Court that it lacks subject matter jurisdiction over this Adversary Proceeding, because BDO relies on case law where the litigation at issue arose from *post-confirmation* conduct. *See Resorts Int'l; In re Craig Stores of Texas*, 266 F.3d 388 (5th Cir. 2001); *In re Leeds Bldg. Prods., Inc.* 160 B.R. 689 (Bankr. N.D. Ga. 1993). Here the conduct at issue is BDO's pre-petition audits of Bankest and therefore the Court finds BDO's cases inapplicable. For example, *Resorts Int'l* involved a post-confirmation litigation trust that received a complete assignment of a claim against Donald Trump and others as part of the debtor's confirmed plan. *Resorts Int'l*, 372 F. 3d at 158. However, the appeal in *Resorts Int'l* did *not* involve the Trump litigation and the Third Circuit did *not* suggest that the bankruptcy court lacked jurisdiction to hear the litigation trust's lawsuit against Trump. The litigation at issue in *Resorts Int'l* was a malpractice action against the litigation trust's accountant retained post-confirmation based on post-confirmation services of the accountants. Therefore, the Third Circuit found that "related to" jurisdiction was lacking. *Resorts Int'l*, 372 F.3d at 165-166.

More analogous to the present case against BDO is the First Circuit's decision in *In re Boston Regional Medical Center*, 410 F.3d at 107, where the First Circuit held that when a debtor or its representative, like Freeman here, "commences litigation designed to marshal the debtor's assets for the benefit of its creditors pursuant to a liquidating plan of reorganization, the compass of related to jurisdiction persists after plan confirmation." *Id.* The court noted that "on its face, section 1334 does *not* distinguish between pre-confirmation and post-confirmation jurisdiction," that the primary reason for certain courts narrowing a bankruptcy court's post-confirmation jurisdiction—that the entity will re-enter the marketplace—is absent in liquidating chapter 11 plans, like Bankest's chapter 11 Plan, and that "a liquidating debtor [like Bankest] exists for the singular purpose of executing an order of the bankruptcy court" such that "any litigation involving such a debtor thus relates much more directly to a proceeding under title 11." *Id.* at 106, 107 (italics added).[8]

Indeed, many courts follow the First Circuit's reasoning in *Boston Regional* and reject the notion of a more limited jurisdiction post-confirmation, on the grounds that such an *ad hoc* limitation is inconsistent with the plain language in section 1334(b). *See, e.g., In re Almac's, Inc.*, 202 B.R. 648, 655 (D.R.I. 1996) ("Section 1334(b) does not evince an intent to curtail bankruptcy jurisdiction upon confirmation or substantial consummation, and this Court will not read one into the statute."); *see also* Lawrence P. King, 8 *Collier on Bankruptcy*, ¶ 1142.04[1], at 1142-7 (15th ed., rev. 2003) ("Bankruptcy jurisdiction is governed by 28 U.S.C. § 1334; this is so whether the matter at issue arises before or after confirmation of a [chapter 11] plan. Confirmation does not alter the basic jurisdictional analysis applicable to bankruptcy courts."); Robert J. Keach, *Afterlife, Reincarnation or Purgatory? Post-Confirmation Jurisdiction in the*

---

[8] The First Circuit cited to the Eleventh Circuit's decision in *Toledo, supra*, as finding "related to" jurisdiction when the outcome of a suit would affect the amount of funds available to creditors. *Boston Regional*, 410 F.3d at 105.

9

*First Circuit*, ABI Journal (Oct. 2005) (concluding, after a review of *Resorts*, its progeny and *Boston Regional*, that bankruptcy courts "should have ["related to"] jurisdiction when the [post-confirmation] litigation at issue is the very litigation contemplated by the plan to be prosecuted for the benefit of creditors, such as the liquidating trustee pursuing a cause of action assigned to the trust. The same should be true where title to, or rights in, an asset assigned to the trust or retained by the reorganized debtor is at issue.").

BDO makes two additional arguments in respect of the Court's subject matter jurisdiction. First, BDO claims that the District Court is the only Court with subject matter jurisdiction that can adjudicate Freeman's securities law claim. The Court disagrees. The Bankruptcy Courts act as a "unit" of the District Court, 28 U.S.C. § 151. There is ample precedent for the adjudication of a securities law claim by a Bankruptcy Court, including securities law claims made by liquidating trustees. *See, e.g., In re Southern Industrial Banking Corp.*, 67 B.R. 399, 402 (Bankr. E.D. Tenn. 1986) (holding it had "related to" jurisdiction over suit by liquidating trustee to recover over $132 million in claims under RICO and federal and state securities laws against FDIC as receiver for failed banking institutions where the outcome would, like here, "significantly impact the value of claims of [the debtor's] creditors holding contingent interest certificates"); *see also California Public Employees' Retirement System v. Worldcom, Inc.*, 368 F.3d 86 (2d Cir. 2004) (holding, in part, that district court sitting in bankruptcy and exercising "related to" jurisdiction had power to hear claims brought under Securities Act of 1933). Thus, Freeman's securities claims are properly the subject of a referral by the District Court to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a) and by District

10

Court Local Rule 87.2 (providing for automatic referral of, *inter alia*, all cases and proceedings related to chapter 11 cases in bankruptcy court) as claims "related to" Bankest's chapter 11 case.[9]

Finally, BDO argues that this Adversary Proceeding is non-core and therefore the Court does not have "arising in" or "arising under" subject matter jurisdiction. However, because the Court has "related-to" subject matter jurisdiction over this matter, the Court need not reach the issue of whether the claims asserted are core or non-core.

## IV.    Freeman, Responsible Officer for the Reorganized Debtor, Possesses Standing to Prosecute This Adversary Proceeding

In order to have standing, a plaintiff must show that the complaint alleges "injury in fact, causation and redressability," and "that the requested relief will redress the injury." *E.F. Hutton & Co. v. Hadley*, 901 F.2d 979, 984 (11th Cir. 1990) (citations omitted). Of these factors, BDO limits its argument to the "injury in fact" prong of the standing analysis, and argues first that Bankest was a sham entity that suffered no injury because its existence was to perpetuate the Capital Officers' fraudulent scheme and second that Bankest's loss in excess of $170 million is "illusory." (BDO Seidman Motion at 13.) The Court finds these arguments unpersuasive.

