UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| E.S. BANKEST, L.C., | Case No. 04-17602-BKC-AJC |
| Debtor, | |
| _____/ | |
| LEWIS B. FREEMAN, Responsible Officer for the Reorganized Debtor E.S. Bankest, L.C., a Florida limited liability corporation, | |
| Plaintiff, | |
| | Adv. Pro. No. 06-1220-BKC-AJC-A |
| v. | |
| BDO SEIDMAN, LLP, BDO INTERNATIONAL B.V., and SANDOR LENNER, | |
| Defendants. | |
| _____/ | |

**PLAINTIFF'S STATEMENT OF MATERIAL ISSUES OF DISPUTED FACT THAT PRECLUDE SUMMARY JUDGMENT ON BDO SEIDMAN, LLP AND SANDOR LENNER'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Lewis B. Freeman ("Freeman" or "Plaintiff"), in his capacity as Responsible Officer for the Reorganized Debtor E.S. Bankest, L.C. ("Bankest"), by and through the undersigned counsel, hereby sets forth the material issues of disputed fact which preclude summary judgment on his claims against BDO Seidman.[1]

**I.    This Court Has Already Ruled Upon the Law Applicable to Defendants' Motions.**

---

[1] Plaintiff hereby incorporates by reference its Statement of Disputed Facts that Preclude Summary Judgment on BDO International's Motion for Partial Summary Judgment.

1. This Court has already ruled upon the law applicable to Defendants' Motions. *See* (Exh. 1 [September 14, 2005 "Opinion (1) Granting Joint Motion of Lewis B. Freeman and Banco Espirito Santo International, Ltd. for Final Summary Judgment Disallowing Claims Filed by BDO Seidman LLP, and (2) Denying BDO Seidman LLP's Motion for Summary Judgment" 2 ("2005 Summary Judgment Order")]; Exh. 2 [September 20, 2006 "Order Denying (I) BDO Seidman, LLP and Sandor Lenner's Motion to Dismiss Adversary Complaint, and (II) BDO Global Coordination, B.V.'s Motion to Dismiss Adversary Complaint with Respect to Standing and Jurisdiction Arguments" ("2006 Imputation/Damages Order")]; Exh. 3 [September 20, 2006 "Order Denying (1) BDO Seidman, LLP and Sandor Lenner's Motion to Dismiss Adversary Complaint, and (2) BDO Global Coordination, B.V.'s Motion to Dismiss Adversary Complaint with Respect to 15 U.S.C. § 78j(b) and Rule 10b-5(b) Arguments" ("2006 Securities Fraud Order")].)

## II. Espirito Santo Is Innocent of Any Fraud and Knowledge of the Fraud

2. Bankest had an eight member board of directors, four directors appointed by Bankest Capital and four appointed by Espirito Santo Bank. (Exh. 37 [4/16/07 a.m. Tr.] at 897-98.) Bankest Capital was wholly owned by Hector and Eduardo Orlansky, who together with the other Bankest Capital officers Dominick Parlapiano and Peter Stanham (collectively, the "Capital Officers"), were convicted of committing the massive fraud at Bankest. (*Id.* at 871; Exh. 28 [Parlapiano Restitution Order]; Exh. 34 [4/11/07 a.m. Tr.] at 243; Exh. 31 [1/26/07 a.m. Tr.] at 1834.)

---

[2] Although the U.S. District Court subsequently dismissed BDO's appeal of this Court's Order as moot, it expressly stated that it was vacating only this Court's findings of facts and law relating to BDO's claims for fees and expenses. *See* (Exh. 4 [May 8, 2007 "Order Dismissing Appeal as Moot, Vacating Bankruptcy Court Order in Part, and Closing Case"] at 13-14.) Accordingly, all other aspects of this Court's Order, including its analyses and findings regarding the imputation defense, remain valid and binding.

3.      The four Espirito Santo Bank-appointed members on Bankest's eight-member board of directors (the "Bank Directors") had absolutely no knowledge of the fraud.  *See* (Exh. 56 [5/18/08 p.m. Tr.] at 4500-02, 4557 (Garnecho); Exh. 57 [5/22/07 Tr.] at 4922; Exh. 59 [7/3/07 p.m. Tr.] at 264-65; Exh. 61 [7/20/07 a.m. Tr.] at 1295-96; Exh. 62 [7/20/07 p.m. Tr.] at 1402 (Balestra); Exh. 63 [7/24/07 a.m. Tr.] at 1832, 1834 (Mollet); Exh. 64 [7/24/07 p.m. Tr.] at 1973 (Espirito Santo).)

