IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR    MIAMI-DADE    COUNTY,
FLORIDA

GENERAL JURISDICTION

BANCO ESPIRITO SANTO
INTERNATIONAL, LTD.,
ESB FINANCE, LTD. and BANCO
ESPIRITO SANTO, S.A. (NASSAU
BRANCH),

CASE NO.:  04-14009 CA 31

      Plaintiffs,

vs.

BDO SEIDMAN, LLP

      Defendant,

_____/

FILED ALCOR
2007 AUG 14  PH 6: 41

## **VERDICT FORM**



A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

We, the jury, return the following verdict:

    1.    What is the total amount of punitive damages, if any, which you find, by the greater weight of evidence, should be assessed against Defendant BDO Seidman?

$ _351,689,343 . 00_

    If you elect not to assess punitive damages against Defendant BDO Seidman, you should enter a zero (0) as the amount of damages, and sign and date the verdict form.

    **SO SAY WE ALL, this** _14_ **day of** _August_ , 2007

_Nancy E. Hammuel_
Foreperson

STATE OF FLORIDA, COUNTY OF DADE
I HEREBY CERTIFY that the foregoing is a true and correct copy of the
original on file in this office. _____ AD 20__
HARVEY RUVIN, Clerk of Circuit and County Court
Deputy Clerk _____
2/73

# FLORIDA STANDARD JURY INSTRUCTIONS IN CIVIL CASES





**THE FLORIDA BAR**

## SUPREME COURT COMMITTEE ON STANDARD JURY INSTRUCTIONS IN CIVIL CASES

Distributed by LexisNexis®
1275 Broadway, Albany, NY 12204-2694
800/833-9844 • FAX: 800/643-1280
*www.lexisnexis.com*



EXHIBIT

8

**PD**
**PUNITIVE DAMAGES**

 *PD 1    Punitive Damages — Bifurcated Procedure*

    *a.    First stage of bifurcated punitive damages procedure*

        *(1)    Introduction*

        *(2)    Punitive damages generally*
            *(a)    Causes of action arising prior to October 1, 1999*
            *(b)    Causes of action arising on or after October 1, 1999*

        *(3)    Direct liability for acts of managing agent, primary owner, or certain others*
            *(a)    Causes of action arising prior to October 1, 1999*
            *(b)    Causes of action arising on or after October 1, 1999*

        *(4)    Vicarious liability for acts of employee or agent*
            *(a)    Causes of action arising prior to October 1, 1999*
            *(b)    Causes of action arising on or after October 1, 1999*

    *b.    Second stage of bifurcated punitive damages procedure*

        *(1)    Opening instruction second stage*

        *(2)    Punitive damages — determination of amount*
            *(a)    Causes of action arising prior to October 1, 1999*
            *(b)    Causes of action arising on or after October 1, 1999*

        *(3)    Closing instruction second stage*

*PD 2    Punitive Damages — Non-Bifurcated Procedure*

    *a.    Punitive damages generally*
        *(1)    Causes of action arising prior to October 1, 1999*
        *(2)    Causes of action arising on or after October 1, 1999*

    *b.    Direct liability for acts of managing agent, primary owner, or certain others*
        *(1)    Causes of action arising prior to October 1, 1999*
        *(2)    Causes of action arising on or after October 1, 1999*

    *c.    Vicarious liability for acts of employee*
        *(1)    Causes of action arising prior to October 1, 1999*
        *(2)    Causes of action arising on or after October 1, 1999*

    *d.    Punitive damages — determination of amount*
        *(1)    Causes of action arising prior to October 1, 1999*
        *(2)    Causes of action arising on or after October 1, 1999*

(PD 1, page 1)

# PD
# PUNITIVE DAMAGES

*PD 1*    *Punitive Damages — Bifurcated Procedure:*

    *a.*    *First stage of bifurcated punitive damages procedure:*

        *(1)*    *Introduction:*

**If you find for** (claimant) **and against defendant** (name person or entity whose conduct may warrant punitive damages)**, you should consider whether, in addition to compensatory damages, punitive damages are warranted in the circumstances of this case as punishment and as a deterrent to others.**

**The trial of the punitive damages issue is divided into two stages. In this first stage, you will decide whether the conduct of** (name defendant whose conduct may warrant punitive damages) **is such that punitive damages are warranted. If you decide that punitive damages are warranted, we will proceed to the second stage during which the parties may present additional evidence and argument on the issue of punitive damages. I will then give you additional instructions, after which you will decide whether in your discretion punitive damages will be assessed and, if so, the amount.**

        *(2)*    *Punitive damages generally:*

            *(a)*    *Causes of action arising prior to October 1, 1999*

**Punitive damages are warranted if you find by clear and convincing evidence that:**

    **(1)**    **the conduct causing [loss] [injury] [or] [damage] to** (claimant) **was so gross and flagrant as to show a reckless disregard of human life or of the safety of persons exposed to the effects of such conduct; or**

7/01

(PD 1, page 2)

**(2)** the conduct showed such an entire lack of care that the defendant must have been consciously indifferent to the consequences; or

**(3)** the conduct showed such an entire lack of care that the defendant must have wantonly or recklessly disregarded the safety and welfare of the public; or

**(4)** the conduct showed such reckless indifference to the rights of others as to be equivalent to an intentional violation of those rights.

[You may determine that punitive damages are warranted against one defendant and not the other[s] or against more than one defendant.]

"Clear and convincing evidence" differs from the "greater weight of the evidence" in that it is more compelling and persuasive. "Greater weight of the evidence" means the more persuasive and convincing force and effect of the entire evidence in the case. In contrast, "clear and convincing evidence" is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.

*(b)    Causes of action arising on or after October 1, 1999*

**Punitive damages** are warranted if you find by clear and convincing evidence that (name person whose conduct may warrant punitive damages) was **personally guilty of intentional misconduct or gross negligence.** "**Intentional misconduct**" means that (name person whose conduct may warrant punitive damages) had **actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to** (claimant) **would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or**

7/01

(PD 1, page 3)



damage. "Gross negligence" means that the conduct of (name person whose conduct may warrant punitive damages) **was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.**

**"Clear and convincing evidence" differs from the "greater weight of the evidence" in that it is more compelling and persuasive. "Greater weight of the evidence" means the more persuasive and convincing force and effect of the entire evidence in the case. In contrast, "clear and convincing evidence" is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.**

       (3)    *Direct liability for acts of managing agent, primary owner, or certain others:*

          (a)      *Causes of action arising prior to October 1, 1999*



**If you find for** (claimant) **and against** (defendant corporation or partnership)**, and you find also that clear and convincing evidence shows that the conduct of** (name managing agent, primary owner, or other person whose conduct may warrant punitive damages without proof of a superior's fault) **was a substantial cause of [loss] [injury] [or] [damage] to** (claimant) **and that such conduct warrants punitive damages against [her] [him] in accordance with the standards I have mentioned, then in your discretion you may also determine that punitive damages are warranted against** (defendant corporation or partnership).

          (b)      *Causes of action arising on or after October 1, 1999*

**If you find for** (claimant) **and against** (defendant corporation or partnership)**, and you find also that clear and convincing evidence shows that** (name managing agent, primary owner, or other person whose conduct may warrant punitive damages without proof of a superior's fault) **was personally guilty of intentional misconduct or gross negligence which was**

7/01

(PD 1, page 4)

a substantial cause of [loss][injury] [or] [damage] to (claimant) **and that such conduct warrants punitive damages against [her] [him] in accordance with the standards I have mentioned, then in your discretion you may also determine that punitive damages are warranted against** (defendant corporation or partnership). **"Intentional misconduct" means that** (name person whose conduct may warrant punitive damages) **had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to** (claimant) **would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage. "Gross negligence" means that the conduct of** (name person whose conduct may warrant punitive damages) **was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.**

      (4)      *Vicarious liability for acts of employee:*

          (a)      *Causes of action arising prior to October 1, 1999*

**If you find for** (claimant) **and against** (defendant employer/principal)**, and you find also that** (name employee/agent) **acted in such a manner as to warrant punitive damages, then if the clear and convincing evidence shows also that** (defendant employer/principal) **was negligent and that such negligence contributed to** (claimant's) **[loss] [injury] [or] [damage], you may determine that punitive damages are warranted against** (defendant employer/principal). **If clear and convincing evidence does not show such negligence by** (defendant employer/principal) **independent of the conduct of** (name employee/agent)**, punitive damages are not warranted against** (defendant employer/principal).

          (b)      *Causes of action arising on or after October 1, 1999*

**If you find for** (claimant) **and against** (defendant employer/principal/ corporation/ or other legal entity)**, and you find also that** (name employee/agent) **was personally guilty of intentional misconduct or gross**

7/01

(PD 1, page 5)



negligence which was a substantial cause of [loss] [injury] [or] [damage] to (claimant) **and that such conduct warrants punitive damages against** (name employee/agent), **then in your discretion you may also determine that punitive damages are warranted against** (defendant employer/principal/corporation/or other legal entity) **if you find that clear and convincing evidence also shows that:**

- (defendant employer/principal/corporation/or other legal entity) **actively and knowingly participated in such conduct of** (name employee/agent); **or**

- **the [officers] [directors] [or] [managers] of** (defendant employer/principal/corporation/or other legal entity) **knowingly condoned, ratified, or consented to such conduct of** (name employee/agent); **or**



- (defendant employer/principal/corporation/or other legal entity) **engaged in conduct that constituted gross negligence and that contributed to the [loss] [damage] [or] [injury] suffered by** (claimant).

**"Intentional misconduct" means that** (name person whose conduct may warrant punitive damages) **had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to** (claimant) **would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage. "Gross negligence" means that the conduct of** (name person whose conduct may warrant punitive damages) **was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.**

7/01

(PD 1, page 6)

*b.*      *Second stage of bifurcated punitive damage procedure:*

     *(1)*      *Opening instruction second stage:*

**The parties may now present additional evidence related to whether punitive damages should be assessed and, if so, in what amount. You should consider this additional evidence along with the evidence already presented, and you should decide any disputed factual issues by the greater weight of the evidence. "Greater weight of the evidence" means the more persuasive and convincing force and effect of the entire evidence in the case."\***

\*The committee added the last sentence at its February 2004 meeting. It has not yet been submitted to the court. The committee determined that the sentence should be published pending its submission to and approval by the court.

     *(2)*      *Punitive damages — determination of amount:*

        *(a)*      *Causes of action arising prior to October 1, 1999*

**You will now determine the amount of punitive damages, if any, to be assessed as punishment and as a deterrent to others. This amount would be in addition to the compensatory damages you have previously awarded. In making this determination, you should consider the following:**

     **(1)**      **the nature, extent and degree of misconduct and the related circumstances; [and]**

     **[(2)**      **[the] [each] defendant's financial resources; and]\***

              **\****Refer to Note on Use 4*

     **[(3)**      **(identify any other circumstance that the jury may consider in determining the amount of punitive damages.)]\***

           **\****Refer to Note on Use 10*



2/04



(PD 1, page 7)

[However, you may not award an amount that would financially destroy (defendant).]*

*Refer to Note on Use 11*

You may in your discretion decline to assess punitive damages. [You may assess punitive damages against one defendant and not the other[s] or against more than one defendant. Punitive damages may be assessed against different defendants in different amounts.]

(b)    Causes of action arising on or after October 1, 1999



You will now determine the amount of punitive damages, if any, to be assessed as punishment and as a deterrent to others. This amount would be in addition to the compensatory damages you have previously awarded. In making this determination, you should consider the following:

(1)    the nature, extent and degree of misconduct and the related circumstances, including the following:

- whether the wrongful conduct was motivated solely by unreasonable financial gain;

- whether the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by [(defendant)] [(the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant)];

2/04

(PD 1, page 8)

- **whether, at the time of [loss] [injury] [or] [damage]**, [(defendant)] [(the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant)] **had a specific intent to harm** (claimant) **and the conduct of** [(defendant)] [(the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant)] **did in fact harm** (claimant), **[and]**

[(2)    [the] [each] defendant's financial resources; and]*

*Refer to Note on Use 4*

[(3)    (identify any other circumstance that the jury may consider in determining the amount of punitive damages.)]*

*Refer to Note on Use 10*

[**However, you may not award an amount that would financially destroy** (defendant).]*

*Refer to Note on Use 11*

**You may in your discretion decline to assess punitive damages. [You may assess punitive damages against one defendant and not the other[s] or against more than one defendant. Punitive damages may be assessed against different defendants in different amounts.]**

(3)    *Closing instruction second stage:*

**Your verdict on the issues raised by the punitive damages claim of** (claimant) **against** (defendant) **must be based on the evidence that has been received during the trial of the first phase of this case and on the**

2/04

(PD 1, page 9)



evidence that has been received in these proceedings and the law on which I have instructed you. In reaching your verdict, you are not to be swayed from the performance of your duty by prejudice or sympathy for or against any party.

