

# E. S. Bankest L.L.C.

## Financial Statements
**For the Years Ended December 31, 2002 and 2001**

Plaintiffs' Exh. No. 87
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts

**BANK 0011345**



EXHIBIT

13

ES0975323



**BDO Seidman, LLP**
Accountants and Consultants

Bank of America Tower at International Place
100 S.E. Second Street, Suite 2200
Miami, Florida 33131-2105
Telephone. (305) 381-8000
Fax (305) 374-1135

## Independent Auditors' Report

Board of Directors
E.S. Bankest L.L.C.

We have audited the accompanying balance sheets of E.S. Bankest L.L.C., as of December 31, 2002 and 2001, and the related statements of income, member's equity and cash flows for the years ended December 31, 2002 and 2001. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of E.S. Bankest L.L.C. as of December 31, 2002 and 2001 and the results of its operations and its cash flows for the years ended December 31, 2002 and 2001 in conformity with accounting principles generally accepted in the United States of America.

BDO Seidman LLP

Miami, Florida
April 16, 2003

Certified Public Accountants

2

**BANK 0011346**

ES0975324

# E. S. Bankest, L.L.C.

## Balance Sheets

| December 31, | 2002 | 2001 |
|---|---:|---:|
| **Assets** | | |
| Cash and cash equivalents (Note 2) | $           - | $      873,781 |
| Accounts receivable ($243,294,187 in 2002, net of amount due to clients of $9,081,710, less allowance for doubtful accounts of $10,342,323) and ($178,103,308 in 2001, net of amount due to clients of $21,051,658, less allowance for doubtful accounts of $3,442,319) (Notes 1, 2 and 3) | 223,870,154 | 153,609,331 |
| Due from affiliates (Note 3) | - | 8,001,069 |
| Prepaid expenses | 182,000 | 137,500 |
| Debt issuance costs net of accumulated amortization of $2,771 and $601,041 in 2002 and 2001, respectively | 99,744 | 325,489 |
| Furniture and equipment, net of accumulated depreciation of $25,213 and $21,504 in 2002 and 2001, respectively | 5,982 | 6,221 |
| Other assets | 48,970 | 49,545 |
| | $ 224,206,850 | $ 163,002,936 |
| **Liabilities** | | |
| Promissory notes (Note 2) | $ 142,447,005 | $ 137,501,917 |
| Due to Parent Company (Note 3) | 29,105,142 | |
| Line of credit (Note 2) | 30,000,000 | 3,000,000 |
| Accrued interest payable | 611,963 | 1,859,239 |
| Accounts payable and accrued liabilities | 273,419 | 103,870 |
| Unearned factoring fees | 383,067 | 1,393,158 |
| Income tax payable | 243,843 | 243,843 |
| Total liabilities | 203,064,439 | 144,102,027 |
| Commitments and Contingencies (Notes 1 and 4) | | |
| **Member's Equity** | | |
| Initial capitalization | 3,000,000 | 3,000,000 |
| Retained earnings | 18,142,411 | 15,900,909 |
| Total member's equity | 21,142,411 | 18,900,909 |
| | $ 224,206,850 | $ 163,002,936 |

*See accompanying summary of significant accounting policies and notes to financial statements.*

3

BANK 0011347

ES0975325

# E. S. Bankest L.C.

## Statements of Income

| *For the years ended December 31,* | 2002 | 2001 |
|---|---|---|
| **Revenues:** | | |
| Interest and fee income | $ 21,878,219 | $ 22,571,675 |
| | | |
| **Expenses:** | | |
| Interest | 6,770,862 | 7,878,609 |
| General and administrative | 3,726,004 | 3,356,419 |
| Commissions (Note 3) | 1,185,665 | 1,045,794 |
| Professional fees | 954,182 | 304,708 |
| Provision for credit losses | 7,000,004 | 3,050,004 |
| Total expenses | 19,636,717 | 15,635,534 |
| Net income | $ 2,241,502 | $ 6,936,141 |

*See accompanying summary of significant accounting policies and notes to financial statements.*

4

BANK 0011348

ES0975326

# E. S. Bankes

## Statements of Member's Equity

|  | Initial Capitalization | Retained Earnings | Total Member's Equity |
|---|---|---|---|
| Balance at December 31, 2000 | $ 3,000,000 | $ 12,964,768 | $ 15,964,768 |
| Distributions to members |  | (4,000,000) | (4,000,000) |
| Net income | - | 6,936,141 | 6,936,141 |
| Balance at December 31, 2001 | 3,000,000 | 15,900,909 | 18,900,909 |
| Net income | - | 2,241,502 | 2,241,502 |
| Balance at December 31, 2002 | $ 3,000,000 | $ 18,142,411 | $ 21,142,411 |

*See accompanying summary of significant accounting policies and notes to financial statements.*

5

BANK 0011349

ES0975327

# E. S. Bankest L.L.C.

## Statements of Cash Flows

| For the years ended December 31, | | 2002 | | 2001 |
|---|---|---|---|---|
| **Operating Activities:** | | | | |
| Net income | $ | 2,241,502 | $ | 6,936,141 |
| Adjustments to reconcile net income to net cash | | | | |
| provided by operating activities: | | | | |
| Depreciation | | 3,709 | | 4,178 |
| Provision for credit losses | | 7,000,004 | | 3,050,004 |
| Amortization of debt issuance costs | | 328,260 | | 117,852 |
| Changes in operating assets and liabilities: | | | | |
| Decrease (increase) in: | | | | |
| Prepaid expenses | | (44,500) | | (28,125) |
| Other assets | | 575 | | (801) |
| Increase (decrease) in: | | | | |
| Accounts payable and accrued liabilities | | 169,549 | | 6,585 |
| Accrued interest payable | | (1,247,276) | | 162,625 |
| Unearned factoring fees | | (1,010,091) | | (377,180) |
| **Net cash provided by operating activities** | | 7,441,732 | | 4,469,635 |
| **Investing Activities:** | | | | |
| Accounts receivable | | (77,260,827) | | (53,408,051) |
| Capital expenditures | | (3,470) | | - |
| **Net cash used in investing activities** | | (77,264,297) | | (53,408,051) |
| **Financing Activities:** | | | | |
| Due from affiliates | | 8,001,069 | | (5,401,644) |
| Due to Parent Company | | 29,105,142 | | - |
| Proceeds from issuance of promissory notes | | 142,447,005 | | 98,451,917 |
| Repayment of promissory notes | | (137,501,917) | | (48,000,000) |
| Proceeds of line of credit | | 27,000,000 | | 2,000,000 |
| Debt issuance costs | | (102,515) | | (382,565) |
| Distributions to members | | - | | (4,000,000) |
| **Net cash provided by financing activities** | | 68,948,784 | | 48,069,352 |
| Net (decrease) in cash and cash equivalents | | (873,781) | | (869,064) |
| Cash and cash equivalents at beginning of period | | 873,781 | | 1,742,845 |
| **Cash and cash equivalents at end of period** | $ | - | $ | 873,781 |
| **Supplemental disclosure of cash flow information:** | | | | |
| Cash paid during the period for interest | $ | 8,018,138 | $ | 7,715,983 |

*See accompanying summary of significant accounting policies and notes to financial statements.*

6

**BANK 0011350**

ES0975328

# E. S. Bankest LLC

## Summary of Significant Accounting Policies

**Organization**

E. S. Bankest Corp. ("The Company") was organized on March 18, 1998 under the laws of the State of Florida as a joint venture company between Bankest Capital Corp. ("BCC") and Espirito Santo Bank ("Espirito Santo"). The Company was established for the purpose of engaging in the operation of a non-regulated commercial factoring business, principally by acquiring a portion of that business already then being conducted by BCC and Bankest Receivables Finance and Factoring Corp. (BRFFC), a wholly-owned subsidiary of BCC.

On October 26, 1998, the Company's two stockholders, BCC and Espirito Santo agreed to merge the Company with and into Lacroze, LLC (a Florida Limited Liability Company) as the surviving company, which changed its name to E.S. Bankest LLC (Florida Limited Liability Company). This surviving entity succeeded to all of the rights, privileges, immunities and franchises and all of the property of E.S. Bankest Corp. and is responsible and liable for all of E.S. Bankest Corp. liabilities and obligations.

On September 18, 2002, BCC purchased all of the membership interests of Espirito Santo for $10 million pursuant to the parties pre-existing Shareholders' Agreement. From and after September 18, 2002, the Company is a 100% wholly owned subsidiary of BCC.

**Accounts Receivable Purchased and Concentration of Credit Risk**

Accounts receivable purchases principally originate from small to medium sized companies in the South Florida geographic area. The Company generally withholds payment on a specified percentage of the purchased receivables and obtains credit insurance to reduce its credit risk. If third parties fail to honor their obligations under the purchased receivables, the Company's loss may be reduced by any withheld payments and/or credit insurance. The Company performs ongoing credit evaluations of its significant customers and account-debtors.

Among the accounts receivable purchased from BCC are those originated by BCC's major client, a manufacturer of sportswear and related apparel goods. At December 31, 2002 and 2001, this major client's concentration approximated 42% and 35% of the receivables purchased, respectively (Note 1).

7

**BANK 0011351**

ES0975329



# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

The Company purchases accounts receivable with recourse, except as to credit risk. The Company's accounts receivable are insured against credit losses pursuant to its Credit Insurance Policy with Euler American Credit Indemnity Company. Insurance coverage aggregated $125 million as of December 31, 2002. The policy expires annually on March 31. The Company has renewed the policy through 2004.

The allowance for credit losses is maintained at a level deemed adequate by management to absorb losses in the portfolio after evaluating the portfolio, current economic conditions, insurance coverage, changes in the nature and the volume of the portfolio, past loss experience and other pertinent factors. Many of these factors involve a significant degree of estimation and are subject to rapid change which may be unforeseen by management. It is reasonably possible that changes in these factors could result in material adjustments to the allowance in the near term.

**Cash and Cash Equivalents**

The Company considers investments with original maturities of three months or less at the time of purchase to be cash equivalents. At times, cash balances in the Company's account may exceed federally insured limits.

**Income Recognition**

Interest income on advances and other amounts owed to the Company is calculated using the simple interest method on the daily balances of principal outstanding and is recorded as earned in accordance with the terms of the related factoring agreements with clients. Factoring fees are recognized over the period that the Company renders the related services.

**Furniture and Equipment**

Furniture and equipment are recorded at cost. Depreciation is calculated on the straight-line basis over the estimated useful lives of the assets. (3-5 years).

**Income Taxes**

Effective with the October 26, 1998 merger into Lacroze, LLC, the Company's operations became taxable directly to the members and, accordingly, no provision for income taxes is included in the accompanying financial statements for periods subsequent to October 25, 1998.

8

**BANK 0011352**

ES0975330

# E. S. Bankest, L.C.

## Summary of Significant Accounting Policies

**Use of Estimates in the Preparation of Financial Statements**

The preparation of the financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

9

**BANK 0011353**

ES0975331

**E. S. Bankest L.L.C**

**Notes to Financial Statements**

1. **Accounts Receivable**

Accounts receivable consists of the following:

|  | 2002 | 2001 |
|---|---|---|
| Accounts receivable | $ 243,294,187 | $ 178,103,308 |
| Allowance for doubtful accounts | (10,342,323) | (3,442,319) |
|  | 232,951,864 | 174,660,989 |
| Due to clients | (9,081,710) | (21,051,658) |
| Net accounts receivable | $ 223,870,154 | $ 153,609,331 |

A purchased account receivable is considered impaired when, based on current information and events, it is probable the Company will be unable to collect the amounts due from account debtors.

As of December 31, 2002, the Company has recorded a $7 million increase in the allowance for doubtful accounts comprised of: (i) $1.7 million substantially related to the balance of the K-Mart accounts receivable (ii) $2.5 million related to the United Container, LLP accounts; (iii) $2.3 million related to accounts receivable purchased from other clients, and (iv) a $500,000 allowance for other estimated losses in the portfolio.

At December 31, 2002, approximately $17 million of purchased accounts receivable relate to receivables purchased from United Container LLP, before $6 million of amounts due to United Container, LLP. In December 2001, United Container, LLP filed for bankruptcy protection under Chapter 11. During early 2002 the Company sought and obtained a conversion of the bankruptcy case to a Chapter 7 liquidation. At the time of filing bankruptcy, United Container, LLP owed the Company approximately $11.0 million against purchased receivables. In addition, other collateral of the debtor, including approximately $9.0 million in unapproved receivables which were not factored, were subject to the Company's security interest. During the course of the United Container, LLP bankruptcy case, the Company determined that it may have been the victim of a multi-party fraudulent invoice

10

BANK 0011354

ES0975332

**E. S. Bankest L.L.C.**

**Notes to Financial Statements**

scheme perpetrated by United Container, LLP its officers and employees and numerous third-party account debtors. The Company is aggressively asserting its claims against various parties it believes responsible, including claims for conspiracy to defraud, violations of Florida's Civil Remedies for Criminal Practices Act ("RICO"), fraudulent misrepresentation, negligent misrepresentation and for the unpaid invoices, as well as pursuing claims against the estate of the deceased owner of United Container, LLP.

Activity in the allowance for losses was as follows:

| Year ended December 31, | 2002 | 2001 |
|---|---|---|
| Balance, beginning | $ 3,442,319 | $ 477,686 |
| Provision for doubtful accounts | 7,000,004 | 3,050,004 |
| Charge-offs, net | (100,000) | (85,371) |
| Balance, ending | $ 10,342,323 | $ 3,442,319 |

**2. Promissory Notes**

Prior to September 18, 2002, the Company obtained financing for its continued business operations through the issuance and sale of Factored Accounts Receivable-Backed Promissory Notes through Espirito Santo and/or one or more of its affiliates.

As a result of Espirito Santo's sale of its membership interest in the Company to BCC on September 18, 2002, Espirito Santo and the Company discontinued issuance of Notes. On November 26, 2002 the Company entered into a Restructuring Agreement with Bank Espirito Santo International Ltd., as collateral agent under the Note placement documents, ESB Finance Ltd., a newly formed affiliate of Espirito Santo, and Banco Espirito Santo SA Nassau Branch ("Restructuring Agreement"). Pursuant to the Restructuring Agreement, ESB Finance Ltd. Agreed to acquire from all of the holders of the Notes the rights to repayment from the Company. The Company's obligations to repay principal under the Notes was restructured to provide for the repayment of the principal balances under the Notes, together with obligations to Banco Espirito Santo SA Nassau Branch.

11

**BANK 0011355**

ES0975333

# E. S. Bankest LLC

## Notes to Financial Statements

Amounts due on the Company's promissory notes and line of credit are as follows:

| | |
|---|---:|
| 2003 | $ 34,000,000 |
| 2004 | 76,000,000 |
| 2005 | 62,447,005 |
| | $ 172,447,005 |

The Notes are collateralized by (i) accounts receivable owned by the Company (ii) an assignment of the proceeds of a credit insurance policy (iii) reserve balances in the factoring accounts and (iv) cash and cash equivalents and are guaranteed by BCC.

Interest on the Notes under the Restructuring Agreement continues to be paid at the rates provided for in each of the underlying Notes through the date of each Note's scheduled maturity. From and after the original scheduled maturity and until the Notes are repaid, interest will accrue under the Restructuring Agreement at a rate equal to the 30 LIBOR rate plus two and one half percent 2.5% until September 1, 2003, after which all Notes will have matured and interest shall thereafter accrue at a rate equal to the Six Month LIBOR rate plus two and one half percent (2.5%). The interest rate will be readjusted on each March 1 and September 1 thereafter.

The Series A Notes ($16,700,000 and $77,550,000 at December 31, 2002 and 2001) accrue interest based on the six month London Inter-Bank Offered Rate plus 1.5% (2.88% and 3.5% at December 31, 2002 and 2001) and originally matured through June 20, 2002.

12

BANK 0011356

ES0975334

**E. S. Bankest L.C.**

**Notes to Financial Statements**

The Series B Notes ($28,750,000 and $59,950,000 at December 31, 2002 and 2001) accrue interest based on the twelve month London Inter-Bank Offered Rate plus 1.75% (3.20% and 4.19% at December 31, 2002 and 2001) and originally matured through December 19, 2002.

Under the terms of the Restructuring Agreement, the Company is obligated to comply with certain financial covenants, including collateral and tangible net worth ratios as defined. At December 31, 2002, the Company was in compliance with the covenants under the Restructuring Agreement.

In connection with the restructuring agreement a $3 million credit facility form Banco Espirito Santo and Commercial de Lisboa was repaid.

At December 31, 2002, the Company had $30,000,000 outstanding under its credit facility from Banco Espirito Santo SA Nassau Branch, an affiliate of Espirito Santo, which is subject to the Restructuring Agreement discussed above. Outstanding amounts under that facility bear interest equal to the other amounts due under the Restructuring Agreement, the six month LIBOR rate in effect on the first date of the month in which a borrowing occurs plus 1.50% (3.50% at December 31, 2002).

Since the Company is no longer able to receive funds from its previous lender the Company has made adjustments to its business plans to reflect these limitations, the Company continues to seek alternative sources of financing for its operations and may in the future require proceeds from new debt, borrowings or sale of the Company's securities to obtain additional capital. There can be no assurance that the Company will be able to maintain profitability or obtain additional capital when needed.

**Related Party Transactions**

At December 31, 2002 $29,105,142 was due to BCC for purchases for accounts receivables.

