USDC FLSD 245B (Rev. 12/03) - Judgment in a Crit.    sxc                                                    Page 1 of 6

# United States District Court
## Southern District of Florida
### MIAMI DIVISION

FILED by _____ D.C.

SEP 2 0 2004

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

| | |
|---|---|
| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
| v. | Case Number: 03-20951-CR-JORDAN |
| DOMINICK PARLAPIANI | USM Number: 63445-004 |

Counsel For Defendant: Manuel Fente, Esq.,
Counsel For The United States: Steve Stallings
Court Reporter: Francine Salopek

The defendant pleaded guilty to Count(s) 1,3, 31 AND 37 of the Indictment.
The defendant is adjudicated guilty of the following offense(s):

| TITLE/SECTION NUMBER | NATURE OF OFFENSE | OFFENSE ENDED | COUNT |
|---|---|---|---|
| 18 U.S.C. § 371 | CONSPIRACY BANK FRAUD AND WIRE FRAUD | August 2003 | 1 |
| 18 U.S.C. § 1344 | BANK FRAUD | April 1998 | 3 |
| 18 U.S.C. § 1344 | BANK FRAUD | September 2002 | 31 |
| 18 U.S.C § 1343 | ~~BANK FRAUD~~ WIRE | August 2003 | 37 |

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

All remaining counts are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of any material changes in economic circumstances.

Date of Imposition of Sentence:
9/17/2004

_Adalberto Jordan_
ADALBERTO JORDAN
United States District Judge

September _____, 2004



EXHIBIT



DEFENDANT: DOMINICK PARLAPIANI
CASE NUMBER: 03-20951-CR-JORDAN

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **SIXTY (60) months as to count one and ONE HUNDRED AND FIFTY ONE (151) months as to counts 3,31 & 37 of the forty-seven count indictment, to be served concurrently including count one.**

The Court makes the following recommendations to the Bureau of Prisons:

•      That the defendant be incarcerated at F.C.I. Miami or institution in the State of Florida

The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons **before 2:00 P.M. on July 15, 2005.**

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By:_____
                Deputy U.S. Marshal

DEFENDANT: DOMINICK PARLAPIANI
CASE NUMBER: 03-20951-CR-JORDAN

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **THREE (3) years as to counts 1,3,31 & 37 to be served concurrently.**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

**The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.**

If this judgment imposes a fine or a restitution obligation, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

- The defendant shall not leave the judicial district without the permission of the court or probation officer;
- The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
- The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
- The defendant shall support his or her dependents and meet other family responsibilities;
- The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
- The defendant shall notify the probation officer at least ten (10) days prior to any change in residence or employment;
- The defendant shall refrain from the excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
- The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
- The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
- The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
- The defendant shall notify the probation officer within seventy-two (72) hours of being arrested or questioned by a law enforcement officer;
- The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
- As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT: DOMINICK PARLAPIANI
CASE NUMBER: 03-20951-CR-JORDAN

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall also comply with the following additional conditions of supervised release:

(A)      The defendant shall provide complete access to financial information, including disclosure of all business and personal finances, to the U.S. Probation Officer

(B)      The defendant shall maintain full-time, legitimate employment and not be unemployed for a term of more than 30 days, unless excused by the U.S. Probation Officer.  Further, the defendant shall provide documentation, including but not limited to, pay stubs, contractual agreements, W-2 Wage and Earnings Statements, and any other documents requested by the U.S. Probation Office.

(C)      The defendant shall not be engaged in any business that offers securities, investments, or business opportunities to the public.  The defendant is further prohibited from engaging in telemarketing, direct mail, or national advertising campaigns for business purposes without the permission of the U.S. Probation Officer.

(D)      The defendant shall obtain prior approval from the U.S. Probation Officer before entering into any self-employment.

DEFENDANT: DOMINICK PARLAPIANI
CASE NUMBER: 03-20951-CR-JORDAN

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments.

| Total Assessment | Total Fine | Total Restitution |
|---|---|---|
| $400.00 | $ | $173,000,000 |

It is further ordered that the defendant shall pay restitution in the amount of $ 173,000,000. During the period of incarceration, payment shall be made as follows: (1) if the defendant earns wages in a Federal Prison Industries (UNICOR) job, then the defendant must pay 50% of wages earned toward the financial obligations imposed by this Judgment in a Criminal Case; (2) if the defendant does not work in a UNICOR job, then the defendant must pay $25.00 per quarter toward the financial obligations imposed in this order. These payments do not preclude the government from using other assets or income of the defendant to satisfy the restitution obligations.

Upon release of incarceration, the defendant shall pay restitution at the rate of 10% of monthly gross earnings, until such time as the court may alter that payment schedule in the interests of justice. The U.S. Bureau of Prisons, U.S. Probation Office and U.S. Attorney's Office shall monitor the payment of restitution and report to the court any material change in the defendant's ability to pay.

The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(I), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| ESPIRITO SANTO BANK | $ | $173,000,000 | |

*Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994, but before April 23, 1996.

*SHAREHOLDERS AGREEMENT*

*BETWEEN*

*ESPIRITO SANTO BANK OF FLORIDA*

*AND*

*BANKEST CAPITAL CORP.*

# EXHIBIT "C"

BDO 04715
Confidential

EXHIBIT
29

Plaintiffs' Exh. No. 6
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts

ES0003237

## INDEX TO

## SHAREHOLDERS AGREEMENT

PAGE

I.      PREAMBLE ............................................................ 1
II.     REPRESENTATIONS ............................................... 2
III.    BUSINESS PLAN ................................................... 2
IV.     CAPITAL ............................................................. 5
V.      DEBT .................................................................. 6
VI.     DISTRIBUTION OF EARNINGS .................................. 9
VII.    MANAGEMENT ..................................................... 10
VIII.   ACCOUNTING ...................................................... 11
IX.     TAX POLICY ........................................................ 12
X.      REPORTS AND STATEMENTS ................................... 12
XI.     RESTRICTION ON TRANSFER OF SHARES ................... 13
XII.    RESTRICTION ON ENCUMBRANCE OF SHARES ............ 18
XIII.   COMPULSORY SALE OF SHARES .............................. 18
XIV.    SPECIFIC PERFORMANCE ....................................... 21
XV.     COVENANT TO RETAIN CONFIDENCES ....................... 21
XVI.    DISSOLUTION ..................................................... 22
XVII.   NOTICES ............................................................ 23
XVIII.  ARBITRATION ..................................................... 24
XIX.    LIMITATION OF LIABILITY ..................................... 24
XX.     ATTORNEY'S FEES ................................................ 24
XXI.    ASSIGNMENT ...................................................... 25
XXII.   TERM ................................................................ 25
XXIII.  GENERAL PROVISIONS .......................................... 25

BDO 04716
Confidential

## SHAREHOLDERS AGREEMENT

THIS AGREEMENT is made and entered into as of the _____ day of ____, 1998, by and among ESPIRITO SANTO BANK OF FLORIDA ("Espirito"), a Florida banking corporation, BANKEST CAPITAL CORP. ("Bankest"), a Florida corporation, (Espirito and Bankest are each individually referred to herein as a "Shareholder" and collectively as the "Shareholders") and E. S. BANKEST CORP., a Florida corporation (the "Company") with respect to the stock of the Company.

### I. PREAMBLE

WHEREAS, concurrently with the execution hereof, Espirito and Bankest have become the owners and holders of all of the issued and outstanding shares of capital stock of the Company in the following amounts and the following proportions:

| Shareholder | Shares | Percentage Owned |
|---|---|---|
| Espirito | 1,000,000 | 50% |
| Bankest | 1,000,000 | 50% |
| | 2,000,000 | 100% |

WHEREAS, the Shareholders desire to promote their mutual interests and the interests of the Company by imposing certain restrictions and mutual obligations on themselves, on the Company, and on the stock of the Company; and

WHEREAS, the Shareholders wish to set forth the various agreements between them which relate to the manner in which the relationship between them and the affairs of the Company are to be governed.

BDO 04717
Confidential

ES0003239

NOW, THEREFORE, in consideration of the promises and mutual obligations contained herein, the parties hereto agree as follows:

## II. REPRESENTATIONS

1.  Each Shareholder represents to the other that (a) all actions contemplated hereby have been duly authorized by all necessary corporate action; (b) the consummation of the transaction contemplated hereby will not result in a breach of any agreement binding on either of the parties hereto; and (c) all authorizations, approvals or consents of governmental or regulatory authorities or agencies respectively required of each of the parties hereto for the execution, delivery and performance of this Agreement or for the legality, validity or enforceability hereof have been obtained.

2.  Any party hereto in breach of the aforesaid representations shall indemnify and hold harmless the other party hereto from and against all liability, loss or expense, including attorney's fees, arising on account of any such breach.

## III. BUSINESS PLAN

1.  Unless with the prior written consent of both Shareholders, the purpose and business of the Company shall be and shall remain the factoring of accounts receivable, to wit: the Company shall function as a non-regulated, collection-based factor and in so doing the Company shall purchase receivables acquired by manufacturers and sellers of tangible goods and/or services in the regular course of the business conducted by such manufacturers and sellers. In carrying out such business, the Company shall at all times adhere to the highest

2

BDO 04718-
Confidential

standards of ethical business practice and shall strictly comply with all laws and regulations applicable to the business of the Company.

2.    Unless with the prior written consent of all Shareholders, the business objective of the Company shall be the factoring of high quality receivables in such manner and under such conditions as shall from time to time be determined by the directors of the Company.  In conducting such business, and except with the prior consent of the Shareholders, the Company shall not undertake any factoring business if such business would cause the Company's leverage ratio (to wit, the ratio of the total liabilities of the Company to the tangible net worth of the Company) to be greater than twelve (12) to one (1).  In the event the Company's leverage ratio ever exceeds such 12:1 ratio, the Company shall undertake all reasonable efforts to bring such ratio to below 12:1 as soon as possible.

3.    Unless with the prior written consent of all Shareholders, the Company shall be required to:  (a) obtain from insurance companies mutually acceptable to the Shareholders and thereafter maintain in force a policy or policies of credit insurance which shall insure the Company against loss due to the insolvency of any party appearing as debtor in any receivable purchased by the Company; and (b) refrain from extending any credit with a maturity of more than three hundred sixty (360) days from the date of the extension of credit. The Company shall not extend overadvance credit to customers for whom accounts receivables have been factored, unless such overadvance amounts shall have been approved by the Shareholders.

4.    As soon as is practicable after execution hereof, Bankest shall wind up and discontinue it's separate factoring business and shall, insofar as is practicable, undertake all new

3

BDO 04719
Confidential

ES0003241

factoring business through the Company. Notwithstanding the foregoing, it is expressly understood and acknowledged that Bankest is obligated under certain debentures, which debentures are secured by customer accounts receivable, to continue to maintain certain levels of factored accounts receivable. Until such time as the debentures are retired or redeemed in accordance with their terms, Bankest shall continue to maintain all required collateral for such debentures and may continue to purchase accounts receivable in accordance therewith. Except as otherwise provided, from and after the date hereof and so long as either Bankest or Espirito shall remain as a Shareholder of the Company, neither Bankest nor Espirito shall directly or indirectly engage in the factoring business. Nothing herein shall prevent either Shareholder from making loans or extending credit in their ordinary course of business, which loans or credit are secured by accounts receivable.

5.    So long as Bankest and Espirito shall each remain a Shareholder of the Company, Bankest shall cause its principals, Eduardo Orlansky and Hector Orlansky (the "Orlanskys"), and Espirito shall cause its directors (the "Espirito Directors"), not to directly or indirectly enter the employment of, or render any services to any other person, partnership, association or corporation engaged in a factoring business or commercial accounts receivable finance business which is competitive with the business of the Company as conducted within the United States of America and not to become interested, directly or indirectly, as an individual, partner, stockholder, director, principal, agent or trustee in any such factoring of finance business which shall engage in a business competitive with the business conducted by the Company in the United States of America; provided, however, that the foregoing shall not be construed to

4

BDO 04720
Confidential

ES0003242

prohibit the Orlanskys or the Espirito Directors from (a) owning securities in any entity if such

securities are held for investment purposes only and shall not exceed five percent (5%) of the

total outstanding number or amount of such securities; or (b) engaging or becoming interested

in, directly or indirectly, in any manner whatsoever, in any factoring or finance business which

shall engage in a factoring or finance business outside the United States of America.

6.    Except as set forth above, nothing contained in this Agreement shall be construed

so as to prohibit either party hereto, or any firm or corporation controlled by or controlling either

party hereto, from engaging in any or all businesses and business ventures allowed by law, .

including those related to banking and finance.

## IV. CAPITAL

1.    Concurrently with the execution of this Agreement, the Shareholders have

subscribed to the following capital contributions of the Company:

(a)    Espirito has paid the Company the sum of One Million Dollars and 00/100

($1,000,000.00).  In exchange therefor, Espirito has received a certificate for one million

(1,000,000) shares of the capital common stock of the Company representing fifty percent of the

issued and outstanding capital stock of the Company.

(b)    Bankest has paid the Company the sum of One Million Dollars and 00/100

($1,000,000.00).  In exchange therefor, Bankest has received a certificate for one million

(1,000,000) shares of the capital common stock of the Company representing fifty percent of the

issued and outstanding capital stock of the Company.

5

BDO 04721
Confidential

ES0003243

2.    No capital contributions or other payments shall be required of the parties other than as set forth in paragraph 1 above and paragraph 5 of Article V below and neither party shall be required to lend money to the Company or guarantee any loan made to the Company by any third party.

## V. DEBT

1.    In carrying out the business plan set forth above, the Company anticipates that it will fund its operations by the issuance of debt instruments (notes) to third parties. The total aggregate amount of such notes outstanding at any one time shall not cause the Company to exceed the 12:1 leverage ratio provided above and no notes issued by the Company shall have a maturity extending more than three hundred sixty (360) days beyond date of issue.

2.    The Company shall at all times seek to maximize its earnings by the placement of its notes at the lowest rates of interest available to the Company at the time of each placement. The parties recognize that those rates of interest will fluctuate in accordance with market conditions and that the conditions on which the notes will be placed will vary accordingly. Nonetheless, as an illustration of the foregoing, the parties have agreed that under market conditions prevailing on the date of execution hereof, reasonable rates of interest for the type of note to be issued by the Company to third parties are as follows: (a) on notes having maturities of one hundred eighty (180) days or less, an interest rate equal to the six month London Inter Bank Offered Rate (LIBOR) plus one and one-half percent (1.5%) per annum; (b) on notes having maturities of between one hundred eighty-one (181) days and three hundred sixty (360)

6

BDO 04722
Confidential

ES0003244

days, an interest rate equal to the one year LIBOR rate plus one and three quarters percent (1.75 %) per annum.

3.   At the request of the Company, Espirito shall use its best efforts to place the notes of the Company with third parties (which may or may not be customers of Espirito) on the terms and conditions specified by the Company in its requests for placement, provided always: (a) the obligation of Espirito to attempt placement of notes for the Company as aforesaid shall remain in effect only so long as Espirito shall remain a shareholder of the Company; (b) excepting the matters set forth in paragraph 5 below, Espirito shall have no liability of any nature for its failure to place any or all notes of the Company unless such failure is due to the gross negligence or wilful malfeasance of Espirito; (c) Espirito shall not be required to attempt placement of any notes of the Company which would cause the Company to be in violation of the terms of this Agreement; and (d) that upon each such placement of notes for the Company, Espirito shall be entitled to a commission equal to one percent (1 %) per annum of the principal amount of each note so placed by Espirito, such commission to be payable quarterly, in arrears.

4.   Notwithstanding the provisions of paragraph 3 above, upon each offer of notes by the Company, Espirito and its affiliates (as that term is herein defined) shall have the right (but not the obligation) to acquire from the Company, on those terms then generally offered by the Company, notes having principal amounts of up to Five Million Dollars ($5,000,000.00)(U.S.). No such acquisition by Espirito or its affiliates shall have the effect of varying any of the terms of this Agreement, including the right of Espirito to the commissions above provided for, it being, the intention of the parties hereto that upon acquiring any such

7

BDO 04723
Confidential

ES0003245

notes Espirito and its affiliates shall stand as holders of such notes with all the rights and obligations common to the other holders thereof.

5.    In the event that at any time the Company is unable to place any notes on terms satisfactory to it, then, at the option and request of the Company, so long as Espirito shall be a shareholder of the Company and so long as the notes so offered have been offered within the terms and conditions contained in this Agreement, Espirito shall provide or cause third parties (which may or may not be affiliates of Espirito) to provide the Company with a line or lines of credit of up to an aggregate maximum amount of Thirty Million Dollars and 00/100 ($30,000,000.00) outstanding at any one time upon the following terms and conditions:

(a)    Each advance under such line of credit shall be for a maximum of three hundred sixty (360) days;

(b)    The first Five Million Dollars ($5,000,000.00) of each advance will bear interest at the following rates: (i) on any such advance having a maturity of one hundred eighty (180) days or less, the interest rate shall be equal to the one year LIBOR rate in effect on the date of the advance plus one and one-half percent (1.5 %) per annum; (ii) on any such advance having a maturity of more than one hundred eighty (180) days, the interest rate shall be equal to the one year LIBOR rate in effect on the date of the advance plus one and three-quarters percent (1.75%) per annum; the remaining amounts of each advance will bear interest at a rate not to exceed the one year LIBOR rate in effect on the date of the advance plus two percent (2%) per annum.

8

BDO 04724
Confidential

ES0003246

(c)   All advances shall be evidenced and secured by notes issued by the Company under the terms and conditions then generally offered by the Company, excepting only as to rate of interest which shall be in the amount aforesaid;

(d)   No advances shall be required to be made hereunder if the amount of any such advance would cause the Company to exceed any of the limitations imposed on the Company under the terms of this Agreement; and

(e)   The Company shall give Espirito written notice of its request for credit hereunder no less than five (5) business days prior to the date on which the Company requires the credit.

6.   Unless with the prior written consent of the Shareholders, the Company shall not undertake any indebtedness other than in the manner and for the purposes set forth above; provided always that nothing herein shall be construed to prohibit the Company from acquiring insubstantial debt on account of trade accounts incurred in the ordinary course of business.


## VI. DISTRIBUTION OF EARNINGS

1.   The Company shall make distributions to the shareholders only upon the affirmative vote of shares representing a majority of the issued and outstanding shares of the Company and only in accordance with the provisions of the Florida Business Corporation Act.

