hereof with respect to events occurring prior thereto; and (iv) continue after any termination of position or employment, whether or not for cause, as to all claims made with respect to the period during which the claimant was a manager, officer, agent or employee.

**Section 8:**    **Further Implementation.**  If this Article XI or any portion thereof shall be invalidated on any ground by any court of competent jurisdiction, then the company shall nevertheless indemnify each manager, officer, employee and agent of the company as to all expenses (including attorneys' fees), judgments, fines, penalties, liabilities, claims and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, legislative, investigative or administrative, including without limitation, any grand jury proceeding and any action, suit or proceeding by or in the right of the company, to the fullest extent permitted, allowed, authorized or not prohibited by any applicable portion of this Article that shall not have been invalidated by the laws of the State of Florida or by any other applicable law or contract.

## ARTICLE XII.

### COMPANY SEAL

The managers shall provide a company seal which shall be circular in form and shall have inscribed thereon the name of the company and the year of organization.

## ARTICLE XIII.

### EXECUTION OF INSTRUMENTS AND DEPOSIT OF FUNDS

**Section 1:**    **Authority for Execution of Contracts and Instruments.**  The managers, except as otherwise provided in these regulations, may authorize any officer

-33-

ES0256411

or officers, agent or agents, to enter into any contract or execute and delivery any instrument in the name of and on behalf of the company, and such authority may be general or confirmed to specific instances; and, unless so authorized, no officer, agent or employee shall have any power or authority to bind the company by any contract or engagement or to pledge its credit or to render it liable pecuniarily for any purpose or in any amount.

Section 2: Instruments Containing Company Seal. Unless otherwise specifically determined by the managers or otherwise required by law, formal contracts of the company, promissory notes, deeds of trust, mortgages, security agreements and other evidences of indebtedness of the company, and other company instruments or documents requiring the company seal, and certificates of shares of stock owned by the company, shall be executed, signed or endorsed by the president and by the secretary.

Section 3: Bank Accounts and Deposits. All funds of the company shall be deposited from time to time to the credit of the company with such banks, bankers, trust companies or other depositories as the managers may select or as may be selected by any officer or officers of the company to whom such power may be delegated from time to time by the managers.

Section 4: Endorsements Without Countersignature. Endorsements for deposit to the credit of the company in any of its duly authorized depositories may be made without countersignature by the president or by any other officer of the company to whom the managers, by resolution, shall have delegated such power, or by hand-stamped impression in the name of the company.

-34-

ES0256412

**Section 5:**    **Signing of Checks, Drafts, Etc.** All checks, drafts or other orders for payment of money, notes or other evidences of indebtedness, issued in the name of or payable to the company, shall be signed or endorsed by such person or persons and in such manner as shall be determined from time to time by resolution of the managers.

### ARTICLE XIV.

### AMENDMENT

The power to adopt, alter, amend and repeal the regulations of the company is reserved to the members of the company. Any action to alter, amend or repeal the regulations of the company shall require the affirmative vote of all of the issued and outstanding units of the company entitled to vote, such vote to be taken at a duly called and competently convened special meeting of the members, or by unanimous written consent in lieu of a meeting.

### ARTICLE XV.

### DISSOLUTION

**Section 1:**    **Events Requiring Termination and Dissolution.** Each member expressly waives any right which it might otherwise have to dissolve the company except as set forth in this Article XV. The company shall be dissolved upon the first to occur of the following:

(a)    The vote of all of the issued and outstanding units of the company, such vote to be taken at a duly called and competently convened special meeting of the members or by unanimous written consent of

-35-

ES0256413

the members in lieu of a meeting approving of the dissolution of the company;

(b)  The occurrence of any other circumstance which, by law, would require that the company be dissolved.

**Section 2:**  **Deemed Distribution and Recontribution**.  Notwithstanding any other provision of this Article, in the event that the company is liquidated within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g) but no event described in Section 1 of this Article XV has occurred, the company's properties shall not be liquidated, the company's liabilities shall not be paid or discharged, and the company's affairs shall not be wound up.  Instead, solely for federal income tax purposes, the company shall be deemed to have distributed the company's assets in kind to the members, who shall be deemed to have assumed and taken such assets subject to all company liabilities, all in accordance with their respective Capital Accounts.

**Section 3:**  **Distributions Upon Dissolution of the Company**. At the dissolution of the company, and after the company has satisfied or provided for the satisfaction of all the company's debts and other obligations, the company's assets will be distributed in cash to the members as follows:

(a)  To pay or provide for the payment of all company liabilities to creditors other than members, and liquidating expenses and obligations;

(b)  To pay debts owing to members other than for capital and profits;

(c)  To pay debts owing to members in respect to capital; and

(d)  To pay debts owing to members in respect to profits.

-36-

ES0256414



GUNSTER, YOAKLEY, VALDES-FAULI & STEWART, P.A.
ATTORNEYS AT LAW

WRITER'S DIRECT DIAL NUMBER: 376-6040
WRITER'S E-MAIL ADDRESS: mscheer@gunster.com

October 28, 1999

Robert W. Stewart, Esq.
999 Brickell Avenue
Suite 1006
Miami, Florida 33131

  Re: E. S. Bankest L.C. Operating Agreement

Dear Bob:

  Accompanying please find the revised Regulations and Operating Agreement for E.S. Bankest L.C. containing the changes per your message yesterday.

  Please call me if there are any questions.

       Sincerely,

       Mark J. Scheer

enclosures
MJS/ms
cc. Eduardo Orlansky (w/encl)
  Hector Orlansky (w/encl)
  Dominick Parlapaino (w/encl)

252367.1

One Biscayne Tower
2 South Biscayne Boulevard, Suite 3400 • Miami, FL 33131-1897
(305) 376-6000 Fax: (305) 376-6010 e-mail: clientservices@gunster.com
http://www.gunster.com

FORT LAUDERDALE • MIAMI • PALM BEACH • STUART • TALLAHASSEE • VERO BEACH • WEST PALM BEACH

ES0256415

# EXHIBIT III.

## ACCOUNTS RECEIVABLE PURCHASE AND
## TRI-PARTY AGREEMENT

ES0256416

## RECEIVABLE PURCHASE AGREEMENT
## AND
## TRI-PARTY AGREEMENT

THIS AGREEMENT is made as of this __ day of March, 1998 by and among E.S. Bankest Corp., a Florida corporation ("ESB"), Bankest Capital Corp., a Florida corporation ("BCC") and Bankest Receivables Finance and Factoring Corporation ("BRFFC").

### RECITALS

WHEREAS, on or about June 27, 1994 BCC and BRFFC executed and delivered, among other things, the following documents and agreements (the "BCC Sale Documents") pursuant to which BCC sold and assigned to BRFFC various accounts receivable and factoring agreements owned or held by BCC in connection with its commercial factoring business:

Receivables Purchase Agreement dated as of June 27, 1994 (the "1994 Receivables Agreement") pursuant to which BCC sold and assigned to BRFFC certain accounts receivables (as defined in the 1994 Receivables Agreement), together with BCC's rights under certain factoring agreements (as defined in the 1994 Receivables Agreement);

Financing Statement dated as of June 27, 1997 securing BCC obligations to BRFFC under the 1994 Receivables Agreement and recorded with the Florida Secretary of State on _____, 1994 under File No. _____;

Management Advisory and Administrative Agreement dated as of June 27, 1994 (the "BCC Management Agreement") pursuant to which BCC has provided certain management and advisory services to BRFFC in connection with BRFFC's factoring business; and

WHEREAS, BRFFC is also a party to that certain Trust Deed dated as of June 27, 1994 (the "Trust Deed") by and between BRFFC and Bank Espirito Santo International, Ltd., a Cayman Island banking corporation (the "Trustee"), pursuant to which BRFFC has issued its debentures to third parties for which it remains obligated (the "Debentureholders"); and

WHEREAS, BCC and BRFFC are also parties to that certain Master Receivables Purchase Agreement dated as of August __, 1994 (the "BCC Master Receivables Agreement") pursuant to which BCC has agreed to continue to sell and assign to BRFFC certain additional accounts receivables and rights under certain additional factoring agreements (each as defined in the BCC

*Page 1*

187819.3
*ESB Tri-Party Agreement*
*Draft Dated 03/30/98*

ES0256417

Master Receivables Agreement); and

WHEREAS, BCC has entered into that certain shareholders agreement dated as of March __, 1998 (the "ESB Shareholder Agreement") with Espirito Santo Bank of Florida for the formation of ESB which contemplates the conduct of a factoring business by ESB and also contemplates the continued business operations of BRFFC until such time as all of the outstanding obligations to Debentureholders under the Trust Deed shall have been satisfied; and

WHEREAS, such factoring businesses will operate simultaneously and BRFFC and ESB may and will share certain mutual clients generating accounts receivable from certain of the same account debtors and which are initially originated and/or contracted for by BCC; and

WHEREAS, the parties desire to coordinate their respective business operations in order to account for accounts receivables and collections of factored accounts by clients and customers which may be mutual clients of the parties; and

WHEREAS, the parties wish to set forth their agreement with respect to the coordination of ESB's and BRFFC's businesses in accordance with the terms and conditions herein.

NOW, THEREFORE, in consideration of $10.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## Article I
### Definitions

Section 1.01   Defined Terms.        Except as otherwise provided herein, defined terms shall have the same meanings as consistently used in the BCC Sale Documents.

## Article II
### Substitute Service Agent

Section 2.01.   Appointment of ESB as Sub-Servicer. In accordance with Section 8.3 of the BCC Management Agreement, BCC hereby designates and appoints ESB as sub-servicing agent under the BCC Management Agreement, and ESB acknowledges and agrees to such delegation, of all of BCC's rights, powers and duties as Servicer of the ESB Purchased Receivables, as defined herein.

*Page 2*

187819.3
*ESB Tri-Party Agreement*
*Draft Dated 03/30/98*

ES0256418

Section 2.02.   Consent to Appointment of Sub-Servicer   BRFFC hereby consents to the delegation of authority of BCC to ESB as Sub-Servicer under the BCC Management Agreement.

Section 2.03.   Fees and Expenses of Servicer.   Notwithstanding the delegation and appointment under Sections 2.01 and 2.02, BRFFC shall continue to be obligated to BCC for all Servicing Fees relating to all non-ESB Purchased Receivables.  ESB shall be solely responsible for all costs and expenses incurred relating to the ESB Purchased Receivables.

## Article III
## Modification of BCC Master Receivables Agreements

Section 3.01   Amendment to BCC Master Receivables Agreement. BCC and BRFFC agree that Sections 2.01 and 2.02 of the BCC Master Receivables Agreement is hereby modified and amended to provide that BCC shall sell to BRFFC only certain Receivables and may sell other receivables and accounts to ESB.

Section 3.02   Right of First Refusal to Purchase Receivables.     Notwithstanding Section 3.01, BRFFC shall have a right of first refusal to purchase any and all Receivables owned or generated by BCC prior to any transfer, assignment or sale of Receivables to ESB, subject to the terms and conditions contained in the BCC Master Receivables Agreement.

Section 3.03   Amendment to Financing Statements. BCC, BRFFC and ESB shall execute such amendments to financing statements as shall reasonably be required to reflect that BRFFC shall maintain a security interest in only a portion of accounts receivables, contract rights and other assets of BCC and that BCC shall be free to pledge or secure to ESB such accounts receivables, contract rights and other assets not otherwise pledged to BRFFC.

## Article IV
## ESB Accounts Receivable Purchase Agreement

Section 4.01   Purchase of Receivables from BRFFC.  (a)  Subject to and upon the terms and conditions hereinafter set forth, BRFFC hereby sells, transfers, conveys, and assigns to ESB, and ESB hereby purchases from BRFFC, all of BRFFC's right, title, and interest in and to the following items:

(i)       an undivided interest in BRFFC's rights to purchase additional Receivables which arise after the date of this Agreement and which relate to each Account and all Additional

*Page 3*

ES0256419

Accounts which become Accounts hereinafter relating to Factoring Agreements; provided, however, the interests in Receivables being sold hereby relate solely to such Receivables as are in excess of the amount or amounts of Receivables which BRFFC is required to maintain as collateral under the Trust Deed (the "ESB Purchased Receivables");

(ii)    an undivided interest in BRFFC"s rights under the Factoring Agreements, including but not limited to such UCC-1's filed in connection with or under the Factoring Agreements and relating to the ESB Purchased Receivables;

(iii)    all monies due or to become due with respect to the ESB Purchased Receivables and Factoring Agreements under items (i) and (ii) above;

(iv)    all proceeds (as defined in the UCC as in effect in the state where BRFFC's chief executive office or books and records relating to the ESB Purchased Receivables are located) thereof, and Insurance Proceeds relating to any ESB Purchased Receivables; and

(v)    an undivided interest in BRFFC's rights under the BCC Master Receivables Purchase Agreement to the extent necessary or reasonable in connection with the ESB Purchased Receivables.

(b)    In connection with the sale and conveyance, BRFFC agrees to record and file one or more financing statements and/or amended financing statements in any and all jurisdictions and in such manner as required by the applicable state law of each such jurisdiction as ESB deems necessary to perfect its title in and to the ESB Purchased Receivables and Factoring Agreements and to assign to ESB a portion of BRFFC's rights under the existing UCC-1's and security agreements arising under the Factoring Agreements.

(c)    In connection with the sale and conveyance of any ESB Purchased Receivables, BRFFC shall provide written notice to each of its customers of the sale and assignment hereunder and direct its customers to reflect on the physical records of receivables that an ESB Purchased Receivables created in connection with an Account has been sold, in whole or in part, to ESB in accordance with this Agreement.

Section 4.02   Participation Interest in Ineligible Receivables.   In accordance with the provisions of the BCC Master Receivables Purchase Agreement, ESB shall not purchase any Receivable which constitutes an Ineligible Receivable. Except as may otherwise be expressly agreed to by ESB in writing, all of the credit risk and equity in all Ineligible Receivables shall remain with BCC.   The provisions contained in Section 2.02 of the BCC Master Receivables Purchase Agreement relating to a participation interest in BCC relating to any Ineligible Receivables shall

*Page 4*

ES0256420

apply with respect to ESB's rights against BCC with respect to such Ineligible Receivables.

Section 4.03.  Purchase Price and Payment. ESB shall pay for all ESB Purchased Receivables by making payment for such Receivables directly to the seller of such ESB Purchased Receivables in accordance with the terms and conditions of each Factoring Agreement. In addition, ESB shall pay to BRFFC the
sum of One Dollar ($1.00) for the transfer of rights under Sections 4.01 and 4.02. ESB shall indemnify and hold BRFFC harmless from any and all costs, expenses and fees in connection with any ESB Purchased Receivables, however arising.

Section 4.04.  Intention of Parties; Option to Acquire Remaining Interests in Receivables and Factoring Agreements. It is the intention of the parties hereto that BRFFC shall continue to maintain its business of purchasing accounts receivables and shall at all times maintain its business in accordance with all of the terms and conditions of the Trust Deed relating to obligations owed by it to Debentureholders. It is also the intention of the parties that to the extent that Receivables may be available for purchase under the various Factoring Agreements which are in excess of the amount of Receivables BRFFC is required to maintain in accordance with the collateral ratio obligations under the Trust Deed (i.e., 120% of the outstanding balance of debentures issued thereunder), that those Receivables will be purchased by ESB. From and after such time as BRFFC shall have satisfied and discharged all of its obligations under the Trust Deed, ESB shall have the option to purchase all of BRFFC's remaining right, title and interest in the Factoring Agreements for a purchase price of One Dollar ($1.00).

## Article V
## Provisions Relating to Trust Deed

Section 5.01.  Transfer of Accounts and Contracts Conditional.  Immediately  after execution of this Agreement, the parties shall provide notice of this Agreement relating to the sale and transfer of the ESB Purchased Receivables and interests in Factoring Agreements to the Trustee. BRFFC shall continue to comply with all covenants and conditions of the Trust Deed and shall provide all required certifications to the Trustee. ESB shall reasonably cooperate with BRFFC in any requests made by the Trustee; provided, however, that nothing in this Agreement shall be construed as to subject ESB to any term or condition of the Trust Deed.

*Page 5*

ES0256421

Article VI
Miscellaneous Provisions

Section 6.01.   Amendment. This agreement and the rights and obligations of the parties hereunder (i) may not be changed orally but only by an instrument in writing signed by the party against which enforcement is sought and (ii) shall be construed in accordance with and governed by the laws of the State of Florida.

