## EXHIBIT IV.

## MASTER CREDIT AGREEMENT

## Exhibit F

**Joinder, Appointment of Collateral Agent and Consent**

ES0256486

## EXHIBIT "F"

To that certain Master Credit Agreement dated April 30, 1998 (the "Master Credit Agreement") by and among E.S. Bankest LLC, a Florida corporation with its principal business address at 999 Brickell Avenue, Penthouse, Miami, Florida, USA 33131 (herein "Borrower"); and BANK ESPIRITO SANTO INTERNATIONAL, LTD., a Cayman Islands corporation, as Collateral Agent ("Collateral Agent").

## JOINDER, APPOINTMENT OF COLLATERAL AGENT AND CONSENT

LENDER: _____      NOTE/LOAN AMOUNT: _____

ADDRESS:_____      ISSUE DATE: _____

_____      NOTE SERIES: _____

_____

The undersigned Lender hereby acknowledges that:

- Lender has received a copy of that certain Master Credit Agreement dated April 30, 1998 (the "Master Credit Agreement") by and among E.S. Bankest LLC, a Florida corporation with its principal business address at 999 Brickell Avenue, Penthouse, Miami, Florida, USA 33131 (herein "Borrower"); and BANK ESPIRITO SANTO INTERNATIONAL, LTD., a Cayman Islands corporation, as Collateral Agent ("Collateral Agent").

- Lender has received a copy of that certain Security Agreement dated April 30, 1998 by and between Borrower and Collateral Agent.

- Lender acknowledges and understands that each promissory note issued by Borrower under the Master Credit Agreement, including the Promissory Note issued to Lender shall be treated pari passu with all other Promissory Notes issued by Borrower and all such Promissory Notes shall be secured by collateral equally and ratably according to the principal amount thereof and the interest from time to time owing thereon, regardless of the Issue Date or interest terms of each separate Promissory Notes

- Lender acknowledges and agrees that as a condition to the extension of credit to Borrower under the Master Credit Agreement and the issuance of a Promissory Note to Lender, Borrower and the other lenders under the Master Credit Agreement require that Lender appoint Bank Espirito Santo International, Ltd. as the Collateral Agent to administer the Security Interests for the benefit of all lenders pursuant to all of the terms and conditions of the Loan Documents.

16

ES0256487

NOW THEREFORE, Lender agrees as follows:

By execution and delivery of this Joinder, Appointment of Collateral Agent and Consent Lender hereby:

1. Joins in the execution and agrees to the terms of the Master Credit Agreement and each and every other Loan or Credit Document relating to the Loan (as defined in the Master Credit Agreement);

2. Appoints the Collateral Agent to act as its agent in connection with the Loan and the Collateral thereof and acknowledges that Collateral Agent shall act as agent for all of the Lenders under the Master Credit Agreement with respect to the administration of the Collateral for the Loan; and

3. Expressly consents to Collateral Agent entering into the Master Credit Agreement and all other loan documents related thereto.

IN WITNESS WHEREOF, Lender has executed this Joinder, Appointment of Collateral Agent and Consent this _____ day of _____, _____

_____    _____
Witness                                              Lender

_____
Witness

17

ES0256488

# EXHIBIT V.

## SAMPLE FORM OF ACKNOWLEDGMENT
## OF RECEIPT OF MEMORANDUM

ES0256489

# E.S. BANKEST LLC

## ACKNOWLEDGMENT OF RECEIPT OF CONFIDENTIAL MEMORANDUM
### Series A and Series B Notes

The offering described in the Confidential Memorandum of E.S. Bankest LLC, a Florida corporation (the "Company"), dated July 1, 2001 (the "Memorandum"), has not been registered with the United States Securities and Exchange Commission, the Florida Division of Securities or any other state securities division or agency and is offered pursuant to exemptions and a safe harbor from the registration requirements of the United States Securities Act of 1933, as amended, applicable rules promulgated thereunder, and exemptions from the registration requirements of any applicable state securities laws.

I UNDERSTAND THAT THE MEMORANDUM IS FOR MY USE OR THAT OF MY ADVISORS OR DESIGNATED PURCHASER REPRESENTATIVES ONLY.

1. I hereby represent that:

(a) I have received the Memorandum;

(b) I will use the Memorandum only for my own purposes and I will not reproduce, duplicate, or distribute the Memorandum except to my designated advisors or purchaser representative, if any.

2. If I decide to participate in the Loan to E.S. Bankest LLC through the purchase Notes described in the Memorandum, I will also complete and execute the Subscription Agreement in the form appended to the Memorandum.

EXECUTION OF THIS DOCUMENT DOES NOT INDICATE AN INTENT FINALLY TO LEND MONIES AND RECEIVE THE NOTES DESCRIBED IN THE MEMORANDUM. THIS DOCUMENT MAY NOT BE EXECUTED IN THE UNITED STATES OF AMERICA OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION.

______________________________
(Name) PLEASE PRINT

______________________________
(Signature)
Date:__________, __________.
Executed in:

______________________________
City and Country
Home Tel.#(___) (__________)

Office Tel.#(___) (__________)

______________________________
(Street Address)

______________________________
(City) (Country)

# EXHIBIT VI.

## SAMPLE FORM OF SUBSCRIPTION AGREEMENT

ES0256491

## E.S. BANKEST LLC

## SUBSCRIPTION AGREEMENT

Confidential Memorandum # 2001-II_____

_____

Name of Subscriber
(please type or print)

To:    Management of E.S. Bankest LLC

The undersigned ("Subscriber") hereby tenders this Subscription Agreement and hereby applies for the purchase, in the amounts and Series shown below, of Notes ("Notes"), of E.S. Bankest LLC ("Company"), a Florida Corporation, with the understanding that the purchase is subject to acceptance by the Management of the Company as described in the Confidential Memorandum of the Company dated July 1, 2001 (the "Memorandum"). Terms used in the Memorandum shall have the same meaning when used herein.

Subscriber hereby warrants and represents that Subscriber, as well as Subscriber's Purchaser Representatives, if any, have had access to all relevant information and documents they desired, including all records and books pertaining to the Company and this subscription, all of which have been made available to Subscriber, as Subscriber's Purchaser Representatives, if any, and Subscriber's accountants, attorneys, business advisors and tax advisors, and all of which will be available, upon reasonable notices, for inspection.

Subscriber hereby acknowledges that Subscriber, as well as Subscriber's Purchaser Representatives and other professional advisors, if any, are in receipt of the copy of the Memorandum with the number set forth above and represent that they have read, are familiar with and fully understand the Memorandum, including all familiar with and fully understand the Memorandum, including all documents referred to in the Memorandum. Subscriber represents that, after careful review of the Memorandum and the documents referred to therein, Subscriber is aware of the risks involved in an investment in the Company.

Subscriber hereby agrees that if this Subscription Agreement is accepted by the Management of the Company in accordance with the provisions of the Memorandum), Subscriber shall become a Noteholder of the Company. Subscriber shall pay to the Company the funds enclosed herewith for the Notes purchased and otherwise be bound by the terms of this Subscription Agreement.

Subscriber is enclosing herewith a check or has wire transferred funds according to the instructions stated on page 2 of the Subscription Instructions Section of this Subscription Documents booklet; in the amount of $_____ payable to "E.S. Bankest LLC." This constitutes the purchase price of the Notes of the Company should this subscription be accepted.

5

ES0256492

In order to allow Management of the Company to determine, in accordance with any criteria established by the Company, whether or not to accept this Subscription Agreement, Subscriber hereby represents and warrants to the Company and the Management of the Company as follows:

(1)     Subscriber has acknowledged receipt of the Memorandum.

(2)     Subscriber represents that:

    (i)     ☐    Subscriber is a Foreign Person/Non-Resident Alien Individual, not United Sates citizen nor resident.

        ☐    Subscriber has executed and provided the Company a Department of Treasury; Internal Revenue Service Form W-8 "Certificate of Foreign Status."

        ☐    Subscriber is a Foreign Corporation, Partnership, Estate or Trust, not a United States Corporation, Partnership, Estate or Trust.

        ☐    Subscriber has executed and provided the Company a Department of Treasury; Internal Revenue Service Form W-8 "Certificate of Foreign Status."

    (ii)     Subscriber is an "Accredited Investor" because (check which items apply):

        ☐    Subscriber is a director or executive officer of the company.

        ☐    Subscriber is a natural person whose combined net worth with his or her spouse currently exceeds $1,000,000 and will exceed $1,000,000 at the time of the purchase of Notes.

        ☐    Subscriber is a natural person whose income exceeded $200,000 in each of the last two years and reasonably expects that his or her income will exceed $200,000 in the current year.

        ☐    Subscriber is a natural person whose individual income exceeded $200,000 in each of the last two years or joint income with his or her spouse exceeded $300,000 in each of those years and reasonably expects to reach the same income levels in the current year.

        ☐    Subscriber is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Notes offered in the Memorandum, whose purchase is being directed by the individual described in the Purchaser Representative

6

ES0256493

Questionnaire attached hereto and by this reference made a part hereof.

☐   Subscriber is a corporation, not formed for the specific purpose of acquiring the Notes offered in the Memorandum, with total assets in excess of $5,000,000.

☐   Subscriber is a partnership, not formed for the specific purpose of acquiring the Notes offered in the Memorandum, with total assets in excess of $5,000,000.

☐   Subscriber is a bank as defined in Section 3(a)(2) of the Securities Act.

☐   Subscriber is a savings and loan association or similar institution as defined in Section 3(a)(5)(A) of the Securities Act.

☐   Subscriber is an insurance company as defined in Section 2(13) of the Securities Act.

☐   Subscriber is an investment company registered under the Investment Company Act of 1940.

☐   Subscriber is a business development company as defined under (2)(a)(48) of the Investment Company Act of 1940.

☐   Subscriber is a small business development company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

☐   Subscriber is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the decision to purchase Notes is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, insurance company, or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000, or, if a self directed plan, with investment decisions made solely by persons that are accredited investors.

7

ES0256494

☐    Subscriber is a plan established and maintained by a state, its political subdivision or any agency or instrumentality of a state or its political subdivisions, for the benefit of the employees of such plan having total assets in excess of $5,000,000.

☐    Subscriber is a private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940.

☐    Subscriber is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, not formed for the specific purpose of acquiring the Notes offered hereby, with total assets in excess of $5,000,000.

☐    Subscriber is a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

☐    Subscriber is an entity in which all of the equity owners meet one of the requirements of the above items.

(3)    Subscriber is a resident of, or has its principal place of business in, the country set forth on the signature page hereof and, if a natural person, is at least twenty-one (21) years of age. Subscriber has no present intention of becoming a resident or domiciliary of, or moving its principal place of business to any other jurisdiction.

(4)    Subscriber has been advised that: (a) the securities being offered as described in the Memorandum are, by their terms, not transferable; (b) the Notes are being offered are "restricted securities", as such term is defined in Rule 144 of the Securities and Exchange Commission, and have not been registered under any state or other jurisdiction's securities laws, including the Securities Act of 1933, as amended (collectively, the "Securities Laws"), and must be held indefinitely unless they are subsequently registered under applicable Securities Laws and/or an exemption from registration under the applicable Securities Laws is available to the Subscriber; (b) Subscriber has no right to require the Notes to be registered under any of the applicable Securities Laws; and it is not contemplated that the securities will ever be registered under any applicable Securities Laws, nor is it contemplated that the securities will ever be saleable under Rule 144 of the Securities and Exchange Commission; and (d) any sales of the securities by the Subscriber must be made in reliance upon any of the very limited exemptions (if any exemption is available) from registration generally available under applicable Securities Laws. Further, Subscriber is aware, notwithstanding the foregoing, that sales or other transfers are subject to the terms and conditions contained in this Agreement, including but not limited to, compliance with all applicable Securities Laws.

(5)    The Subscriber understands that (a) the Notes may not be offered, sold, transferred, accepted or delivered, directly or indirectly, in the United States (or any of its territories, possessions or areas subject to its jurisdiction) or to U.S. Persons; (b) the Subscriber must qualify as an "accredited investor" and must

ES0256495

otherwise meet the qualifications contained in the Memorandum and this Subscription Agreement; (c) all offers and sales of Notes must be conducted pursuant to "offshore transactions" and without any "directed selling efforts" by any person in the United States (as such terms are defined in Regulation S under the United States Securities Act of 1933, as amended (the "Securities Act"). Subscriber represents and warrants to the Company that (a) Subscriber was not solicited to purchase the Notes while present in the United States nor did the Subscriber receive the Memorandum (including the exhibits and annexes thereto), this Subscription Agreement nor any other offering material with respect to the Notes in the United States; and (b) Subscriber is executing this Subscription Agreement outside of the United States and did not otherwise acquire the Notes in the United States.

(6)     The Subscriber is not (a) (i) a natural person resident in the Untied States; (ii) a partnership, corporation or other entity organized or incorporated under the laws of the United States; (iii) an estate of which an executor or administrator is a U.S. person; (iv) a trust of which any trustee is a U.S. person; (v) an agency or branch of a foreign entity located in the United States; (vi) a non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person; (vii) a discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; or (viii) a partnership or corporation (A) organized or incorporated under the laws of any foreign jurisdiction and (B) formed by a U.S. person principally for the purpose of (1) investing in the Company or (2) investing in securities not registered under the Securities Act; and (b) is not acquiring the Notes or any interest therein for the account or benefit of any U.S. Person described in paragraph 6(a), above (and Subscriber agrees to notify the Company immediately if the Subscriber should at any time become a U.S. Person);

(7)     To the best knowledge of the Subscriber, neither the subscription hereby made nor the purchase of the Notes hereunder by the Subscriber will violate any non-U.S. securities law of any jurisdiction to which such Subscriber may be subject.

(8)     The Subscriber will not sell or transfer directly or indirectly any of the Subscriber's Notes (or any participation or beneficial interest therein) to a U.S. Person referred to in paragraph 6(a) above or to any other person or entity (a) except as specifically permitted by the Memorandum and this Subscription Agreement, and (b) provided that (i) the proposed transferee has made representations and warranties similar to those contained herein; and (ii) Subscriber either registers the proposed transfer under the Securities Act and the applicable state and non-U.S. securities laws or furnishes the Company with an opinion or opinions of legal counsel(s) experienced in matters of U.S. securities laws and the securities laws of other applicable jurisdictions (which securities counsel(s) shall be satisfactory to the Company and its legal counsel(s)) confirming that the proposed transfer (x) is exempt from the registration requirements of the Securities Act, any state securities laws and any non-U.S. securities laws, citing to the section of each such act upon which the exemption is based, and (y) will not otherwise violate any such

9

ES0256496

securities laws. Any attempted transfer without complying with the above requirements shall be null and void, and the Company shall refuse to register, confirm or recognize any such transfer.

(9)     The Subscriber will not transfer directly or indirectly any of the Subscriber's Notes (or any participation or beneficial interest therein) except in accordance with the provisions of Regulation S under the Securities Act, pursuant to registration under the Securities Act and applicable State securities laws and any non-U.S. securities laws, or pursuant to an available exemption from the registration provisions of the Securities Act and applicable State securities laws and non-U.S. securities laws. Subscribers are advised that they are subject to the same restrictions on offers and sales of Notes that apply under Regulation S to any "distributor" of such securities, as such term is defined in Regulation S.

(10)    The Notes for which Subscriber hereby tenders this Subscription will be acquired solely for the account of Subscriber and are not being purchased with a view to or for resale in connection with any distribution within the meaning of the Securities Act, or the securities laws of any state or other jurisdiction. Subscriber represents that Subscriber has no agreement, understanding, commitment, or other arrangement with any person and has no present intention to sell, transfer or assign his or her Notes or any part or portion thereof.

(11)    Subscriber acknowledges that the attention of Subscriber and that of his or her purchaser representatives and other professional advisors, if any, has been specifically called to, and they have read and understand the Memorandum, and particularly the sections entitled "Description of Notes" and "Risk Factors" in the Memorandum and they are aware of the contents therein and consequences thereof.

(12)    Subscriber can bear the economic risk of the investment in the Notes without impairing his ability to provide for Subscriber and/or Subscriber's family in the same manner as Subscriber would have been able to provide prior to making this investment in the Notes.

(13)    The Notes have not been registered pursuant to the Florida Securities and Investor Protection Act or any other State securities laws.

(14)    Subscriber has not relied upon any information or documents provided by Management of the Company to any Subscriber prior to delivery of the Memorandum as a basis for entering into this Subscription Agreement, since prior preliminary documents did not accurately and completely describe this Offering. Each Subscriber is aware of his unrestricted right to not enter into this Subscription Agreement and to receive back, without penalty or forfeiture of any kind, any sums previously paid or given to Management of the Company as an indication of interest, or otherwise, in connection with the offering of the Notes.

(15)    Subscriber hereby agrees that the representations and warranties set forth in this Subscription Agreement shall survive the acceptance hereof by the Management of the Company.

10

ES0256497

(16)   At Management's request, Subscriber agrees to promptly execute such other instruments or documents as may be reasonably required by it in connection with the purchase of the Notes or any other matter contained in this Subscription Agreement and to promptly provide all personal and financial information which the Company may deem necessary or appropriate to submit to regulatory authorities.

(17)   Subscriber hereby acknowledges that the acceptance of this Subscription Agreement and the issuance of any securities of the Company is made expressly: (i) subject to approval by applicable regulatory authorities; and (ii) on the condition that the Subscriber meets the Accredited Investor Standards described in the Memorandum and paragraph (2) hereof and on the condition that the Subscriber is not a U.S. Person, as described in the Memorandum and paragraph 6(a) hereof. If (i) in the opinion of Management, the ownership of securities issued by the Company by the Subscriber may cause the failure, refusal or denial of any required or necessary approval for a course of conduct approved by the Board of Directors; or (ii) the Subscriber fails to meet the Accredited Investor Standards described in the Memorandum and paragraph (2) hereof or the Subscriber is deemed to be a U.S. Person, as described in the Memorandum and paragraph (2) hereof; then, at the Company's option, the Subscription Agreement may be canceled and rescinded and (a) all or part of the Notes held by the Subscriber may be repurchased, at any time within six months from the date of acceptance of the Subscription, by the Company at the principal amount of each Note without further notice to Subscriber.

(18)   Subscriber agrees to all other terms and conditions of this investment as disclosed in the Memorandum.

The Subscriber hereby acknowledges and agrees that Subscriber is not entitled to cancel, terminate or revoke this Subscription Agreement, or any agreements of the Subscriber contained herein or the power of attorney granted hereby.

This Subscription Agreement shall be governed in accordance with the laws of the State of Florida, United States of America, and shall bind and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, legal representatives, successors and assigns.

This Subscription Agreement, together with the Agreement, contains the entire agreement between the parties hereto. The provisions of this Subscription Agreement may not be modified or waived except in writing.

11

ES0256498

Set forth below are the number of Notes being subscribed for and the total payment to the Company made hereby:

SERIES A NOTES (185 Day Maturity)

_____ X $_____ = $_____
No. of
NOTES

SERIES B NOTES (365 Day Maturity)

_____ X $_____ = $_____
No. of
NOTES

SERIES C NOTES (90 Day Maturity)

_____ X $_____ = $_____
No. of
NOTES

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement this _____ day of _____, _____.

12

ES0256499

**(FOR NON UNITED STATES NATURAL PERSON)**

WITNESSES:

_____         _____
                                         Signature

_____         _____
                                Signature (required for Joint Tenancy)

**(FOR NON-UNITED STATES CORPORATION, PARTNERSHIP OR TRUST)**

WITNESSES:                       Name of Subscriber:_____

                                 _____

_____         By:_____
                                 Name:_____
_____         Title:_____

                                 Executed in: _____

                                 _____
                                 City and Country

(NOTE: THIS SUBSCRIPTION AGREEMENT MAY <u>NOT</u> BE EXECUTED IN THE UNITED STATES OF AMERICA OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION)

TITLE TO BE TAKEN (check one):

_____         ☐    Individual Ownership

_____         ☐    Joint Tenants with Right of Survivorship

(Name as it should appear on the Note --
two names for Joint Tenants)     ☐    Corporation

                                 ☐    Partnership

                                 ☐    Trust

                                 ☐    Other:_____

                                 _____

                                 _____
                                 (Registration and Mailing Address)

_____         _____
Principal Place of Residency     (Telephone Number)
or Principal Place of Business

13

ES0256500

This Subscription Agreement has been accepted by the Management of the Company this _____ day of _____, _____.

