Page 303

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
------------------------------------------------x

PAGES 303 - 466

Volume 4



AFTERNOON SESSION

Miami, Florida

Wednesday, April 11, 2007

1:30 p.m.

Before the Honorable Jose M. Rodriguez


EXHIBIT
35


Reported by:  Gizella "Gigi" Baan

Page 304

1              APPEARANCES
2
3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4   INTERNATIONAL, LTD., ET AL.:
5
6   SULLIVAN & CROMWELL, LLP
7       1888 Century Park East
8       Los Angeles, California 90067
9       (310) 712-6627
10  BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13  GONZALO R. DORTA, P.A.
14      334 Minorca Avenue
15      Coral Gables, Florida 33134
16      (305) 441-2299
17  BY:  Gonzalo R. Dorta, Esquire
18
19  BERGER SINGERMAN
20      350 East Las Olas Boulevard, Suite
21      Fort Lauderdale, Florida 33301
22      (954) 525-9900
23  BY:  Mitchell W. Berger, Esquire
24
25

Page 305

1   On behalf of Defendant BDO Seidman, LLP:
2
3   ALVAREZ, ARMAS & BORRON
4       901 Ponce de Leon Boulevard, Suite 304
5       Coral Gables, Florida 33134
6       (305) 461-5100
7   BY:  Arturo Alvarez, Esquire
8
9   GREENBERG TRAURIG, LLP
10      MetLife Building
11      200 Park Avenue, 15th Floor
12      New York, New York 10166
13  BY:  Adam D. Cole, Esquire
14      Karen Y. Bitar, Esquire
15
16  GREENBERG TRAURIG, LLP
17      1221 Brickell Avenue
18      Miami, Florida 33131
19  BY:  Mark Schnapp, Esquire
20      Nikki Simon, Esquire
21
22
23
24
25

Page 306

1   On behalf of Third-Party Defendants Victor Balestra,
2   Bernard Mollet, and Joaquin Garnecho
3
4   RICHMAN, GREER, WEIL, BRUMBAUGH,
5   MIRABITO & CHRISTENSEN, P.A.
6       Miami Center, Suite 1000
7       201 S. Biscayne Boulevard
8       Miami, Florida 33131
9       (305) 373-4000
10  BY:  Manuel Garcia Linares, Esquire
11
12
13  On behalf of Third-Party Defendant Bernard Mollet
14
15  GAMBA & LOMBANA, P.A.
16      2701 Ponce de Leon Boulevard, Mezzanine
17      Coral Gables, Florida 33134
18      (305) 448-4010
19  BY:  Hector J. Lombana, Esquire
20      Geoffrey Marks, Esquire
21
22
23
24
25

Page 307

1              CONTENTS
2
3   EXAMINATION OF LEWIS B. FREEMAN BY:        PAGE:
4       MR. THOMAS:  (Direct, cont'd)        325
5       MR. SCHNAPP:  (Voir dire)            354
6       MR. THOMAS:  (Direct, cont'd)        361
7       MR. SCHNAPP:  (Voir dire)            456
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 360

1      MR. SCHNAPP: There are only a few more that
2  I have to do it.
3      THE COURT: That's fine.
4      THE CLERK: Bring them in?
5      THE COURT: Yes.
6      THE CLERK: All rise for the jury.
7      (Thereupon, the jury was brought into the
8  courtroom.)
9      THE COURT: All right, ladies and gentlemen,
10  there's one thing you can say is that you're going to
11  get some exercise so you can eat all you want. Now
12  Mr. Thomas.
13      MR. THOMAS: Your Honor, at this time
14  Plaintiff Espirito Santo moves into evidence Plaintiffs'
15  Exhibit Number 471.
16      MR. SCHNAPP: Objection. Hearsay. There's
17  no predicate for the admissibility.
18      THE COURT:  At this time, 471 marked for ID
19  is going to be accepted into evidence as Plaintiffs'
20  Exhibit 471 into evidence over defense objection. You
21  want to take care of 439?
22      MR. THOMAS: Plaintiffs move into evidence
23  Plaintiffs' Exhibit Number 439 at this time as well,
24  Your Honor.
25      MR. SCHNAPP: No objection.

Page 361

1      THE COURT: Without objection, Plaintiffs'
2  Exhibit 439 as ID is moved into evidence.
3      DIRECT EXAMINATION (continued)
4  BY MR. THOMAS:
5      Q.  If we can look at the top of this document.
6  Is this the document that you found on the premises of
7  E.S. Bankest when you took over your duties?
8      A.  Yes, this is.
9      Q.  Who is Eduardo Orlansky?
10      A.  One of the owners and shareholders of
11  Bankest Capital and E.S. Bankest.
12      Q.  And who is Hector Orlansky?
13      A.  Same answer.
14      Q.  Is he Eduardo's brother?
15      A.  He's Eduardo's brother. Also a stockholder.
16      Q.  Who is R. Peter Stanham?
17      A.  Mr. Stanham was an officer of the company
18  also.
19      Q.  Of both Capital and E.S. Bankest?
20      A.  Yes, sir.
21      Q.  Who is Carlos Mendez?
22      A.  Same answer.  Of both Bankest Capital and
23  E.S. Bankest.
24      Q.  And who is Dominick Parlapiano?
25      A.  Officer of both companies, also.

Page 362

1      Q.  And Mr. Freeman, who were the day-to-day
2  managers, people who ran the business of E.S. Bankest?
3      A.  These five people.
4      Q.  If you look at the re: Line, Mr. Freeman,
5  it says, "Re:  5-23-01 meeting with BDO Seidman, LLC."
6      Do you see that?
7      A.  Yes, sir.
8      Q.  And the first line it says, "Yesterday I
9  attended a meeting of BDO at Sandy Lenner's office."
10      Do you see that?
11      A.  Yes, sir.
12      Q.  Now, Mr. Freeman, in the next paragraph,
13  referenced in attendance at the meeting were Sandy, Dave
14  Larson of BDO's Star Wagon, we've already discussed, and
15  Michael G. O'Hare.  Based on your investigation, who is
16  Michael G. O'Hare?
17      A.  An employee of BDO Seidman.
18      Q.  If you look at the next two sentences it
19  says, "He sits on the board of the parent company and he
20  is an executive director and he is the highest ranking
21  corporate officer relating to non-accounting BDO
22  companies such as Star Wagon."
23      Did I read that correctly?
24      A.  Yes.
25      Q.  If you look down to the next paragraph, it

Page 363

1  says, "The meeting was held to finally negotiate the
2  final terms of the StrataSys BDO Star Wagon alliance
3  agreement (graph attached), StrataSys was represented by
4  its president, Howard Cantor and I as director."
5      Do you see that?
6      A.  Yes.
7      Q.  And who was Howard Cantor?
8      A.  He was the president of StrataSys.
9      Q.  Sorry. I have a little mic problem. Sorry
10  about that, ladies and gentlemen. You should hear me
11  better and I shouldn't scratch when I walk.
12      It says here, if you look down, "I've been
13  working with Sandy and Larson to achieve an acceptable
14  alliance agreement.  We reached final agreement
15  yesterday and are shooting for an executed agreement by
16  5-31-01."
17      Based on your investigation, Mr. Freeman,
18  did BDO and StrataSys enter into an agreement?
19      A.  Yes, they did.
20      Q.  If you look at the next sentence,
21  Mr. Freeman, of the memo.
22      A.  Yes, sir.
23      Q.  It says, "BDO estimates it will originate
24  more than 10 million dollars in business to the
25  StrataSys BDO Star Wagon alliance over the next 12

Page 364

1   months."
2        Is that statement consistent with your
3   investigation about the amount of money BDO would
4   estimate it would make from the Star Wagon alliance?
5        MR. SCHNAPP: Objection, no predicate, lack
6   of personal knowledge, 701, 403.
7        THE COURT: Overruled.
8        THE WITNESS: Yes. That's consistent with
9   my investigation.
10  BY MR. THOMAS:
11       Q.   Now, Mr. Freeman, what did your
12  investigation show BDO Seidman made when it did audits
13  like the one of E.S. Bankest?
14       A.   In the range of anywhere from 25 to 60
15  thousand dollars, a lot less in fees.
16       Q.   And do you know the approximate amount of
17  fees they received from the audits of E.S. Bankest?
18       A.   Yes.
19       Q.   And what was that?
20       A.   As I just stated, I don't think it was ever
21  more than 50, 60 thousand dollars in the best year.
22       Q.   And Mr. Freeman, if BDO received 20 --
23  anticipated they would receive 20 percent in their share
24  of the profits from the 10 million, how much would that
25  be?

Page 365

1        MR. SCHNAPP: Objection, Your Honor,
2   argumentative.
3        THE COURT: Sustained.
4   BY MR. THOMAS:
5        Q.   Mr. Freeman, what's 20 percent of 10
6   million?
7        MR. SCHNAPP: Same objection, Your Honor.
8        THE COURT: Sustained.
9   BY MR. THOMAS:
10       Q.   Mr. Freeman, based on your investigation,
11  how much did BDO estimate it would make from referrals
12  when it entered into the agreement with StrataSys?
13       MR. SCHNAPP: Objection. No foundation, no
14  predicate, lack of personal knowledge.
15       THE COURT: Overruled.
16       THE WITNESS: Based on my investigation,
17  about 2 million dollars a year in fees.
18  BY MR. THOMAS:
19       Q.   Mr. Freeman, if you look down to the next
20  paragraph, it says, "Separately Sandy asked Mr. O'Hare
21  to mention his efforts related to establishing a BDO
22  finance company. Given BDO's insights into how
23  difficult -- into the now difficult and getting tougher
24  by the day cash flow environments of small and mid-size
25  companies, BDO sees an opportunity to provide cash flow

Page 366

1   financing services to its clients and that of companies
2   who are members of the BDO alliances."
3        Did I read that correctly?
4        A.   Yes, sir.
5        Q.   And if -- can we put that up and put the
6   next paragraph there on the screen? If you can just put
7   the next two up there.
8        (Technician complies.)
9        It says that "Mr. O'Hare was clear in that
10  BDO does not intend to take principal risk (credit or
11  client risk) and it will not use its own balance sheet
12  to access what Mr. O'Hare stated to be about a two
13  hundred million dollar a year accounts receivable based
14  cash flow lending which BDO's finance company partner
15  would fund."
16       Did I read that correctly?
17       A.   Yes, sir.
18       Q.   I'm going to ask you, Mr. Freeman, to please
19  look at Plaintiffs' Exhibit 415-B, Mr. Lenner's good guy
20  memo.
21       A.   (Complies).
22       Q.   And look at page 2. Can we go to that? I'm
23  going to ask Mr. Freeman to wait just a moment so our
24  technology can catch up with what you're doing there.
25       (Technician complies.)

Page 367

1        Based on your investigation as the
2   Court-appointed receiver of E.S. Bankest, did you
3   conclude, Mr. Freeman, that the factoring alliance
4   referenced in Mr. Lenner's memo is the same two hundred
5   million dollar a year business referenced in this
6   memorandum?
7        MR. SCHNAPP: Objection under 604, 701, 702.
8   There's no personal knowledge. No foundation.
9        THE COURT: Overruled.
10       THE WITNESS: Yeah. The memos tie in. The
11  May 24th memo with the Lenner memo that was dated for
12  the year-end June 30, '01.
13       MR. THOMAS: Can we go back, please, to 471?
14       (Technician complies.)
15  BY MR. THOMAS:
16       Q.   And if we can go to the next page, please.
17       (Technician complies.)
18       I don't want to stop you from any review of
19  the memo, Mr. Freeman, but I'm going to take you down to
20  the paragraph that begins lastly, it says lastly. No.
21  I'm sorry. I explained. I explained.
22       A.   Okay.
23       Q.   Thank you.
24       (Technician complies.)
25       I'm sorry. We do need to go to the lastly.

Page 368

1    Do you mind highlighting lastly, too, please?
2         (Technician complies.)
3         Thank you so much.
4         You see the paragraph beginning lastly?  It
5    says, "Lastly after our meeting this morning, I called
6    Sandy to tell him of Eduardo's idea of having BDO sell
7    the cash flow financing services to their client for a
8    fee, call it a brokerage or a service fee, et cetera.  I
9    explained that if E.S. Bankest compensates BDO, that the
10   required disclosure, let alone the possible need to
11   replace BDO as our auditor due to the conflict, were
12   deal killers for us."
13        Did I read that correctly?
14   A.   Yes, you did.
15   Q.   Mr. Freeman, was BDO ever able to enter into
16   a factoring alliance with its own audit client, E.S.
17   Bankest, or was that a deal killer?
18        MR. SCHNAPP:  Objection. I object to that.
19   There's no foundation.
20        THE COURT:  Sustained.
21        MR. SCHNAPP:  Compound question.
22   BY MR. THOMAS:
23   Q.   Based on your investigation as the
24   Court-appointed receiver, did you determine whether or
25   not BDO Seidman was able to enter into the 200 million

Page 369

1    dollar a year factoring alliance with its own audit
2    client?
3         MR. SCHNAPP:  I object.  No foundation.
4    701, 702, 403.
5         THE COURT:  Overruled.
6         THE WITNESS:  My investigation never found
7    that type of arrangement.
8    BY MR. THOMAS:
9    Q.   Thank you, Mr. Freeman.
10        Now, Mr. Freeman, if could you please look
11   at Plaintiffs' Exhibit Number 439 in evidence.
12   A.   (Complies.)
13   Q.   If we could go to the top.
14        Mr. Freeman, do you understand this to be a
15   BDO document?
16   A.   Yes, sir.
17   Q.   And do you understand that it was written by
18   a BDO employee, Dave Larson?
19   A.   That's what it says, yes, sir.
20   Q.   And if we look at the very beginning of the
21   memo, Mr. Larson of BDO writes, "Sandy Lenner, BDO
22   Miami, introduced us to StrataSys.  Sandy first tried to
23   make this introduction over two years ago but the Wave
24   Bend personnel and John Higgins declined to pursue the
25   relationship."

Page 370

1         What's the date of this memo?
2    A.   July 27, 2001.
3    Q.   And would two years before 2001 be 1999?
4    A.   Yes.
5    Q.   And, Mr. Freeman, when did BDO conduct the
6    first audit of E.S. Bankest?
7    A.   '98.
8    Q.   And when they audited for the year 1998,
9    when would they start their work?
10   A.   It might have started in the end of '98 but
11   usually most of the work is done in early '99.
12   Q.   So according to what BDO wrote here, at the
13   time of the very first audit of E.S. Bankest, Mr. Lenner
14   attempted to start a relationship with StrataSys.  Was
15   that your understanding based on your investigation?
16        MR. SCHNAPP:  Objection.  Argumentative.
17   Lack of personal knowledge.
18        THE COURT:  Sustained.  Rephrase the
19   question.
20        MR. THOMAS:  I will.  Thank you, Your Honor.
21   BY MR. THOMAS:
22   Q.   Mr. Freeman, when did you understand that
23   Mr. Lenner first tried to form a relationship between
24   Bankest client StrataSys and BDO Seidman?
25        MR. SCHNAPP:  Objection under Rule 604, Your

Page 371

1    Honor.
2         THE COURT:  Overruled.
3         THE WITNESS:  My investigation showed about
4    1999.
5    BY MR. THOMAS:
6    Q.   Mr. Freeman, if you would please turn to
7    page 3 of this document.
8    A.   (Complies.)
9    Q.   And if we look in the middle of the page it
10   discusses the license fee for StrataSys.
11   A.   Yes.
12   Q.   And it states the license fee for StrataSys
13   is established at 48 thousand for year one, 70 thousand
14   (sic) for year two, and 75 thousand for year three.
15        Based on your investigation did you
16   understand those to be the initial fees set forth for
17   StrataSys to pay BDO to use the BDO name?
18   A.   I think you're incorrect.  You stated one
19   (sic) it was 70 and it says 75.
20   Q.   Thank you, Mr. Freeman.  With that
21   correction, is that your understanding?
22   A.   Yes.
23   Q.   Now, based on your investigation,
24   Mr. Freeman, was StrataSys even able to pay these
25   amounts?

Page 372

1    A.   They didn't pay them all, no, sir.
2    Q.   Based on your investigation, did you find
3  that StrataSys was having financial difficulty and
4  wasn't even able to pay its own license fees?
5         MR. SCHNAPP:  Objection, Your Honor,
6  hearsay, lack of foundation and 604.
7         THE COURT:  Overruled.
8         THE WITNESS:  Yeah.  There were several
9  adjustments to the alliance agreement which took the
10  amount of the fee that they were supposed to pay yearly
11  and reduced it.
12        MR. THOMAS:  May I approach the witness with
13  Plaintiffs' marked for ID 7297?
14        THE COURT:  You may.  What's the number
15  again?
16        MR. THOMAS:  7297, Your Honor, for ID.
17  BY MR. THOMAS:
18    Q.   Mr. Freeman, as part of your duties as the
19  Court-appointed receiver, did you receive documents
20  produced by BDO Seidman?
21    A.   Yes, I did.
22    Q.   Included in those documents, Mr. Freeman,
23  were those documents including Plaintiffs' Exhibit
24  marked for ID 7297?
25    A.   Yes.

Page 373

1    Q.   And did you rely upon these documents to
2  carry out your duties as appointed by the Court?
3    A.   Yes.
4    Q.   And have you kept them in the regular course
5  of your business activities as a receiver since that
6  date?
7    A.   Yes, I have.
8         MR. THOMAS:  Plaintiffs move into evidence
9  Plaintiffs' Exhibit marked for ID 7297.
10        MR. SCHNAPP:  May I just have a moment?  I
11  may not have an objection.
12        MR. SCHNAPP:  No objection, Your Honor.
13        THE COURT:  Plaintiffs' Exhibit 7297 for
14  identification is now Plaintiffs' 7297 in evidence.
15  BY MR. THOMAS:
16    Q.   Mr. Freeman, if you would please look at the
17  first page of Plaintiffs' Exhibit 7297 now in evidence.
18    A.   (Complies).
19    Q.   Just one moment.  Do you understand this to
20  be an e-mail from Sandy Lenner to Dave Larson?
21    A.   Yes.
22    Q.   Dated November 1st, 2001?
23    A.   Yes, sir.
24    Q.   And you see where it says, "I called and
25  left a strong voice mail to pay.  Please keep me posted

Page 374

1  and I will help"?
2    A.   Yes.
3    Q.   Based on your investigation, did you
4  understand that at this time StrataSys was not timely
5  paying its invoices for its license fee?
6         MR. SCHNAPP:  Objection, lack of personal
7  knowledge.  Hearsay.
8         THE COURT:  Overruled.
9         THE WITNESS:  That's correct.
10  BY MR. THOMAS:
11    Q.   And if you look at the next page -- sorry.
12  I have BDO 18000.
13        (Technician complies.)
14        You understand this to be an e-mail from now
15  this time Dave Larson to Sandy Lenner?
16    A.   Yes.
17    Q.   "When I speak to him today I will tell him
18  that he promised me twice prior that the check was in
19  the mail"?
20    A.   Yes.
21    Q.   You see that?  Is that confirmed by your
22  investigation?
23    A.   Yes, it is.
24        MR. THOMAS:  May I approach the witness with
25  Plaintiffs' Exhibit 452 marked for ID?

