Page 924

1   without specifying who he was talking to.
2        THE COURT:  Do you have a legal objection?
3        MR. ALVAREZ:  Yes.  Lack of personal
4   knowledge unless -- lack of personal knowledge.
5        THE COURT:  Do you have personal knowledge
6   of that?
7        THE WITNESS:  Yes, I do.
8        THE COURT:  Overruled.
9        THE WITNESS:  Yes.  It was clearly explained
10  that past audits and future audits, audited reports,
11  were going to be provided to the -- to this consolidated
12  lender.
13  BY MR. ALEXANDER:
14       Q.   The consolidated lender was Espirito?
15       A.   Yeah.  It was the bank that we had the line
16  of credit with for the 30 million, and the balance of
17  140 million, it was another entity of the Espirito Santo
18  Group.
19       MS. ALEXANDER:  May I approach, Your Honor?
20       THE COURT:  You may.
21  BY MS. ALEXANDER:
22       Q.   (Complies).
23       Mr. Mendez, I'm approaching with Plaintiffs'
24  Exhibit 94 in evidence.  Is this a copy of the
25  restructuring agreement entered into between Espirito

Page 925

1   Santo and E.S. Bankest for the 170 million dollars?
2        A.   Yes.
3        Q.   And just looking at the title page, is Banco
4   Espirito Santo, S.A., Nassau branch the Espirito Santo
5   entity that loaned the company 30 million dollars?
6        A.   Yes.
7        Q.   And is ESB Finance the Espirito Santo entity
8   that took the assignment of 140 million dollars worth of
9   notes?
10       A.   Yes.
11       Q.   If you turn, Mr. Mendez, to page 15 of the
12  agreement -- actually, let's start at the first page.
13  Just looking at first page, and can we highlight that
14  middle paragraph that begins with borrower?
15       (Technician complies.)
16       And I just want to point out to you what's
17  defined as the existing indebtedness which is 172
18  million dollars.  Is that the debt that was the subject
19  of the restructuring agreement?
20       A.   Yes.
21       Q.   I'm turning now to page 15.  Starting at the
22  top, year-end financials.  I'm going to read.  "Such
23  financial statements shall be audited by BDO Seidman,
24  the present auditors of borrower," and borrower is E.S.
25  Bankest?

Page 926

1        A.   Yes.
2        Q.   "And if borrower or E.S. Bankest shall
3   change auditors, the replacement auditor shall be a firm
4   of independent certified public accountants of
5   recognized regional standing approved by collateral
6   agent, which approval shall not be unreasonably
7   withheld."
8        A condition of this agreement is that there
9   be audited financial statements by BDO Seidman?
10       A.   Yes.
11       Q.   And if the company was going to change
12  auditors, Espirito Santo had to agree to it?
13       A.   Absolutely.
14       Q.   And then going down to Number 4,
15  accountant's reports.  "And the accountant's reports
16  promptly upon receipt thereof, borrower will deliver all
17  significant reports sent to or submitted to borrower by
18  independent public accountant in connection with each
19  annual or special audit of the financial statements of
20  borrower made by such accountants."  And again, borrower
21  is E.S. Bankest?
22       A.   Yes.
23       Q.   And at this time the auditor, the
24  independent public accountant was BDO Seidman?
25       A.   Yes.

Page 927

1        Q.   So it was a condition of the restructuring
2   agreement E.S. Bankest had to provide Espirito Santo
3   with any reports issued by the independent auditors, BDO
4   Seidman?
5        A.   Yes.
6        Q.   And can we turn -- Mr. Mendez, will you turn
7   to page 16, the next page under access to accountants?
8        A.   (Complies).
9        Q.   And before you testified that in the meeting
10  with Mr. Lenner in September of 2002, Mr. Lenner agreed
11  that BDO would assist in the negotiations leading up to
12  the restructuring agreement with respect to Espirito
13  Santo.  This agreement provides access to the
14  accountant, borrower authorizes collateral agent and/or
15  lenders to discuss the financial condition of borrower
16  with borrower's independent public accountants upon
17  reasonable notice to borrower of their intention to do
18  so.
19       Does this provide that E.S. Bankest was
20  going to authorize Espirito Santo to discuss E.S.
21  Bankest's financial condition with BDO Seidman?
22       A.   Yes.
23       Q.   And that was a condition of this agreement
24  that Espirito Santo get that access?
25       A.   Yes.

Page 928

1    Q.   And turning to the very last page of the
2    restructuring agreement, is this the letter sent by E.S.
3    Bankest to Mr. Lenner at BDO Seidman authorizing him to
4    speak with Espirito Santo concerning E.S. Bankest's
5    financial condition?
6        A.   Yes.
7        Q.   Did BDO Seidman continue to audit E.S.
8    Bankest after the restructuring agreement?
9        A.   Yes.
10       Q.   And do you have a copy already of Exhibit
11   87, the 2002 audited financial statements?
12       A.   (Complies).
13       Q.   And can you turn to the balance sheet again?
14       A.   (Complies).
15       Q.   Excuse me.  Will you actually turn to the
16   first page of the opinion letter?
17           Mr. Mendez, what's the date of this opinion
18   letter signed by BDO Seidman?
19       A.   It's April 16th, 2003.
20       Q.   And that is after the restructuring
21   agreement?
22       A.   Yes.
23       Q.   And again, were you the point person for BDO
24   on the 2002 audit issued in April 16th, 2003?
25       A.   Yes.

Page 929

1        Q.   And when BDO Seidman came to E.S. Bankest to
2    prepare this audit for 2002, did you provide them with
3    all the documents they asked for?
4        A.   Yes.
5        Q.   And like all the other audits before that,
6    did BDO Seidman require any proof of payment on the
7    accounts receivable from the people who actually owed
8    the money, the customers?
9        A.   No.
10       Q.   I'm turning now to the balance sheet.  I'm
11   looking at accounts receivable.  And when BDO Seidman
12   said that there was 224 million -- approximately 224
13   million in accounts receivable to pay back Espirito
14   Santo's 170 million dollar loan, were there, in fact,
15   224 million in accounts receivable?
16       A.   No.
17       Q.   And why was that?
18       A.   The majority of those receivables were fake,
19   were false receivables.
20           MS. ALEXANDER:  Espirito Santo passes the
21   witness.
22           THE COURT:  It's a good time to break for
23   lunch.
24           Ladies and gentlemen, we're going to break
25   for lunch.  You are not to discuss the case amongst

Page 930

1    yourselves or allow anyone to discuss the case with you.
2    You're not to form a definite or fixed opinion about the
3    merits of the case until you have heard all the
4    evidence, the argument of the lawyers, and the
5    instructions on the law by me.  You're not to discuss --
6    strike that.
7            You are not to see, listen, or read any
8    accounts of this case in the media and you're to ignore
9    the lawyers' presence outside this courtroom including
10   the witness.
11           Leave your notes.  Have a good lunch.  Wait.
12   1:15.  Wherever he tells you.  All right?  Have a good
13   lunch.
14           (Thereupon, the jury was escorted out of the
15   courtroom.)
16           THE COURT:  Mr. Mendez, you're not to
17   discuss your testimony that you've given or the
18   testimony you're about to give with anyone and that
19   includes the lawyers here.  And you should have lunch by
20   yourself or with no one connected with this case.  1:15.
21           All right.  We're in recess.
22
23           (Whereupon, at 11:55 a.m., a luncheon recess
24   was taken.)
25                 *       *       *

Page 931

1                CERTIFICATE OF COURT REPORTER
2
3        I, GIZELLA BAAN, court reporter, before whom
4    the foregoing statement was taken, do hereby certify
5    that the statement made was taken by me stenographically
6    at the time and place mentioned in the caption hereof
7    and thereafter transcribed by me to the best of my
8    ability; that said transcript is a true record of the
9    statement given; that I am neither counsel or, related
10   to, nor employed by any of the parties to the action in
11   which these proceedings were taken; and further, that I
12   am not a relative or employee of any party hereto, nor
13   financially or otherwise interested in the outcome of
14   this action.
15
16
17
18       _____
19            GIZELLA BAAN
20       Court Reporter and Notary Public
21       in and for the State of Florida
22
23
24
25

Page 932

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

---------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
     Plaintiffs,
  vs.
BDO SEIDMAN, LLP,
     Defendant.
---------------------------------------------------x
BDO SEIDMAN, LLP,
     Third-Party Plaintiff,
  vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
     Third-Party Defendants.
---------------------------------------------------x

PAGES 932 - 1063

Volume 9

AFTERNOON SESSION

Miami, Florida

Monday, April 16, 2007

1:40 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 933

1        A P P E A R A N C E S
2
3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4   INTERNATIONAL, LTD., ET AL.:
5
6   SULLIVAN & CROMWELL, LLP
7        1888 Century Park East
8        Los Angeles, California  90067
9        (310) 712-6627
10  BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13  GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida  33134
16       (305) 441-2299
17  BY:  Gonzalo R. Dorta, Esquire
18
19  BERGER SINGERMAN
20       350 East Las Olas Boulevard, Suite
21       Fort Lauderdale, Florida  33301
22       (954) 525-9900
23  BY:  Mitchell W. Berger, Esquire
24
25

Page 934

1   On behalf of Defendant BDO Seidman, LLP:
2
3   ALVAREZ, ARMAS & BORRON
4        901 Ponce de Leon Boulevard, Suite 304
5        Coral Gables, Florida  33134
6        (305) 461-5100
7   BY:  Arturo Alvarez, Esquire
8
9   GREENBERG TRAURIG, LLP
10       MetLife Building
11       200 Park Avenue, 15th Floor
12       New York, New York  10166
13  BY:  Adam D. Cole, Esquire
14       Karen Y. Bitar, Esquire
15
16  GREENBERG TRAURIG, LLP
17       1221 Brickell Avenue
18       Miami, Florida  33131
19  BY:  Mark Schnapp, Esquire
20       Nikki Simon, Esquire
21
22
23
24
25

Page 935

1   On behalf of Third-Party Defendants Victor Balestra,
2   Bernard Mollet, and Joaquin Garnecho
3
4   RICHMAN, GREER, WEIL, BRUMBAUGH,
5   MIRABITO & CHRISTENSEN, P.A.
6        Miami Center, Suite 1000
7        201 S. Biscayne Boulevard
8        Miami, Florida  33131
9        (305) 373-4000
10  BY:  Manuel Garcia Linares, Esquire
11
12
13  On behalf of Third-Party Defendant Bernard Mollet
14
15  GAMBA & LOMBANA, P.A.
16       2701 Ponce de Leon Boulevard, Mezzanine
17       Coral Gables, Florida  33134
18       (305) 448-4010
19  BY:  Hector J. Lombana, Esquire
20       Geoffrey Marks, Esquire
21
22
23
24
25

Page 936

1        C O N T E N T S
2
3   EXAMINATION OF CARLOS MENDEZ BY:          PAGE:
4     MR. ALVAREZ:  (Cross)           940
5     MS. ALEXANDER:  (Redirect)         1050
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 937**

1          PROCEEDINGS
2          THE COURT: All right. Gigi is back.
3          MS. BITAR: Your Honor, we have a scheduling
4    concern I just want to raise. Yesterday night we did
5    receive a notice of presentment, and Mr. Ellenburg is
6    the next witness after Mr. Ramon Rivera. I'm not
7    getting to the issue about it, if it's timely or what
8    have you. But the concern I have is that Mr. Ellenburg
9    may, according to Mr. Thomas and Ms. Alexander, testify
10   tomorrow. And as soon as we got that notice this
11   morning, I tried to speak to him at his home, his
12   office, and his cell. We just were able to talk to him.
13          As you know, Your Honor, tomorrow is tax day
14   and he has considerable responsibilities at work. And
15   I'm only asking that in the event he's supposed to start
16   tomorrow afternoon, if we can put him off until
17   Wednesday because he has those responsibilities and
18   raised them with me.
19          THE COURT: I believe Mr. Rivera is next.
20          MR. BITAR: That's correct.
21          MR. THOMAS: That's right, Your Honor.
22          THE COURT: I don't think you're going to
23   put on Mr. Rivera -- I think you're going to be done
24   with Mr. Rivera by tomorrow sometime. I don't know if
25   you're going to be able to get to Mr. Ellenburg or not.

**Page 938**

1          MR. THOMAS: I don't either, Your Honor. I
2    was asked (inaud.), but the witnesses do seem to be
3    going faster. And that's why when I was looking at
4    this, I thought, well, they are going faster so maybe we
5    will get to Ellenburg. I originally thought we wouldn't
6    get to him until later. So as soon as we -- that dawned
7    on me, we e-mailed and that's why she's raising the
8    issue now. And if we go faster, I don't have anything
9    to say.
10          THE COURT: We'll cross that bridge when we
11   get to it. Right now he can go ahead and keep working
12   and, you know -- he's in town?
13          MS. BITAR: Yes, but he's not in the office.
14   In other words, he has responsibilities at various
15   client sites -- and tomorrow.
16          THE COURT: We'll see where we go. I'll get
17   a better idea after Mr. Mendez is off, assuming he'll
18   get off today. If he doesn't get off today, I don't
19   think it's going to happen. Even if he gets off today,
20   I'm not sure it's going to happen anyway. Tell him to
21   keep working until I call him.
22          MS. BITAR: Thank you, Judge. I will do
23   that.
24          THE COURT: Ready? You all ready?
25          MS. ALEXANDER: Yes, Your Honor.

**Page 939**

1          THE COURT: Bring in Mr. Mendez first.
2          THE BAILIFF: (Complies.)
3          THE COURT: Are you all ready?
4          MS. ALEXANDER: Yes, Your Honor.
5          THE COURT: Bring them in.
6          THE BAILIFF: (Complies.) All rise for the
7    jury.
8          (Thereupon, the jury was brought into the
9    courtroom.)
10          THE COURT: All right. You may have a seat.
11   Hopefully, ladies and gentlemen, it wasn't too cold for
12   this afternoon. I couldn't sit outside. The only
13   reason I couldn't sit outside is because my lunch date
14   today wanted to sit inside. Otherwise I would have sat
15   outside.
16          THE JURY: We know.
17          (Laughter.)
18          THE COURT: I know you keep watch. I know
19   you're watching me. That's all right. And I also
20   dressed appropriately today. I was too lazy to go back
21   inside the house and change. But it worked out okay. I
22   couldn't have my cigar. So there you go. I'm going to
23   be in a real bad mood.
24          (Laughter.)
25          THE COURT: But not with you, of course.

**Page 940**

1          Mr. Alvarez, you may proceed your
2    cross-examination.
3          MR. ALVAREZ: Thank you, Your Honor. Good
4    afternoon, ladies and gentlemen.
5          CROSS-EXAMINATION
6    BY MR. ALVAREZ:
7     Q.  Good afternoon, Mr. Mendez.
8     A.  Good afternoon.
9     Q.  Mr. Mendez, as I understand your testimony,
10   the way the factoring business worked, at least at E.S.
11   Bankest, you bought accounts receivables and then you
12   sold them, correct? You bought them at less than their
13   face value and then you sold them. In general, that's
14   what factoring is?
15    A.  At E.S. Bankest?
16    Q.  Yes.
17    A.  At E.S. Bankest we didn't -- for the most
18   part, we didn't resell them the invoices. We bought
19   them and we collected them.
20    Q.  That's what I mean. I'm sorry. You bought
21   them and you collected them?
22    A.  Right.
23    Q.  And you bought them. And given the
24   parameters of the business, once you buy them, you want
25   to get -- be able to collect them in 90 days,

Page 941

1   essentially.  And if you don't, you want replacements?
2       A.   Well, in reality, the collection period
3   depends on the terms of the invoice.  It could be 90 day
4   invoices in your example.  If those invoices are not
5   collected -- I'm talking in theory, right?  If they are
6   not collected in -- because of financial inability to
7   pay, it's the factor's responsibility.  If the
8   receivables are not collected because of disputes or
9   because of returns, in the case of goods, the factor has
10  to recourse its client and either get the money back or
11  replacement invoices, good replacement invoices, yes.
12      Q.   But essentially what you're trying to do is
13  once you buy them, be able to collect them in either 30,
14  60, or 90 days depending on the terms, correct?
15      A.   Right.
16      Q.   So basically, in a factoring business like
17  yours -- theoretically -- let's say at the end of the
18  year you have $10 million -- a hundred million dollars
19  in accounts receivables from Wal-Mart.  If everything
20  goes well, by April of the next year, those accounts
21  receivables should have been collected -- if everything
22  goes well?
23      A.   Absolutely.  Like I said, if there are no
24  disputes.  Wal-Mart happens to be a good risk.  And the
25  only reasons for nonpayment, it would be disputes or

Page 942

1   returns.  In our specific case it was fake invoices.
2       Q.   But I'm just trying to see if I can get the
3   flavor of what the factoring business is.
4       A.   Right.
5       Q.   So basically, if everything goes well in the
6   example that I gave you, at the end of April that
7   hundred million from Wal-Mart should have been collected
8   and hopefully you would have bought more accounts
9   receivables?
10      A.   Yes.
11      Q.   In other words, come April you could have
12  bought a hundred million accounts receivables from
13  K-Mart, and then those would go through the 30-, 60-,
14  90-day cycle?
15      A.   Yes.  (Inaud.) the company.  The company
16  reinvests in new receivables.
17      Q.   Now, as I understand what you told the jury,
18  that the way you raise funds in these two factoring
19  businesses, BRFFC and E.S. Bankest, is by the issuance
20  of debentures or notes to the investors, correct?
21      A.   That is correct.
22      Q.   And you told this jury that it was
23  absolutely critical that there be audited financial
24  statements in order to induce and give comfort to the
25  investors, correct?

Page 943

1       A.   Yes.
2       Q.   And that they be attached to the private
3   placement memorandum, correct?
4       A.   That's correct.
5       Q.   Let me show you Plaintiffs' Exhibit 95.
6            MR. ALVAREZ:  If I may, Your Honor?
7            THE COURT:  You may.
8   BY MR. ALVAREZ:
9       Q.   In evidence.  A copy of which I have given
10  Plaintiffs' counsel.
11           And that, sir, is a private placement
12  memorandums, correct?
13      A.   Yes.
14      Q.   And that's one of the private placement
15  memorandums issued by E.S. Bankest, is it not?
16      A.   That is correct.
17      Q.   And this is a rather voluminous document
18  that has legal implications, does it not?
19      A.   Yes, absolutely.
20      Q.   In fact, it's prepared by lawyers in
21  conjunction with the people -- the management at E.S.
22  Bankest, correct?
23      A.   Correct.
24      Q.   And it's meant to give the investors
25  information about the particular note or the particular

Page 944

1   issue that is been raised, correct?
2       A.   That's correct.
3       Q.   And this one is dated April 15, 1998,
4   correct?
5       A.   That is correct.
6       Q.   And the intent of this particular issue is
7   to raise --
8            MR. ALVAREZ:  If you take it all the way to
9   the top.
10           (Technician complies.)
11  BY MR. ALVAREZ:
12      Q.   -- $36 million, correct?
13      A.   That's the maximum allowed on that
14  particular issue.
15      Q.   Under whatever is described in this
16  document.  That's what you're trying to raise,
17  $36 million?
18      A.   That's the maximum for that particular
19  series, yes.
20      Q.   And attached to this private placement
21  memorandums is --
22           MR. ALVAREZ:  If you can go to the next to
23  the last -- actually, the last page.
24           (Technician complies.)
25  BY MR. ALVAREZ:

Page 945

1    Q.  -- is not a BDO audit.  It is an unaudited
2  financial statement of one page, correct?
3    A.  That is correct.
4    Q.  In fact, no BDO audit could conceivably be
5  connected to this PPM because the first audit of BDO
6  came out in 1999, correct?
7    A.  That is correct.  That is correct.
8    Q.  Essentially all the audits that we're
9  talking about in this case were for the end --
10  December 31st end years, correct?
11    A.  Yes.
12    Q.  And these audits would be conducted by BDO
13  in January and February.  And usually the audit opinion
14  would be issued late February, early March, or
15  thereabouts, correct?
16    A.  Yes.  There was when we worked one with the
17  bank, there was a deadline to have the audit ready so we
18  could give it to the bank.  So the audit have to be
19  basically ready by the end of February.
20    Q.  And, of course, whatever audit opinions bear
21  the date that they were issued, correct?
22    A.  Yes.
23    Q.  In point of fact, about $34 million were
24  raised as a result of this particular issue having to do
25  with Plaintiffs' Exhibit 95, correct?

