Page 1097

1    A.  My understanding was a related entity with
2    common ownership, yes.
3    Q.  And then E.S. Bankest was part owned by
4    Capital and part owned by Espirito Santo?
5    A.  Yes.
6    Q.  Mr. Rivera, when you were requesting
7    documents, were you trying to verify the whole
8    transaction?
9    A.  Yes.
10   Q.  And in the whole transaction, which one of
11   these entities is the one that owes the money
12   originally?
13   A.  Wal-Mart.
14   Q.  And what do we call -- in this example is
15   Wal-Mart what you're referring to as the customer?
16   A.  Yes.  Yes.
17   Q.  And were the documents that you were
18   requesting, Mr. Rivera, to see the customer check, the
19   payment for Wal-Mart for the goods?
20       MR. COLE:  Objection.  Leading.
21       THE WITNESS:  I'm sorry?
22       THE COURT:  Sustained.
23       THE WITNESS:  Could you ask the question
24   again, please.
25   BY MR. THOMAS:

Page 1098

1    Q.  I will.  When you asked for the check from
2    Wal-Mart, the customer --
3    A.  Okay.
4    Q.  -- what was the purpose of you seeing the
5    check from Wal-Mart?
6    A.  To assert and make sure that the receivable
7    is coming from the ultimate customer, which in this case
8    is Wal-Mart.
9    Q.  And in this case is the client Joy?
10   A.  Yeah.  You can define it as a client, yes.
11   Q.  And were you -- in requesting your
12   documents, did you also ask to see deposit slips so that
13   if there was any payment from Joy, you could tell
14   whether or not it actually was deposited into the bank
15   account of Bankest Capital?
16   A.  Yes, sir.
17   Q.  Mr. Rivera, who did you first request the
18   documents to audit the whole transaction including the
19   Wal-Mart customer check?
20   A.  (Inaud.) Carlos Mendez, the controller of
21   E.S. Bankest.
22   Q.  And when you asked Carlos Mendez for these
23   documents, did he give them to you?
24   A.  No.
25   Q.  And when Carlos Mendez didn't give them to

Page 1099

1    you, did you just say, okay, we don't need them, and go
2    on about the audit?
3    A.  No.  I asked for a reason why the documents
4    were not available.
5    Q.  And Mr. Rivera, did Mr. Mendez give you a
6    reason?
7    A.  Yes.
8    Q.  And what was that reason?
9        MR. COLE:  Objection.  Hearsay.
10       THE COURT:  Sustained.
11   BY MR. THOMAS:
12   Q.  Well, Mr. Rivera, did he -- did you request
13   it several times from Mr. Mendez, these documents?
14   A.  That's right.
15   Q.  And did he ever give them to you?
16   A.  I never received the document from him.
17   Q.  Now, since Mr. Mendez wouldn't give them to
18   you, did you ask anyone else for the documents?
19   A.  Yes.
20   Q.  Who else did you ask to get these customer
21   checks and deposit slips so you could see if the
22   accounts receivable were real?
23   A.  His supervisor, the vice president of the
24   organization, Mr. Dominick Parlapiano.
25   Q.  And when you asked Mr. Dominick Parlapiano

Page 1100

1    to show you the Wal-Mart checks so you could audit the
2    whole transaction, how did he react?
3        MR. COLE:  Objection.  Hearsay.
4        THE COURT:  Overruled.
5        THE WITNESS:  He refused to provide the
6    documents
7    BY MR. THOMAS:
8    Q.  Was he nice about it?
9    A.  Pardon me?
10   Q.  Was he nice about it?
11   A.  He?  No, he was not.
12   Q.  Did he seem angry to you?
13       MR. COLE:  Objection.
14       THE COURT:  Overruled.
15       THE WITNESS:  Upset.  Angry.  I would say
16   yes.
17   BY MR. THOMAS:
18   Q.  And did you ask him several times to give
19   you these documents so you could figure out whether the
20   accounts receivable were real or fake?
21   A.  The answer is yes.
22   Q.  Did he ever give them to you?
23   A.  No.
24   Q.  Do you know approximately when these
25   requests happened when you were doing the audit of E.S.

Page 1101

1    Bankest for the year-ending 1998?
2        A.   Yeah.  The document have been requested
3    since the beginning of January, but then he came to a
4    point like in the middle of February that the document
5    were not available and -- I mean, that day or close to
6    that day, was that Dominick refused -- that the
7    documents were not going to be available for the
8    auditors.
9        Q.   And when Dominick Parlapiano told you that
10   the documents you believed you needed to tell whether
11   these accounts receivable were real or fake would not be
12   given to you --
13           MR. COLE:  Objection.  Hearsay.
14           THE COURT:  Hold on.
15           THE COURT:  Is that a question?
16           MR. THOMAS:  I hadn't finished the question
17   yet.  You want me to rephrase?  I can do it differently,
18   Judge.
19           THE COURT:  (Nodding.)
20   BY MR. THOMAS:
21       Q.   Mr. Rivera, when you understood that
22   Mr. Parlapiano and Mr. Mendez were not going to give you
23   these documents you needed to tell whether the accounts
24   receivable were real or fake, did you continue the
25   audit?

Page 1102

1        A.   No, I stopped the work.
2        Q.   You stopped the audit?
3        A.   That's right.
4        Q.   And when you stopped the audit, did you tell
5    anybody at BDO?
6        A.   Yeah, definitely.  I tried to reach my
7    superiors.
8        Q.   Did you try to reach Mr. Sandy Lenner?
9        A.   Yeah.  I placed a phone call to BDO Seidman
10   at the time.
11       Q.   And were you able to get a hold of Mr. Sandy
12   Lenner at this time?
13       A.   He was not in the office on that date.
14       Q.   Did you try to talk to your other boss,
15   Mr. Keith Ellenburg?
16       A.   That's right.
17       Q.   And did you talk to him?
18       A.   Yeah.  He was in the office.
19       Q.   And what did you say to Mr. Ellenburg?
20       A.   I basically recreated the circumstances
21   under which Dominick Parlapiano refused to provide the
22   documents.  I explained to him what I did in terms of,
23   listen, I stopped the audit, I think the right thing to
24   do is to go back to the office and not to perform any
25   further work.  And he agreed with my decision.

Page 1103

1        Q.   So the number two partner on this audit,
2    Keith Ellenburg, agreed with you that since you couldn't
3    get the documents you needed, that you should stop the
4    audit?
5        A.   That's right.
6        Q.   Now, this was right during the middle of
7    busy audit season; is that right?
8        A.   My best recollection is the middle of
9    February, yes.
10       Q.   And during this time, the busy audit season,
11   would you normally work late on pretty much every day of
12   the week?
13       A.   60-hour week.  Saturday, Sunday were working
14   days at the time.
15       Q.   So you'd normally go to work on Saturday
16   during audit season?
17       A.   And, in fact, I went to work on Saturday but
18   not for E.S. Bankest.
19       Q.   I see.  Now, Mr. Rivera, do you recall what
20   day of the week it was when you stopped the audit and
21   called Mr. Ellenburg?
22       A.   It was a Friday afternoon.
23       Q.   So the next day on Saturday, you went to
24   work but you didn't go to work to E.S. Bankest?
25       A.   No.

Page 1104

1        Q.   You went back to the office instead?
2        A.   That's right.
3        Q.   And on Monday morning, would you normally
4    have gone out to E.S. Bankest to work on the audit?
5    Would that have been what your normal course would be?
6        A.   That's right.
7        Q.   And did you go on Monday morning out to E.S.
8    Bankest?
9        A.   No.  I showed up at the office based on
10   Mr. Ellenburg's instructions.
11       Q.   And when you got to the office on Monday
12   morning, did you meet with Mr. Lenner and Mr. Ellenburg?
13       A.   During that day, yes.
14       Q.   And in the meeting with Mr. Lenner and
15   Mr. Ellenburg, did you describe again why you had
16   stopped the audit?
17       A.   Absolutely right.
18       Q.   And did Mr. Ellenburg in that discussion,
19   state that he agreed with you, that you should have
20   stopped the audit?
21       A.   Yes.
22       Q.   And in this meeting between you and
23   Mr. Ellenburg and Mr. Lenner, was there a determination
24   made to call Dominick Parlapiano?
25       A.   Yes.  They wanted to know what happened.

Page 1105

1       Q.   And, in fact, did Mr. Lenner, Mr. Ellenburg,
2   and you call Mr. Parlapiano?
3       A.   That's right.
4       Q.   And when you called Mr. Parlapiano, were you
5   in Mr. Lenner's office?
6       A.   Yeah, we were in his office.
7       Q.   And did he have one of those speakerphones
8   so you could hear what's being said?
9       A.   That's right.
10      Q.   So could you hear what Mr. Parlapiano was
11  saying?
12      A.   The whole time.
13      Q.   And could you hear what Mr. Lenner and
14  Mr. Ellenburg were saying?
15      A.   Absolutely right.
16      Q.   And during this conversation, did Mr. Lenner
17  tell Mr. Parlapiano that these documents, including the
18  customer checks, were documents that BDO Seidman had to
19  have in order to conduct this audit?
20          MR. COLE:  Objection.  Leading.
21          THE COURT:  Sustained.
22  BY MR. THOMAS:
23      Q.   What did he tell you?
24      A.   Who?  Mr. Lenner?
25      Q.   Mr. Lenner.  What did he tell Mr. Parlapiano

Page 1106

1   in this meeting?
2       A.   In summary, that he didn't understand the
3   circumstances under which the Parlapiano refusal to give
4   out the document was.  And Mr. Parlapiano again
5   explained to him, you know, in plain English what
6   happened on that afternoon.  And that he's not going to
7   provide the documents at the time because --
8          MR. COLE:  Objection.
9          THE COURT:  Sustained.  Stop right there.
10         Ask a question.
11  BY MR. THOMAS:
12      Q.   Stop right there.  I'm sorry.  We're going
13  to stick to what Mr. Lenner said instead of what
14  Mr. Parlapiano said.
15      A.   I'm sorry.
16      Q.   Did Mr. Lenner tell Mr. Parlapiano that
17  these documents, including the customer checks, were
18  documents that BDO had to have to properly do this
19  audit?
20          MR. COLE:  Objection.  Leading again.  Same
21  question.
22          THE COURT:  Sustained.
23  BY MR. THOMAS:
24      Q.   What did Mr. Lenner tell Mr. Parlapiano
25  about whether or not BDO Seidman needed these documents

Page 1107

1   to properly complete the audit?
2       A.   That we needed the documents, yes.
3       Q.   And what did Mr. Lenner tell Mr. Parlapiano
4   BDO was going to have to do if Mr. Parlapiano refused to
5   give these documents, including the customer checks?
6       A.   Resign as auditors of E.S. Bankest.
7          MR. COLE:  I'm sorry?
8          MR. THOMAS:  Resign as auditors of E.S.
9   Bankest.
10  BY MR. THOMAS:
11      Q.   And in this call, did Mr. Parlapiano agree
12  to give the documents?
13          MR. COLE:  Objection.
14          THE COURT:  Overruled.
15          THE WITNESS:  No.
16  BY MR. THOMAS:
17      Q.   And when this call was over, did you
18  understand that BDO Seidman was no longer doing the
19  audit of E.S. Bankest?
20      A.   Based on the results of the conversation,
21  yes.
22      Q.   And so after the call was over, did
23  Mr. Lenner instruct you to go out to E.S. Bankest and
24  continue the audit?
25      A.   No.  His instructions were clear.  Don't do

Page 1108

1   any further work.
2       Q.   And the instructions of don't do any further
3   work, was that an instruction to you from Sandy Lenner?
4       A.   Absolutely, yes.
5       Q.   Did you go back to your office?
6       A.   Yes.
7       Q.   Did you try to tidy up the stuff on E.S.
8   Bankest and then move on to other matters?
9       A.   I basically start working on other clients.
10      Q.   Mr. Rivera, did there come a time later that
11  week where you saw Mr. Parlapiano in BDO's offices?
12      A.   Two days later, yes.
13      Q.   Where was your office?
14      A.   At the time it was like an angle that I can
15  see the lobby of BDO Seidman when they were in the 22nd
16  floor in the Nation's bank building.
17      Q.   So from your desk chair, you could see the
18  lobby entrance of BDO Seidman?
19      A.   Yeah.
20      Q.   Would it be like over here?  (Indicating.)
21      A.   Yes.
22      Q.   And did you see Mr. Parlapiano a few days
23  later come into the lobby of BDO Seidman?
24      A.   Yes.
25      Q.   Did you greet him?

Page 1109

1     A.   Pardon me?
2     Q.   Did you greet him? Did you see him and say
3   hello?
4     A.   Yeah, I stand up and go to him and shake
5   hands. And basically I ask him, what can I do for you?
6     Q.   And what did he say?
7        MR. COLE: Objection.
8        THE COURT: Overruled.
9   BY MR. THOMAS:
10    Q.   Go ahead.
11    A.   He said that he came to -- because he have a
12   meeting with Sandy Lenner.
13    Q.   And when you were out here in the lobby with
14   Mr. Parlapiano, did Mr. Lenner come up?
15    A.   Yeah.
16    Q.   And where did Mr. Lenner and Mr. Parlapiano
17   go?
18    A.   To his office.
19    Q.   To Mr. Lenner's office?
20    A.   Yes.
21    Q.   Did they invite you?
22    A.   No.
23    Q.   Did you ever get to go in there and
24   participate in the meeting?
25    A.   No, I was not invited.

Page 1110

1     Q.   Did they close the door behind them?
2     A.   That's my understanding, yes.
3     Q.   So you don't know what happened in that
4   meeting?
5     A.   Absolutely not.
6     Q.   But after the meeting, did Mr. Lenner come
7   out and talk to you?
8     A.   Yes. During that afternoon, he came to my
9   office and talked to me, yes.
10    Q.   And now, did Mr. Lenner tell you that now
11   you were going to go back to E.S. Bankest and restart
12   the audit?
13    A.   Yes.
14    Q.   Did he tell you when he told you that you
15   were going to go back to E.S. Bankest and restart the
16   audit, did he tell you about his relationship with
17   Mr. Parlapiano?
18    A.   Yeah. He again told me about their
19   relationship as --
20    Q.   What did he tell you?
21    A.   That he knows Dominick from a long time.
22   And since I haven't been in Miami for a long period of
23   time -- because at the time that this incident happened
24   I was basically only like a year working and living in
25   Miami -- I didn't know how important Dominick is in the

Page 1111

1   community of Miami and Florida. And the relationship
2   between BDO and E.S. Bankest could bring more business
3   to BDO through the way -- by the way, I mean figure of
4   Dominick Parlapiano.
5     Q.   Now, did he tell you anything about as a
6   manager was it part of your job to start thinking about
7   bringing in business?
8        MR. COLE: Objection.
9        THE COURT: I'm sorry. Did you object?
10       MR. COLE: Objection. Leading.
11       THE COURT: Overruled.
12       THE WITNESS: Yeah, he mentioned that as a
13   manager of BDO Seidman, I should do better job managing
14   relationship with the clients to -- definitely clients
15   will help to bring other clients into the organization.
16   BY MR. THOMAS:
17    Q.   And did you understand that some of the
18   business that you were supposed to be bringing in was
19   the business that Mr. Parlapiano could bring in through
20   his relationship and important status in the community
21   in Miami?
22       MR. COLE: Objection. Leading.
23       THE COURT: Sustained.
24   BY MR. THOMAS:
25    Q.   What was part of the business that you

Page 1112

1   understood Mr. Lenner was talking about when he told you
2   that you should be trying to bring in business to BDO
3   Seidman?
4     A.   I mean -- sorry? What type of -- like the
5   name of customers?
6     Q.   Yes. Did it include affiliates of Bankest?
7     A.   Absolutely, yes.
8     Q.   Did it include businesses associated with
9   Dominick Parlapiano?
10    A.   Yes. Yeah, I remember Bankest Capital Corp.
11   I remember Espirito Santo Bank. Yes.
12    Q.   And, Mr. Rivera, did Mr. Lenner tell you
13   that now you were going to get the documents that you
14   had requested?
15    A.   That Dominick -- yes. That Dominick came.
16   They met together. And as a result of the meeting,
17   Dominick agreed to provide the documents to us to finish
18   the audit. Yes.
19    Q.   So Mr. Lenner told you that these customer
20   checks and deposit slips that you had requested, been
21   requesting for months, that now Bankest was going to
22   provide them to you?
23    A.   That's right.
24    Q.   Did Bankest ever give you all the documents
25   that you requested?

Page 1113

1    A.   Not the hundred percent that we were asking
2  for, no.
3    Q.   Did you go back to do the audit?
4    A.   Yes.  Per Mr. Lenner's instruction, yes.
5        MR. COLE:  Your Honor, may I stand near the
6  door?
7        THE COURT:  Sure.
8  BY MR. THOMAS:
9    Q.   Do you know this document?
10   A.   Yes.  Is there any way you can put it on
11 that --
12 BY MR. THOMAS:
13   Q.   Yes.  If I put it here, does that help?
14   A.   Yeah, that's fine.
15   Q.   What is this document, Mr. Rivera?
16   A.   This is amplification of a work paper that
17 we prepared as part of the 1998 audit of E.S. Bankest.
18   Q.   And this is a BDO work paper?
19   A.   Yeah.  It's a BDO work paper, yes.
20   Q.   And is this work paper a test to see if
21 these receivables were paid, collected?
22   A.   Yeah.  It was -- summarized the procedures
23 performed for those receivables, yes.  Yes.
24   Q.   And the customer is listed here on the left,
25 K-Marts, Wal-Marts?

Page 1114

1    A.   Yes.  Like the customer -- like at the end
2  of the chart that you have here.
3    Q.   And these numbers at the bottom, are they
4  the instructions for how you're supposed to determine
5  whether or not these receivables have actually been
6  paid, are real?
7    A.   That's right.
8    Q.   Now, number A says, "Examined collection of
9  1998 invoices, trace to copy of customer check and
10 remittance advice noting agreement to amount and date."
11 And it says trace to copy of customer check, is that the
12 customer checks that you were asking for?
13   A.   I'm sorry.  Could you ask me that question
14 again?
15   Q.   When it says down here, trace to copy of
16 customer check, were these the customer checks that you
17 were asking for from E.S. Bankest?
18   A.   At some point in time, some of these
19 customer checks were not available to us.
20   Q.   Yes.  And we're going to explain that.  But
21 I just want to know are the customer checks, you asked
22 for them, even though they later were not available?
23   A.   Yes.  These are the customer checks we've
24 been asking for.  That's right.
25   Q.   Now, when you asked for these customer

Page 1115

1  checks, if you performed A, you were able to do these
2  things, could you put a check mark under A?  Is this how
3  that worked?
4    A.   The answer is yes.
5    Q.   And what's a remittance advice?
6    A.   It's a -- when you receive a check from an
7  entity that owes you, usually that check comes with a
8  header, like a top side, and then the check is on the
9  bottom.  And then you like tear away and then you
10 deposit the check and you keep the remittance advice,
11 which explains payment of invoice, says X, Y,Z or 1, 2,
12 3.  It's common.
13   Q.   So like when you get your paycheck, it's
14 that other thing that's attached to it and you tear off?
15   A.   Exactly.
16   Q.   Now, Mr. Rivera, you stated that
17 Mr. Parlapiano and E.S. Bankest did not give you all the
18 customer checks you asked for; is that right?
19       MR. COLE:  Objection.
20       THE COURT:  Overruled.
21       THE WITNESS:  Yes.  I don't receive all the
22 customer checks what we were asking for during the
23 course of the audit.
24 BY MR. THOMAS:
25   Q.   And notwithstanding Mr. Lenner telling you

Page 1116

1  that you were going to get all the documents you asked
2  for, when you did not receive a customer check, what did
3  Mr. Lenner instruct you that you could accept instead?
4    A.   That we should limit our review to checks
5  received from Bankest Capital Corp., deposits or
6  customer checks from Bankest Capital Corp.
7    Q.   So when you were performing A, could you
8  treat a customer check and put a check mark if the check
9  you saw was from Bankest Capital?
10   A.   Those were the instructions at the time,
11 yes.
12   Q.   And so you didn't have to see a check from
13 JC Penney for number 14?
14   A.   In some instances, no.
15   Q.   If you got the check from JC Penney, was
16 that fine?
17   A.   It's okay.  But if we don't got it, we
18 should limit our review to Bankest Capital Corp.
19 documents.
20   Q.   Could you look at the thing there.  I may be
21 blocking this view from something.  I'm going to move it
22 just like this.
23       Bankest Capital, is that the business
24 controlled by the Orlanskys?
25   A.   Yes.

