Page 1260

1    A.  Uh-huh. (Nodding.)
2        MR. THOMAS:  Can we hear Mr. Rivera okay?
3    BY MR. THOMAS:
4    Q.  Mr. Rivera --
5    A.  Yes, sir.
6    Q.  -- you had a lot of questions asked of you
7    about these work papers.  Those are those great big
8    volumes there, right?  These are some of the work papers
9    of BDO Seidman?
10   A.  That's right, sir.
11   Q.  And these work papers -- this is only part
12   of them, right?
13   A.  I would have to say yes. I believe there's
14   more than that.
15   Q.  And Mr. Cole for BDO asked you over and over
16   again if you could look at these work papers and tell
17   what happened back in 1998 and 1999.  Do you remember
18   that?
19   A.  That's right, sir.
20   Q.  And these work papers are the Holy Grail of
21   what was happening in Bankest?
22       MR. COLE:  Objection, Your Honor.
23       THE COURT:  Sustained.
24   BY MR. THOMAS:
25   Q.  Well, Mr. Rivera, if we looked at these work

Page 1261

1    papers of BDO, we would think all these accounts
2    receivable were real, right?
3        MR. COLE:  Objection, Your Honor.
4        THE COURT:  Overruled.
5        THE WITNESS:  More than accounts receivable
6    are in those work papers.
7    BY MR. THOMAS:
8    Q.  But for the accounts receivable, in BDO's
9    work papers, they reflected that the accounts receivable
10   were real, they actually existed.
11   A.  Again, if we -- if I get back to my
12   testimony, if we consider Bankest Capital Corp. as a
13   customer, the answer to your question is yes.
14   Q.  I'll submit to you, Mr. Rivera, either way,
15   in these work papers of BDO Seidman, it doesn't say
16   anywhere in these here that almost all the accounts
17   receivable were fake, does it?
18   A.  It doesn't say that.
19   Q.  And if we reviewed what you kept being asked
20   by BDO over and over again that these work papers right
21   here show what was really happening at E.S. Bankest in
22   1998 and 1999, we just looked at these work papers, we'd
23   think the accounts receivable were real?
24       MR. COLE:  Objection.
25       THE COURT:  Overruled.

Page 1262

1        MR. COLE:  Mischaracterizes --
2        THE WITNESS:  The answer is yes.
3    BY MR. THOMAS:
4    Q.  But now you know today, Mr. Rivera, that
5    there was a great big fraud at E.S. Bankest and actually
6    most of those accounts receivable turned out to be fake?
7        MR. COLE:  Objection.
8        THE COURT:  Overruled.
9        THE WITNESS:  Can I answer?
10       THE COURT:  Yes.
11       THE WITNESS:  Based on what I have read,
12   yes.
13   BY MR. THOMAS:
14   Q.  Now, in these work papers that show
15   everything that happened at E.S. Bankest, we're not
16   going to find customer checks for those fake
17   receivables, are we?
18   A.  No, we are not going to.
19   Q.  They're not in the record of everything that
20   happened and what really was going on at E.S. Bankest
21   back in 1998 and 1999, right?
22       MR. COLE:  Objection. Mischaracterizes his
23   testimony.
24       THE COURT:  Overruled.
25       THE WITNESS:  No.

Page 1263

1    BY MR. THOMAS:
2    Q.  Mr. Rivera, based on your understanding then
3    and now, you don't think Wal-Mart stores was in on this
4    fraud, do you?
5        MR. COLE:  Objection. 701. 604.
6        THE COURT:  Sustained.
7    BY MR. THOMAS:
8    Q.  Mr. Rivera, as a matter of fact, do you know
9    whether Wal-Mart stores was in on this fraud?
10   A.  I never testified there is a fraud. I just
11   testified that at some point in time we limit our review
12   to verify customer checks of the Bankest Capital Corp.
13   level. Sometimes as instructed, and as I said before,
14   we didn't have to go to the Wal-Mart or Meijer series or
15   JC Penney level to validate the existence of the
16   receivables.
17   Q.  I understand all of that.  My question is a
18   little bit different.  My question is simply, do you
19   know -- not what you testified before -- but do you know
20   that Wal-Mart or JC Penney or K-Mart or Polygram Records
21   was in on the fraud at E.S. Bankest?  Do you know?
22   A.  I don't know that.
23   Q.  You have never seen any evidence that
24   Wal-Mart, K-Mart, JC Penney, Polygram Records was in on
25   the fraud at E.S. Bankest?

Page 1264

1      A.   I never seen that.
2      Q.   And as far as you know, K-Mart, Wal-Mart, JC
3   Penney, Polygram Records, they wouldn't be given fake
4   customer checks for you to review as far as you know?
5      MR. COLE:   Objection. 604. 701.
6   Cross-examination. Beyond the scope of direct.
7      THE COURT:   Sustained. Regular objection.
8   You can't answer.
9   BY MR. THOMAS:
10     Q.   Mr. Rivera, as you testified before, if you
11  didn't see a Wal-Mart check, what would you -- what were
12  you instructed by Mr. Lenner to look at?
13     A.   Bankest Capital Corp. collection or check or
14  customer check. If you provide me the chart that we had
15  this morning, I can tell you better the answer to your
16  question.
17     MR. THOMAS:   Can we put it up?
18     (Technician complies.)
19     THE WITNESS:   Can you repeat your question,
20  please?
21     MR. THOMAS:   I don't know if I'm that good.
22  But --
23  BY MR. THOMAS:
24     Q.   Mr. Rivera, if you didn't see a Wal-Mart
25  check from E.S. Bankest to verify a receivable, what

Page 1265

1   were you instructed to do by Mr. Lenner?
2      A.   In that situation then, the instruction was
3   to limit our review -- in the case that Wal-Mart check
4   was not available, to limit our review to the Joy
5   customer checks or client checks or to the Bankest
6   Capital Corp. level.
7      Our understanding or at least my
8   understanding at the time was that the relationship
9   between Wal-Mart, it was with Bankest Capital Corp. and
10  not with E.S. Bankest. The only relationship with E.S.
11  Bankest was with Bankest Capital Corp. However, E.S.
12  Bankest doesn't have any relationship with either Joy or
13  Wal-Mart in this, you know, as illustrated in this
14  chart.
15     Everything flows through Bankest Capital
16  Corp. and on the way back it was through Bankest Capital
17  Corp., too.
18     Q.   And earlier when you said BCC, was that also
19  Bankest Capital, this one that says Capital on our
20  chart?
21     A.   Yes, Bankest Capitol Corp.
22     Q.   So for the accounts receivable, for example,
23  that flowed through Capital and Joy, to get to E.S.
24  Bankest that you were auditing, they would have to come
25  in through Capital?

Page 1266

1      A.   That was the relationship, yes.
2      Q.   And who controlled Capital?
3      A.   My understanding, the same owners of E.S.
4   Bankest.
5      Q.   And so Capital was the Orlansky brothers and
6   Parlapiano?
7      A.   That's my best recollection, yes.
8      Q.   And the day-to-day managers of E.S. Bankest
9   were the Orlansky brothers and Parlapiano?
10     A.   That's right.
11     Q.   And when you needed to verify, for example,
12  whether there was an actual accounts receivable that was
13  factored from Wal-Mart down to your client, E.S.
14  Bankest, Mr. Lenner said that you could accept a check
15  from Capital; is that right?
16     MR. COLE:   Objection.
17     THE WITNESS:   That's right.
18     THE COURT:   Overruled.
19  BY MR. THOMAS:
20     Q.   And so you could confirm an account
21  receivable from Wal-Mart by looking at a check from the
22  Orlansky company to the Orlansky company they were the
23  day-to-day managers of, and verify that receivable
24  according to the instructions of Mr. Lenner?
25     A.   That's right, sir.

Page 1267

1      Q.   And when you signed things saying you
2   followed the correct procedures, were you relying upon
3   Mr. Lenner's instructions to you that you could just
4   rely upon checks from the other Orlansky company to
5   verify the receivables?
6      A.   That's absolutely right.
7      Q.   Let's look at one of these great big books
8   with me. May I hand him one that's already up here?
9      THE COURT:   Yes.
10  BY MR. THOMAS:
11     Q.   Look at 3003.
12     A.   We have the same one?
13     Q.   You and I have the same one.
14     A.   1998.
15     Q.   You have that one?
16     A.   All right, sir.
17     Q.   And I'm looking at BDO 0714.
18     A.   Okay, sir.
19     Q.   This is one of the documents that BDO showed
20  you when they were questioning you?
21     A.   You mean the testimony today?
22     Q.   Just now. A little bit ago.
23     A.   Yes.
24     Q.   And remember the questions over and over
25  again about whether you actually requested customer

Page 1268

1   checks?
2       A.   Yeah, I remember.
3       Q.   Well, sorry to keep bringing this thing out.
4   Well, you had to request customer checks because it was
5   on the bottom of this form, is that right?  This is one
6   of the things you were supposed to look at?
7       A.   That's right, Counselor.
8       Q.   And do you remember during all those
9   questions about whether you actually requested them or
10  not, this document that was showed to you?  Can you look
11  at the very top of this document where it says the note?
12  And the first thing you wrote there is, "This may not be
13  a complete listing of all items required for the
14  completion of our audit.  During the course of our work
15  it may become necessary to request additional items."
16  Do you give them to?
17      A.   Yeah, I see that, Counselor.  But one
18  correction.  This document was prepared by Chris Mohr.
19      Q.   Thank you.  So even though when he sent
20  out the list on January 8th, 1999 -- it wasn't you -- he
21  put at the very top of the document that BDO was showing
22  you that it may not be a complete list.  Is that what it
23  says?
24      A.   Absolutely right, Counselor.
25      Q.   If you look down with me a little bit

Page 1269

1   further.  This is one you were reading to the jury but
2   BDO didn't -- they put it up high on the screen.  They
3   didn't go down.  The very first one, "Confirmation
4   request for all customers selected by BDO."  You see
5   that?
6       A.   Yes.
7       Q.   Now, that was the first thing that you tried
8   to do to confirm whether or not Wal-Mart actually owed
9   the money; is that right?
10      A.   That's what it said there.
11      Q.   And when you sent out confirmations to
12  customers in your first line, you got none back, right?
13      A.   That's my best recollection.  That's why an
14  alternate procedure to validate receivables is to review
15  subsequent collection after year-end.
16      Q.   So after Wal-Mart and JC Penney and K-Mart
17  refused to tell you whether or not the accounts
18  receivable were real, you did this procedure to see if
19  they actually paid them?
20      A.   Absolutely right.
21      Q.   And after you didn't start getting those
22  back, you started requesting these checks, right?
23      A.   That's right.
24      Q.   And when E.S. Bankest wouldn't give you
25  these documents, you stopped the audit?

Page 1270

1       A.   Absolutely right.
2       Q.   Now, I was listening to those questions,
3   Mr. Rivera.  Did that actually happen?  You actually
4   stopped the audit?
5       A.   Yes.
6       Q.   And did you actually go back and have a
7   meeting with Mr. Lenner?
8       A.   Absolutely, yes.
9       Q.   And you had that telephone call to
10  Mr. Parlapiano?
11      A.   Yes, sir.
12      Q.   So you had to request these documents at
13  some point if the audit stopped?
14      A.   That's right.
15      Q.   You had to request them before they can
16  refuse to give them to you?
17      A.   Absolutely right.
18      Q.   Now, there was several questions asked about
19  your declaration, do you remember that, the declaration
20  that you signed, the one we passed out to the jury?
21      A.   The question made by you or by him?
22      Q.   Let's say by him.  BDO.
23      A.   Okay.
24      Q.   And remember, you remember the question
25  where he said, you know, in this declaration, you never

Page 1271

1   stated that you didn't get customer checks.  Do you
2   remember that?
3       A.   Yeah.  That's one of the questions of the
4   counselor, yes.
5       Q.   And I believe you answered something about
6   where the declaration stopped in time.
7       A.   Pardon me?
8       Q.   You said the declaration sort of stopped
9   during that meeting so you didn't --
10      A.   Yeah.  Basically I provided the declaration
11  until the -- you can say the February 15th meeting, yes.
12      Q.   And Mr. Cole asked you questions about,
13  well, it's not anywhere in this declaration, do you
14  remember that?
15      A.   Yeah, I remember.
16      Q.   But Mr. Cole knows that --
17              MR. COLE:  Objection, Your Honor.
18  Objection.  I need a side-bar.
19              MR. THOMAS:  Your Honor, I haven't got my
20  question out.
21              MR. COLE:  What I know is it's not relevant.
22              THE COURT:  Hold on.  Hold on.
23              I'm going to sustain the objection before he
24  gets to where he's going.
25              MR. THOMAS:  I will rephrase.

Page 1272

1      MR. COLE: Can I have a side-bar?
2      THE COURT: No. What's the point? There
3 was no question asked. He knows what he can and cannot
4 do.
5      Mr. Thomas.
6 BY MR. THOMAS:
7   Q.   Mr. Rivera, you had your deposition taken by
8 Mr. Cole, right?
9   A.   2005, yes.
10  Q.   And he asked you all kinds of questions over
11 a whole day, right?
12  A.   Yeah, I remember that day.
13  Q.   And he asked you questions not about just
14 this declaration, right?
15      MR. COLE: Objection, Your Honor. I need a
16 side-bar.
17      THE COURT: Overruled. It's a yes or no.
18      MR. THOMAS: But I haven't finished the
19 question.
20      MR. COLE: That's the reason I need the
21 side-bar.
22      THE COURT: He said do you remember that.
23 That's the question.
24      MR. THOMAS: I hadn't finished the question.
25 It may have sounded that way. I apologize.

Page 1273

1      THE COURT: You are not going to get a
2 side-bar yet. It's a yes or no. It's a yes or no. I'm
3 not going to allow you questions concerning what
4 happened in the deposition unless you're going to
5 impeach this witness. That's the answer.
6      MR. THOMAS: I'm just trying to address --
7 I'll do it a different way, Your Honor.
8      With Your Honor's permission, I will
9 approach the witness with Plaintiffs' Exhibit Number 202
10 marked for ID.
11      THE COURT: You may.
12      MR. COLE: Now may I have a side-bar?
13      THE COURT: I want to see what it is first.
14      THE WITNESS: Sorry.
15      (Complies).
16      THE COURT: (Reading).
17      No. No side-bar yet.
18 BY MR. THOMAS:
19  Q.   Mr. Rivera, looking at Plaintiffs' Exhibit
20 Number 202 marked for ID, could you please -- you know
21 what this document is?
22      THE COURT: Just read the top.
23 BY MR. THOMAS:
24  Q.   Just read the title if you would.
25  A.   Supplemental declaration of Ramon Rivera

Page 1274

1 regarding 1998 audit stoppage.
2   Q.   And if you look at the last page there,
3 Mr. Rivera, is that your signature?
4   A.   It is.
5   Q.   And Mr. Rivera, I'm going to ask you just to
6 not look at it for just a minute.
7   A.   (Complies).
8   Q.   Mr. Rivera, as you sit here, can you
9 remember word for word what's in this declaration?
10      MR. COLE: Objection.
11      THE COURT: Are you trying to move it into
12 evidence?
13      MR. THOMAS: I haven't moved it into
14 evidence yet.
15      THE COURT: Then don't ask about the
16 document. Either you lay the predicate or you don't.
17      MR. THOMAS: I'm just asking him, Your
18 Honor. I'm not trying to get him to state what's in it.
19 I want to know if he can without looking at it tell me
20 what's in it because you wouldn't let me do it the other
21 way. That's why I'm doing it this way.
22      THE COURT: I know what you're trying to do.
23      MR. THOMAS: I asked the question.
24      THE COURT: I'm going to overrule the
25 objection for this particular question.

Page 1275

1      MR. THOMAS: You want me to re-ask it?
2      THE COURT: You can ask the question. Read
3 it back.
4      (Thereupon, the court reporter read back the
5 requested portion.)
6      THE WITNESS: Absolutely not.
7 BY MR. THOMAS:
8   Q.   Mr. Rivera, did you provide to Mr. Cole --
9      MR. COLE: Objection.
10      I'd like to have a side-bar now.
11      THE COURT: The answer is -- the objection
12 is sustained. You are not going to do it. It's not
13 going to happen.
14      MR. THOMAS: Well, then I'll just simply ask
15 him a different way.
16      THE COURT: Ask whatever you want.
17 BY MR. THOMAS:
18  Q.   Mr. Rivera, have you kept a copy of this
19 declaration in your possession since you executed it?
20  A.   No. No. In fact, this is the first time --
21      THE COURT: The answer is no.
22      THE WITNESS: The answer is no.
23 BY MR. THOMAS:
24  Q.   Okay. Can you look at the last page and is
25 that your signature?

Page 1276

1    THE COURT: Asked and answered.
2    THE WITNESS: It was answered. It is yes.
3    MR. THOMAS: At this time, Your Honor,
4 Plaintiffs' move into evidence Plaintiffs' Exhibit 202
5 marked for ID.
6    MR. COLE: Objection.
7    THE COURT: Sustained.
8    MR. COLE: Move to strike the entire --
9    THE COURT: There's nothing to strike.
10 Sustained.
11    MR. THOMAS: I understand you sustained the
12 objection. Is the grounds hearsay?
13    THE COURT: It's more than that.
14    MR. THOMAS: At least hearsay.
15    THE COURT: Yes. It's more than that.
16 BY MR. THOMAS:
17    Q.  I'm going to ask him to put that down. Set
18 that to the side. Set that to the side.
19    A.  (Complies).
20    Q.  And my question is different now,
21 Mr. Rivera. Please don't look at that declaration.
22 It's not in evidence and I don't want you to read from
23 it or anything else, please.
24    A.  I won't read it.
25    Q.  Mr. Rivera, in fact, on the audits of E.S.

Page 1277

1 Bankest, for some of the collections, you didn't receive
2 checks from the actual customers of Wal-Mart, is that
3 right?
4    A.  That's absolutely right.
5    Q.  And in those instances, were you asked to
6 treat Bankest Capital checks as the Wal-Mart check?
7    A.  That's absolutely right.
8    Q.  And Mr. Rivera, have you been asked
9 questions --
10    MR. COLE: Objection, Your Honor.
11    THE COURT: Let him finish. I want to know
12 what the question is first.
13 BY MR. THOMAS:
14    Q.  Have you been asked questions about that
15 declaration by BDO Seidman prior to being here today?
16    MR. COLE: Side-bar.
17    THE COURT: Sustained.
18    MR. THOMAS: Your Honor, if I can have a
19 minute. I think there's a way to ask this. I'd like to
20 ask Mr. Dorta.
21    MR. COLE: I'd like a side-bar.
22    THE COURT: You're not having a side-bar.
23 It's ten to 5:00. Relax.
24    MR. THOMAS: (Counsel conferring.)
25 BY MR. THOMAS:

Page 1278

1    Q.  Mr. Rivera --
2    A.  Yes, sir.
3    Q.  -- did you provide a second declaration
4 sworn under oath?
5    A.  At the Plaintiffs' lawyer request, yes.
6    Q.  Mr. Rivera, prior to today under oath, have
7 you told the entire story of what happened at E.S.
8 Bankest just like you told to the jury today? And
9 please only answer yes or no to address any objections.
10    MR. COLE: Objection. Bolstering, not
11 allowed to refer to prior --
12    THE COURT: Sustained. Sustained.
13 BY MR. THOMAS:
14    Q.  Mr. Rivera, when you were asked repeatedly
15 by BDO Seidman during their cross-examination over and
16 over again that your declaration stopped at the end of
17 the day when Mr. Lenner instructed you to go back to the
18 audit --
19    A.  Yes.
20    Q.  -- do you have an understanding as to the
21 reason that your declaration stopped at that time?
22    MR. COLE: Objection.
23    THE COURT: What's your objection?
24    MR. COLE: Leading.
25    THE COURT: Sustained.

