Page 2308

1    A.  Yes.
2    Q.  You weren't embellishing anything when you
3  were writing this memo, were you?
4    A.  Not intentionally.
5    Q.  You were doing your very best to put down
6  what was actually true, right?
7    A.  Yes.
8    Q.  And when you said you had very high
9  expectations for the Miami office and the firm as a
10  result of this alliance, you meant that StrataSys
11  wouldn't just help the Miami office.  They could help
12  BDO as a whole, right?
13    A.  No.  I think what I meant was at that time
14  if the Miami office benefits the firm benefits.  We were
15  one firm.
16    Q.  So your high expectations were for the Miami
17  office and because the Miami office would benefit, the
18  whole firm would benefit.  That's what you understand it
19  to mean?
20    A.  Yes.
21    Q.  And if you look at the next page, this
22  wasn't the only alliance that you were excited about,
23  right?
24    A.  Yes.
25    Q.  And if we look down to factoring alliance,

Page 2309

1  do you see that?  It says factoring alliance.  Now, do
2  you think that was on the BDO form or is that something
3  you put in?
4    A.  I believe that's something I put in.
5    Q.  And then underneath that it says, "Michael
6  O'Hare and I met in July 2001 with the principals of one
7  of my factor clients to provide factoring services to
8  BDO's clients and the alliance member firms' clients."
9    This is the first -- first of all, Michael
10  O'Hare, that's the guy that reports to the CEO, right?
11    A.  Yes.
12    Q.  And you're referring here to Bankest, right?
13    A.  Yes.
14    Q.  I mean, that's your factoring client you're
15  talking about, right?
16    A.  Yes.
17    Q.  And what you're writing here to the CEO and
18  the compensation committee is that BDO -- or at least
19  you and Mr. O'Hare -- are thinking about forming an
20  alliance with your own factoring client, right?
21    MS. BITAR:  Objection, Your Honor.
22    THE COURT:  Overruled.
23    THE WITNESS:  That was a -- that was part of
24  the concept there.  It was a very preliminary concept.
25  BY MR. THOMAS:

Page 2310

1    Q.  Well, it was preliminary as you say but what
2  you wrote to your CEO is that both BDO and my client are
3  very excited about the potential and are working out the
4  economics of the transaction.  Now, that was true when
5  you wrote it, right?
6    A.  Yes.
7    MR. THOMAS:  Your Honor, may I approach?
8    THE COURT:  You may.
9  BY MR. THOMAS:
10    Q.  I approach with Plaintiffs' Exhibit 471 in
11  evidence.
12    (Technician complies.)
13    Now, if we look at this memo from
14  Mr. Parlapiano to the other gentleman at E.S. Bankest
15  and Bankest Capital, the re:  line reads "5-23-01
16  meeting with BDO Seidman."  Did I get that right?
17    A.  Yes.
18    Q.  And what it says is, " Yesterday I attended
19  a meeting at BDO's (Sandy Lenner's) office.  In
20  attendance were Sandy, Dave Larson of BDO's Star Wagon,
21  their technology company, and Michael O'Hare."  You see
22  that?
23    A.  Yes.
24    Q.  And you understand that to be accurate,
25  right?

Page 2311

1    A.  Yes.
2    Q.  Now, the next sentence reads, "Mr. O'Hare
3  sits on the board of the parent company of BDO and he's
4  an executive director and he is the highest ranking
5  corporate officer related to nonaccounting BDO companies
6  such as Star Wagon."
7    Now, do you know if that sentence beginning
8  he is executive director, do you know that's -- he was
9  an executive director at the time?
10    A.  I subsequently learned that he was the
11  executive director at that time.  That is accurate.
12    Q.  And it says -- the next sentence -- "The
13  meeting was held to finally negotiate the final terms of
14  the StrataSys BDO Star Wagon alliance agreement (draft
15  attached).  StrataSys was represented by its president,
16  Howard Cantor, and I as director.  I've been working
17  with Sandy and Larson to achieve an acceptable alliance
18  agreement.  We reached final agreement yesterday and are
19  shooting for an executed agreement by 5-31-01."
20    And you understand that to be generally
21  accurate, right?
22    And then --
23    A.  Yes.
24    Q.  And then the next sentence reads, "BDO
25  estimates it will originate more than 10 million in

Page 2312

1  business to the StrataSys BDO Star Wagon alliance over
2  the next 12 months," and you understand that to be
3  accurate too, right?
4      A.  No.
5      Q.  Mr. Lenner, how much of the business that
6  was generated by StrataSys was BDO going to get?
7          MS. BITAR:  I'm sorry?
8  BY MR. THOMAS:
9      Q.  How much of the business generated by
10  StrataSys was BDO going to get pursuant to your
11  agreement with them?
12      A.  I thought there was an objection pending.
13          THE COURT:  I didn't hear any.
14          MS. BITAR:  I stood up, Your Honor.
15          THE WITNESS:  I'm sorry.
16          MR. THOMAS:  No, that's okay.
17          THE COURT:  Read it back.
18          (Thereupon, the court reporter read back the .
19  requested portion.)
20          THE WITNESS:  I would expect most of the
21  business would come to BDO Miami.
22  BY MR. THOMAS:
23      Q.  And pursuant to that agreement, BDO would
24  make 20 percent on the referrals, do you remember that?
25      A.  Yes.

Page 2313

1      Q.  So if there was 10 million dollars in
2  business, BDO would make 2 million, right, because 20
3  percent of 10 million is 2 million?
4      A.  That's mathematically accurate.  Like I said
5  a moment ago, I don't know where this 10 million dollars
6  came from.  The first I ever saw this was when I looked
7  at this memo.
8      Q.  So if you were supposed to get 20 percent of
9  the 10 million, that would be 2 million, right?
10      A.  Assuming this 10 million --
11          MS. BITAR:  Objection, Your Honor.
12          THE COURT:  What's your objection?
13          MS. BITAR:  I said it mischaracterizes the
14  document and the testimony.
15          THE COURT:  Overruled.
16          THE WITNESS:  So assuming the facts in your
17  hypothetical, the answer is yes.
18  BY MR. THOMAS:
19      Q.  Now, in addition to discussing the StrataSys
20  alliance, this document discusses the factoring alliance
21  too, right?
22      A.  Yes.
23      Q.  And if we -- can we kind of scan down there
24  a little bit?
25          (Technician complies.)

Page 2314

1          It says, "Separately, Sandy asked Mr. O'Hare
2  to mention his efforts related to establishing a BDO
3  finance company.  Given BDO's insight into the now
4  difficult and getting tougher by the day cash flow
5  environment of small and mid-size companies, BDO sees an
6  opportunity to provide cash flow financing services to
7  its clients, and that of companies who are members of
8  the BDO alliances."
9          Now, that's generally accurate, too?
10          MS. BITAR:  Your Honor, I'm going to object.
11  This is improper refreshment and compound.
12          THE COURT:  Overruled.  Why don't you ask it
13  again?
14  BY MR. THOMAS:
15      Q.  I just read that paragraph beginning
16  separately and I asked that's generally accurate too,
17  right?
18      A.  I recall this meeting occurring.  I don't
19  recall specifically all these topics here but that's
20  generally -- that was the topic discussed.
21      Q.  And then the next paragraph reads,
22  "Mr. O'Hare was clear in that BDO does not intend to
23  take principal risk (credit, client, risk, et cetera)
24  and it will not use its own balance sheet to access what
25  Mr. O'Hare stated to be about 200 million a year in

Page 2315

1  accounts receivable-based cash flow lending which BDO's
2  finance company partner would fund."  And that's
3  generally accurate, too, isn't it?
4          MS. BITAR:  Same objection, Your Honor.
5          THE COURT:  Overruled.
6          MS. BITAR:  And hearsay.
7          THE COURT:  Overruled.
8          THE WITNESS:  No.  As I just said a few
9  minutes ago, I don't recall all the contents, all the
10  subject matter of this meeting, and I don't recall -- I
11  don't know where that 200 million dollar number came
12  from.
13      Q.  As I understand your testimony, Mr. Lenner,
14  you can recall the general subject matter of the
15  meeting, but you can't recall all the specifics; is that
16  right?
17      A.  That's correct.
18      Q.  So you can't recall for sure whether or not
19  this number was discussed or not, right?
20      A.  Well, I think if this number was discussed,
21  I'd remember 200 million dollars.  It's a big number.  I
22  just don't remember if it's something that happened six
23  years ago.
24      Q.  So you think you would remember it but as
25  you sit here now, you can't remember it so -- I'm sorry,

Page 2316

1  I'm not sure I understand.
2      A.   I don't recall this number being discussed
3  at the meeting. I don't remember.
4      Q.   Well, if we look on, the memo goes on to
5  describe the meeting that, "Simply put, BDO wants to
6  sell service cash flow financing and earn a point or so
7  as originator broker again without taking money risks."
8  You see that?
9      A.   Yes.
10     Q.   And you remember generally being talked
11 about the finance company, but can you recall that
12 specific?
13     A.   No.
14     Q.   Let's look at the next page.
15         (Technician complies.)
16         It says, "Obviously, Sandy had previewed
17 E.S. Bankest with Mr. O'Hare." And it says, "I
18 expressed an interest in having Sandy and Mr. O'Hare
19 visit with us here at Bankest to further discuss the
20 possibility of BDO finance. Originating the business
21 from a plus or minus one point and E.S. Bankest, 1)
22 owning the client directly, (i.e., each acceptable BDO
23 client would become an E.S. Bankest client) and 2)
24 therefore, all business would be subject to our
25 inquiring, and 3) E.S. Bankest could service and fund

Page 2317

1  advances (cash flow financing) without recourse to BDO
2  and with recourse to clients directly." Do you see
3  that?
4      A.   Yes, I see that.
5      Q.   Now, when we look at the top, "I have
6  expressed an interest in having Sandy and Mr. O'Hare
7  visit us here to further discuss the possibility," you
8  remember that part?
9         MS. BITAR:  It's hearsay and it's asking the
10 witness what someone else is commenting on --
11        MR. THOMAS:  Objection, speaking objection.
12        THE COURT:  Overruled.
13        THE WITNESS:  I don't remember the
14 particulars in this paragraph.
15 BY MR. THOMAS:
16     Q.   All right. So you can't remember whether
17 Dominick asked you guys to come later on or not?
18     A.   That's correct.
19     Q.   The next -- Dominick then says, "I was of
20 the impression that Mr. O'Hare was very interested in
21 discussing this further with us. My impression was
22 confirmed this morning by Sandy who related that
23 Mr. O'Hare wants to visit with E.S. Bankest sometime in
24 the second half of June (he'll call me to arrange) to
25 further discuss this opportunity." Do you see that?

Page 2318

1      A.   Yes.
2      Q.   Do you remember that conversation with
3  Mr. Parlapiano?
4      A.   No.
5      Q.   Can we look back at your good guy memo? Can
6  y'all put that up? Give us just a moment.
7         (Technician complies.)
8         Now, you remember that the meeting that --
9  that other memo we looked at was in May. Mr. Parlapiano's
10 meeting he talked about is in May. That's the one where
11 you were talking about StrataSys?
12     A.   Which memo is that? That's this one?
13        MR. THOMAS:  May I approach, Your Honor?
14        THE COURT:  You may.
15 BY MR. THOMAS:
16     Q.   The one, Plaintiffs' Exhibit Number 471,
17 Mr. Parlapiano is talking about a meeting with BDO and
18 then -- I'm sorry, would you hand me that right there?
19     A.   (Complies).
20     Q.   Thank you. And then Mr. Larson's memo also
21 talks about the May meeting. You see this?
22     A.   Yes.
23     Q.   These two exhibits we're talking about.
24        MS. BITAR:  Objection, Your Honor.
25        MR. THOMAS:  Your Honor, I'm showing to the

Page 2319

1  jury what we don't have up on the screen with your
2  permission.
3         THE COURT:  Overruled.
4  BY MR. THOMAS:
5      Q.   So there was the May meeting, and then
6  Mr. Parlapiano represents in his memo, "My impression
7  was confirmed this morning by Sandy who related that
8  Mr. O'Hare wants to visit with E.S. Bankest sometime in
9  the second half of June (he'll call me to arrange) to
10 further discuss this opportunity."
11        And then what you wrote to your CEO you
12 wrote that you and Michael O'Hare met in July with the
13 principals of my factoring clients. Do you see that?
14     A.   Right. July -- what happened is -- what I
15 think happened is when I was drafting this, I meant to
16 put May. Because that's when it happened and I had this
17 July 27th memo in front of you. It must have been a
18 blind copy to me. That's what I think happened because
19 there weren't two meetings. There was only one.
20     Q.   So as you sit here today you think that when
21 you wrote to your CEO that you had a second meeting with
22 Mr. O'Hare in July that that was a mistake, the date was
23 a mistake?
24        MS. BITAR:  Objection, Your Honor.
25        THE COURT:  Overruled.

Page 2320

1    THE WITNESS: I didn't say I had a second
2 meeting in July in that blowup up there. It doesn't say
3 that.
4 BY MR. THOMAS:
5    Q.  Mr. Lenner, can you please -- may I
6 approach, Your Honor?
7    THE COURT: You may.
8    MR. THOMAS: (Complies).
9 BY MR. THOMAS:
10    Q.  This one right here, 439, is that the one
11 you were talking about?
12    A.  This is the July memo.
13    Q.  Okay. So --
14    A.  Which is not from me.
15    Q.  So the July -- Plaintiffs' Exhibit 439 which
16 is a memo from Dave Larson to James Hannon, dated July
17 27th, 2001 and your testimony is that even though you're
18 not on this memo you think you had this memo in front of
19 you when you wrote your memo to the CEO so you wrote
20 July when you meant to write May; is that right?
21    A.  That's what may have happened.
22    Q.  And even though you're not on that memo, you
23 think you had it in front of you at the time, you think
24 maybe you were a blind copy on it?
25    A.  Yeah.

Page 2321

1    Q.  Why would another BDO person blind copy you?
2 What would be the reason to keep it secret they were
3 sending you that memo?
4    MS. BITAR: Objection, Your Honor.
5    THE COURT: Sustained. Ask him one
6 question.
7 BY MR. THOMAS:
8    Q.  In any event, Mr. Lenner, you think when you
9 wrote to the CEO that Michael O'Hare met in 2001 that
10 July is not right?
11    A.  Correct. It's May.
12    Q.  So when Mr. Parlapiano writes that there
13 was -- that he confirmed with Sandy that Mr. O'Hare
14 wants to visit with us the second half of June for a
15 second meeting, you don't think that happened?
16    A.  Correct.
17    Q.  Can we go back, please, to Plaintiffs'
18 Exhibit Number 471 in evidence? And can we take the box
19 off, please.
20    (Technician complies.)
21    If we look down a little further,
22 Mr. Parlapiano writes, "I explained that if E.S. Bankest
23 compensates BDO that the required disclosure, let alone
24 the possible need to replace BDO as our auditor due to
25 the conflict, were deal killers for us."

Page 2322

1    And then it says, "Sandy responded that he
2 thought the separation of BDO as broker from E.S.
3 Bankest as banker or funder was an excellent one." And
4 then it goes on to describe a similar arrangement.
5    At this time, Mr. Lenner, did you understand
6 that going into business with your own audit client
7 would be a conflict?
8    A.  Yes. But we would not -- if this happened,
9 and then the relationship would be terminated because --
10    Q.  I'm sorry, go ahead.
11    A.  That would be it. The audit relationship
12 would be terminated.
13    Q.  And did you write that to your CEO when you
14 told him that you were excited about the factoring
15 alliance, that that might mean you would terminate your
16 audit relationship?
17    A.  No.
18    Q.  And Mr. Lenner, in fact, ultimately you
19 didn't go into business with your audit client, right?
20    A.  Excuse me?
21    Q.  Ultimately you did not go into business with
22 your audit client? You didn't do this factoring
23 alliance with Bankest, correct?
24    A.  Correct. That's correct.
25    Q.  You didn't do it, right?

Page 2323

1    A.  That's correct.
2    Q.  And you understood that for them, this idea
3 that you were going to terminate them as an audit
4 client, that that was a deal killer because they
5 couldn't lose you as their auditors, right?
6    MS. BITAR: Objection, Your Honor.
7    THE COURT: Overruled.
8    THE WITNESS: At the time I don't know what
9 was in their mind, whether they could lose us or not.
10 The fact is that if we did enter an arrangement we would
11 terminate our relationship with Bankest.
12 BY MR. THOMAS:
13    Q.  And they understood that?
14    MS. BITAR: Objection, Your Honor.
15    THE COURT: Overruled.
16    THE WITNESS: Well, based on what I'm
17 reading here, they understood that.
18 BY MR. THOMAS:
19    Q.  Let's go back to 415-B in evidence.
20    (Technician complies.)
21    Mr. Lenner, it's true that BDO Seidman for
22 these alliance programs like StrataSys made millions and
23 millions of dollars every year, right?
24    MS. BITAR: Objection, Your Honor.
25    THE COURT: Overruled.

Page 2324

1           THE WITNESS:  Yes.
2    BY MR. THOMAS:
3        Q.   Can we please turn to the next page?  I
4    think it's actually the last page.  I'm sorry, page 3.
5           (Technician complies.)
6           Now if we look at Number 4, Mr. Lenner, this
7    talks about change leadership.  "Individuals
8    demonstrated commitment to change leadership, i.e.,
9    moving the cheese."  You see that?
10       A.   Yes.
11       Q.   And underneath that you wrote,
12   "Notwithstanding the importance of my core assurance
13   practice, I truly believe in ADC."  That's the beginning
14   of the sentence.  You see that?
15       A.   Yes.
16       Q.   And your core assurance practice, that was
17   the audits you were doing like for E.S. Bankest, right?
18       A.   Yes.
19       Q.   And ADC is Alternative Distribution Channel,
20   right?
21       A.   Yes.
22       Q.   And that's for alliances like StrataSys,
23   right?
24       A.   Yes.
25       Q.   Or that factoring alliance, right?

Page 2325

1        A.   Yes.
2        Q.   And it says, "My actions set forth above
3    justify my beliefs."  And what you're referring to there
4    is you just detailed in this memo to the CEO the
5    alliances you were trying to do like with StrataSys and
6    the factoring alliance, right?
7        A.   Yes.
8        Q.   And then you say, "I have smelled the cheese
9    for the past couple of years.  I have realized not only
10   must we maintain and upgrade our core practices but we
11   must diversify into new areas such as ADC alliances and
12   mergers.  There is a common pattern to the process.  I
13   have seen and learned that pre-existing CPA business
14   strategies" -- CPA is certified public accountant?
15       A.   Yes.
16       Q.   -- "CPA business strategies and structures
17   become inflexible over time.  These structures may
18   survive for some period with the protection of generally
19   apathy.  But eventually, external catalysts move the
20   cheese for the practicing CPA and give a loud wolf howl
21   (wake up call) to the pack (the firm)."
22          You wrote that, right?
23       A.   Yes.
24       Q.   At this time the symbol, the logo for BDO
25   was a wolf, right?

Page 2326

1        A.   Yes.
2        Q.   In fact, at one of the partners' meetings
3    they brought a live wolf out on stage, right?
4        A.   Yes.  It's very interesting what happened at
5    that meeting was they brought out this wolf and it was a
6    very old wolf and it was being led to the CEO.  I'll
7    never forget this.  And it just urinated right on the
8    stage.
9        Q.   All over the place, right?
10       A.   Yes.
11       Q.   It got reported in the papers?
12       A.   I don't know if it got reported in the
13   papers.  But that's what I remember about that meeting.
14   It was hilarious.
15       Q.   And one of the things they reported in the
16   papers was how ironic it was they brought out that old
17   wolf when what BDO was using the wolf for was to say you
18   were supposed to be ferocious about getting business,
19   right?
20          MS. BITAR:  Objection, Your Honor.
21          THE COURT:  Overruled.  Overruled.  He
22   brought it up.
23          MS. BITAR:  Objection as to what is brought
24   up in the newspaper.
25          THE COURT:  Overruled.

