Page 2471

1  mean, I take Mr. Cole's word for it. I don't remember
2  that.
3          THE COURT: I don't either.
4          MR. COLE: You showed SAS-58.
5          MR. THOMAS: I take your word for it. I
6  don't remember. But it's not bolstering to show that my
7  expert is the one that was involved in writing the rules
8  that apply to this case. That's not bolstering. That's
9  part of his qualifications as an expert.
10         THE COURT: No. Show -- pull the transcript
11 out. Because I don't know how you're going to do this.
12         MR. THOMAS: I'm actually not going to do
13 that. That's not what I'm going to do.
14         MR. COLE: And remember, this is an expert.
15 He is an ethics expert and he's not here to opine on
16 what the standards that we've gone through for the last
17 three weeks. He's opining on a limited issue. He's
18 here -- Jim Feltman was here to opine --
19         MR. THOMAS: And part of his qualifications,
20 he helped write the rules, and that's why I've qualified
21 him. In fact, I guarantee that Mr. Cole is going to
22 attack him for not spending more time out there auditing
23 like he did Feltman, and he's going to attack him that
24 then I have to show his other qualifications, and his
25 chief qualification, the reason we hired him, is because

Page 2472

1  he helped write the rules. But he already said, I write
2  the rules. And I can show that.
3          MR. COLE: Over objection, he said that.
4          THE COURT: I don't know what the question
5  is going to be. If he's going to testify on something
6  other than what he's an expert on, including writing the
7  rules, then it's --
8          MR. THOMAS: That's part of his
9  qualifications.
10         MR. COLE: If you're going to show him the
11 ethics rule --
12         THE COURT: You can qualify that if you
13 wish. I don't know what other questions you're going to
14 ask.
15         MR. THOMAS: I have one thing to do with
16 this book, the copyright, and then I'm moving on.
17         MR. COLE: I think it's bolstering, Judge.
18 This is the way you ruled last time.
19         MR. THOMAS: It's not bolstering to qualify
20 your expert.
21         THE COURT: Take it out.
22         MR. COLE: Okay. (Complies.)
23         THE COURT: I don't remember.
24         MR. COLE: It begins on page 83. Mr. Thomas
25 is about to ask about SAS-67. Then we went into side

Page 2473

1  bar.
2          THE COURT: (Reading.) Okay. Is this the
3  same book? I don't think so.
4          MR. THOMAS: It's different but --
5          MR. COLE: It would be an excerpt, one of
6  the rules in that book.
7          THE COURT: Yeah. (Reading.) Mr. Cole, the
8  problem, the difference here, is that you had no
9  objection of this book coming into evidence. Once it
10 comes into evidence -- SAS-67 was in evidence. No, I
11 believe so. I don't know what 7315 was.
12         MR. COLE: SAS-67 was in evidence. We've
13 been using it this entire time. It's the exception on
14 confirmations where what Mr. Thomas was going to do was
15 go to the last page and show that Mr. Guy was involved,
16 I guess, in writing the rules. But that --
17         MR. THOMAS: It is in evidence but he's my
18 expert. This is part of his expertise that I'm able to
19 show to the jury.
20         THE COURT: What are you going to ask him?
21         MR. THOMAS: I'm going to show him the book.
22 I'm not going to ask him the copyright. I'm going to
23 show that the rules are signed by him at the beginning.
24         THE COURT: Let me see the book.
25         MR. THOMAS: (Complies.)

Page 2474

1          THE COURT: (Reading.) What are you going
2  to show him?
3          MR. THOMAS: (Indicating.)
4          THE COURT: (Reading.)
5          MR. THOMAS: Foreword.
6          THE COURT: Why don't you do the same thing
7  you did last time. He can look at the transcript but
8  don't show him the book. The jury can --
9          MR. THOMAS: He's my expert. And he didn't
10 do --
11         THE COURT: And then you can redirect if he
12 attacks him on that.
13         MR. THOMAS: Do what?
14         MR. COLE: If I do what?
15         THE COURT: If you attack him on his
16 expertise, then we'll see what happens then. You can
17 redirect.
18         MR. THOMAS: I'm sorry, Judge --
19         THE COURT: Mr. Cole --
20         MR. THOMAS: -- I don't actually remember
21 what I did last time.
22         THE COURT: -- I read it.
23         MR. COLE: First of all -- the two years --
24         MR. THOMAS: Can I just, please -- so I
25 can't show him this?

Page 2475

1    THE COURT: Right.
2    MR. THOMAS: Is that the bottom line?
3    THE COURT: Right.
4    MR. COLE: His expertise is lack of an audit
5  experience in the field he's already testified to on
6  direct.
7    MR. THOMAS: If he attacks him on that, then
8  that's where I get this.
9    THE COURT: If he attacks him on that, you
10 can redirect him.
11   MR. COLE: He's already testified to it.
12   (Thereupon, the side-bar conference was
13 concluded.)
14   MR. THOMAS: May I approach, Your Honor?
15   THE COURT: You may.
16   MR. THOMAS: (Complies.)
17 BY MR. THOMAS:
18   Q.  Dr. Guy, the copyright of this book is 1997.
19 Did I get that right?
20   A.  Yes.
21   Q.  But they issued -- if there's any changes,
22 they issue the rules each year?
23   A.  They basically -- that's an AICPA
24 publication that's published once a year, and there are
25 always changes.

Page 2476

1    Q.  And these are the rules that you helped
2  write?
3    A.  That's correct.
4    Q.  Dr. Guy, when did you leave the AICPA?
5    A.  I'd been there, as I said, for almost
6  19 years. I wanted to, quote, repot myself. I
7  wanted -- I had some books that I wanted to write, some
8  new books I wanted to do, which I did, and I wanted to
9  spend more time down in New Mexico, where I had a home
10 in Santa Fe, New Mexico.
11   Q.  And this is when you left the AICPA, did you
12 receive the John J. McCloy award?
13   A.  After I left the AICPA, yes, I received the
14 John J. McCloy award. Yes.
15   Q.  And who gave you that award?
16   A.  It was an award bestowed by the public
17 oversight board of the SEC practice session, a division
18 of firms at the division of CPA.
19   Q.  So it was a division of the auditing firms
20 who gave you this award?
21   A.  By the POB which supervised the division of
22 firms, yes, that's correct.
23   Q.  And the division of firms included BDO?
24   A.  That's correct.
25   Q.  And what did you receive this award for?

Page 2477

1    A.  For outstanding contributions to audit
2  quality in the United States, for the work I had done
3  both prior to joining the AICPA in textbooks and
4  accounting education regarding auditing, but primarily
5  for the work at the auditing standards board and working
6  in a way with the ASB to make sure that the standards
7  that we developed meshed and met the public interest
8  needs.
9    MR. THOMAS: Your Honor, may I approach?
10   THE COURT: You may.
11   MR. THOMAS: (Complies.)
12 BY MR. THOMAS:
13   Q.  I'm going to show you what's been marked as
14 Plaintiffs' Exhibit 7313 for ID.
15      Is that a copy of the award you received,
16 Dr. Guy?
17   A.  Yes, it is.
18   MR. THOMAS: At this time plaintiffs move
19 into evidence, Your Honor, Plaintiffs' Exhibit 7313
20 marked for ID.
21   MR. COLE: Object on the grounds of hearsay.
22   THE COURT: Overruled.
23   MR. COLE: And bolstering.
24   THE COURT: Overruled.
25      What's the number again, I'm sorry?

Page 2478

1    MR. THOMAS: 7313.
2    THE COURT: Plaintiffs' Exhibit 7313 for ID
3  is now Plaintiffs' 7313 into evidence.
4  BY MR. THOMAS:
5    Q.  I apologize, Dr. Guy, for the copy. The
6  copy of the certificate, is that what you understand
7  Plaintiffs' Exhibit 7313 in evidence is?
8    A.  Yes.
9    Q.  And it says down there that Mr. Guy joined
10 the AICPA as director of auditing research in 1979,
11 became vice president of auditing in 1983, and vice
12 president of professional standards and services in
13 1996?
14   A.  Yes.
15   Q.  Is that what you were telling us before?
16   A.  That's correct.
17   Q.  And then it goes on to discuss your career
18 in teaching. You see that?
19   A.  Yes, I do.
20   Q.  And then it says, during Mr. Guy's tenure as
21 vice president, the AICPA issued more than 40 statements
22 of auditing standards and all the statements on
23 standards for attestation engagements.
24      What are attestation engagements?
25   A.  Where auditors provide assurity,

Page 2479

1  believability, credibility, the information that is not
2  financial statements.
3       For example, a company has certain internal
4  controls, any one of the things auditors do is look at
5  the internal control systems to provide assurances, an
6  opinion, if you will, on that.  It's not financial
7  statements.  And so attest is a very broadly used word
8  and it covers all kinds of assurances that CPAs, as
9  auditors, provide in addition to opinions on financial
10  statements.
11     Q.   Thank you, Dr. Guy.  If we look at the next
12  page at the top, it says, Mr. Guy's intellect, his
13  conceptual -- can you help me with that next word?
14     A.   I think it's understanding.
15     Q.   Yeah.  That's what I thought.
16          His conceptual understanding --
17          MR. COLE:  Objection.
18          THE COURT:  Sustained.
19          MR. THOMAS:  I'm sorry, Your Honor?
20          THE COURT:  Sustained.
21          MR. THOMAS:  Well, can we blow up that
22  paragraph, please?
23          THE COURT:  That's it.  No more questions.
24          MR. THOMAS:  I wasn't going to ask a
25  question other than to confirm this was part of the

Page 2480

1  award.  I wasn't going to read it.  But it's very
2  difficult to see.
3          THE COURT:  Ask him a question.
4  BY MR. THOMAS:
5     Q.   Dr. Guy, when you received the John J.
6  McCloy award for your services to the public interest,
7  did you understand that the certificate set forth the
8  qualities and the reasons for which you were being given
9  the award?
10          MR. COLE:  Bolstering.
11          THE COURT:  Overruled.
12          THE WITNESS:  Yes, I didn't and that's set
13  forth in this first paragraph.
14          MR. COLE:  Judge, highlighting the paragraph
15  is bolstering.
16          THE COURT:  Sustained.
17          MR. THOMAS:  Your Honor, without objection,
18  may I approach the witness?
19          THE COURT:  You may.
20          MR. THOMAS:  (Complies.)
21  BY MR. THOMAS:
22     Q.   Dr. Guy, we've covered some -- a lot of
23  ground here in the beginning and we're going to use
24  these demonstratives with your approval just to walk
25  through what we've talked about.

Page 2481

1          MR. THOMAS:  Can we go to the first one,
2  please?
3          (Technician complies.)
4  BY MR. THOMAS:
5     Q.   And you have a doctorate in accountancy from
6  the University of Alabama?
7     A.   I do.
8     Q.   And part of your experience is teaching?
9     A.   That's correct.
10     Q.   And your teaching experience is that you
11  taught accounting, auditing, and ethics for eight years
12  at Texas Tech and the University of Texas?
13     A.   That's correct.
14     Q.   And your work experience included that time
15  you spent in between getting your masters -- college
16  degree and masters and masters and doctorate working at
17  Peat Marwick?
18     A.   That's correct.
19     Q.   And then over the time period that you were
20  teaching for those years at Texas Tech, you also acted
21  as a consultant for some of the large accounting firms?
22     A.   I did.
23     Q.   And as part of your job being a consultant
24  you assisted practitioners by answering their questions
25  with things they couldn't resolve?

Page 2482

1     A.   That's correct.
2     Q.   And for helping draft the rules that they
3  would follow within their firm?
4     A.   That's correct.
5     Q.   And then you worked at the AICPA for
6  19 years --
7     A.   Almost 19 -- 18 years.
8     Q.   -- 18 years helping to draft the rules.
9          Now, up in the right it says, materials
10  co-authored:  SAS-67, the confirmation process.
11          Was that during the time you were at the
12  AICPA?
13     A.   That's correct and that's in this blue and
14  gold book.  That's one of the statements on auditing
15  standards that -- an SAS I refer to -- this part of
16  generally-accepted auditing standards.
17     Q.   And you also drafted confirmations of
18  accounts receivable, the first and second editions?
19     A.   Yes, I was the primary author of those two.
20  Not authoritative studies help practitioners do a better
21  job with confirmations of accounts receivable.
22     Q.   And the SEC mandated and approved
23  independence education programs for CPAs.
24          Was that done after you left the AICPA?
25     A.   Yes, that was after I left the AICPA.

Page 2483

1    Q.   And independence, that is meaning that a --
2         MR. COLE: Objection. Leading.
3         THE COURT: Let him finish the question.
4    BY MR. THOMAS:
5    Q.   Independence, does that mean a situation
6    where a firm doing an audit like BDO --
7         THE COURT: Sustained.
8    BY MR. THOMAS:
9    Q.   What does it mean to be independent for a
10   firm like BDO?
11   A.   To do an audit, a CPA must be independent.
12   And to be independent you got to be independent, in
13   fact, meaning you've got to have integrity, you have to
14   have objectivity, and you have to appear to be
15   independent from a third-party perspective.
16        And if you're not independent, which is one
17   of the bedrock generally-accepted auditing standards --
18   I alluded to 10 generally-accepted auditing standards.
19   They're kind of the foundation for all the SASEs that
20   are attached to those standards.  One of those is
21   independence. It's a bedrock standard.  If you're not
22   independent, you can't do an audit.
23   Q.   And I believe you mentioned earlier that
24   you'd also authored books?
25   A.   That's correct.

Page 2484

1    Q.   And was one of these books the
2    Practitioner's Guide to GAAS?
3    A.   Yes.  Generally-accepted auditing standards,
4    yes.
5    Q.   And --
6         MR. THOMAS:  May I approach, Your Honor?
7         THE COURT:  You may.
8         MR. THOMAS: (Complies.)
9    BY MR. THOMAS:
10   Q.   And you had a co-author here,
11   B.R. Carmichael?
12   A.   Doug Carmichael, that's correct.
13   Q.   And who is Doug Carmichael?
14   A.   Doug Carmichael was the chief auditor of the
15   United States at the accounting oversight board.
16        MR. COLE: Objection. Bolstering.
17        THE COURT:  Overruled.
18   BY MR. THOMAS:
19   Q.   And did you write a textbook on auditing?
20   A.   That is one of my textbooks on auditing,
21   yes, that's correct.
22   Q.   And did you write a book on ethics for CPAs?
23   A.   Yes, I did.
24   Q.   And when did you write the first edition of
25   this book?

Page 2485

1    A.   I think around 2000 if memory serves me
2    correctly.  That's a second edition that you're holding.
3    Q.   And in 2000 when you wrote the first edition
4    of this book on ethics, had you published other books by
5    then?
6    A.   A large number of these and others, yes.
7    Q.   And when you went to your publisher to tell
8    him that you wanted to publish a book on ethics, what
9    happened?
10   A.   They -- typically they do a --
11        MR. COLE:  Objection, Your Honor.
12   Speculation and hearsay.
13        THE COURT:  He says what happened.  The
14   answer is, what happened.
15        Overruled.
16        THE WITNESS:  The publisher -- basically
17   when you have a book they circulate --
18        THE COURT:  Doctor, what happened?  The
19   question is, what happened.
20        Read the question back.
21        THE WITNESS:  What happened.
22        (Thereupon, the court reporter read back the
23   requested portion.)
24        THE WITNESS:  They basically rejected it and
25   said that no one really had an interest in ethics.  It

Page 2486

1    would not be marketable.
2         THE COURT:  Note your objection.
3    BY MR. THOMAS:
4    Q.   Did you eventually get him to publish your
5    book on ethics?
6    A.   I eventually got a publisher to publish my
7    book on ethics, that's right.
8         MR. THOMAS:  May I approach, Your Honor?
9         THE COURT:  You may.
10        MR. THOMAS: (Complies.)
11   BY MR. THOMAS:
12   Q.   And Dr. Guy, did you also publish the
13   Practitioner's Guide to Audit Sampling?
14   A.   I'm the author of that book.  The publisher
15   published it and I wrote it.
16   Q.   You wrote it.  Okay.  And the International
17   Standards on Auditing and Related Services, is this one
18   you wrote too?
19   A.   That's correct.
20        MR. THOMAS:  May I approach, Your Honor?
21        THE COURT:  You may.
22        MR. THOMAS: (Complies.)
23   BY MR. THOMAS:
24   Q.   And finally, Dr. Guy, if you look at the
25   last demonstrative up there, we've already talked about

Page 2487

1    the John J. McCloy award. Did you also receive the
2    American Academy Association Section Award for
3    significant lifetime contributions to auditing?
4        A.   Yes, I did, in 2001.
5        Q.   Dr. Guy, have you reached an opinion in this
6    case?
7        A.   Yes, I have.
8        Q.   What is your opinion?
9        A.   My opinion is that BDO was not independent
10   for any of the five audits from 1999 -- 1998, 1999,
11   2000, 2001, and 2002. For any of those audits they were
12   not independent and had no foundation to issue an audit
13   opinion on the Bankest financial statements.
14       Q.   And what is your opinion in regards to BDO
15   Seidman's adherence as certified public accountants to
16   the public trust?
17       A.   To -- BDO basically grossly violated --
18           MR. COLE: Objection, Your Honor. Move to
19   strike and I reserve.
20           THE COURT: Overruled.
21           THE WITNESS: BDO grossly violated the
22   public trust in terms of their due care duties and
23   responsibilities as auditors and issued opinions on
24   financial statements for which they had no foundation to
25   issue the opinion.

Page 2488

1    BY MR. THOMAS:
2        Q.   When you say that BDO Seidman lacked
3    independence, why is it important for an auditor
4    auditing the financial statements of E.S. Bankest to be
5    independent?
6        A.   Well, the Bankest financial statements are
7    the clients. Bankest is a client, the Bankest financial
8    statements. And the auditor intervenes in terms of
9    financial statements are prepared on Bankest. They go
10   to various users, board of directors, shareholders,
11   noteholders, banks and others.
12           And in order for the user to believe in the
13   financial statements, for the financial statements to
14   have credibility, a firm, an auditor like BDO intervenes
15   to add assurances, to audit the financial statements,
16   otherwise they would not be believable and, therefore,
17   they attach an opinion.
18           The financial statements are the company's,
19   and the auditor is responsible for the opinion that is
20   attached to the financial statements to add credibility,
21   to add believability.
22       Q.   Dr. Guy, are there rules that apply to BDO's
23   lack of independence in this case?
24       A.   Yes, there are. Principles and rules that
25   apply to BDO's lack of independence published by the

Page 2489

1    rules are published by the American Institute of CPAs.
2        Q.   And is one of those rules an auditing
3    standard part of GAAS and SAS?
4        A.   That's right. One of the rules is SAS-1, we
5    call it AU 220. AU standards for auditing. So when you
6    see AU abbreviations, that comes out of the blue and
7    gold book. And it's AU Section 220.
8            MR. THOMAS: With Your Honor's permission, I
9    will approach the witness with Plaintiffs' Exhibit 131
10   evidence in.
11           THE COURT: You may.
12           MR. THOMAS: (Complies.)
13   BY MR. THOMAS:
14       Q.   Dr. Guy, is this AU Section 220?
15       A.   Yes, it is.
16       Q.   And this is one of the -- is this one of the
17   rules that governs BDO's independence in this case?
18       A.   Yes, it is.
19           MR. THOMAS: If we could, please, now look
20   at the title of the rule in .01.
21           (Technician complies.)
22   BY MR. THOMAS:
23       Q.   And the title is Independence. And then .01
24   states it's -- the second general standard is, in all
25   matters relating to the assignment, an independence in

Page 2490

1    mental attitude is to be maintained by the auditor or
2    auditors.
3            Dr. Guy, first, what are the general
4    standards?
5        A.   I referred earlier to 10 auditing standards.
6    And I referred to the statements on auditing standards
7    that are built on those. And that's all part of GAAS.
8    And the 10 auditing standards are divided into three
9    different groups. One of those groups is called the
10   general standards. And the second general standard here
11   of generally-accepted auditing standards is on
12   independence, the one that you see basically in front of
13   you.
14       Q.   Dr. Guy, the independence is part of this
15   top 10 of standards; is that right?
16       A.   It's one of the 10 generally-accepted
17   auditing standards, that's correct.
18           MR. THOMAS: And if we could look at .03.
19           (Technician complies.)
20   BY MR. THOMAS:
21       Q.   .03 says, it is of utmost importance to the
22   profession that the general public maintain confidence
23   in the independence of independent auditors.
24           Why is that important, Dr. Guy?
25       A.   Well, if you were not independent, financial

Page 2491

1  statements would not be believable. For example, you
2  would not know where to vest your retirement funds
3  because you couldn't trust financial statements. Banks
4  would not know how to -- whether to make a decision
5  involving loaning money to a company. Investors
6  wouldn't know if they should invest in the company as
7  stockholders or noteholders or anything else.
8       If we didn't have the independence of the
9  audit function and we didn't have believable financial
10 statements, our market could come tumbling down,
11 crashing down.
12      Q.  If you look at the next sentence, it says,
13 public confidence would be impaired by evidence that
14 independence was actually lacking and it might also be
15 impaired by the existence of circumstances which
16 reasonable people might believe likely to influence
17 independence.
18      What do you understand that to mean?
19      A.  It means there are two facets of
20 independence, what we call independence in fact, and
21 independence in appearance.
22      And to be independent -- independence and
23 appearance means that a party who's not the client and
24 not the auditor has to -- a party knowing all the facts
25 and circumstances that had total awareness, what that

Page 2492

1  party believed, the auditors independence, and what that
2  party believed that he or she could rely on the
3  financial statements.
4       Q.  And is that what you see in the next few
5  sentences here, Dr. Guy, is that this idea that not only
6  must an auditor be independent in fact, but must also
7  appear to the public to be independent?
8       A.  Absolutely.
9       Q.  And if we please look at everything in the
10 paragraph. But if we look down to the bottom it says,
11 independent auditors should not only be independent in
12 fact, they should avoid situations that may lead
13 outsiders to doubt their independence.
14      Do you agree with that statement?
15      A.  Yes, I do.
16      Q.  It says, the profession has established
17 through the AICPA's Code of Professional Conduct
18 precepts to guard against the presumption of loss of
19 independence. Presumption is stressed because the
20 possession of intrinsic independence is a matter of
21 personal quality rather than of rules that formulate
22 certain objective tests.
23      And please feel free to read the last
24 sentence. I just didn't want to keep reading to the
25 jury.

