Page 2793

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


----------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
----------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
----------------------------------------------x

PAGES 2793 - 2868

Volume 23



MORNING SESSION

Miami, Florida

Wednesday, May 2, 2007

10:00 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 2794

1         A P P E A R A N C E S
2
3    On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4    INTERNATIONAL, LTD., ET AL.:
5
6    SULLIVAN & CROMWELL, LLP
7         1888 Century Park East
8         Los Angeles, California 90067
9         (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11        Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14        334 Minorca Avenue
15        Coral Gables, Florida 33134
16        (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20        350 East Las Olas Boulevard, Suite
21        Fort Lauderdale, Florida 33301
22        (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25

Page 2795

1    On behalf of Defendant BDO Seidman, LLP:
2
3    ALVAREZ, ARMAS & BORRON
4         901 Ponce de Leon Boulevard, Suite 304
5         Coral Gables, Florida 33134
6         (305) 461-5100
7    BY:  Arturo Alvarez, Esquire
8
9    GREENBERG TRAURIG, LLP
10        MetLife Building
11        200 Park Avenue, 15th Floor
12        New York, New York 10166
13   BY:  Adam D. Cole, Esquire
14        Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17        1221 Brickell Avenue
18        Miami, Florida 33131
19   BY:  Mark Schnapp, Esquire
20        Nikki Simon, Esquire
21
22
23
24
25

Page 2796

1    On behalf of Third-Party Defendants Victor Balestra,
2    Bernard Mollet, and Joaquin Garnecho
3
4    RICHMAN, GREER, WEIL, BRUMBAUGH,
5    MIRABITO & CHRISTENSEN, P.A.
6         Miami Center, Suite 1000
7         201 S. Biscayne Boulevard
8         Miami, Florida 33131
9         (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16        2701 Ponce de Leon Boulevard, Mezzanine
17        Coral Gables, Florida 33134
18        (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20        Geoffrey Marks, Esquire
21
22
23
24
25

Page 2797

1              C O N T E N T S
2
3    EXAMINATION OF DAN GUY BY:              PAGE:
4       MR. THOMAS:  (Redirect)        2811
5
6    EXAMINATION OF SANDOR LENNER BY:        PAGE:
7       MS. BITAR:  (Direct)          2857
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2838

1        If you look at the top here it says, the
2   following are examples, not all inclusive, of situations
3   that should cause a member to consider whether or not
4   the client, employer, or other appropriate parties could
5   view the relationship as impairing the member's
6   objectivity.
7        But then if you look at the bottom, it says
8   it again.  The above examples are not intended to be all
9   inclusive.
10       Is that what you meant when you referred to
11  bookends in these examples?
12   A.   Yes, that was sort of an obtuse reference.
13   Q.   Can you see that?
14   A.   I can.  I get a dose of how bad my
15  handwriting really is.
16   Q.   And then you were asked a number of
17  questions by BDO about how did these examples involve a
18  relationship with an audit client.
19       Do you remember those questions?
20   A.   Yes.
21   Q.   Now, Dr. Guy, the situation here between BDO
22  and Bankest and BDO and StrataSys, the situation in this
23  case, it involves a relationship between BDO and an
24  audit client; is that right?
25   A.   Absolutely.

Page 2839

1        MR. COLE:  Objection.
2        THE COURT:  Overruled.
3        THE WITNESS:  The reason we're here is
4   because BDO attempted to audit Bankest while it has this
5   relationship with StrataSys which causes this conflict
6   of interest because of Mr. Parlapiano being at Bankest
7   and StrataSys.  That's a -- those are related parties.
8        And because Mr. Lenner, of course, BDO being
9   at both places and have a business relationship and
10  because of the fact that StrataSys basically sells its
11  IOUs or its accounts receivables to Bankest and gets
12  dollars back, that's what this is all about.
13       And it's about how can any man such as -- or
14  woman for that matter, but in this case man --
15  Mr. Lenner, wear two hats.  How can he determine that
16  these financial statements were fairly presented in
17  accordance with generally-accepted accounting
18  principles?  BDO can't.
19       How could they determine these receivables
20  are real or fictitious?  They can't.  They don't have
21  the requisite degree of objectivity.
22       This is a convoluted, intertwined, first
23  class conflict of interest.  And let me tell you, I
24  believe that it is with all of my heart and soul, and
25  it's one of the worst conflicts I've ever seen.

Page 2840

1   Q.   Now, Dr. Guy, we also talked about your
2   stool, and you went over different legs of the stool
3   with BDO.  Do you remember that?
4        And the three legs of the stool are
5   integrity, objectivity, and appearance of independence.
6        Did I get those right?
7   A.   You did.
8   Q.   And am I right in understanding, Dr. Guy,
9   that integrity and objectivity, those are lack of
10  independence in fact.  And then appearance of
11  independence, that's appearance to the general public,
12  the outside world?
13   A.   That's correct.
14   Q.   Now, Dr. Guy, did -- when you were being
15  questioned by BDO, do you remember, did they -- well,
16  let me do it this way.
17       MR. THOMAS:  May I approach, Your Honor?
18       THE COURT:  You may.
19       MR. THOMAS:  (Complies.)
20       I'm approaching with Plaintiffs' Exhibit 118
21  in evidence.
22  BY MR. THOMAS:
23   Q.   Dr. Guy, I know I only gave you a piece of
24  this right here because it's a box.  But what I'm
25  showing you here is a piece of BDO's own audit manual.

Page 2841

1   A.   Okay.
2   Q.   And Dr. Guy, if you look at BDO's audit
3   manual and you turn with me over to 1.25, and that's BDO
4   0029725, the next-to-the-last page.
5   A.   (Complies.)  On Bates number 725?
6   Q.   Exactly.
7   A.   Yeah.  Okay.
8   Q.   And if you look at 1.25, BDO's own audit
9   manual says, no opinion or assurance may be expressed
10  unless the accountant and the firm are independent both
11  in fact and in appearance.
12       Now, is that what your opinion is too?
13   A.   That's what my opinion is and has been, and
14  I've stated it a number of times before this jury and in
15  this courtroom.
16   Q.   And I know it was a lot of time but when BDO
17  was asking you questions, do you recall them asking you
18  questions about that second part, the appearance part?
19       MR. COLE:  Objection.
20       Reserve a motion.
21       THE COURT:  Sustained.
22       Rephrase the question.
23       MR. THOMAS:  I'll just move on, Judge.
24       THE COURT:  All right.
25  BY MR. THOMAS:

Page 2854

1   MR. COLE: Could we, Your Honor?
2   With respect to the first item, there is no
3   door to open. You're not allowed to shift the burden to
4   me to present any evidence. And it is fair, it is fair
5   cross-examination to raise with the -- with any expert
6   witness the information that he or she received from
7   counsel and what was the basis for his or her opinion.
8   It is improper -- there is no door to open
9   from that questioning to suggest that we had to then
10  provide the expert with evidence and it was our burden
11  to show the expert the evidence.
12  That's the crux of the issue. There's no
13  door to open. And by doing that, the burden was
14  suggested to the jury as being shifted to BDO in this
15  phase of the trial, and that was improper. The rest of
16  Mr. Thomas's arguments will be addressed.
17  THE COURT: Then you'll file your motion and
18  then I'll rule.
19  MR. COLE: Okay. Judge, we did distribute
20  the -- I think we did -- we did distribute the motion
21  for directed verdict. Obviously --
22  THE COURT: How many issues are in here or
23  is there just one?
24  MR. COLE: I'm sorry? There's attachments
25  but it's really just -- it's really two issues. We move

Page 2855

1   on the issue of 552 with respect to ESB Finance and 552
2   with respect to Banco Espirito Santo on the $30 million
3   line.
4   THE COURT: You want to -- have you read it,
5   Mr. Thomas? You're not going to be able to respond or
6   give your oral response. I don't want to cut you off if
7   you want to respond to any argument you may have on --
8   MR. THOMAS: I don't know what to say
9   because I haven't even read it yet.
10  THE COURT: What I'm going to do is reserve
11  on your motion for directed verdict and I'll give you an
12  opportunity to argue that when Mr. Thomas reads it, so
13  we'll go back and you can respond to whatever (inaud.).
14  Now, on your motion for directed verdict, do
15  you want to make it now orally or you want to put it in
16  writing and do it at the same time? It's your choice.
17  MR. THOMAS: I'd like to put in writing if
18  we could.
19  THE COURT: Then we'll do the same thing.
20  Make sure the defense gets copies. But don't give it to
21  me at the time when I'm going to hear it. Give it to me
22  in advance.
23  MR. THOMAS: That's what I assumed. Thank
24  you, Your Honor.
25  THE COURT: All right. I assume Mr. Lenner

Page 2856

1   is your first witness; is that correct?
2   MR. COLE: Yes.
3   MS. BITAR: That is correct, Your Honor.
4   THE COURT: What I'm going to do is bring
5   the jury out, let you question Mr. Lenner, and you can
6   ask questions for 25 minutes. When you want to get into
7   substantive stuff --
8   MS. BITAR: Take a break.
9   THE COURT: -- let me know.
10  MS. BITAR: Fine, Your Honor. Thank you.
11  THE COURT: Bring them out.
12  One more thing since you are going to file a
13  motion for directed verdict. I'm going to reserve. I
14  don't want any party waiving. I don't want either party
15  waiving for directed verdict. So I'm going to reserve
16  on both motions.
17  MR. THOMAS: Thank you for that courtesy,
18  Your Honor.
19  THE COURT: Bring them in.
20  THE BAILIFF: (Complies.)
21  All rise for the jury.
22  (Thereupon, the jury was brought into the
23  courtroom.)
24  THE COURT: All right. You may be seated.
25  Ms. Bitar, defendant may call your first

Page 2857

1   witness.
2   MS. BITAR: Thank you, Your Honor.
3   BDO Seidman calls Sandor Lenner.
4   THE COURT: Mr. Lenner, come forward.
5   THE WITNESS: (Complies.)
6   THE COURT: Raise your right hand.
7   Thereupon,
8   SANDOR LENNER,
9   having been duly sworn by the clerk of the Court,
10  testified as follows:
11  THE COURT: Thank you.
12  You may be seated.
13  MS. BITAR: May I inquire, Your Honor?
14  THE COURT: You may.
15  MS. BITAR: Good morning, Mr. Lenner.
16  Good morning, ladies and gentlemen of the
17  jury.
18  THE WITNESS: Good morning, Ms. Bitar.
19  MS. BITAR: I'll give you a moment to outfit
20  your microphone.
21  THE WITNESS: Testing.
22  MS. BITAR: Good.
23  THE WITNESS: Yes.
24  DIRECT EXAMINATION
25  BY MS. BITAR:

Page 2858

1    Q.  Mr. Lenner, when you testified on the
2  plaintiffs' direct case, I asked you some questions
3  about your professional experience.
4         Let's talk a little bit about your
5  background.  Where do you presently reside, sir?
6    A.  Miami, Florida.
7    Q.  And how long have you lived in Florida?
8    A.  About 27 years.
9    Q.  Are you married, sir?
10    A.  Yes, I am.
11    Q.  Do you have any children?
12    A.  Yes.  I have a 19-year-old daughter, and I
13  have a 17-year-old daughter.
14    Q.  And can you please describe your educational
15  background.
16    A.  Sure.  I have a bachelors of accounting from
17  Herbert H. Lehman College of The City University of New
18  York.  That's a public school.  I also have a graduate
19  degree, that's a masters in finance from Bernard M.
20  Baruch College.  That's also part of The City University
21  of New York.
22    Q.  Are you from New York, sir?
23    A.  Yes.
24    Q.  What year did you receive your CPA license?
25    A.  1980.

Page 2859

1    Q.  And since you received that license, have
2  you had any additional training with respect to
3  performing services as a certified public accountant?
4    A.  Yes.
5    Q.  What additional training have you had?
6    A.  Every two years we are required to take
7  80 credits of continuing professional education courses.
8    Q.  And what does that continuing professional
9  education require?
10    A.  It requires 80 credits of various subjects,
11  primarily accounting and auditing.
12    Q.  And Mr. Lenner, in connection with your CPA
13  license, do you have any professional affiliations?
14    A.  Yes.
15    Q.  What are they, sir?
16    A.  I am a member of the American Institute of
17  CPAs.  I am also a member of the Florida Institute of
18  Certified Public Accountants.
19    Q.  And when you say the American Institute of
20  CPAs, is that commonly known as the AICPA?
21    A.  Yes.
22    Q.  Mr. Lenner, have you ever assisted the
23  United States government as a panel trustee as has
24  Mr. Feltman?
25    A.  Yes.  I've gone through the security

Page 2860

1  clearance.  The fact that I was appointed by a
2  bankruptcy Judge to act as an examiner for one matter.
3    Q.  Now, could you briefly describe your
4  employment history since graduating from college?
5    A.  I worked 15 years for a large regional firm
6  in New York City that also had an office in Miami
7  Florida called Eisner & Lubin, then two years I was on
8  my own, and then for 17 years I've been with BDO
9  Seidman.  That's approximately 34 years of experience.
10    Q.  And are you presently at BDO, sir?
11    A.  Yes.
12    Q.  And what is your title at BDO?
13    A.  I am a partner.
14    Q.  And where are you a partner?
15    A.  In the Miami office in the assurance
16  department.
17    Q.  And what does assurance mean, sir?
18    A.  It means audits.
19    Q.  So you're a partner in the Miami office
20  doing audits; is that correct?
21    A.  Yes.
22    Q.  Do you have any other titles or
23  responsibilities?
24    A.  No.
25         MS. BITAR:  Your Honor, per your

Page 2861

1  instruction, at this time I'm done with the preliminary
2  information.
3         THE COURT:  You can ask more questions.
4         MS. BITAR:  Okay, Judge.
5  BY MS. BITAR:
6    Q.  Mr. Lenner, let's talk a little bit about
7  auditing.
8         Did you believe at the time of the Bankest
9  audits that you were qualified to conduct them?
10    A.  Yes.
11    Q.  At the time of the Bankest audits, did you
12  understand that the limits of an audit consisted of
13  selective testing?
14    A.  Yes.
15    Q.  Does an audit require testing every aspect
16  of a company?
17    A.  No, it does not.  It's very clear.  It
18  involves selective testing of certain accounts and
19  certain transactions in the company.
20    Q.  Does an audit guarantee an auditor will
21  detect fraud?
22    A.  No.
23    Q.  Based on your understanding, did you
24  guarantee that at Bankest you would detect fraud?
25    A.  No.

Page 2862

1    Q.   Whose responsibility is it to detect fraud,
2  Mr. Lenner?
3        MR. THOMAS: Objection, Your Honor.
4        THE COURT: Sustained.
5        Rephrase the question.
6  BY MS. BITAR:
7    Q.   Mr. Lenner, are you familiar with the audit
8  literature that discusses the responsibilities to detect
9  fraud in an organization?
10   A.   Yes.
11   Q.   And is this the literature you rely on when
12  conducting your audits?
13   A.   Yes.
14   Q.   Mr. Lenner, whose responsibility is it to
15  detect fraud?
16       MR. THOMAS: Objection, Your Honor. That
17  establishes my objection. 701.
18       THE COURT: I'm going to sustain your
19  objection.
20       Rephrase your question.
21  BY MS. BITAR:
22   Q.   Mr. Lenner, based on your understanding of
23  the duties imposed upon you as a certified public
24  accountant, is it your obligation to detect fraud?
25       MR. THOMAS: Objection, Your Honor. There's

Page 2863

1  a motion in limine.
2        THE COURT: Overruled.
3        THE WITNESS: No.
4  BY MS. BITAR:
5    Q.   Whose responsibility is it based on the
6  literature you use to perform your audits?
7        MR. THOMAS: Objection, Your Honor.
8        THE COURT: Overruled.
9        THE WITNESS: According to SAS-82 --
10       THE COURT: Sustained.
11  BY MS. BITAR:
12   Q.   Without getting into the substance of the
13  literature, whose responsibility --
14   A.   Management's responsibility to detect fraud.
15   Q.   Let's talk a little bit about professional
16  standards you're required to follow.
17       When you conducted the Bankest audits, did
18  you understand that you had to do your work in
19  accordance with professional standards?
20   A.   Yes.
21   Q.   And are those standards commonly known as
22  generally-accepted auditing standards?
23   A.   Yes.
24   Q.   And where are those standards written down,
25  sir?

Page 2864

1    A.   They are written down in the literature
2  that's promulgated or written by the American Institute
3  of Certified Public Accountants. Sometimes they come
4  through what's called statement on auditing standards
5  called SASes. That's where they're written.
6    Q.   And what is generally-accepted auditing
7  standards generally?
8    A.   That's called GAAS. And it's called,
9  generally, G-A-A-S, which stands for generally-accepted
10  auditing standards. Those are the rules that CPAs are
11  required to follow during the performance and the
12  conduct of the audit. It's basically the rules that you
13  have to follow.
14   Q.   Now, Mr. Lenner, we've heard some testimony
15  about the BDO audit manual. Have you heard that
16  testimony as you sat here throughout this trial?
17   A.   Yes.
18   Q.   What is the BDO assurance manual?
19   A.   It's a resource that's used by the
20  professional staff. And it's a compendium of GAAS and
21  GAAP and some of the firm's recommendations on
22  conducting an audit.
23   Q.   And Mr. Lenner, in conducting your audits of
24  Bankest -- let me ask you a preliminary question.
25       Have you reviewed the manual?

Page 2865

1    A.   Yes.
2    Q.   Are you familiar with the manual?
3    A.   Yes.
4    Q.   And did you review the manual when
5  conducting the audits of Bankest?
6    A.   Yes.
7    Q.   And where in the pecking order of GAAS does
8  this assurance manual apply?
9    A.   It's really a higher standard of GAAS. Most
10  national firms like BDO recognize GAAS. They put that
11  into their manual but they also add some additional
12  considerations that they want the audit team to consider
13  when performing the audit.
14   Q.   So when reviewing the internal standards,
15  are you looking at standards higher than those set forth
16  under GAAS?
17   A.   Yes.
18   Q.   So based on that, Mr. Lenner, is it fair to
19  say that you cannot follow your own internal standards
20  and still do an audit in accordance with
21  generally-accepted auditing standards?
22   A.   Yes.
23   Q.   And that's the standard that's at work in
24  this case, correct?
25       MR. THOMAS: Objection, Your Honor, calls

Page 2866

1   for a legal conclusion.
2           THE COURT:  Sustained.
3           MS. BITAR:  Your Honor, at this time I'm --
4           THE COURT:  You want to break?
5           MS. BITAR:  I'm ready to continue but I'm
6   going to show an exhibit, so this is an appropriate
7   place --
8           THE COURT:  I was going to stop you.
9           MS. BITAR:  I thought so.
10          THE COURT:  Ladies and gentlemen, we're
11  going to go to lunch.  Maybe not.  But we're leaving the
12  courtroom.
13          You're not to discuss the case amongst
14  yourselves or anyone else.  You are not to allow anyone
15  to discuss the case with you.  You're not to form a
16  fixed or definite opinion about the case until you've
17  heard all the evidence, the argument by the lawyers, and
18  the instructions on the law by me.
19          You're not to read, hear, or see any reports
20  about this case in the media.  And you're to ignore the
21  lawyers' presence outside this courtroom and the witness
22  as well as they're to ignore yours.
23          All right.  Have a good lunch.  1:30.
24          THE BAILIFF:  All rise for the jury.
25          (Thereupon, the jury was escorted out of the

Page 2867

1   courtroom.)
2           THE COURT:  Mr. Lenner, you're not to
3   discuss the testimony you've given or that you will give
4   with anyone, that includes all the lawyers.  Have a good
5   lunch.
6           Have a good lunch.
7           (Whereupon, at 12:00 p.m., a luncheon recess
8   was taken.)
9
10          *       *       *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2868

1               CERTIFICATE OF COURT REPORTER
2
3           I, GIZELLA BAAN, court reporter, before whom
4   the foregoing statement was taken, do hereby certify
5   that the statement made was taken by me stenographically
6   at the time and place mentioned in the caption hereof
7   and thereafter transcribed by me to the best of my
8   ability; that said transcript is a true record of the
9   statement given; that I am neither counsel or, related
10  to, nor employed by any of the parties to the action in
11  which these proceedings were taken; and further, that I
12  am not a relative or employee of any party hereto, nor
13  financially or otherwise interested in the outcome of
14  this action.
15
16
17
18
19              _____
                    GIZELLA BAAN
20              Court Reporter and Notary Public
21                in and for the State of Florida
22
23
24
25

Page 2869

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

-----------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
　　　　　Plaintiffs,
　　　　vs.
BDO SEIDMAN, LLP,
　　　　　Defendant.
-----------------------------------------------x
BDO SEIDMAN, LLP,
　　　　　Third-Party Plaintiff,
　　　　vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
　　　　　Third-Party Defendants.
-----------------------------------------------x

