Page 3018

1  disregard the presence of the lawyers outside this
2  courtroom, and that includes the witness, and they're to
3  disregard yours. 9:30 tomorrow. Same place. Have a
4  good evening. Leave your notes. Drive safely home.
5        (Thereupon, the jury was escorted out of the
6  courtroom.)
7        THE COURT: Mr. Lenner, you're not to
8  discuss the testimony you've given or the testimony you
9  will be giving with anyone including the lawyers.
10       THE WITNESS: Yes, sir.
11       THE COURT: Have a good evening. You all
12  have a good night unless there's something to take up.
13       MS. BITAR: No, Your Honor. Thank you.
14  Good night.
15
16       (Thereupon, at approximately 5:50 p.m., the
17  above portion of the trial was concluded.)
18
19          *      *      *
20
21
22
23
24
25

Page 3019

1          CERTIFICATE OF COURT REPORTER
2
3        I, GIZELLA BAAN, court reporter, before whom
4  the foregoing statement was taken, do hereby certify
5  that the statement made was taken by me stenographically
6  at the time and place mentioned in the caption hereof
7  and thereafter transcribed by me to the best of my
8  ability; that said transcript is a true record of the
9  statement given; that I am neither counsel or, related
10  to, nor employed by any of the parties to the action in
11  which these proceedings were taken; and further, that I
12  am not a relative or employee of any party hereto, nor
13  financially or otherwise interested in the outcome of
14  this action.
15
16
17
18       _____
19          GIZELLA BAAN
20       Court Reporter and Notary Public
21        in and for the State of Florida
22
23
24
25

Page 3020

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
------------------------------------------------x

PAGES 3020 - 3188

Volume 25

Miami, Florida

Thursday, May 3, 2007

10:10 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 3021

```
 1          A P P E A R A N C E S
 2
 3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
 4   INTERNATIONAL, LTD., ET AL.:
 5
 6   SULLIVAN & CROMWELL, LLP
 7        1888 Century Park East
 8        Los Angeles, California 90067
 9        (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11        Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14        334 Minorca Avenue
15        Coral Gables, Florida 33134
16        (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20        350 East Las Olas Boulevard, Suite
21        Fort Lauderdale, Florida 33301
22        (954) 525-9900
23   BY:  Mitchell W. Berger, Esquire
24
25
```

Page 3022

```
 1   On behalf of Defendant BDO Seidman, LLP:
 2
 3   ALVAREZ, ARMAS & BORRON
 4        901 Ponce de Leon Boulevard, Suite 304
 5        Coral Gables, Florida 33134
 6        (305) 461-5100
 7   BY:  Arturo Alvarez, Esquire
 8
 9   GREENBERG TRAURIG, LLP
10        MetLife Building
11        200 Park Avenue, 15th Floor
12        New York, New York 10166
13   BY:  Adam D. Cole, Esquire
14        Karen Y. Bitar, Esquire
15
16   GREENBERG TRAURIG, LLP
17        1221 Brickell Avenue
18        Miami, Florida 33131
19   BY:  Mark Schnapp, Esquire
20        Nikki Simon, Esquire
21
22
23
24
25
```

Page 3023

```
 1   On behalf of Third-Party Defendants Victor Balestra,
 2   Bernard Mollet, and Joaquin Garnecho
 3
 4   RICHMAN, GREER, WEIL, BRUMBAUGH,
 5   MIRABITO & CHRISTENSEN, P.A.
 6        Miami Center, Suite 1000
 7        201 S. Biscayne Boulevard
 8        Miami, Florida 33131
 9        (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12
13   On behalf of Third-Party Defendant Bernard Mollet
14
15   GAMBA & LOMBANA, P.A.
16        2701 Ponce de Leon Boulevard, Mezzanine
17        Coral Gables, Florida 33134
18        (305) 448-4010
19   BY:  Hector J. Lombana, Esquire
20        Geoffrey Marks, Esquire
21
22
23
24
25
```

Page 3024

```
 1          C O N T E N T S
 2
 3   EXAMINATION OF SANDOR LENNER BY:        PAGE:
 4     MS. BITAR:  (Direct, cont'd)      3027
 5     MR. THOMAS:  (Cross)              3150
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3025

1          PROCEEDINGS
2          THE COURT:  Are you all ready or do we need
3   to address something before we go?
4          MS. BITAR:  I'm ready, Judge.
5          THE COURT:  All right.  I have a request
6   from a juror.
7          (Thereupon there was a brief discussion off
8   the record.)
9          THE COURT:  Why don't you bring in
10  Mr. Lenner?  Are they all here?
11         THE BAILIFF:  I'll check.
12         (Thereupon, the witness takes his seat at
13  the witness stand.)
14         THE COURT:  Mr. Thomas, Plaintiff was going
15  to file a motion sometime today.
16         MR. THOMAS:  Sometime today, yes, sir.
17         (Thereupon, there was a brief discussion off
18  the record.)
19         THE BAILIFF:  All rise for the jury.
20         (Thereupon, the jury was brought into the
21  courtroom.)
22         THE COURT:  Good morning.  You may be
23  seated.  Good morning, ladies and gentlemen.  How are
24  you today?
25         Ms. Murado, I hear you want to participate

Page 3026

1   in the corporate run this afternoon?
2          JUROR:  No, I am.  I'm walking.
3          THE COURT:  You're not running?  Actually,
4   it's at 6:45.
5          JUROR:  No, it's at 6:00.
6          THE COURT:  I'm ahead of you.
7          JUROR:  They told me to be there at 6:00.
8          THE COURT:  They told me at 6:45, Bayfront
9   Park.  That's what it says.  6:45.
10         JUROR:  Yes.
11         THE COURT:  You didn't just make this up so
12  we could go home early?
13         (Laughter).
14         JUROR:  No, I was told that I needed to be
15  there at 6:00.
16         THE COURT:  Meaning, are you ready to go
17  from here?
18         JUROR:  Yeah.  I brought my clothes.  I'm
19  changing here.
20         THE COURT:  All right.
21         I can't tell you right now what time we're
22  finishing but we'll get done in time for you to do what
23  you need to do.
24         JUROR:  All right.
25         THE COURT:  Ms. Bitar, you may proceed with

Page 3027

1   your direct.
2          MS. BITAR:  Thank you, Your Honor.
3          DIRECT EXAMINATION  (continued)
4   BY MS. BITAR:
5      Q.  Good morning, Mr. Lenner.
6      A.  Good morning, Ms. Bitar.
7          MS. BITAR:  Good morning, ladies and
8   gentlemen of the jury
9   BY MS. BITAR:
10     Q.  Mr. Lenner, let's start with a few follow-up
11  questions from yesterday's testimony.  Okay?
12     A.  Yes.
13     Q.  One minute, please.
14         (Closing the door.)
15         Mr. Lenner, yesterday do you remember
16  discussing the BDO assurance manual?
17     A.  Yes.
18     Q.  And I don't know if I asked you this so I'm
19  going to ask you it now.
20         Did you consider the recommendations in the
21  assurance manual when doing the audits of Bankest?
22     A.  Yes.
23     Q.  And I remember you gave some testimony about
24  how the assurance guide is instructive.  Do you remember
25  that ?

Page 3028

1      A.  Yes.
2      Q.  But you made the distinction that it related
3   to a manufacturing or service entity.  Do you recall
4   that testimony?
5      A.  Yes, I do.
6      Q.  What did you mean by that?
7      A.  A commercial company, a manufacturing
8   company and a distribution company -- that's what I
9   mentioned yesterday -- those are the preponderance or
10  the majority of the types of companies there are as well
11  as service-based companies.  And those are companies, a
12  manufacturing company, it manufactures a product.  A
13  distributor, like Sysco Foods, they would buy and sell
14  products, and then a service company would bill for
15  their time such as an engineering firm or a law firm or
16  some type of consulting firm.
17         The manual is geared for those types of
18  companies.  It is not designed for special industries
19  such as banks, car dealerships, industries such as that.
20  That's what I meant.
21     Q.  So is it fair to say that the assurance
22  guide is more of a generic document?
23     A.  Yes.  A commercial company such as a
24  manufacturer or distributor, those are, generically
25  speaking, the basic types of companies that this manual

Page 3029

1   is geared for.  That's correct.
2       Q.   Now, Mr. Lenner, is there an industry-
3   specific authoritative literature relating to finance or
4   factoring companies?
5       A.   Yes.
6       Q.   And what is that, sir?
7       A.   That's the Audit Finance Guide for Finance
8   Companies.
9       Q.   And are you familiar with that guide, sir?
10      A.   Yes.
11      Q.   And are you familiar with the rules
12  contained within the finance company guide?
13      A.   Yes.
14      Q.   And does the finance company guide create
15  authoritative literature to the best of your knowledge?
16      A.   Yes.
17      Q.   And did you review the finance company guide
18  in doing your audits of Bankest?
19      A.   Yes, I did.
20      Q.   And did you consider it when doing your
21  audits of Bankest?
22      A.   Yes, I considered it.
23      Q.   Now, do you remember yesterday discussing
24  the 1998 formation of E.S. Bankest?
25      A.   Yes.

Page 3030

1       Q.   And did you have discussions with people at
2   Bankest about the new company?
3       A.   Yes.
4       Q.   And as part of your audit planning, did you
5   gain an understanding as to the need for BDO's audit
6   opinions to be used to sell private placement
7   memorandums?
8       A.   Yes.
9       Q.   What was your understanding?
10      A.   That it was --
11      MR. THOMAS:  Objection, Your Honor.
12  Hearsay.  He just testified he got it from conversation.
13      MS. BITAR:  Your Honor --
14      THE COURT:  Hold on.
15      Rephrase your question.  Sustained.
16  BY MS. BITAR:
17      Q.   Did you develop an understanding as to the
18  need for BDO's audit opinions in connection with the
19  sale of PPMs?
20      A.   Yes, I did.
21      Q.   What was your understanding?
22      MR. THOMAS:  Objection, Your Honor.
23      THE COURT:  I'm going to overrule it.
24      THE WITNESS:  My understanding was that it
25  was not needed because they had previously raised

Page 3031

1   approximately 40 million dollars without any audited
2   statements.
3       Secondly, they were not needed because it
4   was viewed as a safe investment with a high return and
5   just was not needed because it was being marketed and
6   sold to the bank's customers and was basically -- it was
7   basically the name and the reputation of the bank --
8       MR. THOMAS:  Objection, Your Honor.
9       THE COURT:  Sustained.  Ask him another
10  question.
11  BY MS. BITAR:
12      Q.   Did you take the information you received as
13  a result of conversations -- withdrawn.
14      Did you take the information or
15  understanding you received and use it when making
16  determinations about how to plan the audits for E.S.
17  Bankest?
18      A.   Yes, I did.
19      Q.   Now, yesterday we were talking about the
20  agreed to invoice test.  Do you remember that testimony
21  generally?
22      A.   Yes, I do.
23      Q.   And do you remember talking about an invoice
24  being a contractual obligation to pay?
25      A.   Yes.

Page 3032

1       Q.   And that the invoice was presumed to be
2   real?
3       A.   Yes.
4       Q.   And you talked about the procedures you
5   employed when reviewing the invoice.  Do you recall
6   that?
7       A.   Yes.
8       Q.   And do you recall telling the members of the
9   jury you considered AU 326, the confirmation process,
10  when doing these audits?
11      A.   Yes.
12      Q.   I'd like you to now look at what's been
13  marked Exhibit 131 in evidence and in particular section
14  AU 330.
15      MS. BITAR:  May I approach, Judge?
16      THE COURT:  You may.
17      MS. BITAR:  (Complies).
18  BY MS. BITAR:
19      Q.   It's 131-C in evidence.
20      A.   Thank you.
21      Q.   You're welcome.
22      Now, Mr. Lenner, what does this AU section
23  relate to?
24      A.   The confirmation process.
25      Q.   And is the source for the information

Page 3033

1  contained in this AU SAS 67?
2      A.  Yes, it is.  That's what it says right on
3  the top part of the screen.
4      Q.  Take the pointer out.  Now, let's look at
5  section .23 with respect to AU section 330.  Do you have
6  that?
7      A.  Yes.
8      Q.  Section 23 reads, "Prior experience.  In
9  determining the effectiveness and efficiency of
10  employing confirmation procedures, the auditor may
11  consider information from prior years' audits or audits
12  of similar entities.  This information includes response
13  rates, acknowledgment of mistakes identified during
14  prior years' audits and any knowledge of inaccurate
15  information on returned confirmations.  For example, if
16  the auditor has experienced poor response rates to
17  properly designed confirmation requests in prior audits,
18  the auditor may instead consider obtaining audit
19  evidence from other sources."
20      Mr. Lenner, in doing your audits of Bankest
21  did you review this particular provision of AU 330?
22      A.  Yes.
23      Q.  And did you consider it when doing your
24  audits?
25      A.  Yes, I considered it.

Page 3034

1      Q.  Does this section indicate you can rely on
2  prior years' knowledge?
3      MR. THOMAS:  Objection, Your Honor.
4      THE COURT:  Sustained.
5  BY MS. BITAR:
6      Q.  Mr. Lenner, do you understand this section
7  to indicate that an auditor does not have to send out
8  confirms at all?
9      MR. THOMAS:  Objection, Your Honor.
10      THE COURT:  Sustained.
11  BY MS. BITAR:
12      Q.  Let's go to section 32, please.
13      A.  (Complies).
14      Q.  That discusses the nature of alternative
15  procedures.  Do you see that?
16      A.  Yes, I do.
17      Q.  And it refers to alternate procedures that
18  an auditor may conduct, correct?
19      A.  Yes.
20      Q.  What does it include?
21      A.  It includes the examination of subsequent
22  cash receipts, shipping --
23      Q.  And was that a procedure that was conducted
24  in the Bankest audits?
25      A.  Yes.

Page 3035

1      Q.  Please continue.
2      A.  "Shipping documents or other client" --
3      MR. THOMAS:  Objection, Your Honor.
4      THE COURT:  Overruled.  He's reading from
5  the document.
6      THE WITNESS:  -- "or other client
7  information."
8  BY MS. BITAR:
9      Q.  Was your inspection of the actual invoices
10  an alternate procedure?
11      A.  Yes.
12      Q.  Were the actual invoices other client
13  documentation that demonstrated to you evidence of
14  existence?
15      A.  Certainly was.
16      Q.  Do you have to examine shipping documents
17  according to authoritative literature?
18      MR. THOMAS:  Objection, Your Honor.
19      THE COURT:  Sustained.
20      MR. THOMAS:  Repeated violations of the
21  rule.
22  BY MS. BITAR:
23      Q.  Does this standard reflect shipping
24  documents as one of the procedures an auditor may
25  consider?

Page 3036

1      MR. THOMAS:  Objection, Your Honor.
2      THE COURT:  Sustained.
3  BY MS. BITAR:
4      Q.  Mr. Lenner, let's talk for a few minutes
5  about Joy.  Do you remember being asked some questions
6  about a Joy confirm?
7      A.  Yes.
8      Q.  In the 1998 audit would you enumerate the
9  steps that the BDO audit team used to confirm accounts
10  receivable?
11      A.  We would confirm the non-notification
12  clients and we would confirm the customers that were
13  subject to the notification arrangements.
14      Q.  And who were the non-notification clients
15  that BDO confirmed with in the 1998 audit?
16      A.  The non-notification clients were CD Jewel
17  Box and Perry Baromedical.
18      Q.  And we looked at those confirmations, those
19  signed confirmations yesterday, right?
20      A.  Yes, we did.
21      Q.  And what about the customers that were
22  confirmed?  Whose customers were they or at least for
23  the most part?
24      A.  Joy's customers.
25      Q.  And when we looked at the circularization

Page 3037

1  summary yesterday, were those customers of Joy and other
2  clients that were on that chart?
3      A.  Yes, they were mostly Joy's customers, yes.
4      Q.  Now, Mr. Lenner, in connection -- withdrawn.
5          In connection with the 1998 audit, did BDO
6  actually send a confirm to Joy?
7      A.  No, we did not.
8      Q.  I'd like you to look at -- and you have
9  Exhibit 3003, the 1998 work papers in front of you?
10     A.  Yes, I do.
11     Q.  Please turn to BDO 709.
12     A.  (Complies).
13     Q.  Could you highlight the test for me?
14         (Technician complies.)
15         Now, Mr. Lenner, what is this document?
16     A.  This is the document that we spoke about
17  yesterday.  It is a follow-up list.  It's a fluid
18  document that goes back and forth every week, every
19  other week during the course of the audit of open items.
20     Q.  And it's called a PBC list?
21     A.  Yes.
22     Q.  That's documents the client needs to prepare
23  for you to do your audits?
24     A.  That's correct.
25     Q.  And did you have an opportunity to review

Page 3038

1  the PBC lists as they evolved in connection with the
2  1998 audit and the work papers?
3      A.  No.  I did not review it during the course
4  of their preparation because it was done in the field.
5      Q.  My question was imprecise.  I'm saying in
6  connection to testifying today did you do that?
7      A.  Yes.
8      Q.  And is this the first and only reference to
9  a Joy Athletic accounts receivable confirmation for a
10  notification client?
11     A.  Yes.
12     Q.  Did you ask anybody on the audit team to
13  send out a confirm to Joy?
14     A.  No.
15     Q.  Let me withdraw that.  To ask the client to
16  send out a confirm to Joy?
17     A.  No.
18     Q.  To your knowledge, was a confirm to Joy
19  sent?
20     A.  It was not sent.
21     Q.  And why do you say that, sir?
22     A.  Because a copy of the confirmation is not in
23  our work paper binder in this file right here.
24     Q.  Now we talked yesterday about the
25  confirmation control section of the work papers.  Do you

Page 3039

1  remember that?
2      A.  Yes.
3      Q.  Will you please put on the screen Exhibit
4  364?
5          (Technician complies.)
6          Is this a draft Joy confirm?
7      A.  Yes.
8      Q.  And is this something that somebody at
9  Bankest would create?
10     A.  Yes.
11     Q.  And is this document evident in our -- in
12  the BDO work papers?
13     A.  No, it's not in our work papers.
14     Q.  If the confirmation had actually been sent
15  out as opposed to a suggestion it should be sent out,
16  would a copy of this unsigned confirm exist in the
17  confirmation control section of the work papers?
18     A.  Yes, it would be there.
19     Q.  And there's also a circularization summary
20  in the work papers with respect to confirms sent.  Do
21  you remember looking at that yesterday?
22     A.  Yes.
23     Q.  And is Joy on that list, sir?
24     A.  No.
25     Q.  Now, going back to Exhibit 709 we just

Page 3040

1  looked at, at the very bottom of this PBC list we see
2  some handwriting.
3          Can we blow that up, Glenn?
4          (Technician complies.)
5          And it talks about a lack of account
6  receivable confirmations.  Do you see that?
7      A.  Yes, I do.
8      Q.  Thank you, Glenn.
9          Mr. Lenner, if an audit staff member at a
10  particular point in time did not have sufficient audit
11  evidence or had concerns about getting the audit
12  evidence, would they be permitted on their own to
13  supplement procedures?
14     A.  Yes, they would.
15     Q.  Did you request anybody to send out a Joy
16  confirm?
17     A.  No.
18     Q.  And in reviewing these PBC lists, was there
19  ever any other reference to a Joy confirm?
20     A.  None whatsoever.
21     Q.  So is it possible that this was done on an
22  interim basis and when the other information came in the
23  request was never followed up on?
24         MR. THOMAS:  Objection.
25         THE COURT:  Sustained.

Page 3041

BY MS. BITAR:
1
2      Q.   Would Mr. Rivera or Mr. Mohr be allowed to
3  send out a confirmation if they chose to do so as a
4  supplemental procedure?
5      A.   Yes.
6      Q.   Now, getting back to the confirmations, do
7  you remember sitting here and hearing Mr. Feltman
8  talking about hot lines to confirm?
9      A.   Yes.
10     Q.   And I think he said he had familiarity that
11  that happened at K-Mart.  Do you remember that?
12     A.   Yes.
13     Q.   Mr. Lenner, at the point in time that BDO
14  was conducting these audits, had you ever heard of such
15  a thing?
16     A.   I never heard of that.
17     Q.   And Mr. Lenner, do you know if there's any
18  accounting literature supporting such a procedure?
19         MR. THOMAS:  Objection, Your Honor.
20         THE COURT:  Hold on.  Overruled.  It's a
21  yes or no.
22         THE WITNESS:  No.
23  BY MS. BITAR:
24     Q.   Mr. Lenner, to summarize, in 1998 you sent
25  out client confirms, you sent out customer confirms, you

Page 3042

1  reviewed subsequent collections, and you looked at
2  analytics, correct?
3      A.   Yes.
4         MR. THOMAS:  Objection, Your Honor.
5  Leading.
6         THE COURT:  Overruled.
7  BY MS. BITAR:
8      Q.   How did those audit steps change if at all
9  in 1999?
