Page 3189

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


----------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
----------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
----------------------------------------------------x

PAGES 3189 - 3283

Volume 26




MORNING SESSION

Miami, Florida

Friday, May 4, 2007

10:00 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 3190

```
1              A P P E A R A N C E S
2
3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4   INTERNATIONAL, LTD., ET AL.:
5
6   SULLIVAN & CROMWELL, LLP
7       1888 Century Park East
8       Los Angeles, California  90067
9       (310) 712-6627
10  BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13  GONZALO R. DORTA, P.A.
14      334 Minorca Avenue
15      Coral Gables, Florida  33134
16      (305) 441-2299
17  BY:  Gonzalo R. Dorta, Esquire
18
19  BERGER SINGERMAN
20      350 East Las Olas Boulevard, Suite
21      Fort Lauderdale, Florida  33301
22      (954) 525-9900
23  BY:  Mitchell W. Berger, Esquire
24
25
```

Page 3191

```
1   On behalf of Defendant BDO Seidman, LLP:
2
3   ALVAREZ, ARMAS & BORRON
4       901 Ponce de Leon Boulevard, Suite 304
5       Coral Gables, Florida  33134
6       (305) 461-5100
7   BY:  Arturo Alvarez, Esquire
8
9   GREENBERG TRAURIG, LLP
10      MetLife Building
11      200 Park Avenue, 15th Floor
12      New York, New York  10166
13  BY:  Adam D. Cole, Esquire
14      Karen Y. Bitar, Esquire
15
16  GREENBERG TRAURIG, LLP
17      1221 Brickell Avenue
18      Miami, Florida  33131
19  BY:  Mark Schnapp, Esquire
20      Nikki Simon, Esquire
21
22
23
24
25
```

Page 3192

```
1   On behalf of Third-Party Defendants Victor Balestra,
2   Bernard Mollet, and Joaquin Garnecho
3
4   RICHMAN, GREER, WEIL, BRUMBAUGH,
5   MIRABITO & CHRISTENSEN, P.A.
6       Miami Center, Suite 1000
7       201 S. Biscayne Boulevard
8       Miami, Florida  33131
9       (305) 373-4000
10  BY:  Manuel Garcia Linares, Esquire
11
12
13  On behalf of Third-Party Defendant Bernard Mollet
14
15  GAMBA & LOMBANA, P.A.
16      2701 Ponce de Leon Boulevard, Mezzanine
17      Coral Gables, Florida  33134
18      (305) 448-4010
19  BY:  Hector J. Lombana, Esquire
20      Geoffrey Marks, Esquire
21
22
23
24
25
```

Page 3193

```
1                 C O N T E N T S
2
3   EXAMINATION OF SANDOR LENNER BY:          PAGE:
4       MR. THOMAS:  (Cross, cont'd)        3197
5       MS. BITAR:  (Redirect)             3268
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3194

```
 1              PROCEEDINGS
 2         THE COURT: Everybody ready?
 3         MR. THOMAS: Two things, Your Honor. First,
 4   I want to let Your Honor know that we have -- Espirito
 5   Santo has filed and served its opposition to BDO's
 6   motion for directed verdict and also let Your Honor know
 7   that -- well, a very large member of my team, a very
 8   feminine member of my team --
 9         THE COURT: A very important one but not
10   very large.
11         MR. THOMAS: -- have convinced me that
12   Espirito Santo will withdraw its motion for directed
13   verdict and make that motion at a subsequent time.
14         And Mr. Dorta also had an issue to raise.
15         MR. DORTA: Yes, Your Honor. May it please
16   the Court. Gonzalo Dorta.
17         Yesterday I -- not that it was intentional
18   but I believe that Mr. Alvarez, I guess, innocently
19   walked into an elevator with a juror -- I guess that
20   would be 7?
21         THE COURT: Mr. Jones?
22         MR. DORTA: Yes, sir. Or 6 -- is it 6?
23         THE BAILIFF: 7.
24         MR. DORTA: And just that the Court's
25   directive is that we should not be getting into
```

Page 3195

```
 1   elevators with jurors; is that correct?
 2         THE COURT: I don't think I've ever made
 3   that -- I don't think I've ever given that order, but
 4   it's common sense and logical that you try to stay away
 5   from jurors. Sometimes you're in a hurry and you want
 6   to get downstairs and that happens.
 7         As a matter of fact, I've walking into --
 8   (inaud.) whenever I can stay away from the jurors I do.
 9   And sometimes they had on one occasion walked into the
10   elevator, and I thought it was kind of -- I didn't want
11   to walk out because I thought that would be worse.
12         So I can understand how that could happen.
13   But you should try to avoid that as much as possible
14   because it does cause a perception of impropriety and
15   sometimes the perception is (inaud.). I'm sure
16   Mr. Alvarez did not intend to, and if he did, I'm sure
17   he did not speak to the juror.
18         MR. DORTA: No, I'm not saying it was
19   intentional. I'm just saying the appearance gives rise
20   to the (inaud.) and I want to bring that up to the
21   Court.
22         MR. ALVAREZ: One time there was a juror in
23   the elevator and I didn't go in. One time one came in
24   and I walked out, and if another one came in, the juror
25   they're speaking to, I didn't see him and I walked --
```

Page 3196

```
 1         THE COURT: Just be cognizant and, you know,
 2   it's a long trial so those things could happen, so let's
 3   be cognizant about it.
 4         I purposely did it yesterday. You take this
 5   elevator; I'll take that one. So keep that in mind.
 6         Okay. Thank you, Mr. Dorta.
 7         MR. DORTA: Yes, sir.
 8         THE COURT: Okay. See if they're ready.
 9   Are they all in one piece?
10         THE BAILIFF: I think so.
11         THE COURT: Bring Mr. Lenner in first.
12         (Thereupon, the witness took his seat at the
13   witness stand.)
14         THE BAILIFF: All rise for the jury.
15         (Thereupon, the jury was brought into the
16   courtroom.)
17         THE COURT: You may be seated.
18         Good morning, ladies and gentlemen.
19         JUROR: Good morning.
20         THE COURT: Thank God it's Friday. Right?
21   Did you win?
22         JUROR: (Shaking head.)
23         THE COURT: You didn't win? What's the
24   point? What can I tell you? All right. Let's see if
25   we can proceed with this trial.
```

Page 3197

