Page 4458

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
------------------------------------------------x

PAGES 4458 - 4577

Volume 35



AFTERNOON SESSION

Miami, Florida

Friday, May 18, 2007

2:00 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 4459

```
 1         A P P E A R A N C E S
 2
 3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
 4   INTERNATIONAL, LTD., ET AL.:
 5
 6   SULLIVAN & CROMWELL, LLP
 7      1888 Century Park East
 8      Los Angeles, California  90067
 9      (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11        Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14      334 Minorca Avenue
15      Coral Gables, Florida  33134
16      (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20      200 South Biscayne Boulevard, Suite 1000
21      Miami, Florida  33131
22      (305) 755-9500
23   BY:  Mitchell W. Berger, Esquire
24        Rene Harrod, Esquire
25
```

Page 4460

```
 1   On behalf of Defendant BDO Seidman, LLP:
 2
 3   GREENBERG TRAURIG, LLP
 4      MetLife Building
 5      200 Park Avenue, 15th Floor
 6      New York, New York  10166
 7   BY:  Adam D. Cole, Esquire
 8        Karen Y. Bitar, Esquire
 9        (212) 801-9200
10
11   GREENBERG TRAURIG, LLP
12      1221 Brickell Avenue
13      Miami, Florida  33131
14   BY:  Mark Schnapp, Esquire
15        Nikki Simon, Esquire
16        (305) 579-0500
17
18   ALVAREZ, ARMAS & BORRON
19      901 Ponce de Leon Boulevard, Suite 304
20      Coral Gables, Florida  33134
21      (305) 461-5100
22   BY:  Arturo Alvarez, Esquire
23
24
25
```

Page 4461

```
 1   On behalf of Third-Party Defendants Victor Balestra,
 2   Bernard Mollet, and Joaquim Garnecho
 3
 4   RICHMAN, GREER, WEIL, BRUMBAUGH,
 5   MIRABITO & CHRISTENSEN, P.A.
 6      Miami Center, Suite 1000
 7      201 S. Biscayne Boulevard
 8      Miami, Florida  33131
 9      (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12   On behalf of Third-Party Defendant Bernard Mollet
13
14   GAMBA & LOMBANA, P.A.
15      2701 Ponce de Leon Boulevard, Mezzanine
16      Coral Gables, Florida  33134
17      (305) 448-4010
18   BY:  Hector J. Lombana, Esquire
19        Geoffrey Marks, Esquire
20
21
22
23
24
25
```

Page 4462

```
 1            C O N T E N T S
 2
 3   EXAMINATION OF JOAQUIM GARNECHO BY:        PAGE:
 4      MS. BITAR:  (Direct, cont'd)      4463
 5      MR. THOMAS:  (Cross)             4479
 6      MS. BITAR:  (Redirect)       4502
 7
 8   EXAMINATION OF JOSE MANUEL ESPIRITO SANTO BY:   PAGE:
 9      (By videotape)
10      MR. COLE:                    4529
11      MR. PASANO:                  4543
12
13   EXAMINATION OF PIERRE TREZZINI BY:        PAGE:
14      (By videotape)
15      MR. PASANO:                  4548
16
17
18
19
20
21
22
23
24
25
```

Page 4499

1  you said no.
2       Do you remember that?
3    A.  Yes, sir.
4    Q.  So you don't know that Mr. Lenner testified
5  that he knew the audited financials were going to the
6  parent of Espirito Santo Bank?
7       MS. BITAR: Objection.
8       THE COURT: Sustained.
9       MS. BITAR: And that mischaracterizes his
10  testimony.
11      THE COURT: Sustained.
12  BY MR. THOMAS:
13   Q.  Well, sir, since you don't know what other
14  people testified to, you don't know what their expert
15  said about the use of audited financials just the other
16  day, you don't know that, do you?
17      MS. BITAR: Objection, Your Honor.
18      THE COURT: Overruled.
19      THE WITNESS: No, sir.
20  BY MR. THOMAS:
21   Q.  And you don't know what their other auditors
22  said about what they knew about the use of their audited
23  financials? You don't know that, right?
24   A.  I don't.
25   Q.  And, sir -- I'm sorry, I'm done with that

Page 4500

1  document. You can put it down. Thank you.
2    A.  (Complies.)
3    Q.  Sir, you were asked about the requirement in
4  the shareholder agreement. Let me ask it a different
5  way.
6       When BDO was first asking you questions,
7  they were saying it wasn't a requirement in the
8  shareholder agreement to make the $30 million loan.
9       You remember those questions?
10   A.  Yes, sir.
11   Q.  And at the end of their questions they were
12  asking you it was a requirement.
13      Do you remember that?
14   A.  Yes, sir.
15   Q.  Sir, if in 2001, audited financial
16  statements done by BDO Seidman, if they had done their
17  job and found that there was a great big fraud at E.S.
18  Bankest and that virtually all of those accounts
19  receivable were fake, would you have had to loan
20  $30 million into a great big fraud?
21   A.  No, sir.
22   Q.  If BDO had -- well, let me ask it a
23  different way. Remember you were asked questions about
24  whether the audited financial statements that BDO put
25  out in February were stale by the time you made the loan

Page 4501

1  in September, October.
2       Do you remember that?
3    A.  Yes, sir.
4    Q.  Do you understand what I mean by stale, that
5  it was seven months old or so?
6    A.  Yes, sir.
7    Q.  Would it have been stale information to you
8  in October of 2001 if when BDO issued their audited
9  opinion they would have discovered that there was a
10  great big fraud at E.S. Bankest --
11      MS. BITAR: Objection.
12  BY MR. THOMAS:
13   Q.  -- and if all the receivables --
14      THE COURT: Sustained.
15  BY MR. THOMAS:
16   Q.  I have to look at what I said.
17      Sir, when you reviewed BDO's audited
18  financial statements, was it important for you to know
19  that the accounts receivable reflected in their
20  statement were real?
21   A.  Yes, sir.
22   Q.  And, sir, whether it was a month later or
23  seven months later, did you want to know when you
24  decided whether or not to make a $30 million loan that
25  the accounts receivable were real?

Page 4502

1    A.  Yes, sir.
2       MR. THOMAS: Your Honor, thank you very
3  much.
4       Thank you very much, Mr. Garnecho.
5       THE COURT: Redirect?
6       MS. BITAR: Thank you.
7       REDIRECT EXAMINATION
8  BY MS. BITAR:
9    Q.  I just want to clarify a few questions I
10  have after you've been examined by your attorney.
11      The $3 million line that was initiated in
12  1998 and then repeated again in 1999 and 2000 and 2001,
13  that was something that was not required under the
14  shareholder agreement, correct?
15      Not required under the shareholder
16  agreement, correct?
17      MR. THOMAS: Objection. Beyond the scope.
18      THE COURT: Overruled.
19      THE WITNESS: It was contemplated in the
20  shareholders agreement. That was my previous testimony.
21  BY MS. BITAR:
22   Q.  I understand, but my question is a little
23  different.
24      Bankest could have gone anywhere for that
25  $3 million line if they wanted to, right?

Page 4555

1    A.   Yes.
2    Q.   Who is Mariana Devaud?  I'm not sure I'm
3    pronouncing it right.
4    A.   Devaud?
5    Q.   D-E-V-A-U-D?
6    A.   She was the head of the back office.
7    Q.   What were her responsibilities?
8    A.   Delivery.  That was 90 percent of her
9    responsibilities.  Delivery of any security.
10   Q.   And the customers or clients of CFESSA,
11   primarily where were they located?
12   A.   85 percent in Portugal.  10 percent in
13   Brazil, Italy, and Belgium.  No Swiss.
14   Q.   And were they individuals or companies or
15   both?
16   A.   Individuals.
17   Q.   And when you got to CFESSA in 1991, did you
18   already have clients you brought with you or did you
19   inherent clients from other people?
20   A.   I was not supposed to have clients.  But I
21   had a few friends who came with me.  But that was very,
22   very little.
23   Q.   Do you know a company Bankest Capital
24   Corporation?
25   A.   I heard of it.

Page 4556

1    Q.   I'm going to give you a couple of other
2    names.  Bankest Receivables Finance and Factoring
3    Corporation?
4    A.   Yes.
5    Q.   And E.S. Bankest, do you know that company?
6    A.   Obviously, yes.
7    Q.   Do you know Eduardo and Hector Orlansky?
8    A.   Yes.
9    Q.   When do you recall first meeting either of
10   the Orlanskys?
11   A.   I would say 1995, but it could be 1996.
12   Q.   In what context did you meet -- how did you
13   meet them?
14   A.   He came to a meeting of shareholders,
15   Lausanne.  He was invited each year.
16   Q.   And would that be Hector Orlansky?
17   A.   Hector.  I met Eduardo Orlansky much later.
18   Q.   And did you understand the Orlanskys to be
19   owners of these different Bankest companies?
20   A.   Yes.
21   Q.   Did you come to know a Dominick Parlapiano?
22   A.   At that time, no.
23   Q.   Later?
24   A.   Later.
25   Q.   And in what capacity did you come to know

Page 4557

1    Mr. Parlapiano?
2    A.   When I went to the board meeting at Bankest.
3    Q.   And what did you understand Mr. Parlapiano's
4    role in the Bankest companies to be?
5    A.   I think he was -- I think he was doing the
6    same job as the Orlanskys.
7    Q.   You associate him working with the Bankest
8    companies?
9    A.   Yes.
10   Q.   How about a Peter Stanham.  Did you come to
11   know him at all?
12   A.   I met him but I don't know him.
13   Q.   And did you meet him also in the context of
14   the Bankest companies?
15   A.   Yes.
16   Q.   Now, does there come a time that you were
17   asked to serve as a director on E.S. Bankest?
18   A.   (Nodding.)
19   Q.   Could you tell me how that happened?
20   A.   First of all, the contacts were made by
21   Bernard Mollet, Hector, and myself.  Hector told me what
22   they were doing, and he probably asked me to ask
23   Espirito Santo to do the business with us because I
24   needed more financing.
25   Q.   And that contact had to do with the ultimate

Page 4558

1    formation of this company, E.S. Bankest, with a bank
2    participation and Orlansky participation; is that
3    correct?
4    A.   Yes.
5    Q.   And do you recall when was the earliest that
6    someone spoke to you about the possibility of the bank
7    in some way getting in business with the Orlanskys in
8    factoring?
9    A.   1996.
10   Q.   And the first time you were told about it,
11   was it Hector Orlansky who was talking to you?
12   A.   Hector.
13   Q.   And was that in Lausanne?
14   A.   Yes, in Lausanne.
15   Q.   Was that part of one of these annual
16   meetings or something else?
17   A.   Yes.
18   Q.   Do you think it was in 1996 or 1997 or do
19   you remember?
20   A.   I don't.
21   Q.   Did you keep any notes --
22   A.   No.
23   Q.   -- of that?
24   A.   (Shaking head.)
25   Q.   At the time you started to tell me what he

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

--------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
--------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
--------------------------------------------------x

PAGES 4806 - 5000

Volume 38

Miami, Florida

Tuesday, May 22, 2007

9:45 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 4807

1   APPEARANCES
2
3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4   INTERNATIONAL, LTD., ET AL.:
5
6   SULLIVAN & CROMWELL, LLP
7       1888 Century Park East
8       Los Angeles, California  90067
9       (310) 712-6627
10  BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13  GONZALO R. DORTA, P.A.
14      334 Minorca Avenue
15      Coral Gables, Florida  33134
16      (305) 441-2299
17  BY:  Gonzalo R. Dorta, Esquire
18
19  BERGER SINGERMAN
20      200 South Biscayne Boulevard, Suite 1000
21      Miami, Florida  33131
22      (305) 755-9500
23  BY:  Mitchell W. Berger, Esquire
24      Rene Harrod, Esquire
25

Page 4808

1   On behalf of Defendant BDO Seidman, LLP:
2
3   GREENBERG TRAURIG, LLP
4       MetLife Building
5       200 Park Avenue, 15th Floor
6       New York, New York  10166
7   BY:  Adam D. Cole, Esquire
8       Karen Y. Bitar, Esquire
9       (212) 801-9200
10
11  GREENBERG TRAURIG, LLP
12      1221 Brickell Avenue
13      Miami, Florida  33131
14  BY:  Mark Schnapp, Esquire
15      Nikki Simon, Esquire
16      (305) 579-0500
17
18  ALVAREZ, ARMAS & BORRON
19      901 Ponce de Leon Boulevard, Suite 304
20      Coral Gables, Florida  33134
21      (305) 461-5100
22  BY:  Arturo Alvarez, Esquire
23
24
25

Page 4809

1   On behalf of Third-Party Defendants Victor Balestra,
2   Bernard Mollet, and Joaquim Garnecho
3
4   RICHMAN, GREER, WEIL, BRUMBAUGH,
5   MIRABITO & CHRISTENSEN, P.A.
6       Miami Center, Suite 1000
7       201 S. Biscayne Boulevard
8       Miami, Florida  33131
9       (305) 373-4000
10  BY:  Manuel Garcia Linares, Esquire
11
12  On behalf of Third-Party Defendant Bernard Mollet
13
14  GAMBA & LOMBANA, P.A.
15      2701 Ponce de Leon Boulevard, Mezzanine
16      Coral Gables, Florida  33134
17      (305) 448-4010
18  BY:  Hector J. Lombana, Esquire
19      Geoffrey Marks, Esquire
20
21
22
23
24
25

Page 4810

1               CONTENTS
2
3   EXAMINATION OF VICTOR BALESTRA BY:        PAGE:
4       MR. COLE:  (Direct, cont'd)       4813
5       MR. COLE:  (Voir dire)            4874
6       MR. COLE:  (Direct, cont'd)       4892
7       MR. THOMAS:  (Cross)             4917
8       MR. COLE:  (Redirect)            4969
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4919

1    of Coral Gables and had decided to retire.
2        Q.   So the outgoing member recommended him?
3        A.   Yes.
4        Q.   But over time, Mr. Balestra, is it true that
5    the Espirito Santo family, they got to know the
6    Orlanskys?
7        A.   Sure they got to know the Orlanskys. Yes.
8        Q.   And it's true -- is it true, Mr. Balestra,
9    that over time the Espirito Santo family and the people
10   at the bank, they grew to trust the Orlanskys?
11       A.   Yes, that's a fair statement.
12       Q.   And eventually, Mr. Balestra, Espirito
13   Santo, they went into business with the Orlanskys,
14   right?
15       A.   That's what this was all about, yes.
16       Q.   And they went into business with them and it
17   became BRFFC and that became E.S. Bankest.
18       Did I get that right?
19       MR. COLE: Objection. Mischaracterizes the
20   testimony and leading.
21       THE COURT: Sustained. Ask --
22       MR. THOMAS: I'll do it again.
23   BY MR. THOMAS:
24       Q.   First there was BRFFC; is that right?
25       A.   First there was BRFFC.

Page 4920

1        Q.   And is it your understanding the successor
2    to BRFFC was E.S. Bankest?
3        A.   Yes.
4        Q.   And is it your understanding, sir, that the
5    Orlanskys through Capital owned half of E.S. Bankest and
6    Espirito Santo owned the other half?
7        A.   That is correct.
8        Q.   So is it your understanding, sir, that
9    eventually Espirito Santo went into business with the
10   Orlanskys?
11       A.   Yes.
12       Q.   And at the time Espirito Santo went into
13   business with the Orlanskys, Espirito Santo had known
14   them for 10 years at least?
15       A.   More than that.
16       Q.   A little longer than that?
17       A.   (Nodding.)
18       Q.   And at that time even though Espirito Santo
19   had known them for over 10 years, had been in
20   business -- had business dealings with them, and got to
21   know them through those business dealings personally,
22   did Espirito Santo take an extra step to try to make
23   sure that the business was running properly?
24       MR. COLE: Objection.
25       THE COURT: Overruled.

Page 4921

1        MR. THOMAS: You can answer.
2        THE COURT: Overruled.
3        THE WITNESS: Well, the extra step, yes.
4    The extra step --
5        THE COURT: That wasn't the question. It
6    was a yes or no.
7    BY MR. THOMAS:
8        Q.   Just yes.
9        A.   Yes.
10       Q.   And was the extra step that Espirito Santo
11   took to be sure that the company was audited by
12   supposedly independent, certified public accountants?
13       MR. COLE: (Standing up.)
14       THE COURT: Sustained.
15   BY MR. THOMAS:
16       Q.   What was the extra step?
17       A.   The extra step was to require that the
18   company be externally audited.
19       Q.   And, sir, was that extra step put into the
20   document that formed the company?
21       A.   Yes.
22       Q.   Was that the shareholders agreement?
23       A.   That was the shareholders agreement.
24       Q.   And was there a contractual requirement that
25   E.S. Bankest be audited by certified public accountants

Page 4922

1    every year?
2        A.   Yes. It was included in the document.
3        Q.   Now, Mr. Balestra, the certified public
4    accountants who audited BDO -- who audited E.S. Bankest,
5    that was BDO Seidman, right?
6        A.   Yes.
7        Q.   And we heard a lot of testimony that you
8    were on the board, right? You were one of the four
9    members of E.S. Bankest that was appointed by Espirito
10   Santo, right?
11       A.   I was one of them, yes.
12       Q.   And then there were four that were appointed
13   by the Orlanskys and Parlapiano, the Capital guys?
14       A.   By Bankest Capital.
15       Q.   And of the four that were appointed by
16   Capital, did they run the day-to-day business of the
17   company?
18       A.   Yes. They were the ones running the
19   day-to-day business.
20       Q.   And the four from Espirito Santo, did they
21   run the day-to-day business?
22       A.   No. We did not.
23       Q.   And when you first formed E.S. Bankest, did
24   you know that was going to be part of the deal?
25       A.   Yes.

