

**ORDERED in the Southern District of Florida on April 06, 2010.**

_____
**A. Jay Cristol, Judge**
**United States Bankruptcy Court**

_____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
(*www.flsb.uscourts.gov*)

In re:                                        Chapter 11

E.S. BANKEST, L.C.,                           Case No. 04-17602-BKC-AJC

                    Debtor,
_____/

LEWIS B. FREEMAN, Responsible Officer
for the Reorganized Debtor E.S. Bankest, L.C.,
a Florida limited liability corporation,

                    Plaintiff,
                                              Adv. Pro. No. 06-1220-BKC-AJC-A
vs.

BDO SEIDMAN, LLP, BDO
INTERNATIONAL B.V., and SANDOR
LENNER,

                    Defendants.
_____/

<u>ORDER DENYING BDO SEIDMAN, LLP AND **SANDOR LENNER'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

THE MATTER came before the Court on September 18, 2008 at 2:00 p.m. in Miami, Florida upon the Motion of Defendants BDO Seidman, LLP ("BDO") and Sandor Lenner for Summary Judgment against Plaintiff Lewis B. Freeman ("Freeman" or "Plaintiff"), the Responsible Officer for the Reorganized Debtor E.S. Bankest, L.C. ("Bankest"). The Court has reviewed the relevant pleadings, the court file in this adversary proceeding and heard argument of counsel.

Defendants seek summary judgment on several, purely legal grounds and also challenge whether there are genuine issues of material fact. Specifically, Defendants argue that (1) Freeman's claims are barred by imputation and *in pari delicto*; (2) Freeman cannot establish causation, "in connection with" and damages; (3) Freeman's evidence fails to create a question of material fact on the scienter element of Plaintiff's 10b-5 claim; and (4) Freeman cannot prove that Defendants aided and abetted a breach of fiduciary duty.

**Imputation/*In Pari Delicto*.** This Court has twice held – once on a motion for summary judgment – that imputation/*in pari delicto* does not apply to this case as a matter of law.[1] The Court does not change its rulings here.

**Causation, "In Connection With" and Damages.** BDO also repeats purely legal arguments previously rejected by this Court. *First,* the Court already held that deepening insolvency is a permissible legal theory to prove damages and causation. (Pl. Ex. 2 [2006 Imputation/Damages Order] at 15-18.) Similarly, although BDO argues that as a matter of law it is not foreseeable that BDO's failure to detect the fraud would proximately cause damages, this

---

[1] Pl. Exh. 1 [September 14, 2005 "Opinion (1) Granting Joint Motion of Lewis B. Freeman and Banco Espirito Santo International, Ltd. for Final Summary Judgment Disallowing Claims Filed by BDO Seidman LLP, and (2) Denying BDO Seidman LLP's Motion for Summary Judgment" ("2005 Summary Judgment Order")] at 25; Pl. Exh. 2 [September 20, 2006 "Order Denying (I) BDO Seidman, LLP and Sandor Lenner's Motion to Dismiss Adversary Complaint, and (II) BDO Global Coordination, B.V.'s Motion to Dismiss Adversary Complaint with Respect to Standing and Jurisdiction Arguments" ("2006 Imputation/Damages Order")] at 11-12.

Court already held that it is foreseeable that the "negligent failure to detect falsifications will likely result in continued falsifications." (Pl. Exh. 1 [2005 Summary Judgment Order] at 23.) The Court does not change its ruling here.

*Second,* BDO also repeats its argument previously rejected by the Court that the "in connection with" and loss causation elements of securities fraud cannot be satisfied where "plaintiff received full value for the securities, and then was injured by a subsequent misappropriation of the proceeds." (Pl. Exh. 3 [2006 Securities Fraud Order] at 16, 17 (quoting BDO's argument); Mot. of Defs. BDO Seidman, LLP and Sandor Lenner for Summ. J. at 10-11 (same argument).) BDO also again draws the distinction that this is a "seller" case. (Sept. 18, 2008 Hearing Tr. at 27-28, 30). As this Court previously held, the Supreme Court's decision in *SEC v. Zandford*, 535 U.S. 813, 821 (2002), a seller case, controls and rejects BDO's legal argument.[2] Again, the Court does not change its legal ruling here.

**Scienter/Knowledge Issues of Fact.** Finally, BDO argues that the undisputed record precludes a finding of scienter on Plaintiff's securities fraud claim and the knowledge element of its aiding and abetting breach of fiduciary duty claims. Both the scienter and knowledge elements are satisfied by a showing of recklessness. *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1283 (11th Cir. 1999); *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010-11 (11th Cir. 1985). On the motion to dismiss, the Court found that the facts pleaded in Plaintiff's Complaint, taken as true, adequately alleged recklessness.[3] Thus, the question for the Court on this Motion for Summary Judgment is whether the evidence adduced creates a genuine issue of material fact as to the Complaint's allegations. It does.

---

[2] Pl. Exh. 3 [September 20, 2006 "Order Denying (1) BDO Seidman, LLP and Sandor Lenner's Motion to Dismiss Adversary Complaint, and (2) BDO Global Coordination, B.V.'s Motion to Dismiss Adversary Complaint with Respect to 15 U.S.C. § 78j(b) and Rule 10b-5(b) Arguments" ("2006 Securities Fraud Order")] at 16-18.

[3] Pl. Exh. 3 [2006 Securities Fraud Order].

*Conflict of Interest*.  Plaintiff submitted factual and expert testimony that BDO had a financial interest in a Bankest client that created, in the words of Plaintiff's expert, "a convoluted, intertwined, first class conflict of interest . . . one of the worst conflicts I've ever seen."  (Pl. Exh. 49 [5/2/07 a.m. Tr.] at 2839); *see In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 655 (E.D. Va. 2000) (holding that auditor's partnership with client destroyed independence and created motive to ignore indicia of fraud that supported inference of scienter).

*Defendants Continued Audits After Parlapiano Refused to Provide Documents that Would Have Revealed Fraud*.  BDO's own audit manager, Ramon Rivera, testified that BDO and Lenner willfully ignored documents that would have revealed the fraud.  Mr. Rivera testified that he stopped the audit because Mr. Parlapiano of Bankest would not provide documents he needed to determine if the accounts receivable were real.  (Pl. Exh. 39 [4/17/07 a.m. Tr.] at 1094-95, 1099-1104; *see also* Pl. Exh. 37 [4/16/07 a.m. Tr.] at 878-82.)  However, after Mr. Parlapiano met with Mr. Lenner, Mr. Lenner restarted the audit without the documents because "Mr. Parlapiano was an important person in the community and that a good relationship with him could lead to new business [for BDO]."  (Pl. Exh. 26 [Rivera Aff.] at ¶24; Pl. Exh. 39 [4/17/07 a.m. Tr.] at 1108-16); *see In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 280 (3d Cir. 2006) (client refusal to provide needed documents is a red flag raising suspicion of fraud).

*The Magnitude of the Fraud Defendants Failed to Detect Over Seven Years*.  Still further, the undisputed evidence now establishes that BDO verified as real hundreds of millions of dollars of *fake* account receivables at Bankest, virtually all of its purported assets.  (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 852-62; Pl. Exh. 35 [4/11/07 p.m. Tr.] at 391-92.).  The sheer magnitude of the fraud BDO failed to detect over seven audits raises an issue of fact as to scienter.  *See In re*

*Sunbeam Secs. Litig.*, 89 F. Supp. 2d 1326, 1345 (S.D. Fla. 1999) (sheer magnitude of fraud raises issue of fact as to scienter).

    *Defendants Ignored Numerous Red Flags.*  In verifying as real hundreds of millions of dollars of fake accounts receivable for seven years, Defendants ignored numerous red flags, including the lack of confirmations of Bankest's accounts receivable that BDO's own audit manual said was indicative of fraud.  (Pl. Exh. 14 [BDO Audit Manual] at BDO 031771; Pl. Exh. 43 [4/19/07 p.m. Tr.] at 1674-75.)  Plaintiff's audit expert, James Feltman, testified this lack of confirmations would "cause the hair on the back of [an auditor's] neck to stand up."  (Pl. Exh. 43 [4/19/07 p.m. Tr.] at 1687-88, 1692); *see In re Sunterra Corp. Sec. Litig.,* 199 F. Supp. 2d 1308, 1333 (M.D. Fla. 2002) (holding that to establish scienter, red flags are what would have put any "reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors").

<u>**GENUINE ISSUES OF MATERIAL FACT**</u>

**A.**  **Plaintiff Presented Sufficient Evidence that the Capital Officers Looted Bankest for their Own Benefit and that BDO Had a Duty to Detect the Fraud**

    1.  This Court already found that Hector Orlansky, Eduardo Orlansky, Dominick Parlapiano and Peter Stanham (collectively, the "Capital Officers"), in committing a massive fraud at Bankest, "looted [Bankest] for the benefit of themselves, thus barring imputation."  (Pl. Exh. 1 [2005 Summary Judgment Order] at 25; *see also* Pl. Exh. 37 [4/16/07 a.m. Tr.] at 853-62, 864-65, 868, 877-78, 892.)  The Capital Officers included hundreds of millions of dollars of fake accounts receivable in Bankest's financial statements and used those statements – audited by BDO – to convince Espirito Santo Bank to sell debentures to its clients to extend a $30 million line of credit to Bankest.  (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 853-62, 864-65, 868, 877-78, 892.)

2.      Defendants admit they had a duty to detect fraud in conducting the Bankest audits.  (Pl. Exh. 51 [5/3/07 Tr.] at 3150-51; Pl. Exh. 1 [2005 Summary Judgment Order] at 24 ("Since BDO specifically contracted and agreed to "detect fraud," it cannot claim now that it could not "detect fraud" because of "fraud.").)  BDO acknowledges that to detect the Bankest fraud, it only had to find one fake receivable.  (Pl. Exh. 52 [5/4/07 a.m. Tr.] at 3239.)  It is undisputed that BDO failed to detect the fraud.