### A.    This Court's prior ruling precludes BDO's imputation defense

In a prior decision binding on BDO, this Court rejected BDO's arguments that the fraud perpetrated by the Capital Officers should be imputed to Bankest so as to bar Bankest's claims against BDO for its grossly negligent audits. The same analysis applies here in the context of BDO's standing argument. Specifically, in the Order granting summary judgment dated September 14, 2005 (C.P. #346) against BDO and disallowing BDO's claim in the Bankest chapter 11 proceeding, this Court found that BDO "specifically contracted and agreed to 'detect fraud'" and held that the Capital Officers "looted [Bankest] for the benefit of themselves" and

---

[9] The Court notes that BDO has filed a motion with the District Court seeking to withdraw the reference, which motion is pending.

therefore their alleged fraud could not "be imputed to Bankest as a matter of law." (C.P.#346 at 24, 25, 27 ("Summary Judgment Order").)

Pursuant to the Summary Judgment Order, the Court holds that the fraud perpetrated by the Capital Officers is not imputed to Bankest and therefore Freeman has standing to bring claims on behalf of Bankest against BDO.[10] In addition, the Court's holding is supported by the recent Supreme Court of New Jersey decision rejecting as a matter of law the application of the imputation, or *in pari delicto*, defense to bar claims for damages suffered as a result of an auditor's failure to detect fraud against the auditor who agreed to detect fraud. *NCP Litigation Trust v. KPMG, LLP*, 2006 WL 1766178, at *11 (N.J. Sup. Ct. June 28, 2006) (rejecting imputation defense raised by auditor against audit client and finding that allegations of "auditor negligence" create an "exception" to the imputation doctrine and preclude its application).

**B.    Bankest was injured by BDO's breach of its duty to detect the fraud and Freeman therefore has standing to assert claims against BDO.**

Even absent the Court's prior Summary Judgment Order concluding that the Capital Officers' fraud could not be imputed to Bankest, BDO's argument [that Bankest suffered no injury] is without merit. BDO relies on a line of cases which hold that when a fraud is committed using a corporation, and the corporation is the alter ego of the wrongdoers or has benefited from the fraud, the corporation has no independent identity, suffers no injury and cannot assert any claims seeking damages arising from the fraud. (BDO Seidman Motion at 10,

---

[10] In fact, many courts hold that the imputation, or *in pari delicto*, defense can only be raised if both the plaintiff corporation and the defendant were a part of the same fraudulent scheme. *See, e.g., Kulla v. E.F. Hutton & Co.*, 426 So. 2d 1055, 1057 (Fla. 3d DCA 1983) ("It is a well-settled principle of law requiring little discussion that one who himself engages in a fraudulent scheme, that is, acts in pari delicto, may forfeit his right to any legal remedy against a co-perpetrator."); *Smith ex rel. Estates of Boston Chicken, Inc. v Arthur Anderson LLP*, 175 F. Supp. 2d 1180, 1199 (D. Ariz. 2001) ("The doctrine of in pari delicto dictates that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another *participant in that conduct*, . . . the law will aid neither, but rather, will leave them where it finds them." (italics added)). Bankest, the insolvent debtor, never conspired with BDO, whom Bankest always viewed as an independent auditor—which is another ground to reject the imputation defense raised by BDO.

13.) The Complaint, however, alleges facts that support a finding that Bankest had an identity independent from the wrongdoing Capital Officers, specifically that Bankest had four directors or statutory managers (the equivalent of directors in a limited liability company) who were innocent of the fraud, and that the looting of Bankest by the Capital Officers injured Bankest. (Compl. at ¶¶ 23-26.) Based on these allegations, BDO's cases are inapplicable.

BDO's cases are additionally inapplicable because in each case cited by BDO where the court found that the corporation had not suffered an injury, the plaintiff corporations had no innocent insiders and were merely sham corporations or the alter egos of the wrongdoers. *See* (BDO Seidman Motion at 10-11); *Feltman* v. *Prudential Bache Securities*, 122 B.R. 473-74 (S.D. Fla. 1990) ("The complaint alleges [the corporations were] alter egos with no corporate identity separate from [the fraudulent insider] . . . [and] any alleged injury to the debtors is as illusory as was their corporate identity."); *In re Meridian Asset Mgmt., Inc.*, 296 B.R. 243, 257-58 (Bankr. N.D. Fla. 2003) (trustee lacked standing because debtor "was managed by a sole owner who committed the wrongful acts. There were no innocent decision makers who could have prevented the embezzlement.").

The case law is uniform that a corporation suffers legal injury from fraud committed by insiders and the corporation has standing to sue third parties for that injury as long as there were other insiders who were innocent of the fraud. *See, e.g., In re Fuzion Techs. Group, Inc.*, 332 B.R. 225, 239-40 (Bankr. S.D. Fla. 2005) (holding trustee's claims against law firm were not barred because "there were innocent board members who could have terminated [the fraudulent insider's] wrongdoing had his misconduct been uncovered"). In fact, in *O'Halloran*, cited by BDO, the court specifically found the corporation had standing to bring claims against its lender because the existence of innocent insiders prevented the company from being the alter ego of the

13

wrongdoer. As a consequence, the corporation had suffered injury from its management's fraud. *O'Halloran v. First Union Nat'l Bank*, 350 F.3d 1197, 1204 (11th Cir. 2003) (because the debtor "was not merely Payne's alter ego, it is conceivable that Payne could have wrongfully embezzled money from the organization" and therefore the "alleged injury resulting from Payne's embezzlement . . . gives [the debtor] standing to pursue a claim against [the corporation's lender]"); *see also Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1561 (S.D. Fla. 1990) (when wrongdoing insiders looted corporation and directed it to borrow funds without adequate collateral in order to perpetuate fraud, they were acting adversely to corporation and therefore Trustee was not barred from bringing claims to recover for that injury).

Thus, for BDO to prevail on its argument that Freeman lacks standing and Bankest has no redressable injury, BDO would have to show that the Complaint alleges that Bankest was a sham entity operated exclusively by and for the benefit of the Capital Officers such that Bankest was the alter ego of the Capital Officers. *See, e.g., Feltman*, 122 B.R. at 473-74 & n.8 (corporation was a "sham" that could not suffer injury when corporation was "alter ego" of individual perpetrating fraud); *Wechsler v. Squadron, Ellenoff, Plesent & Scheinfeld, LLP*, 994 F. Supp. 202, 205 (S.D.N.Y. 1997) (recognizing that rule imputing acts of corporate agents' wrongdoings "only applies where *all* relevant shareholders and/or decisionmakers are involved in the fraud" (emphasis added)); *Smith ex rel. Estates of Boston Chicken, Inc. v. Arthur Anderson LLP*, 175 F. Supp. 2d 1180, 1199 (D. Ariz. 2001) (recognizing that fraudulent acts of corporate agents are only attributable to the corporation when "*all* relevant shareholders and/or decisionmakers" were involved in the wrongful conduct (italics added)).