4.      After hearing evidence for five months, a jury held that each of the ten Espirito Santo individuals blamed by BDO for the fraud (including the five of the former Bankest directors), and each Espirito Santo entity blamed by BDO, had zero fault for the loss caused by BDO.  (Exh. 6 [Phase II Verdict Form in Banco Espirito Santo Int'l Ltd. v. BDO Seidman, Case No. 04-14009 CA 31 ("Phase II Verdict Form")] at 6.)  Moreover, the jury found that BDO had acted recklessly and awarded $351,689,343 in punitive damages against BDO.  (Exh. 7 [Phase III Verdict Form in Banco Espirito Santo Int'l Ltd. v. BDO Seidman, Case No. 04-14009 CA 31 ("Phase III Verdict Form")] at 2; Exh. 5 [Phase I Verdict Form in Banco Espirito Santo Int'l Ltd. v. BDO Seidman, Case No. 04-14009 CA 31 ("Phase I Verdict Form")] at 2-3; Exh. 6 [Phase II Verdict Form] at 12; Exh. 58 [6/15/07 Tr.] at 7305; Exh. 8 [Florida Punitive Damages Jury Instruction].)

5.      Moreover, had the Bank Directors been aware of the Capital Officers' fraud, they would have taken steps to stop it, and they certainly would have stopped funding Bankest.  *See* (Exh. 60 [7/16/07 a.m. Tr.] at 736; Exh. 59 [7/3/07 p.m. Tr.] at 391; Exh. 56 [5/18/08 p.m. Tr.] at 4500.)  Thus, if the Bank Directors would have known of the fraud, the damages to Bankest would have never occurred.  Id.

### III. BDO Knew Its Unqualified Audited Financial Statements Were Provided to the Bank Directors and Used to Sell Bankest Debentures

6. BDO admitted that it knew its unqualified audited financial statements were provided to the Bank Directors. (Exh. 27 [BDO Responses to Requests for Admission] at 12-13.)

7. Moreover, BDO had to know that its audited financial statements were provided to Bankest's directors—BDO addressed the audits to Bankest's Board of Directors! *See* (Exhs. 9, 10, 11, 12, 13 [BDO Seidman Audited Financial Statements of Bankest].)

8. BDO also knew that its audits would be provided to innocent investors in connection with the sale of Bankest debentures. (Exhs. 9, 10, 11, 12, 13 [BDO Audited Financial Statements of Bankest]; Exh. 37 [4/16/07 a.m. Tr.] at 851-52, 905, 908-09; Exh. 39 [4/17/07 a.m. Tr.] at 1081; Exh. 29 [Shareholder Agreement] at 11; Exh 30 [PPM] at ES 0256348, ES0256512-26; Exh. 15 [1998 Inherent Risk Questionnaire] at BDO 00658; Exh. 55 [5/17/07 Tr.] at 4297.) The debentures were part of the fraudulent scheme which created a loss in excess of $170 million and drove Bankest to insolvency. (Exh. 37 [4/16/07 a.m. Tr.] at 877-78, 915.)

### IV. BDO Failed to Detect the Fraud and Caused Bankest's Loss in Excess of $170 Million

9. BDO does not dispute that over $220 Million of the accounts receivable it certified in 2002—about 99% of Bankest's assets—did not actually exist. (Exh. 35 [4/11/07 p.m. Tr.] at 391-92.)

10. BDO's audits falsely certified hundreds of millions worth of fake accounts receivables on Bankest's books as real. (Exh. 37 [4/16/07 a.m. Tr.] at 852-62.) Bankest's audits were used to issue debenture notes, increasing Bankest's liabilities by $170 million dollars. (Exh. 37 [4/16/07 a.m. Tr.] at 849, 877-78, 901-02, 915; Exh. 30 [PPM] at ES 0256348, ES0256512-26.) This $170 million loss would not have occurred without BDO's false and misleading audits. (Exh. 37 [4/16/07 a.m. Tr.] at 891-92; id. at 877-91.) Even BDO's own expert testified that "but for" BDO's audits, none of the resulting debt would have been incurred by Bankest. (Exh. 66 [8/3/07 p.m. Tr.] at 3352-64.)