Your verdict must be unanimous, that is, your verdict must be agreed to by each of you.

You will be given a form of verdict, which I shall now read to you:

When you have agreed on your verdict, the foreman or fore-woman, acting for the jury, should date and sign the verdict. You may now retire to consider your verdict.

### NOTES ON USE TO PD 1



1.    Upon timely motion, a demand for punitive damages, and determination of the issues raised by such a demand, must be submitted to the jury under the bifurcated procedure established in *W.R. Grace & Co. v. Waters*, 638 So.2d 502 (Fla. 1994). The instructions found under PD 1 are intended to comply with the required bifurcated procedure. Absent a timely motion, punitive damage issues are to be decided under a non-bifurcated procedure, with the instructions found under PD 2.

2.    PD 1a(1) and (2) are to be given in all cases. When the demand for punitive damages is based on the doctrines of either vicarious or direct liability, *see, e.g., Schropp v. Crown Eurocars, Inc.*, 654 So.2d 1158 (Fla. 1995), PD 1a(1) and (2) should be given first if the person whose conduct may warrant punitive damages is a defendant from whom punitive damages are sought. That person should be named in PD 1a(1) and (2) where indicated. Then PD 1a(3) or PD 1a(4) should be given in reference to the direct or vicarious liability of a corporate or partnership defendant. If the person whose conduct may warrant punitive damages is not a defendant, or punitive damages are not sought from that person, the order and content of the charge should be modified to give the substance of PD 1a(3) or PD 1a(4) first followed by PD 1a(1) and (2). In appropriate cases a corporate policy can provide the basis for punitive damages against a corporation even though the particular officers or agents of the corporation responsible for the policy are not discovered or identified. *See, e.g., Schropp v. Crown Eurocars, Inc.*, 654 So.2d 1158 (Fla. 1995) (Wells, J., concurring). In those cases PD 1a(3) will need to be modified accordingly.

3.    PD 1a(2) and PD 1b(2) are designed for use in most common law tort cases. However, certain types of intentional torts may require a punitive damage charge

2/04



(PD 1, page 10)

appropriate to the particular tort. *See, e.g., First Interstate Development Corp. v. Ablanedo*, 511 So.2d 536 (Fla. 1987); *Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277 (Fla. 1985). The same may be true where punitive damages are authorized by statute. *See, e.g., Home Insurance Co. v. Owens*, 573 So.2d 343, 346 (Fla. 4th DCA 1990).

4.    Subparagraph (2) in PD 1b(2) should only be used when evidence of a defendant's financial worth is introduced.

5.    PD 1a(3) should be used when direct liability for punitive damages is based on the acts of a managing agent, primary owner, or another whose acts may be deemed the acts of the defendant. *See Schropp v. Crown Eurocars, Inc.*, 654 So.2d 1158 (Fla. 1995); *Bankers Multiple Line Ins. Co. v. Farish*, 464 So.2d 530 (Fla. 1985); *Winn Dixie Stores, Inc. v. Robinson*, 472 So.2d 722, 724 (Fla. 1985); and *Taylor v. Gunter Trucking Co., Inc.*, 520 So.2d 624 (Fla. 1st DCA 1988).

6.    PD 1a(4) should be used in other cases, where a defendant's vicarious liability for punitive damages requires additional proof of "some [independent] fault" by the principal. *See Mercury Motors Express, Inc. v. Smith*, 393 So.2d 545, 548–49 (Fla. 1981).



7.    PD 1b(1) is to be given as the preliminary instruction in the second stage of a bifurcated trial. PD 1b(2) and (3) are to be given after presentation of evidence and closing argument in the second stage. If PD 1a(3) or (4) has previously been given in the first stage of the trial, the trial judge may elect to repeat, with modifications as necessary, portions of PD 1a(3) or (4) for the sake of clarity.

8.    Depending upon the length of time between the first and second stages, the trial court may wish to precede these instructions with general instructions 2.1, 2.2, and 3.9.

9.    The purpose of the instructions is not to allow parties to relitigate in the second stage of the bifurcated proceeding, by new evidence or by argument, the underlying question decided in the first stage of the proceeding of whether an award of punitive damages is warranted. Rather, the purpose of the instructions is to advise the jury that in the second stage of the proceeding, evidence may be presented and argued which will allow the jury in its discretion to determine the amount of an award of punitive damages, and that the amount which the jury determines appropriate could be zero.

10.    Subparagraph (3) should be used only after the court has determined that the evidence includes some additional circumstance that may affect the amount of punitive damages. *See, e.g., Owens-Corning Fiberglass Corp. v. Ballard*, 749 So.2d 483 (Fla. 1999) (listing various such factors). *See generally BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). One such circumstance is the assessment of punitive

2/04

(PD 1, page 11)



damages against the defendant in prior cases. *See W.R. Grace & Co. v. Waters,* 638 So.2d 502 (Fla. 1994).

11.     This instruction is to be given when requested by the defendant. *See Wransky v. Dalfo,* 801 So.2d 239 (Fla. 4th DCA 2001). It appears that this instruction can only be used when evidence of the defendant's net worth has been introduced. *See Bould v. Touchette,* 349 So.2d 1181 (Fla. 1977); *Rinaldi v. Aaron,* 314 So.2d 762 (Fla. 1975). This instruction is not intended to supplant the court's function in determining whether a verdict is constitutional. *See BMW of North America v. Gore,* 517 U.S. 559, 116 S.Ct. 1589 (1996); *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The Committee notes that many reported decisions have used alternative terms such as "bankrupt" or "economically castigate" to describe this limitation, instead of or in addition to the term "financially destroy." *See, e.g., Lehman v. Spencer Ladd's Inc.,* 182 So.2d 402 (Fla. 1966); *Wackenhut Corp. v. Canty,* 359 So.2d 430 (Fla. 1978). The Committee has selected the term "financially destroy" for its simplicity, but does not intend to foreclose the use of other legally valid terms where appropriate under the facts of the particular case.

## COMMENT



PD 1a(4) is based on *Schropp v. Crown Eurocars, Inc.,* 654 So.2d 1158 (Fla. 1995). There may be situations other than employer-employee relationships where vicarious liability for punitive damages may be imposed. *See, e.g., Knepper v. Genstar Corp.,* 537 So.2d 619 (Fla. 3d DCA 1988) (joint venture); *Soden v. Starkman,* 218 So.2d 763 (Fla. 3d DCA 1969) (partnership).



2/04



(PD 2, page 1)

*PD 2    Punitive Damages — Non-Bifurcated Procedure:*

    *a.    Punitive damages generally:*

**If you find for** (claimant) **and against defendant** (name person or entity whose conduct may warrant punitive damages)**, you should consider whether, in addition to compensatory damages, punitive damages are warranted in the circumstances of this case as punishment and as a deterrent to others.**

    *(1)    Causes of action arising prior to October 1, 1999*

**Punitive damages are warranted if you find by clear and convincing evidence that:**

    **(1)    the conduct causing [loss] [injury] [or] [damage] to** (claimant) **was so gross and flagrant as to show a reckless disregard of human life or of the safety of persons exposed to the effects of such conduct; or**

    **(2)    the conduct showed such an entire lack of care that the defendant must have been consciously indifferent to the consequences; or**

    **(3) .    the conduct showed such an entire lack of care that the defendant must have wantonly or recklessly disregarded the safety and welfare of the public; or**

    **(4)    the conduct showed such reckless indifference to the rights of others as to be equivalent to an intentional violation of those rights.**

**[You may determine that punitive damages are warranted against one defendant and not the other[s] or against more than one defendant.]**

**"Clear and convincing evidence"** differs from the **"greater weight of the evidence"** in that it is more compelling and persuasive. **"Greater**



7/01



(PD 2, page 2)

weight of the evidence" means the more persuasive and convincing force and effect of the entire evidence in the case. In contrast, "clear and convincing evidence" is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.

(2)     *Causes of action arising on or after October 1, 1999*

Punitive damages are warranted if you find by clear and convincing evidence that (name person whose conduct may warrant punitive damages) was personally guilty of intentional misconduct or gross negligence. "Intentional misconduct" means that (name person whose conduct may warrant punitive damages) had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to (claimant) would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage. "Gross negligence" means that the conduct of (name person whose conduct may warrant punitive damages) was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.



"Clear and convincing evidence" differs from the "greater weight of the evidence" in that it is more compelling and persuasive. "Greater weight of the evidence" means the more persuasive and convincing force and effect of the entire evidence in the case. In contrast, "clear and convincing evidence" is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.

b.     *Direct liability for acts of managing agent, primary owner, or certain others:*

(1)     *Causes of action arising prior to October 1, 1999*

If you find for (claimant) and against (defendant corporation or partnership), and you find also that clear and convincing evidence shows that the conduct of (name managing agent, primary owner, or other person whose conduct may warrant punitive damages without proof of a superior's

7/01

(PD 2, page 3)

fault) **was a substantial cause of [loss] [injury] [or] [damage] to** (claimant) **and that such conduct warrants punitive damages against [her] [him] in accordance with the standards I have mentioned, then in your discretion you may also determine that punitive damages are warranted against** (defendant corporation or partnership).

(2)    *Causes of action arising on or after October 1, 1999*

**If you find for** (claimant) **and against** (defendant corporation or partnership), **and you find also that the clear and convincing evidence shows that** (name managing agent, primary owner, or other person whose conduct may warrant punitive damages without proof of a superior's fault) **was personally guilty of intentional misconduct or gross negligence which was a substantial cause of [loss] [injury] [or] [damage] to** (claimant) **and that such conduct warrants punitive damages against [her] [him] in accordance with the standards I have mentioned, then in your discretion you may also determine that punitive damages are warranted against** (defendant corporation or partnership). **"Intentional misconduct" means that** (name person whose conduct may warrant punitive damages) **had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to** (claimant) **would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage. "Gross negligence" means that the conduct of** (name person whose conduct may warrant punitive damages) **was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.**

c.    *Vicarious liability for acts of employee or agent:*

(1)    *Causes of action arising prior to October 1, 1999*

**If you find for** (claimant) **and against** (defendant employer/principal), **and you find also that** (name employee/agent) **acted in such a manner as to warrant punitive damages, then if clear and convincing evidence shows also that** (defendant employer/principal) **was negligent and that such negligence contributed to** (claimant's) **[loss] [injury] [or] [damage], you may determine that punitive damages are also**

7/01

(PD 2, page 4)

warranted against (defendant employer/principal). **If clear and convincing evidence does not show such negligence by** (defendant employer/principal) **independent of the conduct of** (name employee/agent), **punitive damages are not warranted against** (defendant employer/principal).

     *(2)       Causes of action arising on or after October 1, 1999*

        **If you find for** (claimant) **and against** (defendant employer/principal/corporation/or other legal entity)**, and you find also that** (name employee/agent) **was personally guilty of intentional misconduct or gross negligence which was a substantial cause of [loss] [injury] [or] [damage] to** (claimant) **and that such conduct warrants punitive damages against** (name employee/agent)**, then in your discretion you may also determine that punitive damages are warranted against** (defendant employer/principal/corporation/or other legal entity) **if you find that clear and convincing evidence also shows that:**

-   (defendant employer/principal/corporation/or other legal entity) **actively and knowingly participated in such conduct of** (name employee/agent); **or**

-   **the [officers] [directors] [or] [managers] of** (defendant employer/principal/corporation/or other legal entity) **knowingly condoned, ratified, or consented to such conduct of** (name employee/agent); **or**

-   (defendant employer/principal/corporation/or other legal entity) **engaged in conduct that constituted gross negligence and that contributed to the [loss] [damage] [or] [injury] suffered by** (claimant).

       **"Intentional misconduct" means that** (name person whose conduct may warrant punitive damages) **had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to** (claimant) **would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage. "Gross negligence"**

7/01



means that the conduct of (name person whose conduct may warrant punitive damages) was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

d.    *Punitive damages — determination of amount:*

(1)    *Causes of action arising prior to October 1, 1999*

In determining the amount of punitive damages, if any, to be assessed as punishment and as a deterrent to others, you should decide any disputed factual issues by the greater weight of the evidence. "Greater weight of the evidence" means the more persuasive and convincing force and effect of the entire evidence in the case. You should consider the following:

(1)    the nature, extent and degree of misconduct and the related circumstances;

[(2)    [the] [each] defendant's financial resources; and]*

*Refer to Note On Use 3*

[(3)    (identify any other circumstance that the jury may consider in determining the amount of punitive damages.)]*

*Refer to Note On Use 7*

[However, you may not award an amount that would financially destroy (defendant).]*

*Refer to Note on Use 8*

Any punitive damages you assess would be in addition to any compensatory damages you award. You may in your discretion decline to assess punitive damages. [You may assess punitive damages against one defendant and not the other[s] or against more than one defendant.