13

BANK 0011357

ES0975335

**E. S. Bankest L.L.C.**

**Notes to Financial Statements**

At December 31, 2001 $8,001,069 was due from BCC for cash received by BCC relating to receivables held by the Company, repaid in 2002.

Prior to the purchase by BCC of its interests in the Company and the termination of the then existing Shareholders Agreement, the Company was required to pay 1% commission of the principal amount for the promissory notes placed by Espirito Santo. For the years ended December 31, 2002 and 2001 commission expense amounted to $1,185,665 and $1,045,794, respectively.

An officer of the Company is a member of the board of managers of a limited liability company, from which the Company has purchased $45 million in accounts receivable in 2002.

**4.  Commitments**

The Company rents office space under non-cancelable leases expiring October 31, 2003.  The minimum future rental commitment for leases in effect at December 31, 2002, approximates the following:

| Year ending December 31, | | Amount |
|---|---|---|
| 2003 | $ | 123,000 |
| | $ | 123,000 |

Rent expense in 2002 and 2001 aggregated approximately $146,000 and $149,000, respectively.  Upon expiration of the lease, the Company intends to continue to lease its premises on a month-to-month basis until such time as its new long-term leasehold space is available.

**5.  Fair Value of Financial Instruments**

Disclosure of fair value of financial instruments is required by SFAS No. 107, "Disclosures About Fair Value of Financial Instruments."  The Company's financial instruments consist principally of cash and cash equivalents, accounts receivable and promissory notes payable. The carrying amounts of such financial instruments as reflected in the balance sheets approximate their estimated fair value as of December 31, 2002 and 2001.  The estimated fair value is not necessarily indicative of the amounts the Company could realize in a current market exchange.

14

*BANK 0011358*

ES0975336

PREFACE

Status

1        This Manual describes the basic principles which shall apply to both national and international engagements.

Structure

2        Volume I of the Manual sets out the concepts and principles of the BDO audit approach. Volume II provides additional guidance on the practical techniques that should be used in implementing the BDO audit approach.

3        Volume III of the Manual, the Forms Binder (also available electronically - Electronic Forms Binder), contains examples of key forms and documentation which have been developed to assist in implementing procedures and techniques described in Volumes I and II. The Forms Binder Status Report, which is included in the Forms Binder, provides information on the latest versions of the forms.

BDO Compass

4        The BDO audit approach involves the assessment of inherent risk, control environment strengths and the determination of a risk profile. A software tool, "BDO Compass," has been developed to assist the auditor in these tasks. The use of this software is mandatory in the U.S. for (1) all sensitive audit engagements unless waived by the engagement director following consultation with the ADAA, (2) all engagements which are referred from other BDO Member Firms, and (3) all first-year audit engagements of 400 or more budgeted audit hours. When Firm policy does not require the use of BDO Compass, the necessary assessments can be performed by the Manual Method using Form A-68. However, there may be many opportunities where BDO Compass will be helpful in reducing audit procedures in engagements less than 400 hours. Also, once BDO Compass is used on first-year engagements over 400 hours, its use in subsequent years is simplified and, therefore, usually cost-effective, because of the roll-over feature in the software.

CHAPTER 1

STATEMENT OF PRINCIPLES AND STRUCTURE

CONTENTS

Paragraphs

OUR OBJECTIVE....................................................... 1.1 - 1.5

PRINCIPLES.......................................................... 1.6

STRUCTURE
Introduction........................................................ 1.7
The audit........................................................... 1.8
Controlling the audit............................................... 1.9 - 1.10
Client service...................................................... 1.11 - 1.12

Plaintiffs' Exh. No. 118
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts



CONFIDENTIAL

BDO029719

confirmations and are likely to encourage recipients to respond. In addition, return envelopes may also have "IMPORTANT INFORMATION" printed on the front to encourage recipients to respond;

      (5)    Provide return postage. To facilitate responses, auditors normally include a stamped, self-addressed return envelope along with each confirmation. Stamps tend to generate higher response rates than business and reply envelopes; and

      (6)    Send follow-up reminders. Providing confirmation recipients with reminders or follow-up notices via postcards or letters appears to increase response rates. Follow-up reminders are probably most effective if mailed three or four days after the initial confirmations are mailed. Most recipients apparently decide whether to comply with the confirmations during the three or four-day period immediately after receipt of the requests. Moreover, it seems about as effective to send postcard reminders to non-responders as it is to send second confirmations, letters, or both. Sometimes it may be more economical to send postcard reminders than copies of confirmations.

      Follow-up

1A.11 When the positive method is used, it is important that we should follow up all customers who fail to respond within a reasonable period of time. The failure of a customer to reply after a repeated request should cause us to question whether a valid receivable from a genuine customer existed at the date of verification. In this case we should carry out alternative procedures (see Procedure Note 1A, paragraphs  1A.20 and 1A.21).

1A.12 Generally, as discussed above, such follow-up requests should be in a written form. However, it may be acceptable in certain circumstances to follow-up a written request by telephone provided that we are satisfied that the person to whom our inquiry is addressed is the appropriate person (i.e., we should obtain the phone number independently of the client and make the call ourselves) and is responding to our request with due care. Such confirmation by telephone should be recorded carefully, noting the name of the person to whom we spoke and exactly what was confirmed.

      Fax confirmations

1A.12A    Faxed information can be manipulated in several ways. For example:

      þ   A fax machine can be preprogrammed with an incorrect transmitting number and name.

      þ   The fax can be intercepted by a dishonest party who can remove and replace key information.

      þ   If a fax is printed on thermographic paper, it can be easily erased. (Faxes printed on such paper can also fade within a relatively short period.)

1A.12B    The risk of relying on a bogus fax can be reduced. Faxes received directly by us as a follow-up to a recent telephone conversation generally do not require considerable attention. However, if we receive a fax unexpectedly or the client hands us a fax he or she received directly from the sender, we generally should call the originator to confirm the origin and contents of the fax, particularly if the information being corroborated may be potentially

CONFIDENTIAL

BDO031771

1A.19 This record will assist us in arriving at an opinion, which should be stated on the workpapers, as to whether the results of the circularization indicate:

      (1)    That the client's accounts receivable records have been substantiated; or

      (2)    That there are sufficient discrepancies to indicate errors or fraud which require that other audit procedures be revised; or

      (3)    That the response is too poor to form the basis for a conclusion.

ALTERNATIVE PROCEDURES

1A.20 Where confirmation is not carried out, or where it is not possible to obtain confirmation of a selected account, we should carry out the following procedures:

      (1)    Compare any subsequent remittances credited to these accounts with the cash receipts records (and remittance advices if available); and/or

      (2)    Examine documentation, such as shipping documents, sales invoices and relevant correspondence supporting the account balances or unpaid items.

      Regardless of which alternative procedures are performed, we should always examine some invoices, shipping documents, etc. but not necessarily for each account.

1A.21 When we are unable to substantiate the balance due from the customer, we should bring the matter to the attention of an official of the client, independent of the accounts receivable personnel, with the request that the matter be investigated and we be informed of the result.

POSSIBLE ERRORS OR FRAUD

1A.22 The following should be read in conjunction with FSA Note E.

Failing to record sales and accounts receivable

1A.23 Since the failure to record sales may result in interception of cash receipts, control activities are of prime importance in the area of sales and cash for the proper accounting for accounts receivable. Audit scope in accounts receivable is therefore considerably impacted by the adequacy of client procedures in those areas.

Forced agreement of detail ledger to control account

1A.24 As a result of a defalcation, the detail ledger may be out of balance with the accounts receivable control account. Consequently, the detail trial balance may have balances incorrectly listed or may be misfooted. Likewise, an accounting entry may be made to the control account to force it into agreement with the detail ledger.

1A.25 In addition to obtaining an understanding of internal control to the extent necessary and obtaining direct confirmation from customers discussed

CONFIDENTIAL

BDO031774

RELATED PARTY TRANSACTIONS

INTRODUCTION

6E.1        This Procedure Note gives guidance on procedures which we should
consider to identify transactions with related parties and to obtain
satisfaction that such transactions have been properly recorded in the
accounting records and that the disclosure in the financial statements as
required by SFAS 57 is adequate.

6E.2        Apart from requirements for disclosure in financial statements,
generally accepted accounting principles do not require transactions with
related parties to be accounted for on a basis different from that which would
be appropriate if the parties were not related. Thus, we should place primary
emphasis upon the adequacy of disclosure of the existence of transactions with
related parties and their significance in the financial statements of the
reporting entity. We should be aware that the substance of a particular
transaction could be significantly different from its form.

6E.3        When related parties are dealing among themselves and we do not
audit or review the records of significant parties, we may be exposed to
unusually high risk. This may be the case even if a related company is audited
by another reputable firm. The situation may be particularly troublesome when
material transactions involve individuals such as stockholders or officers,
because the financial affairs of individuals are seldom subject to audit or
review, or when our audit is confined to less than an entire group of affiliated
companies and the client we audit has significant transactions with other group
members which we do not audit. In such situations, we may be exposed to unusual
risk since the substance of the other side of a related party transaction may be
obscured. Such situations may indicate that the engagement should be classified
as sensitive. Depending on our analysis of the situation, we can try to persuade
the client to allow us to audit all related parties, or insist on reviewing the
work of the other auditors in accordance with AU 543.12-.13. If the client
refuses, we should consider whether, through other means, we are able to obtain
sufficient evidence regarding (1) the intercompany transactions or (2) other
matters involving the group members not audited by us which might have a
material effect on the companies we audit. The ADAA should be consulted during
the planning stage of the audit as to the appropriateness of any such
alternative procedures and whether the engagement should be classified as
sensitive. The results of this consultation should be documented in the
workpapers and on the Review Checklist or Matters for Reviewer's Consideration
("MRC") memorandum for sensitive engagements as a significant decision. If we
cannot obtain sufficient evidence, we may decide to qualify or disclaim an
opinion, or we may even decide to resign. In such situations, we should again
consult with the ADAA and document our considerations.

6E.4        It is also our function as auditors to ensure that financial
statements comply with any statutory requirements in respect of disclosure of
such transactions.

PROCEDURES

General

CONFIDENTIAL

BDO031890

48

Client: ES Bankest Corp.

Period end: 12/31/98

INHERENT RISK QUESTIONNAIRE ANSWERS - FULL QUESTIONNAIRE

Schedule No:
Prepared by: CM   01/08/9
Reviewed by:

|  | Question answer | Financial statement area | Assertions |
|---|---|---|---|
| **Management characteristics** | | | |
| 1. Are the entity's operating and financial decisions dominated by a single person? | No   CM   01/07/99 | | |
| 2. Is there a risk of misstatement because the degree of management involvement in day-to-day operations is too high? | No   CM   01/07/99 | | |
| 3. Do management lack sufficient relevant experience and knowledge to operate the business effectively? | No   CM   12/23/98 | | |
| 4. Has management failed to set, communicate and monitor operating objectives? | No   CM   12/23/98 | | |
| 5. Are budgets set at levels which are so unrealistically high that they encourage erroneous reporting of performance? | No   CM   12/23/98 | | |
| 6. Are there attitude or morale problems amongst management and personnel in accounting or supervisory functions? | No   CM   12/23/98 | | |
| 7. Are recruitment procedures inadequate, particularly for senior, sensitive or trustworthy positions? | No   CM   12/23/98 | | |
| 8. Do personnel in accounting or supervisory functions lack sufficient training, experience or ability to carry out allocated tasks and make the required judgements? | No   CM   12/23/98 | | |
| 9. Are management inclined to accept unusually high business risks? | No   CM   12/23/98 | | |
| 10. Is there an undue emphasis on releasing or planning the amount of reported earnings and maintaining the market value of the securities rather than on operating performance? | No   CM   12/23/98 | | |
| 11. Has the client acquired other companies and in so doing warranted the market price of its stock or the level of its earnings? | No   CM   12/23/98 | | |
| 12. Have there been frequent changes in the activities of the business? | No   CM   12/23/98 | | |
| 13. Has management made public projections of earnings that appear to be unduly optimistic? | No   CM   12/23/98 | | |

Produced using BDO Compass   (C) BDO Binder 1991

BDO 00657
Confidential



Plaintiffs' Exh. No. 138
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts

ES0009513

Client: ES Bankest Corp.

Year end: 12/31/98

Schedule No:        2
Prepared by: CM  |01/08/99
Reviewed by:        |

1.   ENT RISK QUESTIONNAIRE ANSWERS - FULL QUESTIONNAIRE

| | Question answer | | | Financial statement area | Assertions |
|---|---|---|---|---|---|
| 14. Do we regard the remuneration of executives as being dependent to a significant degree on the performance of the entity (eg earnings related)? | No | CM | 12/23/98 | | |
| 15. Is the corporate structure unnecessarily complex for the entity's operations and size, taking into account the entity's future plans? | No | CM | 12/23/98 | | |
| 16. Do management have a poor attitude and discipline towards controls and their enforcement? | No | CM | 12/23/98 | | |
| 17. Do management have a poor attitude towards compliance with external legislative or other regulatory obligations? | No | CM | 12/23/98 | | |
| **Engagement characteristics** | | | | | |
| 18. Is more than usual significance likely to be given to the financial statements? Reason: The financial statements are included in the Company's private placement memorandums which are used to sell debentures. | Yes | CM | 12/23/98 | ALL | ALL |
| 19. Is the client or its industry highly visible to the public and receives media attention? | No | CM | 12/23/98 | | |
| 20. Have financial analysts or other investment advisors reported unusual or materially adverse matters that could affect the client or its industry? | No | CM | 12/23/98 | | |
| 21. Is the entity prone to be involved in a large number of law suits or controversies? | No | CM | 12/23/98 | | |
| 22. Does the entity have plans to raise finance using these financial statements? Reason: Financial statements are included as part of the Debenture private placement memorandum. | Yes | CM | 12/23/98 | ALL | ALL |
| 23. Does a contest for control of the entity appear reasonably possible? | No | CM | 12/23/98 | | |
| 24. Are other transfers of interest planned (including management interests)? | No | CM | 12/23/98 | | |
| 25. Are there bonus arrangements based on earnings and/or contingent payments arising from an acquisition? | No | CM | 12/23/98 | | |

Produced using BDO Compass    (C) BDO Binder 1991

BDO 00658
Confidential

ES0009514

Client: ES Bankest Corp.

Year end: 12/31/98

Schedule No:        3
Prepared by: CM  |01/08/99
Reviewed by:       |

1.  .ENT RISK QUESTIONNAIRE ANSWERS - FULL QUESTIONNAIRE

| | Question answer | | | Financial statement area | Assertions |
|---|---|---|---|---|---|
| 26. Will the financial statements be used in connection with litigation or an inquiry by a regulatory agency? | No | CM | 12/23/98 | | |
| 27. Does the entity act in a fiduciary capacity for others? | No | CM | 12/23/98 | | |
| 28. Has the entity recently been acquired by another entity? | No | CM | 12/23/98 | | |
| 29. Has the entity recently acquired or disposed of a controlling interest in another entity? | No | CM | 12/23/98 | | |
| 30. Will the financial statements be used in connection with negotiations relating to an acquisition or disposal of a business or segment of a business? | No | CM | 12/23/98 | | |
| 31. Is there a risk of misstatement arising from a requirement to file the financial statements or submit them to a provider of finance? | No | CM | 12/23/98 | | |
| 32 Have there been recent changes in the entity's advisors because of disagreements? | No | CM | 12/23/98 | | |
| 33. Is there a less than open relationship between our firm and the management of the client which might lead to a reluctance to provide information? | No | CM | 12/23/98 | | |
| 34. Do management give evasive answers to audit inquiries? | No | CM | 12/23/98 | | |
| 35. Are there excessive time pressures or distractions for client staff whilst preparing the financial statement information? | No | CM | 12/23/98 | | |
| 36. Are there explicit limitations on scope or unusual constraints on fees or completion dates? | No | CM | 12/23/98 | | |
| 37. Are there affiliated entities that have different accounting dates? | No | CM | 12/23/98 | | |
| 38. Are any of the assets/transactions unusually susceptible to misappropriation or other manipulation? | No | CM | 12/23/98 | | |
| 39. Are there significant transactions with affiliated entities or related parties? | Yes | CM | 12/23/98 | Accounts receivable<br>Interest income | C E A V<br>C E A V |

Produced using BDO Compass    (C) BDO Binder 1991

BDO 00659
Confidential

ES0009515

Client: ES Bankest Corp.

Year end: 12/31/98

Schedule No:                4
Prepared by: CM  |01/08/99
Reviewed by:     |

1.  ENT RISK QUESTIONNAIRE ANSWERS - FULL QUESTIONNAIRE

| | Question answer | Financial statement area | Assertions |
|---|---|---|---|
| Reason: | | SG&A expenses | C E A V |

All accounts receivbles are purchased from Bankest Capital, parent.  All income,
interest and factoring commissions are derived from Bankest Capital,  Parent.
All management fees are due to parent.

40. Is there a history of lack of documentation of    No   CM   12/23/98
    major transactions or transaction streams?

41. Is there a high frequency of significant          No   CM   12/23/98
    hard-to-audit transactions/balances?

42. Are material transactions or client adjustments   No   CM   12/23/98
    likely to occur at or near the end of accounting
    periods?

43. Are there complex underlying calculations         No   CM   12/23/98
    involved in determining the amount of
    transactions/balances?

44. Are there significant judgements involved in      No   CM   12/23/98
    relation to the accounting treatment of
    transactions, or valuation or classification of
    balances?