9

BDO 04725
Confidential

ES0003247

## VII. MANAGEMENT.

    1.   Unless with the prior written consent of all Shareholders, the Company shall be managed by a board of directors consisting of eight (8) persons, four (4) of whom shall be elected by Espirito and four (4) of whom shall be elected by Bankest. The board of directors shall appoint such officers as it deems appropriate, consistent with the by-laws of the Company and the provisions of this Agreement.

    2.   So long as this Agreement shall remain in effect, each Shareholder shall take such action as shall be necessary to appoint, elect or remove those persons appointed, elected or removed by the other party hereto as directors of the Company or members of committees established by the board of directors. Such action shall include, but shall not be limited to, the obligation to vote for the appointment of the persons nominated as directors or committee members by the other party hereto and to vote for the removal of such persons as directors or committee members whenever such removal is proposed by the other party.

    3.   The unanimous consent of both Shareholders shall be required for any of the following matters:

    (a)   any merger of the Company with any other entity;

    (b)   any acquisition or sale of assets by the Company outside of the ordinary scope of business conducted by the Company.

    (c)   any dissolution or liquidation of the Company;

    (d)   any borrowing by the Company (except as provided in Section 6 of Article V);

10

BDO 04726
Confidential

ES0003248

(e)     any public offering of the shares of the Company;

(f)     selection of the auditors for the Company;

(g)     payment of dividends; and

(h)     compensation of officers and employees of the Company.

## VIII. ACCOUNTING

1.   The fiscal year of the Company shall be the calendar year.

2.   The officers of the Company shall cause to be kept full and accurate records of all transactions of the Company in accordance with generally accepted principles, practices and methods of accounting.  Independent certified public accountants for the Company shall be chosen by the directors of the Company.

3.   All books of account of the Company shall at all times be maintained at the office of the Company.  Such office shall be open during normal business hours for the examination of the books of account and other books, documents, and records of the Company by the shareholders or their authorized representatives at any and all times.  The right to examination provided hereunder shall include the right to make copies of the books of account and other books, documents and records of the Company.

4.   Either party hereto may, at its option and at its own expense, conduct audits of the books, records and accounts of the Company; provided, however, that in the event any such audit discloses material discrepancies in the Company's financial statements, the cost of such audit shall be reimbursed by the Company.  Any such audits may be conducted by employees of a party or by independent auditors retained by a party.

11

BDO 04727
Confidential

ES0003249

## IX.  TAX POLICY

1.    The parties desire to maximize the income of the Company.  The Company shall make any and all tax, accounting and reporting elections reasonably necessary to carry out such intent.

2.    The Company shall cause to be prepared, on an accrual basis, all federal, state and municipal tax returns required to be filed.  Copies of such returns shall be submitted for review and approval of each party hereto no later than fifteen (15) days prior to the due date of such returns.

3.    The Company shall notify each of the shareholders upon receipt of any notice of tax examination by federal, state or local authorities.  No settlement of any tax issues involving the Company shall be made without the approval of the majority of the Shareholders.

## X.  REPORTS AND STATEMENTS

1.    Within thirty (30) days after the end of each calendar month, the officers of the Company shall cause to be delivered to each of the Shareholders an unaudited financial statement of the Company for such calendar month, prepared at the expense of the Company, which financial statement shall set forth, as of the end of and for such calendar month, a full and complete accounting of all corporate operations for such calendar month.

2.    Within ninety (90) days after the close of each fiscal year, the officers of the Company shall cause to be delivered to each of the Shareholders a full and complete audited financial statement of the Company for such fiscal year prepared by the independent auditors of the Company.

12

BDO 04728
Confidential

ES0003250

3.   Each of the parties hereto shall have the right to object to any of the financial statements to be prepared as above set forth by giving written notice of such objection to the other party within thirty (30) days after receipt of each such financial statement. If any party shall fail to give notice within the time and in the manner aforesaid, such financial statements shall, in the absence of fraud and wilful misconduct, be deemed conclusive and binding upon such party. Objection to any financial statement and any disagreements related thereto shall be settled by reference to the independent certified public accountants of the Company.

## XI. RESTRICTION ON TRANSFER OF SHARES

1.   Except as set forth in paragraphs 7 and 8 below, shares of the capital stock of the Company may be sold, assigned or transferred, (any such disposition being hereinafter called a "transfer") only if:

(a)   any such transfer represents all, but not less than all, of the shares held by a Shareholder proposing the transfer; and

(b)   no less than sixty (60) days prior to the date of the proposed transfer, a Shareholder proposing the transfer (the "Selling Shareholder") provides the other Shareholders with as copy of the offer or agreement pursuant to which the Selling Shareholder proposes to effect the transfer of shares; and

(c)   the offer or agreement submitted by the Selling Shareholder by its terms provides that the other Shareholders of the Company shall have the option to sell their shares as a part of the transfer at a price per share which is equal to the price per share being offered to or

13

BDO 04729
Confidential

by the Selling Shareholder and upon terms and conditions identical to those set forth in the offer or agreement submitted by the Selling Shareholder; and

(d)   the other Shareholders, or any of them, within ten (10) days after receipt of such offer or agreement, do not advise the Selling Shareholder that they, or any of them, elect to purchase the offered shares at the same price and under the same terms and conditions set forth in the offer or agreement transmitted by the Selling Shareholder.

2.   If the non-transferring Shareholders, or any of them, elect to purchase the shares proposed to be transferred by the Selling Shareholder, then the Selling Shareholder and the non-transferring Shareholder shall proceed to consummate the transfer of the shares at the price and in accordance with the terms and conditions set forth in the offer or agreement transmitted by the Selling Shareholder.

3.   If the non-transferring Shareholders, or any of them, do not, within ten (10) days of receipt of the aforementioned offer or agreement, advise the Selling Shareholder in writing of an election to purchase the offered shares, then the Selling Shareholder shall be free to proceed with the transfer of the shares in accordance with the terms of said offer or agreement, provided always that such transfer shall not take place sooner than thirty (30) days after the date on which the non-transferring Shareholders shall receive notice of the proposed transfer and provided always that any non-transferring Shareholders who so elect shall have the right to sell their shares as a part of the transfer as contemplated in paragraph l(c) above.  In the event the sale by the Selling Shareholder, and other electing non-transferring Shareholders, shall not be fully consummated and closed within sixty (60) days of the expiration of periods provided

14

BDO 04730
Confidential

ES0003252

*4*

herein, such proposed sale shall again be subject to the provisions of this Article including but not limited to the provisions requiring the Selling Shareholder to provide notice of sale to the non-selling Shareholders.

4.   In the event that more than one non-transferring Shareholder shall elect to purchase shares offered as above set forth, then each non-transferring Shareholder who so elects shall have the right to purchase a pro-rata number of the shares being offered on the basis of the following formula: the number of shares which each such non-transferring Shareholder shall be entitled to purchase shall be determined by multiplying the total number of shares offered by a fraction, the numerator of which shall be the total number of shares held by each such non-transferring Shareholder and the denominator of which shall be the total number of shares held by all non-transferring Shareholders who make the election to purchase; provided, always, that the non-selling Shareholders shall purchase all, but not less than all, of the shares so offered for sale by the Selling Shareholder.

5.   Any transfer of shares hereunder shall only be made if the Selling Shareholder shall have first delivered to the non-transferring Shareholder(s) a valid written assumption by the proposed transferee of all the obligations, covenants and agreements of the Selling Shareholder under this Agreement, such assumption by its terms to require a like assumption from all future transferee of shares. No transfer of shares shall be valid unless each transferee agrees to be so subject and bound and the Company may refuse to register or recognize any transfer of shares until such an agreement is signed.

15

BDO 04731
Confidential

ES0003253

6.    Each certificate of the Company's capital stock shall be stamped or otherwise imprinted with a legend stating that the transfer of the shares represented by such certificate is restricted by this Agreement.

7.    Notwithstanding anything in this agreement to the contrary, each Shareholder may transfer its shares to an affiliate of such Shareholder without the consent of, but upon notice to, the other Shareholder, provided, however, that such affiliate shall become a party to this Agreement. For purposes of this Agreement, an "affiliate" shall mean, with respect to either Shareholder, any person, firm, corporation, partnership, trust, association, joint venture or other business entity fifty percent (50%) of the capital stock or other interest of which is owned and controlled, directly or indirectly, by such Shareholder or (b) any entity fifty percent (50 %) of the capital stock or other interests of which is owned and controlled, directly or indirectly, by any person or entity controlling in any manner, directly or indirectly, more than fifty percent (50%) of the capital stock of such Shareholder. For purposes hereof, a change in control of any Shareholder, or permissible transferee of a Shareholder, shall itself be deemed a transfer under this Agreement which shall be subject to the provisions of this Article XI.

8.    Anything in this Agreement to the contrary notwithstanding, in the event that it becomes unlawful for any Shareholder of the Company to continue to hold all or some portion of the shares in the Company held by it, or restrictions are imposed on any such Shareholder by any law or regulation applicable to it which, in the reasonable judgement of such Shareholder makes it unduly burdensome to continue to hold all or some portion of such shares, and counsel to such Shareholder furnishes the Company with an opinion of counsel as to such restrictions,

16

BDO 04732
Confidential

ES0003254



then except as provided herein, such Shareholder may sell or otherwise dispose of all or any portion of its shares in the Company and the Company and the other party hereto shall use reasonable efforts to assist such Shareholder in disposing of such shares in a prompt and orderly manner, and, at the request of such Shareholder, shall provide (and authorize such Shareholder to provide) financial and other information concerning the Company to any prospective purchaser of such shares subject to such confidentiality agreements as the Company shall reasonably require. Such selling Shareholder shall reimburse the Company for any out of pocket expenses (including internal counsel and other costs) incurred by the Company in connection with the foregoing. The right of a Shareholder to sell its shares under this provision is subject to the right of first refusal of the other Shareholder to purchase shares in accordance with Section 1 of this Article; provided, however, that in the event a Shareholder is required by any applicable state or federal authority to divest itself of its interest in the Company under threat of financial penalty or other regulatory enforcement action and such circumstances makes it manifestly unreasonable to comply with the provisions for first refusal set forth above, then such Shareholder shall notify the other Shareholder and may dispose of such shares without offering the other Shareholder a right of first refusal.

9.    In the event that either Bankest or Espirito shall sell all of their shares to an unrelated party, then within thirty (30) days of receipt of written request of such selling Shareholder, the Company shall change its name to remove such selling Shareholder's name from the name of the Company.

17

BDO 04733
Confidential

ES0003255

## XII. RESTRICTION ON ENCUMBRANCE OF SHARES

1.   Shares of the capital stock of the Company may not be pledged, mortgaged, encumbered or subjected to liens or security interests (any such disposition being hereinafter called an "encumbrance") except with the prior written consent of all Shareholders.

## XIII. COMPULSORY SALE OF SHARES

1.   Either party hereto (hereinafter in this Article XIII the "Offeror") shall have the right, exercisable at any time hereafter, to require that the other party hereto (hereinafter in this Article XIII the "Offeree") either sell to the Offeror all of the shares of the Company held by the Offeree or that the Offeree purchase from the Offeror all of the shares of the Company held by the Offeror upon the terms and conditions set forth herein (such shares being hereinafter referred to as the "Ownership Interest" of the parties).   In either case, it is the understanding and agreement of the parties hereto that in the case of the sale and purchase of an Ownership Interest under the provisions of this Article XIII, the Offeror and the Offeree shall be required to sell all of their shares in the Company or acquire all of the shares of the other party in the Company and that in all events the price offered for sale or purchase of an Ownership Interest may not exceed one hundred twenty-five percent (125%) of the net book value of such Ownership Interest on the date the Offeror invokes the provisions hereof.   For the purposes of this Agreement, "net book value" shall be determined by reference to the financial statements of the Company issued as of the end of the calendar month next preceding the date of the offer.

18

BDO 04734
Confidential

ES0003256

2.    The Offeror shall have the right to invoke the provisions hereof by giving written notice to the Offeree.  Such notice shall state: (a) that the Offeror is invoking these provisions; (b) that the Offeror offers to purchase the Ownership Interest of the Offeree at the price and upon the terms specified in the notice; (c) the specific price for which the Offeror will purchase the Ownership Interest of the Offeree and the specific terms of payment therefor; and (d) that, conversely, the Offeror will, at the option of the Offeree, sell to the Offeree the Ownership Interest of the Offeror at a price and upon terms which are equal and identical to those specified by the Offeror for the purchase of the Ownership Interest of the Offeree.  Such notice shall also be accompanied by proof that the Offeror has deposited the entire purchase price amount, in cash, into the Offeror's attorneys' trust account.

3.    The giving of notice of the Offeror under this Article shall constitute an irrevocable offer by the Offeror to purchase the entire Ownership Interest of the Offeree for the price and upon the terms stated in the notice, or, at the option of the Offeree, to sell to the Offeree the entire Ownership Interest of the Offeror for the equal purchase price and terms.  The giving of such notice shall obligate the Offeree to sell its entire Ownership Interest to the Offeror unless the Offeree shall elect, in the manner hereinafter stated, to purchase the entire Ownership Interest of the Offeror.

4.    The Offeree shall have thirty (30) days from the receipt of the notice to be received from the Offeror to elect either to purchase the entire Ownership Interest of the Offeror or to sell the entire Ownership Interest of the Offeree to the Offeror for the applicable purchase price and terms stated in the notice.  If at the end of such thirty (30) day period the Offeree shall

19

BDO 04735
Confidential

ES0003257

not have given written notice to the Offeror of the election of the Offeree to purchase the entire

Ownership Interest of the Offeror, then the Offeree shall, for all purposes, be deemed

conclusively to have elected to sell its entire Ownership Interest to the Offeror for the purchase

price and upon the terms provided to the Offeree in the notice received from the Offeror and

closing of the purchase and sale shall take place within fifteen (15) days of the expiration of such

thirty (30) day period; provided that if the date of closing would otherwise fall on a Saturday,

Sunday or legal holiday, the date of closing, shall be the next business day.

5.    If prior to or at the end of the thirty (30) day period, the Offeree shall have

delivered its notice electing to purchase the entire Ownership Interest of the Offeror for the

applicable purchase price and terms stated in the notice, the closing of the purchase and sale shall

be effected ninety (90) days after the date of the notice from the Offeror; provided that if the date

of closing would otherwise fall on a Saturday, Sunday or legal holiday, the date of closing, shall

be the next business day. If for any reason the Offeree is unable to consummate the closing at

such time, then the Offeror shall have the right to purchase all of the Offeree's shares for the

purchase price.

6.    Full payment in respect of all transfers of Ownership Interests shall be made at

the closing in the lawful currency of the United States of America, in immediately available

funds and paid in accordance with the instructions of the party entitled to receive payment. At

the closing and as a conditions precedent to the receipt of payment, the selling party shall tender

to the purchasing party certificates representing the Ownership Interest to be acquired, duly

20

BDO 04736
Confidential

ES0003258

endorsed for transfer, with all stamp duties paid, together with duly executed and effective resignations of each director designated by the selling party.

## XIV. SPECIFIC PERFORMANCE

1.    The shares held by the parties in the Company cannot be readily purchased or sold in the open market and for that reason, among others, the parties will be irreparably damaged in the event that the provisions of this Agreement related to restrictions on transfer of shares, restrictions on chance of control, restrictions on encumbrance of shares and compulsory sale of shares are not specifically enforced.  Should any dispute arise concerning the sale, purchase, encumbrance or disposition of shares in the Company, an injunction restraining same may be entered by any court of competent jurisdiction pending final determination of such dispute by arbitration as herein provided.

## XV. COVENANT TO RETAIN CONFIDENCES

1.    The parties hereto will not (except as required in the course of association with the Company or as may be required by governmental order or regulation), while in association with the Company, communicate or divulge to, or use for the benefit of themselves or any other person, firm, association, or corporation, without the consent of the Company, any information concerning any processes, manuals, writings, methods, trade secrets, research, secret data, customer lists, costs or use of the Company's 'services, or other confidential matters possessed, owned, or used by the Company that may be communicated to, acquired by, or learned of by a party hereto in the course of or as result of association with the Company.

21

BDO 04737
Confidential

ES0003259

2.    The parties hereto expressly stipulate and agree that any breach of the obligations imposed hereby will cause irreparable harm. Each party hereto consequently consents to the entry of an order by any court of competent jurisdiction for specific performance of, or an injunction against violation of, the obligations imposed hereby.

## XVI. DISSOLUTION

1.    The Company shall not be dissolved unless upon the unanimous affirmative vote of all of the Shareholders at any special meeting of shareholders invoked for such purpose upon no less than ninety (90) days prior written notice to the Shareholders. In the event of such dissolution, the Company shall be liquidated as soon as is reasonably practical as per the provisions of paragraph 2 below.

2.    In the event that the Company shall hereafter be dissolved for any reason whatsoever, a full and general account of its assets, liabilities and transactions shall at once be taken. Such assets shall be sold and turned into cash as soon as possible and all debts and other amounts due the Company collected. The resulting net cash proceeds shall thereupon be distributed in order of payment as follows:

(a)    To creditors in satisfaction of all liabilities of the Company, including liabilities arising on account of notes issued by the Company as contemplated herein.

(b)    To Shareholders for capital; and

(c)    To Shareholders for profits.

22

BDO 04738
Confidential

ES0003260

## XVII. NOTICES.

1.    All notices under this Agreement shall, at the option of the sender, be served either

personally or by facsimile transmission upon the party to whom such notice is directed.  All

notices shall be directed to the following addresses or facsimile numbers or to those other

addresses or facsimile numbers notified by either party hereto pursuant to the provisions of this

Article XVIII:


TO ESPIRITO:           ESPIRITO SANTO BANK OF FLORIDA
                       1395 Brickell Avenue
                       Miami, Florida 33131
                       Facsimile No.:

with copy to:          ESPIRITO SANTO FINANCIAL HOLDING S.A.
                       15 Avenue de Montchoisi
                       CH-1006 Lausanne
                       Switzerland

TO BANKEST:            BANKEST CAPITAL CORP.
                       1395 Brickell Avenue 7th Floor
                       Miami, Florida 33131
                       Facsimile No.:(305) 372-2816

with copy to
                       Mark J. Scheer, Esq.
                       Gunster, Yoakley, Valdes-Fauli & Stewart, P.A.
                       Two South Biscayne Boulevard
                       Suite 3400
                       Miami, Florida 33131
                       Facsimile No.: (305)376-6010


23

BDO 04739
Confidential

ES0003261

## XVIII. ARBITRATION

1.      Any controversy or claim arising out of or relating to this Agreement, or the breach thereof shall be settled by arbitration in Dade County, Florida, in accordance with the commercial rules of the American Arbitration Association and judgment upon the award entered by the arbitrator(s) may be entered in any court having jurisdiction; provided, however, that this clause shall not limit the right of the of either party hereto to obtain any provisional remedy, in the nature of injunctive relief, from any court of competent jurisdiction, for breach of any obligation owed pursuant to the provisions of Article XI, XII, XIII of this Agreement.