Section 6.02   Governing Law.  THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 6.03   Notices. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, return receipt requested, to

in the case of ESB to:        E.S. Bankest Corp.
                              1395 Brickell Avenue
                              Seventh Floor
                              Miami, Florida 33131

in the case of BCC to:        Bankest Capital Corp.
                              1395 Brickell Avenue
                              Seventh Floor
                              Miami, Florida 33131

in the case of BRFFC to:      Bankest Receivables Finance and Factoring Corp.
                              1395 Brickell Avenue
                              Seventh Floor
                              Miami, Florida 33131

or, as to each party, at such other address as shall be designated by such party in a written notice to each other party.

Section 6.04   Severability of Provisions. Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof,

*Page 6*

*187819.3*
*ESB Tri-Party Agreement*
*Draft Dated 03/30/98*

ES0256422

and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 6.05.    Assignment. Notwithstanding anything to the contrary contained herein, this Agreement may not be assigned by the parties hereto.

Section 6.06.    Further Assurances. Each party agrees to do such further acts and things and to execute and deliver such additional assignments, agreements, powers and instruments as are required to carry into effect the purposes of this Agreement.

Section 6.07.    No Wavier; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of any party, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise hereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privilege provided by law.

Section 6.08.    Counterparts. This Agreement may be executed in three or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument.

Section 6.09. Binding Effect; Third-Party Beneficiaries. This Agreement will inure to the benefit of and be binding upon the parties hereto, and their respective successors and permitted assigns.

Section 6.10. Merger and Integration. Except as specifically stated otherwise herein, this Agreement sets forth the entire understanding of the parties relating to the subject matter hereof, and all prior understandings, written or oral, are superseded by this Agreement. This Agreement may not be modified, amended, waived or supplemented except as provided herein.

Section 6.11. Headings. The headings herein are for purposes of reference only and shall not otherwise affect the meaning or interpretation of any provision hereof.

Section 6.12. Schedules and Exhibits. The schedules and exhibits attached hereto and referred to herein shall constitute a part of this Agreement and are incorporated into this Agreement for all purposes.

Section 6.13. Consent to Jurisdiction and Service of Process; Waiver of Jury Trial. All judicial proceedings brought against Seller or Purchaser with respect to the Seller Documents or the

187819.3
*ESB Tri-Party Agreement*
*Draft Dated 03/30/98*

ES0256423

Purchaser Documents may be brought in any state or federal court of competent jurisdiction in the State of Florida, and by execution and delivery of this agreement, Seller and Purchaser accept for themselves and in connection with their properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any final judgment rendered thereby in connection with such documents from which no appeal has been taken or is available.

IN WITNESS WHEREOF, ESB, BCC and BRFFC have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

E.S. BANKEST CORP.

By: _____

Hector Orlansky

Title: President

BANKEST RECEIVABLES FINANCE AND FACTORING CORP.

By: _____

Hector Orlansky

Title: President

BANKEST CAPITAL CORP.

By: _____

Eduardo Orlansky

Title: President

*Page 8*

ES0256424

# EXHIBIT IV.

## MASTER CREDIT AGREEMENT

**Exhibit A**
**Exhibit B**
**Exhibit C**
**Exhibit D**
**Exhibit E**
**Exhibit F**

ES0256425

MASTER CREDIT AGREEMENT

Dated as of April __, 1998

E.S. BANKEST CORP.,
as Borrower

and

BANK ESPIRITO SANTO INTERNATIONAL LTD.,
as Collateral Agent

Credit Agreement

U.S.$36,000,000.00

This Document Prepared By:

Gunster, Yoakley, Valdes-Fauli & Stewart, P.A.
One Biscayne Tower
Two South Biscayne Boulevard
Suite 3400
Miami, Florida, USA 33131

ES0256426

## TABLE OF CONTENTS

Page

ARTICLE I - THE LOAN

| | | |
|---|---|---|
| 1.01. | Defined Terms | -1- |
| 1.02. | The Loan | -1- |
| 1.03. | Ranking of Promissory Notes | -3- |
| 1.04. | Loans Pursuant to Principal Shareholders' Agreement | -3- |
| 1.05. | Use of Proceeds of Loan | -3- |
| 1.06. | Registration and Transfer of Promissory Notes | -4- |
| 1.07. | Aggregate Loan | -5- |
| 1.08. | Participant Lenders | -5- |
| 1.09. | Prepayments | -5- |
| 1.10. | Prepayment of Closing and Other Costs | - 5- |
| 1.11. | Payments Generally | -6- |
| 1.12. | Specified Currency | -6- |
| 1.13. | Maximum Interest Rate | -6- |

ARTICLE II - REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 2.01. | Organization | -7- |
| 2.02. | Performance | -7- |
| 2.03. | Validity of Documents | -7- |
| 2.04 | Litigation | -7- |

ARTICLE III - PORTFOLIO INTEREST QUALIFICATION

| | | |
|---|---|---|
| 3.01. | Portfolio Interest Qualification | -8- |
| 3.02. | Registration | -8- |
| 3.03 | Certification | -8- |
| 3.04. | Additional Notes to United States Persons | -8- |

ARTICLE IV - COVENANTS OF BORROWER

| | | |
|---|---|---|
| 4.01. | Affirmative Covenants | -8- |
| 4.02. | Negative Covenants | -9- |

ARTICLE V - EVENTS OF DEFAULT

| | | |
|---|---|---|
| 5.01. | Events of Default | -9- |

ES0256427

ARTICLE VI - THE COLLATERAL AGENT

    6.01.   Appointment and Authorization    -10-
    6.02.   Duties and Obligations    -11-
    6.03.   Independent Credit Decision    -12-
    6.04.   Indemnification    -12-
    6.05.   Successor Collateral Agent    -12-

ARTICLE VII - ARRANGEMENT AMONGST LENDERS

    7.01.   Participation in Credit Agreement    -13-
    7.02.   Receipt of Payments    -13-
    7.03.   Borrower Failure to Pay Expenses    -14-
    7.04.   Sharing of Expenses and Losses    -14-
    7.05.   No Joint Venture or Loan    -15-

ARTICLE VIII - MISCELLANEOUS

    8.01.   No Waiver; Cumulative Remedies    -15-
    8.02.   Amendments, Etc.    -15-
    8.03.   Addresses for Notices, Etc.    -15-
    8.04.   Applicable Law, Jurisdiction, Etc.    -16-
    8.05.   Execution in Counterparts    -16-
    8.06.   Binding Effect; Assignment    -17-
    8.07.   Severability of Provisions    -17-
    8.08.   Captions    -17-
    8.09.   Waiver of Jury Trial    -17-

SCHEDULES:

    A -   Lenders

EXHIBITS:

    A -   Defined Terms
    B -   Forms of Promissory Note
          B-1   Six-Month Promissory Note
          B-2   Twelve-Month Promissory Note
    C-   Request for Roll-Over/Maturity Extension of Promissory Note
    D -   Security Agreement
    E -   Additional Security Documents
    F -   Joinder, Appointment of Collateral Agent and Consent
    G -   Addresses of Lenders

ES0256428

the obligation on a date which is 185 days from its issue date. The outstanding principal amount of each Six-Month Promissory Note shall bear interest, after as well as before maturity, default and judgment, at a fixed rate per annum equal to the Six-Month London Inter-Bank Offering Rate ("LIBOR") existing on the date which such Promissory Note is issued plus 1.50% . Interest together with principal on each Six-Month Promissory Note shall be payable in a single lump sum on the Maturity Date of such note. Interest shall be calculated daily on the basis of a 360 day year.

(b)    Twelve-Month Promissory Notes. Twelve-Month Promissory Notes shall be substantially in the form attached as Exhibit "B-2" hereto, and shall provide for maturity of the obligation on a date which is 365 days from its issue date. The outstanding principal amount from time to time of each Twelve-Month Promissory Note shall bear interest, after as well as before maturity, default and judgment, at a fixed rate per annum equal to the Twelve-Month LIBOR existing on the date which such Promissory Note is issued plus 1.75%. Interest on each Twelve-Month Promissory Note shall be payable in two installments, the first of which shall be on the 185th day after the date of issue. The second installment shall be payable together with principal on the Maturity Date of such note. Interest shall be calculated daily on the basis of a 360 day year.

(c)    Rollover Option. Each Holder of a Promissory Note shall have the option to extend the original Maturity Date of a Promissory Note by tendering to the Borrower a Rollover/Maturity Extension Form (the "Rollover Option") substantially in the form attached as Exhibit "C" hereto not less than 90 days prior to the original Maturity Date. In the event that the Holder elects to extend the Maturity Date, and the Borrower accepts such extension, the new Maturity Date of each such Promissory Note in the case of a Six-Month Promissory Note shall be 185 days from the original Maturity Date; and in the case of a Twelve-Month Promissory Note shall be 365 days from the original Maturity Date. Interest on the Promissory Notes during such extension period shall be adjusted on the original Maturity Date in accordance with the then applicable interest rates for Six Month Promissory Notes or Twelve Month Promissory Notes, as the case may be, and such readjusted rate shall be the interest rate during the extended term. The Borrower shall not be obligated to accept a Rollover Option and may accept a Rollover option in its sole and complete discretion.

(d)    Collateral and Security Interest. The Promissory Notes shall be secured by a first priority security interest (the "Security Agreement") in the Collateral substantially in the form attached as Exhibit "D" hereto, which Security Agreement shall incorporate by reference the terms of this Credit Agreement. The Promissory Notes shall be further secured by such Additional Security Documents as are set forth in Exhibit "E", attached hereto. The Promissory Notes, Security Agreements and the Additional Security Documents shall be executed prior to, or simultaneously with, this Agreement.

(e)    Increase in Loan Amount.    Notwithstanding the provisions of this Section

- 2 -

ES0256429

1.02 which provides for the maximum principal amount of the Loan as $36,000,000.00. Borrower may borrow additional amounts under this Credit Agreement and issue additional Promissory Notes under subsections (a) or (b) of this Section 1.02 if and to the extent such additional Promissory Notes do not cause the ratio of Collateral to the aggregate outstanding principal amounts of the Promissory Notes to exceed the required Collateral Ratio as set forth in Section 1.04 hereof.

(f)    Additional Loans. Borrower, Collateral Agent and Lenders acknowledge that the Notes initially being issued under this Master Credit Agreement are being issued to foreign lenders pursuant to one or more exemptions from United States securities laws. Borrower reserves the right to issue additional Notes under this Master Credit Agreement, and the other Credit Documents, to persons other than solely foreign persons. In the event of such issuance of Notes, the Borrower, Collateral Agent and Lenders agree that Borrower may request a modification or amendment to this Master Credit Agreement and the other Credit Documents, as Borrower shall reasonably request, in order to permit Borrower to issue Notes to U.S. persons.

1.03.    Ranking of Promissory Notes. *Each Promissory Note, regardless of whether a Six-Month Promissory Note or a Twelve-Month Promissory Note, and regardless of the exercise of a Rollover Option, shall rank pari passu with all other Promissory Notes issued by Borrower under this Master Credit Agreement, and shall be secured by the Collateral equally and ratably according to the principal amount thereof and the interest from time to time owing thereon, regardless of the Issue Date or terms of the Promissory Notes.*

1.04.    Borrower's Right to Grant Additional Security Interests Ranking Equal to Obligations Secured Hereby. Pursuant to the Shareholders Agreement between the Borrower's existing shareholders, Espirito Santo Bank of Florida has agreed that so long as it is a shareholder of Borrower, in the event Borrower can not raise sufficient working capital through the issuance of Notes under this Master Credit Agreement or other similar borrowings, Espirito Santo Bank shall provide or cause third parties (which may or may not be affiliates of Espirito Santo Bank) to provide Borrower with a line or lines of credit of up to an aggregate maximum amount of Thirty Million Dollars and 00/100 ($30,000,000.00). Advances under any such line shall be for a maximum of three hundred sixty (360) days and shall bear interest (i) in the case of the first Five Million Dollars ($5,000,000.00) at the same rates as provided herein for Series A and B Notes, depending on whether such advances are for 180 days or 360 days and (ii) for amounts in excess of $5,000,000, at a rate not to exceed the one year LIBOR rate in effect on the date of the advance plus two percent (2%) per annum. All advances under such lines of credit shall be evidenced and secured by notes issued by Borrower under the terms and conditions then generally offered under this Master Credit Agreement, excepting only as to rate of interest which shall be in the amount aforesaid, and such advances are to be secured by a security interest in the same assets of Borrower which constitute the Collateral under the Security Interest. In accordance with the foregoing, so long as the Debtor is not in default under this Master Credit Agreement or the other Credit Documents, the Collateral

- 3 -

ES0256430

Agent is authorized to permit the Debtor to execute and deliver a security interest to such lenders, which security interest shall rank pari passu with the liens secured herein by the Collateral.

1.05.   Use of Proceeds of Loan.   Borrower covenants and agrees that it will use all of the Loan proceeds solely for the payment of the purchase price, including factoring advances, of Insured Accounts Receivable from clients provided that Loan proceeds shall not be used to fund more than 80% of the face value of each Insured Accounts Receivable so purchased. During any period in which Borrower retains Loan proceeds which have not been used to purchase or advance an account of purchased Insured Accounts Receivable, such unused proceeds shall be invested in certificates of deposit or other accounts of insured financial institutions, United States federal treasury bills and notes or other investment grade securities ("Approved Securities"). Such unused proceeds and investments shall be pledged to the Collateral Agent as part of the Collateral. Borrower agrees to maintain receivables of a face value (the "Collateral Ratio") equal to at least 120% of the amount of Loan proceeds not invested in Approved Securities. In connection with the limitations on the use of proceeds as contained herein, Borrower shall, upon request of the Collateral Agent and not less often than quarterly, certify that the value of Collateral is in accordance with the covenants contained in this Section 1.04 (the "Collateral Value Certification").

1.06.   Registration and Transfer of Promissory Notes.   The Borrower shall maintain a register of the Promissory Notes, in which shall be entered the name, address, telephone, telex and telecopy number, if any, of each of holder of a Promissory Note, from time to time. The Borrower may appoint one or more other or additional registrars of the Promissory Notes. Such registration shall be noted on the Promissory Notes. No transfer of any Promissory Note shall be valid unless made by the registered Holder or its successors or attorney duly appointed by an instrument in writing in form and execution satisfactory to the Borrower, and upon compliance with such reasonable requirements as the Borrower may prescribe; such transfer shall have been duly noted on the Promissory Notes by the Borrower or a new Promissory Note shall have been issued and certified in lieu thereof; and such transfer shall have been duly noted on one of the registers. The provisions of this section are intended to comply with the provisions of Treas. Reg. §5f.103 and §5f.163-1 which define the requirements applicable to "registered obligations". Neither the Borrower nor any other registrar or registrars shall be required to transfer any Promissory Note during the period of seven Business Days immediately preceding the date of maturity of such Promissory Note. The registers shall at all reasonable times be open for inspection by the Lenders.

The Promissory Notes have not been and will not be registered under the United States Securities Act of 1933, as amended (the "Securities Act") nor the securities laws of the State of Florida or any of the other States of the United States or any other jurisdiction. The offering of the Promissory Notes will be made in reliance upon (i) a safe harbor from the registration requirements of the Securities Act for offers and sales of securities which occur outside of the United States, and/or (ii) an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering, and (iii) analogous exemptions under State securities laws. As such, the Notes may not be offered, sold, transferred, accepted or delivered,

- 4 -

ES0256431

directly or indirectly except pursuant to registration under the Securities Act and applicable state laws and any non-United States securities laws, or pursuant to an available exemption from the registration provisions of the Securities Act and applicable state securities laws and non-United States securities laws.

The Promissory Notes are subject to substantial restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and the applicable State Securities laws pursuant to registration or exemption therefrom, and the applicable securities laws of any other jurisdiction (including the Florida Securities Act).

1.07.   <u>Aggregate Loan</u>.  The Loan is referred to in the aggregate which includes each position in the Loan made by each of the Lender, whether such Lender funds its portion of the Loan contemporaneously or not, and *regardless of the Issue Date of each Promissory Note which may and will vary among all of the Promissory Notes*.  The Loan is deemed to include the entire aggregate unpaid accrued interest and unpaid principal balance owed from time to time by Borrower pursuant to the terms of this Master Credit Agreement and the terms of the Promissory Notes.