**E.S. BANKEST LLC**

By:_____
                    Authorized Officer

14

ES0256501

# EXHIBIT VII.

## SAMPLE FORM OF PURCHASER
## REPRESENTATIVE QUESTIONNAIRE

ES0256502

CONFIDENTIAL                                                                                  CONFIDENTIAL

## E.S. BANKEST LLC

## PURCHASER REPRESENTATIVE QUESTIONNAIRE

To:    Management of E.S. Bankest LLC (the "Company")

  The information contained herein is being furnished to you to enable you to determine whether the undersigned may act as a Purchaser Representative, as such term is used in Rule 501 promulgated under the Securities Act of 1933, as amended (the "Securities Act"), in connection with the proposed offer and sale of Notes by the Company, each Notes consisting of fully registered Notes in the principal amount of $100,000 designated as either Series A or Series B, as described in a Confidential Memorandum dated July 1, 2001, of E.S. Bankest LLC, a Florida corporation.

  I understand that (i) you will rely upon the information contained herein for purposes of such determination, and (ii) the interests will not be registered under the Securities Act in reliance upon, a safe harbor from the registration requirements of the Securities Act for offers and sales of securities which occur outside of the United States and among other exemptions, the exemptions from registration provided in Section 4(2) or other Sections of the Securities Act and Rules promulgated thereunder. I represent to you that (i) the information contained herein is complete and accurate and may be relied upon by you and (ii) I will notify you immediately of any material change in any of such information occurring prior to the closing of the purchase of any of the Shares.

  All information furnished is for use only by you, and your counsel, and will be held in confidence, except that the Questionnaire may be furnished to such parties as you deem desirable to establish with federal or state securities laws.

Name of Purchaser: _____

### PLEASE PRINT OR TYPE

Name of Purchaser Representative: _____

Address: _____

City: _____ State: _____ Zip: _____ Phone: _____

Business
Address: _____

Occupation: _____

19

ES0256503

1.    Occupation or position: _____

2.    Field of professional specialization, if any: _____

_____

3.    Years in Practice: _____

4.    Business  or  professional  education,  including  any  degrees  received:

_____
_____
_____

5.    Have you had prior experience in advising clients with respect to investments of this type?
Yes _____ No _____

6.    List any professional licenses or registrations you hold, including bar admissions,
accounting certifications, real estate brokerage licenses and SEC or State broker/dealer registrations:

_____
_____
_____.

7.    If you are an accountant or an attorney, please describe generally any business, financial
or investment experience that would help you to evaluate the merits and risks of this investment:

_____

8.    How long you have known the Purchaser and in what capacity?

_____

9.    Do you or any of your associates or affiliates have any relationship with the Company, its
Management or any of their affiliates? Yes _____ No _____

If yes, please describe, including amount of any compensation received or to be received as a result
of such relationship:

_____
_____

The undersigned Purchaser Representative understands that the Company will be relying on the
accuracy and completeness of my responses to the foregoing questions and represents and warrants to the
Company as follows:

(a)    I am acting as Purchaser Representative for the Purchaser in connection with the
Purchaser's prospective investment in the NOTES;

(b)    I am familiar with, understand and am in full compliance with all my obligations under
Rules 501 and 506 promulgated under the Act;

(c)    The answers to the above questions are complete and correct and may be relied upon by
the Company and its Management in determining whether the offering in connection with which I have

20

ES0256504

executed this questionnaire is exempt from registration under the Securities Act and any other applicable state securities laws;

(d)   .   I will notify the Company immediately of any material change in any statement made herein occurring prior to the closing of any purchase by the Purchaser of an interest in the Company;

(e) .   I have disclosed to the Purchaser in writing prior to the Purchaser's appointment of me as his Purchaser Representative, any relationship which I may have or which is mutually contemplated with the Company, the Management, and their respective associates and affiliates disclosed in answer to question 9 above; and

(f)    I have such knowledge and experience in financial and business matters that I am capable of evaluating the merits and risks of the Purchaser's prospective investment in the Notes and I have in fact made such an evaluation and communicated the results of the same to the Purchaser.

IN WITNESS WHEREOF, I have executed this Purchaser Representative Questionnaire this _____ day of _____, _____.


_____        _____
                                        (Signature of Purchaser Representative)

_____        _____
(Print name of witness)                 (Date)


_____        _____
                                        (Signature of Purchaser)

_____        _____
(Print name of witness)          .      (Date)

21

ES0256505

# EXHIBIT VIII.

## SAMPLE SUBSCRIPTION INSTRUCTIONS

ES0256506

MEMORANDUM NO.2002-I_____

# E.S. BANKEST LLC
## (a Florida Corporation)

### US$ 175,000,000.00

**Series A Notes:**
Six (6) Month London Inter-Bank Offered Rate ("LIBOR")
plus One and One-Half Percent (1.5%), per annum* 185-Day Maturity Notes
**Series B Notes:**
Twelve (12) Month London Inter-Bank Offered Rate ("LIBOR")
plus One and Three-Quarters Percent (1.75%), per annum** 365-Day Maturity Notes
**Series C Notes:**
Three (3) Month London Inter-Bank Offered Rate ("LIBOR"),
plus One and One-Half Percent (1.5%), per annum*** 90-Day Maturity Notes

**Bank Espirito Santo International, Ltd., Cayman Islands, BWI (Collateral Agent)**

### Minimum Purchase -    1 Note ($ 100,000)

Stated Interest Rates: Series A Notes: Six (6) Month London Inter-Bank Offered Rate ("LIBOR") plus One and One-Half Percent (1.5%) per annum* 185-Day Maturity Notes. Series B Notes: Twelve (12) Month London Inter-Bank Offered Rate ("LIBOR") plus One and Three-Quarters Percent (1.75%), per annum** 365-Day Maturity Notes. Series C Notes: Three (3) Month London Inter-Bank Offered Rate ("LIBOR") plus One and One-Half Percent (1.5%) per annum*** 90-Day Maturity Notes.

---

## SUBSCRIPTION INSTRUCTIONS

In order to subscribe to purchase Notes from E.S. Bankest LLC (the "Company"), a prospective lender must complete and execute the Subscription documents referred to below in accordance with the instructions set forth beginning on the next page. The subscription documents, together with the appropriate payment, should then be delivered to the Company's present address at 999 Brickell Avenue, Miami, Florida 33131. Subscriptions must be received by the Company not later than June 30, 2002. The Company may terminate the Offering at any time in its sole discretion.

The subscription documents are a supplement to the Confidential Memorandum of the Company, dated January 1, 2002 (the "Memorandum"), relating to the private offering of Notes of the Company. Although copies of subscription documents are an integral part of the Memorandum, for your purposes and for purposes of complying with these Subscription Procedures, all subscription documents that are to be executed are printed on green safety paper. NO PERSON IS AUTHORIZED TO RECEIVE THE MEMORANDUM UNLESS SUCH PERSON HAS PREVIOUSLY RECEIVED, OR SIMULTANEOUSLY RECEIVES, A COPY OF THE MEMORANDUM BEARING ON ITS COVER PAGE THE NUMBER SET FORTH ON THE COVER PAGE OF THIS SUBSCRIPTION DOCUMENT. Delivery of the Memorandum to anyone other than the person named on page A of this Subscription Document and the Memorandum is unauthorized, and any reproduction or circulation of the Memorandum, in whole or in part, is prohibited, except for delivery by the named offeree to the attorney, accountant, other professional advisor of Purchaser Representative, if any, of the named offeree.

---

ES0256507

In order to subscribe for Notes, you must complete, execute and deliver the subscription documents accompanying the Memorandum in accordance with the instructions set forth below, together with the appropriate payment (as described below), to the Company. Please be sure that your name appears in exactly the same manner in each signature and in each place where it is inserted in the documents.

Subscriptions from suitable shareholders and prospective investors will be accepted, subject to approval by the Company, after receipt of the subscription documents (properly completed and executed) with the appropriate payment. All subscriptions must be received not later than June 30, 2002.

| ITEM | INSTRUCTIONS |
|---|---|
| PAYMENT | Subscription payment(s) are payable in United States dollars via (i) check or (ii) bank to bank wire transfer of funds. Payments by check should be made payable to the order of the Company, as follows: E.S. Bankest LLC Subscription payments made by bank-to-bank wire transfer of funds should be sent as follows: |

**Espirito Santo Bank**

ABA NUMBER 0660-0902-9

For the Credit of: **E.S. Bankest LLC**

ACCOUNT NUMBER **106 140 606**

| SUBSCRIPTION AGREEMENT | Complete, sign and date the original of the Subscription Agreement. See Note 1 below if two or more individuals jointly purchase Notes. Signatures must be witnessed. |
|---|---|
| PURCHASER REPRESENTATIVE QUESTIONNAIRE | If a prospective purchaser is relying on the advice of a Purchaser Representative to evaluate the merits and risks of an investment in the Notes, the Purchaser Representative must complete (including insertion of the name of the prospective investor at the top of page 1), and the prospective purchaser must acknowledge the Purchaser Representative Questionnaire. |
| TAX CERTIFICATION | Complete, sign and date either IRS Form W-8 (Certificate of Foreign Status). NOTE: These Notes are being offered solely to non-United States investors. |
| MATTERS TO THE ATTENTION OF THE COMPANY: | Subscriber must forward to the Company |

(i)     An original of the completed Subscription Agreement.

(ii)    Check(s) in payment of the Note subscribed for; or

3

ES0256508

   (iii) Bank to bank wire transfer of US funds in payment of the Note(s) subscribed for.

   (iv) Completed originals IRS Form W-8 (certificate of Foreign Status)

<u>Note 1:</u>

If two or more individuals jointly subscribe to purchase Notes, each individuals must sign the Subscription Agreements.

   (i) If the individuals are husband and wife, only one spouse need complete the Subscription Agreements. The name, age, and social security number of the other spouse should be indicated in the Subscription Agreements. Both spouses must sign the Subscription Agreements.

   (ii) If the individuals are not married, each individual must separately complete and sign two Subscription Agreements.

4

ES0256509

## SUBSCRIPTION INSTRUCTIONS AND AUTHORIZATION TO COMPANY

E.S. Bankest LLC
999 Brickell Avenue
Penthouse
Miami, Florida 33131
United States of America

Re: _____, (Subscriber) Confidential Memorandum # 2002-I_____

Please consider this form my/our instructions to and authorization
of you, as follows:

Safekeeping of Note Certificate(s):

☐    Forward Note Certificate(s) to the Address indicated in my/our Subscription Agreement.

☐    Forward Note Certificate(s) to:_____
_____.

☐    Retain my Note Certificate(s) until further notice.

Payment of Note Interest:

☐    Issue checks in payment of Interest, mailing same to address    indicated in my/our Subscription
Document.

☐    Issue checks in payment of Interest, mailing same to: _____
_____.

☐    Wire funds as per the following instructions:
_____
_____.

Repayment of Note(s) Principal Amount:

☐    Issue checks in payment of Principal, mailing same to address indicated in my/our Subscription
Document.

☐    Issue checks in payment of Principal, mailing same
to:_____.

☐    Wire funds as per the following instructions:
_____

FOR SUBSCRIBER:

_____
Signature
Name:_____
Title:_____
Date:_____

15

ES0256510

## EXHIBIT IX

Audited - Financial Statements of the Company dated December 31, 2000 and 2001

ES0256511



# E. S. Bankest L.L.C.

## Financial Statements
### For the years ended December 31, 2001 and 2000



**WOLFPACK**

Cooperation... Collaboration... Concentration... Communication



**BDO Seidman, LLP**
Accountants and Consultants

ES0256512

# E. S. Bankest L.L.C.

**Financial Statements**
For the years ended December 31, 2001 and 2000

ES0256513



**BDO Seidman, LLP**
Accountants and Consultants

International Place
100 S.E. 2nd Street, Suite 2200
Miami, Florida 33131-2105
Telephone: (305) 381-8000
Fax: (305) 374-1135

## Independent Auditors' Report

Board of Directors
E.S. Bankest L.L.C.

We have audited the accompanying balance sheets of E.S. Bankest L.L.C., as of December 31, 2001 and 2000, and the related statements of operations, members' equity and cash flows for the years ended December 31, 2001 and 2000. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of E.S. Bankest L.L.C. as of December 31, 2001 and 2000 and the results of its operations and its cash flows for the years ended December 31, 2001 and 2000 in conformity with accounting principles generally accepted in the United States of America.

BDO Seidman SSP
Certified Public Accountants

Miami, Florida
February 8, 2002

 Cooperation, Collaboration, Concentration, Communication

2

ES0256514

# E. S. Bankest L.L.C.

## Balance Sheets

| December 31, | 2001 | 2000 |
|---|---:|---:|
| **Assets** | | |
| Cash and cash equivalents (Note 2) | $ 873,781 | $ 1,742,845 |
| Accounts receivable ($178,103,308 in 2001 net of amount due to clients of $21,051,658 less allowance for doubtful accounts of $3,442,319 and $119,809,895 in 2000 net of amount due to clients of $16,166,296 less allowance for doubtful accounts of $477,686) | 153,609,331 | 103,165,913 |
| (Notes 1, 2 and 3) | | |
| Due from affiliates (Note 3) | 8,001,069 | 2,599,425 |
| Prepaid expenses | 137,500 | 109,375 |
| Debt issuance costs net of accumulated amortization of $601,041 and $397,789 in 2001 and 2000, respectively | 325,489 | 146,176 |
| Furniture and equipment, net of accumulated depreciation of $21,504 and $17,326 in 2001 and 2000, respectively | 6,221 | 10,369 |
| Other assets | 49,545 | 48,744 |
| | $ 163,002,936 | $ 107,822,847 |
| **Liabilities** | | |
| Promissory notes (Note 2) | $ 137,501,917 | $ 87,050,000 |
| Line of credit (Note 3) | 3,000,000 | 1,000,000 |
| Accrued interest payable | 1,859,239 | 1,696,613 |
| Accounts payable and accrued liabilities | 103,870 | 97,285 |
| Unearned factoring fees | 1,393,158 | 1,770,338 |
| Income tax payable | 243,843 | 243,843 |
| Total liabilities | 144,102,027 | 91,858,079 |
| **Commitments and Contingencies (Notes 1 and 4)** | | |
| **Members' Equity** | | |
| Initial capitalization | 3,000,000 | 3,000,000 |
| Retained earnings | 15,900,909 | 12,964,768 |
| Total members' equity | 18,900,909 | 15,964,768 |
| | $ 163,002,936 | $ 107,822,847 |

*See accompanying summary of accounting policies and notes to financial statements.*

3

ES0256515

# E. S. Bankest L.L.C.

## Statements of Operations

| For the years ended December 31, | 2001 | 2000 |
|---|---|---|
| **Revenues:** | | |
| Interest and fee income | $ 22,571,675 | $ 16,356,060 |
| | | |
| **Expenses:** | | |
| Interest | 7,878,609 | 5,368,517 |
| General and administrative | 3,356,419 | 2,736,393 |
| Commissions (Note 3) | 1,045,794 | 627,719 |
| Professional fees | 304,708 | 189,203 |
| Provision for credit losses | 3,050,004 | 390,003 |
| Total expenses | 15,635,534 | 9,311,835 |
| Net income | $  6,936,141 | $  7,044,225 |

*See accompanying summary of accounting policies and notes to financial statements.*

4

ES0256516

# E. S. Bankest L.L.C.

## Statements of Members' Equity

|  | Initial Capitalization | Retained Earnings | Total Members' Equity |
|---|---|---|---|
| Balance at December 31, 1999 | $   3,000,000 | $   5,920,543 | $   8,920,543 |
| Net income | - | 7,044,225 | 7,044,225 |
| Balance at December 31, 2000 | 3,000,000 | 12,964,768 | 15,964,768 |
| Distributions to members |  | (4,000,000) | (4,000,000) |
| Net income | - | 6,936,141 | 6,936,141 |
| Balance at December 31, 2001 | $   3,000,000 | $  15,900,909 | $  18,900,909 |

*See accompanying summary of accounting policies and notes to financial statements.*

5

ES0256517

# E. S. Bankest L.L.C.

## Statements of Cash Flows

| For the years ended December 31, | 2001 | 2000 |
|---|---|---|
| **Operating Activities:** | | |
| Net income | $ 6,936,141 | $ 7,044,225 |
| Adjustments to reconcile net income to net cash | | |
| provided by operating activities: | | |
| Depreciation | 4,178 | 6,415 |
| Provision for doubtful accounts | 3,050,004 | 390,003 |
| Amortization of debt issuance costs | 117,852 | 112,177 |
| Changes in operating assets and liabilities: | | |
| (Increase) in: | | |
| Due from affiliates | (5,401,644) | (2,443,997) |
| Prepaid expenses | (28,125) | (38,125) |
| Other assets | (801) | (27,252) |
| Increase (decrease) in: | | |
| Accounts payable and accrued expenses | 6,585 | 66,904 |
| Accrued interest payable | 162,625 | 802,259 |
| Unearned factoring fees | (377,180) | 990,559 |
| Net cash provided by operating activities | 4,469,635 | 6,903,168 |
| **Investing Activities:** | | |
| Accounts receivable | (53,408,051) | (44,812,673) |
| Capital expenditures | - | (852) |
| Net cash used in investing activities | (53,408,051) | (44,813,525) |
| **Financing Activities:** | | |
| Proceeds from issuance of promissory notes | 98,451,917 | 54,350,000 |
| Repayment of promissory notes | (48,000,000) | (18,850,000) |
| Net proceeds from line of credit | 2,000,000 | 1,000,000 |
| Debt issuance costs | (382,565) | (238,480) |
| Distributions to members | (4,000,000) | - |
| Net cash provided by financing activities | 48,069,352 | 36,261,520 |
| Net (decrease) in cash and cash equivalents | (869,064) | (1,648,837) |
| Cash and cash equivalents at beginning of period | 1,742,845 | 3,391,682 |
| Cash and cash equivalents at end of period | $ 873,781 | $ 1,742,845 |
| **Supplemental disclosure of cash flow information:** | | |
| Cash paid during the period for interest | $ 7,715,983 | $ 4,566,260 |

*See accompanying summary of accounting policies and notes to financial statements.*

6

ES0256518

# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

**Organization**

E. S. Bankest Corp. ("The Company") was organized on March 18, 1998 under the laws of the State of Florida. The Company was established for the purpose of engaging in the operation of a non-regulated commercial factoring business, principally by acquiring from Bankest Capital Corp. (BCC) and Bankest Receivables Finance and Factoring Corp. (BRFFC), a joint owner and wholly-owned subsidiary of BCC, respectively, a portion of accounts receivable acquired by BCC and BRFFC pursuant to their factoring businesses.

As part of transactions incident to the formation of the Company, the Company entered into an Accounts Receivable Purchase and Tri-Party Agreement (the "AR Purchase Agreement") with BCC and BRFFC, pursuant to which the Company has agreed to purchase certain assets from BCC and BRFFC. Those assets include various accounts receivable acquired by BCC and BRFFC pursuant to their factoring and finance business. The Company also agreed to acquire certain rights, and assume certain obligations, under various factoring agreements presently existing between BCC and/or BRFFC and their respective clients. The Company uses the proceeds derived from the issuance of promissory notes to finance the purchase of the foregoing assets and to fund the purchase of additional insured accounts receivable and to make advances in the operation of its commercial factoring business.

On October 26, 1998, the Company's stockholders agreed to merge the Company with and into Lacroze, LLC (a Florida Limited Liability Company) the surviving company change its name to E.S. Bankest LLC (Florida Limited Liability Company). This surviving entity succeeded to all of the rights, privileges, immunities and franchises and all of the property of E.S. Bankest Corp. and is responsible and liable for all of E.S. Bankest Corp. liabilities and obligations.

7

ES0256519

# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

**Accounts Receivable Purchased and Concentration of Credit Risk**

Accounts receivable purchased principally originate from small to medium sized companies in the South Florida geographic area. The Company generally withholds payment on a specified percentage of the purchased receivables and obtains credit insurance to reduce its credit risk. If third parties fail to honor their obligations under the purchased receivable, the Company's loss is reduced by any withheld payments and credit insurance. The Company performs ongoing credit evaluations of its significant customers.

Among the accounts receivable purchased from BCC are those originated by BCC's major client, a manufacturer of consumer goods. At December 31, 2001 and 2000, this major client's concentration approximated 35% and 42% of the receivables purchased (Note 1).