Page 375

1         THE COURT:  You may.
2         MR. THOMAS:  (Complies).
3  BY MR. THOMAS:
4    Q.   Mr. Freeman, as part of your duties as the
5  Court-appointed receiver of E.S. Bankest, did you
6  receive Plaintiffs' Exhibit Number 452 marked for ID?
7    A.   Yes, I did.
8    Q.   And Mr. Freeman, did you rely upon it to
9  carry out your duties as appointed by the Court?
10    A.   Yes.
11    Q.   And Mr. Freeman, have you kept Plaintiffs'
12  Exhibit Number 452 marked for ID in the regular course
13  of your business since that time?
14    A.   Yes, I have.
15        MR. THOMAS:  At this time, Plaintiffs move
16  into evidence Plaintiffs' 452.
17        MR. SCHNAPP:  We object.  None of the
18  predicate is required for establishing admissibility
19  under rule 8036.  It established here that it's made at
20  or a time.
21        MR. THOMAS:  Objection, Your Honor, to a
22  speaking objection.
23        THE COURT:  Anything else?
24        MR. SCHNAPP:  Your Honor, there's nothing in
25  there to show that it was transmitted by a person with

Page 376

1  knowledge, that it was kept in the regular course of the
2  business activity, and that it was a regular practice of
3  the business to make such a record. Furthermore, it's
4  generally hearsay and contains hearsay within hearsay.
5      THE COURT:  Overruled.  Plaintiffs' Exhibit
6  452 marked for ID is now marked into evidence as
7  Plaintiffs' Exhibit 452 into evidence.
8  BY MR. THOMAS:
9      Q.  If you'll look at the top, Mr. Freeman.
10     A.  Yes, sir.
11     Q.  Do you see that this is an e-mail from
12  Dominick Parlapiano to Carlos Mendez?
13     A.  Yes, sir.
14     Q.  And if we look at the e-mail it says -- I'm
15  sorry, dated February 14th, 2003?
16     A.  Yes.
17     Q.  And it says, "I just wanted to let you see
18  that notwithstanding BDO's Miami office managing partner
19  Albert Lopez' concerns due to his learning that one of
20  StrataSys strategic consultants which had worked on a
21  BDO-referred engagement quit last month when payroll was
22  missed, and Albert knowing that payroll has been missed
23  a couple of times."
24     Did I read that correctly?
25     A.  Yes.

Page 377

1      Q.  Did your investigation confirm that
2  StrataSys was missing payrolls on or about February
3  14th, 2003?
4      MR. SCHNAPP:  Objection.  No foundation.
5  Hearsay.
6      THE COURT:  Overruled.
7      THE WITNESS:  Yes.  They were missing --
8  they were in financial difficulty.
9  BY MR. THOMAS:
10     Q.  And Mr. Freeman, in this time period,
11  February 14th, 2003, was Albert Lopez the managing
12  partner at BDO's Miami office or at least a senior
13  person at that time?
14     A.  Yes.
15     Q.  Mr. Freeman, could you please look at
16  Plaintiffs' Exhibit Number 87 which is the audited
17  financial statements of BDO Seidman?
18     A.  (Complies).
19     Okay.
20     Q.  Mr. Freeman, the top box is Plaintiffs'
21  Exhibit Number 452 that we were just looking at.  The
22  bottom box was taken from the certified financial
23  statements by BDO Seidman which came out on April 16th,
24  2003.
25     Is that your understanding of what's before

Page 378

1  the jury?
2      A.  That's the date it was signed, yes, sir.
3      Q.  So on February 14th, 2003, Mr. Freeman, BDO
4  understood that StrataSys had missed payroll but in
5  April BDO issued audited financials stating that there
6  was 45 million dollars in good accounts receivable from
7  StrataSys?
8      MR. SCHNAPP:  Objection, argumentive.  Move
9  to strike.
10     THE COURT:  Sustained.
11  BY MR. THOMAS:
12     Q.  Mr. Freeman, based on your investigation as
13  the Court-appointed receiver, did you understand that
14  the bottom box, the note from BDO's audited finances was
15  BDO certifying that there was 45 million dollars in
16  accounts receivable from StrataSys?
17     A.  Yes.
18     Q.  And based on your investigation at the same
19  time BDO was certifying that there was 45 million
20  dollars in accounts receivable in their alliance partner
21  StrataSys, in fact, was StrataSys missing payroll?
22     MR. SCHNAPP:  Objection.  No foundation.
23  Lack of personal knowledge.  Hearsay and argumentative.
24     THE COURT:  Overruled.
25     THE WITNESS:  My investigation showed that

Page 379

1  while they were doing the audit, they were missing
2  payroll in StrataSys in February of '03.
3      MR. THOMAS:  Your Honor, may I approach the
4  witness?
5      THE COURT:  You may.
6  BY MR. THOMAS:
7      Q.  Mr. Freeman, approaching you Plaintiffs'
8  Exhibit 78 in evidence, and Defendants' Exhibit 286-A in
9  evidence.  And that's these two sheets.  And I'd like
10  you to keep them together, please.
11     Mr. Freeman, if you could please start with
12  Plaintiffs' Exhibit Number 78.  That's the audited
13  financials.
14     A.  Okay.
15     Q.  Did I give you two copies of the same thing?
16     A.  Yes.
17     Q.  Keep that one.  Mr. Freeman, what is this
18  document?
19     A.  This is BDO Seidman's financial statements
20  for the E.S. Bankest, LLC for the year 2000 and 1999.
21     Q.  Is that the BDO logo down there in the
22  corner?
23     A.  Yes, sir.
24     Q.  Now, Mr. Freeman, if you could please turn
25  with me to the third page.

Page 380

1      A.   (Complies.)
2      Q.   And Mr. Freeman, is this BDO's audit
3  opinions stating that the numbers contained in their
4  audited financials present fairly the finance position
5  of E.S. Bankest at this time?
6      A.   Yes. This is -- as it says up on top the
7  independent auditor's report. And this is the opinion,
8  yes, sir.
9      Q.   Now, Mr. Freeman, if you would please turn
10  with me to the related party transaction which is page
11  13 of BDO's audit.
12     A.   (Complies.)
13     Q.   And if we could highlight the part about
14  StrataSys.
15          (Technician complies.)
16  BY MR. THOMAS:
17     Q.   Mr. Freeman, do you understand that this
18  note audited by BDO states that there are 3.2 million in
19  accounts receivable from their alliance partner
20  StrataSys?
21     A.   Yes.
22     Q.   Now, if you would please look with me 286-A.
23     A.   Okay.
24     Q.   You understand this to be BDO's own internal
25  work paper about the accounts receivable?

Page 381

1      A.   Yes.
2      Q.   Can we put this up, please?
3          (Technician complies.)
4          And what does BDO say in their own internal
5  work paper is the amount of accounts receivable from
6  their alliance partner StrataSys?
7          MR. SCHNAPP: Objection, Your Honor. Rule
8  701. It's improper testimony.
9          Your Honor, may I be heard on this?
10         THE COURT: You want a side-bar?
11         MR. SCHNAPP: Yes, please.
12         THE COURT: Okay.
13         (Thereupon, there was a side-bar conference
14  outside the presence and hearing of the jury.)
15         MR. SCHNAPP: Mr. Freeman is now testifying
16  as an expert. He's being asked to interpret BDO's work
17  papers. His testimony is testimony that only an expert
18  could give, if it was even admissible through an expert.
19  But for Mr. Freeman to testify as to what BDO did in its
20  analysis of its work papers is improper expert testimony
21  under rules 701 and 702.
22         MR. THOMAS: Your Honor, same thing I did
23  last time. All he's going to show is highlight the
24  StrataSys stuff just like he did last time. The amounts
25  in their work paper. I asked him if he relied upon this

Page 382

1  as a receiver. Yes. What's that number?
2          THE COURT: I don't think that was the
3  question. Is he going to make up (inaud.)?
4          MR. THOMAS: He's going to highlight the
5  numbers that are up there for StrataSys.
6          THE COURT: Which numbers -- you ask him one
7  question about a number.
8          MR. THOMAS: Well, there's actually two
9  numbers from StrataSys up there, 78 and the 3.1.
10         THE COURT: Why don't you rephrase the
11  question?
12         MR. THOMAS: I will. I'm not doing anything
13  new. It's like last time.
14         THE COURT: I understand but the question
15  is --
16         MR. THOMAS: I understand.
17         (Thereupon, the side-bar conference was
18  concluded.)
19  BY MR. THOMAS:
20     Q.   Mr. Freeman, what do BDO's own work papers
21  show as the StrataSys accounts receivable in the two
22  numbers up there related to StrataSys?
23         MR. SCHNAPP: Objection under Rule 701 and
24  702.
25         THE COURT: Overruled.

Page 383

1          THE WITNESS: Up on the very top under
2  0022140AR -- accounts receivable -- purchased StrataSys,
3  7 million 802 thousand. Then down below is 0022230,
4  again accounts receivable -- AR -- purchased StrataSys 3
5  million 187. You add the two of those together, it's
6  about 12 million dollars -- 11 million, I'm sorry. 11
7  million dollars.
8  BY MR. THOMAS:
9      Q.   And Mr. Freeman, what did E.S. Bankest's
10  audited financial statements by BDO Seidman say were the
11  amount of accounts receivable from StrataSys?
12     A.   Approximately 3.2 million. It doesn't say
13  approximately. It has purchased 3.2 million.
14         MR. THOMAS: May I approach Mr. Freeman,
15  with His Honor's permission?
16         THE COURT: You may
17  BY MR. THOMAS:
18     Q.   I'm going to approach you and show you BDO's
19  financial statements, Plaintiffs' Exhibit 81 for the
20  next year 2001 and BDO's work paper in evidence.
21         THE COURT: Ladies and gentlemen, you're
22  free to stand and stretch as you wish. If you want to
23  get up and stretch.
24         MR. THOMAS: And coffee.
25  BY MR. THOMAS:

Page 384

1    Q.    Now, Mr. Freeman, Plaintiffs' Exhibit 81,
2   what is that?
3    A.    This is E.S. Bankest, LLC's financial
4   statements for the year December 31, 2001 and 2000.
5    Q.    This is for the next year?
6    A.    Yes.
7    Q.    And if you turn to page 13, this time how
8   much does BDO Seidman say are the accounts receivable
9   from their alliance partner, StrataSys?
10    A.    48 million dollars.
11    Q.    I'm sorry, you must have picked up the wrong
12   one.  2000, 2001?
13    A.    2001, 2000?  Okay.  I'm sorry.  3.2.
14    Q.    3.2 million again?
15    A.    Yes, sir.
16    Q.    And if you could turn to BDO's work paper.
17   I'm sorry, Plaintiffs' Exhibit 286-A.
18    A.    (Complies).
19    Q.    And do you see their numbers for StrataSys?
20    A.    Yes, I do.
21    Q.    And what does BDO's internal work papers say
22   for 2001 are the numbers for StrataSys accounts
23   receivable?
24    A.    0022140 right at the top, 16 million 497
25   thousand.  And down below, at 0022230, 5 million 5.  So

Page 385

1   it would be roughly, 21 million 500 thousand.
2    Q.    And when BDO's own internal work papers in
3   2001 show that their alliance partner's accounts
4   receivable were 21.5 million, what did their audited
5   financials of E.S. Bankest say their accounts receivable
6   were from their alliance partner?
7    A.    3.2.
8    Q.    Mr. Freeman, we looked at several of the
9   audited financials of E.S. Bankest now and may I
10   approach, Your Honor?
11    THE COURT:  You may.
12    THE WITNESS:  They're all right here.
13   BY MR. THOMAS:
14    Q.    We've looked at 2002, 2001, and 2000.  I'm
15   going to show you the rest of them.  Plaintiffs' Exhibit
16   Number 74 is BDO's financial statements for 1998 and
17   Plaintiffs' Exhibit Number 75 is for 1999.
18    A.    Okay.
19    Q.    Mr. Freeman, as part of your duties as the
20   Court-appointed receiver of E.S. Bankest, did you need
21   to determine whether or not the accounts receivable
22   reflected in BDO's audited financial statements were
23   real or fake?
24    A.    Yes, I did.
25    Q.    Would you please get the 1998 E.S. Bankest

Page 386

1   audited financials?  And if you would, turn to the
2   section of the balance sheet with me.
3    A.    (Complies).
4    Okay.
5    Q.    And Mr. Freeman, in 1998 what did it show
6   the accounts receivable were?
7    A.    Over 40 million dollars.
8    Q.    And did you understand that those accounts
9   receivable for 40 million was audited by BDO Seidman?
10    A.    Yes.
11    Q.    And did you understand that BDO Seidman's
12   audit stated that this number, 40 million dollars in
13   accounts receivable, was real or fake?  What did BDO
14   say?
15    MR. SCHNAPP:  Objection under 701, 702, and
16   604.
17    THE COURT:  Overruled.
18    THE WITNESS:  Could you repeat the question?
19   BY MR. THOMAS:
20    Q.    Yes.  BDO's audited financials of 1998 said
21   there was how much in accounts receivable -- real
22   accounts receivable at E.S. Bankest?
23    MR. SCHNAPP:  Objection, Your Honor.
24   That's --
25    THE COURT:  Is this a question?

Page 387

1    MR. SCHNAPP:  Well, there's no question as
2   well.  It's argumentative and I move to strike that
3   statement.
4    THE COURT:  Sustained.  Don't answer.  It's
5   not a question.
6   BY MR. THOMAS:
7    Q.    Mr. Freeman, how much in real accounts
8   receivable did BDO Seidman say E.S. Bankest had in 1998
9   in the audited financials?
10    MR. SCHNAPP:  Objection, Your Honor.  701
11   and 702.  He's not qualified as an expert.
12    THE COURT:  Overruled.
13    THE WITNESS:  It says 40 million 600
14   thousand roughly.
15   BY MR. THOMAS:
16    Q.    And were the majority of those accounts
17   receivable real or fake?
18    MR. SCHNAPP:  Objection, no foundation.
19   604.  Lack of personal knowledge.
20    THE COURT:  Would you rephrase the question?
21   BY MR. THOMAS:
22    Q.    Mr. Freeman, based on your investigation as
23   the Court-appointed receiver of E.S. Bankest, were these
24   accounts receivable mostly real or fake?
25    MR. SCHNAPP:  Objection.  Same objections,

Page 388

1  604.
2        THE COURT: Overruled.
3        THE WITNESS: My investigation showed that
4  most of these receivables were fake.
5  BY MR. THOMAS:
6     Q.  Let's look at the next year 1999 if you
7  will. And if you would just please turn to the
8  financial statements?
9     A.  (Complies).
10    Q.  Now, how much in accounts receivable in 1999
11  are reflected in BDO's audit?
12    A.  58 million 7 hundred thousand roughly.
13    Q.  And based on your investigation,
14  Mr. Freeman, were most of these accounts receivable real
15  or fake?
16       MR. SCHNAPP: Same objection. Lack of
17  foundation. 604.
18       THE COURT: Overruled.
19       THE WITNESS: They were mostly fake.
20  BY MR. THOMAS:
21    Q.  Let's look at the next year, 2000.
22    A.  (Complies).
23    Q.  Now, how much accounts receivable did
24  BDO's audit certify?
25    A.  2 thousand 103 -- 103 million.

Page 389

1     Q.  Mr. Freeman, were these -- based on your
2  investigation were these accounts receivable real or
3  fake?
4     A.  Fake.
5        MR. SCHNAPP: I'm sorry, I didn't get a
6  chance to object. Under Rule 604 and hearsay.
7        THE COURT: Overruled.
8        THE WITNESS: I'm sorry. Fake.
9  BY MR. THOMAS:
10    Q.  Now, from 1999 to 2000, accounts receivable
11  that were fake had grown almost a little over 40 million
12  dollars. Is that right?
13       MR. SCHNAPP: Objection, argumentative.
14       THE COURT: Sustained.
15  BY MR. THOMAS:
16    Q.  Mr. Freeman, how much had the fake accounts
17  receivables grown between 1999 and 2000 as reflected on
18  the financial statements audited by BDO Seidman?
19    A.  They almost doubled from 58 to 103 million.
20  Roughly 45 million dollars.
21    Q.  Let's go to the next year. For 2001 -- if
22  we could go to the numbers page.
23       In 2001, how much had the accounts
24  receivable grown as audited by BDO Seidman?
25    A.  50 million dollars.

Page 390

1     Q.  And of the 153 million dollars approximately
2  reflected in BDO's audited financial statements, were
3  those mostly real or fake?
4        MR. SCHNAPP: Same objection under 604.
5  Hearsay.
6        THE COURT: Sustained.
7  BY MR. THOMAS:
8     Q.  As the Court-appointed receiver of E.S.
9  Bankest and based on your investigation, was 153 million
10  dollars in accounts receivable as certified by BDO
11  Seidman mostly real or fake?
12       MR. SCHNAPP: Objection. Lack of
13  foundation, argumentative, and leading.
14       THE COURT: Overruled.
15       THE WITNESS: Most of them were fake, the
16  153 million dollars.
17  BY MR. THOMAS:
18    Q.  Now let's go to 2002. Can we go to the
19  numbers page?
20       Now, how much had the accounts receivable
21  grown in the BDO audited financials from 2001 to 2002?
22    A.  By 70 million dollars. From 153 million to
23  roughly 223 million.
24    Q.  And Mr. Freeman, of the 223.8 million
25  dollars in accounts receivable found in 2002 for BDO's

Page 391

1  audited finances, were those mostly real or fake?
2        MR. SCHNAPP: Objection, argumentative.
3  604. Hearsay.
4        THE COURT: Sustained.
5  BY MR. THOMAS:
6     Q.  Mr. Freeman, based on your duties, carrying
7  out your duties as the Court-appointed receiver of E.S.
8  Bankest, did you determine whether the 223.8 million
9  dollars certified by BDO Seidman were real or fake?
10       MR. SCHNAPP: Objection 401, 403. No
11  foundation.
12       THE COURT: Overruled.
13       THE WITNESS: Yes, I made a determination
14  that most of them were fake.
15  BY MR. THOMAS:
16    Q.  In fact, Mr. Freeman, as the Court-appointed
17  receiver of E.S. Bankest, how much of the 223.8 million
18  approximately did you determine were real collectible
19  receivables?
20       MR. SCHNAPP: Same objection, Your Honor.
21  403, 604 and hearsay.
22       THE COURT: Overruled.
23       THE WITNESS: Roughly 5 million dollars or,
24  you know, a little over 2 percent.
25  BY MR. THOMAS:

Page 392

1    Q.  So Mr. Freeman, out of the approximately
2  223.8 million dollars in accounts receivable, does that
3  mean about 218 million of them were fake?
4        MR. SCHNAPP:  Objection, leading.
5  Argumentative.
6        THE COURT:  Sustained.
7  BY MR. THOMAS:
8    Q.  As the Court-appointed receiver and based on
9  your investigation, Mr. Freeman, what was the amount of
10  the 223.8 million dollars in accounts receivable
11  certified by Mr. Lenner and BDO Seidman that were fake?
12        MR. SCHNAPP:  Objection.  No foundation,
13  hearsay, and 604.
14        THE COURT:  Overruled.
15        THE WITNESS:  About 218 million which is 5
16  million dollars that we collected from the 223, 224.
17  Those were the fake ones.
18  BY MR. THOMAS:
19    Q.  Mr. Freeman, let's go back.  You told us
20  that on the afternoon you had driven out to StrataSys.
21  Do you recall that testimony?
22    A.  Yeah.
23    Q.  What did you do in the morning?  So we're
24  back in August of 2003, the day after you were appointed
25  as the receiver.  You were appointed as the examiner and

Page 393

1  a few days later you became the receiver.  Do you
2  remember that testimony?
3    A.  Yeah, I became the receiver on Wednesday.
4    Q.  And I believe you testified before that on
5  Thursday you had driven out to StrataSys.  Do you recall
6  that testimony?
7    A.  In the afternoon.
8    Q.  In the afternoon.  What did you do in the
9  morning?
10    A.  I had a meeting with one of the other
11  companies, Joy Manufacturing, and their principals and
12  their counsel.
13    Q.  Was Joy Manufacturing the largest client of
14  E.S. Bankest?
15    A.  Yes.
16    Q.  And how did it come to be that you had a
17  meeting with them on Thursday morning?
18    A.  On Wednesday I picked up the phone and
19  called them.  They were here in Miami.  And thought I
20  should meet with them.  They were about 50 percent or
21  more of the accounts receivable that I owned.
22    Q.  According to what you learned that first few
23  days when you showed up, approximately how much in
24  accounts receivable was E.S. Bankest supposed to have
25  purchased from Joy?