Page 946

1    A.  Yeah.  I don't know exactly how much was
2  raised on that particular issue.  The maximum allowed
3  was 36 million.
4    Q.  Would you recall that it was approximately
5  34 million?
6    A.  I don't recall because I don't have the
7  number.  It was over a period of time.
8    Q.  Let me show you Plaintiffs' Exhibit
9  Number 72, which is an audited financial statement, I
10  believe to be the first one from BDO.  And if you go to
11  page 3, you see that you have about $40 million in
12  accounts receivable.  You see that?
13    A.  Yes, absolutely.  Yes.
14    Q.  And that, of course, is the end result of
15  the private placement that we just talked about,
16  correct?
17    A.  That is correct.
18    Q.  Thank you.  Now let me hand you what has
19  been marked -- actually, what is in evidence as
20  Plaintiffs' Exhibit 97.  Do you see that, sir?
21    A.  Yes, I do.
22    Q.  And this is another one of these issues --
23  another one of these private placement memorandums,
24  correct?
25    A.  That is correct.

Page 947

1    Q.  And this one is -- as you see on the bottom
2  of the first page, is January 1st, 1999, correct?
3    A.  Yes.
4    Q.  And this one does not have a BDO audited
5  opinion, correct?
6    A.  It does not.
7    Q.  Now let me hand you another private
8  placement memorandum in evidence as Plaintiffs'
9  Exhibit 99 and ask you whether or not that's another one
10  of these private placement memoranda used to raise funds
11  from the investors?
12    A.  Yes.
13    Q.  And this one goes out on June 10th, 1999.
14  Do you see that?
15    A.  Yes.
16    Q.  Now, on this one, the offering is now up to
17  $50 million that you're trying to raise, correct?
18    A.  That is correct.
19    Q.  And would you look at the last page --
20  actually, the last two pages.  And this one also
21  contains an unaudited financial statement, does it not?
22    A.  Yes, that is correct.
23    Q.  And none of these unaudited financial
24  statements have -- show an author for the statement,
25  correct?

Page 948

1    A.  Yeah, it's an internal --
2    Q.  An investor would not know whether this was
3  written by a high school student or a junior high school
4  student, correct?
5    A.  Yes, that is correct.  Anyway, let me --
6    MR. ALVAREZ:  Judge, I don't believe there's
7  a question pending.
8    THE WITNESS:  I just want to explain why
9  there is no audited financial statements on the number
10  the $34 million of notes.  As you recall --
11    MR. ALVAREZ:  May I ask him a question
12  before he begins that explanation?
13    THE COURT:  It's a yes or no, and then you
14  can explain the answer.
15    THE WITNESS:  (Inaud.)
16    THE COURT:  Repeat the question, please.
17    MR. ALVAREZ:  There wasn't a question
18  pending, Judge.
19    THE COURT:  Well, ask another question.
20  BY MR. ALVAREZ:
21    Q.  You understand that there were -- whatever
22  it is that the investors were getting, they were getting
23  in this package that I showed you regarding the private
24  placement memorandum, correct?
25    A.  Yes.

Page 949

1    Q.  And that's what the law required?
2    A.  Yes.  And in addition to that, they have
3  received in the past.  The same investors.
4    Q.  Sir, would you agree with me that based on
5  your experience and your knowledge, that every new
6  offering is a brand new offering, correct?
7    A.  That is correct.
8    Q.  And the law requires it to be that way,
9  correct?
10    MS. ALEXANDER: Objection, Your Honor.
11  Calls for a legal conclusion.
12    THE COURT: Sustained.
13  BY MR. ALVAREZ:
14    Q.  Was it your understanding as one of the
15  people helping to issue these private placement
16  memorandums, that that is what the law requires?
17    MS. ALEXANDER: Objection, Your Honor.
18  Calls for a legal conclusion.
19    THE COURT: Sustained.
20  BY MR. ALVAREZ:
21    Q.  All that an investor would have to look at
22  in connection with the offering with any particular
23  private placement memorandum, sir, is what is set out in
24  the private placement memorandum, correct?
25    A.  Well, obviously, the investor can ask for

Page 950

1  whatever he wants.
2    Q.  I understand.
3    A.  And the investors happen to already know a
4  lot about Bankest and its business.  This company, E.S.
5  Bankest, is a successor of Bankest Receivables Finance
6  and Factoring Corp., BRFFC, who happens to be in exactly
7  the same type of business and the principles were
8  exactly the same.  So they already had a lot of
9  information.
10    Q.  You are, sir, if I understand correctly, are
11  speculating that these investors must have felt okay
12  because they had prior audited statements, correct?
13    A.  Yes.
14    Q.  And you don't think it had anything to do
15  with the private placement memorandum telling the
16  investor that half owner of the business is Espirito
17  Santo, a multibillion-dollar international company?
18    MS. ALEXANDER: Objection. Calls for
19  speculation.
20    THE COURT: Overruled.
21  BY MR. ALVAREZ:
22    Q.  Is that what you're telling the jury, that
23  they were not relying on the fact that Espirito Santo is
24  a half owner of E.S. Bankest?  You don't think that gave
25  them comfort?

Page 951

1    MS. ALEXANDER: Objection, Your Honor.
2  Phase 2.
3    THE COURT: Sustained.
4  BY MR. ALVAREZ:
5    Q.  Just by looking at you --
6    THE COURT: Sustained.
7    MR. ALVAREZ: I understand you said
8  sustained.
9  BY MR. ALVAREZ:
10    Q.  Suffice to say, Mr. Mendez, that whatever
11  the investors did or not did, you do not know, correct?
12  Whatever they relied on, you do not know?
13    MS. ALEXANDER: Objection, Your Honor.
14  Phase 2.
15    THE COURT: Overruled.
16    THE WITNESS: No, I didn't know --
17  BY MR. ALVAREZ:
18    Q.  I don't want you to speculate. I'm just
19  asking you, do you know?  You didn't sit down with
20  investors and figure out why did you invest, correct?
21    A.  Customarily I wouldn't sit with investors.
22    Q.  But what you do know is that --
23    A.  But I happen to know some of the investors.
24  They look at the audited financial statements as a piece
25  of vital information for their decision.

Page 952

1  BY MR. ALVAREZ:
2    Q.  What you do know is that for each and every
3  private placement memorandum that we talked about, the
4  only thing that they received is what's in this private
5  placement memorandum and the other ones that have been
6  admitted into evidence, correct?
7    A.  With respect to that specific issue?
8    Q.  Yes.
9    A.  Yes.
10    Q.  Thank you, sir.
11    A.  But also -- let me finish.  Like I was
12  explaining before, most of the placements in those
13  initial issues for E.S. Bankest were rollovers of the
14  predecessor company.  So it was the same type of
15  investment, right, that already had audited numbers,
16  they were just offered to roll over their investment
17  into this new company, which happened to be 50 percent
18  owned by Espirito Santo Bank.
19    Q.  Again, that's your speculation as to what
20  they relied on, correct?
21    A.  No. It's not.
22    Q.  You're saying that some of these investors
23  that bought these, okay, correct?
24    A.  I'm sorry?
25    Q.  You're saying that some of the investors to

Page 953

1  whom you sent this, for example, Plaintiffs' Exhibit
2  Number 99 on June 10th, 1999, that they didn't rely on
3  this. They didn't read this. They said, well, I'm
4  going to rely on something that happened a year or two
5  before. Is that what you're saying?
6          MS. ALEXANDER: Objection, Your Honor.
7  Phase 2.
8          THE COURT: What's your objection?
9          MS. ALEXANDER: Phase 2.
10         THE COURT: Overruled.
11         THE WITNESS: No, that's not what I'm
12  saying.
13  BY MR. ALVAREZ:
14     Q.  Let me ask you this. If it's a first-time
15  investors -- if it's a first-time investor from 99,
16  Plaintiffs' Exhibit 99, a first-time investor, what
17  would he have to rely on?
18         MS. ALEXANDER: Objection, Your Honor.
19  Calls for speculation.
20         THE COURT: Sustained.
21  BY MR. ALVAREZ:
22     Q.  Now, the only thing that a first-time
23  investor would have would be an unaudited financial
24  statement, correct?
25     A.  Yes. But typically the company would

Page 954

1  show --
2     Q.  I'm not asking you about typically.
3          MS. ALEXANDER: Objection, Your Honor.
4          THE COURT: Mr. Alvarez, let him finish the
5  answer, then you can ask him again.
6          THE WITNESS: The company always show prior
7  statements, audited financial statements.
8  BY MR. ALVAREZ:
9     Q.  And at some point in time, sir, any
10  financial statements including statements by BDO become
11  stale, they do not, right? At some point in time -- I
12  repeat the question -- these audited financial
13  statements become stale, correct?
14     A.  Yes. They need to be updated, definitely.
15     Q.  Because about the situation we talked about
16  before, that these accounts receivables turn over,
17  correct?
18     A.  Right.
19     Q.  So the ones that you had in December 31st,
20  '98 may be completely different from the ones that you
21  have in June of 1999, correct?
22     A.  Could be. Could be different. Totally
23  different, yes.
24     Q.  Now, sir, do you have the indictment there
25  with you? I think it's Exhibit 3149.

Page 955

1     A.  Yes, I do have it.
2     Q.  And you pled guilty to -- I'm sorry. You
3  pled guilty to count 1, the conspiracy count on this
4  particular indictment?
5     A.  Yes.
6     Q.  And a number of other counts, correct?
7     A.  Three other counts, yes.
8     Q.  If I can take you to the list of people that
9  were charged in this indictment. If I could take you
10  through them.
11     A.  Sure.
12     Q.  This is the people or the individuals who
13  were part of that conspiracy, correct?
14     A.  That is correct.
15     Q.  And all of them except Jeffrey Barnhill and
16  Howard Cantor were your fellow workers at E.S. Bankest,
17  correct?
18     A.  That is correct.
19     Q.  Eduardo and Hector Orlansky were well known
20  and trusted by the Espirito Santo family, were they not?
21         MS. ALEXANDER: Objection, Your Honor.
22  Calls for speculation.
23         THE COURT: Overruled.
24         THE WITNESS: Well, I can't comment as to
25  how well trusted they were. Everything I know is from

Page 956

1  Eduardo and Hector Orlansky for what they told me. I
2  never had conversations with Espirito Santo people with
3  respect to Eduardo and Hector Orlansky.
4  BY MR. ALVAREZ:
5     Q.  I'm sorry, sir. You said you had no
6  conversation?
7     A.  Not with respect to Hector and Eduardo
8  Orlansky, no.
9     Q.  Suffice to say that Hector Orlansky sat on
10  the board of directors of the bank, correct?
11     A.  Yes. For a period of time, yes, he did.
12     Q.  And Eduardo and Hector Orlansky had been in
13  the factoring business for a while?
14     A.  Since -- from what I understand, since 1986
15  when Bankest Capital was formed.
16     Q.  They were very knowledgeable about
17  factoring, were they not?
18     A.  They definitely had experience in -- for
19  many years in factoring. Factoring is not a very
20  difficult financial mechanism. It's very simple.
21     Q.  Dominick Parlapiano was a very bright
22  individual, was he not?
23     A.  I don't know about the question of
24  brightness, but he seemed to me bright, yes.
25     Q.  And what was his background? His background

Page 957

1   was in the finance world?  Financing or investment
2   banking?
3       A.   Investment banking.
4       Q.   And what is investment banking?
5       A.   Investment banking is obviously very, very
6   broad.  Specifically what Dominick was, you know -- what
7   he did or his experience was basically based on -- well,
8   for a period of time he was in the brokerage business.
9   As I understand, obviously that was before I started
10  working with him.  During the period that we were
11  together, he used to engage in financial advice at work,
12  advising companies on matters related to the finances.
13      Q.   Ariadna Puerto had a bachelor's degree in
14  business, did she not?
15      A.   That's my understanding.  I know for a
16  period of time, I remember Ariadna taking classes at
17  FIU.  I think she did graduate but I'm not so sure.
18      Q.   And Otto Ambrosiani was a computer expert,
19  correct?
20      A.   Yes.  He was the person that handled our,
21  you know, information technology activities.  They were
22  experts.  I'm not qualified to -- you know, to say it
23  because I'm not an expert on computers.
24      Q.   That was his expertise?
25      A.   Yeah, that was his field of work.  Yes.

Page 958

1       Q.   And, of course, Jeffrey Barnhill was the
2   president of the company Joy, correct?
3       A.   Yes.
4       Q.   A real company?
5       A.   A real company.
6       Q.   It had customers like Wal-Mart and K-Mart,
7   et cetera?
8       A.   Yes.
9       Q.   And Howard Cantor was the president of
10  another company?
11      A.   Yes.
12      Q.   And that was StrataSys, correct?
13      A.   That is correct.
14      Q.   An information technology company?
15      A.   That is correct.
16      Q.   And both of these individuals cooperated
17  with all of you in carrying out the fraud?
18      A.   Yes.
19      Q.   Now, if I can take you to the indictment.
20      A.   Sure.
21      Q.   If I can take you to -- excuse me a moment.
22  And this is the indictment Ms. Alexander discussed with
23  you, correct?
24      A.   Yes.
25      Q.   Take you to page 7, paragraph 3.

Page 959

1   Subsection B describes one of the objectives of the
2   conspiracy, correct, sir?
3       A.   Yes.
4       Q.   This is the count to which you went in front
5   of Judge Jordan, a criminal court judge, in federal
6   district court and pled guilty to, correct?
7       A.   Yes.
8       Q.   Now, so one of the things that you pled
9   guilty to is the conspiracy that had as an object -- and
10  if we can read the highlighted portion -- to cover up
11  and conceal the existence of the conspiracy from federal
12  banking regulators, correct, independent auditing firms
13  and managers of Espirito Santo Bank, correct?
14      A.   Yes.
15      Q.   And when they're talking about independent
16  auditing firms, they're talking about two firms:  BDO
17  and PricewaterhouseCoopers, correct?
18      A.   No.
19      Q.   Sir, what are the firms that they're talking
20  about in this indictment?  They're talking about firms,
21  independent auditing firms.  Is one of them BDO?
22      A.   Yes.
23      Q.   Is the other one PricewaterhouseCoopers,
24  sir?
25      A.   I don't know because there was no concealed

Page 960

1   or cover-up while -- I'm sorry.  I was confusing with
2   Ernst and Young earlier.  I apologize.
3       Q.   PricewaterhouseCoopers was the other one,
4   wasn't it, sir?
5       A.   Pricewaterhouse, yes, did some work.  That
6   is correct.
7       Q.   And that was part of the conspiracy to
8   conceal the conspiracy from PricewaterhouseCoopers,
9   correct?
10      A.   Yeah, that's what it says on the indictment.
11      Q.   That's what you pled guilty to.  That's what
12  the government was ready to prove beyond a reasonable
13  doubt, correct?
14      A.   Yep.
15      Q.   Now, if you go to page 9.  If you recall,
16  Ms. Alexander went through many of the items of the
17  conspiracy and she stopped at number 20.  Would you read
18  21, please.
19           MS. ALEXANDER:  Objection, Your Honor.
20           THE COURT:  And is this in evidence?
21           MS. ALEXANDER:  Yes, Your Honor.  This is in
22  evidence but it concerns phase 2.
23           THE COURT:  Overruled.
24           MS. ALEXANDER:  And there's a motion in
25  limine.

Page 961

1          MS. ALEXANDER: Overruled. He can read it.
2  BY MR. ALVAREZ:
3      Q.  Let me read it for you.
4          THE COURT: Are you withdrawing your
5  question?
6          MR. ALVAREZ: Yes.
7  BY MR. ALVAREZ:
8      Q.  Some of the defendants would present the
9  false audited financial statements and accounts
10  receivable reports to examiners from the FDIC, correct?
11      A.  Yes, that's what says.
12      Q.  And the FDIC stands for what, sir?
13      A.  Federal Deposit Insurance Corporation.
14      Q.  And those are -- that's a federal agency
15  that is designed to protect the interest of people that
16  have bank accounts in federal banks, correct?
17          MS. ALEXANDER: Objection, Your Honor.
18          THE COURT: Sustained.
19  BY MR. ALVAREZ:
20      Q.  What did the FDIC do, sir?
21          MS. ALEXANDER: Objection, Your Honor.
22          THE COURT: Sustained.
23  BY MR. ALVAREZ:
24      Q.  When it says some of the defendants, what
25  defendants are we talking about that did that?

Page 962

1          MS. ALEXANDER: Objection, Your Honor.
2  Asking the witness to interpret the indictment.
3          THE COURT: Is that an objection?
4          MS. ALEXANDER: Yes, Your Honor.
5          THE COURT: It's overruled.
6  BY MR. ALVAREZ:
7      Q.  Mr. Mendez, are we talking about all the
8  defendants?
9      A.  Well, I'm not familiar with the counts that
10  the defendants that pled guilty to, you know, what
11  counts they had. But definitely the defendants that
12  were found guilty at trial, and myself included.
13      Q.  Thank you. And this conspiracy that we're
14  talking about was successful from 1994 or '95 until
15  2003, correct?
16      A.  Yeah. That was the period of time that
17  there was fraud in the company, yes.
18          MR. ALVAREZ: Excuse me a moment, Your
19  Honor.
20          THE COURT: Sure.
21  BY MR. ALVAREZ:
22      Q.  Let me take you back to page 8 of the
23  indictment, one of the matters that was read by
24  Ms. Alexander. And on paragraph 13, you see that?
25  "Some of the defendants would represent that uninsured

Page 963

1  accounts receivable were insured."
2          Do you see that?
3      A.  Yes.
4      Q.  Let me show you Plaintiffs' Exhibit
5  Number 11 and 61 marked for identification and ask you
6  whether or not you can identify that document?
7      A.  Yes.
8      Q.  And what is that document, sir?
9      A.  This is a document that shows that -- you
10  know, purportedly from American Credit Indemnity
11  Insurance Company that shows all the name coverages, all
12  the companies, all the customers that we purchased
13  receivables and they have to pay us debtors that had
14  individual insurance.
15      Q.  This was one of the records kept in the
16  ordinary course of business at E.S. Bankest?
17      A.  Yes. This document, it was produced every
18  time there was a renewal of the insurance policy.
19      Q.  I'm trying to connect it, if I may interrupt
20  you a second. This is part of paragraph 13 in the
21  indictment, correct?
22          MS. ALEXANDER: Objection, Your Honor. This
23  document is not yet in evidence.
24          THE COURT: Let me see.
25          THE WITNESS: (Complies.)

Page 964

1          THE COURT: Sustained.
2  BY MR. ALVAREZ:
3      Q.  Mr. Mendez, this is a document that was used
4  by you at E.S. Bankest, correct?
5      A.  Yes. This was a document that was used by
6  E.S. Bankest, yes.
7      Q.  And it was a document that was kept in the
8  regular course of business of E.S. Bankest, correct?
9      A.  Yes. After it was produced, it was kept in
10  the normal course of business.
11      Q.  And this was a document that was used to
12  help perpetrate the fraud, correct?
13      A.  Yes.
14          MS. ALEXANDER: Objection, Your Honor.
15  Again, this document is not in evidence.
16          THE COURT: Sustained.
17          MR. ALVAREZ: Move it into evidence.
18          MS. ALEXANDER: No objection.
19          THE COURT: Sustained.
20          MR. ALVAREZ: I thought she said no
21  objection.
22          THE COURT: I thought you said objection.
23          MS. ALEXANDER: I said no objection.
24          THE COURT: Well, you got lucky.
25          (Laughter.)

Page 965

1    THE COURT: I'll accept it into evidence.
2    MR. ALVAREZ: I thought my hearing had gone.
3    THE COURT: What number was that again?
4  What?
5    MR. ALVAREZ: 1161.
6    THE COURT: Defendant's 1161 for ID is now
7  1161 in evidence.
8    MR. ALVAREZ: Can we put that on the board?
9    (Technician complies.).
10 BY MR. ALVAREZ:
11   Q.   Now, this is an exhibit that has
12 literally -- I don't know -- about a hundred pages,
13 correct?
14   A.   Yeah. Maybe six.
15   Q.   And one of the things that all of you do in
16 the conspiracy -- managed to do is you had taken the
17 original insurance policy from this company Euler,
18 correct?
19   A.   Yes.
20   Q.   You had scanned it into the computer at E.S.
21 Bankest, correct?
22   A.   I don't know where it was scanned, but it
23 was scanned, yes.
24   Q.   And then Otto Ambrosiani would put numbers
25 and figures into the document in order to show falsely

Page 966

1  to the BDO auditors that these accounts were insured,
2  correct?
3    A.   Yeah. It was not precisely Otto Ambrosiani,
4  but one of the defendants typed in the --
5    Q.   It was a cooperation between Dominick
6  Parlapiano --
7    A.   Yes.
8    Q.   -- Otto Ambrosiani?
9    A.   Yes, he participated.
10   Q.   Obviously, to put it into the computer. And
11 was Ariadna Puerto involved that too?
12   A.   Yes.
13   Q.   Anybody else?
14   A.   Not that I remember.
15   Q.   This had to be done every year, correct? It
16 had to be redone whenever it was necessary to show the
17 auditors that there was coverage, correct?
18   A.   Yes. I don't know how many times it was
19 done. But it was done for purposes of obviously of
20 meeting the requirement of the auditors.
21   Q.   Now, Mr. Mendez, as I understand it, over
22 90 percent of the accounts receivables in this case were
23 fraudulent, correct?
24   A.   What period of time?
25   Q.   At the end.