Page 1117

1    Q.   So when Bankest refused to give you Wal-Mart
2    checks, you could accept a check from the Orlanskys'
3    other business?
4         MR. COLE:  Objection.
5         THE COURT:  Sustained.
6    BY MR. THOMAS:
7    Q.   Could you accept a check from the Orlanskys'
8    other business as proof that the account receivable from
9    Wal-Mart was real?
10   A.   The answer is yes.
11   Q.   And in that instance, Mr. Rivera, did you
12   audit the whole transaction?
13   A.   No.
14   Q.   What would you audit?
15   A.   Just like based on the instruction that the
16   team received at the time, we just stopped our work up
17   to this level (indicating).  We don't go further this
18   entity to see either checks or collections from Joy or
19   checks or collections from Wal-Mart.
20   Q.   What if you got a check from Joy?  If you
21   got a check from Joy, did you have to see a Wal-Mart
22   check?
23   A.   I would say yes.
24   Q.   So to audit your transactions -- can I take
25   that for just a minute?  May I?

Page 1118

1    A.   Sure.  (Complies.)
2    Q.   If E.S. Bankest did not provide you proof
3    that the entity that actually owed the money, the
4    Wal-Mart, if they wouldn't give you that check and
5    sometimes you could take a check from Joy instead?
6    A.   Yeah.  We were -- I mean, those were the
7    instructions that we received.  In that case, then a
8    check from Joy will be sufficient evidence and -- okay.
9    I'm sorry.  Repeat the question.
10   Q.   So that would be okay.  But sometimes you
11   wouldn't even get a Joy check?
12   A.   No.
13   Q.   And in that case, you could just stop with
14   Capital; is that right?
15   A.   That's right, yes.
16        MR. THOMAS:  Just want to make clear for the
17   record that the C-10 that we were putting up here is
18   Plaintiffs' Exhibit Number 376 in evidence.
19   BY MR. THOMAS:
20   Q.   Is that right, Mr. Rivera?
21   A.   Yes.
22   Q.   Now, Mr. Rivera, you previously testified
23   that you had been asking for these kinds of documents
24   for, I think, since January; is that right?
25   A.   Yeah.  The audit began like at the beginning

Page 1119

1    of January.  That's why --
2    Q.   Sorry.  Ms. Alexander was trying to keep me
3    from crashing into something.
4         You said the audit began back in January?
5    A.   That's right.
6    Q.   And you had been asking for these kinds of
7    documents since then?
8    A.   Yeah.  By way of reference, the day of the
9    inherent risk questionnaire which is something that we
10   did at the beginning of the audits.  So that's more or
11   less a reference date for you for your information.
12   Q.   Now, after Mr. Lenner instructed you to
13   restart the audit, did you then make specific requests
14   for documents?  Like did you send a fax and say, okay,
15   you refused to give them to me before but now give me
16   these documents?
17   A.   Yeah.  I think from time to time we sent --
18   relayed information asking for the open items to
19   complete the audit, yes.
20   Q.   I'm going to approach you with Exhibit 287
21   in evidence at pages 381 and 382.
22        If you look at the cover of this, is this
23   your handwriting?
24   A.   Yes, sir.
25   Q.   And it says, "Carlos attaches a list of

Page 1120

1    subsequent collections that we will examine as part of
2    the audit of E.S. Bankest.  Tomorrow I'll provide a
3    sample of the invoices that we need to examine.  Best
4    regards, Ramon."
5         Did I get your handwriting right?
6    A.   Yes, sir.
7    Q.   And if we look at the next page, you see a
8    list?
9    A.   Okay.
10   Q.   And is this a list of some of the ones that
11   you were requesting?
12   A.   Yes.  Absolutely, yes.
13   Q.   And I'm hoping my team isn't going to get
14   too upset with me, but I think we need that C-10 board
15   back out here.
16   A.   Pardon me?
17   Q.   I'm sorry.  I think we need this big C-10
18   board back out here.  If you give me just a moment, I'm
19   going to put it back up.  I hope they don't get too mad
20   at me.
21        Now, for -- I know these aren't in perfect
22   order.  But is this list -- nine or so in this list
23   equal to the first nine or ten of this list?  Can you
24   tell that?
25   A.   Yeah.  Based on the customer names and the

Page 1121

1    transaction date, yeah, you can reference or
2    cross-reference items from the February 18th fax and the
3    C-10 work paper, yes.
4        Q.   And you kept requesting, right?
5        A.   I'm sorry, Counselor?
6        Q.   You kept requesting documents.  You
7    requested some initial documents.  I'm going to show you
8    Plaintiffs' Exhibit 286 in evidence at 697.
9        A.   Yes, sir?
10       Q.   If you take a moment to look -- if you look
11   at the last page?
12       A.   Of?
13       Q.   Of Plaintiffs' Exhibit 286.  This one I just
14   gave you, you see a fax sheet on the back there?
15       A.   Yes.  Yes, sir.
16       Q.   And on the fax list it says, "Updated list
17   of open items together with additional subject
18   collections we need to review"?
19       A.   That's right, sir.
20       Q.   And if you look back at the beginning, the
21   first page, do you see a list of open items, the memos?
22       A.   Yes.
23       Q.   And then if you look down at number 8 on
24   that list?
25       A.   Okay.

Page 1122

1        MR. THOMAS:  Can you all get there?  It's
2    number 8 on this one.
3        (Technician complies.)
4    BY MR. THOMAS:
5        Q.   Number 8 says, "Additional accounts
6    receivable collections will be requested when we receive
7    item 7.  Refer to attached lists 1 and 2."
8        You see that?
9        A.   Yes, sir.
10       Q.   Is attached list 1 and 1, is it in this fax,
11   this exhibit I gave you?
12       A.   Yes, sir.
13       Q.   Can you point them out to me?
14       A.   This is list 1 (indicating).
15       Q.   Okay.
16       A.   And this is list 2 (indicating).
17       Q.   Now, are these all part -- these lists, all
18   part of a subset, I guess, of the documents you had
19   already requested?
20       A.   That's right, sir.
21       Q.   And if we look at list 1 and 2, do they end
22   up on about 11 through 32?
23       A.   Yes, sir.
24       Q.   I'm going to show you in evidence
25   Exhibit 286 on pages 695, 96.

Page 1123

1        A.   Okay.
2        Q.   And I believe that first fax we looked at
3    was on February 18th.  The second one we looked at was
4    February 22nd?
5        A.   That's correct.
6        Q.   And this one is the next day, February 23rd?
7        A.   That's right.
8        Q.   And this next fax, is it from Mr. Parlapiano
9    to Mr. Lenner and Mr. Ellenburg and yourself?
10       A.   Yes.
11       Q.   And is that your -- is that your handwriting
12   over there on the left where it says okay, okay, okay,
13   okay, okay?
14       A.   Yes.  It is.
15       Q.   Can we look at the -- if you look at the
16   second page, number 8.
17            MR. THOMAS:  Can we move to the next page?
18            (Technician complies.)
19   BY MR. THOMAS:
20       Q.   Mr. Rivera, if you look at number 8, this is
21   the next day now.  It says, "Same documentation provided
22   on BDO's initial request for A-R collection validation
23   to be provided 2-24-98 on all items listed in the
24   relevant lists 1 and 2."
25            Is that referencing back to the 1 and 2 from

Page 1124

1    the fax from the day before?
2        A.   It's my understanding, yes.
3        Q.   And when you wrote okay over there to the
4    left, what did that mean?
5        A.   To be honest, I don't know what the okay
6    means.
7        Q.   You don't remember why you wrote okay on all
8    these?
9        A.   I do remember a conversation with Dominick
10   Parlapiano with this document.  But as of today, I don't
11   remember why I put okay next to these numbers.  And -- I
12   don't want to speculate, you know, the reason.
13       Q.   We don't want you to speculate.  Could it
14   simply meant you talked to him about each one?
15       A.   It could mean that, yes.
16       Q.   All right.  Mr. Rivera, now we have the
17   first fax from February 18th, which is these, 1 through
18   9 or 10.  And then we have lists 1 and 2, which turns
19   out to be 11 through 32.  Remember that testimony?
20       A.   Yes, sir.
21       Q.   Mr. Rivera, for numbers 1 through 9 or 10,
22   did you receive the actual customer checks?
23       A.   Yeah.  I remember receiving that
24   information, yes.
25       Q.   So from the first list, 1 through 9 or 10,

Page 1125

1  those accounts receivable were real?
2     A.  Yes.
3     Q.  Now, for 11 through 32, did you receive the
4  customer checks?
5     A.  As long as we defined Bankest Capital Corp.
6  as a customer, yes.
7     Q.  Let me rephrase.  For 11 through 32, did you
8  receive a check from the person or entity that actually
9  owed the money, the K-Mart or the JC Penney or the
10  Wal-Mart?
11     A.  My best recollection is that I don't
12  remember receiving those type of checks.
13     Q.  But based on Mr. Lenner's instructions, as
14  you just described, did you treat Bankest Capital checks
15  as customer checks to verify these transactions?
16        MR. COLE:  Objection.  Speculative.
17        THE COURT:  Overruled.
18        THE WITNESS:  The answer is yes.
19  BY MR. THOMAS:
20     Q.  With His Honor's permission, I will approach
21  you with Plaintiffs' Exhibit 321 in evidence.
22        THE COURT:  You may.
23        MR. THOMAS:  (Complies.)
24  BY MR. THOMAS:
25     Q.  Mr. Rivera, if you look at the top of this

Page 1126

1  document, it says, "Bankest Receivables and Financing
2  Corp., period ending 12-31-98."
3     A.  Yes, sir.
4     Q.  That's actually the name of the predecessor
5  entity?
6     A.  You're absolutely right, yes.
7     Q.  So in this instance, BDO Seidman should have
8  put E.S. Bankest at the top?
9     A.  That will be the proper thing to do, yes.
10     Q.  But it was basically the same business; is
11  that right?
12     A.  Yeah.  This is the work paper that we
13  used -- or the work program -- I'm sorry -- that we used
14  for the E.S. Bankest audit in 1998.
15     Q.  And this portion of the work papers sets out
16  the auditing procedures for -- at the top it says,
17  "Sales, shipping, and trade receivables"; is that right?
18     A.  Yes.
19     Q.  And if you look at the last page.
20     A.  Of this document?
21     Q.  Yes, please.
22     A.  Yes, sir.
23     Q.  Where it says conclusions, it says, "Based
24  on the results of the work performed, it is my opinion
25  the trade receivables and sales are properly classified

Page 1127

1  and stated in accordance to Generally Accepted
2  Accounting Principals on a consistent basis and those
3  receivables represent bona fide receivables of the
4  client.  No receivables were pledged or" -- can you help
5  me with that word?
6     A.  Hypothetic.
7     Q.  I'm going to let you say it.  And I'm going
8  to go on and say, "and the allowance for possible losses
9  is adequate."
10        Did I read that correctly except for the
11  word you read for me?
12     A.  That's right, Counselor.
13     Q.  And are your initials on here?
14     A.  The top ones.
15     Q.  That one is yours (indicating)?
16     A.  That's correct, Counselor.
17     Q.  And is Mr. Lenner's initials on here?
18     A.  That one, yes.
19     Q.  And Mr. Ellenburg?
20     A.  That's one.  That's right, sir.  Yes.
21     Q.  And when you signed this document,
22  Mr. Rivera, were you relying upon Mr. Lenner's
23  experience and his instruction that you could treat a
24  Bankest Capital check as a customer check to verify
25  these receivables?

Page 1128

1     A.  That's correct.
2     Q.  Mr. Rivera, did you get taken off the audits
3  of E.S. Bankest?
4     A.  Yeah, I was pulled out.  Yes.  Pulled out is
5  the right word from those audits.  After the audit on
6  December 1999.
7     Q.  So after the next year?
8     A.  Yes.
9     Q.  And the next year in '99, you did the same
10  thing?  You treated either a Joy check or a Capital
11  check as a customer check because that's all Bankest
12  would give you?
13     A.  That's my best recollection, yes.
14     Q.  Now, when you were pulled off the E.S.
15  Bankest audits to work on other audits, they didn't tell
16  you it had anything to do with the work on E.S. Bankest,
17  did they?
18     A.  Not that I remember.
19     Q.  They didn't tell you it had anything to do
20  with this whole situation with Parlapiano, did they?
21     A.  No, I don't think so.
22     Q.  And you continued to work at BDO?
23     A.  On other clients, yes.
24     Q.  But then they fired you?
25     A.  Later on, yes.

Page 1129

1    Q.  And after they fired you, were you able to
2  get another job?
3    A.  Yes.  Fortunately, yes.
4    Q.  And did you get that job pretty quickly?
5    A.  Yeah, within a month.
6    Q.  And what's your -- are you in the same job
7  now?
8    A.  Yes.
9    Q.  And what was your new job?
10   A.  I worked for former company of Philip
11 Morris.  The name of the company now is Altria Corporate
12 Services.
13   Q.  And what do you do there?
14   A.  I'm an auditor but only for that
15 organization.
16   Q.  So you go around and do audits?
17   A.  Exactly.
18   Q.  Are you in charge of any audits now?
19   A.  Yeah.  Usually, yes.
20   Q.  Now, did there a come a time that you
21 received a telephone from Mark Forrester?
22   A.  Like three years ago, yes.
23   Q.  And is that Mark Forrester (indicating)?
24   A.  Yes.
25   Q.  And do you understand Mark Forrester works

Page 1130

1  with me?
2    A.  That's what he said to me in those phone
3  calls.
4    Q.  Now, when Mark Forrester called you, did you
5  immediately tell him everything that you could possibly
6  think of about your time at BDO?
7    A.  I refused to cooperate or give information
8  of a former client of the work that I did to someone
9  that I don't know, especially by the phone, you know.
10   Q.  Were you a little skeptical?
11   A.  Yeah.
12   Q.  Auditors are supposed to be skeptical; is
13 that right?
14   A.  Yes.
15   Q.  And you said about a former client.
16 Actually, BDO Seidman, they made you sign an agreement
17 to keep information about what happened at BDO Seidman
18 secret, right?
19   A.  Confidential.
20       MR. THOMAS:  Your Honor, I need to approach
21 your clerk for just a moment, please.
22       THE COURT:  Okay.
23       MR. THOMAS:  With Your Honor's permission,
24 I'll approach the witness with Plaintiffs' Exhibit 7335
25 marked for ID.

Page 1131

1  BY MR. THOMAS:
2    Q.  Mr. Rivera, if you turn to the last page of
3  this document, is that your signature there?
4    A.  Yes, sir.
5    Q.  And if you turn to the first page of the
6  document, could you please read the title of the
7  document.
8    A.  It says, you know, I have the BDO Seidman
9  header here.
10   Q.  Yes?
11   A.  And then behind that it says, "BDO Seidman,
12 LLP, senior manager/manager agreement.
13       MR. THOMAS:  At this time, Your Honor,
14 Plaintiffs move into evidence Plaintiffs' Exhibit marked
15 for ID 7335.
16       MR. COLE:  No objection.
17       THE COURT:  Without objection, we'll accept
18 Plaintiffs' 7335 marked for ID as Plaintiffs'
19 Exhibit 7335 in evidence.
20 BY MR. THOMAS:
21   Q.  Is this an agreement you signed with BDO
22 Seidman?
23   A.  That's right, sir.
24   Q.  And pursuant to this agreement, did you
25 understand that you had to keep information that you had

Page 1132

1  learned during your work at BDO Seidman confidential?
2    A.  Among other things, yes.
3    Q.  And if you look at -- can we look at sort of
4  paragraph 4 or 5 there?
5    A.  Okay.
6    Q.  And it says at the beginning of 4, "It is
7  agreed that it is important to protect the firm."  And
8  the firm, you understood that means BDO?
9    A.  Of course.
10   Q.  "It is important to protect the firm and its
11 clients from the unauthorized use or appropriation of
12 confidential and proprietary information developed,
13 held, or used by the firm concerning the firm or the
14 firm's clients' confidential information."
15       And that's what you understood?
16   A.  Definitely, yes.
17   Q.  And you understood that part of the reasons
18 for this agreement was that you couldn't go to a
19 competitor and give them confidential information about
20 BDO?
21   A.  Or -- that's right.  Or I can't take clients
22 out of BDO Seidman.
23   Q.  Now, if you look at the next page, number 6,
24 in the little paragraph underneath that on page 6, the
25 one that begins therefore.

## Page 1133

1  MR. THOMAS: You see that, where it says
2  therefore?
3  (Technician complies.)
4  BY MR. THOMAS:
5  Q. And it talks about in consideration of this
6  for 18 months after your departure that these
7  confidentiality provisions apply?
8  A. Absolutely right.
9  Q. Now, when did you leave -- when did BDO
10  Seidman fire you?
11  A. May 2001.
12  Q. And when did Mark Forrester call you?
13  A. About May or June of 2004.
14  Q. And did you tell Mr. Forrester that one of
15  the things you were concerned about was violating this
16  agreement you had with BDO?
17  A. Absolutely, yes.
18  MR. COLE: Objection.
19  THE COURT: Overruled.
20  BY MR. THOMAS:
21  Q. Now, Mr. Rivera, didn't this agreement only
22  apply for 18 months? Did you really think you were
23  going to violate it?
24  A. My best recollection is that I didn't think
25  I was violating this, but definitely it came to my mind

## Page 1134

1  that before I leave BDO Seidman I signed this and I
2  don't want to give or volunteer information that later
3  on, you know, I could be doing something wrong, you
4  know, and follow me like a ghost or something like that.
5  Q. Were you being careful?
6  A. Absolutely.
7  Q. Are you a lawyer?
8  A. No, I'm not.
9  Q. Mr. Rivera, before you would speak to
10  Mr. Forrester about what happened while you were at BDO,
11  did you consult a lawyer?
12  A. Yeah, I talked to a lawyer in my home, in my
13  hometown where I live, in White Plains in New York.
14  Q. Don't tell us what you told that lawyer.
15  That's privileged. But if you could just tell us his
16  name.
17  A. The name of the lawyer?
18  Q. The name of the lawyer.
19  A. Wayne Specter.
20  Q. Now, Mr. Rivera, did you ask Mr. Forrester
21  and maybe me that before you would speak to us, that we
22  would have to assure you that you wouldn't be violating
23  that confidentiality agreement?
24  A. Yes. That's -- I want to make sure you're
25  not doing --

## Page 1135

1  THE COURT: Did you say objection?
2  MR. COLE: Objection. Leading.
3  THE COURT: Overruled.
4  THE WITNESS: The answer is yes. I don't
5  want to violate clauses of that agreement.
6  BY MR. THOMAS:
7  Q. And did you ask Mr. Forrester and maybe me
8  that before you would speak to us, we would have to
9  indemnify you if you were to violate that
10  confidentiality agreement?
11  A. Absolutely right.
12  Q. Now, did you ask us to indemnify you for any
13  negligence for what you might have done at BDO Seidman?
14  A. No.
15  Q. Did we indemnify you for anything wrong you
16  did while you were at BDO Seidman?
17  A. Definitely not.
18  Q. So if someone were to find that you
19  personally were negligent for what you did at BDO
20  Seidman, could Espirito Santo still sue you?
21  A. I'm sorry. What is your question?
22  Q. My question is, is if someone were to
23  find -- Espirito Santo were to decide that what you did
24  while you were working at BDO Seidman was wrong in some
25  way, do you have any agreement with Espirito Santo or me

## Page 1136

1  or Mr. Forrester that would keep us from suing you for
2  what you did wrong at BDO?
3  A. No.
4  Q. So we could sue you?
5  A. Absolutely right.
6  Q. So the only thing that we agreed was that if
7  you did something to violate that confidentiality
8  agreement, we would indemnify you; is that right?
9  A. Absolutely right.
10  MR. THOMAS: With His Honor's permission,
11  I'm going to approach the witness with Plaintiffs'
12  Exhibit Number 7294 marked for ID.
13  THE COURT: You may.
14  MR. THOMAS: (Complies.)
15  BY MR. THOMAS:
16  Q. Mr. Rivera, is this the agreement that
17  relates to your confidentiality with Espirito Santo?
18  A. That's right, sir.
19  Q. And if you look at the last page there, is
20  that your signature?
21  A. Yes, sir.
22  MR. THOMAS: Your Honor, at this time
23  Plaintiffs move into evidence Plaintiffs' Exhibit marked
24  for ID 7294.
25  MR. COLE: No objection, Your Honor.