Page 1279

1    MR. THOMAS: I can rephrase. That part I
2 can rephrase.
3 BY MR. THOMAS:
4    Q.  Mr. Rivera, the declaration of yours that's
5 been admitted into evidence and passed out to the jury
6 here, when you were asked over and over again why it
7 didn't include a comment about not receiving customer
8 checks from Wal-Mart, does that declaration stop at a
9 particular point in time?
10    MR. COLE: Objection, asked and answered.
11    THE COURT: Overruled.
12    THE WITNESS: Does it stop at the particular
13 point in time? Yes.
14 BY MR. THOMAS:
15    Q.  Mr. Rivera, remember all the questions about
16 whether BDO Seidman knew that their audited financials
17 were going to be attached to the private placement
18 memoranda?
19    A.  Yes, sir.
20    Q.  And I believe when I was asking you
21 questions, I showed you maybe one or two documents that
22 stated that they would be attached. Do you remember
23 those questions?
24    A.  The inherent risk questionnaires?
25    Q.  Right.

Page 1280

1      A.   Yes.
2          MR. THOMAS:  Approaching the witness with
3   your permission with Plaintiffs' Exhibit 138 in
4   evidence.
5   BY MR. THOMAS:
6      Q.   This is one of the ones I showed you.  Do
7   you recall that?
8      A.   Yes, Counselor.
9      Q.   And Mr. Rivera, you looked at questions 18
10  and 22.  Do you remember that?
11     A.   Yeah, I remember.
12     Q.   And 18 read, "Is more than usual
13  significance likely to be given to the financial
14  statements?
15          "Yes.
16          "Reason:  The financial statements are
17  include in the company's private placement memoranda
18  which are used to sell debentures."  Do you remember
19  that?
20     A.   Yes, sir.
21     Q.   And you put your initials on this document?
22     A.   In this document?  Yes.
23     Q.   And so did Mr. Lenner and Mr. Ellenburg?
24     A.   Yes.
25     Q.   Now, Mr. Rivera, you knew at this time that

Page 1281

1   the company's financial statements were going to be
2   included in the private placement memoranda to sell
3   debentures, right?
4          MR. COLE:  Objection.  Leading.
5          THE COURT:  Overruled.
6          THE WITNESS:  Does -- yeah.  The answer is
7   yes.
8   BY MR. THOMAS:
9      Q.   And Mr. Rivera, you worked at BDO?
10     A.   For three years and a half, yes.
11     Q.   Well, when you knew that the company's
12  audited financial statements were going to be attached
13  to the private placement memoranda used to sell
14  debentures, you worked at BDO?
15     A.   That's right.
16     Q.   And you were a manager of this audit at BDO?
17     A.   That's right.
18     Q.   And you were an employee of BDO?
19     A.   The answer is yes.
20     Q.   And you knew, right?
21     A.   And --
22     Q.   You knew that the audited financial
23  statements were going to be attached to the private
24  placement memoranda to sell debentures?
25     A.   That was the understanding at the time.

Page 1282

1      Q.   When BDO was asking you questions, I think
2   they also showed you -- no.  I don't think they did.
3   Yes, they did.  Plaintiffs' Exhibit 246.  I think that's
4   one I showed you, too.
5      A.   Yeah.  That's right, Counselor.
6      Q.   Can we put that one up?
7          (Technician complies.)
8      A.   Yeah, we went over this before.
9      Q.   Right.  And that's from the year before.
10  And that was the one that said at the bottom -- are we
11  on the --
12          MR. COLE:  Judge, outside the scope of
13  cross.
14  BY MR. THOMAS:
15     Q.   Let's go to the next page.
16     A.   No, sir.  This is not the one we discussed
17  before.
18     Q.   That's right.  This is the one from --
19     A.   I'm sorry.  I think it was the same one but
20  this is December 31st, 1995.
21     Q.   You're right.  That's actually not for the
22  audit before.
23          THE COURT:  Ask a question.
24  BY MR. THOMAS:
25     Q.   Is that not for the audit before, but even

Page 1283

1   for the audit before that?
2          MR. COLE:  Outside the scope.
3          THE COURT:  Stop.
4          MR. THOMAS:  Your Honor, the scope of the
5   cross was whether or not BDO knew and he was shown --
6          MR. COLE:  Judge --
7          MR. THOMAS:  I'm trying to finish.
8          THE COURT:  The answer is sustained.
9   BY MR. THOMAS:
10     Q.   And as part of -- you were requested on
11  cross by BDO about whether you reviewed the BRFFC work
12  papers.  Do you remember those questions?
13     A.   Yes, Counselor, but may I clarify something?
14  This is not the document that we saw this morning.  This
15  is a different document.
16     Q.   I'm going to make sure everybody knows that.
17  Because when I first gave it to you I thought that's the
18  one I gave you here from the stack of 1996 that we
19  looked at this morning.  And that was -- see if I have
20  that in my mind.  Was that this one?
21     A.   This is a very similar document but it's the
22  not the same.
23     Q.   That's not the same.  It was this one
24  (indicating)?
25     A.   This is the one that we talked about this

Page 1284

1    morning.
2        Q.  And why don't we start with that one?
3    Everybody will be comfortable.  Can we put up the 1996
4    one?
5        (Technician complies.)
6        And this --
7        MR. COLE:  Once again, outside the scope of
8    direct.
9        THE COURT:  Let me see what it is.
10       Ask a question.
11   BY MR. THOMAS:
12       Q.  And when you were asked whether you reviewed
13   the BRFFC work papers by Mr. Cole, this was one of those
14   work papers, right?
15       THE COURT:  Overruled.  You can answer it.
16       THE WITNESS:  This document is included in
17   one of these binders, yes.
18   BY MR. THOMAS:
19       Q.  And at the bottom of this one for 1996 it
20   reads, "The engagement is sensitive because of the
21   company's use of the financial statements in its PPMs."
22   Is that right?
23       A.  That's what it says here, Counselor.
24       Q.  But that's not the only place in this
25   document where it tells about the financial statements

Page 1285

1    being attached, is it?
2        A.  This is a different document than this one.
3        Q.  Well, turn the page for me.
4        A.  No.  It's not the same.  Sorry.
5        Q.  I'm going to put all these down and we're
6    going to stand up here with His Honor's permission and
7    we're going to make sure we're looking at the same
8    document.
9        Now, the first page, that's the sensitivity
10   questions?
11       A.  That's right, sir.
12       Q.  And that's the one that said the engagement
13   is sensitive because of the company's use of the
14   financial statements in its PPMs?
15       A.  That's right, sir.
16       Q.  And if we turn the page to the third page,
17   that's the inherent risk questionnaire?
18       A.  Hold on a second.  Yep.
19       Q.  Can you read the name for me at the top
20   there?
21       A.  This name (indicating)?
22       Q.  Yes.
23       A.  Inherent risk questionnaire answers, full
24   questionnaire.
25       Q.  Okay.

Page 1286

1        A.  Okay.
2        Q.  And if we turn the page, on this one, on the
3    prior year, what does number 18 say?
4        MR. COLE:  Once again, outside the scope.
5        THE COURT:  Overruled.
6        THE WITNESS:  Should I read it?
7    BY MR. THOMAS:
8        Q.  Sure.
9        A.  "Is more than usual significance likely to
10   be given to the financial statements?"  That's the
11   question.
12       Q.  And what's the answer?
13       A.  It says reason -- the answer is yes.
14       Q.  And what's the reason?
15       A.  It says, "Reason:  The financial statements
16   are included in the company's private placement
17   memoranda which are used to sell debentures."
18       Q.  Thank you very much.
19       A.  Okay.
20       Q.  Mr. Rivera, I believe if you look on your
21   ledge right there, you're going to see those evaluations
22   right there.
23       A.  This one (indicating)?
24       Q.  Yes.  Do you see --
25       A.  There's two evaluations here.

Page 1287

1        Q.  -- two evaluations?
2        A.  Okay.
3        Q.  Let's look at Exhibit 7337 first.  It's the
4    one that says, Ramon Rivera, I have World Enterprises?
5        A.  Yeah, yeah, WRT.
6        Q.  And this was an evaluation you received from
7    BDO Seidman?
8        A.  That's right, sir.
9        Q.  And if you look please at the last page,
10   that's where the comments are.  I think -- we can't put
11   this up because I just marked it or -- you can't put it
12   up?
13       MR. THOMAS:  Your Honor, with your
14   permission if I can stand up here because we can't put
15   it up on the screen.
16   BY MR. THOMAS:
17       Q.  If you look on the last page there?
18       A.  Yes.
19       Q.  And if we look at the comment it says,
20   "Ramon needs to be more assertive with the client,
21   especially with sensitive audit issues.  He tends to
22   avoid certain issues and pass them up to the partner to
23   resolve."
24       Did you understand this was a criticism of
25   you?

Page 1288

1      A.  It's an area which requires improvement.
2      Q.  And so what you needed to improve on in
3  BDO's view is that for sensitive audit issues, you
4  needed to be a little more yourself than pass them up to
5  the partner?
6          MR. COLE:  Objection, leading.
7          THE COURT:  Sustained.
8  BY MR. THOMAS:
9      Q.  Mr. Rivera, did you understand from this
10  comment that what BDO thought you needed to improve was
11  that, especially with sensitive audit issues you needed
12  to deal with them yourself rather than alerting the
13  partner to them?
14      A.  No, that was not my understanding.
15      Q.  What was your understanding about this
16  comment?
17      A.  That I should be like dealing more with the
18  client rather than occupying the partner's time.
19      Q.  You should handle it yourself?
20          MR. COLE:  Objection, Your Honor.
21          THE COURT:  Sustained.
22  BY MR. THOMAS:
23      Q.  Well, Mr. Rivera, let's look at the next
24  evaluation.  And that's 3739 in evidence.  And this one
25  can we put up?

Page 1289

1          (Technician complies.)
2          Now, this was the -- this was the evaluation
3  from E.S. Bankest?
4      A.  That's right, sir.
5      Q.  And this was from one of the partners whose
6  time you would be occupying, right, Mr. Ellenburg?
7      A.  Absolutely right.
8      Q.  And you didn't deal with it yourself, it
9  would be Mr. Lenner and Mr. Ellenburg whose time you
10  would be occupying on the E.S. Bankest audit, right?
11      A.  That's right.
12      Q.  And if we look at the comment by Mr.
13  Ellenburg, can we do that right here?
14      A.  Page 3?
15      Q.  Page 3.  You see those handwritten comments
16  there?  Can we blow those up in the middle there?
17          (Technician complies.)
18          Mr. Ellenburg writes, "Prompt resolution of
19  audit issues."  And its first one is A/R collectibility.
20  Do you know what A/R commonly refers to?
21      A.  Accounts receivable.
22      Q.  And he's talking about collectibility?
23          MR. COLE:  Objection.
24          THE COURT:  Overruled.
25  BY MR. THOMAS:

Page 1290

1      Q.  A/R collectibility?
2      A.  That's right, yes.
3      Q.  Accounts receivable collectibility?
4      A.  Yes.
5      Q.  Like the collectibility of this A/R,
6  accounts receivable?
7          MR. COLE:  Objection.
8          THE COURT:  Overruled.
9          THE WITNESS:  Yeah.  It said accounts
10  receivable alternate procedures subsequent collection
11  work.
12  BY MR. THOMAS:
13      Q.  Collectibility?
14      A.  Yes, sir.
15      Q.  And then he goes on to write, "Would improve
16  economics and client relations."  Did I read that right?
17      A.  Yeah.  It's difficult to understand but, I
18  mean, that's what he says.
19      Q.  Improve economics and client relations?
20      A.  Improve economics and client relations, yes.
21      Q.  Would you pick up your declaration for me
22  over there?  Do you see it over there?
23      A.  The one of June 5th?
24      Q.  The one that was handed out to the jury.
25      A.  Let me find this.

Page 1291

1      Q.  I know it's a large stack.  I'd come help
2  you but I have this big board.
3      A.  (Complies.)
4          Yeah, it's here, sir.
5      Q.  Would you please look at the
6  next-to-the-last paragraph there on the last page?
7      A.  (Complies.)
8      Q.  Give us just a minute for our technology to
9  catch up with you.
10      A.  Sure.
11          (Technician complies.)
12      Q.  Now, on the left there we have Mr.
13  Ellenburg's comments on the E.S. Bankest audit.  Is that
14  what you understand?
15      A.  Of that evaluation?
16      Q.  Yes.  See it up there?  That's his comments
17  on the E.S. Bankest audit.  That's what that review is?
18      A.  Yes.  Yes, sir.
19      Q.  And now can we -- I'm going to ask you to
20  look at paragraph 24 and that's your declaration about
21  what Mr. Lenner told you?
22          MR. COLE:  Objection, prior inconsistent
23  statement.
24          THE COURT:  Overruled.
25          THE WITNESS:  Okay, sir.

Page 1292

1   BY MR. THOMAS:
2       Q.   And Mr. Rivera --
3       A.   Am I allowed to read from that declaration?
4           THE COURT:  He has to ask you a question.
5   BY MR. THOMAS:
6       Q.   I have to ask you a question.
7           Now, Mr. Rivera, when Mr. Lenner told you to
8   restart the audit, did he discuss with you the ways to
9   bring in business to improve economics and the
10  importance of client relations and your ability to bring
11  in business?
12      A.   Yeah.  He mentioned those words.
13          MR. THOMAS:  Your Honor, Espirito Santo has
14  no further questions.  Thank you very much.
15          Thank you, ladies and gentlemen.
16          THE WITNESS:  Thank you, Mr. Thomas.
17          THE COURT:  Mr. Rivera, take off your
18  hardware.
19          THE WITNESS:  No more questions?
20          THE COURT:  No.
21          THE WITNESS:  All right.  Perfect.
22          THE COURT:  Thank you.  And you may step
23  down.
24          THE WITNESS:  All right.  Thank you.  Thank
25  you, Your Honor.

Page 1293

1           Thank you, ladies and gentlemen.
2           (Complies.)
3           THE COURT:  Oh, well.  There is no good
4   news.
5           THE JURY:  (Laughter.)
6           THE COURT:  Well, I guess there is.  We're
7   leaving about 50 minutes early.  So, ladies and
8   gentlemen, I'm going -- we're going to go home now.  Let
9   me call Jeffrey.
10          You're not to discuss the case amongst
11  yourselves.  Repeat it after me.  You'll know it by
12  heart.  You're not to discuss the case with anyone.  And
13  you're not to allow anyone to discuss the case with you.
14  And when I say anyone, I mean anyone, boyfriends,
15  girlfriends, husbands, wives, sisters, brothers,
16  friends, neighbors, dogs or cats or parrots.  And
17  everything else.  Okay?
18          You're not to form a definite or fixed
19  opinion about the merits of the case until you have
20  heard all the evidence, the argument of the lawyers, and
21  the instructions on the law by me.  You're not to listen
22  to, hear or read any accounts of this case in the media.
23  And you're to ignore the presence of the lawyers in this
24  courtroom outside this courtroom and they're to ignore
25  yours.

Page 1294

1           Tomorrow morning, same place, second floor,
2   same time, same place.  Have a good evening.  Leave your
3   notes covered.  And stay out of trouble.
4           See you tomorrow.  Have a good night.
5           (Thereupon, the jury was escorted out of the
6   courtroom.)
7           THE COURT:  See you tomorrow at 9:30.  Have
8   a good evening.
9
10          (Thereupon, at approximately 5:15 p.m., the
11  above portion of the trial was concluded.)
12
13              *       *       *
14
15
16
17
18
19
20
21
22
23
24
25

Page 1295

1           CERTIFICATE OF COURT REPORTER
2
3           I, GIZELLA BAAN, court reporter, before whom
4   the foregoing statement was taken, do hereby certify
5   that the statement made was taken by me stenographically
6   at the time and place mentioned in the caption hereof
7   and thereafter transcribed by me to the best of my
8   ability; that said transcript is a true record of the
9   statement given; that I am neither counsel or, related
10  to, nor employed by any of the parties to the action in
11  which these proceedings were taken; and further, that I
12  am not a relative or employee of any party hereto, nor
13  financially or otherwise interested in the outcome of
14  this action.
15
16
17
18          _____
19              GIZELLA BAAN
20          Court Reporter and Notary Public
21          in and for the State of Florida
22
23
24
25

Page 2019

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


--------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
--------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
--------------------------------------------------x

PAGES 2019 - 2194

Volume 18



AFTERNOON SESSION

Miami, Florida

Monday, April 23, 2007

1:45 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 2020

```
 1            A P P E A R A N C E S
 2
 3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
 4   INTERNATIONAL, LTD., ET AL.:
 5
 6   SULLIVAN & CROMWELL, LLP
 7      1888 Century Park East
 8      Los Angeles, California 90067
 9      (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11      Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14      334 Minorca Avenue
15      Coral Gables, Florida 33134
16      (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20      350 East Las Olas Boulevard, Suite
21      Fort Lauderdale, Florida 33301
22      (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25
```

Page 2021

```
 1   On behalf of Defendant BDO Seidman, LLP:
 2
 3   ALVAREZ, ARMAS & BORRON
 4      901 Ponce de Leon Boulevard, Suite 304
 5      Coral Gables, Florida 33134
 6      (305) 461-5100
 7   BY:  Arturo Alvarez, Esquire
 8
 9   GREENBERG TRAURIG, LLP
10      MetLife Building
11      200 Park Avenue, 15th Floor
12      New York, New York 10166
13   BY:  Adam D. Cole, Esquire
14      Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17      1221 Brickell Avenue
18      Miami, Florida 33131
19   BY:  Mark Schnapp, Esquire
20      Nikki Simon, Esquire
21
22
23
24
25
```

Page 2022

```
 1   On behalf of Third-Party Defendants Victor Balestra,
 2   Bernard Mollet, and Joaquin Garnecho
 3
 4   RICHMAN, GREER, WEIL, BRUMBAUGH,
 5   MIRABITO & CHRISTENSEN, P.A.
 6      Miami Center, Suite 1000
 7      201 S. Biscayne Boulevard
 8      Miami, Florida 33131
 9      (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16      2701 Ponce de Leon Boulevard, Mezzanine
17      Coral Gables, Florida 33134
18      (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20      Geoffrey Marks, Esquire
21
22
23
24
25
```