Page 2327

1          THE WITNESS:  Really from what I remember
2    from six years ago was this hilarious event.  I don't
3    remember a lot of the content of that meeting.
4    BY MR. THOMAS:
5        Q.   So you don't remember that it was reported
6    afterwards that the reason BDO was using the wolf is to
7    encourage the partners to be ferocious about going out
8    to get business.  You don't remember that?
9          MS. BITAR:  Objection, Your Honor.
10          THE COURT:  Sustained.
11   BY MR. THOMAS:
12       Q.   Well, Mr. Lenner, when you say up there that
13   you can smell the cheese, you see that?  "I have smelled
14   the cheese for the past couple of years," in the second
15   sentence there?
16       A.   Yes.
17       Q.   Smell the cheese means to grow the practice,
18   right?
19       A.   Yes.
20       Q.   And to grow the practice means to that
21   you're going to make more money, right?
22       A.   I would hope so.
23       Q.   Yes?
24       A.   Yes.
25       Q.   And when you write down here that you want

Page 2328

1   to move the cheese for the practice -- excuse me, CPA
2   and give a loud wolf howl (wake up call) to the pack
3   (the firm), you want to give a loud wolf howl, that's
4   you, right?
5       A.   Yes, in the context of this memo, it's -- I
6   look back at it now six years later it's hokey, it's
7   just goofy, but it's something that the partners had to
8   do.  They had to --
9       Q.   Well, at the time --
10      MS. BITAR:  Excuse me, Your Honor.  He's
11  interrupting.
12      THE COURT:  Did you finish?
13      MR. THOMAS:  I'm sorry.  I didn't mean to
14  interrupt.
15      A.   I was going to say all 250 partners had to
16  do it this way.  We had to do it.  Fill out the form and
17  read this book, Moving the Cheese.
18      Q.   I'm sorry, that's I was going to say, you
19  had to read the book, Moving the Cheese.  And after you
20  read that book, Moving the Cheese, you were trying to
21  apply it to your work, right?
22      A.   Well, I'm not sure if it was this book
23  Moving the Cheese but the basic concepts we were just
24  supposed to -- I don't remember all the concepts now.
25  What I do remember is what I put into this memo and

Page 2329

1   that's basically all I remember.
2       A book that I had to read, I really don't
3   care to remember six years later.
4       Q.   So what you were trying to do was take at
5   least the concepts you had from the book and apply them
6   to your business, right?
7       A.   Yes.
8       Q.   When you took the concepts from the book and
9   you applied them to your business, and you meant smell
10  the cheese meant grow the practice and make more money,
11  you were explaining that by pursuing these alliances you
12  could make more money for the firm, right?
13      A.   Yes.
14      Q.   And make more money for you?
15      A.   Yes.
16      Q.   And hopefully by explaining it to the CEO
17  and the compensation committee get a bigger bonus,
18  right?
19      A.   Yes.
20      Q.   And when you were trying to give a loud wolf
21  howl, wake up call to the pack, the firm, you were
22  trying to make sure that they knew that the business was
23  changing, right?
24      A.   Yes.
25      Q.   And the business was changing because the

Page 2330

1   outmoded practice of just focusing on doing your audits
2   meant you'd be less profitable, right?
3       A.   No.  The first sentence says,
4   "Notwithstanding the importance of the core assurance
5   practice," that's always the primary goal.  This
6   business development, it's supplement, it's secondary to
7   what we do as auditors.
8       So it was part of what we were doing but, as
9   I said over here, the core purpose was the assurance
10  practice of providing quality audit services to our
11  clients.
12      Q.   Well, you wrote down below, right, that "I
13  have seen and learned that pre-existing business
14  strategies and structures become inflexible over time,"
15  and those pre-existing business strategies were the
16  audit practice, right?
17      A.   It's audit -- there are many practices.
18  It's a business strategy for developing business, not
19  working in your audit.  If you mean in the context of
20  bringing in new business, I would agree with you.
21      Q.   And what this whole paragraph is about is
22  about having you truly believe in Alternative
23  Distribution Channel and how you're trying to give a
24  wake up call, a wolf howl to the firm about them, right?
25      A.   Yes.

Page 2331

1       Q.   And Mr. Lenner, this alliance firm partner
2   of yours, StrataSys, their receivables were being
3   factored at E.S. Bankest, right?
4       A.   Yes, but I want you to just -- they're not
5   an alliance partner.  They're an alliance member.
6   They're not partners with BDO.  It's a separate and
7   distinct entity and it's not a partner with us.  We
8   don't manage them and they don't manage us.
9       Q.   Well, Mr. Lenner, when you were acting as an
10  auditor of E.S. Bankest, it was part of your job to know
11  whether the accounts receivable from your business
12  partner StrataSys that you were auditing were real or
13  fake, right?
14      A.   That was our job, yes.
15      MR. THOMAS:  May I approach?
16      THE COURT:  You may.
17      MR. THOMAS:  (Complies).
18  BY MR. THOMAS:
19      Q.   I'm approaching the witness with Plaintiffs'
20  Exhibit Number 78 in evidence.
21      These are the audited financials for E.S.
22  Bankest for the year 2000?
23      A.   Yes.
24      Q.   And 1999 in comparison, right?
25      A.   Yes.

Page 2332

1    Q.  And that's the wolf pack symbol for BDO down
2    there at the bottom, right?
3    A.  Yes.
4    Q.  And part of your job was to audit the
5    numbers and the notes, right?
6    A.  Yes.
7    Q.  And if you look at page 13, we see the note
8    that reads -- you all see that, an officer of the
9    company? "An officer of the company is a member at the
10   board of managers of a limited-liability company from
11   which the company has purchased 3.2 million in accounts
12   receivable." And that's StrataSys, right?
13   A.  Yes.
14   Q.  And that's wrong, right?
15   A.  Yes.
16       MR. THOMAS: With His Honor's permission I
17   will approach you with Plaintiffs' Exhibit Number 306 in
18   evidence.
19       THE COURT:  You may.
20   BY MR. THOMAS:
21   Q.  And Mr. Lenner, Plaintiffs' Exhibit Number
22   306 in evidence, that's BDO's own work paper, right?
23   A.  Yes.
24   Q.  And it's for the same year as that 3.2
25   million dollar note we just looked at in Plaintiffs'

Page 2333

1    Exhibit 87, right?
2    A.  Yes.
3    Q.  And this one it shows not 3.2 million in
4    StrataSys, it shows 7.8 and 3.1, about 11 million,
5    right?
6    A.  Yes.
7    Q.  And the difference between 3.2 and 11,
8    that's like about 8 million dollars, right?
9    A.  Yes.
10   Q.  And so the number in that note, it was off
11   about like 8 million dollars, right?
12   A.  Yes.
13   Q.  And I know we looked at the little mistake
14   about the date earlier, but this is a bigger mistake,
15   right?
16       MS. BITAR:  Objection, Your Honor.
17       THE COURT:  Overruled.
18       THE WITNESS:  No.  This is a small mistake.
19   BY MR. THOMAS:
20   Q.  So for you an 8 million dollar mistake is a
21   small mistake; is that right?
22   A.  Well, the financial statements are correct.
23   The balance sheet is correct.  There is no requirement
24   in generally accepted accounting principals to make this
25   disclosure.  It was optional, it was a supplemental

Page 2334

1    disclosure that was put in there. The footnote is
2    incorrect.
3        MR. THOMAS:  Your Honor, may I approach?
4        THE COURT:  You may.
5        MR. THOMAS:  (Complies).
6    BY MR. THOMAS:
7    Q.  I'm approaching the witness -- may I set
8    this here for a minute?
9    A.  Sure.
10   Q.  -- with Plaintiffs' Exhibit Number 81 in
11   evidence and at the same time I'm going to go ahead and
12   give you Plaintiffs' Exhibit Number 307 in evidence.
13       Mr. Lenner, this is the next year, right?
14   A.  Yes.
15   Q.  And Plaintiffs' Exhibit Number 81 in
16   evidence is the 2001-2000 audited financials of E.S.
17   Bankest, right?
18   A.  Yes.
19   Q.  And if you look, please, over at page 13
20   with me. Do you see the same footnote again that reads,
21   "An officer of the company is a member of the board of
22   managers of a limited-liability company from which the
23   company has purchased 3.2 million in accounts receivable
24   in 2001"? Did I read that right?
25   A.  Yes.

Page 2335

1    Q.  And this is about StrataSys again?
2    A.  Yes.
3    Q.  And this is about Mr. Parlapiano.  That's
4    who they're talking about?
5    A.  Yes.
6    Q.  And this is also a mistake, right?
7    A.  Yes.
8    Q.  And if we look at BDO's work paper which is
9    Plaintiffs' Exhibit Number 307, and this time it shows
10   16.4 and 5, about 21 and a half million, right?
11   A.  Correct.
12   Q.  And now it's about an 18 million dollar
13   mistake, right?
14   A.  Yes.
15   Q.  Well, can you at least give me that 18
16   million dollar mistake is a big mistake?
17   A.  As I said before, the mistake is small but
18   the number is big.
19   Q.  And I'm sorry, why is the mistake small?
20   A.  Because it's not a requirement in accordance
21   with generally accounting principals to make this
22   disclosure.  It was a supplemental disclosure.  And it
23   wasn't required.
24   Q.  But when you make a disclosure in a
25   financial statement as a certified public accountant,

Page 2336

1    you want it to be accurate, right?
2        A.   Yes.
3        Q.   If this number is not right, the balance
4    sheet number is not right; isn't that true?
5        A.   No.  The balance sheet is correct.  The
6    income -- the entire set of financials is correct.  The
7    work paper that is up there is correct.  It's just the
8    footnote which is a supplemental disclosure, that's not
9    correct.
10       Q.   Can we go to the balance sheet on this?
11   It's page 3 of Plaintiffs' Exhibit Number 81.
12           MS. BITAR:  Where is it?
13           MR. THOMAS:  Page 3 of Plaintiffs' Exhibit
14   81.
15           MS. BITAR:  Give me a moment, please.
16   BY MR. THOMAS:
17       Q.   This is the balance sheet for that year,
18   right?
19       A.   Yes.
20       Q.   Mr. Lenner, this balance sheet isn't
21   correct, is it?  Mr. Lenner, those 153 million in
22   accounts receivable that you certified, they were almost
23   all fake, right?
24       A.   At the time we were doing the audit, I had
25   no independent knowledge that they were fake.  It's just

Page 2337

1    the testimony that we've heard during the course of this
2    trial and learning about this massive fraud that was
3    conducted over seven years by eight people who were
4    going to jail who falsified hundreds of thousands of
5    documents and they made it fake.
6        Q.   So when you said earlier that the balance
7    sheet that you audited was correct, that's not right, is
8    it, because you're not here to testify that there was
9    actually 153 million dollars in accounts receivable in
10   2001, right?
11       A.   Based on the information we have had now, I
12   have no reason to -- based on the information we've
13   heard during the course of this trial I've learned that
14   the numbers there are fake and I would agree with you,
15   sir.
16       Q.   And so the note, the 3.2 million, it's not
17   correct and it wasn't correct at the time, based on what
18   you knew because your own work paper said there was 21
19   and a half million, right?
20       A.   Yes.
21       Q.   And the balance sheet we now know it's not
22   correct either because all those accounts receivable you
23   certified were fake, right?
24       A.   Yes.
25       Q.   Mr. Lenner, with His Honor's permission I'm

Page 2338

1    going to approach you with Exhibit 7297 in evidence.
2            THE COURT:  You may.
3            MR. THOMAS:  (Complies).
4    BY MR. THOMAS:
5        Q.   Now, Mr. Lenner, you said you had no
6    independent knowledge at time that the accounts
7    receivable from your business partner StrataSys were
8    fake, but you knew at the time that they couldn't even
9    afford to pay their licensing fee, right?
10       A.   First of all, I'd prefer if you don't call
11   them a business partner because they were not a business
12   partner.  We did not have a partnership with StrataSys.
13   They were an alliance member.  And that's just not a
14   correct use of the term.
15       Q.   You had a business relationship with them,
16   can you at least give me that?
17       A.   Yes.
18       Q.   Because if they made money through
19   referrals, you were going to get 20 percent of it,
20   right?  That's what we talked about earlier, do you
21   remember that?
22       A.   Yes.
23       Q.   All right.  Well, the StrataSys who you had
24   a business relationship with, you knew at the time that
25   they couldn't pay you even their monthly licensing fee,

Page 2339

1    much less have millions of millions of dollars in
2    accounts receivable, right?
3        A.   I knew that they were not paying the license
4    fee.  That's true.  I knew that.
5        Q.   If you look at Plaintiffs' Exhibit 7297 in
6    evidence, that's an e-mail from you, right?
7        A.   Yes.
8        Q.   And you were calling and leaving them a
9    strong voice mail to pay and you can look through those
10   e-mails if you want, it's because you knew they weren't
11   paying their $4,000 a month licensing fee, right?
12       A.   Yes.
13       Q.   And Mr. Lenner, do you remember early on
14   when we saw the description of StrataSys, and you said
15   they were close by the Miami office?
16       A.   Yes.
17       Q.   And so you could have just got in your car
18   and drove over there, right?
19       A.   Excuse me?  For what purpose?
20       Q.   Well, to see that there were no cars in the
21   parking lot and that they had shut down?
22           MS. BITAR:  Objection, Your Honor.
23           THE COURT:  Sustained.
24   BY MR. THOMAS:
25       Q.   Well, one of the purposes you could have

Page 2340

1    gone over there for was to look at the business, right?
2        MS. BITAR: Objection, Your Honor.
3        THE COURT: Overruled.
4        THE WITNESS: We did look at the business.
5    BY MR. THOMAS:
6        Q.   That's right. In fact, not just you, but a
7    bunch of partners from BDO and even your Bankest audit
8    team went over and met all the people at StrataSys,
9    right?
10       A.   I remember the partners going over there. I
11   don't remember the Bankest audit team going over there.
12   It was something -- it was at a partner and maybe a
13   manager level where we had an introductory meeting at
14   the beginning of the relationship.
15       Q.   Well, you know that as the alliance firm
16   liaison, that part of what happened at the very
17   beginning of the relationship is that they gave you
18   financial information and other business information,
19   right?
20       A.   They gave that information to BDO, not -- I
21   did not get that information.
22       Q.   So let me rephrase it. You knew that at the
23   beginning of the relationship, that part of what
24   happened between StrataSys and BDO was that StrataSys
25   gave financial information to BDO?

Page 2341

1        A.   I knew that they gave information. I wasn't
2    aware of exactly what type of information but there
3    would be some information provided by them to BDO.
4        Q.   And you also knew that even though you were
5    the alliance firm liaison, that there were other
6    partners at BDO who had communications with StrataSys,
7    right?
8        A.   Yes.
9        Q.   And one of those was the head of the office
10   Richard Kron, right?
11       A.   Yes.
12       Q.   And when you issued your 2002 audit, that
13   went out in May of 2003 or April, is that right?
14       A.   I think it was April.
15       Q.   And when your audit went out in April saying
16   there was 45 million dollars in accounts receivable from
17   your alliance firm member, StrataSys, Mr. Kron knew that
18   StrataSys couldn't even make payroll, right?
19       MS. BITAR: Objection, Your Honor.
20       THE COURT: Overruled.
21       THE WITNESS: No. He didn't know that.
22       MR. THOMAS: Your Honor, may I approach the
23   witness with Plaintiffs' Exhibit Number 452 in evidence?
24       THE COURT: You may.
25       MR. THOMAS: (Complies.)

Page 2342

1    BY MR. THOMAS:
2        Q.   Now, if you look down at the bottom of this
3    exhibit -- can you all scroll down for just a minute?
4        (Technician complies.)
5        You see a bunch of e-mails back and forth --
6    I'm sorry, I said Mr. Kron, Actually at this time the
7    managing partner was Albert Lopez, right?
8        A.   That's correct.
9        Q.   And you knew not just Mr. Kron when he was
10   managing partner but Mr. Lopez when he was managing
11   partner he had communications with StrataSys, right?
12       A.   Yes.
13       Q.   And if you look down at the bottom of this
14   e-mail string, you see a bunch of e-mails back and forth
15   between some of the guys at StrataSys and Mr. Lopez,
16   right? You see that? There's one to ALopez@BDO.com?
17       A.   I see the one at the very bottom and the one
18   in the middle are the only two references to Mr. Lopez
19   getting this e-mail.
20       Q.   Well, if you look all the way down to the
21   bottom -- can you all go to the next page?
22       (Technician complies.)
23       That's Mr. Lopez sending one of these
24   e-mails. See up there where it says, "Albert Lopez,
25   office business line leader, assurance services," and it

Page 2343

1    has the address and everything?
2        A.   Yes.
3        Q.   That's him sending the e-mail, right?
4        A.   Yes.
5        Q.   Now, if we can go back to the top.
6        (Technician complies.)
7        When we look at the e-mail from Mr. Mendez
8    to Mr. Parlapiano, you see where it says I just wanted?
9        A.   Right.
10       Q.   "I just wanted to let you see that
11   notwithstanding BDO's Miami office managing partner
12   Albert Lopez's concerns due to his learning that one of
13   StrataSys strategic consultants which had worked on a
14   BDO referred engagement quit last month when payroll was
15   missed, and Albert knowing that payroll has missed a
16   couple of times he's still trying to help StrataSys."
17       Mr. Lenner, when you issued your clean audit
18   opinion certifying 45 million dollars in accounts
19   receivable from StrataSys, did you know they couldn't
20   even make payroll?
21       MS. BITAR: Objection, Your Honor and I
22   object to the use of this document in that context.
23       THE COURT: Overruled.
24       THE WITNESS: Not only did I not know about
25   this problem, Mr. Lopez didn't know about the problem

Page 2344

1  because he didn't get this e-mail.
2  BY MR. THOMAS:
3     Q.  Well, actually --
4        THE COURT:  Let him finish.
5        MR. THOMAS:  I'm sorry.  I didn't know he
6  wasn't done.
7  BY MR. THOMAS:
8     Q.  Go right ahead, please.
9     A.  Also, Mr. Lopez at his deposition gave sworn
10 testimony that he wasn't aware of any payroll problems.
11    Q.  That's what he said in his sworn deposition,
12 yes?
13    A.  Yes.
14    Q.  And in your sworn deposition, when you gave
15 testimony, you said you weren't even the alliance firm
16 liaison, right?
17       MS. BITAR:  Objection, Your Honor.
18       THE COURT:  Sustained.
19 BY MR. THOMAS:
20    Q.  Well, Mr. Lenner, in your sworn testimony
21 you stated that all you did was introduce them and then
22 you were out of the picture, right?
23       MS. BITAR:  Objection, Your Honor.
24       THE COURT:  Sustained.
25 BY MR. THOMAS:

Page 2345

1     Q.  Mr. Lenner, my question to you is that when
2  you were certifying 45 million dollars in your alliance
3  firm partner's accounts receivable at E.S. Bankest, did
4  you know that at the same time they couldn't even make
5  payroll?
6     A.  First of all, they are not an alliance
7  partner, number one.  And secondly, I was not aware nor
8  was Mr. Lopez aware of that.
9     Q.  So you didn't know at the time that you
10 certified the 45 million that they couldn't even make
11 payroll, right?
12    A.  I wasn't aware of that, that's correct.  I
13 was not aware.
14       MR. THOMAS:  Your Honor, may I approach?
15       THE COURT:  You may.
16       MR. THOMAS:  (Complies).
17       THE WITNESS:  It's okay.
18       MR. THOMAS:  Take your time.
19       THE WITNESS:  Okay.
20       MR. THOMAS:  With your permission, Your
21 Honor, I'll approach with Plaintiffs' Exhibit Number 87
22 in evidence.
23       (Complies.)
24 BY MR. THOMAS:
25    Q.  Mr. Lenner, this is the 2002 audit of E.S.