Page 2493

1       What do you understand this to mean?
2       A.  It means basically that one of the facets of
3  being independent is making sure that you comply with
4  the precepts and the rules as well as the fact that you
5  have to appear to be independent in addition to just the
6  rules.
7       Q.  And, in fact, the last sentence says,
8  insofar as these precepts have been incorporated in the
9  profession's code, they have the force of professional
10 law for the independent auditor.
11      Does that mean they have to follow the
12 rules?
13      A.  That's correct.
14      MR. THOMAS:  If we look at .06.
15      (Technician complies.)
16 BY MR. THOMAS:
17      Q.  .06 provides that the independent auditor
18 should administer his practice within the spirit of
19 these precepts and rules if he is to achieve a proper
20 degree of independence in the conduct of his work.
21      What does this mean, Dr. Guy?
22      A.  It means that if you look at independence
23 and the principles of independence and the AICPA Code of
24 Conduct, for example, in a way to follow a high level --
25 it's not the kind of thing that you look to see, well,

Page 2494

1  how can I get around it.
2       If you look at a rule, for example, and the
3  rule will have examples in it, you don't say, well, if
4  this example isn't listed here, then it's okay for me to
5  do it. That's not the way you make independence
6  decisions. You can't maintain independence and look at
7  it as a way to short circuit or get around what's in the
8  code of professional conduct.
9       Q.  Well, this .06 Rule 220 says that the
10 independent auditor should administer his practice
11 within the spirit of these rules.
12      Does this mean that an auditor like BDO
13 can't only adhere to the letter of the rule but must
14 also adhere to the spirit of the rule?
15      A.  The form is the rule itself or the
16 principle, and the spirit basically -- it's kind of what
17 I said again, you don't look at it in a way to how can I
18 get around it. How can I avoid it. And you don't --
19 you should never go through -- no CPA, no auditor should
20 go through a code of professional ethics and say, well,
21 again, if it's not here, I don't have to follow it.
22 Those are examples.
23      Q.  So BDO has to follow the rules and the
24 spirit of the rules. Did I get that right?
25      A.  The code of conduct and the principles.

Page 2495

1    That's the way you make independence decisions that are
2    fair and uphold the public interest.
3          MR. THOMAS:  Now can we go to .02?
4          (Technician complies.)
5    BY MR. THOMAS:
6      Q.   .02 starts out with, this standard requires
7    that the auditor be independent.  Aside from being in
8    public practice, as distinct from being in private
9    practice, he must be without bias with respect to the
10   client since otherwise he would lack that impartiality
11   necessary for the dependability of his findings however
12   excellent his technical proficiency may be.
13         Dr. Guy, first of all, in this case when BDO
14   was auditing Bankest, were they in public practice?
15     A.   Yes, BDO is in public practice meaning that
16   they are a CPA firm and they hold themselves out to do
17   audits of financial statements as opposed to private
18   practice where I might be a controller or chief
19   financial officer in a private company or a company that
20   trades on the stock exchange.  That's private practice.
21     Q.   And Dr. Guy, in this rule BDO -- in this
22   case did they have to be without bias?
23     A.   Yes, they have to be without bias.
24     Q.   And then at the end of this statement it
25   talks about, however excellent his technical proficiency

Page 2496

1    may be.
2          Why doesn't excellent technical proficiency
3    make up for a lack of independence?
4      A.   Because you could be a super duper in terms
5    of technical -- knowing what GAAP is, generally-accepted
6    accounting principles -- but the code of conduct says
7    you've got to be independent in fact and independent in
8    appearance, otherwise your opinion is no good on the
9    financial statements.  It's worthless.  It's not worth
10   of the paper it's written on.
11     Q.   And the next sentence reads, however,
12   independence does not imply the attitude of a prosecutor
13   but rather a judicial impartiality that recognizes an
14   obligation for fairness not only to management and
15   owners of a business but also to creditors and those who
16   may otherwise rely, in part, at least, upon the
17   independent auditor's report as in the case of
18   prospective owners or creditors.
19         Dr. Guy, in this case was BDO required to
20   have judicial impartiality?
21     A.   Yes, they have to be independent, and that's
22   what it means.
23     Q.   So in this case, BDO couldn't have an
24   interest in the outcome just like a Judge, His Honor,
25   couldn't have an interest in the outcome of this case?

Page 2497

1          MR. COLE:  Objection.
2          THE COURT:  Sustained.
3    BY MR. THOMAS:
4      Q.   Well, what do you understand judicial
5    impartiality to mean as applied to BDO in this case?
6      A.   Meaning that in their audit they had to
7    be -- have integrity, they have to be objective, they
8    have to be free of conflicts of interest, they can't
9    subordinate their judgment to clients or anyone else.
10         You've got to be like a Judge.  You've got
11   to be impartial.  You can't have any, quote, skin in the
12   game versus one party having advantage over another
13   party.
14     Q.   In doing their audits, could BDO lean toward
15   one party or the other?
16     A.   No.  They have to be like, I guess, the
17   scales of justice.  They have to be impartial.
18     Q.   Dr. Guy, you mentioned objectivity,
19   integrity, and impartiality.
20         Can you take those principles and this rule
21   and apply it to this case?
22     A.   Absolutely, yes.
23     Q.   Would it help you to write it out for the
24   jury?
25     A.   Yes.  To explain what independence is, yes.

Page 2498

1          THE WITNESS:  May I step down?
2          THE COURT:  You may.
3          THE WITNESS:  (Complies.)  Thank you.
4          THE COURT:  You can move if you wish.
5          MR. COLE:  Yes.  (Complies.)
6          THE WITNESS:  Basically I'll use this
7    illustration here to explain why independence -- what is
8    independence about and why it's important.
9          And I apologize to you up-front about my
10   handwriting.
11         Okay.  As we talked about already a little
12   bit, Bankest is a client here.  Bankest is audited by
13   BDO.  And Bankest produces financial statements or
14   prepares financial statements.  Now, those financial
15   statements would be biased and would not be believable,
16   would not be credible.  But we have an event that takes
17   place, we have an intervention, we have an auditor here.
18   And the auditor in this case, of course, is BDO.
19         And the purpose of the auditor -- and the
20   auditor must be independent, and the auditor intervenes
21   in this information flow to add credibility,
22   believability, to make sure that the financial
23   statements that he's paid for technically are fairly
24   presented in accordance with generally-accepted
25   accounting principles.

Page 2499

1          Now, these financial statements, after this
2   shield or filter they go through, then the financial
3   statements are audited. They are blessed, so to speak,
4   Good Housekeeping Seal of Approval or whatever, and they
5   go through various parties, such as board of directors.
6   Board of directors such as banks or bank that's making
7   a --
8          MR. COLE: Objection, Your Honor.
9          THE COURT: Overruled.
10         THE WITNESS: -- such as a bank that's
11  looking to do and make a loan to this company, Bankest
12  or not, what should the interest rate be, things of that
13  sort.
14         They go to noteholders. Noteholders are
15  investors in the company who buy notes or bonds or which
16  is a debt instrument. And we --
17         MR. COLE: Objection, again, Your Honor.
18         THE COURT: Overruled.
19         THE WITNESS: And they also go to
20  shareholders. Now, these users -- if this auditor were
21  not independent, this audit is worthless. And these
22  users have to believe -- if they were aware of all the
23  facts and circumstances, the auditor has to be appear to
24  be independent.
25         So BDO and an auditor has to be independent

Page 2500

1   in fact, and independent in fact means that they have to
2   have integrity, meaning they have to be honest, candid,
3   and they have to be objective without bias. They have
4   to be impartial. They have to be fair. And they also
5   have to be independent in appearance.
6          So these are the two facets, independent in
7   fact, having integrity, you're, again, to be honest, to
8   be candid, to be objective, impartial, not subordinate
9   your judgment or cave in somewhat to the client or
10  anyone else here in this relationship, not have
11  conflicts of interest and so on. And you have to appear
12  to be independent.
13         If these parties were aware of all the facts
14  and circumstances, they have to believe and should
15  believe that the auditor is independent. Otherwise we
16  would not have credible financial statements that you
17  could rely on to make decisions.
18         And in a nutshell that's why independence is
19  critical, and that's what I mean when I said that of the
20  10 generally-accepted auditing standards, this is a
21  foundation or bedrock standard. Without it you can't do
22  an audit.
23         MR. THOMAS: Thank you, Dr. Guy.
24         (Witness takes his seat at the witness
25  stand.)

Page 2501

1   BY MR. THOMAS:
2          Q.  Dr. Guy, you mentioned three things that BDO
3   had to have, integrity, objectivity, and appearance --
4          A.  Appearance, that's correct.
5          Q.  -- of independence.
6              Dr. Guy, are those three things sort of like
7   the legs of a stool?
8          A.  I basically have used the stool analogy a
9   lot, and there are like three legs of a stool, integrity
10  objectivity, and appearance of independence. And if you
11  don't have any one of them, you're not independent.
12         MR. THOMAS: May I approach, Your Honor?
13         THE COURT: You may.
14         MR. THOMAS: Your Honor, BDO objects
15  (inaud.).
16         THE COURT: Let me see it.
17         THE WITNESS: (Complies.)
18         THE COURT: Side bar for a second.
19         (Thereupon, there was a side-bar conference
20  outside the presence and hearing of the jury.)
21         THE COURT: I believe I sustained the
22  objection last time, if I'm not mistaken.
23         MR. THOMAS: If I'm not mistaken.
24         THE COURT: But it's the same one.
25         MR. THOMAS: Last time you sustained the

Page 2502

1   objection because it had the stool crashing down. And
2   so I didn't use the one with the stool crashing down
3   this time. And you said I could use the stool and, in
4   fact, all the demonstratives I used the last time had
5   the stool in the upper right-hand corner.
6          MR. COLE: But the stool itself and the
7   crashing down -- I know the crashing down was definitely
8   sustained.
9          MR. THOMAS: It was on the same
10  demonstrative.
11         MR. COLE: The other demonstratives had the
12  stool on the corner, and I didn't object to that because
13  it could take forever to remove that. It was like a
14  shadow behind. But the fact is that what was allowed
15  last time was the fact of what is integrity, what is
16  objectivity.
17         THE COURT: I believe it was separate but
18  you couldn't take them out.
19         MR. THOMAS: I couldn't take the crashing
20  down, and the objection was to the demonstrative. So
21  this time I did it with without the crashing. He just
22  said it's like the three legs of the stool.
23         He lectures on the three legs of the stool
24  all over the country. It's a demonstrative to aid the
25  jury, and all it does is take the three projects and put

Page 2503

1  them on the legs of the stool, and I'm not showing the
2  crashing down this time.
3          MR. COLE: The stool is argumentative. He
4  can talk about integrity, he can talk about objectivity,
5  he can talk about independence, and that's what was done
6  last time.
7          MR. THOMAS: It's illustrative and helpful
8  to the jury, which is exactly what demonstratives are
9  for, particularly with an expert, and I'm not showing
10  the crash.
11          THE COURT: I understand. I'm going to
12  allow it. It's overruled.
13          MR. COLE: I don't want the crashing, right.
14          THE COURT: No crashing.
15          (Thereupon, the side-bar conference was
16  concluded.)
17  BY MR. THOMAS:
18      Q.  Dr. Guy, with that demonstrative would be
19  helpful in you explaining these three legs of the stool
20  for the jury?
21      A.  Yes, it would.
22          (Technician complies.)
23  BY MR. THOMAS:
24      Q.  Dr. Guy, does independence require all
25  three, integrity, objectivity, and appearance of

Page 2504

1  independence?
2      A.  Yes, it does. If any leg is broken, you're
3  not independent.
4      Q.  So in this case, if BDO had integrity and
5  objectivity, but did not have appearance of
6  independence, would they be independent?
7      A.  No.
8      Q.  What if they had appearance of independence
9  and integrity but not objectivity?
10      A.  They would not be independent. You have to
11  have all three. It's like a stool. You can't sit on a
12  two-legged stool. At least I can't.
13          MR. THOMAS: Without objection, may I
14  approach the witness?
15          THE COURT: You may.
16          MR. THOMAS: (Complies.)
17  BY MR. THOMAS:
18      Q.  And the three requirements of independence,
19  Dr. Guy, the first one being integrity, it says, be
20  honest and candid.
21          What does that mean to an auditor like BDO
22  doing the E.S. Bankest audits?
23      A.  Well, it's the first leg of the stool here
24  that you've got to have integrity. This is -- I listed
25  on the flip chart two facets of independence.

Page 2505

1  Independence in fact, A and B, integrity is part of an
2  important part of independence in fact.
3      Q.  And what about objectivity? It says, don't
4  let client or other relationships affect your judgment.
5  How does that apply to BDO doing the audits of E.S.
6  Bankest?
7      A.  You've got to be fair, you've got to be
8  impartial, you can't have a bias towards one of the
9  clients or some other party. You cannot have a conflict
10  of interest. You cannot subordinate your judgment,
11  meaning you can't give in to the client or other parties
12  in terms of if they weren't -- you can't subordinate
13  your judgment, and this is the second leg of the stool.
14  And leg one and two are what I referred to as
15  independence in fact.
16      Q.  And the final one, appearance of
17  independence means, according to this, doesn't do
18  anything that even looks like your judgment has been
19  influenced by others.
20          Is that what we mean by what it looks like
21  from the outside?
22      A.  From a third-party perspective, someone
23  aware of all the facts and circumstances. If it were up
24  on the marquis out front on the interstate and you
25  described all the facts and circumstances, what would

Page 2506

1  those people think about your independence. Would they
2  include that they were independent if they were aware of
3  all the relationships and all the things that were going
4  on, for example, in the client/auditor relationship,
5  appearance of independence.
6      Q.  Now, integrity, objectivity, and appearance
7  of independence, are they found in the rules too?
8      A.  Yes, they are.
9          MR. THOMAS: Your Honor, with your
10  permission I will -- this is not marked for ID.
11          I'm sorry, Your Honor. Can I please
12  approach your clerk?
13          THE COURT: You may.
14          MR. THOMAS: (Complies.)
15          MR. COLE: No objection.
16          MR. THOMAS: With Your Honor's permission,
17  I'll approach the witness with Plaintiffs' Exhibit 7344
18  for ID.
19          THE COURT: You may.
20          MR. THOMAS: And plaintiffs move 7344 for ID
21  into evidence, I understand, without objection.
22          MR. COLE: No objection.
23          THE COURT: What was the number, again?
24          MR. THOMAS: (Inaud.).
25          THE COURT: All right. Without objection,

Page 2507

1  Defendants' -- Plaintiffs' Exhibit 7344 marked for ID is
2  now Plaintiffs' 7344 in evidence.
3  BY MR. THOMAS:
4      Q.   Dr. Guy, what is Plaintiffs' Exhibit 7344 in
5  evidence which he just provided you?
6      A.   It looks to be a cutout of the AICPA's Code
7  of Professional Conduct dated February 19, 2007. So
8  it's the code of conduct, contains all the principles
9  and rules and of the AICPA requirements to be
10  independent and other ethical requirements.
11      Q.   And Dr. Guy, is ET-101 in here?
12      A.   ET stands for ethics and you're referring to
13  Rule 101 on independence, and it is in here.
14          MR. THOMAS:  And can we highlight the top
15  there where it says independence?
16          (Technician complies.)
17  BY MR. THOMAS:
18      Q.   And this says ET Section 101, Independence.
19  Now, before, we looked at Auditing Standard 220.  Was
20  that a GAAS, SAS rule?
21      A.   AU standards for auditing.  And 220 means
22  it's generally-accepted auditing standards apart -- it's
23  a SAS, an S-A-S.
24      Q.   And is the SAS part of GAAS?
25      A.   Yes, it is.

Page 2508

1      Q.   So when I -- so yes, it is part of GAAS and
2  SAS?
3      A.   That's correct.
4      Q.   And now we're looking at the actual ET,
5  ethics section, and this is Rule 101 on independence?
6      A.   That's correct.
7      Q.   And it provides that a member in public
8  practice shall be independent in the performance of
9  professional services as required by standards
10  promulgated by bodies designated by council.
11          Same idea?
12      A.   Same idea, yes.
13          MR. THOMAS:  And if you would look with me,
14  please, at 102.
15          (Technician complies.)
16  BY MR. THOMAS:
17      Q.   And you see that there, you can see it on
18  the screen.  I know you got a big book there.
19      A.   I see 102 on the screen, yes.
20      Q.   And 102 talks about integrity and
21  objectivity, which we were just discussing with the
22  demonstrative?
23      A.   That's correct, yes.
24      Q.   And this is the rule that talks about that,
25  right?

Page 2509

1      A.   That's correct.
2      Q.   And it says, in the performance of any
3  professional service, a member shall maintain
4  objectivity and integrity, shall be free of conflicts of
5  interest, and shall not knowingly misrepresent facts or
6  subordinate his judgment or her judgment to others.
7          What does it mean to subordinate -- for an
8  auditor like BDO to subordinate their judgment?
9      A.   Subordinate judgment means that -- I guess
10  kind of down home North Carolina way means to cave in.
11  If you caved in to your client, you would have
12  subordinated your judgment.  If you were -- permitted
13  arm-twisting to take place and permitted the client to
14  dictate what you would do and not do to subordinate your
15  judgment.  Or you could subordinate your judgment to
16  some other party.
17          So the concept here is, you will not cave
18  in, you have to maintain objectivity.  You will not
19  subordinate your judgment to anyone to maintain
20  objectivity.  You can't be an auditor if you subordinate
21  your judgment to anyone.
22      Q.   And Dr. Guy, is there a description in the
23  rules of integrity?
24      A.   There is, yes, in the ET section.  All this
25  is ET, but back up in the ET-53, 54, 55 section, there's

Page 2510

1  a discussion of integrity.
2          MR. THOMAS:  Can we please go to ET-54,
3  please.
4          (Technician complies.)
5  BY MR. THOMAS:
6      Q.   And again, this is another ethics rule?
7      A.   This is one of the principles in the AICPA
8  Code of Conduct, yes.
9          MR. THOMAS:  And if we look at the top
10  there, in .01 there.
11          (Technician complies.)
12          MR. THOMAS:  There we go.  Thank you.
13  BY MR. THOMAS:
14      Q.   It says, for integrity to maintain and
15  broaden public confidence, members should perform all
16  professional responsibilities with the highest sense of
17  integrity.
18          And then .01 says, integrity is an element
19  of character fundamental to professional recognition.
20  It is the quality from which the public trust derives
21  and the benchmark against which a member must ultimately
22  test all decisions.
23          This is the first leg of the stool?
24      A.   Integrity is the first leg of the
25  three-legged stool, yes.

Page 2511

1    Q.   And does integrity apply to the audits BDO
2 Seidman did in this case?  Must they have had integrity
3 in doing them?
4    A.   Absolutely.
5    Q.   And if we look at .03, it provides,
6 integrity is measured in terms of what is right and
7 just.  In the absence of specific rules, standards, or
8 guidance, or in the face of conflicting opinions, a
9 member should test his decisions and deeds by asking, am
10 I doing what a person of integrity would do?  Have I
11 retained my integrity?  Integrity requires a member to
12 observe both the form and the spirit of technical and
13 ethical standards.  Circumvention of those standards
14 constitutes subordination of judgment.
15    Dr. Guy, is this the same idea we saw in
16 Rule 220, that you must follow the letter and the spirit
17 of the rules?
18    A.   You must follow the form and the spirit of
19 the rules, and this is what this says.  Technical
20 standards here refer to, for example, the
21 generally-accepted auditing standards, and ethical
22 standards refer to the basic document that I said was
23 printed from the AICPA Web site, yes.
24    MR. THOMAS:  And can we look at the next
25 one, 55?

Page 2512

1    (Technician complies.)
2 BY MR. THOMAS:
3    Q.   And Ethical Rule 55 --
4    MR. THOMAS:  Thank you.
5 BY MR. THOMAS:
6    Q.   -- says, a member should maintain
7 objectivity and be free of conflicts of interest in
8 discharging professional responsibilities.
9    What does it mean to be free of conflicts of
10 interest?
11    A.   Means the CPA can't have a relationship with
12 others.  For example, when you're doing an audit, as an
13 auditor you can't have a relationship with someone else
14 that would taint your audit, that would cause you to not
15 be impartial, a conflict of interest, a relationship.
16    Someone -- when you're doing an audit, for
17 example, and you have a relationship with someone else
18 that would cause you to -- your audit to be tainted, for
19 you to pull your punches in the way you generate audit
20 evidence, and for you to otherwise not do the job that
21 you must do in living up to the public trust that's
22 bestowed upon certified public accountants.
23    MR. THOMAS:  Can we look quickly at .03?
24    (Technician complies.)
25 BY MR. THOMAS:

Page 2513

1    Q.   .03 provides, for a member in public
2 practice, the maintenance of objectivity and
3 independence requires a continuing assessment of client
4 relationships and public responsibility.
5    In this case, Dr. Guy, was BDO required to
6 have a continued assessment of their audit client
7 relationship with Bankest when they entered into their
8 business relationship with StrataSys?
9    A.   Yes, they were.  And you must understand
10 the -- that relationship, that affiliation with
11 StrataSys and the impact that has on your audit client
12 Bankest.
13    Q.   And if we look back up at the top of this
14 rule again, please, I believe we see the third leg of
15 the stool in the second sentence.  A member in public
16 practice should be independent in fact and appearance
17 when providing auditing and other attestation services.
18    Is this the idea of the third leg of the
19 stool also found in Rule 55?
20    A.   That's correct.
21    Q.   And if we look at the bottom of .01 the rule
22 provides, independence precludes relationships that may
23 appear to impair a member's objectivity in rendering
24 attestation services.
25    You can't even look like you're not

Page 2514

1 independent; is that right?
2    A.   That's correct, and remember, attestation
3 here means audit, as well.  Attestation is an umbrella
4 concept.  So one of the facets of service lines under
5 attestation is audit, as well.  Audit and financial
6 statements.
7    MR. THOMAS:  With Your Honor's permission, I
8 will approach the witness with Plaintiffs' Exhibit
9 Number 87 in evidence.
10    THE COURT:  You may.
11    MR. THOMAS:  (Complies.)
12 BY MR. THOMAS:
13    Q.   Dr. Guy, do you understand Plaintiffs'
14 Exhibit 87 in evidence to be E.S. Bankest's financial
15 statements for 2001, 2002 audited by BDO Seidman?
16    A.   Yes, I do.
17    Q.   Could you look at page 2 with me, please.
18    A.   (Complies.)
19    Q.   Is BDO in their heading there required to
20 put it's an independent auditors report?
21    A.   You have to be independent to be an auditor
22 and the authoritative standards mandate that you title
23 your report as independent auditor.
24    Q.   And BDO Seidman signed this report?
25    A.   Yes, they did.