PAGES 2869 - 3019

Volume 24

AFTERNOON SESSION

Miami, Florida

Wednesday, May 2, 2007

1:50 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 2870

1    A P P E A R A N C E S
2
3    On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4    INTERNATIONAL, LTD., ET AL.:
5
6    SULLIVAN & CROMWELL, LLP
7        1888 Century Park East
8        Los Angeles, California 90067
9        (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida 33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       350 East Las Olas Boulevard, Suite
21       Fort Lauderdale, Florida 33301
22       (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25

Page 2871

1    On behalf of Defendant BDO Seidman, LLP:
2
3    ALVAREZ, ARMAS & BORRON
4        901 Ponce de Leon Boulevard, Suite 304
5        Coral Gables, Florida 33134
6        (305) 461-5100
7    BY:  Arturo Alvarez, Esquire
8
9    GREENBERG TRAURIG, LLP
10       MetLife Building
11       200 Park Avenue, 15th Floor
12       New York, New York 10166
13   BY:  Adam D. Cole, Esquire
14       Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17       1221 Brickell Avenue
18       Miami, Florida 33131
19   BY:  Mark Schnapp, Esquire
20       Nikki Simon, Esquire
21
22
23
24
25

Page 2872

1    On behalf of Third-Party Defendants Victor Balestra,
2    Bernard Mollet, and Joaquin Garnecho
3
4    RICHMAN, GREER, WEIL, BRUMBAUGH,
5    MIRABITO & CHRISTENSEN, P.A.
6        Miami Center, Suite 1000
7        201 S. Biscayne Boulevard
8        Miami, Florida 33131
9        (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16       2701 Ponce de Leon Boulevard, Mezzanine
17       Coral Gables, Florida 33134
18       (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20       Geoffrey Marks, Esquire
21
22
23
24
25

Page 2873

1    C O N T E N T S
2
3    EXAMINATION OF SANDOR LENNER BY:          PAGE:
4        MS. BITAR:  (Direct, cont'd)          2896
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2874

1           PROCEEDINGS
2           MR. THOMAS: I have an issue to raise before
3    you get Mr. Lenner.
4           THE COURT: Yes.
5           MR. THOMAS: Your Honor, Ms. Bitar's
6    questioning concerning the professional standards that
7    Mr. Lenner was to follow, Espirito Santo submits
8    violated your motion in limine. In fact, your motion in
9    limine you granted was that there would be no lay
10   opinion testimony on the standards of GAAS and GAAP.
11   But you actually went further.
12          THE COURT: I did?
13          MR. THOMAS: You did.
14          THE COURT: Did I put it in writing?
15          MR. THOMAS: You said it on the record
16   which was, Your Honor, that you said you granted the
17   motion. And then Ms. Bitar said, "But one thing I want
18   to clarify if I may. Our concern is that the questions
19   will be asked. We understand they'll be sustained,"
20   meaning the objections would be sustained, "we don't
21   want the questions asked.
22          "The Court: Obviously, they won't be asked.
23          "Mr. Thomas: We agree to it."
24          And then you instructed me, "Hopefully, they
25   won't be asked, right, Mr. Thomas?" And I replied,

Page 2875

1    "Yes, Your Honor."
2           Your order didn't just apply to Espirito
3    Santo. It applied to BDO Seidman as well.
4           THE COURT: My order applied to all parties
5    on both sides. Now I understand your concern,
6    Mr. Thomas. And I know and I have that -- when you're
7    making the objections I cognizantly listened to the
8    question.
9           The problem I have is I will not allow
10   Mr. Lenner to opine on standards that applies to the
11   profession to all the counts because that would be
12   expert testimony. For example, Mr. Feltman and Dr. Guy.
13          But it's very difficult -- it depends on the
14   question. If the question pertains to how he applied
15   the standard, BDO applied the standard in this case,
16   that is not an expert opinion. Because you can't
17   separate that, at least I can't separate it in my mind.
18          As long as the questions are such that how
19   they apply the standards, what is the standard and how
20   they apply it. What they believe as it is applying to
21   them in this case as they applied to the audits.
22          It's the difference. If you don't agree
23   with that, if you have a question about that, I will
24   hear your response.
25          MR. THOMAS: I do but I could first address

Page 2876

1    the other one?
2           THE COURT: Oh, you have another one?
3           MR. THOMAS: No. The first point which is
4    that the rule that Espirito Santo had to follow was that
5    we wouldn't ask the question.
6           THE COURT: Correct.
7           MR. THOMAS: Ms. Bitar asked the question
8    after establishing with Your Honor that you couldn't ask
9    the question. That's a direct violation of your order.
10   And we ask that the same rules be applied to BDO and be
11   applied to Espirito Santo.
12          THE COURT: And that's why I'm saying it
13   depends how the question is posed. Obviously, if the
14   question is posed, Ms. Bitar, concerning his opinion as
15   to the standards as it applies to --
16          MS. BITAR: I'm sorry, the standards --
17          THE COURT: The standards as they apply to
18   the profession, that question should not be asked.
19          MS. BITAR: I understand.
20          THE COURT: And that question should not be
21   asked.
22          MR. THOMAS: It was asked and you sustained
23   my objection to it, which I agree with you was
24   appropriate to sustain the objection. My point is the
25   rule --

Page 2877

1           THE COURT: That shouldn't be asked.
2           MR. THOMAS: -- the rule that we had to
3    apply, it was in violation of your order to ask the
4    question. And it wasn't an accident because their
5    questions are written out.
6           THE COURT: Now I'm telling you -- I'll let
7    you respond.
8           MS. BITAR: Thank you, Your Honor. May I?
9           THE COURT: But not to ask questions
10   pertaining to that.
11          MS. BITAR: I understand, Your Honor, but I
12   want to make clear what I understood the ruling was.
13   The motion in limine that Mr. Thomas is referring to is
14   BDO's motion in limine and its request was very
15   specific. Its request related to -- so that they would
16   not be able to present someone like Lew Freeman or Ramon
17   Rivera, who are the two people I think that we cited in
18   that motion in limine, to get up on the stand and be
19   asked questions such as, now that you have ten more
20   years of experience, do you still think it's a GAAS
21   audit, Mr. Rivera. And that's what that motion was
22   catered to.
23          Now, Your Honor, the last time we were here
24   we addressed this very specific issue about where
25   Mr. Lenner, the fact witness, the person whose conduct

Page 2878

1  is at issue and the issue of whether or not he followed
2  those standards is at issue, if he was permitted to ask
3  -- if I was allowed to ask him what rules he looked at
4  and how had he applied them in connection with his work.
5  And that is what I will do, Your Honor.
6      THE COURT: That's exactly what I'm
7  referring to. But I'm not going to allow you to ask
8  questions such as what is your opinion -- which you
9  started -- and I sustained -- I overruled him first and
10  then I think it was him. I can't remember right now.
11  Somebody mentioned --
12      MR. THOMAS: It was.
13      THE COURT: He went to the standards and
14  then I sustained the objection and I stopped him from
15  doing that.
16      So I don't know how more clear I can be.
17      MR. THOMAS: Well, Your Honor, the motion in
18  limine stated that to prevent -- preclude opinion
19  testimony from lay witnesses concerning whether BDO
20  conducted audits via Bankest's financial statements in
21  accordance with GAAP. It didn't say our witnesses,
22  their witnesses, and you granted the order. The issue
23  came up with Mr. Rivera, as you may recall. I raised it
24  and you said no BDO, so it was clarified then that this
25  applied. You can't ask those questions. You can say

Page 2879

1  where he signed it and you so made clear that it applied
2  to BDO as well as. This is no mystery.
3      THE COURT: That's what I'm telling you.
4  That's not what I'm going to allow. Now, if it
5  applies -- I agree with Mr. Thomas. If you're going to
6  ask for expert opinion concerning the profession, I'm
7  not going to allow you to ask the question because --
8  but if you're not, if you say that you're going to do it
9  the way you just said it, it's a different issue.
10  You're allowed to ask those questions.
11      MS. BITAR: Your Honor, I understand the
12  distinction. Again, the purpose of that motion in
13  limine was to preclude people who were not parties to be
14  testifying.
15      THE COURT: I understand. But if you're
16  going to keep repeatedly asking about it and Mr. Thomas
17  is going to be repeatedly objecting to it and I will be
18  repeatedly sustaining them, then what's the point?
19      MS. BITAR: Your Honor, just so we're clear, I did not ask
20  be clear, I did not ask Mr. Lenner about any specific
21  standard. I asked him who had responsibility to detect
22  fraud and I think that was the question.
23      MR. THOMAS: I don't know of any questions,
24  but that's also improper.
25      Your Honor, just so we're clear, then BDO

Page 2880

1  can ask Mr. Lenner what he did on these audits, but they
2  can't ask him whether what he did on these audits
3  complied with GAAS because that would be --
4      THE COURT: That's correct.
5      MS. BITAR: Your Honor, may I ask a
6  question? Am I not permitted to ask my own witness
7  whose integrity and work is being called into question
8  if he believes he did his job and does he believe he did
9  his job in conformance with the standards he is
10  obligated to follow? I'm not allowed to ask my witness
11  that question?
12      THE COURT: Hold on.
13      MS. BITAR: For example, when a physician
14  takes the stand in a medical malpractice case, he's
15  permitted to say he met the standard of care. We've now
16  heard three weeks of testimony about how Mr. Lenner
17  failed to meet the standard of care. I think we should
18  be entitled to rebut that on our direct examination.
19      THE COURT: I believe this came up in the
20  last trial.
21      MS. BITAR: It did, and we have it right
22  here, Your Honor.
23      MS. SIMON: And I have copies for
24  plaintiffs.
25      THE COURT: He can certainly ask him whether

Page 2881

1  he followed the rules, and he can say yes or something
2  to that effect. Of course he can. And that will be my
3  ruling. But certainly you can ask your witness whether
4  he followed the rules. You can ask a physician that,
5  you can ask Mr. Lenner that, you can whoever has
6  conducted the audits did you apply the rules -- if you
7  applied the rules in his audit.
8      MS. BITAR: Thank you, Your Honor. That was
9  the clarification I needed.
10      THE COURT: Now, it depends on how you ask
11  the question. The question as you posed it, that is a
12  very loaded question.
13      MS. BITAR: Your Honor, would you like the
14  transcript from the prior hearing where you addressed
15  this issue?
16      THE COURT: That would be a good idea to
17  refresh my recollection.
18      MS. BITAR: I'm handing up the trial
19  transcript when this was raised by Mr. Dorta, page 7 on
20  February 22nd.
21      MR. THOMAS: Your Honor, you can do both,
22  right?
23      THE COURT: Yes, I can.
24      MR. THOMAS: As Mr. Lombana has just
25  explained to me the doctor context, he can ask whether

Page 2882

1  he did it right but then he can't start bolstering his
2  testimony by saying he complied with this rule and that
3  rule.
4       And from the last trial, I'm looking at page
5  13 where it was asked, is this one of the standards you
6  were considering when you performed your auditing steps
7  and I objected and you sustained it, that being the
8  idea.
9       MS. BITAR: Actually, Your Honor, I think
10  it's a little bit different than that and this is how I
11  understood Your Honor's ruling. I can ask the witness
12  the question, do you believe you followed the standards
13  of your profession in doing your job. And you'd let
14  that answer stand. You'd also allow me to ask the
15  witness if during the course of his audits he considered
16  a specific part of the literature, for example --
17       MR. LOMBANA: No.
18       MS. BITAR: -- confirmations. And if he
19  considered in conducting his work.
20       MR. LOMBANA: No.
21       MS. BITAR: And he was allowed to testify to
22  that but he was not allowed to testify as to the way in
23  which he considered it was appropriate. And that's
24  where the expert comes in to opine.
25       MR. THOMAS: He's a lay witness and he can't

Page 2883

1  opine whether or not he met the rules or didn't meet the
2  rules.
3       MS. BITAR: I'm not going to ask him on a
4  specific rule if he met it or not but I can ask him if
5  he believes he did his job and conducted the audits in
6  accordance with the professional standard.
7       MR. THOMAS: That's exactly what your motion
8  in limine precluded and precluded Espirito Santo from
9  doing and it's not fair to let BDO do it and that was
10  one with one of their own auditors. If Espirito Santo
11  can't do it, they shouldn't be allowed to do it.
12       MS. BITAR: It's very clear that that motion
13  related to two specific witnesses. That motion in
14  limine discussed those witnesses and it was because of
15  the transgressions of Mr. Freeman and Mr. Rivera
16  providing expert testimony.
17       This is a very different circumstance.
18       MR. THOMAS: Your Honor, in your transcript,
19  do you have pages --
20       THE COURT: I'm on the last page.
21       MR. THOMAS: But do you have pages 12, 14?
22       THE COURT: I have 13, 15 -- no, I don't.
23       MR. THOMAS: You have every other page?
24       THE COURT: I have every other page.
25       MR. THOMAS: So do we. Here is -- Your

Page 2884

1  Honor, I apologize for it being smaller text but it
2  actually has all the pages.
3       THE COURT: (Reading).
4       That was my ruling right now.
5       I quote from the transcript, "I didn't say
6  you didn't read it. I'm not saying you shouldn't. I'm
7  just saying that you can't opine as to why it is -- as
8  to why it is -- as to why it was done that way. It's
9  done that way because the rules provide. You can tell
10  what the rules are and you can say I followed the
11  rules."
12       I believe that's what I said.
13       MR. THOMAS: Your Honor, may I?
14       THE COURT: Yes.
15       MR. THOMAS: The motion that you granted
16  says that the Court should preclude opinion testimony
17  from lay witnesses concerning whether BDO conducted
18  audits of Bankest financial statements in accordance
19  with GAAP and GAAS and you entered that order. And one
20  of their auditors was on the stand, Ramon Rivera, and
21  Espirito Santo was precluded from asking him whether or
22  not their audits followed the rules and he believed they
23  complied with the rules.
24       Now, they've chosen to put a different
25  auditor on the stand and BDO is being permitted to ask

Page 2885

1  the auditor they choose the question you precluded
2  Espirito Santo from asking another one of their
3  auditors. That's unfair. They don't get to pick and
4  choose which auditors they ask if we follow the rules.
5       Now they chose to bring this motion in
6  limine. We didn't. So once they brought the motion in
7  limine and said we can't ask lay witnesses whether or
8  not you followed the rules and complied --
9       THE COURT: Can I see the transcript from
10  that from, Mr. Rivera?
11       MR. THOMAS: From the motion in limine?
12       THE COURT: No, no.
13       MR. LOMBANA: Mr. Rivera's testimony.
14       MS. BITAR: From the initial trial?
15       MR. THOMAS: We never asked the question,
16  Your Honor, because of your motion in limine. We never
17  asked that question because -- not only did -- not only
18  did I not -- did I ask the question and you sustained
19  it, you instructed me I couldn't even ask the question.
20  So I never asked that question of Mr. Rivera, one of
21  their auditors.
22       Now what -- they brought this motion. This
23  chose to say lay witnesses can't give opinions.
24  Mr. Lenner is a lay witness. They can't say, okay, now
25  Espirito Santo, here is one of our auditors. You can't

Page 2886

1   ask him that question, but we're going to choose a
2   different auditor and we're going to put him on the
3   stand and we're going to ask him that question so he'll
4   give the right answer. We know Mr. Lenner will give the
5   right answer because we spent two days preparing him.
6   But Mr. Rivera, we don't get to prepare him so you don't
7   get to ask him that question.
8         You can't stop us and then allow them to
9   pick and choose which auditor, Your Honor. Your order
10  precludes it.
11        MS. BITAR: May I be heard, Your Honor?
12  It's very different.
13        Mr. Rivera's own signature at the time these
14  audits were done indicated that he believed that work
15  was done in accordance with GAAS. The questions that
16  the plaintiffs posed in the first trial to him were, now
17  ten years later with the benefit of all kinds of
18  experience and hindsight, what do you think? Do you
19  still that's a GAAS audit?
20        The question was asked and the objection was
21  sustained. We wanted to make sure that question wasn't
22  asked again because we should not be in a position to
23  object to it.
24        Mr. Freeman had nothing to do with these
25  audits. He has no personal knowledge of any of this.

Page 2887

1   This motion in limine was directed to both of them and
2   that's what's referenced throughout the motion in
3   limine. Mr. Lenner is the fact witness that did the
4   work himself. It would be extraordinarily unfair to not
5   allow me to ask him if he thinks he did his job when for
6   the last two weeks the plaintiffs' focus from their
7   experts was that he didn't.
8         And in fact, if I'm not permitted to ask
9   that question it leads to the conclusion that somehow
10  we're afraid to ask that kind of a question of the man
11  who -- who did the work. And I think it's an extreme --
12  it's very -- the circumstances can be easily
13  distinguished here, Judge.
14        MR. THOMAS: Do you need to hear further
15  from me?
16        THE COURT: Not yet.
17        MS. BITAR: And, Your Honor, if I may be
18  heard, I'm realizing as I read this motion the request
19  was that the plaintiffs should be precluded from asking
20  the lay witnesses, Mr. Rivera or Mr. Freeman, whether
21  BDO performed the audit in accordance with GAAS. That
22  was what we requested.
23        MR. THOMAS: That's just plain incorrect,
24  Your Honor. I can read you from the introduction and I
25  can read you from the conclusion. And the introduction

Page 2888

1   and what you granted in court talks about lay witnesses
2   in both places and you've already affirmed in this trial
3   prior to today that your order applies to both sides.
4   And that was the order you entered and you went so far
5   as to preclude me from even asking any question in this
6   trial. That was their choice. But it's unfair now for
7   them to pick and choose which auditors they get to ask.
8         THE COURT: Okay. Anything else, Ms. Bitar?
9         MS. BITAR: Again, Your Honor, I just refer
10  to the motion and the statement of fact that
11  specifically states that the plaintiffs should not be
12  allowed to ask Mr. Rivera or Mr. Freeman. And the title
13  is not what's operative. It's what the report, the
14  requested --
15        THE COURT: Regardless of what my (inaud.),
16  in essence, Mr. Lenner is a fact witness. He's not an
17  expert. He's not opining in this case. And that is an
18  opinion. And I agree with Mr. Thomas in that respect.
19  It's the same -- I agree with Mr. Thomas
20  that it would be unfair and that's my business. My
21  business is to be fair.
22        MS. BITAR: May I ask a question?
23        THE COURT: Yes.
24        MS. BITAR: May I ask the witness the
25  following: You're an auditor. You rely on certain

Page 2889

1   standards when doing your work. Ask him if he
2   considered X standard, whatever it might be, in
3   connection with his work on this audit. Take his answer
4   yes or no and not ask him the next question, do you
5   think you followed it properly, do you think -- you
6   know -- well, let me withdraw that.
7         I think I should be able to do two things.
8   I think I should be able to show the witness the
9   standard, ask the witness if he is familiar with the
10  standard, ask the witness if he considered the standard
11  when doing the work, and ask him if he believes he
12  followed the standard. Not asking him the ultimate
13  question, do you believe based on all your work your
14  audits were done in accordance with GAAS.
15        That was what this motion in limine speaks
16  to. It doesn't speak to asking a fact witness what
17  standards he applied in doing the work, that's the
18  subject of the litigation. And then it's up to the
19  experts to make a determination if the witness's
20  application of those standards was in accordance with
21  generally accepted auditing standards or not.
22        I mean, how can he be precluded from telling
23  this jury what he did and what he considered when he did
24  his work?
25        THE COURT: Mr. Thomas, do you wish to

Page 2890

1   address that issue as to have you considered?
2         MR. THOMAS: Yes, Your Honor. And by asking
3   him what he considered did you apply that in this audit,
4   that's bolstering. It's just like --
5         THE COURT: I'm not saying apply. If he
6   considered it.
7         MR. THOMAS: If he considered it in doing
8   this audit. I'm going to talk to Mr. Lombana.
9         (Counsel confers.)
10        MS. BITAR: May I say one thing?
11        THE COURT: Hold on. Let me hear a response
12  from Mr. Thomas.
13        MR. THOMAS: I'm trying to understand the
14  analogy to medical. That's why I'm speaking to him.
15        (Counsel confers.)
16        MR. THOMAS: Your Honor, we disagree that he
17  could say that he considered specific standards and
18  applied them. That's bolstering. And by analogy, for
19  example, if a surgeon in a case was asked, did you
20  consider this book when you did it and it says you make
21  the cut here, you can't do those things. In this case,
22  if he's allowed to go through and say each standard he
23  considered in doing your work, that in and of itself is
24  bolstering and inappropriate and also violates the
25  motion in limine.