10     A.   They were basically the same in 1999 except
11  the focus in 1999 was on customer invoices and the
12  materiality levels changed as they would change every
13  year.
14     Q.   When you say customer invoices, what do you
15  mean by that?
16     A.   Being the actual, for instance, Joy invoice
17  or CD Jewel Box invoice.  That's what I mean.
18     Q.   And we talked yesterday about statistical
19  sampling.  Do you remember that?
20     A.   Yes.
21     Q.   And we talked about materiality, correct?
22     A.   Yes.
23     Q.   And did those analyses change year over year
24  based on how the business is developing?
25     A.   Yes, it did.

Page 3043

1      Q.   And did that happen in 1999?
2      A.   Yes.
3      Q.   And did BDO again seek guidance from the
4  technical people in the national office to advise them
5  on those issues?
6      A.   We certainly did.
7      Q.   And do you remember receiving any client
8  confirms in 1999?
9      A.   Yes.  There was one.
10     Q.   And could you please put up Exhibit 3004 at
11  388?
12         (Technician complies.)
13         MS. BITAR:  May I approach, Judge?
14         THE COURT:  You may.
15         MS. BITAR:  (Complies).
16  BY MS. BITAR:
17     Q.   Could you identify Exhibit 3004 for the
18  jury?
19     A.   These are the audit work papers for the 1999
20  audit.
21     Q.   And I direct you to page 388.  Actually, I
22  think it's 366.  I stand corrected.
23     A.   (Complies).
24     Q.   Can you identify that document for the
25  record?

Page 3044

1      A.   This document is the client confirmation
2  that was sent out in connection with the 1999 audit
3  which I just mentioned a few minutes ago.
4      Q.   And this was for ENA?
5      A.   Yes.
6      Q.   And this was a client of Bankest Capital?
7      A.   Yes.
8      Q.   Now, Mr. Lenner, did the audit approach --
9  thank you, Glenn.  Did the audit approach change
10  significantly between 1999 and 2000?
11     A.   Yes, it did.
12     Q.   Why was that?
13     A.   The company grew substantially.  Wanted to
14  just take a different look at it, shake it up and do the
15  audit a little differently.
16     Q.   Are there two different approaches an
17  auditor uses when conducting an audit?
18     A.   Yes.
19     Q.   What are they called?
20     A.   One approach would be a substantive approach
21  and the other approach would be a controls test
22  approach.
23     Q.   And in 1998 and 1999, what type of approach
24  did BDO use to audit Bankest?
25     A.   In 1998 and 1999 we used the substantive

Page 3045

1   approach to conduct our audit.
2       Q.   And in the years 2000 to 2002, what type of
3   approach did BDO use?
4       A.   In those years we changed from a substantive
5   approach to what's called a controls testing approach
6   and there was some substantive work done but it was
7   primarily a controls-based audit.
8       Q.   What does a substantive test approach mean?
9       A.   A substantive approach is when you look at
10  the details within the account.  You examine the
11  information in the balance sheet as of December 31.
12  You're not so interested in how it gets there.  You just
13  want to examine and gain your audit evidence and look at
14  what exists at December 31.  So that's a substantive
15  approach.
16      Q.   And is that done by sample testing?
17      A.   Yes.  In the substantive approach when the
18  focus is on the balance sheet as of December 31, you
19  would sample your invoices through either confirmation
20  and alternate procedures, and that's how you're really
21  examining the components of that account.  You see the
22  invoice, you get the confirmation back and it agrees,
23  it's a substantive test.  You see what's inside that
24  account.
25      Q.   How is that different than a control

Page 3046

1   reliance approach or test of controls?
2       A.   In a control reliance approach, is -- you
3   gain an understanding of the internal controls that we
4   spoke about yesterday.  You review the internal controls
5   to see that they're properly designed.  And then you
6   test those controls.
7           But the test, unlike the substantive test,
8   which is at December 31, the control testing is through
9   the whole year.  So because if you test and the test is
10  satisfactory, it passes, you gain assurance that the
11  system is working for the whole year.  And that also
12  allows you now to reduce the amount of substantive work
13  that you're going to be performing at the end of the
14  year and that's what we did in the years 2000 through
15  2002.
16      Q.   Now, let me ask you this.  Is it correct to
17  say then that if you do a control test of the system and
18  the auditor concludes that they could rely on the output
19  of the company's systems, then you're permitted to
20  reduce substantive testing?
21      A.   Yes.  That's correct.
22      Q.   And if you're doing substantive testing, is
23  it correct to say that that means if you're doing a
24  substantive test approach audit you're not relying on
25  the internal controls; you're doing the testing yourself

Page 3047

1   to see if the information in the company is correct?
2       A.   Yes.  When you're doing a substantive
3   approach only, you're not relying on the internal
4   controls.  You're not testing them for the whole year
5   because you're just concerned that the ending balance is
6   correct in the balance sheet.
7       Q.   And if you test the internal controls and
8   you believe that you can rely on those controls, then
9   you're allowed to accept the output from the system?
10          MR. THOMAS:  Objection, leading.
11          THE COURT:  Sustained.
12  BY MS. BITAR:
13      Q.   If you test the internal controls, what does
14  that tell you the auditor can do with respect to the
15  output from the system?
16      A.   If you test the internal controls and
17  it's -- it passes, then you know that the accounting
18  information going through the system is reliable and
19  accurate.  That's what it tells you.
20      Q.   Does that permit the auditor to reduce
21  substantive testing?
22      A.   Yes, it does.
23      Q.   And is the information you're telling us
24  about now information that's that widely held with
25  respect to auditing practice?

Page 3048

1           MR. THOMAS:  Objection, Your Honor.
2           THE COURT:  Sustained.
3   BY MS. BITAR:
4       Q.   Mr. Lenner, is this something specific to
5   BDO?
6       A.   No.  It's --
7           THE COURT:  No, it's a yes or no.
8           MR. THOMAS:  Objection.
9           THE WITNESS:  No.
10  BY MS. BITAR:
11      Q.   Have you reviewed other audits and other
12  auditor's work?
13          MR. THOMAS:  Objection, Your Honor.
14          THE COURT:  Repeat the question.
15  BY MS. BITAR:
16      Q.   Have you reviewed other audits and other
17  auditor's work?
18          THE COURT:  What's your objection?
19          MR. THOMAS:  Well, based on a prior
20  question, my objection is -- I'm trying to hear what Mr.
21  Dorta is saying but I just can't hear him.
22          THE COURT:  It's okay.
23          MR. THOMAS:  (Counsel confers).
24          My objection is opinion testimony,
25  irrelevant under 401 and prejudicial.

Page 3049

1    MS. BITAR: Your Honor, I don't think -- do
2  you want me to respond to that?
3    THE COURT: No. Not all of the objections
4  apply. Sustained. Rephrase your question.
5    MS. BITAR:  May I have a read back of my
6  question? I'm sorry.
7    (Thereupon, the court reporter read back the
8  requested portion.)
9  BY MS. BITAR:
10    Q.   Mr. Lenner, you've been an auditor for 35
11  years?
12    A.   Yes.
13    Q.   You've worked with other accounting firms?
14    A.   Yes.
15    Q.   You've taken over audits when one auditor
16  ceases to do an engagement and BDO takes over?
17    A.   Yes.
18    Q.   When you do that you review work papers of
19  the prior accounting firm, correct?
20    A.   Yes.
21    Q.   You're trained as a CPA, right?
22    A.   Yes.
23    Q.   You learned how to do audits as part of your
24  job?
25    A.   Yes.

Page 3050

1    Q.   Based on your experiences, is a control
2  reliance and a substantive approach the two ways
3  auditors do audits?
4    A.   Yes.
5    Q.   And Mr. Lenner, are both recognized as
6  proper procedures to be employed to conduct audits?
7    MR. THOMAS: Objection, Your Honor.
8    THE COURT:  That's sustained.
9  BY MS. BITAR:
10    Q.   Mr. Lenner, is one approach in your view
11  better than another?
12    A.   No.
13    Q.   And can both give the auditor reasonable
14  assurance so that they can render an opinion?
15    A.   Yes.
16    Q.   And can both yield sufficient competent
17  evidential material from which an auditor can render an
18  opinion?
19    A.   Absolutely.
20    Q.   Let's turn to the 2002 work papers. That's
21  Exhibit 3005. Do you have it there?
22    A.   No.
23    MS. BITAR: May I approach, Judge?
24    THE COURT:  You may.
25    MS. BITAR:  (Complies).

Page 3051

1  BY MS. BITAR:
2    Q.   Mr. Lenner, to talk about the control
3  testing BDO began in 2000, would a demonstrative exhibit
4  showing the two types of testing assist you with your
5  testimony?
6    A.   Yes, it would.
7    MR. THOMAS:  No objection, Judge.
8    MS. BITAR:  May I approach?
9    THE COURT:  You may.
10    MS. BITAR:  (Complies).
11  BY MS. BITAR:
12    Q.   Just put it on the screen, please.
13    (Technician complies.)
14    Just to circle back to the difference of the
15  testing, can you use that diagram to explain the
16  difference between substantive testing and
17  controls-based testing?
18    A.   Yes, starting with the left side,
19  substantive testing, if you see there's a bar at
20  December 31 and there's a bunch of dots there.  What
21  that means is the focus on the audit is the balance
22  sheet. It's substantive testing.
23    The chart to the right called controls-based
24  testing, each dot reflects the system working 365 days
25  during the year and that's what the sample transaction

Page 3052

1  is based on, the 365 days.  So once you look at a
2  transaction on a day and you trace it through that
3  system, you gain assurance that the system is operating
4  and the information is accurate.  So you can see it's
5  happening throughout the whole year.  So that's the
6  basic difference between substantive and controls-based
7  testing.
8    Q.   And so, Mr. Lenner, does that mean that at
9  year-end you can do less testing with respect to
10  accounts receivable because of the reliance throughout
11  the year on the internal controls?
12    A.   Yes.  And if you look at the chart going
13  back to the chart on the right, you can see that the
14  blue vertical bar is less than the vertical bar in the
15  substantive-based testing because you can do less of the
16  substantive-testing which means you can examine less or
17  confirm less because you're doing more work during the
18  whole year.
19    Q.   Now, Mr. Lenner, Fortune 500 companies, how
20  are they audited?
21    MR. THOMAS:  Objection, Your Honor.
22    THE COURT:  What's your objection?
23    MR. THOMAS:  Irrelevant and leading.
24    THE COURT:  I'm going to give you a little
25  leeway because I don't know where you're going.  It's a

Page 3053

1  yes or no.
2       THE WITNESS:  Yes.
3       MS. BITAR:  I think I said how are they
4  audited.  I don't know if he can answer yes or no.
5       THE COURT:  Sorry.
6       MR. THOMAS:  Objection.
7       THE COURT:  Let me read the question.
8       I'm going to sustain the objection.  Make it
9  relevant.
10  BY MS. BITAR:
11      Q.   Mr. Lenner, Bankest grew considerably
12  between 1998 and 2000, correct?
13      A.   Yes, it did.
14      Q.   Was that the reason you changed your
15  approach?
16      A.   Yes.
17      Q.   And are most large companies audited based
18  on controls-based testing?
19       MR. THOMAS:  Objection, Your Honor.
20       THE COURT:  Sustained.
21  BY MS. BITAR:
22      Q.   Mr. Lenner, as a company grows, as a company
23  has more transactions, more sales, more accounts
24  receivable to confirm, why does an auditor go to a
25  controls-based testing?

Page 3054

1      A.   I'm sorry.  I thought --
2       MR. THOMAS:  It's just a race so I don't do
3  anything.  Go ahead.
4       THE COURT:  Overruled.  There's no
5  objection.
6  BY MS. BITAR:
7      Q.   There's no objection.
8      A.   Okay.  I apologize.  Most large companies
9  would be controls-based testing companies.  It would
10  be -- it's unheard of to do substantive approaches for
11  very, very large --
12       MR. THOMAS:  Objection.
13       THE COURT:  Sustained.  Why don't you read
14  back the question, Gigi?
15       (Thereupon, the court reporter read back the
16  requested portion.)
17       THE WITNESS:  To confirm their understanding
18  of the system for the entire year there's a lot of
19  transactions going on.  That's number one, to make sure
20  the system is operating and, number two, when the
21  company is very large, there's a lot more potential
22  confirmations or invoices to confirm or to examine
23  invoices.
24       So by testing for the entire year you can
25  reduce the amount of substantive testing.  That's why

Page 3055

1  it's done.
2  BY MS. BITAR:
3      Q.   Is it fair to say that when Bankest got so
4  large that to confirm based on a substantive testing
5  would have required much more testing of accounts
6  receivable?
7       MR. THOMAS:  Objection, leading.
8       THE COURT:  Sustained.
9  BY MS. BITAR:
10      Q.   Mr. Lenner, when an auditor does audits, do
11  they need to get sufficient evidence to be able to
12  render an opinion?
13      A.   Yes.
14      Q.   And when a company gets so large that they
15  have to test so many transactions, do auditors switch to
16  controls-based tests?
17      A.   Yes.
18      Q.   And is that what you did with respect to
19  Bankest?
20      A.   Yes.
21      Q.   And does the literature, accounting
22  literature speak to that issue?
23       MR. THOMAS:  Objection, Your Honor.
24       THE COURT:  Sustained.
25  BY MS. BITAR:

Page 3056

1      Q.   Did you consider the literature relating to
2  switching to controls-based testing when making the
3  decision to use a control testing approach?
4      A.   Yes.
5      Q.   Now, let's turn to the 2000 audit and I'll
6  direct your attention to page 316.  This document is
7  called test of key controls, correct?
8      A.   Yes.
9      Q.   Mr. Lenner, what is this document generally?
10      A.   This document is a summary of the types of
11  control procedures the auditor planned on carrying out
12  in order to achieve the controls-based testing.
13      Q.   So is this a recitation of the steps
14  employed to test the accounts receivable cycle?
15      A.   Yes.
16      Q.   It says, "In order to test the key controls
17  in the accounts receivable cycle, BDO performed the
18  following procedures for each of the invoices selected
19  for testing."
20       Let's walk through what this means that the
21  auditors had to do so they could make a determination as
22  to whether or not they could rely on the output of the
23  Bankest computer systems.
24       MR. THOMAS:  Objection, Your Honor.
25       THE COURT:  Sustained.

Page 3057

1  BY MS. BITAR:
2      Q.  "One, for the invoices selected determine
3  the client from whom each invoice was purchased.
4  Examine the agreement between E.S. Bankest and the
5  client that establishes, among other points, a rate of
6  interest, a discount rate, factoring fee rate, and
7  recourse for invalid receivables."
8          In a nutshell, what does that mean?
9      A.  That's two steps.  One is inspecting the
10  invoice and the second one is comparing the information
11  in the invoice to make sure that there is a factoring
12  agreement between the factor and the client.  That's the
13  purpose of step one.
14      Q.  Step two says, "For each invoice selected,
15  trace to customer -- trace the customer to documentation
16  of approval of the customer by ACI."  That's the
17  insurance company, right?
18      A.  Yes.
19      Q.  "Determine the total client balance at the
20  time the invoice is accepted by E.S. Bankest is below
21  the maximums set by ACI."  What does that mean the
22  system had to demonstrate?
23      A.  As I mentioned yesterday, each invoice
24  purchased for the most part were purchased with
25  insurance so in the event that the customer came

Page 3058

1  insolvent, they were unable to pay, the insurance would
2  provide proceeds for the receivables.  In other words,
3  the receivable was insured and we wanted to make sure
4  that in that system, there was a process where somebody
5  was actually looking at that invoice, making sure that
6  the coverage was there, and then observing it or
7  approving it.
8      Q.  Three says, "For each invoice selected,
9  vouch the invoice to the list of total outstanding
10  invoices for that client.  Trace the total to the
11  monthly client statement."
12          What does that mean the auditors do?
13      A.  Well, what happens there is when invoices
14  are purchased from the client, they would come in a
15  stack of invoices and that stack would be -- there would
16  be a list created so we'd want to make sure that that
17  invoice was in the list, so -- because they were
18  purchasing a group of invoices each time.
19          And then we also traced it into the monthly
20  statement.  A monthly statement is what the factor would
21  send to the client each month.  We wanted to make sure
22  that that information, the invoice was actually going
23  into a client's statement being sent out.
24      Q.  Four says, "For each invoice selected, vouch
25  the invoice to the batch detail included with the

Page 3059

1  payment received from the customer.  Agree amount on the
2  check received from the customer to the posting in the
3  system."  What does that mean?
4      A.  That means when payment was received they
5  would not pay one invoice.  They'd pay a bunch of
6  invoices.  So we'd want to make sure that that payment,
7  if it covered one hundred invoices, that invoice we
8  selected was included in that payment for one hundred
9  invoices.
10          And we also wanted to -- this step is we're
11  also looking at the check that was received from the
12  customer and we were making sure that that check covered
13  the total payment for that invoice, too.
14      Q.  Mr. Lenner, is that a customer check or a
15  BCC check?
16      A.  It's a customer check.
17      Q.  Number five, "For each invoice selected,
18  vouch the invoice to the batch of invoices posted to the
19  system when payment is received from the customer.
20  Examine the posting to ensure that the percentage of
21  revenue recognized upon receipt of the cash agrees to
22  the client agreement."  What does that mean?
23      A.  It means when the payment was received, we
24  wanted to make sure that that payment was being properly
25  reflected in this system.

Page 3060

1      Q.  And the last step is, "Examine the accounts
2  receivable detail in order to determine that the invoice
3  has been properly relieved from the accounts receivable
4  account subsequent to payment."  What does that mean?
5      A.  What that means is when the invoice is paid,
6  we want to make sure it's taken off the system, it's
7  there because if it's not removed from the system, there
8  would be a duplication.  So it's just making sure that
9  as the payment hits the system, it automatically then
10  reduces that invoice from the receivable balance.
11      Q.  Let's go to the next page, please.  If you
12  can highlight the top.
13          (Technician complies.)
14          What does this chart signify?
15      A.  This chart signifies if you remember from
16  the previous page we had six procedures.  And this is
17  basically a schedule that lists the 30 invoices that
18  we're sampling and each procedure for each invoice.
19  This is your controls-based test.
20      Q.  And these check marks, what do they signify?
21      A.  That the system worked and the control
22  indicated in steps 1 through 6 worked, too.
23      Q.  Now, let's take a look at the bottom of the
24  document where it says note relating to step 3.
25          Glenn, can you put that up and highlight it,

Page 3061

1    please?
2         (Technician complies.)
3         Mr. Lenner, it says, "All of the items
4    selected are items that E.S. Bankest has purchased from
5    Bankest Capital Corporation with one exception." It
6    goes on to say that, "ESB, Bankest, and BCC have
7    integrated systems. When entries are input into ESB's
8    system, they are electronically transmitted into BCC's
9    system, and a mirror entry is created resulting in the
10   two systems always being reconciled. Therefore, monthly
11   statements with BCC aren't prepared. During a control
12   testing, BDO examined the postings in both ESB's and
13   BCC's general ledgers noting that they appeared proper
14   and reflected the aforementioned scenario." Did I read
15   that correctly?
16        A.   Yes, you did.
17        Q.   Is this an important footnote?
18        A.   Yes, it's very important.
19        Q.   What does it tell you about BCC and Bankest?
20        A.   It demonstrates that the two systems are
21   interrelated. As a transaction is recorded on BCC's
22   system, it's automatically recorded on E.S. Bankest's
23   system. And it also demonstrates that the auditor at
24   the time had an understanding of how these systems
25   interrelated.

Page 3062

1        Q.   Does it also mean that BDO had access to
2    BCC's internal system?
3        A.   It certainly does.
4        Q.   Would you please turn to page 3404 in those
5    work papers?
6        A.   (Complies).
7         MS. BITAR: May I approach, Judge?
8         THE COURT: You may.
9    BY MS. BITAR:
10        Q.   Mr. Lenner, do you have it in front you?
11        A.   Yes, I do.
12        Q.   Would it be easier to work with just a few
13   pieces of paper?
14        A.   This is fine.
15        Q.   Could you describe what this document is?
16        A.   This is the last page of the substantive
17   testing. This is the test where we are examining the
18   invoices. Also, examining the cash receipts. This is
19   the substantive test.
20        Q.   We'll just go to the first page so we can
21   show the jury what that first page says on the top.
22        A.   (Complies).
23        Q.   Mr. Lenner, is this a circularization
24   summary like the one we saw in the 1998 work papers?
25        A.   Yes.

Page 3063

1        Q.   And does it reflect the various steps
2    employed with respect to testing the invoices?
3        A.   Yes.
4        Q.   And I'm going to the last page. You were
5    asked some questions by Mr. Thomas a few days ago about
6    that footnote. Could you highlight the footnote,
7    please?