```
 1         Mr. Thomas, you may proceed with your
 2   cross-examination.
 3         MR. THOMAS: Thank you, Your Honor.
 4         Good morning, Mr. Lenner.
 5         THE WITNESS: Good morning, Mr. Thomas.
 6         MR. THOMAS: Good morning, ladies and
 7   gentlemen.
 8         THE JURY: Good morning.
 9         CROSS-EXAMINATION (continued)
10   BY MR. THOMAS:
11      Q.   Mr. Lenner, when your lawyer was asking you
12   questions, you described how important the audit
13   planning process was, right?
14      A.   Yes.
15      Q.   And you said that the audit planning process
16   was really important for an auditor, right?
17      A.   Yes.
18      Q.   And the reason I think you said that
19   planning is so important, it's just like -- was this
20   like everything we do in life, right? Planning is
21   important to make sure you do it correctly?
22      A.   That's correct.
23      Q.   And you said for an auditor planning is
24   important to do it correctly because you have to assess
25   the risk in the financial statements, right?
```

Page 3198

1    A.  Yes.
2    Q.  And that ends up being -- when you assess
3  the control risk, that was one of the questionnaires for
4  planning, right?
5    A.  Yes.
6    Q.  And then there was the inherent risk
7  question.  That was another one that was important for
8  planning?
9    A.  Yes.
10   Q.  And after doing those questionnaires and
11 looking at it, you decide how to assess the risk for the
12 audit, right?
13   A.  Yes.
14   Q.  And you decide whether or not to make it
15 sensitive or not, right?
16   A.  No. No.
17   Q.  You have to decide whether you're going to
18 make the audit sensitive or not, to talk about the
19 procedures you're going to do for audit planning.
20     You remember telling us that, right?
21   A.  That is correct.
22   Q.  Now, Mr. Lenner, when I was asking you
23 questions -- sorry, Mr. Lenner.
24     When I was asking you questions about that
25 important planning process, do you remember telling us

Page 3199

1  that the questions were real important, right?
2    A.  Yes.
3    Q.  And then we went over the questionnaire with
4  your lawyer.  Do you remember that, the 1998 inherent
5  risk questionnaire?
6    A.  Yes.
7    MR. THOMAS:  Can we put that up?
8    (Technician complies.)
9    MR. THOMAS:  Your Honor, may I approach?
10   THE COURT:  You may.
11   MR. THOMAS:  (Complies.)
12 BY MR. THOMAS:
13   Q.  Here is another copy for you, sir.  It's
14 Plaintiffs' Exhibit 134 in evidence.
15     And when your lawyer was asking you
16 questions, you said numbers 1, 3, 9, 16 through 17,
17 those were real important questions.
18     Do you remember that?
19   A.  Yes.
20   Q.  And you said those questions, the answers on
21 here were correct, right?
22   A.  That's correct.
23   Q.  I'm sorry for the back and forth with me on
24 who was answering questions, but remember, I asked you
25 questions about 18 and 22.

Page 3200

1     Do you remember that?
2    A.  Yes.
3    Q.  And I said numbers 18 and 22, they're
4  important too for this audit just like all the others,
5  and you said yes.
6     Do you remember that?
7    A.  Yes.
8    MS. BITAR:  Objection, Your Honor.
9    THE COURT:  Overruled.
10 BY MR. THOMAS:
11   Q.  But then when your lawyer asked you, you
12 said 18 and 22 weren't important for this audit.
13     You remember that, right?
14   A.  Yes.  I'd like to explain.
15   THE COURT:  Okay.
16   MR. THOMAS:  Please.
17   THE COURT:  You can explain.
18   THE WITNESS:  When you're completing this
19 form, it's important at the time.  However, if something
20 comes to your attention afterwards and it doesn't
21 diminish the purpose or it doesn't reduce the risk,
22 which was our case, because we had already manually made
23 this a high-risk engagement.  Later on in the audit
24 process, it's not important.  You just asked me in terms
25 of planning.

Page 3201

1  BY MR. THOMAS:
2    Q.  Now, I think you just answered -- I'll just
3  look on our screen.  Just a moment ago, Mr. Lenner, I
4  said -- and I said numbers 18 and 22, they're important
5  too for this audit just like all the others, and you
6  said yes.  Do you remember that?  And your answer was
7  yes.
8     Do you remember that happening just now,
9  right?
10   A.  Yes.
11   Q.  But when your lawyer asked you, you said 18
12 and 22 weren't important for this audit, right?
13   A.  What I tried to explain to you is that in
14 the context -- the audit is a fluid process.  You can
15 make a decision; you can change your mind.  Things
16 change during the course of the audit.  It wasn't
17 important to go back and change this.  That's the point
18 I'm trying to convey.
19     The point that you are completing this
20 program, it's important.  When you look at the audit in
21 totality and knowing what I knew, that point in time, it
22 wasn't that important.
23   Q.  And when your lawyer asked you if 18 and 22
24 were important, you said they were not, right?
25   MS. BITAR:  Objection, Your Honor.

Page 3202

1  Argumentative.
2       THE COURT: Sustained.
3       Stop. He's asked and answered already.
4       MR. THOMAS: Okay. Thank you, Your Honor.
5  BY MR. THOMAS:
6    Q.  Now, another thing you discussed with BDO
7  was that in 1998 and 1999 you sent out first
8  confirmations, didn't get anything back, then sent out
9  second confirms and didn't get anything back from
10 customers, right?
11   A.  That's correct.
12   Q.  And when you looked at the work papers about
13 sending out the confirms in 1998, on one of the work
14 papers it didn't show seconds going out.
15      Do you remember that?
16   A.  Yes, I do.
17      MR. THOMAS: Can we put that one up?
18      (Technician complies.)
19      MR. THOMAS: Your Honor, may I approach?
20      THE COURT: You may.
21      MR. THOMAS: (Complies.)
22 BY MR. THOMAS:
23   Q.  Approaching the witness with 3003 in
24 evidence as 248.
25   A.  Thank you.

Page 3203

1    Q.  You're welcome.
2        Now, if we look up there at the top --
3        MR. THOMAS: You all can you blow that up
4  for me.
5        (Technician complies.)
6  BY MR. THOMAS:
7    Q.  And this is the work paper that shows
8  confirms going out to customers on February 9th, 1999,
9  under date sent.
10       You see that?
11   A.  Yes, I do.
12   Q.  And then where it says second request,
13 there's nothing in the column, right?
14   A.  That is correct.
15   Q.  And so if you just looked at this work
16 paper, you'd think second requests weren't sent out?
17   A.  If you only looked at this work paper, you
18 would reach that conclusion. But it's evident elsewhere
19 that seconds were sent out.
20   Q.  And when you answered questions from BDO, I
21 think one of the ways that you said you could tell that
22 seconds were sent out, is that you looked in the work
23 papers at the copies of the confirms that were sent out.
24      Do you remember that?
25   A.  I said that and I also said that it was

Page 3204

1  signed off in the audit program that seconds were sent
2  out. So that's correct.
3    Q.  That's right. And let me just separate
4  those two points so we're all clear.
5        Although this work paper shows no second
6  requests going out, there's another work paper that's
7  initialed saying second requests did go out, right?
8    A.  Yes.
9    Q.  And then another way, since one work paper
10 said yes and one said no, that you could tell that
11 confirms actually went out twice to customers was that
12 you looked in the work papers and you saw two copies,
13 right?
14   A.  Yes, that was one of the ways.
15   Q.  And because you saw two copies, you knew it
16 was because you always keep the confirms in your work
17 papers.
18       Do you remember saying that over and over,
19 right?
20   A.  No, I didn't say always. I said sometimes
21 they keep copies, but the guiding rules is what the
22 auditor wrote at the time in the audit program that
23 seconds were sent.
24   Q.  So just so I'm clear because I thought I
25 heard you say it several times. BDO doesn't always keep

Page 3205

1  copies of the confirms they send out in their work
2  papers, right?
3    A.  Second confirms, not first. Seconds.
4    Q.  So let's just be clear. First confirms that
5  BDO sends out, if you really send them out, we're going
6  to find them in those work papers, right?
7    A.  Generally speaking they would be in the work
8  papers.
9    Q.  Sir, for first confirms, if BDO sent them
10 out, are we going to find them in those work papers?
11      MS. BITAR: Objection, Judge.
12      THE WITNESS: You're going --
13      THE COURT: Overruled.
14      THE WITNESS: You're going to find it it
15 came back, there may not be a need to keep a copy of the
16 first that was sent out. It's extra work. It's just
17 extra papers in the file. So it depends on the
18 situation.
19      That's why I said generally speaking.
20 BY MR. THOMAS:
21   Q.  So for first confirms that go out, BDO may
22 keep them in their work papers and they may not?
23   A.  Generally speaking, first confirmation is
24 going to be a record that it was sent either a copy of
25 the confirmation or it will be here.

Page 3206

1        Generally speaking, first they're in the
2   work papers. There's some evidence that a first was
3   sent.
4        Q.   So for copies of first confirms, they may be
5   in the work papers and they may not if they were sent,
6   right?
7        A.   Generally they are.
8        Q.   I appreciate that you want to say generally
9   they are. But my question is a little different.
10       For first confirms that are sent out, they
11   may be in the work papers and they may not, correct?
12       A.   It will be either --
13       MS. BITAR: Objection, Your Honor.
14       THE COURT: Overruled.
15       THE WITNESS: It will either be a copy of
16   the confirmation or there will be an indication
17   elsewhere in the work papers that the first was sent
18   out. There will be some evidence of the first sent out.
19   BY MR. THOMAS:
20       Q.   So to tell whether a first confirm was sent
21   out or look in the work paper that a copy, that it may
22   be in there if it was sent out and it may not, right?
23       A.   I said there will either be a copy in the
24   work paper or it will be in the control.
25       Q.   So the copy itself to tell whether it's

Page 3207

1   actually sent out, that first confirm may be in the work
2   papers or it may not, right?
3        A.   Yes.
4        Q.   Now, Mr. Lenner, at least for -- in 1998,
5   one of the ways you said you could tell there was second
6   requests was because you looked in the work papers, you
7   examined them, and you saw a first request and a second
8   request, and that confirmed to you that both went out,
9   right?
10       A.   I said that and I also said that there was a
11   signature in the audit program indicating that the step
12   was performed.
13       Q.   Now, you -- I'm sorry, go ahead.
14       We just went over that a moment ago. Right?
15   There's one per paper that said there was no second
16   confirms, there's one that said that did, and then you
17   took the additional steps of reviewing the work papers
18   and seeing copies of first confirm and a copy of the
19   second confirm, right?
20       MS. BITAR: Objection, Your Honor.
21       THE COURT: What's your objection?
22       MS. BITAR: Mischaracterizes the evidence.
23       THE COURT: Overruled. He can answer the
24   question. I'm sure he can do that.
25       THE WITNESS: Yes.

Page 3208

1        MR. THOMAS: May I approach the witness,
2   Your Honor?
3        THE COURT: You may.
4        MR. THOMAS: (Complies.)
5   BY MR. THOMAS:
6        Q.   Mr. Lenner, this is copies of your work
7   papers, 3003 in evidence. And if you prefer, you can
8   look in this big book too and you can see the Bates
9   numbers down there at the bottom.
10       MR. THOMAS: Can we put those up, y'all?
11       (Technician complies.)
12   BY MR. THOMAS:
13       Q.   Now, I want you to feel free to look in
14   there, but what I tried to do is take the same two that
15   you looked at with your lawyer for Ames, that you
16   referenced through your work papers and put them
17   together and put them up on the screen.
18       That's what I've done, right?
19       A.   Yes.
20       Q.   Now, let's see, the second -- well,
21   Mr. Lenner, which one is the second confirm?
22       A.   The second confirmation?
23       Q.   Yeah. Which one is the second one?
24       A.   It would be the 745 if they were put in the
25   numerical order. The first would be on top, the second

Page 3209

1   would be on the bottom.
2        Q.   You are relying now on the Bates stamp down
3   at the bottom?
4        A.   Well, I'm relying on I see two
5   confirmations. There's a first and then there's a
6   second.
7        Q.   Right, but I just handed them to you, right?
8        A.   Yes.
9        Q.   Well, if I hand them to you like this, which
10   one is the first and second?
11       A.   It doesn't make a difference. They were
12   both sent out, Mr. Thomas. The work papers indicate
13   that, the audit program indicates that, and the two
14   documents you just gave me indicate that.
15       Q.   Well, actually, Mr. Lenner, they both have
16   the same dates, right?
17       A.   I know that. They always --
18       Q.   You didn't send out two confirms on the --
19       MS. BITAR: Objection, Your Honor.
20       THE COURT: Hold on. You need to let him
21   finish his answer.
22       MR. THOMAS: I'm sorry, were you telling him
23   to finish his answer?
24       THE WITNESS: Yes, I'd like to explain.
25   BY MR. THOMAS:

Page 3210

1     Q.   Please.
2     A.   When you send out a second, you fold it up
3  and write on the envelope second request, you send it
4  out. You take a copy of the first. You don't -- the
5  procedure is you don't just change the date and send it
6  again. That's one way of doing it.
7     Q.   That's one way of doing it --
8     A.   Yeah.
9     Q.   -- is to not change the date on the second
10  one; is that right?
11     A.   Yes.
12          MR. THOMAS: Could you go back and can we
13  put up the first column?
14          (Technician complies.)
15  BY MR. THOMAS:
16     Q.   The date sent there, are those dates
17  February 9th, right?
18     A.   Yes.
19     Q.   And your first request was dated February
20  8th and your second request is dated February 8th,
21  right?
22     A.   Yes.
23     Q.   Now, Mr. Lenner, back to the confirm list.
24  Is that that same -- this one?
25          MR. THOMAS: May I approach, Your Honor?

Page 3211

1          THE COURT: You may.
2          MR. THOMAS: (Complies.)
3  BY MR. THOMAS:
4     Q.   Now, this is out -- when you send out
5  confirms, I know for the 2001 audit, I'm approaching you
6  with Exhibit 3005 at pages 217 through 242. I've tried
7  to put them all together, but if you need to look in
8  this book, feel free to. Okay?
9     A.   Yes.
10          MR. THOMAS: Can we put this up?
11          (Technician complies.)
12  BY MR. THOMAS:
13     Q.   Now, this is another one of those lists of
14  all the confirms you sent out, right?
15     A.   Yes.
16     Q.   And these confirms in 2000, you didn't get
17  any confirms back from customers either, right?
18     A.   Yes.
19     Q.   And when you were doing the audit, you
20  assumed that the reason you didn't get them back was
21  because these kinds of customers, they wouldn't respond,
22  right?
23     A.   Yes.
24     Q.   You didn't assume that the reason that you
25  sent out all these confirms and you didn't get any back

Page 3212

1  was because the accounts receivable you were confirming
2  were fake, right? You didn't think of that, right?
3     A.   No.
4     Q.   Now, sir, you can take the time to do it and
5  I don't want to stop you from doing it, but I took the
6  time to count these things up last night. Actually it
7  was the night before but -- and I think there's 74 of
8  them.
9          Does that look about right to you?
10     A.   74 confirmations?
11     Q.   Confirmations that are on the list here.
12     A.   Okay.
13     Q.   74 customers. And these are first confirms,
14  right?
15     A.   Yes.
16     Q.   They're listed here. And it doesn't show
17  any second ones sent out on that first page, right?
18     A.   That's correct.
19     Q.   But when I looked in your work papers to try
20  to find all those first confirms, they weren't all
21  there. There was about 20-something of them there.
22          You see that? They're attached there.
23     A.   Are you saying there was 20 on this --
24     Q.   20-some-odd -- there was 74 on the list?
25     A.   Yes.

Page 3213

1     Q.   But you only had, I think, 20 -- let me see
2  if I wrote that down right. 23 actual confirms in the
3  work papers?
4     A.   So you're saying there's more on the list?
5          MS. BITAR: I'm going to object. Counsel is
6  testifying.
7          THE COURT: Sustained.
8          Ask him a question.
9  BY MR. THOMAS:
10     Q.   Well, Mr. Lenner, you got the packet right
11  there. There are 74 confirms that were sent out but
12  only 23 confirms kept in your work papers, right?
13     A.   If that's what you're saying, I'll take your
14  word for it, correct.
15     Q.   So in this case there was at least about
16  50 first confirms that you didn't keep copies of in your
17  work papers, right?
18     A.   No. They're on the list. So there's a
19  record that the confirmation went out. Whether it's on
20  the list or a physical copy of the confirmation. One or
21  the other is acceptable.
22     Q.   So my question is a little different. My
23  question was that in your work papers, copies of the
24  actual confirms, there's about 50 copies of your actual
25  confirms that you did not keep, right?

Page 3214

1      A.   You're saying -- if I understand you, you're
2   saying that there's -- that the list has more
3   confirmations than what was kept in the work papers.
4           Is that what you're saying?
5      Q.   What I'm saying, sir, is that there are over
6   50 confirms on the list for which you don't have
7   hard-copy confirmations in your work papers, right?
8      A.   Now I understand you.  Okay.
9      Q.   And that's right?
10     A.   If that's what you're saying is correct,
11  then I will take it at face as being correct.
12     Q.   And so this is one of those instances where
13  the actual confirms that your work papers say you sent
14  out, you didn't copy the copies in your work papers,
15  right?
16     A.   Yes, and I'd like to explain.  And as I said
17  earlier in my testimony today that you would either keep
18  a record of the confirmation being sent out on a list,
19  which was the case here, or you'd keep copies of the
20  confirmation.  As long as you have a record, that's
21  what's relevant.
22     Q.   Now, one other thing, Mr. Lenner, in these
23  audits, for BRFFC and E.S. Bankest, it wasn't part of
24  what you did to regularly look at shipping documents,
25  right?

Page 3215

1      A.   That's correct.
2      Q.   And yesterday when your counsel was asking
3   you things you did and she gave a list and one of them
4   was look at shipping documents, you didn't mean to say
5   you looked at shipping documents as part of your work
6   for these audits, right?
7      A.   I don't believe I said we looked at any
8   shipping documents.
9      Q.   So in other words, if someone misconstrued
10  that, then that would be right because you didn't look
11  at shipping documents for these audits, right?
12     A.   That's correct.
13     Q.   Now, what you did do is you looked at
14  invoices, right?
15     A.   That was one of the procedures that we
16  performed.  There were others too.
17     Q.   Well, one of the procedures you performed
18  was the agreed-to invoice test, right?
19     A.   Yes.
20     Q.   And the agreed-to invoice test is where you
21  look at the invoice from like Joy and then you look at
22  that invoice and you match it up to your audit client,
23  Bankest's books, right?
24     A.   Yes.
25     Q.   And when you do that, right, you're looking

Page 3216

1   at Joy who is the one that is selling the T-shirts to
2   Wal-Mart, right?
3      A.   Yes.
4      Q.   That invoice.
5      A.   Yes.
6      Q.   And that invoice is like a bill, right?
7   It's a bill to Wal-Mart to pay for the T-shirts, right?
8      A.   It's a contract.
9      Q.   Well, you get bills at home, right?
10     A.   I get bills but an invoice is different than
11  a bill.  That bill just lists what's owed to you.  A
12  contract sets the terms and conditions, and that's what
13  we examined.
14     Q.   Right.  Well, actually it turns out in the
15  law that the contract is something that's signed on both
16  sides by each party, right?
17         MS. BITAR:  Objection, Your Honor.
18         THE COURT:  Sustained.
19         Ask him another question.
20  BY MR. THOMAS:
21     Q.   Well, you're not a lawyer, right?
22     A.   That's correct.
23     Q.   And the invoice that goes from Joy to
24  Wal-Mart, it just has what Joy puts on it, right?
25     A.   It is -- it sets the terms and the

Page 3217

1   conditions between a buyer and a seller where the buyer,
2   which is Wal-Mart, has sent a purchase order to Joy
3   saying they want to purchase X number of T-shirts.
4           Joy, a third party here, prepares the
5   invoice, lists the components of the invoice whether
6   shirts or pants, and sends it to its customer.
7           So it's not a bill.  It's an invoice.
8      Q.   Well, you just said that Wal-Mart sends a
9   purchase order for that invoice, but that didn't happen
10  here, right?
11     A.   That's generally how it happens.  That's how
12  an invoice is created.  That's the basis for an invoice,
13  someone wants something and you fill out a purchase
14  order.
15     Q.   Right.  And in this case when you looked at
16  the Joy invoice, you just assumed Wal-Mart had sent a
17  purchase order, right?
18     A.   It was a third-party document.  So it was --
19  an invoice sets the terms and conditions between a buyer
20  and seller of a concluded transaction.  That's what an