Page 7292

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


-------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
        Plaintiffs,
     vs.
BDO SEIDMAN, LLP,
        Defendant.
-------------------------------------------------x
BDO SEIDMAN, LLP,
        Third-Party Plaintiff,
     vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
        Third-Party Defendants.
-------------------------------------------------x

PAGES 7292 - 7324

Volume 59


JURY CHARGE AND VERDICT

Miami, Florida

Friday, June 15, 2007

10:25 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 7293

1      A P P E A R A N C E S
2
3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4   INTERNATIONAL, LTD., ET AL.:
5
6   SULLIVAN & CROMWELL, LLP
7       1888 Century Park East
8       Los Angeles, California  90067
9       (310) 712-6627
10  BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13  GONZALO R. DORTA, P.A.
14      334 Minorca Avenue
15      Coral Gables, Florida  33134
16      (305) 441-2299
17  BY:  Gonzalo R. Dorta, Esquire
18
19  BERGER SINGERMAN
20      200 South Biscayne Boulevard, Suite 1000
21      Miami, Florida  33131
22      (305) 755-9500
23  BY:  Mitchell W. Berger, Esquire
24       Rene Harrod, Esquire
25

Page 7294

1   On behalf of Defendant BDO Seidman, LLP:
2
3   GREENBERG TRAURIG, LLP
4       MetLife Building
5       200 Park Avenue, 15th Floor
6       New York, New York  10166
7   BY:  Adam D. Cole, Esquire
8        Karen Y. Bitar, Esquire
9        (212) 801-9200
10
11  GREENBERG TRAURIG, LLP
12      1221 Brickell Avenue
13      Miami, Florida  33131
14  BY:  Mark Schnapp, Esquire
15       Nikki Simon, Esquire
16       (305) 579-0500
17
18  ALVAREZ, ARMAS & BORRON
19      901 Ponce de Leon Boulevard, Suite 304
20      Coral Gables, Florida  33134
21      (305) 461-5100
22  BY:  Arturo Alvarez, Esquire
23
24
25

Page 7295

1   On behalf of Third-Party Defendants Victor Balestra,
2   Bernard Mollet, and Joaquim Garnecho
3
4   RICHMAN, GREER, WEIL, BRUMBAUGH,
5   MIRABITO & CHRISTENSEN, P.A.
6       Miami Center, Suite 1000
7       201 S. Biscayne Boulevard
8       Miami, Florida  33131
9       (305) 373-4000
10  BY:  Manuel Garcia Linares, Esquire
11
12  On behalf of Third-Party Defendant Bernard Mollet
13
14  GAMBA & LOMBANA, P.A.
15      2701 Ponce de Leon Boulevard, Mezzanine
16      Coral Gables, Florida  33134
17      (305) 448-4010
18  BY:  Hector J. Lombana, Esquire
19       Geoffrey Marks, Esquire
20
21
22
23
24
25

Page 7296

1        P R O C E E D I N G S
2        THE COURT:  Good morning.  You let me know
3   when you all are ready.
4        Mr. Cole, how are you?
5        MR. COLE:  Good morning.
6        THE COURT:  Ms. Bitar?
7        MS. BITAR:  Good morning.  I'm fine.
8        MR. THOMAS:  Ms. Alexander will be right
9   back.
10        THE COURT:  I need someone to change
11   something on the jury instructions, and I'll direct you
12   to the last page.  And it should be done in two seconds,
13   Ms. Alexander, I'm sure.  If you did them.
14        MS. ALEXANDER:  I did them.
15        THE COURT:  If you look at the one with the
16   signature on it -- my signature on it, it says you will
17   be given one form of verdict which I shall now read to
18   you, and then it says, if you find for the plaintiffs or
19   you find for the defendants.  I want those two things
20   out of there.  I will read the whole verdict form.  Not
21   one way or the other.  Just the verdict form.  You see?
22        MR. COLE:  So, Judge, you're removing --
23        THE COURT:  If you find for plaintiffs, the
24   verdict will be in the following form, and if you find
25   for defendant, the verdict will be in the following

Page 7297

1  form. I want those two sentences out. I will read all
2  of the jury instruction -- I mean all of the verdict
3  form complete. I'm not going to read it piecemeal.
4       MR. COLE: So there's a period after you.
5  You'll be given --
6       THE COURT: What I will do is when I read,
7  you will given one form of verdict, which I shall now
8  read to you and I will read it.
9       MR. COLE: Okay. We obviously object to the
10  jury instructions, Your Honor.
11       THE COURT: Yeah. You object to that
12  change. I understand that. You object to that change?
13       MR. COLE: I object to the jury instructions
14  as a whole, but I don't object to you making that
15  change.
16       THE COURT: That's what I wanted to know.
17  Mr. Thomas?
18       MR. THOMAS: No.
19       THE COURT: Unless you want to print the
20  whole thing out, you can just print three pages.
21       MS. ALEXANDER: I think it's easier to print
22  the whole thing out.
23       THE COURT: It's up to you.
24       MS. ALEXANDER: Thank you, Your Honor.
25       THE COURT: You can do it now or you can do

Page 7298

1  it later. It's not going to prohibit me from reading
2  the instructions.
3       Okay. Why don't you line them up.
4       THE BAILIFF: (Complies.)
5       THE COURT: All right. Ready? Bring them
6  out.
7       THE BAILIFF: All rise for the jury.
8       (Thereupon, the jury was brought into the
9  courtroom.)
10       THE COURT: Good morning.
11       THE JURY: Good morning.
12       THE COURT: You may be seated. How do you
13  feel, Mr. Cooper?
14       JUROR: I feel good.
15       THE COURT: I like your shirt. It's one of
16  my favorites.
17       JUROR: Thank you.
18       THE COURT: It's true.
19       Mr. Jones, how are you?
20       JUROR: Okay.
21       THE COURT: Ladies? Mr. Velasquez? Good.
22  How is your cold?
23       JUROR: Better.
24       THE COURT: Good.
25       Well, it's my turn now, ladies and

Page 7299

1  gentlemen, and I'm only going to speak to you very
2  briefly compared to what you have heard here for the
3  last two-and-a-half months. So are you ready?
4       THE JURY: Yes.
5       THE COURT: There you go. Good.
6       Excuse my reading because these lights -- my
7  eyesight is not great. I have lenses on, and with these
8  white lights it's sometimes very difficult to read. So
9  I'll give it my best shot.
10       Members of the jury, I shall now instruct
11  you on the law that you must follow in reaching your
12  verdict. It is your duty as jurors to decide the issues
13  and only those issues that I submit for determination by
14  the verdict. In reaching your verdict you should
15  consider and weigh the evidence, decide the disputed
16  issues of fact, and apply the law on which I shall
17  instruct you to facts as you find them from the
18  evidence.
19       The evidence in this case consists of the
20  sworn testimony of the witnesses, all exhibits received
21  in evidence, and any documents of which the Court has
22  taken Judicial Notice.
23       In determining the facts, you may draw
24  reasonable inferences from the evidence. You may make
25  deductions and reach conclusions which reason and common

Page 7300

1  sense lead you to draw from the facts shown by the
2  evidence in this case, but you should not speculate on
3  any matters outside the evidence.
4       In determining the believability of any
5  witness and the weight to be given the testimony of any
6  witness, you may properly consider the demeanor of the
7  witness while testifying, the frankness or lack of
8  frankness of the witness, the intelligence of the
9  witness, any interest the witness may have in the
10  outcome of the case, the means and opportunity the
11  witness had to know the facts about which the witness
12  testified, the ability of the witness to remember the
13  matters about which the witness testified, has the
14  witness been offered any preferred treatment and other
15  benefit in order to get the witness to testify, had any
16  pressure or threat been used against the witness that
17  affected the truth of the witness' testimony, did the
18  witness at some other time make a statement that is
19  inconsistent with the testimony he or she gave in court,
20  was it proved that the witness had been convicted of a
21  crime, and the reasonableness of the testimony of the
22  witness considered in the light of all the evidence in
23  the case and in the light of your own experience and
24  common sense.
25       You have heard opinion testimony on certain

Page 7301

1 technical subjects from persons referred to as expert
2 witnesses.  You may accept such opinion testimony,
3 reject it, or give it the weight you think it deserves
4 considering the knowledge, skill, experience, training,
5 or education of the witness, the reasons given by the
6 witness for the opinion expressed, and all the other
7 evidence in the case.
8        Before you can find for ESB Finance on its
9 claim, you must find the following four elements:
10 First, whether BDO Seidman supplied false information to
11 ESB Finance in the course of BDO Seidman's profession.
12        Second, whether BDO Seidman was negligent in
13 obtaining the false information.
14        Third, whether ESB Finance was the entity
15 for whose benefit and guidance BDO Seidman intended to
16 supply the false information for use in ESB Finance's
17 lending of money to E.S. Bankest, LC, and/or in the
18 exchange of ESB Finance debenture notes for E.S.
19 Bankest, LC, debenture notes.
20        And fourth, whether BDO Seidman intended the
21 false information to influence ESB Finance in this
22 transaction.
23        Negligence in obtaining false information is
24 the failure to use reasonable care.  Reasonable care on
25 the part of an auditor is that degree of care which a

Page 7302

1 reasonably-careful auditor would use under like
2 circumstances.  Negligence may consist either in doing
3 something that a reasonably-careful auditor would not do
4 under like circumstances or in failing to do something
5 that a reasonably-careful auditor would do under like
6 circumstances.
7        To be an entity for whose benefit and
8 guidance BDO Seidman intended to supply the false
9 information, BDO Seidman did not have to know ESB
10 Finance by name.
11        It is sufficient that either at the time BDO
12 Seidman audited E.S. Bankest, LC, or at the time BDO
13 Seidman vouched for its audits of E.S. Bankest, LC, BDO
14 Seidman supplied false information to, intended to
15 supply, and intended the false information to influence
16 a group or class of persons known to BDO Seidman, and
17 that ESB Finance was one of the group or class.
18        It is sufficient that BDO Seidman supply the
19 information to someone for repetition to the group or
20 class of persons known to BDO Seidman that included ESB
21 Finance.
22        If the greater weight of the evidence does
23 not support the claim of ESB Finance, your verdict
24 should be for BDO Seidman.  If the greater weight of the
25 evidence supports the claim of ESB Finance, your verdict

Page 7303

1 should be for ESB Finance and against BDO Seidman.
2        Before you can find for Banco Espirito
3 Santo, S.A., Nassau Branch on its claim, you must find
4 the following four elements:
5        First, whether BDO Seidman supplied false
6 information to Banco Espirito Santo, S.A., Nassau Branch
7 in the course of BDO's Seidman's profession.
8        Second, whether BDO Seidman was negligent in
9 obtaining the false information.
10        Third, whether Banco Espirito Santo, S.A.,
11 Nassau Branch was the entity for whose benefit and
12 guidance BDO Seidman intended to supply the false
13 information for use in Banco Espirito Santo, S.A.,
14 Nassau Branch's line of credit loan to E.S. Bankest, LC.
15        And four, whether BDO Seidman intended the
16 false information to influence Banco Espirito Santo,
17 S.A., Nassau Branch in this transaction.
18        Negligence in obtaining false information is
19 the failure to use reasonable care.  Reasonable care on
20 the part of an auditor is that degree of care which a
21 reasonably-careful auditor would use under like
22 circumstances.
23        Negligence may consist in either doing
24 something that a reasonably-careful auditor would not do
25 under like circumstances or in failing to do something

Page 7304

1 that a reasonably-careful auditor would do under like
2 circumstances.  To be an entity for whose benefit and
3 guidance BDO Seidman intended to supply false
4 information, BDO Seidman did not have to know Banco
5 Espirito Santo, S.A., Nassau Branch by name.
6        It is sufficient that either at the time BDO
7 Seidman audited E.S. Bankest, LC, or at the time BDO
8 Seidman vouched for its audits of E.S. Bankest, LC, BDO
9 Seidman supplied false information to, intended the
10 false information to influence a group or class of
11 persons known to BDO Seidman and Banco Espirito Santo,
12 S.A., Nassau Branch was one of the group of class.
13        It is sufficient that BDO Seidman supplied
14 the information to the group or class of persons known
15 to BDO Seidman that included Banco Espirito Santo, S.A.,
16 Nassau Branch.
17        If the greater weight of the evidence does
18 not support the claim of Banco Espirito Santo, S.A.,
19 Nassau Branch, your verdict should be for BDO Seidman.
20        If the greater weight of the evidence
21 supports the claim of Banco Espirito Santo, S.A., Nassau
22 Branch your verdict should be for Banco Espirito Santo,
23 S.A., Nassau Branch and against BDO Seidman.
24        Greater weight of the evidence means the
25 more persuasive and convincing words to that effect of

Page 7305

1   the entire evidence in the case.
2           An issue for your determination is whether
3   as auditor of E.S. Bankest, LC, BDO Seidman is
4   personally guilty of gross negligence.  Gross negligence
5   means you find by the clear and convincing evidence that
6   the conduct of BDO Seidman was so reckless or want in
7   care that it constituted a conscious disregard or
8   indifference to the rights of persons exposed to its
9   conduct.
10          Clear and convincing evidence differs from
11  the greater weight of the evidence in that it is more
12  compelling and persuasive.  Greater weight of the
13  evidence means the more persuasive and convincing force
14  and effect of the entire evidence in the case.  In
15  contrast, clear and convincing evidence is evidence that
16  is precise, explicit, lacking in confusion, and of such
17  weight that it produces a firm belief or conviction
18  without hesitation about the matter at issue.
19          In your deliberations you are to consider
20  two distinct claims.  The negligence claim of ESB
21  Finance and the negligence claim of Banco Espirito
22  Santo, S.A., Nassau Branch.  Although these claims have
23  been tried together, each is separate from the other and
24  each party is entitled to have you separately consider
25  each claim as it affects that party.  Therefore in your

Page 7306

1   deliberations you should consider the evidence as it
2   relates to each claim separately as you would had each
3   claim been tried before you separately.
4           In reaching your verdict you are not to be
5   swayed from the performance of your duty by prejudice,
6   sympathy, or any other sentiment for or against any
7   party.  Your verdict must be based on the evidence that
8   has been received and the law on which I have instructed
9   you.  Reaching your verdict is exclusively your job.  I
10  cannot participate in that decision in any way.  You
11  should not speculate about how I might evaluate the
12  testimony of any witness or any other evidence in the
13  case.  And you should not think that I prefer one
14  verdict over another.  Therefore in reaching your
15  verdict you should not consider anything I have said or
16  done except for my specific instructions to you.
17          When you retire to the jury room, you should
18  select one of your number to act as a foreperson
19  presiding over your deliberations and sign your verdict.
20  Your verdict must be unanimous; that is, that your
21  verdict must be agreed to by each of you.  You will be
22  given one form of verdict which I shall now read to you.
23          We, the jury, return the following verdict.
24  1) on the claim of ESB Finance do you find that the
25  defendant BDO Seidman, LLP, was negligent when auditing

Page 7307

1   ESB Bankest, LC?  Under that there's a yes and there's a
2   no and there's a blank line after the yes, and there's a
3   blank line after the no.  You're to check one of those
4   two lines.
5           If your answer to Question Number 1 is yes,
6   then go to Question Number 2.  If your answer to
7   Question Number 1 is no, then you go to Question
8   Number 3.
9           Question Number 2.  On the claim of ESB
10  Finance do you find that defendant BDO Seidman, LLP, was
11  grossly negligent when auditing E.S. Bankest, LC, and,
12  again, there's a yes or no and a blank line following
13  those two words, and if you go to Question Number 2,
14  then you should check one of those two lines.
15          Then please answer question number three.
16  On the claim of Banco Espirito Santo, S.A., Nassau
17  Branch, do you find that the defendant BDO Seidman, LLP,
18  was negligent when auditing E.S. Bankest, LC, then after
19  that there's yes and there's a no followed by a blank
20  line.  You have to check one of those two lines.  If
21  your answer to Question Number 3 is yes, then you go to
22  Question Number 4.  If your answer to Question Number 3
23  is no, then you go to the end of the verdict form.
24          Question Number 4.  On the claim of Banco
25  Espirito Santo, S.A., Nassau Branch do you find that the

Page 7308

1   defendant BDO Seidman, LLP, was grossly negligent when
2   auditing E.S. Bankest, LC, if you get to question number
3   four.  Following that question there's a yes and there's
4   a no followed by a blank line, and you have to check one
5   of those two lines.  This is the end of the verdict
6   form.  The foreperson should sign and date the verdict
7   form below.  So say we all this blank day of blank and
8   there's a line for the signature of the foreperson.
9           When you have agreed on your verdict, the
10  foreperson acting for the jury should date and sign the
11  appropriate form of verdict.
12          Ladies and gentlemen, you may retire to
13  consider your verdict.  Hold on, I got more
14  instructions.  If this jury has a question of the Court,
15  you have to put it in writing, and we'll give you a pen
16  and pad for that, and the question must be signed by the
17  foreperson.  Okay?  Now, one, two, three, four, five,
18  six, Mr. Jones, I need you to stand up and take a seat
19  in the back.
20          JUROR:  (Complies.)
21          THE COURT:  You six may now retire to
22  deliberate.
23          Those are your notes.  We will pick up your
24  notes at the end of each day.
25          THE BAILIFF:  All rise.