3.      BDO's audits falsely certified hundreds of millions worth of fake accounts receivables on Bankest's books as real.  (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 852-62; Pl. Exh. 35 [4/11/07 p.m. Tr.] at 391-92.)  There is substantial evidence that BDO's audits were the key to Espirito Santo Bank's ability to sell Bankest debenture notes, as BDO's audited financial statements were attached to the private placement memoranda used to sell the debentures.  (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 905 ("[The audit] was critical."); Pl. Exh. 37 [4/16/07 a.m. Tr.] at 849, 877-78, 901-02, 905, 915; Pl. Exh. 30 [PPM] at ES 0256348, ES0256512-26.)  BDO's own expert testified that without BDO's audits, none of the resulting debt would have been incurred by Bankest.  (Pl. Exh. 66 [8/3/07 p.m. Tr.] at 3352-64.)

**B.      Plaintiff Presented Sufficient Evidence that the Bank Directors Were Innocent Directors Who Could Have Prevented Bankest's Losses If BDO Had Informed Them of the Fraud.**

4.      The Bank Directors, the four Bankest directors appointed by Espirito Santo Bank, claim not to have known about the massive fraud the Capital Officers were perpetrating at Bankest.  (Pl. Exh. 59 [7/3/07 p.m. Tr.] at 264-65 ("we had no reason to suspect that [the accounts receivable] were fake"); Pl. Exh. 61 [7/20/07 a.m. Tr.] at 1295-96; Pl. Exh. 62 [4/20/07 p.m. Tr.] at 1402; Pl. Exh. 63 [7/24/07 a.m. Tr.] at 1832, 1834; Pl. Exh. 56 [5/18/08 p.m. Tr.] at 4500-02; Pl. Exh. 57 [5/22/07 Tr.] at 4922.)  In fact, the evidence demonstrates that the Bank

Directors drew comfort from BDO's audits certifying—falsely—the accounts receivables as real. (Pl. Exh. 57 [7/3/07 p.m. Tr.] at 264-65 ("And again, the fact that we – for five years we had received clean and qualified audits gave us a great degree of comfort in that the accounts receivable portfolio was there and we had no reason to suspect they were fake."); Pl. Exh. 63 [7/24/07 a.m. Tr.] at 1832; Pl. Exh. 56 [5/18/07 pm. Tr.] at 4500-01; Pl. Exh. 61 [7/20/07 a.m. Tr.] at 1295; Pl. Exh. 62 [7/20/07 p.m. Tr.] at 1402.)  Accordingly, this Court held that Espirito Santo was "the victim of the fraud."  (Order Granting Judgment on Partial Findings in Favor of Respondents on the Motion by Gunster, Yoakley & Stewart, P.A. for an Order (I) Converting Chapter 11 Case to Case Under Chapter 7 of the Bankruptcy Code, or (II) Appointing Chapter 11 Trustee, or (III) Appointing an Examiner Pursuant to 11 U.S.C. § 1112(B) and Bankruptcy Rule 9014 at 8.)

5.       BDO knew the Bank Directors received and reviewed BDO's audited financial statements of Bankest.  (Pl. Exhs. 9, 10, 11, 12, 13 [BDO Seidman Audited Financial Statements of Bankest] (addressed to Bankest's Board of Directors); Pl. Exh. 27 [BDO Responses to Requests for Admission] at 12-13.)  Plaintiff also provided evidence that BDO knew the audits were being provided to investors in connection with the sale of Bankest debenture notes.  (Pl. Exh. 10 [BDO Seidman Audited Financial Statement of Bankest] at 10; Pl. Exh. 15 [1998 Inherent Risk Questionnaire] at BDO 00658; Pl. Exh. 30 [PPM] at ES 0256348, ES0256512-26; Pl. Exh. 37 [4/16/07 a.m. Tr.] at 905.)

6.       The evidence demonstrates that if BDO had informed the Bank Directors about the fraud, the Bank Directors would not have allowed Bankest to incur any debt, and the damages to Bankest would never have occurred.  (Pl. Exh. 63 [7/24/07 a.m. Tr.] at 1832 ("If BDO had told us at any time … that they were fake receivables we would never have sold any

7

notes to the customer."); Pl. Exh. 60 [7/16/07 a.m. Tr.] at 736; Pl. Exh. 56 [5/18/08 p.m. Tr.] at

4500.)  Instead, the Capital Officers diverted the looted funds, which were never recovered, from

Bankest to various companies and drove Bankest into $170 million worth of debt—all without

the Bank Directors' knowledge or consent.  (Pl. Exh. 35 [4/11/07 p.m. Tr.] at 442; Pl. Exh. 37

[4/16/07 a.m. Tr.] at 856-62, 897-98.)

**C.    Plaintiff Presented Ample Evidence of Scienter, that BDO Conducted Its Audits of Bankest with Severe Recklessness.**

> **1.    BDO's Relationship with Stratasys, a Bankest Client, Was a Conflict of Interest that Gave BDO an Incentive to Ignore Numerous Red Flags that Warned of the Bankest Fraud**

7.      Plaintiff submitted expert testimony that BDO's and Lenner's relationship with

Stratasys created a "first class" conflict of interest that disqualified BDO under accounting

ethical rules from acting as BDO's accountant.  (Pl. Exh. 49 [5/2/07 a.m. Tr.] at 2839 ("This is a

convoluted, intertwined, first class conflict of interest. And let me tell you, I believe that it is

with all of my heart and soul, and it's one of the worst conflicts I've ever seen."); Pl. Exh. 48

[4/30/07 Tr.] at 2483, 2487, 2490-91, 2547-53.)

8.      At the same time BDO audited Bankest, BDO was the financial partner of

Stratasys, a Bankest client.  Lenner was the partner in charge of both relationships.  (Pl. Exh. 46

[4/24/07 Tr.] at 2202, 2294.)  As Stratasys' partner, BDO shared in Stratasys' revenues.  (Pl.

Exh. 46 [4/24/07 Tr.] at 2347-48.)  BDO intended to make millions from its partnership with

Stratasys.  *See* (Pl. Exh. 23 [5/23/01 Meeting Memorandum]; Pl. Exh. 35 [4/11/07 p.m. Tr.] at

363-65; Pl. Exh. 46 [4/24/07 Tr.] at 2323-24; Pl. Exh. 47 [4/26/07 Tr.] at 2435-37.)  Mr. Lenner,

the lead audit partner on the Bankest audit, acknowledged that his own personal benefit was a

motive for the BDO-Stratasys alliance.  (Pl. Exh. 46 [4/24/07 Tr.] at 2305-08; Pl. Exh. 47

[4/26/07 Tr.] at 2435-37; Pl. Exh. 25 [Good Guy Memo] at 1.)

9.      Mr. Lenner testified that as the auditor of Bankest, BDO verified as real

receivables on Bankest books of BDO's own business partner, Stratasys.  (Pl. Exh. 46 [4/24/07

Tr.] at 2346-48.)  BDO verified $77 million in Stratasys receivables as real, when in fact all of

them were fake.  (*Id.*)  However, as Stratasys' business partner, BDO had access to Stratasys'

financial information, including the fact that Stratasys has less than $1 million in accounts

receivable.  (Pl. Exh. 24 [2/14/03 Email from Mr. Parlapiano to Mr. Mendez]; Pl. Exh. 34

[4/11/07 a.m. Tr.] at 284-85; Pl. Exh. 46 [4/24/07 Tr.] at 2340-41.)  BDO knew or should have

known through its access to Stratasys's actual financial information that Stratasys did not have

$77 million in accounts receivable.  *See* (Pl. Exh. 36 [4/13/07 Tr.] at 829-36 (BDO's "own

records showed both numbers, and they're totally at odds with each other.").)

### 2.      Bankest Refused to Provide BDO with Necessary Audit Evidence that Would Have Revealed the Fraud – And BDO Intentionally Ignored this Red Flag.

10.      Ramon Rivera, BDO audit manager of the Bankest audit, testified that BDO and

Lenner did not insist on required records that would have revealed the fraud because "Mr.

Parlapiano was an important person in the community and that a good relationship with him

could lead to new business."  (Pl. Exh. 26 [Rivera Aff.] at ¶24.)

11.      Bankest—at the direction of the Capital Officers—refused to provide BDO with

documents and information BDO deemed necessary to perform accurate audits.  *See* (Pl. Exh. 39

[4/17/07 a.m. Tr.] at 1094-95, 1099-1118; Pl. Exh. 44 [4/20/07 a.m. Tr.] at 1799-1800.)  During

BDO's first audit of Bankest, one of the Capital Officers refused to provide BDO with customer

checks, the very documents that would have provided the sole independent confirmation that the

receivables on Bankest's books were real.  *See* (Pl. Exh. 26 [Rivera Aff.] at ¶¶12-15; Pl. Exh. 39

[4/17/07 a.m. Tr.] at 1099-1100; Pl. Exh. 43 [4/19/07 p.m. Tr.] at 1706-14; Pl. Exh. 41 [4/18/07

a.m. Tr.] at 1321-22.)  When Bankest refused to provide customer checks, BDO Seidman

immediately stopped work on the audit.  (Pl. Exh. 26 [Rivera Aff.] at ¶17; Pl. Exh. 39 [4/17/07 a.m. Tr.] at 1101-02.)  BDO threatened to resign if the documents were not provided.  (Pl. Exh. 26 [Rivera Aff.] at ¶¶18-21.)

12.    Mr. Lenner, the lead audit partner, and Mr. Parlapiano, a Capital Officer, had a closed door meeting, after which Mr. Lenner told the audit manager to restart the audit and to accept checks from clients or Bankest Capital, a company owned by the Capital Officers, in lieu of customer checks as proof of the existence of Bankest's account receivables. (*Id*. at ¶¶23-24; Pl. Exh. 39 [4/17/07 a.m. Tr.] at 1110-18.)  Mr. Lenner justified his decision to allow Mr. Parlapiano to dictate the audit evidence by explaining that Mr. Parlapiano was an important person in the community and that a good relationship with him could lead to new business.  (Pl. Exh. 26 [Rivera Aff.] at ¶24.)  BDO auditor Mr. Ellenberg, the concurring partner on the Bankest audit, admits that client checks do not provide sufficient audit evidence. (Pl. Exh. 41 [4/18/07 a.m. Tr.] at 1321-22.)

13.    Because the Capital Officers knew that BDO would not require customer checks, the Capital Officers were able to grow the fraud.  (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 891-92.)