The Complaint, however, alleges just the opposite:  Bankest was independent from the Capital Officers because Capital never had majority control over Bankest and half of the eight-

14

member board of directors had no knowledge of the fraud. (Compl. ¶¶ 16, 18, 57.) Because the identity of Bankest never merged with the identity of the Capital Officers, Bankest suffered injury as a result of their actions for which Freeman can seek redress. *See, e.g., O'Halloran*, 350 F.3d at 1204 (debtor corporation will have injury "[a]s long as [the debtor] was not merely [the wrongdoer's] alter ego" and corporation could not be alter ego of director who perpetrated the fraud when corporation had "significant membership and governing body" innocent of the fraud); *In re Fuzion Techs. Group, Inc.*, 332 B.R. at 239-40 (holding that corporation not barred from asserting claims because innocent board members would have stopped the fraudulent activity if they had known about it); *Boston Chicken*, 175 F. Supp. 2d at 1199, 1200 (declining to impute agents' acts to corporation and bar claims when Trustee "alleged that there were innocent members . . . who were unaware of the wrongdoing" and that in "cases involving more than one corporate actor, the plaintiff may avoid dismissal for lack of standing by alleging the existence of an innocent member of management who would have been able to prevent the fraud had he known about it" (internal quotation marks omitted)); *Wechsler*, 994 F. Supp. at 214 (refusing to impute corporate agents' wrongdoings to corporation when innocent directors had been "identified" in pleadings and when pleadings "explained how [the directors] could and would have brought the fraud to an end," and that the debtor "is not required to do more at the initial pleading stage").

## C.    Bankest's $170 million debt is a cognizable injury and is not "illusory."

BDO argues Freeman lacks standing on the grounds that Bankest's claimed injury of a "deepening insolvency" as a result of BDO's grossly negligent audits is "illusory." (BDO Seidman Motion at 14.) The Court finds BDO's argument unavailing. BDO's argument that Bankest's injury is "illusory" is confined only to one alleged type of injury, deepening

insolvency. (*Id.* at 13-16.) BDO omits any reference to the other injuries Bankest alleges it suffered in the Complaint, including that $170 million was stolen from Bankest through fraud that BDO was duty-bound to detect. (Compl. ¶ 79) Specifically, Freeman alleges that BDO's negligence proximately caused Bankest's injuries in part because

> "[t]he Capital Officers required the acquiescence and participation of BDO in order to continue their fraudulent scheme and funnel money out of Bankest. The fraud committed by the Capital Officers should have and would have been discovered had a competent and independent auditor performed the audits of Bankest." (*Id.* ¶ 87)

In other words, the Complaint alleges that BDO's negligence injured Bankest because it allowed the Capital Officers to steal from Bankest. It is settled Eleventh Circuit law that a debtor has standing to sue a third party for negligently failing to discover and stop the debtor's principals from stealing money from the debtor. *See O'Halloran*, 350 F.3d at 1203-04 (trustee has standing to sue bank for the bank's negligence in allowing debtor's principal to embezzle from the debtor); *In re Huff*, 109 B.R. 506, 512 (Bankr. S.D. Fla. 1989) (fact that $800,000 was stolen from the corporation "alone is sufficient to sustain standing"); *In re Plaza Mortg. & Fin. Corp.*, 187 B.R. at 43 (Bankr. N.D. Ga. 1995) (trustee has standing to sue accountants for negligently allowing bankrupt corporation to make improper distributions). Before reaching the question of whether Bankest suffered an injury in the form of deepening insolvency, the Court holds that Bankest suffered injury as a result of the funds stolen by the Capital Officers, for which it can sue BDO.

Further, BDO's argument that Bankest's injury is "illusory" ignores the holdings of cases cited by BDO in the Motion to Dismiss. The only grounds for finding an injury "illusory" such that the plaintiff lacks standing in the cases cited by BDO is when the corporation is the alter ego of the wrongdoing insider. *See Feltman*, 122 B.R. at 473, 474 n.8 (holding injury was "illusory"

16

where debtor corporations were "sham corporations, alter egos with no corporate identity separate from" the wrongdoer); *In re Meridian Asset Mgmt., Inc.*, 296 B.R. at 252 (holding injury was "illusory" where one wrongdoer "exercised complete dominion and control over the accounts and treated them as his own, they were his alter-ego"). As previously discussed, Bankest had four innocent insiders and it was not the alter ego of the Capital Officers, *see supra*, Part IV.B. As a result, the Court rejects BDO's "illusory" injury argument.

Finally, BDO argues that Bankest could not have been injured by its deepening insolvency because from its formation, Bankest was incapable of rehabilitation. (BDO Seidman Motion at 14.) In so arguing, BDO ignores the Complaint's allegation that "[a]s a direct and proximate result of BDO's professional negligence, Bankest *became* insolvent." (Compl. ¶ 89 (italics added)). Moreover, the only authority cited by BDO in support of this argument, *In re Flagship Healthcare*, expressly holds that deepening insolvency is an injury that *confers* standing. In that case, the court held that even a corporation insolvent *prior* to the commission of any wrongdoing *can* be injured by increased debt incurred as a result of the wrongdoing, because the extra debt itself is a legal injury. 269 B.R. at 728 ("[E]ven if the Debtor may have been insolvent before the Greenleaf Valuation, the additional debt incurred thereafter, and allegedly as a result of the Defendants' negligence, may provide a measure of damages recoverable by the Trustee."); *see also In re Huff*, 109 B.R. at 512 ("A corporation is damaged where its officers and directors fraudulently conceal its insolvency and allow the corporation to continue incurring more and more debt and become more and more insolvent."); *Schact v. Brown*, 711 F.2d 1343, 1350 (7th Cir. 1983) ("[T]he corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability.").

Here, Bankest began and continued to incur $170 million in debt through the issuance of debentures and a line of credit, debt that would not have been incurred absent what Plaintiff alleges were five grossly negligent audits in which BDO verified assets that did not exist and failed to detect the fraud it was duty-bound to detect. (Compl. ¶¶ 20, 56, 57, 79, 87-89.) The Court holds that these allegations suffice to plead injury. *In re Flagship Healthcare*, 269 B.R. at 728.

For the reasons set forth herein, it is

**ORDERED AND ADJUDGED** that the Motions to Dismiss, to the extent they are based upon lack of standing and lack of "related to" jurisdiction contemplated by 28 U.S.C. § 1334(b) are DENIED. Defendants shall file an answer to the Plaintiff's Complaint within twenty (20) days of the date of this order.