11. As a result of BDO's issuance of unqualified financial statements, its verification of non-existent assets, and its failure to detect massive fraud, Bankest began and continued to incur more than $170 Million in debt that it could not repay. *See* (Exh. 37 [4/16/07 a.m. Tr.] at 891-92.) Bankest could not have incurred this debt, through the issuance of debentures and the securing of a line of credit, absent BDO's severely reckless conduct. (Exh. 59 [7/3/07 p.m. Tr.] at 391; Exh. 60 [7/16/07 a.m. Tr.] at 736; Exh. 56 [5/18/08 p.m. Tr.] at 4500; Exh. 37 [4/16/07 a.m. Tr.] at 877-78, 891-92.)

**V.    BDO Had a Duty to Detect the Fraud**

12. BDO had a duty to detect the fraud. (Exh. 51 [5/3/07 Tr.] at 3150-51; Exh. 1 [2005 Summary Judgment Order] at 24.)

13. As this Court held: "BDO specifically contracted and agreed to 'detect fraud' . . . ." (Exh. 1 [2005 Summary Judgment Order] at 24.) BDO grossly failed to keep its promise and do its public duty as a certified public accountant. The evidence is overwhelming that BDO's breach of duty caused Bankest's loss. As lead audit partner Sandor Lenner admitted at trial:

5

Q. Mr. Lenner, you were a certified public accountant doing audits at BRFFC and E.S. Bankest, right?

A. Yes.

Q. And you understood you had duties, right?

A. Yes,

Q. And you understood that you were hired to do a job?

A. Yes.

Q. And you understood people were counting on you to do that job, right?

A. Yes.

Q. And you understood that one of your duties was to make sure that there wee no material misstatements in these financial statements due to fraud, right?

A. Yes.

Q. And here there was a great big fraud, right?

A. Yes.

Q. And you had that duty to find the fraud in 1995, right?

A. Yes.

Q. And you had that duty to find the fraud in 1996?

A. Yes.

Q. And you had the duty to find the great big fraud in 1998, 1999, 200, 2001, and 2002, right?

A. Yes.

(Exh. 51 [5/3/07 Tr.] at 3150-51.)

14. BDO's failure to do its duty to find the fraud directly led to Bankest damages, as testified to by a perpetrator of the fraud, Carlos Mendez. Mr. Mendez testified he was able to grow the fraud because of BDO's gross negligence:

> Q. And every year did you depend on the fact that BDO was not going to require you to provide them with documents from the customers, the ones who actually owed the money?
>
> A. Yes.
>
> Q. And as a result, were you able to grow the fraud?
>
> A. Yes.

(Exh. 37 [4/16/07 a.m. Tr.] at 891-92; *id.* at 877-91.)

## VI. BDO's Intentional Blind Eye to the Fraud

15. As Bankest's auditor, BDO overrode its own audit manager and accepted the Capital Officers' refusal to provide documents necessary to the Bankest audit. (Exh. 26 [Rivera Aff.]; Exh. 39 [4/17/07 a.m. Tr.] at 1098-1118; Exh. 37 [4/16/07 a.m. Tr.] at 878-90.) BDO's own audit manager, Ramon Rivera, testified for Plaintiff and explained that BDO and Mr. Lenner purposely ignored auditing standards and badges of fraud to keep its fees flowing. (Exh. 26 [Rivera Aff.]; Exh. 39 [4/17/07 a.m. Tr.] at 1110-18.)

16. During the 1998 audit, Mr. Rivera requested customer checks from Bankest in order to validate the existence of the account receivables, Bankest's largest asset. (Exh. 39 [4/17/07 a.m. Tr.] at 1094-95; Exh. 26 [Rivera Aff.] at ¶¶12-13.) In order to properly perform the audit of Bankest, the auditors had to examine the customer checks. *See* (Exh. 43 [4/19/07 p.m. Tr.] at 1706-14; Exh. 41 [4/18/07 a.m. Tr.] at 1321-22.)

17.  Dominick Parlapiano refused to provide the customer checks to the BDO audit team. (Exh. 26 [Rivera Aff.] at ¶¶12-16; Exh. 39 [4/17/07 a.m. Tr.] at 1099-1100.) BDO Seidman immediately stopped work on the audit. (Exh. 26 [Rivera Aff.] at ¶17; Exh. 39 [4/17/07 a.m. Tr.] at 1101-02.)