2/04

(PD 2, page 6)



**Punitive damages may be assessed against different defendants in different amounts.]**

    (2)    *Causes of action arising on or after October 1, 1999*

        In determining the amount of punitive damages, if any, to be assessed as punishment and as a deterrent to others, you should decide any disputed factual issues by the greater weight of the evidence. "Greater weight of the evidence" means the more persuasive and convincing force and effect of the entire evidence in the case. You should consider the following:

    (1)    the nature, extent and degree of misconduct and the related circumstances, including the following:

- whether the wrongful conduct was motivated solely by unreasonable financial gain;

- whether the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by [(defendant)] [(the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant)];

- whether, at the time of [loss] [injury] [or] [damage], [(defendant)] [(the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant)] had a specific intent to harm (claimant) and the conduct of [(defendant)] [(the managing agent,

2/04

(PD 2, page 7)



director, officer, or other person responsible for making policy decisions on behalf of the defendant)] **did in fact harm** (claimant), **[and]**

**[(2)    [the] [each] defendant's financial resources; and]***

*\*Refer to Note on Use 3*

**[(3)**    (identify any other circumstance that the jury may consider in determining the amount of punitive damages.)]***

*\*Refer to Note on Use 7*

**[However, you may not award an amount that would financially destroy (defendant).]***

*\*Refer to Note on Use 8*



**Any punitive damages you assess would be in addition to any compensatory damages you award. You may in your discretion decline to assess punitive damages. [You may assess punitive damages against one defendant and not the other[s] or against more than one defendant. Punitive damages may be assessed against different defendants in different amounts.]**

NOTES ON USE TO PD 2



1.    When the demand for punitive damages is based on the doctrines of either vicarious or direct liability, *see, e.g., Schropp v. Crown Eurocars, Inc.*, 654 So.2d 1158 (Fla. 1995), PD 2a should be given first if the person whose conduct may warrant punitive damages is a defendant from whom punitive damages are sought. That person should be named in PD 2a where indicated. Then PD 2b or 2c should be given in reference to the direct or vicarious liability of a corporate or partnership defendant. If the person whose conduct may warrant punitive damages is not a defendant, or punitive damages are not sought from that person, the order and content of the charge should be modified to give the substance of PD 2b or PD 2c first followed by PD 2a. In appropriate cases a corporate policy can provide the basis for punitive damages against a corporation even though the particular officers or agents of the corporation responsible for the policy are not discovered or identified. *See, e.g., Schropp v. Crown Eurocars, Inc.*, 654 So.2d 1158 (Fla. 1995) (Wells, J., concurring). In those cases, PD 2b will need to be modified accordingly.

2/04

(PD 2, page 8)



2.       PD 2a is designed for use in most common law tort cases. However, certain types of intentional torts may require a punitive damage charge appropriate to the particular tort. *See, e.g., First Interstate Development Corp. v. Ablanedo*, 511 So.2d 536 (Fla. 1987); *Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277 (Fla. 1985). The same may be true where punitive damages are authorized by statute. *See, e.g., Home Insurance Co. v. Owens*, 573 So.2d 343, 346 (Fla. 4th DCA 1991).

3.       Subparagraph (2) in PD 2d should only be used when evidence of a defendant's financial worth is introduced.

4.       PD 2b should be used when direct liability for punitive damages is based on the acts of a managing agent, primary owner, or another whose acts may be deemed the acts of the defendant. *See Schropp v. Crown Eurocars, Inc.*, 654 So.2d 1158 (Fla. 1995); *Bankers Multiple Line Ins. Co. v. Farish*, 464 So.2d 530 (Fla. 1985); *Winn Dixie Stores, Inc. v. Robinson*, 472 So.2d 722, 724 (Fla. 1985); *Taylor v. Gunter Trucking Co., Inc.*, 520 So.2d 624 (Fla. 1st DCA 1988).

5.       PD 2c should be used in other cases, where a defendant's vicarious liability for punitive damages requires additional proof of "some independent fault" by the principal. *See Mercury Motors Express, Inc. v. Smith*, 393 So.2d 545, 548–49 (Fla. 1981).

6.       PD 2d should be given after the last of instructions PD 2a, 2b, or 2c that is given.

7.       Subparagraph (3) should be used only after the court has determined that the evidence includes some additional circumstance that may affect the amount of punitive damages. *See, e.g., Owens-Corning Fiberglass Corp. v. Ballard*, 749 So.2d 483 (Fla. 1999) (listing various such factors). *See generally BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). One such circumstance is the assessment of punitive damages against the defendant in prior cases. *See W.R. Grace & Co. v. Waters*, 638 So.2d 502 (Fla.1994).

8.       This instruction is to be given when requested by the defendant. *See Wransky v. Dalfo*, 801 So.2d 239 (Fla. 4th DCA 2001). It appears that this instruction can only be used when evidence of the defendant's net worth has been introduced. *See Bould v. Touchette*, 349 So.2d 1181 (Fla. 1977); *Rinaldi v. Aaron*, 314 So.2d 762 (Fla. 1975). This instruction is not intended to supplant the court's function in determining whether a verdict is constitutional. *See BMW of North America v. Gore*, 517 U.S. 559, 116 S.Ct. 1589 (1996); *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The Committee notes that many reported decisions have used alternative terms such as "bankrupt" or "economically castigate" to describe this limitation, instead of or in addition to the term "financially destroy." *See, e.g., Lehman v. Spencer Ladd's Inc.*, 182 So.2d 402 (Fla. 1966); *Wackenhut Corp. v. Canty*, 359 So.2d 430 (Fla. 1978). The Committee has selected the term "financially destroy" for its simplicity, but does not intend to foreclose the use of other legally valid terms where appropriate under the facts of the particular case.



(PD 2, page 9)

## COMMENT

PD 2c is based on *Schropp v. Crown Eurocars, Inc.*, 654 So.2d 1158 (Fla. 1995). There may be situations other than employer-employee relationships where vicarious liability for punitive damages may be imposed. *See, e.g., Knepper v. Genstar Corp.*, 537 So.2d 619 (Fla. 3d DCA 1988) (joint venture); *Soden v. Starkman*, 218 So.2d 763 (Fla. 3d DCA 1969) (partnership).

2/04

03/04/99  17:08                                            NO.253  P002/004

# E. S. Bankest L.L.C.

## Financial Statements
### For the period from March 18, 1998 (inception) through December 31, 1998



**BANK 0001766**

Plaintiffs' Exh. No. 74
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts

ES0980220

03-04/99  17:07                                        NO.253  P003-004



# E. S. Bank

**Financial Statements**
For the period from March 18, 1998 (inception)
through December 31, 1998

BANK 0001767

ES0980221

03-04-99  17:07

NO.253  P004 004

## Independent Auditors' Report

Board of Directors
E.S. Bankest L.L.C.

We have audited the accompanying balance sheet of E.S. Bankest L.L.C., as of December 31, 1998, and the related statements of operations, members' equity and cash flows for the period from March 18, 1998 (inception) through December 31, 1998. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of E.S. Bankest L.L.C. as of December 31, 1998 and the results of its operations and its cash flows for the period from March 18, 1998 (inception) through December 31, 1998 in conformity with generally accepted accounting principles.

*BDO Seidman, LLP*

Certified Public Accountants

Miami, Florida
February 26, 1999

2

BANK 0001768

ES0980222



**E. S. Bankes**

**Balan**

| December 31, | 1998 |
|---|---|
| **Assets** | |
| Cash and cash equivalents (Note 1) | $ 2,603,238 |
| Accounts receivable, less allowance for doubtful | |
| accounts of $83,000 (Notes 1 and 3) | 40,638,879 |
| Prepaid expenses | 40,430 |
| Debt issuance costs | 177,333 |
| Furniture and equipment, net of accumulated depreciation of $1,220 | 23,174 |
| Other assets | 21,492 |
| | $ 43,504,546 |
| **Liabilities** | |
| Promissory notes (Note 1) | $ 34,350,000 |
| Due to affiliates (Note 3) | 3,654,980 |
| Accrued interest payable | 516,424 |
| Accounts payable and accrued liabilities | 34,284 |
| Unearned factoring fees | 389,791 |
| Income tax payable | 263,100 |
| Total liabilities | 39,208,579 |
| **Members' Equity** | |
| Initial capitalization | 3,000,000 |
| Retained earnings | 1,295,967 |
| Total members' equity | 4,295,967 |
| | $ 43,504,546 |

*See accompanying summary of accounting policies*
*and notes to financial statements.*

3

**BANK 0001769**

ES0980223

03 04/99  17:09                                    HO.254  P002 012

## E. S. Bankest

### Statement of Operations

| Period from March 18, 1998 (inception) through December 31, | 1998 |
|---|---|
| **Revenues:** | |
| Interest and fee income | $ 4,147,147 |
| **Expenses:** | |
| General and administrative | 1,116,018 |
| Interest | 1,000,580 |
| Provision for credit losses | 159,666 |
| Commissions | 117,667 |
| Professional fees | 57,249 |
| Total expenses | 2,451,180 |
| Income before provision for income taxes | 1,695,967 |
| Provision for income taxes | 400,000 |
| **Net income** | $ 1,295,967 |

*See accompanying summary of accounting policies and notes to financial statements.*

*4*

BANK 0001770

ES0980224



# E. S. Bankest

## Statement of Member

| | | Initial Capitalization | Retained Earnings | Total Members' Equity |
|---|---|---|---|---|
| Initial capitalization | $ | 3,000,000 | $ - | $ 3,000,000 |
| Net income | | - | 1,295,967 | 1,295,967 |
| Balance at December 31, 1998 | $ | 3,000,000 | $ 1,295,967 | $ 4,295,967 |

*See accompanying summary of accounting policies and notes to financial statements.*

**BANK 0001771**

5

ES0980225

03-04/99   17:09                                    NO. 254   P004/012

# E. S. Bankest 

### Statement of Cash Flows

| Period from March 18, 1998 (inception) through December 31. | 1998 |
|---|---|
| **Operating Activities:** | |
| Net income | $ 1,295,967 |
| Adjustments to reconcile net income to net cash | |
| provided by operating activities: | |
| Depreciation | 1,220 |
| Provision for doubtful accounts | 82,576 |
| Changes in operating assets and liabilities: | |
| (Increase) decrease in: | |
| Prepaid expenses | (40,430) |
| Other assets | (21,492) |
| Increase (decrease) in: | |
| Due to affiliates | 3,654,980 |
| Accounts payable and accrued expenses | 34,284 |
| Unearned factoring fees | 389,791 |
| Income tax payable | 263,100 |
| Net cash provided by operating activities | 5,659,996 |
| **Investing Activities:** | |
| Capital expenditures | (24,394) |
| Accounts receivable | (40,721,455) |
| Net cash used in investing activities | (40,745,849) |
| **Financing Activities:** | |
| Proceeds from issuance of promissory notes | 39,275,000 |
| Repayment of promissory notes | (4,925,000) |
| Debt issuance costs | (177,333) |
| Accrued interest on promissory notes | 546,424 |
| Members' contribution | 3,000,000 |
| Net cash provided by financing activities | 37,689,091 |
| Net increase in cash and cash equivalents | 2,603,238 |
| Cash and cash equivalents at beginning of period | |
| Cash and cash equivalents at end of period | $ 2,603,238 |
| **Supplemental disclosure of cash flow information:** | |
| Cash paid during the year for interest | $ 1,000,580 |

*See accompanying summary of accounting policies and notes to financial statements.*

6

BANK 0001772

ES0980226

03/04/99  17:09                                           NO.254  P005/012

# E. S. Bankest

## Summary of Significant Accounting

**Organization**

E. S. Bankest Corp. was organized on March 18, 1998 under the laws of the State of Florida. The Company was established for the purpose of engaging in the operation of a non-regulated commercial factoring business, principally by acquiring from Bankest Capital Corp. (BCC) and Bankest Receivables Finance and Factoring Corp. (BRFFC), a joint owner and wholly-owned subsidiary of BCC, respectively, a portion of accounts receivable acquired by BCC and BRFFC pursuant to their factoring businesses.