45. Are there significant contingent liabilities such No   CM   12/23/98
    as off balance sheet financing or credible litig-
    ation brought against either the management or the
    entity by third parties or regulatory bodies?

46. Have there been any new accounting pronouncements No   CM   12/23/98
    which could materially affect the financial
    statements this period?

47. Were significant audit adjustments arising from   No   CM   12/23/98
    client errors made in prior audits?

48. Are there any controversial accounting policies?  No   CM   12/23/98

49. Is there inconsistent application of any          No   CM   12/23/98
    accounting policy?

50. Are there unexplained relationships or trends in  No   CM   12/23/98
    the management accounts?

51. Are there significant unexpected adjustments      No   CM   12/23/98
    between the management accounts and the financial
    statements?

52. Is there an absence of essential up-to-date       No   CM   12/23/98
    accounting records, including those required by
    legislative and regulatory requirements?

BDO 00660
Confidential

ES0009516

Client: ES Bankest Corp.

Year end: 12/31/98

Schedule No: 5
Prepared by: CM  |01/08/99
Reviewed by:      |

1.- ...ENT RISK QUESTIONNAIRE ANSWERS - FULL QUESTIONNAIRE

| | Question answer | | | Financial statement area | Assertions |
|---|---|---|---|---|---|

53. Have any new information systems of audit significance been implemented during the year, or have there been any amendments to such existing systems?   No  CM  12/23/98

54. Have there been any disruptions or breakdowns of the information systems during the year?   No  CM  12/23/98

Operating and industry characteristics

55. Does the business operate in a high risk industry such as "hi-tech", regulated or declining industry?   No  CM  12/23/98

56. Are the business' products or services new and thus involve uncertainties as to technical development or market potential?   No  CM  12/23/98

57. Is increased competition, market saturation, product obsolescence or declining demand evident or expected?   No  CM  12/23/98

58. Is there a risk of misstatement because the market for the business' products or services is concentrated in a few customers?   No  CM  12/23/98

59. Is there a risk of misstatement because the supply for essential raw materials is concentrated in a few sources?   No  CM  12/23/98

60. Are there domestic or international, political, social, environmental or economic issues that could adversely affect the financial position or operations?   No  CM  12/23/98

61. Has the performance of the entity been significantly worse than that of its industry as a whole?   No  CM  12/23/98

62. Have there been a large number of business failures in this or related industries?   No  CM  12/23/98

63. Has the performance of the entity been significantly better than that of the industry as a whole for no apparent reason?   No  CM  12/23/98

64. Are there indications that the entity's financial condition may decline in the future?   No  CM  12/23/98

65. Are the proceeds of short term borrowings being invested in long term assets?   No  CM  12/23/98

Produced using BDO Compass    (C) BDO Binder 1991

BDO 00661
Confidential

ES0009517

Client: ES Bankest Corp.

Year end: 12/31/98

Schedule No:               6
Prepared by: CM  |01/08/99
Reviewed by:      |

1. .IENT RISK QUESTIONNAIRE ANSWERS - FULL QUESTIONNAIRE

| | Question answer | | | Financial statement area | Assertions |
|---|---|---|---|---|---|
| 66. Is the expected cash flow for the next year not adequate for the expected needs for operations and payments to creditors and investors?<br>Reason:<br>Cash flow into the company primarily arise from sale of new debentures. Cash receipts of collections of A/R are maintained at the parent level. Bankest receivables books due from parent for amount due from these proceeds. Bankest continues to purchase a/r from parent and books due to parent for amounts owed to parent. | Yes | CM | 12/23/98 | Due to note holders | C E A V |
| 67. Is there likely to be difficulty in complying with conditions in debt agreements? | No | CM | 12/23/98 | | |
| 68. Are there abrasive/deteriorating relationships with bankers, investors, creditors? | No | CM | 12/23/98 | | |
| 69. Has there been rapid expansion in the scale of the entity's activities?<br>Reason:<br>Purchases of A/R in 1996 were double that of the prior year. Bankest Receivables has booked all A/R collected on its behalf by the parent as a due from parent. This due from has been offset by continued purchases of additional A/R. | Yes | CM | 12/23/96 | ALL | ALL |
| 70. Are there frequent stock shortages or excessive unfulfilled back-orders? | No | CM | 12/23/98 | | |
| 71. Is there excess productive capacity? | No | CM | 12/23/98 | | |
| 72. Is the level of insurance coverage inadequate for the business? | No | CM | 12/23/98 | | |

Produced using BDO Compass    (C) BDO Binder 1991

BDO 00662
Confidential

ES0009518

EC
2/99

| ES Bankest | | | | | | | |
|---|---|---|---|---|---|---|---|
| A/R Circularization | | | | | | | |
| 12/31/98 | | | | | | | |
| | | | Amount | Date | Date | 2nd | Date |
| | Acct. name | Balance | Confirmed | Sent | Faxed | Request | Received |
| Items over SSD | | | | | | | |
| 1 | Ames Dept Stores | 190,105.18 | | 2/9/99 | | | |
| 2 | Baptist Memorial Hosp | 690,000.00 | NNC | | | | |
| 3 | Bexar County Hosp | 522,334.00 | NNC | | | | |
| 4 | Bon Secours | 757,260.00 | NNC | | | | |
| 5 | Cabarrus Memorial Hosp | 720,000.00 | NNC | | | | |
| 6 | Curative Health | 300,000.00 | NNC | | | | |
| 7 | Dayton Hudson | 4,392,430.32 | | 2/9/99 | | | |
| 8 | Des Moines General | 229,520.00 | NNC | | | | |
| 9 | Diversified Therapy | 1,138,500.00 | NNC | | | | |
| 10 | DVI Financial | 889,238.00 | NNC | | | | |
| 11 | Electronic Arts | 1,224,840.00 | NNC | | | | |
| 12 | Frye Regional | 300,000.00 | NNC | | | | |
| 13 | Hendrick Medical | 295,000.00 | NNC | | | | |
| 14 | Hospital Board | 365,000.00 | NNC | | | | |
| 15 | JC Penney | 2,692,977.25 | | 2/9/99 | | | ✓ |
| 16 | K-Mart Corp | 4,140,187.58 | | 2/9/99 | | | |
| 17 | MCA Inc | 1,250,000.00 | NNC | | | | |
| 18 | Meijer, Inc | 3,310,128.05 | | 2/9/99 | | | |
| 19 | Microsoft Corp | 1,296,000.00 | NNC | | | | |
| 20 | Polygram Records | 1,400,400.00 | NNC | | | | |
| 21 | Rush Medical | 350,000.00 | NNC | | | | |
| 22 | Sears Roebuck | 2,819,007.25 | | 2/9/99 | | | |
| 23 | Sony Music | 1,951,200.00 | NNC | | | | |
| 24 | Tenet Healthcare | 330,000.00 | NNC | | | | |
| 25 | The Society of NY Hosp | 235,000.00 | NNC | | | | |
| 26 | Toys R Us | 432,000.00 | NNC | | | | |
| 27 | Transmedic Co | 920,000.00 | NNC | | | | |
| 28 | Wal-Mart | 4,254,254.00 | | 2/9/99 | | | |
| 29 | Wound Treatment Centers | 320,000.00 | NNC | | | | |
| | | 37,915,381.63 | | | | | |
| Sample Items | | | | | | | |
| 1 | Bulu Sports | 3,820.23 | | 2/9/99 | 2/9/99 | | 2/10/99 |
| 2 | Debrich Inc | 1,198.55 | | 2/9/99 | 2/9/99 | | ✱ |
| 3 | Kohl's Corp | 10,692.00 | | 2/9/99 | 2/9/99 | | |
| 4 | Michael Krop Sr High | 13,986.24 | | 2/9/99 | 2/9/99 | | |
| 5 | Office Depot | 84,881.04 | | | | | |
| 6 | Richman Gordman | 57,228.50 | | 2/9/99 | | | |
| | NNC: Non-notification customer, no confirmation | | | | | | |
| | sent per the request of ES Bankest. | | | | | | |

✱ BDO Auditor received voice mail message on 2/10/99 from Debrich, Inc. stating that
invoice relates to inventory sent to them that was subsequently returned to Joy.
The account was settled w/ Joy. BDO will perform alternate procedures.

✓ BDO Auditor spoke w/ customer for confirmation. she stated JC Penny does
not confirm balances as a company policy - She will send letter w/ stmt.
BDO will perform alternate procedures.

BDO 00738
Confidential

Plaintiffs' Exh. No. 346
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts

Page 1

AR Circularization SSD and 10 random



ES0009594

Es Bankest Corp.
**A/R Alternate Procedures - Subsequent Collections Work**
**12/31/1998**
**File: AR Test**

Scope: Collections over SSD Plus Items haphazardly selected. C 3

| Customer | Date Collected | Amount | A | B | C |
|---|---|---|---|---|---|
| 1 Just For Feet | 01/13/99 | 17,422.00 | ✓ | ✓ | ✓ |
| 2 K-Mart Corp. | 01/11/99 | 18,425.88 | ✓ | ✓ | ✓ |
| 3 K-Mart Corp. | 01/11/99 | 143,813.34 | ✓ | ✓ | ✓ |
| 4 K-Mart Corp. | 01/12/99 | 40,772.16 | ✓ | ✓ | ✓ |
| 5 K-Mart Corp. | 02/01/99 | 165,463.30 | ✓ | ✓ | ✓ |
| 6 Modell, Henry & Co | 01/08/99 | 17,667.61 | ✓ | ✓ | ✓ |
| 7 Sears Roebuck & Co | 01/08/99 | 67,579.05 | ✓ | ✓ | ✓ |
| 8 Wal-Mart Stores | 01/04/99 | 164,051.32 | ✓ | ✓ | ✓ |
| 9 Wal-Mart Stores | 01/22/99 | 67,106.44 | ✓ | ✓ | ✓ |
| 10 Wal-Mart Stores | 02/05/99 | 289,427.00 | ✓ | ✓ | ✓ |
| 11 Meijer, Inc. | 01/07/99 | 314,910.00 | ✓ | ✓ | ✓ |
| 12 Meijer, Inc. | 01/08/99 | 447,089.00 | ✓ | ✓ | ✓ |
| 13 Dayton Hudson | 01/11/99 | 275,800.00 | ✓ | ✓ | ✓ |
| 14 JC Penny | 01/13/99 | 192,060.00 | ✓ | ✓ | ✓ |
| 15 K-Mart | 01/13/99 | 416,740.00 | ✓ | ✓ | ✓ |
| 16 DVI Financial Services | 01/15/99 | 288,581.00 | ✓ | ✓ | ✓ |
| 17 Sears Roebuck Co. | 01/15/99 | 376,740.00 | ✓ | ✓ | ✓ |
| 18 Wal-Mart Stores | 01/20/99 | 359,910.00 | ✓ | ✓ | ✓ |
| 19 JC Penny | 01/25/99 | 261,345.41 | ✓ | ✓ | ✓ |
| 20 K-Mart | 01/25/99 | 237,531.40 | ✓ | ✓ | ✓ |
| 21 K-Mart | 01/26/99 | 409,893.00 | ✓ | ✓ | ✓ |
| 22 Wal-Mart Stores | 01/27/99 | 301,150.00 | ✓ | ✓ | ✓ |
| 23 JC Penny | 01/28/99 | 337,770.00 | ✓ | ✓ | ✓ |
| 24 MCA Inc | 01/28/99 | 262,080.00 | ✓ | ✓ | ✓ |
| 25 Polygram Records | 01/29/99 | 403,200.00 | ✓ | ✓ | ✓ |
| 26 Transmedic | 01/29/99 | 299,951.00 | ✓ | ✓ | ✓ |
| 27 Electronic Arts | 02/08/99 | 330,600.00 | ✓ | ✓ | ✓ |
| 28 MCA Inc | 02/08/99 | 247,740.00 | ✓ | ✓ | ✓ |
| 29 Electronic Arts | 02/09/99 | 198,720.00 | ✓ | ✓ | ✓ |
| 30 Meijer, Inc. | 02/09/99 | 339,651.00 | ✓ | ✓ | ✓ |
| 31 Sears Roebuck Co. | 02/11/99 | 198,600.00 | ✓ | ✓ | ✓ |
| 32 Sears Roebuck Co. | 02/11/99 | 301,197.00 | ✓ | ✓ | ✓ |
| | Total: | 7,792,986.91 | | | |

A. Examined collection of 1998 invoices, traced to copy of customer check and remittance advice noting agreement to amount and date.

B. Traced to cash collection report prepared by E.S. Bankest and agreed to information in remittance advice.

C. Traced information from remittance advice to A/R aging 12/31/98.

BDO Seidman, LLP. Confidential                    2/25/99

BDO 00897
Confidential

AR test
C-10

Plaintiffs' Exh. No. 376
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts



EXHIBIT
17

ES0009753

*Carried forward to FY 99 w/P's*

# CONSIDERATION OF FRAUD RISK AND EVALUATION OF CONTROL STRUCTURE
## Supplement to BDO Compass Full Inherent Risk and Control Strengths Questionnaires

Client_ *ES Bankest Corp.*

Client No._____          Period Ended_ *12/31/98*_

## INTRODUCTION

This form provides additional guidance to help us discharge our responsibility to consider fraud (i.e., fraudulent financial reporting and misappropriation of assets) and internal control in a financial statement audit  For the most part, our full Inherent Risk Questionnaire ("IRQ") and Control Strengths Questionnaire ("CSQ") in BDO Compass already contain inquiries covering all the major areas of fraud concern and most of the specific fraud risk factors included in a related guide to SAS 82, *Consideration of Fraud in a Financial Statement Audit*. In addition, the questions in our full CSQ already enable us to gain an understanding of the five internal control components discussed in SAS 78, *Consideration of Internal Control in a Financial Statement Audit: An Amendment to SAS No. 55*, although our questions are not segregated by the five components  This form incorporates the expanded operational guidance provided in SAS 82 and SAS 78, provides additional questions to supplement those contained in the IRQ and CSQ, and establishes a framework to help us document our compliance with SAS 82. Form A-82/1 Supplement contains material that is useful in completing this form and should be reviewed as this form is being completed

## INSTRUCTIONS

Parts A through D of this form should be completed at the same time the full IRQ and CSQ in BDO Compass are completed/updated (i e , during planning)  Parts E and F should be completed at the conclusion of the audit  As you develop responses to the questions in the IRQ and CSQ, you should review the "consider points" (shown in the Help screens) in BDO Compass as well as those contained in Section 1 of Form A-82/  Supplement  This form should only be used with the full IRQ and CSQ in BDO Compass

- **Part A** should be completed when you are completing/updating the questions in the full IRQ and CSQ in BDO Compass  You should consider how the responses to the questions in this section affect our initial assessment of inherent risk and control strengths determined by BDO Compass. In considering how these questions affect those assessments, remember that BDO Compass does not allow us to change a control environment grade from Neutral ("N") to Strong ("S")

- **Part B** elicits information from management regarding its understanding of the risk of fraud in the company  This includes asking management whether it has any knowledge of fraud that has been perpetrated on or within the company  These questions ordinarily should be directed to appropriate management (e g , CEO, CFO, controller, director of internal audit, audit committee), taking into consideration their roles and responsibilities within the company, by the engagement manager or engagement direc or

- After considering the "Yes" responses to the IRQ questions and those in Part A of this form, the "No" responses to the CSQ questions and those in Part A of this form and management's understanding and knowledge of fraud within the company, we should document our overall assessment of the risk of material misstatement due to fraud in **Part C**. Considerable judgment will be required in making this assessment  Generally, if the Risk Profile in BDO Compass is High for a number of key financial statement area assertions, the risk of material misstatement due to fraud is likely to be High

- If factors exist indicating a risk of material misstatement due to fraud, our audit procedures should be designed to provide reasonable assurance that such misstatement will be detected. **Part D** is used to document that our overall and specific responses to fraud reflect an appropriate response to the fraud risk factors identified  Sections 2 and 3 of Form A-82/1 Supplement provide examples of appropriate overall and specific responses to the various fraud risk factors that might be identified as we complete the IRQ, CSQ and Part A of this form

A-82/1 (P  1 of 11)  (9/97)



EXHIBIT
18

BDO 00643
Confidential

X-2





- After substantially all audit work has been performed, we should consider whether the results of our audit procedures indicate the existence of fraud risk factors that were not previously identified during planning Section 4 of Form A-82/1 Supplement describes conditions that could change or support our initial judgment about fraud risk If we identify additional fraud risk factors, we should describe those fraud risk factors in **Part E** and specify what changes, if any, were required to the nature, timing and extent of our audit procedures. If no modifications were made to our audit procedures as a result of additional fraud risk factors identified, we should indicate why in Part E.

- SAS 82 requires that we communicate to management any evidence we find indicating fraud has been perpetrated by the company or on the company by its employees. Part F should be used to document any such required communication.

## CONSULTATION REQUIREMENTS

Upon discovery of possible fraud, we should consult with the Firm's general counsel and the National SEC Director in the case of public companies and the Associate Director of Accounting and Auditing in the case of non-public companies when we:

- Believe senior management is implicated, including members of the board of directors;

- Are unsure as to the person to whom to report,

- Are precluded from obtaining sufficient appropriate audit evidence to evaluate whether fraud has occurred; or

- Believe our report may not be acted upon

## CONTENTS

Part A - Additional Inherent Risk and Control Strengths Questions                    3

Part B - Inquines of Management                                                      7

Part C - Overall Assessment of the Risk of Material Misstatement Due to Fraud        9

Part D - Planned Audit Procedures                                                   10

Part E - Evaluation of the Results of Audit Procedures                              11

Part F - Communication With Management and the Audit Committee                      11



A-82/1 (P. 2 of 11)  (9/97)

BDO 00644
Confidential

## PART A—ADDITIONAL INHERENT RISK AND CONTROL STRENGTHS QUESTIONS

**Instructions:** The following questions are intended to supplement the questions in the full Inherent Risk Questionnaire and the Control Strengths Questionnaire in BDO Compass. This section should be completed when BDO Compass is completed/updated.