## XIX. LIMITATION OF LIABILITY

1.      Neither Espirito or Bankest shall be liable for any punitive, consequential, indirect or special damages of any nature whatsoever arising out of or in connection with the performance or breach by it of this Agreement and each of Espirito and Bankest agree that no arbitral tribunal or panel shall have the authority to award such damages to either party.

## XX. ATTORNEY'S FEES

1.      In the event of any litigation or arbitration, including appellate proceedings, arising out of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees.

24

BDO 04740
Confidential.

ES0003262

## XXI. ASSIGNMENT

1.      Except in connection with the transfers of shares as herein provided, neither party hereto may assign its rights or delegate its duties under this Agreement.


## XXII. TERM

1.      This Agreement shall become effective on the date of execution and shall thereafter remain in effect unless and until terminated by instrument in writing duly executed by all parties who may then be shareholders of the Company.


## XXIII. GENERAL PROVISIONS

1.      This Agreement contains the entire understanding between the parties, and there are no other representations, stipulations, warranties, agreements or understandings with respect to the subject matter of this Agreement which are not fully expressed herein.  Neither this Agreement nor its execution have been induced by any representation, stipulation, warranty, agreement or understanding of any kind other than those herein expressed.

2.      This Agreement shall be interpreted and governed by the laws of the State of Florida which shall control all matters bearing on execution, validity, interpretation, performance and the rights and obligations of the parties hereto.  No provision of this Agreement shall be interpreted for or against either party hereto because such provision was drafted by or for either party hereto.


25

BDO 04741
Confidential

ES0003263

3.    This Agreement may not be changed orally, nor may any of its provisions be waived or amended, except by an instrument in writing signed on behalf of the party making such waiver.  In the event any provision of this Agreement is held or declared by any court or tribunal to be void, invalid, or unenforceable, the remaining provisions hereunder shall be unaffected.

4.    This Agreement shall be binding upon the parties and their respective assigns, and successors in interest.

5.    This Agreement may be executed in one or more counterparts, each of which will be deemed an original.

IN WITNESS WHEREOF, this Agreement has been executed on this 7 day of _April_ 1998.

ESPIRITO SANTO BANK OF FLORIDA

BY: _____

BANKEST CAPITAL CORP.

BY: _____

E. S. BANKEST CORP.

BY: _____

26

BDO 04742
Confidential

ES0003264

## JOINDER

The undersigned, EDUARDO ORLANSKY and HECTOR ORLANSKY, being the principals of BANKEST CAPITAL CORP., hereby join in the above agreement for the purpose of accepting and adopting the obligations set forth in paragraph 5 of Article III thereof.

IN WITNESS WHEREOF, this Joinder has been executed on this 7 day of april 1998.

_____
EDUARDO ORLANSKY

_____
HECTOR ORLANSKY

172578.6

27

BDO 04743
Confidential

ES0003265

No. 2002-1  

*CONFIDENTIAL MEMORANDUM*



US$175,000,000.00

# E.S. BANKEST LLC
### (the "Company")

### Factored Accounts Receivable-Backed Promissory Notes
#### (the "Notes")



**Minimum Purchase $100,000.00**
**Series A Notes:**
**Six (6) Month London Inter-Bank Offered Rate ("LIBOR"),**
**plus One and One-Half Percent (1.5%), per annum\* 185-Day Maturity Notes**
**Series B Notes:**
**Twelve (12) Month London Inter-Bank Offered Rate ("LIBOR"),**
**plus One and Three-Quarters Percent (1.75%), per annum\*\* 365-Day Maturity Notes**
**Series C Notes:**
**Three (3) Month London Inter-Bank Offered Rate ("LIBOR"),**
**plus One and One-Half Percent (1.5%), per annum\*\*\* 90-Day Maturity Notes**

**Bank Espirito Santo International, Ltd., Cayman Islands, BWI  (Collateral Agent)**

*Accrued interest, to the extent of the respective Stated Interest Rates, will be distributed to Series A Noteholders on the Maturity Date of Note(s) if such Date is a Business Day and if not a Business Day, then or the first Business Day subsequent to the Maturity Date of Series A Notes. Accrued interest to Noteholders of Series B Notes, will be distributed on those Dates which are: (i) one hundred and eighty five (185) days and, (ii) three hundred and sixty five (365) days, subsequent to the Date of Issuance of said Notes. If said Series B Interest Payment Date(s) are not Business Days, then on the first Business Day, immediately subsequent to said Series B Interest Payment Date(s). Accrued interest, to the extent of the respective Stated Interest Rates, will be distributed to Series C Noteholders on the Maturity Date or Note(s) if such Date is a Business Day and if not a Business Day, then or the first Business Day subsequent to the Maturity Date of Series C Notes. Payments of the Principal Amount of the Notes will be distributed to Noteholders on Note(s) Maturity Dates, subject to the Principal Distribution Options, as described herein.*

*The Notes are secured and/or collateralized via the receipt by the Collateral Agent of a Senior Security Interest/Lien (the "Collateral Lien") on accounts receivable ("Accounts Receivable") purchased or to be purchased by the Company from Clients of the Company. The Accounts Receivable are created by Company Clients as a result of the sale by the Clients of merchandise, goods, products and/or services to Customers of the Clients. Insured Accounts Receivable purchased by the Company will be insured by American Credit Indemnity Company, the world's oldest business credit insurer, ("ACI", and the "Credit Insurer"), or other similar credit insurer with an A.M. Best rating not inferior to A-. ACI is currently rated A,(Superior), by A. M. Best.*

### *For a discussion of certain factors relating to this Offering, see "Risk Factors."*

**THE NOTES OFFERED IN THE CONFIDENTIAL MEMORANDUM ARE NOT AND WILL NOT BE APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, THE FLORIDA DIVISION OF SECURITIES, OR ANY OTHER STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY NOR HAS NOR WILL THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PASS UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, NOR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION. THE NOTES HAVE NOT BEEN AND ARE NOT BEING OFFERED FOR SALE IN THE UNITED STATES (OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), OR TO ANY PERSON WHO IS A U.S. PERSON (AS DEFINED HEREIN). THE NOTES ARE SUBJECT TO SUBSTANTIAL RESTRICTIONS ON RESALE.**

The Notes will be offered only to Non U.S. Persons who are *Accredited Investors*, as defined by applicable Federal and state securities laws, and in reliance on certain exemptions as promulgated by the United States Securities and Exchange Commission.

Stated Interest Rates: Series A Notes: Six (6) Month London Inter-Bank Offered Rate ("LIBOR") plus One and One-Half Percent (1.5%) per annum\* 185-Day Maturity Notes. Series B Notes: Twelve (12) Month London Inter-Bank Offered Rate ("LIBOR") plus One and Three-Quarters Percent (1.75%), per annum\*\* 365-Day Maturity Notes. Series C Notes: Three (3) Month London Inter-Bank Offered Rate ("LIBOR") plus One and One-Half Percent (1.5%) per annum\*\*\* 90-Day Maturity Notes.

---

¹ The aggregate principal amount of Notes issuable by the Company is limited by certain terms and conditions including, but not limited to: (i) the issuance of Notes do not cause the ratio of Collateral (as defined in Exhibit A of the Master Credit Agreement, Exhibit IV hereof) to the aggregate outstanding principal amount of Notes, to exceed the required collateral ratio (as set forth in Section 1.05 of said Master Credit Agreement), and (ii) the issuance of Notes does not cause non-compliance with provisions of the Shareholders Agreement amongst the Shareholders of the Company, pertaining to the ratio of total liabilities of the Company to the tangible net worth of the Company.

### E.S. BANKEST LLC
**999 Brickell Avenue, Penthouse, Miami, Florida 33131**
**The date of this Memorandum is  January 1, 2002**

Plaintiffs' Exh. No. 107
Filed: January 16 A.D. 2007
Case No. 04-14009 CA 31
Harvey Ruvin, Clerk of Courts



ES0256343

# E.S. BANKEST LLC

## CONFIDENTIAL MEMORANDUM

## IMPORTANT NOTICES

THIS CONFIDENTIAL MEMORANDUM (THE "MEMORANDUM") IS BASED UPON INFORMATION SUPPLIED BY THE COMPANY, SOLELY FOR USE BY PROSPECTIVE ACCREDITED INVESTORS TO DETERMINE THEIR INTEREST IN CONSIDERING MAKING THE LOAN TO THE COMPANY.

**PROSPECTIVE LENDERS/INVESTORS SHOULD BE AWARE THAT ANY INVESTMENT IN THE NOTES WILL BE AN ILLIQUID INVESTMENT WITH SUBSTANTIAL FINANCIAL RISK. THE NOTES OFFERED HEREBY SHOULD BE PURCHASED ONLY BY PERSONS OF SUBSTANTIAL MEANS WHO: (A) HAVE NO NEED FOR LIQUIDITY WITH RESPECT TO THIS INVESTMENT; (B) CAN BEAR THE ECONOMIC RISK OF A TOTAL LOSS OF THEIR INVESTMENT; AND (C) UNDERSTAND OR HAVE BEEN ADVISED WITH RESPECT TO THE LONG-TERM NATURE AND TAX CONSEQUENCES OF, AND RISK FACTORS ASSOCIATED WITH, THIS INVESTMENT. IN MAKING A DECISION TO PURCHASE NOTES, INVESTORS MUST RELY UPON THEIR OWN EXAMINATION OF THE COMPANY, THE NOTES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. PROSPECTIVE INVESTORS SHOULD CAREFULLY REVIEW THE "RISK FACTORS" SECTION OF THE MEMORANDUM BEFORE DECIDING WHETHER OR NOT TO PURCHASE NOTES.**

THE NOTES WHICH ARE DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED, NOR THE SECURITIES LAWS OF THE STATE OF FLORIDA OR ANY OF THE OTHER STATES OF THE UNITED STATES OR ANY OTHER JURISDICTION. THE OFFERING CONTEMPLATED BY THIS MEMORANDUM WILL BE MADE IN RELIANCE UPON (I) A SAFE HARBOR FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH OCCUR OUTSIDE OF THE UNITED STATES, AND (II) AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND (III) ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS. AS SUCH, THE NOTES MAY NOT BE OFFERED, SOLD, TRANSFERRED, ACCEPTED OR DELIVERED, DIRECTLY OR INDIRECTLY, IN THE UNITED STATES (OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), TO U.S. PERSONS, OR OTHERWISE IN CONTRAVENTION OF REGULATION S UNDER THE SECURITIES ACT.

**THIS MEMORANDUM SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY SALE OF NOTES IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS CONCERNING THE COMPANY WHICH ARE INCONSISTENT WITH**

ES0256344

THOSE CONTAINED IN THIS MEMORANDUM. PROSPECTIVE INVESTORS SHOULD NOT RELY ON ANY INFORMATION NOT CONTAINED IN THIS MEMORANDUM OR DOCUMENTS REFERENCED HEREIN.

IN MAKING AN INVESTMENT DECISION PROSPECTIVE INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY, WHICH PROPOSES TO ISSUE THE NOTES, AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY SECURITIES COMMISSIONS OR REGULATORY AUTHORITY OF ANY JURISDICTION, INCLUDING ANY FEDERAL, FLORIDA OR OTHER STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE NOTES ARE SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM, AND THE APPLICABLE SECURITIES LAWS OF ANY OTHER JURISDICTION (INCLUDING THE FLORIDA SECURITIES ACT), AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS MEMORANDUM AND THE SUBSCRIPTION AGREEMENT.

THE NOTES SHALL BE OFFERED AND SOLD BY THE COMPANY ONLY TO NON-U.S. PERSONS IN ACCORDANCE WITH REGULATION S AND SECTION 4(2) UNDER THE SECURITIES ACT. ACCORDINGLY, ALL OFFERS AND SALES WILL BE CONDUCTED IN "OFFSHORE TRANSACTIONS," WITHOUT ANY "DIRECTED SELLING EFFORTS," AND IN ACCORDANCE WITH "OFFERING RESTRICTIONS," AS SUCH TERMS ARE DEFINED IN REGULATION S, AND PURSUANT TO OTHER REQUIREMENTS SET FORTH IN RULE 903 OF REGULATION S.  EACH PROSPECTIVE INVESTOR MUST QUALIFY UNDER THE SUITABILITY STANDARDS SET FORTH IN THIS MEMORANDUM, AND THE INVESTOR'S NOTES WILL BE SUBJECT TO SUBSTANTIAL RESTRICTIONS ON RESALE.

EACH PROSPECTIVE INVESTOR WILL BE REQUIRED TO EXECUTE AND DELIVER TO THE COMPANY THE DOCUMENTS CONTAINED IN A SEPARATE SUBJECTION BOOKLET, INCLUDING A PROSPECTIVE INVESTOR QUESTIONNAIRE, AND A SUBSCRIPTION AGREEMENT BETWEEN THE INVESTOR AND THE COMPANY.

ES0256345

## E.S. BANKEST LLC

THIS MEMORANDUM IS INTENDED SOLELY FOR THE USE OF THE PERSON TO WHOM IT IS PRESENTED. THE DISCLOSURE OF ANY OF THE INFORMATION CONTAINED HEREIN OR THE USE OF THIS MEMORANDUM FOR ANY OTHER PURPOSE WITHOUT THE WRITTEN CONSENT OF THE COMPANY IS SPECIFICALLY PROHIBITED. THIS MEMORANDUM MAY NOT BE REPRODUCED IN WHOLE OR IN PART, AND IT IS ACCEPTED WITH THE UNDERSTANDING THAT IT WILL BE RETURNED UPON REQUEST.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY COMMUNICATION, WHETHER WRITTEN OR ORAL, AS LEGAL, TAX, ACCOUNTING, OR OTHER EXPERT ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OWN ADVISORS REGARDING THE LEGAL, TAX, ACCOUNTING AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE COMPANY.

PRIOR TO ISSUANCE OF THE NOTES AND ACCEPTANCE OF THE LOANS BY THE COMPANY CONTEMPLATED HEREBY, THE COMPANY WILL PROVIDE EACH PROSPECTIVE LENDER WITH THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE COMPANY CONCERNING THE TERMS AND CONDITIONS OF THE LOAN, AND TO OBTAIN ANY ADDITIONAL INFORMATION WHICH THE COMPANY POSSESSES OR CAN ACQUIRE WITHOUT UNREASONABLE EFFORT OR EXPENSE THAT IS NECESSARY TO VERIFY THE ACCURACY OR INFORMATION CONTAINED IN THIS MEMORANDUM OR WHICH OTHERWISE IS FURNISHED TO PROSPECTIVE LENDERS. QUESTIONS FROM LENDERS CONCERNING THE TERMS AND CONDITIONS OF THE LOAN AND INQUIRIES FOR ADDITIONAL INFORMATION SHOULD BE DIRECTED TO:

Hector Orlansky
President, Chief Executive Officer, Director

Dominick C. Parlapiano                          Bernard Mollet
Senior Vice President, Director          Vice President, Director

E.S. BANKEST LLC
999 Brickell Avenue
Penthouse
Miami, Florida 33131
Telephone: (305) 358-5610
Telecopier: (305) 372-2816

ES0256346

US$175,000,000.00 [1]

# E.S. BANKEST LLC

(the "Company")
**Factored Accounts Receivable-Backed Promissory Notes**
(the "Notes")

Minimum Purchase $100,000.00
Series A Notes:
Six (6) Month London Inter-Bank Offered Rate ("LIBOR"),
plus One and One-Half Percent (1.5%), per annum* 185-Day Maturity Notes
Series B Notes:
Twelve (12) Month London Inter-Bank Offered Rate ("LIBOR"),
plus One and Three-Quarters Percent (1.75%), per annum** 365-Day Maturity Notes
Series C Notes:
Three (3) Month London Inter-Bank Offered Rate ("LIBOR"),
plus One and One-Half Percent (1.5%), per annum*** 90-Day Maturity Notes

## CONFIDENTIAL MEMORANDUM
## TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Access to Corporate Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background - The Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Description of the Loan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Master Credit Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Promissory Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Collateral and Security Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

  Company History and Business Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  Conflicts of Interest; Competing Business of Shareholders . . . . . . . . . . . . . . . . . . . 6

Other Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States Tax Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

No Registration/Exempt Offering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Modification of Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Principal Shareholder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Investor's Suitability Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

-iv-

ES0256347

## <u>EXHIBITS</u>

### TABLE OF CONTENTS

I.      Articles of Incorporation

II.     Regulations of E.S. Bankest LLC

III.    Accounts Receivable Purchase and Tri-Party Agreement

IV.     Master Credit Agreement

        Exhibit A
        Exhibit B
        Exhibit C
        Exhibit D
        Exhibit E
        Exhibit F

V.      Sample Form of Acknowledgment of Receipt of Memorandum

VI.     Sample Form of Subscription Agreement

VII.    Sample Form of Purchaser Representative Questionnaire

VIII.   Sample Subscription Instructions

IX.     Audited - Financial Statements of the Company dated December 31, 2000 and December 31, 2001

---

\* Enclosed Exhibits are draft Agreements of executed documents, available upon request at the offices of the Issuer.

ES0256348

## INTRODUCTION

This Confidential Memorandum (the "Memorandum") describes the proposed loan transaction pursuant to which E.S. Bankest LLC (the "Company") shall enter into a Master Credit Agreement providing for the issuance by the Company of its collateralized 90-day, 185-day and 365-day Notes (respectively, the "Series C Notes", "Series A Notes" and " Series B Notes", are referred to herein collectively as the "Notes").

### THIS MEMORANDUM SUPERSEDES ALL PRIOR INFORMATION PROVIDED TO PROSPECTIVE LENDERS.

The information contained in this Memorandum is intended to provide prospective Lenders with a brief summary of the relevant terms and conditions of the various agreement and documents which will evidence the Loan (as hereinafter defined). This Memorandum is qualified in its entirety by the Master Credit Agreement and related documents and each prospective Lender should carefully and fully review each of those documents.