1.08.   <u>Participant Lenders</u>.  Each Lender agrees severally and not jointly with the other Lenders to make the Loan to Borrower and to fund that portion of the Loan represented by each such separate Promissory Note issued by the Borrower.  The Borrower covenants and agrees not to issue a Promissory Note under this Master Credit Agreement unless and until a Lender has advanced the funds for such Loan.  Each Lender shall evidence its consent and joinder to the terms and conditions of this Master Credit Agreement by executing and delivering to the Borrower and the Collateral Agent a Joinder, Appointment of Collateral Agent and Consent, substantially in the form and content attached as Exhibit "F" hereto.  *By execution of such Joinder, each Lender expressly acknowledges and agrees that the maximum amount of the Loan under this Master Credit Agreement may exceed $36,000,000.00 and that additional Promissory Notes may be issued by Borrower which Promissory Notes, although issued after a Lender's particular Promissory Note, shall rank pari passu with all other outstanding Promissory Notes.  Upon execution and delivery of such Joinder, Borrower shall amend Schedule A hereto to include the name and address of such Lender.*

Subject to Article VII hereof, the Lenders have herein designated and granted Collateral Agent the authority to determine and to take all such requisite actions as may be necessary or desirable on behalf of the Lenders and in their interests to maintain, collect and enforce this Loan. The Lenders participating herein shall rely upon and shall ratify the decisions, determinations and instructions of the Collateral Agent and the Collateral Agent shall solicit the decisions of the participating Lenders in all matters as required under Article VII hereof, in which case the Collateral Agent shall be authorized to take action based upon the decisions of such Lenders as shall then represent no less than 66.67% or all of the aggregate amounts outstanding under the Loan as required by Section 7.07 hereof.

- 5 -

ES0256432

1.09.   Prepayments. The installments of principal due under the Promissory Notes may be prepaid at any time prior to the stated installment dates thereof without penalty. Any such prepayment shall not affect any other scheduled payment of principal.

1.10.   Payment of Closing and Other Costs. Borrower agrees to pay on demand all out-of-pocket expenses (hereafter "Closing Costs") in connection with the preparation, execution and delivery of the Loan. In addition to the foregoing, Borrower agrees to pay on demand all out-of-pocket expenses of the Collateral Agent in connection with the administration of the Loan, including any special problems which may arise with respect to this Master Credit Agreement, the Promissory Notes and the other instruments and documents to be delivered hereunder and thereunder, and all fees and expenses, if any, incurred by the Lenders in connection with the enforcement of this Master Credit Agreement, the Promissory Notes, and the Credit Documents, or any of them. In addition, Borrower shall pay (or reimburse the Lenders for paying) all documentary stamp taxes, intangible taxes, and other taxes payable or determined to be payable in connection with the execution and delivery of this Master Credit Agreement, the Promissory Notes, the Credit Documents, or any other note, document, instrument or agreement delivered or to be delivered hereunder or thereunder, and agrees to indemnify, save and hold harmless the Collateral Agent and the Lenders from any and all liabilities with respect to or resulting from any delay in paying or failure to pay such taxes.

1.11.   Payments Generally. All payments (including prepayments) of the principal of, or interest on, any of the Promissory Notes or in respect of any fees, costs, expenses or taxes hereunder, or any other amounts payable hereunder, shall be paid directly by the Borrower to each Lender in in United States Dollars in immediately available funds. Whenever any payment hereunder or on any Promissory Note is stated as due on a Saturday, Sunday, or any public holiday under the laws of the State of Florida, the maturity of such payment shall be extended to the next succeeding business day and interest shall continue to accrue during such extension. Upon payment in full of the principal of, and interest on, each such Promissory Note issued to a Lender, together with all other amounts payable hereunder, each such Lender will surrender to Borrower such Promissory Note duly marked canceled.

1.12.   Specified Currency. This is an international loan transaction in which the requirement for paying in United States dollars and in Miami, Florida, is of the essence, and United States dollars shall be the denominated currency of the Promissory Notes in all events. The obligation of Borrower to repay the Promissory Notes and all other obligations arising under this Master Credit Agreement shall not be discharged by any amount paid in any other currency or in any other place, whether pursuant to a judgment or otherwise, except to the extent that full payment in United States dollars is actually received.

1.13.   Maximum Interest Rate. Notwithstanding any provisions of this Master Credit Agreement to the contrary, in no event shall the aggregate "interest" (as that term is defined in Section 687.02 of the Florida Statutes (1997)) hereunder exceed the maximum rate allowed by applicable law. If from any circumstance whatsoever, fulfillment of any obligation hereof, at the

- 6 -

ES0256433

time such performance shall be due, shall cause the effective rate of interest due hereunder to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law. Such reduction shall not constitute an Event of Default hereunder.

## ARTICLE II

### Representations and Warranties

Borrower represents and warrants to the Lenders and to the Collateral Agent that:

2.01.    Organization.  Borrower is the duly organized, validly subsisting corporation under the laws of the State of Florida and Borrower has all the corporate power and authority necessary to conduct the activities necessary to enter into and perform this Agreement, to become obligated for the repayment and for the performance of its obligations hereunder and under the Promissory Notes and to pledge the Collateral as herein provided.

2.02.    Performance.  The performance of this Master Credit Agreement and the repayment of the obligations and the Promissory Notes by Borrower will not, under present law: (i) require any consent or approval of any shareholder or of any public authority, (ii) violate any provision of law (including without limitation any usury law), or violate any rule or regulation governing, or applicable to Borrower, violate any rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect and having application to Borrower or to any transaction contemplated hereby, or any provision of this Master Credit Agreement, or (iii) result in any breach of, or constitute a default under, or result in the creation or imposition of any lien or charge upon any property of Borrower pursuant to the terms of any document or any indenture, loan or credit agreement (other than this Master Credit Agreement), or other agreement, lease or instrument to which Borrower is a party or by which it may be bound or to which any of its properties may be subject.

2.03.    Validity of Documents.  This Master Credit Agreement is, and the Promissory Notes and the Documents when executed and delivered will be, the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their terms.  No authorization, consent, approval, license, exemption of or filing or registration with any court or other tribunal or any governmental department, commission, board, bureau or agency, domestic or foreign, is or under present law will be necessary to the valid execution, delivery or performance by Borrower of this Master Credit Agreement, any of the Promissory Notes or the Documents.

2.04.    Litigation.  There are no actions, suits or proceedings pending or, to the knowledge of Borrower and its executive officers, threatened against or affecting Borrower, or any of the assets

- 7 -

ES0256434

or properties of the Borrower, before any court or other tribunal or any governmental department, commission, board, bureau or agency, domestic or foreign, which if determined adversely to Borrower could have a material adverse effect on the financial condition, operations or properties of Borrower or upon the ability of Borrower to perform its obligations hereunder, or its obligations under the Promissory Notes.

## ARTICLE III

### Portfolio Interest Qualification

3.01.    Portfolio Interest Qualification.    The Promissory Notes are designed and intended to constitute "registered obligations" as defined by the Code and, when held by non-U.S. persons, are intended to qualify for exemption from United States withholding taxes on interest paid to foreign lenders pursuant to the Repeal of Tax on Interest of Non-Resident Alien Individuals and Foreign Corporations Received from Certain Portfolio Debt Investments provisions of Section 871(h) and 881(c) of the Code. Borrower shall in no way take any action in violation of such provisions or which may result in the Promissory Notes failing to so qualify. All terms and conditions of this Master Credit Agreement shall be construed in accordance with such provisions. In the event of any conflict between this Master Credit Agreement or the other Credit Documents and the provisions applicable to Portfolio Debt Investments, the provisions applicable to Portfolio Debt Investments shall control and the Credit Documents shall automatically be modified accordingly.

3.02.    Registration.    In accordance with Section 1.3 of this Master Credit Agreement, transfer and surrender of the Promissory Notes may be achieved only by actual surrender of the Promissory Notes to the Borrower and registration of the transfer by the Borrower.

3.03.    Certification.    In accordance with applicable Code sections and United States Treasury regulations, each non-United States holder of Promissory Notes shall provide to the Borrower a certification stating, under penalties of perjury, that the holder is not a United States person. Certifications shall be obtained annually and shall be retained by the Borrower for a period of not less than four years. Each Lender or holder of a Promissory Note shall immediately notify the Borrower of any changes to any certifications.

3.04.    Additional Notes to United States Persons.    In accordance with Section 1.02(f) of this Master Credit Agreement, the Borrower may issue notes to United States Persons which notes will be substantially the same as the Promissory Notes contemplated under this Master Credit Agreement, and which will be in registered form but need not otherwise comply with the Portfolio Debt exemption provisions applicable to foreign lenders.

- 8 -

ES0256435

## ARTICLE IV

### Covenants of Borrower

4.01. Affirmative Covenants. At all times prior to the Maturity Date, and thereafter until payment in full of all of the Promissory Notes and the performance of all of its other obligations hereunder and under the Loan Documents, unless excused in writing by the Lenders, Borrower will:

(a) Corporate Existence. Maintain its existence in good standing as an entity authorized to contract for credit and perform the obligations hereunder and pursuant to the Promissory Notes under the laws of the State of Florida.

(b) Performance of Loan Documents, Etc. Duly and punctually perform each and every obligation of Borrower under this Master Credit Agreement, the Promissory Notes and each of the Credit Documents and execute and deliver all such other and further instruments, and do and perform all such further acts and things, as the Lenders or the Collateral Agent may reasonable request to protect or further protect and assure to the Lenders the rights and benefits intended to be afforded.

(d) Records and Books of Account. Keep adequate records and books of account in which complete and correct entries will be made in accordance with sound accounting practice, reflecting all financial transactions of these credit arrangements.

4.02. Negative Covenants. At all times prior to the Maturity Date and thereafter until payment in full of the Promissory Notes and the performance of all of its other obligations hereunder, Borrower will not, without the written consent of the Lenders in each case, take any action, fail to take any action, do any thing or cause another to do any thing or take any act which shall diminish the value of the undertaking hereunder by the Lenders or repudiate the obligations hereunder or under the Promissory Notes.

## ARTICLE V

### Events of Default

5.01. Events of Default. If any one or more of the following events (hereinafter an "Event of Default") shall occur:

(a) default shall be made in any repayment of the principal of or the payment of interest on any of the Promissory Notes when due and payable, whether at an installment date, at maturity, by notice of intention to prepay or otherwise; or

- 9 -

ES0256436

(b)   default shall be made in the due observance or performance of any term, covenant or condition contained in Section 4.01 or 4.02 hereof; or

(c)   default shall be made in the due observance or performance of any other term, covenant or condition contained in this Master Credit Agreement or any Credit Document and such default shall have continued unremedied for a period of 30 days after written notice thereof, specifying such default and requiring that it be remedied, shall have been given to Borrower by the Collateral Agent (which notice the Collateral Agent shall give if required to do so by the Lenders); or

(d)   any representation or warranty made by Borrower herein or in any Credit Document, or any statement or representation made in any certificate, report or opinion delivered pursuant hereto or thereto, shall prove to have been incorrect in any material respect when made; or

(e)   any obligation of Borrower (other than the Loan) payable within or enforceable pursuant to the laws of the State of Florida for the payment of borrowed money becomes or is declared to be due and payable prior to its stated maturity or there shall occur any event permitting the holder of any such obligation or a trustee therefor to make any such declaration and such event shall have continued past any grace period applicable thereto;

then, upon the happening of any one or more of the foregoing Events of Default which shall be continuing, any and all further obligations (if any) of the Lenders shall terminate and all sums payable by Borrower hereunder and under the Promissory Notes shall become and be immediately due and payable upon declaration to such effect delivered by the Collateral Agent to Borrower (which declaration the Collateral Agent shall deliver if requested to do so by the Lenders); and the Promissory Notes then outstanding shall be accelerated and immediately mature and become due and payable without declaration or other notice to Borrower. Borrower expressly waives any presentment, demand, protest or other notice of any kind.

## ARTICLE VI

### The Collateral Agent

6.01.   Appointment and Authorization. Each Lender hereby irrevocably appoints and authorizes the Collateral Agent to take such action on its behalf and to exercise such powers under this Credit Agreement as are specifically delegated to the Collateral Agent by the terms hereof, together with such other powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, each Lender hereby authorizes the Collateral Agent to execute and deliver, and to perform all of the Collateral Agent's obligations under the Master Credit Agreement, the Notes and the documents. The relationship between the Collateral Agent and each of the Lenders is only

- 10 -

ES0256437

that of agent and principal and has no fiduciary aspects, and the Collateral Agent's duties hereunder are acknowledged to be only ministerial and not involving the exercise of discretion on its part. Nothing in this Agreement or elsewhere contained shall be construed to impose on the Collateral Agent any duties or responsibilities other than those for which express provision is herein made. In performing its duties and functions hereunder, the Collateral Agent does not assume and shall not be deemed to have assumed, and hereby expressly disclaims, any obligation or responsibility toward, or any relationship of agency or trust with or for, Borrower. As to matters not expressly provided for in this Agreement, the Collateral Agent shall not be required to exercise any discretion or to take any action or communicate any notice, but shall be fully protected in so acting or refraining from acting upon the instructions of the Lenders and their respective successors and assigns; provided, however, that in no event shall the Collateral Agent be required to take any action which exposes it to personal liability or which is contrary to this Master Credit Agreement or applicable law, and the Collateral Agent shall be fully justified in failing or refusing to take any action hereunder unless it shall first be specifically indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or omitting to take any such action.

6.02.   Duties and Obligations. In performing its functions and duties hereunder on behalf of the Lenders, the Collateral Agent shall exercise the same care and skill as it would exercise in dealing with loans for its own account. Neither the Collateral Agent nor any of its directors, officers, employees or other agents shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Master Credit Agreement except for its or their own gross negligence or willful misconduct. Without limiting the generality of the foregoing, the Collateral Agent (i) may consult with legal counsel and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith and in accordance with the advice of such experts; (ii) makes no representation or warranty to any Lender as to, and shall not be responsible to any Lender for, any recital, statement, representation or warranty made in or in connection with this Master Credit Agreement or in any written or oral statement (including a financial or other such statement), instrument or other document delivered in connection herewith or furnished to any of the Lenders by or on behalf of Borrower; (iii) shall have no duty to ascertain or inquire into Borrower's performance or observance of any of the covenants or conditions contained herein or to inspect any of the property (including the books and records) of Borrower or inquire into the use of the proceeds of the Loans or to inquire into the existence or possible existence of any Event of Default or of any act, event, circumstance or condition which with the giving of notice or the lapse of time, or both, would constitute such an Event of Default; (iv) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency, collectibility or value of this Agreement or any instrument or document executed or issued pursuant hereto or in connection herewith; (v) except as expressly provided herein in respect of information and data furnished to the Collateral Agent for distribution to the Lenders, shall have no duty or responsibility, either initially or on a continuing basis, to provide to any Lender any credit or other information with respect to Borrower whether coming into its possession before the making of the Loan or at any time or times thereafter; (vi) shall incur no liability under or in respect of this Master Credit Agreement for, and shall be entitled to rely and act upon, any notice, consent,

- 11 -

ES0256438

certificate or other instrument or writing (which may be by facsimile (telecopier), telegram, cable, telex or other electronic means) delivered to it and believed by it to be genuine and correct and to have been signed or sent by the proper party or parties; and (vii) shall be under no duty to inquire into or investigate the validity, accuracy or content of any notice, consent, certificate or other instrument delivered to it.

6.03.    Independent Credit Decision.  Each Lender acknowledges to each of the other Lenders and to the Collateral Agent that it has, independently and without reliance upon the Collateral Agent or any other Lender, and based upon such documents and information as it has deemed appropriate, made its own independent credit analysis and decision to enter into this Master Credit Agreement. Each Lender also acknowledges that it will, independently or through other advisers and representatives but without reliance upon the Collateral Agent or any other Lender, and based upon such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or refraining from taking any action under this Agreement.

6.04.    Indemnification.  The Lenders agree to indemnify the Collateral Agent (to the extent not reimbursed by Borrower), ratably according to the respective unpaid principal amounts of their Loans (or if there be no Loans outstanding at the time, ratably according to the respective commitments of the Lenders), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Collateral Agent in any way relating to or arising out of this Master Credit Agreement or any of the Credit Documents or any action taken or omitted to be taken by the Collateral Agent hereunder or under any of the Credit Documents; provided that none of the Lenders shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Collateral Agent's gross negligence or willful misconduct. Without limiting the generality of the foregoing, each Lender agrees to reimburse or advance to the Collateral Agent promptly on demand, for such Lender's ratable share (based upon the aforesaid apportionment) of any out-of-pocket expenses (including counsel fees and disbursements) incurred by the Collateral Agent in connection with the preparation, execution, administration or enforcement of, or the preservation of any rights under, this Master Credit Agreement, the Promissory Notes and the Credit Documents to the extent that the Collateral Agent is not advanced or reimbursed for such expenses by Borrower.