The Company purchases accounts receivable with recourse, except as to credit risk. The Company's accounts receivable are insured against credit losses pursuant to its Credit Insurance Policy with Euler American Credit Indemnity Company. Insurance coverage aggregated $125 million as of December 31, 2001. The policy expires on March 31, 2002.

The allowance for credit losses is maintained at a level deemed adequate by management to absorb losses in the portfolio after evaluating the portfolio, current economic conditions, insurance coverage, changes in the nature and the volume of the portfolio, past loss experience and other pertinent factors. Many of these factors involve a significant degree of estimation and are subject to rapid change which may be unforeseen by management. It is reasonably possible that changes in these factors could result in material adjustments to the allowance in the near term.

**Cash and Cash Equivalents**

The Company considers investments with original maturities of three months or less at the time of purchase to be cash equivalents. At times, cash balances in the Company's account may exceed federally insured limits.

**Income Recognition**

Interest income on advances and other amounts owed to the Company is calculated using the simple interest method on the daily balances of principal outstanding and is recorded as earned in accordance with the terms of the related factoring agreements with clients. Factoring fees are recognized over the period that the Company renders the related services.

8

ES0256520

# E. S. Bankest L.L.C.

## Summary of Significant Accounting Policies

| | |
|---|---|
| **Furniture and Equipment** | Furniture and equipment are recorded at cost. Depreciation is calculated on the straight-line basis over the estimated useful lives of the assets. (3-5 years). |
| **Income Taxes** | Effective upon the October 26, 1998 merger into Lacroze, LLC, the Company's operations are taxable directly to the members and accordingly, no provision for income taxes is included in the accompanying financial statements for periods subsequent to October 25, 1998. |
| **Use of Estimates in the Preparation of Financial Statements** | The preparation of the financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. |

9

ES0256521

# E. S. Bankest L.L.C.

## Notes to Financial Statements

**1. Accounts Receivable**

Accounts receivable consists of the following:

|  | 2001 | 2000 |
|---|---|---|
| Accounts receivable | $ 178,103,308 | $ 119,809,895 |
| Allowance | (3,442,319) | (477,686) |
|  | 174,660,989 | 119,332,209 |
| Due to clients | (21,051,658) | (16,166,296) |
| Net accounts receivable | $ 153,609,331 | $ 103,165,913 |

At December 31, 2001 approximately $5.3 million of purchased accounts receivable are due from K-Mart Corp. K-Mart Corp. filed for bankruptcy protection under Chapter 11 subsequent to December 31, 2001. Said $5.3 million of K-Mart Corp.'s accounts receivable being insured against credit losses, including bankruptcy.

One of the Company's clients, United Container, LLP filed for bankruptcy protection under Chapter 11 in December 2001. On the advice of the Company's bankruptcy counsel, the Company sought and succeeded to convert the Chapter 11 to a Chapter 7. At December 31, 2001 such purchased accounts receivables aggregated approximately $17 million.

The Company is of the opinion that they own the purchased accounts receivable, and therefore have legally perfected the security interest in such purchased accounts receivable due from K-Mart and customers of United Container, LLP. Interest and fee income attributable to the purchased receivables of K-Mart Corp. and the customers of United Container, LLP aggregated approximately $1,931,000 in 2001.

A purchased account receivable is considered impaired when, based on current information and events, it is probable the Company will be unable to collect the amounts due from account debtors.

10

ES0256522

# E. S. Bankest L.L.C.

## Notes to Financial Statements

As of December 31, 2001, the Company's recorded investment in purchased accounts receivable which were impaired amounted to approximately $7.8 million. Said $7.8 million being comprised of the aforementioned $5.3 million credit-insured accounts receivable due from K-Mart Corp. and approximately $2.55 million of accounts receivable due from customers of United Container, LLP. Whereas the Company anticipates collections of $5.3 million K-Mart Corp. accounts receivable from either K-Mart Corp. or the credit insurer, EULER American Credit Indemnity Company, it has effected an allowance for doubtful accounts aggregated approximately $3.4 million. Said $3.4 million comprised of the aforementioned $2.55 million accounts receivable due from customers of United Container, LLP, $500,000 for the deductible portion of the insured K-Mart Corp. account receivables and a $350,000 general reserve for doubtful accounts. No purchased accounts receivable were impaired at or during the year ended December 31, 2000.

Activity in the allowance for losses was as follows:

| Year ended December 31. | | 2001 | | 2000 |
|---|---|---|---|---|
| Balance, beginning | S | 477,686 | S | 142,555 |
| Provision for doubtful accounts | | 3,050,004 | | 390,003 |
| Charge-offs, net | | (85,371) | | (54,872) |
| Balance, ending | S | 3,442,319 | S | 477,686 |

**2. Promissory Notes**

Factored Accounts Receivable-Backed Promissory Notes (the Notes), were issued through private placements resulting in proceeds to the Company of $98,451,917 and $54,350,000 in 2001 and 2000, respectively. The Notes are collateralized by (i) accounts receivable owned by the Company (ii) an assignment of the proceeds of a credit insurance policy (iii) reserve balances in the factoring accounts (iv) cash and cash equivalents.

The Series A Notes ($77,550,000 and $45,850,000 at December 31, 2001 and 2000) accrue interest based on the six month London Inter-Bank Offered Rate plus 1.5% (3.5% and 7.62% at December 31, 2001 and 2000) and mature through June 20, 2002.

**11**

ES0256523

# E. S. Bankest L.L.C.

## Notes to Financial Statements

The Series B Notes ($59,950,000 and $41,200,000 at December 31, 2001 and 2000) accrue interest based on the twelve month London Inter-Bank Offered Rate plus 1.75% (4.19% and 7.64% at December 31, 2001 and 2000) and mature through December 19, 2002.

Under the terms of the Notes, the Company is obligated to comply with certain covenants. These covenants provide that during any period during which there exists an outstanding principal amount under the Notes, the outstanding balance of accounts receivable and pledged to the collateral agent and lenders under the security agreement will be not less than 120% of the principal amount of all Notes outstanding minus cash deposits and securities pledged. At December 31, 2001, the Company was in compliance with this covenant.

Depending on the Company's rate of growth, the Company may in the future require proceeds from new debt, borrowings or sale of the Company's securities to obtain additional capital. Although the Company believes that it can raise additional capital and have profitable operations in the ensuing year, there can be no assurance that the Company will be able to maintain profitability or obtain additional capital when needed.

3. **Related Party Transactions**

At December 31, 2001, the Company has a credit facility from Banco Espirito Santo & Commercial de Lisboa, which provides for a demand revolving line of credit with maximum borrowings of $3,000,000. Outstanding amounts under this facility bear interest equal to the six month LIBOR rate in effect on the first date of the month in which a borrowing occurs plus 1.50% (3.50% at December 31, 2001). At December 31, 2001, $3,000,000 was outstanding under this facility. Under the terms of the agreement, the Company is required to maintain credit insurance against any loss arising from the insolvency of any party appearing as debtor in any receivable purchased by the Company. Also, the Company is required to maintain a ratio of total liabilities to total tangible net worth not greater than 12:1. At December 31, 2001, the Company was in compliance with these covenants.

12

ES0256524

# E. S. Bankest L.L.C.

## Notes to Financial Statements

At December 31, 2001 and 2000, $8,001,069 and $2,599,425 and at January 31, 2002 $4,0005,707 was due from Bankest Capital Corp. for cash received by Bankest Capital Corp. relating to receivables held by the Company.

Approximately $48 million of the promissory notes are payable to an entity, in which a senior executive is a member of the Company's Board of Directors.

The Company is required to pay 1% commission of the principal amount for the promissary notes placed by one of the Company's members. At December 31, 2001 and 2000 commission expense amounted to $1,045,794 and $627,719, respectively.

An officer of the Company is a member of the board of managers of a limited liability company, from which the Company has purchased $3.2 million in accounts receivable in 2001.

**4.  Commitments**

The Company rents office space under non-cancelable leases expiring October 31, 2002.  The minimum future rental commitment for leases in effect at December 31, 2001, approximates the following:

| Year ending December 31. | | Amount |
|---|---|---|
| 2002 | $ | 120,500 |
| | $ | 120,500 |

Rent expense in 2001 and 2000 aggregated approximately $149,000 and $131,000, respectively.  Upon expiration of the lease, the Company intends to continue to lease its premises on a month-to-month basis until such time as its new long-term leasehold space is available.

13

ES0256525

# E. S. Bankest L.L.C.

## Notes to Financial Statements

5.  **Fair Value of Financial Instruments**

Disclosure of fair value of financial instruments is required by SFAS No. 107, "Disclosures About Fair Value of Financial Instruments." The Company's financial instruments consist principally of cash and cash equivalents, accounts receivable and promissory notes payable. The carrying amounts of such financial instruments as reflected in the balance sheets approximate their estimated fair value as of December 31, 2001 and 2000. The estimated fair value is not necessarily indicative of the amounts the Company could realize in a current market exchange.

**14**

ES0256526

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP, AND BDO INTERNATIONAL B.V.,
      Defendants.
------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
------------------------------------------------x

PAGES 1777 - 1872

VOLUME 16

MORNING SESSION

Miami, Florida

Friday, January 26, 2007

9:35 a.m.

Before the Honorable Jose M. Rodriguez



EXHIBIT 31

Reported by:  Gizella "Gigi" Baan

Page 1777

1          A P P E A R A N C E S
2
3    On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4    INTERNATIONAL, LTD., ET AL.:
5
6    SULLIVAN & CROMWELL, LLP
7        1888 Century Park East
8        Los Angeles, California  90067
9        (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida  33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       350 East Las Olas Boulevard, Suite
21       Fort Lauderdale, Florida  33301
22       (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25

Page 1778

1    On behalf of Defendant BDO Seidman, LLP:
2
3    ALVAREZ, ARMAS & BORRON
4        901 Ponce de Leon Boulevard, Suite 304
5        Coral Gables, Florida  33134
6        (305) 461-5100
7    BY:  Arturo Alvarez, Esquire
8
9    GREENBERG TRAURIG, LLP
10       MetLife Building
11       200 Park Avenue, 15th Floor
12       New York, New York  10166
13   BY:  Adam D. Cole, Esquire
14       Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17       1221 Brickell Avenue
18       Miami, Florida  33131
19   BY:  Mark Schnapp, Esquire
20       Nikki Simon, Esquire
21
22
23
24
25

Page 1779

1    On behalf of Defendant BDO International B.V., n/k/a BDO
2    GLOBAL COORDINATION B.V.:
3
4    BROAD AND CASSEL
5        One Biscayne Tower, 21st Floor
6        Miami, Florida  33131
7        (305) 373-9400
8    BY:  Mark Raymond, Esquire
9        Rhett Traband, Esquire
10
11   SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
12       30 Rockefeller Plaza, 24th Floor
13       New York, New York  10112
14       (212) 332-3831
15   BY:  Kevin W. Goering, Esquire
16       Lisa M. Lewis, Esquire
17
18
19
20
21
22
23
24
25

Page 1780

1    On behalf of Third-Party Defendants Victor Balestra,
2    Bernard Mollet, and Joaquim Garnecho
3
4    RICHMAN, GREER, WEIL, BRUMBAUGH,
5    MIRABITO & CHRISTENSEN, P.A.
6        Miami Center, Suite 1000
7        201 S. Biscayne Boulevard
8        Miami, Florida  33131
9        (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16       2701 Ponce de Leon Boulevard, Mezzanine
17       Coral Gables, Florida  33134
18       (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20       Geoffrey Marks, Esquire
21       Marisol Gomez, Esquire
22
23
24
25

Page 1781

CONTENTS

EXAMINATION OF LEWIS B. FREEMAN BY:         PAGE:

MR. THOMAS:  (Direct)      1810
MR. SCHNAPP:  (Voir dire)      1861
MR. RAYMOND:  (Voir dire)      1865
MR. THOMAS:  (Voir dire)      1866

Page 1782

PROCEEDINGS

THE COURT:  Good morning, everyone.  I'm sure you have a lot to say this morning.

Is there anything we need to address before we bring in the jury?

MR. DORTA:  Yes, Your Honor.  Good morning. May it please the Court.  Gonzalo Dorta on behalf of the Plaintiff.  The issue raised yesterday that Your Honor0.

THE COURT:  Jury questions.

MR. DORTA:  Yes.

THE COURT:  I just need Mr. -- what's his name? -- Mr. Baker wanted to ask a question in opening statement.  It's not proper to ask questions of the lawyers.  They're not allowed to ask questions but will when the proper time comes.  Unfortunately, ladies and gentlemen, if they insist, the statute says I have to allow them -- I shall allow them.

MR. COLE:  You shall allow them?

THE COURT:  I knew that but I needed to -- I needed to get the supporting documentation for it so I did.

The statute says 40.50.  It says the Court shall prevent jurors to submit in Court written questions directed to the witnesses or to the Court.

Page 1783

The Court shall give counsel an opportunity to object to such questions outside the presence of this jury.  The Court may properly limit the submissions of questions to witnesses.

That's what the law is.  It's not discretionary with me.  I knew that, too, but I tried to find case on that.  It actually gave me the discretion to do that.  So if -- it can come up in several ways. It can come up now before the jury comes out.  Then Mr. Baker can ask questions.  If they ask, can we ask questions, I'll have to say yes.  Then I will to have to go through the proceeding.

MR. COLE:  Does it deal only with witnesses or lawyers as well?

THE COURT:  Only witnesses.  They can't ask lawyers questions.

MR. COLE:  And if I understand, if there's an objection --

THE COURT:  That's the procedure we're going to use if they insist.  If they ask, can we ask questions.  The procedure is they have to submit them in writing to the Court.  The Court will take the questions.  The Court will read the questions.  I'll dismiss them for that period, and I will then take up the questions with you.  Obviously, the questions have

Page 1784

to be comport with the evidence code, hearsay, et cetera, et cetera, et cetera, the whole gambit.  And you get check it.  Once the questions gets to be asked, the other side can object on the issue.

MR. COLE:  And the jury doesn't know who objects?

THE COURT:  Absolutely not.  And I will ask the questions unless you want to ask the question. Questions that are actually allowable to ask if the objection is overruled.  Most of them will probably be -- will not comport with the evidence code, but we'll have to wait.

MR. DORTA:  We still have the pending issue. Your Honor is right.  Watson and the statute in question presupposes that we started a case in chief and there's a witness on the stand.  What happened yesterday was it was opening statement.  Statute doesn't apply to opening statement.  And if a juror raises his hand for a question, the law prior to the statute governs the procedure.

And the law says that it is much more appropriate that this Court ask that juror to put in a piece of paper in a note the question he wanted to ask. And you should read it to the attorneys because that question could reflect a preconceived opinion or

Page 1833

1    Q.   Mr. Freeman --
2         THE COURT:  Take your time.
3    BY MR. THOMAS:
4    Q.   Mr. Freeman, you were the receiver for E.S.
5    Bankest; is that correct?
6    A.   Yes.
7    Q.   Mr. Freeman, were you the court-appointed
8    receiver for E.S. Bankest?
9    A.   Yes.
10        MR. SCHNAPP:  Objection.  Asked and
11   answered.
12        THE COURT:  Overruled.
13   BY MR. THOMAS:
14   Q.   Mr. Freeman, as the court-appointed receiver
15   for E.S. Bankest, in our example, how would E.S. Bankest
16   become involved in this transaction?
17        MR. RAYMOND:  Objection.
18        THE COURT:  Overruled.
19   BY MR. THOMAS:
20   Q.   You may answer.
21   A.   Going back to Joy sells the T-shirts
22   February 1.  Wal-Mart promises to pay July 1.  Joy.  And
23   let's assume we sold $10,000 dollars worth of T-shirts.
24   Joy, for whatever reasons they have --
25        MR. SCHNAPP:  Your Honor, I object.  It's

Page 1834

1    the same objection as before.  That he's lecturing to
2    the jury.
3         THE COURT:  Overruled.  That's part of the
4    answer.  Overruled.
5         THE WITNESS:  Joy has its own bills to pay.
6    T-shirts, employees, rent, just like any other business.
7    And they sent them in February so they were already
8    paid.  Everything was done.  And Joy says, we need
9    money.  Joy found Bankest Capital and said, we are owed
10   $10,000 on July 1st.  What we're going to do is say to
11   you, we're going to assign that right to you for the
12   $10,000 on July 1st if you give us $8,000 today.
13   BY MR. THOMAS:
14   Q.   Mr. Freeman, who owned Bankest Capital?
15   A.   Okay.  Bankest Capital --
16   Q.   I'm sorry.
17   A.   Oh, Bankest Capital?
18   Q.   I'm sorry.  Because I got confused.  Let me
19   rephrase.
20        Mr. Freeman, Bankest Capital, who owned and
21   controlled Bankest Capital?
22   A.   The Orlansky brothers.
23   Q.   And, Mr. Freeman, do you understand whether
24   Mr. Parlapiano had a role at Bankest Capital?
25   A.   Yes.

Page 1835

1    Q.   And what was Mr. Parlapiano's role at
2    Bankest Capital?
3    A.   He was the chief financial officer and ran
4    the day-to-day.
5    Q.   Now, Mr. Freeman, you had reached for E.S.
6    Bankest.  Mr. Freeman, how did E.S. Bankest become
7    involved in this transaction?
8    A.   Okay.
9         MR. RAYMOND:  Objection.  604, 702, 701,
10   hearsay.
11        MR. SCHNAPP:  I adopt those.
12        THE COURT:  Sustained.  Rephrase the
13   question.
14   BY MR. THOMAS:
15   Q.   Mr. Freeman, once the example as you were
16   phrasing it to us, that the $10,000 IOU was owed from
17   Wal-Mart now to Capital.  What did Capital do in that
18   transaction?
19        MR. RAYMOND:  Same objections, Judge.
20        THE COURT:  Sustained.  Rephrase the
21   question.
22   BY LEFT:
23   Q.   Mr. Freeman, what happened next in your
24   example, based on your work as the court-appointed
25   receiver of E.S. Bankest, when an IOU was owed from

Page 1836

1    Wal-Mart to Joy and it was assigned to Capital?  What
2    did Capital do with that IOU?
3         MR. RAYMOND:  Objection, Your Honor.
4         THE COURT:  Overruled.
5         THE WITNESS:  Well, as I said earlier,
6    everything is about the money.  Joy wanted to get paid.
7    They had to wait.  They took $8,000 instead of waiting a
8    couple months for $10,000.  So instead of Wal-Mart
9    paying up to Joy, Wal-Mart was going to pay to here, to
10   pay Bankest.  Bankest -- I'm sorry -- Bankest Capital.
11   Bankest Capital got their money from Bankest which they
12   were half owners of.
13        So the $10,000 that was due on July 1
14   went -- instead of Capital was supposed to go right down
15   to Bankest on the July 1 date.  It was just assigning
16   where the money was going.  And since they gave the
17   money to them to get the money up there, that's how it
18   worked.
19   BY MR. THOMAS:
20   Q.   And, Mr. Freeman, where did Bankest get the
21   money that it sent to Bankest Capital?
22   A.   Okay.  Bankest got the money from Espirito
23   Santo's bank.
24   Q.   You have a little board here?
25   A.   Okay.  (Indicating.)  They went out and got

Page 3321

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


-------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
          Plaintiffs,
      vs.
BDO SEIDMAN, LLP, AND BDO INTERNATIONAL B.V.,
          Defendants.
-------------------------------------------------x
BDO SEIDMAN, LLP,
          Third-Party Plaintiff,
      vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
          Third-Party Defendants.
-------------------------------------------------x

PAGES 3321 - 3465

VOLUME 29




AFTERNOON SESSION

Miami, Florida

Tuesday, February 6, 2007

2:00 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 3322

```
 1           A P P E A R A N C E S
 2
 3    On behalf of the Plaintiffs BANCO ESPIRITO SANTO
 4    INTERNATIONAL, LTD., ET AL.:
 5
 6    SULLIVAN & CROMWELL, LLP
 7         1888 Century Park East
 8         Los Angeles, California 90067
 9         (310) 712-6627
10    BY:  Steven W. Thomas, Esquire
11         Emily S. Alexander, Esquire
12
13    GONZALO R. DORTA, P.A.
14         334 Minorca Avenue
15         Coral Gables, Florida 33134
16         (305) 441-2299
17    BY:  Gonzalo R. Dorta, Esquire
18
19.   BERGER SINGERMAN
20         350 East Las Olas Boulevard, Suite
21         Fort Lauderdale, Florida 33301
22         (954) 525-9900
23    BY:  Mitchell W. Berger, Esquire
24
25
```

Page 3323

```
 1    On behalf of Defendant BDO Seidman, LLP:
 2
 3    ALVAREZ, ARMAS & BORRON
 4         901 Ponce de Leon Boulevard, Suite 304
 5         Coral Gables, Florida 33134
 6         (305) 461-5100
 7    BY:  Arturo Alvarez, Esquire
 8
 9    GREENBERG TRAURIG, LLP
10         MetLife Building
11         200 Park Avenue, 15th Floor
12         New York, New York 10166
13    BY:  Adam D. Cole, Esquire
14         Karen Y. Bitar, Esquire
15
16    GREENBERG TRAURIG, LLP
17         1221 Brickell Avenue
18         Miami, Florida 33131
19    BY:  Mark Schnapp, Esquire
20         Nikki Simon, Esquire
21
22
23
24
25
```

Page 3324

```
 1    On behalf of Defendant BDO International B.V., n/k/a BDO
 2    GLOBAL COORDINATION B.V.:
 3
 4    BROAD AND CASSEL
 5         One Biscayne Tower, 21st Floor
 6         Miami, Florida 33131
 7         (305) 373-9400
 8    BY:  Mark Raymond, Esquire
 9         Rhett Traband, Esquire
10
11    SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
12         30 Rockefeller Plaza, 24th Floor
13         New York, New York 10112
14         (212) 332-3831
15    BY:  Kevin W. Goering, Esquire
16         Lisa M. Lewis, Esquire
17
18
19
20
21
22
23
24
25
```

Page 3325

```
 1    On behalf of Third-Party Defendants Victor Balestra,
 2    Bernard Mollet, and Joaquim Garnecho
 3
 4    RICHMAN, GREER, WEIL, BRUMBAUGH,
 5    MIRABITO & CHRISTENSEN, P.A.
 6         Miami Center, Suite 1000
 7         201 S. Biscayne Boulevard
 8         Miami, Florida 33131
 9         (305) 373-4000
10    BY:  Manuel Garcia Linares, Esquire
11
12
13    On behalf of Third-Party Defendant Bernard Mollet
14
15    GAMBA & LOMBANA, P.A.
16         2701 Ponce de Leon Boulevard, Mezzanine
17         Coral Gables, Florida 33134
18         (305) 448-4010
19    BY:  Hector J. Lombana, Esquire
20         Geoffrey Marks, Esquire
21
22
23
24
25
```

Page 3326

CONTENTS

EXAMINATION OF KEITH ELLENBURG BY:      PAGE:

MS. BITAR: (Cross)          3327, 3374

MR. THOMAS: (Redirect)          3320

EXAMINATION OF CARLOS MENDEZ BY:      PAGE:

MR. DORTA: (Direct)          3415

Page 3327

PROCEEDINGS

THE COURT: Ready? Bring them in.