Page 394

1    A.  Somewhere over one hundred million dollars.
2  Between 100 and 120 million dollars of the 123.
3    Q.  And when you picked up the phone and you
4  called Joy, one of the biggest clients, what did you
5  say?
6    A.  I said hi.
7        MR. SCHNAPP:  Objection, Your Honor,
8  hearsay.
9        THE COURT:  Overruled.
10        THE WITNESS:  I am the receiver appointed by
11  the federal court.  We have very large receivables that
12  we bought from you and I'd like to meet with you as
13  quickly as possible.
14  BY MR. THOMAS:
15    Q.  And who from Joy did you call?
16    A.  I called the president, Mr. Barnhill.
17  Jeffrey Barnhill.
18    Q.  And did Mr. Barnhill agree to meet with you?
19    A.  Yeah, he was very interested in meeting with
20  me.
21        MR. SCHNAPP:  Objection, calls for
22  speculation.
23        THE COURT:  Overruled.
24  BY MR. THOMAS:
25    Q.  And did you arrange to have a meeting with

Page 395

1  Mr. Barnhill the next day?
2    A.  Yes, I did.
3    Q.  And is that what you did in the morning
4  before you drove out to StrataSys in the afternoon?
5    A.  It was one of the many things, yes, sir.
6    Q.  And what happened when you met with
7  Mr. Barnhill, the president of Joy, the largest client
8  of E.S. Bankest on Thursday morning?
9    A.  Well, we were -- he was with his counsel.  I
10  also had my lawyer with me.  And Mr. Barnhill was very
11  concerned that I fund --
12        MR. SCHNAPP:  Objection, hearsay.
13        THE COURT:  Overruled.
14        THE WITNESS:  My investigation had led me to
15  the meeting and met with Mr. Barnhill.  He was very
16  concerned about meeting payroll that week.  And he had
17  large overdrafts in his bank.  And he wanted me to fund
18  or prefund.
19        MR. SCHNAPP:  I'm sorry, Your Honor.
20  Objection.  Not responsive and hearsay.
21        MR. THOMAS:  I can stop and ask him a
22  question.
23        THE COURT:  Ask him a question.
24  BY MR. THOMAS:
25    Q.  Mr. Freeman, based on that meeting, did you

Page 440

1    it up yet.
2         (Technician complies.)
3         MR. SCHNAPP: I don't object to this being
4    used solely for purposes of the demonstrative aid at
5    this point.
6         THE COURT: Is that all you're using it for?
7         MR. THOMAS: That's all I'm going to use it
8    for.
9         Put this up.
10        (Technician complies.)
11   BY MR. THOMAS:
12        Q.   Mr. Freeman, you've talked about how
13   factoring works already once. But just to help with
14   this demonstrative aid, Joy, largest client of Capital
15   and E.S. Bankest; is that right?
16        A.   Correct.
17        Q.   And Joy, would they be called a client?
18        A.   Yes.
19        Q.   And Wal-Mart would be called a customer?
20        A.   Correct.
21        Q.   And for the largest client, the accounts
22   receivable and the funding didn't flow directly to E.S.
23   Bankest; is that right?
24        A.   Correct.
25        Q.   It went through Capital?

Page 441

1         A.   Yes, that's correct.
2         Q.   And was Capital wholly owned by the
3    Orlanskys and Parlapiano?
4         A.   Yes.
5         Q.   So using this demonstrative aid -- and
6    you're welcome to this pointer, if you like it -- if you
7    would like to, can you explain how the money would flow
8    in and out.
9         A.   Okay. Sure. Always love the pointers. I
10   guess we should start with what we did before, that Joy
11   would sell T shirts to Wal-Mart. As I said in the
12   earlier example, maybe $100,000. They sell them today
13   and get paid a promise to pay the IOU. We'd get paid --
14   we'll say we'll pay 90 days from today. Joy needed
15   the money earlier so they went to Capital and got
16   $80,000 today. And instead of the promise by Wal-Mart
17   to pay Joy, Joy assigned it to Capital. Capital got
18   their money from E.S. Bankest. Bankest borrowed it from
19   Espirito Santo's bank or bought these notes.
20        So what would happen is after 90 days,
21   Wal-Mart, instead of paying Joy, would pay Bankest
22   Capital. Bankest Capital was then supposed to pay E.S.
23   Bankest, and Bankest was supposed to pay Espirito Santo.
24   The audit that was done was on the financial statements
25   of E.S. Bankest, not of their parent company or their

Page 442

1    partners, Capital and Espirito Santo.
2         You want this back.
3         MR. THOMAS: May I approach, Your Honor?
4         THE COURT: You may.
5         MR. THOMAS: (Complies.)
6    BY MR. THOMAS:
7         Q.   Now, Mr. Freeman, in using the money that
8    came in from Espirito Santo and its customers, did
9    Bankest Capital and the Orlanskys buy interest in
10   client's like Joy?
11        A.   Yes.
12        Q.   And what does that mean, that they got an
13   interest in client's like Joy?
14        A.   Well, instead of them being -- buying the
15   accounts receivable, they ended up buying into the
16   companies. They were supposed to be buying -- just like
17   with Joy. If Joy sold $100,000 to Wal-Mart, Joy would
18   have been getting $80,000 to purchase the receivables
19   and to assign it. Instead, Capital was getting --
20   putting money into Joy to fund their losses and building
21   of the business, not to just buy real receivables.
22        Q.   And, Mr. Freeman, based on your
23   investigation as the court-appointed receiver, to carry
24   out this fraud, did the gentlemen who were indicted
25   create fake checks from the customer Wal-Mart for the

Page 443

1    fake accounts receivable?
2         A.   No.
3         MR. SCHNAPP: Objection.
4         THE COURT: Overruled.
5         THE WITNESS: No.
6    BY MR. THOMAS:
7         Q.   Did they create fake checks from Capital
8    owned by the Orlanskys?
9         A.   Yes. To Bankest. Yes.
10        Q.   And did they sometimes create fake checks
11   from the client Joy?
12        A.   Yes.
13        Q.   And in this aid, who was the person or the
14   entity that actually owes the money?
15        A.   Bankest actually owed the money.
16        Q.   And which -- in the factoring, who is the
17   account debtor, the one that actually owes the accounts
18   receivable?
19        A.   Wal-Mart.
20        Q.   And Wal-Mart, is that the customer?
21        A.   Yes.
22        Q.   And based on your investigation as the
23   court-appointed receiver of E.S. Bankest, did the
24   persons committing the fraud create fake documents from
25   customers, the ones that actually owed the money?

Page 444

1  A.  No.
2      MR. SCHNAPP:  Objection.  No foundation.
3      THE COURT:  Overruled.
4      MR. SCHNAPP:  I'm sorry, Your Honor.  604
5  and 701.
6      THE COURT:  Overruled.
7      THE WITNESS:  No, they didn't.
8  BY MR. THOMAS:
9      Q.  Mr. Freeman, including in the fact that as
10 part of the fraud, the persons committing this fraud did
11 not create fake documents from the customers who
12 actually owed the money, did they create fake
13 confirmations from customers saying the money was owed?
14     A.  Yes.
15     MR. THOMAS:  I'm sorry, Your Honor.  I asked
16 a bad question.  Let me ask it again.
17 BY MR. THOMAS:
18     Q.  Joy is the client?
19     A.  Okay.
20     Q.  And Bankest and Capital sent out
21 confirmations for BDO to the client Joy; is that right?
22     A.  Yes.
23     Q.  And in the first year that this was done,
24 did Joy sign it and send it back?
25     A.  Yes, they did.

Page 445

1      Q.  And in the second year that this was done,
2  did Joy sign a confirmation for BDO Seidman saying that
3  Joy, at least the client, the accounts receivable were
4  real?
5      A.  Yes.
6      Q.  And in the third year, did BDO send a
7  statement for a confirmation to Joy that the accounts
8  receivable were real?
9      A.  Yes, they sent them.
10     Q.  And in that third year, based on your
11 investigation, did Mr. Barnhill receive this request of
12 confirmation from BDO to Joy?
13     MR. SCHNAPP:  Your Honor, I'm sorry.  Can
14 I -- I object on the grounds of hearsay and Rule 701,
15 702, 403.
16     THE COURT:  Overruled.
17     THE WITNESS:  Yes, my investigation found
18 that Mr. Barnhill did receive a confirmation.
19 BY MR. THOMAS:
20     Q.  And as the largest client of E.S. Bankest
21 having twice returned confirmations, in this third year,
22 did Mr. Barnhill refuse to send it back?
23     MR. SCHNAPP:  Objection.  Hearsay.
24     THE COURT:  Overruled.
25     THE WITNESS:  Yes, he did object and did not

Page 446

1  send it back to the accounting firm.
2  BY MR. THOMAS:
3      Q.  And, Mr. Freeman, was that year in 1999?
4      A.  I think it might have been 2000.
5      Q.  2000, 1999?
6      A.  Yeah.
7      Q.  And what did your investigation show for
8  BDO's audit for that year when the largest client
9  refused to send back a confirmation?  Did BDO Seidman
10 issue clean, certified financials for E.S. Bankest?
11     MR. SCHNAPP:  Objection.  No foundation,
12 lack of predicate, hearsay.
13     THE COURT:  Overruled.
14     THE WITNESS:  Yes, they did.  All the way
15 through they issued independent, clean, financial
16 statements.
17     MR. THOMAS:  If we can go back to the
18 indictment.
19     (Technician complies.)
20     MR. THOMAS:  And if we could go to
21 paragraph 10 on page 11, please.
22     (Technician complies.)
23 BY MR. THOMAS:
24     Q.  And this says, "On or about May 29th, 1997,
25 Jeffrey Barnhill executed a letter to BDO Seidman

Page 447

1  purporting to confirm that Joy had sold and transferred
2  accounts receivable totaling 10.6 million."
3      Did your investigation confirm that that was
4  accurate?
5      A.  Yes.
6      Q.  Sorry.  Give me just one moment.  Here we
7  are.
8      MR. THOMAS:  Can we go to paragraph 34,
9  please.
10     (Technician complies.)
11 BY MR. THOMAS:
12     Q.  Paragraph 34 says, "On or about
13 February 17th, 1999, Eduardo Orlansky and Dominick
14 Parlapiano asked Jeffrey Barnhill to sign an audit
15 inquiry confirmation letter to BDO Seidman reflecting
16 the value of accounts receivable sold to BCC by Joy as
17 23.9 million."
18     Did your investigation confirm that that was
19 true?
20     MR. SCHNAPP:  Objection.  Hearsay.
21     THE COURT:  Overruled.
22     THE WITNESS:  Yes.
23 BY MR. THOMAS:
24     Q.  And, in fact, Mr. Freeman, did your
25 investigation find that after previously signing

Page 673

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
------------------------------------------------x

PAGES 673 - 838

Volume 7




Miami, Florida

Friday, April 13, 2007

9:50 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 674

1      A P P E A R A N C E S
2
3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4   INTERNATIONAL, LTD., ET AL.:
5
6   SULLIVAN & CROMWELL, LLP
7      1888 Century Park East
8      Los Angeles, California 90067
9      (310) 712-6627
10  BY:  Steven W. Thomas, Esquire
11     Emily S. Alexander, Esquire
12
13  GONZALO R. DORTA, P.A.
14     334 Minorca Avenue
15     Coral Gables, Florida 33134
16     (305) 441-2299
17  BY:  Gonzalo R. Dorta, Esquire
18
19  BERGER SINGERMAN
20     350 East Las Olas Boulevard, Suite
21     Fort Lauderdale, Florida 33301
22     (954) 525-9900
23  BY:  Mitchell W. Berger, Esquire
24
25

Page 675

1   On behalf of Defendant BDO Seidman, LLP:
2
3   ALVAREZ, ARMAS & BORRON
4      901 Ponce de Leon Boulevard, Suite 304
5      Coral Gables, Florida 33134
6      (305) 461-5100
7   BY:  Arturo Alvarez, Esquire
8
9   GREENBERG TRAURIG, LLP
10     MetLife Building
11     200 Park Avenue, 15th Floor
12     New York, New York 10166
13  BY:  Adam D. Cole, Esquire
14     Karen Y. Bitar, Esquire
15
16  GREENBERG TRAURIG, LLP
17     1221 Brickell Avenue
18     Miami, Florida 33131
19  BY:  Mark Schnapp, Esquire
20     Nikki Simon, Esquire
21
22
23
24
25

Page 676

1   On behalf of Third-Party Defendants Victor Balestra,
2   Bernard Mollet, and Joaquin Garnecho
3
4   RICHMAN, GREER, WEIL, BRUMBAUGH,
5   MIRABITO & CHRISTENSEN, P.A.
6      Miami Center, Suite 1000
7      201 S. Biscayne Boulevard
8      Miami, Florida 33131
9      (305) 373-4000
10  BY:  Manuel Garcia Linares, Esquire
11
12
13  On behalf of Third-Party Defendant Bernard Mollet
14
15  GAMBA & LOMBANA, P.A.
16     2701 Ponce de Leon Boulevard, Mezzanine
17     Coral Gables, Florida 33134
18     (305) 448-4010
19  BY:  Hector J. Lombana, Esquire
20     Geoffrey Marks, Esquire
21
22
23
24
25

Page 677

1              CONTENTS
2
3   EXAMINATION OF LEWIS B. FREEMAN BY:        PAGE:
4      MR. THOMAS:  (Direct, cont'd)        681
5      MR. SCHNAPP:  (Cross)              709
6      MR. THOMAS:  (Redirect)            822
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 698

1    THE COURT: Sustained.
2  BY MR. THOMAS:
3    Q.  Mr. Freeman, if you look at the next
4  sentence it says "With that goal in mind, BDO has
5  renewed our pledge to maintain the integrity of our
6  audit process.  Our professionals are highly sensitized
7  to the need to maintain objectivity and independence."
8  And then they go on to say at the bottom there that
9  "Each audit also has a suitable level of independent
10  technical oversight."
11    Did I read that correctly, Mr. Freeman?
12    A.  Yes.
13    Q.  And, Mr. Freeman, in carrying out your
14  duties as the court-appointed receiver, did you rely
15  upon what BDO represented in this web site?
16    MR. SCHNAPP:  Objection.  401, 403, and 701.
17    THE COURT:  Overruled.
18    THE WITNESS:  Yes.
19  BY MR. THOMAS:
20    Q.  Based on your experience and over 30
21  receiverships, was the fraud at E.S. Bankest a little
22  one?
23    A.  No, sir.
24    Q.  Was it a big fraud?
25    A.  It was a great big fraud.

Page 699

1    Q.  Mr. Freeman, was this a great big fraud
2  because when you arrived, of the 224-odd million in
3  accounts receivable, 219 were fake?
4    A.  Yes, sir.
5    Q.  Was it a great big fraud because, in fact,
6  the year before, I think we looked at out of 150 million
7  in accounts receivable, almost all of those were fake?
8    MR. SCHNAPP:  Objection.  Argumentative.
9    THE COURT:  Sustained.
10  BY MR. THOMAS:
11    Q.  Was one of the reasons this was a great big
12  fraud, Mr. Freeman, have to do with that the year
13  before, accounts receivable and the millions of dollars
14  were fake?
15    MR. SCHNAPP:  Objection.  Same question and
16  same objection.
17    THE COURT:  Sustained.  It's also leading.
18    MR. THOMAS:  I'm sorry.  I don't want to
19  lead Mr. Freeman.
20  BY MR. THOMAS:
21    Q.  Mr. Freeman, is there anything that happened
22  in the year before that made this a big great fraud?
23    A.  Yes.
24    Q.  What was that?
25    A.  The vast majority of the accounts receivable

Page 700

1  in the year 2001 also were majority -- vast majority --
2  fraudulent.
3    Q.  So would that be about 219 million in 2002
4  and at least over a hundred million in fake in 2001?
5    MR. SCHNAPP:  Objection.  Leading witness.
6  Let me look at the financials.
7    THE COURT:  Sustained.  Sustained.
8    MR. THOMAS:  Put up the 2001 audit for me.
9    (Technician complies.)
10    MR. THOMAS:  Can we go to the balance sheet,
11  please.
12    (Technician complies.)
13  BY MR. THOMAS:
14    Q.  So, Mr. Freeman, in 2001, were at least over
15  a hundred million dollars of those fake?
16    A.  Easily.
17    Q.  And what about in 2000?  It's represented
18  there before, at least over 50 million of those be fake?
19    MR. SCHNAPP:  Your Honor, objection.  This
20  is asked and answered and just repetitive.
21    THE COURT:  Overruled.
22    THE WITNESS:  Probably closer to a hundred
23  million.  98 million.
24  BY MR. THOMAS:
25    Q.  Mr. Freeman, so is one of the reasons this

Page 701

1  is a great big fraud because if you total up the fake
2  ones to now, we're over 400 million in fake accounts
3  receivable?
4    MR. SCHNAPP:  Objection.  Argumentative,
5  403.
6    THE COURT:  Sustained.
7  BY MR. THOMAS:
8    Q.  Is the amount of money that was fake here,
9  is that one of the reasons this is a great big fraud?
10    MR. SCHNAPP:  Objection, Your Honor.
11  Argumentative.
12    MR. THOMAS:  Your Honor, there's no way I
13  can ask it --
14    THE COURT:  I get to rule.  You get to ask.
15    MR. THOMAS:  I was just answering, Your
16  Honor.
17    THE COURT:  Sustained.  It's leading as
18  well.
19  BY MR. THOMAS:
20    Q.  Mr. Freeman, for the years 2000, 2001, and
21  2002, what's one of the reasons this was a great big
22  fraud?
23    A.  The amount of money that was involved and
24  the amount of -- the majority is -- 99 percent or
25  98 percent of the money was fraudulent.

Page 702

1    Q.   And for 2000, and 2001, and 2002, if you add
2    up the fraudulent receivables, how much would that be,
3    approximately?
4    A.   400 -- the fraudulent? $470 million,
5    roughly.
6    Q.   So is one of the reasons, Mr. Freeman, you
7    characterize this as a great big fraud is the amount of
8    fake receivable in excess of 400 million?
9    A.   Yes.
10   Q.   Mr. Freeman, is one of the reasons you
11   characterize this as a great big fraud because it
12   happened on one day?
13        MR. SCHNAPP: Objection. Leading.
14        THE COURT: Sustained.
15   BY MR. THOMAS:
16   Q.   Mr. Freeman, is this a great big fraud
17   because it happened on a single day?
18        MR. SCHNAPP: Objection. Leading.
19        THE COURT: Overruled.
20        THE WITNESS: No.
21   BY MR. THOMAS:
22   Q.   Mr. Freeman, is this a great big fraud
23   because it happened over a month?
24   A.   No, sir.
25   Q.   Over a year?

Page 703

1    A.   Multiple years.
2    Q.   Mr. Freeman, is one of the reasons you
3    characterize this as a great big fraud because it
4    happened over seven years?
5    A.   Yes, sir.
6    Q.   Mr. Freeman, is one of the reasons you
7    characterize this as a great big fraud because it
8    involved more than one company?
9    A.   Yes, sir.
10   Q.   And was one of those companies -- did it
11   involve, Mr. Freeman, a company called CD Jewel Box?
12   A.   Yes, sir.
13   Q.   And was CD Jewel Box a client of E.S.
14   Bankest?
15   A.   Yes.
16   Q.   And was CD Jewel Box controlled by Dominick
17   Parlapiano?
18   A.   Yes.
19   Q.   And was CD Jewel Box supposed to be doing
20   thousands of transactions in CD cases?
21   A.   Yes, it was.
22   Q.   And did BDO Seidman, based on your
23   investigation as the court-appointed receiver, verify
24   millions and millions of dollars in accounts receivable
25   from CD Jewel Box?