Page 967

1    A.   Yes.
2    Q.   And so this document has to contain numerous
3  entries that are just absolutely made up. In other
4  words, they indicate accounts receivables that are
5  insured -- the accounts receivable did not exist,
6  correct?
7    A.   Yes. There was -- there was coverage
8  purchased, insurance purchased by the company, to the
9  insurance company for receivables that didn't exist.
10 Absolutely. But the coverages were real. The
11 receivables were not real.
12   Q.   So there has to be literally hundreds, if
13 not thousands, of entries here that reflect amounts that
14 are just made up, correct?
15   A.   Well, most of the -- I don't think so. No.
16   Q.   So the amounts are not made up?
17   A.   No. Well, you have to understand first what
18 the document is. And --
19   Q.   Let me ask you this question and maybe you
20 can answer it that way?
21     MS. ALEXANDER: Objection.
22     THE COURT: Let him answer it.
23     Go ahead.
24     THE WITNESS: And the other thing you need
25 to understand is that the fraud was mainly concentrated

Page 968

1  on a few customers, you know. So there was accounts
2  receivables inflated for those major retailers for the
3  most part. Joy Athletic. So the vast majority of the
4  customers, you know, the little ones were all fine. I
5  mean, they were real customers. Certainly they were
6  real receivables. There was real coverage. So I don't
7  think it's hundreds.
8  BY MR. ALVAREZ:
9    Q.   But the ones -- who would keep track of --
10 who would keep track to make sure that this particular
11 document would not alert the auditors that the fraud was
12 going on? Who was it that was in charge to make sure
13 that whatever -- how many entries were put in here that
14 it made sense? Was there such a person?
15   A.   Right. That's what I was trying to explain.
16 There were not that many entries. There were just a
17 few.
18   Q.   Who was in charge of that?
19   A.   Well, we mentioned three individuals that
20 worked on this report, but --
21   Q.   Are these three individuals that you
22 mentioned the ones that were in charge of doctoring the
23 insurance information?
24   A.   There was that I know that did. But
25 probably twice -- but -- but what I'm trying to say is

## Page 969

1   there was no -- not a number of entries. There were
2   just a few -- I'll give you one example. K-Mart. I
3   know that K-Mart had what's called a co-insurance. And
4   as you see on the last column of this report, there is a
5   co-insurance, you know, percentage amount, and K-Mart
6   happens to have several. And I remember clearly K-Mart
7   the company had a lot of financial difficulties, they
8   had at least a 30 percent co-insurance. So that was
9   something that I know was changed. But that what --
10  that single line.
11      Q.  If I can take you back to the indictment on
12  paragraph 12 which said that the -- it says that the
13  defendants would seek to thwart the audit function by
14  providing the auditors with fictitious checks, correct?
15      A.  Yes.
16      Q.  And in point of fact, you yourself through
17  the internet ordered checks for different companies,
18  correct?
19      A.  Yes. For two companies.
20      Q.  You ordered checks for StrataSys?
21      A.  Yes.
22      Q.  And you ordered checks, I believe, also for
23  Joy?
24      A.  No. For ENA.
25      Q.  I'm sorry.

## Page 970

1       A.  Yeah.
2       Q.  And all you do is you got on the internet
3   and you ordered these checks, correct?
4       A.  Yes.
5       Q.  And these checks were delivered to you?
6       A.  They were delivered to the company.
7       Q.  And were used by the company to help
8   perpetrate the fraud?
9       A.  Yes.
10      Q.  Let me show you what has been marked as
11  Defendant's Exhibit 4500 and ask you, sir, whether you
12  can identify that document?
13      A.  Yes. Yes, I can.
14      Q.  What is that document, sir? Is that a copy
15  of the checks that you ordered from Intuit?
16      A.  These are copies of checks of some of the
17  checks and most of the checks that were ordered through
18  Intuit for the group of StrataSys Group.
19      Q.  There is another item like this for the
20  other company, ENA, right?
21      A.  That's correct.
22      Q.  They're both ordered from the same company?
23  ·  A.  Yes.
24      MR. ALVAREZ: I move it into evidence at
25  this time, Judge.

## Page 971

1       MS. ALEXANDER: No objection, Your Honor.
2       THE COURT: Without objection -- may I see
3   it?
4       THE WITNESS: (Complies.)
5       THE COURT: Defendant's 4500 marked for ID
6   is now 4500 marked for evidence.
7   BY MR. ALVAREZ:
8       Q.  And that's what it looked like, correct?
9   It's designed to look and be a real check, correct?
10      A.  Yes.
11      Q.  And then it would be up to whoever it is of
12  you who were participating in that aspect of the
13  conspiracy to fill out the amount, the given invoice,
14  and to sign it, correct?
15      A.  Yes.
16      Q.  And then a copy of that is what would be
17  given to the auditors, correct?
18      A.  Yes. If it was a need for that, yes.
19      Q.  It was one of the ways to show the auditors
20  how, in fact, the make-believe invoices of StrataSys
21  were being paid?
22      A.  Yes. Yes.
23      Q.  So make-believe invoices were being paid
24  with make-believe checks, correct?
25      A.  Correct.

## Page 972

1       Q.  And who was in charge -- who was in charge
2   of putting the -- making sure that the correct invoice
3   numbers would be reflected in the memo and the correct
4   amount would be reflected on the check? Who is in
5   charge of that?
6       A.  Okay. I did personally prepare the -- for
7   the (inaud.) probably a few checks and I -- for those
8   checks that I prepared, I got the information from the
9   system.
10      Q.  And whatever information you got, it was
11  information designed to deceive the auditors of BDO,
12  correct?
13      A.  Well, the information, it was to show proof
14  of payment.
15      Q.  To falsely show proof of payment?
16      A.  That's correct.
17      Q.  So you had something to show the auditors,
18  correct?
19      A.  Exactly. That's why the auditors were
20  asking us for proof of payment, and that's what we
21  provided as proof of payment.
22      Q.  If I can take you back for a moment to
23  page 9 -- I'm sorry -- page 7, paragraph 9.
24      A.  The indictment?
25      Q.  Yes, sir. I'm sorry.

Page 973

1      A.  Page 9?
2      Q.  Do you see that?
3      A.  Yes.
4      Q.  The defendants would cycle money from
5  Bankest and BCC to factoring clients and then bact to
6  BCC and Bankest with no underlying factoring transaction
7  in order to make it appear that the factoring client's
8  accounts receivable were being paid on a timely basis,
9  correct?
10     A.  Yes.
11     Q.  And this is something that Dominick
12  Parlapiano came up with?  That was Dominick Parlapiano's
13  idea, was it not?  If you don't remember --
14     A.  I don't -- I mean --
15     Q.  Do you remember whose idea it was?
16     A.  I would guess Dominick.  But yes, it was for
17  the case of StrataSys.
18     Q.  Now, the banks accounts that E.S. Bankest
19  had were at Espirito Santo Bank, correct?
20     A.  E.S. Bankest had the accounts at Espirito
21  Santo.
22     Q.  In fact, the offices were at Espirito Santo
23  Bank, correct?
24     A.  Yes.
25     Q.  And this cycling was termed la bicicleta?

Page 974

1      A.  Right.
2      Q.  Bicicleta means the bicycle?
3      A.  Yes.
4      Q.  And la bicicleta was designed to do is to
5  cycle money to make it appear that an invoice was
6  performing or was being paid, correct?
7      A.  Yes.
8      Q.  So basically, it is basically -- amounted to
9  Bankest sending money to StrataSys, and StrataSys paying
10  an invoice with the same money?
11     A.  Yes.
12     Q.  And this happened over a period of years?
13     A.  In that form (inaud.), I don't know really
14  how long.  But there were a number of transactions.
15     Q.  It was another way to deceive and fool the
16  auditors, correct?
17     A.  Yes.  It was a way to show that the
18  receivables were being paid, they were performing.
19     Q.  So if the auditors looked at the bank
20  accounts, they would see them being paid, correct?
21     A.  They would show the movement of funds, yes.
22  Yes, the bank accounts reflect that.
23     Q.  Were there any other type of la bicicleta
24  involved in the fraud, or is the one you just described
25  the only one?

Page 975

1      A.  You're talking specifically about a
2  particular client?
3      Q.  No.  The system itself.  The system itself
4  of la bicicleta was the same one or were there different
5  versions of it?
6      A.  I mean, the la bicicleta relates
7  transactions that took place -- well, also between
8  Bankest Capital and E.S. Bankest.
9      Q.  Same thing.  Shows the same thing?
10     A.  Were both that came from clients of Bankest
11  Capital, particularly Joy.
12     Q.  False invoices you mean?
13     A.  Fake invoices.  Right.  Exactly.
14     Q.  To show that they were fake?
15     A.  As you recall, because we touched already on
16  that type of transaction.  Supposedly Bankest Capital
17  was getting paid by Joy on invoices that had been paid
18  supposedly purportedly by Wal-Mart to Joy.  So -- which
19  didn't happen.  So Bankest Capital was paying E.S.
20  Bankest for those invoices.  And to enable Bankest
21  Capital to pay for those invoices, E.S. Bankest had to
22  advance funds again to Bankest Capital.
23         So there was a la bicicleta.  It was a
24  cycling of funds between E.S. Bankest to cover up
25  invoices that were fake that -- and that was the only

Page 976

1  proof of payment that the auditors ever requested.
2      Q.  If I can take you down to paragraph 11 of
3  the indictment.  "The defendants would seek to thwart
4  the audit function by providing the auditors with
5  fictitious invoices."
6         Do you see that?
7      A.  Yes.
8      Q.  Let me show you Exhibit 4492 in evidence.
9      A.  Okay.
10     Q.  And Mr. Mendez, this is a photocopy -- not a
11  very good photocopy -- but a photocopy nonetheless of
12  the fake invoices that this paragraph 11 refers to,
13  correct, from Joy?
14     A.  Yes.
15     Q.  Now, literally throughout the years of the
16  fraud, there were thousands and thousands of fictitious
17  invoices that had to be made up, correct?
18     A.  Yeah.  I don't know the numbers.  There
19  were -- it was a --
20     Q.  Would you say --
21     A.  It was a substantial number.  Whether it was
22  thousands or -- but it was very substantial.
23     Q.  This fraud required numerous false invoices
24  and numerous false entries and numerous false
25  representations to the BDO auditors, right?

Page 977

1      A.  Yeah.  It represented numerous false
2  invoices and --
3      Q.  And all of them had to be --
4      A.  And entries.
5      Q.  I'm sorry.  And all of them had to be
6  coordinated, correct?
7      A.  Yes.
8      Q.  Because the point of it was that you could
9  not afford to alert the auditors that a fraud was going
10 on, correct?
11     A.  Certainly we could not -- I mean, we could
12 not afford to have the fraud discovered, yes.
13     Q.  And the reason for that is that all of
14 you -- and you in particular -- feared that if that was
15 the case, you could possibly be prosecuted for a federal
16 crime and go to jail, correct?
17     A.  Yes, absolutely.  Sure.
18     Q.  And everybody else knew that.  Everybody
19 else in the conspiracy knew that, correct?
20     A.  I think.  I can't tell you for -- I can tell
21 for me, yes.
22     Q.  Now, if you can look at -- and fake invoices
23 were from different companies, were they not?  The fake
24 invoices that were prepared during this conspiracy.
25     A.  You're talking about clients or the

Page 978

1  customers --
2      Q.  I'm talking about fake invoices.  For
3  example, some of the invoices for Joy -- many of the
4  invoices for Joy were fake?
5      A.  Yes.
6      Q.  And they were created at Joy?
7      A.  Some were -- yes, a lot of them were created
8  at Joy, yes.
9      Q.  And some of them were created in house?
10     A.  In the premises of Bankest, yes.
11     Q.  And some of them literally would have to be
12 created during the time of an audit, correct?
13     A.  Some were created, yes.  In the case of Joy,
14 yes.  There were invoices created over the course of the
15 year but with a high concentration on the last quarter
16 of the year before fiscal year-end.
17     Q.  There were fake invoices that -- when you
18 had Joy create fake invoices in their own letterhead,
19 who would call Joy or Mr. Barnhill, the president of
20 Joy, and tell them what kind of an invoice for what
21 amount would be necessary?
22     A.  Well --
23     Q.  Who would give that information?
24     A.  Most of those communications to Joy -- for
25 the most part it was Dominick Parlapiano who may request

Page 979

1  to Joy.  But then, you know, our computer system would
2  generate, you know, listings of invoices that were in
3  our system for which we need physical invoices to be
4  created.
5      Q.  So the computer would alert you as to what
6  you needed?
7      A.  Well, it's not -- alert us.  We knew that
8  there was a shortage.  And Otto Ambrosiani would
9  generate those records of invoices that needed to cover
10 the shortages.
11     Q.  There were also false invoices from
12 StrataSys, correct?
13     A.  Yes.
14     Q.  And those were created by StrataSys?
15     A.  From what I know, yes.
16     Q.  Much the same way as the Joy invoices were
17 created?
18     A.  I'm sorry?
19     Q.  Much the same way as the Joy invoices were
20 created?  StrataSys, similar thing.  They would come in
21 from StrataSys in StrataSys's letterhead?
22     A.  Yes.
23     Q.  Because you had to show the auditors was a
24 real -- a real invoice, correct?
25     A.  Yes.

Page 980

1      Q.  It just had false information in it?
2      A.  Yes.
3      Q.  And ENA was another company?
4      A.  ENA was another company, yes.
5      Q.  And those invoices were created at ENA or in
6  house?
7      A.  No, they were created in house.
8      Q.  In house?
9      A.  Yes.
10     Q.  And where would you get the documents to
11 create them, the paper to create them?
12     A.  You mean the actual letterheads?
13     Q.  Yes.
14     A.  It was all word processed in house.  It was
15 a very simple invoice in terms of how it looked.
16     Q.  Any other companies from where -- that
17 produced fake invoices that you can recall?
18     A.  No.  I mean the CD Jewel Box, but that was
19 another kind of -- it was within the fraud but it was
20 Dominick's, you know, creation.
21     Q.  Mr. Mendez, let me show you what has been
22 marked Plaintiffs' Exhibit 1675 in evidence.  Do you
23 recognize that, sir?
24     A.  Yes, I do.
25     Q.  And that is a fax that you sent to a

Page 981

1  manager, an auditing manager at PricewaterhouseCoopers,
2  correct?
3      A.  Yes.
4      Q.  And PricewaterhouseCoopers was doing an
5  examination of E.S. Bankest, correct?
6          MS. ALEXANDER:  Objection, Your Honor.
7  Subject of a motion in limine.
8          MR. ALVAREZ:  The document is in evidence,
9  Your Honor.
10         THE COURT:  Can I see that?
11         THE WITNESS:  (Complies.)
12         THE COURT:  Overruled.
13  BY MR. ALVAREZ:
14     Q.  Do you remember the question, Mr. Mendez?
15     A.  No.  If you could repeat it, I would
16  appreciate it.
17         MR. ALVAREZ:  Would you, please.
18         (Thereupon, the Court reporter read back the
19  requested portion.)
20         THE WITNESS:  Yeah, it was not precisely an
21  examination
22  BY MR. ALVAREZ:
23     Q.  What would you call what
24  PricewaterhouseCoopers was doing?
25     A.  I think I would call it like agreed-upon

Page 982

1  procedures.
2      Q.  Are you an accountant, sir?
3      A.  No, I'm not.
4      Q.  At any rate, you would call it an
5  agreed-upon procedure, correct?
6      A.  Yes.
7      Q.  And what you were trying to do with this
8  letter -- in fact, you were the vice president of E.S.
9  Bankest, correct?
10     A.  Yes.
11     Q.  The last thing that you wanted to do is have
12  PricewaterhouseCoopers, one of the largest accounting
13  firms in the world, come look at your books, correct?
14         MS. ALEXANDER:  Objection, Your Honor.
15  Subject of a motion in limine.
16         THE COURT:  Sustained.
17  BY MR. ALVAREZ:
18     Q.  Did E.S. Bankest hire
19  PricewaterhouseCoopers?
20     A.  No.
21     Q.  How is it that PricewaterhouseCoopers showed
22  up to ask you questions about E.S. Bankest?
23         MS. ALEXANDER:  Objection, Your Honor.
24  Again, subject of a motion in limine.
25         THE COURT:  Sustained.

Page 983

1  BY MR. ALVAREZ:
2      Q.  Why are you corresponding with
3  PricewaterhouseCoopers?
4          MS. ALEXANDER:  Objection, Your Honor.
5  Again, subject of a motion in limine.
6          THE COURT:  Sustained.
7  BY MR. ALVAREZ:
8      Q.  You wrote this e-mail, correct, Mr. Mendez?
9      A.  Yes.
10     Q.  And in this e-mail you were asking somebody
11  at PricewaterhouseCoopers to let you know in advance
12  what information they were going to need, correct?
13  That's one of the things that you're asking in this
14  e-mail?
15         MS. ALEXANDER:  Objection, Your Honor.  Same
16  grounds, subject of a motion in limine.
17         THE COURT:  Overruled.
18  BY MR. ALVAREZ:
19     Q.  Is that true, sir?
20     A.  Yes.  I mean, we just wanted to get the list
21  of requests.  Yes.
22     Q.  And the reason you wanted that is you wanted
23  to make sure that you had some advance notice because
24  you probably needed to give them false information?
25         MS. ALEXANDER:  Objection, Your Honor.

Page 984

1  Again, subject of a motion in limine.
2          THE COURT:  Overruled.
3  BY MR. ALVAREZ:
4      Q.  Isn't that true, sir?
5      A.  Yes.  We needed to -- the purpose was to
6  learn in advance what they wanted to look at.
7  Absolutely.  Yes.
8      Q.  So if there was a problem, you could fix it,
9  correct?
10     A.  Well, if there was a problem, we had to deal
11  with it.
12     Q.  Fair enough.  Can you take a look at the
13  document itself, Mr. Mendez?
14     A.  Sure.
15     Q.  You see here on the third line from the
16  bottom that you are referring to giving them access to
17  examination materials?
18     A.  Yes.
19     Q.  Is the reason that you were using the word
20  examination materials was because they were doing an
21  examination?
22     A.  No.  No.  Because --
23     Q.  I just want a yes or no answer.
24     A.  No.  No.
25         MS. ALEXANDER:  Objection, Your Honor.  If

Page 985

1    Mr. Alvarez would allow the witness to answer the
2    question.
3            THE COURT: Let him answer the question.
4            Yes or no, and then you can explain the
5    answer.
6    BY MR. ALVAREZ:
7        Q.   You want me to ask the question again?
8        A.   Yes, please.
9        Q.   Is the reason you were referring to -- that
10   you were referring to giving PricewaterhouseCoopers
11   access to examination materials is that what they're
12   doing is an examination?
13       A.   No. I thought it was going to be an
14   examination or quasi-examination.
15       Q.   That's what you thought at this point in
16   time when you wrote that letter?
17       A.   Yes.
18       Q.   Or write a note about it. It's a fax?
19       A.   I didn't know the scope of their work until
20   we learned that they were just -- they wanted to do some
21   procedures.
22       Q.   Mr. Mendez, let me hand you what has been
23   marked as Plaintiffs' Exhibit 1676-A in evidence.
24       A.   Okay.
25       Q.   And this letter, sir, is, in fact, a

Page 986

1    response to your fax, correct?
2        A.   Yes.
3        Q.   And the auditor from PricewaterhouseCoopers,
4    the CPA auditor, is telling you, we're not going to go
5    along with your request, correct?
6        A.   Well, this is a letter from Victor Balestra,
7    the president of the bank.
8        Q.   You're right. You're right. But this is an
9    answer to your fax, is it not?
10           MS. ALEXANDER: Objection.
11           THE WITNESS: Yes, that's what he's saying.
12   It's in response to my fax.
13   BY MR. ALVAREZ:
14       Q.   So Mr. Balestra, the president of Espirito
15   Santo Bank, is telling you, no, we're not going to agree
16   or have our auditors agree to the request that you make
17   in your fax of a couple days earlier, correct?
18       A.   Yeah. I mean, it's in a nutshell that's
19   what he wanted, to be more expeditious as to
20   Pricewaterhouse's work now.
21       Q.   Now, let me show you Plaintiffs'
22   Exhibit 1674 in evidence. Would you take a look at that
23   document.
24       A.   Okay.
25       Q.   You see that?