Page 1137

1     THE COURT: Let me see it.
2     THE WITNESS: Sure.
3     THE COURT: I'm sorry. What was your --
4  what was your request?
5     MR. THOMAS: To move it into evidence.
6     THE COURT: Without objection, marked for ID
7  7294, Plaintiffs -- Defendant's Exhibit 7294 marked for
8  ID is now Plaintiffs' Exhibit 7294 in evidence.
9     MR. THOMAS: Now we put it up there.
10    (Technician complies.)
11 BY MR. THOMAS:
12    Q.  When we were just talking about an
13 agreement, Mr. Rivera, is this the written agreement
14 that we were talking about?
15    A.  Absolutely right, Counselor.
16    Q.  7294 in evidence?
17    A.  Yes.
18    Q.  So, Mr. Rivera, as long as we're right about
19 the 18-month provision in your confidentiality
20 agreement, among other reasons maybe, then you're not
21 violating that confidentiality agreement. Is that your
22 understanding?
23    A.  Yes.
24    Q.  And if that's right, then we got nothing to
25 indemnify you for; is that right?

Page 1138

1     A.  Yeah, that's right. But --
2     Q.  You're being extra careful?
3     A.  Absolutely.
4     Q.  But pursuant to this agreement, your
5  understanding is that this doesn't protect you in any
6  way for your testimony here today if what you did at BDO
7  Seidman was wrong?
8     A.  Absolutely right.
9     Q.  Now, Mr. Rivera, after you consulted your
10 lawyer and got the agreement and you were -- finally
11 agreed to speak to Mr. Forrester and me, did you sit
12 down with us and tell us what you remembered from your
13 time at BDO Seidman?
14    A.  The answer is yes.
15    Q.  And after you -- when you spoke to us,
16 did -- was there a document put into writing as to what
17 you said?
18    A.  Yes.
19    Q.  And was that document a draft of -- sort of
20 a draft declaration swearing that what you're telling us
21 is true?
22    A.  Absolutely, yes.
23    Q.  And as part of the agreement with us, did
24 you agree that you're going to tell the truth?
25    A.  As always.

Page 1139

1     MR. COLE: Objection, Your Honor.
2     THE COURT: Sustained.
3  BY MR. THOMAS:
4     Q.  Mr. Rivera, when the first draft of your
5  declaration was given to you, did you just sign it and
6  hand it back?
7     A.  No.
8     Q.  Mr. Rivera, did you make changes to it?
9     A.  Whatever I consider appropriate to state the
10 truth in that document.
11    Q.  Mr. Rivera, was it a painstaking process to
12 make sure that every line in the declaration, that you
13 were comfortable signing?
14    MR. COLE: Objection. Bolstering again.
15    THE COURT: It's leading. Sustained.
16 BY MR. THOMAS:
17    Q.  Are you familiar with the word painstaking?
18 Is that something --
19    A.  Like a pain?
20    THE COURT: Doloroso, could be.
21    MR. THOMAS: You can't ask him in Spanish.
22 It turns out (inaud.) answer.
23    THE COURT: I understand but it --
24 BY MR. THOMAS:
25    Q.  Let me ask you in a little bit different

Page 1140

1  way. Were you very careful in reviewing the drafts of
2  the declaration?
3     MR. COLE: Objection. Bolstering.
4     THE COURT: Overruled.
5     THE WITNESS: Absolutely right.
6  BY MR. THOMAS:
7     Q.  And did drafts with your comments go back
8  and forth between you and Mr. Forrester?
9     A.  Many times.
10    Q.  You know what the word tedious means?
11    A.  Yes.
12    Q.  And was the process of getting to a
13 declaration that you believed was accurate and you could
14 sign, was that a tedious process?
15    A.  For me it was.
16    Q.  I'm not allowed to comment. Mr. Rivera,
17 after all this back and forth, after you had consulted
18 with your lawyer, did you sign a declaration?
19    A.  That's right.
20    Q.  Mr. Rivera, during this entire process, BDO
21 Seidman ever call you up until this point?
22    A.  Pardon me?
23    Q.  Up until the point where you signed the
24 declaration, did BDO Seidman ever call you prior to you
25 signing the declaration?

Page 1141

1    A.  No.  The call from them came after I signed
2  that declaration.
3    Q.  And when BDO Seidman called you after you
4  signed the declaration, did they try to get you to hire
5  Greenberg Traurig as your lawyer instead of your own
6  lawyer?
7    MR. COLE:  Objection.  Hearsay and
8  irrelevant.
9    THE COURT:  Sustained.
10  BY MR. THOMAS:
11    Q.  Mr. Rivera, did you ever hire Greenberg
12  Traurig as your lawyers?
13    A.  No.
14    Q.  And in addition to the lawyer that you hired
15  in New York, the one that looked at it, did you hire a
16  lawyer here in Miami?
17    A.  Yes, I hired a lawyer here.
18    Q.  And what's his name?
19    A.  His name?
20    Q.  His name.
21    A.  Bryan West.
22    Q.  Mr. Rivera, after going through all this,
23  having never heard from BDO Seidman, when you signed
24  that declaration, did you believe that that declaration
25  was true and accurate?

Page 1142

1    A.  The answer is yes.
2    Q.  And after being contacted by BDO after that,
3  did you still believe your declaration was true and
4  accurate?
5    A.  Mine had never changed since the day that I
6  signed that declaration.
7    MR. THOMAS:  Your Honor, with your
8  permission, I will approach the witness with Exhibit --
9  it's actually Defendant's Exhibit 7353, but it's in
10  evidence.
11    THE COURT:  You may.
12    MR. THOMAS:  (Complies).
13    MR. COLE:  Your Honor, we object to this
14  document in evidence on the grounds of hearsay.  We also
15  object to the use of this document on the grounds that
16  it's bolstering testimony and it should not be permitted
17  to be used in this trial.
18    THE COURT:  Overruled.
19  BY MR. THOMAS:
20    Q.  Mr. Rivera, is this the declaration that you
21  signed after everything we've talked about?
22    A.  Yes, sir.
23    MR. THOMAS:  With Your Honor's permission,
24  I'll publish this declaration to the jury.
25    THE COURT:  You may.

Page 1143

1    (Technician complies.)
2    MR. COLE:  Your Honor, again note my
3  objection on the grounds of bolstering.
4    THE COURT:  Overruled.
5    MR. COLE:  Your Honor, may we have a brief
6  side bar --
7    THE COURT:  Sure.
8    MR. COLE:  -- while the jury is reading?
9    (Thereupon, there was a side-bar conference
10  outside the presence and hearing of the jury.)
11    MR. COLE:  I just want to make my record on
12  the document.  My understanding for the defendants, at
13  the time we created a document list, we did not
14  understand that you could -- that we could not lodge
15  objections during the trial, especially on issues such
16  as bolstering and hearsay.  The -- we did our best to
17  ensure that we lodged all the objections to authenticity
18  and things of that nature.  This document was left on
19  the list, our list, by mistake.  It was not something
20  that should have been there.  And I requested at the
21  beginning of the prior proceeding that this document be
22  removed from the list and not be admitted into evidence
23  on the grounds that it was hearsay and it's bolstering,
24  and therefore I still request that now.
25    The reason why it's in evidence is because

Page 1144

1  it was inadvertently put on our document list, and I
2  requested that it be taken off.  I understand your
3  ruling to be that since it's on the list, then there's
4  no objection to it, it's in evidence.  And I
5  respectfully disagree with that and object.
6    MR. THOMAS:  Your Honor, this was raised in
7  the prior proceeding.  And not to rehash everything, but
8  there actually was a meeting on the exhibit list.
9  Mr. Cole was telephoned.  You were in this -- you were
10  in this courtroom.  Ms. Alexander was present where Your
11  Honor actually made very clear that what was on the list
12  and was not objected to would come into evidence.
13    It's also true that, Your Honor, when things
14  are in evidence, that doesn't mean that you have to use
15  them for every purpose with the jury, which you've done
16  to me a lot.  But for purposes of this document, it's in
17  evidence.  It's not hearsay.  And therefore, all the
18  other objections have already been overruled by Your
19  Honor.  Respectfully, I think you should adhere to your
20  rulings.
21    MR. COLE:  Again, I understand the
22  instruction by Your Honor.  But this was an inadvertent
23  addition to the list and therefore we believe that given
24  its nature and given its -- these documents or
25  affidavits are usually not admitted into evidence, that

Page 1145

1  it not be included in the record.
2         THE COURT: Okay. Overruled.
3         MR. COLE: Thank you.
4         (Thereupon, the side-bar conference was
5  concluded.)
6         MR. THOMAS: Your Honor, while the jury
7  finishes, permission to approach your clerk?
8         THE COURT: (Nodding.)
9         MR. THOMAS: (Complies.)
10        THE COURT: All right. Mr. Thomas, you may
11 proceed.
12        MR. THOMAS: Thank you, Your Honor. With
13 Your Honor's permission, I'll approach the witness with
14 Plaintiffs' Exhibit 7336 marked for ID.
15 BY MR. THOMAS:
16     Q.   Mr. Rivera, is this an e-mail that you sent
17 to Mark Forrester and one from Mark Forrester to you?
18     A.   I'm sorry? Is this an e-mail that I sent to
19 Mark Forrester?
20     Q.   Yes.
21     A.   Yes. (Inaud.)
22     Q.   Wait. It's not in evidence so --
23     A.   Okay.
24     Q.   And what's the date of these e-mails?
25     A.   The date?

Page 1146

1     Q.   The date.
2     A.   June 30th, 2004.
3         MR. THOMAS: At this time, Your Honor,
4  Plaintiffs move into evidence Plaintiffs' Exhibit 7336
5  marked for ID.
6         MR. COLE: Objection. Hearsay.
7         THE COURT: May I see it?
8         THE WITNESS: (Complies.)
9         MR. COLE: And irrelevant, Judge.
10        THE COURT: Sustained.
11 BY MR. THOMAS:
12     Q.   That means we can't use that, so put it to
13 the side, please.
14         Mr. Rivera, in providing your declaration
15 and travel here, has Espirito Santo reimbursed you for
16 your expenses?
17     A.   That's right, sir.
18     Q.   But you understand that Espirito Santo --
19 well, let me ask it a different way. Other than
20 reimbursing you for your expenses --
21     A.   Just I don't hear.
22     Q.   Let me move it here.
23     A.   All right.
24     Q.   You understand that although Espirito Santo
25 is permitted to reimburse you for your expenses, that

Page 1147

1  there's nothing else Espirito Santo can do? We haven't
2  paid you for your testimony, in other words?
3      A.   Definitely not.
4      Q.   And has -- Mr. Rivera, looking at
5  Plaintiffs' Exhibit 3753 in evidence, your declaration,
6  is this the truth?
7          MR. COLE: Objection. Hearsay and
8  bolstering.
9          THE COURT: Sustained.
10 BY MR. THOMAS:
11     Q.   In signing this declaration, Mr. Rivera, and
12 you put your name on page 8 -- is that your signature?
13     A.   That's right.
14     Q.   When you put your signature on page 8, did
15 you carefully read this declaration to make sure that
16 you agreed with all the statements in it?
17         MR. COLE: Hearsay and bolstering.
18         THE COURT: Overruled.
19         THE WITNESS: The answer is yes.
20         MR. THOMAS: I have no further questions.
21 Thank you, Your Honor.
22         THE COURT: All right. I need you to pick
23 up the document, Mr. Thomas.
24         MR. THOMAS: Yes, Your Honor. (Complies.)
25         THE COURT: All right. Ladies and

Page 1148

1  gentlemen, we're going to go to lunch. So let me get
2  Jeffrey down here. Not that we really need him but --
3  relax, Mr. Rivera.
4          THE WITNESS: Sorry.
5          THE COURT: You're not finished yet.
6          Ladies and gentlemen, you're not to discuss
7  the case amongst yourselves or with anyone else. You're
8  not to allow anyone to discuss the case with you.
9  You're not to form a fixed or definite opinion about the
10 case until you've heard all the evidence, the argument
11 of the lawyers, and the instructions on the law by me.
12 You're not to read, hear, or see any accounts of this
13 case in the media. You're to ignore the lawyers'
14 existence outside this courtroom and they're to ignore
15 yours, and that includes the witness. And he will
16 ignore your existence. Okay? So how long do you want
17 for lunch? I never ask. I'm asking today.
18         JUROR: 1:30.
19         THE COURT: All right. 1:30. I guess he
20 tells you to come back to the jury room. So leave your
21 notes covered, fold them back. And we'll see you then.
22 Have a good lunch. Go on a shopping spree. I know how
23 it works.
24         (Thereupon, the jury was escorted out of the
25 courtroom.)

Page 1149

1        THE COURT:  Mr. Rivera, you're not to
2   discuss the testimony you've given or the testimony you
3   are going to give with anyone and that includes all the
4   lawyers.  Make sure you take off your microphone, turn
5   it off.  And have a good lunch break.
6        THE WITNESS:  Thank you.
7
8        (Whereupon, at 12:00 p.m., a luncheon recess
9   was taken.)
10
11        *        *        *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1150

1        CERTIFICATE OF COURT REPORTER
2
3        I, GIZELLA BAAN, court reporter, before whom
4   the foregoing statement was taken, do hereby certify
5   that the statement made was taken by me stenographically
6   at the time and place mentioned in the caption hereof
7   and thereafter transcribed by me to the best of my
8   ability; that said transcript is a true record of the
9   statement given; that I am neither counsel or, related
10   to, nor employed by any of the parties to the action in
11   which these proceedings were taken; and further, that I
12   am not a relative or employee of any party hereto, nor
13   financially or otherwise interested in the outcome of
14   this action.
15
16
17
18        _____
19             GIZELLA BAAN
20        Court Reporter and Notary Public
21           in and for the State of Florida
22
23
24
25

Page 1151

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
       Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
       Defendant.
------------------------------------------------x
BDO SEIDMAN, LLP,
       Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
       Third-Party Defendants.
------------------------------------------------x

PAGES 1151 - 1295

Volume 11



AFTERNOON SESSION

Miami, Florida

Tuesday, April 17, 2007

1:50 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 1152

```
 1           A P P E A R A N C E S
 2
 3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
 4   INTERNATIONAL, LTD., ET AL.:
 5
 6   SULLIVAN & CROMWELL, LLP
 7       1888 Century Park East
 8       Los Angeles, California  90067
 9       (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida  33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       350 East Las Olas Boulevard, Suite
21       Fort Lauderdale, Florida  33301
22       (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25
```

Page 1153

```
 1   On behalf of Defendant BDO Seidman, LLP:
 2
 3   ALVAREZ, ARMAS & BORRON
 4       901 Ponce de Leon Boulevard, Suite 304
 5       Coral Gables, Florida  33134
 6       (305) 461-5100
 7   BY:  Arturo Alvarez, Esquire
 8
 9   GREENBERG TRAURIG, LLP
10       MetLife Building
11       200 Park Avenue, 15th Floor
12       New York, New York  10166
13   BY:  Adam D. Cole, Esquire
14       Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17       1221 Brickell Avenue
18       Miami, Florida  33131
19   BY:  Mark Schnapp, Esquire
20       Nikki Simon, Esquire
21
22
23
24
25
```

Page 1154

```
 1   On behalf of Third-Party Defendants Victor Balestra,
 2   Bernard Mollet, and Joaquin Garnecho
 3
 4   RICHMAN, GREER, WEIL, BRUMBAUGH,
 5   MIRABITO & CHRISTENSEN, P.A.
 6       Miami Center, Suite 1000
 7       201 S. Biscayne Boulevard
 8       Miami, Florida  33131
 9       (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16       2701 Ponce de Leon Boulevard, Mezzanine
17       Coral Gables, Florida  33134
18       (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20       Geoffrey Marks, Esquire
21
22
23
24
25
```