Page 2023

```
 1            C O N T E N T S
 2
 3   EXAMINATION OF JAMES FELTMAN BY:          PAGE:
 4      MR. COLE:  (Cross, cont'd)          2026
 5      MR. THOMAS:  (Redirect)            2119
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2032

1    shipping documents.  And then it talks about, or other
2    client documentation to provide evidence for the
3    existence assertion.  Alternative procedures allows for
4    other client-created documents, right?
5        A.    Yes.
6        Q.    And the client here that we're talking about
7    is not the Joys of the world.  In this instance, it's
8    the audited company, Bankest, correct?
9        A.    No.  No.  If you're asking me whether the
10   term here, other client documentation, means that it's
11   documentation created by the client, that's not the
12   correct interpretation.  It's documentation that the
13   client has or provides.
14       Q.    It's -- let me rephrase it.  It's documents
15   within the possession of the client?
16       A.    Right.  But not documents created by the
17   client.
18       Q.    Now, Bankest had in its possession accounts
19   receivable, right, documents?
20       A.    Factored accounts receivable?
21       Q.    Right.
22       A.    Yes.
23       Q.    Those factored accounts receivable
24   theoretically were created by companies like Joy, right?
25       A.    Yes.

Page 2033

1        Q.    And then were in the possession of Bankest,
2    right?
3        A.    Yes.
4        Q.    And they would qualify as other client
5    documentation to provide evidence for the existence
6    assertion, right?
7        A.    No.
8        Q.    Those aren't other documents?
9        A.    No, not in this context.
10       Q.    Well, the invoice is the asset that's being
11   tested, correct?  The accounts receivable is the asset
12   being tested, correct?
13       A.    It's evidence of -- to try and prove the
14   assertion of existence, yes.
15       Q.    So if the evidence -- if the invoice is
16   evidence of the existence assertion, then the invoice is
17   other client documentation, correct?
18       A.    It could be, but the principal of what we're
19   talking about now is as a third step, if you can't get a
20   confirm, you can't get subsequent receipts, you want to
21   get proof from third parties that a transaction exists.
22   So looking at a document that isn't from a third party
23   here and -- a third party in my description in these
24   circumstances isn't Joy.
25           It's a shipping company.  It's the customer

Page 2034

1    who signs a purchase order.  It's something from someone
2    removed from the initial transaction to prove the
3    reality of what's going on here.  You can't prove the
4    reality if it's just the audit -- the company being
5    audited with the next person in line here.  That doesn't
6    prove the existence of the transaction.
7        Q.    Well, in this case, this is not a retailer,
8    right?
9        A.    Joy is not a --
10       Q.    Bankest is not a retailer, correct?
11       A.    Bankest is a finance company.
12       Q.    It's receiving an invoice from another
13   party, correct?
14       A.    That's right.
15       Q.    And then it's keeping that invoice in its
16   records, correct?
17       A.    Right.  The Wal-Marts of the world.
18       Q.    Well, it's actually the invoices created by
19   Joy, isn't it?
20       A.    What -- Wal-Mart is the customer, Wal-Mart
21   owes on the invoice.
22       Q.    Right.  But the invoice is created by Joy,
23   right?
24       A.    Right.  But that's the whole point here.
25   It's not to test whether Joy says the transaction

Page 2035

1    exists.  It's to test whether the transaction exists by
2    looking at the real obligator.  The real party that owes
3    the money.  The Wal-Marts of the world.
4        Q.    My question, sir -- now for my question.  My
5    question is that Joy creates the invoice, not Wal-Mart,
6    right?
7        A.    That's right.
8        Q.    And Joy sells the invoice through Capital to
9    Bankest, right?
10       A.    Right.
11       Q.    Joy is a third party and Bankest is holding
12   client documentation to provide existence, right?
13       A.    That's correct as far as you've described
14   it, but it's not the complete thought.
15       Q.    Sir, you also understand that there are
16   different types of evidence.  And you're saying that it
17   should be -- it has to be something from a third party?
18       A.    Yes, under these circumstances it would have
19   to be something from a third party.
20       Q.    Let's take a look at another piece of the
21   guidance.  This is called evidential matter.  You see
22   that?
23       A.    Yes, I do.
24       Q.    What is evidential matter?
25       A.    It's what we've been talking about.  It's a

Page 2036

1  type of information that's gathered in order to prove a
2  particular assertion or set of facts.
3      Q.   And you just testified that in this
4  circumstance, you have to have third-party confirmation,
5  right?
6      A.   Yes.
7      Q.   But you will agree with me, sir, that that's
8  not the only type of evidence that you could use to
9  verify an assertion in the financial statements, right?
10     A.   Generally or in this specific set of facts?
11     Q.   Generally.
12     A.   Generally, that's correct.
13     Q.   Let's take a look at AU 326.  Let's take a
14  look at the different items that you can use to
15  determine existence.  And I'll refer you to page 449.
16         MR. COLE:  It's page 54.
17         (Technician complies.)
18  BY MR. COLE:
19     Q.   We talked about different types of
20  evidential matter, right?
21     A.   Right.
22     Q.   Your testimony in this case, the only
23  evidential matter that you can rely on is that created
24  by a third party, right?
25     A.   In the facts that we were just describing,

Page 2037

1  where you try to prove the existence of a transaction
2  beyond the set of a factor and the client, yes, you'd
3  need some third-party evidence.
4      Q.   And I gather that's something you learned
5  when you were auditing, when you were at Peat Marwick,
6  right?
7      A.   No.  No, that's in every set of instructions
8  that I've seen including BDO's own audit manual.
9      Q.   This document is entitled Evidential Matter
10  and discusses the different types of evidence.  It was
11  one of those rules that was amended in 1997, right?  You
12  see that at the bottom, January 1997?
13     A.   Yes.
14     Q.   This is after you finished your experience
15  auditing, correct?
16     A.   It's in 1997, yes.
17     Q.   Almost ten years after you finished auditing
18  companies, right?
19     A.   Working as an auditor, yes.
20     Q.   And you said that the -- in this
21  circumstances, only one way to do it and that's
22  third-party evidence, right?
23     A.   In the set of facts that you've asked me
24  about, not the general principle that you're asking me
25  to look at, no.

Page 2038

1      Q.   Now, it says here that there are three
2  different types of evidential matter, correct?
3      A.   Where does it say that?
4      Q.   Let me rephrase.  This is entitled
5  Competence of Evidential Matter, right?
6      A.   Yes.
7      Q.   And competence is important, right?
8      A.   Yes.
9      Q.   Competence tells you whether or not the
10  auditor should be able to rely on the information,
11  correct?
12     A.   Competent tells you whether it's useful for
13  the purpose intended.
14     Q.   Now, in this rule that auditors are supposed
15  to follow, it talks about "If the possibility of
16  important exceptions is recognized, the following
17  presumptions which are not mutually exclusive about the
18  validity of evidential matter in auditing have some
19  usefulness."
20         You see that?
21     A.   Yes.
22     Q.   And it makes some assumptions that the
23  auditor can follow, correct?  The rule makes
24  assumptions, right?
25     A.   Yes.

Page 2039

1      Q.   And assumption A is when evidential matter
2  can be obtained from independent sources.  That's what
3  you were talking about, right?
4      A.   Yes.
5      Q.   Third-party sources?
6      A.   Right.  It says it provides greater
7  assurance of reliability.
8      Q.   For the purpose of an independent audit and
9  secured solely within the entity?
10     A.   Right.
11     Q.   So it's better to get third-party evidence
12  than what's solely in the entity, right?
13     A.   It's better to get independent evidence than
14  evidence that the company provides you.
15     Q.   And we saw independent third-party evidence
16  in the form of confirms from clients, right?
17     A.   Of limited value, yes.
18     Q.   Outside of the entity, right?
19     A.   No, not for the purposes here.
20     Q.   Well, sir, Perry -- we saw a confirm from
21  Perry.  That was outside the entity, right?
22     A.   Right.  It was.
23     Q.   And that's a type of evidential matter that
24  can be obtained -- that's obtained from an independent
25  source, right?

Page 2195

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

```
-----------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
         Plaintiffs,
      vs.
BDO SEIDMAN, LLP,
         Defendant.
-----------------------------------------------x
BDO SEIDMAN, LLP,
         Third-Party Plaintiff,
      vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
         Third-Party Defendants.
-----------------------------------------------x
```

PAGES 2195 - 2351

Volume 19

Miami, Florida

Tuesday, April 24, 2007

1:20 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 2196

```
 1              A P P E A R A N C E S
 2
 3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
 4   INTERNATIONAL, LTD., ET AL.:
 5
 6   SULLIVAN & CROMWELL, LLP
 7       1888 Century Park East
 8       Los Angeles, California  90067
 9       (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida  33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       350 East Las Olas Boulevard, Suite
21       Fort Lauderdale, Florida  33301
22       (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25
```

Page 2197

```
 1   On behalf of Defendant BDO Seidman, LLP:
 2
 3   ALVAREZ, ARMAS & BORRON
 4       901 Ponce de Leon Boulevard, Suite 304
 5       Coral Gables, Florida  33134
 6       (305) 461-5100
 7   BY:  Arturo Alvarez, Esquire
 8
 9   GREENBERG TRAURIG, LLP
10       MetLife Building
11       200 Park Avenue, 15th Floor
12       New York, New York  10166
13   BY:  Adam D. Cole, Esquire
14       Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17       1221 Brickell Avenue
18       Miami, Florida  33131
19   BY:  Mark Schnapp, Esquire
20       Nikki Simon, Esquire
21
22
23
24
25
```

Page 2198

```
 1   On behalf of Third-Party Defendants Victor Balestra,
 2   Bernard Mollet, and Joaquin Garnecho
 3
 4   RICHMAN, GREER, WEIL, BRUMBAUGH,
 5   MIRABITO & CHRISTENSEN, P.A.
 6       Miami Center, Suite 1000
 7       201 S. Biscayne Boulevard
 8       Miami, Florida  33131
 9       (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16       2701 Ponce de Leon Boulevard, Mezzanine
17       Coral Gables, Florida  33134
18       (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20       Geoffrey Marks, Esquire
21
22
23
24
25
```

Page 2199

```
 1              C O N T E N T S
 2
 3   EXAMINATION OF SANDOR LENNER BY:        PAGE:
 4       MR. THOMAS:  (Direct)            2202
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2200

PROCEEDINGS

1  THE COURT: Good afternoon. Let me know
2  when you all are ready.
3  All right. Like I said, whenever you all
4  are ready.
5  MS. BITAR: I'm ready.
6  THE COURT: Obviously tomorrow we're not
7  working. We're not working in here. And we're not
8  going to work on Friday either. So I don't know how
9  long you're going to take with Mr. Lenner but I suspect
10  Mr. Lenner will be back next week. And I'm going to ask
11  the juror --
12  MR. THOMAS: We'll be working on Thursday.
13  THE COURT: -- juror Number 8, Mashack. I
14  want to make sure when she's taking vacation exactly so
15  we can make plans for that, and I believe one of the
16  jurors had to leave early on Friday afternoon because
17  she had some sort of confrontation, but we don't have to
18  worry about that.
19  Anything else?
20  THE BAILIFF: That's it.
21  MR. THOMAS: We're just waiting on George.
22  THE BAILIFF: All rise for the jury.
23  (Thereupon, the jury was brought into the
24  courtroom.)

Page 2201

1  THE COURT: Good afternoon. You may be
2  seated. What are you all so smiley about?
3  JUROR: (Laughter.)
4  THE COURT: I will tell you so you can smile
5  some more. Tomorrow you're not going to work. I'm
6  going to work. And Friday you're not going to work.
7  JUROR: We won't argue with that.
8  THE COURT: So you can play hooky.
9  Ms. Mashack, I need to know exactly when you are leaving
10  and coming back. I know it's coming up next month so
11  everybody can have an idea what those dates are.
12  Do you recall?
13  JUROR: Saturday morning the 12th, Saturday,
14  May 12th, I think.
15  THE COURT: Saturday, Sunday, Monday,
16  Tuesday, the 12th, 13th, 14th, and 15. So you'll be
17  ready to go on Wednesday morning?
18  12th through the 15th?
19  JUROR: Uh-huh. (Nodding.)
20  THE COURT: Everybody will take notes on
21  that and somebody will remind me eventually.
22  Ready? Are you sure?
23  All right. Mr. Thomas, you may call your
24  next witness.
25  MR. THOMAS: Your Honor, Espirito Santo

Page 2202

1  calls Sandor Lenner.
2  THE COURT: Mr. Lenner.
3  THE CLERK: Please remain standing and raise
4  your right hand.
5  Thereupon,
6  SANDOR LENNER,
7  having been duly sworn by the clerk of the Court,
8  testified as follows:
9  DIRECT EXAMINATION
10  BY MR. THOMAS:
11  Q. Mr. Lenner, you are a partner at BDO
12  Seidman, right?
13  A. Yes.
14  Q. And you were the partner in charge of all
15  seven of the audits that are at issue in this case,
16  right?
17  A. Yes.
18  MR. THOMAS: Move it down a little bit.
19  (Technician complies.)
20  BY MR. THOMAS:
21  Q. And Mr. Lenner, you are what's known as a
22  rainmaker, right?
23  A. Yes, although I am a rainmaker, that's one
24  of the many things that I do. Being a rainmaker is
25  nothing unusual in a large CPA firm or a small CPA firm.

Page 2203

1  My primary role is to service my audit clients.
2  Rainmaking is something that's just bringing
3  business into the firm, and it's something I do, say,
4  after 9:00 to 5:00, not during my normal course of the
5  day.
6  Q. Well, one of the things you did after 9:00
7  to 5:00, not during the normal course of your day and
8  your rainmaking activities is bring in BRFFC, right?
9  A. Yes.
10  Q. And that's because you met Dominick
11  Parlapiano at a cocktail party, right?
12  A. Yes.
13  Q. And then BRFFC became E.S. Bankest, right?
14  A. Yes.
15  Q. And at E.S. Bankest, one of the people who
16  worked for you was Ramon Rivera, right?
17  A. Yes.
18  Q. And Ramon Rivera was your subordinate,
19  right?
20  A. That's correct.
21  Q. And Mr. Rivera as your subordinate, he
22  stopped the audit of E.S. Bankest, right?
23  A. After -- yes, but after hearing the
24  testimony --
25  Q. I'm sorry to interrupt you. When you say

Page 2204

1  after yes, the answer to my question is, yes, he stopped
2  the audit, right?
3      A.  Yes, but I'd like to explain.
4          THE COURT:  You may.
5          THE WITNESS:  Yes.  After hearing the
6  testimony of Mr. Rivera here and reading the affidavits
7  that he prepared, you know, it refreshed my recollection
8  that I now have about this whole event that occurred, so
9  as I sit here today, I do have a fleeting recollection
10 of this event.
11 BY MR. THOMAS:
12     Q.  Mr. Lenner, the reason you told the jury
13 that sitting here and hearing all this testimony
14 refreshed your recollection is because when I asked you
15 when you were under oath in your deposition, you told me
16 that didn't happen, right?  That's why you were telling
17 the jury that, right?
18     A.  Yes.
19         THE COURT:  Before you go on, Mr. Thomas, I
20 just want to make sure and have a side-bar.
21         MS. BITAR:  Would you like Mr. Lenner at the
22 side-bar, Judge?
23         THE COURT:  Absolutely.
24         (Thereupon, there was a side-bar conference
25 outside the presence and hearing of the jury.)

Page 2205

1          THE COURT:  All right.  Mr. Lenner, in any
2  of your answers are you to allude that you've testified
3  in this trial before.  Just in the trial.
4          MS. BITAR:  Or reference of mistrial.
5          THE COURT:  And obviously lawyers are not
6  going to ask any questions concerning -- asking you or
7  referring to the last trial either.
8          MR. THOMAS:  And if I impeach him with that,
9  I'll let you know.
10         THE COURT:  Come let me know.  Thank you.
11         (Thereupon, the side-bar conference was
12 concluded.)
13 BY MR. THOMAS:
14     Q.  Mr. Lenner, before we broke for the side-bar
15 there, you were explaining that the reason you told the
16 jury your recollection was refreshed about Mr. Rivera
17 stopping the audit is because when you were under oath
18 in your deposition, you said one thing and you're saying
19 something different today, right?
20     A.  Yes.  I did not recall it at the time when
21 you asked me that question.
22     Q.  And that was -- that was three years ago I
23 asked you that question when you were under oath in your
24 deposition, right?
25     A.  Yes.  It was three years ago but I think it

Page 2206

1  was five years after the event, and I just didn't
2  remember something that occurred five years earlier.
3      Q.  Well, three years ago was three years closer
4  to the event than today, right?
5      A.  Yes.
6      Q.  And this thing that you couldn't remember
7  when you were under oath in your deposition and being
8  asked questions was not just that Mr. Rivera stopped the
9  audit, right?  It was that he stopped the audit, he came
10 back to the office, he met with you, he even threatened
11 to resign, right?  All that happened?
12         MS. BITAR:  Objection, Your Honor.
13         THE COURT:  What's your objection.
14         MS. BITAR:  Mischaracterizes his deposition
15 testimony.
16         MR. THOMAS:  Your Honor --
17         THE COURT:  I'm going to sustain the
18 objection.  If you want to impeach him, impeach him.
19         MR. THOMAS:  I'm just confirming with him,
20 Your Honor.  I'll ask a different question.  Thank you.
21 BY MR. THOMAS:
22     Q.  But at least now when you're under oath,
23 Mr. Lenner, you remember that Ramon Rivera stopped the
24 audit, right?
25     A.  Yes.  I had that fleeting recollection.

Page 2207

1      Q.  And your fleeting recollection is the same
2  recollection that your partner Keith Ellenburg has,
3  right?
4      A.  I don't know what recollection he has.
5      Q.  Well, Mr. Lenner, you've been the corporate
6  representative sitting here the whole time, right?  You
7  were here the day Mr. Ellenburg testified under oath to
8  this jury, right?
9      A.  Yes.
10         MS. BITAR:  Your Honor, now I'm going to
11 object.  Argumentative.
12         THE COURT:  Sustained.
13 BY MR. THOMAS:
14     Q.  Were you here the day that your partner,
15 Mr. Ellenburg, testified under oath to this jury?
16     A.  Yes.
17     Q.  So now you know, Mr. Lenner, right, that
18 Mr. Ellenburg also remembers Mr. Rivera stopping the
19 audit, right?
20     A.  Yes.
21     Q.  And you know that it was a serious matter to
22 Mr. Ellenburg, right?
23     A.  I don't recall if it was serious to him but
24 it would be serious to me if we never got the documents
25 that we requested, which we got.

Page 2208

1    Q.  Again, Mr. Lenner, you were here in the
2  courtroom, right?
3        You need to say something to her?
4        You were here in the courtroom, right?
5    A.  Yes.
6    Q.  And so you know, Mr. Lenner, that it was
7  serious to Mr. Ellenburg, right?
8        MS. BITAR:  Your Honor, at this point I
9  object.
10       THE COURT:  Give me your legal basis.
11       MS. BITAR:  It's not appropriate for
12  Mr. Thomas to question the witness on what he heard on
13  what another witness said.  That's not the purpose of
14  the examination.  It's the jury's recollection about
15  what witness said that controls.
16       THE COURT:  Sustained.
17  BY MR. THOMAS:
18   Q.  Mr. Lenner, at least you'll give me that you
19  know now that not only did Mr. Rivera stop the audit but
20  that Mr. Ellenburg approved him stopping the audit,
21  right?
22   A.  Yes.
23   Q.  And you'll give me now that on Monday after
24  it was stopped on the Friday by your partner
25  Mr. Ellenburg and your subordinate Mr. Rivera, that they

Page 2209

1  came back to the office and had a conversation with you,
2  right?
3    A.  I have a fleeting recollection of that
4  conversation, that's correct.
5    Q.  Well, as part of your fleeting recollection
6  of that conversation, does it include the part where you
7  called your audit client and threatened to resign?  Is
8  that part of your fleeting recollection?
9    A.  Yes.
10   Q.  And the reason that you called your audit
11  client and threatened to resign is that without those
12  documents you couldn't do this audit, right?
13   A.  Yes.
14   Q.  And those documents that you had to have to
15  properly do this audit included customer checks, right?
16   A.  Yes.
17   Q.  And when you threatened to resign to your
18  client, your client didn't agree to hand over the
19  documents, did he?
20   A.  I don't recall.
21   Q.  So when you, on Monday, threatened to resign
22  to your client, your fleeting memory here today doesn't
23  let you remember whether or not your client agreed to
24  give you those documents or not?
25       MS. BITAR:  Objection, Your Honor.