Page 2346

1  Bankest, right?
2     A.  Yes.
3     Q.  Certified by BDO Seidman?
4     A.  Yes.
5     Q.  And one of your jobs when you did this audit
6  and all the other audits was to ensure that these audits
7  were free of material misstatements due to error or
8  fraud, right?
9     A.  Yes.
10    Q.  And if we look over now at page 14, and this
11 is again the note about StrataSys.  Do you see that?
12    A.  Yes.
13    Q.  And it says, "An officer of the company is a
14 member of the board of managers of a limited-liability
15 company from which the company has purchased 45 million
16 in accounts receivable in 2002."  Right?
17    A.  Yes.
18    Q.  Now, in 2001 according to BDO's internal
19 memorandum, there was about a 21 and a half million in
20 receivables, right?
21       MS. BITAR:  I'm sorry, can you say that
22 again?  I'm sorry.
23 BY MR. THOMAS:
24    Q.  Yes.  Mr. Lenner, according to BDO's own
25 work papers in the prior year, there was about 21 and a

Page 2347

1  half million of accounts receivables from StrataSys,
2  right?
3     A.  Yes.
4     Q.  And according to BDO's own internal work
5  papers for the prior year 2000, there was about 11
6  million in accounts receivable, right?
7     A.  Yes.
8     Q.  So if we add those up, 45 million for 2002,
9  21 and a half for 2001, how much would that be?
10    A.  About 66 million.
11    Q.  And about 66 million.  And then if we add on
12 11 for 2000, how much does that make?
13    A.  77 million.
14    Q.  So by this time, 2002, BDO had certified
15 about 77 million dollars in accounts receivable is real
16 from StrataSys who is your alliance firm member, right?
17    A.  Yes.
18    Q.  And Mr. Lenner, the way that worked was when
19 you were the auditor at E.S. Bankest, when you were
20 wearing that hat, Bankest would get accounts receivable
21 from StrataSys, right?
22    A.  Yes.
23    Q.  They were factoring.  And part of BDO's job
24 was to look at those accounts receivable and say whether
25 they were real or fake, right?

Page 2348

1      A.   That would be on the books of Bankest when
2  they purchased the receivables from StrataSys.  That was
3  our job.
4      Q.   To look at the StrataSys receivables to see
5  if they were real or fake, right?
6      A.   Along with all the other receivables that
7  were being purchased.  It wasn't just StrataSys
8  receivables.  There were many other receivables.
9      Q.   Right.  You had to say whether all the
10 receivables were real or fake, right, not just
11 StrataSys?
12     A.   Yes.
13     Q.   So for the StrataSys ones you would have to
14 look at what came from StrataSys and you would say
15 whether they were real or fake, right?
16     A.   Yes.
17     Q.   And when you were over here, with StrataSys,
18 right, BDO potentially was going to profit from those
19 accounts receivable, right?  You can make 20 percent
20 from them; isn't that right?
21     A.   Yes.
22          MR. THOMAS:  I have nothing further, Your
23 Honor.
24          THE COURT:  Thank you, Mr. Lenner.
25          MS. BITAR:  Your Honor, if you'd like to

Page 2349

1  start --
2          THE COURT:  I'd rather not.
3          MS. BITAR:  I just need to take a bathroom
4  break, Judge, so --
5          THE COURT:  I'd rather not.
6          MS. BITAR:  Thank you, Your Honor.  That's
7  fine.
8          THE COURT:  All right.  Ladies and
9  gentlemen, all right.  I'm going to let you go home.  I
10 want -- wait, let me get Jeffrey down here.
11         All right.  Thursday morning.  9:30.  Same
12 place.  Okay?  And you're not to discuss the case
13 amongst yourselves, you're not to allow anyone to
14 discuss the case with you or you're not to discuss the
15 case with anyone else.  You're not to form a definite or
16 fixed opinion on the merits of the case until you've
17 heard all the evidence, the argument by the lawyers and
18 the instruction on the law by me.
19         You're not to read, hear or see any accounts
20 of this case in the media and you're to ignore the
21 lawyers' presence outside this courtroom and that
22 includes the witnesses and they're to ignores yours.
23         Do you need to pick your stuff up in the
24 jury room?  Those of you who do, do and those of you who
25 don't, don't.  Thank you very much.

Page 2350

1          We'll see you on Thursday morning.  Leave
2  your notes.
3          (Thereupon, the jury was escorted out of the
4  courtroom.)
5          THE COURT:  Mr. Lenner, you're not to
6  discuss the testimony you've given or the testimony
7  you're about to give with anyone, and that includes your
8  lawyers.
9          We'll see you on Thursday morning.  Have a
10 good day tomorrow and a good evening.
11         Anything we need to do before we go?
12         MS. BITAR:  Not on this end, Your Honor.
13         THE COURT:  Mr. Thomas?
14         MR. THOMAS:  No, Your Honor.  Thank you for
15 asking.
16         THE COURT:  You all have a good evening and
17 we'll see you on Thursday morning.
18
19
20         (Thereupon, at approximately 5:30 p.m., the
21 above portion of the trial was concluded.)
22
23              *     *     *
24
25

Page 2351

1              CERTIFICATE OF COURT REPORTER
2
3          I, GIZELLA BAAN, court reporter, before whom
4  the foregoing statement was taken, do hereby certify
5  that the statement made was taken by me stenographically
6  at the time and place mentioned in the caption hereof
7  and thereafter transcribed by me to the best of my
8  ability; that said transcript is a true record of the
9  statement given; that I am neither counsel or, related
10 to, nor employed by any of the parties to the action in
11 which these proceedings were taken; and further, that I
12 am not a relative or employee of any party hereto, nor
13 financially or otherwise interested in the outcome of
14 this action.
15
16
17
18         _____
19              GIZELLA BAAN
20         Court Reporter and Notary Public
21          in and for the State of Florida
22
23
24
25

Page 2352

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

```
--------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
        Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
        Defendant.
--------------------------------------------------x
BDO SEIDMAN, LLP,
        Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
        Third-Party Defendants.
--------------------------------------------------x
```

PAGES 2352 - 2445

Volume 20

Miami, Florida

Thursday, April 26, 2007

10:00 a.m.

Before the Honorable Jose M. Rodriguez

EXHIBIT
47

Reported by:  Gizella "Gigi" Baan

Page 2353

1           A P P E A R A N C E S
2
3    On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4    INTERNATIONAL, LTD., ET AL.:
5
6    SULLIVAN & CROMWELL, LLP
7        1888 Century Park East
8        Los Angeles, California 90067
9        (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida 33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       350 East Las Olas Boulevard, Suite
21       Fort Lauderdale, Florida 33301
22       (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25

Page 2354

1    On behalf of Defendant BDO Seidman, LLP:
2
3    ALVAREZ, ARMAS & BORRON
4        901 Ponce de Leon Boulevard, Suite 304
5        Coral Gables, Florida 33134
6        (305) 461-5100
7    BY:  Arturo Alvarez, Esquire
8
9    GREENBERG TRAURIG, LLP
10       MetLife Building
11       200 Park Avenue, 15th Floor
12       New York, New York 10166
13   BY:  Adam D. Cole, Esquire
14       Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17       1221 Brickell Avenue
18       Miami, Florida 33131
19   BY:  Mark Schnapp, Esquire
20       Nikki Simon, Esquire
21
22
23
24
25

Page 2355

1    On behalf of Third-Party Defendants Victor Balestra,
2    Bernard Mollet, and Joaquin Garnecho
3
4    RICHMAN, GREER, WEIL, BRUMBAUGH,
5    MIRABITO & CHRISTENSEN, P.A.
6        Miami Center, Suite 1000
7        201 S. Biscayne Boulevard
8        Miami, Florida 33131
9        (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16       2701 Ponce de Leon Boulevard, Mezzanine
17       Coral Gables, Florida 33134
18       (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20       Geoffrey Marks, Esquire
21
22
23
24
25

Page 2356

1           C O N T E N T S
2
3    EXAMINATION OF SANDOR LENNER BY:        PAGE:
4        MS. BITAR:  (Cross)            2358
5        MR. THOMAS:  (Redirect)        2427
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2357

```
1           PROCEEDINGS
2        THE COURT:  Good morning.  Are you all
3   ready?  Is Mr. Lenner here anywhere?
4        MS. BITAR:  He's outside.  He wasn't sure
5   whether to sit in here or outside.
6        THE COURT:  Go get him.
7        THE BAILIFF:  (Complies).
8        (Witness takes the stand).
9        (Thereupon, the jury was brought into the
10  courtroom.)
11       THE COURT:  All right, you may be seated.
12       Good morning, ladies and gentlemen.  I was
13  expecting you all to have your children.  That would
14  have been funny.  You should have.
15       Hope you had a nice day off yesterday.  Hope
16  you're ready to go today.  You'll have another day off
17  tomorrow.  I have a little headache so I'm still trying
18  to get with it.  But I'll get with it in a second.
19       We have a new member of the jury.
20       (Laughter).
21       So do remember not to discuss the case
22  amongst yourselves or with any member of the jury.
23       Are you ready?
24       Ms. Bitar, you may start your
25  cross-examination.
```

Page 2358

```
1        MS. BITAR:  Thank you, Your Honor.
2        Good morning, everybody.
3        CROSS-EXAMINATION
4   BY MS. BITAR:
5        Q.   Good morning.
6        A.   Good morning, Ms. Bitar.
7        Q.   Mr. Lenner, you're a partner at BDO,
8   correct?
9        A.   Yes.
10       Q.   For how long have you been a partner at BDO
11  Seidman?
12       A.   Since 1989.
13       Q.   And you're a certified public accountant,
14  correct?
15       A.   Yes.
16       Q.   And for how long have you been a certified
17  public accountant?
18       A.   Since 1980.
19       Q.   And by the time you had begun to conduct the
20  Bankest audits, approximately how many audits do you
21  think you had done either -- let me just correct my
22  question -- as a staff member to partner?
23       A.   Somewhere between two to three hundred
24  audits.
25       Q.   And can you -- and you received your license
```

Page 2359

```
1   in 1980 and the Bankest audit began in 1988, correct?
2        A.   Yes.
3        Q.   So in those 18 years before you began
4   working on the Bankest audits, approximately how many
5   hours did you spend doing actual auditing work?
6        A.   I believe about 30 thousand hours.
7        Q.   And Mr. Lenner, in all those years, and in
8   all those audits, was your integrity ever called into
9   question by anybody?
10       A.   Never.
11       Q.   Mr. Lenner, is it proper to work in a
12  partnership such as BDO and make money?
13       A.   Yes.
14       Q.   Is it proper to want to personally make more
15  money?
16       A.   Yes.
17       Q.   Is it proper to, as part of your duties as a
18  partner, look for business opportunities that will
19  benefit both you and your firm?
20       A.   Yes.
21       Q.   And is it all right to pursue those business
22  opportunities?
23       A.   Yes.
24       Q.   And with respect to alliances, which we'll
25  talk a little bit more about in a little bit, the
```

Page 2360

```
1   concept of exploring these opportunities is something
2   that was not specific to you at BDO, correct?
3        A.   Yes.
4        MR. THOMAS:  Objection, Your Honor.
5   Leading.
6        THE COURT:  Sustained.
7   BY MS. BITAR:
8        Q.   Mr. Lenner, was all of BDO doing --
9   withdrawn.  Were all the partners at BDO doing the same
10  type of things that you were doing to increase the pie?
11       A.   Yes.
12       Q.   Now, Mr. Lenner, is that what's expected of
13  partners at BDO?
14       A.   Yes.
15       Q.   And based on your observation, is that the
16  type of activities that are expected of partners and
17  professional service firms everywhere?
18       A.   Yes.
19       Q.   And is it all right to write a memorandum to
20  your bosses to tell them what you've done, both
21  professionally with your audit practice and with respect
22  to other opportunities so that they're aware of your
23  efforts?
24       A.   Yes.
25       Q.   Mr. Lenner, how many people read Who Moved
```

Page 2361

1   the Cheese and that whole series of books, if you know?
2       A.   At that time it was a New York Times best
3   seller, approximately five million copies of the book
4   sold. It was a very common book that most companies
5   were requiring that their employees read and BDO was
6   just one of those companies.
7       Q.   And Mr. Lenner, is it wrong to smell the
8   cheese?
9       A.   No. It's not wrong to smell the cheese.
10      Q.   Thank you, sir.
11          THE COURT: Are you finished?
12          MS. BITAR: No, Judge.
13          THE COURT: Wishful thinking.
14          (Laughter).
15  BY MS. BITAR:
16      Q.   Mr. Lenner, when you testified on Tuesday
17  afternoon, do you remember Mr. Thomas put on the board a
18  bunch of documents and highlighted a bunch of
19  paragraphs?
20      A.   He put on many documents. I don't recall
21  all of them but he did put on some.
22      Q.   Okay. Let me start by asking you this.
23  Let's discuss your relationship with Dominick
24  Parlapiano.
25          Do you remember being asked a series of

Page 2362

1   questions by Mr. Thomas about Mr. Parlapiano?
2       A.   Yes, I remember some of them but not all.
3       Q.   And you met him at a party in 1995 or 1996;
4   is that correct?
5       A.   Yes.
6       Q.   And you discussed at that party the type of
7   work you did?
8       A.   Yes.
9       Q.   And at some point after that party did he
10  call you to ask if BDO would be engaged to be the BRFFC
11  auditors?
12      A.   Yes. After the party he called me and asked
13  me if we'd be interested --
14          MR. THOMAS: Objection, Your Honor.
15  Hearsay.
16          THE COURT: Sustained. It's also leading.
17  BY MS. BITAR:
18      Q.   After he called you did you develop a
19  business relationship with Mr. Parlapiano relating to
20  BRFFC?
21      A.   Yes. Only a business relationship.
22      Q.   And did you get to know him a little bit
23  because he was your client?
24      A.   Yes.
25      Q.   And you and your BDO team conducted audits

Page 2363

1   of BRFFC in 1995 and 1996, correct?
2          MR. THOMAS: Objection. Leading, Your
3   Honor.
4          THE COURT: Sustained.
5   BY MS. BITAR:
6       Q.   What years did you conduct the BRFFC audits,
7   Mr. Lenner?
8       A.   The audit years were 1995 and 1996.
9       Q.   And then in 1997 was there any audit?
10      A.   There was no audit in 1997.
11      Q.   Did you understand why there was no audit?
12      A.   He just said that --
13          MR. THOMAS: Objection. Hearsay, Your
14  Honor.
15          MS. BITAR: I'll withdraw the question,
16  Judge.
17  BY MS. BITAR:
18      Q.   After the 1996 audit, when was the next time
19  you dealt with Mr. Parlapiano in connection with any
20  audit work?
21      A.   It was for the 1998 audit.
22      Q.   And that was now the new company Bankest?
23      A.   Yes, that was a new company.
24      Q.   So that would have been end of 1998, 1999?
25          MR. THOMAS: Objection. Leading.

Page 2364

1          THE COURT: Overruled.
2          THE WITNESS: Yes. That would have been in
3   the winter of '98 or January/February of the following
4   year, when we would generally do the bulk of the audit
5   work.
6   BY MS. BITAR:
7       Q.   I'm not sure I understand. So when would
8   the work be done?
9       A.   The bulk of the work would be done in
10  January/February 1999 for the 1998 audit.
11      Q.   Mr. Lenner, did you like Mr. Parlapiano?
12      A.   Yes, he was pleasant. He was professional.
13  And he was knowledgeable.
14      Q.   Did he fool you, Mr. Lenner?
15      A.   I wasn't fooled at that time but now after
16  hearing all this testimony and everything I've learned
17  during these proceedings, we were deceived and fooled.
18      Q.   Were you surprised when you heard about what
19  happened at Bankest?
20      A.   Surprised is a very slight word. I was
21  shocked and I was just absolutely horrified when I heard
22  about this massive fraud. It was terrible.
23      Q.   And Mr. Lenner, did you have a social
24  relationship with Mr. Parlapiano?
25      A.   No. We just had a professional

Page 2365

1    relationship. I would meet with him two times, maybe
2    three times during the course of the audit, never
3    socialized with him at all outside of the audit.
4        Q.   Did you ever go out to dinner with his wife
5    and your wife?
6        A.   No. Never went out to dinner.
7        Q.   Did you ever go to a sporting event with
8    Mr. Parlapiano?
9        A.   Not one single basketball game, football
10   game, absolutely nothing.
11       Q.   Would you call him up and say, hey, how are
12   you doing with him, shoot the breeze with him?
13       A.   Rarely.
14       Q.   Did you consider your relationship to
15   revolve around your role as the auditor at Bankest?
16       A.   Yes.
17       Q.   Were you ever at his house, sir?
18       A.   No.
19       Q.   Ever meet his children?
20       A.   I think at the initial cocktail party that I
21   met him at, his children might have been there.
22       Q.   But other than that, did you have any other
23   social contact with him?
24       A.   Absolutely not.
25       Q.   Getting back to the documents we looked at a

Page 2366

1    couple of days ago, let's take a step back and give some
2    perspective about this IT alliance.
3            What was the IT alliance? First of all,
4    what does IT stand for?
5        A.   IT stands for information technology and it
6    was an alliance that was designed with IT firms and CPA
7    firms to provide services to our clients in the IT area.
8    At that point we did not have an IT department and we
9    thought that would be a need to provide that type of
10   service to our clients and for that reason the alliance
11   concept with respect to IT firms, it was thought about
12   at BDO and developed so we could provide those services
13   to our clients.
14       Q.   And do you remember if StrataSys was one of
15   the first or one of the later IT alliances that BDO
16   developed?
17       A.   Yes. StrataSys was in the early stage at
18   that point. I think we had about a hundred or so CPA,
19   that's accounting firm alliances, and we were developing
20   IT alliances and I think they are the third, fourth or
21   the fifth alliance firm that we had in the country.
22       Q.   And can you briefly describe for the members
23   of the jury how it was supposed to work, the alliance
24   part of this relationship?
25       A.   If we had a client that needed an IT

Page 2367

1    service, we would contact them. If they had a client
2    that needed an audit for tax services they would contact
3    us. It was basically -- it was just a referral. It was
4    a captured referral system. We refer clients to them
5    and they'd refer clients to us.
6        Q.   Thank you. Let's talk about the strategic
7    alliance with StrataSys. How did it begin?
8        A.   Sometime in I think the early part of
9    January of '01, I was having one of my lunches or
10   dinners with Mr. Parlapiano and he'd ask asked me a very
11   simple question: What's new at BDO? And at that time
12   we -- I really hadn't spoken to him for a year and a
13   half because the prior time it was with the BRFFC and
14   that last audit was for 1996. So just bringing him up
15   to speed with the new developments at BDO I mentioned to
16   him that we had about a hundred plus CPA alliance firms
17   and we also were developing the IT alliance firm.
18           So at that time he brought to my attention
19   that he'd be interested in meeting --
20           MR. THOMAS: Objection, Your Honor.
21   Hearsay.
22           THE COURT: Sustained.
23   BY MS. BITAR:
24       Q.   Mr. Lenner, let me ask you another question
25   because I didn't understand something you said. We're

Page 2368

1    talking about 1996 and you're talking about 2001.
2        A.   I'm sorry.
3        Q.   I just want to make sure I'm understanding
4    you.
5        A.   All right.
6        Q.   When did you have this conversation with
7    Mr. Parlapiano without getting into what was said about
8    the IT alliance, the StrataSys alliance?
9        A.   It was in the early part of January of 2001.
10       Q.   Now, would you be meeting with
11   Mr. Parlapiano around that time because that's when
12   you're beginning to do work on the 2000 audit?
13           MR. THOMAS: Objection, Your Honor.
14   Leading.
15           THE WITNESS: Yes.
16           THE COURT: Answered. Overruled.
17           THE WITNESS: Yes, we'd do the bulk of the
18   work, the planning part in January.
19   BY MS. BITAR:
20       Q.   And as a result of this conversation did you
21   learn that StrataSys -- withdrawn.
22           As a result of that conversation, did you
23   discuss with Mr. Parlapiano BDO's relatively new IT
24   strategic alliance?
25       A.   Yes. At that time I was telling him about

Page 2369

1  the alliance program that we had with respect to CPA
2  firms and the developing IT firms.
3        (Thereupon, there was a brief discussion off
4  the record.)
5        MS. BITAR: I lost my train of thought.
6        THE COURT: That's what I wanted to avoid.
7        (Thereupon, the court reporter read back the
8  requested portion.)
9  BY MS. BITAR:
10       Q.  And what happened next?
11       A.  There was an interest on his part.
12       MR. THOMAS: Objection, Your Honor.
13  Speculation.
14       THE COURT: Sustained.
15  BY MS. BITAR:
16       Q.  Mr. Lenner, were there followup meetings or
17  discussions?
18       A.  Yes, there was a followup meeting and I
19  introduced him to David Larson at that time who was the
20  head of our IT alliance practice.  So that if something
21  was to develop, Mr. Larson and Mr. Parlapiano would be
22  able to speak together about developing this IT
23  alliance.
24       Q.  Now, sir, you're an auditor, correct?
25       A.  Yes.