Page 2515

1    Q.   And if you would look with me, please, at
2  the paragraph that states we conducted.
3         Do you see that?
4    A.   The second paragraph?  Yes, I do.
5    Q.   We conducted our audits in accordance with
6  auditing standards generally accepted in the United
7  States of America.
8         Dr. Guy, is that statement by BDO Seidman
9  true?
10   A.   No, it is not true.  One of the auditing
11 standards absolutely mandates that you have to be
12 independent.  They're not independent.
13   Q.   Dr. Guy, as part of reaching your opinion in
14 this case, did you have a chance to review BDO Seidman's
15 work papers?
16   A.   Yes, I did.  For the five audits we alluded
17 to, I reviewed the work papers, yes.
18   Q.   Dr. Guy, in these audits, did BDO Seidman's
19 work papers constitute evidence?
20   A.   They document evidence that's needed to
21 support an opinion on the Bankest financial statements.
22   Q.   And -- but in this case are they reliable
23 evidence that BDO complied with generally-accepted
24 auditing standards?
25        MR. COLE:  Objection.  Outside the scope.

Page 2516

1        THE COURT:  Overruled.
2        MR. COLE:  And it's impairing the jury's
3  function as to what is reliance.
4        THE COURT:  Overruled.
5        THE WITNESS:  BDO in this case did not have
6  as a result, for example, of subordination of their
7  judgment from the get-go, from the 1998 audit
8  subordinating their judgment to Mr. Parlapiano, they
9  basically had inadequate evidence, for example, the use
10 of what's referred to as invoice-only is totally
11 inappropriate for an auditor to use --
12       MR. COLE:  Objection.  Outside the scope.
13       THE WITNESS:  -- and that demonstrates the
14 subordinate --
15       THE COURT:  What is your objection?
16       MR. COLE:  Outside the scope.
17       MR. THOMAS:  Actually -- well, Your Honor, I
18 think I can demonstrate --
19       THE COURT:  Then ask another question.
20 Maybe you'll get another answer.
21       MR. THOMAS:  Actually I can just show it
22 from here.
23       THE COURT:  Okay.
24       MR. THOMAS:  If you'll just give me a chance
25 to approach your clerk.

Page 2517

1        THE COURT:  Okay.
2        MR. THOMAS:  (Complies.)
3        May I approach, Your Honor?
4        THE COURT:  You may.
5        MR. THOMAS:  (Complies.)
6  BY MR. THOMAS:
7    Q.   Dr. Guy, Plaintiffs' Exhibit 7345 marked for
8  ID, is that the book you wrote on ethics?
9    A.   Yes, it is.
10       MR. THOMAS:  Plaintiffs move 7345 marked for
11 ID into evidence, Your Honor.
12       MR. COLE:  Objection.  Irrelevant and
13 bolstering.
14       THE COURT:  Overruled.
15       I'll accept Plaintiffs' Exhibit 7345 marked
16 for ID is now Plaintiffs' Exhibit 7345 in evidence.
17 BY MR. THOMAS:
18   Q.   Dr. Guy, I'd ask you to turn to page 36 of
19 your ethics book.
20   A.   Yes, I have page 36.
21   Q.   And if you look at the bottom there where it
22 says, consequences of not being independent.
23       MR. COLE:  Objection.  This falls squarely
24 within (inaud.), bolstering.
25       THE COURT:  Overruled.

Page 2518

1  BY MR. THOMAS:
2    Q.   Dr. Guy, what is the consequence of BDO not
3  being independent in this case?
4    A.   As stated here, if you're not independent,
5  you haven't complied with the generally-accepted
6  auditing standards, and the auditor is precluded, the
7  auditor is prohibited from expressing an opinion of
8  financial statements.
9         And it also goes on to say in the second
10 paragraph here that no matter how extensive your audit
11 procedures are, if you're not independent, your audit is
12 no good, you haven't done an audit and you can't issue
13 an audit opinion.  And for -- it says, for all practical
14 purposes the financial statements are unaudited.
15   Q.   So let me revisit the question I asked you a
16 moment ago, Dr. Guy.  If BDO was not independent when
17 they did these audits, are the work papers for their
18 audits reliable evidence that they complied with
19 generally-accepted accounting standards?
20   A.   Generally-accepted auditing standards?  No.
21 Because no matter how much work they did, if you're not
22 independent full stock, you can't even refer to
23 something as audit procedure because it's not an audit
24 procedure.
25   Q.   Several times, Dr. Guy, you've explained or

Page 2519

1   noted subordination of judgment.
2          Did you see in this case, in your opinion,
3   that BDO Seidman subordinated its judgment and,
4   therefore, violated one of the three legs of the stool?
5      A.   Yes, I did.
6      Q.   Where did you see that evidence?
7      A.   Well, it -- from the get-go basically and
8   throughout the entirety of the five years of audits they
9   subordinated their judgment.
10         For example, if we go back to the refusal to
11  grant access to, the need access, unfettered access,
12  unrestricted access, to Capital's books and records when
13  Ramon Rivera was denied that access, and then basically
14  when they had the meeting with Mr. Parlapiano, he
15  indicated that --
16     Q.   I'm going to stop you for just a minute,
17  Dr. Guy, and let's try to take it in steps.  Okay?
18     A.   Okay.
19     Q.   You've had a chance to review the
20  depositions and some of the testimony in this case?
21     A.   Yes, I have.
22     Q.   And you understand that on a Friday in
23  the -- in the 1998 audit, that Ramon Rivera requested
24  certain documents --
25         MR. COLE:  Objection.

Page 2520

1          THE COURT:  Let him finish the question.
2   BY MR. THOMAS:
3      Q.   -- documents from Carlos Mendez and Dominick
4   Parlapiano?
5      A.   I understand --
6          THE COURT:  Hold on.  What's your objection?
7          MR. COLE:  Leading.
8          THE COURT:  Sustained.
9   BY MR. THOMAS:
10     Q.   Dr. Guy, what do you understand happened on
11  a Friday in the 1998 audit concerning Ramon Rivera?
12     A.   In February of 1999, Ramon Rivera asked for needed
13  doing the 1998 audit, Ramon Rivera asked for needed
14  access to Capital's books and records and was denied
15  that access.
16     Q.   And Dr. Guy, when -- on that first -- first
17  time on Friday, when Mr. Ellenburg, the partner for BDO
18  was notified that they had denied access, did that
19  constitute a subordination of judgment?
20         MR. COLE:  Objection.
21         THE COURT:  Sustained.
22  BY MR. THOMAS:
23     Q.   Do you understand, Dr. Guy, from your review
24  of the testimony in this case whether or not Ramon
25  Rivera contacted Keith Ellenburg, the partner for BDO,

Page 2521

1   when he was denied documents?
2          MR. COLE:  Objection.  Based upon the last
3   question and this question is leading.
4          THE COURT:  Overruled.
5          THE WITNESS:  I understand that Mr. Rivera
6   was denied access, needed access to Capital's books and
7   records and had a conversation with Mr. Ellenburg on
8   that Friday we're talking about in February of 1999, and
9   stopped work.
10  BY MR. THOMAS:
11     Q.   And do you have an understanding about
12  whether or not there was another conversation with
13  Mr. Parlapiano, this time involving Mr. Lenner?
14     A.   I understand that there was a conversation
15  the following week, and that it was a telephone
16  conversation, for example, that took place -- Mr. Lenner
17  was part of that conversation that took place.
18     Q.   And do you understand whether or not now for
19  a second time Mr. Parlapiano denied access to documents
20  BDO said it needed to complete the audit?
21         MR. COLE:  This is leading and
22  argumentative.
23         Judge, can we have a side bar on this?
24         THE COURT:  No.  Sustained.
25  BY MR. THOMAS:

Page 2522

1      Q.   Do you understand whether it happened for a
2   second time?
3      A.   I understand that the door was shut.  You
4   can't audit Bankest without getting into Capital.  And
5   the door was shut a second time.  You can't get behind
6   this door and there need -- books and records that an
7   auditor has to get to audit Bankest.
8      Q.   And in forming your opinion in this case and
9   understanding the two times you just talked to us about,
10  did you see whether or not BDO Seidman demonstrated
11  professional skepticism when they responded to these two
12  closed doors?
13     A.   Did they demonstrate professional
14  skepticism?
15     Q.   Yes, sir.
16     A.   Basically at this stage your only option is
17  to decline to be the auditor because you can't get
18  needed evidence.  Here again, 99.5 percent of the
19  receivables were generated by Capital.  And you can't
20  possibly audit a shell of a company that has such a
21  small percentage of the business, Bankest, without
22  getting access.
23         So they basically did not get access.  They
24  have subordination of judgment.  And your decision at
25  this point should be, unless you've gained unfettered

Page 2523

1  access to decline, to continue, or withdraw from the
2  engagement.
3      Q.   And after this point, Dr. Guy, do you
4  understand whether or not there was a meeting between
5  Mr. Lenner and Mr. Parlapiano?
6      A.   I understand that Mr. Parlapiano came to
7  BDO's office and had a meeting a couple days after this
8  telephone conversation I think which was on a Monday or
9  so.
10     Q.   And do you have an understanding after
11 Mr. Lenner's meeting with Mr. Parlapiano whether he gave
12 instructions to Ramon Rivera?
13     A.   I understand that Mr. Lenner after meeting
14 with Mr. Parlapiano in the BDO offices, instructed Ramon
15 Rivera --
16         MR. COLE:  Objection, Your Honor.
17         THE COURT:  Hold on.  Sustained.
18 BY MR. THOMAS:
19     Q.   In forming your opinion, are you relying, in
20 part, on what you understood happened at BDO's audit in
21 1998 involving Ramon Rivera?
22     A.   Yes, they were --
23     Q.   Please just answer my question and don't go
24 further so we can avoid an objection.
25     A.   Yes.

Page 2524

1      Q.   And in reaching that opinion, did you review
2  and rely upon, in part, the declaration of Ramon Rivera?
3      A.   Yes.
4      Q.   And did you rely upon some of the testimony
5  in this case?
6      A.   Yes.
7      Q.   And did that include deposition testimony?
8      A.   Yes.
9      Q.   And did that include testimony in this
10 trial?
11     A.   Yes.
12     Q.   And did it include testimony from
13 Mr. Ellenburg?
14     A.   Yes.
15     Q.   Did it include -- well --
16         MR. THOMAS:  May I approach the witness,
17 Your Honor --
18         THE COURT:  You may.
19         MR. THOMAS:  -- with Exhibit 3753 in
20 evidence?
21         (Complies.)
22 BY MR. THOMAS:
23     Q.   Is this part of what you relied upon?
24     A.   Yes, it is part of what I relied upon.
25     Q.   And based upon your understanding of

Page 2525

1  reviewing the declarations and the testimony in this
2  case, do you have an understanding of what instructions
3  were given to Mr. Rivera by Mr. Lenner that you are
4  relying upon to give your opinion?
5      A.   Yes.
6      Q.   What?
7         MR. COLE:  Objection.  Hearsay.
8         THE COURT:  Overruled.
9         THE WITNESS:  Well, the declaration
10 addresses that.  For example, at least, in part, in
11 paragraph 24 it indicates that Mr. Lenner had a
12 discussion with Mr. Rivera, and basically said restart
13 the audit.
14         Mr. Parlapiano's is a very important person
15 in the Miami business community and we need to be
16 looking -- BDO needs to be looking at ways to be
17 developing new business.  And this is an important
18 person, and Ramon Rivera needs to develop a better
19 understanding of management of client relationships.
20 BY MR. THOMAS:
21     Q.   And Dr. Guy, did you understand that based
22 upon Mr. Lenner's conversation with Mr. Rivera, that he
23 was to treat Bankest Capital checks and Joy checks as
24 Wal-Mart checks?
25         MR. COLE:  Objection.  Hearsay.

Page 2526

1         THE COURT:  Overruled.
2  BY MR. THOMAS:
3      Q.   Do you have that understanding?
4      A.   I'm sorry.  I have the understanding that he
5  was told to treat Capital checks as customer checks.
6      Q.   And Dr. Guy, in your opinion, do these
7  events constitute a subordination of judgment by BDO
8  Seidman?
9      A.   Yes, they do.  Yes.  Absolutely.
10     Q.   And if BDO Seidman subordinated their
11 judgment to Mr. Parlapiano, were they independent?
12     A.   No, you cannot be independent if you lack
13 objectivity.  And subordination of judgment is meaning
14 that you're minus objectivity.
15     Q.   And if BDO subordinated their judgment and
16 was not independent, did they violate generally-accepted
17 auditing standards in all five of the E.S. Bankest
18 audits?
19     A.   Yes, they did.
20     Q.   And in reviewing the work of BDO Seidman,
21 did you find a pattern of BDO Seidman subordinating
22 their judgment to that of their audit client?
23     A.   Yes, I did.
24         MR. THOMAS:  Your Honor, may I approach the
25 witness, please, with Exhibit 3005 in evidence?

Page 2527

1    THE COURT: You may.
2    MR. THOMAS: (Complies.)
3 BY MR. THOMAS:
4    Q.   Dr. Guy, do you understand this to be a
5 portion of BDO Seidman's work paper for the audit for
6 the year-end 2000?
7    A.   Yes, I do. For 2000, yes.
8    Q.   And do you understand that for the audit for
9 the year-ended 2000, that Mr. Rivera was no longer
10 working on the Bankest audit?
11   A.   That's correct.
12   Q.   If you could please look with me over at
13 third page?
14   A.   (Complies.)
15   Q.   And at the top where it says customer name
16 and invoice and it ends with invoice only, you see that?
17   A.   I see customer name and invoice, yes.
18   Q.   And then you see invoice only at the end?
19   A.   Yes, I do.
20   Q.   And then if you look down at the percentages
21 for invoice only, it says 61.43 percent?
22   A.   Yes.
23   Q.   In your opinion, is this evidence of BDO
24 Seidman's subordination of their judgment in their
25 audits of E.S. Bankest?

Page 2528

1    A.   Yes, it is. They've got invoice-only audit
2 evidence; they can't get anything else. You can't
3 possibly determine if a receivable -- you start out to
4 confirm a receivable with a Wal-Mart, with a customer.
5 And you can't possibly determine by looking at invoices.
6 You have to find out if the -- for example, if the
7 materials were shipped.
8    MR. COLE: Outside the scope.
9    THE COURT: Overruled. Go ahead.
10   THE WITNESS: Okay. You have to support an
11 invoice with proof of shipment to find out if anything
12 was shipped. I could create invoices all day long to
13 Mr. Thomas, for example, alleging that he owed me money
14 for work in this case. And that doesn't mean -- unless
15 I provide the services are here with some of the other
16 customers, unless the goods were provided, there's
17 evidence of shipping, this is woefully inadequate as
18 audit evidence, and it demonstrates -- the only thing
19 you can get here are a bunch of invoices, and that, by
20 itself, is not enough to take the place of not getting
21 confirmation from the person or company that owes the
22 money.
23 BY MR. THOMAS:
24   Q.   Dr. Guy, I want you to assume for me that
25 BDO did perfect audits. Perfect audits in 1998, 1999,

Page 2529

1 2000, 2001, and 2002. They got all of the confirmations
2 back. They saw shipping documents. They recognized
3 Capital was a related party. They did everything they
4 were supposed to do. But BDO was not independent.
5    Assuming those facts, did BDO Seidman still
6 violate generally-accepted auditing standards in doing
7 these audits?
8    A.   If you did a perfect audio, for example, and
9 you had a conflict of interest which was obvious in 2001
10 and 2002, you're not independent. So you're not
11 independent regarding those two audits.
12   Q.   And what about -- I want you to assume for
13 me that they did perfect audits in 1998, 1999, and 2000
14 but they had subordinated their judgment and they lacked
15 the appearance, the appearance of being independent.
16   Did they still violate generally-accepted
17 auditing standards by not being independent when they
18 did their audits?
19   A.   If you violate the appearance of
20 independence, you do. You would not be independent if
21 you're not -- if you don't appear to be independent.
22   Q.   So then assuming my facts, even if they did
23 perfect audits, but they were not independent in 1998,
24 1999, 2000, 2001, and 2002, would BDO have violated
25 generally-accepted auditing standards because they were

Page 2530

1 not independent?
2    A.   If you're not independent even if you've
3 done perfect audits, your report is no good.
4    Q.   So --
5    A.   So you can't do it. You have to be
6 independent under generally-accepted auditing standards.
7 It's a bedrock principle. You've got to be independent.
8    Q.   I understand that. So I need you to focus,
9 please, on my question. If they are not independent,
10 not independent --
11   A.   Not independent.
12   Q.   Even though they do perfect audits --
13   A.   Yes.
14   Q.   -- for 1998, 1999, 2000, 2001, 2002, if
15 they're not independent, did they nonetheless violate
16 generally-accepted auditing standards in doing their
17 audits?
18   A.   Absolutely.
19   Q.   Thank you.
20   MR. THOMAS: And can we go to paragraph 24,
21 please.
22   (Technician complies.)
23 BY MR. THOMAS:
24   Q.   I apologize, Dr. Guy. I think the reason
25 you're having -- I don't think I have my mic on.

Page 2531

1       Better?
2    A.   Better.
3    Q.   Now, Dr. Guy, you understand this to be
4  paragraph 24 of Mr. Rivera's declaration?
5    A.   Yes, it is.
6    Q.   And if you look here, it says that
7  Mr. Lenner said that he had known Mr. Parlapiano for
8  many years and that they had developed a good
9  professional relationship.  And then he says he also
10  noted that as a manager I should be looking for ways to
11  bring in new business and suggested that working for
12  Bankest could lead to other work through Mr. Parlapiano,
13  the Orlanskys, and affiliates of Bankest.
14       Dr. Guy, in this case, do you understand
15  that working for Bankest did lead to new business for
16  BDO?
17    A.   Yes, I do.
18    Q.   And that through Mr. Parlapiano did lead to
19  other work for BDO?
20    A.   Yes, I do.
21    Q.   And what was that other work?
22    A.   Well, it led to the creation of a technology
23  alliance relationship with StrataSys.
24       MR. THOMAS:  May I approach the witness with
25  Plaintiffs' Exhibit 415-B in evidence?

Page 2532

1       THE COURT:  You may.
2       MR. THOMAS:  (Complies.)
3  BY MR. THOMAS:
4    Q.   Dr. Guy, do you understand this to be the
5  memo that Mr. Lenner wrote to the CEO of BDO to get a
6  bonus?
7    A.   I do.
8    Q.   And if you look down at the bottom of the
9  first page there, Mr. Lenner writes that Dave Larson and
10  I recently closed an IT alliance firm transaction with
11  StrataSys, Inc.  And if you look a little lower it says,
12  I have very high expectations for the Miami office and
13  the firm as a result of this alliance.
14       Do you see that?
15    A.   Yes, I do.
16    Q.   Is this the StrataSys relationship that you
17  were referring to?
18    A.   That is the relationship I alluded to.
19       MR. THOMAS:  Now, can you please turn with
20  me to page 3, and can we look at paragraph 4.
21       (Technician complies.)
22  BY MR. THOMAS:
23    Q.   And the first thing Mr. Lenner writes here
24  is, notwithstanding the importance of my core assurance
25  practice, I truly believe in ADC.  My actions set forth

Page 2533

1  above justify my beliefs.
2       You see that?
3    A.   Yes, I do.
4    Q.   What's ADC?
5    A.   A BDO term that refers to alternative
6  distribution channels.
7    Q.   And alternative distribution channels, is
8  that auditing?
9    A.   No.  It's other ways to generate revenue for
10  a CPA firm.
11    Q.   And in this case how did BDO identify an ADC
12  to generate other money for BDO?
13    A.   They basically through Mr. Parlapiano were
14  able to form a technology alliance business relationship
15  with StrataSys.
16    Q.   Do you know what a loss leader is?
17    A.   Yes, I do.
18    Q.   What is it?
19    A.   A loss leader is a term that's widely used
20  in business.  For example, even in retail business, a
21  company will have a product that is fairly desirable,
22  sell it at a loss, and the people come in to buy the
23  product, and they buy a bunch of other things.
24       Well, here it's also used in the auditing
25  profession to -- unfortunately in a way that get your

Page 2534

1  foot in the door with a client and then through the
2  client and relationship with the client establish other
3  business venues and extend your revenue sources.  So you
4  basically price the audit below what it really cost you.
5    Q.   And in this case, Dr. Guy, did BDO Seidman
6  use their audit of E.S. Bankest to try to generate other
7  revenue like StrataSys?
8    A.   Well, they certainly had expectations to
9  with Bankest and with Mr. Parlapiano.  He's an important
10  person in the business community, and he would be a
11  great networking source and business-generating source.
12    Q.   If we read a little more of what Mr. Lenner
13  writes, he says, I have smelled the cheese for the past
14  couple of years.  I have realized not only must we
15  maintain and upgrade our core practice but we must
16  diversify into new areas such as ADC, alliances, and
17  mergers.  There is a common pattern to the process.  I
18  have seen and learned that preexisting CPA business
19  strategies and structures become inflexible over time.
20  These structures may survive for some period with the
21  protection of general apathy, but eventually external
22  catalysts move the cheese for the practicing CPA and
23  give a loud wolf howl wake-up call to the pack, the
24  firm.
25       Dr. Guy, based on your expertise, what was

Page 2535

1   BDO Seidman trying to do with these alternative
2   distribution channels as related to their auditing
3   services?
4           MR. COLE: Objection. Speculation.
5           THE WITNESS: Well. Based --
6           THE COURT: Hold on. Hold on.
7           MR. COLE: And beyond his expertise, as
8   well.
9           THE COURT: I'm sorry, what was that?
10          MR. COLE: Speculation beyond his expertise.
11          THE COURT: Sustained.
12  BY MR. THOMAS:
13      Q.  Dr. Guy, did you have an opportunity to
14  review the testimony of Mr. Lenner?
15      A.  I did review the testimony of Mr. Lenner.
16      Q.  Did you see the, and rely upon, the portion
17  of Mr. Lenner's testimony where he stated that --
18          MR. COLE: Objection, Your Honor.
19          THE COURT: Sustained. Ask a question.
20  BY MR. THOMAS:
21      Q.  Dr. Guy, when you reviewed Mr. Lenner's
22  testimony and relied upon it to perform your opinion in
23  this case, did you rely upon the portion of his
24  testimony --
25          MR. COLE: Objection.