Page 2891

1         I do believe that she can ask him in general
2   whether he considered the standards in doing it, but I
3   don't think you can go piece by piece through each
4   standard, I think that gets to the same purpose and it's
5   improper under your order and also under bolstering.
6         THE COURT: You wanted to say something
7   else?
8         MS. BITAR: One moment, Your Honor.
9         MS. BITAR: Mr. Alvarez who's done these
10  medical malpractice cases has advised me the first
11  questions you ask the surgeon when he takes the stand
12  are if he followed the standard of care.
13        THE COURT: I disagree with Mr. Alvarez.
14        MS. BITAR: And this is the equivalent of
15  that. Now, if you're not going to let me ask that
16  question, notwithstanding that Mr. Thomas has asked the
17  witness repeatedly are you doing your job, have you done
18  your job, which I think opens the door, Judge --
19        THE COURT: That's what I'm trying to
20  balance.
21        MS. BITAR: Which I think opens the door.
22        THE COURT: I'm trying to balance because I
23  don't want the case coming back on this issue. Maybe on
24  another issue but not this issue.
25        MS. BITAR: What I'm proposing to do, Judge,

Page 2892

1   is there are couple of standards that relate to his work
2   that are very specific to the issues in this case. I
3   was going to ask him if he's familiar with them and ask
4   them -- and ask if he considered them when doing his
5   work. And I think I should be entitled to ask if he
6   believes he complied with them without getting to the
7   ultimate issue about whether this was a GAAS audit.
8         And that's fact testimony, Judge. That's
9   the work he performed and analyzed and he's testified to
10  this before. This is no surprise.
11        MR. THOMAS: She can ask him whether he
12  thought he was doing his job. She can't say you thought
13  you were doing your job and you thought you complied
14  with GAAS or you complied with SAS.
15        THE COURT: I didn't disagree with you on
16  that issue. Now, I will allow this and I will allow her
17  to -- Ms. Bitar. I'm sorry, and I don't mean to call
18  you her.
19        MS. BITAR: That's all right, Judge.
20        THE COURT: I won't allow Ms. Bitar to ask
21  the question as to whether he considered -- no. I'm not
22  going to allow you, Ms. Bitar, to go through every
23  single rule and ask him whether he considered it. I'm
24  not going to allow you to go that extra step. That's at
25  that point I believe Mr. Thomas is correct. And not

Page 2893

1   only is Mr. Thomas correct on one but he's correct on
2   both in that it's opinion testimony and it's unfair at
3   this time to do that.
4         Bolstering, Mr. Thomas has been --
5   there's -- I've been very flexible in that in the
6   bolstering part in your case at this point and I'm going
7   to be -- I have to balance it out. So I'm going to
8   allow you to do that. But I don't know what you're
9   going to use or -- I'm not going to let you go through
10  every single one. If you're going to use a couple of
11  rules, I will allow you to do that, ask the question did
12  you consider it and Mr. Lenner is not to go beyond the
13  yes or no answer.
14        Well, I'll stop if he starts doing it. And
15  I'm not sure Mr. Thomas is not going to get out of his
16  chair.
17        Okay?
18        MR. THOMAS: (Nodding).
19        MS. BITAR: So I'm clear I just want to make
20  sure I'm not running afoul of your ruling. I can
21  present very selective pieces of authoritative
22  literature.
23        THE COURT: Authoritative meaning?
24        MS. BITAR: Meaning GAAS, a couple
25  standards. Ask him --

Page 2894

1       THE COURT:  The SAS rules?
2       MS. BITAR:  Yes, Your Honor, and use our
3   form.
4       THE COURT:  And did you consider them and
5   that's it.
6       MS. BITAR:  If he was familiar with them
7   when he did the work, if he reviewed them and if he
8   considered them.
9       MR. THOMAS:  Your Honor --
10      THE COURT:  If he's familiar with them and
11  whether he considered this.  Reviewing issue, it's
12  analogous even closer to bolstering.  So I will allow
13  you to ask him is he familiar and if he considered it.
14  And that's it.  Nothing more than that.
15      MS. BITAR:  And I'm not permitted to ask
16  him --
17      THE COURT:  I think it's my office.  Hold
18  on.
19      (Judge on the phone. )
20      MS. BITAR:  But I'm not permitted to ask him
21  if he believes he did a GAAS audit?
22      THE COURT:  Absolutely not.
23      MS. BITAR:  Am I allowed to ask him if he
24  thinks he did his job properly?
25      THE COURT:  That's a general question.  I'll

Page 2895

1   allow you to do that.
2       MS. BITAR:  Thank you, Judge.
3       THE COURT:  Do you want to take these back?
4   Bring Mr. Lenner back first.
5       MS. BITAR:  Your Honor, perhaps we want
6   to -- I don't know if we'll get to this in the testimony
7   but I'd like the opportunity to have you or me tell him
8   that.
9       THE COURT:  Since I don't know what you're
10  going to ask him or what you'll use, I will certainly --
11  I will stop him if he says -- what I'm going to do is
12  instruct him to answer yes or no when you ask that
13  question.
14      MS. BITAR:  Okay, Judge.
15      (The witness takes his seat at the witness
16  stand.)
17      THE BAILIFF:  All rise for the jury.
18      (Thereupon, the jury was brought into the
19  courtroom.)
20      THE COURT:  All right.  You may be seated.
21  Ms. Bitar, you may proceed with your direct
22  examination.
23      MS. BITAR:  Thank you, Your Honor.
24      Good afternoon, Mr. Lenner.  Good afternoon,
25  ladies and gentlemen of the jury.

Page 2896

1       DIRECT EXAMINATION (continued)
2   BY MS. BITAR:
3       Q.   When we broke before lunch we were talking
4   about BDO's assurance manual.  Do you remember that
5   testimony generally, sir?
6       A.   Yes.
7       Q.   Mr. Lenner, I'd like you to look at what's
8   been marked Exhibit 118 in evidence at page 518.
9       MS. BITAR:  May I approach, Your Honor?
10      THE COURT:  You may.
11      MS. BITAR:  (Complies).
12  BY MS. BITAR:
13      Q.   And Mr. Lenner, could you identify for the
14  record what that document is, please?
15      A.   Yes.  This is part of our assurance manual
16  and deals with the section accounts and notes receivable
17  confirmations.
18      Q.   Were accounts receivable part of the things
19  you looked at in connection with the performance of your
20  audits of Bankest?
21      A.   Yes.
22      Q.   And does this part of the assurance manual
23  give you guidance in this case?
24      A.   Yes, it does.
25      Q.   Mr. Lenner, I'd like you to look at what's

Page 2897

1   listed at page 518 of the document relating to
2   alternative procedures.  Do you see that?
3       A.   Yes, it does.
4       Q.   And do you remember Mr. Feltman giving some
5   testimony about the use of this assurance manual with
6   respect to the -- your conducting the Bankest audits?
7       A.   Yes.
8       Q.   Could you please blow up the alternate
9   procedure section, please?
10      (Technician complies.)
11      And this talks about the use of alternate
12  procedures to confirm accounts receivable, correct?
13      A.   Yes.
14      Q.   And Mr. Lenner, am I correct that there was
15  very, very low response rates with respect to
16  confirmations that were sent out on the Bankest audits?
17      A.   Yes.
18      Q.   And as a result of that, what did the BDO
19  audit team do?
20      A.   It went into alternative procedures which
21  included examining the invoice, examining the cash
22  receipts, et cetera.
23      Q.   And what does this section talk about with
24  respect to procedures?
25      A.   This speaks to examining the subsequent

Page 2898

1  remittances which is the cash receipts. That's section
2  1. And section 2 deals with examining documentation
3  such as shipping documents, sales invoices, and relevant
4  correspondence according to account balances and
5  checks.
6      Q.   And are those things that the BDO audit team
7  did?
8      A.   Yes.
9      Q.   Mr. Lenner, do you believe you complied with
10  what the assurance manual required or suggested you do
11  with respect to alternate procedures?
12      A.   Yes.
13      Q.   Now, Mr. Lenner, the BDO assurance manual,
14  is it an industry specific document?
15      A.   No, it's not.
16      Q.   Could you tell us why it applies or might
17  not apply relevant to the audits of Bankest, a factoring
18  company?
19      A.   Yes.  This manual is geared for your typical
20  company which is either a manufacturer of a product or a
21  distributor of a product like Sysco or a service
22  company, someone that provides a service for their time.
23      So Bankest was not one of those types of
24  three companies.  It was unique.  It was a factor.  And
25  it's something that's not contemplated in the audit

Page 2899

1  manual.
2      Q.   And so how did you change the procedures in
3  conducting this audit so that it would apply and be more
4  relevant for the type of company you were auditing?
5      A.   We considered what was here.  We also went
6  to the specific literature which is SAS 67.
7      MR. THOMAS:  Objection, Your Honor.
8      THE COURT:  Ask him another question.
9  Sustained.
10      MS. BITAR:  Your Honor, may we approach?
11      THE COURT:  Sure.
12      (Thereupon, there was a side-bar conference
13  outside the presence and hearing of the jury.)
14      MS. BITAR:  I thought your ruling, Judge,
15  was to the following and I wasn't asking what the
16  standards --
17      THE COURT:  I know but he's answering.
18      MS. BITAR:  Well, because they're
19  intertwined.  My point is this.  You said I could ask
20  him did he consider it and he said yes.  But he said --
21  I said did you consider this and he said I considered
22  this and SAS 67.
23      THE COURT:  Well, I don't know what he's
24  going to say next.  That's why I asked you to ask him
25  another question.

Page 2900

1      MR. THOMAS:  Actually, I'm not sure exactly
2  what you said but the impression I got was it all right
3  to carry out your audit, what did you do to make this --
4  if this didn't apply, what did you do and he said I went
5  and looked at SAS 67 which would fall squarely within
6  His Honor's ruling.
7      THE COURT:  That's my problem because I
8  don't know what is going to come out of his mouth next.
9      MS. BITAR:  What he said is I considered
10  this and SAS 67 on confirmations and that's all I was
11  going to ask him.
12      THE COURT:  But I wasn't sure what he was
13  going to answer.
14      MS. BITAR:  I don't know what he's going to
15  say.  All right.  Well, could you tell me what his last
16  answer was and I can go from there?
17      (Thereupon, the court reporter read back the
18  requested portion.)
19      THE COURT:  I don't what he's going to say
20  next.
21      MR. THOMAS:  You asked him how did he change
22  his audit and he said --
23      MS. BITAR:  I said --
24      THE COURT:  My problem is I don't know what
25  he's going to say next.  And I don't know if he's going

Page 2901

1  to explain it.  That's why I told you to ask a specific
2  question.
3      MS. BITAR:  I will ask him then the
4  following:  What is SAS 67 and he's going to say what it
5  is and then I'll move on.
6      THE COURT:  That's fine.
7      (Thereupon, the side-bar conference was
8  concluded.)
9      MS. BITAR:  May I continue?
10      THE COURT:  You may.
11  BY MS. BITAR:
12      Q.   Before the side-bar I believe you testified
13  that you considered what was in the BDO assurance manual
14  and you considered SAS 67.  Do you recall that?
15      A.   Yes.
16      Q.   And what is SAS 67, Mr. Lenner?
17      A.   It's a statement.  It's a statement on
18  auditing standards.  It's promulgated by the American
19  Institute of Certified Public Accountants.
20      Q.   And what does it relate to?
21      A.   It relates to the confirmation of accounts
22  receivable and the related alternative procedures.
23      Q.   Thank you, sir.
24      Mr. Lenner, do you recall that Mr. Feltman
25  also provided some testimony relating to BDO's use of

Page 2902

1   confirmations and sending them out?
2       A.   Yes.
3       Q.   Mr. Lenner, I'd like you to now look at
4   Exhibit 323 in evidence.
5           MS. BITAR:  May I approach, Judge?
6           THE COURT:  You may.
7           MS. BITAR:  (Complies).
8   BY MS. BITAR:
9       Q.   Mr. Lenner, what is Exhibit 323, please?
10      A.   This is the accounts receivable audit
11  program.
12      Q.   And could you tell the members of the jury
13  what that means, the audit program?
14      A.   The audit program lists the procedures that
15  we plan on performing to conduct the audit to gain
16  assurance that the accounts receivable or the particular
17  account is in accordance with generally accepted
18  accounting principles.
19      Q.   And does -- is there an audit plan or
20  program for each of the various financial statement
21  areas that you're going to be performing audit
22  procedures on?
23      A.   Yes.
24      Q.   And so this is the one, the C sections, the
25  C section -- can you blow that up, please?

Page 2903

1           (Technician complies.)
2           That relates to accounts receivable, right?
3       A.   Yes.
4       Q.   And that's what was important with respect
5   to Bankest?
6       A.   Yes.
7       Q.   Now, do you remember Mr. Feltman being asked
8   about this document?
9           MR. THOMAS:  Objection, Your Honor.
10  Commenting on the questions from another witness.
11          THE COURT:  Sustained.
12  BY MS. BITAR:
13      Q.   Do you remember this document being shown in
14  this case, Mr. Lenner?
15      A.   Yes.
16      Q.   You see over here there's a reference to
17  NCN?
18      A.   Yes.
19      Q.   And can we blow up that whole section so
20  that the jury sees what that reference relates to?  This
21  is section D.
22          (Technician complies.)
23          Mr. Lenner, could you explain this portion
24  of the work papers for the members of the jury?
25      A.   This portion of the work papers deal with

Page 2904

1   the confirmation of the accounts receivable and in
2   particular, this section D deals with sending out second
3   confirmations.
4       Q.   Now, this was the -- this was not the first
5   year in which Bankest -- BDO was doing an audit of
6   Bankest, correct?
7       A.   That's correct.
8       Q.   And if you turn, please, to section D-F, it
9   says NCN.  Can we blow up D and the answer, please?
10          (Technician complies.)
11          Mr. Lenner, can auditors when doing their
12  audit in the process of reviewing the planning memos
13  make a determination that a step that they had listed
14  was not considered necessary?
15      A.   Yes, certainly.
16      Q.   And why is that, sir?
17      A.   The audit process is a fluid process.  It
18  can change at any point in time.
19      Q.   Does the accounting literature permit an
20  auditor to change steps as necessary?
21          MR. THOMAS:  Objection, Your Honor.
22          THE COURT:  Sustained.
23  BY MS. BITAR:
24      Q.   Did you consider the accounting literature
25  when a step was changed in connection with the Bankest

Page 2905

1   audit?
2       A.   Yes.
3       Q.   Could you tell the members of the jury how
4   this step, sending out second confirmations, changed
5   over time and why?
6       A.   Certainly.  In the 1998 audit, we sent out
7   the confirmations, we did not get a response, so we sent
8   out seconds.  In the 1999 audit, we sent out
9   confirmations, first.  We did not get a response so we
10  sent out seconds.  And we did not get a response either.
11  The accounting literature --
12          MR. THOMAS:  Objection, Your Honor.
13          THE COURT:  Ask him another question.
14  BY MS. BITAR:
15      Q.   Did you consider the accounting literature
16  which permits you to rely on history with a client --
17          MR. THOMAS:  Objection in the question, Your
18  Honor.
19  BY MS. BITAR:
20      Q.   Did you consider the accounting literature
21  which permits you --
22          MR. THOMAS:  Objection, Your Honor.
23  BY MS. BITAR:
24      Q.   -- to consider the history of the client --
25          THE COURT:  Sustained.

Page 2906

BY MS. BITAR:
1  BY MS. BITAR:
2      Q.   Mr. Lenner, we've just -- we've sat through
3  several weeks of this trial and heard a lot of testimony
4  about the work that the BDO audit team performed.  Let
5  me ask you this question.  Do you believe that you did
6  your job?
7      A.   Yes, absolutely.
8      Q.   And if you didn't think you had done your
9  job, would you have permitted BDO to issue audit
10 opinions in accordance with generally accepted auditing
11 standards?
12     A.   I personally would not be associated with a
13 financial statement in which I did not do the right job
14 nor would I let my firm be associated with a financial
15 statement in which we didn't conduct it in accordance
16 with generally accepted auditing standards.
17     MR. THOMAS:  Objection, Your Honor.
18     THE COURT:  Overruled.
19 BY MS. BITAR:
20     Q.   Mr. Lenner, let's talk a little bit about
21 how an audit works.  In a nutshell, let's say you have a
22 new client, how do you assemble a team?
23     A.   The first thing you do is you try to learn a
24 little bit about the business.  Then after you have an
25 understanding as to what type of industry the business

Page 2907

1  is in, you discuss it with the partners and you look for
2  the people in your office that have the relevant
3  experience who can properly service the account.
4      Q.   And once that determination is made, how is
5  the team assembled?
6      A.   What happens next is we have a scheduling
7  meeting.  Then we decide which people will be assigned
8  to the job.  Then we decide which manager, which senior,
9  and which staff will be assigned to the audit.
10     Q.   And do auditors on a job have specific
11 titles?
12     A.   Yes.
13     Q.   Referring to the Bankest audits, what were
14 the levels of audit staff you had when conducting those
15 audits?
16     A.   Starting with the lowest level and then
17 working up, the first level would be your staff
18 accountant.  Typically it would be a person with
19 anywhere from a couple months to a couple years of
20 experience.  Then you would have a senior accountant
21 which would have anywhere between three to six years
22 experience.  Then there would be a manager on the
23 assignment that could have anywhere between seven to 12
24 years of experience.  Then there would be a partner, the
25 engagement partner.  And in this assignment that was me.

Page 2908

1  And then after me, it would be the concurring partner.
2  And that would be a second partner who's assigned to a
3  particular type of engagement to provide a second set of
4  eyes as part of your quality control function.
5      Q.   And what do you mean by a second set of eyes
6  in these circumstances?
7      A.   What I mean by that is if an audit
8  engagement is deemed sensitive and it's a firm
9  requirement to have a concurring partner assigned to the
10 engagement which was the case here.
11     Q.   Now we've heard some discussion about field
12 work.  What is field work?
13     A.   Field work is the work that you do at the
14 client's office.  We call that the field.  So it's
15 generally where most of the audit work is performed.
16     Q.   And who are the people that are generally in
17 the field conducting an audit?
18     A.   It would be the people that perform most of
19 the -- spend most of the time there and that would be in
20 this order, the staff, and the senior.  They're there
21 most of the time.  The manager there is to supervise and
22 to review.  He or she is there for a considerable amount
23 of time.  And then there is the two partners, myself and
24 the concurring partner.
25     Q.   And are you in the field reviewing the work

Page 2909

1  or is that generally done after the work is finished?
2      A.   I'm generally in the field reviewing the
3  work.  It doesn't happen all the time but I try in most
4  situations to actually be at the client's office to
5  perform my job.
6      Q.   Now, let's give some perspective.  How long
7  did an audit -- does an audit like Bankest take?
8      A.   An audit like Bankest took anywhere between
9  350 to 450 hours over the period of time that we were
10 performing the audit.  So it's -- each year it would
11 take between 350 to 450 hours.
12     Q.   And is that the amount of time that all the
13 auditors spend or is that 300 or 400 each person?
14     A.   No.  That is the total of all the auditors
15 together each year.
16     Q.   And you said over the period of time.
17 Generally speaking, how long does an audit take and when
18 is it done relative to the last day of the -- relative
19 to the balance sheet date?
20     A.   We would generally perform a little work in
21 the fourth quarter.  That would be sometime between
22 September, October, and November, do some work then.
23 But most of the work occurred in January, February.
24 That's after the company was able to close out their
25 books.  That was when most of the work occurred.