8         (Technician complies.)
9         And Mr. Lenner, could you read it into the
10   record?
11        A.   "E.S. Bankest works with notification and
12   non-notification customers. Non-notification customers
13   are not aware that their payables have been factored.
14   Therefore, in performing alternative procedures BDO
15   traced the payment from the customer to the client and
16   the client to E.S. Bankest. For notification customers,
17   BDO traced payment from customer directly to E.S.
18   Bankest."
19        Q.   Do you remember Mr. Thomas asking you about
20   that footnote?
21        A.   Yes.
22        Q.   And you discussed with him receipts of
23   customers checks and why there's no reference to BCC in
24   this footnote. Do you remember that?
25        A.   Yes.

Page 3064

1        Q.   And you said something about how the
2    control-based testing made that unnecessary?
3         MR. THOMAS: Objection, Your Honor. Leading
4    and commenting --
5         THE COURT: Sustained.
6    BY MS. BITAR:
7        Q.   Do you remember what you told him about BCC
8    when he asked you about the footnote?
9        A.   Yes.
10        Q.   What did you say?
11        A.   I told him that it was covered through our
12   controls-based testing.
13        Q.   Now, could you explain to the members of the
14   jury what you meant by that?
15        A.   What I meant by that is it is very clear to
16   the auditor that was performing this test --
17        MR. THOMAS: Objection, speculation.
18        MS. BITAR: I'll rephrase, Judge.
19        THE COURT: Yes.
20   BY MS. BITAR:
21        Q.   Mr. Lenner, from your review of the work
22   papers, why is there no need to reference BCC in that
23   footnote?
24        A.   Because it's explained in the control --
25   it's -- the interrelationship and the simultaneous

Page 3065

1   transactions that occur between BCC and E.S. Bankest is
2   explained in the controls-based testing as well as
3   elsewhere in the work papers. It was common knowledge
4   through the course of the audit that that system or
5   systems were interrelated.
6       Q.  Mr. Lenner, I'd like you to look at a
7   demonstrative exhibit that the plaintiffs have been
8   showing us as this trial has begun. It's the one with
9   the Wal-Mart check and the Joy check and the Bankest
10  Capital.
11      MR. THOMAS: If you want we can just put it
12  up.
13      MS. BITAR: We have it, too, so that's fine.
14  BY MS. BITAR:
15      Q.  We didn't get to do it in color.
16      A.  May I have a copy, please?
17      Q.  Yes. Sure.
18      MS. BITAR: May I approach?
19      THE COURT: You may.
20      MS. BITAR: (Complies.)
21  BY MS. BITAR:
22      Q.  Let me ask you this question, Mr. Lenner.
23  Based on your understanding of Bankest, what does this
24  diagram portray?
25      A.  It portrays the purchase of invoices as well

Page 3066

1   as the flow of cash for a non-notification arrangement
2   between the client, the customer, and E.S. Bankest.
3       Q.  Now, could you remind the jury what a
4   non-notification relationship is versus a notification
5   relationship?
6       A.  A non-notification arrangement is an
7   arrangement where the customer is not aware that the
8   receivable has been factored. So the flow of cash will
9   go exactly from the Wal-Mart circle to Joy, then from
10  Joy to Capital, and from Capital to E.S. Bankest.
11      Q.  And why from Capital to E.S. Bankest? Is
12  that because of the refactoring arrangement?
13      A.  Yes.
14      Q.  Now, was Joy a notification client or a
15  non-notification client?
16      A.  Joy was a notification client.
17      Q.  And that means that Wal-Mart knew that those
18  receivables were factored, correct?
19      A.  Yes.
20      Q.  And that means that Wal-Mart should be
21  remitting the money right to Capital, right?
22      A.  That's correct.
23      Q.  So, Mr. Lenner, is this chart showing Joy as
24  a non-notification client meaning the money is going
25  from Wal-Mart to Joy wrong?

Page 3067

1       A.  Yes, it's wrong.
2       Q.  Can we go to the next document, please,
3   which is -- just one minute, Your Honor. I'm sorry.
4   Can we go to 221-A, Glenn, please?
5       (Technician complies.)
6       So, Mr. Lenner, what the plaintiffs' chart
7   is showing is Joy's non-notification arrangement for
8   refactored receivables, correct?
9       MR. THOMAS: Objection. Leading, Your Honor
10  and this is --
11      THE COURT: Sustained.
12      MR. THOMAS: -- a new demonstrative that
13  hasn't been shown to us.
14      MS. BITAR: It's the exact same
15  demonstrative.
16      MR. THOMAS: It's different. But I don't
17  object. Go ahead.
18  BY MS. BITAR:
19      Q.  Mr. Lenner, what does the plaintiffs' chart
20  show?
21      A.  It shows a non-notification arrangement.
22      Q.  For factored or refactored receivables?
23      A.  For the refactored receivables.
24      Q.  And is that wrong because Joy was a
25  notification relationship?

Page 3068

1       A.  The cash money did flow this way and it also
2   flowed a different way. But the arrangement in the
3   factor agreement indicates that was a notification
4   client which meant the money went directly from the
5   customer to the factor.
6       Q.  And in that case, it would be from Wal-Mart
7   to Capital; is that correct?
8       A.  That's correct.
9       Q.  Mr. Lenner, would a demonstrative assist you
10  in showing how that money flow should work where you
11  have a notification arrangement with refactored
12  receivables?
13      A.  Yes.
14      MS. BITAR: May I approach, Judge?
15      THE COURT: You may.
16      MS. BITAR: (Complies.)
17      May I approach, Judge?
18      THE COURT: You may.
19      MS. BITAR: (Complies.)
20  BY MS. BITAR:
21      Q.  Mr. Lenner, what does that demonstrative
22  show?
23      A.  This chart shows a notification arrangement
24  where the cash through the solid red line is going from
25  the customer directly to Capital and then it's

Page 3069

1   automatically going to Bankest.
2       Q.  So does this chart more accurately represent
3   a notification arrangement such as the one that existed
4   with Joy, whereby the customer would pay Bankest Capital
5   directly?
6       A.  Yes.
7       Q.  And because this was a refactoring
8   arrangement then that money would be passed down from --
9   would go from Capital to Bankest, correct?
10      A.  Yes.
11      Q.  Now, Mr. Lenner, when the money hits the
12  Capital account, is there a mirrored corresponding entry
13  in Bankest's account?
14      A.  Yes.  There is an automatic credit that's
15  recorded on the books of E.S. Bankest for the collection
16  of that accounts receivable because the two systems are
17  interrelated.  So as the money is collected on BCC, it's
18  automatically credited on E.S. Bankest's books.
19      Q.  So does that mean that Bankest receives a
20  direct credit --
21      A.  Yes.
22      Q.  -- when the customer pays?
23      A.  Yes.
24      Q.  And just to be clear then, this is a
25  notification arrangement for refactored receivables,

Page 3070

1   correct?
2       A.  Yes, it is.
3       Q.  Now, Mr. Lenner, now that you've explained
4   that to us, would you tell the jury why that footnote is
5   correct?
6       A.  The footnote explains the relationship
7   between the customer -- when the customer -- when we
8   examine the customer collection, it was -- we saw that
9   it was deposited, that it was credited on the books of
10  E.S. Bankest by virtue of that automatic credit because
11  the systems are interrelated.  The two are linked
12  together.
13      Q.  And that's because of those mirrored entries
14  we saw in the control testing?
15      A.  As indicated in the control testing.
16      Q.  Mr. Lenner, would a demonstrative help you
17  explain that to the jury?
18      A.  Sure.
19          MS. BITAR:  Any objection?
20          MR. THOMAS:  Oh, no.
21          MS. BITAR:  May I approach?
22          THE COURT:  You may.
23          MS. BITAR:  (Complies)
24  BY MS. BITAR:
25      Q.  So just to reiterate, the money goes

Page 3071

1   directly to BCC and there's a corresponding simultaneous
2   book entry at E.S. Bankest reflecting the collection, is
3   that accurate?
4       A.  Yes, it is.
5       Q.  Now, Mr. Lenner, I'd like you to look at --
6   take that down.
7          (Technician complies.)
8          In Exhibit 3005, page 361, what does this
9   work paper reflect, sir?
10      A.  Just one second, please.
11      Q.  Sure, take your time.
12          Mr. Lenner, it's at BDO 427.
13      A.  I have it.  I found it.  This is a
14  memorandum to the file that explains how this automatic
15  entry works between BCC and E.S. Bankest.
16      Q.  Would you highlight this paragraph with the
17  sentence to the end, please, Glenn?
18          (Technician complies.)
19          It says, "When E.S. Bankest -- when Bankest
20  Capital receives cash for receivables that are on E.S.
21  Bankest's books, E.S. Bankest receivables are credited
22  and the due from BCC account is debited.  This is done
23  automatically through Bankest Capital's links with
24  Bankest's computer.  Bankest Capital regularly settles
25  these accounts with E.S. Bankest.  When this takes

Page 3072

1   place, cash is debited and due from BCC is credited
2   cash."
3          Mr. Lenner, is that where in the work papers
4   it requests, in addition to the control testing, the
5   mirrored entries is on Bankest and Bankest Capital's
6   books?
7       A.  Yes, it is.
8       Q.  Now, Mr. Lenner, is that footnote -- let's
9   go back to Exhibit 3005 at 324.  Is that footnote
10  accurate?
11      A.  Yes, it is.
12      Q.  And does it properly reflect the tracing of
13  customer checks under both a notification and
14  non-notification basis?
15      A.  Yes, it does.
16      Q.  Now, Mr. Lenner, remember Mr. Thomas asking
17  you about the necessity for Joy checks in a
18  non-notification -- in a notification relationship?
19      A.  Yes.
20      Q.  Could we go back, please, Glenn, to B-1?
21          (Technician complies.)
22          And I believe you gave some testimony about
23  how in a classic non-notification -- in a classic
24  notification relationship, there shouldn't be a need for
25  a Joy check.  Do you remember that testimony?

Page 3073

1    A.    Yes.
2    Q.    Then you later on gave some testimony about
3  why a Joy check may exist.  Do you recall that
4  testimony?
5    A.    Yes.
6    Q.    Could you explain to the members of the jury
7  why that might happen?
8    A.    Well, according to the factoring agreement,
9  on a notification arrangement, Wal-Mart is aware that
10  the receivable is being factored and they are instructed
11  to pay Capital.  There are times when certain customers
12  may not choose to pay the factor.  There are times where
13  they feel more comfortable or for whatever reason they
14  choose to pay Joy.
15    Q.    So, in other words, the customer is making a
16  decision that they'll pay the client, the vendor even
17  though the factoring agreement would tell them to remit
18  to Bankest or Bankest Capital?
19    A.    Yes.
20    Q.    And so under those circumstances, would the
21  existence of Joy checks surprise you?
22    A.    No, I would not be surprised.
23    Q.    And what does the factoring agreements
24  between Bankest or Bankest Capital and their clients say
25  about that process?

Page 3074

1    A.    When there is a notification factoring
2  arrangement, there is some language in the agreements
3  that require that should the customer pay the client
4  which is Joy, Joy would have the fiduciary
5  responsibility to hold that cash and remit it to the
6  factor because that's where it's supposed to go in the
7  first place.
8    Q.    Now, Mr. Lenner, are those the -- we've
9  talked about two types of relationships, two types of
10  business practices of Bankest; the notification
11  arrangement with a refactored receivable, right?
12    A.    Yes.
13    Q.    And a non-notification arrangement with
14  refactored receivables, correct?
15    A.    Yes.
16    Q.    Are there other relationships that exist
17  between customers, clients, and Bankest?
18    A.    Yes.
19    Q.    What are they?
20    A.    There are two more types of relationships.
21    Q.    Now, let me ask you a question.  Would a
22  demonstrative help you explain to the jury what they
23  are?
24    A.    Yes.
25      MR. THOMAS:  No objection, Your Honor.

Page 3075

1      THE COURT:  All right.
2      MS. BITAR:  May I approach, Judge?
3      THE COURT:  You may.
4      MS. BITAR:  (Complies).
5  BY MS. BITAR:
6    Q.    Let's put up D-1.  This talks about a
7  relationship, a notification arrangement with no
8  refactoring, correct?
9    A.    Yes, it does.
10    Q.    Now, I'm just using Joy because we're using
11  that icon.  But Joy was in a refactoring relationship,
12  correct?
13    A.    Yes, that is correct.
14    Q.    But where you have a no refactoring
15  relationship, the notification arrangement is such that
16  the customer pays Bankest directly, correct?
17    A.    That's correct.
18    Q.    And that's because the customer knows that
19  the receivables have been factored, correct?
20      MR. THOMAS:  Objection, leading.
21      THE COURT:  Overruled.
22      THE WITNESS:  Yes.
23  BY MS. BITAR:
24    Q.    What do these arrows signify?
25    A.    These arrows -- well, the solid arrow on the

Page 3076

1  bottom of the screen signifies the -- what you would
2  expect in a notification arrangement where you do not
3  have BCC.  BCC was a -- was when there was a refactoring
4  arrangement.  This is without BCC.  These are clients of
5  E.S. Bankest.
6      So the solid line is the flow of cash.
7    Q.    And so that's how you would expect it to
8  work, correct?
9    A.    Yes.
10    Q.    And what do these broken arrows indicate?
11    A.    The broken arrow indicates sometimes they
12  would not pay directly to the factor; they would pay to
13  Joy.
14    Q.    They pay to the client?
15    A.    Yes.
16    Q.    And let's go to the next chart, please.
17      (Technician complies.)
18      Is this a non-notification arrangement where
19  there is no factoring?
20    A.    Yes.
21    Q.    And again, we're using the Joy icon but
22  that's not really right to use Joy because Joy was a
23  refactored client, right?
24    A.    Yes.
25    Q.    But with that understanding, how does the

Page 3077

1  money flow in a non-notification arrangement when
2  there's no refactoring?
3      A.  It would flow from Wal-Mart to Joy to the
4  client, and then from Joy to the client to Bankest.  It
5  would not flow through Bankest Capital because they're
6  not a party to this transaction.
7      Q.  So in those contexts you would expect to see
8  checks from the client to the factor, correct?
9      A.  Yes.
10     Q.  Now, Mr. Lenner, under each of those
11 scenarios, is that footnote that we've been looking at
12 on 3404 accurate?
13     A.  Yes.
14     Q.  And it would fit into each of the four
15 scenarios; is that correct?
16     A.  Yes.
17     Q.  And is that because of the mirrored entries
18 on BCC and Bankest's accounts as it relates to the
19 refactored arrangement?
20         MR. THOMAS:  Objection, leading.
21         THE COURT:  Sustained.
22 BY MS. BITAR:
23     Q.  Why is it accurate with respect to the
24 refactoring arrangement?
25     A.  Because the footnote describes the

Page 3078

1  refactoring relationships and it also -- the footnote
2  works when there isn't a refactor involved in the
3  collection process.
4      Q.  Thank you.
5          Now, Mr. Lenner, let's turn to 2001.  Did
6  BDO's audit plan change in any measurable way between
7  2000 and 2001?
8      A.  No, it was basically the same.  There were
9  some changes in the materiality but our overall
10 approach, which was a controls-based approach, remained
11 the same.
12     Q.  Mr. Lenner, I'd like you to look at Exhibit
13 3006 in evidence, and what is that document for the
14 record, sir?
15     A.  This is the work paper file for the 2001
16 audit.  Thank you.
17     Q.  You're welcome.  Now, Mr. Lenner, I direct
18 your attention to Bates stamp Number 3551.  What is this
19 memo?
20     A.  This memo is very similar to the previous
21 memo that we saw for the prior year audit 2000.  It
22 contains the planned procedures for the controls-based
23 testing that we were going to and we did perform.
24     Q.  And was an additional step performed, if you
25 recall?

Page 3079

1      A.  It was basically the same.  We extended the
2  test to document the verification of the aging in step
3  7.
4      Q.  Would you go to the next page, please, sir?
5      A.  (Complies).
6      Q.  And again, is this the list and the tick
7  mark signifying the work?
8      A.  Yes, it is.
9      Q.  And is there a corresponding memo in the
10 2001 work papers that talk about the accounting and the
11 mirrored entries on the Bankest and BCC's books and
12 records?
13     A.  Yes.
14     Q.  Mr. Lenner, when you do control testing and
15 you -- there were 30 samples that were used; is that
16 correct?
17     A.  Yes.
18     Q.  And how was the sample size of 30
19 determined?
20     A.  It's statistically determined through using
21 software that we have.
22     Q.  And so if BDO is using a statistical sample,
23 does that tell the auditor that they can rely on the
24 system for the entire population based on the fact of
25 the 30 selected being statistically selected?

Page 3080

1      A.  Yes.
2          MR. THOMAS:  Objection, leading.
3          THE WITNESS:  Sorry.
4          THE COURT:  Sustained.
5  BY MS. BITAR:
6      Q.  And Mr. Lenner, when you're doing a
7  controls-based testing of these 30 receivables, and
8  you're looking at all the various facets of them and how
9  they go through the books and records of the company,
10 does it verify the existence of those 30 receivables?
11     A.  Yes.
12     Q.  Now, Mr. Lenner, in 2002, did the audit
13 approach change in any significant way?
14     A.  We modified the controls-based testing.  We
15 wanted to try a different approach.  And what we did is
16 we then increased our confirmation and our alternative
17 procedures and I believe we confirmed about 215
18 invoices.
19     Q.  So you actually extended more substantive
20 procedures?
21     A.  Yes, we did.
22     Q.  Again, is that a question of auditor
23 judgment?
24     A.  Yes.
25     Q.  And did you increase the substantive testing

Page 3081

1  because of the growth of the business?
2      A.  Yes.
3      Q.  Now, turning back to the 2001, 2002 time
4  frame, that's when BDO developed its relationship with
5  StrataSys, correct?
6      A.  Yes.
7      Q.  What did you understand Mr. Parlapiano's
8  role to be?
9      A.  He was an advisor to StrataSys and a member
10 of the board of managers.
11     Q.  Did you understand that Mr. Parlapiano had
12 any control of StrataSys?
13     A.  No.
14     Q.  Did you ever see Mr. Parlapiano exert any
15 control of StrataSys?
16     A.  No.
17     Q.  Did you ever understand that Mr. Parlapiano
18 had any ownership stake in StrataSys?
19     A.  No ownership.
20     MS. BITAR:  Your Honor, may I have a side-
21 bar for a minute?
22     THE COURT:  Okay.
23     (Thereupon, there was a side-bar conference
24 outside the presence and hearing of the jury.)
25     MS. BITAR:  So as to not run afoul of

Page 3082

1  anything, at this point I would like to introduce
2  Pricewaterhouse agreed-upon procedures report to
3  Mr. Lenner and ask him if he was aware of this when
4  planning these audits.  Because, again, I think Your
5  Honor knows our position is that part of audit planning
6  is based on the information that's conveyed to the
7  auditors about the company and about any concerns
8  relating to the company by management.
9      I think it ties in directly to what BDO's
10 audit -- what information got into BDO's plan and what
11 information BDO was denied.
12     I understand the concerns about phase two
13 but I think it's directly relevant in front of phase one as well.
14 So before I get shot down in front of the jury I want to
15 know what latitude, if any, I'll have.
16     MR. THOMAS:  This is not just a phase one/
17 phase two issue, as you've repeatedly ruled.  The issue
18 as to whether someone else is fooled is not proper in
19 determining BDO's negligence.  Phase one, phase two or
20 in any case involving negligence, number one.
21     Number two, if she intends to put up the
22 report, then that's clearly to show the basis that
23 someone else was there and someone else -- some other
24 auditor was fooled or not fooled.  In fact, it wasn't
25 another auditor, it was another accounting company who

Page 3083

1  was not doing the audit.  So it's completely improper
2  and we maintain our continued objection.
3      THE COURT:  Sustained.
4      MS. BITAR:  So I can't ask any questions of
5  him about Pricewaterhouse?
6      THE COURT:  That's not what you asked.  You
7  asked to show the document and put it in and show him
8  the document.
9      MS. BITAR:  Can I ask him if he was aware
10 that Pricewaterhouse did forensic procedures as to the
11 propriety of the accounts receivable?
12     MR. THOMAS:  You can't ask that question
13 because you don't have a good faith basis to do it
14 because the only evidence in the case is that they
15 didn't do forensic procedures.  And you know it.  You
16 know it better than I do because you represent auditors.
17 So you can't ask that question.
18     MS. BITAR:  I disagree.  My expert will say
19 it's forensic.  They did a more detailed sample.  They
20 did not do an entire audit, that's correct.  They
21 weren't asked to look at expenses or the payroll.  They
22 were asked to look at the propriety of the factoring
23 operations and their testing was more in-depth in that
24 specific area.