21  invoice is.
22     Q.   So when you looked at the Joy invoice, you
23  assumed that Wal-Mart sent a purchase order, right?
24     A.   Yes.
25     Q.   But in this case we know Wal-Mart didn't

Page 3218

1   send a purchase order because almost all those invoices
2   were fake, right?
3       A.   I don't have any personal knowledge that
4   they sent purchase orders or not, and I only know
5   they're fake based on the testimony that we've heard
6   from the people that have sat here for the last couple
7   of weeks.
8       Q.   And you don't have any personal knowledge
9   whether Wal-Mart sent a purchase order or not because
10  you didn't look at documents from the customer, right,
11  purchase orders? You didn't review those, right?
12      A.   That's correct.
13      Q.   Instead, what you relied upon was the bill,
14  the invoice that Joy filled out, right?
15      A.   Yes. It was a third-party document, and
16  it's reliable.
17      Q.   It's reliable -- in this case they were all
18  fake.
19          MS. BITAR: Objection, Your Honor.
20          THE COURT: Is that a question?
21          MR. THOMAS: I'll rephrase it. Thank you,
22  Your Honor.
23  BY MR. THOMAS:
24      Q.   In this case that invoice wasn't reliable
25  because they were almost all fake, right?

Page 3219

1       A.   Mr. Thomas, excuse me, sir. As I said
2   before, an invoice was only one part of the procedure
3   that we looked at. As you know, we looked at cash
4   receipts. As you know, we performed analytical
5   procedures. That's only one test of many that we did in
6   determining the existence of the accounts receivable.
7       Q.   In this case that invoice wasn't reliable
8   because they were almost all fake, right?
9       A.   Based on what I know now, that is correct.
10      Q.   And that invoice was filled out by Joy,
11  right?
12      A.   Yes.
13      Q.   It wasn't filled out by Wal-Mart, right?
14      A.   It never would be.
15      Q.   That's right. So when you looked at the
16  invoice, you didn't have any information that came
17  directly from Wal-Mart, the ones that actually owed the
18  money, right?
19      A.   That's not the purpose of looking at an
20  invoice. An invoice in this case was from a third party
21  and it was evidence of a concluded transaction between
22  the two parties. That's what I looked at.
23      Q.   The purpose in this case of looking at the
24  invoice was to figure out whether the accounts
25  receivable were real or fake, right?

Page 3220

1       A.   Examining the invoice as well as performing
2   other procedures, that was the purpose, to determine
3   whether or not the invoice and the underlying accounts
4   receivable truly existed.
5       Q.   Were real or fake, right?
6       A.   Correct.
7       Q.   And, sir, you just said the invoice
8   represents a completed transaction. You just testified
9   to that?
10      A.   Yes.
11      Q.   But the invoice only shows the bill that Joy
12  fills out and sends, right?
13      A.   As I said before, it's based -- it's a
14  transaction between a buyer and a seller. Joy would get
15  a purchase order. That's an acknowledgment that the
16  buyer is willing to buy, and when Joy sells it, that's
17  their acknowledgment that they're willing to sell.
18  That's what an invoice is.
19      Q.   But in this case you didn't look at the
20  purchase order part, right?
21          MS. BITAR: Objection, Your Honor. Asked
22  and answered, argumentative.
23          THE COURT: Sustained.
24          MR. THOMAS: Your Honor, I'm just taking --
25  I'll do it from his question -- from his answer, I'm

Page 3221

1   sorry.
2   BY MR. THOMAS:
3       Q.   When you just stated in your answer, sir,
4   that Joy would get a purchase order, in this case, you
5   didn't look at purchase orders to see that side of the
6   transaction, right?
7           MS. BITAR: Objection, Your Honor. Now it's
8   asked and answered for the third time.
9           THE COURT: It's asked and answered.
10          MR. THOMAS: Your Honor, I meant to do it
11  differently from his own answer.
12          MS. BITAR: Your Honor --
13          THE COURT: It was asked and answered
14  questions ago, Mr. Thomas.
15          MR. THOMAS: All right.
16  BY MR. THOMAS:
17      Q.   Mr. Lenner, since you agree with me that you
18  didn't look at the purchase order from Wal-Mart, what
19  you were looking at was the invoice from Joy, right?
20      A.   Looked at the invoice and in some cases we
21  looked at the collections and we applied other
22  procedures in connection with the audit. It's just you
23  don't look at the invoice as the only procedure. There
24  are other things that auditors do, Mr. Thomas.
25      Q.   Yes. And in this case as the years went on,

Page 3222

1  you relied more and more and more on the agreed-to
2  invoice test, right?
3      A.  It -- our approach was it was one of the
4  procedures that we performed every year.  I agree with
5  you there.
6      Q.  Well, you'll also agree with me, sir, that
7  as the years went on, you relied more and more and more
8  on the agreed-to invoice test, right?
9      A.  We performed different procedures in
10  different years to gain assurance as to the existence of
11  the receivables in conjunction with looking at the
12  invoices.  It's not the only thing that auditors do.
13      Q.  Will you agree with me, sir, that as the
14  years went on, you relied more and more and more on the
15  agreed-to invoice test, right?
16      MS. BITAR:  Objection, Your Honor.  Asked
17  and answered.
18      THE COURT:  Overruled.  It's a yes or no and
19  if you need to explain, you may explain.
20      THE WITNESS:  Yes.  And I'd like to explain.
21  BY MR. THOMAS:
22      Q.  Please.
23      A.  Yes, and we also performed other procedures
24  each year.
25      Q.  And when you were testifying to the jury

Page 3223

1  when your lawyer was asking you questions, you explained
2  that when you did this agreed-to invoice procedure, you
3  had to look at the invoice.
4      Do you remember that?
5      A.  Yes.
6      Q.  And it was important that you inspect the
7  invoice, right?
8      A.  Yes.
9      Q.  And you had to touch it and feel it.
10      You remember that, right?
11      A.  Yes.
12      Q.  And what you were looking at was to make
13  sure on the face of the invoice, right, that it was --
14  it looked right?
15      A.  That was one of the procedures, correct.
16      Q.  And when you were touching, feeling, and
17  inspecting it, you wanted to make sure that the invoice
18  itself was consistent so at least it looked like a real
19  invoice, right?
20      A.  That was one of the procedures.
21      MR. THOMAS:  Your Honor, may I approach the
22  witness?
23      THE COURT:  You may.
24      MR. THOMAS:  (Complies.)
25  BY MR. THOMAS:

Page 3224

1      Q.  I'm approaching you, sir, with BDO
2  Exhibit 4492 in evidence.  Now, these are the invoices
3  that you looked at when BDO was asking you questions,
4  right?
5      A.  Yes.
6      Q.  If you could flip over with me, please, to,
7  I think if you look at the 014163 Bates number, it says
8  Sam's Club.
9      You see that one?
10      MS. BITAR:  Can I get it again, Mr. Thomas?
11      MR. THOMAS:  014163.
12      Can he come over and help you, sir?
13      THE WITNESS:  Just tell me the Bates number.
14  I can find it.  Which Bates number?
15      MR. THOMAS:  This one.
16      THE WITNESS:  The ES?
17      MS. BITAR:  I'm having trouble finding it.
18      THE WITNESS:  What number is it?
19      MR. THOMAS:  014163.  There you go.
20  BY MR. THOMAS:
21      Q.  Now, you remember when your lawyer was
22  asking you questions and she first asked you, hey, this
23  is a 30-day invoice and then you correct her and said,
24  no, it's 90 days.
25      A.  I don't remember if it was this invoice or

Page 3225

1  some other invoice but I do remember that dialogue.
2      Q.  And it would be important when you were
3  holding and touching and feeling this to make sure that
4  this invoice itself was consistent, right, because if it
5  was inconsistent, that would be a red flag to you,
6  right?
7      A.  Yes.
8      Q.  Well, if you look down there at the bottom,
9  it talks about the balance being unpaid after 30 days.
10  That's part of the little typewritten that looks like
11  it's on the form?
12      A.  Uh-huh.  (Nodding.)
13      THE COURT:  Is this a yes?
14      THE WITNESS:  I'm sorry.  Yes.
15  BY MR. THOMAS:
16      Q.  But that's what your lawyer asked you but
17  you corrected her because you looked up at the top and
18  you saw that it was for a 90-day term, right?
19      A.  Yes.
20      Q.  When you were touching and feeling these
21  invoices at the time, did you pick up on that
22  inconsistency?
23      A.  It's not an inconsistency.
24      Would you like me to explain?
25      Q.  Sir, if the invoice is for 30 days or

Page 3226

1  90 days I want you to explain why it's not an
2  inconsistency?
3      A.   Because the interest is going to be paid.
4  They're going to start charging interest after 30 days.
5  That's one of the terms of the invoice.
6      Q.   So just so we're clear, your testimony is
7  that on this invoice -- because you've got to know the
8  industry, right.  When you're auditing this industry,
9  you've got to know the industry, right?
10          MS. BITAR:  Your Honor, I'm going to object
11 to that.
12          THE COURT:  Overruled.
13          Ask one question at a time.
14 BY MR. THOMAS:
15     Q.   Sir, when you're auditing those companies,
16 you've got to know the industry, right?
17     A.   Yes.
18     Q.   And you've got to know what goes on in the
19 industry if you're going to be able to inspect this
20 invoice and tell whether, just like you just swore to
21 the jury, whether it's consistent or not, right?
22     A.   Yes.
23     Q.   And your testimony to this jury is that this
24 invoice is consistent when it says, term, 90 days at the
25 top, and at the bottom it says 30 days, because they're

Page 3227

1  going to start charging interest after 30 days.
2          That's why it's consistent, right?
3      A.   Yes.
4      Q.   So if it turns out that in this industry
5  that you had to know that that's not true at all, that
6  would be something you missed as an auditor, right?
7          MS. BITAR:  Objection, Your Honor.
8          THE COURT:  Overruled.
9          THE WITNESS:  It could be, you know.
10 BY MR. THOMAS:
11     Q.   And, sir, another thing you were going to do
12 when you looked at this to make sure it was consistent
13 is make sure the pricing terms were all right, correct?
14     A.   You would review the pricing, that's right.
15         MR. THOMAS:  Can we look up there at the
16 prices?
17         (Technician complies.)
18 BY MR. THOMAS:
19     Q.   Now, the quantities shipped are 1589 and
20 1589.  See that under medium and extra large of these --
21 I'm going to say they're pants.  And there's a unit
22 price of $10, right?
23     A.   Yes.
24     Q.   And you know that unit price means that's
25 how much it costs per pant, right?

Page 3228

1      A.   It could be per pants.  It could be per
2  dozen; it could be how they're shipping it.  I'm not
3  quite sure exactly how it's working here.  It depends on
4  what the unit cost is, what the basis of the unit cost
5  is.
6      Q.   Well, sir, if you know how to do your job,
7  to look at this invoice and be sure that the pricing and
8  everything is consistent like you just told me, you'd
9  need to know that, right?
10         MS. BITAR:  Objection, Your Honor.
11         THE COURT:  What's your objection?
12         MS. BITAR:  Mischaracterizes his testimony.
13         THE COURT:  Overruled.
14         THE WITNESS:  Let me explain that.
15         Yes.  And let me explain that.
16         This is one of the situations where you
17 would want -- you would go to the client and you would
18 ask them what is the pricing structure, what is the
19 basis for the unit price, and how does it work.
20         That's something you would speak to the
21 client in your audit of the invoice if it didn't appear
22 right on the face of it.
23 BY MR. THOMAS:
24     Q.   Well --
25     A.   It's part of what you do.

Page 3229

1      Q.   Well, you'll give me that this doesn't
2  appear right on the face of it, right?  Because when you
3  add up those quantities shipped times the unit price,
4  it's not 57,204, right?
5      A.   I think at the time this was done and when
6  the auditor inspected it, that person had an
7  understanding of how -- what the unit's price was based
8  on.  At this point, eight or nine years later, I don't
9  have that understanding.
10     Q.   You said the auditor at the time had an
11 understanding.  Which auditor was that?
12     A.   The person that was examining the invoice.
13     Q.   Right.  But you said they had an
14 understanding.  Who was it?
15     A.   Well, we had -- over the five years we had
16 various auditors.  Each one.
17     Q.   So when you said that the auditor at the
18 time you understood it, you were just speculating,
19 right?
20         MS. BITAR:  Objection.
21         THE COURT:  Overruled.
22         THE WITNESS:  No.
23 BY MR. THOMAS:
24     Q.   Well, then how do you know the auditor at
25 the time understood it if you don't even know who the

Page 3230

1  auditor was?
2      A.  I do know who the auditors were.  You know,
3  we can look at the work papers.  I generally have the
4  knowledge of who they were by year, and it depends on
5  which year you're talking about.
6      Q.  So, sir, you didn't look at this, right?
7      A.  That's correct.
8      Q.  Some other auditor at BDO looked at that,
9  right?
10     A.  That's -- yes, generally partners do not
11 look at invoices.
12     Q.  You're not the one who touches it, feels it,
13 and inspects it to make sure it's consistent, right?
14     A.  That's correct.
15     Q.  And when you said the auditor at the time
16 understood it, you are just assuming that, right?
17     A.  No.  I'm pretty confident the auditor at the
18 time understood it because if he or she did it, they
19 would speak to us about it.
20     Q.  Well, I thought you said they would speak to
21 the client to make sure they understood?
22     A.  They'd speak to the client and speak to us
23 if they had a question about it.
24     Q.  And if they spoke to the client -- the
25 client, actually, they would just talk to Carlos Mendez

Page 3231

1  or Dominick Parlapiano?  That's generally who you dealt
2  with, right?
3      A.  There were other people that they spoke to,
4  but that could be one of the people that they spoke to.
5      Q.  And when they went and spoke to them if they
6  could explain to them, they could just take their word
7  for it, right?
8      A.  They wouldn't take their word at face.  It
9  would have to make sense to them, and they may want to
10 look it up at some type of other audit evidence but it
11 depends.
12     Q.  And one of the other audit evidence they
13 could look at when the invoice didn't make sense, is
14 they could have talked to Joy, right?
15     A.  If they had a question, they were not
16 satisfied in their judgment that they needed to go to
17 Joy, they could have done that.  But they obviously
18 didn't have that need.
19     Q.  And, in fact, over -- even though Joy was
20 the largest client, sometimes the hundred percent
21 client, from 1995 all the way to 2002, BDO never spoke
22 to Joy, right?
23     A.  Joy was only the hundred percent client in
24 the first year.  It wasn't in any other year.
25     Q.  Sir, Joy was the largest client from 1995

Page 3232

1  through 2002, right?
2      A.  Yes.
3      Q.  And, in fact, Joy was over 50 percent of the
4  business client for 1995, 1996, 1998, 1999, and maybe
5  even 2000, right?
6      A.  It very well may have been.  It was there.
7      Q.  And over that whole time BDO never spoke to
8  Joy, right?
9      A.  Let me answer that, please, yes with an
10 explanation.
11     Q.  Please.
12     A.  The auditor -- you know, it was the
13 auditor's judgment at the time that we examine
14 sufficient, competent evidential matter.  We considered
15 the standards, and it was the auditor's judgment that it
16 wasn't necessary.  We had enough evidence matter between
17 invoices, collections, and other procedures.  It was not
18 necessary to call Joy.
19     Q.  Well, remember, sir, that one of the things
20 your audit manual told you you could do was pick up the
21 phone, right?
22     A.  It said, and it was suggested, that it was
23 the modifier may -- you may consider this, to call them
24 up, but it wasn't obligatory.
25     Q.  And one of the other things that you made

Page 3233

1  clear to your lawyer when she was asking you questions
2  was that there was another guide that was used that was
3  really applicable to factoring companies.
4          Do you remember that?
5      A.  Yes, I said we considered SAS-67 and the
6  finance guide.
7      Q.  Well, in fact, you said that the finance
8  guide was something that was drafted particularly for
9  finance companies including factoring companies just
10 like E.S. Bankest, right?
11     A.  Yes.
12         MR. THOMAS:  May I approach the witness,
13 Your Honor?
14         THE COURT:  You may.
15         MR. THOMAS:  (Complies.)
16 BY MR. THOMAS:
17     Q.  Exhibit 7340 in evidence.
18         Sir, Plaintiffs' Exhibit 7340 in evidence,
19 that's that audits of finance companies guide that we
20 were just talking about that applies right to E.S.
21 Bankest, right?
22     A.  This as well as SAS-67 applies to Bankest.
23     Q.  So this audit guide, audits of finance
24 companies, applies right to E.S. Bankest, right?
25     A.  I said -- yes.  This and SAS-67 both apply.

Page 3234

1    Q.  So this one applies, right?
2        MS. BITAR: Objection, Your Honor.
3        THE COURT: Overruled.
4        THE WITNESS: Yes.
5    BY MR. THOMAS:
6    Q.  Now, would you please look with me over to
7    confirmation procedures, paragraph 2.126?
8        MS. BITAR: What was that, Mr. Thomas?
9        MR. THOMAS: 2.126.
10       MS. BITAR: Can you give me the Bates
11   number?
12       MR. THOMAS: It doesn't have a Bates number.
13   You all produced this. (Indicating.)
14   BY MR. THOMAS:
15   Q.  Sir, if you look at 2.126 there --
16   A.  Yes.
17   Q.  -- it talks about doing it by telephone,
18   right, to confirm information by telephone?  Do you see
19   that?  Some finance companies use written confirmations,
20   others confirm information by telephone?
21   A.  What the literature says here, it's giving a
22   little background, 2.128.  That's what the finance
23   companies do.  It doesn't say -- it says, some finance
24   companies use written confirmation, others confirm
25   information by telephone.  That's what the company does.

Page 3235

1    Q.  All right.  Well, let's look at what the
2    auditor does, at 2.130.  And it says, the auditor shall
3    apply alternative procedures for all unanswered positive
4    confirmations.  To apply alternative procedures, the
5    auditor should consider reviewing subsequent cash
6    receipts, confirming information by telephone, and
7    examining additional loan documentation.
8        Did you consider that when you were doing
9    the Bankest audit?
10   A.  Yes.  This is not --
11       THE COURT: It's a yes or no.
12       THE WITNESS: Yes.
13   BY MR. THOMAS:
14   Q.  And could we look over at 2.144 because one
15   of the things you could have done besides just pick up
16   the telephone is actually drive over to the largest
17   client and take a look yourself, right?
18   A.  Where do you see that?
19   Q.  I'm asking you just an independent question,
20   sir.  That one of the things you could have done is you
21   could have just gone over to the largest client, whether
22   to know whether this stuff was real or fake, and see
23   yourself?
24   A.  Yes.  I'd like it explain that.
25       THE COURT: Okay.

Page 3236

1        THE WITNESS: You could do that if there was
2    an indication that the receivables were not being
3    collected.  But in these cases when we reviewed and when
4    we were performing our audit procedures, we had every
5    indication that they were being paid, they were being
6    collected.  That's what the aging showed.  That's what
7    the cash receipts analysis showed.
8        You would only go to the client's facility
9    if the receivables were old and not being paid and you
10   had substantial doubt as to the collectability of those
11   receivables.
12       If the receivables are current, there is no
13   need to apply that audit procedure.  That's the purpose
14   of that procedure.  No other purpose.  It's not -- you
15   don't do it in the beginning of your audit step.  You do
16   it if there's a need to do that step.
17   BY MR. THOMAS:
18   Q.  Well, one of the things that your audit
19   manual says might give you doubt that the receivables
20   are being paid is if you send out hundreds of
21   confirmations year after year after year and you get
22   zero back.  That's what your own audit manual says,
23   right?
24   A.  Yes.  And I want to explain.
25       The audit manual says that and it also

Page 3237

1    indicates that it depends on the industry, and large
2    companies do not respond to confirmations.  That's what
3    the audit manual says, that's what SAS -- that's what
4    the literature says, and that's what we followed.
5    Q.  So you followed the explanation that these
6    kind of companies don't send them back, every single one
7    of them for every single account receivable for seven
8    years, rather than the part of the audit manual says
9    that if they don't send back the confirmations, it may
10   be because they're fake, right?
11       MS. BITAR: Objection, Your Honor.  This is
12   now argumentative.
13       THE COURT: Sustained.
14       MS. BITAR: And asked and answered.
15   BY MR. THOMAS:
16   Q.  Well, sir, if applying professional
17   skepticism as an auditor, you would have thought that
18   maybe the reason you got zero confirmations back from