Page 7309

1        (Thereupon, the jury of six was escorted out
2    of the courtroom to deliberate.)
3        THE COURT:  All right.  You may be seated.
4        Have a seat.  Relax.  Ladies and gentlemen
5    or ladies and gentleman.  Okay?  I am not releasing you.
6    Okay?  So I'm not releasing you at this time.  I'm going
7    to give you some instructions which you are to follow.
8    You're not to discuss this case amongst yourselves, that
9    includes you three or anybody else in the whole wide
10   world, or allow anybody to discuss this case with you.
11       Now, this instruction that I'm going to give
12   you next is more poignant.  You're not to read, listen,
13   or see any accounts of this case in the media, any
14   media.  That includes Internet, whatsoever.  You
15   understand that?
16       Is that a yes, Mr. Jones?
17       JUROR:  Yes.
18       THE COURT:  Okay?  And those are the only
19   two instructions I'm going to give you on that with one
20   option.  You're to ignore the presence of the lawyers
21   outside this courtroom and they are to ignore yours.
22       I'm going to let you go home today because
23   it's Friday.  I want you back here Monday morning at
24   9:30.  And you are to report to the jury pool.
25       The rest of the jury deliberating now is not

Page 7310

1    going to report to the jury pool.  I do not really wish
2    for you to mingle with the jury inside the jury room.
3    Waive to them from afar, good morning, good-bye.
4    Hopefully you will not intersect them in the lobby or
5    anywhere else.  Okay?  But I really don't want you to
6    mingle with them.  You're not to discuss anything with
7    anybody.  And obviously I will give them the same
8    instructions that I've been giving you all along, that's
9    not to discuss the case amongst yourselves or anybody
10   else.  But I do not want you to mingle with the six
11   individuals in the jury room.  All right?  Anything
12   else?
13       You're not to call them on the phone just to
14   say hello.  For you right now they don't exist.
15       You will leave your notes.  We will have
16   those notes and we'll keep them for you.  You're not
17   going to need them now or Monday, but I will have you
18   report every day in the morning to the jury pool.  Most
19   likely you'll be staying here all day long.  You're just
20   not going to be staying with them.  You're going to be a
21   parallel track.  They're going to be in one place, and
22   you're going to be somewhere else just waiting.  And at
23   one point in time you may be able to get together again
24   right there when they're done.  All right?
25       You're not to form a definite or fixed

Page 7311

1    opinion on anything in this case for now.  Okay?  All
2    right.  Have a great weekend.
3        (Thereupon, the alternate jury was escorted
4    out of the courtroom.)
5        MR. COLE:  Judge?
6        THE COURT:  Yes, Mr. Cole.
7        MR. COLE:  Two motions, Your Honor.  First
8    motion is to discharge the alternate jurors.  We believe
9    that the alternate jurors should be discharged now that
10   the jury is deliberating in Phase I and deliberating on
11   any facts in this case.
12       Secondly, Judge, we move for a mistrial on
13   the ground that the jury instruction is highly
14   prejudicial and is incorrect under the law.  We've
15   raised all the issues in the past, and I incorporate
16   them into my argument if that's okay with you, Your
17   Honor.
18       In particular -- Judge, I believe that the
19   instructions as stated, in particular, the 552
20   instruction where it talks about vouching for its
21   audits, that's a fact that had to be determined by the
22   jury, and it's now been directed to the jury by the
23   Court and, therefore, we believe that that's grounds for
24   a mistrial and the jury should be dismissed.
25       Secondly, Your Honor, the verdict form --

Page 7312

1    again, the verdict form is objectionable for all the
2    reasons that we discussed.  We move for a mistrial on
3    that ground.  And, in particular, the term negligent
4    when auditing, obviously the instruction goes beyond
5    auditing.  It goes to all the other elements, and the
6    verdict form does not mention any of the other elements.
7    It allows the jury to reach a conclusion based upon a
8    negligent audit, and that's only one of the elements in
9    the case.  Therefore, BDO respectfully moves for a
10   mistrial and dismiss the jury.
11       THE COURT:  Mr. Thomas?
12       MR. THOMAS:  As to the first motion, which
13   is to discharge the alternates, the Court has acted
14   correctly.  I believe we did this back when, but we
15   actually have some additional case law --
16       THE COURT:  I've done all the research.  I
17   have all the case law I need.  I actually try to foresee
18   these issues.
19       MR. COLE:  I didn't think it was a surprise,
20   Judge.
21       THE COURT:  So as far as that motion is
22   concerned, your request is denied, and I will not
23   discharge the alternate jurors at this time.
24       MR. THOMAS:  As to the motion for mistrial,
25   on the jury instructions and on the verdict form,

Page 7313

1  incorporating all of Espirito Santo's prior arguments on
2  the times which we argued the jury form, in addition I
3  would just add that the jury instructions are consistent
4  with the law of the State of Florida and the verdict
5  form is consistent with the law of the State of Florida,
6  and we ask that motion for mistrial be denied.
7      THE COURT:  At this time after listening to
8  the arguments and -- which I've heard many times
9  before, nothing has changed.  It does not rise to the
10  level of mistrial; therefore, the motion for mistrial
11  will be denied.
12      I suspect you will be presenting another
13  motion for mistrial?
14      MR. COLE:  We're writing it.
15      THE COURT:  You can stay or you can go.  If
16  you're going to leave, just leave us some numbers so we
17  can call you because I'm sure there's going to be some
18  questions.  Right now what we're doing is, the clerks
19  are taking the evidence into the jury room and -- where
20  is my bailiff?
21      THE CLERK:  He went up to get me a dolly.
22      THE COURT:  We'll send back my bailiff with
23  the clerks the copy of the original copy of the jury
24  instructions and the verdict form.
25      So like I said, if you're leaving, just let

Page 7314

1  us know where you're at.
2      MR. COLE:  Judge, I don't want to raise an
3  idea for you, but I was thinking --
4      THE COURT:  Is it a good or bad idea?
5      MS. BITAR:  Bad idea.
6      MR. COLE:  Bad idea.  We were going to go
7  home tonight.  They're not going to deliberate over the
8  weekend, are they?
9      THE COURT:  No.  You can go home.
10      MR. COLE:  Are you going to cut off at 5:00?
11      THE COURT:  I have a feeling they're going
12  to be wanting to cut off before that.  I won't be
13  cutting off like 5:00 unless there's no objection to me
14  cutting off at 4:00.  But certainly by 5:00 o'clock
15  we'll go unless you all want to go home earlier.
16      MR. ALVAREZ:  How available do you want us?
17      THE COURT:  Enough for a question and not
18  have to wait three or four hours.  I mean, not all of
19  you have to be here for a question.  That's up to you.
20  I think you should be no more than an hour away.
21  Yes?
22      MR. THOMAS:  I would just urge 30 minutes
23  for questions.  I mean we're all right here.
24      THE COURT:  We're in Miami.  Traffic is the
25  best in town.  So an hour -- I think an hour is

Page 7315

1  reasonable.
2      MR. COLE:  (Inaud.).
3      THE COURT:  Obviously I don't want you to
4  take a full hour.  I want you to be here as quickly as
5  possible.
6      MR. COLE:  I understand.
7      THE COURT:  That may also apply to me.
8      I just want on the record my clerk wants to
9  make sure -- I don't know how to say it.  My clerk wants
10  to make sure everything is done properly.
11      THE CLERK:  Thank you.
12      THE COURT:  You're welcome.
13      You have looked at all the exhibits that are
14  now going back into evidence.  You've stipulated to
15  some; you've greed to others; you have objected to some
16  which I have ruled on, et cetera.  She wants to make
17  sure -- for the record -- I don't think it needs to be
18  on the record -- but she wants it.  I mean, it's been
19  done for a week so it's on the record off and on
20  forever.  But I want you to look at -- with the
21  exception -- without waiving your objections to the
22  evidence that's going back, do you both agree that
23  that's the evidence that should go back?
24      MR. THOMAS:  On behalf of Espirito Santo,
25  yes, Your Honor.

Page 7316

1      MR. COLE:  On behalf of the defendant BDO
2  Seidman, yes, Your Honor, although I object to the
3  evidence going back.
4      THE COURT:  That's why I said it before you
5  do, as well as the clerk.  The clerk has the keys to the
6  filing cabinets, and she wants to make sure that
7  everybody agrees that nobody has tampered with the
8  evidence.  Nobody, as far as you all know.
9      MR. COLE:  We have no evidence.
10      MR. THOMAS:  Agreed.  Espirito Santo.
11      THE COURT:  Are you happy?
12      THE CLERK:  There's a total of 17 boxes to
13  go back.  17 boxes are going back.
14      THE COURT:  We have to make room for the
15  jury back there.
16      MR. COLE:  May I go?
17      THE COURT:  You may.
18      (Thereupon, there was a brief pause while
19  the jury deliberated.)
20      (Thereupon, the jury reached a verdict at
21  1:53 p.m.)
22      THE COURT:  All right.  As you know, we have
23  a verdict.  Is everybody here that's supposed to be
24  here, that is needed to be here?
25      MR. COLE:  Yes, Your Honor.

## Page 7317

1  THE COURT: Line them up.
2  THE BAILIFF: (Complies.)
3  THE COURT: Bring them in.
4  THE BAILIFF: All rise for the jury.
5  (Thereupon, the jury was brought into the
6  courtroom.)
7  THE COURT: All right. You may be seated.
8  And who is the foreperson? Could you please state your
9  name for the record?
10  JUROR: Nancy Hammiel.
11  THE COURT: Ma'am, has the jury reached a
12  verdict?
13  JUROR: Yes.
14  THE COURT: Would you hand it to my bailiff,
15  please.
16  JUROR: (Complies.)
17  THE COURT: Mr. Clerk, please publish the
18  verdict.
19  THE CLERK: Yes, Judge.
20  In the Circuit Court of the 11th Judicial
21  Circuit in and for Miami-Dade County, Florida. Case
22  04-14009 CA 31. Banco Espirito Santo International,
23  LTD; ESB Finance, LTD; and Banco Espirito Santo, S.A.,
24  plaintiff, versus BDO Seidman, LLP, defendant.
25  We, the jury, return the following verdict:

## Page 7318

1  On the claim of ESB Finance do you find the defendant
2  BDO Seidman, LLP, was negligent when auditing E.S.
3  Bankest, LC?
4  Yes.
5  On the claim of ESB Finance do you find that
6  defendant BDO Seidman, LLP, was grossly negligent when
7  auditing E.S. Bankest, LC?
8  Yes.
9  On the claim of Banco Espirito Santo, S.A.,
10  Nassau Branch, do you find that defendant BDO Seidman,
11  LLP, was negligent when auditing E.S. Bankest, LC?
12  Yes.
13  On the claim of Banco Espirito Santo, S.A.,
14  Nassau Branch, do you find that defendant BDO Seidman,
15  LLP, was grossly negligent when auditing E.S. Bankest?
16  Yes.
17  So say we all this 15th day of June, 2007,
18  signed by the foreperson, Nancy E. Hammiel.
19  THE COURT: Thank you.
20  At this time I find that the verdict form is
21  legally sufficient and there are no other (inaud.).
22  Defense, do you wish the jury polled?
23  MR. COLE: Yes, Your Honor.
24  THE COURT: Mr. Clerk, please poll the jury.
25  THE CLERK: Ladies and gentlemen of the

## Page 7319

1  jury, as your names are called, if the verdict just read
2  is your verdict, please answer that is my verdict.
3  Marino Velasquez.
4  JUROR: Yes, that's my verdict.
5  THE CLERK: Nancy Hammiel.
6  JUROR: Yes, that's my verdict.
7  THE CLERK: Ben James Cooper.
8  JUROR: Yes, that's my verdict.
9  THE CLERK: Olga Lopez.
10  JUROR: Yes, that's my verdict.
11  THE CLERK: Gretel Maria Murado.
12  JUROR: Yes.
13  THE CLERK: Xenia Marcela Robles.
14  JUROR: Yes, that's my verdict.
15  THE COURT: Thank you very much. You can
16  step down and go back to your table.
17  Ladies and gentlemen, at this time I would
18  get up and give you all certificates of service from
19  this Court to you, but I'm not doing that, and the
20  reason is because you're coming back on Monday morning
21  at 9:30 a.m.
22  You're not to discuss the case amongst
23  yourselves from now on. You're not to allow anyone to
24  discuss the case with you. Okay? You're to ignore the
25  lawyers' presence outside this courtroom and they're to

## Page 7320

1  ignore yours.
2  You are not to see -- and I'm making this
3  very poignant -- hear, or read in any way, shape, or
4  form, including the Internet, the stories or releases or
5  any accounts of this case in the media. You understand
6  that? This case is not over.
7  Okay. When I say do not discuss the case
8  amongst yourselves or anyone else or allow anybody to
9  discuss the case with you, I mean everyone, including
10  the press. That means the whole world. Your husbands,
11  your wives, your cats, your dogs, nobody. I can't make
12  that more focused to you. Okay?
13  I want to thank you for this part of your
14  time and service. But there's more to come. You have a
15  great weekend. On Monday morning we will decide when we
16  start again. Okay?
17  Thank you very much. Have a great weekend.
18  See you Monday morning at 9:30.
19  THE BAILIFF: All rise for the jury.
20  THE COURT: One more thing. Come back. One
21  more thing. Sorry. You can stay standing.
22  The other three members of the jury will
23  come back on Monday morning. I want you to report not
24  to the jury room on the second floor. I want you to
25  report to -- the jury pool room. I want you to report

Page 7321

1  directly to this jury room here.
2          You're not to discuss -- and I will give the
3  same instructions to them.  If you see them, if you bump
4  into them in the morning when you come in, you're not to
5  discuss anything that's been discussed inside that jury
6  room with those three members of the jury.  You
7  understand that you're not to discuss anything.  You're
8  not to discuss, not even the verdict itself, until I
9  instruct you all on Monday morning when I bring you all
10  in together.  Okay?
11          Thank you very much.  See you Monday
12  morning, 9:30.
13          (Thereupon, the jury was escorted out of the
14  courtroom.)
15          THE COURT:  All right.  Monday morning,
16  9:30, at that time we will decide when we ramp up for
17  the second phase.  I have pending motions; I haven't
18  forgotten.
19          MR. COLE:  I understand, Judge, but I would
20  like to have a few days so --
21          THE COURT:  We need to come in on Monday.  I
22  don't plan to start this thing on Monday morning.  I
23  think -- I'll certainly take that up with the jury.  But
24  now you know where we're headed.  We'll make whatever
25  arrangements you need to make.  We're not going to take

Page 7322

1  a long time to start it up again, but we'll discuss that
2  on Monday morning.
3          MR. ALVAREZ:  Judge, is it possible to start
4  on Tuesday instead of Monday so that Mr. Cole can --
5          THE COURT:  I'm having the jury -- I already
6  told the other three to come in on Monday morning.
7  (Inaud.) but certainly I need them to come in and
8  instruct them accordingly and tell them where we're
9  headed.
10          MR. COLE:  Just the issue of spending time
11  with family.
12          THE COURT:  I'm sorry, Mr. Cole.
13          MR. COLE:  I understand.
14          THE COURT:  You can safely say, Mr. Cole,
15  that I'm not going to do anything Monday morning other
16  than instruct the jury, so if you need to take an extra
17  day -- I'm not sure -- I'm sure you have capable lawyers
18  here that can handle that --
19          MR. COLE:  I understand that, Judge.
20          THE COURT:  -- so I don't want to keep you
21  away from the family, but I need to address the jury,
22  and that's basically what I'm going to do is address
23  them and figure out when we're starting again.  So if
24  you want to be here for that, fine; if not, I'm sure a
25  bunch of good lawyers here -- they're all good

Page 7323

1  lawyers -- I think they can take that on for you.
2          MR. COLE:  Thank you.
3          THE COURT:  Anything else?
4          MR. THOMAS:  Yes, Your Honor, there are
5  significant family issues on our side and especially for
6  Ms. Alexander who's been all the way across the country
7  from her kids for five months.
8          THE COURT:  I don't plant plan to start
9  anything on Monday.  I don't even plan to start anything
10  on Tuesday.  I think the jury needs a little time, as
11  well.  It's not only the lawyers.
12          MR. THOMAS:  We want to get going for that
13  reason.
14          THE COURT:  We have to stay practical.
15  We've gone this far.  Everybody, including the jury,
16  needs a little breathing room other than the lawyers, as
17  well.  For me, that's why I get paid the big bucks.  It
18  has nothing to do with my life.
19          MR. THOMAS:  Thank you.  We all appreciate
20  it.
21          THE COURT:  Have a good weekend.
22
23          (Thereupon, at approximately 3:00 p.m., the
24  above portion of the trial was concluded.)
25          *        *        *