**3.    BDO Ignored Numerous Additional Red Flags that Warned of the Fraud According to Expert Testimony and BDO's Own Audit Manual.**

14.     During its audits, BDO sent out confirmations to verify the existence of Bankest's accounts receivable; however, none of the confirmations were returned.  (Pl. Exh. 43 [4/19/07 p.m. Tr.] at 1665-1670; Pl. Exh. 50 [5/2/07 p.m. Tr.] at 2905; Pl. Exh. 40 [4/17/07 p.m. Tr.] at 1197-98; Pl. Exh. 16 [1998 A/R Circularization Workpaper]; Pl. Exh. 19 [1999 Confirmation Control]; Pl. Exh. 20 [1999 Workpaper] at BDO 03392; Pl. Exh. 21 [2000 Confirmation Control]; Pl. Exh. 22 [2001 Confirmation Control].)  Plaintiff submitted expert testimony that no confirmations being returned is a red flag for an auditor.  (Pl. Exh. 43 [4/19/07

p.m. Tr.] at 1687-88, 1692 (noting that it would "cause the hair on the back of [an auditor's] neck to stand up").)  In fact, BDO's own audit manual warns auditors that a zero confirmation response rate is a potential indicator of fraud.  (*Id.* at 1674-75; Pl. Exh. 51 [5/3/07 Tr.] at 3157; Pl. Exh. 14 [BDO Audit Manual] at BDO 031771.)  Yet, BDO did nothing.  (Pl. Exh. 43 [4/19/07 p.m. Tr.] at 1677-78 ("Under these circumstances, it's inconceivable that the auditor wouldn't have taken strong measures, independent measures to validate the existence of accounts receivable.").)

15.     At Bankest, virtually all the transactions flowed through related party Capital – a situation which BDO's audit manual also warned could be indicative of fraud at Bankest.  (Pl. Exh. 14 [BDO Audit Manual] at BDO 031890.)  Yet BDO admits it counted on the Capital Officers "to detect and prevent fraud."  (Pl. Exh. 54 [5/9/07 Tr.] at 3944-45; Pl. Exh. 18 [Consideration of Fraud Risk Workpaper] at BDO 00649.)

16.     BDO's audit manual also required that BDO check shipping documents to confirm the account receivables.  (Pl. Exh. 14 [BDO Audit Manual] at BDO 031774.)  Again, BDO did not do what it was required to do and never looked at shipping documents.  (Pl. Exh. 52 [5/4/07 a.m. Tr.] at 3214-15.)

17.     BDO's failure to verify Bankest's accounts receivable with information obtained from independent third parties violated GAAS.  *See* (Pl. Exh. 43 [4/19/07 p.m. Tr.] at 1706-31, 1738-42; Pl. Exh. 44 [4/20/07 Tr.] at 1858-59 ("There wasn't the audit evidence that would have permitted them to make those conclusions."); Pl. Exh. 45 [4/23/07 p.m. Tr.] at 2036-37; Pl. Exh. 48 [4/30/07 Tr.] at 2637-38.)

<u>ANALYSIS</u>

## I.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), as incorporated by the Federal Rule of Bankruptcy Procedure 7056 and 9014(c), summary judgment shall be granted only if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *In re Optical Technologies, Inc.*, 246 F.3d 1332, 1334 (11th Cir. 2000) ("It is axiomatic that a bankruptcy court deciding a summary judgment motion, just like a district court, must determine whether there are any genuine issues of material fact."). "In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Id.* (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc)). Summary judgment cannot be granted where there is a genuine question of fact such that a reasonable jury could find in the non-movant's favor. *In re John's Bean Farm of Homestead, Inc.*, 378 B.R. 385, 387 (Bankr. S.D. Fla. 2007).

## II.    THE COURT FINDS THAT FREEMAN'S CLAIMS ARE NOT BARRED BY THE DOCTRINES OF IMPUTATION AND *IN PARI DELICTO*

### A.    The Court's Prior Rulings Rejecting Defendants' Imputation and *In Pari Delicto* Defenses Are Binding.

BDO moves for summary judgment on the grounds of imputation/*in pari delicto*, arguing that the fraud committed by four of the eight directors is imputed to Freeman and bars all of Plaintiff's claims. This Court has twice held that Freeman's claims against BDO are *not* barred by imputation or *in pari delicto* as a matter of law. *See* (Pl. Exh. 1 [2005 Summary Judgment Order]; Pl. Exh. 2 [2006 Imputation/Damages Order].) These two orders rejecting the same arguments BDO makes on this Motion are the law of the case and are binding. *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1550 n.3 (11th Cir. 1990) ("the law of the case . . . require[s] a

court to follow what has been decided explicitly, as well as by necessary implication, in an earlier proceeding.").

### 1.    2005 Summary Judgment Order

In its 2005 Summary Judgment Order, the Court found that because the Capital Officers at Bankest "looted [Bankest] for the benefit of themselves," their fraudulent conduct could not "be imputed to Bankest as a matter of law."  *See* (Pl. Exh. 1 [2005 Summary Judgment Order] at 25, 27; *see also id.* at 27 ("[T]he Capital Officers acted for their own benefit and adversely to Bankest in loading Bankest with $170 million in debt.").[4]  Moreover, the Court held that because BDO had a duty to detect the fraud at Bankest, BDO could not benefit from the fraud it failed to detect by asserting claims or defenses based on that fraud.  *See* (*id.* at 23-24.)

### 2.    2006 Imputation & Damages Order

When BDO again raised the imputation defense in its 2006 Motion to Dismiss, this Court held that its 2005 Summary Judgment Order precluded BDO from raising the defense.  *See* (Pl. Exh. 2 [2006 Imputation/Damages Order] at 11-12.)  Specifically, the Court found that "[p]ursuant to the Summary Judgment Order… the fraud perpetrated by the Capital Officers is not imputed to Bankest."  (*Id.* at 12.)

The Court further held that imputation/*in pari delicto* could not apply in this case as a matter of law.  *First*, the Court held BDO cannot avail itself of the imputation defense based on the Capital Officer's fraud when BDO specifically agreed to detect that very fraud.  *See* (Pl. Exh. 2 [2006 Imputation/Damages Order] at 12 (citing *NCP Litig. Trust v. KPMG, LLP*, 2006 WL 1766178, at *11 (N.J. Sup. Ct. June 28, 2006)).  *Second*, BDO cannot assert the *in pari delicto*

---

[4]The Court's holding was not disturbed on appeal.  The U.S. District Court specifically left undisturbed all findings and analysis concerning imputation when it dismissed BDO's appeal as moot, vacating only this Court's findings of fact and conclusions of law relating to BDO's claims for fees and expenses.  (Pl. Exh. 4 [May 8, 2007 "Order Dismissing Appeal as Moot, Vacating Bankruptcy Court Order in Part, and Closing Case"] at 13-14.)

13

defense because BDO states it was not part of any fraudulent scheme at Bankest and the *in pari delicto* defense may only be asserted by a defendant who was involved in the same fraudulent scheme as the plaintiff. *See* (Pl. Exh. 2 [2006 Imputation/Damages Order] at 12 n.10 (citing cases).) *Third*, the Court held that imputation is barred where, as here, there are innocent directors. *See* (*id.* at 12-14.)

      **B.**     The Innocent Directors Preclude the Imputation/*In Pari Delicto* Defense.

      The Court's two prior rulings held that because Bankest had four innocent directors—the Bank Directors—BDO's imputation and *in pari delicto* defenses failed. Now on this motion, the evidence is undisputed that Bankest had innocent directors. Thus, the defenses again fail, and summary judgment is denied.

      **1.**     **The Law Holds that Innocent Directors Preclude the Imputation/*In Pari Delicto* Defense.**

      The law cited by the parties on this motion is consistent with the Court's prior holdings and there is no basis for the Court to diverge from its prior orders. As this Court held in its 2006 Order:

> The case law is uniform that a corporation suffers legal injury from fraud committed by insiders and the corporation has standing to sue third parties for that injury as long as there were other insiders who were innocent of the fraud.

(Pl. Exh. 2 [2006 Imputation/Damages Order] at 13.) Indeed, the case law has remained uniform that if there are "innocent decision-makers" at the corporation, the wrongdoing cannot be imputed to the corporation. *See, e.g.*, *O'Halloran v. PriceWaterhouseCoopers LLP*, 969 So. 2d 1039 (Fla. 2d DCA 2007); *In re Fuzion Tech. Group, Inc.*, 332 B.R. 225, 231 (S.D. Fla. 2005).

      Thus, only where there is no evidence of innocent insiders at the corporation do courts find the corporation to be merely a sham or alter ego of the wrongdoers and bar claims brought

on behalf of the corporation against third parties.  *See, e.g.*, *Gee*, 625 So. 2d 1 (company was

under the "management and control" of wrongdoer); *Feltman v. Prudential Bache Securities*,

122 B.R. 466, 473-74 (S.D. Fla. 1990); *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543,

551 (Fla. 2d DCA 2003).

BDO cites *Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d

1145 (11th Cir. 2006) to the Court in support of its argument on imputation, however that

decision concerns a company where a single shareholder committed fraud and there were no

innocent insiders.  437 F. 3d at 1148.  By contrast, as reviewed below, there is substantial and

undisputed evidence that the four Bank Directors had no knowledge of the fraud being

committed on Bankest by the Capital officers, and that evidence precludes summary judgment.

> **2.    Evidence of Innocent Directors Precludes the Application of the Imputation and *In Pari Delicto* Defenses.**

The Bank Directors testified that they did not know of the fraud.  (Pl. Exh. 59 [7/3/07

p.m. Tr.] at 264-65 ("we had no reason to suspect that [the accounts receivable] were fake"); Pl.

Exh. 61 [7/20/07 a.m. Tr.] at 1295-96 ("Q. Well, sir, were you aware that fake documents were

being created at E.S. Bankest? A. No, I was not."); Pl. Exh. 62 [4/20/07 p.m. Tr.] at 1402 ("And

we firmly believed those receivables were collectible because we firmly believed the collateral

was there. Now we know that the collateral wasn't there."); Pl. Exh. 63 [7/24/07 a.m. Tr.] at

1832, 1834 ("But at the time we didn't know they were fake."); Pl. Exh. 56 [5/18/08 p.m. Tr.] at

4500-02; Pl. Exh. 57 [5/22/07 Tr.] at 4922.)