# # #

**Submitted by:**
Paul J. Battista, Esq.
pbattista@gjb-law.com
GENOVESE, JOBLOVE & BATTISTA, P.A.
Bank of America Tower Int'l Place
100 S.E. 2nd Ave., 44th Floor
Miami, FL 33131
Tel. (305) 349-2300
Fax (305) 349-2310
**Copies to:**
Paul J. Battista, Esq.
*(Attorney Battista shall serve a copy of this Order upon all interested parties upon receipt and file a certificate of service.)*

18

Exhibit 3



ORDERED in the Southern District of Florida on

A. Jay Cristol, Chief Judge Emeritus
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

SEP 20 2006

In re:

E.S. BANKEST L.C.,

      Debtor.

Chapter 11
Case No. 04-17602-BKC-AJC

_____/

LEWIS B. FREEMAN,

      Plaintiff,

Adv. Pro. No. 06-1220-BKC-AJC-A

vs.

BDO SEIDMAN, LLP, BDO
INTERNATIONAL, B.V., SANDOR
LENNER, KEITH ELLENBURG,

      Defendants.

_____/

**ORDER DENYING (I) BDO SEIDMAN, LLP AND SANDOR LENNER'S MOTION TO
DISMISS ADVERSARY COMPLAINT, AND (II) BDO GLOBAL COORDINATION,
B.V.'S MOTION TO DISMISS ADVERSARY COMPLAINT WITH RESPECT TO
15 U.S.C. § 78J(B) AND RULE 10B-5(B) ARGUMENTS**

**THE MATTER** came before the Court on July 13, 2006 at 2:30 p.m. in Miami, Florida upon the (1) Motion of Defendants BDO Seidman, LLP ("BDO") and Sandor Lenner to Dismiss Adversary Complaint ("BDO Seidman Motion") (C.P.#14), (2) BDO Global Coordination, B.V.'s[1] Motion to Dismiss Adversary Complaint ("BDO Int'l Motion") (C.P.#31), (3) Defendant Keith Ellenberg's Joinder in Motion by BDO Seidman, LLP and Sandor Lenner to Dismiss Freeman's Complaint (the "Joinder") (C.P.#17) (collectively, the BDO Seidman Motion, BDO Int'l Motion and Joinder shall be referred to herein as the "Motion to Dismiss"), and (4) Plaintiff's Response in Opposition to (i) BDO Seidman, LLP and Sandor Lenner's Motion to Dismiss Adversary Complaint and, (ii) BDO Global Coordination, B.V.'s Motion to Dismiss Adversary Complaint. (C.P.#64.)  The Court has reviewed the above-identified pleadings, the Court file in this adversary proceeding and the main case, and heard argument of counsel.

BDO moves to dismiss Plaintiff Lewis B. Freeman's claim under 15 U.S.C. § 78j(b) and Rule 10b-5(b) on the grounds that the Complaint does not adequately allege scienter or that BDO's allegedly unlawful conduct was "in connection with" the sale of debenture notes. *See* (BDO Seidman Motion at 29, 33.)  By this Order, the Court denies the Motion to Dismiss Count V of the Complaint and holds that the allegations of the Complaint are sufficient to state a Rule 10b-5 claim against each of the Defendants.

## SUMMARY

BDO's primary argument is that scienter is not adequately pled  The Court disagrees. *In re Eagle Bldg. Techs. Inc., Sec. Litig.*, 319 F. Supp. 2d 1318, 1326 (S.D. Fla. 2004); *see also In re Sahlen & Assoc., Inc. Sec. Litig.*, 773 F. Supp. 342, 359 (S.D. Fla. 1991) (Compl. ¶¶ 2, 4, 53).

---

[1] The Adversary Complaint for Damages ("Complaint") filed February 22, 2006 names as a Defendant BDO International B.V., which is the alias of BDO Global Coordination B.V.  (BDO Int'l Motion at 1.)  For consistency, the Court refers to this entity as "BDO International."

The determination of whether the Complaint sufficiently pleads scienter is "fact-specific" and requires "consideration of each individual factor as well as the context as a whole." *In re Eagle Bldg.*, 319 F. Supp. 2d at 1326. Courts consider whether allegations of GAAS and GAAP violations, red flags that would have placed a reasonable auditor on notice of the wrongdoing, and the magnitude of the fraud, taken together and in context, create the "sufficient inference of scienter" for pleading a Rule 10b-5 claim. *See, e.g., id.* at 1326-32 quoting *Arnlund v. Deloitte & Touche, LLP*, 199 F. Supp. 2d 461 (E.D. Va. 2002) (reviewing case law and concluding that "when the GAAS and GAAP violations are combined with the magnitude of the fraud or red flags . . . it is apparent that the 'factual picture painted by the complaint' reveals allegations providing a sufficient inference of scienter.").

To withstand a motion to dismiss, the Eleventh Circuit held that allegations that defendant "acted with a severely reckless state of mind" will establish scienter. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir. 1999). Here, the Complaint alleges that BDO, and its lead partners on the Bankest audit, Defendants Lenner and Ellenburg, intentionally ignored red flags that warranted further investigation. The Complaint alleges that these red flags included the Capital Officers' refusal to provide documents necessary to the Bankest audit, and that BDO's own audit manager stopped the audit. Defendants Lenner and Ellenberg then overruled the audit manager and restarted the audit, informing the audit manager that Capital Officer Parlapiano, with whom Lenner had a "social relationship," was an "important person in the community," and that the manager should be more "business oriented." (Compl. ¶ 38.); *In re Rent-way Sec. Litig.*, 209 F. Supp. 2d 493, 509 (W.D. Pa. 2002) (scienter alleged against auditor when employee who raised concerns regarding accuracy of client's information was removed from audit by partner who had friendship with officer at client); *see also In re Suprema*

3

*Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 280 (3d Cir. 2006) (noting that client's limitation of the scope of an audit is a strong indicator of fraud and reversing dismissal of a Rule 10b-5 claim against auditor).

The Complaint further alleges that BDO was a financial partner with Stratasys, which generated some of the very accounts receivable that BDO was supposed to verify as Bankest's auditor. The Complaint alleges that BDO verified as real over $30 million in fake receivables from its financial partner, Stratasys. (Compl. ¶¶ 37, 53.) BDO, Lenner and Ellenburg also each are alleged to have had a motive to ignore the fraud because, by continuing to certify Bankest's financial statements, they could guarantee that BDO would continue to receive revenue from its strategic financial partner Stratasys, revenue that was reflected in Lenner and Ellenburg's compensation. (*Id.* ¶¶ 4, 24-26, 38, 46-48, 51-53.); *see, e.g., In re Microstrategy, Inc. Secs. Litig.*, 115 F. Supp. 2d at 655 (holding that auditor's partnership with and financial stake in audit client compromised independence and provided auditor with the "motive" to certify allegedly false financial statements necessary to find inference of scienter).