18.  Sandor Lenner, the partner in charge of the Bankest audit, and Keith Ellenberg, the concurring partner on the Bankest audit, spoke with Mr. Parlapiano, a Capital Officer of Bankest, about Bankest's refusal to provide the customer checks and threatened to resign if the customer checks were not provided. (Exh. 26 [Rivera Aff.] at ¶¶18-21.) A few days later, after Mr. Lenner and Mr. Parlapiano had a closed door meeting, Mr. Lenner told Mr. Rivera that he could restart the audit without the key documents that would have revealed the fraud. (*Id*. at ¶¶23-24; [Exh. 39 [4/17/07 a.m. Tr.] at 1110-18.) Mr. Lenner told Mr. Rivera that he should accept checks from clients or Bankest Capital, a company owned by the Capital Officers, in lieu of customer checks as proof of the existence of Bankest's account receivables. (Exh. 26 [Rivera Aff.] at ¶¶15, 23-25; Exh. 39 [4/17/07 a.m. Tr.] at 1110-18; Exh. 32 [2/6/07 p.m. Tr.] at 3452-58, 3462; Exh. 44 [4/20/07 a.m. Tr.] at 1799-1800.) Mr. Lenner explained why to Mr. Rivera:

> Following the meeting, Sandy came to my office and informed me that BDO would be continuing the audit. He told me that because I had not been in Miami for long, **I did not understand that Mr. Parlapiano was an important person in the community.** He said that he had known Mr. Parlapiano for many years and that they had developed a good professional relationship. **He also noted that as a Manager, I should be looking for ways to bring in new business, and suggested that working for Bankest could lead to other work, through Mr. Parlapiano, the Orlanskys and affiliates of Bankest.** He said that as time went on, I would better understand the management of client relationships.

(Exh. 26 [Rivera Aff.] at ¶ 24 (emphasis added).)

8

19.    Even Mr. Ellenberg admits that customer checks would not provide sufficient audit evidence. (Exh. 41 [4/18/07 a.m. Tr.] at 1321-22.) As a result, BDO's audits could not and did not satisfy GAAS. (*Id*.; Exh. 43 [4/19/07 p.m. Tr.] at 1706-14.)

## VII.    BDO's Unethical Conflict of Interest

20.    Also as Bankest's auditor, BDO verified as real over $77 million in fake receivables from its financial partner Stratasys. (Exh. 46 [4/24/07 Tr.] at 2346-48.) BDO entered into a strategic partnership with Dominick Parlapiano and Stratasys, Inc. (a Bankest factor client), an ethics violation that should have disqualified BDO from even auditing Bankest. (Exh. 48 [4/30/07 Tr.] at 2483, 2487, 2538-39, 2547-53, 2557; Exh. 34 [4/11/07 a.m. Tr.] at 281.) As auditor of Bankest, one of its job's was to determine whether the accounts receivable of Stratasys were real or fake. (Exh. 46 [4/24/07 Tr.] at 2347-48.) However, because of BDO's strategic partnership with Stratasys, BDO stood to make a twenty percent profit on those same Stratasys accounts receivable as Defendant and lead BDO audit partner Sandor Lenner were forced to admit:

> Q. So by this time, 2002, BDO had certified about 77 million dollars in accounts receivable as real from StrataSys who is your alliance firm member, right?
>
> A. Yes.
>
> . . . .
>
> Q. . . . [As auditor of Bankest] you had to say whether all the receivables were real or fake, right, not just Stratasys?
>
> A. Yes.
>
> Q. So for the Stratasys ones you would have to look at what came from Stratasys and you would say whether they were real or fake, right?
>
> A. Yes.

> Q. And when you were over here, with Stratasys, right, BDO potentially was going to profit from those accounts receivable, right? You can make 20 percent from them; isn't that right?
>
> A. Yes.

(Exh. 46 [4/24/07 Tr.] at 2347-48.)

21. Mr. Lenner used the BDO-Stratasys partnership to increase his personal compensation. Mr. Lenner wrote a memorandum to his superiors to justify increasing his compensation at BDO and trumpeted the forging of the BDO-Stratasys alliance as a reason why. (Exh. 25 [Good Guy Memo] at 1 ("I have very high expectations for the Miami office and the firm as a result of this Alliance.") Mr. Lenner admitted his own personal benefit was a motive for the Stratasys alliance. (Exh. 46 [4/24/07 Tr.] at 2305-08; Exh. 27 [4/26/07 Tr.] at 2435-37.)