As part of transactions incident to the formation of the Company, the Company has entered into an Accounts Receivable Purchase and Tri-Party Agreement (the "AR Purchase Agreement") with BCC and BRFFC, pursuant to which the Company has agreed to purchase certain assets from BCC and BRFFC. Those assets include various accounts receivable acquired by BCC and BRFFC pursuant to their factoring and finance business. The Company also agreed to acquire certain rights, and assume certain obligations, under various factoring agreements presently existing between BCC and/or BRFFC and their respective clients. The Company used the proceeds derived from the issuance of Promissory Notes to finance the purchase of the foregoing assets and to fund the purchase of additional Insured Accounts Receivable and to make advances in the operation of its commercial factoring business.

On October 26, 1998, the Company's stockholders agreed to merge the Company with and into Lacroze, LLC (a Florida Limited Liability Company) the surviving company change its name to E.S. Bankest LLC (Florida Limited Liability Company). This surviving entity succeeded to all of the rights, privileges, immunities and franchises and all of the property of E.S. Bankest Corp. and is responsible and liable for all of E.S. Bankest Corp. liabilities and obligations.

The merger was accounted for in a manner similar to a pooling of interest since both companies are under common control. The common stock of E.S. Bankest Corp. were converted into units of E.S. Bankest L.L.C.

7

**BANK 0001773**

ES0980227

03-04-99  17:12                                    NO.354  P011/012

# E. S. Bankest

## Summary of Significant Accounting ▮▮▮▮

The accompanying financial statements include the results of operations since the March 18, 1998 formation of E.S. Bankest Corp.

**Accounts Receivable Purchased and Concentration of Credit Risk**

Accounts receivable purchased from BCC and BRFFC have principally been originated by small to medium sized companies in the South Florida geographic area. The Company generally withholds payment on a specified percentage of the purchased receivables and obtains credit insurance to reduce a portion of its credit risk. If third parties fail to honor their obligations under the purchased receivable, the Company's loss is reduced by any withheld payments and credit insurance. The Company performs ongoing credit evaluations of its significant customers.

The Company's major client is a manufacturer of consumer goods. At December 31, 1998, approximately 59% of the receivables purchased were concentrated with that one client. Although the Company is directly affected by the well being of this client, management does not believe significant credit risk exists at December 31, 1998 as the collectibility of the receivables is insured against insolvency and the receivables are substantially due from large corporations. Should the Company, not be able to acquire receivables from this major client, for any reason, there may be materially adverse effects on the Company's operations.

The allowance for credit losses is maintained at a level deemed adequate by management to absorb losses in the portfolio after evaluating the portfolio, current economic conditions, insurance coverage, changes in the nature and the volume of the portfolio, past loss experience and other pertinent factors. Many of these factors involve a significant degree of estimation and are subject to rapid change which may be unforeseen by management. It is reasonably possible that changes in these factors could result in material adjustments to the allowance in the near term. During the period ended December 31, 1998, the Company has had no significant charge-offs.

8

**BANK 0001774**

ES0980228

# E. S. Bankest

## Summary of Significant Accounting

| | |
|---|---|
| **Cash and Cash Equivalents** | The Company considers investments with original maturities of three months or less at the time of purchase to be cash equivalents. At times, cash balances in the Company's account may exceed federally insured limits. |
| **Income Recognition** | Interest income on advances and other amounts owed to the Company is calculated using the simple interest method on the daily balances of principal outstanding and is recorded as earned in accordance with the terms of the related factoring agreements with clients. Factoring fees are recognized over the period that the Company renders the related services. |
| **Furniture and Equipment** | Furniture and equipment are recorded at cost. Depreciation is calculated on the straight-line basis over the estimated useful lives of the assets. (3-5 years). |
| **Income Taxes** | Income taxes are provided for in the accompanying financial statements for the period from March 18, 1998 (inception) through October 25, 1998 during which the Company was a taxable entity. Effective upon the October 26, 1998 merger into Lacroze, LLC, the Company's operations are taxable directly to the members and accordingly, no provision for income taxes is included in the accompanying financial statements for periods subsequent to October 25, 1998. |
| **Use of Estimates in the Preparation of Financial Statements** | The preparation of the financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. |

9

BANK 0001775

ES0980229

# E. S. Bankes

## Summary of Significant Accounting

| | |
|---|---|
| **Reporting Comprehensive Income** | Statement of Financial Accounting Standards (SFAS) No. 130, "Reporting Comprehensive Income," establishes standards for reporting and display of comprehensive income, its components and accumulated balances. Comprehensive income is defined to include all changes in equity except those resulting from investments by owners and distributions to owners. Among other disclosures, SFAS No. 130 requires that all items that are required to be recognized under current accounting standards as components of comprehensive income be reported in a financial statement that is displayed with the same prominence as other financial statements. At December 31, 1998, SFAS No. 130 had no material impact on the Company's financial statements. |

10

**BANK 0001776**

ES0980230

03-04-99  17:10                                      NO.254  P007/012

# E. S. Bankest▮▮▮

## Notes to Financial Sta▮▮▮

| 1. | Promissory Notes |
|----|-----------------|

Factored Accounts Receivable-Backed Promissory Notes (the Notes), were issued through private placements resulting in proceeds to the Company of $39,275,000 in 1998. Of these proceeds, $34,350,000 are outstanding at December 31, 1998. The Notes are collateralized by (i) accounts receivable owned by the Company (ii) an assignment of the proceeds of a credit insurance policy (iii) reserve balances in the factoring accounts (iv) unused note proceeds and (v) cash and cash equivalents.

The Series A Notes ($18,050,000 at December 31, 1998) accrue interest based on the six month London Inter-Bank Offered Rate plus 1.5% (6.65% at December 31, 1998) and mature through July 1, 1999.

The Series B Notes ($16,300,000 at December 31, 1998) accrue interest based on the twelve month London Inter-Bank Offered Rate plus 1.75% (6.90% at December 31, 1998) and through December 30, 1999.

Under the terms of the Promissory Notes agreement, the Company is obligated to comply with certain covenants. These covenants provide that during any period during which there exists an outstanding principal amount under the Notes, the outstanding balance of Accounts Receivable and pledged to the Collateral Agent and Lenders under the Security Agreement will be not less than one hundred and twenty percent (120%) of the principal amount of all Notes outstanding minus cash deposits and securities pledged. At December 31, 1998, the Company was in compliance with this covenant.

Depending on the Company's rate of growth, the Company may in the future require proceeds from new debt, borrowings or sale of the Company's securities to obtain additional capital. Although the Company believes that it can raise additional capital and have profitable operations in the ensuing year, there can be no assurance that the Company will be able to maintain profitability or obtain additional capital when needed.

11

**BANK 0001777**

ES0980231

03/04/99  17:11

NO.254  P008/012

# E. S. Bankest ▐▐▐

### Notes to Financial Sta▐▐▐

| | | |
|---|---|---|
| 2. | **Line of Credit** | In July 1998, the Company obtained a credit facility from Banco Espirito Santo & Commercial de Lisboa which provides for a demand revolving line of credit with maximum borrowings of $3,000,000. Outstanding amounts under this facility bear interest equal to the six month LIBOR rate in effect on the first date of the month in which a borrowing occurs plus 1.50% (6.65% at December 31, 1998). |
| | | At December 31, 1998, no amounts were outstanding under this facility. This credit facility expires in August 1999. Under the terms of the Agreement, the Company is required to maintain credit insurance against any loss arising from the insolvency of any party appearing as debtor in any receivable purchased by the Company. Also the Company is required to maintain a ratio of total liabilities to total tangible net worth not greater than 12:1. |
| 3. | **Related Party Transactions** | At December 31, 1998, due to affiliates consist of the following: |

| | | |
|---|---|---:|
| Due to Bankest Capital Corp. | $ | 1,822,642 |
| Due to Bankest Receivables Finance and Factoring Corp. | | 1,832,338 |
| Total | $ | 3,654,980 |

The Company purchases accounts receivable, at face, principally from BCC and BRFFC. Proceeds from the notes are used by the Company to finance additional purchases of accounts receivable and to make advances under its factoring agreements.

The Company purchases accounts receivable with recourse, except as to credit risk. The Company's accounts receivable are insured against credit losses through credit insurance. During the period ended December 31, 1998, BCC and BRFFC accepted the return by the Company of invoices, aggregating approximately $1,330,000, for which the Company did not wish to retain credit

12

**BANK 0001778**

ES0980232

03/04/99   17:11                                                              NO.254   P009/012



**E. S. Bankest**

**Notes to Financial Statements**

risk. No purchased accounts receivable are considered to be impaired as of December 31, 1998.

The Company's indebtedness to BCC and BRFFC represents the accrued purchase price of accounts receivable acquired. Such amount is net of advances. The net obligation to BCC and BRFFC is unsecured and due upon demand. Interest is charged on the amounts outstanding for the purchase price of accounts receivable net of advances based on the base rate as published by Citibank N.A. plus 3%.

**4. Income Taxes** — The significant components of the provision for income taxes are as follows:

| Period ended December 31, | | 1998 |
|---|---|---|
| Current: | | |
| State | $ | 56,000 |
| Federal | | 344,000 |
| | $ | 400,000 |

The principal difference between the provision for income taxes computed at the statutory rate (34%) and the Company's effective tax rate is due to the Company's results of operations subsequent to October 25, 1998 being taxable directly to the stockholders as a result of the merger into Lacroze, LLC.

**5. Commitments** — The Company rents office space under non-cancelable leases. The minimum future rental commitment for leases in effect at December 31, 1998, approximates the following:

| Year ending December 31, | | Amount |
|---|---|---|
| 1999 | $ | 111,500 |
| 2000 | | 114,500 |
| 2001 | | 97,500 |
| | $ | 323,500 |

13

BANK 0001779

ES0980233

03 '04 '99  17:11                                              NO.254  P010·012

# E. S. Bankest L. L. C.

### Notes to Financial Statements

Rent expense in 1998 aggregated approximately $56,000.

6. **Year 2000 Issues**
   **(Unaudited)**

Like other companies, E.S. Bankest L.L.C. could be adversely affected if the computer systems we, our suppliers or customers use, do not properly process and calculate date-related information and data from the period surrounding and including January 1, 2000. This is commonly known as the "Year 2000" issue. Additionally, this issue could impact non-computer systems and devices such as production equipment, elevators, etc. At this time, because of the complexities involved in the issue, management cannot provide assurances that the Year 2000 issue will not have an impact on the company's operations.

BANK 0001780    14

ES0980234



# E. S. Bankest L L C

## Financial Statements

**For the year ended December 31, 1999 and
for the period from March 18, 1998 (Inception)
through December 31, 1998**



**BANK 0011305**

Plaintiffs' Exh. No. 77
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts

ES0975283



**BDO Seidman, LLP**
Accountants and Consultants

NationsBank Tower at International Place
100 S.E. 2nd Street, Suite 2200
Miami, Florida 33131
Telephone: (305) 381-8000
Fax: (305) 374-1135

## Independent Auditors' Report

Board of Directors
E.S. Bankest L.L.C.

We have audited the accompanying balance sheets of E.S. Bankest L.L.C., as of December 31, 1999 and 1998, and the related statements of operations, members' equity and cash flows for the year ended December 31, 1999 and for the period from March 18, 1998 (inception) through December 31, 1998. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of E.S. Bankest L.L.C. as of December 31, 1999 and 1998 and the results of its operations and its cash flows for the year ended December 31, 1999 and for the period from March 18, 1998 (inception) through December 31, 1998 in conformity with generally accepted accounting principles.