### INHERENT RISK

| Management Characteristics | Yes | No |
|---|---|---|
| 1  Is there a high turnover of senior management, counsel or board members? | | ✓ |

Comments, if any:

_____
_____
_____

| | | |
|---|---|---|
| 2.  Are there significant bank accounts or subsidiary or branch operations in tax-haven jurisdictions for which there appears to be no clear business justification? | | ✓ |

Comments, if any.

_____
_____
_____

| | | |
|---|---|---|
| 3  Is there difficulty determining the organization or individual(s) that control(s) the company? | | ✓ |

Comments, if any.

_____
_____
_____

| | | |
|---|---|---|
| 4  Is the company experiencing a poor or deteriorating financial position and management has personally guaranteed significant debts of the company? | | ✓ |

Comments, if any

_____
_____
_____



A-82/1 (P 3 of 11)  (9/97)

BDO 00645
Confidential

|  | Yes | No |
|---|---|---|
| 5. Does management's financial reporting philosophy seek to minimize taxable income? |  | ✓ |

Comments, if any:

_____

_____

_____

| 6. Does management's financial reporting philosophy seek to maximize or smooth earnings? |  | ✓ |

Comments, if any

_____

_____

_____

**Engagement Characteristics**

| 7  Is there a known history of securities law violations or claims against the company or its senior management alleging fraud or violations of securities laws? |  | ✓ |

Comments, if any

_____

_____

_____

| 8. Have there been any new statutory or regulatory requirements that could impair the financial stability or profitability of the company this period? |  | ✓ |

Comments, if any

_____

_____

_____



A-82/1 (P 4 of 11)  (9/97)

BDO 00646
Confidential

|  | Yes | No |
|---|---|---|
| 9. Is the company unusually dependent on debt financing or especially vulnerable to changes in interest rates because of variable rate debt? | | / |

Comments, if any

_____

_____

_____

| | | |
|---|---|---|
| 10. Are we aware of any indications of financial stress of employees or adverse relationships between the company and its employees that might increase the risk of misappropriation of assets? | | / |

Comments, if any

_____

_____

_____

## CONTROL STRENGTHS

### Business Strategy, Objectives and Organization

| | | |
|---|---|---|
| 1  Does the company maintain appropriate physical safeguards over cash, investments, inventory and/or fixed assets? | / | . |

Comments, if any.

_____

_____

_____

### Information Systems

| | | |
|---|---|---|
| 2  Is there adequate recordkeeping with respect to assets susceptible to misappropriation? | / | |

Comments, if any

_____

_____

_____

A-82/1 (P  5 of 11)  (9/97)

BDO 00647
Confidential

|  | Yes | No |
|---|---|---|
| 3  Are amounts recorded by accounting system periodically compared to physical assets? | ✓ | |

Comments, if any

_____

_____
_____

4. Does communication flow throughout the company adequately to allow people to discharge their duties? ✓

Comments, if any·

_____

_____
_____

**Personnel Policies and Procedures**

5  Is there a mandatory vacation policy for employees performing key control functions? ✓

Comments, if any

_____

_____
_____

I have completed the full Inherent Risk Questionnaire ("IRQ") and Control Strengths Questionnaire ("CSQ") in BDO Compass and have reviewed the "Points to Consider" in Section 1 of Form A-82/1 Supplement in developing responses to the questions in the IRQ and CSQ  The inherent risk and control strengths grades resulting from the use of BDO Compass appropriately reflect the responses to the questions in Part A above

_____    _1/19/55_
In-charge Auditor                        Date

_____    _____
In-charge Auditor                        Date

_____    _____
In-charge Auditor                        Date

A-82/1 (P  6 of 11)  (9/97)

BDO 00648
Confidential



## PART B—INQUIRIES OF MANAGEMENT

**Instructions:** Obtain management's understanding regarding the risk of fraud in the company and determine whether management has knowledge of fraud that has been perpetrated on or within the company. The following questions should be asked of appropriate management (e.g., CEO, CFO, controller, director of internal audit, audit committee), taking into consideration their roles and responsibilities within the company, by the engagement manager or engagement director. In making these inquiries, we should ask management to describe the bases for their response.

Indicate who provided responses to these inquiries    *Dominick Palagano, Vice President*
*Carlos Mendez - Controller*

1   Is management aware of any instances of fraud perpetrated against the company by any of its employees?

| Yes ☐    No ☑ | If yes, describe below and discuss company actions taken and the status of the fraud and the financial statement areas and assertions affected. |
|---|---|
| | |

2   Is management aware of any instances of fraud perpetrated by the company, either fraudulent financial reporting or defrauding of another company or individual?

| Yes ☐    No ☑ | If yes, describe below and discuss company actions taken and the status of the fraud and the financial statements areas and assertions affected |
|---|---|
| | |

3   Are there particular subsidiary locations, business segments, types of transactions, accounts balances, or financial statement categories where fraud risk exists or may be more likely to exist?

| Yes ☐    No ☑ | If yes, describe below and discuss the financial statements areas and assertions affected |
|---|---|
| | |



A-82/1 (P 7 of 11)  (9/97)

BDO 00649
Confidential

4   What does management believe is the level of risk of fraud being perpetrated against or by the company?

| High ☐ | Medium ☐ | Low ☑ |
|--------|----------|-------|

5   How is management addressing the risk of fraud?  For example, does the company have a written fraud prevention policy or has it implemented policies to prevent or detect fraud (e.g., routinely investigates any accounting, analytical or operating performance anomalies; has strong internal controls; encourages employees to report possible fraud, focuses on creating a culture of honesty, openness and assistance, attempts to eliminate opportunities for fraud)

*Detail transaction review by Mr. Carlagiano + Mr. Orlansky is relied upon to detect + prevent fraud.*

6.  Has the company identified any fraud risk factors that are not included in BDO Compass or Part A of this form?

| Yes ☐   No ☑ | If yes, describe below and discuss the financial statement areas and assertions affected |
|--------------|------------------------------------------------------------------------------------------|

BDO 00650
Confidential





## PART C—OVERALL ASSESSMENT OF THE RISK OF MATERIAL MISSTATEMENT DUE TO FRAUD

Considering the questions answered "Yes" in the Inherent Risk Questionnaire ("IRQ") (including Part A of this form), those answered "No" in the Control Strengths Questionnaire ("CSQ") (including Part A of this form) and inquiries of management in Part B above, the risk for this engagement of material misstatement due to fraud is considered to be:

| High ☐ | Medium ☐ | Low ☑ |
|---|---|---|

In evaluating the risk of material misstatement due to fraud, you should consider the results determined using BDO Compass. Generally, if the Risk Profile is High for a number of key financial statement area assertions, the risk of material misstatement due to fraud is likely to be High. Consideration also should be given to both the qualitative nature and number of negative responses to the IRQ/CSQ questions that resulted in the High Risk Profiles for these key areas as well as the responses provided by management to the questions in Part B of this form.

If the risk of material misstatement due to fraud is "High", a copy of this form should be sent to the Associate Director of Accounting and Auditing ("ADAA") to provide early consideration of whether to retain the client.

Copy of Supplement sent to ADAA, if required (✓) _____

BDO 00651
Confidential

## PART D—PLANNED AUDIT PROCEDURES

**Instructions:** Considering the responses to the questions in the IRQ and CSQ, the additional questions in Part A of this form, and the inquiries of management included in Part B of this form, if factors exist that indicate a risk of material misstatement due to fraud, our audit procedures should be designed to provide reasonable assurance that such a misstatement would be detected. In general, there are two types of responses that might be appropriate

- *Overall responses* - these include such things as increased professional skepticism (See Section 2 of Form A-82/1 Supplement for examples of appropriate overall responses.)

- *Specific responses* - these are particular audit procedures such as surprise visits to locations where the risk of fraud is considered to be higher. (See Section 3 of Form A-82/1 Supplement for examples of appropriate specific audit procedures.)

Based on completion of Parts A, B and C of this form and considering the information in Sections 2 and 3 of Form A-82/1 Supplement, the audit procedures documented in the audit programs reflect an appropriate response to the fraud risk factors identified

| | |
|---|---|
| _C 2/1/_ | 1/14/99 |
| In-charge Auditor | Date |
| | |
| In-charge Auditor | Date |
| | |
| In-charge Auditor | Date |

Parts A through D have been appropriately completed.

| Fiscal Year | Prepared by | | | Reviewed by | |
|---|---|---|---|---|---|
| | Name | Date | | Name | Date |
| 98 | _c2/l_ | 1/14/99 | | _signature_ | 2/99 |
| | | | | | |
| | | | | | |



A-82/1 (P  10 of 11)  (9/97)

BDO 00652
Confidential





## PART E—EVALUATION OF THE RESULTS OF AUDIT PROCEDURES

> **Instructions:** This section should be completed after substantially all audit work has been performed. Examples of conditions that may indicate the existence of additional fraud risk factors are included in Section 4 of Form A-82/1 Supplement

1. Do the results of audit procedures indicate the existence of fraud risk factors that were not previously identified?

   | Yes ☐ | Yes, but no modifications made to our audit procedures ☐ | No ☑ |
   | --- | --- | --- |

   If yes, identify the new fraud risk factors and describe the changes in the nature, timing and extent of audit procedures that were considered necessary. If no modifications were considered necessary, indicate why no changes were necessary.

## PART F—COMMUNICATION WITH MANAGEMENT AND THE AUDIT COMMITTEE

> **Instructions:** The following communications are required by SAS 82 if we find evidence that a fraud has been perpetrated by the company or on the company by its employees.

| | | Done By | W/P Ref. |
| --- | --- | --- | --- |
| 1 | Inform the appropriate level of management of any evidence that fraud may exist within the company | _____ | _____ |
| 2 | Inform the audit committee of any fraud involving senior management and fraud that causes a material misstatement of the financial statements. | _____ | _____ |
| 3 | Inform the audit committee of fraud risk factors that have continuing control implications that are considered reportable conditions | _____ | _____ |

Parts E and F have been appropriately completed

| Fiscal Year | Prepared by | | Reviewed by | |
| --- | --- | --- | --- | --- |
| | Name | Date | Name | Date |
| 98 | C 7he | 2/13/99 | | 2/11 |



A-82/1 (P 11 of 11) (9/97)

BDO 00653
Confidential

*ES. Banhart*

~~Interactive Response Technologies~~
**Confirmation Control**
**12/31/99**

| | Mailed | Follow-up | Follow-up | Received |
|---|---|---|---|---|
| **Cash** | | | | |
| Espirito Santo Bank--Acct# 51002499310 | 1/26/00 | | | 2/3/00 |
| Espirito Santo Bank--Acct# 0106140606 | 1/26/00 | | | ✓ |
| **Receivables** | | | | |
| Ames Dept Stores | 1/27/00 | | | |
| Dayton Hudson Corp | 1/27/00 | | | |
| Electronic Arts | 1/27/00 | | | |
| JC Penney | 1/27/00 | | | |
| K-Mart Corp | 1/27/00 | | | |
| Meijer, Inc | 1/27/00 | | | |
| Microsoft Corp | 1/27/00 | | | |
| Sam's Club | 1/27/00 | | | |
| Sears Roebuck | 1/27/00 | | | |
| Sports Authority | 1/27/00 | | | |
| Sports Authority | 1/27/00 | | | |
| Wal-Mart | 1/27/00 | | | |
| **Legal** | | | | |
| Gunster, Yoakley, et al | 1/28/00 | | | 2/16/00 |
| **Notes Payable** | | | | |
| CFESSA- A Series Note List | 1/31/00 | | | 2/28/00 |
| CFESSA- B Series Note List | 1/31/00 | | | |
| Becket Holdings Ltd. | 1/31/00 | | | |
| The Vigel Trust | 1/31/00 | | | 2/24/00 |
| Caetano Moruzzi | 1/31/00 | | | |
| Arlindo Petejo | 1/31/00 | | | |
| Maria D. Maciel | 1/31/00 | | | |
| Walter Kinkerfus | 1/31/00 | | | |
| Bocaje | 1/31/00 | | | |
| Becket Holdings Ltd. | 2/7/00 | | | |
| Dinanath Maharaj | 2/7/00 | | | |
| F. Neder Garib /F. Neder Diaz | 2/7/00 | | | |
| Milan Investments | 2/7/00 | | | |
| Milan Investments | 2/7/00 | | | |

*Bco. Espirito Santo b- Revolving L of C*        *2/9/00*        *2/14/00*

Plaintiffs' Exh. No. 347
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts



BDO 00258
Confidential

ES0009114

E.S. Bankest Corp.
**Period Ended 12/31/99**

## C. SALES, SHIPPING & TRADE RECS

...is expected that these tests will be performed as substantive tests. If tests of controls are to be performed, refer to regular audit program guide C in the Audit Program Generator.

| Item No. | Auditing Procedure | Done By | W/P Ref. |
|---|---|---|---|

### A. GENERAL

1. Review business memo, summary flowcharts, narratives, etc , which document our understanding of client procedures.

2. To ascertain that our understanding of the system is correct, perform a systems control review (walk-through) test of one item from historical data (a recorded transaction) and one item from live data (a systems control review of transactions currently being processed).

### B. PERFORM PRELIMINARY AND FINAL ANALYTICAL REVIEW OF SALES AMOUNTS

1. Perform preliminary analytical review

2. Perform final analytical review (see a. to e. above)

### C. TO ASCERTAIN THAT THE PERIOD-END CUTOFF WAS ACCURATE

1. Scan sales journal just prior to and just after year-end and investigate unusually large entries (coordinate with "Subsequent Events" program). (CE)

2. Review credit memoranda issued subsequent to year-end for propriety of recording period (coordinate with "Subsequent Events" program). (E)

### D. TO ASCERTAIN THE PROPRIETY AND COLLECTIBILITY OF ACCOUNTS RECEIVABLE BALANCES

1. Obtain a detailed listing of accounts receivable as of the balance sheet date: (EA)

    a. Test the footing of the listing.

    b. Reconcile the balance with the general ledger.

    c. Summarize scope for confirmation request. We will perform circularization procedures on all invoices greater than or equal to 1/2 SSD ($112,000) as well as a randomly selected sample. The sample size will be determined through the use of the A40 or PPS sampling approach.

    d. Consider sending confirmations to accounts charged off, collection agencies and holders of notes and collateral not on hand.

    e. Check replies to confirmations and investigate exceptions.

    f. Send second requests on positive confirmations for which no replies are received.

Revised 02/02/00
Page 1

BDO 03392
Confidential

Plaintiffs' Exh. No. 323
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts

EXHIBIT

ES0001919

| Item No. | Auditing Procedure | Done By | W/P Ref. |
|---|---|---|---|

g. Investigate all undelivered requests returned by post office; if possible, obtain correct addresses and remail; apply alternative auditing procedures to requests which cannot be delivered and to positive requests for which no replies are received; alternative procedures may include checking to subsequent remittances, shipping documents, billing records, customer orders and correspondence, etc.    *an*   *none noted*

h. Summarize results of circularization and conclude on adequacy of confirmation procedures.    *an*   *L-2*

i. Furnish management with a list of "no reply" and "unable to reply" customers for their own follow-up.    *an*   *none noted*

2. Review other monthly trial balance reconciliations and investigate large or seemingly unusual reconciling items. (CEA)    *none noted*

3. Make an overall test of total debits to accounts receivable with credits to sales to ascertain reasonableness of total postings to accounts receivable. (E)    *N/A*

4. Examine support for accounts written off, trace to memorandum records, assess subsequent collection efforts. (CV)    *L-9*

5. Review entries in general ledger accounts for the year and investigate large or unusual items. (CEA)    *none noted*

6. Evaluation of collectibility of receivables:

a. Obtain (and check to underlying invoices, etc.) a copy of client's aging of year-end accounts receivable and compare it with prior-year aging for significant changes. (AV)    *an*   *L-8*

b. Compare percentage of delinquent accounts, number of days sales in accounts receivable, total returns and allowances, and bad debts written off with those of prior periods. (V)    *an*   *L-8*

c. Analyze the allowance for doubtful receivables and compare to prior year considering sales level and current economic conditions. (V)    *an*   *L-8*

d. Review entries in allowance for doubtful accounts general ledger accounts for the year and investigate large or unusual items. (V)    *cy*

e. Review turnover ratios and obtain management's explanation of unusual fluctuations. (V)    *see separate analysis*

f. Discuss collectibility of accounts with a responsible official considering possible overall effect of economy on customers' ability to pay; in evaluating the collectibility of accounts, the following items should be tested if considered appropriate: (V)    *L-8 + L-9*

(1) Subsequent payments;    *cy*

(2) Payment history;    *cy*

(3) Current amounts of sales to customers, and    *cy*

(4) Information contained in credit file.    *cy*

g. Determine whether the allowance for doubtful accounts is adequate and document conclusions in the workpapers. (V)    *an*   *L-2 C(S)*

Revised 02/02/00
Page 2

BDO 03393
Confidential

ES0001920

| Item No. | Auditing Procedure | Done By | W/P Ref. |
|---|---|---|---|

h  Review collection activity for accounts previously written off. (V)

i.  If the Company uses the direct write-off method, evaluate the exposure that significant uncollectible accounts remain in accounts receivable. (Note: The direct write-off method is not GAAP. However, it may approximate GAAP depending on the materiality of the allowance and write-offs during the period.)