### Access to Corporate Information

The Company extends to each prospective Lender and their representatives, if any, the opportunity prior to the extension of any credit to the Company under the Master Credit Agreement and issuance by the Company of its Notes, to ask questions of and receive answers from Management concerning the Company and the terms and conditions of this Loan and to obtain any additional information which the Company possesses or can acquire without unreasonable effort or expense and which is necessary or helpful to verify the accuracy of information contained in this Memorandum or which otherwise is furnished to other prospective lenders. Requests for such additional information should be directed to the Company, Attention: Hector Orlansky, President, 1395 Brickell Avenue, Miami, Florida 33131.

### Background - The Company

The Company was incorporated on March 18, 1998 as a Florida corporation for the purpose of (i) engaging in the operation of a non-regulated commercial factoring business, and (ii) acquiring certain accounts receivable, existing factoring contracts, and other assets. Fifty percent (50%) of the Company's common voting stock is owned by Espirito Santo Bank, a Florida licensed bank ("Espirito Santo Bank") and the other fifty percent (50%) of the Company's common voting stock is owned by Bankest Capital Corp., a Florida corporation ("BCC"). Copies of the Company's Articles of Incorporation and Bylaws are attached hereto as Exhibits I and II respectively.

As part of the transactions incident to the formation of the Company, the Company has entered into an Accounts Receivable Purchase and Tri-Party Agreement (the "AR Purchase Agreement") with BCC and its wholly owned subsidiary, Bankest Receivables Finance and Factoring Corporation ("BRFFC"), pursuant to which the Company has agreed to purchase certain assets from BCC and BRFFC. A copy of the AR Purchase Agreement is attached hereto as Exhibit III. Those assets include various accounts receivable acquired by BCC and BRFFC pursuant to their factoring and finance businesses. The Company shall also agreed to acquire certain rights, and assume certain obligations, under various factoring agreements presently existing between BCC and/or BRFFC and their respective clients. The Company will use the proceeds derived from the Loan to finance the purchase of the foregoing assets and to fund the purchase of additional Insured Accounts Receivable and to make Advances in the operation of its commercial factoring business.

The Company's principal business will be to provide what it considers to be traditional factoring. The Company's method of factoring is designed for the Client whose cash needs are greater than the amount of funds that the Client can borrow on an unsecured basis from a bank. Generally, the Company will enter into a factoring agreement with a Client whereby the Client agrees to sell to the Company, and the Company agrees to purchase all "eligible" accounts receivable. Under the factoring agreement, eligible accounts receivable include only those accounts receivable for which the Company can purchase credit insurance or are receivables due from the U.S. government or a government agency (an "Insured Account Receivable"). Subject to the specific terms of the factoring agreement, the Company will pay the Client for the purchased receivables upon the earlier of (i) the Company's collection from the Customer or (ii) the agreed upon payment date (usually 120 days after the purchase). The purchase price for each receivable is equal

-1-

ES0256349

to the face amount of the Client invoice to its Customer less commissions and other charges provided for in the factoring agreement ("factoring commissions"). At any time before payment of the purchase price to the Client, the Client may be eligible to borrow from the Company against the purchase price (i.e., obtain an "Advance" from the Company). In general, factoring agreements which the Company intends to enter into will limit Advances to no more than 80% of the net purchase price due to the Client. Clients will also be required to maintain certain reserve balances with the Company (generally to be not less than 20% of unpaid Accounts Receivable purchased by the Company) as additional security for Advances by the Company to Clients. Advances incur interest by the Client typically, at the rate of not less than 3.00% above the Base Rate as announced from time to time by Citibank, N.A., New York. By using the traditional form of factoring, the Client can obtain the needed cash as an advance against Accounts Receivable purchased by the Company. The Company also provides certain bookkeeping (related to accounts receivable and sales only) and receivables services, as well as credit protection.

Most Accounts Receivable will be insured as to credit risk by the Credit Insurer, pursuant to the terms and conditions of the Company's credit risk insurance policy (described below). The Company, however, reserves the right to acquire any and all types of insured and uninsured Accounts Receivable without restriction. In addition, Accounts Receivable due from the United States government and/or its agencies will not be insured as to credit risk. The Company will also loan funds to its Clients. Upon the Company's collection of the Insured Accounts Receivable purchased from its Clients, the principal amount of any and all such loans or Advances plus any and all interest and other fees and charges due from Clients will be debited from the purchase price of the Insured Accounts Receivable and, after retaining certain required reserve balances, which the Company requires to mitigate certain risks associated with unrepaid Advances and/or related to uncollected Insured Accounts Receivable, the differential balance is available for payment to the Client. The Company derives revenue from its factoring commissions, certain other factoring charges and interest charged Clients on Advances.

The Company may purchase Insured Accounts Receivable from the same Clients or from new or different Clients in accordance with the terms of its factoring agreements with clients. The Company anticipates that the spread between its purchase price for Insured Accounts Receivable and the collections of those accounts receivable, together with interest paid to the Company on Advances and other fees and income related to the factoring business will provide adequate funds from which interest on the Notes may be made and that collections of the Insured Accounts Receivable will provide adequate funds for payment of principal obligations under the Notes.

## Description of the Loan

The Company has entered into a Master Credit Agreement, together with a Security Agreement and related Security Documents with Bank Espirito Santo International Ltd., a Cayman Islands company ("BESIL"), pursuant to which BESIL will serve as collateral agent for the Lenders. The Notes will be fully registered on the books of the Company as to interest and principal and the transfer of Notes will be limited so as to require the surrender of the Notes to the Company and the replacement or exchange of the Notes to any new holder. The Company will make all payments of interest and principal directly to the Noteholders.

Master Credit Agreement. The Master Credit Agreement sets forth the basis upon which the Company intends to borrow up to an aggregate of Seventy Five million dollars ($ 75,000,000.00) (the "Loan") through the issuance of the Company's Promissory Notes called Series A and Series B Notes. Each Note issued by the Company will represent a fractional undivided interest in the total Loan to the Company under the Master Credit Agreement and that Agreement shall serve as the participation agreement amongst all Lenders in connection with the Loan and the Collateral.

For ease of administration of the Master Credit Agreement and the Loan thereunder, the Company anticipates that Notes will be issued by the Company in minimum denominations of $100,000.00 and multiples thereof. The Company has not established any maximum amount of Notes which may be issued, although subject to the terms of the Master Credit Agreement, the Company has tentatively limited the maximum issuance under this Offering to an aggregate of fifty million dollars ($50,000,000.00). The Company has reserved the right under the Master Credit Agreement to make additional offerings of Notes substantially similar, though not identified, to those offered herein. Additional Notes may be issued by the Company under the Master Credit Agreement from time to time, subject to certain restrictions contained in that Agreement. The principal limitation on the issuance of additional Notes by the

-2-

ES0256350

Company will be the requirement that the Company maintain a minimum loan to collateral value ratio. All Notes issued under the Master Credit Agreement will rank pari passu with each other with respect to priority to the Collateral, regardless of the date of issuance of each Notes.

Promissory Notes. Notes will be issued in two forms, Series A and Series B. The differences in Series A and Series B Notes relate to the scheduled maturity and interest rates formulas under the Notes:

Maturity Dates: Series A Notes will have a scheduled maturity date which is 90 days after the date of issue of each Series C Note. 185 days after the date of issue of each Series A Note. Series B Notes will have a scheduled maturity date which is 365 days after the date of issue of each Series B Note. Notes which are issued under the Master Credit Agreement, regardless of whether Series A or Series B, may and will have different dates of issue.

Interest Rates: Each Note will have a differing interest rate depending on the then applicable rate on the date of issue and the rate of interest paid on Notes within the same Series and between the separate Series may and will probably not be equal. The Series A Notes will accrue interest based on a rate equal to one and one half percent (1.50%) over the Six (6) Month London Inter-Bank Offered Rate ("LIBOR"). The Series B Notes will accrue interest at a rate equal to one and three quarters percent (1.75%) over the Twelve (12) Month LIBOR rate. The respective stated interest rate on each of the Notes will be fixed on the date of issuance of each Note and shall remain in effect until the Maturity Date of each Note. Interest on each Series A Note will accrue and will be paid, along with outstanding principal, on the Maturity Date of each Series A Note. Interest on each Series B Note will accrue and will be paid on: (i) the day one hundred and eighty (185) days after the date of issuance and (ii) on the Maturity Date, at which time all outstanding principal on each Series B Note shall likewise be paid. If interest or principal are due on any day which is not a Business Days, then such interest will be paid on the next Business Day. Interest will accrue on a per diem basis based on a three hundred sixty (360) day year.

Maturity Date Extension Option ("Rollover"). Series A Notes and Series B Notes shall mature on the stated Maturity Date of each such Note unless the Maturity Dates are extended under the procedures described in the Master Credit Agreement and in each Note. The Master Credit Agreement and each Note will provide that each holder of a Note may extend the original Maturity Date of a Note by tendering to the Company a Roll-Over/Maturity Extension Form not less than 90 days prior to the original Maturity Date. In the event that the Lender or Holder elects to extent the Maturity Date, and the Company accepts such extension, the new maturity date of each such Note shall in the case of a Series A Note be 185 days from the original Maturity Date and in the case of a Series B Note, such extended maturity date shall be 365 days from the original Maturity Date of such Series B Note. Interest on any Series A or Series B Note during such extension period shall be adjusted on the original Maturity Date in accordance with the then applicable interest rates for Series A or Series B Notes, as the case may be, and such readjusted rate shall be the interest rate during the extended term. The Company shall not be obligated to accept any Roll-Over/Maturity Extension and may accept these in its sole and complete discretion.

Collateral and Security Interest. Pursuant to the Security Agreement, the Collateral Agent will be vested with a first priority lien and security interest in the Collateral for the Loan. The Collateral will consist of: (i) factored Accounts Receivable (both insured and uninsured); (ii) an assignment of the proceeds of the Credit Insurance Policy issued by the Credit Insurer; (iii) the reserve balances in the underlying Clients' factoring accounts with the Company; and (iv) the unused proceeds of the Loan received from the issuance of any Notes by the Company. The Security Agreement will set forth the terms upon which the Collateral Agent will act as agent for the Lenders in connection with any enforcement actions against the Company with respect to the Collateral. The Collateral Agent, as agent for the Lenders, will have the exclusive authority in the enforcement of the security interests under the Master Credit Agreement and Security Agreement. The Lenders or other holders of the Notes may, by 66 2/3% majority vote, require the Collateral Agent to take certain actions with respect to the Collateral or may replace the Collateral Agent.

Required Collateral Ratios. The Company has covenanted and agreed under the Master Credit Agreement and the Security Agreement to limit the principal amounts of borrowings through the issuance of

ES0256351

Notes in accordance with certain collateral ratios set forth in the Master Credit Agreement. These covenants provide that during any period during which there exists an outstanding principal amount under the Notes, the outstanding balance of Accounts Receivable, whether insured or uninsured, and pledged to the Collateral Agent and Lenders under the Security Agreement will be not less than one hundred and twenty percent (120%) of the principal amount of all Notes issued under the Master Credit Agreement, minus cash deposits and securities pledged.

Credit Insurance. The Notes are secured in large part by Insured Accounts Receivable of the Company and by other collateral. The quality of said collateral or security is enhanced by the existence of a credit insurance policy ("Policy"), issued by the *American Credit Indemnity Company* ("ACI" or "the Credit Insurer"), or other similar credit insurer. Established in 1887, ACI is the world's oldest business credit insurer. ACI is owned 50% by *Compagnie Financiere SFAC*, the world's largest credit insurer, and 50% by *Securitas Capital, LLC*, whose principal shareholders are *Swiss Re-Insurance Company* and *CS Holdings*, the parent company of *Credit Suisse*. The Company has assigned the proceeds of the Policy to the Collateral Agent for the benefits of the Noteholders, as further collateral for the repayment of the Notes. Pursuant to the terms of the credit risk insurance policy the Credit Insurer insures the Company against loss due to "Insolvency," as defined in the Policy, of Customers of Clients ("debtors"). Subject to the specific terms, definitions, conditions and limitations contained in the Policy and the conditions set forth in the Policy Declaration, the Policy insures the Company (as the "Insured") against "losses" consisting of the unpaid invoice price of bona fide sales to debtors and actually delivered in the usual course of business to individuals, firms, partnerships or corporations located in the United States of America or Canada. The Policy covers only losses sustained against debtors specifically approved for coverage under the Policy and coverage on any loss is limited to that portion of the indebtedness of a debtor to the Insured which consists of the unpaid invoice price of shipments. Further limitations under the Policy establish that the total covered amount of indebtedness of any one debtor will be limited to the total amount owed to the Insured by that debtor at date of insolvency, but not in excess of the amount established as the debtor's Credit Insurance Limit. Under conditions of the Policy, merchandise placed with a debtor on consignment is also covered. The Company reserves the right to change Credit Insurers; provided, however, that any Credit Insurer shall have a AM Best rating of A- or better.

Although the Insured Accounts Receivable are insured by the Credit Insurer or are Accounts Receivable due from the United States government, state governments and/or their agencies and municipalities, the Notes are neither insured by any commercial insurance company or any governmental agency, as are certain investments in financial institutions such as banks, savings and loan associations or credit unions, nor are they guaranteed by any public agency or private entity. Also, the Company is not subject to any generally applicable governmental limitations on its own borrowing which are designed to protect investors.

Related Party Security Interest Rights. Pursuant to the Shareholders Agreement between BCC and Espirito Santo Bank, Espirito Santo Bank of Florida has agreed that so long as Espirito Santo Bank is a shareholder of the Company, in the event the Company can not raise sufficient working capital through the issuance of Notes under this or other similar offerings, Espirito Santo Bank shall provide or cause third parties (which may or may not be affiliates of Espirito Santo Bank) to provide the Company with a line or lines of credit of up to an aggregate maximum amount of Thirty Million Dollars and 00/100 ($30,000,000.00). Advances under any such line shall be for a maximum of three hundred sixty (360) days and shall bear interest (i) in the case of the first Five Million Dollars ($5,000,000.00) at the same rates as provided herein for Series A and B Notes, depending on whether such advances are for 180 days or 360 days and (ii) for amounts in excess of $5,000,000, at a rate not to exceed the one year LIBOR rate in effect on the date of the advance plus two percent (2%) per annum. All advances under these lines of credit shall be evidenced and secured by notes issued by the Company under the terms and conditions then generally offered by the Company under this or similar offerings, excepting only as to rate of interest which shall be in the amount aforesaid, and such advances are to be secured by a security interest in the same assets of the Company as stand as security for the Notes issued hereunder. The Collateral Agent is authorized under the Security Agreement to permit the Company to execute and deliver a security interest to such lenders, which security interest shall rank pari passu with the liens granted the Collateral Agent under the Security Agreement herein.

-4-

ES0256352

## Risk Factors

In addition to the various risks ordinarily attendant upon investments of the nature described herein, certain unique factors relating to the Company and its business make a prospective Lender's decision to advance monies to the Company under the Master Credit Agreement, and thus to receive the Notes hereunder, subject to a high degree of risk. Prospective Lenders are cautioned that the Company's business is speculative and involves significant risks and, as such, the Loan to the Company is likewise speculative and it is not possible to foresee and describe all of the business, economic and financial risk factors that may affect the Company.

<u>Company History and Business Operations</u>.  **The Company has a limited operating history.**  The Company has and will in the future have significant and substantial short term liabilities in the form of outstanding Notes issued and anticipated to be issued thereafter. The Company intends to finance operations through the proceeds of the Master Credit Agreement and the Notes as well as subsequent borrowings under similar additional notes. The Company has no commitments for alternative sources of funding for its operations nor are there any assurances that it may do so in the future. **There can be no assurances that subsequent efforts to raise additional funding will be successful, and thus the Company's ability to meet its obligations under the Notes will be entirely dependent upon the immediate success or failure of its business operations.**  The success of the Company will also materially depend upon the creditworthiness of the Company's Clients.

Both of the Company's Shareholders, Espirito Santo Bank and BCC may, but are not obligated to, make additional capital contributions and funds available to the Company. Under the Shareholders Agreement, the Company has agreed to certain limitations on dividends or other cash flows which may be paid or transferred to its Shareholders.

A substantial portion of the Company's cost of operations and cash flow requirements include interest expense and principal repayment of its Notes. The Company incurs interest expense under the Notes at annual rates of between Six (6) Month LIBOR plus one and one half percent (1.50%) and twelve (12) month LIBOR plus one and three quarter percent (1.75%).  Under its standard factoring agreements with clients, the Company receives interest income from Advances to Clients at an average of 300 basis points above Citibank's announced Base Rate, as well as commissions, fees and other income. There can be no assurance that the principal amounts accruing interest from Clients, together with factoring commissions and other fees will equal or exceed interest due under the Notes issued by the Company. Since a material portion of the Company's working capital consist of borrowed funds, the interest expenses the Company will incur will be higher than similar businesses which have more long-term debt and equity capital.

Whereas the credit risk, as defined in the Policy, of the obligor of an Insured Account Receivable is intended to be insured under the Policy, the Customer's payment of its obligations and legal liability emanate and initiate from receipt and acceptance of goods and/or services from the Company's Clients.  The assessment of each Client's ability to deliver goods and/or services to its Customers in compliance with the terms and conditions of the underlying transactions which give rise to an Account Receivable will have an integral and material impact on the singular and aggregate collateral value and repayment experience of the Accounts Receivable. This risk, the "non-credit risk," will be retained by the Company with full recourse against its Clients. The Company's credit policies will seek to assess the probability of exposing the Company to the non-credit risks which are present and related to a particular Client's inability or failure to satisfy the recourse provisions in the event any Account Receivable or any portion thereof becomes uncollectible as a result of events or circumstances which are not covered under the Policy, therefore leaving the Client as the remaining liable party. The Company intends to maintain as part of its documentation comprehensive information related to the credit and business character of its proposed Clients.  The Company also intends to assign an account officer to each Client account who will have the primary responsibility for developing the necessary Client business credit and character information in compliance with Company policies. Company policies will generally include such items as requiring the account officer to visit and inspect each Client's business operation so as to determine location, general neighborhood area, physical conditions, maintenance, occupancy, future plans, prospects, etc. The scope of information necessary to substantiate the business reputation and character of a Client will vary from case-to-case and will depend on the collective judgement of the account officer and other officers approving the Client.