6.05.    Successor Collateral Agent.  The Collateral Agent may resign at any time by giving written notice of such resignation to the Lenders and Borrower, and may be removed at any time, with or without cause, upon ten (10) days' prior written notice to the Collateral Agent and Borrower in writing signed by 66.67% of the Lenders, such resignation or removal to be effective only upon the appointment of a successor Collateral Agent as hereinafter provided. The Collateral Agent shall have the right to withhold an amount equal to the amount due and owing to the Collateral Agent, plus any costs and expenses the Collateral Agent shall reasonably believe may be incurred by the

- 12 -

ES0256439

Collateral Agent in connection with its resignation or removal as Collateral Agent. Upon any such notice of resignation or removal, the Lenders shall appoint a successor Collateral Agent upon written notice to Borrower and the retiring Collateral Agent. If no successor Collateral Agent shall have been appointed by the Lenders and shall have accepted such appointment within 30 days after the retiring Collateral Agent shall have given notice of resignation or the Lenders shall have given notice of the removal of the retiring Collateral Agent, the retiring Collateral Agent may, upon notice to Borrower and the Lenders, appoint a successor Collateral Agent. Upon its acceptance of any appointment as Collateral Agent hereunder, the successor Collateral Agent shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Collateral Agent, and the retiring Collateral Agent shall be discharged from its duties and obligations under this Master Credit Agreement. After any retiring Collateral Agent's resignation or removal hereunder, the provisions of this Article VI shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent under this Master Credit Agreement.

## ARTICLE VII

### Arrangement Amongst Lenders

7.01. <u>Participation in Master Credit Agreement</u>. The Lenders agree that each Lender has an undivided interest in the Loan in the percentage equal to the proportion of such Lender's principal amount indicated on its Promissory Note as bears to the aggregate outstanding principal balance on all outstanding Promissory Notes and each Lender further agrees that such percentages shall reflect each Lender's percentage interest in the Master Credit Agreement and the Credit Documents and the rights and powers contained therein. Collateral Agent shall hold the Loan Documents for and on behalf of the Lenders and to the extent of each Lender's interest therein. Upon funding, each Lender shall be entitled to receive as evidence of its participation in the Loan a Promissory Note as provided herein and each Lender agrees that its Promissory Note is intended to reflect and evidence such percentage participation. The respective interests of the Lenders shall be ratably proportionate and none shall have priority over the others.

7.02. <u>Receipt of Payments</u>. Except as expressly provided herein to the contrary, Collateral Agent shall promptly, upon receipt of written instructions from 66.67% of Lenders, credit to each of the Lender's account or accounts at Collateral Agent each Lender's pro rata part of each repayment of principal, payment of interest or payment of expenses, taxes, fees or otherwise as of the date of payment or due date thereof, as applicable. All late charges, penalties, costs, expenses taxes and any other charges or additional amounts owed shall be shared pro rata by the Lenders determined based upon each Lender's pro rata share of the then outstanding principal balances owed by Borrower. Except as expressly provided herein to the contrary, if any of the Lenders ever receives any payment (whether voluntarily, involuntarily, by offset or application against any existing indebtedness, by virtue of any exercise of legal rights, or otherwise) on account of the Loan or treated by such Lender as on account of the Loan or any other amount payable hereunder, other

- 13 -

ES0256440

than amounts reimbursable to a particular Lender or Lenders, and such payment is in excess of such Lender's pro rata share thereof (based upon the total amounts outstanding that are owed to the Lenders by Borrower), then such Lender obtaining such excess payment shall (unless resolved in accordance with this Section) pay to the other Lenders the amount necessary to equalize the excess payment among all of the Lenders. This provision is intended to require that any sum applied or to be applied to the obligations of Borrower under this Loan shall be shared in a manner so that each of the Lenders receives (or retains) up to, but not in excess of, its pro rata share thereof.

7.03. <u>Borrower Failure to Pay Expenses</u>. In the event of any failure of Borrower to pay expenses, fees, types, costs or additional amounts required by this Master Credit Agreement or the Credit Documents, Collateral Agent may request each of the Lenders to advance a proportionate share of such amounts as may be necessary to pay the same and the Lenders shall remit their applicable portion to the Collateral Agent within ten (10) days after notice and request thereof. In the event any Lender shall fail or refuse to pay its proportionate share of such amounts or shall fail or refuse to reimburse the Collateral Agent upon request as provided, then the other Lenders may advance such additional sums as necessary and the Collateral Agent may apply any amounts paid by Borrower or held by Collateral Agent first to pay such advances or reimbursements to the other Lenders before any further distribution of monies to such Lender.

7.04. <u>Sharing of Expenses and Losses</u>. Each of the Lenders shall pay its pro rata share of all reasonable attorneys' fees and other expenses incurred in connection with the maintenance, collection or enforcement of the obligations of Borrower under the Loan, and each of the Lenders shall be entitled to a pro rata share of any payments subsequently received with respect to such fees and expenses. Except as expressly provided herein to the contrary, nothing herein shall be deemed (a) to give any of the Lenders an advantage over any of the other Lenders with respect to reimbursement for or other payment on account of any of Borrower's obligations under the Loan or of any attorneys' fees and expenses incurred by the Collateral Agent in connection with enforcement of the obligations of Borrower under any of the Promissory Notes, or (b) to relieve any of the Lenders from absorbing its pro rata share of any losses sustained with respect to the amount of any of Borrower's obligations under the Loan, except to the extent unilateral actions or inactions by any of the Lenders result in any credit, allowance, set-off, defense, or counterclaim solely with respect to all or any part of such Lender's pro rata obligations under Loan. Upon demand, each of the Lenders shall repay to Collateral Agent any sums distributed to any of the Lenders which the Collateral Agent shall be required to return to Borrower or to any receiver, trustee, or custodian for Borrower.

7.05. <u>No Joint Venture or Loan</u>. Neither the execution of this Master Credit Agreement, the sharing in the Loan, nor any agreement to share in profits or losses arising as a result of the transactions contemplated hereby is intended to be or to create, and the foregoing shall not be construed to be or to create, any partnership, joint venture, or other joint enterprise between the Lenders; and neither the execution of this Master Credit Agreement, nor the management and administration of the Loan and the related documents by the Collateral Agent, nor any other right,

- 14 -

ES0256441

duty or obligation of the Collateral Agent, nor any other right, duty or obligation of Collateral Agent under or pursuant to this Master Credit Agreement is intended to be or to create any express, implied, or constructive trust or other fiduciary relationship between or amongst the Collateral Agent and the Lenders. No amounts funded by any of the Lenders pursuant to any of the Promissory Notes shall be considered a loan by any of the Lenders to the Collateral Agent.

## ARTICLE VIII

### Miscellaneous

8.01.  No Waiver; Cumulative Remedies.  No failure or delay on the part of the Collateral Agent or any Lender or any other holder of any Promissory Notes in exercising any right, power or remedy hereunder or under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. The remedies provided for herein and in the Credit Documents are cumulative and not exclusive of any remedies provided by law.

8.02.  Amendments, Etc.  No amendment, modification, termination or waiver of this Master Credit Agreement or any provision hereof, nor any consent to any departure by Borrower therefrom, shall be effective unless the same is in writing and signed (or authorized by a writing signed) by the Collateral Agent and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances.

8.03.  Addresses for Notices, Etc.  All notices, requests, demands, directions, declarations and other communications provided for herein or in any Promissory Notes shall (except as otherwise expressly provided) be sent by confirmed telex or transmitted by facsimile or delivered in hand to the applicable party at its address indicated below:

If to Borrower:

E.S. BANKEST CORP.
1395 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 358-5610
Telefax:    (305) 372-2816
Attention:  Hector Orlansky, President

- 15 -

ES0256442

with copy to:

Mark J. Scheer, Esq.
Gunster, Yoakley, Valdes-Fauli & Stewart, P.A.
One Biscayne Tower
Two South Biscayne Boulevard, Suite 3400
Miami, Florida 33131-1897

If to the Collateral Agent:

BANK ESPIRITO SANTO INTERNATIONAL LTD
c/o Cayman International Bank & Trust Company
P.O. Box 887
Grand Cayman, BWI
Telephone: (809) 949-8655
Telecopy: (809) 949-7946
Attention: J. Bothwell

If to any Lender:

At its address set forth on Exhibit "G" hereto.

or, as to each party, at such other address as shall be designated by such party in a written notice to all of the others complying as to delivery with the terms of this Section. All such notices, requests, demands, directions, declarations and other communi-cations shall be effective when received.

8.04.  Applicable Law, Jurisdiction, Etc. This Master Credit Agreement and each of the Promissory Notes and Credit Documents, and all of the rights and obligations of the parties hereunder and thereunder, shall be governed by and construed and enforced in accordance with the laws of the State of Florida.

8.05.  Execution in Counterparts. This Master Credit Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which, taken together, shall constitute but one and the same instrument.

8.06.  Binding Effect; Assignment. This Master Credit Agreement shall bind and inure to the benefit of Borrower, the Collateral Agent and the Lenders and their respective successors and assigns, except that Borrower shall not have the right to assign any of its rights hereunder or any interest of it herein without the prior written consent of the Lenders in each case. No person not a party hereto is intended to be benefited hereby.

- 16 -

ES0256443

8.07.   Severability of Provisions.  Any provision of this Master Credit Agreement or any Promissory Notes or Credit Document which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective solely to the extent of such prohibition or unenforceability without affecting the validity or enforceability of the remainder of this Master Credit Agreement or such Promissory Notes or Credit Document or the enforceability of such provision in any other jurisdiction.

8.08.   Captions.  Article and section captions in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

8.09.   Waiver of Jury Trial.  Borrower and the Lenders, after consulting or having had the opportunity to consult with their respective counsel, knowingly, voluntarily and intentionally waives any right each may have to a trial by jury in any action brought with respect to any of the Loan Documents or any related instrument or agreement of any of the transactions contemplated by this Master Credit Agreement, the Promissory Notes or any course of conduct, dealing, statements (whether oral or written) or actions of any party to this Master Credit Agreement, the Promissory Notes, or any other Credit Documents.  Neither Borrower nor the Lenders shall not seek to consolidate, by counterclaim or otherwise, any such action in which a jury trial cannot be or has not been waived.  These provisions shall not be deemed to have been modified in any respect or relinquished by any of the parties except by a written instrument executed by all of the parties.

IN WITNESS WHEREOF, Borrower and the Collateral Agent have caused this Master Credit Agreement to be executed by their proper corporate officers thereunto duly authorized as of the day and year first above written.

BORROWER:

E.S. BANKEST CORP., a Florida corporation

By:_____

COLLATERAL AGENT:

BANK ESPIRITO SANTO INTERNATIONAL, LTD., a Cayman Islands corporation

By:_____

- 17 -

ES0256444

# EXHIBIT IV.

## MASTER CREDIT AGREEMENT

### Exhibit A

### Defined Terms

ES0256445

## EXHIBIT "A"

### DEFINED TERMS

For purposes of this Master Credit Agreement, the following terms shall have the respective meanings set out below:

"Account" shall mean each individual account receivable established pursuant to a factoring agreement between E.S. Bankest Corp. and an Obligor.

"Approved Securities" has the meaning ascribed thereto in Section 1.04.

"Business Day" means a day on which banks are open for business in Miami, Florida and in the British Virgin Islands.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all of Borrower's right, title and interest in and to the following, whether now owned or hereafter acquired, whether now or hereafter existing and wherever located:

> (a)    a pledge and security interest in all of Borrower's rights to the payment of money however evidenced or arising, including each existing and future account, contract right, general intangible, instrument and document, within the meaning of the Florida Uniform Commercial Code (the "Code"), and in all trademarks, copyrights, good will, names, patents, licenses, inventions, causes of action and goods giving rise to Borrower's right to the payment of money, including such goods in which Borrower has retained a security interest or which have been reclaimed, returned or repossessed, all documents of title and warehouse receipts, and all book entries, records and files relating to the foregoing, and the proceeds (cash and non-cash) of all the foregoing and any insurance policies relating thereto;

> (b)    a pledge and security interest in all deposit accounts, credits, securities, moneys, or other property of Borrower which may at any time be in the possession of, delivered to, or owed by the Collateral Agent, including any proceeds or return or unearned premiums of insurance, and the proceeds of all the foregoing property; and

> (c)    a pledge and security interest in all short-term interest bearing securities, certificates of deposits and any other investment purchased

ES0256446

by Borrower or established by Borrower with proceeds of the Loan.

"Credit Insurance Protection" means insurance obtained by Borrower from American Credit Indemnity Company, or other qualified credit insurance company with an A.M. Best rating of not less than A+ Superior, which guarantees Borrower, as the "Insured", against loss due to insolvency of Obligors, as those terms are defined in the Policy.

"Eligible Account" shall mean each Account:

     (a)    which is payable in United States dollars;

     (b)    which is serviced by Borrower; and

     (c)    which has not been charged off in accordance with E.S. Bankest Corp.'s account guidelines.

"Eligible Receivable" shall mean each Receivable:

     (a)    which has arisen under an Eligible Account;

     (b)    which was created in compliance, in all material respects, with all requirements of law applicable to Borrower and pursuant to and in compliance with a factoring agreement which is enforceable in accordance with its terms (except that such enforceability may be limited by general principles of equity, whether considered in a suit at law or in equity, or by any applicable bankruptcy, insolvency or other laws of general application affecting creditor's rights);

     (c)    with respect to which all consents, licenses, approvals or authorizations of, or registrations or declarations with, any Governmental Authority required to be obtained, effected or given in connection with the creation of such Receivable or the execution, delivery and performance by Borrower of a factoring agreement pursuant to which such Receivable was created, have been duly obtained, effected or given and are in full force and effect as of such date of creation;

     (d)    as to which, at the time of the creation of such Receivable, Borrower has good and marketable title thereto free and clear of all liens;

     (e)    which is the legal, valid and binding payment obligation of the Obligor thereon, enforceable against such Obligor in accordance

ES0256447

with its terms, except as such enforceability may be limited by applicable debtor relief laws, and except as such enforceability may be limited by general principles of equity (whether considered in a suit of law or in equity); and

(f)        which constitutes an "account" under and as defined in Article 9 of the Uniform Commercial Code as then in effect in the State of Florida.

"Event of Default" means an event described in Section 5.01.

"Governmental Approval" means any authorization, order, permit, approval, grant, license, consent, commitment, right, franchise, privilege, certificate, judgment, writ, injunction, award, determination, direction, decree or demand or the like which may be issued or granted by law or by rule or regulation of any Governmental Body.

"Governmental Body" means any government, parliament or legislature, whether federal, provincial, state, municipal or otherwise, or any regulatory authority, agency, commission or board of any government, parliament or legislature, whether federal, provincial, state, municipal or otherwise, or any court or (without limitation to the foregoing) other law-making, regulation-making or rule-making entity having or purporting to have jurisdiction in the relevant circumstances, or any person acting or purporting to act under the authority of any of the foregoing.

"Holder" and "Holders" means the Persons entered in the Registers as holders of any of the Promissory Notes.

"Insured Accounts Receivable" shall include only Eligible Receivables for which Borrower has obtained, and continues to maintain, Credit Insurance Protection or Eligible Receivables which are receivables due from the United States government, or state government or instrumentality or agency thereof.

"Lenders' Resolution" means an instrument approving any action or circumstance specified therein or containing a determination by all of the Lenders or any of them or requiring the Collateral Agent to take some action or proceeding specified therein, and signed in one or more counterparts by Holders of at least 66-2/3% of the outstanding principal amount, in the aggregate, of all of the Promissory Notes.

ES0256448

"Maturity Date shall mean:

    (a)    with respect to a Six-Month Promissory Note, a date which is 185 days from its issue date;

    (b)    with respect to a Twelve-Month Promissory Note, a date which is 365 days from its issue date;

    (c)    with respect to a Roll-Over Option of s Six-Month Promissory Note, a date which is 185 days from the original Maturity Date;

    (d)    with respect to a Roll-Over Option of a Twelve-Month Promissory Note, a date which is 365 days from the original Maturity Date.

"Obligor" shall mean, with respect to any Account, the Person or Persons obligated to make payments with respect to such Account, including any guarantor thereof.

"Person" or "person" means an individual, corporation, partnership, trust, joint venture, unincorporated organization, or any other juridical entity or a Government Body; and pronouns have a similarly extended meaning.

"Promissory Notes" means collectively at any time, the Series A and B Notes issued and certified hereunder and outstanding at such time.

"Receivable" shall mean any and all amounts owing by the Obligors under an Account from time to time, including, without limitation, the right to payment of amounts owing for the payment of goods and services. A Receivable shall be deemed to have been created at the end of the day on the date of processing of such Receivable by the Borrower.

ES0256449

# EXHIBIT IV,

## MASTER CREDIT AGREEMENT

### Exhibits B

**B-1**
**Series A**
**Promissory Note**

**B-2**
**Series B**
**Promissory Note**

ES0256450

### EXHIBIT "B-1"

> **Any United States person who holds this obligation may be subject to limitations under United States income tax laws, including the limitations provided in Sections 165(j) and 1287(a) of the Internal Revenue Code of 1986, as amended.**

THIS PROMISSORY NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, NOR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION. THE PROMISSORY NOTE HAS NOT BEEN AND IS NOT BEING OFFERED FOR SALE IN THE UNITED STATES (OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), OR TO ANY PERSON WHO IS A U.S. PERSON (AS SUCH TERM IS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OF 1933, AS AMENDED). THIS NOTE IS SUBJECT TO SUBSTANTIAL RESTRICTIONS ON RESALE.