THE BAILIFF: (Complies.)

All rise for the jury.

(Thereupon, the jury was brought into the courtroom.)

THE COURT: All right. Ladies and gentlemen, let's go ahead and start. Ms. Bitar, you may proceed with your cross-examination.

MS. BITAR: May I inquire, Your Honor?

CROSS-EXAMINATION (continued)

BY MS. BITAR:

Q. Good afternoon, Mr. Ellenburg.

A. Good afternoon.

Q. Before we broke for lunch we had an exhibit up on the screen. I'd like to put it back up on the screen, please. Exhibit 66.

(Technician complies.)

Mr. Ellenburg, I'd just like to walk you through the document a little bit so you can discuss the procedures that BDO employed when it learned after the fact that its audit opinion was concluded in a private-placement memorandum.

Let me first ask you this question. What is the difference between an audited financial statement

Page 3328

and an unaudited financial statement?

A. An audited financial statement would have attached to it the opinion of a firm of independent certified public accountants that it had performed an audit in conformity with generally accepted auditing standards and expressed an opinion as to whether the financial statements were fairly stated in accordance with generally accepted accounting principles.

An unaudited statement, for example, could be an internal financial statement prepared by a company.

Q. Okay. And why does BDO need to approve before it will permit -- I'm sorry, to approve financial statements before it will permit its opinion to be used in connection with a securities offering?

A. In all cases where the auditor's opinion is attached to another document which contains other information such as a securities offering, both generally accepted auditing standards as well as BDO Seidman's firm policies call for the auditor to review that other document and give its approval or consent for attaching its audit opinion.

Q. Now, before lunch you testified that BDO, after the fact, granted approval with respect to the use of its 1995 opinion in connection with a private

Page 3329

placement, correct?

A. Correct.

Q. And just to be clear, a private placement of debentures is the sale of a security, correct?

A. It is.

Q. When BDO granted that permission after the fact, did that mean that BDO was giving permission to use its audited opinion in any subsequent offerings?

A. Absolutely not.

Q. So there's no perspective permission that's being granted --

A. No.

Q. -- by virtue of what you talked about earlier today?

A. Each and every time that the financials were utilized as an attachment to a document would require the approval of the accounting firm.

Q. Thank you. Now let's go back to the document. It says, subsequent procedures performed by BDO. That's in the first -- right after the first paragraph.

Do you have that in mind, sir?

A. I do.

Q. Going to Number 2 because I know Mr. Thomas read Number 1 with you, it says, we compared the

Page 3450

1  Santo would have invested or loaned over a hundred
2  million dollars without audited financial statements?
3        MR. RAYMOND: Objection.
4        THE COURT: Sustained. Speculative.
5        MR. DORTA: I'll rephrase.
6  BY MR. DORTA:
7     Q.   What was the first audit year that BDO
8  Seidman audited this newly created company E.S. Bankest?
9  The first audit year?
10    A.   It was in 1998 -- fiscal year-end 1998 which
11 is typically conducted at the beginning of the following
12 year, 1999.
13    Q.   You have to help me out here, Mr. Mendez.
14 When you do an audit of a particular audit, you need the
15 year-end to do the audit?
16    A.   That's correct.
17    Q.   Hence, that's why the audit for '98 starts
18 in January or February '99?
19    A.   That's correct.
20    Q.   Now, were you involved in the 1998 audit
21 that started in January or February of 1999?
22    A.   Yes.
23    Q.   And this was an audit of E.S. Bankest?
24    A.   Yes.
25    Q.   At this point in time had E.S. Bankest been

Page 3451

1  using PPMs, subscription agreements to raise money?
2     A.   Yes.
3     Q.   And was E.S. Bankest selling notes and
4  debentures to customers of Espirito Santo group?
5     A.   Yes.
6     Q.   And to your knowledge, were the audited
7  financial statements of BDO being used and given to
8  Espirito Santo group and their customers?
9     A.   Yes. Absolutely.
10    Q.   Now, let's talk about this first audit
11 year-end audited in 1998. Do you recall a man by the
12 name of Ramon Rivera concerning the audit of 1998?
13    A.   Yes.
14    Q.   Was Ramon Rivera an employee of BDO?
15    A.   Yes.
16    Q.   Was he an auditor of BDO?
17    A.   Yes.
18    Q.   Do you know whether he was an audit manager
19 or somebody very low, like a staff person?
20    A.   No. He was the manager of the audit.
21    Q.   And did you deal with Ramon Rivera on the
22 audit of '98?
23    A.   Yes.
24    Q.   Were you the person at E.S. Bankest that
25 dealt with this man?

Page 3452

1     A.   Yes.
2     Q.   Did it come a point in time in the
3  commencement of the audit of 1998 that Mr. Rivera asked
4  documents of you, Carlos Mendez, concerning E.S.
5  Bankest?
6     A.   Yes.
7     Q.   Was your understanding that this man needed
8  those records to do his audit?
9        MR. ALVAREZ: Objection as to his
10 understanding, calls to speculation.
11       THE COURT: Sustained.
12 BY MR. DORTA:
13    Q.   Were these records requested because an
14 audit was going?
15       MR. ALVAREZ: Objection.
16       MR. RAYMOND: Objection. Leading.
17       THE COURT: Overruled.
18 BY MR. DORTA:
19    Q.   You can answer.
20    A.   Yes.
21    Q.   I mean, he wasn't requesting records because
22 he wanted to take it home and do leisure reading, did
23 he?
24       MR. RAYMOND: Objection. Argumentative.
25       THE COURT: Sustained.

Page 3453

1  BY MR. DORTA:
2     Q.   He was doing an audit?
3     A.   Absolutely.
4     Q.   Of E.S. Bankest, correct?
5     A.   Yes. He deemed those documents necessary to
6  complete his audit.
7     Q.   Did you provide this man the records he was
8  requesting?
9     A.   No.
10    Q.   Do you recall what you told this auditor
11 when you did not provide the records he was asking for?
12 What did you tell Ramon Rivera?
13    A.   I referred him to Dominick Parlapiano.
14    Q.   Why did you refer him to Dominick
15 Parlapiano -- can't pronounce his name. How do you
16 pronounce his last name?
17    A.   Parlapiano.
18    Q.   Why would you refer him to Dominick
19 Parlapiano if the man is asking you for the records?
20       MR. ALVAREZ: Objection. Irrelevant as to
21 why he would do that.
22       THE COURT: Overruled.
23       THE WITNESS: Because we didn't have the
24 records he was asking for and I honestly thought that
25 that's -- that was -- I mean, that was a very shocking

Page 3454

1  situation to me. I thought that was going to be the end
2  of definitely the audit.
3      MR. ALVAREZ: Unresponsive.
4      THE COURT: Hold on a second. Overruled.
5  BY MR. DORTA: The end of what? What was ending when
6  this man asked for records and you didn't give the man?
7  What was ending?
8      A.   Well, he was about to discover the fraud.
9      Q.   The what?
10     A.   The fraud that was going on.
11     Q.   How long has this fraud been going on when
12  this man asked for records to detect the fraud? How
13  long was the fraud going on, sir?
14     MR. RAYMOND: Objection. Leading.
15     THE COURT: Overruled.
16     MR. RAYMOND: Argumentative.
17     THE COURT: Overruled.
18     THE WITNESS: Since 1995.
19  BY MR. DORTA:
20     Q.   Who was the auditor when the fraud commenced
21  in 1995?
22     A.   BDO Seidman.
23     Q.   Do you know, sir, whether or not Mr. Ramon
24  Rivera went and spoke to Dominick Parlapiano after you
25  told him to go speak to that man for the records?

Page 3455

1      THE COURT: Hold on. There's an objection.
2      MR. ALVAREZ: Objection. Lack of personal
3  knowledge.
4      THE COURT: Overruled. It's a yes-or-no
5  question.
6      THE WITNESS: Can you ask me --
7      THE COURT: Read it back, please.
8      (Thereupon, the court reporter read back the
9  requested portion.)
10     THE WITNESS: Yes.
11     MR. ALVAREZ: Judge, may I have a two-second
12  side bar?
13     THE COURT: No.
14  BY MR. DORTA:
15     Q.   Yes what?
16     A.   Yes, I do know that he went to speak to
17  Dominick Parlapiano.
18     Q.   Do you know if Dominick Parlapiano gave
19  Mr. Rivera the records that he requested of you?
20     MR. ALVAREZ: Objection. Lack of personal
21  knowledge.
22     THE COURT: Overruled.
23     THE WITNESS: No.
24  BY MR. DORTA:
25     Q.   Did Dominick ever come to you in order for

Page 3456

1  both of you to give the man the records that he was
2  requesting?
3      A.   No.
4      Q.   Did the man ever that day walk away with the
5  records he was requesting, sir?
6      MR. RAYMOND: Objection. Leading.
7      THE COURT: Overruled.
8      THE WITNESS: He walked away without the
9  records. He stopped the audit.
10  BY MR. DORTA:
11     Q.   What then happened with respect to the audit
12  that Ramon Rivera stopped because he didn't get all the
13  records? What happened next with this particular audit?
14     A.   The audit was resumed a few days after the
15  audit -- the field team left the office of Bankest and
16  they came back a few days later to continue with the
17  audit.
18     Q.   When the audit was resumed, did you give
19  Ramon Rivera all the documents that he had initially
20  requested?
21     A.   No. We didn't have the documents.
22     Q.   What do you mean you didn't have the
23  documents? What documents did this man initially
24  request of you that you didn't have?
25     A.   He wanted to -- for purpose of one of their

Page 3457

1  tests, which is collectibility test, receivables
2  collectibility test, he wanted to trace the flow of
3  payment all the way from the customer, meaning Wal-Mart
4  which owed Joy, the payment to Joy, from Joy into
5  Bankest Capital, and from Bankest Capital to E.S.
6  Bankest. He wanted proof that that flow took place from
7  the origin.
8      Q.   And why couldn't you give them the check
9  from Wal-Mart paying Joy?
10     A.   Because there was no check from Wal-Mart to
11  Joy because the invoice that was in question that we're
12  trying to test the collectibility, it was a fake
13  invoice. In other words, Wal-Mart had no knowledge of
14  that piece of business.
15     Q.   Did you ever fake a Wal-Mart check?
16     A.   Never.
17     Q.   Do you have access to Wal-Mart's checkbook
18  to fake a check?
19     A.   No.
20     Q.   Is that why you didn't fake it?
21     A.   We couldn't fake a Wal-Mart check.
22     Q.   And that was what Ramon was asking of you,
23  those records?
24     A.   He wanted to see the Wal-Mart check. He
25  wanted to see a copy, rather, of a Wal-Mart check.

Page 3458

1    Q.   Do you know under what procedures was this
2 audit resumed? It's yes or no, and then you can
3 explain. Do you know?
4    A.   Yes.
5    Q.   Okay. Tell the ladies and gentlemen of the
6 jury when this audit restarts, under what procedure does
7 it restart?
8    A.   The auditors or meaning BDO was satisfied
9 for purpose of completing this test with a copy of a
10 check from Joy to Bankest Capital and the payment from
11 Bankest Capital to E.S. Bankest. So in other words, it
12 was, I would say, half of the transaction.
13    Q.   When you say half of the transaction, what
14 do you mean by that? When they restart the audit, what
15 are they looking at when you say half of the
16 transaction?
17        MR. RAYMOND: Objection. Calls for
18 speculation.
19        THE COURT: Overruled.
20        THE WITNESS: There was -- we were not
21 providing proof of payment coming from Wal-Mart for that
22 particular invoice as it was represented in our numbers,
23 in our books. And we're not providing payment from
24 Joy -- proof of payment from Joy to Bankest Capital.
25 BY MR. DORTA:

Page 3459

1    Q.   Let me stop you right there. Why weren't
2 you providing payment from Joy to Bankest Capital?
3    A.   Because it didn't exist. We didn't have any
4 payments from Joy. We didn't have any payments from
5 Wal-Mart. We didn't have any payments from Joy.
6    Q.   You may continue.
7    A.   The only payment that we could show them, it
8 was Bankest Capital to E.S. Bankest.
9    Q.   Let me stop you right there now. Bankest
10 Capital is that company that's controlled by the
11 Orlanskys?
12    A.   Yes.
13    Q.   And what BDO was being satisfied with is a
14 check from Capital to E.S. Bankest?
15    A.   Exactly.
16    Q.   Did you provide them real checks or fake
17 checks of that transaction?
18    A.   I'm sorry. Copy for two years?
19    Q.   The check from Capital to E.S. Bankest, was
20 that a real check?
21    A.   The Capital to E.S. Bankest, it was a real
22 check. The one that was not real, it was a fake check,
23 it was a Joy check to Bankest Capital.
24    Q.   All right. So BDO is -- starts re-auditing
25 or resumes the auditing and they don't need to see the

Page 3460

1 customer checks, Wal-Mart and K-Mart, correct?
2    A.   Right. They didn't need to see the Wal-Mart
3 check. They didn't need to see proof of payment from
4 Joy to E.S. Bankest.
5    Q.   When you say proof of payment, are you
6 referring to like a deposit slip showing the Wal-Mart
7 check being deposited by Joy? Is that what you mean?
8        MR. ALVAREZ: Objection. Leading.
9        THE COURT: Sustained.
10 BY MR. DORTA:
11    Q.   What do you mean by proof of payment into
12 Joy, that they didn't need to see that?
13    A.   I mean, a cancelled check from Joy that
14 supposedly was deposited into Bankest Capital's bank
15 account. They didn't ask for the deposit slip that
16 validated the deposit slip or copy of the validated
17 deposit slip that would correspond to that deposit.
18 They didn't ask and they didn't get to see the Bankest
19 Capital bank statement to vouch the deposit that Joy --
20 the Joy check deposited into Bankest Capital.
21        They only saw a copy from the front of a
22 fake check of Joy issued to the order of Bankest Capital
23 Corp. And the Bankest Capital Corp. check -- copy of a
24 check -- I mean copy of a check from Capital Corp. to
25 E.S. Bankest. And they could vouch the deposit because

Page 3461

1 they had bank statements for E.S. Bankest. So they
2 could confirm that, in fact, there was -- they were
3 monies transferred from Capital to E.S. Bankest.
4    Q.   Now, when this audit was restarted with
5 those procedures in place, did you formulate an
6 impression with respect to how the re-audit was going to
7 be done?
8        MR. ALVAREZ: Objection.
9        THE COURT: I don't understand the question.
10 BY MR. DORTA:
11    Q.   All right. When the audit resumed, were you
12 still the lead person?
13    A.   Yes.
14    Q.   When the audit resumed, were you made aware
15 how the audit was going to be conducted?
16    A.   Yes.
17    Q.   When you were made aware how the audit was
18 going to be conducted, that certain things were not
19 going to be asked for, how did you feel?
20        MR. ALVAREZ: Objection.
21        THE COURT: Sustained. Feel is irrelevant.
22 Rephrase your question.
23 BY MR. DORTA:
24    Q.   What was your view?
25        MR. ALVAREZ: Objection. Calls for the same

Page 3462

1   information in a different question.
2           THE COURT: (Inaud.)
3   BY MR. DORTA:
4       Q.   Your view as --
5           THE COURT: Sustained. Rephrase the
6   question.
7   BY MR. DORTA:
8       Q.   When the audit was redone -- strike that.
9           When the audit was restarted with this
10  procedure, did you believe that the fraud would be
11  uncovered?
12      A.   Well, not definitely at that point.
13          THE COURT: Do you have an objection?
14          MR. ALVAREZ: Yes, Judge.
15          THE COURT: Or are you just standing up?
16          MR. ALVAREZ: No, Judge, I have an
17  objection.
18          THE COURT: What's the legal basis?
19          MR. ALVAREZ: It calls for the information
20  that I referred to in Court in my oral motion in limine.
21          THE COURT: Overruled. You may continue.
22          MR. RAYMOND: Objection 403, Your Honor.
23          THE COURT: Overruled.
24          THE WITNESS: I -- I had a couple of
25  reactions.

Page 3463

1           THE COURT: Why don't we stop there with the
2   couple of reactions (laughter) and we can go -- you can
3   go home. I'm not going home but you can go home.
4   Ladies and gentlemen, we're sending you home. Do not
5   discuss the case amongst yourselves. Do not form a
6   fixed or definite opinion about the merits of the case
7   until you have heard all the evidence, the argument of
8   the lawyers, the instructions on the law by me. You're
9   not to read or listen to any accounts or see any
10  accounts of this case in the media. And you're to
11  ignore all the lawyers outside this courtroom including
12  Mr. Mendez, who is on the witness stand.
13          All right. You have a good night. See you
14  tomorrow morning, same place, same time. And we'll go
15  from there. Leave the notes, please. Thank you.
16          (Thereupon, the jury was escorted out of the
17  courtroom.)
18          THE COURT: (Inaud.) for a second.
19  Mr. Mendez, I'm going to instruct you that you're not to
20  discuss the testimony you have given nor the testimony
21  you are going to give with any of the lawyers or anyone.
22  Period. And that includes any personal lawyers you may
23  have.
24          THE WITNESS: Sure.
25          THE COURT: You understand?