Page 704

1    A.   Yes.
2    Q.   Was CD Jewel Box a real company?
3    A.   No.
4    Q.   Was CD Jewel Box actually a mailbox at a
5    Mailboxes R Us?
6        MR. SCHNAPP: Objection. Leading.
7        THE WITNESS: Yes.
8        THE COURT: Sustained.
9        THE WITNESS: Sorry.
10   BY MR. THOMAS:
11   Q.   What was CD Jewel Box?
12        MR. SCHNAPP: Objection. 701 and 604.
13        THE COURT: Overruled.
14        THE WITNESS: My investigation showed that
15   CD Jewel Box was just a mail drop. Had no business
16   function.
17   BY MR. THOMAS:
18   Q.   Mr. Freeman, is one of the reasons you
19   characterized this as a great big fraud because it
20   involved companies like StrataSys?
21   A.   Yes, sir.
22   Q.   Mr. Freeman, was StrataSys a strategic
23   business partner of BDO Seidman?
24        MR. SCHNAPP: Objection. Misstates the
25   evidence and --

Page 705

1        THE COURT: Sustained. Rephrase the
2    question.
3    BY MR. THOMAS:
4    Q.   Mr. Freeman, what was StrataSys's
5    relationship with BDO Seidman?
6    A.   My investigation showed that StrataSys was
7    the strategic alliance partner with BDO Seidman.
8    Q.   And, Mr. Freeman, was Mr. Lenner, who was
9    the partner in charge of the audit of E.S. Bankest, also
10   the partner in charge of BDO's strategic alliance
11   partnership with StrataSys?
12        MR. SCHNAPP: Objection. 604.
13        THE COURT: Overruled.
14        THE WITNESS: Yes, Mr. Lenner was.
15   BY MR. THOMAS:
16   Q.   And was one of the reasons you characterized
17   this as a great big fraud because at least in the last
18   year, $45 million in fake accounts receivable were
19   purchased by E.S. Bankest from StrataSys?
20   A.   In that range, yes, sir.
21   Q.   And, Mr. Freeman, what did your
22   investigation show as to how many of those fake accounts
23   receivable from BDO's strategic alliance partner,
24   StrataSys, did BDO identify as fake?
25   A.   None.

Page 826

1  report, let's see, in 2005 about two years after you had
2  been appointed?
3      A.  Yes, sir.
4      Q.  It says you have conducted an extensive
5  examination and investigation into the business and
6  financial affairs of the debtor.
7          Is the debtor E.S. Bankest?
8      A.  Yes, it is.
9      Q.  Have reviewed thousands of documents, have
10 traced approximately $2 billion through the bank
11 accounts of the debtor and its affiliates, have
12 interviewed dozens of persons, have worked closely with
13 and cooperated with the U.S. Attorney's office and the
14 FBI, and have investigated the affairs of the portfolio
15 companies.
16         Did I read that right?
17     A.  Yes, sir.
18     Q.  Mr. Freeman, the portfolio companies, is
19 that -- in this document is that like the clients, Joy?
20     A.  Joy, ENA, StrataSys.
21     Q.  Mr. Freeman, as part of interviewing the
22 dozens of persons that you interviewed, did that include
23 Mr. Carlos Mendez?
24     A.  Yes.
25     Q.  And Mr. Freeman, Carlos Mendez, he's one of

Page 827

1  the guys who pled guilty to this fraud?
2      A.  Yes, sir.
3      Q.  And he hasn't spent time in jail yet?
4      A.  I don't believe so.
5      Q.  Mr. Freeman, other than the people who
6  didn't plead guilty, the ones who were convicted
7  actually went to trial.  Of all the others who pled
8  guilty, have any of them spent time in jail yet?
9      A.  Could you repeat it?
10     Q.  Right.  Of all the people who cooperated
11 with the U.S. Attorney's office and the FBI, had any of
12 them spent time in jail yet?
13     A.  Yes.
14     Q.  Which one?
15     A.  Howard Cantor.
16     Q.  And was that because Howard Cantor asked to
17 go in and start his sentence?
18     A.  I believe that was the case.  He wanted to
19 get it over with, yeah.
20     Q.  And Mr. Freeman, for the people who pled
21 guilty and cooperated with the U.S. Attorney's office
22 and the FBI, took responsibility for their crimes, are
23 you the one sentencing them?
24     A.  Not necessarily.
25     Q.  Who is the person who's making the decision

Page 828

1  about when they will begin to serve their time?
2      A.  Federal Judge in the federal court who has
3  the case.
4      Q.  Mr. Freeman, which federal Judge appointed
5  you?
6      A.  Judge Huck.
7      Q.  And this is a different federal Judge?
8      A.  Yes.  Judge Jordan.
9      Q.  And it's Judge Jordan that's going to decide
10 when these individuals will start serving their
11 sentences?
12     A.  That's my belief, yes, sir.
13     Q.  Do you have any understanding that Judge
14 Jordan, the federal Judge has done anything wrong in not
15 sending these people to actually start serving their
16 sentences in jail yet?
17     A.  I can say that the Judge is always right
18 (laughter.)
19     Q.  So you don't know of anything that says that
20 Judge Jordan is corrupt in any way for not sentencing
21 these people?
22         MR. SCHNAPP:  That's offensive.
23         THE COURT:  Sustained.
24         Rephrase your question.
25         MR. THOMAS:  I'll use a different adjective.

Page 829

1  BY MR. THOMAS:
2      Q.  Mr. Freeman, are you aware that Judge Jordan
3  has done anything improper by at this point not yet
4  sentencing these people to go ahead and start serving
5  time in jail?
6          MR. SCHNAPP:  Objection.  There's no --
7  there's not even the remote suggestion that that's even
8  an issue.  That's improper.
9          THE COURT:  That's enough.  Calls for a
10 legal conclusion.  Sustained.
11 BY MR. THOMAS:
12     Q.  Well, Mr. Freeman, didn't BDO ask you
13 repeatedly during their cross-examination that I think I
14 counted six different times that Mr. Mendez had not yet
15 began to serve a day in jail?
16     A.  I don't know how many times, but I was
17 definitely asked that, yes, sir.
18     Q.  And as far as you know, Mr. Freeman, the
19 person that's making that decision is United States
20 District Judge Jordan?
21     A.  Yes, sir.
22     Q.  Mr. Freeman, do you recall BDO asking you
23 whether or not BDO ever received any financial
24 information from StrataSys?
25     A.  Yes.

Page 830

1    MR. THOMAS: With His Honor's permission,
2  I'll approach the witness with Exhibit 472 in evidence.
3        THE COURT: You may.
4        MR. THOMAS: (Complies.)
5  BY MR. THOMAS:
6     Q.   Mr. Freeman, you see that Bates stamp down
7  there on the bottom that says BDO?
8     A.   Yes, sir.
9     Q.   Is that your understanding that this is a
10 document produced by BDO Seidman?
11    A.   Yes, sir.
12    Q.   And what is this document, Mr. Freeman?
13    A.   It's a technology consulting firm
14 confidential profile that I received from BDO.
15    Q.   Mr. Freeman, could I get you to quickly turn
16 to the last page to me there -- with me there?
17    A.   (Complies.)
18    Q.   And what's the date of this document?
19    A.   August 9th, 2001.
20        MR. THOMAS: And if it's not too much
21 trouble, can you go back to the first page?
22        (Technician complies.)
23        MR. THOMAS: Thank you.
24 BY MR. THOMAS:
25    Q.   Mr. Freeman, if you look down with me under

Page 831

1  net fee revenue, do you see that, Number 9?
2     A.   Yes, sir.
3     Q.   And what does StrataSys tell BDO their
4  latest completed year net fee revenue is?
5        MR. SCHNAPP: Objection. Speculation.
6        THE COURT: Overruled.
7        THE WITNESS: Approximately $4 million.
8  BY MR. THOMAS:
9     Q.   And if you look at the next projected here,
10 they think they're going to get $4 million again?
11    A.   Yes, sir.
12    Q.   And that's for products and as much as 12 or
13 14 million for services; is that right?
14    A.   It says, products 12 million, and then my
15 belief is, products 14 million would be the second --
16       MR. SCHNAPP: Objection. Speculation.
17       THE COURT: Overruled.
18 BY MR. THOMAS:
19    Q.   Well, Mr. Freeman, at most -- in the last
20 completed year at most it could be 16 million, right,
21 4 plus 12?
22    A.   Yes, sir.
23    Q.   And for the next -- and this is signed in
24 2001, right?
25    A.   Yes, sir.

Page 832

1     Q.   And for the next year at most it could be
2  4 plus 14 or 18 million, right?
3     A.   That would be the math, yes, sir.
4     Q.   Mr. Freeman, I'd like for you to please look
5  at Exhibit 286A in evidence. Mr. Freeman, 286A, that's
6  an internal work paper of BDO; is that right?
7     A.   Yes. This is a work paper I got from BDO.
8     Q.   And when we say a work paper by BDO, what
9  does that mean?
10    A.   This would be one of the documents used to
11 perform the independent certified audit. These are
12 what's known as the work papers that make up the overall
13 file.
14    Q.   So this shows the work BDO did on the 2001
15 audit; is that right?
16    A.   Yes, sir.
17    Q.   And that's the -- 2001, that's the same year
18 as the StrataSys information that was given to BDO
19 that's Plaintiffs' Exhibit Number 432?
20    A.   Yes, sir.
21    Q.   Now, on BDO's own internal work paper, how
22 much in accounts receivable does BDO say there is at
23 StrataSys?
24    A.   There's two places, the 16 million -- almost
25 500,000, that 022410.

Page 833

1        MR. THOMAS: You all see that one?
2        Can you highlight that for us?
3        (Technician complies.)
4        THE WITNESS: And then down below at
5  0022230, roughly 5 million more.
6  BY MR. THOMAS:
7     Q.   And 16 and a half million plus 5 million is
8  how much?
9     A.   21 million that would be outstanding at
10 December 31, which means the receivables that are less
11 than 90 days old or 120 days old.
12    Q.   So they're showing from StrataSys accounts
13 receivable of 21 and a half million dollars?
14    A.   Yes, sir.
15    Q.   That's a business StrataSys is doing, right?
16    A.   Yes, sir.
17       MR. THOMAS: Can we get that side by side?
18       (Technician complies.)
19 BY MR. THOMAS:
20    Q.   In the latest completed year the most would
21 be -- if we add those together, would be 16 million, is
22 that right, on the bottom for the net fee revenue, the
23 one in 2001.
24       Do you remember that document was in 2001?
25    A.   That would be for the total year which would

Page 834

1  be approximately a million 4 a month.
2      Q.  So that's how much StrataSys told BDO they
3  had was for the whole year, 16 million in 2001, right?
4      A.  For the whole year.
5      Q.  In BDO's own work papers they said they had
6  21 and a half million?
7      A.  At the end of the year.
8      Q.  So how much would it have been if you had
9  added it up for the whole year?
10     A.  Should have been about 5 million based on
11 the 16.
12     Q.  So the 21 and a half million should have
13 been 5 million?
14     A.  Yeah.
15         MR. SCHNAPP:  Objection.
16         THE COURT:  Overruled.
17 BY MR. THOMAS:
18     Q.  Mr. Freeman, based on your investigation as
19 the court-appointed receiver, how could on the one hand
20 BDO actually receive financial information from
21 StrataSys that showed 16 million for the whole year but
22 in their own work papers BDO say they had 21 and a half
23 for just the last few months?
24         MR. SCHNAPP:  Objection. Argumentative.
25 Also misstates.

Page 835

1          THE COURT:  Sustained.
2  BY MR. THOMAS:
3      Q.  Mr. Freeman, based on your investigation,
4  can you reconcile StrataSys telling BDO there was
5  16 million for the whole year in this document and BDO
6  turning around and saying that there was 21 and a half
7  million in accounts receivable in this document?
8          MR. SCHNAPP:  Objection. Speculation..
9  Mischaracterizes the document.
10         THE COURT:  Overruled.
11         THE WITNESS:  Can you reread the question?
12         THE COURT:  Read it back.
13         (Thereupon, the court reporter read back the
14 requested portion.)
15         THE WITNESS:  Could you read it one more
16 time?
17         (Thereupon, the court reporter read back the
18 requested portion.)
19         THE WITNESS:  I can't reconcile it. Their
20 own records showed both numbers, and they're totally at
21 odds with each other.
22 BY MR. THOMAS:
23     Q.  And, in fact, Mr. Freeman, isn't it true
24 that at the end of the day the millions and millions of
25 dollars from StrataSys, BDO's own alliance partner that

Page 836

1  BDO certified, turned out to be fake?
2      A.  Yes.
3          MR. THOMAS:  Your Honor, I have no further
4  questions of this witness.
5          Thank you very much, Mr. Freeman.
6          THE COURT:  10 minutes to -- 12 minutes
7  before time.
8          Mr. Freeman, leave your microphone.
9          THE WITNESS:  Gladly, Your Honor.
10         THE COURT:  You may step down.
11         THE WITNESS:  Thank you. (Complies.)
12         THE COURT:  All right.  Now we can move on
13 with our lives for today.
14         JUROR:  Yes.
15         THE COURT:  9:30 Monday morning, same place.
16 We'll come and get you as soon as we can.
17         You're not to discuss the case amongst
18 yourselves.  You're not to have anybody discuss the case
19 with you.  You're not to read, listen, or see any
20 reports about this case in the media.
21         You're not to form a fixed opinion about the
22 merits of the case until you have heard all of the
23 evidence, the argument of the lawyers, and the
24 instruction on the law by me.  And you are to disregard
25 the presence of the lawyers in this courtroom, and

Page 837

1  they're to disregard yours.
2          Have a good weekend.  Don't forget to bring
3  your tags on Monday.  Bring sweaters.  I see some of you
4  get cold.  If you don't bring your sweaters, so can't
5  help you.  Okay?
6          All right.  We'll see you Monday morning.
7          (Thereupon, the jury was escorted out of the
8  courtroom.)
9          THE COURT:  Okay.  Unless there's something
10 else pending, we'll break until Monday morning.  Have a
11 good one.
12         MR. THOMAS:  You too.
13         MR. SCHNAPP:  Thank you, Your Honor.
14
15         (Thereupon, at approximately 3:50 p.m., the
16 above portion of the trial was concluded.)
17
18             *     *     *
19
20
21
22
23
24
25

Page 839

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
        Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
        Defendant.
------------------------------------------------x
BDO SEIDMAN, LLP,
        Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
        Third-Party Defendants.
------------------------------------------------x

PAGES 839 - 931

Volume 8




MORNING SESSION

Miami, Florida

Monday, April 16, 2007

9:55 a.m.

Before the Honorable Jose M. Rodriguez

EXHIBIT
37

Reported by:  Gizella "Gigi" Baan

APPEARANCES

On behalf of the Plaintiffs BANCO ESPIRITO SANTO
INTERNATIONAL, LTD., ET AL.:

SULLIVAN & CROMWELL, LLP
    1888 Century Park East
    Los Angeles, California  90067
    (310) 712-6627
BY:  Steven W. Thomas, Esquire
    Emily S. Alexander, Esquire

GONZALO R. DORTA, P.A.
    334 Minorca Avenue
    Coral Gables, Florida  33134
    (305) 441-2299
BY:  Gonzalo R. Dorta, Esquire

BERGER SINGERMAN
    350 East Las Olas Boulevard, Suite
    Fort Lauderdale, Florida  33301
    (954) 525-9900
BY:  Mitchell W. Berger, Esquire

On behalf of Defendant BDO Seidman, LLP:

ALVAREZ, ARMAS & BORRON
    901 Ponce de Leon Boulevard, Suite 304
    Coral Gables, Florida  33134
    (305) 461-5100
BY:  Arturo Alvarez, Esquire

GREENBERG TRAURIG, LLP
    MetLife Building
    200 Park Avenue, 15th Floor
    New York, New York  10166
BY:  Adam D. Cole, Esquire
    Karen Y. Bitar, Esquire

GREENBERG TRAURIG, LLP
    1221 Brickell Avenue
    Miami, Florida  33131
BY:  Mark Schnapp, Esquire
    Nikki Simon, Esquire

On behalf of Third-Party Defendants Victor Balestra,
Bernard Mollet, and Joaquin Garnecho

RICHMAN, GREER, WEIL, BRUMBAUGH,
MIRABITO & CHRISTENSEN, P.A.
    Miami Center, Suite 1000
    201 S. Biscayne Boulevard
    Miami, Florida  33131
    (305) 373-4000
BY:  Manuel Garcia Linares, Esquire


On behalf of Third-Party Defendant Bernard Mollet

GAMBA & LOMBANA, P.A.
    2701 Ponce de Leon Boulevard, Mezzanine
    Coral Gables, Florida  33134
    (305) 448-4010
BY:  Hector J. Lombana, Esquire
    Geoffrey Marks, Esquire

CONTENTS

EXAMINATION OF CARLOS MENDEZ BY:                    PAGE:
    MS. ALEXANDER:  (Direct)              846

Page 844

```
 1        PROCEEDINGS
 2        THE COURT: Let me know when you all are
 3    ready.
 4        I hope you all had a good weekend. I'm glad
 5    you guys didn't go home because you probably wouldn't
 6    have been able to get back.
 7        MS. ALEXANDER: Ready, Your Honor.
 8        THE COURT: Mr. Alvarez, are you ready?
 9        MR. ALVAREZ: Yes, sir.
10        THE COURT: Bring them in.
11        THE BAILIFF: (Complies).
12        All rise for the jury.
13        (Thereupon, the jury was brought into the
14    courtroom.)
15        THE COURT: All right. You may be seated.
16    Good morning, ladies and gentlemen. Today is Monday.
17    We have Tuesday, Wednesday, Thursday, and Friday to go.
18    Okay? I thought I'd give you a preview of what's to
19    come.
20        I hope you had a good weekend. I hope you
21    rested over the weekend. I hope you had fun over the
22    weekend. I hope you didn't have to deal with a lot of
23    your children over the weekend. But it's a lot of
24    hopes.
25        So are you ready to go?
```

Page 845

```
 1        THE JURY: (Nodding.)
 2        THE COURT: Are you ready? Are you sure,
 3    Mr. Cooper?
 4        JUROR: Yes, sir.
 5        THE COURT: You really have no choice but --
 6        (Laughter).
 7        All right. Let's get this thing started.
 8    Ms. Alexander, you may call your next witness.
 9        MS. ALEXANDER: Espirito Santo calls Carlos
10    Mendez.
11        THE COURT: Step up, Mr. Mendez.
12        THE CLERK: Please remain standing and raise
13    your hand.
14        Thereupon,
15            CARLOS MENDEZ,
16    having been duly sworn by the clerk of the Court,
17    testified as follows:
18        THE COURT: Before we get started, I need a
19    side-bar with Mr. Mendez as well.
20        (Thereupon, there was a side-bar conference
21    outside the presence and hearing of the jury.)
22        THE COURT: Mr. Mendez, this is really
23    directed at you and to the lawyers that are going to be
24    questioning you. You're not to let the jury know in any
25    way, shape or form -- and that includes the lawyers by
```

Page 846

```
 1    questioning -- that you've done this before in this
 2    trial.
 3        THE WITNESS: I understand.
 4        THE COURT: There's nothing to refer to the
 5    last trial whether in questioning or in answering.
 6        MR. ALVAREZ: Judge, in the event that I
 7    need to impeach him with testimony from the mistrial, I
 8    will ask him whether or not he's testified before you
 9    before, correct?
10        THE COURT: That's fine. Before you do
11    that, let's have a side-bar and see exactly what we're
12    going to do. We're not there yet. We've got a while.
13        MS. ALEXANDER: So I understand, if
14    Mr. Alvarez is going to be impeaching with prior
15    testimony from the prior proceeding, we're going to have
16    a side-bar first?
17        THE COURT: Yes.
18        (Thereupon, the side-bar conference was
19    concluded.)
20        THE COURT: You may proceed.
21        MS. ALEXANDER: Good morning, ladies and
22    gentlemen.
23        DIRECT EXAMINATION
24    BY MS. ALEXANDER:
25        Q.  Good morning, Mr. Mendez.
```

Page 847

```
 1        A.  Good morning, Ms. Alexander.
 2        Q.  Mr. Mendez, did you work for the Orlanskys
 3    in the factoring business?
 4        A.  Yes, I did.
 5        Q.  And when did you begin to work for the
 6    Orlanskys in the factoring business?
 7        A.  I began in 1989.
 8        Q.  And at what company is that?
 9        A.  That was Bankest Capitol Corp.
10        Q.  What was your position at Bankest Capital
11    Corp.?
12        A.  I can't hear you very well.
13        Q.  Let's try moving it over here. Is that
14    better?
15        A.  Yes. Sorry.
16        Q.  That's quite all right. And what was your
17    position at Bankest Capital Corp.?
18        A.  I was a vice president with the company.
19        Q.  And were you part of the day-to-day
20    management at Bankest Capital?
21        A.  Yes.
22        Q.  And then did you later work for another
23    factoring entity owned by the Orlanskys?
24        A.  Yes.
25        Q.  What was the name of that company?
```

Page 848

1    A.  It was called Bankest Receivables, Finance
2  and Factoring Corp.
3    Q.  If I refer to it as BRFFC, will you
4  understand what I'm talking about?
5    A.  Yes.
6    Q.  And when did you start working at BRFFC?
7    A.  1994.
8    Q.  And what was your position at BRFFC?
9    A.  It was vice president as well.
10    Q.  So you were also part of the day-to-day
11  management at BRFFC?
12    A.  Yes.
13    Q.  And then did you also have a position at
14  E.S. Bankest?
15    A.  Yes, I did.
16    Q.  And what was your position there?
17    A.  Initially it was vice president and towards
18  the end of the company, I was senior vice president.
19    Q.  And again, were you part of the day-to-day
20  management at E.S. Bankest?
21    A.  Yes.
22    Q.  And as part of the day-to-day management at
23  Bankest Capital, BRFFC and Bankest, were you personally
24  familiar with the operations of those companies?
25    A.  Yes.