Page 987

1        A.   Yes.
2        Q.   Sir, in fact, that is a letter from
3    PricewaterhouseCoopers directed to Mr. Parlapiano at
4    E.S. Bankest asking for specific information, correct?
5        A.   That is correct. And they clearly say that
6    they wanted to perform procedures. So going back to the
7    term of examination, it obviously, as you said, I'm
8    not -- I'm not an accountant.
9        Q.   I understand that.
10       A.   So I'm not using the word -- I was not using
11   the word examination as the accounting word.
12       Q.   Whatever you want to call it.
13           MS. ALEXANDER: Again, I would request
14   Mr. Alvarez to allow Mr. Mendez to finish his answer.
15           THE COURT: Let him finish.
16           THE WITNESS: (Inaud.)
17           THE COURT: I guess he's not done.
18           THE WITNESS: So they -- you know, they
19   clearly say that they just wanted to perform procedures.
20   BY MR. ALVAREZ:
21       Q.   Great. We'll use that. Let's look and
22   see -- whatever it was called -- let's look and see what
23   they're asking for.
24       A.   Sure.
25       Q.   One of the things that they were asking for

Page 988

1    was the copy of the December 31st, 2001 and most current
2    trial balances, correct?
3        A.   Yes.
4        Q.   And if you gave them those, the ones that
5    you gave them were -- contained false information,
6    correct?
7        A.   Yes.
8        Q.   Without any doubt in your mind, correct?
9        A.   Yeah. Sure, yes. Yes.
10       Q.   And the next thing that they were asking
11   for, copy of the December 31st, 2001 and the most
12   current trial balance of receivables by client and by
13   debtor, correct?
14       A.   That is correct.
15       Q.   And if you gave them those, then most of
16   those things that you gave them were absolutely false?
17       A.   Yes.
18       Q.   Number 6, a copy of the December 31, 2001
19   and most current aged trial balance of receivables.
20   Same thing, correct?
21       A.   Yes.
22       Q.   You gave them those, you gave them false
23   information, correct?
24       A.   Yes.
25       Q.   Number 7, copy of the cash collections

Page 989

1  report from January 1st, 2002, present, sorted by
2  customer and also cash collections report sorted by
3  debtor. The same thing apply to this paragraph?
4      A.  Yes. For those cash collections, yes.
5      Q.  Go to number 9. Go to number 10. I'm
6  sorry. Copy of the December 31st, 2001 and most current
7  reconciliation of receivables listing to the trial
8  balance. See that?
9      A.  I'm sorry? Was 9?
10     Q.  Paragraph number 10.
11     A.  Okay.
12     Q.  Told you 9 and I read you 10. "Copy of the
13  December 31, 2001 and most current reconciliation of
14  receivables listing for the trial balance."
15         You see that?
16     A.  Yes.
17     Q.  Whatever information you gave them in
18  connection with that paragraph was absolutely false,
19  correct?
20     A.  Yes.
21     Q.  Number 12, copy of a detailed list of income
22  by customer for the year-ended 2001.
23         Same thing applies to that, does it not,
24  Mr. Mendez?
25     A.  On -- obviously it was false income for

Page 990

1  those --
2      Q.  Of course. 95 percent of the information
3  you have in the company is false, is it not?
4      A.  Okay.
5      Q.  And now, they now tell you in these last
6  three paragraphs the following: That E.S. Bankest
7  management and personnel should be available for
8  interviews, be accessible to provide answers to our
9  questions and documentations we request.
10         You see that?
11     A.  Yes.
12     Q.  The second paragraph -- if I can jump to the
13  second paragraph, the one from the bottom. E.S. Bankest
14  management and personnel should provide timely responses
15  to inquiries and requests for documentation. And then
16  finally, E.S. Bankest management should represent to us
17  the accuracy and the completeness of the financial
18  information provided to us.
19         You see that?
20     A.  Yes.
21     Q.  And that's not what happened. You gave them
22  false information, right? You represented to them what
23  was true when, in fact, you knew it was false, correct?
24     A.  Yeah. It was false information provided.
25  Now, not all, but it was substantial false information,

Page 991

1  yes.
2      Q.  If you can go to paragraph number 9.
3      A.  (Complies.)
4      Q.  You see that?
5      A.  Yes.
6      Q.  They're asking you for access to support
7  files which would have copies of purchased invoices,
8  shipping documents, credit approvals and decisions,
9  factoring agreement, and significant terms
10  corresponding, et cetera.
11         You see that?
12     A.  Yes.
13     Q.  And you did provide them with support files,
14  correct?
15     A.  Well, again, this is their request. It
16  doesn't mean necessarily that we answered in the same
17  fashion that they requested. Because they needed to
18  understand how operation --
19     Q.  If you, in fact, gave them this kind of
20  information --
21     A.  Yes.
22     Q.  And I understand that this document just
23  tells you only what they requested. If you gave them
24  that kind of information --
25     A.  I'd like to see what we answered on every

Page 992

1  point.
2      Q.  Did you provide shipping documents?
3      A.  I don't remember.
4      Q.  You don't know?
5      A.  I do not remember. That's why I'm asking
6  you to show me what we replied to PWC.
7      Q.  Simple question. You don't remember whether
8  you supplied shipping documents?
9      A.  Huh?
10     Q.  The answer is, as I understand it, you don't
11  remember whether or not you supplied false shipping
12  documents, correct?
13     A.  Right. My point is whatever they requested,
14  doesn't mean that it was, you know, replied to them.
15     Q.  I understand.
16     A.  So --
17     Q.  Let me show you what has been marked as
18  1674-A in evidence, which appears to be the same
19  document that now -- is the document has some
20  handwriting on it, some circling, some handwriting, et
21  cetera. You see that?
22     A.  Yes.
23     Q.  Now, does yours have a third page with --
24  handwritten third page? Does it?
25     A.  Yes.

Page 993

1    Q.   Is that your handwriting?
2    A.   Yes, it is.
3    Q.   So this is -- who is Teddy by the way?  Up
4  here on the top.  Joan Lorda (ph), Ariadna and Teddy?
5    A.   It's Teddy Stanham.
6    Q.   Now, this is your handwritten instructions,
7  correct?
8    A.   Yes.
9    Q.   To some of the individuals and telling them
10  what to do, correct?
11    A.   Yes.
12    Q.   And how about the -- if you go to the first
13  page, when you have paragraphs circled and comments made
14  on the side, whose handwriting is that?
15    A.   The Pricewaterhouse letter?
16    Q.   I'm sorry?
17    A.   The handwriting on the --
18    Q.   Yes.  You notice that on the letter that you
19  received there's no handwriting now.  And assuming that
20  somebody at Bankest, either you or Mr. Parlapiano --
21    A.   It's Mr. Parlapiano's handwriting.
22    Q.   So this is Mr. Parlapiano basically
23  indicating to the people and personnel at E.S. Bankest
24  involved in the fraud how to provide the documentation?
25    A.   Yeah.  Well, not necessarily everyone was

Page 994

1  involved in the fraud.  But there was information that
2  needed to be retrieved from the files.
3    Q.   And to the best of your knowledge, whatever
4  information is indicated in this document is what was
5  provided PricewaterhouseCoopers?
6    A.   No.
7    Q.   No?
8    A.   I don't know.
9    Q.   You don't know.
10    A.   I don't know it was provided.  I would say
11  that, you know, a big portion of it, it was provided
12  them.  But when they talk about support files, we never
13  had them.
14    Q.   You basically had a letter in the prior
15  exhibit that we talked about from Victor Balestra
16  telling you -- Victor Balestra, the president of the
17  bank, (inaud.) owner of the company, telling you to go
18  ahead and provide PricewaterhouseCoopers what they need,
19  correct?
20    A.   Yes.
21    Q.   And you understood that to be the case?
22    A.   Yes.
23    Q.   And that's why you went -- you didn't hire
24  PricewaterhouseCoopers, correct?
25    A.   No, I didn't.

Page 995

1    Q.   And the only reason you were dealing with
2  them is because Victor Balestra had told you, go ahead
3  and give them the information, correct?
4    A.   That's correct.  It was -- I mean, the bank
5  was exercising their right to look at our books.
6    Q.   And all of this took place on or about March
7  of 2002 -- March or April of 2002, correct?
8    A.   Yes.
9    Q.   In point of fact, auditors, there were two
10  women who were CPAs who actually came to E.S. Bankest,
11  did they not?
12    A.   Yes.
13    Q.   To go through the operations -- in
14  connection with this request to go through E.S. Bankest
15  to figure out how E.S. Bankest operated, correct?
16    MS. ALEXANDER:  Objection, Your Honor.
17  Subject of a motion.
18    THE COURT:  Sustained.
19    MR. ALVAREZ:  May I have just a moment, Your
20  Honor?
21    (Counsel conferring.)
22    MR. ALVAREZ:  Could you take it to page 4?
23    (Technician complies.)
24  BY MR. ALVAREZ:
25    Q.   Do you have page 4 in front of you,

Page 996

1  Mr. Mendez?
2    A.   Yes.
3    Q.   And you see there where they're asking
4  you -- this is -- or thanking you -- somebody from
5  PricewaterhouseCoopers is thanking you for the
6  information you've given and asking for more
7  information?
8    A.   Yeah.
9    Q.   You see that?
10    A.   Yes.
11    Q.   And did you refuse to give
12  PricewaterhouseCoopers any information that they
13  requested?
14    A.   No, I don't remember.
15    Q.   And here at the bottom of this page they're
16  talking about that they were looking forward to a
17  walk-through of the processing of the receivables, et
18  cetera, et cetera.
19    You see that?
20    A.   Yes.
21    Q.   And this walk-through actually took place,
22  correct?
23    MS. ALEXANDER:  Objection, Your Honor.
24  Subject of a motion in limine.
25    THE COURT:  It's a yes or no.  Overruled.

Page 997

1      THE WITNESS: I'm sorry. Can you --
2      THE COURT: Read it back.
3      (Thereupon, the Court reporter read back the
4  requested portion.)
5      THE WITNESS: Yes, I do.
6  BY MR. ALVAREZ:
7      Q.   And this walk-through that they're talking
8  about eventually took place? They actually came to E.S.
9  Bankest to do exactly what this letter says, correct?
10     A.   Yes.
11     MS. ALEXANDER: Objection, Your Honor.
12     THE COURT: Overruled.
13     THE WITNESS: Yes. This was --
14     THE COURT: No. It's a yes or no. Yes.
15     THE WITNESS: Yes. And I wanted to add --
16     THE COURT: I don't believe so.
17  BY MR. ALVAREZ:
18     Q.   And when they get this walk-through, did you
19  deal with them or was it Mr. Parlapiano that dealt with
20  them?
21     MS. ALEXANDER: Same objection, Your Honor.
22     THE COURT: Overruled.
23     THE WITNESS: When they did this limited
24  walk-through, as I recall, Dominick dealt with them.
25  BY MR. ALVAREZ:

Page 998

1      Q.   Were you present when Dominick was dealing
2  with them?
3      A.   Yes.
4      Q.   Were you present when Dominick was giving
5  them false information?
6      MS. ALEXANDER: Objection, Your Honor. Same
7  objection.
8      THE COURT: Overruled. Yes or no?
9      THE WITNESS: I was present, but I don't
10  know the information that was provided the auditors was
11  precisely false information.
12  BY MR. ALVAREZ:
13     Q.   You don't remember?
14     A.   No. Because it was a batch of invoices that
15  were -- they wanted to see how the system worked, how
16  they were booked, and I don't remember exactly what
17  invoices were given to the auditors.  Could have been
18  perfectly good invoices.
19  BY MR. ALVAREZ:
20     Q.   Weren't they StrataSys invoices, sir?
21     A.   Possibly.
22     Q.   If they were StrataSys invoices, they were
23  fake invoices?
24     A.   For the most part.  StrataSys had some
25  business, had a little bit of business.

Page 999

1      Q.   But for the most part, StrataSys invoices
2  were fake?
3      A.   Yes, the vast majority of the invoices that
4  were in the books were faked, yes.
5      Q.   So if, in fact, these were StrataSys
6  invoices --
7      A.   Yes.
8      Q.   Mr. Parlapiano in your presence is taking
9  two auditors in this walk-through through invoices and
10  how they get recorded, and those invoices are absolutely
11  false, correct?
12     MS. ALEXANDER: Objection, Your Honor.
13     THE COURT: Sustained.
14  BY MR. ALVAREZ:
15     Q.   And Mr. Mendez, PricewaterhouseCoopers never
16  ever detected the fraud, correct?
17     THE COURT: Objection, Your Honor. Same
18  basis.
19     THE COURT: Overruled.
20     THE WITNESS: Pricewaterhouse was --
21     MR. ALVAREZ: Excuse me, Judge. May I ask
22  that the witness give an answer and then he can explain
23  it. But the question is very simply --
24     THE COURT: You can answer yes or no.
25     THE WITNESS: Not to my knowledge, but let

Page 1000

1  me explain.
2      MR. ALVAREZ: Then I'm going to object to
3  anything that is not outside of his knowledge. He's
4  already answered the question, not to his knowledge.
5      THE COURT: Overruled.
6      MR. ALVAREZ: He doesn't need to explain
7  what that means.
8      THE WITNESS: Pricewaterhouse was not
9  reporting to us. I don't know their findings. I don't
10  know their comments because they never reported to E.S.
11  Bankest. They were hired by Espirito Santo Bank.
12  BY MR. ALVAREZ:
13     Q.   But, sir --
14     A.   And I can tell you they did not audit, they
15  did not test anything, and they spent very little time.
16     Q.   Sir, as a vice president in charge of
17  dealing with the auditors while this fraud was being
18  committed, did anyone subsequent to the departure of the
19  auditors of PricewaterhouseCoopers at E.S. Bankest, did
20  anybody tell you that Pricewaterhouse Cooper had
21  detected a fraud?
22     MS. ALEXANDER: Objection, Your Honor.
23     THE COURT: Sustained.
24     MR. ALVAREZ: Not being offered the truth of
25  the matter asserted.

Page 1001

1      THE COURT: Sustained.
2  BY MR. ALVAREZ:
3      Q.   Did you acquire any information during the
4  remaining time that you were vice president to lead you
5  to believe that PricewaterhouseCoopers had detected the
6  fraud?
7          MS. ALEXANDER: Objection, Your Honor.
8          THE COURT: Hold on. Sustained.
9  BY MR. ALVAREZ:
10     Q.   Sir, if PricewaterhouseCoopers had detected
11 this criminal fraud, you would have known about it?
12         MS. ALEXANDER: Objection, Your Honor. Same
13 base.
14 BY MR. ALVAREZ:
15     Q.   As the vice president of E.S. Bankest, would
16 you have not?
17         MS. ALEXANDER: Objection, Your Honor.
18         THE COURT: What's your objection?
19         MS. ALEXANDER: Objection. This is the
20 subject of a motion in limine.
21         THE COURT: More speculation than that.
22 Sustained.
23         MS. ALEXANDER: I'm sorry. Did you sustain
24 it on another ground?
25         THE COURT: Yes.

Page 1002

1          MS. ALEXANDER: Thank you.
2          MR. ALVAREZ: May I have just a moment,
3  Judge?
4          THE COURT: Sure.
5  BY MR. ALVAREZ:
6      Q.   Mr. Mendez, did you ever have any
7  conversations -- strike that.
8          Subsequent to your receipt of the letter,
9  that March, I think, 28th letter from Victor Balestra,
10 the president of the bank -- do you recall that letter?
11     A.   Yes, I have it here.
12     Q.   Subsequent to that letter, did you ever have
13 any conversation with the president of the bank, Victor
14 Balestra, regarding the PricewaterhouseCoopers matter,
15 that you recall?
16     A.   I don't.
17     Q.   Did Mr. Balestra at any time call you and
18 tell you that PricewaterhouseCoopers had detected some
19 improprieties?
20         MS. ALEXANDER: Objection, Your Honor.
21 Hearsay.
22         THE COURT: Overruled.
23         THE WITNESS: Well, I don't recall the
24 conversation with Balestra with respect to the, you
25 know, Pricewaterhouse work. So --

Page 1003

1  BY MR. ALVAREZ:
2      Q.   Do you remember what the question is?  The
3  question is very simple. Did Victor Balestra, the
4  president of Espirito Santo, call you to tell you that
5  the PricewaterhouseCoopers exam, agree-upon procedure,
6  whatever you want to call it, had detected a fraud?
7          MS. ALEXANDER: Objection, Your Honor.
8          THE COURT: Sustained.
9          MR. ALVAREZ: Judge, may I have the witness
10 be read the previous question?
11         THE COURT: Sure.
12         (Thereupon, the Court reporter read back the
13 requested portion.)
14         MS. ALEXANDER: Objection, Your Honor. Also
15 on phase 2.
16         THE COURT: Overruled.
17         THE WITNESS: I don't remember.
18 BY MR. ALVAREZ:
19     Q.   Sir, isn't that something that you would
20 never forget?
21     A.   Is that a personal -- I mean, it's -- yeah,
22 it would be a major thing, yes.
23     Q.   It would seem to me that I would have a
24 recollection for the rest of my life if the president of
25 the bank had called me and told me --

Page 1004

1          MS. ALEXANDER: Objection.
2          THE COURT: Sustained.
3          MR. ALVAREZ: Judge, can we have a
4  ten-minute break?
5          THE COURT: Are you done with your
6  questioning?
7          MR. ALVAREZ: No.
8          THE COURT: You need to go to the bathroom?
9  Don't answer that question. I do. You too? We'll take
10 a few-minute break.
11         Ladies and gentlemen, do not discuss the
12 case amongst yourselves. Step back into the jury room
13 and be happy.
14         THE BAILIFF: All rise for the jury.
15         (Thereupon, the jury was escorted out of the
16 courtroom.)
17         (Thereupon, a brief recess was taken.)
18         THE COURT: Why don't you line them up?
19         THE BAILIFF: (Complies.) Should I bring
20 Mr. Mendez in first?
21         THE COURT: Yes.
22         THE BAILIFF: All rise for the jury.
23         (Thereupon, the jury was brought into the
24 courtroom.)
25         THE COURT: All right. You may be seated.

Page 1005

1    Were you happy?
2    THE JURY: Yes. Thank you.
3    THE COURT: Keep you happy.
4    THE JURY: We thanked Jeff. He brought us
5  Cuban coffee.
6    THE COURT: Those are bad habits.
7    All right. Let's go on. Mr. Alvarez, you
8  may proceed.
9    MR. ALVAREZ: Thank you.
10  BY MR. ALVAREZ:
11    Q.  Mr. Mendez, let me hand you what's part of
12  Exhibit 3003. That's defendants' exhibit.
13    Do you recognize that, sir?
14    A.  Yes.
15    Q.  Remember going back to the indictment where
16  we were talking about fictitious or false confirmation
17  letters?
18    A.  Yes. That is correct.
19    Q.  And is that what that is?
20    A.  Yeah. This was -- it's an audit, audit
21  confirmation letter that -- yeah. At the time it was
22  not fictitious. Later on we learned about CD Jewel Box.
23    Q.  Okay. This is a --
24    MR. ALVAREZ: Can you highlight this part
25  right here (indicating)?