Page 1155

```
 1              C O N T E N T S
 2
 3   EXAMINATION OF RAMON RIVERA BY:          PAGE:
 4       MR. COLE:  (Cross)            1157
 5       MR. THOMAS:  (Redirect)         1259
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 1156

1              PROCEEDINGS
2         THE COURT: Are you ready? Mr. Cole, are
3    you ready?
4         MR. COLE: Yes.
5         THE COURT: (Indicating.)
6         THE BAILIFF: (Complies.) All rise for the
7    jury.
8         (Thereupon, the jury was brought into the
9    courtroom.)
10        THE COURT: Welcome back, ladies and
11   gentlemen.
12        Why don't you go back and get Mr. Rivera.
13        I hope you didn't spend too much money over
14   lunch. Some good specialties at Macy's. That's what I
15   hear.
16        (Thereupon, there was a brief discussion off
17   the record.)
18        Thereupon,
19            RAMON RIVERA
20   was recalled as a witness and, having been previously
21   duly sworn, was examined and testified further as
22   follows:
23        THE COURT: Have a seat. Put on your
24   microphone.
25        Mr. Cole, you may proceed with your

Page 1157

1    cross-examination.
2         MR. COLE: Thank you, Your Honor.
3         Good afternoon, ladies and gentlemen.
4         CROSS-EXAMINATION
5    BY MR. COLE:
6         Q.   Good afternoon, Mr. Rivera.
7         A.   Good afternoon, Mr. Cole.
8         Q.   As I understand it, Mr. Rivera -- as I
9    understand it, Mr. Rivera, you're here testifying at the
10   request of Espirito Santo; is that right?
11        A.   That's right, Counselor. Can you speak a
12   little bit louder, please?
13        Q.   Sure. Can you hear me? Can you hear me
14   now?
15        A.   Better.
16        Q.   And today you're here represented by a
17   lawyer, as well; is that right?
18        A.   That's right, sir.
19        Q.   And when who is that lawyer?
20        A.   Mr. Bryan West.
21        Q.   Mr. West is in the courtroom today?
22        A.   Yes, sir.
23        Q.   Who is paying for Mr. Bryan West to be here?
24        A.   Them and then them reimbursing my legal
25   expense.

Page 1158

1         Q.   So Espirito Santo is reimbursing you for
2    Mr. West's presence today?
3         A.   That's right, sir.
4         Q.   Now, you said you had another lawyer in New
5    York when you were thinking about signing that
6    affidavit, right?
7         A.   That's right.
8         Q.   Was that Mr. West?
9         A.   No, it was a different lawyer.
10        Q.   It was a different lawyer?
11        A.   Yes.
12        Q.   It was your lawyer in White Plains, New
13   York?
14        A.   Yes.
15        Q.   And after you signed your affidavit,
16   Mr. West came into the picture or before?
17        A.   I could say, yes. Yes.
18        Q.   And isn't it a fact, sir, that Mr. West was
19   recommended to you by the Espirito Santo lawyers?
20        A.   That's right, sir.
21        Q.   And it was even though you already had your
22   own lawyer, right?
23        A.   But at the time I hire Mr. West, I was
24   already terminated the relationship with the other
25   lawyer.

Page 1159

1         Q.   I see. Now, did Mr. West help you --
2    without telling me what he said to you, did Mr. West
3    help you with the affidavit?
4         A.   If Mr. West, pardon me?
5         Q.   Help you with your affidavit?
6         A.   With the June 5th, 2004?
7         Q.   Yes.
8         A.   No.
9         Q.   Isn't it a fact, sir, that you agreed to
10   provide that affidavit as long as Espirito Santo paid
11   for Mr. West?
12        A.   No. That was not the case.
13        MR. COLE: Your Honor, may I approach?
14        THE COURT: Sure.
15        MR. COLE: (Complies.) Your Honor, we'd
16   like to play for the jury page 30, line 7 through 19.
17        THE COURT: Page 30, line 7 through 19, is
18   that what you said?
19        MR. COLE: Yes, sir.
20        THE COURT: Mr. Thomas?
21        MR. THOMAS: Your Honor, the only thing I
22   would say is different than the question asked so I
23   don't think it's improper impeachment, but I don't have
24   any objection to him playing it for the jury.
25        THE COURT: All right. You can redirect him

Page 1160

1   on this issue.
2          MR. THOMAS:  I'm sorry --
3          THE COURT:  If you have no objections, he
4   can read the record if he wishes.
5   BY MR. COLE:
6      Q.   Mr. Rivera, you do remember having your
7   deposition --
8          MR. THOMAS:  I object to another question.
9   If he's going to use it for impeachment, then he needs
10  to play it.  So I object now to further questions.
11         THE COURT:  You can ask the question,
12  Mr. Cole.
13         MR. COLE:  Thank you, Your Honor.
14  BY MR. COLE:
15     Q.   Mr. Rivera, do you remember having your
16  deposition taken?
17     A.   That's what I said.
18     Q.   And I was the person who took your
19  deposition, right?
20     A.   I remember that time.
21     Q.   And it was in July of '05; do you remember
22  that?
23     A.   July 15.
24     Q.   And you remember me asking you a series of
25  questions and you answering them?

Page 1161

1      A.   I remember that day.  That's right.
2      Q.   And you testified then under oath, right?
3      A.   Under oath?
4      Q.   Yeah.
5      A.   That's right, sir.
6      Q.   You swore to tell the truth?
7      A.   As far as I remember, yes.
8      Q.   Please play the footnote.
9          (Video playing.)
10  BY MR. COLE:
11     Q.   We're just talking about these, not the
12  first and second one, but the series of conversations
13  leading up to the meeting in June of 2004.  What did you
14  discuss with Mr. Forrester relating to fees?
15         MR. THOMAS:  Objection to the form.
16         THE WITNESS:  I don't have to answer that
17  question.
18  BY MR. COLE:
19     Q.   You can answer.
20     A.   In summary was that if I provided those
21  declarations, they would cover, you know, the legal fees
22  of Mr. West.
23         (Video stopped playing.)
24  BY MR. COLE:
25     Q.   Since that deposition, sir, did you have an

Page 1162

1   opportunity to meet with the plaintiffs' counsel?
2      A.   Yes, sir.
3      Q.   How many times did you say you met with the
4   plaintiffs' counsel since that deposition?
5      A.   At least two times.
6      Q.   And you met with Mr. Thomas, right?
7      A.   That's right.
8      Q.   And you met with Mr. Dorta, correct?
9      A.   That's right.
10     Q.   And today your testimony is -- as you sit
11  here today, not in 2005, but as you sit here today,
12  almost two years later, your testimony is that you
13  didn't provide these declaration -- the declaration in
14  exchange for Espirito Santo paying Mr. West?
15     A.   As I can tell today, it's not contingent to
16  my presence here in this Court today.
17     Q.   Now, the declaration that you were referring
18  to there, or declaration you referred to today, we
19  showed the jury; do you remember that?
20     A.   Yes, sir.
21     Q.   And if I understand your testimony, sir,
22  this declaration grew out of a series of meetings or
23  series of conversations you had with Mr. Forrester; is
24  that right?
25     A.   That's right, sir.

Page 1163

1      Q.   And if I understand correctly, sir, you met
2   with Mr. Forrester and told him your story before the
3   declaration?
4      A.   Yeah.
5      Q.   And then Mr. Forrester wrote the declaration
6   for you, right?
7      A.   He provided the draft, yes.
8      Q.   And then you went back and forth a few
9   times, right?
10     A.   That's right, sir.
11     Q.   It was a real tedious process, remember
12  that?
13     A.   I remember.
14     Q.   Went back and forth and back and forth to
15  get it just right, right?
16     A.   To the best of my knowledge and belief, yes.
17     Q.   Well, I'm sorry, based on your knowledge and
18  belief on what?
19     A.   At the time, yes.
20     Q.   And this declaration you're saying was based
21  upon your knowledge and belief at the time?
22     A.   Of the facts that happens, you know, when I
23  was with BDO, yes.
24     Q.   After you went back and forth with
25  Mr. Forrester a number of times, correct?

Page 1164

1    A.  That's exactly right.
2    Q.  This is the perfect declaration, right?
3  This is the one you signed?
4    A.  I mean, this is the one that --
5    Q.  It's Exhibit 3753 that we showed the jury
6  before?
7    A.  Yeah.
8    Q.  It's right there if you want to see.
9    A.  That's right, sir.
10   Q.  Now, you also testified, sir, that you
11  entered into an agreement with Espirito Santo to
12  indemnify you, right?
13   A.  That's right, sir.
14   Q.  And at the time you entered into that
15  agreement, you were represented by a lawyer, correct?
16   A.  No, I was not.
17   Q.  The New York lawyer didn't help you with
18  that agreement either?
19   A.  No.  He don't review that agreement when I
20  signed that agreement, no.
21   Q.  In any event, the agreement you signed with
22  Espirito Santo states that they'll indemnify you against
23  the lawsuit by BDO?
24   A.  No.  Against a lawsuit by BDO or someone
25  else in connection for me to provide confidential

Page 1165

1  information -- in connection with that confidentiality
2  agreement.
3    Q.  And your agreement was to provide -- was
4  contingent on you providing truthful information, right?
5    A.  Or information about clients of BDO.
6    Q.  Well, it was written into the agreement that
7  you would provide truthful information, right?
8    A.  In the confidentiality agreement or --
9    Q.  The agreement with Espirito Santo.  You
10  remember that?
11   A.  You show me those specific words.
12   Q.  Take a look at Exhibit 7294 in evidence.
13       MR. COLE:  May I approach, Your Honor?
14       THE COURT:  You may.
15       MR. COLE:  (Complies.)
16  BY MR. COLE:
17   Q.  Now, here it is.  Remember speaking to the jury
18  about this agreement?
19   A.  Yeah, this morning.  Yes.
20       MR. COLE:  Can you blow up the section on
21  the bottom there?
22       (Technician complies.)
23  BY MR. COLE:
24   Q.  See where it says that Mr. Rivera agrees to
25  appear for interview and subsequent deposition in a

Page 1166

1  place mutually agreed to by the parties and therefore
2  provide truthful and fulsome testimony.
3       You see that?
4    A.  Yes.
5    Q.  Why did you need to enter into an agreement
6  to provide truthful testimony?
7    A.  My answer to that question is that they
8  approached me to provide information regarding those
9  events with BDO, and I feel afraid to disclose something
10  that I will be violating that confidentiality agreement,
11  and when they redacted this document and I read it, my
12  concern was to -- that I could be like doing something
13  wrong if I provide information, and I decided to like be
14  covered by an agreement.
15   Q.  My question is, why did you need to say that
16  you would agree to provide truthful testimony?  I mean
17  you tell the truth, don't you?
18   A.  As far as I remember, yes.
19   Q.  Why did you have to put it in the agreement?
20  Why did you need an agreement to remind you?
21   A.  Just to make sure we were on the same page.
22   Q.  I see.  The affidavits, why did you have to
23  sign the affidavits?
24   A.  Why?
25   Q.  Yeah.  After you went back and forth with

Page 1167

1  Mr. Forrester and you got it just right, why did you
2  feel the need that you had to sign a declaration?
3    A.  They asked me to provide it that way.
4    Q.  Was it to lock you into your testimony to
5  make sure that you wouldn't change it?
6    A.  My understanding just to make sure I agree
7  with that, I sign it, and for me it's a truth statement.
8  Regardless I sign or not, it wouldn't make a difference.
9  If I sign it or not, I will be saying the same.
10   Q.  The same thing as your declaration?
11   A.  Not in those specific words but in general
12  terms.
13   Q.  That's because those are not your words,
14  those are his words, right?
15   A.  Some of them are legal terms.  You are
16  right.  Absolutely right.
17   Q.  Now, did BDO ever threaten to sue you?
18   A.  No, never.
19   Q.  Did BDO ever sue you?
20   A.  Until today, no.
21   Q.  Have you ever been sued in connection with
22  this -- with Bankest?
23   A.  No.
24   Q.  So you're saying that -- you're testifying
25  here today that you didn't look at half the documents or

Page 1168

1  you didn't receive half the documents for your audit,
2  you are here testifying for Espirito Santo, Espirito
3  Santo never sued you?
4      MR. THOMAS:  Objection, Your Honor.
5  Argumentative.
6      THE COURT:  Sustained.
7  BY MR. COLE:
8      Q.  Sir, you did testify that most of the
9  documents you never -- for Exhibit C-10 or the C-10 work
10  paper that we'll get to in a moment, Mr. Parlapiano
11  didn't give them to you, right?
12      A.  You're absolutely right.  It's just that
13  instruction that I received at the time was that some of
14  those documents were not required as part of the audit,
15  to complete the audit, as I testified before.
16      Q.  Well, how long have you been an auditor?
17  How long had you been an auditor at the time you did
18  that work paper?
19      A.  Approximately 10 years.
20      Q.  So you've been working for 10 years?
21      A.  That's right.
22      Q.  You weren't new at the game, were you?
23      A.  No, I was not.
24      Q.  You understood, sir, how important work
25  papers are, right?

Page 1169

1      A.  At the time, yes.
2      Q.  Work papers are there so that -- to document
3  what you did during the audit, correct?
4      A.  That's right, sir.
5      Q.  And you, as the manager of the audit, could
6  put anything in those work papers to make sure that the
7  audit is properly documented; isn't that right?
8      A.  Not that way, sir.
9      Q.  Nothing prevented you from creating a
10  document that said I only received client and BCC checks
11  for customer checks?  Anything prevent you from doing
12  that?
13      A.  The documentation that we used is that -- it
14  was consistent with the instructions that in some cases
15  we should be allowed to treat Bankest Capital Corp. as a
16  customer.
17      Q.  And that was an important thing, right?
18      A.  When I stopped the audit, I addressed the
19  issue with my superiors, they came back to me.  They
20  said Ramon, your concerns have been addressed, you can
21  go back, and in the event that Bankest Capital Corp. --
22  I mean E.S. Bankest is unable to provide you documents
23  from the ultimate customer like Wal-Mart or Joy, it
24  would be sufficient for us to accept Bankest Capital
25  Corp. as customer checks.

Page 1170

1      Q.  Let's break that down.  You said that on
2  Friday you stopped the audit, right?
3      A.  That's right, sir.
4      Q.  And that was Friday of 12th of February?
5      A.  That's right, sir.
6      Q.  Now, when you stop an audit, that's a pretty
7  important event, right?
8      A.  I consider that an important event, yes.
9      Q.  Yet you didn't write that down on any single
10  document, whether it's a work paper, a review form, a
11  note, a napkin, you didn't write it down on a single
12  document at that time, did you?
13      A.  No.  That's right.  I didn't write it.  You
14  are right.
15      Q.  Now, you wanted customer checks from
16  Wal-Mart, was it?
17      A.  Yes, sir.
18      Q.  That was important to you at the time,
19  wasn't it?
20      A.  Because up to February 12th, those were the
21  guidelines to go over that level to review those
22  documents.
23      Q.  But up to February 12th you hadn't asked for
24  those documents, did you?
25      A.  Yeah, I did.

Page 1171

1      Q.  You did.  Well, we'll see that in writing.
2  But it was important to get those documents to do the
3  test, right?  That's the reason why you stopped the
4  audit?
5      A.  That's right, sir.
6      Q.  And then the instruction changed, right?
7      A.  To my best recollection and belief, yes.
8      Q.  And there is not a single document, not a
9  single work paper, not a single memorandum, not a single
10  piece of napkin where you reflect that change, is there?
11      A.  Not that I remember.
12      Q.  Now, these are work papers that are really
13  important.  They allow auditors to go back and look at
14  what they did, right?
15      A.  That's right, sir.
16      Q.  So 10 years after the fact, or 8 years after
17  the fact, as we sit here today in this case, those work
18  papers are there so you can go back and see what you
19  did, right?
20      A.  That should be the purpose of work papers,
21  yes, sir.
22      Q.  You don't have to rely on memory, right?
23  You can go to the work paper?
24      A.  You're absolutely right.
25      Q.  You don't have to rely on what somebody else

Page 1172

1   tells you to put in the declaration, right?
2       MR. THOMAS: Objection, Your Honor.
3   Argumentative.
4       THE COURT: Overruled
5   BY MR. COLE:
6       Q.   You don't have to rely on what a lawyer
7   tells you to put in a declaration, right?
8       A.   That's right, sir.
9       Q.   The work papers show you what you did,
10  right?
11      A.   Right.
12      Q.   Now, you said that you signed the
13  affidavit -- that affidavit. You had already terminated
14  one lawyer, right, in New York?
15      A.   Yes.
16      Q.   And did you hire a new lawyer at that point
17  in time?
18      A.   Not until like July 1st.
19      Q.   So this declaration was signed in between,
20  right?
21      A.   That's right, sir.
22      Q.   Anybody providing you advice as to what your
23  rights were during that time period, any lawyer?
24      A.   No.
25      Q.   Isn't it a fact that Mr. Forrester was

Page 1173

1   providing you advice at that time?
2       A.   No, he basically interact in the back and
3   forth.
4       Q.   Well, Mr. Forrester told you, you could be
5   sued; isn't that right?
6       A.   He mentioned that to me.
7       Q.   And he didn't tell you who was going to sue
8   you, did he?
9       A.   That's exactly right.
10      Q.   And isn't it a fact, sir, that the reason
11  why you signed that declaration is because you were
12  afraid, based on what Mr. Forrester said, that Espirito
13  Santo may sue you?
14      A.   I just want to cooperate with the case.
15      Q.   Mr. Forrester threatened you, didn't he?
16      A.   He mentioned those words. But then my
17  understanding is that it could be by someone else. It
18  doesn't have to be Espirito Santo or BDO.
19      Q.   After Mr. Forrester threatened you, it was
20  at that time you signed the declar -- you filled out the
21  declaration and you signed it, right?
22      MR. THOMAS: Objection, Your Honor. Assumes
23  facts not in evidence.
24      THE COURT: Sustained.
25  BY MR. COLE:

Page 1174

1       Q.   After Mr. Forrester said you could be
2   sued -- without telling you who would sue you -- at that
3   point you felt necessary to cooperate with the
4   plaintiffs, right?
5       A.   It was not like that, Counselor.
6       Q.   You just decided to show up one day and help
7   the plaintiffs out?
8       A.   No, it was a series of conversations and you
9   get to the point that I decided to cooperate with them.
10      Q.   Let's take a step back, sir. You joined BDO
11  in, if I heard you right, 1998; is that right?
12      A.   January 1998, yes.
13      Q.   And prior to that time you were a practicing
14  accountant in Puerto Rico?
15      A.   That's right, sir.
16      Q.   And if I understand correctly, you were at
17  Arthur Andersen for five years, right?
18      A.   Yes.
19      Q.   And then you were at a local firm for how
20  long?
21      A.   Four or five years.
22      Q.   So you had about 10 years' experience,
23  right?
24      A.   That's right.
25      Q.   I believe you testified that BDO recruited

Page 1175

1   you; is that right?
2       A.   Yeah. They hired me.
3       Q.   I thought I heard that this morning.
4       A.   They hired me.
5       Q.   They hired you?
6       A.   Yes.
7       Q.   How did you connect with BDO in Miami. How
8   did you know there was a job available?
9       A.   I mean, I was looking for a job through a
10  headhunter here in the United States, and it happened
11  that there was one in Miami and they were the connecting
12  bridge between me and BDO Seidman.
13      Q.   Why did you want to come to the United
14  States -- the Continental United States to practice as
15  an accountant?
16      A.   Improve my English language skills,
17  accounting, auditing, and I consider I could have a
18  better quality of life here in the United States.
19      Q.   And one of the things -- you were hired as a
20  senior and then promoted to a manager; is that right?
21      A.   At that point, yes.
22      Q.   And after being promoted to a manager, what
23  would have been the next step?
24      A.   Partner or senior manager.
25      Q.   And after senior manager would have been

Page 1176

1  partner, right?
2      A.  Those were the guidelines at the time.
3      Q.  Is that something you wanted to do?  You
4  wanted to be a partner?
5      A.  Not necessarily.
6      Q.  It's a prestigious position, right?
7      A.  For some people, yes.
8      Q.  But that's something you would strive for;
9  isn't that correct?
10     A.  Depends on the circumstances.
11     Q.  Did you want to be a partner at BDO?
12     A.  Definitely not.
13     Q.  Now, prior to the time you joined BDO, were
14  you a partner at any firm in Puerto Rico?
15     A.  No.
16     Q.  When you joined BDO, you started working
17  with Mr. Lenner; is that right?
18     A.  Among other partners, yes.
19     Q.  You were on a number of audits with
20  Mr. Lenner; is that correct?
21     A.  Yeah, we have different jobs.