Page 2210

1  Argumentative.
2        THE COURT:  Sustained.
3  BY MR. THOMAS:
4    Q.  Mr. Lenner, as you sit here today under
5  oath, does your memory allow you to recall that when you
6  called up your client and threatened to resign, whether
7  in that call, your client agreed to give you the
8  documents?
9        MS. BITAR:  I'm sorry.  I can't hear
10  Mr. Thomas.
11       THE COURT:  Read back the question, please.
12       (Thereupon, the court reporter read back the
13  requested portion.)
14       THE COURT:  There's no objection.
15       THE WITNESS:  I really don't recall a lot
16  about that whole event that occurred about eight years
17  ago, Mr. Thomas.
18  BY MR. THOMAS:
19   Q.  So as you sit here today under oath in front
20  of this jury, you can't recall one way or the other
21  about when you called up your client and threatened to
22  resign, whether or not in that call they decided to give
23  you the documents or not?
24   A.  I remember we subsequently received the
25  documents that we requested.  It was the next day or the

Page 2211

1  following day.  That's what happened.
2    Q.  So when you made the call to your client and
3  you threatened to resign, you can't recall as you sit
4  here today whether or not in that call your client
5  agreed to give you the documents or not, right?
6    A.  That's accurate.
7    Q.  Mr. Lenner, you told the jury several times
8  now that you actually got the documents.  That's your
9  testimony, right?
10   A.  Yes.
11   Q.  But you never saw the documents, did you?
12   A.  Yes.
13   Q.  Yes, you were out in the field looking at
14  the documents or no, that's right?
15   A.  The answer to your question is yes.
16   Q.  You never saw the documents?
17   A.  What I saw was a tick mark indicating that
18  we received the documents that we requested.  I would
19  generally not see the source documents during the course
20  of an audit.  People that work for me would obtain that
21  source documents, put a tick mark in the work paper, and
22  indicate that they examined the documents in question.
23   Q.  And in this case, that person for 1998 was
24  Ramon Rivera, right?
25   A.  Yes.

Page 2212

1     Q.   But you personally, you never saw the
2  documents?
3     A.   That's correct.
4     Q.   And Mr. Ellenburg, you know that he never
5  saw the documents either because he wasn't out in the
6  field?
7        MS. BITAR:  Objection, Your Honor.
8        THE COURT:  What's your objection?
9        MS. BITAR:  Predicate foundation.
10        THE COURT:  Overruled.
11        THE WITNESS:  Generally speaking, that is
12  correct.
13  BY MR. THOMAS:
14     Q.   So as far as you know, Mr. Ellenburg never
15  saw the documents either?
16     A.   That's correct.
17     Q.   So the person who would have first-hand
18  knowledge would be the person who either saw them or
19  didn't see them in the field, Mr. Rivera, right?
20     A.   Mr. Rivera would have first-hand knowledge
21  of those documents, that's correct.
22     Q.   And you wouldn't?
23        I'm sorry, and your answer was that you
24  wouldn't, right?
25     A.   That's correct.

Page 2213

1     Q.   Now, what you were relying -- this is
2  Plaintiffs' Exhibit Number 376 which we refer to as
3  C-10, the blowup of it.
4        You can see this okay, right?
5     A.   Yes.
6     Q.   And the tick mark you're referring to is
7  this mark right here, right?  These tick marks under the
8  A, B, C column?
9     A.   Yes.
10     Q.   And since you didn't have first-hand
11  knowledge, you were relying on Mr. Rivera to put those
12  tick marks in there, right?
13     A.   To put the tick marks in and to perform the
14  step as indicated for A, B, and C.
15     Q.   And Mr. Rivera, he worked for you, right?
16     A.   Yes.
17     Q.   And he worked for BDO, right?
18     A.   Yes.
19     Q.   And so if Mr. Rivera made a mistake, BDO
20  made a mistake, right?
21     A.   Yes.
22     Q.   And if Mr. Rivera made a mistake, you're
23  responsible for it, right, as the partner in charge?
24        MS. BITAR:  Objection.
25        THE COURT:  What's your objection?

Page 2214

1        MS. BITAR:  Calls for a legal conclusion.
2        THE COURT:  Overruled.
3        THE WITNESS:  Yes.
4  BY MR. THOMAS:
5     Q.   Now, Mr. Lenner, you at least recall that
6  after this phone call, you had a meeting at your offices
7  with Dominick Parlapiano, right?
8     A.   I have a recollection -- a vague
9  recollection of that too.
10     Q.   In your vague recollection of that too, is
11  that Mr. Parlapiano came to your offices and you had a
12  meeting with him, right?
13     A.   Hearing the testimony, the people, during
14  the course of this trial, that's what I heard, and I
15  have this vague recollection of that occurring.
16     Q.   And Mr. Lenner, that vague recollection is
17  that you met in your office with Mr. Parlapiano, right,
18  in BDO's offices?
19     A.   I'm hearing from people that saw it.
20  Mr. Ramon said that he saw Mr. Parlapiano come to my
21  office.  It happened eight years ago, Mr. Thomas.  I
22  really don't remember a lot about this whole event.
23     Q.   Right.  Because you threatened to resign
24  from audits every day, right?
25        MS. BITAR:  Objection, Your Honor.

Page 2215

1        THE COURT:  Overruled.
2        THE WITNESS:  Mr. Thomas, we received what
3  we requested I think within 48 hours, within two work
4  days or three work days later.  You know, it was just a
5  misunderstanding.
6  BY MR. THOMAS:
7     Q.   Because you refused to resign from your
8  audits every day, right?
9        MS. BITAR:  Objection, Your Honor.
10        THE COURT:  Sustained.
11        Rephrase the question.
12  BY MR. THOMAS:
13     Q.   Mr. Lenner, your meeting with Mr. Parlapiano
14  in your office, Mr. Ellenburg wasn't there, right?
15     A.   That's what I heard from his testimony.
16     Q.   And Mr. Rivera wasn't there, right?
17     A.   That's what Mr. Rivera said.
18     Q.   Why did you exclude Mr. Rivera from your
19  meeting?
20     A.   I don't --
21        MS. BITAR:  Objection, Your Honor.
22        THE COURT:  Overruled.
23        THE WITNESS:  I don't remember a lot of the
24  meeting.  I don't know why he was excluded.  I don't
25  know why he was not there.

Page 2216

1   BY MR. THOMAS:
2       Q.   Well, Mr. Rivera, he was the one actually
3   out in the field doing the work, right?
4       A.   Yes.
5       Q.   And he was the one that on Friday had
6   requested the documents and had them refused to him,
7   right?
8       A.   Yes.
9       Q.   In fact, the only way you knew about this
10  was Mr. Rivera reporting it to you, right?
11      A.   Yes.
12      Q.   And if you agreed to restart the audit with
13  Mr. Parlapiano, the person out in the field doing that
14  work was going to be Mr. Rivera, right?
15      A.   Yes.
16      Q.   So why did you exclude him from the meeting?
17      A.   I think I just told you, sir, I don't
18  remember a lot about the meeting. I don't know why he
19  was there or not. I don't know why he wasn't there.
20      Q.   So you don't know why you excluded him as
21  you sit here today?
22      A.   I don't know if I purposely excluded him
23  or -- I don't know why he wasn't part of that meeting.
24      Q.   This is Plaintiffs' Exhibit Number 376
25  again, C-10. Now, to properly do this test, BDO had to

Page 2217

1   see copies of the customer checks, right?
2       A.   Yes.
3       Q.   And you understand now that like most of the
4   accounts receivable at E.S. Bankest, that at least
5   10 through 32 of these was fake, right?
6       MS. BITAR:  Objection, Your Honor.
7       THE COURT:  Overruled.
8       THE WITNESS:  I have no independent
9   knowledge if those are fake or not fake. Just based on
10  what I've heard from the proceedings, you know, they --
11  I've learned now that they were fake.
12  BY MR. THOMAS:
13      Q.   What you're trying to say that you didn't
14  know at the time they were fake? Is that what you want
15  to say?
16      A.   Yes.
17      Q.   And you understand now because you've been
18  here that they're fake, right?
19      A.   Yes.
20      Q.   So in order for BDO to properly do this
21  test, BDO had to see a JC Penney check, like for Number
22  14, right?
23      A.   Yes.
24      Q.   Or they had to see a K-Mart check for
25  Number 21, right?

Page 2218

1       A.   Yes.
2       Q.   Where are all these fake customer checks?
3       A.   Excuse me?
4       Q.   Where are all the fake customer checks?
5       A.   Well, they were examined at that point in
6   time when Mr. Rivera did the work. He examined them,
7   and he gave them back to the client. I don't know where
8   they are now, if that's your question.
9       Q.   Well, they're not in BDO's work papers,
10  right?
11      A.   No. And -- nor do we ever put checks in our
12  work papers or invoices or any other documentation.
13  That's the whole point of a tick mark, to indicate that
14  the work that was done at the time, which was eight
15  years ago.
16      MR. THOMAS:  With His Honor's permission, I
17  will approach the witness with Defendants' Exhibit 3003
18  in evidence.
19      THE COURT:  You may.
20      MR. THOMAS:  (Complies.)
21  BY MR. THOMAS:
22      Q.   And I'm looking at BDO 00705. Mr. Lenner,
23  this is a copy of your work papers for 1998 audit,
24  right?
25      A.   Yes.

Page 2219

1       Q.   And that's a copy of a customer check,
2   right?
3       A.   Yes.
4       Q.   And that's in your work papers, right?
5       A.   I think it's in our work papers because it
6   was in response -- I could be wrong -- to a request of
7   documents from our clients. It's something -- if you
8   look at -- it's probably the only check or maybe there's
9   one or two other checks that are in our file. We
10  generally don't keep checks.
11      Q.   Well, you kept that one, right?
12      A.   Mr. Rivera chose to keep that check and we
13  kept it.
14      Q.   And we is BDO?
15      A.   Yes.
16      Q.   But this happens to be one of the K-Mart
17  checks we looked at for one of the real ones, right, the
18  165 down here, right? Number 4?
19      Please answer quick, it's falling out of my
20  hand.
21      A.   I think it's 5.
22      Q.   Number 5. That's one of the real ones,
23  right?
24      A.   Yes.
25      Q.   So you kept that check but for all the fake

Page 2220

1   ones, there's no customer checks in your work papers,
2   right?
3       A.   Mr. Rivera kept that check. I think it was
4   part of something that was produced to us when we asked
5   for documents. That was one of the checks he kept. I
6   just don't know why he kept it.
7       Q.   Well, Mr. Rivera works for you, again,
8   right?
9       A.   Yes.
10      Q.   And what he does, BDO does, right?
11      A.   That's correct.
12      Q.   So BDO kept that customer check for the real
13  one, right?
14      A.   There's one check in the 2,000 pages that
15  you looked at and that's the only check that's there,
16  that's correct.
17      Q.   That's right because none of the fake checks
18  are there, right?
19          MS. BITAR: Objection, Your Honor.
20          THE COURT: Overruled.
21          THE WITNESS: Well, neither are the other
22  eight real checks there.
23  BY MR. THOMAS:
24      Q.   So at least one check you kept for K-Mart,
25  right?

Page 2221

1       A.   That's true. It was kept.
2       Q.   Okay. Now, you said that the copies of the
3   check were given back to Bankest, correct?
4           Do you remember that?
5       A.   That would be the normal course that the
6   auditor would do, that's correct. I said that.
7       Q.   But you don't know that either, do you?
8       A.   It's -- that's my expectation. When
9   somebody gives you a document, you return it to them.
10  It's something I would expect the auditor to do.
11      Q.   But you don't know that either, right?
12      A.   Yes.
13      Q.   Well, let's assume you're right for a
14  minute. They did give the checks back to Bankest.
15  Where are they?
16          MS. BITAR: Objection, Your Honor.
17  Predicate.
18          THE COURT: Overruled.
19          MS. BITAR: And asked and answered.
20          THE WITNESS: I don't know where they are.
21  They might have been thrown out or they may have been in
22  the millions of documents that are in the warehouse.
23  BY MR. THOMAS:
24      Q.   And we know that there's millions of

Page 2222

1   documents in the warehouse because that's what your
2   lawyers told the jury and you've heard that, right?
3           MS. BITAR: Objection, Your Honor.
4           THE COURT: Sustained.
5   BY MR. THOMAS:
6       Q.   Is that one of the ways you know that
7   there's millions of documents in the warehouse?
8           MS. BITAR: Objection, Your Honor.
9           THE COURT: Sustained.
10  BY MR. THOMAS:
11      Q.   Well, there are millions of documents in the
12  warehouse and you're the client representative for these
13  lawyers, right?
14      A.   Yes.
15      Q.   And so --
16          MS. BITAR: Objection, Your Honor.
17  BY MR. THOMAS:
18      Q.   -- you must know --
19          THE COURT: Overruled.
20  BY MR. THOMAS:
21      Q.   So you must know that your lawyers spent
22  literally months out at the warehouse looking through
23  all the documents, right?
24          MS. BITAR: Your Honor, object on privilege
25  grounds.

Page 2223

1           THE COURT: Sustained.
2   BY MR. THOMAS:
3       Q.   These lawyers, they're not doing their work
4   on their own, right? You're the representative; you're
5   the client, right?
6       A.   Yes.
7           MS. BITAR: Objection, Your Honor.
8           THE COURT: Overruled.
9   BY MR. THOMAS:
10      Q.   And do you know, Mr. Lenner, that your
11  lawyers spent months out in the warehouse looking at all
12  the documents?
13          MS. BITAR: Your Honor, same objection.
14          THE COURT: Sustained.
15  BY MR. THOMAS:
16      Q.   Well, you know, Mr. Lenner, right, that the
17  FBI was out in the warehouse. Right?
18          MS. BITAR: Objection, Your Honor. May we
19  have a side-bar?
20          THE COURT: Overruled.
21          No, not yet. It's a yes or no.
22          Or something else.
23          THE WITNESS: I don't know if the FBI was at
24  the warehouse.
25  BY MR. THOMAS:

Page 2224

1      Q.   Mr. Lenner, you've been sitting here the
2  whole trial, right?
3          MS. BITAR:  Your Honor, now I'm going to
4  object again.
5          THE COURT:  Ask a question.
6  BY MR. THOMAS:
7      Q.   Mr. Lenner, you've been sitting here the
8  whole trial, right?
9      A.   Yes.
10      Q.   And is your testimony to this jury that you
11  don't know one way or the other whether or not the FBI
12  was out at the warehouse looking at documents?
13      A.   I didn't hear -- I didn't hear during the
14  course of the trial that the FBI was in the warehouse.
15      Q.   And you know that there's been a criminal
16  trial, right?
17      A.   Yes.
18      Q.   And you know it went on for months?  You
19  know that, right?
20      A.   Yes.
21      Q.   Where are the fake customer checks?
22          MS. BITAR:  I'm sorry, could I hear that
23  question again, please.
24          THE COURT:  Read it back.
25          (Thereupon, the court reporter read back the

Page 2225

1  requested portion.)
2          MS. BITAR:  Objection, Your Honor.  Asked
3  and answered.
4          THE COURT:  Sustained.
5  BY MR. THOMAS:
6      Q.   As far as you know, Mr. Lenner, there aren't
7  any fake customer checks out in the warehouse either,
8  right, just like they're not in your work papers?
9          MS. BITAR:  Objection, Your Honor.
10          THE COURT:  Overruled.
11          THE WITNESS:  Our work papers indicate that
12  we examined customer checks.  As far as the first part
13  of your question, which was if they're not in the
14  warehouse, regarding the warehouse, you had a bunch of
15  criminals orchestrating a very large crime and it's
16  conceivable that they were thrown out by those people.
17  BY MR. THOMAS:
18      Q.   Now, Mr. Lenner, you also heard your lawyers
19  tell the jury that there are thousands and thousands of
20  fake documents in the warehouse that the criminals
21  didn't throw out, right?
22          MS. BITAR:  Objection, Your Honor.
23          THE COURT:  Sustained.
24  BY MR. THOMAS:
25      Q.   Well, Mr. Lenner, you know that there are

Page 2226

1  thousands and thousands of fake documents in the
2  warehouse, right?
3          MS. BITAR:  Objection, Your Honor.
4          THE COURT:  Overruled.
5          THE WITNESS:  Yes.
6  BY MR. THOMAS:
7      Q.   And when the authorities were coming and the
8  crooks were going to try to get rid of the documents,
9  the ones they chose to get rid of just happened to be
10  the 22 customer checks that you need to defend this
11  action?
12          MS. BITAR:  Objection, Your Honor.
13  Argumentative --
14          THE COURT:  Sustained.
15          MS. BITAR:  -- foundation, and I reserve at
16  this point.
17          THE COURT:  Sustained.
18  BY MR. THOMAS:
19      Q.   Well, at least you'll give me, Mr. Lenner,
20  that there are thousands and thousands of fake documents
21  in the warehouse -- at least according to BDO -- that
22  the crooks didn't throw out?
23      A.   Did not?
24      Q.   Did not throw out, right?
25          MS. BITAR:  Objection, Your Honor.

Page 2227

1          THE COURT:  What's your legal basis?
2          MS. BITAR:  According to BDO --
3          THE COURT:  It's a simple legal basis.
4          MS. BITAR:  Foundation as to what BDO did or
5  didn't do or BDO knows.
6          THE COURT:  Sustained.
7  BY MR. THOMAS:
8      Q.   You're the client representative of BDO,
9  right?
10      A.   Yes.
11      Q.   And you know what BDO's position is in this
12  litigation, right?
13          MS. BITAR:  Objection, Your Honor.
14          THE COURT:  Overruled.
15          THE WITNESS:  Yes.
16  BY MR. THOMAS:
17      Q.   So Mr. Lenner, you know that according to
18  BDO there are thousands and thousands of fake documents
19  in the warehouse that the criminals didn't throw out,
20  right?
21          MS. BITAR:  Objection, Your Honor.
22          THE COURT:  Sustained.
23          MR. THOMAS:  May I approach the witness,
24  Your Honor?
25          THE COURT:  You may.

Page 2228

1          MR. THOMAS: (Complies.)
2   BY MR. THOMAS:
3       Q.  Mr. Lenner, I'm approaching you with
4   Defendants' Exhibit 3003. Mr. Lenner, would you do me a
5   favor and look at page 248.
6       A.  (Complies.)
7       Q.  It might be easier for you, sir, if I told
8   you it was BDO 00738.
9       A.  (Complies.) Okay. I have it.
10          MS. BITAR: Just give me a moment, please.
11          Thank you.
12          MR. THOMAS: Can we put this up?
13          (Technician complies.)
14  BY MR. THOMAS:
15      Q.  Now, this is one of BDO's work papers,
16  right?
17      A.  Yes.
18      Q.  And this is for the 1998 audit, right?
19      A.  Yes.
20      Q.  And if we look up there, you see on some of
21  them it says NNC. You see that, by amount confirmed?
22      A.  Yes.
23      Q.  And that means nonnotification client,
24  right, or customer, sorry -- nonnotification customer,
25  right?

Page 2229

1       A.  Yes.
2       Q.  And that means that BDO understood from
3   Bankest at least that when those customers were
4   factoring, that they didn't know that their receivables
5   were being factored, right?
6       A.  Yes.
7       Q.  Now, for others like JC Penney and K-Mart,
8   it doesn't say NNC next to them, right?
9       A.  Yes.
10      Q.  And that's because those are notification
11  customers, right?
12      A.  Yes.
13      Q.  And those are Joy customers mostly, right?
14      A.  Yes.
15      Q.  And for Joy customers, they were supposed to
16  be -- they could be notified because they were supposed
17  to know that their receivables were being factored,
18  right?
19      A.  Yes.
20      Q.  And in those cases, did you try to send out
21  a confirmation to Joy or did you send it out to the
22  customers?
23      A.  To the customer.
24      Q.  Well, why wouldn't you send it out to Joy
25  too?