Page 2370

1       Q.  And that means you conduct audits primarily,
2  right?
3       MR. THOMAS: Objection, Your Honor.
4  Leading.
5       THE COURT: Sustained.
6  BY MS. BITAR:
7       Q.  What does an auditor do, Mr. Lenner?
8       A.  I conduct audits.  It's over 95 percent of
9  what I do.
10       Q.  And do you have any specific expertise in
11  information technology?
12       A.  Very little.  None.
13       Q.  Do you know how to use a computer to do your
14  own work?
15       A.  Yes.
16       Q.  Other than that, do you have experience with
17  things like main frames and the type and installing
18  computer programs and companies and things of that
19  nature?
20       A.  Absolutely not.
21       Q.  Where was Mr. Larson residing at the time if
22  you remember?
23       A.  I believe it was in Chicago.
24       Q.  What was Mr. Larson's role as the head of
25  the IT alliance?

Page 2371

1       A.  He was known as the national leader, the
2  business leader to the IT alliance program that we had
3  firm-wide.
4       Q.  And this was done on a national level?
5       A.  Yes, it was.
6       Q.  And who was Michael O'Hare?  That's another
7  name we've seen in the last few days.
8       A.  Michael O'Hare at that time was a board
9  member who had a responsibility above Mr. Larson in
10  connection with the IT alliance firms.
11       Q.  And when you say "above Mr. Larson," what do
12  you mean by that?
13       A.  I mean Mr. Larson reported to Mr. O'Hare.
14       Q.  Now, you said you had this discussion with
15  Mr. Parlapiano and he seemed interested to you.
16       MR. THOMAS: Objection, Your Honor.
17  Speculation.
18       THE COURT: Overruled.  You can answer the
19  question.
20       MS. BITAR: I was in the middle of it.  I
21  wasn't done.
22       THE COURT: I thought it was a yes or no.
23  BY MS. BITAR:
24       Q.  When you were talking to Mr. Parlapiano,
25  what was your understanding about why he would be

Page 2372

1  interested?  In other words, what was his relationship
2  to StrataSys?
3       A.  He was on the board of managers and he was
4  also an advisor to StrataSys.
5       Q.  And so when you were speaking to him about
6  the IT alliance, is it fair to say you were talking to
7  him as a member of the board of StrataSys as opposed to
8  the CFO of Bankest?
9       MR. THOMAS: Objection, Your Honor.
10  Leading.
11       THE COURT: Sustained.
12  BY MS. BITAR:
13       Q.  In what capacity were you talking to
14  Mr. Parlapiano about StrataSys?
15       A.  As an advisor and a member of the board of
16  managers to StrataSys.
17       Q.  Now, did you have an understanding --
18       THE COURT: Sorry, Ms. Bitar.  This is going
19  to happen a lot.
20       (People walking into the courtroom.)
21  BY MS. BITAR:
22       Q.  Mr. Lenner --
23       THE COURT: Hold on.  Hold on.  One more.
24       MS. BITAR: May I continue?
25       THE COURT: You may.

Page 2373

1  BY MS. BITAR:
2      Q.  How were you familiar with StrataSys?
3      A.  A couple years before that Mr. Parlapiano
4  had expressed an interest --
5          MR. THOMAS: Objection, Your Honor.
6  Hearsay.
7          THE COURT: Overruled.
8  BY MS. BITAR:
9      Q.  You may answer, Mr. Lenner.
10     A.  Thank you.  There was an interest at that
11  time.  He wanted to introduce --
12         MR. THOMAS: Objection, Your Honor.
13  Speculation about what his wants or interests were.
14         THE COURT: Sustained.
15  BY MS. BITAR:
16     Q.  Mr. Lenner, are you aware of introductions
17  that were made as a result of conversations with
18  Mr. Parlapiano?
19     A.  Yes.
20     Q.  Tell the jury about those meetings, please.
21     A.  Sometime in 1999 he had an interest of --
22         MR. THOMAS: Objection, Your Honor.
23  Speculation.
24         THE COURT: Sustained.  Mr. Lenner, you can
25  say what you said and maybe there will be an objection

Page 2374

1  or not.
2          THE WITNESS: A meeting was set up with one
3  of my partners and they discussed a potential business
4  relationship which never developed at that point in
5  time.  And my partner then was a young lady named
6  Ms. Donna Sabbag who was knowledgeable at StrataSys and
7  had some very nice comments about the firm.  So I was
8  knowledgeable about the StrataSys IT development
9  activities in Dade County through her.
10  BY MS. BITAR:
11     Q.  And you heard them, StrataSys, to be a
12  reputable company, correct?
13     A.  Yes.
14         MR. THOMAS: Objection, Your Honor.
15  Leading.
16         THE COURT: Sustained.
17  BY MS. BITAR:
18     Q.  What was your view of StrataSys?
19     A.  It was my understanding that it was a
20  reputable company.
21     Q.  At this point, Mr. Lenner, I'd like you to
22  look at what's been marked in evidence as Exhibit 439.
23  Mr. Lenner, I think you have all those exhibits in front
24  of you.
25         So, Mr. Lenner, this is a memo from July

Page 2375

1  27th, 2001, correct?
2      A.  Yes, it is.
3      Q.  And this is from Mr. Larson who you've
4  identified, correct?
5      A.  Yes.
6      Q.  To Mr. Hannon?
7      A.  Yes.
8      Q.  And where did Mr. Hannon reside, if you
9  remember?
10     A.  New York City.
11     Q.  And do you remember what his title was?
12     A.  He was -- I know he was a founder of the
13  entire alliance concept and he was -- I don't remember
14  his exact title but he was the number one person
15  regarding the alliance programs for the firm.
16     Q.  So by way of background in 2001, Mr. Larson
17  was telling Mr. Hannon about your relationship with
18  StrataSys and going back to 1999, correct?
19         MR. THOMAS: Objection. Leading, Your
20  Honor.
21         THE COURT: Overruled.
22         THE WITNESS: Yes.
23  BY MS. BITAR:
24     Q.  And that's -- do you believe that to be
25  accurate?

Page 2376

1      A.  Yes.
2      Q.  Just give me a second.  I'm having trouble
3  with my pointer.  Okay.
4          And going down to the third paragraph of the
5  document about StrataSys, if you could block that,
6  please, Ian.
7          (Technician complies.)
8          Is this the type of services you understood
9  as a result of those meetings that StrataSys provided in
10  Florida?
11     A.  Yes, exactly those types of services were
12  provided by them.
13     Q.  Do you know what this stuff means, financial
14  and ERP system consulting and implementation?
15     A.  I have a general knowledge but not a
16  specific knowledge.  I can't say a lot about each item.
17  I know it relates to IT and some of them relate to the
18  financial aspects, the network aspects.  But I really
19  don't know how these services are provided to a
20  customer.
21     Q.  Now, just to be clear, when Mr. Parlapiano
22  and Ms. Sabbag were having these meetings in 1999, this
23  was not in connection with an IT alliance, correct?
24         MR. THOMAS: Objection.
25         THE COURT: Sustained.

Page 2377

1    BY MS. BITAR:
2        Q.   Did an alliance exist in 1999?
3        A.   No, it did not.
4        Q.   And Mr. Lenner, going to the bottom of this
5    page there's discussion about it says financial
6    manufacturing and ERP software packages. Do you see
7    that?
8        A.   Yes.
9        Q.   And it talks about things such as being a
10   reseller of software of Sage Software Enterprises and
11   various specific software products. Do you see that?
12       A.   Yes.
13       Q.   Do you have an understanding about what this
14   stuff is?
15       A.   This is software that is used by large
16   institutional type of companies. It's not for smaller
17   companies. It's -- I just know who uses it. I do not
18   know how it works or how why it works.
19       Q.   That's something Mr. Larson would know
20   about?
21       A.   Yes, he would certainly know about how the
22   software packages worked.
23       Q.   Now, -- I'm done with the document. Thank
24   you.
25           THE COURT: Let's stop right there for a

Page 2378

1    second. Ladies and gentlemen, I want to let some people
2    come in. I'm sure they are dying to come in. I'm going
3    to let you go back to the jury room. Do not discuss the
4    case amongst yourselves. Don't get too comfortable. If
5    you need to go to the bathroom, it's a good time.
6           (Thereupon, the jury was escorted out of the
7    courtroom.)
8           THE COURT: Mr. Lenner, you can go outside
9    for a minute. Go to the bathroom or have a seat and be
10   comfortable.
11          (Thereupon, a brief recess was taken.)
12          THE COURT: Are you all ready? We'll try to
13   keep the interruptions down to a minimum.
14          MS. BITAR: It's not your fault, Judge.
15   It's one of those things.
16          THE COURT: I don't know why the attorneys
17   come in the front of the podium instead of behind. I
18   don't understand that.
19          THE CLERK: All rise for the jury.
20          (Thereupon, the jury was brought into the
21   courtroom.)
22          THE COURT: All right, you may be seated.
23   Ms. Bitar, you may continue at your own risk.
24          (Laughter).
25          MS. BITAR: Just my luck, Judge.

Page 2379

1    BY MS. BITAR:
2        Q.   Mr. Lenner, did the strategic alliance with
3    StrataSys cause you any concern about a conflict of
4    interest?
5        A.   No.
6        Q.   Why?
7        A.   For a couple of reasons. First of all, it's
8    perfectly okay --
9           MR. THOMAS: Objection, Your Honor.
10          THE COURT: Overruled.
11          THE WITNESS: You're allowed to have a
12   business relationship with a customer of your client or
13   a vendor of your client.
14          Secondly, this was cleared through our
15   national office. It was vetted -- well vetted at BDO.
16   BY MS. BITAR:
17       Q.   And so individuals -- when you say vetted at
18   the national office, what do you mean by that?
19       A.   It was discussed --
20          MR. THOMAS: Objection, Your Honor.
21   Hearsay.
22          THE COURT: Sustained.
23          MS. BITAR: Your Honor, this is
24   cross-examination. I don't think he's going to get into
25   the substance of the testimony.

Page 2380

1           THE COURT: Well, I don't know what the
2    answer is going to be.
3           Stop right there. We'll pick this up at a
4    later time. And there's a reason for that.
5           Ladies and gentlemen, there's been a bomb
6    threat. Therefore, ladies and gentlemen, do not discuss
7    the case amongst yourselves. And don't talk to anybody.
8    Pick up your things from the jury room. Do not leave
9    the area; just go downstairs. Go outside the building
10   and I'm sure -- I'll stay but I can't keep you guys. Go
11   ahead. I got notified. So don't go too far. Go
12   outside. And wait around until we're ready. Go outside
13   the courthouse. Leave the building.
14          (Thereupon, the jury was escorted out of
15   the courtroom.)
16
17          (Whereupon, at 10:50 a.m., a luncheon recess
18   was taken.)
19
20
21          *      *      *
22
23
24
25

Page 2381

1    A F T E R N O O N   S E S S I O N
2             (1:45 p.m.)
3    Thereupon,
4         SANDOR LENNER,
5    was recalled as a witness and, having been previously
6    duly sworn, was examined and testified further as
7    follows:
8         THE COURT:  You all ready?
9         MS. BITAR:  Yes, Your Honor.
10        THE COURT:  Bring them in.
11        MS. BITAR:  Should we bring in Mr. Lenner
12   first?
13        THE COURT:  That would be a good idea.
14        THE BAILIFF:  (Complies.)
15        MS. BITAR:  Should I get him, Judge?
16        THE COURT:  He went to get him.
17        (Thereupon, there was a brief pause.)
18        THE BAILIFF:  All rise for the jury.
19        (Thereupon, the jury was brought into the
20   courtroom.)
21        THE COURT:  All right.  You may be seated.
22   I hope you had a good time off.
23        Ms. Bitar, you may continue with your
24   cross-examination.
25        MS. BITAR:  Thank you, Your Honor.

Page 2382

1    Good afternoon, ladies and gentlemen of the
2    jury.
3         CROSS-EXAMINATION (continued)
4    BY MS. BITAR:
5    Q.    Good afternoon, Mr. Lenner.
6    A.    Good afternoon, Ms. Bitar.
7    Q.    Before we broke for lunch for the bomb
8    scare, we were talking about StrataSys.  Do you recall
9    that?
10   A.    Yes.
11   Q.    Let me ask you some preliminary questions.
12   When you had discussions with your partners about the
13   potential of an alliance with StrataSys in 2001, did you
14   go and visit StrataSys?
15   A.    No.
16   Q.    How many times would you say you visited
17   StrataSys?
18   A.    During the two years that -- in the two-year
19   period we -- or I visited StrataSys somewhere between
20   four to five times.
21   Q.    And was that -- what was the reason for
22   those visits?
23   A.    One may have been an introductory meeting.
24   And I think we had one or two where it's called meet and
25   greet, where the partners from BDO would be meeting the

Page 2383

1    principals from StrataSys.
2    Q.    And Mr. Lenner, at any of the times that you
3    went to StrataSys, did you go there for the single
4    purpose of visiting Dominick Parlapiano?
5    A.    No.
6    Q.    Were your meetings in connection with
7    alliance-related objectives?
8         MR. THOMAS:  Objection, Your Honor.
9    Leading.
10        THE COURT:  Sustained.
11   BY MS. BITAR:
12   Q.    What were your objectives in going there,
13   Mr. Lenner?
14   A.    The purpose of the meetings were for them to
15   get to know about BDO and for us to get to know about
16   them.  That was it.
17   Q.    Mr. Lenner, when you visited StrataSys, did
18   you notice if Dominick Parlapiano had an office there?
19   A.    I never saw his office there.
20   Q.    Now, right before the break, we were talking
21   about the issue of a possible conflict of interest
22   because of StrataSys.  Do you remember generally that
23   testimony?
24   A.    Yes, I do.
25   Q.    And before we broke, you were in the middle

Page 2384

1    of explaining why you did not believe there was a
2    conflict of interest.  Could you continue with your
3    answer, please, sir.
4    A.    Yes.  We gave it a lot of thought.  And it
5    was clearly known at that time that you can have a
6    business relationship --
7         MR. THOMAS:  Objection, Your Honor.
8         THE COURT:  What's your objection?
9         MR. THOMAS:  Opinion testimony.
10        THE COURT:  Overruled.
11        THE WITNESS:  -- with a customer of your
12   audit client or a vendor of your audit client.  As long
13   as you don't have a business relationship with the audit
14   client.  That's what you can't do.  And this was vetted
15   out with the people at BDO and it was a perfectly
16   acceptable alliance program.
17   BY MS. BITAR:
18   Q.    Now, Mr. Lenner, you've been sitting here as
19   the BDO representative, correct?
20   A.    Yes.
21   Q.    And that meant you've heard some of the
22   testimony of some of the other people in the case,
23   right?
24   A.    Yes.
25   Q.    Do you remember Mr. Freeman at the inception

Page 2385

1    of the trial showing the jury some documents and
2    discussing the fact that Bankest might have an ownership
3    stake in StrataSys?
4        A.   Yes.
5        Q.   Are those documents you had ever seen before
6    this case?
7        A.   I never saw those documents until this case.
8        Q.   Now, Mr. Lenner, did you have any belief
9    whatsoever that Bankest had an ownership stake in
10   StrataSys?
11       A.   I had no understanding about whatsoever.
12       Q.   What was your understanding, sir?
13       A.   That StrataSys was independently owned by
14   the four principals of StrataSys, and that E.S. Bankest
15   had no interest, no financial interest, no ownership
16   interest in StrataSys whatsoever.
17       Q.   In connection with these meet and greets
18   you've been telling the jury about, were the people who
19   were the owners of StrataSys introduced to the people at
20   BDO as the owners?
21       A.   Yes.
22       Q.   And as you sit here today, do you remember
23   their names?
24       A.   Yes, I do.  It was Mr. Arnie Girnun.  There
25   was Mr. Howard Cantor.  Mr. Jay Pierce.  And I believe

Page 2386

1    the final individual was Mr. Tony Ronconi or Anthony
2    Ronconi.
3        Q.   Now, Mr. Lenner, you're familiar, obviously,
4    with the books and records of Bankest, right?
5        A.   Yes.
6        Q.   If Bankest had an ownership stake in
7    StrataSys, would the books and records of Bankest
8    reflect that in any way?
9        A.   Yes, they would.
10       Q.   How would they do that?
11       A.   If they had an interest in StrataSys, it
12   would be called -- it would be called an investment in
13   StrataSys because they would own -- if they owned the
14   stock of StrataSys, then that ownership, that stock
15   would be an asset on the books of E.S. Bankest.
16       Q.   And some of those documents we looked at
17   talked about approximately 70 percent of the shares of
18   StrataSys being pledged or guaranteed to Bankest.  How
19   would that amount, the 70-percent stake, impact the
20   books and records of Bankest?
21       A.   Well, I wasn't even sure what that document
22   meant.  It's a legal document.  And I don't know whether
23   the shares were actually owned by E.S. Bankest or
24   whether they were just pledged as collateral.  So it's
25   hard to answer your question because I really don't know

Page 2387

1    what the true purpose or what -- or what those shares
2    represented and who factually owned them.
3        Q.   Assuming for purposes of my question,
4    though, that it was Bankest's, when you get past a
5    50-percent-ownership stake, does that impact the books
6    and records?
7        A.   Yes, that would be a consolidation.  So not
8    only would the investment be there, you would
9    consolidate substantially all of the operations of
10   StrataSys into E.S. Bankest's books and records.
11       Q.   And, in fact, isn't that what happened with
12   respect to the Espirito Santo Bank of Florida's
13   financial statements relating to its 50-percent stake in
14   Bankest?
15       A.   Yes.
16       Q.   Now, this alliance didn't start until the
17   end of 2001; is that right?
18            MR. THOMAS:  Objection, Your Honor.
19   Leading.
20            THE COURT:  Overruled.
21            THE WITNESS:  It started in I think the --
22   in August of 2001.
23   BY MS. BITAR:
24       Q.   Did the alliance relationship impact any
25   audits prior to 2001?

Page 2388

1        A.   No, whatsoever.
2        Q.   Now let's talk about after 2000.  Was it
3    your understanding that the audits of Bankest changed in
4    any way after the alliance with StrataSys was created?
5        A.   No.  They did not change at all.  In the
6    year 2000 we went to a controls-based testing.  And we
7    continued that same approach in 2001.  There was no
8    change whatsoever.
9        Q.   Mr. Lenner, did you ever see any financial
10   statements of StrataSys?
11       A.   No.
12       Q.   Mr. Lenner, did BDO audit any aspect of
13   StrataSys' financial statements?
14       A.   No, we did not audit StrataSys.  We were the
15   auditors for E.S. Bankest.
16       Q.   Did you audit any of StrataSys receivables?
17       A.   We did not audit StrataSys receivables only
18   to the extent that E.S. Bankest would purchase them,
19   then they would become the receivables of E.S. Bankest.
20   And in that regard they were audited as well as the
21   other hundreds of receivables that were owned by E.S.
22   Bankest.  There was no different treatment at all
23   whatsoever.
24       Q.   Mr. Lenner, did you have any audit
25   responsibilities with respect to StrataSys?