Page 2536

1           MR. THOMAS: -- where he testified --
2           THE COURT: Same question.
3           Sustained.
4           MR. THOMAS: I'm sorry, did you -- start
5   again.
6           THE COURT: Sustained.
7   BY MR. THOMAS:
8       Q.  In forming your opinion in this case, did
9   you rely on the testimony given by Mr. Lenner?
10      A.  Yes.
11      Q.  Did you rely upon the testimony given by
12  Mr. Lenner relating to his moving the cheese?
13      A.  Yes. I read this material, yes.
14      Q.  And what did -- and in reaching your
15  testimony, did you rely upon where he talked about
16  growing his practice?
17          MR. COLE: Objection.
18          THE COURT: Overruled.
19          THE WITNESS: Yes.
20  BY MR. THOMAS:
21      Q.  And in relying upon that in reaching your
22  testimony here today, based on your expertise as an
23  ethics expert, do you have an understanding of the
24  ethics problems caused by just what Mr. Lenner's talking
25  about in this paragraph?

Page 2537

1       A.  Yes. Not per se with alternative
2   distribution channels but when an alternative
3   distribution channel such as StrataSys impinges on your
4   audit client, you can't, you know, sell out your audit
5   to generate additional revenues.
6       Q.  And if we look up here, is it says, outmoded
7   practices become obvious and limit success. Opening up
8   the distribution channel through ADC, consolidations or
9   mergers must happen in order for there to be enough
10  cheese to be eaten.
11          In reaching your opinion, did you review the
12  deposition testimony of Mr. Herrera?
13      A.  Yes, I did.
14      Q.  In reaching your opinion, did you rely upon
15  Mr. Herrera's testimony that it precisely this time --
16          MR. COLE: Objection, Your Honor.
17          THE COURT: Sustained.
18  BY MR. THOMAS:
19      Q.  In reaching your testimony -- I'm sorry, in
20  reaching your opinion, did you rely upon the testimony
21  of Mr. Herrera concerning the financial abilities of the
22  Miami office at the time this memo was written?
23          MR. COLE: Objection, Your Honor.
24          THE COURT: Overruled.
25          THE WITNESS: Yes.

Page 2538

1   BY MR. THOMAS:
2       Q.  And what was that?
3       A.  Mr. Herrera indicated he came to BDO, he
4   stayed a short period of time, I think a little bit over
5   two months or so, and he testified that he left
6   because --
7           MR. COLE: Objection.
8           THE COURT: Sustained.
9   BY MR. THOMAS:
10      Q.  In reaching your opinion, what about
11  Mr. Herrera's testimony did you rely upon?
12      A.  He said that --
13          MR. COLE: Objection.
14          THE COURT: Sustained.
15  BY MR. THOMAS:
16      Q.  Dr. Guy, you've just got to tell us what you
17  relied upon in reaching your testimony.
18          MR. COLE: Objection.
19          THE COURT: Overruled.
20          THE WITNESS: That the Miami office was
21  having some financial problems.
22  BY MR. THOMAS:
23      Q.  Dr. Guy, now, when BDO Seidman pursued the
24  StrataSys relationship, when their office was in
25  financial difficulty, the relationship between StrataSys

Page 2539

1 and BDO and Bankest and BDO, did that relationship cause
2 an independence problem for BDO?
3     A.   Yes.  A first class conflict of interest.
4     Q.   And it would be helpful to you in explaining
5 that to this jury to illustrate it for them.
6     A.   Yes, it would be easier to see on paper, I
7 think, than hearing words.
8         THE COURT:  Why don't we do this before he
9 starts drawing.  Is he going to start drawing?
10        MR. THOMAS:  He's going to start drawing
11 now.
12        THE COURT:  No, let's not do that.  Let's go
13 to lunch.
14        Ladies and gentlemen, you're not to discuss
15 the case amongst yourselves.  You're not to and discuss
16 or allow anyone to discuss the case with you, and you're
17 not to discuss the testimony with anyone.
18        You're not to form a definite or fixed
19 opinion about the case until you've heard all the
20 evidence, the arguments by the lawyers, and the
21 instructions of the law by me.
22        You're not to see, hear, or read any
23 accounts of this case in the media, and you're to ignore
24 the lawyers' presence outside this courtroom and they're
25 to ignores yours and that includes the witness.

Page 2540

1        Leave your notes.  And 1:30 in the jury
2 room.  I think that's what he tells you.
3        Have a good lunch.
4        (Thereupon, the jury was escorted out of the
5 courtroom.)
6        THE COURT:  Dr. Guy, you are not to discuss
7 the testimony you've given or you're about to give with
8 anyone and that includes all the lawyers.
9        Have a good lunch.
10        (Whereupon, at 11:55 a.m., a luncheon recess
11 was taken.)
12
13            *    *    *
14
15
16
17
18
19
20
21
22
23
24
25

Page 2541

1        AFTERNOON SESSION
2            (1:45 p.m.)
3     Thereupon,
4        DAN GUY
5 was recalled as a witness and, having been previously
6 duly sworn, was examined and testified further as
7 follows:
8        MR. COLE:  Judge, before we get started,
9 Your Honor, I just wanted to clarify an objection that I
10 had this morning.
11        THE COURT:  I know what you're going to say
12 but go ahead and say it.
13        MR. COLE:  You always know what I'm going to
14 say.  How does that happen?
15        When Mr. Guy referred to his own textbook, I
16 believe that that was improper and made the objection at
17 the time but for the record we believe that the law is
18 pretty clear that an expert witness is not allowed to
19 refer to a learned treatise in support of his opinion
20 both on the grounds of hearsay and bolstering under 706.
21 The only time you're allowed to use a treatise is on
22 cross-examination.
23        And Mr. -- Dr. Guy is obviously the
24 plaintiffs' expert.  Your Honor, we cite in favor of our
25 position Green vs. Goldberg, 630 So.2nd 606 and Donshik

Page 2542

1 vs. Sherman, 861 So.2nd 53.
2        Your Honor, again it was improper
3 bolstering.  The document should not have come in also
4 on the grounds that it's hearsay.  And putting it up on
5 the screen and having the witness testify from it
6 created multiple levels of hearsay and impropriety.  And
7 that's the reason I wanted to make that clear for the
8 record.
9        I, therefore, move also to strike Dr. Guy's
10 testimony on that ground.  And it's -- I was referring
11 to Rule 706 of the Florida Rules of Evidence and I move
12 to strike the testimony.
13        THE COURT:  Mr. Thomas?
14        MR. THOMAS:  Can I see the cases?
15        MR. COLE:  I was just referring
16 to (indicating) Lynn vs. Fossum, but I know it came out
17 right before our case law.  I just don't have it.  I'm
18 happy to update the record.  It's 946 So.2nd 1032, a
19 Supreme Court case.  And if I may hand it up, Your
20 Honor.
21        (Complies).
22        MR. THOMAS:  Judge, these cases, including
23 Lynn vs. Fossum which talks about not being able to rely
24 upon other experts to build your expert testimony is not
25 what happened here.  What happened here, he wasn't

Page 2543

1  relying on what someone else said.  He was relying on
2  what he said.  And that's what's different than these
3  cases.
4          Also, it goes to his qualifications as an
5  expert and it is certainly not improper bolstering or
6  hearsay.
7          THE COURT:  Anything else, Mr. Cole?
8          MR. COLE:  No.  I think it's clear that
9  Green vs. Goldberg is directly on point.  It deals with
10 the learned treatise exception and 706 talks about the
11 use of learned treatises only in connection with
12 cross-examination.
13         THE COURT:  Thank you.  Anything else?
14         MR. COLE:  That's it.
15         THE COURT:  At this time, your request is
16 denied.
17         (Thereupon, there was a brief pause.)
18         THE COURT:  All right.  Bring them in.
19         THE BAILIFF:  All rise for the jury.
20         (Thereupon, the jury was brought into the
21 courtroom.)
22         THE COURT:  You may be seated.  All right,
23 ladies and gentlemen, let's see if we can move it along.
24         Mr. Thomas, you may proceed.
25         DIRECT EXAMINATION  (continued)

Page 2544

1  BY MR. THOMAS:
2      Q.   Dr. Guy, when you left the AICPA did you go
3  into your own consulting practice?
4      A.   Yes.
5      Q.   And did you consult for accounting firms?
6      A.   Yes, I did.
7      Q.   And did you also begin doing expert
8  testimony?
9      A.   That's correct.
10     Q.   And in doing expert testimony, Dr. Guy, do
11 you sometimes testify for accounting firms who are
12 defending their audits?
13     A.   Yes, I do.
14     Q.   And sometimes do you testify for people like
15 me who are suing accounting firms?
16     A.   I do.  That's correct.
17     Q.   Dr. Guy, you are being compensated for your
18 work?
19     A.   Yes, I am.
20     Q.   And you're being compensated for the work
21 you've done in reviewing these audits?
22     A.   Yes, I have been.
23     Q.   And for reaching -- and for working on an
24 opinion on ethics?
25     A.   That's correct.

Page 2545

1      Q.   And how much money have you made for this
2  case?
3      A.   $320,000, approximately.
4      Q.   And are you charging me the same rate you
5  charge others?
6      A.   Yes, I am.
7      Q.   And do you know in your experience is that
8  about right for the amount of money for this kind of
9  case for doing the work that you're doing?
10     A.   It's about right.  Sometimes it's a little
11 less and sometimes it's a lot more.
12     Q.   And Dr. Guy, sometimes when you've been
13 retained by an accounting firm to represent them as an
14 expert --
15     A.   Yes.
16     Q.   -- have you ever reviewed the file and then
17 said you can't do the work?
18     A.   Yes, I have.
19     Q.   And when you review the file and say you
20 can't do the work, how come?
21     A.   Well, sometimes it's a case where I feel
22 like it's not a very good case.  For example, sometimes
23 I'll find that the firm is not independent and therefore
24 I reject the work.  I get paid for the work I've done
25 but in my engagement letter I have a withdrawal

Page 2546

1  provision, so I withdraw from the engagement.
2      Q.   And if you withdraw from the engagement then
3  you don't make any more money?
4      A.   That's correct.
5      Q.   And have you ever been -- tried to be
6  retained by someone who is suing an accounting firm and
7  after looking at it say no, I can't do that?
8      A.   That's correct.
9      Q.   And when that happens you do not make the
10 money on the engagement going forward?
11     A.   That's correct.
12     Q.   And Dr. Guy, in this case we were talking
13 about the stool.  Do you remember that?
14     A.   I'm sorry, talking about ---
15     Q.   We were talking about the stool.
16     A.   Yes.  Okay.
17     Q.   And the three legs of the stool are
18 integrity, objectivity and appearance of independence.
19 Do you remember that?
20     A.   Yes, I do.
21     Q.   And we've also talked about subordination of
22 judgment, do you remember that?
23     A.   That's correct.
24     Q.   And which legs of the stool does
25 subordination of judgment affect?

Page 2547

1    A.   Well, actually at ET-54 there's a
2    subordination of judgment.  But primarily from a rules
3    perspective it's under objectivity and Rule 102 of the
4    AICPA code of conduct addresses subordination of
5    judgment, etc.
6    Q.   Now, just before we went to lunch we were
7    talking about StrataSys and a conflict of interest.  Do
8    you remember that?
9    A.   I do.
10   Q.   And is it your opinion that in its business
11   relationship with StrataSys, while it was also auditing
12   E.S. Bankest, that BDO Seidman had a conflict of
13   interest?
14   A.   Yes, they did.
15   Q.   And is it your opinion that BDO Seidman as a
16   result was not independent in doing the audits of E.S.
17   Bankest?
18   A.   That is correct.
19   Q.   And we were going to do some drawings.
20   Would it be helpful to you to come down and explain that
21   to the jury?
22   A.   Okay.
23        (Complies).
24        MR. COLE:  Can I?
25        THE COURT:  You may.

Page 2548

1        MR. COLE:  (Complies).
2        (Relocates to another side of the room.)
3    BY MR. THOMAS:
4    Q.   Dr. Guy, this business relationship involved
5    BDO, StrataSys and Bankest.  Would it be helpful for you
6    to illustrate that?
7    A.   Okay.
8        (Complies).
9        So Bankest here is the BDO audit client and
10   of course we talked about the business alliance
11   relationships, and that is StrataSys.  And here we're
12   talking about, of course, BDO conflict.  It's the
13   purpose of this illustration.
14   Q.   And where is BDO in this conflict?
15   A.   Well, BDO is the auditor and BDO also is --
16   has their alliance relationship, a technology alliance
17   relationship with StrataSys.  So this is what we call a
18   technology alliance relationship here.
19   Q.   And what is Mr. Lenner's role with BDO's
20   audit?
21   A.   Mr. Lenner is the audit engagement partner
22   from the audit side for Bankest.
23   Q.   And what is he on the StrataSys side?
24   A.   On the StrataSys side, Mr. Lenner is the
25   champion, the point person for this relationship with

Page 2549

1    StrataSys.
2    Q.   And is there an individual business person
3    who is both at Bankest and StrataSys?
4    A.   That's correct.  For example, Mr. Parlapiano
5    is the CFO, the chief financial person here and he's
6    also involved here with the management of StrataSys.
7    Q.   And in doing the audit of E.S. Bankest, what
8    is BDO's role?
9    A.   Well, basically BDO has to be independent in
10   doing this audit.  And they've got to do the audit in
11   accordance with generally accepted auditing standards.
12   Q.   And in the time period 2001-2002, do you
13   know approximately how much accounts receivable was
14   going from StrataSys to Bankest?
15   A.   Well, StrataSys was factoring its -- I think
16   you've referred to them as IOUs or accounts receivable.
17   Accounts receivables, and in 2001 I believe there were
18   21.5 million dollars.  And in 2002 there were 45 million
19   dollars of accounts receivables.
20   Q.   So what does that total up to about?
21   A.   47.5 million.  I mean, I'm sorry.  67.5
22   million.  Well, I'll just add it up, how's that?  I'm so
23   used to using calculators.
24   Q.   So going from StrataSys to Bankest was
25   supposed to be about in 2001 and 2002, 66.5 million in

Page 2550

1    accounts receivable?
2    A.   That's correct.
3    Q.   And for BDO and Mr. Lenner, was one of their
4    jobs as the auditor to say whether that 66.5 million in
5    accounts receivable was real or fake?
6    A.   One of the responsibilities here.  And of
7    course StrataSys, by the way, is buying these
8    receivables -- I mean StrataSys is selling the
9    receivables.  So money is going this way.  Bankest is
10   buying the receivables.  And one of the responsibilities
11   of BDO is to determine if these receivables are real or
12   fictitious in the financial statements of Bankest
13   because you're auditing the financial statements of
14   Bankest.  BDO was auditing the financial statements of
15   Bankest.
16   Q.   And BDO, do they have an expectation of
17   receiving money from StrataSys as part of their
18   relationship, the part on the right?
19   A.   Certainly.  One of the things, their license
20   fees and there are other kind of monetary relationships
21   or monetary expectations based on their alliance
22   agreement.  License fees being one example.
23   Q.   And Dr. Guy, would BDO have any expectation
24   of receiving business from StrataSys at the same time
25   that BDO and Mr. Lenner are deciding whether or not the

Page 2551

1  accounts receivable from StrataSys are real or fake, are
2  they demonstrating the judicial impartiality that's
3  required by the rules?
4      A.  No.  BDO has a conflict of interest here.
5  And one of the primary reasons they have a conflict here
6  is they basically have to be objective and impartial,
7  judicial impartiality.  And they're championing this
8  business and of course they want fees as well from the
9  alliance relationship.
10      So on the one hand they're rooting for
11  StrataSys.  On the other hand they have to be totally
12  without bias when they audit the financial statements of
13  Bankest.  So it's obvious they're going to have great
14  difficulty being hard-nosed about whether these
15  receivables are real or fictitious.
16      Q.   And Dr. Guy, have you had a chance to review
17  the testimony and review the agreement between BDO and
18  StrataSys from which their business relationship --
19      A.   Yes, I have.
20      Q.   And can I ask you, maybe you can just draw a
21  line across the bottom there?
22      A.   Okay.
23         (Complies).
24      Q.   And would it be helpful for you to use below
25  there to demonstrate the different ways BDO had high

Page 2552

1  expectations they would make money from StrataSys?
2      A.   Okay.
3      Q.   Do you remember what some of those were?
4      A.   Yes, I do.  It's quite a laundry list.
5      Q.   You think you're not going to have enough
6  room?
7      A.   I'm not going to have enough room.
8      Q.   Okay.  Flip that back?
9      A.   (Complies).
10      Is this the way that BDO's expectation of
11  dollars of money to be made from the technology alliance
12  relationship.  And I've already indicated that license
13  fees were one way.  Other ways, they had referral fees
14  and there are lots of ways that referral fees come into
15  play in this alliance relationship.  For example, BDO
16  could refer work to StrataSys and in that situation
17  StrataSys would be obligated to kick back 20 percent of
18  the revenue from that work.
19      Also, StrataSys could refer work to BDO, BDO
20  would basically pay back 20 percent and retain 80
21  percent.
22      StrataSys could also refer work to
23  alliance -- other members of the alliance, their CPA
24  firms and others that are members that are involved in
25  this alliance relationship.  And if BDO does that -- I

Page 2553

1  mean, if StrataSys does that, if they make a referral to
2  businesses, then BDO makes five percent of that.
3  Likewise, the alliance members, other alliance members
4  I'm talking about could refer work to StrataSys and in
5  that situation BDO would get five percent of this.
6      And in addition, there are commissions
7  involved here in terms of products that BDO or StrataSys
8  might have on hand, they would get a commission for
9  selling these products to outsiders.
10      And there are management fees in terms of
11  the expectation.
12      And finally, new members.  For example, if
13  StrataSys identifies a new member, then BDO would pay
14  back one-third of the license fee up to I believe
15  $10,000 and BDO would retain the remainder.
16      Q.   Dr. Guy, I know that BDO received license
17  fees and Mr. Lenner received a fee.  But in -- from an
18  expert -- from your expert opinion, when you look at
19  this arrangement, is it the amount of money that BDO
20  gets or is it the expectation of money that creates the
21  conflict?
22      A.   Well, it's the relationship here that per se
23  creates a conflict.
24      Q.   Thank you very much, Dr. Guy.
25         MR. THOMAS:  With Your Honor's permission

Page 2554

1  I'll have your clerk mark them for ID.
2         THE COURT:  Have them both marked for ID.
3         MR. THOMAS:  Would you like for me to bring
4  them there?  I can bring them there.
5         (Complies).
6         MR. THOMAS:  At this time, Plaintiffs move
7  into evidence Plaintiffs' Exhibits 7346, 7347, and 7348
8  marked for ID.
9         MR. COLE:  Actually, I don't think it is in
10  evidence.
11         THE COURT:  Do you have an objection?
12         MR. COLE:  I have an objection.
13         THE COURT:  Sustained.
14         MR. THOMAS:  Your Honor -- I'll address it
15  at side-bar.
16  BY MR. THOMAS:
17      Q.   Now, Dr. Guy, you should have up there with
18  you hopefully still Plaintiffs' Exhibit 415-B.
19      A.   Okay.  The good-guy memo, yes.
20      Q.   Exactly.  And if we can go to the bottom of
21  the page.  When you were writing on your exhibit there
22  the high expectations BDO had and Mr. Lenner had for
23  StrataSys, were you relying upon Mr. Lenner's own memo
24  where he says "I have very high expectations"?
25      A.   Yes, I was.

Page 2555

1    Q.   And if you could please turn the page,
2  Dr. Guy.
3    A.   And we looked at the -- under the alliances,
4  where Mr. Lenner wrote about the factoring alliance.
5  And he says, "Michael O'Hare and I met in July of 2001
6  with the principals of one of my factor clients to
7  provide factoring services to BDO clients and the
8  alliance member firms' clients. Both BDO and my client
9  are very excited about the potential and are working out
10 the economics of the transaction."
11   Q.   Dr. Guy, can you go into business with your
12 own audit clients?
13   A.   No, this would not be permitted. You would
14 definitely not be independent if you established a
15 factoring business with your audit client.
16   Q.   And where BDO and Mr. Lenner are very
17 excited about the potential and are working out the
18 economics of the transaction, is this another way BDO is
19 looking to make money off their audits?
20   A.   It appears to be a way to make money.
21 Obviously, there's nothing wrong with CPAs making money
22 but this is certainly directed towards making more
23 money.
24   Q.   And Dr. Guy, in fact, in entering into an
25 alliance in and of itself, that's okay for an accounting

Page 2556

1  firm, isn't it?
2    A.   Yes, it is. It's only when it has an
3  adverse impact on the audit client. It's the
4  relationship with the audit client that generates the
5  problem.
6    Q.   So in this case, is the problem that BDO
7  entered into an alliance with another company or is the
8  problem that BDO entered into an alliance with StrataSys
9  when they were saying whether the accounts receivable
10 from StrataSys were real or fake?
11   A.   That's part -- a big part of the problem.
12   Q.   Dr. Guy, take a look at another rule if you
13 would with me. In that big stack I gave you I think
14 it's kind of opened up to 102-2.
15   A.   Yes.
16   Q.   And that's Exhibit 7344 into evidence. And
17 I'd like for you to -- we've been talking about the
18 conflicts of interest and I'd like you to look down at
19 102-2 with me entitled conflicts of interest.
20   A.   Yes.
21   Q.   And it provides that "A conflict of interest
22 may occur if a member performs a professional service
23 for a client or employer and the member or his or her
24 firm has a relationship with another person, entity,
25 product, or service that could, in the member's

Page 2557

1  professional judgment, be viewed by the client,
2  employer, or other appropriate parties as impairing the
3  member's objectivity."
4          Did that happen here?
5    A.   Yes.
6    Q.   Does the relationship between BDO and
7  StrataSys and Mr. Lenner and StrataSys and BDO and
8  Bankest and Mr. Lenner and Bankest violate this rule?
9    A.   It violates Rule 102 and it violates the
10 interpretation here that we have in front of us, 102-2.
11   Q.   Now, if you look at the next sentence it
12 says, "If the member believes that the professional
13 service can be performed with objectivity and the
14 relationship is disclosed to and consent is obtained
15 from such client, employer, or other appropriate
16 parties, the rules shall not operate to prohibit the
17 performance of the professional service. When making
18 the disclosure, a member should consider Rule 301."
19 Does that apply here?
20   A.   Yes, it does and in a rare circumstance you
21 could get a conflict and you could get all the parties
22 to give you a green light and you could proceed with
23 what we call a restricted use audit report.
24   Q.   Let me take that in two parts.
25   A.   Okay.