Page 2910

1   January, February, sometimes March.
2       Q.   And to be clear, when you say close out
3   their books, what was the date in which Bankest would
4   yearly close out its books?
5       A.   Close out the books, broadly speaking, just
6   means to get the books ready to be audited and Bankest's
7   year-end was December 31st.
8       Q.   And that's why when we look at the financial
9   -- the audit opinions they're as of 12-31 of a
10  particular year; is that right?
11      A.   Yes.
12      Q.   Now, what is an audit opinion?
13      A.   The audit opinion is generally the first
14  page of the audited financial statements which are
15  behind it.  And that's what the audit firm is giving the
16  client.  The audit opinion states that we have audited
17  the financial statements for a particular time period.
18  It also states that the -- that we conducted the audit
19  in accordance with the generally accepted auditing
20  standards.
21          And then at the end we give an opinion that
22  in all material respects, the financial statements are
23  fairly presented.
24      Q.   Now, Mr. Lenner, I just pulled one up on the
25  screen to help the jury.  Is this an example of a

Page 2911

1   financial statement?
2       A.   That would be the first page known as the
3   cover sheet.
4       Q.   And if you go to the second page, please.
5          (Technician complies.)
6          Where it says independent auditors' report.
7   Is that what you mean by the audit opinion?
8       A.   Yes.
9       Q.   And is that what BDO is responsible for?
10      A.   Yes.
11      Q.   And then could you turn to the next page
12  please, Glenn?
13          (Technician complies.)
14          Then you get into the actual financial
15  information itself, correct?
16      A.   Yes.
17      Q.   And who's responsible for the financial
18  statements of the company?
19      A.   Its management and it says that on the first
20  page.
21      Q.   Now, when we say that the company's
22  financials present fairly in all material respects, what
23  does that mean?  Does it mean as of a certain point in
24  time?
25      A.   It means that the financial statements have

Page 2912

1   been prepared by the company, by the client, in
2   accordance with generally accepted accounting
3   principles.  So they're fairly presented because that's
4   the benchmark that you have to compare the client's
5   financial statements against those principles of
6   accounting.  And the financial statements are always at
7   a particular point in time.  There's a balance sheet
8   which is as of, in this case, December 31st, and then
9   there is the income statement which is another important
10  financial statement in the set of financial statements
11  that are given to the clients each year.
12      Q.   Let me ask you this question then.  When BDO
13  does an audit, is it opining about the financial
14  condition of the company as of the balance sheet date?
15      A.   Yes.
16      Q.   So if something happens a day later, is BDO
17  rendering an opinion on the financial statements of the
18  company on January 1st?
19      A.   No.
20      Q.   Now, why would a June 30th balance sheet be
21  different than a December 31st balance sheet?
22      A.   A December 31st balance sheet is as of a
23  particular point in time.  In the case of Bankest, the
24  predominant asset there, as we hear, is the accounts
25  receivable.  That accounts receivable is collected every

Page 2913

1   couple of months and the new receivables are purchased.
2   So it's a very fluid process constantly
3   changing every day.  And certainly after six months at
4   June 30th it would be a totally different set of
5   information that's in the financial statements.
6   Different invoices were being purchased as well as it
7   could conceivably be different customers.
8       So it's a totally different balance sheet as
9   of June 30th when compared to December 30th.
10      Q.   And is that, Mr. Lenner, because if most of
11  these receivables have a 90-day payment cycle, three
12  months after an opinion is issued those receivables are
13  no longer on the books, they've been paid for and new
14  receivables have been purchased, correct?
15          MR. THOMAS:  Objection.  Leading, Your
16  Honor.
17          THE COURT:  Sustained.  Sustained.
18  BY MS. BITAR:
19      Q.   Why is three months relevant at Bankest,
20  Mr. Lenner?
21      A.   Well, in the example that I just gave you
22  was six months.  Certainly three months is relevant,
23  too, because the receivables turn over, that means they
24  are collected.  Generally the terms were 90 days.  They
25  could vary.  But, generally speaking, if the term is 90

Page 2914

1    days it means the receivable should be collected in 90
2    days and then a new receivable is purchased.
3            So it's basically very stale information if
4    you look at December 31st and you look at March or June.
5    It's apples and oranges.
6        Q.   Now, does an audit determine how a company
7    is doing throughout the year?
8        A.   Yes.
9        Q.   In what respect?
10       A.   That would be the income statement and the
11   income statement has basically three important items.
12   One is revenue, the second one is expense, and the third
13   is net income.  That's if you're making money or losing
14   money.
15           In the income statement its purpose is
16   basically it aggregates all of the revenue that the
17   company is earning for each of the 12 months as well as
18   all the expenses that the company is paying each of the
19   12 months.
20           So the income statement is very similar --
21   looking at the revenue it would be very similar to a W-2
22   that you would get from your employer.  It's what you
23   earned for a period of time.
24       Q.   Does the balance sheet reflect how the
25   company does throughout the year?

Page 2915

1        A.   No.  The balance sheet is just a snapshot.
2    It's what they have which is a receivable.  What they
3    owe.  It's similar to your checking account or your
4    credit card statement.  It's what you owe at a
5    particular point in time in your credit card statement
6    or what you have in your own bank account.  That's what
7    the balance sheet is.
8        Q.   And in the Bankest case, that was as of
9    12-31 of a particular year?
10       A.   Yes, it was.
11       Q.   Now, Mr. Lenner, we've heard some testimony
12   about internal controls.  Have you heard some of that
13   testimony?
14       A.   Yes.
15       Q.   Could you explain to the members of the jury
16   what is internal control and why it's important in
17   connection with an organization?
18       A.   Okay.  Internal control is very important.
19   And what it is, it's a process that's affected by the
20   company's board and management to achieve certain stated
21   objectives.  The three primary objectives are
22   reliability of the financial statements, efficiency and
23   effectiveness of the company's operations and third,
24   compliance with the laws and regulations for that
25   industry.

Page 2916

1        Q.   Now, talking about Bankest, did you -- did
2    the BDO audit team consider the internal controls of
3    Bankest when making a determination about how to conduct
4    the audits of Bankest?
5        A.   Yes.  What we considered is within the
6    internal controls structure, it just described a
7    process.  And the process leads to the recording of
8    financial and non-financial information for any company.
9    An internal control, is the -- what we consider and what
10   the company has to have and most companies have this, is
11   the first element which is probably a very important
12   element and it's called the control environment.
13           And the control environment is the tone at
14   the top that's set by the board to run the business.
15   It's basically the control consciousness and I'll
16   explain controls next.
17           What these controls are, these control
18   activities, these are policies and procedures that have
19   to be in place for the company to run their business to
20   reach their stated objectives.  Policies and procedures
21   would be some examples, would be review and approval
22   process, two signatures on a check, just where there is
23   someone reviewing what someone else is doing.
24           The third aspect is part of a control
25   environment that we assess, is the risk assessment.  And

Page 2917

1    that deals with what is the extent of or what is the
2    degree of the risk that the company is undertaking or
3    how it assesses these risks in conducting their
4    business.
5        Q.   Now, Mr. Lenner, I don't mean to interrupt
6    you but I want to make sure you're answering my question
7    and maybe you are.  What is inherent risk?
8        A.   Inherent risk is a risk that's very specific
9    to the industry as well as to the company.  It basically
10   is the risk that there might be a material misstatement
11   in the event that there are no controls.  Like we just
12   spoke about, if the controls aren't there, how
13   susceptible is this company's product or business to a
14   risk.  And the typical example would be a jewelry store.
15           A jewelry store without controls is very
16   susceptible to the risk of fraud.  Someone might steal
17   something and the controls are not working.  Controls
18   have to be in a jewelry store and if the controls are
19   working, then that's good.  Compared to a company where
20   the product is not so susceptible, would say a company
21   that manufactures mattresses and box springs, that
22   generally just keeps inventories of coils, wood, canvas.
23   That type of inventory product is not susceptible to a
24   fraud.  It's very hard for that kind of product to be
25   put into the pickup truck and be driven away.

Page 2918

1    So inherent risk deals with what the
2 business -- you know, the business without any type of control
3 misstatement in the business without any type of control
4 activities or any controls.
5    Q.   Okay. Now, understanding that different
6 types of companies have different inherent risks, is
7 there another part of the analysis called control
8 strengths?
9    A.   Right.
10    Q.   What is that, sir?
11    A.   Controls strengths are -- if you remember in
12 that example before a couple of minutes before -- are
13 the control activities that are put there by the company
14 to offset, to mitigate, to deal with those risks of
15 something going wrong, of a material misstatement
16 happening.
17    Some control strengths would be -- some
18 examples would be -- at the higher level would be an
19 active board in running the company. That's a good
20 control strength.
21    A second one which is very simple and very
22 basic is experience. If the board and management have
23 experience, that's a control strength. And then getting
24 a little granular, another example would be if the board
25 oversees the control activities in the business. That's

Page 2919

1 good. And the board is in favor of having good controls
2 in place.
3    So those are control strengths that offset
4 those inherent risks that we've been speaking about.
5    Q.   Now, when auditing a company and let's use
6 Bankest as an example because that's what's relevant in
7 this case, did BDO consider both the inherent risks and
8 the control strengths when developing an audit plan to
9 audit the company?
10    A.   Yes. Of course.
11    Q.   And how is that done in terms of the work
12 papers because we're going to be looking at some of them
13 now?
14    A.   We have -- like many other national firms,
15 we have questionnaires that deal with identifying those
16 inherent risks as well as questionnaires that deal with
17 the control strengths. So the idea is when we start the
18 audit, is to identify the inherent risks and then to
19 identify the control strengths.
20    Q.   And once you analyze those two factors, why
21 do you do that?
22    A.   You have to offset -- you have to match the
23 control strengths to the inherent risks because we're
24 doing that on an account by account level. What I mean
25 by that is we do it for all the accounts on the balance

Page 2920

1 sheet and if you remember, there are about six or seven
2 accounts beginning with cash and accounts receivable and
3 a few other accounts.
4    We do that for each account because we want
5 to understand what are the risks of misstatement for
6 that particular account. And in order to do that you
7 have to understand the risks and you have to understand
8 the control strengths that are there to offset the
9 risks.
10    So that's what we do on each and every
11 audit, including the Bankest audit.
12    Q.   Now, Mr. Lenner, is that process part of
13 audit planning?
14    A.   Yes, it is.
15    Q.   Why is audit planning important?
16    A.   Audit planning is important because like
17 anything you do in life, it's always a good idea to plan
18 what you do. But it's particularly important for the
19 auditor because the auditor has to first determine what
20 is the risk of misstatement and after you do that, you
21 determine your audit procedures.
22    So that's -- part of the audit plan is first
23 determining the risk profiles for each account that
24 you're going to be auditing. Then after you have an
25 understanding of the risk profiles, then you design what

Page 2921

1 you're going to do to be satisfied that that account is
2 fairly stated.
3    Q.   Now, let me ask you a question. The higher
4 the risk -- is it fair to say the higher the risk
5 generally the more steps you're going to perform?
6    A.   Yes.
7    MS. BITAR:   Your Honor, may I approach the
8 witness?
9    THE COURT:   You may.
10 BY MS. BITAR:
11    Q.   Mr. Lenner, I'd like you to look at Exhibit
12 3003 in evidence. Could you identify it for the record?
13    A.   Exhibit 3003 is a compendium of the work
14 papers for the E.S. Bankest audit for the year-ended
15 December 31, 1998.
16    Q.   Now, Mr. Lenner, I'd like to direct your
17 attention to page 143 of the 1998 audit and we're
18 going -- I'm going to be asking you a bunch of questions
19 about this audit as an example year. Okay?
20    A.   Yes.
21    Q.   Now, Mr. Lenner, the first document I'm
22 showing you is called the audit engagement planning
23 memo. Could you tell the members of the jury what this
24 document is?
25    A.   What this document is it's a checklist.

Page 2922

1    It's a reminder of the procedures that each auditor must
2    complete for sensitive engagements in connection with
3    the completion of the planning stage of the audit which
4    was before you carry out the audit plan. These are a
5    bunch of questions that we need to respond to to help us
6    understand and properly plan the audit.
7        Q.   Let's go to part A. It says are the
8    following conditions present. If you go to Number 2 it
9    asks -- part A, Glenn.
10            (Technician complies.)
11            And Number 2. Part A 1 B, significant
12   changes. Can you blow that up, please?
13            (Technician complies.)
14            The question reads, "Are there significant
15   changes in officers, directors, more than 20 percent
16   stockholders or any other individual or entities that
17   could significantly influence the financial statements?"
18   Do you see that?
19       A.   Yes.
20       Q.   And the audit team checked off yes?
21       A.   That's correct.
22       Q.   Why is that an important question?
23       A.   Well, if you -- if there were changes in
24   who's running the business which are typically officers
25   and directors, it could have an effect on your plan

Page 2923

1    because if this was the second year of doing the audit
2    and you thought there was one set of shareholders in
3    place and it changed, then if it changed then you'd want
4    to note it here.
5        So it's something that you want to make sure
6    that you've considered that in your audit plan.
7        Q.   And looking at some of these other
8    questions, you consider questions like if there's been a
9    conviction of a client or an employee, if there's been
10   any illegality, if there's been threatened litigation,
11   those are the types of things you think about when
12   making a determination about how to plan the audit?
13       A.   Absolutely.
14       Q.   I read -- if we can blow that up? "Is there
15   a financial interest of firm member in client or a new
16   relationship that might impair our objectivity?" Do you
17   see that?
18       A.   Yes, I do.
19       Q.   So in planning for the audit you also
20   consider from the initial stages if there are any issues
21   relating to the objectivity of the audit team in
22   performing the work?
23       A.   Yes, we do.
24       Q.   Turning to the next page of the document up
25   at Number 3 it reads -- blow that up -- "Have we updated

Page 2924

1    the permanent file?" That refers you to the audit
2    manual. What is the permanent file, sir?
3        A.   A permanent file is a document -- looks
4    something like this, and what it has it has documents
5    that are permanent in nature such as a factoring
6    agreement in this case. Or a typical permanent file
7    would have a lease agreement, things that are going to
8    carry over year after year as well as certain policies
9    and procedures as to the company's controls. Items like
10   that are typically in a permanent file.
11       Q.   Are private placement memorandums contained
12   in a permanent file?
13       A.   Yes.
14       Q.   Are leases contained in a permanent file?
15       A.   Yes.
16       Q.   Is it the type of documents that have
17   continuing life that might be used from audit year to
18   audit year?
19       A.   Yes.
20       Q.   Going to the bottom of this document at
21   number 19, one of the questions relating to the planning
22   of the audit says, "Have we communicated with management
23   regarding significant matters relating to the planning
24   process and documented our understanding as to the
25   assistance to be provided by the client's personnel, for

Page 2925

1    example, the PBC schedule?" Why is that important and
2    what is a PBC schedule?
3        A.   A PBC schedule is a document that -- well,
4    first let me start by explaining what PBC means. It
5    means prepared by client. So it's a list of documents
6    that we would like the client to prepare for us in order
7    for us to complete the audit or to gain certain audit
8    evidence that we need. It's a very fluid process. It's
9    a document that changes. It starts off at the first
10   week of the audit or maybe a week before the audit even
11   begins and it's constantly updated. As the audit
12   develops and as we gain new information about the audit
13   we adjust this PBC list.
14       Q.   And, Mr. Lenner, is it -- am I correct that
15   you need assistance from the audit client to undertake
16   the audit?
17       A.   Absolutely, yes.
18       Q.   Now, going to the next page of the document,
19   up at the top it says, "Documentation of preliminary
20   estimate of materiality."
21       A.   Yes.
22       Q.   And could you explain what that is and why
23   that's important in planning an audit?
24       A.   Okay. Whenever you plan the audit since the
25   audit is a -- you perform selective tests. You don't

Page 2926

1  examine every single number, every single transaction.
2  What helps the auditor is the determination of what's
3  called the materiality. And materiality is, generally
4  speaking, a number by which a misstatement of that
5  number or the omission of that number might affect the
6  user's judgment about the financial statements should he
7  or she have known about that number. So that's
8  materiality.
9       It's something that's very prevalent in all
10  audits. And in this case the materiality determined was
11  about $175,000.
12     Q.   And, Mr. Lenner, so I'm understanding
13  correctly, you're saying that for a particular account
14  balance the audit team makes discussions about basically
15  a threshold number about what might matter or might not
16  matter about the reading of the financial statements?
17     A.   Yes.
18     Q.   And when you're considering issues like
19  materiality, does that factor into how you're actually
20  going to test certain accounts?
21     A.   Yes, it does.
22     Q.   And is a determination of materiality set
23  just by the audit team or is there guidance from any
24  others at BDO associated with the audit?
25     A.   The materiality is initially set by the

Page 2927

1  senior or the manager. It's discussed as part of the
2  planning. It is approved by the partner. Sometimes we
3  will go out of the office to a specialist and seek their
4  approval in certain situations.
5     Q.   And was that done in the Bankest audits?
6     A.   Yes, it was.
7     Q.   And who was the person that provided
8  assistance on making determinations about materiality?
9     A.   Over the years I think it was either one
10  or -- either Ms. Eileen McGinley or Ms. Carla Freeman.
11     Q.   And are those two of the people that are
12  technical advisors that we've been hearing about?
13     A.   Yes. These people -- BDO has many regional
14  technical advisors as well as specialists throughout the
15  firm. And when we need their support, it's very common
16  to converse with them and to discuss a particular issue
17  with them.
18     Q.   Turning to page 148 of the document at BDO
19  641, this part of the planning required that BDO audit
20  team consider who is going to be the engagement team,
21  correct?
22     A.   Yes.
23     Q.   And then below that it asks that you
24  document the industry experience of the engagement team.
25  Do you see that?

Page 2928

1     A.   Yes.
2     Q.   And someone wrote in here that the
3  experience was adequate. Why did you believe when you
4  conducted this audit that the experience of the team was
5  adequate?
6     A.   The experience of the team was adequate
7  because starting with our manager, he had financial
8  institution experience, about ten years experience in
9  total.
10     Q.   Who was that, by the way?
11     A.   Mr. Rivera. Secondly, the concurring
12  partner, Mr. Keith Ellenburg, he was in charge at that
13  time of our financial institution practice which is
14  primarily banks and mortgage bankers. And he certainly
15  had a wealth of experience.
16       Myself at that time I had clients that were
17  in the financial services business as well as I had
18  experience with factors from the client side where my
19  clients were -- some of my clients were borrowing money
20  from factors or selling their receivables to factors and
21  had experience from that side.
22       So taking that all together, we believed
23  that we had sufficient experience to conduct this audit.
24     Q.   Turning to the last page of the planning
25  memo, please. It states conclusion. Blow that up,

Page 2929

1  please.
2       (Technician complies.)
3       And it says, "We've reviewed the planning
4  documentation contained herein and we are satisfied that
5  the planning process has been completed, the budget
6  realistic, and specific consideration has been given to
7  performing an effective audit" -- excuse me, "has been
8  given to performing effective audit procedures in the
9  most efficient manner."
10     Mr. Lenner, why is that important as part of
11  the planning of the audit?
12     A.   Well, before you go into the next phase
13  which is after planning we call execution or performing
14  the audit, it's really important that the engagement
15  team, we all agree on the plan and we're satisfied that
16  this checklist was complete which is a compendium of
17  everything that's important and we want to make sure and
18  we document that agreement by signing off in this
19  conclusion section.
20     Q.   Now, Mr. Lenner, let's talk about some of
21  the other planning documentation. Let's go to the
22  inherent risk questionnaire. Do you have that document,
23  sir? I'll give you the Bates stamp.
24     A.   Please do -- I --
25       (Complies.)

Page 2930

1      Q.   We're at BDO 164 at Bates stamp 657.  Do you
2    have that, sir?
3      A.   Yes.
4      Q.   Now, Mr. Lenner, we've seen some of the
5    questions on the inherent risk questionnaire but we're
6    going to look at some other ones, okay?
7      A.   Yes.
8      Q.   The first part of this inherent risk
9    questionnaire talks about management characteristics.
10   Do you see that?
11     A.   Yes.
12     Q.   When you were discussing before the
13   assessment of the inherent risk and the control
14   strengths, is this the form that the audit team fills
15   out relating to its analysis of the risks?
16     A.   This particular page deals with the
17   first part that I was discussing and that's assessing
18   the inherent risks of the client that you're about to
19   audit.
20     Q.   And the first set of questions relates to
21   management characteristics, correct?
22     A.   Yes, it does.
23     Q.   Let's just look at a few of these so we can
24   all get a flavor of the types of things you look at.
25   Question one reads, "Are the entities operating and

Page 2931

1    financial decisions dominated by a single person?"  Do
2    you see that?
3      A.   Yes.
4      Q.   And the BDO team answered no, correct?
5      A.   Yes.
6      Q.   And that C.M. is Mr. Mohr?
7      A.   That's correct.
8      Q.   Why is that an important question in
9    considering the risks associated with auditing the
10   company?
11     A.   Well, if there's a person that's domineering
12   in management, there is a risk that that person might
13   override the internal -- one of the internal control
14   activities by doing more things himself and not letting
15   other people do their jobs because he or she wants to
16   override and possibly misstate the financial statement.
17   So it's important that we want to know if the business
18   that we're about to audit has a domineering person or
19   not.
20     Q.   Is there a concept in auditing known as
21   segregation of duties?
22     A.   Yes.
23     Q.   How does it apply to this question?
24     A.   Well, if you have a domineering person, that
25   person might prevent that segregation of duties.  And

Page 2932

1    what I mean by that segregation of duties very simply
2    speaking is having a person checking another person in
3    your job.  So a domineering person might override that
4    and do it himself.  So you can't -- it might be a risk
5    if you have a domineering person there.  Because there's
6    a risk that that person might override the segregation
7    of duties function.
8      Q.   Now, question three reads, "Do management
9    lack sufficient relevant experience and knowledge to
10   operate this business effectively?"  Do you see that?
11     A.   Yes.
12     Q.   And the team answered no, right?
13     A.   Yes.  That's correct.
14     Q.   Why is making a determination about the
15   significant relevant experience of management important
16   when assessing inherent risk?
17     A.   Well, if you have a new company or you have
18   new management and they're not familiar with the
19   industry, they're not familiar with the business, then
20   they're probably not going to make the right decisions
21   in running their business.
22          So it's always better from a risk
23   standpoint, it's less risk if management is experienced
24   when they run a particular business.
25     Q.   Then if you go to question 9 it asks, "Are

Page 2933

1    management inclined to accept unusually high business
2    risks?"  Why is that question important in assessing the
3    risk of an organization?
4      A.   Well, if management is inclined to take high
5    business risks, then there is the potential that they
6    might shortcut something, they -- because if they're
7    taking a higher risk they want to make more money and if
8    they're going to be doing that, they might be motivated
9    by the money and they might just take a lot of risks.
10   And that would present an audit problem to us because
11   we'd have to implement more procedures to deal with
12   those types of risks.
13     Q.   Turning to the second page of the document,
14   question 16 asks, "Does management have a poor attitude
15   and discipline toward controls and their enforcement,"
16   and then question 17 asks if management has a poor
17   attitude toward compliance with external legislative or
18   other regulatory obligations.
19          Why are these the type of questions you need
20   to consider when making a determination about the
21   inherent risk of auditing a company?
22     A.   Well, these two questions deal with what I
23   was explaining a little earlier before in the first and
24   very important aspect of internal control and that deals
25   with the tone at the top.  What exactly is management

Page 2934

1   all about and what is their attitude in controls.
2   That's what question 16 deals with and 17 deals with if
3   they're just not respective of the regulatory rules and
4   requirements that's somebody that's going to -- that
5   might have some problems and we want to know that.
6       So in this case, Mr. Mohr answered no and it
7   was our view that there wasn't a poor attitudes towards
8   the compliance with legislation.
9       Q.   Now, when BDO was filling out this
10  questionnaire in 1998 -- actually in 1999 in connection
11  with their 1998 audit, was this the first year that
12  Bankest was in existence?
13      A.   Yes.
14      Q.   And were at least some of the people that
15  were in charge of Bankest people who you had familiarity
16  with because they had been running BRFFC?
17      A.   Yes.
18      Q.   And so did that factor into some of the
19  conclusions that were rendered by the audit team when
20  answering these questions?
21      A.   Yes.
22      Q.   Mr. Lenner, let's turn to questions 18 and
23  22 which we've all seen many times now.  Do you have
24  those questions?
25      A.   Yes.