25     So I do believe I have a good faith basis.

Page 3084

1      MR. THOMAS:  Your Honor, based on that
2  admission by BDO's lead counsel that Pricewaterhouse did
3  not do an audit, it brings into question the entire line
4  of questioning of Pricewaterhouse because, as you may
5  recall, the two other lawyers representing BDO in this
6  case have repeatedly questioned witnesses, Mr. Freeman
7  and Mr. Mendez, isn't it true that Pricewaterhouse did
8  an audit.  They even put up the document -- I can't
9  recall -- repeatedly questioned did they do an audit and
10 counsel just admitted they didn't.  And that makes clear
11 that they don't have a good faith basis to ask these
12 questions and we again object.
13     MS. BITAR:  That doesn't flow from what
14 you're saying, Mr. Thomas.
15     THE COURT:  Is that the question you're
16 going to ask?
17     MS. BITAR:  Which question, Your Honor?
18     THE COURT:  The one that you just said you
19 wanted to ask.
20     MS. BITAR:  I believe the question I wanted
21 to ask is if he was aware that Pricewaterhouse had done
22 forensic review of the propriety of factoring operations
23 at Bankest.  I'm happy to take the word forensic out.
24     Is he aware that Pricewaterhouse was asked
25 to review the propriety of the factoring operations of

Page 3085

1    Bankest and did he know about that when he was doing his
2    audit?
3           MR. THOMAS:  We object it that.  It's
4    obviously being offered for the fact of, hey, see,
5    Pricewaterhouse did go in there and they didn't find it
6    out either.  And it's improper not only in your rulings
7    in this case but I mean in general.
8           You can't defend a negligence claim as an
9    auditor saying, hey, someone else was fooled.  That's
10   clearly the purpose and I object.
11          MS. BITAR:  That's not my point.
12          THE COURT:  Assume I allow that question,
13   what's he going to say?
14          MS. BITAR:  He's going to say that he did
15   not did not know and then I will ask, and I know this is
16   relevant and I'm sure Mr. Thomas is concerned, but the
17   reason I want to introduce it now is for a very
18   different reason.
19          One of the reasons is what steps BDO
20   undertook in planning its audit and whether that was
21   done in accordance with GAAS.
22          As this witness has now explained, the way
23   audits are planned are based on the risks associated
24   with the entity and the information the auditor has.  If
25   a critical piece of evidence is being withheld from an

Page 3086

1    auditor and as a result of that they may perform less
2    procedures or improperly assess the risk of an
3    organization, then that is relevant to phase one, for
4    BDO's potential liability, what information they had and
5    what information they didn't have.  I agree that there's
6    significant ramification in phase two.
7           MR. THOMAS:  It's not a phase one or phase
8    two.  It's irrelevant.
9           MS. BITAR:  It's relevant to the planning of
10   the audit.  I think it's abundantly clear from this
11   witness and every other witness.  The questionnaires
12   that we've spent hours on to talk about things like
13   that.  And, by the way, the next side-bar will be on the
14   FDIC for the same reason.
15          THE COURT:  We're not there yet.
16          MS. BITAR:  But I'm letting Your Honor know
17   as to the issue.  These are specific questions about
18   assessing the risks.
19          If Your Honor wishes, I could do some other
20   stuff and we can consider it during lunch.
21          THE COURT:  (Reflecting.)  All right.  Do
22   that.  I have to think about it.
23          MS. BITAR:  Okay.
24          (Thereupon, the side-bar conference was
25   concluded.)

Page 3087

1    BY MS. BITAR:
2        Q.   Mr. Lenner, we've been talking about the
3    1998 work papers as an example.  Do you recall that?
4        A.   Yes.
5        Q.   And we've looked at the C section work
6    papers and we've looked at the planning work papers,
7    correct?
8        A.   Yes.
9        Q.   Let's go back to Exhibit 3003 for a few
10   minutes.
11       A.   (Complies).
12       Q.   BDO did more than just test accounts
13   receivable, right?
14       A.   Yes.
15       Q.   This was an entire audit of the various
16   financial aspects of the company?
17       A.   Yes.
18       Q.   Let's walk through some of the other steps
19   BDO employed using 1998 as an example year, okay?
20   Starting at page 5, this is the beginning of the work
21   papers.  The document is called a review checklist.  You
22   see that, sir?
23       A.   Yes.
24       Q.   Can you briefly describe to the jury what
25   that document is and why it's important in an audit?

Page 3088

1        A.   Yes.  After we've completed the planning,
2    we've designed our audit program, we've executed which
3    means we gathered the audit evidence to support the
4    opinion before we signed the accountant's letter that
5    you saw before we issue the financial statements to the
6    client, we have a checklist to go through to make sure
7    that we've covered various areas and that's what this
8    checklist covers.
9        Q.   And do you need to fill out this checklist
10   so that you can ensure that all the other documents
11   necessary before a report can be issued are in the file?
12       A.   Yes.
13       Q.   If you go to number two on the chart it
14   talks about management representation letters.  Do you
15   see that, sir?  I've got the wrong number.  Two under
16   work papers.  I apologize.
17          Mr. Lenner, what is a management
18   representation letter and why is it important in an
19   audit?
20       A.   A management representation letter is an
21   additional source of audit evidence that provides the
22   auditor evidence regarding certain questions and answers
23   that were given to us by management during the course of
24   the audit.  It also provides us with information that we
25   otherwise would not be able to obtain through the course

Page 3089

1  of the audit. So it's really just a confirmation of
2  what they're telling us.
3     Q.   And are management representation letters
4  required before a report can be issued?
5     A.   Yes.
6     Q.   And is there authoritative literature that
7  discusses management representation letters?
8     A.   Yes.
9     Q.   And is that at AU 332?
10    A.   Yes.
11    Q.   And did you review that in conducting your
12 audits of Bankest?
13    A.   Yes.
14    Q.   And did you consider it?
15    A.   Yes.
16    Q.   Going to Number 4 on the planning -- on the
17 review checklist, it asks if there's an adequate
18 understanding and documentation of related party
19 transactions. Do you see that, sir?
20    A.   Yes.
21    Q.   What is a related party transaction?
22    A.   A related party transaction is a transaction
23 between two parties where they are related, related in
24 terms of there might be common ownership of certain
25 owners of company A might also own company B. That's a

Page 3090

1  related transaction.
2        There's -- the term is brother-sister
3  corporations or affiliates. Those are related party
4  transactions. It's a transaction with someone that's
5  not a third party. The person is related to you through
6  a corporate reason or through a paternal or family
7  reason.
8     Q.   And why is it important to have adequate
9  understanding of related party transactions?
10    A.   It's important to understand it because
11 they're always not apparent to the auditor. So we have
12 to -- there are certain audit programs that we have to
13 follow and certain questions that we need to ask to gain
14 our understanding to identify the related party
15 transactions and then to carry out the audit plan to
16 determine the existence and the testing of those related
17 parties.
18    Q.   And the BDO audit team checked that that was
19 done, correct?
20    A.   Yes.
21    Q.   Are management representation letters
22 required before a report can be issued?
23    A.   Yes.
24    Q.   Turning to page 7 of this document, the
25 conclusion. The conclusion indicates and the auditors

Page 3091

1  sign off that they have reviewed the financial
2  statements auditor's report and work papers including
3  related planning documentation and find the scope -- and
4  I'm quoting -- "The scope of our procedures which have
5  been completed in conformity with the requirements of
6  the policies and procedures and applicable professional
7  standards as appropriate, that all significant open
8  issues have been resolved and that the work papers
9  support the financial statements and our report which
10 has been prepared in conformity with applicable
11 professional standards."
12        Did I read that correctly, sir?
13    A.   Yes.
14    Q.   And, Mr. Lenner, who signed that on behalf
15 of the audit team in 1998?
16    A.   The first signature is Mr. Ramon Rivera.
17 The second signature is mine. And the third signature
18 is Mr. Keith Ellenburg who was the concurring partner.
19    Q.   And by signing your name to this are you
20 agreeing with the conclusion?
21    A.   Yes.
22    Q.   If you go to BDO page 10, Exhibit 3003, page
23 10. You talked about a balance sheet. I'd like you to
24 Identify for the record what this is.
25    A.   If you remember before we saw a lead sheet,

Page 3092

1  that was where we took the information from the client's
2  general ledger and electronically imported it into our
3  software. Our software also gives us a set of financial
4  statements and this is a balance sheet.
5     Q.   So when you talked about it before, this is
6  what it looks likes?
7     A.   Yes.
8     Q.   And again, this is information you received
9  from E.S. Bankest?
10    A.   Yes.
11    Q.   Turning to page 13, please, that's 518.
12    A.   (Complies).
13    Q.   This document is a trial balance?
14    A.   Yes, this is a trial balance which is a
15 little more detailed than a lead sheet. It gives you
16 the components of the account.
17    Q.   What do you mean by the components of the
18 account?
19    A.   It gives you a source of reference in one
20 section. If you look at, say, the first one which is
21 cash and cash equivalents, you see that the cash
22 account, which has a total of 2.6 million, consists of
23 two types of bank accounts. So those are the
24 components.
25    Q.   And let's turn now to BDO page 49.

Page 3093

1      A.   Would you give me the Bates number, please?
2      Q.   Sure. 549.
3      A.   (Complies).
4      Q.   We were talking about management
5   representation letters. Do you remember that testimony?
6      A.   Yes, I do.
7      Q.   Would you please blow up the first two
8   paragraphs of the document, please?
9            (Technician complies.)
10           Who creates the management representation
11   letter?
12     A.   We give the client a sample. It could be an
13   electronic sample or it could be a hard copy. We give
14   it to the client. Then they type it up. Review it. If
15   they have anything else that they want to add to it,
16   they're free to do that and then they sign it and give
17   it back to us.
18     Q.   And so in this document it says, "We are
19   providing this letter in connection with your audit of
20   the financial statements of Bankest for the purpose of
21   expressing an opinion on whether the financials present
22   fairly in all material respects the results of
23   operations and cash flows of E.S. Bankest in conformity
24   with GAAP. We confirm that we are responsible for the
25   fair presentation in the financial statements of

Page 3094

1   financial position, results of operations and cash flows
2   in conformity with generally accepted accounting
3   principles," correct?
4      A.   Yes.
5      Q.   So by this letter, management is accepting
6   responsibility for those things?
7      A.   Yes.
8      Q.   Going down to the third paragraph it states,
9   "We confirm to the best of our knowledge and belief,
10   February 26th, 1999, the following representations made
11   to you during the audit." You see that, sir?
12     A.   Yes.
13     Q.   And if you go to number two, it says, "We
14   are responsible for adopting sound accounting policies,
15   establishing and maintaining internal control to, among
16   other things, help assure the preparation of the
17   financial statements in conformity with generally
18   accepted accounting principles and preventing and
19   detecting fraud." Did I read that correctly?
20     A.   Yes.
21     Q.   And does the audit guidance indicate that
22   management needs to make this representation in each
23   audit?
24           MR. THOMAS:  Objection, Your Honor.
25           MS. BITAR:  I'll withdraw the question,

Page 3095

1   Judge.
2   BY MS. BITAR:
3      Q.   Mr. Lenner, why is this paragraph in this
4   letter?
5      A.   It's required and to be very clear that what
6   the responsibilities are of management.
7      Q.   And do you know what literature speaks to
8   responsibilities of management and management
9   representation letters?
10     A.   Yes.
11     Q.   Which ones?
12     A.   It's AU 333.
13     Q.   And is that something you considered when
14   doing your audits of E.S. Bankest?
15     A.   Yes.
16     Q.   Let's go to the next page. At four it says,
17   "We have made available to you all, A) financial records
18   and related data." Do you see that?
19     A.   Yes.
20     Q.   Do you now know, Mr. Lenner, that you did
21   not receive all financial records and related data?
22     A.   Yes.
23     Q.   Going to number five it says, "There have
24   been no communications from regulatory agencies
25   regarding noncompliance or deficiencies in financial

Page 3096

1   reporting practices."
2           Why is that important for management to
3   represent that in a management representation letter?
4      A.   It's important because if a regulatory
5   agency believes that you're in noncompliance with their
6   reporting practices, they can effectively put you out of
7   business. They can ask you to correct it. It's a very
8   big indication of a potential problem. So it's
9   important that we -- the management confirm that to us
10   because we don't have a direct communication with the
11   regulatory agencies. This is one way and this is the
12   perfect example of how a management rep provides us with
13   additional audit evidence that we otherwise would not be
14   able to have access to.
15     Q.   And Mr. Lenner, if you know or you learn in
16   the course of an audit that there are deficiencies in
17   financial reporting practices, what does BDO do in terms
18   of audit procedures?
19     A.   We would first have to understand the nature
20   of the regulatory agency's concern. We would want to
21   determine if they still want to continue as the auditor
22   if we chose to. We would want to design additional
23   audit procedures to better understand and to document
24   our approach. And we'd want to know what exactly is
25   going on because it might have a significant bearing on

Page 3097

1   the audit and on the financial statements.
2       Q.   So is this an important question to you in
3   planning your audit and conducting those procedures?
4       A.   Yes.
5       Q.   Going to number 7 it says, "There has been
6   no, A) fraud involving management or employees who have
7   significant roles in internal control. And B) fraud
8   involving others that could have a material effect on
9   the financial statements," correct?
10      A.   Yes.
11      Q.   Now, Mr. Lenner, why is this important?
12      A.   Well, if there is a fraud going on, we would
13  need to know exactly what it's about and we would need
14  to make a decision if we want to be -- if we want to
15  continue the relationship with this audit client and if
16  we chose to, we would want to understand the type of
17  fraud and possibly design alternative procedures to come
18  to the fairness and the accurate financial statements.
19      Q.   Is the problem here, Mr. Lenner, with the
20  benefit of hindsight that the people who are making
21  those representations to you the same people that were
22  committing the fraud?
23          MR. THOMAS:  Objection, Your Honor.
24          THE COURT:  Overruled.
25          THE WITNESS:  Yes.

Page 3098

1   BY MS. BITAR:
2       Q.   Going to number nine it says, "The following
3   where applicable have been properly recorded or
4   disclosed in the financial statements."  And it talks
5   about A, related party transactions.  Do you see that?
6       A.   Yes.
7       Q.   Do you remember when you were testifying I
8   think yesterday or maybe back on the plaintiffs' case
9   about ownership of StrataSys and questions about whether
10  or not Bankest had any ownership stake in that entity?
11      A.   Yes.
12      Q.   If, in fact, there was an ownership stake,
13  should it have been disclosed in -- should it have been
14  disclosed both as a related party and with respect to
15  this management representation letter?
16      A.   Yes.
17      Q.   And so if, in fact, there was some ownership
18  stake, that was withheld from BDO; is that correct?
19      A.   Certainly was.
20      Q.   Let's go to the next page at 10.  "The
21  management indicates that there have been no violations
22  or possible violations of laws or regulations including
23  the failure to file reports required by regulatory
24  bodies," and it notes several bodies including the FDIC.
25  Do you see that, sir?

Page 3099

1       A.   Yes.
2       Q.   Why is that important when -- as part of a
3   management representation letter?
4       A.   Once again, if there are violations of the
5   laws and regulations which could result in a material
6   misstatement, we would want to know about it.  If these
7   regulatory bodies have concerns and there are issues,
8   that's something that we need to know in order to
9   properly conduct our audit.
10      Q.   So is one of the functions of the management
11  representation letter making sure that management is
12  considering these various issues when providing the
13  auditors with information?
14      A.   Yes.
15      Q.   And it's telling the management what the
16  auditors view as important information that they need to
17  do their audit, correct?
18          MR. THOMAS:  Objection, leading.
19          THE COURT:  Sustained.
20  BY MS. BITAR:
21      Q.   What is it telling management, Mr. Lenner?
22      A.   It's telling management that they need to
23  disclose if there's any violations of these regulatory
24  bodies because that's important to us in order for us to
25  conduct our audit.

Page 3100

1       Q.   And, Mr. Lenner, if you go to number two at
2   the bottom of this page, management's representing that
3   they've complied with all aspects of contractual
4   agreements that would have a material effect on the
5   financial statements in the effect -- in the event of
6   noncompliance.  Do you see that?
7       A.   Yes.
8       Q.   And if Bankest was not in compliance or had
9   been breaching any contractual obligations, is this
10  something that management is supposed to tell you in
11  connection with the audit?
12      A.   Yes.
13      Q.   And again, would the answers to that
14  question affect the procedures the auditors will employ?
15      A.   Yes.
16      Q.   Let's go to the last page of this document.
17  It says to, "The best of our knowledge and belief no
18  events have occurred subsequent to the balance sheet
19  date and through the date of this letter that would
20  require adjustment to or disclosure in the
21  aforementioned financial statements."  Why is that an
22  important representation in management?
23      A.   That's important because the audit ends at
24  December 31.  But we don't finish our audit until
25  sometime in February.  So the auditor needs to make sure

Page 3101

1   that a transaction or something hasn't occurred because
2   it might impact the financial statements, number one, as
3   of December 31. And secondly, if it doesn't impact the
4   financial statements it might warrant disclosure in the
5   financial statements because it might have an effect on
6   the company in the future.
7       Q.  Now, who signed this representation letter?
8       A.  Hector Orlansky.
9       Q.  And when he signs this, does he sign on
10  behalf of management?
11      MR. THOMAS: Objection, Your Honor. Calls
12  for a legal conclusion.
13      THE COURT: Sustained. Rephrase your
14  question.
15  BY MS. BITAR:
16      Q.  Mr. Lenner, when a represent -- when a
17  representative of management signs of management
18  representation letter, is it your understanding that
19  they're signing on behalf of the management as opposed
20  to in their personal capacity?
21      A.  Yes.
22      Q.  Let me ask you one final question about
23  this. If you have all these representations, why do you
24  need to do an audit in the first place?
25      A.  Because this just compliments the audit

Page 3102

1   procedures that we need to apply in order to issue our
2   opinion. If we did this and we didn't do any other
3   audit procedures, we would not be following the
4   standards. So this just compliments the audit
5   procedures. It's part of the audit evidence
6   requirements and, as you said before, it also gives us
7   answers to certain questions that would otherwise not be
8   available to us during the course of our auditing.
9       MS. BITAR: Thank you.
10      Your Honor, I think maybe now is a good time
11  to break.
12      THE COURT: All right. Ladies and
13  gentlemen, lunch. You're not to discuss the case
14  amongst yourselves or with anyone else nor allow anyone
15  to discuss the case with you. You're not to form a
16  definite or fixed opinion about the merits of the case
17  until you have heard all the evidence, the argument by
18  the lawyers and the instructions on the law by me.
19  You're not to see, hear or read any accounts of this
20  case in the media. And you're to ignore the presence of
21  the lawyers and the witness outside this courtroom and
22  they're to ignore yours.
23      Leave your notes. 1:30. Have a good lunch.
24      (Thereupon, the jury was escorted out of the
25  courtroom.)

Page 3103

1       THE COURT: Mr. Lenner, you're not to
2   discuss the testimony you've given or the testimony you
3   will be giving with anyone and that includes all the
4   lawyers.
5       MS. BITAR: Your Honor, may I ask one
6   question? In light of the juror and the whatever it is,
7   the corporate run, do you have an idea about what time
8   you want to break?
9       THE COURT: Well, I was planning to break at
10  5:00. The problem with that is that the clerk's office
11  is closing at 4:00. So I don't know what we're going to
12  do. So let me hash it out with them. I was going to
13  stop at 5:00 but I may have to stop at 4:00.
14      (Whereupon, at 12:00 p.m., a luncheon recess
15  was taken.)
16
17          *       *       *
18
19
20
21
22
23
24
25

Page 3104

1           A F T E R N O O N   S E S S I O N
2               (1:50 p.m.)
3       Thereupon,
4               SANDOR LENNER
5   was recalled as a witness and, having been previously
6   duly sworn, was examined and testified further as
7   follows:
8       THE COURT: Just so we're clear, let's take
9   up the issue of the questions of Mr. Lenner concerning
10  the Pricewaterhouse. Just so the record is clear,
11  that's the issue we were going to resolve. Is there
12  anything else you all want to say?
13      MS. BITAR: No, Your Honor. I think I've
14  outlined my position at side bar.
15      MR. THOMAS: You know mine.
16      THE COURT: Ms. Bitar, I'm not going to
17  allow you to do that, so I guess Mr. Thomas' objection
18  is sustained. Now I'd like to take up the issue of
19  FDIC. For the record -- it's your record.
20      MS. BITAR: Your Honor, you heard the
21  witness testify. I didn't raise (inaud.) the FDIC
22  issue. And then we went and discussed the importance of
23  management representations.