19   all of these customers was because the accounts
20   receivable weren't real, then that at least would have
21   been a reason for you to go out and visit Joy, right?
22   A.  No.  I want to explain that.
23   Q.  Please.
24   A.  I think we exercised professional
25   skepticism.  The literature is very clear, SAS-67 is

Page 3238

1   very clear that based on your experience, if there is a
2   poor response, you do not even have to send out seconds.
3   But we chose -- or firsts, I'm sorry.
4       You don't even have to send out first
5   confirmations if after one or two years you have the
6   experience.  But we chose -- we exercised our
7   skepticism.  We still sent out first confirmations even
8   though we didn't have to do that, so I disagree with
9   you, sir.
10      Q.   And you got zero of those back, right?
11      A.   That's correct.
12      Q.   And the reason it turns out that you didn't
13  get confirmations back is because it turned out all the
14  accounts receivable were fake, right?
15          MS. BITAR:  Objection, Your Honor.  Asked
16  and answered.
17          THE COURT:  Overruled.
18          THE WITNESS:  Yes.  And I want to explain.
19  BY MR. THOMAS:
20      Q.   Please.
21      A.   The reason why, at the time we had no
22  personal knowledge that -- of the fraud.  It's only
23  after hearing this testimony that there was a massive
24  fraud, in which eight people are going to jail or are in
25  jail, created hundreds of thousands of invoices and

Page 3239

1   other documents, and that's why I know they're fake.
2       Q.   In fact, there were thousands and thousands
3   of fake transactions over seven years, year after year
4   after year after year, right?
5       A.   That's what I've learned during the course
6   of this trial and other proceedings, correct.
7       Q.   And to find the fraud, you only had to find
8   one fake one, right?
9       A.   Yes.
10      Q.   And if we look at the guide --
11          MR. THOMAS:  Can we go to 2.144, please.
12          (Technician complies.)
13  BY MR. THOMAS:
14      Q.   And if you go down there to the finance
15  company and its auditors, it says the finance company
16  and its auditors -- now, in this case the finance
17  company was E.S. Bankest, right?
18      A.   Yes.
19      Q.   The finance company and its auditors usually
20  have access to the seller's or borrower's accounting
21  records if collateral records are maintained in bulk.
22  And in this case the seller or borrowers, that's talking
23  about someone like Joy, right?
24      A.   Yes.
25      Q.   And in this case did you consider this when

Page 3240

1   you did your audits?
2       A.   Yes.
3           MR. THOMAS:  And then if we look down at
4   2.145.
5           (Technician complies.)
6   BY MR. THOMAS:
7       Q.   It says, in addition to the effectiveness of
8   credit-approval policies, collection activities,
9   internal confirmation procedures, and visits by field
10  representatives to the client's or borrower's place of
11  business, the auditor should consider other accounting
12  and management controls.  You see that?
13      A.   Yes.
14      Q.   Now, did you consider this, visits by field
15  representatives part, when you were doing your audits of
16  E.S. Bankest?
17      A.   Yes.  And I want to explain.
18          Mr. Thomas, this is really not relevant for
19  E.S. Bankest.  This is relevant for a financial -- a
20  finance company in which they take collateral and the
21  person has to go to the field office to examine the
22  collateral.
23          In this case Bankest purchased the invoice.
24  They own the asset.  They had the assets in their
25  possession.  There's no need to go to the field rep to
26  look at the collateral.  That's what this is all about.

Page 3241

1   This --
2       Q.   Anything else?
3       A.   No.
4       Q.   Now, sir, over the years I think you talked
5   about this a bunch.  You tested their controls at E.S.
6   Bankest, right?
7       A.   Yes.
8       Q.   And when you did your audit planning every
9   year, you filled out a form about the controls, right?
10      A.   Yes.
11      Q.   And over all the time that you tested the
12  controls, year after year after year, you determined
13  that the controls were good, right?
14      A.   Yes.
15      Q.   And year after year after year you tested
16  the aging of the receivables, right?
17      A.   I believe so.
18      Q.   Yes?
19      A.   Yes.
20      Q.   And the aging, that's a form that's given to
21  you by the client, right?  It shows when the accounts
22  receivable are going to be paid, right?
23      A.   Yes.
24      Q.   And year after year after year you
25  determined that the aging of the receivables was fine,

Page 3242

1  right?
2      A.  Yes.
3          MR. THOMAS: May I approach, Your Honor?
4          THE COURT: You may.
5          MR. THOMAS: (Complies.)
6  BY MR. THOMAS:
7      Q.  Sir, I'm approaching you with Exhibit 3007
8  in evidence at page 571.
9      A.  Thank you.
10     Q.  Sir, this is --
11         MR. THOMAS: It's actually this one here.
12         (Technician complies.)
13 BY MR. THOMAS:
14     Q.  Give us just a minute, sir.  I'll tell you
15 what, Mr. Lenner, we're having a little trouble getting
16 it up.  With His Honor's permission, I'll just stand up
17 here.
18         THE COURT: That's fine.
19 BY MR. THOMAS:
20     Q.  This is one of those aging reports, right?
21     A.  Yes, this is one of the aging tests that we
22 perform.
23     Q.  And this is for December 31st, 2002, right?
24     A.  Yes.
25     Q.  And this is for the 2002 audit, so you were

Page 3243

1  doing this in 2003, right?
2      A.  Yes.
3      Q.  And what you would do was you would show
4  the --
5          THE COURT: Mr. Thomas, either you give each
6  juror a copy of the evidence or you put it up.
7          MR. THOMAS: Okay.  Just give me a minute,
8  Your Honor.  I'll see if we can get it fixed.  Thank
9  you.
10         We're going use that Elmo sheet, Judge.
11         THE COURT: Sure.
12         MR. THOMAS: Take your time.  Actually, I'm
13 going to ask Keith to do it.  Do you mind so I can run
14 back and forth?
15         (Technician complies.)
16         MR. THOMAS: Look at that.  Can we focus in
17 a little bit?
18         (Technician complies.)
19         MR. THOMAS: Can you all see that?  Okay.
20 Thank you, Keith.  I appreciate it.
21 BY MR. THOMAS:
22     Q.  Now, this aging report, it shows back all
23 the way to 1999, right?
24     A.  Yes.
25     Q.  And what you all do is, this is what you're

Page 3244

1  talking about, this is current, 60 days, 90 days, over
2  90 days, right?
3      A.  Yes.
4      Q.  And every year you looked at the aging, and
5  you determined that the aging was okay, when I would
6  say, now this is what we're talking about, right?
7      A.  This is one of the tests.
8      Q.  Well, for aging -- I'm not trying to say
9  it's the only thing you did.  But for aging you looked
10 at it every year and you determined it was fine, right?
11     A.  Yes.
12     Q.  Now the other thing --
13         MR. THOMAS: Thanks, Keith, I appreciate it.
14         (Technician complies.)
15         MR. THOMAS: I really just wanted to
16 illustrate so everyone understood what we were talking
17 about.  I appreciate it.
18 BY MR. THOMAS:
19     Q.  Now, the other thing you all do is you would
20 review the bank statements, right?
21     A.  Yes.
22     Q.  And so BDO would get the bank statements for
23 E.S. Bankest and you would review them and do tests on
24 them to match up cash and checks, right?
25     A.  It would be part of the procedures in

Page 3245

1  connection with the audit of the ending balance of cash.
2  You would examine the confirmation, the checks, you
3  would get -- you would look at the bank statement.
4      Q.  And in addition, BDO, remember that general
5  ledger where it had the corresponding books for E.S.
6  Bankest and Capital, right?
7          Do you remember that?
8      A.  Yes.
9      Q.  And you all examined that too, right?
10     A.  Yes.
11     Q.  And so you could see all the money going
12 back and forth between Capital and E.S. Bankest, right?
13     A.  You would see it as part of a test, as part
14 of either a control test or whatever test the auditor
15 was performing at the time he or she was doing their
16 work.  I don't know which test you're talking about.
17     Q.  Well, you had access to the general ledger.
18 Do you remember telling the jury about that, about how
19 there would be corresponding entries would go
20 automatically and you all would look at it, right?
21     A.  That's what the work paper says, correct.
22     Q.  Well, that's what you did, right?
23     A.  Yes.
24     Q.  And so BDO could see on the general ledger
25 the money going back and forth between Capital and E.S.

Page 3246

1  Bankest, right?
2      A.   It wanted to see the transactions that are
3  reflected in that particular footnote explanation,
4  that's correct, wanted to see if it was being recorded,
5  the accounts receivable purchased and the collection and
6  how it was going through the intercompany accounts.
7          So we saw that transaction, one of the
8  30 transactions, we saw that being recorded in the
9  general ledger of the respective entity.  That's what
10  the tick mark says.
11      Q.   I'm not just asking about that footnote,
12  sir.
13      A.   I thought you were.  I'm sorry.
14      Q.   I'm sorry.  If I did, I apologize.
15          My question is that BDO had access and
16  looked at as part of your audits every year the general
17  ledger for Capital and E.S. Bankest, right?
18      A.   It only depends what it said in the work --
19  in the work papers, in the years -- I believe we looked
20  in general ledgers in, certainly, '00, '01, '02, '98,
21  '99, I don't recall, but I know we looked at customer
22  checks because that's with a substantive test.  So it
23  depends on what year you're talking about and what
24  procedures we're performing.
25      Q.   So sometimes, then, BDO didn't even look at

Page 3247

1  the general ledger between the related parties E.S.
2  Bankest and Capital, right?
3      A.   That might have been the case in '98 and
4  '99.
5      Q.   And in those cases when you did look at the
6  general ledger for that footnote, you were looking at
7  the entry in Bankest Capital, in the entry to E.S.
8  Bankest to see if it was correct, right?
9      A.   For that particular transaction.  For the
10  one of the 30 transactions.
11      Q.   And when you were looking at the general
12  ledger between the related parties Bankest and Capital
13  to see if that number was right, that general ledger was
14  filled out by the same party on both sides of the
15  transaction, right?
16          Dominick Parlapiano and the Orlanskys on
17  this side and Dominick Parlapiano and the Orlanskys on
18  that side, right?
19      A.   Yes.
20      Q.   And the other thing you did was you examined
21  the cash or the liquidity of E.S. Bankest every year,
22  right?
23      A.   We audited the cash, that is correct.
24      Q.   And when you audited the cash every year,
25  you looked at in the financial statements whether there

Page 3248

1  was any liquidity concern, right, whether they could pay
2  their bills or not?
3      A.   The liquidity concern you're talking about
4  at the customer level?
5      Q.   I'm talking about for E.S. Bankest.  Every
6  year you looked at the company and looked at its
7  liquidity, otherwise you'd have to give a growing
8  concern opinion, right?
9      A.   That's correct.
10      Q.   And for the members of the jury liquidity
11  means whether or not they can pay their bills or not,
12  right?
13      A.   That's one of the explanations.
14      Q.   One definition.
15      A.   One definition.
16      Q.   And when we say growing concern is if you
17  thought that they were having problems, go out of
18  business, you'd have to put that right in your audit,
19  right?
20      A.   That's correct.
21      Q.   And when you audited the E.S. Bankest in
22  2002 for the year-end, you didn't think there was a
23  problem, right?
24      A.   We did not see any indication.  The total
25  assets were way in excess of the total liabilities.

Page 3249

1  They were profitable and they had all the indications of
2  a going concern.
3      Q.   Plaintiffs' Exhibit Number 405 in evidence.
4  I'm sorry, for ID, for ID.  Not in evidence.
5          THE COURT:  What's the number again?
6          MR. THOMAS:  405.
7  BY MR. THOMAS:
8      Q.   Sir, Plaintiffs' Exhibit Number 405 for ID,
9  that's part of BDO's work papers, and you see BDO's
10  Bates stamp at the bottom there?
11      A.   Yes, I see the Bates stamp on the second
12  page.
13          MR. THOMAS:  May I approach, Your Honor?
14          THE COURT:  You may.
15          MR. THOMAS:  (Complies.)
16  BY MR. THOMAS:
17      Q.   You see that on the front there?
18      A.   Yes, I do.
19          MR. THOMAS:  Your Honor, plaintiffs move
20  into evidence Plaintiffs' Exhibit 405 marked for ID.
21          MS. BITAR:  No objection, Your Honor.
22          THE COURT:  Without objection, Plaintiffs'
23  Exhibit 405 marked for ID as 405 into evidence.
24  BY MR. THOMAS:
25      Q.   Now, this is part of that -- those

Page 3250

1  checklists that you do, right?
2      A.  Yes, sir.
3      Q.  And if you look down there at the bottom, it
4  says, severe liquidity problems, right?  And at least at
5  this stage you said no, right?
6      A.  That's correct.
7      MR. THOMAS:  And, Your Honor, may I
8  approach?
9      THE COURT:  You may.
10     MR. THOMAS:  (Complies.)
11 BY MR. THOMAS:
12     Q.  And this is Plaintiffs' Exhibit Number 87 in
13 evidence.  And these are the financial statements for
14 2002, right?
15     A.  Yes, they are.
16     Q.  Now, sir, if you look over at the balance
17 sheet -- I'm sorry, can you go to page 2 first?  BDO,
18 you all signed off and said that the financial
19 statements fairly presented the financial position of
20 E.S. Bankest, right?
21     A.  Yes.
22     Q.  And these -- this was issued on April 16th,
23 2003, right?
24     A.  Yes.
25     Q.  And if you look at the next page, which is

Page 3251

1  the balance sheet that you've been talking about.  Down
2  under cash, it doesn't list any; isn't that right?
3      A.  Yes.
4      Q.  But when you did these audited financial
5  statements, you didn't think that was a problem, right?
6      A.  No.
7      MR. THOMAS:  Your Honor, may I approach?
8      THE COURT:  You may.
9      MR. THOMAS:  (Complies.)
10 BY MR. THOMAS:
11     Q.  Approaching with Plaintiffs' Exhibit
12 Number 6007 in evidence.
13     A.  Thank you.
14     Q.  So those are BDO's time records.  You've
15 seen that before, right?
16     A.  Yes, I have.
17     Q.  Now, it was for the 1998 audit when --
18     THE COURT:  Hold on.  Hold on.  The clerk is
19 telling me that 6007 is only ID.
20     MR. THOMAS:  ID?
21 BY MR. THOMAS:
22     Q.  Mr. Lenner -- I think I already asked you if
23 you recognize that as your time records, right?
24     A.  Yes.
25     MR. THOMAS:  At this time plaintiffs move

Page 3252

1  into evidence Plaintiffs' Exhibit Number 6007.
2      MS. BITAR:  No objection.
3      THE COURT:  Without objection, Plaintiffs'
4  6007 marked for identification is now Plaintiffs' 6007
5  for ID.
6  BY MR. THOMAS:
7      Q.  Sir, it was the 1998 audit where there was
8  the work stoppage with Ramon Rivera where -- stopped on
9  a Friday, there was the call on Monday.  Mr. Ellenburg
10 thought it was a serious matter and talked to the heavy
11 office.
12     Do you remember that, sir?
13     MS. BITAR:  Objection, Your Honor.
14     THE COURT:  What's your objection.
15     MS. BITAR:  Lawyer is testifying and it's
16 outside the scope.
17     THE COURT:  Sustained.
18     Ask him a question.
19 BY MR. THOMAS:
20     Q.  Sir, you remember your audit was stopped
21 because Dominick Parlapiano refused to give you some
22 records that you needed, right?
23     A.  I have -- yes.
24     Q.  I think you told me earlier in the trial
25 that you had a fleeting memory of some of this; is that

Page 3253

1  fair?
2      MS. BITAR:  Objection, Your Honor.  This was
3  asked and answered.  I did not go into this in this
4  stage.
5      THE COURT:  Sustained.
6  BY MR. THOMAS:
7      Q.  Mr. Lenner, you at least recall that at the
8  time that you had the telephone call with Dominick
9  Parlapiano that you threatened to resign in that call,
10 right?
11     MS. BITAR:  Objection, Your Honor.
12     THE COURT:  Sustained.
13     Rephrase the question.
14 BY MR. THOMAS:
15     Q.  In connection with the work stoppage re:
16 Ramon Rivera, you, in a call with Dominick Parlapiano,
17 you threatened to resign, right?
18     A.  That's what I heard through the testimony
19 here at the trial.  I don't recall that.
20     Q.  I'm sorry, you don't recall calling Dominick
21 Parlapiano and threatening to resign?
22     A.  I don't recall directly.  I have a vague
23 recollection of that call.
24     Q.  Okay.  I want to make it clear.  I'm not
25 asking you what you heard here in the trial.  Okay?  I'm

Page 3254

1  just asking you what you remember. All right?
2      As you sit here today, do you remember that
3  you had a telephone call with Dominick Parlapiano where
4  you threatened that BDO was going to resign?
5      MS. BITAR: Your Honor, at this point I
6  object. This is outside the scope of my entire direct
7  case. He's going through what Mr. Thomas asked him last
8  time around that's not appropriate.
9      THE COURT: Overruled.
10     THE WITNESS: I think I said that I have a
11  recollection of that call. I don't remember the
12  specifics about it.
13  BY MR. THOMAS:
14     Q.  My question is a little different, which is,
15  do you recall that in the telephone call with Dominick
16  Parlapiano you threatened to resign?
17     A.  I do not recall the contents of that
18  conversation. I may have said it. I have been hearing
19  everyone else said that I said it. It's very likely
20  that I would have said it, but I just don't recall.
21  It's the contents of the call that happened eight years
22  ago.
23     Q.  Sir, I'm not trying to ask you if you recall
24  all the contents. I'm just trying to ask you if you
25  remember in the telephone call with Dominick Parlapiano

Page 3255

1  you threatened to resign.
2      MS. BITAR: Objection, Your Honor. Asked
3  and answered.
4      THE COURT: Overruled.
5      THE WITNESS: I don't recall the specifics
6  of that phone call. I may have said that. I just don't
7  recall. That's my testimony.
8  BY MR. THOMAS:
9      Q.  Sir, I'm going to ask you to turn with me to
10  Plaintiffs' Exhibit Number 6007, to Bates stamp
11  BDO 019706. It's kind of toward the back. About three
12  quarters of the way through. 019706. Do you see that?
13     And would you go down to the bottom for a
14  minute first. That's your signature down there at the
15  bottom, right, sir?
16     A.  Yes.
17     Q.  And can we now go back up to the top? And
18  this is one of the bills to E.S. Bankest for the audit.
19  I mean, if you'll look through here, you'll see that you
20  sent a number of bills at different times. This is one
21  of them?
22     A.  Yes.
23     Q.  And if you look at the top, over here on the
24  left, it says factors considered in this bill, including
25  explanation for any under or over standard billing.

Page 3256

1      You see that?
2      A.  Yes.
3      Q.  And the first one is first-time audit for
4  manager and senior and staff.
5      You see that?
6      A.  Yes.
7      Q.  Is that your handwriting?
8      A.  Yes.
9      Q.  And then the second one is BDO
10  inefficiencies, right?
11     A.  Yes.
12     Q.  And then the third one is extra time due to
13  client retention problem.
14     You see that?
15     A.  Yes.
16     Q.  And you understand now, sir, that the client
17  retention problem was the work stoppage with Ramon
18  Rivera where you threatened to resign, right?
19     A.  No. Let me explain.
20     Q.  Please.
21     A.  I think Mr. Ellenburg gave testimony, I
22  think I might have even given you testimony prior to
23  today that related to there was some tax issues
24  that were -- that they were dealing with at the time.
25  And a lot of the time spent was dealing with those tax

Page 3257

1  issues. That was the problem.
2      Q.  So what you recall today, years later, not
3  that you had to stop your audit and threaten to resign,
4  but that there was some tax problems at E.S. Bankest,
5  right?
6      A.  No. I recall it because I see it right here
7  in the detail. The billing detail goes on for a couple
8  of pages in detail as to these tax problems that we had.
9      Q.  And where in that detail does it say there's
10  a client retention problem?
11     A.  That was the cause of the client retention
12  problem.
13     Q.  Where in that detail does it say that tax
14  problem was a client retention problem?
15     A.  It doesn't say that.
16     Q.  And so, sir, you say because you see the
17  detail, that means you don't really remember that's the
18  reason either, right? You're just relying on what you
19  see there about the bill about tax time?
20     A.  Yes, I'm relying on what was written eight
21  or nine years ago.
22     Q.  So as you sit here today, your testimony to
23  the jury is that you can't remember having your audit
24  stopped for five days and threatening to resign, but you
25  can remember there was a tax problem and that's the

Page 3258

1 reason you wrote client retention problem at the top of
2 this bill, right?
3    A.   Mr. Thomas, you know, the audit from the day
4 Mr. Rivera walked off the job on the Friday, he
5 continued to still work on Bankest every single day
6 until he finished for the next 15 days. So I'm a little
7 confused as to if he walked off the job, then why does
8 he have time in these time runs for the next 15 days in
9 a row.
10       So that's why I'm -- I'm not sure that this
11 retention problem that you've been talking about at