Page 7324

1          CERTIFICATE OF COURT REPORTER
2
3          I, GIZELLA BAAN, court reporter, before whom
4  the foregoing statement was taken, do hereby certify
5  that the statement made was taken by me stenographically
6  at the time and place mentioned in the caption hereof
7  and thereafter transcribed by me to the best of my
8  ability; that said transcript is a true record of the
9  statement given; that I am neither counsel or, related
10  to, nor employed by any of the parties to the action in
11  which these proceedings were taken; and further, that I
12  am not a relative or employee of any party hereto, nor
13  financially or otherwise interested in the outcome of
14  this action.
15
16
17
18          _____
19                  GIZELLA BAAN
20          Court Reporter and Notary Public
21          in and for the State of Florida
22
23
24
25

Page 245

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


----------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
     Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
     Defendant.
----------------------------------------------x
BDO SEIDMAN, LLP,
     Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
     Third-Party Defendants.
----------------------------------------------x

PAGES 245 - 402

VOLUME 3



AFTERNOON SESSION

Miami, Florida

Tuesday, July 3, 2007

2:00 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 246

1    APPEARANCES
2
3    On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4    INTERNATIONAL, LTD., ET AL.:
5
6    SULLIVAN & CROMWELL, LLP
7        1888 Century Park East
8        Los Angeles, California 90067
9        (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida 33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       200 South Biscayne Boulevard, Suite 1000
21       Miami, Florida 33131
22       (305) 755-9500
23   BY:  Mitchell W. Berger, Esquire
24       Rene Harrod, Esquire
25

Page 247

1    On behalf of Defendant BDO Seidman, LLP:
2
3    GREENBERG TRAURIG, LLP
4        MetLife Building
5        200 Park Avenue, 15th Floor
6        New York, New York  10166
7    BY:  Adam D. Cole, Esquire
8        Karen Y. Bitar, Esquire
9        (212) 801-9200
10
11   GREENBERG TRAURIG, LLP
12       1221 Brickell Avenue
13       Miami, Florida 33131
14   BY:  Mark Schnapp, Esquire
15       Nikki Simon, Esquire
16       (305) 579-0500
17
18   ALVAREZ, ARMAS & BORRON
19       901 Ponce de Leon Boulevard, Suite 304
20       Coral Gables, Florida 33134
21       (305) 461-5100
22   BY:  Arturo Alvarez, Esquire
23
24
25

Page 248

1    On behalf of Third-Party Defendants Victor Balestra,
2    Bernard Mollet, and Joaquim Garnecho
3
4    RICHMAN, GREER, WEIL, BRUMBAUGH,
5    MIRABITO & CHRISTENSEN, P.A.
6        Miami Center, Suite 1000
7        201 S. Biscayne Boulevard
8        Miami, Florida 33131
9        (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12   On behalf of Third-Party Defendant Bernard Mollet
13
14   GAMBA & LOMBANA, P.A.
15       2701 Ponce de Leon Boulevard, Mezzanine
16       Coral Gables, Florida 33134
17       (305) 448-4010
18   BY:  Hector J. Lombana, Esquire
19       Geoffrey Marks, Esquire
20
21
22
23
24
25

Page 249

1    CONTENTS
2
3    EXAMINATION OF VICTOR BALESTRA BY:        PAGE:
4        MR. COLE:  (Cross)            250
5        MR. THOMAS:  (Redirect)       343
6        MR. COLE:  (Re-Cross)         363
7
8    EXAMINATION OF NUNO POPPE BY:             PAGE:
9        MS. ALEXANDER:  (Direct)      373
10       MR. COLE:  (Cross)            379
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 250

```
1          PROCEEDINGS
2     THE WITNESS:  Good afternoon.
3     THE COURT:  Ready, Mr. Cole?
4     MR. COLE:  Yes.
5     THE COURT:  Bring them in.
6     THE BAILIFF:  (Complies.)
7     All rise for the jury.
8     (Thereupon, the jury was brought into the
9  courtroom.)
10     THE COURT:  You may be seated.  Are you all
11  ready?
12     JUROR:  Yes, sir.
13     THE COURT:  Mr. Cole, you may proceed with
14  your cross-examination.
15     MR. COLE:  Thank you.
16     CROSS-EXAMINATION  (continued)
17  BY MR. COLE:
18     Q.  Welcome back.  Welcome back, Mr. Balestra.
19     This morning you testified that when E.S.
20  Bankest was created, one of the requirements that
21  Espirito Santo made was that there would be financial
22  statements, audited financial statements at the end of
23  each year; is that right?
24     A.  Yes, I did.
25     Q.  And what was the reason why you needed
```

Page 251

```
1  financial statements audited at the end of each year?
2     A.  Because as I stated, we were not going to be
3  there on a day-to-day basis.  The other side of Bankest
4  Capital and directors were going to be minding the
5  business.  We were going to be placing the debentures
6  with clients.  And eventually we were going to be
7  lending money to the company.
8     So we wanted -- on a yearly basis we wanted
9  to have the assurance of an externally audited financial
10  statement.
11     Q.  And why couldn't you just rely on one year,
12  the first year's audited financial statements?
13     A.  Because this was going to be an ongoing
14  concern so we wanted them every year.
15     Q.  But my question, sir, why couldn't you just
16  have it audited once and not worry about the next
17  year's?
18     A.  Because it was going to be a moving
19  portfolio of receivables and, therefore, we needed --
20  the business was going to be evolving so we wanted it
21  every year.
22     Q.  I see.  So, is it your testimony, sir, that
23  at the end of 1998 when the first audited financial
24  statement comes out, that was for the year of 1998,
25  correct?
```

Page 252

```
1     A.  That statement was for the -- yes, for the
2  period from its inception of the company in April until
3  December, yes.
4     Q.  And it was your understanding that the
5  accounts receivable on the books and records of the
6  company, the profits, the cash, everything about the
7  company changes over the course of the year and that's
8  the reason why you needed to have a new financial
9  statement audited, right?
10     A.  Yes.
11     Q.  And when you have the new financial
12  statement audited, the old one is stale, right?
13     A.  I don't know if it's stale or not.  It's
14  part of the records of the company.  It's what the
15  auditors audited on that particular day.
16     Q.  You understand what stale means, right?  Do
17  you understand what stale means?
18     A.  Stale means dated.
19     Q.  So, is it your testimony, sir, that in
20  199 -- at the year-end 1999 when BDO came and did its
21  audited financial statement, isn't it a fact that the
22  year-end 1998 audit was dated?
23     A.  Can you rephrase?  I don't understand the
24  question.
25     Q.  I apologize.  It was not a clear question.
```

Page 253

```
1  You'll agree with me, sir, that when year-end 1999 rolls
2  around, December 31st, 1999, rolls around, and BDO comes
3  in and conducts an audit of 1999, that the numbers from
4  year-end 1998 were dated?
5     A.  They were the numbers as of December 30th,
6  1998.  Yes, you cannot change the document.
7     Q.  And they were no longer -- the accounts
8  receivable on the books and records at year-end 1998
9  were not the same as the accounts receivable on the
10  books and records for year-end 1999, correct?
11     A.  They would have been different, yes.
12     Q.  This morning you testified about this
13  concept of turn over and I'd like to get a better
14  understanding of that, okay?
15     On December 31st, is it your understanding
16  that E.S. Bankest had a portfolio of accounts
17  receivable?
18     A.  Yes.
19     MR. COLE:  May I approach, Your Honor?
20     THE COURT:  You may.
21     MR. COLE:  Exhibit 287 in evidence.
22  BY MR. COLE:
23     Q.  You recognize what this document is?
24     A.  This is an invoice.
25     Q.  It's an invoice from a company known as Joy,
```

Page 254

1    right?
2        A.   Joy.
3        Q.   Can we move up on the page a little bit?
4            (Technician complies.)
5            And this is an example of what would be an
6    accounts receivable on the books and records of E.S.
7    Bankest; is that correct?
8        A.   Yes.
9        Q.   Now, the Joy invoice -- you mentioned
10   earlier today that accounts receivable have terms,
11   right?
12       A.   Yes.
13       Q.   And that's reflected in this example as net
14   90. Do you see that?
15       A.   Yes.
16       Q.   What does net 90 mean?
17       A.   That it has to be paid in 90 days.
18       Q.   In 90 days. So if Joy's invoice was on the
19   books and records as of December 31st of the year, when
20   would it have to be paid by?
21       A.   I'm sorry. I got distracted. What?
22       Q.   I'm sorry. I apologize. If Joy's invoice
23   was on the books and records of E.S. Bankest and was
24   issued on December 31st, meaning it was purchased on
25   December 31st --

Page 255

1        A.   Well, I don't know when it was purchased.
2    It was on the books as of December 31st.
3        Q.   If it were purchased on December 31st,
4    okay --
5        A.   Yes.
6        Q.   -- in net 90 when would it have to be paid
7    by?
8        A.   90 days from the date of the invoice.
9        Q.   And let's assume the invoice is dated
10   December 31st.
11       A.   Which is not this case.
12       Q.   I understand that. I'm just using an
13   example. Assume it's dated December 31st of the year.
14   What time the next year, what day on the next year would
15   it have to be paid by?
16       A.   March 31st.
17       Q.   90 days later, right?
18       A.   Right.
19       Q.   And if -- you realize that Joy was one of
20   E.S. Bankest's biggest clients, right?
21       A.   Yes.
22       Q.   And if they bought another one on March 31st
23   at net 90, when would it be due to be paid?
24       A.   And the date of that invoice was March 31st?
25       Q.   March 31st.

Page 256

1        A.   June 30th.
2        Q.   And then if E.S. Bankest bought another
3    invoice on June 30th, when would it be paid?
4        A.   Same terms?
5        Q.   Same terms, 90 days.
6        A.   The following September.
7        Q.   Now, those terms, net 90, were typical terms
8    with E.S. Bankest clients, weren't they?
9        A.   Yes. I'm not sure. There were some that
10   were longer terms.
11       Q.   And there were some that were shorter terms?
12       A.   Some were shorter.
13       Q.   But typically it was net 90?
14       A.   90 to 120, I would say.
15       Q.   Now, in the 90 situation where an invoice is
16   dated December 31st and it's collected on the 31st of
17   March, a new invoice is purchased, collected on June
18   30th, a new invoice is purchased, collected in
19   September, at the end of September, is that what you
20   were referring to as turn over?
21       A.   Yes.
22       Q.   Now, BDO would come in and audit E.S.
23   Bankest in February or thereabouts of the year, correct?
24       A.   Yes.
25       Q.   And BDO would be testing the accounts

Page 257

1    receivable on the books and records as of December 31st
2    of the prior year, correct?
3        A.   Yes.
4        Q.   And BDO wouldn't test March 31st, would it,
5    in its audit?
6        A.   No.
7        Q.   And it wouldn't test June 30th in its audit?
8        A.   Right.
9        Q.   And it wouldn't test September?
10       A.   That's right.
11       Q.   In 2002, when -- in September 2002 and
12   October 2002 when the swap occurred, when you as a
13   director of ESB Finance helped make the decision to
14   purchase or swap its notes for notes outstanding, that
15   was done in October, right, or September/October?
16       A.   Yes, something like that.
17       Q.   And by that time, for the most part, the
18   accounts receivable portfolio turned over three times,
19   right?
20           MR. THOMAS: Objection. Assumes facts not
21   in evidence and is incorrect.
22           THE COURT: Overruled.
23           THE WITNESS: The accounts receivable would
24   have turned, yes.
25   BY MR. COLE:

Page 258

1    Q.  And therefore, the accounts receivable at
2  the time of the decision were different than the time
3  that BDO tested them, right?
4    A.  Yes.
5    Q.  And is it your testimony, sir, that when you
6  made the decision in September or October of 2002 to do
7  the swap transaction, that the most correct information
8  that you had, the most recent information you had was
9  the information provided by Dominick Parlapiano and the
10  Orlanskys?
11    MR. THOMAS:  Objection, Your Honor.
12  Speculation. Assumes facts not in evidence.
13    THE COURT:  Overruled.
14    THE WITNESS:  I have that information and I
15  had five -- four years or five years of audited
16  financials. The clients were the same. The customers
17  were pretty much the same. And for four consecutive
18  years BDO had certified the portfolio of receivables, it
19  was legit and it was there.
20    So it was very reasonable to assume there
21  had been no changes. Any reasonable person would have
22  assumed that.
23    Q.  Well, you will agree that there were changes
24  in the accounts receivable?
25    MR. THOMAS:  Objection. Assumes facts not

Page 259

1  in evidence.
2    THE COURT:  Sustained.
3  BY MR. COLE:
4    Q.  Well, you said nothing would change. You
5  will agree with me that the accounts receivable on the
6  books and records in September were not the same as on
7  the books and records in December?
8    MR. THOMAS:  Objection. Assumes facts not
9  in evidence.
10    THE COURT:  Overruled.
11    THE WITNESS:  There may have been some
12  accounts receivable that had come into play during the
13  course of the year, yes.
14  BY MR. COLE:
15    Q.  And that's because of turn over, right?
16    A.  Yes.
17    Q.  And on this day, in September and October,
18  the most recent information you had was from Parlapiano
19  and Orlansky, correct --
20    A.  Yes.
21    Q.  -- about what the accounts receivable were
22  that were going to be collateral for the swap, right?
23    A.  Yes.
24    Q.  And that was what you were relying on as
25  part of your decision, right?

Page 260

1    A.  I was relying on the fact that -- and I'm
2  going to repeat it for the fifth time -- that for five
3  consecutive years I received certified audits by BDO
4  telling me that the accounts receivable portfolio was
5  genuine, was there, it was the collateral for the
6  receivables, and that gave me and the rest of the
7  directors a great degree of comfort so that we just had
8  no reason to assume that things would have changed.
9    Again, I say it was the same clients and
10  pretty much the same customers.
11    Q.  And the audited financial statements, the
12  most recent audited financial statements did not have
13  the same accounts receivable as in September, correct?
14  You understood that, right?
15    MR. THOMAS:  Objection. Assumes facts not
16  in evidence.
17    THE COURT:  Overruled.
18    THE WITNESS:  I don't know what -- I never
19  saw the -- I never compared the two sets of accounts
20  receivable.
21  BY MR. COLE:
22    Q.  Let me see if I can do this a different way.
23  Sir, in September, did you take a look at the list of
24  accounts receivable on the books and records of E.S.
25  Bankest before you made the decision to do the swap?

Page 261

1    A.  Yes.
2    Q.  Who provided you that list?
3    A.  The managers, the day-to-day managers.
4    Q.  Parlapiano, Orlansky, correct?
5    A.  Yes.
6    Q.  And that was a list that you reviewed before
7  you made your decision, correct?
8    A.  And that list contained by client and then
9  by customer, the aggregate amount, not the individual
10  receivable.
11    Q.  Really?  You're saying that the aging
12  reports you got month to month didn't have the
13  individual receivables?
14    A.  Yeah, they were in there classified by
15  bucket as you said.
16    Q.  Now, but it was listed by customer, correct?
17    A.  Yes. Yes.
18    Q.  So it wasn't just client. It was customer
19  also?
20    A.  Client and customer.
21    Q.  And you had information about the amounts of
22  receivables on the books and records at that time that
23  was provided by Mr. Parlapiano and the Orlanskys,
24  correct?
25    A.  By the managers.

Page 262

1     Q.  Is it your testimony that you did not rely
2  on that?
3     A.  Yes.  That was information that we were
4  getting on a monthly basis and, yes, we relied on that
5  but we also -- to us it was more important to have the
6  assurance that for five years we had an independent
7  certified public accounting firm go there and check for
8  the existence of the receivables and attest that they
9  were there.
10    Q.  Isn't it a fact, sir, that you relied on the
11 listing of accounts receivables that they provided at
12 the time, right?  That's one of the things you relied
13 on?
14    A.  That's one of the things I relied.
15    Q.  And that was the accounts receivable listing
16 that was most current, correct?
17    A.  Yes.
18    Q.  And at the time -- this is September of
19 2002 -- you have already asked PWC to go into E.S.
20 Bankest and do a special procedure, correct?
21    A.  Yes.
22    Q.  And they did that special procedure back in
23 April; is that right?
24    A.  Yeah, I think it was in April.
25    Q.  That was in '02?