The Bank Directors attended monthly board meetings, where the company's activities

and status was reviewed.  (Pl. Exh. 63 [7/24/07 Tr.] at 1831-34.)  The four Bank Directors

received and reviewed BDO's audited financial statements.  (Pl. Exh. 59 [7/3/07 Tr.] at 260; Pl.

Exh. 56 [5/18/07 pm. Tr.] at 4500-01.)  The evidence also demonstrates that BDO knew the

Bank Directors reviewed BDO's audited financial statements—BDO addressed each annual audit to the "Board of Directors," which included the four Bank Directors.  (Pl. Exhs. 9, 10, 11, 12, 13 [BDO Seidman Audited Financial Statements of Bankest].)  Thus, had BDO found the fraud, the Bank Directors testified that they were in the position to prevent the corporation from continuing to incur debt and the damages to Bankest would have never occurred.  (Pl. Exh. 63 [7/24/07 a.m. Tr.] at 1832 ("If BDO had told us at any time … that they were fake receivables we would never have sold any notes to the customer."); Pl. Exh. 60 [7/16/07 a.m. Tr.] at 736 ("So if back at the end of '96 BDO had told us the accounts were fraudulent, we would have never entered into the company at the end of 1998. Unfortunately it didn't happen that way."); Pl. Exh. 56 [5/18/08 p.m. Tr.] at 4500.)  Even BDO's own expert admitted that if BDO had done its job and found the fraud, none of the losses would have occurred.  (Pl. Exh. 66 [8/3/07] at 3359-3361.)

Moreover, at least one jury has found this evidence to demonstrate the complete innocence of the Bank Directors.  On this same evidence, after a five month trial, a jury found all of the Bank Directors innocent of any fraud, negligence or fault for the fraud at Bankest.  (Pl. Exh. 6 [Phase II Verdict Form in *Banco Espirito Santo Int'l Ltd. v. BDO Seidman*, Case No. 04-14009 CA 31 ("Phase II Verdict Form")] at 2-6.)

On these facts—that demonstrate that the four Bank Directors were innocent directors with the ability to prevent the losses had they been informed of the fraud—summary judgment must be denied.  *See, e.g., O'Halloran*, 969 So. 2d at 1045-46.

C.    The Evidence of Looting and the Capital Officers' Adverse Interest
**Precludes the Application of the Imputation and In Pari Delicto Defenses.**

A second, independent ground to preclude the Application of the Imputation/*In Pari Delicto* defense is whether there is a genuine issue of material fact that the Capital Officers looted Bankest.  There is, and summary judgment must be denied.

1.    **Looting by Officers Precludes the Imputation/*In Pari Delicto* Defense as a Matter of Law.**

If the Capital Officers looted Bankest for the benefit of themselves, BDO cannot assert the imputation/*in pari delicto* defense.  *See Gee*, 625 So. 2d at 3.  In seeking to bar Freeman's claims, BDO again relies on the line of cases finding that if the fraud provided some benefit to the corporation, imputation is warranted.  *See*, *e.g*., *id.*; *Banco Latino Intern v. Lopez*, 95 F. Supp. 2d 1327, 1335-36 (S.D. Fla. 2000).  This Court, however, already rejected this argument and found that *Gee* supported summary judgment where, as here, the Capital Officers looted Bankest.  (Pl. Exh. 1 [2005 Summary Judgment Order] at 25, 27.)  As this Court previously held, driving a company into debt is not a benefit to the corporation.  (Pl. Exh. 1 [2005 Summary Judgment Order] at 25); *see also In re Huff*, 109 B.R. 506, 512 (Bankr. S.D. Fla. 1989) (Cristol, J.) (holding that adding more and more debt damages corporation and bars imputation).

Still further, in the cases cited by BDO there was no evidence of innocent insiders and as discussed above, the presence of innocent insiders precludes the imputation defense.

2.    **The Evidence Creates a Genuine Issue of Material Fact of Looting Which Precludes the Imputation/*In Pari Delicto* Defense.**

Plaintiff presents substantial evidence regarding the nature of the fraud and the fact that the fraud was not to Bankest's benefit.  The Capital Officers stole hundreds of millions of dollars by presenting false financial statements to Espirito Santo Bank in order to continue obtaining funding.  (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 868, 877-78, 892.)  The Capital Officers included

hundreds of millions of dollars of fake accounts receivable in Bankest's financial statements, even though the accounts receivable did not exist. (*See id.* at 853-62.) They represented that invoices were collectible that they knew were not collectible, (*id.* at 864), and created fictitious accounts receivable records where there were no actual invoices or sales at all. (*Id.* at 865.) At no time did the Bank Directors know that the accounts receivable did not exist—in fact the Bank Directors drew comfort from BDO's audits certifying—falsely—the accounts receivables as real. (Pl. Exh. 57 [7/3/07 p.m. Tr.] at 264-65 ("And again, the fact that we – for five years we had received clean and qualified audits gave us a great degree of comfort in that the accounts receivable portfolio was there and we had no reason to suspect they were fake."); Pl. Exh. 63 [7/24/07 a.m. Tr.] at 1832 ("But at the time we didn't know they were fake. If BDO would have told us at any time … that they were fake receivables we would never have sold any notes to the customer."); Pl. Exh. 56 [5/18/07 pm. Tr.] at 4500-01 ("Q. Sir, when you reviewed BDO's audited financial statements, was it important for you to know that the accounts receivable reflected in the statement were real? A. Yes, sir."); Pl. Exh. 61 [7/20/07 a.m. Tr.] at 1295; Pl. Exh. 62 [7/20/07 p.m. Tr.] at 1402.)

The Capital Officers diverted the looted funds, which were never recovered, from Bankest to various companies and drove Bankest into $170 million worth of debt—all without the Bank Directors' knowledge or consent. (Pl. Exh. 35 [4/11/07 p.m. Tr.] at 442; Pl. Exh. 37 [4/16/07 a.m. Tr.] at 856-62, 897-98.) At a minimum, there is a question of fact whether the Capital Officers were acting adversely to the corporation and summary judgment is denied on imputation grounds. *See Fuzion Tech. Group*, 332 B.R. at 231 (denying summary judgment on imputation defense); *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1314-15 (M.D. Fla. 2001) (denying summary judgment on *in pari delicto* defense where significant disputes of

18

material fact existed).  It is undisputed that the Bankest Capital Officers saddled Bankest with more than $170 million in debt that it could not repay.  (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 915.)

      **D.**      **BDO Cannot Assert that Bankest's Fraud Gives Rise to the Imputation/*In Pari Delicto* Defense Where BDO Agreed to Detect that Fraud.**

As this Court previously held, BDO cannot on the one hand have a duty to detect fraud at Bankest, and then on the other hand claim that the very fraud it failed to detect bars the claims against it through the imputation/*in pari delicto* defense.  (Pl. Exh. 1 [2005 Summary Judgment Order] at 24; *see also* Pl. Exh. 2 [2006 Imputation/Damages Order] at 12 (citing *NCP Litig. Trust*, 2006 WL 1766178, at *11).)

The Court now reaffirms that holding with the benefit of BDO's admission that it had a duty to detect the fraud at Bankest.  BDO's Lead Audit Partner, Sandor Lenner testified:

> Q.     Mr. Lenner, you were a certified public accountant doing audits at BRFFC and E.S. Bankest, right?
>
> A.     Yes.
>
> Q.     And you understood you had duties, right?
>
> A.     Yes.
>
> . . . .
>
> Q.     And you understood that one of your duties was to make sure that there were no material misstatements in these financial statements due to fraud, right?
>
> A.     Yes.
>
> Q.     And here there was a great big fraud, right?
>
> A.     Yes.
>
> . . . .
>
> Q.     And you had the duty to find the great big fraud in 1998, 1999, 2000, 2001, and 2002, right?

19

A.     Yes.

(Pl. Exh. 51 [5/3/07 Tr.] at 3150-51.)

As in *NCP Litigation Trust*, here BDO expressly agreed to detect fraud in connection

with its audit and should not be allowed to avoid liability because of that very fraud.  *See* 2006

WL 1766178, at *11; *see also* (Pl. Exh. 51 [5/3/07 Tr.] at 3150-51.)  Contrary to what BDO

argues, this is not a blanket bar applicable to all auditors; rather, the Court holds that in this

specific circumstance when the auditors agree to detect fraud, they cannot raise the imputation

defense to avoid liability for their failure to detect the fraud.  *See* (Pl. Exh. 1 [2005 Summary

Judgment Order] at 24; Pl. Exh. 2 [2006 Imputation/Damages Order] at 12.)

This Court holds that BDO's agreement to detect fraud as Bankest's auditor precludes

BDO from using that fraud it failed to detect to assert the imputation/*in pari delicto* defense as a

shield to Plaintiff's claims.  *See* (Pl. Exh. 1 [2005 Summary Judgment Order] at 24; Pl. Exh. 2

[2006 Imputation/Damages Order] at 12.)  Summary judgment is therefore denied for this

independent reason.

### E.     The Law Precludes the Imputation/*In Pari Delicto* Defense Where BDO Was Not a Co-Conspirator in the Fraud.

The imputation/*in pari delicto* defense is available only to a defendant who was involved

in the same fraudulent scheme as the plaintiff.  (Pl. Exh. 2 [2006 Imputation/Damages Order] at

12 n.10); *see, e.g.*, *Kulla v. E.F. Hutton & Co.,* 426 So. 2d 1055, 1057 (Fla. 3d CA 1983) ("It is a

well-settled principle of law requiring little discussion that one who himself engages in a

fraudulent scheme, that is, acts *in pari delicto*, may forfeit his right to any legal remedy against *a*

*co-perpetrator.*" (emphasis added)); *Smith ex rel. Estates of Boston Chicken, Inc. v. Arthur*

*Andersen LLP*, 175 F. Supp. 2d 1180, 1199 (D. Ariz. 2001) ("The doctrine of *in pari delicto*

20

dictates that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another *participant in that conduct,…*the law will aid neither, but rather, will leave them where it finds them." (emphasis added)).  BDO does not argue that it was a co-conspirator with Bankest in the fraud, and therefore cannot raise *in pari delicto* as a defense to Freeman's claims.

For this independent reason, summary judgment is denied.