Finally, the Complaint alleges that over the course of five years, BDO verified over $1 billion in fictitious accounts receivables, virtually all of Bankest's purported assets. (Compl. ¶¶ 2, 51.) Plaintiff asserts the overwhelming magnitude of the fraud BDO failed to detect over five separate audits supports a finding of scienter. *See, e.g. In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1345 (S.D. Fla. 1999) ("[W]hen tidal waives of accounting fraud are alleged, it may be determined that the accountant's failure to discover the client's fraud raises an inference of scienter on the face of the pleading.").

The Court agrees with the Plaintiff that the Complaint's allegations of GAAS violations, red flags ignored by BDO, the magnitude of the fraud undetected by BDO and that BDO had a

4

motive to turn a blind eye to the fraud, taken together, adequately plead scienter under Rule 10b-5. Furthermore, the Complaint's allegations that BDO knew or should have known that its unqualified audited financial statements were provided to the Bank Directors who authorized the issuance of the debenture notes and the investors who purchased the debenture notes satisfies the "in connection with" prong of a 10b-5 claim. (*Id.* ¶ 115); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 126 S. Ct. 1503, 1513 (2006) (defining "in connection with" to encompass any fraud that "coincide[s]" with a securities transaction).

## FACTS

In light of the standard applicable to motions to dismiss, to wit, that a trial court "must accept the allegations of the complaint as true and must construe the facts alleged in the light most favorable to the plaintiff," *In re Johannessen*, 76 F.3d 347, 350 (11th Cir. 1996); *Kirwin v. Price Commc'ns Corp.*, 391 F.3d 1323, 1325 (11th Cir. 2004) (same), the Court adopts the facts as alleged in the Complaint and incorporates those facts herein in their entirety.

## ANALYSIS

### I.    LEGAL STANDARDS

On a motion to dismiss the Court "must accept the allegations of the complaint as true and must construe the facts alleged in the light most favorable to the plaintiff." *Johannessen*, 76 F.3d at 350; *Kirwin*, 391 F.3d at 1325. "The threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low." *In re Southeast Banking Corp.*, 69 F.3d 1539, 1551 (11th Cir. 1995). The threshold is similarly low when the defendant moves to dismiss on the grounds that the plaintiff lacks standing. *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1536 & n.5 (11th Cir. 1994) (reversing the district court's order granting a motion to dismiss based on standing and "reiterat[ing] that we may only affirm the dismissal of the complaint if it is clear that no relief could be granted under any set of facts that

5

could be proved consistent with the allegations"). At bottom, "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that Plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood*, 430 F. Supp. 2d 1296, 1309 (S.D. Fla. 2006) citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

To state a claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5 (collectively, "Rule 10b-5"), a plaintiff must show: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

## II.   THE COMPLAINT'S ALLEGATIONS OF BDO'S SEVERELY RECKLESS CONDUCT ARE SUFFICIENT TO ALLEGE SCIENTER.

The Court holds that the Complaint satisfies the Eleventh Circuit Court of Appeals standard for pleading scienter.[2] The Eleventh Circuit has held that, to adequately plead scienter under Rule 10b-5, plaintiff need only show severe recklessness. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir. 1999) (allegations that defendant "acted with a severely reckless state of mind still suffices to state a claim for civil liability under Rule 10b-5"); *see also Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F. Supp. 2d 1324, 1339 (N.D. Ga. 1998) ("A showing of severe recklessness satisfies the scienter requirement" of Rule 10b-5).

There is no single allegation required to plead scienter for a Rule 10b-5 claim against an auditor. Instead, courts consider whether allegations of GAAS and GAAP violations, red flags

---

[2] The securities law claim under the Securities Act of 1934 is the only claim asserted by Freeman on behalf of Bankest which requires scienter as an element. Although scienter was discussed at the Hearing in the context of Plaintiffs' claim for aiding and abetting the breach of a fiduciary duty, scienter is not an element of a claim for breach of fiduciary duty. *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002) ("The elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages.").

and the magnitude of the fraud, taken together and in context, create the "sufficient inference of scienter" for pleading a Rule 10b-5 claim. *See, e.g., In re Eagle Bldg. Techs., Inc., Sec. Litig.,* 319 F. Supp. 2d at 1326-32 (reviewing case law and concluding that "when the GAAS and GAAP violations are combined with the magnitude of the fraud or red flags . . . it is apparent that the 'factual picture painted by the complaint' reveals allegations providing a sufficient inference of scienter." (quoting *Arnlund v. Deloitte & Touche, LLP,* 199 F. Supp. 2d 461 (E.D. Va. 2002).)

BDO relies on *Ziemba,* 256 F.3d 1194, to argue that Freeman must allege BDO was tipped off to the fraud; however, BDO quotes *Ziemba* out of context when it states that the *Ziemba* court "dismiss[ed] [the complaint] because '. . . Plaintiffs have pointed to no 'tips,' letters or conversations raising inferences that [the auditor] knew of any fraud.'" (BDO Motion at 30-31 (quoting *Ziemba,* 256 F.3d at 1210).) In the sentence immediately following the one cited by BDO, the Court additionally stated "Plaintiffs have pointed to no facts suggesting that C&L was severely reckless in not knowing about any fraud." *Ziemba,* 256 F.3d at 1210. Thus, the *Ziemba* court contemplated that scienter could be alleged *either* by pointing to tip-offs giving rise to an inference of knowledge *or* by pointing to red flags giving rise to an inference of severe recklessness. At least one district court has found scienter adequately pled without allegations of a tip. *In re Eagle Bldg. Techs., Inc., Sec. Litig.,* 319 F. Supp. 2d 1318, 1330-32 (S.D. Fla. 2004) (rejecting argument that *Ziemba* requires allegation of a "tip-off" to plead scienter).

   **A.    The Complaint's Allegations of the Magnitude of the Fraud—Over 90% of Bankest's Assets Certified by BDO Were Fake—Gives Rise to an Inference of Scienter.**

The Complaint alleges that BDO verified over $1 billion in fictitious account receivables as real. (Compl. ¶ 2.) Violations of accounting standards can give rise to a strong inference of scienter "when combined with a drastic overstatement of financial results." *Carley Capital Group,* 27 F. Supp. 2d at 1339; *see also In re Eagle Bldg. Techs., Inc., Sec. Litig.,* 319 F. Supp.