22. In fact, the world's leading expert in accounting ethics described BDO's conflict as follows:

> This is a convoluted, intertwined, first class conflict of interest. And let me tell you, I believe that it is with all of my heart and soul, and it's one of the worst conflicts I've ever seen.

(Exh. 49 [5/2/07 a.m. Tr.] at 2839.)

### VIII. BDO's Reckless Audits

23. BDO's reckless audits ignored red flag after red flag, year after year after year. For example, about 99% of the assets of Bankest were accounts receivable, and thus a vital function of the audit was to determine whether those accounts receivable were real or fake. (Exh. 34 [4/11/07 a.m. Tr.] at 251; Exh. 42 [4/19/07 a.m. Tr.] at 1605-06; Exh. 46 [4/24/07 Tr.] at 2347-48; Exh. 65 [8/3/07 a.m. Tr.] at 3307.)

10

24.     When BDO obtained a highly suspicious result in testing the validity of Bankest's accounts receivable it chose to ignore that result and switched to a different—and less rigorous and reliable—test.  When BDO sent out confirmations to verify the existence of Bankest's accounts receivable, none of the confirmations were returned.  (Exh. 43 [4/19/07 p.m. Tr.] at 1665-70; Exh. 40 [4/17/07 p.m. Tr.] at 1197-98 (received 2 confirmations for 1998 audit); Exh. 16 [1998 A/R Circularization Workpaper]; Exh. 19 [1999 Confirmation Control]; Exh. 20 [1999 Workpaper] at BDO 03392 ("no confirms received"); Exh. 21 [2000 Confirmation Control]; Exh. 22 [2001 Confirmation Control].)  When no confirmations are returned, it is indicative that there is a "major problem." (Exh. 43 [4/19/07 p.m. Tr.] at 1687-88, 1692 (noting that it would "cause the hair on the back of your neck to stand up").)  BDO's own audit manual warns auditors that a zero confirmation response rate is a potential indicator of fraud.  (*Id*. at 1674-75; Exh. 14 [BDO Audit Manual] at BDO 031771.)  In such a situation, the auditor must take strong independent measures to validate the existence of accounts receivable.  (Exh. 43 [4/19/07 p.m. Tr.] at 1677-78.)  BDO did not.

25.     BDO's audit manual also required that BDO check shipping documents to confirm the account receivables, see Exh. 14 [BDO Audit Manual] at BDO 031774, but BDO did not do it.  (Exh. 52 [5/4/07 a.m. Tr.] at 3214-15.)  Still further, where, as here, virtually all the transactions flowed through related party Capital, BDO's audit manual warned of the possibility for fraud, see Exh. 14 [BDO Audit Manual] at BDO 031890, but BDO actually counted on the Capital Officers "to detect and prevent fraud." (Exh. 54 [5/9/07 Tr.] at 3944-45; Exh. 18 [Consideration of Fraud Risk Workpaper] at BDO 00649.)  Again, BDO ignored the warnings in its own audit manual.

26.     Instead BDO chose to apply consistently less rigorous tests, until ultimately BDO accepted verifications based on Bankest internal documents prepared by the Capital Officers— the very people committing the fraud. (Exh. 43 [4/19/07 p.m. Tr.] at 1706-29, 1738-42; Exh. 17 [1998 Alternate Procedures Workpaper].)  BDO's failure to verify Bankest's accounts receivable with information obtained from third parties violated GAAS. *See, e.g.*, AU § 330; see also (Exh. 43 [4/19/07 p.m. Tr.] at 1741-42; Exh. 44 [4/20/07 a.m. Tr.] at 1858-59; Exh. 45 [4/23/07 p.m. Tr.] at 2036-37.)

### IX.    Due to BDO's Failed Audits, There Was a Massive Fraud at Bankest

27.     As a result of BDO's reckless audits and failure to detect the fraud, the Capital Officers did perpetrate a fraud and did steal the money, Exh. 37 [4/16/07 a.m. Tr.] at 852-62, 877-78, Exh. 28 [Parlapiano Restitution Order]. The Capital Officers stole hundreds of millions of dollars by presenting false financial statements to Espirito Santo Bank in order to continue obtaining funding. (Exh. 37 [4/16/07 a.m. Tr.] at 868, 877-78, 892.)  They included hundreds of millions of dollars of fake accounts receivable in its financial statements, even though the accounts receivable did not exist. (*Id*. at 853-62.)  They represented that invoices were collectible that they knew were not collectible, *id*. at 864, and created fictitious accounts receivable records where there were no actual invoices or sales at all, *id*. at 865. BDO had a duty to detect this fraud and completely failed to do so.