*BDO Seidman, LLP*

Certified Public Accountants

Miami, Florida
February 23, 2000

**BANK 0011306**

2

ES0975284

# E. S. Bankest L.L.C.

## Balance Sheets

| December 31, | 1999 | 1998 |
|---|---:|---:|
| **Assets** | | |
| Cash and cash equivalents (Note 1) | $  3,391,682 | $  2,603,238 |
| Accounts receivable, ($60,320,109, net of amount in 1999 due to clients of $1,353,368) less allowance for doubtful accounts of $143,000 and $83,000 (Notes 1 and 3) | 58,688,290 | 40,638,879 |
| Due from affiliates (Note 3) | 155,428 | - |
| Prepaid expenses | 71,250 | 40,430 |
| Debt issuance costs net of accumulated amortization of $560,487 and $117,667 | 74,826 | 177,333 |
| Furniture and equipment, net of accumulated depreciation of $10,941 and $1,220 | 15,932 | 23,174 |
| Other assets | 21,492 | 21,492 |
| | $  62,418,900 | $  43,504,546 |
| **Liabilities** | | |
| Promissory notes (Note 1) | $  51,550,000 | $  34,350,000 |
| Due to affiliates (Note 3) | - | 3,654,980 |
| Accrued interest payable | 894,354 | 516,424 |
| Accounts payable and accrued liabilities | 30,381 | 34,284 |
| Unearned factoring fees | 779,779 | 389,791 |
| Income tax payable | 243,843 | 263,100 |
| Total liabilities | 53,498,357 | 39,208,579 |
| **Members' Equity** | | |
| Initial capitalization | 3,000,000 | 3,000,000 |
| Retained earnings | 5,920,543 | 1,295,967 |
| Total members' equity | 8,920,543 | 4,295,967 |
| | $  62,418,900 | $  43,504,546 |

*See accompanying summary of accounting policies
and notes to financial statements.*

**BANK 0011307**

3

ES0975285

# E. S. Bankest L.L.C.

## Statements of Operations

| For the year ended December 31, 1999 and for the period from March 18, 1998 (inception) through December 31, 1998 | 1999 | 1998 |
|---|---|---|
| **Revenues:** | | |
| Interest and fee income | $ 10,334,805 | $ 4,147,147 |
| | | |
| **Expenses:** | | |
| Interest | 3,053,351 | 1,000,580 |
| General and administrative | 2,044,284 | 1,116,018 |
| Commissions (Note 3) | 442,820 | 117,667 |
| Professional fees | 109,774 | 57,249 |
| Provision for credit losses | 60,000 | 159,666 |
| | | |
| Total expenses | 5,710,229 | 2,451,180 |
| | | |
| Income before provision for income taxes | 4,624,576 | 1,695,967 |
| | | |
| Provision for income taxes (Note 4) | - | 400,000 |
| | | |
| Net income | $   4,624,576 | $   1,295,967 |

*See accompanying summary of accounting policies and notes to financial statements.*

BANK 0011308                    4

ES0975286



# E. S. Bankest, LLC

## Statements of Members' Equity

|  | Initial Capitalization | Retained Earnings | Total Members' Equity |
|---|---|---|---|
| Initial capitalization | $ 3,000,000 | $ - | $ 3,000,000 |
| Net income | - | 1,295,967 | 1,295,967 |
| Balance at December 31, 1998 | 3,000,000 | 1,295,967 | 4,295,967 |
| Net income | - | 4,624,576 | 4,624,576 |
| Balance at December 31, 1999 | $ 3,000,000 | $ 5,920,543 | $ 8,920,543 |

*See accompanying summary of accounting policies and notes to financial statements.*

BANK 0011309          5

ES0975287

**E. S. Bankest LLC**

**Statements of Cash Flows**

| For the year ended December 31, 1999 and for the period from March 18, 1998 (inception) through December 31, 1998 | 1999 | 1998 |
|---|---|---|
| **Operating Activities:** | | |
| Net income | $ 4,624,576 | $ 1,295,967 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation | 9,721 | 1,220 |
| Provision for doubtful accounts | 60,000 | 82,576 |
| Amortization of debt issuance costs | 442,820 | 117,667 |
| Changes in operating assets and liabilities: | | |
| (Increase) decrease in: | | |
| Prepaid expenses | (30,820) | (40,430) |
| Other assets | - | (21,492) |
| Increase (decrease) in: | | |
| Due to affiliates | (3,810,408) | 3,654,980 |
| Accounts payable and accrued expenses | (3,903) | 34,284 |
| Unearned factoring fees | 389,988 | 389,791 |
| Income tax payable | (19,257) | 263,100 |
| Net cash provided by operating activities | 1,662,717 | 5,777,663 |
| **Investing Activities:** | | |
| Capital expenditures | (2,479) | (24,394) |
| Accounts receivable | (18,109,411) | (40,721,455) |
| Net cash used in investing activities | (18,111,890) | (40,745,849) |
| **Financing Activities:** | | |
| Proceeds from issuance of promissory notes | 33,650,000 | 39,275,000 |
| Repayment of promissory notes | (16,450,000) | (4,925,000) |
| Debt issuance costs | (340,313) | (295,000) |
| Accrued interest on promissory notes | 377,930 | 516,424 |
| Members' contribution | - | 3,000,000 |
| Net cash provided by financing activities | 17,237,617 | 37,571,424 |
| Net increase in cash and cash equivalents | 788,444 | 2,603,238 |
| Cash and cash equivalents at beginning of period | 2,603,238 | - |
| Cash and cash equivalents at end of period | $ 3,391,682 | $ 2,603,238 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the period for interest | $ 2,675,421 | $ 484,156 |

*See accompanying summary of accounting policies and notes to financial statements.*

BANK 0011310     6

ES0975288

# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

**Organization**

E. S. Bankest Corp. was organized on March 18, 1998 under the laws of the State of Florida. The Company was established for the purpose of engaging in the operation of a non-regulated commercial factoring business, principally by acquiring from Bankest Capital Corp. (BCC) and Bankest Receivables Finance and Factoring Corp. (BRFFC), a joint owner and wholly-owned subsidiary of BCC, respectively, a portion of accounts receivable acquired by BCC and BRFFC pursuant to their factoring businesses.

As part of transactions incident to the formation of the Company, the Company entered into an Accounts Receivable Purchase and Tri-Party Agreement (the "AR Purchase Agreement") with BCC and BRFFC, pursuant to which the Company has agreed to purchase certain assets from BCC and BRFFC. Those assets include various accounts receivable acquired by BCC and BRFFC pursuant to their factoring and finance business. The Company also agreed to acquire certain rights, and assume certain obligations, under various factoring agreements presently existing between BCC and/or BRFFC and their respective clients. The Company used the proceeds derived from the issuance of Promissory Notes to finance the purchase of the foregoing assets and to fund the purchase of additional Insured Accounts Receivable and to make advances in the operation of its commercial factoring business.

On October 26, 1998, the Company's stockholders agreed to merge the Company with and into Lacroze, LLC (a Florida Limited Liability Company) the surviving company change its name to E.S. Bankest LLC (Florida Limited Liability Company). This surviving entity succeeded to all of the rights, privileges, immunities and franchises and all of the property of E.S. Bankest Corp. and is responsible and liable for all of E.S. Bankest Corp. liabilities and obligations.

The merger was accounted for in a manner similar to a pooling of interest since both companies are under common control. The common stock of E.S. Bankest Corp. were converted into units of E.S. Bankest L.L.C.

*BANK 0011311*                                               7

ES0975289

# E. S. Bankest LLC

## Summary of Significant Accounting Policies

The accompanying financial statements include the results of operations since the March 18, 1998 formation of E.S. Bankest Corp.

**Accounts Receivable Purchased and Concentration of Credit Risk**

Accounts receivable purchased from BCC and BRFFC have principally been originated by small to medium sized companies in the South Florida geographic area. The Company generally withholds payment on a specified percentage of the purchased receivables and obtains credit insurance to reduce its credit risk. If third parties fail to honor their obligations under the purchased receivable, the Company's loss is reduced by any withheld payments and credit insurance. The Company performs ongoing credit evaluations of its significant customers.

Among the accounts receivable purchased from BCC are those originated by BCC's major client, a manufacturer of consumer goods. At December 31, 1999 and 1998, approximately 62% and 59% of the receivables purchased were concentrated with that one (manufacturing company). Although the Company is directly affected by the well being of this client, management does not believe significant credit risk exists at December 31, 1999 and 1998 as the collectibility of the receivables is insured against insolvency and the receivables are substantially due from large corporations. Should the Company, not be able to acquire receivables from this major client, for any reason, there may be materially adverse effects on the Company's operations.

The allowance for credit losses is maintained at a level deemed adequate by management to absorb losses in the portfolio after evaluating the portfolio, current economic conditions, insurance coverage, changes in the nature and the volume of the portfolio, past loss experience and other pertinent factors. Many of these factors involve a significant degree of estimation and are subject to rapid change which may be unforeseen by management. It is reasonably possible that changes in these factors could result in material adjustments to the allowance in the near term. During the year ended December 31, 1999 and for the period ended December 31, 1998, the Company had no significant charge-offs.

BANK 0011312

8

ES0975290

# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

| | |
|---|---|
| **Cash and Cash Equivalents** | The Company considers investments with original maturities of three months or less at the time of purchase to be cash equivalents. At times, cash balances in the Company's account may exceed federally insured limits. |
| **Income Recognition** | Interest income on advances and other amounts owed to the Company is calculated using the simple interest method on the daily balances of principal outstanding and is recorded as earned in accordance with the terms of the related factoring agreements with clients. Factoring fees are recognized over the period that the Company renders the related services. |
| **Furniture and Equipment** | Furniture and equipment are recorded at cost. Depreciation is calculated on the straight-line basis over the estimated useful lives of the assets. (3-5 years). |
| **Income Taxes** | Income taxes has been provided for in the accompanying financial statements for the period from March 18, 1998 (inception) through October 25, 1998 during which the Company was a taxable entity. Effective upon the October 26, 1998 merger into Lacroze, LLC, the Company's operations are taxable directly to the members and accordingly, no provision for income taxes is included in the accompanying financial statements for periods subsequent to October 25, 1998. |
| **Use of Estimates in the Preparation of Financial Statements** | The preparation of the financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. |

BANK 0011313                 9

ES0975291

# E. S. Bankest LLC

## Notes to Financial Statements

| 1. | Promissory Notes |
|----|----|

**1. Promissory Notes**

Factored Accounts Receivable-Backed Promissory Notes (the Notes), were issued through private placements resulting in proceeds to the Company of $33,650,000 and $39,275,000 in 1999 and 1998, respectively. Of these proceeds, $51,550,000 and $34,350,000 are outstanding at December 31, 1999 and 1998, respectively. The Notes are collateralized by (i) accounts receivable owned by the Company (ii) an assignment of the proceeds of a credit insurance policy (iii) reserve balances in the factoring accounts (iv) unused note proceeds and (v) cash and cash equivalents.

The Series A Notes ($25,150,000 and $18,050,000 at December 31, 1999 and 1998) accrue interest based on the six month London Inter-Bank Offered Rate plus 1.5% (7.83% and 6.65% at December 31, 1999 and 1998) and mature through June 26, 2000.

The Series B Notes ($26,400,000 and $16,300,000 at December 31, 1999 and 1998) accrue interest based on the twelve month London Inter-Bank Offered Rate plus 1.75% (8.51% and 6.90% at December 31, 1999 and 1998) and mature through December 29, 2000.

Under the terms of the Promissory Notes agreement, the Company is obligated to comply with certain covenants. These covenants provide that during any period during which there exists an outstanding principal amount under the Notes, the outstanding balance of Accounts Receivable and pledged to the Collateral Agent and Lenders under the Security Agreement will be not less than 120% of the principal amount of all Notes outstanding minus cash deposits and securities pledged. At December 31, 1999, the Company was in compliance with this covenant.

Depending on the Company's rate of growth, the Company may in the future require proceeds from new debt, borrowings or sale of the Company's securities to obtain additional capital. Although the Company believes that it can raise additional capital and have profitable operations in the ensuing year, there can be no assurance that the Company will be able to maintain profitability or obtain additional capital when needed.

ES0975292

# E. S. Bankest L.L.C.

## Notes to Financial Statements

**2. Line of Credit**

At December 31, 1999, the Company has a credit facility from Banco Espirito Santo & Commercial de Lisboa, which provides for a demand revolving line of credit with maximum borrowings of $3,000,000. Outstanding amounts under this facility bear interest equal to the six month LIBOR rate in effect on the first date of the month in which a borrowing occurs plus 1.50% (7.83% at December 31, 1999).

At December 31, 1999, no amounts were outstanding under this facility. This credit facility expires in October 2000. Under the terms of the Agreement, the Company is required to maintain credit insurance against any loss arising from the insolvency of any party appearing as debtor in any receivable purchased by the Company. Also the Company is required to maintain a ratio of total liabilities to total tangible net worth not greater than 12:1. At December 31, 1999, the Company was in compliance with this covenant.

**3. Related Party Transactions**

At December 31, 1999 and 1998, due from (due to) affiliates consist of the following:

|  | | 1999 | | 1998 |
|---|---|---|---|---|
| Due from (due to) Bankest Capital Corp. | $ | 155,428 | $ | (1,822,642) |
| Due from (due to) Bankest Receivables Finance and Factoring Corp. | | - | | (1,832,338) |
| Net | $ | 155,428 | $ | (3,654,980) |

The Company purchases accounts receivable, at face, principally from BCC and BRFFC. Proceeds from the notes are used by the Company to finance additional purchases of accounts receivable and to make advances under its factoring agreements.