## E.  CLASSIFICATION AND DISCLOSURE (P)

1  Inquire as to accounts pledged, assigned, or discounted, adverse sales commitments, cancellation of major sales agreements, etc.

2.  Determine that classifications (trade, credit balances, due from officers, affiliates, etc.) are appropriate for financial statement presentation.

3.  Inquire as to significant concentrations of credit risk arising from all financial instruments. (see paragraph 20 of SFAS 105.)

4.  Consider reclassification of credit balances.

5.  In accordance with FASB Statement No. 107, *Disclosures about Fair Value of Financial Instruments*, obtain information about the fair value of notes payable and long-term debt, and perform the following:

(Note:  Disclosures about the fair value of financial instruments prescribed in FASB Statement No. 107 are optional for nonpublic entities that meet certain criteria (see FASB Statement No. 126).  Determine if the client is making FASB Statement No 107 disclosures.)

a.  Determine that the fair value amounts are determined in accordance with FASB Statement No. 107

b.  Determine that the valuation principles are being consistently applied.

c.  Determine that the fair value amounts are supported by the underlying documentation.

d.  Determine that the method of estimation and significant assumptions used are properly disclosed.

6  If the Company has transferred receivables to a third party, determine whether the transaction has been accounted for in accordance with SFAS No. 125. (See also Audit Program H - Transfers/Servicing of Financial Assets)

## F.  CONCLUSIONS ON YEAR-END BALANCES OF SALES AND TRADE RECEIVABLES

Based on the results of work performed, it is my opinion that trade receivables and sales are properly classified and stated in accordance with generally accepted accounting principles on a consistent basis and those receivables represent bona fide receivables of the client. No receivables were pledged and the allowance for possible losses is adequate.

Reviewed By._____  Date:_____

Revised 02/02/00
Page 3

BDO 03394
Confidential

C(S)

ES0001921



| ES Bankest | | | | | |
|---|---|---|---|---|---|
| Confirm Control | | | | | |
| 12/31/00 | | | | | |
| | | | 1st Sent | 2nd Req. | Recvd. |
| | | | | | |
| Cash | | | | | |
| | Espirito Santo Bank 0106 140 606 | | 1/15/01 | | |
| | Espirito Santo Bank 51 002499310 | | 1/15/01 | | |
| | | | | | |
| Accounts receivable | | | | | |
| | ADORNO & ZEDER PA | | 1/15/01 | | Ⓐ |
| | ALCOA INC | | 1/15/01 | | |
| | ALLTEL COMMUNICATION PRODUCTS | | 1/15/01 | | |
| | AMERICAN TROUSER, INC.,*HOLD* | | 1/15/01 | | |
| | AT&T CORP | | 1/15/01 | | |
| | AVENATECH INC. | | 1/15/01 | | |
| | BAPTIST HEALTH SYSTEMS OF S F | | 1/15/01 | | |
| | BAR ACQUISITION CORP., | | 1/15/01 | | |
| | BELL ATLANTIC CORPORATION | | 1/15/01 | | |
| | BELLSOUTH COMMUNICATION | | 1/15/01 | | |
| | BELLSOUTH TELECOMMUNICATIONS | | 1/15/01 | | |
| | BROWARD, COUNTY OF | | 1/15/01 | | |
| | BURGER KING.CORPORATION | | 1/15/01 | | |
| | CARNIVAL CORP. | | 1/15/01 | | |
| | CATO CORPORATION | | 1/15/01 | | |
| | CENTURY TELEPHONE ENT. | | 1/15/01 | | |
| | CFW COMMUNICATIONS COMPANY | | 1/15/01 | | |
| | CONAGRA POULTRY COMPANY | | 1/15/01 | | |
| | CONSOLIDATED EDISON INC. | | 1/15/01 | | |
| | COVERALL NORTH AMERICA, INC | | 1/15/01 | | |
| | CT COMMUNICATIONS | | 1/15/01 | | |
| | DELTACOM | | 1/15/01 | | |
| | ELECTRONIC DATA SYSTEMS CORP | | 1/15/01 | | |
| | FINE, M & SONS MFG CO | | 1/15/01 | | |
| | FLORIDA DEPT.OF TRANSPORTATIO | | 1/15/01 | | |
| | FLORIDA POWER & LIGHT COMPANY | | 1/15/01 | | |
| | FRAMATOME CONNECTORS INTERLOC | | 1/15/01 | | |
| | GENERAL ELECTRIC COMPANY INC | | 1/15/01 | | |
| | GENERAL MOTORS CORPORATION | | 1/15/01 | | |
| | GINSBERG'S INSTITUTIONAL FOOD | | 1/15/01 | | |
| | GTE CALIFORNIA | | 1/15/01 | | |
| | GTE SOUTHWEST INCORPORATED | | 1/15/01 | | |
| | HIGH TOP PRODUCTS CORPORATION | | 1/15/01 | | |
| | HOME SHOPPING NETWORK INC. | | 1/15/01 | | |
| | ILLUMINET HOLDING, INC. | | 1/15/01 | | |
| | INTERNATIONAL STAR TEXTILE | | 1/15/01 | | |
| | J C PENNEY | | 1/15/01 | | |
| | KAISER FOUNDATION HOSPITALS | | 1/15/01 | | |
| | K-MART CORPORATION | | 1/15/01 | | |
| | LINVATEC CORPORATION | | 1/15/01 | | |
| | MAREX.COM INC | | 1/15/01 | | |
| | MCI WORLDCOM INC | | 1/15/01 | | |

confirm control.xls

BDO 03300
Confidential

1 of 3

Plaintiffs' Exh. No. 348
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts



EXHIBIT
21

ES0001827

| ES Bankest | | 1st Sent | 2nd Req. | Recvd. |
|---|---|---|---|---|
| Confirm Control | | | | |
| 12/31/00 | | | | |
| | MEIJER, INC. | 1/15/01 | | (A) |
| | MICCOSUKEE SER. **USE M1528** | 1/15/01 | | |
| | MIVILA FOODS | 1/15/01 | | |
| | MULTIFOODS DIST. GROUP INC | 1/15/01 | | |
| | NOKIA MOBILE PHONES, INC | 1/15/01 | | |
| | NORTH PITTSBURG TELEPHONE CO | 1/15/01 | | |
| | NORTHERN TELECOMM | 1/15/01 | | |
| | ORANGE, COUNTY OF | 1/15/01 | | |
| | P & E COMMUNICATIONS, INC | 1/15/01 | | |
| | PACIFIC BELL | 1/15/01 | | |
| | PACIFIC WEST TELECOMM INC | 1/15/01 | | |
| | PAMIDA INC. | 1/15/01 | | |
| | PLATINUM PACKAGING PRODUCTS | 1/15/01 | | |
| | RORTIZ AUTO DISTRIBUTORS INC | 1/15/01 | | |
| | SAM'S CLUB  (USE W134) | 1/15/01 | | |
| | SCHOOL BOARD OF DADE COUNTY | 1/15/01 | | |
| | SEARS ROEBUCK & COMPANY | 1/15/01 | | |
| | SOUTH MOTOR CO. OF DADE CNTY. | 1/15/01 | | |
| | SPORTS AUTHORITY, INC. | 1/15/01 | | |
| | TAMARIJN DIVI ARUBA BEACH | 1/15/01 | | |
| | TARGET | 1/15/01 | | |
| | TECO ENERGY INC | 1/15/01 | | |
| | TIME WARNER TELECOMM | 1/15/01 | | |
| | TRUSCELLO & SONS WHOLESALERS | 1/15/01 | | |
| | U S WEST COMMUNICATIONS GROUP | 1/15/01 | | |
| | U.S. LEC CORP. | 1/15/01 | | |
| | UNISOURCE WORLDWIDE INC | 1/15/01 | | |
| | UPPER LAKES FOODS, INC | 1/15/01 | | |
| | VITAS HEALTHCARE CORP | 1/15/01 | | |
| | WAL-MART STORES, INC. | 1/15/01 | | |
| | WESTINGHOUSE SAVANNAH RIVER C | 1/15/01 | | |
| | WILLIAMETTE INDUSTRIES INC | 1/15/01 | | |
| | | | | |
| Attorneys | | | | |
| | Gunster Yoakley & Stewart | 2/12/01 | | ✓ |
| | | | | |
| Debt | | | | |
| | Espirito Santo Bank - credit facility | 1/15/01 | | ✓ |
| | CFESSA Series A | 1/16/01 | | ✓ |
| | CFESSA Series B | 1/16/01 | | ✓ |
| | 2000-004/B-003 | Rui Patricio | 1/16/01 | | (B) |
| | 2000-015/B-012 | Zorba | 1/16/01 | | |
| | 2000-016/B-013 | Dinanath Maharaj | 1/16/01 | | |
| | 2000-018/B-014 | Gamboa | 1/16/01 | | |
| | 2000-026/B-020 | Bocaje | 1/16/01 | | |
| | 2000-027/B-021 | Caprice International | 1/16/01 | | |
| | 2000-028/B-022 | Jose Luis Minetto | 1/16/01 | | |
| | 2000-032/A-006 | Migue | 1/16/01 | | |

confirm control.xls

BDO 03301
Confidential

- 2 of 3

ES0001828

| ES Bankest | | | | | |
|---|---|---|---|---|---|
| Confirm Control | | | | | |
| 12/31/00 | | | | | |
| | | | 1st Sent | 2nd Req. | Recvd. |
| | 2000-040/B-027 | Rene Neme Filho | 1/16/01 | | (6) |
| | 2000-044/A-014 | Carlos Gama | 1/16/01 | | |
| | 2000-045/A-018 | Pioneer Coast Ltd. | 1/16/01 | | |
| | 2000-060/A-035 | Jorge Cunha | 1/16/01 | | |
| | 2000-068/A-038 | Marcio Pinto | 1/16/01 | | |
| | 2000-072/A-042 | Licinio Bastos | 1/16/01 | | |
| | 2000-078/A-049 | Island Enterprises | 1/16/01 | | |
| | 2000-084/A-052 | Lilian Jara | 1/16/01 | | |
| | 2000-094/A-064 | Licinio Bastos | 1/16/01 | | |
| | 2000-110/A-077 | Migue | 1/16/01 | | |
| | 2000-111/A-078 | CYSO | 1/16/01 | | |
| | 2000-119/B-032 | Marcos Correa | 1/16/01 | | |
| | 2000-120/A-084 | Amalfi S.A. | 1/16/01 | | |
| | 98-057/A-023 | Piedmont Financial | 1/16/01 | | |
| | 98-065/A-029 | Caetano Moruzzi | 1/16/01 | | |
| | 98-068/A-037 | Estupenda | 1/16/01 | | |
| | 98-082/A-038 | Certame International | 1/16/01 | | |
| | 98-26/B-016 | Chiswell International | 1/16/01 | | |
| | 98-4/B-010 | Manoel Gomez Da Cruz | 1/16/01 | | |
| | 98-40/A-017 | The Vigel Trust | 1/16/01 | | |
| | 98-67/B-030 | Nakiska Ltd. | 1/16/01 | | |
| | 98-93/B-040 | Jaime Nasser | 1/16/01 | | |
| | 99-006/A-003 | Humberto Freitas | 1/16/01 | | |
| | 99-022/A-015 | Helio O. Rimes | 1/16/01 | | |
| | 99-024/A-017 | Beckett Holdings | 1/16/01 | | |
| | 99-026/A-020 | Vitor Moutinho | 1/16/01 | | |
| | 99-030/A-022 | Muller Assets (Light-up) | 1/16/01 | | |
| | 99-041/A-024 | Jaime Nasser | 1/16/01 | | |
| | 99-05/B-002 | Albano Ferreira | 1/16/01 | | |
| | 99-054/A-034 | L Pataky | 1/16/01 | | |
| | 99-065/A-041 | Shenzheng Limited | 1/16/01 | | |
| | 99-066/B-019 | Milan Investments | 1/16/01 | | |
| | 99-45/B-013 | Becket Holdings Ltd. | 1/16/01 | | |
| | 99-50/B-015 | Harmony | 1/16/01 | | |

confirm control.xls

BDO 03302
Confidential
3 of 3

ES0001829



au
2402

**ES BANKEST**
**CONFIRM CONTROL**
**12/31/2001**

| | | | 2nd | Date |
|---|---|---|---|---|
| *Cash* | Account # | Date Sent | Request | Received |
| Espirito Santo Bank | 0106140606 | 1/31/2002 | | 2/4/2002 |
| Espirito Santo Bank | 51002499310 | 1/31/2002 | | 2/4/2002 |
| | | | | |
| *Line of Credit* | | | | |
| Banco Espirito Santo N.Y. | CB16004984 | 1/31/2002 | | 2/5/2002 |
| | | | | |
| *Attorneys* | | | | |
| Gunster, Yoakley & Stewart | | 1/31/2002 | | ✓ |
| | | | | |
| *Notes* | | | | |
| Compagnie Bancaire Espirito Santo S.A. | | 1/31/2002 | | |
| | | | | |
| *Accounts Receivable* | | | | |
| Dallas Stars L.P. | | 2/1/2002 | | |
| Wings Sportswear, Inc. | | 2/1/2002 | | |
| General Motors Corp | | 2/1/2002 | | |
| Alcoa Inc. | | 2/1/2002 | | |
| Atofina Petrochemical, Inc. | | 2/1/2002 | | |
| Modecraft Fashion | | 2/1/2002 | | |
| Charming Shoppes, Inc. | | 2/1/2002 | | |
| Gabriel Bros | | 2/1/2002 | | |
| Jack's of Broward Inc. | | 2/1/2002 | | |
| Rich's/Lazarus/Goldsmith's | | 2/1/2002 | | |
| Cato Corporation | | 2/1/2002 | | |
| Marshall's Inc. | | 2/1/2002 | | |
| EDS Security Systems Mgmts | | 2/1/2002 | | |
| EDS | | 2/1/2002 | | |
| Maurice's Inc. | | 2/1/2002 | | |
| Conagra Poultry Company | | 2/1/2002 | | |
| Esteban Auto Sales | | 2/1/2002 | | |
| General Electric Company, Inc. | | 2/1/2002 | | |
| Sysco Food Service | | 2/1/2002 | | |
| General Services Admn. | | 2/1/2002 | | |
| University of Central Florida | | 2/1/2002 | | |
| CMT Construction | | 2/1/2002 | | |

Plaintiffs' Exh. No. 349
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts



EXHIBIT
aa

BDO 03930
Confidential

ES0002455

au
2/02

| | | |
|---|---|---|
| American Trousers, Inc | 2/1/2002 | |
| Floridinos Specialties Dist. | 2/1/2002 | |
| Glazier Foods Company | 2/1/2002 | |
| Glazier Foods Company | 2/1/2002 | |
| Haag Foods & Poultry Inc. | 2/1/2002 | |
| K-Mart Corporation | 2/1/2002 | |
| Kohl's Corporation | 2/1/2002 | |
| L T B Industries | 2/1/2002 | |
| Multifoods Dist. Group Inc. | 2/1/2002 | |
| New Jersey Dept. Militry | 2/1/2002 | |
| Schaeffer Hat Store | 2/1/2002 | |
| Simplot J.R. Company | 2/1/2002 | |
| Unisource Worldwide Inc. | 2/1/2002 | |
| Marshall's Inc. | 2/1/2002 | |
| Kohl's Corporation | 2/1/2002 | |
| Wal-Mart Stores Inc. | 2/1/2002 | |
| W H Smith, Inc. | 2/1/2002 | |
| TJX Companies | 2/1/2002 | |
| Target | 2/1/2002 | |
| Sports Authority | 2/1/2002 | |
| Sears Roebuck & Company | 2/1/2002 | |
| Sam's Club | 2/1/2002 | |
| Meijer, Inc. | 2/1/2002 | |
| JC Penney | 2/1/2002 | |
| Federated Dept Stores Inc. | 2/1/2002 | |
| Disney, Walt World Co. | 2/1/2002 | |

BDO 03931
- Confidential

ES0002456

## HIGHLY CONFIDENTIAL MEMORANDUM

**Date:** May 24, 2001

**To:**   Eduardo Orlansky
          Hector Orlansky
          R. Peter Stanham
          Carlos Mendez

**From:** Dominick C. Parlapiano

**Re:**   05/23/01 Meeting with BDO Seidman, LLC

Yesterday, I attended a meeting at BDO's (Sandy Lenner's) office.

In attendance were Sandy, Dave Larson of BDO's Starwagon, their Technology Company and Michael G. O'Hare. Mr. O'Hare sit's on the Board of the Parent Company of BDO. He is an Executive Director, and is the highest ranking Corporate Officer related to non-accounting BDO companies, such as Starwagon.

The meeting was held to finally negotiate the final terms of the StrataSys/BDO/Starwagon Alliance Agreement, (draft attached). StrataSys was represented by it's President, Howard Cantor, and I, as Director. I have been working with Sandy and Larson to achieve an acceptable Alliance Agreement. We reached final Agreement yesterday, and are shooting for an executed Agreement by 05/31/01. BDO estimates it will originate more than $10 million in business to the StrataSys/BDO/Starwagon Alliance, over the next 12 months.