The Company also intends to use an ongoing process after completion of the initial credit and business background investigation of a Client by periodically updating the Client's business and credit data. The Company will

-5-

ES0256353

seek to identify historical experience related to the manner in which a Client deals with business customers, creditors (past and present), employees and competitors. The primary objective of the Company's credit policies will be to determine each Client's general business standing as a responsible provider of its particular goods and/or services to its customers and the Client's financial ability to meet its obligations pursuant to the recourse provision as stated in the factoring agreement. While the objectives of the Company's credit policies will be to maintain careful review of each Client's particular financial status and business practices, the Company has no assurance, and can not assure Lenders and holders of the Notes that such procedures will be sufficient to prevent financial defalcations and other failures of Clients.

        <u>Conflicts of Interest; Competing Businesses of Shareholders.</u> BCC and its wholly owned subsidiary BRFFC are presently engaged in a factoring business which will be substantially similar to that of the Company. While BCC has agreed with Espirito Santo Bank in connection with the formation of the Company to undertake new factoring business through the Company, BCC and BRFFC will continue to operate separate factoring businesses for an indefinite period of time. The terms of such agreements are contained in the Shareholders Agreement for the Company, a copy of which is available for inspection upon request. In addition, BCC will continue to provide management and servicing services to BRFFC in connection with factored accounts and accounts receivable pursuant to a Management Advisory and Administrative Agreement.

        The Company does, and intends to maintain deposit accounts and banking relations with the Espirito Santo Bank of Florida, of Miami, Florida, the fifty percent (50%) Shareholder of the Company. Espirito Santo Bank of Florida is a full service bank which from time to time engages in commercial loan transactions which are secured by accounts receivable. The Shareholders Agreement does not impair or restrict Espirito Santo Bank of Florida from continuing to make asset based loans to customers.

        The Collateral Agent is a Cayman Islands corporation, operating under a Class B banking license and separate trust license issued by the Cayman Islands Supervisor of Banks and Trust Companies. The Collateral Agent is a wholly-owned subsidiary of Espirito Santo Financial Holding, S.A., a Luxembourg corporation, which is an affiliate of Espirito Santo Bank of Florida., a 50% shareholder of the Company.

## Other Matters

        <u>United States Tax Matters.</u> **EACH PROSPECTIVE LENDER SHOULD CONSULT THEIR TAX ADVISOR BEFORE MAKING ANY LOAN HEREUNDER.**

        <u>Interest Withholding Taxes.</u> The Internal Revenue Code of 1986, as amended (the "Code"), generally provides that interest paid by a United States borrower to a foreign lender is subject to a 30% tax which the borrower is required to withhold from each interest payment and remit to the United States Internal Revenue Service. The rate of tax may be reduced under certain United States Income Tax Treaties. Interest paid on obligations which qualify under provisions applicable to the *Repeal of Tax on Interest of Nonresident Alien Individuals and Corporations Received from Portfolio Debt Investments* are exempt from the 30% withholding tax on interest. The Notes are intended to qualify as portfolio debt under these provisions. As such, each Note will be issued in accordance with the provisions applicable to "fully registered obligations" as defined in the Code and regulations issued thereunder. Each Lender shall be required to make certain representations relating to qualification under the portfolio debt rules and will be required to provide the Company with certain certifications relating to the Lender's foreign status for U.S. tax purposes and that such Lender is neither a related party to the Company or a bank making a loan in the ordinary course of its banking business, as defined under relevant provisions of the Code. Lenders who can not satisfy those requirements may be subject to withholding taxes on interest.

        <u>Back-Up Withholding.</u> Provisions of the Code require reporting and inclusion of interest as income to certain security holders. In general, the Company is required to file annually with the Internal Revenue Service an information return (Form 1099) reporting the amount of interest which is paid or which is considered earned by the Noteholders during each calendar year period and to provide a copy of such information return to the Noteholder (such reporting may not be required for qualified holders of portfolio debt instruments). Noteholders are required to include such amount as income in his/her Federal Income Tax Return for that year. In certain instances, depending on the status of the

ES0256354

Noteholder, applicable provisions of the Code may require backup withholding by the payor of interest of 30% of all interest payments (or amounts equivalent thereto) on and after December 31, 1984. Under the backup withholding provisions, withholding on interest or dividends may be imposed either:

(1)     after the Secretary of the Treasury has mailed four notices to the taxpayer stating that the taxpayer has under-reported his income, and, if the taxpayer has filed a return for the taxable year in which he under-reported income, the Secretary has made a deficiency assessment against the taxpayer;

(2)     if the taxpayer fails to furnish a taxpayer identification number when required to do so;

(3)     if the Secretary notifies the payor that the taxpayer furnished an incorrect taxpayer identification number; or

(4)     with respect to instruments acquired after 1983, the taxpayer fails to certify under penalty of perjury that he is not subject to backup withholding as a consequence of having under-reported his income.

Any payor required to withhold from interest or dividend payments on the basis of taxpayer under-reporting of income is required to notify the payee at the time the withholding begins.

**No Registration/Exempt Offering**

The offer and sale of Notes will be made privately to a limited number of accredited investors ("Accredited Investors") who are not U.S. Persons, as such term is defined in Regulation S under the Securities Act: (i) in reliance upon a safe harbor from the registration requirement of the Securities Act for offers and sales of Securities which occur outside of the United States; (ii) in reliance upon exemptions from registration provided in Section 4(2) of the Securities Act, and Rule 506 of Regulation D promulgated under the Securities Act and, where available, upon appropriate exemptions from state registration or qualification requirements; and (iii) pursuant to registration or qualification under state securities laws. To assure compliance with the requirements for such exemptions, Notes will be offered and sold only to persons who meet the qualifications set forth herein and who comply with the requirements set forth below.

The Company has reserved the right under the Master Credit Agreement to make additional offerings of Notes to persons who would not otherwise meet the suitability standards of this Offering.

<u>Acceptance of Subscriptions</u>.  The Company must accept, limit or reject a subscription within 30 days from the date of receipt. The Company will notify any prospective investor whose subscription is rejected and will promptly return any proceeds from subscriptions delivered to the Company by such prospective investor. Upon acceptance of any subscription, the Company will duly execute and deliver a counterpart of a subscription agreement to the investor.

<u>Subscription Method</u>          Persons who satisfy the Lender's Suitability Standards set forth in this Memorandum and described in the Subscription Agreement and who wish to subscribe for Notes must deliver all of the following to the Company, duly completed and executed, prior to the termination date of the Offering:

(i) the Acknowledgment of Receipt of Confidential Memorandum in the form attached as Exhibit V to this Memorandum;

(ii) one (1) Subscription Agreement in the form attached as Exhibit VI to this Memorandum;

(iii) a check, or bank to bank wire transfer of available U.S. funds, payable to "E.S. Bankest LLC" for the face amount of the Notes subscribed for;

(iv) Joinder, Appointment of Collateral Agent and Consent;

(v) if applicable, a Purchaser Representative Questionnaire in the form attached as Exhibit VII to this Memorandum.

Execution copies of the above documents and subscription instructions in the form attached as Exhibit VIII to this Memorandum are also provided with this Memorandum.

ES0256355

## Modification of Terms

The Company reserves the right, by written notice, to withdraw, cancel, modify or terminate the transactions contemplated hereby at any time if, in the opinion of counsel to the Company, there exists any actual or threatened legal impediment to the Loan, including any material legal action or administrative proceeding instituted or threatened against the Company with respect to the Loan. No such impediments are presently known by the Company to exist. Upon any such termination the Company will, at its option, either accept the subscriptions and cash payments previously tendered or return all subscriptions and cash payments, without interest thereon or deduction therefrom, and, in either case, the Company will have no further obligation or liability with respect to the Loan and the transactions contemplated hereby.

### PRINCIPAL SHAREHOLDER

All of the common stock of the Company presently outstanding is owned fifty percent (50%) by Espirito Santo Bank of Florida ("Espirito Santo Bank") and fifty percent (50%) by Bankest Capital Corporation ("BCC").

Espirito Santo Bank is a full service bank charted by the State of Florida, with deposits backed by the Federal Deposit Insurance Corporation (FDIC), and is a U.S. affiliate of Espirito Santo Financial Holdings, S.A. ("ESFH"),a Luxembourg-based holding company. Presently, ESFH has consolidated assets worldwide exceeding $24 billion, with capitalization of over $400 million. ESFH is a public company, whose shares are listed in New York, London and Luxembourg stock exchanges.

BCC is the 100% parent corporation of Bankest Receivables Finance and Factoring Corp., also a Florida corporation ("Bankest Receivables"). All of the common stock of BCC is owned by Bankest International, Inc., a Florida corporation, which is in turn owned by B.I. S.A., Ltd., a Bahamas corporation (formerly Bankest International S.A.). B.I. S.A., Ltd. was organized in 1967 in Nassau, Bahamas and is an international investment banking firm, specializes in arranging financing for companies, governments, and government agencies on a worldwide basis. Bankest International, Inc. was organized in 1972 and serves primarily as a holding company for a number of subsidiaries engaged in unrelated business. BCC was organized in 1986 to engage primarily in the business of factoring and account receivable financing. Presently, BCC's business has evolved to include a domestic commercial factoring division and separate domestic and international corporate finance divisions, as well as separate domestic and international lending, investing and advisory services divisions. Bankest Receivables Finance and Factoring Corp. was organized in 1994, it engages primarily in the financing and operation of a factoring business.

-8-

ES0256356

# MANAGEMENT

**Directors and Executive Officers**

The following table identifies the Directors and Officers of the Company.

| Name | Position with the Company | Age |
|------|---------------------------|-----|
| Eduardo Orlansky | Chairman & Member | 64 |
| Victor Balestra | Vice-Chairman & Member | 57 |
| Hector Orlansky | President, CEO & Member | 57 |
| R. Peter Stanham | Senior Vice President Administration & Member | 65 |
| Dominick C. Parlapiano | Senior Vice President & Member | 46 |
| Bernard Mollet | Vice President, Member | 57 |
| Pierre-Antoine Trezzini | Member | 60 |
| Joaquin Manuel de Almeida Garnecho | Member | 49 |

**Management Profiles**

Following is selected information regarding the business and professional backgrounds of the Company's Management:

**Eduardo Orlansky, Chairman of the Board of Directors.** -Since 1986, Mr. Eduardo Orlansky has been a Director and President of BCC, the fifty percent (50%) Shareholder of the Company (See "Principal Shareholders"), whose primary businesses are its Commercial Finance/Factoring Division and its Domestic and International Corporate Finance Investment, Lending and Advisory Division. Mr. Orlansky is also Executive Vice President and Director of Bankest Capital's wholly-owned factoring company, Bankest Receivables Finance and Factoring Corp. Since 1972, Mr. Orlansky has also been President and Director of Bankest International, Inc. Prior to 1972, Mr. Orlansky was with the Wall Street firm Loeb Rhoades & Co., an international and domestic investment banking firm, as a Vice President and Director, Mr. Orlansky directed all the operations of the Latin American division of Loeb Rhoades & Co.

**Victor Balestra, Vice-Chairman of the Board of Directors.** -Since 1990, Mr. Balestra has been President, Chief Executive Officer and a Member of the Board of Directors of the fifty percent (50%) Shareholder of the Company, Espirito Santo Bank (See "Principal Shareholders"), an affiliate of Espirito Santo Financial Holdings S.A. which owns financial institutions in Portugal, Spain, France, Switzerland, Brazil, the United States and the Cayman Islands. Mr. Balestra joined Espirito Santo Bank from Riggs International Banking Corporation, the Edge Act subsidiary of Riggs National Bank of Washington D.C., where he was President and Chief Operating Officer.

ES0256357

**Hector Orlansky, President, Chief Executive Officer and Director of the Company.** -In 1967, Mr. H. Orlansky established the offices of Bankest International S.A., Ltd. in Nassau, Bahamas. Mr. Orlansky is also a Director of Bankest International, Inc., Bankest Trading, Inc., Orler Travel and Cruises, Inc., and Bankest Capital Corp., a fifty percent (50%) Shareholders of the Company. Mr. H. Orlansky is also a member of the Board of Directors of the other fifty percent (50%) Shareholder of the Company, Espirito Santo Bank of Florida, (See "Principal Shareholders").

**R. Peter Stanham, Senior Vice President, Corporate Secretary, Treasurer, Director.** -Mr. Stanham joined Bankest International, S.A., Ltd. in the Bahamas in May 1970. In March 1972, he came to Miami to join Eduardo Orlansky in establishing Bankest International, S.A., Ltd.'s U.S. office. He now manages, as Administrator, the Bankest Group of companies. Mr. Stanham is Honorary Consul for Uruguay. Mr. Stanham is Senior Vice President, Corporate Secretary, Treasurer and Director of all of the Bankest Group of Companies.

**Dominick C. Parlapiano, Senior Vice President, Director.** -Mr. Parlapiano joined Bankest Capital Corp. in February 1991, where he currently serves as Senior Vice President, Director. He is also Senior Vice President, Director of Bankest Receivables Finance and Factoring Corp., Bankest Capital's wholly-owned factoring subsidiary. He is also head of Bankest Capital's Domestic Corporate Finance Division. Mr. Parlapiano is also a Director of Bankest Capital's Commercial Finance/Factoring Division. Mr. Parlapiano also heads Bankest's Structured Finance Group, which specializes in asset securitization advisory services. Prior to joining the Bankest Companies, Mr. Parlapiano was President of Corporate Finance Group Inc. and co-founder and Managing Director of Capital Resources Financial Group, Inc., both firms being traditional investment banking boutiques, serving mostly small to mid-size corporate clients.

**Bernard Mollet -Vice President, Director.** -Mr. Mollet is a Senior Vice President of the Company's fifty percent (50%) Shareholder Espirito Santo Bank. Mr. Mollet heads the Bank's Trust and Investment Services operation which provides the Bank's Private Banking Clients, Trust , Discretionary and Custodial investment management services. Mr. Mollet joined the Espirito Santo Group in 1991. Prior to joining the Group, Mr. Mollet held high level investment management positions at Banque Cantrade Lausanne, a private bank affiliated to the Union Bank of Switzerland Group of companies ("UBS"), and of UBS Phillips & Drew International, Tokyo, Japan.

**Pierre-Antoine Trezzini -Director.** -Mr. Trezzini is Directeur of Compagnie Financiere Espirito Santo S.A., of Lausanne, Switzerland, an investment management affiliate of Espirito Santo Financial Holdings, S.A. ("ESFH") (See "Principal Shareholders"). Mr. Trezzini joined ESFH in 1990, prior to which held senior investment management positions at firms including Tradition International S.A., Lausanne, Deltec International S.A., Lausanne and Merrill Lynch, Geneva.

**Joaquin Manuel de Almeida Garnecho -Director.** -Mr. Garnecho is Executive Vice President and General Manager of Banco Espirito Santo è Commercial de Lisboa -New York (Agency). Mr. Garnecho first became affiliated with the Espirito Santo Group in 1979. Amongst Mr. Garnecho's other experience were positions as Head of the International Division of Monetary Authority of Macau, and Senior Economist of the Ministry of Foreign Trade for the Nation of Portugal.

---

ES0256358

## E. S. BANKEST LLC

### INVESTOR'S SUITABILITY STANDARDS

PURCHASE OF THE NOTES IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. THIS OFFERING IS NOT A SUITABLE INVESTMENT FOR ALL INVESTORS AND WILL BE SOLD ON A SELECTED PRIVATE BASIS TO A LIMITED NUMBER OF INVESTORS WHO MEET THE STANDARDS DESCRIBED BELOW. *SEE "RISK FACTORS AND OTHER SPECIAL CONSIDERATIONS"* FOR MORE DETAILED INFORMATION.

There is no established market for the Notes. Furthermore, there are only a limited number of investors and given the restrictions on the transferability of Notes, a market in the Notes will not exist. The Notes have not been registered under the Act or the securities laws of any state or other jurisdiction ("Other Securities Law"). The Notes cannot be resold unless: (i) they are subsequently registered under the Act and/or Other Securities Laws; and/or (ii) an exemption from such registration is available. The Company does not intend to register the Notes under the Act or any Other Securities Laws. It is not anticipated that any exemption from registration will be available to investors in connection with any sales. Accordingly, a purchaser of Notes must bear the economic risk of investment in the Notes.

The offering contemplated under this Memorandum will be made in reliance upon (i) a safe harbor from the registration requirements of the Securities Act for offers and sales of securities which occur outside of the United States, (ii) an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering, (iii) analogous exemptions under State securities laws where available, and (iv) pursuant to registration or qualification under State securities laws. As such, the Notes may not be offered, sold, transferred, accepted or delivered, directly or indirectly, in the United States (or any of its territories, possessions or areas subject to its jurisdiction) or to "U.S. Persons" (as such term is defined herein). Pursuant to this Offering, the Company will only sell Notes to Non-U.S. Persons and Accredited Investors as defined by Regulation D promulgated pursuant to the Securities Act ("Accredited Investor(s)").

All offers and sales of Notes to eligible non-U.S. Persons under this Offering will be conducted in accordance with Rule 903 of Regulation S, including without limitation, pursuant to "offshore transactions" and without any "directed selling efforts" by any person in the United States (as such terms are defined in Regulation S). No solicitation to purchase the Notes will be made to U.S. Persons and non-U.S. Persons in the United States, no offering material or subscription documents will be delivered to such persons, and no subscription agreements will be accepted from such persons in the United States.

For purposes hereof, a "U.S. Person" is a person who is (i) a natural person resident in the Untied States; (ii) a partnership, corporation or other entity organized or incorporated under the laws of the United States; (iii) an estate of which an executor or administrator is a U.S. person; (iv) a trust of which any trustee is a U.S. person; (v) an agency or branch of a foreign entity located in the United States; (vi) a non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person; (vii) a discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; or (viii) a partnership or corporation (A) organized or incorporated under the laws of any foreign jurisdiction and (B) formed by a U.S. person principally for the purpose of (1) investing in the Company or (2) investing in securities not registered under the Securities Act.