### SERIES A
### PROMISSORY NOTE

NOTE NO. _____

The capitalized and defined terms used in this Promissory Note shall have the following meanings:

HOLDER: _____ whose mailing address is c/o _____

_____ .

MAKER: E.S. BANKEST, LLC, a Florida corporation with its principal business address at 999 Brickell Avenue, Miami, Florida 33131

DATE:

PRINCIPAL AMOUNT: _____ *(S_____)*

DUE DATE:

PLACE OF EXECUTION:

> GOVERNING LAW: The laws of the State of Florida with regard to its conflicts of law principles shall govern all matters hereunder.
>
> LOAN AND SECURITY DOCUMENTS: Master Credit Agreement and Security Agreement dated as of April __, 1998.
>
> SECURITY: The property described in and conveyed or encumbered by the Security Documents.

**FOR VALUE RECEIVED**, Maker hereby promises to pay to the order of Holder, in lawful money of the United States of America at the office of the Holder, or at such other place outside the United States as Holder may designate in writing, the Principal Amount, or so much of the Principal Amount as shall be advanced by Holder to Maker with interest thereon, at the rate _____ *percent (  %), per annum.* Interest shall be calculated daily and on the basis of a 360-day year.

ES0256451

Accrued interest and principal shall be paid in a single lump sum on the Maturity Date.

This Note may be repaid at any time without penalty.

This Note is made pursuant to that certain Master Credit Agreement between E.S. BANKEST LLC, as Borrower, BANK ESPIRITO SANTO INTERNATIONAL, LTD., as Collateral Agent and the Lenders (as defined therein) and the obligations of the Holder and Maker hereunder shall be subject to all the terms and conditions of the Loan and Security Documents.

The Maturity Date of this Note may be extended by Holder's execution of a Request for Roll-Over/Maturity Extension of Promissory Note if accepted by the Borrower and certified by the Collateral Agent in accordance with the terms and conditions of the Master Credit Agreement.

Notwithstanding anything herein to the contrary, this Note is intended to qualify under the provisions of Sections 871 and 881 of the United States Internal Revenue Code of 1986, as amended, relating to the Repeal of Interest on Portfolio Debt Obligations of Certain Foreign Persons and, in accordance therewith, this Note may only be transferred by Holder in accordance with the provisions of the Master Credit Agreement and the registration-required obligation provisions of Section 163(f) of the Internal Revenue Code of 1986, as amended, and accompanying regulations.

If default be made in the payment of any installment under this Note or if the Maker violates any of the terms or breaches any of the conditions of the Master Credit Agreement or any other Credit Document, and such default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest shall become due and payable without notice at the option of the Holder unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control. Failure to exercise this option shall not constitute a waiver of the right to exercise the same at any other time. From and after default and until paid, the principal of this Note and any part thereof, and accrued and unpaid interest, if any, shall bear interest at the highest legal rate permissible under applicable law (the "Default Rate"). Without limiting the scope or generality of any other obligations of Maker set forth in the Master Credit Agreement with respect to attorneys' fees, all parties liable for the payment of this Note agree to pay the Holder hereof reasonable attorneys' fees and paralegal fees for the services and expenses of counsel employed after maturity or default to collect this Note (including any bankruptcy proceedings or appeals relating to such enforcement proceedings), or to protect or enforce its rights in any collateral securing this Note, whether or not suit be brought.

The remedies of Holder as provided herein, in the Master Credit Agreement and in the other Loan Documents shall be cumulative and concurrent, and may be pursued singly, successively or together, at the sole discretion of Holder, and may be exercised as often as occasion therefor shall arise.

Maker and all sureties, endorsers and guarantors of this Note hereby: (a) waive demand, presentment for payment, notice of nonpayment, protest, notice of protest and all other notice, filing of suit and diligence in collecting this Note, in enforcing any of the security rights or in proceeding against any collateral securing this Note; (b) agree that this Note may be enforced by Holder against Maker without the necessity at any time of resorting to or exhausting any of the collateral for the Note; (c) waive the right to require the Holder to proceed against any of the collateral, or to require the Holder to pursue any other remedy or enforce any right; and (d) agree that, notwithstanding the occurrence of any of the foregoing (except the express written release by Holder of any such person), Maker shall be and remain directly and primarily liable for all sums due under this Note.

Upon the occurrence of a default under the terms of this Note or any of the Loan Documents, the Holder is hereby authorized at any time or from time to time without notice to the Maker or to any other person, any such notice being hereby expressly waived, to immediately set off and appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by the Holder to or for the

ES0256452

credit or the account of the Maker against and on account of the obligations and liabilities of the Maker hereunder.

This Note shall be governed by, and construed and enforced according to, the laws of the State of Florida, without giving effect to conflicts of laws principles, except where specifically preempted by Federal law. Any action brought against the Maker, or any guarantor or indemnitor of the indebtedness or obligations arising under this Note, shall be brought in the State or Federal Courts of Miami-Dade County, Florida and Maker and Holder hereby submit to jurisdiction in such location.

Notwithstanding anything herein to the contrary, the Holder does not intend to violate any applicable usury laws. Accordingly, all agreements between Maker and Holder are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder (including all interest on this Note, all loan fees, and the aggregate of all other amounts taken, reserved or charged pursuant to this Note, the Master Credit Agreement or any Loan Documents, which, under applicable laws is or may be deemed to be interest) exceed the maximum rate allowed by applicable law. If, from any circumstances whatsoever, at the time performance of such obligation shall be due, shall cause the effective rate of interest upon the sums evidenced hereby to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal, the excess shall be refunded to the Maker. This provision shall control every other provision of all agreements between the Maker and the Holder.

**THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THEREOF, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION THEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER EXTENDING THIS LOAN, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THERETO.**

IN WITNESS WHEREOF, Maker has executed this Note as of the date first herein above written.

WITNESSES:

MAKER:

**E.S. BANKEST LLC,** a Florida corporation

By: _____
Print Name:_____
Title: _____

_____

_____

-3-

ES0256453

## EXHIBIT "B-2"

> Any United States person who holds this obligation may be subject to limitations under United States income tax laws, including the limitations provided in Sections 165(j) and 1287(a) of the Internal Revenue Code of 1986, as amended.

THIS PROMISSORY NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, NOR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION. THE PROMISSORY NOTE HAS NOT BEEN AND IS NOT BEING OFFERED FOR SALE IN THE UNITED STATES (OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), OR TO ANY PERSON WHO IS A U.S. PERSON (AS SUCH TERM IS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OF 1933, AS AMENDED). THIS NOTE IS SUBJECT TO SUBSTANTIAL RESTRICTIONS ON RESALE.

### SERIES B
### PROMISSORY NOTE

NOTE NO. _____

The capitalized and defined terms used in this Promissory Note shall have the following meanings:

HOLDER: _____ whose mailing address is c/o_____
_____ .

MAKER:     E.S. BANKEST, LLC, a Florida corporation with its principal business address at 999 Brickell Avenue, Miami, Florida 33131

DATE:

PRINCIPAL AMOUNT:     _____ ($_____ )

DUE DATE:

PLACE OF EXECUTION:

GOVERNING LAW: The laws of the State of Florida with regard to its conflicts of law principles shall govern all matters hereunder.

LOAN AND SECURITY DOCUMENTS: Master Credit Agreement and Security Agreement dated as of April __, 1998.

SECURITY: The property described in and conveyed or encumbered by the Security Documents.

FOR VALUE RECEIVED, Maker hereby promises to pay to the order of Holder, in lawful money of the United States of America at the office of the Holder, or at such other place outside the United States as Holder may designate in writing, the Principal Amount, or so much of the Principal Amount as shall be advanced by Holder to Maker with interest thereon, at the rate _____ *percent (    %), per annum.* . Interest shall be calculated daily and on the basis of a 360-day year.

ES0256454

Accrued interest shall be paid one hundred and eighty five (185) days after the date of issuance and additional accrued interest and all outstanding principal shall be paid in a single lump sum on the Maturity Date.

This Note may be repaid at any time without penalty.

This Note is made pursuant to that certain Master Credit Agreement between E.S. BANKEST LLC, as Borrower, BANK ESPIRITO SANTO INTERNATIONAL, LTD., as Collateral Agent and the Lenders (as defined therein) and the obligations of the Holder and Maker hereunder shall be subject to all the terms and conditions of the Loan and Security Documents.

Notwithstanding anything herein to the contrary, this Note is intended to qualify under the provisions of Sections 871 and 881 of the United States Internal Revenue Code of 1986, as amended, relating to the Repeal of Interest on Portfolio Debt Obligations of Certain Foreign Persons and, in accordance therewith, this Note may only be transferred by Holder in accordance with the provisions of the Master Credit Agreement and the registration-required obligation provisions of Section 163(f) of the Internal Revenue Code of 1986, as amended, and accompanying regulations.

If default be made in the payment of any installment under this Note or if the Maker violates any of the terms or breaches any of the conditions of the Master Credit Agreement or any other Credit Document, and such default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest shall become due and payable without notice at the option of the Holder unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control. Failure to exercise this option shall not constitute a waiver of the right to exercise the same at any other time. From and after default and until paid, the principal of this Note and any part thereof, and accrued and unpaid interest, if any, shall bear interest at the highest legal rate permissible under applicable law (the "Default Rate"). Without limiting the scope or generality of any other obligations of Maker set forth in the Master Credit Agreement with respect to attorneys' fees, all parties liable for the payment of this Note agree to pay the Holder hereof reasonable attorneys' fees and paralegal fees for the services and expenses of counsel employed after maturity or default to collect this Note (including any bankruptcy proceedings or appeals relating to such enforcement proceedings), or to protect or enforce its rights in any collateral securing this Note, whether or not suit be brought.

The remedies of Holder as provided herein, in the Master Credit Agreement and in the other Loan Documents shall be cumulative and concurrent, and may be pursued singly, successively or together, at the sole discretion of Holder, and may be exercised as often as occasion therefor shall arise.

Maker and all sureties, endorsers and guarantors of this Note hereby: (a) waive demand, presentment for payment, notice of nonpayment, protest, notice of protest and all other notice, filing of suit and diligence in collecting this Note, in enforcing any of the security rights or in proceeding against any collateral securing this Note; (b) agree that this Note may be enforced by Holder against Maker without the necessity at any time of resorting to or exhausting any of the collateral for the Note; (c) waive the right to require the Holder to proceed against any of the collateral, or to require the Holder to pursue any other remedy or enforce any right; and (d) agree that, notwithstanding the occurrence of any of the foregoing (except the express written release by Holder of any such person), Maker shall be and remain directly and primarily liable for all sums due under this Note.

Upon the occurrence of a default under the terms of this Note or any of the Loan Documents, the Holder is hereby authorized at any time or from time to time without notice to the Maker or to any other person, any such notice being hereby expressly waived, to immediately set off and appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by the Holder to or for the credit or the account of the Maker against and on account of the obligations and liabilities of the Maker hereunder.

-2-

ES0256455

This Note shall be governed by, and construed and enforced according to, the laws of the State of Florida, without giving effect to conflicts of laws principles, except where specifically preempted by Federal law. Any action brought against the Maker, or any guarantor or indemnitor of the indebtedness or obligations arising under this Note, shall be brought in the State or Federal Courts of Miami-Dade County, Florida and Maker and Holder hereby submit to jurisdiction in such location.

Notwithstanding anything herein to the contrary, the Holder does not intend to violate any applicable usury laws. Accordingly, all agreements between Maker and Holder are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder (including all interest on this Note, all loan fees, and the aggregate of all other amounts taken, reserved or charged pursuant to this Note, the Master Credit Agreement or any Loan Documents, which, under applicable laws is or may be deemed to be interest) exceed the maximum rate allowed by applicable law. If, from any circumstances whatsoever, at the time performance of such obligation shall be due, shall cause the effective rate of interest upon the sums evidenced hereby to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal, the excess shall be refunded to the Maker. This provision shall control every other provision of all agreements between the Maker and the Holder.

**THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THEREOF, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION THEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER EXTENDING THIS LOAN, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THERETO.**

IN WITNESS WHEREOF, Maker has executed this Note as of the date first herein above written.

WITNESSES:                          MAKER:

                                    E.S. BANKEST LLC, a Florida corporation


_____        By: _____
                                    Print Name:_____
_____        Title: _____


-3-

ES0256456

## EXHIBIT IV,

## MASTER CREDIT AGREEMENT

### Exhibits C

**C-1**
**Request for Roll-Over/Maturity Extension**
**of**
**Promissory Note (185-Day)**

**C-2**
**Request for Roll-Over/Maturity Extension**
**of**
**Promissory Note (365-Day)**

ES0256457

## EXHIBIT "C-1"

## REQUEST FOR ROLL-OVER/MATURITY EXTENSION
## OF
## PROMISSORY NOTE

### (185-DAY PROMISSORY NOTE)

The undersigned Noteholder is the registered holder of a 185-Day Promissory Note (the "Note") issued by E.S. Bankest LLC (the "Company") and secured by the Master Security Agreement and Collateral Agent Agreement through Bank Espirito Santo International, Ltd. (the "Collateral Agent"). The Note issue date, maturity date, and face value are as follows:

> ISSUE DATE:_____
> ORIGINAL MATURITY DATE:_____
> FACE VALUE: _____

Pursuant to the terms of the Master Credit Agreement (as defined in the Note), the undersigned Noteholder elects and requests to extend the Original Maturity Date of the Note. By signing this Request, I/we understand and agree to the following terms and conditions:

1.      If accepted by the Company, and certified by the Collateral Agent, the Note shall be renewed for the Roll-Over/Maturity Extension Term (the "Extension Term"), which shall be equal to 185 days. The Extension Term shall commence on the Original Maturity Date.

2.      During the Extension Term, the Note shall bear interest at the rate equal to LIBOR plus 1.5% as determined on the Original Maturity Date (the then rate for other 185-Day Promissory Notes issued on such date).

I/we further warrant and represent to the Company and the Collateral Agent that the information contained in the original Subscription Agreement executed by me/us, including in particular such information as relates to my/our status as an "accredited investor," continues to be correct, complete and accurate as of this date and the Company has provided me/us with access to all relevant information and documents desired or requested.

I/we understand that the Company shall not be obligated to accept this Request and that any Request must be tendered to the Company at least 90 days prior to the Original Maturity Date. Failure to provide this Request within 90 days of the Original Maturity Date shall be considered by the Company to be a waiver of this right. In the event that the Company elects not to accept this Request, I/we understand that the Note will mature on the Original Maturity Date in accordance with the Master Credit Agreement.

Noteholder:

_____

Print Name:_____

ES0256458

## EXHIBIT "C-2"

### REQUEST FOR ROLL-OVER/MATURITY EXTENSION
### OF
### PROMISSORY NOTE

#### (365-DAY PROMISSORY NOTE)

The undersigned Noteholder is the registered holder of a 365-Day Promissory Note (the "Note") issued by E.S. Bankest LLC (the "Company") and secured by the Security Agreement and Collateral Agent Agreement through Bank Espirito Santo International, Ltd. (the "Collateral Agent"). The Note issue date, maturity date and face value are as follows:

> ISSUE DATE:_____
> ORIGINAL MATURITY DATE:_____
> FACE VALUE: _____

Pursuant to the terms of the Master Credit Agreement (as defined in the Note), the undersigned Noteholder elects and requests to extend the Original Maturity Date of the Note. By signing this Request, I/we understand and agree to the following terms and conditions:

1. If accepted by the Company, and certified by the Collateral Agent, the Note shall be renewed for the Roll-Over/Maturity Extension Term (the "Extension Term"), which shall be equal to 365 days. The Extension Term shall commence on the Original Maturity Date.

2. During the Extension Term, the Note shall bear interest at the rate equal to LIBOR plus 1.75% as determined on the Original Maturity Date (the then rate for other 365-Day Promissory Notes issued on such date).

I/we further warrant and represent to the Company and the Collateral Agent that the information contained in the original Subscription Agreement executed by me/us, including in particular such information as relates to my/our status as an "accredited investor," continues to be correct, complete and accurate as of this date and the Company has provided me/us with access to all relevant information and documents desired or requested.

I/we understand that the Company shall not be obligated to accept this Request and that any Request must be tendered to the Company at least 90 days prior to the Original Maturity Date. Failure to provide this Request within 90 days of the Original Maturity Date shall be considered by the Company to be a waiver of this right. In the event that the Company elects not to accept this Request, I/we understand that the Note will mature on the Original Maturity Date in accordance with the Master Credit Agreement.