Page 3464

1           THE WITNESS: Yes.
2           THE COURT: Be here before 9:30. Thank you
3   very much. You're excused Mr. Mendez for today.
4           (Thereupon the witness was excused from the
5   courtroom.)
6           THE COURT: Mr. Alvarez, do you wish to say
7   something to the Court?
8           MR. ALVAREZ: No, Judge. I just want to
9   stare.
10          THE COURT: Are you sure? All right.
11  Anything else we need to discuss before we go?
12          MR. ALVAREZ: I guess we can take up his two
13  reactions.
14          THE COURT: We don't know what they're going
15  to be. I don't know what the questions are going to be,
16  so we'll see what the questions will be and then we'll
17  go from there and then you can object. Or not.
18          Mr. Thomas.
19          MR. DORTA: Yes, Your Honor.
20          THE COURT: These are yours.
21          MR. DORTA: Thank you.
22          (Thereupon, at approximately 6:00 p.m., the
23  above portion of the trial was concluded.)
24          *       *       *
25

Page 3465

1           CERTIFICATE OF COURT REPORTER
2
3           I, GIZELLA BAAN, court reporter, before whom
4   the foregoing statement was taken, do hereby certify
5   that the statement made was taken by me stenographically
6   at the time and place mentioned in the caption hereof
7   and thereafter transcribed by me to the best of my
8   ability; that said transcript is a true record of the
9   statement given; that I am neither counsel or, related
10  to, nor employed by any of the parties to the action in
11  which these proceedings were taken; and further, that I
12  am not a relative or employee of any party hereto, nor
13  financially or otherwise interested in the outcome of
14  this action.
15
16
17
18
19          _____
19          GIZELLA BAAN
20          Court Reporter and Notary Public
21          in and for the State of Florida
22
23
24
25

Page 3829

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


--------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
          Plaintiffs,
     vs.
BDO SEIDMAN, LLP, AND BDO INTERNATIONAL B.V.,
          Defendants.
--------------------------------------------------x
BDO SEIDMAN, LLP,
          Third-Party Plaintiff,
     vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
          Third-Party Defendants.
--------------------------------------------------x

PAGES 3829 - 3969

VOLUME 33



AFTERNOON SESSION

Miami, Florida

Thursday, February 8, 2007

1:50 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 3830

```
 1          A P P E A R A N C E S
 2
 3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
 4   INTERNATIONAL, LTD., ET AL.:
 5
 6   SULLIVAN & CROMWELL, LLP
 7      1888 Century Park East
 8      Los Angeles, California  90067
 9      (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11      Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14      334 Minorca Avenue
15      Coral Gables, Florida  33134
16      (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20      350 East Las Olas Boulevard, Suite
21      Fort Lauderdale, Florida  33301
22      (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25
```

Page 3831

```
 1   On behalf of Defendant BDO Seidman, LLP:
 2
 3   ALVAREZ, ARMAS & BORRON
 4      901 Ponce de Leon Boulevard, Suite 304
 5      Coral Gables, Florida  33134
 6      (305) 461-5100
 7   BY:  Arturo Alvarez, Esquire
 8
 9   GREENBERG TRAURIG, LLP
10      MetLife Building
11      200 Park Avenue, 15th Floor
12      New York, New York  10166
13   BY:  Adam D. Cole, Esquire
14      Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17      1221 Brickell Avenue
18      Miami, Florida  33131
19   BY:  Mark Schnapp, Esquire
20      Nikki Simon, Esquire
21
22
23
24
25
```

Page 3832

```
 1   On behalf of Defendant BDO International B.V., n/k/a BDO
 2   GLOBAL COORDINATION B.V.:
 3
 4   BROAD AND CASSEL
 5      One Biscayne Tower, 21st Floor
 6      Miami, Florida  33131
 7      (305) 373-9400
 8   BY:  Mark Raymond, Esquire
 9      Rhett Traband, Esquire
10
11   SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
12      30 Rockefeller Plaza, 24th Floor
13      New York, New York  10112
14      (212) 332-3831
15   BY:  Kevin W. Goering, Esquire
16      Lisa M. Lewis, Esquire
17
18
19
20
21
22
23
24
25
```

Page 3833

```
 1   On behalf of Third-Party Defendants Victor Balestra,
 2   Bernard Mollet, and Joaquim Garnecho
 3
 4   RICHMAN, GREER, WEIL, BRUMBAUGH,
 5   MIRABITO & CHRISTENSEN, P.A.
 6      Miami Center, Suite 1000
 7      201 S. Biscayne Boulevard
 8      Miami, Florida  33131
 9      (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16      2701 Ponce de Leon Boulevard, Mezzanine
17      Coral Gables, Florida  33134
18      (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20      Geoffrey Marks, Esquire
21
22
23
24
25
```

Page 3834

1          CONTENTS
2
3   EXAMINATION OF CARLOS MENDEZ BY:          PAGE:
4      MR. RAYMOND: (Cross, cont'd)        3835
5      MR. RAYMOND: (Voir dire)            3900
6      MR. RAYMOND: (Cross, cont'd)        3907
7      MR. DORTA: (Redirect)          3928, 3946
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3835

1          PROCEEDINGS
2      THE COURT:  Ready?  Bring him out.
3      THE BAILIFF:  (Complies.)
4      All rise for the jury.
5      (Thereupon, the jury was brought into the
6   courtroom.)
7      THE COURT:  All right.  You may be seated.
8      Are you all ready?
9      THE JURY:  We're ready.
10      THE COURT:  All right.  Mr. Raymond, you may
11   proceed with your cross-examination.
12      MR. RAYMOND:  Thank you, Judge.
13      CROSS-EXAMINATION  (continued)
14      MR. RAYMOND:  Good afternoon, ladies and
15   gentlemen.
16      THE JURY:  Good afternoon.
17   BY MR. RAYMOND:
18      Q.  Mr. Mendez, good afternoon.
19      A.  Good afternoon.
20      Q.  We were talking about your home in Coral
21   Gables.  And we established that you purchased it for
22   $520,000 in 2002, correct?
23      A.  Yes.
24      Q.  And when you went for the refinancing, the
25   house was appraised for more than $520,000, wasn't it?

Page 3836

1      A.  I don't remember.
2      Q.  You do know, as you sit here today, that the
3   value of the home in Coral Gables when you purchased it
4   for $520,000 in 2002 has appreciated, correct?
5      A.  Yes.
6      Q.  And what do you believe the house to be
7   worth today?
8      MR. DORTA:  Objection.  Clearly outside the
9   scope of direct and totally irrelevant.
10      THE COURT:  Overruled.
11      THE WITNESS:  Honestly, I don't know because
12   there was a market increase which was pretty much
13   national increase, and now there is a drop, so I'm not
14   in the real estate market.
15   BY MR. RAYMOND:
16      Q.  Would you agree with me that you are aware
17   that your house is worth approximately $800,000 today?
18      A.  I have no way to know because, again, I
19   haven't really kept up with the prices.
20      Q.  Well, you received from -- like any of us
21   who live in Dade County, we get a tax from Dade County
22   Assessor every year, right?
23      A.  Right.
24      Q.  And you get one too, don't you?
25      A.  Certainly I do, sure.

Page 3837

1      Q.  And it tells you on there what they believe
2   the market value of your house is, correct?
3      A.  The appraised value for purpose of property
4   taxes.
5      Q.  There's two values on that form --
6      MR. DORTA:  Judge, he's referring to a
7   document outside --
8      THE COURT:  Sustained.
9   BY MR. RAYMOND:
10      Q.  Sir --
11      MR. DORTA:  And this is not a real estate
12   case, Your Honor.
13      THE COURT:  I'm not going to let you go too
14   far.  So make it relevant or move on.
15      MR. RAYMOND:  It's extremely relevant and I
16   will tie it up.
17   BY MR. RAYMOND:
18      Q.  You agree, sir, that your house is worth
19   substantially more than what you paid for it, correct?
20      A.  I agree that it has increased in value and
21   it's worth more than what I paid for, yes.
22      Q.  You paid $520,000?  Yes?
23      A.  Yes.
24      Q.  And your mortgage is 231,000?
25      A.  Yes.

Page 3838

1      Q.   Now, of course, the mortgage is a little bit
2  less than that because you've paid some of it off,
3  correct?
4      A.   Probably 229.
5      Q.   Would you agree for purposes of making the
6  math easier the mortgage is certainly no more than
7  $230,000?
8      A.   It certainly is not.
9      Q.   You agree?
10     A.   Yes.
11     Q.   The equity in your house is no less than
12 $290,000, correct?
13     A.   That's correct.
14     Q.   In fact, as a person with an MBA, you know
15 that it's more than that, correct?
16     A.   Yeah -- yes.
17     Q.   The receiver hasn't sued you for the equity
18 in your home, has he?
19         MR. DORTA:  Your Honor, objection.  Side
20 bar.  Homestead is preempted by excuse.
21         THE COURT:  You can redirect, sir.
22 Overruled.
23 BY MR. RAYMOND:
24     Q.   Well, let's address that, sir.  Are you
25 aware that if property is bought with money obtained in

Page 3839

1  a crime that that property is not subject to Homestead?
2  Have you learned that, sir?
3      A.   I don't know about it but I don't think that
4  property was purchased with -- I mean the loan is being
5  paid -- began to be paid with, obviously, salary.
6      Q.   That salary was money from a criminal
7  enterprise called Bankest, correct?
8      A.   Yes.  The salary was from Bankest, yes.
9      Q.   And you've come to learn in connection with
10 your having been convicted of your crimes that your
11 Homestead isn't protected because it was bought with
12 money from your crimes; isn't that true?
13         MR. DORTA:  Objection.  Calls for a legal
14 conclusion.
15         THE COURT:  Sustained.
16 BY MR. RAYMOND:
17     Q.   Has the receiver sued you, sir?
18     A.   No.  No.  He has not.
19     Q.   Has Bankest sued you?
20     A.   E.S. Bankest?
21     Q.   Yes.
22     A.   No.
23     Q.   How about Espirito Santo, have they sued
24 you?
25     A.   No, they have not.

Page 3840

1      Q.   Now, you've testified that as the vice
2  president and senior vice president of operations and
3  finance that you were the point person for supplying
4  documents to various persons that would ask for
5  documents, correct?  Yes?
6      A.   Yes.
7      Q.   And as the point person interacting with,
8  for example, BDO Seidman auditors, did you ever work
9  with employees of BDO International?
10     A.   I don't know.
11     Q.   To your knowledge as you sit here today,
12 you've never worked with anybody from my client,
13 BDO International, correct?
14     A.   I didn't say that.
15     Q.   You're not -- can you tell this jury anybody
16 from BDO International that you ever supplied documents
17 to?
18     A.   Not that I know.  I don't know the persons
19 that came to the field represented BDO whether they were
20 BDO USA, BDO International.
21     Q.   Let's be sure about this.  They were from
22 the BDO Seidman office in Miami, correct?
23     A.   Yes.  Yes.
24     Q.   And you're not aware of BDO International
25 having an office other than the office in Brussels,

Page 3841

1  Belgium, correct?
2      A.   I'm not aware of where BDO International is.
3      Q.   Nobody presented a card to you at any time
4  while you were at Bankest that said they were from BDO
5  International, correct?
6      A.   Not that I recall.
7      Q.   And as the person dealing with documents
8  being produced, management also had interactions with
9  BDO Seidman employees, correct?
10     A.   Yes.
11     Q.   And you were part of those meetings?
12     A.   Yes.
13     Q.   And you saw engagement letters?
14     A.   Yes.
15     Q.   And you saw what's called representation
16 letters from Bankest to BDO Seidman?
17     A.   Yes.
18     Q.   And you've never seen an engagement letter
19 between Bankest and my client, BDO International, have
20 you?
21     A.   No, I've never seen.
22     Q.   And you've never seen a letter from
23 management of Bankest to BDO International making any
24 representations, correct?
25     A.   Correct.

Page 3842

1    Q.   You've never seen any such communications?
2    A.   Correct.
3    Q.   Just so the record is clear, correct?
4    A.   Correct.  Let me just say something.
5         Other than for purpose of qualifying with
6    our partner and with the noteholders, the stature of the
7    company, the fact that BDO is the fifth audit firm in
8    the world, it was very redolent (ph.), and it was
9    expressed to the noteholders and to the bank.
10   Q.   Now, let's talk about
11   PricewaterhouseCoopers.  Are they, what, the first
12   largest auditing firm in the world?
13   A.   Possibly.  If not the first, it's the
14   second.
15   Q.   So they're much -- they're even bigger than
16   BDO Seidman, right?
17   A.   They rank higher than BDO, yes.
18   Q.   And you gave them fraudulent documents and
19   they didn't discover the fraud either, correct?
20   A.   Again, they didn't report to me.  My
21   understanding is that they did not discover the fraud.
22   Q.   You would have known it?
23   A.   Right.  And they didn't audit.
24   Q.   Well, sir, we don't have to bring your
25   testimony from the criminal trial out again.  When you

Page 3843

1    were at the criminal trial, you testified that it was an
2    audit.
3         Do you remember when you reviewed that
4    testimony with Mr. Alvarez yesterday.  You used the word
5    audit during the criminal trial in referring to the work
6    performed by PricewaterhouseCoopers, correct?
7    A.   It was improperly used.
8    Q.   I'm sorry?
9    A.   It was incorrectly used.
10   Q.   So the five times during the criminal trial
11   when you talked about the work performed by
12   PricewaterhouseCoopers you were wrong five times to that
13   jury?
14   A.   I don't know if it was five times.  I may
15   have been questioned as Pricewaterhouse audit.  We're
16   now discussing the scope of the work as we may be
17   discussing it here.  We were discussing it.  What we
18   were discussing in trial was whether false information
19   was provided to PWC.
20   Q.   Sir, yesterday, you saw -- you used the word
21   audit in referring to PricewaterhouseCoopers's work,
22   correct?
23   A.   Okay.
24   Q.   Yes or no?
25   A.   I don't know.  I don't remember.

Page 3844

1    Q.   MR. DORTA:  Judge, as they're getting it,
2    can I have the same request granted to cross designate
3    his entire testimony concerning the Pricewaterhouse as
4    you permitted the defense to do on our right, please?
5         THE COURT:  I don't know what he's going to
6    ask, so he'll give you the page and number and you can
7    tell me.
8         MR. RAYMOND:  The same page shown to the
9    witness yesterday, page 2557 from the criminal trial
10   that took place Day 19, May 1st, 2006.
11        May I approached the witness, Judge?
12        THE COURT:  You may.
13        Don't come up.  What's it going to do for
14   his recollection?
15        MR. RAYMOND:  Yesterday --
16        THE COURT:  Stop, stop, stop.
17        MR. RAYMOND:  He was shown this yesterday
18   and he read it.
19        THE COURT:  Let it refresh his recollection.
20        Don't read it out loud.
21   BY MR. RAYMOND:
22   Q.   I'm at page 2557.  Take a look, if you
23   would, please, at line 9 through 15, please.
24   A.   Sure.  (Reading.)
25   Q.   Does that refresh your recollection that you

Page 3845

1    were asked questions referring to the
2    PricewaterhouseCooper work as an audit and you responded
3    that it was an audit?
4    A.   Okay.
5    Q.   First, you have to tell everybody does that
6    refresh your recollection?
7    A.   Yes.  It does refresh my recollection.
8    Q.   And you did use that word then and you
9    didn't offer any explanation then, did you?
10        THE COURT:  Is that a yes or no.
11        THE WITNESS:  No, I did not use that word
12   audit.  I did not.  I used yes.  And the question was
13   phrased and the BDO -- I mean the PWC work was labeled
14   as an audit by the prosecutor.  We were not discussing
15   the scope of the work.  He was referring as to the
16   specific work that PWC was done and how we acted.
17        MR. RAYMOND:  I'd like permission to publish
18   his questions and answers to the jury.
19        THE COURT:  Any objections?
20        THE WITNESS:  I'm not finished.
21        In this case I think it's worth explaining
22   what an audit is and what PWC did.  They didn't do an
23   audit.  It was not an audit.
24        MR. RAYMOND:  Objection, Your Honor.  It's
25   outside the scope of the question.

Page 3846

1         THE COURT: He explained it.
2     Are there any objections?
3         MR. DORTA: Publishing a testimony -- yes.
4  The answer is yes. There is an objection. To -- the
5  basis of the objection that improper use of impeachment.
6  Three, he hasn't --
7         THE COURT: That's enough. Sit down.
8     Mr. Raymond.
9         MR. RAYMOND: Yes, Your Honor. Pardon my
10  back for a moment. I'm highlighting it for Your
11  Honor --
12        THE COURT: I remember it.
13        MR. RAYMOND: -- so you can see exactly why
14  it's relevant.
15        THE COURT: I remember the question and
16  answer. I'm going to allow you to impeach the witness
17  on that. He gave his explanation, now you can impeach
18  him.
19  BY MR. RAYMOND:
20     Q.   You were under oath on May 1, 2006, were you
21  not?
22     A.   Yes.
23     Q.   At page 2557 at line 9 you were asked the
24  following question: Focusing on the PWC audit in 2002,
25  PricewaterhouseCoopers, remember your testimony

Page 3847

1  concerning that? Sir, do you remember that?
2         ANSWER: Yes.
3         QUESTION: And just to refresh everybody's
4  recollection, that was the audit that took place after
5  the bank -- Espirito Santo bank, Florida, discovered the
6  United Container fraud, correct?
7         ANSWER: Correct.
8         Did you give that testimony and were you
9  were asked those questions at that time?
10     A.   Yes. Yes. Yes, I did.
11     Q.   Thank you.
12        Do you recall being shown a check yesterday
13  by Mr. Dorta? Do you recall him showing you a check?
14  Pulled the check out of his --
15     A.   Oh, his --
16     Q.   -- his own personal check?
17     A.   Yes.
18     Q.   Well, I don't have his check but I have one
19  of mine.
20     A.   I recall him presented a check, yes.
21     Q.   Now, when somebody writes a check, the check
22  is sent to whoever you're paying the money to. In the
23  instance of Wal-Mart, Wal-Mart writes a check to
24  Bankest. Bankest gets the check, correct?
25     A.   Yes.

Page 3848

1     Q.   Now, at that time when they get the check,
2  there's nothing -- when you at Bankest get the check,
3  there's nothing on the back of the check, is there?
4  There's no --
5     A.   No.
6     Q.   -- banking information?
7     A.   Absolutely.
8     Q.   What happens is that, like all of us do, we
9  get a check, we deposit it, we have to endorse it, and
10  then it goes through the Federal Reserve system,
11  correct?
12     A.   That's correct.
13     Q.   And you get like this example here, there's
14  information printed on the back of the check, correct?
15     A.   Yes.
16     Q.   Now when Wal-Mart presents a check to
17  Bankest and Bankest deposits that check, when you make a
18  copy of that check for your records, you don't copy the
19  back of the check because there's no information on the
20  back of the check, correct?
21     A.   That is correct.
22     Q.   So if you left the impression with the jury
23  that when the auditors only got the front of the checks,
24  it's because there's nothing on the back to give them,
25  correct? They didn't need the back because there's

Page 3849

1  nothing there, correct?
2     A.   Yes, but I'd like to explain.
3     Q.   Well, let me ask you a couple more
4  questions.
5         THE COURT: No. Let him explain.
6         MR. RAYMOND: There's no pending question,
7  Your Honor.
8         THE COURT: He said, yes, but I'd like to
9  explain.
10        MR. RAYMOND: There's nothing on the back of
11  the check.
12        THE COURT: He wants to explain it. He can
13  explain it.
14        THE WITNESS: Okay. You were referring
15  specifically about a Joy check?
16  BY MR. RAYMOND:
17     Q.   No, we were talking about a Wal-Mart check,
18  we're talking about. That's why --
19        MR. DORTA: Judge --
20        THE COURT: Mr. Dorta, have a seat.
21  BY MR. RAYMOND:
22     Q.   We were talking about a Wal-Mart check.
23     A.   We were explaining -- we were talking about
24  the flow.
25        THE COURT: No, he's talking about the

Page 3850

1   Wal-Mart check.
2       THE WITNESS: Okay.
3   BY MR. RAYMOND:
4       Q.   If the jury was left with the impression
5   that the auditors only got the front of the check from
6   the Wal-Mart check, and that they should have gotten the
7   back, there was no need for them to get the back of the
8   check because there was nothing on the back, correct?
9       A.   No. That's -- we were talking specifically
10  about the change of the request. The check that was
11  provided with the front of the check --
12      Q.   We're talking about the Wal-Mart check.
13      A.   The Wal-Mart check went directly -- I mean
14  the real checks went directly from Wal-Mart to Bankest.
15      Q.   Right.
16      A.   And they were supposed to go all the time.
17      Q.   And like anybody else, when a check comes to
18  them, you get a check, I get a check, anyone in this
19  room gets a check, we deposit it, and until we endorse
20  it and put our account number on the back, there's
21  nothing on the back of the check. So Wal-Mart's check
22  had nothing on the back for the auditors to look at,
23  correct?
24      A.   For the Wal-Mart check, yes. That's
25  correct. For the Joy check, it's not correct.