Page 849

1    Q.  Did BDO audit BRFFC and E.S. Bankest?
2    A.  Yes.
3    Q.  And were you the point person for BDO when
4  they came to audit those two companies?
5    A.  Yes, I was.
6    Q.  Now, you said that BRFFC and E.S. Bankest
7  were factoring companies.  What do you mean by
8  factoring?
9    A.  Factoring is -- it's a financial arrangement
10  whereby companies borrow funds by selling their accounts
11  receivable to the factor at a discount and the factor
12  collects the accounts receivable from the customers.
13    Q.  And how did BRFFC and E.S. Bankest raise
14  money to fund the purchase of accounts receivable?
15    A.  The funding came from borrowings of monies
16  that were lent to the company by investors called
17  debenture holders at BRFFC, and later at E.S. Bankest
18  were note holders, and also the bank -- I mean, the
19  company borrowed -- had from the bank of Espirito Santo
20  Bank, they had a line of credit with the bank at E.S.
21  Bankest.
22    Q.  And the investors who loaned money to BRFFC
23  and E.S. Bankest, were those the customers of Espirito
24  Santo?
25    A.  In its majority yes, they were clients of

Page 850

1  Espirito Santo Group Bank, yes.
2    Q.  And the loans that Espirito Santo's
3  customers made to BRFFC and then to E.S. Bankest, how
4  were they supposed to be paid back?
5    A.  I'm sorry.  Would you repeat it?
6    Q.  The loans that the customers made, that
7  Espirito Santo's customers made to BRFFC and E.S.
8  Bankest, how were those loans supposed to be paid back?
9    A.  Well, the source of repayment was the
10  collection of the accounts receivable.
11    Q.  So were the accounts receivable owned by
12  BRFFC and later E.S. Bankest supposed to be the
13  collateral for those loans?
14    A.  That is correct.
15    Q.  And why did BRFFC and E.S. Bankest need to
16  be audited?
17    A.  Because the company had to give comfort, had
18  to give comfort to the investors.  And at E.S. Bankest
19  it was a requirement, but the main reason for the audits
20  with -- it was to provide the lenders with, you know,
21  with a certified financial and economic condition of the
22  company to its lenders to make them have faith in the
23  company and be comfortable with their investments.
24    Q.  And when you were at BRFFC and then later at
25  E.S. Bankest, did you provide the audited financial

Page 851

1  statements to the people making the loan to those
2  companies?
3    A.  Yes.
4    Q.  And did BDO Seidman, as the auditor for
5  BRFFC and then E.S. Bankest, know that Bankest was
6  providing its audited financial statements to those
7  lenders?
8    MR. ALVAREZ:  Objection.  Lack of
9  foundation, lack of a predicate.  Calls for hearsay
10  information.
11    THE COURT:  Sustain it.  Rephrase your
12  question.
13  BY MS. ALEXANDER:
14    Q.  As the point person for BDO when they came
15  to audit BRFFC and E.S. Bankest, do you know -- did you
16  inform BDO what the companies were going to be using --
17  how the companies were going to be using their audits?
18    MR. ALVAREZ:  Objection to the reference of
19  BDO.  BDO is not a person.  We ask that whoever it is he
20  is referring to be specified and a time period.
21    MS. ALEXANDER:  Your Honor, speaking
22  objection.
23    THE COURT:  Overruled.
24    MS. ALEXANDER:  You overruled my objection
25  or his objection?

Page 852

1    THE COURT: You didn't have an objection.
2  They did.
3    They objected. I overruled it.
4  BY MS. ALEXANDER:
5    Q.  You can answer the question.
6    A.  I did inform the auditors, BDO, that the
7  financial statements, the audited report was going to be
8  provided to the lenders, to the note holders as well as
9  to the bank.
10   Q.  And you did that both at BRFFC and at E.S.
11 Bankest?
12   A.  Yes.
13   Q.  Now, Mr. Mendez, did you participate in a
14 fraud that began, started in 1995 at BRFFC?
15   A.  Yes.
16   Q.  And did that fraud involve the creation of
17 fake accounts receivable?
18   A.  Yes.
19   Q.  As the auditor for BRFFC and then for E.S.
20 Bankest, did BDO ever detect that fraud?
21   A.  No.
22   Q.  I'm going to show you what's -- may I
23 approach, Your Honor?
24   THE COURT:  You may.
25 BY MS. ALEXANDER:

Page 853

1    Q.  (Complies).
2    Mr. Mendez, I'm going to show you 65-A for
3  identification. Can you tell me looking at the front
4  page what that document is?
5    A.  This is the audit report. This is the
6  audited financial statements as issued by BDO for the
7  year-end December 31st, 1995.
8    Q.  And what entity is this audited financial
9  statement for?
10   A.  It's BRFFC, Bankest Receivables, Finance and
11 Banking Corp.
12   MR. ALVAREZ:  I'm going to object to any
13 discussion about this document.
14   THE COURT:  Sustained. Lay a predicate.
15   MS. ALEXANDER:  Yes, Your Honor.
16 BY MS. ALEXANDER:
17   Q.  Looking down at the bottom right-hand of the
18 corner, Mr. Mendez, I'm still on the first page, did you
19 see a Bates label?
20   A.  Yes.
21   Q.  And can you read what that first number is?
22   A.  I'm sorry. The number of the page?
23   Q.  The letters and then the number.
24   A.  It's BDO 04125.
25   Q.  Thank you. And is this a -- looking at this

Page 854

1  document now, is this a copy of the BRFFC audited
2  financial statements for year-end 1995 that you received
3  as the vice president of BRFFC?
4    A.  Yes.
5    MS. ALEXANDER:  Plaintiffs move Plaintiffs'
6  Exhibit 65-A into evidence.
7    MR. ALVAREZ:  Objection on the grounds of
8  relevance. This document has nothing to do with E.S.
9  Bankest.
10   THE COURT:  Overruled. I'll accept it into
11 evidence. Plaintiffs' Exhibit 65-A for ID is now 65-A
12 into evidence.
13 BY MS. ALEXANDER:
14   Q.  I'm turning now to the assets page which is
15 BDO 04129. Do you see that?
16   A.  Yes, I do.
17   Q.  And when it says assets of a little over 4.7
18 million in accounts receivable, do you see that?
19   A.  Yes.
20   Q.  And those were the accounts receivable that
21 were supposed to be there to repay the loans made by the
22 investors in BRFFC?
23   A.  Yes.
24   Q.  And were there in fact, 4.7 million dollars
25 in accounts receivable to repay those loans as of

Page 855

1  year-end December 31st, 1995?
2    A.  No.
3    Q.  I'm going to show you what is Plaintiffs'
4  Exhibit 70 into evidence.
5    Mr. Mendez, can you identify that document
6  for me?
7    A.  Yes. This is another financial statement
8  audited by BDO. This is BDO's report.
9    Q.  And for which entity is this for?
10   A.  For Bankest Receivables, Finance and
11 Factoring Corp.
12   Q.  And again, could you turn to the balance
13 sheet under assets, page 4 of the document?
14   A.  (Complies).
15   MR. ALVAREZ:  Your Honor, same objection as
16 to the prior document. This has nothing to do with E.S.
17 Bankest. It has to do with BRFFC.
18   THE COURT:  Overruled.
19 BY MS. ALEXANDER:
20   Q.  And Mr. Mendez, looking at the listing under
21 accounts receivable and then the 12.7 million, is that
22 the 12.7 million in accounts receivable that was
23 supposed to be there to repay the loans made by the
24 investors to BRFFC?
25   A.  Yes.

Page 856

1    Q.   And as of year-end December 31st, 1996 were
2  there, in fact, 12.7 million dollars in accounts
3  receivable to repay those loans?
4    A.   No.
5    Q.   And why not?
6    A.   Because in that number, there were
7  receivables that were either fake or receivables that
8  were not -- that the company knew that were not
9  collectible, good receivables, that were being kept as
10  part of the collateral, you know, with no right to have
11  it there. There was -- it was not a good receivable.
12    MS. ALEXANDER: May I approach? Your Honor,
13  may I approach the witness?
14    THE COURT: You may.
15  BY MS. ALEXANDER:
16    Q.   Mr. Mendez, I'm now going to hand you what's
17  been marked as Plaintiffs' Exhibit 74 in evidence.  Can
18  you tell me what that document is?
19    A.   Yeah. This is BDO's audited financial
20  statements for E.S. Bankest for fiscal year-end December
21  31st, 1998.
22    Q.   And was this the first audit that BDO
23  conducted of E.S. Bankest?
24    A.   Yes.
25    Q.   And turning to the asset page again, page

Page 857

1  Number 3 of Exhibit 74, looking at the listing under
2  accounts receivable where it reads 40.6 million dollars
3  in accounts receivable, were those -- again, were those
4  the accounts receivable that were supposed to be there
5  to repay the loans made by the investors in E.S.
6  Bankest?
7    A.   Yes.
8    Q.   And were there, in fact, 40.6 million
9  dollars in accounts receivable at E.S. Bankest as of
10  year-end 1998?
11    A.   No.
12    Q.   And why not?
13    A.   Because there was a substantial amount of
14  receivables within that number that were fake
15  receivables, that were not real receivables.
16    Q.   Thank you.
17    Now, looking at Plaintiffs' Exhibit Number
18  75 in evidence.
19    MS. ALEXANDER: May I approach, Your Honor?
20  Excuse me.
21    THE COURT: You may.
22  BY MS. ALEXANDER:
23    Q.   (Complies).
24    Can you tell me what this document is?
25    THE COURT: Can you identify the document by

Page 858

1  the -- whatever it is the Court has (inaud.)
2    MS. ALEXANDER: I'm sorry. It's Plaintiffs'
3  Exhibit 75 in evidence.
4    THE WITNESS: I can identify the attachment
5  to this document.
6  BY MS. ALEXANDER:
7    Q.   Looking at page 2 of the document, is that
8  what you're referring to?
9    A.   I'm sorry?
10    Q.   Are you referring to page -- starting at
11  page 2 of the document?
12    A.   That is correct.
13    Q.   And what is that?
14    A.   This is the audited financial statements for
15  E.S. Bankest for the year-ending again December 31st,
16  1999.
17    Q.   And again, these are audited financial
18  statements prepared by BDO Seidman?
19    A.   That is correct.
20    Q.   And looking at the balance sheet page of
21  this document starting at page 3, under accounts
22  receivable, where it says that there is over 58 million
23  dollars in accounts receivable, again, were those the
24  accounts receivable that were supposed to be there to
25  repay the loans made by the investors in E.S. Bankest?

Page 859

1    A.   Yes.
2    Q.   And were there, in fact, over 58 million
3  dollars in accounts receivable at E.S. Bankest as of
4  year-end 1999?
5    A.   No.
6    Q.   And again, were those accounts -- is that
7  because those -- that number included accounts
8  receivable that were fake?
9    A.   That is correct.
10    MS. ALEXANDER: May I approach, Your Honor?
11    THE COURT: You may.
12  BY MS. ALEXANDER:
13    Q.   (Complies).
14    Mr. Mendez, I'm giving you what is
15  Plaintiffs' Exhibit 78 in evidence.  Can you tell me
16  what that document is?
17    A.   This is BDO's audited financial statement
18  for the year-ending December 31st, 2000.
19    Q.   And looking at the balance sheet for
20  year-end 2000, it starts at page 3 of this exhibit. Do
21  you see where it says accounts receivable and it says
22  there's 103 million dollars in accounts receivable at
23  E.S. Bankest?
24    A.   Yes.
25    Q.   Was there, in fact, 103 million dollars in

Page 860

1  accounts receivable at E.S. Bankest as of year-end 2000?
2      A.   No.
3      Q.   And again, is that because the majority of
4  those accounts receivable were fake?
5      A.   A pretty substantial percentage of that
6  amount was -- were fake receivables, yes.
7      Q.   Just a couple more.
8          MS. ALEXANDER:  Your Honor, may I approach?
9          THE COURT:  You may.
10 BY MS. ALEXANDER:
11     Q.   (Complies).
12         Mr. Mendez, I'm approaching with Plaintiffs'
13 Exhibit 81 in evidence.  And can you identify this
14 document for me?
15     A.   This is, again, the audited financial
16 statements as reported by BDO to the company of E.S.
17 Bankest for the fiscal year-end December 31st, 2001.
18     Q.   And looking at the balance sheet, page 3 of
19 the document, and can you see under where accounts
20 receivable it says that there's over 153 million dollars
21 of accounts receivable at E.S. Bankest?
22     A.   Yes.
23     Q.   And again, this was the 153 million dollars
24 in accounts receivable that was supposed to be there to
25 repay the loans made by the investors at E.S. Bankest?

Page 861

1      A.   Yes.
2      Q.   And were there, in fact, 153 million dollars
3  in accounts receivable at E.S. Bankest as of year-end
4  2001?
5      A.   No.
6      Q.   And is that because the majority of them
7  were fake?
8      A.   Yes.
9          MS. ALEXANDER:  May I approach, Your Honor?
10         THE COURT:  You may.
11 BY MS. ALEXANDER:
12     Q.   (Complies).
13         Mr. Mendez, I'm approaching with what's been
14 marked as Plaintiffs' Exhibit 87 in evidence.  Can you
15 tell me what that document is?
16     A.   This is the audited financial statements as
17 reported by BDO to the company for the fiscal year-end
18 December 31st, 2002.
19     Q.   And again, these were prepared by BDO
20 Seidman?
21     A.   Yes.
22     Q.   In looking at the balance sheet on page 3,
23 you see where it says accounts receivable and it says
24 that there is 223 million dollars in accounts
25 receivables at E.S. Bankest?

Page 862

1      A.   Yes.
2      Q.   And again, those 223 million dollars in
3  accounts receivable were the accounts receivable that
4  were supposed to be there to pay back the investors of
5  E.S. Bankest?
6      A.   That is correct, yes.
7      Q.   And again, were there, in fact, 223 million
8  dollars in accounts receivable at E.S. Bankest as of
9  year-end 2002?
10     A.   No.
11     Q.   And is that because the majority of them
12 were fake?
13     A.   The majority were fake, yes.
14     Q.   Now, Mr. Mendez, you were a participant in
15 the fraud that created these fake receivables?
16     A.   Yes.
17     Q.   And you were indicted for that fraud, is
18 that right?
19     A.   Yes.
20         MS. ALEXANDER:  Your Honor, may I approach?
21         THE COURT:  You may.
22         MS. ALEXANDER: (Complies).
23 BY MS. ALEXANDER:
24     Q.   Approaching Mr. Mendez with what is
25 Exhibit 3149.

Page 863

1          MR. ALVAREZ:  Is that the document that
2  (inaud.)?
3          MS. ALEXANDER:  Yes.
4  BY MS. ALEXANDER:
5      Q.   And Mr. Mendez, this is the indictment that
6  charges you with crimes involving the creation of fake
7  receivables at E.S. Bankest?
8      A.   Yes.
9      Q.   And that's --
10         (Technician complies.)
11         And that's your name there?
12     A.   Yes.
13     Q.   Turning now to page 3 of the document,
14 paragraph 8.
15         (Technician complies.)
16         Where it reads, "Defendant, Carlos Mendez,
17 was a senior vice president of Bankest.  He managed the
18 finance operations of Bankest, BCC, and BRFFC."  Did I
19 read that right?
20     A.   Yes.
21     Q.   And that is you?
22     A.   That is correct.
23     Q.   Did you plead guilty to these crimes of the
24 indictment?
25     A.   Yes, I did.

Page 864

1    Q.  And I'm looking now at page 7 of the
2  document.  Under manner and means of the conspiracy,
3  starting with paragraph 4.  "The defendants," and that
4  would include you, Mr. Mendez?
5    A.  Yes.
6    Q.  "Would inflate the quantity and value of
7  accounts receivable used as collateral for the debenture
8  notes."  Did I read that correctly?
9    A.  Yes.
10    Q.  When we were looking at audited financial
11  statements, are those the same accounts receivables that
12  were being used for the collateral for the debenture
13  notes?
14    A.  Yes.
15    Q.  And you pled guilty to inflating the
16  quantity and value of those accounts receivable?
17    A.  Yes.
18    Q.  I'm looking at number 5.  "The defendants"
19  -- and that would include you, Mr. Mendez -- "would
20  represent that the invoices they knew to be
21  uncollectible were actually collectible."  Did I read
22  that correctly?
23    A.  Yes.
24    Q.  And you did that?
25    A.  Yes.