Page 1006

1    (Technician complies.)
2  BY MR. ALVAREZ:
3    Q.  This is a letter purportedly written by you,
4  correct?
5    A.  Yeah. It was prepared by the company and
6  signed by me, yes.
7    Q.  And you're sending it to CD Jewel Box?
8    A.  It was sent to -- yeah. Purportedly it was
9  sent to CD Jewel Box, yes.
10    Q.  And it is asking CD Jewel Box to confirm
11  that there are approximately 7 and a half million
12  dollars in accounts receivable?
13    A.  Correct.
14    Q.  Correct?
15    A.  Correct.
16    Q.  Of course, CD Jewel Box didn't have 7 and a
17  half million dollars in accounts receivable?
18    A.  No, it did not.
19    Q.  In fact, CD Jewel Box was a nonexistent
20  company. It was a shell company.
21    A.  Yeah. I don't think it ever had any
22  operation.
23    Q.  So basically if you go down to the bottom,
24  now you've got somebody signing this on behalf of CD
25  Jewel Box, a nonexistent company, and it's showing that

Page 1007

1  yeah, we owe 7 and a half million dollars, correct?
2    A.  That's right.
3    Q.  And this would be one of the documents that
4  would be given to the auditors of BDO, correct?
5    A.  Yes. By the company to the auditors, yes.
6    Q.  By E.S. Bankest to the auditors?
7    A.  This is -- the confirmation typically comes
8  from the client in this particular case to the auditors
9  or from the customer to the auditors.
10    Q.  And who is Jay Kossoff?
11    A.  No, I don't.
12    Q.  No idea?
13    A.  No idea.
14    Q.  Wouldn't Jay Kossoff be Dominick Parlapiano?
15    A.  I'm sorry?
16    Q.  Wouldn't Jay Kossoff be Dominick Parlapiano?
17  If you know?
18    A.  I don't know. No, I don't. No, I don't.
19    Q.  Let me show you Plaintiffs' Exhibit 1006
20  marked for ID and ask you whether or not you can
21  identify that.
22    A.  Yes. Yes, I can.
23    Q.  And what is that, sir?
24    A.  This is an accounts receivable report,
25  detailed accounts receivable report, for CD Jewel Box, a

Page 1008

1  client of Bankest Capital corp.
2    Q.  Would this be a record that would be kept in
3  the ordinary course of business of the company --
4    A.  Yes.
5    Q.  -- and was used by the company to show the
6  auditors?
7    A.  Yes. I mean, the auditors would get the
8  whole company, all the clients, inclusive of CD Jewel
9  Box.
10    MR. ALVAREZ: Move it into evidence, Your
11  Honor.
12    MS. ALEXANDER: No evidence.
13    THE COURT: It will be accepted into
14  evidence -- did you mark it as an ID?
15    MR. ALVAREZ: It was marked as an ID.
16    THE COURT: Where is the marking?
17    Plaintiffs' Exhibit 1006.
18    It will be defendants' exhibit.
19    MS. ALEXANDER: It's Plaintiffs' Exhibit.
20    THE COURT: Hold on.
21    Plaintiffs' Exhibit Number 1006 for
22  identification is now Defendants' Exhibit in evidence
23  1006 -- Plaintiffs' for ID.
24  BY MR. ALVAREZ:
25    Q.  And what is this document called, sir?

Page 1009

1      A.  I'm sorry?  I couldn't understand.
2      Q.  This document is called accounts receivable
3  aging?
4      A.  That is correct.  Accounts receivable aging
5  report, yes.
6      Q.  And aging report is something that is used
7  to indicate the ages of the accounts receivables?
8      A.  That is correct.
9      Q.  And this is an accounts receivable aging
10  report for CD Jewel Box, right?
11      A.  Yes.
12      Q.  A nonexistent company?
13      A.  Yes.  Later on as I said, it was --
14      Q.  Certainly a company that doesn't have any
15  invoices that are real, correct?
16      A.  Yes.  Certainly.
17      Q.  So all of these numbers here are fictitious
18  numbers, all --
19      A.  Yeah.  Those are all fake invoices and
20  fictitious numbers.
21      Q.  And someone had to figure out how to put all
22  those numbers on this sheet of paper?
23      A.  I'm sorry?
24      Q.  Somebody had to figure out how and what
25  amounts and what dates to put on this particular

Page 1010

1  document?
2      A.  Yes.  This particular account, the
3  information came from actual invoices, documents, that
4  have all that information, the due date, the amount, the
5  customer, but it happened to be false invoices.
6      Q.  And this is like a, what, five- or six-page
7  document, correct?  Several pages, correct?
8      A.  Four-page report.
9      Q.  And every entry is fake?
10      A.  Yes.  Well, the entries were caused as a
11  result of the receivables that were booked in the
12  system.  The receivables were fake.
13      Q.  And these are one of the things that were
14  given to the auditors?
15      A.  Like I said, it's part of the accounts
16  receivable aging for the whole company that the auditors
17  audited.
18      Q.  Which was part of a fraud?
19      A.  Part of the fraud, yes.  Yes.
20      Q.  Thank you.  Let me show you Defendants'
21  Exhibit 4505 for ID and ask you whether or not you can
22  identify it.
23      A.  Yes.  The copies are very poor but it's an
24  assignment of accounts receivables from Joy to Bankest
25  Capital corp.

Page 1011

1      Q.  And this was a document that was kept in the
2  ordinary course of business of the company?
3      A.  Yes.
4      Q.  And another one of the documents that was
5  used by the company to help perpetrate the fraud?
6      A.  Yes.  Obviously these invoices are not
7  legible but --
8      Q.  But this is the way it was done.  I
9  understand that the numbers on the invoices are very
10  illegible, but this is the way -- if you look at the
11  first page, there's an assignment of accounts receivable
12  that you well knew accounts did not exist?
13      A.  But I have no way to tell with this that
14  these were fake receivables because it was business with
15  K-Mart.
16      Q.  You would never be able to tell if an
17  invoice was fictitious or not, particularly one from
18  Joy, correct, unless you knew what the figures were?
19      A.  Well, we did have the Joy fake business
20  segregated in a particular account.
21      Q.  But if you were just looking at the invoice,
22  you would have to look at a ledger somewhere because the
23  invoice looked like a regular invoice; it just had
24  fictitious information on it?
25      A.  If it was a fake invoice, you have

Page 1012

1  fictitious information.  Absolutely.
2      Q.  If you looked at two separate ones, say,
3  from a year ago in your business, you wouldn't be able
4  to know which was the real one or the fake one without
5  accessing other information to let you know?
6      A.  There were certain characteristics that knew
7  about the fraud could tell but --
8      Q.  But they were certainly on the same
9  letterhead?
10      A.  They were the same -- yes.  They would be
11  the same.
12      Q.  One of them would have fictitious
13  information and one would not?
14      A.  Right.  I mean, and not only a fictitious
15  information, it would not have payment records.  It
16  would not have -- all those things --
17      Q.  All right.  All those things --
18      A.  -- shipping records.  That's -- there's a
19  lot of information that was attached to the records that
20  the fake invoices didn't have as opposed to the real
21  ones.  You know, checks from the customer as opposed to
22  checks from the client.
23      Q.  A lot of information needed to be
24  coordinated all the time to make sure that the fraud
25  could continue to be perpetrated?

Page 1013

1      A.   Yes.  It had to be coordinated, yes.
2           MR. ALVAREZ: Judge, I would move this
3   exhibit into evidence.
4           MS. ALEXANDER: No objection, Your Honor.
5           THE COURT: Can I see that?
6           THE WITNESS: (Complies.)
7           THE COURT: Defendants' Exhibit 4505 marked
8   for ID is now Defendants' Exhibit 4505 in evidence.
9   BY MR. ALVAREZ:
10     Q.   If you look at it, the first page looks like
11  an accounts receivable, correct?
12     A.   Yes.
13     Q.   And what's attached to it are invoices
14  purportedly for the amount of $947,000, correct?
15     A.   Correct.
16     Q.   And attached to it are the invoices?
17     A.   The batch the invoices that would amount to
18  that total, yes.
19     Q.   It was the backup for the 947?
20     A.   Correct.
21     Q.   Mr. Mendez, let me show you what has now
22  been marked as Plaintiffs' Exhibit 1707 in evidence.
23          You've seen that before, have you not, sir?
24     A.   No.  Actually, I have not.
25     Q.   It's titled the historic investment recap.

Page 1014

1           Do you see that?
2      A.   Yes.  I do.
3      Q.   And basically it talks about, for example,
4   here, the original investment, and that would have been
5   the original investment of Espirito Santo Bank, does it
6   not?
7           MS. ALEXANDER: Objection, Your Honor.
8   Calls for speculation.
9           THE COURT: Sustained.
10          He's already said that he didn't -- he
11  hasn't seen this before.
12  BY MR. ALVAREZ:
13     Q.   As the vice president of E.S. Bankest, were
14  you familiar with the operation of E.S. Bankest?
15     A.   Of E.S. Bankest?
16     Q.   Yes.
17     A.   Yes.
18     Q.   E.S. Bankest had -- was owned by two
19  companies, correct?
20     A.   That is correct.
21     Q.   Espirito Santo Bank and the Orlanskys,
22  correct?
23     A.   That's correct.
24     Q.   And E.S. Bankest paid distributions in 2001,
25  did it not?

Page 1015

1      A.   Yeah.  I believe so.  Yes.
2      Q.   And there are 50/50 partners, correct?
3      A.   Yes.
4      Q.   So if E.S. Bankest paid the Orlanskys
5   2 million, they also paid their other partners
6   $2 million as distribution in 2001, correct?
7      A.   Yeah.  I don't recall the exact amount, but
8   I know there was a distribution.
9      Q.   Do you recall it was approximately
10  $2 million?
11     A.   Could be.  Could be right, yeah.
12     Q.   And you also recall because you testified
13  earlier that Espirito Santo Bank sold their interest for
14  $10 million --
15     A.   Yes.
16     Q.   -- in the year 2002, correct?
17     A.   Yes.  That is correct.
18     Q.   And there is an asterisk here in reference
19  to fees earned by one of the affiliates of Espirito
20  Santo, correct?
21          MS. ALEXANDER: Objection.  Leading.
22          THE COURT: Sustained.
23  BY MR. ALVAREZ:
24     Q.   Mr. Mendez, are you aware of the fact as the
25  vice president of E.S. Bankest that every time that one

Page 1016

1   of these notes was placed, in other words, every time
2   that one of these noteholders bought a note, Espirito
3   Santo would be paid a percentage as a fee.  Were you
4   aware of that?
5      A.   Yes.
6      Q.   Now, looking at that figure of 4,142,487 do
7   you have an understanding that that was the amount of
8   money that Espirito Santo had been paid by Bankest
9   simply, simply for doing other -- nothing other than
10  getting one of their rich clients to buy one of the
11  notes?
12          MS. ALEXANDER: Objection, Your Honor, calls
13  for speculation.
14          I object to the use of this document when
15  the witness says he has no knowledge.
16          THE COURT: Let me ask you, is that document
17  in evidence?
18          MR. ALVAREZ: Yes.
19          THE COURT: I don't know if you identified
20  it.  I need you to identify before you start questioning
21  Mr. Mendez and not let me guess at it as to whether it's
22  in evidence or it's marked for ID.
23          MR. ALVAREZ: I'm sorry, Judge, I thought --
24          THE COURT: Stop.  Maybe you did.
25          MR. ALVAREZ: I don't even remember, but

Page 1017

1   it's 1707 in evidence.
2         MS. ALEXANDER: My objection is it calls for
3   speculation. The witness has testified that he doesn't
4   know this document; he's never seen it before.
5         THE COURT: Overruled.
6         MR. ALVAREZ: Do you remember the question?
7         THE WITNESS: If you could repeat the
8   question.
9         MR. ALVAREZ: Madam Court Reporter, would
10  you read it back for me?
11        (Thereupon, the court reporter read back the
12  requested portion.)
13        THE WITNESS: By looking at that number, I
14  do not have an understanding. I do know that there was
15  a fee paid for the placement of the notes.
16        MR. ALVAREZ: Can we go to page 2?
17        (Technician complies.)
18  BY MR. ALVAREZ:
19     Q.   Did you look at page 2, Mr. Mendez?
20     A.   Yes.
21     Q.   It's the same total. Does that give you a
22  better understanding that that's how much they were
23  being paid?
24     A.   Yeah. Again, this is Espirito Santo
25  document. It's not a Bankest document. So I never seen

Page 1018

1   it. I do know that the fees -- that there were
2   placement fees paid to the bank.
3      Q.   Do you recall if the placement fee was
4   1 percent?
5      A.   For the one-year note. A half of 1 percent
6   for the six-month note.
7      Q.   So it was 1 percent for all notes?
8      A.   For the one-year notes, there were two
9   different series. One that was a six-month note --
10     Q.   That was 1 percent.
11     A.   -- and the other one was one year.
12     Q.   Was it 1 percent for both?
13     A.   Half of 1 percent for the six month --
14     Q.   And 1 percent?
15     A.   -- and 1 percent. If I recall correctly,
16  yes.
17     Q.   Thank you, sir. Mr. Mendez, earlier today
18  when Ms. Alexander was asking you questions about the
19  restructuring document, you possibly have that or should
20  have that in that pile of documents on your left.
21        Can you find that?
22     A.   I don't think it was shown to me.
23     Q.   Look and see. See if you can --
24     A.   I'm sorry. Yes.
25     Q.   And that's a document that's marked

Page 1019

1   Plaintiffs' Exhibit Number 94, correct?
2      A.   That's correct.
3      Q.   And that's a restructuring document that you
4   talked about and discussed with Ms. Alexander that
5   contains an agreement that was reached between E.S.
6   Bankest and Espirito Santo back in 2002, correct?
7      A.   Yes.
8      Q.   Now, the date of the document is -- if you
9   look at it in front -- is November 26th, 2002?
10     A.   That is correct.
11     Q.   You had testified earlier this morning that
12  Mr. Lenner, the manager of the BDO audits, had been
13  present at some sort of meeting that took place, was
14  it -- I think you said in September of 2002?
15     A.   Yeah. It was about on the closing of the
16  sale of the company. It was probably September.
17     Q.   Could it have been November?
18     A.   No. I don't -- no, I think it was more like
19  September.
20     Q.   Do you have any document that would permit
21  you to reference the exact date? That's going back --
22     A.   No. I don't.
23     Q.   You think it was closer to September than it
24  was to November?
25     A.   Yes.

Page 1020

1      Q.   Could it have been October?
2      A.   Very early on October. It was -- I'm pretty
3   sure it was September because of the default.
4   Everything that rose as the result of a default letter
5   that it was received by the company.
6      Q.   And that was a default letter written in
7   late September by a lawyer representing the company?
8      A.   The bank, yeah. Yes.
9      Q.   Now, at this meeting that you testified
10  about earlier today, who was present at this meeting?
11     A.   Well, it was Dominick Parlapiano.
12     Q.   Right.
13     A.   I was present. Hector and Eduardo Orlansky.
14  I do not remember if Chris Mohr was there or Peter
15  Stanham was there. I can't remember. But I do remember
16  Dominick, the Orlanskys, myself.
17     Q.   Just the three of you?
18     A.   Yeah -- we were four. Dominick, two
19  Orlanskys, me.
20     Q.   You don't recall if anybody from BDO was
21  there?
22     A.   Not then.
23     Q.   You don't know if Chris Mohr was there, do
24  you?
25     A.   No. That's right.

Page 1021

1    Q.  And this meeting took place where?
2    A.  At the office of Bankest.
3    Q.  Nobody from Espirito Santo bank was there?
4    A.  No, not that I remember.  No.  No.
5    Q.  Now, as I understand your earlier testimony,
6  you talked about the restructuring agreement that was
7  worked out to be able to pay the debt that existed,
8  correct?
9    A.  Yes.
10    Q.  And to your knowledge, you don't know if
11  Mr. Lenner discussed that matter with Espirito Santo
12  Bank, correct?
13    A.  No, I don't know.
14    Q.  And, in fact, if you look at the last page
15  of that restructuring agreement, that is a letter
16  directed to Mr. Lenner, correct?
17    A.  Yes.
18    Q.  And the -- again, the letter is November
19  25th, 2002.  It is a letter written by Mr. Orlansky,
20  correct?
21    A.  Yes.
22    Q.  And it was telling him -- well, let's read
23  it.  This letter shall serve as our authorization to you
24  to discuss our financial condition with the Espirito
25  Santo affiliates.  Correct?

Page 1022

1    A.  Yes.
2    Q.  So this authorization was given to Sandy
3  Lenner on November 25th, 2002?
4    A.  That is correct.  This was given as a
5  condition to close the restructure agreement.  It was to
6  meet the requirements to be able to close on the
7  restructure.  As you can see, it's one day earlier, one
8  day before the restructure was closed, agreement was
9  signed.
10    Q.  And obviously it was after this letter was
11  sent that Mr. Lenner for the first time had the
12  authority of your company to speak to Espirito Santo,
13  correct?
14    A.  They always had the authority but, I mean,
15  informal.  We formalized the authority for purposes of
16  the restructuring agreement.
17    Q.  So on this day Mr. Orlansky is formally
18  telling Mr. Lenner at BDO that he can now discuss the
19  financial affairs of Bankest with Espirito Santo,
20  correct?
21    A.  Correct.  Pursuant to Section 4.01 D of the
22  restructuring agreement.
23    Q.  Mr. Mendez, this fraud, this conspiracy to
24  defraud and deceive the auditors went on for about nine
25  years, did it not?

Page 1023

1    A.  Yes.  It was eight years.  '95.  Yeah.  '95,
2  '96 -- yeah, nine years.
3    Q.  During those nine years, you and
4  Mr. Parlapiano were the point persons in dealing with
5  the auditors, correct?
6    A.  Yes.
7    Q.  There were -- you, sir, had the uncanny
8  ability to look at people in the eye much the same as
9  you're looking at me now and lie, correct?
10    A.  Yes.  I did lie and I'm sorry for that.
11    Q.  You lied for nine years.  You lied to each
12  and every auditor that did the auditing for those nine
13  years, correct?
14    A.  Yes.  I mean, I did lie to them, yes.
15    Q.  You sat with them, had cups of coffee, and
16  the whole time you were flat out lying to them, correct?
17    A.  Well, I don't know if I had a cup of coffee
18  but we sat down and discussed different aspects of the
19  receivables and certainly when there were fake
20  receivables, I did lie, yes.
21    Q.  And a lot of people were fooled by your
22  lies, correct?
23        MS. ALEXANDER:  Objection, Your Honor.
24        THE COURT:  Sustained.
25  BY MR. ALVAREZ:

Page 1024

1    Q.  You fooled the BDO auditors, correct?
2    A.  I lied to them.  I don't know if they were
3  fooled or not but --
4    Q.  Sir, let me draw your attention to the
5  testimony that you gave in the criminal trial on May
6  1st, 2006, on page 2538, line 17.
7        MS. ALEXANDER:  Objection, Your Honor.
8  Grounds for impeachment.  He hasn't answered the
9  question.
10        THE COURT:  You want a side bar?
11        MR. ALVAREZ:  Judge, this is to impeach the
12  answer he just gave.
13        MS. ALEXANDER:  I'm sorry --
14        THE COURT:  Do you have a deposition?  Is
15  that a deposition?
16        MR. ALVAREZ:  Trial transcript.
17        MS. ALEXANDER:  Can I get a copy?
18        MR. ALVAREZ:  (Complies.)
19        THE COURT:  Thank you.  Give me a line and
20  page, please.
21        MR. ALVAREZ:  Page 2538, line 17.
22        THE COURT:  2538, line 17?
23        MR. ALVAREZ:  17 through 19.
24        THE COURT:  And you want to impeach on the
25  last question you asked?

Page 1025

1    MR. ALVAREZ: Judge, just let me make sure
2  it is the last question.
3    Yes, sir.
4    THE COURT: Do you want an objection?
5    MS. ALEXANDER: Yes.
6    THE COURT: Sustained.
7    MR. ALVAREZ: May we come side bar on that?
8    THE COURT: No. I want to make sure the
9  last question you asked is the last one on my screen.
10    MR. ALVAREZ: May I tell you the question
11  that I'm referring to?
12    MS. ALEXANDER: Your Honor, I request that
13  it not be read again out loud.
14    THE COURT: Ask the question again.
15  BY MR. ALVAREZ:
16    Q.  Mr. Mendez, you fooled the BDO auditors,
17  correct?
18    I'm asking you the question, Mr. Mendez.
19    MS. ALEXANDER: Your Honor, I believe the
20  witness answered that.
21    THE COURT: He did but he can answer it
22  again.
23    THE WITNESS: And I said I did lie to them.
24  BY MR. ALVAREZ:
25    Q.  That wasn't the question, sir. The question

Page 1026

1  I asked was you fooled the BDO auditors, correct?
2    A.  Yes, I guess I fooled them.
3    Q.  Approximately how many people worked in
4  Bankest, Mr. Mendez? Was it approximately about
5  20 people?
6    A.  Yeah. Just about. Yeah.
7    Q.  Many of those people were not aware of the
8  fraud, correct?
9    A.  Yes, that's correct.
10    Q.  There was a gentleman named Ed Dubner who
11  was one of the vice presidents, correct?
12    A.  Yes.
13    Q.  He was fooled too. He was not aware of the
14  fraud, right?
15    MS. ALEXANDER: Objection, Your Honor.
16    THE COURT: Sustained.
17  BY MR. ALVAREZ:
18    Q.  Was Mr. Dubner, the vice president of E.S.
19  Bankest, aware of the fraud?
20    A.  Not to my knowledge.
21    Q.  Mark Scheer was a lawyer, correct?
22    MS. ALEXANDER: Objection, Your Honor.
23    THE COURT: What's your objection.
24    MS. ALEXANDER: I withdraw the objection to
25  that particular question, Your Honor.