22     Q.  Did Mr. Lenner ever yell at you?
23     A.  I mean, maybe he raised his voice.  I
24  wouldn't consider yelling but maybe other people would
25  consider yelling.  I mean, there is sensitivity.  Some

Page 1177

1  people are more sensitive than others.
2      Q.  And you're saying you're less sensitive, I
3  guess?
4      A.  I would say, yes.
5      Q.  Now, you went -- you were at BDO for
6  approximately three years, was it?
7      A.  Three and a half years, yes.
8      Q.  You weren't promoted to partner, were you?
9      A.  Never.
10     Q.  And you were fired?
11     A.  That's right.
12     Q.  Did it come as a surprise to you to be
13  fired?
14     A.  Absolutely, yes.
15     Q.  Why did it surprise you?
16     A.  Because I was not expecting that.
17     Q.  Because you thought you were doing well,
18  right?
19     A.  Yes.
20     Q.  And when you got fired, you got angry,
21  didn't you?
22     A.  I mean, you could get angry at some point in
23  time and then you realize that, you know, that's part of
24  the life.  That happens every day, everywhere to a lot
25  of people, and you got to move on.  And that's what I

Page 1178

1  did.
2      Q.  You weren't fired because of what happened
3  at E.S. Bankest, were you?
4          MR. THOMAS:  Objection, Your Honor.  Calls
5  for speculation.  Unless he knows.
6          THE COURT:  Sustained.
7          Rephrase the question.
8  BY MR. COLE:
9      Q.  Do you have an understanding that you were
10  fired for your work on E.S. Bankest?
11     A.  No.  The reason that I was given by the
12  managing partner at the time was that they had to reduce
13  staff because they had been losing a lot of business.
14     Q.  And that made you upset, right?
15     A.  First couple of days, definitely, I was
16  upset.  I start looking for a job.  And, in fact, at the
17  time BDO allows me to continue using my office, the
18  computer, and they provided references for the people
19  that I was interviewing with when I decided to -- or
20  when I start looking for a job.  So not specifically
21  Mr. Lenner but Mr. Lopez and Mr. Kron, a former partner.
22     Q.  Mr. Lenner didn't provide you with a
23  recommendation?
24     A.  Not that I remember of.
25     Q.  You didn't like Mr. Lenner when you worked

Page 1179

1  at BDO, did you?
2      A.  I like him as a professional.
3      Q.  Sir, you didn't like Mr. Lenner as a person,
4  did you?
5      A.  I don't have anything against him.
6      Q.  When you left BDO, did you like him or
7  dislike him?
8      A.  If you are asking me those questions, yes, I
9  like him.
10     Q.  And it didn't bother you that from time to
11  time he'd yell at you?
12     A.  It don't bother me.
13     Q.  Now, if I understand correctly, you joined
14  in January of 1998 and sometimes towards the -- sometime
15  towards the end of 1998 you're assigned to the E.S.
16  Bankest audit; is that right?
17     A.  Yes, sir.
18     Q.  And in preparation for that audit, you met
19  with people from E.S. Bankest, right?
20     A.  Yes.
21     Q.  And you met with Mr. Lenner, correct?
22     A.  That's right.
23     Q.  And I believe you testified that you
24  reviewed the work papers from the audit of BRFFC; is
25  that right?

Page 1180

1      A.  Following recommendations and guidelines
2   from the partners, yeah, I did it.
3      Q.  And you reviewed both years of work papers?
4      A.  I mean, both -- what?
5      Q.  Did you review -- I didn't understand your
6   answer so I'm going to ask you again, if that's okay.
7      A.  Go ahead.
8      Q.  Did you review the BRFFC audit work papers?
9      A.  Yes.
10      Q.  I'd like you to take a look at one of those
11   work papers.  Let's look at Exhibit 3002.
12         Before we get there, it's a big book, right?
13      A.  Yeah.  It's big.
14      Q.  Mr. Thomas showed you a couple pages of work
15   papers earlier today.  But work papers are generally
16   big, right?
17      A.  Yeah.  I would say about this in this case,
18   yes.
19      Q.  And they're big because it's not just a few
20   pieces of paper that you put together.  You actually do
21   a whole audit with lots of stuff in it, right?
22      A.  Several areas that comprise an auditing,
23   you're right.
24      Q.  And at the end of the audit the work papers
25   are compiled; is that right?

Page 1181

1      A.  Similar to this.
2      Q.  Is it fair to say that the work papers
3   reflect the procedures that you used when you were doing
4   an audit?
5      A.  Summarize the procedures performed, yes.
6      Q.  Not every document goes in the work papers,
7   right?
8      A.  Not every document that you see at the
9   client, no.
10      Q.  So for example, if I look at the work papers
11   of E.S. Bankest, I would see every single check that was
12   received?
13      A.  No, sir.
14      Q.  So if there were customer checks received by
15   you or by a member of your staff, that's not something
16   you would typically see in the work paper, right?
17      A.  No, we don't have to keep copy of everything
18   that we see.
19      Q.  So you may have received customer checks for
20   E.S. Bankest, but you didn't reflect -- you didn't put
21   any of those customer checks in the work papers, right?
22      A.  Not the physical customer check, no.
23      Q.  This is -- what you have in front of you,
24   Exhibit 3002, is the work papers, the second part of the
25   work papers for the BRFFC audit?

Page 1182

1      A.  Okay.
2      Q.  I'd like you to turn to page BDO 1747.
3   There's a little stamp at the bottom right-hand corner
4   of the page.
5      A.  1747?
6      Q.  1747.
7      A.  (Complies.)  All right, sir.
8      Q.  You recognize that document, sir?  Do you
9   recognize what it is?
10      A.  Yeah.
11      Q.  What is it?
12      A.  Looks like a sample of a prospectus
13   agreement.
14      Q.  And this is a private-placement memorandum
15   for Bankest Receivables Factoring Corp.
16      A.  It looks like the first page, yes.
17      Q.  And this would be something that would
18   typically be in work papers, and you may have reviewed
19   this at the time you were assigned to the E.S. Bankest
20   audit, right?
21      A.  As part of the planning that I did for the
22   1998 audit, yes.
23         MR. COLE:  Now, turn to page 1752, which is
24   771, Ian.
25         (Technician complies.)

Page 1183

1   BY MR. COLE:
2      Q.  See, that's a table of contents.
3      A.  Hold on a second, please.  Yes, sir.
4      Q.  This table of contents makes reference to
5   audited financial statements being attached where?
6      A.  May I read it, please?
7      Q.  Sure.
8      A.  (Reading.)  In this page?
9      Q.  Yeah.
10      A.  Just spoke about unaudited balance sheet and
11   income statements and that's it.
12      Q.  And this was the private-placement
13   memoranda --
14         MR. COLE:  If you go back to page 1747 which
15   is 766, Ian.
16         (Technician complies.)
17   BY MR. COLE:
18      Q.  It's dated July 1st, 1996.
19         MR. COLE:  Blow up the bottom.
20         (Technician complies.)
21   BY MR. COLE:
22      Q.  You see that?
23      A.  Yeah, that's what it says.  That's right.
24      Q.  This would have been one of the documents
25   had that you looked at in conducting your audit, in

Page 1184

1  preparing for the audit of E.S. Bankest, correct?
2      A.   Yeah, that's right. I mean if the document
3  was part of the work papers for the 1996 audit, that's
4  something that I saw, observed, reviewed before we began
5  the audit for the 1999 -- 1998 of E.S. Bankest.
6      Q.   Isn't it a fact, sir, that you knew when you
7  started the Bankest audit and, in fact, audited
8  financial statements were not attached to the prior
9  entities' private-placement memos?
10     A.   No. We knew that because management told us
11  that too. They really needed the financial statements
12  of E.S. Bankest because they planned to raise money and,
13  in fact, they raised money.
14     Q.   And they raised money with private-placement
15  memos that had no attached audited financial statements,
16  right?
17     A.   I don't remember seeing anything for the
18  1998 audit, but they mentioned, at least that I
19  remember, that part of the reason why they needed
20  financial statements was to include it as part of the
21  PPMs and, in fact, at the time that we conducted the
22  audit, there was some people that already lent money to
23  the organization, you know.
24     Q.   And they lent money without an audited
25  financial, right?

Page 1185

1      A.   They lend money on an audit in 1998, but
2  definitely when we conducted the 1999 audit, there was
3  already a previous year financial statements in place.
4      Q.   Really? That's right.
5      A.   I cannot testify if they received those
6  financial statements or not.
7      Q.   Okay. But at least with respect to what we
8  just saw, the document that was contained in the work
9  papers that you reviewed did not reflect audited
10 financials being attached to a BRFFC private-placement,
11 right?
12     A.   Based on the information that is there, no.
13     Q.   Let's take a look at what you signed in the
14 1998 audit. This is Exhibit 95 in evidence.
15     A.   Thank you.
16         MR. COLE: Blow up the page, please.
17         (Technician complies.)
18 BY MR. COLE:
19     Q.   Now, you've definitely seen this document
20 before, right?
21     A.   Yeah, I remember seeing this document.
22     Q.   And the reason you remember it because your
23 signature is there at the top, right?
24     A.   That's right, sir.
25     Q.   You reviewed this document as part of your

Page 1186

1  audit in 1998?
2      A.   At least I read it, yes.
3      Q.   And there was no audited financial statement
4  attached to this document either, was there?
5      A.   No, sir.
6      Q.   Did you review the private-placement
7  memoranda in 1999?
8      A.   Pardon me?
9      Q.   For the 1999 audit did you review the
10 private-placement memoranda?
11     A.   I don't remember seeing any
12 private-placement memoranda.
13     Q.   Let me show you what's been admitted into
14 evidence as Exhibit 99. See if you can recognize that
15 document. Do you have an understanding of what that is?
16     A.   It looked like similar to this document.
17 It's dated -- the date of this memorandum is June 10,
18 1999, which is month after -- okay. It's dated -- okay.
19 It was prepared -- it looked like it was prepared after
20 the audit of 1998 but before the December 1999 audit.
21         I'm sorry.
22     Q.   You conducted the 1998 audit prior to June
23 10th of 1999, right?
24     A.   Yes, same released before.
25     Q.   And the report, as you said, would have been

Page 1187

1  issued sometime in March of 1998?
2      A.   '99.
3      Q.   I'm sorry, '99?
4      A.   That's right, sir.
5      Q.   And this was a few months later, right?
6      A.   Absolutely right, sir.
7      Q.   Now, I don't know if I heard you correctly.
8  Did you say you didn't review private-placement memos
9  for 1999?
10     A.   Not to --
11         MR. THOMAS: Objection, Your Honor, asked
12 and answered, just because he can't remember. He said,
13 I didn't remember.
14         THE COURT: Overruled.
15         THE WITNESS: I remember seeing those
16 documents. Okay? I don't remember seeing any financial
17 statements attached to this document. Okay? The
18 understanding at all times is that financial statements
19 are going to be attached to this documents.
20         However, personally, I never did any
21 procedures in connection with tying up or make sure that
22 the numbers of the financial statements agree with any
23 numbers or make sure that the information here is
24 consistent with whatever financial statements were
25 issued by BDO Seidman.

Page 1188

1  BY MR. COLE:
2      Q.   You don't remember ever seeing a
3  private-placement memorandum with an audited financial
4  statement actually attached to it, do you?
5      A.   That's absolutely right.
6      Q.   I'm sorry, you said right?
7      A.   Right.  I never saw that before.
8      Q.   And indeed, this private-placement
9  memorandum, which is dated June 10th, 1999, day after
10  you conducted the 1998 audit and issued the audit
11  opinion, has an unaudited financial statement in the
12  back?
13      A.   Let me see it, please.
14          MR. COLE:  Last page.
15          (Technician complies.)
16          THE WITNESS:  You said last page?
17  BY MR. COLE:
18      Q.   Last page.
19      A.   1999, June 10?
20      Q.   Yeah.  (Indicating).  It's the very last
21  page.
22      A.   This is just -- this is a balance sheet.
23      Q.   There's no financial statement?
24      A.   That's right.
25      Q.   And, in fact, if you take a look at the

Page 1189

1  page -- it's Bank 0011577 -- no, wait, 557.  It's maybe
2  the fifth page in.
3          The table of contents for after the audit
4  was conducted and after you issued your audited opinion
5  attached an unaudited financial statement, right?
6      A.   I'm sorry, Counselor, I'm still looking for
7  the page.  All right.
8      Q.   (Indicating.)
9      A.   Oh.  Sorry.  557?
10      Q.   11557.
11      A.   Just because they have two numerical
12  sequences.
13      Q.   You can use mine if you want.
14      A.   I'm sorry, what was the question?
15      Q.   This June 1999 private-placement memorandum
16  issued months after you finished your audit, issued your
17  audit opinion, as of -- even the table of contents, that
18  refers to unaudited balance sheets, right?
19      A.   That's what it says there.
20      Q.   You thought maybe Bankest was going to
21  attach them but they really didn't?
22      A.   Well, when we conducted the audit and
23  conversations that I remember having with team members
24  and Bankest management, one of the main purposes of
25  having those audited financial statements was to include

Page 1190

1  it as part of either this document or a similar
2  document.  But that's my understanding.
3      Q.   But you never saw that?
4      A.   As far as I remember, no.
5      Q.   Now, if I understand for the 1998 audit, you
6  were the manager; is that right?
7      A.   If you understand for which --
8      Q.   For the 1998 audit?
9      A.   I was the what?
10      Q.   The manager?
11      A.   Yes, sir.
12      Q.   You were the manager, right?
13      A.   That's right, sir.
14          THE COURT:  Mr. Rivera, I need you to put it
15  on this side because he's on this side of the floor and
16  you're looking that way.
17          THE WITNESS:  (Complies.)  I'm sorry,
18  Counselor, what was the question?
19  BY MR. COLE:
20      Q.   You were the manager of that audit?
21      A.   Yes, sir.
22      Q.   And you had below you what's known as a
23  senior?
24      A.   Senior and staff people.
25      Q.   Staff people.  I'd just like to explain to

Page 1191

1  the jury what is a the role of a staff person?
2      A.   Staff?
3      Q.   Yeah.
4      A.   Work under the direction of a senior or
5  manager or partner doing -- reviewing documents or
6  working documentation, that type of things.  But the
7  responsibility is definitely less than whatever a senior
8  is and less than whatever a manager or a partner is.
9      Q.   Now, there are staff people at the bottom
10  reviewing documents.  What's the senior's role?
11      A.   Review the work of the staff and do some
12  other riskier areas during the audit.
13      Q.   And the senior is onsite also, typically?
14      A.   Yes.
15      Q.   And then the manager supervises the audit;
16  is that right?
17      A.   That's the process, yes.
18      Q.   And then once the audit is completed, it
19  gets run up the line to the partner?
20      A.   It was the procedure at the time.
21      Q.   And during that time period in 1998, you
22  would sign, as the manager, any work paper that you
23  either prepared or reviewed; is that right?
24      A.   That's right, sir.
25      Q.   And when you prepared it, you were careful

Page 1192

1   to make sure that that work paper was right, correct?
2       A.  Yeah.  Exercise prudent man rule to make
3   sure whatever goes there is to the best of my knowledge
4   and it's accurate, and reasonably accurate.
5       Q.   And when you reviewed it, you do the same
6   thing?  You reviewed the work paper to see if the
7   information on the work paper was accurate, correct?
8       A.   I would say make sense, it's correct, and
9   it's conducted according to audit plan.
10      Q.   And as an auditor at the time with 10 years'
11  of experience you thought it was very important to make
12  sure that those work papers were accurate, correct?
13      A.   I would say yes.
14      Q.   And when you signed your name to a work
15  paper, you understood as being sent up to the line so
16  that someone else would rely on it, right?
17      A.   That's right, sir.
18      Q.   And in this case E.S. Bankest -- you sent
19  the work paper up the line so that Sandy Lenner and
20  Keith Ellenburg would rely, correct?
21      A.   Absolutely, yes.
22      Q.   You made sure that you were in that
23  situation, the work papers were absolutely correct?
24      A.   I don't want to use the word absolutely
25  correct but fairly state or summarizes the work that was

Page 1193

1   performed in the field.
2       Q.   Now, sir, I'd like to hand you Exhibit 3003,
3   which is the 199 -- the work papers for the 1998 audit
4   of E.S. Bankest for which you were the manager.
5           Do you recognize these work papers, sir?
6       A.   Yes, sir.
7       Q.   These are the 1998 work papers, right?
8       A.   Look like a copy of the original work paper,
9   yes.
10      Q.   And consistent with procedure, the audit
11  staff and you and whoever and the senior would do work
12  and write it down in work papers, right?
13      A.   That's right.
14      Q.   And then this document, this big fat
15  document with all the work papers in it, would be
16  compiled at the end of the audit?
17      A.   That's right, sir.
18      Q.   And then put together and stored, correct?
19      A.   That was the procedure.
20      Q.   And there was nothing stopping you from
21  writing anything as the manager in these work papers,
22  right?
23      A.   You're absolutely right, Counselor.
24      Q.   Now, take a look at page 862.
25      A.   862?

Page 1194

1       Q.   00862.
2       A.   (Complies.)  Okay, sir.
3       Q.   See that?
4       A.   Yes.
5       Q.   Recognize that document?
6       A.   Yes, sir.
7           MR. COLE:  Would you pull up just the top,
8   please?
9           (Technician complies.)
10  BY MR. COLE:
11      Q.   Document created by you, correct?
12      A.   That's right, sir.
13      Q.   And those are your signatures at the top,
14  right -- signature at the top, right?
15      A.   That's right, sir.
16      Q.   And would you please explain to the jury
17  what the purpose of this document is?
18      A.   May I read it, please?
19      Q.   Sure.
20      A.   (Reading.)  Okay.  It summarized in this
21  paper some of the procedures that we performed and some
22  of those audits that are behind this memorandum.
23      Q.   This is a -- these are procedures dealing
24  with confirming accounts receivable, right?
25      A.   Yes, sir.

Page 1195

1       Q.   And these are the procedures that were --
2   part of these procedures were the procedures you were
3   discussing in connection with the C-10 work paper,
4   right?
5       A.   Let me see, please.
6           MR. COLE:  Just blow up the text part.
7           (Technician complies.)
8           THE WITNESS:  That's right, sir.
9   BY MR. COLE:
10      Q.   This document I gather was prepared to
11  explain what you did, correct?
12      A.   I would say summarize.
13      Q.   Summarize what you did?
14      A.   Yes.
15      Q.   It was prepared on February 24th, correct?
16      A.   At least the memo is dated February 24th.
17      Q.   And that was after this event that you had
18  with Mr. Parlapiano, correct?
19      A.   Yes, sir.
20      Q.   Twelve days later?
21      A.   Approximately.
22      Q.   And you said, sir, that during that event --
23  after that event, you were allowed to treat Bankest
24  Capital checks as customer checks, right?
25      A.   In the event that the ultimate customer

Page 1196

1   check was not available, yes.
2       Q.   This memorandum summarizing what you did,
3   did you state anywhere on this memorandum?
4       A.   No, sir, it's not there.
5       Q.   Now, again, this memorandum was created in
6   February of 1999, right?
7       A.   Yeah.  But the fact that the memorandum is
8   dated February 24, that doesn't mean that it was
9   completely completed as of February 24.
10      Q.   I see.  It was certainly completed by the
11  time you finished the audit, right?
12      A.   Absolutely, yes.
13      Q.   So at least the information on this
14  memorandum was done at the end of February or early
15  March maybe?
16      A.   I would say before March 1st.
17      Q.   Before March 1st?
18      A.   I think the financial statements were
19  issued -- I mean, we have to say the date of issue of
20  financial statements but certainly before the release
21  date.
22      Q.   This document was created seven years ago or
23  eight years ago to summarize what you did, right?
24      A.   That's right, yes.
25      Q.   And nowhere on this document is a mention of

Page 1197

1   Dominick Parlapiano saying I will not give you
2   documents, is there?
3       A.   No.  It's not there.
4       Q.   And there's nowhere on this document that
5   mentions that you were allowed to use Bankest Capital
6   checks as customer checks, right?