Page 2230

1       A.  It was more efficient to confirm it with the
2   person or the entity that owes the money. It's just a
3   more efficient way to do the audits.
4       Q.  It was better when you could to confirm with
5   the customer Wal-Mart than the client Joy, right?
6       A.  Yes.
7       Q.  And because BDO was confirming directly with
8   the customers, at least for 1998, you didn't think you
9   needed to confirm with Joy, right?
10      A.  Yes.
11      Q.  But in 1995 you would send out a
12  confirmation to Joy and they'd sign it and send it back,
13  right?
14      A.  Yes.
15      Q.  That was the first audit year, right?
16      A.  Yes.
17      Q.  And then in the second audit year, you'd
18  send out to Joy again and they'd returned it and
19  confirmed again, right?
20      A.  Yes.
21      Q.  And now we're in the third audit year and
22  your position is that you didn't need to send one out to
23  Joy because you were confirming directly with the
24  customer, right?
25      A.  Yes.

Page 2231

1          MR. THOMAS: Your Honor, may I approach the
2   witness?
3          THE COURT: You may.
4          MR. THOMAS: (Complies.)
5   BY MR. THOMAS:
6       Q.  Sir, this is Plaintiffs' Exhibit 364 in
7   evidence. Now, this is a confirmation to Joy for the
8   1998 audit dated February 16th, 1999, right?
9       A.  Yes.
10      Q.  And this is the one that you've been
11  explaining to the jury -- well, you, BDO -- that doesn't
12  have a BDO Bates stamp on it, right?
13      A.  Yes.
14          MS. BITAR: Objection, Your Honor.
15          THE COURT: Overruled.
16  BY MR. THOMAS:
17      Q.  And Mr. Lenner, you'll tell them that this
18  wasn't sent out, right?
19      A.  That's correct.
20          MS. BITAR: Objection, Your Honor.
21          THE COURT: Overruled.
22  BY MR. THOMAS:
23      Q.  And, in fact, Mr. Lenner as you just
24  explained to me, you weren't even asked for one of these
25  because you don't need it because you're going directly

Page 2232

1   with customers, right?
2       A.   Yes.
3       Q.   Would you please turn the page with me to
4   the 1998 papers to BDO 00708.
5       A.   708?
6       Q.   Please.
7       A.   (Complies.)
8       Q.   Now, this is dated February 12th, right?
9       A.   Yes.
10      Q.   And this is a memo from BDO asking for stuff
11  from Bankest to the client, right?
12      A.   Yes.
13      Q.   In fact, it's items that you're requiring to
14  complete the audit, right?
15           See that at the top of the heading?
16      A.   Yes.
17           MR. THOMAS:  Can you look over at Number 15
18  with me?
19           (Technician complies.)
20  BY MR. THOMAS:
21      Q.   One of the things you're requiring to
22  complete the 1998 audit is the Joy Athletic accounts
23  receivable confirmation for notification client, right?
24      A.   That's what it says here but it was never
25  sent out.

Page 2233

1       Q.   Yeah.  But you just told me a minute ago
2   that you didn't even ask for it.  Remember that
3   testimony?  Remember you told us how you didn't even
4   need it and you wouldn't ask for it.  Remember that?
5       A.   Yes.
6       Q.   Turns out that was wrong, you did ask for
7   it, right?
8           MS. BITAR:  Objection, Your Honor.
9           THE COURT:  Overruled.
10          THE WITNESS:  Yes.
11  BY MR. THOMAS:
12      Q.   And it was one of the items that BDO
13  required to complete the audit, right?
14      A.   At this point in time it was but it was
15  not -- subsequently it wasn't deemed relevant because we
16  were confirming with the customers.
17          MR. THOMAS:  Can we put that confirmation
18  back up?
19          (Technician complies.)
20          MR. THOMAS:  No, the list of confirms.
21          (Technician complies.)
22  BY MR. THOMAS:
23      Q.   All right.  This was -- you didn't need to
24  confirm with Joy because you were confirmed with all
25  those customers of Joy, right?  They're the ones that

Page 2234

1   don't have NNC next to them, right?
2       A.   Right.
3       Q.   And how many of those confirms from
4   customers did you get back?
5       A.   Looks like we got a couple back.  There's 15
6   came back and I think one -- number -- one below came
7   back.  So a couple.
8       Q.   So you got just a couple, right?  That's
9   what we'd call a not-very-good response rate?
10      A.   Yes.
11      Q.   But even though you got no real
12  confirmations from customers, your testimony is you
13  didn't need to confirm with Joy, right, even though your
14  customer confirmations failed?
15      A.   While we did not get a response, you know,
16  the literature provides that you can go into alternative
17  procedures, and that's exactly what we did.
18      Q.   So your testimony earlier when you said the
19  reason you didn't send out a confirmation to the client
20  Joy was because you were confirming with the customers.
21  Those two aren't actually related, are they?
22      A.   Well, we didn't send it out.
23      Q.   We just said --
24      A.   We did not send out the confirmation.  I
25  think that was a correct statement I made.

Page 2235

1       Q.   You asked for it, you required it, you
2   needed it, but your testimony is that wasn't sent out,
3   right?
4           MS. BITAR:  Objection, Your Honor.
5   Argumentative.
6           THE COURT:  Sustained.
7   BY MR. THOMAS:
8       Q.   Mr. Lenner, you required it to complete your
9   audit, right?
10          MS. BITAR:  Objection, Your Honor.
11          THE COURT:  Overruled.
12          THE WITNESS:  While we required it, it's not
13  uncommon to change your requirements and to change your
14  mind.  It's a very fluid process, the audit, Mr. Thomas.
15  BY MR. THOMAS:
16      Q.   You required it, right?  It's what your own
17  document says?
18          MS. BITAR:  Objection, Your Honor.
19          THE COURT:  Overruled.
20          THE WITNESS:  On February 11th, we required
21  it.  But subsequently we changed our mind and did not
22  require it.
23  BY MR. THOMAS:
24      Q.   On February 12th I think, is that the date
25  of that memo?

Page 2236

1    A.   The 11th.
2    Q.   February 11th?  Well, maybe you can help me
3  with that because at the top of the memo it says
4  February 12th, right?
5         MR. THOMAS:  Can we look at the memo,
6  please.
7         (Technician complies.)
8  BY MR. THOMAS:
9    Q.   That's February 12th, right?
10   A.   Uh-huh.  (Nodding.)
11   Q.   Yes?
12   A.   That is February 12th, that's correct.
13   Q.   But on the next page it's dated February
14  11th.  Is that what you were looking at?
15   A.   Yes.
16        MR. THOMAS:  Can we show that?  It's over
17  here on the right.  February 11th.
18        (Technician complies.)
19  BY MR. THOMAS:
20   Q.   So is this a February 12th memo or a
21  February 11th memo?
22   A.   February 12th going by the first page.
23   Q.   So that --
24   A.   I'm not sure.
25   Q.   So the February 11th on the second page,

Page 2237

1  that's probably a mistake, right?
2    A.   I don't -- I'm not sure which is accurate,
3  the 11th or the 12th.
4    Q.   So one of them is a mistake and we can't
5  tell which one by looking at the work paper, right?
6         MS. BITAR:  Objection, Your Honor.
7         THE COURT:  Overruled.
8         THE WITNESS:  Mr. Thomas, it's quite
9  possible, you know, when you have a computer and it's
10  set up to page date.  If you work with Word you know
11  that whenever you -- if you just reprint that one page,
12  only that date will automatically change for the current
13  date that you're working on.  It's just the way it is
14  with modern technology.
15  BY MR. THOMAS:
16   Q.   So one of those two dates is a mistake,
17  right?
18        MS. BITAR:  Objection, Your Honor.
19        THE COURT:  Overruled.
20        THE WITNESS:  Yes.
21  BY MR. THOMAS:
22   Q.   But that's just a little mistake, right?
23   A.   Yes.
24   Q.   That's sort of like a little detail, right?
25   A.   It's -- yes.

Page 2238

1    Q.   But it's important for certified public
2  accountants doing audits to pay attention to the
3  details, right?
4    A.   That's correct.
5    Q.   Because if you move that decimal point just
6  one little space, 10 million could turn into a hundred
7  million, right?
8    A.   Yes.
9         MR. THOMAS:  With His Honor's permission,
10  I'll approach the witness with Defendants' Exhibit 3005.
11        THE COURT:  You may.
12        MR. THOMAS:  (Complies.)
13        Mr. Lenner, if you would please turn with me
14  to page BDO 03402.
15        MS. BITAR:  (Inaud.).
16        MR. THOMAS:  03402.
17        THE WITNESS:  0402.
18        MR. THOMAS:  03402.  Can I help you?  Let me
19  just step up here.
20        Your Honor, may I approach?
21        THE WITNESS:  I see it.  I see it.  Okay.
22        MR. THOMAS:  May I?  I think that may be
23  Ms. Alexander's.
24  BY MR. THOMAS:
25   Q.   Mr. Lenner, these are more of your work

Page 2239

1  papers, right?
2    A.   Yes.
3    Q.   In fact, these are the work papers now for
4  the 2000 audit, right?
5    A.   Yes.
6    Q.   And we're looking now at an A/R sample,
7  accounts receivable sample in 2000, right?
8    A.   Yes.
9    Q.   And again, there's going to be notification
10  and nonnotification clients -- customers, right?
11   A.   Yes.
12   Q.   And we know now that Joy is a notification,
13  right?
14   A.   Yes.
15   Q.   Now, if you'll turn with me to the last page
16  of this --
17   A.   (Complies.)
18   Q.   -- and we look at the note down there.
19   A.   Uh-huh.  (Nodding.)
20   Q.   Somebody from BDO is writing down what
21  you're doing, right?
22   A.   Excuse me?  What did you say?
23   Q.   Somebody from BDO is writing down what
24  you're doing?  That's somebody from BDO's handwriting,
25  right?

Page 2240

1    A.   Yes.
2    Q.   And that's describing notification and
3  nonnotification and what your test is, right?
4    A.   Yes.
5    Q.   And it says -- well, first of all, do you
6  know whose handwriting that is?
7    A.   I think it's Chris Mohr's.
8    Q.   You're looking at the initials up there on
9  the right-hand corner of the page?
10   A.   Yes.
11   Q.   And the note says E.S. Bankest works with
12  notification and nonnotification customers.
13  Nonnotification customers are not aware that their
14  payables have been factored.  Therefore, in performing
15  alternate procedures, BDO treats the payment from the
16  customer -- traces the payment from the customer to the
17  client and the client to E.S. Bankest.
18      You see that?
19   A.   Yes.
20   Q.   So if they're a notification client, you
21  would see the customer check, then you'd see the client
22  check, and then you'd see the check to E.S. Bankest,
23  right?
24   A.   If it's notification?
25   Q.   Nonnotification.

Page 2241

1    A.   If it's nonnotification, that's correct.
2    Q.   And then it says, for notification customer,
3  BDO traces payment from customer directly to E.S.
4  Bankest, right?
5    A.   Yes.
6    Q.   And for notification, you don't have to see
7  the middle step, you see the customer check, right?
8    A.   Yes.
9    Q.   And Joy was notification, right?
10   A.   Yes.
11   Q.   And so that's why when we look at C-10 for
12  Joy stuff, you just need to see the customer check,
13  right?
14   A.   The customer check, correct.
15   Q.   Since you didn't need to see the Joy check,
16  why did they need the fake Joy checks for you?
17      MS. BITAR:  Objection, Your Honor.
18      THE COURT:  Sustained.
19  BY MR. THOMAS:
20   Q.   Mr. Lenner, if what BDO wrote there in their
21  own work papers is true, you don't need to look at a Joy
22  check, right?
23   A.   That's correct.
24   Q.   So the fact that E.S. Bankest may or may not
25  fake Joy checks, that's irrelevant to you, right?

Page 2242

1      MS. BITAR:  Objection, Your Honor.
2      THE COURT:  Overruled.
3      THE WITNESS:  Well, in a factoring business,
4  it's not unusual for a client to sometimes receive the
5  money instead of it going directly to the factor.
6      So sometimes the clients would collect
7  directly from the customers notwithstanding the
8  factoring arrangement which would be notification.  It's
9  just not unusual.
10  BY MR. THOMAS:
11   Q.   So just a minute ago when you said you
12  didn't mean it, now you want to amend that a little bit
13  and maybe you do?
14      MS. BITAR:  Objection, Your Honor.
15      THE COURT:  Sustained.
16  BY MR. THOMAS:
17   Q.   Well, to do this test, to do that test, you
18  didn't need to see a Joy check, right?
19      MS. BITAR:  Objection, Your Honor.  Asked
20  and answered.
21      THE COURT:  Overruled.
22      THE WITNESS:  A customer check would be the
23  best source of the evidence of the collection.
24  BY MR. THOMAS:
25   Q.   That's right.  But on C-10 Mr. Rivera could

Page 2243

1  see a client check, a Joy check, and treat it as a
2  customer check, right?
3      MS. BITAR:  Objection, Your Honor.
4      THE COURT:  Overruled.
5      THE WITNESS:  No.
6  BY MR. THOMAS:
7    Q.   Because seeing the Joy check wasn't part of
8  your test, right?
9    A.   In that test it was just going right from
10  the customer back to the factor.
11   Q.   And in that test too, in the 2000 audit that
12  we're looking at right up there, right?
13   A.   For which one?
14   Q.   For Joy notification?
15   A.   Traced from the customer to the client, if
16  Joy was notification but sometimes that notification
17  relationship was not respected so you'd expect it to go
18  to the client.
19   Q.   So now different than what you just told me,
20  I'm going to say, three minutes ago --
21      MS. BITAR:  Objection, Your Honor.
22  BY MR. THOMAS:
23   Q.   -- you're going to say --
24      THE COURT:  Sustained.  Ask a question.
25      Stop doing that.

Page 2244

BY MR. THOMAS:
1
2      Q.   Mr. Lenner, is it your testimony now that
3   even though you agreed with me that Joy was for
4   notification, and that that's the test you use and that
5   therefore you didn't need to see a Joy check, is your
6   testimony now that you do need to see a Joy check?
7           MS. BITAR:  Your Honor, objection. That's
8   argumentative.
9           THE COURT:  Sustained.
10   BY MR. THOMAS:
11      Q.   Is your testimony now that you do need to
12   see a Joy check?
13           MS. BITAR:  Your Honor, again,
14   argumentative, asked and answered, and I reserve again.
15           THE COURT:  Sustained.
16           Ask another question.
17           MR. THOMAS:  I'm trying to think of a way to
18   ask it, Your Honor.
19   BY MR. THOMAS:
20      Q.   Mr. Lenner, all the Joy receivables flowed
21   through Bankest Capital, right?
22      A.   Yes.
23      Q.   Is -- when you say, for notification
24   customers BDO traced payment from customer directly to
25   E.S. Bankest, which one is Capital, the customer or E.S.

Page 2245

1   Bankest?
2      A.   In that, what -- the test is designed to go
3   from the customer right to E.S. Bankest which is the
4   factor. Based on this test he -- if you saw the
5   collection coming in from the customer and he saw the
6   collection being deposited at E.S. Bankest, in this test
7   he did not run -- he did not examine BCC. That's what
8   it's saying here.
9      Q.   So for the largest client where all the
10   transactions went through the related party Capital,
11   when BDO did this test, you didn't even look at Capital,
12   right?
13      A.   We got the records of Capital. We got the
14   customer -- we got the checks that we were receiving so
15   that those were records that we examined. That's all we
16   needed to see was the collection.
17      Q.   Where does it say that up there? For
18   notification customers BDO traced payment from customer
19   directly to E.S. Bankest. The customer, that's Bankest
20   Capital, right?
21      A.   No, the customer is the customer. (Inaud.).
22      Q.   You wouldn't leave out what you actually
23   did, right? We can rely on these work papers and know
24   what you actually did, right?
25      A.   Yes.

Page 2246

1      Q.   So which one is Capital?
2      A.   In this one? It looks like he just -- if
3   you saw the check coming in from the customer, that's
4   all that really matters here. And it is getting into
5   the factors books, E.S. Bankest. He examined it here.
6      Q.   So which one is Capital?
7      A.   It was examined through our test of controls
8   in this year. And it gave us assurance that the system
9   was operating for the whole year. So part of the audit
10   is to be efficient, and if we saw the source of the
11   transaction, where it started from, the customer
12   collection, ending up in the factor's books, and we've
13   tested the system for all 365 days, and we saw it going
14   through BCC, that's why you do control tests.
15           There's no -- there was no reason to do that
16   here because we knew the system is working.
17      Q.   The system was working? Mr. Lenner, all the
18   accounts receivable were fake.
19           MS. BITAR:  Objection, Your Honor.
20           THE COURT:  Sustained.
21           Do you have a question?
22   BY MR. THOMAS:
23      Q.   The system was working so well that it
24   turned out all the accounts receivable were fake, right,
25   Mr. Lenner?

Page 2247

1           MS. BITAR:  Your Honor, again,
2   argumentative.
3           THE COURT:  Sustained.
4           Rephrase your question.
5   BY MR. THOMAS:
6      Q.   Mr. Lenner, you said the system was working,
7   and my question to you is the system was working and it
8   turned out that all the accounts receivable were fake,
9   right?
10           MS. BITAR:  Objection, Judge.
11           THE COURT:  Overruled.
12           THE WITNESS:  Yes. And I'd like to explain
13   that.
14   BY MR. THOMAS:
15      Q.   That all the accounts receivable were fake?
16           MS. BITAR:  Objection.
17           THE COURT:  If he wants to explain, let him
18   explain.
19           THE WITNESS:  There's a reason for that.
20   There was a massive fraud that was perpetrated by eight
21   people that are in jail or going to jail, people inside
22   the company, management inside the company, clerks
23   inside the company, people, third parties, the clients,
24   and other people.
25           It was a massive fraud perpetrated for seven

Page 2248

1    years, and that's the reason why they were fake.
2    BY MR. THOMAS:
3        Q.    And the reason that you missed that it was
4    fake in 1995, in 1996, in 1998, in 1999, in 2000, and
5    2001, in 2002 is because you didn't see the customer
6    checks, right?
7        MS. BITAR:  Objection, Your Honor.
8        THE COURT:  Overruled.
9        THE WITNESS:  No, Mr. Thomas.  You know the
10    work papers say the last five years, all the years, the
11    five years, we looked at customer checks.  Different
12    people besides Mr. Rivera examined the customer checks.
13    This one hereby Mr. Mohr said it.  In other years other
14    people did it.  So it's not just one year.  You know, I
15    had people working on there and knew what a customer
16    check is.
17    BY MR. THOMAS:
18        Q.    You're right.  It wasn't just one person at
19    BDO who failed to detect the fraud, right?
20        MS. BITAR:  Objection, Your Honor.
21        THE COURT:  Overruled.
22        Yes or no.
23        THE WITNESS:  Yes.
24    BY MR. THOMAS:
25        Q.    And those work papers that you're relying

Page 2249

1    upon to say that you saw the customer checks, those are
2    the same work papers that if we look at them and rely
3    upon, say, all the accounts receivable are real, right?
4        A.    Yes.
5        Q.    But it turns out that notwithstanding what
6    your work papers say, they were all fake, right?
7        MS. BITAR:  Objection, Your Honor.
8        THE COURT:  Sustained.
9    BY MR. THOMAS:
10        Q.    Well, on this note, Mr. Lenner, where it
11    says, for notification customers, BDO traced payment
12    from customers directly to E.S. Bankest.
13        We know that for Joy, far and away the
14    largest client of E.S. Bankest, that all that money had
15    to go through Bankest Capital, right?
16        A.    Yes.
17        Q.    And even though in this work paper -- you
18    say you traced it.  It doesn't tell us that you traced
19    it through Capital, right?
20        A.    Yes.
21        MR. THOMAS:  With Your Honor's permission, I
22    will approach the witness with Plaintiffs' Exhibit 262.
23        THE COURT:  You may.
24        MR. THOMAS:  (Complies.)
25        THE WITNESS:  Can we put these back if we're