Page 2389

1    A.   No, because it was not an audit client.
2    Q.   Let's turn now to Exhibit 440 in evidence.
3  This is a document Mr. Thomas showed you on Tuesday,
4  correct?
5    A.   Yes.
6    Q.   Going to the top of the document, we have
7  some new names here.  You've identified Dave Larson.
8    A.   Yes.
9    Q.   Who was Richard Kron?
10   A.   Richard Kron at that time was the managing
11  partner of the Miami office.
12   Q.   And who was Ed Godoy?
13   A.   He was a tax partner in the Miami office.
14   Q.   And there was discussion on Mr. Thomas'
15  direct of your role as the alliance firm liaison.  Do
16  you remember that?
17   A.   Yes.
18   Q.   And you gave some testimony that, reading
19  from this document, you were the single point of
20  contact.  Do you remember those words?
21   A.   That's what the document says.
22   Q.   Could you explain to the members of the jury
23  what exactly your point of contact was, what your
24  responsibilities were as the alliance firm liaison?
25   A.   Well, it says right here that -- in the

Page 2390

1  second sentence -- this individual is responsible for
2  maintaining the local information base on the alliance
3  firm and assisting the technology alliance program
4  management team in managing the relationship with the
5  alliance firm.
6        Then it goes on to say exactly what this
7  local information base.  And that's a very key operative
8  part of this paragraph because it explains what the role
9  is.  And the role was just basically to manage the
10  referrals, the joint proposals, and projects between the
11  two entities.  And at that point in time, which was in
12  September, it was the process that I would just ask the
13  other partners what their activities were and I would
14  periodically report it.  And then I think in January of
15  '02 or towards the beginning of the next year, the
16  process became -- it became computerized.  So it was
17  just a way for us to manage the referrals between the
18  two entities.  Nothing else than that.
19   Q.   Mr. Lenner, when you say manage it, what did
20  you mean by that?  Keep track of it?
21   A.   Yes.  Just keep track of it and report back
22  to Mr. Larson.
23   Q.   Now, did you understand that Mr. Kron wanted
24  that job?
25   A.   Yes.

Page 2391

1    Q.   And is it correct that by this memo,
2  Mr. Larson is telling Mr. Kron, Mr. Godoy, and you that
3  he had selected you to that be person, right?
4        MR. THOMAS:  Objection, Your Honor.
5  Leading.
6        THE COURT:  Overruled.
7        THE WITNESS:  That's correct.
8  BY MS. BITAR:
9    Q.   Does it surprise you that Mr. Larson would
10  justify that decision by playing up your importance in
11  that relationship?
12   A.   No, it doesn't surprise me at all.  Mr. Kron
13  was very persistent about it.  He was the managing
14  partner of the office and he wanted this role.
15   Q.   Now, Mr. Kron instead became the assurance
16  business line coordinator; is that right?
17   A.   I believe so.  I don't remember a hundred
18  percent.
19   Q.   Mr. Lenner, it says in the top --
20       MS. BITAR:  Can you go to the top of the
21  document, Ian?
22       (Technician complies.)
23  BY MS. BITAR:
24   Q.   It says the assurance business line leader.
25  It says, "The assurance business line coordinator is

Page 2392

1  appointed by the local assurance practice leader.  The
2  assurance coordinator's responsibilities include
3  identifying opportunities for involving the technology
4  alliance firm in assurance business line engagements."
5        What does assurance mean, Mr. Lenner?
6    A.   It means audit, basically.  It's an audit
7  function.
8    Q.   "Developing business leads within the
9  assurance client base."
10       Does that mean with audit clients?
11   A.   Yes.
12   Q.   "For the technology alliance firm and for
13  coordinating the resolution of any conflict or
14  independence issues.  The assurance coordinator is
15  responsible for keeping the liaison firm liaison up to
16  date on all business development or relationship issues
17  with the alliance firm."  Is that right?
18   A.   Yes.
19   Q.   And going to the bottom of the document it
20  says, "Because Mr. Lenner identified, championed, and
21  helped negotiate the alliance agreement, Sandy is the
22  logical choice to be the liaison."  Correct?
23   A.   Yes.
24   Q.   It's accurate that you identified the
25  StrataSys relationship, correct?

Page 2393

1    A.   Yes, I was the person that brought this
2    opportunity to Mr. Larson.  I identified StrataSys.
3       Q.   Did you think it was a good idea at the
4    time?
5       A.   Yes.
6       Q.   And did you help negotiate the alliance
7    agreement with StrataSys?
8       A.   The negotiations were primarily handled by
9    Mr. Larson.  I was involved in a couple of phone calls
10   at most.  That was -- I really had a limited involvement
11   in the negotiations.
12      Q.   Would it be fair to say you were
13   facilitating the negotiations?
14      A.   Yes.  I was the friendly face because I was
15   the local partner.  I got to know Mr. Arnie Girnun and a
16   couple of the other principals.  And when the firm
17   brings in an alliance firm and they use the national
18   resources, they always want a local partner involved to
19   help facilitate.  So I was basically there because they
20   felt comfortable with me.  So I didn't have an active
21   role in the negotiations.  Some but not much.
22      Q.   And, in fact, the negotiations related to
23   the alliance agreement; is that correct?
24      A.   Yes.
25      Q.   And are you familiar with the terms and

Page 2394

1    conditions relating to an information technology
2    alliance agreement?
3       A.   No.  That's a very lengthy document, and I
4    don't have a big understanding about that document at
5    all.
6       Q.   I'm done with the document.  Thank you.
7            Mr. Lenner, for championing the StrataSys
8    relationship, did you get -- did you make any money for
9    yourself?
10      A.   Yes.
11      Q.   How much money did you make, sir?
12      A.   $7,500.
13      Q.   And was that in the nature of a -- is that a
14   yearly amount or is that a one-time fee?
15      A.   It was a one-time fee that was given to me.
16      Q.   I'd like you to look, please, now at
17   Exhibit 471 in evidence.  It's one of the other
18   documents that we looked at on Tuesday.
19           Now, Mr. Lenner this is not a BDO document,
20   is it?
21      A.   Just one second, please.
22      Q.   Oh, sure.  I have another copy if you want.
23      A.   Okay.  That would be helpful.
24      Q.   Sure.
25           MS. BITAR:  May I approach, Judge?

Page 2395

1            THE COURT:  You may.
2            MS. BITAR:  (Complies.)
3            And if you can blow up the to and from,
4    please.
5            (Technician complies.)
6    BY MS. BITAR:
7       Q.   Are you familiar with the document, sir?
8       A.   I've only come to become familiar with this
9    document during the course of this trial.  I never
10   saw --
11      Q.   I'm sorry.  That was going to be my
12   question.  Have you ever seen this document before?
13      A.   No.
14      Q.   Was this ever submitted to you for any sort
15   of review?
16      A.   No.
17      Q.   And is this a document that comes from BDO?
18      A.   No.
19      Q.   How do you know that, sir?
20      A.   Because the to and from, they're not BDO
21   employees, and there's no BDO letterhead or BDO memo
22   sign here at all.
23      Q.   Now, this is from Dominick Parlapiano,
24   correct?
25      A.   Yes.

Page 2396

1       Q.   And he's reporting to his bosses, Eduardo
2    Orlansky and Hector Orlansky?
3       A.   Yes.
4       Q.   And to Mr. Stanham and Mr. Mendez, correct?
5       A.   Yes.
6       Q.   And all five of these individuals are
7    criminals, right?
8       A.   Yes.
9       Q.   And they were all indicted or either pled
10   guilty or are awaiting sentence, correct?
11      A.   Yes.
12      Q.   Let's talk about what's accurate in this
13   memo.  Going to the first paragraph, it references a
14   meeting, a meeting on or about May 24th, 2001, correct?
15      A.   Yes.
16      Q.   In BDO's offices?
17      A.   Yes.
18      Q.   Do you recall that meeting?
19      A.   I have a recollection that a meeting
20   occurred on or about May of that year.
21      Q.   And is that the meeting you talked about
22   with Mr. Thomas where Mr. O'Hare was present?
23      A.   Yes.
24      Q.   It states here, in attendance were Sandy,
25   Dave Larson of BDO's Star Wagon, their technology

Page 2397

1  company. What does that mean, if you know?
2      A.   Star Wagon was a subsidiary that was owned
3  by BDO. So effectively it's BDO.
4      Q.   But was that the technical entity that was
5  the alliance, the BDO alliance side of the equation?
6      A.   Right. Any alliance firms with respect to
7  IT were put through this Star Wagon subsidiary.
8      Q.   And that was what Mr. Larson was responsible
9  for, right?
10     A.   Yes.
11     Q.   And then is says, "Also present was Michael
12  O'Hare -- or Michael G. O'Hare. Mr. O'Hare sits on the
13  board of the parent company of BDO."
14         Mr. Lenner, was there a board of a parent
15  company of BDO?
16     A.   No, that's not correct.
17     Q.   Is there a parent company of BDO?
18     A.   No, there's no parent company.
19     Q.   It then goes on to say he's an executive
20  director. At the time that you met with Mr. O'Hare and
21  Mr. Larson and Mr. Parlapiano, did you know he had the
22  title of executive director?
23     A.   No.
24     Q.   You know that now?
25     A.   Yes.

Page 2398

1      Q.   And then it states, "and is the
2  highest-ranking corporate officer related to
3  non-accounting BDO companies such as Star Wagon."
4         Mr. Lenner, do you have any understanding
5  that Mr. O'Hare was the highest-ranking corporate
6  officer related to non-accounting BDO companies?
7      A.   No, I don't even know what that sentence
8  means. But he certainty wasn't the highest-ranking
9  corporate officer.
10     Q.   The memo goes on to say that the meeting was
11  held to finally negotiate the final terms of the
12  BDO/Star Wagon alliance agreement, correct?
13     A.   Yes.
14     Q.   Indicates that Mr. Cantor was there and
15  Mr. Parlapiano as a director, correct?
16     A.   Yes.
17     Q.   And it said that "We're shooting for an
18  executed agreement. BDO estimates it will originate
19  more than $10 million in business to the
20  StrataSys/BDO/Star Wagon alliance over the next 12
21  months."
22         Mr. Lenner, do you have any idea where
23  Dominick Parlapiano got this $10 million number from?
24     A.   I have no idea where he got this number
25  from. It's a huge number.

Page 2399

1      Q.   And just to give some perspective, what were
2  the annual revenues of the Miami office that year?
3      A.   Roughly speaking, about $3 million. So this
4  was more than triple any business that we could even --
5  we couldn't even dream of getting this amount of
6  business in one year into our firm, let alone referring
7  it to StrataSys. It's a huge number.
8      Q.   It says, "Separately, Sandy asked Mr. O'Hare
9  to mention his efforts related to establishing a BDO
10  finance company."
11         Do you remember anything about a BDO finance
12  company?
13     A.   I remember we spoke about this concept here
14  but we don't have -- BDO has no BDO finance company that
15  I'm aware of.
16     Q.   It goes on to say, "Given the insight into
17  the now difficult and getting tougher by the day cash
18  flow environment of small and midsize companies, BDO
19  sees an opportunity to provide cash flow financing
20  services to its clients and that of companies who are
21  members of BDO alliances."
22         Do you understand what Mr. Parlapiano is
23  talking about here?
24     A.   No.
25     Q.   The next paragraph talks about what

Page 2400

1  Mr. Parlapiano is saying Mr. O'Hare was clear about.
2  Namely, that BDO doesn't intend to take principal risk,
3  credit, client risk, et cetera, and will not use its own
4  balance sheet to assets. What Mr. O'Hare said was about
5  a $200 million a year in accounts-receivable-based
6  cash-flow lending, which BDO's finance company partner
7  would fund.
8         Do you have any idea what Mr. Parlapiano was
9  talking about in this portion of the memo where he's
10  reporting up to his bosses about his successes with you
11  at the meeting?
12     A.   No. I have no idea where this $200 million
13  number came from. It's such a huge number I think I
14  would remember it, but I just don't recall it at all. I
15  don't even think it happened.
16     Q.   Do you think Mr. Parlapiano made this up?
17     A.   I think so.
18     Q.   The next page of the document explains
19  Mr. Parlapiano's interest in having you and Mr. O'Hare
20  visit us up here at Bankest to further discuss the
21  possibility. And then it goes on to discuss some of the
22  terms and conditions that would be associated with the
23  venture.
24         Do you understand what this means,
25  originating the business for plus or minus a point and

Page 2401

1  E.S. Bankest owing the client directly, i.e., each
2  acceptable BDO client would become an E.S. Bankest
3  client and that all the business would be subject to
4  Bankest's underwriting and that Bankest could service
5  the funds access cash-flow financing without recourse to
6  BDO and with recourse to the clients directly?
7      A.  I have no idea where he's getting this from.
8      Q.  Do you understand what it means?
9      A.  Not really.
10     Q.  Now, to the extent there was any discussion,
11  it says this -- "My impression was confirmed this
12  morning by Sandy who related that Mr. O'Hare wants to
13  visit E.S. Bankest sometime in the second half of June
14  to further discuss."
15         Did you tell Mr. Parlapiano that Mr. O'Hare
16  wanted to come to E.S. Bankest to further discuss this?
17         MR. THOMAS:  Objection.  Hearsay, Your
18  Honor.
19         THE COURT:  Sustained.
20  BY MS. BITAR:
21     Q.  Mr. Lenner, did you -- what did you discuss
22  with Mr. Parlapiano about going to Bankest -- about
23  Mr. O'Hare going to Bankest in the second half of June?
24         MR. THOMAS:  Objection.  Hearsay.
25         THE COURT:  Sustained.

Page 2402

1  BY MS. BITAR:
2      Q.  Mr. Lenner, is this paragraph accurate?
3      A.  No.
4      Q.  Did you place a call to Mr. Parlapiano and
5  arrange for any meeting with Mr. O'Hare?
6      A.  No, I don't remember any of this.
7      Q.  And lastly, in the second to last paragraph
8  there's a discussion that -- in which Mr. Parlapiano is
9  reflecting information you conveyed about separating BDO
10  as broker from E.S. Bankest as a banker, and that BDO
11  already had a similar arrangement with an insurance
12  brokerage.  Do you have any idea what Mr. Parlapiano is
13  discussing with respect to this paragraph?
14     A.  No.
15     Q.  The idea of BDO as broker and Bankest as a
16  banker, did that come from you, sir?
17     A.  No.
18     Q.  Notwithstanding there was some discussion
19  about some sort of financing arrangement, did anything
20  come of it?
21     A.  Nothing happened from this.  Nothing came
22  from this at all.
23     Q.  Was there a second meeting that Mr. O'Hare
24  came in and attended to discuss the alliance, a
25  factoring alliance?

Page 2403

1      A.  No, there was no second meeting.
2      Q.  Did you later learn that Mr. O'Hare really
3  had no interest in proceeding in this way?
4      A.  Yes.
5         MR. THOMAS:  Objection, Your Honor.
6  Hearsay, speculation.
7         THE COURT:  Overruled.
8  BY MS. BITAR:
9      Q.  You may answer, sir.
10     A.  Yes.  Sometime a couple months later, I
11  think in either October or November, we had our annual
12  partner's meeting.  And I just followed up with
13  Mr. O'Hare and asked him what was going on --
14         MR. THOMAS:  Objection.  Hearsay.
15         THE COURT:  Sustained.
16  BY MS. BITAR:
17     Q.  After the conversations, did you develop an
18  understanding that nothing was going on with this?
19         MR. THOMAS:  Objection, Your Honor.
20  Hearsay.
21         THE COURT:  Overruled.
22         THE WITNESS:  That's correct.  Nothing ever
23  happened.
24  BY MS. BITAR:
25     Q.  Mr. Lenner, do you remember on Tuesday

Page 2404

1  Mr. Thomas showed you various E.S. Bankest financial
2  statements?
3      A.  Yes, he showed me some.
4      Q.  And do you remember he showed you
5  Exhibit 67?  I think it's on the table.  This is
6  financial statements for year-ended December 31, '02 and
7  '01.
8      A.  Yes.
9      Q.  And do you remember you gave some testimony
10  about the footnote disclosure on the last page of the
11  document is wrong?
12     A.  Yes.
13     Q.  And you also testified that the balance
14  sheet was right.  Do you recall that testimony?
15     A.  Yes.
16     Q.  And Mr. Thomas asked you some questions
17  about is actually wasn't right because many of these
18  were fake.  Do you remember that testimony generally?
19     A.  Yes.
20     Q.  I just want to ask you one question about
21  the document.  When you said the balance sheet was
22  right, what did you mean by that?
23     A.  What I meant by that was that the -- all the
24  assets that we had examined as part of our audit, the
25  hundred or so million dollars that was on their balance

Page 2405

1   sheet, we performed our tests. They were the amounts
2   that we saw in the lead sheet. And we were satisfied at
3   that point in time that the balance sheet was -- that
4   those assets were real.
5       Q.  My question is a little bit different.
6   Could you explain to the jury what you meant with the
7   understanding that the footnote amount, the
8   $3.2 million, is wrong?
9       A.  Yes. What I meant by that was I said that
10  the balance sheet is correct, the financial statements
11  are correct, the lead sheet that Mr. Thomas put up on
12  the screen was correct, the footnote was not correct.
13  And it wasn't even a requirement for Generally Accepted
14  Accounting Principles.
15      Q.  Mr. Lenner, let me ask you a question one
16  other way. The outstanding StrataSys receivables for
17  that audit opinion were closer to $29 million, correct?
18      A.  Yes.
19      Q.  Was that $29 million reflected on the
20  balance sheet?
21      A.  Yes. In the balance sheet was a 29 million
22  StrataSys receivables, it was in the footnotes,
23  29 million was in the lead sheet. All that was
24  incorrect was the footnote.
25      Q.  Thank you. Getting back to the question of

Page 2406

1   a conflict of interest. Did you believe that you were
2   objective in your audits of Bankest?
3       A.  Yes.
4       Q.  Did you have any question about your ability
5   to be objective?
6       A.  No.
7       Q.  Why do you think you were objective?
8       A.  We did not change our approach from the year
9   2000. It was the same approach that we did in 2001.
10  These receivables were no longer the receivables of
11  StrataSys. They were one of the -- they were one of
12  many receivables that were on the books of E.S. Bankest.
13  That's what we were auditing. They were treated no
14  differently. They were in our sample selection. They
15  weren't treated any differently than any other
16  receivable was purchased by E.S. Bankest.
17      Q.  Mr. Lenner, did you consider issues of
18  objectivity when you took on the 2001 audit after BDO
19  had a strategic alliance with StrataSys?
20      A.  Yes.
21      Q.  And did you determine that you could be
22  objective?
23      A.  Yes.
24      Q.  And was Dominick Parlapiano aware from
25  discussions with you about the fact that you audited

Page 2407

1   Bankest and you had a strategic alliance with StrataSys?
2       MR. THOMAS: Objection, Your Honor.
3   Speculation.
4       MS. BITAR: I'll rephrase it, Judge.
5   BY MS. BITAR:
6       Q.  Based on your dealings with Mr. Parlapiano
7   at meetings and at -- whether at Bankest or at
8   StrataSys, did you understand Mr. Parlapiano knew that
9   Bankest was -- that BDO was Bankest's auditor?
10      MR. THOMAS: Objection, Your Honor.
11      THE COURT: Overruled.
12      THE WITNESS: Yes.
13  BY MS. BITAR:
14      Q.  And did you have similar conversations with
15  Mr. Girnun and Mr. Cantor at StrataSys?
16      MR. THOMAS: Objection, Your Honor.
17  Hearsay.
18      THE COURT: It's a yes-or-no question. It's
19  either yes or no.
20      THE WITNESS: Yes.
21  BY MS. BITAR:
22      Q.  Okay. Let's continue with how this alliance
23  ended. How did the big $10 million alliance with
24  StrataSys turn out?
25      A.  It really never went anywhere. There was

Page 2408

1   very, very little business between us. I think there
2   was one small referral. That was it. Nowhere near
3   10 million. Nowhere near a million. It just wasn't --
4   it never went anywhere. They were --
5       Q.  Let me just ask another question. Why do
6   you think it didn't go anywhere?
7       A.  Because their client base was different than
8   our client base. They were geared towards very large
9   institutional type of companies such as Baptist
10  Hospital, Mercy, FIU. Our practice at BDO at that time
11  and still now, we are a middle-market firm. We don't
12  really handle here in Miami these institutional large
13  megacompanies. We have smaller companies, that middle
14  market. So it really -- we really weren't able to offer
15  them the types of referrals that they were looking for.
16  And likewise, they weren't able to offer us the
17  referrals. It didn't work out.
18      Q.  Now, do you remember during, I think it was
19  Mr. Freeman's testimony, the jury saw the alliance
20  agreement?
21      A.  Yes.
22      Q.  That was up on the screen. Do you remember
23  that there was some reference in the document that the
24  alliance fee that BDO was going to receive was $75,000?
25      A.  Yes.