Page 2558

1    Q.   In this case, who did BDO need to get
2  consent from?
3    A.   Basically all the parties that would be
4  users or recipients of the audited financial statements,
5  the note holders, bank, board of directors, clients, all
6  of the parties.
7    Q.   And did that happen here?
8    A.   No.
9    Q.   Now, it also says if the member believes
10 that the professional services can be performed with
11 objectivity, do we just go on what BDO thinks?
12   A.   No. First you have to recognize that
13 there's a conflict problem. You have to recognize that
14 102-2 applies. And then you have to make a judgment and
15 the judgment has to be reasonable and appropriate in the
16 circumstances and you have to view the relationship from
17 the perspective of a third party and see what they would
18 conclude.
19          So two things here. One, you must recognize
20 it, hey, I've got a conflict problem, 102-2 applies.
21 And then you must basically analyze it and put yourself
22 in the shoes of the third party that would have
23 knowledge of all the facts and circumstances to come to
24 an appropriate decision that you can proceed to then go
25 to the next stage and get permission, get a green light

Page 2559

1    from all the users.
2        Q.   Now, if all those things happen, first you
3    recognize the problem, then you get consent from
4    everybody that's going to be affected by the audit
5    opinion and it's reasonable, you said that there was
6    a -- I'm sorry, a restricted opinion that you can issue?
7        A.   Yes, I did.
8        Q.   And what's a restricted audit report?
9        A.   The audit report would be restricted to
10   those parties that gave you the green light to proceed
11   when faced with the potential conflict as opposed to a
12   general use report which is available to any and
13   everybody.
14       Q.   And were the audit reports that BDO Seidman
15   issued in this case restricted?
16       A.   No.  No audit report including those where
17   the conflict is at for year 2001 and 2002, the reports
18   are general use reports.  They're not restricted to
19   defined parties.
20       Q.   Dr. Guy, I know we talked about before the
21   break that even if it's a perfect audit, if BDO Seidman
22   has a conflict of interest, then they still violate the
23   rules.
24       A.   That's correct.  You have to be independent
25   to do an audit.

Page 2560

1        Q.   But in this case involving StrataSys, did
2    you see evidence that the conflict of interest actually
3    affected their work?
4        A.   Yes.  For example, it manifested itself, the
5    conflict showed itself and even the disclosures in the
6    financial statements about -- the footnote disclosures
7    about StrataSys and their related parties.
8        MR. COLE:  Objection.
9        THE COURT:  Overruled.
10   BY MR. THOMAS:
11       Q.   With His Honor's permission, I'll approach
12   you with Plaintiffs' Exhibit Number 84 in evidence and
13   Plaintiffs' Exhibit Number 307 in evidence.
14       THE COURT:  You may.
15       MR. THOMAS:  (Complies).
16   BY MR. THOMAS:
17       Q.   Can we please look at Plaintiffs Exhibit 84
18   in evidence?
19       (Technician complies.)
20       Dr. Guy, you understand Plaintiffs' Exhibit
21   84 in evidence to be the financial statements audited by
22   BDO Seidman in 2001?
23       A.   Yes.  Presented in a comparative format,
24   yes.
25       Q.   With 2000?

Page 2561

1        A.   That's correct.
2        Q.   And on the second page we see the
3    independent auditor's report signed by BDO Seidman, is
4    that right?
5        A.   That's correct.
6        Q.   Would you please turn with me to page 13?
7        A.   (Complies).
8        Q.   And could we highlight the "an officer of
9    the company"?
10       (Technician complies.)
11       Now, Dr. Guy, you were referring to a
12   footnote where you saw actually that effected a
13   conflict.  Is this the footnote you were referring to?
14       A.   Yes, it is.
15       MR. COLE:  Objection, speculation.
16       THE COURT:  Overruled.
17   BY MR. THOMAS:
18       Q.   And, in your opinion, what is the effect
19   here?
20       A.   I'm sorry, you turned.
21       Q.   Your opinion, what is the effect here in
22   this footnote?
23       A.   Basically there are lots of things wrong
24   with this footnote.  This is a footnote under related
25   parties, the caption is under related parties.  And

Page 2562

1    GAAP, generally accepted accounting principles, have
2    very strict requirements for related parties because --
3        MR. COLE:  Objection.
4    BY MR. THOMAS:
5        Q.   You don't have to stop speaking unless he
6    actually starts speaking.
7        THE COURT:  Overruled.
8        THE WITNESS:  GAAP, generally accepted
9    accounting principles, has very stringent requirements
10   for related parties to go by because otherwise you
11   couldn't consume or interpret or use financial
12   statements unless you know how related parties affect
13   that financial statement.  So one of the things here,
14   there are a number of things wrong.
15       First of all, GAAP requires this disclosure.
16   Bankest and StrataSys are absolutely related parties.
17   So this disclosure is required.  And one of the things
18   you have to disclose is the amount of receivables due to
19   and from a related party.  Here it says purchased 3.2
20   million dollars.  Apparently this footnote was copied
21   from the prior year with no change.  And actually, I
22   know that the receivable balance is 21 -- I believe 21.5
23   million dollars.  So it's grossly understated.  This is
24   a material misstatement of the financial statements
25   BY MR. THOMAS:

Page 2563

1    Q.  I'm sorry to stop you but I just wanted to
2  cover two things.
3    A.  Yeah, we've covered a bunch of things.
4    Q.  Number one, in your opinion this disclosure
5  is required by generally accepted accounting principles?
6    A.  It is absolutely required by generally
7  accepted accounting principles.
8    Q.  And the second thing I believe you said is
9  that the 3.2 million grossly understated the amount of
10  receivables that BDO was showing in their work papers?
11    A.  That's correct.
12    Q.  And for that I'm going to ask you to please
13  look at the other exhibit I gave you, Plaintiffs'
14  Exhibit 307 in evidence.
15        Now, I know that the typing is small,
16  Dr. Guy, but do you see two places on there for
17  StrataSys?
18    A.  There are two places.  Like, it could be 16.
19  18.5 million is one item.
20    Q.  I'm going to suggest, Dr. Guy, I know you
21  are -- it's a little difficult to see but it's 16
22  million.
23    A.  Okay.
24    Q.  Let's make sure you can see it and you agree
25  with me.

Page 2564

1    A.  Yes.
2    Q.  Can you see it okay on the screen?
3    A.  Yes.  And the next one is 5 million.  And
4  those two added together, that's where I was getting the
5  21.5 million from if I added that correctly.
6    Q.  That you wrote up on when you were doing
7  the --
8    A.  That's correct.
9    Q.  And Dr. Guy, do I understand that this is
10  BDO's own work paper showing the amount of accounts
11  receivable from StrataSys from that financial statement
12  we were looking at?
13    A.  It is.  This is their own work paper, yes.
14    Q.  And so in BDO's own work paper they showed
15  21 and a half million dollars in receivables from
16  StrataSys and then in the disclosure in the footnote it
17  said 3.2.  Do I have that right?
18    A.  Yes, and the 3.2 is described as purchases,
19  not as receivables.  So that's another problem.
20    Q.  Can we go back to the --
21        THE COURT:  Mr. Thomas, are you going to be
22  a lot longer?
23        MR. THOMAS:  I have an estimate of about
24  five to ten minutes.
25        THE COURT:  All right.

Page 2565

1  BY MR. THOMAS:
2    Q.  And Dr. Guy, this is required by GAAP that
3  the 3.2 million understates by about 18 million dollars
4  what BDO has in its own work papers and it talks about
5  purchasing.  Are there any other issues with this
6  disclosure?
7    A.  You have to disclose the financial
8  statements for both the years.  You have to disclose
9  both years.  And the last year it had 3.2 million
10  dollars and it was understated as well.  It should have
11  been 11.  So it should disclose purchases.  It should
12  disclose the receivables, and GAAP requires that you
13  disclose the transactions, the nature of the
14  relationship and the type of transaction.  Some of that
15  is disclosed here but it's a woefully deficient
16  disclosure that as CPAs we all know related parties are
17  high risk transactions.  We put those under the
18  microscope and handle those with kid gloves.  And here
19  it's just a run -- it runs roughshod over what GAAP
20  requires and it's totally inappropriate and it makes
21  this financial statement materially misstated in and of
22  and by itself.
23    Q.  And with that last statement, Dr. Guy, did
24  you mean if the only problem was this footnote would
25  this financial statement still be materially misstated

Page 2566

1  in violation of GAAS?
2    A.  GAAP.  In violation of GAAP, generally
3  accepted accounting principles.  And the answer is
4  absolutely because footnotes are required.  Footnotes,
5  you can't constrain financial statements and GAAP
6  requires a lot of information that's of special interest
7  to users to be in notes to financials.  So you can't say
8  the balance sheet's okay because the number is above in
9  the financial statement and the footnotes, they're all
10  goofed up.  That's totally inappropriate.
11    Q.  If you would look with me at Plaintiffs' 87
12  in evidence which is the 2002 audited financials which
13  should be right there in front of you on the table in
14  front of you.
15    A.  Okay.
16        MR. THOMAS:  I'm sorry, may I approach?
17        THE COURT:  Yes.
18        THE WITNESS:  Yes, I have it.  Yes.
19  BY MR. THOMAS:
20    Q.  Thank you.  Now, you understand that these
21  are the 2002 compared to the 2001 --
22        (Cell phone rings.)
23        (Laughter.)
24        MR. THOMAS:  Nice ring.
25        JUROR:  Thank you.  Sorry.

Page 2567

1          MR. THOMAS: It's okay.
2     BY MR. THOMAS:
3          Q.   Doctor Guy, these are the 2002 financial
4     statements audited by BDO?
5          A.   Compared to begin with 2001, yes.
6          Q.   And if we could go to the footnote here,
7     it's either on 13, maybe 14. Now this time it says 45
8     million dollars. Is that right, Dr. Guy?
9          A.   It does say 45 million dollars.
10         Q.   And it's on page 14 if you want to look.
11         A.   I have the page number, yes.
12         Q.   Now, Dr. Guy, you said that these financial
13    statements are comparative 2002 to 2001. So the year
14    before this footnote said 3.2?
15         A.   Yes.
16         Q.   Does an auditor, a certified public
17    accountant, do they have a duty to correct mistakes?
18         A.   Well, these are the client's financial
19    statements. These are Bankest's financial statements.
20    And they're not the auditor's. The auditor is
21    responsible for the opinion on the financial and if
22    there's a mistake on the financial statements, as an
23    auditor and a CPA you tell the client, this is a
24    mistake, this doesn't comply with GAAP. Look at GAAP.
25    This is what you've got to do.

Page 2568

1          And if they don't correct it, you would
2     qualify the opinion. You would even say given the
3     magnitude of information here that these financial
4     statements are not -- everything else is okay. These
5     financial statements are not fairly presented. Now,
6     this assumes -- I'm sorry, that assumes that they were
7     independent.
8          Q.   Yes. Yes, and your opinion is they're not
9     independent?
10         A.   That's correct.
11         Q.   And in this case, did BDO Seidman -- one of
12    their responsibilities was to audit this footnote?
13         A.   Absolutely. Footnotes are an integral part
14    of financial statements.
15         Q.   And Dr. Guy, if BDO Seidman audited this
16    footnote knowing that it jumped 42 million dollars from
17    the year before, was part of the obligations of a
18    certified public accountant to attempt to correct any
19    mistakes that they saw in the financial statements?
20         A.   To basically identify -- to drill down, find
21    out what the problem is, and to tell the client, hey,
22    you've got a problem and this is what you've got to do
23    to rectify it. The auditor doesn't just make statements
24    in the financial statements. These are the client's,
25    these are the Bankest financial statements.

Page 2569

1          Q.   But what the auditor does is the auditor is
2     the shield between the financial statements and the
3     people who use them?
4          A.   That's correct.
5          Q.   And if the auditor brings up a mistake and
6     it's not corrected must the auditor qualify their
7     opinion?
8          A.   Well, here I would -- I'm not independent so
9     you could not -- you'd have to issue a funny kind of
10    report saying you're not independent. But if they
11    didn't correct this problem, they'd have to spell it
12    out.
13         Q.   And in reviewing the financial statements,
14    the audits by BDO, did BDO correct any mistakes or spell
15    them out?
16         A.   No.
17         MR. THOMAS: Without objection, Your Honor,
18    may I approach?
19         THE COURT: You may.
20         MR. THOMAS: (Complies).
21    BY MR. THOMAS:
22         Q.   Dr. Guy, the three legs of our stool,
23    integrity, objectivity, and appearance of independence,
24    in this case for these audits that BDO Seidman did, did
25    they violate one leg of the stool, integrity?

Page 2570

1          A.   Yes.
2          Q.   Dr. Guy, for these audits that BDO Seidman
3     did, did they violate the second leg of the stool,
4     objectivity?
5          A.   Yes.
6          Q.   And Dr. Guy, for these audits that BDO
7     Seidman did, did they violate the third leg of the
8     stool, appearance of independence?
9          A.   Yes, they did.
10         Q.   And Dr. Guy, was BDO Seidman independent?
11         A.   No. Not for any of these engagements. For
12    the 1998 they were not independent. For the 1999
13    engagement they were not independent. For the 2000
14    engagement they were not independent. For 2001 they
15    were not independent and for 2002 they were not
16    independent.
17         They had no foundation to issue the audit
18    reports on the Bankest financial statements.
19         MR. THOMAS: Thank you, Dr. Guy. Thank you,
20    Your Honor. I hope I stuck to my ten minutes.
21         THE COURT: Ladies and gentlemen, I want you
22    to go back to the jury room. Do not discuss the case
23    amongst yourselves. We're going to take a break and
24    I'll bring you right back for cross-examination. Leave
25    your notes.

Page 2571

1    (Thereupon, the jury was escorted out of the
2    courtroom.)
3    THE COURT: Dr. Guy, step outside. Do not
4    discuss the testimony you've given or the testimony
5    you're about to give and that includes all the lawyers.
6    THE WITNESS: Is this a break?
7    THE COURT: 15 minutes. Short break.
8    (Thereupon, a brief recess was taken.)
9    MR. THOMAS: Your Honor, prior to the break
10   we marked as ID the drawings that Dr. Guy did for his
11   opinion and we moved it into evidence and the objection
12   was demonstrative.
13   THE COURT: Correct.
14   MR. THOMAS: And I submit to Your Honor that
15   that's not an appropriate objection because
16   demonstratives do become evidence and can be admitted.
17   In fact, in the last trial we admitted a number of them
18   into evidence.
19   THE COURT: I don't believe they were
20   objected to.
21   MR. THOMAS: And under Florida law there
22   must be four things established and I would submit, Your
23   Honor, that we've established all four. One, the
24   opinion evidence must be helpful to the trier of fact.
25   Number two, the witness must be qualified as an expert.

Page 2572

1    Three, the opinion evidence must be applied to evidence
2    offered at trial, which we did. And the evidence --
3    well, must survive 403, the prejudice can't outweigh the
4    relevance.
5    And I can hand you the case and we can
6    actually do it later if you want, but we met all four
7    prongs. So we would argue to Your Honor that we should
8    be able to admit the three exhibits we marked for ID
9    into evidence and that certainly demonstrative is not an
10   appropriate objection. And I'm going to hand the case
11   to Mr. Cole because I only have one copy.
12   THE COURT: All right.
13   MR. THOMAS: (Complies).
14   MR. COLE: I'm prepared to cite, Judge, in
15   Gold, Vanberg and White versus DuBarre (ph.), 639 So.2nd
16   47, the District, the Fourth DCA found that it was error
17   to the Court to admit charts and admit demonstrative
18   summaries and exhibits as evidence.
19   The proper practice under that case and the
20   proper practice in the State has been to mark --
21   actually mark the document as a court exhibit, not in
22   evidence and cannot be allowed in the jury room as a
23   piece of evidence.
24   Demonstratives are not evidence. They're
25   just demonstrating what evidence shows and helps the

Page 2573

1    jury understand what the expert is talking about.
2    They're not evidence in the case to show facts.
3    MR. THOMAS: Your Honor, the case -- Fourth
4    District case relied upon by BDO is a Fourth District
5    case in 1994. I only am looking at the book. I don't
6    have the case. The case I relied upon is also a Fourth
7    District case in 1997 which sets forth the four prongs
8    you must meet to admit it into evidence.
9    THE COURT: You're talking about apples and
10   oranges. I disagree with you, Mr. Thomas. Mr. Cole is
11   correct.
12   MR. THOMAS: I'm sorry. I don't understand
13   the apples and oranges.
14   THE COURT: It's a demonstrative aid for the
15   jury. It's not evidence in the case. It is helps the
16   jury understand what Dr. Guy is talking about. Just
17   because he writes it up on the chart doesn't make it
18   evidence. The chart is only helpful to make the jury
19   understand or help the jury understand what he's talking
20   about while he's explaining it.
21   MR. THOMAS: Your Honor, if I would -- if I
22   could just read one portion of the case.
23   THE COURT: Sure.
24   MR. THOMAS: The case I cited to you and
25   which I'll hand up to the Court actually is addressing

Page 2574

1    an expert illustrating his opinion. So it actually
2    deals with exactly what we dealt with here and
3    establishes the four prongs which we submit we met and
4    I'll hand it to you.
5    Thanks, Judge.
6    And we're ready, too, Judge.
7    THE COURT: (Reading.)
8    MR. THOMAS: Sorry, Judge. May I just say
9    on the record even though he is not here, give kudos to
10   Geoffrey Marks whose presence is helping us out?
11   THE COURT: (Reading.)
12   My ruling still stands.
13   All right. Bring them in.
14   THE BAILIFF: (Complies.)
15   All rise for the jury.
16   (Thereupon, the jury was brought into the
17   courtroom.)
18   THE COURT: You may be seated. Mr. Cole,
19   you may proceed with your cross-examination.
20   MR. COLE: Thank you, Your Honor.
21   CROSS-EXAMINATION
22   BY MR. COLE:
23   Q.   Good afternoon, Dr. Guy.
24   A.   Good afternoon, Mr. Cole.
25   Q.   Good afternoon, ladies and gentlemen. If I

Page 2575

1  understand your testimony, Dr. Guy, there's nothing
2  wrong with a CPA firm entering into an alliance
3  arrangement with another party; isn't that right?
4      A.   Generally speaking. I mean you still have
5  conduct rules. But in this situation here, I mean you
6  could have entered into an alliance, a relationship with
7  someone else that had no -- did not impinge on the audit
8  of Bankest, yes, that's generally right.
9      Q.   So generally speaking, an accounting firm
10 can enter into an alliance agreement with another
11 company, right?
12     A.   That's correct, as long as the other company
13 is not its audit client.
14     Q.   And in this case, StrataSys was not BDO's
15 audit client, correct?
16     A.   That's what BDO understood. That's right.
17     Q.   There's nothing in those stacks of books
18 that you have there, some of which you authored, that
19 says anything about it being wrong for an accounting
20 firm to enter into an alliance agreement with another
21 company, right?
22     A.   It does talk about an alliance agreement
23 with an audit client. And that's foreboden (sic, ph.).
24 And it also talks about a conflict of interest and here
25 we have a conflict of interest.

Page 2576

1      Q.   But again, nothing in those books that you
2  authored. And said that BDO is prohibited from entering into
3  an alliance agreement when it's not an audit company,
4  right?
5      A.   Well, the book addresses conflicts of
6  interest. So you can have -- if you enter into an
7  alliance relationship that impinges on your audit, for
8  example, Bankest here, then the book does address that,
9  yes.
10     Q.   We'll get to conflicts of interest. In
11 general, though?
12     A.   In general. I want to make sure I
13 understand what your question is, Mr. Cole.
14     Q.   In general --
15     A.   Yes.
16     Q.   -- and we'll get to conflicts of interest, I
17 promise you -- in general, there's nothing wrong with an
18 accounting firm entering into an alliance agreement with
19 another company, correct?
20     A.   Well --
21     Q.   As long as that other company is not its
22 audit client?
23     A.   That's the first consideration. And the
24 second consideration or unless it creates a conflict of
25 interest.

Page 2577

1      Q.   And you will agree with me, sir, that
2  there's nothing with wrong with a CPA firm, accounting
3  firm seeking to make money, correct?
4      A.   That's correct.
5      Q.   Nothing wrong with a CPA firm seeking to
6  move the cheese, right?
7      A.   No. Moving the cheese means to make more
8  money or whatever, no.
9      Q.   It's okay for that?
10     A.   Yes.
11     Q.   Now, sir, if I understand your testimony,
12 you are here as an expert; is that right?
13     A.   That's correct. I'm here as an expert.
14     Q.   And as an expert in I guess the field of
15 auditing, you are here under the consultancy rules; is
16 that right?
17     A.   Yes, I'm here under an AICPA rule called the
18 stages of standards under consulting services, yes.
19     Q.   As part of that rule you're required to have
20 integrity as well, right?
21     A.   Yes, I am. Yes.
22     Q.   And you're required to be objective?
23     A.   I am required to be objective, that's
24 correct.
25     Q.   And you're also required to be independent?