Page 2935

1       Q.   Let's go to question 22.  Now, this is the
2   section that relates to engagement characteristics,
3   correct?
4       A.   Yes.
5       Q.   What are engagement characteristics, sir?
6       A.   They are particular attributes that are
7   unique to the particular audit client and some of the
8   examples would be here if -- looking at 21 -- if this
9   particular client, this entity is prone to be involved
10  in a large number of lawsuits.  That's an engagement
11  characteristic, something that's specific to the
12  engagement or specific to the client.
13      Q.   And turning to 18 and 22, those questions
14  were answered by Mr. Mohr, correct?
15      A.   Yes.
16      Q.   And this was his first year working on
17  Bankest, correct?
18      A.   Yes.
19      Q.   And it's the first year Bankest existed?
20      A.   Yes.
21      Q.   Going to question 22, it says, "Does the
22  entity have plans to raise financing using these
23  financial statements," and he answered yes and then the
24  financial statements are included as part of the
25  debenture private placement memo, right?

Page 2936

1       A.   Yes.
2       Q.   Mr. Lenner, referring now to Bankest in
3   1998, did you know that to be the case?
4       A.   That was not the case.
5       Q.   Take that down.
6           (Technician complies.)
7           Mr. Lenner, could you walk the jury through
8   your understanding of the use of BDO's audit opinions in
9   connection with private placement memorandums starting
10  with the predecessor entity BRFFC?
11      A.   When we were performing the audit of this
12  predecessor entity BRFFC, which was for the year-ended
13  December 31, 1995, we were aware that they might use the
14  financial statements in a private placement.
15          If they were going to do that, then there
16  was certain obligations that they had to follow.  And
17  that's when, you know -- that's when we had some trouble
18  with them even way back when.
19      Q.   Now, is it fair to say then that there's two
20  questions that have to be considered.  One, when you're
21  starting -- when you're going through this planning
22  process, does the audit team have an understanding that
23  the financials may be used in connection with the sale
24  of securities, correct?
25          MR. THOMAS.  Objection.  Leading, Your

Page 2937

1   Honor.
2           THE COURT:  Sustained.
3   BY MS. BITAR:
4       Q.   Mr. Lenner, what are the two considerations
5   that go into your head when considering the use of BDO's
6   audit opinion?
7       A.   Well, in 1995 when we were aware that they
8   might use the audit opinion in a private placement, the
9   obligations that they had would be to make us aware of
10  it by giving us the financial statements as well as the
11  private placement in sufficient time for us to review
12  the private placement and for us to review the audited
13  statements, again just to be sure that they haven't
14  changed.
15      Q.   So to kind of sum this up, you start working
16  on this new client, correct?
17      A.   Yes.
18      Q.   And you interview the client, correct?
19      A.   Yes.
20      Q.   And you develop an understanding that they
21  may be using your opinion for the placement of notes,
22  correct?
23          MR. THOMAS:  Objection.  Leading.
24          THE COURT:  Sustained.
25  BY MS. BITAR:

Page 2938

1    Q.   What understanding do you develop,
2  Mr. Lenner, about the use of BDO's financials with
3  respect to the placement of debentures?
4    A.   In 1995 it was our understanding that they
5  might use the financial statements in a private
6  placement.
7    Q.   Now, once you understand that at the
8  inception of the audit, what's the next thing that has
9  to happen before the opinion, the BDO opinion can be
10  used?
11    A.   They need -- the company, the client needs
12  to contact the audit firm and to deliver to them the
13  private placement memorandum in its full form along with
14  the audited financial statements.  So we have the time
15  to review the PPMs as well as the financial statements
16  again.
17    Q.   Let's look at Exhibit 63-A.  Can you
18  identify that document, please, for the jury?
19    A.   That is our engagement letter for the first
20  audit of BRFFC.
21    Q.   And Mr. Lenner, could you show us where
22  there is the separate and independent requirement that
23  the client has to give these statements to you for your
24  review before the opinion can be attached?
25    A.   Yes.  If you go to page 2, it's the top two

Page 2939

1  paragraphs.
2      MR. THOMAS:  Objection, Your Honor.  This
3  document is not in evidence but I'll agree that it comes
4  in.  As far as we can tell it's not.
5      MS. BITAR:  I believe it was entered through
6  Mr. Ellenburg.
7      THE COURT:  My clerk will figure it out.
8  That's her job.  I'll lay the foundation if I need to.
9  I apologize.
10      MR. THOMAS:  I'll stipulate to it.
11      THE COURT:  63, according to my clerk this
12  is in.  63-A is not.  So without objection -- mark it
13  then Defendants' Exhibit -- is it defendant or
14  plaintiff?
15      Plaintiffs' Exhibit 63 marked for
16  identification is now Defendants' 63 in evidence.
17      MS. BITAR:  63-A.
18      THE COURT:  I'm sorry, 63-A in evidence.
19      MS. BITAR:  Thank you.
20  BY MS. BITAR:
21    Q.   Mr. Lenner, turning to the second page of
22  the engagement letter --
23    A.   Yes.
24    Q.   -- could you identify where in this document
25  it indicates that the client needs to provide this

Page 2940

1  information for your review before the opinion can be
2  issued?
3    A.   It's in the first two paragraphs.
4    Q.   Can we blow that up, please, Glenn?
5      (Technician complies.)
6      Are those the two paragraphs you're
7  referring to?
8      Now, Mr. Lenner, is it your understanding
9  that those requirements exist in every one of the
10  engagement letters relating to all the Bankest audits as
11  well?
12    A.   Yes.
13    Q.   Now, I believe Mr. Thomas showed either you
14  or Mr. Ellenburg Exhibit 61.  Can you please look at
15  that?
16      MS. BITAR:  May I approach, Judge?
17      THE COURT:  You may.
18      MS. BITAR:  (Complies.)
19  BY MS. BITAR:
20    Q.   Turning to the second page, this has
21  language that's a little bit different than the other
22  ones we've seen.
23      Do you see that where I'm talking about that
24  where it says reproduction of report and review of
25  documents (inaud.)?

Page 2941

1    A.   Yes.
2    Q.   Can you blow that up, please, Glenn?
3      (Technician complies.)
4      Now, Mr. Lenner --
5      MR. THOMAS:  Excuse me, Your Honor.  What's
6  been provided to me is different than that and it has
7  handwriting and a question on it.  I just want to know
8  if the witness has what's on the screen or does his have
9  handwriting and questions?
10      MS. BITAR:  May I approach the witness?
11      (Complies.)
12      It does.  Thank you, Mr. Thomas.
13  BY MS. BITAR:
14    Q.   Mr. Lenner, could you read that document
15  without having a copy in front of you?
16    A.   Yes.
17    Q.   Now we found where my working copy went.
18      Mr. Lenner, was it your understanding that
19  with respect to this engagement letter as well there was
20  a requirement for BDO to review the documentation for
21  anything other than a planned private placement
22  memorandum?
23    A.   We had to review, as these paragraphs say,
24  any document being offered for the sale of securities or
25  any time that our audited financial statements are

Page 2942

1    included in a document, we needed to review it.
2        Q.   And looking at the first paragraph, if you
3    could highlight that, please.
4            (Technician complies.)
5            It says, "If E.S. Bankest plans reproduction
6    or publication of our report or any portion of it,
7    copies of the master's or printer's proofs of the entire
8    document should be submitted to us in sufficient time
9    for our review and approval before printing.  You also
10   agree to provide us with a copy of the final reproduced
11   material for our approval before it's distributed."  Did
12   I read that correctly?
13       A.   Yes.
14       Q.   And Mr. Lenner, does that tell you that you
15   were supposed to review printer's proofs of any private
16   placement memorandums before an audited opinion could be
17   issued?
18       A.   It certainly does.
19       Q.   Thank you.  Now, getting back to some -- you
20   referenced some problems with respect to the 1995
21   audited opinion.
22           THE COURT:  Is that an objection?
23           MR. THOMAS:  It was a bless you for a
24   sneeze.
25           (Laughter.)

Page 2943

1    BY MS. BITAR:
2        Q.   What happened in connection with the BDO
3    1995 audited opinion?
4        A.   What happened is about a year later when we
5    were performing the 1996 audit, we were reviewing the
6    private placement document and what we saw was that our
7    audited opinion and the company's financial statements
8    were attached to the private placement.  And --
9        Q.   Now, let me just interrupt.  But,
10   Mr. Lenner, you said that in 1995 you knew that that's
11   something the company might be doing, correct?
12       A.   Yes.
13       Q.   And that's -- is that why that question was
14   answered yes as to Number 22 on the inherent risk
15   questionnaire in 1995?
16       A.   Yes.
17       Q.   So why would this be a surprise to you, sir?
18       A.   The reason why it was a surprise was because
19   the company failed to communicate to us that they were
20   going to or they did, in fact, include the financials in
21   a private placement.  As we just saw in the engagement
22   letter they were supposed to do that.
23       Q.   So what did you do?
24       A.   What I did is I contacted the company and I
25   told them what they did was the wrong thing.  I also

Page 2944

1    contacted at that time Mr. Frank Pearlman who was one of
2    our regional directors to make them aware of the
3    situation.
4        Q.   And was that what the rules of BDO required?
5        A.   Yes.
6        Q.   And could we turn to Exhibit 66 in evidence,
7    please?
8            And Mr. Lenner, did you write Mr. Pearlman a
9    memo?
10       A.   Yes.  That's the memo I wrote Mr. Pearlman.
11       Q.   And that's a May 27th memo relating to the
12   use of the BDO opinion improperly, correct?
13       A.   Yes.
14       Q.   And going to the portion that says,
15   "Subsequent procedures performed by BDO"?
16       A.   If you don't mind giving that to me.  I
17   can't see.
18           MS. BITAR:  May I approach, Judge?
19           THE COURT:  You may.
20           MS. BITAR:  (Complies)
21   BY MS. BITAR:
22       Q.   If you can blow up that section, please.
23           (Technician complies.)
24           I'm not going to go through the various
25   steps with you but let me ask you this question:  Are

Page 2945

1    there specific detailed steps you need to take when
2    BDO's opinion is going to be attached to a securities
3    offering?
4        A.   Yes, there are.
5        Q.   And they're reflected in this memo?
6        A.   Yes.
7        Q.   And is it fair to say, sir, that the fact
8    that the opinion was used without BDO's review and
9    approval was a big deal?
10           MR. THOMAS:  Objection, Your Honor.
11   Leading.
12   BY MS. BITAR:
13       Q.   Was it a big deal?
14       A.   Yes.
15       Q.   And did the client act improperly?
16       A.   Their action was certainly -- it was
17   improper.
18       Q.   And, in fact, you referenced that in this
19   memo where you say that at number one, "Informed client
20   of wrongdoing"?
21       A.   That's correct.  I informed the client of
22   what they did was wrong.
23       Q.   And they told you it was an oversight?
24       A.   Yes.
25           MR. THOMAS:  Objection.  Leading and

Page 2946

1   hearsay.
2           THE COURT: Sustained.
3   BY MS. BITAR:
4       Q.  Where is Mr. Pearlman today, Mr. Lenner?
5       A.  Mr. Pearlman passed away about five years
6   ago.
7       Q.  Now, after you wrote this memo to
8   Mr. Pearlman, what else did you do?
9       A.  I had a conversation and I think I followed
10  up with a letter to Mr. Parlapiano about this
11  wrongdoing.
12      Q.  And what did Mr. Parlapiano -- withdrawn.
13          I would like you to look please at Exhibit
14  67 in evidence.  Is this a memorandum that you wrote to
15  Mr. Parlapiano or a draft that you wrote to
16  Mr. Parlapiano relating to the use of the private
17  placement memorandum?
18      A.  Yes.
19      Q.  And what did you decide needed to be done?
20      A.  I decided that we needed to review the
21  private placement.  He needed to inform his investors
22  that the private placement was incomplete.  And also
23  advised him to seek counsel as to the potential
24  ramifications of omitting a page from the private
25  placement.

Page 2947

1       Q.  And, to your knowledge, did he do that?
2       A.  Yes.
3       Q.  Why after the fact did you let the opinion
4   go out without BDO's approval in advance?
5       A.  It seemed -- as the memo indicates, it
6   seemed to me that it was an oversight by Mr. Parlapiano.
7   It just seemed that he -- it was my understanding that
8   he was just very sincere when he expressed to me that it
9   was --
10          MR. THOMAS: Objection, Your Honor.
11          THE COURT: Sustained.
12  BY MS. BITAR:
13      Q.  Without telling us what Mr. Parlapiano said,
14  did you believe that Mr. Parlapiano intended to deceive
15  anybody?
16          MR. THOMAS: Objection, Your Honor.
17  Speculation.
18          THE COURT: Rephrase your question.
19  Sustained.  Rephrase the question.
20  BY MS. BITAR:
21      Q.  Without telling us about any conversation
22  you had with Mr. Parlapiano, after you spoke to
23  Mr. Parlapiano did you believe it was an oversight on
24  his part?
25      A.  Yes, I did.

Page 2948

1       Q.  Now, if you had -- by taking the steps you
2   took were the financial statements corrected?
3       A.  Yes.
4       Q.  And is that another reason why you permitted
5   the financial statements to be used in connection with
6   the PPMs after the fact?
7       A.  Yes.  As we went through the procedures
8   after the fact, and he informed the investors and it was
9   the right procedure to be performed at the time, so he
10  could include the financial statements in the private
11  placement memorandums for that year.
12      Q.  Mr. Lenner, if you didn't do anything would
13  those financials have been corrected?
14          MR. THOMAS: Objection, Your Honor.
15  Speculative.
16          THE COURT: Sustained.
17  BY MS. BITAR:
18      Q.  Mr. Lenner, why did you insist on correcting
19  the financial statements?
20      A.  Because it's necessary for the private
21  placement to have true and accurate information and if
22  the financial statements are missing a page, they're not
23  true and accurate.  So it's important for them to have
24  all the financial statement pages in the private
25  placement.

Page 2949

1       Q.  Mr. Lenner, I'd like you to look at what's
2   been marked Plaintiffs' Exhibit 3002 which is the 1996
3   work papers, and in particular the A-67 form at page
4   1058.
5           MS. BITAR: May I approach the witness,
6   Judge?
7           THE COURT: You may.
8   BY MS. BITAR:
9       Q.  And I'll represent to you this is not the
10  entirety of those work papers but it's a portion.  And
11  if you turn to the green tab, please.  Could you
12  identify that for the record?
13      A.  Yes.  This is the form 867 entitled,
14  "Pre-release review by SEC director or director of
15  accounting."
16      Q.  And was it your understanding that
17  Mr. Pearlman was one of the associate directors of
18  accounting and auditing?
19      A.  Yes.
20      Q.  Do you remember when Mr. Thomas was asking
21  you questions he showed you the last paragraph of this
22  document that said this had to go to the SEC director
23  for the first time a report is issued?
24      A.  Yes.
25      Q.  What's your understanding about subsequent

Page 2950

1    private placement memorandums?
2        A.   That they would still need to go to the
3    associate director of accounting and auditing.
4        Q.   And is that reflected in BDO's assurance
5    manual as well?
6        A.   Yes.
7        Q.   Now, this A-67 form, in connection with this
8    case, sir, have you reviewed all of the work papers for
9    subsequent years?
10       A.   Yes.
11       Q.   And have you reviewed the billing records in
12   connection with the 1998 audit and all subsequent years?
13       A.   Yes.
14       Q.   Mr. Lenner, are there any other A-67 forms
15   in the BDO work papers reflecting any technical advisor
16   review of private placement memorandums?
17       A.   There are no such forms in the work papers.
18       Q.   And in reviewing your -- the time records in
19   connection with these audits, did you notice as to
20   whether or not Mr. Pearlman billed time in connection
21   with his review of the private placement memorandums?
22       A.   Yes.  He billed time for his review of this
23   1995 private placement.
24       Q.   And Mr. Lenner, is there any other reference
25   to any other regional technical coordinator reviewing

Page 2951

1    any private placement memorandums in any subsequent
2    year?
3        A.   There is no evidence whatsoever on any
4    review by any other person in any subsequent year.
5        Q.   And if BDO knew its financial statement
6    opinions would be included in PPMs would these forms
7    have been prepared?
8        A.   Yes.
9        Q.   Now, Mr. Lenner, is it fair to say that both
10   the engagement letters and the assurance guide explain
11   the procedures to be followed when the auditor knows
12   that the financial statement opinions are to be used in
13   connection with private placement memorandums?
14           MR. THOMAS:  Objection.  Leading.
15           THE COURT:  Sustained.
16   BY MS. BITAR:
17       Q.   Mr. Lenner, what do the engagement letters
18   and the assurance guide say about the procedures to be
19   followed when an auditor knows that the financial
20   statement opinions are being used to sell securities?
21       A.   Both sources of documents say that we have
22   to review the private placement memorandums and read the
23   financial statements again.
24       Q.   Now, getting back to this situation with
25   Mr. Parlapiano in 1997 relating to the 1995 audit

Page 2952

1    opinion, did Mr. Parlapiano present corrected financial
2    statements for your review?
3        A.   Yes.
4        Q.   I would like to direct your attention,
5    please, to BDO 280 -- I'm sorry, Exhibit 286-A in
6    evidence.
7            MS. BITAR:  May I approach, Judge?
8            THE COURT:  You may.
9            MS. BITAR:  (Complies.)
10   BY MS. BITAR:
11       Q.   This is a fax from Mr. Parlapiano to BDO.
12   It will take a moment to get it on the screen.  286-A,
13   please.
14           (Technician complies.)
15           Turning to the text of the fax, this is from
16   Mr. Parlapiano to Gabe Duarte.  Do you see that?
17       A.   Yes, do I.
18       Q.   And who was Gabe Duarte?
19       A.   At that time Gabe Duarte was a manager who
20   was working on the audit of Bankest.
21       Q.   And the text reads, "Dear Gabriel:
22   Following is a draft form letter regarding our proposed
23   forwarding to 1997 BRFFC debenture subscribers of BDO's
24   entire audit report of BRFFC's operations for fiscal
25   1995.  As per our conversation, we await BDO's comments

Page 2953

1    prior to sending out this letter and the attached 1995
2    audit report."  Did I read that correctly?
3        A.   Yes.
4        Q.   Was it your understanding that
5    Mr. Parlapiano presented the 1995 audit report as well
6    as a letter to the debenture holders which is attached
7    when the opinion was reissued?
8        A.   Yes.  It does.
9        Q.   Now, Mr. Lenner, did you have a discussion
10   with Dominick Parlapiano about the use of BDO's audited
11   financial statements going forward after this incident?
12           MR. THOMAS:  Objection, Your Honor.  Hearsay
13   in the question.
14           THE COURT:  Overruled.  It's a yes or no.
15           THE WITNESS:  Yes.
16   BY MS. BITAR:
17       Q.   What did he say to you?
18           MR. THOMAS:  Objection.  Hearsay.
19           THE COURT:  Sustained.
20           MS. BITAR:  Your Honor, I'm not offering it
21   for the truth.  I don't think what Mr. Parlapiano --
22           MR. THOMAS:  Objection, Your Honor.
23           THE COURT:  Sustained.
24           MS. BITAR:  Your Honor, I'm offering it for
25   the witness's state of mind.