24      THE COURT: I know what you did.
25      MS. BITAR: Yes, I think you do know what I

Page 3105

1   did. And I did that for a reason because now you're
2   beginning to, I think, understand it. So I would say in
3   the context of a proffer of how important it is that the
4   jury be told the fact that these things were being
5   withheld from the auditors. That's right there in the
6   management representation letter. Your Honor, you know
7   it was our belief that Mr. Balestra, the vice chairman
8   of Bankest, was the management of Bankest. Plaintiffs
9   can disagree, but that is our position. Certainly he
10  has that title and he did not tell BDO.
11          And I believe -- and nobody provided that
12  report to BDO. And you understand now from the witness'
13  own testimony about how that would have impacted the
14  audit. To not have this jury hear this in phase 1,
15  where the question is our liability, the steps we
16  employed, whether we planned this audit properly, is
17  highly relevant. And I think overcomes any kind of
18  prejudice because it's being offered for the very
19  limited purpose, the fact that this information was
20  withheld from the auditors.
21          THE COURT: Mr. Thomas.
22          MR. THOMAS: On the FDIC I'll make two
23  points. One, it's -- even in the FDIC case, it's even
24  more powerful than Pricewaterhouse because BDO Seidman
25  made a motion in limine in this Court, an

Page 3106

1   investigation -- there's an ongoing investigation of BDO
2   Seidman -- it's irrelevant under the case law -- I think
3   it's Kutner (ph.) -- and highly prejudicial under
4   Florida law. That motion in limine applies right to the
5   FDIC in this case. And for that reason in the last
6   trial, four, five, six times you sustained the objection
7   to introduce any of that testimony under Florida law as
8   irrelevant and prejudicial.
9           And secondly -- and I believe I said this
10  last time -- is that the -- what she tried to establish
11  is a regulated -- a regulated entity. And if something
12  happens to a regulated entity, then that's something you
13  may want to know. But each audit of BDO Seidman states
14  that the company is established for the purpose of
15  engaging in the operations of a non-regulated commercial
16  factoring business. And as Your Honor remembers from
17  last time, it's Espirito Santo is regulated, not their
18  audit client. Those are the two points from last time.
19          MS. BITAR: May I respond to the two points?
20          THE COURT: Yes.
21          MS. BITAR: Number one, the issue about it's
22  a non-regulated factoring business, I understand that
23  that's what the financial statement does say, and I
24  understand that's the position of Bankest and it's their
25  financial statements. I also know that the FDIC thought

Page 3107

1   differently. And that was part of the big dispute that
2   existed when the FDIC went in and asked to review
3   Bankest's books -- I'm sorry -- the bank's books. And
4   in particular, because of its heavy reliance on its
5   subsidiary Bankest.
6           Second of all, I understand the Cutner case.
7   We have cited to it, but I think it was used very
8   differently in our motion in limine. And I think the
9   circumstances warrant your attention. There was a
10  specific investigation at work with respect to -- I
11  think it was a police investigation of some sort -- as
12  to a defendant. The FDIC comes in on a yearly or
13  biyearly basis as part of its regulatory authority and
14  does a review. I think the kind of work the FDIC is
15  doing in its regulatory capacity is not the same type of
16  work or the same type of quote/unquote investigation
17  that Mr. Thomas is speaking of. I don't think the FDIC
18  conducts any investigation.
19          And the concern, the prejudice that
20  Mr. Thomas speaks to, if it was the police or the FBI, I
21  understand that. But the jury -- and Mr. Thomas can ask
22  witnesses. But this is something the FDIC does every
23  year. And to compare that to the fact that the
24  Department of Licensing is investigating BDO in this
25  very case on this very audit, is I think a comparison

Page 3108

1   that is clearly distinguishable. So again, I would like
2   to have that information presented to the jury.
3           MR. THOMAS: Let me just ask to adhere to
4   your rulings for --
5           THE COURT: (Inaud.), Mr. Thomas.
6           I'm going to sustain his objection,
7   therefore, you're not to go into that area as well.
8           MS. BITAR: Thank you, Your Honor.
9           THE COURT: It will be preserved.
10          MS. BITAR: I know.
11          MR. THOMAS: And again, Your Honor, I
12  appreciate you letting me keep the cough drop in. I
13  apologize.
14          THE COURT: How much longer do you think
15  you'll have?
16          MS. BITAR: I tried to pare it down at lunch
17  and you've now paired it down even more.
18          THE COURT: That was not my intention.
19          MS. BITAR: I didn't say that, sir. I would
20  say probably 45 minutes to an hour.
21          THE COURT: I'm planning to leave at 4:30.
22  I think my clerks can stay for a half an hour. I'm sure
23  everybody would appreciate that.
24          MS. BITAR: Your Honor, one thing, if I may.
25  Understanding that, and I'm just trying to gauge,

Page 3109

1  assuming I'm done around, let's say, 3:00 o'clock or a
2  little bit before 3:00 and we end at 4:30, and
3  Mr. Thomas -- based on your representations before
4  lunch, should I ask Mr. Ellenburg to come here at 4:30?
5        THE COURT: I don't think Mr. Thomas is
6  going to be done in an hour and a half. And maybe --
7  then you've got redirect.
8        MS. BITAR: And then the other issue is they
9  are closing off some streets.
10       THE COURT: The closing starts at 4:00, but
11 I suspect they start closing from Bay Front Park this
12 way. So we'll be one of the last ones to be closed, I
13 suspect. I don't know what they're going to do. I know
14 they're going to start backwards. So I don't think -- I
15 would suggest that you bring Mr. Ellenburg tomorrow.
16       MS. BITAR: That's fine. Just wanted to
17 make sure what the Court is inclined --
18       MR. LOMBANA: I know exactly how they're
19 going to close the streets.
20       THE COURT: You do? (Inaud.)
21       MR. LOMBANA: No. I read it in the
22 newspaper. They're going to close Biscayne Boulevard
23 North first and then Biscayne Boulevard and Southeast
24 4th Street. So it's going to go down Brickell Avenue,
25 not this way.

Page 3110

1        (Thereupon, there was a brief discussion off
2  the record.)
3        THE COURT: All right. Bring Mr. Lenner in.
4        (Thereupon, the witness was brought in.)
5        THE COURT: Just so you know, I will be out
6  the first week of June -- actually, the second week some
7  days. Not all week. But there was a conference. And
8  again, I will be out the end of June for a bar
9  conference in Orlando. So just letting you know the
10 dates.
11       MR. LOMBANA: That's right. I'll have to go
12 there.
13       THE COURT: I also have a meeting in
14 Orlando.
15       MS. BITAR: Do you know when in the end of
16 June? So hopefully it coincides --
17       THE COURT: I don't know. It's the last --
18 27th, 28th, 29th. Somewhere in that area. If you want,
19 I'll let you know exactly.
20       MS. BITAR: If you get a chance, Judge.
21       THE COURT: It's not going to be -- it's
22 going to be Thursday through Sunday. (Inaud.) Friday,
23 I'm not going to be here. Whatever those days are.
24       MR. ALVAREZ: In June?
25       THE COURT: In June. There's a 4th of July.

Page 3111

1        MS. BITAR: We're going to be done before
2  then.
3        THE COURT: All right. Bring them in.
4        THE BAILIFF: All rise for the jury.
5        (Thereupon, the jury was brought into the
6  courtroom.)
7        THE COURT: All right. Please be seated.
8  All right, ladies and gentlemen. Hope you had a good
9  lunch.
10       Ms. Bitar, you may continue with your
11 direct.
12       MS. BITAR: Thank you, Your Honor.
13       DIRECT EXAMINATION (continued)
14 BY MS. BITAR:
15   Q.  Good afternoon, Mr. Lenner.
16   A.  Good afternoon, Ms. Bitar.
17       MS. BITAR: Good afternoon, ladies and
18 gentlemen of the jury.
19 BY MS. BITAR:
20   Q.  Mr. Lenner, when we broke before lunch, we
21 were talking about the 1998 work papers, and we were
22 using them as an example to talk about the type of stuff
23 that auditors do when conducting audits. Do you
24 remember that testimony?
25   A.  Yes.

Page 3112

1    Q.  And we had just finished talking about the
2  importance of management representation letters and what
3  they meant to the auditor. Do you recall that
4  testimony?
5    A.  Yes.
6    Q.  Could you please have in front of you the
7  1998 work papers again, Exhibit 3003. And let me know
8  when you have the book.
9    A.  Yes, I have it.
10   Q.  Now, the representation letters are
11 section 1, correct -- or I?
12   A.  Yes.
13   Q.  And then the next section that's reflected
14 in the work papers are the shareholder minutes of the
15 entity. Do you see that?
16   A.  Yes.
17   Q.  Referring now to the minutes of the board of
18 managers, correct?
19   A.  Yes.
20       MS. BITAR: And Glenn, can you please put on
21 the screen BDO 59?
22       (Technician complies.)
23 BY MS. BITAR:
24   Q.  Mr. Lenner, could you identify this document
25 for the members of the jury?

Page 3113

1  A.  What you see is a summary of the minutes
2  that occurred during 1998. The auditor had read the
3  minutes, summarized his understanding of the minutes
4  into the summary document.
5  Q.  So is it fair to say that this is a summary
6  or an abstract of important information contained in the
7  board of directors' minutes of Bankest for the first
8  year of its formation, 1998?
9  A.  Yes.
10  Q.  And do the auditors do that every year,
11  review the board of directors' minutes?
12  A.  Yes.
13  Q.  As part of -- let me just finish -- as part
14  of audit steps?
15  A.  Yes.
16  Q.  And why is that important, Mr. Lenner?
17  A.  By reviewing the minutes you can see the
18  behind-the-scenes scenes of the board in action. You
19  could see that they're functioning as a control
20  strength. You could see them questioning management.
21  You could see the issues that are important to the
22  board. You want to make sure those issues -- and you as
23  the auditor are aware of them. So it's very important
24  and it's required that the auditors always review the
25  minutes of any corporation that they are auditing.

Page 3114

1  Q.  Now, Mr. Lenner, you've been hearing about
2  how this fraud was conducted, correct?
3  A.  Yes.
4  Q.  Do you now understand that the minutes that
5  were given to the auditors were doctored and fake?
6  A.  I now know that.
7  Q.  Let's turn to the very first minutes of the
8  company when it was formed in April 1998. It's the next
9  page, please.
10  A.  (Complies.)
11  MS. BITAR:  And if you could just highlight
12  the first paragraph, please.
13  (Technician complies.)
14  BY MS. BITAR:
15  Q.  It says, "The organizational meeting of the
16  directors of Bankest was held. Present at the meeting
17  were all of the initial directors listed in the articles
18  of incorporation of the corporation, excepting only
19  Fernando Espirito Santo Silva.  Joaquin Garnecho
20  participated in the meeting by means of telephone
21  communication which allowed all participating directors
22  to simultaneously hear each other during the meeting."
23  Mr. Lenner, this was the first meeting of
24  Bankest, correct?
25  A.  Yes.

Page 3115

1  Q.  And the board assembled to have a meeting,
2  correct?
3  A.  Yes.
4  Q.  And at the meeting they appointed the
5  officers of the corporation, correct?
6  MR. THOMAS:  Objection, Your Honor.
7  Leading.
8  THE COURT:  Sustained.
9  BY MS. BITAR:
10  Q.  Mr. Lenner, do the meeting minutes reflect
11  the election of officers to the corporation?
12  A.  Yes.
13  Q.  And who was listed as the chairman of
14  Bankest?
15  A.  Mr. Eduardo Orlansky.
16  MS. BITAR:  Go down. Highlight that
17  section, please.
18  (Technician complies.)
19  BY MS. BITAR:
20  Q.  And was he on the board as well?
21  A.  Yes.
22  Q.  What about Victor Balestra, did you know who
23  he was?
24  A.  He was a vice chairman of E.S. Bankest as
25  well as chairman of the board of the Florida bank.

Page 3116

1  Q.  So Mr. Balestra was both on the board of the
2  Florida bank, on the board of Bankest, and was the vice
3  chairman Bankest, correct?
4  A.  That's correct.
5  Q.  He was an officer of the company, correct?
6  A.  Correct.
7  MR. THOMAS:  Objection. Leading.
8  THE COURT:  Overruled.
9  BY MS. BITAR:
10  Q.  What about Mr. Bernard Mollet. Do you
11  recognize that name?
12  A.  Yes.
13  Q.  And who was he, sir?
14  A.  He was a vice president of E.S. Bankest and
15  he was an officer of the Florida bank or one of their
16  affiliates.
17  Q.  And he was also on the board of Bankest,
18  correct?
19  A.  Yes.
20  Q.  Was it important to you in doing these
21  audits in 1998 that there would be bankers on the board
22  and bankers acting as officers of the company?
23  A.  Yes.
24  Q.  Why, sir?
25  A.  It's important because you want to make sure

Page 3117

1    that the board consists of people that have experience
2    in the industry, that come from a good background in
3    terms of a regulated background, which would be the case
4    for officers that worked for a bank. So it's
5    effectively a control strength. You know those are the
6    people that are part of the control environment that are
7    responsible for the controls and internal control of the
8    audit client.
9        Q.   Now, Mr. Lenner, am I correct that other
10   than Mr. Mollet and Mr. Balestra, every other member
11   of -- every other member of the board and every other
12   officer of the company is now an indicted and convicted
13   felon?
14       A.   Yes.
15       Q.   Let's go to the next page of the first
16   minutes and see what they tell us.
17       A.   (Complies.)
18           MS. BITAR: Would you highlight that
19   paragraph, please.
20           (Technician complies.)
21   BY MS. BITAR:
22       Q.   It says, "Further resolved that the
23   corporation shall open a bank account with Espirito
24   Santo Bank of Florida upon the terms of the standard
25   form of resolutions appended to these minutes."

Page 3118

1            You see that, sir?
2        A.   Yes.
3        Q.   Why was it important that the -- that
4    Bankest was opening a bank account at the Florida bank,
5    its 50-percent owner?
6        A.   It was important because that way the bank
7    would be able to see the --
8            MR. THOMAS: Objection, Your Honor.
9    Speculation.
10           THE COURT: Sustained as to the answer.
11           You can rephrase the question or ask another
12   question.
13   BY MS. BITAR:
14       Q.   Mr. Lenner, what would you hope to see if
15   you understand that the 50-percent-owner bank is the
16   bank that will be servicing the company Bankest?
17       A.   I would like to see the funds going through
18   that bank.
19       Q.   And did that give you comfort as an auditor
20   in planning this audit?
21       A.   Yes, it did.
22       Q.   And why is that, sir?
23       A.   That's because those individuals at the
24   Florida bank would be able to see the E.S. Bankest
25   transactions as they went through the Florida bank.

Page 3119

1        Q.   And Mr. Lenner, would that also serve as a
2    control strength in your mind?
3        A.   Yes.
4        Q.   And you understand that banks have
5    compliance programs and they're supposed to know their
6    customers, correct?
7            MR. THOMAS: Objection. Leading and
8    irrelevant.
9            THE COURT: Sustained.
10   BY MS. BITAR:
11       Q.   Mr. Lenner, why is seeing the bank
12   controlling the bank accounts or having the bank
13   accounts at the Florida bank serve as a control strength
14   in this instance?
15       A.   Because the Florida bank, like all other
16   banks, are regulated by the --
17           MR. THOMAS: Objection, Your Honor. Opinion
18   testimony and speculation.
19           THE COURT: Overruled.
20           THE WITNESS: It's regulated by the federal
21   government and by the State.
22   BY MS. BITAR:
23       Q.   And what does that mean?
24       A.   That means the activities are monitored,
25   periodically audited by the federal government and by

Page 3120

1    the State banking authorities. So that's an added
2    control.
3        Q.   And did you have an understanding as an
4    auditor with 35 years of experience that banks
5    themselves have internal policies to monitor and
6    regulate business and their accounts?
7            MR. THOMAS: Objection, Your Honor.
8            THE COURT: Overruled.
9            THE WITNESS: Yes.
10   BY MS. BITAR:
11       Q.   And how did that affect how you viewed the
12   risks associated with this company?
13       A.   It was a control strength to us and it
14   minimized the risks for this company.
15       Q.   Going down to the last paragraph of this
16   page. It says, "Further resolve that all checks drawn
17   on the bank account of the corporation to be opened as
18   aforesaid shall bear the joint signatures of any two of
19   the officers of the corporation."
20           You see that?
21       A.   Yes.
22       Q.   I think I said, "Further resolve that all
23   checks drawn on the bank account of the corporation to
24   be opened as aforesaid shall bear the joint signatures
25   of any two officers of the corporation."

Page 3121

1        Do you see that, sir?
2     A.  Yes.
3     Q.  Did you understand that to mean that
4  Mr. Mollet and Mr. Balestra could sign checks on behalf
5  of E.S. Bankest as officers of that corporation?
6     A.  Yes.
7     Q.  And they were affiliated with the Florida
8  bank, correct?
9     A.  Yes.
10     Q.  How did that impact the way in which you
11  viewed the audit risk associated with this entity?
12     A.  It reduced the audit risk.
13     Q.  And so in that respect it was a control
14  strength?
15     A.  Yes.
16     Q.  And what about the fact that all of the
17  customers' bank accounts went through the Florida bank?
18  Would that be something that you would view as a control
19  strength?
20     A.  Yes.
21     Q.  Why is that, sir?
22     A.  It's because the board would be able to
23  monitor the transactions that are going between E.S.
24  Bankest and the Florida bank.  And if something wasn't
25  correct or didn't meet their expectations, there would

Page 3122

1  be a good likelihood that they would be able to see that
2  and react to it accordingly.
3     Q.  Let me get my microphone.  Hang on.
4        Now, Mr. Lenner, just to walk briefly
5  through some more of these papers, and I promise you
6  I'll be brief.  Turn to section 4, commitments and
7  contingencies.  It's at BDO 586.
8     A.  Yes.
9     Q.  Tell the jury what commitments and
10  contingencies mean and why they're audited.
11     A.  What you saw there or what this section
12  is another audit program and it deals with commitments
13  and contingencies.  Commitments, generally speaking, are
14  obligations of the company, potential obligations of the
15  company.  Whereas a contingency would be a potential
16  obligation that might arise based on some type of event.
17  So these are questions that -- and various audit
18  procedures that we have written down here, such as
19  reviewing the minutes would give the auditor some
20  insight as the potential contingencies and commitments
21  as well as asking questions of management and additional
22  procedures here.  So it's just another type of checklist
23  that we complete.
24     Q.  And who performed the majority of the audit
25  steps relating to commitments and contingencies,

Page 3123

1  contingent liabilities?
2     A.  Ramon Rivera.
3     Q.  And let's go to section 5 briefly.  Do
4  auditors also ask for information from lawyers when
5  doing audits?
6     A.  Yes, they do.
7     Q.  And those are called legal letters?
8     A.  Yes.
9     Q.  And what is the purpose of legal letters and
10  how did they affect an audit?
11     A.  The purpose of a legal letter is to obtain
12  from a third party, which is counsel, their assessments
13  of a particular case.  Both cases are asserted and those
14  that are potentially unasserted cases.  So it's another
15  way for us to get our hand around potential commitments
16  or contingencies.
17     Q.  Mr. Lenner, when you're performing audit
18  procedures, is it fair to say that you take all the
19  evidence that's presented before you and you use that to
20  reach a conclusion?
21     A.  Yes, that's true.
22     Q.  And is it correct that sometimes the
23  evidence you receive in reviewing one aspect of the
24  balance sheet may have implications in other portions of
25  the audit?

Page 3124

1     A.  Yes.
2     Q.  And at the end of the day, do you look at
3  the totality of the evidence before you render an
4  opinion?
5     A.  Yes.
6     Q.  Let's turn now, please, to section 6.
7  That's the subsequent event section.  It's at BDO 591.
8  And it's 95.  You talked a little bit about the idea of
9  subsequent events before lunch.
10        MS. BITAR:  Can you blow that up, please,
11  Glenn.
12        (Technician complies.)
13        MS. BITAR:  Would you blow up some of the
14  text, some of the audits steps associated with
15  subsequent events.
16        (Technician complies.)
17        MS. BITAR:  Thank you.
18  BY MS. BITAR:
19     Q.  Mr. Lenner, why is it important to look at
20  what a subsequent event is in connection with an audit?
21     A.  It's important to see what happens after
22  December 31, which is the end of the company's year-end,
23  to determine what transactions might impact those
24  amounts at December 31.  So you have to look at
25  subsequent events -- at subsequent activities.  And

Page 3125

1    that's why there's an audit program and procedures
2    designed to capture that audit objective.
3        Q.   And is subsequent -- would a subsequent
4    event also include, for example, reviewing subsequent
5    collections?
6        A.   Yes, it would.
7        Q.   Mr. Lenner, turning now to section 7.
8    That's the related party section.  I think you've
9    already defined what a related party is.  But if you can
10   go to the auditing procedure, where it says
11   determination of the existence of related parties.  Do
12   you see that?
13       A.   Yes.
14       Q.   What does BDO do to determine the existence
15   of a related party?