12 great length really was a big problem because we got the
13 records that we requested. But I'm looking at and I'm
14 seeing pages of detail about these tax problems that we
15 had which is documented here and, to me, that was the
16 reason for indicating the information on the top of the
17 billing notice.
18    Q.   Do you think Mr. Ellenburg got it wrong too
19 when he agreed that there would be a work stoppage on a
20 Friday, that Mr. Rivera was told not to come in on
21 Saturday and instead he came into the office and cleaned
22 up some stuff on Bankest and that he said there was a
23 call on Monday --
24       MS. BITAR:  Your Honor, I'm going to object.
25       THE COURT:  Sustained.

Page 3259

1       Ask him a question.
2       MS. BITAR:  That's not even the testimony of
3 the witness.
4 BY MR. THOMAS:
5    Q.   Do you think Mr. Ellenburg got it wrong too?
6    A.   No.
7    Q.   Now, sir, when you were testifying with your
8 lawyer, do you remember talking about how there wasn't a
9 meeting with Carlos Mendez around September 24th, that
10 time -- 25th that time frame in 2002.
11       Do you remember that?
12    A.   I said I don't recall a meeting in September
13 with Mr. Mendez.
14    Q.   You don't recall one, but like the other
15 meetings, it could have happened, you just don't
16 remember it or it didn't happen, one of the two, right?
17    A.   That's right.  I don't recall it happening.
18    Q.   Right.  So like you just said, it could have
19 happened or it could not have happened, right?
20    A.   I don't think it happened because I didn't
21 put my time down on the time sheet and charge it to a
22 restructuring code.
23    Q.   Right.  Because you don't do restructuring,
24 right?
25    A.   But that doesn't make a difference because

Page 3260

1 if I was involved in some kind of introduction or
2 anything, I would have charged my time to restructuring
3 and so would the other people in the firm.
4    Q.   So you don't do restructuring, right?
5    A.   That's correct.
6    Q.   Restructuring is something BDO does, right?
7    A.   Yes.
8    Q.   In fact, you, if you needed to for a client,
9 someone told you they were interested and explained the
10 problem to you, you could go get other people in your
11 firm at BDO and do restructuring for them, right?
12    A.   After I learned about the problem, I'd have
13 to prepare for some memoranda and understand it, then I
14 would give that information to the department in New
15 York that handles that.  That's correct.
16    Q.   So you could refer a restructuring issue to
17 someone else in BDO who could handle it because that's
18 part of what BDO does, right?
19    A.   Yes, that's part of what we do.
20    Q.   You advertise that you do it, right?
21    A.   I'm not -- I don't see all the
22 advertisements.  I'm not sure if we advertise it or not,
23 sir.
24    Q.   Mr. Lenner, how long have you been at BDO?
25    A.   17 years.

Page 3261

1    Q.   And, in fact, over that whole 17 years, BDO
2 has had a permanent restructuring practice, right?
3    A.   Yes.
4    Q.   And, in fact, the guy that's the chairman of
5 the firm now, he used to do restructuring and work in
6 bankruptcies, right?
7    A.   That's correct.
8    Q.   All right.  Mr. Lenner, please look with me
9 at page BDO 019568.
10       You need some help, sir?
11    A.   I'll get there.  Okay.
12    Q.   Mr. Lenner, on September 24th, 2002, the
13 same day that Mr. Mendez testified he was meeting with
14 you, you charged seven hours to Bankest, right?
15       MS. BITAR:  Objection, Your Honor.
16       THE COURT:  What's your objection?
17       MS. BITAR:  Mr. Mendez never gave any
18 testimony --
19       THE COURT:  Stop.
20       MS. BITAR:  -- in a day --
21       THE COURT:  Mr. Thomas.
22       MR. THOMAS:  I'll do it different.  I know.
23 I'm sorry, Your Honor.  I'll do it.  I know.  I know.
24 I'll stop.
25       MS. BITAR:  Judge, this is highly --

Page 3262

1  objection.
2  BY MR. THOMAS:
3      Q.   Mr. Lenner, in September of 2002 on the
4  24th, on the 25th, and on the 26th you billed time to
5  Bankest, right?
6      A.   I did and so did Chris Mohr.
7      Q.   You billed time to Bankest on September
8  24th, September 25th, and September 26th, right?
9      A.   Yes.
10     Q.   And, sir, do you remember testifying that
11  when you do audits, and the audits at E.S. Bankest, that
12  you do your work either right at the end of the year,
13  right, in December or afterwards in January or February,
14  most of the time, right?
15     A.   And we sometimes do work in September and
16  October and November. It's the fourth quarter.
17     Q.   And, sir, when you say you sometimes do work
18  in September and -- sorry, in September, October,
19  November --
20     A.   Yes.
21     Q.   -- you will agree with me that for you to
22  bill time in September for this client, E.S. Bankest, is
23  unusual, right?
24     A.   I don't recall. I think that other people
25  have worked and I may have worked also over the years,

Page 3263

1  that couple different years in September, October,
2  November. My time is -- I would imagine it's there and
3  so are other people.
4      Q.   Sir, you'll give me that just like when you
5  were testifying yesterday that it's unusual for you when
6  you're working on these audits to bill time in
7  September, right?
8      A.   No. It's not unusual in this case.
9          Would you like me to explain?
10     Q.   Sir, I think you can tell I've never stopped
11  you, sir. If you want to explain something to the jury,
12  please do.
13     A.   No. At this time our firm had gone to a
14  paperless audit and Bankest, as well as many of our
15  other audit clients, we were learning the software. It
16  was a major overhaul in our audit approach in terms of
17  taking everything that was in paper and putting it into
18  an electronic format.
19         And we decided since we had an early
20  deadline on E.S. Bankest, that it made sense to really
21  gain an understanding of the software. So Mr. Mohr and
22  myself took the time out in September and we went
23  through the software, went through the manuals, spent a
24  considerable amount of time.
25         And this was one of the first clients, as

Page 3264

1  well as many other clients, that we went through the
2  same procedure, just to transfer the information, update
3  the information to permanent files and history into the
4  computer. It took a lot of time, and that's why the
5  time is here. That I remember.
6      Q.   Sir, you can't remember threatening to
7  resign, but you can remember that in 2002 when you
8  billed three days in September, that what you were doing
9  was getting computer training, right?
10     A.   And using this -- it was computer training
11  and using this client to utilize and learn the software.
12  And I know that because we -- it was something that was
13  prevalent for all of our clients in September, October,
14  November of that year.
15         We were one of the first offices to switch
16  to the electronic and we wanted to make sure that we had
17  a successful implementation for all of the '02 audits,
18  so the whole office as a group made that plan to do
19  that. That's why I remember.
20     Q.   Sir, you remember testifying that it was
21  okay to make money, it's okay to smell the cheese?
22     A.   Yes, I do.
23     Q.   And you know, sir, that certified public
24  accountants, they're held to a higher standard, right?
25         MS. BITAR: I didn't hear the question.

Page 3265

1  BY MR. THOMAS:
2      Q.   They're held to a higher standard, right?
3         MS. BITAR: Objection, Your Honor.
4         THE COURT: Overruled.
5         THE WITNESS: We're held to the standards of
6  our profession, if that's what you mean.
7  BY MR. THOMAS:
8      Q.   I mean, your own audit manual states that
9  what might be okay for the general public might not be
10  okay for a certified public accountant because as
11  certified public accountants, you're held to a higher
12  standard, right?
13     A.   If -- I don't recall that, but I'll take
14  your word for it that that's in the audit manual.
15     Q.   You don't have to take my word for it, sir.
16         MR. THOMAS: May I approach the witness,
17  Your Honor, with Exhibit 18 (sic) in evidence at 1529?
18         THE COURT: You may.
19         MR. THOMAS: (Complies.)
20         THE WITNESS: Thank you.
21  BY MR. THOMAS:
22     Q.   Mr. Lenner, you know this is part of your
23  audit manual, right?
24     A.   Yes, it is.
25     Q.   And if you look at 1.19 under professional

Page 3266

1   conduct it says, the profession's code of conduct
2   prescribes guidelines for behavior of CPAs.  These
3   guidelines go beyond those required of the general
4   public.
5       A.  Yes, I see that.
6       Q.  And you would agree with me that as a
7   certified public accountant, your profession requires
8   higher standard than the general public, right?
9       A.  Yes.
10      Q.  And sir, you understand -- I'm sorry, can we
11  look at one other thing in your audit manual?  Can we go
12  to the very beginning there?
13      MR. THOMAS:  Y'all have that?
14      (Technician complies.)
15      MR. THOMAS:  Your Honor, may I approach?
16      THE COURT:  You may.
17      MR. THOMAS:  (Complies.)
18  BY MR. THOMAS:
19      Q.  Sir, this is another piece of your audit
20  manual, Plaintiffs' Exhibit 118.  And if you look at the
21  very first thing your audit manual says, it says, this
22  manual describes the basic principles which shall apply
23  to both national and international engagements.
24      Did I read that right?
25      A.  Yes.

Page 3267

1       Q.  And this was a national engagement, right?
2   It wasn't an international engagement?
3       A.  No, it was not an international.
4       Q.  This was an engagement here in Florida, in
5   the United States?
6       A.  Yes.
7       Q.  Now, sir, you understand that where your own
8   audit manual makes clear that you're held to a higher
9   standard, that if you're going to enter into a business
10  relationship, you need to be sure that it's not going to
11  violate that higher standard, right?
12      A.  Yes.
13      Q.  And as part of not violating that higher
14  standard, that business relationship can't affect how
15  you do your audits, right?
16      A.  If you have a business relationship with
17  your audit client, which generally -- you know, which is
18  not the case here.
19      Q.  Sir, when you're held to this higher
20  standard of your profession, if you enter into a
21  business relationship to make money, you have to be sure
22  that that's not going to affect your duties as an
23  auditor, right?
24      A.  Provided the business relationship is not
25  with your -- with your audit client.

Page 3268

1       Q.  Sir, when you're held to this higher
2   standard of your profession, if you enter into a
3   business relationship to make money, you have to be sure
4   that that's not going to affect your duties as an
5   auditor, right?
6       A.  That is correct.
7       Q.  And if it does affect your duties as an
8   auditor, that you violate that higher standard, right?
9       A.  Yes.
10      MR. THOMAS:  Thank you, Your Honor.
11      Thank you, Mr. Lenner.
12      I pass the witness.
13      THE COURT:  Ms. Bitar?
14      MS. BITAR:  Judge -- just give me a moment,
15  Your Honor.
16      THE COURT:  Sure.
17      MS. BITAR:  Good morning, Mr. Lenner.
18      THE WITNESS:  Good morning, Ms. Bitar.
19      MS. BITAR:  Good morning, ladies and
20  gentlemen of the jury.
21      REDIRECT EXAMINATION
22  BY MS. BITAR:
23      Q.  Mr. Lenner, yesterday you gave some
24  testimony when Mr. Thomas was cross-examining you about
25  a duty to detect fraud.

Page 3269

1       Do you remember your testimony generally
2   about that?
3       A.  Yes.
4       Q.  And several times you said to Mr. Thomas,
5   auditors have a duty to detect fraud, correct?
6       A.  Yes.
7       Q.  And then Mr. Thomas went to the stenographer
8   and he read what you said and said oh, you just said
9   something different.
10      Do you remember that testimony?
11      A.  Yes.
12      Q.  And he was complaining that you were somehow
13  contradicting yourself?
14      MR. THOMAS:  Objection.
15      THE COURT:  Sustained.
16  BY MS. BITAR:
17      Q.  Mr. Lenner, were you contradicting yourself?
18      A.  No.
19      Q.  What is an auditor's duty to detect fraud?
20      A.  There is no duty to detect fraud.  Our
21  responsibility is to plan and to perform the audit to
22  obtain reasonable assurance that the financial
23  statements are free of material error whether it's by
24  fraud or by error.
25      Q.  So Mr. Lenner, when you were talking about

Page 3270

1    the duty to detect fraud, the duty stems from what the
2    accounting literature tells you, correct?
3        A.   Yes.
4            MR. THOMAS:  Objection, Your Honor.
5            THE COURT:  Overruled.
6    BY MS. BITAR:
7        Q.   And Mr. Lenner, we've been seeing the
8    auditor's duty with respect to the detection of fraud
9    throughout this case, correct?
10       A.   Yes, we have.
11       Q.   And it's reflected in SAS-82 (inaud.)
12   everybody, correct?
13           MR. THOMAS:  Objection, Your Honor.
14           THE COURT:  Sustained.
15   BY MS. BITAR:
16       Q.   Mr. Lenner, did we see the literature on the
17   screen that related to the auditor's obligation to
18   detect fraud?
19       A.   Yes, we did.
20       Q.   And does an auditor have a duty to detect
21   fraud?
22       A.   No, it does not.
23       Q.   Does an auditor have a duty to provide
24   reasonable assurance?
25       A.   Yes.

Page 3271

1            MS. BITAR:  Could we please have an
2    engagement letter up on the screen, please.
3            (Technician complies.)
4    BY MS. BITAR:
5        Q.   Mr. Lenner, is it your understanding that
6    BDO's engagement letters reflect the obligations of the
7    profession?
8        A.   Yes, they do.
9        Q.   And this is an engagement letter for the
10   1998 audit, correct?
11       A.   Yes, it is.
12       Q.   And we've been speaking about this audit
13   throughout your testimony for the last several days,
14   correct?
15       A.   Yes.
16       Q.   And it talks about the responsibilities of
17   the auditor, right?
18       A.   Yes, it does.
19       Q.   And it says that the responsibility of the
20   auditor to express an opinion on the financial statement
21   is based on an audit, right?
22       A.   Yes, that's what it says.
23       Q.   And if you go to the third paragraph, the
24   operative paragraph, could you please read that into the
25   record.

Page 3272

1        A.   We will design our audit to provide
2    reasonable assurance of detecting errors or fraud that
3    would have a material impact on the financials.  Our
4    work will be based primary upon selected tests of
5    evidence supporting the amounts and disclosures in the
6    financial statements and, therefore, will not include a
7    detailed check of your company's transactions for the
8    period.  Accordingly, the audit performed in accordance
9    with generally-accepted auditing standards is not a
10   guarantee of the accuracy of the financial statements,
11   and there is a risk that material errors or fraud may
12   exist and may not be detected by us.
13           MS. BITAR:  Could you please highlight there
14   is a risk section here.
15           (Technician complies.)
16   BY MS. BITAR:
17       Q.   Mr. Lenner, is this what you were attempting
18   to explain to Mr. Thomas yesterday?
19       A.   Yes.
20       Q.   And does this tell you that you can
21   discharge your duties as an auditor and miss a fraud?
22       A.   Yes, it does.
23       Q.   And does it tell you that you can discharge
24   your duties as an auditor and you have no obligation to
25   guarantee a detection of fraud?

Page 3273

1        A.   It's very clear about that, yes.
2        Q.   And Mr. Lenner, do you believe you
3    discharged your duties in accordance with this
4    engagement letter and the standards when conducting this
5    audit --
6            MR. THOMAS:  Objection, Your Honor.
7    BY MS. BITAR:
8        Q.   -- to do your job, Mr. Lenner?
9            THE COURT:  Overruled.
10           MR. THOMAS:  Objection to the standards
11   part.
12           THE COURT:  Overruled.  I know why it's
13   overruled.
14   BY MR. THOMAS:
15       Q.   Did you do your job, Mr. Lenner?
16       A.   Yes, I did.
17       Q.   And this contemplates the very thing that
18   happened in this case, correct, that a material fraud
19   was not detected as part of an audit?
20           MR. THOMAS:  Objection.  Leading.
21           THE COURT:  Sustained.
22   BY MS. BITAR:
23       Q.   Mr. Lenner, does the engagement letter
24   contemplate that an auditor can conduct an audit in
25   accordance with generally-accepted auditing standards

Page 3274

1  and not detect a fraud?
2      A.  Yes, it does.
3      Q.  And is that what happened here, sir?
4      MR. THOMAS:  Objection, Your Honor.
5      THE COURT:  Sustained.
6  BY MS. BITAR:
7      Q.  Did you not detect the fraud, sir?
8      A.  That's correct.
9      Q.  Does that mean you did not discharge your
10 duties appropriately?
11     A.  It doesn't mean that.
12     Q.  Now, Mr. Lenner, you heard Mr. Feltman say
13 that that can happen, correct?
14     MR. THOMAS:  Objection, Your Honor.
15     THE COURT:  Sustained.
16 BY MS. BITAR:
17     Q.  Let's talk a little bit about confirms.
18 We've been hearing a lot about that.
19         Do you remember Mr. Thomas asked you
20 yesterday as well as today about the confirmation
21 process?
22     A.  Yes, I do.
23     Q.  And Mr. Lenner, based on your experience as
24 an auditor and your experience in this case, can
25 auditors send out confirmations and not receive

Page 3275

1  responses?
2      A.  Yes.
3      Q.  And does all the accounting literature you
4  look at contemplate that occurring?
5      A.  Yes.
6      Q.  And is that something that you considered
7  when doing your job?
8      A.  Yes.
9      Q.  And as part of that contemplation, did you
10 understand that based on the type of this business where
11 there are customers who don't even know that the
12 accounts receivable are being factored, there would be
13 nothing suspicious about not getting responses?
14     MR. THOMAS:  Objection, Your Honor.
15 Leading.
16     THE COURT:  Sustained.
17 BY MS. BITAR:
18     Q.  Was that suspicious to you, Mr. Lenner?
19     A.  Not at all.
20     Q.  And Mr. Lenner, I know Mr. Thomas kept
21 asking you questions about the very specific agreed-to
22 invoice test.  But did BDO rely simply on the agreed-to
23 invoice test to develop a reasonable assurance when
24 issuing its opinions for those years?
25     A.  No, we did not.  As I tried to explain to

Page 3276

1  Mr. Thomas, we performed other procedures in addition to
2  the invoice test.
3      Q.  And those are what, Mr. Lenner?
4      A.  Examining the subsequent collections,
5  reviewing the aging, look -- reviewing the turnover,
6  reviewing the relationship of interest income to the
7  total portfolio.
8          There was a whole host of ratios that we
9  would look at some years.  And then comparison this year
10 versus last year.  Everything that any other auditor
11 would do I believe we performed.
12     Q.  And you talked about looking at -- and those
13 are -- sorry.  Those are called alternate procedures,
14 sir?
15     A.  Yes.
16     Q.  And is that fully recognized as appropriate
17 mechanisms to determine the existence of accounts
18 receivable?
19     A.  Yes, it is.
20     Q.  And those are fully recognized practices?
21     A.  Yes, they are.
22     Q.  And is an auditor allowed to do a host of
23 tests and put together various pieces of evidence so as
24 to ultimately get to a point where they have that
25 reasonable assurance?

Page 3277

1      MR. THOMAS:  Objection, Your Honor.
2      THE COURT:  Sustained.
3  BY MS. BITAR:
4      Q.  Mr. Lenner, is it a black-and-white thing,
5  you look at the agreed-to invoice test and you decide,
6  or do you look at the host of information available to
7  you during an audit to render an opinion?
8      A.  Yes, you have to consider the entire audit
9  as a whole.  You just can't look at one piece with
10 blinders on one test.  You have to consider the results
11 of the other tests that you performed in connection with
12 your audit.
13     Q.  Now, Mr. Lenner, let's go to Exhibit 426.
14     MS. BITAR:  Your Honor, I can just do this.
15 We can take a few minutes and then we can break for
16 lunch.
17 BY MS. BITAR:
18     Q.  Let's look at Exhibit 426.  Do you recall
19 giving some testimony about that document yesterday?
20     A.  Yes.
21     Q.  And Mr. Lenner, when you audit a company, do
22 you prepare the numbers or does the company prepare the
23 numbers?
24     A.  The client prepares the numbers.
25     Q.  And the financial statements are the

Page 3278

1  responsibility of the company, correct?
2         MR. THOMAS: Objection. Leading.
3         THE COURT: Overruled.
4         THE WITNESS: Yes, they are.
5  BY MS. BITAR:
6      Q.  Now, Mr. Lenner, is it common or uncommon
7  that when the company gives you a draft financial
8  statement and footnotes, that the auditors will review
9  the financial statement?
10     A.  It's very common.
11     Q.  And is it common or uncommon that they will
12  review the footnotes?
13     A.  It's very common.
14     Q.  And, in fact, we've heard testimony from you
15  and when Mr. Thomas asked you questions about how BDO
16  has an obligation to look at those footnotes, correct?
17     A.  Yes.
18     Q.  And so is BDO properly discharging its
19  obligations when it's looking at the textual footnotes
20  as part of their own financial statements?
21     A.  Yes.
22     Q.  Now, there was some discussion about
23  related-party disclosures.
24         Do you recall that testimony, generally?
25     A.  Yes, do I.

Page 3279

1      Q.  Do auditors only put required disclosures in