Page 263

1     A.  Yes.  In '02.  I'm sorry, yes.
2     Q.  So just a few months before, right?
3     A.  Yes.
4     Q.  And they were allowed to go do that, right?
5     A.  Yes.
6     Q.  PWC went in and actually looked at accounts
7  receivable on the books and records of E.S. Bankest,
8  correct?
9     A.  What they did is they reviewed the overall
10 factoring operations and they reviewed BDO's papers and
11 then they reviewed the circumstances around United
12 Container.  That's what they went to see.
13    Q.  And they also reviewed accounts receivable
14 on the books and records of E.S. Bankest, correct?
15    A.  I don't know that they did that.  I know
16 that they reviewed the BDO work papers.  They did not
17 perform an audit.  They reviewed the BDO work papers.
18    Q.  And we'll get back to that in a moment.  I
19 just want to know if you actually remember them looking
20 at accounts receivable and testing accounts receivable.
21    A.  I don't know.
22    Q.  We'll get back to that.  In any event, in
23 April of 2002 you were able to get PWC to go in and
24 check out the factoring operations, right?
25    A.  Yeah, that was prompted because of the

Page 264

1  United Container bankruptcy.
2     Q.  Now, in September of 2002, your bank is
3  about to go out of pocket 140 million dollars, right?
4     A.  Yes.
5     Q.  They're going to buy notes that were with
6  note holders, correct?
7     A.  Yes.
8     Q.  And is it your testimony, sir, that you
9  didn't ask PWC to even look at the accounts receivable
10 as of that date?  Is that your testimony?
11    A.  In September we didn't ask that.
12    Q.  And you didn't ask anybody to take a look at
13 those accounts receivable, right?
14    A.  No, we relied on the past experience that we
15 had.
16    Q.  Did you ask anybody in the bank to take a
17 look at the listing of accounts receivable that was on
18 the books and records at the time in September of 2002
19 to see if they were real or fake?
20    A.  No.  We couldn't find out if they were real
21 or fake.  That has to be done by the auditors.  And
22 again, the fact that we -- for five years we had
23 received clean and qualified audits gave us a great
24 degree of comfort in that the accounts receivable
25 portfolio was there and we had no reason to suspect that

Page 265

1  they were fake.
2     Q.  Did you make any phone calls leading up to
3  this period of time?  Did you call Joy, the biggest
4  customer of E.S. Bankest, and say, "I'm the vice
5  chairman.  What's your outstanding amount"?
6     A.  No, I did not.
7     Q.  You could do that, right?  As vice chairman
8  you had the ability to do that, right?
9     A.  I didn't do that.
10    Q.  You were about to spend 140 million dollars.
11 You decided not to do any other due diligence, correct?
12    A.  Again, the due diligence was based on the
13 information we were getting and on the fact that in
14 April we had received a clean and qualified opinion from
15 BDO.
16    Q.  So your entire due diligence was information
17 provided by the creditors?
18    A.  Provided by the company, yes.
19    Q.  And information you say was contained in
20 audited financial statements that were turned over three
21 times, right?
22    A.  (Nodding).
23    Q.  And you made a decision to purchase these
24 notes on a collateral base, accounts receivable
25 collateral base, that you did no testing of?

Page 390

1  you repeat the question.
2       MR. COLE: My concern is that I asked two
3  questions, so I don't remember which one. Let me ask it
4  again. If there's an objection, I'll deal with it.
5       THE COURT: It's overruled.
6  BY MR. COLE:
7       Q. Sir --
8       A. Yes.
9       Q. -- in September of 2002 when you made the
10  decision to accept the assignments of E.S. Bankest
11  notes, did you do anything -- any investigation, did you
12  do any analysis at that time as to whether or not those
13  accounts receivable on the books and records of E.S.
14  Bankest were real or fake?
15       A. No. As of September 2002 we had gotten the
16  statements as of the months prior. And we had seen the
17  aging as of the months prior. And we had analyzed that
18  aging. And we were satisfied with the amount
19  outstanding in receivables. We were satisfied with the
20  current amount of receivables and the zero to 30 days
21  past due and the 30 to 60 days past due, and we were
22  satisfied that the trend was a good trend from the
23  beginning of the year.
24       Q. Is it your testimony, sir, that the only
25  analysis you did to determine whether accounts

Page 391

1  receivable were real or fake was to look at the aging?
2       MS. ALEXANDER: Objection, Your Honor.
3       THE COURT: Overruled.
4       THE WITNESS: We never, never, you know,
5  considered that they were fake. We were -- we trusted
6  on that business. We knew the business was a profitable
7  business, sir. We had our clients invested in the
8  debentures of that business. Had we ever known that
9  they were fake receivables, we would not have sold one
10  single debenture to our clients. We would not have
11  invested $140 million in the debentures of E.S. Bankest.
12  We always believed, always believed, in the quality of
13  those receivables. We had no reason to believe
14  otherwise.
15  BY MR. COLE:
16       Q. My question, sir, was, in determining in
17  September 2002 whether accounts receivable on the books
18  and records of E.S. Bankest existed, was the only thing
19  you did was look at the aging of accounts receivable?
20       A. Yes.
21       MS. ALEXANDER: Objection, Your Honor.
22  Asked and answered.
23       THE COURT: He answered it.
24  BY MR. COLE:
25       Q. You believe that in determining whether or

Page 392

1  not accounts receivable existed on the books and records
2  of E.S. Bankest, a proper way or a good way of looking
3  at that is to look at aging, correct?
4       A. Yes.
5       Q. Now, during 2000 -- let me ask you something
6  about ESB Finance.
7       ESB Finance had no business; is that right?
8       A. Yes.
9       Q. It was just a shell company; is that right?
10       A. Uh-huh. (Nodding.)
11       THE COURT: Yes?
12       THE WITNESS: Yes.
13  BY MR. COLE:
14       Q. And at the time E.S. Bankest was created, I
15  believe you testified that it was created to try to gain
16  leverage against the Orlanskys.
17       Am I stating that properly?
18       A. Well, when in September 2002 E.S. Bankest
19  defaulted in its notes and Espirito Santo Bank was a
20  partner in the business and there was a breakout and we
21  left the business in September 18 of 2002, September 19,
22  2002, E.S. Bankest defaulted on notes, and then
23  subsequently they defaulted in all the notes that came
24  due. So we were, of course, concerned because we were
25  no longer part of the business, but our clients had the

Page 393

1  debentures in their hands. So we knew that E.S. Bankest
2  management was playing hardball at that time because
3  they had the assets to turn into cash and to pay off
4  those loans.
5       So we believed that by stepping into our
6  clients' shoes that we will become a very large creditor
7  and that we will be able to bring E.S. Bankest
8  management to the table and to pay off those loans.
9       What we wanted was for them to shrink the
10  business, to collect all those receivables because they
11  were growing at a very fast rate, but they were not
12  getting the funding that they were used to because we
13  were no longer selling those debentures, and that's a
14  very important element.
15       So they were not getting the funding that
16  they needed, but they had good receivables and so we
17  believed.
18       Q. So if I understand your testimony, in
19  September of 2002 E.S. Bankest defaulted on payments to
20  noteholders in South America. Correct?
21       A. Yes.
22       Q. And secondly, at the time, E.S. Bankest had
23  a problem, because it wasn't getting any further loans
24  from anybody, correct?
25       A. They were not selling --

Page 648

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


----------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
          Plaintiffs,
      vs.
BDO SEIDMAN, LLP,
          Defendant.
----------------------------------------------------x
BDO SEIDMAN, LLP,
          Third-Party Plaintiff,
      vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
          Third-Party Defendants.
----------------------------------------------------x

PAGES 648 - 756

VOLUME 7




MORNING SESSION

Miami, Florida

Monday, July 16, 2007

9:50 a.m.

Before the Honorable Jose M. Rodriguez


EXHIBIT
60

Reported by:  Gizella "Gigi" Baan

Page 649

```
 1           A P P E A R A N C E S
 2
 3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
 4   INTERNATIONAL, LTD., ET AL.:
 5
 6   SULLIVAN & CROMWELL, LLP
 7       1888 Century Park East
 8       Los Angeles, California  90067
 9       (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida 33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       200 South Biscayne Boulevard, Suite 1000
21       Miami, Florida 33131
22       (305) 755-9500
23   BY:  Mitchell W. Berger, Esquire
24       Rene Harrod, Esquire
25
```

Page 650

```
 1   On behalf of Defendant BDO Seidman, LLP:
 2
 3   GREENBERG TRAURIG, LLP
 4       MetLife Building
 5       200 Park Avenue, 15th Floor
 6       New York, New York  10166
 7   BY:  Adam D. Cole, Esquire
 8       Karen Y. Bitar, Esquire
 9       (212) 801-9200
10
11   GREENBERG TRAURIG, LLP
12       1221 Brickell Avenue
13       Miami, Florida 33131
14   BY:  Mark Schnapp, Esquire
15       Nikki Simon, Esquire
16       (305) 579-0500
17
18   ALVAREZ, ARMAS & BORRON
19       901 Ponce de Leon Boulevard, Suite 304
20       Coral Gables, Florida 33134
21       (305) 461-5100
22   BY:  Arturo Alvarez, Esquire
23
24
25
```

Page 651

```
 1   On behalf of Third-Party Defendants Victor Balestra,
 2   Bernard Mollet, and Joaquim Garnecho
 3
 4   RICHMAN, GREER, WEIL, BRUMBAUGH,
 5   MIRABITO & CHRISTENSEN, P.A.
 6       Miami Center, Suite 1000
 7       201 S. Biscayne Boulevard
 8       Miami, Florida 33131
 9       (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12   On behalf of Third-Party Defendant Bernard Mollet
13
14   GAMBA & LOMBANA, P.A.
15       2701 Ponce de Leon Boulevard, Mezzanine
16       Coral Gables, Florida 33134
17       (305) 448-4010
18   BY:  Hector J. Lombana, Esquire
19       Geoffrey Marks, Esquire
20
21
22
23
24
25
```