## III.    PLAINTIFF'S EVIDENCE IS SUFFICENT TO CREATE AN ISSUE OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT ON SCIENTER

BDO moves for summary judgment on the scienter element of Plaintiff's 10b-5 claim. BDO previously moved to dismiss on the same grounds and this Court denied that motion because the allegations in Plaintiff's complaint, taken as true, sufficiently alleged scienter.  (Pl. Exh. 3 [2006 Securities Fraud Order].)  Now, on summary judgment, Plaintiff presents evidence to support each of the allegations the Court already found would establish scienter.  Thus, the Court finds that the evidence creates a genuine issue of material fact as to whether BDO acted with the "severe recklessness" necessary to satisfy the scienter requirement for a Rule 10b-5 claim.  *See Bryant,* 187 F.3d at 1283 (allegations that defendant "acted with a severely reckless state of mind still suffices to state a claim for civil liability under 10b-5").

### A.    Legal Requirement of Scienter in Audit Cases.

The severe recklessness by an auditor necessary to satisfy the scienter requirement may be proved in several ways.  Most fundamentally, proof that an auditor ignored red flags that would have put any "reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors" can demonstrate scienter.  *Sunterra Corp. Sec. Litig.,* 199 F. Supp. 2d at 1333.  The "sheer magnitude" of the fraud, combined with GAAS and GAAP violations, can demonstrate scienter.  *See In re Sunbeam Secs. Litig.*, 89 F. Supp. 2d 1326, 1345 (S.D. Fla. 1999).  A scope limitation, where the audit client fails to provide

21

documents needed for the audit, raises a red flag that, if ignored by the auditor, can establish scienter.  *See In re Suprema Specialties, Inc. Sec. Litig*., 438 F.3d 256, 280 (3d Cir. 2006). Finally, a conflict of interest by the auditor, showing a motive to ignore the fraud, establishes scienter.  *See In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 655 (E.D. Va. 2000). Plaintiffs have submitted evidence of each of these grounds and the Court holds that there are genuine issues of material fact that preclude summary judgment.

### B.    A Jury Reasonably Could Find that BDO Had a Conflict of Interest and Therefore Acted with "Severe Recklessness".

#### 1.    BDO Had a Public Duty to Be Independent and Free of Conflicts of Interest.

Auditors like BDO owe a public duty and must be independent of the company they are auditing:  an auditor's "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust." *United States v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984); *KPMG Peat Marwick v. National Union Fire Ins. Co.*, 765 So. 2d 36, 38 (Fla. 2000).  Moreover, the ethical rules governing auditors require auditors to be independent or free from conflicts of interest.  (Pl. Exh. 48 [4/30/07 Tr.] at 2483 ("To do an audit, a CPA must be independent. … which is one of the bedrock generally-accepted auditing standards").) -

#### 2.    Plaintiff Presented Evidence that BDO Was Not Independent Because It Verified Its Own Financial Partner's Receivables.

Plaintiffs submitted substantial factual and expert testimony that BDO was not independent and had a conflict of interest in auditing Bankest.  *See, e.g., In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 655 (E.D. Va. 2000).  BDO was financial partners with a Bankest client, Stratasys.  Specifically, as Stratasys' partner, BDO shared in Stratasys' revenues, (Pl. Exh. 46 [4/24/07 Tr.] at 2347-48), and there is evidence that BDO intended to make millions

from its partnership with Stratasys, a client of Bankest.  *See* (Pl. Exh. 23 [5/23/01 Meeting

Memorandum] ("BDO estimates it will originate more than 10 million dollars in business to the

StrataSys BDO Star Wagon alliance over the next 12 months."); Pl. Exh. 35 [4/11/07 p.m. Tr.] at

363-65; Pl. Exh. 46 [4/24/07 Tr.] at 2323-24; Pl. Exh. 47 [4/26/07 Tr.] at 2435-37.)

As the auditor of Bankest, BDO was required to verify whether the Stratasys' receivables

on Bankest's books were real.  (Pl. Exh. 46 [4/24/07 Tr.] at 2347-48)  Thus, BDO was verifying

its own financial partner's receivables – receivables in which BDO had a financial interest.

(Exh. 48 [4/30/07 Tr.] at 2550-51.)  Plaintiff's expert testified that this destroyed BDO's

independence and created a conflict of interest that should have precluded BDO from even doing

the Bankest audits.  (*Id.* at 2483, 2487, 2547-53; *id.* at 2490-91 (an auditor's independence "is of

the utmost importance.").)

### 3.    Plaintiff Presented Evidence that BDO Turned a Blind Eye and Verified $77 Million of Its  Financial Partner's Fake Receivables as Real.

Plaintiffs further presented evidence that BDO knew or recklessly disregarded that

Stratasys' receivables were real, and that the conflict of interest caused harm.  BDO certified $77

million in Stratasys receivables as real, when all of them were fake.  (Pl. Exh. 46 [4/24/07 Tr.] at

2346-48.)  As Stratasys' business partner, BDO had access to Stratasys' financial information

which showed Stratasys was not generating $77 million in receivables, but only a small fraction

of that – less than $1 million in accounts receivable.  *See* (Pl. Exh. 36 [4/13/07 Tr.] at 829-36

(BDO's "own records showed both numbers, and they're totally at odds with each other.") Pl.

Exh. 24 [2/14/03 Email from Mr. Parlapiano to Mr. Mendez]; Pl. Exh. 34 [4/11/07 a.m. Tr.] at

284-85 (BDO had the right to audit the books and records of StrataSys); Pl. Exh. 46 [4/24/07 Tr.]

at 2340-41.)

### 4. Plaintiff Presented Evidence that Lenner Had a Personal Financial Interest in Stratasys.

Plaintiff also presents evidence that Mr. Lenner, the lead audit partner on the Bankest audit, had a personal financial stake in the BDO-Stratasys partnership that placed him in direct conflict with his duties as Bankest's auditor. Mr. Lenner wrote a memorandum to his superiors to justify increasing his compensation at BDO, and Mr. Lenner trumpeted the forging of the BDO-Stratasys alliance as a reason why. (Pl. Exh. 25 [Good Guy Memo] at 1 ("I have very high expectations for the Miami office and the firm as a result of this Alliance.").) Mr. Lenner admitted his own personal benefit was a motive for the BDO-Stratasys alliance. (Pl. Exh. 46 [4/24/07 Tr.] at 2305-08; Pl. Exh. 47 [4/26/07 Tr.] at 2435-37.)

### 5. Plaintiff's Expert Testified that BDO Was Not Independent and Had a Severe Conflict of Interest.

Plaintiff's ethics expert testified that "[t]his is a convoluted, intertwined, first class conflict of interest. And let me tell you, I believe that it is with all of my heart and soul, and it's one of the worst conflicts I've ever seen." (Pl. Exh. 49 [5/2/07 a.m. Tr.] at 2839.) In plain terms, Plaintiff's expert testified that BDO's relationship with Stratasys meant BDO had a direct interest in the positive financial results of BDO's own audits. (Pl. Exh. 48 [4/30/07 Tr.] at 2550-51 ("BDO has a conflict of interest here … So on the one hand they're rooting for StrataSys. On the other hand they have to be totally without bias when they audit the financial statements of Bankest."); *see also id.* at 2483, 2487, 2547-53; *id.* at 2490-91.)

Thus, a jury could easily find that the evidence demonstrates that BDO's relationship with Stratasys both created a conflict of interest and gave it an incentive to ignore the numerous red flags that warranted further investigation, which, according to Plaintiff's expert, were never investigated. *See* (Pl. Exh. 48 [4/30/07 Tr.] at 2637-38 ("These work papers do not support any

opinion on the financial statements.").)  Plaintiff's evidence of BDO's motive to turn a blind eye

to the fraud creates an issue of material fact that BDO acted with severe recklessness.  *See*

*Bryant*, 187 F.3d at 1285.

    **C.**    **A Jury Could Find BDO Acted With Scienter Because BDO Repeatedly Ignored Red Flags that Put It on Notice of the Fraud.**

    Moreover, there is evidence that BDO and its lead partners on the Bankest audit ignored

numerous red flags that warranted further investigation.  *See Sunterra Corp. Sec. Litig.,* 199 F.

Supp. 2d at 1333 (holding that to establish scienter, red flags are what would have put any

"reasonable auditor on notice that the audited company was engaged in wrongdoing to the

detriment of its investors").  A jury could determine that in ignoring these obvious and serious

red flags, BDO acted with scienter.

    **1.**    **Plaintiff Presented Evidence that BDO Continued to Audit Bankest Even After the Bankest Capital Officers Refused to Give BDO the Documents that Would Have Revealed the Fraud.**

    There is undisputed evidence that Bankest—at the direction of the Capital Officers—

repeatedly refused to provide BDO with documents and information BDO deemed necessary to

perform accurate audits.  *See* (Pl. Exh. 39 [4/17/07 a.m. Tr.] at 1094-95, 1099-1118; Pl. Exh. 44

[4/20/07 a.m. Tr.] at 1799-1800.)  During BDO's first audit of Bankest, one of the Capital

Officers refused to provide BDO with the very documents that would have provided the sole

independent confirmation that the receivables on Bankest's books were real.  *See* (Pl. Exh. 26

[Rivera Aff.] at ¶¶12-15; Pl. Exh. 39 [4/17/07 a.m. Tr.] at 1099-1100.)  The Capital Officers

refused to provide the documents—because the documents did not exist—which sufficiently

raised the suspicion of the audit manager that he terminated the audit.  (*Id.* at 1101-02.)  The

audit resumed only because the audit manager's decision to discontinue the audit was overridden

by BDO's lead audit partner, Sandy Lenner.  (Pl. Exh. 26 [Rivera Aff.] at ¶¶15, 23-25; Pl. Exh.
39 [4/17/07 a.m. Tr.] at 1110-18.)

When an audit client—here Bankest under the control of the Bankest Capital officers—
limits the scope and breadth of an audit, it raises a red flag and can establish scienter.  *See
Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d at 280 (client's limitation of scope of audit is a red
flag raising suspicion of fraud); *see also* (Pl. Exh. 43 [4/19/07 p.m. Tr.] at 1752-53; Pl. Exh. 44
[4/20/07 a.m. Tr.] at 1766-68.)