2d at 1326. Here, allegations of BDO's numerous GAAS violations, (Compl. ¶ 81), and the "sheer magnitude" of the fraud that BDO's audits concealed and BDO failed to detect are sufficient to create an inference of scienter. *See, e.g., In re Sunbeam Sec. Litig.,* 89 F. Supp. 2d 1326, 1345 (S.D. Fla. 1999) ("[W]hen tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover the client's fraud raises an inference of scienter on the face of the pleading.").

BDO relies on *In re Eagle Building Technologies, Inc., Sec. Litig.,* 319 F. Supp. 2d 1318, to argue that the Complaint's allegations of the magnitude of the fraud are insufficient because in *Eagle Technologies,* there was a single large receivable—BDO refers to it as the "pink elephant in the room"—that was misstated, whereas here the Complaint alleges BDO misstated many smaller account receivables, and, according to BDO, it is the "magnitude of the single account receivable" that demonstrates scienter. (July 13, 2004 Transcript at 49, 85.) The Court finds BDO's argument unpersuasive.

*In re Eagle Building Technologies* does not support BDO's claim that it is necessary to allege BDO verified a single false transaction or account receivable to find scienter adequately pled. In fact, as the court in *Eagle Building Technologies* noted, in that case the plaintiff's allegation of a single false accounting entry was unlike any of the cases on which the parties relied because in those cases—like here—the allegations were that the auditor verified numerous false transactions over a period of time. *Id.* at 1327. In *Eagle Building Technologies,* the court merely held that allegations that an auditor verified as accurate a single large fictitious transaction would suffice to allege scienter; it was not necessary to allege that the auditor failed to discover numerous false transactions. 319 F. Supp. 2d at 1327-38 ("[T]he number of transactions and the amount of money involved must be taken in context.").

8

Moreover, the Complaint does allege that among the $1 billion in fictitious accounts receivable verified as real by BDO, there was a single $30 million fictitious account verified by BDO while BDO had specific knowledge of its falsity. (Compl. ¶ 53.)  Specifically, the Complaint alleges that at the same time BDO was Bankest's auditor, it was also the strategic partner of Stratasys, a Bankest factor client who sold Bankest accounts receivable. (Compl. ¶ 48.)  The Complaint further alleges that as Stratasys' partner, BDO—via Lenner, BDO's "Alliance Liaison Partner" for Stratasys—had access to Stratasys' financial information. (*Id.* ¶¶ 50, 52-53.)  The Complaint alleges that BDO also knew that Stratasys could barely pay its licensing fees to BDO. (*Id.* ¶ 53.)  According to the Complaint, BDO knew or was extremely reckless in not knowing that Stratasys had less than $1 million in accounts receivable to sell to Bankest, when BDO verified that Stratasys had sold $30 million in accounts receivable to Bankest. (*Id.*)

The Complaint's allegations that BDO verified as real over $1 billion in fictitious accounts receivables, which included BDO's verification of the Stratasys $30 million for which BDO had additional knowledge of its falsity, adequately allege the magnitude of the fraud that, taken with the allegations of GAAS and GAAP violations, satisfy the pleading requirements for scienter. *In re Eagle Bldg. Techs., Inc., Sec. Litig.*, 319 F. Supp. 2d at 1326-28; *Carley Capital*, 27 F. Supp. 2d at 1335-36, 1339 (where auditor issued clean opinion despite improper accounting treatment of several transactions, including understating expenses by $4 million and improperly including $12.5 million in revenue, and failed to confirm a $3.5 million contract, the magnitude of the mistakes was "dramatic" and, coupled with GAAP violations, created a strong inference of scienter); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d at 1331-32, 1345 (where the company re-stated a restructuring charge from $300 million to $239 million, the "sheer

9

magnitude" of the mistakes contributed to strong inference of scienter); *In re Sahlen & Assocs., Inc. Sec. Litig.*, 773 F. Supp. 342, 359 (S.D. Fla. 1991) (denying motion to dismiss claim against auditor, finding the write-off of nearly two-thirds of SAI's accounts receivable gave a "strong indication that something was seriously amiss); *Kinney v. Metro Global Media, Inc.*, 170 F. Supp. 2d 173, 180 (D.R.I. 2001) (denying motion to dismiss 10b-5 claim because of the "magnitude of the accounting error," where company overstated net income by 240% and 306% in successive years); *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636-38 (E.D. Va. 2000) (where company overstated revenue by a total of $66 million over three years, due to improperly recognized revenue on numerous contracts, including three of its most important contracts, the overstatements were "of such a great magnitude—amounting to a night-and-day difference with regard to MicroStrategy's representations of profitability—as to compel an inference that fraud or recklessness was afoot").

**B.    The Complaint's Allegations of Numerous Red Flags Ignored by BDO Are Sufficient to Establish BDO's Scienter.**

The Complaint's allegations that BDO's partnership with Stratasys gave BDO a motive to turn a blind eye to the fraud and that as a result BDO consciously ignored red flags in its audits of Bankest further support the Court's finding that the Complaint adequately pleads scienter.  In evaluating allegations of red flags in the context of a Rule 10b-5 claim against an auditor, courts recognize a "wide variety of alleged red flags" to find scienter, none of which are "specifically required or dispositive" because "each analysis of scienter relies heavily on the overall context." *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1362-63 (S.D. Fla. 2005);[3] *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1333 (M.D. Fla. 2002) (red flags

---

[3] BDO also argues that because some of the red flags it ignored are a "re-hash" of alleged Generally Accepted Accounting Standard (GAAS) violations, Freeman cannot establish scienter.  (BDO Seidman Motion at 30.)  The fact that a red flag may also constitute a violation of GAAS does not render it inadequate to plead scienter. *See, e.g.,*

are what would have put any "reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors"); *Bryant*, 187 F.3d at 1285 (motive and opportunity may be relevant to a showing of severe recklessness); *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d at 655 (auditor's partnership with audit client destroyed auditor's independence and created a motive to ignore indicia of fraud that supported an inference of scienter).