28.     In addition, BDO took concrete steps to assist the Capital Officers in committing the fraud.  In the Bankest fraud, fake customer checks did not exist because they were difficult, if not impossible, to manufacture.  (Exh. 32 [2/6/07 p.m. Tr.] at 3457; Exh. 33 [2/8/07 p.m. Tr.] at 3852-55; Exh. 35 [4/11/07 p.m. Tr.] at 442-44; Exh. 37 [4/16/07 a.m. Tr.] at 887-89.)  The Capital Officers needed BDO to agree to complete its audits without requiring customer checks.  (Exh. 37 [4/16/07 a.m. Tr.] at 891-92.)  BDO complied – after Mr. Lenner and Mr. Parlapiano's closed door discussion, BDO never again asked for customer checks.  (Exh. 37 [4/16/07 a.m. Tr.] at 889, 891.)  If BDO had required customer checks, the fraud would have been discovered.  Exh. 37 [4/16/07 a.m. Tr.] at 878-82, 891-92; Exh. 26 [Rivera Aff.] at ¶¶15, 23-25; Exh. 39 [4/17/07 a.m. Tr.] at 1110-18; Exh. 32 [2/6/07 p.m. Tr.] at 3452-58, 3462; Exh. 44 [4/20/07 a.m. Tr.] at 1799-1800; Exh. 52 [5/4/07 a.m. Tr.] at 3239.)  Not only was BDO's assistance substantial – it was necessary to committing the fraud.  (Exh. 37 [4/16/07 a.m. Tr.] at 891-92.)

Dated:  September 16, 2008

                                          Respectfully submitted,

                                          THOMAS, ALEXANDER & FORRESTER LLP
                                          Co-Counsel for Plaintiff
                                          14 27th Avenue
                                          Venice, CA 90291
                                          Tel:  (310) 961-2536
                                          Fax: (310) 526-6852

                                          and

                                          WARREN R. TRAZENFELD, PA
                                          Co-Counsel for Plaintiff
                                          3225 Aviation Avenue, Suite 600
                                          Miami, FL 33133-4741
                                          Tel.  (305) 860-1100
                                          Fax. (305) 858-6123

                                          and

        GENOVESE JOBLOVE & BATTISTA, P.A.
        Co-Counsel for Plaintiff
        Bank of America Tower, Suite 4400
        100 Southeast Second Street
        Miami, FL 33131
        Tel. (305) 349-2300
        Fax. (305) 349-2310

        By:     /s/ Allison R. Day
            Paul J. Battista, Esq.
            Florida Bar No. 884162
            Allison R. Day, Esq.
            Florida Bar No. 494097

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by U.S. mail, postage prepaid, over-night mail, hand-delivery and/or electronic mail upon all parties on the attached Service List, this 16th day of September, 2008.

        By:    /s/ Allison R. Day
            Allison R. Day

**Service List**

Daniel A. Miller, Esq.
Broad & Cassel
One North Clematis Street, Suite 500
West Palm Beach, FL 33401

Kevin W. Goering, Esq.
Lisa M. Lewis, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
30 Rockefeller Plaza, 24th Floor
New York, NY 10112

John B. Hutton, Esq.
Greenberg Traurig, P.A.
1221 Brickell Ave.
Miami, FL 33131

Karen Y. Bitar, Esq./Adam D. Cole, Esq.
Greenberg Traurig, P.A.
885 Third Ave.
New York, NY 10166

Daniel F. Blonsky, Esq.
Burlington, Weil, Schweip, Kaplan & Blonsky, P.A.
Office in the Grove, Penthouse A
2699 South Bayshore Drive
Miami, FL 33133

Office of the U.S. Trustee
51 S.W. First Ave., Room 1204
Miami, FL 33130

Rhett Traband, Esq.
Mark Raymond, Esq.
Broad and Cassel
One Biscayne Tower
21st Floor
2 S. Biscayne Blvd
Miami, Florida 33131

Daniel L. Gold, Esq.
800 Brickell Ave # 902
Miami, FL 33131