The Company purchases accounts receivable with recourse, except as to credit risk. The Company's accounts receivable are insured against credit losses pursuant to its Credit Insurance Policy with

BANK 0011315                    11

ES0975293

# E. S. Bankest L.L.C.

## Notes to Financial Statements

Euler American Credit Indemnity Company. During the year ended December 31, 1999 and during the period ended December 31, 1998, BCC and BRFFC accepted the return by the Company of invoices, aggregating approximately $1,075,800 and $1,330,000, respectively, for which the Company did not wish to retain non-credit, related repayment or collection risk. No purchased accounts receivable are considered to be impaired as of December 31, 1999 and 1998.

The Company's indebtedness to BCC and BRFFC represents the accrued purchase price of accounts receivable acquired. Such amount is net of advances. The net obligation to BCC and BRFFC is unsecured and due upon demand. Interest is charged on the amounts outstanding for the purchase price of accounts receivable net of advances based on the base rate as published by Citibank N.A. plus 3%.

In addition, approximately $39 million of the promissory notes are payable to an entity, in which a senior executive is a member of the Company's Board of Directors.

The Company is required to pay 1% commission of the principal amount for the promissory notes placed by one of the Company's members. At December 31, 1999 and 1998 commission expense amounted to $442,820 and $117,667.

4.  **Income Taxes**

The significant components of the provision for income taxes are as follows:

|  | 1999 | 1998 |
|---|---|---|
| Current: | | |
| State | $ - | $ 56,000 |
| Federal | - | 344,000 |
| | $ - | $ 400,000 |

BANK 0011316                    12

ES0975294

# E. S. Bankest L.L.C

## Notes to Financial Statements

The principal difference between the provision for income taxes computed at the statutory rate (34%) and the Company's effective tax rate is due to the Company's results of operations subsequent to October 25,1999 being taxable directly to the stockholders as a result of the merger into Lacroze, LLC.

Effective upon the October 26, 1998 merger into Lacroze, LLC, the Company's operations are taxable directly to the members and accordingly, no provision for income taxes is included in the accompanying financial statements for periods subsequent to October 25, 1998.

5.  **Commitments**

The Company rents office space under non-cancelable leases. The minimum future rental commitment for leases in effect at December 31, 1999, approximates the following:

| Year ending December 31, | | Amount |
|---|---|---|
| 2000 | $ | 115,000 |
| 2001 | | 97,000 |
| | $ | 212,000 |

Rent expense in 1999 and 1998 aggregated approximately $119,000 and $56,000, respectively.

BANK 0011317

13



# E. S. Bankest L.L.C.

## Financial Statements

**For the years ended December 31, 2000 and 1999**

Plaintiffs' Exh. No. 78
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts

**USREC-23-1389**



GOVERNMENT
EXHIBIT

CASE
NO. 03-20951-CR-AJ(s)

EXHIBIT
NO. 300-5c

**ES-Q-025888**

**IBDO.**

**BDO Seidman, LLP**
Accountants and Consultants



**WOLFPACK**

Cooperation... Collaboration... Concentration... Communication



# E. S. Bankest L.L.C.

## Financial Statements
### For the years ended December 31, 2000 and 1999

USREC-23-1390

ES-Q-025889



**BDO Seidman, LLP**
Accountants and Consultants

International Place
100 S.E. 2nd Street, Suite 2200
Miami, Florida 33131-2105
Telephone: (305) 381-8000
Fax: (305) 374-1135

## Independent Auditors' Report

Board of Directors
E.S. Bankest L.L.C.

We have audited the accompanying balance sheets of E.S. Bankest L.L.C., as of December 31, 2000 and 1999, and the related statements of operations, members' equity and cash flows for the years ended December 31, 2000 and 1999. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of E.S. Bankest L.L.C. as of December 31, 2000 and 1999 and the results of its operations and its cash flows for the years ended December 31, 2000 and 1999 in conformity with accounting principles generally accepted in the United States of America.

BDO Seidman, LLP

Certified Public Accountants

Miami, Florida
February 16, 2001

USREC-23-1391

 **Cooperation, Collaboration, Concentration, Communication**    2

# E. S. Bankest L.L.C.

## Balance Sheets

USREC-23-1392

| December 31, | 2000 | 1999 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents (Note 2) | $ 1,742,845 | $ 3,391,682 |
| Accounts receivable ($119,809,895 net of amount in 2000 due to clients of $16,166,296) less allowance for doubtful accounts $477,686 and $60,320,109 net of amount in 1999 due to clients of $1,489,264 less allowance for doubtful accounts of $142,555) (Notes 1 and 3) | 103,165,913 | 58,688,290 |
| Due from affiliates (Note 3) | 2,599,425 | 155,428 |
| Prepaid expenses | 109,375 | 71,250 |
| Debt issuance costs net of accumulated amortization of $397,789 and $285,612 in 2000 and 1999, respectively | 146,176 | 74,826 |
| Furniture and equipment, net of accumulated depreciation of $17,356 and $10,941 | 10,369 | 15,932 |
| Other assets | 48,744 | 21,492 |
| | $ 107,822,847 | $ 62,418,900 |
| **Liabilities** | | |
| Promissory notes (Note 2) | $ 87,050,000 | $ 51,550,000 |
| Line of credit (Note 3) | 1,000,000 | - |
| Accrued interest payable | 1,696,613 | 894,354 |
| Accounts payable and accrued liabilities | 97,285 | 30,381 |
| Unearned factoring fees | 1,770,338 | 779,779 |
| Income tax payable | 243,843 | 243,843 |
| Total liabilities | 91,858,079 | 53,498,357 |
| **Members' Equity** | | |
| Initial capitalization | 3,000,000 | 3,000,000 |
| Retained earnings | 12,964,768 | 5,920,543 |
| Total members' equity | 15,964,768 | 8,920,543 |
| | $ 107,822,847 | $ 62,418,900 |

*See accompanying summary of accounting policies
and notes to financial statements.*

ES-Q-025890          3

# E. S. Bankest L.L.C.

## Statements of Operations

| For the years ended December 31, | 2000 | 1999 |
|---|---|---|
| **Revenues:** | | |
| Interest and fee income | $ 16,356,060 | $ 10,334,805 |
| | | |
| **Expenses:** | | |
| Interest | 5,368,517 | 3,053,351 |
| General and administrative | 2,736,393 | 2,044,284 |
| Commissions (Note 3) | 627,719 | 442,820 |
| Professional fees | 189,203 | 109,774 |
| Provision for credit losses | 390,003 | 60,000 |
| | | |
| Total expenses | 9,311,835 | 5,710,229 |
| | | |
| Net income | $    7,044,225 | $    4,624,576 |

*See accompanying summary of accounting policies and notes to financial statements.*

USREC-23-1393

ES-Q-025891

4

# E. S. Bankest L.L.C.

## Statements of Members' Equity

| | Initial Capitalization | Retained Earnings | Total Members' Equity |
|---|---|---|---|
| Balance at December 31, 1998 | $ 3,000,000 | $ 1,295,967 | $ 4,295,967 |
| Net income | - | 4,624,576 | 4,624,576 |
| Balance at December 31, 1999 | 3,000,000 | 5,920,543 | 8,920,543 |
| Net income | - | 7,044,225 | 7,044,225 |
| Balance at December 31, 2000 | $ 3,000,000 | $ 12,964,768 | $ 15,964,768 |

*See accompanying summary of accounting policies and notes to financial statements.*

USREC-23-1394

ES-Q-025892

5

# E. S. Bankest L.L.C.

## Statements of Cash Flows

USREC-23-1395

| *For the years ended December 31,* | | 2000 | | 1999 |
|---|---|---|---|---|
| **Operating Activities:** | | | | |
| Net income | $ | 7,044,225 | $ | 4,624,576 |
| Adjustments to reconcile net income to net cash | | | | |
| provided by operating activities: | | | | |
| Depreciation | | 6,415 | | 9,721 |
| Provision for doubtful accounts | | 390,003 | | 60,000 |
| Amortization of debt issuance costs | | 112,177 | | 442,820 |
| Changes in operating assets and liabilities: | | | | |
| (Increase) in: | | | | |
| Due from affiliates | | (2,443,997) | | (3,810,408) |
| Prepaid expenses | | (38,125) | | (30,820) |
| Other assets | | (27,252) | | - |
| Increase (decrease) in: | | | | |
| Accounts payable and accrued expenses | | 66,904 | | (3,903) |
| Accrued interest on promissory notes | | 802,259 | | 377,930 |
| Unearned factoring fees | | 990,559 | | 389,988 |
| Income tax payable | | - | | (19,257) |
| Net cash provided by operating activities | | 6,903,168 | | 2,040,647 |
| **Investing Activities:** | | | | |
| Accounts receivable | | (44,812,673) | | (18,109,411) |
| Capital expenditures | | (852) | | (2,479) |
| Net cash used in investing activities | | (44,813,525) | | (18,111,890) |
| **Financing Activities:** | | | | |
| Proceeds from issuance of promissory notes | | 54,350,000 | | 33,650,000 |
| Repayment of promissory notes | | (18,850,000) | | (16,450,000) |
| Net proceeds from line of credit | | 1,000,000 | | - |
| Debt issuance costs | | (238,480) | | (340,313) |
| Net cash provided by financing activities | | 36,261,520 | | 16,859,687 |
| Net (decrease) increase in cash and cash equivalents | | (1,648,837) | | 788,444 |
| Cash and cash equivalents at beginning of period | | 3,391,682 | | 2,603,238 |
| Cash and cash equivalents at end of period | $ | 1,742,845 | $ | 3,391,682 |
| **Supplemental disclosure of cash flow information:** | | | | |
| Cash paid during the period for interest | $ | 4,566,260 | $ | 2,675,421 |

*See accompanying summary of accounting policies and notes to financial statements.*

ES-Q-025893

6

# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

USREC-23-1396

**Organization**

E. S. Bankest Corp. was organized on March 18, 1998 under the laws of the State of Florida. The Company was established for the purpose of engaging in the operation of a non-regulated commercial factoring business, principally by acquiring from Bankest Capital Corp. (BCC) and Bankest Receivables Finance and Factoring Corp. (BRFFC), a joint owner and wholly-owned subsidiary of BCC, respectively, a portion of accounts receivable acquired by BCC and BRFFC pursuant to their factoring businesses.

As part of transactions incident to the formation of the Company, the Company entered into an Accounts Receivable Purchase and Tri-Party Agreement (the "AR Purchase Agreement") with BCC and BRFFC, pursuant to which the Company has agreed to purchase certain assets from BCC and BRFFC. Those assets include various accounts receivable acquired by BCC and BRFFC pursuant to their factoring and finance business. The Company also agreed to acquire certain rights, and assume certain obligations, under various factoring agreements presently existing between BCC and/or BRFFC and their respective clients. The Company used the proceeds derived from the issuance of Promissory Notes to finance the purchase of the foregoing assets and to fund the purchase of additional Insured Accounts Receivable and to make advances in the operation of its commercial factoring business.

On October 26, 1998, the Company's stockholders agreed to merge the Company with and into Lacroze, LLC (a Florida Limited Liability Company) the surviving company change its name to E.S. Bankest LLC (Florida Limited Liability Company). This surviving entity succeeded to all of the rights, privileges, immunities and franchises and all of the property of E.S. Bankest Corp. and is responsible and liable for all of E.S. Bankest Corp. liabilities and obligations.

ES-Q-025894

7

# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

USREC-23-1397

**Accounts Receivable Purchased and Concentration of Credit Risk**

Accounts receivable purchased from BCC and BRFFC have principally been originated by small to medium sized companies in the South Florida geographic area. The Company generally withholds payment on a specified percentage of the purchased receivables and obtains credit insurance to reduce its credit risk. If third parties fail to honor their obligations under the purchased receivable, the Company's loss is reduced by any withheld payments and credit insurance. The Company performs ongoing credit evaluations of its significant customers.

Among the accounts receivable purchased from BCC are those originated by BCC's major client, a manufacturer of consumer goods. At December 31, 2000 and 1999, this major client's concentration approximated 42% and 62% of the receivables purchased. Although the Company is directly affected by the well being of this client, management does not believe significant credit risk exists at December 31, 2000 and 1999 as the collectibility of the receivables is insured against insolvency and the receivables are substantially due from large corporations. Should the Company, not be able to acquire receivables from this major client, for any reason, there may be materially adverse effects on the Company's operations.

The Company purchases accounts receivable with recourse, except as to credit risk. The Company's accounts receivable are insured against credit losses pursuant to its Credit Insurance Policy with Euler American Credit Indemnity Company. Insurance coverage aggregated $125 million as of December 31, 2000. The policy expires on March 31, 2001.