Separately, Sandy asked Mr. O'Hare to mention his efforts related to establishing a BDO Finance Company. Given BDO's insight into the now difficult and getting tougher by the day, cash flow environment of small and mid-size companies; BDO sees an opportunity to provide "cash flow financing" services to it's clients, and that of companies who are members of BDO Alliances.

Mr. O'Hare was clear in that, BDO does not intend to take principal risk (credit, client-risk, etc.) and it will not use it's own balance sheet to access, what Mr. O'Hare stated to be "about $200 million a year in Account Receivables-based cash-flow lending", which BDO's Finance Company "Partner" would fund.

Simply put, BDO want's to, "sell a Service, "cash flow financing", and earn a point or so" as originator/broker again without taking money risks.

Page 1 of 2



Plaintiffs' Exh. No. 471
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts

ES-S-005336

ES0530163

Obviously, Sandy had previewed E.S. Bankest with Mr. O'Hare.

I expressed an interest in having Sandy and Mr. O'Hare visit with us here at Bankest to further discuss the possibility of BDO Finance: originating the business for +/-1pt., and E.S. Bankest: 1. "Owning the client directly (ie. each acceptable BDO client would become an E.S. Bankest client) 2. Therefore, all business would be subject to our underwriting, and 3. E.S. Bankest could service and fund Advances ("cash flow financing") without recourse to BDO, and with recourse to the clients directly.

I was of the impression that Mr. O' Hare was very interested in discussing this further with us.

My impression was confirmed this morning by Sandy, who related that, Mr. O'Hare want's to visit with E.S. Bankest some time in the second half of June (he'll call me to arrange) to further discuss this opportunity.

Lastly, after our meeting this morning, I called Sandy to tell him of Eduardo's idea of having BDO sell the "cash flow financing Services" to their client's for a fee, call it a brokerage or service, fee, etc.

I explained that if E.S. Bankest compensates BDO; that the required disclosure, let alone the possible need to replace BDO as our Auditor, due to the "conflict" were "deal killers" for us.

Sandy responded that he thought the separation of BDO as "broker" from E.S. Bankest as "Banker or Funder" was an excellent one. He told me that BDO already has a similar arrangement for Insurance Brokerage, where BDO is compensated a Brokerage fee directly from it's clients and the Insurance Cos. (Health, Property & Casualty, General Insurance lines) have direct client/billing with BDO's clients.

So, maybe we are on to something which could be big.

I'll advise of any further discussion about this and when O'Hare wants to visit with us.

Dominick

ES-S-005337

ES0530164



## Carlos E. Mendez

**From:** "Dominick C. Parlapiano"
**To:** "Carlos E. Mendez" <cemendez@esbankest.com>
**Sent:** Friday, February 14, 2003 11:13 AM
**Subject:** Fw: Miami visit

Carlitos,

I just wanted to let you see that, notwithstanding BDO's Miami Office Managing Partner, Albert Lopez's concerns, due to his learning that one of Stratasys Strategic Consultants, which had worked on a BDO-referred engagement quit last month when payroll was missed, and Albert knowing that payroll has been missed couple of times;

He is still trying to help Stratasys.

The matter of the string of e-mails below, deals with scheduling conflicts ( given Stratasys' reduced staff ) between SEM follow-up with Carnival and Sports Authority. Carnival is not BDO-related. Stratasys' entree to Carnival is  Jim Bussey, Chair of Strat's Advisory Board. Jim was CIO of Carnival for over 10 years before joining Strat.

Charles Bennett is Managing Partner of another BDO Alliance Partner "*Operations Associates*." Stratasys just completed a 3-Day consulting job with OA, for La-Z-Boy. And now OA wants to do more with Stratasys. Sports Authority is a BDO and OA Client. Stratasys did a little work for SA a couple of years ago, and enjoys a good rep w/SA. I'll let you know what happens for Stratasys with SA.

As I, and now Amie have shared with Bankest, Stratasys has a lot *of good* opportunities with "marquee" companies. They will close some of these, and when things get better, they will close most of these!

I leave it up to you whether you wish to share this with *Eduardo* and *Hector*.

Lastly, you are now a part of the good things that will happen for Stratasys and therefore Bankest.

Thank you for your help
Dominick

----- Original Message -----
From: "Pedro Del Valle" <Pdelvalle@stratasys.net>
To: <ALOPEZ@bdo.com>; <charlesbennett@oallp.com>
Cc: "Amie Girnun" <agirnun@stratasys.net>; "James Bussey" <JBussey@stratasys.net>
Sent: Friday, February 14, 2003 10:14 AM
Subject: RE: Miami visit

> ** High Priority **
>
> Gentlemen:
>
> I look to you for guidance on the dates.  But let's select them, as
> soon as possible, so we can try scheduling times with Carnival Cruise
> Lines, The Sports Authority and others.
>
> Thanks,
> Pedro
>
> >>> "Charles Bennett" <charlesbennett@oallp.com> 02/13/03 06:13PM >>>
> No problem. Let's aim at March. whatever dates would be better
> for
> you. Let me know. The last week of Feb was looking tight for me also
> with
> some current client projects in process.
>
>
> Charles Bennett, Principal
>  charlesbennett@oallp.com <mailto:charlesbennett@oallp.com>
> mobile:864-483-1383
> www.operationsassociates.com <http://www.operationsassociates.com/>
>
>
>
> -----Original Message-----
> From: Albert Lopez [mailto:ALOPEZ@bdo.com]
> Sent: Thursday, February 13, 2003 1:11 PM
> To: charlesbennett@oallp.com
> Subject: Re: Miami visit

*ES-L-049613*



Plaintiffs' Exh. No. 452
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts

2/14/2003

ES0661915

>
>
> We have not been able to set up meetings.  Due to a combination of
> factors: client conflicts and our people being too busy to follow up.
>
> Patience, let's properly plan this.
>
> Albert D. Lopez
> Office Business Line Leader, Assurance Services
> BDO Seidman, LLP
> Bank of America Tower @ Int'l Place
> 100 S. E. 2 St. Suite 2200
> Miami, Fl. 33131
> (305) 381-8000
> (305) 420-8008 - Direct Dial
> (305) 374-1135 - Fax
> alopez@bdo.com
>
>
> >>> "Charles Bennett" <charlesbennett@oallp.com> 02/12/03 04:38PM >>>
> Albert and Pedro,
> Hope all is well - just got back from Chicago - windchill -8 degrees -
> I am
> ready to come to Miami - Are we still on for the 27th and 28th? Let me
> know
> so I can book by flights. Thanks
>
>
> Charles Bennett, Principal
>
> charlesbennett@oallp.com
>
> mobile:864-483-1383
>
> www.operationsassociates.com
>
>
>
>
>
> NOTICE:
> The contents of this email and any attachments to it may contain
> privileged
> and confidential information from BDO Seidman, LLP.  This information
> is
> only for the viewing or use of the intended recipient.  If you are not
> the
> intended recipient, you are hereby notified that any disclosure,
> copying,
> distribution or use of, or the taking of any action in reliance upon,
> the
> information contained in this e-mail, or any of the attachments to
> this
> e-mail, is strictly prohibited and that this e-mail and all of the
> attachments to this e-mail, if any, must be immediately returned to
> BDO
> Seidman, LLP or destroyed and, in either case, this e-mail and all
> attachments to this e-mail must be immediately deleted from your
> computer
> without making any copies thereof.  If you have received this e-mail
> in
> error, please notify BDO Seidman, LLP by e-mail immediately.
>
>

ES-L-049614

2/14/2003

ES0661916

41SB

**Partner Name:** <u>Sandy Lenner</u> **Fiscal Year Ending:** <u>6/30/01</u>

**REDACTED**

## Good Guy/Good Gal Memo – Driving Earnings

**Partner Name:** <u>Sandy Lenner</u> **Fiscal Year Ending:** <u>6/30/01</u>

---

**1. Partner's Overall Profit Contribution** (Revenues less Expenses)

$ ▉▉▉▉▉▉   **Revenues**(excludes $250,000 of fees handled by another

Miami partner, but originated by me)

– ▉▉▉▉▉▉   **Expenses** ( includes my draw at $460 per unit)

= ▉▉▉▉▉▉

$ ▉▉▉▉▉▉   **Profits**

Referrals to others (within BDO):   ▉▉▉▉▉

Referrals from others (within BDO):   $ <u>None</u>

**2. Technical Participation/Support:** (Key technical partner.  Why are you key?)

<u>Not applicable</u>

---

**3. Alternative Distribution/Support:** (Discussion of personal activity)

*Alliances:*

<u>Information Technology - Alliance</u>

   **Dave Larson and I recently closed an IT Alliance firm transaction with Stratasys, Inc.  Its an 88 person IT firm located in close proximity to the Miami office.  This transaction took 7 months to close. I have very high expectations for the Miami office and the firm as a result of this Alliance.**

Plaintiff's Exhibit
No. 415B
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts

EXHIBIT
25

1

BDO021439
CONFIDENTIAL

ES0497734

**Partner Name: <u>Sandy Lenner</u>  Fiscal Year Ending: <u>6/30/01</u>**      **REDACTED**

## *CPA firms- Alliance*

I met with 6 \ potential alliance firms which resulted in the following:

> **Berenfeld ,Sprtizer et al**
> Jim Cross and I have met with Berenfield Spritzer on two occasions,
> They are a $5.5 million firm. I am meeting them later this month for
> the final meeting.

> **Watson and Co.**
> Jim and I had another meeting with a minority based CPA firm. The
> deal died.

> **Mallah Furman**
> Richard Kron and I met once. They are not ready.

> **Koch and Reiss**
> Jim Cross, Richard Kron and I met with them twice. They do not want
> to do anything.

> **Spear, Safer**
> I met with them once. They do not want to do anything

> **Hoffman Danner**
> I met with them once. They are not ready to do anything.

## *Factoring- Alliance*
> Michael O'Hare and I  met in July 2001  with the principals of one of
> my factor clients to provide factoring services to BDO clients and the
> Alliance member firms' clients.  Both BDO and my client are very
> excited about the potential and are working out   the economics of
> the transaction

## Mergers

> **Goldstein,Price Lucas CPA's  et al. Merger –**
> Contact has been made by James Hannon and they have agreed to
> meet in August 2001. Richard Kron and I have met them on two
> occasions to pre-qualify them.   This is a $7 million CPA  Firm
> located in Miami.

> **Becker Yaeger CPA's  et al- Merger ...**
> Richard and myself have met this firm in July 2001. This is a $2
> million firm, mostly a tax practice. They are interested in talking

2

BDO021440
CONFIDENTIAL

ES0497735

**Partner Name:** <u>Sandy Lenner</u> **Fiscal Year Ending:** <u>6/30/01</u>          **REDACTED**

> further. The next step is for our tax partner to meet them and to evaluate their practice.

4. **Change Leadership:** (Individual's demonstrated commitment to change leadership, i.e. "Moving The Cheese.)

**Notwithstanding the importance of my core assurance practice, I truly believe in ADC, my actions setforth above, justify my beliefs. I have smelled the cheese for the past couple of years. I have realized, not only must we maintain and upgrade our core practices, but we must diversify into new areas, such as ADC, alliances and merger. There is a common pattern to the process. I have seen and learned that pre-existing CPA business strategies and structures become inflexible over time. These structures may survive for some period, with the protection of generally apathy, but eventually, external catalysts move the cheese for the practicing CPA and give a loud Wolf howl (wake up call) to the pack (firm). Outmoded practices become obvious and limit success. Opening up the distribution channel through ADC, consolidations or mergers must happen in order for there to be enough cheese to be eaten. To smell the cheese is nothing more than to react to the <u>change</u> of new business realities. I believe that BDO now has the foresight and is clearly recognizing these industry changes sooner than the rest, and will become a leader in the CPA / financial services industries.**

5. **Decreasing Expenses:** (Individual's efforts in reducing expenses.)

   $ ▮▮▮▮    Recurring Expense Reduction

   _____    Non-recurring Expense Reduction

   $ ▮▮▮▮    Total Expense Reduction

Explain:
   a. **Rather than requiring a secretary, I share a secretary with 2 other partners and 3 assurance managers. I do most of my own typing and scheduling appointments, and thus saving $15,000**
   b. **Rather than sending staff to expensive outside CPE , we sponsored a two local cpe programs within the Jewish CPA organizations and saved $2,000**

3

BDO021441
CONFIDENTIAL

ES0497736

**Partner Name: <u>Sandy Lenner</u>  Fiscal Year Ending: <u>6/30/01</u>**      **REDACTED**

6. . Initiative:  (Individual's efforts in effectively increasing pricing.)

   $ █████   Additional profits (billings) due to increase pricing

   10      Number of clients where fees were increased to comply with
   firm pricing initiatives

Explain:  **My  yield  increased  from  $119  in  2000  to  $136  in  2001. The
increase  in  yield    resulted  from  increased    pricing  and  better  job
management. This translates into $164,000 ($17.42 increase in yield x 9440
hours).  Some examples are the following new and existing clients.**

| Clients | Billings | Yield | |
|---|---|---|---|
| | $558,338.00 | $156.09 | New |
| | $137,134.00 | $157.08 | New |
| | $ 54,250.00 | $149.24 | Existing |
| | $ 47,070.00 | $143.44 | Existing |
| | $ 19,900.00 | $208.94 | New |
| | $ 11,145.00 | $185.15 | New |
| | $827,837.00 | | |

7. **National Tax Consulting Group/Support:**

                              3   Number of Opportunities

                              $__0  Amount of Billings

                              $___0 Amount of Profit

8. **Lincoln Participation/Support:**      7   Number of substantive meetings

Did you meet your obligation to our firm?      Yes <u>X</u>      No _____

4

BDO021442
CONFIDENTIAL

ES0497737

**Partner Name: <u>Sandy Lenner</u> Fiscal Year Ending: <u>6/30/01</u>    REDACTED**

9. **Risk Management:** (Individual's efforts in minimizing risk/exposure for the Firm.)

Explain:
**All of my clients have up-to-date engagement letters. I am no longer pursuing all business. I am looking for mature audit clients, with strong CFO's and staying away from start ups and internet companies.**

10. **Account Management:** (Effectively managing the profitability of the client base through the elimination of unprofitable accounts.)

Explain:
**As indicated above I have substantially increased my yield and have eliminated unprofitable accounts.**

<u>**4**</u>   Number of clients resigned/transferred to other firms

11. **Other:** (Be specific)

**For 2002, I have closed the following:**

| Matter | Billings | |
|---|---|---|
| | $130,000.00 | summer 2001 work |
| | $ 12,000.00 | summer 2001 work |
| | $ 81,000.00 | summer 2001 and fall work |
| | $223,000.00 | |
| | **Stratasys** | |

*Community Involvement:*
**I have realized that BDO does not have a strong presence in the Jewish Leadership in Miami. To remedy this problem, I have become involved and to some extent involved the Miami office in the following Jewish organizations in the Miami community . My results are as follows:**

5

BDO021443
CONFIDENTIAL

ES0497738

**Partner Name:** <u>Sandy Lenner</u> **Fiscal Year Ending:** <u>6/30/01</u>        **REDACTED**

A $14 million agency. I became a board member in 2001. I am also a member of the finance committee and the audit committee chair. I was previously the president of a merged in entity. The Chairman of the board is a senior partner with Holland and Knight, LLP.

In 2001, I was appointed to the executive committee this year . We meet monthly. I will be active this year.

In 2001, I became a committee member of this division and BDO sponsored a CPE event, which provided free CPE to our staff and access to the Jewish CPA community which resulted in acceptance to BDO calls for Alliance and merger discussions.

6

BDO021444
CONFIDENTIAL

ES0497739



## DECLARATION OF RAMON RIVERA

I, Ramon Rivera, do hereby declare as follows:

1.     I am a former employee of BDO Seidman, LLP ("BDO"). I make
this declaration in connection with the action styled *Banco Espirito Santo International,
Ltd. et al.* v. *BDO Seidman, LLP et al.*, Case No. 04-11128, filed on May 18, 2004 in the
Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida,
and such other actions as have been or may be filed in connection with the dissolution
and receivership of E.S. Bankest L.C. ("Bankest"). Except where otherwise indicated, I
have personal knowledge of the facts set forth herein and could and would, if necessary,
testify competently thereto.

**My Employment With BDO**

2.     I was hired by BDO in January 1998 as a "Senior," a position that
is more senior than an "Associate," but less senior than a "Manager." Prior to my
employment with BDO, I had worked for five years as an accountant for Arthur
Andersen in Puerto Rico. At the time I was hired, I was told by BDO partners that one of
the reasons that I was hired by BDO was that I speak Spanish fluently and was able to
communicate effectively with Spanish-speaking clients located in South Florida.

3.     During my first year with BDO, I worked on numerous audits. I
believe these included audits of electronics, manufacturing, real estate and service
companies. They did not include any audits of factoring or finance companies.

BDO Defendant's Exhibit 3753
January 16, 2007
Case No. 04-14009 CA 31
Harvey Rubin Clerks of Courts



BESIL05191

4.      In July 1998, I was promoted to "Manager." The promotion came with a salary increase as well as increased responsibility. Among the new responsibilities was increased contact with and management of clients.

**My Introduction to Bankest and Preparation for the Initial Audit**

5.      In October or November of 1998, I was assigned to work on the audit of the 1998 year-end financial statements of Bankest (the "Initial Audit"). Consistent with BDO practice, Sandy Lenner, the Engagement Partner in charge of Bankest, advised me that I would be the Manager on the Initial Audit. He said that although Bankest was a new client, BDO had done work for a related company in prior years. Later, I learned that the name of the previous BDO client was Bankest Receivables Factoring & Finance Corporation ("BRFFC"), and that BRFFC was owned by the principals of Bankest Capital Corporation ("Capital"), a 50% owner of Bankest.