Pursuant to Regulation D promulgated under the Securities Act, an Accredited Investor is:

(a)     any natural person who had individual income in excess of $200,000 in each of the last two (2) most recent years, or joint income with the person's spouse in excess of $300,000 in each of those years, and reasonably expects to reach the same income level in the current year;

-11-

ES0256359

     (b)     any natural person who individually, or together with a spouse, has a net worth, at the time of purchase, in excess of $1,000,000;

     (c)     any director or executive officer of the Company;

     (d)     any bank as defined in Section 3(a)(2) of the Securities Act, whether acting in an individual or fiduciary capacity;

     (e)     any savings and loan association or similar institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in an individual or fiduciary capacity;

     (f)     any insurance company as defined in Section 2(13) of the Securities Act;

     (g)     any investment company registered under the Investment Company Act of 1940;

     (h)     a business development company as defined under (2)(a)(48) of the Investment Company Act of 1940;

     (i)     any small business development company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958;

     (j)     any employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the decision to purchase Notes is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, insurance company, or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self directed plan, with investment decisions made solely by persons that are accredited investors;

     (k)     any plan established and maintained by a state, its political subdivision or any agency or instrumentality of a state or its political subdivisions, for the benefit of the employees of such plan having total assets in excess of $5,000,000;

     (l)     any private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940;

     (m)     any organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, not formed for the specific purpose of acquiring the Notes offered hereby, with total assets in excess of $5,000,000;

     (n)     any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Notes offered hereby, whose purchase is directed by a sophisticated person as described in Rule 506(B)(2)(1) of Regulation D promulgated pursuant to the Securities Act;

     (o)     any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended; and

     (p)     any entity in which all of the equity owners meet one of the requirements of the above subsections.

**Transfers**

     The Notes are "restricted securities," as such term is used in the Securities Act. Each prospective investor must represent and warrant in the Subscription Agreement to be completed by each investor that he is purchasing the Notes for his own account, and not with a view to the assignment, transfer or disposition of such Notes. An investor may not assign, transfer or otherwise dispose of, by gift or otherwise, any of his Notes (or any participation or beneficial interest therein) to any person or entity (a) except as specifically permitted by the Memorandum and the Subscription

-12-

ES0256360

Agreement, and (b) provided that (i) the proposed transferee has made written representations and warranties similar to those contained in the Subscription Agreement; and (ii) the investor either registers the proposed transfer under the Securities Act and the applicable state and non-U.S. securities laws or furnishes the Company with an opinion or opinions of legal counsel(s) experienced in matters of U.S. securities laws and the securities laws of other applicable jurisdictions (which securities counsel(s) shall be satisfactory to the Company and its legal counsel(s)) confirming that the proposed transfer (x) is exempt from the registration requirements of the Securities Act, any state securities laws and any non-U.S. securities laws, citing to the section of each such act upon which the exemption is based, and (y) will not otherwise violate any such securities laws. Any attempted transfer without complying with the above requirements shall be null and void, and the Company shall refuse to register, confirm or recognize any such transfer. The notice to the Company must include evidence satisfactory to the Company that the proposed assignee meets any requirements imposed by the Company with respect to investor and/or transferee eligibility and suitability. If an assignment, transfer or disposition occurs by reason of the death of a shareholder or assignee, the notice may be given by the duly authorized representative of the estate of the shareholder or assignee. The notice must be supported by proof of legal authority and valid assignment acceptable to the Company.

Investors shall not transfer directly or indirectly any of the Investor's Notes (or any participation or beneficial interest therein) except in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act and applicable State securities laws and any non-U.S. securities laws, or pursuant to an available exemption from the registration provisions of the Securities Act and applicable State securities laws and non-U.S. securities laws. Investors are advised that they are subject to the same restrictions on offers and sales of Notes that apply under Regulation S to a "distributor" of such securities, as such term is defined in Regulation S.

-13-

ES0256361

# EXHIBITS

ES0256362

## EXHIBIT I.

## ARTICLES OF INCORPORATION

ES0256363



# State of Florida

## Department of State

I certify the attached is a true and correct copy of Articles of Organization, as amended to date, of E.S. BANKEST L.C., a limited liability company, organized under the laws of the State of Florida, filed on October 26, 1998, as shown by the records of this office.

The document number of this company is L98000002401.

Given under my hand and the
Great Seal of the State of Florida
at Tallahassee, the Capitol, this the
Twelfth day of October, 1999



CR2EO22 (1-99)

*Katherine Harris*

Katherine Harris
Secretary of State

ES0256364

# ARTICLES OF ORGANIZATION
## OF
## LACROZE L.L.C.

## ARTICLE I.
### NAME

The name of the limited liability company is LACROZE L.L.C.

## ARTICLE II.
### DURATION

The period of duration for the limited liability company shall be ninety-nine (99) years from the date of execution hereof.

## ARTICLE III.
### ADDRESS

The mailing address and the street address of the principal office of the limited liability company is 999 Brickell Avenue, Penthouse, Miami, Florida 33131.

## ARTICLE IV.
### INITIAL REGISTERED AGENT

The name and street address of the initial registered agent of the limited liability company is: Robert W. Stewart, P.A., 999 Brickell Avenue, Miami, Florida 33131.

## ARTICLE V.
### ADMISSION OF ADDITIONAL MEMBERS

No additional members may be admitted as members of the limited liability company unless each member consents in writing to the admission of the additional member.

FILED
99 JUN 26 PM 2: 57
SECRETARY OF STATE
DIVISION OF CORPORATIONS

ES0256365

## AFFIDAVIT

Under penalties of perjury, the undersigned hereby declare:

1. They are members of the limited liability company.

2. The limited liability company has at least one member.

3. The amount of the cash contributed by the members is Ten Thousand Dollars and .00/100 ($10,000.00).

4. The agreed value of property other than cash contributed by the members is none.

5. The total amount of cash or property anticipated to be contributed by the members is Ten Thousand Dollars and 00/100 ( $10,000.00). This total includes amounts from 3 and 4 above.

In witness whereof these Articles and Affidavit have been executed the 23rd day of October, 1998.

ESPIRITO SANTO BANK

BY: _____
VICTOR C. BALESTRA, President

BANKEST CAPITAL CORP.

BY: _____
HECTOR ORLANSKY, Vice-President

STATE OF FLORIDA          )
                          )SS:
COUNTY OF MIAMI-DADE      )

The foregoing instrument was acknowledged before me this 23rd day of October, 1998, by Victor C. Balestra, as President of Espirito Santo Bank, a Florida banking corporation, on behalf of the corporation, who is personally known to me and who did take an oath.

_____
NOTARY PUBLIC, State of Florida at Large

My Commission Expires:
3



ROBERT W. STEWART
MY COMMISSION # CC740535
EXPIRES: 06/21/2002
1-800-3-NOTARY  Fla. Notary Services & Bonding Co.

ES0256366

STATE OF FLORIDA        )
                        )SS:
COUNTY OF MIAMI-DADE    )

The foregoing instrument was acknowledged before me this 23rd day of October, 1998, by Hector Orlansky, as Vice-President of Bankest Capital Corp., a Florida corporation, on behalf of the corporation, who is personally known to me and who did take an oath.

_____
NOTARY PUBLIC, State of Florida at Large

My Commission Expires:

ROBERT W. STEWART
MY COMMISSION # CC 748333
EXPIRES: 06/21/2002
BONDED THRU Fla. Notary Services & Bonding Co.

**REGISTERED AGENT ACKNOWLEDGMENT**

The undersigned; hereby accepts appointment as registered agent for the above limited liability company and affirms that it is familiar with and accepts the obligations of that position.

ROBERT W. STEWART, P.A.

BY: _____
ROBERT W. STEWART, President

98 OCT 26 PM 2: 57
FILED
SECRETARY OF STATE
DIVISION OF CORPORATIONS

4

ES0256367

## ARTICLES OF MERGER
### FOR
### E.S. BANKEST L.C.

Pursuant to 607.1109 and 608.4382 .Fla.Stats., E.S. Bankest Corp., a Florida corporation, and Lacroze LLC, a Florida limited liability company, hereby adopt the following Articles of Merger.

### I.

### PLAN OF MERGER

The following plan of merger has been approved by the parties to the merger:

1. **Merger.** This instrument sets forth the plan of merger for E.S. Bankest Corp., a Florida corporation and Lacroze LLC., a Florida limited liability company which is intended to take effect as of October 26, 1998. The name of the surviving entity will be E.S. Bankest L.C., a Florida limited liability company.

2. **Terms and Conditions of Merger.** Subject always to the terms and conditions set forth herein, Bankest shall be merged with and into Lacroze. The separate corporate existence of Bankest shall thereupon cease and Lacroze shall be the surviving entity (the "Surviving Entity") which shall thereafter continue as a limited liability company under the laws of the State of Florida and under the name E.S. Bankest L.C. The Surviving Entity shall succeed to all of the rights, privileges, immunities and franchises and all of the property, of whatever kind and description,

ES0256368

of Bankest and shall thereafter be responsible and liable for all the liabilities and obligations of Bankest, none of which shall be impaired by the merger.

3. <u>Conversion of Shares</u>. Upon the effective date of the merger herein contemplated, the shares of common stock of Bankest issued and outstanding on the date hereof shall cease to be outstanding and each such share shall be converted into and shall become one unit of interest in the Surviving Entity. Promptly after the effective date of the merger, the management of the Surviving Entity shall cause to be issued to the shareholders of Bankest certificates for the units of the Surviving Entity which are to be acquired hereby.

4. <u>Managers</u>. As aforesaid, E.S. Bankest L.C., a Florida limited liability company, is to be the Surviving Entity. Management thereof shall be vested in managers who shall be elected annually by the members of the Surviving Entity in the manner prescribed by and provided in the regulations of the Surviving Entity. The names and addresses of the managers who are to serve until the next succeeding annual meeting of members or until their successors are elected and qualify are:

Victor C. Balestra
999 Brickell Avenue, 4th Fl.
Miami, Florida 33131

Eduardo Orlansky
999 Brickell Avenue, PH
Miami, Florida 33131

Bernard Mollet
999 Brickell Avenue, 4th Fl.
Miami, Florida 33131

Hector Orlansky
999 Brickell Avenue, PH
Miami, Florida 33131

Joaquim Garnecho
320 Park Avenue
New York, N.Y. 10022

R. Peter Stanham
999 Brickell Avenue, PH
Miami, Florida 33131

2

ES0256369

Pierre Antoine Trezzini          Dominick Parlapiano
14 Avenue Montchoisi, CH-1006    999 Brickell Avenue, PH
Lausanne, Switzerland            Miami, Florida  33131

    5.   <u>Articles of Organization</u>. The articles of organization of Lacroze in

effect on the date hereof shall be amended as follows:

        a) Article I. of the articles of organization shall be amended to read:

           "The name of the limited liability company is E.S. Bankest L.C."

        b) Article VII. of the articles of organization shall be amended to

           read:

           "The management of the limited liability company shall be

vested in managers who shall be elected annually by the

members in the manner prescribed by and provided in the

regulations of the limited liability company.   The names and

business addresses of the managers who are to serve until the

next succeeding annual meeting of the members or until their

successors are elected and qualified are:

Victor C. Balestra              Eduardo Orlansky
999 Brickell Avenue, 4th Fl.    999 Brickell Avenue, PH
Miami, Florida 33131            Miami, Florida 33131

Bernard Mollet                  Hector Orlansky
999 Brickell Avenue, 4th Fl.    999 Brickell Avenue, PH
Miami, Florida 33131            Miami, Florida 33131

3

ES0256370

Joaquim Garnecho
320 Park Avenue
New York, N.Y. 10022

R. Peter Stanham
999 Brickell Avenue, PH
Miami, Florida 33131

Pierre Antoine Trezzini
14 Avenue Montchoisi, CH-1006
Lausanne, Switzerland

Dominick Parlapiano″
999 Brickell Avenue, PH
Miami, Florida 33131

## II.

## APPROVAL

The foregoing Plan of Merger was approved by E.S. Bankest Corp., a Florida corporation in conformity with the applicable provisions of Chapter 607, Fla.Stats. The foregoing Plan of Merger was approved by Lacroze LLC, a Florida limited liability company, in conformity with the applicable provisions of Chapter 608, Fla.Stats. Neither party hereto will become a general partner of the surviving entity.

## III.

## EFFECTIVE DATE

The effective date of these articles of merger shall be the date on which such articles of merger are filed with and accepted by the Department of State of the State of Florida.

4

ES0256371

In witness whereof, the above and foregoing Articles of Merger were executed the 16ᵗʰ day of December, 1998.

E.S. BANKEST CORP.

BY: _____
HECTOR ORLANSKY,
President

LACROZE LLC

ESPIRITO SANTO BANK,
Managing Member

BY: _____
VICTOR C. BALLESTRA,
President

BANKEST CAPITAL CORP.,
Managing Member

BY: _____
EDUARDO ORLANSKY,
President

STATE OF FLORIDA          )
                          )
COUNTY OF MIAMI-DADE      )

The foregoing instrument was acknowledged before me this 16ᵗʰ day of December, 1998, by Hector Orlansky, as President E.S. Bankest Corp., a Florida corporation on behalf of the corporation who is personally known to me and who did take an oath.

_____
NOTARY PUBLIC, State of Florida at Large

My Commission Expires:

ROBERT W. STEWART
MY COMMISSION # CC 749531
EXPIRES: 04/21/2002
1-800-3-NOTARY   Fla. Notary Services & Bonding Co.

5

ES0256372

## EXHIBIT II.

### REGULATIONS
### OF
### E.S. BANKEST LLC

ES0256374

**REGULATIONS**

*OF*

*E.S. BANKEST L.C.*

ES0256375

# INDEX OF REGULATIONS OF
## E.S. BANKEST L.C.

**PAGE**

**ARTICLE I.    MEETINGS OF MEMBERS** .................................... -1-
    **Section 1:**    Annual Meeting ...................................... -1-
    **Section 2:**    Special Meetings ................................... -1-
    **Section 3:**    Place ............................................. -1-
    **Section 4:**    Notice ............................................ -1-
    **Section 5:**    Notice of Adjourned Meetings ....................... -2-
    **Section 6:**    Closing of Transfer Books and Fixing Record Date ....... -2-
    **Section 7:**    Member Quorum ..................................... -3-
    **Section 8:**    Voting of Units .................................... -3-
    **Section 9:**    Proxies ........................................... -4-
    **Section 10:**   Matters Requiring Unanimity ......................... -5-
    **Section 11:**   Members Agreements ................................ -5-
    **Section 12:**   Action by Members Without a Meeting ................. -6-

**ARTICLE II.    MANAGERS** ......................................... -6-
    **Section 1:**    Compensation ...................................... -6-
    **Section 2:**    Duties of Managers ................................ -6-
    **Section 3:**    Presumption of Assent ............................. -7-
    **Section 4:**    Number ........................................... -7-
    **Section 5:**    Election and Term ................................. -7-
    **Section 6:**    Vacancies ........................................ -8-
    **Section 7:**    Removal of Managers ............................... -8-
    **Section 8:**    Quorum and Voting ................................ -8-
    **Section 9:**    Manager Conflicts of Interest ...................... -9-
    **Section 10:**   Executive and Other Committees ..................... -10-
    **Section 11:**   Place of Meetings ................................. -11-
    **Section 12:**   Time, Notice and Call of Meetings .................. -11-
    **Section 13:**   Action Without a Meeting ........................... -12-

**ARTICLE III.    OFFICERS** .......................................... -12-
    **Section 1:**    Officers .......................................... -12-
    **Section 2:**    Duties ............................................ -13-
    **Section 3:**    Salaries .......................................... -15-
    **Section 4:**    Removal of Officers ............................... -15-

**ARTICLE IV.    UNITS** ............................................. -15-
    **Section 1:**    Membership Units .................................. -15-
    **Section 2:**    Issuance .......................................... -15-
    **Section 3:**    Form .............................................. -16-

-i-

ES0256376

Section 4:   Liens ............................................ -16-
Section 5:   Transfer ......................................... -16-
Section 6:   Transfer Agents and Registrars ...................... -17-
Section 7:   Restrictions on Transfer ........................... -18-
Section 8:   Loss ............................................ -20-
Section 9:   Payment.......................................... -21-

ARTICLE V.   ALLOCATION OF PROFITS AND LOSSES
Section 1:   Determination .................................... -21-
Section 2:   Allocation of Profit, Gains and Losses ................ -21-
Section 3:   Gain or Loss From Revaluation of Property ............ -22-
Section 4:   Gain or Loss From Contribution of Property ........... -22-

ARTICLE VI.   CAPITAL ACCOUNTS
Section 1:   Capital Accounts ................................. -23-
Section 2:   Capital Accounts of Transferees ..................... -23-
Section 3:   Revaluation of Company Property .................... -23-
Section 4:   Distributions and Allocations in Respect of a
             Transferred Ownership Interest ...................... -24-

ARTICLE VII.   PREEMPTIVE RIGHTS .................................. -25-

ARTICLE VIII.   BOOKS AND RECORDS ................................ -25-
Section 1:   Books and Records ............................... -25-
Section 2:   Members' Inspection Rights ......................... -26-
Section 3:   Financial Information .............................. -26-

ARTICLE IX.   DISTRIBUTIONS ...................................... -26-

ARTICLE X.   REPORTS AND STATEMENTS ........................... -27-

ARTICLE XI.   INDEMNIFICATION ................................... -28-
Section 1:   Right to Indemnification ........................... -28-
Section 2:   Right to Advancement of Expenses ................... -29-
Section 3:   Right of Indemnitee to Bring Suit .................... -30-
Section 4:   Non-Exclusivity of Rights .......................... -31-
Section 5:   Insurance ....................................... -32-
Section 6:   Applicable Law ................................... -32-
Section 7:   Contract Rights .................................. -32-
Section 8:   Further Implementation ............................ -33-

ARTICLE XII.   COMPANY SEAL ..................................... -33-

-ii-

ES0256377

ARTICLE XIII. EXECUTION OF INSTRUMENTS AND DEPOSIT OF FUNDS .... -33-
    Section 1:   Authority for Execution of Contracts and Instruments .... -33-
    Section 2:   Instruments Containing Company Seal ................ -34-
    Section 3:   Bank Accounts and Deposits ....................... -34-
    Section 4:   Endorsements Without Countersignature ............. -34-
    Section 5:   Signing of Checks, Drafts, Etc. ...................... -35-

ARTICLE XIV. AMENDMENT ....................................... -35-

ARTICLE XV. DISSOLUTION ....................................... -35-
    Section 1:   Events Requiring Termination and Dissolution .......... -35-
    Section 2:   Deemed Distribution and Recontribution .............. -36-
    Section 3:   Distributions Upon Dissolution of the Company ........ -36-
    Section 4:   Distributions in Kind ............................... -37-

ES0256378

## REGULATIONS

## OF

## E.S. BANKEST L.C.

In consideration of the mutual covenants set forth herein, **ESPIRITO SANTO BANK OF FLORIDA, a Florida banking corporation, and BANKEST CAPITAL CORP., a Florida corporation,** hereby adopt the following regulations which shall govern the business and affairs of E.S. Bankest L.C., a Florida limited liability company.