Noteholder:

_____

Print Name:_____

# EXHIBIT IV,

## MASTER CREDIT AGREEMENT

### Exhibit D

**Master Security Agreement**

ES0256460

## EXHIBIT "D"

## MASTER SECURITY AGREEMENT
### AND
## APPOINTMENT OF COLLATERAL AGENT AGREEMENT

THIS MASTER SECURITY AGREEMENT AND APPOINTMENT OF COLLATERAL AGENT AGREEMENT dated as of April __, 1998, by and among E.S. BANKEST CORP., a Florida corporation with its principal business address at 1395 Brickell Avenue, Suite 700, Miami, Florida, USA 33131 ("Debtor"), BANK ESPIRITO SANTO INTERNATIONAL, LTD., a Cayman Islands corporation, (hereinafter sometimes referred to either as the "Collateral Agent," "Secured Party," or "Collateral Agent as Secured Party") and each of the Lenders to Debtor pursuant to that certain Master Credit Agreement dated of even date herewith.

## RECITALS

A.    Debtor is engaged in the operation of a non-regulated traditional factoring business;

B.    In order to finance Debtor's factoring business, Debtor desires to issue certain Promissory Notes (as more particularly defined in the Master Credit Agreement) to certain investors which shall become the lenders ("Lenders") of the Loan to Debtor under the Master Credit Agreement, which loans are intended to be secured by the Collateral as hereinafter set forth;

C.    In order to secure the Promissory Notes and thus create a valid and subsisting security interest in the accounts receivable and other assets acquired by Debtor pursuant to its factoring business, and as a condition of the Master Credit Agreement, Debtor by this instrument intends and hereby grants the security interest in favor of the Collateral Agent as Secured Party on behalf of the Lenders pursuant to the terms and conditions herein contained.

NOW, THEREFORE, in consideration of the mutual promises and other covenants herein contained, and for $1.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

Section 1. Defined Terms. Capitalized Terms shall have the same meaning as used in the Master Credit Agreement except as otherwise defined herein.

Section 2. Grant of Security Interest. Debtor hereby pledges and assigns to Collateral Agent as Secured Party acting on behalf of itself and the Lenders, and hereby grants Collateral Agent as Secured Party a Uniform Commercial Code security interest in all of Debtor's right, title and interest

ES0256461

in and to the following, whether now owned or hereafter acquired, whether now or hereafter existing and wherever located (the "Collateral"):

      (a)    a pledge and security interest in all of Debtor's rights to the payment of money however evidenced or arising, including each existing and future account, contract right, general intangible, instrument and document, within the meaning of the Florida Uniform Commercial Code (the "Code"), and in all trademarks, copyrights, good will, names, patents, licenses, inventions, causes of action and goods giving rise to Debtor's right to the payment of money, including such goods in which Debtor has retained a security interest or which have been reclaimed, returned or repossessed, all documents of title and warehouse receipts, and all book entries, records and files relating to the foregoing, and the proceeds (cash and non-cash) of all the foregoing and any insurance policies relating thereto;

      (b)    a pledge and security interest in all deposit accounts, credits, securities, moneys, or other property of Debtor which may at any time be in the possession of, delivered to, or owed by the Secured Party, including any proceeds or return or unearned premiums of insurance, and the proceeds of all the foregoing property; and

      (c)    a pledge and security interest in all short-term interest bearing securities, certificates of deposits and any other investment purchased by Debtor or established by Debtor with proceeds of the Loan.

Section 3.  Collateral: Use of Loan Proceeds.

      (a)    At all times during which any of the Promissory Notes evidencing the Loan are outstanding, Debtor has covenanted and agreed under the Master Credit Agreement to limit the use of proceeds from the Loan for the payment of the purchase price, including factoring advances, of certain accounts receivable from clients and has further agreed that all unused proceeds of the Loan shall be invested in certificates of deposit or other accounts of insured financial institutions, United States federal treasury bills and notes or other investment grade securities ("Approved Securities") which, together with the Collateral defined in Section 2 above, are hereby pledged to the Secured Party as part of the Collateral.

      (b)    Debtor agrees to maintain receivables of a face value equal to at least 120% of the amount of Loan proceeds not invested in Approved Securities.

      (c)    Debtor will, upon request of the Secured Party, certify that the value of the Collateral is in accordance with the covenants contained in Section (a) and (b) above (the "Collateral Value Certification"). Debtor shall provide the Secured Party with such Collateral Value Certification not less often than quarterly.

ES0256462

Section 4. Secured Obligations.

(1)    The foregoing security interests are granted to the Collateral Agent as Secured Party on behalf of the Lenders as security for the due, prompt, full and complete payment and performance by Debtor of: (a) all obligations of Debtor under this Agreement and the Master Credit Agreement, including without limitation the due and punctual payment of all sums due and to become due under the Promissory Notes, as the same become due and payable, whether at maturity, by acceleration or otherwise; (b) all costs and expenses, including reasonable attorney's fees, incurred by the Secured Party in the collection of the same or in the enforcement of any of the rights of the Secured Party or the Lenders hereunder or under or in connection with the Promissory Notes; (c) all future advances made by the Secured Party or the Lenders for taxes, levies, insurance and repairs to, or maintenance or protection of, any of the Collateral; and (d) all other past, present and future, direct or indirect, absolute or contingent, liabilities of Debtor arising under this Agreement, the Master Credit Agreement or any other related document (collectively, the "Secured Obligations")

(2)    All obligations secured hereby shall be secured with the same priority at all times, notwithstanding that any such obligations may be increased or decreased at any time during the term hereof; provided the Secured Party in its sole discretion may elect to enforce any remedies hereunder in any order of priority, partially or fully, as to any particular obligation or collateral, without otherwise affecting its remaining interests hereunder.

Section 5. Borrower's Right to Grant Additional Security Interests Ranking Equal to Obligations Secured Hereby. Pursuant to the Shareholders Agreement between the Debtor's existing shareholders, Espirito Santo Bank of Florida has agreed that so long as it is a shareholder of the Debtor, in the event the Debtor can not raise sufficient working capital through the issuance of Notes under the Master Credit Agreement or other similar borrowings, Espirito Santo Bank shall provide or cause third parties (which may or may not be affiliates of Espirito Santo Bank) to provide the Debtor with a line or lines of credit of up to an aggregate maximum amount of Thirty Million Dollars and 00/100 ($30,000,000.00). Advances under any such line shall be for a maximum of three hundred sixty (360) days and shall bear interest (i) in the case of the first Five Million Dollars ($5,000,000.00) at the same rates as provided in the Master Credit Agreement for Series A and B Notes, depending on whether such advances are for 180 days or 360 days and (ii) for amounts in excess of $5,000,000, at a rate not to exceed the one year LIBOR rate in effect on the date of the advance plus two percent (2%) per annum. All advances under such lines of credit shall be evidenced and secured by notes issued by the Debtor under the terms and conditions then generally offered by the Debtor under the Master Credit Agreement, excepting only as to rate of interest which shall be in the amount aforesaid, and such advances are to be secured by a security interest in the same assets of the Debtor which constitute the Collateral hereunder. In accordance with the foregoing, and as permitted under the Mater Credit Agreement, so long as the Debtor is not in default under this Agreement or the other Loan Documents, the Collateral Agent is authorized to permit the Debtor to execute and deliver a security interest to such lenders, which security interest shall rank pari passu with the liens secured herein by the Collateral.

---

ES0256463

Section 6. Effective Date of Security. The mortgages, assignments, pledges, charges and security interests hereby created or provided to be created shall be effective whether the moneys thereby secured or any part thereof shall be advanced before or after or at the same time as the issue of any of the Promissory Notes intended to be secured thereby or before or after or upon the date of execution of this Agreement.

Section 7. Defeasance. These presents are upon the express condition that if Debtor shall well and truly pay all moneys payable to the Secured Party and satisfy all obligations secured hereby then these presents and the rights hereby granted shall cease and become null and void and the Collateral shall revert to and revest in Debtor, without any release, acquittance, reconveyance, re-entry or other act or formality whatsoever.

Section 8. Assignments. Nothing in this Agreement shall be construed as an attempt to assign (i) any representation, warranty, covenant, agreement, account, claim, demand or cause of action which, as a matter of law or by its terms, is non-assignable without the consent of some other person unless such consent shall have been given or (ii) unless and to the extent that any Lenders' Resolution otherwise requires, any agreement or claim as to which all the remedies for the enforcement of same that are available to Debtor would not, as a matter of law, be available to the Secured Party upon any realization proceedings hereunder, provided, however, that the foregoing shall not apply to any such agreement or claim which would be available to the Secured Party, except as otherwise provided in this Section 7. In order, however, that the full value of the items described in clauses (i) and (ii) above may constitute security hereunder and may be realized for the benefit of the Secured Party, Debtor shall at its expense and at the request of the Secured Party or pursuant to any Lenders' Resolution to that effect, in the name of Debtor or otherwise as the Secured Party or Lenders' Resolution may specify, and whether as Secured Party or agent of the Secured Party or otherwise, execute and deliver any necessary financing statements and take all such action and do or cause to be done all such things as shall, in the reasonable opinion of the Secured Party or as specified in such Lenders' Resolution, be necessary or proper in order that the items described in clauses (i) and (ii) above shall inure to the benefit of and be enforceable in favor of the Secured Party and the Lenders.

Section 9. Attachment. Debtor and the Secured Party agree that it is their intention that the security interests hereby created shall attach immediately to the Collateral in which Debtor has any interest on the date hereof, and, with respect to any after-acquired property, forthwith at the time Debtor shall acquire an interest therein.

Section 10. Release of Collateral. The Secured Party shall, upon receipt of a Lenders' Resolution to such effect, release any part of the Collateral from the lien hereof or concur in Debtor dealing in any part of such Collateral, in the manner specified in such Lenders' Resolution.

---

4

ES0256464

Section 11. Releases by Secured Party. Subject to Sections 6 and 9, the Secured Party shall not release any part of the Collateral from the lien hereof at any time, whether or not an Event of Default shall have occurred and be continuing.

Section 12. Application of Moneys Held by Secured Party.

(a)    Any moneys received by the Secured Party in respect of the Collateral and all other moneys at any time held by or on behalf of the Secured Party pursuant to any other provisions hereof or of any other instruments or agreements in connection with the Collateral, the disposition of which is not otherwise provided for herein, shall be held by the Secured Party as part of the Collateral and applied by the Secured Party as directed by a Lenders' Resolution. Pending such application, such moneys shall be held and dealt with by the Secured Party in accordance with Section 32.

(b)    In no case shall the receipt of moneys by the Secured Party from releases or other dealings with any Collateral be deemed to be a payment hereunder nor shall the lien hereof be affected by reason of such receipt except as herein expressly provided.

Section 13. Protection of Purchasers. It is hereby declared and agreed that no purchaser or purchasers from, or other person having dealings with, Debtor or the Secured Party or their respective permitted successors or assigns shall be obliged to inquire into the necessity, expediency, authority or regularity of or for any action or concurrence on the part of the Secured Party or any release or other instrument taken or given under the provisions of this Section nor be obliged to inquire into the sufficiency of the performance by Debtor of any of the conditions upon which it is or may be entitled to any such action or concurrence or release or other instrument.

Section 14. Proceeds Held in Trust. Subject to the provision of Section 6, all proceeds of any disposition or transfer of the Collateral received or obtained by Debtor at any time shall be held in trust by Debtor for the benefit of the Lenders and forthwith delivered to the Secured Party.

Section 15. Representations and Warranties. Debtor represents and warrants to Secured Party as set forth below.

(a)    Debtor is the legal and beneficial owner of the Collateral, free and clear of any lien, security interest, charge or encumbrance other than the security interest created by this Agreement. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office, except such as may have been filed in favor of Secured Party relating to this Agreement.

(b)    Debtor has the exclusive right and claim to the Collateral.

5

ES0256465

(c)     Debtor does not have any bank accounts or other deposit accounts other than in the bank accounts, as described in Exhibit "A" attached hereto (the "Bank Accounts") and a payroll account. Debtor does not have any deposit accounts into which deposits by third parties are made or amounts received from third parties are deposited other than the Bank Accounts. Debtor has instructed all account debtors and obligors to make payments directly into the Bank Accounts.

(d)     This Agreement, together with (i) appropriate UCC-1 filings in the states identified in Exhibit "B" attached hereto and (ii) an appropriate letter agreement with the bank at which the Bank Accounts are maintained, creates a valid and perfected first-priority security interest in the Collateral, securing the payment of the Secured Obligations, and all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken or made.

(e)     No authorization, approval or other action by, or notice to or filing with, any governmental authority or regulatory body (other than appropriate UCC-1 filings) is required (i) for the grant by Debtor of the security interest granted hereby or for the execution, delivery or performance of this Agreement by Debtor or (ii) for the perfection of or the exercise by Secured Party of its rights and remedies hereunder.

(f)     The execution, delivery and performance by Debtor of this Agreement are within Debtor's corporate powers, have been duly authorized by all necessary corporate action and do not contravene (i) Debtor's articles of incorporation or bylaws or (ii) any applicable law or contractual restriction binding on or affecting Debtor. This Agreement has been duly executed and delivered by Debtor and is the legal, valid and binding obligation of Debtor, enforceable against Debtor in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting creditors, rights generally.

Section 16. Further Assurances.

(a)     Debtor agrees that at any time and from time to time, at its own expense, it will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Secured Party may request, in order to perfect and protect the security interest granted or purported to be granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

(b)     Debtor hereby authorizes Secured Party to file one or more financing or continuation statements, and amendments thereto, relating to all or any part of the Collateral without the signature of Debtor where permitted by law. A photographic or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

6

ES0256466

(c)     Debtor will furnish to Secured Party from time to time such statements and schedules further identifying and describing the Collateral, and such other reports in connection with the Collateral, as Secured Party may reasonably request.

Section 17.  Conditions Precedent to Collateral Agent's Obligation to Act.

(a)     The obligation of the Collateral Agent to commence or continue any act, action or proceeding for the purpose of enforcing any rights of the Collateral Agent as Secured Party on behalf of any of the Lenders hereunder shall be conditional upon the Lenders or, if less than all the Lenders request that the Collateral Agent as Secured Party proceed to realize upon the lien hereof and to enforce its rights as contemplated by Sections 27 and 45, then, upon such requesting Lender or Lenders furnishing, when required by notice in writing by the Collateral Agent, sufficient funds to commence or continue such act, action or proceeding and an indemnity reasonably satisfactory to the Collateral Agent to protect and hold harmless the Collateral Agent against the costs, charges and expenses and liabilities to be incurred thereby and any loss and damage it may suffer by reason thereof.  Without limiting the generality of the foregoing, such requesting Lender or Lenders shall ensure that the Collateral Agent is furnished with sufficient funds:

(i)     to pay all amounts it is required to pay pursuant to Section 27;

(ii)     to pay amounts necessary to discharge all liens, if any, on the Collateral ranking (or capable of ranking) in priority to the lien hereof or to keep any such prior lien in good standing; and

(iii)     to pay all costs and expenses incurred in connection with the repossession, holding, processing, preparing for disposition and remarketing of the Collateral.

(b)     None of the provisions contained in this Agreement shall require the Collateral Agent as Secured Party to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers unless indemnified as aforesaid.

(c)     The Collateral Agent as Secured Party may, before commencing, or at any time during the continuance of, any such act, action or proceeding, require the Lenders at whose instance it is acting to deposit with the Collateral Agent the Promissory Notes held by it, for which Promissory Notes the Collateral Agent shall issue receipts.

Section 18.  Evidence.

(a)     Whenever it is provided in this Agreement with reference to any application to the Collateral Agent as Secured Party, for the certification and delivery of Promissory Notes, the release of property, the withdrawal of money or other action hereunder or thereunder, that Debtor shall deposit with the Collateral Agent resolutions, certificates or other documents, it is intended

7

ES0256467

that the truth, accuracy and good faith at the time of granting of such application (or on the effective date of any such certificate or document, as the case may be) of the acts and opinions stated in all documents so deposited shall, in each and every such case, be conditions precedent to the right of Debtor to have such application granted.

(b)     The Collateral Agent as Secured Party may rely and shall be protected in acting upon any resolution, certificate or other document believed by it to be genuine and to have been signed, sent or presented by or on behalf of the proper party or parties. However the Collateral Agent may in its discretion require reasonable evidence of the due execution thereof before acting or relying thereon.

Section 19.  Experts and Advisors.  The Secured Party may act and shall be protected in acting in good faith on the opinion or advice of or information obtained from any counsel, accountant or other expert or advisor, whether retained or employed by Debtor or the Secured Party, in relation to any matters arising in the performance of the Secured Party's duties as Collateral Agent.