Page 3851

1       Q.   Well, let's talk -- we'll talk about Joy
2   checks. I promise you I will come back and I will tell
3   them to you.
4       A.   I just don't want them to misunderstand.
5       Q.   We're both in agreement on that, and with
6   respect to Wal-Mart check, nothing on the back, so BDO
7   Seidman didn't need the back of the check.
8       A.   Right. With respect to the check of
9   Wal-Mart, yeah, there was no --
10      Q.   Now, we're talking about checks. Exhibit
11  4500, I believe, is in evidence. You were shown this
12  yesterday?
13      A.   Yes.
14      Q.   Now, you were able to order over the
15  internet fake checks, right?
16      A.   Yes.
17      Q.   So you had a Wal-Mart check. You had
18  possession of Wal-Mart checks and you had the front of
19  Wal-Mart Checks. And what you do when you order fake
20  checks is that you provide all the information that's on
21  the bottom line. Can you go to -- go to any check
22  please, five or six in.
23          When you order checks, you need that
24  information there, right, the banking -- that's the bank
25  routing information?

Page 3852

1       A.   Yes, absolutely.
2       Q.   And if you wanted to, you could have taken
3   the Wal-Mart check, the front of the check, and taken
4   that information off of there and made fake Wal-Mart
5   checks, correct?
6       A.   I don't know.
7       Q.   Well, you do know how to make fake checks,
8   sir, you've done it. You could have done it for
9   Wal-Mart checks if you wanted to?
10          MR. DORTA: Objection.
11          THE COURT: Sustained.
12          THE WITNESS: I know how to order --
13          THE COURT: Stop. Sustained.
14  BY MR. RAYMOND:
15      Q.   Sir, you made fake checks for every company
16  you wanted to make fake checks for, correct?
17      A.   No.
18      Q.   You mean there are companies that you wanted
19  to make fake checks for that you didn't make fake
20  checks?
21      A.   No. The only companies that fake checks
22  were made for were StrataSys, ENA, and the Joy check
23  that were provided by Joy. So the only two companies --
24  there were only two companies that checks were
25  requested -- were purchased over the internet.

Page 3853

1       Q.   Sir, just as you made the fake checks, all
2   these, (indicating) all these fake checks, you could
3   have made and did make fake checks for another company
4   called ENA, right?
5       A.   Yes.
6       Q.   And you got the checks, Joy, and those were
7   fake checks --
8       A.   (Nodding.)
9       Q.   -- but because you had all this information,
10  if you needed to make fake checks, you had the ability
11  to make fake checks, correct?
12      A.   Yeah.
13      Q.   That's correct, isn't it? One of the things
14  you learned at --
15          THE COURT: He hasn't answered the question.
16          MR. RAYMOND: I saw him nod his head.
17          THE COURT: I'm not sure what that meant.
18          THE WITNESS: I'm going to ask you to
19  rephrase your question.
20  BY MR. RAYMOND:
21      Q.   Certainly. One of the things that you
22  learned over the years at Bankest was how to create fake
23  checks, correct?
24      A.   For those two companies, for three
25  companies, yes.

Page 3854

1    Q.   And you could have made fake checks for
2  other companies if you had to, correct?
3         MR. DORTA:  Your Honor, it calls for
4  speculation.
5         THE COURT:  Sustained.  That question is --
6  stop.
7  BY MR. RAYMOND:
8    Q.   As the vice president of finance, you were
9  in charge of making sure that every fake document that
10  needed to be made was made, correct?
11    A.   Yes.
12    Q.   And you made the deliberate and conscious
13  decision to order fake checks for StrataSys, correct?
14    A.   Yes.
15    Q.   And you made the deliberate and conscious
16  decision to order fake checks for ENA?
17    A.   Yes.
18    Q.   And you worked with the folks at Joy
19  Athletic to produce fake checks for Joy Athletic,
20  correct?
21    A.   That is correct.
22    Q.   And if you were asked for checks for other
23  companies, you knew how to make them if you so chose to,
24  correct?
25    A.   I don't know for other companies.  For

Page 3855

1  Wal-Mart certainly not.
2         THE COURT:  That's not the question.
3  BY MR. RAYMOND:
4    Q.   You knew how to make them.  You knew how to
5  make fake checks, yes?
6    A.   For StrataSys, ENA, and Joy, yes.
7    Q.   But sir, you chose to put the name StrataSys
8  here?
9         MR. DORTA:  Judge --
10  BY MR. RAYMOND:
11    Q.   You could have put another name there?
12         MR. DORTA:  Judge, asked and answered.
13         THE COURT:  Overruled.  He hasn't answered
14  the question.
15  BY MR. RAYMOND:
16    Q.   You could have put other names here if you
17  so chose, correct?
18    A.   Possibly.  I don't know.  I did it with
19  those two companies.  And I was able to purchase those
20  checks.  And I don't know if I was going to be able to do it
21  with a third company.  I don't know.
22    Q.   Did you place orders for any other checks?
23    A.   No.
24    Q.   So each time you tried it, you were
25  successful?

Page 3856

1    A.   Those two times, yes.
2    Q.   You batted a thousand those two times?
3    A.   I'm sorry?
4    Q.   You got it right both times?  You were able
5  to do it both times?
6    A.   We got the checks, yes.
7    Q.   Now, when -- with the exception of
8  StrataSys, ENA, and Joy that you had control over, if
9  you wanted the back of the Wal-Mart check, you didn't
10  have it, correct?
11    A.   No.
12    Q.   Because it goes back to the person that
13  writes the check?
14    A.   That's right.
15    Q.   Cancelled checks are at Wal-Mart, they're at
16  K-Mart?
17    A.   That is correct.
18    Q.   Cancelled checks for real customers and even
19  cancelled checks for fake customers, they were with
20  those customers.  They weren't with Bankest, correct?
21    A.   That is correct.
22         MR. RAYMOND:  Can I ask you to please take a
23  look on the screen, Exhibit 95 in evidence.
24         (Technician complies.)
25         MR. RAYMOND:  Judge, if the jury doesn't

Page 3857

1  object, can I make it a little cooler in here?
2         THE COURT:  That's asking a lot of the jury.
3  I'll make it just one degree cooler.
4         MR. RAYMOND:  Thanks, Judge.
5  BY MR. RAYMOND:
6    Q.   You're looking at Exhibit 95?
7    A.   Yes.
8    Q.   This is a private-placement memorandum dated
9  April 15th, 1998?
10    A.   That is correct.
11    Q.   And this was private-placement memorandum
12  utilized by E.S. Bankest corp to raise $36 million?
13    A.   Yes.
14    Q.   And you see in the middle there it talks
15  about the collateral agent?
16    A.   Yes.
17    Q.   Do you see that right there?  (Indicating.)
18    A.   Yes.
19    Q.   Now, that meant that the collateral behind
20  these notes was to be held by Banco Espirito Santo bank;
21  is that correct?
22    A.   Yeah.  They were party in charge on behalf
23  of the noteholders.
24    Q.   Now, with respect to the collateral, do you
25  know what collateral was given to Banco Espirito Santo

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


----------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
     Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
     Defendant.
----------------------------------------------------x
BDO SEIDMAN, LLP,
     Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
     Third-Party Defendants.
----------------------------------------------------x

PAGES 215 - 302

Volume 3




MORNING SESSION

Miami, Florida

Wednesday, April 11, 2007

9:50 a.m.

Before the Honorable Jose M. Rodriguez





Reported by:  Gizella "Gigi" Baan

Page 216

1          A P P E A R A N C E S
2
3    On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4    INTERNATIONAL, LTD., ET AL.:
5
6    SULLIVAN & CROMWELL, LLP
7        1888 Century Park East
8        Los Angeles, California  90067
9        (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida  33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       350 East Las Olas Boulevard, Suite
21       Fort Lauderdale, Florida  33301
22       (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25

Page 217

1    On behalf of Defendant BDO Seidman, LLP:
2
3    ALVAREZ, ARMAS & BORRON
4        901 Ponce de Leon Boulevard, Suite 304
5        Coral Gables, Florida  33134
6        (305) 461-5100
7    BY:  Arturo Alvarez, Esquire
8
9    GREENBERG TRAURIG, LLP
10       MetLife Building
11       200 Park Avenue, 15th Floor
12       New York, New York  10166
13   BY:  Adam D. Cole, Esquire
14       Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17       1221 Brickell Avenue
18       Miami, Florida  33131
19   BY:  Mark Schnapp, Esquire
20       Nikki Simon, Esquire
21
22
23
24
25

Page 218

1    On behalf of Third-Party Defendants Victor Balestra,
2    Bernard Mollet, and Joaquin Garnecho
3
4    RICHMAN, GREER, WEIL, BRUMBAUGH,
5    MIRABITO & CHRISTENSEN, P.A.
6        Miami Center, Suite 1000
7        201 S. Biscayne Boulevard
8        Miami, Florida  33131
9        (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16       2701 Ponce de Leon Boulevard, Mezzanine
17       Coral Gables, Florida  33134
18       (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20       Geoffrey Marks, Esquire
21
22
23
24
25

Page 219

1            C O N T E N T S
2
3    EXAMINATION OF LEWIS B. FREEMAN BY:        PAGE:
4        MR. THOMAS:  (Direct)              224
5        MR. SCHNAPP:  (Voir dire)          255
6        MR. THOMAS:  (Voir dire)           257
7        MR. SCHNAPP:  (Voir dire)          258
8        MR. THOMAS:  (Direct, cont'd)      260
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 240

1  T-shirts, and let me just use a number of $100,000.
2      MR. SCHNAPP:  Your Honor, I'm going to pose
3  an objection that Mr. Freeman is lecturing the jury.
4  This should be question-and-answer form.
5      THE COURT:  Sustained.  Ask the question and
6  then a question only.
7  BY MR. THOMAS:
8      Q.   Mr. Freeman, in what you're describing,
9  Wal-Mart would purchase $100,000 worth of T-shirts from
10  Joy?
11     A.   Yes.
12     Q.   And would Wal-Mart pay when the truck
13  arrives?
14     A.   No.
15     Q.   What would be the arrangement, then?
16     A.   Wal-Mart -- let's say these were shipped
17  today; they don't get paid today.  Wal-Mart would say we
18  owe you $100,000.  And let's assume this is today.
19  T-shirts go this way.  And Wal-Mart says we will pay you
20  30 days from now.  I'm sorry.  90 days from now.  So
21  90 days from then, they would send their money back to
22  Joy.
23     Q.   Mr. Freeman, when Wal-Mart would owe Joy
24  within 90 days, what would Joy do if Joy could not wait
25  90 days to receive the payment for the T-shirts?

Page 241

1      MR. SCHNAPP:  Your Honor, objection.
2  Hypothetical not based on evidence.  Also under 701,
3  he's not been qualified as an expert.
4      THE COURT:  Sustained.
5  BY MR. THOMAS:
6      Q.   Mr. Freeman, were you appointed by a federal
7  court to examine the business of E.S. Bankest?
8      A.   Yes, I was.
9      Q.   And as part of being appointed by a federal
10  court to examine the business of E.S. Bankest, did you
11  have to report back to that federal court?
12     A.   Yes, I did.
13     Q.   And were part of the responsibilities that
14  the federal court gave you as the examiner and later
15  receiver of E.S. Bankest to understand the business of
16  E.S. Bankest?
17     MR. SCHNAPP:  Objection.  Series of leading
18  questions.
19     THE COURT:  Overruled.
20     THE WITNESS:  Correct.
21  BY MR. THOMAS:
22     Q.   And in fulfilling your duties to the federal
23  court, did you, in fact, learn about the business of
24  E.S. Bankest?
25     A.   Yes.

Page 242

1      Q.   And in fulfilling your duties to the federal
2  court, did you learn about specific transactions
3  involving Joy Athletic selling T-shirts?
4      A.   Yes.
5      Q.   And is what you're explaining to this jury
6  based on the information that you gathered in performing
7  your duties for a federal court?
8      MR. SCHNAPP:  Objection.  Leading.
9      THE COURT:  Overruled.
10     THE WITNESS:  Yes.
11  BY MR. THOMAS:
12     Q.   And when 90 days later Wal-Mart was supposed
13  to pay Joy --
14     A.   Okay.
15     Q.   -- and Joy couldn't wait 90 days to receive
16  that money, what did Joy do?
17     A.   Okay.  Joy, like any business, has to pay
18  their rent, their salaries, and for the T-shirts they
19  bought and all their other expenses.  So if today was
20  the day that we shipped this, and tomorrow was payroll
21  or I had to pay for the T-shirts, Joy had to figure
22  out -- either have enough money in the bank to pay for
23  all these things for the next 90 days or they had to go
24  out and get money against this $100,000 today so they
25  could pay their bills.

Page 243

1      Q.   And Mr. Freeman, who was Bankest Capital?
2      A.   Bankest Capital was a company here in
3  Miami --
4      Q.   I think it's the other little thing.  I'm
5  sorry, mine is more confusing, it says, Capital.
6      A.   I'm sorry.  Bankest Capital was a company
7  here in Miami that factored receivables.
8      Q.   And who were the gentlemen who owned and ran
9  Bankest Capital?
10     A.   They were the Orlanskys and Mr. Parlapiano.
11     Q.   And what did Joy do with Bankest Capital
12  when they couldn't wait the 90 days to get the money
13  from Wal-Mart?
14     A.   Wal-Mart, instead of paying here, 90 days
15  out, Joy would say don't pay us in 90 days, pay right
16  here, pay Bankest Capital.
17     Q.   And what would Bankest Capital do for Joy?
18     A.   Okay.  Day one, when the shirts were
19  shipped, Bankest Capital paid 80 percent or $80,000 to
20  Joy.
21     Q.   In this situation, Mr. Freeman, was the
22  business of Capital to pay $80,000 today to Joy Athletic
23  in exchange for receiving 100,000 in 90 days from
24  Wal-Mart?
25     A.   Correct.

## Page 244

1    Q.   Mr. Freeman, you weren't the court-appointed
2  examiner initially for Bankest Capital, were you?
3    A.   No.
4    Q.   How did E.S. Bankest fit into this
5  transaction?
6    A.   E.S. Bankest would go out and get the money
7  and say to Capital, here is the $80,000 you need.  When
8  the $100,000 comes in in 90 days, don't pay them; pay
9  me.
10    Q.   Mr. Freeman, who owned E.S. Bankest?  Let me
11  ask it in a different time frame.
12        During the period 1998 until 2002, who owned
13  E.S. Bankest?
14    A.   There were two groups of shareholders or
15  members.  Bankest Capital owned 50 percent, and the
16  other 50 percent was owned by the Espirito Santo bank
17  group.
18    Q.   Now, Mr. Freeman, at this point in the
19  transaction, Bankest is paying out 80,000 through
20  Capital to Joy; is that right?
21    A.   Yes.
22    Q.   And in exchange in 90 days is now E.S.
23  Bankest supposed to receive the 100,000?
24    A.   Correct.  So the IOU is now being paid to
25  Bankest.

## Page 245

1    Q.   Mr. Freeman, you said E.S. Bankest was
2  getting the money.  Where was E.S. Bankest getting the
3  money from?
4    A.   E.S. Bankest got the money from Espirito
5  Santo who went out and raised it for them.
6    Q.   And Mr. Freeman, understanding now the
7  transaction, E.S. Bankest was supposed to make money by
8  paying 80,000 out today in exchange for making $100,000
9  in 90 days?
10    A.   Yes.
11        MR. SCHNAPP:  Objection.  Leading.
12        THE COURT:  Rephrase the question.
13  BY MR. THOMAS:
14    Q.   How was E.S. Bankest supposed to make money,
15  Mr. Freeman?
16    A.   Okay.  E.S. Bankest went out and got the
17  80,000 or bought the receivables from Bankest Capital
18  who had bought them from Joy.  So instead of Wal-Mart
19  paying them or paying Bankest Capital, they were
20  supposed to pay Bankest.  Bankest would then repay the
21  money that they got and make their profits.
22    Q.   And the difference between 100,000 and
23  80,000 is how much?
24    A.   $20,000.
25    Q.   Thank you, Mr. Freeman.

## Page 246

1        MR. THOMAS:  With Your Honor's permission, I
2  will ask Mr. Freeman to retake the stand.
3        THE COURT:  He may.
4        THE WITNESS:  (Complies.)
5  BY MR. THOMAS:
6    Q.   Now, Mr. Freeman, based on your
7  understanding of the business as you've just explained
8  to the jury, what was the primary asset of E.S. Bankest?
9    A.   The accounts receivable they had bought from
10  other companies, customers.
11    Q.   And these accounts receivable, are they like
12  an IOU?
13    A.   Correct.
14    Q.   And Mr. Freeman, when you showed up that
15  first morning as the court-appointed examiner of E.S.
16  Bankest, what were you provided about the accounts
17  receivable?
18    A.   The first morning when I got there, my
19  question was, well, do we have current financial
20  statements, do we have a list of the accounts receivable
21  that we own, and I was told, yeah, we do.
22        And Victor Balestra, who was Espirito Santo
23  from downstairs, went and got me copies of the most
24  current list of the accounts receivable and the
25  certified financial statements.

## Page 247

1        MR. THOMAS:  Your Honor, may I approach the
2  witness?
3        THE COURT:  You may.
4        MR. THOMAS:  Your Honor, I'm approaching the
5  witness with Plaintiffs' Exhibit Number 87 in evidence.
6  BY MR. THOMAS:
7    Q.   Mr. Freeman, Plaintiffs' Exhibit Number 87
8  in evidence, is that what you received that first
9  morning?
10    A.   Yes, sir.
11    Q.   And what is it?
12    A.   It's the certified financial statements of
13  E.S. Bankest, LLC, dated -- financial statements dated
14  December 31, 2002, and 2001.
15        MR. THOMAS:  Your Honor, may I just inquire
16  of Jurors 6 and 7 if they're able to see the screen.
17        THE COURT:  Ladies and gentlemen, if you
18  cannot see the screen, please tell me so you may move to
19  accommodate yourselves.
20        MR. THOMAS:  If you have trouble seeing, you
21  can move up one --
22        THE COURT:  I just said that.
23        Ask the question.
24  BY MR. THOMAS:
25    Q.   Mr. Freeman, can you please turn to the next

Page 248

1    page?
2        A.    (Complies.)
3        Q.    When did these financial statements come
4    out?
5        A.    Well, the independent auditor's report came
6    out on April 16th, 2003.
7        Q.    And how long was that before you were
8    appointed by Judge Huck as the examiner of E.S. Bankest?
9        A.    Three to four months.
10       Q.    Mr. Freeman, if you would look at the bottom
11   paragraph --
12       A.    Okay.
13       Q.    -- where it states, in our opinion, the
14   financial statements referred to above present fairly in
15   all material respects, the finance position of E.S.
16   Bankest, LLC, as of December 31, 2002, and 2001, and the
17   results of its operations and its cash flows for the
18   years ended December 31st, 2002, and 2001 in conformity
19   with accounting principles generally accepted in the
20   United States of America.
21           Mr. Freeman, when you arrived as the
22   court-appointed examiner in August of 2003 just a few
23   months after this came out, did you review this report?
24       A.    Yes.
25       Q.    And Mr. Freeman, what was your conclusions

Page 249

1    as the court-appointed examiner when you first reviewed
2    this report?
3            MR. SCHNAPP: Objection, Your Honor.
4    Rule 701.
5            THE COURT:  Overruled.
6            MR. SCHNAPP:  And also 604.
7            THE COURT:  What is that?
8            MR. SCHNAPP:  Your Honor, it's Rule 701 and
9    Rule 604.
10           THE COURT:  Overruled.
11           THE WITNESS:  Could you repeat the question?
12           THE COURT:  Read it back, Gigi.
13           (Thereupon, the court reporter read back the
14   requested portion.)
15           THE WITNESS:  I was happy.
16   BY MR. THOMAS:
17       Q.    And why, Mr. Freeman, in carrying out your
18   duties as appointed by the Court were you happy when you
19   saw this audit report from BDO Seidman issued just a few
20   months before?
21       A.    Well, as a -- in my role as the examiner --
22           MR. SCHNAPP:  Objection, Your Honor.  Not
23   responsive.
24           THE COURT:  I'm not sure you and I know the
25   question.  Why don't you rephrase the question.