Page 865

1    Q.  I'm looking at number 7.  "The defendants
2  would create fictitious accounts receivable records
3  where there were no actual invoices or sales at all."
4  Did I read that correctly?
5    A.  Yes.
6    Q.  And did you do that?
7    A.  Yes.
8    Q.  I'm looking at number 8.  "The defendants
9  would prepare materially false financial statements."
10  Did you do that?
11    A.  Yes.
12    Q.  And number 9.  "The defendants would cycle
13  money from Bankest to BCC to factoring clients and then
14  back to BCC and Bankest with no underlying factoring
15  transaction in order to make it appear that the
16  factoring client's accounts receivable were being paid
17  on a timely basis."  Did you also do that?
18    A.  Yes.
19    Q.  And, I'm sorry, Mr. Thomas pointed out that
20  I skipped number 6.  Can we go back to the prior page?
21        (Technician complies.)
22        And number 6.  "The defendants would
23  represent that invoices prepared prematurely for goods
24  not yet shipped were actually valid, legitimate invoices
25  for shipped goods."  Did you also do that when you were

Page 866

1  working at these companies?
2    A.  Yes.
3    Q.  And then the next page under 10.  "The
4  defendants would change the dates on accounts receivable
5  to make them appear more recent and, thus, more likely
6  to be collectible."  Did you also do that when you were
7  at these companies?
8    A.  Yes.
9    Q.  And Number 11.  "The defendants would seek
10  to thwart the audit function by providing auditors with
11  fictitious invoices."  Did you also do that?
12    A.  Yes.
13    Q.  And did that include providing fictitious
14  invoices to BDO Seidman?
15    A.  Yes.
16    Q.  And number 12.  "The defendants would seek
17  to thwart the audit function by providing auditors with
18  fictitious checks."  Did you do that?
19    A.  Yes.
20    Q.  And did that include providing BDO Seidman
21  with fictitious checks?
22    A.  Yes.
23    Q.  And number 13.  "Some of the defendants
24  would represent that uninsured accounts receivable were
25  insured."  Did you also engage in that conduct?

Page 867

1    A.  Yes.
2    Q.  And number 14.  "Some of the defendants
3  would seek to thwart the audit function by providing
4  auditors with fictitious insurance confirmations
5  reflecting that accounts receivable were actually
6  insured when, in fact, they were not insured."  Did you
7  also engage in that conduct?
8    A.  Yes.
9    Q.  And did that include providing BDO Seidman
10  as the auditors for BRFFC and E.S. Bankest with
11  fictitious insurance confirmations?
12    A.  Yes.
13    Q.  And number 15.  "Some of the defendants
14  would seek to thwart the audit function by providing
15  auditors with fictitious and forged audit inquiry
16  confirmation letters."  Did you also engage in that
17  conduct?
18    A.  Yes.
19    Q.  And did that include providing BDO Seidman
20  with fictitious and forged audit inquiry confirmation
21  letters?
22    A.  Yes.
23    Q.  Number 16.  "The defendants would obtain
24  unqualified audit opinions on false financial
25  statements."  Did you also engage in that conduct?

Page 868

1    A.   Yes.
2    Q.   And you would obtain unqualified audit
3  opinions from BDO Seidman?
4    A.   Yes.
5    Q.   And number 17. "The defendants would
6  present the false audited financial statements to
7  Espirito Santo Bank in order to continue obtaining
8  funding." Did you also provide BDO's audited financial
9  statements to Espirito Santo Bank in order to continue
10 to receive funding for the company?
11   A.   Yes.
12   Q.   And did you also -- under number 18, would
13 you present the false audited financial statements
14 prepared by BDO Seidman to Espirito Santo Bank to show
15 compliance with the collateral ratio requirements in the
16 loan agreements?
17   A.   Yes.
18   Q.   You also engaged in that conduct?
19   A.   Yes.
20   Q.   And number 19, would you prepare accounts
21 receivable aging reports with inflated amounts?
22   A.   Yes.
23   Q.   And number 20. "The defendants would
24 present the false accounts receivable reports to
25 Espirito Santo Bank in order to continue obtaining

Page 869

1  funding."
2    A.   Yes.
3    Q.   Can we go to page 9 of the document, and
4  paragraph 3?
5         (Technician complies.)
6         This paragraph in the indictment reads on or
7  about March 31, 1995 you, Mr. -- the Orlanskys and
8  Mr. Parlapiano communicated regarding funding Joy in an
9  amount greater than 80 percent of valid legitimate
10 accounts receivable corresponding to the shipped
11 merchandise. Was this the first fraudulent act that you
12 engaged in working for the Orlanskys and their factoring
13 business?
14   A.   Yes.
15   Q.   And this is when the fraud began?
16   A.   That is correct.
17   Q.   You pled guilty to this fraud?
18   A.   Yes, I did.
19        MS. ALEXANDER: May I approach, Your Honor?
20        THE COURT: You may.
21 BY MS. ALEXANDER:
22   Q.   (Complies).
23        Mr. Mendez, I'm approaching with Plaintiffs'
24 Exhibit 17 and 67 in evidence. Can you identify that
25 document for me?

Page 870

1    A.   Yes, I can.
2    Q.   And what is it?
3    A.   This is the plea agreement that I signed
4  with the government.
5    Q.   Now, as a result of this plea agreement, was
6  your sentence reduced from the maximum possible sentence
7  that could be imposed for the crimes that you committed?
8    A.   Yes. I mean, it's a lesser sentence.
9    Q.   A lesser sentence. And how long have you
10 been sentenced to?
11   A.   Nine years.
12   Q.   And looking at paragraph 7 on page 3 of the
13 document of your plea agreement, I'm just going to read,
14 "This office agrees that it will" -- and that's the U.S.
15 Attorney's Office?
16   A.   That is correct.
17   Q.   "This office agrees that it will recommend
18 sentencing that the Court reduce by two levels the
19 sentencing guideline level applicable to the defendant's
20 offense pursuant to Section 3E1A of the sentencing
21 guidelines based upon the defendant's recognition and
22 affirmative and timely acceptance of personal
23 responsibility." Did I read that correctly?
24   A.   Yes.
25   Q.   So did the government agree to reduce -- to

Page 871

1  seek a reduction of the sentence because you had
2  accepted responsibility for your crimes?
3    A.   Yes.
4    Q.   Now, did you testify at the criminal -- the
5  federal criminal trial?
6    A.   Yes, I did.
7    Q.   And who was on trial at that trial?
8    A.   There were four defendants on trial.
9  Eduardo Orlansky, Hector Orlansky, Peter Stanham and
10 Ariadna Puerto.
11   Q.   And how many days did you testify?
12   A.   Thirty. About 30.
13   Q.   And were all those four defendants
14 convicted?
15   A.   Yes.
16   Q.   And did you understand that you're obligated
17 to testify truthfully here today?
18        MR. ALVAREZ: Objection. Judge, it's an
19 oblique reference to the plea agreement.
20        THE COURT: Hold on. I'm going to sustain
21 it unless you lay a predicate.
22 BY MS. ALEXANDER:
23   Q.   Looking further down on paragraph 7 starting
24 with, "However, this office will be required -- not be
25 required to make these sentencing recommendations if the

Page 872

1　defendant" -- and then could you highlight Number 3 --
2　"commits any misconduct after entering into this plea
3　agreement including but not limited to committing a
4　state or federal offense, violating any term of release,
5　or making false statements or misrepresentations to any
6　government entity or official." Did I read that
7　correctly?
8　　A.　Yes.
9　　Q.　And do you understand that if you provide
10　testimony that is untruthful, you will violate this plea
11　agreement?
12　　　MR. ALVAREZ: Objection, Your Honor. Calls
13　for a legal conclusion on his part in connection with an
14　agreement that is (inaud.) --
15　　　MS. ALEXANDER: Speaking objection.
16　　　THE COURT: Overruled. Answer the question.
17　　　THE WITNESS: Yes, I do understand.
18　BY MS. ALEXANDER:
19　　Q.　Now, prior to your testimony at the criminal
20　trial, did you meet with the U.S. Attorney?
21　　A.　Yes, I did.
22　　Q.　And did you go over the subject matter of
23　your testimony at the criminal trial?
24　　　MR. ALVAREZ: Objection. Irrelevant.
25　　　THE COURT: Overruled.

Page 873

1　　　THE WITNESS: Yes.
2　BY MS. ALEXANDER:
3　　Q.　And did you meet with me today prior to
4　testifying today?
5　　A.　I'm sorry?
6　　Q.　Did you meet with me prior to testifying
7　here today?
8　　A.　Yes.
9　　Q.　And did we -- and what did we discuss?
10　　A.　Basically the type of -- the subject matter
11　of the case, the questions that I was going to be asked.
12　　Q.　And did I tell you what the answers to the
13　questions were?
14　　A.　I'm sorry, I couldn't hear.
15　　Q.　Did I tell you what the answers to the
16　questions were?
17　　A.　No.
18　　Q.　And do you understand -- and what would be
19　the consequence of a violation of your plea agreement?
20　　　MR. ALVAREZ: Objection. Calls for a legal
21　conclusion.
22　　　THE COURT: Overruled.
23　　　THE WITNESS: To get the maximum sentence of
24　30 years.
25　BY MS. ALEXANDER:

Page 874

1　　Q.　And you testified that you are currently
2　sentenced for nine years; is that right?
3　　A.　That is correct.
4　　Q.　Are you also seeking a further reduction of
5　that sentence?
6　　A.　Yes.
7　　Q.　And who's responsible, whose decision is it
8　whether or not to further reduce your sentence?
9　　A.　It's Judge Adalberto Jordan's decision,
10　Federal Judge Adalberto Jordan's decision.
11　　　MS. ALEXANDER: May I approach, Your Honor?
12　　　THE COURT: You may.
13　BY MS. ALEXANDER:
14　　Q.　Mr. Mendez, I'm going to show you what has
15　been marked Plaintiffs' Exhibit for identification No.
16　7307. Can you tell me what that document is?
17　　A.　Yes.
18　　Q.　What is it?
19　　A.　This is a letter written by Attorney Steven
20　Thomas to my attorney basically stating that I have, you
21　know, consistently to the best of my knowledge, you
22　know, told the truth and that he would be, you know,
23　available to answer any questions, you know, as it
24　relates to my sentencing.
25　　Q.　And did you receive a copy of this letter

Page 875

1　around the time when it was sent?
2　　A.　Yes. My attorney showed me a copy of the
3　letter.
4　　　MS. ALEXANDER: Plaintiffs move Exhibit 7304
5　into evidence.
6　　　MR. ALVAREZ: Objection, Your Honor.
7　Improper bolstering.
8　　　THE COURT: Can I see that, please?
9　　　THE WITNESS: (Complies).
10　　　THE COURT: Thank you.
11　　　Overruled. It's accepted into evidence over
12　defense objection. Plaintiffs' Exhibit 7304 for ID is
13　now in evidence.
14　　　MS. ALEXANDER: I'm sorry, Your Honor,
15　that's actually the incorrect number. 7307. That's my
16　mistake.
17　　　THE COURT: 7307 is now in evidence.
18　　　MS. ALEXANDER: Thank you.
19　BY MS. ALEXANDER:
20　　Q.　Mr. Mendez, does Mr. Thomas or any lawyer
21　for Espirito Santo have any control --
22　　A.　I'm sorry, I couldn't hear.
23　　Q.　Mr. Mendez, is that better?
24　　　Mr. Mendez, does Mr. Thomas or any lawyer
25　for Espirito Santo control the amount of how long you're

Page 876

1  sentenced for?
2       A.   No.
3       Q.   And whose decision is that?
4       A.   It's exclusively the Court's decision. It's
5  the judge dispatched to the case, U.S. federal judge
6  Adalberto Jordan's decision.
7       Q.   We were just looking at the indictment and
8  the indictment concluded that you had provided BDO
9  Seidman as the auditors for E.S. Bankest and BRFFC with
10 fake documents; is that right?
11      A.   Yes.
12      Q.   So did you lie to BDO Seidman as part of
13 this fraud?
14      A.   Yes.
15      Q.   And was lying to BDO Seidman a critical part
16 of this fraud?
17      A.   Yes.
18      Q.   Why was it a critical part of the fraud to
19 lie to BDO Seidman?
20           MR. ALVAREZ: Objection, calls for
21 speculation.
22           THE COURT: Sustained.
23 BY MS. ALEXANDER:
24      Q.   Mr. Mendez, was it important to continue the
25 fraud -- was it necessary to continue the fraud to have

Page 877

1  BDO issue unqualified audits every year?
2           MR. ALVAREZ: Same objection. Judge,
3  different question asking for the same information.
4           THE COURT: Sustain the objection. Rephrase
5  the question.
6  BY MS. ALEXANDER:
7       Q.   Mr. Mendez, at BRFFC and at E.S. Bankest,
8  what did you use BDO's unqualified audits for?
9       A.   The audits were used mainly to induce
10 investors to lend monies to the company. And also to,
11 you know, to use the bank, Espirito Santo Bank, you
12 know, to lend monies to the company.
13           The main purpose was to give comfort to the
14 lenders that the company was -- it was a good operation,
15 a profitable operation, it was a clean company.
16      Q.   Without the audited financial statements
17 provided by BDO Seidman, would have you been able to
18 continue to raise money at BRFFC and E.S. Bankest?
19           MR. ALVAREZ: Objection. Calls for
20 speculation.
21           THE COURT: Overruled.
22           THE WITNESS: No way. No way. It was
23 critical. It was critical to have audited financial
24 statements to be able to raise monies.
25 BY MS. ALEXANDER:

Page 878

1       Q.   And the money that you raised using BDO's
2  audited financial statements, is that the money that was
3  stolen as part of the fraud?
4       A.   Yes.
5       Q.   Mr. Mendez, did there come a time when you
6  thought BDO Seidman as the auditors would discover this
7  fraud?
8           MR. ALVAREZ: Objection. Calls for
9  speculation.
10          THE COURT: Overruled.
11          MR. ALVAREZ: In addition to that, 701,
12 Judge. Calls for an expert opinion.
13          THE COURT: Overruled.
14          THE WITNESS: Yes.
15 BY MS. ALEXANDER:
16      Q.   And when was that?
17      A.   That was in early 1999 while BDO was
18 conducting their audit of E.S. Bankest for fiscal
19 year-end 1998.
20      Q.   So that would be the first audit that BDO
21 conducted of E.S. Bankest?
22      A.   Yes.
23      Q.   And what happened?
24          MR. ALVAREZ: Objection as to a narrative,
25 Judge.

Page 879

1           THE COURT: Overruled.
2           THE WITNESS: I was the point person to deal
3  -- for my company to deal with the auditors and to
4  assist the auditors in providing them with the
5  documentation that they required to conduct their audit.
6  And the manager of the audit in that particular year
7  requested that E.S. Bankest or that I provide them for
8  E.S. Bankest proof of payments for certain receivables
9  that we showed as paid in our records.
10          He wanted to see the proof of payment
11 originating from the customer all the way to the
12 company. The whole stream of the payment.
13 BY MS. ALEXANDER:
14      Q.   And what was the purpose of him asking you
15 for those documents?
16          MR. ALVAREZ: Objection. Calls for a legal
17 conclusion.
18          THE COURT: Sustained.
19 BY MS. ALEXANDER:
20      Q.   Did you --
21          THE COURT: Go ahead. Ask the question.
22 BY MS. ALEXANDER:
23      Q.   Did you have an understanding as to what why
24 he was asking for those documents?
25          MR. ALVAREZ: Objection. Calls for

Page 880

1    speculation.
2        THE COURT: Overruled. It's yes or no.
3        THE WITNESS: Yes.
4    BY MS. ALEXANDER:
5        Q.   What was your understanding as to why BDO
6    Seidman was requesting those documents?
7        MR. ALVAREZ: Objection. Lack of personal
8    knowledge. Calls for speculation as part of the
9    witness, calls for hearsay.
10       THE COURT: Sir, only if you know exactly
11   why. Do you have an independent knowledge of why?
12       THE WITNESS: (Nodding).
13       THE COURT: Is that a yes or no?
14       THE WITNESS: Yes.
15       THE COURT: Overruled.
16       THE WITNESS: The auditor wanted to confirm
17   that the payments, in fact, were made and that the
18   monies were received ultimately by the company from the
19   party that was supposed to pay which was the customer.
20   BY MS. ALEXANDER:
21       Q.   So the auditor was asking for proof of
22   payment that certain accounts receivable had, in fact,
23   been paid on?
24       A.   Yes.
25       Q.   And if he got proof of that payment, it

Page 881

1    would show that those accounts receivable were real?
2        A.   Yes.
3        MS. ALEXANDER: Your Honor, may I approach?
4        THE COURT: You may.
5    BY MS. ALEXANDER:
6        Q.   (Complies).
7        Mr. Mendez, I'm going to approach you with a
8    demonstrative and ask you to take a look at it. And let
9    me know if it would aid you in describing BDO's Request
10   for Documents in this particular instance.
11       A.   Yes.
12       Q.   And Mr. Mendez, the answer is yes?
13       A.   Yes. Yes. I'm sorry.
14       Q.   Can we put it up?
15       (Technician complies).
16       Mr. Mendez, you said that there was -- this
17   was a request that came from the audit manager on the
18   1998 audit. What was his name?
19       A.   Ramon Rivera.
20       Q.   So Mr. Rivera was asking for documents for
21   proof of payment from which of these entities?
22       A.   Mr. Rivera wanted to see proof of payments
23   in this particular case from Wal-Mart to our client, Joy
24   Athletic, and from Joy Athletic to Capital which was the
25   factor of Joy Athletic, and from Capital ultimately to

Page 882

1    E.S. Bankest, the company being audited.
2        Q.   So Mr. Ramon wanted documents starting from
3    the customer here in our example Wal-Mart --
4        A.   Yes.
5        Q.   -- showing payment to Joy, the client in our
6    example?
7        A.   Yes.
8        Q.   And then payment from Joy to Capital in our
9    example, and then proof of payment from Capital to
10   Bankest; is that correct?
11       A.   That is correct.
12       Q.   And were you able to give Mr. Rivera those
13   documents?
14       A.   No.
15       Q.   Why not?
16       A.   Because they didn't exist. The receivables
17   in question were fake receivables so there was no such
18   payment ever made by Wal-Mart to Joy Athletic.
19       Q.   So Mr. Rivera was asking for proof of
20   payment on accounts receivable that were fake?
21       A.   Yes.
22       Q.   And when you didn't give Mr. Rivera those
23   documents, what happened?
24       A.   Well, I -- Mr. Rivera stopped the audit. He
25   instructed his team to --

Page 883

1        MR. ALVAREZ: Objection.
2        THE COURT: What's your objection?
3        MR. ALVAREZ: Judge, he's going into a
4    narrative. I would not know where to object to the
5    appropriate objection other than stop the audit.
6        THE COURT: Overruled.
7        THE WITNESS: He stopped the audit. He
8    instructed his team --
9        MR. ALVAREZ: Objection, calls for hearsay.
10       THE COURT: Overruled.
11       THE WITNESS: -- to leave the audit field.
12   That's what happened.
13   BY MS. ALEXANDER:
14       Q.   And when you say "instructed his team to
15   leave the audit field," you mean the auditors left
16   Bankest?
17       A.   Yes.
18       Q.   And for how long was the audit stopped?
19       A.   This, as I recall, happened on a Friday and
20   the audit was resumed by the middle of the following
21   week.
22       Q.   And -- strike that.
23       And when BDO resumed the audit and the audit
24   restarted, were you required to give them the documents
25   that Mr. Rivera had asked for from Wal-Mart to Joy to

Page 884

1   Capital?
2       A.   No.
3       Q.   When the audit restarted, what did BDO ask
4   for?
5           MR. ALVAREZ: Objection, Judge.
6           THE COURT: What's your legal objection?
7           MR. ALVAREZ: There's no BDO.
8           THE COURT: Overruled.
9           THE WITNESS: BDO just wanted to see copy of
10  the check from Joy to Bankest Capital Corp. They wanted
11  to see the payment, the check from Capital to Bankest
12  and that would be the extent of their new requirement.
13  BY MS. ALEXANDER:
14      Q.   So when the audit restarted, BDO wasn't
15  asking for documents from the customer, the one who
16  actually owed the money on the accounts receivable at
17  issue?
18      A.   That is correct.
19          MR. ALVAREZ: May I ask that -- objection.
20  Leading. And so is every other question.
21          THE COURT: You can object to them.
22  Overruled. It's been asked and answered.
23  Go ahead.
24  BY MS. ALEXANDER:
25      Q.   Do you have an understanding of how it was

Page 885

1   that BDO came -- when BDO restarted the audit, they
2   weren't going to ask for the customer documents any
3   more?
4       A.   I'm sorry?
5           MR. ALVAREZ: Objection.
6           MS. ALEXANDER: That was not a great
7   question.
8           THE COURT: Sustained.
9   BY MS. ALEXANDER:
10      Q.   When BDO came back, it wasn't asking for
11  documents from the Wal-Marts, from the customers; is
12  that correct?
13      A.   That is correct.
14      Q.   And why wasn't BDO asking for those
15  documents any more?
16          MR. ALVAREZ: Objection.
17          THE COURT: What's your objection?
18          MR. ALVAREZ: Calls for hearsay. Lack of
19  personal information.
20          THE COURT: Do you have personal knowledge
21  of why, sir?
22          It's a yes or no. Do you have personal
23  knowledge?
24          THE WITNESS: No.
25          THE COURT: Sustained.