Page 1027

1    THE COURT: Okay.
2  BY MR. ALVAREZ:
3    Q.  Mark Scheer was a lawyer for Gunster Yoakley
4  and a lawyer who helped prepare the PPMs, correct?
5    A.  Yes.
6    Q.  He was fooled too, wasn't he?
7    MS. ALEXANDER: Objection, Your Honor.
8    THE COURT: Sustained.
9  BY MR. ALVAREZ:
10    Q.  Did he know about the fraud?
11    MS. ALEXANDER: Objection, Your Honor.
12  Calls for speculation.
13    THE COURT: Sustained.
14  BY MR. ALVAREZ:
15    Q.  Do you know if anyone told him about the
16  fraud while it was occurring?
17    A.  No, I don't.
18    MS. ALEXANDER: Your Honor, I request a side
19  bar.
20    THE COURT: No.
21  BY MR. ALVAREZ:
22    Q.  Mr. Mendez, on or about the time -- strike
23  that.
24    On or about 2002, 2003 you were getting paid
25  $120,000 by E.S. Bankest, correct?

Page 1028

1    A.  Yes.
2    Q.  On or about May or -- of 2002 you were, in
3  fact, able to purchase a home in Coral Gables for about
4  a half a million dollars, were you not?
5    A.  Yes.
6    Q.  In 2003, there came a point in time when you
7  knew that you could no longer sustain this fraud by
8  lying, correct?
9    A.  There came a point in time --
10    Q.  I'm not asking you for a precise time. I'm
11  talking about 2003; the question is very simple.
12    Did there come a time in August -- I'm
13  sorry -- sometime in 2003 when you became aware in your
14  own mind, were convinced in your own mind, that you
15  could no longer continue to lie because the fraud was
16  going to be discovered?
17    A.  Yes. You can say that. And I can explain?
18    THE COURT: You may.
19  BY MR. ALVAREZ:
20    Q.  I'll ask you --
21    THE COURT: No, he can explain his answer.
22    THE WITNESS: Yeah. The company, you know,
23  there was a receiver appointed to the company, and
24  certainly I wasn't willing to lie to the receiver.
25    MR. ALVAREZ: I'm sorry, Judge, I didn't

Page 1029

1   understand that answer.
2        THE COURT: Did you get it down? Do you
3   have more of an answer?
4        Read it back to him.
5        (Thereupon, the court reporter read back the
6   requested portion.)
7   BY MR. ALVAREZ:
8    Q.   And that was in about August of 2003.
9   Actually, an examiner had been appointed before there
10  was a receiver, correct?
11   A.   Yes.
12   Q.   And at that point in time you knew an
13  examiner was coming in and he's going to discover the
14  fraud, correct?
15   A.   Yes.
16   Q.   And at that point in time is when you make
17  the decision I'm not going to lie anymore, correct?
18   A.   That is correct.
19   Q.   And in point of fact, you have a meeting
20  with Dominick Parlapiano, Otto Ambrosiani, and
21  Ms. Puerto, correct?
22   A.   Yes.
23   Q.   And that is the subject of the discussion,
24  correct?
25   A.   Yes.

Page 1030

1    Q.   And when that meeting ended, you had, in
2   fact, concluded that you weren't going to lie anymore,
3   correct?
4    A.   Yes.
5    Q.   Because the fraud was eventually going to be
6   discovered, correct?
7    A.   Because I wasn't going to lie anymore. That
8   was the end.
9    Q.   Now, once that meeting was concluded, you
10  had in your office, if I remember correctly, some checks
11  from Joy?
12   A.   Yes.
13   Q.   Some blank checks, correct?
14   A.   Yes.
15   Q.   And you asked that -- you asked
16  Mr. Ambrosiani to destroy them because you knew that was
17  evidence of the fraud?
18   A.   Yes.
19   Q.   And then what you did is you went out and
20  hired Mr. McGuirk, James McGuirk, an excellent criminal
21  defense lawyer here in town, correct?
22   A.   Yes.
23   Q.   And shortly thereafter you were at the U.S.
24  Attorney's office talking to the assistant United States
25  attorney in connection with the case --

Page 1031

1    A.   Yes.
2    Q.   -- and confessing to what you had done?
3    A.   Correct.
4    Q.   And shortly thereafter you were also talking
5   to Mr. Freeman, the person who had been appointed the
6   examiner and later the receiver, correct?
7    A.   That is correct.
8    Q.   And you were with your lawyer at that time
9   also, correct, Mr. McGuirk?
10   A.   That is correct.
11   Q.   And he hired you, Mr. Freeman did hire you
12  for a short period of time, correct?
13   A.   Yes.
14   Q.   For a couple of months?
15   A.   Yes.
16   Q.   During which time you explained to him what
17  you knew about Bankest and the fraud, correct?
18   A.   That is correct.
19   Q.   You made the decision at that point in time
20  to cooperate with the government to figure out if
21  there's some way that the sentence that would be -- that
22  would be imposed would be lesser, correct?
23   A.   Yeah. I decided to tell the truth to the
24  government and certainly was hoping that I could have
25  some consideration for my sentencing, yes.

Page 1032

1    Q.   So in late 2003 the indictment that we
2   talked about comes down, correct? Sometime in late
3   2003?
4    A.   Yes. It was in December of 2003, yes.
5    Q.   Initially you plead not guilty to the
6   indictment at the arraignment stage and then sometime in
7   the middle of 2004 you go before Judge Jordan and
8   withdraw your previously entered plea of not guilty and
9   entered a plea of guilty, correct?
10   A.   Correct.
11   Q.   And it was pursuant to the agreement, the
12  signed plea agreement, that you and -- your lawyer,
13  Mr. McGuirk, signed with the United States -- the office
14  of the United States attorney, correct?
15   A.   Yes.
16   Q.   Now, you well knew that if you were
17  convicted of all the counts in the indictment, you could
18  get a sentence of upwards of 50 or 60 years, correct?
19   A.   Yes. At least 30.
20   Q.   Depending on how many counts would be
21  involved in your conviction, correct?
22   A.   Yeah, if you add them up, it would be
23  990 years.
24   Q.   And therefore you entered into a plea
25  agreement with the office of the United States attorney

Page 1033

1  with the expectation and the hope that you would be able
2  to put this behind you with a very lenient sentence or
3  as lenient a sentence as possible, correct?
4      A.   Yes.  Put it behind me, yes.  Be able to,
5  you know, to tell the truth and be subject to justice.
6  Yeah.
7      Q.   But the agreement that you signed was with
8  no one else but the U.S. Attorney's office, correct?
9  This plea agreement that you signed.
10      A.   That is correct.
11      Q.   It wasn't signed with Espirito Santo; it was
12  signed with the U.S. Attorney's office?
13      A.   That is correct.
14      Q.   And it required you whenever they called
15  upon you to testify at a trial or whatever to tell the
16  truth?
17      A.   Sure.
18      Q.   They have not asked you to testify in this
19  case, correct?
20      A.   No, they have not.
21      Q.   Now, in that plea agreement, which is in
22  evidence I believe as 1767, you may have it in front of
23  you I think.  It was introduced this morning.  On page.
24      A.   Okay.
25      Q.   Have you had a chance to look at it,

Page 1034

1  Mr. Mendez?
2      A.   Yeah.  What section, page 4?
3      Q.   Yeah.  I'm looking at paragraph C.  And
4  that's something you were agreeing with, that the
5  offenses you committed were committed by sophisticated
6  means, correct?
7      A.   Yeah.  That's what it says.
8      Q.   Because in point of fact, when an offense is
9  sophisticated under the guidelines, that makes for a
10  more substantial sentence.  You understand that,
11  correct?
12          MS. ALEXANDER:  Objection, Your Honor.
13  Calls for a legal conclusion.
14          THE COURT:  Sustained.
15  BY MR. ALVAREZ:
16      Q.   When you signed this agreement, was it
17  explained to you?
18      A.   The agreement was explained to me.
19      Q.   By Mr. McGuirk?
20      A.   Yes.
21      Q.   Mr. McGuirk is a very meticulous lawyer,
22  correct?
23      A.   Yes.
24      Q.   And a very good one?
25      A.   Yes.

Page 1035

1      Q.   And made sure you understood this agreement?
2      A.   Yes.  Yes.  Yes.  Having said that, the
3  precise meaning of sophistication, I don't know about
4  it.
5      Q.   But he explained to you the subject of the
6  federal sentencing guidelines, correct?
7          MS. ALEXANDER:  Objection, Your Honor.
8  Calls for privileged communications.
9          THE COURT:  Overruled.  It's a yes or no.
10          THE WITNESS:  He did explain the sentencing
11  guidelines, yes.
12  BY MR. ALVAREZ:
13      Q.   And you know the federal sentencing
14  guidelines take into consideration various aspects of a
15  crime and give it a number so that eventually that
16  number is determined what your sentence can possibly be.
17          Do you understand that?
18      A.   Yes, I do.
19          MS. ALEXANDER:  Objection, Your Honor.
20          THE COURT:  Overruled.
21  BY MR. ALVAREZ:
22      Q.   And here in this agreement making sure --
23  the government is making sure that you know that they're
24  going to ask the United States District Court Judge to
25  make a finding that this crime was committed by a

Page 1036

1  sophisticated means, correct?
2      A.   I'm sorry?
3      Q.   This paragraph, in this paragraph --
4      A.   Yes.
5      Q.   -- the office of the United States attorney
6  is making sure that you know that they are going to ask
7  the District Court Judge to making a finding that your
8  crime, what you were pleading guilty to, was committed
9  by sophisticated means, correct?
10      A.   That's what it says.  Again, to be honest
11  with you, I don't know how they define sophistication.
12  I mean, if you'd like to explain to me --
13      Q.   I won't have the opportunity.
14      A.   All right.
15      Q.   I only get to ask questions.
16      A.   It has a connotation.  It's measured in some
17  way to get to that word.
18      Q.   Okay.
19      A.   Because if you ask me whether it was
20  sophisticated or not, I would tell you it was not
21  sophisticated at all.
22      Q.   Did you tell that -- you know, when you
23  enter a plea in federal court, Judge Jordan also is a
24  very meticulous Judge, correct?
25      A.   Yes.

Page 1037

1    Q.   One of the things he asked you about this
2  agreement is, have you read it?
3    A.   Yes, I have.
4    Q.   Have you understood it?
5    A.   Yes.
6    Q.   And do you agree with it?  I'm sure he asked
7  you those questions.
8    A.   He did.
9    Q.   And so at least in the opinion of the -- I
10  know that you have a different opinion.  But at least in
11  the opinion of the assistant United States attorney and
12  the Judge, there were grounds to believe that the
13  offense was committed by sophisticated means.  Would you
14  agree with that?
15      MR. ALEXANDER:  Objection, Your Honor.
16  Calls for speculation.
17      THE COURT:  Sustained.
18  BY MR. ALVAREZ:
19    Q.   After the agreement, of course, even before
20  the agreement, you had already been working and
21  cooperating with the government, correct?
22    A.   Yes.
23    Q.   You had told them about the checks that you
24  had thrown out or attempted to have destroyed, correct?
25    A.   Yes.

Page 1038

1    Q.   In fact, you had them shredded, correct?
2    A.   No.  I asked Otto Ambrosiani to do it, and
3  he didn't do it, fortunately.
4    Q.   Now, that was the year 2004.  Eventually,
5  pursuant to this plea agreement, you were sentenced by
6  Judge Jordan, correct?
7    A.   Yes.
8    Q.   And he sentenced you to nine years in
9  prison?
10    A.   That's correct.
11    Q.   And to pay Espirito Santo $170 million?
12    A.   Yes.
13    Q.   As a result of the money that had been
14  stolen from the bank, correct?
15    A.   That is correct.
16    Q.   But, of course, the way your plea agreement
17  works is your final sentence has not yet been
18  determined, correct?
19    A.   Not yet.  I'll have the opportunity to be
20  resentenced.
21    Q.   That's coming up in two or three weeks,
22  correct?
23    A.   That is correct.
24    Q.   And the way these plea agreements work when
25  you're giving assistance to the government, you get

Page 1039

1  sentenced and then the government; that is, the office
2  of the United States attorney has the opportunity to
3  file a motion and tell the Court that you gave them
4  substantial assistance, and at that point in time, the
5  Judge can reduce the sentence.
6      That's the way you understand it, correct?
7    A.   Yes.
8    Q.   So you were not -- you have not yet to serve
9  a single day in jail, correct?
10    A.   That is correct.
11    Q.   You were permitted to remain free on bond
12  and then last year the trial took place?
13    A.   Yes.
14    Q.   And at that trial you testified for like
15  20 days or something like that, correct?
16    A.   It was closer to 30.
17    Q.   Closer to 30.  Explaining to that jury all
18  the details of the fraud, correct?
19    A.   Answering all the questions that was asked.
20    Q.   Mr. Menchel was the prosecutor in the case;
21  you remember him?
22    A.   Yes.
23    Q.   And he took you through the entire fraud,
24  correct?
25    A.   Yes.

Page 1040

1    Q.   Now, in the year 2005, in the year 2005 in
2  approximately June, a lawyer for Gunster Yoakley
3  attempted to take your deposition in a civil case.
4      Do you remember that?
5    A.   Yes, I do.
6    Q.   And he asked you a whole host of questions
7  having to do with the fraud, correct?
8    A.   Yeah.  Yes.
9    Q.   And you refused to answer each and every
10  question, correct?
11    A.   Well, I did not answer the questions.  I
12  raised my Fifth Amendment privilege as -- you know --
13  you know, under the advice of my counsel.
14    Q.   So to each and every question that was asked
15  you essentially said, I refuse to answer the question
16  because a truthful answer to the question may tend to
17  incriminate me?
18      MS. ALEXANDER:  Objection, Your Honor.
19      THE COURT:  Sustained.
20  BY MR. ALVAREZ:
21    Q.   Do you understand what the Fifth Amendment
22  privilege is?
23      MS. ALEXANDER:  Objection, Your Honor.
24      THE COURT:  Overruled.
25  BY MR. ALVAREZ:

Page 1041

1      Q.   The answer is yes, right?
2      A.   Yes, I do.
3      Q.   And Mr. Mendez, the Fifth Amendment
4  privilege is the right that a witness has not to
5  testify, not to be forced to testify if a truthful
6  answer would tend to incriminate them, correct?
7      A.   That's what the amendment says.
8      Q.   So to each and every one of those questions,
9  you took the Fifth Amendment.  And then did you find out
10 that later on the lawyers from BDO wanted to take your
11 deposition but you refused to give a deposition?
12          Do you remember that?
13     A.   No.
14     Q.   You don't recall?
15     A.   No.
16     Q.   Do you recall discussing with your lawyer?
17     A.   No.
18     Q.   Now, eventually you do give a deposition in
19 this case, correct?
20          In this case.
21     A.   Yes.
22     Q.   And that's in November 29th of last year,
23 correct?
24     A.   That's right.
25     Q.   You remember Mr. Thomas was the one who took

Page 1042

1  your deposition, correct?
2      A.   Yes, I do remember.
3      Q.   And the deposition is a sworn statement
4  where the lawyers appear and questions are asked under
5  oath, correct?
6      A.   That's right.
7      Q.   And before the 29th, you met with
8  Mr. Thomas, correct, to discuss what was going to go on
9  in the deposition, correct?
10     A.   I met with him, yes.
11     Q.   You also met with Mr. Forrester, an
12 associate of Mr. Thomas --
13     A.   Yes.
14     Q.   -- and discussed the subject?
15     A.   Yes.
16     Q.   Did you ever meet with anyone from BDO?
17     A.   I was never asked.
18     Q.   You would have met with someone from BDO?
19     A.   Possibly.  I was never asked.
20     Q.   Nevertheless it is November 29th when you
21 give the first deposition in the case, correct?
22          In this case, correct?
23     A.   Yes.
24     Q.   Now, two days later, two days later you had
25 a sentencing hearing before Judge Jordan, correct?

Page 1043

1      A.   Yes.
2      Q.   And that would have been like December 1st
3  or December 2nd, correct?
4      A.   The 1st.
5      Q.   And that was the date, that was the date --
6  I know it's been postponed -- but that was the date when
7  you were going to be sentenced by Judge Jordan, correct?
8      A.   Yes.
9      Q.   And you knew that your lawyer, Mr. McGuirk,
10 was going to make a presentation to the Judge by way of
11 witnesses and argument in order to try to persuade Judge
12 Jordan to give you probation, correct?
13     A.   Yes.
14     Q.   You also knew that the assistant United
15 States attorney in the case was objecting to you getting
16 probation, correct?
17     A.   Yes.
18     Q.   They want you to serve a term of
19 imprisonment, correct?
20     A.   That is correct.
21     Q.   And at that hearing, at that hearing the
22 first person that your lawyer put on to testify was
23 Mr. Freeman, correct?
24     A.   Yes.
25     Q.   And he testified on your -- he was

Page 1044

1  questioned by your lawyer, correct?  He was part of the
2  presentation that your lawyer put on, correct?
3      A.   That is correct.
4      Q.   The second person that your lawyer put on to
5  testify was another lawyer, Mitch Berger, correct?
6      A.   Yes.
7      Q.   And he is a lawyer with the firm of Berger
8  Singerman, correct?
9      A.   Correct.
10     Q.   A law firm that represents the plaintiffs,
11 correct?
12     A.   That is correct.
13     Q.   And then your lawyer handed a letter to
14 Judge Jordan, correct?
15     A.   Yes.
16     Q.   And that was the letter written by
17 Mr. Thomas, correct?
18     A.   Yes.
19     Q.   On your behalf?
20     A.   Yes.  Yeah.  With respect to my case, yeah.
21     Q.   And your lawyer also advised Judge Jordan
22 that Mr. Thomas was in California but he would be
23 available to talk to the Judge right from the courtroom
24 if the Court was inclined to listen to him.
25          Do you remember that?