7       A.   No, it's not there.
8       Q.   Now, the first part of this document, it
9   says on the top here, as part of our audit procedure --
10      A.   Yes, sir.
11      Q.   -- we sent account receivable confirmations.
12      You see that?
13      A.   That's what it says there.
14      Q.   Now, you don't remember that as you sit here
15  today, right?
16      A.   Remember what?
17      Q.   Sending out confirmations.  Do you remember
18  doing that?
19      A.   Well, I remember that we sent confirmations
20  because it's a requirement in every audit that at least,
21  you know, it's like SAS.  It's a standard procedure in
22  every audit to confirm receivables.
23      Q.   Do you remember as you sit here, as you sit
24  here today, receiving back confirmations?
25      A.   My best recollection is yes, and it says

Page 1198

1   here that we received two confirmations.
2       Q.   And that's the reason why you put it down
3   there because it reflects what you did and the
4   confirmation procedure you conducted, right?  It
5   summarizes it?
6       A.   Yeah.  Basically, I mean we prepared this
7   paper just to like put it in one single piece of paper,
8   summarize what is behind.  You know, because if you can
9   see, it's a lot of documents here, and that facilitates
10  review, manager review, and concurring partner review,
11  and someone else that would like to review these work
12  papers.  That was the purpose of that work paper, just
13  to summarize.
14      Q.   I understand.
15      A.   But the audit can be released without this
16  document.
17      Q.   This document that you did include the work
18  papers to summarize, right?
19      A.   Yes.
20      Q.   I think we all understand that.
21          All right.  My question, sir, is seven years
22  ago or eight years ago when you prepared this document,
23  it allows you to remember that you, in fact,
24  received confirmations, right?
25      A.   Yes.  I mean, I don't have to C-6 or C-14 to

Page 1199

1   see if we received the confirmation.  It's documented
2   here.
3       Q.   And in this case you received confirmations
4   for over $15 million in accounts receivable, right?
5       A.   What is there.
6       Q.   Well, you don't remember as you sit here
7   today, right?
8       A.   No.  If I was seeing the work paper, I
9   definitely would not remember that.
10      Q.   It's important -- confirmations are
11  important, right?
12      A.   Absolutely, yes.
13      Q.   And when you receive them, you put it down
14  in the work paper?
15      A.   That's right, sir.
16      Q.   Now, the second step here is it talks about
17  AR collections from January 1st to February 12th.
18          You see that?
19      A.   Yes, sir.
20      Q.   That's the work paper C-10, the big board
21  that we were looking at before, right?
22      A.   That's right, sir.
23      Q.   And this document talks about receiving over
24  $10 million in collections as reflected on work paper
25  C-10, right?

Page 1200

1     A.   That's what it says.
2     Q.   Let's talk about that for a second.  It says
3  here collections made from January 1st to February 12th
4  of 1998, right?
5     A.   That's right.
6     Q.   And the reason for doing that test is if
7  somebody pays it, it's probably real, right?  Why would
8  somebody pay an account receivable if it was fake?
9     A.   It was like a -- for example, my best
10  recollection is that at the beginning we sent
11  confirmations.  If we don't receive it, then there's
12  alternate procedures to validate accounts receivables.
13     Q.   And one of the alternate procedures was
14  subsequent collections, right?
15     A.   Absolutely right.
16     Q.   Now, you testified that you had been asking
17  for information relating to subsequent collections from
18  the beginning, correct?
19     A.   Yeah, we were.
20     Q.   In January, was there any subsequent
21  collections for February 12th, 1998?
22     A.   Hold on a second.  I mean the day, it is
23  incorrect.  The date should be February 12th, 1999.
24     Q.   I'm sorry.  February 12th, 1999.
25     A.   No.

Page 1201

1     Q.   So in January, beginning of January, when
2  you were requesting information, subsequent collections,
3  it was only for collections that occurred at the time,
4  correct?
5     A.   Absolutely right.
6     Q.   In fact, isn't it a fact, sir, that you
7  didn't ask for subsequent collections information until
8  after February 12th?
9     A.   No.  No, we've been requesting subsequent
10  collection information since January.
11     Q.   Really?
12     A.   Yes.
13     Q.   Let's take a look at the -- we'll get back
14  to that, as well.  Let's take a look at the C-10 work
15  paper.
16          This was the C-10 work paper that you
17  signed?
18     A.   The one that we saw this morning, yes.
19     Q.   And if I understand your testimony, the A,
20  B, and C over here correspond to the work that's
21  reflected down at the bottom, correct?
22     A.   That's right, Counselor.
23     Q.   And A, under A --
24     MR. COLE:  Can you blow that up, please?
25     (Technician complies.)

Page 1202

1  BY MR. COLE:
2     Q.   -- it says examined collection of 1998
3  invoices, right?
4     A.   Right.
5     Q.   Would you look, that's a copy of the
6  customer check, right?
7     A.   Right.
8     Q.   And the remittance advice noting agreement,
9  right?
10     A.   Right.
11     Q.   Now, the remittance advice, that's something
12  that's attached to the customer check?
13     A.   Yes.  Attached to the customer check.
14     Q.   Now, you didn't put it here that you could
15  use a BCC check, right?
16     A.   No, we didn't.
17     Q.   Now, you testified that you saw customer
18  checks for the first 10 or so; is that right?
19     A.   That's my best recollection.
20     Q.   Now, you didn't -- one moment.
21          You didn't do -- you don't remember doing
22  any of the other ones, do you?
23     A.   If I did, then definitely my best recall is
24  that I limit the work up to the BCC records.
25     Q.   Sir, my question is for 11 through 32, you

Page 1203

1  don't remember doing any of those procedures, do you?
2     A.   My answer is, if I did it, then I may limit
3  my work to the BCC customer checks.
4     Q.   You said if you did it, sir.  You don't
5  remember ever doing that, right?
6     A.   No.  Remember, there was more than one
7  person working in this audit.  The work was distributed
8  among a team.  So members of one team did one part of
9  the audit, and other members did another part, and I
10  participated in other parts of the audit.
11          The fact that my signature is the only one
12  on this paper that -- junior to the partner, that
13  doesn't mean that I was the only one working this work
14  paper.
15     Q.   I understand.  My question is very simple.
16  You do remember the first 10, right?
17     A.   Yes.
18     Q.   But you don't remember doing the work for 11
19  through 32 as you sit here today.  You don't remember
20  doing that.  It could have been somebody else.
21     A.   Or it could be me too.
22     Q.   But you don't remember one way or another?
23     A.   If I -- I mean, Counselor, you have to
24  understand.  If I did it, then I may limit my job to the
25  BCC customer checks.  But I don't remember what I did or

Page 1204

1  didn't do because I'm not completely sure up to what
2  extent I was involved in the testing of these customer
3  checks or collections.
4      Q.   Okay.  So the people who actually did 11
5  through 32 may have received customers checks just like
6  it says here from the work papers, right?
7      A.   That's a question that you should ask the
8  people who did that job.  I'm telling what I did.
9      Q.   You did 1 through 10?
10     A.   I don't remember because of the fax that I
11 sent to Carlos Mendez on February 12 or February 14 or
12 15, 16 -- February 18.  But definitely those are the big
13 collections.  I don't remember be involved in receiving
14 customer checks such as Wal-Mart or Joy.
15     Q.   So it could have happened.  You just don't
16 know one way or another, right?
17     A.   Right.  That's a fair answer.
18     Q.   Now, in the C-10 work paper --
19          MR. COLE:  Can you please blow it up?
20          (Technician complies.)
21 BY MR. COLE:
22     Q.   After this work paper -- well, this work
23 paper is dated February 25th, 1999, right?
24     A.   That's what it says there.
25     Q.   It could have been prepared afterwards is

Page 1205

1  what you're saying or finished afterwards?
2      A.   I don't know what that date means.
3      Q.   Well, this was prepared after this Dominick
4  Parlapiano event, right?
5      A.   It was prepared after the event definitely.
6      Q.   And nowhere on this document either is there
7  any mention of Dominick Parlapiano, is there?
8      A.   It's not there.
9      Q.   Now, let's talk about that event for a
10 second.  You said that you'd been asking for these
11 documents for some time, since the beginning of January,
12 right?
13     A.   The auditing, yes.
14     Q.   And on February 12th, which was a Friday --
15     A.   Yes.
16     Q.   -- you were denied the information you had
17 requested, right?
18     A.   Yes, sir.
19     Q.   Now, what time of day did you leave the job?
20     A.   That day?
21     Q.   Yeah.
22     A.   I know it was after 5:00.
23     Q.   So it was at the end of the day on Friday?
24     A.   Yes.
25     Q.   And you said you called Mr. Ellenburg,

Page 1206

1  right?  You called Mr. Lenner first, he wasn't there,
2  and then you called Mr. Ellenburg, right?
3      A.   That's right, sir.
4      Q.   Mr. Ellenburg said you could leave.  You
5  know, it's Friday.  You could leave, right?
6      A.   Yeah, he said, given the circumstances and
7  the fact that you're not getting the documents today,
8  yeah, you can leave.  And don't work tomorrow or Sunday
9  until we clarify this with Mr. Lenner.
10     Q.   Now, you said you went to work over the
11 weekend but you worked on other matters, right?
12     A.   That's my best recollection.
13     Q.   This is a busy season, so you had other
14 matters to work on, right?
15     A.   Absolutely, yes.
16     Q.   And it wasn't until Monday that you were
17 able to meet with Mr. Lenner in this three-way meeting
18 between you, Mr. Lenner, and Mr. Ellenburg, right?
19     A.   That's right, sir.
20     Q.   During that meeting I believe what you
21 testified is you called Mr. Parlapiano, correct?
22     A.   We called.
23     Q.   And Mr. Lenner told Mr. Parlapiano if you
24 didn't get the documents, we're going to have to resign?
25     A.   That's absolutely true.

Page 1207

1      Q.   That was your understanding, right?
2      A.   That's what happened.
3      Q.   That was your understanding.  If you didn't
4  get the documents, you'd have to resign?
5      A.   Yeah.  Yeah, definitely.
6      Q.   You were an auditor for 10 years.  With
7  10 years' of experience.  You knew that, right?
8      A.   Absolutely, yes.
9      Q.   When you didn't get the documents
10 supposedly, did you resign?
11     A.   At BDO?
12     Q.   When Mr. Parlapiano ultimately, supposedly
13 didn't give you the documents, did you resign?
14     A.   Me?
15     Q.   Yes.
16     A.   As a BDO employee?
17     Q.   Yes.
18     A.   No.
19     Q.   Did you resign from the audit?
20     A.   No. I didn't have that authority.
21     Q.   When Mr. Parlapiano didn't give you the
22 documents later on, did you go to Mr. Lenner and say,
23 where are the documents?
24     A.   I'm sorry.  What is your question in time
25 frame.

Page 1208

1    Q.   You said on February 12th you were off the
2  job, right?
3    A.   That's right.
4    Q.   Monday was February 15th, right?
5    A.   That's right.
6    Q.   And you went back to the job, say, February
7  17th or 18th maybe; that's Wednesday or Thursday?
8    A.   As instructed, yes.
9    Q.   And you said you didn't receive the
10 documents you requested, right?
11   A.   We didn't receive all the documents that
12 we've been asking in terms of, on that chart we saw this
13 morning, go up to the customer level.
14   Q.   Did you know that -- did you think that was
15 wrong at the time?
16   A.   No, definitely not. I was -- we asked for
17 the documents. Some of the documents were not
18 available. We communicated to our superiors. They said
19 to us, listen, it is okay to limit our review to the
20 Bankest Capital Corp. documents on collections, and
21 that's what we did.
22   Q.   As the manager of the audit -- you're in
23 charge as the manager of the audit; do you think that
24 was a valid audit test?
25       MR. THOMAS: Objection, Your Honor, assumes

Page 1209

1  facts not in evidence.
2        THE WITNESS: (Inaud.).
3        MR. COLE: At the time.
4        MR. THOMAS: Objection --
5        THE COURT: I need to hear what the
6  objection is.
7        MR. THOMAS: Objection. Assumes facts not
8  in evidence that Mr. Rivera instead of Mr. Lenner was in
9  charge of the audit.
10       THE COURT: Overruled.
11 BY MR. COLE:
12   Q.   At the time did you think you were doing
13 right?
14   A.   I didn't think I was doing anything wrong.
15 I mean, I was conducting the audit. Those were the
16 guidelines. That was the advice that we received from
17 our superiors, and that's what we did.
18   Q.   Did you as an experienced professional who
19 had responsibility of this audit believe that you were
20 receiving the documents you needed to sign off on the
21 audit?
22   A.   The answer is yes, but remember, Counselor,
23 I was new in this audit, I was new in the organization.
24 It was the first time that I faced this type of
25 situation. I addressed this situation to the people who

Page 1210

1  were responsible on the account, people who hired me,
2  and the principals of the organization.
3        And they said that's fine. We can stop the
4  work up to the Bankest Capital Corp. level and then move
5  forward. And that's what we did. We saw some of the
6  checks from customers like Wal-Mart, K-Mart, and we saw
7  some other checks from Bankest Capital Corp.
8    Q.   You were a CPA at the time, weren't you?
9    A.   Yeah, I was.
10   Q.   You had to take the CPA exam?
11   A.   Yeah, I did.
12   Q.   You were familiar with the rules in
13 existence at the time in conducting an audit?
14   A.   That's right.
15   Q.   You had no problem finishing this audit with
16 the documents that you had, correct?
17       MR. THOMAS: Objection, Your Honor.
18       THE COURT: Sustained.
19 BY MR. COLE:
20   Q.   At that time?
21       MR. THOMAS: Objection, Your Honor.
22       THE COURT: Sustained.
23 BY MR. COLE:
24   Q.   Did you ultimately sign off on the audit?
25   A.   It was not my job to sign off on the audit.

Page 1211

1  It was the partners' responsibility.
2    Q.   Now, sir, take a look at page 696?
3    A.   I'm sorry? Which page?
4    Q.   696, which is --
5    A.   Which binder?
6    Q.   Of Exhibit 3003.
7        MR. COLE: It's page 205, Ian.
8        (Technician complies.)
9        MR. COLE: That's it.
10       THE WITNESS: It's blank.
11 BY MR. COLE:
12   Q.   Yeah, but you see the little tab at the
13 bottom there?
14   A.   Uh-huh. (Nodding.)
15   Q.   What is PBC?
16   A.   It was three letters that we used to define
17 prepared by client.
18   Q.   And those are the documents -- this is the
19 section of the work papers that I looked -- I'd look at
20 to find out what you were requesting during the audit,
21 correct?
22   A.   I would say yes.
23   Q.   Now, turn to page 717.
24   A.   77?
25   Q.   717.

Page 1212

1     A.   (Complies.)
2     Q.   This is an example of a list of documents
3  that you were requesting?
4     A.   Yeah.  It was a -- a list definitely.
5     Q.   And this was really early on.  This was even
6  before the audit started in November of '98, right?
7     A.   Yeah.  But by that time we were engaged as
8  auditors of E.S. Bankest.
9     Q.   Right.  But this, in fact, is a list of
10 information you were requesting, right?  This is the
11 list of documents needed in connection with the audit
12 work, right?
13    A.   This is a document that we requested to the
14 client, yes.
15    Q.   And where in this document does it say we
16 need customer checks?
17    A.   No.  You know what?  It's not there and I'm
18 going to -- if you want I can explain to you the reason
19 why.  It's not --
20    Q.   It's not there?
21    A.   It's not there, but if you allow me to
22 explain, I can tell you why it's not there.
23         MR. THOMAS:  Your Honor, I ask that the
24 witness be able to give his full answer.
25         THE COURT:  No.  You can him ask him on

Page 1213

1  redirect.
2  BY MR. COLE:
3     Q.   Let me start over.  This date, November
4  1998, right?
5     A.   November 16.
6     Q.   This is before year-end, correct?
7     A.   That's right.
8     Q.   So there couldn't have been any subsequent
9  receipts, yet, right?
10    A.   You're absolutely right, yeah.
11    Q.   So there was nothing to ask for at that
12 time, right?
13    A.   No, but that's not the principal reason.
14 The answer is that it's not there.
15    Q.   There are no request for customer checks on
16 this request, correct?
17    A.   Absolutely right.
18    Q.   Now, turn to page 714.
19    A.   (Complies.)
20    Q.   This is dated January 8, 1999, right?
21    A.   Yes.
22    Q.   This is one prepared by Chris Mohr, correct?
23    A.   It looks like that.
24    Q.   And this is another one of those documents
25 where you list the documents that you want and you need

Page 1214

1  for the audit, correct?
2     A.   Absolutely right, Counselor.
3     Q.   And this is where I would find the request
4  for customer checks, right?
5     A.   And this is -- pardon me?
6     Q.   Isn't this where I would find the request
7  for the customer checks?  This request to the client for
8  documents?
9     A.   If you allow me to read the whole document,
10 I can answer your question.
11    Q.   I'll let you read the document.  But I want
12 an answer.
13         Is this the type of document that you would
14 provide to the client asking for customers checks?
15    A.   Absolutely, yes.
16    Q.   Now, look at the document and tell me where
17 on this document it talks about customer checks?
18    A.   (Complies.)  (Reading.)  It doesn't clearly
19 specify customer checks.
20    Q.   There's a huge list of information that it's
21 requesting.  I mean, there must be 30 or 40 items on
22 here, 20 items maybe?
23    A.   But however, the first request in the
24 accounts receivable subcaption it says, confirmation
25 request for all customers related to BDO aging detail of

Page 1215

1  accounts receivable, Number 4, all supporting
2  documentation for customer invoices.
3         If we would receive that information, then
4  there would be no need to see customer checks subsequent
5  collection.
6     Q.   Were there subsequent collections from
7  January 18, 1999?
8     A.   Very few.
9     Q.   Thank you.  Now, your testimony is that the
10 document doesn't mention customer checks, right?
11    A.   Not at that time.
12    Q.   This is early January, right?
13    A.   That's right.
14    Q.   And that was the information you really
15 wanted.  You really wanted those customer checks.  They
16 were important to you, correct?
17    A.   As I mentioned before, it was an alternate
18 procedure to validate accounts receivable.
19    Q.   Sir, you spent all morning long talking
20 about customer checks.  The customer checks were the
21 document you wanted, correct?
22         MR. THOMAS:  Objection, Your Honor.
23 Argumentative.
24         THE COURT:  Overruled.
25         THE WITNESS:  Yeah.  At that time we were

Page 1216

1  asking for customer checks.
2  BY MR. COLE:
3      Q.  And although you could put down all this
4  detailed information, in early January when you said you
5  were requesting customer checks, you didn't put down the
6  request for customer checks specifically, at least in
7  January of 1999?
8      A.  No, we didn't.
9      Q.  Let's turn to the next request, okay, which
10 is on page 713. I'm sorry. It's on page 711.
11     A.  Yes, sir.
12     Q.  I'm sorry. The next request, I apologize,
13 is 708?
14     A.  7?
15     Q.  708. You see that? It's dated February
16 12th, 1999, right?
17     A.  Yes, sir.
18     Q.  That's the day that Mr. Parlapiano and
19 Mr. Mendez refused to give you customer checks, right?
20 That's that Friday, right?
21     A.  Yes, sir. That's based on my declaration,
22 yes.
23     Q.  This is the day. Where does it say you need
24 customer checks to complete the audit?
25     A.  If you go to item number 25, it says,

Page 1217

1  detailed receipts register.
2      Q.  What's a register, sir?
3      A.  My understanding is because of the dates
4  1-1-99 through present. So the only way I can interpret
5  this sentence is that detailed receipts register,
6  whatever the company has received from January 1st,
7  1999, through present. Present in this document, as you
8  said, February 12th.
9      Q.  What is a register, sir?
10     A.  A register have a lot of definitions, but in
11 this specific audit it's like a cash collection
12 register.
13     Q.  And what is a cash collection register?
14     A.  Whatever subsequent collections were made by
15 E.S. Bankest subsequent to January 1st, 1999.
16     Q.  And the register is something that you'd
17 find in the computer, right? It lists all the accounts
18 receivable, right?
19     A.  Yes.
20     Q.  It's not a customer check. It doesn't say
21 customer checks on there, does it?
22     A.  The document does not specifically say
23 customer check on it. But I mean, any other person in a
24 similar audit will get to the same conclusion that