Page 2250

1    not using it?
2        MR. THOMAS:  I'll tell you what, we'll set
3    them right here just in case.
4    BY MR. THOMAS:
5        Q.    Mr. Lenner, this is another part of BDO's
6    work, right?
7        A.    Yes.
8        Q.    And Plaintiffs' Exhibit Number 262, this is
9    part the client setup sensitivity questions and part of
10    the inherent risk questionnaire, right?
11        A.    Yes.
12        Q.    And if you look on that first page down
13    there at the bottom, BDO wrote here why the engagement
14    is sensitive, right?
15        A.    Yes.
16        Q.    And BDO wrote the engagement is sensitive
17    because of the company's use of the financial
18    statements -- that's what FS means, right?
19        A.    Yes.
20        Q.    -- in its PPMs, right?
21        A.    Yes.
22        Q.    And this was for the 1996 audit?
23        A.    Correct.
24        Q.    And so the reason the engagement was
25    sensitive in 1996 is because the company used its

Page 2251

1    financial statements in the PPMs, right?
2        A.    Although that's what it says here, this is
3    not accurate.
4        Q.    Well, I thought when we looked in the work
5    papers that it said something that you did, something
6    that you knew, that we could rely upon it?
7        A.    Well, we -- okay, Mr. Thomas, this is a
8    ministerial-type of item here and it had no relevance
9    fact -- if we had changed it to a -- if we changed it to
10    a no, or changed the reason here, it would have no
11    effect on our audit plan ,and for that reason it wasn't
12    changed.
13        Q.    And someone took the trouble to type in,
14    right?  You can tell that, right?  Someone took the
15    trouble to type in the engagement is sensitive because
16    of the company's use of the financial statements in its
17    PPMs, right?
18        A.    Someone typed it in, correct.
19        Q.    And that someone worked for BDO, right?
20        A.    Yes.
21        Q.    And this statement in BDO's work papers
22    you're saying we can't rely upon, right?
23        MS. BITAR:  Objection, Your Honor.
24        THE COURT:  Overruled.
25        THE WITNESS:  I'm saying there's no -- it's

Page 2252

1  different because there's no result from the reliance on
2  this.  It doesn't diminish or doesn't detract from the
3  audit procedures that we planned on doing because the
4  job was already sensitive for another reason.  That
5  reason, it wasn't changed.
6  BY MR. THOMAS:
7      Q.  So for this statement by BDO in your work
8  papers, we cannot rely upon it.  That's your testimony,
9  right?
10     A.  No.  I'm saying it's just not -- it's not
11  correct.
12     Q.  So then we can rely upon it and now we know
13  that the engagement is sensitive because of the
14  company's use of the financial statements in its PPMs,
15  right?
16     A.  No, I said --
17         MS. BITAR:  Objection, Your Honor.
18         THE COURT:  Overruled.
19         THE WITNESS:  No, I said this statement is
20  not correct.
21  BY MR. THOMAS:
22     Q.  So your testimony now is that we can't rely
23  upon this statement in your work papers, right?
24     A.  Yes.
25     Q.  So some statements in your work papers you

Page 2253

1  say we can rely upon and some of them we can't, right?
2      A.  There are sometimes when you're involved in
3  a large project, there are things that are important,
4  like that work paper over there is important and that
5  was important.  And the things that have lesser
6  importance, and sometimes when you're trying to finish
7  something and be efficient and if you know the
8  experience that we have that it's not going to change
9  the audit plan, then you leave it alone because it
10  doesn't have an effect on the outcome of what you're
11  doing.  That's important.  That's accurate.
12         This -- okay, this document over here, I
13  agree with you.  It's not accurate.  But it's not
14  important either.
15     Q.  So some statements in your work papers we
16  can rely upon and some of them we can't, right?
17     A.  Most of the statements in our work papers
18  you can rely upon.
19     Q.  So some of the statements in the work papers
20  we can rely upon and some of them we can't, right?
21         MS. BITAR:  Objection.  Asked and answered.
22         THE COURT:  Sustained.
23  BY MR. THOMAS:
24     Q.  Mr. Lenner, some of the statements in your
25  work papers are reliable and some of them are not,

Page 2254

1  right?
2         MS. BITAR:  Objection, Your Honor.
3         THE COURT:  Overruled.
4         THE WITNESS:  Most of the statements in our
5  work papers are reliable.  There's some like you're
6  pointing out here are not accurate.
7  BY MR. THOMAS:
8      Q.  So some of them are reliable and some of
9  them are not, right?
10        MS. BITAR:  Objection, Your Honor.  Asked
11  and answered about seven times.
12        THE COURT:  Overruled.
13        It's a yes or no.
14        If you want to explain it, you may,
15  Mr. Lenner.
16        THE WITNESS:  It would be -- the statements
17  that are incorrect here, some of them like this, that's
18  incorrect, it's not a correct statement, and there would
19  be no reason to rely on it because it doesn't affect
20  what you're trying to accomplish during the audit
21  process.  That's why we didn't change it.
22  BY MR. THOMAS:
23     Q.  So some of the statements in your work
24  papers are reliable and some of them are not, right,
25  Mr. Lenner?

Page 2255

1         MS. BITAR:  Objection, Your Honor.
2         THE COURT:  Overruled.
3         THE WITNESS:  Yes, only the statements that
4  are incorrect are unreliable.
5  BY MR. THOMAS:
6      Q.  And for purposes of this litigation, you
7  believe -- your testimony under oath to the jury, is
8  that statement that hurts you is unreliable?
9         MS. BITAR:  Objection, Judge.
10  BY MR. THOMAS:
11     Q.  Right?
12        THE COURT:  Sustained.
13        MR. THOMAS:  May I approach, Your Honor?
14        THE COURT:  You may.
15        MR. THOMAS:  (Complies.)
16  BY MR. THOMAS:
17     Q.  Mr. Lenner, if you can please look in
18  Exhibit 3003.
19     A.  (Complies.)
20     Q.  And if you'd turn to BDO 00655.
21     A.  655?
22     Q.  Yes, sir.
23     A.  (Complies.)  Yes, I see it.
24     Q.  Now, this is a question for the 1998 audit,
25  right?

Page 2256

1    A.  Yes.
2    Q.  And this one says, sensitivity questions.
3  Is there anything public owned or a member of a group
4  containing a publically-owned entity?  And the answer is
5  yes.  You see that?
6    A.  Yes.
7    Q.  Is your testimony going to be that this is
8  the reason that it was sensitive in 1998?
9        MS. BITAR:  Objection, Your Honor.
10        THE COURT:  Sustained.
11        Rephrase your question.
12  BY MR. THOMAS:
13    Q.  Mr. Lenner, is BDO's position that the
14  reason that the 1998 audit was sensitive was because
15  there was an entity that was publically owned or a
16  member of a group of a publically-owned entity?
17    A.  Yes.
18    Q.  And why would that make an audit sensitive?
19    A.  Because it's going into a public document --
20  it's going into a document where a public document would
21  be basically -- one or two types of documents would be a
22  document that fit the financial statements here since
23  the Florida bank was a 50 percent owner of E.S. Bankest.
24        Each year 50 percent of the profit of this
25  company E.S. Bankest was recorded or rolled up or rolled

Page 2257

1  into the consolidated financial statements of the
2  Florida bank.  And that's one reason.
3        Florida bank's a regulated bank.  Secondly,
4  it's also owned by -- indirectly that bank is owned by
5  an Espirito Santo conglomerate which is a very large
6  bank in Portugal.
7    Q.  And you knew all this at the time, right?
8    A.  Yes.
9    Q.  And I think you said the reason is the
10  statement that could go into something that was public,
11  and you're a certified public accountant, right?
12    A.  Yes.
13    Q.  And because it can go -- your audits can go
14  into something public and you're a certified public
15  accountant, you'd make the audit sensitive because it's
16  important that you're sure it's correct, right?
17    A.  Well, it's publically owned.
18        MS. BITAR:  Objection, Your Honor.
19        THE COURT:  What's your legal base.
20        MS. BITAR:  Argumentative and it's apples
21  and oranges.
22        THE COURT:  Overruled.
23        THE WITNESS:  When I said public it's a
24  short phrase.  What's up there is publically owned or a
25  member of a group containing a publically-owned entity.

Page 2258

1        So it's a company that has active stock
2  trading or has active trading on an exchange.  That's
3  what a public company is.  It's regulated by the
4  Securities and Exchange Commission in Washington, D.C.
5  That's what publically owned means here.
6  BY MR. THOMAS:
7    Q.  And you're a certified public accountant and
8  you wanted to be sure that your audited statements were
9  right so you made it sensitive because it was going to
10  go to a publically-owned entity, right?
11    A.  Yes.  The reason is it was going to be
12  rolled up into this public company, and that's a reason
13  to treat it as sensitive.
14    Q.  Now, Mr. Lenner, if you'll turn the page
15  with me, you there you'll see that you had a whole
16  questionnaire about sensitivity questions too, right,
17  about risk?
18        MR. THOMAS:  Turn one more page for me.
19        (Technician complies.)
20  BY MR. THOMAS:
21    Q.  That's the inherent risk questionnaire,
22  right?
23    A.  Yes.
24    Q.  And the answers to these questions, they
25  were important, right?

Page 2259

1    A.  Yes.
2    Q.  And the answer to these questions were
3  important and you read them, right?
4    A.  Yes.
5    Q.  And you put your initials on the page when
6  you read them, right?
7    A.  Yes.
8    Q.  And Numbers 18 and 22 on this form, just
9  like all the others, they were important too, right?
10    A.  Yes.
11    Q.  And you read those too, right?
12    A.  Yes.
13        MR. THOMAS:  Can we put those up, please.
14        (Technician complies.)
15  BY MR. THOMAS:
16    Q.  And you put your initials on the page,
17  right?
18    A.  Yes.
19    Q.  And at the time you read them, you knew what
20  they said, right?
21    A.  Yep -- yes.
22    Q.  And 18 said, is more than usual significance
23  likely to be given to the financial statements?  And BDO
24  answered yes, right?
25    A.  Yes.

Page 2260

1     Q.   And then BDO typed in the financial
2   statements are included in the company's
3   private-placement memoranda which are used to sell
4   debentures, right?
5     A.   Although that's what's written here, at the
6   time when I was reviewing the work paper, I knew that to
7   be incorrect similar to the situation in 1996.
8          And since the purpose of this work paper is
9   to determine the risk profile, it was already deemed a
10   high-risk profile.  There was no point in going back and
11   changing it.
12     Q.   Going back and changing it?
13     A.   Going back and, as I'm reviewing it, just
14   sending it back to the staff and say fix it because it's
15   a -- you know, we're just trying to be efficient.  And I
16   knew that was incorrect.
17     Q.   You wanted to be efficient, right?
18     A.   Yes.
19     Q.   You wanted to be accurate too, right.  I
20   mean, you're an auditor.  You want to be accurate,
21   right?
22     A.   I wanted to be accurate, but I knew the
23   consequence was nil.  There wasn't any consequence to
24   answering it a no because if it's already yes, it's
25   maximum risk which means you're doing a little more work

Page 2261

1   than if you answered a no.  And since we already did the
2   work or planned on doing the work, there was just no
3   point in changing it.
4     Q.   And you wanted to be efficient?
5     A.   That's correct.
6     Q.   And how much time would it have taken you
7   with the pen that you used to initial just to cross it
8   out and write no?
9     A.   Well, I would have sent it back to the
10   staff, they would have had to make the change, it
11   requires going through the software and making a whole
12   bunch of changes.  And it just was more efficient just
13   to leave it alone.
14     Q.   How much time would it have taken to use the
15   pen you used to write your initials just to scratch it
16   out and write no and make sure it was correct?
17     A.   It's not just my time, it's the time of
18   other people just to fix the whole -- you just don't
19   want to cross it out.  You'd want to change everything
20   else in it and have it correct at the end.
21          So there was -- it would take maybe a couple
22   of hours, one or two hours for me to make the change,
23   get the staff to go back and change it.  It would be a
24   couple of hours.
25     Q.   How long would it take you to use the pen

Page 2262

1   you used to put your initials in at the top to scratch
2   it out and write, sir, so it was correct?
3     A.   I wouldn't do it that way.  The way we
4   review jobs is you have -- you type up your comments,
5   you have a list of comments that you want the staff
6   person to fix.  It's a process.
7          And it might take me a few hours to review
8   this.  Then I would give the list back to the person,
9   and then the person would have to go back into the
10   software, open it up, then make the change, print it out
11   again, give it back to me to read.
12          And I made that judgment, thought it made
13   sense just to knowing that it doesn't have a negative
14   effect on our audit plan, that it made sense just to
15   leave it alone.
16     Q.   How long would it have taken you to use the
17   pen that you used to make your initials at the top just
18   to scratch it out and write no?
19     A.   I think I just answered the question.
20          MS. BITAR:  I was just going to object.
21          THE COURT:  Sustained.
22   BY MR. THOMAS:
23     Q.   It wouldn't have taken you more than two
24   seconds, three seconds to scratch it out and write no;
25   isn't that right?

Page 2263

1          MS. BITAR:  Objection, Your Honor.
2   Argumentative.
3          THE COURT:  Sustained.
4          Ask another question, Mr. Thomas.
5   BY MR. THOMAS:
6     Q.   So this is -- these real important questions
7   that you just told us a minute ago, these are two of
8   them at least that they're mistakes, right?
9     A.   Yes.
10     Q.   And you used this document to plan your
11   audit, right?
12     A.   Yes.
13     Q.   Could you go back to Plaintiffs' Exhibit 262
14   for me?
15     A.   Is that in this binder?
16     Q.   It was.  I'll tell you what, sir, I'll just
17   give you another copy.  It's Plaintiffs' Exhibit 246,
18   which is the client setup and inherent risk
19   questionnaire for the 1995 audit.
20     A.   Thank you.
21          MR. THOMAS:  And Mr. Lenner, I'm also going
22   to approach you, with His Honor's permission.
23          THE COURT:  Yes.
24          MR. THOMAS:  (Complies.)
25          We're going to look at the 1995 Plaintiffs'

Page 2264

1  Exhibit 262.
2      MS. BITAR: I think the 262 is the 1996
3  questionnaire. That's why I'm confused.
4      MR. THOMAS: No. Okay. We'll look at that.
5  BY MR. THOMAS:
6      Q.  Plaintiffs' Exhibit 262. Just a minute,
7  Mr. Lenner, for us to catch up with you.
8      MR. THOMAS: May I approach, Your Honor?
9      THE COURT: You may.
10     MR. THOMAS: (Complies.)
11 BY MR. THOMAS:
12     Q.  This one is Plaintiffs' Exhibit 262. And
13 this is the one for the 1996 audit.
14         You see that?
15     A.  Uh-huh. (Nodding.)
16     Q.  And you also have Plaintiffs' Exhibit 246
17 for the 1995 audit?
18     A.  Yes.
19     Q.  Are you with me?
20     A.  Yes.
21     Q.  Okay.
22     MS. BITAR: I'm sorry, what's the --
23     MR. THOMAS: Look at the one we're on.
24 Plaintiffs' Exhibit 262.
25     MS. BITAR: I don't, but you just referenced

Page 2265

1  242. (Inaud.).
2      MR. THOMAS: He didn't know what the
3  document was and I promise I won't do anything about
4  that. I promise.
5      THE WITNESS: Which one am I looking at?
6      MR. THOMAS: We're looking at Plaintiffs'
7  Exhibit 262. It's up on the screen. And it's one of
8  the two I handed you.
9  BY MR. THOMAS:
10     Q.  Now, this is the one that at the bottom it
11 said the engagement is sensitive because of the
12 company's use of the financial statements in its PPMs,
13 right?
14     A.  Yes.
15     Q.  And this one -- this is something we've
16 already agreed upon that your testimony is it's a
17 mistake and we can't rely upon it, right?
18     MS. BITAR: Objection, Your Honor.
19     THE COURT: What's your legal basis?
20     MS. BITAR: Mischaracterizes his testimony.
21     THE COURT: Overruled.
22     THE WITNESS: Yes.
23 BY MR. THOMAS:
24     Q.  And in the next -- the next audit we just
25 looked at questions 18 and 22. Those are mistakes too

Page 2266

1  and we can't rely upon them, right?
2      A.  Yes.
3      Q.  Now, in this document, this wasn't the only
4  mistake, was it?
5      A.  In 1996?
6      Q.  Yeah.
7      A.  I don't know what you mean by that. If you
8  don't mind clarifying your question.
9      Q.  Can you turn the page with me please to the
10 inherent risk questionnaire.
11     A.  Oh.
12     Q.  And if you look at Number 18 and you look at
13 Number 22, it says, is more than usual significance
14 likely to be given to the financial statements? And the
15 answer is yes.
16         And the reason is the financial statements
17 are included in the company's private-placement
18 memoranda which are used to sell debentures.
19         And 22 sort of says it again, right? It
20 says, does the entity have plans to raise finance using
21 these financial statements. And the answer is yes.
22         You see that?
23     A.  Yes.
24     Q.  And the reason is that financial statements
25 are included as part of the debenture private-placement

Page 2267

1  memoranda.
2      These mistakes too?
3      A.  It's the same as the mistake you just showed
4  on the first page of the inherent risk questionnaire.
5  It's no different. It's just a continuation of it.
6      Q.  So are these mistakes too?
7      A.  Yes.
8      Q.  And we can't rely upon these important
9  questions 18 and 22 either, right?
10     MS. BITAR: Objection, Your Honor.
11     THE COURT: Overruled.
12     THE WITNESS: I believe I already told you
13 the significance of this in view of the fact that it's
14 already deemed a sensitive client.
15         Just to make this ministerial change would
16 have no impact on the audit. It wouldn't require us to
17 do any additional work. It's the same situation as I
18 explained before to you.
19 BY MR. THOMAS:
20     Q.  Well, you also told me before that these
21 were all important questions.
22         Do you remember that?
23     A.  Yes.
24     Q.  And 18 and 22, they're still important,
25 right?

Page 2268

1    A.  They were important at the time of -- when
2  you're preparing it, but in view of what I've just told
3  you, the fact that the job is already deemed a sensitive
4  job and this would not create any additional work,
5  it's -- although it's important, it doesn't negatively
6  impact the audit.
7    Q.  So far I guess we've seen five different
8  places where BDO wrote down that you knew that the
9  financial statements are included in the company's
10  private-placement memoranda, and no matter what year and
11  no matter what document we see them in, there are always
12  mistakes, right?
13      MS. BITAR:  Objection, Your Honor.
14      THE COURT:  Sustained.
15  BY MR. THOMAS:
16    Q.  There are always mistakes, right?
17      MS. BITAR:  Same objection, Your Honor.
18      THE COURT:  I don't understand the question,
19  Mr. Thomas.
20  BY MR. THOMAS:
21    Q.  The five different places, Mr. Lenner, that
22  we've seen that BDO wrote down in its own documents that
23  it knew that the financial statements were included in
24  the private-placement memoranda to sell debentures, you
25  testified now that all of them are mistakes, right?