Page 2409

1    Q.   Do you know how that licensing number was
2  set?
3    A.   No.
4    Q.   Who set the fee?
5    A.   It was by Mr. Larson.
6    Q.   And do you know what factors Mr. Larson
7  looked at to come up with that amount?
8    A.   None.
9    Q.   Do you know if that fee, it was ultimately
10  paid?
11   A.   No, I don't think it was paid.
12   Q.   What do you remember happening about the
13  $75,000?
14   A.   I remember that it was reduced because they
15  were not getting any referrals. It went down to
16  1.4 thousand a month. It was -- I think it was about
17  6,000 a month, was the original starting point. Then it
18  went down to 4,000. They weren't getting referrals and
19  they negotiated down to 3,000 a month. And then finally
20  it was negotiated down to $1250 a month.
21   Q.   Do you know what BDO's entire gain was from
22  this licensing arrangement?
23   A.   Yes.
24   Q.   How much?
25   A.   $36,000.

Page 2410

1    Q.   And again, it was your understanding it was
2  reduced downward because they were not pleased with the
3  lack of referrals?
4        MR. THOMAS: Objection, Your Honor.
5  Leading.
6        THE COURT: Sustained.
7  BY MS. BITAR:
8    Q.   What was your understanding as to why it was
9  (inaud.) down so much?
10   A.   They weren't receiving any referrals or any
11  benefit from it, and they were questioning this whole
12  relationship. And for that reason, Mr. Larson wanted to
13  keep them in the program and reduce the fee so we could
14  keep them.
15   Q.   Mr. Lenner, did you have any understanding
16  at the time that StrataSys was having money troubles?
17   A.   No.
18   Q.   And to the best of your knowledge, did
19  anybody at BDO?
20   A.   No one.
21       MR. THOMAS: Objection. Speculation.
22       THE COURT: Overruled.
23  BY MS. BITAR:
24   Q.   Now, there was a licensing fee. And we now
25  know that that was approximately $36,000, correct?

Page 2411

1    A.   Yes.
2    Q.   And then there was supposed to be these
3  referral fees you talked to Mr. Thomas about. Do you
4  remember that?
5    A.   Yes.
6    Q.   And that -- the way that was supposed to
7  work is that if there was referrals, BDO would get a
8  commission on that, 10 or 20 percent. That's what you
9  testified to, sir?
10       MR. THOMAS: Objection. Leading, Your
11  Honor.
12       THE COURT: Overruled.
13       THE WITNESS: Yes.
14  BY MS. BITAR:
15   Q.   You said that you recall that there was one
16  referral. You said that earlier this afternoon; is that
17  right?
18   A.   Yes.
19   Q.   Did BDO receive any referral fee from that
20  one referral?
21   A.   No, we did not.
22   Q.   And do you know why that was?
23   A.   Yes, because it was an assurance client.
24  And we're not allowed to receive referral fees when you
25  refer assurance clients to alliance firms.

Page 2412

1    Q.   So again, when you say assurance you mean?
2    A.   Audit.
3    Q.   One of your audit clients?
4    A.   Yes.
5    Q.   So even though you made a referral, you got
6  no fee?
7    A.   Nothing.
8    Q.   The strategic alliance agreement talks about
9  methodology fees. Do you have any idea of a methodology
10  fee being received by BDO?
11   A.   Nothing was received.
12   Q.   Mr. Lenner, at the end of the day, how much
13  money did BDO make on the StrataSys relationship?
14   A.   $36,000.
15   Q.   And how much money did you make?
16   A.   $7500.
17   Q.   And when BDO developed this relationship
18  with StrataSys, was it something that was internally
19  discussed at the firm?
20   A.   Yes.
21   Q.   And was it publicized in the newspaper and
22  press releases?
23   A.   Yes, there were press releases taken out,
24  something in the Miami Herald. There was even a deal
25  (inaud.) made. We were very optimistic and very proud

Page 2413

1  of this alliance firm. And we were hoping something
2  would develop from this relationship with StrataSys.
3  Unfortunately, nothing developed.
4      Q.  Let's change topics -- once I put on my
5  microphone. Mr. Lenner, did you know Ramon Rivera?
6      A.  Yes.
7      Q.  Did you hear Mr. Rivera testify in this
8  courtroom?
9      A.  Yes.
10     Q.  Did you hear what he said?
11     A.  Yes.
12     Q.  Do you remember him working at BDO?
13     A.  Yes.
14     Q.  Was he a competent auditor?
15     A.  Yes.
16     Q.  He testified he didn't work on the 2000
17  audit. Do you know why?
18     A.  Yes.
19     Q.  Why?
20     A.  At that point in time we needed Ramon for
21  more complex audit engagements. It was time for Chris
22  Mohr, who was a senior for a couple of prior years, and
23  he moved up and he filled the shoes of Ramon that year.
24  And Ramon went on to work at some other public companies
25  and some other clients.

Page 2414

1      Q.  Was he punished in any way taking him off
2  the Bankest audit?
3      A.  No.
4      Q.  Was he, in essence, promoted to do more
5  challenging work?
6      A.  In fact, to work for public companies --
7  those are companies that trade securities on the stock
8  exchange -- in a public accounting firm, that's a pretty
9  high honor. That's prestigious to work on those types
10  of clients. And he worked on a couple of those.
11     Q.  Now, was he fired?
12     A.  Yes.
13     Q.  Why was he fired if he's being given these
14  responsible roles?
15     A.  He was fired because he was with us for two,
16  three years, and we reached a conclusion that he wasn't
17  able to advance to the next level, which would have been
18  the senior manager, and ultimately, it would have been a
19  partner. So we told him that it wasn't working out and,
20  you know, we asked him to seek other employment.
21     Q.  Was he upset about that?
22     A.  Yes.
23     MR. THOMAS: Objection. Speculation.
24     THE COURT: Overruled.
25  BY MS. BITAR:

Page 2415

1      Q.  Were you on occasion critical of Mr. Rivera?
2      A.  Yes.
3      Q.  Did Mr. Rivera's termination in 2001 have
4  anything to do with the work he did on Bankest in 1998?
5      A.  None whatsoever.
6      Q.  Do you remember Mr. Thomas showed you the
7  C-10 work paper?
8      A.  Yes.
9      Q.  Do you have that in front of you, sir?
10     MS. BITAR: Can you get that on the screen,
11  please?
12     (Technician complies.)
13     THE WITNESS: Ms. Bitar, I don't have a copy
14  of it.
15     MS. BITAR: May I approach, Judge?
16     THE COURT: Yes.
17     MS. BITAR: (Complies.)
18  BY MS. BITAR:
19     Q.  Mr. Lenner, I'm asking you this question
20  flat out under oath. Did you ever tell Ramon Rivera
21  that he can accept a BCC check instead of a customer
22  check when performing this audit step?
23     A.  I never said that.
24     Q.  Did you ever say it to the auditor who
25  replaced him, Chris Mohr?

Page 2416

1      A.  No.
2      Q.  Did you ever tell the next person down the
3  line, George Herrera?
4      A.  No.
5      Q.  When Mr. Rivera is saying to this jury that
6  that's what you told him to do, is he mistaken?
7      MR. THOMAS: Objection, Your Honor.
8      THE COURT: Sustained.
9  BY MS. BITAR:
10     Q.  Did you ever tell him that, sir?
11     MR. THOMAS: Objection, Your Honor.
12     THE COURT: Sustained.
13  BY MS. BITAR:
14     Q.  Looking at the work paper, we've heard now
15  about the initials on the top right corner mean, but let
16  me ask you a little bit different question. Who
17  prepared this work paper?
18     A.  Mr. Rivera prepared this work paper.
19     Q.  And do you see this work paper after the
20  fact?
21     A.  Yes.
22     Q.  And the text at the bottom, the three
23  footnotes --
24     MS. BITAR: Can we highlight that, please?
25     (Technician complies.)

Page 2417

1   BY MS. BITAR:
2       Q.   Who wrote the text?
3       A.   He did.
4       Q.   Mr. Lenner, assume for purposes of this
5   question only that you did tell him, you could use a BCC
6   check, what should have been reflected on that work
7   paper?
8           MR. THOMAS:  Objection, Your Honor.
9           THE COURT:  Overruled.
10          THE WITNESS:  Assuming I told him that, then
11  he would set up a fourth column, column D, and that
12  would say examined -- it would say the same thing as A
13  but except for saying traced to copy of customer check,
14  it would say traced to BCC check.  Because the whole
15  purpose of these tick marks, to explain the documents
16  that you examined and to be clear.
17  BY MS. BITAR:
18      Q.   And is that why you told Mr. Thomas on
19  Tuesday this was an important work paper?
20      A.   Yes.
21      Q.   Is that also because what it does is it
22  provides the audit trail so you can recount the steps
23  back to see how the test was performed?
24          MR. THOMAS:  Objection. Leading, Your
25  Honor.

Page 2418

1           THE COURT:  Sustained.
2   BY MS. BITAR:
3       Q.   Why is it important, Mr. Lenner?
4       A.   Because this is an audit trail that
5   indicates the work that was performed at the time in
6   1999 when this person was examining the checks and the
7   invoices.  It says exactly what he did.  Instead of
8   attaching the check, attaching the invoice, attaching
9   the remittance, the auditors put this tick mark and
10  explained what he or she examined.  That's the purpose
11  of it.
12      Q.   Are checks and invoices routinely kept, sir?
13      A.   No.
14      Q.   And why is that?
15      A.   To do so, it would be voluminous.  It's just
16  no point in keeping thousands or millions of invoices,
17  and for all your clients nationally.  That's why you put
18  tick marks in, to explain what you looked at or
19  information so there's an audit trail to see the
20  documents that were examined.
21      Q.   And a document such as this which provides
22  the audit trail evidence, is that why this document is
23  important and the inherent risk questionnaire that we
24  looked at not important?
25          MR. THOMAS:  Objection, Your Honor.

Page 2419

1           THE COURT:  Sustained.
2   BY MS. BITAR:
3       Q.   Mr. Lenner, you told Mr. Thomas something
4   about how this was an important document and that was a
5   less important document.  Could you explain that to the
6   jury, please?
7       A.   Yes.  This is an important document because
8   it's very key, that it's very clear what the auditor
9   examined.  Whereas, in the internal control
10  questionnaire that we were looking at the other day, we
11  already concluded that the company was high risk and
12  sensitive.  And to go back and change it, it had no
13  bearing on the audit.  So that's why it wasn't that
14  important or wasn't relevant then, because we already
15  deemed the audit to be high risk.  This is important.
16      Q.   Do you remember, Mr. Lenner, Mr. Thomas
17  asked you a bunch of times, "So you couldn't rely on
18  that?  Answer:  Yes, in the inherent questionnaire."
19          You couldn't rely on the questionnaire.  Do
20  you remember that?
21      A.   Yes.
22      Q.   Mr. Lenner, did you need to rely on the
23  answer to that question?
24      A.   No.
25      Q.   And is that the reason you've just explained

Page 2420

1   to the jury?
2       A.   Yes.
3       Q.   Because you overroad what the actual
4   questionnaire analysis told you?
5           MR. THOMAS:  Objection.
6           THE COURT:  Sustained.
7   BY MS. BITAR:
8       Q.   Why was it not important, Mr. Lenner?
9       A.   Because we already made the decision that
10  the company was high risk and sensitive.  There was no
11  point in making that change.  So we made that
12  conclusion -- it was a manual change later on in the
13  audit.
14      Q.   Mr. Lenner, do you remember when Mr. Thomas
15  showed you that document, he asked you if it was your
16  understanding that items 10 through 32 were fake?
17      A.   Yes.
18      Q.   And I think you said yes.  Do you have
19  personal knowledge of that?
20      A.   No.  I had no personal knowledge at that
21  time that they were fake.  It's only hearing the
22  testimony of the people that had presented their
23  testimony in this case have I learned to hear that these
24  invoices, you know, were fake.
25      Q.   So even as you sit here today, your answer

Page 2421

1   is based on what you heard other people tell you; is
2   that correct?
3       A.  That's correct.
4       Q.  You talked about this work stoppage, and you
5   said you had a vague or fleeting -- I don't remember the
6   words you used -- recollection of it.  Do you remember
7   that testimony?
8       A.  Yes.
9       Q.  And do you remember you told the jury that
10  at your deposition you didn't remember this happening at
11  all?
12      A.  Yes.
13      Q.  Do you remember -- withdrawn.
14          And that your memory is refreshed after
15  hearing Mr. Ellenburg and Mr. Rivera talk about what
16  happened?
17      A.  Yes.
18      Q.  And as you sit there and you listen and you
19  try to put the pieces and have them try to make sense to
20  you?
21      A.  Yes.
22      Q.  Do you remember when your deposition was?
23      A.  It was in I think May or June of 2004.
24      Q.  And Mr. Lenner, was the deposition in
25  connection with this case?

Page 2422

1       A.  No, it was not.
2       Q.  It was in connection with the receiver's
3   action, correct?
4       A.  Yes.
5       Q.  And you were not a defendant in that case,
6   correct?
7       A.  That's correct.
8       Q.  BDO wasn't either?
9       A.  That's correct.
10      Q.  And Mr. Thomas was there asking you
11  questions as special counsel to the receiver and on
12  behalf of the bank, correct?
13      A.  Yes.
14      Q.  And a subpoena was served on you and you
15  gave testimony in that action, correct?
16      A.  Yes, I did.
17      Q.  By the way, when did you first learn about
18  the fraud?
19      A.  When it was in the paper, which I think was
20  in August of 2003.
21      Q.  And do you recall that within a week
22  Mr. Freeman had subpoenaed BDO's work papers?
23      A.  Yes.
24      Q.  And then about ten months later he
25  subpoenaed you for a deposition?

Page 2423

1       MR. THOMAS:  Objection.  Leading, Your
2   Honor.
3       THE COURT:  Overruled.
4       THE WITNESS:  Yes
5   BY MS. BITAR:
6       Q.  And during that period of time, did you
7   corroborate with the United States Attorney's office and
8   answer their questions?
9       A.  Yes, I did.
10      Q.  Did Mr. Freeman ever pick up a phone and ask
11  you questions about this case -- I'm sorry -- about the
12  audits?
13      A.  He never called me.
14      Q.  Now, getting back to your deposition, what
15  did -- do you remember what Mr. Thomas asked you about
16  the work stoppage?
17      A.  I think he asked me if there was -- if there
18  ever work was a work stoppage on this audit.  And that
19  was it.
20      Q.  And what did you say?
21      A.  I said I don't recall any.
22      Q.  Well, let me ask you a question.  Do you
23  remember if he asked you about this audit or any audit?
24      MR. THOMAS:  Objection, Your Honor.
25  BY MS. BITAR:

Page 2424

1       Q.  Do you remember?
2       THE COURT:  Sustained.
3       MR. THOMAS:  Objection, Your Honor.
4       THE COURT:  Sustained.  Rephrase your
5   question.
6   BY MS. BITAR:
7       Q.  Were you asked about a work stoppage on this
8   audit or any other audits?  Do you remember?
9       MR. THOMAS:  Objection, Your Honor.
10      THE COURT:  What's the legal basis?
11      MR. THOMAS:  Hearsay.
12      THE COURT:  Sustained.  There's more
13  objections but this is fine.
14  BY MS. BITAR:
15      Q.  Were you asked any questions about Ramon
16  Rivera?
17      MR. THOMAS:  Objection, Your Honor.
18      THE COURT:  Same -- what's your objection?
19      MR. THOMAS:  My objection is, one, hearsay
20  because the hearsay is in the question.  Two, violates
21  the rules on depositions.  I'll stop there.
22      THE COURT:  Sustained.
23  BY MS. BITAR:
24      Q.  Were you shown an affidavit by Ramon Rivera?
25      MR. THOMAS:  Objection, Your Honor.

Page 2425

1          THE COURT: It's overruled. It's a yes or
2  no.
3          MS. BITAR: Okay.
4          THE WITNESS: No. The question was just
5  asked --
6          MR. THOMAS: Objection, Your Honor.
7          THE COURT: Sustained.
8  BY MS. BITAR:
9      Q.   Did learning it was Mr. Rivera in 1998 when
10  he came and testified refresh your recollection about
11  this matter?
12     A.   Yes.
13     Q.   And that's something you didn't know at your
14  deposition, sir?
15     A.   I had no recollection of it. Even now after
16  hearing the testimony, I just have a very vague
17  recollection that the work stopped and then it resumed a
18  couple days later.
19     Q.   Mr. Lenner, let me ask you this. You gave
20  some testimony to Mr. Thomas about a meeting with
21  Dominick Parlapiano when this issue was apparently
22  resolved. Do you remember that testimony?
23     A.   Yes.
24     Q.   I want to be clear. Do you actually
25  remember this meeting or are you assuming it happened

Page 2426

1  based on what you heard everyone else tell you happened?
2          MR. THOMAS: Objection. Leading, Your
3  Honor.
4          THE COURT: Overruled.
5          THE WITNESS: I don't recall that meeting at
6  all. Just putting together the snippets of information
7  that I've been hearing.
8  BY MS. BITAR:
9      Q.   So Mr. Lenner, is it fair to say that other
10  than your recollection there was some several-day glitch
11  with respect to receiving documents, you have no other
12  specific recollection of this incident?
13     A.   That's correct.
14     Q.   And why is that, sir?
15     A.   Because it happened -- because if it
16  happened, it happened eight years ago. And it's not
17  uncommon for audits to stop because there's
18  misunderstandings on why we need certain evidence to
19  complete our audits. And phone calls are made and it
20  resumes.
21     Q.   So Mr. Lenner, was this incident significant
22  to you?
23     A.   No.
24     Q.   Mr. Lenner, we will be discussing the audit
25  work you performed when I call you on our case --

Page 2427

1          MR. THOMAS: Objection, Your Honor.
2          MS. BITAR: At this time, I have no further
3  questions.
4          THE COURT: Mr. Thomas, do you have any
5  redirect?
6          MS. BITAR: Thank you, sir.
7          MR. THOMAS: I'm going to say yes.
8          THE COURT: Okay. Just asking.
9          MR. THOMAS: I was thinking about it myself.
10          REDIRECT EXAMINATION
11  BY MR. THOMAS:
12     Q.   Hello again, Mr. Lenner.
13     A.   Hello, Mr. Thomas.
14     Q.   Mr. Lenner, I think you established with
15  your counsel that you weren't very familiar with all the
16  technology that they were using at StrataSys. Do you
17  remember that?
18     A.   Yes.
19     Q.   You didn't really understand the details of
20  their business because you're not a computer guy?
21     A.   Yes.
22     Q.   And, in fact, she put up the memo --
23          MR. THOMAS: Can we put that one up that has
24  all the stuff that StrataSys does?
25          (Technician complies.)