Page 2578

1      A.   No, I am not. Independence is only required
2  for auditors. And all of the independence materials
3  that we went over are audit requirements.
4          For an expert such as myself, objectivity is
5  required. Independence is not required.
6      Q.   Now, in exercising your objectivity --
7      A.   Yes.
8      Q.   -- you're required to take a look at -- to
9  weigh evidence; is that correct?
10     A.   That's correct.
11     Q.   And in this case you did say that you did
12 weigh the evidence?
13     A.   Yes, sir.
14     Q.   And in weighing that evidence, sir, you
15 believed you used your full integrity; is that right?
16     A.   I absolutely -- I used my full integrity and
17 I was totally objective, yes.
18     Q.   Now, if I understand your testimony, sir,
19 you started out as a staff accountant; is that right?
20     A.   After undergraduate school?
21     Q.   Correct.
22     A.   Yes, I did. Uh-huh. (Nodding).
23     Q.   And in your direct testimony you didn't give
24 us many dates. When did you graduate your undergraduate
25 degree?

Page 2579

1    A.   In 1965.
2    Q.   And then you went to work for Peat Marwick?
3    A.   It was, that's correct.
4    Q.   And you were there for less than a year as a
5    staff accountant?
6    A.   Yes.
7    Q.   And then you went for your master's degree?
8    A.   Yes.
9    Q.   And that was a one or a two year degree?
10   A.   I think I got it in a year.
11   Q.   So we're in '67?
12   A.   12 months or so.
13   Q.   About '67?
14   A.   '67 is when I got the MBA degree.
15   Q.   And then you went back to Peat Marwick
16   again?
17   A.   Yes.
18   Q.   And you worked as a staff auditor?
19   A.   I did, yes.
20   Q.   And that entire time working as a staff
21   auditor was approximately one year or less?
22   A.   That's fair.  Yes.
23   Q.   Now, during that time period were you even a
24   CPA?
25   A.   No.

Page 2580

1    Q.   And you didn't pass the CPA the first time?
2    A.   No.
3    Q.   You did pass -- did you pass your CPA test
4    the first time?
5    A.   Two parts of it, yes.
6    Q.   And then the other two parts you didn't?
7    A.   Yes.
8    Q.   Doesn't make you any less of an expert
9    today?
10   A.   No.
11   Q.   In fact, it's a hard test?
12   A.   Yes, it's a hard exam.
13   Q.   And it's not uncommon for people to pass
14   parts and not pass parts?
15   A.   That's common.
16   Q.   As an auditor, sir, in your less than a year
17   you never operated as a senior auditor, right?
18   A.   In my experience at KPMG or Peat Marwick, I
19   never operated as a senior, make sure I understood your
20   question.
21   Q.   Let me rephrase it to make sure we
22   understand it.  As somebody working at an accounting
23   firm conducting audits --
24   A.   Yes.
25   Q.   -- you've never operated as a senior

Page 2581

1    auditor?
2    A.   I've never operated as a senior.
3    Q.   You've never operated as a manager, correct?
4    A.   No, I have not.
5    Q.   In your review of the work papers in this
6    case, a senior would be somebody like Chris Mohr; do you
7    remember that?
8    A.   Yes, I remember Chris Mohr.
9    Q.   And a manager would be somebody like Ramon
10   Rivera?
11   A.   Yes.
12   Q.   He's the next level up?
13   A.   Next level up.
14   Q.   And Jorge Herrera who was here earlier
15   today? I don't know if you know Jorge Herrera.
16   A.   Would be a manager for one of the
17   engagements for one year.
18   Q.   And then above that is the senior manager,
19   right?
20   A.   In some firms, yes.
21   Q.   You were never a senior manager?
22   A.   No.
23   Q.   And above that is a partner?
24   A.   Yes.  In some firms, yes.
25   Q.   And I've never -- you never operated as a

Page 2582

1    partner on an audit either, have you?
2    A.   No, I have not.
3    Q.   And you were never a concurring partner?
4    A.   No, I was not.
5    Q.   Now, you would agree with me, sir, that a
6    lot of what you discussed today in your direct testimony
7    is a matter of judgment; isn't that right?
8    A.   A lot of what I discussed today is a matter
9    of judgment?
10   Q.   Yes.
11   A.   Well, the subordination of judgment here is
12   almost black and white.  This is a crass case of a
13   client shutting a door, not permitting you to gain
14   access to -- unfettered access to books and records and
15   I don't think there's a lot of judgment in there.
16   That's called the scope limit on one side of the coin
17   and subordination of judgment on the other side.  And
18   the conflict here -- I mean, this is so entangled that,
19   you know, is it judgment driven?  This is one of the
20   worst audits I think I've ever seen and it's certainly
21   -- and I've seen a number of conflicts and it's very,
22   very bad if not the worst conflicts I've seen.
23            Does it require judgment?  It's fairly black
24   and white.
25   Q.   Now for my question, sir.

Page 2583

1        MR. THOMAS:  Objection to the comment by
2    counsel.  Argumentative.
3        THE COURT:  Overruled.
4    BY MR. COLE:
5        Q.   You would agree with me, sir, that many of
6    the ethical concepts you discussed today --
7        A.   Yes.
8        Q.   -- involve the exercise of an auditor's
9    judgment, right?
10       A.   Well, I mean, there's no encyclopedia of
11   ethics if that's what we're talking about.  You
12   basically have to know based on experience or whatever
13   you identify when there's a potential rule problem, you
14   go to the rule and you discuss it.
15       But I want to emphasize here again, the
16   judgment game here, this is pathetic.  These audits are
17   pathetic.  Subordination of judgment runs rampant
18   throughout -- and I say don't say that lightly.  With
19   all my soul, subordination of judgment starts from the
20   get-go and runs through the audit engagements.
21       Q.   In the ethical rules that you discussed
22   today for the entire morning, you would agree that an
23   auditor's judgment is an important component of those
24   rules, right?
25       A.   Judgment is important in the profession but

Page 2584

1    when a client -- an auditor determines what they need to
2    do, an auditor determines, he or she determines what
3    evidence they need, not the client.  I'm not going to
4    sit there and let the client cherry pick and tell me you
5    can have this and you can't have that.  That's totally
6    inappropriate.
7        So if we're talking about judgment in a
8    situation where there's a limit on what you can gain
9    access to and given the volume of business back here at
10   Capital, you know, that doesn't require a lot of
11   judgment.  I want to use the term black and white.  If
12   you don't permit me to do what I need to do, I'm not
13   your auditor.
14       The same thing with me.  If you withhold
15   information from me, I'm not going to get up here and
16   express an opinion.  I'm a CPA.  That's part of what the
17   profession is all about.
18       Q.   Let me see if I can rephrase my question.
19   In determining, when an auditor determines in the
20   field -- talking about somebody actually in the field,
21   sitting in the field, they come across an issue that may
22   or may not be a conflict of interest, okay?  You would
23   agree, sir, that that's a point in time where the
24   auditor exercises judgment, correct?
25       A.   Well, I would hope first the auditor would

Page 2585

1    have the ability and the knowledge to recognize, hey,
2    here is a potential conflict.
3        In this case I never saw anything that
4    indicated they even recognized a conflict of interest.
5    And you can't very well deal with a conflict and you
6    can't very well deal with the application of judgment in
7    a code of conduct provision if you don't even recognize
8    the problem to begin with.  That's (inaud.), recognize
9    the problem and consider, hey, we've got a potential
10   conflict here, let's deal with it, and let's talk about
11   it, and let's get other people involved, let's call a
12   hotline.  I see none of that here.
13       So judgment, I don't think judgment is
14   required to know that you've got a conflict potential
15   here.  No.
16       Q.   So when an auditor is in the field, the
17   auditor doesn't exercise judgment in determining whether
18   there's a conflict, is that what you're saying?
19       A.   I'm saying first an auditor should
20   recognize, should understand and know what the code of
21   conduct is.  Especially one that's an engagement partner
22   that's done two or three hundred audits.  I would hope
23   they would understand what ethical requirements are.
24       In this matter it doesn't appear that they
25   did, know what they were, they certainly did not apply

Page 2586

1    them.  So, therefore, in response to your question did
2    they exercise judgment, I don't think.  If they did, it
3    was very poor judgment.
4        Q.   I'm not asking about BDO.  I'm asking
5    about --
6        MR. THOMAS:  Objection, Your Honor.
7    Argumentative.
8        THE COURT:  Overruled.
9        THE WITNESS:  You're asking me --
10   BY MR. COLE:
11       Q.   Sir, I'll ask the question.
12       MR. THOMAS:  Objection, Your Honor.
13   Argumentative.
14       THE COURT:  Overruled.
15       THE WITNESS:  Can you repeat the question?
16   BY MR. COLE:
17       Q.   In applying the ethical rules, that rules
18   that were up on the board, the rules that you relied on,
19   isn't it a fact that auditors are required to exercise
20   judgment in applying those rules?
21       A.   Auditors exercise judgment, certainly.  I
22   mean, there are numerous cases in an audit where you
23   have to apply judgment.  But there's not a lot of
24   judgment involved, Mr. Cole, when I need access to books
25   and records because they're 99.5 percent of the business

Page 2587

1 and they're a big chunk of the business throughout all
2 this and I'm not permitted to gain access.
3        I mean, we can play games but if someone
4 exercises judgment and says I don't need to do that,
5 they're saying I don't need adequate evidence to support
6 the financial statements and I'm going to subordinate my
7 judgment to Mr. Parlapiano.
8        If that's what we're talking about, I can't
9 go there. So we can sit here all afternoon and you can
10 ask that question again and that's the way I have to
11 answer it.
12        That requires that I answer your question
13 with my integrity and that's what I'm going to do and
14 that's what I just did.
15    Q.   Okay. You will agree with me, sir, that in
16 exercising judgment, experience is important? Would you
17 agree with me on that?
18    A.   Well, we're talking about the code of
19 conduct. Engagement partners should have an
20 understanding and an awareness of when there's a code of
21 potential problems. But I don't think I've ever met an
22 expert who is an engagement partner that I would say has
23 a walking encyclopedic knowledge of the code. But they
24 know when they get into problems.
25        However, I would say every auditor, even in

Page 2588

1 auditing 101 which I taught on a number of occasions
2 recognizes, hey, you stop me from doing what I need to
3 do, you limit what I need to do, that's called a scope
4 limit. You limit what I'm going to do and the other
5 side of that is subordination of judgment and I am
6 walking out. I'm not going to be your auditor.
7        And that is taught from at least in auditing
8 101 and it's a section in every auditing textbook I've
9 ever seen, including mine.
10        So auditors are the ones that determine what
11 they need, not the client saying, oh, this is what we'll
12 give you. When the client does things of that sort, a
13 smart auditor, the prudent auditor, the auditor using
14 due care walks, leaves the engagement, doesn't do the
15 audit. That's what happens. And that's what should
16 happen. That's what should have happened here. It did
17 not.
18    Q.   In exercising judgment, when an auditor
19 exercises judgment, you would agree with me, sir, that
20 experience is important, right?
21    A.   I mean, we come up with these abstract
22 concepts. Mr. Lenner has lots of experience, you would
23 hope he would have recognized this is subordination of
24 judgment. You would have hoped he would have recognized
25 conflict of interest. But all those years of experience

Page 2589

1 and he didn't recognize it. Shame on him.
2        So is experience important? Maybe it's a
3 bad experience.
4    Q.   Experience is important, correct?
5    A.   For what, Mr. Cole?
6    Q.   When an auditor exercises judgment, you will
7 agree with me, sir, that experience is important; isn't
8 that correct?
9    A.   I will say to you when a client prevents me
10 from gaining access to Capital's books and records, I
11 know right then and there we have a heck of a problem
12 and I know that it's a scope limit and I know if I
13 proceed in the face of that scope limit it's
14 subordination of judgment.
15        Now, it doesn't require a lot of experience
16 for me to have because I'm going to go back and tell you
17 my auditing students at University of Texas Austin would
18 have recognized that there's a problem here, we're not
19 going to be able to do this work.
20        So, I mean, how much experience does the
21 University of Texas -- and I had Ph.D. students as well,
22 but I'm talking about in auditing 101.
23    Q.   I'm going to talk to you about the so-called
24 scope limitation in a moment. I would just like an
25 answer to my question.

Page 2590

1        MR. THOMAS:  Objection.
2        THE COURT:  Overruled.
3        I haven't gotten involved yet but I'm about
4 to. It's overruled.
5 BY MR. COLE:
6    Q.   Do you agree with me, sir, that when an
7 auditor exercises judgment, experience is important?
8    A.   I do not agree with you in the situation
9 here that experience gives you much of anything. They
10 didn't even recognize the problem. I saw no situation
11 where they recognized the problem. I saw where
12 Mr. Lenner told Mr. Rivera, hey, this is an important
13 client, you know, a business feeder. What kind of
14 advice does an audit partner give to a manager to tie
15 one hand behind his back and go gently with this
16 client.
17        This is about auditing, Mr. Cole, and you
18 can't sell your audit. You can't basically forego your
19 audit and violate GAAS to make more money.
20        I'm sorry. That's the way the chips fall
21 and I'm sorry. I'm sorry that it happened. If they had
22 done what they should have done, we wouldn't be in this
23 courtroom.
24    Q.   Is it your testimony, sir, that experience
25 is not important in the exercise of judgment; is that

Page 2591

1   your testimony?
2       A.  No. Experience is important in the exercise
3   of judgment. But I told you an auditing 101 student
4   would recognize a scope limit and a subordination
5   problem in this case. The client says no, you can't
6   possibly audit Bankest without auditing Capital and
7   gaining access to books and records.
8           That doesn't require rocket science. That
9   requires -- if you gave that as a final exam in 101 I
10  think you would -- that would be a test that would be
11  described as easy. And they don't have experience.
12  We're talking about two or three hundred audits that Mr.
13  Lenner has done. I'm sorry that he apparently has a
14  woeful amount of knowledge of the code of conduct.
15      Q.  You would agree with me, sir, that
16  Mr. Lenner has maybe 30 times the experience you have in
17  the field; is that right?
18      A.  That's a very loaded question. In the
19  field? I mean, what field are we talking about? Are we
20  talking about code of ethics? No. Are we talking about
21  writing? No. But if you're talking about in the field
22  that he's, quote, been a senior, a manager, a partner,
23  yes, I've never done that.
24      Q.  And you would agree with me, sir, that
25  Mr. Ellenburg has 25 times the experience you do in the

Page 2592

1   field as an auditor?
2       A.  In the field. That's very pejorative.
3       Q.  Well, I'll use your words. Using the picks
4   and the shovels, he's got 25 years more experience than
5   you do?
6       A.  If you want to characterize it that way.
7   I've had responsibility for hundreds and hundreds of
8   questions from audit partners doing pick and shovel work
9   wondering what to do and how to do it.
10      Q.  Now, and Mr. Rivera --
11      A.  Mr. Rivera you said?
12      Q.  -- ten times as much experience as you had
13  with the picks and the shovels, right?
14      A.  Out working as a manager I've never worked
15  as a manager. I've handled the most complex questions
16  in this profession involving auditing for years and
17  years and years. Our experience is different. And what
18  it is, you understand that I basically pursue an
19  education. I became an accounting educator. And I
20  devoted a large part of my life to being an educator,
21  that I've written a lot as you see here. I became the
22  standard setter.
23          Mr. Lenner. Mr. Rivera. They took one
24  route. I took another route. I'm not going to belittle
25  the fact that they work as a manager, senior, and

Page 2593

1   likewise I worked as an academic and as a standard
2   setter. We just took a different road.
3       Q.  And would you agree, sir, that Mr. Lenner's
4   30 years, Mr. Ellenburg's 25 years, and Mr. Rivera's 10
5   years at the time --
6       A.  Yes.
7       Q.  -- during that time, that would be the time
8   when an auditor would be required to take a look at the
9   rules and apply them to the situation in front of him or
10  her; isn't that right?
11      A.  I would hope they would look at the rules
12  and apply the GAAP rules, the GAAS rules and the ethics
13  rules, yes.
14      Q.  And all you did was look at others in your
15  experience and tell them whether or not they were doing
16  right or wrong; isn't that right?
17          MR. THOMAS: Objection, argumentative.
18          THE COURT: Overruled.
19          THE WITNESS: I mean, I basically, Mr. Cole,
20  received hundreds and hundreds of questions about here
21  is a situation, what do you think I should do. I wasn't
22  saying you're right, you're wrong. I was providing
23  assistance.
24  BY MR. COLE:
25      Q.  You never applied your own judgment in

Page 2594

1   ethics in the field with the picks and shovels, did you?
2       A.  I wasn't doing pick and shovel work.
3       Q.  You said after you became -- you got your
4   doctoral degree?
5       A.  Yes.
6       Q.  You went to work at Texas Tech; is that
7   right?
8       A.  At Texas Tech, and then followed at the
9   University of Texas.
10      Q.  And after you were an academic for seven
11  years or eight years --
12      A.  Eight years or so.
13      Q.  -- you went would at the AICPA?
14      A.  I did, yes.
15      Q.  And at the AICPA, if I understand your
16  testimony, you were responsible in the first bunch of
17  years and some in the second for doing research; is that
18  right?
19      A.  The first bunch of years I just want to make
20  sure --
21      Q.  You said you were initially a senior
22  research person?
23      A.  I was director of audit research. But I
24  wasn't doing -- I was doing projects and working with
25  standards, SASes that were new to the ASB. So, you

Page 2595

1    know, yeah, I was working on projects and policy and
2    things of that sort, yes.
3        Q.   So if I understand that, Dr. Guy --
4        A.   Yes.
5        Q.   -- part of what you did is you supervised
6    other people doing research in the standards; is that
7    fair?
8        A.   Writing standards, yes.
9        Q.   And if I understand what you did is in
10   drafting these standards, you provided them to the
11   auditing standards board, is that right, in any given
12   year?
13       A.   Yeah.  We had groups that -- task force.  We
14   worked with the task forces and eventually they'd go to
15   the ASB.  That's correct.
16       Q.   And who were the people on the ASB?
17       A.   At that time, there were 15 people on the
18   ASB.  Basically one typically was from government, one
19   was from academics.  The others were primarily
20   practitioners.  Were practitioners I think, by and
21   large.
22       Q.   And those were the people who typically --
23   what would happen to the drafted rule that you drafted
24   when it got to the ASB?
25       A.   We'd have discussions and public meetings.

Page 2596

1        Q.   And then ultimately the ASB could amend the
2    rule; is that right?
3        A.   Changes -- you're looking at a draft and
4    yes, paragraphs are discussed.  Yes, changes were made.
5        Q.   And it was the ASB who made the decision as
6    to what the rules should be ultimately, correct?
7        A.   Basically yes.  But I had a big voice at the
8    table.
9        Q.   But no vote?
10       A.   I had no vote.  I never voted on an SAS.
11       Q.   You were never part of the ASB?
12       A.   No, I was never a member of the ASB.  I was
13   the senior -- I was the vice president of research on
14   the ASB staff -- on the AICPA staff, I'm sorry.
15           MR. COLE:  Your Honor, may I approach the
16   witness with Exhibit 128 in evidence?
17           THE COURT:  Yes.
18           MR. COLE:  (Complies).
19   BY MR. COLE:
20       Q.   Sir, I want to know if you recognize this
21   document?
22       A.   Yes, I do.
23       Q.   And is this one of those SASes?
24       A.   This is SAS No. 58, yes.
25       Q.   And this is one of the SASes you worked on,

Page 2597

1    right?
2        A.   Yes, I did.
3        Q.   And you could see that on the second to the
4    last page, right, page 27?  Is your name down there, Dan
5    Guy?
6        A.   On page 27, yes, my name is listed as vice
7    president, comma, auditing.  Yes.
8        Q.   And you have Mimi Blanco, I gather that
9    person helped you out, too?
10       A.   That's correct.
11       Q.   And all these other people, who are they,
12   just in general?  You don't have to tell me who
13   Mr. Sullivan is.  Who are they?
14       A.   They basically are practitioners.
15       Q.   And these are the people you report to; is
16   that right?
17       A.   These are the people I worked with.
18       Q.   Well, you created drafts and you gave it to
19   them, right?
20       A.   Along with the task force of practitioners
21   typically.
22       Q.   So it was you and other people?
23       A.   That's right.
24       Q.   And there you are, vice president of
25   auditing, right?

Page 2598

1        A.   That's correct.
2        Q.   And they are up there, right?
3        A.   That's correct.
4        Q.   So, for example, Samuel Gunther, right,
5    that's the person who is on the auditing standards
6    board, correct?
7        A.   That's correct.
8        Q.   He would be one of the people who would have
9    a vote as to whether or not this particular SAS became
10   the rule, correct?
11       A.   Correct.
12       Q.   You didn't have a vote, did you?
13       A.   No, I had a big influence but no vote.
14       Q.   And Robert H. Temkin, he was one of the
15   people on the board as well?
16       A.   That's correct.
17       Q.   And he would have a vote as well, correct?
18           MR. THOMAS:  Objection, Your Honor.  Side-
19   bar.
20           THE COURT:  I'm not going to rule until we
21   have a side-bar.
22           (Thereupon, there was a side-bar conference
23   outside the presence and hearing of the jury.)
24           THE COURT:  Yes?
25           MR. THOMAS:  If you will recall, I wanted to

---

**Page 2599**

1  put in something like this and I also wanted to put in
2  the book. And Mr. Cole objected on the grounds that it
3  was bolstering. He did it in the last trial and he did
4  it in this trial and you sustained that objection on the
5  grounds that I couldn't show the back part where he was.
6          Now, after getting your ruling precluding me
7  from doing it, Mr. Cole has put it up, put his experts
8  up here, Robert Temkin, and said that he got to vote and
9  my expert didn't.
10         MR. COLE: I don't -- that's what we talked
11  about last time.
12         THE COURT: What is your objection?
13         MR. THOMAS: My objection is that it's dirty
14  and it's using exactly your ruling keeping me from
15  putting my stuff from my expert and it's sticking it to
16  me with a knife and doing exactly what you said I
17  couldn't do it. And he did it before I could object.
18  You know it and I know it. You said no because it's
19  bolstering. So you sustained the objection. You said
20  no, that's not proper in this courtroom, which is what
21  you said. It's not proper to do. Then he hands it to
22  me, puts his expert on and says not only do I not get to
23  put mine up but my expert gets to vote and mine doesn't.
24         THE COURT: I'm not sure what the objection
25  is.