Page 2954

1       THE COURT: I understand what you're
2    offering it for.  Sustained.
3    BY MS. BITAR:
4       Q.   Mr. Lenner, as a result of your conversation
5    with Mr. Parlapiano, did you believe that BDO's audited
6    financial statements would be attached to any future
7    private placements?
8       A.   No, they were not going to be attached.
9       Q.   Now Mr. -- we're done with that.  Thank you.
10      The 1996 questionnaire, inherent risk
11   questionnaire has the same language as the 1998
12   questionnaire; is that right?
13      A.   Yes.
14      Q.   Who filled out the 1996 questionnaire if you
15   know?
16      A.   I believe it was Mr. David Aronson.
17      Q.   And was Mr. Aronson correct when he filled
18   out question 22 to state that he believed that the
19   private placement would be -- the opinion would be used
20   to sell debentures?
21      A.   Yes, at that time he was correct.
22      Q.   What do you mean by that?
23      A.   What I mean by that is when he was
24   completing that form, it was just about that same time
25   that we were discussing this whole issue about the

Page 2955

1    improper use of the financial statements for 1995 and
2    when he was conducting the 1996 audit, he was in the
3    room, and he was aware and it was his understanding at
4    that point in time the financials --
5       MR. THOMAS: Objection.  Speculation.
6       THE COURT: Sustained.
7    BY MS. BITAR:
8       Q.   Mr. Lenner, let me ask you this.  Even
9    though you had an understanding that the financials
10   would not be used in the future, can you understand why
11   Mr. Aronson at the time he was filling out that form
12   might think differently?
13      MR. THOMAS: Objection, Your Honor.
14      THE COURT: Sustained.
15   BY MS. BITAR:
16      Q.   When Mr. Aronson was filling out that form
17   in the beginning of June 1997, is that the point in time
18   where BDO was dealing with Mr. Parlapiano and BRFFC
19   about the very -- about the fact that they had just used
20   BDO's audited financial statements in connection with a
21   private placement memorandum?
22      A.   Yes.
23      Q.   Now let's go back to the 1998 audit.  Going
24   back to question 22.  Question 22.
25      (Technician complies.)

Page 2956

1       Did Mr. Mohr fill out this questionnaire
2    identically to Mr. Aronson?
3       A.   For question 22 he did.  Yes.
4       Q.   Now, do you remember when you were asked
5    questions by Mr. Thomas on the plaintiffs' direct case
6    he asked you if these were important questions?
7       A.   Yes.
8       Q.   And you said they were important questions?
9       A.   Yes.
10      Q.   Were they important here?
11      A.   No.
12      Q.   Why?
13      A.   They were not important in this particular
14   case because we had decided that we were going to, in
15   1998, consider this a high risk engagement.  When you
16   answer these questions based on the number of yeses,
17   based on the responses, it will -- the software will
18   generate a risk profile.  And the maximum audit
19   procedures that you will perform will be for a situation
20   when the company is deemed to be a high risk.
21      Since we knew it was a high risk already, it
22   wasn't relevant at this point.
23      Q.   Let me ask you this question.  The more
24   yeses on the questionnaire -- now we've seen there's
25   about, what, 75 questions on that questionnaire?

Page 2957

1       A.   At least, yes.
2       Q.   The more question yeses, the higher the
3    risk?
4       A.   Basically.
5       Q.   Now, you have Exhibit 3003 in front of you.
6    That's the 1998 papers?
7       A.   Yes.
8       Q.   Could you turn to page 180?
9       A.   (Complies).
10      Q.   It's at BDO 673.  Could you identify this
11   document for the members of the jury and could you blow
12   it up, please, Glenn?
13      (Technician complies.)
14      Now, let me ask you a question.  This part
15   of the document where it says audit risk matrix,
16   inherent risk, what does this tell the audit staff about
17   how the questionnaire assessed the risk associated with
18   auditing Bankest where it says risk profile?
19      A.   Well, after answering all the questions in
20   the inherent risk questionnaire that we saw a few
21   minutes ago, the answer here would be M which stands for
22   medium risk.  So the engagement has a medium risk level
23   at this point.
24      Q.   This is relating to the inherent risk,
25   correct?

Page 2958

1     A.   Correct.
2     Q.   And then we'll talk about the control
3   strengths in a minute.  But was there also an analysis
4   of the control strengths which is as a result of the
5   questions relating to the control strengths
6   questionnaires?
7     A.   Yes.  There were a series of questions that
8   we also saw before that deal with the control strengths
9   and based on the responses that we received, and based
10  on our analysis at that time, the control environment
11  strengths were deemed strong.  And that's what the S
12  stands for.
13    Q.   It's right up here?
14    A.   Yes.
15    Q.   So when you have a medium inherent risk and
16  a strong control strength, what is the risk profile that
17  the audit risk matrix generates?
18    A.   In this case it generated a low risk
19  profile.  So that's, as we spoke before, it's taking the
20  inherent risks that are specific to the company, the
21  software is matching the responses that we received and
22  taking the control strengths, matching it and it's
23  coming up with an overall risk profile and in this case
24  it was low.
25    Q.   Now, what is this handwriting underneath

Page 2959

1   below?
2     A.   This is where we overrode the profile,
3   wanted to be more conservative and do more audit
4   procedures so we considered the risk profile here to be
5   high.
6     Q.   So, Mr. Lenner, when you answered questions
7   from Mr. Thomas about that question 22 being important,
8   is this the reason why it was not important in this
9   audit?
10    A.   Absolutely right.
11    Q.   And do you remember Mr. Thomas asking you
12  questions about if the answer to that question was
13  reliable, do you remember that?
14    A.   Yes.
15    Q.   In this instance where you're going to
16  override and test as high, were you going to be relying
17  on that question?
18    A.   No.
19    Q.   Now, other than the reference in question 18
20  and question 22 to the use of BDO's audit opinion to
21  sell debentures in the 1998 work papers, is there any
22  other reference to BDO's -- to BDO's knowledge that the
23  client Bankest would be using its audit opinion in
24  connection with the placement of debenture notes?
25    A.   No.  We had no knowledge.  In fact, the

Page 2960

1   knowledge we had is we had a private placement where
2   they attached non-audited or unaudited financial
3   statements.
4     Q.   And did BDO's work papers contain any
5   private placement memorandum with any BDO audit opinions
6   attached?
7     A.   No.  That's not in our files.  We don't have
8   it.
9     Q.   And is that something that would routinely
10  be kept if, in fact, BDO had knowledge of that?
11    A.   Yes.
12    Q.   Is that the kind of thing you keep in the
13  permanent file?
14    A.   Yes.
15    Q.   Now, let's go to the 1999 inherent risk
16  questionnaire to question 11.  And the question reads --
17  will you blow it up, please, Glenn?
18        (Technician complies.)
19        "Is there a risk of misstatement arising
20  from a requirement to submit the financial statements to
21  an existing or potential provider of finance?"  Now,
22  what is the answer, sir?
23    A.   No.
24    Q.   And let's turn to the year 2000 IRC at BDO
25  315-B.  Can I have question 11 for that as well?

Page 2961

1   Mr. Lenner, do you want me to give you hard copies or
2   can you look at the screen?
3     A.   This is fine.
4     Q.   And what's the answer in 2000, sir?
5     A.   No.
6     Q.   And could you please look at Exhibit 315-C
7   in evidence and again could you highlight question 11?
8         (Technician complies.)
9         Same question, same answer, Mr. Lenner?
10    A.   Correct.
11    Q.   Now, let's go back to the 1998 form for a
12  moment.  We'll let technology catch up.  Could you turn
13  to question 31, please?  Could you read that question
14  and that answer into the record?
15    A.   Just one second.  Question 31?
16    Q.   Yes, sir.
17    A.   The question reads, "Is there a risk of
18  misstatement arising from a requirement to file the
19  financial statements or submit them to a provider of
20  finance?"  The answer is, "No."
21    Q.   Now, Mr. Lenner, did that question change in
22  subsequent questionnaires?
23    A.   Yes.
24    Q.   Mr. Lenner, let me ask you this.  What
25  questions in the 1999 and following questionnaires speak

Page 2962

1    to the fundamental question about whether or not BDO
2    knew if its financials were being used to place debt?
3        A.   If you could give me the 1999 -- now I need
4    the 1999 questionnaire.
5        Q.   Sure. I'm handing up to you 1999, 2000, and
6    2001.
7        A.   That would be question 11.
8        Q.   Okay. Now, did the form change from 1998 to
9    1999?
10       A.   Yes.
11       Q.   And were the questions shortened?
12       A.   Yes. They were substantially shortened.
13       Q.   And were certain questions consolidated?
14       A.   Yes. That was the case.
15       Q.   What do you understand question 11 in the
16   1999, 2000, 2001 financials -- I'm sorry -- inherent
17   risk questionnaires being designed to capture?
18       A.   They're being designed to capture questions
19   18 and 22 in the 1998 inherent risk questionnaire.
20       Q.   And what about question 31 in the 1998
21   questionnaire?
22       A.   That, too.
23       Q.   So, Mr. Lenner, what question in the 1999
24   and following questionnaires replaces question 22 in the
25   1998 questionnaire?

Page 2963

1        A.   It's question 11.
2        Q.   And what is the answer about whether or not
3    BDO knew that its financial statements would be used to
4    place debentures in 1999, 2000, and 2001?
5        A.   The answer is no. We had no knowledge that
6    they were being used as evidenced by our response to
7    question 11.
8        Q.   And does that comport with your memory as to
9    the use of BDO's financials?
10       A.   Yes.
11       Q.   And, Mr. Lenner, how do you know that
12   BDO's -- how do you know that question 11 effectively
13   replaced question 22 in the 1998 questionnaire?
14       A.   Well, question 22 goes to does the entity
15   have plans to raise finance using the financial
16   statements. So that's something for the future. A plan
17   is something for the future.
18            Whereas question 11 in the second part of
19   the sentence it goes, "Is there a risk of misstatement
20   arising from a requirement to submit the financial
21   statements to an existing or potential provider of
22   finance?"
23            So it's -- those last few words in question
24   11 are clearly matched to question 22.
25       Q.   Now, Mr. Lenner, does that comport with your

Page 2964

1    understanding of the firm assurance guidance manual on
2    this very question?
3        A.   Yes, it does.
4        Q.   I'm done with all those documents.
5            MS. BITAR:  Your Honor if I may, may I have
6    a restroom break?
7            THE COURT:  All right. Do not discuss the
8    case amongst yourselves. Step into the jury room.
9    We'll get you when we're ready.
10           (Thereupon, the jury was escorted out of the
11   courtroom.)
12           THE COURT:  All right. Mr. Lenner, you're
13   not about to discuss your testimony with anyone
14   including any of the lawyers. Take 15 minutes.
15           MS. BITAR:  Thank you, Judge.
16           (Thereupon, a brief recess was taken.)
17           MS. BITAR:  Your Honor, before the jury
18   comes in, can we address an issue?
19           THE COURT:  All right.
20           MS. BITAR:  With the Court's permission,
21   I'll stand here and then I think we can talk. Your
22   Honor, I want to make sure I'm understanding something
23   about your ruling and I want to raise why. I had a work
24   paper on the screen with Mr. Lenner and it talked about
25   sending out --

Page 2965

1            MR. THOMAS:  Your Honor, can we send the
2    witness out?
3            MS. BITAR:  I'm so sorry. You're right. I
4    apologize.
5            (Thereupon the witness steps down from the
6    witness stand.)
7            THE COURT:  Okay.
8            MS. BITAR:  Sorry. I want to keep this on.
9    When Mr. Lenner was on the stand, I had an exhibit on
10   the screen which was the audit program. And the
11   program -- I was focusing in on some steps about the
12   decision to send or not send second confirms. And I was
13   asking the witness some questions about what NCN meant
14   and not considered necessary and why it wasn't
15   considered necessary.
16           And I asked him -- I don't have the exact
17   question but words to the effect of, well, Mr. Lenner,
18   when making the decision not to consider it necessary,
19   did you consider the standard that allows you to look at
20   prior history? Did you consider? And I thought that
21   was the question I was allowed to ask. And Mr. Thomas
22   objected and you sustained the objection.
23           THE COURT:  I think it was more than that,
24   from my understanding.
25           MS. BITAR:  I don't believe so, Your Honor.

Page 2966

1  But I will look at it this evening, if I may, and
2  revisit the issue with you.
3        THE COURT: I think it was more than just
4  that.
5        MS. BITAR: And I may be inaccurate and I
6  didn't look. But I just wanted to alert you to Your
7  Honor because, frankly, I don't know what I could do at
8  that point. And that's important. Because the only way
9  our expert can testify that these people did a GAAS
10  audit is to show that they knew the literature and
11  considered it.
12        THE COURT: Well, we'll look at it and bring
13  it up tomorrow. I'm sure you're not going to finish.
14        MS. BITAR: I'm nowhere near finished. My
15  second question relates to the hearsay objection on
16  Mr. Parlapiano. Judge, we're not offering this
17  information for the truth, we're offering it to show
18  what the auditors were told.
19        THE COURT: If you ask the proper question
20  for the second question.
21        MS. BITAR: I don't know what the second
22  question --
23        THE COURT: Whatever it was, it was the
24  proper question to ask and there was no objection. If
25  it was objectioned to, it would have overruled.

Page 2967

1        MS. BITAR: Well, then, you know what? I'll
2  try to do it again and I'll look at the transcript.
3  Thank you, Judge.
4        THE COURT: Okay. We're ready?
5        (Thereupon, the witness takes his seat at
6  the witness stand.)
7        THE BAILIFF: All rise for the jury.
8        (Thereupon, the jury was brought into the
9  courtroom.)
10        THE COURT: You may be seated.
11        Ms. Bitar, you may proceed with your direct.
12        MS. BITAR: Thank you, Your Honor.
13        Good afternoon. Good afternoon, members of
14  the jury.
15  BY MS. BITAR:
16      Q.   And Mr. Lenner, before the break we were talking
17  about the inherent risk questionnaire and the control
18  strengths questionnaire. I'd like you to turn to BDO
19  3003, Exhibit 3003 at Bates stamp 663. It's 170. We're
20  going to go through this briefly. But I just want to
21  give some examples of what BDO views as control
22  strengths.
23        So this is the control strengths
24  questionnaire, correct?
25      A.   Yes, it is.

Page 2968

1      Q.   Okay. And the first question reads
2  "Business strategy objectives and organization. 1) Does
3  the board of directors or equivalent have well-defined
4  business plans, policies, and objectives, regularly
5  monitor the entity's performance against them and take
6  action on a timely basis?" The answer is yes. And the
7  narrative reads "The directors are involved in the
8  business day-to-day operations."
9        Do you see that?
10      A.   Yes.
11      Q.   The next question reads "Does the board of
12  directors or equivalent regularly monitor the entity's
13  exposure to general business risk and ensure that the
14  exposure is kept within well -- within established
15  limits?" The answer is yes. And the justification is
16  "The board closely monitors the company's exposure on a
17  regular basis."
18      A.   Yes, I see that.
19      Q.   The next question talks about if the board
20  encourages a strong control environment. And it
21  indicates that the directors and management have close
22  supervision of all aspects of the business, correct?
23      A.   Yes.
24      Q.   The next question asked if the board or
25  equivalent established and communicated to employees

Page 2969

1  policies regarding acceptable business practices,
2  conflicts of interest, and codes of conduct. And again
3  the answer is yes. And the justification "The board is
4  in communication with employees on a daily basis.
5  Policies are in place regarding acceptable business
6  practices," et cetera.
7        Mr. Lenner, why are questions like this and
8  the answers elicited control strength within an
9  organization?
10      A.   Because it shows the board and management's
11  involvement in running the business. It basically shows
12  that they respect the policies and procedures. They
13  understand them and they advocate those types of
14  policies and procedures which are specific for a
15  well-run business.
16      Q.   And why would the involvement of the board
17  be considered a control strength in an organization?
18      A.   Well, the board has the most knowledge of
19  the organization. What was very interesting in this
20  situation is you had a very broad board here. You had
21  four board members that were from the E.S. Bankest side,
22  and then you had four board members that were appointed
23  by the Florida bank. And you had well-seasoned bankers,
24  people that understood the factoring operations. So it
25  would effect a control strength to have that knowledge,

Page 2970

1    to have those kind of quality people involved in the
2    company.
3        Unlike -- just to give you an example -- a
4    couple of years when there were dotcoms and you would
5    have a lot of young people running large businesses that
6    didn't have the experience such as these people had at
7    that point in time.
8        Q.    Mr. Lenner, let's go -- in the planning
9    section to BDO 643, which is another form that's filled
10   out, entitled Consideration of Fraud Risk and Evaluation
11   of Control Structure.  And it's a supplemental to the
12   full inherent risk and control strengths questionnaires.
13   Do you see that, sir?
14       A.    Yes.
15       Q.    And Mr. Lenner, this form provides guidance
16   to help the auditors discharge their responsibilities to
17   assess fraud risk, correct?
18       A.    Yes, it does.
19       Q.    And does this form and the questions that
20   you need to evaluate consider the literature regarding
21   fraud and fraud risk in an organization?
22       A.    Yes, it does.
23       Q.    And what does the relevant literature with
24   respect to the evaluation of fraud risk in an
25   organization?

Page 2971

1        A.    It's SAS 82, as indicated right in the
2    document on the screen.
3        Q.    SAS 82 is consideration of fraud in a
4    financial statements audit, correct?
5        A.    Yes.
6        MS. BITAR:  Blow that up, please.
7        (Technician complies.)
8    BY MS. BITAR:
9        Q.    And this is called the A 82 form, correct?
10       A.    Yes.
11       Q.    And is it your understanding that the
12   questions that are discussed in this form mirror the
13   literature in SAS 82?
14       A.    Yes, they do.  And that's why this form was
15   put out by BDO, so it could incorporate the guidance
16   from SAS 82 at that time.
17       Q.    And did you consider the guidance reflected
18   in SAS 82, consideration of fraud risk in an audit, when
19   doing your audit of Bankest?
20       A.    Yes, I certainly considered SAS 82.
21       Q.    And Mr. Lenner, going to page 152 of the
22   document, it's 645.  As a result of the implementation
23   of SAS 82 --
24       MS. BITAR:  I'll let you get that on the
25   screen.

Page 2972

1        (Technician complies.)
2    BY MS. BITAR:
3        Q.    It says "Additional inherent risk and
4    control strengths questions."  Did BDO modify its
5    procedures in assessing internal risk and control
6    strengths in light of considerations in SAS 82?
7        MR. THOMAS:  Objection, Your Honor.
8        THE COURT:  Hold on.  Sustained.
9    BY MS. BITAR:
10       Q.    Mr. Lenner, did you take any steps to do
11   additional analysis of inherent risks and control
12   strengths as a result of the implementation of SAS 82?
13       MR. THOMAS:  Objection.  Your Honor.
14       THE COURT:  Overruled.
15       THE WITNESS:  Yes, we did.  We --
16       THE COURT:  It's a yes or no.
17       THE WITNESS:  I'm sorry.  Yes.
18   BY MS. BITAR:
19       Q.    And are some of the steps you took reflected
20   in the answers to the A 82 fraud risk questionnaire?
21       A.    Yes, they are.
22       Q.    And was that a direct response to the
23   implementation of the SAS 82 literature?
24       MR. THOMAS:  Objection, Your Honor.
25       THE COURT:  Sustained.

Page 2973

1    BY MS. BITAR:
2        Q.    Now, Mr. Lenner, I'd like you to look,
3    please, at BDO 655.  We've been discussing Bankest as a
4    quote/unquote sensitive audit.  Do you recall that
5    testimony?
6        A.    Yes.
7        Q.    Why was BDO's audit of Bankest in 1998
8    viewed as a sensitive audit?
9        A.    Primarily for the reason that's indicated
10   right on this form.  That it's an entity that's
11   publically owned or a member of a group containing a
12   publically-owned entity.
13       Q.    Thank you, Mr. Lenner.
14       Now, Mr. Lenner, we talked about the audits
15   of BRFFC, correct?
16       A.    Yes.
17       Q.    And Bankest was created in the middle of
18   1998, correct?
19       A.    Yes.
20       Q.    The last audit of BRFFC was done sometime in
21   1997 relating to 1996, correct?
22       A.    That is correct.
23       Q.    Turning to Bankest, when Espirito Santo
24   Bankest was formed, did you understand it to be the same
25   company as BRFFC?