16       A.   Well, there's various steps that are
17   outlined here.  The first of -- the first one which is a
18   very important one is to inquire of appropriate
19   management personnel as to the names of all related
20   parties.  So the first step here in this group is to
21   identify the existence of related parties.  And one of
22   the ways we do that is ask management about that.
23       Q.   And wasn't that done in this case?
24       A.   Yes.
25       Q.   And Mr. Lenner, are the steps employed when

Page 3126

1    making determinations about the existence of related
2    parties something that's discussed in relevant audit
3    literature?
4        A.   Yes.
5        Q.   And do you know what SAS that relates to,
6    sir?
7        A.   That would be SAS 57.
8        Q.   Thank you for correcting me.
9             Mr. Lenner, are you familiar with that
10   literature when doing the audits?
11       A.   Yes.
12       Q.   And did you consider them when doing these
13   audits?
14       A.   Yes, I did.
15       Q.   And Mr. Lenner, are the auditing procedures
16   set forth in this planning document, this work paper,
17   procedures that come right out of standards?
18            MR. THOMAS:  Objection, Your Honor.
19            THE COURT:  Overruled.
20            THE WITNESS:  Yes.
21   BY MS. BITAR:
22       Q.   And, in fact, isn't that the purpose of
23   these checklists throughout all of these balance sheet
24   areas?
25       A.   Yes.

Page 3127

1        Q.   Now, Mr. Lenner, did you hear Mr. Feltman
2    talk about issues relating to the related party
3    relationship of Bankest and BCC?
4        A.   Yes.
5        Q.   Is the fact that they were related parties
6    something that was of specific concern to you in doing
7    this audit?
8        A.   Yes.
9        Q.   Did you consider it when performing steps
10   relating to related parties?
11       A.   Yes.
12       Q.   Mr. Lenner, was there any specific or
13   unusual concerns with respect to these related parties
14   understanding the nature of their relationship?
15       A.   No.
16       Q.   Why is that?  Could you explain that to the
17   jury.
18       A.   Sure.  Generally, the concern is that if
19   there's a transaction between a related party, it may or
20   may not have a business purpose because the two parties
21   are not independent of each other.  There's a
22   relationship, as I described before.  So the profit
23   incentive or any other incentive might not be there.  So
24   the concern is that the related party might be obscured.
25   It might be unclear as to what's going on.  So by way of

Page 3128

1    example -- if you permit me to give an example.
2        Q.   Sure.  If you think that would be helpful.
3        A.   Explain related parties and how it affects,
4    in our view, in terms of this audit.
5             If your parents bought a house on
6    December 30th for $75,000 and one day -- and the next
7    day, December 31st, you leave court early, you buy a
8    lotto ticket and you win a million dollars.
9        Q.   I'm waiting.  Go ahead.
10       A.   And what happens now is you want to buy that
11   house from your parents, and they're going to charge you
12   a million dollars for that house.  But you know, your
13   parents know that only one day has gone by and the house
14   hasn't appreciated by much in one day.  The house hasn't
15   depreciated by that much in one day.  And your parents
16   even got an appraisal and knew the value of the house,
17   and it was $75,000.  So when you -- if we were auditing
18   your financial statements, generally speaking, you
19   record the cost of an asset equal to the price that you
20   would pay.  So the asset might be recorded at a million
21   dollars.  That's the price that Ms. Bitar paid for the
22   house.  But knowing that she bought it from a related
23   party, knowing that she bought it from a parent, and
24   that parent is getting a million dollars for a house
25   that's worth $75,000, that doesn't make sense.  That's

Page 3129

1  something that's being obscured. There's a way for
2  Ms. Bitar wants to get that million dollars to her
3  parents for a reason. So you'd want to look at that
4  transaction. So that's the obscurity of it. You have to
5  look at it.
6     Q.  When you say the obscurity, I just want to
7  make sure the jury understands. You're saying that
8  that's what makes auditing related parties something
9  that requires a careful eye; is that correct?
10    A.  That's correct. For that type of situation.
11    Q.  And understand the substance of the
12 transaction?
13    A.  Yes. Now, if you were to buy that house for
14 $75,000, which is the same price that your parents paid
15 for it, that would not be a problem because it's the
16 same price your parents paid for. There's no -- we
17 don't see any reason -- you're not paying a million
18 dollars. Nothing is being obscured here. You're paying
19 for it effectively what your parents paid for it. Well,
20 that was the case here with E.S. Bankest.
21    Q.  How is that, sir?
22    A.  Because if BCC was purchasing a receivable
23 for $75, it was selling it to Bankest for $75. There
24 was no markup. We didn't see any of the receivables
25 being obscured. They were paying -- E.S. Bankest was

Page 3130

1  paying the same price that BCC was purchasing the
2  receivable for. That's why it was not a red flag to us.
3     Q.  And was BCC in those circumstances
4  effectively acting as a pass-through in the refactoring
5  agreements?
6     A.  Yes.
7     Q.  Thank you, sir. Turning to page 105 at
8  BDO 600. One of the audit steps, as I think you've just
9  described, is that you have the company explain its
10 related parties; is that correct?
11    A.  Yes.
12    Q.  And does that mean that in each of these
13 audit years, the company prepared a memo reflecting
14 related parties?
15    A.  Yes.
16    Q.  And let's -- and who prepared that memo year
17 after year, if you recall?
18    A.  Mr. Parlapiano.
19       MS. BITAR: If we can blow up the heading,
20 please.
21       (Technician complies.)
22 BY MS. BITAR:
23    Q.  Entitled Significant Related Parties of E.S.
24 Bankest and the Nature of Associated Transaction Amongst
25 Said Related Parties. Do you see that?

Page 3131

1     A.  Yes.
2     Q.  Going to number 1 it says E.S. Bankest, LLC.
3  It says the company is owned 50 percent by Bankest
4  Capital Corp. and 50 percent by Espirito Santo Bank,
5  correct?
6     A.  Yes.
7     Q.  And then going to number 2, Bankest Capital
8  Corp. And it describes the related party relationship
9  between Bankest and Bankest Capital, correct?
10    A.  Yes.
11    Q.  And then going to number 3, it talks about
12 Espirito Santo Bank. It says, "Espirito Santo Bank is a
13 Florida chartered commercial bank. The stock of the
14 bank is owned as follows." And then go to the next
15 paragraph, please. "42 percent for -- approximately
16 42 percent by Fernando Espirito Santo, a non-U.S.
17 person; 42 percent by Manuel Espirito Santo, a non-U.S.
18 person; approximately 14.8 percent by Espirito Santo
19 Financial Holdings; and approximately .6 percent other
20 non-U.S. persons."
21       Did you understand these individuals also to
22 be related parties to Bankest?
23    A.  Yes.
24    Q.  And if you go to the next page, the top --
25       MS. BITAR: Highlight the section.

Page 3132

1       (Technician complies.)
2  BY MS. BITAR:
3     Q.  It says, "The bank operates a private
4  banking division. The bank also operates a trust and
5  investments division. Certain non-U.S. persons, clients
6  of the bank's private banking and trust and investment
7  divisions are noteholders of notes issued by the
8  company."
9       Did you understand those to be related
10 parties?
11    A.  Yes.
12    Q.  And if you go down to number 5, please. It
13 says, "Other related parties -- and I'm not even going
14 to try the French. I'll just use the abbreviation
15 CFESSA. Did you understand there was another entity
16 CFESSA, a Lausanne, Switzerland-based asset management
17 company of Espirito Santo Holdings?
18    A.  Yes.
19    Q.  And that ESFH, Espirito Santo Financial
20 Holdings is a Luxembourg-based diversified financial
21 services company with loan interest in commercial and
22 merchant banking, insurance, real estate, and other
23 financial service companies, that's listed on the New
24 York Stock Exchange?
25    A.  Yes.

Page 3133

1    Q.   And when we talked earlier about why this
2  audit was considered sensitive.  And it said that it was
3  rolled up into a publicly-held company.  Is it your
4  understanding that was  ESFH as related in this
5  related-party memo?
6    A.   Yes.
7    Q.   And the last section says a senior member of
8  CFESSA is a member of the board of directors of the
9  company.  You see that?
10    A.   Yes.
11    Q.   Did you understand that to be Mr. Trezzini?
12    A.   Yes.
13    Q.   Mr. Lenner, I'm going further back into the
14  work papers.  I'd like you to look at BDO 842.
15  Actually, let me get you a better page.  846.  And this
16  is the audit program for cash, correct?
17    A.   Yes, it is.
18    Q.   What does cash mean?
19    A.   Cash is the company's bank accounts that are
20  generally held in a bank.  And there are various steps
21  that the audit team has to undertake in order to audit
22  cash, and those steps are in this program.
23    Q.   And if you could turn, please, to page 362.
24  It's BDO 849 on the Bates stamp number.  What is this
25  document, sir?

Page 3134

1    MS. BITAR:  Blow it up, please.
2    (Technician complies.)
3    THE WITNESS:  These are the two Espirito
4  Santo Bank accounts that are in the lead sheet that are
5  effectively in the company's general ledger, and it's
6  where they conduct their banking.
7  BY MS. BITAR:
8    Q.   So is it your understanding that all of the
9  bankings, all the transaction of Bankest -- withdrawn.
10    All the banking transactions of Bankest
11  filter through Espirito Santo Bank of Florida?
12    A.   Yes.
13    Q.   And that was the 50-percent owner of the
14  company, correct?
15    A.   Yes.
16    Q.   We've talked about the accounts receivable
17  section, but I want to ask you one question.  I'm going
18  to direct your attention to the C-10 work paper.  And
19  it's at BDO 897.  You see that, sir?
20    A.   Yes.
21    Q.   And we're all familiar with the document by
22  now, but I have one question.  Can you distinguish for
23  me how a work paper such as this, setting forth an audit
24  trail, is different than the internal risk
25  questionnaires we were looking at earlier?

Page 3135

1    A.   This is a very important work paper.  It
2  denotes the actual procedures that are being performed
3  by the auditor.  It lists the documents that were
4  examined by the auditor.  And it is the result of the
5  risk assessment that was made during the planning and
6  during the inherent risk questionnaire.
7    The inherent risk questionnaire that we saw
8  earlier, yesterday, is your basis for determining the
9  risk level.  And if you recall we -- it came out as low.
10  And then it was adjusted to high, make it a high-risk
11  engagement.  That was a manual override that was done by
12  the audit team.  And so in that case, the answers were
13  not important or not relevant to our audit plan, whereas
14  this work paper is.
15    Q.   Let me ask you another question.  Is it fair
16  to say that the checklist, the IR checklist is a
17  planning document as opposed to a document such as this
18  which actually reflects the work performed?
19    A.   That's correct.
20    Q.   Mr. Lenner, turning to page 472,
21  compensation.  This is another section of the work
22  papers.  What is compensation and why is it audited?
23    A.   Compensation represents the salaries that
24  are paid to the officers and the employees of the
25  company.  It's an income statement account.  And there's

Page 3136

1  various procedures that we have to employ to make sure
2  that those numbers are accurate.
3    Q.   And when performing audits you look at
4  expenses of the company such as compensation, correct?
5    A.   Yes, we do.
6    Q.   Prepaid expenses?
7    A.   That too.
8    Q.   Other liabilities?
9    A.   Yes.
10    Q.   Long-term debt?
11    A.   Yes, we look at long term -- we audit the
12  long-term debt.
13    Q.   And these are all areas of audit
14  significance when conducting an audit at Bankest,
15  correct?
16    A.   Yes.
17    Q.   And when you audit long-term debt, would
18  that include notes payable, the notes we've been hearing
19  about?
20    A.   Yes, it does.
21    Q.   And you are aware from reviewing these
22  financial statements that investors or clients of
23  Espirito Santo Bank of Florida were individuals or
24  entities that purchased the notes, correct?
25    A.   Yes.

Page 3137

1    Q.   And when you were confirming the notes,
2  would anyone at BDO deal with the noteholders
3  themselves?
4    A.   No.
5    Q.   And when you say confirm, what is it that
6  you're confirming exactly when you're dealing with notes
7  payable?
8    A.   We're confirming the amount of the note,
9  which is the obligation recorded on the company's books
10  as a liability. And it's being confirmed with one of
11  the agents of the bank, which is an agent for the
12  noteholders.
13    Q.   So is it correct that nobody at BDO ever
14  spoke to any of these noteholders in Latin America or
15  around the world?
16    A.   Yes, that is correct.
17    Q.   Mr. Lenner, I'll direct your attention to
18  section WW, the equity section. It's at BDO 999.
19    A.   Yes.
20    Q.   And their audit procedures are done with
21  respect to stockholder's equity, correct?
22    A.   Yes.
23        MS. BITAR:  Blow that up, please.
24        (Technician complies.)
25  BY MS. BITAR:

Page 3138

1    Q.   What is stockholder's equity?
2    A.   Stockholder's equity basically consists of
3  invested capital -- that's your investment into the
4  business -- as well as an accumulation of your profits
5  and losses which is known as your net income, which
6  means retained earnings. So those are the two
7  components of the equity section.
8    Q.   And then the last section of the work papers
9  talks about P&L. What's a P&L, sir?
10    A.   A P&L is --
11    Q.   And I direct your attention to BDO 528.
12    A.   A P&L stands for profit and loss. That's
13  another name for the statement of income. Also known as
14  a statement of operations which lists the revenues and
15  expenses. And we perform various procedures on those
16  accounts too.
17    Q.   And so when you were talking yesterday about
18  the balance sheet only gives you a snapshot at year-end,
19  the income statement basically tells you what happened
20  at the company throughout the year; is that correct?
21    A.   That's correct.
22    Q.   And you perform audit tests on that as well,
23  right?
24    A.   Yes.
25    Q.   And Mr. Lenner, I'm not going to take you

Page 3139

1  through the next four years of auditing work papers, but
2  is it fair to say that this type of work is done each
3  and every year?
4    A.   Yes.
5    Q.   And it's reflected in the work papers that
6  are in front of you now; is that right?
7    A.   Yes.
8    Q.   Mr. Lenner, did you understand that in
9  September of 2002 the bank sold its interest in this
10  company?
11    A.   Yes.
12    Q.   When did you learn that?
13    A.   During either December, January -- December
14  of '02 or January of '03. Around that time.
15    Q.   Was that in connection with beginning
16  procedures in connection with the 2002 audit?
17    A.   Yes.
18    Q.   Until that time, Mr. Lenner, had you ever
19  heard of a company called ESB Finance Limited?
20    A.   No.
21    Q.   Do you understand that that's a plaintiff in
22  this case now?
23    A.   Yes.
24    Q.   Did you know about a company called ESB
25  Finance Limited in February 2002 when you did this

Page 3140

1  audit?
2    A.   I couldn't have. No.
3    Q.   Why couldn't you have?
4    A.   It was created well after we finished the
5  2001 audit.
6    Q.   Now, Mr. Lenner, when BDO did its work in
7  the end of 2002 relating to the -- I'm sorry.
8        When BDO did its work in connection with the
9  2001 audit, so that would be sometime in 2002, did you
10  understand that the bank was going to buy out its own
11  noteholders?
12    A.   No.
13    Q.   And did you ever speak to any noteholder in
14  connection with the buyout?
15    A.   No.
16    Q.   Did you ever have any contact with any
17  noteholders?
18    A.   No.
19    Q.   When did you learn about the buyout with the
20  noteholders?
21    A.   In that November -- either November,
22  December of 2002 or January of 2003.
23    Q.   Mr. Lenner, when BDO issued its audit report
24  for 2001, which was in approximately February of 2002,
25  who did you understand would be receiving the financial

Page 3141

1  statements?
2      A.  The Florida bank would be receiving the
3  financials and the owners of E.S. Bankest.
4      Q.  Why did the Florida bank need the financial
5  statements to be audited?
6      A.  They needed the financial statements because
7  it was being consolidated. Their 50-percent interest
8  was being consolidated into the Florida bank's audited
9  statements. So they needed our opinion in the company
10 statements to put into that consolidation.
11     Q.  Now, you sat here through this whole trial,
12 correct?
13     A.  Yes.
14     Q.  Pretty much. Did you hear Mr. Mendez talk
15 about your assistance with respect to the restructuring
16 of the Bankest debt which he claims occurred in
17 September of 2002?
18     A.  Yes.
19     Q.  Do you recall such a meeting?
20     A.  No.
21     Q.  What do you recall about this issue?
22     A.  What I recall is sometime in November,
23 December of 2002 or January of '03 I became aware of the
24 restructuring. And that was it.
25     Q.  Do you remember ever attending any meeting

Page 3142

1  with Mr. Mendez and Mr. Parlapiano and Mr. Orlansky and
2  possibly Mr. Mohr in September of 2002?
3      A.  No.
4      Q.  Mr. Lenner, did you ever agree to put in a
5  good word to the bank about Bankest?
6      A.  No. We don't do that.
7      Q.  Mr. Lenner, did you offer to help Bankest
8  restructure its debt?
9      A.  No.
10     Q.  Mr. Lenner, are you a restructuring expert?
11     A.  No, I'm not.
12     Q.  What is restructuring, Mr. Lenner?
13     A.  It's a very complex and sophisticated aspect
14 of changing the terms of a debt instrument because the
15 debtor is having financial difficulties in paying. So
16 they might increase the interest rate, decrease the
17 interest rate. It might change the terms of that
18 payment of the debt. It's something that I've never
19 done. And it's something that at BDO we have a
20 restructuring department to handle those types of needs.
21     Q.  And did you understand from Mr. Mendez's
22 testimony that the reason Bankest was restructuring was
23 because if they didn't, they would be in trouble?
24     MR. THOMAS:  Objection, Your Honor.
25 Commenting on testimony of another witness.

Page 3143

1      THE COURT:  Overruled. It's a yes or no.
2  BY MS. BITAR:
3      Q.  Do you remember Mr. Mendez saying that,
4  Mr. Lenner?
5      A.  Yes.
6      Q.  In connection with the trouble they were in,
7  did you offer to give some comfort to the bank?
8      A.  No.
9      Q.  Do you have any idea what Mr. Mendez is
10 talking about?
11     A.  I have no idea what he's talking about.
12     Q.  You're an auditor?
13     A.  Yes.
14     Q.  Are you an investment banker?
15     A.  No.
16     Q.  Did you work out to restruct debt (inaud.)?
17     A.  No.
18     Q.  Do you know how do it?
19     A.  No.
20     Q.  Did you ever speak to anyone at Espirito
21 Santo about this restructuring?
22     A.  Not a sole.
23     Q.  Did you ever authorize anyone at Bankest to
24 attribute any opinion or comment about this
25 restructuring to you or BDO?

Page 3144

1      A.  No.
2      Q.  Do you recall ever agreeing or permitting
3  Bankest to give to consolidated lenders the prior year's
4  financial statement?
5      A.  No.
6      Q.  Mr. Lenner, assume for the sake of this
7  question that you did have a meeting in September of
8  2002. When would the last audit opinion have been
9  issued prior to that time?
10     A.  It would have been issued in February of
11 2002 for the December 31, '01 -- 2001 year-end.
12     Q.  Mr. Lenner, yesterday you gave some
13 testimony about the stale nature of audit opinions. Do
14 you recall that testimony?
15     A.  Yes.
16     Q.  And do you recall you testified that these
17 receivables turn over every 90 days or so?
18     A.  Yes.
19     Q.  And, in fact, we saw an invoice from Joy and
20 it says payments terms, 90 days?
21     A.  Yes.
22     Q.  Based on those facts, if somehow the bank
23 was using BDO's financial statements from 2001 in
24 connection with a September 2002 restructuring, what
25 would be the value of those opinions?

Page 3145

1      A.  It would have no value.  It's yesterday's
2  news.  The receivables that existed at December 31, '01
3  have turned over, collected, purchased within 90 days,
4  120 days, two times possibly three times.  It's a
5  completely different set of invoices as of
6  September 30th '02 versus the invoices that were
7  included in the accounts receivable at December 31, '01.
8          It's just ludicrous to me that they would
9  even want those financial statements when the bank had a
10  wealth of information that we didn't have on the current
11  information of those receivables.
12      Q.  And if the company was, in fact, having
13  trouble paying its debts, wouldn't that mean that the
14  opinion from nine months earlier would be totally
15  irrelevant?
16      A.  Yes.
17      Q.  Mr. Lenner, at any time that you were the
18  audit partner for the Bankest audits, were you told that
19  there was a fraud?
20      A.  No.
21      Q.  Did any lawyer call you up and tell you
22  there was a fraud?
23      A.  No.
24      Q.  Mr. Freeman call you up and tell you there
25  was a fraud?

Page 3146

1      A.  No.
2      Q.  Anybody ever tell you that the checks you
3  looked at were forgeries?
4      A.  No.
5      Q.  Anybody tell you that there was open check
6  stock, that they could write checks as they needed to
7  and show to the auditors?