2  financial statements?
3      A.  No, we don't.
4      Q.  And when I say we, I mean, when auditors are
5  making comments on the footnotes they review, do
6  auditors only require -- do auditors only ask for
7  required disclosures to be in financial statements?
8      A.  No.
9      Q.  What do auditors do, sir?
10     A.  In addition to having the required
11  disclosures in the footnotes, it's common for the
12  auditors to make suggestions to put additional
13  information into the footnotes that the auditor believes
14  in his or her professional judgment is informative to
15  the user of the financial statements. That frequently
16  happens.
17         So there's disclosures that are put in that
18  are not required by the literature but are just based on
19  the auditor's judgment.
20     Q.  And Mr. Lenner, was that the objective when
21  BDO had in the footnotes the reference to Mr. Parlapiano
22  being a member of the board of StrataSys and a member of
23  the audit client?
24     A.  Yes. That was the purpose to show the
25  relationship.

Page 3280

1      Q.  And that's something that BDO thought was a
2  good thing to put in those financial statements?
3      A.  Yes, we did.
4         MS. BITAR: Now, let's turn to the document
5  and the paragraph -- and paragraph 3, if we can
6  highlight that.
7         (Technician complies.)
8  BY MS. BITAR:
9      Q.  Now, these are notes Mr. Parlapiano sent to
10  you in a fax, correct?
11     A.  Yes.
12     Q.  And he says -- he talks about related-party
13  transactions and he says, although I offer the correct
14  text of my relationship at StrataSys Group, LLC, and
15  while I, slash, we have no problem with their
16  disclosures, is it required?  If not, please delete it.
17         Did you believe that that disclosure was
18  required?
19     A.  No, it was not.
20     Q.  Nontheless, it's in the financial
21  statements, correct?
22     A.  That's correct.
23     Q.  And why is it in the financial statements,
24  sir?
25     A.  It was put into the financial statements

Page 3281

1  because we believed in our judgment that that was
2  important information that should be put in as a
3  disclosure to put the relationship of Mr. Parlapiano
4  between the two entities.
5      Q.  And Mr. Parlapiano would rather you didn't
6  put it in there?
7      A.  Oh, yes, he did.
8      Q.  So Mr. Lenner, is this one of those examples
9  when you were subordinating your judgment to please
10  Mr. Parlapiano, the guy who was the important member of
11  the community who could give you all this business?
12     A.  No, I certainly didn't subordinate my
13  judgment here.
14     Q.  You followed your judgment, right?
15     A.  That's correct.
16         MS. BITAR: Your Honor, I think this would
17  be a good time.
18         THE COURT: Okay. All right. Let's go to
19  lunch. I guess there's a sale at Macy's but I'm not
20  sure. (Laughter.) I think today is the last day.
21         Please do not discuss the case amongst
22  yourselves or anyone else or allow anyone to discuss the
23  case with you. You're not to form a definite or fixed
24  opinion about the merits of the case until you've heard
25  all the evidence, the arguments by the lawyers, and the

Page 3282

1   instructions on the law by me.
2        You're not to read, listen, or see any
3   accounts of this case in the media.  And you're to
4   ignore the lawyers' presence outside this courtroom and
5   they are to ignores yours.  And that includes the
6   witness.
7        Have a good lunch.  See you at 1:30.
8        (Thereupon, the jury was escorted out of the
9   courtroom.)
10       THE COURT:  Mr. Lenner, you're not to
11  discuss the testimony you've given or you will be giving
12  with anyone and that includes all the lawyers.
13       THE WITNESS:  Yes, sir.
14       THE COURT:  Thank you.  Have a good lunch.
15       (Whereupon, at 12:00 p.m., a luncheon recess
16  was taken.)
17
18        *       *       *
19
20
21
22
23
24
25

Page 3283

1        CERTIFICATE OF COURT REPORTER
2
3        I, GIZELLA BAAN, court reporter, before whom
4   the foregoing statement was taken, do hereby certify
5   that the statement made was taken by me stenographically
6   at the time and place mentioned in the caption hereof
7   and thereafter transcribed by me to the best of my
8   ability; that said transcript is a true record of the
9   statement given; that I am neither counsel or, related
10  to, nor employed by any of the parties to the action in
11  which these proceedings were taken; and further, that I
12  am not a relative or employee of any party hereto, nor
13  financially or otherwise interested in the outcome of
14  this action.
15
16
17
18        _____
19             GIZELLA BAAN
20        Court Reporter and Notary Public
21         in and for the State of Florida
22
23
24
25

Page 3284

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

-------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
-------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
-------------------------------------------------x

PAGES 3284 - 3419

Volume 27

AFTERNOON SESSION

Miami, Florida

Friday, May 4, 2007

2:00 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 3285

1          A P P E A R A N C E S
2
3  On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4  INTERNATIONAL, LTD., ET AL.:
5
6  SULLIVAN & CROMWELL, LLP
7      1888 Century Park East
8      Los Angeles, California  90067
9      (310) 712-6627
10 BY:  Steven W. Thomas, Esquire
11     Emily S. Alexander, Esquire
12
13 GONZALO R. DORTA, P.A.
14     334 Minorca Avenue
15     Coral Gables, Florida  33134
16     (305) 441-2299
17 BY:  Gonzalo R. Dorta, Esquire
18
19 BERGER SINGERMAN
20     350 East Las Olas Boulevard, Suite
21     Fort Lauderdale, Florida  33301
22     (954) 525-9900
23 BY:  Mitchell W. Berger, Esquire
24
25

Page 3287

1  On behalf of Third-Party Defendants Victor Balestra,
2  Bernard Mollet, and Joaquin Garnecho
3
4  RICHMAN, GREER, WEIL, BRUMBAUGH,
5  MIRABITO & CHRISTENSEN, P.A.
6      Miami Center, Suite 1000
7      201 S. Biscayne Boulevard
8      Miami, Florida  33131
9      (305) 373-4000
10 BY:  Manuel Garcia Linares, Esquire
11
12
13 On behalf of Third-Party Defendant Bernard Mollet
14
15 GAMBA & LOMBANA, P.A.
16     2701 Ponce de Leon Boulevard, Mezzanine
17     Coral Gables, Florida  33134
18     (305) 448-4010
19 BY:  Hector J. Lombana, Esquire
20     Geoffrey Marks, Esquire
21
22
23
24
25

Page 3286

1  On behalf of Defendant BDO Seidman, LLP:
2
3  ALVAREZ, ARMAS & BORRON
4      901 Ponce de Leon Boulevard, Suite 304
5      Coral Gables, Florida  33134
6      (305) 461-5100
7  BY:  Arturo Alvarez, Esquire
8
9  GREENBERG TRAURIG, LLP
10     MetLife Building
11     200 Park Avenue, 15th Floor
12     New York, New York  10166
13 BY:  Adam D. Cole, Esquire
14     Karen Y. Bitar, Esquire
15
16 GREENBERG TRAURIG, LLP
17     1221 Brickell Avenue
18     Miami, Florida  33131
19 BY:  Mark Schnapp, Esquire
20     Nikki Simon, Esquire
21
22
23
24
25

Page 3288

1          C O N T E N T S
2
3  EXAMINATION OF SANDOR LENNER BY:          PAGE:
4      MS. BITAR:  (Redirect, cont'd)     3289
5
6  EXAMINATION OF KEITH ELLENBURG BY:        PAGE:
7      MS. BITAR:  (Direct)              3338
8      MR. THOMAS:  (Cross)              3359
9      MS. BITAR:  (Redirect)            3389
10
11 EXAMINATION OF JACK WEISBAUM BY:          PAGE:
12     MS. BITAR:  (Direct)              3393
13     MR. THOMAS:  (Cross)              3409
14     MS. BITAR:  (Direct)              3414
15
16
17
18
19
20
21
22
23
24
25

Page 3289

1           PROCEEDINGS
2        THE BAILIFF:  All rise for the jury.
3        (Thereupon, the jury was brought into the
4 courtroom.)
5        Thereupon,
6           SANDOR LENNER
7 was recalled as a witness, and having been previously
8 duly sworn, was examined and testified further as
9 follows:
10       THE COURT:  All right.  You may be seated.
11 How many of you went to Macy's for the sale?  My clerk
12 went to Macy's.  She has got something.
13       Ms. Bitar, you may proceed with your direct.
14       MS. BITAR:  Thank you.
15       REDIRECT EXAMINATION  (continued)
16 BY MS. BITAR:
17    Q.   Good afternoon, Mr. Lenner.
18    A.   Good afternoon, Ms. Bitar.
19    Q.   Good afternoon, ladies and gentlemen of the
20 jury.
21       Mr. Lenner, do you recall yesterday you were
22 shown a document?  It's Exhibit 3002 at Bates stamp
23 1080, 1060.
24       May I approach the witness, Judge?
25       THE COURT:  You may.

Page 3290

1        MS. BITAR:  (Complies.)
2 BY MS. BITAR:
3    Q.   It may have been a standing document like
4 this.  Do you have a copy of that, sir?  The Bates stamp
5 is BDO 4188.
6    A.   4188?
7    Q.   That's correct.  In the Exhibit 2002 work
8 papers.
9    A.   Thank you.
10   Q.   You've got that, sir?
11   A.   Yes, I do.
12   Q.   And do you remember Mr. Thomas asking you a
13 bunch of questions about it?
14   A.   Yes.
15   Q.   Mr. Lenner, let me focus on the portion of
16 the document Mr. Thomas didn't show you.  Over here
17 (indicating).  Blow this part up, please, Glenn.  Thank
18 you.
19       (Technician complies.)
20       Mr. Lenner, who was the client listed on the
21 document?
22   A.   Bankest International.
23   Q.   And what was the contact name of the person
24 at Bankest International?
25   A.   Dominick Parlapiano.

Page 3291

1    Q.   And what's the date of the document, sir?
2    A.   8-14 -- the date of the document?
3    Q.   Yes.  When you filled it out.
4    A.   8-14-96.
5    Q.   And that's about the time you met
6 Mr. Parlapiano at this cocktail party/barbecue?
7    A.   Yes.
8    Q.   And could you please satisfy my curiosity
9 and explain to me what a cocktail party/barbecue is?
10   A.   Okay.  Well, at least the ones that I go to
11 or I have gone to, they start off with you bring your
12 family which includes your children and there's a
13 barbecue around 4:00 o'clock and the kids are in the
14 back and you're with your children, and then as the
15 evening comes the adults, some of the men go into a
16 particular part of the house, into like a lounge or
17 where the bar is, and you have a couple of drinks and
18 you watch a game.
19       So that was the barbecue that ends up as a
20 cocktail party.
21   Q.   And Mr. Lenner, let's go to the second half
22 of the document, please.
23       Mr. Lenner, why did you identify
24 Mr. Parlapiano as the source in the document?
25   A.   I was looking for the category which had the

Page 3292

1 closest fit.  There was nothing -- he wasn't an
2 accountant or an attorney or a banker, although he
3 clearly wasn't a relative.  He just fit into this area.
4 I just recently met him and he wasn't an attorney or
5 banker and I just put it there.  It just made sense to
6 put it on that one form.  It was the only place it could
7 go to.
8    Q.   Now I'm done with that document.  Do you
9 remember yesterday Mr. Thomas asked you a bunch of
10 questions about the demonstratives in the case?
11   A.   Yes.
12   Q.   Let's start with the first demonstrative.
13 This was the one that was our copy of the plaintiffs'
14 demonstrative.  That's 221 at A-2.  I'll give you a
15 moment.  Do you have any of them?
16   A.   No, I don't have any of them.
17       MS. BITAR:  May I approach, Your Honor?
18       THE COURT:  You may.
19       MS. BITAR:  (Complies.)
20 BY MS. BITAR:
21   Q.   Now, Mr. Lenner, remember I asked you a
22 bunch of questions about the document?
23   A.   Yes.
24   Q.   And those questions did not relate to the
25 IOUs associated with who owed who, correct?

Page 3293

1      A.  That is correct.
2      Q.  Is it fair to say the focus of our
3  discussion was about the collections?
4      A.  Yes, it was.
5      Q.  And it was about the money flows, correct?
6      A.  Yes, it was.
7      Q.  And it was attempting to tie the diagram to
8  the footnote that we were looking at from the 2000 work
9  papers, correct?
10      A.  Yes.
11      Q.  And we were trying to document the way in
12  which money is collected from a customer to a client to
13  a Bankest or to a BCC in a refactoring arrangement or to
14  Bankest in a factoring arrangement, correct?
15      MR. THOMAS:  Objection, leading.
16      THE COURT:  Overruled.
17      THE WITNESS:  Yes.
18  BY MS. BITAR:
19      Q.  And after you gave testimony about the
20  collection process, we put another document on the
21  screen this time identifying it as such.  And I'd like
22  you to turn now to 221 at A-1.
23      A.  Thank you.
24      Q.  So Mr. Lenner, when we were using this
25  diagram, it was to document the collections associated

Page 3294

1  with the customer, client and Bankest, right?
2      A.  Yes.
3      Q.  And you talked about what was misleading
4  about the document.  Do you recall that?
5      A.  Yes.
6      Q.  And you said that what was improper was that
7  it's -- this document is a Joy non-notification
8  arrangement for refactored receivables.  Withdrawn.  Let
9  me clarify that.
10      You said that Joy is a non-notification
11  arrangement where there are refactored receivables,
12  correct?
13      MR. THOMAS:  Objection, leading.
14      THE COURT:  Sustained.
15  BY MS. BITAR:
16      Q.  What kind of relationship was Joy?
17      A.  Notification.
18      Q.  And what does this chart show?
19      A.  Non-notification.
20      Q.  And Mr. Lenner, did you explain that the
21  reason the plaintiffs' chart was wrong as it relates to
22  collections is because this documents a non-notification
23  arrangement?
24      MR. THOMAS:  Objection, leading.
25      THE COURT:  Sustained.

Page 3295

1  BY MS. BITAR:
2      Q.  Why was the plaintiffs' chart wrong when it
3  relates to the collections from Joy?
4      A.  Because Joy, generally speaking, is a
5  notification client.  That's what the contract says.
6  That's the kind of client they were.
7      Q.  Now, I'd like you to look, please, at 110221
8  B-2.
9      MS. BITAR:  May I approach, Judge?
10      THE COURT:  You may.
11  BY MS. BITAR:
12      Q.  Now, Mr. Lenner, we talked about that,
13  correct?
14      A.  Yes, we did.
15      Q.  And at that point in time we presented this
16  demonstrative to you, correct?
17      A.  Yes.
18      Q.  And what does this demonstrative
19  demonstrate?
20      A.  This shows the flow of cash from Wal-Mart
21  directly to Capital.
22      Q.  And what does that indicate to you is the
23  nature of the relationship?
24      A.  This is a notification relationship.
25      Q.  And is it a notification relationship using

Page 3296

1  refactored receivables?
2      A.  Yes, it is.
3      Q.  And after you identified the flow of money
4  relating to this type of transaction, I showed you
5  another document, correct?
6      A.  Yes.
7      Q.  And that was B-2.
8      MS. BITAR:  May I approach, Judge?
9      THE COURT:  You may.
10  BY MS. BITAR:
11      Q.  And Mr. Lenner, this diagram includes the
12  text explaining what you were telling the jury, that in
13  this situation, based on the mirrored journal entries of
14  the two entries the money goes directly from the
15  customer to BCC and Bankest as a result of a
16  simultaneous corresponding book entry?
17      MR. THOMAS:  Objection, leading.
18      THE COURT:  Sustained.
19  BY MS. BITAR:
20      Q.  What does this diagram show, Mr. Lenner?
21      A.  This diagram shows that there's a
22  simultaneous entry, that upon the receipt of cash by BCC
23  there's an automatic credit on the books of E.S.
24  Bankest.  That's the purpose of this chart.
25      Q.  And Mr. Lenner, we were discussing this in

Page 3297

1    the context of the subsequent collection test, correct?
2        A.   Yes.
3        Q.   And the footnote that we talked about at
4    length yesterday, correct?
5        A.   Yes.
6        Q.   And is the footnote accurate under this
7    scenario?
8        A.   Yes, it is.
9        Q.   And then we talked about another chart.
10   This is 221 E-1.
11       MS. BITAR:   May I approach, Judge?
12       THE COURT:   You may.
13   BY MS. BITAR:
14       Q.   And Mr. Lenner, what does this document
15   show?
16       A.   This document shows the collections on a
17   non-notification arrangement.
18       Q.   And Mr. Lenner, do you remember Mr. Thomas
19   was asking you questions about this Joy icon?
20       A.   Yes, I do.
21       Q.   Mr. Lenner, did you understand we were using
22   Joy simply because it is the visible icon for a client
23   in this case?
24       A.   Yes, we made that very clear yesterday.
25       Q.   And Mr. Lenner, did you tell the jury that

Page 3298

1    Joy was probably the wrong icon to use because there
2    was -- because it was a refactored client?
3        A.   That's correct.
4        Q.   Did you attempt to mislead the jury in any
5    way?
6        A.   No.
7        Q.   And remember then we looked at the other
8    chart which was the collections for notification
9    arrangement with no refactoring?
10       A.   Yes.
11       Q.   And we walked through the footnote with
12   respect to those four various types of transactions,
13   correct?
14       A.   Yes.
15       Q.   And the footnote is accurate to each and
16   every one of them?
17       A.   Yes, it is.
18       MR. THOMAS:   Objection. Leading, Your
19   Honor.
20       THE COURT:   Overruled.
21   BY MS. BITAR:
22       Q.   Did the plaintiffs ever show you four types
23   of transactions in the diagram, sir?
24       A.   No.
25       Q.   Now, Mr. Lenner, you were asked some

Page 3299

1    questions earlier this morning by Mr. Thomas relating to
2    the 2002 audit opinion. Do you remember that testimony
3    generally?
4        A.   Yes.
5        Q.   And you were asked some questions about
6    liquidity. Do you remember that?
7        A.   Yes.
8        Q.   I'd like you to look at Exhibit 405, please.
9        A.   (Complies.)
10       Q.   And this related to a questionnaire relating
11   to the 2002 audit?
12       A.   Just one second, please.
13       Q.   Sure.
14       A.   I have it.
15       Q.   Okay. And this is related to a client
16   acceptance checklist report relating to the 2002 audit,
17   correct?
18       A.   Yes.
19       Q.   And can you tell from the document when this
20   work checklist was filled out?
21       A.   Looks like it was completed in November.
22       Q.   So is this part of gearing up for the audit
23   for the following year?
24       A.   Yes.
25       Q.   And if you turn to question 11 which was the

Page 3300

1    question Mr. Thomas asked you about, about the severe
2    liquidity problems and the answer was no. Do you see
3    that, sir?
4        A.   Yes.
5        Q.   By that time, that's when you learned the
6    company had restructured its debt?
7        MR. THOMAS:   Objection, leading.
8        THE COURT:   Sustained.
9    BY MS. BITAR:
10       Q.   Mr. Lenner, what did you learn in November
11   of 2002 about the company when you were or members of
12   the BDO team were filling out this checklist?
13       A.   That's when they learned about it.
14       Q.   And would the answer to this problem be no,
15   as a result of restructuring the notes, the debt so that
16   the company can make payments when due?
17       A.   The answer would be no. It's correct as it
18   is.
19       Q.   And, Mr. Lenner, I'd like you to look at
20   Exhibit 87 in evidence. That's the actual financial
21   statements associated with that audit. Do you see that,
22   sir?
23       A.   Yes.
24       Q.   And I'd like to direct your attention to
25   page 3. It's the balance sheet, right?

Page 3301

1    A.   Yes, it is.
2    Q.   And do you remember Mr. Thomas asked you
3    questions about cash?
4    A.   Yes.
5    Q.   And it was blank?
6    A.   Yes.
7    Q.   Mr. Lenner, what is a blank -- the fact that
8    it's blank on these -- on this balance sheet, what does
9    that mean to you?
10   A.   That means the company is properly managing
11   their cash. The goal of any business is always to have
12   your cash so to speak in investment earning assets such
13   as accounts receivable or stocks. So a well-run
14   business who can time their cash flows will typically
15   have zero in the bank account.
16   Q.   So is zero here a sign in any way of a
17   liquidity problem?
18   A.   Not at all.
19   Q.   It's not inconsistent with respect to the
20   checklist?
21   A.   That's correct.
22   Q.   And you want a company to not have its money
23   in the bank. You want it to be used in the company like
24   purchasing receivables?
25   MR. THOMAS:  Leading.

Page 3302

1    THE COURT:  Sustained.
2    BY MS. BITAR:
3    Q.   Does a company make more money when it's
4    holding it in a bank account or when it's using it to
5    grow the business?
6    A.   What happens is --
7    MR. THOMAS:  Objection. Speculation and
8    opinion testimony.
9    THE COURT:  Sustained. Rephrase your
10   question.
11   BY MS. BITAR:
12   Q.   Is it better or worse for a company to have
13   a large amount of cash on hand in the bank than to use
14   it for other reasons?
15   A.   It's better to have your cash invested in
16   other assets, not to have it, per se, in cash on your
17   balance sheet.
18   Q.   And I'd like to direct your attention to
19   page 13 which are the notes to the financial statements.
20   And I direct you to the second paragraph.
21   This talks about the fact that the company
22   had been restructured, correct?
23   A.   Yes, it does.
24   Q.   And going down to the last full paragraph,
25   if you could blow that up, please?

Page 3303

1    (Technician complies.)
2    Notwithstanding that the work papers show
3    the company did not have a liquidity crisis, could you
4    read this portion of the footnote into the record and
5    tell me what it means to you?
6    A.   Sure. "Since the company is no longer able
7    to receive funds from its previous lender, the company
8    has made adjustments to its business plan to reflect
9    these limitations. The company continues to seek
10   alternative sources of financing for its operations and
11   may in the future require proceeds from new debt,