Page 652

```
 1                C O N T E N T S
 2
 3   EXAMINATION OF VICTOR BALESTRA BY:           PAGE:
 4       MR. COLE:  (Direct)              655
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 733

1 E.S. Bankest, right?
2    A.   The E.S. Bankest meetings were at the
3 offices of E.S. Bankest.
4    Q.   The bank accounts for Espirito Santo -- E.S.
5 Bankest, Bankest Capital, and BRFFC were at E.S.
6 Bankest.  Let me say it over again.
7       The bank accounts of E.S. Bankest, Bankest
8 Capital, and BRFFC were at Espirito Santo, correct?
9    A.   Yes.
10    Q.   And they were at that branch in Miami; is
11 that right?
12    A.   Yes.
13    Q.   So when somebody from Bankest wanted to
14 deposit a check into E.S. Bankest's bank account, they'd
15 just go downstairs and deposit the check; is that right?
16    A.   Yes.
17    Q.   And if they wanted to wire money, they could
18 just call downstairs and wire money, is that right,
19 submit a request?
20    A.   I don't know if they could call.  They had
21 to submit a written request.
22    Q.   But either way they just had to go
23 downstairs; is that right?
24    A.   They had to go to the bank, yes.
25    Q.   And if there were any questions that a

Page 734

1 banker had with respect to what E.S. Bankest was doing,
2 they could just go upstairs and ask, correct?
3    A.   If there were any questions, questions would
4 be asked either at the bank or upstairs at the company.
5    Q.   And you from time to time would do is that,
6 as well.  If you had a question, you would just go
7 upstairs and ask; is that right?
8    A.   When I had questions to ask, I would request
9 a meeting with the Orlanskys.
10    Q.   Well, like, for example, when the FDIC came
11 in and said that there were no credit files, you went
12 upstairs to demand to see the credit files; is that
13 right?
14    A.   Yes.
15    Q.   And you just walked right up and demanded,
16 correct?
17    A.   No, I didn't just walk up and demanded it.
18 I said we need to see the credit files, and they
19 produced them for us.
20    Q.   If there was anything that you needed
21 about -- to find out about E.S. Bankest, you could just
22 go right upstairs, fair?
23    A.   If I needed something, I would ask the
24 questions, yes.  Always did.
25    Q.   And the bank also monitoring the Bankest

Page 735

1 accounts could do the same thing, correct?
2    A.   I don't know how the officer would look at
3 the activity, but he certainly would contact the client.
4    Q.   The bank officer that was monitoring E.S.
5 Bankest and Bankest Receivables and Bankest Capital
6 accounts was Claudette (ph.) Randall; is that right?
7    A.   At some point it was.
8    Q.   And she was the branch manager or is the
9 branch manager still; is that right?
10    A.   Yes, she was but she's no longer.  She
11 retired.
12    Q.   Now, the joint venture of E.S. Bankest
13 and -- the joint venture of E.S. Bankest you saw started
14 sometime in April of 1998; is that right?
15    A.   The C corporation that was formed started in
16 April of '98.
17    Q.   Now, you said that you reviewed BDO's
18 audited financial statements of BRFFC; is that right?
19    A.   We had reviewed the '95, '96, prior to
20 that -- to entertaining the whole issue of forming a new
21 company.
22    Q.   Now, 1995 was for year-end 1995, correct?
23    A.   Yes.
24    Q.   And 1996 was for year-end 1996, right?
25    A.   Yes.

Page 736

1    Q.   And there was no audit for 1997, correct?
2    A.   There was no audit for 1997.  The premise
3 was the clients -- the clients that E.S. Bankest was
4 going to be doing business with were the same.  Many of
5 the end customers would be -- some of those would be the
6 same.  But it's true there was no audit for 1997.
7    Q.   So there was no audit in 1997 for you to
8 review before you entered into the joint venture in
9 1998, right?
10    A.   That's what I just said.  There was no audit
11 in 1997.
12    Q.   Now, given the fact that a year, more than a
13 year had passed since the prior year-end audit before
14 you entered into E.S. Bankest, what other information
15 did you look at to determine what was on the books and
16 records of Bankest receivables?
17    A.   We looked at the -- whatever information the
18 company might have given us at the time, but the most
19 important thing is that we now know that the fraud went
20 back to 1995.
21       So if back at the end of '96 BDO had told us
22 the accounts were fraudulent, we would have never
23 entered into the company at the end of 1998.
24 Unfortunately it didn't happen that way.
25    Q.   My question is very simple.  I know what you

Page 1218

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


-------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
        Plaintiffs,
     vs.
BDO SEIDMAN, LLP,
        Defendant.
-------------------------------------------------x
BDO SEIDMAN, LLP,
        Third-Party Plaintiff,
     vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
        Third-Party Defendants.
-------------------------------------------------x

PAGES 1218 - 1314

VOLUME 12


MORNING SESSION

Miami, Florida

Friday, July 20, 2007

9:50 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 1219

1          A P P E A R A N C E S
2
3  On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4  INTERNATIONAL, LTD., ET AL.:
5
6  SULLIVAN & CROMWELL, LLP
7       1888 Century Park East
8       Los Angeles, California  90067
9       (310) 712-6627
10  BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13  GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida  33134
16       (305) 441-2299
17  BY:  Gonzalo R. Dorta, Esquire
18
19  BERGER SINGERMAN
20       200 South Biscayne Boulevard, Suite 1000
21       Miami, Florida  33131
22       (305) 755-9500
23  BY:  Mitchell W. Berger, Esquire
24       Rene Harrod, Esquire
25

Page 1221

1  On behalf of Third-Party Defendants Victor Balestra,
2  Bernard Mollet, and Joaquim Garnecho
3
4  RICHMAN, GREER, WEIL, BRUMBAUGH,
5  MIRABITO & CHRISTENSEN, P.A.
6       Miami Center, Suite 1000
7       201 S. Biscayne Boulevard
8       Miami, Florida  33131
9       (305) 373-4000
10  BY:  Manuel Garcia Linares, Esquire
11
12  On behalf of Third-Party Defendant Bernard Mollet
13
14  GAMBA & LOMBANA, P.A.
15       2701 Ponce de Leon Boulevard, Mezzanine
16       Coral Gables, Florida  33134
17       (305) 448-4010
18  BY:  Hector J. Lombana, Esquire
19       Geoffrey Marks, Esquire
20
21
22
23
24
25

Page 1220

1  On behalf of Defendant BDO Seidman, LLP:
2
3  GREENBERG TRAURIG, LLP
4       MetLife Building
5       200 Park Avenue, 15th Floor
6       New York, New York  10166
7  BY:  Adam D. Cole, Esquire
8       Karen Y. Bitar, Esquire
9       (212) 801-9200
10
11  GREENBERG TRAURIG, LLP
12       1221 Brickell Avenue
13       Miami, Florida  33131
14  BY:  Mark Schnapp, Esquire
15       Nikki Simon, Esquire
16       (305) 579-0500
17
18  ALVAREZ, ARMAS & BORRON
19       901 Ponce de Leon Boulevard, Suite 304
20       Coral Gables, Florida  33134
21       (305) 461-5100
22  BY:  Arturo Alvarez, Esquire
23
24
25

Page 1222

1          C O N T E N T S
2
3  EXAMINATION OF VICTOR BALESTRA BY:        PAGE:
4       MR. COLE:  (Direct, cont'd)          1237
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1295

1    THE COURT: Read the question back so --
2    (Thereupon, the court reporter read back the
3  requested portion.)
4    THE WITNESS: The answer is no, I did not.
5  That's what I rely on the external auditors to do, to
6  give the comfort of the books and records were correct.
7  I couldn't do that. As director, I (inaud.).
8  BY MR. COLE:
9    Q.  Now, as a director or vice chairman of E.S.
10  Bankest, the company was in the same building, correct?
11    A.  Yes.
12    Q.  And at any time did you go and check to see
13  whether or not fake documents were being created?
14    THE COURT: Sustained.
15  BY MR. COLE:
16    Q.  Well, sir, were you aware that fake
17  documents were being created at E.S. Bankest?
18    MR. THOMAS: Objection, Your Honor.
19    THE COURT: Overruled.
20    THE WITNESS: No, I was not.
21  BY MR. COLE:
22    Q.  Did you know that there were fake
23  transactions flowing through your bank during the time
24  E.S. Bankest was existing?
25    MR. THOMAS: Objection, Your Honor.

Page 1296

1    THE COURT: Overruled.
2    THE WITNESS: Of course I had no knowledge
3  that there were fake transactions, but they were not
4  being run through the bank. They were being run through
5  E.S. Bankest. I had no knowledge, of course.
6  BY MR. COLE:
7    Q.  You had no knowledge of fake transactions or
8  fictitious transactions flowing through the bank
9  accounts that were at Espirito Santo Bank, right?
10    MR. THOMAS: Objection, Your Honor.
11    THE COURT: Sustained.
12  BY MR. COLE:
13    Q.  Now, in this report from PWC, you were
14  talking about the procedures relating to United
15  Container. And you understood that from this page that
16  PWC reviewed information from the lawyers, right?
17    A.  My understanding is that PWC reviewed
18  information provided by the managers of the company. I
19  see a reference here to Carlos Mendez. And yeah, I
20  think it's stated earlier here that they did talk to the
21  lawyers.
22    Q.  Now, one of the lawyers that provided
23  information to PWC was Gunster Yoakley, correct?
24    A.  I believe there were two lawyers involved.
25  One being Gunster and one being Tallet (ph.) and other

Page 1297

1  lawyers.
2    Q.  And you understood, sir, that Gunster
3  Yoakley was the law firm that introduced United
4  Container to E.S. Bankest, right?
5    A.  I came to learn that later on.
6    Q.  Now, turn to page 13.
7    A.  Page 13?
8    Q.  Page 13.
9    MR. COLE: At the bottom there where it says
10  summary.
11    (Technician complies.)
12  BY MR. COLE:
13    Q.  And it says, "Miller confirmed that United
14  Containers was most likely a significant fraud." You
15  see that?
16    A.  Right.
17    Q.  So by April of 2002 you were at least aware
18  that a significant of fraud was likely to be occurring
19  at United Container, correct?
20    A.  That's what this lawyer was saying.
21    Q.  And that was one of the things that PWC
22  identified, right?
23    A.  I don't know if they identified. They
24  referred to the conversation they had with the lawyers.
25    Q.  And the conversation with the lawyer was

Page 1298

1  reported back to you as part of this report, right?
2    A.  Sure.
3    Q.  Now, if you turn to the next page, it talks
4  about the nature of the fraud. And there's this long
5  narrative about the nature of the fraud relating to
6  United Container. Do you remember that?
7    A.  Yes.
8    Q.  And one of the items was wrongdoing relating
9  to insiders of the company, right?
10    A.  It says that -- those words are here, yes.
11    Q.  And the insiders to the company were the
12  people who you understood were dealing with Hector and
13  Eduardo Orlansky, Dominick Parlapiano; isn't that right?
14    MR. THOMAS: Objection.
15    THE COURT: What's your objection?
16    MR. THOMAS: Confusion of issues,
17  misleading.
18    THE COURT: If you understand the question,
19  it's overruled.
20    Or you can rephrase it, Mr. Cole.
21    THE WITNESS: Rephrase your question.
22  BY MR. COLE:
23    Q.  Sir, you understood as vice chairman of E.S.
24  Bankest that the people who were working with the
25  insiders at United Container were people like Dominick

Page 1315

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
      Defendant.
------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
------------------------------------------------x

PAGES 1315 - 1486

VOLUME 13




AFTERNOON SESSION

Miami, Florida

Friday, July 20, 2007

2:00 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 1316

A P P E A R A N C E S

1

2

3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4   INTERNATIONAL, LTD., ET AL.:
5
6   SULLIVAN & CROMWELL, LLP
7       1888 Century Park East
8       Los Angeles, California  90067
9       (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida  33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       200 South Biscayne Boulevard, Suite 1000
21       Miami, Florida  33131
22       (305) 755-9500
23   BY:  Mitchell W. Berger, Esquire
24       Rene Harrod, Esquire
25

Page 1317

1   On behalf of Defendant BDO Seidman, LLP:
2
3   GREENBERG TRAURIG, LLP
4       MetLife Building
5       200 Park Avenue, 15th Floor
6       New York, New York  10166
7   BY:  Adam D. Cole, Esquire
8       Karen Y. Bitar, Esquire
9       (212) 801-9200
10
11   GREENBERG TRAURIG, LLP
12       1221 Brickell Avenue
13       Miami, Florida  33131
14   BY:  Mark Schnapp, Esquire
15       Nikki Simon, Esquire
16       (305) 579-0500
17
18   ALVAREZ, ARMAS & BORRON
19       901 Ponce de Leon Boulevard, Suite 304
20       Coral Gables, Florida  33134
21       (305) 461-5100
22   BY:  Arturo Alvarez, Esquire
23
24
25

Page 1318

1   On behalf of Third-Party Defendants Victor Balestra,
2   Bernard Mollet, and Joaquim Garnecho
3
4   RICHMAN, GREER, WEIL, BRUMBAUGH,
5   MIRABITO & CHRISTENSEN, P.A.
6       Miami Center, Suite 1000
7       201 S. Biscayne Boulevard
8       Miami, Florida  33131
9       (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12   On behalf of Third-Party Defendant Bernard Mollet
13
14   GAMBA & LOMBANA, P.A.
15       2701 Ponce de Leon Boulevard, Mezzanine
16       Coral Gables, Florida  33134
17       (305) 448-4010
18   BY:  Hector J. Lombana, Esquire
19       Geoffrey Marks, Esquire
20
21
22
23
24
25

Page 1319

CONTENTS

1

2

3   EXAMINATION OF VICTOR BALESTRA BY:          PAGE:
4       MR. COLE:  (Direct, cont'd)        1320
5       MR. THOMAS:  (Direct)              1405
6       MR. COLE:  (Redirect)              1441
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1400

1      THE WITNESS: Was it asked and answered?
2      THE COURT: No, it was not. Overruled.
3      THE WITNESS: Read me the question again.
4      (Thereupon, the court reporter read back the
5  requested portion.)
6      THE WITNESS: I don't remember. That
7  pertained to the bank, not to E.S. Bankest.
8  BY MR. COLE:
9      Q. And you understood, sir, that the
10  private-placement memorandum omitted some very important
11  information, correct?
12      MR. THOMAS: Objection, Your Honor.
13      THE COURT: Sustained.
14  BY MR. COLE:
15      Q. You understood, sir, that the
16  private-placement memorandum during this time period
17  omitted information that should have been in that
18  private-placement memorandum, correct?
19      MR. THOMAS: Objection, Your Honor.
20      THE COURT: Sustained.
21  BY MR. COLE:
22      Q. Well, sir, weren't you concerned about the
23  fact that the private-placement memoranda as they
24  existed in 2001, 2002, without any of this information
25  placed in them, were a violation of federal securities

Page 1401

1  laws and that's the reason why you bought back the
2  notes?
3      MR. THOMAS: Objection, Your Honor.
4      THE COURT: Sustained.
5  BY MR. COLE:
6      Q. You were trying to resolve a problem that
7  the bank made of its own, right, in placing these notes?
8      MR. THOMAS: Objection, Your Honor.
9      THE COURT: Sustained.
10  BY MR. COLE:
11      Q. Sir, when you decided to create ESB Finance,
12  you understood about the FDIC, United Container, the
13  deterioration of accounts receivable, and all the things
14  we've been discussing including the activity in those
15  accounts, right?
16      You understood all of that, right?
17      A. Yes.
18      Q. And isn't it a fact, sir, that the reason
19  why you decided and you recommended that those notes be
20  purchased back was that the bank was afraid to be sued?
21      MR. THOMAS: Objection, Your Honor.
22      THE COURT: Overruled.
23      THE WITNESS: No. The answer is no. The
24  reason why we decided to buy the debentures was because
25  we believed that the debentures were collectible

Page 1402

1  because -- with the accounts receivable. We knew that
2  the company was going to have to its debt restructured.
3  And it was much simpler to deal with one creditor, one
4  creditor versus -- not 200 plus. Those were the
5  reasons.
6      And we firmly believed that those
7  receivables were collectible because we firmly believed
8  that the collateral was there. Now we know that the
9  collateral wasn't there. The collateral was fake. And
10  that's what BDO certified.
11  BY MR. COLE:
12      Q. And you were relying on nine month old
13  financial statements at the time, right?
14      MR. THOMAS: Objection, Your Honor.
15      THE COURT: Sustained.
16  BY MR. COLE:
17      Q. Now -- and you understood, sir, that as of
18  September of 2002, the Orlanskys were threatening the
19  bank with a lawsuit and exposing things that the
20  bank did to the noteholders, right?
21      MR. THOMAS: Objection, Your Honor.
22      THE COURT: Sustained.
23      MR. THOMAS: Instruction, Your Honor.
24      THE COURT: There's no answer to the
25  question. What lawyers say, ladies and gentlemen, is

Page 1403

1  not evidence.
2      MR. COLE: May I approach, Your Honor?
3      THE COURT: You may.
4      MR. COLE: Exhibit 1425 in evidence.
5      (Complies.)
6  BY MR. COLE:
7      Q. On the second page of this document, it's a
8  letter from E.S. Bankest to Ricardo Salgado and Jose
9  Manual Espirito Santo.
10      Do you see that?
11      A. Yes.
12      Q. And you understood, sir, that at the time
13  that the bank decided to repurchase notes, the Orlanskys
14  were telling the bank this will hurt the bank and the
15  rest of the group as much more -- as much more than us
16  because it will also mean that this will have to involve
17  debenture holders. All of the debentures were sold to
18  your customers. They did not know what happened to them
19  and to us as a result of what the bank did here in
20  Miami.
21      You understood, sir, that the Orlanskys were
22  threatening to expose to your debenture holders what the
23  bank did here in Miami and that's the reason you
24  purchased back the notes?
25      MR. THOMAS: Objection, Your Honor.

Page 1758

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


---------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
     Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
     Defendant.
---------------------------------------------------x
BDO SEIDMAN, LLP,
     Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
     Third-Party Defendants.
---------------------------------------------------x

PAGES 1758 - 1853

VOLUME 16



MORNING SESSION

Miami, Florida

Tuesday, July 24, 2007

10:00 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 1759

APPEARANCES

1
2
3  On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4  INTERNATIONAL, LTD., ET AL.:
5
6  SULLIVAN & CROMWELL, LLP
7      1888 Century Park East
8      Los Angeles, California  90067
9      (310) 712-6627
10  BY:  Steven W. Thomas, Esquire
11      Emily S. Alexander, Esquire
12
13  GONZALO R. DORTA, P.A.
14      334 Minorca Avenue
15      Coral Gables, Florida 33134
16      (305) 441-2299
17  BY:  Gonzalo R. Dorta, Esquire
18
19  BERGER SINGERMAN
20      200 South Biscayne Boulevard, Suite 1000
21      Miami, Florida  33131
22      (305) 755-9500
23  BY:  Mitchell W. Berger, Esquire
24      Rene Harrod, Esquire
25

Page 1761

1  On behalf of Third-Party Defendants Victor Balestra,
2  Bernard Mollet, and Joaquim Garnecho
3
4  RICHMAN, GREER, WEIL, BRUMBAUGH,
5  MIRABITO & CHRISTENSEN, P.A.
6      Miami Center, Suite 1000
7      201 S. Biscayne Boulevard
8      Miami, Florida 33131
9      (305) 373-4000
10  BY:  Manuel Garcia Linares, Esquire
11
12  On behalf of Third-Party Defendant Bernard Mollet
13
14  GAMBA & LOMBANA, P.A.
15      2701 Ponce de Leon Boulevard, Mezzanine
16      Coral Gables, Florida  33134
17      (305) 448-4010
18  BY:  Hector J. Lombana, Esquire
19      Geoffrey Marks, Esquire
20
21
22
23
24
25

Page 1760

1  On behalf of Defendant BDO Seidman, LLP:
2
3  GREENBERG TRAURIG, LLP
4      MetLife Building
5      200 Park Avenue, 15th Floor
6      New York, New York  10166
7  BY:  Adam D. Cole, Esquire
8      Karen Y. Bitar, Esquire
9      (212) 801-9200
10
11  GREENBERG TRAURIG, LLP
12      1221 Brickell Avenue
13      Miami, Florida  33131
14  BY:  Mark Schnapp, Esquire
15      Nikki Simon, Esquire
16      (305) 579-0500
17
18  ALVAREZ, ARMAS & BORRON
19      901 Ponce de Leon Boulevard, Suite 304
20      Coral Gables, Florida  33134
21      (305) 461-5100
22  BY:  Arturo Alvarez, Esquire
23
24
25

Page 1762

CONTENTS

1
2
3  EXAMINATION OF MARK NORTH BY:                    PAGE:
4      MR. ALVAREZ:  (Voir dire)          1764
5      MR. THOMAS:  (Voir dire)           1802
6      MR. ALVAREZ:  (Voir dire)          1804
7      MR. THOMAS:  (Voir dire)           1809
8      MR. ALVAREZ:  (Voir dire)          1811
9
10  EXAMINATION OF BERNARD MOLLET BY:              PAGE:
11      MR. COLE:  (Direct, cont'd)        1825
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1831

1  United Container problem, you understood as vice
2  president of E.S. Bankest that the accounts receivable
3  on the books and records of E.S. Bankest were starting
4  to become more and more aged; isn't that right?
5      A.  Yes. What I don't understand is I said the
6  aging, for me there is no aging of fake receivable. It
7  doesn't exist in the aging of a fake receivable.
8      Q.  When you looked at the aging and you saw
9  aging getting worse and worse, you understood at that
10  time that a fake receivable that's reflected on the
11  aging report may not get paid, right?
12      A.  Yes. But I understand also that fake
13  receivables cannot be repaid.
14      Q.  That's right.
15      A.  Aging or not aging.
16      Q.  Now, when you saw the accounts receivable on
17  the aging reports being provided to you, by management,
18  aging in a greater and greater, did you raise any
19  question as to the reasons --
20      A.  We always called at the board meeting about
21  our concern about aging. We were asking about aging.
22  We never received a good answer. We received answers
23  but they were not a good answer.
24      Q.  And not receiving a good answer, the
25  accounts receivable that you looked at or you understood

Page 1832

1  on that aging report could have been fake, right?
2      A.  Yes.
3          MR. THOMAS:  Objection.
4          THE COURT:  Overruled.
5          You can explain, if you wish.
6          THE WITNESS:  But at the time we didn't know
7  they were fake. If BDO would have told us at any time,
8  in the previous time, that they were fake receivables we
9  would never have sold any notes to the customer.
10  BY MR. COLE:
11      Q.  Now, BDO finished its audit in about
12  February of 2002; isn't that right?
13      A.  Yes.
14      Q.  And after February of 2002, you noticed this
15  aging, isn't that right, on the aging reports?
16      A.  I'm sorry, it's a question?
17      Q.  Yes. I'll rephrase it. Apologize. It was
18  unclear.
19          After BDO's audit was issued in February of
20  2002, it was at that point in time where you, as vice
21  president of E.S. Bankest, noticed that aging was
22  becoming worse and worse; isn't that right?
23      A.  As I said, we were always concerned about
24  the aging and asking questions about the aging.
25      Q.  And it became worse and worse even after

Page 1833

1  BDO's audit opinion, right, in 2002?
2      A.  I mean, yes, but BDO in its last report
3  never mentioned that there was a concern about the
4  aging. They were reasonable set up, but there was no
5  special concern about the aging.
6      Q.  And, sir, there was no special concern of
7  the aging as of February 2002 when BDO issued its audit
8  opinion.
9          Is that what you're saying?
10      A.  Yes.
11      Q.  And it was after that audit opinion when
12  these aging became worse and worse and you became
13  concerned with it, right?
14      A.  Yes, we became concerned, but I don't see
15  the difference because they were still fake receivables.
16  They were -- before or after the final audit, they were
17  still fake receivables.
18          MR. COLE:  I understand.
19          Your Honor, may I approach?
20          THE COURT:  You may.
21          MR. COLE:  With exhibit 3476 in evidence.
22          (Complies.)
23  BY MR. COLE:
24      Q.  Now, sir, you recognize this document; isn't
25  that right?

Page 1834

1      A.  Yes.
2      Q.  This is a -- one of the examples of an
3  agenda for a meeting of the board of directors of E.S.
4  Bankest, right?
5      A.  Yes.
6      Q.  And you were one of the people, as vice
7  president of E.S. Bankest and a member of its board of
8  management, that attended these meetings, right?
9      A.  As a director, yes.
10      Q.  And at these meetings, aging was discussed
11  from time to time, correct?
12      A.  Yes.
13      Q.  Now, if you turn with me, sir, to page 4 --
14  I'm sorry, page 2 of the exhibit. I apologize. This is
15  minutes of the board of directors of E.S. Bankest as of
16  February 26th, 2002.
17          Do you see that?
18      A.  Page 2?
19      Q.  Yeah. It's the second page.
20      A.  Yes. Okay.
21      Q.  And you were somebody who was at this
22  meeting; is that right?
23      A.  Yes.
24      Q.  Now, during the meeting at the end of
25  February after BDO's audit, you recall discussing the

Page 1854

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
        Plaintiffs,
    vs.
BDO SEIDMAN, LLP,
        Defendant.
------------------------------------------------x
BDO SEIDMAN, LLP,
        Third-Party Plaintiff,
    vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
        Third-Party Defendants.
------------------------------------------------x

PAGES 1854 - 2005

VOLUME 17

AFTERNOON SESSION

Miami, Florida

Tuesday, July 24, 2007

1:55 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 1855

APPEARANCES

1
2
3  On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4  INTERNATIONAL, LTD., ET AL.:
5
6  SULLIVAN & CROMWELL, LLP
7      1888 Century Park East
8      Los Angeles, California 90067
9      (310) 712-6627
10 BY: Steven W. Thomas, Esquire
11     Emily S. Alexander, Esquire
12
13 GONZALO R. DORTA, P.A.
14     334 Minorca Avenue
15     Coral Gables, Florida 33134
16     (305) 441-2299
17 BY: Gonzalo R. Dorta, Esquire
18
19 BERGER SINGERMAN
20     200 South Biscayne Boulevard, Suite 1000
21     Miami, Florida 33131
22     (305) 755-9500
23 BY: Mitchell W. Berger, Esquire
24     Rene Harrod, Esquire
25

Page 1857

1  On behalf of Third-Party Defendants Victor Balestra,
2  Bernard Mollet, and Joaquim Garnecho
3
4  RICHMAN, GREER, WEIL, BRUMBAUGH,
5  MIRABITO & CHRISTENSEN, P.A.
6      Miami Center, Suite 1000
7      201 S. Biscayne Boulevard
8      Miami, Florida 33131
9      (305) 373-4000
10 BY: Manuel Garcia Linares, Esquire
11
12 On behalf of Third-Party Defendant Bernard Mollet
13
14 GAMBA & LOMBANA, P.A.
15     2701 Ponce de Leon Boulevard, Mezzanine
16     Coral Gables, Florida 33134
17     (305) 448-4010
18 BY: Hector J. Lombana, Esquire
19     Geoffrey Marks, Esquire
20
21
22
23
24
25

Page 1856

1  On behalf of Defendant BDO Seidman, LLP:
2
3  GREENBERG TRAURIG, LLP
4      MetLife Building
5      200 Park Avenue, 15th Floor
6      New York, New York 10166
7  BY: Adam D. Cole, Esquire
8      Karen Y. Bitar, Esquire
9      (212) 801-9200
10
11 GREENBERG TRAURIG, LLP
12     1221 Brickell Avenue
13     Miami, Florida 33131
14 BY: Mark Schnapp, Esquire
15     Nikki Simon, Esquire
16     (305) 579-0500
17
18 ALVAREZ, ARMAS & BORRON
19     901 Ponce de Leon Boulevard, Suite 304
20     Coral Gables, Florida 33134
21     (305) 461-5100
22 BY: Arturo Alvarez, Esquire
23
24
25

Page 1858

CONTENTS

1
2
3  EXAMINATION OF BERNARD MOLLET BY:          PAGE:
4      MR. COLE: (Direct)              1860
5      MR. THOMAS: (Cross)            1892
6      MR. COLE: (Redirect)           1910
7
8  EXAMINATION OF JORGE ESPIRITO SANTO BY:     PAGE:
9      MR. COLE: (Direct)              1940
10     MR. THOMAS: (Cross)            1963
11     MR. COLE: (Redirect)           1971
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1971

1      Q.   And do you understand whether your family
2   would have kept putting its own money into E.S. Bankest
3   if they thought that there was a situation where the
4   loans could not be paid back?
5           MR. COLE:  Objection.
6           THE COURT:  Sustained.
7   BY MR. THOMAS:
8      Q.   Well, sir, what is your understanding of why
9   Espirito Santo kept putting its own money into E.S.
10  Bankest throughout 2002?
11          MR. COLE:  Objection.  Hearsay.
12          THE COURT:  Overruled.
13          THE WITNESS:  Because we were assured by BDO
14  that there was always enough accounts receivable to
15  support the debt and the cushion was always there.  It
16  was there in 1998, in 1999, 2000, 2001, and 2002.  If we
17  were to know that they were fake, I can assure you that
18  we will not be here today.
19          MR. THOMAS:  Thank you, Your Honor.
20          Thank you, Mr. Espirito Santo.
21          THE COURT:  Mr. Cole, redirect?
22          MR. COLE:  Just a quick redirect, Your
23  Honor.
24          REDIRECT EXAMINATION
25  BY MR. COLE:

Page 1972

1      Q.   Sir, the reason why you swapped the notes --
2   do you understand the reason why you swapped the notes
3   was to protect your clients?
4           MR. THOMAS:  Objection.  Scope.
5           THE COURT:  Overruled.
6           THE WITNESS:  No, sir.  The reason we
7   swapped the notes was because we just had a default on
8   the notes.  And we thought it was easier for us to force
9   the Orlanskys to start collecting the receivables and to
10  facilitate the process
11  BY MR. COLE:
12     Q.   And these are your very best clients?
13     A.   The best customers we have.
14     Q.   And sir, is it your testimony that had you
15  known that the accounts receivable were fake, would you
16  have left your clients out in the cold?
17     A.   No.
18          MR. THOMAS:  Objection, Your Honor.
19          THE COURT:  Sustained.
20  BY MR. COLE:
21     Q.   Well, had you known that accounts
22  receivable -- you said that had we known that accounts
23  receivable were fake, you may never have done it, right?
24          MR. THOMAS:  Objection, Your Honor.
25          THE COURT:  Sustained.

Page 1973

1   BY MR. COLE:
2      Q.   Let me rephrase it.  Sir, as you sit here
3   today, you know -- you state that the accounts
4   receivable were fake, right?
5      A.   We all know now that almost all of them were
6   fake.
7      Q.   And you learned that through this litigation
8   process, right?
9      A.   We've learned that when Mr. Freeman
10  discovered the fraud.
11     Q.   Now, when the swap occurred, it was your
12  understanding that the receivables were not fake, right?
13          MR. THOMAS:  Objection, Your Honor.  Scope.
14          THE COURT:  Overruled.
15          THE WITNESS:  The -- when we did the swap,
16  we never thought that the receivables were fake.  And
17  that's what BDO assured a couple of months after.
18  BY MR. COLE:
19     Q.   And each of your best customers were holding
20  these notes at the time?
21     A.   And there were defaults.
22     Q.   And these were factored receivable-backed
23  notes, right?
24     A.   Correct.
25     Q.   And that the receivables backing the notes

Page 1974

1   turned out to be fake, you would not have purchased,
2   right?
3      A.   Sorry?
4      Q.   If they turned out to be fake in 2002, if
5   you learned that they were fake in 2002, is it your
6   testimony that Espirito Santo would not have purchased
7   the notes from its best customers?
8           MR. THOMAS:  Objection, Your Honor.
9           THE COURT:  Sustained.
10  BY MR. COLE:
11     Q.   Sir, you were asked the questions and got
12  into some of the history of your bank, right?
13          MR. THOMAS:  Objection, Your Honor.  You
14  wouldn't let me --
15          THE COURT:  Sustained.
16  BY MR. COLE:
17     Q.   Sir, the first time you found out about the
18  decision to swap was after Espirito Santo decided to
19  sell its interest in E.S. Bankest, right?
20     A.   No.  When we -- the decision to swap was
21  after a couple of promissory notes were not paid.  And
22  then we thought that the Orlanskys were being stubborn
23  about not collecting the receivables and keep growing
24  the business.
25     Q.   And did you discuss this with Ricardo

Page 3250

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31

---------------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
      Plaintiffs,
   vs.
BDO SEIDMAN, LLP,
      Defendant.
---------------------------------------------------x
BDO SEIDMAN, LLP,
      Third-Party Plaintiff,
   vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
      Third-Party Defendants.
---------------------------------------------------x

PAGES 3250 - 3325

VOLUME 27

MORNING SESSION

Miami, Florida

Friday, August 3, 2007

10:30 a.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 3251