### 2.   Plaintiff Presented Evidence that BDO Ignored Suspicious Results and Continued Audits.

Plaintiff claims that even when BDO obtained a highly suspicious result in testing the
validity of Bankest's accounts receivable, it did not investigate those results.  Instead, it chose to
ignore the suspicious result and switched to a different—and less rigorous and reliable—test.
Plaintiff's evidence is that when BDO sent out confirmations to verify the existence of Bankest's
accounts receivable, none of the confirmations were returned.  (Pl. Exh. 43 [4/19/07 p.m. Tr.] at
1665-1670; Pl. Exh. 50 [5/2/07 p.m. Tr.] at 2905; Pl. Exh. 40 [4/17/07 p.m. Tr.] at 1197-98
(received 2 confirmations for 1998 audit); Pl. Exh. 16 [1998 A/R Circularization Workpaper]; Pl.
Exh. 19 [1999 Confirmation Control]; Pl. Exh. 20 [1999 Workpaper] at BDO 03392 ("no
confirms received"); Pl. Exh. 21 [2000 Confirmation Control]; Pl. Exh. 22 [2001 Confirmation
Control].)

Plaintiff's expert, James Feltman, testified that when no confirmations are returned, it is
indicative that there is a "major problem." (Pl. Exh. 43 [4/19/07 p.m. Tr.] at 1687-88, 1692
(noting that it would "cause the hair on the back of [an auditor's] neck to stand up").)  BDO's
own audit manual warns auditors that a zero confirmation response rate is a potential indicator of

fraud.  (*Id.* at 1674-75; Pl. Exh. 51 [5/3/07 Tr.] at 3157 ("Q. Mr. Lenner, your own audit manual

says, if you don't get confirmations back, the reason may be because the accounts receivable

don't exist, right? A. Yes. Q. And that's what happened in this case, right? A. Yes."); Pl. Exh. 14

[BDO Audit Manual] at BDO 031771.)  According to Mr. Feltman's expert testimony, in such a

situation, the auditor must take strong independent measures to validate the existence of accounts

receivable, yet there is no evidence that BDO did so.  (Pl. Exh. 43 [4/19/07 p.m. Tr.] at 1677-78

("Under these circumstances, it's inconceivable that the auditor wouldn't have taken strong

measures, independent measures to validate the existence of accounts receivable.").)

     BDO's audit manual also required that BDO check shipping documents to confirm the

account receivables.  (Pl. Exh. 14 [BDO Audit Manual] at BDO 031774.)  Plaintiff presents

evidence that BDO did not do what it was required to do and never looked at shipping

documents.  (Pl. Exh. 52 [5/4/07 a.m. Tr.] at 3214-15.)  Moreover, in this circumstance where

virtually all the transactions flowed through related party Capital, BDO's audit manual warned of

the possibility for fraud.  *See* (Pl. Exh. 14 [BDO Audit Manual] at BDO 031890.)  Yet BDO

admits it counted on the Capital Officers "to detect and prevent fraud."  (Pl. Exh. 54 [5/9/07 Tr.]

at 3944-45; Pl. Exh. 18 [Consideration of Fraud Risk Workpaper] at BDO 00649.)

     Plaintiff claims that instead of following its audit manual and subjecting Bankest to more

rigorous review, the evidence is that BDO chose to apply consistently less rigorous tests, until

ultimately BDO accepted verifications based on Bankest internal documents prepared by the

Capital Officers—the very people committing the fraud.  (Pl. Exh. 43 [4/19/07 p.m. Tr.] at

170631, ("the agreed to invoice [test] without third-party corroboration is very weak, if any,

audit evidence… over time BDO began to rely more and more heavily [on it]."); *id*. at 1738-42.)

Finally, plaintiff's expert Mr. Feltman testified that BDO's failure to verify Bankest's accounts

receivable with information obtained from independent third parties violated GAAS.  *See* (Pl. Exh. 43 [4/19/07 p.m. Tr.] at 1729-31, 1741-42; Pl. Exh. 44 [4/20/07 Tr.] at 1858-59 ("There wasn't the audit evidence that would have permitted them to make those conclusions."); Pl. Exh. 45 [4/23/07 p.m. Tr.] at 2036-37 ("you'd need some third party evidence"); Pl. Exh. 48 [4/30/07 Tr.] at 2637-38.)

A jury could reasonably find that BDO's decision to ignore numerous red flags and its repeated violations of its own audit manual and GAAS establishes scienter.

**D.    A Reasonable Jury Could Conclude that the Sheer Magnitude of the Fraud Demonstrates that BDO Was Severely Reckless in Failing to Discover the Fraud.**

Finally, a jury could find that the "sheer magnitude" of the fraud perpetrated on Bankest by the Capital Officers supports the conclusion that BDO was severely reckless in failing to discover it.  *See In re Sunbeam Secs. Litig.*, 89 F. Supp. 2d 1326, 1345 (S.D. Fla. 1999).  BDO does not dispute that over $220 million of the accounts receivable it certified in 2002—about 99% of Bankest's assets—did not actually exist.  (Pl. Exh. 35 [4/11/07 p.m. Tr.] at 391-92.)  The massive scale of the Bankest fraud, coupled with BDO's GAAP and GAAS violations, creates an issue of material fact as to whether BDO acted with scienter.  *See Sunterra Corp. Secs. Litig.*, 199 F. Supp. 2d at 1334-35 (violations of GAAS that lead to a "drastic overstatement of financial results" support a finding of recklessness); *see also In re Eagle Bldg. Tech. Inc. Sec. Litig.*, 319 F. Supp. 2d 1318, 1327-28 (S.D. Fla. 2004) ("When one of relatively few transactions is fictitious and makes up over 74% of the company's revenue, the opportunity for the auditor to discover the fraud increases, and the magnitude of the fraud gives rise to an inference of scienter.").

In light of the evidence supporting the Complaint's allegations—all of which is evidence supporting the very allegations which this Court already found demonstrate BDO's scienter in denying BDO's motion to dismiss—BDO's argument fails. Freeman has established significant evidence of scienter and summary judgment is denied.

## IV.  PLAINTIFF HAS ESTABLISHED THE "IN CONNECTION WITH" AND DAMAGES ELEMENTS OF ITS 10B-5 CLAIM

In moving for summary judgment on the causation, "in connection with" and damages elements of Plaintiff's 10b-5 claim, BDO argues that Plaintiff has no recoverable damages because Plaintiff cannot show the required connection between the securities transactions at issue—the sale of Bankest debenture notes—and Bankest's $170 million loss. BDO argues that the fact that the proceeds of the debenture notes were misappropriated by the Capital Officers after the sale of the debenture note means that Plaintiff cannot establish "loss causation" and has no damages recoverable under 10b-5. BDO's argument cannot be credited in light of the Supreme Court's decision in *SEC v. Zandford*, 535 U.S. 813 (2002). Moreover, Plaintiff's evidence precludes summary judgment. The Court therefore denies summary judgment on these elements.

### A.    The Supreme Court's Decision in *Zandford* Precludes Summary Judgment.

BDO's argument that as a seller of securities, Bankest cannot establish loss causation or damages because its damages were not suffered at the time of the securities sale fails. The Supreme Court's decision in *SEC v. Zandford*, 535 U.S. 813 (2002) is squarely on point.[5]  In

---

[5] BDO also cites *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), to the Court for the proposition that the only way Plaintiff could suffer a recoverable loss is if the loss occurred at the time of the transaction, however, that is not the holding in *Dura*. In *Dura*, the Court held that allegations of an "inflated purchase price" alone will not establish loss causation because Plaintiff must show both that the price was inflated by the misrepresentation and that the "defendant's misrepresentation proximately caused the plaintiff's economic loss." 544 U.S at 346. Moreover, *Dura* is inapplicable because the facts in *Dura* did not concern a sale of securities where the proceeds were subsequently misappropriated as is the case here and in *Zandford*.

*Zandford*, the Court recognized a claim under 10b-5 where the seller initially received fair value for his stock but subsequently had the proceeds misappropriated through fraud and sought damages for the full amount lost.  535 U.S. at 820-21.  The Supreme Court rejected the defendant's defense that the security sales were lawful transactions separate from the fraudulent misappropriation and found that the "fraud coincided with the sales themselves."  *Id*. at 820. Indeed, the Supreme Court stated that whether the proceeds of the security sales were subsequently misappropriated was "irrelevant," *id.* at 822, and that it "is enough that the scheme to defraud and the sale of securities coincide." *Id.* (explaining *Superintendent of NY Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6 (1971)).

In arguing that because Bankest—a seller of securities as in *Zandford*—received the full value of the debenture notes, it did not suffer a loss in connection with the sale of securities and therefore had no damages, BDO relies on cases that have been superseded by the Supreme Court's 2002 decision in *Zandford*.  In light of *Zandford*, BDO's argument that Plaintiff's 10b-5 claim fails simply because the funds were first received by Bankest and then misappropriated by the Capital Officers is without legal support.

## B.    Plaintiff's Evidence Precludes Summary Judgment on Causation and Damages.

As defined by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo,* loss causation is "a causal connection between the material misrepresentation and the loss."  544 U.S. 336, 342 (2005).  Thus, "the loss causation requirement will be satisfied if such conduct has the effect of concealing the circumstances that bore on the ultimate loss."  *See In re Parmalat Secs. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005).  Therefore, Plaintiff must demonstrate that BDO's misrepresentations about the existence of $225 million in false accounts receivable

concealed the fraud that led to the loss of over $170 million.  As discussed below, Plaintiff's

evidence is enough to create an issue of genuine fact and summary judgment is denied.

As this Court previously held, to establish the causal link between Bankest's damages

and BDO's material misstatements—*i.e.* that the loss was foreseeable—Freeman must have

evidence that "BDO knew or should have known that its unqualified financial statements were

provided to the Bank Directors who authorized the issuance of the debenture notes and the

investors who purchased the debenture notes."  (Pl. Exh. 3 [2006 Securities Fraud Order] at 16);

*see also Parmalat Secs. Litig.*, 376 F. Supp. 2d at 510.  The Court finds that there is substantial,

and often undisputed, evidence that BDO knew both that its audited financial statements were

provided to Bankest's directors and that the financial statements would be provided to Bankest's

investors.

### 1.    The Evidence Creates a Genuine Issue of Material Fact as to BDO's Knowledge.

BDO admits that it knew its unqualified audited financial statements were provided to the

Bank Directors.  (Pl. Exh. 27 [BDO Responses to Requests for Admission] at 12-13 ("BDO

admits that it understood that representatives of the Espirito Santo Bank in Florida, that were also

members of Bankest Management, were supposed to receive BDO's opinion relating to the

Bankest financial statements that BDO audited").)  BDO even addressed the audits to Bankest's

Board of Directors.  *See* (Pl. Exhs. 9, 10, 11, 12, 13 [BDO Seidman Audited Financial

Statements of Bankest].)