1.   **Red flag:  The Complaint alleges that BDO intentionally failed to investigate when the Capital Officers refused to provide BDO with information necessary to prepare accurate financial statements.**

The Complaint alleges that BDO signed off on Bankest's financials as "free of material misstatement" even though Bankest—at the direction of the Capital Officers—repeatedly refused to provide BDO with the documents and information BDO deemed necessary to perform accurate audits.  (Compl. ¶¶ 37, 47.)  As alleged in the Complaint, BDO's severely reckless conduct was evident during BDO's first audit of Bankest when one of the Capital Officers *refused* to provide BDO with the requested documentation, raising the suspicion of the audit manager, who promptly terminated the audit.  (*Id.* ¶¶ 37-38.)  The Complaint alleges that the audit resumed only because the decision to discontinue the audit was overridden by Defendants Lenner and Ellenburg, the BDO partners responsible for the Bankest audit.  (*Id.* ¶¶ 5, 38.)  The Complaint alleges that Lenner had a social relationship with Dominick Parlapiano, the Capital officer who refused to provide the requested information.  (*Id.* ¶ 24.)  According to the Complaint, Lenner informed the audit manager that Parlapiano was an "important person in the community," and that the manager should be more "business orientated." (*Id.* ¶ 38.)

---

*In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d at 1337-38 (noting that a conflict of interest is a GAAS violation and can support an inference of scienter). The Complaint identifies red flags—some of which included GAAS violations—that were allegedly ignored by BDO at the time of the Bankest audits such that BDO was allegedly severely reckless when it failed to investigate further and instead consciously decided to issue unqualified opinions warranting the accuracy of Bankest's financials.

11

An allegation that an audit partner ignored indicia of fraud and continued an audit on the basis of his personal relationship with the audit client constitutes a red flag sufficient to plead scienter. *In re Rent-way Sec. Litig.*, 209 F. Supp. 2d 493, 509 (W.D. Pa. 2002) (scienter alleged against auditor when employee who raised concerns regarding accuracy of client's information removed from audit by partner who had friendship with officer at client); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 280 (3d Cir. 2006) (noting that client's limitation of the scope of an audit is a strong indicator of fraud and reversing dismissal of a Rule 10b-5 claim against auditor); *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1366 (N.D. Ga. 2005) (allegations that "defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter" and state a 10b-5 claim quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002)).

**2.    Red Flag:  The Complaint alleges that BDO repeatedly disregarded suspicious results when it purported to test Bankest's accounts receivable and reduced its level of scrutiny to match those results.**

The Complaint also alleges in detail that when BDO obtained a suspicious result in testing the validity of Bankest's accounts receivable it chose to ignore that result and switch to a different—and less rigorous and reliable—test.  (Compl. ¶¶ 33-36, 39-43.)  Specifically, according to the Complaint, in verifying the existence of Bankest's accounts receivable, BDO could not obtain the necessary third-party confirmations that the receivables were good and valid.  (*Id.*)  The Complaint alleges that BDO chose to apply consistently less rigorous tests, until ultimately BDO accepted verifications based on Bankest internal documents prepared by the Capital Officers.  (*Id.*)  The Complaint alleges that not only did BDO violate GAAS, by failing to verify Bankest's accounts receivable with information obtained from third parties independent from the audit client, but these allegations establish scienter because they demonstrate that BDO

12

chose to "ignore the obvious" and conducted audits so deficient that they "amounted to no audit at all." *In re Eagle Bldg. Techs., Inc., Sec. Litig.*, 319 F. Supp. 2d at 1326-31.

For example, according to the Complaint, in its 1998 audit, BDO determined that it needed to contact 29 account debtors to confirm that the accounts receivable listed as Bankest's primary asset actually existed. The Complaint alleges that, inexplicably, BDO acquiesced when the Capital Officers requested that BDO not contact 22 of the 29 debtors. (Compl. ¶ 33.) The Complaint alleges that even when BDO switched to the "subsequent collections" test to verify Bankest's receivables, BDO *again* proceeded with the audit despite being denied access to proper evidence of payments from third parties—information necessary to perform that test. (*Id.* ¶ 36.)

According to the Complaint, in 1999, for example, BDO was able to obtain confirmation from only one vendor (*id.* ¶ 39), and incredibly BDO never verified Bankest's receivables with the account debtors who actually owed the purported debts. (*Id.* ¶ 43.) The Complaint further alleges that for its 2001 audit, BDO sent 48 confirmations and did not receive back a single one. (*Id.*) The Complaint alleges that rather than questioning these startling results, BDO gave up. (*Id.* ¶ 35.)

According to the Complaint, ultimately, BDO claims to have relied on a "Agreed to Invoice" test in which the auditors simply examined a seller's invoice and compared it to the amount recorded on Bankest's own books—a test which merely confirmed that Bankest properly had recorded the amount it was purportedly owed and was a procedure that conveniently required no third party confirmation of the receivables whatsoever. (*Id.* ¶¶ 40, 43.) The Complaint alleges that BDO used this "test" to certify the validity of Bankest's entire accounts receivable portfolio. (*Id.*)

13

According to the Complaint, BDO also never applied the GAAS-mandated "greater scrutiny" when it verified the receivables Bankest purchased from its related parties, Capital and Stratasys. (*Id.* ¶¶ 4, 30, 81(c).) The Complaint alleges that the majority of Bankest's receivables were "re-factored" through Capital, meaning that Capital purchased the receivables and then re-sold them to Bankest. (*Id.* ¶ 27.) The Complaint alleges that BDO, despite having a duty to Bankest to detect fraud, accepted without question the validity of transactions confirmed *by the same person for both Capital and Bankest.* (*Id.* ¶ 30.)

According to the Complaint, Bankest also listed as assets $30 million in purported receivables from Stratasys, whose CEO was also the CFO of Bankest, making Stratasys another related party for the purposes of GAAS. (*Id.* ¶ 4.) The Complaint alleges that even though BDO knew Bankest and Stratasys constituted related parties, BDO performed no additional testing of their transactions. (*Id.* ¶ 81(c).)

BDO argues that allegations that it failed to verify Bankest's accounts receivable are no different from the red flag found "insufficient" by the court in *Cheney v. Cyberguard Corp.*, No. 98-6879, 2000 WL 1140306 (S.D. Fla. July 31, 2000). (BDO Seidman Motion at 31-32.) In *Cheney*, however, the auditor "failed to directly contact [the company's] resellers and make inquiries regarding the terms of their payment obligations"; that is, the auditor negligently failed to take steps that *would have* put it on notice that something was amiss. *Cheney*, 2000 WL 1140306, at *12. Here, according to the Complaint, BDO actually took those steps, and obtained highly suspicious results when it attempted to contact the vendors and their customers. Thus, according to the Complaint, BDO *was* on notice that something was amiss—precisely the sort of red flag that courts consistently hold is adequate to allege scienter under 10b-5. *See, e.g., In re Eagle Bldg. Techs., Inc., Sec. Litig.*, 319 F. Supp. 2d at 1329 (red flags are sufficient to establish

an auditor's scienter). As in *Eagle Building Technologies*, "Plaintiffs are not pleading that 'later disclosed information' would have been discovered earlier, but that information actually disclosed should have been investigated." *Id.* (distinguishing *Cheney* and finding that plaintiff had alleged facts giving rise to a strong inference of scienter). If proven true, the allegations of the Complaint may well establish severely reckless conduct by BDO that establishes scienter under Eleventh Circuit law.