At December 31, 2000, approximately $2 million of accounts receivable were not subject to coverage by ACI. These receivables were accepted by the Company under client agreements that grant the Company full recourse in the event a receivable is not collectible. The Company does not make advances on these receivables to clients.

ES-Q-025895

8

# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

USREC-23-1398

The allowance for credit losses is maintained at a level deemed adequate by management to absorb losses in the portfolio after evaluating the portfolio, current economic conditions, insurance coverage, changes in the nature and the volume of the portfolio, past loss experience and other pertinent factors. Many of these factors involve a significant degree of estimation and are subject to rapid change which may be unforeseen by management. It is reasonably possible that changes in these factors could result in material adjustments to the allowance in the near term. During the years ended December 31, 2000 and 1999, the Company had no significant charge-offs.

**Cash and Cash Equivalents**

The Company considers investments with original maturities of three months or less at the time of purchase to be cash equivalents. At times, cash balances in the Company's account may exceed federally insured limits.

**Income Recognition**

Interest income on advances and other amounts owed to the Company is calculated using the simple interest method on the daily balances of principal outstanding and is recorded as earned in accordance with the terms of the related factoring agreements with clients. Factoring fees are recognized over the period that the Company renders the related services.

**Furniture and Equipment**

Furniture and equipment are recorded at cost. Depreciation is calculated on the straight-line basis over the estimated useful lives of the assets. (3-5 years).

**Income Taxes**

Effective upon the October 26, 1998 merger into Lacroze, LLC, the Company's operations are taxable directly to the members and accordingly, no provision for income taxes is included in the accompanying financial statements for periods subsequent to October 25, 1998.

ES-Q-025896

9

# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

| | |
|---|---|
| **Use of Estimates in the Preparation of Financial Statements** | The preparation of the financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. |

USREC-23-1399

ES-Q-025897

10

# E. S. Bankest L.L.C.

## Notes to Financial Statements

USREC-23-1400

**1. Accounts Receivable**

Accounts receivable consists of the following:

|  | 2000 | 1999 |
|---|---|---|
| Accounts receivable | $ 119,809,895 | $ 60,320,109 |
| Allowance | (477,686) | (142,555) |
|  | 119,332,209 | 60,177,554 |
| Due to clients | (16,166,296) | (1,489,264) |
| Net accounts receivable | $ 103,165,913 | $ 58,688,290 |

**2. Promissory Notes**

Factored Accounts Receivable-Backed Promissory Notes (the Notes), were issued through private placements resulting in proceeds to the Company of $54,350,000 and $33,650,000 in 2000 and 1999, respectively. The Notes are collateralized by (i) accounts receivable owned by the Company (ii) an assignment of the proceeds of a credit insurance policy (iii) reserve balances in the factoring accounts (iv) cash and cash equivalents.

The Series A Notes ($45,850,000 and $25,150,000 at December 31, 2000 and 1999) accrue interest based on the six month London Inter-Bank Offered Rate plus 1.5% (7.62% and 7.83% at December 31, 2000 and 1999) and mature through July 2, 2001.

The Series B Notes ($41,200,000 and $26,400,000 at December 31, 2000 and 1999) accrue interest based on the twelve month London Inter-Bank Offered Rate plus 1.75% (7.64% and 8.51% at December 31, 2000 and 1999) and mature through December 31, 2001.

Under the terms of the Notes, the Company is obligated to comply with certain covenants. These covenants provide that during any period during which there exists an outstanding principal amount under the Notes, the outstanding balance of accounts receivable and pledged to the collateral agent and lenders under the security agreement will be not less than 120% of the principal amount of all



# E. S. Bankest L.L.C.

## Notes to Financial Statements

USREC-23-1401

Notes outstanding minus cash deposits and securities pledged. At December 31, 2000, the Company was in compliance with this covenant.

Depending on the Company's rate of growth, the Company may in the future require proceeds from new debt, borrowings or sale of the Company's securities to obtain additional capital. Although the Company believes that it can raise additional capital and have profitable operations in the ensuing year, there can be no assurance that the Company will be able to maintain profitability or obtain additional capital when needed.

**3.  Related Party Transactions**

At December 31, 2000, the Company has a credit facility from Banco Espirito Santo & Commercial de Lisboa, which provides for a demand revolving line of credit with maximum borrowings of $3,000,000. Outstanding amounts under this facility bear interest equal to the six month LIBOR rate in effect on the first date of the month in which a borrowing occurs plus 1.50% (7.62% at December 31, 2000).

At December 31, 2000, $1,000,000 was outstanding under this facility. Under the terms of the agreement, the Company is required to maintain credit insurance against any loss arising from the insolvency of any party appearing as debtor in any receivable purchased by the Company. Also the Company is required to maintain a ratio of total liabilities to total tangible net worth not greater than 12:1. At December 31, 2000, the Company was in compliance with these covenants.

At December 31, 2000 and 1999, $2,599,425 and $155,428 was substantially due from Bankest Capital Corp. for cash received by Bankest Capital Corp. relating to receivables held by the Company.

The Company purchases accounts receivable, at face, principally from BCC. Proceeds from the notes are used by the Company to finance additional purchases of accounts receivable and to make advances under its factoring agreements. No purchased accounts receivable are considered to be impaired as of December 31, 2000 and 1999.

ES-Q-025899

12

# E. S. Bankest L.L.C.

## Notes to Financial Statements

USREC-23-1402

In addition, approximately $48 million of the promissory notes are payable to an entity, in which a senior executive is a member of the Company's Board of Directors.

The Company is required to pay 1% commission of the principal amount for the promissory notes placed by one of the Company's members. At December 31, 2000 and 1999 commission expense amounted to $627,719 and $442,820.

An officer of the Company is a member at the board of managers of a limited liability company, from which the Company has purchased $3.2 million in accounts receivable.

**4.   Commitments**

The Company rents office space under non-cancelable leases expiring October 31, 2001. The minimum future rental commitment for leases in effect at December 31, 2000, approximates the following:

| Years ending December 31, | | Amount |
|---|---|---|
| 2001 | $ | 97,500 |
| | $ | 97,500 |

Rent expense in 2000 and 1999 aggregated approximately $131,000 and $119,000, respectively. Upon expiration of the lease, the Company intends to continue to lease its premises on a month-to-month basis until such time as its new long-term leasehold space is available.

**5.   Fair Value of Financial Instruments**

Disclosure of fair value of financial instruments is required by SFAS No. 107, "Disclosures About Fair Value of Financial Instruments." The Company's financial instruments consist principally of cash and cash equivalents, accounts receivable and promissory notes payable. The carrying amounts of such financial instruments as reflected in the balance sheet approximate their estimated fair value as of December 31, 2000. The estimated fair value is not necessarily indicative of the amounts the Company could realize in a current market exchange.

ES-Q-025900                    **13**

# E. S. Bankest L.L.C.

## Financial Statements
**For the years ended December 31, 2001 and 2000**

Plaintiffs' Exh. No. 81
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts



GOVERNMENT
EXHIBIT
CASE
NO. 03-20951-CR-AJ(s)

EXHIBIT
NO. 300-5d

USREC-23-1285

*ES-Q-025784*



WOLFPACK
Cooperation... Collaboration... Concentration... Communication



**BDO**

**BDO Seidman, LLP**
Accountants and Consultants



# E. S. Bankest L.L.C.

## Financial Statements
### For the years ended December 31, 2001 and 2000

USREC-23-1286

ES-Q-025785



**BDO Seidman, LLP**
Accountants and Consultants

International Place
100 S.E. 2nd Street, Suite 2200
Miami, Florida 33131-2105
Telephone: (305) 381-8000
Fax: (305) 374-1135

## Independent Auditors' Report

Board of Directors
E.S. Bankest L.L.C.

We have audited the accompanying balance sheets of E.S. Bankest L.L.C., as of December 31, 2001 and 2000, and the related statements of operations, members' equity and cash flows for the years ended December 31, 2001 and 2000. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of E.S. Bankest L.L.C. as of December 31, 2001 and 2000 and the results of its operations and its cash flows for the years ended December 31, 2001 and 2000 in conformity with accounting principles generally accepted in the United States of America.

BDO Seidman SSP

Miami, Florida
February 8, 2002

Certified Public Accountants

USREC-23-1287

ES-Q-025786



**Cooperation, Collaboration, Concentration, Communication**

2

# E. S. Bankest L.L.C.

## Balance Sheets

| December 31, | 2001 | 2000 |
|---|---:|---:|
| **Assets** | | |
| Cash and cash equivalents (Note 2) | $ 873,781 | $ 1,742,845 |
| Accounts receivable ($178,103,308 in 2001 net of amount due to | | |
| clients of $21,051,658 less allowance for doubtful accounts of | | |
| $3,442,319 and $119,809,895 in 2000 net of amount due to | | |
| clients of $16,166,296 less allowance for doubtful accounts of | | |
| $477,686) | 153,609,331 | 103,165,913 |
| (Notes 1, 2 and 3) | | |
| Due from affiliates (Note 3) | 8,001,069 | 2,599,425 |
| Prepaid expenses | 137,500 | 109,375 |
| Debt issuance costs net of accumulated amortization of | | |
| $601,041 and $397,789 in 2001 and 2000, respectively | 325,489 | 146,176 |
| Furniture and equipment, net of accumulated depreciation | | |
| of $21,504 and $17,326 in 2001 and 2000, respectively | 6,221 | 10,369 |
| Other assets | 49,545 | 48,744 |
| | $ 163,002,936 | $ 107,822,847 |
| **Liabilities** | | |
| Promissory notes (Note 2) | $ 137,501,917 | $ 87,050,000 |
| Line of credit (Note 3) | 3,000,000 | 1,000,000 |
| Accrued interest payable | 1,859,239 | 1,696,613 |
| Accounts payable and accrued liabilities | 103,870 | 97,285 |
| Unearned factoring fees | 1,393,158 | 1,770,338 |
| Income tax payable | 243,843 | 243,843 |
| Total liabilities | 144,102,027 | 91,858,079 |
| **Commitments and Contingencies (Notes 1 and 4)** | | |
| **Members' Equity** | | |
| Initial capitalization | 3,000,000 | 3,000,000 |
| Retained earnings | 15,900,909 | 12,964,768 |
| Total members' equity | 18,900,909 | 15,964,768 |
| | $ 163,002,936 | $ 107,822,847 |

*See accompanying summary of accounting policies and notes to financial statements.*

# E. S. Bankest L.L.C.

## Statements of Operations

| For the years ended December 31, | 2001 | 2000 |
|---|---:|---:|
| **Revenues:** | | |
| Interest and fee income | $ 22,571,675 | $ 16,356,060 |
| | | |
| **Expenses:** | | |
| Interest | 7,878,609 | 5,368,517 |
| General and administrative | 3,356,419 | 2,736,393 |
| Commissions (Note 3) | 1,045,794 | 627,719 |
| Professional fees | 304,708 | 189,203 |
| Provision for credit losses | 3,050,004 | 390,003 |
| | | |
| Total expenses | 15,635,534 | 9,311,835 |
| | | |
| **Net income** | $ 6,936,141 | $ 7,044,225 |

*See accompanying summary of accounting policies and notes to financial statements.*

USREC-23-1289

ES-Q-025788

4

# E. S. Bankest L.L.C.

## Statements of Members' Equity

| | Initial Capitalization | Retained Earnings | Total Members' Equity |
|---|---|---|---|
| Balance at December 31, 1999 | $ 3,000,000 | $ 5,920,543 | $ 8,920,543 |
| Net income | - | 7,044,225 | 7,044,225 |
| Balance at December 31, 2000 | 3,000,000 | 12,964,768 | 15,964,768 |
| Distributions to members | | (4,000,000) | (4,000,000) |
| Net income | - | 6,936,141 | 6,936,141 |
| Balance at December 31, 2001 | $ 3,000,000 | $ 15,900,909 | $ 18,900,909 |

*See accompanying summary of accounting policies and notes to financial statements.*