6.      Shortly after learning from Sandy that I would be working on the Initial Audit, and again consistent with BDO's practice, I assisted in the preparation of a package of new client materials to be sent to a client acceptance committee at BDO for approval to proceed with the audit. The package included a form detailing certain information about the new client such as who its owners and what its gross revenues were, budget estimates, and a recommendation of the estimated fee amount. When I finished this "new client" package, I delivered it to Sandy who, on information and belief and in accordance with BDO's practice, forwarded it to the BDO client acceptance committee for approval.

2

BESIL05192

7.      Following or shortly before receiving the required approval, Sandy introduced me to Dominick Parlapiano and Carlos Mendez so we could get acquainted and discuss the Initial Audit. We met at Morton's Steakhouse on Brickell Avenue in Miami, Florida, and discussed, in general terms, the background of Bankest, its relationship to Capital, and what information might be necessary for the conduct of the Initial Audit.

8.      Following this initial meeting, I had a number of conversations with Mr. Mendez and Mr. Parlapiano. Although I do not presently recall all of the specifics of these conversations, which were numerous and took place over the course of several weeks during the planning stages, I recall that we discussed information that BDO would need to audit Bankest's financial statements including Capital's factoring relationship with Bankest, Bankest's relationship to Espirito Santo Bank, its other 50% owner, Bankest's list of factored companies including Joy Athletic ("Joy") and CD Jewelbox, Bankest's placement of notes with investors affiliated with or who were clients of Espirito Santo Bank, and timing of the issuance of the financial statements. Later, during fieldwork, I discussed many of these same issues with Otto Ambrosioni, Adriana Puerto, Hector Orlansky and Eduardo Orlansky, as well as members of Bankest's collections department.

9.      In addition to these conversations, I also reviewed BDO's previous audits of BRFPC and the workpapers underlying these audits.

3

BESIL05193

### BDO's Conduct of the Initial Audit and Work Stoppage

10.     In conducting the Initial Audit, I visited Bankest's offices regularly. My involvement in the field was, for a Manager, more than is typical because the Senior on the audit had been pulled off to work on other audits. Also, since Mr. Mendez, the Orlanskys, Mr. Ambrosiani and several other members of Bankest's management were Spanish-speaking, my presence facilitated the audit process.

11.     In or about January 1999, the audit team began to encounter problems with Bankest's provision of information, causing delays in the audit process and threatening the timely completion of the audit. Although I (or other employees of BDO) had sent several lists of documentation that BDO required for the conduct of its audit, Bankest repeatedly failed to provide the requested information. As is customary, these lists were general at first and then, as the audit progressed, more specific. The information requested included trial balances, details regarding the receivables owed to Bankest, backup documentation for payments made by Capital to Bankest (since Bankest was factoring receivables initially factored by Capital), and other documentation relating to the relationship between Capital and Bankest in Capital's possession.

12.     Although I felt responsible to complete the audit, at some point I determined that Bankest's management's failure to provide information made it impossible for BDO to move forward in accordance with generally accepted auditing standards. When I asked Mr. Mendez why we were not getting the information we required, he told me that I should speak to Mr. Parlapiano who was, in addition to his

4

BESIL05194

management role with Bankest and as I was told, a member of Capital's management team.

13.     Accordingly, on a Friday afternoon in or about mid to late February 1999 and at approximately 5:00 p.m., I discussed with Mr. Parlapiano Bankest's failure to produce certain information, namely documents sufficient to justify receivables purportedly owed to Bankest. Although we had received information sufficient to track transactions between Bankest and Capital, I insisted that BDO must be able to review documents sufficient to verify the debts owed to Bankest by Capital's factoring clients, such as Joy and CD Jewelbox. These documents included or may have included invoices to or checks from certain significant customers of the factoring clients such as WalMart and KMart.

14.     After several minutes of conversation, Mr. Parlapiano refused to provide the requested documentation.   He informed me that this information and documentation was Capital's, and not Bankest's, and suggested that I still did not understand the nature of the business or the relationship between Bankest and Capital. He reminded me that BDO was not auditing Capital and that Capital records therefore would not be subject to BDO's audit process.

15.     Although I felt uncomfortable, as an employee and not a partner of BDO, in risking the client relationship, I informed Mr. Parlapiano that I believed I understood Bankest's business and that the requested records were necessary for the conduct of the audit of Bankest. I told Mr. Parlapiano that the requested documents were

5

BESIL05195

necessary in order to conduct the audits in accordance with generally accepted auditing standards.

16.    Mr. Parlapiano still refused to produce the necessary records. In all of my years of experience as an auditor, I had never encountered a client that refused to provide patently relevant information. Accordingly, when Mr. Parlapiano declined to provide Capital's records, I instructed my staff to discontinue work on the audit, not to report to Bankest the following work day, and to stop incurring time on the Bankest audit until further notice.

**BDO's Reaction to the Work Stoppage**

17.    Immediately after my conversation with Mr. Parlapiano, I called BDO's Miami offices. I discussed the details of my conversation with Keith Ellenberg, the Concurring Review Partner on the audit, since Sandy was not in the office that afternoon. Mr. Ellenberg agreed that BDO could not continue without the information requested from Bankest, namely the Capital records, and further agreed that it was appropriate to stop the audit. Accordingly, and counter to customary practice, BDO did not work on the Initial Audit over the weekend.

18.    On Monday, I met with Sandy Lenner and Keith Ellenberg to discuss further the conduct of the Initial Audit and Mr. Parlapiano's refusal to permit BDO to access Capital's records. To clarify these matters, and in attempt to preserve the client relationship, we together contacted Mr. Parlapiano by telephone. Sandy was the principal speaker for BDO.

6

BESIL05196

19.    Initially, Sandy told Mr. Parlapiano that, because of my English language limitations, I had failed to understand the scope of the audit and what documents were at issue. Mr. Parlapiano stated that I in fact did understand what documents and records were at issue, that we had discussed the matter in both English and in Spanish, and that BDO would not get access to Capital's records. Mr. Parlapiano spoke in an aggressive and loud manner.

20.    Sandy informed Mr. Parlapiano that this was a very unusual circumstance and that BDO would not be able to continue the audit without access to the records. He informed Mr. Parlapiano that resignation was a formal process, and described the procedures that BDO would have to undergo in order to discontinue the audit. These procedures included the issuance of a resignation letter.

21.    Mr. Parlapiano responded that if BDO needed to resign, it should resign; Bankest would find another auditor. The conversation ended.

22.    Although Sandy seemed shocked by the call with Mr. Parlapiano, I was relieved not to have to continue the audit because I had never encountered a client that refused an auditor's reasonable request for information. That afternoon, I resumed work on other audits.

**Mr. Parlapiano Visits BDO**

23.    One or two days following our Monday call with Mr. Parlapiano, Mr. Parlapiano showed up at BDO's offices. Although we did not have an appointment or other business, I happened to see him in the lobby of the office where he informed me

7

BESIL05197

that he came to have a meeting with Sandy. I was not invited to this meeting and, accordingly, I did not participate in it.

24.    Following the meeting, Sandy came to my office and informed me that BDO would be continuing the audit. He told me that because I had not been in Miami for long, I did not understand that Mr. Parlapiano was an important person in the community. He said that he had known Mr. Parlapiano for many years and that they had developed a good professional relationship. He also noted that as a Manager, I should be looking for ways to bring in new business, and suggested that working for Bankest could lead to other work, through Mr. Parlapiano, the Orlanskys and affiliates of Bankest. He said that as time went on, I would better understand the management of client relationships.

25.    Because BDO's practice was that a Manager acted at the direction of the Engagement Partner, I proceeded to complete the audit according to Sandy's instruction.

I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct.

Executed this ⅃ day of June 2004 at Buenos Aires, Argentina.

_____
/Ramon Rivera

8

BESIL05198

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR MIAMI-DADE COUNTY,
FLORIDA

CASE NO. 04-14009 CA 31

BANCO ESPIRITO SANTO )
INTERNATIONAL, LTD., ESB )
FINANCE, LTD. and BANCO )
ESPIRITO SANTO S.A. )
(Nassau Branch), )
                         )
        Plaintiffs, )
                         )
    vs. )
                         )
BDO SEIDMAN, LLP and BDO )
INTERNATIONAL B.V., )
                         )
        Defendants. )

BDO SEIDMAN, LLP, )
                         )
        Third-Party Plaintiff, )
                         )
    vs. )
                         )
VICTOR BALESTRA, BERNARD )
MOLLET, JOAQUIN GARNECHO, )
PIERRE TREZZINI, EDUARDO )
ORLANSKY, HECTOR ORLANSKY, )
R. PETER STANHAM, DOMINICK )
PARLAPIANO, CARLOS E. MENDEZ, )
ARIADNA PUERTO, and OTTO )
AMBROSIANI, )
                         )
        Third-Party Defendants. )

**DEFENDANT/THIRD-PARTY
PLAINTIFF BDO SEIDMAN, LLP'S
RESPONSES AND OBJECTIONS TO
PLAINTIFF BANCO ESPIRITO SANTO
INTERNATIONAL, LTD.'S
REQUESTS FOR ADMISSION**

PCTF MAR 1 2 2007 7354 FOR 1D
7354
E.X. (a)
Filed 5-18      A.D. 18  2007
Case No. 04-14009CA31
          HARVEY RUVIN
          Cle k Circuit Court

    Defendant/Third-Party Plaintiff BDO Seidman, LLP ("BDO") by and through

undersigned counsel and pursuant to Fla. R. Civ. P. R. 1.370, hereby responds and objects to

Plaintiff Banco Espirito Santo International, Ltd.'s ("BESIL") requests for admission dated

November 29, 2006.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com


EXHIBIT
27

## GENERAL OBJECTIONS

BDO make the following General Objections to the Requests, reserving the right to amend or add to the general or specific objections. Each of these General Objections is incorporated into each and every one of BDO's responses.

1.    BDO objects to the Requests to the extent that it seeks information that is not relevant to any of the claims raised in this lawsuit.

2.    BDO objects to the Requests to the extent they seek information protected from discovery under the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or immunity. Such information is immune from disclosure and will not be disclosed.

3.    BDO objects to the Requests to the extent that they seek information prohibited and/or restricted from disclosure by agreement, law or regulation.

4.    BDO objects to the Requests to the extent that the Requests seek to characterize or summarize documents. Specifically, BDO objects to the extent that the Requests seek to have BDO admit or deny that statements, fragments of sentences and phrases taken out of context were made without regard to the remainder of the documents — rather than seeking an admission with respect to the authenticity of the documents. The documents speak for themselves and BDO objects to any purported summary or characterization by the Requests of the meaning, content or effect thereof.

5.    BDO objects to the Requests to the extent that it purports to impose obligations and procedures that differ from those mandated by Florida statutes, the Florida Rules of Civil Procedure, the local rules of this Court, or any order entered in this case.

6.    BDO objects to the Requests to the extent that they seek admissions concerning issues during the period preceding 1998, the time of the relevant period in the Complaint.

2

NO.862   P005

7.      BDO objects to the Requests to the extent a statement contained therein seeks admissions of law and not fact, or seeks conclusory facts or admissions on ultimate issues.

8.      BDO objects to the Requests to the extent that they purport to (i) require searches of files or the provision of information in the possession of third parties, or (ii) require BDO to make admissions regarding information or materials not within BDO's possession, custody or control, and (iii) require admissions of fact that are within the unique knowledge of parties or persons other than BDO.

9.      BDO objects to the Requests as improper to the extent that they seek the provision of information in lieu of other disclosure devices.

10.     BDO objects to the Requests as improper to the extent that any request for admission cannot be answered with a simple admit or deny without an explanation or to the extent that any request for admission seeks interpretations of documents.

11.     BDO submits these responses without conceding the relevancy or materiality of the subject matter of any specific Request.

12.     By responding to the Requests, BDO does not waive their right to object to the use of the following responses at any time, on any ground, in this or any other proceeding. These responses are limited to the information known to BDO and do not constitute a waiver of BDO's right to introduce additional evidence at trial.  BDO reserves the right to alter or supplement these responses, but it does not hereby obligate itself to do so.

13.     BDO reserves the right to supplement, amend or correct all or part of any of the responses provided herein, and to object to the admissibility in evidence of any part of the responses to these Requests or any information contained therein.

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

14.    These General Objections apply to all of BDO's responses.  To the extent that specific objections are cited in a specific response, those specific objections are provided because they are believed to be particularly applicable to a specific request and are not to be construed as a waiver of any General Objection applicable to responses falling within the scope of the Request.

## SPECIFIC OBJECTIONS AND RESPONSES

**Request No. 1**
Admit that all documents produced by BDO in this litigation, including documents bates-stamped BDO 00001 through BDO 076685, are authentic documents under Florida Statute 90.901.

**RESPONSE:**

BDO specifically objects to the definition of "BDO" in BESIL's Definitions and Instructions as overlybroad and improper.  Subject to its Specific and General Objections, BDO admits that the documents that BDO created are authentic, but to the extent that BDO produced documents received from third parties, BDO is unable to opine on whether those documents are authentic.

**Request No. 2**
Admit that BDO was hired on or about August 15, 1996 to audit the financial statements of Bankest Receivables Factoring and Finance Corp.

**RESPONSE:**

BDO specifically objects to this Request on the ground that it seeks an admission concerning a matter that is not relevant to any claim or defense in the pending action.  BDO further objects to this Request on the ground that the term "hired" is vague and ambiguous.  Subject to BDO's General and Specific Objections, BDO admits that on or around August 15, 1996 it was engaged by BRFFC to audit the year-end December 31, 1995 financial statements of Bankest Receivables Factoring and Finance Corporation, and denies the remainder.

4

**Request No. 3**

Admit that BDO issued unqualified audits for BRFFC for 1995 and 1996.

**RESPONSE:**

BDO specifically objects to this Request on the ground that it seeks an admission concerning a matter that is not relevant to any claim or defense in the pending action. BDO further objects to this Request on the ground that it is vague and ambiguous as the phrase "unqualified audits" is undefined. BDO further objects to this Request on the ground that it did not issue "unqualified audits", it issued opinion. To the extent a response is required, subject to its General and Specific Objections, BDO admits that it issued an unqualified opinion.

**Request No. 4**

Admit that BDO failed to detect any fraud at BRRFC during the course of performing its audits.

**RESPONSE:**

BDO specifically objects to this Request on the ground that it seeks an admission concerning a matter that is not relevant to any claim or defense in the pending action. BDO further objects to this Request on the ground that it seeks a legal conclusion that is not proper for a Request for Admission. Subject to its General and Specific Objections, BDO admits that it issued audit opinions that set forth that the financial statements of BRFFC presented fairly, in all material respects, the financial position of BRFFC as of December 31, 1996 and December 31, 1995, and the results of its operations and its cash flows for the years ended December 31, 1996 and December 31, 1995 in conformity with generally accepted accounting principles, and denies the remainder.

5

**Request No. 5**

Admit that BDO was hired on or about January 22, 1999 to audit the financial statements of Bankest.

**RESPONSE:**

BDO specifically objects to this Request on the ground that the term "hired" is vague and ambiguous.    Subject to its General and Specific Objections, BDO admits that on or about January 22, 1999 it was engaged by Bankest to audit the year-end December 31, 1998 financial statements of Bankest, and denies the remainder.

**Request No. 6**

Admit that BDO issued unqualified audits for Bankest for the fiscal years of 1998, 1999, 2000, 2001 and 2002.

**RESPONSE:**

BDO specifically objects to this Request on the ground that it combines requests for admission of matters.  BDO further objects to this Request on the ground that it is vague and ambiguous as the phrase "unqualified audits" is undefined.  BDO further objects to this Request on the ground that it did not issue "unqualified audits", it issued opinion.  Subject to its General and Specific Objections, BDO admits that it issued audit opinions that set forth that the financial statements of E.S. Bankest, L.L.C presented fairly, in all material respects, the financial position of E.S. Bankest, L.L.C as of December 31, 2002, December 31, 2001, December 31, 2000, December 31, 1999, and December 31, 1998, and the results of its operations and its cash flows for the years ended December 31, 2002, December 31, 2001, December 31, 2000, December 31, 1999, and December 31, 1998, in conformity with generally accepted accounting principles, and denies the remainder.

6

**Request No. 7**

Admit that in connection with its engagement to audit the financial statements of Bankest, BDO was required to conduct an audit that provided "reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements."

**RESPONSE:**

BDO specifically objects to this Request on the ground that it seeks to have BDO admit to a section of a document taken out of context without regard to the remainder of the document rather than seeking an admission with respect to the authenticity of the document. BDO further objects to this request on the ground that it is vague and ambiguous as it fails to even refer to the document from which the Request quotes. BDO further objects to this Request on the ground that the terms of its engagement do not create a duty to Plaintiffs. BDO further objects to this Request on the ground that it seeks a legal conclusion that is not proper for a Request for Admission. Subject to its General and Specific Objections, BDO admits that in connection with its engagement to audit the financial statements of Bankest, BDO's engagement letters with Bankest executed in connection with its audits of Bankest's year-end December 31, 1998 through December 31, 2002 financial statements stated that, among other things, BDO would "design[] [its] audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements", and denies the remainder.