### ARTICLE I.

### MEETINGS OF MEMBERS

**Section 1:** **Annual Meeting.** The annual meeting of the members of the company shall be held within three months of the close of the company's fiscal year. At such meeting, the members shall conduct such business as shall properly come before the meeting and shall elect the managers of the company to serve for the following one (1) year period or until their successors shall have been elected and shall have qualified.

**Section 2:** **Special Meetings.** Special meetings of the members shall be held when directed by the president or the managers, or when requested in writing by the holders of not less than ten percent of all the interests entitled to vote at the meeting.

**Section 3:** **Place.** Unless with the prior written consent of all members meetings of members shall be held at the principal office of the Company or any other place designated in the notice of the meeting.

**Section 4:** **Notice.** Written notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than fifteen (15) days nor more than thirty (30) days

ES0256379

before the meeting, either by personal (courier) delivery or by telefax to the members at the addresses or facsimile numbers which respectively appear on the books or business records of the company.

**Section 5**:    **Notice of Adjourned Meetings**.    When a meeting is adjourned to another time or place, it shall not be necessary to give any notice of the adjourned meeting if all members are present and if the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken.    At the adjourned meeting any business may be transacted that might have been transacted on the original date of the meeting.

**Section 6**:    **Closing of Transfer Books and Fixing Record Date**.    For the purpose of determining members entitled to notice of or to vote at any meeting of members or any adjournment thereof, or entitled to receive payment of any distribution, or in order to make a determination of members for any other purpose, the unit transfer books shall be deemed closed and the record date shall be fixed ten (10) days prior to the meeting or action which requires a determination of members.

In lieu of the closing the transfer books as aforesaid, the managers may fix in advance a date as the record date for any determination of members, such date in any case to be not more than seventy (70) days prior to the meeting or action which requires a determination of members.

When a determination of members entitled to vote at any meeting of members has been made as provided in this section, such determination shall apply to any adjournment thereof, unless the managers fix a new record date for the adjourned meeting.

-2-

ES0256380

**Section 7:**    Member Quorum. A majority of the units of the company represented in person or by proxy, shall constitute a quorum at a meeting members.

If a quorum is present, the affirmative vote of the majority of the units represented at the meeting and entitled to vote on the subject matter shall be the act of the members unless otherwise provided by law or these regulations.

After a quorum has been established at a members' meeting, the subsequent withdrawal of members, so as to reduce the number of units entitled to vote at the meeting below the number required for a quorum, shall not affect the validity of any action taken at the meeting or any adjournment thereof.

**Section 8:**    Voting of Units. Each outstanding unit, shall be entitled to one vote on each matter submitted to a vote at a meeting of members.  A member may vote either in person or by proxy executed in writing by the member or its duly authorized attorney-in-fact.

At each election for the managers, every member shall have the right to vote, in person or by proxy, the number of units owned by it for as many persons as there are managers to be elected at that time, or, to cumulate its votes and to give any one candidate that number of votes as shall equal the number of its units or to distribute such votes on the same principle among any number of such candidates.

Units standing in the name of another entity, domestic or foreign, shall be voted by the attorney-in-fact or proxy designated by such entity.  Proof of such designation may be made by presentation of a certified copy of the instrument designating the attorney-in-fact or proxy for such entity.  In the absence of any such designation, of in case of conflicting

-3-

ES0256381

designations by such entity, the chairman of the board, president, any vice president, secretary and treasurer of the such entity shall be presumed to possess, in that order, authority to vote such units.

Units standing in the name of a trustee may be voted by such trustee, either in person or by proxy, but no trustee shall be entitled to vote units held by such trustee without a transfer of such units into the name of the trustee.

Units standing in the name of a receiver may be voted by such receiver, and units held by or under the control of a receiver may be voted by such receiver without the transfer thereof into the name of the receiver if authority therefor is contained in an appropriate order of the court by which such receiver was appointed.

A member whose units are pledged shall be entitled to vote such units until the units have been transferred into the name of the pledgee and thereafter, unless otherwise prohibited from doing so by virtue of any members's agreement or other like document, the pledgee or his nominee shall be entitled to vote the units so transferred.

On and after the date on which written notice of redemption of redeemable units has been mailed to the holders thereof upon surrender of certificates therefor, such units shall not be entitled to vote on any matter and shall not be deemed to be outstanding units.

**Section 9:**    **Proxies.** Every member entitled to vote at a meeting of members or to express cons dissent without a meeting may authorize another person or persons to act for such member. If a proxy expressly provides, any proxy holder may appoint in writing a substitute to act in his or her place.

-4-

ES0256382

Every proxy must be signed by the member or his attorney-in-fact. No proxy shall be valid after the expiration of eleven months from the date thereof unless otherwise provided in the Proxy. Every proxy shall be revocable at the pleasure of the member executing it, except as otherwise provided by law.

If a proxy for the same units confers authority upon two or more persons and does not otherwise provide, a majority of them present at the meeting, or if only one is present then that one, may exercise all the powers conferred by the proxy; but if the proxy holders present at the meeting are equally divided as to the right and manner of voting in any particular case, the voting of such units shall be prorated.

Section 10: Matters Requiring Unanimity. Anything in these Regulations to the contrary notwithstanding, the unanimous, affirmative vote of all of the units of the company entitled to vote shall be required for any of the following matters:

(a)   any merger of the company with any other entity;

(b)   any acquisition or sale of assets by the company outside of the ordinary scope of business conducted by the company.

(c)   any dissolution or liquidation of the company;

(d)   any public offering of the units of the company;

(e)   increase or decrease in capital;

(f)   issuance of units.

Section 11: Members Agreements. At the time of the adoption and execution of these Regulations, the members have entered into a separate Members' Agreement. A copy of any such members' agreement shall be delivered to the company's principal office

-5-

ES0256383

and shall be open to inspection by any member of the company (or any party to the agreement) during business hours.

Section 12:  Action by Members Without a Meeting.  Any action required by law, these Regulations, or the articles of organization of the company which is to be taken or which may be taken at any annual or special meeting of members of the company, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of all of the issued and outstanding units of the company.

**ARTICLE II.**

**MANAGERS**

Section 1:  Compensation.  The managers shall not have the authority to fix the compensation of individual managers without the consent of the members.

Section 2:  Duties of Managers.  A manager shall perform his duties as a manager, including his duties as a member of any committee upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of the company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.

In performing his duties, a manager shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by:

(a)    one or more officers or employees of the company whom the manager reasonably believes to be reliable and competent in the matters presented;

-6-

ES0256384

(b)   counsel, public accountants or other persons as to matters which the manager reasonably believes to be within such person's professional or expert competence; or

(c)   a committee of the managers upon which he does not serve, duly designated in accordance with a provision of these by-laws, as to matters within its designated authority, which committee the manager reasonably believes to merit confidence.

A manager shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause such reliance described above to be unwarranted.

A person who performs his duties in compliance with this section shall have no liability by reason of being or having been a manager of the company.

**Section 3:**   **Presumption of Assent**. A manager of the company who is present at a meeting of its managers at which action on any company matter is taken shall be presumed to have assented to the action taken unless he votes against such action or abstains from voting in respect thereto because of an asserted conflict of interest.

**Section 4:**   **Number**. The company shall have eight (8) managers. The number of managers may be increased or decreased from time to time by amendment to these regulations, but no decrease shall have the effect of shortening the terms of any incumbent manager.

**Section 5:**   **Election and Term**. At the first annual meeting of members and at each annual meeting thereafter the members shall elect managers to hold office until the

-7-

ES0256385

next succeeding annual meeting. Each manager shall hold office for the term for which he or she is elected and until his or her successor shall have been elected and qualified or until his or her earlier resignation, removal from office or death.

Section 6:    Vacancies.  Subject to the terms of any members' agreement, any vacancy occurring among the managers, including any vacancy created by reason of an increase in the number of managers, shall be filled by the affirmative vote of the majority of the members of the company. A manager elected to fill a vacancy shall hold office only until the next election of managers by the members.

Section 7:    Removal of Managers. Subject to the terms of any members' agreement, any manager or all of the managers may be removed at any time, with or without cause, by a vote of the holders of a majority of the issued and outstanding units of the company, except that if less than all the managers are to be removed, no individual manager may be removed if the number of votes cast against his removal would be sufficient, if voted cumulatively at an election of all of the managers, to elect one or more managers.

Section 8:    Quorum and Voting. Seventy-five percent (75%) of the managers of the company shall constitute a quorum for the transaction of business and the act of the majority of the managers of the company shall be the act of the managers, provided always that the vote or written consent of seventy-five (75%) of the managers of the company shall be required for any of the following matters:

(a)    any borrowing by the company;

(b)    selection of the independent auditors for the company;

-8-

ES0256386

(c)    payment of distributions to members;

(d)    compensation of officers and employees;

(e)    approval of annual operating budgets for the company.

After a quorum has been established at a managers' meeting, the subsequent withdrawal of any individual managers, so as to reduce the number of managers entitled to vote at the meeting below the number required for a quorum, shall not affect the validity of any action taken at the meeting or any adjournment thereof.

**Section 9:    Manager Conflicts of Interest**.    No contract or other transaction between the corporation and one or more of its managers or any other corporation, firm, association or entity in which one or more of the managers are directors or officers or are financially interested, shall be either void or voidable because of such relationship or interest or because such manager or managers are present at the meeting of the managers or a committee thereof which authorizes, approves or ratifies such contract or transaction, if:

(a)    The fact of such relationship or interest is disclosed or known to the managers or a committee of managers which authorizes, approves or ratifies the contract or transaction by a vote or consent sufficient for the purpose without counting the votes or consents of such interested managers; or

(b)    The fact of such relationship or interest is disclosed or known to the members entitled to vote and the authorize, approve or ratify such contract or transaction by vote or written consent; or

-9-

ES0256387

(c)    The contract or transaction is fair and reasonable as to the company at the time it is authorized by the managers, a committee or the members.

Common or interested managers may be counted in determining the presence of a quorum at a meeting of the managers or a committee of managers which authorizes, approves or ratifies such contract or transaction.

Section 10: Executive and Other Committees. The managers, by resolution adopted by not less than seventy-five percent (75%) of all of the managers, may designate from among its members an executive committee and one or more other committees each of which, to the extent provided in such resolution, shall have and may exercise all the authority of the managers, except that no such committee shall have the authority to:

(a)    approve or recommend to members actions or proposals required by law to be approved by members;

(b)    designate candidates for the office of manager, for purposes of proxy solicitation or otherwise;

(c)    fill vacancies among the managers or any committee of managers;

(d)    amend the regulations;

(e)    authorize or approve the reacquisition of units unless pursuant to a general formula or method specified by the managers; or

(f)    authorize or approve the issuance or sale of units, or any contract to issue or sell units or designate the terms of a series of a class of units.

The managers, by resolution adopted in accordance with this section, may designate one or more managers as alternate managers of any such committee, who may

-10-

ES0256388

act in the place and stead of any absent manager or managers at any meeting of such committee.

Section 11:  Place of Meetings.  Unless with the prior written consent of the majority of the managers, regular and special meetings of the managers shall be held at 999 Brickell Avenue, Miami, Florida 33131.  Upon prior written consent of the majority of the managers, regular and special meeting of the managers may be held outside the United States of America.

Section 12:  Time, Notice and Call of Meetings.   Regular meetings of the managers shall be held without notice immediately following the annual meeting of members.

Notice of a meeting of the managers need not be given to any manager who signs a waiver of notice either before or after the meeting.  Attendance of a manager at a meeting shall constitute a waiver of notice of such meeting and waiver of any and all objections to the place of the meeting, the time of the meeting, or the manner in which it has been called or convened, except when a manager shall state, at the beginning of the meeting, that he or she objects to the transaction of business because the meeting is not lawfully called or convened.

Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the managers need be specified in the notice or waiver of notice of such meeting.

A majority of the managers present, whether or not a quorum exists, may adjourn any meeting of the managers to another time and place.  Notice of any such adjourned

-11-

ES0256389

meeting shall be given in writing to the managers who were not present at the time of the adjournment.

Meetings of the managers may be called by the chairman, by the president of the company, or by any two managers of the company.

Managers may participate in a meeting of such managers by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can simultaneously hear each other during the meeting. Participation by such means shall constitute presence in person at a meeting.

Section 13: Action Without a Meeting. Any action required to be taken at a meeting of the managers of the company, or at any meeting of any executive or other committee, may be taken without a meeting if a consent in writing, setting forth the action so to be taken, signed by all of the managers or committee members is filed in the minutes of the proceedings of the board or the committee. Such consent shall have the same effect as a unanimous vote.

ARTICLE III.

OFFICERS

Section 1: Officers. The officers of the company shall consist of a chairman, a president and a secretary, each of whom shall be elected by the managers and each of whom shall serve until he or she shall resign, or shall be removed or otherwise disqualified to serve, or his or her successor shall be elected and qualified. Other officers may be elected or appointed by the managers from time to time as may be deemed necessary or

-12-

ES0256390

convenient. Any two or more offices may be held by the same person. The failure to elect officers shall not affect the existence of the company.

**Section 2:** **Duties**. The officers of the company shall have the following duties:

The chairman shall preside at all meetings of the managers and shall exercise and perform such other powers and duties as may be from time to time assigned by the managers.

The president shall be the chief executive officer of the company, shall have general and active management of the business and affairs of the company subject to the directions of the managers, and shall preside at all meetings of the members. Within this authority and in the course of his or her duties, the president shall:

(a)    In the absence of the chairman, preside at all meetings of the members and at all meetings of the managers, and shall be ex officio a member of all the standing committees, including the executive committee, if any.

(b)    Sign all certificates of units of the company, in conjunction with the secretary, unless otherwise ordered by the board of managers.

(c)    When authorized by the managers, execute in the name of the company, deeds, conveyances, notices, leases, checks, drafts, bills of exchange, warrants, promissory notes, bonds, debentures, contracts and other papers and instruments in writing, and unless the managers shall order otherwise by resolution, make such contracts as the ordinary conduct of the company's business may require.

(d)    Appoint and remove, employ and discharge, and prescribe the duties and fix the compensation of all agents, employees, and clerks of the company other than

-13-

ES0256391

the duly appointed officers, subject to the approval of the managers, and control, subject to the direction of the managers, all of the officers, agents and employees of the company.

Any vice president, if there shall be any such officer, shall have the powers and duties as may be prescribed from time to time by the managers. In the event of incapacity of the president, the vice president, or if more than one vice president exists, a vice president designated by the managers, shall perform such duties of the president as the managers shall prescribe.

The secretary shall have custody of, and maintain, all of the company records except the financial records; shall record the minutes of all meetings of the members and the managers, send all notices of meetings out, and perform such other duties as may be prescribed by the managers or the president.

The assistant secretary, if there shall be any such officer, shall at the request of the secretary, or in his absence or disability, perform all the duties of the secretary, and when so acting, he shall have aft the powers of, and be subject to all the restrictions upon, the secretary. The assistant secretary shall perform such other duties as from time to time may be assigned to him by the managers, or the secretary.

The treasurer, if there shall be any such officer, shall have custody of all company funds and financial records, shall keep full and accurate accounts of receipts and disbursements and render accounts thereof at the annual meetings of members and whenever else required by the managers or the president, and shall perform such other duties as may be prescribed by the managers or the president.

The assistant treasurer, if there shall be any such officer, shall at the request of the treasurer, or in his absence or disability, perform all the duties of the treasurer, and when

-14-

so acting, he shall have all the powers of, and be subject to all the restrictions, upon the treasurer. He shall perform such other duties as from time to time may be assigned to him by the managers or the treasurer.

Section 3: **Salaries**. The salaries of the officers shall be fixed from time to time by the managers. No officer shall be prevented from receiving a salary from the company by reason of the fact that he is also a manager of the corporation.

Section 4: **Removal of Officers**. Any officer or agent elected or appointed by the managers may be removed by the managers whenever in its judgment the best interests of the company will be served thereby.

Any vacancy, however occurring, in any office shall be filled by the managers;

Removal of any officer shall be without prejudice to the contract rights, if any, of the person so removed; however, election or appointment of an officer or agent shall not of itself create contract rights.

### ARTICLE IV.

### UNITS

Section 1: **Membership Units**. The ownership of interests in the company, and the right of the members to participate in the profits and distributions of the company, shall be represented by units issued by the company.

Section 2: **Issuance**. Every holder of units in the company shall be entitled to have a certificate, representing all units to which such holder is entitled. No certificate shall be issued for any unit until such unit is fully paid.

-15-

ES0256393

Section 3:    <u>Form</u>.  Certificates representing units in the company shall be signed by the president and the secretary and shall be sealed with the seal of the company.  The signatures of the president or the secretary may be facsimiles if the certificate is manually signed on behalf of a transfer agent or a registrar, other than the company itself or an employee of the company.  In case any officer who signed or whose facsimile signature has been placed upon such certificate shall have ceased to be such officer before such certificate is issued, it may be issued by the company with the same effect as if he or she were still such officer.

Every certificate representing units which are restricted as to sale, disposition or other transfer shall state by conspicuous notice on the front or the back of the certificate that such units are restricted as to transfer.

Each certificate representing units shall state upon the face thereof: the name of the company; that the company is organized under the laws of this state; the name of the person or persons to whom issued; the number and class of units, and the designation of the series, if any, which such certificate represents; and the par value of each unit represented by such certificate or a statement that the units are without par value.

Section 4:    <u>Liens</u>.  The company shall have a first lien on all the units and upon all distributions declared upon the same for any indebtedness of the respective holders hereof to the company.

Section 5:    <u>Transfer</u>.  Transfer of units shall be made only on the books of the company.  The certificates being transferred, properly endorsed, shall be surrendered and canceled before a new certificate is issued.  A person in whose name units stand on the

-16-

ES0256394

books of the company shall be deemed the owner thereof as regards the company; provided that whenever any transfer of units shall be made for collateral security, and not absolutely, and written notice thereof shall be given to the secretary of the company or its transfer agent, if any, such fact shall be stated in the entry of the transfer. When a transfer of units is requested and there is reasonable doubt as to the right of the person seeking the transfer, the company or its transfer agent, before recording the transfer of the units on its books or issuing any certificate therefor, may require from the person seeking the transfer reasonable proof of the right to the transfer. If there remains a reasonable doubt of the right to the transfer, the corporation may refuse a transfer unless provided with adequate security or a bond of indemnity executed by a corporate surety or by two individual sureties satisfactory to the company as to form, amount, and responsibilities of sureties. The bond shall be conditioned to protect the company, its officers, transfer agents and registrars or any of them against any loss, damage, expense or other liability to the owner of the units by reason of the recordation of the transfer or the issuance of a new certificate for units.