Section 20.  Documents, Cash, Etc. Held by the Secured Party.

(a)     Pending the application or withdrawal thereof under any of the provisions of this Agreement, all moneys that may at any time be deposited with or held by the Collateral Agent as Secured Party in accordance with the provisions hereof shall be held in an account maintained by the Collateral Agent or invested by the Collateral Agent (and reinvested) in Approved Securities in the same currency as the moneys so deposited and held by the Collateral Agent for the exclusive benefit of the Lenders, provided that if the Collateral shall revert to Debtor in accordance with Section 6, any amounts to be discharged or any residual amounts shall be paid to Debtor, and the Collateral Agent may deposit the same or any part thereof in the name of the Collateral Agent in the deposit vaults of the Collateral Agent or of any Eligible Institution or for safekeeping with any Eligible Institution.

(b)     For the purposes of immediately applying the proceeds of any Approved Securities pursuant to any provision hereof the Collateral Agent as Secured Party may sell such Approved Securities from time to time in its discretion at the best prices in the Collateral Agent's opinion obtainable.  Unless a Default or an Event of Default (as defined in Article V of the Master Credit Agreement) shall have occurred and be continuing, all interest or other income received by the Collateral Agent as Secured Party in respect of such investments and any profits realized by the Collateral Agent as Secured Party upon any such sale thereof shall belong to Debtor.

Section 21.  Action by Secured Party to Protect Security.  After the occurrence of an Event of Default and so long as it is continuing, the Secured Party shall have power to institute and maintain such action and proceedings as it may consider necessary or expedient to prevent any impairment of the lien hereof by any acts of Debtor or of other persons or to preserve or protect its

8

ES0256468

interests and the security and interests of the Lenders in respect of the Collateral or in respect of the income, earnings, rents, issues and profits thereof.

Section 22. Secured Party Not Required to Give Security. The Collateral Agent shall not be required to give any security in respect of the appointment as Collateral Agent or as Secured Party under this Agreement or otherwise in respect of the Collateral.

Section 23. Protection of the Lenders. By way of supplement to the provisions of any law for the time being relating to secured parties, it is expressly declared and agreed that, except as otherwise provided herein:

(a)     neither the Collateral Agent as Secured Party nor any Lender shall be liable for or by reason of any failure or defect of title to, or any lien upon, the Collateral;

(b)     neither the Collateral Agent as Secured Party nor any Lender shall be liable for or by reason of any statements of fact or recitals in this Agreement or in the Promissory Notes (except in the certificate of the Secured Party thereon) or be required to verify the same, but all such statements or recitals are and shall be deemed to be made by Debtor;

(c)     nothing herein contained shall cast any obligation on the Secured Party or any Lender to see to or to require evidence of the registration or filing or renewal of this Agreement or any other instrument ancillary or supplemental hereto or any other document or writing by way of mortgage, security interest or charge upon the Collateral or any part thereof or upon any other property of Debtor or to procure any further, other or additional instrument or to do any other act for the continuance of the lien hereof or for giving notice of the existence of such liens or for extending or supplementing the same;

(d)     neither the Secured Party nor any Lender shall be bound to give notice to any person or persons of the execution hereof or of the lien hereof or in any way to interfere with the conduct of the business of Debtor unless and until the lien hereof shall have become enforceable and the Secured Party shall have become bound to enforce the same;

(e)     the Secured Party and each Lender on their own behalf or in any other capacity, may buy, lend upon and deal in shares in the capital stock of and other securities of Debtor and in the Promissory Notes generally may contract and enter into financial transactions with Debtor or any affiliate of Debtor without being liable to account for any profit made thereby.

Section 24. Replacement of the Secured Party. The Secured Party may resign as collateral agent and be discharged from all further duties and liabilities hereunder by giving to Debtor and the Lenders two months prior notice in writing or such shorter notice as Debtor and the Lenders may accept as sufficient. The Lenders shall have power at any time to remove the Collateral Agent as Secured Party from its position and to appoint a new collateral agent to act as secured party, the costs of which removal and appointment shall be at Debtor's expense. In the event of the Secured

9

ES0256469

Party resigning or being removed as set forth above or being dissolved, becoming bankrupt, going into liquidation or otherwise becoming incapable of acting hereunder, Debtor shall forthwith appoint a new collateral agent to act as secured party unless a new collateral agent has already been appointed by the Lenders; failing such appointment by Debtor, the retiring Collateral Agent or any Lender may apply to a court of competent jurisdiction for the appointment of a new collateral agent to act as secured party; but any new collateral agent so appointed by Debtor or by the Court shall be subject to removal as aforesaid by the Lenders. Any new collateral agent appointed under any provision of this section shall be a corporation authorized and qualified to carry on business in its jurisdiction of organization and in every other jurisdiction where such authorization or qualification is necessary to enable it to act as secured party and collateral agent hereunder. On any new appointment the new secured party and collateral agent shall, to the extent permitted by law, be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as secured party and collateral agent, without any further assurance, conveyance, act or authorization; but there shall be immediately executed, at the expense of Debtor, all such conveyances or other instruments as may, in the opinion of counsel, be necessary or advisable for the purpose of assuring to the new secured party a perfected security interest in the Collateral. Any corporation into which the Secured Party may be merged or with which it may be consolidated or amalgamated, or any corporation resulting from any merger, consolidation or amalgamation to which the Secured Party shall be a party, shall be the successor Secured Party under this Agreement without the execution of any instrument or any further act. Except as otherwise provided herein, the costs of resignation and appointment of Secured Parties hereunder shall be at the expense of Debtor.

Section 25.  Acceptance of Duties as Collateral Agent.  The Secured Party hereby accepts the duties of Collateral Agent as set forth in this Agreement and agrees to perform the same upon the terms and conditions set forth herein and to hold the Collateral and the fixed and specific mortgages, assignments, pledges, charges and security interests and all the rights, privileges and benefits conferred hereby and by law as Collateral Agent, for the various persons who shall from time to time be Lenders, each of whom shall be owed the relevant legal duties as principals of such Collateral Agent, subject to all the terms and conditions set forth herein.

Section 26.  Legislation Relating to Agreements.  The provisions of these Sections 16 through 25 are subject to the provisions of any legislation applicable from time to time relating to Agreements and to the rights, duties and obligations of Secured Parties acting as agents responsible for the safekeeping of property and of corporations serving as agents to certain principals.

Section 27.  General Liability of Secured Party as Collateral Agent.  Notwithstanding anything herein to the contrary, Secured Party shall not be liable for any action taken or failure to act in the performance of its duties as Secured Party hereunder unless such action or failure of action shall have resulted from Secured Party's gross negligence or willful fraud.

10

ES0256470

Section 28.  Duties and Rights of Collateral Agent.

(a)    Notice to Lenders.  Upon the Collateral Agent becoming aware of the occurrence of any material Event of Default arising under this Agreement or the Master Credit Agreement, it shall give notice to the Lenders and each Holder of a Promissory Note of the occurrence of the Event of Default unless the Collateral Agent in good faith determines and reasonably believes that the withholding of such notice is in the best interest of the Lenders and Holders of Promissory Notes and so advises Debtor in writing.  Where notice of the occurrence of the Event of Default has been given to Lenders and Holders of Promissory Notes and the Event of Default is thereafter remedied or cured, notice that the Event of Default is no longer continuing shall be given by the Collateral Agent to the Lenders and Holders of Promissory Notes within a reasonable time, but not exceeding 30 calendar days, after the Collateral Agent becomes aware that the Event of Default has been cured.

(b)    Enforcement by the Collateral Agent as Secured Party.  Whenever the lien hereof shall have become and so long as it remains enforceable and the Collateral Agent has declared the Promissory Notes to be accelerated, the Collateral Agent as Secured Party may, and, upon the receipt of a Lenders' Resolution requesting it to do so shall, proceed to realize upon the lien hereof and to enforce its rights hereunder by any or all of: (a) proceedings in any court of competent jurisdiction for the appointment of a receiver or for sale or other disposition of the Collateral or any part thereof; (b) generally any other action, suit, remedy or proceeding authorized or permitted by the Master Credit Agreement, the provisions of this Agreement, including, but not limited to, such remedies set forth in Section 45, or by law or by equity; or (c) any and all remedies allowed secured parties under the provisions of the Uniform Commercial Code of Florida, as amended, provided that in the event of any such acceleration or realization, Debtor shall have the right to pay to the Secured Party all amounts then owing by Debtor hereunder and under the Promissory Notes, and shall be entitled to the release and reconveyance of the Collateral in accordance with Section 6.  Whenever the lien hereof shall have become and so long as it remains enforceable and the Collateral Agent has declared the Promissory Notes to be accelerated, the Collateral Agent as Secured Party may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Lenders and Holders of Promissory Notes lodged in any bankruptcy, winding-up or other judicial proceeding relative to Debtor or the Collateral; and none of the aforesaid remedies for the realization of the lien hereof or for the enforcement of the rights of the Lenders and Holders of Promissory Notes and the Collateral Agent as Secured Party shall be exclusive of or dependent on any other such remedy but any one or more of such remedies may from time to time be exercised independently or in combination.  Further, no taking of any judgment or order in respect of any of the covenants contained in this Agreement shall operate as a merger of any of the said covenants or operate to prevent any further judgment or order in respect thereof or any further remedy for the enforcement of the lien hereof.

11

ES0256471

(c)    Waiver of Default.

(i)    In case the lien hereof shall have become enforceable, and the Collateral Agent as Secured Party shall have determined to realize upon the lien hereof and to enforce its rights hereunder, whether or not it shall have received a Lenders' Resolution in accordance with Section 41, the Lenders and Holders of Promissory Notes shall have the power exercisable by Lenders' Resolution to require the Collateral Agent to waive any default and/or cancel any declaration made by the Collateral Agent as Secured Party under Section 39 and the Collateral Agent shall thereupon waive such default and/or cancel such declaration upon such terms and conditions as such Lenders and Holders of Promissory Notes shall prescribe. So long as the Secured Party has not become bound as provided in Section 27 to declare the Promissory Notes accelerated, or to obtain and enforce payment of the Promissory Notes, the Collateral Agent shall have power to waive any default arising hereunder if, in the opinion of the Collateral Agent, the same shall have been cured or adequate satisfaction made therefor, and in such event cancel any declaration therefor made by the Collateral Agent pursuant to Section 27 upon such terms and conditions as the Collateral Agent may deem advisable.

(ii)    If as a result of any default herein, the Secured Party shall have taken any steps pursuant to the provisions of this Agreement to enforce the lien hereof and subsequently such default shall be waived by the Lenders as herein provided or such Event of Default shall be deemed to have been cured or remedied, the Secured Party shall at the request and at the cost of Debtor take such action as may be reasonably required to restore the position which prevailed immediately prior to the taking of such steps by the Secured Party, subject, however, to any condition or conditions imposed by the Lenders in such waiver, if applicable, and neither the Secured Party nor any receiver theretofore appointed by the Secured Party or by a court shall incur any liability by reason of the taking of such steps.

Section 29.    Proof of Promissory Notes. All rights of action hereunder may be enforced by the Secured Party without the possession of any of the Promissory Notes or the production thereof at the trial or other proceedings relative thereto.

Section 30.    Lenders May Direct Secured Party's Action. The Lenders may, by Lenders' Resolution and upon indemnifying the Secured Party to its satisfaction as provided in Section 16 from time to time direct and control the actions of the Secured Party in any proceedings authorized to be taken by it under Section 27.

Section 31.    Enforcement by Lenders.

(a)    No Lender shall have any right to institute any action or proceeding or to exercise any other remedy authorized by this Agreement or by law or by equity for the purpose of enforcing payment of the principal or interest on the Promissory Notes or of realizing on the lien hereof, or by reason of jeopardy of security, or for the execution of any power hereunder, unless the Lenders' Resolution referred to in Section 39 and the indemnity referred to in Section 16 shall have

12

ES0256472

been tendered to the Secured Party and the Secured Party shall have failed to act within a reasonable time. In such case but not otherwise any Lender acting on behalf of itself and all other Lenders shall be entitled to take proceedings in any court of competent jurisdiction such as the Secured Party might have taken under Section 27, including, without limitation, applying for an order appointing a receiver to take possession of the Collateral or such part thereof as may be the subject matter of such proceedings with any or all of the powers and rights set forth in Section 27 and such additional powers and rights as the court may direct, and, in that event, all of the Lenders shall be deemed to have consented to such proceedings and to any such order; it being understood and intended that no one or more Lenders shall have any right in any manner whatsoever to affect, disturb or prejudice the lien hereof by its or their action, or to enforce any right hereunder or under any Promissory Note, except subject to the conditions and in the manner herein provided, and that all powers and trusts hereunder shall be exercised and all proceedings at law shall be instituted, had and maintained by the Secured Party, except only as herein provided, and in any event for the benefit of all Lenders.

      (b)    Notwithstanding, however, any provision of this Agreement, if in any competent jurisdiction neither the Secured Party nor any Lender has the right under the laws of such jurisdiction to act on behalf of the Lenders in connection with the enforcement of any rights hereunder, then each Lender shall have the right to enforce its rights hereunder individually provided that the Lenders shall have first authorized such individual action by Lenders' Resolution.

    Section 32.  Lenders May Bid.  The Lenders shall be entitled, at any sale pursuant to the provisions hereof, to credit against any purchase price bid at such sale by such Lender all or any part of the unpaid obligations owing to such Lender and secured by the lien hereof.

    Section 33.  Application of Proceeds of Realization of Security.  Except as otherwise provided herein or by law or by the order of a court, the moneys arising from the enforcement of any remedy provided for herein or in any other instrument concerning the Collateral, including, without limitation, the sale or other realization of the whole or any part of the Collateral, whether under any sale by the Collateral Agent as Secured Party or by judicial process or otherwise, shall be held by the Secured Party and, together with any other moneys then or thereafter in the hands of the Collateral Agent as Secured Party available for the purpose, shall be applied by the Collateral Agent as Secured Party as follows:

      (a)    first, to pay all amounts due to the Secured Party hereunder, including, without limitation, amounts in respect of remuneration, expenses, disbursements and advances, including the interest thereon, but not including any amounts in respect of such expenses, disbursements and advances to the extent that the funds used to incur or make such expenses, disbursements or advances were provided to the Secured Party by a Lender or Lenders pursuant to Section 16;

      (b)    second, to repay in full all Lenders who provided funds to the Secured Party pursuant to Section 16;

ES0256473

(c)   third, to pay the amount due on the Promissory Notes outstanding first for principal and then for interest, including interest on amounts overdue, and then for premium, if any, and then for any other amounts secured hereunder unless otherwise directed by a Lenders' Resolution and in that case in such order of priority as between principal, interest and premium, if any, and such other amounts as may be directed by such Lenders' Resolution; and

(d)   fourth, the surplus, if any, of such moneys shall be paid to Debtor or its assigns or otherwise in accordance with applicable law.

Section 34. Distribution of Proceeds. Payments to Lenders pursuant to Section 1.10 of the Master Credit Agreement, shall be made upon presentation thereby of Promissory Notes in the form of Promissory Note attached as Exhibits B-1 or B-2 to the Master Credit Agreement, as the case may be, and any such Promissory Note thereby paid in full shall be surrendered. The Secured Party may in its discretion dispense with presentation and surrender upon such indemnity being given as it shall deem sufficient or the Secured Party may endorse on such Promissory Note a memorandum of payment.

Section 35. Maintenance of Records. The Secured Party shall create and maintain proper accounts and records showing, without limitation:

(a)   all amounts due to the Secured Party pursuant to Section 33;

(b)   all expenditures made by the Secured Party pursuant to Section 16 or in connection with the repossession, holding, processing, preparing for disposition and remarketing of the Collateral or to pay Liens, if any, on the Collateral ranking (or capable of ranking) in priority to the lien hereof or to keep any such prior Lien in good standing;

(c)   all proceeds arising from the sale or other realization of the whole or any part of the Collateral; and

(d)   all amounts furnished to the Secured Party pursuant to Section 6;

Absent proof of manifest error, the accounts and records maintained by the Secured Party shall constitute prima facie evidence of such matters so recorded therein.

Section 36. Person Dealing with the Secured Party. No person dealing with the Secured Party or any agents thereof shall be concerned to inquire whether the lien hereof has become or remains enforceable or whether the powers which the Collateral Agent as Secured Party is purporting to exercise have become or remain exercisable, or whether any moneys remain due upon the security of this Agreement or under any Promissory Note, or as to the necessity or expediency of the stipulations and conditions subject to which any sale shall be made or otherwise as to the propriety or regularity of any sale or of any other dealing by the Secured Party with the Collateral or any part thereof, or to see to the application of any moneys paid to the Secured Party and, in the

14

ES0256474

absence of fraud on the part of such person, such dealing shall be deemed so far as regards the safety and protection of such person, to be within the powers hereby conferred and to be valid and effective.