Page 250

1    BY MR. THOMAS:
2        Q.    Mr. Freeman, you earlier testified that when
3    you reviewed this independent auditor's report of BDO
4    Seidman just a -- issued just a few months before you
5    showed up, that you were happy to see it.
6            Do you recall that testimony?
7        A.    Yes.
8        Q.    And in carrying out your duties as the
9    court-appointed examiner of E.S. Bankest, why were you
10   pleased to see this report issued just a few months
11   before you showed up?
12       A.    National accounting firm that issued this
13   audit report, independent audit report, said everything
14   was fine and that, you know, based in April -- up to
15   April, three months, four months before I came in, this
16   is as good as it gets.
17           You know, this is when the big accounting
18   firm is saying that it's independent and the audit is
19   fairly stated.  So that the numbers -- in my opinion, in
20   my history, these numbers are great.  I'm overjoyed to
21   have them.
22       Q.    And when you're referring to these numbers
23   that BDO Seidman say present fairly the financial
24   position of E.S. Bankest, are you referring to some of
25   the numbers that are found on the next page?

Page 251

1        A.    Yes.  That's the balance sheet, part of the
2    financial statements.
3        Q.    And Mr. Freeman, do you see an amount there
4    for the accounts receivable?
5        A.    Yes, I do.
6        Q.    And what's that amount?
7        A.    223,870,000.
8        Q.    And what percentage of the assets of E.S.
9    Bankest were made up of these accounts receivable?
10       A.    About 99 percent.
11       Q.    And Mr. Freeman, did you also see on the
12   numbers audited by BDO Seidman the loans from E.S. --
13   from Espirito Santo?
14       A.    Yes.
15       Q.    And could you point those out, please?
16       A.    The 142 million and the line of credit of
17   30. So 172 million.
18       Q.    And Mr. Freeman, when you arrived as the
19   court-appointed examiner on that first day at E.S.
20   Bankest, did you understand that the approximate amount
21   of the money owed to Espirito Santo was $170 million?
22       A.    Yes.
23       Q.    And Mr. Freeman, when you arrived on that
24   first day as the court-appointed examiner of E.S.
25   Bankest, what did you understand based on BDO's audited

Page 252

1  financials for the amount of assets available to pay
2  back that loan to Espirito Santo?
3      A.  There is --
4      MR. SCHNAPP:  Objection under Rule 701.
5      THE COURT:  Overruled.
6      THE WITNESS:  That there was approximately
7  $224 million available in accounts receivable to pay
8  back the 172 million which was 142 plus the 30 owed to
9  the bank.
10 BY MR. THOMAS:
11     Q.  Mr. Freeman, as part of your duties as the
12 court-appointed examiner of E.S. Bankest, did you
13 understand that BDO Seidman had audited these numbers?
14     A.  Yes.
15     Q.  And Mr. Freeman, as part of your duties as
16 the court-appointed examiner of E.S. Bankest, did you
17 understand that BDO Seidman had also audited the notes
18 that were in the financial statements?
19     A.  Yes.
20     Q.  I'm going to ask you to please turn with me
21 to page 11.
22     A.  (Complies.)
23     Q.  Mr. Freeman, do you see on page 11 where it
24 refers to promissory notes?
25     A.  Yes.

Page 253

1      Q.  And based on your carrying out your duties
2  as the examiner and later the receiver as appointed by
3  the federal court, what did you understand the
4  promissory notes referred to?
5      A.  If we go back to page 3 for a second --
6      MR. THOMAS:  Can we do that, please?
7      MR. SCHNAPP:  Your Honor, I'm going to
8  object under Rules 604 and 701 again.
9      THE COURT:  Overruled.
10     THE WITNESS:  If we go under liabilities and
11 promissory notes, Note Number 2, the 142 million, that's
12 what Note 2 on page 11 -- we can go back to that --
13 refers to.
14     (Technician complies.)
15     MR. THOMAS:  And if we can just go back to
16 page 3.
17     Sorry to jump around on you.
18     (Technician complies.)
19 BY MR. THOMAS:
20     Q.  On page 3 where it says, line of credit,
21 30 million?
22     A.  Yes.
23     Q.  And what did you understand based upon your
24 performance of your duties as appointed by the Court
25 that the line of credit referred to?

Page 254

1      A.  Also the $30 million, Note 2 also.
2      Q.  Mr. Freeman, on that first day that you
3  arrived at E.S. Bankest, you earlier referred to a list
4  of accounts receivable that was provided to you by
5  Victor Balestra of Espirito Santo.
6      Do you recall that testimony?
7      A.  Yes, I do.
8      MR. THOMAS:  May I approach the witness,
9  Your Honor.
10     THE COURT:  You may.
11     MR. THOMAS:  I'm approaching the witness
12 with Plaintiffs' Exhibit 7293 marked for ID.
13 BY MR. THOMAS:
14     Q.  Mr. Freeman, have you seen Plaintiffs'
15 Exhibit 7293 marked for ID before?
16     A.  Yes.
17     Q.  What is it?
18     A.  It's a list of accounts receivable that I
19 received on August 11th, '03, from Victor Balestra.
20     MR. THOMAS:  Your Honor, at this time
21 plaintiffs move into evidence Plaintiffs' Exhibit 7293
22 marked for ID.
23     MR. SCHNAPP:  Your Honor, may I voir dire on
24 this document?  Or actually, can I just -- if I can just
25 make -- Your Honor, can I approach?  I can do it on the

Page 255

1  record faster.
2      THE COURT:  Not in front of the jury.  Are
3  you asking to voir dire the witness?
4      MR. SCHNAPP:  I'm asking to voir dire the
5  witness.
6      THE COURT:  Ladies and gentlemen, I need you
7  to step into the jury room for a couple of minutes.
8  Leave your notes, turn them over.  Only the front page.
9      Do not discuss this case amongst yourselves,
10 ladies and gentlemen.
11     (Thereupon, the jury was escorted out of the
12 courtroom.)
13     THE COURT:  All right.  You may be seated.
14     Mr. Schnapp.
15     VOIR DIRE EXAMINATION
16 BY MR. SCHNAPP:
17     Q.  Mr. Freeman, who prepared Exhibit 7293?
18     A.  It was prepared from the books and records
19 of E.S. Bankest.
20     Q.  My question, sir, is who prepared it?
21     A.  The employees of E.S. Bankest.
22     Q.  Where did you get it?
23     A.  I got it from Victor Balestra.
24     Q.  And how do you know that Mr. Balestra --
25 where Mr. Balestra got this document from?

Page 256

1    A.  Mr. Balestra told me that he got it from
2  E.S. Bankest, and I found copies of this later at E.S.
3  Bankest.
4    Q.  Do you know if this is accurate?
5    A.  I don't know how to answer that,
6  Mr. Schnapp.
7    Q.  Do you know if this was a document --
8    A.  This was a record that was kept in the
9  ordinary course of business and used as a -- used at
10  E.S. Bankest, yes, sir.  I know that much.
11    Q.  Sir, the document that is 7293 marked for
12  identification, it has a date of 8-11-03 at the upper
13  left-hand corner.  Do you see that?
14    A.  Yes, sir.
15    Q.  Do you know who put that there?
16    A.  I did.
17    Q.  And what is the significance of that date?
18    A.  It's the first day I was there.
19    Q.  What is the date that the receivables that
20  are listed on 7293 -- strike that.
21       What is the as-of date for 7293?
22    A.  Well, I see my annotation there where it
23  says 6, dash, 30.  June 30th would be the date.
24    Q.  And Exhibit Number 87, which was earlier
25  shown to you, that was the -- that would have shown the

Page 257

1  receivables as of the close --
2       MR. THOMAS:  Objection, Your Honor.  Outside
3  the scope of voir dire on this document.
4       MR. SCHNAPP:  If I can tie it --
5       THE COURT:  I haven't heard the whole thing.
6  BY MR. SCHNAPP:
7    Q.  That covers a different time frame than the
8  document that was shown to you as Exhibit 7293, right?
9    A.  Yes, sir.
10       MR. SCHNAPP:  Your Honor, I would object to
11  this document on several grounds.
12       THE COURT:  I think Mr. Thomas has to ask
13  questions.
14       MR. SCHNAPP:  After Mr. Thomas.
15       VOIR DIRE EXAMINATION
16  BY MR. THOMAS:
17    Q.  Mr. Freeman, as part of your duties as the
18  court-appointed examiner of E.S. Bankest, did you
19  receive Plaintiffs' Exhibit marked for ID 7293?
20    A.  Yes, sir.
21    Q.  As part of your duties as court-appointed
22  examiner of E.S. Bankest, did you keep Plaintiffs'
23  Exhibit marked for ID 7293 in the ordinary course of
24  your business as receiver?
25    A.  Yes.

Page 258

1    Q.  In carrying out your duties as the
2  court-appointed examiner of E.S. Bankest, did you rely
3  upon Plaintiffs' Exhibit 7293 marked for ID?
4    A.  Yes, I did.
5    Q.  And just to follow up on something you said
6  before, Mr. Freeman, did you also see other copies of
7  Plaintiffs' Exhibit 7293 marked for ID at E.S. Bankest
8  when you were there?
9    A.  Yes, I did.
10       MR. THOMAS:  Just one moment.
11       THE COURT:  That's it?
12       MR. THOMAS:  Sorry, Your Honor.  I have
13  nothing further.
14       THE COURT:  Hold on.
15       MR. SCHNAPP:  I have two more questions.
16       THE COURT:  Ask the two questions and then
17  you can go.
18       VOIR DIRE EXAMINATION
19  BY MR. SCHNAPP:
20    Q.  Is everything that you know about this
21  document based upon what you were told by others?
22    A.  Which document?
23    Q.  7293.
24    A.  No, sir.  From our investigation.
25    Q.  But you were told information about the

Page 259

1  document by others; is that correct?
2    A.  As part of my investigation.
3    Q.  Sir, who create the information --
4       THE COURT:  He's answered that.
5       MR. THOMAS:  Objection.  Asked and answered.
6       THE COURT:  All right.  We're going to take
7  a quick bathroom break.  So if you need to go, this is
8  the time to go.
9       Tell the jury the same thing.
10       THE CLERK:  They're already doing that.
11       (Thereupon, a brief recess was taken.)
12       MR. SCHNAPP:  May I make my objection?
13       THE COURT:  You did make the objection.
14       MR. SCHNAPP:  I wanted to make sure that I
15  added in there -- I wanted to be clear that this
16  document does not reflect the time frame that was
17  audited by BDO Seidman.
18       These receivables have not been shown to
19  connect the forms that were in the audited statements
20  for 2001, 2002, and Mr. Freeman has no personal
21  knowledge about how this document was created or what it
22  represents.
23       THE COURT:  Ready?  Bring them in.
24       THE CLERK:  (Complies.)
25       All rise for the jury.

Page 260

1          (Thereupon, the jury was brought into the
2     courtroom.)
3          THE COURT: You may be seated.
4          Are you getting coffee back in the jury
5     room? Is there coffee back there for you?
6          THE JURY: Yes.
7          THE COURT: All right. You may be seated.
8          Exhibit 7293 for ID is accepted into
9     evidence as Plaintiffs' 7293 into evidence over defense
10    objection.
11         You may proceed.
12         DIRECT EXAMINATION (continued)
13    BY MR. THOMAS:
14         Q.   Mr. Freeman, Plaintiffs' Exhibit 7293 now in
15    evidence, can you please describe for the jury what it
16    is?
17         A.   Yes. I asked and received a list as of June
18    30th or the most current list of the accounts receivable
19    that were owned by E.S. Bankest. And up on top it says,
20    E.S. Bankest, LLC, Accounts Receivable, AR, Aging for
21    2003, dash, 06-30, which is June 30th.
22         Q.   And in the upper left it says from Victor?
23         A.   Yes. I wrote it.
24         Q.   Who does that refer to?
25         A.   Victor Balestra, August 11th. It was my

Page 261

1     first day there.
2          Q.   And Mr. Freeman, who did you understand were
3     the names that are listed on the left here, AT&T and
4     those sort of companies? What did they represent?
5          A.   Those were the companies whose accounts
6     receivables were purchased by -- in this case, Bankest
7     Capital, E.S. Bankest.
8          Q.   And if you would please look at the last
9     page of the accounts receivable list.
10         MR. THOMAS: Can we go there?
11         (Technician complies.)
12    BY MR. THOMAS:
13         Q.   And what is the total amount of accounts
14    receivable -- that this accounts receivable list shows?
15         A.   224,416,000 plus.
16         Q.   And was this consistent with the audited
17    financials of BDO Seidman, Plaintiffs' Exhibit
18    Number 87?
19         A.   Yes. On page 3 of the audited financials
20    for December 31, 2002, the number was very close.
21    223,870,000.
22         Q.   Mr. Freeman, did you discover anything that
23    first week about BDO's relationship with one of Bankest
24    clients that made you think that you could not, in fact,
25    rely on BDO Seidman's audited financial statements?

Page 262

1          MR. SCHNAPP: Objection, Your Honor, under
2     701 and 604, and this gets into the issue of what was --
3          THE COURT: Overruled.
4          THE WITNESS: Yes.
5          THE COURT: That's fine.
6          I'm going to sustain the objection.
7          Rephrase the question.
8     BY MR. THOMAS:
9          Q.   Mr. Freeman, during that first week in
10    carrying out your duties as the court-appointed examiner
11    and then receiver of E.S. Bankest, did you find out
12    anything about BDO's relationship with one of E.S.
13    Bankest's clients that made you conclude, based on your
14    investigation, that you could not rely upon BDO
15    Seidman's audited financial statements?
16         MR. SCHNAPP: Objection under Rules 401,
17    403, and 701.
18         THE COURT: Overruled.
19         THE WITNESS: Yes.
20    BY MR. THOMAS:
21         Q.   And what did you discover about a
22    relationship between BDO Seidman and one of E.S.
23    Bankest's clients?
24         A.   That they were business partners.
25         Q.   Could you please describe to the jury your

Page 263

1     investigation and how you discovered this?
2          A.   In the first week I went from examiner to
3     receiver. And as the receiver, I had a lot more power
4     and a lot more duties and a lot more investigative
5     things I was supposed to do. So what I tried to do was,
6     you know, the balance sheet that's full of money that's
7     owed to you, you want to make sure it's collectible.
8     And there were four or five companies that we bought
9     their accounts receivable from, and I wanted to know if
10    the receivables were good.
11         So on the first day -- second day I was the
12    receiver, Thursday, I got in my car, the offices of E.S.
13    Bankest were on Brickell Avenue, and I went out to a
14    company called StrataSys, S-T-R-A-T-A-S-Y-S, which was a
15    consulting computer company out on Kendall Drive.
16         And in my investigation up to then I had
17    found that Mr. Parlapiano, who was one of the operating
18    people of E.S. Bankest, was also very active and
19    president or chairman of StrataSys, this company out on
20    Kendall Drive that was in the computer consulting
21    business.
22         Q.   Mr. Freeman, could you please explain when
23    we say that StrataSys is a client of E.S. Bankest, what
24    that means as far as the receivables?
25         A.   Okay. If I look at the -- maybe put up the

Page 264

1  chart. That might help.
2      Q.   (Complies.) Mind if I just hold it for a
3  moment?
4      A.   If you're able to, that's great.
5      Q.   Not too long.
6      A.   Okay. Joy -- if I can read my writing
7  properly -- okay.
8          Wal-Mart was a customer. Joy was the
9  client. So Joy's accounts receivable were purchased by
10 Capital. The customer was Wal-Mart. So StrataSys was
11 just like Joy. It was a company that we bought their
12 accounts receivable.
13         That's good enough, Mr. Thomas.
14     Q.   Thank you.
15     A.   And if I go through the list of accounts
16 receivable as of June 30th, I'll get to a place where --
17 I don't know if this one has it.
18         Okay. If we go to page 4 of Exhibit 7293,
19 it says StrataSys Corporation. I circled it. That's my
20 writing. It's a Miami company. It's at Kendall and
21 107th, and it says, in my writing, Parlapiano -- I guess
22 it's Parlapiano -- is a director. This is the first
23 couple of days.
24         Then the listing on page 4 goes ABN AMRO,
25 AIG, American Bankers, those are 400,000, 600,000.

Page 265

1  That's the amount of the receivables that we purchased.
2  If we go to page 5, and let's take that first column
3  down from a million 1302 all the way down --
4          (Technician complies.)
5          -- to the School Board of Dade County, these
6  are all people that StrataSys sold goods or services to,
7  and we had purchased all these accounts receivable.
8  Carnival Corporation, City of Hialeah, EMC, Fresh Del
9  Monte, a great big one, in Dade County,
10 (inaud.) School Board, a million 780.
11         Let's go to the next page. And if we can go
12 on that first column again --
13         (Technician complies.)
14         Perfect -- to the 32 million. You've got
15 Union Planters, University of Miami, Visa International,
16 these were the customers. Did I get it right?
17 Customers. Clients? Yeah. Customers.
18         And this shows that on that listing
19 StrataSys had controlled $32 million worth of accounts
20 receivable to E.S. Bankest.
21         Well, I looked at it and said 32 million
22 bucks --
23         MR. SCHNAPP: I'm sorry, Your Honor, is
24 there a question?
25         THE COURT: Not anymore. Sustained.

Page 266

1  (Laughter.)
2          THE WITNESS: Okay.
3  BY MR. THOMAS:
4      Q.   Mr. Freeman, when you reviewed this accounts
5  receivable listing and saw that it showed a total of
6  $32 million from StrataSys as part of your
7  investigation, what did you try to do?
8      A.   Verify that they were collectible.
9      Q.   And to verify that they were collectible,
10 now having learned that Mr. Parlapiano, who worked for
11 E.S. Bankest and Capital also worked for StrataSys, what
12 did you do?
13     A.   I called. I called Mr. Parlapiano out at
14 StrataSys and I left a voice mail. He didn't answer.
15     Q.   So then what did you do?
16     A.   Got in my car. Drove out to -- from
17 Brickell Avenue out to 107th and Kendall.
18     Q.   And when you got out to 107th and Kendall
19 which was StrataSys offices -- well, how long did it
20 take you to get out there?
21     A.   I was lucky; it was about 2:00 o'clock. I
22 didn't hit rush hour. In about 15 minutes.
23     Q.   And what did you find when you got out to
24 StrataSys's offices?
25     A.   I called the Capital Bank building out on

Page 267

1  107th and Kendall. I found the offices of StrataSys. I
2  found a parking lot that was very empty with a lot of
3  spaces on it that said StrataSys. You know how they
4  stencil them on the bumpers? And this is a Thursday at
5  3:00 in the afternoon. I said, gee, there's an awful
6  lot of empty parking spaces.
7      Q.   So what did you do?
8      A.   I went in the building and I looked at the
9  marquis, and it said what floor StrataSys was on, and I
10 believe it was up on the 4th or 5th floor. I went to
11 the 5th floor. Went to get off on the 4th, it was
12 locked. They were being evicted. There was a sign from
13 the landlord that StrataSys was being evicted. I went
14 to the 5th floor, the floor above it, and I walked into
15 a lobby that had a reception area and a desk.
16     Q.   And what did you do?
17     A.   There was no receptionist. There was a
18 phone and a listing of employees, maybe half a page
19 long. I picked up the phone and I called
20 Mr. Parlapiano's extension. I got voice mail again.
21     Q.   Then what happened?
22     A.   I continued to look around the lobby. This
23 is just a desk area. And on the desk was a lucite cube.
24     Q.   And what was the lucite cube? What did it
25 say on it?

Page 268

1      A.   The lucite cube said that it was announcing
2  that StrataSys had become strategic partners with BDO
3  Seidman/Star Alliance, I believe was the name of it, and
4  an effective date.
5      Q.   And as the court-appointed receiver of E.S.
6  Bankest and based upon your investigation at that point,
7  what was your reaction when you saw a cube that
8  announced that BDO Seidman was partners with one of the
9  clients of Bankest whose accounts receivables they were
10 supposed to be certifying?
11     A.   I was stunned.
12     Q.   Why?
13     A.   Well --
14         MR. SCHNAPP: Objection, Your Honor. Rule
15 701.
16         THE COURT: Sustained.
17 BY MR. THOMAS:
18     Q.   Mr. Freeman, as the court-appointed receiver
19 of E.S. Bankest, were part of your duties to determine
20 whether the accounts receivable were real or fake?  Is
21 that part of your duties?
22     A.   Yes, sir.
23     Q.   And as part of your duties as the
24 court-appointed receiver of Bankest, did you travel to
25 StrataSys?