Page 886

1   BY MS. ALEXANDER:
2       Q.   Did Mr. Parlapiano have a meeting with
3   Mr. Lenner prior to the restart of the audit?
4           MR. ALVAREZ: Objection. Lack of personal
5   knowledge. Lack of predicate.
6           THE COURT: Overruled.
7           THE WITNESS: Yes.
8   BY MS. ALEXANDER:
9       Q.   And what is your -- what was the result of
10  that meeting?
11          MR. ALVAREZ: Objection. Calls for hearsay.
12          THE COURT: Sustained. Rephrase your
13  question.
14  BY MS. ALEXANDER:
15      Q.   What happened after that meeting?
16      A.   Mr. Parlapiano came back to our office to
17  report --
18          MR. ALVAREZ: Objection as to what it is
19  that Mr. --
20          THE COURT: Overruled.
21          MR. ALVAREZ: The objection is hearsay,
22  Judge.
23          THE COURT: I know. Overruled. Do not tell
24  us what he said. Just what he came back to report.
25  What's next without telling us what he said right now?

Page 887

1           THE WITNESS: He came to report to me and to
2   the management as to BDO's new requirement, new set
3   of -- the new standard to meet their test of this
4   particular collectibility area.
5   BY MS. ALEXANDER:
6       Q.   And what was that new standard?
7           MR. ALVAREZ: Objection. Calls for hearsay.
8           THE COURT: Overruled.
9           THE WITNESS: They would be satisfied in
10  giving us -- I'm talking BDO, this is what
11  Mr. Parlapiano told me and told management -- with a
12  copy of Joy's check, our client's check, to Bankest
13  Capital. And from -- I mean, and the proof of payment
14  or a check from Bankest Capital to E.S. Bankest.
15          MR. ALVAREZ: Objection. Move to strike.
16  Hearsay.
17          THE COURT: Overruled.
18  BY MS. ALEXANDER:
19      Q.   Well, Mr. Mendez, you said that these were
20  fake transactions that Mr. Rivera was asking for
21  documents on. Is that right?
22      A.   That is correct.
23      Q.   Well, if they were fake accounts receivable,
24  how were you able to give them a check from Joy to
25  Capital?

Page 888

1      A.   Because Joy was a client that we control
2   and Joy participated in the fraud. Joy provided our
3   company, Bankest Capital, with copies of blank checks,
4   signed blank checks to enable us to, you know, complete,
5   to fill out those checks to -- you know, for the amounts
6   that were needed for payment of those particular
7   invoices. But this was a check that was never deposited
8   into the Bankest Capital account.
9      Q.   When you provided BDO with a copy of a check
10  from Joy to Capital, did they ask for any proof that
11  that check had, in fact, been deposited into Capital's
12  account?
13     A.   No. No, they didn't, no.
14     Q.   Now, you said that Joy was one of the
15  companies that you controlled?
16     A.   Basically, yes. We did.
17     Q.   And was that the reason why you could get
18  fake checks from Joy?
19     A.   Yes.
20     Q.   Did you control Wal-Mart or any of the other
21  customers who were factoring their accounts receivable?
22     A.   No.
23     Q.   So were you able to fake customer checks?
24     A.   Never, no.
25     Q.   For the whole time this fraud was going on,

Page 889

1   you never faked a customer check?
2      A.   Never.
3      Q.   And after the audit restarted BDO never
4   again asked for a customer check?
5            MR. ALVAREZ: Objection. Leading.
6            THE COURT: Sustained.
7   BY MS. ALEXANDER:
8      Q.   After the audit restarted in 1998, did BDO
9   ever ask for a customer check?
10     A.   No. No, they never asked. Payments that
11  supposedly came through Joy Athletic they never asked,
12  you know, from -- you know, for copies of customer
13  checks, the origin of the payment.
14     Q.   Well, for any transaction, did BDO after the
15  audit restarted ever ask for a customer check?
16     A.   Again, no, they never asked for customer
17  checks. Some customer checks were provided for some of
18  their real invoices because we did have them, but the
19  vast majority of the receivables were fake. We didn't
20  have customer checks. We didn't provide them customer
21  checks because we didn't have them and they didn't ask
22  for it either.
23     Q.   So if it was a real transaction, you would
24  have a customer check?
25     A.   Yes.

Page 890

1      Q.   And if it was a real transaction and you had
2   a customer check, you would provide it to BDO during the
3   course of their audit?
4      A.   Yes.
5      Q.   But after the restart of the audit in 1998,
6   if it was a fake transaction, you didn't have a customer
7   check?
8      A.   That is correct.
9      Q.   And BDO -- after the restart of the audit,
10  if you didn't have a customer check, BDO didn't ask for
11  it?
12     A.   That is correct.
13     Q.   Now, did BDO, after the restart of the
14  audit, did they ask for any shipping documents that
15  would show that the T-shirts from Joy to Wal-Mart had,
16  in fact, been shipped on any of these fake transactions?
17     A.   No.
18     Q.   When the audit restarted, did BDO ask for
19  any bank account statements from Joy or from Capital
20  that would show that a payment had, in fact, been made
21  on any of these fake transactions?
22     A.   No.
23     Q.   After the audit restarted in 1998, did you
24  know what would satisfy BDO when they came to conduct
25  the audits?

Page 891

1            MR. ALVAREZ: Objection. Calls for
2   speculation.
3            THE COURT: Sustained.
4   BY MS. ALEXANDER:
5      Q.   After -- strike that. Did BDO ever require
6   you to hand over documents that would have revealed the
7   fraud?
8            MR. ALVAREZ: Objection. Calls for
9   speculation and for an expert opinion on the part of the
10  witness.
11           THE COURT: Overruled.
12           THE WITNESS: No.
13  BY MS. ALEXANDER:
14     Q.   And did BDO ever require you to provide them
15  with documents, with customer checks from the people who
16  actually owed the money on the accounts receivable?
17     A.   No.
18     Q.   And in 1999, 2000, 2001, and 2002, did BDO
19  ever require you to provide them with documents from the
20  people who actually owed the money on the accounts
21  receivable, the customers?
22     A.   No.
23     Q.   And every year did you depend on the fact
24  that BDO was not going to require you to provide them
25  with documents from the customers, the ones who actually

Page 892

1  owed the money?
2      A.   Yes.
3      Q.   And as a result, were you able to grow the
4  fraud?
5      A.   Yes.
6      Q.   And as we saw in the audited financial
7  statements, the fraud grew every year?
8      A.   Yes.
9      Q.   And it involved hundreds of millions of
10  dollars?
11      A.   Yes.
12      Q.   Mr. Mendez, I'd like to spend a little time
13  now on background involving BRFFC and E.S. Bankest. You
14  testified that BRFFC raised money to purchase accounts
15  receivable. How would BRFFC raise money to purchase
16  accounts receivable?
17      MR. ALVAREZ: Objection as to relevance.
18      THE COURT: Overruled.
19      THE WITNESS: BRFFC put together a program
20  for lenders, for lenders to lend monies to the company
21  and monies that -- or loans that would be
22  collateralized, secured, backed by accounts receivables.
23      The company, Bankest Receivables, would
24  issue, you know, notes or debentures in favor of these
25  lenders. These were basically promissory notes that

Page 893

1  would be repaid from the collection of those
2  receivables.
3      A private placement memorandum, which is a
4  document that typically explains the nature of the
5  transaction, it would be provided to the lenders and
6  that memorandum, typically called PPMs, it would have
7  attachments to it.
8      But the most important document that would
9  be attached to that document, it was the audited
10  financial statements --
11      MR. ALVAREZ: Objection.
12      THE COURT: Overruled.
13      THE WITNESS: -- by a nationally recognized
14  audit firm. That was a basic requirement that we had to
15  be able to access funding from all these investors and
16  from the bank.
17      MS. ALEXANDER: May I approach, Your Honor?
18      THE COURT: You may.
19  BY MS. ALEXANDER:
20      Q.   (Complies).
21      Mr. Mendez, I'm approaching with Plaintiffs'
22  235 in evidence. Can you identify this document for me?
23      A.   Yes.
24      Q.   Is this a private placement memorandum as
25  you were just describing like the ones used by Bankest

Page 894

1  Receivables, Financing and Factoring Corp.?
2      A.   Yes.
3      Q.   And just looking through the attachment,
4  does one of the attachments include BDO Seidman's
5  audited financial statements for BRFFC?
6      A.   Yes.
7      Q.   And this is the document that would be
8  provided to prospective investors in the company?
9      A.   Yes.
10      Q.   Were these documents part of the files, were
11  the PPMs such as this one part of the files at BRFFC?
12      A.   Yes. Yes.
13      Q.   And were the PPMs part of the files that BDO
14  as auditor of BRFFC would review when it came to audit
15  the company?
16      A.   Yes, they would review the PPMs as well.
17  Yes.
18      Q.   So you made available to the auditors who
19  came to the offices of the company copies of the PPMs
20  which attached BDO's audited financial statements?
21      A.   Yes.
22      Q.   So BDO knew that BRFFC was attaching the
23  audited financial statements to the private placement
24  memorandums provided to the investors?
25      MR. ALVAREZ: Objection, Judge. Leading and

Page 895

1  calls for speculation on the part of the witness.
2      THE COURT: Sustained. It's leading.
3  BY MS. ALEXANDER:
4      Q.   How would BDO know that the audited
5  financial statements were attached to the private
6  placement memorandums that the company provided its
7  investors?
8      A.   Two ways. One, because the copy that were
9  maintained in the office would customarily have the most
10  recent audited financial statements attached to it. But
11  before we ever entered into this program, it was clearly
12  expressed by my company, by me and the other officers of
13  the company, that the audited financial statements were
14  needed to raise funds from the investors and they were
15  going to be attached in the package to be sent to
16  prospective investors.
17      Q.   When E.S. Bankest was formed, what happened
18  to the investment that had been made in BRFFC?
19      A.   Most of the notes or debentures that were
20  outstanding, the investments that the predecessor
21  company BRFFC had received, most of those investments
22  were rolled over to the new company.
23      So, in other words, investors for BRFFC
24  became investors of E.S. Bankest.
25      Q.   And what about the accounts receivable

Page 896

1 portfolio at BRFFC, what happened to that when E.S.
2 Bankest was formed?
3    A.   The same way. The portfolio receivables was
4 sold to E.S. Bankest. It was transferred over to E.S.
5 Bankest to continue collateralizing the investments.
6    Q.   In terms of the investors and the initial
7 accounts receivable owned by E.S. Bankest, E.S. Bankest
8 was the successor to BRFFC?
9    A.   Yes. Yes, it was.
10    Q.   And did the factor clients -- were the
11 factor clients of BRFFC moved over to E.S. Bankest?
12    A.   Yes.
13    Q.   And was the day-to-day management of BRFFC
14 the same at E.S. Bankest?
15    A.   The same, yes.
16    Q.   Now, one difference between BRFFC and E.S.
17 Bankest was the ownership; is that right?
18    A.   That's correct, yes.
19    Q.   And who owned E.S. Bankest?
20    A.   E.S. Bankest was owned 50 percent by Bankest
21 Capital Corp. which basically it's the Orlanskys, and 50
22 percent -- the other 50 percent owned by Espirito Santo
23 Bank of Florida.
24    Q.   And who were the day-to-day managers of E.S.
25 Bankest?

Page 897

1    A.   Bankest Capital Corp.
2    Q.   And that includes yourself?
3    A.   Yes.
4    Q.   And did that also include Hector Orlansky?
5    A.   Yeah, it would be basically myself, Eduardo
6 and Hector Orlansky, Dominick Parlapiano, Ariadna
7 Puerto, you know, among other people. These were the
8 main -- Peter Stanham, I'm sorry.
9    Q.   And was Bankest Capital responsible then for
10 the day-to-day management of E.S. Bankest?
11    A.   Yes.
12    Q.   And did Espirito Santo Bank have a
13 responsibility as part of its role as the 50 percent
14 owner of the company?
15    MR. ALVAREZ: Objection. Calls for a legal
16 conclusion.
17    THE COURT: Overruled.
18    THE WITNESS: Yes. The bank, the other 50
19 percent owner, had the responsibility to secure funding,
20 you know, for -- to be able to buy the accounts
21 receivable. So the investors, the lenders, came from
22 Espirito Santo Bank or were clients of the bank.
23 BY MS. ALEXANDER:
24    Q.   And did E.S. Bankest have a board of
25 directors?

Page 898

1    A.   Yes.
2    Q.   And who were the members of the board of
3 directors?
4    A.   There were eight members. Four that
5 belonged to Bankest Capital Corp., the operating
6 partner, and the remaining four from the Espirito Santo
7 Bank.
8    Q.   And who were the ones appointed from
9 Espirito Santo Bank?
10    A.   I'm sorry?
11    Q.   Who were the -- what were the individuals
12 who were appointed by Espirito Santo Bank?
13    A.   The four individuals were Victor Balestra,
14 Bernard Mollet, Joachin Garnecho, Pierre Trazzini.
15    Q.   And did any of those individuals have any
16 day-to-day responsibilities at E.S. Bankest?
17    A.   No.
18    Q.   And were there regular board meetings held
19 at E.S. Bankest?
20    A.   Yes, customarily there were monthly
21 meetings.
22    Q.   And did the Capital and Espirito Santo Bank
23 board members attend those meetings?
24    A.   Yes.
25    Q.   Not all the members were in all the

Page 899

1 meetings, particularly --
2    MR. ALVAREZ: Objection --
3    THE WITNESS: -- there were members that --
4    MR. ALVAREZ: -- lack of personal knowledge
5 as to who was present at the meeting.
6    THE COURT: Only if you have personal
7 knowledge, sir. Do you have personal knowledge, sir?
8    THE WITNESS: Yes.
9    THE COURT: Overruled.
10    THE WITNESS: There were members that
11 resided overseas or out of town and not always attended
12 the meetings in person. Some meetings were conducted
13 over the phone, sometimes.
14 BY MS. ALEXANDER:
15    Q.   And was information provided the board
16 members in connection with the monthly meetings?
17    A.   Yes.
18    Q.   What was the information provided the board
19 members?
20    A.   There were monthly --
21    MR. ALVAREZ: Objection. Lack of personal
22 knowledge.
23    THE COURT: Do you have personal knowledge,
24 sir?
25    THE WITNESS: Yes.

Page 900

1    THE COURT: Overruled.
2        THE WITNESS: Yes.  I was one of the persons
3    that put together the package to be presented to the
4    board of directors.  Although I didn't participate in
5    the meetings but I prepared the financial report for the
6    board which included, you know, financial statements,
7    accounts receivable ages which basically is a detail of
8    all the receivables that the company had in its books.
9        There was, you know, discussions -- I mean
10   analysis as to the portfolio of the receivables.  And
11   customarily that was presented for the board's
12   discussions.
13       MS. ALEXANDER: May I approach, Your Honor?
14   BY MS. ALEXANDER:
15   Q.   Mr. Mendez, I'm approaching with Plaintiffs'
16   Exhibit Number 6 in evidence, the shareholders'
17   agreement between Espirito Santo Bank and Bankest
18   Capital.
19       As part of the day-to-day management of the
20   company, are you familiar with this document?
21   A.   Yes, I am.
22   Q.   And this was essentially the formation
23   agreement for E.S. Bankest?
24   A.   Yes.
25   Q.   And looking now at page 12, paragraph 2, can

Page 901

1    you read that?  "Within 90 days after the close of each
2    fiscal year, the officers of the company shall cause to
3    be delivered to each of the shareholders a full and
4    complete audited financial statement of the company for
5    such fiscal year prepared by the independent auditors of
6    the company."  Did I read that correctly?
7    A.   Yes.
8    Q.   And were the independent auditors of the
9    company BDO Seidman?
10   A.   Yes.
11   Q.   And was it a condition of this company's
12   existence that it have audited financial statements by
13   an independent auditor like BDO Seidman?
14       MR. ALVAREZ: Objection, Judge.  Calls for a
15   legal conclusion and interpretation of the document as
16   part of the (inaud.).
17       THE COURT: Overruled.
18       THE WITNESS: Yes.
19   BY MS. ALEXANDER:
20   Q.   And we discussed how BRFFC raised monies
21   through the payment of debenture notes using a PPM.  Did
22   the same system exist for E.S. Bankest?
23   A.   The same system.
24       MS. ALEXANDER: One second.  May I approach,
25   Your Honor?

Page 902

1    THE COURT: You may.
2    BY MS. ALEXANDER:
3    Q.   Mr. Mendez, I'm approaching with what is
4    Plaintiffs' Numbers Exhibit 107, 109, 98-B and 104 in
5    evidence.  I'm looking first at Exhibit 107, the January
6    1st, 2002 confidential memorandum.
7        Is this an example of the confidential
8    memorandum that E.S. Bankest would send to its
9    perspective investors to solicit investment in the
10   company?
11   A.   Yes.
12   Q.   I'm turning to the back.  I have labeled ES
13   0256512.  Are the audited financial statements that
14   were prepared by BDO Seidman attached to that document?
15   A.   Yes.
16   Q.   And part of what the -- what you were
17   responsible for doing at E.S. Bankest was ensuring that
18   the PPMs, including the audited financial statements,
19   were attached and sent to the perspective investors?
20   A.   Yes.
21   Q.   I'm looking now at Exhibit 109, the July
22   1st, 2002 confidential memorandum.  Do you have that in
23   front of you?
24   A.   Yes.  Yes.
25   Q.   And again, is this a copy of --

Page 903

1    MR. ALVAREZ: What exhibit is that?
2    MS. ALEXANDER: 109.
3    BY MS. ALEXANDER:
4    Q.   And again, is this a copy of the
5    confidential memorandum that would be sent to E.S.
6    Bankest perspective investors to solicit investment in
7    the company?
8    A.   That is correct.
9    Q.   And is this also attached to the audited
10   financial statements of BDO Seidman at the back?
11   A.   Yes.
12   Q.   I'm looking now at Exhibit 104, which is the
13   July 1st, 2001 confidential memorandum.  Is this a copy
14   of the confidential memorandum that E.S. Bankest sent to
15   the perspective investors to solicit investment in the
16   company?
17   A.   Yes.
18   Q.   And do you see that the audited financial
19   statements prepared by BDO Seidman are attached at the
20   back?
21   A.   Yes.
22   Q.   I'm looking now at Exhibit 98-B, the June
23   10th, 1999 confidential memorandum.  Do you see that
24   document?
25   A.   Yes, I do.

Page 904

1    Q.   Now, does this look like the -- again, the
2  confidential memorandum that would be sent to the
3  clients, the perspective -- excuse me, to the
4  perspective investors in E.S. Bankest?
5    A.   Yes.
6    Q.   If you turn to the back of this document,
7  are the audited financial statements prepared by BDO
8  Seidman attached to this copy?
9    A.   No.
10   Q.   Why not?
11   A.   I don't know but it was --
12       MR. ALVAREZ:  Objection.
13       THE WITNESS:  -- common practice.
14       THE COURT:  Hold on.  Repeat the question.
15  BY MS. ALEXANDER:
16   Q.   The question was why not?
17       MR. ALVAREZ:  Objection.
18       THE COURT:  The previous question before
19  that.
20       MS. ALEXANDER:  I asked him whether the
21  audited financial statements prepared by BDO Seidman
22  were attached to the copy that is Plaintiffs' Exhibit
23  98-B, the June 10th, 1999 confidential memorandum.
24       THE COURT:  And you said no, is that
25  correct, Mr. Mendez?