Page 1045

1        MS. ALEXANDER: Objection, Your Honor.
2    Calls for hearsay.
3        THE COURT: I didn't hear the objection.
4        MS. ALEXANDER: Hearsay.
5        THE COURT: Hold on.
6    Sustained. What's the exception?
7        MR. ALVAREZ: May I --
8        THE COURT: What's your exception?
9        MR. ALVAREZ: Not for the truth of the
10   matter asserted. The question is whether or not it was
11   said, not for the truth of the matter asserted.
12       THE COURT: Sustained.
13   BY MR. ALVAREZ:
14       Q.   Do you recall whether or not Mr. Thomas
15   agreed to make himself available to talk to the Judge?
16       A.   Yeah. I do recall. However, I don't
17   know -- I don't remember exactly what my attorney
18   communicated to the Judge. I learned that from my
19   attorney.
20       Q.   Now, your sentencing date is coming up in
21   the next three weeks, correct?
22       A.   Yes.
23       Q.   And that would be the date when you for sure
24   are going to get sentenced, correct? That's what the
25   Judge has told you. There's been enough time since the

Page 1046

1    day you entered the plea, right?
2        A.   Yeah. To date -- that's the date that I'm
3    being sentenced.
4        Q.   That's on the day when your lawyer will
5    attempt to persuade the Judge that based on everything
6    that he has presented, you deserve probation and the
7    government will argue the opposite of that, correct?
8        A.   Yeah. That's up to my attorney on that
9    date.
10       Q.   But that's what's going to happen, correct?
11   I mean, that's what -- your understanding right now
12   that's what's going to happen three weeks from now,
13   correct?
14       A.   Certainly my attorney is going to ask for
15   me.
16       Q.   And the reality is that you had never been
17   sued by Espirito Santo, correct?
18       A.   That's correct.
19       Q.   They never sued you, correct?
20       A.   That's correct.
21       Q.   Mr. Freeman never sued you?
22       A.   That's correct.
23       Q.   Nobody went after your house which is worth,
24   what, 800,000 now? Whatever. Nobody attempted to sue
25   you to see if they could recover some of the money that

Page 1047

1    you owe them, correct?
2        MS. ALEXANDER: Objection. Calls for
3    speculation.
4        THE COURT: Overruled.
5        Is that a yes or no? If you remember the
6    question.
7        THE WITNESS: I'm sorry, what was the last
8    question?
9        MR. ALVAREZ: Could you -- I'm sorry, Judge.
10       THE COURT: I overruled the objection.
11       You want to repeat the question or you want
12   to ask him another question?
13       MR. ALVAREZ: I want the court reporter to
14   read it.
15       THE COURT: Okay. Read it back.
16       (Thereupon, the court reporter read back the
17   requested portion.)
18       THE COURT: You understand the question?
19   I'm not sure that's a question but if you understand it,
20   you can answer it.
21       MR. ALVAREZ: You want me to rephrase it,
22   Judge?
23       THE COURT: It's up to you.
24   BY MR. ALVAREZ:
25       Q.   Nobody from Espirito Santo or Mr. Freeman

Page 1048

1    has sued you, correct?
2        A.   No.
3        Q.   They haven't collected a single penny from
4    you, correct?
5        A.   No.
6        Q.   Mr. Mendez --
7        A.   I do have an order of restitution of
8    170 million to Espirito Santo.
9        Q.   Right. You have an order of restitution
10   that says if you go to prison --
11       A.   If I go to prison, they're going to have to
12   get in line.
13       THE COURT REPORTER: Sorry. What was that?
14   Repeat please.
15       THE WITNESS: That I have an order for
16   restitution of 170 million.
17       THE COURT: What did you say after that?
18       THE WITNESS: That I said whoever sues me --
19       THE COURT: What?
20       THE WITNESS: -- yeah -- to collect is going
21   to have to get behind the restitution order.
22       THE COURT: Ask another question.
23   BY MR. ALVAREZ:
24       Q.   Mr. Mendez, the deal that you have with
25   Espirito Santo, the deal that you have with Espirito

Page 1049

1    Santo is you don't sue me, you don't try to collect any
2    monies against me, and you testify for me to try to get
3    probation -- I mean, you testify (please listen) in
4    court and ask the Judge to get me probation and I will
5    testify here in court for you. Isn't that the deal that
6    you have with them?
7            MS. ALEXANDER: Objection. Argumentative
8    and assumes facts not in evidence.
9            THE COURT: Overruled.
10   BY MR. ALVAREZ:
11       Q.   Simple question, sir. Is that the deal?
12       A.   No. I have no deal.
13       Q.   You have no deal. The fact that they
14   appeared in court two days subsequent to your deposition
15   in the case and they haven't collected any money from
16   you, that is a mere coincidence, correct?
17           MS. ALEXANDER: Objection, Your Honor.
18           THE COURT: Hold on. What was your
19   objection?
20           MS. ALEXANDER: Argumentative.
21           THE COURT: Sustained.
22           MR. ALVAREZ: I have nothing further, Your
23   Honor.
24           THE COURT: Mr. Alvarez, you want this back?
25           MR. ALVAREZ: Thank you, Judge.

Page 1050

1            THE COURT: Ms. Alexander, you may redirect
2    if you wish.
3            MS. ALEXANDER: Thank you, Your Honor.
4            One moment.
5            REDIRECT EXAMINATION
6    BY MS. ALEXANDER:
7        Q.   Mr. Mendez, just a follow up on one point
8    that was just made. The restitution order, who is that
9    in favor of?
10       A.   The restitution order was in favor of
11   Espirito Santo Bank.
12       Q.   So you owed Espirito Santo $170 million?
13       A.   That is correct.
14       Q.   And have you paid Espirito Santo any money?
15       A.   No.
16       Q.   Another point, during that deposition that
17   you attended where Mr. Thomas asked you questions, did
18   Mr. Cole, representing BDO Seidman, ask you questions
19   during that deposition?
20       A.   Yes, he did.
21       Q.   And did you answer all of his questions?
22       A.   Yes, I did.
23       Q.   Is PricewaterhouseCoopers the auditors of
24   E.S. Bankest?
25       A.   No.

Page 1051

1        Q.   And was PricewaterhouseCoopers ever the
2    auditor for E.S. Bankest?
3        A.   Never.
4        Q.   And was 2002 the only time that
5    PricewaterhouseCoopers ever came to E.S. Bankest?
6        A.   Yes.
7        Q.   And did PricewaterhouseCoopers ever agree to
8    detect fraud at E.S. Bankest?
9            MR. ALVAREZ: Objection. Irrelevant.
10           THE COURT: Sustained.
11           Rephrase your question.
12   BY MS. ALEXANDER:
13       Q.   Did PricewaterhouseCoopers ever audit E.S.
14   Bankest?
15       A.   Never.
16       Q.   Did PricewaterhouseCoopers ever prepare
17   audited financial statements for E.S. Bankest?
18       A.   Never.
19       Q.   Who did audit E.S. Bankest?
20       A.   BDO Seidman.
21       Q.   Was it BDO Seidman's audited financial
22   statements that were issued every year?
23       A.   Yes.
24       Q.   And was it BDO Seidman who verified the
25   accounts receivables on the books of E.S. Bankest?

Page 1052

1        A.   Yes.
2        Q.   And for 2002, the same year that
3    Pricewaterhouse came to E.S. Bankest, was it BDO Seidman
4    who verified over $224 million in fake accounts
5    receivables as real?
6        A.   Yes.
7        Q.   Mr. Mendez, at one point during
8    cross-examination you were trying to explain to the jury
9    something about the first private-placement memorandum
10   issued by E.S. Bankest, the 1998 private placement
11   memorandums?
12       A.   Yes.
13       Q.   And that's exhibit -- Plaintiffs' Exhibit
14   Number 95.
15           MR. ALVAREZ: What was the date of that?
16           MS. ALEXANDER: April 15th, 1995.
17           I can give you another copy.
18           May I approach, Your Honor.
19           THE COURT: You may.
20   BY MS. ALEXANDER:
21       Q.   Here you go.
22           And was the April 15th, 1998,
23   private-placement memorandums the first
24   private-placement memorandums for E.S. Bankest?
25       A.   Yes.

Page 1053

1    Q.   And was that issued right after the company
2  was first formed?
3    A.   Yes.
4    Q.   And at the time, right after the company was
5  first formed in April of 1998, were there audited
6  financial statements for that company?
7    A.   No.  Because -- no.  No.  No.  The answer is
8  no.
9    Q.   And why not?
10   A.   Because the company was formed in March of
11 1998, and the first fiscal year-end was December 31st,
12 1998.  So as of that date, we would have financial
13 statements audited.
14   Q.   And when did the first audit for E.S.
15 Bankest prepared by BDO Seidman come out?
16   A.   At the end of February, first week of March
17 of 1999.
18   Q.   So when you issued -- E.S. Bankest issued
19 the first private-placement memorandum, there were -- no
20 financial statements existed to attach to that
21 private-placement memorandum?
22   A.   That's right.
23   Q.   Now, BDO Seidman was the auditor for BRFFC,
24 correct?
25   A.   Yes.

Page 1054

1    Q.   And had BDO Seidman's audited financial
2  statements been provided to the investors of BRFFC?
3         MR. ALVAREZ:  Objection.  Outside the scope
4  of cross.
5         THE COURT:  Overruled.
6         THE WITNESS:  Yes.
7  BY MS. ALEXANDER:
8    Q.   And did the customers of Espirito Santo who
9  had invested in BRFFC also become the investors at E.S.
10 Bankest?
11        MR. ALVAREZ:  Objection.  Leading.
12        THE COURT:  Sustained.
13 BY MS. ALEXANDER:
14   Q.   Mr. Mendez, do you know who were the initial
15 investors in E.S. Bankest?
16        MR. ALVAREZ:  Objection.  Unless the witness
17 has personal knowledge.  Lack of personal knowledge.
18        THE COURT:  Do you have personal knowledge?
19        THE WITNESS:  Yes.
20        THE COURT:  Overruled.
21        MR. ALVAREZ:  Judge, may I voir dire on
22 that?
23        THE COURT:  No.
24        THE WITNESS:  The initial investors,
25 noteholders, of E.S. Bankest were investors in the

Page 1055

1  predecessor company, BRFFC.  Those were rollovers that
2  went from one company to the successor company.
3  BY MS. ALEXANDER:
4    Q.   Let me just make sure I understand.  BRFFC
5  was the company that existed before E.S. Bankest?
6    A.   Yes.
7    Q.   And after E.S. Bankest was formed, what
8  happened to the investment that was made by the clients
9  of Espirito Santo in BRFFC?
10   A.   They were, in essence, redeemed, paid, and
11 rolled over into the new company.  So it was basically
12 the same investment that was moved from one company to
13 the -- from the old company to the new company.
14   Q.   The clients who had invested in BRFFC had
15 received BDO's audited financial statements for BRFFC?
16        MR. ALVAREZ:  Objection.  Calls for
17 speculation on the part of the witness, lack of personal
18 knowledge.
19        THE COURT:  Sustained.
20        Rephrase the question.
21 BY MS. ALEXANDER:
22   Q.   When BRFFC solicited the investment in the
23 company, did it provide audited -- the audited financial
24 statements from BDO Seidman to the prospective investors
25 in the company?

Page 1056

1    A.   Yes.
2    Q.   And many of those same investors were the
3  ones who rolled over into E.S. Bankest when it was
4  formed in 1998?
5         MR. ALVAREZ:  Objection --
6         THE WITNESS:  Yes.
7         MR. ALVAREZ:  -- calls for speculation.
8         THE COURT:  Overruled.
9         THE WITNESS:  It was common practice with
10 the company every time there was an issue to attach the
11 most recent audited financial statements.
12 BY MS. ALEXANDER:
13   Q.   So going forward, once BDO Seidman issued
14 its first audit in 1999, it was the practice of the
15 company to provide prospective investors with the most
16 recent copy of the audited financial statements?
17   A.   Yes.
18   Q.   Mr. Mendez, I'd like to spend a little time
19 talking about the nature of the fake documents that you
20 provided BDO Seidman.
21        You were shown fake documents from Joy as
22 well as from other clients of E.S. Bankest; is that
23 right?
24   A.   Yes --
25   Q.   And that included --

Page 1057

1    A.   -- of E.S. Bankest and Bankest Capital.
2    Q.   And that included, for example, the
3  StrataSys blank checks that you were shown?
4    A.   Yes.
5    Q.   And the confirmation from, I think it was
6  from CD Jewel Box?
7    A.   CD Jewel Box, yes.
8    Q.   And the fake Joy invoices?
9    A.   Yes. Yeah, I didn't know whether those
10 particular ones were fake but yeah, right.
11   Q.   During the course of the audit you provided
12 BDO Seidman with fake Joy invoices?
13   A.   Yes.
14   Q.   And Joy and StrataSys and CD Jewel Box as
15 well as ENA, which I think you also testified was
16 another client you provided fake documents for?
17   A.   Yes.
18   Q.   They're all clients, correct?
19   A.   Yes.
20   Q.   At any point did you provide BDO Seidman
21 with fake customer documents?
22   A.   Never.
23   Q.   How is it that you were able to provide BDO
24 Seidman with fake client documents from Joy, ENA,
25 StrataSys, and CD Jewel Box?

Page 1058

1    A.   Because we did have control of all those
2  companies.
3    Q.   Well, let's take CD Jewel Box as an example.
4        Can we look at Plaintiffs' Exhibit 1006,
5  which looks like this (indicating)? I think that's it
6  right here. This one (indicating).
7    A.   Thank you.
8    Q.   And you explained that this was an aging
9  report for CD Jewel Box?
10   A.   Yes.
11   Q.   And did CD Jewel Box exist?
12   A.   No.
13   Q.   It was a completely fake company?
14   A.   Yes.
15   Q.   And whose company was it, or whose fake
16 creation was it?
17   A.   Dominick Parlapiano's.
18   Q.   Now -- so every single one of these entries
19 under CD Jewel Box were fake?
20   A.   Yes.
21   Q.   And when BDO Seidman audited E.S. Bankest,
22 did it verify these accounts receivable, these among the
23 accounts receivable that it verified as real?
24   A.   Yes.
25       MS. ALEXANDER: Can we go back to the

Page 1059

1  demonstrative?
2        (Technician complies.)
3  BY MS. ALEXANDER:
4    Q.   Now, when BDO Seidman restarted the audit in
5  1998, did you -- did BDO ever ask for customer checks?
6        MR. ALVAREZ: Objection --
7        THE WITNESS: That was 1999.
8  BY MS. ALEXANDER:
9    Q.   I'm sorry. That's right, for the audit of
10 1998 which was occurring in 1999.
11       MR. ALVAREZ: Objection. Outside of the
12 scope of cross.
13       THE COURT: Sustained.
14 BY MS. ALEXANDER:
15   Q.   When you provided BDO Seidman with fake
16 client checks from Joy and ENA and StrataSys, did BDO
17 Seidman ever ask for proof that those checks could
18 actually have been deposited in Bankest Capital's
19 account?
20   A.   No.
21   Q.   And did you just provide BDO Seidman with a
22 xerox copy of the front of those checks?
23   A.   Yes.
24   Q.   Did they ever ask you for a cancelled check
25 from any of those clients?

Page 1060

1        MR. ALVAREZ: Objection. Outside of the
2  scope of cross.
3        THE COURT: I'll sustain the objection.
4  BY MS. ALEXANDER:
5    Q.   Did you ever provide BDO Seidman the fake
6  documents from the customers, the ones who actually owed
7  the money?
8    A.   Never.
9    Q.   Did BDO Seidman ever ask for the customers'
10 documents that would show who actually owed the money?
11   A.   I'm sorry?
12   Q.   Did BDO Seidman ever ask for customer checks
13 which would be from customers who actually owed the
14 money?
15   A.   No. Those cases that the money purportedly
16 went through Joy Athletic, they never asked for customer
17 check -- I mean, for proof of payment from customer,
18 from Wal-Mart, in that particular.
19   Q.   So you never provided BDO Seidman proof,
20 including a customer check from the customer, that that
21 money had, in fact, been paid?
22   A.   No.
23       MS. ALEXANDER: I have no further questions,
24 Your Honor.
25       THE COURT: Mr. Mendez, leave your hardware

Page 1061

```
 1    there.  Take off the mic.
 2           THE WITNESS:  (Complies.)
 3           THE COURT:  Thank you.  You may step down.
 4           THE WITNESS:  (Complies.)
 5           THE COURT:  Everybody relax.
 6           MR. ALVAREZ:  Stretching, Judge.
 7           THE COURT:  Well, we're going to go home.
 8    We'll start early in the morning.  Same time.  Same
 9    place.
10           You're not to discuss the case amongst
11    yourselves or anyone else.  You're not to let anybody
12    discuss the case with you.  You're to keep an open mind.
13    You're not to form a definite or fixed opinion about the
14    case until you've heard all the evidence, the argument
15    of the lawyers, and the instructions on the law by me.
16           You're not to see, hear, or read any
17    accounts of this case in the media, and you're to ignore
18    the presence of the lawyers in this courtroom and
19    they're to ignore yours.  All right?
20           So, leave your notes, gather your stuff, and
21    have a good evening.  We'll see you tomorrow morning.
22    Bring some more pillows.  Good night.
23           THE COURT:  Jeffrey, you can go to the same
24    place.  Second floor.  He'll probably stop you in the
25    lobby.
```

Page 1062

```
 1           (Thereupon, the jury was escorted out of the
 2    courtroom.)
 3           THE COURT:  All right.  I assume you will
 4    call Mr. Rivera tomorrow morning when you start, am I
 5    right?
 6           MR. THOMAS:  You're right, Your Honor.
 7           THE COURT:  Who is going to question
 8    Mr. Rivera?
 9           MR. THOMAS:  I am, Your Honor.
10           THE COURT:  And for defense?  Anybody in
11    particular yet.
12           MR. COLE:  (Indicating).
13           THE COURT:  See you tomorrow morning at
14    9:30.  Have a good night.
15
16           (Thereupon, at approximately 5:25 p.m., the
17    above portion of the trial was concluded.)
18
19              *      *      *
20
21
22
23
24
25
```

Page 1063

```
 1           CERTIFICATE OF COURT REPORTER
 2
 3           I, GIZELLA BAAN, court reporter, before whom
 4    the foregoing statement was taken, do hereby certify
 5    that the statement made was taken by me stenographically
 6    at the time and place mentioned in the caption hereof
 7    and thereafter transcribed by me to the best of my
 8    ability; that said transcript is a true record of the
 9    statement given; that I am neither counsel or, related
10    to, nor employed by any of the parties to the action in
11    which these proceedings were taken; and further, that I
12    am not a relative or employee of any party hereto, nor
13    financially or otherwise interested in the outcome of
14    this action.
15
16
17
18    _____
19           GIZELLA BAAN
20       Court Reporter and Notary Public
21        in and for the State of Florida
22
23
24
25
```

Page 1064

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

---------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
---------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
---------------------------------------------------x

PAGES 1064 - 1150

Volume 10

MORNING SESSION

Miami, Florida

Tuesday, April 17, 2007

9:50 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 1073

1  would be. That would be totally absurd since he is a
2  fact witness. That's a -- he can testify as to the
3  facts. If he signed the work papers based on his --
4  because of his job, then that's a fact. Now, to give an
5  opinion as to what is GAAS? No.
6          MR. THOMAS: So I can, without running afoul
7  of your ruling --
8          THE COURT: And I understand some -- some of
9  those work papers may have.
10         MR. THOMAS: They have the words GAAS or
11 GAAP in them.
12         THE COURT: But you know what? He still is
13 a fact witness. Your can't separate -- he can't give an
14 opinion as to what it is, but he can certainly say that
15 he did it.
16         MR. COLE: And he can't give an opinion that
17 he was wrong when he signed it.
18         MR. THOMAS: See, this is what I don't
19 understand. On the one hand they get to show him an
20 opinion that he put GAAS and GAAP, and on the other hand
21 I can't ask him the question. I mean, why is that?
22         THE COURT: That's not what I said. If it
23 has -- if it's related to his work as to what tasks he
24 performed and under the guidelines under which he
25 performed them, that is certainly not the same thing as

Page 1074

1  an opinion. I don't know -- that's as clear as I can
2  get. Now, he's going to give an opinion as to what it's
3  going to be -- or in his opinion, it shouldn't have
4  been. That's an opinion. But if you follow the
5  guidelines and the rules or didn't, that's certainly a
6  fact issue.
7          MR. THOMAS: So -- okay. So I can show him
8  the document even though the document says --
9          THE COURT: Absolutely.
10         MR. THOMAS: -- in your opinion did this use
11 GAAS or GAAP? Did you sign that? What was your
12 understanding.
13         THE COURT: It's not an expert opinion.
14 It's within the scope of his employment, his work.
15         MR. THOMAS: That's permissible?
16         THE COURT: (Nodding.)
17         MR. THOMAS: Thank you, Your Honor.
18         THE COURT: Anything else?
19         MR. THOMAS: Hang on. My computer guy is
20 coming.
21         THE COURT: Are you all ready? Let me know.
22         MR. THOMAS: We're ready when you are, Your
23 Honor.
24         THE COURT: Are you ready, Mr. Cole?
25         MR. COLE: Yes, Your Honor. You're waiting

Page 1075

1  for me? I apologize, Your Honor.
2          THE COURT: Actually, you're waiting for me.
3  Bring them in.
4          THE BAILIFF: (Complies.) All rise for the
5  jury.
6          (Thereupon, the jury was brought into the
7  courtroom.)
8          THE COURT: All right. You may be seated.
9  Good morning, ladies and gentlemen.
10         THE JURY: Good morning.
11         THE COURT: Some of you are not well
12 equipped for the cold weather this morning.
13         JUROR: Some of us don't get cold.
14         THE COURT: Okay. Did you have a good
15 evening?
16         THE JURY: Yes.
17         THE COURT: I may have some good news later
18 for you but I'm not going to tell you yet. I'm going to
19 keep you in suspense. So let's proceed. Ready to go?
20 See, he's cold. You can't get anymore layered than
21 that.
22         All right. Mr. Thomas, you may call your
23 next witness.
24         MR. THOMAS: Thank you, Your Honor.
25         Good morning, ladies and gentlemen.