25 receipts register January '99 through present.

Page 1218

1      Q.  Sir, the customer checks were important.
2  They were supposedly the reason why you walked off the
3  audit, and your request doesn't even mention that; isn't
4  that right?
5      A.  It's there; it's in item number 25.
6      Q.  You're saying a detailed receipts register
7  is customer checks, right?
8      A.  Counselor, you're asking me a question based
9  on my knowledge and belief today of whatever happened
10 nine years ago. With all the respect that you deserve,
11 my best answer to your question is that item 25. That's
12 the all I can say.
13         The word, specifically, customer check, is
14 not in this document. However, the explanation that I
15 can give to you and the members of this jury is that my
16 understanding is that item 25 said detail receipts
17 register.
18     Q.  It doesn't say anything about any check. It
19 doesn't say client check, BCC check --
20     A.  It doesn't say like that.
21     Q.  And that's January 12th, the day that --
22     A.  The day of the Parlapiano incident.
23     Q.  The next document, as I understand it, is
24 February 18th?
25         MR. COLE: And can we please put that up?

Page 1219

1          (Technician complies.)
2          May I approach, Your Honor?
3          THE COURT:  You may.
4  BY MR. COLE:
5      Q.  It's this one. It's not in 3003. It's the
6  one that Mr. Thomas showed you. It looks like this fax.
7      A.  Yeah, you're absolutely right. It's not
8  here. It --
9      Q.  It may be next to you over there. That's
10 it.
11         This is the fax that Mr. Thomas showed you,
12 Exhibit 287B, remember that?
13     A.  Yes, sir.
14     Q.  And this one is dated February 18th, 1999,
15 right?
16     A.  Right, sir.
17     Q.  And this is your fax, correct?
18     A.  That's right.
19     Q.  You have your meeting with Mr. Lenner -- I'm
20 sorry, Lenner, Ellenburg, and the call of Parlapiano on
21 the 15th, right?
22     A.  That's right.
23     Q.  You see Mr. Parlapiano come to the office
24 sometime thereafter, correct?
25     A.  I would say the 17th.

Page 1220

1    Q.   And then on the 18th you start back up the
2    audit, right?
3    A.   At least we requested these documents.
4    Q.   And that's Wednesday?
5    A.   Thursday.
6    Q.   You're right. Thursday. Start back up the
7    audit on Thursday?
8    A.   That's right.
9    Q.   And this is the document where you say --
10   you attach a list of the subsequent collection that
11   you'll examine as part of the audit, right?
12   A.   Right.
13   Q.   That's what you requested from Mr. Mendez,
14   correct?
15   A.   That's right, sir.
16   Q.   And then attached to that are the first 10
17   or so items that were on exhibit -- on the C-10 work
18   paper, correct?
19   A.   That's what I said, yes.
20   Q.   And this is the first request -- the first
21   list that you sent, the very first list that you sent of
22   subsequent receipts that you tested, correct?
23   A.   Yeah, I don't remember seeing any other list
24   before this one.
25   Q.   This is the first list?

Page 1221

1    A.   Yeah, this is the first list.
2    Q.   And it's your testimony, sir, that you
3    yourself, you personally received documents in response
4    to this list; is that right?
5    A.   Of this ones?
6    Q.   Yeah.
7    A.   Yeah, that's right.
8    Q.   And you received the customer check;
9    correct?
10   A.   That's right, sir.
11   Q.   And you reviewed that, right? You reviewed
12   that customer check? You know you received it?
13   A.   I don't specifically remember out of this
14   list which one I received. But I remember seeing some
15   from Wal-Mart, K-Mart, Just For Feet, for example.
16   Q.   Is it your testimony that you don't remember
17   what documents you received from the first 10 either?
18   Is that your testimony now?
19   A.   No, I said I remember receiving them.
20   Q.   Okay. You received for each and every one
21   of these?
22   A.   That's my testimony, yes.
23   Q.   And you received customer checks and
24   remittance advice, right?
25   A.   Yes.

Page 1222

1    Q.   Consistent with the C-10 work paper
2    required, correct?
3    A.   That's right.
4    Q.   Now, the very next request was at page 699
5    of Exhibit 3003?
6    A.   6?
7    Q.   699. I think Mr. Thomas showed you this
8    earlier, as well.
9    A.   Yes, sir.
10   Q.   Do you remember this document?
11   A.   Yes.
12   Q.   This is dated February 22nd, four days
13   later, right?
14   A.   That's right.
15   Q.   Next Monday?
16   A.   It was a Monday, yes.
17   Q.   And this is what's known as the significant
18   open items update list, right?
19   A.   Yeah.
20   Q.   And you created it, right?
21   Right?
22   A.   Yes.
23   Q.   And again, there's nothing on here that
24   refers to customer checks, correct?
25   A.   Hold on a second, please. (Reading.)

Page 1223

1    Yeah, it said number 8. Additional accounts
2    receivable collections will be requested when we receive
3    item 7, refer to attached lists 1 and 2.
4    Q.   Attached lists 1 and 2 were the additional
5    collections that you wanted to test, right? That's what
6    you said before. You want to see it again?
7    The next two pages, the next three pages,
8    1 and 2 correspond to 11 through 32, right?
9    A.   Exactly. If you see this list, Counselor,
10   Number 1 goes from like January 4th through January
11   29th, and Number 2 goes from like January 29 to February
12   12th. So it's like what we define collections for those
13   customers after year-end.
14   Q.   And those are the -- those are the lists
15   referred to in item 8, refer to attached list 1 and 2,
16   correct?
17   A.   That's my best recollection and belief, yes.
18   Q.   And what you wanted was you wanted the same
19   documents, the same documents that you had received for
20   1 through 10, correct?
21   A.   That was the original request, yes.
22   Q.   That was what your request was, right?
23   A.   Yes.
24   Q.   Now, Mr. Parlapiano wrote you back, correct?
25   A.   (Inaud.).

Page 1224

1    Q.   Turn to page 697.  It's all in your work
2  papers to reflect what happened, correct?
3    A.   Pardon me?
4    Q.   697.  You got that document?
5    A.   Yes.  This is a memo from them to us the
6  next day.
7    Q.   This is something that's in the work papers,
8  correct?
9    A.   Yeah, it was in the work papers.
10    Q.   And it's there to memorialize what happened,
11  correct?
12    A.   At least -- yes.
13    Q.   And if you go to the top, all the way to the
14  top of the page, you reviewed this, right?
15    A.   That's right.
16    Q.   And you said these little okays at the side
17  were your handwriting, correct?
18    A.   I already testified about it.
19    Q.   Now, if you take a look at item 8, which is
20  on the next page --
21    A.   All right.
22    Q.   -- it corresponds to item 8 on your request,
23  correct?
24    A.   (Reading.)  Yes.  This is a follow up to
25  my -- our request the day before item 8, that's right.

Page 1225

1    Q.   And the initial request for AR collections
2  validation was the February 18th fax, correct?
3    A.   That part I cannot tell you what do they
4  mean when they said initial request.
5    Q.   But for the February 18th request, which was
6  the first 10 --
7    A.   Exactly.
8    Q.   You received all the documents you needed,
9  right?
10    A.   Absolutely right.
11    Q.   And this says, same documentation provided
12  on BDO's initial request for AR validation to be
13  provided February 24th on all items for list 1 and 2;
14  you see had that?
15    A.   That's what is up there.
16    Q.   And that's for Mr. Parlapiano to you, right?
17    A.   To us.
18    Q.   To whoever received the document?
19    A.   Yes.
20    Q.   And you put okay.  You took it off, didn't
21  you?
22    A.   Well, if I, as I testified before,
23  Counselor, and more than once, I remember saying that I
24  wrote these okays next to the number of the -- the --
25  each item.  But I don't remember what the meaning of the

Page 1226

1  okay is as of today when I did it nine years ago.
2    Q.   Well --
3    A.   If you want, we can speculate what okay
4  mean.
5    Q.   I'm not speculating.  I'm just asking
6  questions; that's all.  You did put okay though, right?
7    A.   I did.
8    Q.   Isn't it a fact, sir, that you received the
9  same documents for 11 through 32 as it states there as
10  you did for 1 through 10?
11    A.   No, I don't remember that.
12    Q.   Well, when Mr. Parlapiano wrote this memo
13  and said you can get the same documents, this is
14  February 23rd.  This is a week later.  Right?
15    A.   Right.
16    Q.   And he told you you're going to get those
17  documents, right?
18    A.   Like you said, that's what Mr. Parlapiano,
19  the one who wrote that.  So I don't know what he meant
20  when he said initial request.  You know, how many
21  requests have you shown me today that we communicated
22  between Bankest and BDO during the course of this audit,
23  November, December, January, February, at least four or
24  five.  So what he means by initial request, I cannot
25  tell you, honestly.

Page 1227

1    Q.   This okay, does that okay mean, okay, I
2  didn't get what I asked for?
3    MR. THOMAS:  Objection, Your Honor.
4  Argumentative.
5    THE COURT:  Sustained.
6  BY MR. COLE:
7    Q.   I mean, you received the documents, didn't
8  you?
9    A.   I never have testified what the okay means.
10    Q.   I'm not asking what you've testified to in
11  the past.
12    A.   No, no.  I'm saying I don't know what okay
13  means.  I don't remember.
14    Q.   I'm asking you straight out.  You received
15  the same documents to finish the audit of 11 through 32
16  like 1 through 10 just like this document says, right?
17    A.   No.  As I said before in this Court, I don't
18  remember receiving, in some of the customer checks that
19  we reviewed, information about the BCC level for all the
20  cases that we tested.
21    Q.   And that's your signature up at the top
22  there, right?
23    A.   Yes.
24    Q.   And this is your handwriting down at the
25  bottom?

Page 1228

1   A.  Yes.
2   Q.  Does it say anywhere that it talks about
3  customer checks?  It talks about legal invoices; it
4  talks about all these detailed things.  It says,
5  $20,000, BCC services; tax account documents; legal
6  invoices.  It doesn't say anything there that you
7  received customer checks, did it?
8   A.  Don't say anything there that I don't
9  receive it.
10   Q.  Does it say there that customer checks --
11  we're still waiting for customer checks and then it's
12  crossed off?
13   A.  Pardon me?  Does it say there what?
14   Q.  Why did you make this list?
15   A.  That list?
16   Q.  Yeah.
17   A.  The only thing that I can remember right now
18  is that I have this paper in front of me, and then the
19  word audit were there, other items were open and were
20  not included inside this memorandum from Dominick
21  Parlapiano, and I started writing either from another
22  document or from my mind, okay, they still owe us the
23  tax accrual document or they owe us some bank statement;
24  they owe us notes, account payable.
25   Q.  So it's a list of things they still owe you

Page 1229

1  in handwriting; is that fair?
2   A.  It's fair to say but that's my best
3  recollection as of today.
4   Q.  And in your practice as an auditor, when you
5  cross it off, I gather that you cross it off when you
6  get the document, right?
7   A.  In this particular instance I don't remember
8  if I cross it off because I received it or because we
9  discussed it at the time we were discussing that.
10   Q.  And customer checks are really important.
11  They were more important than, say, the legal invoices,
12  weren't they?
13   A.  Maybe for you.
14   Q.  Or for you weren't they important?  That's
15  the reason you walked off the audit.
16   A.  Maybe the legal invoices is more important.
17   Q.  You walked off the audit because of the
18  customer checks, right?
19   A.  At that time, yes.
20   Q.  You didn't list the customer checks as being
21  an open issue, did you?
22   A.  Not in that handwriting piece of paper.
23   Q.  And this is February 23rd, 1999 or
24  thereafter, correct.  This is the end of the audit?
25   A.  Close to.

Page 1230

1   Q.  One moment, sir.
2   A.  The declaration.
3   Q.  Where in the declaration did you say that
4  you didn't receive customer checks.  This declaration
5  that you went back and forth with Mr. Forrester that you
6  tediously fixed.  Where does it say in this declaration
7  that you didn't receive customer checks?
8   A.  Because at the date that I -- I mean, we
9  don't know that the declaration was provided by Ramon
10  Rivera as a request of the plaintiffs' lawyers.  Okay?
11   Q.  It doesn't say it, does it?
12   A.  No, it doesn't say that.  But that's what
13  happened during the process.  You know, it's not that I
14  magically find out whatever, the phone book, Mark
15  Forrester's name.  And then when I need to provide the
16  declaration up to the incident of Dominick Parlapiano.
17   Q.  This declaration itemizes what you talked
18  about today, that there was the Dominick Parlapiano
19  incident, right?
20   A.  Yes.
21   Q.  And the punch line, according to you, of the
22  Dominick Parlapiano incident is an instruction by Sandy
23  Lenner that you could accept BCC checks, right?  That's
24  the punch line, right?
25   A.  I don't know what you mean by punch line.

Page 1231

1   Q.  That's how you finish the audit, right?
2  That arose out of the Parlapiano incident, right?
3   A.  There was a Parlapiano incident.  We went
4  back to the field.  All documents were not available.
5  So we were told to accept BCC Capital as a customer and
6  then limit our work up to the BCC Capital level.
7   Q.  And in the tedious time period back in 2004
8  when you were communicating with Mr. Forrester, this big
9  event, this big change in the audit program that allowed
10  you to take BCC checks was never put in that affidavit,
11  was it?
12   A.  It was not there.
13   Q.  Since this affidavit was created, did you
14  have a chance to meet with the counsel for the bank?
15   A.  These guys?
16   Q.  Yeah.
17   A.  Yeah, absolutely.
18   Q.  And you had an opportunity to discuss this
19  event, this Parlapiano event, right?
20   A.  Many times.
21   Q.  Not in your affidavit but you're testifying
22  to it today at trial, correct?
23   A.  At their request, yes.
24   Q.  Now, you ultimately finished the audit; is
25  that right?

Page 1232

1      A.   I was involved in the process of the audit,
2  and the audit was completed.
3      Q.   And in completing it, Mr. Thomas showed you
4  the work paper that's at page 693 of 3003?
5      A.   693?
6      Q.   Yep.
7      A.   Yes, sir.
8      Q.   This is --
9      A.   No.  He didn't show me this one.
10     Q.   I'm sorry, I thought he did.  If I --
11     A.   No, it's not the same.
12     Q.   Then it's my error, then.  Let's look at
13  this work paper.
14         MR. COLE:  This is general matters at the
15  top.
16         (Technician complies.)
17  BY MR. COLE:
18     Q.   It says the audit objectives are to
19  determine whether the financial statements have been
20  presented in conformity with generally-accepted
21  accounting principles applied on a consistent basis,
22  right?
23     A.   Right.
24     Q.   That's what that audit plan -- this is what
25  you testified to as a document that looks like an audit

Page 1233

1  plan?
2      A.   No.  This was like a -- this was like a
3  specific work program just to document or refer our
4  procedures related to areas different than, for example,
5  receivables, inventory, cash, whatever, just like the
6  title said, general matters.  General matters during the
7  course of the audit.
8      Q.   And then at the side here it says, done by
9  and WP reference, see that?  That's reference?
10     A.   Work-paper reference.
11     Q.   And under the column -- under the column
12  entitled done by, you see signatures, right?
13     A.   Most of them are my signatures.
14     Q.   And then that's a thing that says done,
15  right?
16     A.   Yes.
17     Q.   And when you sign your name and say it's
18  done, it's done; is that right?
19     A.   That's my understanding.
20     Q.   And that's the reason you put it there,
21  correct?
22     A.   Otherwise I wouldn't put it.
23     Q.   That's right.  Now turn to the next page,
24  I'm sorry, two pages in, and there's a conclusion?
25     A.   That's the last page, no?

Page 1234

1      Q.   Yes, that's right.  Conclusions.  This is
2  the general work paper, and that's your signature on the
3  conclusion, right?
4      A.   That's right, sir.
5      Q.   And this conclusion and this work paper
6  says, based on the results of work performed, it is my
7  opinion that the financial statements are presented in
8  conformity with generally-accepted accounting principles
9  applied on a consistent basis, right?  It says that?
10  Did I read that right?
11     A.   Absolutely.
12     Q.   And it says all necessary procedures have
13  been completed and no exceptions noted; you see that?
14     A.   That's correct, Counselor.
15     Q.   Where does it say Dominick Parlapiano denied
16  me documents?
17     A.   It's not there.
18     Q.   Where does it say that I had to change my
19  audit procedure to something different than when I
20  started?
21     A.   It's not there.
22     Q.   Isn't it a fact, sir, that all necessary
23  procedures were completed and that's the reason why you
24  signed the document?
25         MR. THOMAS:  Objection, Your Honor.

Page 1235

1         THE COURT:  Overruled.
2         MR. THOMAS:  Your Honor, 701.
3         THE COURT:  No.  Overruled.
4         You can answer.
5         THE WITNESS:  Counselor, the answer is
6  definitely the procedures were conducted according to
7  the plan, and the instructions that from day to day we
8  received from the principals of BDO Seidman in this
9  case.
10  BY MR. COLE:
11     Q.   Sir, this is the general document.  Where
12  does it say that Sandy Lenner told me to accept BCC
13  checks on here?
14     A.   It's not there.  But not all conversations
15  that we had during that were documented in the work
16  papers.
17     Q.   But that was an important conversation?
18     A.   Like any other important conversation too.
19     Q.   Turn to page 511 which is at the beginning
20  of the very first document.  It's -- you see that
21  document, the review checklist?
22     A.   Yes, sir.
23     Q.   What's the review checklist for?
24     A.   To my best recollection and belief today,
25  it's a checklist that BDO Seidman used at the time to

Page 1236

1   make sure at least the minimum procedures are addressed
2   before, like it says, the report release, you know.
3       Q.   So this document has to be prepared before
4   the report is released to the client?
5       A.   Absolutely right.
6       Q.   And then there were checks.
7           MR. COLE:  Can you just highlight the top
8   where it says yes and then NA?
9           (Technician complies.)
10          THE WITNESS:  If you can see, no questions
11  should be no, you know.
12  BY MR. COLE:
13      Q.   Are we independent with regard to unpaid
14  fees, you checked yes, right?
15      A.   Yeah.
16      Q.   And the NA means not applicable?
17      A.   Not applicable, yes.
18      Q.   So some of the items were yes, some of the
19  items were not applicable.  And if there was something
20  wrong here, if here was a problem, you'd reflect it on
21  this page, right?
22      A.   Or as part of this document, yes.
23      Q.   And there's nothing on this document that
24  says that Mr. Parlapiano denied me information, does it?
25      A.   No.  No, sir.

Page 1237

1       Q.   Now, take a look at the next page, 512?
2       A.   (Complies.)  Yes, sir.
3       Q.   Under 9 and 10.  See 9 and 10?
4       A.   Yes, sir.
5       Q.   If we encountered circumstances indicating
6   the possibility of a reportable condition or material
7   weakness, example, scope, expansion, because internal
8   control objective is not met.
9           Anything in those paragraphs talking about
10  what you saw with respect to internal control refer to
11  Dominick Parlapiano limiting your scope, anything there?
12      A.   No.
13      Q.   In fact, it's checked not applicable, right?
14      A.   Yeah, it's not applicable in the -- in this
15  questionnaire.
16      Q.   Now turn to the next page where it says
17  conclusion.
18      A.   All right.
19      Q.   Is that your signature, right?
20      A.   The one on the top, yes.
21      Q.   You're the first one that signed; you were
22  all the way at the top.  Right?
23      A.   Yeah.  It's a detailed reviewer's signature.
24      Q.   That's you?
25      A.   In that case, yes.

Page 1238

1       Q.   And you're signing it after the conclusion,
2   correct?
3       A.   Yes, sir.
4       Q.   At the time of the Parlapiano event, did you
5   view that to be an open issue?
6       A.   At the time of the Parlapiano event?
7       Q.   Yeah.  Did you believe that not receiving
8   customers checks an open issue?
9       A.   At that time yes.
10      Q.   This says I reviewed the financial
11  statements, auditors report, and work papers including
12  related planning documentation and find that the scope
13  of our audit procedures which have been completed in
14  conformity with the requirements of the firm's policies
15  and procedures and applicable professional standards was
16  appropriate.
17          You see that?
18      A.   Yes, sir.
19      Q.   And that's what you signed, right?
20      A.   That's right.