Page 2269

1    A.  Yes.
2    Q.  But there's more mistakes, right?
3      MS. BITAR:  Objection, Your Honor.
4      THE COURT:  Overruled.
5      THE WITNESS:  You know, I really don't know
6  what you have in mind, Mr. Thomas.
7  BY MR. THOMAS:
8    Q.  Well, let's go back to the 2005 that's in
9  front of you, Plaintiffs' Exhibit Number 246 -- sorry,
10  the 1995?
11    A.  (Complies.)
12    Q.  And this is more of those important
13  questions that you fill out to plan your audit, right?
14    A.  Yes.
15    Q.  And, in fact, this was the very first audit
16  that you did of this factoring company, right?
17    A.  You're in 1995?  I was in 1996.
18    Q.  Yeah.  246.
19    A.  Yes.
20    Q.  And the first year that you filled out the
21  questionnaire to plan the audit, you couldn't have
22  copied the mistakes over from anywhere else, right?
23      MS. BITAR:  Objection, Your Honor.
24      THE COURT:  Sustained.
25  BY MR. THOMAS:

Page 2270

1    Q.  Well, Mr. Lenner, remember you earlier
2  testified that from the '96 to the '98 it was the same
3  mistake over.
4      You remember that, right?
5    A.  Yes.
6    Q.  And Mr. Lenner, in the first year that you
7  audited the company, you filled out the form, you
8  couldn't copy the mistake from anywhere else, could you?
9    A.  I don't think there's any -- I don't think
10  there's any mistake here.
11    Q.  Well, let's look at Number 22 then.  It
12  says, does the entity have plans to raise finance using
13  these financial statements.  Answer, yes.  Reason,
14  financials are used as part of the debenture private
15  placement.
16      This time is it right?
17    A.  Yes.
18    Q.  And this time you knew in the beginning that
19  the way the company was going to raise money was by
20  selling debentures, right?
21    A.  We knew that in -- after we started the
22  audit it was told to us and we were aware for that year
23  only, and after this year we became aware that they no
24  longer were going to use the financials going forward.
25  Only for this year we were aware, that's correct.

Page 2271

1    Q.  So when you filled out the questionnaire on
2  August 28th, 1996, you knew then that they were going to
3  use your audited financial statements, they were going
4  to attach them to the private-placement memoranda, and
5  they were going to sell debentures, right?
6      MS. BITAR:  Objection, Your Honor.
7  Foundation.
8      THE COURT:  Overruled.
9      THE WITNESS:  We knew that they were going
10  to do that providing that they follow the terms of our
11  engagement letter and gave us the document in sufficient
12  time to review.  We were aware of that in 1995, and
13  after that year it changed.
14  BY MR. THOMAS:
15    Q.  Well, it didn't change according to your own
16  work papers, right, because the next two audits said
17  they were doing the same thing, right?
18    A.  I think we've already answered that
19  question.
20    Q.  You're right.  The answer was that those
21  work papers are mistakes and we can't rely upon them,
22  right?
23    A.  I think I answered that question.
24    Q.  And that's the answer, right?
25    A.  Yes.

Page 2272

1      MR. THOMAS: Your Honor, may I approach the
2  witness?
3          THE COURT: You may.
4          MR. THOMAS: (Complies.)
5  BY MR. THOMAS:
6      Q.   3002. Mr. Lenner, those two volumes,
7  Exhibit 3002, those are your work papers for -- is that
8  going to be the 1996 audit?
9      A.   Yes.
10     Q.   Could you turn with me, please, to BDO
11 04183?
12         MS. BITAR: May I have a minute, Mr. Thomas?
13         MR. THOMAS: Sure.
14         MS. BITAR: Thank you.
15         THE WITNESS: 04183?
16         MR. THOMAS: Yes, sir.
17         MS. BITAR: Can I have the number again?
18         MR. THOMAS: 04183.
19         May I come and help you?
20         THE WITNESS: Yeah.
21         MS. BITAR: Exhibit 3002?
22         MR. THOMAS: Y'all, I'm going to say I think
23 we have the wrong volumes.  What year is this one?
24 That's '95, right?
25         THE WITNESS: No, that's '96.

Page 2273

1          MR. THOMAS: For the year-end '96, right?
2          THE WITNESS: Yes.
3          MR. THOMAS: Y'all are going to have to give
4  me just a minute.  I'm sorry.
5          I'll tell you what, an easier way to do it
6  is just for me to give you the page like I have.
7          May I approach, Your Honor?
8          THE COURT: You may.
9          MR. THOMAS: (Complies.)
10         Y'all put that one up.
11         (Technician complies.)
12 BY MR. THOMAS:
13     Q.   Now, this is a memo from you to Dominick
14 Parlapiano, right?
15     A.   Yes.
16     Q.   And, in fact, since you knew back when that
17 planning memo, all the way back in '96 that they were
18 going to attach your memo, you weren't really surprised
19 when you saw it was attached, right?
20     A.   I was surprised.
21     Q.   Well, even though you knew before and even
22 though you were surprised now, when you found out about
23 it, you didn't tell Mr. Parlapiano, whoa, stop sending
24 that out, did you?
25     A.   I think I did tell him that.

Page 2274

1      Q.   Well, that's not what you told him in this
2  memo, right?
3      A.   I think this other memos that when I wrote
4  to other people in my firm about the situation to get
5  their approval to release the financial statements
6  included in this private placement because
7  Mr. Parlapiano did not follow the terms of our
8  engagement letter when he was suppose to present the
9  financials along with the PPMs, the private placement,
10 so we can make sure the two documents are consistent
11 with one another.  That would be our typical procedure
12 there, and it would go out of the office.
13         And I think there's some other memos you
14 need to show the jury.
15     Q.   Do you think we're misleading the jury,
16 Mr. Lenner?
17     A.   No, I think --
18         MS. BITAR: Objection, Your Honor.
19         THE COURT: Sustained.
20 BY MR. THOMAS:
21     Q.   You think that's what plaintiffs have been
22 doing, misleading the jury?
23         MS. BITAR: Objection, Your Honor.
24         THE COURT: Sustained.
25 BY MR. THOMAS:

Page 2275

1      Q.   Mr. Lenner --
2          MS. BITAR: Your Honor, I'm going to reserve
3  again.
4          THE COURT: Ask a question, please.
5  BY MR. THOMAS:
6      Q.   Mr. Lenner, in fact, when you wrote this
7  memo, what you were doing was approving E.S. Bankest
8  sending out your audited financial statements to all
9  those debenture holders, right?
10     A.   Let me just read it.
11     Q.   Please.
12     A.   (Reading.)  I think we were saying here is
13 we recognize the situation, and the last sentence says
14 that we were not -- we didn't give our formal approval
15 here.  It just says, BDO will read these documents prior
16 to mailing, so there was another step that had to
17 happen.
18         But at this point we were just advising him
19 that we started -- the procedures that we did do -- this
20 is what we found and these are preliminary observations
21 and this is how you got to fix the situation.
22     Q.   Well, let's start reading, in order to
23 correct this omission, we recommend you do the
24 following.  You see that at the end of the first
25 paragraph?

Page 2276

1          And who is the we recommending that you do
2   the following?
3      A.   BDO.
4      Q.   BDO. And BDO recommends that Bankest
5   redistribute the audited financial statements to those
6   investors that participated in the January 1st, 1997,
7   private-placement memoranda. That's what BDO
8   recommended, right?
9      A.   Correct.
10     Q.   So Mr. Lenner, at least for this one, you
11  knew that your audited financial statements were
12  attached to a private-placement memorandum and it was
13  redistributed out, right?
14     A.   Absolutely.
15     Q.   May I approach the witness, Your Honor?
16          THE COURT:  You may.
17          MR. THOMAS:  Thank you. (Complies.)
18  BY MR. THOMAS:
19     Q.   Mr. Lenner, this is another BDO document.
20          MR. THOMAS:  Can you all put it up?
21          (Technician complies.)
22  BY MR. THOMAS:
23     Q.   Now, is this the memo from you to someone
24  else from your firm that you were referencing earlier?
25     A.   Yes, this memo is going to Frank Pearlman.

Page 2277

1   He is a regional technical reviewer, that he would
2   normally review private placements or registration
3   statements.
4      Q.   And in this memo you sent it to
5   Mr. Pearlman, and Mr. Pearlman, he works in Chicago?
6      A.   I believe so. Chicago or New York.
7      Q.   He's not local Miami office, right?
8      A.   That's correct.
9      Q.   He's somebody who works in either Chicago or
10  New York office of BDO, right?
11     A.   At that time that's where he worked.
12     Q.   And Mr. Pearlman, he got your memo and he
13  reviewed all this stuff, right?
14     A.   Yes.
15     Q.   And Mr. Pearlman, the reason you sent it to
16  him was for him to approve it going out in the
17  private-placement memoranda, right?
18     A.   Yes.
19     Q.   The thing BDO recommended E.S. Bankest do,
20  right?
21     A.   For that year, yes.
22     Q.   And the reason you sent it to him is because
23  he had to approve it, right?
24     A.   Yes.
25     Q.   May I approach the witness, Your Honor?

Page 2278

1          THE COURT:  You may.
2          MR. THOMAS:  (Complies.)
3   BY MR. THOMAS:
4      Q.   Now, Mr. Lenner, can we please look at BDO
5   04186. Now, is this the other document you were talking
6   about? We need to be sure and show the jury.
7      A.   Yes.
8      Q.   And this is the document where Mr. Pearlman,
9   he signed off on it, right?
10     A.   Yes.
11     Q.   Meaning it was okay to send out BDO's
12  audited financial statements with the private-placement
13  memoranda to the debenture holders, right?
14     A.   For December 31, 1995.
15     Q.   Well, the first time you did it, he had to
16  approve it, right?
17     A.   He would have to approve it every time there
18  is a filing or private-placement memoranda.
19          MR. THOMAS:  Can we look down at the
20  instructions on the bottom there?
21          (Technician complies.)
22  BY MR. THOMAS:
23     Q.   It says, a prerelease review by the national
24  SEC director is required of SEC filings, private
25  placement, and annual stockholders reports including

Page 2279

1   Form 10 K. This was a private placement, right?
2      A.   Yes.
3      Q.   Together with the review checklist,
4   Form A-21, noting any significant decisions and any
5   supporting memoranda if our report is associated with
6   the client's financial statements for the first time.
7          So he had to approve it for the first time
8   just like he did here, right, Mr. Lenner?
9      A.   No. Let me explain this to you.
10     Q.   I'm sorry. Is this BDO document a mistake
11  too?
12     A.   No.
13          MS. BITAR:  Objection, Your Honor.
14          THE COURT:  Sustained.
15          Let him finish the answer.
16          THE WITNESS:  A first-time filing would go
17  to the SEC director. At his option he will review the
18  first-time filing or he can delegate it to the associate
19  director of accounting and auditing. That was a
20  decision that was made at that time. That's why Frank
21  Pearlman had to review the document.
22          All subsequent years, okay, after the
23  first-time filing do not have to go to the SEC reviewer.
24  They can go to the associate director of accounting and
25  auditing. That's how it works at BDO.

Page 2280

BY MR. THOMAS:
1   BY MR. THOMAS:
2       Q.   Our reported associated financial statements
3   for the first time.  So that means for Mr. Pearlman the
4   kind of things he had to check, then he'd have to check
5   them every single year, right?
6       A.   I would suspect it's a different document
7   every year.
8       Q.   Right.  He couldn't just do it the first
9   time.  If something came up -- else up about the client,
10  he'd have to check that out, right?
11      A.   He would check it.  He would review it every
12  subsequent year.  That's the policy and procedure at
13  BDO.  The first time is only for the SEC director.
14          MR. THOMAS:  Your Honor, I need to approach.
15          THE COURT:  Okay.
16          (Thereupon, there was a side-bar conference
17  outside the presence and hearing of the jury.)
18          MR. THOMAS:  This is a document in evidence
19  because it contains something that violates your order.
20          MS. BITAR:  You're saying it's not in
21  evidence?
22          MR. THOMAS:  It's in evidence about finance
23  condition of the companies.  So I redacted that out like
24  you ordered for Bankest International last time, but I
25  didn't want to do it without showing everyone.

Page 2281

1       So that's the redacted form, and this is
2   unredacted.  And the only thing I've redacted is the
3   stuff that talks about the amount of money.  Everything
4   else in the whole document is the same.
5       It's the last paragraph.  It's that one
6   sentence in the last paragraph.
7           THE COURT:  I'm sorry, I don't understand.
8           MR. THOMAS:  I've redacted the sentence
9   right here about the money.
10          MS. BITAR:  I have to tell you I don't think
11  this is fair and I'll tell you why.  Because part of the
12  issue that goes into client retention is what factors
13  constitute the makeup of the client.  And this is a very
14  short memo.  It doesn't speak to a lot of facts.
15          But one of the facts it notes is that the
16  newly-created entity is going to be held 50 percent
17  owned by this extremely large banking conglomerate.  And
18  that, in fact, was the one reason why when you're going
19  through client retention, this was selected and allowed
20  to be retained.
21          So what you're doing is you're telling --
22  you're giving the jury selective facts, some of the
23  facts and not all of the facts, and I don't think that's
24  accurate.  It was important enough to be listed in that
25  memo.

Page 2282

1           THE COURT:  Anything else you want to say,
2   Mr. Thomas?
3           MR. THOMAS:  I'm not using it for that
4   purpose and I'm not going to ask any question that's
5   going to go to that matter.
6           THE COURT:  What are you going to ask?
7           MR. THOMAS:  I'm going to ask him about the
8   description in this paragraph (indicating).
9           MS. BITAR:  I'm sorry, I can't see.
10          THE COURT:  First paragraph.
11          MR. THOMAS:  I'm going ask him about that
12  description.
13          THE COURT:  What about it?
14          MR. THOMAS:  It's inaccurate.  I'm going to
15  ask him about the accuracy of this paragraph, and then
16  I'm going to ask him if I can go back to the next page.
17          MS. BITAR:  Let me just read it sentence by
18  sentence.  (Reading.)
19          You think that's inaccurate?
20          THE COURT:  I don't know what he's going to
21  ask him.  We'll find out.
22          MS. BITAR:  No, no, but that's what he said.
23          MR. THOMAS:  I'm going to ask him about this
24  sentence and that comment (indicating).
25          MS. BITAR:  (Reading.)

Page 2283

1       On that issue, that's a Phase II question.
2   If we're going to going to get who is management and the
3   responsibilities of management which Mr. Cole -- let me
4   finish -- wanted to get into yesterday and was denied,
5   then that opens the door and I want to make this clear.
6           MR. THOMAS:  That's not what I'm asking him
7   for.  He just testified that Mr. Pearlman rechecked
8   every year and he didn't, and that's why I'm doing this.
9           MS. BITAR:  I'm sorry, I can't hear you.
10          MR. THOMAS:  Mr. Pearlman rechecks it every
11  year.
12          MS. BITAR:  Rechecks what?
13          MR. THOMAS:  Rechecks.
14          MS. BITAR:  Rechecks?
15          Rejects or rechecks?
16          MR. THOMAS:  And this shows it's not true.
17          THE COURT:  Rechecks.
18          MR. THOMAS:  He doesn't require it be
19  rechecked.
20          THE COURT:  Rechecks?
21          MR. THOMAS:  Yes.
22          MS. BITAR:  Rechecks what?  That's not what
23  this is talking about.  This talks about client
24  retention.
25          MR. THOMAS:  You can cross him on it.

Page 2284

1    MS. BITAR: But Mr. --
2    MR. THOMAS: Recross him on it.
3    THE COURT: Let me have it. Go back to your
4  places.
5    MR. THOMAS: I'm going to do it right now.
6    THE COURT: You're not going to do it.
7    (Thereupon, the side-bar conference was
8  concluded.)
9    THE COURT: We're going to take a break. I
10  need it.
11    Go to the restroom. Do whatever you want to
12  do. Do not discuss the case among yourselves in the
13  jury room. Go for it.
14    (Thereupon, the jury was escorted out of the
15  courtroom.)
16    THE COURT: Mr. Lenner, you're not to
17  discuss the testimony you've given or the testimony
18  you're about to give with anyone including your lawyers.
19    I need you to step outside for a second.
20    THE WITNESS: (Complies.)
21    THE COURT: You may want to take this time
22  to go to the restroom.
23    THE WITNESS: I'll wait outside the
24  courtroom.
25    THE COURT: Please.

Page 2285

1    THE WITNESS: (Complies.)
2    THE COURT: All right. I want to hear the
3  questions and answers. I mean, I need the questions. I
4  don't know what the answers are going to be but what you
5  think the answers are going to be.
6    MS. BITAR: Your Honor, may I have the
7  exhibit number so I can look at the document and follow
8  along?
9    THE COURT: 415.
10    MS. BITAR: Exhibit 415? May we have a
11  minute, Your Honor?
12    MR. THOMAS: (Hands her a copy.)
13    MS. BITAR: Thank you.
14    MR. THOMAS: I gave her a copy, Judge.
15    On the second page --
16    THE COURT: I want to go through it again.
17  I want to go through the issue of Bankest.
18    MR. THOMAS: On the first page there's a
19  question asked about whether they need to do background
20  checks and Pearlman says, I assume there's no change in
21  management of the client. If there is we need to do
22  appropriate background checks. If not, I approve your
23  conclusion, meaning that since the business didn't
24  change, right, if you just tell me that, I don't have to
25  do anything. Which is exactly what happened.