Page 2428

1  BY MR. THOMAS:
2      Q.   Exhibit 439. Do you remember that? And
3  your counsel blew up that middle part where the bullet
4  points are. They talked about they have this whole
5  infrastructure and network system, consulting, and
6  implementation. And I believe you testified -- I mean,
7  you really didn't even know what that stuff was hardly,
8  right?
9      A.   I said I had a general understanding. I
10  don't know how to implement that type of service.
11  That's what I said.
12     Q.   Right. And if you look down there below
13  where it talks about the financing manufacturing, see
14  that right down there? And it talks about the MAS 200
15  and MAS 90 software. You really don't know what any of
16  that stuff is either, right?
17     A.   As it says here, it's like a general ledger
18  or financing accounting package.
19     Q.   But you just know that from reading that
20  there, right?
21     A.   I know that in general.
22     Q.   In general. But you don't really know the
23  computer stuff at StrataSys, right? Isn't that what you
24  just told your counsel?
25     A.   Yes.

Page 2429

1    Q.  You didn't know that stuff, right?
2       MS. BITAR:  Objection, Your Honor.
3   BY MR. THOMAS:
4    Q.  That's what you just told her, right?
5       THE COURT:  Overruled.
6       THE WITNESS:  Yes.
7   BY MR. THOMAS:
8    Q.  So you weren't named the alliance firm
9   liaison because you had some expertise in StrataSys'
10  business, right?
11   A.  Repeat the question, please.
12   Q.  You were not named the alliance firm liaison
13  because you had some expertise in StrataSys' business,
14  right?
15   A.  Yes.
16   Q.  You were named the alliance firm liaison
17  because of your relationships with the people at
18  StrataSys, right?
19   A.  Yes.
20   Q.  And those relationships included Dominick
21  Parlapiano, right?
22   A.  It was after Dominick -- after
23  Mr. Parlapiano introduced me to the people at StrataSys,
24  the relationship progressed to Mr. Girnun.  That was my
25  contact person.

Page 2430

1    Q.  So it wasn't just your relationship with
2   Dominick Parlapiano?  I mean, that's how you got the
3   business, right?
4    A.  That was the introduction, correct.
5    Q.  You also had relationships with other people
6   at StrataSys including Arnie Girnun, right?
7    A.  Just professional relationships.  That was
8   it.
9    Q.  Well, professional relationships enough that
10  even though you didn't even understand their business,
11  you were named the alliance firm liaison, right?
12   A.  While I was named the alliance firm liaison,
13  I had a general understanding of the business.  I could
14  not work for them because I don't know what they sell or
15  how to sell it or how to implement it.  So I had a
16  general understanding.
17   Q.  What you had was relationships and that's
18  why you were named the alliance firm liaison, right?
19      MS. BITAR:  Objection.  Asked and answered.
20      THE COURT:  Sustained.
21      MR. THOMAS:  Well, can we go to the memo
22  that talks about it?
23      (Technician complies.)
24  BY. MR. THOMAS:
25   Q.  Mr. Lenner, I've showed you this before.

Page 2431

1   But just so you can find a copy, it's Plaintiffs'
2   Exhibit Number 440.  Here you go.
3       MR. THOMAS:  You all have a copy?
4       MS. BITAR:  (Nodding.)
5   BY MR. THOMAS:
6    Q.  And if you look down there at the bottom,
7   after we see the first sentence because --
8       MR. THOMAS:  Can we blow up that paragraph?
9       (Technician complies.)
10  BY MR. THOMAS:
11   Q.  That second sentence says, "Sandy has
12  developed many relationships at StrataSys over the eight
13  months we worked on bringing StrataSys into the alliance
14  program."
15      Now, that sentence is true, right?
16   A.  Yes.
17   Q.  And you see that sentence above that?  You
18  see where it says, "Because Sandy Lenner identified,
19  championed, and helped negotiate the alliance agreement
20  with StrataSys, Sandy is the logical choice and will be
21  the alliance firm liaison."
22      You see that one?
23   A.  Yes.
24   Q.  Now, you told your lawyer that the gentleman
25  who wrote this was playing up your importance.  Do you

Page 2432

1   remember that testimony?
2    A.  Yes.
3    Q.  He's another BDO employee, right?
4    A.  Yes.
5    Q.  You don't think he was lying, do you?
6       MS. BITAR:  Objection, Your Honor.
7       THE COURT:  Sustained.
8   BY MR. THOMAS:
9    Q.  Mr. Lenner, do you think he was telling the
10  truth when he wrote this sentence or you think he was
11  playing it up?
12      MS. BITAR:  (Standing up.)
13      THE COURT:  Sustained.  Rephrase your
14  question.
15  BY MR. THOMAS:
16   Q.  Mr. Lenner, do you think he was telling the
17  truth when he wrote this sentence?
18      MS. BITAR:  Objection, Your Honor.
19      THE COURT:  Sustained.
20  BY MR. THOMAS:
21   Q.  Mr. Lenner, is this sentence true?
22      MS. BITAR:  Objection, Your Honor.
23      THE COURT:  Overruled.
24      THE WITNESS:  Yes.  It's for the most part
25  accurate.  I was involved in the process and I helped

Page 2433

1  negotiate one or two times, as I gave testimony before.
2  But the day-to-day negotiations were handled by
3  Mr. Larson, not me.
4  BY MR. THOMAS:
5      Q.  Do you remember when I was asking you
6  questions the first time, it was just a couple of days
7  ago?
8      A.  Maybe some of the questions, sure.
9      Q.  And I asked you then whether this sentence
10  was true and you just said yes. Do you remember that?
11     A.  Repeat the question.
12     Q.  When we were here on Tuesday, a couple of
13  days ago, I asked you the same question about whether
14  this sentence was true or not and you just said yes. Do
15  you remember that?
16     A.  Yes.
17     Q.  And it's the same answer or now is it just
18  mostly correct?
19         MS. BITAR: Objection, Your Honor.
20         THE COURT: Sustained.
21  BY MR. THOMAS:
22     Q.  I just want to know, Mr. Lenner, is your
23  answer the same today?
24         MS. BITAR: Objection, Your Honor.
25         THE COURT: Sustained.

Page 2434

1  BY MR. THOMAS:
2      Q.  Today is it mostly correct?
3          MS. BITAR: Objection, Your Honor.
4          THE COURT: Sustained. Go on to another
5  question.
6          MR. THOMAS: A different way? Okay.
7  BY MR. THOMAS:
8      Q.  Mr. Lenner, you championed the StrataSys
9  alliance?
10     A.  Yes.
11     Q.  And at the time you championed the StrataSys
12  alliance, you thought it was going to be very
13  profitable, right?
14     A.  I was hoping it would be profitable.
15     Q.  Well, you didn't champion it because you
16  thought it wouldn't be profitable, right?
17     A.  That's correct.
18     Q.  In fact, you were very excited about it
19  because you thought it was going to be profitable,
20  right?
21     A.  Yes.
22     Q.  And at this time, BDO was making millions
23  and millions of dollars a year from just these kind of
24  alliances, right?
25         MS. BITAR: Objection, Your Honor.

Page 2435

1          THE COURT: Overruled.
2          THE WITNESS: Yes. Although we were making
3  millions of dollars a year, it wasn't -- it was a -- not
4  in the Miami office. It was nationally the firm was
5  making millions of dollars.
6  BY MR. THOMAS:
7      Q.  So at the time that you were championing
8  StrataSys, at the time that you got StrataSys signed up,
9  the firm was making millions and millions of dollars
10  from such alliances and you were hopeful that you would
11  make a bunch of money too, right?
12         MS. BITAR: Objection, Your Honor.
13         THE COURT: Overruled.
14         THE WITNESS: Yes.
15         MR. THOMAS: With His Honor's permission,
16  I'll approach you with Plaintiffs' Exhibit 415-B.
17         THE COURT: You may.
18  BY MR. THOMAS:
19     Q.  You've seen this before. This is your
20  good-guy memo, right?
21     A.  Yes.
22     Q.  And this was the memo you were writing to
23  the CEO to try to get a bigger bonus, right?
24     A.  To get a bonus.
25     Q.  To get a bonus. Some sort of money?

Page 2436

1      A.  Yes.
2      Q.  And in here you said that you have very high
3  expectations for StrataSys, right?
4      A.  Yes.
5      Q.  And those high expectations included that it
6  would be very profitable? You'd make money from it,
7  right?
8      A.  Yes.
9      Q.  And do you remember talking to your counsel
10  about how that was okay?
11         MS. BITAR: Objection, Your Honor. Talking
12  to your counsel.
13         THE COURT: Sustained.
14  BY MR. THOMAS:
15     Q.  Well, do you remember testifying to the jury
16  that that was okay to try to make money?
17     A.  Yes.
18     Q.  And if we look at the back of this thing, we
19  see on page 3 your whole discussion about smelling the
20  cheese. You see that?
21     A.  Yes.
22     Q.  And do you remember testifying to the jury
23  that that smell the cheese meant grow the business and make
24  it -- meant making more money, right?
25     A.  Yes.

Page 2437

1    Q.  And I think you even told the jury today
2  that smelling the cheese was good, right?
3    A.  Yes.
4    Q.  Greed it good, right?
5    MS. BITAR:  Objection, Your Honor.
6    THE COURT:  Sustained.
7  BY MR. THOMAS:
8    Q.  Well, Mr. Lenner, when you were trying to
9  grow the business and you wanted to smell the cheese,
10 that meant that you were going to use these alternative
11 distribution channels to grow that business, right?
12   A.  Yes.
13   Q.  And one of those alternative distribution
14 channels was StrataSys, right?
15   A.  It was one of many.
16   Q.  So it was one of them?
17   A.  That's what I just said, yes.
18   Q.  So when you were giving your loud wolf howl,
19 wake-up call to the pack, that's what you were
20 trying to communicate, that you were going to grow your
21 business through these alternative distribution
22 channels?
23   MS. BITAR:  Objection, Your Honor.  I think
24 this is outside the scope.
25   THE COURT:  Overruled.

Page 2438

1    THE WITNESS:  Yes.
2  BY MR. THOMAS:
3    Q.  And one of those that you had high
4  expectations of when you wrote this memo was StrataSys,
5  right?
6    A.  Yes.
7    Q.  Mr. Lenner, when you were talking about
8  C-10 -- this is Plaintiffs' Exhibit Number 376.  Do you
9  remember this, right?
10   A.  Yes.
11   Q.  And I believe you previously testified to
12 the jury that you had no personal knowledge whether
13 these steps were done or not, right?
14   A.  No, I didn't think I said that.
15   Q.  Well, you didn't do any of them, right?
16   A.  Mr. Rivera performed the steps.
17   Q.  That's right.  Mr. Rivera.  He's the one
18 that has personal knowledge, right?
19   A.  Yes.
20   Q.  And you don't have personal knowledge,
21 right?
22   A.  Well, when I read the tick mark, I have
23 personal knowledge that's what he did.
24   Q.  So your personal knowledge is just based on
25 looking at the work paper?

Page 2439

1    A.  It is reviewing the work paper, Mr. Rivera
2  performing the task as indicated by steps A, B, and C.
3  That's the personal knowledge I have.
4    Q.  So you don't have personal knowledge of
5  actually being there and seeing the checks and
6  performing the tests, right?
7    A.  You're asking me if I did that step?
8    Q.  I'm asking you if you were even there when
9  he did the step?  You weren't at Bankest, were you?
10   A.  I do visit my clients, Mr. Thomas.  I don't
11 go there as much as Mr. Rivera would be there.  I do --
12 I don't know if I was there that day when he was doing
13 that test.  But there are times that I'm in the field.
14   Q.  You remember when I was asking you questions
15 on Tuesday, right?
16   A.  Yes.
17   Q.  And when I asked you questions on Tuesday
18 and I asked you if you saw the checks and you were
19 there, you said you weren't.  Do you remember that?
20   A.  Yes.
21   Q.  So you weren't there when this test was
22 performed, just like you said on Tuesday?
23   A.  Your question was, did I perform the test?
24 And I said no.  I don't think you asked me the question
25 was I there when the test was being done.

Page 2440

1    Q.  Are you testifying to the jury that you were
2  there and you remember doing the test and seeing the
3  checks?
4    A.  No. I --
5    Q.  Right.  And the one that did do it was
6  Mr. Rivera, right?
7    A.  Yes, sir.
8    Q.  And the way that you think, as you sit here
9  and you're testifying to the jury now, is that you're
10 reading this work paper where it describes here and
11 looking at the check mark and saying that's what was
12 done, right?
13   A.  Yes.  That's the whole purpose of this work
14 paper is to evidence the work that was performed at the
15 time eight years ago.
16   Q.  So you're relying on what's said on the work
17 paper to figure out what was done?
18   A.  Yes.
19   MR. THOMAS:  With His Honor's permission, I
20 will approach the witness with Exhibit 3005, pages 322
21 through 324.
22   THE COURT:  You may.
23   MR. THOMAS:  Thank you.
24 BY MR. THOMAS:
25   Q.  And Mr. Lenner, if you'd look at the last

Page 2441

1  page, please.
2       MR. THOMAS: And could we do the highlight,
3  please? Thank you.
4       (Technician complies.)
5  BY MR. THOMAS:
6    Q.  Now, Mr. Lenner, when we read this work
7  paper and we rely upon it to find out what BDO did for
8  notification customers --
9       MR. THOMAS: Can we see that last one? It's
10 a little hard to read.
11      (Technician complies.)
12 BY MR. THOMAS:
13   Q.  For notification customers, BDO traced
14 payment from customer directly to E.S. Bankest. And do
15 you remember agreeing with me that this doesn't mention
16 Capital at all?
17      MS. BITAR: Your Honor, I'm going to object.
18 This is outside the scope. I did not show him any work
19 papers.
20      THE COURT: Outside the scope.
21      MR. THOMAS: I have a response if you need
22 one.
23      THE COURT: Hold on. Overruled.
24 BY MR. THOMAS:
25   Q.  And you remember agreeing with me on

Page 2442

1  Tuesday, Mr. Lenner, that the notification customers
2  like Joy, where all the money went through Capital, that
3  this work paper didn't mention Capital at all? Remember
4  that?
5    A.  Yes.
6    Q.  And if we just relied upon this work paper,
7  then it wouldn't even tell us that BDO looked at
8  Capital, right? You remember agreeing with me to that,
9  don't you?
10   A.  Yeah. Because we tested the internal
11 control system this year where we went through Capital's
12 books and records, and for that reason this is a
13 substantive test. We did not have to do it here.
14 That's what it says.
15   Q.  Well, actually, what you said, Mr. Lenner --
16 but I don't want to argue -- is that you were describing
17 the test there and the money had to have gone through
18 Capital for Joy. And Capital wasn't listed in the work
19 paper, right?
20   A.  Yes.
21      MS. BITAR: Objection, Your Honor.
22      MR. THOMAS: No further questions.
23      THE COURT: Mr. Lenner, you may step down.
24      THE WITNESS: (Complies.)
25      THE COURT: Let's take a break before we go

Page 2443

1  on to the next witness. Ladies and gentlemen, do not
2  discuss the case amongst yourselves. Go to the
3  bathroom. You may not have another break after this.
4       THE COURT: All right. Take 15 minutes.
5       (Thereupon, a brief recess was taken.)
6       THE COURT: All right. You all ready to go?
7       MS. SIMON: Yes.
8       THE COURT: All right. You all ready to go?
9  Bring them in.
10      THE BAILIFF: (Complies.) All rise for the
11 jury.
12      (Thereupon, the jury was brought into the
13 courtroom.)
14      THE COURT: All right. Have a seat. Well,
15 we're going home. So you're going to have a long
16 weekend. Is that okay with you, Mr. Cooper?
17      JUROR: Absolutely.
18      (Laughter.)
19      THE COURT: All right. Do not discuss the
20 case amongst yourselves or anyone else and do not allow
21 anybody to discuss the case with you. Do not form a
22 opinion or a fixed opinion about the merits of the case
23 until you've had heard all the evidence, the argument by
24 the lawyers, and the instructions on the law by me. And
25 you're not to read, hear, or see any accounts of this

Page 2444

1  case in the media. Still been a long week.
2       And you're to ignore the presence of the
3  lawyers outside this courtroom and they're to ignore
4  yours. So have a wonderful weekend. Stay out of
5  trouble.
6       Mr. Cooper, the way you dress you need to
7  stay out of trouble. Okay? I got to get some pants.
8       JUROR: It's cool.
9       THE COURT: I love it. I love it. Have a
10 good weekend.
11      THE BAILIFF: All rise for the jury.
12      (Thereupon, the jury was escorted out of the
13 courtroom.)
14      THE COURT: Anything else we need to address
15 before we go?
16      MR. THOMAS: No, Judge.
17      THE COURT: Have a nice weekend with your
18 families.
19      MR. THOMAS: Thanks, Judge.
20
21      (Thereupon, at approximately 3:50 p.m., the
22 above portion of the trial was concluded.)
23
24           *    *    *
25

Page 2445

1       CERTIFICATE OF COURT REPORTER
2
3           I, GIZELLA BAAN, court reporter, before whom
4       the foregoing statement was taken, do hereby certify
5       that the statement made was taken by me stenographically
6       at the time and place mentioned in the caption hereof
7       and thereafter transcribed by me to the best of my
8       ability; that said transcript is a true record of the
9       statement given; that I am neither counsel or, related
10      to, nor employed by any of the parties to the action in
11      which these proceedings were taken; and further, that I
12      am not a relative or employee of any party hereto, nor
13      financially or otherwise interested in the outcome of
14      this action.
15
16
17
18          _____
19              GIZELLA BAAN
20          Court Reporter and Notary Public
21           in and for the State of Florida
22
23
24
25

Page 2446

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


---------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
---------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
---------------------------------------------------x

PAGES 2446 - 2641

Volume 21




Miami, Florida

Monday, April 30, 2007

9:50 a.m.

: Before the Honorable Jose M. Rodriguez


EXHIBIT
48


Reported by:  Gizella "Gigi" Baan

Page 2447

1    A P P E A R A N C E S
2
3    On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4    INTERNATIONAL, LTD., ET AL.:
5
6    SULLIVAN & CROMWELL, LLP
7        1888 Century Park East
8        Los Angeles, California 90067
9        (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida 33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       350 East Las Olas Boulevard, Suite
21       Fort Lauderdale, Florida 33301
22       (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25

Page 2448

1    On behalf of Defendant BDO Seidman, LLP:
2
3    ALVAREZ, ARMAS & BORRON
4        901 Ponce de Leon Boulevard, Suite 304
5        Coral Gables, Florida 33134
6        (305) 461-5100
7    BY:  Arturo Alvarez, Esquire
8
9    GREENBERG TRAURIG, LLP
10       MetLife Building
11       200 Park Avenue, 15th Floor
12       New York, New York 10166
13   BY:  Adam D. Cole, Esquire
14       Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17       1221 Brickell Avenue
18       Miami, Florida 33131
19   BY:  Mark Schnapp, Esquire
20       Nikki Simon, Esquire
21
22
23
24
25

Page 2449

1    On behalf of Third-Party Defendants Victor Balestra,
2    Bernard Mollet, and Joaquin Garnecho
3
4    RICHMAN, GREER, WEIL, BRUMBAUGH,
5    MIRABITO & CHRISTENSEN, P.A.
6        Miami Center, Suite 1000
7        201 S. Biscayne Boulevard
8        Miami, Florida 33131
9        (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16       2701 Ponce de Leon Boulevard, Mezzanine
17       Coral Gables, Florida 33134
18       (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20       Geoffrey Marks, Esquire
21
22
23
24
25

Page 2450

1                C O N T E N T S
2
3    EXAMINATION OF GEORGE HERRERA BY:          PAGE:
4        MR. THOMAS:  (Direct)        2453
5        MR. COLE:  (Cross)           2456
6
7    EXAMINATION OF DAN GUY BY:                 PAGE:
8        MR. THOMAS:  (Direct)        2457
9        MR. COLE:  (Cross)           2574
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2451

1           PROCEEDINGS
2           THE COURT: Who is the next witness?
3           MR. THOMAS: Mr. Herrera.
4           THE COURT: Any objections about quitting by
5   4:30 tonight? She needs to get her car.
6           MR. COLE: No objection.
7           MR. THOMAS: No objection, Judge.
8           THE COURT: Ready? Bring them in.
9           THE BAILIFF: All rise for the jury.
10          (Thereupon, the jury was brought into the
11   courtroom.)
12          THE COURT: You may be seated.
13          Good morning, ladies and gentlemen. How are
14   you today?
15          JUROR: Fine.
16          THE COURT: Everybody good? You sure? Had
17   a good weekend?
18          JUROR: Rough.
19          THE COURT: Well, you're young. Me and
20   Mr. Cooper can't have those weekends anymore except when
21   he goes to Vegas, of course.
22          So are you ready to go? Did you get your
23   coffee? No? Yes? Maybe? I couldn't see any cups in
24   your hands. Anything else you need there now?
25          JUROR: We're good now. We're ready to go.