---

**Page 2600**

1          MR. COLE: It's --
2          THE COURT: But you tell me.
3          MR. COLE: It's a dirty pool. You know it
4  as well as he does apparently. But let me respond if I
5  may. Last time we were at this side-bar I objected.
6  Your ruling was sustained. But if I question his
7  credibility it would open the door. I have now
8  questioned his credibility. It's opened the door. I
9  put in anticipating what Mr. Thomas would do because he
10  brought up the right to do that and I anticipated what
11  Mr. Thomas is doing and now Mr. Thomas is upset because
12  I anticipated.
13         MR. THOMAS: That's not what Mr. Thomas is
14  upset about.
15         THE COURT: What is your legal objection?
16  You objected after the fact so I'm allowing you --
17         MR. THOMAS: My objection is the objection
18  that you sustained in this courtroom.
19         THE COURT: And I sustained it properly.
20         MR. THOMAS: And said it was bolstering.
21         THE COURT: And you didn't object. I didn't
22  hear --
23         MR. THOMAS: As soon as I recognized what he
24  was going to do I objected and asked for a side-bar.
25         THE COURT: What do you want me to do,

---

**Page 2601**

1  sustain your objection based on this time? It's not
2  bolstering. And it is -- you're right, it's bolstering
3  your expert. Is that your objection?
4          MR. THOMAS: Maybe I'm not being clear.
5          THE COURT: Mr. Thomas, I know what you're
6  trying to say.
7          MR. THOMAS: Please let me try because this
8  shouldn't happen in courtrooms.
9          THE COURT: What are you requesting from
10  this Court? You're objecting -- you don't have a legal
11  objection.
12         MR. THOMAS: My legal objection is you just
13  violated your rule and bolstered his expert in exactly
14  the way you said it was improper in this courtroom.
15         THE COURT: I don't know who his expert is.
16         MR. THOMAS: I'll show you.
17         THE COURT: I believe you.
18         MR. THOMAS: Judge, come on. This is
19  outrageous. His expert is Robert H. Temkin. You said
20  in this courtroom you can't put this up and bolster your
21  expert. And prevent --
22         THE COURT: I understand that.
23         MR. THOMAS: So what he did is stand up and
24  not attack.
25         THE COURT: Mr. Thomas, you don't have a

---

**Page 2602**

1  legal objection. You do not have a legal objection. I
2  understand your position. I understand that. Now I need
3  you to respond because I will suspect -- I don't know
4  what you are requesting me to do. What do you want me
5  to do?
6          MR. THOMAS: I'm requesting that you strike
7  his expert, Robert Temkin. That's what I'm requesting.
8          MR. COLE: Well, that's a request. First of
9  all, I'm allowed to question this person and saying I
10  was on the AICPA, I did this, I did that, I did that. I
11  wrote the rules. I was the man. I put up the APB. My
12  expert is part of that APB. I'm allowed to attack his
13  credibility. And open the door like you said before.
14         You sustained the objection and you did say
15  after that. It was -- it wasn't just sustained and walk
16  back. If I open the door, then Mr. Thomas can come back
17  in and I opened the door, I admitted. And I anticipate
18  what he was going to do. And that's -- I'm allowed to
19  do that.
20         THE COURT: That's enough.
21         MR. THOMAS: I need to get this on the
22  record.
23         THE COURT: You can get it on the record but
24  we're wasting time.
25         MR. THOMAS: This is really outrageous.

Page 2603

1    THE COURT: It is not outrageous. It's
2  playing within the rules.
3    MR. THOMAS: Then I'm in the wrong
4  courtroom.
5    THE COURT: Mr. Thomas --
6    MR. COLE: What did you say? I'm sorry,
7  what did you say?
8    MR. THOMAS: I said that I am in the wrong
9  courtroom.
10    THE COURT: She got it. Mr. Thomas, you're
11  treading very closely and I know you're a good lawyer.
12    MR. THOMAS: I feel very strongly about this
13  sort of thing.
14    THE COURT: Stop.
15    MR. THOMAS: Let me make my objection.
16    THE COURT: No.
17    Ladies and gentlemen, you're to step into
18  the jury room and you're not to discuss the case amongst
19  yourselves.
20    THE BAILIFF: All rise for the jury.
21    (Thereupon, the jury was escorted out of the
22  courtroom.)
23    (Thereupon, the witness excused himself from
24  the courtroom.)
25    THE COURT: Mr. Thomas, you have access to

Page 2604

1  the record.
2    MR. THOMAS: Thank you. You ruled in this
3  courtroom --
4    THE COURT: I don't want to hear it again.
5    MR. THOMAS: I thought you said I have
6  access to the record.
7    THE COURT: You've said it three times for
8  the record. Say something new for the record other than
9  what you just said.
10    MR. THOMAS: It's not the attacking of my
11  expert that I'm objecting to. What I'm objecting to is
12  taking a rule that you set in this courtroom and using
13  it --
14    THE COURT: Mr. Thomas, that's what you
15  stated. I don't set rules. I rule on objections at the
16  proper time. If I were to set rules other than the
17  lawyers standing up and objecting one for each side,
18  then the Third DCA would be really upset because I'm not
19  being fair and impartial.
20    I rule on objections as they come up, under
21  the circumstances as they come up, and I rule on motions
22  in limine as they're presented to the Court. That's
23  what I do. That's my job, and parties play within the
24  rules and that's what you lawyers do for a living, as
25  long as you keep within the rules.

Page 2605

1    Sometimes objections are made on one side
2  during direct and I've sustained them. And sometimes
3  objections -- and sometimes they're not. I sustain the
4  objections and then the other side gets up and say
5  something similar and there are no objections.
6    Why did I allow it? Because there were no
7  objections.
8    But in this case, you objected after that
9  document was on the screen.
10    MR. THOMAS: I objected as soon as I
11  recognized that what Mr. Cole was doing was using this
12  document to bolster his expert in a way that you
13  prohibited me from doing mine.
14    THE COURT: Because your expert is on the
15  stand at this time. And the objection was made at the
16  time and I sustained it.
17    MR. THOMAS: If I could just please get
18  Espirito Santo's objection I would appreciate it.
19    THE COURT: We already have it.
20    MR. THOMAS: I haven't, Your Honor, and I
21  would appreciate the opportunity to do it. With your
22  permission -- really, I don't want to be disrespectful
23  but --
24    THE COURT: You've been there already.
25    MR. THOMAS: I'm trying not to.

Page 2606

1    THE COURT: And I'm going to let it go
2  because you were there.
3    MR. THOMAS: I apologize for that.
4    THE COURT: And one thing I do not tolerate
5  unless it is obvious enough is to have some -- have a
6  lawyer call me unfair. I think I've proven to all of
7  you that I've been as fair and impartial under the rules
8  as I could have been and I have during both trials. So
9  if you don't believe that I'm being fair and impartial,
10  Mr. Thomas, then there's motions to deal with that
11  issue.
12    MR. THOMAS: I appreciate that and if I
13  actually do believe that at any time, Your Honor,
14  Espirito Santo will use those motions for that purpose.
15  But I do not believe that and that is not what I said.
16  What I said when we were in side-bar is if this is
17  within the rules, then I'm in the wrong place. And you
18  know that I feel strongly about this sort of thing.
19  You've seen it over the course of weeks of this trial.
20  And I do not believe it is proper, whether your expert's
21  on the stand or not, to do something to bolster someone
22  else's --
23    THE COURT: You give me a memorandum of law
24  and we'll stop right here and we'll spend today and this
25  afternoon dealing with that issue and give me case law

Page 2607

1    tomorrow and tell me exactly how to deal with this
2    objection.
3            MR. THOMAS: Your Honor, you've dealt with
4    it. You're obviously upset with me because of something
5    I did.
6            THE COURT: I'm not upset with you.
7            MR. THOMAS: But you know -- you know that I
8    feel strongly about this stuff.
9            THE COURT: And Mr. Thomas, not only do I
10   know you feel strongly about it, you need to give me
11   supporting documentation to back up your objection to
12   tell me that he cannot do that on the stand. Just
13   because his expert is on the stand and he's asking
14   Dr. Guy whether he votes on these rules on or not, is
15   that bolstering his expert? Show me.
16           MR. THOMAS: I will show you.
17           THE COURT: Please.
18           MR. THOMAS: I don't need to stop the case
19   because I'll do like I do like everything else, I'll
20   handle it myself.
21           THE COURT: Unless on redirect. But I
22   assume you want a ruling in the way that I should rule
23   and that's the way that you want me to rule. Let me
24   decide. And that goes for Mr. Cole as well.
25           MR. THOMAS: I understand that. Your Honor,

Page 2608

1    if I think you're -- as you know, if I thought that you
2    were actually trying not to be fair just like you said I
3    would say that so. That's not what I meant to say.
4            I do think this is unfair. But at this time
5    I think the best interest of my client is to proceed
6    with this case. Because we don't want another mistrial.
7    We don't want to keep from getting to the point where we
8    don't get our judgment and I'll do just like I do when
9    they object too much, I'll punish them for it.
10           So let's go.
11           THE COURT: Are you sure? I just want to
12   make sure you're sure.
13           MR. THOMAS: I've never been more sure. And
14   we will take care of it ourselves and if there comes a
15   chance where I think you should intervene again,
16   Espirito Santo, we'll make an objection, I will ask you
17   to do it.
18           I've made my objection for the record and if
19   there is an additional motion to be made, we'll make it
20   at the appropriate time but we're ready to proceed.
21           MR. COLE: I believe I'm allowed to impeach
22   the witness the way I'm allowed to.
23           THE COURT: Whatever he's going to say he's
24   going to say.
25           I guess your objection is overruled or

Page 2609

1    withdrawn.
2            MR. THOMAS: Oh, it's not withdrawn.
3            THE COURT: Then, honestly, Mr. Thomas if
4    the objection is not withdrawn, I need the legal
5    substance and I need your legal case law on that issue.
6    I really do. I'm not telling you --
7            MR. THOMAS: There's not a pending question
8    for me to object to.
9            THE COURT: But you made the objection and
10   I'm not going to rule on your objection until I believe
11   I should be ruling in the appropriate way.
12           MR. THOMAS: Well, I'll withdraw the
13   objection until I think there's a question pending that
14   I believe is objectionable.
15           THE COURT: Bring in Dr. Guy first.
16           THE BAILIFF: (Complies.)
17           (The witness takes his seat at the witness
18   stand.)
19           THE BAILIFF: All rise for the jury.
20           (Thereupon, the jury was brought into the
21   courtroom.)
22           THE COURT: All right. You may be seated.
23           Mr. Cole, you may proceed with your
24   cross-examination.
25           MR. COLE: Thank you, Your Honor.

Page 2610

1    BY MR. COLE:
2       Q.   Dr. Guy, we were talking about the time that
3    you were involved with the AICPA as the director of
4    research, was it?
5       A.   We were talking about that, yes.
6       Q.   I just want to make sure I have the title
7    right.
8       A.   Director of audit research.
9       Q.   If I understand your testimony, sir, you
10   were there for approximately 19 years?
11      A.   18 years plus a little bit -- I always say,
12   Mr. Cole, almost 19 years.
13      Q.   I'm not going to hold you to a couple of
14   months. I just wanted to get back on track.
15           When did you join the AICPA again?
16      A.   I joined the AICPA in 1979.
17      Q.   And you left when?
18      A.   I left in 1998.
19      Q.   '98. Okay. Now, after -- during that
20   entire time, sir, those 18 and a half, 19, whatever it
21   is years, you served as the director of research and
22   then you had vice president -- you had some vice
23   president titles as well, is that right?
24      A.   Yes.
25      Q.   And during the entire time you were in that

Page 2611

1    role of advising the audit standards board, right?
2        A.    Yes.
3        Q.    And you also answering -- you said you
4    developed a hot line of some sort?
5        A.    In 1996 I received expanded responsibilities
6    in the A&A called the accounting and auditing hot line,
7    reported to me, for example.
8        Q.    But that entire time is it fair to say that
9    part of your responsibilities at least was to advise the
10   auditing standards board?
11       A.    That's correct.
12       Q.    And during that time period, you were
13   advising the auditing standards board with respect to
14   rules; is that right, SASes?
15       A.    SASes.  We were developing SASes and --
16   that's correct.
17       Q.    And who develops the ethical standards?
18       A.    The AICPA's professional ethics executive
19   committee.
20       Q.    And you weren't on that board, right?
21       A.    No, I was not.
22       Q.    And you weren't on the research committee
23   for that board either?
24       A.    No, I was not.
25       Q.    So you had no role in dealing with the rules

Page 2612

1    that we've been dealing with today, namely the code of
2    professional conduct, right?
3        A.    My role was limited to frequent discussions
4    with the director of professional ethics in terms of
5    things that they were doing and we call signals every
6    two weeks or so.
7        Q.    You call signals?
8        A.    We basically had meetings and we talked
9    about, well, here is a problem we've got, how do you
10   think we can address this problem, should we address it
11   in an SAS, those kind of discussions went on --
12       Q.    I'm sorry.
13       A.    -- went on.  For example, my -- I had those
14   kinds of discussions frequently with what I referred to
15   as the director of the professional ethics.
16       Q.    But it is fair to say that you had no direct
17   role either as a board member, an executive, a
18   researcher for that board in enacting any one of these
19   ethical rules?
20       A.    I did not.  That's fair to say.
21       Q.    Now, during the time period that you were at
22   the AICPA in the committee that you worked on developing
23   the SASes and the GAASes and that stuff?
24       A.    Yes.
25       Q.    Okay.  Any time during your entire 19 years

Page 2613

1    did the subject of alternative distribution channels
2    come up?
3        A.    Well, the scope of service as a CPA firm,
4    the term alternative distribution channel is this term
5    that's used with BDO Seidman but it's not a widely used
6    term.  It's a service extension -- service extension
7    lines and scope of services, and I had literally
8    hundreds of discussions about those topics.
9        Q.    I'll use your term.  Are you using
10   alternative distribution channels, scope of services,
11   lines --
12       A.    Yes.
13       Q.    -- interchangeably?
14       A.    Yes.  Basically, yes.
15       Q.    And it's your testimony, sir, you had lots
16   and lots of those conversations?
17       A.    Absolutely, yes.
18       Q.    During the entire 19 years?
19       A.    Yes.
20       Q.    And were those conversations including the
21   auditing standards board?
22       A.    Rarely.  No.
23       Q.    Rarely or no?
24       A.    Maybe occasionally, but they were
25   discussions I had with various groups that had an

Page 2614

1    interest in standard setting, state societies of CPAs,
2    with staff, in-house staff and things of this sort.  So
3    I don't recall -- limited discussions.  I don't recall a
4    lot about them in terms of -- how it was demarcated
5    between an ASB discussion or discussion I had that was
6    part of my role and responsibility at AICPA.
7        Q.    So notwithstanding all these discussions you
8    had, is it fair to say that it never bubbled up into the
9    auditing standards board; is that fair?
10       A.    It was discussed.  I just don't recall the
11   frequency of discussion.  The ASB did not promulgate or
12   publish or develop a standard on the scope of services.
13       Q.    Right.  All I'm asking you, I thought you
14   said no and I'm not trying to catch you, I'm just trying
15   to understand.  Did the auditing standards board
16   actually discuss whether it enacted a rule or not?  Did
17   it actually discuss the concept of scope of services, or
18   lines or --
19       A.    I don't recall a discussion of that nature
20   at the ASB level.  I don't recall an agenda item.  The
21   ASB has responsibilities for a GAAS, the ten auditing
22   standards, and SASes.  One of those standards is the
23   independence standards.  So, obviously, that would be
24   discussed from time to time.
25       Q.    But you as the staff would discuss it quite

Page 2615

1   a bit, correct?
2       A.   Yes.
3       Q.   And although you discussed it quite a bit,
4   in the entire 19 years you were at the AICPA there was
5   never a rule created that prohibited alternative
6   distribution channels, scopes, and lines, right?
7       A.   Well, there are rules that, for example,
8   that say what's acceptable and what's not acceptable for
9   audit clients.
10      Q.   I'm talking about the SASes, is there any
11  SAS that says you're not allowed to have an alternate
12  distribution channel, scope, or line, however you want
13  to call it?
14      A.   The SAS that addresses independence is
15  the -- what we introduced earlier as AU 220 on
16  independence.
17      Q.   And nothing in AU 220 says that an
18  accounting firm is prohibited from having a line or a
19  scope or alternate distribution channels?
20      A.   That deals with impacts on things on your
21  audits. For example, it talks about independence and
22  appearance. So you could have some activity that would
23  impinge on your audit clients and have an appearance of
24  independence problem, but per se in terms of alternative
25  distribution channels it doesn't explicitly address

Page 2616

1   that.
2       Q.   And that would be this entire book, right?
3       A.   I refer to AU 220.
4       Q.   This entire book doesn't refer to
5   alternative distribution channels, right?
6       A.   That's not in that book.
7       Q.   Doesn't prohibit alliances with companies,
8   right?
9       A.   It doesn't prohibit --
10      Q.   Alliances?
11      A.   No. Unless, here again, you have an -- it
12  impinges on an activity that a CPA firm or a
13  relationship or whatever causes the CPA firm not to be
14  independent. Then you -- tells you how to report.
15      Q.   And we'll get to that. I promise you. And
16  in Exhibit 7344, which is the code of professional
17  conduct, that big fat document --
18      A.   Yeah. Okay.
19      Q.   -- there's nothing in there that prohibits
20  alternative distribution channels per se, correct?
21      A.   The scope of services and what you can do
22  and not do with audit clients. So there's sections on
23  scope of services for an audit client.
24      Q.   And those sections prohibit fee sharing with
25  an audit client, right?

Page 2617

1       A.   There is a rule that addresses referral fees
2   and things of that sort. And it addresses an audit
3   client.
4       Q.   And the referral fees are something that
5   we've discussed -- you drew it on the piece of paper, do
6   you remember that?
7       A.   That's correct. And we were looking at the
8   referral. We were looking at the different fees that
9   were being paid from a conflict of interest perspective.
10  I wasn't looking at those in a Rule 503 perspective.
11      Q.   Because StrataSys was not BDO's --
12      A.   StrataSys was not a BDO client.
13      Q.   Now, I promised you and we'll go into it
14  right now.
15      A.   Okay.
16      Q.   You wanted to talk about the scope -- the
17  so-called scope limitation -- the Ramon Rivera event.
18  Remember we started talking about that?
19      A.   Okay.
20      Q.   And you understand, sir, that Mr. Rivera
21  testified that on -- withdrawn.
22          If I understand your testimony, you believe
23  that there was a subordination of judgment in 1998 in
24  connection with the Ramon Rivera incident?
25      A.   I do. Yes.

Page 2618

1       Q.   And your understanding is based upon
2   Mr. Rivera's testimony and his affidavit; is that right?
3       A.   That's certainly information that I looked
4   at, yes.
5       Q.   And I thought that's what you testified to.
6   Is there anything else you relied on?
7       A.   Well, I mean there are other depositions and
8   things that I read, testimony I read by Mr. Freeman,
9   testimony by Mr. Mohr, and Amanda Nardini who was under
10  Mr. Mohr in the 2000 audit. Mr. Mendez. A litany of
11  things that I looked at. Mr. Ellenburg.
12      Q.   What do you recall Mr. Mohr and Ms. Nardini
13  talking about with respect to the Ramon Rivera incident?
14      A.   I don't with respect to the Ramon Rivera
15  incident. I'm sorry.
16      Q.   I'm just talking about the Ramon Rivera
17  incident.
18      A.   I understand. I was going beyond that.
19  Thank you.
20      Q.   I thought on direct you said you were
21  relying on Mr. Rivera's testimony, and his affidavit; is
22  that right?
23      A.   That's correct.
24      Q.   Now, and I believe you may have said --
25  correct me if I'm wrong -- that you relied on what

Page 2619

1    Mr. Ellenburg said as well?
2       A.  Yes.  The work stoppage, yes.
3       Q.  Now, you believe that the subordination of
4    judgment occurred when in the sequence?
5       A.  Well, when you have a limit on what you can
6    do, the door is slammed, and the door is slammed first
7    on Ramon Rivera on a Monday.  The door is slammed again
8    on -- I'm sorry, go back.  The door is slammed first on
9    a Friday when Mr. Rivera attempts and indicates to
10   Mr. Mendez and Mr. Parlapiano that he needs access to
11   Capital books and records.  And then it's slammed again
12   on Monday.  And then its work is restarted and he's told
13   basically that Mr. Parlapiano is an important person in
14   the community and the kind of things we looked at I
15   believe in paragraph 24.
16          And then at that point when you proceed to
17   move or forge ahead in the audit, you're basically --
18   you're facing dead on an inability to do what the
19   auditor needs to do.  Remember, at that point in time,
20   1998, 99.5 of the business is over at Capital so you
21   can't audit this shell because the business is over at
22   Capital.
23          When that door is shut and you persist to
24   not get evidence and to be limited and to have evidence
25   or information cherry picked for you, then you've

Page 2620

1    subordinated your judgment.
2       Q.  Where in the sequence of the Ramon Rivera
3    incident do you say was the point that a subordination
4    of judgment occurred?
5       A.  Well, let me answer that.  Let's say the
6    door is shut the first time on the Friday.  And let's
7    say everybody packs up and goes home and that's the end
8    of the engagement, there would be no subordination of
9    judgment.
10          Let's say on Monday, the second time, based
11   on the phone call that Mr. Parlapiano and Mr. Lenner,
12   Mr. Ellenburg, Mr. Rivera have, and the door is shut a
13   second time.  If you pack up and say, well, we can't do
14   the audit, there is no subordination of judgment.
15          And then the third time when you restart and
16   you are admonished, if you will, the manager on the job
17   to basically, you know, develop client relation skills
18   and basically to recognize that Mr. Parlapiano is an
19   important person in the business community, and at that
20   point if you say, well, wait a minute, we can't do this
21   audit, and you withdraw from the engagement, we wouldn't
22   be here talking about subordination of judgment.
23          The work continues.  The audit is restarted
24   and continues and it continues with, for example, and
25   the work papers show that Mr. Rivera relied on Capital

Page 2621

1    checks as customer checks.  So the work continues.
2       Q.  Did I hear you just say that the work papers
3    show that Mr. Rivera relied on Capital checks?
4       A.  No.  The work papers don't show that.  His
5    testimony does.
6       Q.  Let me see if I can take this step by step.
7    Mr. Rivera is denied information on Friday -- so he
8    says?
9       A.  I could not hear you.
10      Q.  Let's take it step by step.  It's the end of
11   the day, I'm getting hoarse.  Mr. Rivera is denied
12   information on Friday, so he says?
13      A.  That's correct.
14      Q.  And he walks off or he calls Mr. Ellenburg
15   and he walks off the job?
16      A.  That's correct.
17      Q.  Subordination of judgment?
18      A.  No.  You should walk off the job and stay
19   off the job until there's unfettered access to Capital
20   books and records.
21      Q.  So subordination of judgment at that point,
22   correct?
23      A.  Only if you continue.
24      Q.  He walked off the job.  Is there a
25   subordination of judgment at that point?