Page 2974

1    A.   Basically, it had the same -- it was the
2  same business but it was different ownership.
3    Q.   And in what respect was it different
4  ownership?
5    A.   50 percent of the business, E.S. Bankest,
6  was owned by BCC and the other 50 percent was owned by
7  the Florida bank.
8    Q.   And why was the -- was the Florida bank --
9  the fact that Espirito Santo Bank of Florida was going
10  to be a 50-percent owner now, was that something that
11  was something you considered when planning the 1998
12  audit?
13    A.   Yes.  That is clearly a control strength to
14  have individuals that are put there from the Florida
15  bank that have a wealth of experience and knowledge of
16  banking and that come from a banking environment.  We
17  were very happy to see those kinds of individuals being
18  on the board of the new entity.
19    Q.   And did you understand that the bankers on
20  the board of E.S. Bankest had considerable banking
21  and/or factoring experience?
22    A.   Yes.
23    Q.   Now, we talked about inherent risk.  And we
24  talked about a jewelry store being more susceptible of
25  misappropriation or stealing of assets than, I think you

Page 2975

1  said, a mattress store.  Where does a company like
2  Bankest fit into that equation?  Did you view accounts
3  receivable as automatically an inherent -- as an
4  inherently risky business?
5    A.   No.
6    Q.   Why?
7    A.   Well, first of all, they owned the
8  receivable.  They had it in their possession, which was
9  each invoice.  Secondly, the receivables that they
10  purchased were insured for solvency.  And thirdly, the
11  receivables that they purchased had what's called the
12  right of recourse.
13    Q.   What does that mean, sir?
14    A.   Which means that if one of the receivables
15  they purchased, the customer was disputing it because
16  there was the wrong color of blouse or the wrong size
17  was being shipped, then the client would have the
18  responsibility and the obligation to replace that
19  invoice with another invoice.
20    Q.   So let me ask you this.  If based on the
21  nature of the business, BDO did not consider a factoring
22  company inherently high risk, why did you do the manual
23  override to test it as if the risk was high?
24    A.   It was the first year that we were doing --
25  performing this audit and we wanted to be conservative

Page 2976

1  and do more audit procedures.  So it was a decision that
2  we made at that time to perform additional audit
3  procedures and to elevate it to a high risk.
4    Q.   Now, we talked about the planning.  What
5  happens after you make determinations about the control
6  strengths and the inherent risks and the amount of
7  testing you're going to do?  What's the next step in
8  conducting an audit?
9    A.   Okay.  In addition to what you said, there's
10  looking at the risk profile, which we saw before the
11  break.  And after you understand what the risks are,
12  then you design your audit program.  And the audit
13  program are the steps that you plan to carry out to
14  achieve your stated objective, which is eventually
15  expressing an opinion on the fairness of the financial
16  statements.
17    Q.   As part of that planning, do you make a
18  determination to analyze the risks associated with each
19  financial statement area like cash, accounts receivable,
20  accounts payable, et cetera?
21    A.   Yes.  What we do is we look at the entire
22  balance sheet and we determine what is significant.  And
23  based on the accounts that we determine that are
24  significant, we then have an audit program for each
25  area, and we apply specific audit procedures to each

Page 2977

1  area.
2    Q.   And when we look at that grid where there
3  was the handwritten manual, HHHHH, are there similar
4  analyses for all of the various financial statement
5  areas?
6    A.   Yes.  For the most part, every balance sheet
7  account will have that type of grid, as well as some
8  other accounts will also have it.
9    Q.   Now, referring to Bankest, what did the
10  audit team determine to be the area of the most audit
11  significance?
12    A.   Well, it's obviously the accounts receivable
13  that was the most audit significance for this audit.
14    Q.   And is that because the accounts receivable
15  constituted so large a portion of the assets of the
16  company?
17    A.   Yes.  It was over 95 percent of the total
18  assets for that year and subsequent years.
19    Q.   And where is the work that was done relating
20  to the accounts receivable found in the work papers?
21    A.   Well, what we have in the work papers is
22  each audit area or each account that we've looked at,
23  including accounts receivable, there will be a section.
24  They'll have an audit program.  And behind the audit
25  program, we'll have audit work papers which documents

Page 2978

1    the audit evidence that we have examined in reaching a
2    conclusion as to each account.
3        Q.   So if the jury at the end of this case wants
4    to go in the jury room with the work papers, they'll be
5    able to look through and see the work performed in each
6    of these areas?
7            MR. THOMAS:  Objection, Your Honor.
8            THE COURT:  Sustained.
9    BY MS. BITAR:
10       Q.   Is the work performed contained in the work
11   papers?
12       A.   Yes, it is.
13       Q.   And in each year, are the C section work
14   papers the work papers relating to accounts receivable?
15       A.   Yes.
16       Q.   And is the X section the planning section?
17       A.   Yes.
18       Q.   And the work papers are laid out similarly
19   each year; is that correct?
20       A.   Yes.
21       Q.   Let's turn to the C section work papers,
22   then.  Again, this is BDO 3003.  Let's start the first
23   page which relates to the audit program with respect to
24   accounts receivable.  That's at BDO 857.
25           MS. BITAR:  And Glenn, it's 371.

Page 2979

1            (Technician complies.)
2    BY MS. BITAR:
3        Q.   The first step of the audit program requires
4    you to develop a general understanding of the accounts
5    receivable, correct?
6        A.   Yes, it does.
7        Q.   And that's reflected in A general?
8        A.   That is correct.  And that would include
9    redoing the business memo, any narratives.  It would --
10   reviewing the history of the client that would be in our
11   permanent files.  So that would be performed in the
12   beginning of each audit.
13       Q.   And the second thing reads to understand --
14   to ascertain an understanding of the system, you're to
15   provide a walk-through.  What does that mean?
16       A.   A walk-through is basically when you walk
17   through the system to make sure that the transactions
18   are being recorded to comport to your understanding as
19   to how the system of internal accounting control for
20   that particular account is working.
21       Q.   And then it talks about later down in the
22   program that you need to ascertain that the sales of
23   items shipped or services rendered are properly
24   recorded.  Do you see that?
25       A.   Yes.

Page 2980

1        Q.   Okay.  And what does that require the audit
2    team to do?
3        A.   Well, there are various steps there that
4    require you to look at the invoices, to examine the
5    invoices, to foot some of the companies's schedules.
6    Foot means to add them up.  You review the postings in
7    the general ledger.  Postings are entries that go into a
8    general ledger.  That would be like I'm looking at
9    step 3, which is just reviewing the accounts receivable
10   and general ledger accounts.  So you're looking inside
11   the books.
12       Q.   And turning to the next page, it talks
13   about -- and this is at E.  "Ascertain the propriety and
14   collectability of account receivable balances."  Do you
15   see that, sir?
16       A.   Yes, I do.
17       Q.   And what is the objective of the test
18   performed under section E relating to accounts
19   receivable?
20       A.   Well, propriety means you want to ascertain
21   that the account exists, it's proper.  And
22   collectability for an account receivable means you want
23   to determine that it was collected.  It became cash.
24       Q.   And are those some of the financial
25   statement assertions you need to audit when conducting

Page 2981

1    an audit of a company like Bankest?
2        A.   Yes.  In particular, that's the existence
3    assertion where we want to make sure that the
4    receivables and the other information here exist.
5        Q.   And to explain how these markings work, do
6    these notations, the C-1 or C-2, relate to specific
7    sections of the C section work papers where those steps
8    performed are listed?
9        A.   Yes.  It's kind of like an index or table of
10   contents.  So the column on the far right that has work
11   paper reference, that would indicate the author or the
12   preparer of the work paper.  So if you went to that work
13   paper, you could see the work that's being performed.
14   And to the left of that column are the initials of the
15   person that's performing that particular task.
16       Q.   Briefly discussing the types of steps you
17   need to perform to make a determination about the
18   propriety and collectability of the accounts receivable,
19   could you explain what these steps require?  For
20   example, testing the footing of the listings,
21   reconciling the balance of the general ledger, and
22   summarizing the scope for confirmations requests.
23       A.   Well, it's -- as far as the first step is
24   very basic step.  Testing the footing of the listing.
25   You want to make sure that what you received is

Page 2982

1   accurate. So you add it all up. The second step,
2   reconcile the balance of the general ledger. The
3   balance means the schedule that you are auditing. The
4   audit evidence that you are auditing, you want to make
5   sure it agrees to the general ledger.
6           The general ledger is basically the document
7   that is maintained by the client or the company that
8   records all of the cash in, all the cash out, all the
9   expenses. It's the whole history of the company. So
10  you want to make -- and that is you want to make sure
11  that what you have and what you're working with agrees
12  to that general ledger.
13      Q.   And the general ledger is a client-created
14  document?
15      A.   Yes, it is. And also what's in this section
16  is dealing with confirmations, sending out
17  confirmations, and monitoring the replies to the
18  confirmations.
19      Q.   Do you see here at section I it says -- I'm
20  sorry. Maybe it's not I. F rather. "Send out second
21  requests on positive confirmations for which no reply
22  was received." Do you see that?
23      A.   Yes, I do.
24      Q.   First of all, what do you mean -- what's a
25  positive confirmation?

Page 2983

1       A.   A positive confirmation is a -- basically,
2   it means when you send a confirmation which is a letter,
3   you want that third party to confirm back to you that
4   they are in agreement or not in agreement with the
5   amount that you're seeking the confirmation. It's
6   compared to just -- to take the (inaud.) all the way
7   through real quick -- to a negative confirmation, where
8   you send it out and you did not expect a response. But
9   in this case we used positive confirmations.
10      Q.   And it says that that step was done. Do you
11  see that?
12      A.   Yes.
13      Q.   How do you know that step was done,
14  Mr. Lenner?
15      A.   Because the individual that signed this work
16  paper stated by his signature that he performed that
17  step.
18      Q.   And you reviewed these work papers in
19  connection with this case, correct?
20      A.   Yes.
21      Q.   And did you review them also at the time?
22      A.   I certainly did.
23      Q.   But separate and apart from that, in
24  connection with this case, did you review the work
25  papers to determine as to whether or not second confirms

Page 2984

1   were sent as reflected on the planning document?
2       A.   Yes, I did.
3       Q.   And what did you ascertain, sir?
4       A.   That in the files we have duplicate
5   confirmations, means we have two copies of the same
6   confirmation that was sent to a customer. Which
7   indicates to me, seconds were sent.
8       Q.   And we started off your testimony after
9   lunch with a notation in some subsequent audit plans for
10  the C section work papers where there was a
11  determination that sending out a second confirm was not
12  considered necessary. NCN. Do you remember that?
13      A.   Yes.
14      Q.   Why did you think it wasn't considered
15  necessary in some prior years audits?
16      A.   After we had the experience of not receiving
17  response to the seconds, we determined that it wasn't
18  necessary to send out the seconds after we had two years
19  of history of no response.
20      Q.   Now, Mr. Lenner, are you familiar with the
21  GAAS standards relating to the confirmation process?
22      A.   Yes.
23      Q.   Did you consider whether the standard allows
24  you to take prior history into account when changing
25  your procedures?

Page 2985

1           MR. THOMAS: Objection, Your Honor.
2           THE COURT: Sustained. Rephrase your
3   question.
4   BY MS. BITAR:
5       Q.   Mr. Lenner, in making a decision to not send
6   second confirms in subsequent years, did you consider
7   the literature that addresses the confirmation process
8   that permits you to change your procedures based on
9   prior history?
10          MR. THOMAS: Objection, Your Honor.
11          THE COURT: Sustained.
12          MS. BITAR: Your Honor, may we have a side
13  bar?
14          THE COURT: No. Rephrase your question.
15  BY MS. BITAR:
16      Q.   Mr. Lenner, in performing your audit
17  procedures in connection with the 1998 audit, did you
18  consider the literature that speaks to reviewing prior
19  history of a client in conducting subsequent procedures?
20      A.   Yes.
21      Q.   Let's turn to the next page of the document,
22  please. This talks about evaluation of collectability
23  of receivables. And collectability is something
24  different than existence, right?
25      A.   Yes.

Page 2986

1    Q.    What's the difference?
2    A.    Collectability means that the receivable
3  is -- you realize cash for the receivable.  It converts
4  to a cash asset.
5    Q.    And why is collectability important?
6    A.    It is important because it proves the
7  existence assertion.  If someone pays you, that means
8  they're paying for an invoice that existed.
9    Q.    And how do you evaluate the collectability
10  of receivables when auditing Bankest?  What do these
11  steps require the auditor to do?
12    A.    It requires you to look in January, look in
13  February, that's the period after the end of the year,
14  which is December 31, and examine invoices and customer
15  checks and remittances to verify that collections were
16  received.
17    Q.    This section of the work papers references
18  comparing percentage of delinquent accounts, number of
19  days, sales and accounts receivable, the total returns
20  and allowances, and debt that's written off for those
21  prior periods.  What does that mean, sir?
22    A.    That's basically in a -- called a
23  substantive analytical procedure as we look at
24  relationships between the various components of a
25  particular account.  In this case you'd be looking at

Page 2987

1  the various components that relate to accounts
2  receivable, such as bad debts written off or delinquent
3  accounts or the number of days.  Those are looking at
4  relationships.
5    Q.    And why is looking at relationships
6  important when making a determination about the
7  existence of accounts receivable?
8    A.    You have certain expectations.  You have
9  certain history to consider.  And if the relationships
10  that you look at match your expectations or match your
11  history, then you can conclude that the accounts do
12  exist.  It's an additional procedure that's used in
13  conjunction with your basic procedure, such as looking
14  at invoices, looking at customer collections.  It's
15  something that you use together to reach a conclusion as
16  to the fairness of the particular account that you are
17  auditing.
18    Q.    Let's look at E.  It says, "Turnover ratios
19  and obtain management explanation for unusual
20  fluctuations."  What kind of analysis does that entail,
21  and why is it important?
22    A.    That would entail looking at the receivables
23  as to how many times they are collected in a particular
24  year over a 12-month period.  You would expect it to
25  turn over a certain number of times.  And then you have

Page 2988

1  a discussion with management if it doesn't reach your
2  expectation.
3    Q.    And then in the last thing it talks about is
4  "To discuss the collectability of accounts with a
5  responsible official considering possible overall effect
6  of the economy, customer's ability to pay," et cetera.
7  Why is that important?
8    A.    That's important because at any point in
9  time not all the receivables would be collected.  Some
10  people might pay beyond 90 days, beyond a hundred days.
11  And you want to understand what that company is doing to
12  collect the receivables.  What kind of communications do
13  they have with the customers or with the clients in this
14  case to see that the receivables will be, in fact,
15  collected at some future time.
16    Q.    And if those receivables are not
17  collectable, are they written off as assets?
18    A.    What happens is if you have doubt as to the
19  collectability of a receivable, then what you do is you
20  would suggest to the company or you do what's called
21  propose an adjustment to write-off or to reserve those
22  particular accounts receivable.  That would mean you
23  would take an allowance and you would estimate what you
24  think might not be collected.  And that's something that
25  you would record because you want to record receivables

Page 2989

1  based on what you expect to collect.
2    Q.    And are those steps that the BDO engagement
3  team performed when reviewing the collectability and
4  existence of accounts receivable?
5    A.    Yes.
6    Q.    If you turn to the very end of the document
7  it says, "Conclusions on year-end balances and sales and
8  trade receivables."  You see that?
9    A.    Yes.
10    Q.    Now, Mr. Lenner, is there a conclusion
11  section at the end of every planning memo with respect
12  to each of the balance sheet items?
13    A.    Not only is there a conclusion for every
14  planning memo, there is -- this is an audit program
15  which is our plan procedures for every, single, major
16  account.  We have these audit steps that you've seen one
17  example of and we have this conclusion there too.  It's
18  signed off.
19    Q.    And so it says, "Based on the result of work
20  performed, it's my opinion that the trade receivables
21  and sales" -- that's the accounts receivable here,
22  correct?
23    A.    Yes.
24    Q.    -- "are properly classified and stated in
25  accordance with Generally Accepted Accounting Principles

Page 2990

1   on a consistent base and that those receivables
2   represent bona fide receivables."
3        Did I read that correctly?
4        A.   Yes.
5        Q.   And that's something each auditor has to
6   individually sign off on?
7        A.   That's correct.
8        Q.   And was that done here, sir?
9        A.   Yes.  That was signed by Mr. Rivera, myself,
10  and Mr. Ellenburg.  Those are the three signatures that
11  are on this page.
12       Q.   Turning to the next page of the document,
13  just describe what a lead sheet is, sir.  It says lead
14  sheet on top.
15       A.   A lead sheet is a summary of the account.
16  It's coming from the general ledger.  What we do is we
17  import electronically the information from the general
18  ledger into our software so we have these lead sheets.
19       Q.   Now let's go to the next page of the
20  document.  This is a memo from Mr. Rivera and an Alain
21  Steiselboin to the files.
22       A.   That's correct.
23       Q.   Can you identify what that document is, sir?
24       A.   This is a memo that -- that supplement the
25  audit programs.  It explains in a little more details

Page 2991

1   the procedures that are performed by Mr. Rivera and
2   Mr. Steiselboin.
3        Q.   And it talks about the fact that certain
4   confirmations were sent and received; is that right?
5        A.   Yes, it does.
6        Q.   And it talks about review of certain
7   collections, correct?
8        A.   Yes.  It gives an overall picture to the
9   reviewer.  In this case, it says in the first paragraph
10  that we confirmed two confirmations.  We got back two.
11  A total of a little over $15 million.  And in addition
12  to that, we obtained from the client a listing of the
13  collections through a particular point in time -- which
14  is February 12th in this memo -- and we examined about
15  $10 million.
16       And in the second step goes on to talk about
17  additional tests that we did to test the accounts
18  receivable.  And in this case, we were testing the aging
19  to see that the invoice dates on the invoice were the
20  same invoice dates that are being used in the company's
21  aging analysis or aging reports.  So that is with a
22  test -- those are the tests that we performed and it's
23  just summarized in a memo.
24       Q.   And when there are references to other
25  sections in the work papers like C-10 or C-12, is that

Page 2992

1   where the actual work is being performed that relates to
2   the narrative of the work paper?
3        A.   Similar context to a program, a reference.
4   Like an index, it's a reference to where the work was
5   being performed.
6        Q.   And again, is this to create an audit trial
7   so that you can understand years later what steps were
8   performed?
9        A.   Exactly.  It's there to document that the
10  work that was performed at the time is -- was performed.
11  And in this case it was performed in February of 1999.
12       Q.   Now, if you go to the next page, this is
13  something that says PBC.  That's prepared by client?
14       A.   Yes, this is an aging analysis.  It
15  basically lists all of the customers of E.S. Bankest,
16  and it just lists them and then ages them.  And we were
17  able to review the aging and review the customer base by
18  looking at the next few pages.
19       Q.   Now, let's go to BDO 870, where it says A/R
20  circularization.
21            MS. BITAR:  It's at 384.
22            (Technician complies.)
23            MS. BITAR:  Can we blow up the document,
24  please?
25            (Technician complies.)

Page 2993

1   BY MS. BITAR:
2        Q.   I think we've seen that document.
3            Mr. Lenner, what is a circularization
4   summary?
5        A.   This is a summary of the various customers
6   of E.S. Bankest, and it ties into our lead sheet.  And
7   it also indicates -- it's a summary of supporting the
8   information that we saw in that memo as well as -- it's
9   like if you look in the first or the second column, it
10  shows that $15 million was confirmed.  And then in the
11  second column it shows that we examined subsequent
12  receipts -- which is the actual cash coming in -- of a
13  little over $7 million.  And then we performed some
14  other procedures in the third column.  So those columns
15  denote the types of procedures that we performed in
16  summary form.
17       Q.   So does this work paper reflect the various
18  tests that were performed to conclude the existence of
19  the accounts receivable?
20       A.   Yes.  And in a nutshell, it basically
21  puts -- it summarizes the procedures.  It summarizes the
22  numbers and the procedures that we performed.
23       Q.   Now, when it says amount confirmed, you see
24  that in the first column?
25       A.   Yes.

Page 2994

1    Q.   From looking at this work paper, do you
2  understand how those account balances were confirmed?
3    A.   Yes.
4    Q.   How was that, sir?
5    A.   A confirmation was sent out to the clients
6  in this case and they responded back that they were in
7  agreement with the accounts receivable balances on the
8  books of E.S. Bankest.
9    Q.   And that references -- there's a reference
10 in the work papers to C-14 and C-6.  Do you see that?
11   A.   Yes.
12   Q.   Does that mean that that's where those
13 confirms are maintained in the work papers?
14   A.   Yes.
15   Q.   Let's try to find one just so we can show
16 the jury what that confirm looks like.  Can you go to
17 BDO 881?
18   A.   Yes.
19   Q.   And --
20       MS. BITAR:  Let's just get it on the screen.
21       (Technician complies.)
22       MS. BITAR:  Can you blow up the first
23 paragraph, Glenn?
24       (Technician complies.)
25 BY MS. BITAR:

Page 2995

1    Q.   Now, this is a confirm to CD Jewel Box; is
2  that right?
3    A.   Yes.
4    Q.   Was CD Jewel Box a customer or a client of
5  Bankest?
6    A.   A client of Bankest.
7    Q.   And did CD Jewel Box send back this
8  confirmation reflecting the amount of accounts
9  receivable at December 31st?
10   A.   Yes.
11       MS. BITAR:  Could you blow up the bottom
12 part of that confirm, please.
13       (Technician complies.)
14 BY MS. BITAR:
15   Q.   Could you explain what -- how this
16 confirmation process works, Mr. Lenner?
17   A.   In the first sentence, which is the typed
18 sentence on that blowup -- actually, it's in the middle
19 of the page, Mr. Kossoff is confirming that $7.5 million
20 is correct and represents accounts receivable that were
21 sold and transferred to Bankest Capital for certain CD
22 Jewel Box customers.  In addition, he gives supplemental
23 information indicating that according to his records,
24 he's telling us that subsequent to year-end, he made the
25 following -- he remitted the following customer

Page 2996

1  collections.  And it goes to list some of the customers
2  and the invoices that were paid by the customers.
3    Q.   Mr. Lenner, do you now know that CD Jewel
4  Box was a sham company of Dominick Parlapiano?
5    A.   I now know that.
6    Q.   Do you now know that Jay Kossoff was
7  Dominick Parlapiano?
8    A.   I became aware of that during the course of
9  these proceedings.
10   Q.   And at the time, did you have any reason to
11 doubt that Jay Kossoff at CD Jewel Box was an actual
12 person at a righteous company?
13   A.   No.
14   Q.   Going back to BDO 384, the circularization
15 summary we looked at before we actually looked at the CD
16 Jewel Box confirm, going to the -- we talked about the
17 accounts -- the amounts confirmed.  And there's a
18 reference to the CD Jewel Box confirmation.  Do you know
19 what the other confirmation was in the 1998 work papers,
20 sir?
21   A.   Yes.  That was Perry Baromedical, I believe.
22   Q.   And that's located at C-14?
23   A.   That's correct.  If you go to work paper
24 C-14, you will see the confirmation from Perry.
25   Q.   And then it talks about subsequent receipts.