8      A.  No.
9      Q.  Did anyone ever tell you that they were
10  manufacturing invoices in the basement to show to the
11  auditors?
12      A.  No.
13      Q.  Did anybody ever tell you that if you asked
14  for document A, they would go and manufacture it?
15      A.  No.
16      Q.  Did anybody ever tell you that they were
17  going to take the aging of those receivables and
18  extrapolate and change those charts to make it look like
19  those receivables were being paid?
20      A.  No.
21      Q.  Did anyone ever tell you they were
22  jerry-rigging the documents you were looking at to make
23  it look like those receivables were real?
24      A.  No.
25      Q.  Did anyone ever tell you there was

Page 3147

1  $140 million shortfall?
2      A.  No.
3      Q.  Mr. Lenner, did the United States government
4  identify BDO as a victim being deceived by this fraud?
5          MR. THOMAS:  Objection, Your Honor.
6          THE COURT:  Sustained.
7  BY MS. BITAR:
8      Q.  Mr. Lenner, did you see the indictment in
9  this case?
10      A.  Yes.
11      Q.  Does the indictment indicate that BDO was
12  deceived by this fraud?
13          MR. THOMAS:  Objection, Your Honor.
14          THE COURT:  Overruled.
15  BY MS. BITAR:
16      Q.  You may answer, sir.
17      A.  Yes.
18      Q.  And do you feel you were deceived?
19      A.  Very much so.
20      Q.  How has it impacted your life?
21          MR. THOMAS:  Objection, Your Honor.
22          THE COURT:  Sustained.
23  BY MS. BITAR:
24      Q.  Mr. Lenner, do you think about how this --
25  how this happened?

Page 3148

1      A.  Yes.
2      Q.  You did five years of E.S. Bankest audits,
3  correct?
4      A.  Yes.
5      Q.  You testified that you believed you did your
6  job, correct?
7      A.  Yes.
8      Q.  How did this happen?
9      A.  It's -- the audit is the biggest, biggest
10  nightmare for something like this to happen.  It
11  happened because there was a massive fraud that involved
12  people inside the company, outside the company, people
13  falsified hundreds of thousands of documents, invoices,
14  checks, contracts.  People lied to us every day.  They
15  lied to our staff.  They lied to me every day for every
16  audit.  That's how it happened.  We were deceived.  I
17  feel that I'm the victim.
18          MS. BITAR:  Mr. Lenner, thank you.  I have
19  nothing further.  I pass the witness.
20          THE COURT:  Let's take a short break.  Maybe
21  the jury needs to go to the bathroom.  And some of us.
22          Ladies and gentlemen, you're not to discuss
23  the case amongst yourselves inside the jury room.
24          (Thereupon, the jury was escorted out of the
25  courtroom.)

Page 3149

1        THE COURT: You're not to discuss the
2    testimony you've given or the testimony you're about to
3    give with anyone, and that include the lawyers. Take
4    15 minutes.
5        (Thereupon, a brief recess was taken.)
6        MR. THOMAS: If I impeach your prior trial
7    testimony, I'll be careful that I don't mention the
8    prior trial. I was just going to say, you remember
9    you've testified under oath? And I was just going to
10   give the date, but I cannot give the date that I want
11   to.
12       I'm just trying to comply with all the
13   rules.
14       THE COURT: Do you have a problem with the
15   date?
16       MS. BITAR: Why don't you say the prior
17   proceeding and then call it a deposition?
18       MR. THOMAS: That's fine with me. Obviously
19   (inaud.) you recall I asked you questions.
20       MS. BITAR: I actually don't care.
21       THE COURT: Okay. Can you please bring in
22   the jury, please.
23       THE CLERK: (Complies.) All rise for the
24   jury.
25       (Thereupon, the jury was brought into the

Page 3150

1    courtroom.)
2        THE COURT: Having fun? You may be seated.
3        All right. We're going to leave at 4:30, so
4    you can look forward to something.
5        All right. Mr. Thomas, you may proceed with
6    your cross-examination.
7        MR. THOMAS: Thank you, Judge.
8        Hello, again, Mr. Lenner.
9        THE WITNESS: Good afternoon, Mr. Thomas.
10       MR. THOMAS: Hello, ladies and gentlemen.
11       CROSS-EXAMINATION
12   BY MR. THOMAS:
13       Q.   Mr. Lenner, you were a certified public
14   accountant doing audits at BRFFC and E.S. Bankest,
15   right?
16       A.   Yes.
17       Q.   And you understood you had duties, right?
18       A.   Yes.
19       Q.   You understood that you were hired to do a
20   job?
21       A.   Yes.
22       Q.   And you understood people were counting on
23   you to do that job, right?
24       A.   Yes.
25       Q.   And you understood that one of your duties

Page 3151

1    was to make sure that there were no material
2    misstatements in these financial statements due to
3    fraud, right?
4        A.   Yes.
5        Q.   And here there was a great big fraud, right?
6        A.   Yes.
7        Q.   And you had that duty to find the fraud in
8    1995, right?
9        A.   Yes.
10       Q.   And you had that duty to find the fraud in
11   1996?
12       A.   Yes.
13       Q.   And you had the duty to find the great big
14   fraud in 1998, 1999, 2000, 2001, and 2002, right?
15       A.   Yes.
16       Q.   Mr. Lenner, one of the questions that your
17   lawyer asked you -- I wrote it down to make sure I got
18   it right -- was that the problem here was that people
19   representing to you were committing the fraud, right?
20       A.   Yes.
21       Q.   And that included that management letter
22   that Mr. Orlansky signed saying there was no fraud,
23   right?
24       A.   Yes.
25       Q.   But since it was part of your job, part of

Page 3152

1    your duty to find the fraud, you couldn't just rely on
2    what he said, right?
3        A.   Yes.
4        Q.   And so since you couldn't just rely on what
5    Mr. Orlansky said, then you had to do stuff to your
6    job to see if there was fraud, right?
7        A.   Yes.
8        Q.   And one of the things that you had to do
9    because it was your job to find the fraud was you had to
10   consider that maybe Mr. Orlansky wasn't telling you the
11   truth, right?
12       A.   Yes.
13       Q.   And, in fact, your own audit manual tells
14   you that, right?
15       A.   Yes.
16       MR. THOMAS: Your Honor, may I approach?
17       THE COURT: You may.
18       MR. THOMAS: (Complies.)
19   BY MR. THOMAS:
20       Q.   Mr. Lenner, this is Plaintiffs' Exhibit 118
21   into evidence. It's a page from it. It's a big
22   document. And you understand this is part of your own
23   audit manual, right?
24       A.   Yes.
25       MR. THOMAS: Please put this one up, please.

Page 3153

1          (Technician complies.)
2     BY MR. THOMAS:
3          Q.   And it says, as part of doing your job, in
4     considering the possible existence of fraud in the
5     financial statements, we should be aware of the
6     importance of management's integrity to the effective
7     operation of internal control as management can direct
8     subordinates to record or conceal transactions in a
9     manner that could result in a material misstatement.
10    Management can perpetrate fraud by overriding controls
11    that would otherwise prevent misstatements.
12         Now, that's what your own audit manual
13    warned you about when you were doing these audits where
14    there was a great big fraud that it was your job to
15    find, right?
16         A.   Yes.
17         MS. BITAR:  Objection, Your Honor.
18         THE COURT:  Overruled.
19    BY MR. THOMAS:
20         Q.   And, sir, one of the ways that you were
21    supposed to do your job to find the fraud, was to send
22    out confirmations to customers, right?
23         A.   Yes.  That was one of the ways to do it, but
24    there are other ways.
25         Q.   Well, actually the first way, the first step

Page 3154

1     to confirm whether or not an accounts receivable is real
2     or fake is to send out a confirmation, right?
3          A.   Yes.
4          Q.   And you told the jury that for E.S. Bankest
5     in the beginning you sent out confirmations to
6     customers, and you got basically none back, first year.
7          Do you remember that?
8          A.   Yes.
9          Q.   But then you sent out second requests,
10    right?
11         A.   Yes.
12         Q.   But you got none of those back either?
13         A.   That's correct.
14         Q.   And then the next year you sent
15    confirmations out again to customers, right?
16         A.   Yes.
17         Q.   And you didn't get any of those back?
18         A.   That's correct.
19         Q.   And you said you sent out second
20    confirmations to the customers, and you didn't get any
21    of those back either, right?
22         A.   Yes.
23         Q.   And I believe you told the jury that even
24    though after all of that, when you got zero back, that
25    you concluded that that was okay because these kinds of

Page 3155

1     customers didn't normally send back confirmations,
2     right?
3          A.   Yes.
4          Q.   But that's not the only reason they wouldn't
5     send back confirmations, right?
6          A.   It's the only reason I know.
7          Q.   Well, in this case -- I mean, this very
8     case -- none of the confirmations got sent back because
9     all of those accounts receivable were fake, right?  They
10    didn't exist?
11         MS. BITAR:  Objection, Your Honor.
12         THE COURT:  Overruled.
13         THE WITNESS:  Mr. Thomas, at the time that I
14    was performing the audit with my staff, we had no
15    personal knowledge that those accounts receivables were
16    fake.  It's only after hearing the testimony, the people
17    that have appeared in this proceeding, we are aware of
18    the massive fraud, massive falsifications of hundreds of
19    thousands of invoices and other documents.  Now I know
20    that they are fake.
21    BY MR. THOMAS:
22         Q.   Well, no one falsified any fake
23    confirmations from those customers coming back, right?
24    You just got zero back?
25         A.   Yes.

Page 3156

1          Q.   And even though you concluded that the
2     reason was because those customers didn't want to send
3     them back, one of the reasons could have been like what
4     actually happened, is the reason they didn't come back
5     is because the accounts receivable were fake, right?
6          MS. BITAR:  Objection, Your Honor.  Calls
7     for speculation.
8          THE COURT:  Sustained.
9     BY MR. THOMAS:
10         Q.   Let's see what your own audit manual says.
11         MR. THOMAS:  Your Honor, may I approach?
12         THE COURT:  You may.
13         MR. THOMAS:  (Complies.)
14    BY MR. THOMAS:
15         Q.   Mr. Lenner, I'm giving you another page from
16    your audit manual, Exhibit 118 and 515.
17         MR. THOMAS:  And let's look at 1 A.11.
18         (Technician complies.)
19    BY MR. THOMAS:
20         Q.   It says, when the positive method is used --
21    that's what you're using here, right, sending out
22    confirmations to customers?
23         A.   Yes.
24         Q.   -- it is important that we should follow up
25    all customers who fail to respond within a reasonable

Page 3157

1   time.  The failure of a customer to reply after repeated
2   requests should cause us to question whether a valid
3   receivable from a genuine customer existed at the date
4   of verification.
5           Mr. Lenner, your own audit manual says, if
6   you don't get confirmations back, the reason may be
7   because the accounts receivable don't exist, right?
8       A.   Yes.
9       Q.   And that's what happened in this case,
10  right?
11      A.   Yes.
12      Q.   Mr. Lenner, let's look at the next paragraph
13  if you could, please.  And the next paragraph in your
14  audit manual says, in situations just like this, that
15  you can pick up the phone and call them, right?
16          You see that follow-up written request by
17  telephone, right?
18      A.   It says you may do that.
19      Q.   And that's not something you chose to do in
20  this case, right?
21      A.   Yes.
22      Q.   And as a certified public accountant doing
23  audits of a factoring company, it was part of your job
24  to understand their business, right?
25      A.   Yes.

Page 3158

1       Q.   And it was part of your job to understand
2   how the old accounts receivable system worked, right?
3       A.   Yes.
4       Q.   And one of the things if you were going to
5   confirm accounts receivables would have been helpful to
6   know at the time, was that you could have just picked up
7   the phone and called K-Mart through their automated
8   system and found out if their receivables were real or
9   fake, right?
10      A.   No.
11      Q.   Mr. Lenner, at the time, if you would have
12  known that you could have just called up K-Mart and used
13  their accounts receivable system to figure out whether
14  the accounts receivable were real or fake, your
15  testimony is you just wouldn't have done that either?
16          MS. BITAR:  Objection, Your Honor.
17          THE COURT:  What is your objection?
18          MS. BITAR:  Calls for speculation.
19          THE COURT:  Sustained.
20  BY MR. THOMAS:
21      Q.   Well, suffice it to say, Mr. Lenner, that
22  consistent with your testimony to the jury when BDO was
23  questioning you, you didn't even know you could do that
24  at the time, right?
25      A.   No.

Page 3159

1       Q.   Now, Mr. Lenner, as I understand the way it
2   works when it's your job to find fraud in these
3   financial statements, is that the company prepares the
4   financial statements and then you take them and you
5   audit them, is that right?
6       A.   It's not our job to find fraud.  It's part
7   of the process.  It's -- the -- to plan and to perform
8   the audit within reasonable terms.
9       Q.   Mr. Lenner, do you recall a few moments ago
10  when I was asking you questions and you were answering
11  them under oath to this jury?
12      A.   Yes.
13      Q.   And do you recall when I asked you the
14  question you had the duty to find the fraud in 1995,
15  right, and you answered yes?
16      A.   Yes.
17      Q.   And do you recall when I asked you the
18  question that you had the duty to find fraud in 1996,
19  and you answered yes?
20      A.   Yes.
21      Q.   And do you recall I asked you the questions
22  that you had the duty to find the great big fraud in
23  1998, 1999, 2000, 2001, and 2002, right, and you
24  answered yes?
25      A.   Yes.

Page 3160

1       Q.   Now, Mr. Lenner, the company, they prepare a
2   financial statement and then they provide it to you and
3   you audit it; is that right?
4       A.   That's basically correct.
5       Q.   And if you were the one preparing the
6   financial statement, then you'd have to get someone else
7   to audit it, right?  You couldn't audit your own
8   financial statement, right?
9       A.   You mean if I was a client preparing the
10  financial statement?
11      Q.   I see, you're right.  That's not a great
12  question.
13      A.   Okay.
14      Q.   It's important that somebody else, other
15  than the one who prepares the financial statement, audit
16  it, right?
17      A.   The financial statement is prepared by the
18  client.  It's audited by the CPA firm.
19      Q.   And it's important that the CPA firm, right,
20  be separate from the client?  You don't want to audit
21  your own numbers, right?
22          MS. BITAR:  Objection, Your Honor.
23          THE COURT:  What's your objection?
24          MS. BITAR:  Foundation and vague and
25  ambiguous.

Page 3161

1    THE COURT:  Overruled.
2    THE WITNESS:  I don't understand the
3  question.
4  BY MR. THOMAS:
5    Q.  Was it vague and ambiguous?
6    THE COURT:  Ask him a question.
7    MR. THOMAS:  That was my question.
8    THE WITNESS:  It's just unclear to me.
9  BY MR. THOMAS:
10   Q.  Let's look at the document.  If we could
11  look at Exhibit 302 at page 337.  I can give you the
12  sheet.
13     You understand that this comes out of BDO's
14  own work papers, right, Mr. Lenner?
15   A.  Yes.
16   Q.  And you understand that this is a letter
17  from Carlos Mendez to Gabe Duarte.  He worked for you,
18  right?
19   A.  Yes.
20    MR. THOMAS:  And if we go down there to the
21  text if you could y'all.
22    (Technician complies.)
23  BY MR. THOMAS:
24   Q.  Carlos writes -- Carlos Mendez writes to
25  Gabriel Duarte, it's a gentleman, thank you for faxing a

Page 3162

1  preliminary draft of BRFFC's financial statement at
2  December 31, 1996.  Since Dominick and I have reviewed
3  said draft and we noticed that under accounts receivable
4  purchased in Note 1, your statement about the company's
5  insurance coverage is factually wrong.  In reality, the
6  aggregate amount of insurance coverage at December 31,
7  1996, was close to 14 million as confirmed by American
8  Credit Indemnity Company.
9     At least in July 2nd, 1997, Mr. Mendez, he
10  was marking up BDO's draft of the financial statements,
11  right?
12   A.  I don't think they were BDO's draft of the
13  financial statements.  They are the client's financial
14  statements.
15   Q.  So you think when Mr. Mendez said thank you
16  for faxing a preliminary draft of BRFFC's financial
17  statements and talked about your statement about the
18  company's insurance coverage, that he was talking about
19  his own draft?
20   A.  It's quite conceivable that a draft was
21  initiated by Mr. Mendez and it came to BDO and we put
22  some comments on it and sent it back to him.  I really
23  don't know what happened in this document.
24   Q.  You're just not sure?
25   A.  That's correct.

Page 3163

1    MR. THOMAS:  Your Honor, may I approach?
2    THE COURT:  You may.
3    MR. THOMAS:  (Complies.)
4    I'm approaching the witness with Plaintiffs'
5  Exhibit Number 426 in evidence.
6  BY MR. THOMAS:
7    Q.  Now, Mr. Lenner, this is from BDO's work
8  papers in 2001 for the 2000 audit, right?
9    A.  Yes.
10   Q.  And this is actually a fax from -- it says
11  from Carlos Mendez and Dominick Parlapiano to you,
12  right?
13   A.  Yes.
14   Q.  And you recognize that below is Dominick's
15  signature (inaud.)?
16   A.  I'm not sure.  It could very well be.
17   Q.  And Dominick writes to you, Sandy, following
18  are our requested restatement revisions.  And in the
19  balance sheet he asked you to please gross up the
20  accounts receivable in the description of the asset as
21  you did for FY '99.
22    That would have been the prior year, right?
23   A.  Yes.
24   Q.  Now, again, in -- here in 2001,
25  Mr. Parlapiano, he's not auditing BDO's statements, is

Page 3164

1  he?
2    A.  No.  Mr. Parlapiano is not auditing BDO's
3  statements.
4    Q.  He's just giving you some comments to put
5  in; is that right?
6    A.  Well, this was a back-and-forth,
7  electronically, of the financial statements where he
8  would work on it, send it to my staff, they'd make some
9  changes and then go back and forth.  It's typically how
10  it's done.
11   Q.  So the financial statements would go back
12  and forth between BDO and Dominick or other people at
13  E.S. Bankest, back and forth marking them up; is that
14  right?
15   A.  That's basically correct.
16   Q.  Thank you.
17    MR. THOMAS:  Your Honor, may I approach?
18    THE COURT:  You may.
19    MR. THOMAS:  (Complies.)
20    I'm approaching the witness with Exhibit
21  3006 in evidence.
22  BY MR. THOMAS:
23   Q.  Now, you've seen this document before,
24  right?  This is from your work papers too?
25   A.  Yes.

Page 3165

1    Q.   And if you turn the pages --
2        MR. THOMAS:  You all want to go over maybe
3   to page 3 or so?
4        (Technician complies.)
5   BY MR. THOMAS:
6    Q.   Is that your initials in the upper
7   right-hand corner?
8    A.   Yes.
9    Q.   And are these your markings on the document?
10   A.   No.
11   Q.   So you were just signing off on someone
12  else's comments?
13   A.   No, I signed off it -- I signed after I read
14  the statement.
15   Q.   With the comments on it?  You put your
16  initials on these pages, right?
17   A.   Yes.
18   Q.   Now, if you'd look over with me, please, at
19  page 12 -- actually, I'm sorry, can we start on page 11?
20  Are you there with me, page 11?
21   A.   Yes, I am.
22       MS. BITAR:  Page 11 you said?  I'm sorry.
23  BY MR. THOMAS:
24   Q.   Yes, page 11.  And Mr. Lenner, on page 11
25  that's where it starts listing the related-party

Page 3166

1   transactions, right?
2    A.   Yes.
3    Q.   And you remember you testified when you
4   were -- to the jury -- when BDO was asking you questions
5   about how important related-party transactions were.
6        Do you remember that?
7    A.   Yes.
8    Q.   And now if you look at the next page, you
9   see down there at the bottom where it says, an officer
10  of the company is a member at the board of managers of a
11  limited-liability company from which the company has
12  purchased 3.2 million in accounts receivable.
13       You see that?
14   A.   That's what I said.
15   Q.   And that was one of these related-party
16  transactions, right?
17   A.   Yes.
18   Q.   And there's no markings here, right?
19  There's other markings on the page, but there's none on
20  that footnote, right?
21   A.   Yes.
22   Q.   And you remember you've already testified to
23  the jury that that's a mistake?
24   A.   Yes.
25   Q.   And so whoever was marking up this financial

Page 3167

1   statement and you put your initials up there on the
2   corner of this page, this is one of those mistakes you
3   didn't catch, right?
4        MS. BITAR:  Objection, Your Honor.
5        THE COURT:  What's your objection?
6        MS. BITAR:  Did not discuss this document
7   with this witness, it's cumulative.  We went through it
8   the last time, and he answered questions about it the
9   last time.