12   borrowings or sale of the company securities to obtain
13   additional capital. There can be no assurance that the
14   company will be able to maintain profitability or obtain
15   additional capital when needed."
16   Q.   Thank you. So what does that tell the
17   reader of the financial statements about the condition
18   of the company?
19   A.   This tells the reader that there is no
20   certainty as to the future of the company. There is the
21   possibility that if they don't continue to get
22   replacement debt, they might have a problem with their
23   viability as to continue to go forward. It's not --
24   it's informative disclosure as to the liquidity of the
25   company. It wasn't a concern but it's just letting the

Page 3304

1    reader know that it's dependent on outside financing to
2    continue purchase of accounts receivable. That's what
3    it means.
4    Q.   And, in fact, as you were doing these audit
5    procedures in January and February of 2003, was it your
6    understanding the company was looking for replacement
7    bankers to finance the company after Espirito Santo
8    stopped being 50 percent owner?
9    A.   Yes, and that's why we put this disclosure
10   here.
11   Q.   Thank you. I'm done with that document.
12   Let's talk about confirms again. Mr. Lenner, let's go
13   over the process. In 1998, how would a confirm be
14   created?
15   A.   We would obtain a list of customers ,
16   invoices, those are accounts receivable. We would make
17   a selection of the customers that we wanted to confirm.
18   We'd give that selection to the client.
19   Q.   Meaning to Bankest?
20   A.   Yes, to Bankest. We'd give them a pro forma
21   or sample confirmation. We would ask them to fill it
22   out for us. They would complete it. We would then
23   return it back to the audit team. We would then enter
24   it into the control. And then send it out.
25   Q.   And it's done -- the company does that both

Page 3305

1  because it's efficient and because it's on the company's
2  letterhead?
3      A.  That's correct.
4      Q.  Now, with the second confirm, one way to do
5  that is to simply resend the initial confirmation,
6  correct?
7      A.  Yes.
8      Q.  And in 1998 there were two sets of confirms
9  placed in the work papers for the customers that were
10  sent the confirms, correct?
11      MR. THOMAS:  Objection. Leading, Your
12  Honor.
13      THE COURT:  Sustained.
14  BY MS. BITAR:
15      Q.  Mr. Lenner, what did the -- what did the
16  confirm control section of the work papers tell you?
17      A.  That first confirmations were sent out by
18  virtue of having one copy. And then a second
19  confirmation was sent out because there was an identical
20  copy of the first that was sent out. That's what it
21  means to me.
22      Q.  And would that be a proper way to
23  demonstrate in the work papers that confirmations were
24  sent out twice?
25      A.  It's a very common way of demonstrating it

Page 3306

1  when you conduct an audit.
2      Q.  And there's another common way to sign off
3  in the planning section of the work papers relating to
4  accounts receivable that second confirms were sent?
5      A.  Yes.
6      Q.  And in the 1998 work papers, is that what we
7  see being done by Mr. Rivera?
8      A.  Yes, we saw that.
9      Q.  And would that be an appropriate way to
10  reflect confirmations are being sent?
11      A.  Yes.
12      Q.  Now, I'd like you to look at Exhibit 3005 at
13  section 217. That was the confirm control for the 2000
14  work papers. If you can just blow up the top, please.
15      (Technician complies.)
16      Do you remember Mr. Thomas asked you
17  questions about this?
18      A.  Yes.
19      Q.  And you indicated that you didn't have
20  actual copies of all of the confirms in the work papers?
21      A.  Yes.
22      Q.  Would it also be appropriate, Mr. Lenner, to
23  document the sending of confirms by having a date and
24  when sent on a confirmation control document instead of
25  copies of the confirms?

Page 3307

1      A.  Yes, that's the whole purpose of the
2  control.
3      Q.  So is it fair to say that what's important
4  is that whether it be in the circularization summary
5  like the one in front of our the actual work plan --
6      MR. THOMAS:  Objection, leading.
7      THE COURT:  Sustained.
8  BY MS. BITAR:
9      Q.  What are the three ways in which you can
10  judge that there has been confirmations sent in the work
11  papers, Mr. Lenner?
12      A.  There are three ways. The first way is on
13  the control that you're looking at on the screen. The
14  second way would be a copy of the first confirmation.
15  And the third way would be a sign off in the audit
16  program saying that confirmations were, in fact --
17  second confirmations were, in fact, sent out.
18      Q.  And Mr. Lenner, with respect to the 1998 Joy
19  confirm, is there any reflection in the work papers in
20  any of those areas that a confirm was actually sent out
21  by BDO as opposed to just prepared by Bankest?
22      A.  There is nothing in the work papers.
23      Q.  By the way, Mr. Lenner, is it fair to say
24  then going to -- well, withdrawn.
25      Could you please go to Exhibit 3003 at BDO

Page 3308

1  738? It's 248.
2      A.  I have it.
3      Q.  Can you blow that up, please, Glenn?
4      (Technician complies.)
5      Mr. Lenner, could you identify this document
6  for the record?
7      A.  It's the accounts receivable circularization
8  schedule, Bates 738.
9      Q.  So this is the equivalent of the document we
10  looked at just before for the 2000 work papers, in the
11  2000 work papers?
12      A.  Yes, a couple years earlier.
13      Q.  And by the way, Mr. Lenner, you see where it
14  says second request it's left blank?
15      A.  Yes.
16      Q.  Does leaving it blank mean it wasn't done if
17  it's reflected elsewhere in the work papers?
18      A.  That's correct.
19      Q.  It's just blank, right?
20      A.  It's just blank.
21      Q.  It's not saying it wasn't done, correct?
22      MR. THOMAS:  Objection, leading.
23      THE COURT:  Sustained.
24  BY MS. BITAR:
25      Q.  Is it saying it wasn't done?

Page 3309

1   A.   No, it's not.
2   Q.   I'm done with that document.
3        We were talking a little bit about invoices.
4   Mr. Thomas asked you some questions about the agreed to
5   invoice test. Do you remember that?
6   A.   Yes, I do.
7   Q.   And you testified that an invoice is a third
8   party document, correct?
9   A.   Yes, I did.
10  Q.   When conducting your audits of Bankest, sir,
11  did you consider the invoice sold to Bankest as third
12  party evidence?
13  A.   Yes.
14  Q.   Did you understand at the time that the
15  evidence prepared by a third party is competent
16  evidence?
17  A.   Yes, I did.
18  Q.   Now Mr. Lenner, it's fair to say that from
19  time to time there can be a problem with an invoice,
20  right?
21  A.   Yes.
22  Q.   Sometimes mistakes happen, right?
23  A.   Yes.
24  Q.   In your wildest dreams would you ever
25  believe that not only Bankest but many of its clients

Page 3310

1   were entering collusive fraud that faked invoices?
2        MR. THOMAS: Objection, Your Honor.
3        THE COURT: Sustained.
4   BY MS. BITAR:
5   Q.   Could you ever have imagined a scenario
6   where your audit client --
7        MR. THOMAS: Objection, Your Honor.
8        THE COURT: Sustained.
9        MS. BITAR: I'll withdraw the question,
10  Judge.
11  BY MS. BITAR:
12  Q.   Even now with the benefit of hindsight and
13  even knowing now what you know, is it fair to say that
14  an invoice is competent evidence?
15       MR. THOMAS: Objection, leading.
16       THE COURT: Sustained.
17  BY MS. BITAR:
18  Q.   When you were doing your audits of Bankest,
19  did you consider whether an invoice constituted
20  competent evidence from which you could render an
21  opinion?
22  A.   Yes, I did.
23  Q.   Now, do you remember Mr. Thomas was showing
24  you an invoice before lunch?
25  A.   Yes.

Page 3311

1   Q.   Joy invoice. Do you have that document,
2   please?  Is that a copy of the document, please, Nikki?
3        MS. SIMON: (Complies.)
4        MS. BITAR: May I approach the witness?
5        THE COURT: You may.
6   BY MS. BITAR:
7   Q.   Now Mr. Lenner, Mr. Thomas showed you page
8   14. If you can get to that. It's 0014 at the bottom of
9   the page.
10  A.   Yes.
11  Q.   Do you have that, sir?
12  A.   Yes.
13  Q.   I'd like you to look really carefully at the
14  part of the document where it says unit price. Do you
15  see that?
16  A.   Yes.
17  Q.   And you were asked some questions about the
18  unit price being listed as 10 dollars, right?
19  A.   Yes.
20  Q.   Now, Mr. Lenner, you see that this document
21  has a bunch of Bates stamps on it. It has a U.S.
22  government Bates stamp on it and it has an ESB number
23  which means it came from Bankest in some way?  Do you
24  see that?
25  A.   Yes.

Page 3312

1   Q.   So is it fair to say this is at least a copy
2   of a copy of a copy?
3        MR. THOMAS: Objection, Your Honor.
4        THE COURT: Sustained.
5   BY MS. BITAR:
6   Q.   Mr. Lenner, can you tell that this document
7   has been reproduced by virtue of the various Bates stamp
8   on it?
9   A.   Yes, it's very obvious.
10  Q.   I'd like you to look very carefully at the
11  unit price of ten dollars.
12  A.   Yes, I'm looking at it closely.
13  Q.   Do you think, sir, that the 10 could be an
14  18?
15       MR. THOMAS: Objection, Your Honor.
16       THE COURT: Sustained. Don't answer that
17  question.
18  BY MS. BITAR:
19  Q.   Let me ask you this question, Mr. Lenner.
20  Why don't you take a look at the invoice -- well,
21  withdrawn.
22       Do you have the document in front of you?
23  A.   Yes.
24  Q.   What is the description of the item on the
25  invoice?

Page 3313

1    A.   It's pants.
2    Q.   And it says -- does it give a style number?
3    A.   Yes.
4    Q.   And it says style PA 480, pan-wrist top
5    pants?
6    A.   Yes.
7    Q.   Go to the invoice in front of it.
8    A.   Yes.
9    Q.   And what's the document -- and what's the
10   item being sold in the invoice that precedes the one in
11   front of you?
12   A.   It's the same garment.  It's the same style
13   number.  And what I'm seeing here is that in the invoice
14   before it's an 18 dollars price, so looking at this real
15   close and multiplying it in my head, it looks like that
16   unit price should be 18 dollars.
17   Q.   So, in other words, you see here on the
18   invoice beforehand that you have the same pants, the
19   same description, and the unit price of 18 dollars,
20   right?
21   A.   Yes.
22   Q.   And when you go back to the invoice that
23   Mr. Thomas showed you that looks like a 10 and you
24   multiply out 3,178 items at 18 dollars, what do you get
25   to be the extended price?

Page 3314

1    A.   It looks like roughly speaking it would be
2    approximately 57 thousand dollars.
3    Q.   So this invoice is correct, isn't it?
4    A.   Yes, it is.
5        MR. THOMAS:  Objection, leading.
6        THE COURT:  He answered it.
7    BY MS. BITAR:
8    Q.   Now, Mr. Lenner, when you looked at these
9    invoices, did you believe it was your job to make a
10   determination by looking at the ink if it was real or
11   fake?
12   A.   No.
13   Q.   And is an invoice presumed to be competent
14   evidence when you look at it?
15   A.   Yes.
16   Q.   And is it your job to make a determination
17   as to the authenticity of the documents you look at?
18   A.   No.
19   Q.   I'm done with that document.  Do you
20   remember being asked some questions about aging and
21   about control testing?
22   A.   Yes.
23   Q.   And Mr. Thomas referred you to information
24   as having been prepared by Mr. Parlapiano, the client,
25   both in connection with BCC and Bankest.  Do you

Page 3315

1    remember that?
2    A.   Yes.
3    Q.   And you received the information as part of
4    control testing and your aging analysis that the jury
5    looked at based on information that you got from the
6    Bankest computer system, right?
7    A.   Yes.
8    Q.   And you understood as part of the control
9    testing that there was also corresponding entries on the
10   BCC system, correct?
11   A.   Yes.
12   Q.   And that was verified as part of the control
13   testing?
14   A.   Yes.
15   Q.   And that allowed the auditors to believe
16   that the system was reliable, correct?
17       MR. THOMAS:  Objection.  Leading, Your
18   Honor.
19       THE COURT:  Sustained.
20   BY MS. BITAR:
21   Q.   What did the control testing establish to
22   the audit team?
23   A.   The control testing -- the success of the
24   control testing indicated to us that the system was
25   designed properly and operated as planned.  It was

Page 3316

1    operating as to its design since it was passing all the
2    tests.
3    Q.   And that's the whole purpose of control
4    testing?
5        MR. THOMAS:  Objection, leading.
6        THE COURT:  Sustained, Ms. Bitar.
7        MS. BITAR:  Your Honor --
8    BY MS. BITAR:
9    Q.   Did you understand when you were doing that
10   work that the control testing -- let me try to make it
11   less leading.
12       Is control testing a recognized way of
13   making those determinations?
14       MR. THOMAS:  Objection, Your Honor.
15       THE COURT:  What's your objection?
16       MR. THOMAS:  My objection is repeatedly
17   telling the witness the answer and then rephrasing her
18   question.  That's my objection.
19       MS. BITAR:  Your Honor, I object to
20   counsel's remark that I'm telling the witness --
21       THE COURT:  Sustained.  Rephrase your
22   question.
23   BY MS. BITAR:
24   Q.   Is controls testing an appropriate way of
25   making a determination as to whether or not the computer

Page 3317

1   systems are reliable?
2       A.   Yes.
3       Q.   And an aging report that you reviewed, the
4   BDO audit team reviewed was a product of the system,
5   that BDO testing control?
6           MR. THOMAS: Objection. Leading, Your
7   Honor.
8           THE COURT: Sustained.
9   BY MS. BITAR:
10      Q.   Where did the information in the -- that BDO
11  tested come from?
12      A.   All of the reports were the results of the
13  internal systems at E.S. Bankest.
14      Q.   And reviewing of aging, how would you
15  characterize that type of review?
16      A.   Reviewing of the aging is basically
17  comparing the information on the invoice as to invoice
18  date and due date to the information in the aging
19  report. So it's really just a comparison of one
20  document to the other.
21      Q.   Is that deemed an analytical procedure?
22      A.   That's part analytical and -- when you look
23  at the aging to look at the relationships, that's an
24  analytical procedure. But the procedure which I just
25  explained is a substantive procedure. So it's a

Page 3318

1   combination of the two.
2       Q.   And Mr. Lenner, are analytical tests and
3   substantive tests appropriate ways of developing
4   competent evidential material from which BDO can render
5   an audit opinion?
6       A.   Yes, they are.
7       Q.   Now, Mr. Lenner, do you remember Mr. Thomas
8   asked you a bunch of questions about Ramon Rivera right
9   before I think he concluded his cross-examination?
10      A.   Yes.
11      Q.   And do you remember he asked you if the
12  Ramon Rivera situation would constitute a client
13  retention problem for purposes of some write-offs on a
14  bill?
15      A.   Yes.
16      Q.   And I believe you gave some testimony that
17  the client retention issue addressed on the bill which
18  is BDO 6007 in evidence -- I'm sorry, Plaintiffs'
19  Exhibit 6007 in evidence did not relate to the Ramon
20  Rivera situation?
21      A.   Yes.
22      Q.   And you said it related to a tax issue,
23  right?
24      A.   Yes.
25      Q.   And Mr. Lenner, is that something that was

Page 3319

1   significant to you?
2       A.   The tax issue?
3       Q.   Yes.
4       A.   Yes, it was.
5       Q.   Do you remember specifically what the tax
6   issue was in question?
7       A.   I have a general understanding and a
8   recollection about it.
9       Q.   What is your recollection?
10      A.   That when they converted from one type of
11  corporation into the LLC, which typically is treated for
12  tax purposes as a partnership, there was a tax liability
13  created of about $400,000. And they had a lot of
14  difficulty in understanding why if they're going to be
15  taxed as a partnership which means no tax by the
16  corporate entity, why they had to pay this $400,000 tax.
17  It was just we had to get our tax department involved.
18  We spoke to their tax advisors. We met. We spent a lot
19  of time on that issue.
20      Q.   And do you remember what the company wanted
21  to do? Did they want to book the tax liability or not?
22      A.   They did not want to book the tax liability
23  but we told them that they had to because that was
24  generally accepted accounting principles. If you have a
25  tax to pay, you need to record it.

Page 3320

1       Q.   And, in fact, did the company book the tax
2   liability?
3       A.   Yes, they did.
4       Q.   I'd like you to look at BDO 966 or BDO Bates
5   stamp 966. It's part of the 3003 1998 work papers.
6   It's pretty much at the end.
7           Could you blow that up, Glenn? It says
8   strictly confidential memorandum.
9           (Technician complies.)
10          Would you blow up the facts section, please?
11          (Technician complies.)
12          Is this where BDO audit team memorialized
13  the problem with respect to the tax liability issue?
14      A.   Yes, it is.
15      Q.   Could you please get out the time records
16  that Mr. Thomas was showing you?
17      A.   (Complies.)
18      Q.   And why don't you turn to Bates stamp 19707?
19  Tell me when you have it, Mr. Lenner.
20      A.   I have it now.
21      Q.   Mr. Lenner, is this page and the subsequent
22  pages, the time and billing records with respect to the
23  1998 audit?
24      A.   Yes, it is.
25      Q.   And this is part of a larger compendium of

Page 3321

1   all of the time records in connection with these audits
2   put together by the plaintiffs and marked as an exhibit?
3       A.  Yes.
4       Q.  And if you look at the very bottom of the
5   page, this is now 19707, it says audit meeting with
6   Sandy on Saturday referring to tax, the very, very last
7   entry, Glenn.
8           (Technician complies.)
9           And who's Godoy that's listed there, sir?
10      A.  Mr. Godoy is and was a tax partner at BDO.
11      Q.  And was he brought in to deal with the
12  specific issue?
13      A.  Yes, he was brought in.  He spent a lot of
14  time.  That's on the next page.
15      Q.  I was going to go to that next.  Let's go to
16  the next page.  What does it say on the next page, the
17  entries relating to the tax issue?
18      A.  It says, "Accrual meeting with Keith and
19  Ramon to discuss the audit issue, conference call with
20  Keith regarding same issue."  Accrual means tax accrual.
21      Q.  And there's references to other outside
22  people such as Martha Castillo.  Do you see that, sir?
23      A.  Yes.
24      Q.  Do you remember who she was?
25      A.  No.

Page 3322

1       Q.  What about Felix Castillo referring to
2   accrual and memo needed referring to merger, taxable and
3   exposure, et cetera?
4       A.  Yes.  Felix Castillo was the tax advisor for
5   E.S. Bankest.
6       Q.  And if you go further down there's
7   discussions about various calls between Keith and Sandy
8   and Mary, calls from Felix, to and from Felix Castillo.
9   Research one hour Sunday.  Calls from and to Felix
10  Castillo again relating to the tax accrual issue.
11      A.  Right.
12      Q.  And Mr. Lenner, is it fair to say you can go
13  looking through the rest of the document but there's
14  various references to this issue throughout the 1998
15  time and billing records, correct?
16      A.  That's correct.
17      Q.  And this is the time that you wrote off in
18  part?
19      A.  Yes.
20      Q.  And Mr. Godoy, the memo we just looked at,
21  BDO 966?
22      A.  Yes.
23      Q.  Is that back on?  Who wrote that memo, sir?
24      A.  Mr. Godoy and Ms. Cruz.
25      Q.  And that's Maria?

Page 3323

1       A.  Yes.
2       Q.  And it was dated March 5th, 1999, correct?
3       A.  Yes.
4       Q.  And if could you flag the last -- it says
5   the purpose of this memo is to briefly summarize certain
6   tax issues that arose during the audit of the financial
7   statements, correct?
8       A.  Yes.
9       Q.  And, in fact, Mr. Lenner going back to the
10  time records, you can see -- go right back to the very
11  first page.  That Mr. -- the very top of the page,
12  please -- that Mr. Ellenburg billed -- the very --
13  19707.
14          (Technician complies.)
15          Would you highlight Mr. Ellenburg's bill?
16  And Mr. Ellenburg's bill is approximately 13 and a half
17  hours to this issue.
18      A.  Yes.
19      Q.  And how did he define --
20          MR. THOMAS:  Objection, Your Honor.
21          THE COURT:  Sustained.
22  BY MS. BITAR:
23      Q.  Did you review these bills, Mr. Lenner?
24      A.  Yes.
25      Q.  And do you believe they're accurate?

Page 3324

1       A.  Yes.
2       Q.  Is it your understanding based on looking at
3   these bills that Mr. Ellenburg billed approximately 13.5
4   hours under the code description client retention?
5       A.  Yes.
6       Q.  And did you understand that related to his
7   involvement in the tax issue?
8       A.  Yes.
9       Q.  By the way, the company wanted to not
10  include as a liability the tax issue, correct?
11      A.  That's correct.
12      Q.  And what did BDO do?
13      A.  We told them that they had to do it.
14      Q.  And is this another example of BDO
15  subordinating their judgment?
16          MR. THOMAS:  Objection, leading.
17          THE COURT:  Sustained.
18  BY MS. BITAR:
19      Q.  Did the company do what the auditors
20  required?