```
 1          A P P E A R A N C E S
 2
 3   On behalf of the Plaintiffs BANCO ESPIRITO SANTO
 4   INTERNATIONAL, LTD., ET AL.:
 5
 6   SULLIVAN & CROMWELL, LLP
 7       1888 Century Park East
 8       Los Angeles, California  90067
 9       (310) 712-6627
10   BY:  Steven W. Thomas, Esquire
11       Emily S. Alexander, Esquire
12
13   GONZALO R. DORTA, P.A.
14       334 Minorca Avenue
15       Coral Gables, Florida  33134
16       (305) 441-2299
17   BY:  Gonzalo R. Dorta, Esquire
18
19   BERGER SINGERMAN
20       200 South Biscayne Boulevard, Suite 1000
21       Miami, Florida  33131
22       (305) 755-9500
23   BY:  Mitchell W. Berger, Esquire
24       Rene Harrod, Esquire
25
```

Page 3253

```
 1   On behalf of Third-Party Defendants Victor Balestra,
 2   Bernard Mollet, and Joaquim Garnecho
 3
 4   RICHMAN, GREER, WEIL, BRUMBAUGH,
 5   MIRABITO & CHRISTENSEN, P.A.
 6       Miami Center, Suite 1000
 7       201 S. Biscayne Boulevard
 8       Miami, Florida  33131
 9       (305) 373-4000
10   BY:  Manuel Garcia Linares, Esquire
11
12   On behalf of Third-Party Defendant Bernard Mollet
13
14   GAMBA & LOMBANA, P.A.
15       2701 Ponce de Leon Boulevard, Mezzanine
16       Coral Gables, Florida  33134
17       (305) 448-4010
18   BY:  Hector J. Lombana, Esquire
19       Geoffrey Marks, Esquire
20
21
22
23
24
25
```

Page 3252

```
 1   On behalf of Defendant BDO Seidman, LLP:
 2
 3   GREENBERG TRAURIG, LLP
 4       MetLife Building
 5       200 Park Avenue, 15th Floor
 6       New York, New York  10166
 7   BY:  Adam D. Cole, Esquire
 8       Karen Y. Bitar, Esquire
 9       (212) 801-9200
10
11   GREENBERG TRAURIG, LLP
12       1221 Brickell Avenue
13       Miami, Florida  33131
14   BY:  Mark Schnapp, Esquire
15       Nikki Simon, Esquire
16       (305) 579-0500
17
18   ALVAREZ, ARMAS & BORRON
19       901 Ponce de Leon Boulevard, Suite 304
20       Coral Gables, Florida  33134
21       (305) 461-5100
22   BY:  Arturo Alvarez, Esquire
23
24
25
```

Page 3254