There is also evidence that BDO knew the audits were being provided to investors in

connection with the sale of the debenture notes.  The audits themselves detail how Bankest

issued debenture notes.  (Pl. Exh. 10 [BDO Seidman Audited Financial Statement of Bankest] at

10.)  BDO's own workpapers acknowledge that the audited financial statements would be used

in connection with private placements. (Pl. Exh. 15 [1998 Inherent Risk Questionnaire] at BDO 00658.) Indeed, the Bankest Private Placement Memorandum ("PPM") provided to investors attached BDO's audits. (Pl. Exh. 30 [PPM] at ES 0256348, ES0256512-26; Pl. Exh. 37 [4/16/07 a.m. Tr.] at 905.)

BDO's own expert testified that if BDO would have detected the fraud in 1998 in its first audit of Bankest, none of the losses would have occurred. (Pl. Exh. 66 [8/3/07 p.m. Tr.] at 3357-58.)

Plaintiff has presented at least a material issue of fact regarding whether it is foreseeable that false certifications in BDO's audits would lead to losses when their falsity became known. *See, e.g., Cromer Finance Ltd. v. Berger*, 2003 WL 21436164, at *7 (S.D.N.Y. June 23, 2003) (denying summary judgment on the issue of causation when audits attached to investment materials because "audits of investment funds . . . are generally understood to be essential if a fund is to obtain any investors.").

### 2. The Evidence Creates a Genuine Issue of Material Fact as to Whether BDO's Audits Concealed the Fraud.

It is also undisputed that the BDO audits attached to Bankest's PPMs falsely certified hundreds of millions worth of fake accounts receivables on Bankest's books as real. (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 852-62.) Bankest's audits were used to issue debenture notes, increasing Bankest's liabilities by $170 million dollars. (*Id.* at 849, 877-78, 901-02, 905, 915; Pl. Exh. 30 [PPM] at ES 0256348, ES0256512-26.) There is substantial evidence that BDO's audits were the key to Bankest's ability to sell the debenture notes. (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 905 ("[The audit] was critical.").) Even BDO's own expert testified that without BDO's audits, none of the resulting debt would have been incurred by Bankest. (Pl. Exh. 66 [8/3/07 p.m. Tr.] at 3352-64.) Thus, there is substantial evidence that the $170 million loss was both foreseeable and

could not have occurred without BDO's false and misleading audits.  (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 891-92; *id*. at 877-91.)

As to BDO's argument that it was the fraud that caused the $170 million loss, thereby eliminating BDO from the causal chain, it too fails.  BDO admits it had a duty to detect fraud in conducting the Bankest audits.  (Pl. Exh. 51 [5/3/07 Tr.] at 3150-51.)  It is undisputed that BDO failed to detect the fraud at Bankest.  This Court already denied summary judgment and found it foreseeable that the "negligent failure to detect falsifications will likely result in continued falsifications." (Pl. Exh. 1 [2005 Summary Judgment Order] at 23.)  Even BDO admits that to detect the fraud, it only had to find one fake receivable.  (Pl. Exh. 52 [5/4/07 a.m. Tr.] at 3239.) Thus, the fraud and—most important—BDO's failure to detect it are part of the proximate cause that foreseeably led to Bankest's $170 million loss.  From these facts, a reasonable juror could find that it was foreseeable that BDO's misrepresentations would cause Plaintiff's loss and summary judgment must be denied.  *Cromer Finance Ltd.*, 2003 WL 21436164, at *7 (summary judgment denied because defendant's argument that the "true causes of plaintiffs' losses" were due to fraud not "appropriate for summary judgment").

## V.    THE EVIDENCE PRECLUDES SUMMARY JUDGMENT ON PLAINTIFF'S AIDING AND ABETTING CLAIM

BDO also moves for summary judgment on Plaintiff's claim against BDO for aiding and abetting the Bankest Capital Officers' Breach of their fiduciary duties.  A claim for aiding and abetting the breach of a fiduciary duty requires: "(1) a fiduciary duty on the part of the primary wrongdoer, (2) a breach of this fiduciary duty, (3) knowledge of the breach by the alleged aider and abettor and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing." *AmeriFirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991).  BDO seeks summary judgment on the last two elements; however, the Court finds that there is evidence

33

sufficient to raise a material question of fact on both and denies BDO's motion.

> ### A.    There Is Substantial Evidence that BDO Had Knowledge of the Capital Officers' Breach of Fiduciary Duty.

> #### 1.    Recklessness Satisfies the Knowledge Requirement.

Because knowledge of the fraud must usually be inferred, recklessness satisfies the knowledge, or scienter, requirement, and is specifically applied to auditors like BDO.  *Woods*, 765 F.2d at 1010-11 (citing with approval *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1356-57 (S.D.N.Y. 1982)).  A recklessness standard is applied to "alleged aiders and abettors who have issued statements or certifications foreseeably relied upon by investors" because a "duty to disclose arises under such circumstances."  *See Woods*, 765 F.2d at 1011; *see also Rudolph v. Arthur Anderson & Co.*, 800 F.2d 1040, 1045 (11th Cir. 1986) (finding that auditors could be liable for aiding and abetting a breach of fiduciary duty claim and that proof of conscious intent was not required).

The level of recklessness that must be shown is less where there is silence combined with affirmative assistance–here BDO's agreement not to request documents that would have revealed the fraud.  *See Woods*, 765 F.2d at 1010 (holding that  the degree of knowledge required depends upon how ordinary the assisting activity is in the involved businesses).  Moreover, knowing assistance can be inferred from atypical business actions that lack business justification.  *Id.*; *see also Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975).

The facts in *Woods* are instructive.  In *Woods*, the court found that the atypical circumstances surrounding a letter written by a loan officer at defendant bank supported the inference that the bank had the requisite knowledge of assistance.  *Woods*, 765 F.2d at 1011-13.  When the wrongdoers were not satisfied with a recommendation letter from defendant bank, they

turned to Smith, a loan officer at the bank who allowed the wrongdoers to essentially dictate the

bank's recommendation.  *Id*. at 1012.  The court found Smith's actions on behalf of defendant

bank constituted "severely reckless conduct, as Smith's representation was given without basis in

reckless disregard of its truth or falsity."  *Id*.  The court found that Smith wrote the letter with the

sole purpose of "currying favor" with a good client of the bank—an improper motive for not

probing more deeply into the wrongdoers' operations before he acted.  *Id*.  The court held that

Smith's actions allowing the wrongdoers to write their own recommendation were atypical and

sufficient to infer that his assistance was knowingly done.  *Id*.

### 2. The Evidence Raises a Genuine Issue of Material Fact as to BDO's Knowledge, or Recklessness.

Following *Woods*, BDO had the requisite knowledge for Plaintiff's aiding and abetting

claim.  During the 1998 audit, a BDO auditor, Mr. Rivera, requested customer checks from

Bankest to validate the existence of the account receivables, Bankest's largest asset.  (Pl. Exh. 39

[4/17/07 a.m. Tr.] at 1094-95; Pl. Exh. 26 [Rivera Aff.] at ¶¶12-13.)  In order to properly

perform the audit of Bankest, the auditors had to examine the customer checks.  (Pl. Exh. 43

[4/19/07 p.m. Tr.] at 1706-14; Pl. Exh. 41 [4/18/07 a.m. Tr.] at 1321-22.)  Dominick Parlapiano,

a Capital Officer at Bankest, refused to provide the required documents to the BDO audit team.

(Pl. Exh. 26 [Rivera Aff.] at ¶¶12-16; Pl. Exh. 39 [4/17/07 a.m. Tr.] at 1099-1100.)  BDO

Seidman immediately stopped work on the audit.  (Pl. Exh. 26 [Rivera Aff.] at ¶17; Pl. Exh. 39

[4/17/07 a.m. Tr.] at 1101-02.)

Sandor Lenner, the partner in charge of the Bankest audit, and Keith Ellenberg, the

concurring partner on the Bankest audit, spoke with Mr. Parlapiano about Bankest's refusal to

provide the customer checks and threatened to resign if the customer checks were not provided.

(Pl. Exh. 26 [Rivera Aff.] at ¶¶18-21.)  A few days later, after Mr. Lenner and Mr. Parlapiano

had a closed door meeting, Mr. Lenner told Mr. Rivera to restart the audit and to accept checks from clients or Bankest Capital, a company owned by the Capital Officers, in lieu of customer checks as proof of the existence of Bankest's account receivables.  (*Id*. at ¶¶23-24; [Pl. Exh. 39 [4/17/07 a.m. Tr.] at 1110-18.)  Mr. Lenner justified his decision by explaining that Mr. Parlapiano was an important person in the community and that a good relationship with him could lead to new business.  (Pl. Exh. 26 [Rivera Aff.] at ¶24.)  However, even BDO auditor Mr. Ellenberg admits that client checks would not provide sufficient audit evidence. (Pl. Exh. 41 [4/18/07 a.m. Tr.] at 1321-22.)  Mr. Lenner's actions demonstrate severe recklessness, as the client or Bankest Capital checks accepted in lieu of the required customer checks could not provide the audit evidence needed to satisfy GAAS.  (*Id.*Pl. Exh. 43 [4/19/07 p.m. Tr.] at 1706-14.)

Under *Woods*, BDO's knowledge of the Capital Officers' wrongdoing can be inferred from Mr. Lenner's willingness to allow Mr. Parlapiano to dictate the audit evidence – a highly atypical practice.  *See Woods*, 765 F.2d at 1012.  BDO cannot hide behind Mr. Lenner's willful ignorance about why customer checks could not be provided.  *See Court Appointed Receiver of Lancer Offshore, Inc. v. The Citco Group Ltd*., No. 05-60080-Civ., 2008 WL 926509 (S.D.Fla. Mar. 31, 2008) (allegations that defendants willingly, knowingly, consciously, and recklessly failed to use reasonable skill and care to be aware of, discover, investigate and report numerous glaring red flags which would have put a reasonably prudent director on notice that the wrongdoer was engaged in conduct to the extreme detriment of plaintiff was sufficient to find defendants liable for aiding and abetting a breach of fiduciary duty).  In addition, as discussed herein, a jury could find BDO acted with recklessness or scienter on several, independent grounds.  That same evidence also creates a genuine issue of fact as to this prong of Plaintiff's

36

aiding and abetting claim.