### C. Allegations of BDO's Conflict of Interest and Motive to Turn a Blind Eye to the Fraud Create Inference of Scienter.

The Complaint also alleges that BDO had a significant motive to ignore these red flags: The Complaint alleges that at the same time BDO—as Bankest's auditor—was certifying that $30 million in receivables Stratasys had sold to Bankest were genuine, it—as Stratasys' strategic partner—was profiting from the revenue generated by those receivables. (Compl. ¶ 53.) Thus, according to the Complaint, as long as Bankest had BDO's unqualified audited financials necessary for Bankest to remain in business, BDO would continue to generate audit fees from Bankest and revenue in the form of fees paid to BDO by Stratasys. (*Id.* ¶¶ 49, 53.) BDO's motive -- its alleged direct stake in the Bankest audit -- supports a finding of scienter. *See, e.g., In re Microstrategy, Inc. Secs. Litig.*, 115 F. Supp. 2d at 655 (holding that auditor's partnership with and financial stake in audit client compromised independence and provided auditor with the "motive" to certify allegedly false financial statements necessary to find inference of scienter).

Moreover, according to the Complaint, Lenner and Ellenburg also each had a similar motive that supports a finding of scienter: their compensation was tied to the success of BDO's strategic partnerships, including the Stratasys partnership. (Compl. ¶ 51.) BDO's, Lenner's and Ellenburg's alleged conflicts of interest therefore "weigh heavily in favor of a finding of scienter." *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d at 1337 (dismissing Rule 10b-5 claim

15

in part because plaintiffs did not allege any "benefit that would enure to [the auditor] as a result of returning an audit favorable to Sunterra").

## III.  BDO'S MATERIALLY MISLEADING AUDITS WERE IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

The Complaint alleges that BDO's audited financials were provided to Bankest's investors in connection with their purchase of Bankest debenture notes and relied upon by the Bank Directors in authorizing Bankest's issuance of the debenture notes. *See* (Compl. ¶115). BDO argues that these allegations fail to establish that BDO's alleged severely reckless conduct as Bankest's auditor was in connection with the purchase or sale of Bankest debenture notes. (BDO Seidman Motion at 33; BDO Int'l Mot. at 12-13.)

Recent Supreme Court cases define the "in connection with" element of a Rule 10b-5 claim quite expansively.  The phrase "in connection with" encompasses any fraud that "coincide[s]" with a securities transaction. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 126 S. Ct. 1503, 1513 (2006).  This broad construction of the "in connection with" element has been applied to find Rule 10b-5 claims against auditors adequately pled when the allegations were that the auditor's representations were communicated to the investors. *See, e.g., In re Enron Corp. Secs., Derivative & ERISA Litig.,* 235 F. Supp. 2d 549, 584-85 (S.D. Tex. 2002). Here, the Complaint's allegations that BDO knew or should have known that its unqualified audited financial statements were provided to the Bank Directors who authorized the issuance of the debenture notes and the investors who purchased the debenture notes satisfies the "in connection with" prong of a 10b-5 claim.  (Compl. ¶ 115); *Dabit,* 126 S. Ct. at 1513.

BDO relies on four cases from outside the Eleventh Circuit to argue that the "in connection with" requirement cannot be met if the plaintiff received full value for the securities, and then was injured by a subsequent misappropriation of the proceeds. *See* (BDO Seidman

16

Motion at 33).  However, the Supreme Court has rejected such a narrow construction of the "in connection with" element of a Rule 10b-5 claim.  In *SEC v. Zandford*, 535 U.S. 813, 821 (2002), the Supreme Court rejected the argument that the misconduct at issue must take place "within the context of a securities exchange" in order for it to be conduct prohibited by Rule 10b-5.  *Id.*  In holding that a Rule 10b-5 claim is stated even when the lawful sale or purchase of a security "coincides" with a subsequent misappropriation of the value of that security, the *Zandford* Court cited with approval the holding of *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6 (1971).  *Zandford*, 535 U.S. at 821-22.  In *Bankers Life*, the Court found that a corporation could state a 10b-5 claim based on allegations that its directors had been misled into authorizing the sale of bonds believing that the corporation would receive the proceeds of the sale, finding that the fact that those proceeds were misappropriated by someone other than the defendant was "irrelevant."  *Id.* at 822 quoting *Bankers Life*, 404 U.S. at 10.

Finally, BDO International cites the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), to argue that Plaintiff has not alleged "loss causation" because its damages "were directly caused by the Debtor's scheme to fraudulently funnel money out of the company."  (BDO Int'l Mot. at 12-13.)  In *Dura Pharmaceuticals*, the Court held that all that was required of a plaintiff who seeks to recover an economic loss under Rule 10b-5 claim is to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind in the allegations of his complaint."  544 U.S. at 347.  The allegations of the Complaint that Bankest lost in excess of $170 million as a result of BDO's certification of $220 million in fake accounts receivable as good and valid satisfies that standard.  *See, e.g.,* (Compl. ¶ 2).

17

The Court finds that the Complaint adequately alleges that BDO's allegedly unlawful conduct as Bankest's auditor was in connection with the sale or purchase of a security for the purposes of pleading a Rule 10b-5 claim.

For the reasons set forth herein, it is

**ORDERED AND ADJUDGED** that the Motions to Dismiss are DENIED as to Count V of the Complaint which alleges a violation of 15 U.S.C. § 78j(b) and Rule 10b-5(b). Defendants shall file an answer to the Plaintiff's Complaint within twenty (20) days of the date of this order.

# # #

**Submitted by:**
Paul J. Battista, Esq.
pbattista@gjb-law.com
GENOVESE, JOBLOVE & BATTISTA, P.A.
Bank of America Tower Int'l Place
100 S.E. 2nd Ave., 44th Floor
Miami, FL 33131
Tel. (305) 349-2300
Fax (305) 349-2310

**Copies to:**
Paul Battista, Esq.
*(Attorney Battista shall serve a copy of this Order upon all interested parties upon receipt and file a certificate of service.)*