# E. S. Bankest L.L.C.

## Statements of Cash Flows

| For the years ended December 31, | | 2001 | | 2000 |
|---|---|---|---|---|
| **Operating Activities:** | | | | |
| Net income | $ | 6,936,141 | $ | 7,044,225 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | |
| Depreciation | | 4,178 | | 6,415 |
| Provision for doubtful accounts | | 3,050,004 | | 390,003 |
| Amortization of debt issuance costs | | 117,852 | | 112,177 |
| Changes in operating assets and liabilities: | | | | |
| (Increase) in: | | | | |
| Due from affiliates | | (5,401,644) | | (2,443,997) |
| Prepaid expenses | | (28,125) | | (38,125) |
| Other assets | | (801) | | (27,252) |
| Increase (decrease) in: | | | | |
| Accounts payable and accrued expenses | | 6,585 | | 66,904 |
| Accrued interest payable | | 162,625 | | 802,259 |
| Unearned factoring fees | | (377,180) | | 990,559 |
| Net cash provided by operating activities | | 4,469,635 | | 6,903,168 |
| **Investing Activities:** | | | | |
| Accounts receivable | | (53,408,051) | | (44,812,673) |
| Capital expenditures | | - | | (852) |
| Net cash used in investing activities | | (53,408,051) | | (44,813,525) |
| **Financing Activities:** | | | | |
| Proceeds from issuance of promissory notes | | 98,451,917 | | 54,350,000 |
| Repayment of promissory notes | | (48,000,000) | | (18,850,000) |
| Net proceeds from line of credit | | 2,000,000 | | 1,000,000 |
| Debt issuance costs | | (382,565) | | (238,480) |
| Distributions to members | | (4,000,000) | | - |
| Net cash provided by financing activities | | 48,069,352 | | 36,261,520 |
| Net (decrease) in cash and cash equivalents | | (869,064) | | (1,648,837) |
| Cash and cash equivalents at beginning of period | | 1,742,845 | | 3,391,682 |
| Cash and cash equivalents at end of period | $ | 873,781 | $ | 1,742,845 |
| **Supplemental disclosure of cash flow information:** | | | | |
| Cash paid during the period for interest | $ | 7,715,983 | $ | 4,566,260 |

*See accompanying summary of accounting policies and notes to financial statements.*

# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

| | |
|---|---|
| **Organization** | E. S. Bankest Corp. ("The Company") was organized on March 18, 1998 under the laws of the State of Florida. The Company was established for the purpose of engaging in the operation of a non-regulated commercial factoring business, principally by acquiring from Bankest Capital Corp. (BCC) and Bankest Receivables Finance and Factoring Corp. (BRFFC), a joint owner and wholly-owned subsidiary of BCC, respectively, a portion of accounts receivable acquired by BCC and BRFFC pursuant to their factoring businesses.

As part of transactions incident to the formation of the Company, the Company entered into an Accounts Receivable Purchase and Tri-Party Agreement (the "AR Purchase Agreement") with BCC and BRFFC, pursuant to which the Company has agreed to purchase certain assets from BCC and BRFFC. Those assets include various accounts receivable acquired by BCC and BRFFC pursuant to their factoring and finance business. The Company also agreed to acquire certain rights, and assume certain obligations, under various factoring agreements presently existing between BCC and/or BRFFC and their respective clients. The Company uses the proceeds derived from the issuance of promissory notes to finance the purchase of the foregoing assets and to fund the purchase of additional insured accounts receivable and to make advances in the operation of its commercial factoring business.

On October 26, 1998, the Company's stockholders agreed to merge the Company with and into Lacroze, LLC (a Florida Limited Liability Company) the surviving company change its name to E.S. Bankest LLC (Florida Limited Liability Company). This surviving entity succeeded to all of the rights, privileges, immunities and franchises and all of the property of E.S. Bankest Corp. and is responsible and liable for all of E.S. Bankest Corp. liabilities and obligations. |

**USREC-23-1292**

ES-Q-025791

7

# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

**Accounts Receivable Purchased and Concentration of Credit Risk**

Accounts receivable purchased principally originate from small to medium sized companies in the South Florida geographic area. The Company generally withholds payment on a specified percentage of the purchased receivables and obtains credit insurance to reduce its credit risk. If third parties fail to honor their obligations under the purchased receivable, the Company's loss is reduced by any withheld payments and credit insurance. The Company performs ongoing credit evaluations of its significant customers.

Among the accounts receivable purchased from BCC are those originated by BCC's major client, a manufacturer of consumer goods. At December 31, 2001 and 2000, this major client's concentration approximated 35% and 42% of the receivables purchased (Note 1).

The Company purchases accounts receivable with recourse, except as to credit risk. The Company's accounts receivable are insured against credit losses pursuant to its Credit Insurance Policy with Euler American Credit Indemnity Company. Insurance coverage aggregated $125 million as of December 31, 2001. The policy expires on March 31, 2002.

The allowance for credit losses is maintained at a level deemed adequate by management to absorb losses in the portfolio after evaluating the portfolio, current economic conditions, insurance coverage, changes in the nature and the volume of the portfolio, past loss experience and other pertinent factors. Many of these factors involve a significant degree of estimation and are subject to rapid change which may be unforeseen by management. It is reasonably possible that changes in these factors could result in material adjustments to the allowance in the near term.

**Cash and Cash Equivalents**

The Company considers investments with original maturities of three months or less at the time of purchase to be cash equivalents. At times, cash balances in the Company's account may exceed federally insured limits.

**Income Recognition**

Interest income on advances and other amounts owed to the Company is calculated using the simple interest method on the daily balances of principal outstanding and is recorded as earned in accordance with the terms of the related factoring agreements with clients. Factoring fees are recognized over the period that the Company renders the related services.

8

USREC-23-1293          ES-Q-025792

# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

| | |
|---|---|
| **Furniture and Equipment** | Furniture and equipment are recorded at cost. Depreciation is calculated on the straight-line basis over the estimated useful lives of the assets. (3-5 years). |
| **Income Taxes** | Effective upon the October 26, 1998 merger into Lacroze, LLC, the Company's operations are taxable directly to the members and accordingly, no provision for income taxes is included in the accompanying financial statements for periods subsequent to October 25, 1998. |
| **Use of Estimates in the Preparation of Financial Statements** | The preparation of the financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. |

USREC-23-1294

ES-Q-025793

9

# E. S. Bankest L.L.C.

## Notes to Financial Statements

| 1. Accounts Receivable |

Accounts receivable consists of the following:

|  | 2001 | 2000 |
|---|---|---|
| Accounts receivable | $ 178,103,308 | $ 119,809,895 |
| Allowance | (3,442,319) | (477,686) |
|  | 174,660,989 | 119,332,209 |
| Due to clients | (21,051,658) | (16,166,296) |
| Net accounts receivable | $ 153,609,331 | $ 103,165,913 |

At December 31, 2001 approximately $5.3 million of purchased accounts receivable are due from K-Mart Corp. K-Mart Corp. filed for bankruptcy protection under Chapter 11 subsequent to December 31, 2001. Said $5.3 million of K-Mart Corp.'s accounts receivable being insured against credit losses, including bankruptcy.

One of the Company's clients, United Container, LLP filed for bankruptcy protection under Chapter 11 in December 2001. On the advice of the Company's bankruptcy counsel, the Company sought and succeeded to convert the Chapter 11 to a Chapter 7. At December 31, 2001 such purchased accounts receivables aggregated approximately $17 million.

The Company is of the opinion that they own the purchased accounts receivable, and therefore have legally perfected the security interest in such purchased accounts receivable due from K-Mart and customers of United Container, LLP. Interest and fee income attributable to the purchased receivables of K-Mart Corp. and the customers of United Container, LLP aggregated approximately $1,931,000 in 2001.

A purchased account receivable is considered impaired when, based on current information and events, it is probable the Company will be unable to collect the amounts due from account debtors.

# E. S. Bankest L.L.C.

## Notes to Financial Statements

As of December 31, 2001, the Company's recorded investment in purchased accounts receivable which were impaired amounted to approximately $7.8 million. Said $7.8 million being comprised of the aforementioned $5.3 million credit-insured accounts receivable due from K-Mart Corp. and approximately $2.55 million of accounts receivable due from customers of United Container, LLP. Whereas the Company anticipates collections of $5.3 million K-Mart Corp. accounts receivable from either K-Mart Corp. or the credit insurer, EULER American Credit Indemnity Company, it has effected an allowance for doubtful accounts aggregated approximately $3.4 million. Said $3.4 million comprised of the aforementioned $2.55 million accounts receivable due from customers of United Container, LLP, $500,000 for the deductible portion of the insured K-Mart Corp. account receivables and a $350,000 general reserve for doubtful accounts. No purchased accounts receivable were impaired at or during the year ended December 31, 2000.

Activity in the allowance for losses was as follows:

| Year ended December 31, | 2001 | 2000 |
|---|---|---|
| Balance, beginning | $ 477,686 | $ 142,555 |
| Provision for doubtful accounts | 3,050,004 | 390,003 |
| Charge-offs, net | (85,371) | (54,872) |
| Balance, ending | $ 3,442,319 | $ 477,686 |

**2. Promissory Notes**

Factored Accounts Receivable-Backed Promissory Notes (the Notes), were issued through private placements resulting in proceeds to the Company of $98,451,917 and $54,350,000 in 2001 and 2000, respectively. The Notes are collateralized by (i) accounts receivable owned by the Company (ii) an assignment of the proceeds of a credit insurance policy (iii) reserve balances in the factoring accounts (iv) cash and cash equivalents.
The Series A Notes ($77,550,000 and $45,850,000 at December 31, 2001 and 2000) accrue interest based on the six month London Inter-Bank Offered Rate plus 1.5% (3.5% and 7.62% at December 31, 2001 and 2000) and mature through June 20, 2002.

# E. S. Bankest L.L.C.

## Notes to Financial Statements

The Series B Notes ($59,950,000 and $41,200,000 at December 31, 2001 and 2000) accrue interest based on the twelve month London Inter-Bank Offered Rate plus 1.75% (4.19% and 7.64% at December 31, 2001 and 2000) and mature through December 19, 2002.

Under the terms of the Notes, the Company is obligated to comply with certain covenants. These covenants provide that during any period during which there exists an outstanding principal amount under the Notes, the outstanding balance of accounts receivable and pledged to the collateral agent and lenders under the security agreement will be not less than 120% of the principal amount of all Notes outstanding minus cash deposits and securities pledged. At December 31, 2001, the Company was in compliance with this covenant.

Depending on the Company's rate of growth, the Company may in the future require proceeds from new debt, borrowings or sale of the Company's securities to obtain additional capital. Although the Company believes that it can raise additional capital and have profitable operations in the ensuing year, there can be no assurance that the Company will be able to maintain profitability or obtain additional capital when needed.

3. **Related Party Transactions**

At December 31, 2001, the Company has a credit facility from Banco Espírito Santo & Commercial de Lisboa, which provides for a demand revolving line of credit with maximum borrowings of $3,000,000. Outstanding amounts under this facility bear interest equal to the six month LIBOR rate in effect on the first date of the month in which a borrowing occurs plus 1.50% (3.50% at December 31, 2001). At December 31, 2001, $3,000,000 was outstanding under this facility. Under the terms of the agreement, the Company is required to maintain credit insurance against any loss arising from the insolvency of any party appearing as debtor in any receivable purchased by the Company. Also, the Company is required to maintain a ratio of total liabilities to total tangible net worth not greater than 12:1. At December 31, 2001, the Company was in compliance with these covenants.

# E. S. Bankest L.L.C.

## Notes to Financial Statements

At December 31, 2001 and 2000, $8,001,069 and $2,599,425 and at January 31, 2002 $4,0005,707 was due from Bankest Capital Corp. for cash received by Bankest Capital Corp. relating to receivables held by the Company.

Approximately $48 million of the promissory notes are payable to an entity, in which a senior executive is a member of the Company's Board of Directors.

The Company is required to pay 1% commission of the principal amount for the promissory notes placed by one of the Company's members. At December 31, 2001 and 2000 commission expense amounted to $1,045,794 and $627,719, respectively.

An officer of the Company is a member of the board of managers of a limited liability company, from which the Company has purchased $3.2 million in accounts receivable in 2001.

**4.   Commitments**       The Company rents office space under non-cancelable leases expiring October 31, 2002.   The minimum future rental commitment for leases in effect at December 31, 2001, approximates the following:

| Year ending December 31, | | Amount |
|---|---|---|
| 2002 | $ | 120,500 |
| | $ | 120,500 |

Rent expense in 2001 and 2000 aggregated approximately $149,000 and $131,000, respectively.   Upon expiration of the lease, the Company intends to continue to lease its premises on a month-to-month basis until such time as its new long-term leasehold space is available.

# E. S. Bankest L.L.C.

## Notes to Financial Statements

| 5. | Fair Value of Financial Instruments | Disclosure of fair value of financial instruments is required by SFAS No. 107, "Disclosures About Fair Value of Financial Instruments." The Company's financial instruments consist principally of cash and cash equivalents, accounts receivable and promissory notes payable. The carrying amounts of such financial instruments as reflected in the balance sheets approximate their estimated fair value as of December 31, 2001 and 2000. The estimated fair value is not necessarily indicative of the amounts the Company could realize in a current market exchange. |

USREC-23-1299

ES-Q-025798