**Request No. 8**

Admit that BDO did not detect fraud at Bankest during the course of any of its audits of Bankest's financial statements.

**RESPONSE:**

BDO specifically objects to this Request on the ground that it seeks a legal conclusion that is not proper for a Request for Admission. BDO further objects to this Request on the ground that it combines requests for admission of matters. Subject to its General and Specific Objections,

7

BDO admits that it issued audit opinions that set forth that the financial statements of E.S. Bankest, L.L.C presented fairly, in all material respects, the financial position of E.S. Bankest, L.L.C as of December 31, 2002, December 31, 2001, December 31, 2000, December 31, 1999, and December 31, 1998, and the results of its operations and its cash flows for the years ended December 31, 2002, December 31, 2001, December 31, 2000, December 31, 1999, and December 31, 1998, in conformity with generally accepted accounting principles, did not detect the collusive fraud, and denies the remainder.

**Request No. 9**

Admit that a $170 million fraud occurred at Bankest which was not detected by BDO.

**RESPONSE:**

BDO specifically objects to this Request on the ground that it seeks a legal conclusion that is not proper for a Request for Admission. BDO further objects to this Request on the ground that it seeks an admission concerning a matter that is not relevant to any claim or defense in the pending action, that BDO was not engaged to detect a fraud at Bankest. BDO further objects to this Request on the ground that it combines requests for admission of matters. Subject to its General and Specific Objections, BDO admits that it did not detect a collusive fraud at Bankest, which under relevant audit guidelines it was not responsible to detect, and denies the remainder.

**Request No. 10**

Admit that BDO certified that the audited financial statements of Bankest were accurate and free from material misstatement.

**RESPONSE:**

BDO specifically objects to this Request on the ground that it seeks to have BDO make an admission about a document taken out of context rather than seeking an admission with respect to the authenticity of the document. BDO further objects to this Request on the ground that it

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

combines requests for admission of matters. BDO further objects to this Request on the ground

that it did not issue financial statements, it issued an opinion. Subject to its General and Specific

Objections, BDO admits that it issued audit opinions that set forth that the financial statements of

E.S. Bankest, L.L.C presented fairly, in all material respects, the financial position of E.S.

Bankest, L.L.C as of December 31, 2002, December 31, 2001, December 31, 2000, December

31, 1999, and December 31, 1998, and the results of its operations and its cash flows for the

years ended December 31, 2002, December 31, 2001, December 31, 2000, December 31, 1999,

and December 31, 1998, in conformity with generally accepted accounting principles, and denies

the remainder.

**Request No. 11**

Admit that the BDO-audited financial statements of Bankest for the year 2002 overstated the
total accounts receivable of Bankest by more than $200 million.

**RESPONSE:**

BDO specifically objects to this Request on the ground that it did not issue financial statements,

it issued an opinion. BDO further objects to this Request on the ground that it seeks a conclusion

that is not proper for a Request for Admission. BDO further objects to this Request on the

ground that it seeks an admission concerning a matter that is not relevant to any claim or defense

in the pending action. Subject to its General and Specific Objections, BDO is unable to admit or

deny this Request.

**Request No. 12**

Admit that the BDO-audited financial statements of Bankest for the years 1998, 1999, 2000,
2001 and 2002 materially misstated the assets of Bankest.

9

**RESPONSE:**

BDO specifically objects to this Request on the ground that it seeks to have BDO make an admission about a document taken out of context rather than seeking an admission with respect to the authenticity of the document. BDO further objects to this Request on the ground that it did not issue financial statements, it issued an opinion. BDO further objects to this Request on the ground that it seeks a legal conclusion that is not proper for a Request for Admission. BDO further objects to this Request on the ground that it combines requests for admission of matters. Subject to its General and Specific Objections, BDO is unable to admit or deny this Request.

**Request No. 13**

Admit that BDO reviewed the Bankest Board of Directors minutes for 1998-2002.

**RESPONSE:**

BDO specifically objects to this Request on the ground that the phrase "the Bankest Board of Directors minutes" is vague and ambiguous since Bankest had a Board of Managers. BDO further objects to this Request on the ground that it combines requests for admission of matters. Subject to its General and Specific Objections, BDO admits that it reviewed certain of the Minutes of Meeting of Directors of E.S. Bankest, L.L.C. between 1998 and 2002, and denies the remainder.

**Request No. 14**

Admit that BDO knew Victor Balestra was President of Espirito Santo Bank.

**RESPONSE:**

BDO specifically objects to this Request on the ground that the "Espirito Santo Bank" is not defined and the term is ambiguous given the inconsistent positions taken by Plaintiffs throughout this case. Subject to its General and Specific Objections, BDO admits that during the time

10

period relevant to this action, knew Victor Balestra was President of Espirito Santo Bank in Florida.

**Request No. 15**

Admit that BDO knew Bernard Mollet was Senior Vice President of Espirito Santo Bank.

**RESPONSE:**

BDO specifically objects to this Request on the ground that the "Espirito Santo Bank" is not defined and the term is ambiguous given the inconsistent positions taken by Plaintiffs throughout this case. Subject to its General and Specific Objections, BDO admits that during the time period relevant to this action, knew Bernard Mollet was the Vice President of Espirito Santo Bank in Florida.

**Request No. 16**

Admit that BDO knew Joaquim Garnecho was an officer of Banco Espirito Santo, S.A.

**RESPONSE:**

Subject to its General Objections, BDO admits that during the time period relevant to this action, BDO knew Joaquin Garnecho was the General Manager of Banco Espirito Santo, S.A.

**Request No. 17**

Admit that BDO knew Pierre Trezzini was an officer of Compagnie Bancaire Espirito Santo, S.A.

**RESPONSE:**

Subject to its General Objections, BDO admits that during the time period relevant to this action, knew Pierre Trezzini was an officer of Compagnie Bancaire Espirito Santo, S.A.

11

**Request No. 18**

Admit that BDO knew the Board of Directors, later known as the Board of Managers, of Bankest received the BDO-audited financial statements for Bankest each year.

**RESPONSE:**

BDO specifically objects to this Request on the ground that it did not issue financial statements, it issued an opinion. BDO further objects to this Request on the ground that it combines requests for admission of matters. Subject to its General and Specific Objections, BDO admits that it provided BDO's audited financial statements for the years-ending December 31, 1998 through December 31, 2002 to the Manager of Bankest and to the Board of Directors of Bankest Corp.

**Request No. 19**

Admit that BDO knew a representative of Espirito Santo Bank received the BDO audited financial statements for Bankest.

**RESPONSE:**

BDO specifically objects to this Request on the ground that the "Espirito Santo Bank" is not defined and the term is ambiguous given the inconsistent positions taken by Plaintiffs throughout this case. BDO further objects to this Request on the ground that it did not issue financial statements, it issued an opinion. BDO further objects on the ground that the Bankest financial statements are those of management, and BDO provided an opinion relating to those financial statements. BDO further objects to this Request on the ground that it is vague and ambiguous as it does not set forth a time period. Subject to its General and Specific Objections, BDO admits that it understood that representatives of the Espirito Santo Bank in Florida, that were also members Bankest Management, were supposed to receive BDO's opinion relating to the Bankest financial statements that BDO audited, and denies the remainder.

12

Request No. 20

Admit that BDO knew a representative of Banco Espirito Santo, S.A. received the BDO-audited financial statements for Bankest.

RESPONSE:

BDO specifically objects to this Request on the ground that it did not issue financial statements, it issued an opinion. BDO further objects on the ground that the Bankest financial statements are those of management, and BDO provided an opinion relating to those financial statements. BDO further objects to this Request on the ground that it is vague and ambiguous as it does not set forth a time period. Subject to its General and Specific Objections, BDO admits that it understood that representatives of the Espirito Santo Bank in Florida, that were also members Bankest Management, were supposed to receive BDO's opinion relating to the Bankest financial statements that BDO audited, and denies the remainder.

Request No. 21

Admit that BDO knew a representative of CBESSA received the BDO-audited financial statements for Bankest.

RESPONSE:

BDO specifically objects to this Request on the ground that it did not issue financial statements, it issued an opinion. BDO further objects on the ground that the Bankest financial statements are those of management, and BDO provided an opinion relating to those financial statements. BDO further objects to this Request on the ground that it is vague and ambiguous as it does not set forth a time period. Subject to its General and Specific Objections, BDO admits that it understood that representative of the Espirito Santo Bank in Florida, that were also members Bankest Management, were supposed to receive BDO's opinion relating to the Bankest financial statements that BDO audited, and denies the remainder.

13

Request No. 22

Admit that BDO knew Espirito Santo Bank, Banco Espirito Santo, S.A. (Nassau Branch) and Compangnie Bancaire Espirito Santo, S.A. were related companies.

RESPONSE:

BDO specifically objects to this Request on the ground that the "Espirito Santo Bank" is not defined and the term is ambiguous given the inconsistent positions taken by Plaintiffs throughout this case. BDO further objects to this Request on the ground that it is vague and ambiguous in that it does not define the term "related companies", and BDO does not understand if "related companies" means the legal sense or accounting sense or otherwise. Subject to its General and Specific Objections, BDO is unable to admit or deny this Request.

Request No. 23

Admit that for the period 1998 through 2003, BDO never spoke with or otherwise communicated directly with Victor Balestra, Bernard Mollet, Joaquim Garnecho or Pierre Trezzini concerning BDO's audits of Bankest.

RESPONSE:

BDO specifically objects to this Request on the ground that it combines requests for admission of matters. Subject to its General and Specific Objections, BDO denies this Request.

Request No. 24

Admit that BDO reviewed the Shareholders Agreement between Bankest Capital and Espirito Santo Bank.

RESPONSE:

BDO specifically objects to this Request on the ground that the "Espirito Santo Bank" is not defined and the term is ambiguous given the inconsistent positions taken by Plaintiffs throughout this case. Subject to its General and Specific Objections, BDO admits that in connection with its audit of Bankest's year-end December 31, 1998 financial statements, BDO reviewed the

14

Shareholders Agreement between Espirito Santo Bank of Florida and Bankest Capital Corp.

dated April 7, 1998, and denies the remainder.

**Request No. 25**

Admit that prior to January 1, 2002 BDO knew that pursuant to the Shareholders Agreement Espirito Santo Bank was obligated to provide, directly or indirectly, a credit line of up to $30 million to Bankest.

**RESPONSE:**

BDO further objects to this Request on the ground that it seeks a legal conclusion that is not

proper for a Request for Admission. To the extent a response is required, subject to its General

and Specific Objections, BDO denies this Request.

**Request No. 26**

Admit that BDO confirmed the amount of Bankest's credit line with Banco Espirito Santo, S.A. each year BDO audited Bankest.

**RESPONSE:**

BDO specifically objects to this Request on the ground that BDO did not audit Bankest, it

audited Bankest's year-end financial statements. Subject to its General and Specific Objections,

BDO admits that it confirmed Bankest's line of credit with Banco Espirito Santo, S.A.

**Request No. 27**

Admit that prior to January 1, 2003, BDO knew that Banco Espirito Santo S.A. (Nassau Branch) had extended a credit line to Bankest

**RESPONSE:**

BDO specifically objects to this Request on the ground that it fails to set forth which line of

credit for which it requests an admission. Subject to its General and Specific Objections, BDO

15

admits the prior to January 1, 2003, BDO knew that Banco Espirito Santo S.A. (Nassau Branch)

had extended a credit line to Bankest.

**Request No. 28**

Admit that BDO knew Banco Espirito Santo, S.A. (Nassau Branch) received BDO' s audited
financial statements for Bankest prior to February 2002.

**RESPONSE:**

BDO specifically objects to this Request on the ground that it did not issue financial statements,

it issued an opinion. Subject to its General and Specific Objections, BDO denies this Request.

**Request No. 29**

Admit that BDO knew prior to January 1, 1998 that the BDO-audited financial statements of
BRFFC were attached to private placement memoranda used to sell BRFFC debenture notes.

**RESPONSE:**

BDO specifically objects to this Request on the ground that it did not issue financial statements,

it issued an opinion. BDO further objects to this Request on the ground that it is vague and

ambiguous as it does not set forth a time period. BDO further objects to this Request on the

ground that it seeks an admission concerning a matter that is not relevant to any claim or defense

in the pending action. Subject to its General and Specific Objections, BDO admits that once it

was made aware after the fact of an instance in which its opinion was attached to a private

placement memorandum, to which BDO objected to after learning about, and denies the

remainder.

**Request No. 30**

Admit that BDO knew Espirito Santo Bank offered BRFFC debenture notes to its clients.

16

RESPONSE:

BDO specifically objects to this Request on the ground that the "Espirito Santo Bank" is not defined and the term is ambiguous given the inconsistent positions taken by Plaintiffs throughout this case. BDO further objects to this Request on the ground that it seeks an admission concerning a matter that is not relevant to any claim or defense in the pending action. Subject to its General and Specific Objections, BDO admits this Request

17

Dated: December 29, 2006

Respectfully submitted,

GREENBERG TRAURIG, LLP
Karen Y. Bitar
Adam D. Cole
Caroline J. Heller
MetLife Building
200 Park Avenue, 15th Floor
New York, New York 10166
Tel: (212) 801-9200
Fax: (212) 801-6400
*Co-Counsel for BDO Seidman, LLP*

and

ALVAREZ ARMAS & BORRON
Arturo Alvarez
901 Ponce de Leon Boulevard, Suite 304
Coral Gables, Florida 33134
Telephone: (305) 461-5100
Facsimile: (305) 461-8642
*Co-Counsel for BDO Seidman, LLP*

GREENBERG TRAURIG, P.A.
Mark P. Schnapp
David A. Coulson
Nikki Lewis Simon
1221 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
*Counsel for BDO Seidman, LLP*

By: _____
DAVID A. COULSON
Florida Bar No. 176222
NIKKI LEWIS SIMON
Florida Bar No. 181536

18

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this

\_\_\_\_\_ day of _____, 2006, *via fax (where available) and hand delivery* upon the following

persons:

Mitchell W. Berger
Rene D. Harrod
BERGER SINGERMAN, PA
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, Florida 33301
Phone: 954-525-9900
Facsimile: 954-523-2872
*Counsel for Plaintiffs*

James C. Cunningham, Jr.
BERGER SINGERMAN, PA
200 S. Biscayne Boulevard, Suite 1000
Miami, Florida 33131
Phone: 305-755-9500
Facsimile: 305-714-4340
*Counsel for Plaintiffs*

Steven W. Thomas
Emily Alexander
Anthony J. Lewis
SULLIVAN & CROMWELL, LLP
1888 Century Park East
Los Angeles, California 90067
Phone: 310-712-6627
Facsimile: 310-712-8800
*Co-Counsel for Plaintiffs*

Gonzalo Dorta
GONZALO DORTA, P.A.
334 Minorca Avenue
Coral Gables, Florida 33134
Phone: 305-441-2299
Facsimile 305-441-2299
*Co-Counsel for Plaintiffs*

Geoffrey B. Marks
BILLBROUGH & MARKS, P.A.
Suite 320
100 Almeria Avenue
Miami, Florida 33134
Phone: 305-442-2701
Facsimile: 305-442-2801
*Co-Counsel for Plaintiffs*

Mark F. Raymond
Rhett Traband
BROAD AND CASSEL
One Biscayne Tower, 21st Floor
2 South Biscayne Blvd.
Miami, FL 33131
Phone: 305-373-9425
Facsimile: 305-995-6385
*Counsel for BDO International B.V.*

19

Alan G. Greer
Manuel A. Garcia-Linares
Laline Concepcion-Veloso
RICHMAN GREER, ET AL.
Miami Center, 10th Floor
201 South Biscayne Boulevard
Miami, Florida 33131
Phone: 305-373-4000
Facsimile: 305-373-4099
*Counsel for Victor Balestra, Bernard
Mollet, Joaquin Garnecho and
Pierre Trezzini*

Manuel F. Fente
LAW OFFICES OF
  MANUEL F. FENTE, P.A.
1110 Brickell Avenue, 7th Floor
Miami, Florida 33131
Phone: 305-379-4900
Facsimile: 305-423-3212
*Counsel for Otto Ambrosiani*

*(VIA MAIL ONLY BY REQUEST)*
Michel O. Weisz
SEGREDO & WEISZ
9350 South Dixie Highway, Suite 1500
Miami, Florida 33156
Phone: 305-670-3820
Facsimile: 305-670-8230
*Counsel for Ariadna Puerto*

Dominick C. Parlapiano
17325 Southwest 84 Court
Miami, Florida 33157
*Appearing Pro Se*

Kevin W. Goering
Lisa Lewis
SHEPPARD, MULLIN, ET AL.
30 Rockefeller Plaza
24th Floor
New York, New York 10112
Phone: 212-332-3831
Facsimile: 212-332-3888
*Co-Counsel for BDO International B.V.*

Ira N. Loewy
BIERMAN SHOHAT LOEWY, ET AL.
800 Brickell Avenue, Penthouse 2
Miami, Florida 33131
Phone: 305-358-7000
Facsimile: 305-358-4010
*Counsel for Eduardo Orlansky and
Hector Orlansky*

Carlos E. Mendez
1122 Sevilla Avenue
Coral Gables, Florida 33134
*Appearing Pro Se*

Hector J. Lombana
GAMBA & LOMBANA, P.A.
2701 Ponce de Leon Boulevard
Mezzanine
Coral Gables, Florida 33134
Phone: 305-448-4010
Facsimile 305-448-9891
*Co-counsel for Bernard Mollet*

20