Section 6: Transfer Agents and Registrars. The managers may appoint one or more transfer agents or transfer clerks, and one or more registrars which shall be an incorporated bank or trust company, either domestic or foreign, who shall be appointed at such times and places as the requirements of the company may necessitate and the managers may designate.

-17-

### Section 7:    Restrictions on Transfer of Units

(a)    Except as set forth below, and as may otherwise be provided in a written agreement among all members, units of the company may be sold assigned, transferred, pledged, encumbered or otherwise disposed of (any such disposition being hereinafter called a "transfer") only if:

(i)    any such transfer represents all, but not less than all, of the units held by the member proposing the transfer; and

(ii)    no less than sixty (60) days prior to the date of the proposed transfer, the member proposing the transfer (the selling member) provides the other members, at their respective addresses shown in the records of the company, with a copy of the offer or agreement pursuant to which such selling member proposes to effect the transfer of units;

(iii)    the offer or agreement submitted by the selling member by its terms provides that the other members shall have the option to sell their units as a part of the transfer at a price per unit which is equal to the price per unit being offered to or by the selling member and upon terms and conditions identical to those set forth in the offer or agreement submitted by the selling member; and

(iv)    the other members, or any one of them, within ten (10) days after receipt of such offer or agreement, do not advise the selling member that they elect to purchase the offered units at the same price and

-18-

ES0256396

under the same terms and conditions set forth in the offer or agreement transmitted by the selling member.

(b)    If the non-transferring member (or any one of them) elect to purchase the units proposed to be transferred by the selling member, the selling member and the purchasing member(s) shall proceed to consummate the transfer of the units at the price and in accordance with the terms and conditions set forth in the agreement or offer transmitted by the selling member.

(c)    It is understood that if the non-transferring members do not, within ten (10) days of receipt of the aforementioned offer or agreement, advise the selling member in writing of an election to purchase the offered units, then the selling member shall be free to proceed with the transfer of the units in accordance with and subject to other provisions of this Agreement provided always that such transfer shall not take place sooner than thirty (30) days after the date on which the non-transferring members shall receive notice of the proposed transfer and provided always that any non-transferring members who so elect shall have the right to sell their units as a part of the transfers contemplated in paragraph (a) above. In the event the sale by the Selling member, and other electing non-transferring members shall not be fully consummated and closed within sixty (60) days of the expiration of periods provided herein, such proposed sale shall again be subject to the provisions of this Article including but not limited to the provisions requiring the Selling Member to provide notice of sale to the non-selling members.

(d)    In the event that more than one non-transferring member shall elect to purchase units offered as above set forth, then each non-transferring member who so elects shall have the right to purchase a pro-rata number of the units being offered on the

-19-

ES0256397

basis of the following formula: the number of units which each such non-transferring member shall be entitled to purchase shall be determined by multiplying the total number of units offered by a fraction, the numerator of which shall be the total number of units held each such non-transferring member and the denominator of which shall be the total number of units held by all non-transferring members who make the election to purchase; provided always that the non-selling members shall purchase all, but not less than all, of the units so offered for sale by the selling member.

(e)    Notwithstanding anything in these regulations to the contrary, any member may transfer its units to an affiliate of such member without the consent of, but upon notice to, the other members, provided however, that such affiliate shall become a party to these regulations. For purposes of this Agreement, an "affiliate" shall mean, with respect to any member, any firm, corporation, partnership, trust, association, joint venture or other business entity more than fifty percent (50%) of the capital stock or other interest of which is controlled directly or indirectly, by such member or (b) any entity fifty percent (50%) of the capital stock or other interests of which is controlled directly or indirectly by any person or entity controlling in any manner, directly or indirectly, more than fifty percent (50%) of the capital stock or other interest of such member. For purposes hereof, a change in control of any member or permissible transferee of a member, shall itself be deemed a transfer under these regulations and shall be subject to the provisions of this Article.

Section 8:    Loss. In case of loss or destruction of a certificate of units, no new certificate shall be issued in lieu thereof, except upon satisfactory proof to the managers

-20-

ES0256398

of such loss or destruction and upon the giving of satisfactory security, by bond or otherwise, against loss to the company. Any such new certificate shall be plainly marked "duplicate" upon its face.

Section 9:    Payment.    The units shall be paid for in cash or in other property (tangible or intangible), or by labor or service actually performed for the company at a just valuation to be fixed by the managers at a meeting called for such purpose. Units or interests in other corporations or going businesses may be purchased by the company in return for the issuance of its units and said purchase shall be on such basis and for such consideration, and the issue of so much of the capital stock as the managers of the company may decide. The foregoing notwithstanding, neither promissory notes nor future services shall constitute payment or part payment for the issuance of units.

## ARTICLE V.

## ALLOCATION OF PROFITS AND LOSSES

Section 1:    Determination.    The profits, gains and losses of the Company shall be determined for each calendar year of the Company in accordance with the method of accounting selected by the managers.

Section 2:    Allocation of Profits, Gains and Losses.    All items of profit and loss shall be allocated among the members in proportion to their respective membership units in the company. To the extent permitted by law, all items of company taxable income, gain, loss, credit and deduction recognized or allowable for Federal income tax purposes shall be allocated and credited or charged to the members in the same manner as the

-21-

ES0256399

revenues, income, receipts, costs or expenses giving rise to such item of taxable income, gain, loss, credit, or deduction are allocated and credited or charged. Any member allocated and charged a particular cost or expense shall be entitled to such deductions or credits as are attributable to such cost or expense in computing such member's taxable income or tax liability to the exclusion of any other member. Upon the sale or other transfer of any asset of the company, any recapture of depreciation deductions or other deductions previously taken shall be allocated to the member to whom such credit was originally allocated.

Section 3:    Gain or Loss From Revaluation of Property. In the event the value of company property is adjusted on the company's books to reflect the fair market value in accordance with Section 4 of this Article, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such property for federal income tax purposes and its value on the company's books in the same manner as under Section 704(c) of the Internal Revenue Code of 1986, as amended, and any successor statute thereto (the "Code").

Section 4:    Gain or Loss From Contribution of Property. In accordance with Code Section 704(c), income, gain, loss and deduction with respect to any property contributed to the capital of the company by a member shall, solely for tax purposes, be allocated among the members so as to take account of any variation between the adjusted basis of such property to the company for federal income tax purposes and its fair market value at the time of contribution.

-22-

ES0256400

## ARTICLE VI.

## CAPITAL ACCOUNTS

**Section 1:**    **Capital Accounts.**  A separate capital account shall be maintained for each member with respect to the units owned by such member and which account shall be maintained in accordance with applicable Treasury Regulations, including but not limited to the requirements of Treas. Reg. Section 1.704, and each such capital account shall be credited for each such member (i) its capital contribution and (ii) its share of all company revenues as allocated to it under these Regulations, and shall be debited with (iii) its share of all costs, expenses, and losses of the company as allocated to it under these Regulations and (iv) the amount of any distributions made to it.

**Section 2:**    **Capital Accounts of Transferees.**  If the units, or any part of the units, of any member is sold or otherwise transferred, the Capital Account, or the respective allocable portion thereof, of the transferee with respect to such interest shall be the same as the Capital Account of the transferor at the time of transfer, or the respective allocable portion thereof, adjusted to reflect any Income or Loss allocated to the transferee in accordance with Article V.

**Section 3:**    **Revaluation of Company Property.**  Upon (i) the admission of any member to the company, (ii) the liquidation of a member's interest in the company, (iii) the making of any additional capital contributions or partial withdrawals (other than de minimis amounts) by a member which changes that member's relative percentage interest in the company as determined by reference to the relative balances in the Capital Accounts, or (iv) immediately before liquidation of the company, all the property of the company shall

-23-

ES0256401

be revalued at its fair value, and the Capital Accounts shall be adjusted to reflect the manner in which the unrealized income, gain, loss or deduction inherent in such property (that has not been reflected in adjustments to the Capital Accounts previously) would be allocated among the members if the property were sold at its fair value on such valuation date.

Section 4:    Distributions and Allocations in Respect of a Transferred Ownership Interest. If any member's units are sold, assigned, or transferred during any accounting period in compliance with the provisions of Section 7 of Article IV, Profits, Losses, each item thereof, and all other items attributable to the transferred units for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the accounting period in accordance with Code Section 706(d), using any conventions permitted by law and selected in the sole discretion of the managers. All distributions on or before the date of such transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocation and distributions, the company shall recognize such transfer not later than the end of the calendar quarter during which it is given notice of such transfer, provided that if the company does not receive a notice stating the date such units were transferred and such other information as the managers may reasonably require within thirty (30) days after the end of the accounting period during which the transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the transferor who, was the owner of the units. Neither the company nor any manager shall incur any liability for making allocations and distributions in accordance with the provisions

-24-

ES0256402

of this Section whether or not any manager or the company has knowledge of any transfer of ownership of any units.

## ARTICLE VII.

## PREEMPTIVE RIGHTS

Each member of the company shall have the right to purchase, subscribe for, or receive a right or rights to purchase or subscribe for, at the par value thereof, a pro rata portion of:

1.      Any units of any class that the company may issue or sell, whether or not exchangeable for any unit of the company of any class or classes and whether issued for cash, labor done, personal property, or real property, or leases thereof; or

2.      Any obligation that the company may issue or sell which is convertible into or exchangeable for any units of the company of any class or classes, or to which is attached or pertinent any warrant or warrants or other instrument or instruments conferring unto the holder the right to subscribe for or purchase from the company any units of any class or classes.

## ARTICLE VIII.

## BOOKS AND RECORDS

**Section 1:**    **Books and Records**. The company shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its members, managers and committees of managers.

-25-

The company shall keep at its registered office or principal place of business, or at the office of its transfer agent or registrar, a record of its members, giving the names and addresses of all members, and the number, class and series, if any, of the units held by each.

Any books, records and minutes may be in written form or in any other form capable of being converted into written form within a reasonable time.

**Section 2:**    **Members' Inspection Rights**.  Any holder of record of units of the company, shall have the right to examine, in person or by agent or attorney, at any reasonable time or times during normal business hours, its relevant books and records of accounts, minutes and records of members and to make extracts therefrom.

**Section 3:**    **Financial Information**. Not later than three (3) months after the close of each fiscal year, unless this provision is modified by resolution of the managers, the company shall prepare an audited balance sheet showing in reasonable detail the financial condition of the company as of the close of its fiscal year, and an audited profit and loss statement showing the results of the operations of the company during its fiscal year.

Upon written request of any member or holder of voting trust certificates for units of the company, the company shall mail to such member or holder of voting trust certificates a copy of the most recent such balance sheet and profit and loss statement.

## ARTICLE IX.

## DISTRIBUTIONS

The managers of this company may from time to time declare and the company may make distributions in cash, property or its own units, except when the company is insolvent

-26-

ES0256404

or when the payment thereof would render the company insolvent or when the declaration or payment thereof would be contrary to any restrictions imposed by law, subject to the following provisions:

(a)    Distributions in cash or property may be paid, except as otherwise provided in this section, only out of the unreserved and unrestricted earned surplus of the company. The amount paid from such surplus shall be disclosed to the members receiving the same concurrently with the distribution.

(b)    Distributions may be declared and paid in the company's own units.

(c)    No distribution payable in units of any class shall be paid to the holders of units of any other class unless such payment is authorized by the affirmative vote or the written consent of the holders of at least a majority of the outstanding units of the class in which the payment is to be made.

(d)    A split-up or division of the issued units of any class into a greater number of units of the same class without increasing the stated capital of the company shall not be construed to be a distribution within the meaning of this section.

## ARTICLE X.

## REPORTS AND STATEMENTS

Within thirty (30) days after the end of each calendar month, the officers of the company shall cause to be delivered to each of the members an unaudited financial statement of the company for such calendar month, prepared at the expense of the company, which financial statement shall set forth, as of the end of and for such calendar month, a full and complete accounting of all company operations for such calendar month.

-27-

ES0256405

Within ninety (90) days after the close of each fiscal year, the officers of the company shall cause to be delivered to each of the members a full and complete audited financial statement of the company for such fiscal year.

Any member shall have the right to object to any of the financial statements to be prepared as above set forth by giving written notice of such objection to the company within thirty (30) days after receipt of each such financial statement. If any member shall fail to give notice within the time and in the manner aforesaid, such financial statements shall, in the absence of fraud and wilful misconduct, be deemed conclusive and binding upon such member. Objection to any financial statement and any disagreements related thereto shall be settled by reference to the independent certified public accountants of the company.

### ARTICLE XI.

### INDEMNIFICATION

**Section 1:** **Right to Indemnification.** Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative, legislative or investigative (hereinafter a "Proceeding"), by reason of the fact that he or she is or was a manager, officer, employee or agent of the company or is or was serving at the request of the Company as a manager, officer, employee or agent of another corporation or partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "Indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a manager, officer, employee or agent, or in any other capacity while

-28-

ES0256406

serving as a manager, officer, employee or agent, whether involving any actual or alleged breach of duty, neglect or error, any accountability, or any actual or alleged misstatement, misleading statement or other act or omission, shall be and is hereby indemnified and held harmless by the company to the fullest extent provided, authorized, allowed, or not prohibited by section 608.4363 Florida Statutes as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the company to provide broader indemnification rights than permitted prior thereto), against all claims, judgments, expenses, costs, liabilities and losses including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes, penalties and amounts paid in settlement, reasonably incurred or suffered by such indemnitee in connection therewith and such indemnification shall continue as to an Indemnitee who has ceased to be a manager, officer, employee or agent and shall inure to the benefit of the Indemnitee's heirs, executors and administrators; provided, however, that, except as provided in Section 3 hereof with respect to proceedings to enforce rights to indemnification, the company shall and does hereby indemnify and such Indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized by the manager of the company.

    **Section 2:**    **Right to Advancement of Expenses**. The right to indemnification conferred in Section 1 of this Article XI shall include the right to be paid, repaid or advanced b the company the expenses incurred in defending any proceeding for which such right to indemnification is, may be or may become, applicable in advance of its final disposition (hereinafter "Advancement of Expenses"); provided, however, that if

-29-

ES0256407

section 608.4363 Florida Statutes requires an Advancement of Expenses incurred by an Indemnitee in his or her capacity as manager or officer (and not in any other capacity in which service was or is rendered by such Indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the company of an undertaking (hereinafter an "Undertaking"), by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereafter a "Final Adjudication") that such Indemnitee is not entitled to be indemnified for such expenses under this Article XI, by law, or contract or otherwise.

Section 3:    Right of Indemnitee to Bring Suit. The rights of indemnification and to the Advancement of Expenses conferred in Sections 1 and 2 of this Article XI shall be deemed to constitute contract rights. If a claim under Section 1 and 2 of this Article XI is not paid in full by the company within sixty days after a written claim has been received by the company except in the case of a claim for Advancement of Expenses, in which case the applicable period shall be twenty days, the Indemnitee ma at an time thereafter bring suit against the company to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the company to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the Indemnitee shall be entitled to be paid also the expense and cost (including attorney's fees) of prosecuting or defending such suit. In any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the Indemnitee to enforce a right to an advancement of expenses) it shall be a defense of the company that upon a Final

-30-

ES0256408

Adjudication that the Indemnitee has not met any applicable standard for indemnification set forth in Section 608.4363, Florida Statutes. Likewise, in any suit by the company to recover an Advancement of Expenses pursuant to the terms of an Undertaking, the company shall be entitled to recover its expenses and costs (including attorney's fees) upon a Final Adjudication that the Indemnitee has not met any applicable standard for indemnification set forth in Section 608.4363, Florida Statutes. Neither the failure of the company (including its managers, independent legal counsel, or its members) to have made a determination prior to the commencement of such suit that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in Section 608.4363 Florida Statutes, nor an actual determination by the company (including its managers, independent legal counsel or its members) that the Indemnitee has not met such applicable standard of conduct, shall create a presumption that the Indemnitee has not met the applicable standard of conduct or in the case of such a suit brought by the Indemnitee, be a defense to such suit. In any suit brought by the Indemnitee to enforce a right to indemnification or to an Advancement of Expenses hereunder, or by the company to recover an Advancement of Expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such Advancement of Expenses, whether under this Article XI, by statute, law, contract or otherwise, shall be on the company.

   **Section 4:** **Non-Exclusivity of Rights.** The rights to indemnification and to the reimbursement or Advancement of Expenses conferred in this Article XI shall not be exclusive of any other right which in any person may have or hereafter acquire under

-31-

ES0256409

any statute or law, the company's articles of organization, regulations, agreement, vote of members or disinterested managers or otherwise.

    **Section 5:**   **Insurance.** The company may maintain insurance, at its expense, to protect itself and any manager, officer, employee or agent of the company or another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise against any expense, cost, claim, judgment, penalty, liability or loss, whether or not the company would have the power to indemnify such person against such expense, cost, claim, judgment, penalty, liability or loss under Section 608.4363, Florida Statutes.

    **Section 6:**   **Applicable Law.** Any person entitled to be indemnified or to the reimbursement or Advancement of Expenses as a matter of right pursuant to this Article IX may elect to have the r' ht to indemnification (or Advancement of Expenses) interpreted on the basis of the applicable law in effect at the time of the occurrence of the event or events giving rise to the action or proceeding, to the extent provided or authorized by law, or on the basis of the applicable law in effect at the time indemnification is sought.

    **Section 7:**   **Contract Rights.**   The rights to indemnification and to the reimbursement or Advancement of Expenses conferred to in this Article XI shall: (i) be deemed to constitute contract rights pursuant to which the person entitled thereto may bring suit as if the provisions hereof were set forth in a separate written contract between the company and the manager, officer, employee or agent (notwithstanding the existence or non-existence of any separate written contract); (ii) be intended to be, and shall be, retroactive and shall be available with respect of events occurring prior to the adoption hereof; (iii) continue to exit after the recission or restrictive modification or amendment

-32-

ES0256410