Section 37. Cancellation and Destruction. Prior to the payment of any Promissory Note in full, such Promissory Note shall forthwith be delivered to the Secured Party and after payment thereof, such Promissory Note shall be canceled. All Promissory Notes so canceled or required to be canceled under this or any other provision of this Agreement shall be destroyed by the Secured Party, and if required by Debtor, the Secured Party shall furnish to it a destruction certificate setting forth the numbers and denominations of the Promissory Notes so destroyed.

Section 38. Non-Presentation of Promissory Notes. In case the Holder of any Promissory Note shall fail to present the same for payment or shall otherwise not accept payment on account thereof as herein provided and give such receipt therefor, if any, as the Secured Party may require, Debtor shall be entitled to deposit with the Secured Party the amount due on such Promissory Note (including interest and interest on overdue interest, if any) in trust to be paid to such Holder upon due presentation thereof in accordance with the provisions of this Agreement or as otherwise provided herein and thereupon the principal amount of such Promissory Note and interest (including interest on overdue interest, if any) payable on or represented by such Promissory Note in respect whereof such amounts have been deposited shall be deemed to have been paid and such Holder thereof shall thereafter have no right in respect thereof except that of receiving payment of the amounts so deposited with the Secured Party upon due presentation and surrender thereof or as otherwise provided herein, subject always to the provisions of Section 38. Upon receipt of such funds Secured Party shall deposit such monies with a bank of its choosing.

Section 39. Repayment of Unclaimed Moneys to Debtor. Any moneys deposited under Section 37 and not claimed by and paid to Holders of Promissory Notes as provided in Section 33 within six years after the date of such deposit shall be repaid to Debtor by the Secured Party on demand and thereupon the Secured Party shall be released from all further liability with respect to such moneys and thereafter the Holders of the Promissory Notes in respect of which such moneys were so repaid to Debtor shall have no right in respect of such Promissory Notes except to obtain payment of such moneys from Debtor.

Section 40. Powers of the Lenders. The Lenders shall have the following powers exercisable from time to time by Lenders' Resolution (as described more particularly in Section 41):

(a)    power to take such actions as are provided for in this Agreement to be taken upon the making of a Lenders' Resolution, or such other actions as may be necessary or desirable in furtherance thereof;

(b)    power to sanction any scheme for the reconstruction or reorganization of Debtor or for the consolidation, amalgamation or merger of Debtor with any other company, or for the selling of the Collateral or any part thereof;

15

ES0256475

(c)   power to require the Secured Party to refrain from enforcing any of the covenants on the part of Debtor herein contained or to refrain from exercising any of the powers hereby conferred upon the Secured Party or to direct the Secured Party to waive any Default or Event of Default on the part of Debtor on such terms as may be deemed advisable or to cancel any declaration or waiver previously made by the Secured Party hereunder;

(d)   power to remove the Secured Party from office and to appoint a new Secured Party to act as Collateral Agent, provided such new Secured Party is acceptable to Debtor, acting reasonably;

(e)   power to assent to any judgment, compromise or arrangement by Debtor with any creditor, creditors or class or classes of creditors or with the holders of any shares or securities of Debtor;

(f)   power to sanction the release of the whole or any part of the Collateral from the lien hereof;

(g)   power to require the Secured Party to take any action or to do any other matter or thing which is consented to by Debtor and approved by a Lenders' Resolution;

(h)   power to direct the Secured Party, when the lien hereof shall have become enforceable, as to the manner of sale or disposition of any part of the Collateral;

(i)   power to authorize the Secured Party, in the event of Debtor making an authorized assignment to an assignee, Secured Party or liquidator under applicable bankruptcy or insolvency legislation or legislation relating to winding-up, for and on behalf of the Lenders, and in addition to any claim or debt proved or made for its own account as Secured Party hereunder, to file and prove a claim or debt against Debtor and its property for an amount equivalent to the aggregate amount which may be payable in respect of the Promissory Notes and other amounts payable hereunder, and vote such claim or debt at meetings of creditors and generally act for and on behalf of the Lenders in such proceedings as such resolution or requisition may provide; and

(j)   power to appoint a committee with power and authority (subject to such limitations, if any, as may be prescribed in the resolution of requisition) to exercise, and to direct the Collateral Agent as Secured Party to exercise, on behalf of the Lenders, such of the powers of the Lenders which are exercisable by resolution as shall be included in the resolution appointing the committee. The resolution making such appointment may provide for payment of the expenses, disbursements and compensation of such committee. Such committee shall consist of such number of persons as shall be prescribed in the resolution appointing it and the members need not be themselves Lenders. Every such committee may elect its chairman and may make regulations respecting its quorum, the calling of its meetings, the filing of vacancies occurring in its number and its procedures generally. Such regulations may provide that the committee may act at a meeting at

---

16

ES0256476

which a quorum is present or may act by minutes signed by the number of members thereof necessary to constitute a quorum. All acts of any such committee within the authority delegated to it shall be binding upon the Lenders. Neither the committee nor any member thereof shall be liable for any loss arising from or in connection with any action taken or omitted to be taken by them in good faith.

Section 41. Lenders Resolution Required. Any change whatsoever of any provision of the Promissory Notes, whether or not the same has been agreed to by Debtor, and any modification, compromise or arrangement of or in respect of the rights of the Lenders against Debtor or against the Collateral whether such rights shall arise under the provisions of the Agreement or otherwise, shall require confirmation by a Lenders' Resolution.

Section 42. Execution of Lenders' Resolutions. Any instrument comprising a Lenders' Resolution, and any requisition or other instrument to be executed by Lenders under any provision of this Agreement, may be in any number of concurrent instruments of similar tenor and effect and any Lender may execute the same in person or by agent or attorney duly authorized in writing. The fact and date of execution by any Lender of any power of attorney may be proved by the certificate of any notary public that the person signing the same acknowledged to him the execution thereof or by the affidavit or statutory declaration of a witness to such execution, and such proof shall be conclusive in favor of the Secured Party with regard to any action taken or suffered by the Secured Party under such instrument. No such instrument shall be effective until delivery thereof to the Secured Party. The Secured Party shall give notice to all Lenders of each Lenders' Resolution delivered as aforesaid.

Section 43. Effect of Lenders' Resolution. Any Lenders' Resolution shall be binding upon the Lenders and each of them, and the Secured Party (subject to the provisions for its indemnity herein contained) shall be bound to give effect thereto accordingly.

Section 44. Secured Party Appointed Attorney-in-Fact. Debtor hereby irrevocably appoints Secured Party as Debtor's attorney-in-fact, with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, from time to time in Secured Party's discretion upon the occurrence and during the continuation of any Event of Default, to take any action and to execute any instrument that Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, the following:

(a)    to ask for, demand, collect, sue for, recover, compromise, receive, and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(b)    to file any claims, take any action and institute any proceedings that Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Secured Party with respect to any of the Collateral.

17

ES0256477

Section 45. Secured Party's Duties. The powers conferred on Secured Party under this Agreement are solely to protect its interest in the Collateral as Collateral Agent and shall not impose any duty upon it to exercise any such powers, except as provided herein. Secured Party shall be deemed to have exercised reasonable care in the custody and presentation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to the treatment that Secured Party accords its own property.

Section 46. Remedies. If any Event of Default occurs and shall remain unpaid or uncured for a period of thirty (30) days, Secured Party shall be entitled to exercise the following remedies, in addition to those set forth in Section 27.

(a)    Secured Party may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party in default under the Code, as in effect at that time, (whether or not the Code applies to the affected Collateral).

(b)    All cash held by Secured Party as Collateral, all payments received by Secured Party in connection with the Collateral and all cash proceeds received by Secured Party in respect of any sale of, collection from or other realization upon all or any part of the Collateral may, in the discretion of Secured Party, be held by Secured Party as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to Secured Party) in whole or in part by Secured Party against, all or any part of the Secured Obligations (as set forth in Section 4 hereof) in such order as Secured Party may elect. Any surplus of such cash or cash proceeds held by Secured Party and remaining after payment in full of the Secured Obligations shall be paid over to Debtor or to whoever may be lawfully entitled to receive such surplus.

Section 47. Indemnity and Expenses.

(a)    Debtor agrees to indemnify Secured Party from and against any and all claims, losses and liabilities arising out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting from Secured Party's gross negligence or willful misconduct.

(b)    Debtor will upon demand pay to Secured Party the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and disbursements of its counsel and of any experts and agents, that Secured Party may incur in connection with (i) the custody, preservation, use, operation or sale of, the collection from, or any other realization upon, any of the Collateral, (ii) the exercise or enforcement of any of the rights of Secured Party hereunder, whether in any insolvency or reorganization proceeding or otherwise, or (iii) the failure by Debtor to perform or observe any of the provisions hereof.

18

ES0256478

Section 48. Amendments, Waivers, Etc.

(a)     No amendment or waiver of any provision of this Agreement or consent to any departure by Debtor therefrom shall in any event be effective unless the same is in writing and signed by Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)     The waiver (whether express or implied) by Secured Party of any breach of any term or condition of this Agreement shall not prejudice any remedy of Secured Party in respect of any continuing or other breach of the terms and conditions hereof and shall not be construed as a bar to any right or remedy that Secured Party would otherwise have on any future occasion under this Agreement.

(c)     No failure to exercise or delay in exercising, on the part of Secured Party, any right, power or privilege under this Agreement shall operate as a waiver thereof or the exercise of any other right, power or privilege.

Section 49. Notices, Etc. All notices and other communications provided for hereunder shall be given in accordance with Section 8.03 of the Master Credit Agreement.

Section 50. Continuing Security Interest. This Agreement creates a continuing security interest in the Collateral and shall (a) remain in full force and effect until payment in full of the Secured Obligations, (b) be binding upon Debtor and its successors and assigns and (c) inure, together with the rights and remedies of Secured Party hereunder, to the benefit of Secured Party and its successors, transferees and assigns. Without limiting the generality of the foregoing clause (c), Secured Party may assign or otherwise transfer any or all of its rights and obligations under this Agreement to any other person, and such other person shall thereupon become vested with all of the benefits in respect thereof granted to Secured Party herein or otherwise. Upon payment in full of the Secured Obligations, the security interest granted hereby shall terminate, and all rights to the Collateral shall revert to Debtor, as provided for in Section 6. Upon any such termination, Secured Party will, at Debtor's expense, execute and deliver to Debtor such documents as Debtor may reasonably request to evidence such termination.

ES0256479

Section 51. Governing Law; Terms. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF FLORIDA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THE STATE OF FLORIDA, EXCEPT TO THE EXTENT THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTEREST HEREUNDER, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF FLORIDA.

Unless otherwise defined herein or in the Master Credit Agreement, terms defined in Article 9 of the Code are used herein as therein defined.

**SECURED PARTY AND**
**COLLATERAL AGENT:**

**BANK ESPIRITO SANTO INTERNATIONAL, LTD.,**
a Cayman Islands, BWI corporation

By:_____
Name:_____
Title:_____

**DEBTOR:**

**E.S. BANKEST CORP., a**
Florida corporation

By:_____
Name:_____
Title:_____

20

ES0256480

## EXHIBIT "A" TO MASTER SECURITY AGREEMENT
## AND APPOINTMENT OF COLLATERAL AGENT AGREEMENT

### BANK ACCOUNTS

1.    Espirito Bank of Florida, 1395 Brickell Avenue, Miami, Florida 33131.

ES0256481

## EXHIBIT "B" TO MASTER SECURITY AGREEMENT
## AND APPOINTMENT OF COLLATERAL AGENT AGREEMENT

## UCC FILINGS

1.    Florida.

ES0256482

## EXHIBIT IV.

### MASTER CREDIT AGREEMENT

### Exhibit E

### UCC-1 Financing Statement

ES0256483

## STATE OF FLORIDA
### UNIFORM COMMERCIAL CODE — FINANCING STATEMENT — FORM UCC-1 REV. 1981
THIS FINANCING STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code:

**ONLY ONE NAME PER BOX**

**DEBTOR (Last Name First if a Person)**

**1A** NAME   E.S. BANKEST CORP.

MAILING ADDRESS
1395 BRICKELL AVE., SEVENTH FLOOR

CITY MIAMI   STATE   FLORIDA

**MULTIPLE DEBTOR**  (IF ANY)  (Last Name First if a Person)

**1B** NAME

MAILING ADDRESS

CITY   STATE

**MULTIPLE DEBTOR**  (IF ANY)  (Last Name First if a Person)

**1C** NAME

MAILING ADDRESS

CITY   STATE

**SECURED PARTY (Last Name First if a Person)**

**2A** NAME   BANK ESPIRITO SANTO INTERNATIONAL LTD.

MAILING ADDRESS
P.O. BOX 887

CITY GRAND CAYMAN   STATE CAYMAN ISLANDS, BWI

**MULTIPLE SECURED PARTY**  (IF ANY)  (Last Name First if a Person)

**2B** NAME

MAILING ADDRESS

CITY   STATE

**ASSIGNEE OF SECURED PARTY**  (IF ANY)  (Last Name First if a Person)

**3** NAME

MAILING ADDRESS

CITY   STATE

**THIS SPACE FOR USE OF FILING OFFICER**
Date, Time, Number & Filing Office

**AUDIT**   **UPDATE**

**VALIDATION INFORMATION**

---

**4.** This FINANCING STATEMENT covers the following types or items of property (include description of real property on which located and owner of record when required). If more space is required, attach additional sheets 8½" x 11".

SEE EXHIBIT "A" attached hereto.

**5.** Proceeds of collateral are covered as provided in Sections 679.203 and 679.306, F.S.  YES

**6.** Filed with:  FLORIDA SECRETARY OF STATE

**7.** No. of additional Sheets presented:  1

**8.** (Check ☐) ☐ All documentary stamp taxes due and payable or to become due and payable pursuant to Section 201.22, F.S., have been paid.
☐ Florida Documentary Stamp Tax is not required.

**9.** This statement is filed without the debtor's signature to perfect a security interest in collateral (Check ☐ if so)
☐ already subject to a security interest in another jurisdiction when it was brought into this state or debtor's location changed to this state.
☐ which is proceeds of the original collateral described above in which a security interest was perfected.
☐ as to which the filing has lapsed.
☐ acquired after a change of name, identity, or corporate structure of the
☐ debtor or ☐ secured party.

**10.** (Check ☐ if so)
☐ Debtor is a transmitting utility
☐ Products of collateral are covered

**11.** SIGNATURE(S) OF DEBTOR(S)
E.S. BANKEST CORP.

**12.** SIGNATURE(S) OF SECURED PARTY(IES) OR ASSIGNEE

**13.** Return copy to:

| NAME |  |
|------|--|
| ADDRESS |  |
| CITY |  |
| STATE | ZIP CODE |

**NAME AND ADDRESS OF PREPARER**

STANDARD FORM — FORM UCC-1   Approved by Secretary of State, State of Florida

ES0256484

## EXHIBIT "A"

**TO UCC-1 FINANCING STATEMENT FROM E.S. BANKEST CORP., A FLORIDA CORPORATION ("DEBTOR") TO BANK ESPIRITO SANTO INTERNATIONAL LTD., A BRITISH VIRGIN ISLANDS CORPORATION ("SECURED PARTY")**

Debtor hereby gives Secured Party an unconditional and continuing first priority security interest, lien and right of set-off and hereby assigns, transfers, pledges, conveys and sets over to the Secured Party an interest in the collateral described below, and in all proceeds and products thereof in any form, together with all documents, records and information relating thereto (collectively, the "Collateral"):

1.     A pledge and security interest in all of Debtor's rights to the payment of money however evidenced or arising, including each existing and future account, contract right, general intangible, instrument and document, within the meaning of the Florida Uniform Commercial Code (the "Code"), and in all trademarks, copyrights, good will, names, patents, licenses, inventions, causes of action and goods giving rise to Debtor's right to the payment of money, including such goods in which Debtor has retained a security interest or which have been reclaimed, returned or repossessed, all documents of title and warehouse receipts, and all book entries, records and files relating to the foregoing, and the proceeds (cash and non-cash) of all the foregoing and any insurance policies relating thereto;

2.     A pledge and security interest in all deposits accounts, credits, securities, moneys, or other property of Debtor which may at any time be in the possession of, delivered to, or owed by the Secured Party, including any proceeds or return or unearned premiums of insurance, and the proceeds of all the foregoing property; and

3.     A pledge and security interest in all short-term interest bearing securities, certificates of deposits and any other investment purchased by Debtor established by Debtor with proceeds of the Notes (as more particularly defined in the Master Credit Agreement).

ES0256485