Page 269

1      A.   Yeah.
2      Q.   And was the purpose for you traveling to
3  StrataSys to determine whether that company could pay on
4  the accounts receivable that it owed E.S. Bankest of
5  which you were the court-appointed receiver?
6          MR. SCHNAPP: Your Honor, objection.
7  Leading.
8          THE COURT: Overruled.
9          THE WITNESS: Yep.
10 BY MR. THOMAS:
11     Q.   And was one of the pieces of information
12 that you relied upon to carry out your duties as
13 appointed by a federal court, the cube that you saw at
14 the offices of StrataSys?
15     A.   Well, it was part of my investigation,
16 definitely.
17     Q.   And what -- seeing that cube that you said
18 in prior testimony made you stunned, how did that affect
19 your investigation as the court-appointed receiver of
20 Bankest?
21         MR. SCHNAPP: Objection, Your Honor. Rule
22 701 and Rule 403.
23         THE COURT: Overruled.
24         THE WITNESS: Gave me no reliance on those
25 accounts receivable because one side said that they were

Page 270

1  independent.  Over here --
2          MR. SCHNAPP: Objection, Your Honor.  It's
3  not responsive.  Also Rules 401, 403, and 701.
4          THE COURT: Gigi, I want you to read back
5  the question, and I want Mr. Freeman to answer the
6  question.
7          (Thereupon, the court reporter read back the
8  requested portion.)
9          THE WITNESS: Made me question the
10 independence --
11         THE COURT: Overruled.
12         MR. SCHNAPP: Your Honor, I'm going to
13 object under 701, 403, and 401.
14         THE COURT: Not yet.
15         THE WITNESS: Okay.
16         THE COURT: I'm going to sustain the
17 objection.
18         Actually the question is proper.  The answer
19 is not.
20         MR. THOMAS: I will try to lay a predicate,
21 Your Honor.  Thank you.
22 BY MR. THOMAS:
23     Q.   Mr. Freeman, as part of your duties as the
24 Court-appointed receiver of E.S. Bankest, was one of --
25 some of the documents that you got, reviewed, the

Page 271

1  audited financial statements of BDO Seidman?
2      A.   Yes.
3      Q.   And as part of your duties as the
4  court-appointed receiver of E.S. Bankest, did your use
5  of the audited financial statements affect your
6  investigation?
7      A.   Yes.
8      Q.   And as part of carrying out your duties as
9  the court-appointed receiver, did you try to determine
10 whether or not the accounts receivable certified and
11 BDO's audited financial statements of E.S. Bankest as
12 real were actually fake?
13     A.   Yes.
14     Q.   And in trying to determine in carrying out
15 your duties as the court-appointed receiver of E.S.
16 Bankest, whether those accounts receivable were real or
17 fake, did you rely upon the information that you were
18 able to obtain from StrataSys, one of the clients?
19     A.   Yes, I did.
20     Q.   And was one of the pieces of information you
21 relied upon to carry out your duties, the lucite cube
22 that you saw, showing that BDO Seidman had an alliance
23 with StrataSys?
24     A.   Yes.
25     Q.   Could you please explain as the

Page 272

1   court-appointed receiver how seeing the lucite cube
2   affected your ability to carry out your duties based
3   upon the audited financial statements of BDO Seidman?
4        MR. SCHNAPP:  Your Honor, I'm going to
5   object.  In particular, I'd like to rely on the
6   motion in limine prior to the argument -- prior to the
7   commencement of the trial.  Also Rules 401, 403 and 701.
8        THE COURT:  Overruled.
9        Did you understand the question?
10       THE WITNESS:  I'd ask for it to be read
11  back, and I'll try to answer it.
12       THE COURT:  Read it back, Gigi.
13       (Thereupon, the court reporter read back the
14  requested portion.)
15       MR. SCHNAPP:  Your Honor, I would renew my
16  objections.
17       THE COURT:  Overruled.
18       THE WITNESS:  The lucite cube sent a message
19  to me --
20       THE COURT:  Mr. Freeman, you need to
21  understand the question.
22       He obviously didn't understand the question.
23       MR. THOMAS:  I will rephrase, Your Honor.
24  I'm going to ask a predicate and then I'll rephrase,
25  Your Honor.

Page 273

1   BY MR. THOMAS:
2       Q.  Mr. Freeman, based upon your review of BDO
3   Seidman's audited financial statements certifying the
4   accounts receivable in the years 1998, 1999, 2000, 2001,
5   2002, was your initial understanding as the
6   court-appointed receiver that those accounts receivable
7   were collectible?
8       MR. SCHNAPP:  Objection.  No foundation.
9       THE COURT:  Sustained.
10      Rephrase your question.  The problem is not
11  the question.  The problem is the understanding of the
12  question, and I don't want Mr. Freeman to not be
13  responsive.  It's too critical not to be responsive.
14      MR. THOMAS:  Thank you, Your Honor.
15  BY MR. THOMAS:
16      Q.  Mr. Freeman, as the court-appointed receiver
17  of E.S. Bankest, how did seeing the lucite cube stating
18  that BDO Seidman had an alliance with StrataSys affect
19  your ability to determine whether or not the accounts
20  receivable were real or fake based on BDO's Seidman's
21  audited financial statements?
22      MR. SCHNAPP:  Your Honor, can I have a
23  standing objection.
24      THE COURT:  I have the same rule.
25  Overruled.

Page 274

1        THE WITNESS:  Could I ask the reporter to
2   read it back again?
3        THE COURT:  You may.
4        THE WITNESS:  I'm not trying to be
5   difficult.
6        MR. THOMAS:  We appreciate it.
7        THE COURT:  Go ahead.
8        (Thereupon, the court reporter read back the
9   requested portion.)
10       THE WITNESS:  Made me question them.
11       MR. SCHNAPP:  Objection.  Move to strike.
12       THE COURT:  Overruled.
13  BY MR. THOMAS:
14      Q.  And Mr. Freeman, why did seeing the lucite
15  cube make you question BDO's Seidman's audited financial
16  statements of E.S. Bankest?
17       MR. SCHNAPP:  Your Honor, I object under
18  401, 403, 701, and the motion in limine.
19       THE COURT:  Overruled.
20       THE WITNESS:  May I ask the reporter again?
21       (Thereupon, the court reporter read back the
22  requested portion.)
23       THE WITNESS:  Yes.
24  BY MR. THOMAS:
25      Q.  Why?

Page 275

1        MR. SCHNAPP:  Objection, Your Honor.  Same
2   objections, 401, 403, 701, motion in limine regarding
3   GAAS and GAAP.
4        THE COURT:  Overruled.
5        THE WITNESS:  The auditor's report from BDO
6   dated April 16th says, independent auditor's report.
7   The $32 million out of $224 million is over 10 percent
8   from a company that I'm now aware of is an affiliate.
9   Their independence --
10       MR. SCHNAPP:  (Standing up.)
11       THE COURT:  Sustained.
12       MR. SCHNAPP:  I reserve.
13       THE COURT:  The jury is to disregard
14  whatever answer was given for the last part of the
15  answer.
16       MR. THOMAS:  Your Honor, may I approach your
17  clerk?
18       THE COURT:  You may.
19       MR. THOMAS:  (Complies.)
20       Your Honor, may I approach the witness with
21  Plaintiffs' Exhibit Number 472 marked for ID?
22       THE COURT:  You may.
23       What number was that?
24       MR. THOMAS:  472, Your Honor.
25       THE COURT:  472?

Page 276

1      MR. THOMAS: Yes, sir.
2  BY MR. THOMAS:
3      Q.   Mr. Freeman, what is Plaintiffs' Exhibit 472
4  marked for ID?
5      A.   The lucite cube that I found at the premises
6  of StrataSys Corporation on Kendall Drive that first
7  week.
8      Q.   Mr. Freeman, as part of your duties as the
9  court-appointed receiver of E.S. Bankest, did you obtain
10 Plaintiffs' Exhibit 472 marked for ID?
11     A.   Yes.
12     Q.   And in performing your duties as
13 court-appointed receiver of E.S. Bankest, is this one of
14 the things you relied on Plaintiffs' Exhibit 472?
15     A.   Yes.
16     Q.   And have you kept Plaintiffs' Exhibit 472 in
17 your possession, custody, and control since the time you
18 obtained it?
19     A.   Yes, sir.
20     Q.   And is Plaintiffs' Exhibit 472 marked for ID
21 something you've kept in the normal course of your
22 business activities as the receiver of E.S. Bankest?
23     A.   Yes, sir.
24     MR. THOMAS: Your Honor, at this time
25 plaintiffs move into evidence Plaintiffs' Exhibit 472.

Page 277

1      MR. SCHNAPP: No objection.
2      THE COURT: Without objection, Plaintiffs'
3  Exhibit 472 marked for ID is now 472 into evidence.
4      MR. THOMAS: Your Honor, I would request
5  permission to publish it to the jury.
6      THE COURT: You may.
7      MR. THOMAS: (Complies.)
8      (Thereupon, the exhibit was shown to the
9  jury.)
10     MR. THOMAS: Your Honor, permission to
11 approach the witness.
12     THE COURT: You may.
13     MR. THOMAS: With your permission, I'm
14 returning Plaintiffs' Exhibit 472 to the witness.
15 BY MR. THOMAS:
16     Q.   Mr. Freeman, after you saw the lucite cube
17 marked as Plaintiffs' Exhibit 472, did you take other
18 steps to investigate StrataSys?
19     A.   Yes.
20     Q.   And Mr. Freeman, as part of that
21 investigation of StrataSys, did you discover who at BDO
22 Seidman was in charge of the relationship between BDO
23 Seidman and StrataSys?
24     A.   Yes.
25     Q.   Who was that?

Page 278

1      A.   Sandy Lenner.
2      Q.   Mr. Freeman, do you see Sandy Lenner in the
3  courtroom today?
4      A.   Yes. He's --
5      Q.   Would you please identify him?
6      A.   -- the third person from the table with the
7  gray hair between the lady and the gentleman with the
8  reddish tie.
9      THE COURT: You said reddish tie?
10     THE WITNESS: Reddish. Blue. Blue red.
11     MR. THOMAS: Your Honor, I would ask that
12 the record reflect that Mr. Freeman has identified
13 Mr. Sandy Lenner and ask Mr. Sandy Lenner to stand --
14     THE COURT: Mr. Sandy Lenner can sit unless
15 he wants to stand, and the record will reflect that he
16 is pointing to Mr. Lenner.
17     MR. THOMAS: Mr. Lenner, would you mind
18 standing for the jury?
19     MR. LENNER: (Complies.)
20     MR. THOMAS: Thank you.
21 BY MR. THOMAS:
22     Q.   Mr. Freeman, as part of your investigation
23 as the court-appointed receiver of E.S. Bankest, did you
24 determine who at BDO Seidman was in charge of the audits
25 including verifying whether the StrataSys accounts

Page 279

1  receivable were real or fake?
2      A.   Yes.
3      Q.   And who at BDO Seidman was in charge of the
4  audits of E.S. Bankest?
5      A.   Same person, Sandy Lenner.
6      Q.   Mr. Freeman, as part of your investigation,
7  did you determine whether Mr. Freeman had ongoing
8  contact with StrataSys at the same time he was the
9  person in charge of the audit of E.S. Bankest?
10     A.   I think you have --
11     Q.   Let me rephrase if I missed it up and I
12 apologize.
13     A.   I didn't understand it.
14     Q.   As part of your investigation as
15 court-appointed receiver of E.S. Bankest, did you
16 determine what Mr. Lenner's relationship was with
17 StrataSys?
18     A.   Yes.
19     Q.   And did you determine how often he visited
20 StrataSys?
21     MR. SCHNAPP: Objection. No foundation.
22     THE COURT: Sustained.
23 BY MR. THOMAS:
24     Q.   Mr. Freeman, as part of your duties
25 appointed by the federal court as the receiver, did you

Page 280

1   need to understand whether or not the audited financial
2   statements of BDO Seidman were reliable?
3       A.   Yes.
4       Q.   And in order to carry out your duties, did
5   you need to understand the relationship between BDO
6   Seidman and one of the major clients of E.S. Bankest,
7   StrataSys?
8       A.   Yes.
9           MR. SCHNAPP:   Objection.
10          THE COURT:   Overruled.
11  BY MR. THOMAS:
12      Q.   And to carry out your duties to determine
13  the relationship between BDO Seidman and StrataSys, did
14  you investigate by reviewing documents and interviewing
15  persons at StrataSys and other places?
16      A.   Yes, I did.
17      Q.   And based on that investigation, what did
18  you determine was Mr. Sandy Lenner's role in regards to
19  BDO's relationship with StrataSys?
20          MR. SCHNAPP:   Your Honor, objection under
21  Rule 604 and hearsay.
22          THE COURT:   Overruled.
23          THE WITNESS:   The job was to help StrataSys
24  refer work to BDO and BDO to do work or send work to
25  StrataSys so that they could each share in each other's

Page 281

1   profits.
2   BY MR. THOMAS:
3       Q.   And as part of your investigation,
4   Mr. Freeman, did you determine whether Mr. Lenner had a
5   relationship with Dominick Parlapiano?
6       A.   Yes.
7       Q.   And who was Dominick Parlapiano?
8       A.   Dominick Parlapiano at StrataSys was the
9   president, chairman of the board.  And E.S. Bankest he
10  was the chief financial officer, so he was in both
11  places.
12      Q.   And as part of your investigation,
13  Mr. Freeman, did you determine whether or not Mr. Lenner
14  physically visited StrataSys?
15      A.   Yes.
16      Q.   And what did your investigation reveal?
17          MR. SCHNAPP:   Objection, Your Honor.
18  Hearsay.
19          THE COURT:   Overruled.
20          THE WITNESS:   That Mr. Lenner visited
21  StrataSys multiple times.
22          MR. THOMAS:   Your Honor, may I approach the
23  witness?
24          THE COURT:   You may.
25          MR. THOMAS:   I'm approaching the witness,

Page 282

1   Your Honor, with Plaintiffs' Exhibit Number 435 marked
2   for ID.
3   BY MR. THOMAS:
4       Q.   Mr. Freeman, Plaintiffs' Exhibit Number 435,
5   marked for ID, have you seen that document before?
6       A.   Yes, I have.
7       Q.   What is it?
8       A.   It's the rider to an alliance agreement,
9   document that was found on the E.S. Bankest property and
10  taken control of by me at that time.
11      Q.   And if you look at -- further into the
12  pages, and you look at page 4 of the document, what is
13  that title?
14      A.   An alliance agreement dated August 2001.
15      Q.   Mr. Freeman, as part of your duties as the
16  court-appointed receiver of E.S. Bankest, did you obtain
17  this document?
18      A.   Yes.
19      Q.   Mr. Freeman, as part of your duties as the
20  court-appointed receiver of E.S. Bankest, did you rely
21  upon this document?
22      A.   I sure did.
23      Q.   And did you keep it in the ordinary course
24  of your business activities as the court-appointed
25  receiver of E.S. Bankest up and through today?

Page 283

1       A.   Yes.
2           MR. THOMAS:   At this time, Your Honor,
3   plaintiffs move into evidence Plaintiffs' Exhibit
4   Number 435 marked for ID.
5           MR. SCHNAPP:   No objection.
6           THE COURT:   Without objection, Plaintiffs'
7   Exhibit Number 435 for ID is now 435 into evidence.
8   BY MR. THOMAS:
9       Q.   Mr. Freeman, based on your investigation,
10  what do you understand this document to be?
11      A.   This is the alliance agreement that was
12  entered into in August of 2001 between StrataSys and
13  Star Wagon/BDO Seidman.
14      Q.   Could you please turn with me to page 5 of
15  the agreement?
16      A.   (Complies.)
17      Q.   Which is -- it's a little 5 on mine.  I have
18  Bates stamp ESSTR 002361.  Does that help you?
19      A.   Yes.  That's 2360 on the next page.
20      Q.   Mr. Freeman, you previously testified that
21  StrataSys and BDO Seidman would share profits.  If you
22  could look at me, please, paragraph (c), little (i).
23      A.   Yes, sir.
24      Q.   Based upon your review of this document and
25  your investigation as the court-appointed receiver of

Page 284

1  E.S. Bankest, what did you understand would be the
2  sharing arrangement between BDO and StrataSys for
3  technology alliance member business development
4  revenues?
5         MR. SCHNAPP: Objection. 604, 701, and 702.
6         THE COURT: Overruled.
7         THE WITNESS: In the bottom it says, equal
8  to 20 percent.
9  BY MR. THOMAS:
10    Q.   20 percent of those revenues?
11    A.   Yes, sir.
12        MR. THOMAS: Can we have the ability to
13  highlight that?
14        (Technician complies.)
15        MR. SCHNAPP: Your Honor, I think it's this
16  microphone that's causing the feedback.
17        MR. THOMAS: With Your Honor's permission,
18  we'll see if we have another one.
19        MR. SCHNAPP: I'll just speak loudly.
20  BY MR. THOMAS:
21    Q.   In addition, Mr. Freeman, did you understand
22  that BDO had the right to audit the books and records of
23  its alliance partner, StrataSys?
24        MR. SCHNAPP: Objection, Your Honor.  Same
25  objection as before, 604, 701, and 702.

Page 285

1         THE COURT: Overruled.
2         THE WITNESS: Yes, they did.
3  BY MR. THOMAS:
4    Q.   Can we please turn to paragraph 7 of the
5  agreement?
6    A.   (Complies.)
7         (Technician complies.)
8  BY MR. THOMAS:
9    Q.   And if we look at A under 7 it says,
10  reports.  Do you see where I'm talking about
11  Mr. Freeman?
12    A.   Yes, I do.
13    Q.   And the first sentence provides -- well, I'm
14  sorry.  Let me ask you a separate question.
15        Do you see a reference here in the agreement
16  to Star Wagon?  Mr. Freeman, who is Star Wagon?
17    A.   That's the entity that BDO created for these
18  strategic alliances.
19    Q.   So Star Wagon is a BDO entity?
20    A.   Yes, sir.
21    Q.   The first sentence provides that the
22  technology alliance members shall provide to Star Wagon.
23  Who is the technology alliance member referred to in
24  this paragraph?
25    A.   StrataSys.

Page 286

1    Q.   It says the technology alliance member of
2  StrataSys shall provide to Star Wagon -- which you
3  understand to be BDO; is that right?
4    A.   Yes, sir.
5    Q.   -- such information as Star Wagon may
6  reasonably request from time to time for the purpose of
7  determining the applicable license fee in accordance
8  with Section 2 hereof, and the applicable technology
9  alliance member business development revenues and
10  technology alliance member product revenues in
11  accordance with 5 B and 6 C hereof.  Do you see that?
12    A.   Yes, I do.
13    Q.   Now, without going page by page with the
14  agreement, based on your investigation as the
15  court-appointed receiver in addition to sharing
16  revenues, did you understand that StrataSys paid BDO a
17  license fee?
18    A.   Yes.
19        MR. SCHNAPP: Same objection.
20        THE COURT: Overruled.
21  BY MR. THOMAS:
22    Q.   The next sentence provides, notwithstanding
23  the foregoing, technology alliance member hereby grants
24  to Star Wagon the right to audit the books and records
25  of the technology alliance member which pertains in

Page 287

1  whole or in part to this agreement and its obligations
2  hereunder.  Do you see that, Mr. Freeman?
3    A.   Yes, I do.
4    Q.   Based on your investigation, did you
5  understand that BDO Seidman had the right to audit the
6  books and records of StrataSys?
7         MR. SCHNAPP: Your Honor, I have the same
8  objection under Rules 401, 403, 604, 701, and 702.
9         THE COURT: Overruled.
10        THE WITNESS: Yes, they did.
11  BY MR. THOMAS:
12    Q.   Mr. Freeman, could you please turn with me
13  to the non-disclosure agreement which is Plaintiffs'
14  Exhibit 435 in evidence?
15        (Technician complies.)
16        THE WITNESS: (Complies.) Okay.
17  BY MR. THOMAS:
18    Q.   Mr. Freeman, what do you understand the
19  non-disclosure agreement to be?
20    A.   Non-disclosure agreement --
21        MR. SCHNAPP: Your Honor, I have the same
22  objections.
23        THE COURT: Overruled.
24        THE WITNESS: The non --
25        MR. SCHNAPP: I'm sorry, not to interrupt.