Page 905

1        THE WITNESS:  Yes, I said no.
2        THE COURT:  The next question is why not.
3  Do you have personal knowledge as to why not?
4        THE WITNESS:  No, I don't -- I don't know
5  why it was not attached.  I don't.
6        THE COURT:  Sustained.
7  BY MS. ALEXANDER:
8    Q.   Were the copies -- by June 1999 had BDO
9  Seidman issued audited financial statements for E.S.
10  Bankest?
11   A.   Yes.
12   Q.   And were those audited financial statements
13  attached to the confidential memorandum that were sent
14  to the perspective investors in E.S. Bankest?
15   A.   Yes.  Yes, it was customarily attached to
16  it, yes.
17   Q.   And that was the practice of the company?
18   A.   That was -- exactly right.  That was a
19  practice.  Exactly.  It was critical.  We had -- that we
20  have an audited financial statements available, we would
21  always attach it to a memorandum.
22       MS. ALEXANDER:  May I approach, Your Honor?
23       THE COURT:  You may.
24  BY MS. ALEXANDER:
25   Q.   (Complies).

Page 906

1        Mr. Mendez, I'm approaching with what is
2  part of Plaintiffs' Exhibit 110-A in evidence,
3  confidential memorandum subscription documents.
4        Now, in addition to the private placement
5  memorandum that was sent to the perspective investors,
6  did you also send them a subscription document?
7    A.   Yes.
8    Q.   And what was the subscription document?
9    A.   Subscription document, it's a document for
10  the investor to sign when they decide to make the
11  investment.  Basically it has a questionnaire that the
12  investor has to answer confirming that they understand
13  the investment and also that they qualified as an
14  investor according to security laws.
15        And this subscription agreement, once it's
16  signed -- completed and signed by the investors, it's
17  returned to the company, to E.S. Bankest or Bankest
18  Receivables.
19   Q.   So to solicit investments from perspective
20  investors, the company would send a private placement
21  memorandum with a subscription document?
22   A.   Yes.
23   Q.   And would you get -- you would get the
24  subscription document back from the customer signed?
25   A.   That is correct.

Page 907

1    Q.   Would you get the private placement
2  memorandums back?
3    A.   No.
4    Q.   And were the subscription documents
5  maintained in the files of E.S. Bankest?
6    A.   Yes.
7    Q.   And were the subscription documents part of
8  the funding agreements relied on by the company as part
9  of the operations?
10   A.   Yes.
11   Q.   Now, in addition to the investment raised
12  through the private placement memorandums with
13  individual investors, did E.S. Bankest also have another
14  source of funding?
15   A.   Yes.
16   Q.   And what was that?
17   A.   That was a line of credit extended by
18  Espirito Santo Bank Nassau branch.
19   Q.   And did you provide Espirito Santo with the
20  audited finances in connection with obtaining a line of
21  credit?
22   A.   Yes, it was a requirement.
23   Q.   And how much was that line of credit
24  initially?
25   A.   Three million dollars.

Page 908

1    Q.   And did that line of credit increase?
2    A.   Yes.
3    Q.   And what was the total amount that it
4  increased to?
5    A.   Thirty. Thirty million.
6    Q.   And did you -- was BDO Seidman aware of the
7  line of credit from Banco Espirito Santo Nassau branch?
8    A.   Certainly.
9    Q.   And was BDO aware that the audited financial
10 statements had been provided Banco Espirito Santo in
11 connection with that line of credit?
12         MR. ALVAREZ: Objection. Calls for
13 speculation on the part of the witness.
14         THE COURT: Sustained. What was the last
15 part?
16         MR. ALVAREZ: Calls for speculation on the
17 part of the witness.
18         THE COURT: I got it. She didn't get it.
19         Overruled -- I'm sorry. Sustained.
20 BY MS. ALEXANDER:
21   Q.   When BDO Seidman came to audit E.S. Bankest,
22 did you provide them as the point person for the audit
23 with a line of credit loan agreements?
24   A.   Yes.
25   Q.   And did you inform the auditors that the

Page 909

1  company E.S. Bankest was providing Banco Espirito Santo
2  Nassau branch with audits, the audited financial
3  statements in connection with receiving that loan?
4    A.   Yes.
5         MR. ALVAREZ: Objection.
6         THE COURT: Overruled.
7  BY MS. ALEXANDER:
8    Q.   Now, as the point person for the BDO audits,
9  did you meet with the BDO auditors every year?
10   A.   Yes.
11   Q.   And how long -- when BDO came to audit E.S.
12 Bankest, how long did it stay at the company?
13   A.   At least four weeks.
14   Q.   Every day for about four weeks?
15   A.   Pretty much full time for four weeks.
16   Q.   And did you provide the auditors with
17 information about the company?
18   A.   Yes.
19   Q.   What did you -- what was the kind of
20 information that you provided the BDO auditors?
21   A.   Well, there was, other than incorporation of
22 papers and, you know, which was pretty much the same
23 every single year, they were provided with detail,
24 general ledger, you know, detailed balance sheet, income
25 statement, trial balance, accounts receivable aging

Page 910

1  detail activity for the whole year. That was on the
2  receivables side which was the main area of their audit.
3         And then on the investment side, on the
4  funding side, they would be provided with copies of the,
5  you know, of the recent PPMs that they had not seen over
6  the year, you know. They would be provided with
7  subscription agreements as they requested it because
8  they had the whole list of investors. Basically, you
9  know, everything that they requested.
10   Q.   I'm going to break that down a little bit.
11 So one thing you would provide them with is copies of
12 the formation agreements including the shareholder
13 agreement that we looked at before?
14   A.   Yes.
15   Q.   And you would also provide them with
16 agreements concerning how the company was raising money?
17   A.   Yes.
18   Q.   And that would include the line of credit
19 agreements?
20   A.   As well.
21   Q.   Copies of the PPMs?
22   A.   Yes.
23   Q.   Copies of the subscription documents?
24   A.   Yes.
25   Q.   And then you would also provide them with

Page 911

1  annual information concerning the accounts receivable
2  portfolio?
3    A.   Yes. Accounts receivable aging, yes.
4    Q.   And when you gave them information regarding
5  the accounts receivable portfolio, did you give them
6  information regarding that whole year's worth of
7  transactions?
8    A.   Yes. We used to provide -- I mean we
9  provided them information -- in the last few years after
10 the year 2000 in an electronic base. Everything was
11 transmitted electronically so they had access to all the
12 transactions that took place in the company.
13   Q.   And these were the documents prepared
14 internally by the company?
15   A.   As well, yes.
16   Q.   So that -- I'm sorry. These were documents
17 prepared internally by the company?
18   A.   That is correct.
19   Q.   And so when they saw the accounts receivable
20 reports, the aging reports, that would be a year-end
21 report for all of the accounts receivable purchased by
22 the company?
23   A.   Yeah. Those -- the aging report has the
24 receivables that are outstanding as of year-end.
25 However, we provided them with, you know, with complete,

Page 912

1   you know, general ledger activity reports so they had
2   access to details for the whole year.
3       Q.   So in addition to the year-end, what the
4   accounts portfolio looked like at year-end, you would
5   also provide them with information during that year?
6       A.   That is correct.
7           MR. ALVAREZ: Objection. Leading.
8           THE COURT: Overruled.
9   BY MS. ALEXANDER:
10      Q.   And were those year-end accounts receivable
11  reports the same as what would be provided to the board
12  of directors in the board of director meetings?
13      A.   Yes.
14      Q.   Now, in addition to providing or receiving
15  information from Bankest about accounts receivable,
16  portfolio funding, operations, did BDO Seidman auditors
17  also do a walk-through of Bankest's offices as part of
18  the audits?
19      A.   Yes.
20      Q.   And did they review the operations of
21  various departments at Bankest?
22      A.   Yes. They would walk through, like you
23  said. I mean through the whole office and based on each
24  department and see how each department operated.
25      Q.   And Bankest had a collections department,

Page 913

1   right?
2       A.   Yes.
3       Q.   And it had a collections department because
4   there were some real transactions where there was real
5   accounts receivables to be collected?
6           MR. ALVAREZ: Objection. Leading.
7           THE COURT: Overruled.
8           THE WITNESS: Yes. Yes.
9   BY MS. ALEXANDER:
10      Q.   And what when the Bankest collections department
11  wanted to verify that accounts receivable was real and
12  was going to be paid, how did it do that?
13      A.   Well, the collections department would be
14  calling all day, you know, all day to customers,
15  companies who owed the money to learn about the status
16  of their receivables.
17          In the case of, you know, the larger
18  retailers such as Wal-Mart, Target, JC Penney, there
19  were hotlines that we could call, you know, toll-free
20  numbers that we could call and you access through
21  passwords and, you know, into their system to learn
22  about the status of the receivables that were being
23  scheduled for payment or if they were being still unpaid
24  for they would tell you the reasons, which showed they
25  were not in the system that these retailers would not

Page 914

1   know about it.
2       Q.   So when Bankest wanted to confirm when
3   accounts receivable were going to be paid, its
4   collections department would call the customer, the one
5   who actually owed the money?
6       A.   Yes.
7       Q.   And BDO knew that that's what the
8   collections department did at E.S. Bankest?
9       A.   Yes.
10          MR. ALVAREZ: Objection, Judge. Lack of
11  personal --
12          THE COURT: Overruled.
13  BY MS. ALEXANDER:
14      Q.   I'm going to turn to a little bit later on.
15  Did there come a time when Bankest Capital purchased
16  Espirito Santo Bank's 50 percent interest in E.S.
17  Bankest?
18      A.   Yes.
19      Q.   And when was that?
20      A.   It was in September of 2002.
21      Q.   And why did Bankest Capital purchase
22  Espirito Santo Bank's 50 percent interest?
23      A.   Because Bankest Capital was offered by
24  Espirito Santo Bank, the 50 percent owner, you know, to
25  buy Espirito Santo -- offered Bankest Capital to buy the

Page 915

1   company, to buy the 50 percent ownership of Bankest
2   Capital. But Bankest Capital could not sell -- we could
3   not sell. We had a huge fraud in the company. And so
4   we were forced to buy them out instead of selling.
5       Q.   And did the company E.S. Bankest default on
6   the money it owed to Espirito Santo and its customers
7   after the sale when Bankest Capital became the hundred
8   percent owner?
9       A.   Yes, immediately.
10      Q.   And what was the outstanding amount of the
11  loans at that time?
12      A.   It was in excess of 170 million dollars. It
13  was 30 million owed for the line of credit to the bank
14  directly to Espirito Santo Bank. And in excess of 140
15  million to individual investors, you know, the note
16  holders.
17      Q.   And so by September of 2002, E.S. Bankest
18  defaulted on the -- at least part of the 170 million it
19  owed to Espirito Santo and its customers?
20      A.   Yes. The line of credit, you know, we had
21  an automatic immediate default of the whole line.
22  Because as the company was sold, the line of credit
23  became due and payable. So we didn't pay it. We
24  defaulted.
25      Q.   And that was 30 million dollars?

Page 916

1      A.   Thirty million dollars right in the first
2  day. And every day the default was increased, the
3  default on the notes from the investors. As the notes
4  became due every single day, we didn't pay them. We
5  couldn't pay them. We defaulted.
6      Q.   Mr. Mendez, maybe you could find in the
7  stack of documents that I've given you Plaintiffs'
8  Exhibit 81, the audited financials for 2001.
9      A.   (Complies).
10     Q.   And if we could go to the balance sheet.
11     A.   (Complies).
12     Q.   And if you could turn to the balance sheet?
13     A.   Sure.
14          (Complies).
15     Q.   Looking at the accounts receivable again.
16  Now at year-end 2001, BDO certified that company had 153
17  million dollars in accounts receivable available to
18  repay the loans to Espirito Santo and its customers. So
19  how did you explain to Espirito Santo in September of
20  2002 why it couldn't repay, the company couldn't repay
21  its loan to Espirito Santo?
22     A.   Well, we had to continue in operation. We
23  had to continue funding our existing clients --
24          MR. ALVAREZ: Your Honor, I'm going to
25  object to the narrative. She asked a question how did

Page 917

1  you explain. My objection is --
2          THE COURT: I got your legal objection.
3  Overruled.
4          MR. ALVAREZ: -- lack of predicate.
5          THE COURT: Overruled.
6          THE WITNESS: The company didn't have
7  sufficient operating capital to repay the debt and to
8  continue funding its clients. And even though the notes
9  and the loans were supposed to be repaid by the
10  collection of the receivables, it cannot be, you know,
11  accomplished, you know, within -- I mean within just a
12  few days. We had to restructure the repayment of the
13  debt in a way that the company would continue in
14  operations and would be able to, you know, to make the
15  payments.
16  BY MS. ALEXANDER:
17     Q.   So essentially what you're describing is a
18  cash flow problem?
19     A.   Tremendous, we were in a very serious cash
20  crunch. The company didn't have any money. Once
21  Espirito Santo cut the funding, and no more note
22  holders, the company didn't have any money.
23     Q.   And as a result of the default and the
24  explanation to Espirito Santo, did the company
25  restructure the debt, the 170 million that was

Page 918

1  outstanding?
2      A.   Yes. There was a restructure of the debt.
3      Q.   And what was going to happen to the 140
4  million dollars that had been vested by the Espirito
5  Santo customers in connection with the restructuring of
6  the 170 million?
7      A.   The bank was -- or took assignments of all
8  the notes. In other words, repaid all the note holders
9  and repaid them -- I mean, all the past due -- all the
10  defaulted notes were repaid and as the notes came due,
11  the bank repaid all the note holders and they
12  consolidated the debt in one agreement, the debt to
13  Espirito Santo Bank as well as the debt to the note
14  holders that the bank took over and they rescheduled the
15  repayment of the total consolidated debt.
16     Q.   And as of September of 2002, did you have an
17  understanding as to what Espirito Santo entity was going
18  to take on this assignment of the notes?
19     A.   Yes.
20     Q.   And what was the entity?
21     A.   I'm sorry?
22     Q.   I asked you whether you had an understanding
23  as to what Espirito Santo company was going to take an
24  assignment of the 140 million dollars in debenture
25  notes.

Page 919

1      A.   Yes.
2      Q.   And do you remember what that company was
3  named?
4      A.   Well, at the very beginning I didn't know
5  the name of the Espirito Santo entity that was going to
6  take the assignment. Certainly as negotiations
7  progressed and we learned about the entity that was
8  going to take the assignment --
9      Q.   You understood that as part of the
10  restructuring Espirito Santo was going to consolidate
11  all the debt to itself, the 140 owed by its company it
12  was going to take an assignment and then there was going
13  to be the 30 million from Banco Espirito Santo?
14     A.   Yes.
15     Q.   Now, did Espirito Santo require any comfort
16  that there was accounts receivable available to repay
17  this 170 million dollar loan?
18          MR. ALVAREZ: Objection. Calls for hearsay.
19  Lack of personal knowledge.
20          THE COURT: Sustained.
21  BY MS. ALEXANDER:
22     Q.   In the negotiations leading up to the
23  restructuring agreement, did you understand that
24  Espirito Santo was going to require comfort regarding
25  the existence of the accounts receivable as a condition

Page 920

1   to entering into the restructuring agreement?
2       MR. ALVAREZ: Objection. Lack of personal
3   knowledge, did you understand. Calls for hearsay.
4       THE COURT: Do you have personal knowledge,
5   sir?
6       THE WITNESS: Yes.
7       THE COURT: Overruled.
8       THE WITNESS: Yes. Yeah. One of the
9   requirements, and a very important one, critical one,
10  was for the company to continue being audited and to
11  provide the consolidated lender with audited financial
12  statements and to continue having, you know, an
13  independent, you know, nationally-recognized firm,
14  certifying the financial condition of the company.
15  BY MS. ALEXANDER:
16      Q.  And was it important that the independent
17  auditor continue to be BDO Seidman?
18      A.  It was very important for us, yes.
19      Q.  Why is that?
20      A.  Because we had already -- we had already a
21  number of years of experience with BDO. We could
22  anticipate, you know, the extent, the scope of their
23  audits and we could prepare for it and continue
24  perpetrating this fraud.
25      Q.  In September of 2002, did you participate in

Page 921

1   a meeting with Sandy Lenner of BDO Seidman?
2       A.  Yes.
3       Q.  And what was the purpose of that meeting?
4       A.  The main purpose of the meeting was to
5   discuss the restructure of the debt to the Espirito
6   Santo Group.
7       Q.  So was one of the issues that was discussed
8   at the meeting the fact that the company had defaulted
9   on some of the money it owed to Espirito Santo and its
10  customers?
11      MR. ALVAREZ: Objection. Leading. Calls
12  for hearsay.
13      THE COURT: Sustained.
14  BY MS. ALEXANDER:
15      Q.  Was the reason for the restructuring
16  discussed in the meeting with Mr. Lenner?
17      MR. ALVAREZ: Objection. Calls for hearsay.
18      THE COURT: Overruled.
19      THE WITNESS: The main topic of discussion
20  if not the only topic, it was the fact that Bankest
21  Capital -- I mean, yeah, Bankest Capital, the sole owner
22  of E.S. Bankest was defaulting on the payments to
23  Espirito Santo and were trying to reach a restructure --
24  you know, a restructure repayment schedule to allow the
25  company, you know, an extended period of time for the

Page 922

1   repayment of the debt.
2       So the topic of the meeting was the
3   restructure and the fact that Bankest Capital or rather
4   E.S. Bankest needed to have continued audited financial
5   statements and we needed to provide to the new lender or
6   the new consolidated lender. That was the essence of
7   the meeting.
8   BY MS. ALEXANDER:
9       Q.  Previously you testified regarding the
10  explanation provided to Espirito Santo for the default
11  on the loans from Espirito Santo and its customers. Was
12  the same explanation given to Mr. Lenner?
13      A.  Yes. I mean, we told him that we could not
14  repay with collections all the outstanding receivables.
15  We had to continue in business. So the company was
16  going to be killed by repaying everything as it matured.
17      Q.  And you said that one of the reasons for the
18  meeting was -- well, was one of the reasons for the
19  meeting to obtain BDO's agreement to assist Bankest in
20  the restructuring agreement?
21      A.  Yes. We wanted to -- the answer is yes.
22  And Bankest needed to give continued comfort to the
23  lenders and we needed BDO to make themselves available
24  for any questioning as to the financial condition of the
25  company, as to the viability of the business.

Page 923

1       Q.  And did Mr. Lenner in that meeting agree to
2   make BDO available to assist Bankest in connection with
3   the restructuring agreement?
4       A.  Yes.
5       Q.  And did Mr. Lenner agree that BDO would
6   continue to audit E.S. Bankest?
7       A.  Yes.
8       Q.  Now, as part of the negotiations of the
9   restructuring, did E.S. Bankest provide Espirito Santo
10  with copies of the audited financial statements of E.S.
11  Bankest?
12      A.  Yes.
13      Q.  And did Mr. Lenner understand that the
14  audited financial statements were being provided
15  Espirito Santo as part of the negotiations of the
16  restructuring agreement?
17      MR. ALVAREZ: Objection as to what
18  Mr. Lenner understood.
19      THE COURT: Sustained.
20  BY MS. ALEXANDER:
21      Q.  Was Mr. Lenner told in the meeting that E.S.
22  Bankest was going to be providing Espirito Santo with
23  the audited financial statements in connection with
24  negotiations of the restructuring agreement?
25      MR. ALVAREZ: Objection as to what was told