Page 1076

1          Your Honor, Espirito Santo calls Ramon
2  Rivera.
3          THE COURT: Can you get Mr. Rivera, please.
4          THE BAILIFF: (Complies.)
5          THE CLERK: Work your way around, please.
6          THE WITNESS: (Complies.)
7          THE CLERK: Please remain standing and raise
8  your right hand
9          Thereupon,
10         RAMON RIVERA,
11 having been duly sworn by the clerk of the Court,
12 testified as follows:
13         THE COURT: Can we have a side bar, please.
14         (Thereupon, there was a side-bar conference
15 outside the presence and hearing of the jury.)
16         THE WITNESS: Yes, sir?
17         THE COURT: Mr. Rivera, you're not to let
18 the jury know that you've been here before and have
19 testified in this trial whether it be -- whether any of
20 the answers -- that goes for the lawyers as far as
21 questioning.
22         If you need to impeach him with his prior
23 transcript, with his trial transcript, ask for a side
24 bar first and then we'll take it from there.
25         MR. COLE: You'll let me know how I refer to

Page 1077

1   it at that point?
2           THE COURT: That's what I want.
3   You understand?
4           THE WITNESS: What he said?
5           THE COURT: No, what I told you.
6           THE WITNESS: Yeah.
7           (Thereupon, the side-bar conference was
8   concluded.)
9           THE COURT: Mr. Thomas, you may proceed.
10          DIRECT EXAMINATION
11  BY MR. THOMAS:
12      Q.   Mr. Rivera, could you please introduce
13  yourself to the ladies and gentlemen of the jury.
14      A.   Yeah. Good morning. My name is Ramon
15  Rivera.
16      Q.   Mr. Rivera, did you work for BDO Seidman?
17      A.   Yes.
18      Q.   And when you were working for BDO Seidman,
19  did you participate in their audit of E.S. Bankest?
20      A.   The answer is yes.
21      Q.   Mr. Rivera, I'm going to ask you a little
22  bit about yourself. Where were you born?
23      A.   I was born in Puerto Rico.
24          THE COURT: Sir, why don't you put your
25  microphone on your left lapel. On the lapel. On the

Page 1078

1   lapel. The coat. Not this one, the other one.
2           THE WITNESS: Now is better?
3           MR. THOMAS: Better.
4           THE WITNESS: Yes. I'm sorry.
5   BY MR. THOMAS:
6       Q.   I'm going to re-ask the last question
7   because I think we can hear you a little better now.
8   Where were you born?
9       A.   I born in Puerto Rico.
10      Q.   Did you grow up in Puerto Rico?
11      A.   Yes.
12      Q.   Did you go to school in Puerto Rico?
13      A.   Yes.
14      Q.   Did you receive a degree like at the
15  university in Puerto Rico?
16      A.   That's right.
17      Q.   And what was your degree?
18      A.   Bachelor in business administration with an
19  accounting major.
20      Q.   Did you become an accountant in Puerto Rico?
21      A.   That's right.
22      Q.   And did you practice as an accountant in
23  Puerto Rico?
24      A.   Yes.
25      Q.   Did you do audits in Puerto Rico?

Page 1079

1       A.   Yes.
2       Q.   And who did you work for there?
3       A.   When I began working I worked for Arthur
4   Andersen, an accounting firm that's no longer -- and
5   then after that, I moved to another local CPA firm in
6   Puerto Rico.
7       Q.   And when you say CPA firm, are you referring
8   to certified public accountant?
9       A.   That's right.
10      Q.   Did there come a time, Mr. Rivera, when you
11  came to Miami?
12      A.   That's right.
13      Q.   And when you came to Miami, who did you work
14  for?
15      A.   I was hired by BDO Seidman.
16      Q.   And during the first year that you were
17  hired by BDO Seidman, did you work on the audit of E.S.
18  Bankest?
19      A.   That's right.
20      Q.   And when you worked on the audit of E.S.
21  Bankest, what was your position?
22      A.   I was a manager at the time.
23      Q.   And as the manager, who were your superiors,
24  your bosses?
25      A.   The partners.

Page 1080

1       Q.   Who were the partners?
2       A.   In this specific audit, the partner in
3   charge was Mr. Sandy Lenner.
4       Q.   Is that Mr. Lenner in the foreground sitting
5   at the table there?
6       A.   Yes.
7       Q.   And who was the other partner working on
8   this audit at BDO Seidman?
9       A.   This audit have a concurring partner and his
10  name is Keith Ellenburg.
11      Q.   Mr. Rivera, what year did you work on the
12  audits of E.S. Bankest?
13      A.   The audit began in the month of December
14  1998 and it was completed in February 1999 for the
15  year-ended December 31st, 1998.
16      Q.   Mr. Rivera, when you were the manager on the
17  audit of E.S. Bankest, does that mean that you were out
18  in the field, meaning you were out at E.S. Bankest doing
19  the audit?
20      A.   Yes.
21      Q.   And who was working with you on the audit?
22  Not the partners, but who worked sort of your
23  subordinates?
24      A.   There was a team of auditors. There was a
25  senior, who is my best recollection was Chris Mohr, and

Page 1081

1    there was at least two staff, I believe.
2        Q.   And during the audit of E.S. Bankest for the
3    year-ending 1998, was there a time period when Chris
4    Mohr didn't work on the audit?
5        A.   Yes.
6        Q.   And why wasn't Chris Mohr working on the
7    audit then?
8        A.   Because he was pulled out to work on other
9    audits that BDO was working on for other customers.
10        Q.   Mr. Rivera, during the period when Mr. Mohr
11    wasn't working, were you doing your job as manager and
12    his job as senior too?
13        A.   That's right.
14        Q.   And so during the course of this audit, were
15    you at E.S. Bankest?  In other words, were you hands on?
16        A.   I have to do it.  Yes.
17        Q.   Mr. Rivera, when you were hands on, working
18    on the audit of E.S. Bankest, did you understand that
19    the audited financial statements of E.S. Bankest done by
20    BDO Seidman would be attached to the private placement
21    memorandum used to raise debentures?
22        A.   Yes.
23            MR. THOMAS:  Your Honor, with your
24    permission, I will approach the witness with Plaintiffs'
25    Exhibit Number 138 in evidence.

Page 1082

1            THE COURT:  You may.
2            MR. THOMAS:  (Complies.)
3            THE WITNESS:  Thank you.
4    BY MR. THOMAS:
5        Q.   Mr. Rivera, if you look at the top of this
6    document, it says "inherent risk questionnaire" --
7            MR. THOMAS:  No.  It's the number 138.
8            (Technician complies.)
9    BY MR. THOMAS:
10        Q.   "Inherent risk questionnaire answers full
11    questionnaire."
12            Do you see that at the top?
13        A.   Yes, sir.
14        Q.   And was this a BDO document?
15        A.   Yes, it is.
16        Q.   And, Mr. Rivera, what's the inherent risk
17    questionnaire?
18        A.   My best recall is to asses the rules
19    associated with a particular audit.  And this is a
20    question that is filled at the beginning of the audit.
21        Q.   If you would please turn with me to page 2,
22    and we're going to look at questions 18 and 22 to start.
23    I'll start with number 18.
24        A.   Okay.
25        Q.   Number 18 asks, "Is more than usual

Page 1083

1    significance likely to be given to the financial
2    statements?"  And what's the answer on this form,
3    Mr. Rivera?
4        A.   Should I read it?
5        Q.   Yes.  What's the answer?  Where it says to
6    the right?
7        A.   "The financial statements are included in
8    the company's private placement memoranda which are used
9    to sell debentures."
10        Q.   And that's the reason why, if you look
11    above, where it says yes?
12        A.   That's correct.
13        Q.   So is more than usual significance likely to
14    be given to the financial statements, the answer is yes.
15    And the reason is the financial statements are included
16    in the company's private placement memoranda which are
17    used to sell debentures; is that right?
18        A.   That's correct, Counselor.
19        Q.   And was this consistent with your
20    understanding when you were the man in the field doing
21    the audit of E.S. Bankest for the year-ending 1998?
22        A.   Absolutely right.
23        Q.   Will you please look at Number 22.
24            (Technician complies.)
25    BY MR. THOMAS:

Page 1084

1        Q.   22 says, "Does the entity have plans to
2    raise finance using these financial statements?"  And
3    the answer is yes; is that right?
4        A.   That's correct, Counselor.
5        Q.   And the reason is the financial statements
6    are included as part of the debenture private placement
7    memorandum.  Again, Mr. Rivera, was this your --
8    consistent with your knowledge when you were working for
9    BDO on this audit?
10        A.   That's correct.
11        Q.   If you could look on the upper right-hand
12    corner of the document, you can see it on the screen.
13        A.   Yes, sir.
14        Q.   What is that?
15        A.   There is a -- this is four initials or
16    signatures of the people that at the time were involved
17    with the preparation of this document or the review of
18    these documents.
19        Q.   So when -- are those initials of BDO
20    auditors?
21        A.   Yes.
22        Q.   So when a BDO auditor signs, I believe, each
23    and every page of this inherent risk questionnaire, does
24    that signify that they either prepared it or they
25    reviewed it?

Page 1085

1    A.  That's right.
2    Q.  Is your initials up there?
3    A.  Yes, sir.
4    Q.  Which one of those is yours?
5    A.  The one on the left.
6    Q.  This one?
7    A.  Yeah.  Looks like a J but it's an R.  That's
8  mine.
9    Q.  Those are your initials?
10   A.  Yes.
11   Q.  Working on this audit at BDO, are you able
12 to recognize the initials of the other auditors at BDO
13 who initialed this very page where it states that the
14 financial statements are included in the company's
15 private placement memorandums which are used to sell
16 debentures?
17   A.  The answer is yes.
18   Q.  Is Mr. Lenner's initials up there?
19   A.  Yes.
20   Q.  Which one is his?
21   A.  That one.  (Indicating.)
22   Q.  This one?
23   A.  Yeah, that one.
24   Q.  Is the other partner who worked on this
25 audit, Keith Ellenburg, are his initials on this very

Page 1086

1  page that says the financial statements are included in
2  the company's private placement memorandums which are
3  used to sell debentures?
4    A.  The answer is yes.
5    Q.  And which one is Mr. Ellenburg's?
6    A.  The one behind Sandy Lenner's, looks like a
7  W.
8    Q.  Here?  (Indicating.)
9    A.  Yeah, that one.
10   Q.  And there's another one.  Do you recognize
11 this initials?
12   A.  Yeah.  It's a CM, which means Chris Mohr,
13 who my understanding, I believe, is the one who prepared
14 this document at the time.
15   Q.  Mr. Rivera, if you would please look with me
16 at question 31.
17         Just a moment so our technology can catch up
18 with me.
19         (Technician complies.)
20 BY MR. THOMAS:
21   Q.  Now, question 31, that's another question
22 within this same document; is that right?
23   A.  Yes.  In the next page.
24   Q.  And 31 says, "Is there a risk of
25 misstatement arising from a requirement to file the

Page 1087

1  financial statements or submit them to a provider of
2  finance?"  And the answer is no; is that right?
3    A.  Yeah.  It's right.  It says no.
4    Q.  Mr. Rivera, at this time, based on your
5  understanding, was there a requirement that the audited
6  financials be filed or submitted to a provider of
7  finance?
8    A.  Not -- no, sir.
9    Q.  However, based on questions 18 and 22, you
10 understand that the financial statements actually were
11 provided to the -- put in the company's private
12 placement memorandums which were used to sell
13 debentures; is that right?
14      MR. COLE:  Objection.  Leading.
15      THE COURT:  Overruled.
16      THE WITNESS:  Should I answer?
17 BY MR. THOMAS:
18   Q.  You may.  When he says overruled, you can
19 answer.  When he says sustained, don't answer.
20   A.  All right, sir.  I'm sorry.  Would you
21 please --
22   Q.  I'll rephrase.  Mr. Rivera, did you
23 understand that at this time, the financial statements
24 were included as part of the debenture private placement
25 memorandums, even if there wasn't some regulatory

Page 1088

1  request?
2    A.  That's correct.  That was my understanding.
3    Q.  Thank you.  Mr. Rivera, you worked on the
4  audit the following year too; is that right?
5    A.  Yeah.  For the year-ended December 31st,
6  1999.
7    Q.  And was your understanding the same in 1999,
8  that the audited financial statements of BDO Seidman
9  would be attached to the private placement memorandum
10 used to sell debentures?
11   A.  That's right.
12   Q.  And, in fact, did your understanding ever
13 change?
14   A.  No.
15   Q.  So based on your knowledge working in the
16 field for BDO Seidman, you always understood that the
17 audited financial statements of BDO Seidman would be
18 attached to the private placement memorandum used to
19 sell debentures?
20      MR. COLE:  Objection.  Leading.
21      THE COURT:  Sustained.
22 BY MR. THOMAS:
23   Q.  Did you always understand that the audited
24 financial statements of BDO Seidman would be attached to
25 the private placement memorandum used to sell

Page 1089

1    debentures?
2        A.   Yes.
3        Q.   Mr. Rivera, when you came to audit -- came
4    to work at BDO Seidman and audited E.S. Bankest, what
5    kind of business was E.S. Bankest?
6        A.   Factoring business.
7        Q.   And, Mr. Rivera, had you ever audited a
8    factoring business before?
9        A.   No.  A factoring receivable business.  A
10   factoring receivable business, yes.  But I never -- it
11   was my first time when I joined BDO Seidman that I was
12   faced to audit that type of business.
13       Q.   And what did you do to understand the
14   business and how you were going to do the audit since
15   this was your first one?
16       A.   I basically received the advice of the two
17   partners, Sandy Lenner and Keith Ellenburg, which were
18   involved in a predecessor business related to the
19   factoring business which was a client of BDO Seidman.
20   And I also reviewed the -- those prior year work papers
21   related to that BDO client.
22       Q.   Let's start with the second one you said,
23   reviewing the prior work papers of the predecessor of
24   E.S. Bankest.  Do you remember what the name of that
25   company was?

Page 1090

1        A.   It was something like Bankest Receivable
2    Factoring Company, but it was a very large name which I
3    don't remember specifically --
4        Q.   If I said the initials BRFFC, does that
5    sound right?
6        A.   The answer should be yes.
7            MR. THOMAS:  With His Honor's permission,
8    I'll approach the witness with Exhibit 262 in evidence.
9            THE COURT:  You may.
10           MR. THOMAS:  (Complies.)
11   BY MR. THOMAS:
12       Q.   If you look at the top of this document, it
13   says Bankest Receivables Finance.  Is that your
14   recollection that that was the predecessor entity of
15   E.S. Bankest?
16       A.   Yes.
17       Q.   And is this a BDO document?
18       A.   Yes.
19       Q.   And so you understood that prior to E.S.
20   Bankest, BDO Seidman had done audits of the predecessor
21   entity BRFFC or Bankest Receivables Finance?
22       A.   Absolutely right.
23       Q.   And to get yourself familiar with how BDO
24   would audit E.S. Bankest, did you review the documents
25   of BRFFC, the audit work papers?

Page 1091

1        A.   Yeah.  At the time it was a common practice.
2        Q.   If we could look at the bottom of the first
3    page.
4        A.   Okay.
5        Q.   Where it reads, "The engagement is sensitive
6    because," and then repeats it.  "The engagement is
7    sensitive because of the company's use of the F/S in its
8    PPMs."  You understand F slash S is a financial
9    statements?
10       A.   Yes, it's a common practice to abbreviate
11   financial statements as F slash S.
12       Q.   And this statement in this BDO document that
13   the engagement is sensitive because of the company's use
14   of the financial statements in its PPMs, that was
15   consistent with your understanding at the time for E.S.
16   Bankest?
17       A.   That's correct, sir.
18       Q.   And did BDO describe the audit of E.S.
19   Bankest as a sensitive audit?
20       A.   My understanding is yes.
21           MR. THOMAS:  With His Honor's permission, I
22   will approach you, Mr. Rivera, with Plaintiffs'
23   Exhibit 315-A.
24           THE COURT:  You may.
25           MR. THOMAS:  (Complies.)

Page 1092

1    BY MR. THOMAS:
2        Q.   Mr. Rivera, is this the inherent risk
3    questionnaire for the next year that you audited at E.S.
4    Bankest for 1999?
5        A.   Yes.
6        Q.   Mr. Rivera, if you look with me at
7    Number 11 --
8        A.   Yes, sir.
9        Q.   -- it says, "Is there a risk of misstatement
10   arising from a requirement to submit the financial
11   statements to an existing or potential provider of
12   finance?"  And the answer is no.  Do you see that?
13       A.   Yes, sir.
14       Q.   Is that the same question we saw in
15   number 31 on the prior year, in effect?
16       A.   That's right.
17       Q.   And was it still your understanding at this
18   time that there was no requirement, like a regulatory
19   requirement, to submit it to the provider of finance?
20       A.   That's my understanding, yes.
21       Q.   But in 1999, was it still your understanding
22   that the audited financial statements done by BDO
23   Seidman of E.S. Bankest would be attached to the private
24   placement memorandum to use to sell debentures?
25       A.   That's right.  That was my understanding.

Page 1093

1    Q.   Now, remember in the prior year, remember we
2  looked at questions 18 and 22?
3    A.   Yes, sir.
4    Q.   That had that answer?
5    A.   Yes, sir.
6    Q.   That's one from the prior year.  If you look
7  in this document, do you see questions 18 and 22 in this
8  one in 1999?  Those questions, is there more than usual
9  significance likely to be given to the financial
10 statements, with the answers, they somehow got deleted
11 from this document; is that right?
12       MR. COLE:  Objection.  Argumentative.
13       THE COURT:  Sustained.
14 BY MR. THOMAS:
15   Q.   Are they in this document?  Do you see them
16 anywhere?
17       THE WITNESS:  Should I answer?
18       THE COURT:  Yes.
19       THE WITNESS:  No, I don't see those
20 questions in this document.
21 BY MR. THOMAS:
22   Q.   Now, since you knew in 1999 that the
23 financial statements are included in the company's
24 private placement memorandums which are used to sell
25 debentures, if BDO would have included those questions

Page 1094

1  in here, would you have answered the same way?
2        MR. COLE:  Speculative.
3        THE COURT:  Sustained.
4  BY MR. THOMAS:
5    Q.   Well, Mr. Rivera, do you know why BDO
6  deleted those questions from the 1999 questionnaire?
7    A.   I don't know.
8    Q.   When you were conducting the 1998 audit of
9  E.S. Bankest, did there come a time when you requested
10 documents that you believed you needed to complete the
11 audit from E.S. Bankest and they refused to give you the
12 documents?
13   A.   Yes.
14   Q.   What documents were you asking for?
15   A.   We were asking for, in summary, customer
16 checks or deposits to validate receivable bonds as of
17 December 31st, 1998.
18   Q.   And so when you say you were asking for
19 customer checks, would that be checks from the people
20 who actually owed the money?
21   A.   Yes.  Collections --
22       MR. COLE:  Objection.
23       THE COURT:  Overruled.
24       THE WITNESS:  I'm sorry.  Yes.
25 BY MR. THOMAS:

Page 1095

1    Q.   And, Mr. Rivera, was the purpose of seeing
2  checks from the people who actually owed the money to
3  determine whether or not those accounts receivable were
4  real or fake?
5        MR. COLE:  Objection.  Leading.
6        THE COURT:  Sustained.
7  BY MR. THOMAS:
8    Q.   What was the purpose of seeing the checks
9  from the customer, the ones who actually owed the money?
10   A.   To validate the existence of a receivable as
11 a particular date.
12   Q.   And when you say validate the existence of a
13 receivable, in plain terms, you mean determine whether
14 it was real?
15   A.   Yes.
16       MR. THOMAS:  With His Honor's permission,
17 I'll approach the witness.
18       THE COURT:  You may.
19       MR. THOMAS:  (Complies.)
20 BY MR. THOMAS:
21   Q.   Mr. Rivera, to explain how -- what you were
22 requesting, would it be helpful to you to use this
23 diagram with the jury?
24   A.   Yes.
25       MR. THOMAS:  Any objection?

Page 1096

1        MR. COLE:  No.  Go ahead.
2        MR. THOMAS:  You can put it up.
3        (Technician complies.)
4  BY MR. THOMAS:
5    Q.   Mr. Rivera, this diagram, you understand it
6  depicts an example of a factoring transaction for E.S.
7  Bankest?
8    A.   Yes.
9    Q.   And E.S. Bankest, that was the firm that BDO
10 Seidman was auditing; is that right?
11   A.   Yes, sir.
12   Q.   And so in this diagram, Joy sells T-shirts
13 to Wal-Mart and then Wal-Mart owes Joy money in 60 or 90
14 days like an IOU or accounts receivable.  Do you
15 understand that to be right?
16   A.   Yes, sir.
17       MR. COLE:  Objection.
18       THE COURT:  Overruled.
19 BY MR. THOMAS:
20   Q.   And then Joy would turn around and sell the
21 account receivable at a discount to Capital; is that
22 right?
23   A.   That was the nature of the business, yes.
24   Q.   And Capital, was that controlled by the
25 Orlanskys and Parlapiano?