21      Q.   That all significant open issues have been
22  resolved, right?
23      A.   That's a true statement.
24      Q.   And you believe that Parlapiano incidence
25  was an open issue, correct?

Page 1239

1       A.   At that time yes.
2       Q.   And it was resolved, right?
3       A.   Yeah, it was resolved.
4       Q.   Otherwise you wouldn't have signed this?
5       A.   Absolutely right.
6       Q.   And it was resolved consistent with what you
7   understand the applicable professional standards were at
8   the time, right?
9       A.   That's right.
10      Q.   Otherwise you wouldn't have signed the
11  document, correct?
12      A.   Correct.
13      Q.   And they had been prepared in conformity
14  with applicable professional standards.  You believed
15  that at the time, right?
16      A.   Applicable professional standards, yes.
17      Q.   You didn't say anywhere on that page that
18  Mr. Parlapiano's prevented you from completing your
19  audit, did you?
20      A.   No, it's not in this document.
21      Q.   Now -- one moment.
22          You testified, sir, that you also were
23  brought in to the '99 audit; is that right?
24      A.   Yes, sir.
25      Q.   You were the manager for 1998 and then you

Page 1240

1   were brought back to 1999, correct?
2      A.   Yes, sir.
3      Q.   You didn't ask to be transferred off of the
4   Bankest audit?
5      A.   I don't remember that.
6      Q.   And did you ever complain to anybody that
7   you didn't trust Mr. Parlapiano?
8      A.   I don't remember saying that.
9      Q.   Did you ever tell somebody else, other than
10  Mr. Lenner, that you would go to Mr. Kron, your office
11  manager, and complain to him?
12     A.   No.
13     Q.   Did you ever complain to any other partners
14  at BDO?
15     A.   Not that I remember.
16     Q.   You understood, sir, that you disagreed with
17  what Mr. Lenner told you to do, that you had the ability
18  to complain, right?
19     A.   That was the procedure at the time.
20     Q.   And you understood that to be the procedure
21  at the time, right?
22     A.   That's right.
23     Q.   You could complain that something Mr. Lenner
24  told you to do was not consistent with professional
25  standards and there would be no retributions to you,

Page 1241

1   right?
2      A.   That was the guideline at the time.
3      Q.   And you didn't complain to anybody, did you?
4      A.   I didn't do it.
5      Q.   You thought that everything you did on the
6   audit was correct and consistent with professional
7   standards, right?
8           MR. THOMAS:  Objection, Your Honor.
9           THE COURT:  Sustained.
10  BY MR. COLE:
11     Q.   You didn't complain to anybody above
12  Mr. Lenner, correct?
13     A.   No, I didn't complain except for the
14  conversation that we had in terms of when I stopped the
15  work, I went to them, we had that phone conversation.
16  After that he meet with Mr. Parlapiano, he came to my
17  office, and he said to me, Ramon, he's going to provide
18  the documents.  Go ahead, pick up a sample and then do
19  the audit.  And that's what I did.
20     Q.   My question, sir, is you didn't complain to
21  anybody about what Mr. Lenner decided, correct?
22     A.   No.
23     Q.   Now, what I placed in front of you was 3004,
24  that's the 1999 work papers, right?  That's the audit
25  that you were brought in to do again at E.S. Bankest,

Page 1242

1   correct?
2      A.   Correct.
3      Q.   And on page 377 -- you see 377?
4      A.   Yes, sir.
5      Q.   -- you did the same test as you did the year
6   before, right?
7      A.   We did the same test, yes.
8      Q.   And this is the test testing subsequent
9   collection on accounts receivable?
10     A.   Right.  Exactly.
11     Q.   Now, although the boxes are not there,
12  there's still a bunch of checks, right?
13     A.   Check marks.
14     Q.   Check marks?
15     A.   Yes.
16     Q.   And corresponding to the check marks is an
17  explanation down at the bottom, right?
18     A.   Yes, sir.
19     Q.   And once again it says, examine collection
20  of invoices, trace to copy of customer check and
21  remittance advice noting agreement to amount and date?
22     A.   Yes, sir.
23     Q.   Mr. Parlapiano didn't deny you any documents
24  in the 1999 audit, did he?
25     A.   No, I don't remember any instance similar to

Page 1243

1   the one that we have for the 1998 audit.
2      Q.   This was a recreated document because those
3   boxes aren't there anymore.  It had to be recreated with
4   new information, right?
5      A.   It's a different work paper than the one we
6   saw last year.
7      Q.   These are different collections, correct?
8      A.   Different customers too, yes.
9      Q.   Different customers for the next year,
10  correct?
11     A.   And different dates, yes.
12     Q.   So this information had to be put into this
13  document, right?
14     A.   Of course.
15     Q.   And the document had to be created again,
16  correct?
17     A.   Of course.
18     Q.   And there's your signature at the top?
19     A.   Of course.
20     Q.   And you decided a year later, again, not to
21  put in any reference about receiving BCC checks, right?
22  Made that decision?
23     A.   I didn't make that decision.  In this
24  particular case my understanding is that we received the
25  same instructions as in 1998.

Page 1244

1      Q.   You received customer checks, didn't you?
2      A.   Again, if we consider BCC as a customer,
3   yes.
4      Q.   In the entirety of this work paper, do you
5   remember ever mentioning this for 1999.  You talked
6   about 1998.  But for 1999 do you remember ever
7   mentioning in a piece of paper that you could accept the
8   BCC check as a customer check?
9      A.   I don't remember.  To answer that question
10  to you, I want to review all this set of documents.
11     Q.   And just like before, like we discussed for
12  the 1998 audit, you signed a series of documents signing
13  off on the audit, right?
14     A.   Yes, sir.
15     Q.   And those documents said that all open
16  issues have been resolved, right?
17     A.   See the front of this binder if you want to
18  see it.
19     Q.   Look at the very first one.  Okay.  We can
20  look at that.  This is the sign-off, the sign-off page,
21  the review checklist, right?
22     A.   Yes, sir.  Right.
23     Q.   And after doing the 1999 audit, you again
24  signed off on it, correct?  Same conclusion?
25     A.   Same process, yes.

Page 1245

1      Q.   We don't have to go through the language
2   again, correct?
3      A.   Basically the same standard.
4      Q.   Now -- one moment please.
5           We turn your attention to page 171 of that
6   document, of the 1999 work papers which is Exhibit 3004.
7           I believe Mr. Thomas may have shown you this
8   document.
9      A.   You said 171?
10     Q.   171, yes.
11     A.   (Complies.)  All right.  Yes.
12     Q.   Do you have the inherent risk questionnaire?
13     A.   Yes, sir.
14     Q.   This is the document I believe Mr. Thomas
15  showed you?
16     A.   This morning, yes.
17     Q.   And this inherent risk questionnaire is a
18  list of questions that get filled out, right, that get
19  answered by the audit staff, correct?
20     A.   Yeah.
21     Q.   And as you explained to Mr. Thomas this
22  morning, let's just take the first one.  Is there a risk
23  of misstatement arising from a high degree of management
24  involvement in the day-to-day operations.  That's an
25  example of a question.  It's answered no, right?

Page 1246

1      A.   Right.
2      Q.   You see that?  And then there's an initial
3   there, right?
4      A.   And a date.
5      Q.   You see that?
6      A.   That's how it works, yes.
7      Q.   And the initial is the person answering the
8   question, correct?
9      A.   Yes, in this case, Chris Mohr.
10     Q.   Now -- and then you review it after that,
11  right?
12     A.   That's my best recollection, yes.  Otherwise
13  it would have my initials in this -- you know, next to
14  the NO or next to the date.
15     Q.   And did I hear your testimony correct this
16  morning, correctly this morning, that this is something
17  that's created at the beginning of the audit?
18     A.   Based on the date of the document, yes.
19     Q.   And this is filled out to help you determine
20  what the risk is, right?
21     A.   It was a BDO standard at the time.
22     Q.   Turn to the third page, which is BDO 173.
23     A.   Okay, sir.
24     Q.   Do you have the third page?
25     A.   Yes.

Page 1247

1      Q.   Take a look at paragraph or question number
2   18?
3      A.   18?
4      Q.   Yep.
5      A.   Okay.
6      Q.   Are there any indications that we may not be
7   given all appropriate information by the client.  And
8   the answer was no, right?
9      A.   That's right.
10     Q.   The year before, you testified that you were
11  not given information sufficient to take you off the
12  audit and have Mr. Lenner threaten to resign, but the
13  answer is no the next year; is that right?
14     A.   Yes, that's right.
15     Q.   Where does it say there that, you know, wait
16  a minute, Mr. Parlapiano, in one instance, decided not
17  to give me all the information I requested.  Does it say
18  it there?
19     A.   No, it's not there.
20     Q.   And you reviewed this piece of paper,
21  correct?
22     A.   At the time, yes.
23     Q.   Isn't it a fact, sir, that Mr. Parlapiano
24  gave you what you needed?
25     A.   Again, Counselor, I've said this before and

Page 1248

1  I'm going to say it again. At the time that those
2  documents from the ultimate customer were not available,
3  the instruction given to the team was to treat Bankest
4  Capital Corp. as a customer. It was a judgment call by
5  the partners of BDO, specifically Mr. Lenner, and he
6  made that call, and then we went back to the field based
7  on those instructions.
8       Q.  Didn't even raise an indication to you that
9  he may not be giving you all the information you wanted?
10  Not even an indication?
11      A.  What was your question?
12      Q.  The answer is no?
13      A.  In that questionnaire.
14      Q.  That Parlapiano incident didn't give you an
15  indication that you may not be given all appropriate
16  information?
17      A.  It's not there.
18      Q.  Didn't happen, did it? We have a 1999 --
19          MR. THOMAS:  Objection, Your Honor. Was
20  that a comment by counsel or a question? Didn't happen.
21          MR. COLE:  Did it? That's a question.
22          THE COURT:  You started something else so
23  give him an opportunity to answer the question, didn't
24  happen, did it? I think he hasn't answered that
25  question.

Page 1249

1          MR. THOMAS:  I object to that question. I
2  have no idea what he's talking about.
3          MR. COLE:  I'll withdraw the question.
4  BY MR. COLE:
5       Q.  Now, we've talked about 1999 where there's
6  no mention. You talked about the 1998 work papers where
7  there's no mention. You testified that you never
8  complained to anybody above Sandy Lenner, right?
9       A.  That's right.
10      Q.  Every year you received reviews of your
11  work; is that correct?
12      A.  That was the standard.
13      Q.  And in those reviews, people who you worked
14  for would write things down about you and show them to
15  you, right?
16      A.  That's right, sir.
17      Q.  Let's take a look at one of those reviews.
18  Let's use -- one moment.
19          7337 marked for identification.
20          MR. COLE:  May I approach, Your Honor?
21          THE COURT:  You may.
22          MR. COLE:  (Complies.)
23  BY MR. COLE:
24      Q.  I'm showing you what's been marked for ID as
25  Exhibit 7337. Do you recognize that document?

Page 1250

1       A.  Yes, I recognize it.
2       Q.  And without getting into the detail, can you
3  identify for the jury what the document is?
4       A.  It's an evaluation of a job that was
5  completed, an audit was completed, and then after the
6  audit, BDO provides some forms to evaluate stuff.
7       Q.  And on the last page, does it have your
8  signature?
9       A.  Yes, sir.
10      Q.  Is this an evaluation of an audit that you
11  participated in?
12      A.  Yes.
13          MR. COLE:  Your Honor, defendants offer
14  Exhibit 7337 into evidence.
15          MR. THOMAS:  No objection.
16          THE COURT:  Without objection, Defendants'
17  Exhibit 7337 for ID is now Defendants' Exhibit 7337 in
18  evidence.
19  BY MR. COLE:
20      Q.  Sir, I'd like to direct your attention to
21  the very last page of the exhibit that has your
22  signature on it.
23          MR. COLE:  And just blow up the bottom
24  there.
25          (Technician complies.)

Page 1251

1  BY MR. COLE:
2       Q.  You see at the bottom there where it says
3  areas performed exceptionally well -- before I go there,
4  what audit was this involved with, in connection with?
5       A.  WRT World Enterprises.
6       Q.  That was one of the clients you worked on?
7       A.  At that time, yes.
8       Q.  And at the bottom here it has a box that
9  talks about areas performed exceptionally well.
10          You see that?
11      A.  Yes, sir.
12      Q.  And then do you know who the reviewing
13  person is?
14      A.  I believe it's Bonner Hearst (ph.).
15      Q.  And he would write his comments in that box
16  where he performed exceptionally well; is that the way
17  this worked?
18      A.  It is his handwriting. I remember.
19      Q.  And then it says areas which require
20  improvement. You see that?
21      A.  Yes, sir.
22      Q.  And in this instance it said you need to be
23  more assertive with the client, especially with
24  sensitive audit issues. He tends to avoid certain
25  issues and pass them up to the partner to resolve.

Page 1252

1        Do you see that?
2        A.   That's a misunderstanding, yes.
3        Q.   In that audit, correct?
4        A.   That's correct.
5        Q.   And underneath there's a box, and it says
6    comments on evaluation by review, right?
7        A.   Right.
8        Q.   And that's a box that's provided you so that
9    you can make comments about the review, right?
10       A.   That's right.
11       Q.   And you weren't afraid to make comments
12   about a review, were you?
13       A.   No, sir.
14       Q.   In the past when you reviewed BDO, you
15   actually did make comments, correct?
16       A.   I remember some instances.
17       Q.   And sometimes those comments discussed what
18   happened on the audit, right?
19       A.   Yeah.  The purpose of this evaluation is to
20   reflect things that happen in the audit, yes.
21       Q.   In this instance you didn't put anything,
22   correct?
23       A.   No.
24       Q.   There were times -- let me show you Exhibit
25   3745.  This is in evidence, right?

Page 1253

1        3745 in evidence.  I'll ask you, sir, if you
2    recognize that document?
3        A.   Yeah, I recognize it.
4        Q.   And there were times when there were things
5    that happened on an audit that you learned about as part
6    of your review and actually reduced it into a whole
7    memo, right?
8        A.   In this case, yes.
9        Q.   A document with some relevant facts that
10   occurred during the engagement that would influence the
11   performance documented in the evaluation?
12       A.   That's right.
13       Q.   A page and a half, right?
14       A.   Yes.
15       Q.   Let's take a look at Exhibit 3739 in
16   evidence.
17        Did I hand it to you?  Here is the -- here
18   is your review for E.S. Bankest, right?
19       A.   Give me a second.  Yeah, this is for the
20   1999 -- 1998 audit.  Yes.
21       Q.   That's the audit that Mr. Parlapiano
22   supposedly denied you some documents, right?
23       A.   Right, sir.
24       Q.   And this was something that was filled out
25   by Keith Ellenburg, correct?

Page 1254

1        MR. COLE:  Can you take a look at the last
2    page?
3        (Technician complies.)
4        THE WITNESS:  That's right.
5    BY MR. COLE:
6        Q.   He was the concurring partner for the 1998
7    audit that you said this Parlapiano incident occurred;
8    is that right?
9        A.   That's right, sir.
10       Q.   Mr. Ellenburg, signed it, right?  Recognize
11   his signature?
12       A.   Yes.
13       Q.   And you signed it, correct?
14       A.   Yes, sir.
15       Q.   In the box talking about comment on
16   evaluation by reviewee; is that right?
17       A.   That's right, sir.
18       Q.   You didn't comment about Mr. Parlapiano
19   there, right?
20       A.   No, I didn't.
21       Q.   You never made one of these two-page memos
22   saying that the audit had a problem because
23   Mr. Parlapiano denied me documents, did you?
24       A.   No, I didn't.
25       Q.   In fact, in this document, in Exhibit 7337,

Page 1255

1    Mr. Ellenburg raises something about your performance on
2    that audit at page 3, correct, at the bottom there?
3        A.   Yes, sir.
4        MR. COLE:  This box down here.  That
5    handwriting.
6        (Technician complies.)
7    BY MR. COLE:
8        Q.   It says, prompt resolution of audit issues,
9    AR collectibility, and taxes would improve economics and
10   client relations.
11        Sir, that was the only comment, written
12   comment, that Mr. Ellenburg made in your 1998 review
13   related to E.S. Bankest.
14        You see that?
15       A.   Yes, sir.
16       Q.   And because -- even though Mr. Parlapiano
17   did this whole thing that caused the audit to be
18   delayed, you didn't find it important enough to even
19   comment on your review like you did on your other
20   reviews?
21       A.   I don't believe I did.
22       Q.   So you didn't complain to anybody above
23   Mr. Lenner.  You didn't reference it in the 1998 work
24   papers.  You didn't reference it in the 1999 work
25   papers.  You didn't reference it in your review.

Page 1256

1   There's not a single document that you can show me from
2   seven, eight years ago that references this, right?
3       A.  That's right.
4       Q.  And you don't even reference it receiving
5   only BCC checks in your affidavit, correct?
6       A.  It's not in that affidavit, no.
7       Q.  Didn't happen, did it?
8       A.  It happens.
9       Q.  Now, just one final couple of questions.
10  Sir, are you here today -- you live in New York now; is
11  that right?
12      A.  Yes, sir.
13      Q.  And you attended a deposition in New York;
14  is that right?  That's where your deposition was?
15      A.  2005.
16      Q.  Back in 2005?
17      A.  Yes.
18      Q.  And you flew down here today just to give
19  your testimony; is that right?
20      A.  Yeah.  Prepare and give this testimony, yes.
21      Q.  And at the request of the plaintiffs?
22      A.  Of course.
23      Q.  And again, all your expenses were paid,
24  correct?
25      A.  Reimbursed.

Page 1257

1       Q.  Reimbursed.  Including the presence of your
2   attorney, correct?
3       A.  That's right.
4       Q.  Now, when you were fired in 2000 -- May of
5   2001 --
6       A.  Yes.
7       Q.  -- how long did it take you to find another
8   job?
9       A.  Like a month.  I mean, I find a job and then
10  I decided to go with Altria later on.
11      Q.  And you said you conducted audits for
12  Altria?
13      A.  Yes.
14      Q.  Did you ever mention anyone at Altria that
15  you filled out work papers that weren't correct?
16      A.  If I mentioned anybody at Altria?
17      Q.  When you interviewed for your job, did you
18  tell them that you filled out work papers that weren't
19  correct?
20      A.  No, I didn't say that.
21      Q.  You didn't say that to Altria either?
22      A.  No.
23      Q.  You didn't say it to anybody?
24      A.  I didn't do anything incorrect.
25      Q.  You believe all the work papers you filled

Page 1258

1   out were correct?
2       A.  Absolutely right.
3       Q.  Thank you, sir.  No further questions.
4       THE COURT:  Mr. Thomas, how long are you
5   going to be, more or less, so I can give the jury a
6   break.
7       We'll go on break anyway.
8       MR. THOMAS:  The other day I said a half
9   hour and it turned out 15 minutes, so I'm going to say a
10  half hour.
11      THE COURT:  You want a break?
12      THE JURY:  Yes.
13      THE COURT:  Do not discuss the case amongst
14  yourselves.  Okay.  Hold on for a second.
15      I want you to check the room first.
16      THE CLERK:  (Complies.)
17      It's okay.
18      THE COURT:  Okay.  Go ahead.  Thank you.
19      Leave your notes.
20      (Thereupon, the jury was escorted out of the
21  courtroom.)
22      THE COURT:  Mr. Rivera, you're not to
23  discuss your testimony that you've given or the
24  testimony you're going to give with anybody and that
25  includes the lawyers.

Page 1259

1       Let's take a break.  Keep it to a minimum.
2       (Thereupon, a brief recess was taken.)
3       THE COURT:  Let me know when you're ready.
4       All right.
5       MR. THOMAS:  If you'll give us just one
6   second.  If I can get the documents together, I think it
7   might go faster.
8       THE COURT:  Tell me when you're ready.
9       MR. THOMAS:  Your Honor, we're ready.
10      THE COURT:  Can you bring in Mr. Rivera,
11  then bring in the jury?
12      THE BAILIFF:  (Complies.)
13      All rise for the jury.
14      (Thereupon, the jury was brought into the
15  courtroom.)
16      THE COURT:  All right, you may be seated.
17      Mr. Thomas, you may proceed with your
18  redirect.
19      MR. THOMAS:  Thank you, Your Honor.  Hello
20  again, Mr. Rivera.
21      REDIRECT EXAMINATION
22  BY MR. THOMAS:
23      Q.  I said hello again.
24      A.  Hello, Mr. Thomas.
25      Q.  How are we doing?  Are you okay?