Page 2286

1    THE COURT: That's in response to the memo
2  that's attached to that.
3    MR. THOMAS: I'm going have to say that the
4  answer appears to be yes. Right? I mean it's saying, I
5  assume there's no change in management of our client.
6  If there is, we need to do appropriate background
7  checks. If not, I approve your conclusion.
8    THE COURT: And that's the answer next to --
9    MR. THOMAS: And it's above, attached is a
10  client retention memo on Bankest for your review, and
11  that's the statement or question I would say.
12    THE COURT: Who's reading that?
13    MR. THOMAS: Keith Ellenburg. And no change
14  in management is written by Keith too.
15    THE COURT: Okay. I understand.
16    MR. THOMAS: Understand? That's all I'm
17  going to do.
18    MS. BITAR: So I'm understanding what you're
19  saying -- I just want to make sure I'm understanding
20  Mr. Thomas's point.
21    Mr. Thomas, just to make sure I'm
22  understanding, your point now that what you want to ask
23  the witness with respect to this document is the comment
24  on the second page as to, I assume there's no change in
25  management? If there is, we need to do appropriate

Page 2287

1  background checks. If not, I approve your conclusion.
2    MR. THOMAS: My question is no different
3  than what I just told the Judge. I have nothing in
4  addition to that.
5    MS. BITAR: And -- but didn't you say
6  something before at the side bar that you wanted to be
7  able to ask him, meaning the witness, that Mr. Pearlman
8  approved this every year. Something about reviewing the
9  client every year.
10    MR. THOMAS: The Judge asked me not to go
11  back over what I said at side bar.
12    THE COURT: The answer to that is yes.
13    MS. BITAR: That's what I have a problem
14  with.
15    THE COURT: The answer -- what he's
16  trying -- touch with the jury is that he didn't have --
17  he didn't approve it every year because he assumed the
18  management didn't change. I believe that's what it is.
19    MR. THOMAS: He didn't approve it every year
20  because it's the same business and he didn't need to
21  every year.
22    THE COURT: What's -- what -- the question
23  really -- the question really is that last sentence in
24  the memo.
25    MS. BITAR: And I'll get to that but I want

Page 2288

1  to be clear. When you say "it," is it your belief that
2  what this document is speaking to is that
3  Mr. Pearlman -- what you're trying to elicit from the
4  witness is that Mr. Pearlman didn't have to look at PPMs
5  every year because it's the same management?
6          MR. THOMAS: I'm trying to ask questions of
7  the witness. The witness will, I presume, tell me what
8  he thinks is true or not.
9          MS. BITAR: Understood, but first of all,
10 this memo has nothing to do with that question, which I
11 suspect the witness will say. The subject of this memo
12 has nothing to do with Mr. Pearlman's reviews of PPMs.
13 It's a question of making a determination as to client
14 retention.
15         And in connection with that, the next page
16 of the document speaks to the analysis as to whether or
17 not the retention in this year or this entity is proper.
18 And the analysis centers on several facts, one of which
19 is the relationship between Bankest Capital and Espirito
20 Santo Bank prior to the formation of this entity,
21 meaning in the BCC days.
22         And then now you have a 50 percent change of
23 ownership and we are re-evaluating client retention, and
24 then it goes on to discuss about Espirito Santo Bank
25 being a very significant company with assets exceeding X

Page 2289

1  amount of dollars, and it was based on those factors the
2  retention was agreed to. So it has nothing to do with
3  what Mr. Thomas is talking about.
4          THE COURT: I'm going to allow the redacted
5  document. You may -- it's already in evidence. Unless
6  he lays the predicate for relevancy and to that issue,
7  then you can object accordingly.
8          MS. BITAR: When you say "that issue," you
9  mean the issue of client retention?
10         THE COURT: No. The issue of reviewing the
11 PPMs every year. And this may not be relevant to that
12 issue. And I don't know what kind of predicate he's
13 going to lay. But if the witness says it's not -- I
14 don't know what the word is. But he's going to lay a
15 predicate to be relevant to that issue.
16         MS. BITAR: I understand, Your Honor, but
17 again --
18         THE COURT: You cannot allow the jury to be
19 confused.
20         MS. BITAR: I understand that, Your Honor.
21 But again, this document has -- it goes actually to the
22 determination about whether to accept this company,
23 Bankest, as an audit client, and it's involving that but
24 you're saying he has to lay a predicate on --
25         THE COURT: He has to lay a predicate

Page 2290

1  because I'm not going to allow the jury to be misled.
2  So I don't know if Mr. Thomas is listening, but I hope
3  he is.
4          MR. THOMAS: Your Honor, I know what you're
5  saying; I know what to do.
6          MS. BITAR: Your Honor, just understanding
7  that that may open the up the door. If the --
8          THE COURT: That's Mr. Thomas's risk. I
9  don't know where he's going with it, and I don't know if
10 the door is going to be opened, if the door is open, how
11 far. I don't know. We'll find out.
12         MS. BITAR: Your Honor, before we take a
13 break --
14         THE COURT: You want the motion for
15 mistrial?
16         MS. BITAR: I do, Your Honor.
17         You want to take a break first?
18         THE COURT: No. Go ahead.
19         MS. BITAR: Your Honor, it's not so much the
20 motion for mistrial. I reserved on that, but going
21 forward I want to be clear.
22         It's totally inappropriate to ask questions
23 of this witness who is sitting here and hearing certain
24 facts and hearing things and asking loaded questions
25 which implies he's getting that information from his

Page 2291

1  lawyer.
2          THE COURT: I don't disagree with you except
3  that Mr. Lenner and I only allowed -- I sustained a lot
4  of those objections.
5          Mr. Lenner himself brought it to the
6  attention of the jury. And he testified based on what
7  he was hearing from the witnesses. That is
8  inappropriate for the lawyers, and I sustained all those
9  objections.
10         MS. BITAR: That was a question, Judge.
11         THE COURT: I allowed some and I didn't
12 allow the others. But once I allowed it, I didn't think
13 they were improper questions. So that is -- I
14 understand your objection, and I'm only going to allow
15 certain things under the evidence code.
16         MS. BITAR: Your Honor, I would ask that
17 Mr. Thomas be admonished not to ask questions about what
18 the witness learned from his lawyers. It's totally
19 inappropriate. And it was asked -- it was his question
20 and it was asked several times, and the witness is being
21 put in a position --
22         THE COURT: I think we're past that point.
23         MS. BITAR: And, Your Honor, I have one
24 other objection and it's a standing objection. I think
25 it's also highly improper, and Mr. Thomas has done it

Page 2292

1    over and over again to marshal the testimony of other
2    witnesses and say, you know this. You know this, right?
3    You were sitting here. You heard it. You know this.
4    And that's not appropriate questions.
5            He can ask the witness what the witness has
6    personal knowledge from. He can ask the witness if a
7    piece of information refreshes his recollection. But he
8    cannot marshal the testimony of other people in a way
9    that's beneficial to him and then suggest that the
10   witness has actual or personal knowledge about something
11   he heard in this proceeding.
12           THE COURT: I don't think it's inappropriate
13   if he is part of the action, he is sitting in court, he
14   is listening to the testimony. That's the whole point
15   about the rule does not apply to him or to Mr. Espirito
16   Santo.
17           That's the point of the rule. They are
18   allowed to listen to the testimony and they can at
19   certain times be asked about testimony that has been
20   given since they are sitting here, and they have the
21   advantage of being privy to what the witnesses are going
22   to say. But depending on the question and depending on
23   the objection, I will rule accordingly.
24           What I don't want you to do, Mr. Thomas, is
25   rehash every single -- prefix the questions with

Page 2293

1    testimony. Maybe not in that particular way, but
2    certainly the jury already knows what testimony has been
3    given in other areas. If you're going to ask a
4    question, then you need to prefix it with what we
5    already heard because that's unfair prejudice.
6            MS. BITAR: Your Honor, the question as
7    phrased in this context, we heard Mr. -- let's say --
8    Rivera give testimony about what happened. Not marshal
9    the testimony. That's my problem. If he's asking the
10   witness questions, that's one thing. If he's
11   marshaling --
12           THE COURT: And that's where I'm leading to.
13   Certainly the witness can handle himself. He's already
14   done it once. I'm sure he can do it again.
15           I'm done.
16           (Thereupon, a brief recess was taken.)
17           THE COURT: All right. Go get them.
18           THE CLERK: (Complies).
19           All rise for the jury.
20           (Thereupon, the jury was brought into the
21   courtroom.)
22           THE COURT: All right. You may be seated.
23   Mr. Thomas, you may proceed with your direct.
24           MR. THOMAS: Thanks, Your Honor.
25   BY MR. THOMAS:

Page 2294

1        Q.   Mr. Lenner, you were the alliance liaison
2    partner in charge of the relationship between BDO and
3    StrataSys, right?
4        A.   Yes.
5        Q.   And as the partner in charge of the
6    relationship between BDO and StrataSys, you had certain
7    obligations, right?
8        A.   Yes.
9        Q.   And you were the single point of contact I
10   think between BDO and StrataSys, right?
11       A.   Yes.
12       Q.   And you were the alliance firm liaison for
13   the entire time of the relationship between StrataSys
14   and BDO, right?
15       A.   Yes.
16       Q.   And you first tried to get there to be a
17   business relationship between StrataSys and BDO in 1999,
18   right?
19       A.   Yes.
20       Q.   And that was the same year that you did the
21   first audit of E.S. Bankest, right?
22       A.   Yes.
23       Q.   And the way that you were able to try to
24   have a business relationship between StrataSys and BDO
25   was that you had a relationship with Dominick

Page 2295

1    Parlapiano, right?
2        A.   Yes.
3        Q.   Because Dominick Parlapiano, he was also
4    both at E.S. Bankest and at StrataSys, right?
5        A.   He was a member of the board of managers at
6    StrataSys and he worked at Bankest. That's correct.
7        Q.   And when you say member of the board of
8    managers, you viewed that like a board of directors,
9    right?
10       A.   Yes.
11       Q.   And your understanding was that he was on
12   the board at StrataSys, right?
13       A.   Yes.
14       Q.   And you understood that he was an officer
15   and on the board of E.S. Bankest, right?
16       A.   While I knew he was an officer, I did not
17   have any personal knowledge that was on the board at
18   Bankest.
19       Q.   At E.S. Bankest?
20       A.   At E.S. Bankest, correct. Wait. I think he
21   was. I think he was.
22       Q.   And you also knew that Mr. Parlapiano was an
23   officer at Bankest Capital, right?
24       A.   Yes.
25       Q.   And, in fact, the primary point of contact

Page 2296

1  for you as the auditor of E.S. Bankest was
2  Mr. Parlapiano, right?
3      A.   Mr. Parlapiano along with other people there
4  like Mr. Mendez, that dealt with other people that
5  worked at BDO, correct.
6      Q.   And -- well, one of your contacts was
7  Mr. Mendez?
8      A.   Not -- I didn't have a -- somewhat I dealt
9  with him.
10     Q.   Let me rephrase it a different way.
11     A.   Sure.
12     Q.   BDO's primary contacts for the audits were
13  Parlapiano and Mendez, right?
14     A.   Yes.
15     Q.   And the person of those two who you dealt
16  with most of the time was Mr. Parlapiano?
17     A.   Yes.
18     Q.   And in doing the audits, you knew that
19  Mr. Parlapiano was an officer helping to run the
20  business of E.S. Bankest?
21     A.   Yes.
22     Q.   And you knew that he was also at Bankest
23  Capital?
24     A.   Yes.
25     Q.   And you knew that the majority of Bankest

Page 2297

1  business flowed through Capital, right?
2      A.   Yes.
3      Q.   And Mr. Lenner, when you first tried to have
4  a business relationship between BDO and StrataSys in
5  1999, it didn't work at first, right?
6      A.   Yes.
7      Q.   But eventually you were able to have a
8  business relationship with StrataSys -- I mean you being
9  BDO?
10     A.   That's correct.
11     Q.   And that took a lot of negotiation, right?
12     A.   Yes.
13     Q.   And you participated in those negotiations,
14  right?
15     A.   I participated not in the day-to-day
16  negotiations but a couple of times I participated in the
17  negotiations by phone.
18     Q.   Well, Mr. Lenner, you were very much
19  involved in reaching an agreement with StrataSys to form
20  the alliance, right?
21     A.   I was part of that process but the most
22  important person was David Larson who was able to
23  effectuate them joining the BDO alliance.
24     Q.   Mr. Lenner, you were very much involved in
25  reaching an agreement with StrataSys to form the

Page 2298

1  alliance, right?
2      A.   Yes, I was involved.
3      Q.   Yes, you were very much involved, right?
4          MS. BITAR:  Objection, Your Honor.
5          THE COURT:  Overruled.
6          THE WITNESS:  I had a couple instances where
7  I was involved, yes.  That's correct.
8  BY MR. THOMAS:
9      Q.   Yes?
10     A.   Yes.
11     Q.   Mr. Lenner, you do recall giving a
12  deposition in this case, right?
13     A.   Yes.
14     Q.   And do you recall me asking you questions
15  and you giving answers?
16     A.   Yes.
17     Q.   And you recall that you gave an oath to tell
18  the truth just like an oath today to this jury, right?
19     A.   Yes.
20         MR. THOMAS:  Your Honor, from the
21  deposition.
22         THE COURT:  Page and line?
23         MR. THOMAS:  Yes.  Page 196, line 2 to line
24  15.
25         MS. BITAR:  1 through what, 16?

Page 2299

1          MR. THOMAS:  15.
2          MS. BITAR:  One moment, Your Honor.
3          MS. BITAR:  No objection, Judge.
4          MR. THOMAS:  May I proceed, Your Honor?
5          THE COURT:  You may.
6          (Thereupon, the video was played in open
7  court.)
8  BY MR. THOMAS:
9      Q.   Well, we know from an earlier document that
10  the eight months leading up to the agreement that you
11  were -- what's the word -- very much involved in
12  reaching an agreement with StrataSys to form the
13  alliance, right?
14     A.   Okay, no.  I wasn't -- no.
15     Q.   Exhibit 3.  Because Sandy Lenner identified,
16  championed, and helped negotiate the alliance agreement
17  with StrataSys, Sandy is the logical choice and will be
18  alliance firm liaison.  Now, does that refresh your
19  recollection?
20     A.   Yes.
21         (Thereupon, the video was stopped playing.)
22  BY MR. THOMAS:
23     Q.   Now, Mr. Lenner, what we looked at then was
24  Exhibit 440 and with His Honor's permission I'll
25  approach you with it.

Page 2300

1     And Mr. Lenner, although when you were first
2 asked under oath about your involvement you said no,
3 after you saw the BDO document, you corrected yourself,
4 right?
5     A.   It refreshed my recollection.
6     Q.   And the BDO document we're looking at now
7 and that we looked at then was dated September 10th,
8 2001. It's Plaintiff's Exhibit 440?
9     A.   Yes, I have it.
10    Q.   And this is a memo from Dave Larson to
11 Richard Kron, Ed Godoy and to yourself, right?
12    A.   Yes.
13    Q.   And they both work for BDO, too, right?
14    A.   Yes.
15    Q.   And Mr. Lenner, this is sort of a memo that
16 Mr. Larson wrote to describe, one of the things was that
17 your responsibilities were as alliance firm liaison,
18 right?
19    A.   Yes.
20    Q.   So if we look down there under alliance firm
21 liaison, can you all go down to that?
22        (Technician complies.)
23        There it talks about, "The alliance firm
24 liaison is the single point of contact for information
25 on the alliance firm and for the alliance firm to obtain

Page 2301

1 information on BDO. The individual is responsible for
2 maintaining the local information base on the alliance
3 firm and assisting the technology alliance program
4 management team in managing the relationship with the
5 alliance firm." You see that?
6     A.   Yes.
7     Q.   And you understood that was part of your
8 job?
9     A.   Yes.
10    Q.   And then when BDO was deciding who was going
11 to fulfill this job, down at the bottom BDO wrote -- can
12 you all go down to where it says because?
13        (Technician complies.)
14        "Because Sandy Lenner identified, championed
15 and helped negotiate the alliance agreement with
16 StrataSys, Sandy is the logical choice and will be
17 alliance firm liaison. Sandy has developed many
18 relationships at StrataSys over the eight months we
19 worked on bringing StrataSys into the alliance program."
20        And that statement was true when BDO wrote
21 it, right?
22    A.   Yes.
23    Q.   And you understood at this time that BDO
24 believed that your relationship with the StrataSys folks
25 couldn't be replaced, right?

Page 2302

1     A.   Yes.
2     Q.   And with His Honor's permission I'll
3 approach you with Plaintiffs' Exhibit Number 439 in
4 evidence.
5        THE COURT:  You may.
6        MR. THOMAS:  Thank you, Your Honor.
7        (Complies.)
8        THE WITNESS:  Thank you.
9 BY MR. THOMAS:
10    Q.   And Mr. Lenner, this is another BDO memo?
11    A.   Yes.
12    Q.   And Mr. Lenner, this is from Dave Larson,
13 another guy at BDO responsible for alliance to James
14 Hannon, right?
15    A.   Yes.
16    Q.   And in the background and relationship there
17 it describes how you were the one that introduced BDO
18 Miami to StrataSys, right?
19    A.   Yes.
20    Q.   And it talks about how you first tried to
21 make the introduction over two years ago. That's what
22 we talked about before in 1999, right?
23    A.   Yes.
24    Q.   And then in describing how this came about,
25 Mr. Larson writes that "Sandy and I first wrote about

Page 2303

1 Dominick Parlapiano, a StrataSys director on January
2 8th, 2001 to explore the potential for a continuing and
3 mutually beneficial business relationship." It says,
4 "Following our initial conversation, Sandy and I
5 presented BDO and the alliance concept to the StrataSys
6 management team and arranged an introductory meeting
7 between -- with the BDO partners."  It says,
8        That happened, right?
9     A.   Yes.
10    Q.   And then it says, "Over the next four
11 months, Sandy and I had numerous conversations with
12 StrataSys about the alliance program. And on May 24th,
13 Mike O'Hare, Sandy Lenner and I met with Dominick
14 Parlapiano and Howard Cantor to discuss the terms of the
15 alliance agreement."
16        And that stuff happened too, right?
17    A.   Yes. Except the first sentence, "Over the
18 next four months Sandy and I had numerous conversations
19 with StrataSys," I had a couple. Dave Larson, who is
20 the national business line leader for IT alliances, he
21 had the majority of the conversations.
22    Q.   So what you think is what he meant when he
23 wrote Sandy and I had numerous conversations, what he
24 meant was that together you had numerous but he had a
25 whole bunch and you had a couple?

Page 2304

1   A.   Yes.
2   Q.   And it goes on to talk about Mike O'Hare.
3   Now, Mike O'Hare, he's a senior person at BDO?
4   A.   Yes.
5   Q.   He's not somebody from the local Miami
6   office?
7   A.   No.
8   Q.   He reports directly to the CEO, right?
9   A.   At that time, yes.
10   Q.   And he says Mike -- and you understand that
11   to mean Mr. O'Hare, the guy that reports to the CEO, the
12   beginning of that next sentence?
13   A.   Yes.
14   Q.   "Mike was very helpful in helping StrataSys
15   understand the rationale for many of the contract
16   terms," right?  You think that happened too, right?
17   A.   Yes.
18   Q.   Mr. Lenner, the StrataSys alliance, that was
19   important to you, right?
20   A.   Yes.
21   Q.   And it was something that you had very high
22   expectations about, right?
23   A.   Yes.
24   Q.   And it's something that you wanted people to
25   know that you were involved in, right?

Page 2305

1   A.   That along with other things which I had
2   accomplished during the year, sure.
3   Q.   Are you referring to the memo you wrote to
4   the CEO?
5   MS. BITAR:   Objection, Your Honor.
6   THE WITNESS:   Yes.
7   THE COURT:   Overruled.
8   BY MR. THOMAS:
9   Q.   With Your Honor's permission I'm going to
10   approach the witness with Plaintiffs' Exhibit 415-B in
11   evidence.
12   Mr. Lenner, that's the memo you were just
13   talking about?
14   A.   Yes.
15   Q.   And Mr. Lenner, you wrote this memo to the
16   CEO and to the compensation committee to try to
17   encourage them to pay as much as possible, right?
18   A.   No.  The purpose of this memo was for them
19   to get a listing of my accomplishments and to give me or
20   for them to consider them giving me a bonus.  It wasn't
21   my overall compensation.  It was just part of my
22   compensation.
23   Q.   So you wrote this memo to the CEO and the
24   compensation committee to try to encourage them to give
25   you a bonus; is that right?

Page 2306

1   A.   Yes.
2   Q.   And it's called the good guy/good gal memo
3   driving earnings, right?
4   A.   Yes.
5   Q.   And this was a memo that BDO partners filled
6   out for the CEO and for the compensation committee to
7   sort of ask them to give you a bonus?
8   A.   Yes.
9   Q.   And if -- can you expand this page just a
10   little bit?
11   (Technician complies.)
12   And what you wrote there on the first page
13   was about StrataSys, right?
14   A.   Yes.
15   Q.   And that's under alternative distribution
16   support -- see that?
17   A.   Yes.
18   Q.   And then it has alliances there, right?
19   A.   Yes.
20   Q.   And under alliances you wrote information
21   technology alliance or was that already on the form?
22   A.   I don't recall if it was prepopulated with
23   that.  It may have been.  I may have put it in.  I just
24   don't remember.
25   Q.   You don't know whether that line was on the

Page 2307

1   form that BDO wanted to know what everybody was doing in
2   the alliance or whether you wrote information technology
3   alliance; am I getting that right?
4   A.   I'm not sure if the alliances was there.  It
5   may have been.  I certainly wrote in information
6   technology alliance.
7   Q.   I see.  So the first one, alliances colon,
8   may have been on the form for BDO or you may have typed
9   it but the next one, information technology alliance,
10   you typed that?
11   A.   Probably, yeah.
12   Q.   And when you wrote under there, "Dave Larson
13   and I recently closed an IT alliance firm transaction
14   with StrataSys, Inc.  It's an 88 person IT firm located
15   in close proximity to the Miami office.  This
16   transaction took seven months to close.  I have very
17   high expectations for the Miami office and the firm as a
18   result of this alliance."  You typed those words, right?
19   A.   Yes.
20   Q.   And when you were writing this memo to your
21   CEO about what bonus you should get, you wanted to be as
22   accurate as you could, right?
23   A.   Yes.
24   Q.   And you were trying to be accurate when you
25   typed this whole memo, right?