Page 2452

1           THE COURT: Okay. You're quiet today. I
2   don't know if that's good.
3           JUROR: It's Monday. Mr. Cooper brought his
4   gumbo.
5           THE COURT: He did? Today?
6           JUROR: You want to join us?
7           THE COURT: I'll think about it. That's
8   good. All right. Well, let's see if we can get this
9   moving along.
10          Mr. Thomas, you may call your next witness.
11          MR. THOMAS: Good morning.
12          Your Honor, Espirito Santo calls Jorge
13   Herrera.
14          THE CLERK: Raise your right hand.
15          Thereupon,
16                  Jorge Herrera,
17   having been duly sworn by the clerk of the Court,
18   testified as follows:
19          (Thereupon, there was a side-bar conference
20   outside the presence and hearing of the jury.)
21          THE COURT: Mr. Herrera, I don't want you in
22   any of your answers to allude to the fact that you've
23   testified in this trial previously.
24          THE WITNESS: Okay.
25          THE COURT: And the lawyers aren't going to

Page 2453

1   ask you anything to allude to that. Okay?
2           THE WITNESS: Understood.
3           (Thereupon, the side-bar conference was
4   concluded.)
5           DIRECT EXAMINATION
6   BY MR. THOMAS:
7       Q.  Good morning, Mr. Herrera.
8       A.  Good morning.
9       Q.  Mr. Herrera, you had your deposition taken
10   in this action, remember that?
11      A.  That's correct.
12      Q.  And when you had your deposition taken, you
13   gave an oath to tell the truth?
14      A.  That's correct.
15      Q.  And that was the same oath that you just
16   gave here this morning, to tell the truth to this jury;
17   is that right?
18      A.  That's correct.
19      Q.  Now, you worked at BDO?
20      A.  Yes, I did.
21      Q.  And you worked at BDO from December 2000 to
22   February of 2001?
23      A.  That's correct.
24      Q.  So you were only at BDO for about
25   two-and-a-half months?

Page 2454

1       A.  Yes, sir.
2       Q.  Now, you left BDO, right?
3       A.  Yes, sir.
4       Q.  And you left BDO because you were concerned
5   that the Miami office was having financial trouble,
6   right?
7           MR. COLE: Objection. Leading.
8           THE COURT: Sustained.
9           Ask another question.
10   BY MR. THOMAS:
11      Q.  Why did you leave?
12      A.  I left because I felt that the office wasn't
13   doing well in terms of financially, and my prospects of
14   becoming partner in that firm -- that office, excuse me,
15   may be limited.
16      Q.  And when you had concerns that the office
17   was having trouble financially, had you seen the
18   financial statements for the prior year?
19      A.  Yes, I did.
20      Q.  And did those financial statements show that
21   the Miami BDO office was losing money?
22          MR. COLE: Objection. Relevance.
23          THE COURT: Overruled.
24          THE WITNESS: Yes.
25   BY MR. THOMAS:

Page 2455

1    Q.  And you saw the projections for the current
2 year 2000, right?
3    A.  Yes, sir.
4    Q.  And they showed that -- well, did they show
5 that for 2000 that they were projected to lose money?
6    A.  Yes, sir.
7    Q.  And so for -- I'm sorry, what was the date
8 that you started?
9    A.  December of 2000.
10   Q.  And so I may have misstated that last
11 question.
12       So for December 2000 you saw the financial
13 statements for 2000 for the past year?
14   A.  That's correct.
15   Q.  And for December 2000 BDO lost money for the
16 year 2000?
17   A.  For that office, yes.
18   Q.  And for the projections were actually for
19 2001, and that showed that they were going to lose
20 money?
21   A.  That's correct.
22   Q.  I'm sorry, Ms. Alexander is trying to remind
23 me of the other question I was going to ask you.
24       And during the time that you were there that
25 two-and-a-half months, BDO's Miami office, they couldn't

Page 2456

1 keep the whole staff busy, right?
2    A.  At that time that I was there, they could.
3 The schedule showed that possibly they may not.
4    Q.  Or possibly they wouldn't going forward for
5 2001?
6    A.  Right.
7    Q.  Thanks.  I have nothing further.
8       MR. THOMAS:  Thank you, Your Honor.
9       THE COURT:  Mr. Cole?
10      CROSS-EXAMINATION
11 BY MR. COLE:
12   Q.  Mr. Herrera, during the time period you were
13 at BDO, did you work on the E.S. Bankest audit?
14   A.  Yes, I did.
15   Q.  What was your role in the Bankest audit?
16      MR. THOMAS:  Objection, Your Honor.  Scope.
17      THE COURT:  Hold on for a second.
18      What was your objection, Mr. Thomas?
19      MR. THOMAS:  Scope, Your Honor.
20      THE COURT:  Sustained.
21      MR. COLE:  Your Honor, no other questions.
22      THE COURT:  You may step down.
23      You may call your next witness, Mr. Thomas.
24      MR. THOMAS:  Your Honor, Espirito Santo
25 calls Dr. Dan Guy.

Page 2457

1       THE CLERK:  Raise your right hand.
2    Thereupon,
3          DAN GUY,
4 having been duly sworn by the clerk of the Court,
5 testified as follows:
6       (Thereupon, there was a side-bar conference
7 outside the presence and hearing of the jury.)
8       THE COURT:  I don't want you to allude in
9 any of your answers to the fact that we've been in this
10 trial before and that you've testified.  The lawyers
11 aren't going to ask you.
12      THE WITNESS:  Sure.
13      (Thereupon, the side-bar conference was
14 concluded.)
15      THE COURT:  You may proceed, Mr. Thomas.
16      DIRECT EXAMINATION
17 BY MR. THOMAS:
18   Q.  Good morning, Doctor.
19   A.  Good morning.
20   Q.  Would you please introduce yourself to the
21 jury.
22   A.  Good morning.  My name is Dan Guy.
23   Q.  And Dr. Guy, are you here to testify as an
24 expert for Espirito Santo?
25   A.  Yes, I am.

Page 2458

1    Q.  Where were you born?
2    A.  North Carolina.
3    Q.  And did you go to college?
4    A.  Yes, I did.
5    Q.  Where did you go to college?
6    A.  I went to undergraduate school at East
7 Carolina University in Greenville, North Carolina, and I
8 received an undergraduate degree in accounting.
9    Q.  You received an undergraduate degree.  Did
10 you go on and get a masters degree?
11   A.  I did.  Also at East Carolina University I
12 received an MBA degree, which is a masters degree in
13 business administration.
14   Q.  After you got your undergraduate degree and
15 then you got a masters degree, did you go on to get a
16 doctorate degree?
17   A.  Yes, I did.  I went to the University of
18 Alabama at Tuscaloosa and received a Ph.D. degree in
19 accountancy.
20   Q.  So you received a doctorate in accounting?
21   A.  Yes, I did.
22   Q.  Now, after you received that undergraduate
23 degree, did you work as an accountant?
24   A.  I did.  I worked as an accountant.
25   Q.  And where did you work?

Page 2459

1     A.   I worked for a firm called Peat Marwick
2  Mitchell, which today is KPMG, one of the large
3  accounting firms.
4     Q.   And did you work for Peat Marwick in between
5  getting your graduate degree and your masters degree?
6     A.   Yes, I did.
7     Q.   And did you do auditing work while you were
8  there?
9     A.   Yes, I did.
10    Q.   And were you sort of the guy on the ground
11 out doing the audits?
12    A.   Basic stuff, a staff accountant, yes.
13    Q.   And in between getting your undergraduate
14 degree and getting your masters degree where you worked
15 at Peat Marwick, was that about a year?
16    A.   Under a year, yes.
17    Q.   And so you left Peat Marwick to go back to
18 school?
19    A.   That's correct.
20    Q.   And after you got your masters degree before
21 you got your doctorate, did you go back and work as an
22 accountant some more?
23    A.   I did. I went back to work at Peat Marwick
24 Mitchell, yes.
25    Q.   And is the reason you left Peat Marwick

Page 2460

1  Mitchell the second time to go get your doctorate
2  degree?
3     A.   That's correct.
4     Q.   And when you went back and worked that
5  second time at Peat Marwick, did you work as an
6  accountant?
7     A.   Yes, I did. As an auditor.
8     Q.   As an auditor and did audits. And so
9  between the two times that you worked at Peat Marwick,
10 was that a little under two years?
11    A.   Under a year.
12    Q.   Now --
13    A.   In and around a year I would estimate.
14    Q.   And Dr. Guy, after you received your
15 doctorate from the University of Alabama, what did you
16 do?
17    A.   I joined the faculty at Texas Tech
18 University as an assistant professor.
19    Q.   How long does it take to get a doctorate in
20 accounting?
21    A.   Three or four years. It took me four years
22 to get a Ph.D.
23    Q.   And when you went to work teaching at Texas
24 Tech, did you teach accounting courses?
25    A.   I did teach accounting courses. That's all

Page 2461

1  I taught.
2     Q.   Did you teach courses in auditing?
3     A.   I did. I did teach auditing courses. That
4  was my forte, my expertise, yes.
5     Q.   And did you teach ethics?
6     A.   Yes, I did.
7     Q.   And how long did you teach at Texas Tech
8  teaching auditing and ethics?
9     A.   For about seven years.
10    Q.   Now, during the time that you were at Texas
11 Tech, those seven years, did you also work for
12 accounting firms?
13    A.   Yes, I did. I had an academic contract for
14 nine months for the academic years and I never taught
15 summer school. So I worked in the summers doing various
16 consulting projects and working with various CPA firms,
17 yes.
18    Q.   And what CPA firms did you work with?
19    A.   I worked, for example, with Arthur Andersen,
20 and I worked with Ernst & Young, and I worked with a
21 firm called Fox & Coe Partnership, (ph.) and I worked
22 with a host of others.
23    Q.   And for example, Arthur Andersen and Ernst &
24 Young, are these more of these big international
25 accounting firms?

Page 2462

1     A.   Yes, they were very large firms. Yes.
2     Q.   And when they hired you to consult with
3  them, what kind of things did you do?
4     A.   One of the things I did, for example, was
5  work at audit sampling, and I was -- I worked -- I
6  taught partners, for example, how to apply audit
7  sampling partners in the CPA firm. I also developed
8  firm policy in various areas for CPA firms. Policy that
9  adds on to what the professional authoritative standards
10 require. I developed how-to guides for those firms.
11    Q.   So one of the things you did is develop
12 how-to guides for the practitioners, the ones that were
13 out doing the audits?
14    A.   That's correct.
15    Q.   Did you ever answer questions from auditors
16 in the field?
17    A.   Yes, I did.
18    Q.   How did that work?
19    A.   I worked at -- in the executive office --
20 for example, one of the firms -- and questions came in
21 from auditors who were doing work. And one of my
22 responsibilities was to assist in answering those
23 questions, people that were out doing the
24 pick-and-shovel work and partners and managers and
25 others, yes.

Page 2463

1    Q.  So again, practitioners who were out doing
2  the work, if they encountered a problem, they could call
3  you?
4    A.  That's correct.
5    Q.  And you would try to help them?
6    A.  That's correct.
7    Q.  Now, after teaching auditing and ethics at
8  Texas Tech for seven years and also working with these
9  international accounting firms, what did you do next?
10    A.  I basically joined the faculty at the
11  University of Texas at Austin as a visiting professor.
12    Q.  And how long were you there?
13    A.  I was there for one academic year, an
14  academic year here, again, is nine months.
15    Q.  Did you teach auditing there?
16    A.  I did teach auditing there.
17    Q.  And teach ethics?
18    A.  Yes, I did.
19    Q.  Now, during this time between -- I think you
20  said you started at Texas Tech as an assistant
21  professor.  Did you become a full professor over this
22  time?
23    A.  Yes.  I got promoted from assistant to
24  associate professor to full professor, yes.
25    Q.  And after you had taught auditing and ethics

Page 2464

1  at the University of Texas for a year, what did you do
2  next?
3    A.  I joined the American Institute of Certified
4  Public Accountants as director of audit research.
5    Q.  Is that the AICPA?
6    A.  That's the AICPA, yes.
7    Q.  Dr. Guy, in this trial we've been looking at
8  a lot of rules.  Is the AICPA, are they the ones that do
9  these rules?
10    A.  That's correct.  In terms of both ethical
11  rules and regulations and also for the auditing
12  standards, what we call GAAS, generally-accepted
13  auditing standards, and you probably refer to statements
14  on auditing standards, the SASes, that's part of GAAS.
15    Yes.  That was one of the major
16  comprehensive responsibilities of the American Institute
17  of CPAs, AICPA, yes.
18    MR. THOMAS:  Your Honor, without objection,
19  may I approach?
20    THE COURT:  You may.
21    MR. THOMAS:  (Complies.)
22  BY MR. THOMAS:
23    Q.  Now, the AICPA is the organization where you
24  were working, and it's also the organization that sets
25  authoritative auditing standards; is that right?

Page 2465

1    A.  Yes, that's correct.
2    Q.  And the AICPA has a mission statement?
3    A.  That's correct.
4    Q.  And we've put that up on the board.  And the
5  AICPA writes, its mission is to provide members with the
6  resources, information, and leadership that enable them
7  to provide valuable services in the highest professional
8  manner to benefit the public as well as employers and
9  clients.
10    Why is it important in the mission statement
11  of the AICPA to benefit the public in addition to
12  employers and clients?
13    A.  Well, the AICPA is much, much more than a
14  trade association.  It sets authoritative standards for
15  CPAs, for example, that do audits.  And when they audit
16  financial statements, those financial statements go out
17  to -- the financial statements are prepared on the
18  client; they go out to various users.
19    Banks, for example, make decisions about
20  extending credit, investors, people who invest their
21  retirement funds, and so on.
22    So these financial statements go to the
23  public, for example.  And the AICPA and one of my major
24  responsibilities was to make sure that what we did was
25  in the public interest, not just in the self interest of

Page 2466

1  CPAs.
2    Q.  And Dr. Guy, what year did you join the
3  AICPA?
4    A.  In 1979.
5    Q.  And when you were doing the research -- I'm
6  sorry, what was your position in 1979?
7    A.  Director of audit research at the AICPA.
8    Q.  And what were your responsibilities as the
9  director of audit research at the AICPA?
10    A.  Basically assist in the auditing standards
11  board which was the body that sets generally-accepted
12  auditing standards, and I did various projects for them.
13    So some of the projects were research
14  projects, some of the projects were basically developing
15  drafts for what would be new standards.  And I also had
16  major responsibility to supervise the staff that we had,
17  which the staff, they were all certified public
18  accountants.
19    Q.  Were you a certified public accountant?
20    A.  Yes, I was.
21    Q.  And you became a certified public accountant
22  back in, when, in Texas?
23    A.  In 1972 I became a certified public
24  accountant.
25    Q.  And Dr. Guy, how long were you the director

Page 2467

1  of research?
2      A.  I was director of audit research until 1983.
3      Q.  And what did -- did you get a new position
4  in '83?
5      A.  Yes, I did.
6      Q.  At the AICPA?
7      A.  Yes, I did.
8      Q.  What was that position?
9      A.  I became vice president of auditing.  And I
10  was a senior person at the AICPA in charge of auditing
11  standards.
12      Q.  And what were your responsibilities then?
13      A.  Basically to pick -- do some of the things I
14  did before in terms of administrative work but also to
15  attend all ASB meetings, which I did, and participate in
16  all debates of new standards.  We had to go through an
17  exposure process.
18          Since these standards have the force of law,
19  you had to first go through an exposure draft.  I was
20  responsible for clearing those exposure drafts, looking
21  at comment letters with the staff involved, presenting
22  material to the ASB for consideration, and reaching --
23  making changes in developing a final standard that would
24  become an SAS, a statement on auditing standards.
25      Q.  And how long did you hold that position?

Page 2468

1      A.  I was in that position from 1983 until 1996.
2      Q.  And was there a time when you got additional
3  responsibilities?
4      A.  Yes.
5      Q.  And when was that?
6      A.  In 1996, for example, I became vice
7  president of technical standards and professional
8  services, and I had responsibility for auditing, which I
9  had had in accounting and what was called compilation
10  and review services for private companies, a level
11  service below an audit.
12          I had responsibility for a hotline.  We had
13  over a thousand phone calls a month from practitioners
14  doing work and those questions about generally-accepted
15  auditing standards and GAAP, generally-accepted
16  accounting principles.  We had a staff and I was
17  responsible for supervising and helping that staff with
18  technical responses to practitioners.
19      Q.  Dr. Guy, how long were you at the AICPA?
20      A.  For almost 19 years.
21          MR. THOMAS:  Your Honor, may I approach your
22  clerk?
23          THE COURT:  You may.
24          MR. THOMAS:  (Complies.)
25  BY MR. THOMAS:

Page 2469

1      Q.  Dr. Guy, as part of your job at the AICPA,
2  did you help write the rules that governed audits?
3      A.  Yes, I did.
4      Q.  Did you help write the rules that governed
5  the audits --
6          MR. COLE:  Bolstering, Your Honor.
7          THE COURT:  Overruled.
8  BY MR. THOMAS:
9      Q.  -- governed the audits that BDO did in this
10  case?
11      A.  Yes, I did.
12          MR. THOMAS:  May I approach the witness with
13  Plaintiffs' Exhibit marked for ID 7343?
14          THE COURT:  You may.
15          MR. THOMAS:  (Complies.)
16  BY MR. THOMAS:
17      Q.  Do you know what that is, Dr. Guy?
18      A.  Yes.  I spent a lot of years in my life
19  working with it, yes.
20      Q.  What is it?
21      A.  It's the, I call it the blue and gold book,
22  but it's the codification of the statements on auditing
23  standards.  It contains the generally-accepted auditing
24  standards, there are 10 of those, and it contains all of
25  the statements, the SASes that were basically in effect

Page 2470

1  at the time this book was published.
2          It's codified once a year.
3      Q.  And --
4          MR. THOMAS:  Your Honor, at this time
5  Espirito Santo moves into evidence Plaintiffs' Exhibit
6  7343 marked for ID.
7          MR. COLE:  No objection.
8          THE COURT:  Without objection we'll accept
9  Plaintiffs' Exhibit 7343 for ID as Plaintiffs' Exhibit
10  7343 in evidence.
11          MR. THOMAS:  May I approach, Your Honor?
12          THE COURT:  You may.
13          MR. THOMAS:  (Complies.)
14          MR. COLE:  Judge, now I'd like to have a
15  side bar.
16          THE COURT:  Okay.  We'll have a side bar.
17          (Thereupon, there was a side-bar conference
18  outside the presence and hearing of the jury.)
19          MR. COLE:  I don't know where Mr. Thomas is
20  going but last time, if you recall, you precluded him
21  from showing the back page of the rules -- where it says
22  who's on the committee and who wrote the rules -- as
23  bolstering last time.  If that's what we're going to do,
24  I object.
25          MR. THOMAS:  Your Honor, first of all, I