Page 2622

1       A.  There's work stoppage.  I can't get
2    evidence.  If you can't get evidence, you basically in
3    the face of not getting evidence withdraw from the
4    engagement.
5       Q.  So he walks off the job.  There's no
6    subordination of judgment, right?
7       A.  When does the subordination of judgment
8    takes place?  Certainly when they accept audit evidence
9    that is inadequate audit evidence because there's a
10   limit on your access to Capital books and records and
11   you issue an opinion, you subordinated judgment.
12          Now, is there an exact line?  I guess one
13   could say certainly by the time they issued an audit
14   opinion and they had danced to the tune of
15   Mr. Parlapiano calling the shots and closing doors, they
16   certainly subordinated judgments by that point in time.
17          If they had withdrawn from the engagement at
18   any point in time before issuance of the audit opinion
19   on the 1998 financial statements we wouldn't be talking
20   about subordination of judgment.  We wouldn't be talking
21   about scope limits which I said is one side of the coin,
22   the flip side is subordination of judgment.
23      Q.  When he walks off the job has a
24   subordination of judgment occurred at that time?
25      A.  Only if he continued and did not gain access

Page 2623

1    to Capital books and records. Mr. Ramon Rivera never
2    gained access that he needed, that BDO needed to audit
3    Bankest financial statements.
4        Q.   Monday rolls around, and there's apparently
5    a telephone conversation attended by Mr. Lenner,
6    Mr. Rivera, and Mr. Ellenburg. You're familiar with
7    that, right?
8        A.   Yes. Uh-huh. (Nodding).
9        Q.   And during that telephone conversation,
10   Mr. Lenner says if you don't give us the documents that
11   we need, we're going to have to resign from the audit.
12   You're familiar with that, right?
13       A.   Yes.
14       Q.   Did a -- was that a subordination of
15   judgment?
16       A.   If you resign from the audit, no. If you --
17   subordination of judgment occurs basically when you
18   persist and forge ahead and you are basically arm-
19   twisted by the client and don't do what generally
20   accepted auditing standards say and don't get the needed
21   evidence that you have to have to support the opinion on
22   financial statements. So they could again --
23       Q.   The answer is --
24       A.   They could have quit and said, let's forget
25   this. We're not going to audit Bankest and we wouldn't

Page 2624

1    be talking about subordination of judgment.
2        Q.   When Mr. Lenner hangs up the phone and says,
3    we won't continue with the audit without the evidence,
4    has a subordination of evidence occurred at that point?
5        A.   No. It's a door shut. It's the first class
6    red flag. You've got a domineering client that's
7    basically attempting to influence the scope of the audit
8    and, in fact, does influence the scope of the audit
9    eventually and BDO persists with this domineering person
10   who not only attempts to but does influence the scope of
11   the audit. Therefore, we have subordination of
12   judgment.
13       Q.   Now, it's your understanding that a few days
14   later Mr. Rivera is told to go back on the job.
15       A.   I understand that.
16       Q.   And Mr. Rivera received the information he
17   wanted for the first ten items on the subsequent
18   collections test?
19       A.   First ten or eleven.
20       Q.   First group. You are familiar with that,
21   right?
22       A.   Yes.
23       Q.   And that's the information he says he wanted
24   to finish the audit, right?
25       A.   That's correct.

Page 2625

1        Q.   Now, if Mr. Rivera testified that he doesn't
2    remember one way or the other whether or not he received
3    checks for 11 through 32, what evidence are you relying
4    on to determine whether, in fact, he received checks for
5    11 through 32?
6        A.   He basically indicated that he used Capital
7    checks for 11 through 32, not customer checks. We know
8    those transactions were by and large fake. And, quote,
9    there were no customer checks.
10       Q.   My question is, if Mr. Rivera testified that
11   he did not remember one way or the other whether or not
12   customer checks were reviewed for 11 through 32 on that
13   list, what evidence are you relying on to determine that
14   customer checks were not reviewed?
15       A.   Well, I understand that Mr. Rivera indicated
16   that he used Capital checks and I've looked at those --
17   we're talking about a worksheet. And I looked at the
18   checks that correlated and they, in fact, were Capital
19   checks.
20       Q.   Oh, you looked at checks?
21       A.   I looked at checks, some checks, yes.
22       Q.   Where did you get those checks from?
23       A.   I got the checks from counsel.
24       Q.   I'm giving you a hypothetical. If he's
25   testified -- if he testified that he doesn't remember

Page 2626

1    one way or the other whether or not he received customer
2    checks or a member of his staff received customer checks
3    for 11 through 32, okay --
4        A.   Yeah.
5        Q.   -- would you rely on Mr. Rivera's testimony
6    to determine whether or not he, in fact, received --
7        A.   You would ascertain through the forensic
8    work that the people did if, in fact, such customer
9    checks existed to begin with. And if they did not exist
10   and none had been produced, no fake customer checks have
11   been produced in this matter, fake customer checks, then
12   you would say, well, it couldn't have been done.
13       Q.   Who is the only person who said no fake
14   customer checks were produced?
15       A.   Mr. Freeman, the court-appointed fiduciary
16   receiver so indicated.
17       Q.   And he wasn't there at the time, was he?
18       A.   Mr. Ramon Rivera indicated that he basically
19   used Capital checks instead of customer checks.
20   Mr. Mendez indicated that no fake checks were produced
21   by -- he was the fraudster, of course, and he indicated
22   that. I saw no fake customer checks that were produced
23   in discovery.
24           So it's hard -- where are the customer
25   checks that were relied on if such things existed? No

Page 2627

1  fake customer checks have been produced so it looks to
2  me next to impossible that anyone looked at customer
3  checks, for example, for items 11 through 32.
4      Q.  You would agree Mr. Freeman was not there at
5  the time?
6      A.  I don't think he was there, no.
7      Q.  You would agree if Mr. Rivera doesn't
8  remember one way or the another if he received customer
9  checks that the only evidence there is what Mr. Mendez
10  said?
11      A.  No. No. Again that's not fair, Mr. Cole,
12  because I said he testified, he indicated that he relied
13  on Capital checks. So for those 11 through 32 there
14  were no customer checks. There were no fake customer
15  checks produced according to Mr. Freeman. Mr. Mendez
16  affirmed that. I looked at 11 through 32 and those
17  checks and the dates in the column were dates of Capital
18  checks to Bankest. They were not, quote, customer
19  checks.
20      So I mean, you know, we can't turn water
21  into wine here. These things don't exist. And I've not
22  seen one.
23      Q.  I'm sorry. Are you finished?
24      A.  I have not seen, quote, a fake customer
25  check.

Page 2628

1      Q.  My question is a little different. You've
2  testified that Mr. Freeman wasn't there, right?
3      A.  He was not on the audit team. He is a
4  fiduciary, the receiver in this matter.
5      Q.  Mr. Freeman wasn't there at the time of the
6  fraud, correct?
7      A.  No.
8      Q.  Mr. Mendez was, correct?
9      A.  Yes. He so testified.
10      Q.  Mr. Rivera was an auditor at the time,
11  right?
12      A.  He was the manager of the job, yes.
13      Q.  And you didn't go into this gigantic
14  warehouse and look for customer checks yourself?
15      A.  I did not. I did not go back and attempt to
16  redo the audit. I did not go on the gigantic warehouse
17  and look for documents myself, no.
18      Q.  And the only checks you saw were checks that
19  counsel gave you, correct?
20      A.  I saw the box basically that contained the
21  items for the worksheet that we are talking about from 1
22  through 32.
23      Q.  And that was the box of items that counsel
24  gave you?
25      A.  That's correct.

Page 2629

1      Q.  Now, Mr. Rivera is the only person who's
2  testified that no customer checks were made, were faked;
3  you understand that, right?
4      A.  No.
5      MR. THOMAS:  Objection, Your Honor.
6      THE COURT:  Overruled.
7      THE WITNESS:  That's not true.
8  BY MR. COLE:
9      Q.  Sir, let me rephrase my question.
10  Mr. Riviera was the only person who was there for the
11  fraud that testified that no customer checks were fake,
12  correct?
13      A.  Mr. Mendez testified.
14      Q.  I'm sorry, Mr. Mendez.
15      A.  So who are we talking about? Let's go back
16  and start over.
17      Q.  You would agree Mr. Mendez was the only
18  person that was there at the time who testified that no
19  customer checks were fake, right?
20      A.  He testified to that, yes.
21      Q.  Only one, only person?
22      A.  Mr. Rivera testified he could only get and
23  only got and relied on Capital checks.
24      Q.  Did you read the testimony, the trial
25  testimony in the trial?

Page 2630

1      A.  I scanned a lot of the testimony, yes.
2      Q.  And you're absolutely sure that Mr. Rivera
3  said he only received Bankest Capital checks for 11
4  through 32?
5      A.  Basically for those items, that's my
6  understanding, that's correct. Capital checks.
7      Q.  If he said he didn't remember, you wouldn't
8  agree that his testimony is no longer reliable for you,
9  right?
10      A.  I would say basically here we go again. 11
11  through 32, no checks have been produced in this matter
12  to indicate there were fake customers checks.
13  Mr. Mendez so testified. Mr. Freeman testified they
14  didn't exist.
15      So, here again, we're turning water into
16  wine. The checks don't exist. So even if he said,
17  well, I don't remember what I did, even if he said that,
18  then the proof is in the pudding. There are no fake
19  customer checks.
20      Q.  You will agree with me if he said I don't
21  remember one way or the other that you're not going to
22  rely on his testimony for your opinion, right?
23      MR. THOMAS:  Objection. Asked and answered,
24  Your Honor.
25      THE WITNESS:  I basically ---

Page 2631

1    THE COURT: Hold on, Dr. Guy.
2    MR. THOMAS: Objection. Asked and answered.
3    THE COURT: I heard you.
4    THE WITNESS: I'm sorry.
5    THE COURT: I'm sustaining the objection.
6    BY MR. COLE:
7    Q.   Now, Mr. Rivera was only there for the 1998
8    and 1999 audits, right?
9    A.   That's my understanding. Only on this
10    audit. He was at BDO longer but only at the Bankest.
11    Q.   I'm talking just about the Bankest.
12    A.   Okay.
13    Q.   And you understand that there were three
14    audits thereafter, right?
15    A.   Nineteen -- the 2000, 2001, 2002, yes.
16    Q.   And each one of those audits, the work
17    papers refer to customer checks being received, right?
18    A.   I think there is an audit work paper for
19    2000 that Mr. Mohr had manager or responsibilities for
20    the staff doing the work, there's a note in there about
21    checks that's a very convoluted note, incomprehensible
22    note.
23    MR. COLE: May I approach, Your Honor?
24    THE COURT: You may.
25    MR. COLE: (Complies).

Page 2632

1    BY MR. COLE:
2    Q.   I'm showing you an exhibit that's been
3    marked as Plaintiffs' Exhibit 3004 in evidence. Do you
4    recognize 3006? Is this the 1999 audit work papers?
5    A.   1999.
6    Q.   And you understand, sir, that 1999
7    Mr. Rivera was the manager, correct?
8    A.   I do. Yes.
9    Q.   And Mr. Mohr was involved in this as well?
10    A.   I understand Mr. Mohr to be involved on
11    every engagement for the five years we're talking about.
12    Q.   And did you ever interview Mr. Mohr?
13    A.   No, but I read his deposition.
14    Q.   And did you ever interview Mr. Lenner?
15    A.   No, but I read his deposition and testimony.
16    Q.   Did you ever interview Mr. Ellenburg?
17    A.   No, but I read -- what he had to say.
18    Q.   And take a look at page BDO 377 which is
19    399.
20    (Technician complies.)
21    And you testified -- I'm sorry. Are you
22    there? It's on the screen.
23    A.   I'm on -- oh, yes, thank you. I'm here.
24    Q.   You testified that you remember a work paper
25    in the year-end 2000 that -- one place they were

Page 2633

1    referred to customer checks, right?
2    A.   I testified to a worksheet I think that's
3    called C-10 or whatever in 1998. And then here we have
4    a work paper for the 1999 audit.
5    Q.   My question, sir, is I thought you said when
6    I asked you the question there were customer checks
7    throughout -- reflected in the work papers throughout
8    the five years of the audits, right?
9    A.   There were. Ask the question again.
10    Q.   Sure. I asked you -- I'll ask it again.
11    A.   Okay.
12    Q.   Isn't it a fact, sir, that even during the
13    time Mr. Rivera was there and even after the time
14    Mr. Rivera was there, there were customer checks
15    referred to multiple places in the work papers?
16    A.   Well, they're referred to here at point A on
17    this worksheet, at footnote A on this worksheet. In the
18    prior year they were referred to in footnote A. In the
19    next year I recall there was very limited documentation
20    but subsequent cash collection work. But there was a
21    note on the third or fourth page of the work papers that
22    Mr. Mohr had written and it alludes to customer checks,
23    I believe.
24    Q.   Anywhere else you remember seeing customer
25    checks?

Page 2634

1    A.   Well, in the 2000 -- I mean, this is a
2    memory test.
3    Q.   No, no, if you don't remember, I'll show
4    you.
5    A.   In the 2000 audit there were some so-called
6    control work done that was really pathetic control work.
7    It was in no shape, form or fashion control work. And
8    in 2001 there was another attempt to do control work
9    that was probably the most substandard control work I've
10    ever seen, and it is referred to I believe.
11    So do I have a recall of every place,
12    probably not. But I've given you certainly ones that I
13    know of.
14    Q.   You will agree with me that they were,
15    customer checks were referred to throughout the entire
16    five years of the audits, right?
17    A.   Well, you know, we might want to look in ---
18    Q.   Okay. Let's look at it.
19    A.   We might want to look in 2001, 2003.
20    Remember, for example, in 2000, it started in 1999.
21    Even if they had done this work on customer checks which
22    they're fake, they didn't have them, but even if they
23    had done this work there's a still a subordination of
24    judgment because of the work they did. Look how invoice
25    only grows from about 30-something percent of the audit

Page 2635

1    evidence in 1999 all the way up to well over 90 percent
2    in the last two years. That's insubordination. That's
3    insufficient evidence. That demonstrates that they
4    basically subordinated their judgment.
5            So this audit comes crashing down without
6    regard. I mean, we shouldn't, the jury shouldn't think
7    that this thing rises or falls. The subsequent cash
8    collection work is bad but the other work is bad as well
9    and it demonstrates a lack of independence.
10           So we can talk about audit evidence until
11   we're blue in the face. But remember, I've said this
12   firm wasn't independent. And even if they had done an
13   impeccable audit, which this is a far cry from anything
14   that even represents close to being a decent audit, even
15   if they had done that, they're not independent. There's
16   no evidence, it -- there's nothing in these work papers
17   that qualifies as audit evidence because you can't refer
18   to an audit procedure if you're not independent.
19           They're not independent so, let's not forget
20   that independence is a bedrock foundation of auditing
21   and if you're not independent, you can't come along and
22   say, well, look what they did here.
23           It's important to know that. So this stuff
24   should not masquerade as audit evidence because it is
25   not.

Page 2636

1        Q.   If I'm not mistaken, sir, one of the reasons
2    why you say there was an independence violation was
3    because there was a subordination of judgment, right?
4        A.   That's absolutely correct.
5        Q.   And one of the reasons you say there's a
6    subordination of judgment is because in 1998 Ramon
7    Rivera didn't receive what he asked for, right?
8        A.   That's one of the reasons. And they went on
9    with the audit.
10       Q.   And the thing that Ramon Rivera was seeking
11   was customer checks, right?
12       A.   That's one of the reasons.
13       Q.   And you said that you've never seen customer
14   checks, right?
15       A.   No, I didn't say that.
16       Q.   You've seen limited customer checks?
17       A.   No, I had never said I've never seen
18   customer checks. No. I said I have never seen fake
19   customer checks.
20           We talked about the first 10 or 11 items on
21   the 1998 work papers. And those items there are copies
22   of customer checks that relate to those items.
23       Q.   And you've seen -- you saw customer checks
24   throughout the entire time period of the five years?
25       A.   There's some -- a little bit of real

Page 2637

1    business here. And what I'm talking about are fake
2    customer checks.
3        Q.   Sir, you saw in your review customer checks
4    throughout the entire time period of the audits; is that
5    correct?
6        A.   I saw some customer checks. I don't
7    remember exactly. I just alluded to the fact that for
8    1998 I saw some customer checks.
9        Q.   And you saw some throughout the rest of the
10   audit as well?
11       A.   I would expect there would be some.
12   Believe it or not there was an occasional real
13   transaction.
14       Q.   My question is, sir, you spent $300,000 or
15   more on looking at all the work papers and looking at
16   documents. My question is very simple: Did you see
17   customer checks?
18           MR. THOMAS: Objection. Argumentative, Your
19   Honor.
20           THE COURT: Overruled.
21           THE WITNESS: You know, I don't recall the
22   details of customer checks except the ones that I
23   mentioned. Remember, here again, you can show me all
24   this stuff but they're not independent. These work
25   papers do not support any opinion on the financial

Page 2638

1    statements. It's a travesty and they ran roughshod over
2    the public trust for each and every year.
3    BY MR. COLE:
4        Q.   So is your answer that you don't remember?
5    I just want to know. You don't remember seeing customer
6    checks for the other four years of the audits?
7        A.   I saw -- you've shown me some customer
8    checks before from other years. You personally have.
9        Q.   I showed you customer checks?
10       A.   I think that's the case, yeah. But -- you
11   know, I don't recall. Let me say I don't recall.
12       Q.   That's fine. Let's take a look at ---
13           MR. COLE: You know what, Judge? It's a
14   good time to stop.
15           THE COURT: Ladies and gentlemen, I'm going
16   to let you go home now because obviously there's a
17   reason for that. You know what reason that is. Do not
18   discuss the case amongst yourselves. Do not allow
19   anyone else to discuss the case with you. Do not form a
20   definite or fixed opinion about the merits of the case
21   until you've heard all the evidence, the arguments by
22   the lawyers and the instructions on the law by me.
23           You're not to acknowledge the presence of
24   the lawyers outside this courtroom and they're not to
25   acknowledge yours and you're not to see, hear or read

Page 2639

1  any accounts of this case in the media.
2        Okay? 9:30 tomorrow. Same place. You know
3  where to go. Have a good night.
4        (Thereupon, the jury was escorted out of the
5  courtroom.)
6        THE COURT: You know what? Rosie, go get
7  them, bring them all back here.
8        THE CLERK: (Complies).
9        (Thereupon, the jury was brought into the
10  courtroom.)
11        THE COURT: You don't have to sit down.
12  Just come over here. You do not have to sit down. Step
13  outside. Walk around the rail so you all fit in here.
14  There you go. That's good.
15        Everybody is here. 2, 4, 6, 8, there's one
16  missing. Who is missing?
17        JUROR: Nancy.
18        THE COURT: Did she leave?
19        JUROR: No, I think she's in the bathroom.
20        THE COURT: You're all here now. Tomorrow
21  we are leaving at 4:00 o'clock in the afternoon.
22  There's a demonstration outside, an immigration
23  demonstration starting at 5:00. I want you all to be
24  able to get out of here before that happens. So plan
25  for tomorrow we're only going until 4:00, unless you

Page 2640

1  want to stay longer.
2        I won't give you the instruction. Have a
3  good night.
4        (Thereupon, the jury was escorted out of the
5  courtroom.)
6        THE COURT: All right. Dr. Guy, you're not
7  to discuss the testimony you've given or the testimony
8  you're about to give with anyone and that includes all
9  the lawyers.
10        Tomorrow morning at 9:30.
11        MR. THOMAS: Your Honor, we will rest soon,
12  so could we ask the first witness of BDO or the first
13  couple of witnesses of BDO?
14        THE COURT: Mr. Cole?
15        MR. COLE: Yes. The first witness will be
16  Sandy Lenner. And the next one is Ellenburg but we'll
17  submit a formal designation tonight.
18        THE COURT: Okay. Have a good night.
19
20        (Thereupon, at approximately 4:30 p.m., the
21  above portion of the trial was concluded.)
22            *    *    *
23
24
25

Page 2641

1        CERTIFICATE OF COURT REPORTER
2
3        I, GIZELLA BAAN, court reporter, before whom
4  the foregoing statement was taken, do hereby certify
5  that the statement made was taken by me stenographically
6  at the time and place mentioned in the caption hereof
7  and thereafter transcribed by me to the best of my
8  ability; that said transcript is a true record of the
9  statement given; that I am neither counsel or, related
10  to, nor employed by any of the parties to the action in
11  which these proceedings were taken; and further, that I
12  am not a relative or employee of any party hereto, nor
13  financially or otherwise interested in the outcome of
14  this action.
15
16
17
18
19        GIZELLA BAAN
20        Court Reporter and Notary Public
21        in and for the State of Florida
22
23
24
25