Page 2997

1  Do you see that?  That's the next column, right?
2    A.   Yes.
3    Q.   What does subsequent receipts mean in this
4  context?
5    A.   Those are the receipts that are received in
6  January, February, after the end of the year, that
7  are -- that relate to the accounts receivable that
8  exist.  So it's showing what came in after the end of
9  the year as an additional proof of the existence of
10 those receivables.
11   Q.   Now, Mr. Lenner, we've seen a lot of the
12 C-10 work paper.
13       MS. BITAR:  Mr. Thomas, with your
14 permission, can I just show this to Mr. Lenner for a
15 moment?
16       MR. THOMAS:  Sure.  You got it?
17       MS. BITAR:  Yeah.
18 BY MS. BITAR:
19   Q.   You see that, sir?
20   A.   Yes.
21   Q.   And are the listed customers on the C-10
22 work paper reflected on the circularization summary?
23   A.   Yes.
24   Q.   Let me ask you a question.  For example, DBI
25 Financial, that's number 10 --

Page 2998

1      MS. BITAR: I don't need that on. I want to
2  keep the circularization on.
3      (Technician complies.)
4  BY MS. BITAR:
5      Q. If you go down to number 10, DVI Financial,
6  you see that?
7      A. Yes.
8      Q. That was a Perry customer, correct?
9      A. Yes.
10     Q. And Perry confirmed that accounts receivable
11 by virtue of a confirmation, correct?
12     A. Yes.
13     Q. And yet you still looked at the subsequent
14 collection from DVI, correct?
15     A. That's correct.
16     Q. Did you need to do that if you already got a
17 confirmation from the client Perry Baromedical?
18     A. No, it was not necessary. We already
19 received confirmation that the receivable exists, but we
20 did an additional procedure. It was our first year and
21 we did a little more than what we normally would do.
22     Q. So, Mr. Lenner, is it fair to say you didn't
23 even have to go to alternate procedures as it related to
24 those customers where the client confirmed the
25 outstanding balance, correct?

Page 2999

1      A. Yes.
2      Q. Let's go to the next page of the -- after
3  the circularization summary. And this talks about a
4  substantive test sample size guide. What kind of
5  information is conveyed in this work paper?
6      A. This work paper just assists us in
7  determining our sample size that we would determine for
8  purposes of auditing these receivables.
9      Q. Now, we talked before about the engagement
10 letters and that an audit is a sampling, correct?
11     A. Yes.
12     Q. And when conducting audit procedures related
13 to sampling, does BDO use a specific -- various types of
14 methodologies, various ways of determining how you're
15 going to sample?
16     A. Yes, we do.
17     Q. And does this work reflect the way in which
18 the accounts receivable sample was created?
19     A. Yes, it does.
20     Q. And generally speaking, does the audit team
21 do this or does somebody else do this?
22     A. Generally, it's done by the audit team. And
23 if there's a question, then it goes outside the office
24 for one of the firm specialists to assist with.
25     Q. And in the course of these Bankest audits,

Page 3000

1  did the BDO audit team go to outside technical support
2  at BDO to make sure that the sampling was done
3  correctly?
4      A. Yes. We frequently obtained the approval of
5  these people, of these national experts, to assist us in
6  sampling in other areas in this audit.
7      Q. And Mr. Lenner, there's something called a
8  statistically reliable sample. Did you hear some
9  discussion about that in the course of this trial?
10     A. Yes.
11     Q. What is that and why is that important?
12     A. It's important to make a statistical sample
13 so your sample has an equal chance of being selected
14 from the entire population. Because the sample -- if
15 you look at a few items, you want it to be
16 representative of the total population. So by achieving
17 a statistical sample, then you reach that goal of
18 getting a sample that's statistically sound.
19     Q. And when you say statistically sound, what
20 does that mean?
21     A. That means it's based on certain parameters
22 that the firm uses, as well as it's just based on
23 sampling history and sampling knowledge that the audit
24 team has, as well as what's in the audit manual and
25 what's in the literature.

Page 3001

1      Q. Can you go to BDO 875 at 389?
2      A. (Complies.)
3      Q. This says, "Substantive test sample size
4  guide." Does this document reflect the type of analysis
5  that goes into a determination about sampling the
6  population?
7      A. Yes, it does.
8      Q. And when you say statistically reliable
9  sample, once a determination is made that you have a
10 statistically reliable sample based on this matrix, are
11 you allowed to take from that the result for the entire
12 population?
13     A. Yes.
14     Q. So is this the mechanism whereby BDO can do
15 selective testing and reach conclusions on the entire
16 accounts receivable portfolio?
17     A. This is one mechanism that allows you to do
18 selective testing, and there's certainly many other
19 mechanisms too.
20     Q. And these steps were all employed in the
21 Bankest audits?
22     A. Yes.
23     Q. Mr. Lenner, we were talking about sending
24 out confirms. Do you recall that testimony generally?
25     A. Yes.

Page 3002

1    Q.   And is it fair to say that sometimes
2  companies will not send confirms back?
3    A.   Yes.
4    Q.   And in connection with factoring companies,
5  was it your experience that that was often the case?
6    A.   Yes, that was my experience.  It was the
7  experience of PricewaterhouseCoopers --
8       MR. THOMAS:  Objection, Your Honor.
9       THE COURT:  Sustained.
10 BY MS. BITAR:
11   Q.   Was it your experience based on what you saw
12 at Bankest and based on your prior experience?
13   A.   Yes.  It's very common for large companies
14 such as the customers that the E.S. Bankest had that
15 they would not confirm the receivables.
16   Q.   I'd like you to look at BDO 890.
17   A.   (Complies.)
18   Q.   Do you have that, sir?
19   A.   Yes.
20   Q.   890.
21      MS. BITAR:  It's 404, Glenn.
22      (Technician complies.)
23 BY MS. BITAR:
24   Q.   I know it's pretty hard to read.
25   A.   It certainly is.

Page 3003

1    Q.   Maybe your copy is a little better.  Can you
2  read what this is, Mr. Lenner?  Can you identify this
3  work paper?
4    A.   Yes.  This is a response that we received
5  from JC Penney basically saying that they're unable to
6  confirm.  And if you look, they were giving the
7  reason -- that's the first reason up there -- saying,
8  "JC Penney cannot verify the balance of the accounts.
9  You can verify the balance by referring to your
10 remittance statements and the company payments made
11 prior to the date of your audit."
12      So they are basically unable to respond to a
13 confirmation request.
14   Q.   Mr. Lenner, turning now --
15      MS. BITAR:  One moment, please, Judge.
16 BY MS. BITAR:
17   Q.   Let's turn now, Mr. Lenner, to the
18 confirmation/control section of these work papers.  Do
19 you have that, sir?
20   A.   Not yet.  All right.  I have it.
21   Q.   Thank you.  Is the confirmation/control
22 section an independent section of each year's Bankest
23 work papers?
24   A.   Yes, it is.
25   Q.   And what is a confirmation, slash, control

Page 3004

1  work paper?
2    A.   A confirmation/control work paper, it's the
3  listing of the confirmations that we sent out on the
4  first time.  And there's little columns that when a
5  confirmation comes back, you would put a check mark that
6  it's been received.
7    Q.   Now, so is it basically the work papers that
8  reflect what was sent out and what was received back?
9    A.   Generally speaking, yes.
10   Q.   And do you keep copies of the confirmations
11 that are sent in this portion of the work papers?
12   A.   Yes.  Some people keep lists.  Some people
13 keep copies of the confirmations in lieu of a list.  And
14 we have both here.
15   Q.   Okay.  And when the confirmation is actually
16 sent back and signed, is that part of the C section
17 accounts receivable work papers?
18   A.   Yes.  That's like the two confirmations that
19 we saw earlier today.
20   Q.   Now, let's just go through these
21 confirmations to get an idea about the type of things
22 that are confirmed.
23      Turning to -- relating to accounts
24 receivable.  Turning to BDO 232, you see that, sir?
25   A.   If you can give me the Bates number.

Page 3005

1    Q.   I'm sorry.  It's BDO 722.
2    A.   Yes.
3       MS. BITAR:  And if we can blow that up so
4  the jury can see it a little better.
5       (Technician complies.)
6  BY MS. BITAR:
7    Q.   That's a confirmation to JC Penney, right?
8    A.   That was the confirmation that we sent to
9  JC Penney, correct.
10   Q.   And we saw the actual returned confirmation
11 previously, correct?
12   A.   Yes, we did.
13   Q.   And who prepares the confirmation?
14   A.   The confirmation is prepared by the client,
15 then it's returned to BDO, and then we mail it.
16   Q.   And why does the client prepare the
17 confirmation?
18   A.   They prepare it because it's a ministerial
19 type of a task.  It's something that it would not make
20 sense for us to do it.  It's something that's more cost
21 effective if the client prepares it, then we review it,
22 and then we mail it out.
23   Q.   And is it your understanding, sir, that the
24 amount to confirm is a number that ties to the general
25 ledger?

Page 3006

1      A.   Yes.
2      Q.   And I see that this is a confirm to
3  JC Penney, correct?
4      A.   Yes.
5      Q.   And the vendor is Joy.  Do you see that,
6  sir?
7      A.   Correct.
8      Q.   So that means Joy was the Bankest client and
9  you were confirming to the client's customer, JC Penney,
10  correct?
11      A.   That's correct.
12      Q.   And by the way, it says on the top here,
13  Espirito Santo Bankest, LLC.
14      A.   Yes.
15      Q.   So is this a client letterhead?
16      A.   Yes.
17      Q.   And Mr. Lenner, in this confirmation/control
18  section, are there copies of all of the accounts
19  receivable confirmations that BDO sent?
20      A.   Yes.
21      Q.   And you talked about second requests.  Let's
22  go, for example, to the Ames Department Store
23  confirmation which is at BDO 726.
24      A.   Yes.
25      Q.   Is there another one of those confirmations

Page 3007

1  a little further back in the confirmation/control
2  section?
3      A.   Yes.
4      Q.   And that's at BDO 745?
5      A.   That's correct.
6      MS. BITAR:  Can we go to that one, please?
7      (Technician complies.)
8  BY MS. BITAR:
9      Q.   So was it based on review of these work
10  papers that you conclude that second requests were, in
11  fact, sent to these customers?
12      A.   This as well as the signature in the audit
13  program that documented that the procedure was
14  performed, yes.
15      Q.   Now, Mr. Lenner, there's been some testimony
16  about the agreed-to-invoice test, correct?
17      A.   Yes.
18      Q.   And what is the agreed-to-invoice test?
19      A.   That is where we obtain the invoice.  We
20  examine the invoice.  We inspect it, and we compare it
21  to the books and records of E.S. Bankest.
22      Q.   When you do that, sir, do you take the
23  invoices at face value?
24      A.   No.
25      Q.   For example, if an invoice did not have the

Page 3008

1  traditional terms of an invoice, would that have raised
2  questions to you?
3      A.   Yes.  If it doesn't have the terms that we
4  would expect to see, it certainly would raise a
5  question.
6      Q.   If it was written on a napkin, would that
7  have raised a question?
8      A.   Yes.
9      Q.   Indeed, a valid invoice has certain
10  information on it, correct?
11      A.   Yes.
12      Q.   Let's look at Exhibit 4492 in evidence.
13  This is a composite exhibit of a bunch of invoices.
14      MS. BITAR:  May I approach, Judge?
15      THE COURT:  You may.
16      MS. BITAR:  (Complies.)
17  BY MS. BITAR:
18      Q.   And could you please turn to page 7 of the
19  document, 4492-0007.  You see that?
20      A.   Not yet.
21      Q.   Tell me when you get there.
22      A.   I have that invoice in front of me.
23      MS. BITAR:  Get it on the screen.
24      (Technician complies.)
25      MS. BITAR:  Can you highlight the top of the

Page 3009

1  invoice, please?
2      (Technician complies.)
3      MS. BITAR:  Give me a second, Your Honor.  I
4  don't know what I did with the -- okay.
5  BY MS. BITAR:
6      Q.   Mr. Lenner, an invoice is a contract,
7  correct?
8      MR. THOMAS:  Objection, Your Honor.  Calls
9  for a legal conclusion.
10      THE COURT:  Overruled.
11  BY MS. BITAR:
12      Q.   You may answer.
13      A.   Yes, it is.
14      Q.   It has a heading that tells you the name of
15  the company that issued the invoice, right?
16      A.   Yes.
17      Q.   If the invoice was missing a letterhead,
18  would that have raised an issue with you?
19      A.   It certainly would.
20      Q.   The invoice also has a description of the
21  product sold, correct?
22      A.   Yes, it does.
23      Q.   And in this case, this is an invoice showing
24  to Sam's Club, correct?
25      A.   Yes.

Page 3010

1    Q.  And what is being shipped, Mr. Lenner?
2    A.  Microfiber pants.
3    Q.  And the invoice has the amount owed,
4  correct?
5    A.  Yes, it does.
6    Q.  And this invoice shows the money owing, does
7  it not?
8    A.  Yes.
9    Q.  And the invoice has the payment terms,
10  correct?
11    A.  Yes, it does.
12    Q.  What are the terms of this invoice, sir?
13    A.  It says "Terms net 30" on the top and then
14  "Payment due by 11-13-00."
15    Q.  So the terms of this invoice is 30 days,
16  correct?
17    A.  No.  The term of this invoice is --
18  actually, it's 90 days.
19    Q.  Where is that on the document?
20    A.  It's on the bottom.
21    Q.  I'm trying to find it myself.
22    A.  It's net 90 in the top.  It's due 11-13.
23  That's on the bottom.  And on the top it says net 90.
24    Q.  And that's over here, correct?
25    A.  Yes.

Page 3011

1    Q.  And that means the payment is due in
2  90 days, right?
3    A.  Yes.
4    Q.  Does this invoice have all the terms you'd
5  expect?
6    A.  Yes, it does.
7    Q.  Does it look real?
8    A.  Yes.
9    Q.  Do you have any reason to believe that it's
10  fake?
11    A.  None.
12    Q.  And what you've just done is inspect the
13  invoice, correct?
14    A.  That's correct.
15    Q.  It has all the terms you'd expect, right?
16    A.  Yes.
17    Q.  It's not on a napkin?
18    A.  No.
19    Q.  In conducting the agreed-to-invoice test,
20  you relied upon the face of the invoice, right?
21    MR. THOMAS:  Objection.  Leading, Your
22  Honor.
23    THE COURT:  Sustained.
24  BY MS. BITAR:
25    Q.  Did you rely -- what did you rely on?

Page 3012

1    A.  I relied on the information that was in the
2  invoice and that it appeared to be a true and accurate
3  document prepared by a third party.
4    Q.  You inspected the -- did you inspect the
5  invoice?
6    A.  Yes.
7    Q.  Did you touch the invoice?
8    A.  Yes.
9    Q.  Put that down, sir.
10    Mr. Lenner, I would like you to look at
11  Exhibit 131 in evidence and specifically at page 138.
12    MS. BITAR:  May I approach, Judge?
13    THE COURT:  You may.
14    MS. BITAR:  (Complies.)
15  BY MS. BITAR:
16    Q.  Now, Mr. Lenner, what is an AU?
17    A.  That is a prefix for a section, that's the
18  beginning section.  It stands for auditing.  So this
19  would be in this document AU section 326.  If you wanted
20  to find this, you just look for AU 326.
21    Q.  And is this audit literature you considered
22  when conducting the Bankest audit?
23    A.  Yes.
24    Q.  Mr. Lenner, the first -- the section 01 of
25  this standard says that "The third standard of field

Page 3013

1  work is sufficient, competent evidential matter is to be
2  obtained through inspection, observation, inquiries, and
3  confirmations to afford a reasonable basis for an
4  opinion regarding the financial statements of an audit."
5    You see that, sir?
6    A.  Yes.
7    Q.  And you recognize this rule, sir?
8    A.  Very much so.
9    Q.  What is evidential matter?
10    A.  Evidential matter is basically any
11  information that's in the hands of the client, any
12  accounting records, anything that corroborates or
13  anything that supports the assertion or supports a
14  number that's in the financial statements.  That's
15  really what evidential matter is.  That's something we
16  then have to audit it.  But evidential matter on its
17  face is documents in the client's possession that are
18  given to the auditor so he or she can conduct their
19  audit.
20    Q.  And in determining about whether an invoice
21  actually exists, is evidential matter important?
22    A.  Yes, it is.  It's very important.
23    Q.  When you conducted the Bankest audits, did
24  you believe that the invoices themselves constituted
25  evidential matter?

Page 3014

1    A.  Yes.
2    Q.  And did you consider section 01 which states
3  that sufficient, competent evidential matter is to
4  obtained through inspection?
5    A.  Yes.
6    Q.  Did you believe that reviewing the invoices
7  constituted competent evidence upon which you could
8  rely?
9    A.  Yes, it's the first example right here.
10      MR. THOMAS:  Objection, Your Honor.
11      THE COURT:  Overruled.
12  BY MS. BITAR:
13    Q.  You may answer, sir.
14    A.  Yes, it's the first item here.  Inspection.
15  That's what we did.
16    Q.  And is an invoice a contractual obligation
17  to pay?
18      MR. THOMAS:  Objection, Your Honor.
19      THE COURT:  Overruled.
20      THE WITNESS:  Yes, it is.
21  BY MS. BITAR:
22    Q.  Now, let's turn to section .21 in this
23  standard.  That's on page 140.
24      Mr. Lenner, do you recognize this standard?
25    A.  Yes.

Page 3015

1    Q.  And is this the standard that says evidence
2  is presumed competent?
3    A.  Yes.
4    Q.  And is evidential matter one of the core
5  concepts in auditing?
6    A.  Yes.
7    Q.  And did you consider this portion of the
8  standard when conducting your audits of Bankest?
9    A.  Yes, I considered this portion.
10    Q.  And this portion of the standard discusses
11  the various types of evidence that constitute good
12  evidence, correct?
13      MR. THOMAS:  Objection, Your Honor.  Leading
14  as well as --
15      THE COURT:  Sustained.
16  BY MS. BITAR:
17    Q.  Did you consider whether receiving evidence
18  from an independent source provides greater assurance
19  for purposes of developing competent evidential material
20  from which you can render an opinion?
21    A.  Yes, I considered that.
22      THE COURT:  It's a yes or no.
23      THE WITNESS:  I'm sorry.  Yes.
24      THE COURT:  Next question.
25  BY MS. BITAR:

Page 3016

1    Q.  Did you consider the evidence competent at
2  the time?
3    A.  Yes.
4    Q.  Now, subsection B of the standard discusses
5  internal controls.  And it says, "The more effective the
6  internal control, the more assurance it provides about
7  the reliability of the accounting data and financial
8  statements."
9      Did I read that correctly?
10    A.  Yes.
11    Q.  And section C speaks to "The independent
12  auditor's direct personal knowledge obtained through
13  physical examination, observation, computation, and
14  inspection and is deemed more persuasive than
15  information obtained indirectly."
16      Did I read that right?
17    A.  Yes.
18    Q.  Did you consider your team's physical
19  examination and inspection of invoices to fall within
20  this provision?
21      MR. THOMAS:  Objection, Your Honor.
22      THE COURT:  Sustained.
23  BY MS. BITAR:
24    Q.  Did you consider this provision when
25  conducting the Bankest audits?

Page 3017

1    A.  Yes.
2    Q.  Did you conclude at this time that
3  inspecting the invoices provided competent evidence of
4  existence?
5    A.  Very much so.
6    Q.  This case is all about hindsight, isn't it?
7      MR. THOMAS:  Objection, Your Honor.
8      THE COURT:  Sustained.
9  BY MS. BITAR:
10    Q.  Did you have any reason to believe in 1998
11  through 2002 that those invoices inspected by your audit
12  team or you were fake?
13    A.  No.
14      THE COURT:  Are you going into a new area?
15      MS. BITAR:  Yes, Your Honor.
16      THE COURT:  Why don't we break for the day.
17  Let me get my bailiff down here.
18      All right.  Ladies and gentlemen, you're not
19  to discuss the case among yourselves or with anyone
20  else.  Do not allow anyone to discuss the case with you.
21  You're not to form a definite or fixed opinion about
22  this case until you've heard all the evidence, the
23  argument by the lawyers, the instructions on the law by
24  me.  You're not to see, hear, or read any accounts of
25  this case in the media.  And you're not to -- you're to