10       THE COURT:  Overruled.
11       THE WITNESS:  Yes.
12  BY MR. THOMAS:
13   Q.   Now, Mr. Lenner, if this was not a
14  related-party transaction, it would be misleading to put
15  it in the financial statements under related-party
16  transactions, right?
17   A.   No.
18   Q.   You think that would be okay to list
19  nonrelated-party transactions under related-party
20  transactions in the financial statements?
21   A.   Yes.
22   Q.   Now, you understood that that related-party
23  transaction between StrataSys and Bankest -- StrataSys,
24  your alliance member firm, you understood that was
25  required to be in there, right?

Page 3168

1        MS. BITAR:  I couldn't hear what you said.
2   BY MR. THOMAS:
3    Q.   You understood that was required to be in
4   there, that disclosure, right?
5    A.   No.
6        THE COURT:  (Inaud.).
7        MS. BITAR:  I'm not -- could I have the
8   whole question from the beginning?
9        THE COURT:  Read that, please.
10       (Thereupon, the court reporter read back the
11  requested portion.)
12  BY MR. THOMAS:
13   Q.   No?
14   A.   That's what I said.
15   Q.   You'll at least give me that it was a
16  related-party transaction since you listed it under the
17  related-party transactions, won't you?
18   A.   No.
19   Q.   So -- just so I'm clear on your testimony,
20  sir, you audited E.S. Bankest financial statements, you
21  saw a note that was not a related-party transaction
22  under the related-party transaction heading, and you
23  thought that was okay?
24       MS. BITAR:  Objection, Your Honor.
25       THE COURT:  Overruled.

Page 3169

1    THE WITNESS: Yes. It --
2    BY MR. THOMAS:
3    Q.   And, sir, so I also understand your
4    testimony to the jury is that this relationship between
5    Bankest and StrataSys, which you were a party, was not
6    required to be disclosed in these financial statements,
7    right?
8         MS. BITAR: Objection, Your Honor.
9         THE COURT: Overruled.
10        THE WITNESS: Yes.
11   BY MR. THOMAS:
12   Q.   But you remember that at the time you were
13   asked that, right?
14   A.   At what time?
15   Q.   At the time that you all put the note in,
16   you were asked whether or not it was required to be in
17   there. You remember that, right?
18   A.   You'd have to show me the fax again.
19        Maybe I have it here.
20   Q.   You don't remember that?
21        Are you going back to look at the document?
22   Is that Exhibit 426?
23   A.   Yes.
24   Q.   And at the time, Mr. Lenner, Dominick
25   Parlapiano, he asked you if it was required, right?

Page 3170

1    A.   Yes.
2    Q.   And, in fact, you said, unless it's
3    required, don't put it in there, right? And he was
4    commenting on the financial statements to you.
5         See when he was commenting on the Note 13,
6    that's the same one we've been looking at, right?
7    A.   Yes.
8    Q.   And he's writing back to you after he looks
9    at -- I don't want to say your draft -- a draft that
10   went back. And he would say, although I offer the
11   correct test of my relationship with StrataSys, while we
12   had no problem with this disclosure, is it required? If
13   not, please delete it. If it is required, and it goes
14   on, I do not believe my being a manager qualifies me as
15   a related party, does it? And he says, if it's not
16   required, take it out, right?
17   A.   That's what he said.
18   Q.   But it's in, right?
19   A.   Yes.
20   Q.   Mr. Lenner, you and your lawyer, you spent a
21   long time on the demonstrative.
22        Do you remember that?
23   A.   Yes.
24   Q.   And this is a demonstrative you know that --
25   you've been here when I used it. I used it in the

Page 3171

1    opening statement, and you were here for that, right?
2    A.   Yes.
3    Q.   And you were here when we used it with
4    witnesses, right?
5    A.   Yes.
6    Q.   And you were here when Mr. Cole borrowed it,
7    I think, on two different occasions, and he used it with
8    witnesses, right?
9    A.   I believe so.
10   Q.   And I want you to help me look at it,
11   please. In this transaction, Joy sells T shirts to
12   Wal-Mart, right?
13   A.   Yes.
14   Q.   And that's this right here, right, the arrow
15   with the T-shirts (indicating)?
16   A.   Yes.
17   Q.   And then when Joy sells T-shirts to
18   Wal-Mart, then an accounts receivable or IOU goes back
19   to Joy, right?
20   A.   Yes.
21   Q.   And that's this arrow right here, right
22   (indicating)?
23   A.   Yes.
24   Q.   And then what happens next is Joy factors it
25   to Capital, right, and that shows this accounts

Page 3172

1    receivable and IOU right here, right?
2    A.   In this scenario, yes.
3    Q.   Yes. And that's all correct, right?
4    A.   For a nonnotification, that's correct.
5    Q.   Well, for any notification, right? When Joy
6    sells T-shirts to Wal-Mart, an accounts receivable comes
7    back, right?
8    A.   That's correct.
9    Q.   And then an accounts receivable goes to
10   Capital, right?
11   A.   Yes.
12   Q.   You agree with me, right?
13   A.   Yes.
14   Q.   And then Capital turns around and they send
15   the receivable down here to Bankest, right, and that's
16   this arrow on this IOU, right (indicating)?
17   A.   They sell it they don't send it.
18   Q.   They refactor it, if you want to get
19   technical, and it goes right there (indicating); isn't
20   that right?
21   A.   Yes.
22   Q.   And then what happens is money goes back to
23   Bankest from Capital, right? That's true? Because they
24   sold it as you just told me, right?
25   A.   Yes.

Page 3173

1    Q.   And then Capital sends the money to Joy,
2  that's this arrow on this money right here, right
3  (indicating)?
4    A.   Yes.
5    Q.   And, in fact, everything we just went over
6  was accurate, right?
7    A.   Yes.
8    Q.   But you told the jury that it was not
9  accurate.  That it was false and that's not right; isn't
10 that true?
11   A.   No.
12   Q.   I'm sorry, is there some other arrow I'm
13 missing on this chart?
14   A.   Yes, you're missing a notification
15 arrangement when the cash goes -- it doesn't follow this
16 stream.
17   Q.   Where does it show the cash on here going
18 back?
19   A.   The dollar bills are cash.
20   Q.   You just told me that this and this was
21 right (indicating)?
22   A.   I said for a nonnotification arrangement.
23   Q.   For any notification arrangement because I
24 asked you that three times.
25   A.   You asked me that for invoices.  You did not

Page 3174

1  ask me that for cash.
2    Q.   Let's try again.  Okay?  Because what you
3  told your lawyer the problem was, was that it didn't
4  show the money going from Wal-Mart to Capital.  Don't
5  you remember that, or do you want me to get out that
6  demonstrative?
7    A.   I said in a notification arrangement it goes
8  directly from Wal-Mart to Capital, and that's -- this is
9  not shown here (inaud.).
10   Q.   It doesn't show the money going back to Joy;
11 isn't that right?
12   A.   I see dollar signs between Capital and Joy
13 Athletics.
14   Q.   All right.  I'll tell you what, I'll hold it
15 here so they can see it.
16         This is the one you did with your lawyer,
17 right, to show the mistake?
18   A.   Yes.
19   Q.   Do you remember that?  Now, what you showed
20 the mistake was not dollar signs going this way, the
21 mistake was it didn't show dollar signs from Wal-Mart to
22 Capital, right?
23   A.   Correct.
24   Q.   And that's not depicted on this graph,
25 right?  That's the whole point?

Page 3175

1    A.   It's not how I interpreted it.  I see signs.
2  I see arrows going both ways.  For dollar signs on top
3  of the dollars, the arrows are going to the left, and on
4  top of the dollars, the arrows are going to the right.
5    Q.   That's why we spent so much time,
6  Mr. Lenner, going through each one and having you tell
7  the jury that each one was correct?
8         MS. BITAR:  Objection.
9         THE COURT:  Sustained.
10        Ask him a question.
11 BY MR. THOMAS:
12   Q.   Mr. Lenner, is it now your testimony that
13 when you told me the arrow with the IOU meant the IOU
14 going from Joy to Capital, that you thought that was
15 dollars?
16   A.   From Joy to Capital?
17   Q.   Uh-huh.  (Nodding.)
18        Are you going to tell me that you think this
19 one now is dollars, not the IOU?
20   A.   Mr. Thomas, you know, there's no footnotes.
21 It's really not that clear to you or to me.  What I'm
22 telling you is it looked that way when I gave my
23 interpretation of it.
24   Q.   Well, as you sit here now after answering
25 each one of my questions about what the arrow and IOU

Page 3176

1  was, do you understand that if this arrow goes with the
2  IOU, that this graph is correct?
3    A.   It's correct for the IOU aspect of it.
4    Q.   And, sir, when you were gone from the trial
5  here for two-and-a-half days and Ms. Bitar was gone,
6  were you preparing for your testimony?
7    A.   Yes.
8    Q.   And did you go over the questions she was
9  going to ask and the answers you were going to give?
10        MS. BITAR:  Your Honor, now I'm going to
11 object --
12        THE COURT:  Sustained.
13        MS. BITAR:  And I reserve, Judge.
14        MR. THOMAS:  Would you all do me a favor?
15 Would you put this demonstrative up for me?
16        (Technician complies.)
17        MR. THOMAS:  Thank you.
18 BY MR. THOMAS:
19   Q.   Now, this one -- this actually is incorrect,
20 right?
21        MS. BITAR:  Sorry, did you say correct or
22 incorrect?
23 BY MR. THOMAS:
24   Q.   Incorrect.
25   A.   No.

Page 3177

1    Q.   Well, Joy -- all this money flowed through
2  Capital, right?
3    A.   As Ms. Bitar pointed out in this, she was
4  using Joy here, but Joy would not fall into this exact
5  chart. It could have been any other customers, but she
6  was just using it to keep that Joy customer consistent.
7    Joy would -- this is not applicable for Joy,
8  and Ms. Bitar made that very clear.
9    Q.   To match up with the purported mistake in
10  Espirito Santo's chart, is that what you're saying?
11    MS. BITAR: Objection, Your Honor.
12    THE COURT: Sustained.
13  BY MR. THOMAS:
14    Q.   So you will agree with me then that this
15  chart, there should be a Capital right there?
16    A.   No. It says no refactoring on the top.
17    Q.   Well, Joy only did refactoring, right?
18    A.   But we made it very clear to the jury and we
19  made it very clear that you just put Joy here as an
20  example but it was -- it would not be Joy, typically.
21  It would be a different type of client.
22    Q.   So the example, it was a mistake. Should
23  have used StrataSys?
24    A.   No.
25    MS. BITAR: Object, Your Honor.

Page 3178

1    THE COURT: Overruled. Unless you can give
2  an explanation.
3    MR. THOMAS: No explanation.
4    THE WITNESS: I didn't even know -- what's
5  the question? I didn't hear with the objection.
6  BY MR. THOMAS:
7    Q.   I'm sorry, sir.
8    StrataSys was one of those companies that
9  wasn't refactored through Capital, right?
10    A.   Correct.
11    Q.   So instead of using Joy, which was
12  refactored through Capital, that shows no refactoring.
13  The example here could have been StrataSys, and that
14  would have been right?
15    A.   No, it would not have been right because
16  StrataSys is nonnotification. The correct client would
17  be a company like United Containers.
18    Q.   So to make this correct, you could have put
19  United Container?
20    A.   Yes.
21    Q.   Now -- I get now that we have a
22  misunderstanding about Espirito Santo's graphs. But
23  that was one of the things you were using to try to
24  explain why Capital was left out of that footnote.
25    Do you remember that?

Page 3179

1    MS. BITAR: Objection, Your Honor.
2    THE COURT: Do you understand the question?
3    THE WITNESS: No.
4  BY MR. THOMAS:
5    Q.   You want to see the footnote again?
6    THE COURT: Why don't you ask the question.
7  I didn't understand.
8  BY MR. THOMAS:
9    Q.   Do you want to see the footnote again is my
10  question.
11    A.   What footnote?
12    Q.   Well, let's look at it.
13    MR. THOMAS: Your Honor, this is
14  Exhibit 3005.
15    THE WITNESS: Thank you.
16  BY MR. THOMAS:
17    Q.   Now, can we go to that third page there?
18  Remember this footnote? You all spent a long time on
19  this.
20    A.   Yes.
21    Q.   And remember, this is the one for
22  notification customers, and that's ones like Joy, right?
23    A.   Yes.
24    MR. THOMAS: Can you all highlight that down
25  there at the bottom?

Page 3180

1    (Technician complies.)
2  BY MR. THOMAS:
3    Q.   Remember, Joy is notification, and Joy --
4  all the money always goes through Capital, right?
5    A.   All the money whether it's a -- whether it's
6  being paid by a customer or being paid by Joy would
7  always go through Capital, that's correct.
8    Q.   But when you wrote the note here for
9  notification customers, you left Capital out of the
10  note, right?
11    A.   Although it's not in this note per se,
12  it's -- it was very clear to the auditor that all the
13  cash went through BCC, and simultaneously there was a
14  credit to E.S. Bankest as we saw in the controls
15  testing.
16    Q.   Just like it was very clear to the auditor
17  here, the customer could use a Capital check, didn't
18  have to write it in just like this, right, Mr. Lenner?
19    A.   No.
20    Q.   Mr. Lenner, you were referencing the control
21  testing, right?
22    A.   Yes.
23    Q.   But remember all the time you spent telling
24  the jury how the control testing was different than the
25  substantive testing.

Page 3181

1    Do you remember that?
2    A.   Yes.
3    Q.   Two totally different tests, right?
4    A.   Yes.
5    Q.   And in this test, right, this isn't a
6  controls test, right?
7    A.   That's correct.
8    Q.   In fact, when you look up there and you see
9  receipts right before invoice only, that's this test,
10  right? Subsequent collections, subsequent receipts?
11    A.   Well, you're mixing -- they're different
12  years, but --
13    Q.   They're different years, same test?
14    A.   Basically.
15    Q.   And when you do this test or you do that
16  same test, you're looking at actual documents, checks,
17  remittance advices, right?
18    A.   Yes.
19    Q.   So when you're doing this test with this
20  footnote, what's on those ledgers one way or the other,
21  that's not what you're testing, right?
22    A.   You've already tested that through your
23  controls testing.
24    Q.   A different test?
25    A.   The same year, same client, same objective,

Page 3182

1  same audit objective.
2    Q.   Different test?
3    A.   Yes.
4    Q.   And when you're doing this test, you're
5  supposed to look at the actual documents, right?
6    A.   Yes.
7    Q.   And the fact that there may be an entry on
8  E.S. Bankest's ledger that automatically goes into
9  Bankest Capital's ledger, that has nothing to do with
10  this test, right?
11    A.   No.
12    Q.   So to do this test, if the payment went
13  through Capital, you had to look at that payment, right?
14    A.   You would examine the customer payment.
15    Q.   Well, if you were going to trace it all the
16  way through like it says but leaving out Capital, you'd
17  have to see the customer check to Capital, then you'd
18  have to see the Capital check to Bankest, right?
19    A.   No. It's an automatic interface, as I said
20  before, that when there's a correction at Capital,
21  there's an automatic credit on the books of E.S.
22  Bankest. It's in our work papers.
23    Q.   Now, Mr. Lenner, you got the whole business
24  that we've been talking about all this time, it's your
25  job to find the fraud by Dominick Parlapiano, right?

Page 3183

1    A.   Could you repeat the question?
2    Q.   You got this whole business, BRFFC to E.S.
3  Bankest, this business came in through your relationship
4  with Dominick Parlapiano, right?
5    A.   Yes.
6    Q.   And he was a friend of yours?
7    A.   He was a professional acquaintance. He was
8  not a friend. I did not socialize with him.
9        MR. THOMAS:  Your Honor, may I approach?
10        THE COURT:  You may.
11        MR. THOMAS:  (Complies.)
12  BY MR. THOMAS:
13    Q.   I'm approaching the witness with
14  Exhibit 3002 in evidence.
15        MR. THOMAS:  Can we put that up, you all?
16        (Technician complies.)
17  BY MR. THOMAS:
18    Q.   Now, this is the client data form that you
19  filled out, right?
20    A.   Yes.
21    Q.   And those are your initials at the top?
22    A.   Yes.
23    Q.   And this was kind of to tell who the client
24  was and where the business came from?
25    A.   Yes.

Page 3184

1    Q.   And it looks like 8-14-06, but is that
2  '96 --
3    A.   Yes.
4    Q.   -- the top date up there?
5        And if you look down there at the bottom
6  with me, you have to give the source and the name of
7  your new client, right?
8    A.   Yes.
9    Q.   And you didn't write in E.S. Bankest, right?
10  This is the name of your new client?
11    A.   This was BRFFC.
12    Q.   Oh, you're right, you didn't write BRFFC,
13  did you?
14    A.   No.
15    Q.   You wrote in the client name is Dominick
16  Parlapiano, right?
17    A.   This is -- no, not the client. The
18  source -- that's correct.
19    Q.   And then after you wrote in Dominick
20  Parlapiano, not BRFFC as your client, you had to say
21  what he was, and there was all these different ways you
22  could have met him, right?
23    A.   It's not a way of meeting him. It's a
24  characterization of his profession, if he's an
25  accountant, if he's an attorney, banker, if you met him

Page 3185

1  at a social club, service club.
2      Q.  Well, was he a relative of yours?
3      A.  No, he wasn't.
4      Q.  Was he then a friend, sir?
5      A.  He was -- that's -- I met him at that
6  barbecue, cocktail party, and we spoke, and that's how I
7  was able to characterize it into here because he wasn't
8  an attorney or banker.  He wasn't an alumni or anything
9  else, and that's where he would fit in that made the
10 most sense to me.
11     Q.  You didn't scratch this out and write, he
12 was a professional acquaintance there, right?
13     A.  No.
14     Q.  And you were free to do that, right?
15     A.  You generally don't do that.
16     Q.  Well, you were free to do that, right, just
17 remember all those auditors could have added extra
18 columns and wrote in stuff.  You could have just
19 scratched that out and wrote professional acquaintance,
20 right?
21     MS. BITAR:  Objection, Your Honor.
22 Argumentative.
23     THE COURT:  Sustained.
24 BY MR. THOMAS:
25     Q.  Mr. Lenner, you said the barbecue or

Page 3186

1  cocktail party.  When you testified to me, you called it
2  a cocktail party, right?
3      A.  It was a barbecue that became a cocktail
4  party.  That's what's in my deposition.  That's what
5  I've testified to.
6      Q.  I'm sorry.  A barbecue that turned into a
7  cocktail party?
8      A.  Yes.
9      MR. THOMAS:  I see you staring at me, Judge.
10 Are you asking me if I'm going to be done in three
11 minutes?
12     THE COURT:  Done in three minutes?
13     MR. THOMAS:  I don't think I'll be done in
14 three minutes.  I don't have that much longer.  I
15 shouldn't be three minutes.
16     I can stop.
17     THE COURT:  What do you want to do?  You
18 want to stop or go on?
19     MR. THOMAS:  I'll stop (laughter).
20     THE COURT:  So we'll stop.
21     MR. THOMAS:  Thank you.
22     THE COURT:  All right, ladies and gentlemen,
23 tomorrow, 9:30.
24     You're not to discuss the case with anyone
25 or amongst yourselves.  You're not to allow anyone to

Page 3187

1  discuss the case with you.
2      You're not to form a definite or fixed
3  opinion about the case until you've heard all the
4  evidence, the argument of the lawyers, and the
5  instructions on the law by me.
6      And you are not to hear, listen, or read any
7  accounts of this case in the media.  You're to ignore
8  the lawyers' presence, and that includes the witness
9  outside this courtroom.
10     Have a good evening.  Have a good lunch.
11 Make sure you don't hurt yourself, even if you're
12 walking, because we need you tomorrow morning.  Have a
13 good night.
14     (Thereupon, the jury was escorted out of the
15 courtroom.)
16     THE COURT:  Mr. Lenner, you're not to
17 discuss the testimony you've given or the testimony
18 you're going to give with anyone, and that includes all
19 the lawyers.
20     You all have a good night.
21
22     (Thereupon, at approximately 4:30 p.m., the
23 above portion of the trial was concluded.)
24
25             *     *     *

Page 3188

1         CERTIFICATE OF COURT REPORTER
2
3      I, GIZELLA BAAN, court reporter, before whom
4  the foregoing statement was taken, do hereby certify
5  that the statement made was taken by me stenographically
6  at the time and place mentioned in the caption hereof
7  and thereafter transcribed by me to the best of my
8  ability; that said transcript is a true record of the
9  statement given; that I am neither counsel or, related
10 to, nor employed by any of the parties to the action in
11 which these proceedings were taken; and further, that I
12 am not a relative or employee of any party hereto, nor
13 financially or otherwise interested in the outcome of
14 this action.
15
16
17
18     _____
19         GIZELLA BAAN
20     Court Reporter and Notary Public
21     in and for the State of Florida
22
23
24
25