21      A.  Yes, they did.
22      Q.  Going back to the time records just one more
23  time.  You made a reference to Mr. Rivera.  Do you
24  remember that?
25      A.  Yes.

Page 3325

1    Q.    And I'd like you to look at BDO 19710. Do
2    you see that, sir?
3    A.    Not yet.
4    Q.    Take your time.
5    A.    Okay.
6    Q.    And do you remember as you sat here that
7    Mr. Rivera said there was a work stop on Friday,
8    February 12th?
9    A.    Yes.
10    Q.    And that he didn't do any work on Bankest
11    until approximately the following Wednesday?
12        MR. THOMAS:  Objection, Your Honor.
13        THE COURT:  Sustained.
14   BY MS. BITAR:
15    Q.    Mr. Lenner, from review of these time
16    records, did Mr. Rivera work on the 12th?
17    A.    Yes.
18    Q.    Did he work on the 15th?
19    A.    Yes.
20    Q.    Did he work on the 16th?
21    A.    Yes.
22    Q.    Did he work on the 17th?
23    A.    Yes.
24    Q.    Did he work on the 18th?
25    A.    Yes.

Page 3326

1    Q.    Did he work on the 19th?
2    A.    Yes.
3    Q.    Did he work on the 22nd?
4    A.    Yes.
5    Q.    I'm done with the document as it relates to
6    1998.
7        Mr. Lenner, do you remember you gave some
8    testimony to Mr. Thomas before the break about September
9    of 2002?
10    A.    Yes.
11    Q.    And I'd like to direct your attention to the
12    time records at BDO 19568.  You see that, sir?
13    A.    Yes.
14    Q.    Get it up on the screen.
15        (Technician complies.)
16        I'm referring to the first three entries --
17    the first five entries of Mr. Lenner and Mr. Mohr.
18        Mr. Lenner, explain to the members of the
19    jury the type of work they had to do as part of the
20    conversion from paper audit like the ones we have in
21    front of you to the paperless audit?
22    A.    Well, the first step was reading the firm's
23    manuals, which they were pretty thick.  That took a
24    considerable amount of time.  Next we had to enter in
25    the opening balances on the prior years into the new

Page 3327

1    software.  We were also answering the questions and
2    trying to see how the new software would give the result
3    just to make sure that the result was coming out at the
4    way that we expected the result to come out so if we
5    answered the question and we answered a yes on a risk
6    questionnaire, we wanted to see how it affected the
7    various other accounts.  And it was just our first time
8    dealing with the software and we just wanted to be sure
9    that when we implemented it in January, we wouldn't have
10    any problems because we were on a very tight timeline to
11    deliver the financials in February or March of that year
12    and just had three to four weeks of schedule time and we
13    couldn't take the chance like we always have problems in
14    implementing new software because we just had four
15    weeks, a window of four weeks to complete the audit and
16    we wanted to make sure we wouldn't have any problems
17    using this new software.
18    Q.    So, Mr. Lenner, this was a firm-wide
19    process, right?
20    A.    Yes.  And in particular it was in the Miami
21    office.
22    Q.    So let's make it a Miami office effort.
23    A.    Yes.
24    Q.    So Bankest was one of the audits you used to
25    learn them?

Page 3328

1    A.    Yes, it was one of the first audits.
2    Q.    Was it a tedious process?
3    A.    Yes.
4    Q.    And it's something you yourself did because
5    you needed to understand how to use that software?
6    A.    Absolutely.
7    Q.    And Mr. Lenner, is it fair to say that
8    auditors are usually pretty busy after January?
9        MR. THOMAS:  Objection, leading.
10        THE COURT:  Sustained.
11   BY MS. BITAR:
12    Q.    Mr. Lenner, explain generally the peaks and
13    flows of an auditor based on company financial
14    statements based at year-end.
15    A.    Since most companies have a December
16    year-end, we're very busy from January through April
17    30th, sometimes into May.  But come the summer and fall,
18    we don't have a lot of due dates.  We don't have a lot
19    of audits due because they've all been completed and we
20    use that time for gearing up for the next audit or if
21    there's a new transition in the firm, something new,
22    we'll spend that time to learn the new software or just
23    to get up to speed with the new developments in the
24    firm. So we're very busy from January through the
25    beginning of May.

Page 3329

1      Q.   And is September a general time to regroup
2  to get yourself ready for the busy season?
3      A.   Yes, it is.
4      Q.   Mr. Lenner, how did you bill this time, to
5  what?
6      A.   The time was charged to the company but it
7  was not -- it was charged in these time runs but we were
8  not able to bill for it. It's our own what we call on-
9  the-job training type of time.
10      Q.   And Mr. Lenner, if this was restructuring
11  work would it say restructuring?
12      A.   Yes, it would.
13      Q.   And Mr. Lenner, does it take you 14 hours to
14  try to develop a restructuring assignment?
15      A.   No.
16      Q.   Mr. Lenner, do you have 14 hours to say
17  about anything relating to restructuring?
18      A.   No, I don't.
19      Q.   One last question, Mr. Lenner. Do you
20  remember Mr. Thomas asked you if you were holed up with
21  me for two days writing up questions?
22      A.   Yes.
23      Q.   Were we doing that, sir?
24      A.   No, we were not.
25      Q.   What were we doing?

Page 3330

1      A.   I contacted Ms. Bitar. I wanted to meet
2  with her on Monday or Tuesday. She told me that her
3  mother went into the hospital --
4      MR. THOMAS: (Standing up) .
5      THE COURT: Sustained.
6      MR. THOMAS: Your Honor --
7      THE COURT: Hold on.
8      MS. BITAR: I'll rephrase the question,
9  Judge.
10  BY MS. BITAR:
11      Q.   How many hours did we meet, Mr. Lenner?
12      A.   A couple hours.
13      MS. BITAR: Thank you. I have no further
14  questions.
15      MR. THOMAS: Your Honor, I'd appreciate if
16  you wouldn't dismiss this witness until I have an
17  opportunity to speak to you.
18      THE COURT: Okay. Mr. Lenner, you can step
19  down. And just stay outside for a second.
20      (Thereupon the witness stepped outside. )
21      THE COURT: All right. Ladies and
22  gentlemen, I need you to step into the jury room. It's
23  a good time maybe to go to the restroom. Do not discuss
24  the case amongst yourselves.
25      (Thereupon, the jury was escorted out of the

Page 3331

1  courtroom.)
2      THE COURT: All right. Settle down.
3      (Thereupon, there was a brief pause.)
4      THE COURT: Ready to go?
5      All right, Mr. Thomas.
6      MR. THOMAS: Espirito Santo objects to what
7  occurred on three separate grounds. One, we object to
8  what was obviously a planned last question and obviously
9  improper question to be asked and answered and improper
10  for the jury to hear the answer. We object that there
11  was throughout his direct, but I'm focusing on his
12  redirect now, that Your Honor entered an order and then
13  made clear that not only could he not give testimony on
14  whether or not GAAS was violated but the questions
15  couldn't even be asked and they were asked repeatedly
16  and I was willing in the beginning to say it was just an
17  inability to understand your order, but when it comes up
18  again on redirect, questions directly asked about it as
19  a violation of your motion in limine, it's intentional.
20      And on the third ground that the entire
21  redirect -- trying to think of the best way to say this.
22  It's not only leading but clearly communicated.
23      And on those three bases, we move to strike
24  their entire direct testimony and the jury be instructed
25  as such. If the Court is not willing to do that, then

Page 3332

1  we would request that the Court instruct the jury that
2  the last question was improper and that they are to
3  disregard it.
4      Thank you, Your Honor.
5      THE COURT: What makes the last question
6  improper?
7      MR. THOMAS: Well --
8      THE COURT: Maybe the answer was improper
9  but what was it about that the last question that was
10  improper?
11      MR. THOMAS: Yeah, and he gave a wholly
12  different answer to me. So why is that --
13      THE COURT: You say the last question was
14  improper. Tell me how you believe evidentially it was
15  improper.
16      MR. THOMAS: Can I just have a moment to go
17  back?
18      THE COURT: Absolutely. And not only that,
19  but there was no objection to the question. It was the
20  objection to the answer.
21      MR. THOMAS: Can I address that?
22      THE COURT: You may but like I said, you did
23  not object to the question, therefore, that's a moot
24  issue.
25      MR. THOMAS: You know, Your Honor, I think

Page 3798

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

-------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
     Plaintiffs,
      vs.
BDO SEIDMAN, LLP,
     Defendant.
-------------------------------------------------x
BDO SEIDMAN, LLP,
     Third-Party Plaintiff,
      vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
     Third-Party Defendants.
-------------------------------------------------x

PAGES 3798 - 3983

Volume 30

Miami, Florida

Wednesday, May 9, 2007

9:55 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 3799

1        **A P P E A R A N C E S**
2
3  On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4  INTERNATIONAL, LTD., ET AL.:
5
6  SULLIVAN & CROMWELL, LLP
7     1888 Century Park East
8     Los Angeles, California 90067
9     (310) 712-6627
10  BY:  Steven W. Thomas, Esquire
11     Emily S. Alexander, Esquire
12
13  GONZALO R. DORTA, P.A.
14     334 Minorca Avenue
15     Coral Gables, Florida 33134
16     (305) 441-2299
17  BY:  Gonzalo R. Dorta, Esquire
18
19  BERGER SINGERMAN
20     350 East Las Olas Boulevard, Suite
21     Fort Lauderdale, Florida 33301
22     (954) 525-9900
23  BY:  Mitchell W. Berger, Esquire
24
25

Page 3800

1  On behalf of Defendant BDO Seidman, LLP:
2
3  ALVAREZ, ARMAS & BORRON
4     901 Ponce de Leon Boulevard, Suite 304
5     Coral Gables, Florida 33134
6     (305) 461-5100
7  BY:  Arturo Alvarez, Esquire
8
9  GREENBERG TRAURIG, LLP
10     MetLife Building
11     200 Park Avenue, 15th Floor
12     New York, New York 10166
13  BY:  Adam D. Cole, Esquire
14     Karen Y. Bitar, Esquire
15     (212) 801-9200
16
17  GREENBERG TRAURIG, LLP
18     1221 Brickell Avenue
19     Miami, Florida 33131
20  BY:  Mark Schnapp, Esquire
21     Nikki Simon, Esquire
22     (305) 579-0500
23
24
25

Page 3801

1  On behalf of Third-Party Defendants Victor Balestra,
2  Bernard Mollet, and Joaquin Garnecho
3
4  RICHMAN, GREER, WEIL, BRUMBAUGH,
5  MIRABITO & CHRISTENSEN, P.A.
6     Miami Center, Suite 1000
7     201 S. Biscayne Boulevard
8     Miami, Florida 33131
9     (305) 373-4000
10  BY:  Manuel Garcia Linares, Esquire
11
12
13  On behalf of Third-Party Defendant Bernard Mollet
14
15  GAMBA & LOMBANA, P.A.
16     2701 Ponce de Leon Boulevard, Mezzanine
17     Coral Gables, Florida 33134
18     (305) 448-4010
19  BY:  Hector J. Lombana, Esquire
20     Geoffrey Marks, Esquire
21
22
23
24
25

Page 3802

1         **C O N T E N T S**
2
3  EXAMINATION OF CHRISTOPHER MOHR BY:   PAGE:
4    MR. COLE: (Direct, cont'd)    3804
5    MR. THOMAS: (Cross)    3827
6    MR. COLE: (Redirect)    3945
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3943

1    Q.  So, sir, when you testified under oath in
2    February and you answered "Question: So, in fact, you
3    actually thought it was better to get them from
4    customers than from clients, right?
5         "Answer: Yeah. For the following reasons
6    in the memo."
7         You were telling the truth then, right?
8    A.  Yes.
9    Q.  Now, sir, in 1998 you were not doing
10   controls testing, right?
11   A.  Correct.
12   Q.  There was C-10?
13   A.  Yes.
14   Q.  You didn't participate in, right?
15   A.  No.
16   Q.  Then there was confirmations sent out to
17   customers, right?
18   A.  Yes.
19   Q.  And zero back, right?
20   A.  I didn't -- I'm not sure which years, but
21   I'll take your word for it.
22   Q.  Well, you'll give me that over the five
23   years of audits --
24   A.  Yes, there were very few received back. But
25   when you say zero, I know there have about some. And

Page 3944

1    now I'm getting confused between '99 and '98. (Inaud.)
2    Q.  We don't want you to be confused, so I'll
3    qualify it a little bit more for you. In 1998 you sent
4    out a bunch of confirmations to customers and you got
5    virtually none back, right?
6    A.  Correct.
7    Q.  Now, sir, in that situation, if you will
8    look with me, please, at 3003 at 150 and look at the
9    last page.
10   A.  The last page?
11   Q.  Yeah.
12   A.  Okay.
13        MR. THOMAS: Can we highlight that, please?
14        (Technician complies.)
15   BY MR. THOMAS:
16   Q.  And that reads "Detailed transaction review
17   by Mr. Parlapiano and Mr. Orlansky is relied upon to
18   detect and prevent fraud." Right?
19   A.  Yes.
20   Q.  And, sir, at this time, Mr. Orlansky and
21   Mr. Parlapiano, they were at Bankest Capital, right?
22   A.  Yes.
23   Q.  And at this time, the vast majority of the
24   business flowed through Capital because Joy was the
25   largest client, right?

Page 3945

1    A.  Correct.
2    Q.  And Mr. Parlapiano and Mr. Orlansky were
3    also at E.S. Bankest, right?
4    A.  Yes.
5    Q.  And so these gentlemen, Mr. Parlapiano and
6    Mr. Orlansky, were on both sides of the transaction
7    between the related party, E.S. Bankest and Capital,
8    right?
9    A.  Correct.
10   Q.  And your own audit manual tells you that
11   between related parties you have to be extra careful
12   because there's a risk of misstatement and fraud, right?
13   A.  Correct.
14        MR. THOMAS: I have nothing further, Your
15   Honor.
16        Thank you, sir.
17        Thank you, ladies and gentlemen.
18        THE COURT: Mr. Cole, you may proceed.
19        REDIRECT EXAMINATION
20   BY MR. COLE:
21   Q.  Mr. Mohr --
22   A.  Yes.
23   Q.  -- you started out in cross-examination
24   today talking about your depositions. Do you remember
25   that?

Page 3946

1    A.  Yes, I remember.
2    Q.  900 pages of depositions. Do you remember
3    that?
4    A.  Yes.
5    Q.  Three volumes of depositions. Do you
6    remember that?
7    A.  Yes, I do.
8    Q.  Let's talk about what a deposition is, what
9    you experienced in the deposition. Before the
10   deposition, did anybody give you the questions ahead of
11   time?
12   A.  No.
13   Q.  Before the deposition, did you look at work
14   papers?
15   A.  I believe I reviewed some work papers.
16   Q.  And you reviewed some work papers with
17   Ms. Bitar as well, right?
18   A.  Yes.
19   Q.  Did you know what questions would be asked
20   so that she can look in the work paper to see how you
21   answer them prior to the deposition?
22   A.  No.
23   Q.  And did you learn during the course of the
24   deposition the types of questions that were being asked
25   of you?

Page 4227

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
     Plaintiffs,
   vs.
BDO SEIDMAN, LLP,
     Defendant.
------------------------------------------------x
BDO SEIDMAN, LLP,
     Third-Party Plaintiff,
   vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIN GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
     Third-Party Defendants.
------------------------------------------------x

PAGES 4227 - 4359

Volume 33




Miami, Florida

Thursday, May 17, 2007

10:00 a.m.

Before the Honorable Jose M. Rodriguez


EXHIBIT
35

Reported by:  Gizella "Gigi" Baan

Page 4228

APPEARANCES

On behalf of the Plaintiffs BANCO ESPIRITO SANTO
INTERNATIONAL, LTD., ET AL.:

SULLIVAN & CROMWELL, LLP
    1888 Century Park East
    Los Angeles, California  90067
    (310) 712-6627
BY:  Steven W. Thomas, Esquire
    Emily S. Alexander, Esquire

GONZALO R. DORTA, P.A.
    334 Minorca Avenue
    Coral Gables, Florida  33134
    (305) 441-2299
BY:  Gonzalo R. Dorta, Esquire

BERGER SINGERMAN
    200 South Biscayne Boulevard, Suite 1000
    Miami, Florida  33131
    (305) 755-9500
BY:  Mitchell W. Berger, Esquire
    Rene Harrod, Esquire

Page 4229

On behalf of Defendant BDO Seidman, LLP:

GREENBERG TRAURIG, LLP
    MetLife Building
    200 Park Avenue, 15th Floor
    New York, New York  10166
BY:  Adam D. Cole, Esquire
    Karen Y. Bitar, Esquire
    (212) 801-9200

GREENBERG TRAURIG, LLP
    1221 Brickell Avenue
    Miami, Florida  33131
BY:  Mark Schnapp, Esquire
    Nikki Simon, Esquire
    (305) 579-0500

ALVAREZ, ARMAS & BORRON
    901 Ponce de Leon Boulevard, Suite 304
    Coral Gables, Florida  33134
    (305) 461-5100
BY:  Arturo Alvarez, Esquire

Page 4230

On behalf of Third-Party Defendants Victor Balestra,
Bernard Mollet, and Joaquin Garnecho

RICHMAN, GREER, WEIL, BRUMBAUGH,
MIRABITO & CHRISTENSEN, P.A.
    Miami Center, Suite 1000
    201 S. Biscayne Boulevard
    Miami, Florida  33131
    (305) 373-4000
BY:  Manuel Garcia Linares, Esquire

On behalf of Third-Party Defendant Bernard Mollet

GAMBA & LOMBANA, P.A.
    2701 Ponce de Leon Boulevard, Mezzanine
    Coral Gables, Florida  33134
    (305) 448-4010
BY:  Hector J. Lombana, Esquire
    Geoffrey Marks, Esquire

Page 4231

CONTENTS

EXAMINATION OF ROBERT H. TEMKIN BY:          PAGE:
    MR. THOMAS:  (Cross, cont'd)          4233
    MR. COLE:  (Redirect)          4286

Page 4296

1    If he didn't exercise professional judgment,
2 if he did not consider anything, would there be a
3 conflict -- potentially?
4    A.    Potentially.
5    Q.    Could he satisfy the rule?
6    A.    Without thinking of anything?
7    Q.    Yeah.
8    A.    He could not.
9    Q.    Now, in this case I want you to assume that
10 Mr. Lenner audited E.S. Bankest five years in a row. I
11 want you to assume that Dominick Parlapiano was the
12 chief financial officer of E.S. Bankest and Sandy knew
13 it.
14    A.    Okay.
15    Q.    I want you to assume that Dominick
16 Parlapiano was a director of StrataSys and Sandy knew
17 it. I want you to assume that Sandy knew that Bankest
18 was purchasing receivables from StrataSys and Sandy knew
19 it. And I want you to assume that lenders were lending
20 into E.S. Bankest and Sandy knew it. And he considered
21 all those items and still was able to make a
22 determination that in his mind, not other people's minds
23 yet, but in his mind he can maintain objectivity.
24    Does that satisfy the rule, at least the
25 first part?

Page 4297

1    A.    It satisfies the first part. Can I try to
2 explain why?
3    Q.    Yes. I was just about to ask you why.
4    A.    In the exercise of professional judgment,
5 Mr. Lenner needs to consider everything that he knows
6 about the relationship, not only who these three parties
7 are but those folks if they exist up in the upper
8 left-hand corner.
9    He's going to be auditing a set of financial
10 statements which, if they purport to present with
11 generally-accepted accounting principles, they're
12 intended for general use. Anybody can use them. They
13 can be given to creditors; they can be given to
14 potential investors; they can be given to anybody.
15    He needs to know that. That's his
16 responsibility in making his decision. He knows he has
17 a responsibility to the public without necessarily being
18 able to identify who all those people are. That's the
19 basis for his reasoned professional judgment.
20    Professional judgment can't be, am I going
21 to make a lot of money out of this deal. That can't be
22 the sole base. It can't even be the sole basis, is
23 StrataSys going to make a lot of money out of this deal.
24    The question is, considering my obligations,
25 his obligations in this case, my obligations if I'm in

Page 4298

1 that position as a professional accountant, as a CPA, is
2 to say I'm about to -- I'm auditing these financial
3 statements of E.S. Bankest. They're general purpose
4 financial statements.
5    My interest is not in -- solely in keeping
6 Bankest happy. It isn't solely in keeping StrataSys
7 happy. I have an obligation to a wider audience.
8    That's part of the consideration that CPAs
9 learn over the course of this experience that we've
10 talked about yesterday. Part of the process of
11 exercising professional judgment.
12    Sorry for the long answer.
13    Q.    No, that's fine.
14    But let's assume all those facts I just gave
15 you. Dominick is the CFO of Bankest, he's a director of
16 StrataSys, and so on and so on. Let's assume Mr. Lenner
17 looked at all that and in his mind thought he couldn't
18 be objective but still did the audit.
19    Would that be a conflict of interest?
20    A.    If he believed he couldn't be objective and
21 he did the audit, he would have violated the code of
22 conduct on objectivity.
23    Q.    Do you have any evidence to believe that
24 Mr. Lenner determined that he was -- could not maintain
25 his objectivity?

Page 4299

1    MR. THOMAS: Objection. Speculation as to
2 what was in Mr. Lenner's mind unless that's the test.
3    THE COURT:  Overruled.
4    THE WITNESS: I have seen no such evidence.
5 BY MR. COLE:
6    Q.    Well, in the evidence that was created at
7 the time, not as we sit here eight years later with
8 whatever evidence comes after, based upon the evidence
9 at the time, the sign-offs by Sandy Lenner saying that
10 he believes that he maintained objectivity and did a
11 GAAS audit, his testimony that he said he did his job,
12 he thought he did his job at the time, is that evidence
13 that he determined he maintained his objectivity?
14    MR. THOMAS: Objection, Your Honor. Same
15 objection unless the test is what was in his mind.
16    THE COURT:  That's a long question.
17    MR. COLE:  I'll rephrase.
18    THE COURT:  Please.
19 BY MR. COLE:
20    Q.    In this case you remember seeing lots of
21 documents, right?
22    A.    Yes.
23    Q.    And in many of those documents, there were
24 references to what Mr. Lenner was thinking at the time,
25 right?