```
 1          C O N T E N T S
 2
 3   EXAMINATION OF STEPHEN HALPERT BY:          PAGE:
 4      MR. SCHNAPP:  (Direct, cont'd)      3264
 5      MR. THOMAS:  (Cross)                3306
```

Page 3307

1     A.   I understand that as collateral, the value
2  of the accounts receivable stand behind the note
3  obligations.
4     Q.   And so you understand that someone who is
5  going to purchase one of these debenture notes, they'd
6  be real interested in the, how did you put it, the value
7  of the collateral that would stand behind the debenture
8  note, right?
9     A.   Yes, of course.
10    Q.   And so the most important fact would be to
11 know whether or not those accounts receivable were real
12 or fake, right?
13    A.   Well, that's an important fact.
14    Q.   An important fact? Sir, is it your expert
15 testimony that it wouldn't be the most important thing
16 for someone to know buying one of these debenture notes
17 that all of the accounts receivable were fake?
18    MR. SCHNAPP:  Objection. Argumentative.
19    THE COURT:  Overruled.
20    THE WITNESS:  Sure, that's important.  If
21 they were all fake, that's obviously a critical fact.
22 BY MR. THOMAS:
23    Q.   Now, you gave the opinion, as I understand
24 it, that information that came out after BDO's audited
25 financials, right, in February 2002, information that

Page 3308

1  came out afterwards made those financial statements
2  misleading, right.
3        You want me to read it back to you?
4     A.   Let me -- can I answer that?
5        Yes, I said that.  I also said that there
6  was some information that may have been available at an
7  earlier time that should have been disclosed. And --
8     Q.   I'm sorry.  Really, I didn't mean to cut you
9  off.  You did a whole timeline, didn't you?
10    MR. SCHNAPP:  I object.  Let him finish.
11 BY MR. THOMAS:
12    Q.   I'm sorry.  Were you finished?  No, please,
13 go ahead.
14    A.   There was information that was available
15 beforehand that called into question the accuracy and
16 completeness of the PPM and the financials that also
17 ought to have been disclosed.  I'm not saying this is
18 exclusively information after January 1st.
19    MR. THOMAS:  Can we put up his demonstrative
20 real quick?
21    (Technician complies.)
22 BY MR. THOMAS:
23    Q.   Sir, you went to all kinds of trouble to put
24 together this demonstrative, right?
25    A.   I had the wonderful assistance of staff at

Page 3309

1  Greenberg Traurig.  They made it quite easy.
2     Q.   Oh, good.  So they kind of put to together
3  for you?
4     A.   They physically did it.  I picked out the
5  documents.
6     Q.   You're the one, then, that decided where you
7  were going to start your timeline, what you were going
8  to put on it, and where you were going to end it, right?
9     A.   Yes.
10    Q.   And that's because you thought -- I believe
11 that next -- I don't think the last question was --
12 because you thought this was the important fact that
13 needed to be disclosed, right?
14    A.   I thought that these were important facts
15 that ought to have been disclosed, yes.
16    Q.   Uh-huh.  (Nodding.)
17        And you started after the 2002 -- February
18 8th, 2002, audit for 2001, right, for the timeline you
19 were going to show the ladies and gentlemen of the jury,
20 correct?
21    A.   It starts after January 1st, 2002.
22    Q.   Well, yes, sir.  And all your facts come
23 after the audit that came out in February of 2002,
24 right?
25    A.   All the facts that are on display came out

Page 3310

1  after 2002, January 1.
2     Q.   And when you testified for quite a while --
3  I mean, you now remember saying, right, that the facts
4  that came out after February 2002, made BDO's audited
5  financial statements misleading, right?
6     A.   Yes.
7     Q.   Sir, do you understand that that audited
8  financial statement was misleading when it came out
9  because it said all the accounts receivable were real
10 when they were fake, right?
11    A.   I understand that.  I don't understand all
12 of them were fake, but I understand there was a
13 significant fraud.
14    Q.   They didn't tell you how many of them were
15 fake?
16    A.   I don't know the dollar amount, no.
17    Q.   Do you understand it's almost all of them?
18 Do you understand that?
19    A.   I understand it's -- yes.  The lion's share.
20    Q.   And that would be the most important fact to
21 anyone interested in these notes, right?
22    A.   It would be an important fact, sure.
23    Q.   So you won't give me that the most important
24 fact would be that all the accounts receivable standing
25 behind these notes were fake?

Page 3326

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 04-14009 CA 31


-----------------------------------------------x
BANCO ESPIRITO SANTO INTERNATIONAL, LTD., ESB FINANCE,
LTD., AND BANCO ESPIRITO SANTO, S.A.,
        Plaintiffs,
     vs.
BDO SEIDMAN, LLP,
        Defendant.
-----------------------------------------------x
BDO SEIDMAN, LLP,
        Third-Party Plaintiff,
     vs.
VICTOR BALESTRA, BERNARD MOLLET, JOAQUIM GARNECHO,
PIERRE TREZZINI, EDUARDO ORLANSKY, HECTOR ORLANSKY, R.
PETER STANHAM, DOMINICK PARLAPIANO, CARLOS E. MENDEZ,
ARIADNA PUERTO, AND OTTO AMBROSIANI,
        Third-Party Defendants.
-----------------------------------------------x

PAGES 3326 - 3486

VOLUME 28




AFTERNOON SESSION

Miami, Florida

Friday, August 3, 2007

1:45 p.m.

Before the Honorable Jose M. Rodriguez



Reported by:  Gizella "Gigi" Baan

Page 3327

1        A P P E A R A N C E S
2
3  On behalf of the Plaintiffs BANCO ESPIRITO SANTO
4  INTERNATIONAL, LTD., ET AL.:
5
6  SULLIVAN & CROMWELL, LLP
7      1888 Century Park East
8      Los Angeles, California  90067
9      (310) 712-6627
10 BY:  Steven W. Thomas, Esquire
11     Emily S. Alexander, Esquire
12
13 GONZALO R. DORTA, P.A.
14     334 Minorca Avenue
15     Coral Gables, Florida  33134
16     (305) 441-2299
17 BY:  Gonzalo R. Dorta, Esquire
18
19 BERGER SINGERMAN
20     200 South Biscayne Boulevard, Suite 1000
21     Miami, Florida  33131
22     (305) 755-9500
23 BY:  Mitchell W. Berger, Esquire
24     Rene Harrod, Esquire
25

Page 3328

1  On behalf of Defendant BDO Seidman, LLP:
2
3  GREENBERG TRAURIG, LLP
4      MetLife Building
5      200 Park Avenue, 15th Floor
6      New York, New York  10166
7  BY:  Adam D. Cole, Esquire
8      Karen Y. Bitar, Esquire
9      (212) 801-9200
10
11 GREENBERG TRAURIG, LLP
12     1221 Brickell Avenue
13     Miami, Florida  33131
14 BY:  Mark Schnapp, Esquire
15     Nikki Simon, Esquire
16     (305) 579-0500
17
18 ALVAREZ, ARMAS & BORRON
19     901 Ponce de Leon Boulevard, Suite 304
20     Coral Gables, Florida  33134
21     (305) 461-5100
22 BY:  Arturo Alvarez, Esquire
23
24
25

Page 3329

1  On behalf of Third-Party Defendants Victor Balestra,
2  Bernard Mollet, and Joaquim Garnecho
3
4  RICHMAN, GREER, WEIL, BRUMBAUGH,
5  MIRABITO & CHRISTENSEN, P.A.
6      Miami Center, Suite 1000
7      201 S. Biscayne Boulevard
8      Miami, Florida  33131
9      (305) 373-4000
10 BY:  Manuel Garcia Linares, Esquire
11
12 On behalf of Third-Party Defendant Bernard Mollet
13
14 GAMBA & LOMBANA, P.A.
15     2701 Ponce de Leon Boulevard, Mezzanine
16     Coral Gables, Florida  33134
17     (305) 448-4010
18 BY:  Hector J. Lombana, Esquire
19     Geoffrey Marks, Esquire
20
21
22
23
24
25

Page 3330

1              CONTENTS
2
3  EXAMINATION OF STEPHEN HALPERT BY:        PAGE:
4      MR. THOMAS:  (Cross, cont'd)       3349
5      MR. SCHNAPP:  (Redirect)           3388
6
7  EXAMINATION OF RAUL ZAYAS BY:             PAGE:
8      (Outside the presence of the jury)
9      MS. BITAR:                         3406
10     MR. THOMAS:                        3413
11
12 EXAMINATION OF JORGE ESPIRITO SANTO BY:    PAGE:
13     (Outside the presence of the jury)
14     MR. THOMAS:                        3416
15
16 EXAMINATION OF CHARLES GRICE BY:          PAGE:
17     MR. COLE:  (Direct)                3434
18
19
20
21
22
23
24
25

Page 3351

1    Q.   And you understand, sir, that BDO Seidman
2  said that those accounts receivable were real, right?
3    A.   Yes.
4    Q.   And you understand now that almost all the
5  accounts receivable at BRFFC were fake, right?
6    A.   I don't know the extent of the fake accounts
7  at BRFFC.
8    Q.   You understand that there were fake accounts
9  at BRFFC?
10    A.   I do.
11    Q.   And in all the documents that you reviewed
12  and all the testimony in this case, you didn't see the
13  evidence that almost all of them were fake?
14    A.   I may have. I didn't focus on it.
15    Q.   Sir, I'm going to ask you -- sir, I'm going
16  to now take us back in the demonstrative to earlier in
17  time. Okay?
18    A.   Understood.
19    Q.   Now, sir, you understand that the audits for
20  BRFFC -- the first one for '95 would have come out in
21  '96. You understand that, right?
22    A.   Yes.
23    Q.   And I think as we just discussed you
24  understand now that most of those -- at least some of
25  those accounts receivable were fake, right?

Page 3352

1    A.   Yes.
2    Q.   And as you testified earlier, sir, if BDO
3  would have said in 1995 just like in 2001 that most of
4  these accounts receivable were fake, there wouldn't have
5  been any more selling notes at BRFFC, right?
6    A.   Yes.
7    Q.   And so if there weren't any more selling of
8  notes at BRFFC, we would have never got to your timeline
9  in 2002, right?
10    A.   I believe that that's true.
11    MR. SCHNAPP: Judge, I'm going to --
12    MR. THOMAS: I'm sorry. Take it down. I
13  thought your nod was okay. Take that down.
14    MR. SCHNAPP: I would like to have any
15  demonstratives before they be viewed.
16    THE COURT: Do you object?
17    MR. SCHNAPP: I'm not going to object. But
18  if there are more, I'd like to see them.
19    MR. THOMAS: I'll give them all the rest.
20    MR. SCHNAPP: Judge, I'm just being handed a
21  big pile of demonstratives I've never seen. I don't
22  want to delay the trial.
23    THE COURT: Why don't you keep looking at
24  them until --
25    MR. SCHNAPP: I think it's a build, so if I

Page 3353

1  can just have a moment.
2    (Reading).
3    MR. SCHNAPP: Your Honor, I do have
4  objections to some of these.
5    THE COURT: To how many? Just pull those
6  out.
7    MR. SCHNAPP: (Complies).
8    THE COURT: Can you bring them up to me,
9  please, or show them to Mr. Thomas first?
10    MR. SCHNAPP: (Complies).
11    THE COURT: I don't want them all. I just
12  want the ones with the objections. I just want to see
13  them.
14    MR. SCHNAPP: Your Honor, objecting --
15    THE COURT: I just want to see them.
16    MR. SCHNAPP: All right.
17    (Complies).
18    THE COURT: Let's do a side-bar.
19    (Thereupon, there was a side-bar conference
20  outside the presence and hearing of the jury.)
21    THE COURT: You seem to have circled and
22  crossed out the same thing over and over again.
23    MR. SCHNAPP: Your Honor, because it's
24  basically a build, one build on the other so it's
25  duplicative. But, first of all, I was just given these

Page 3354

1  this moment so I haven't had a chance to look at them.
2  Secondly, all of these events -- he testified to what
3  happened in -- what happened in 2002 based upon what the
4  bankers knew in that time frame. Going back to 1996 and
5  those events is way outside the scope. It has nothing
6  to do with what he was testifying to. These are
7  arguments he wants to make. But he didn't talk about
8  anything other than what happened in 2002 subsequent to
9  this audit.
10    Secondly, if I might go through them.
11    THE COURT: It's the same thing over and
12  over again.
13    MR. SCHNAPP: Well, it's not.
14    THE COURT: It isn't? Okay.
15    MR. SCHNAPP: Your Honor, first of all,
16  again -- there are comments on this that on September
17  24th of -- that BDO -- I'm sorry. I don't know what the
18  date is supposed to be 2001 -- that BDO vouches for
19  audits.
20    THE COURT: Let me ask you, Mr. Thomas. Are
21  these going to be added on, on the screen? See, I don't
22  know how you're going to present it.
23    MR. THOMAS: The way he's going to go is the
24  one he agreed to we just go up and --
25    THE COURT: So it would be one extra on each

Page 3355

1   one?
2           MR. THOMAS:  Right.  So in this audit they
3   address aging, liquidity, and United Container.  And on
4   September 24th, we have a jury who found that BDO
5   vouched on September 24th and that's the time records
6   for Lenner, which was known at the time.
7           He says he doesn't know what's known by the
8   bank managers.  What was known is that Mr. Lenner
9   vouched for the audits, that's already known.  And
10  there's the restructuring agreement.  That's the letter
11  in the restructuring agreement.  Then in 2002 in that
12  audit is aging, liquidity and United Container.  There
13  is nothing argumentative about this.  This is the actual
14  things that are in the audit.  They are in the
15  restructuring agreement.  That's the letter.  And these
16  are the time records for where BDO vouches.  And we have
17  testimony in the record that BDO vouched for their
18  audits at that time.
19          THE COURT:  The question is did he review
20  it.
21          MR. THOMAS:  It doesn't matter if he
22  reviewed it.  That's actually the point.  The point is
23  that he said he's basing it on what the managers knew.
24  So during this time period --
25          THE COURT:  I understand.  You're going to

Page 3356

1   be questioning that issue.
2           MR. SCHNAPP:  Can we take that down?
3           MR. THOMAS:  You already agreed to that.
4           THE COURT:  Anything else?
5           MR. SCHNAPP:  Yes, Your Honor.  The word
6   vouches is improper.  BDO doesn't vouch for anything.
7   BDO is not in the restructuring agreement.
8           THE COURT:  That question has been asked
9   thousands of times.
10          MR. SCHNAPP:  It's not the --
11          THE COURT:  Then you can cross-examine him.
12  Here, you can have these.  The objection is overruled.
13          (Thereupon, the side-bar conference was
14  concluded.)
15  BY MR. THOMAS:
16      Q.   So Mr. Halpert, if there were no notes sold
17  in -- it would be stopped, BDO would have said they were
18  fake in 1996, there would have been no notes sold and we
19  would have never gotten to the timeline that you were
20  looking at.  You just answered that question, right?
21  Correct?
22      A.   Correct.
23      Q.   Now, you understand that for 1996 BDO also
24  audited BRFFC, right?
25      A.   I do.

Page 3357

1       Q.   And you understand that in -- for 1996, BDO
2   said that the accounts receivable of BRFFC were real?
3       A.   Yes.
4       Q.   And you understand now that they were fake,
5   or at least some portion were fake?
6       A.   I understand some portions were fake.
7       Q.   And you would agree again that if BDO would
8   have said the accounts receivable are fake, they would
9   have stopped selling notes and we would have never
10  gotten to your portion of the time frame, correct?
11          MR. SCHNAPP:  Your Honor, I object to that.
12  I object to the pure speculation of whether they were
13  not selling notes --
14          MR. THOMAS:  Objection.
15          THE COURT:  Overruled.
16          THE WITNESS:  Yes.
17  BY MR. THOMAS:
18      Q.   Now, sir, you understand that after BDO's
19  audits of BRFFC for two years saying the accounts
20  receivable were real, then E.S. Bankest was formed as
21  the successor, correct?
22      A.   Was the successor, yes.
23      Q.   And you understand that BDO audited the
24  financial statements for 1998 and that came out in 1999,
25  right?

Page 3358

1       A.   Yes.
2       Q.   And you understand that BDO said the
3   accounts receivable were real, right?
4       A.   Yes.
5       Q.   And you understand now that they were mostly
6   fake, right?
7       A.   I don't know the proportion that were not
8   real.
9       Q.   Not real.  And you also understand, sir,
10  that if BDO would have said in 1998 that the accounts
11  receivable were fake, notes would have stopped -- we
12  would have stopped selling notes and we would have never
13  gotten to your time frame again, right?
14      A.   Yes.
15      Q.   Now, sir, you haven't given any opinion
16  about anything Espirito Santo should have known or
17  disclosed in '96, '97, or '99, right?
18      A.   I haven't looked at those years, no.
19      Q.   So as far as you know, there was nothing
20  that Espirito Santo could have disclosed in those years
21  that would have rendered anything misleading in the PPMs
22  or in BDO's audits, right?
23      A.   I haven't reviewed the conduct so I
24  wouldn't -- I don't have any opinion as to whether they
25  would or wouldn't have.

Page 3359

1    Q.  No opinion whatsoever?
2    A.  Right.
3    Q.  Well, you know that BDO audited E.S. Bankest
4  again, right, for 1999, it came out in 2000, right?
5    A.  Yes.
6    Q.  And you understand that BDO said the
7  accounts receivable were real?
8    A.  I do. I understand that they gave a
9  positive audit.
10    Q.  And you understand that it turned out that
11  they were fake?
12    A.  I understand that some portion of them were
13  not real.
14    Q.  And the "them" is the accounts receivable?
15    A.  I'm sorry?
16    Q.  The "them" is the accounts receivable?
17    A.  Yes.
18    Q.  The accounts receivable were fake?
19    A.  Yes.
20    Q.  And you also understand that if BDO would
21  have said in February of 2000, wait, accounts receivable
22  are fake, then no more notes would have been sold?
23      MR. SCHNAPP: Objection. Argumentative and
24  speculation.
25      THE COURT: Overruled. He already answered

Page 3360

1  that.
2      THE WITNESS: Yes.
3  BY MR. THOMAS:
4    Q.  And if that would have happened, nobody from
5  the bank would have failed to disclose anything in 2002,
6  right, because we wouldn't have even been selling notes?
7    A.  Right. I believe that that would have
8  brought the business to an end.
9    Q.  So nobody from the bank would have done
10  anything wrong in 2002 because there would have been no
11  business, right?
12      MR. SCHNAPP: Objection. Speculation.
13      THE COURT: Sustained.
14  BY MR. THOMAS:
15    Q.  Well, sir, of the disclosures that you
16  testified about in your opinion in 2002, there would
17  have been no need for that if BDO would have said on
18  February 23rd, 2000 that the accounts receivable were
19  fake, right?
20    A.  If the fraud had been detected before
21  December 31st, 2001, I believe the business would not
22  have continued into 2002.
23    Q.  Sir, of the disclosures that you testified
24  about in your opinion in 2002, there would have been no
25  need for that if BDO would have said in February 2000

Page 3361

1  that the accounts receivable were fake, right?
2    A.  There would have been no business. Nothing
3  would have occurred, right.
4    Q.  So there would have been no need for
5  disclosures that you've testified about, right?
6    A.  Presumably there would have been no
7  marketing of notes and no need for disclosures.
8    Q.  Thank you. Now, you know that BDO audited
9  E.S. Bankest yet again, right, the next year?
10    A.  The next year being 2001?
11    Q.  Yes. For 2000 it came out in 2001, right?
12    A.  Yes.
13    Q.  And BDO said the accounts receivable were
14  real?
15    A.  Positive audit.
16    Q.  So they said the accounts receivable were
17  real?
18    A.  I don't know that they used that exact
19  language but they failed to say that they were not real.
20    Q.  And it turned out that they were fake, the
21  accounts receivable were fake?
22    A.  Some amount of them, a good share were fake.
23    Q.  And if BDO in February of 2001 had said the
24  accounts receivable were fake, then there would have
25  been no need for the disclosures by the bank people that

Page 3362

1  you talked about in 2002, right?
2    A.  Yes.
3    Q.  Well, sir, now we're going to move inside
4  your timeline. Okay? And now we're going to say that
5  BDO -- the first thing that happened -- let me start
6  over.
7      The first thing that happened in your
8  timeline was that there was a BDO audited financial
9  statement, right?
10    A.  Yes.
11    Q.  And you understand now that in that audited
12  financial statement which came out in February that BDO
13  said there was no problem with aging, right?
14    A.  Yes.
15      MR. SCHNAPP: Objection. Argumentative.
16      THE COURT: Overruled.
17      THE WITNESS: Yes.
18      THE COURT: It's already been answered.
19  BY MR. THOMAS:
20    Q.  And you understand, sir, that BDO said that
21  there was no problem with liquidity?
22      MR. SCHNAPP: Objection. Misstates the
23  testimony and the record.
24      THE COURT: Overruled.
25      THE WITNESS: I understand that they

Page 3363

1    provided a standard audit letter that they had audited
2    the financials prepared by management.
3    BY MR. THOMAS:
4        Q.   And you understand that that audit letter
5    and the audit made no reservation about liquidity,
6    right?
7        A.   I do.
8        Q.   And you understand that also in that audit
9    there was a disclosure and a reserve taken for United
10   Container, right?
11       A.   I do know there was a reserve of 2.5 million
12   dollars taken for United Container.
13       Q.   Sir, I'm sorry, I've got to ask you this.
14   Now, for February 16th -- this came out -- sorry,
15   February 8th, 2002, that starts your timeline, BDO said
16   all the accounts receivable were real?
17       A.   I don't think they said all the accounts
18   receivable. They have a reserve for some expected
19   noncollection. I don't think there's any express
20   language that any of them are real.
21       Q.   Well, sir, you understand that BDO certified
22   that there was over 150 million dollars worth of
23   accounts receivable to pay back the notes, right?
24       A.   They certified a financial statement that
25   showed 153 million in value of accounts receivable after

Page 3364

1    reserve for nonpayment.
2        Q.   Thank you. And you understand now that
3    virtually all of those were fake?
4        MR. SCHNAPP: Objection. Argumentative.
5        THE COURT: Overruled.
6        THE WITNESS: Yes.
7    BY MR. THOMAS:
8        Q.   And we understand now that if BDO would have
9    said virtually all the accounts receivable were fake on
10   February 8th, 2002, then no more notes would have been
11   sold?
12       A.   Yes.
13       Q.   And then all the disclosures you've talked
14   about never would have never needed to be made, right?
15       A.   Yes.
16       Q.   Now, sir, also in your timeline, did you
17   figure in that in September of 2002, that BDO vouched
18   for their audits?
19       MR. SCHNAPP: Objection. Misstates the
20   record.
21       THE COURT: Overruled.
22       THE WITNESS: No.
23   BY MR. THOMAS:
24       Q.   Well, sir, did you review BDO's time
25   records?

Page 3365

1        MR. SCHNAPP: Objection. Argumentative.
2        THE COURT: Overruled.
3        MR. SCHNAPP: Outside the scope.
4        THE COURT: Overruled.
5        THE WITNESS: I'm sorry. I don't know what
6    you mean by BDO's time records.
7    BY MR. THOMAS:
8        Q.   Did you know that auditors keep time
9    records?
10       A.   I do.
11       Q.   Did you review them?
12       A.   No.
13       MR. SCHNAPP: Objection. Outside the scope.
14       THE COURT: It's already been answered.
15   BY MR. THOMAS:
16       Q.   Sir, in making your timeline through
17   September, did you consider the fact that Mr. Lenner met
18   with the people at E.S. Bankest about restructuring the
19   debt? Did you consider that?
20       MR. SCHNAPP: Objection. Relevance.
21       THE COURT: Overruled.
22       THE WITNESS: I don't -- I didn't see how it
23   would impact on my opinion.
24       MR. SCHNAPP: Objection.
25       THE COURT: Overruled.

Page 3366

1    BY MR. THOMAS:
2        Q.   I'm sorry, you said what?
3        MR. SCHNAPP: Objection, Your Honor.
4    There's no --
5        THE COURT: Overruled.
6    BY MR. THOMAS:
7        Q.   That did not impact on your opinion?
8        A.   No.
9        Q.   Well, one of the things your opinion was
10   considering was what was known to Bankest and the bank
11   at the time, right?
12       A.   Yes.
13       Q.   And did you consider that the bank
14   understood at the time in September that BDO was
15   vouching for their audits?
16       MR. SCHNAPP: Objection, Your Honor.
17   Misstates the record.
18       THE COURT: Rephrase your question.
19       MR. THOMAS: I'll show him a document,
20   Judge, if that's all right.
21       Your Honor, I'll approach with Exhibit 6007
22   and 16 in evidence.
23   BY MR. THOMAS:
24       Q.   Now, sir, did you know that Mr. Lenner in
25   September of 2002 billed time to E.S. Bankest, 14 hours?