**B.** **The Evidence Creates a Genuine Issue of Material Fact Regarding Whether BDO Substantially Assisted the Capital Officers in Committing the Fraud.**

Whether BDO "substantially assisted" the Capital Officers is a fact-driven inquiry based on the totality of the circumstances. *See Rudolph*, 800 F.2d at 1046. Proof that an auditor has knowledge of a fraud and fails to disclose it is sufficient to prove that the auditor substantially assisted the wrongdoing. *Id.*

Here, there is evidence of substantial assistance because BDO took concrete steps to assist the Capital Officers in committing the fraud. In the Bankest fraud, the Capital Officers created numerous fake documents, however, there were no fake customer checks because as third party documents they were difficult, if not impossible, to fraudulently manufacture. (Pl. Exh. 32 [2/6/07 p.m. Tr.] at 3457 ("We couldn't fake a Wal-Mart check."); Pl. Exh. 33 [2/8/07 p.m. Tr.] at 3852-55; Pl. Exh. 35 [4/11/07 p.m. Tr.] at 442-44; Pl. Exh. 37 [4/16/07 a.m. Tr.] at 887-89.) Thus, the Capital Officers needed BDO to audit Bankest without requiring customer checks. (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 891-92.) BDO complied – after Mr. Lenner and Mr. Parlapiano's closed door discussion, BDO never asked for customer checks again. (*Id.* at 889, 891.)

There is substantial evidence that if BDO had required customer checks, the fraud would have been discovered. (Pl. Exh. 32 [2/6/07 p.m. Tr.] at 3452-58, 3462; Pl. Exh. 37 [4/16/07 a.m. Tr.] at 878-82, 891-92; Pl. Exh. 26 [Rivera Aff.] at ¶¶15, 23-25; Pl. Exh. 39 [4/17/07 a.m. Tr.] at 1110-18; Pl. Exh. 44 [4/20/07 a.m. Tr.] at 1799-1800; Pl. Exh. 52 [5/4/07 a.m. Tr.] at 3239.) In fact, Mr. Mendez testified he was able to grow the fraud because BDO did not require customer checks:

37

> Q.  And every year did you depend on the fact that BDO was not going to require you to provide them with documents from the customers, the ones who actually owed the money?
>
> A.  Yes.
>
> Q.  And as a result, were you able to grow the fraud?
>
> A.  Yes.

(Pl. Exh. 37 [4/16/07 a.m. Tr.] at 891-92.)  Thus, a jury could find that not only was BDO's assistance substantial – it was necessary to committing the fraud.  (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 891-92.)

### C.    The Aiding and Abetting a Breach of Fiduciary Claim Is Not Barred by the "Economic Loss" Doctrine.

Contrary to BDO's argument, the aiding and abetting a breach of fiduciary duty claim is not barred by the "economic loss" rule.  In Florida, the "economic loss" doctrine bars recovery in tort for economic losses incurred pursuant to the terms of a written contract.  *See Hoseline, Inc. v. U.S.A. Diversified Products, Inc.*, 40 F.3d 1198, 1199 (11th Cir. 1994).  Because Plaintiff's claim is that BDO aided and abetted the Capital Officers in their breach of their fiduciary duties to Bankest—not that Plaintiff suffered losses pursuant to the terms of a written contract—the "economic loss" doctrine is inapplicable in this case.  *See id.* at 1199-1200.  The Capital Officers' fiduciary duties to Bankest arose not from contract but from their position as officers on Bankest's Board of Directors.  (Pl. Exh. 37 [4/16/07 a.m. Tr.] at 897-98.)  The difference between this case and the *Waters* case cited by BDO is that the damages from the breach of duty in *Waters* "flow[ed] solely from a breach of contract," whereas the damages here resulted from the Capital Officers breach of their noncontractual fiduciary duties to Bankest.  *See Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 499 (S.D. Fla. 1996).

38

Moreover, BDO's conduct occurred outside the contractual relationship governed by the audit engagement letter between Bankest and BDO Seidman.  BDO's actions were not just a mere breach of contract, but, rather, affirmative, intentional acts which allegedly assisted the Capital Officers in carrying out their fraud on Bankest.  Such acts are not governed by the "economic loss" doctrine.  *See Ishii v. Welty*, 1998 WL 1064846 (M.D. Fla. Sept. 30, 1999).

## VI.    BDO'S REMAINING ARGUMENTS ON DAMAGES FAIL

### A.    The Court Again Finds Deepening Insolvency a Viable Damages Theory.

BDO argues Plaintiff cannot recover as a matter of law for damages that caused Bankest's deepening insolvency.  This Court already ruled that plaintiff could recover damages for Bankest's in excess of $170 million in debt incurred as a result of BDO's audits.  (Pl. Exh. 2 [2006 Imputation/Damages Order] at 3.)  The law is consistent with this Court's prior ruling. In addition to this Court's own Order, BDO ignores consistent case law in Florida and other jurisdictions recognizing claims for damages based on a theory of "deepening insolvency."  *See*, *e.g*., *In re Flagship Health Care*, 269 B.R. 721, 728-29 (Bankr. S.D. Fla. 2001) ("[E]ven if the Debtor  may have been insolvent before [the alleged misconduct], the additional debt incurred thereafter, and allegedly as a result of Defendant's negligence, may provide a measure of damages recoverable by the Trustee"); *In re Huff*, 109 B.R. 506, 512 (Bankr. S.D. Fla. 1989) ("A corporation is damaged where its officers and directors fraudulently conceal its insolvency and allow the corporation to continue incurring more and more debt and become more and more insolvent"); *see also Thabault v. Chait*, 541 F.3d 512, 523 (3d DCA 2008)("[W]e hold that an increase in liabilities is a harm to the company and the law provides a remedy when a plaintiff proves a negligence cause of action."); *NCP Litig. Trust v. KPMG, LLP*, 901 A.2d 871, 888 (N.J. 2006) ("inflating a corporation's revenues and enabling a corporation to continue in business

'past the point of insolvency' cannot be consider a benefit to the corporation."); *Official Comm.*

*of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 345-37 (3d Cir. 2001)

(finding that corporation could recover against auditor for increased debt and ultimate

insolvency).

Moreover, the two "deepening insolvency" cases on which BDO relies are inapposite

because in both instances the company at issue was already insolvent. *See In re Parmalat*

*Securities Litig.*, 501 F.Supp.2d 560, 576 (S.D.N.Y. 2007) ("Plaintiffs do not claim that

defendants' actions ultimately drove the Companies into bankruptcy. Indeed, they allege that the

Companies already were insolvent by 1999 and would have filed for bankruptcy sooner than they

did had Parmalat's true financial condition been revealed"); *In re CitX Corp., Inc*., 448 F.3d 672,

677 (3d Cir. 2006) ("Before the equity infusion [at issue], CitX was $2,000,000 in the red…With

the added $1,000,000 investment, it was thereby insolvent only $1,000,000. Insolvency

decreased rather than deepened"). Here, Bankest was only able to incur the $170 million debt

that caused its insolvency after BDO issued its first fraudulent audited financial statement. (Pl.

Exh. 37 [4/16/07 a.m. Tr.] at 877-78.)

Still further, there is evidence that creates genuine issues of material fact as to Plaintiff's

damages. As a result of BDO's issuance of unqualified financial statements, its verification of

non-existent assets, and its failure to detect massive fraud, Bankest began and continued to incur

more than $170 million in debt that it could not repay. *See* (Pl. Exh. 37 [4/16/07 a.m. Tr.] at

877-78, 891-92.) There is also evidence that Bankest could not have incurred this debt, through

the issuance of debentures and the securing of a line of credit, absent BDO's severely reckless

conduct. (*Id.*; Pl. Exh. 59 [7/3/07 p.m. Tr.] at 391 ("Had we ever known that they were fake

receivables, we would not have sold one single debenture to our clients."); Pl. Exh. 60 [7/16/07

a.m. Tr.] at 736 ("if back at the end of '96 BDO had told us the accounts were fraudulent, we would have never entered into the company"); Pl. Exh. 56 [5/18/08 p.m. Tr.] at 4500 (would not have extended $30 million line of credit).)

Accordingly, the Motion for Summary Judgment is denied on this basis.

B.    BDO's Argument that Plaintiff Is Asserting Creditor Claims Again Fails.

BDO argues for summary judgment on the grounds that only Bankest's creditors were harmed by BDO's fraudulent audits.  The Court rejected this argument before:  "Thus, the Court holds that the BESIL Lawsuit in which BESIL is asserting its own rights against BDO is no bar to Bankest, BDO's client, suing BDO on Bankest's own claims to redress the injuries to Bankest."  (Pl. Exh. 2 [2006 Imputation/Damages Order] at 5-6.)  This Court has also rejected BDO's related argument that there will be "double recovery" against Defendants:

> There is a difference between getting a judgment for 170 million dollars and collecting 170 million dollars, and it's my experience that there's nothing that prevents people from getting two judgments, it's only collecting on the same judgment twice but there is also argument that it's not the same judgment.

(July 13, 2006 Hearing Tr. at 72.)  The Court continues to hold that Freeman's claims against BDO are not barred or precluded by the fact that Bankest's creditors also have claims against BDO.  BDO admits that neither the creditors nor Freeman have recovered any money against it at this time.

Accordingly, the Court holds that Plaintiff submitted substantial evidence sufficient to create genuine issues of material fact that preclude summary judgment as to each of Plaintiff's claims.

Based upon the foregoing, it is

41

**ORDERED AND ADJUDGED** that the Defendants' Motion for Summary Judgment is

DENIED.

# # #

<u>Submitted by</u>:
Allison R. Day, Esq.
GENOVESE JOBLOVE & BATTISTA, P.A.
*Attorneys for Plaintiff, Lewis B. Freeman*
100 S.E. Second Street, 44th Floor
Miami, Florida  33131
Telephone No. (305)349-2300
Facsimile No. (305) 349-2310

[Attorney Allison R. Day, Esq. is directed to serve a conformed copy of this Order on all parties in interest]